UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
                                    :
UNITED STATES OF AMERICA
                                    :
        -v-
                                    :        INDICTMENT
PETER J. AJEMIAN,                   :
PETER J. LESNIEWSKI,                :   11 CRIM 1091
MARIA RUSIN,                        :
MARIE BARAN,                        :
JOSEPH RUTIGLIANO,                  :
GREGORY NOONE,                      :
REGINA WALSH,
SHARON FALLOON,                     :
GARY SATIN,
STEVEN GAGLIANO, and                :
RICHARD EHRLINGER,                  :

            Defendants.            :
                                    :
------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: DEC 19 2011

### COUNT ONE

(Conspiracy to Commit Mail Fraud and Health Care Fraud)

        The Grand Jury charges:

#### The Defendants

        1.    PETER J. AJEMIAN, the defendant, is a
Board-certified orthopedist who has been assisting retirees from
the Long Island Railroad ("LIRR") apply for occupational
disability benefits from the United States Rail Road Retirement
Board ("RRB") since at least in or about 1998.  From in or about
January 2008 until his termination on or about September 29, 2008,
AJEMIAN was employed at a medical practice based in Rockville
Centre, New York (the "Ajemian Practice").  AJEMIAN previously had
worked at other Long Island-based practices.  From 1998 through

**Judge Marrero**

2008, AJEMIAN submitted medical reports to the RRB, recommending hundreds of LIRR employees for disability benefits.

2.    MARIA RUSIN, the defendant, was the office manager for PETER J. AJEMIAN, the defendant, in a succession of practices, including at the Ajemian Practice, starting at least in or about 2000.  RUSIN retired and began receiving disability benefits in or about late 2009, based upon injuries she claimed to have sustained while working for AJEMIAN and based, in part, upon medical documentation submitted by AJEMIAN.

3.    PETER J. LESNIEWSKI, the defendant, is a Board-certified orthopedist.  From at least in or about 1998 until in or about 2008, LESNIEWSKI submitted medical reports to the RRB, recommending at least approximately 222 LIRR workers for disability benefits.  At times relevant to this indictment, LESNIEWSKI worked with another orthopedist who is recently deceased ("Disability Doctor-3").

4.    MARIE BARAN, the defendant, worked as an RRB district office manager, based in Westbury, New York, until her retirement in or about December 2006.  No later than upon her retirement, she began working as a "facilitator" who purported to advise and assist LIRR workers in planning for post-retirement disability and in preparing disability applications for submission to the RRB.

5.    JOSEPH RUTIGLIANO, the defendant, was a former LIRR conductor and union president who applied for and received RRB

occupational disability benefits after his retirement.   After his retirement, RUTIGLIANO also worked as a "facilitator," like MARIE BARAN, the defendant.

6.    GREGORY NOONE, REGINA WALSH, SHARON FALLOON, GARY SATIN, STEVEN GAGLIANO, and RICHARD EHRLINGER, the defendants, are all former LIRR employees who have retired on LIRR pensions. After their retirement, they each applied for and received RRB disability benefits.

### Overview Of The Premeditated Disability Fraud

7.    The defendants and their co-conspirators committed a fraud in which LIRR workers who were ready to retire falsely claimed to be disabled, including occupationally disabled, in order to receive extra benefits to which they were not entitled. Specifically, LIRR employees, who were eligible to retire as early as age 50 with an LIRR pension, sought to supplement their LIRR pension with a separate RRB disability annuity which, when combined with their LIRR pension, resulted in a total income level that often approximated their pre-retirement, working income. This fraud was perpetrated with the knowing and intentional involvement primarily of three doctors - PETER J. AJEMIAN and PETER J. LESNIEWSKI, the defendants, and Disability Doctor-3 - who falsely declared retiring LIRR workers to be disabled when in truth and in fact the workers were not disabled.   Typically, these disability doctors claimed that their LIRR patients suffered from various musculoskeletal impairments, which can involve claims of

soft tissue injury that are more difficult to confirm by objective criteria than are other impairments, and are often diagnosed clinically, based upon pain as subjectively reported by the patient.  This fraud was also aided by "facilitators" who served as liaisons between the retiring workers and participating doctors.  As a result, the doctors received millions of dollars from patients and insurance companies, and the foreseeable loss to the RRB disability funds, if the fraudulent claims were paid out in full, would exceed approximately $1 billion.

