## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>                Plaintiff, <br><br>     - v. - <br><br> PETER J. AJEMIAN, et al., <br>                Defendants. | 11-Cr.-1091-VM <br><br> **DEFENDANT PETER J. AJEMIAN'S** <br> **NOTICE OF MOTIONS** |

PLEASE TAKE NOTICE, that upon the annexed memorandum of the law, the documents cited therein, and all proceedings had herein, defendant Peter J. Ajemian will move this Court at the United States District Court, Southern District of New York, located at 500 Pearl Street, New York, NY before the Hon. Victor Marrero at a date convenient to the Court, or as soon thereafter as counsel can be heard, for orders: (1) striking the allegations of statistics set forth at paragraphs 22-26 of the May 22, 2012 Superseding Indictment and precluding the Government from introducing, referring to, or relying upon such statistics; (2) directing the Government to file a bill of particulars; (3) directing the Government to search for and produce all potentially exculpatory evidence from the files of the Railroad Retirement Board and United States Attorney's Office for the Eastern District of New York; and (4) severing the trial of the charges against Dr. Ajemian from the trial(s) of the charges against defendants Gregory Noone, Regina Walsh. Sharon Falloon, Steven Gagliano, Richard Ehrlinger, Brian Delgiorno, Philip Pulsonetti, Gregory Bianchini, Franklin Plaia, Michael Stavola, Michael Dasaro, Karl Brittel, Kevin Nugent, Gary Supper, and Thomas DeLalla, Maria Baran, Joseph Rutigliano, and Peter J. Lesniewski.

-1-

Dr. Ajemian also respectfully seeks to join in motions and applications filed by some of his co-defendants, as explained in the annexed memorandum of law.

Dated:  September 14, 2012                           Respectfully submitted,


                                  _____/s/ Thomas E. Engel_____
                                  Thomas E. Engel, Esq.
                                  McKool Smith, P.C.
                                  One Bryant Park, 47th Floor
                                  New York, NY 10036

                                  *Attorneys for Defendant Peter J. Ajemian, M.D.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>- v. -<br><br>PETER J. AJEMIAN, et al.,<br><br>Defendants. | 11-Cr.-1091-VM |

**DEFENDANT PETER J. AJEMIAN'S MOTIONS**

McKool 780924v1

# TABLE OF CONTENTS

Relevant Background. ………………………………………………………....1

Argument...………………………………………………….......................4

A.    The Court Should Strike the Government's Statistical Surplusage.........................................................................................4

B.    The Government Should Be Directed to File a Bill of Particulars. ...................................................................................9

C.    The Government Should Be Directed to Search for and Produce All Potentially Exculpatory Evidence From the Files of the RRB and the EDNY USAO. ..............................................14

D.    The Court Should Sever the Trial of the Charges Against Dr. Ajemian From the Trial(s) of the Charges Against the Patient Defendants, the Facilitator Defendants, and Dr. Peter Lesniewski. ...............................................................16

E.    Dr. Ajemian Seeks Permission to Join in a Number of Motions Filed by His Co-Defendants. ...............................................19

McKool 780924v1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Marx & Co., Inc. v. The Diners' Club, Inc.*,
  550 F.2d 505 (2d Cir. 1977).............................................................................4

*United States v. Armstrong*,
  429 F. Supp. 2d 782 (E.D. La. 2006).............................................................8

*United States v. Barnes*,
  158 F.3d 662 (2d Cir. 1998).........................................................................13

*United States v. Bin Laden*,
  92 F. Supp. 2d 225 (S.D.N.Y. 2000)............................................................14

*United States v. Bortnovsky*,
  820 F.2d 572 (2d Cir. 1987)..............................................................10, 13, 14

*United States v. Cardascia*,
  951 F.2d 474 (2d Cir. 1991).........................................................................17

*United States v. Casamento*,
  887 F.2d 1141 (2d. Cir. 1989).......................................................................17

*United States v. Chalmers*,
  410 F. Supp. 2d 278 (S.D.N.Y. 2006)..........................................................10

*United States v. Diaz*,
  No. 07-cr-20398, 2008 U.S. Dist. LEXIS 27477 (S.D. Fla. March 28, 2008) ......................5

*United States v. Finnerty*,
  411 F. Supp. 2d 428 (S.D.N.Y. 2006)..........................................................15

*United States v. Ganim*,
  225 F. Supp. 2d 145 (D. Conn. 2002)...........................................................13

*United States v. Jones*,
  570 F.2d 765 (8th Cir. 1978) .....................................................................7, 8

*United States v. Kiszewski*,
  877 F.2d 210 (2d Cir. 1989).........................................................................16

*United States v. Nachamie*,
  91 F. Supp. 2d 565 (S.D.N.Y. 2000).............................................................14

McKool 780924v1

*United States v. Shonubi,*
  103 F.3d 1085 (2d Cir. 1997)..................................................................................6

*United States v. Sylvester,*
  918 F.3d 56 (8th Cir. 1990) ...................................................................................4

*United States v. Tran Trong Cuong,*
  18 F.3d 1132 (4th Cir. 1994) .................................................................................8

*United States v. Vazquez-Ruiz,*
  No. 00-cr-1044, 2002 U.S. Dist. LEXIS 1665 (N.D. Ill. Feb. 4, 2002)....................................5

McKool 780924v1

Pursuant to Rules 7(d), 7(f), and 14 of the Federal Rules of Criminal Procedure, Defendant Peter J. Ajemian, M.D. ("Dr. Ajemian"), respectfully moves for (1) an order both striking the allegations of statistics set forth at paragraphs 22-26 of the May 22, 2012 Superseding Indictment (the "Superseding Indictment") and precluding the Government from introducing, referring to, or relying upon such statistics; (2) an order directing the Government to file a bill of particulars, as set forth herein; (3) an order directing the Government to search for and produce all potentially exculpatory evidence from the files of the Railroad Retirement Board ("RRB") and the files of the United States Attorney's Office for the Eastern District of New York ("EDNY USAO"); and (4) an order severing the trial of the charges against Dr. Ajemian from the trial(s) of the charges against the fifteen remaining patient defendants (Gregory Noone, Regina Walsh. Sharon Falloon, Steven Gagliano, Richard Ehrlinger, Brian Delgiorno, Philip Pulsonetti, Gregory Bianchini, Franklin Plaia, Michael Stavola, Michael Dasaro, Karl Brittel, Kevin Nugent, Gary Supper, and Thomas Dalalla (collectively, the "Patient Defendants")), the two alleged facilitators (Maria Baran and Joseph Rutigliano (collectively, the "Facilitator Defendants"), and Dr. Peter J. Lesniewski.

## **Relevant Background**

The chain of events that led to the filing of the Superseding Indictment began four years ago when the *New York Times* published a series of articles alleging that the rate at which employees of the Long Island Railroad ("LIRR") obtained occupational disability awards from the RRB was nothing short of a "disability epidemic." *See* W. Bogdanich, *A Disability Epidemic Among a Railroad's Retirees*, N.Y. Times, Sept. 21, 2008.[1]  The fair import of the *Times* story was that some—but not all—of the LIRR patients who over the years had obtained disability

---

[1] A copy of the September 21, 2008 *Times* article is attached as Exhibit A to this pleading.

benefits had done so under false pretenses.  The *Times*'s reporting was not entirely one-sided, however.  In particular, the *Times* was also highly critical of the purported victim of this "epidemic"—the RRB.  The *Times*, for instance, noted that the RRB's then-Inspector General, *i.e.*, the RRB officer in charge of preventing fraud, had acknowledged that "the retirement board's rejection rate was 'almost nonexistent'" and suggested that the United States Congress, which mandated that the RRB use a low "threshold" for occupational disability awards, was to blame.  *Id.* ("If Congress wants to change the statute and raise the threshold, that's up to Congress.  That's not up to us to do.").

After a four-year investigation, the Government now claims that the real culprits are not the Congress and not the RRB, but rather the 22 indicted defendants herein, among them Dr. Ajemian, an orthopedic surgeon.  According to the Government, Dr. Ajemian participated in a massive fraudulent scheme that had allegedly been in effect for <u>fourteen years</u> and potentially involved as many as <u>fifteen hundred</u> (1,500) LIRR employees alongside numerous other alleged co-conspirators.  Bergman Decl. Ex. A, May 22, 2012 Sealed Indictment ("Superseding Indictment") ¶ 1; Bergman Decl. Ex. C, Transcript of March 16, 2012 Pretrial Conference, at 14:18-20.[2]

Notwithstanding the Government's efforts over a period of years to marshal evidence against Dr. Ajemian, the Superseding Indictment is remarkably meager on specifics.  Although the Superseding Indictment specifically charges as defendants no less than sixteen LIRR employees (twelve of whom were patients of Dr. Ajemian), it refers generally to "hundreds" of other "LIRR employees," including all LIRR patients Dr. Ajemian saw between 1997 and 2008.  Superseding Indictment ¶¶ 2, 26.  The Government alleges that a significant portion of the LIRR

---

[2] "Bergman Decl." refers to the Omnibus Declaration of Paul B. Bergman in support of the Defendants' Motions.

