UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------x

UNITED STATES OF AMERICA,          :
                                   :
             - v. -                :          S1 11 Cr. 1091 (VM)
                                   :
PETER J. AJEMIAN, et al.,          :
                                   :
             Defendants            :
                                   :
--------------------------------------X


# MEMORANDUM OF LAW AND APPENDIX IN SUPPORT
## OF PRETRIAL MOTIONS OF REGINA WALSH


**PAUL B. BERGMAN, PC**
**950 THIRD AVENUE**
**NEW YORK, NY 10022**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT................................................................................1

STATEMENT OF THE CASE ...............................................................................2

THE CHARGES.....................................................................................................4

ARGUMENT ..........................................................................................................6

POINT I      THE PROLIX "SPEAKING" SUPERSEDING INDICTMENT
SHOULD BE DISMISSED BECAUSE IT IS NOT THE
PLAIN, CONCISE AND DEFINITE STATEMENT OF THE
ESSENTIAL FACTS OF THE OFFENSE EXPRESSLY
REQUIRED BY RULE 7, FED. R. CRIM. P.............................................6

POINT II    COUNTS THREE, FOUR AND NINETEEN ARE
CONSTITUTIONALLY DEFICIENT AND SHOULD BE
DISMISSED AS VIOLATIVE OF RULE 7(c), FED R. CRIM. P.
BECAUSE THEY FAIL TO IDENTIFY ANY SPECIFIC
DOCUMENT, TEST, SUBMISSION OR WIRE WHICH,
OVER THE SPAN OF THE THIRTEEN YEARS COVERED
BY THESE COUNTS, IS ALLEGED TO BE CRIMINAL ............... 17

POINT III   THE GOVERNMENT SHOULD BE DIRECTED TO
PROVIDE  THE DEFENDANT WALSH WITH A BILL OF
PARTICULARS .................................................................................... 21

POINT IV   THE SUPERSEDING INDICTMENT SHOULD BE
DISMISSED  BECAUSE OF THE GOVERNMENT'S
VIOLATION OF THE DEFENDANT'S FIFTH
AMENDMENT RIGHT OF DUE PROCESS........................................ 23

POINT V    THE ALLEGATIONS OF STATISITICAL CONCLUSIONS
IN  THE SUPERSEDING INDICTMENT SHOULD BE
STRICKEN.............................................................................................. 23

POINT VI   IN THE INTERESTS OF JUSTICE THE COURT SHOULD
DIRECT A SEVERANCE PURSUANT TO RULE 14(a), FED.
R. CRIM. P., OF THE DEFENDANTS WALSH, NOONE,
GAGLIANO, EHRLINGER, PULSONETTI, DASARO AND
SUPPER ................................................................................................... 24

A. The *Bruton* and *Crawford* Decisions Compel Severance ........................... 25

  1. Neither Limiting Instructions Nor Redactions Will Cure The *Bruton/Crawford* Issue .................................................. 25

  2. The Potential *Bruton/Crawford* Statements at a Joint Trial of All the Defendants Would Take *Zafiro* to the Breaking Point ...................................................................................... 27

B. The Adverse Defense of the Doctors Also Supports the Severance ..... 36

C. This Projected Mega-Trial Should Parsed ................................. 38

D. The Case Should be Severed Into Three Trial Groups ........................... 38

  1. First Severance Division: Sever the Core Group of Doctors and Consultants from the LIRR Workers ...................... 39

  2. Second Severance Division: Sever Those LIRR Workers Who Gave Testimony Before the Grand Jury .............................. 40

  3. The Remaining Group of Defendants Who can Be Tried Without the Overlay of *Bruton/Crawford* Limiting Instructions ......................................................................... 41

POINT VII THIS COURT SHOULD ISSUE AN ORDER DIRECTING THE GOVERNMENT TO DISCLOSE ALL *BRADY/GIGLIO* MATERIAL TO THE EXTENT NOT ALREADY PROVIDED..... 41

POINT VIII THE GOVERNMENT SHOULD BE DIRECTED TO PRODUCE JENCKS ACT MATERIAL AT LEAST 60 DAYS BEFORE TRIAL ........................................................................ 42

POINT IX THE JURY SERVICE OPT-OUT FOR JURORS 70 AND OLDER IN THE COURT'S AMENDED JURY PLAN VIOLATES THE FAIR CROSS SECTION REQUIREMENT OF THE SIXTH AMENDMENT AND 18 U.S.C. §1867(a), AS WELL AS THE RANDOM SELECTION REQUIREMENT OF 18 U.S.C. §1867(a) ..................................................... 42

CONCLUSION .............................................................................. 45

## TABLE OF AUTHORITIES

Page

**Cases**

*Bierenbaum v. Graham*, 607 F. 3d 36 (2d Cir. 2010) ................................................................ 28

*Cruz v. New York*, 481 U.S. 186 (1987) .................................................................................... 29

*Crawford v. Washington*, 541 U.S. 36 (2004) ..................................................................... passim

*Davis v. Washington*, 547 U.S. 813 (2006) ......................................................................... 27, 28

*Gray v. Maryland*, 523 U.S. 185 (1998) .............................................................................. 30, 33

*Hamling v. United States*, 418 U.S. 87 (1974) .......................................................................... 21

*Richardson v. Marsh*, 481 U.S. 200 (1987) .............................................................................. 30

*Russell v. United States*, 369 U.S. 749 (1962) ..................................................................... 20, 21

*United States v. Abrams*, 539 F. Supp. 378 (S.D.N.Y. 1982) .................................................. 22

*United States v. Aisenberg*, 247 F. Supp. 2d 1272 (M.D. Fla. 2003) ......................................... 9

*United States v. Autorino*, 381 F.3d 48 (2d. Cir. 2004) ........................................................... 11

*United States v. Becker*, 502 F.3d 122 (2d Cir. 2007) .............................................................. 30

*United States v. Bertolotti*, 529 F.2d 149 (2d Cir. 1975) .......................................................... 26

*United States v. Cardascia*, 951 F. 2d 474 (2d Cir. 1991) ....................................................... 40

*United States v. Carrier*, 672 F.2d 300 (2d Cir. 1982) ......................................................... 6, 21

*United States v. Cirami*, 510 F.2d 69 (2d Cir. 1975) ............................................................... 11

*United States v. Clay*, 159 F. Supp. 2d 1357 (M.D. Ala. 2001) .............................................. 47

*United States v. Cooper*, 384 F. Supp. 2d 958 (W.D. Va. 2005) ............................... 8, 9, 11, 18

*United States v. Cruikshank*, 92 U.S. 542 (1876) .................................................................... 20

*United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988) ......................................................... 25

*United States v. Edmond*, 924 F.2d 261(D.C. Cir. 1991) ........................................................ 10

*United States v. Esso*, 684 F.3d 347 (2d Cir. 2012) ........................................................... 17, 18

*United States v. Figueroa*, 618 F.2d 934 (2d Cir.1980) ........................................................... 29

*United States v. Forde*, 699 F. Supp. 2d 637 (S.D.N.Y. 2010) ................................................ 36

*United States v. Gallo*, 668 F. Supp. 736 (S.D.N.Y. 1987) ...................................................... 40

*United States v. Hernandez*, 85 F.3d 1023 (2d Cir. 1996) ......................................................... 7

*United States v. Hess*, 124 U.S. 483 (1888) ....................................................................... 20, 21

*United States v. Jass*, 569 F.3d 47 (2d Cir. 2009) .............................................................. 29, 33

*United States v. Lawson*, 2009 WL 62145 (E.D. Ky. Jan. 8, 2009) ..........................................9

*United States v. McDermott*, 245 F.3d 133 (2d. Cir. 2001)........................................... 30

*United States v. Mermelstein*, 487 F. Supp. 2d. 242 (E.D.N.Y. 2007)................................. 21

*United States v. Miller,* 26 F. Supp. 2d 415 (N.D.N.Y. 1998) ................................10, 19, 33

*United States v. Murphy*, 762 F.2d 1151 (1st Cir. 1985) ............................................... 23

*United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) ................................ 25, 41

*United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000) .................................................. 21

*United States v. Poindexter*, 725 F. Supp. 13 (D.C. 1989)........................................ 12

*United States v. Presgraves*, 658 F. Supp.2d 770 (W.D. Va. 2009) ........................................9

*United States v. Ramos*, 346 F. Supp. 2d 567 (S.D.N.Y. 2004) ........................................... 36

*United States v. Santiago*, 174 F. Supp. 2d 16 (S.D.N.Y. 2001).................................. 36, 38

*United States v. Sattar*, 314 F. Supp. 2d 279 (S.D.N.Y. 2004) ...............................................7

*United States v. Scarpa*, 913 F.2d 993 (2d Cir.1990)...............................................................7

*United States v. Serpoosh*, 919 F.2d 835 (2d Cir. 1990)............................................... 40

*United States v. Silverman*, 430 F.2d 106 (2d Cir. 1970) .......................................... 22

*United States v. Simmons*, 96 U.S. 360 (1877) ........................................................ 20

*United States v. Simon*, 664 F. Supp. 780 (S.D.N.Y. 1987)............................................. 16

*United States v. Stavroulakis,* 952 F.2d 686 (2d Cir. 1992)............................................. 22

*United States v. Stein*, 429 F. Supp. 2d 633 (S.D.N.Y. 2006) ...............................................7

*United States v. Tomasetta*, 429 F.2d 978 (1st Cir. 1970)......................................... 23

*United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) ................................................. 22

*United States v. Wilson,* 565 F. Supp. 1416 (S.D.N.Y 1983) ...................................10, 11, 13

*United States v. Zafiro*, 506 U.S. 534 (1993) .............................................................. 40

**Statutes**

18 U.S.C. § 1341 ............................................................................................... 4, 5

18 U.S.C. § 1343 ............................................................................................... 4, 5

18 U.S.C. § 1349 ...................................................................................................4

18 U.S.C. § 1861 ................................................................................................. 43

18 U.S.C. § 286.....................................................................................................4

18 U.S.C. § 371 .....................................................................................................4

18 U.S.C.§ 1347.............................................................................................. 4, 19

20 C.F.R. § 120.112(d) ............................................................................................ 13

**Other Authorities**

Bernabe-Riefkohl, Alberto, *Silence is Golden: The New Illinois Rules on Attorney Extrajudicial Speech*, 33 LOY. U. CHI. L.J. 323 (2002)........................................................................ 14

Brown, Lonnie, *"May It Please the Camera... I Mean the Court" – An Intrajudicial Solution to an Extrajudicial Problem*, 39 Georgia Law Review 83 (2004).......................................... 14

Robert J. Anello and Richard F. Albert, *Keeping the Indictment Out of the Jury Room*, 248 N.Y.L.J. 26 (August 7, 2012)................................................................................. 14

United States Attorney's Manual § 1-7.550......................................................................... 15

**Rules**

Rule 12, Fed. R. Crim. P. ................................................................................. 7, 17

Rule 14(a) Fed. R. Crim. Pro.................................................................................. 1, 25, 38

Rule 7(c)(1) Fed. Crim.P. .................................................................................. passim

Rule 7(d) Fed.Crim. P. .................................................................................. 6, 7, 17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA,          :
                                   :
            - v. -                 :          S1 11 Cr. 1091 (VM)
                                   :
PETER J. AJEMIAN, et al.,          :
                                   :
            Defendants             :
                                   :
------------------------------------x


## MEMORANDUM OF LAW AND APPENDIX IN SUPPORT OF PRETRIAL MOTIONS OF REGINA WALSH

### PRELIMINARY STATEMENT

This Memorandum of Law is respectfully submitted in support of the pretrial motions of the defendant Regina Walsh, as set forth in the Defendant Walsh's Notice of Omnibus Pretrial Motion. The defendant Walsh requests permission to join in the pretrial motions of the co-defendants as may be applicable, as indicated herein. Also submitted with this Memorandum of Law is the Declaration In Support Of Defense Pretrial Motions ("Bergman Dec.") dated September 14, 2012 which collects the Exhibits that pertain to the Walsh motions and some of the other defense motions.[1] The Appendix to this Memorandum consists of documents which relate to Point VI of this Memorandum, our Rule 14(a) Fed. R. Crim. Pro. severance argument.[2]

---

[1]   References in this Memorandum styled "Ex.__" refer to the exhibits to the Bergman Dec.

[2]   References to the Appendix will be "App.__".

## STATEMENT OF THE CASE

The Superseding Indictment ("SI-1") in this prosecution, Ex. A, is the outgrowth of a lengthy investigation by multiple districts principally of three physicians and former Long Island Railroad workers ("LIRR workers") who applied for and received occupational disability benefits from the Railroad Retirement Board ("RRB") premised upon claims that they were no longer able to perform their jobs at the LIRR.[3] Two of the physicians, Dr. Peter Ajemian and Dr. Peter J. Lesniewski, and a third physician who is now deceased, examined the LIRR workers and had medical tests done to evaluate their patients' physical condition. The physicians thereafter prepared narrative reports to the RRB which confirmed the LIRR workers' claims of occupational disability. A clerical office worker of Dr. Ajemian, Maria Rusin, was also indicted, as well as a former employee of the RRB, Marie Baran, who acted as a consultant for some of the LIRR workers in their submission of documents to the RRB. The defendant Joseph Rutigliano, also charged in the indictment, a former LIRR worker, is alleged to have also been a consultant for some of the defendants and others.

