UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA      :         S1 11 Cr. 01091 (VM)

     - against -             :

                                        (Electronically Filed)

PETER LESNIEWSKI, et al.,       :

                  Defendant.     :
------------------------------------------------------X

# MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT PETER LESNIEWSKI'S PRETRIAL MOTIONS

JOSHUA L. DRATEL
DRATEL & MYSLIWIEC
2 Wall Street
3rd floor
New York, New York 10005
(212) 732-0707

THOMAS ANTHONY DURKIN
DURKIN & ROBERTS
2446 N. Clark Street
Chicago, Illinois 60614
(312) 981-0123

*Attorneys for Defendant Peter Lesniewski*

– Of Counsel –

Joshua L. Dratel
Thomas Anthony Durkin
Lindsay A. Lewis
Joshua G. Herman
Janis D. Roberts

TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

POINT I

THE COURT SHOULD ORDER INSPECTION
OR IN CAMERA PRODUCTION OF THE GRAND JURY MINUTES  . . . . . . . . . . . . . . . . . 2

POINT II

THE COURT SHOULD ORDER THE IMMEDIATE DISCLOSURE
OF FAVORABLE EVIDENCE REGARDING THE DECISION OF THE
U.S. ATTORNEY FOR THE EASTERN DISTRICT OF NEW YORK
NOT TO INDICT BASED UPON ITS REVIEW OF THE SAME
ALLEGED CRIMINAL CONDUCT CHARGED IN THIS INDICTMENT . . . . . . . . . . . . . . . 6

POINT III

ANY AND ALL WITNESSES AND INFORMATION
ACQUIRED BY THE GOVERNMENT THROUGH ITS
AMNESTY PROGRAM SHOULD BE SUPPRESSED
AND/OR PRECLUDED FROM TRIAL BECAUSE THE
GOVERNMENT'S INDUCEMENTS TO THOSE
PERSONS DENY THE DEFENDANTS DUE PROCESS;
AND THE COURT SHOULD ORDER THE GOVERNMENT
TO DISCONTINUE ITS USE OF THE GRAND JURY TO
PREPARE ITS CASE FOR TRIAL AND DENY THE
DEFENDANTS ACCESS TO POTENTIAL WITNESSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

A.      The Nature and Terms of the Government's Offer of Amnesty  . . . . . . . . . . . . . . . . . . . . 10

B.      The Nature and Terms of the Government's Amnesty Offer Are Unprecedented  . . . . . . 15

C.      Case Law Regarding the Government's Inducements to Witnesses to Testify  . . . . . . . . 20

D.      The Amnesty Program In This Case Presents Unique Circumstances That
         Demand a Remedy In Order to Ensure That the Defendants Receive a Fair Trial . . . . . 22

E.      *The Government's Amnesty Program and Abuse of the Grand Jury Have Denied
        Defendants Due Process By Denying Them Access to Potential Defense Witnesses* . . . 26

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

POINT IV

THE COURT SHOULD ORDER THE IMMEDIATE PRODUCTION
OF THE ORIGINAL UNDERLYING MATERIALS PROVIDING
THE BASIS FOR THE GOVERNMENT'S STATISTICAL DATA
REFERRED TO IN THE INDICTMENT, ALONG WITH ANY
STATISTICAL SUMMARIES PRESENTED TO THE GRAND JURY . . . . . . . . . . . . . . . . . . 36

POINT V

THE COURT SHOULD CONDUCT A PRETRIAL
HEARING OR REQUIRE THE GOVERNMENT
TO SUBMIT A FORMAL WRITTEN PROFFER
OF ITS EVIDENCE IT INTENDS TO OFFER
AT TRIAL AS CO-CONSPIRATOR STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

POINT VI

THE COURT SHOULD GRANT DR. LESNIEWSKI'S
REQUEST  TO JOIN IN HIS CO-DEFENDANTS' MOTIONS
TO THE EXTENT THEY INURE TO HIS BENEFIT AND FOR
LEAVE TO JOIN IN ANY ADDITIONAL MOTIONS THAT
COUNSEL IS NOT APPRAISED OF AT THE TIME OF FILING  . . . . . . . . . . . . . . . . . . . . . 51

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

TABLE OF AUTHORITIES

CASES

*Agurs v. United States*, 427 U.S. 97 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,7

*Blumenthal v. United States*, 332 U.S. 539 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Bourjaily v. United States*, 483 U.S. 171 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41,46

*Brady v. Maryland*, 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Brady v. United States*, 397 U.S. 742 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Coppolino v. Helpern*, 266 F. Supp. 930 (S.D.N.Y.1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Costello v. United States*, 350 U.S. 359 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Crawford v. Washington*, 541 U.S. 26 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Eichorn v. AT&T Corp.*, 484 F.3d 644 (3rd Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Fagiola v. National Gypsum Co. AC & S., Inc.*, 906 F.2d 53 (2d Cir. 1990) . . . . . . . . . . . . . . 38

*Giglio v. United States*, 405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Glenn v. Bartlett,* 98 F.3d 721 (2d Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Hale v Davis*, WL 4666489 (ED Mich. Dec. 3, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Int'l Bus. Mach. Corp. v. Edelstein*, 526 F.2d 37 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . 32

*Kotteakos v. United States*, 328 U.S. 750 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Payden v. United States [In re Grand Jury Subpoena Duces Tecum Dated
January 2, 1985 (Simels)]*, 767 F.2d 26 (2d Cir. 1985) . . . . . . . . . . . . . . . . . 28,29,33,34

*The Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Arnaout*, 2003 WL 255226 (N.D. Ill. Feb. 4, 2003) . . . . . . . . . . . . . . . . . . . . 46

*United States v. Bagley*, 473 U.S. 667 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,7

*United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir. 1989) . . . . . . . . . . . . . . . 48

*United States v. Blassingame,* 197 F.3d 271 (7th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Untied States v. Borelli*, 336 F.2d 376 (2d Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Casamento*, 887 F.2d 1141 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Ceballos*, 340 F.3d 115 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Cervantes-Pacheco*, 826 F2d 310 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Cianchetti*, 315 F.2d 584 (2d Cir. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Conlin,* 551 F.2d 534 (2d Cir.1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Cuellar*, 96 F.3d 1179 (9th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Dailey*, 759 F.2d 192 (1st Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Dardi*, 330 F.2d 316 (2d Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28,29,30

*United States v. Dawson*, 425 F.3d 389 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 20,25,26

*United States v. Diaz*, 176 F.3d 52 (2d Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45,48

*United States v. Estrada*, 256 F.3d 456 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Gambino*, 101 F.3d 683 (2d Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Golding*, 168 F.3d 700 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30,33

*United States v. Gonzales*, 164 F.3d 1285 (10th 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Haese*, 162 F.3d 359 (5th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Hammond*, 598 F.2d 1008 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Heller*, 830 F.2d 150 (11th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. James*, 590 F.2d 575 (5th Cir.1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44,49

*United States v. Johnson*, 513 F.2d 819 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Johnson*, 169 F.3d 1092 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Jones*, 129 F.3d 718 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28,33

*United States v. Leung*, 40 F.3d 577 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28,29,33

*United States v. Little*, 753 F.2d 1420 (9th Cir.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27,29

*United States v. Lowery*, 166 F.3d 1119 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. MacCloskey*, 682 F.2d 468 (4th Cir.1982) . . . . . . . . . . . . . . . . . . . . . . . . 27,30

*United States v. Mastropieri*, 685 F.2d 776 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*United States v. McDermott*, 245 F.3d 133 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Mechanik,* 475 U.S. 66 (1986 ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Morris*, 988 F.2d 1335 (4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30,33

*United States v. Morrison*, 535 F.2d 223 (3rd Cir.1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27,33

*United States v. Muirs*, 145 Fed. Appx. 208 (9th Cir.2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Orr*, 136 Fed. Appx. 632 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Paredes*, 176 F.Supp.2d 183 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Persico*, 832 F2d 705 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Puco*, 476 F.2d 1099 (2d Cir.1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Rivera*, 22 F.3d 430 (2d Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Rosenblatt*, 554 F.2d 36 (2d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . 46,47

*United States v. Rubin*, 844 F.2d 979 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Russo,* 302 F.3d 37 (2d. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Saneaux*, 365 F. Supp. 2d 493 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . 45,47,48

*United States v. Santiago,* 582 F.2d 1128 (7th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Singleton*, 144 F3d 1343 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 20,21

*United States v. Smalls*, 131 F.3d 132 (2d Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Smith*, 478 F.2d 976 (D.C.Cir.1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Stein*, 435 F. Supp.2d 330 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 32,35

*United States v. Tarantino*, 846 F.2d 1384 (D.C. Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Tejada*, 956 F.2d 1256 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Thomas*, 488 F.2d 334 (6th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Tracy*, 12 F.3d 1186 (2d Cir.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Tsai*, 14 Fed Appx 834 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Valle-Ferrer*, 739 F2d 545 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Vanwort*, 887 F.2d 375 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 28,29,33

*United States v. Vavages*, 151 F.3d 1185 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33,34

*United States v. Warner*, 396 F. Supp. 2d 924 (N.D. Ill. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Ware*, 161 F.3d 414 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Waterman*, 732 F.2d 1527 (8th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Whittington*, 783 F.2d 1210 (5th Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Williams*, 504 U.S. 36 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Williams*, 205 F.3d 23 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29,33

*United States v. Wilson*, 565 F. Supp. 1416 (S.D.N.Y. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Webb v. Texas*, 409 U.S. 95 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Wheat v. United States*, 486 U.S. 153 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Williamson v. United States*, 311 F2d 441 (5th Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## STATUTES

US Const. Amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,6,8,9,36,50

US Const. Amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,8,36,39,50

18 U.S.C. § 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

18 U.S.C. § 201(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

18 U.S.C. § 287 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,42

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,42

18 U.S.C. § 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,42

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,42

18 U.S.C. § 1347 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,42

18 U.S.C. § 1349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,42

Rule 2, Fed.R.Crim.P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41,50

Rule 7, Fed.R.Crim.P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,42,51

Rule 6(e)(3)(E)(ii), Fed.R.Crim.P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Rule 8(a)(1), Fed.R.Crim.P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,51

Rule 12(b), Fed.R.Crim.P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Rule 12(b)(3), Fed.R.Crim.P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Rule 16(a)(1)(E)(I), Fed.R.Crim.P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Rule 16(a)(1)(F), Fed.R.Crim.P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36,37

Rule 104(a), Fed.R.Evid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41,44

Rule 801(d)(2), Fed.R.Evid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41,45

Rule 801(d)(2)(E), Fed.R.Evid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41,45,46,48

Rule 1006, Fed.R.Evid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36,38,40

## OTHER

Andrew Sorkin, "DealBook: How the Broadcom Backdating Case Went Awry,"
   *The New York Times*, December 14, 2009
   <http://dealbook.nytimes.com/2009/12/14/how-the-broadcom-backdating
   -case-has-gone-awry/> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Bennett L. Gershman, *Witness Coaching by Prosecutors*, 23 Cardozo L. Rev. 829 (2002) . . . . 23

C.A. WRIGHT & V.J. GOLD, 31 FEDERAL PRACTICE AND PROCEDURE § 8043 (2000) . . . . . . . . 38

Kocienniewski, David. "Amnesty Program Yields Millions More in Back Taxes."
   *The New York Times*. September 15, 2011.
   <http://www.nytimes.com/2011/09/16/business/amnesty-
    program-yields-millions-more-in-back-taxes.html> . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Lucian E. Dervan, *Bargained Justice: Plea-Bargaining's Innocence Problem and the* Brady
   *Safety-Valve*, 2012 UTAH L. REV. 51 (2012)
   <http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1664620> . . . . . . . . . . 18,19,23,25

Lucian E. Dervan and Vanessa A. Edkins, *The Innocent Defendant's Dilemma: An Innovative
   Empirical Study of Plea Bargain's Innocence Problem*, 103 JOURNAL OF CRIMINAL
   LAW & CRIMINOLOGY ___ (forthcoming 2013)
   <http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2071397> . . . . . . . . . . . . . . . . . . 18

Michael Owen Miller, *Working With Memory*, 19 LITIG. 10 (Summer 1993) . . . . . . . . . . . . . 23

R. Michael Cassidy, "*Soft Words of Hope*: *Giglio, Accomplice Witnesses,
    and the Problem of     Implied Inducements*, 98 NW. U. L. REV. 1129 (2004) . . . . . . . 23

The Honorable Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as
   Witnesses*, 47 HASTINGS L. J. 1381 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Ruehle*, 08 Cr. 139 (C.D. Cal.) (Carney, J.), transcript ruling of Dec. 15, 2009
   <http://www.scribd.com/doc/24206782/Transcript-of-Judge-Cormac-
    Carney-Dismissal-Ruling-in-Criminal-Case-of-William-Ruehle> . . . . . . . . . . . . . . . . 27

### Introduction

This memorandum of law is submitted in support of defendant Peter Lesniewski's pretrial motions pursuant to Rule 12(b), Fed.R.Crim.P.:  (1)  for inspection or *in camera* production of the grand jury minutes;  (2)  for disclosure of favorable evidence regarding the decision of the U.S. Attorney for the Eastern District of New York not to pursue an indictment after investigating the same alleged criminal conduct set forth in the Superseding Indictment in this case;  (3)  to suppress and/or exclude from trial any and all information, documents, evidence, and fruits thereof, and any projected testimony, gained as a result of the government's amnesty program, and order the government to halt its abuse of the grand jury;  (4)  for the immediate production of the original underlying materials providing the basis for the government's statistical data referred to in the Indictment, along with any statistical summaries presented to the grand jury;  (5)  for a pretrial evidentiary hearing, or in the alternative, an order requiring a formal written proffer by the government that permits the Court to determine preliminarily the admissibility of co-conspirator statements against Dr. Lesniewski;  and (6)  to join in the other motions filed by his co-defendants to the extent they inure to his benefit, and for leave to join in any additional motions that counsel is not apprised of at the time of filing.