        8.    Participants in the fraud typically took some or all of the following steps, among others:

        a.    In anticipation of filing an RRB disability application, LIRR employees saw one of three disability doctors - PETER J. AJEMIAN and PETER J. LESNIEWKSI, the defendants, and Disability Doctor-3, who collectively accounted for approximately 86% of the LIRR disability applications filed during the times relevant to this Indictment.

        b.    The disability doctors prescribed for the LIRR employees a series of unnecessary medical tests, including at times rounds of x-rays, scans and nerve conduction tests, as well as purported treatments, including physical therapy, in order to pad the patients' medical files.

        c.    The LIRR employees generally paid the doctors between approximately $800 and $1200, often in cash, to prepare a medical assessment and illness narrative, or both, for submission

to the RRB.

        d.    The disability doctors then prepared fabricated or exaggerated medical assessments and illness narratives, or both, in which they recommended a set of restrictions that, if bona fide, would have prevented the LIRR employees from continuing in their occupations.

        e.    Sometime after retiring in anticipation of receiving an LIRR pension, the LIRR employees prepared disability applications that falsely claimed an inability to work, even though the employees were performing their jobs up until the time they retired.

        f.    The LIRR employees paid one of a small group of so-called "facilitators," including MARIE BARAN and JOSEPH RUTIGLIANO, the defendants, to assist with the disability process by, among other things, working with the doctors' offices, coordinating the disability benefit applications of LIRR employees, and either filling out the applications or coaching the LIRR employees to fill out their disability applications in such a way as to maximize the likelihood that such employees would receive disability benefits.

        g.    The doctors, facilitators, and other participants did all of this knowing that the LIRR employees were not, in fact, disabled – that is, they were not, in fact, unable to perform their jobs because of medical impairments; rather, the employees were simply planning to retire and wished to supplement their LIRR

pension benefits with RRB occupational disability payments.   In fact, the doctors, facilitators, and other participants knew full well that the LIRR employees, who were generally working full-time (and, indeed, who were often working overtime), had pre-planned the date on which they would declare themselves disabled, and that this scheduled date was contemporaneous with their projected retirement date.   PETER J. AJEMIAN, the defendant – with the assistance of MARIA RUSIN, the defendant – and PETER J. LESNIEWSKI, the defendant, and others ordered unnecessary medical tests and wrote exaggerated medical narratives to conceal the fact that the LIRR employees were paying them to prepare disability applications when the employees were not in fact disabled.

    9.   The doctors participating in the fraud profited by charging fees for preparing disability narratives and medical assessment forms, by obtaining new patient referrals from other LIRR employees and facilitators, and by billing private health insurers for unnecessary tests and visits.   For example, from in or about September 2004 to in or about September 2008, the total such revenue for each of PETER J. AJEMIAN and PETER J. LESNIEWSKI, the defendants, was at least hundreds of thousands of dollars. This revenue provided financial motivation for the doctors to participate in the fraud.

The Defendants' Exploitation Of The Overlap Between The LIRR
Pension And The Railroad Retirement Board Disability Programs

    10.   The RRB is an independent agency within the

6

executive branch of the Federal Government that was created in the 1930s. The RRB administers comprehensive retirement, survivor, and benefit programs, including disability benefits, for the nation's railroad workers and their families, under the Railroad Retirement and Railroad Unemployment Insurance Acts. LIRR employees participate in the RRB disability program and in the RRB pension program. The RRB disability and pension programs are primarily funded by federal employment taxes paid by railroad employers and railroad employees nationwide and by certain federal income taxes paid by recipients of RRB pensions.