McKool 780924v1

patients Dr. Ajemian treated over the years and ultimately recommended for occupational disability awards were not in fact occupationally disabled and that, in order to deceive the RRB into issuing occupational disability awards for those patients, Dr. Ajemian "prescribed … a series of unnecessary medical tests, including at times rounds of X-rays, scans and nerve conduction tests, as well as purported treatments, including physical therapy, in order to pad the patients' medical files." *Id.* ¶ 7.  No detail is provided, however, concerning the specific tests that were allegedly unnecessary.  Nor does the Government allege which clinical diagnoses made by Dr. Ajemian were incorrect or how Dr. Ajemian's medical assessments and illness narratives were fabricated or exaggerated.  Moreover, while claiming that "RRB claims examiners" relied on, and were misled by, Dr. Ajemian's "statements about the medical condition of the applicant, including [his] opinion of exertional and environmental restrictions necessitated by the patient's medical condition" (*id.* ¶ 20), not one RRB examiner is identified and no instance of his or her being misled is described.

Instead of reciting these specifics of the alleged fraud, the Superseding Indictment purports to rely heavily on allegations of statistics, some of which appear to be the result of a cut-and-paste of the *Times*'s investigative work.  For instance:

- "In fiscal year 2007" LIRR workers applied for occupational disability benefits at a rate 12 times higher than workers from "comparable commuter railroads."  Superseding Indictment ¶ 22.

- "Between 2004 and 2008", approximately 61% of LIRR employees who stopped working and began receiving benefits were between the ages of 50 and 55, as compared to Metro North, where 7% of employees who stopped working to receive benefits were aged 50 to 55.  *Id.* ¶ 23.

- "Between 2004 and 2008", over 75% of LIRR workers receiving RRB occupational disability first retired while in their early fifties.  *Id.* ¶ 23.

- "For the period 2005 to 2009" 91% of LIRR workers listed musculoskeletal impairments as primary diagnosis, as compared with 45% at Metro North.  *Id.* ¶ 24.

- "For the period 2005 to 2009" only 38% of LIRR annuitants met the medical criteria for total and permanent disability, in comparison to approximately 73% of all RRB annuitants. *Id.* ¶ 24.

- "For the period August 2004 through August 2008" three doctors – Peter Ajemian, Peter Lesniewksi, and "Disability Doctor 3" collectively accounted for approximately 86% of LIRR disability applications filed by LIRR employees younger than 65. *Id.* ¶ 25.

- "For the period in or about 1997 and in or about 2008 Dr. Ajemian … declared disabled over 94% of the LIRR employees he saw as patients who were eligible to retire." *Id.* ¶ 26.

- "For the period in or about 1997 and in or about 2008" Dr. Lesniewksi declared disabled over 98% of the LIRR employees he saw as patients who were eligible to retire. *Id.* ¶ 26.

### Argument

**A.  The Court Should Strike the Government's Statistical Surplusage.**

The Second Circuit has cautioned that the use of statistics can amount to "prejudicial overweight." *Marx & Co., Inc. v. The Diners' Club, Inc.*, 550 F.2d 505, 512 (2d Cir. 1977).[3] The use of statistics in criminal cases only enhances their dangers. As the Eighth Circuit noted, "juries in criminal cases may give undue weight and deference to presented statistical evidence and [courts should be] reluctant to take that risk." *United States v. Sylvester*, 918 F.3d 56, 60 (8th Cir. 1990) (quotations omitted). Even if the data underlying the Government's statistics were compiled and analyzed pursuant to reliable principles,[4] we respectfully submit that

---

[3] *See also The Evolving Role of Statistical Assessments as Evidence in the Courts*, p. 150 (Report of the Panel on Statistical Assessments as Evidence in the Courts) (Stephen E. Fienberg ed., 1989) ("the apparent precision of statistical evidence often stands in marked contrast to the uncertainties of other testimony . . . the danger is that such evidence will overshadow equally probative but admittedly unscientific and anecdotal nonstatistical evidence"); Lawrence Tribe, *Trial by Mathematics: Precision and Ritual in the Legal Process*, 84 Harv. L. Review 1329 (1971).

[4] We respectfully refer the Court to the motion by co-defendant Dr. Peter J. Lesniewski to preclude introduction of pleaded statistical evidence without first providing the underlying data pursuant to Fed. R. Evid. 1006.  Dr. Ajemian respectfully adopts the arguments in Dr. Lesniewski's motion and joins therein. We also respectfully reserve the right to submit *Daubert*-based challenges to the Government's statistical analyses at the appropriate time.

McKool 780924v1

permitting the jury to rely on such data would be reversible error.   Whatever importance may have attached to these statistics in a piece of investigative reporting, their relevance, if any, in the trial of a criminal case is clearly dwarfed by the measurable prejudice to the defendants that stand charged in the Superseding Indictment.

As an initial matter, it is unclear precisely what the Government's comparisons and percentages are intended to prove.   *United States v. Vazquez-Ruiz*, No. 00-cr-1044, 2002 U.S. Dist. LEXIS 1665, at *9 (N.D. Ill. Feb. 4, 2002).   Even if relevant, this statistical evidence would be unfairly prejudicial in a way that far outweighs its potential relevance.   *Id.*   Preclusion is thus appropriate under Fed. R. Evid. 403.   At bottom, the Government's intent is to use the innuendo of the indictment before the jury and argue that these statistics show—explicitly or by implication—that it just cannot be that each one of hundreds of patients Dr. Ajemian treated over the years and ultimately recommended to the RRB as occupationally disabled was in fact so, and worse, that the jury should infer Dr. Ajemian's criminal intent not from Dr. Ajemian's acts or omissions deemed in furtherance of the scheme alleged but from these exogenous numbers alone.   This argument, however, would immediately—and improperly—substitute one case (that set forth in these statistical allegations) for an altogether different case (that contained in the statutory allegations of the indictment against the defendants).   The prosecution would thus shift the burden to the defendant to *disprove* the overall statistical fraud by defending each and every one of the medical diagnoses and recommendations Dr. Ajemian made for LIRR employees over the course of 14 years.   This impossible task would take many months to complete, all the while obscuring the <u>actual</u> charges at issue in the Superseding Indictment and confusing the jury. *United States v. Diaz*, No. 07-cr-20398, 2008 U.S. Dist. LEXIS 27477, at *20 (S.D. Fla. March

McKool 780924v1

28, 2008). Indeed, permitting this proof would simply incite the jury to infer guilt from the statistics themselves.

More importantly, the "trial by numbers" the prosecution seems to have in mind here violates basic tenets of criminal law and fundamental rights of the criminal defendant. A criminal trial requires that guilt be established beyond a reasonable doubt, based on evidence of a crime, in this case a fraud, rather than by the use of hypothesis or mathematical innuendo inviting a jury to consider hundreds of uncharged individuals who are not on trial, may not be found or subject to process, and cannot be subjected to cross-examination. *See United States v. Shonubi*, 103 F.3d 1085, 1091-1092 (2d Cir. 1997) (vacating sentence of a drug trafficker where lower court found drug quantity based upon "statistical and economic analyses relat[ing] to drug trafficking generally and not [by reference to the actual evidence].").

Moreover, with respect to the allegations set forth in paragraphs 22, 23, and 24 of the Superseding Indictment, the Government has made no disclosure concerning disability applications by employees of Metro North or other "comparable commuter railroads," nor has the Government shown that the retirement and disability benefit programs available to such other employees were comparable to those available to LIRR employees. Thus, it is impossible even to confirm the bare numbers, let alone to investigate whether the Government's purported comparisons are apples-to-apples or apples-to-oranges. Myriad differences no doubt exist between LIRR and non-LIRR employees, their job descriptions, the hours worked, their union contracts, for example.[5] Those differences could certainly explain why the numbers touted by

---

[5] It might well be that non-LIRR employees were eligible for full retirement benefits before turning 65, in which case they might have been willing to work through pain longer than LIRR employees. It might also well be that, by virtue of their union membership, non-LIRR employees enjoyed particular rights, *e.g.*, the right to be reassigned to a different job posing fewer physical challenges than a current job, thereby obviating the need for occupational

the Government as evidence of a fraud are in fact the result of different work forces, incentives and job descriptions, among other factors, are different.

The allegations in paragraph 26, even though they mention Dr. Ajemian specifically, are equally inadmissible. In a strikingly similar context the Eighth Circuit held that it is prejudicial and improper to attempt to prove physician misconduct through such "pattern" evidence. In *United States v. Jones*, 570 F.2d 765 (8th Cir. 1978), the Eighth Circuit reviewed an appeal by a physician, Dr. Jones, who had been convicted on two counts of distributing narcotics without a legitimate medical purpose. At trial, the Government had not confined itself to the defendant's interactions with the two patients named in the indictment, but instead introduced generalized evidence that the defendant had issued to various patients a grand total of 478 prescriptions over a 20-month period, and that during a three-month period, the defendant's prescriptions had accounted for 47% of the total volume of narcotics issued by a local drug store.