All told, twenty-one defendants have been indicted and, with one exception,[4] all are presently scheduled to stand trial on February 11, 2013. The government has

---

[3]    According to the government at the March 16 pretrial conference, the ongoing investigation in this matter is "basically covering something like fifteen hundred Long Island Railroad retirees . . ." Ex. C at T. 14.

[4]    The defendant Gary Satin plead guilty on August 14, 2012 to conspiracy and false declaration charges in a superseding indictment charging him alone as a defendant. Dkt# 200. Another LIRR worker, Donald Alevas, was arrested by the

2

predicted that the trial of the case, in a "worst case scenario" in which most of the defendants were to go to trial, would be from four to six weeks. *See* Ex. D at T. 16. A trial of "several" of the LIRR workers would be a "few weeks," and a trial of just the doctors "would still be relatively lengthy . . . probably three to four weeks," according to the government. *Id.*

The government has undertaken to provide the discovery in this case which, to date, consists of hundreds of thousands of documents that for the most part have been made available in image form on computer disks, although a quite substantial amount of the documentation has not been imaged and exists in hard copy only. In correspondence with defense counsel, the government has stated that it views its responsibility with respect to the turnover of Rule 16 material as limited to documents in its custody and control. It has advised the defense that RRB documents, while they may be in the custody of the "Government," are not thereby in the custody of the "Government's prosecution team." Ex. F, at 3, n.1. The government has not stated if it views its *Brady* obligations as limited in the same fashion.

The defense has made several informal requests for particulars, e.g., Exs. E, J, but the government has either not responded or has replied that because of the lengthy charging instruments in the case the defense is not entitled to particulars, and that the volume of discovery "eliminate[s] any prospect of unfair surprise." Ex. F, at 2.

───────────────

*footnote continued . . .*

government on July 6, *see* Ex. Q; Dkt. 2012 mj 1804, but he was not added as a defendant in the instant case. On September 12, the government announced the arrests of additional LIRR workers and the prior plea of one of them. Ex. X

3

### THE CHARGES

Count One of SI-1 is a conspiracy charge, 18 U.S.C. § 1349, against all defendants with three objectives: (1) to violate the mail fraud statute, 18 U.S.C. § 1341; (2) to violate the wire fraud statute, 18 U.S.C. § 1343; and (3) to violate the health care fraud statute, 18 U.S.C. § 1347. Ex. A, SI-1 at ¶27. SI-1 alleges that the conspiracy existed from 1998 until 2011. *Id.*

Count Two charges all the defendants with a second conspiracy, this one to defraud the RRB, also from 1998 to 2011. This count, which is laid under 18 U.S.C. § 371, recites the commission by the defendants of 46 overt acts, the first one on November 6, 1998 and the last on March 15, 2011. Ex. A at ¶32. Regina Walsh is alleged to have committed two overt acts, one when she submitted her application for RRB disability benefits on January 25, 2007, and on March 3, 2011 when she is alleged to have mailed a Disability Recertification, which the government solicited, to the RRB. *See* Overt Acts e and l, Ex. A at ¶33

Count Three charges all of the defendants with violating 18 U.S.C. §§ 286, and 2, again from 1998 to 2011, having allegedly made and presented false claims to the RRB. Count Three does not identify any specific claim which is alleged to be "false, fictitious" or "fraudulent." Ex. A at ¶35.

Count Four charges all of the defendants with violating 18 U.S.C. §§ 1347 and 2, again from 1998 to 2011, with health care fraud, alleging that they entered into a scheme to defraud health care benefit programs by submitting bills to private insurance carriers for "unnecessary medical treatments, services, and tests." Count Three does

4

not identify the specific medical treatments, services or tests which are the subject of the Count. Ex. A, at ¶37.

Counts Five through Eighteen contain individual mail fraud and aiding and abetting charges, 18 U.S.C. § 1341 and 2, relating to mailings of Disability Recertifications by individual LIRR defendants, said to be aided and abetted by other named defendants. Each count is set out in columnar form listing the "Charged Defendants," the "Mailing Defendant" (who is also among the "Charged Defendants"), and the approximate date of the mailing of the Disability Recertifications (submitted on form G-254A) to RRB in Manhattan. Ex. A at ¶39. These forms were mailed in March, 2011 in the midst of the grand jury's investigation which culminated in the charges. Ex. A at ¶39. As earlier noted, Ms. Walsh was among those solicited to mail back the recertification form

Count Nineteen charges all defendants with wire fraud and aiding and abetting, 18 U.S.C. §§ 1343 and 2, again from 1998 to 2011. It alleges that they entered into a scheme to defraud the RRB and caused the RRB to wire disability payments to the LIRR workers. This count is similar in structure to Count Three and Count Four in that it does not set forth which particular wire transfers are claimed to have been fraudulently induced. Ex. A ¶41. The remainder of SI-1 consists of the forfeiture allegations against the defendants arising from the allegations in Counts One, Four, and Five through Eighteen. Ex. A at ¶¶42-47.

## ARGUMENT

## POINT I

### THE PROLIX "SPEAKING" SUPERSEDING INDICTMENT SHOULD BE DISMISSED BECAUSE IT IS NOT THE PLAIN, CONCISE AND DEFINITE STATEMENT OF THE ESSENTIAL FACTS OF THE OFFENSE EXPRESSLY REQUIRED BY RULE 7, FED. R. CRIM. P.

The sprawling Superseding Indictment ("SI-1") in this prosecution violates Rule 7's command that an indictment "must be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). As stated by the Court in *United States v. Carrier,* 672 F.2d 300, 303 (2d Cir. 1982), "[t]his rule is designed to eliminate prolix indictments and to secure simplicity in procedure." (Internal quotes and citation omitted).

(1)

Manifestly, this is not an indictment that contains mere isolated instances of "surplusage;" these are typically treated as permissible so long as they might describe "relevant" evidence. *See, e.g., United States v. Hernandez,* 85 F.3d 1023, 1030 (2d Cir. 1996)(allegation of cocaine distribution in two of the overt acts of a heroin conspiracy); *United States v. Scarpa,* 913 F.2d 993, 1013 (2d Cir.1990) (reference in the indictment to the Columbo organized crime family under which the defendant Scarpa's crew operated). While decisions in the Southern District have from time to time afforded the government some amount of leeway in crafting an indictment, *see e.g., United States v. Stein,* 429 F. Supp. 2d 633, 646 (S.D.N.Y. 2006), most of these cases deal with individual instances of surplusage on motions to strike pursuant to Rule 7(d), not with an indictment so expansive that it shatters the requirement of Rule 7(c)(1) and should

6

therefore be dismissed in its entirety. Nor is this a case in which this Court should, as the Court did for example in *United States v. Sattar*, 314 F. Supp. 2d 279, 320 (S.D.N.Y. 2004), defer to "the policy of courts within the Southern District to refrain from tampering with indictments" (citation omitted), and allow the surplusage in the form of a lengthy introduction to the conspiracy count thereafter incorporated in subsequent counts of SI-1[5]

Courts have specifically enforced the command of Rule 7(c)(1) that allegations be "essential," not simply relevant. Given the plain text of the Rule, the law could hardly be otherwise. Moreover, a speaking indictment: (1)flouts the policy against public commentary by prosecuting officials; and (2) subverts the principle, and the court's standard jury instruction, that an indictment should play no part in the jury's deliberation on the factual issues of the case.

SI-1 is so thoroughly riddled with non-essential allegations of the government's purported underlying evidence and so irreparable that only the remedy of dismissal, provided in Rule 12, Fed. R. Crim. P., vindicates the mandate in Rule 7(c)(1). In the alternative, the Court should, in the exercise of its discretion, strike the surplusage pursuant to Rule 7(d).

---

[5] The largely superfluous allegations in the introductory paragraphs in Count One are incorporated by reference in Count Two (Conspiracy to Defraud the RRB), Count Three (False Claims), Count Four (Health Care Fraud), and Counts Five through Eighteen (Mail Fraud). *See* Ex. A. at ¶¶31, 34, 36, *and* 38.

(2)

In *United States v. Cooper*, 384 F. Supp. 2d 958, 960 (W.D. Va. 2005), an indictment charged the defendant with serious environmental law violations and, in a preamble, devoted considerable effort to describing the defendant's past dealings with environmental and health agencies. That preamble was the focus of the defense claim that these allegations were not "essential" and should be stricken. The government argued that because the material was "largely relevant" it could *not* be stricken. *Id.* at 959. The District Court disagreed:

> Rule 7(c) . . . contemplates an indictment that merely pleads each of the factual elements of the offense charged. It does not contemplate the inclusion of every piece of evidence that ultimately may be relevant to building a case against the defendant. If it did, a criminal indictment would be free to grow from a "plain and concise" statement of "essential" facts to an unreadable monstrosity discussing every piece of evidence that would be conceivably relevant at trial. Indeed, the Government would be free to use an indictment to thoroughly present its case to the jury before the trial even began, at a time when the defendant would not be entitled to defend himself. Although the cases defining surplusage sometimes inquire as to whether the material is "relevant to the charges,"... this language should not be read as permitting any material that would be legally relevant at trial. Because so much material can qualify as legally relevant, such a reading would contravene the explicit language of Rule 7(c).

The extensive recitations of the government's evidence and arguments, as they are found in SI-1, have no place in an indictment that complies with the Rule. *See also United States v. Presgraves*, 658 F. Supp.2d 770, 783 (W.D. Va. 2009) (adopting *Cooper*); *United States v. Aisenberg*, 247 F. Supp. 2d 1272, 1279 (M.D. Fla. 2003) ("An indictment is not an opportunity for the United States to marshal all available details of the

inculpatory evidence, to advance arguments (especially tendentious or highly provocative arguments) and promote inferences in support of conviction")); *United States v. Lawson*, 2009 WL 62145, at *2 (E.D. Ky. Jan. 8, 2009) ("Despite the all too common use of 'speaking' indictments, the function of a federal indictment is to state concisely the essential facts constituting the offense, not how the government plans to go about proving them." (quoting *United States v. Edmond*, 924 F.2d 261, 269 (D.C. Cir. 1991))); *Cf. United States v. Miller*, 26 F. Supp. 2d 415 (N.D.N.Y. 1998) (collecting cases in support of its conclusion that, where an indictment charged defendants with smuggling cigarettes on an Indian Reservation, background paragraphs alleging confrontations between law enforcement and a paramilitary group on the reservation were impermissible surplusage).

These holdings are also in accord with prior authority in this Court. The defendant in *United States v. Wilson*, 565 F. Supp. 1416, 1439-40 (S.D.N.Y 1983) (Weinfeld, *J.*) was a prisoner held in New York who was charged with orchestrating a conspiracy to murder witnesses and government attorneys who were involved in three separate criminal cases against him in Texas, Virginia and the District of Columbia. *Id.* at 1420. Those three underlying criminal cases involved serious allegations of terrorism, including assassination and smuggling of high explosives. *Id.* at 1439. The indictment in the Southern District set forth many of the details of these underlying crimes. The Court struck most of this detail :

> [W]hether the defendant sought and conspired to export "20 tons of C-4 plastic explosives" is surplusage and unnecessary as far as this case is concerned. What is important is that Wilson was under indictment under a federal charge, and whether the

9

> purpose was to export 1 ton or 20 tons is not a matter of
> consequence. So, too, that the conspiracy charged in another
> district included the murder 'of a member of the Libyan
> Revolutionary Council who had defected to Egypt' has, in view
> of the nature of the charges in this case, the potentiality of an
> overshadowing prejudice at the very start of this trial. The same
> applies to paragraph 2, which alleges Wilson was incarcerated at
> the [Metropolitan Correction Center] in lieu of $20 million dollars
> bail and after December 20, 1982 was serving a fifteen-year
> sentence.  Neither the amount of the bail nor the period of
> sentence is of significant importance. What is significant is that
> the defendant was confined at the MCC in lieu of failure to post
> bail previously fixed and was serving a sentence under a judgment
> of conviction.

*Id.* at 1439-40.  Crucially, as in *Cooper*, the court in *Wilson* reasoned that reading such

details to the jury before the case even began exposed the defendant to substantial

prejudice.  *Id.* at 1439.

The "essential" standard required by Rule 7(c)(1) is *not* equivalent to what is

"relevant" in an evidentiary sense.  This distinction becomes sharply drawn where a

defendant challenges the verdict or moves to dismiss because the government failed to

prove a non-essential allegation in the indictment. In those instances the Court of

Appeals has found that the allegations were "surplusage." *See e.g., United States v.

Autorino*, 381 F.3d 48, 54 (2d. Cir. 2004) ("The government need not prove allegations

of an indictment that are surplusage to the essential elements of the offense[s]

charged." (Citation and internal quotation marks omitted)); *United States v. Cirami*, 510

F.2d 69, 73 (2d Cir. 1975)("The disregarded portions of the indictment in this case

were plainly surplusage. The manner of an attempted evasion of income taxes has been

deemed not essential to a valid indictment."). In such circumstances, the government

has argued, and the courts have accepted, that charging language that once seemed

hard-hitting, but now threatens its case, is actually mere surplusage and was in fact

surplusage all along.   Plainly, what is surplusage for purposes of requiring the

government to prove the allegation, is also surplusage for purposes of determining

whether the allegation is essential, unless the government is to have its cake and eat it

too.  Nothing in Rule 7(c)(1) suggests otherwise.