Accordingly, it is respectfully submitted that Dr. Lesniewski's pretrial motions should be granted in their entirety.

## POINT I

### THE COURT SHOULD ORDER INSPECTION
### OR *IN CAMERA* PRODUCTION OF THE GRAND JURY MINUTES

Pursuant to the Due Process and Grand Jury Clauses of the Fifth Amendment, and Rules 6(e)(3)(E)(ii) and 12(b)(3) of the Federal Rules of Criminal Procedure, Dr. Lesniewski respectfully moves this Court for an order requiring  (1)  disclosure and production of the entire minutes of the proceedings before the grand jury which returned the indictment in this matter;  or in the alternative (2)  production of said minutes to the Court for its *in camera* inspection so as to determine whether the decision to indict was substantially influenced by improper instructions on the law, or the product of insufficient evidence, and/or prejudicial influence on the grand jury's fact finding process as a result of the deliberate use of misleading, unreliable and scientifically inadmissible statistical evidence that essentially negated the government's burden of proof and rendered a nullity Dr. Lesniewski's right to an indictment by a fair and impartial grand jury.

On May 22, 2012, the government filed the Superseding Indictment, which pleads a total of 19 counts against a total of 21 defendants.   Dr. Lesniewski is charged in *six* of those counts. Specifically, Dr. Lesniewski is charged with: Conspiracy to Commit Mail Fraud, Wire Fraud, and Health Care Fraud, in violation of 18 USC §1341, 1343, 1347, and 1349 (Count One); Conspiracy to Defraud the United States, in violation of 18 USC § 371 (Count Two); False Claims, in violation of 18 USC § 287 (Count Three); Health Care Fraud, in violation of 18 USC § 1347 (Count Four); Mail Fraud, in violation of 18 USC § 1341 (Count Nine); and Wire Fraud, in violation of 18 USC § 1343 (Count Nineteen).

Along with Dr. Lesniewski, another physician, Peter J. Ajemian, M.D., is also similarly charged.  Notably, a third physician who died during the pendency of this lengthy *New York Times* generated investigation is also named as an unindicted co-conspirator. Charged along with

the physicians are two so-called "facilitators" and 17 Long Island Rail Road workers who have been awarded occupational disability, and Dr. Ajemian's office manager, Maria Rusin.

Counsel for several co-defendants have filed simultaneously herewith a variety of motions attacking this speaking Superseding Indictment, its prolixity, inclusion of dubious statistics, surplusage and other material frailties.  *See*, *e.g.,* Defendant Peter J.Ajemian's Motion to Preclude Statistical Evidence and Strike Surplusage; Defendant Steven Gagliano's Motion to Preclude Statistical Evidence and Strike Surplusage, or in the Alternative, to Sever the Annuitant Defendants from the Doctor and Facilitator Defendants Based Upon Prejudicial Spillover; Defendant Regina Walsh's Motion to Dismiss the Prolix "Speaking" Superseding Indictment Pursuant to Rule 7, Fed. R. Crim. P.  The allegations, argument and authorities set forth in those motions are respectfully incorporated herein by reference.As these motions allege, the government relies heavily on purported statistics rather than alleging specifics of the purported fraud.   As set forth in the above motions, the government has improperly relied on these faulty statistics to construct  the inherently flawed argument that, absent fraud committed by the defendants, there is no other explanation for the number of LIRR workers who have been awarded occupational disability.

As acutely observed by counsel for  Dr. Ajemian in  his Motion  entitled "The Court Should Strike the Government's Statistical Surplusage," allowing proof of these statistics "would simply incite the jury to infer guilt as soon as the bare 'numbers' are received in the prosecution's opening statement."  *See*  Defendant Peter J. Ajemian's Motion,  entitled "The Court Should Strike the Government's Statistical Surplusage," at 4-9.

This very issue necessarily raises a serious question that the Grand Jury that returned this indictment was both not properly instructed on the law, and  indicted, instead, on improper bases.

In addition to the legal problems with the Indictment advanced in the aforesaid arguments of co-counsel, issues with the Indictment also abound with regard to the admission of co-conspirators' statements against Dr. Lesniewski.  As is advanced **post**, in Point V, which requests a hearing regarding these co-conspirator statements, the charges in the Superseding Indictment are based on allegations of a conspiracy that is so wide-ranging and ill-defined that it is unclear whether there is a single conspiracy or multiple conspiracies—a problem exacerbated by the total lack of any relationship between Dr. Lesniewski and virtually every single co-defendant, not to mention the numerous potential unknown co-conspirators referenced in the Indictment.  *See also* Rule 8(a)(1) Motion on behalf of Defendant Maria Rusin entitled "Counts One and Two of the S-1 Indictment Improperly Charge Multiple Conspiracies in Single Counts and Should be Dismissed on Grounds of Facial Duplicity.  In the Alternative, the Government Should be Required to Reformulate Counts One and Two to Charge Single Conspiracies in Each Count."  In the same vein, these weak and multiple conspiracy allegations raise serious doubt whether the grand jury was properly instructed on the law of conspiracy.

As such, counsel would also submit, therefore, that this case presents one of those rare situations where this Court could, and should, exercise its supervisory powers over the conduct of the grand jury, and at least insure itself that the grand jury was not misinstructed, misused, or manipulated.  Dr. Lesniewski is mindful that review of facially valid indictments on the grounds of sufficiency of the evidence is not warranted.  *United States v. Williams*, 504 U.S. 36, 112 S.Ct 1735, 118 L.Ed.2d 2352 (1992); *citing*, *Costello v. United States*, 350 U.S. 359 (1956).  However, in light of the constitutional questions presented, and the serious irregularities raised herein, it is submitted that a sufficiently serious doubt might exist with respect to whether the grand jury's very decision to indict was not influenced by erroneous instructions on the law.  *See*

*United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986 ); *The Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988).

Accordingly, counsel requests an evidentiary hearing to develop these allegations further, and that upon the conclusion of the same, ask that this Court exercise its supervisory powers and grant the relief requested.

## POINT II

### THE COURT SHOULD ORDER THE IMMEDIATE DISCLOSURE OF FAVORABLE EVIDENCE REGARDING THE DECISION OF THE U.S. ATTORNEY FOR THE EASTERN DISTRICT OF NEW YORK NOT TO INDICT BASED UPON ITS REVIEW OF THE SAME ALLEGED CRIMINAL CONDUCT CHARGED IN THIS INDICTMENT

Pursuant to the Fifth and Sixth Amendments to the Constitution of the United States, and the principles enunciated in *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), *Agurs v. United States*, 427 U.S. 97 (1976), and *United States v. Bagley*, 473 U.S. 667 (1986), Dr. Lesniewski respectfully moves this Court to require the government to disclose immediately any previously undisclosed evidence, information, documentation or materials known to the government or in its possession, custody, or control, the existence of which is known or by the exercise of reasonable diligence may become known, that is favorable to Dr. Lesniewski and is material to the issues of his guilt, innocence, or sentencing, or which bears upon the credibility of a government witness, and specifically regarding the decision of the U.S. Attorney for the Eastern District of New York not to pursue an indictment after investigating the same alleged criminal conduct set forth in the Superseding Indictment.

The information requested specifically includes, but is not limited to the following itemized request:

> Any and all, books records or documentation, including but not limited to Declination Memoranda, internal correspondence or communications with the Department of Justice; the Department of Health and Human Services; and the Office of the Inspector General of the Railroad Retirement Board, regarding the decision of the U.S. Attorney for the Eastern District of New York not to prosecute the matters investigated in the September 25, 2008, and April 8, 2009, Subpoenas *Duces Tecum*,

attached as Exhibits T and S, respectively,  to the separately filed September 14, 2012, Declaration of Paul S. Bergman, Esq.

The government has acknowledged its obligation to disclose all evidence favorable to the accused, which counsel appreciates.  However, Dr. Lesniewski believes that his motion, in its specificity, is necessitated by the Supreme Court's decisions in *Agurs,* and *Bagley,* in which the Court, in enunciating the standard of review to be applied in cases of non-disclosure of favorable evidence, distinguished between cases in which specific requests for such information were made prior to trial and those in which general requests or no requests were made.  In *Bagley*, the Court held that the test for materiality of such non-disclosed evidence was the same in any event; *i.e.*, the evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

The *Bagley* Court recognized, however, that "the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the non-disclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption."  *Bagley,* 473 U.S. at 682-683.

Therefore, pursuant to the Court's admonition, "[t]he reviewing court should assess the possibility that [the preparation or presentation of the defendant's case may have been adversely affected] in light of the totality of the circumstances and with the awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response." *Id*. at 683. Accordingly, it is requested that the Court order the government to produce such evidence immediately, and impose on  the government  a continuing obligation to furnish all such evidence which comes to its attention during the preparation and trial of this case.

In addition to the Due Process rights at issue, this information is necessary well in advance of trial so that Dr. Lesniewski may adequately prepare for trial pursuant to his Sixth Amendment right to effective assistance of counsel and his Fifth Amendment right to prepare a defense.

**POINT III**

**ANY AND ALL WITNESSES AND INFORMATION
ACQUIRED BY THE GOVERNMENT THROUGH ITS
AMNESTY PROGRAM SHOULD BE SUPPRESSED
AND/OR PRECLUDED FROM TRIAL BECAUSE THE
GOVERNMENT'S INDUCEMENTS TO THOSE
PERSONS DENY THE DEFENDANTS DUE PROCESS;
AND THE COURT SHOULD ORDER THE GOVERNMENT
TO DISCONTINUE ITS USE OF THE GRAND JURY TO
PREPARE ITS CASE FOR TRIAL AND DENY THE
DEFENDANTS ACCESS TO POTENTIAL WITNESSES**

The government's conduct in the course of its investigation and prosecution of this case has denied defendants their Fifth Amendment right to Due Process, and will continue to do so absent relief from the Court. The Due Process violation can be distilled into two primary forms summarized here and detailed below.

During the course of this prosecution, the government has gone to unprecedented lengths to acquire the cooperation and, perhaps ultimately, testimony of former Long Island Railroad (hereinafter "LIRR") personnel. Indeed, the government has extended to more than 1,500 former LIRR employees the proverbial "offer they can't refuse," *i.e.*, an amnesty that ensures that those former employees not only avoid criminal prosecution for the very offenses charged in this case, but also reap thousands – and in some cases perhaps hundreds of thousands – of dollars in allegedly ill-gotten gains. In return, those former employees have been encouraged by the terms of the amnesty offer to provide information specifically against particular defendants in this case – including Dr. Lesniewski and the other charged physician, Dr. Ajemian, both of whom are named in the document.

It is respectfully submitted that such an arrangement, pernicious in formulation, communication, implementation, and impact, transcends the bounds of proper inducement, and denies the defendants Due Process guaranteed them by the Fifth Amendment. Accordingly, all

information, documents, and evidence, and fruits thereof, and any projected testimony, gained as a result of the government's amnesty offer, should be suppressed and/or precluded from the trial in this case.

In addition, and equally violative of Dr. Lesniewski's Due Process rights, the government has made improper use of the grand jury, utilizing it to prepare its case for trial and intimidate and discourage witnesses from providing exculpatory testimony and/or testifying on defendants' behalf. As a result, the Court should order the government to desist from abusing the grand jury, and instead to defer further grand jury subpoenas until after trial in this case. In the alternative, if the problems identified in this motion continue, or have already extended beyond the curative stage, the Superseding Indictment should be dismissed.