11. Retired LIRR workers can receive two pensions, but the minimum eligibility age is different for the two programs. First, LIRR workers are eligible for a pension paid by the LIRR. LIRR workers hired before 1988 may draw the LIRR pension at the age of 50, provided they have been employed for at least 20 years. Second, LIRR workers are eligible for a pension paid by the RRB, but most workers only become eligible for that full pension at the age of 65. Thus, a 65-year old LIRR retiree receives two pension payments – one from LIRR and one from RRB. But qualifying 50-year old retirees receive only an LIRR pension, and generally must wait 15 years before receiving their full second, RRB pension.

12. An LIRR employee may apply for – and receive if qualified – an RRB disability award after he or she has retired and stopped working, notwithstanding the fact that the employee collects an LIRR pension. This enables an LIRR worker to receive

7

both the LIRR pension as well as RRB payments prior to the time he or she would be eligible to receive an RRB pension.  For example, an LIRR worker who retired at age 50 would be eligible only for an LIRR pension, and would have to wait 15 years until her 65th birthday to begin collecting a supplemental RRB pension, thereby drawing a substantially lower income upon retirement.  However, if that worker was deemed occupationally disabled after she retired at the age of 50, then she could immediately begin collecting both her LIRR pension and RRB disability payments.  That retiree – who would receive both her LIRR pension, as well as RRB disability payments – could then draw roughly the base salary earned during her career.

13.  The RRB provides two types of disability annuities. First, a total disability annuity is based upon guidelines similar to those for Social Security disability; in other words, it requires a showing of a permanent and total disability.  Second, the RRB provides for "occupational disability" annuities for railroad workers who have permanent physical or mental impairments that prevent them from performing their specific railroad jobs, regardless of whether they might be capable of performing other work.  See 20 C.F.R. § 220.10(a).  A railroad worker is eligible to apply for an occupational disability at age 60 if he or she has 10 years of employment, or at any age with at least 20 years of employment.

14.  At all times relevant to this Indictment, the RRB

has required medical findings to support a claim of occupational disability, including "objective" tests and reports.  See 20 C.F.R. § 220.46.  Among other things, these medical findings must be complete and detailed enough to allow the RRB to make a determination about whether a claimant's disability is a legitimate impairment, including "(1) [t]he nature and limiting effects of the claimant's impairment(s) for any period in question; (2) the probable duration of the claimant's impairment(s); and (3) the claimant's residual functional capacity to do work-related physical and mental activities."  Id.  A "functional capacity test" is defined as "one of a number of tests which provide objective measures of a claimant's maximal work ability and includes functional capacity evaluations which provide a systematic comprehensive assessment of a claimant's overall strength, mobility, endurance and capacity to perform physically demanding tasks, such as standing, walking, lifting, crouching, stooping or bending, climbing or kneeling."  20 C.F.R. § 220.11.

15.  Pursuant to federal regulations, the RRB must take into account an applicant's statement concerning the intensity of pain that he or she is suffering as well as the treating physician's descriptions of those symptoms.  While applicable regulations require that the RRB determine that subjective symptoms such as pain be consistent with objectively demonstrable medical evidence, the regulations provide:

Since symptoms sometimes suggest a greater

severity of impairment than can be shown by
objective medical evidence alone, the Board
will carefully consider any other information
the claimant may submit about his or her
symptoms.  The information that the claimant,
the claimant's treating or examining physician
or psychologist, or other persons provide
about the claimant's pain or other symptoms
(e.g., what may precipitate or aggravate the
claimant's symptoms, what medications,
treatments or other methods he or she uses to
alleviate them, and how the symptoms may
affect the claimant's pattern of daily living)
is also an important indicator of the
intensity and persistence of the claimant's
symptoms.  Because symptoms, such as pain, are
subjective and difficult to quantify, any
symptom-related functional limitations and
restrictions which the claimant, his or her
treating or examining physician or
psychologist, or other persons report, which
can reasonably be accepted as consistent with
the objective medical evidence and other
evidence, will be taken into account . . . .