The Eighth Circuit reversed the conviction, noting that "[a]bsent any evidence bearing upon Dr. Jones' treatment of the patients in question, issuance of the prescriptions without more does not show that Dr. Jones acted unprofessionally in issuing these prescriptions." *Id.* at 768. The evidence was highly prejudicial, insofar as "it could have led the jury to speculate that the quantity of prescriptions alone established wrongful conduct..." *Id.* at 769. Furthermore, the Court noted that the evidence put defense counsel in the impossible position of trying to demonstrate that all 478 prescriptions were valid. "Indeed, the transcript of the trial establishes that most of the trial time, including examination and cross examination of Dr. Jones, dwelt not

---

disability. It might also well be that LIRR employees were better informed of their rights to apply for and obtain occupational disability awards. While the defense has no practical way to test the hypotheses that might explain the discrepancy the Government has seized upon and made a centerpiece of its case, all these hypotheses would have to be eliminated before the relevance, if any, of the Government's purported statistics could be demonstrated.

McKool 780924v1

on matters covered by the indictment but on Dr. Jones's conduct in issuing the 478 other prescriptions." *Id.* at 768; *see also United States v. Tran Trong Cuong*, 18 F.3d 1132 (4th Cir. 1994) (holding that where the prosecution introduced pattern evidence relating to the issuance of multiple prescriptions, without calling patients to prove that the prescriptions were medically unnecessary, the evidence was insufficient to sustain the conviction); *United States v. Armstrong*, 429 F. Supp. 2d 782, 792-793 (E.D. La. 2006) (holding that the Government should not be permitted to use summaries or statistics regarding patient files in order to prove that the treatment of such patients was medically unnecessary).

The same reasoning applies here. Unless the Government calls all of Dr. Ajemian's unindicted LIRR patients as witnesses to demonstrate that they were *not* in fact disabled when they were examined by Dr. Ajemian and that Dr. Ajemian knew or must have known that, the fact that Dr. Ajemian saw "X" number of patients and recommended "Y" percentage of them for occupational disability proves nothing. Entire industries are dedicated to assisting injured workers to navigate "red tape" and obtain Social Security, workers' compensation, disability, or other benefits, and the mere fact that some of the LIRR workers may have fraudulently pursued occupational benefits, and some did not, does not mean that Dr. Ajemian was "in" on the chicanery, if indeed there was any. Again, as in *Jones*, permitting the jury to infer that because Dr. Ajemian saw hundreds of patients, he must have known that at least some of them were not genuinely disabled and nonetheless corruptly aided them impermissibly redraws the indictment by discarding the charges and substituting statistics.[6]

---

[6] As a separate matter, it is unclear without a review of the grand jury minutes whether the grand jury that returned the Superseding Indictment reviewed the alleged statistics and whether it was properly instructed with respect to their evidentiary import. (We respectfully refer the Court to the accompanying motion for the inspection of the grand jury minutes filed by defendant Dr. Peter J. Lesniewski, and we respectfully adopt and join the arguments therein.)

McKool 780924v1

Finally, for all of the Government's attempts in the aftermath of the *Times* articles to portray the RRB as a defenseless victim of an alleged fraud the RRB <u>re-confirmed occupational disability awards to hundreds of the patients Dr. Ajemian had previously recommended to the RRB</u>. In 2009, for instance, the RRB undertook an audit of occupational disability awards it had approved for 258 LIRR employees. *See* 2009 RRB OIG Annual Report at 117.[7] Those 258 patients were sent for 422 medical tests that were administered by third-party independent medical professionals. Next, 200 patients were selected for further review by the RRB's Office of the Inspector General, and based on the "medical evidence" prepared by those independent third-party medical professionals, "<u>none of the annuitants were determined not to be disabled</u>." *Id.* (emphasis added). Because the RRB, upon further review and relying on medical evidence provided by its own independent physicians, re-confirmed <u>100% of the awards</u> in question, the entire premise for the Government's statistical evidence collapses.

\*       \*       \*

For the foregoing reasons, Dr. Ajemian respectfully requests that the Court preclude the introduction of statistical evidence and strike any references to such purported evidence from the Superseding Indictment.

### B. The Government Should Be Directed to File a Bill of Particulars.

Dr. Ajemian respectfully requests that the Government should be directed to file a bill of particulars setting forth:  (1) the identity of all individuals alleged by the Government to have conspired with Dr. Ajemian to commit the offenses charged in the Superseding Indictment; (2) the identity of all LIRR employees alleged by the Government to have been "falsely declared disabled" by Dr. Ajemian; (3) the tests or services administered or ordered by Dr. Ajemian

---

[7] An excerpt from the 2009 RRB OIG report is attached as Exhibit B to this pleading.

-9-

alleged by the Government to have been unnecessary and the dates when, and the patients for whom, those tests and services were administered or ordered; (4) the respect(s) in which the Government alleges that Dr. Ajemian's clinical diagnoses, medical assessments and/or illness narratives were incorrect, fabricated, or exaggerated; (5) the identity of all RRB representatives who were allegedly deceived by Dr. Ajemian; (6) pertinent details concerning a number of vague and open-ended allegations in the Superseding Indictment; and (7) pertinent details concerning Count Three (False Claims), Count Four (Health Care Fraud), and Count Nineteen (Wire Fraud).[8]

A criminal defendant may request a bill of particulars "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [him] to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (citation omitted). *See also United States v. Chalmers*, 410 F. Supp. 2d 278, 283 (S.D.N.Y. 2006) ("The function of a bill of particulars is to provide [a] defendant with information about the details of the charge against him … and to avoid prejudicial surprise at …trial.") (quoting Charles Alan Wright, 1 Federal Practice and Procedure: Criminal 3d § 129)).

The breadth of this unique case and the consequent unfairness thrust by its scope upon Dr. Ajemian compels the issuance of an order directing the Government to provide a bill of particulars. At bottom, the prosecution's objection to a bill of particulars rests on its claim that

---

[8] Since the spring, when the Government began disclosing hundreds of thousands of pages, counsel for Dr. Ajemian has sought further definition from the Government of the bounds of its case. *See* Bergman Decl. Exs. E, G, and I. To date, however, the Government has rebuffed Dr. Ajemian's efforts to delimit the charges against him, instead taking the position that the Superseding Indictment, the October 2011 Complaint, and the massive disgorgement of documents the Government has made available to the defense sufficiently apprise Dr. Ajemian of the pending charges. *See* Bergman Decl. Ex. F.

McKool 780924v1

sufficient disclosure has been provided in pleadings filed in this action and within the Government's avalanche of documents. This claim is simply not true. While the Government's pleadings provide some information concerning the dozen patients whom Dr. Ajemian recommended for occupational disability, none of the Government's disclosures provides essential detail concerning the fundamental matters that are the subject of this motion:

- **Who are Dr. Ajemian's unindicted "co-conspirators"?** Are they other doctors in addition to Dr. Lesniewski? Are they LIRR union officials? Are they some or all of the LIRR patients Dr. Ajemian saw through the years or just those named in the Superseding Indictment? Are they RRB employees? Are they individuals who worked in Dr. Ajemian's office? All of the foregoing?

- **Who are the LIRR patients whom Dr. Ajemian "falsely declared disabled"?** Does the Government claim that each and every one of the LIRR patients whom Dr. Ajemian recommended for occupational disability was not in fact occupationally disabled? Does the Government claim that only a percentage of those patients were "falsely declared disabled"? Precisely who are the LIRR patients whom Dr. Ajemian "falsely declared disabled"?

- **Which of the medical tests Dr. Ajemian administered or ordered were "unnecessary" or were used to "pad the patients' medical files"?** Does the Government claim that none of the tests Dr. Ajemian administered or commissioned was necessary and that each and every one of them was delivered as part of the alleged fraud? Does the Government claim that Dr. Ajemian did not in fact administer the tests in question? Does the Government claim that Dr. Ajemian should have administered different tests altogether?

- **In what respect were Dr. Ajemian clinical diagnoses, medical assessments and illness narratives allegedly false and fabricated?** Does the Government claim that Dr. Ajemian's narratives of his patients' symptoms were not based on information he received from the patients? Does the Government claim that Dr. Ajemian was deceptive or reckless in making his diagnoses? Does the Government claim that Dr. Ajemian misrepresented information contained in objective medical tests, such as X-rays, MRIs, or nerve conduction tests? Does the Government claim that Dr. Ajemian made up his diagnoses? Does the Government claim that Dr. Ajemian knew that patients were making misrepresentations to him? Does the Government claim that Dr. Ajemian prepared illness narratives without actually meeting his patients? In sum, what is Dr. Ajemian accused of?

- **Who are the RRB claims examiners whom Dr. Ajemian allegedly misled?** Does the Government claim that Dr. Ajemian misled each and every RRB claims examiner who approved occupational disability claims? Does the Government claim that Dr. Ajemian misled only particular RRB claims examiners?

- **What is hiding behind the various vague and open-ended allegations set forth in several paragraphs of the Superseding Indictment?** Specifically, what are the "other[]" allegedly fraudulent acts referred to in paragraphs 8 and 33? What are the "fraudulent pretenses, representations and promises" referred to in paragraphs 28 through 30, 37, and 39? What are the "false and fraudulent statements" referred to in paragraph 35?