(3)

SI-1 is the antithesis of a plain and concise statement of the essential facts. It is

riddled with allegations that are not "essential."[6] For example, and not by way of

limitation:

> ¶1.    SI-1 recites that Dr. Peter Ajemian, an "employee," was
> "terminat[ed]" from his practice by his employer.  This is not an
> essential part of the charged crime and is arguably not even
> admissible. The implication in SI-1 is that, if he was terminated
> from his practice, Dr. Ajemian's employers must have concluded
> that he was guilty of something. *Cf. United States v. Poindexter*, 725
> F. Supp. 13, 36 (D.C. 1989) (allegation that defendant Oliver
> North was discharged and that Admiral John Poindexter resigned
> as a result of the Iran-Contra affair was irrelevant and prejudicial,
> insofar as it might objectively suggest fault and indicated that the
> Reagan Administration considered the defendants guilty).

> ¶2.    SI-1 states that the defendant Marie Rusin also retired on
> unspecified "disability benefits." This is another lazy innuendo:
> Ms. Rusin is not charged with falsely claiming occupational
> disability and could not have claimed occupational disability with
> the RRB. The unstated implication is that, whatever that
> program was, she must have bilked it.

> ¶7.    SI-1 initially uses the term "occupational disability" but
> then repeatedly employs the term "disabled."  This is a
> misleading approach to a key point of law.  "Occupational
> disability" is the classification at issue in this case.  It is a term of

---

6    Ex. A is a copy of SI-1 which is highlighted to show those parts  most
egregiously non-essential to the charges.

art requiring a showing that the LIRR employee could no longer perform his or her LIRR function, not that the employee was a shut-in. By repeatedly employing the word "disabled" and "disability" SI-1 endeavors to confuse the jury into thinking that these defendants must conform to that stereotype or they must have lied.

¶7.    Having initially ascribed the pejorative phrase "Disability Doctor-3" to a physician who died before the arrests were made last year, *see* ¶3, SI-1 then commences to employ that tendentious description in this paragraph to refer to Drs. Ajemian and Lesniewski, as "these disability doctors," and thereafter throughout SI-1. *See* ¶¶ 7(x2), 8a (x2), 8b, 8d, 25 (x3), 33a, 33dd. The phrase is pure argument and has no place in an indictment.

¶7.    SI-1 states a total foreseeable loss figure over $1 billion, an eye-popping figure.  Yet this allegation intimates that there is proof that virtually every claim brought by LIRR retirees, regardless of their doctor, was fraudulent.  The government is not bound to prove that case, however, like the "20 tons of C-4" allegation in *Wilson*, the government simply uses a big, round number to attract publicity.

¶¶8(a) through (e), (g):  These six paragraphs in SI-1 are introduced by this sentence: "Participants in the fraud typically took some or all of the following steps, among others."  They are not "essential" to anything other than to summarize the alleged evidence and conclusions which will serve as a verbal chart for government's opening and closing arguments to the jury.

¶8(f)    This paragraph characterizes certain defendants as the "so-called facilitators" (the term "facilitator" makes its first appearance in ¶¶ 4-5 in describing the defendants Baran and Rutigliano). They are "so-called" only by the government, for argumentative purposes.

¶10    The second full sentence in this paragraph, which starts with "For example," by its own terms (this sentence alleges that Drs. Ajemian and Lesniewski had ill-gotten revenue of "at least hundreds of thousands of dollars") is inserted for sensational publicity purposes, is evidentiary and not "essential" to the charge. The next sentence, that the revenue "provided financial motivation" is just argument, nothing more.

12

¶13    Beginning with "For example" in the third sentence, the language is by its own terms (here SI-1 explains how the disability award might work in a hypothetical instance) evidentiary and is not "essential" to the charge.

¶17    SI-1 cites 20 C.F.R. § 120.112(d) before opining that "the regulatory system is vulnerable to abuse by employees and treating physicians who falsify and exaggerate symptoms, as the RRB is required to give their statements extra weight." The government's citation of the Code of Federal Regulations is highly problematic as it is, given that there is no allegation that any of the defendants violated 20 C.F.R. § 120.112(d), nor could there be as it is not a criminal provision. But the editorial commentary compounds that irrelevant citation with an argument about how the Occupational Disability systems function.

¶¶20 and 21 contain entirely evidentiary allegations, boiling down to the assertion that the RRB extensively relied on the representations in the AA-1d application form – "RRB claims examiners reviewing applications for disability generally . . ." assumed and relied, etc. They are argumentative: they maintain the government's narrative theme of SI-1 that the defendants criminally tricked the RRB.

¶¶22-26   These five paragraphs, which are embraced within the subheading "The Pattern Of Disability Claims At The Long Island Railroad," provide an overview of the government's intended statistical showing and consists entirely of the conclusions that the government asserts will be supported by the statistical evidence it intends to present. It has no place in SI-1, nor for that matter  is it sufficiently relevant for the evidence to come in the first place. The defense addresses these paragraphs separately in three separate pretrial motions. [7] Suffice it to say that these assertions have no place in an indictment which should be restricted to "essential" components of the offenses charged.

---

[7]    Motions addressed to the statistical allegations have been made by counsel for defendants Ajemian and Gagliano, and counsel for Dr. Lesniewski, who has sought discovery with respect to the statistical allegations. Defendant Walsh joins in those motions.

(4)

The concerns underlying Rule 7(c)(1) are not merely academic. The court should rigorously police the government's resort to prolix speaking indictments for sound policy reasons. Here, for instance, SI-1 represents the continuation of a disturbing trend by which the government, particularly in high profile cases, seeks to evade the rules prohibiting public commentary on matters before the court by generating a sprawling speaking indictment. *See generally* Brown, Lonnie, *"May It Please the Camera... I Mean the Court" – An Intrajudicial Solution to an Extrajudicial Problem*, 39 Georgia Law Review 83, 109 n. 118 (2004); Bernabe-Riefkohl, Alberto, *Silence is Golden: The New Illinois Rules on Attorney Extrajudicial Speech*, 33 LOY. U. CHI. L.J. 323, 373 (2002); Robert J. Anello and Richard F. Albert, *Keeping the Indictment Out of the Jury Room*, 248 N.Y.L.J. 26 (August 7, 2012) ("[I]ssuing a detailed, apparently persuasive speaking indictment at the outset of the case may have significant public relations and tactical benefits... One that has been the subject of some commentary is to release information into the public arena that the government otherwise likely could not pursuant to Department of Justice no-comment rules or other ethical constraints"). By repeatedly ladling one extraneous accusation upon another, the government thus establishes a wide-ranging public record upon which it props its comments. *See Id.*; *United States v. Simon*, 664 F. Supp. 780, 796 (S.D.N.Y. 1987) (ordering both defendants and the government to refrain from making any extrajudicial statements going beyond the indictment or the public record).

14

The unsealing of this speaking indictment was accompanied with press releases, press conferences and general media fanfare. *See generally*, Exs. O through R. Multiple press releases rehashed the most sensational aspects of the first and superseding indictments, and were leavened with cheap shots, for example, that the "LIRR is a commuter railroad, not a gravy train." *See* Press Release, "United States Attorney's Office, Southern District of New York, Manhattan U.S. Attorney Announces Charges Against Ten Additional Long Island Railroad Retirees for Participating in Massive Disability Fraud Scheme" (Ex. P, May 22, 2012 press release). The initial press release contained "statements concerning evidence or argument in the case" which would otherwise be contrary to the DOJ's own guidelines. *Compare* United States Attorney's Manual § 1-7.550 ("Because the release of certain types of information could tend to prejudice an adjudicative proceeding, Department personnel should refrain from making available the following... Statements concerning evidence or argument in the case") with Press Release, United States Attorney's Office, Southern District of New York, Manhattan U.S. Attorney Announces Pension Disability Fraud Charges Against Eleven Defendants Associated With The Long Island Railroad That Could Cost $1 Billion (Oct. 27, 2011) ("In a September 2008 interview with BARAN[8] that was conducted by a law enforcement agent, she said, 'you are never going to figure it [this scheme] out honey.'") *See* Ex. O.

Worse than eliding its own Manual, the "speaking indictment" disregards, even disdains, the Local Rules of this Court which are designed to forestall the type of

---

[8]   This refers to the defendant Marie Baran.

15

pretrial prejudice typically associated extrajudicial comments. For example, under this

Court's Local Criminal Rule 23.1(d) ("Free Press - Fair Trial Directives") provision is

made that "The existence or contents of any confession or statement given by the

accused . . ." is considered to "presumptively involve a substantial likelihood that their

public dissemination will interfere with a fair trial or otherwise prejudice the due

administration of justice within the meaning of this rule." In the case of quoting Ms.

Baran, which was wrong to begin with, the government's press release compounded

the prejudice by inserting in the press release the impudent bracketed interpretative

"[this scheme]," words that Ms. Baran is not even alleged to have used.

(5)

The Second Circuit has recently recognized the concerns raised by jurors being

exposed to "speaking indictments" like the one at issue here. In *United States v. Esso,*

684 F.3d 347, 353 (2d Cir. 2012) (Lynch, J.), while strongly advising against the

practice, the court held that it was not a constitutional violation to allow a jury that

requested it to take to an indictment home, where the jury was carefully advised that it

was not evidence. [9]  *Id.* at *3-4. In the course of discussing this issue, the Court

advised that indeed the better practice is not to send an indictment into the jury room

at all, "particularly when the indictment does not merely state the statutory charges

against the defendant, but additionally contains a running narrative of the

government's version of the facts of the case, including detailed allegations of facts not

---

[9]     We note that no challenge to the *Esso* indictment had been made under Rule
7(c)(1), so the "plain," "concise" and "essential" issue, which is the subject of this
motion, was not addressed by the Court in *Esso.*

16

necessary for the jury to find in order to address the elements of the charged offenses,"
*Id.* at *4. Here, the government's media barrage which highlighted extraneous and
prejudicial aspects of the indictment undermines *Esso's* caution that the better practice
is for a speaking indictment like this to be kept from the jury – by the time they are
seated for trial, potential jurors will already have been exposed to it. The sole remedy
to prevent further prejudice from the government's violation of Rule 7(c)(1) is for the
Court to dismiss the indictment.

In summary, the Court should dismiss this "monstrosity" of an indictment – to
use the term from *Cooper* – and require the government to comply with Rule 7(c)(1).
Only further error would be courted by exposing this Superseding Indictment to the
jury. Rule 7(c)(1) provides one means by which the courts may police such tactics;
accordingly, this Court should therefore dismiss SI-1 under Rule 12 or, alternatively,
the Court should strike as surplusage, pursuant to Rule 7(d), the highlighted portions
of Ex. A.

## POINT II

### COUNTS THREE, FOUR AND NINETEEN ARE CONSTITUTIONALLY DEFICIENT AND SHOULD BE DISMISSED AS VIOLATIVE OF RULE 7(c), FED R. CRIM. P. BECAUSE THEY FAIL TO IDENTIFY ANY SPECIFIC DOCUMENT, TEST, SUBMISSION OR WIRE WHICH, OVER THE SPAN OF THE THIRTEEN YEARS COVERED BY THESE COUNTS, IS ALLEGED TO BE CRIMINAL

Counts Three, Four and Nineteen of the indictment are constitutionally
defective. In contrast to the over-expansiveness of the evidentiary, conclusory and
argumentative allegations which riddle the opening paragraphs of SI-1, here the
government seems to have suffered a case of writer's block. Moreover, SI-1's ritualistic

"incorporation" of paragraphs 1 through 26 in each of these counts, i.e., ¶¶ 34, 36 and 40, does not even provide the specificity that the law requires.

We deal here principally, although not exclusively, with what the Supreme Court termed in *United States v. Miller*, 471 U.S. 130, 135 (1985), as the " 'notice' related concerns" which "of course are among the important concerns underlying the requirement that criminal charges be set out in an indictment . . . ."

Fundamentally, the charges in Counts Three, Four and Nineteen, are also deficient because, by not describing the essential facts and circumstances of the charges alleged, they deprive the defense of a basic protection of the grand jury's intervention to ensure that the indictment returned was based on facts found by, and presented to, the grand jury that returned SI-1.

In *United States v. Cruikshank*, 92 U.S. 542, 588 (1876), the Court set out the twin purposes of the Sixth Amendment's constitutional protection:

> The object of the indictment is to furnish the accused with such a description of the charge against him as will enable him to make his defense, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and second, to inform the court of the facts sufficient in law to support a conviction if one should be had. <u>For this, facts are to be stated, not conclusions of law alone. A crime is made up of acts and intent; and these must be set forth in the indictment with reasonable particularity of time, place, and circumstances.</u> (emphasis added).

*See also United States v. Simmons*, 96 U.S. 360, 362 (1877) (an indictment not framed to apprise the defendant "with reasonable certainty, of the nature of the accusation against him . . . is defective, although it may follow the language of the statute.") As the Supreme Court stated in *United States v. Hess*, 124 U.S. 483, 487 (1888):

18

> Undoubtedly, the language of the statute may be used in the general description of an offense, <u>but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged</u>. (emphasis added)

The Supreme Court jurisprudence in this area has been consistent from

*Cruikshank* to the present. *See e.g., Russell v. United States,* 369 U.S. 749, 765-66 (1962)

(the indictment itself must "descend to particulars"), a decision which succinctly

collected the Court's jurisprudence in this area until then. *See also Hamling v. United*

*States,* 418 U.S. 87, 117-118 (1974), quoting *Hess,* above. *Russell* also stands for the

proposition that a bill of particulars cannot cure an indictment that omits an essential

element of the offense. *Russell,* 369 U.S. at 769. (". . . it is a settled rule that a bill of

particulars cannot save an invalid indictment.") ;[10] see also *United States v. Carrier,* 672

F.2d 300, 303 (2d Cir. 1982) ("A bill of particulars may not save an invalid indictment,

it may provide the defendant with the evidentiary details needed to establish his

defense."); *United States v. Pirro,* 212 F.3d 86, 95 n.10 (2d Cir. 2000)( "the government

had notice of Pirro's objection to the challenged portion of the indictment, and could

have, but did not, file a superseding indictment.") .[11]

---

[10]  In *Russell,* the Supreme Court struck down the indictment as fatally defective because it failed to specify the question under inquiry in a prosecution of a witness for refusing to answer questions pertinent to a congressional committee's inquiry. *Id.* at 771.