**A.**     ***The Nature and Terms of the Government's Offer of Amnesty***

Subsequent to the public filing of the Indictment in this case, the United States Attorney's Office for the Southern District of New York (hereinafter "USAO-SDNY") disseminated to "all LIRR retirees who are receiving [United States Railroad Retirement Board (hereinafter "RRB")] disability benefits" a document entitled "LIRR Disability Fraud – Voluntary Disclosure and Disposition Program" (hereinafter "Amnesty Letter"). *See* Amnesty Letter, at 1 (a copy of which is part of Exhibit P to the separately filed September 14, 2012, Declaration of Paul B. Bergman, Esq.).[1]

The Amnesty Letter alerted each recipient (greeted as "Dear Annuitant") that USAO-SDNY "is conducting a continuing investigation involving an alleged fraud in which individuals retiring from the [LIRR] falsely and fraudulently claimed that they were entitled to receive

---

[1] *See also*
<http://www.mta.info/supplemental/lirr/images/LIRRDisabilityFraudVoluntaryDisclosureDispositionExtension.pdf>.

disability benefits from the [RRB] upon their retirement from the LIRR." *Id.*  The Amnesty

Letter adds that USAO-SDNY "has criminally charged a number of individuals in connection

with this unlawful conduct, and our criminal and civil investigations are ongoing." *Id.*

 The Amnesty Letter also lists the terms of the amnesty if the applicant is accepted in the

program:

- USAO-SDNY will not criminally prosecute the applicant, or file any civil action

  against the applicant, "based on any RRB disability benefits [the applicant]

  previously [] received." *Id.*;

- "the RRB will agree not to commence any administrative proceedings against [the

  applicant] seeking repayment of any disability benefits that are the subject of" the

  amnesty program. *Id.*;  and

- "the LIRR will agree not to seek forfeiture of [the applicant's] Company Pension

  Plan benefits." *Id.*

Applicants need not surrender any benefits previously received, but merely must forego

future benefits (unless they fail to apply by the "Early Version" deadline, in which case they

would be obligated to return 50% of RRB benefits they had already received). *Id.*, at 2.  As a

result, in terms of adverse consequences avoided, and money retained (that, according to the

government's theory of the case, may have been obtained illegitimately), the benefits to those

accepted in the program are staggering.

 As the Amnesty Letter summarizes, the amnesty program

> is designed to enable participants to avoid some of the most serious
> consequences that may flow from having made false statements to
> the RRB – criminal prosecution, possible imprisonment, forfeiture
> of money and assets, and court-ordered restitution or fines.  In
> addition, the [amnesty program] allows participants to avoid other
> consequences, including court- or agency-ordered monetary

> penalties, damages of up to three times the amount of any
> disability payments that participants were not entitled to receive,
> and the potential forfeiture of LIRR Company Pension Plan
> benefits, based on statements made in connection with applying for
> disability benefits.

*Id*.

An addendum to the Amnesty Letter, entitled "LIRR Disability Fraud Voluntary Disclosure and Disposition Program" (and attached as part of Exhibit 1 to the accompanying September 14, 2012, Declaration of Joshua L. Dratel, Esq.), sets forth two criteria for eligibility: that the applicant (1) is an "LIRR retiree . . . receiving RRB disability benefits[;]" and (2) "in support of [the] application for disability, and/or subsequent statements made to the RRB, [the applicant], or doctors or others on [the applicant's] behalf, made what [the applicant] understood to be false or misleading statements with respect to your health condition, ability to work, or your eligibility for RRB disability benefits." *Id*., at 1-2.

The addendum cautions that persons are disqualified from the amnesty program if they are "presently charged or under active investigation by" USAO-SDNY. *Id*., at 2. However, the addendum notes that USAO-SDNY "reserves the right to permit an otherwise disqualified person to participate in the" amnesty program. *Id*. The addendum further advises that "[t]o determine if you are disqualified, you should apply for the [amnesty program,]" adding that the applicant's "statements in the application and agreement document will not be used against [the applicant] in any way except" if the applicant makes a false statement in the application, or later breaches the amnesty agreement or makes "statements that are inconsistent with the statements [the applicant] made in the [application]." *Id*. The government thereby reserves the right to use the application for impeachment on cross-examination, making conviction a *fait accompli* for anyone refused amnesty.

The Early Version Application and Agreement (also attached as part of Exhibit 2), after seeking pedigree information, contains the following three items:

- "List all 'Facilitators' or 'Consultants' consulted in connection with retirement and/or disability[;]"

- "List all medical professionals who filed any documentation with the RRB on your behalf in connection with retirement and/or disability[;]"  and

- "Did you ever see Dr. Peter J. Ajemian?"

  "Did you ever see Dr. Peter J. Lesniewski?"

  "Did you ever see Dr. Ralph Parisi?"

The addendum, at 3, while noting that "[p]articipation in the [amnesty program] is entirely voluntary[,]" also warns the "Annuitant" of the possible repercussions of not joining the program:

> [i]f you do not participate in the [amnesty program], however, and engaged in wrongdoing, you may face criminal, civil, or other administrative action.  You may be prosecuted for various criminal offenses, including offenses carrying maximum punishments of 20 years' imprisonment, and if convicted, face a prison term.  You may also be subject to forfeiture of all proceeds of the crime (*i.e.*, all disability and post-retirement sick pay benefits received by you), an order of restitution requiring you to repay the disability and sickness payments, and fines.  In addition, you may face a civil (*i.e.*, non-criminal) action brought by [USAO-SDNY] to terminate your benefits and to require you to pay up to three times the disability and post-retirement sick pay benefits you have received, plus monetary penalties.  Furthermore, the RRB could potentially bring administrative proceedings seeking forfeiture of your Company Pension Plan benefits.

While the Amnesty Letter, at 2, "encourage[s] [the Annuitant] to consult an attorney" if he or she has any questions, it also provides in that same paragraph an e-mail address and telephone number that Annuitants can use to contact USAO-SDNY directly.  Moreover, in the

event the message of the Amnesty Letter was not sufficiently apparent to the LIRR retirees,

Janice Fedarcyk, Assistant Director-In-Charge for the Federal Bureau of Investigation

(hereinafter "FBI"), later announced that:

> [l]ast October, when we carried out the first round of arrests in this
> investigation, we encouraged other fraudulent disability pensioners
> to come forward.  We said then that if we didn't hear from them,
> they would likely hear from us.  That was not an idle threat then,
> and it is not now.  If you are culpable in this fraud, the voluntary
> disclosure program announced today is certainly a better choice
> than crossing your fingers and hoping we don't find you.

*See* Exhibit P to the Bergman Declaration, at 2.

Apparently not satisfied with the response, just this past Wednesday, September 12,

2012, the government further turned up the heat on retired LIRR workers by unsealing Criminal

Complaints against ten more purported co-conspirator LIRR employees.  Of course, that was

accompanied by a press release from USAO-SDNY in which the United States Attorney was

quoted as issuing the following brazen admonition to those LIRR retirees still with the temerity

to resist the government's blandishments:

> [i]f you are an LIRR retiree who lied to get disability benefits, the
> deadline for participation in the early version of the Voluntary
> Disclosure program is upon you.  But make no mistake – there is
> no deadline for concluding our investigation.  We are both
> relentless and patient and will continue to investigate this
> widespread, alleged fraud.

*See* <http://www.justice.gov/usao/nys/pressreleases/September12/lirrthirdwave.html>.

While the initial Amnesty Letter set strict deadlines for applicants, with those missing the

first date subject to repayment of 50% of their previously-received RRB disability benefits, the

government has since twice extended the due date for the "Early Version" (from July 6, 2012, to

September 14, 2012, and now September 28, 2012) as well as the "Standard Version" (from

August 10, 2012, until October 15, 2012, and now October 26, 2012).[2]

**B.**      ***The Nature and Terms of the Government's Amnesty Offer Are Unprecedented***

In counsel's experience – and that includes *all* defense counsel in this case – the particular features of the government's amnesty offer to retired LIRR employees is unprecedented on several grounds.  While, as detailed below, other amnesty programs enable individuals to avoid criminal prosecution and certain monetary penalties, this amnesty program permits those accepted in the program to:

(1)      avoid payment of *any* monies or other consideration in return for acceptance in the program;

(2)      retain years of allegedly ill-gotten gains without any penalty or repayment;

(3)      continue to receive LIRR pension benefits to which, because of misconduct, they might not otherwise be entitled;  and

(4)      avoid any civil or administrative proceedings related to their LIRR or RRB benefits.

In addition, a unique aspect of this amnesty program is its specific targeting of three physicians, two of whom – Dr. Ajemian, and Dr. Lesniewski[3] – are defendants in this Indictment.  By implication, the amnesty program seeks information about two other defendants in this case who the government claims acted as "facilitators."

In contrast, two other recent amnesty programs, instituted separately and for different

---

[2]  *See* <http://www.mta.info/supplemental/lirr/images/LIRRDisabilityFraudVoluntaryDisclosureDispositionExtension.pdf> and <http://www.justice.gov/usao/nys/pressreleases/September12/lirrthirdwave.html>.

[3]  The third physician, Dr. Parisi, is deceased.

purposes by the Internal Revenue Service (hereinafter "IRS") in 2009 (to recover unpaid federal taxes due on money maintained in foreign bank accounts) and the ongoing New York State Department of Taxation and Finance program that began in 2008 (to recover unpaid New York State taxes due on false and fraudulent returns), each required payment of the taxes due.  *See, e.g.,*

<http://www.nytimes.com/2011/09/16/business/amnesty-program-yields-millions-more-in-back-taxes.html> & <http://www.tax.ny.gov/enforcement/vold/>.

Also, the IRS amnesty program, which required payment of up to eight years of back taxes, merely offered the prospect of *reduced* fines and penalties (in addition to avoiding criminal charges), but not their elimination altogether.[4]

Nor did either the IRS or NYS program identify targets of the government's investigation, or create ambiguity regarding who – and/or what conduct – was covered by the amnesty program.  Here, by introducing into the amnesty program the conduct of third parties – whether "doctors or others on [the applicant's] behalf [meaning the so-called "facilitators," including defendants Marie Baran and Joseph Rutigliano], made what [the applicant] understood to be false or misleading statements with respect to your health condition, ability to work, or your eligibility for RRB disability benefits" – as well as by not limiting the prospect of criminal charges to those whose false statements were *material* to collection of benefits, and/or which were knowing and  intentionally false, or not merely inadvertently "misleading" – the government has impaired the ability of LIRR retirees to determine whether they are indeed in jeopardy should they not avail themselves of the amnesty program.

---

[4]  Indeed, the IRS program still imposed fines of up to 25% of the highest balance in an overseas account between 2003-2010.

In that context, both the IRS and New York State programs were publicized, respectively, by notice generally to banks and account-holders, and to all taxpayers statewide (and those outside New York who might owe New York State taxes).  Here, though, the Amnesty Letter was mailed to approximately 1,500 retired LIRR employees "under suspicion for conspiracy to commit health care fraud[,]" although there is no evidence the government distinguished the recipients on the basis of any sorting process, and instead simply sent a mass mailing to those receiving disability who retired from the LIRR within a certain time frame (which approximates 1,500 employees within the past decade).  *See* Exhibit P, at 4.  *See also* <http://www.fbi.gov/newyork/press-releases/2012/manhattan-u.s.-attorney-announces-charges-against-10-additional-long-island-railroad-retirees-for-participating-in-massive-disability-fraud-scheme>.  In addition, the IRS and New York State programs were publicized and operated by the taxing agencies themselves, and not by criminal law enforcement organs (the USAO-SDNY and the FBI).

Thus, receiving notice of the IRS and New York State programs was meaningless to the average taxpayer who either did not have overseas accounts (or reported all income in them and paid taxes accordingly), or who had not filed false or fraudulent returns.  Yet here, receiving the Amnesty Letter constituted stark evidence, in the most ominous and obvious overtones, of appearing prominently on the government's investigative radar.  That, in turn, has presented those retired LIRR employees a Hobson's choice for those recipients regardless whether they had engaged in wrongdoing in obtaining disability benefits.

As one commentator has noted, currently "the incentives for defendants to plead guilty are greater than at any previous point in the history of our criminal justice system[,]" and that "[t]oday, the incentives to bargain are powerful enough to force even an innocent defendant

to falsely confess guilt in hopes of leniency and in fear of reprisal."  Lucian E. Dervan,

*Bargained Justice:  Plea-Bargaining's Innocence Problem and the* Brady *Safety-Valve*, 2012

UTAH L. REV. 51, 64, 56 (2012) (hereinafter "*Bargained Justice*") (footnote omitted).[5]

      As a result, according to Prof. Dervan, "it is clear that plea-bargaining has an innocence

problem."  *Id*. at 84 & n. 257 (citing research literature).  *See also* Lucian E. Dervan and Vanessa

A. Edkins, *The Innocent Defendant's Dilemma: An Innovative Empirical Study of Plea*

*Bargainin's Innocence Problem*, 103 JOURNAL OF CRIMINAL LAW & CRIMINOLOGY ____

(forthcoming 2013) (available at

<http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2071397>).