See 20 C.F.R. § 220.114(c)(3).

16.   The regulations further provide that, if the

treating physician gives an opinion that is inconsistent with

other medical evidence, including opinions obtained by RRB medical

consultants, the RRB must resolve those inconsistencies based on

all the evidence in the case record.  In doing so, however, the

RRB must "give some extra weight to the treating source's

supported opinion(s) which interprets the medical findings about

the nature and severity of the impairment(s)."  20 C.F.R.

§ 220.112(d).  Thus, the regulatory system is vulnerable to abuse

by employees and treating physicians who falsify and exaggerate

symptoms, as the RRB is required to give their statements extra

weight.

17.   Typically, a treating physician completes and signs an RRB Medical Assessment filing, known as a G-250 form (hereinafter referred to as a "Medical Assessment").  The Medical Assessment sets forth the doctor's view of objective medical tests, medical findings, and required medical restrictions.

18.   As a critical part of the RRB disability process, every annuitant also must file an Application for Determination of Employee's Disability, known as a Form AA-1d (hereinafter referred to as a "Disability Application.")  On the form, annuitants must describe in detail the limitations resulting from their impairment and state when they could no longer work because of their conditions.  The signature page of the Disability Application reminds an applicant that he or she must answer these questions truthfully, as follows:

> I know that if I make a false or fraudulent statement in order to receive benefits from the RRB or if I fail to disclose earnings or report employment of any kind to the RRB, I am committing a crime which is punishable under Federal law.

At times, annuitants receiving disability payments are directed to file a Continuing Disability Update Report, known as a form G-254A (hereinafter referred to as a "Disability Recertification"), in which they have to certify, under penalty of prosecution, certain facts about their physical condition and employment.

19.   At all times relevant to this Indictment, RRB

claims examiners reviewing applications for disability generally:

a.   assumed that the doctor who provided a Medical Assessment and the applicant who submitted a Disability Application were telling the truth about the applicant's medical conditions;

b.   relied on the applicant when the applicant stated, as required in an RRB Disability Application, that he or she was unable to continue working because of his or her medical condition;

c.   relied on the treating physician's statements about the medical condition of the applicant, including the doctor's opinion of exertional and environmental restrictions necessitated by the patient's medical condition; and

d.   relied on applicants' descriptions of their job requirements, set out in a Form G-251, to determine whether the applicants' medical conditions made them unable to fulfill their occupational duties.

20.   Prior to September 2008, the RRB generally requested review by an outside medical consultant or medical examiner only when the patient's application was incomplete in some manner, not as a method for detecting fraud.  Because the RRB examiners were not medical experts, they could request that a contracted consultant review medical records if the examiner believed that he or she could not interpret the disability medical evidence without expert advice.

## The Pattern Of Disability Claims
## At The Long Island Railroad

21.   In fiscal year 2007, LIRR workers applied for occupational disability benefits at a rate 12 times higher than workers from comparable commuter railroads, such as Metro North Railroad.

22.   Between 2004 and 2008, approximately 61% of LIRR employees who stopped working and began receiving some type of benefits from the RRB were between the ages of 50 and 55 years old.  By contrast, at Metro North, only approximately 7% of the employees who stopped working and started receiving RRB benefits were between the ages of 50 and 55.  Over 75% of LIRR workers receiving RRB occupational disability first retired while in their early fifties.  Given the way that the LIRR and RRB pensions work, as described above, absent a disability award, these retirees – who could retire as early as age 50 under a unique LIRR contract – would generally have had to rely only upon their LIRR pensions until the age of 65.

23.   For the period 2005 to 2009:

a.   over approximately 91% of LIRR employees listed musculoskeletal impairments (including arthritis/rheumatism) as their primary diagnosis, compared with approximately 45% of employees at Metro-North, a comparable tri-state commuter railroad; and

b.   only approximately 38% of the LIRR annuitants met

the medical criteria for a total and permanent disability determination, in comparison to approximately 73% of all RRB annuitants.