- **What are the particulars of Counts Three (False Claims), Four (Health Care Fraud), and Nineteen (Wire Fraud)?** What are the claims Dr. Ajemian submitted that were allegedly false? What are the particulars of the health care fraud and wire fraud Dr. Ajemian is alleged to have committed?

Dr. Ajemian respectfully submits that he needs and is entitled to answers to these questions. The answers Dr. Ajemian seeks are certainly nowhere to be found in the Superseding Indictment, which instead outlines a scheme and conspiracy both of breathtaking scope and duration. Between 1997 and today, while the alleged conspiracy was ongoing, Dr. Ajemian has interacted with thousands of individuals, but Dr. Ajemian has no way of knowing which of these individuals is alleged to have been a co-conspirator. During the same time, Dr. Ajemian saw hundreds of if not more than one thousand LIRR patients, each and every one of whom appears to be referenced in the Superseding Indictment. Because many of the LIRR patients saw Dr. Ajemian on numerous occasions, there are tens of thousands of tests that the Government may claim as "fraudulent" and tens of thousands of diagnoses and medical observations that the Government may claim to have been "fabricated." Along the same lines, over the course of the 14 years while the massive alleged conspiracy was ongoing, there were numerous RRB claims examiners who reviewed, approved, re-reviewed, and re-approved occupational disability claims, but Dr. Ajemian has no way of knowing which of those examiners were allegedly deceived.

A criminal trial carries consequences for a defendant too dire for it to be a game, and least of all a guessing game. The charges filed against Dr. Ajemian are grave, and the statutory penalties are harsh. Dr. Ajemian is entitled to defend himself vigorously by investigating the alleged charges and developing evidence to refute them. The preparation of Dr. Ajemian's

-12-

defense will take time, and the defense cannot reasonably be expected to produce rebuttal testimony on the fly and without significant advance work. Among other things, to defend Dr. Ajemian's clinical diagnoses, courses of treatment, and medical recommendations, the defense team will have to delve into mountains of evidence, including X-rays, MRIs, and nerve conduction tests and interview and/or subpoena third-party medical professionals who administered some of those tests.

Against this background, the Government's arguments that it has provided *some* detail are legally irrelevant and should be rejected.[9] *See Bortnovsky*, 820 F.2d 574-75 ("We conclude that appellants were hindered in preparing their defense by the district court's failure to compel the Government to reveal crucial information: the dates of the fake burglaries and the identity of the three fraudulent documents. Appellants were forced to explain the events surrounding eight actual burglaries and to confront numerous documents unrelated to the charges pending. In effect, the burden of proof impermissibly was shifted to appellants."); *United States v. Barnes*, 158 F.3d 662, 666 (2d Cir. 1998) ("since the indictment provided not a shred of detail, the defendant was entitled to be otherwise apprised of the conduct that he was alleged to have undertaken in furtherance of this multi-faceted, if not multiple, conspiracy.") (citing *United States v. Ramirez*, 602 F. Supp. 783, 793 (S.D.N.Y. 1985); *United States v. Feola*, 651 F. Supp. 1068, 1133 (S.D.N.Y. 1987)); *United States v. Ganim*, 225 F. Supp. 2d 145, 155 (D. Conn. 2002) (requiring particularization of allegation that certain improper gifts were accepted "among

---

[9] The Government alleges eight specific overt acts by Dr. Ajemian, which relate to his signing of medical assessments for eight of the indicted defendants. But even these allegations fail to particularly state how these otherwise legal acts were in furtherance of the conspiracy, *i.e.*, whether Dr. Ajemian's assessment were "exaggerated," as alleged in paragraph 8(g) of the Superseding Indictment, or rather merely verbatim recitations of the "false claims" of the LIRR employees, as set forth in paragraph 8(e).

others"); *United States v. Nachamie*, 91 F. Supp. 2d 565, 572-73 (S.D.N.Y. 2000) (requiring government to provide the names of any known unindicted co-conspirators).

The Government's massive "document dump" in this case adds up to hundreds of thousands of pages and only highlights the untenable situation in which the prosecution has deliberately placed the defense. Without the information sought herein, most of the documents the Government has provided are meaningless, and, indeed, as this Court and the Second Circuit have recognized, "sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars." *United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000) (citations omitted). *See also Bortnovsky*, 820 F.2d at 575 (noting that "[t]he Government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified or which of some fifteen burglaries would be demonstrated to be staged."); *Nachamie*, 91 F. Supp. 2d at 574-75 (ordering the Government to specify, *inter alia*, each false and misleading claim allegedly submitted and/or filed as part of the conspiracy, as well as each item, statement, or entry on each document alleged to be false or fraudulent).

*   *   *

For the foregoing reasons, Dr. Ajemian respectfully requests that the Court order the Government to provide a bill of particulars, as set forth above.

### C. The Government Should Be Directed to Search for and Produce All Potentially Exculpatory Evidence From the Files of the RRB and the EDNY USAO.

Dr. Ajemian respectfully requests that the Government be directed to search for and produce all potentially exculpatory evidence from the files of the RRB and the EDNY USAO, which handled the investigation that led to the filing of the Superseding Indictment in the aftermath of the *Times* articles. (*See* Bergman Decl. Exs. S, T.)

-14-

Even though it clearly stands in the shoes of the RRB in this prosecution, the Government has taken the position that only a portion of the documents maintained by that governmental agency is accessible to the prosecution team, and that, as such, the Government will not search the entire universe of relevant RRB documents for potentially exculpatory evidence.  Bergman Decl. Ex. F at 3 n.1.  We respectfully submit that the Government's position is untenable.

It is plain that the RRB is "so closely aligned with the prosecution so as to be considered part of the prosecution team."  *United States v. Finnerty*, 411 F. Supp. 2d 428, 432 (S.D.N.Y. 2006).  Among other things, the Complaint in this matter consists of an affidavit by a Special Agent with the Office of the Inspector General of the RRB (*see* Bergman Decl. Ex. B), the Government has issued several press releases touting the partnership between the U.S. Attorney's Office and the RRB (*see* Bergman Decl. Exs. O, X), and the Government has already produced hundreds of thousands of pages from the RRB's files.

The Government has shown limited interest in searching or producing potentially exculpatory documents contained within the files of the RRB.  The Government has not produced, for instance, documents concerning audits to which the RRB was subjected over the years, which according to the *Times* "found serious shortcomings in the disability program."  *See* Exhibit A.  Nor has the Government produced communications between RRB and the *Times*, even though it is clear that many of these communications are exculpatory in nature.  *Id.* (noting that Steven A. Bartholow, the RRB's then-general counsel, had acknowledged to the *Times* that "workers for the most part would not give up well-paying jobs unless there was a good reason" and quoting Mr. Bartholow as follows:  "I think most of the people who apply for occupational disability annuities are in fact occupationally disabled[.] … They are hurting.").  Nor do we have reason to believe that the government has produced (i) relevant portions of the personnel

-15-

files of the RRB who were allegedly deceived by Dr Ajemian; (ii) memoranda RRB personnel

most likely authored during the 2009 OIG audit discussed *infra*; or (iii) memoranda that were

prepared during the Government Accountability Office's 2009 performance audit of the RRB.[10]

The defense has requested copies of these materials (*see* Bergman Decl. Ex. G), but the

Government has without justification ignored our request.

The foregoing analysis applies *a fortiori* with respect to potentially exculpatory evidence

that was collected by the EDNY USAO.  It appears that, after a lengthy investigation of the

alleged RRB fraud, the EDNY USAO declined to prosecute Dr. Ajemian and his co-defendants.

To the extent that that decision was made based on evidence that has not been made available to

the defense by the current prosecution team, Dr. Ajemian respectfully submits that the

Government should be directed to obtain it and turn it over to the defense.

*      *      *

Because the Government should not be allowed to pick and choose the evidence it makes

available to the defense, the Government should be directed to search for and produce all

potentially exculpatory evidence from the files of the RRB, including all impeachment evidence,

and all potentially exculpatory evidence that was collected by the EDNY USAO.  *See United

States v. Kiszewski*, 877 F.2d 210, (2d Cir. 1989).

### D. The Court Should Sever the Trial of the Charges Against Dr. Ajemian From the Trial(s) of the Charges Against the Patient Defendants, the Facilitator Defendants, and Dr. Peter Lesniewski.

Dr. Ajemian respectfully requests that the trial of the charges against him be severed

from the trial(s) of the charges against the Patient Defendants, the Facilitator Defendants, and Dr.

Peter Lesniewski, and that the trial of the charges against Dr. Ajemian proceed after the trial

---

[10] *See* http://www.gao.gov/htext/d09821r.html.

against the Patient Defendants is concluded. The severance and sequencing proposed by Dr. Ajemian are appropriate for several distinct reasons.