[11]  We note that the Court in *United States v. Mermelstein,* 487 F. Supp. 2d. 242, 249 (E.D.N.Y. 2007) sustained an indictment which contained a similarly phrased health care fraud charge under 18 U.S.C. §1347, as here alleged in Count Four, but there the government, in addition to providing extensive discovery, <u>also</u> provided a "detailed bill of particulars," as the Court noted. As set out in the defendant Ajemian's Motion for a Bill of Particulars, filed contemporaneously with this motion, the

Apart from the Constitutional mandate, Fed. R. Crim. P. 7(c)(1) requirements are imposed to serve three objectives: to (i) satisfy the Sixth Amendment's right "to be informed of the nature and cause of the accusation;" (ii) protect the Fifth Amendment's proscription against being subject to double jeopardy; and (iii) uphold the Fifth Amendment's "protection against prosecution for crimes based on evidence not presented to the grand jury." *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999), citing *United States v. Silverman*, 430 F.2d 106, 110 (2d Cir. 1970), *modified*, 439 F.2d 1198 (2d Cir. 1970).

The Second Circuit has emphasized the well-established requirement that indictments contain adequate specificity. "An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir. 1992), quoted in *Walsh*, 194 F.3d at 44. The Second Circuit also has reaffirmed that the Fifth Amendment's Indictment Clause "requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *Id.* quoting *United States v. Abrams*, 539 F. Supp. 378, 384 (S.D.N.Y. 1982).

---

*footnote continued . . .*

government has refused to provide any particularization with respect to the charges in Counts Three, Four and Nineteen. In Point Three of this Memorandum, *infra,* at 21, the defendant Walsh briefly elaborates on the Ajemian motion, in which we join, as well as the motion for a bill of particulars filed on behalf of the defendant Rutigliano. *See* Dkt #s 208 and 209.

"A vital function of an indictment is to provide 'such description of the particular act alleged to have been committed by the accused as will enable him properly to defend against the accusation....' " *United States v. Murphy*, 762 F.2d 1151, 1154 (1st Cir. 1985), quoting *United States v. Tomasetta*, 429 F.2d 978, 979 (1st Cir. 1970). The Sixth Amendment right guaranteeing the accused the right to be informed of the nature and cause of the accusation "is basic to the proper functioning of our adversary system of justice." *Id.* "Without sufficient information to identify that conduct which the grand jury has deemed adequate to support an indictment, an accused is at a material disadvantage in meeting the charge against him (footnote omitted)." *Id.* It is mystifying that the government, which has recognized the need to identify specific documents in Counts Five through Eighteen, the mail fraud counts, has not followed the same constitutional required process in setting out the charges in Counts Three, Four and Nineteen.

## POINT III

### THE GOVERNMENT SHOULD BE DIRECTED TO PROVIDE THE DEFENDANT WALSH WITH A BILL OF PARTICULARS

We fully join in the application for particulars submitted on behalf of the defendants Ajemian and Rutigliano and elaborate only in the following respects:

- With respect to Count Three, the False Claims charges, the government should particularize the statements of the defendants to the RRB which it will assert at trial were false and fraudulent and state whether the defendant Walsh is alleged to be an aider and abettor or principal.

21

- With respect to Count Four, the Health Care Fraud charges, the government should particularize which of the thousands of bills to private insurance carriers that it will claim at trial were for "unnecessary medical treatments, services, and tests," and state if defendant Walsh is alleged to have been a principal or aider and abettor.

- With respect to Count Nineteen, the Wire Fraud charges, the government should identify the alleged "writings, signs, signals" etc. of the defendants upon which it will rely at trial to establish the defendants' liability, either as principal or as aider and abettor, specifying which it will claim defendant Walsh to be.

The generalized, and as we have urged, Point Two, *supra*, the legally insufficient statement of the charges in Counts Three, Four and Nineteen stand in sharp contrast to the substantive mail fraud charges in Counts Five through Eighteen. In each of Counts Five through Eighteen SI-1 sets forth in a separate column the "Charged Defendants." One of those defendants is identified as the "Mailing Defendant."[12] The government should be required to provide in a bill of particulars as to Counts Three, Four and Nineteen, what it has provided, as it must, in SI-1 for the mail fraud charges.

---

[12] This is an example of how one of the mail fraud counts is charged:

| COUNT | Charged Defendants | Mailing Defendant | Approx. Date of G-254A mailing |
|-------|-------------------|-------------------|-------------------------------|
| FIVE | GREGORY NOONE<br>PETER J. AJEMIAN<br>MARIA RUSIN<br>MARIE BARAN | GREGORY NOONE | March 12, 2011 |

A voluminous document production is simply not a substitute for that required

delineation. *See e.g., United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000)

(voluminous document production is a reason to require particulars, rather than a

reason to deny them);[13] see also *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir.

1988) (fact that government produced 6,000 pages of discovery did not obviate need

for bill of particulars in complex prosecution).

## POINT IV

### THE SUPERSEDING INDICTMENT SHOULD BE DISMISSED BECAUSE OF THE GOVERNMENT'S VIOLATION OF THE DEFENDANT'S FIFTH AMENDMENT RIGHT OF DUE PROCESS

The defendant Walsh joins in, and incorporates by reference as if fully set forth

herein the defendant Lesniewski's arguments with respect to the government's amnesty

plan, the misuse of the grand jury and the government's interference with the

defendants' ability to defend the charges in S-1.

## POINT V

### THE ALLEGATIONS OF STATISITICAL CONCLUSIONS IN THE SUPERSEDING INDICTMENT SHOULD BE STRICKEN

The defendant Walsh hereby joins in, and incorporates by reference as if fully

set forth herein the defendants Ajemian's and Gagliano's arguments in support of the

motion to strike the statistical allegations in the Superseding Indictment. We reserve

---

[13]  Relying on *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987), the Court in *Nachamie* directed the government to specify, *inter alia,* each false and misleading claim allegedly submitted and/or filed as part of the conspiracy, as well as each item, statement, or entry on each document alleged to be false or fraudulent. *Nachamie.* 91 F. Supp. 2d at 574-75.

the right, following the government's production of discovery with respect to the statistical allegations, to seek *in limine* relief with respect to any evidence that the government might seek to introduce at trial in support of the allegations in the statistical paragraphs, and to make any appropriate evidentiary objections at the time that the government seeks to introduce such evidence, including as appropriate, objections under Rules 403 and 404(b), Fed R. Evid.

## POINT VI

### IN THE INTERESTS OF JUSTICE THE COURT SHOULD DIRECT A SEVERANCE PURSUANT TO RULE 14(a), FED. R. CRIM. P., OF THE DEFENDANTS WALSH, NOONE, GAGLIANO, EHRLINGER, PULSONETTI, DASARO AND SUPPER[14]

At the outset of this Rule 14(a) severance motion for severance we want to state clearly that we believe that Ms. Walsh should be tried alone, and not with any of the other defendants. S-1 is an "incubus," as Judge Friendly observed in his concurring opinion of the indictment at issue in *United States v. Bertolotti*, 529 F.2d 149, 160 (2d Cir. 1975). Relief at this stage, however, is not ordinarily afforded a defendant, *see e.g., United States v. Ashley*, 905 F. Supp. 1146, 1164 (E.D.N.Y. 1995) ("[T]he propriety of joinder [under Rule 8b] is to be determined solely by examining the allegations in the Indictment."), and we recognize the statistical practicalities that the Court has alluded to. Our suggested severance, therefore, is one in which the severe prejudice to Mrs. Walsh that a multi-defendant trial will inevitably spawn, might possibly be brought into proportions that might not deprive her of a fair trial.

---

[14] These other defendants have each joined in this application.

24

A.      The *Bruton* and *Crawford* Decisions Compel  Severance

The Supreme Court's decision in *Zafiro v. United States,* 506 U.S. 534 (1993)

identifies the most compelling reason for a Rule 14(a) severance in this case for seven

of the defendants: Ms. Walsh, and Messrs. Noone, Gagliano, Ehrlinger, Pulsonetti,

Dasaro and Supper.  They are a singular group of defendants who, if tried together,

would be free of the constitutional impediments that would otherwise attach to their

trial should they be lumped together with other defendants who have given testimonial

statements to the government.  This grouping is manifestly necessary, given the

government's likely introduction of *Bruton/Crawford* statements, which would violate

the rights of a defendant under the Confrontation Clause of the Sixth Amendment.  *See*

*Bruton v. United States*, 391 U.S. 123, 137 (1968); *Crawford v. Washington*, 541 U.S. 36, 68-

69 (2004); *Davis v. Washington*, 547 U.S. 813, 824 (2006).  In *Zafiro*, the Supreme Court

expressly cited *Bruton* when explaining those situations that create "a serious risk that a

joint trial would compromise a specific trial right of one of the defendants, or prevent

the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S.

534, 539.  Severance under Rule 14(a) severance is entirely justified.

1.      Neither Limiting Instructions Nor Redactions Will Cure
        The *Bruton/Crawford* Issue

Pursuant to *Crawford* and *Davis*, the testimonial statements of a witness who is

unavailable to testify cannot be introduced in evidence to prove the truth of the matter

asserted without violating the Confrontation Clause of the Sixth Amendment.  *See e.g.,*

*Bierenbaum v. Graham*, 607 F. 3d 36, 49 (2d Cir. 2010)

This creates a particularized risk of harm in a multi-defendant trial in which individual defendants have made statements. Testimonial statements of a "declarant-defendant" can only be admitted against that same defendant, and cannot be admitted against a "non-declarant defendant."[15] This rule requires the courts to fashion limiting instructions to eliminate *Crawford* error.[16] Yet, as the Second Circuit has noted, a barrage of instructions can create its own set of problems: "[w]hile the utility of limiting instructions 'is not to be invariably rejected, neither should it be invariably accepted.'" *Gallo*, 668 F. Supp. at 753-53 (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir.1980)).

*Bruton* carves out a specific situation in which a limiting instruction is insufficient to protect the non-declarant defendant: when the government introduces statements by a declarant-defendant that directly and obviously incriminate the non-declarants, the jury is presumed *incapable* of following the limiting instruction. *See Cruz v. New York*, 481 U.S. 186, 190 (1987) (citing *Bruton*, 391 U.S. at 135-36). In that

---

[15] We employ the terminology commonly used in the Second Circuit, in which a defendant who has given a testimonial statement is often referred to as a "declarant-defendant" and the defendants who did not make that statement are referred to as "non-declarant defendants" or "non-declarant co-defendants." *See e.g., United States v. Kahale*, 789 F. Supp. 2d 359, 389 (E.D.N.Y. 2009)

[16] The law is clear that, whenever a declarant-defendant has made statements, those statements cannot be admitted without a limiting instruction. This rule applies regardless of whether the statement has the obviously incriminating character of a *Bruton* statement. *See e.g., Defreitas*, 701 F. Supp. 2d at 315-16 (declining to sever on *Bruton* grounds, but crafting extensive limiting instructions to eliminate any remaining *Bruton* or *Crawford* error); *United States v. Hardwick*, 523 F.3d 94, 98-99 (2d Cir. 2008) (admission of *Crawford* statement with inadequate limiting instruction constituted reversible plain error).

situation, if the government wishes to make use of the statement, then the non-declarants must be severed from the declarant-defendant. *United States v. Jass*, 569 F.3d 47, 56 n. 5 (2d Cir. 2009).

The government has previously stated that redaction and alteration will solve any *Bruton/Crawford* issues in this case without the need for severance. Gov't Memo in Oppo. at 4-5 (Dkt# 170); *see also Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *Gray v. Maryland*, 523 U.S. 185, 195-97 (1998). But redaction and alteration cannot bring this case into full conformity with *Bruton* and *Crawford* without severance. This is so for two reasons. First, the incriminating character of the *Bruton* statements is not amenable to name redaction, because the statements refer generally to LIRR workers and incriminate all such workers. Second, even assuming the government can redact the statements in some Procrustean fashion, the sheer number of required limiting instructions will be too unwieldy, forcing the jury to engage in the type of "mental acrobatics" that are unsustainable absent severance – especially in conjunction with the inevitable variance in proof on the conspiracy charge. *See e.g., United States v. Becker*, 502 F.3d 122, 130-31 (2d Cir. 2007); *United States v. McDermott*, 245 F.3d 133, 139-40 (2d. Cir. 2001); *Gallo*, 668 F. Supp. at 754.