      Indeed, Prof. Dervan points out that the inducements offered those who are *not* guilty, or

against whom the government possesses less evidence, are often significantly *greater* than those

offered those against whom the case is strong, and for whom guilt is a foregone conclusion

(because innocent defendants, or those against whom the government's case is weak, require

more substantial incentives to plead guilty):

> [t]oday, defendants whose guilt is uncertain are offered plea
> bargains as often, if not more often, than those for whom the
> evidence is particularly strong.  Not only are these defendants of
> questionable guilt offered plea bargains, their bargains are often
> more generous and, therefore, more irresistible than those offered
> to defendants against whom the government believes it has a
> strong chance of success at trial.

*Id*., at 90-91 (footnotes omitted).  *See also id*., at 90 (". . . it is very likely that innocent

defendants will plead guilty in return for the incredible incentives currently being offered by the

prosecution, incentives that strip away a defendant's ability to freely decide whether to accept or

---

    [5]  Mr. Dervan is an Associate Professor of Law at Southern Illinois University School of
Law.  His article is available at
<<http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1664620>).

reject the government's advances") (footnote omitted).

Consequently, Prof. Dervan concludes that "one can hardly be expected to make a rational and free decision regarding an offer to plead guilty when the differences between the offered leniency and the threat of punishment are staggering and life altering." *Id.*, at 96.  That problem is aggravated exponentially when, as is the case here with respect to the amnesty program, the offer provides the opportunity to avoid criminal prosecution and financial penalty *altogether.*

In addition, the amnesty process is beyond the Court's control.  Unlike the situation when a person pleads guilty, the voluntariness of an LIRR retiree's entry in the amnesty program – including providing the information about the defendants required by the application – is not subject to court supervision.  While courts engage in a comprehensive colloquy with a defendant and counsel in order to ensure that guilty pleas are knowing and voluntary, here – since there will not be guilty pleas, but instead amnesty – such safeguards are glaringly absent.  Indeed, a retiree's entry in the amnesty program may not even be accompanied at all by the advice of or representation by counsel.  Nor will the specific benefits received by each entrant, or the value of those benefits, necessarily be reduced to writing.

That absence of any judicial or other monitoring exacerbates the problems created by the amnesty program, and further justify this Court's intervention in order to preserve defendants' Fifth Amendment right to a fair trial.[6]

---

[6] As Prof. Dervan notes in his article, "[t]oday, a general consensus has evolved within plea bargaining scholarship that plea bargaining became a dominant force as a result of prosecutors gaining increasing power and control in an ever more complex criminal justice system." *Bargained Justice*, at 61 (footnote omitted).  *See also id.*, at 63 ("[w]hile defendants also play an important role in the plea bargaining process, prosecutors' control of charging decisions and their influence over sentencing are key elements that contributed to the system's dominance") (footnote omitted).  Ironically, as Prof. Dervan points out, plea bargaining in its

C.      *Case Law Regarding the Government's Inducements to Witnesses to Testify*

Courts have, despite some reservations, ultimately and uniformly afforded the government essentially unfettered discretion in providing emoluments to potential witnesses to secure their testimony on the government's behalf.  *See, e.g., United States v. Dailey*, 759 F.2d 192 (1st Cir. 1985).[7]  *See also United States v. Dawson*, 425 F.3d 389, 393-95 (7th Cir. 2005); *United States v. Tarantino*, 846 F.2d 1384, 1418 (D.C. Cir.1988);  *United States v. Valle-Ferrer*, 739 F2d 545 (11th Cir. 1984).

Even when courts have initially ruled otherwise, those decisions have been superseded on review, or by subsequent cases.  For example, the Fifth Circuit's opinion in *Williamson v. United States*, 311 F2d 441, 444 (5th Cir. 1962), establishing *per se* rule that an informant paid a contingent fee is not a competent witness, has since been explicitly overruled in  *United States v. Cervantes-Pacheco*, 826 F2d 310 (5th Cir. 1987).  Similarly, the Eighth Circuit vacated *en banc* the panel's decision in *United States v. Waterman*, 732 F.2d 1527, 1528 (8th Cir.), *vacated en banc*, 732 F.2d 1533 (8th Cir. 1984).  *See also United States v. Singleton*, 144 F.3d 1343 (10th Cir. 1998), *rev'd on rehearing en banc*, 165 F3d 1297 (10th Cir.) (exempting government and prosecutors from the constraints of 18 U.S.C. §201, the federal anti-bribery, anti-gratuity statute,

---

infancy was a product of defendants bribing prosecutors in order to receive lenient treatment. *Id*., at 59.  Now the system has revolved in the exact opposite direction.

    [7]  In *Dailey*, the First Circuit concluded that the benefits the witnesses had already received, and might later receive, from the government in return for their testimony "all went to the weight of [their] testimony, not to its admissibility."  759 F.2d at 199.  As a result, the Court in *Dailey* determined that the proper remedy would be that "the agreements should be read to the jury and made available during its deliberations;  defense counsel may cross-examine the accomplices at length about the agreements;  and the jury should be given the standard cautionary instruction concerning the testimony of accomplices and a special cautionary instruction concerning the nature of each accomplice's contingent agreement and the risk that it creates, particularly in instances where the accomplice's testimony cannot be corroborated."  *Id*., at 200.

in the context of benefits provided to government witnesses in return for testimony).[8]

Also, courts have regularly restated the principle that "a favorable plea agreement in exchange for truthful testimony does not violate [18 U.S.C.] §201." *United States v. Orr*, 136 Fed. Appx. 632, 637 (5th Cir. 2005) (citing *United States v. Haese*, 162 F.3d 359, 368 (5th Cir.1998)); *accord United States v. Johnson*, 169 F.3d 1092, 1097-98 (8th Cir. 1999); *United States v. Lowery*, 166 F.3d 1119, 1123 (11th Cir. 1999); *United States v. Ware*, 161 F.3d 414, 419–23 (6th Cir. 1998); *Hale v Davis*, 07-12397, 2009 WL 4666489 (ED Mich. Dec. 3, 2009).

Nor have a witness's monetary gain or incentive provided a basis for preclusion of testimony. *See, e.g.*, *United States v. Cuellar*, 96 F.3d 1179, 1183 (9th Cir.1996); *United States v. Tsai*, 14 Fed Appx 834, 835 (9th Cir. 2001); *United States v. Persico*, 832 F2d 705, 716 (2d Cir. 1987).

Nevertheless, the American Bar Association's Standards for the Prosecution Function include the following provision, entitled "Relations With Victims and Prospective Witnesses:"

> A prosecutor should not compensate a witness, other than an
> expert, for giving testimony, but it is not improper to reimburse an

---

[8] In *Singleton*, the panel opinion, later reversed *en banc*, had concluded that "under [18 U.S.C.] §201(c)(2) the promise need not be intended to affect, and need not actually affect, the testimony in any way. Promising something of value to secure truthful testimony is as much prohibited as buying perjured testimony." 144 F.3d at 1358 (citation omitted). The statute at issue in *Singleton*, 18 U.S.C. §201, provides that a violation occurs when a person

> directly or indirectly, gives, offers, or promises anything of value
> to any person, for or because of the testimony under oath or
> affirmation given or to be given by such person as a witness upon a
> trial, hearing, or other proceeding, before any court, any committee
> of either House or both Houses of Congress, or any agency,
> commission, or officer authorized by the laws of the United States
> to hear evidence or take testimony, or for or because of such
> person's absence therefrom.

18 U.S.C. §201(c)(2).

> ordinary witness for the reasonable expenses of attendance upon
> court, attendance for depositions pursuant to statute or court rule,
> or attendance for pretrial interviews.  Payments to a witness may
> be for transportation and loss of income, provided there is no
> attempt to conceal the fact of reimbursement.

Standard 3-3.2(a).

### D.     *The Amnesty Program In This Case Presents Unique Circumstances That Demand a Remedy In Order to Ensure That the Defendants Receive a Fair Trial*

The general rule – that the inducements the government offers witnesses are not matters for admissibility, but rather constitute issues of credibility to be disclosed to, and determined by, the jury – cannot be without limits.  In the cases cited above, and generally, the challenged benefits were offered or provided to one or two witnesses (and three in *Dailey*), and based on individualized negotiation and disposition.  They also more often than not related to leniency at sentencing after the witness had pleaded guilty to a crime.

Here, in contrast, the government's solicitation of witnesses is not isolated but instead has been calculated and systematic, and presents the prospect of an entire character or class of witnesses whose testimony will have been purchased, and who have been provided a roadmap on how to incriminate Dr. Lesniewski and others.  Thus, the amnesty program threatens to create a parade of witnesses offering contrived, if not entirely manufactured, testimony.  *See also* **post**, at 30-31.

Also, the amnesty program's identification of the targets of the investigation, coupled with the very public and continued media campaign orchestrated by the government, violates all principles of proper investigative technique.  Counsel have represented many defendants and other who have cooperated with the government.  The hallmark of investigative integrity is *not* telegraphing to the prospective witness the identity of the target, the nature of the information sought to be elicited, or any details that could lead to the witness simply parroting back to the

interrogator answers the interrogator wants to hear.  The naming of particular targets – again, combined with the persistent public description of the nature of the alleged offense conduct – thus completely undermines the *bona fides* of any witnesses procured through the amnesty program.

Many studies describe the distorting effects of suggestive questioning.[9]  Cooperating witnesses, are susceptible to several extraneous influences, and are "(1)  easily manipulated by coercive and suggestive interviewing techniques;  (2)  readily capable of giving false and embellished testimony with the prosecutor's knowledge, acquiescence, indifference, or ignorance;  (3)  readily capable of creating false impressions by omissions or memory alterations that in the absence of any recordation or documentation eludes disclosure and impeachment;  and (4)  able to present . . . testimony to the jury in a truthful and convincing manner, which because of the nature of the cooperation process is difficult to impeach through cross-examination."[10]

Adding to that mixture the financial incentives provided to the amnesty program entrants if they satisfy the government, in contravention of the ABA Standards set forth **ante**, at 22, only

---

[9]  Bennett L. Gershman, *Witness Coaching by Prosecutors*, 23 CARDOZO L. REV. 829, 839 n. 46 (2002) (hereinafter "*Witness Coaching*") ("[a] common misconception about memory is that it is a process of reproducing or retrieving stored information, in the manner of a videotape or a computer.  In fact, memory is much more a process of reconstruction");  Michael Owen Miller, *Working With Memory*, 19 LITIG. 10, 11 (Summer 1993) (noting memory is not a single mental process but involves three stages of acquisition, retention, and retrieval, each of which may be "enhanced, suppressed, or distorted").

[10]  *See* Gershman, *Witness Coaching*, at 848 & n. 100 ("[t]he setting for the proffer session is hardly conducive to producing a neutral, objective, and accurate recollection.  The setting is often tense and intimidating.  Given the enormous inducements to the cooperator to give false or misleading testimony, as well as the inducements to the prosecutor to accept the cooperator's veracity, the context is inherently manipulative for both the cooperator and the prosecutor").  *See also* The Honorable Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 HASTINGS L. J. 1381, 1383 (1996);  R. Michael Cassidy, *"Soft Words of Hope:"*  Giglio, *Accomplice Witnesses, and the Problem of Implied Inducements*, 98 NW. U. L. REV. 1129, 1135–36 ns. 34–38 (2004).

exacerbates the problem presented by offers the entrants simply cannot refuse.  *See also*

*Bargained Justice*, at 95 ("[a]t some point, the sentencing differential [the difference in the

sentence imposed after a guilty plea and that imposed after trial] becomes so large that it

destroys the defendant's ability to act freely and decide in a rational manner whether to accept or

reject the government's offer").