24.   For the period August 2004 through August 2008, only three New York-area doctors — PETER J. AJEMIAN and PETER J. LESNIEWSKI, the defendants, and Disability Doctor-3 — were the treating physicians for more than 86% of the RRB disability applications filed by LIRR employees younger than 65.   In particular, for this time period, AJEMIAN was the treating physician for approximately 47%, LESNIEWSKI was the treating physician for approximately 13%, and Disability Doctor-3 was the treating physician for approximately 25%.   As set forth above, LESNIEWSKI and Disability Doctor-3 worked together at times relevant to this Indictment.

25.   For the period between in or about 1997 and in or about 2008, PETER J. AJEMIAN, the defendant declared disabled over 94% of the LIRR employees he saw as patients who were eligible to retire with an LIRR pension.   Similarly, for the same time period, PETER J. LESNIEWSKI, the defendant, declared disabled over 98% of the LIRR employees he saw as patients who were eligible to retire with an LIRR pension.

## Statutory Allegations

26. From at least in or about 1998, up to and including
in or about 2011, in the Southern District of New York and
elsewhere, PETER J. AJEMIAN, PETER J. LESNIEWSKI, MARIA RUSIN,
MARIE BARAN, JOSEPH RUTIGLIANO, GREGORY NOONE, REGINA WALSH,
SHARON FALLOON, GARY SATIN, STEVEN GAGLIANO, and RICHARD
EHRLINGER, the defendants, and others known and unknown to the
Grand Jury, combined, conspired, confederated and agreed together
and with each other to violate Title 18, United States Code,
Sections 1341 and 1347.

27. It was a part and an object of the conspiracy that
PETER J. AJEMIAN, PETER J. LESNIEWSKI, MARIA RUSIN, MARIE BARAN,
JOSEPH RUTIGLIANO, GREGORY NOONE, REGINA WALSH, SHARON FALLOON,
GARY SATIN, STEVEN GAGLIANO, and RICHARD EHRLINGER, the
defendants, and others known and unknown to the Grand Jury, having
devised and intending to devise a scheme and artifice to defraud,
and for obtaining money and property by means of false and
fraudulent pretenses, representations and promises, for the
purpose of executing such scheme and artifice and attempting so to
do, would and did place in a post office and authorized depository
for mail matter, a matter and thing to be sent and delivered by
the Postal Service, and would and did deposit and cause to be
deposited a matter and thing to be sent and delivered by a private
and commercial interstate carrier, and would and did take and
receive therefrom, a matter and thing, and would and did knowingly

15

cause to be delivered by mail and such carrier according to the direction thereon, and at the place at which it is directed to be delivered by the person to whom it is addressed, a matter and thing, in violation of Title 18, United States Code, Section 1341.

28.   It was a further part and object of the conspiracy that PETER J. AJEMIAN, PETER J. LESNIEWSKI, MARIA RUSIN, MARIE BARAN, JOSEPH RUTIGLIANO, GREGORY NOONE, REGINA WALSH, SHARON FALLOON, GARY SATIN, STEVEN GAGLIANO, and RICHARD EHRLINGER, the defendants, and others known and unknown, knowingly and willfully, would and did execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money and property owned by, and under the custody and control of, a health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

(Title 18, United States Code, Section 1349.)

## COUNT TWO

(Conspiracy to Defraud the United States RRB)

The Grand Jury further charges:

29.   The allegations contained in Paragraphs 1 through 25 are repeated and realleged as if fully stated herein.

30.   From at least in or about 1998, up to and including

16

in or about 2011, in the Southern District of New York and elsewhere, PETER J. AJEMIAN, PETER J. LESNIEWSKI, MARIA RUSIN, MARIE BARAN, JOSEPH RUTIGLIANO, GREGORY NOONE, REGINA WALSH, SHARON FALLOON, GARY SATIN, STEVEN GAGLIANO, and RICHARD EHRLINGER, the defendants, and others known and unknown to the Grand Jury, combined, conspired, confederated and agreed together and with each other to defraud the United States and an agency thereof, to wit, the RRB.