As an initial matter, tying the 20-plus defendants named in the Superseding Indictment in one "mega-trial" is neither prudent nor feasible. *United States v. Casamento*, 887 F.2d 1141, 1151-52 (2d. Cir. 1989). Indeed, the Government itself appears to recognize that unless a number of defendants accept guilty pleas the case must be pared down to a manageable number for trial purposes. *See* Bergman Decl. Aff. Ex. D, Transcript of May 5, 2012 Pretrial Conference, at 8:5-14.

More importantly, it is clear that the Government's case against Dr. Ajemian falls apart unless the Government is able to make a threshold showing that the Patient Defendants were not in fact occupationally disabled at the time they came to see Dr. Ajemian. For that reason Dr. Ajemian respectfully submits that the most economical way to streamline this otherwise elephantine prosecution is by conducting an initial trial that will adjudicate the culpability, if any, of the Patient and Facilitator Defendants. If these defendants are acquitted, it follows that the case against Dr. Ajemian should be dismissed. If some or all of the defendants are found guilty, Dr. Ajemian's defense will be guided and shortened.

This approach is not only sensible and efficient, but it is also the only way to ensure that Dr. Ajemian receives a fair trial. It is well established that severance is appropriate where a criminal defendant intends to present a defense that "conflict[s with a co-defendant's defense] to the point of being so irreconcilable as to be mutually exclusive." *United States v. Cardascia*, 951 F.2d 474, 484 (2d Cir. 1991). "Defenses are mutually exclusive or irreconcilable if, in order to accept the defense of one defendant, the jury must of necessity convict a second defendant." *Id.* Here, Dr. Ajemian's defense will be—at least in part—irreconcilable with that of the Patient

McKool 780924v1

Defendants and the Facilitator Defendants.  In particular, Dr. Ajemian intends to prove that, if it turns out that the Patient and Facilitator Defendants did perpetrate a fraud upon the RRB, then Dr. Ajemian was a victim of—not an accomplice in—the alleged wrongdoing.  To prove his defense, Dr. Ajemian will have no choice but to call to the stand the Patient Defendants themselves to establish that, during their interactions with Dr. Ajemian, they omitted or misrepresented highly pertinent details, such as (1) their ability to perform strenuous physical activities (*cf.* Complaint ¶¶ 15, 60 (describing various activities that defendants Falloon, Walsh, Noone, and Satin were able to perform after telling Dr. Ajemian that they were suffering debilitating physical conditions)); (2) their failure to follow the course of treatment recommended by Dr. Ajemian (*cf.* Complaint ¶¶ 60, 75, 100 (noting that defendants Noone, Walsh, Falloon, and Satin failed to fill the prescriptions given to them by Dr. Ajemian)); (3) their ability to perform overtime work (*cf.* Complaint ¶ 107 (noting that, while he was under Dr. Ajemian's care, defendant Satin performed a substantial amount of overtime work)); and (4) their apparent lack of need to use sick days (*cf.* Complaint ¶¶ 62, 77, 94, 107 (noting that defendants Noone, Walsh, Falloon, and Satin made little, if any, use of sick days while they were seeing Dr. Ajemian)).  Unless a severance is granted, however, Dr. Ajemian will be unable to call the Patient Defendants to the witness stand to prove his defense.[11]

*        *        *

For the foregoing reasons, Dr. Ajemian respectfully requests that the trial of the charges against him be severed from the trial(s) of the charges against the Patient Defendants, the

---

[11] Severance from Dr. Lesniewski is also appropriate.  The Superseding Indictment alleges, and the Government apparently concedes, no connection whatsoever between Drs. Ajemian and Lesniewski.

McKool 780924v1

Facilitator Defendants, and Dr. Lesniewski, and that the trial of the charges against Dr. Ajemian

proceed after the trial against the Patient Defendants is concluded.

### E.  Dr. Ajemian Seeks Permission to Join in a Number of Motions Filed by His Co-Defendants.

As per the Court's instruction, Dr. Ajemian respectfully seeks permission to join in the

following motions filed by certain of his co-defendants:

- The motion to dismiss the single conspiracy counts of the Superseding Indictment filed by defendant Maria Rusin.

- The motion for early disclosure of 18 U.S.C. § 3500 materials filed by defendant Richard Ehrlinger.

- The motion pursuant to Rule 7(c)(1) addressed to the prolixity of the Superseding Indictment filed by defendant Regina Walsh.

- The motions for disclosure of *Brady* material filed by defendants Gregory Bianchini and Dr. Peter J. Lesniewksi.

- The motion for disclosure pursuant to Fed. R. Evid. 1006 filed by defendant Dr. Peter J. Lesniewski.

- The motion directed to the Government's Amnesty Program filed by defendant Dr. Peter J. Lesniewski.

- The motion to inspect the grand jury minutes filed by defendant Dr. Peter J. Lesniewski.

- The motion to preclude the introduction of alleged co-conspirator statements filed by Dr. Peter J. Lesniewski.

- The motion directed to the exclusion from the grand jury pool of individuals older than 70 filed by defendant Regina Walsh.

Dated:  September 14, 2012                    Respectfully submitted,


                                        _____/s/ Thomas E. Engel_____
                                        Thomas E. Engel, Esq.
                                        McKool Smith, P.C.
                                        One Bryant Park, 47th Floor
                                        New York, NY 10036

                                        *Attorneys for Defendant Peter J. Ajemian, M.D.*

# EXHIBIT A

**The New York Times** Reprints



This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.

September 20, 2008

# A Disability Epidemic Among a Railroad's Retirees

**By WALT BOGDANICH**

*This article was reported by **Walt Bogdanich**, **Andrew W. Lehren**, **Robert A. McDonald** and **Nicholas Phillips** and written by Mr. Bogdanich.*

To understand what it's like to work on the railroad — the Long Island Rail Road — a good place to start is the Sunken Meadow golf course, a rolling stretch of state-owned land on Long Island Sound.

During the workweek, it is not uncommon to find retired L.I.R.R. employees, sometimes dozens of them, golfing there. A few even walk the course. Yet this is not your typical retiree outing.

These golfers are considered disabled. At an age when most people still work, they get a pension and tens of thousands of dollars in annual disability payments — a sum roughly equal to the base salary of their old jobs. Even the golf is free, courtesy of New York State taxpayers.

With incentives like these, occupational disabilities at the L.I.R.R. have become a full-blown epidemic.

Virtually every career employee — as many as 97 percent in one recent year — applies for and gets disability payments soon after retirement, a computer analysis of federal records by The New York Times has found. Since 2000, those records show, about a quarter of a billion dollars in federal disability money has gone to former L.I.R.R. employees, including about 2,000 who retired during that time.

The L.I.R.R.'s disability rate suggests it is one of the nation's most dangerous places to work. Yet in four of the last five years, the railroad has won national awards for improving worker safety.

"Short of the gulag, I can't imagine any work force that would have a so-to-speak 90 percent disability attrition rate," said Glenn Scammel, long one of Capitol Hill's top experts on railroads. "That defies both logic and experience."

Said Dr. J. Mark Melhorn, co-editor of a book on occupational disability published by the American Medical Association: "No one has a rate that high — that just doesn't happen."

And it is not just engineers, conductors or track workers seeking disability payments. Dozens of retired white-collar managers are doing it as well, including the former deputy general counsel, employment manager, claims manager and director of government and community affairs.

In fact, two formerly influential figures at the L.I.R.R. — a married couple, one from management and one from labor — are retired and drawing about $280,000 annually in combined disability and pension payments, according to estimates based on public records.

Railroad officials say that as far as they know, most of the disabled workers were able-bodied until their early retirement, and only then filed papers seeking occupational disability payments.

"How is it that somebody is occupationally disabled the day after he retires when he wasn't occupationally disabled the day before he retired?" asked Gary Dellaverson, chief financial officer for the Metropolitan Transportation Authority, the railroad's parent.

The answer, according to government records and dozens of interviews, stems from a combination of factors, including highly unusual L.I.R.R. contracts that allow longtime workers to retire with a pension as early as age 50, federal rules that let railroad retirees claim disability for jobs they no longer hold, and an obscure federal agency called the Railroad Retirement Board that almost never says no to a disability claim.

The federal agency pays the disability claims, but losing so many workers to early retirement costs the L.I.R.R. money — in overtime, training of replacements and early pension payments. At the same time, passengers could soon face another fare increase and the transportation authority is seeking more taxpayer support, already half a billion dollars a year, to close a huge budget gap.

Union contracts also inflate operating costs through arcane work rules, some dating back to the 1920s, which pad employee paychecks, boosting pension and disability payments in turn.

"There are maybe nine different ways to show up at work and get two days' pay without doing anything extra," Michael J. Quinn, general chairman of the Brotherhood of Locomotive Engineers and Trainmen at the L.I.R.R., said in an interview.

These work rules made it possible for eight senior train engineers to earn from $215,000 to $277,000 in 2006. Younger workers earn much less, and income in the top tier was lower in 2007.

Since medical records are private, individual cases could not be examined, and there is little doubt that some of the retirees receiving disability payments actually have debilitating conditions.

Still, the L.I.R.R.'s disability rate in recent years has been three to four times that of the average railroad, and is particularly striking when compared with the number of disabilities at Metro-North, the Metropolitan Transportation Authority subsidiary that serves commuters north of New York City.