> ## 2. The Potential *Bruton/Crawford* Statements at a Joint Trial of All the Defendants Would Take *Zafiro* to the Breaking Point

The government's investigation in this matter resulted in scores of witness statements, including extensive testimony before the grand jury. These extended

testimonial statements include the following individual *Bruton/Crawford* statements,

from defendants Lesniewski, Baran, Stavola, and Brittell. [17]   Dr. Lesniewski stated that:

> (1) Half of the LIRR workers submitted false claims: "he thinks approximately [sic] fifty percent of the LIRR patients he saw had an honest disability while the other fifty percent should have been weeded out prior to awarding them their disability." App. A at 1;

> (2) In his opinion, the potential financial gain motivated LIRR workers to lie: "[T]hat the patients had to (sic) much secondary gain (Disability) not to exaggerate their symptoms and problems." App. A at 2.  "The patient had to (sic) much secondary gain not to exaggerate their symptoms and problems." App. B at 2;

> (3) LIRR workers declined treatment that might have ameliorated their illnesses because they wanted an occupational disability annuity instead: "Many of these patients declined any treatment because all they wanted was to get the U.S. RRB disability. They were afraid if their medical condition improved they would not get the disability." App. A at 2;

> (4) MRI findings were exaggerated by incorporating false subjective reports of pain: "Some of the MRI had minimal findings but I would insert subjective complaints not objective findings of pain." App. B at 2.

Ms. Baran stated that:

> (1) LIRR workers exerted pressure on her in order to get occupational disability: "employees who worked for various labor unions would be pissed off at her if they did not get their disability from the RRB." App. C at 1;

> (2) LIRR workers were referred to her by word of mouth and she used space provided by the union, an allegation that supports the government's wide-net conspiracy theory: "BARAN stated that her business was by word of mouth and that she currently had office space at the labor union called TCU [Transportation Communications Union] in Rockville Centre, New York." App. C at 3;

---

[17] The attached appendices – Appendix A through Appendix. G – contain the source material for the following thumbnail descriptions.

(3) LIRR workers manipulated the occupational disability system: "BARAN stated that it was not her fault that the LIRR applicants worked the system." App. C at 3.

(4) According to the government, Ms. Baran stated to one of the FBI Agents: "that you are never going to figure it out honey." App C at 3. The government has taken the position elsewhere that when Ms. Baran said "it", she meant "this scheme."

Mr. Stavola stated and testified that:

(1) It was common knowledge among the LIRR workers that Dr. Ajemian and Dr. Parisi filled out narrative forms for occupational disability and that Ms. Baran provided consulting services: "everyone knew to utilize her [Ms. Baran's] services... it was common knowledge that either Parisi and (sic) Dr. Ajemian... could be used to fill out the narrative section." App. D at 2.

(2) LIRR workers were already contemplating occupational disability awards before retirement, put in applications in the "hope" that they would be granted and were collectively aware of how the system operated: "Listen, we all knew how it worked. We all knew that we retired and we all knew that we put our disability papers in and hopefully we got it, hopefully we met the criteria. There was no surprise. The guys who retired before us told us how it worked. This is how it was. I knew I was applying for railroad retirement before I retired, but I can't do it until after I retire and I don't get approved until after I retire and it's not up to me that I get approved... I'm sorry, was I ranting?... Q: [Were there] other coworkers of yours who had the same thought in mind?... A: Absolutely." App. E at 15.

(3) LIRR workers discussed occupational disability extensively and shared the names of doctors who would support their applications: "Q: And it sounds like there was a lot of buzz about this at the railroad. Were there doctors who were known as go-to doctors in order to get benefits? A: Yes, there were names out there... Doctor Ajemian was one of them." App. E at 16.

(4) The potential combination of the LIRR pension and RRB annuity provided a financial motive for both himself and other LIRR workers to apply for occupational disability: "Stavola said that if you could get paid a retirement benefit from the LIRR and receive a disability pension from the RRB without having to beat up your body wouldn't you take it?" App. F at 1.

Mr. Brittell, in his proffer session, stated that:

(1) Dr. Ajemian gave the impression that he issued favorable
narratives to support the LIRR workers' occupational disability
applications as a matter of course and LIRR workers shared that
impression with each other: "Brittell did have the impression,
from the start, that he could go to Dr. Ajemian and get an OD...
It was common knowledge among the LIRR employees that
there were three or four doctors that people could go to and get a
'good narrative.'" App. G at 3-4.

In addition, several defendants testified at length before the grand jury: Ms.

Falloon and Messrs. Delgiorno, Bianchini, Plaia, Nugent and Delalla. Their grand jury

testimony plainly could not come into evidence without some type of limiting

instruction.

The first reason that these *Bruton/Crawford* statements mandate severance is that

the combination of alteration and redaction counseled by *Richardson* and *Gray* cannot

remedy the incriminating content of the *Bruton* statements. Accordingly, pursuant to

*Jass*, 569 F.3d at 56 n. 5, the statements mandate non-discretionary severance, unless

the government agrees to forfeit their use entirely.

The statements cannot be cured via redaction and alteration because their

incriminating character does not hinge on the use of proper names. *Cf. Ryan v. Miller*,

303 F.3d 231, 248 (2d Cir. 2002) ("Testimony need not contain an explicit accusation

in order to be excluded as a violation of the Confrontation Clause."). Rather, the

statements incriminate every member of a distinct class of people, LIRR workers, and

give rise to the following broadly stated inferences:

(1) LIRR workers shared their knowledge of the occupational disability
program and the relevant doctors and facilitators. In the government's
parlance, the LIRR workers banded together in a "culture of fraud," as
the government puts it, an inference that the government might argue
supports its tenuous conspiracy theory;

30

(2) A majority or substantial minority of LIRR workers submitted fraudulent claims, an inference that, like the government's highly charged and misleading statistical evidence invites the jury to improperly conclude that the individual defendants are numerically "likely" to have committed fraud;

(3) The LIRR workers all possessed a common motive: to increase their monthly pension payments regardless of their actual condition;

(4) The LIRR workers supplemented inconclusive medical test results with unsupported subjective claims of pain.

None of these *Bruton*-prohibited inferences depends in the slightest on the outright naming of any defendant, nor do they depend on the introduction of additional evidence or an extensive chain of inference not apparent on the face of the statement itself. Rather, the prejudicial inference flows from what is incontrovertible, that the non-declarant defendants are members of the specific group directly accused of malfeasance, i.e. LIRR workers. Moreover, although *Richardson* holds that a statement typically does not run afoul of *Bruton* when it employs neutral pronouns, these statements use reflexive pronouns (e.g. "we" or "everyone" at the LIRR) or proper nouns (e.g. "LIRR patients") or common but unambiguous nouns (e.g. "patients" or "other coworkers"). Accordingly, these referents are *not* neutral: they refer directly to LIRR workers as a group. Nor are these attenuated inferences: each *Bruton/Crawford* statement remains facially incriminating, regardless of whatever individual name redactions the government might employ. In short, this is a classic *Bruton/Crawford* problem and one that it appears no alteration or redaction could possibly fix. Accordingly, the only viable remedies are suppression of the statements or severance of the non-declarant defendants.

The second reason that *Bruton* and *Crawford* require severance is that the sheer number of declarant-defendants renders limiting instructions ineffective, forcing the jury to engage in "mental gymnastics" unless the case is severed into more manageable units. *See, e.g., Gallo*, 668 F. Supp. at 753. This concern was a major factor in Judge Weinstein's decision to sever the defendants in his seminal *Gallo* ruling. *Id.* at 751-52. In that case, the court recognized both the preference for joint trials and the general rule that jurors are presumed capable of considering evidence separately against the defendants. *Id.* at 749. Yet the court explained that both presumptions are strained to the breaking point in a trial that will include large amounts of material that is only selectively admissible against certain defendants. Judge Weinstein stated:

> Admissibility decisions... will often depend on having faith in the jury's ability adequately to heed extraordinarily intricate limiting instructions (e.g., this statement is only admissible as to defendant A on Counts X and Y, and predicates 6, 9, 20 and 21; to defendant C on Count Y, Count Z, Count W, and Count V, and on predicates 1, 2, 7, 8, and 9; .... and to defendant N not at all). Over the course of several months, this task would be virtually impossible without the aid of a computer, given the numerous defendants and charges.

*Id.* at 751-52 (citations omitted)

In *Gallo*, the source of these conflicts among selectively admissible statements was the large number of tape-recorded co-conspirator statements. Here, the source of selectively admissible statements is the large number of declarant-defendant statements. Yet Judge Weinstein's overarching concern applies regardless of the source: where the jury cannot possibly be expected to track the various impermissible connections among statements, severance should be granted.

Obviously this concern is more pronounced in so-called "mega-trials" – and the more "mega" the trial, the more arduous the jury's task. *Gallo*, 668 F. Supp. at 750. Where, as here, a trial includes a large number of declarant-defendants the court and the jury more quickly run into the problem identified in *Gallo*: the sheer number of potential connections that the jurors will have to banish from their minds spins out of control. This is the critical point of distinction between this situation and the situation this Court confronted in cases such as *United States v. Forde*, 699 F. Supp. 2d 637 (S.D.N.Y. 2010), *United States v. Ramos*, 346 F. Supp. 2d 567 (S.D.N.Y. 2004) and *United States v. Santiago*, 174 F. Supp. 2d 16 (S.D.N.Y. 2001), none of which had as many defendants as this case or anywhere near as many Sixth Amendment declarant-defendants. *Ramos*, for example, involved only non-testimonial wiretapped conversations, which did not implicate *Bruton* or *Crawford*. The following brief examination of the numbers involved will demonstrate why this distinction is so crucial.

Inexorably, as the number of declarant-defendants increases, the number of possible impermissible connections a juror could draw from their statements against every other defendant quickly spirals out of control. Consider first a case with only two defendants, only one of which has made testimonial statements. The following diagram (in which the circular box indicates the declarant-defendant, the rectangle indicates the non-declarant defendant and the directional arrow indicates an impermissible inference) shows that the problem in that case is quite manageable, with only one line of impermissible usage that the jury must avoid:



When one adds additional non-declarant defendants, the scope of the *Bruton/Crawford* problem increases in linear fashion, from one improper inference to three – still fairly manageable for the court and for the jurors:



However, when one increases the complexity of the case by adding declarant-defendants – for example, a case with two declarant-defendants and two non-declarant defendants – the *Bruton/Crawford* problem increases geometrically, in this case from one connection to six:



This problem arises even if the out of court hearsay statements do not present clear *Bruton* problems, because the jury must still be instructed to consider a declarant's statements only against the declarant. This non-linear progression is why *Bruton* and *Crawford* statements, even when properly limited, can rapidly create an insurmountable problem in the type of mega-trial that the government wishes to press in this matter. As the number of declarant-defendants increases, the number of impermissible

connections that the Court must cure and the jury must disregard increases exponentially: and we mean exponentially quite literally.[18]

Again, in cases such as *Santiago*, these problems remain manageable because, even though the indictment charges a large number of total defendants, few of them have made testimonial statements and typically none have made core *Bruton* statements. This is not surprising: hardened drug dealers and members of organized crime are much less likely to give statements to the authorities than mild mannered suburban retirees, and physicians who are convinced that they have done nothing wrong. As a result, in this case the government has secured grand jury testimony from eight defendants and extended interviews that include clear *Bruton* statements, resulting in a total of ten declarant-defendants and ten non-declarant defendants. What follows is the diagram of the *one-hundred-ninety* potential connections that the Court will have to limit and the jury will have to ignore if the case proceeds as presently constituted:

---

[18] This problem presents a variant of "Metcalfe's Law,"which describes the progression of connections in a network as it increases in size. Wikipedia provides a lucid explanation of the phenomenon. *See* http://en.wikipedia.org/wiki/Metcalfe's_law. The key differences here are that we are dealing with one-way inferences rather than two-way communications and that not every "network node" is active: only the declarant defendants. Expressed as a mathematical function in terms of declarant and non-declarant defendants, the number of impermissible connections is as follows.

$$c = d^2 + dn - d$$

where $c$ = the number of total impermissible connections; $d$ = the number of declarant defendants; and $n$ = the number of non-declarant defendants. Thus, the number of inferences increases exponentially in relation to the number of declarant-defendants. Here, where the record includes ten declarant-defendants and ten non-declarant defendants, the number is 190.



The government has previously objected to our description of this problem as "labyrinthian." Govt' Memo in Opp. at 9 n. 5 (Dkt# 170); *Cf. Gallo*, 668 F. Supp. at 739. But labyrinthian is indeed the most apt description of the web of interlocking, impermissible connections flowing from each declarant-defendant to every other defendant. Daedalus himself could scarcely do better. The only question left is what to do about it. We submit that a Rule 14 severance is the only sufficient remedy.

### B.     The Adverse Defense of the Doctors Also Supports the Severance

This case potentially pits the LIRR workers and their doctors against each other through antagonistic defenses: a factor that weighs heavily in favor of severance.