      In addition, the amnesty program, though its dissemination and extension, thereby

precipitating another round of media coverage, reinforces negative publicity about these

defendants (and Dr. Lesniewski, Dr. Ajemian, Ms. Baran, and Mr. Rutigliano in particular), and

perpetuates the public relations onslaught the government has launched against these

defendants.[11]  Indeed, only this past Wednesday, in its press release accompanying the unsealing

of an additional ten criminal complaints, the government reiterated the full contours of the

charges against *all* 32 defendants in this and the other cases, and its claim that the new

defendants constituted "additional participants in a massive fraud scheme . . ."[12]

      The transparent purpose of the Amnesty Letter and program – and continued press

campaign despite defendants' objections – is to generate and coerce witnesses for the

government, with those witnesses benefitting enormously, and providing information knowing in

advance the precise character of information the government seeks, *and against whom*.  Thus,

the continuing amnesty program has maximized the prospect for manipulation by being

disseminated *after* public disclosure of the considerably detailed "speaking" Indictment in this

---

    [11]  In that context, the amnesty program constitutes another element of the government's
evasion, or even violation, of Local Criminal Rule 23.1, the Free Press-Fair Trial Directives, that
constrain a lawyer's extrajudicial statements.  *See* Memo of Law on Behalf of Regina Walsh, at
14-16.

    [12]  *See* <http://www.justice.gov/usao/nys/pressreleases/September12/lirrthirdwave.html>.

case.  Yet the government, on notice from defense counsel that its tactics impair defendants'

right to a fair trial, obtusely continues its scorched-earth campaign to eliminate from the

landscape the possibility that any retired LIRR worker could legitimately be disabled, and could

claim so from the witness stand.

Consequently, the amnesty program possesses an authentic danger of corrupting this

case, and presents a genuine threat to the integrity of any trial, and to defendants' right to Due

Process.  As the First Circuit noted in *Dailey* in the context of benefits contingent upon

subsequent indictments and convictions, such inducements "skate very close to, if indeed they do

not cross, the limits imposed by the due process clause."  759 F.3d at 201 n. 9.

As Prof. Dervan notes, when the Supreme Court endorsed the constitutionality of plea-

bargaining in *Brady v. United States*, 397 U.S. 742 (1970), it included a "safety-valve" designed

to "prohibit[] prosecutors from offering incentives in return for guilty pleas that are so coercive

as to overbear defendants' abilities to act freely."  *Bargained Justice*, at 57.  As a result, the

"*Brady* safety-valve . . . plac[es] a limit on the amount of pressure that can constitutionally be

placed on defendants to plead guilty."  *Id*., at 88.

In fact, in *Brady*, the Court cautioned that it "[w]ould have serious doubts about this case

if the encouragement of guilty pleas by offers of leniency substantially increased the likelihood

that defendants, advised by competent counsel, would falsely condemn themselves."  397 U.S. at

757-78.  In that context, Prof. Dervan has concluded that

> there is a significant innocence problem with plea bargaining
> today. This being the case, the *Brady* safety-valve may not be
> working and, if so, defendants, both innocent and guilty, are being
> offered unconstitutional incentives to confess.

*Bargained Justice*, at 57 (footnote omitted).

In *Dawson*, in which the witness was paid what amounted to a bounty for his

cooperation, Judge Williams, in dissent, did not argue with the majority's conclusion that preclusion of the witness's testimony would constitute a "windfall" for the defendant, but noted that "to appreciate that value is not to say that other values do not here exist. Indeed, they do, and they are nothing less than due process and fairness to defendants."  425 F.3d at 398 (Williams, J., *dissenting*).

As Judge Williams emphasized, "[t]hese values too are important[,]" adding that "[s]uch an incentive structure does little to enhance overall confidence in the criminal justice system." *Id.*, quoting *United States v. Estrada*, 256 F.3d 456, 472 (7th Cir. 2001).

The same is true here.  While the benefits are not technically contingent, they are so overwhelming – in conjunction with a *quid pro quo* that is patently transparent – and beyond the supervision of the Court that they augur a denial of Due Process on a scale not addressed or even contemplated in the decisions affording the government its considerable leeway in lavishing witnesses with benefits.  As Judge Williams recognized in dissent in *Dawson*,

> witnesses can receive immunity or reduced sentences in exchange for their truthful testimony, *see, e.g., United States v. Blassingame,* 197 F.3d 271, 285 (7th Cir.1999), and I have no quarrel with that practice.  It is one thing to accept the myriad and sometimes sordid realities that motivate witnesses to testify;  but it is another affirmatively to invite inherently tainted testimony.

425 F.3d at 399 (Williams, J., *dissenting*).

Accordingly, relief is required, and it is respectfully submitted that the remedy should be suppression of all information, evidence, and documents obtained by the government as a result of the amnesty program, and preclusion of any witnesses enlisted via the amnesty program.

**E.**     ***The Government's Amnesty Program and Abuse of the Grand Jury Have Denied Defendants Due Process By Denying Them Access to Potential Defense Witnesses***

Moreover, the overt threats in the Amnesty Letter (and by ADIC Fedarcyk, *see* **ante**, at

14) will discourage and intimidate potential defense witnesses who have, in effect, been threatened with investigation and prosecution if they do not avail themselves of the amnesty program and capitulate to the government.

Thus, even if it was not designed for that purpose, the amnesty program will have the inevitable effect of preventing the defense from calling (at trial) or even speaking to witnesses who would provide testimony in conflict with the government's theory of the case.  In addition, the government has used the grand jury to prepare its case for trial, and to negate the defense's ability to interview and ultimately call potential defense witnesses.

The notion that somehow those witnesses will withstand this multifaceted government pressure, and instead cooperate with and testify for the defense, is fanciful.  *See United States v. Morrison*, 535 F.2d 223, 228 (3rd Cir.1976) (prosecutor's intimidating interview of witness before start of defense case and indirect warnings regarding potential criminal liability dissuaded witness from testifying).

Improper interference with potential defense witnesses may involve threats of prosecution or other conduct designed to intimidate.  *See, e.g., United States v. Smith*, 478 F.2d 976, 979 (D.C.Cir.1973);  *United States v. MacCloskey*, 682 F.2d 468, 479 (4th Cir.1982) (prosecutor's "eleventh hour" telephone call to witness's attorney reminding him of potential Fifth Amendment problem if witness took stand);  *United States v. Whittington*, 783 F.2d 1210, 1219 (5th Cir.);  *United States v. Little*, 753 F.2d 1420, 1440 (9th Cir.1984).  *See also United States v. Ruehle*, 08 Cr. 139 (C.D. Cal.) (Carney, J.), transcript ruling of Dec. 15, 2009 (available at <http://www.scribd.com/doc/24206782/Transcript-of-Judge-Cormac-Carney-Dismissal-Ruling-in-Criminal-Case-of-William-Ruehle>) (indictment dismissed because, in part, government threatened an immunized defense witness with perjury if he testified consistent with

his testimony at a civil deposition [and which was exculpatory with respect to the defendants in the criminal case]).[13]

Moreover, a grand jury subpoena may not be issued to prepare for trial and/or intimidate and/or discourage potential defense witnesses, yet here the government continues to employ the grand jury for those very illegitimate purposes.  In that context, the Second Circuit has repeatedly stated that "'[i]t is, of course, improper for the Government to use the grand jury for the sole or dominant purpose of preparing for trial under a pending indictment.'"  *United States v. Jones*, 129 F.3d 718, 723 (2d Cir. 1997), *quoting United States v. Leung*, 40 F.3d 577, 581 (2d Cir. 1994).  *See also United States v. Vanwort*, 887 F.2d 375, 387 (2d Cir. 1989), *cert. denied*, 495 U.S. 906 (1990) ("[i]t is clearly 'improper to utilize a Grand Jury for the sole or dominating purpose of preparing an already pending indictment for trial'"), *quoting Payden v. United States [In re Grand Jury Subpoena Duces Tecum Dated January 2, 1985 (Simels)]*, 767 F.2d 26, 29 (2d Cir. 1985) (second internal quotation marks omitted), *quoting United States v. Dardi*, 330 F.2d 316, 336 (2d Cir. 1964).[14]

As the Second Circuit explained in *Simels*, "[t]he question of a grand jury's dominant purpose is not the typical question of historical fact nor even the typical inquiry as to the state of mind of a witness or a party."  767 F.2d at 29.  Rather, as the Court continued, "[i]t is the application of a legal standard designed to ensure that the grand jury, a body operating peculiarly

---

[13]  *See also* Andrew Sorkin, "DealB%k: How the Broadcom Backdating Case Went Awry," *The New York Times*, December 14, 2009 (available at <http://dealbook.nytimes.com/2009/12/14/how-the-broadcom-backdating-case-has-gone-awry/>) The Ruehle case appears to no longer be available on PACER.

[14]  In *Simels*, the Second Circuit made it clear that the rule applies to third-party subpoenas challenged by a defendant.  767 F.2d at 29.

under court supervision, [citations omitted], is not misused by the prosecutor for trial preparation." *Id*.

Equally clear is the principle that the government's improper intimidation and/or coercion of potential defense witnesses can deny a defendant Due Process and a fair trial. *See, e.g., United States v. Williams*, 205 F.3d 23, 29 (2d Cir. 2000); *United States v. Vavages*, 151 F.3d 1185, 1188 (9th Cir. 1998) ("[i]t is well established that 'substantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process'"), *quoting United States v. Little*, 753 F.2d 1420, 1438 (9th Cir. 1984). In addition, the government cannot act in a manner that makes favorable defense witnesses unavailable to the extent it "necessarily prevents a fair trial." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982). *See also* **ante**, at 27-28.

In evaluating whether the government is abusing the grand jury, the Second Circuit has examined (a)  timing;  (b)   the relationship of the subpoenaed person to any objective of a continuing investigation;  and (c)  the potential for prejudice to the defendant. *See, e.g., Jones*, 129 F.3d at 723-24; *Leung*, 40 F.3d at 581-82; *Vanwort*, 887 F.2d at 386-87; *Simels*, 767 F.2d at 29-30; *Dardi*, 330 F.2d at 336.

Here, examination of each factor demonstrates that the government's purpose is improper. For instance, regarding *timing*, the Indictment in this case was unsealed ten months ago. A superseding Indictment – which has been the stated Indictment for trial in this case – was filed this past May. Trial is essentially only five months away. *Cf. Vanwort*, 887 F.2d at 387. *See also Simels*, 767 F.2d at 29-30 ("[t]he timing of the subpoena casts significant light on its purposes").

Also, by continuing to subpoena LIRR retirees to the grand jury, the government is endeavoring to foreclose the possibility of the defense calling *any* of them defense witnesses. By abusing the grand jury and its subpoena power, the government will, unless relief is granted, haul as many as possible before the grand jury, admonish each about the penalties for perjury – with each witness knowing the consequences of testimony that deviates from the government's version of events, with Gary Satin already prosecuted for alleged perjury during his grand jury testimony, *see* Dkt. # 210 (Mr. Satin's guilty plea allocution) – and then obtain in a closed proceeding in which the witness's counsel is excluded a version of events that will effectively "lock in" that witness's potential trial testimony in a form to which the defense lacks any access. *Cf. Dardi*, 330 F.2d at 336. *See also United States v. Golding*, 168 F.3d 700, 704 (4th Cir. 1999) (government's reminder to witness that self-incriminating testimony as a defense witness exposed witness to indictment "'destroyed the choice . . . [of the witness] to testify freely"), *quoting United States v. MacCloskey*, 682 F.2d 468, 479 (4th Cir. 1982).[15]

For example, Michael Stavola, a retired LIRR electrician who was added as a defendant in the superseding Indictment, testified in the grand jury (without counsel), and his examination is instructive. When he initially resisted the prosecutor's suggestions that his disability application had been false, and his disability benefits fraudulently, obtained, the prosecutor, with the assistance of law enforcement agents, conveniently used the lunch break to "wood shed" Mr. Stavola, who upon his return after lunch was subject to a barrage of bullying to the point that he

---

[15]  *See Golding*, 168 F.3d at 704 (noting that in an earlier case, impairment of defense witness' credibility via earlier, improper grand jury subpoena was not harmless because she had been "an important corroborative witness . . ."), *citing United States v. Morris*, 988 F.2d 1335 (4th Cir. 1993).

exclaimed he was "so nervous that I don't know exactly what I'm saying."  Grand Jury

Testimony of Michael Stavola, April 28, 2011, at 29.[16]

Similarly, Brian DelGiorno, also added as a defendant in the superseding Indictment, and

peppered during his grand jury appearance with questions about a particular incident, protested –

despite interruptions by the prosecutor designed to prevent Mr. DelGiorno from speaking – that

"you're going on three years with me . . ."  Grand Jury Testimony of Brian DelGiorno, April 14,

2011, at 14.  Later, Mr. DelGiorno professed that "I'm not sure, I'm not sure, I'm losing it."  *Id.*,

at 45.

Another grand jury witness, and now a defendant, Karl Brittell, ultimately requested a

lawyer after being grilled about being able to drive to Albany despite his disability, although the

questioning continued thereafter.  Grand Jury Testimony of Karl Brittell, April 28, 2011, at 30-

32, 25-28.  *See also* Grand Jury Testimony of Thomas DeLalla, April 14, 2011, at 26-28 (Mr.