<u>Overt Acts</u>

31.   In furtherance of the conspiracy and to effect the illegal object thereof, PETER J. AJEMIAN, PETER J. LESNIEWSKI, MARIA RUSIN, MARIE BARAN, JOSEPH RUTIGLIANO, GREGORY NOONE, REGINA WALSH, SHARON FALLOON, GARY SATIN, STEVEN GAGLIANO, and RICHARD EHRLINGER, the defendants, and their co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about November 6, 1998, Disability Doctor-3 signed a medical assessment relating to RICHARD EHRLINGER, the defendant.

b.   On or about November 9, 1998, RICHARD EHRLINGER, the defendant, signed an application for RRB disability benefits.

c.   On or about July 1, 2005, PETER J. AJEMIAN, the defendant, signed a narrative regarding GARY SATIN, the defendant.

d.   On or about July 25, 2005, GARY SATIN, the defendant, signed an application for RRB disability benefits.

e.    On or about September 5, 2006, PETER J. AJEMIAN, the defendant, signed a narrative regarding REGINA WALSH, the defendant.

f.    On or about January 25, 2007, REGINA WALSH, the defendant, signed an application for RRB disability benefits.

g.    On or about June 1, 2007, PETER J. AJEMIAN, the defendant, signed a narrative regarding GREGORY NOONE, the defendant.

h.    On or about August 8, 2007, GREGORY NOONE, the defendant, signed an application for RRB disability benefits.

i.    On or about October 1, 2007, PETER J. AJEMIAN, the defendant, signed a narrative regarding SHARON FALLOON, the defendant.

j.    On or about November 14, 2007, SHARON FALLOON, the defendant, signed an application for RRB disability benefits.

k.    On or about July 29, 2008, MARIE BARAN, the defendant, instructed an LIRR employee to contact MARIA RUSIN, the defendant, and obtain an appointment with PETER J. AJEMIAN, the defendant.

l.    On or about March 3, 2011, REGINA WALSH, the defendant, mailed and caused to be mailed to the RRB's office in Manhattan, New York, a form G-254A, known as a Continuing Disability Update Report.

m.    On or about March 5, 2011, SHARON FALLOON, the defendant, mailed and caused to be mailed to the RRB's office in

18

Manhattan, New York, a form G-254A, known as a Continuing Disability Update Report.

n.    On or about March 7, 2011, GARY SATIN, the defendant, mailed and caused to be mailed to the RRB's office in Manhattan, New York, a form G-254A, known as a Continuing Disability Update Report.

o.    On or about March 11, 2011, GREGORY NOONE, the defendant, mailed and caused to be mailed to the RRB's office in Manhattan, New York, a form G-254A, known as a Continuing Disability Update Report.

p.    On or about March 24, 2011, RICHARD EHRLINGER, the defendant, mailed and caused to be mailed to the RRB's office in Manhattan, New York, a form G-254A, known as a Continuing Disability Update Report.

q.    On or about April 28, 2011, in Manhattan, New York, GARY SATIN, the defendant, testified before a Grand Jury for the Southern District of New York.

(Title 18, United States Code, Section 371.)


## COUNT THREE

(False Claims)

The Grand Jury further charges:

32.    The allegations contained in Paragraphs 1 through 25 are repeated and realleged as if fully stated herein.

19

33.   From at least in or about 1998, up to and including in or about 2011, in the Southern District of New York and elsewhere, PETER J. AJEMIAN, PETER J. LESNIEWSKI, MARIA RUSIN, MARIE BARAN, JOSEPH RUTIGLIANO, GREGORY NOONE, REGINA WALSH, SHARON FALLOON, GARY SATIN, STEVEN GAGLIANO, and RICHARD EHRLINGER, the defendants, made and presented to a person and officer in the civil, military, and naval service of the United States, and to a department and agency thereof, a claim upon and against the United States and a department and agency thereof, knowing such claim to be false, fictitious, and fraudulent, to wit, the defendants defrauded the RRB by making false and fraudulent statements in order to obtain disability benefits.