Their work forces are of similar size and composition. Employees perform roughly the same tasks: operating trains, punching tickets and maintaining tracks.

And yet in one area — debilitating illness and injury — the difference is so vast as to almost defy medical explanation.

One example: disabilities resulting from arthritis and rheumatism. From 2001 through 2007, Metro-North had 32 cases, compared with 753 at the L.I.R.R. In one year, Metro-North had just 2 cases. The L.I.R.R. had 118.

For certain diseases of the musculoskeletal system, like a herniated disc, Metro-North had 49 cases. The L.I.R.R. had 850.

No one at the two railroads, at the transportation authority or at the Railroad Retirement Board could explain these gaping differences, nor were they even aware of them.

"I've not seen that until you just showed it to me," Michael S. Schwartz, the retirement board's chairman, said in an interview this summer. The board focuses on individual claims, not specific railroads, Mr. Schwartz, said, but added, "We want to make sure that anything we do here is done correctly."

The L.I.R.R. president, Helena E. Williams, called the data compiled by The Times "alarming" and has asked the inspectors general of the retirement board and the transportation authority to investigate.

Dr. Melhorn, who has studied disabilities, said the numbers alone were a cause for concern, "in particular if there seems to be a limited number of physicians who are providing this disability impairment."

Work-related injuries and illnesses do not explain the high disability rate. From 2005 through 2007, the L.I.R.R. had 2.91 per 200,000 working hours, compared with 2.98 for New Jersey Transit, 3.13 for Metro-North, 9.42 for PATH and 12.91 for Philadelphia's transit system, according to an analysis of federal records.

The L.I.R.R.'s record also raises questions about why the Railroad Retirement Board approves nearly 100 percent of disability requests from all the nation's railroads. The board is funded through taxes on railroads and their workers, but Social Security had to contribute $3.6 billion last year to cover expenses.

"Everyone in America is going to contribute to that," said Rick Lifto, assistant vice president of general claims for B.N.S.F., a large freight railroad. B.N.S.F.'s disability rate is lower than the L.I.R.R.'s, but even so, Mr. Lifto said, disabilities still cost his company millions of dollars.

John Britt Jr., a former engineer, is an example of someone who benefited not only from the work rules, but also from disability payments. In his last year on the job, during which he earned more than any other engineer, Mr. Britt's paycheck swelled with $58,853 for tasks that had violated the normal work rules of his union contract, including $2,309 for running diesel and electric trains on the same shift and $3,354 for working through his regular meal period, government records show. He also got $40,553 for overtime, $41,594 for a vacation buyout and $47,337 for a sick leave buyout.

For the year, Mr. Britt received $277,075 — five times his base salary and $100,000 more than the highest-paid engineer at Metro-North. Then, after retiring at age 56 in 2006, he was classified as disabled by the Railroad Retirement Board.

In fact, the 12 highest paid L.I.R.R. engineers in 2006 — most earning over $200,000 — are now retired and receiving disability payments, records show. And so are the top-earning conductors, three of whom had incomes over $190,000.

Mr. Britt could not be reached for comment, but a woman responding to a note left at his listed residence said, "Our family has no comment."

The L.I.R.R. president, Ms. Williams, who has been on the job a little more than a year, says she recognizes the need to fix the railroad's problems. The transportation authority's inspector general has praised her willingness to quickly address deficiencies once they are identified. She has taken steps to help curb overtime, and the railroad's on-time record has never been better.

But many problems are beyond her control. Without the political support needed to weather a strike, management has been unwilling to press for the removal of costly work rules, according to former management and union officials. The railroad also has no authority to intervene in federal disability cases.

Changes in the railroad's contract have made it more difficult for many employees to retire early, although it is still possible for them to receive a regular pension at age 55, and 1,100 long-term employees were still working under the old provisions at the end of 2007.

If the transportation authority needed any expertise on disabilities, it could have turned to a former board member and union official, Joseph Rutigliano, who became occupationally disabled after retiring in late 1999 at age 52.

Mr. Rutigliano said in an interview that he "crushed" his back in a fall at home and eventually could no longer work as a conductor, where his duties included walking through trains taking tickets and repeatedly climbing in and out of railroad cars. "I needed to use my legs and my back every day," he said. "It meets the criteria for what the railroad retirement system says prevents you from performing your railroad occupation."

If Mr. Rutigliano's condition kept him from working, it did not stop him from golfing. He was a regular this summer at Sunken Meadow, often walking the course twice a week. As a disabled worker, he played free.

## A Puzzling Discrepancy

About five years ago, L.I.R.R. officials say, they wanted to know more about why some employees were retiring and then filing for occupational disability. Because the L.I.R.R. had made progress in reducing workplace accidents, railroad managers wondered if something was amiss, so they contacted the Railroad Retirement Board.

But L.I.R.R. officials said the retirement board assured them that the number of disabilities among former L.I.R.R. workers "was typical of railroads industrywide." Nothing more happened, officials said, until several months ago, when they were contacted by The Times and shown numbers far exceeding the industry average.

"We have been asked by newspaper reporters to explain why the L.I.R.R. has a high number of retirees who receive a disability annuity," Ms. Williams said on July 15 in a letter to Mr. Schwartz of the retirement board.

In a letter late last month to the retirement board's inspector general, Ms. Williams expressed specific concerns about why so many retirees were citing the same two disease categories.

"I find the high rate of R.R.B. disability awards in these categories alarming," she wrote, asking the inspectors general from the retirement board and the transportation authority to look into the matter.

Barry L. Kluger, inspector general for the authority, said, "The numbers and the cost I think do merit the kind of review that's going on at this time."

Ms. Williams said the railroad also examined its own disability program, which, unlike the retirement board's, handles disability claims from current employees.

The figures looked nothing alike. The number last year, she said: zero.

"So, the question I have is, 'What is the medical criteria used?' " Ms. Williams said in an interview, referring to the retirement board. "How are they evaluating the standards for an occupational disability?"

Outside the insular world of railroads, little is known about the Railroad Retirement Board. With headquarters not in Washington, but in an old insurance building in Chicago, the board is overseen by three presidential appointees: one from labor, one from management and one representing consumers.

The board, created in the 1930s, performs many of the same functions as Social Security, but for rail workers only. Both offer disability programs, but the similarities end there.

A worker must be incapable of any gainful employment to be classified as disabled by Social Security. But rail workers can get disability payments even if they can perform other jobs — just not their regular railroad jobs. This provision, enacted in 1946, was based on the view that rail workers had especially hazardous jobs involving skills not easily transferred to other occupations.

To document their occupational disability, rail workers can choose their own doctors who provide the board with detailed medical evaluations, usually including M.R.I. test results. Workers must also describe in full the physical demands of their rail jobs.

L.I.R.R. officials say they have little interaction with the retirement board. "We do not have any representation on the board," Ms. Williams said. "We are not asked for any medical evidence. We are not participants in any way. This is something employees do after they leave employment."

Cathleen Quinn, who runs the Long Island office of the retirement board, said her office gets "mainly orthopedic disabilities — herniated discs, bad knees."

L.I.R.R. employees favor certain doctors, and their disability applications are sometimes so similar as to be almost interchangeable, said one Long Island resident who has seen dozens of those applications. That person said that M.R.I.'s merely document physiological changes that commonly affect people over the age of 50.

"I've never heard of anybody not finding something," said the person, who did not wish to be identified for fear of angering friends who are getting disability payments.

Dr. Robert K. McLellan, section chief for occupational and environmental medicine at Dartmouth-Hitchcock Medical Center in New Hampshire, said M.R.I.'s alone were not enough to determine whether someone was incapacitated.

"As we get older, we accumulate all kinds of abnormalities on M.R.I.'s," Dr. McLellan said. "You can't use an M.R.I. to say, 'This person must have really bad back pain and therefore must be disabled.' It is extremely common to have disc bulge and disc degeneration and disc herniation and have no symptoms whatsoever."

He said most people with a herniated disc recover within 6 to 12 weeks "without any intervention except time."

To account for those who might regain their ability to work, Social Security requires medical re-evaluations for the disabled, said Mark Lassiter, a Social Security spokesman. The Railroad Retirement Board has no such provision for an occupational disability and does not require any rehabilitation therapy.

In all, the retirement board is far more generous in handing out disabilities than the Social Security Administration, which says it rejects roughly 45 percent of its applicants for total disability. The railroad board rejects only 2 percent of those seeking occupational disability, a lower threshold than total disability.

"You have to say to yourself, 'Why is Railroad Retirement Board so different?' " Ms. Williams said.

Martin J. Dickman, the retirement board's inspector general, acknowledged in an interview that the retirement board's rejection rate was "almost nonexistent," but he added: "If Congress wants to change the statute and raise the threshold, that's up to Congress. That's not up to us to do."

Mr. Lifto, the B.N.S.F. claims official, said he was so concerned about the board's generosity that he and representatives of other freight railroads went to Chicago a couple of years ago to see how the retirement board decided disability cases. He said he couldn't recall finding a single applicant who had been rejected on medical grounds — only for incorrect or incomplete paperwork.