The leading Supreme Court case on Rule 14 severance, *United States v. Zafiro*, 506 U.S. 534, 538 (1993) declined to adopt a rule that that the existence of mutually

antagonistic defenses requires severance, noting that such conflicts are not *per se* prejudicial. However, in a case where clashing defenses creates a conflict so pervasive that the jury cannot accept one defendant's defense without convicting the other, severance is mandatory. *See, e.g., United States v. Cardascia*, 951 F. 2d 474, 484 (2d Cir. 1991); *United States v. Serpoosh*, 919 F.2d 835, 836 (2d Cir. 1990)

Even where the conflict among defenses is not so pervasive that severance is mandatory, the existence of such conflict factors in favor of severance. *United States v. Gallo*, 668 F. Supp. 736, 751 (S.D.N.Y. 1987) ("Because of the sheer number of defendants involved here, we may anticipate that there may arise some prejudicial antagonism, even if it does not rise to the level where severance would be *required*. This, too, weighs in favor of splitting the indictment for trial."). Furthermore, if other individual Rule 14 factors or all the factors taken together justify severance, the court may consider existence of an antagonistic defense in deciding whom to sever from whom, even if the antagonistic defenses alone do not mandate severance. *See also Nachamie*, 101 F. Supp. at 152 (S.D.N.Y. 2000)

Here, the conflict is not conjectural. Counsel for Ajemian explained the nature of this conflict as early as April 17, 2012, in a letter to the government: "we intend to show at trial that, while his diagnoses, assessments, and opinions were supported by medical evidence and were made in good faith, Dr. Ajemian – like any treating physician – perforce relied upon his patients... Dr. Ajemian was a victim of their chicanery no less that the RRB." Ex. I at 1.

It is not idle speculation, therefore, that the doctors and their LIRR patients have highly antagonistic defenses.  Rule 14 severance of Ms. Walsh from the trial of Dr. Ajemian, therefore, is warranted on that ground.

### C.    This Projected Mega-Trial Should Parsed

We adopt the Rule 14(a) severance argument advanced by counsel for Mr. Noone and specifically incorporate the argument he has advanced asserting spillover prejudice and disproportionate evidence based upon the Second Circuit's decision in *United States v. Casamento*, *United States v. DiNome* and related authority.  *See* Noone Memo of Law in Supp. at 9-11, Dkt 213.

We write separately to emphasize one major and overwhelming category of prejudicial spillover: the statistical evidence attacked at length by counsel for Dr. Ajemian and Mr. Gagliano.  That evidence should not come into evidence against defendant in any way whatsoever.  Yet the prejudice erupting from this highly charged evidence strikes with greatest force against the LIRR worker defendants.  Moreover, Rule 404(b) bars admission against the workers entirely.  Therefore, if the Court is nevertheless inclined to admit the statistical evidence against the doctors, we submit that the Court *must* sever the LIRR workers defendants to avoid irreparable spillover.

### D.    The Case Should be Severed Into Three Trial Groups

Applying the foregoing principles, we respectfully urge this Court to sever the twenty defendants in the following two-part sequence, yielding three trial groups.

### 1.   First Severance Division: Sever the Core Group of Doctors and Consultants from the LIRR Workers

The Court should first sever what might be described as the "core" group of defendants in this case – the doctors and consultants – along with one LIRR worker, Mr. Stavola.[19] This approach solves several of the more compelling problems with the case as constituted. It avoids the clashing adverse defense theories between, on the one hand, Dr. Ajemian and possibly his office manager Ms. Rusin, and on the other hand Dr. Ajemian's thirteen patients. It resolves the same clash between Dr. Lesniewski and his patients. This approach also mitigates the substantial problems with spillover prejudice and disproportionality of evidence. Having effectively charged them with hundreds of false claims, the government may be presenting reams of evidence against the doctors and consultants (the government calls them "facilitators") that have no bearing on the claims of the LIRR workers, evidence that might even include the government's tendentious "statistical" evidence; severance solves the issue. Finally, this approach surgically solves the specific *Bruton* problem introduced by the statements of Dr. Lesniewski and Ms. Baran.

Mr. Stavola is a candidate for this group because of the series of *Bruton* statements he made before the grand jury which facially incriminate every other LIRR worker. Distinct from the other declarant-defendants among the LIRR workers, Mr. Stavola's statements are so toxic that he should in fairness be separated from all other LIRR workers.

---

[19] At the March 16 pretrial conference, the government described the indicted doctors as "the hub" of this conspiracy. Ex. C at T. 19

This first severance division would thus yield the following trial group: Defendants Ajemian, Lesniewski, Rusin, Baran, Rutigliano and Stavola.

### 2.   Second Severance Division: Sever Those LIRR Workers Who Gave Testimony Before the Grand Jury

We urge that the Court's second severance division should split off the LIRR retirees who gave testimony before the grand jury. This approach is most desirable because it would greatly ease the residual *Bruton/Crawford* issue: the labyrinthine series of *Crawford* limiting instructions and impermissible connections that would otherwise confront the jury. Quite apart from whether the grand jury testimony of these defendants raise core *Bruton* issues, they can come into evidence only with a *Crawford* limiting instruction directing the jury to consider the testimony only against the individual declarant. But by breaking the group down into fewer defendants, the jury must contend with fewer impermissible connections (eighty-four, if one uses the equation we have incorporated in footnote 18 as an abstract benchmark). Moreover, the jury will not be forced to sort out declarants and non-declarants. In this second trial group, every defendant will have made a statement and the jury will know that each of those statements can only be considered against the individual declarant. To the extent possible, the necessary limiting instructions will become routine: thus for this trial group, the residual *Bruton/Crawford* problem will be eased, although not eliminated. This group would consist of seven defendants: Ms. Falloon, and Messrs. Bianchini, Plaia, Brittel, Nugent, DeLalla and Delgiorno.

3.   **The Remaining Group of Defendants Who can Be Tried Without the Overlay of *Bruton/Crawford* Limiting Instructions**

The foregoing two groupings almost entirely eliminates the *Bruton* and *Crawford* problems for the remaining defendants: Messrs Noone, Gagliano, Ehrlinger, Pulsonetti, Dasaro, Supper, and Ms. Walsh.  Isolated individual statements may come into evidence in the last trial group, but none of these defendants have made anything like the extended testimony provided in the grand jury proceedings; in addition, their interviews concerned only their own conduct.  In contrast, the decision to keep all of the remaining fourteen LIRR retiree defendants together would do nothing at all to ease to the jury's task or smooth the residual *Bruton/Crawford* problem.

## POINT VII

## THIS COURT SHOULD ISSUE AN ORDER DIRECTING THE GOVERNMENT TO DISCLOSE ALL *BRADY/GIGLIO* MATERIAL TO THE EXTENT NOT ALREADY PROVIDED

The defendant Walsh hereby joins in, and incorporates by reference as if fully set forth herein the defendant Bianchini's, the defendant Leniewski's and the defendant Ajemian's arguments in support of the motions those defendants have brought for disclosure of *Brady/Giglio* material.

41

## POINT VIII

## THE GOVERNMENT SHOULD BE DIRECTED TO PRODUCE JENCKS ACT MATERIAL AT LEAST 60 DAYS BEFORE TRIAL

The defendant Walsh hereby joins in, and incorporates by reference as if fully set forth herein the defendant Ehrlinger's argument in support of the motion to require the government to produce 3500 material in advance of trial.

## POINT IX

## THE JURY SERVICE OPT-OUT FOR JURORS 70 AND OLDER IN THE COURT'S AMENDED JURY PLAN VIOLATES THE FAIR CROSS SECTION REQUIREMENT OF THE SIXTH AMENDMENT AND 18 U.S.C. §1867(a), AS WELL AS THE RANDOM SELECTION REQUIREMENT OF 18 U.S.C. §1867(a)

The Court has already ruled, in its Decision and Order ("Decision") of August 6, 2002, Dkt #197, upon the defendant's application for jury pool information with respect to the representation of the seventy-plus age in the venire.  *See* Letter Application, Dkt# 82; Reply Memo in Supp. of Letter Application, Dkt# 88.  In its Decision the Court stated:

> Accordingly, the Court finds that the relief Walsh seeks is unnecessary.  Even if jury selection data did ultimately reveal that the SDNY Amended Jury Plan excluded all persons aged over seventy from the grand jury that returned the indictment in this case, Walsh would still be unable to establish a violation of the fair-cross-section requirement provide for in the Sixth Amendment and the Jury Selection Act.

In renewing our application for relief, the defendant Walsh will not reargue the question of whether persons seventy years and older are a cognizable group for purposes of the 6th Amendment fair cross section requirement.  The Court noted its Decision that "[t]he Court of Appeals for the Second Circuit has not considered the

42

implications of permitting persons aged over seventy to opt out of service." By renewing our application at this point in the process, we simply seek to preserve the issue for review in the Court of Appeals in the event that Ms. Walsh is convicted based upon an indictment returned by a grand jury selected under the SDNY Amended Jury Plan as it currently stands and which was the Plan in effect at the time of the Court's decision. To the extent that the Plan as written still contains the provision of which we have complained at the time the petit jury is selected, we will, of course, renew the application so as to preserve the record for appellate review insofar as the venire from which the petit jury is selected in this case.

We add, however, one more component to our substantive claim. The exclusion of jurors in the 70+ group, which the Court assumed for purposes of its decision, would also violate the Jury Selection Act, which requires that juries be selected randomly. 18 U.S.C. § 1861 provides:

> It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit jurors selected at random from a fair cross section of the community in the district or division wherein the court convenes. (emphasis added)

The exclusion of members of the 70+ age group introduces a substantial non-random element to the creation of the Qualified Jury Wheel, essentially skewing the process by allowing self-selection in violation of the randomness required by Jury Selection Act. *See, e.g., United States* v. *Clay*, 159 F. Supp. 2d 1357, 1367 (M.D. Ala. 2001) (allowing jurors to self-select may introduce a non-random element into the selection process). As such, we maintain that the separate randomness requirement of

43

the statute is compromised also be if prospective jurors in the 70+ age group were

excluded from the venire.

## CONCLUSION

## THE COURT SHOULD GRANT THE RELIEF REQUESTED HEREIN

Dated:   New York, New York
September 14, 2012

Yours, etc.

PAUL B. BERGMAN PC

By:

PAUL B. BERGMAN, ESQ.
Attorney for Regina Walsh
950 Third Avenue
New York, NY 10022
Tel. No.: (212) 355-7711
Fax No.: (212) 755-5509
Email: paul.bergman@paulbbergmanpc.com

*Of counsel:*
Paul B. Bergman, Esq.
Michael Van Riper, Esq.

# APPENDIX A

# OFFICE OF INVESTIGATIONS
### United States of America
### Railroad Retirement Board

On October 29, 2008 Special Agent in Charge (SAIC) Joseph J. Del Favero and Deputy Assistant Inspector General (DAIG) Louis Rossignuolo of the U.S. Railroad Retirement Board (U.S. RRB), Office of Inspector General (OIG), Office of Investigation (OI) interviewed Dr. Peter J. Lesniewski. The agents advised Dr. Lesniewski that he was being interviewed regarding his involvement with Long Island Railroad employees applying for U.S. RRB administered disability benefits. The interview was conducted at Dr. Lesniewski's place of employment, Genesis Orthopedics located at 2900 Foxfield Road, Suite 102, St. Charles, Illinois 60174 (630) 377-1188.

After the agents identified themselves to Dr. Lesniewski he provided the following information:

Dr. Lesniewski stated that he was born and raised in New York and has practiced medicine in Long Island since 1977. Dr. Lesniewski stated that he graduated from Cornell University Medical School.

Dr. Lesniewski stated that he had moved to Wheaton, Illinois approximatley two months ago after sell his residence in Long Island. Dr. Lesniewski stated that his three children all attended Wheaton College and two of them remained in Illinois after graduation. Dr. Lesniewski stated that he and his wife decided to move to Illinois in December 2007 at which time he listed his residence in Long Island for sale. Dr. Lesniewski stated that there were two reasons that they decided to move out of New York. The first reason so they could be near their children and the second reason was because he was having serious problems with Dr. Parisi. Dr. Lesniewski stated that Dr. Parisi is only interested in "Power" and "Money" and does not care about the treatment and/or care of his patients. Dr. Parisi was "pushing patients through the system", "short changing them" and was "running around regulations". Dr. Lesniewski stated that the total disregard Dr. Parisi had with his patients was causing him trouble with sleeping at night and caused his blood pressure to increase to a level when he had to start taking medication. Dr. Lesniewski stated that since moving to Illinois and getting away from Dr. Parisi he is off the blood pressure medication.

| Investigation conducted on: | October 29, 2008 | at | St. Charles, Illinois |
|---|---|---|---|
| SAIC Joseph J. Del Favero | | | |
| by    DAIGI Louis Rossignuolo | OI File No. | C-2008-0605 | |
| Date Prepared    October 30, 2008 | | by | JDF |

This report is the property of the Office of Investigations and is loaned to your agency and must be returned after it has served its official purpose. It and its contents may not be reproduced without written permission. This report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined under 5 U.S.C 552.

I-103 (Rev. 08/00)

Dr. Lesniewski stated that he and Attorney Mike Flynn have been friends and it was Flynn who referred LIRR employees to him for medical evaluations. Dr. Lesniewski stated that he has talked with Flynn on a couple of occasions after the release of the news articles regarding this matter. One of the telephone conversations Dr. Lesniewski had with Flynn, he was told "not to worry about the investigation, you have done nothing wrong". Dr. Lesniewski stated that all of the patient referrals he received for LIRR employees came from Flynn. He had never seen LIRR employees referred by any other person. Dr. Lesniewski stated that he was work up the patients medical and write a narrative. The cost for these narratives was between $850.00 and $1,000.00 each. He would accept payment for these narratives in cash, credit cards, or checks. These payments went into the general account for his office and he did not handle these payments differently.