DeLalla was also added as a defendant in the superseding Indictment).[17]

Such improper and tactical use of the grand jury irremediably discourages the witnesses

from testifying as defense witnesses, compromises their effectiveness as defense witnesses if

called, and may very well even precipitate *false* inculpatory testimony against the defendants.

*See United States v. Heller*, 830 F.2d 150, 153-54 (11th Cir. 1987) (government's intimidation

induced potential defense witness to offer false testimony against defendant).

---

[16]  A copy of Mr. Stavola's grand jury testimony was produced by the government in
discovery.  Because it is grand jury testimony, a copy is being provided to the Court under seal
under separate cover pursuant to arrangements with the Court's chambers.

[17]  As with Mr. Stavola's grand jury testimony, copies of the grand jury testimony of Mr.
DelGiorno, Mr. Brittell, and Mr. DeLalla are provided under separate cover (with all four in a
single submission).

Also, in *United States v. Stein*, 435 F. Supp.2d 330 (S.D.N.Y. 2006), *aff'd on other grounds*, 541 F.3d 130 (2d Cir. 2008), the Court, in dismissing the indictment on Due Process grounds due to government interference with the defendants' right to counsel of choice, noted that among the limits on prosecutorial conduct is that prosecutors "may not obstruct defendants' access to a potential witness unless that is necessary to protect the witness's safety." 435 F. Supp.2d at 359 & n. 139, *citing United States v. Gonzales*, 164 F.3d 1285, 1292 (10th 1999) (defendants have "a right to be free from prosecution interference with a witness' freedom of choice about whether to talk to the defense"); *Int'l Bus. Mach. Corp. v. Edelstein*, 526 F.2d 37, 44 (2d Cir. 1975) (supporting "wholeheartedly" the conclusion that "constitutional notions of fair play and due process dictate that defense counsel be free from obstruction, whether it come from the prosecutor in the case or from a state official or another state acting under color of law") (*quoting Coppolino v. Helpern*, 266 F. Supp. 930 (S.D.N.Y.1967)); *Gregory v. United States*, 369 F.2d 185, 188 (D.C. Cir. 1966) (defendant denied a fair trial where prosecutor advised witnesses to the alleged crime not to speak to defense counsel outside the prosecutor's presence); *see also United States v. Muirs*, 145 Fed. Appx. 208, 209 (9th Cir.2005) ("government interference with defense access to witnesses implicates due process").

The government's subversion of the grand jury's function, and the attendant pressure applied by the government, might very well also induce any potential defense witnesses to invoke their Fifth Amendment privilege with respect to *any* testimony, including trial testimony, and to refuse to speak to the defense at all. That would make them completely unavailable to the defense. Also, to the extent the witnesses' grand jury appearances provides the government with incriminating information about them that later forms the basis for government cross-examination, and an assertion of th Fifth Amendment privilege at that juncture, that would be a

devastating and improper blow to their effectiveness as defense witnesses.  *See, e.g., United States v. Morris*, 988 F.2d 1335 (4ᵗʰ Cir. 1993);  *United States v. Golding*, 168 F.3d at 704.

That evisceration of defendants' right to present a defense is precisely the type of prejudice – overwhelming in this case – that was absent in *Jones*, *Leung*, and *Vanwort*.  It also eclipses even that present in *Simels*, in which the Second Circuit ordered that the subpoena be quashed.  767 F.2d at 29-30.

As the Second Circuit noted in *Williams*, "[i]t is elementary that criminal defendants have a right to establish a defense by presenting witnesses."  205 F.3d at 29, *citing Webb v. Texas*, 409 U.S. 95, 98 (1972).  Thus, as the Court in *Williams* explained, it follows that

> [r]elying on that principle, courts have held that judicial or prosecutorial intimidation that dissuades a potential defense witness from testifying for the defense can, under certain circumstances, violated the defendant's right to present a defense.

205 F.3d at 29 (*citing* cases).

Here, those "certain circumstances" exist in abundance.  Moreover, the "bad faith" required under *Williams*, 205 F.3d at 29,[18] is manifest from the government's continued pattern of coercion and intimidation, evidenced by the treatment of Michael Stavola and others (discussed **ante**, at 30-31).

---

[18]  There is a split in the Circuit Courts of Appeal with respect to the requirement of prejudice, *compare United States v. Williams*, 205 F.3d at 29 (requiring showing of bad faith) *with United States v. Morrison*, 535 F.2d 223, 227 (3d Cir. 1976) (good faith of prosecutor irrelevant) and *United States v. Vavages*, 151 F.3d 1185, 1190 (9ᵗʰ Cir. 1998) (focusing on objective reasonableness of officials' conduct and their basis for believing defense witness would perjure himself), and the extent to which an aggrieved defendant must show prejudice, *compare Williams*, 205 F.3d at 29-30 ("the acts complained of must be of such quality as necessarily prevents a fair trial") and *United States v. Golding*, 168 F.3d at 702 (requiring showing of prejudicial effect on defendant's "substantial rights") *with United States v. Hammond*, 598 F.2d 1008, 1013 (5ᵗʰ Cir. 1979);  *United States v. Morrison*, and *United States v. Thomas*, 488 F.2d 334 (6ᵗʰ Cir. 1973) (requiring no showing of prejudice).

In *United States v. Vavages*, the Ninth Circuit also distinguished between permissible prosecutorial warnings and impermissible attempts at coercion and intimidation, and the impact of the latter on a prospective defense witness:

> [w]e cannot disregard this prosecutor's conduct, however, where the additional statement [that he believed the witness would be lying if she supported the defendant's alibi] served as no more than a thinly veiled attempt to coerce a witness off the stand. It does not require much of an interpretative gloss on the prosecutor's warning to conclude that unless [the witness] changed her testimony or refused to testify at all, she *would* be prosecuted for perjury and suffer any attendant consequences. As the district court found, "[the prosecutor's] warnings were intimidating and were intended to stifle testimony which he believed would be perjurious in the defense of [the defendant]."

151 F.3d at 1190 (emphasis in original).

Here, the government's efforts have been even less subtle, but, considering the witnesses' membership in a category of workers specifically targeted by the government, are likely to be effective. While the defense may be powerless to combat the government's display of might that would convince even the most staunch and committed witness to avoid testifying for the defense, the Court is not. In *Simels*, the Second Circuit recognized the need for a sanction more concrete and effective than a mere admonition. 767 F.2d at 30.

However, the remedy of suppression would not be sufficient here, since that still would not make these persons (and, very likely, others) available as defense witnesses. The only relief that can ensure that defendants receive a fair trial is simply to halt the government's abuse of the grand jury. In *United States v. Regan*, 88 Cr. 517 (RLC), Judge Carter put to the test the government's representation that a subpoena to a potential defense witness on the eve of trial was *not* for the dominant purpose of preparation of the pending indictment, but rather for a

34

"continuing" unrelated investigation.  Judge Carter did not quash the subpoena outright, but instead adjourned its return date until *after* conclusion of the trial.[19]

### Conclusion

Here, regardless whether its language is sufficiently careful to avoid conferring a benefit contingent upon the defendants' conviction, the amnesty program for all practical purposes constitutes a perverse bounty in which those applying for amnesty are awarded immunity from prosecution and the right to retain considerable allegedly ill-gotten sums in exchange for delivering essentially scripted testimony against these defendants, and Dr. Lesniewski, Dr. Ajemian, Ms. Baran, and Mr. Rutigliano in particular.  Consequently, it denies the defendants Due Process, and any and all witnesses and/or information, or fruits thereof, derived from the amnesty program should be suppressed and/or precluded from trial in this case.

Likewise, in order to preserve defendants' Due Process rights and their ability to call witnesses, the Court should order the government to defer further grand jury subpoenas until trial in this case has concluded.  Otherwise, in the event the government's conduct continues, or if these measures prove ineffective in securing the defendants their Due Process right to a fair trial, the Superseding Indictment should be dismissed as was done in the *Stein* case.

---

[19]  Judge Carter's decision was unpublished and unreported, but I was co-counsel for one of the defendants in that case.

## POINT IV

### THE COURT SHOULD ORDER THE IMMEDIATE PRODUCTION OF THE ORIGINAL UNDERLYING MATERIALS PROVIDING THE BASIS FOR THE GOVERNMENT'S STATISTICAL DATA REFERRED TO IN THE INDICTMENT, ALONG WITH ANY STATISTICAL SUMMARIES PRESENTED TO THE GRAND JURY

Pursuant to the Due Process and Effective Assistance of Counsel and Confrontation clauses of the Fifth and Sixth Amendments to the Constitution to the United States, Rule 1006 of the Federal Rules of Evidence, as well as Rules 16(a)(1)(E)(i) and 16(a)(1)(F), Dr. Lesniewski hereby moves for the immediate production of the original underlying materials upon which the government's statistical data referred to in the Indictment is based, as well as any statistical summaries presented to the Grand Jury.  For the reasons set forth below, these materials are material to the preparation of Dr. Lesniewski's defense, and for counsel to effectively assist Dr. Lesniewski in the preparation and presentation of significant pre-trial issues concerning the return of the Indictment in this case, certain pre-trial evidentiary issues, and the propriety of the government's well-publicized voluntary disclosure and disposition program.

The Indictment relies on purported statistics in support of the alleged fraud, which are obviously summaries of other underlying materials or documentation.  For example, the Indictment sets forth the following statistical conclusions:

- "In fiscal year 2007" LIRR workers applied for occupational disability benefits at a rate 12 times higher than workers from "comparable commuter railroads."  Indictment ¶ 22.

- "Between 2004 and 2008", approximately 61% of LIRR employees who stopped working and began receiving benefits were between the ages of 50 and 55, as compared to Metro North, where 7% of employees who stopped working to receive benefits were 50 to 55.  *Id.* ¶ 23.

- "Between 2004 and 2008", over 75% of LIRR workers receiving RRB occupational disability first retired while in their early fifties.  *Id.* ¶ 23.

- "For the period 2005 to 2009" 91% of LIRR workers listed musculoskeletal impairments as primary diagnosis, as compared with 45% at Metro North.  *Id.* ¶ 24.

- "For the period 2005 to 2009" only 38% of LIRR annuitants met the medical criteria for total and permanent disability, in comparison to approximately 73% of all RRB annuitants. *Id.* ¶ 24.

- "For the period August 2004 through August 2008" three doctors – Peter Ajemian, Peter Lesniewksi, and "Disability Doctor 3" collectively accounted for approximately 86% of LIRR disability applications filed by LIRR employees younger than 65. *Id.* ¶ 25.

- "For the period in or about 1997 and in or about 2008" Dr. Ajemian declared disabled over 94% of the LIRR employees he saw as patients who were eligible to retire. *Id.* ¶ 26.

- "For the period in or about 1997 and in or about 2008" Dr. Lesniewksi declared disabled over 98% of the LIRR employees he saw as patients who were eligible to retire. *Id.* ¶ 26.

While the Indictment prominently features these statistical conclusions, it wholly fails to include any reference any of the data underlying the summaries upon which these statistics are based. Nor has this underlying data been produced in discovery tendered by the government to the defense thus far, notwithstanding the written requests of defense counsel.[1] Moreover, and based on the emphasis on these statistical conclusions and summaries in the Indictment, counsel assume that the government intends to introduce these summaries at trial.

Further, simultaneous with the filing of this motion, Defendant Ajemian has filed a motion including an argument entitled, "The Court Should Strike the Government's Statistical Surplusage." While this motion raises several substantive evidentiary issues, counsel for Dr. Lesniewski cannot yet counsel him to specifically adopt or disavow this motion without access to the underlying data. As is mentioned at pages eight (8) and nine (9) of the Ajemian pleading, the RRB apparently is also in possession of documents and reports with statistical evidence

---

[1] For example, in an April 27, 2012, letter to the attorneys for the government, counsel for Defendant Walsh expressly noted that the discovered tendered to date did not include "the underlying worksheets, reports, calculations – in short, the paperwork which shows the methodology from which the alleged statistical conclusions were drawn." (*See* Bergman Declaration, Exhibit J.) Counsel for Defendant Walsh continued to observe that "[t]hese documents are essentially the technical data involved at arriving at the statistical conclusions and should be provided to the defense pursuant to Rule 16(a)(1)(F)."

indicating that a large number of the disabled workers were retested by third-party independent

medical professionals and found to be disabled—evidence extremely exculpatory to the doctors.