(Title 18, United States Code, Sections 287 and 2.)

## COUNT FOUR

(Health Care Fraud)

The Grand Jury further charges:

34.   The allegations contained in Paragraphs 1 through 25 are repeated and realleged as if fully stated herein.

35.   From at least in or about 1998, up to and including in or about 2011, in the Southern District of New York and elsewhere, PETER J. AJEMIAN, PETER J. LESNIEWSKI, MARIA RUSIN, MARIE BARAN, JOSEPH RUTIGLIANO, GREGORY NOONE, REGINA WALSH, SHARON FALLOON, GARY SATIN, STEVEN GAGLIANO, and RICHARD

EHRLINGER, the defendants, knowingly and willfully executed and attempted to execute a scheme and artifice to defraud health care benefit programs and obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, health care benefit programs, in connection with the delivery of and payment for health care benefits, items and services, to wit, the defendants fraudulently billed, and caused to be billed, private insurance carriers for unnecessary medical treatments, services, and tests.

(Title 18, United States Code, Sections 1347 and 2.)

## COUNTS FIVE THOUGH NINE

(Mail Fraud)

The Grand Jury further charges:

36.   The allegations contained in Paragraphs 1 through 25 are repeated and realleged as if fully stated herein.

37.   On or about the dates listed below, in the Southern District of New York and elsewhere, the following defendants, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting so to do, placed in a post office and authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal

21

Service, and deposited and caused to be deposited a matter and thing to be sent and delivered by a private and commercial interstate carrier, and took and received therefrom, a matter and thing, and knowingly caused to be delivered by mail and such carrier according to the direction thereon, and at the place at which it is directed to be delivered by the person to whom it is addressed, a matter and thing, to wit, the defendant listed below as "Mailing Defendant," on the approximate dates listed below, for the purpose of executing the fraudulent scheme and in furtherance of a conspiracy with the other defendants listed below as "Charged Defendants," mailed and caused to be mailed a form G-254A, known as a Continuing Disability Update Report, to the RRB's offices in Manhattan, New York:

| COUNT | Charged Defendants | Mailing Defendant | Approx. Date of G-254A mailing |
|-------|--------------------|--------------------|--------------------------------|
| FIVE | GREGORY NOONE<br>PETER J. AJEMIAN<br>MARIA RUSIN<br>MARIE BARAN | GREGORY NOONE | March 12, 2011 |
| SIX | REGINA WALSH<br>PETER J. AJEMIAN<br>MARIA RUSIN<br>MARIE BARAN | REGINA WALSH | March 7, 2011 |
| SEVEN | SHARON FALLOON<br>PETER J. AJEMIAN<br>MARIA RUSIN<br>MARIE BARAN | SHARON FALLOON | March 16, 2011 |
| EIGHT | GARY SATIN<br>PETER J. AJEMIAN<br>MARIA RUSIN<br>MARIE BARAN | GARY SATIN | March 7, 2011 |

| NINE | RICHARD EHRLINGER PETER J. LESNIEWSKI JOSEPH RUTIGLIANO | RICHARD EHRLINGER | March 24, 2011 |
|------|-----------------------------------------------------------|--------------------|-----------------|

(Title 18, United States Code, Sections 1341 and 2.)


_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

23

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

- v -

**PETER J. AJEMIAN, PETER J. LESNIEWSKI,
MARIA RUSIN, MARIE BARAN, JOSEPH
RUTIGLIANO, GREGORY NOONE, REGINA
WALSH, SHARON FALLOON, GARY SATIN,
STEVEN GAGLIANO, and RICHARD EHRLINGER,**

**Defendants.**

**INDICTMENT**

11 Cr.

18 U.S.C. 1349, 371, 287, 1347, 2341, and 2

PREET BHARARA
United States Attorney.

**A TRUE BILL**

_____
Foreperson.

12/19/11
MB

Indict Filed. Case assigned to
Judge Marrero for all purposes.....
Judge Ellis