Railroad management's concerns got support from an internal retirement board audit in 2000 that found serious shortcomings in the disability program. A copy of that report, obtained by The Times, stated that medical files did not justify all the disabilities awarded. "This number could be as high as 10 to 20 percent of the cases reviewed," according to the report, by two physician auditors.

The audit also found that disability decisions were "largely made on the medical disease being present rather than an understanding of the functional limitations created by that disease." The report also suggested that applications were overstating job demands.

In a follow-up audit submitted in June of this year, one of the auditors, Dr. Natalie P. Hartenbaum, a management representative, found the problem had not been resolved.

"Dr. Hartenbaum did not feel that the medical opinions rendered sufficiently took into account the actual work performed," the audit stated. A second doctor representing labor found fewer faults than Dr. Hartenbaum.

Although railroad work is not as difficult or as dangerous as in years past, it does require physical activity that can strain the body. Engineers have to climb ladders. Conductors are on their feet for hours.

Charles Anderson, a former L.I.R.R. engineer, said a shoulder injury unrelated to work made it hard for him to climb up and down on the train. "I was doing it with one arm," Mr. Anderson said. "The thing that really made me retire is I fell and I was by myself."

Mr. Rutigliano, the former transportation authority board member, said injured workers are seeking only what the law provides. "The doctors don't lie," he said. "They got X-rays, M.R.I.'s.

They have bad backs. They have hearing disabilities."

Steven A. Bartholow, general counsel for the retirement board, said workers for the most part would not give up well-paying jobs unless there was a good reason.

"I think most of the people who apply for occupational disability annuities are in fact occupationally disabled," Mr. Bartholow said. "They are hurting."

### Unusual Rules

If L.I.R.R. workers are hurting, it is also true that they have an added financial incentive to seek disability. Unlike other rail workers, they have a contract that allows them to get an early pension, which they can then supplement with disability payments.

L.I.R.R. employees hired before 1988 with 20 years of service can start drawing on that pension at age 50. In fact, most workers start filing for disability in their 50s, records show. With monthly disability payments averaging about $3,000 a month, plus pension, retirees can earn their base salary and sometimes more until they reach normal retirement age.

"When you're 50, you're still active," said Tom Prendergast, a former L.I.R.R. president who is now running a transit system in Canada. "You like to work on your house, go out on your boat, travel, whatever."

In each year since 2000, between 93 percent and 97 percent of employees over 50 who retired with 20 years of service also received disability payments.

Four years ago, the transportation authority's inspector general cautioned that occupational disabilities could have financial implications for the L.I.R.R.'s pension plan, which it found to be "extremely" underfunded. "An added incentive for employees to take their pensions is the ease with which they can qualify for occupational disability," the inspector general said in a 2004 report.

The railroad for a variety of reasons had to triple its annual contributions to the pension fund to $94 million in 2004 from $32 million in 2000.

There are other benefits to being a disabled L.I.R.R. employee. Those deemed to be so severely incapacitated that they cannot hold any job — not just their regular railroad job — also get health care through Medicare, as well as special tax breaks. Nearly half of L.I.R.R. workers classified as occupationally disabled are later reclassified by the retirement board as totally disabled, records show.

And then there is the free golf. Debbie Keville, an official with the state's Office of Parks, Recreation and Historic Preservation, explained who qualifies for what is called an Access Pass,

allowing the disabled free use of sports facilities in state parks:

"You have to have a functional disability. By that, I mean a person has to have severe limitations —
for example, with sight impairment, you have to have a high level of visual loss — you can't have
your better eye seeing fine. If you have to have an ambulatory aid — such as a cane — you need to
have it at all times, not just some of the time. Mental retardation or developmental disability
qualifies you."

Ms. Keville says her agency isn't in the business of saying no to the truly disabled. "You've probably
heard of blind and visually impaired golfers," she said. "They're out there."

Ms. Keville said the state could not investigate each and every case. "We have no way of knowing
why or how they are disabled, just that the government says they are," she said.

**Maximizing a Paycheck**

The size of a disability payment, as well as a pension, is determined partly by what an employee
earns in the five years before retirement. Here again, the L.I.R.R.'s unique work rules give
employees an edge.

Take the case of Edward J. Koerber.

On a spring evening in 2004, Mr. Koerber reported for his overnight shift as a train engineer at the
Jamaica Storage Yard. By the end of his eight-hour shift, Mr. Koerber would earn four days' pay
for one day's work, transportation authority records show.

Assigned to the railyard that night, Koerber was instead sent to passenger service. Under union
rules, this change entitled him to an extra day's pay. Over the next few hours, he ended up
operating both an electric engine and a diesel engine. These dual duties earned him a second day's
pay.

Around 2 a.m., Mr. Koerber took an engine in for maintenance. With that came another day's pay.

These three contract violations resulted in penalty payments that totaled $718. He also earned,
among other things, $157 for a few hours of overtime and $15 for not getting to eat during his
normal lunch break. The L.I.R.R. was supposed to pay him $247 for his work that day. Instead, he
ended up with $1,177.

Shifts like this were not that unusual. Mr. Koerber pulled off seven others like it that year.

Nor was he alone: L.I.R.R. engineers were paid four days' wages for a single day of work on 30
occasions in 2004. These cases were documented in a 2006 report by the transportation
authority's inspector general, who also found more than 500 examples of engineers making three

days' wages in one day and nearly 150 examples of conductors doing the same.

That year, Mr. Koerber earned $211,586, according to payroll data. But his compensation the next year was even more remarkable: $276,456. Only the president of the railroad earned more: $287,658.

Soon after, Mr. Koerber retired from the L.I.R.R., and he ultimately took with him more than just a pension. In 2006, records show, he began receiving disability payments from the Railroad Retirement Board. In all, his retiree income is about $170,000 a year, according to estimates based on public records.

Mr. Koerber, who is now 60, declined to comment.

Metro-North operates differently. "We don't have full-day penalty payments here," says Jane Murawski, assistant director of labor relations at Metro-North. "It would never be that the person works their eight-hour shift and then they get another eight hours and another eight hours for other things. That doesn't happen here."

Metro-North, formed in 1983 from the old Conrail commuter lines, largely inherited the work rules of its parent, which was mostly a freight railroad. But because the L.I.R.R. has always been primarily a commuter railroad, many existing labor agreements remained after the authority took it over in 1966.

The disparity in pay between the two railroads is considerable. At the L.I.R.R, 107 nonmanagement workers earned more than $150,000 in 2006, compared with only a handful at Metro-North.

"We have the best work rules in the industry nationwide — I would say worldwide," said Mr. Quinn, the official with the Long Island chapter of the engineers union. "They've never been able to negotiate them away from us."

## Struggle Over Work Rules

Over the years, management has tried to chip away at those work rules.

In the 1980s, L.I.R.R. officials became worried about losing so many veteran workers to early retirement, many of whom were quitting to take other jobs. So management made early retirement an issue during negotiations. The result: an 11-day strike. In the end, the rules were changed so that employees hired after 1987 had to reach age 55 and work 30 years before retiring on a normal pension.

But that did not affect thousands of employees hired before 1988. And in time, it started to become apparent that second jobs were not necessary, not when it was so easy to be classified as occupationally disabled.

During contract negotiations in 1994, management also tried to take a stand against work rule provisions that inflated earnings. But the political will to fight for these changes evaporated after workers went on strike, as they were legally entitled to do, unlike some other transit workers.

"What's lacking is leadership on the public side, people with strong beliefs and the courage to act on those beliefs," said Louis Anemone, a former security director of the transportation authority. "There's no stomach for it on the management level, and none of it on the political level."

There is a reason for that, Mr. Quinn says: "We move millions of people a week. And for this railroad to stop, people would be screaming. Politicians would have to answer questions: 'What the hell is this? What are you doing?' So they let us kind of co-exist."

But work rules and penalty payments, much like overtime, can be managed to reduce their financial impact — something that Ms. Williams, the railroad president, says she is trying to do.

Over the years, the railroad has also made its share of serious mistakes. In 2006, the transportation authority inspector general found a 50 percent error rate when sampling sick-leave buyouts, a negotiated entitlement in which the railroad buys unused sick days. The buyouts cost the L.I.R.R. nearly $2 million in 2006.

"The Long Island Rail Road has to confront its culture of lethargy and develop a proactive management structure," Matthew D. Sansverie, the authority's inspector general, wrote in a 2006 report. "The failure of staff and supervisors to question things that do not make sense must end."

Getting overtime costs under control has been a longstanding problem. "There continues to be lax controls over overtime and penalties earned by crews in the railyards," authority investigators said in 2006.

Early retirements by those seeking disability payments haven't helped. "The railroad has experienced a substantial number of retirements in the last seven years," said Ms. Williams. "It takes two years to train an engineer."

The L.I.R.R. has been successful under Ms. Williams in reducing overtime and some penalty payments, but eliminating those penalties is another matter. "We have not been successful in achieving that in collective bargaining," she said.