Dr. Lesniewski stated that he was advised by Flynn on how to write the narratives that the U.S.RRB wanted to see them. Dr. Lesniewski stated that he would prepare the summaries for disability purposes and would "Highlight to bring things home". Dr. Lesniewski stated that he would expound on pains and complaints that the patient had that would help get them their disability. Dr. Lesniewski stated that the patients had to much secondary gain (Disability) not to exaggerate their symptoms and problems. Dr Lesniewski stated that on occasion a patient would come into his office and advise his that he was applying for his disability benefits and needed a narrative written. Dr. Lesniewski informed the patient that he had to be evaluated and tests needed to be done like any other patient and the patient would leave his office. Dr. Lesniewski stated that he would again see some of these patients that he did not write the narratives for and they would be on U.S. RRB disability. Dr. Lesniewski could not understand how they were able to get their disability because he did not think they disabled.

Dr. Lesniewski stated that he could not comprehend how everyone applying for a disability was approved. He could not believe that there are not checks and balances in determining who is qualified to receive the U.S. RRB disability. On occasions Dr. Lesniewski would order MRI tests for the patients that had minimal findings. With these LIRR patients he would write the narrative using subjective findings. He would highlight the patient's complaints of pain in their neck, back, shoulder, etc.

Dr. Lesniewski stated that he has examined LIRR employees with medical problems that were correctable with surgery. Many of these patients declined any treatment because all they wanted was to get the U.S. RRB disability. They were afraid if their medical condition improved they would not get the disability.

Dr. Lesniewski stated that approximatley twenty five to thirty percent of the LIRR employees that he prepared narratives and completed the documentation for disability were done incorrectly. On all the U.S. RRB G-251 forms, Dr.

Lesniewski stated that the patient could not do heavy lifting, could not bend, could not kneel, could not stand, could not walk, could not sit, etc. Dr Lesniewski. stated that if he could do it again he would not have made those statements on the official forms. Dr Lesniewski stated that he was advised by Flynn on how to complete these forms.  He stated that he never thought that these patients would be approved for their disability just because of these incorrect statements he made.  Dr. Lesniewski made these statements because he knew that the LIRR patients were seeing him just to get their disability and he believed that the U.S. RRB would not approve their disability just because these questions.

Dr. Lesniewski stated that he thinks approximatley fifty percent of the LIRR patients he saw had an honest disability while the other fifty percent should have been weeded out prior to awarding them their disability. Dr. Lesniewski stated that he now wishes he knew before completing the disability documentation that the U.S. RRB was going to rely on his report only in making a determination; he would not have made those statements.

Dr. Lesniewski stated that he is willing to cooperate with this investigation and is willing to be re-interviewed at a later date.

At this time the interview ended and Dr. Lesniewski provided the following free and voluntary statement:

# APPENDIX B

On October 29, 2008, I, Dr. Peter J. Lesniewski, MD, was interviewed at my office by Special Agents Joseph Del Favero and Louis Rossignuolo, from the Office of Inspector General, U.S. Railroad Retirement Board (U.S. RRB). The Special Agents showed me their credentials and advised me that I was being interviewed regarding individuals that worked at Long Island Railroad (LIRR) that are receiving disability benefits from the U.S. RRB. Some of the individuals that are receiving the disability benefits from the U.S. RRB were patients of mine when I practiced in Long Island, NY. I have been a medical doctor for approximately 30 years and graduated from Cornell University.

I, Peter J. Lesniewski, MD, stated that I am aware of the investigation based on recent news reports. I recently spoke with Michael Flynn, an Attorney, regarding the newspaper articles. Flynn has referred approximately 30 patients to me.

The Special Agents showed me narratives that I prepared for Long Island Railroad employees. The narratives that I prepared generally concluded with a statement stating that it can be stated with a "reasonable degree of medical certainty that the patient is disabled for his occupation with the Long Island Railroad". I put this statement on the narratives to ensure that the patient would receive his occupational disability. I thought that an independent doctor would have determined that my statements would fall short of the level for disability. I have advised the Special Agents that this information was exaggerated on approximately 20 percent of the narratives. If I were to prepare the narrative now I would not have made this statement.   This statement was inserted based on guidance I received and lack of knowledge of the independent oversight of the process. I was advised that this is the language that was needed for the patient to be considered for the disability. If I would have known that there was no oversight, I would not have used that precise language. The signatures on the narratives are mine.

The Special Agents also showed me the Form G-250, Medical Assessments, that I have completed for some of my patients. I advised the Special Agents that the G-250's that they showed me were for patients that had actual restrictions. I advised that there would be approximately 20 percent of the G-250's that I completed I exaggerated the restrictions on question number 21 "Describe, in detail, any type of exertional restriction (e.g., limitations on lifting, standing, walking, sitting, stooping, crouching, climbing, etc.). For example on approximately 20 percent (or 25-30 cases) of the G-250's I would not have stated the absolute statement "no heavy lifting, no bending, no lifting". If I would have known that there was no oversight, I would have said "that these activities might contribute to increased symptoms. I knew that by inserting this language would aid in their receiving an occupational disability benefit from the U.S. RRB. I was told to put this information on the form by Michael Flynn. The signatures on the G-250's are mine.

I was paid approximately $850 to $1,000 for each narrative that I prepared. Some the patients paid in cash but most paid with a credit card or check. I would be willing to sit down with the Special Agents and/or officials at the U.S. RRB to review all the narratives and Medical Assessments that I prepared to identify the forms and narratives that were highlighted for disability purposes.

The narratives that I prepared highlighted the patient's problems to aid them or "to bring it home" that they would obtain their disability from the U.S. RRB. Some of the MRI had minimal findings but I would insert subjective complaints not objective findings of pain. The patient had to much secondary gain not to exaggerate their symptoms and problems. I hoped that someone on review would have noted the subjective nature of these findings and follow up.

All of my patients were treated equally. On occasion, I refused some of the LIRR employees as patients due to their flagrant lack any disability and their desire to obtain it.

The statement was prepared on my desktop computer in my office. I am sorry for any actions on my part that have caused any individual to receive a benefit from the U.S. RRB that they were not entitled to. I am absolutely willing to cooperate with the U.S. Attorneys Office or law enforcement investigating this matter. I would have never completed these forms in this manner if I had been aware of the system and the lack of checks and balances within it.

I, Peter J. Lesniewski, have reviewed and read this statement and have initialed all corrections. All statements are accurate, true and complete.

# APPENDIX C

FD-302 (Rev. 10-6-95)

-1-

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    04/13/2009

        MARIE BARAN, date of birth ████████████
████████████████, was interviewed at her place of residence
located at ████████ ████████████████████. Present during
the interview was Special Agent Louis Rossignuolo of the Railroad
Retirement Board (RRB) - OIG. After being advised of the identity
of the interviewing agents and the nature of the interview, BARAN
provided the following information:

        BARAN stated that she never did anything wrong in
processing claims for RRB disability while she was employed as a
district manager in Westbury, New York. BARAN stated that the Long
Island Railroad (LIRR) employees who worked for various labor
unions would be pissed off at her if they did not get their
disability from the RRB. BARAN stated that she was tough on the
applicants and sometimes the LIRR workers did not like what she
told them.

        The RRB occupational disability (O/D) program is broken.
BARAN stated that the regulations and parameters governing
occupational disability are too loose. BARAN stated that it was
not her fault if the LIRR workers applied for the disability. All
BARAN knows is that she is not lying and that it is not her fault.

        Doctors recommend LIRR workers for O/D all the time. It
is perfectly legal. LIRR workers do a very tough job that includes
bending, lifting and standing on their feet for extended periods.
The Doctors took the appropriate tests like MRIs and X-Rays and
reported the findings to the RRB. The RRB then made the final
decision based on the paperwork.

        BARAN stated that after she left the RRB in December of
2006, she opened up her own labor consulting company in which she
helped the LIRR workers get through the RRB O/D system. BARAN
assisted them in filling out the appropriate RRB forms and
sometimes recommended Doctors for medical appointments. BARAN had
the LIRR employees sign a release so that she could act on their
behalf with the LIRR benefits office, the RRB and the Doctors.

        BARAN stated again that it is not her fault that the LIRR
workers got their disability. They were all seen by Doctors who
examined them and did testings. The RRB in Chicago was the final

Investigation on    9/24/08    at East Meadow, New York

File # 58D-NY-300062                                     Date dictated

by    SA AnnMarie Cuocci

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FBI- 000048

FD-302a (Rev. 10-6-95)

58D-NY-300062

Continuation of FD-302 of    Marie Baran                              , On  9/24/08      , Page    2

say in whether the applicant received the benefit.  BARAN stated
that the law is broken and has been for a long time.

          BARAN then addressed Special Agent Cuocci and stated that
she (BARAN) has been dealing with RRB rules for many years and
commented that Special Agent Cuocci probably never heard of the RRB
before today.  BARAN stated to Special Agent Cuocci that she was
never going to be able to figure it out or prove anything because
it's all legal.

          BARAN stated that when she assisted an LIRR applicant for
RRB O/D, she just "sent in the applicant to the local RRB office
with the completed paperwork package and crossed her fingers".

          BARAN stated that the LIRR job descriptions are no
mystery and that they are public information.  The LIRR applicants
used a labor consultant to help with the paperwork, gather the
correct information, and help forward the package to Chicago.

          BARAN stated that the LIRR workers received the O/D
because they met the law of the RRB.  Some of the LIRR workers even
meet the law of the RRB total and permanent disability parameters.

          BARAN described the board of the RRB as very labor union
influenced.  The RRB top echelon knew of the amount of LIRR workers
getting the O/D but they did not want to piss of the labor unions.
BARAN stated that now they are disgruntled at the RRB because of
how many applicants got the benefit under the present law.

          BARAN stated that Dr. Ajemian and Dr. Parisi saw a lot of
the LIRR workers who applied for the O/D.  BARAN stated that it was
a tough job and many had knee and back injuries.  BARAN stated that
she saw one of the doctors herself for a knee injury but that she
was not on O/D.  BARAN's husband OSTAP BARAN was a former LIRR
worker who was on O/D.

          BARAN stated that the Doctors were not paid off to do the
reports.  The Doctors did not need the money.  They were paid to
complete the forms and provided a narrative.

          BARAN stated that the RRB law has to be changed.  BARAN
would tell the LIRR workers who came to her as a consultant to " go
ahead, give it a shot at the O/D".  BARAN stated that the LIRR
workers felt that they were entitled to give it a shot at the
disability because they had paid into the RRB fund from their

FBI- 000049

FD-302a (Rev. 10-6-95)

58D-NY-300062

Continuation of FD-302 of ___Marie Baran_____ , On _9/24/08__ , Page ___3___

      paychecks for all those years.  However, BARAN stated that she was
not a Doctor and that the proper tests and results were reported to
the RRB.  The RRB decided who and who did not get the O/D, not her.

           BARAN stated that she got paid to prepare the RRB
paperwork as a consultant.  She said that she never accepted any
payment from anybody while she was employed at the RRB.  BARAN
stated that people paid her because she was good and knew all of
the RRB rules and regulations based on her experience.  BARAN
stated that she got paid whether the applicant got a final O/D
recommendation or not.  BARAN stated that her business was by word
of mouth and that she currently had office space at the labor union
called TCU in Rockville Centre, New York.

           BARAN stated that the amount of money she made from her
consulting business was between her and the IRS.

           BARAN told the agents to go out and get the medical
records.  She advised the agents to see for themselves that
everything was properly documented.

           BARAN stated that it was not her fault that the LIRR
applicants worked the system.  BARAN again stated that the RRB law
needed to be changed.

           In filling out the RRB application for disability, BARAN
would say to the applicants in a leading manner things such as " is
it safe to say that you can't lift 50 pounds, bend down, walk on
uneven terrain, etc"  The applicant provided the answer, not BARAN.
BARAN stated that she even tried to stop a guy who she thought was
not disabled from filing.  BARAN could not recall his name.

           BARAN stated that her husband does play golf every week
even though he is on disability from the LIRR with a bad back.
BARAN stated that she tells him to " go out and play golf because
it is exercise".

           BARAN stated that she is only a consultant or facilitator
in the process.  BARAN told the agents that the system is broken.
BARAN then told Special Agent Cuocci "that you are never going to
figure it out honey".

FBI- 000050

# APPENDIX D

C:\Documents and Settings\RSCHIMMEL\Local Settings\Temporary Internet Files\OLKB14\08-026 RRB Disability Stavola 10 06 08.doc

**DATE:**      October 6, 2008

**TO:**          Case File # 08-026

**FROM:**      Wayne R. Buchan – Senior Principal Investigator

**SUBJECT:**   Interview of former LIRR employee Michael Stavola.

Cc: CP, CF, MS, EM

-----------------------------------------------------------------------------------------------------

**Action Taken:**

A joint investigation is being conducted by the Federal Bureau of Investigation, U.S. Railroad Retirement Board Office of the Inspector General, the US Attorney's Office EDNY and the Metropolitan Transportation Authority Office of the Inspector General as to the matter of occupational disability fraud. Investigators are looking into the allegations that members from the LIRR may be defrauding the Railroad Retirement Occupational Pension system.

Information was developed in an investigation conducted by the OIG (Inv.# 06-083) indicating that two doctors, Ralph Parisi and Peter Ajemian, both with offices on Long Island, are the primary doctors used by LIRR employees in applying for Occupational Disability Pensions.