As such, these underlying materials upon which the statistical conclusions are based are critical

both to the preparation of the defense and counsel's ability to advise Dr. Lesniewski regarding

the pre-trial evidentiary issues raised by Dr. Ajemian.  Likewise, counsel are in need of the

underlying data so as to determine whether to supplement this request for inspection of the

Grand Jury minutes and their motion concerning the government's voluntary disclosure and

disposition program.  Accordingly, it is submitted that these documents must be produced

immediately.

Moreover, the government cannot, in any event, introduce these statistical summaries without

providing the underlying data pursuant to Fed. R. Evid. 1006, which in its entirety states as

follows:

> The proponent may use a summary, chart, or calculation to prove the content of
> voluminous writings, recordings, or photographs that cannot be conveniently examined in
> court.  The proponent must make the originals or duplicates available for examination or
> copying, or both, by other parties at a reasonable time and place.  And the court may
> order the proponent to produce them in court.

As the Rule plainly states the proponent "*must make* the originals or duplicates available."  A

summary must be "based on foundation testimony connecting it with the underlying evidence

summarized … and must be based upon and fairly represent competent evidence already before

the jury."  *Fagiola v. National Gypsum Co. AC & S., Inc.*, 906 F.2d 53, 56-57 (2d Cir. 1990)

(internal citations and quotation marks omitted). The use of statistical summaries cannot be used

as a "back-door vehicle for the introduction of evidence which is otherwise inadmissible."

*Eichorn v. AT&T Corp.*, 484 F.3d 644, 650 (3rd Cir. 2007) (quotation marks omitted); C.A.

WRIGHT & V.J. GOLD, 31 FEDERAL PRACTICE AND PROCEDURE § 8043, at 527 (2000)

("Rule 1006 evidence may also be excluded where the source materials are inadmissible hearsay or even where just some parts of those materials are inadmissible hearsay.").

Here, the data upon which these statistical summaries in the Indictment must be produced so that the Court may "ascertain with certainty that they are based upon and fairly represent competent evidence already before the jury." *United States v. Conlin,* 551 F.2d 534, 538 (2d Cir.1977) (internal quotation marks omitted).  Moreover, absent production of this data, the original content, counsel cannot confirm, challenge, or dispute the government's summary statistics.  As such, counsel's request is also rooted in Dr. Lesniewski's right to confrontation under the Sixth Amendment.

In producing the data underlying the statistics referenced in the Indictment, and the data which the government seeks to rely upon at trial, the government should also be required to produce the data used both expressly and comparatively in its statistical summaries.  For example, the government states that Dr. Lesniewski, his co-Defendant Dr. Ajemian, and Dr. Parisi (referred to in the Indictment as Disability Doctor-3), were the treating physicians "for approximately 86% of LIRR disability applications filed by LIRR employees younger than 65" (Indictment, ¶ 25), which is an incomplete, question-begging summary, particularly as Defendant is alleged to be the treating physician for 13% of the total LIRR disability applications.  Moreover, statistical summaries in the Indictment are based on comparisons "comparable commuter railroads." (*see*, *e.g.*, Indictment ¶ 22.)  In order to determine if the statistics relied upon by the government are based on competent evidence, the government should be required to

produce not only the underlying LIRR data, but also the data of the "comparable commuter railroads."[2]

Finally, the government should also be required to produce any and all summaries presented to the Grand Jury that returned the Indictment in this case.

---

[2] In making this request pursuant to Fed. R. Evid. 1006, Defendant preserves his right to challenge the underlying statistical data and any attempt by the government to rely upon it under *Daubert* and its progeny.  Indeed, production of this underlying statistical data may very well be necessary for any necessary *Daubert* litigation.

## POINT V

**THE COURT SHOULD CONDUCT A PRETRIAL HEARING OR REQUIRE THE GOVERNMENT TO SUBMIT A FORMAL WRITTEN PROFFER OF ITS EVIDENCE IT INTENDS TO OFFER AT TRIAL AS CO-CONSPIRATOR STATEMENTS**

As detailed below, this case presents an extraordinary situation in which the government will likely seek to introduce at trial a plethora of statements it claims are admissible as co-conspirator statements pursuant to Rule 801(d)(2)(E), FED.R.EVID., but to which Dr. Lesniewski lacks any connection—even to the declarants, much less their alleged statements in furtherance of the charged conspiracy.  As a result, a remedy commensurate with these circumstances is required to ensure that Dr. Lesniewski receives a fair trial, and that his rights guaranteed him by the Due Process, Effective Assistance of Counsel, Counsel of Choice, and Confrontation Clauses of the Fifth and Sixth Amendments to the Constitution to the United States are provided to him in full.

Accordingly, pursuant to those constitutional provisions, as well as Rules 801(d)(2)(E) and 104(a), FED.R.EVID., the principles enunciated in *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1988), and the Court's supervisory powers under Rule 2 of the Federal Rules of Criminal Procedure,[1] it is respectfully submitted that the Court should conduct a pretrial evidentiary hearing; or, in the alternative, require a formal written proffer by the government that permits the Court to determine preliminarily, and prior to the impaneling of the jury or the swearing of the first witness, the admissibility of co-conspirator statements against Dr. Lesniewski so as to prevent a "chilling effect" on his right to proceed to trial and also to insure him a fair trial..  Only such relief can adequately safeguard against a mistrial, that would

---

[1] Rule 2 Interpretation reads in its entirety:  "These rules are to be interpreted to provide for the just determination of every criminal proceeding, to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay."

unfairly and improperly prejudice Dr. Lesniewski economically to the extent it would, at a second trial, preclude his retaining counsel of choice.

As set forth **ante**, in Point I, the Superseding Indictment in this case was filed May 22, 2012, and charges 19 counts against a total of 21 defendants.   Dr. Lesniewski is charged with: Conspiracy to Commit Mail Fraud, Wire Fraud, and Health Care Fraud, in violation of 18 USC §1341, 1343, 1347, and 1349 (Count One); Conspiracy to Defraud the United States, in violation of 18 USC § 371 (Count Two); False Claims, in violation of 18 USC § 287 (Count Three); Health Care Fraud, in violation of 18 USC § 1347 (Count Four); Mail Fraud, in violation of 18 USC § 1341 (Count Nine); and Wire Fraud, in violation of 18 USC § 1343 (Count Nineteen). Along with Dr. Lesniewski, another physician, Peter J. Ajemian, is similarly charged.  Notably, a third physician, Ralph F. Parisi, who died during the pendency of the lengthy investigation in this case, is also named as an unindicted co-conspirator. Charged along with the two physicians are two so-called "facilitators" and 16 retired Long Island Rail Road employees who have been awarded occupational disability, as well as Dr. Ajemian's officer manager, Maria Rusin.

Notwithstanding this sprawling Indictment, which is subject to pretrial challenges for its prolixity and surplusage,[2] Dr. Lesniewski is specifically mentioned as having provided any services to only two of the co-defendants, Gary Supper (*see* ¶ 33pp) and Richard Ehrlinger (*see* Count Nine).[3]

---

[2] *See* Steven Gagliano's Motion, with argument entitled, "The Court Should Preclude Statistical Evidence and Strike the Surplusage in the Indictment";  Defendant Peter J. Ajemian's Motion, with argument entitled "The Court Should Strike the Government's Statistical Surplusage" (pp. 4-9);  and Regina Walsh's Motion, with argument entitled "Motion to Dismiss the Prolix 'Speaking' Superseding Indictment Pursuant to Rule 7, FED.R.CRIM.P."

[3] With respect to the indictment's charging of Dr. Lesniewski in connection with Richard Ehrlinger's alleged fraudulent submission of a Disability Recertification to the RRB on March 24, 2011, in Count Nine, it must be noted that Ralph F. Parisi, "Disability Doctor-3," not Dr. Lesniewski is alleged to have prepared a medical assessment relating to co-defendant Ehrlinger.  (*see* ¶33a.) Thus, setting aside the Indictment's mistaken association of Dr. Lesniewski with co-defendant Ehrlinger, Dr. Lesniewski has allegedly only provided medical services to *one* other co-defendant, Supper.

The government has tendered voluminous electronic discovery in multiple productions to defendants.  Further, an extremely large amount of non-electronic discovery has been made available for physical inspection at the government offices.  This discovery includes numerous statements made by co-defendants, ranging from memoranda reflecting co-defendants' interviews with federal agents and investigators, grand jury testimony, and statements set forth in documents submitted to entities including the RRB.  Notwithstanding the veritable document dump that the instant discovery process quickly evolved into, it is quite evident that there is a limited—and, more accurately put, non-existent—connection between Dr. Lesniewski and any other Co-Defendant.[4]  Yet, the government will no doubt still attempt to use the statements of purported "co-defendants" against Dr. Lesniewski even though these statements and the documents in which they appear are hearsay as to Dr. Lesniewski, pursuant to Fed. R. Evid. 801(d)(2)(E), as statements made by co-conspirators during the course of and in furtherance of the conspiracy.

Counsel respectfully submit that the introduction of co-defendant statements pursuant to the co-conspirator exception to the hearsay rule would irreparably harm Dr. Lesniewski's fair trial rights for the simple reason that the government has not alleged and will not be able to prove the overarching conspiracy, or even multiple conspiracies, that must exist in the first instance to justify the introduction of the co-conspirator statements against him.  Based primarily on the lack of evidence showing any connection with virtually any other co-defendant, it is respectfully submitted that the government will not be able to meet its burden of proof as to the essential issue of whether Dr. Lesniewski was a knowing and intentional member of the *charged*

---

[4] Based upon a review of the discovery, one could question if Dr. Parisi was still alive, whether Dr. Lesniewski would have been included in this indictment.  Interestingly, as set forth in paragraph 25 of the indictment, Dr. Ajemian and Dr. Parisi  were treating physicians for approximately 72% of "the RRB disability applications filed by LIRR employees younger than 65."  Dr. Lesniewski, on the other hand, was responsible for only 13%. Interestingly,, the Indictment does not identify the physicians – who have not been charged – who treated the remaining 14%.

conspiracy.  And, if the government cannot establish Dr. Lesniewski's membership in the

*charged* conspiracy at the time the coconspirator statements were made, the statements cannot be

admitted against him.  Therefore, in order to make this required preliminary determination, the

Court should hold an evidentiary hearing or, at a minimum, require the government to submit a

detailed written proffer setting forth its evidence showing the existence of the charged

conspiracy and Defendant's membership in it.

Under Rules 104(a) and (b), FED. R. EVID., preliminary questions concerning the

admissibility of evidence are determined by the Court.  If the relevance of the evidence depends

upon the fulfillment of a condition of fact, the Court may admit the evidence subject to the

introduction of evidence sufficient to support a finding of the fulfillment of the condition.

It is undisputed that in the Second Circuit, case law does not require any pretrial or preliminary

determination by the trial court.  For example, in *United States v. Wilson*, 565 F. Supp. 1416

(S.D.N.Y. 1983), the Court explained that while "[u]nder *United States v. James*, [590 F.2d 575

(5th Cir.1979)] the Fifth Circuit requires a pretrial hearing before hearsay statements of co-

conspirators may be received as against one another[,] . . . [i]n our Circuit, however, the matter is

admissible upon the trial court's determination, made at the close of the government's case, of

the sufficiency of the evidence, independent of the hearsay testimony, that the alleged co-

conspirator participated in the conspiracy."  565 F. Supp. at 1437.

However, other Circuits differ in their approach.  For instance, the Seventh Circuit has

held that before a coconspirator's statement is admitted into evidence the government must

present to the Court sufficient evidence to convince the Court that it is more likely than not that

(1) the alleged conspiracy existed; (2) the defendant and the declarant were members thereof;

and, (3) the proffered statement(s) were made during the course of and in furtherance of the

conspiracy.  *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).   It is respectfully submitted that here, given the unusual circumstances present, and the prospect for an avalanche of prejudicial testimony (heard by the jury but ultimately inadmissible) that will compel a mistrial if the Rule 801(d)(2)(E) determinations are deferred until the close of the government's case, the Second Circuit approach is inappropriate and a recipe for a second trial.

Under Rule 801(d)(2)(E), a hearsay statement offered by the government and made by a co-conspirator may be admitted into evidence only if the government shows, by a preponderance of the evidence, that "(1) that there was a conspiracy, (2) that its members included the declarant and the party against whom the statement is offered, and (3) that the statement was made both (a) during the course of and (b) in furtherance of the conspiracy." *United States v. Saneaux*, 365 F. Supp. 2d 493, 497 (S.D.N.Y. 2005) (quoting *United States v. Tracy,* 12 F.3d 1186, 1196 (2d Cir.1993). While the hearsay statements may be considered by the court, "these statements are presumptively unreliable, and, for such statements to be admissible, there must be some independent corroboration of the defendant's participation in the conspiracy." *Saneaux*, 365 F. Supp. 2d at 497 (quoting *United States v. Diaz,* 176 F.3d 52, 83 (2d Cir.1999)). Indeed, while Rule 801(d)(2) instructs the Court to consider the contents of the out-of-court statement, it also specifies that the contents of the statement "are not alone sufficient to establish … the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under [801(d)(2)(E)]." FED. R. EVID. 801(d)(2).