One penalty payment agreed to by management proved so embarrassing that the union was willing to give it up. In the 1980s, workers who maintained the track corridors got an extra two hours of pay if it rained. But because the agreement was poorly constructed, it opened the gates to abuse.

The intent was to pay extra for work performed in the rain, but workers got paid even if it rained going to or from the work site. In one year, they got rain pay on 42 days when no rain fell, transportation authority investigators said in a 1989 report. One union official was quoted as

saying that workers deserved the supplement "even if a bird flies over and urinates on them."

In one six-month period, rain pay cost the railroad $1.1 million. "Some of these things are ridiculous," said Gerard P. Bringmann, general chairman of the Long Island Rail Road Commuter Council. "It makes absolutely no sense. Any company would go bankrupt that operates that way."

## White-Collar Disabled

If L.I.R.R. managers had decided in years past to investigate disabilities, they would not have had to look very far; most of them were retiring and getting disability payments, too.

Records show that in one recent three-year period, more than 60 white-collar managers retired and were classified as disabled. Like union members, many managers can retire at age 50 or 55 with benefits.

One such retiree was Janet Lewis, a former director of government and community affairs. Ms. Lewis declined to discuss the nature of her disability, saying it was a private matter. Her husband, Michael J. Canino, is also retired on disability. He is a former authority board member and chairman of the L.I.R.R. labor council, which represents all of the L.I.R.R. unions.

Between their pensions and disability payments, Ms. Lewis and Mr. Canino take in about $280,000 annually, according to estimates based on public records.

Mr. Canino could not be reached for comment. On two occasions Ms. Lewis said he was out of town, and he did not return a message left at his house.

Walter Kueffner is one manager who didn't say he was disabled, even though many others around him did.

"People claimed they had back problems and carpal tunnel," said Mr. Kueffner, a former auditor at the railroad. "I am sure some really did, but a lot of healthy people were doing it."

Disability awards were being handed out when he started at the railroad in 1968, and the numbers "got bigger as time went on," he said. "They don't reject too many for a disability, you know."

Mr. Kueffner said that while he's not "a saint," the thought of claiming disability never crossed his mind for one simple reason: "I didn't have a disability," he said. "I was doing a job that people do everywhere. I worked at a desk and I retired in good shape."

*Reporting was contributed by Katia Bachko, Ivan Dominguez, Alex Lang and Elana Margulies.*

# EXHIBIT B

**OIG REPORT #10-02**

The Office of Inspector General's report on the RRB's financial statements begins on page 99 of the Railroad Retirement Board's FY 2009 Performance and Accountability Report.

# RAILROAD RETIREMENT BOARD

# PERFORMANCE AND ACCOUNTABILITY REPORT



# FISCAL YEAR 2009

**Management's Comments**

These are Management's comments on the Management and Performance Challenges identified by the Railroad Retirement Board (RRB) Inspector General.

Providing Oversight of Invested Assets of the Railroad Retirement Act Program

The Inspector General lists as a Management Challenge what he perceives to be a lack of oversight of the investment of railroad retirement trust funds. He correctly notes that the Railroad Retirement and Survivors' Improvement Act of 2001 (RRSIA) created a separate entity, the National Railroad Retirement Investment Trust (NRRIT), to handle investment of railroad retirement assets.

The RRSIA provides that the NRRIT is to be a separate entity from the RRB and is not a Federal agency or instrumentality. The legislation requires the NRRIT to engage a qualified independent public accountant to conduct an annual audit of the financial statements of the Trust. The audit report of the independent auditor is a part of the Annual Management Report required by the legislation to be submitted to the Congress, with copies provided to the President, the RRB, and the Office of Management and Budget (OMB). In addition, the NRRIT, RRB, OMB and the Department of the Treasury have in place a Memorandum of Understanding that calls for the reporting of certain information concerning the NRRIT's activities on a monthly basis.

The RRB exercises its oversight responsibilities with respect to the NRRIT by thorough review by agency staff of the various reports provided by the NRRIT pursuant to the statutory requirements and the multi-agency Memorandum of Understanding. The RRB's General Counsel meets with the NRRIT's Chief Executive Officer/Chief Investment Officer and the Counsel to the NRRIT numerous times each year to discuss NRRIT activities. Financial officials of the RRB have frequent contact with the NRRIT. And, the three Members of the Railroad Retirement Board meet twice a year with the Trustees and NRRIT officials concerning NRRIT activities and investment performance of the NRRIT portfolio.

It is the position of the RRB that the agency is fulfilling its oversight responsibilities assigned by the Congress under the RRSIA.

Preventing Fraud and Abuse in the Occupational Disability Program

The Inspector General states that the threshold for entitlement to an occupational disability annuity under the Railroad Retirement Act, which he correctly points out is less strenuous than the standard under the Social Security Act for total and permanent disability, makes the program susceptible to fraud and abuse.

The Railroad Retirement Act provides two types of disability benefits for railroad employees. The Act provides for payment of a benefit to an employee who is totally and permanently disabled from all regular employment and the Act provides for the payment of a benefit to an employee who has at least 20 years of railroad service or who has attained the age of 60 and who is unable to perform his or her regular railroad occupation. The Act provides that in determining entitlement to occupational disability, the RRB must look to standards adopted with the cooperation of railroad employers and railroad employees. The Board Members adopted standards, along with supporting regulations, with the cooperation of railroad employers and

railroad employees, in 1998.  We currently use those standards and regulations in adjudicating each individual application for an occupational disability benefit.  We also require specific medical evidence to support our decisions in each case.

While the standard for occupational disability is lower than that for total and permanent disability, approximately 70 percent of the employees awarded an occupational disability annuity are also awarded a period of disability, which means that they meet the more strenuous total and permanent disability standard under the Social Security Act.  In fiscal year 2008, the RRB awarded annuities to approximately 31,500 beneficiaries.  Of this total, approximately 2,300 were occupational disability annuities.  However, only about 690 of these beneficiaries would not have met the more stringent total and permanent disability standard.

As the Inspector General notes, the Board adopted Board Order 08-63 last year to address a potential issue with the number of applications for occupational disability annuity filed by former employees of the Long Island Rail Road (LIRR).  The Board Order calls for greater scrutiny of applications filed by LIRR employees.  The Order calls for additional independent medical examinations of LIRR applicants to be conducted by independent physicians selected and paid by the RRB.  In addition, the Order calls for post-award review of cases to determine whether beneficiaries continue to meet the requirements for entitlement.  Through September 30, 2009, 117 applications were decided under the Board Order.  In each of these cases, the applicants were sent for independent medical examinations and the applications were handled by a separate group of claims examiners.  The additional scrutiny applied to these cases showed that nearly all of those who applied for benefits met the standards adopted pursuant to the statute.  Moreover, 258 LIRR annuitants currently receiving an occupational disability annuity were sent for 422 medical tests.  Our review of 200 of these annuitants and their medical evidence has been completed, and none of the annuitants were determined not to be disabled.

As the Inspector General notes, the RRB has also created a new position to handle quality review of the occupational disability program data.  It will be the responsibility of this employee to review the program data and identify any anomalies that might require additional scrutiny similar to what was done in Board Order 08-63.  The Board will take additional corrective action as necessary to ensure that the agency is meeting its mission to pay benefits to the right people and in the right amount.

<u>Ensuring the Integrity of the Railroad Medicare Program</u>

We agree with the Inspector General that the agency's Medicare carrier has had limited resources to devote to proactive fraud investigations and data analysis.  Since funding for that program is provided by the Centers for Medicare & Medicaid Services (CMS), we have concurred with the Inspector General's recommendation for the RRB to work together with the carrier to request additional funding for the Medicare Integrity Program in future years.  The carrier's fiscal year 2010 budget request to CMS did include a request for an additional $50,000 to initiate increasing its benefit integrity activities in keeping with this recommendation.

<u>Managing for the Security and Privacy of Information</u>

The RRB takes its responsibility to manage the security and privacy of information very seriously.  During fiscal year 2009, its Bureau of Information Services (BIS) addressed recommendations associated with high priority significant deficiencies.  BIS completed work on 16 deficiencies that had been reported to OMB and on 7 other significant deficiencies.  The

agency's Chief Information Officer has initiated a plan to prioritize the remaining open recommendations, with the intent to focus on the most significant ones.

Financial Accounting and Reporting

During fiscal year 2009, the agency's accounting staff have addressed the reported material weakness related to internal controls over financial reporting by acting on 12 financial statement-related audit recommendations.  This includes such recommendations presented in the OIG's Letter to Management, Report Number 09-02, dated March 24, 2009.  Most of the implementing actions taken are being evaluated by the OIG auditors during their audit of the fiscal year 2009 financial statements.

Preventing and Detecting Improper Payments

We agree that monitoring and reducing improper payment rates is challenging.  The agency has made concerted efforts to pay out only those benefits due and all the benefits due.  As a result, we have increased efforts to recognize and prevent overpayments caused by excess earnings after retirement, and focused efforts on paying out additional benefits due as a result of changes to service and compensation records.  The results of those efforts are reflected in reductions in rates of improper payments since our earlier reports.  We will continue to focus on reducing improper payments in the coming year.