**Action Taken:**

At the request of the Railroad Retirement Board investigators from the MTA/OIG assisted in interviews of annuitant that file for occupational disability pensions. The Railroad Retirement Board wanted the following questions asked of the annuitants:

1. Did you use a Railroad Retirement consultant/expediter to file for an occupational disability pension?
2. Did you pay with cash or a check?
3. Do you have a receipt?
4. Did the consultant recommend a specific doctor to use?
5. What doctor did you see?
6. How did you find out about this doctor?
7. Were the railroad disability retirement forms pre-filled out?
8. Did you or do you know anybody who purchased supplemental disability insurance prior to retiring from the railroad?   (asked after September 3rd meeting as per EDNY)

MOI 000264

On Thursday October 2, 2008 Principal Investigator Edward McDermott and Senior Principal Investigator Wayne R. Buchan from the Metropolitan Transportation Authority Office of the Inspector General conducted an interview of a former LIRR employee. Interviewed was Michael Stavola ███████████████████████████████████████████████████ and he related the following:

- He was employed as a Road Car Electrician for 25 years and retired June 1, 2008.
- He utilized the services of Marie Baran (Baran), Retirement Consultant – Railroad Retirement Disability Specialist, who is a former employee of the RRB at her Transportation Communications Union office located at 200 Sunrise Hwy, 3rd floor, Rockville Centre, NY 11570 and utilized her services because the forms were difficult to fill out and everyone knew that Baran would fill it out correctly.
- He applied for an occupational disability.
- He did not have a business card from Baran.
- He paid the cash sum of $1,200.00 for Baran to fill out the paperwork.
- He does not remember if he requested a payment receipt but will search his files and call this office should he locate it.
- He did not feel this fee was overly expensive and stated everyone knew to utilize her services.
- He utilized the services of Dr. Parisi (Parisi) an Orthopedic Surgeon located at 651 Old Country Road, Suite 200, Plainview, NY 11803 to fill out the narrative on his RRB Disability Pension and stated that no one had referred him to Parisi, but it was common knowledge that either Parisi and Dr. Ajemian (Ajemian), also an Orthopedic Surgeon located at 143 N Long Beach Rd Ste 2, Rockville Centre New York, NY 11570, could be used to fill out the narrative section.
- He doesn't know of anyone at LIRR that is receiving the disability pension that does not deserve it.
- He related that the LIRR Hillside facility held pension seminars in which they informed employees about the RRB Disability Pension.
- He did purchase disability insurance from AFLAC about two (2) or three (3) years prior to retiring and many LIRR workers knew about the benefits of purchasing additional disability insurance from AFLAC.
- 

Investigation continues...

2

MOI 000265

# APPENDIX E

# APPENDIX F

# OFFICE OF INVESTIGATIONS
### United States of America
### Railroad Retirement Board

On April 28, 2011, Senior Special Agent (SSA) Adam M. Suits, Special Agent in Charge (SAIC) Michael Angelucci and Deputy Assistant Inspector General for Investigations (DAIGI) Louis Rossignuolo, Office of Inspector General, Office of Investigations (OIG-OI), U.S. Railroad Retirement Board (RRB); and Danya Perry and William Harrington, Assistant United States Attorneys (AUSA) – Southern District of New York interviewed Michael Stavola in a witness room on the fourth floor in the Federal Court House located at Worth and Centre Street, in Manhattan, NY.

After completing his Grand Jury testimony on this date, Stavola entered one of the witness rooms where the interviewing Agents were coordinating the copying of his medical records.

AUSA Harrington asked Stavola if he remembered putting a date down on the RRB Form (AA-1d) that he could no longer work because of his condition. Stavola said no. AUSA Harrington read the question to Stavola "Enter the date you could no longer work because of your condition". Stavola stated that he could still work. Then AUSA Harrington asked Stavola: So this statement isn't true? Stavola replied: "No."

Stavola said that if you could get paid a retirement benefit from the LIRR and receive a disability pension from the RRB without having to beat up your body wouldn't you take it?

DAIGI Rossignuolo asked Stavola if he remembered putting down on the RRB Form (AA-1d) that it was hard for him to Sit, Stand, Walk. Stavola said no. Stavola said that he did not remember. DAIGI Rossignuolo asked Stavola if Marie Baran helped him complete the form and guided him through answering the question by saying "Isn't it fair to say that it is hard for you to sit, stand and walk". Stavola stated it was something like that.

| Investigation conducted on: | 04/28/2011 | at | New York, New York |
|---|---|---|---|

| by | DAIGI Louis Rossignuolo | OI File No. | C-2006-0605 |
|---|---|---|---|
| | SAIC Michael D. Angelucci | | |
| | SSA Adam M. Suits | | |

| Date Prepared | 05/02/2011 | by | lr/mda/ams |
|---|---|---|---|

This report is the property of the Office of Investigations and is loaned to your agency and must be returned after it has served its official purpose. It and its contents may not be reproduced without written permission. This report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined under 5 U.S.C 552.

I-103 (Rev. 08/00)

MOI 000266

# APPENDIX G

# OFFICE OF INVESTIGATIONS
## United States of America
### Railroad Retirement Board

On May 11, 2011, Senior Special Agent (SSA) Adam M. Suits, Special Agent in Charge (SAIC) Michael Angelucci and Deputy Assistant Inspector General for Investigations (DAIGI) Louis Rossignuolo, Office of Inspector General, Office of Investigations (OIG-OI), U.S. Railroad Retirement Board (RRB); SA Michael Craft, Federal Bureau of Investigation, William Harrington and Danya Perry, Assistant United States Attorneys (AUSA) – Southern District of New York (SDNY) interviewed Karl Brittell, pursuant to Proffer Agreement, in a witness room on the sixth fourth floor of the Department of Justice, 1 Saint Andrews Plaza, New York, New York. Brittell's attorney, Robert G. Del Grosso was also present throughout the interview.

After all those present identified themselves to Brittell, his attorney took time to explain the terms of the Proffer Agreement to Brittell privately. When the Agents and AUSAs returned to the room, just prior to executing all the necessary signatures, AUSA Perry explained all the terms and rights associated with the Proffer Agreement to Brittell a second time. Attorney Del Grasso then advised Brittell to be sure to provide accurate accounts of his dealing with Dr. Ajemian.

At this point, attorney Del Grasso stated that Brittell needed to clear up or correct a part of the record that was discussed when he made his earlier Grand Jury appearance in connection with the LIRR investigation, more specifically, regarding his application for forgiveness on his Federal student loans. Brittell claimed not to remember having sent a letter to Dr. Ajemian directing him to change his medical assessment of Brittell regarding his ability to work part-time.

Brittell had originally applied for the Federal loan forgiveness, based on his alleged occupational disability (OD) and its accompanying written substantiation by Dr. Ajemian, a year after he retired with an OD. After a year's time, Brittell was required to renew his substantiation with the Federal loan forgiveness program. A form was sent to him through the mail that he was asked to complete

---

| Investigation conducted on: | 05/11/2011 | at | New York, New York |
|---|---|---|---|

| by | **DAIGI Louis Rossignuolo**<br>**SAIC Michael D. Angelucci**<br>**SSA Adam M. Suits**<br>**SA Michael S. Craft** | OI File No. | **C-2006-0605** |
|---|---|---|---|

| Date Prepared | **05/25/2011** | By | **lr/mda/ams/msc** |
|---|---|---|---|

This report is the property of the Office of Investigations and is loaned to your agency and must be returned after it has served its official purpose. It and its contents may not be reproduced without written permission. This report is FOR OFFICIAL USE ONLY and its disclosure to unauthorized persons is prohibited. Public availability to be determined under 5 U.S.C 552.

I-103 (Rev. 08/00)

and included a section for renewed medical substantiation. Brittell brought the form to Ajemian's office but gave the form directly to Maria Rusin, not Dr. Ajemian. Dr. Ajemian charged a $50.00 fee for completing the form.

When the renewal form was first completed by Dr. Ajemian, Ajemian stated that Brittell was capable of working part-time. After Brittell saw what Ajemian had written regarding his current condition and knowing it would not suffice for his Federal student loan forgiveness to continue, Brittell wrote Ajemian a note, through his office secretary Julie, directing and instructing Ajemian to change the account of his ability to work part-time to state he could not work at all. Brittell went to see Ajemian about, as he put it, not completing the form "correctly." Brittell confronted Ajemian directly about the statement. Brittell reminded Ajemian that he told Brittell he had a disability and could not work. Brittell said that he was then told by Ajemian that the latter had made a mistake.

Brittell does not remember if he later picked up the amended form or asked Maria Rusin to mail it in for him. Brittell said he only found the form after his initial Grand Jury appearance. He was asked by if he looked for the form, as he was obligated to do, prior to making his Grand Jury appearance. Brittell answered: "no."

Brittell does not currently have any conversations with Dr. Ajemian, as he is already certified as OD. Brittell regularly played golf, travels, drives and flies. Referring to Dr. Ajemian, Brittell said: "I don't want to be near him." Brittell initially said he never had a discussion with Dr. Ajemian about an occupational disability until he was nearing retirement.

Brittell wanted to get to at least February 27th, 2002 before retiring, which would have given him 30 years. He did not see Dr Ajemian until that time. Brittell said he did not remember when he made his decision about retiring. He said he did not know when he was going to retire. He does not remember having any communication with anyone in reception at Dr. Ajemian's office regarding his retirement date.

Brittell said he did not speak much with Joseph Rutigliano before he retired. He spoke with him and paid him after his retirement. He did get an estimate of what his pension benefits would be but he could not remember when. Brittell stated he was getting progressively worse but did not know he would retire until just weeks before he actually did retire. He tied his vacation time in with his retirement.

Brittell retired on November 29th, 2003. Brittell, despite having already said he could not remember when he decided to retire, said November 2003 was when he first decided he would retire. But then he repeated his earlier assertion and said he could not remember when he decided to retire.

Brittell was asked if he could keep working. He gave no answer at first. He was then asked if Dr. Ajemian asked him if he could still work at the time he was putting together his OD application. Brittell said: "he recommended that I retire." At this point Brittell, still referring to Dr. Ajemian, also said: "he never told me I couldn't do anything." Brittell was never told, nor did he ever have a conversation with Dr. Ajemian, about restrictions. He never had any discussion with Dr. Ajemian about restrictions at any time. Brittell claimed Dr. Ajemian never said much to him during his appointments.

Brittell was asked if he received and/or was directed to take any prescription medications from Dr. Ajemian related to his treatment. Brittell said that Ajemian prescribed Celebrex but he never took the medication. Brittell said he could not take the medication because he was a drug addict and suffers from hepatitis. Even though Brittell felt it was important to tell Dr Ajemian that he was not taking his prescribed medication, he never did. Brittell just shrugged his shoulders when asked why he did not tell Dr. Ajemian about his not taking the Celebrex.

Brittell never told the MTA, during any fitness for duty exams, about his bad back or other health problems. He said: "the last thing I wanted to do was be disqualified from working." After already starting his treatment with Ajemian, Brittell was still not telling the MTA anything, despite his talking to Ajemian just two months prior to an MTA exam, about crippling pain. Brittell would probably not have told the MTA anything in the first place.

Brittell was asked if he was thinking about applying for an occupational disability when he first saw Dr. Ajemian. Brittell answered: "right." Brittell was asked about working overtime (OT) during his OD application period. He said he worked some better jobs but received the same money as he was not working all OT but double days. Brittell had seniority which helped him some. Brittell said he forced himself to do the job but a moment later said it was fair to say he could have kept working at the time he retired with an OD.

Having said he could still go on working at the time he retired from the LIRR with an occupational disability, Brittell was asked whether he told Ajemian he couldn't work. Brittell responded by saying: "I didn't lie to him." Brittell went on to say: "I never told him I couldn't work and I never told him I could work." Brittell said Ajemian did not say he could qualify for an OD but did recommend that he both retire and apply for an OD. Brittell then stated that Ajemian told Brittell that he couldn't work.

Brittell did have the impression, from the start, that he could go to Dr. Ajemian and get an OD. At the time he first saw Ajemian in 2002, Brittell again said he had no idea when he would retire. Brittell stated that no one at Ajemian's office said anything to him about retiring because he never said he was retiring. He knows that many people at LIRR went to see Dr. Ajemian.

MOI 000046

Brittell then repeated the fact that he could have kept working at the time he was granted an OD. He says he did have some back pain at the time. He used to play golf, including after getting his OD, and did not stop playing in the wake of the press about the LIRR disability scandal. Brittell does not play golf anymore but swims 2000 meters per day. Ajemian told Brittell it was okay for him to swim.

Brittell agrees it was not in his interest to complain of pain to the MTA during fitness for duty exams but that it was in his interest to do so during his treatment under Dr. Ajemian, and leading up to his application for an OD. Brittell readily agreed that, since he had the full ability to go on working at the time he retired and received an OD, the activity restrictions in his OD application form 251 were completely inaccurate. Brittell's entire application was filled out by Rutigliano. Brittell never spoke to Rutigliano about his OD application or what was written in it but said: "I must have signed it."

Brittell heard it was in the RRB's interest to grant a Total and Permanent disability to annuitants after they received an OD. It was common knowledge among the LIRR employees that there were three or four doctors that people could go to and get a "good narrative." Brittell went to Ajemian because he was in Rockville Centre, Long Island and it was convenient. Brittell thinks the fee he paid to Rutigliano was less than $1000.00. He thinks Rutigliano was the cheapest facilitator available. Brittell stated he thought attorney Flynn charged $1500.00. At the time of his OD application, Brittell did think you had to pay someone to generate your application because they knew the right things to say. Brittell thinks it was the UTU office near or part of Babylon, New York where he met with Rutigliano.

MOI 000047