In addition, in the Seventh Circuit, to satisfy Rule 801(d)(2)(E), the government must identify—prior to the admission of any hearsay statements at trial—each alleged co-conspirator and the specific hearsay statement attributed to each co-conspirator that it intends to introduce. The government must identify which trial witnesses are alleged to be co-conspirators and the

hearsay statements attributed to each co-conspirator it seeks to introduce through the testimony of these witnesses against the charged defendants. *United States v. Warner*, 396 F. Supp. 2d 924, 944 (N.D. Ill. 2005) ("[r]eciting summaries of witnesses' 302 memoranda or grand jury testimony is not alone sufficient for purposes of Rule 801(d)(2)(E)"); *United States v. Arnaout*, No. 02 CR 892, 2003 WL 255226, *1 (N.D. Ill. Feb. 4, 2003).

Also, here the Indictment fails to allege a single overarching conspiracy. *See Kotteakos v. United States*, 328 U.S. 750 (1946). The threshold requirement of Rule 801(d)(2)(E) is whether a conspiracy existed in the first instance; that is, the government must show, by a preponderance of the evidence, that Dr. Lesniewski was a knowing and intentional member of the *charged* conspiracy. *See Bourjaily*, 483 U.S. at 174-175.

As to the critical element of whether a conspiracy existed, the Second Circuit has often explained, *see, e.g., United States v. McDermott*, 245 F.3d 133, 137-38 (2d Cir. 2001), "the fundamental element of a conspiracy is unlawful agreement." *United States v. Mittelstaedt*, 31 F.3d 1208, 1218 (2d Cir. 1994), *quoting United States v. Rubin*, 844 F.2d 979, 983 (2d Cir. 1988). *See also United States v. Tejada*, 956 F.2d 1256, 1264 (2d Cir. 1992) ("agreement defines the conspiracy"); *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977). Thus, as the Second Circuit stated in *United States v. Casamento,* 887 F.2d 1141 (2d Cir. 1989), "[t]o be a conspirator, an individual must agree to participate in the conspiracy." 887 F.2d at 1167 (citation omitted). In addition, in *Rosenblatt*, the Second Circuit emphasized, "[t]he law of conspiracy requires agreement as to the 'object' of the conspiracy[,]" 554 F.2d at 38 (citation omitted), adding that "'the essential nature of the plan' must be shown." *Id.*, at 38, *citing Blumenthal v. United States*, 332 U.S. 539, 557 (1947).

Continuing, the Court in *Rosenblatt* explicated that "[p]roof of the essential nature of the plan is required because 'the gist of the offense remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant." *Id.*, at 39, *quoting Untied States v. Borelli*, 336 F.2d 376, 384 (2d Cir. 1964). The Circuit explained in *United States v. Ceballos*, 340 F.3d 115 (2d Cir. 2003), however, that "'knowledge of the existence and goals of a conspiracy does not of itself make one a coconspirator.'" *Id.*, at 124, *quoting United States v. Cianchetti*, 315 F.2d 584, 588 (2d Cir. 1963).

Thus, "'[t]here must be something more than [m]ere knowledge, approval of acquiescence in the object or the purpose of the conspiracy.'" *Ceballos*, 340 F.3d at 124, *quoting Cianchetti*, 315 F.2d at 588 (internal quotation marks omitted). As set forth in *United States v. Johnson*, 513 F.2d 819 (2d Cir. 1975), "[g]uilt may not be inferred from mere association with a guilty party." *Id.*, at 824.

The government must also establish that the statements were made in during the course of the conspiracy. Under this requirement, "statements cannot be made after the cessation of the conspiracy or before its formation." *Saneaux*, 365 F. Supp.2d at 499. As such, the requirement "protect[s] against the use of unreliable evidence, since the circumstances in which the statement is made-prior to detection ... tend[s] to assure the reliability of the declarant and the accuracy of the statement." *Id.* (quoting *United States v. Puco,* 476 F.2d 1099, 1109 (2d Cir.1973)). A hearing is required to determine if the government has met this standard due to the ill-defined and amorphous conspiracy it has attempted to describe in the indictment. Indeed, it is unclear in the first instance if the government alleges but one conspiracy, or rather multiple separate conspiracies.

The government must also demonstrate that the statements were made in furtherance of the conspiracy, because to fall within the co-conspirator exception to the hearsay rule "the conspiratorial objective being furthered by the declarant's statement *must in fact be the objective of a conspiracy between the defendant and the declarant." Russo,* 302 F.3d 37,45 (2d. Cir. 2002) (emphasis added). "[T]he statements must in some way have been designed to *promote or facilitate achievement of the goals of the ongoing conspiracy*[.]" *United States v. Diaz,* 176 F.3d 52, 85 (2d Cir.1999) (citing *Tracy,* 12 F.3d at 1196) (emphasis added); *United States v. Smalls,* 131 F.3d 132 (2d Cir.1997); *Glenn v. Bartlett,* 98 F.3d 721, 728 (2d Cir.1996); *United States v. Gambino,* 101 F.3d 683 (2d Cir.1996). Thus, "communicating with a person who is not a member of the conspiracy *in a way that is designed to help the coconspirators to achieve the conspiracy's goals* is also in furtherance of the conspiracy." *United States v. Rivera,* 22 F.3d 430, 436 (2d Cir.1994) (emphasis added)." *Saneaux*, 365 F. Supp. 2d at 500.

Moreover, "[t]o satisfy 801(d)(2)(E)'s 'in furtherance' standard, the statements must in some way have been designed to promote or facilitate achievement of the goals of the conspiracy." *United States v. Paredes*, 176 F.Supp.2d 183 ,187 (S.D.N.Y. 2001), *citing United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994).  As set forth in *Paredes*, such a statement "includ[es] providing information or reassurance to a coconspirator or seeking assistance from a coconspirator, or . . . communicating with a person who is not a member of the conspiracy in a way that is designed to help the coconspirators to achieve the plan's goals." *Id*.  Accordingly, "[t]he Second Circuit has held . . .  that neither 'idle chatter' nor 'merely narrative' description by one coconspirator of the acts of another, meet the Rule 801(d)(2)(E) test." *Id*., *quoting United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir. 1989) (additional citations omitted).

Here, a pretrial hearing and/or government proffer would reveal that the statements the government intends to use at trial fail to meet the "in furtherance" requirement under Rule 801(d)(2)(E). As a result, absent a pretrial hearing or formal written proffer to establish that purported co-conspirator statements may be admitted pursuant to Rule 801(d)(2)(E) because they are made in the context of conspiracy, or in the furtherance of any such conspiracy, the introduction of such statements at trial would violate Defendant's Sixth Amendment right to confrontation. *See Crawford v. Washington*, 541 U.S. 26 (2004).

In addition, counsel submit that in these exceptional circumstances a pretrial hearing or formal written proffer is necessary to avoid a significant infringement of Defendant's Fifth and Sixth Amendment rights based upon the operation of this peculiarly-pled Indictment. While counsel concede that in the Second Circuit courts  typically admit co-conspirator statements into evidence on a conditional basis, subject to the introduction of evidence sufficient to law a foundation for admissibility (*see, e.g., United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir. 1969)), this Court no doubt has the authority under Fed. R. Evid. 104 to "hold a hearing outside the presence of the jury to determine whether the party offering the statements has established the existence of a conspiracy by a preponderance of the evidence." *Saneaux,* 365 F. Supp. 2d at 497 (citation omitted); *see also United States v. Mastropieri,* 685 F.2d 776, 788-89 (2d Cir. 1982) (noting that the question of the admissibility of a co-conspirator statement is a question of law "for the judge alone," and may not be abdicated to the jury).; *James,* 590 F.2d 575.

Without a hearing regarding whether the prerequisites are met for the introduction of the co-conspirator statements, this Court will be left solely with the representations of the government that its evidence will sufficiently connect Dr. Lesniewski to the alleged coconspirators, so as to permit the introduction of coconspirator statements.  This will lead to

endless side bars or other hearings outside the presence of the jury, considerable confusion, and, worst of all, the very real possibility that this case will result in a mistrial.

The specter of a mistrial at the middle or end of a long jury trial such as is anticipated here, necessitating a second trial that Dr. Lesniewski simply cannot afford based upon his economic circumstances, , creates a "chilling effect" on the exercise of Dr. Lesniewski's Due Process right to trial with his Sixth Amendment guaranteed right to counsel of his choosing.  *See generally*, *Wheat v. United States,* 486 U.S. 153 (1988).  A mistrial itself will most certainly deny him retained counsel of his choice. Such an outcome, with such a readily available alternative as a pre-trial hearing or formal written proffer, would be unconscionable as well as unconstitutional.

Accordingly, conscious of Second Circuit precedent but recognizing that in these exceptional circumstances the Seventh and Fifth Circuit's approaches are necessary to protect Dr. Lesniewski's Fifth and Sixth Amendment rights, counsel respectfully submit that in order to avoid this constitutional violation the Court must exercise its supervisory powers, as FED.R. CRIM.P. 2 mandates, to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay.

**POINT VI**

**THE COURT SHOULD GRANT DR. LESNIEWSKI'S
REQUEST TO JOIN IN HIS CO-DEFENDANTS' MOTIONS
TO THE EXTENT THEY INURE TO HIS BENEFIT AND FOR
LEAVE TO JOIN IN ANY ADDITIONAL MOTIONS THAT
<u>COUNSEL IS NOT APPRAISED OF AT THE TIME OF FILING</u>**

Dr. Lesniewski respectfully seeks leave to join in the following motions filed by his co-defendants to the extent that they inure to his benefit:

● Richard Ehrlinger's Motion for Pretrial Disclosure;

● Peter J. Ajemian's Motion for a Bill of Particulars;

● Regina Walsh's Motion to Dismiss the Prolix "Speaking" Superseding Indictment Pursuant to Rule 7, Fed.R.Crim.P.;

● Regina Walsh's Motion to Dismiss Counts 3, 4, and 19;

● Gregory Bianchini's Motion compelling the production of *Brady* materials;

● Peter J.Ajemian's Motion to strike statistical allegations; and

● Maria Rusin's Motion Pursuant to Rule 8(a), with respect to the remedy requested, *i.e.*, dismissal of the Superseding Indictment, because it charges multiple conspiracies.

Dr. Lesniewski also seeks leave to join in any additional motions that counsel is not apprised of at the time of filing.

**Conclusion**

For the foregoing reasons, it is respectfully submitted that the Court should grant Dr. Lesniewski's motions: (1)  for inspection or *in camera* production of the grand jury minutes;  (2) for disclosure of favorable evidence regarding the decision of the U.S. Attorney for the Eastern District of New York not to pursue an indictment after investigating the same alleged criminal conduct set forth in the Superseding Indictment in this case;  (3)  to suppress and/or exclude

51

from trial any and all information, documents, evidence, and fruits thereof, and any projected

testimony, gained as a result of the government's amnesty program, and order the government to

halt its abuse of the grand jury;  (4)  for the immediate production of the original underlying

materials providing the basis for the government's statistical data referred to in the Indictment,

along with any statistical summaries presented to the grand jury;  (5)  for a pretrial evidentiary

hearing, or in the alternative, an order requiring a formal written proffer by the government that

permits the Court to determine preliminarily the admissibility of co-conspirator statements

against Dr. Lesniewski; (6)  to join in the other motions filed by his co-defendants to the extent

they inure to his benefit, and for leave to join in any additional motions that counsel is not

apprised of at the time of filing; and (7)  for any such other relief as the Court deems just and

proper.

Dated: September 14, 2012
      New York, New York

                                                Respectfully submitted,

                                               /s/Joshua L. Dratel
                                              Joshua L. Dratel
                                              DRATEL & MYSLIWIEC, P.C.
                                              2 Wall Street, 3rd Floor
                                              New York, New York 10005
                                              (212) 732-0707
                                              jdratel@dratelmys.com

                                              /s/Thomas Anthony Durkin
                                              Thomas Anthony Durkin
                                              DURKIN & ROBERTS
                                              2446 N. Clark Street
                                              Chicago, Illinois 60614
                                              (312) 981-0123
                                              tdurkin@durkinroberts.com

                                              *Attorneys for Defendant Peter Lesniewski*

-Of counsel-
Joshua L. Dratel

Thomas Anthony Durkin
Lindsay A. Lewis
Joshua G. Herman
Janis Roberts