UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

UNITED STATES OF AMERICA                                  :

   - against -                                                      :          S1 11 Cr. 1091 (VM)

PETER J. AJEMIAN, PETER J. LESNIEWSKI,          :
MARIA RUSIN, MARIE BARAN, JOSEPH
RUTIGLIANO, GREGORY NOONE, REGINA              :
WALSH, SHARON FALLOON, GARY SATIN,
STEVEN GAGLIANO, RICHARD EHRLINGER,          :
BRIAN DELGIORNO, PHILIP PULSONETTI,
GREGORY BIANCHINI, FRANKLIN PLAIA,              :
MICHAEL STAVOLA, MICHAEL DASARO,
KARL BRITTEL, KEVIN NUGENT, GARY                  :
SUPPER, and THOMAS DELALLA,
                                                                               :
                      Defendants.

------------------------------------------------------------------- X

## GOVERNMENT'S MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' PRETRIAL MOTIONS

PREET BHARARA,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States*
   *of America.*

JUSTIN S. WEDDLE,
E. DANYA PERRY,
DANIEL TEHRANI,
NICOLE W. FRIEDLANDER,
*Assistant United States Attorneys,*
   *Of Counsel.*

October 23, 2012

**TABLE OF CONTENTS**

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

POINT I — The "Statistical" Allegations Are Proper and the Government's Numerical
Analyses Are Admissible. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A. Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B. Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

POINT II — While Severance Is Not Required, the Government Nevertheless
Consents to Sever the Case into Two Trial Groups. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    A. Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    B. Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        1. While Severance Is Not Required, The Government Nevertheless Proposes that the
        Defendants Be Separated Into Two Smaller Trial Groups. . . . . . . . . . . . . . . . . . . . . 23

        2. The Defendants' Severance Arguments and Proposals Are Without Merit. . . . . . . 26

            a. The Government's Proposal Cures Any Spillover Problems Caused by a Single
            Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

            b. The Defendants' Claim of "Antagonistic Defenses"Does Not Justify Severance. 31

            c. The *Bruton* Motion Is Both Premature and Meritless. . . . . . . . . . . . . . . . . . . . . 33

POINT III — The Indictment Properly Alleges a Unified Conspiracy. . . . . . . . . . . . . . . . . 39

    A. Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    B. Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        1. Counts One and Two Are Not Duplicitous. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        2. The Government's Severance Proposal Moots Rusin's Motion. . . . . . . . . . . . . . . . 46

POINT IV — The Government's Voluntary Disclosure and Disposition Program Is Proper and
Has No Adverse Effect on the Defendant's Due Process Rights. . . . . . . . . . . . . . . . . . . . . 47

    A. The Voluntary Disclosure and Disposition Program. . . . . . . . . . . . . . . . . . . . . . . . . 47

    B. The Program Does Not Violate the Defendants' Due Process Rights. . . . . . . . . . . . 49

POINT V — The Motions to Dismiss Under Rule 7(c)(1), or Alternately to Strike Alleged
"Surplusage" from the Indictment, Should Be Denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

    A.  Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

    B.  Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

        1.  Baran's Motion to Dismiss Is Meritless . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

        2.  Walsh's Motion to Dismiss for Prolixity Is Meritless. . . . . . . . . . . . . . . . . . . . 59

        3.  Walsh's and Rusin's Motions to Strike Alleged "Surplusage" Are Meritless.. . . . . . 60

POINT VI — The Government Has Conscientiously Complied with Its *Brady* Disclosure
Obligations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

    A.  Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

    B.  Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

        1.  The Government Is Not Required to Obtain and Produce Materials Not in the
Possession of the Prosecution Team. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

        2.  Patient Files. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

        3.  "Innocent" Selection of the Doctor-Defendants. . . . . . . . . . . . . . . . . . . . . . . . . 69

        4.  "Failure to Charge Others with the Same or Similar Claimed Injuries". . . . . . . . . 70

        5.  Improper Methods to Secure Witness Testimony. . . . . . . . . . . . . . . . . . . . . . . . 72

        6.  Opinion Work Product in the Possession of the EDNY. . . . . . . . . . . . . . . . . . . 73

POINT VII — The Defendants' Bill of Particulars Motions Improperly
Seek Evidentiary Detail. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

    A.  Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

    B.  Defendants Are Not Entitled to a Bill of Particulars. . . . . . . . . . . . . . . . . . . . . . . . 77

POINT VIII — Defendants' Pretrial Disclosure Motions Should Be Denied. . . . . . . . . . . . . . . 83

    A.  Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

        1.  Jencks Act/3500 Material. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

        2.  Rule 404(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

        3.  Exhibits, Charts, Summaries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

        4.  Witness List. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

        5.  Expert Notification.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

    B.  Ehrlinger's Proposed Pretrial Disclosure Schedule Is Unwarranted. . . . . . . . . . . . . . 87

POINT IX — Lesniewski's Request for a Pretrial Hearing on Co-Conspirator
Statements Should Be Denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

A.  Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

B.  Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

POINT X — Lesniewski's Motion to Inspect Grand Jury Minutes Should Be Rejected. . . . . . . . 92

POINT XI — Noone's Motions Should Be Denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

A.  Noone's Motion to Exclude Evidence About His Golf Pass Should Be Denied.. . . . . . . 93

B.  Noone's *Kastigar* Motion Should Be Denied At This Time. . . . . . . . . . . . . . . . . . . . . . . 95

POINT XII — Nugent's Motion to Exclude Direct Evidence
of the Fraud Should Be Denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

POINT XIII — Walsh's Jury Pool Motion Has Properly Been Denied. . . . . . . . . . . . . . . . . . . . 99

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

# TABLE OF AUTHORITIES

## CASES

*Benson* v. *United States*, 146 U.S. 325 (1892).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*In re Biaggi*, 478 F.2d 489 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*Bordenkircher* v. *Hayes*, 434 U.S. 357 (1978).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Bourjaily* v. *United States*, 483 U.S. 171 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*Brady* v. *Maryland*, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 64

*Bruton* v. *United States*, 391 U.S. 123 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 34

*Cobb* v. *Pozzi*, 363 F.3d 89 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Costello* v. *United States*, 350 U.S. 359 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*Dennis* v. *United States*, 384 U.S. 855 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*Dranow* v. *United States*, 307 F.2d 545 (8th Cir. 1962). . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Ferreira* v. *United States*, 350 F. Supp. 2d 550 (S.D.N.Y. 2004). . . . . . . . . . . . . . . . . . . 65

*Giglio* v. *United States*, 405 U.S. 150 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 64

*Gray* v. *Maryland*, 523 U.S. 185 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Hamling* v. *United States*, 418 U.S. 87 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Hazelwood Sch. District* v. *United States*, 433 U.S. 299 (1977). . . . . . . . . . . . . . . . . . . . . 8

*Hoffa* v. *United States*, 385 U.S. 293 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*International Broth. of Teamsters* v. *United States*, 431 U.S. 324 (1977).. . . . . . . . . . . . . . . 9

*Kastigar* v. *United States*, 406 U.S. 441 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95-96

*Kyles* v. *Whitley*, 514 U.S. 419 (1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Lisenba* v. *California*, 314 U.S. 219 (1941). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

iv

*Morgan* v. *Salamack*, 735 F.2d 354 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   64

*Murphy* v. *Waterfront Commission*, 378 U.S. 52 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . .   95

*Oregon* v. *Kennedy*, 456 U.S. 667 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   98

*Pacheco* v. *United States,* No. 02 CV. 4266 (SAS),  2006 WL 760287 (S.D.N.Y. March 23,
    2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   57

*People* v. *Collins*, 68 Cal. 2d 319 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

*In re Petition of Craig*, 131 F.3d 99 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   92

*Pina* v. *Henderson*, 752 F.2d 47 (2d Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   68

*Pittsburgh Plate Glass Co.* v. *United States*, 360 U.S. 395 (1959). . . . . . . . . . . . . . . . . . . .   92

*Richardson* v. *Marsh*, 481 U.S. 200 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19, 21, 25

*SEC* v. *Stanard*, No. 06 CV. 7736 (GEL), 2007 WL 1834709 (S.D.N.Y. June 26, 2007). . . . .   65

*United States* v. *Avellino*, 136 F.3d 249 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . .   65

*United States* v. *Al-Marri*, 230 F. Supp. 2d 535 (S.D.N.Y. 2002). . . . . . . . . . . . . . . . . . . . .   89

*United States* v. *Alameh*, 341 F.3d 167 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . .   71

*United States* v. *Aloi*, 511 F.2d 585 (2d Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

*United States* v. *Alvarado*, 882 F.2d 645 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

*United States* v. *Aracri*, 968 F.2d 1512 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . 39-40

*United States* v. *Archer*, 671 F.3d 149 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-16

*United States* v. *Armstrong*, 517 U.S. 456 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   71

*United States* v. *Attanasio*, 870 F.2d 809 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

*United States* v. *Bari*, 750 F.2d 1169 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

*United States* v. *Barnes*, 158 F.3d 662 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   77

*United States* v. *Barnes*, 604 F.2d 121 (2d Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 47-48

*United States* v. *Barton*, 647 F.2d 224 (2d Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States* v. *Bejasa*, 904 F.2d 137 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*United States* v. *Bin Laden*, 91 F. Supp. 2d 600 (S.D.N.Y. 2000).. . . . . . . . . . . . . . . . . . . . . 60

*United States* v. *Borelli*, 336 F.2d 376 (2d Cir. 1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States* v. *Butler*, 351 F. Supp. 2d 121 (S.D.N.Y. 2004). . . . . . . . . . . . . . . . . . . . . . . . . 60

*United States* v. *Cambindo Valencia*, 609 F.2d 603 (2d Cir. 1979). . . . . . . . . . . . . . . . . . . . . 90

*United States* v. *Cannone*, 528 F.2d 296 (2d Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*United States* v. *Canter*, 338 F. Supp. 2d 460 (S.D.N.Y. 2004). . . . . . . . . . . . . . . . . . . . . . . . 89

*United States* v. *Cardascia*, 951 F.2d 474 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States* v. *Carrington*, No. 02 CR. 897 (LTS),
    2002 WL 31496199 (S.D.N.Y. Nov. 7, 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*United States* v. *Carson*, 702 F.2d 351 (2d Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . 22, 28, 30

*United States* v. *Casamento*, 887 F.2d 1141 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . 25, 29, 33

*United States* v. *Castellano*, 610 F. Supp. 1359 (S.D.N.Y. 1985).. . . . . . . . . . . . . . . . . . . . . . 61

*United States* v. *Cephas*, 937 F.2d 816 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*United States* v. *Cervantes-Pacheco*, 826 F.2d 310 (5th Cir. 1987). . . . . . . . . . . . . . . . . . . . . 51

*United States* v. *Cervone*, 907 F.2d 332 (2d Cir. 1990).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States* v. *Chang An-Lo*, 851 F.2d 547 (2d Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Coppa*, 267 F.3d 132 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*United States* v. *Dailey*, 759 F.2d 192 (1st Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States* v. *Daly*, 842 F.2d 1380 (2d Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

vi

*United States* v. *Davis*, No. 05 CR. 0694 (VM), 2006 WL 20493 (S.D.N.Y. Jan. 3, 2006). . . .   88

*United States* v. *Davis*, No. 06 CR. 911 (LBS), 2009 WL 1098477 (S.D.N.Y. Apr. 21, 2009) .   91

*United States* v. *De Larosa*, 450 F.2d 1057 (3d Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . .   51

*United States* v. *DeLaurentis*, 230 F.3d 659 (3d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . .   58

*United States* v. *Diaz*, 176 F.3d 52 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

*United States* v. *Diaz*, 878 F.2d 608 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   98

*United States* v. *Ebner*, 782 F.2d 1120 (2d Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

*United States* v. *Fares*, 978 F.2d 52 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   71

*United States* v. *Fennell*, 496 F. Supp. 2d 279 (S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . .   85

*United States* v. *Feola*, 651 F. Supp. 1068 (S.D.N.Y. 1987). . . . . . . . . . . . . . . . . . . . . . . . . .   75

*United States* v. *Ferguson*, 653 F.3d 61 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

*United States* v. *Ferguson*, 478 F. Supp. 2d 220 (D. Conn 2007). . . . . . . . . . . . . . . . . . . . . .   82

*United States* v. *Fernandez*, 2000 WL 1409738 (S.D.N.Y. Sept. 22, 2000). . . . . . . . . . . . . . .   97

*United States* v. *Finkelstein*, 526 F.2d 517 (2d Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

*United States* v. *Finnerty*, 411 F. Supp. 2d 428 (S.D.N.Y. 2006). . . . . . . . . . . . . . . . . . . . . . .   65

*United States* v. *Forde*, 740 F. Supp. 2d 406 (S.D.N.Y. 2010). . . . . . . . . . . . . . . . . . . . . . . . .   93

*United States* v. *Fuller*, 149 F. Supp. 2d 17 (S.D.N.Y. 2001). . . . . . . . . . . . . . . . . . . . . . . . . .   97

*United States* v. *Geibel*, 369 F.3d 682 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

*United States* v. *Giraldo*, No. 90 CR. 085 (KMW),
      1990 WL 134883 (S.D.N.Y. Sept. 12, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   91

*United States* v. *Girard*, 601 F.2d 69 (2d Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

*United States* v. *Glover*, 398 F. App'x 677 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . .   44

*United States* v. *Gonzalez*, 2012 WL 4204170 (W.D.N.Y. Sept. 18, 2012) . . . . . . . . . . . . . . .  85

*United States* v. *Gotti*, 42 F. Supp. 2d 252 (S.D.N.Y. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61

*United States* v. *Gottlieb*, 493 F.2d 987 (2d Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . .  76, 78-79

*United States* v. *Gray*, 648 F.3d 562 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  68

*United States* v. *Green*, No. 04 CR.424 (RWS), 2004 WL 2985361(S.D.N.Y. Dec. 23, 2004).  77

*United States* v. *Gregory*, 611 F. Supp. 1033 (S.D.N.Y. 1985). . . . . . . . . . . . . . . . . . . . . . . . . 96-97

*United States* v. *Grimes*, 438 F.2d 391 (6th Cir. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51

*United States* v. *Groezinger*, 625 F. Supp. 2d 145 (S.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . .  85

*United States* v. *Guerrerio*, 670 F. Supp. 1215 (S.D.N.Y. 1987). . . . . . . . . . . . . . . . . . . . . . . 66-67

*United States* v. *Haynes*, 16 F.3d 29 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

*United States* v. *Helmsley*, 941 F.2d 71 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  97

*United States* v. *Hernandez*, 85 F.3d 1023 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*United States* v. *Jass*, 569 F.3d 47 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-37, 39

*United States* v. *Jimenez*, 789 F.2d 167 (2d Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  98

*United States* v. *Jones*, 570 F.2d 765 (8th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*United States* v. *Joyner*, 201 F.3d 61 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

*United States* v. *Kassir*, No. S2 04 CR. 356 (JFK),
   2009 WL 995139 (S.D.N.Y. April 9, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  60

*United States* v. *Kelley*, 459 F. App'x 527 (6th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58

*United States* v. *Kohring*, 637 F.3d 895 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . .  72, 73

*United States* v. *Labate*, No. S1 00 CR. 632 (WHP),
   2001 WL 533714 (S.D.N.Y. May 18, 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  92

*United States* v. *Locasio*, 6 F.3d 924 (2d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 64-65

*United States* v. *Logan*, 845 F. Supp. 2d 499 (E.D.N.Y. 2012). . . . . . . . . . . . . . . . . . . . . . . . 57-58

*United States* v. *Love*, 859 F. Supp. 725 (S.D.N.Y. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*United States* v. *Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . 44, 90

*United States* v. *Margiotta*, 646 F.2d 729 (2d Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

*United States* v. *Mariani*, 851 F.2d 595 (2d Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*United States* v. *Matos-Peralta*, 691 F. Supp. 780 (S.D.N.Y 1988). . . . . . . . . . . . . . . . . . . 85

*United States* v. *McDermot*, 58 F.3d 636, 1995 WL 371036 (5th Cir. June 5, 1995). . . . . . . . . 60

*United States* v. *Miller*, 116 F.3d 641 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States* v. *Ming He*, 94 F.3d 782 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States* v. *Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001). . . . . . . . . . . . . . . . . . . . . . 76, 77

*United States* v. *Moon*, 718 F.2d 1210 (2d Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*United States* v. *Morales*, 280 F. Supp. 2d 262 (S.D.N.Y. 2003). . . . . . . . . . . . . . . . . . . . . . 77

*United States* v. *Morell*, 524 F.2d 550 (2d Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*United States* v. *Morgan*, 942 F.2d 243 (4th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States* v. *Morrison*, 535 F.2d 223 (3rd Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States*  v. *Moten*, 582 F.2d 654 (2d Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*United States* v. *Mucciante*, 21 F.3d 1228 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*United States* v. *Mulder*, 273 F.3d 91 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . 10, 19, 61

*United States* v. *Murphy*, 41 U.S. 203 (1842). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*United States* v. *Murray*, 618 F.2d 892 (2d Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States* v. *Muyet*, 945 F. Supp. 586 (S.D.N.Y. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . 77

ix

*United States* v. *NYNEX Corp.*, 781 F. Supp. 19 (D.D.C. 1987). . . . . . . . . . . . . . . . . . . . . . . . 72-73

*United States* v. *Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000). . . . . . . . . . . . . . . . . . . . . . 86-87

*United States* v. *Nemes*, 555 F.2d 51 (2d Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*United States* v. *Nersesian*, 824 F.2d 1294 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States* v. *Ohle*, 678 F. Supp. 2d 215 (S.D.N.Y. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States* v. *Ordaz-Gallardo*, 520 F. Supp. 2d 516 (S.D.N.Y. 2007). . . . . . . . . . . . . . . . . 84

*United States* v. *Ostrer*, 506 F. Supp. 962 (S.D.N.Y. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*United States* v. *Panza*, 750 F.2d 1141 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 76

*United States* v. *Payden*, 613 F. Supp. 800 (S.D.N.Y. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . 76

*United States* v. *Pelletier*, 898 F.2d 297 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . 96, 97

*United States* v. *Pelullo*, 399 F.3d 197 (3rd Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*United States* v. *Perez*, 940 F. Supp. 540 (S.D.N.Y. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*United States* v. *Perez*, No. 01 CR. 112 (AGS),
    2001 WL 36082803 (S.D.N.Y. May 25, 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*United States* v. *Persico*, 621 F. Supp. 842 (S.D.N.Y. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . 77

*United States* v. *Persico*, 832 F.2d 705 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States* v. *Pilnick*, 267 F. Supp. 791 (S.D.N.Y. 1967). . . . . . . . . . . . . . . . . . . . . . . . . 57-58

*United States* v. *Pirro*, 76 F. Supp. 2d 478 (S.D.N.Y. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . 87

*United States* v. *Pitre*, 960 F.2d 1112 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*United States* v. *Quinn*, 445 F.2d 940 (2d Cir. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*United States* v. *Rahman*, 854 F. Supp. 254 (S.D.N.Y. 1994). . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States* v. *Rajaratnam*, 736 F. Supp. 2d 683 (S.D.N.Y. 2010). . . . . . . . . . . . . . . . . . . . 40

*United States* v. *Ramirez*, 602 F. Supp. 783 (S.D.N.Y. 1985)............................. 76

*United States* v. *Reinhold*, 994 F. Supp. 194 (S.D.N.Y. 1998). ........................... 44

*United States* v. *Reynoso-Ulloa*, 548 F.2d 1329 (9th Cir. 1977)......................... 51

*United States* v. *Rigas*, 258 F. Supp. 2d 299 (S.D.N.Y. 2003). ......................... 82

*United States* v. *Rigas*, 583 F.3d 108 (2d Cir. 2009)................................... 65

*United States* v. *Rivieccio*, 919 F.2d 812 (2d Cir. 1990)............................. 96-97

*United States* v. *Romero*, 54 F.3d 56 (2d Cir. 1995)................................... 31

*United States* v. *Rooney*, 866 F.2d 28 (2d Cir. 1989). ................................. 40

*United States* v. *Rosa*, 11 F.3d 315 (2d Cir. 1993). ........................... 21-22, 30-31

*United States* v. *Rucker*, 586 F.2d 899 (2d Cir. 1978)................................. 22

*United States* v. *Russo*, 483 F. Supp. 2d 301 (S.D.N.Y. 2007). ....................... 85-87

*United States* v. *Salameh*, 152 F.3d 88 (2d Cir. 1998). ..................... 9, 12-13, 29, 32

*United States* v. *Salazar*, 485 F.2d 1272 (2d Cir. 1973). ........................... 75, 77

*United States* v. *Sanin*, 252 F.3d 79 (2d Cir. 2001)................................... 34

*United States* v. *Sattar*, 314 F. Supp. 2d 279 (S.D.N.Y. 2004)......................... 60

*United States* v. *Scarpa*, 913 F.2d 993 (2d Cir. 1990)............................... 28, 61

*United States* v. *Shoher*, 555 F. Supp. 346 (S.D.N.Y. 1983)......................... 77, 80

*United States* v. *Shonubi*, 103 F.3d 1085 (2d Cir. 1997)............................... 16

*United States* v. *Smith*, 478 F.2d 976 (D.C. Cir. 1973)............................... 54

*United States* v. *Solomonyan*, 452 F. Supp. 2d 334 (S.D.N.Y. 2006). .................... 91

*United States* v. *Spector*, 793 F.2d 932 (8th Cir. 1986)............................... 51

*United States* v. *Spinelli*, 352 F.3d 48 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*United States* v. *Stein*, 424 F. Supp. 2d 720 (S.D.N.Y. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . 68

*United States* v. *Stewart*, 433 F.3d 273 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68-69

*United States* v. *Stirling*, 571 F.2d 708 (2d Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Sturdivant*, 244 F.3d 71 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . 40-41

*United States* v. *Sureff*, 15 F.3d 225 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 43-44

*United States* v. *Szur*, No. 97-108, 1998 WL 132942 (S.D.N.Y. Mar. 20, 1998). . . . . . . . . . . . 40

*United States* v. *Taggert*, No. 09 CR. 984 (BSJ), 2010 WL 532530
    (S.D.N.Y. Feb. 11, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States* v. *Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States* v. *Tillem*, 906 F.2d 814 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*United States* v. *Torres*, 901 F.2d 205 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 75-77

*United States* v. *Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001). . . . . . . . . . . . . . . . . . . . . . . . 76

*United States* v. *Turkish*, 458 F. Supp. 874 (S.D.N.Y. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . 87

*United States* v. *Tussa*, 816 F.2d 58 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States* v. *Tutino*, 883 F.2d 1125 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34-35

*United States* v. *Upton*, 856 F. Supp. 727 (E.D.N.Y. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*United States*  v. *Valdez*, 16 F.3d 1324 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States* v. *Valle Ferrer*, 739 F.2d 545 (11th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States* v. *Valona*, 834 F.2d 1334 (7th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States* v. *Vanwort*, 887 F.2d 375 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 39

*United States* v. *Villegas*, 899 F.2d 1324 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 29

*United States* v. *Volpe*, 42 F. Supp. 2d 204 (E.D.N.Y. 1999). . . . . . . . . . . . . . . . . . . . . . . . . .  97

*United States* v. *Walsh*, 194 F.3d 37 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  75

*United States* v. *Whittington*, 783 F.2d 1210 (5th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . 54-55

*United States* v. *Williams*, 205 F.3d 23 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . .  23, 62

*United States* v. *Williams*, 936 F.2d 698 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

*United States* v. *Zackson*, 6 F.3d 911 (2d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20, 22

*United States* v. *Zafiro*, 945 F.2d 881 (7th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Wayte* v. *United States*, 470 U.S. 598 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  71-72

*Williamson* v *Moore*, 221 F.3d 1177 (11th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  72-73

*Wong Tai* v. *United States*, 273 U.S. 77 (1927). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  75

*Zafiro* v. *United States*, 506 U.S. 534 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22, 31-33

## STATUTES

18 U.S.C. 3500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  84

Fed. R. Civ. P. 7(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  60

Fed. R. Crim. P. 8(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Fed. R. Crim. P. 14(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Fed. R. Crim. P. 16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  87-88

Fed. R. Evid. 402. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

" Fed. R. Evid. 403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9, 94

Fed. R. Evid. 801(d)(2)(E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  90

## MISCELLANEOUS

1 Wright, *Federal Practice and Procedure* § 127 (2d ed. 1982). . . . . . . . . . . . . . . . . . . . . . .  60

Laurence H. Tribe, *Trial by Mathematics: Precision and Ritual in the Legal Process,* 84
   Harv. L. Rev. 1329, 1334-35 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

Lucian E. Dervan, *Bargained Justice: Plea-Bargaining's Innocence Problem and the
   Brady Safety-Valve,* 2012 Utah L. Rev. 51, 94 (2012). . . . . . . . . . . . . . . . . . . . . . . . . 51-52

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

UNITED STATES OF AMERICA                      :

   - against -                                              :          S1 11 Cr. 1091 (VM)

PETER J. AJEMIAN et al.                          :

                                   Defendants.           :

------------------------------------------------------------- X

## GOVERNMENT'S MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' PRETRIAL MOTIONS

The Government respectfully submits this Memorandum in Opposition to Defendants'

Pretrial Motions.

### Preliminary Statement

In more than a dozen briefs, totaling more than 300 pages, the defendants strain to create

an impression that this prosecution is somehow extraordinary or unprecedented.  Although the

fraud alleged is widespread and the intended losses it caused are significant, the prosecution itself

is straightforward.  Like many fraud cases, this is a case about lies told by the defendants to get

money.  And, as in many fraud cases, the lies told here worked — they duped a federal agency,

the Railroad Retirement Board ("RRB"), into approving disability applications on behalf of

workers taking early retirement from the Long Island Railroad Company (the "LIRR") and

awarding to these retirees sizeable, and undeserved, disability annuities.

Similarly, the principles applicable to the various motions filed are neither novel nor

complex.  Stripped of rhetoric, the motions here are largely the same as those that are routinely

1

made, and routinely denied, in fraud cases in this Court.

As the Government indicated by letter dated October 9, 2012, we have combined our responses to the various defense motions in this single Memorandum of Law.  We have organized the defense motions, which overlap in various respects, into thirteen points.  With the exception of certain items (such as discovery motions calling for documents that we have produced or agree to produce, and requests for a severance to the extent consistent with our proposed severance plan), the defense motions should be denied in their entirety for the reasons set forth below.

## Statement of Facts

As set forth in the Complaint and the Superseding Indictment (the "Indictment") filed in this case, the defendants conspired fraudulently to obtain disability annuities from the RRB that would permit LIRR employees to supplement their early-retirement pensions from the railroad in order to retire as early as age 50 with a retirement income that approximated their pre-retirement, working income.  This conduct was widespread at the LIRR and largely converged around three doctors — defendants Peter J. Ajemian and Peter J. Lesniewski, and a third doctor, now deceased, Ralph Parisi (identified in the Indictment as "Disability Doctor-3").  These three doctors were responsible for supporting more than 86% of the disability applications submitted from August 2004 through August 2008.  (Complaint ¶ 30; Indictment ¶ 25).  From 1997 through 2008, Ajemian declared disabled over 94% of the LIRR employees he saw as patients who were eligible for an early retirement pension.  (Complaint ¶ 32; Indictment ¶ 26).  Similarly, for the same time period, Lesniewski declared disabled over 98% of the LIRR employees he saw as patients who were eligible to retire for an early retirement pension.  (Complaint ¶ 34; Indictment

¶ 26).

As explained in the charging documents, the LIRR pension plan at issue is unique in that it permits employees with more than 20 years of service to retire as early as age 50 with a retirement pension.  However, this LIRR pension typically amounts to substantially less than those employees' pre-retirement, working income.  Thus, in order to retire at such a young age, LIRR workers would have to be willing to live on a dramatically reduced income until they were eligible for their RRB pensions, generally at age 65 — *unless*, of course, the workers were willing to lie to obtain a disability annuity from the RRB as well.  Defendant Maria Rusin (Ajemian's office manager and the primary interface for many of the LIRR annuitants) perfectly captured this cold calculus in a consensually monitored telephone call, in which she explained that LIRR patients "get a certain amount of money" upon retirement, and "when they go on disability they get the rest of the money so for them if they go on disability and retirement that's what's worth it.  Otherwise, just to go on retirement is not worth it."  (Complaint ¶ 35(f)).

In order to obtain this full-income early retirement, employees typically did the following, usually beginning one or two years before retirement:

- Pre-selected a retirement date with a coinciding (and similarly pre-selected) date of purported disability;

- Began seeing a disability doctor — typically Ajemian, Lesniewski, or Parisi — for regular periodic visits to create a paper record to be used in applying for disability;

- Obtained various unnecessary medical tests and services, again to create a record to be used in applying for disability; and

- Engaged a "facilitator" who would advise the employee in applying for disability

3

and assist in filling out the forms in a manner that would ensure that they would
receive the disability.

As alleged in the charging documents, doctors Ajemian and Lesniewski would refer the
employees for multiple medical tests, such as x-rays, MRIs, and nerve conduction studies to
support the disability application; these purportedly "objective" tests in fact often documented
nothing more than normal degenerative changes that are often largely asymptomatic.  These
doctors also would, over the course of a number of visits, document in medical records various
ailments that were purportedly causing the employees to slide inexorably toward disability.
Upon the approach of the employees' targeted retirement date, the doctors would declare the
employees to be disabled from working at the LIRR, and would prepare medical forms and a
"narrative" to be submitted to the RRB in support of their disability application.  The employees
typically paid the doctors in the neighborhood of $1000, often in cash, for these narratives, and
additional sums in exchange for the rest of the paper trail created in preparation for their
disability retirement.  Notably, during the time the doctors documented the employees' steady
decline, the employees were almost invariably continuing to work at their railroad job, and some
of the employees were voluntarily performing large amounts of overtime in order to inflate their
anticipated pension amounts.

Defendants Marie Baran and Joseph Rutigliano acted as "facilitators" ostensibly
counseling people regarding their benefits, but in fact steering them through the steps necessary
to prepare for and make successful (and false) disability applications.

As noted, Maria Rusin was Ajemian's office manager, and was personally responsible for
guiding the LIRR employees through the process of creating and compiling the medical backup

and narrative statement, which was produced on command at the precise moment when an employee wished to retire (Complaint ¶¶ 39-41): as Rusin explained in a consensually monitored conversation, "the target date for the [medical] reports is right around when, uh, their retirement date." (Complaint ¶ 35(g)). At times, employees paid Ajemian for a disability narrative well in advance of the date on which the employee purportedly became disabled. (*See, e.g.*, Complaint ¶ 37(c) (describing phone message from employee to Rusin about wanting to change date of narrative)).

The Indictment charged sixteen LIRR retirees who are on RRB disability with participating in this fraud, three of whom have pled guilty. All of them submitted disability applications to the RRB that falsely claimed that they were unable to work because of their medical condition, when in truth and fact they were not unable to perform their jobs. Rather, they were simply planning to retire and wished to supplement their LIRR retirement pensions with RRB disability payments. For example, as early as 1991, defendant Rutigliano (who is charged as an annuitant and as a facilitator) began planning to retire in the fall of 1997 — a few months after his 50th birthday. (Complaint ¶ 53). Ultimately, he retired in the fall of 1999, a date he chose as early as March 1998. (Complaint ¶ 53). In the twelve months before he retired and claimed to be unable to work because of "severe disabilities" he suffered, he worked hundreds of hours of overtime and took no sick leave. (Complaint ¶ 54). In addition, he was prominently featured in a published *New York Times* video playing golf without apparent difficulty. (Complaint ¶ 56).

In addition to this basic lie told by all annuitant-participants in the fraud, the applications of these defendants contained various additional false or exaggerated claims about their medical

5

symptoms or physical limitations.  To take a few examples:

- Defendant Noone claimed that gripping and using hand tools caused severe pain, and that dressing was hard because "reaching above shoulder causes pain," yet he is an avid tennis and golf player.  (Complaint ¶¶ 63, 69).

- Defendant Walsh claimed that she experienced "leg pains when standing more than 5 min or when sitting more than 15 min," and that she could "not at all" perform outdoor chores, yet she was discharged from physical therapy because all of the goals of treatment were met, and she was surveilled shoveling snow for more than an hour and walking for approximately 40 minutes while pushing a baby stroller.  (Complaint ¶¶ 78, 83, 86).

- Defendant Falloon claimed that after standing for more than 15 to 20 minutes, she gets "severe, sharp, disabling pain" and that "climbing steps is very difficult and causes great pain so I try to avoid this," yet she was surveilled at a gym performing more than two hours of almost continuous exercise, including 45 minutes of step aerobics.  (Complaint ¶¶ 92, 99).

- Defendant Gagliano claimed that he could no longer work because of "severe and disabling pain and weakness in back, left shoulder, and left wrist," and in his legs and claimed that sitting and using public transportation is "hard," yet since his 2006 retirement on disability he has completed a number of bike tours, including a 400 mile bike tour in northern New York, and a number of 5K runs  (Complaint ¶¶ 129, 134), and (the evidence will show) traveled to Egypt, Kenya, Tanzania, Belgium, the Czech Republic, Greece, Iceland, the Netherlands, Costa Rica,

6

Ecuador, Mexico, and Peru.

•　　Defendant Ehrlinger claimed that standing, walking, driving, and using public
transportation are "hard" and that he could not do outdoor chores at all, but after
retiring with a disability annuity, he operated a business that rents tables, chairs,
and tents, and was surveilled personally loading and unloading tables and chairs
from a truck.  (Complaint ¶¶ 120, 123-24).

The monetary losses from this scheme are high.  For each annuitant, the expected value of
his or her disability annuity, if paid out in full, runs from tens of thousands to hundreds of
thousands of dollars.  In addition, the unnecessary medical billings by the doctors for visits and
tests designed to pad files, rather than to provide care, total in the millions of dollars.

**A R G U M E N T**

**POINT I**

**The "Statistical" Allegations Are Proper and
The Government's Numerical Analyses Are Admissible**

Defendants Ajemian and Gagliano (joined by others) have moved to strike from the
Indictment and to exclude from evidence at trial "statistical evidence."  Despite the unsupported
rhetorical claims made in these motions about the purported dangers of statistics, these motions
appear to concede that what is at stake here is a simple balancing of probative evidence under
Rule 403 of the Federal Rules of Evidence.  (Ajemian Mem. 5 (arguing that prejudice outweighs
probative value); Gagliano Mem. 6 (specifically referencing Rule 403 as the basis for the
motion))[1].  In other words, no special rules of evidence apply to numerical analyses such as those

---

[1] The defense briefs are cited herein as follows: "[defendant's last name] Mem."; exhibits
thereto are cited as "[defendant's last name] Mem. Ex. [exhibit designation]."  Ehrlinger filed

alleged in the Indictment and described more completely in the Complaint.  Because any

prejudice does not substantially outweigh the probative value of such evidence, the numerical

analyses, and other evidence like it, should not be excluded from the trial.[2]

### A.    Applicable Law

Pursuant to Fed. R. Evid. 402, "[r]elevant evidence is admissible unless any of the

following provides otherwise: the United States Constitution; a federal statute; these rules; or

other rules prescribed by the Supreme Court.  Irrelevant evidence is not admissible."  Rule 401

defines "relevant evidence" expansively: "Evidence is relevant if: (a) it has any tendency to make

a fact more or less probable than it would be without the evidence; and (b) the fact is of

consequence in determining the action."

Statistical evidence is not treated differently than any other evidence.  Indeed, in a

discrimination case, the Supreme Court has stated: "'[S]tatistics . . . come in infinite variety . . . .

[T]heir usefulness depends on all of the surrounding facts and circumstances.'  Only the trial

court is in a position to make the appropriate determination after further findings."  *Hazelwood*

---

two briefs, so his are cited as "Ehrlinger Severance Mem." and "Ehrlinger Disclosure Mem."

[2]Defendants have also moved for discovery of the data underlying the statistics alleged in the Indictment.  In responding to defendants' motion, the Government realized that the underlying data runs that we used as the base of our analyses were mistakenly not included in the discovery.  On October 19, 2012, we produced the data runs and other back-up for the allegations in the Indictment and Complaint, as well as additional data sets that will form the basis for a comparative analysis of disability rates at LIRR and Metro North that we anticipate offering at trial.  In addition, in order to assist the defense and to avoid its having to replicate our work, we produced a compilation database that combined data sets from several different sources into a single spreadsheet.  Because this compilation database is a work in progress, it was produced with the understanding that it would not be used in cross-examination or otherwise in front of the jury.  Thus, the portion of the defense motions requesting production of the data underlying the numerical analyses in the Indictment and Complaint is moot.

*Sch. Dist.* v. *United States*, 433 U.S. 299, 312 (1977) (quoting *International Broth. of Teamsters* v. *United States*, 431 U.S. 324, 340 (1977)) (holding that Court of Appeals erred by disregarding statistics in the record; Court of Appeals should have remanded to district court for findings relating to the statistics).  In other words, the operative question is whether the evidence is relevant.[3]

As with all relevant evidence, statistical evidence may be excluded pursuant to Rule 403, but only if the probative value is "*substantially* outweighed by one or more of the following: unfair prejudice, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403 (emphasis added).  Again, "[a] district court is obviously in the best position to do the balancing mandated by Rule 403," *United States* v. *Salameh*, 152 F.3d 88, 110 (2d Cir. 1998), and the Second Circuit "will second-guess a district court 'only if there is a clear showing

---

[3]Gagliano's parenthetical descriptions of the cases contained in his string-cites incorrectly suggest a blanket aversion to statistics that does not exist, rather than the highly case-specific analysis used in those cases. (Gagliano Mem. 5).  For example, Gagliano's description of *United States* v. *Ferguson*, 653 F.3d 61 (2d Cir. 2011), is "convictions vacated where Govt. Bar charts gave misleading impression of clear *statistical* relationship between events and stock price changes." (Gagliano Mem. 5 (emphasis added)).  The case involved nothing of the sort.  Rather, *Ferguson* involved stock price data ostensibly offered to prove materiality, but which instead gave an inaccurate and prejudicial suggestion of a direct causal relationship between the particular accounting fraud charged and a dramatic plunge in the stock price.  *United States* v. *Ferguson*, 653 F.3d at 274-75.  There was no attempt to draw a "statistical relationship" as Gagliano asserts.  On the contrary, the Second Circuit stated that the Government could have called an expert to estimate the extent of the stock price drop that was attributable to the accounting fraud charged in the case, presumably using comparisons to other frauds and price movements.  *Id.* at 275 & n.11.  Moreover, there was special unfair prejudice attached to this materiality evidence — in order to challenge the causal connection suggested by the Government's stock price information, the defense would have had to prove that other alleged bad conduct at AIG (including "bid-rigging, improper self-dealing, earnings manipulations and more") that was swirling in the press at the same time was the cause of the stock plunge.  *Id.* at 274.  There is no such other bad conduct by these defendants that would account for the disability rates alleged here.

that the court abused its discretion or acted arbitrarily or irrationally.'" *Id.* (quoting *United States* v. *Valdez*, 16 F.3d 1324, 1332 (2d Cir. 1994)).

"Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States* v. *Mulder* 273 F.3d 91, 99 (2d Cir. 2001).

**B.    Discussion**

The analyses contained in the charging documents and that the Government anticipates presenting at trial are highly probative, and that probative value is not substantially outweighed by any unfair prejudice.[4]  Thus, the defense motions attacking these allegations should be rejected.

As an initial matter, the numerical analyses contained in the charging documents are entirely straightforward, and are not at all the complex kind of statistical sampling or probabilistic analyses that have caused trouble for some courts.  *See* Laurence H. Tribe, Trial by Mathematics: Precision and Ritual in the Legal Process, 84 Harv. L. Rev. 1329, 1334-35 (1971) (discussing the well-known case of *People* v. *Collins*, 68 Cal. 2d 319, 320 (1968)), in which the prosecution improperly presented expert evidence that there was a one in twelve million chance of the defendants' innocence based on a purported statistical analysis of the likelihood that

---

[4]The trial is, of course, more than three months away, and thus the Government has not yet made final decisions about the evidence it intends to present at trial or the manner in which it intends to lay the foundation for any numerical or statistical analysis it decides to present. Nevertheless, the Government recognizes that a preliminary decision by the Court that the analyses and comparisons in the charging documents are relevant and not unfairly prejudicial likely will assist the parties in planning for trial or other resolution.  Thus, the Government has not requested that the Court defer making such a preliminary ruling until the time for *in limine* motions.

characteristics of the perpetrator and the defendant would match).  Rather, the allegations in the

Indictment are simple and specific to the crime charged.  They include comparing disability rates,

types of disabilities, and age at disability at commuter railroads, including Metro North, another

commuter railroad located in New York.  (Indictment ¶¶ 22-24; Complaint ¶¶ 27-29).  They also

include information specific to the charged doctors and the charged annuitants who used those

doctors to support their disability applications.  Thus, they note that during the analyzed time

period, Ajemian, Lesniewski, and Parisi supported more than 86% of the disability claims

submitted by LIRR retirees.  (Indictment ¶ 25; Complaint ¶ 30).  In addition, they show that

LIRR patients of Ajemian and Lesniewski, although working when they first went to see these

doctors, inexorably and almost invariably were declared by these doctors to be disabled within

720 days of their first visit.  (Complaint ¶¶ 31, 33).  Finally, the allegations describe the fact that

almost all of the LIRR patients who saw Ajemian or Lesniewski eventually obtained an RRB

disability annuity.  (Indictment ¶ 26; Complaint ¶¶ 32, 34).[5]

These straightforward allegations are highly probative in a number of ways.  *First*, the

comparison of rates of disability, types of disability, and age of disability between LIRR and

Metro North Railroad are highly probative that there is a criminal conspiracy and scheme to

_____

[5]The defendants claim that these statistics are "gerrymandered" because in the Indictment, the different numerical analyses use different time periods.  The reasons for the time frames used are clear from the Complaint — certain of the numbers come from pre-existing reports or analyses, and the time periods were necessarily selected by the authors of those reports. (Complaint ¶¶ 27, 29).  Other time periods were selected because they made sense — for example, some of the analyses use September or August 2008 as a cut-off date, because media reports alleging that there was a fraudulent disability scheme were published in September 2008. (Complaint ¶¶ 30, 32, 34, 69).  In any event, the Government has and will continue to produce the data underlying any analysis we intend to offer at trial, so the defense can use it to conduct its own alternate analyses.

defraud at work among LIRR retirees, because the extreme disparities between LIRR and Metro North in these regards suggest that the disparities do not occur by chance.

*Second*, these same numerical comparisons are highly probative of motive: as alleged, at the LIRR there is a motive to fraudulently seek disability because of the early retirement pension available to employees at the LIRR hired before 1988.  *See Salameh*, 152 F.3d at 111 ("Although it does not bear directly on the charged elements of a crime, evidence offered to prove motive is commonly admitted.").[6]

*Third*, the existence of this unmistakable pattern of widespread disability claims is important evidence of the background of the scheme and helps put in context the testimonial evidence that the Government anticipates presenting at trial.  For example, a juror might assume, based on his or her pre-conceived notions of how a criminal conspiracy operates, that for conspirators to execute a complex fraud scheme, they would need to have detailed and secretive conversations planning how to execute the scheme. Here, however, the conspiracy worked differently, as demonstrated by the numerical evidence.  That is, the evidence shows that the conspirators should not be expected to have all met together in a darkened room to plan the scheme — the scheme took place openly among workers at the railroad, and thus the necessary steps for carrying it out were well-known and explicit conversations were not necessary.  In addition, the comparatively high rates of "disability" among LIRR retirees conveyed to prospective retirees that, so long as they took certain steps to prepare for the fraud, including

---

[6]Defendant Noone indeed admits that because Metro North employees are not eligible for pension benefits until age 62, there is "no incentive" for them to "request an occupational disability." (Noone Mem. 3). This admission is true, is entirely consistent with the Government's theory, and is highly inculpatory.

seeing certain doctors who had a proven track record for successfully supporting disability applications, engaging facilitators with similar records, and telling lies in their applications about their inability to work, they faced little risk that they would be stuck in early retirement without the supplementary income of a fraudulently obtained disability annuity.  *See id.* ("[E]vidence that provides background information necessary to the jury's understanding of the nature of the conspiratorial agreement properly is admitted 'to furnish an explanation of the understanding or intent with which certain acts were performed.'" (quoting *United States* v. *Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988))).

*Fourth*, comparative disability rates between Metro North and LIRR are probative to dispel any argument or notion that railroad work by its nature results in a high, but legitimate, disability rate.  For example, when facilitator-defendant Baran was interviewed by the FBI in 2008, she claimed "it [apparently, working at the LIRR] was a tough job and many had knee and back injuries." And, in a 2004 interview, Baran stated that "railroad work is difficult and hard. Over the course of a 20 or 30 year career, almost all workers will be disabled to some degree and unable to perform some parts of their jobs."  The disability rates at LIRR compared to Metro North are highly probative because they show that there is nothing about working at a commuter railroad in New York that causes a supermajority of workers to end up disabled by the time they are in their early fifties.

*Fifth*, evidence showing the high rates of purported disability among Ajemian's or Lesniewski's patients demonstrates that Ajemian's and Lesniewski's role was not to provide medical care to these patients, but rather to pad a file in order to support a future disability application.  For example, it is highly relevant that Ajemian declared to be disabled not only

13

virtually every LIRR employee who saw him (during the analyzed time period), but also that he created a file supporting disability even for LIRR employees who ultimately decided not to file for disability.  Complaint ¶ 32.  Moreover, the specific evidence regarding Ajemian's and Lesniewski's almost inevitable finding of disability within two years of first seeing an LIRR employee will corroborate anticipated testimony from LIRR retirees that they decided to go to these doctors not to obtain medical treatment, but rather to obtain disability benefits.  Finally, the fact that Ajemian and Lesniewski saw numerous LIRR employees who were actively employed at the time of their first visit, but who within two years were declared to be disabled, is highly probative of the doctors' intent to defraud and knowledge that any symptoms reported by those patients did not truly prevent the employees from performing their railroad jobs.

The most recent Second Circuit case that the Government has located addressing the use of statistics in a criminal case, *United States* v. *Archer*, 671 F.3d 149 (2d Cir. 2011), is instructive in two ways.  First, although it found the particular numerical analysis relied on by the trial court to support a sentencing enhancement to be insufficient standing alone, it made no criticism of the admission of those same statistics at trial. Second, in its discussion of statistics, it noted the importance of establishing a baseline comparison, and provided an illustration that demonstrates the propriety of the analyses the Government plans to offer at trial here.

Archer was an immigration lawyer convicted at trial of visa fraud.  At trial, the Government presented the testimony of three of his clients to the effect that their visa applications were false and that Archer was responsible for the falsehoods.  In addition, the Government presented at trial "descriptive statistics about 175 of Archer's I-687 applications." *Id.* at 156.  Among other things, these statistics showed that 96% of these Archer applications

claimed that the applicant entered the United States in 1981, and that all of them claimed that the applicant arrived in the United States illegally. *Id.* at 156-57. At sentencing, the district court applied a Guidelines enhancement for 100 or more false documents based on the descriptive statistics presented at trial. *Id.* 162. The Second Circuit found that these statistics were insufficient to prove that the offense involved 100 or more false documents. *Id.* at 164.[7] Notably, at no point did the Second Circuit indicate that there was some fundamental defect in "descriptive statistics" or that there was any error in presenting them at trial.

In addition, the primary reason *Archer* identified for the inadequacy of the statistics was that they lacked a "baseline," and the Second Circuit illustrated the point with a discussion of patient outcomes for doctors. *Id.* The Court posited the hypothetical case of one "Dr. Jones," whose "patients died, on average, a year after their initial visit with her." *Id.* The court noted that "if most of her patients were healthy people coming for a check-up, this information suggests a finding that Dr. Jones is a terrible physician; if, on the other hand, Dr. Jones is an oncologist, all of whose patients had terminal cancer of a sort that had a national average life expectancy of two months, the same information makes her look very good indeed." *Id.* The *Archer* illustration thus demonstrates the propriety, indeed the necessity, of providing a comparative "baseline" to Metro North in order to establish the context for the LIRR analyses. In other words, *Archer* did not in any way suggest that a trial court should preclude evidence of Dr. Jones's patients' life

---

[7]The Second Circuit in *Archer* also indicated that other evidence might have been presented that would show why the similarities among the applications were incriminating, and specifically stated that there may be cases where "the incriminating character of similarities is sufficiently obvious that no further explanation is needed." *Archer*, 671 F.3d at 164. As noted above, the incriminating character of the evidence here is "sufficiently obvious," in its own right, to establish relevance, and it will be accompanied at trial with other incriminating evidence.

expectancy — or, analogously, of Dr. Ajemian's patients' disability expectancy — but noted that "[c]ontext is essential" and that an appropriate baseline (or an obviously incriminating character of the evidence) should be used. *Id.*

For all of these reasons, the evidence is highly probative of the existence of the conspiracy and scheme, and of the participation of the doctors, facilitators, and Maria Rusin (Ajemian's office manager) in the scheme.

Gagliano and Ajemian rely on *United States* v. *Shonubi*, 103 F.3d 1085 (2d Cir. 1997), in arguing that the allegations here should be excluded under Rule 403, and perhaps Rule 401 as well.  (Ajemian Mem. 6; Gagliano Mem. 5).  *Shonubi*, however, is nothing like this case.  In *Shonubi*, the defendant was caught after arriving at J.F.K. airport from Lagos, Nigeria with 103 heroin-containing balloons in his digestive tract.  *Shonubi*, 103 F.3d at 1087.  He was convicted after trial of possessing with intent to distribute and importing this quantity of heroin.  *Id.*  The trial evidence also revealed that Shonubi had made at least eight trips to Nigeria between September 1990 and December 1991, including the trip resulting in his arrest.  *Id.* The district court at sentencing simply multiplied the amount of heroin on the final trip by eight to calculate the total quantity of heroin for Guidelines purposes.  *Id.*  After this sentencing decision was reversed and remanded, the district court appointed a panel of experts, heard statistical and economic evidence, and conducted a poll of his fellow judges, in order to estimate the drug quantity involved in the trips other than the eighth trip.  *Id.* at 1088.  Although the evidence presented was elaborate, the Second Circuit held that it was not sufficient to establish drug quantity.  In particular, the Second Circuit found that the actions of 117 other drug couriers (necessarily limited to the actions of drug couriers who were caught) did not provide sufficient

proof from which to extrapolate the actions of the defendant on the seven other trips.  *Id.* at 1092-93.  The Second Circuit at no point claimed that statistics were irrelevant, or that they should be mistrusted or excluded by district courts.  Rather, the Second Circuit simply made a case-specific finding about the inadequacy of the particular statistics considered in that case.[8]

In contrast to *Shonubi*, the Government does not allege, and does not intend to argue to the jury, that the actions of other persons alone can be used to extrapolate to the actions of a particular defendant.  Rather, the arguments we intend to make regarding the appropriate probative value of this evidence are set forth above.  With respect to individual annuitant-defendants, the Government does not intend to offer the statistical evidence to establish that an individual annuitant was a participant in the scheme.  Thus, the purposes of the evidence is not to suggest that an annuitant-defendant is guilty of joining the criminal conspiracy simply from the fact, for example, that they are among the 86 percent of annuitants who saw one of the alleged disability doctors.  Rather, the Government will prove each charged annuitant's participation in the proven scheme through evidence specific to that annuitant, such as by juxtaposing the

_____

[8]Ajemian and Gagliano also rely on the Eighth Circuit's decision in *United States* v. *Jones*, 570 F.2d 765 (8th Cir. 1978).  *Jones* is also inapposite to this case.  In *Jones*, the defendant was charged with two specific substantive counts of distributing a Quaalude (a Schedule II drug) without a legitimate medical purpose on two specific dates.  *Id.* at 766.  The Government then introduced at trial evidence regarding 478 other, uncharged prescriptions issued by the defendant for Schedule II drugs.  *Id.* at 768.  One fundamental difference between *Jones* and this case is that the defendants here have been charged with participating in a conspiracy and in a scheme to defraud, and the evidence described in the text is direct evidence of the conspiracy and scheme, whereas the evidence in *Jones* was expressly argued by the Government to be Rule 404(b) "other act" evidence.  *Id.*  In addition, *Jones* confirms that there is no special rule that applies to statistical evidence — it noted that the evidence was relevant, but found that it should have been excluded pursuant to Rule 403.  *Id.* at 769.  It appears that *Jones* relied on a *de novo* balancing of probative value with unfair prejudice, rather than any appellate deference to the district court's discretion on this issue.  *Id.*

17

annuitant's claims regarding their symptoms and their supposed inability to work and perform

daily tasks with evidence demonstrating the falsity of those claims.  For example, the

Government anticipates offering evidence juxtaposing: (1) Gregory Noone's claim that he could

no longer work at the railroad because gripping small tools caused him "severe pain" with the

fact that he is an avid tennis player and golfer, Complaint ¶¶ 63, 69; (2) Sharon Falloon's claim

that she "ha[s] great trouble with stairs" with the video of her performing step aerobics,

Complaint ¶¶ 92, 99; (3) Gagliano's claim that he had "severe and disabling pain and weakness

in back, left shoulder, and left wrist," with his completion of a 400 mile bike tour and various 5K

races; and (4) Gagliano's claim that sitting and using public transportation is "hard" for him with

his travels, since his retirement on disability in 2006, to Egypt, Kenya, Tanzania, Belgium, the

Czech Republic, Greece, Iceland, the Netherlands, Costa Rica, Ecuador, Mexico, and Peru.

It is thus doubtful that any potential for this type of unfair prejudice would "substantially

outweigh" the probative value of the numerical evidence the Government has alleged and intends

to prove at trial, and thus this potential prejudice would not justify excluding the evidence.

Moreover, to the extent such unfair prejudice were possible, it could be eliminated by a simple

limiting instruction.  For example, if warranted based on the specific evidence offered at trial and

the Court's analysis at trial of Rule 403's balancing test, the Court could instruct the jury that this

statistical or numerical evidence was admitted as to all defendants to prove the existence of the

conspiracy and of the scheme, and as to certain [named] defendants to prove their participation in

the scheme, but it was not admitted to prove the participation of individual [named] annuitants in

the scheme and it should not be considered for that purpose.  Such an instruction, which the jury

would be bound to follow, would eliminate the risk of any prejudice.  *See United States* v. *Tussa*,

18

816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice to defendant).

Thus, the motions to strike the Government's numerical analyses, and to strike such allegations from the Indictment, *see Mulder* 273 F.3d at 99, should be denied.

### POINT II

### While Severance Is Not Required, the Government Nevertheless Consents to Sever the Case into Two Trial Groups

With different rationales and shifting proposals for how to cluster the defendants, nearly all of the moving defendants in this case have requested a severance.  Due to the number of defendants who remain in the case at present, the Government would consent to separate trials organized by doctor-defendant — one trial of Ajemian, his patients, his office manager (Rusin), and the facilitator used by many of his patients (Baran); and a second trial of Lesniewski, his (or his co-worker, Parisi's) patients, and the facilitator used by a number of their patients (Rutigliano).  This proposal, the Government submits, largely moots the defendants' motions.  To the extent it does not, the balance of the defendants' remaining arguments are without merit, as set forth below.

#### A.    Applicable Law

The federal criminal justice system has a strong policy in favor of joint trials.  Joint trials of defendants indicted together "play a vital role in the criminal justice system" as they "conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial."  *Richardson* v. *Marsh*, 481 U.S. 200, 209 (1987); *see Bruton* v. *United States*, 391 U.S. 123, 134 (1968).

Defendants who nonetheless seek a severance can argue: (i) that the charges or defendants

were not properly joined in a single indictment in the first instance under Rule 8 of the Federal

Rules of Criminal Procedure; or (ii) that properly joined charges or defendants should

nonetheless be severed at the discretion of the trial court pursuant to Rule 14 of the Federal Rules

of Criminal Procedure.  Neither is a proper basis for severance in this case.

      Rule 8(b) of the Federal Rules of Criminal Procedure provides:

> The indictment or information may charge 2 or more defendants if
> they are alleged to have participated in the same act or transaction,
> or in the same series of acts or transactions, constituting an offense
> or offenses.

Fed. R. Crim. P. 8(b).  Offenses and defendants are properly joined under Rule 8(b) where the

criminal acts of two or more persons are "unified by some substantial identity of facts or

participants or arise out of a common plan or scheme."  *United States* v. *Attanasio*, 870 F.2d 809,

815 (2d Cir. 1989) (internal quotations omitted).  Thus, where, as here, the acts of defendants are

connected, those acts, and the defendants who performed them, are properly joined in a single

indictment.

      Federal Rule of Criminal Procedure 14(a) authorizes the court, in its discretion, to sever

properly joined defendants "[i]f it appears that a defendant or the government is prejudiced by a

joinder."  Fed. R. Crim. P. 14(a).  The decision whether to grant a severance is committed to the

sound discretion of the trial court and is virtually unreviewable."  *United States* v. *Zackson*, 6

F.3d 911, 922 (2d Cir. 1993) (internal quotations omitted).  The Supreme Court has instructed

that this discretionary severance is warranted only if "there is a *serious risk* that a joint trial

would compromise a *specific trial right* of one of the defendants, or prevent the jury from

making a reliable judgment about guilt or innocence."  *Zafiro* v. *United States*, 506 U.S. 534, 539

(1993) (emphasis added).  In other words, analysis of prejudice under a Rule 14 motion must be

viewed through the lens of the strong presumption in favor of joint trials. As the Supreme Court

has explained:

> Many joint trials — for example, those involving large
> conspiracies to import and distribute illegal drugs — involve a
> dozen or more codefendants. . . .  It would impair both the
> efficiency and the fairness of the criminal justice system to require
> . . . that prosecutors bring separate proceedings, presenting the
> same evidence again and again, requiring victims and witnesses to
> repeat the inconvenience (and sometimes trauma) of testifying, and
> randomly favoring the last-tried defendants who have the
> advantage of knowing the prosecution's case beforehand.  Joint
> trials generally serve the interests of justice by avoiding
> inconsistent verdicts and enabling more accurate assessment of
> relative culpability — advantages which sometimes operate to the
> defendant's benefit.  Even apart from these tactical considerations,
> joint trials generally serve the interests of justice by avoiding the
> scandal and inequity of inconsistent verdicts.

*Richardson* v. *Marsh*, 481 U.S. at 209-10; *see also United States* v. *Zafiro*, 945 F.2d 881, 886

(7th Cir. 1991) (joint trials reduce not only litigation costs but also "error costs," *i.e.*, the costs

associated from depriving jury from making its determinations based on "the full picture"), *aff'd*,

506 U.S. 534 (1993).  "The principles that guide the district court's consideration of a motion for

severance usually counsel denial."  *United States* v. *Rosa*, 11 F.3d 315, 341 (2d Cir. 1993); *see*

*United States* v. *Girard*, 601 F.2d 69, 72 (2d Cir. 1979) (joint trial is proper where the crime

involves a common scheme.  Accordingly, the Second Circuit consistently has approved the

joinder of defendants and charges where the acts of the defendants share some identity of facts or

participants, or arise from a common plan or scheme.  *See, e.g., United States* v. *Cervone*, 907

F.2d 332, 341 (2d Cir. 1990) (proper joinder of eighteen defendants in 102-count indictment with

a variety of labor racketeering charges, as well as related charges of obstruction of justice,

21

bribery, and making false statements); *United States* v. *Attanasio*, 870 F.2d at 815 (defendants

charged with conspiracy to defraud IRS properly joined with defendants and charges relating to a

separate conspiracy to defraud IRS because of common participants and because they were part

of a series of acts).

Notably, it is not enough for a defendant to show that he "may have a better chance of

acquittal in [a] separate trial[]." *Zafiro*, 506 U.S. at 540; *see also United States* v. *Panza*, 750

F.2d 1141, 1149 (2d Cir. 1984) (explaining that prejudice must be "sufficiently severe to

outweigh the judicial economy that would be realized by avoiding lengthy multiple trials").  It is

well settled that "differing levels of culpability and proof are inevitable in any multi-defendant

trial and, standing alone, are insufficient grounds for separate trials." *United States* v. *Spinelli*,

352 F.3d 48, 55 (2d Cir. 2003) (internal quotations omitted); *United States* v. *Carson*, 702 F.2d

351, 366-67 (2d Cir. 1983); *United States* v. *Torres*, 901 F.2d 205, 230 (2d Cir. 1990).

Similarly, "[t]he fact that evidence may be admissible against one defendant but not against

others does not require separate trials." *United States* v. *Rucker*, 586 F.2d 899, 902 (2d Cir.

1978); *see also Zackson*, 6 F.3d at 922.  Moreover, "[t]he fact that . . . codefendants [are] tried

for a crime not committed by another codefendant does not, without more, create the sort of

miscarriage of justice that would require a new trial." *United States* v. *Hernandez*, 85 F.3d 1023,

1029 (2d Cir. 1996).  Rather, a defendant must show that evidence introduced against his co-

defendants would "in some way affect[] the jury's ability fairly and rationally to evaluate the

evidence of [the defendant's] guilt." *Id.*

Moreover, "[e]vidence at the joint trial of alleged co-conspirators that, because of the

alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial

of the moving defendant is neither spillover nor prejudicial." *Rosa*, 11 F.3d at 341; *see also*

*Spinelli*, 352 F.3d at 55-56 (upholding denial of severance motion and denying prejudicial

spillover claim where "much of the evidence of [co-defendant's] crimes would have been

admissible at a separate trial of [defendant], since it was relevant to proving the nature and the

scope of the conspiracy"); *United States* v. *Villegas*, 899 F.2d 1324, 1347-48 (2d Cir. 1990)

(rejecting claims that spillover evidence against co-defendants prejudiced moving defendants).

Any potential for prejudice is diminished where the court instructs the jury to consider separately

each individual and each charge. *Spinelli*, 352 F.3d at 55 (noting that spillover prejudice may be

remedied by limiting instruction); *United States* v. *Miller*, 116 F.3d 641, 679 (2d Cir. 1997)

(same).

      **B.**      **Discussion**

            **1.**      **While Severance Is Not Required, The Government Nevertheless Proposes That the Defendants Be Separated Into Two Smaller Trial Groups**

      Consistent with the foregoing legal principles, severance is not required under the law.

The Indictment charges, and the proof at trial will show, the existence of a single, massive

conspiracy involving a well-defined and well-rehearsed scheme, many common conspirators, and

each of the charged defendants. *United States* v. *Williams*, 205 F.3d 23, 33 (2d Cir. 2000) (A

single conspiracy exists where there is "'mutual dependence among the participants, a common

aim or purpose or a permissible inference from the nature and scope of the operation, that each

actor was aware of his part in a larger organization where others performed similar roles equally

important to the success of the venture.'" (quoting *United States* v. *Vanwort*, 887 F.2d 375, 383

23

(2d Cir. 1989))).[9]

Nevertheless, the Government recognizes that a trial of eighteen defendants may be unwieldy.  To avoid such an unwieldy trial, while promoting the efficiency, fairness, and accuracy that underlie the policy in favor of joint trials, the Government proposes the following trial groups:

**Group One**:  The Government respectfully proposes that the following group of thirteen defendants proceed to trial first (the "Ajemian Group"): Ajemian and his office manager Rusin, along with each of the annuitant-defendants who used Ajemian in connection with their disability applications — Noone, Walsh, Falloon, Pulsonetti, Bianchini, Brittell, Delgiorno, Plaia, Nugent, and Dellala.  Finally, the group also would include facilitator Baran, who often referred patients to Ajemian, who communicated directly with Rusin, and whose clients included co-defendants Noone, Walsh, Falloon, and Pulsonetti.

**Group Two**:   The Government respectfully proposes that the following group of five defendants proceed to trial second (the "Lesniewski Group"): Lesniewski, Rutigliano, Gagliano, Ehrlinger, and Stavola.  The Government anticipates that the proof adduced at trial will show that, at times relevant to the Indictment, Lesniewski worked with Parisi, another orthopedist who

---

[9]Indeed, because the Indictment charges, and the proof will show, one large conspiracy, there will necessarily be some overlapping proof presented in the two trials. Thus, for example, the numerical analyses discussed above in Point I, including the fact that most LIRR "disabled" retirees saw one of three doctors; that the rates, types, and ages of disability claims differ markedly between LIRR and Metro North railroad; and that the particular doctor-defendant on trial declared virtually all LIRR patients to be disabled, would all be presented at severed trials. In addition, evidence about the facilitators like Rutigliano and Baran would be presented at both trials, as each of these facilitator-defendants assisted patients of each of the charged disability doctors.  Nevertheless, the Government agrees that each of the trials proposed in the Government's trial plan would be shorter than, and would omit some of the evidence that would be presented in, an omnibus trial of all currently-charged defendants.

saw a great number of LIRR retirees in connection with their applications for disability benefits from the RRB.  Rutigliano was a facilitator for patients who used both Lesniewski and Parisi; he was also a former LIRR employee and union head, who himself used Lesniewski in connection with his own RRB disability application.  Because Gagliano was a Leniewski patient, and Stavola and Ehrlinger were Parisi patients, it is sensible and economical for them to be tried together.

While the Ajemian Group is of course larger than the Lesniewski Group at present, the proposed grouping would result in the greatest judicial efficiency and would dispose of some of the concerns raised by the defendants.  *First*, as noted, it would skirt the concern of participating in the type of "mega-trial" of which so many of the defendants complain — even in the unlikely scenario that all thirteen defendants in the Ajemian group proceed to trial, it would still fall within the parameters established by the Second Circuit in *United States* v. *Casamento*, 887 F.2d 1141 (2d Cir. 1989) (while acknowledging that mega-trials should be avoided, the Second Circuit did not deem severance necessary in a case in which twenty-one defendants charged in a sixteen-count indictment were tried in a seventeen-month-long trial and the parties introduced thousands of exhibits and testimony from more than 275 witnesses); *see also Richardson*, 481 U.S. at 209 (noting that many trials routinely "involve a dozen or more codefendants" without issue).

*Second*, trials severed in the above-proposed manner would obviate the "multiple conspiracies" argument raised by Rusin and joined by many of her co-defendants.  (*See* Rusin Mem. 1 *et seq.*).  To be clear, and as set forth in detail below (*see* Point III, *infra*), Rusin's multiple conspiracies argument is wrong on the law and the facts that will be proven at trial.

25

Nevertheless, the Government's proposed severance plan eliminates Rusin's multiple conspiracy concerns, since Rusin claims that the Indictment secretly describes two conspiracies, an "Ajemian Conspiracy" and a "Lesniewski Conspiracy," which, she argues, may not be joined together at trial (s*ee* Rusin Mem. 4-5); in her brief, Rusin herself separates out the two groups largely as the Government has in its proposal. (*Id.* at 8).[10]

The Government submits that the Ajemian Group should be tried first because such a trial will be more substantial, given that Ajemian was responsible for approximately half of the LIRR disability applications submitted to the RRB (including, of course, the group of annuitants who should be tried alongside him). After the conclusion of the Ajemian Group trial, should the members of the Lesniewski Group elect to proceed to trial, such a trial would be significantly streamlined, due to the fact that various common issues will have been resolved at the first trial; the fact that Leniweski simply saw fewer patients; and the fact that Lesniewski effectively confessed to his criminal conduct both verbally and in writing.

### 2.     The Defendants' Severance Arguments and Proposals Are Without Merit

Although their complaints regarding an unmanageably large mega-trial and multiple conspiracies are largely mooted by the Government's severance proposal, the defendants argue incorrectly that other claimed issues, including *Bruton* problems, spillover prejudice, and antagonistic defenses, require severance. As the factual basis for their argument, the moving defendants imagine a fanciful world in which they could each be tried individually or with a

---

[10]Despite this, Rusin nevertheless requests that she be tried alone with Ajemian. (Rusin Mem. 19-23). For the reasons set forth below, this request is completely unwarranted, as are similar requests from her co-defendants.

small, hand-picked group of co-defendants, solely on evidence of their own acts and statements, and without regard to the statements and actions of their co-conspirators.  Yet this alternate universe is entirely illusory.  None of the defendants' various claims survives scrutiny or describes a prejudice sufficiently severe to overcome the strong presumption in favor of joint trials for defendants indicted together as part of the same conspiracy.  Accordingly, the Government's proposed accommodation for a severance, as set forth above, should be granted; to the extent any of the individual defendants seeks a separately configured severance, that motion should be denied.

### a.    The Government's Proposal Cures Any Spillover Problems Caused by a Single Trial

Certain of the annuitant-defendants argue that they would suffer "spillover prejudice" in a joint trial, asserting that there is a "disparity in the degree of involvement" between the defendants and that much of the evidence that would be relevant against certain of the defendants would be both irrelevant and prejudicial as against them.  (*See* Noone Mem. 9-14; *see also* Walsh Mem. 39; Ehrlinger Severance Mem. 3-5; Bianchini Mem. 21-22).  Under the circumstances of this case, this argument does not amount to the type of "spillover prejudice" that would justify any severance.  First, the severance proposal offered by the Government, separating the Lesniewski Group from the Ajemian Group, would mean that all of the proof adduced against Ajemian and Rusin, and each of the individual annuitants seen by the Ajemian practice, for example, need not be presented at the trial of the Lesniewski Group; the reverse is equally true. Thus, the complaint that any given defendant would have to sit through "[s]everal weeks of evidence" during which they are not implicated or even mentioned (Noone Mem. 13; *see also*

Ehlinger Severance Mem. 4), is largely obviated.

In addition, there is no risk of "spillover prejudice" within the trial groups suggested by the Government. This is so because relative culpability or level of engagement in a joint conspiracy simply is not a basis for severance. "Different levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *United States* v. *Chang An-Lo*, 851 F.2d 547, 557 (2d Cir. 1988) (internal quotations omitted); *see also United States* v. *Scarpa*, 913 F.2d 993, 1015 (2d Cir. 1990) (same); *United States* v. *Ebner*, 782 F.2d 1120, 1127 (2d Cir. 1986) (joinder proper even though moving defendant participated in conspiracy for shorter period of time and conduct caused less loss than co-defendants); *United States* v. *Stirling*, 571 F.2d 708, 733 (2d Cir. 1978) (joinder proper even though moving defendant did not participate "in every detail of the conspiracy"). Indeed, the Second Circuit "has repeatedly recognized that joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible." *United States* v. *Locasio*, 6 F.3d 924, 947 (2d Cir. 1993); *see also United States* v. *Joyner*, 201 F.3d 61, 80 (2d Cir. 2000) (district court properly denied severance motion where two-month trial focused almost exclusively on narcotics conspiracy and defendant was only charged with committing a single act of arson on a single day); *United States* v. *Carson*, 702 F.2d 351, 366-367 (2d Cir. 1983) (fact that defendant played a less prominent role in the conspiracy than many of his co-conspirators was not a sufficient ground for a separate trial); *United States* v. *Aloi*, 511 F.2d 585, 598 (2d Cir. 1975) (individual trials are not warranted merely because of "differences in degree of guilt and possibly degree of notoriety of the defendants").

Spillover prejudice of the sort warranting severance can occur only "when proof

inadmissible against a defendant becomes a part of his trial solely due to the presence of

co-defendants as to whom its admission is proper." *Salameh*, 152 F.3d at 115.  However, a

"defendant's claim that he was prejudiced by the admission of evidence at a joint conspiracy trial

is insupportable when the evidence would have been admissible against him in a separate trial

alone as a member of the conspiracy." *Id.*  Thus, even at a hypothetical trial of Rusin and

Ajemian alone, the Government would necessarily offer evidence relating to a number of their

LIRR patients in order to prove specific instances where Ajemian and Rusin participated in

making false claims of disability to the RRB.  Similarly, even at a trial of a single annuitant, the

role of the assessing physician, the pattern of disability at the LIRR, as well as evidence of the

assessing doctor's other LIRR patients, would be admissible for the reasons stated in Point I.

Thus, there is no "prejudicial spillover" from this evidence that is admissible regardless of the

trial groups.  *See Salameh*, 152 F.3d at 116; *United States* v. *Villegas*, 899 F.2d at 1347 (one of

factors courts consider is "to what extent the evidence presented at the joint trial would have

been admitted at a single-defendant trial because of the alleged conspiratorial nature of the illegal

activity;" denial of severance was proper where "all of the evidence as to each of the other

defendants' acts in furtherance of the conspiracy was admissible against each of them.");

*Casamento*, 887 F.2d at 1153 (activities of alleged co-conspirators would have been admissible

in single-defendant trials and thus severance properly denied); *United States* v. *Nersesian,* 824

F.2d 1294, 1304 (2d Cir. 1987) (where evidence was sufficient to support conclusion that

defendants participated in single conspiracy, Government was "entitled to show the entire range

of evidence of the conspiracy against each appellant" and separate trials were unwarranted);

*United States v. Bari*, 750 F.2d 1169, 1178 (2d Cir. 1984) (even "least active" member of

conspiracy rightly denied severance, because as "fully implicated conspirator," "acts of

co-conspirators in the furtherance of [the charged] conspiracy" would have been admissible

"against him in a separate trial").[11]

Moreover, even if there were some evidence that would not be admissible in a severed

trial, "the fact that evidence may be admissible against one defendant but not another does not

necessarily require a severance." *Carson*, 702 F.2d at 367; *United States* v. *Barton*, 647 F.2d

224, 241 (2d Cir. 1981) (defendant charged only with obstruction of justice was properly denied

a severance from co-defendants charged with bombings, attempted bombings, and racketeering).

In addition, because much of the same evidence will be presented regardless, the one- and

two-defendant trials posited by certain defendants would result in an enormous duplication of

efforts.  The Government would be required to call and subject to cross-examination many of the

same accomplice witnesses, law enforcement personnel, and other witnesses that it intends to call

at the trial of the remaining defendants.  In these circumstances, a severance would be extremely

burdensome and needlessly disadvantage the public, the Court, and the Government with

lengthy, duplicative trials, with no lessening of "prejudice" to the defendants.  *See United States*

*v. Rahman*, 854 F. Supp. 254, 262 (S.D.N.Y. 1994)  ("Once such proof is shown to be

---

[11] Nor are the acts of the defendants' co-conspirators in this case so provocative or
outrageous as to potentially inflame a jury.  Indeed, the well-settled principles regarding
prejudicial spillover have been applied in cases involving much more significant potential
prejudice than what may even arguably be present here, such as when only certain
co-conspirators are alleged to have committed extremely violent acts.  *See, e.g.*, *Rosa*, 11 F.3d
315, 342 (affirming denial of severance motion of two non-violent defendants, reasoning that
each "was an integral part of the conspiracy" and "[e]vidence of the [murderous and violent]
workings of the conspiracy would therefore have been admissible at the individual trials of [the
two drug defendants] had they been tried separately."); *United States* v. *Diaz*, 176 F.3d 52, 102-
03 (2d Cir. 1999) (admission of evidence of eight murders in which moving defendant did not
participate did not cause him substantial spillover prejudice).

admissible, there is no potential prejudice to be avoided by severing the charges [or, in this case, defendants] to which that proof relates.").  Thus, any theoretical prejudice that would be suffered by the Defendants as a result of a joint trial is far outweighed by the prejudice that would be imposed upon the witnesses, the Court, and the Government in this matter if the defendants' trials were to be further severed from that of their co-conspirators.

Finally, as discussed in detail below in the context of defendant Walsh's meritless *Bruton* claims, to the extent there were some unfair prejudice that otherwise would result from proof of acts committed by co-conspirators (which there is not), it could be mitigated or eliminated by appropriate limiting instructions on particular pieces of evidence and jury instructions that guilt is individual, and that the jury should decide the guilt of a particular defendant based on the evidence pertaining to that defendant only.  *See Zafiro*, 506 U.S. at 538-39; *United States* v. *Romero*, 54 F.3d 56, 60 (2d Cir. 1995); *Rosa*, 11 F.3d at 342 (despite evidence of violent acts, including murder, committed by non-moving defendants, joinder was proper where court gave appropriate limiting instructions).

**b.      The Defendants' Claim of "Antagonistic Defenses"
Does Not Justify Severance**

The defendants also claim that the possibility of mutually antagonistic defenses among the co-conspirators creates sufficient prejudice to warrant severance. (*See* Walsh Mem. 36-38; Bianchini Mem. 19-21).  Even assuming these defenses are actually presented at a joint trial in this matter, they do not meet the standard for "mutually antagonistic" defenses requiring severance.

Although courts, including the Second Circuit, once adhered to the view that a severance

was justified where competing defenses could not both be credited, the Supreme Court's decision in *Zafiro* effectively overruled these cases. *See United States* v. *Haynes*, 16 F.3d 29, 32 (2d Cir. 1994). Under *Zafiro*, the existence of mutually antagonistic defenses — even wholly irreconcilable ones — is not prejudicial in and of itself, nor does it afford a freestanding basis for a severance. Rather, under *Zafiro*, the party seeking severance on account of mutually antagonistic defenses must show not only that he and his co-defendant have antagonistic defenses, but also that the antagonism deprives him of a specific trial right or that simultaneous presentation of the defenses will somehow prevent the jury from reliably evaluating the evidence. *Zafiro*, 506 U.S. at 539-40; *Haynes*, 16 F.3d at 31-32. As the Second Circuit has noted, "an adversarial stance by a codefendant clearly does not, alone, require trials to be severed. Were this true, a virtual ban on multidefendant conspiracy trials would ensue since co-conspirators raise many different and conflicting defenses." *United States v. Cardascia*, 951 F.2d 474, 484-85 (2d Cir. 1991)

Accordingly, a defendant seeking a severance on the ground of mutually antagonistic defenses satisfies his burden of showing substantial prejudice only if "the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant." *Haynes*, 16 F.3d at 31 (internal quotations omitted); *see also Salameh*, 152 F.3d at 115 ("In order to make a showing of 'mutually antagonistic' or 'irreconcilable defenses,' the defendant must make a factual demonstration that acceptance of one party's defense would tend to preclude the acquittal of [the] other.") (internal citation and quotations omitted). In other words, mere "fingerpointing" by one defendant seeking to shift the blame to his co-defendant is not the sort of antagonism that commands a severance.

32

*Casamento*, 887 F.2d at 1154.

The type of purported conflict among defenses hypothesized by defendants is no different than that permitted in *Zafiro* itself — one defense lawyer argued that his client was innocent and unaware that his girlfriend, a co-defendant, was "distributing drugs." *Zafiro*, 506 U.S. at 536. And, as with other asserted grounds for prejudice from a joint trial, the Court in *Zafiro* emphasized that severance is not required to alleviate prejudice; rather, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* at 539.

Accordingly, the defendants have not come close to meeting their burden to establish mutually antagonistic defenses of the type to justify the requested severance.[12]

### c.   The *Bruton* Motion Is Both Premature and Meritless

Defendant Walsh, joined by several of her co-defendants, also argues for severance on the grounds that admission of statements made by certain of her co-defendants, even if redacted, would violate her confrontational rights at trial.  (Walsh Mem. 25-41; *see, e.g.*, Bianchini Mem. 17-19; Rusin Mem. 23). This motion remains unripe for adjudication; however, even if it were not premature, it would nevertheless be without merit because the statements at issue generally

---

[12]Several of the defendants go even further and suggest that severance is required so that they may call co-defendants as witnesses on their behalf.  (*See* Baran Mem. 12; Ajemian Mem. 18).  None of the defendants have come close to making the required showing to support this argument.  A defendant's request for severance on the grounds that he would otherwise be denied a fair trial because of the supposed possibility that his co-defendant would otherwise testify on his behalf at a separate trial is governed by *United States* v. *Finkelstein*, 526 F.2d 517, 523 (2d Cir. 1975), which requires (among other things) a sufficient "showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege." *Id.* at 523-24.  Here there has been *no* indication that any co-defendant would open himself or herself up to the significant risks involved in testifying on behalf of another while facing her or her own criminal charges. *Compare id.* at 524 (even affidavits from co-defendant and another co-defendant's counsel did not constitute a sufficient showing).  These defendants have not even cited *Finkelstein*, let alone attempted to satisfy its requirements.

do not make explicit reference to any co-defendant and therefore do not implicate *Bruton*, 391 U.S. 123, and its progeny.  Any that do may easily be redacted, and thus also do not run afoul of *Bruton*.

First, as the Government has already argued in its June 21, 2012 response to Defendant Walsh's earlier *Bruton*-related motion, a determination on this motion is premature, and properly deferred until the Court entertains *in limine* motions.  (*See* Govt's 6/21/12 Mem. 1-5).  At that time, the Government will make determinations as to which statements it intends to offer at trial (depending in part on if and how the Court severs the case and on any subsequent pleas), and will make any necessary modifications to the statements to ensure that they comply with *Bruton*.  If the proposed modifications do not, in the Court's view, satisfy *Bruton*, the Government will propose further modifications.  In other words, as is typical in a multi-defendant case, *Bruton* issues are resolved in the context of *in limine* motions shortly before trial.

Second, there are no true *Bruton* issues here because a statement is only problematic if it "*facially* incriminat[es]" the non-declarant defendant.  *See Gray* v. *Maryland*, 523 U.S. 185, 196 (1998) (emphasis in original).  Thus, the Second Circuit has consistently held that the introduction of a co-defendant's confession with the defendant's name replaced by a neutral noun or pronoun does not violate *Bruton*.  *See, e.g., United States* v. *Alvarado*, 882 F.2d 645, 652 (2d Cir. 1989), *overruled on other grounds by Bailey* v. *United States*, 516 U.S. 137 (1995); *see also United States* v. *Sanin*, 252 F.3d 79, 84 (2d Cir. 2001) (noting that *Gray* "did not overrule prior decisions or alter doctrines employed by this Circuit").  For example, in *United States* v. *Tutino*, 883 F.2d 1125, 1135 (2d Cir. 1989), the Court affirmed a conviction based in part on a statement of a co-defendant that, as redacted, referred to "others," "other people," and "another person."  As

34

the Court explained, "a redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise connect co-defendants to the crimes, may be admitted without violating a co-defendant's *Bruton* rights." *Id.*

Notably, the Second Circuit has emphasized that, in determining whether a proposed redaction is sufficient to pass muster under *Bruton*, courts should view the redacted statement separate and apart from any other evidence admitted at trial. *United States* v. *Williams*, 936 F.2d 698, 700-01 (2d Cir. 1991) (if the confession, "when so viewed, does not incriminate the defendant, then it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to the defendant.").

Thus, in *United States* v. *Jass*, 569 F.3d 47, 53 (2d Cir. 2009), the Second Circuit rejected a *Bruton*-based claim that the defendant was prejudiced by the admission at a joint trial of the co-defendant's statements that the co-defendant "took pictures of [Victim 2] and the other person in various sexual poses with the digital camera. [The co-defendant also stated] that the other person took pictures of he and [Victim 2] in various sexual poses with the digital camera." *Id.* at 53. (The co-defendant's actual confession had used Jass's name, rather than the phrase "the other person.").  The Second Circuit rejected the defendant's argument that the jury was incapable of considering this confession only against the co-defendant, and that the jury would necessarily infer that "the other person" was the defendant. *Id.* at 58.  The Court explained: "From *Bruton* to *Richardson* to *Gray*, the Supreme Court's Confrontation Clause concern has been with juries learning that a declarant specifically identified a co-defendant as an accomplice in the charged crime." *Id.* at 60.  Where redaction or alteration of the statement conceals the co-defendant's

35

"*specific* identification of a confederate," however, even where the statement would inferentially incriminate the defendant, the court's instruction to the jury to consider the statement only against its maker is normally sufficient to eliminate prejudice and to prevent the jury from misusing the statement to draw such an incriminating inference against the non-declarant defendant.  *Id.* at 60-61 (emphasis in original).

Thus, although the Government has not yet made final determinations as to whether *Bruton* redactions are appropriate, it appears that many of the statements that will be offered do not require any redaction at all, since most do not specifically identify any co-defendant.  To take one example, defendant Lesniewski stated to agents that "he thinks approximately . . . fifty percent of the LIRR patients he saw had an honest disability while the other fifty percent should have been weeded out prior to awarding them their disability" (*see* Walsh Mem. Exh. A at 3 (cited at Walsh Mem. 28)).  While highly incriminating of Lesniewski, the statement does not *specifically* or directly incriminate *any* other defendant, since, for one thing, there is nothing about the statement that indicates which "fifty percent" group includes a particular individual patient.  This statement, and the others cited in defendant Walsh's brief, therefore present far less of a *Bruton* concern than the statements properly admitted in *Williams*, *Jass*, and other Second Circuit cases.[13]

Indeed, none of the statements identified by Walsh as problematic specifically identify or implicate her — or any person other than the speaker (s*ee* Walsh Mem. 27-31), and therefore

---

[13]Moreover, Lesniewski's statement would not even be admitted at Walsh's trial should the Government's grouping proposal be granted, as Walsh, an Ajemian patient, would be tried in the Ajemian Group, not in the Lesniewski Group.  Nor would be the statements of defendant Stavola, about whom Walsh also complains be admitted at such a trial.

simply do not raise confrontation problems.[14]  Without apparent irony, Walsh argues that "[t]he statements cannot be cured via redaction and alteration because their incriminating character does not hinge on the use of proper names." (Walsh Mem. 30).  This is the very fact that makes these statements inoffensive under *Bruton* and its progeny, which prohibit only the "*specific*" identification of a co-defendant as an accomplice, *see, e.g.*, *Jass*, 569 F.3d at 60 (emphasis in original) : in other words, it is the exact opposite of what is at issue here.

No doubt in recognition of this inconvenient fact, Walsh makes a brand-new argument: that generalized reference to a group of people *that does not specifically or individually refer to a particular defendant* is somehow violative of *Bruton* and its progeny.  This is so, according to the argument, because some of the statements refer generally to LIRR workers as a group, creating a "prejudicial inference" that "the non-declarant defendants are members of the specific group directly accused of malfeasance."  (Walsh Mem. 31).  The reason no legal support is cited for this novel argument is because there is none; indeed, it would turn on its head the *Bruton* line of cases — which expressly allows such non-specific references.  Because none of the statements in question are specific to the non-declarant defendants — and do not generally even purport, for that matter, to make universal or all-encompassing assertions relating to *all* LIRR workers or

---

[14]It is possible that certain other statements should be Brutonized; indeed, while the statements identified by Walsh generally do not require redaction (given that they do not implicate any of the non-declarant defendants), a few of the defendants in the Ajemian Group made testimonial statements, including Rusin, Baran, Walsh, and others, that the Government would have to examine closely.  For example, Walsh herself has made some of the few statements that would likely need to be Brutonized: her descriptions of conversations with Baran and with Rusin would likely require redaction to refer non-specifically to "a facilitator" and "an office manager."  But, consistent with the Government's argument above, these considerations should be evaluated in the context of *in limine* motions.

*each and every* LIRR retiree[15] — they simply do not implicate the defendants' confrontation rights.

Moreover, the appropriate limiting instructions are straightforward and simple, and do not require the performance of any "mental gymnastics," as Walsh claims.  (Walsh Mem. 32).  A plain instruction that the jury may only consider a particular statement against the declarant-defendant, and may not consider it in any way against any other defendant, is the most that would be required.  This would entail at most one such instruction for each defendant who has made an incriminating, testimonial statement.  Such a straightforward instruction would preclude the "*one-hundred-ninety*" potential connections Walsh so dramatically posits.  (Walsh Mem. 35 (emphasis in original)).  Moreover, each instruction, simple to comprehend in the first instance, would be similar or identical in kind and therefore no less (and indeed likely more) comprehensible with repetition.

In short, each of the claimed bases for a severance is meritless.  In any event, the Government's proposed trial groupings alleviate many of the concerns raised by the defendants, and would result in the greatest economies.

---

[15]The only statement identified by Walsh that arguably seems to implicate the universe of LIRR workers is one made by defendant Stavola while testifying before the grand jury, in a non-responsive answer to a yes or no question: "Listen, we all knew how it worked.  We all knew that we retired and we all knew that we put our disability papers in and hopefully we got it, hopefully we met the criteria.  There was no surprise. The guys who retired before us told us how it worked.  This is how it was.  I knew I was applying for railroad retirement before I retired. . . ." (Walsh Mem. Exh. E at 15).  Should Stavola proceed to trial, the Government would raise with the Court (in an appropriately timed *in limine* motion) what form a proper redaction might take, such as "workers knew," or "it was common knowledge," rather than "we all knew."  In any event, the Government anticipates that cooperating witnesses will testify, from their own personal knowledge and subject to cross-examination, that the facts described by Stavola were known to them and were commonly discussed at the LIRR.

## POINT III

## The Indictment Properly Alleges a Unified Conspiracy

Defendant Rusin, Ajemian's office manager, moves to dismiss Counts One and Two as duplicitous, or, in the alternative, to require the Government to choose which conspiracy to pursue at trial.  (Rusin Mem. 1-17.)  According to Rusin, Counts One and Two each charge two separate conspiracies: an Ajemian Conspiracy and a Lesniewski Conspiracy.  (*Id.* at 4-5.)  For the reasons set forth below, Rusin's argument is meritless.  In any event, the Court need not reach this issue, as the Government's severance proposal moots Rusin's duplicity concerns.

### A.      Applicable Law

As a general matter, "[a]n indictment is duplicitous if it joins two or more distinct crimes in a single count."  *United States* v. *Aracri*, 968 F.2d 1512, 1518 (2d Cir 1992).  However, even where certain acts could be charged as separate counts of an indictment, they "may instead be charged as a single count if those acts could be characterized as part of a single continuing scheme."  *Id.*  Moreover, the Second Circuit has recognized that a single conspiracy can encompass multiple phases of operation, shifting members and shifting locations.  *See United States* v. *Sureff*, 15 F.3d 225, 230 (2d Cir. 1994);  *United States* v. *Geibel*, 369 F.3d 682, 688 (2d Cir. 2004).

"A single conspiracy may be found where there is 'mutual dependence and assistance' among the [participants], a common aim or purpose . . . or a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture.'"  *United States* v. *Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989) (alterations in original) (quoting *United*

39

*States* v. *Bertolotti*, 529 F.2d 149, 154 (2d Cir. 1975)).  "Each member of the conspiracy is not required to have conspired directly with every other member of the conspiracy; a member need only have 'participated in the alleged enterprise with a consciousness of its general nature and extent.'"  *United States* v. *Ohle*, 678 F. Supp. 2d 215, 222 (S.D.N.Y. 2010) (quoting *United States* v. *Rooney*, 866 F.2d 28, 32 (2d Cir. 1989)).

So long as an indictment, on its face, alleges a single conspiracy, "the question of whether a single conspiracy or multiple conspiracies exists is a question of fact for the jury."  *United States* v. *Rajaratnam*, 736 F. Supp. 2d 683, 688 (S.D.N.Y. 2010); *see Aracri*, 968 F.2d at 1519 ("Whether the government has proved a single conspiracy or has instead proved multiple other independent conspiracies is a question of fact for a properly instructed jury."); *United States* v. *Szur*, No. 97-108, 1998 WL 132942, at *11 (S.D.N.Y. Mar. 20, 1998) ("[S]ince the Indictment on its face sufficiently alleges a single conspiracy, the question of whether a single or multiple conspiracies exist is a question for the jury and is not a basis to dismiss the conspiracy count.  As the Government correctly notes, the defendants may properly request a multiple conspiracies jury instruction depending upon the evidence presented at trial."), *conviction aff'd*, 289 F.3d 200 (2d Cir. 2002).  Therefore, "courts in this Circuit have repeatedly denied motions to dismiss a count as duplicitous."  *United States* v. *Ohle*, 678 F. Supp. 2d at 222.

Finally, an indictment is not impermissibly duplicitous unless the defendant is thereby prejudiced.  *See United States* v. *Sturdivant*, 244 F.3d 71, 74 (2d Cir. 2001).  As the Second Circuit has noted, if "the doctrine of duplicity is to be more than an exercise in mere formalism it must be invoked only when an indictment affects the policy considerations" underlying the doctrine.  *United States* v. *Murray*, 618 F.2d 892, 897 (2d Cir. 1980).  These policy

40

considerations include:

> avoiding the uncertainty of whether a general verdict of guilty
> conceals a finding of guilty as to one crime and a finding of not
> guilty as to another, avoiding the risk that the jurors may not have
> been unanimous as to any one of the crimes charged, assuring the
> defendant adequate notice, providing the basis for appropriate
> sentencing, and protecting against double jeopardy in subsequent
> prosecutions.

*United States* v. *Sturdivant*, 244 F.3d at 75 (quoting *United States* v. *Margiotta*, 646 F.2d 729,

733 (2d Cir. 1981)).  Because the doctrine of duplicity is meant to avoid these specific types of

prejudice to the defendant, even impermissible duplicity "does not necessarily require dismissal

of an indictment," where other remedies are available to cure the prejudice.  *Id.* at 79.

The Second Circuit has recognized that concerns relating to jury unanimity can be

addressed by an appropriate jury instruction "that ensures that the jury is unanimous as to the

conduct underlying the conviction."  *Id.*  A jury is presumed to follow the District Court's

unanimity instructions.  *Id.* at 80 ("Nor is there a threat of a completely non-unanimous verdict

that would undermine the validity of defendant's conviction, to the extent such conviction is

premised on defendant's participation in only one of the two transactions, because we may

assume that the jury followed the court's unanimity instruction.").

> **B.      Discussion**
>
> **1.      Counts One and Two Are Not Duplicitous**

Rusin argues that Counts One and Two are duplicitous because the Indictment "fails to

allege a single fact connecting [Ajemian's and Lesniewski's] independent medical practices

under a single conspiratorial agreement to further a common goal."  (Rusin Mem. 5).  She goes

on to state that "[t]he only defendants common to both conspiracies are Marie Baran and Joseph

41

Rutigliano . . . the so-called 'facilitators' or consultants to the retiring LIRR workers." (*Id.* at 8).

Rusin argues, however, that the facilitators, who "were hired to assist the workers in preparing

and filing their retirement benefit applications," "did not form the 'hub' to the Ajemian and

Lesniewski conspiracies because they were actors on the mere periphery of either scheme." (*Id.*).

Therefore, according to Rusin, the Indictment charges are "two disconnected 'hubs,' many

'spokes' (the LIRR workers), and no 'connecting rim.'" (*Id.* at 9).[16]

However, one overarching conspiracy is properly charged in the conspiracy.  Rusin's

argument fails to take into account several allegations in the Indictment, and tries to explain away

others.  For example, although Rusin suggests that the facilitators' role was "too fleeting to join

one conspiracy together," (Rusin Mem. 9), the allegation in the Indictment is that facilitators

played an integral role in the scheme:

> The LIRR employees paid one of a small group of so-called
> "facilitators," including MARIE BARAN and JOSEPH
> RUTIGLIANO, the defendants, to assist with the disability process
> by, among other things, working with the doctors' offices,
> coordinating the disability benefit applications of LIRR employees,
> and either filling out the applications or coaching the LIRR
> employees to fill out their disability applications in such a way as
> to maximize the likelihood that such employees would receive
> disability benefits.

(Indictment ¶ 8(f)).  Those facilitators worked with both charged doctors.  (Indictment ¶ 33(k),

Counts 9 & 12; Complaint ¶¶ 47, 57).  Moreover, the Indictment specifically alleges that

facilitators and LIRR employees referred additional patients to the doctors.  (Indictment ¶ 10

("The doctors participating in the fraud profited by charging fees for preparing disability

---

[16]Of course, the Second Circuit has stated that "the common pictorial distinction between 'chain' and 'spoke' conspiracies can obscure as much as it clarifies."  *United States* v. *Borelli*, 336 F.2d 376, 383 (2d Cir. 1964) (Friendly, C.J.).

narratives and medical assessment forms, by obtaining new patient referrals from other LIRR employees and facilitators, and by billing private health insurers for unnecessary tests and visits.")).  And the referral allegations are corroborated by the numerical evidence alleged in the Indictment.  (*See* Indictment ¶ 25 ("For the period August 2004 through August 2008, only three New York-area doctors — PETER J. AJEMIAN and PETER J. LESNIEWSKI, the defendants, and Disability Doctor-3 — were the treating physicians for more than 86% of the RRB disability applications filed by LIRR employees younger than 65.")).  This process of referral, from employees and facilitators to the three primary disability doctors, alleged in the Indictment and corroborated by the numerical evidence allegations, is itself sufficient to demonstrate a single overarching conspiracy.

The numerical analyses also demonstrates common knowledge among the charged LIRR employees of the purpose of the conspiracy as well as coordinated efforts in accomplishing those goals.  (*See, e.g.*, Indictment ¶¶ 22 ("In fiscal year 2007, LIRR workers applied for occupational disability benefits at a rate 12 times higher than workers from comparable commuter railroads, such as Metro North Railroad."), 23 ("Between 2004 and 2008, approximately 61% of LIRR employees who stopped working and began receiving some type of benefits from the RRB were between the ages of 50 and 55 years old.  By contrast, at Metro North, only approximately 7% of the employees who stopped working and started receiving RRB benefits were between the ages of 50 and 55.  Over 75% of LIRR workers receiving RRB occupational disability first retired while in their early fifties.")).  In other words, the overwhelming prevalence of the fraud establishes the common knowledge of purpose — and knowledge of the broader conspiracy — that establishes a conspiracy.  *See United States* v. *Sureff*, 15 F.3d 225, 229 (2d Cir. 1994) ("To

prove a single conspiracy, 'the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal.'" (quoting *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990))); *United States* v. *Reinhold*, 994 F. Supp. 194, 200 (S.D.N.Y. 1998) ("It is not significant that a conspirator may not know of the participation or self-interest of other conspirators.  It is sufficient each defendant have participated in the conspiracy with the common goal or purpose of the other defendants."); *United States* v. *Taggert*, No. 09 CR. 984 (BSJ), 2010 WL 532530, at *1 (S.D.N.Y. Feb. 11, 2010) (same).  That knowledge of broader common purpose establishes the "rim" that Rusin argues has not been alleged.  *See Sureff*, 15 F.3d at 230 ("Both men had reason to know that in dealing with Metral they were involved with a larger organization . . . . Each thus knew that Metral was an intermediary . . .  and that their conduct was part of a large conspiracy . . . .").

In fact, even if a co-conspirator does not have actual knowledge of other specific co-conspirators, it is sufficient for a defendant to have *reason to know* of a broader conspiracy.  *See United States* v. *Glover*, 398 F. App'x 677, 680 (2d Cir. 2010); *United States* v. *Barnes*, 604 F.2d 121, 155 (2d Cir. 1979) ("[R]etailers whose existence is actually unknown to each other can be held to have agreed in a single conspiracy if each knew or *had reason to know* that other retailers were involved in a broad project for the importation, distribution, and retail sale of narcotics and had reason to believe that their own benefits derived from the operation were probably dependent upon the success of the entire venture." (emphasis in original)).  The pervasiveness of the fraud, as alleged in the Indictment, gave the individual annuitant defendants reason to know of the broader conspiracy.

And, the scheme here involved mutual dependence and assistance among the

44

conspirators.  In each individual annuitant's case, multiple other conspirators participated in obtaining the disability, from the annuitant himself or herself, to the doctor and people in the doctor's office involved in creating the padded file, to the facilitator who helped fill out the application.  But beyond that, the collective and widespread nature of the fraud involved dependence and mutual assistance and had tremendous benefits for each individual annuitant joining the conspiracy.  Thus, for example, when defendant Gagliano first decided to visit Lesniewski in 2003 (that is, approximately two years before he retired on an LIRR pension at age 50), thanks to those who went before him, he did not risk going to a doctor who would tell him (and note in his file) that his complaints were entirely subjective and order no tests.  Nor did he risk Lesniewski telling him (and noting in the file) that the x-rays and MRIs were normal for forty-eight or fifty-year-olds.  Instead, he knew because of the conspirators who went before him that Lesniewski would conduct multiple unnecessary tests, schedule multiple visits, and inevitably declare him to be disabled just at the time he decided to retire at age 50.  In addition, because of others who went before him, Gagliano was not required to tell Lesniewski expressly that Gagliano was not hoping for treatment that would improve his condition or relieve his claimed symptoms, but rather was expecting a finding of disability regardless.  In other words, he simple needed to pay the fee for his narrative and Lesniewki would deliver it on demand.

Nor did the annuitant participants have to worry that they might apply for a disability but not tell the right lies or make the right exaggerated claims to get a disability.  Because of the nature of the RRB program, the annuitants had to retire before they applied for or obtained a disability annuity, and thus if they were unsuccessful in executing the fraud to obtain the disability, they would have risked being stuck living only on a retirement pension.  Because of

the mutual assistance of annuitants who went before them, as well as the doctors and facilitators, however, each annuitant could retire with confidence that the fraud would be successful and they would have a post-retirement income that approximated his or her pre-retirement working income.

The doctors also benefitted from the widespread collective nature of the fraud.  For example, Ajemian did not need to carefully evaluate defendants Noone, Falloon, Walsh, and Desaro (or any of his other LIRR patients, for that matter) to determine whether each needed individualized environmental limitations, like the need to avoid vibrations, or exertional limitations like the need to avoid kneeling, bending, or stooping.  (Indeed, each of his patients received virtually cookie-cutter environmental and exertional limitations).  And, because of the success of earlier annuitant participants in the fraud, Ajemian did not need to worry that his LIRR employee patient base might shrink or disappear, or that his patients would balk at paying him $1000 for a narrative statement.  Because of his years-long successful participation in the conspiracy, Ajemian knew that his narrative was a golden ticket for the LIRR employees and they would happily pay him and a facilitator each $1000 — and then, in turn, refer their co-workers — as part of their path toward a comfortable disability retirement of golf, tennis, biking, and even perhaps working at the family business.

In sum, the evidence at trial will demonstrate what is alleged on the face of the Indictment — that the doctors (and an office employee), facilitators, and individual annuitants were engaged in a common scheme with overlapping members, common purpose, and knowledge of the broader scope of the single conspiracy charged.  Therefore, Rusin's multiplicity argument fails.

### 2.    The Government's Severance Proposal Moots Rusin's Motion

Assuming, for the sake of argument, that Counts One and Two were somehow facially duplicitous, the Government's proposed severance plan — severing the defendants based primarily on the doctor with whom they were associated — addresses the concerns raised in Rusin's motion.  Accordingly, if the Court were to sever the defendants as suggested in the Government's proposal, Rusin's motion would be moot, and the Court need not reach this issue.

**POINT IV**

**The Government's Voluntary Disclosure and Disposition Program Is Proper and Has No Adverse Effect on the Defendant's Due Process Rights**

Claiming a Due Process violation, defendant Lesniewski, joined by his co-defendants, moves for suppression or preclusion of all evidence and witnesses derived as a result of what he refers to as the Government's "amnesty" program.  (Lesniewski Mem. 9 *et seq.*).  The Government's inducements to potential cooperators are so great, he argues, as to deprive such individuals of their free will and the defendants of their constitutional rights.  (*Id.*).  This argument is as lacking in precedent as in logic, and should be rejected.

**A.     The Voluntary Disclosure and Disposition Program**

In order to address the massive LIRR fraud as efficiently and effectively as possible, and to expedite a resolution that will protect the federal government from ongoing financial harm, the U.S. Attorney's Office, in partnership with the RRB and the LIRR, implemented a voluntary disclosure and disposition program (the "Program").  Under the Program, the U.S. Attorney's Office has agreed not to prosecute, or file a civil action against, any LIRR retiree who obtained RRB disability benefits by making false and/or misleading statements to the RRB, if he or she voluntarily comes forward and agrees to give up his or her right to all future RRB disability

47

benefits he or she otherwise would receive as a result of the fraud.[17]  In addition, the RRB has agreed not to commence any administrative proceedings seeking the repayment of any disability benefits that are the subject of the Program, and the LIRR has agreed not to seek forfeiture of LIRR Company Pension Plan benefits that a Program participant receives.  As set forth in the Program materials, any retiree who has engaged in fraud but who does not participate in the Program remains subject to criminal prosecution and civil action.  The cover letter to the application for the Program explicitly provides that: **"If your application and statements submitted to the RRB relating to disability benefits were truthful, the Program is not relevant to you**." (Emphasis in original).  (*See* Lesniewski Mem. Exh. 1).  Individuals under active investigation (including the charged defendants) are excluded from the Program.  *Id.*

The application for the Program, among other things, requires that annuitants list the facilitators and medical professionals they used, and specifically inquires whether the annuitants consulted one of the three disability doctors who together submitted medical assessments on behalf of approximately 86% of all LIRR retirees seeking RRB disability benefits.

Given the scope of the fraud uncovered by the Government's investigation — there are over 1,500 retirees who took early retirement and are receiving RRB disability benefits — the Program was created to: (1) prevent further payments by the RRB that are the result of fraud; (2) recover as much money as possible as quickly as possible for the RRB; (3) allow retirees to take responsibility for their actions; and (4) narrow the class of participants in the fraud not currently

---

[17]The above describes the "Early Version" of the Program, which closed on September 28, 2012.  The "Standard Version" of the Program, which is still open and closes on October 26, 2012, carries the same terms, except that participants give up their right to all future RRB disability benefits they would receive as a result of the fraud, and agree to return 50% of the RRB disability benefits they have already received.

under active investigation as to whom the Government will or may expend investigative and

prosecutive resources.  To date, 44 LIRR retirees have been accepted into the Program, which,

according to the Government's estimate, will result in savings of millions of dollars to the RRB.

**B.     The Program Does Not Violate the Defendants' Due Process Rights**

Lesniewski argues that the Program is so advantageous to annuitants that it presents the

"proverbial 'offer they can't refuse,'" and thereby so improperly induces their cooperation as to

deprive the defendants of their Due Process rights.  (Lesniewski Mem. 9).  Yet, there simply is

no precedent for the notion that the Government may not use against a defendant the testimony of

a witness to whom the Government has offered advantageous terms.  Indeed, the Government

frequently presents testimony from witnesses who have been granted not only cooperation

agreements, but also non-prosecution agreements, grants of immunity, promises of protection and

relocation, or even who have been paid fees for providing information.  The routine and

appropriate recourse available to the defense in such an instance is to attack the witness's

motivations on cross-examination — not to preclude that witness's testimony or suppress

evidence gathered from that witness.  Indeed, Lesniewski candidly acknowledges that case law

"*uniformly* afford[s] the government essentially unfettered discretion in providing emoluments to

potential witnesses to secure their testimony on the government's behalf."  (Lesniewski Mem. 20

(citing cases) (emphasis added)).  The cases cited by Lesniewski, as well as numerous other

cases, make clear that courts will not exclude witnesses whose arrangements with the

Government are far more advantageous than those alleged in this case.[18]  For example, in *Hoffa*

---

[18]Although Lesniewski argues that the Program provides unprecedented advantages to
participants, in fact non-prosecution agreements, immunity agreements, and arrangements with
paid informants are arguably more advantageous because — as distinguished from the agreement

v. *United States*, 385 U.S. 293, 310-12 (1966), the Supreme Court rejected the contention that the testimony of an informant who had been paid for his cooperation required the reversal of a criminal conviction.  While agreeing that an informant may sometimes have a motive to lie, the Court held that "it does not follow" that the informant's testimony is either "untrue" or "constitutionally inadmissible."  *Id.*  Instead, "[t]he established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury."  *Id.*

Many other cases have recognized and approved the longstanding practice of offering witnesses leniency and other concessions in return for testimony.  "[A]n accomplice is a competent witness for the prosecution, although his expectation of pardon depends upon the defendant's conviction."  *Benson* v. *United States*, 146 U.S. 325, 334 (1892) (internal quotation marks and citation omitted); *see also United States* v. *Murphy*, 41 U.S. 203, 210 (1842) ("[A] person who is to receive a reward for or upon the conviction of the offender . . . is universally recognized as a competent witness."); *Lisenba* v. *California*, 314 U.S. 219, 227 (1941) ("[T]he practice of taking into consideration, in sentencing an accomplice, his aid to the state in turning state's evidence can be no denial of due process to a convicted confederate."); *cf. Giglio* v. *United States*, 405 U.S. 150 (1972) (prosecution promises of leniency to witnesses are impeachment evidence falling within the constitutional disclosure requirements of *Brady* v. *Maryland*, 373 U.S. 83 (1963)).

As the Second Circuit has explained:

> The government's practice of relying on the interviewing of

_____

with Program participants — they often do not require the relinquishment or repayment of funds.

> informers is an old one, recognized in the common law, where it
> was called "approvement."  *See* 4 William Blackstone,
> Commentaries.  The government has always solicited the help of
> cooperating witnesses to prosecute its cases, . . . and these
> witnesses, in turn, have traditionally been shown leniency at
> sentencing.

*United States* v. *Ming He*, 94 F.3d 782, 787 (2d Cir. 1996) (citations omitted).  Indeed, "no

practice is more ingrained in our criminal justice system than the practice of the Government

calling a witness who is an accessory to the crime for which the defendant is charged and having

that witness testify under a plea bargain that promises him a reduced sentence."  *United States* v.

*Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987) (en banc) (overturning a series of cases

suppressing testimony of prosecution witnesses who were promised contingent fees for their

testimony).  Courts have routinely trusted juries to evaluate the testimony of cooperating

witnesses testifying in return for sentencing, financial, or other considerations.  *See, e.g., United

States* v. *Persico*, 832 F.2d 705, 716-17 (2d Cir. 1987); *United States* v. *Morgan*, 942 F.2d 243,

247 (4th Cir. 1991); *United States* v. *Tarantino*, 846 F.2d 1384, 1418 (D.C. Cir. 1988); *United

States* v. *Valona*, 834 F.2d 1334, 1344 (7th Cir. 1987); *United States* v. *Spector*, 793 F.2d 932,

936-37 (8th Cir. 1986); *United States* v. *Dailey*, 759 F.2d 192, 198-200 (1st Cir. 1985); *United

States* v. *Valle Ferrer*, 739 F.2d 545, 546-47 (11th Cir. 1984) *United States* v. *Reynoso-Ulloa*,

548 F.2d 1329, 1338 n.19 (9th Cir. 1977); *United States* v. *De Larosa*, 450 F.2d 1057, 1060 (3d

Cir. 1972); *United States* v. *Grimes*, 438 F.2d 391, 395-96 (6th Cir. 1971).[19]

---

[19]In support of his argument that annuitants may admit wrongdoing even if they have
done no wrong, Lesniewski cites exclusively to the body of work of one assistant law professor
(consisting, in turn, of one published article in Utah Law Review, and another as yet unpublished
article).  It is worth noting that there are fatal defects even in the lone publication offered in
support of the defendant's position.  *See* Lucian E. Dervan, *Bargained Justice: Plea-
Bargaining's Innocence Problem and the* Brady *Safety-Valve*, 2012 Utah L. Rev. 51, 94 (2012).

Despite this uniform body of case law, Lesniewski nevertheless argues that this case is somehow different from all other cases due to the "calculated and systematic" nature of the Program, which purportedly "threatens to create a parade of witnesses offering contrived, if not entirely manufactured, testimony." (Lesniewski Mem. 22).[20]  Yet there is no basis in logic or fact for distinguishing the Program from other incentives the Government offers for witnesses to come forward with information.  Each witness called by the Government will be subject to cross-

_____

Assistant Professor Dervan's central premise — that "innocent defendants in significant numbers" are pleading guilty as a result of an inherently coercive plea bargaining system — appears to be grounded on just two cases where a defendant who pled guilty was later exonerated and several "studies" (never discussed in any detail) finding that some small percentage of convicted defendants are factually innocent.  *Id.* at 86.  From this, Dervan makes the quantum leap to baldly assert that "plea-bargaining certainly has a significant and unacceptable innocence problem."  *Id.*  For example, Dervan cites the conclusion by the United States Supreme Court that, given our procedural and constitutional safeguards, "*it is unlikely an innocent defendant would be 'driven to false self-condemnation*,'" *id.* at 89-90 (citing *Bordenkircher* v. *Hayes*, 434 U.S. 357, 363 (1978)) (emphasis added).  He then comes to his own, different conclusion: "*Of course*, the Supreme Court was wrong regarding its estimation of the impact of prosecutors' offers on innocent defendants." *Id.* at 90 (emphasis added).  The sole stated basis for this finding of such obvious fault with the Supreme Court is the case of one exonerated defendant, which "demonstrates" that "it is very likely that innocent defendants will plead guilty in return for the incredible incentives currently being offered by the prosecution . . . ." *Id.* This is *ipse dixit*, not authority.

[20]As a corollary to this argument, Lesniewski takes issue with the Government's methodology in implementing the Program, as violative of "all principles of proper investigative technique" (Lesniewski Mem. 22), because the Program application specifically asks the participant if he or she used three specified physicians, including the two doctor-defendants in this case, Lesniewski and Ajemian (it does not, contrary to the defense's repeated suggestions, specify the names of the two charged facilitator-defendants in this case).  First, while it may be the case that "many studies" have found that "suggestive questioning" may have "distorting effects" (*id.* 23), that phenomenon is entirely irrelevant here.  The question put to the applicants is simply one of verifiable fact; that is, whether they used a particular doctor.  The application specifically calls for a "yes" or a "no" answer, which allows no room for distortion, and which can readily be corroborated by the business records in the case from the RRB and the doctors' practices.  More to the point, however, a defendant's remedy for a disagreement with how the Government conducts its investigations is not exclusion, but appropriate jury argument and cross-examination.

52

examination and may be questioned about his or her motivations in subscribing to the Program and — if Lesniewski deems it beneficial to his case — whether or not he or she has falsely admitted wrongdoing.

Lesniewski goes on to argue that the "overt threats" made by the Government through the Program (and by the FBI in a press release) "will discourage and intimidate potential defense witnesses who have, in effect, been threatened with investigation and prosecution if they do not avail themselves of the amnesty program and capitulate to the government."  (Lesniewski Mem. 26-27).  First, there simply have been no threats, overt or otherwise.  The Government took pains to avoid even the appearance of heavy-handedness in its Program materials.  For example, as noted above, the non-customized cover letter to the Program,[21] on its face, explicitly provides — in big, bold letters — that: "**If your application and statements submitted to the RRB relating to disability benefits were truthful, the Program is not relevant to you.**"  (*See* Lesniewski Mem. Exh. 1) (emphasis in original).  As another example, in the "Frequently Asked Questions" form in the Program packet, the response to the question: "What if I am an LIRR retiree who receives disability benefits from the RRB, but my application for those benefits was entirely truthful?", provides as follows: "*You are not eligible. This Program does not apply to you*."  (Emphasis added).  Innocent annuitants therefore are well aware that the Program is not applicable to them, and they have no cause to feel threatened or intimidated by it.  Also demonstrating the absence of intimidation is the empirical fact that, to date, some 44 individuals have been accepted into the Program.  While this level of participation in the Program will result

---

[21] Each letter is addressed simply as "Dear Annuitant," and makes clear that it is not targeted to any particular recipients: "We are providing this notice to all LIRR retirees who are receiving RRB disability benefits. . . ."  (*See* Lesniewski Mem. Exh. 1).

in substantial savings to the RRB, it falls wells short of the likely number of participants in the

fraud.  Clearly, the vast majority of the 1,500 or so recipients of the Program materials felt no

threat or intimidation to bend to the allegedly "coercive" force of the Program.

Nor is there any comparison between the Government's conduct in this case — which, as

described even by Lesniewski, was directed to a broad category of *"potential"* defense witnesses

(Lesniewski Mem. 27) and not to individual, identified defense witnesses — and the tactics

employed by the prosecution in the improper intimidation cases cited by the defendant.  (*See*

Lesniewski Mem. 27-28).  Those (decades-old, out-of-district) cases relate principally to

intimidation by prosecutors of identified defense witnesses wherein such witnesses were

threatened with criminal prosecution if they testified in a particular way.  *See United States* v.

*Morrison*, 535 F.2d 223, 228 (3rd Cir. 1976) (finding fault with prosecutor's "repeated warnings"

to defendant's identified witness, "which culminated in a highly intimidating personal interview"

of that witness, procured via an illegitimate subpoena); *United States* v. *Smith*, 478 F.2d 976, 979

(D.C. Cir. 1973) (prosecutor personally threatened subpoenaed defense witness with various

criminal charges).  Nothing of the like is even alleged to have happened in this case, nor is there

any danger that it ever will.  As noted, the Program materials were sent to approximately 1,500

annuitants, and were not customized to particular individuals.  The recipient of a packet of

Program materials would in no way have felt singled out, let alone threatened, particularly where

the documents themselves stated that they were not relevant to a recipient whose application was

truthful.  Further, the Program materials clearly were distributed as part of a pre-existing

investigation, not as some effort to intimidate potential (and as yet unidentified) witnesses.

Indeed, *United States* v. *Whittington,* 783 F.2d 1210, 1219 (5th Cir. 1986), cited by the defense

(Lesniewski Mem. 27), is instructive.  In that case, the court found no fault where the government had issued a subpoena to an identified defense witness just before his testimony, where the government's investigation of this witness had not been prompted by his prospective testimony as a defense witness.  *See id.* ("A prosecutor may . . . engage in proper investigatory actions if his conduct is not designed to intimidate a witness.  The prosecutor's hands are not tied so tightly as to prevent good faith efforts to avert perjury or to investigate past offenses.").  And the facts in this case still do not come close to those in the *Whittington* case because, here, the defendants of course had not conveyed any intention to the Government to call any particular witness prior to the Government's initiation of the Program (and, indeed, still have not).

Lesniewski, also without any evidence, asserts that the Government is attempting to intimidate witnesses, not only through the Program, but through an alleged abuse of the grand jury.  (Lesniewski Mem. 28).  He argues that the Government is improperly subpoenaing witnesses to the grand jury in order to foreclose any witness from testifying on behalf of a defendant,[22] as well as improperly to prepare for trial.  He therefore requests, as a remedy, that the Court order the Government to halt its issuance of grand jury subpoenas.  This claim, and this requested remedy, are frivolous.  With respect to the claim itself, the Government agrees that it would not have the right to use the grand jury solely to prepare for trial against the charged defendants with respect to the charged crimes or to intimidate witnesses.  But it emphatically has not done so.  Rather, it appropriately has and will continue to issue subpoenas as part of its active, ongoing investigation regarding additional crimes and/or targets.  For example, since the

---

[22]It is worth noting that the grand jury testimony of annuitants that is cited in various places in the defendant's briefs all took place months before any annuitant was arrested, let alone indicted.

filing of the Indictment in this case before the Court, an additional ten annuitants have been charged by complaint and/or indictment, and, as the United States Attorney has indicated on each occasion that new charges have been filed, the investigation continues.  *See also* Tr. of 5/4/12 conf. (attached to Walsh Mem. as Exh. D), at 17 (Government noting that "this is an ongoing investigation.  It's very much an active investigation.  There's a huge population of potential defendants we are investigating.").

Finally, the relief requested for the outrageous charge of "abuse of the grand jury" is similarly audacious: Lesniewski requests that the Court *enjoin the Government from continuing to investigate criminal conduct* and/or *dismiss the Indictment.*  (Lesniewski Mem. 34-35).  The defense does not cite to case law to support such relief,[23] and it is indeed hard to conceive of such, as a simple matter of separation of powers.  In its ongoing investigation of a massive fraud scheme, representatives of the executive branch are permitted to carry out the investigative and prosecutive duties they have sworn solemn oaths to perform.  This is particularly so where, as here, grand juries and United States Magistrate Judges have continued to return multiple findings of probable cause to believe that the extensive frauds alleged have been committed.

In short, there is no basis for the claims that the Government has misused the Program or the grand jury. They should be rejected.

---

[23] Lesniewski does cite to an unpublished, unreported decision from 1988 in which a district judge reportedly extended the return date for a grand jury subpoena, issued on the eve of trial, until after the conclusion of the trial. (Lesniewski Mem. 34-35).  It is impossible to respond without any details about the facts or ruling in that case.  But whatever they may be, it is clear that there is a legitimate, large-scale ongoing investigation that continues in this case — as evidenced by the filing of additional charges against additional defendants.  Simply put, the Government should not be ordered to cease investigating criminal conduct.

**POINT V**

**The Motions to Dismiss Under Rule 7(c)(1), or Alternately
to Strike Alleged "Surplusage" from the Indictment, Should Be Denied**

Walsh and Baran move to dismiss the Indictment under Rule 7(c)(1), which requires that

an indictment be "a plain, concise and definite written statement of the essential facts

constituting the offense charged. . . ."  Walsh moves to dismiss Counts Three (false claims to a

federal agency), Four (health care fraud), and Nineteen (wire fraud) under Rule 7(c)(1) on the

ground that they fail to identify any specific fraudulent statement, unnecessary medical test, or

wire, respectively, and Baran moves to dismiss the entire Indictment for facial insufficiency.

Walsh separately moves to dismiss the Indictment for its alleged prolixity.  Alternatively, Walsh

moves to strike alleged surplusage from the Indictment.   These motions are meritless and should

be denied.

A.      **Applicable Law**

It is well-settled that an indictment is sufficient where, as here, it "first, contains the

elements of the offense charged and fairly informs a defendant of the charge against which he

must defend, and, second, enables him to plead an acquittal or conviction in bar of future

prosecutions for the same offense."  *Hamling* v. *United States*, 418 U.S. 87, 117 (1974); *see*

*United States* v. *Pilnick*, 267 F. Supp. 791 (S.D.N.Y. 1967) (same)*; United States* v. *Logan*, 845

F. Supp. 2d 499, 515 (E.D.N.Y. 2012) ("As a substantive matter, the Indictment is not flawed

because it accurately mirrors the criminal statutes defendant was charged with violating and

provides sufficient details to put the defendant on adequate notice of the charges against him."

(internal quotation marks omitted) (quoting *Pacheco* v. *United States,* No. 02 CV. 4266 (SAS),

57

2006 WL 760287, at *5 n. 52 (S.D.N.Y. March 23, 2006)).   As set forth more fully above in the Statement of Facts, the Indictment contains detailed allegations regarding the nature of the conspiracy and substantive crimes charged, the manner in which the disability fraud scheme was executed, and the respective roles of the various co-conspirators.[24]  Further, each Count in the Indictment, including the counts which Walsh separately to seeks to dismiss under Rule 7(c)(1) for lack of specificity, tracks the language of the relevant statute, including any and all statutory language regarding knowledge and specific intent.  The substantive counts contain additional particularization in the form of "to wit" clauses.  Nothing more is required.  *See, e.g., United States* v. *Kelley*, 459 F. App'x 527 (6th Cir. 2012) (denying motion to dismiss indictment because challenged counts "track the language of the statute and set forth a sufficient set of facts to prove a violation of the statute; therefore, these counts were legally sufficient"); *United States* v. *DeLaurentis*, 230 F.3d 659, 661 (3d Cir. 2000)  (reversing district court's dismissal of counts, and stating, "[t]he charges set forth in the two dismissed counts substantially track the language of the statute; the indictment is sufficient on its face"); *Logan*, 845 F. Supp. 2d at 515; *Pilnick*, 267 F. Supp. at 791.

## B.   Discussion

### 1.   Baran's Motion to Dismiss Is Meritless

In support of her motion to dismiss, Baran disingenuously claims that the Indictment fails to allege that she acted knowingly, or otherwise to allege any "conduct by Ms. Baran that can be

---

[24]Walsh apparently concedes this point, as her principal objection to the Indictment is that it is a "speaking indictment" that contains an "extensive recitation[] of the Government's evidence and arguments," including purportedly "sensational" allegations about the conduct of Walsh, Baran, and their co-defendants.  (Walsh Mem. 7, 8, 15).

even remotely construed as criminal." (Baran Mem. 10).  To the contrary, as set forth above, the

Indictment makes detailed allegations about the role of the various co-conspirators, including the

"facilitators" such as Baran.  (*See* Indictment ¶ 4 (alleging that Baran acted as a "facilitator" for

the scheme)).  Among other things, after describing in detail the coordinated steps taken by the

LIRR workers, facilitators, and doctors in order to prepare and submit allegedly fraudulent

disability applications, the Indictment alleges:

> The doctors, facilitators, and other participants did all of this
> knowing that the LIRR employees were not, in fact, disabled —
> that is, they were not, in fact, unable to perform their jobs because
> of medical impairments; rather, the employees were simply
> planning to retire and wished to supplement their LIRR pension
> benefits with RRB occupational disability payments.  In fact, the
> doctors, facilitators, and other participants knew full well that the
> LIRR employees, who were generally working full-time (and,
> indeed, who were often working overtime), had pre-planned the
> date on which they would declare themselves disabled, and that
> this scheduled date was contemporaneous with their projected
> retirement date.

(Indictment  ¶ 8(g)).  And, the indictment alleges in multiple places that Baran acted

"knowingly," "willfully," or "fraudulently."  (*E.g.*, Indictment ¶¶ 35, 37, 41).  Accordingly,

Baran's claim must be denied.

### 2.        Walsh's Motion to Dismiss for Prolixity Is Meritless

Walsh separately moves to dismiss the Indictment on the alleged ground that it is "prolix"

or contains "surplusage," a claim which merits little discussion.  There is no question that "[t]he

proper remedy where allegations of an indictment are [allegedly] unnecessary or prejudicial is

not by motion to dismiss the whole indictment or an entire count thereof, but by motion to strike

the claimed surplusage." *Dranow* v. *United States*, 307 F.2d 545, 558 (8th Cir. 1962) (citing

Fed. R. Civ. P. 7(d) ("Upon the defendant's motion, the court may strike surplusage from the

indictment. . . ."); *see also, e.g., United States* v. *McDermot*, 58 F.3d 636, 1995 WL 371036, at

*5 (5th Cir. June 5, 1995) (affirming denial of motion to dismiss indictment that allegedly

contained surplusage, and noting the "ample authority" stating that "[t]he proper course is to

move to strike the [alleged] surplusage rather than to move to dismiss the indictment.'" (quoting

1 Wright, *Federal Practice and Procedure* § 127 (2d ed. 1982), at 424-27)).  Indeed, Walsh cites

no contrary authority.  Accordingly, her motion to dismiss should be denied.

> **3.      Walsh's and Rusin's Motions to Strike Alleged "Surplusage" Are**
> **Meritless**

Walsh's alternate motion to strike alleged "surplusage" from the indictment likewise

should be denied**.**   As a general matter, defendants face a heavy burden in moving to strike

alleged surplusage from an indictment.   "'It has long been the policy of courts within the

Southern District to refrain from tampering with indictments.'" *United States* v. *Kassir*, No. S2

04 CR. 356 (JFK), 2009 WL 995139, at *2 (S.D.N.Y. April 9, 2009) (quoting *United States* v.

*Bin Laden,* 91 F. Supp. 2d 600, 621 (S.D.N.Y. 2000)).  Indeed, a number of judges in this district

have noted recently that pretrial motions to strike surplusage are, in general, either premature or

of no practical consequence, and, in any event, are almost never granted.  *See, e.g.*, *Bin Laden*, 91

F. Supp. 2d at 621 (denying motion to strike as surplusage references to "terrorist groups" from

the indictment); *United States* v. *Sattar*, 314 F. Supp. 2d 279, 320 (S.D.N.Y. 2004) (denying

motion to strike "background" or "introductory" paragraphs in the indictment, and words like

"fatwah" or "jihad"; impossible to tell if such words are irrelevant or prejudicial until the

government has presented its case); *United States* v. *Butler*, 351 F. Supp. 2d 121, 123-24

(S.D.N.Y. 2004) (noting that pretrial "motions to strike purported surplusage are largely meaningless"). More specifically, "'[m]otions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial.'" *Mulder,* 273 F.3d at 100 (quoting *United States* v. *Scarpa,* 913 F.2d 993, 1013 (2d Cir. 1990)). "If evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *Scarpa,* 913 F.2d at 1013 (brackets omitted). Because this is an "exacting standard," *id.* at 1013, "only rarely is alleged surplusage stricken from an indictment." *United States* v. *Gotti,* 42 F. Supp. 2d 252, 292 (S.D.N.Y. 1999).

Walsh fails to meet her heavy burden of demonstrating that the language to which she objects should be stricken. Walsh principally objects to various allegations in the Indictment on the alleged grounds that they are "argument," "not essential," and/or made simply in an alleged effort "to attract publicity" and/or "confuse the jury." (Walsh Mem. 11-13). These alleged grounds do not come close to making the requisite showing that the language is "not relevant. . . and [] inflammatory and prejudicial." *Mulder,* 273 F.3d at 100; *see also United States* v. *Castellano*, 610 F. Supp. 1359, 1428-29 (S.D.N.Y. 1985) (rejecting motion to strike alleged surplusage and stating that "[a] grand jury's power to describe crimes goes beyond the bare charges."). In addition, while the relevance of an allegation may not be obvious from the face of the Indictment, the evidence at trial will amply demonstrate the relevance. For example, though Walsh objects to the allegation of Ajemian's termination from his medical practice by his employer, the relevance of these facts will be clear as the evidence at trial is presented. Among other things, these facts will explain the context of the consensually monitored meeting and

telephone call that is described in the Complaint, and in which both Ajemian and Rusin made highly inculpatory admissions.  (Complaint ¶ 35).  In addition, the evidence at trial will demonstrate that Ajemian's files contain notations about examinations *that are dated after Ajemian's termination — i.e.,* Ajemian's files pre-documented examinations that had not occurred.

Similarly, although Walsh and Rusin both object to the Indictment's allegation of Rusin's receipt of other "disability benefits," the allegation (and the evidence behind it) is highly probative of her relationship of trust with Ajemian, as well as of her participation in the charged scheme.  *See United States* v. *Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000) ("[E]vidence of Williams's prior criminal conduct with his co-conspirators was relevant 'to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed.'" (quoting *United States* v. *Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992))).  First, the Government anticipates that the evidence at trial will show that before Rusin became Ajemian's office manager, she made a worker's compensation claim supported by Ajemian's narrative that won her thousands of dollars.  This prior involvement with Ajemian is relevant to show why Ajemian — who is alleged to serve as a disability mill for LIRR employees wishing to supplement their anticipated early retirement pensions — would hire Rusin to help him execute that fraud.  It also is relevant to demonstrate Rusin's knowledge of the fraud that she was getting into by agreeing to take on the role offered by Ajemian.  Second, Rusin made additional worker's compensation claims with Ajemian's assistance in 2009 and 2010.  These claims are also highly relevant because they constitute part of Rusin's payout (and motivation) for participating in the charged

fraud.  (Rusin's long-time employment by Ajemian and the income she received from that employment also is evidence of her motive to participate).  Rusin claimed that she was injured when documents fell on her in Ajemian's office, and then injured again when she tripped over a chair, again in Ajemian's office.  Ajemian purported to treat her for these alleged injuries and submitted documents in support of her workers' compensation claims, from which both of them profited.

Thus, since the allegations in the Indictment are not "inflammatory," and since they are relevant (as will be clear at trial), Walsh's and Rusin's motions to strike alleged "surplusage" should be denied.

## POINT VI

### The Government Has Conscientiously Complied with Its *Brady* Disclosure Obligations

Defendants Bianchini, Lesniewski, and Ajemian, joined by their co-defendants, seek the disclosure of material ostensibly pursuant to *Brady*.  Specifically, Bianchini requests: (1) exculpatory information held by the RRB; (2) patient files for LIRR workers "who did not apply for, rescinded applications for, or canceled occupational disability benefits"; (3) evidence that the charged doctors were "innocently selected" to treat LIRR employees; (4) the failure to charge similarly situated LIRR retirees; and (5) evidence "suggesting exploitation of the uncertainty of culpability to obtain cooperation from witnesses or influence their credibility."  (Bianchini Mem. 5- 6).  Lesniewski and Ajemian also seek the disclosure of materials relevant to the decision not to prosecute by the United States Attorney's Office for the Eastern District of New York.  (*See* Lesniewski Mem. 6-7; Ajemian Mem. 14-16).  The Government is keenly aware of its *Brady* obligations, has conscientiously produced all arguably exculpatory material within its possession

63

— or that it has learned about and affirmatively procured — and will continue to do so if and as it becomes aware of any additional material.  However, the Government has no obligation to cast so wide a net as requested by the defense in its fishing expedition, or to seek vague and broad categories of documents that are outside of its control.  Accordingly,  the Court should deny the defendants' request for such material.

### A.      Applicable Law

Under *Brady* v. *Maryland*, 373 U.S. 83 (1963), the prosecution has a duty to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment.  However, the constitutional duty to disclose applies only to material to which the prosecution has access and of which it has reason to be aware, for, as a matter of logic, the prosecution cannot disclose what it does not know and has no reasonable means of discovering. *United States* v. *Locascio*, 6 F.3d 924, 949 (2d Cir. 1993); *United States* v. *Tillem*, 906 F.2d 814, 824 (2d Cir. 1990); *Morgan* v. *Salamack*, 735 F.2d 354, 358 (2d Cir. 1984) ("[W]e reject . . . a notion of 'possession' which is so elastic as to embrace materials that the prosecution has never had in its files, never inspected, and never knew about.") (internal quotations omitted).  Although the scope of knowledge imputed to the prosecution may be deemed to reach beyond the knowledge of the individual prosecutors, *Kyles* v. *Whitley*, 514 U.S. 419, 437 (1995), it does not encompass the collective knowledge of all government agents.  Instead, the knowledge that prosecutors are expected to draw upon in determining the existence of *Brady* material is the knowledge possessed by the prosecutor's office, as in *Giglio* v. *United States*, 405 U.S. 150 (1972), and the particular agents directly involved in the criminal investigation of the case at hand, i.e., the "prosecution team," *United States* v. *Morell*, 524 F.2d 550, 555 (2d Cir. 1975);

64

*Locascio*, 6 F.3d at 949.

Where the prosecution team does not know and could not have known of evidence favorable to the defense, a *Brady* violation does not occur. *United States* v. *Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (rejecting imputation of knowledge of FBI reports by agents who were not involved in the investigation or trial); *see also United States* v. *Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) ("Nonetheless, knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'") (citations omitted); *United States* v. *Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (rejecting imputation of knowledge of a Florida prosecutor to an AUSA in New York); *United States* v. *Rigas*, 583 F.3d 108, 126 (2d Cir. 2009), *aff'd*, 583 F.3d 108 (2d Cir. 2009) (holding that the United States Attorney's Office ("USAO") was not obligated to produce documents that were not within its possession, custody, or control and "there was no joint investigation with the SEC"); *SEC* v. *Stanard*, No. 06 CV. 7736 (GEL), 2007 WL 1834709 (S.D.N.Y. June 26, 2007) (holding that USAO and SEC did not conduct a "joint" investigation); *United States* v. *Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (holding that USAO and NYSE did not conduct a joint investigation); *Ferreira* v. *United States*, 350 F. Supp. 2d 550, 556-57 (S.D.N.Y. 2004) (holding that cooperation between USAO and NYPD was "not sufficient to make the USAO and the state prosecutor members of the same 'prosecutorial team'"); *United States* v. *Upton*, 856 F. Supp. 727, 750 (E.D.N.Y. 1994) (holding that USAO and agency did not conduct a "joint

investigation" even though the agency provided two inspectors to assist the criminal investigation); *United States* v. *Guerrerio*, 670 F. Supp. 1215, 1219 (S.D.N.Y. 1987) (denying Rule 16 discovery request for grand jury minutes at the Bronx District Attorney's Office where there was no joint investigation with the USAO and USAO had no control over the material).

### B.      Factual Background

An investigation was launched by the United States Attorney's Office for the Eastern District of New York (the "EDNY") at least as of the time that news stories broke in September 2008 about an alleged massive disability scheme at the LIRR.  The EDNY was assisted in that investigation by agents from the Railroad Retirement Board's Office of the Inspector General ("RRB-OIG"), the FBI, and the MTA Office of Inspector General.  Ultimately, the EDNY did not file any charges, and the SDNY thereafter commenced its own investigation, working with some of the same agents who had assisted in the EDNY investigation.

The Government has faithfully and liberally complied — and will continue to comply — with its disclosure obligations.  The Government has already produced voluminous discovery, including, as examples, medical files obtained from Lesniewski and Ajemian, other medical records, bank records, claim files of scores of RRB disability annuitants, defendant and witness statements (including interview memoranda and grand jury testimony), and examples of RRB policy or procedure manuals regarding disability and sickness claims.  In addition, this material has been produced in an accessible format — the discoverable paper files that we collected generally have been scanned and produced in two formats, searchable pdf and concordance database format.  Many other documents have been produced in native format.  In addition, claim files for approximately 1,504 LIRR annuitants were made available in paper format for

inspection.[25]  Moreover, the Government has provided a detailed index of the contents of the

various items made available.  As part of this discovery, certain of the categories of documents

now requested of the Government already have been made available to the defense.  Other

categories, as set forth below, are not within the possession of the Government and therefore

cannot be disclosed by the Government.

### C.      Discussion

In light of the above principles and facts, the Government responds to the defense's

specific *Brady* requests as follows.

### 1.      The Government Is Not Required to Obtain and Produce Materials Not in the Possession of the Prosecution Team

Bianchini first requests potentially exculpatory material that may or may not be in the

possession of the RRB.  (*See* Bianchini 6-12).  Yet, Bianchini mistakenly conflates "the RRB" —

an independent federal agency charged with the administration of social insurance programs and

retirement benefits to the nation's railroad workers and their families — with the members of the

RRB-OIG who have assisted in the criminal investigation of this case.[26]  He then makes a vague

and blanket request for "exculpatory information possessed by the RRB." (*Id.* at 5).  First, the

---

[25]These paper-format claim files were made available in the Government's first production on February 6, 2012.  Since that date, only two defendants have accessed any of them — Lesniewski in late February and Ehrlinger on August 28, 2012.  After inspecting the materials, Ehrlinger's counsel requested that the Government scan these claim files as well.  The Government has agreed and the claim files are currently in the process of being scanned into electronic format by a vendor.

[26]Specifically, Bianchini points to the Complaint, which was sworn to by an agent with RRB-OIG, and a press release, jointly issued by the U.S. Attorney's Office and the RRB-OIG. (*See* Bianchini Mem. 6-7).  As is clear from these very citations, the Government has partnered with criminal investigators from the RRB-OIG in this case, not with the civil agency of the RRB.

Government has turned over any and all such information of which it has been made aware, and has specifically sought out and produced certain materials at the request of the defense.  Yet, materials held by the RRB, unknown to the prosecution team, simply may not be deemed "known" to the Government by imputation simply because they are somewhere within the files of the RRB.  Rather, membership in the "prosecution team" requires active involvement in the criminal investigation and prosecution.  *See, e.g., Pina* v. *Henderson,* 752 F.2d 47, 49 (2d Cir. 1985) (collecting Second Circuit cases).  *Brady* does not require the Government obtain and review materials in the possession of government agents who are not "arms of the prosecutor," and who do not work in conjunction with the prosecutor.  *Id.* (citing cases); *see also United States* v. *Pelullo*, 399 F.3d 197, 218 (3rd Cir. 2005) (disclosure of documents held by civil side of investigating agency not required under *Brady*); *United States* v. *Stein*, 424 F. Supp. 2d 720, 723 (S.D.N.Y. 2006)  (same); *United States* v. *Gray*, 648 F.3d 562, 567 (7th Cir. 2011) (finding that billing agent for government entity is not encompassed within the "prosecution team" and holding that "[t]o charge prosecutors with knowledge of exculpatory evidence buried in the computer databases of institutions that collect and store vast amounts of digitized data would be an unreasonable extension of the *Brady* rule.  The courts, rightly in our view, have refused to make it. The government is not 'obliged to sift fastidiously' through millions of pages (whether paper or electronic)") (citations omitted); *accord United States* v. *Stewart*, 433 F.3d 273 (2d Cir. 2006) (knowledge not imputed to government employee who acted only as witness and not as arm of prosecution team).

  More specifically, the first category of documents requested by Bianchini relates to any and all evidence that the RRB was "lax" and "routinely granted applications with relatively little

scrutiny." (Bianchini Mem. 11).  To be clear, the Government *already has turned over* a (not insignificant) quantum of evidence it has in its possession relating to the RRB's review and approval of disability applications.  But the defense goes further, and requests that the Government comb the historical files of the RRB to determine if there exists within that agency's possession any similar such material.  (*Id.*)  Where a specific and reasonable request has been made, the Government has considered that request and complied as appropriate; for example, at the request of the defense, the Government obtained from the RRB certain policy and procedure manuals it uses in making claims adjudications.  Thus, the Government has turned over such materials within its possession; but it cannot be required to obtain and review all documents within the possession of the RRB to determine whether any of them fall within the defense's requested category.  Accordingly, this request should be denied to the extent it seeks potential materials outside the Government's possession.

### 2.    Patient Files

Second, the defense also requests materials relating to certain patients of Ajemian, Lesniewski, and other doctors who filed medical assessments with the RRB on behalf of LIRR claimants.  (Bianchini Mem. 12).  As Bianchini acknowledges, the Government already has made a substantial production of such materials within its possession with respect to patients of Ajemian and Lesniewski.  The Government subpoenaed patient files and information from each of these doctors, and has produced that which it has received.  Thus, this request is mooted by the Government's production of the requested materials.

### 3.    "Innocent" Selection of the Doctor-Defendants

Third, Bianchini requests any evidence that the charged doctors were "innocently

69

selected" by LIRR workers — that is, while many patients have admitted that they went to these doctors because they were the "go to" disability doctors who would help them get their disability awards, there have been other patients who have claimed to have chosen these doctors because they were highly regarded or because they were referred through non-LIRR channels.  (Bianchini Mem. 12).  As Bianchini notes, the Government already has produced such materials, and the Government will continue to produce any additional such material that it discovers within its control.  Thus, this request is mooted by the Government's production of the requested materials.

**4.    "Failure to Charge Others with the Same or Similar Claimed Injuries"**

Fourth, Bianchini argues that the Government may have drawn an "arbitrary line" between charged and uncharged conspirators, and therefore requests the Government's work product and internal deliberative process in making its prosecutive decisions.  (Bianchini Mem. 13).  To begin, as set forth above, the Government already has produced documents relating to other annuitants who have not been charged to date, including the claim files and medical records of hundreds of them, and interview memoranda and grand jury testimony of dozens.  To be sure, virtually all of these additional annuitants claimed to suffer from the exact same musculoskeletal maladies that the charged defendants claimed; indeed, as charged in the Complaint and Indictment in this case, the rampant incidence of "soft-tissue" injuries was one of the very hallmarks of this massive fraud.

However, the Government has not, and need not, produce its own internal documentation relating to its deliberative process in making the charging decisions that it has.  Nor has the defense cited a single case in support of this request.  That is so because "[p]rosecutorial

70

decisions enjoy a presumption of regularity, and in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States* v. *Armstrong*, 517 U.S. 456, 464 (1996) (internal quotations omitted); *see also Wayte* v. *United States*, 470 U.S. 598, 607 (1985) ("In our criminal justice system, the Government retains broad discretion as to whom to prosecute.") (internal quotations omitted).  Even a claim for selective prosecution — which the defendant of course does not and cannot make in this case — requires that a defendant "provide 'clear evidence' that the prosecutorial decision or policy in question had both 'a discriminatory effect and . . . was motivated by a discriminatory purpose.'" *United States* v. *Alameh*, 341 F.3d 167, 173 (2d Cir. 2003) (quoting *United States* v. *Armstrong*, 517 U.S. at 465).  As the Supreme Court has noted, "selective prosecution implies that a selection has taken place." *Armstrong*, 517 U.S. at 469.  In other words, it requires that a defendant make a *prima facie* showing that "others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against the [the defendant]" and that the defendant has been "singled out." *United States* v. *Fares*, 978 F.2d 52, 59 (2d Cir. 1992) (quoting *United States* v. *Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983)); *see also Cobb* v. *Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004) (same).  Moreover, the Supreme Court has explained that "the showing necessary to obtain discovery" on such a claim "should itself be a significant barrier to the litigation of insubstantial claims." *Armstrong*, 517 U.S. at 464.  These high thresholds are necessary because the "decision to prosecute is particularly ill-suited to judicial review," and "[e]xamining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy."

71

*Wayte* v. *United States*, 470 U.S. at 607. In this case, the defendants do not even allege — much less make a *prima facie* case, of unconstitutional selective prosecution, and thus they are not entitled to any discovery relating to the Government's deliberative process in making the charging decisions that it has.

As such, the Government's work product and deliberative process simply is not discloseable, and is not trumped even by a *Brady* request. *See, e.g.*, *United States* v. *Kohring*, 637 F.3d 895, 907 (9th Cir. 2011) ("a prosecutor does not have a duty to disclose his or her strategies, legal theories or impressions of the evidence," including "opinion work product," unless they contain underlying exculpatory facts) (internal citations and quotations omitted); *Williamson v Moore*, 221 F.3d 1177, 1182-83 (11th Cir. 2000) (disclosure of opinion work product "enjoys almost absolute immunity" from *Brady* disclosure); *United States* v. *NYNEX Corp.*, 781 F. Supp. 19 (D.D.C. 1987) (documents reflecting opinions of government attorneys need not be disclosed under either Rule 16 or *Brady*). In short, such material is classically not discoverable, and, respectfully, must not be ordered produced.

### 5.   Improper Methods to Secure Witness Testimony

Fifth, Bianchini argues that

> "[t]he government may have used the lack of clarity as to wrongdoing during its investigation by suggesting that workers, physicians, or consultants were culpable when they were not, or that the government's decisions regarding who was culpable were arbitrary or subjective. If this was the case, the government may have exploited the uncertainty of culpability, and its own charging power, to obtain cooperation by witnesses and influence witnesses to overstate or misrepresent what the charged defendants allegedly did, or how the alleged conspiracy purportedly operated . . . ."

(Bianchini Mem. 14). Although the prose is difficult to parse, it appears that the argument both

(i) rests on an unsound premise (*i.e.*, that there exists, in the first instance, some "lack of clarity as to wrongdoing"); and (ii) is once again requesting the Government's decisions — i.e. its work product and deliberative process.  Thus, for the same reasons set forth above, Bianchini's request should be denied.  *See, e.g.*, *Kohring*, 637 F.3d at 907.

### 6.     Opinion Work Product in the Possession of the EDNY

Both Lesniewski and Ajemian seek the disclosure of materials relevant to the decision not to prosecute made by the EDNY.  (*See* Lesniewski Mem. 6-7; Ajemian Mem. 14-16).  As noted (and as the defense is well aware), the EDNY conducted an investigation of this case, and ultimately did not file any charges.  Subsequently, this Office initiated its own investigation.  Thus, there never was any collaborative or joint investigation, in which decisions were made in concert or in consultation.  Nevertheless, this Office did make a request of the EDNY that it provide fact materials it gathered in its investigation to the SDNY, including grand jury documents and interview memoranda.  That request was honored, and those materials were obtained and thereby did come into the possession of the SDNY.  Those documents have been produced as appropriate.  If there remain any such materials within the possession of the EDNY, this Office is not aware of it.  To be clear, the SDNY did not request, and generally has not received the EDNY's work product, such as, for example, opinions of the prosecutors as contained in memoranda and emails.

However, to the extent the defense seeks the opinions of prosecuting attorneys regarding the declination of the EDNY to prosecute, such materials need not be disclosed for the reasons set forth above.  *See, e.g.*, *Kohring*, 637 F.3d at 907; *Williamson* v. *Moore*, 221 F.3d at 1182-83 *United States* v. *NYNEX Corp.*, 781 F. Supp. 19.  In short, this request is moot to the extent it

73

seeks production of discoverable materials in the Government's possession; the motion should be denied to the extent it seeks any non-discloseable opinion work product, much less work product that is not even within the prosecution team's possession.

In sum, the Government emphasizes that it takes its *Brady* obligations seriously. As set forth above, where the Government knows, or has reason to believe, the RRB or any other agency possesses exculpatory information about a criminal defendant, the Government would seek to obtain that information — as it has done and will continue to do. But *Brady* would be pushed well past its breaking point if the Government were required to honor a blanket request that it conduct an exhaustive review for some speculative exculpatory material — identical in kind to that already disclosed — within the vast amount of data storehoused by various independent Government agencies outside the prosecution team. Accordingly, there is no need for any Court order regarding production of *Brady* materials. The defendants' motions should therefore be denied.

## POINT VII

### The Defendants' Bill of Particulars Motions Improperly Seek Evidentiary Detail

Defendants Ajemian, Rutigliano, Walsh, Noone, Nugent, and Delalla move, pursuant to Federal Rule of Criminal Procedure 7(f), to compel the Government to provide a bill of particulars. The defendants variously seek to compel the Government to specifically identify allegedly false statements made in disability applications and the fraudulent insurance claims submitted in the course of the conspiracy; the identity of unindicted co-conspirators and certain witnesses; any and all medical tests by Ajemian alleged to have been unnecessary; any and all disability applications allegedly facilitated by Rutigliano, and the payments he allegedly received

74

for each of them; whether Walsh is charged as a principal or an aider and abettor; and the wire/s of which the Government intends to introduce evidence at trial in support of its wire fraud charge.

The defendants' motions seek a detailed roadmap of the facts the Government will seek to prove at trial and the Government's theories as to how the facts and evidence support the charges. Such particularization is not required under applicable Second Circuit law and would unduly prejudice the Government. The particularized Complaint and Indictment, along with the extensive discovery in this case, provide more than enough detail to apprise the defendants of the charges against them and to avoid any unfair surprise. Accordingly, the defendants' motions for a bill of particulars should be denied.

### A.      Applicable Law

The sole legitimate purpose of a bill of particulars is to furnish facts that are necessary to apprise a defendant of the charges against him with sufficient precision to (i) enable him to prepare his defense, (ii) avoid unfair surprise at trial, and (iii) preclude a second prosecution for the same offense. *See Wong Tai* v. *United States*, 273 U.S. 77, 80-82 (1927); *Torres*, 901 F.2d at 234; *United States* v. *Salazar*, 485 F.2d 1272, 1278 (2d Cir. 1973). Indeed, "a bill of particulars should be required only where the charges of an indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Torres*, 901 F.2d at 234 (quoting *United States* v. *Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987)). Furthermore, "a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." *United States* v. *Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (affirming denial of request for a bill of particulars where the Government adequately informed

75

the defendant of the nature of the charges against him through discovery); *see United States* v. *Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984) (affirming denial of request for a bill of particulars based on indictment and pretrial discovery in a case that involved 150 separate fraud claims because counsel "was furnished with all information needed to prepare for trial[]"); *Torres*, 901 F.2d at 234 (affirming denial of request for bill of particulars based on indictment and evidentiary detail from discovery).

       The test for whether a bill of particulars should be granted is not whether the information sought is merely helpful in preparing for trial, but whether it is necessary. *See United States* v. *Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) ("[T]he proper test in deciding whether a bill of particulars should be required of the Government is whether the bill of particulars is necessary for the defense, not whether it would aid the defendant in his preparation."); *United States* v. *Ramirez*, 602 F. Supp. 783, 793 (S.D.N.Y. 1985); *United States* v. *Love*, 859 F. Supp. 725, 738 (S.D.N.Y. 1994).   When considering requests for bills of particulars, courts "must be cognizant of the fact that a bill of particulars confines the government's evidence at trial to the particulars furnished [and therefore] the court is required to balance restricting the government's proof against protecting defendants from surprise." *United States* v. *Payden*, 613 F. Supp. 800, 816 (S.D.N.Y. 1985) (internal quotations and citation omitted).

       The law is equally clear about the improper uses of a bill of particulars.  "Acquisition of evidentiary detail is not the function of the bill of particulars." *Torres*, 901 F.2d at 234; *see also United States* v. *Cephas*, 937 F.2d 816, 823 (2d Cir. 1991) ("the government need not particularize all of its evidence"); *United States* v. *Gottlieb*, 493 F.2d 987, 994 (2d Cir. 1974); *United States* v. *Mitlof*, 165 F. Supp. 2d 558, 569-70 (S.D.N.Y. 2001).  Similarly, a bill of

particulars is not a general investigative tool for the defense.  *Salazar*, 485 F.2d at 1278.   In

addition, a bill of particulars is not to be used as a vehicle to "compel disclosure of how much the

Government can prove and how much it cannot, or to foreclose the Government from using proof

it may develop as the trial approaches."  *United States* v. *Green*, No. 04 CR.424 (RWS), 2004

WL 2985361, at *2 (S.D.N.Y. Dec. 23, 2004) (internal quotations omitted); *United States* v.

*Perez*, 940 F. Supp. 540, 550 (S.D.N.Y. 1996) (same).

It is also well-settled that a bill of particulars is not intended to serve as a vehicle for

forcing the Government to disclose its theory of the case, or the specific acts committed by the

defendants and their co-conspirators.  *See, e.g., United States* v. *Muyet*, 945 F. Supp. 586, 598-99

(S.D.N.Y. 1996) ("It is improper to use a bill of particulars to compel the Government to disclose

the manner in which it will prove the charges or preview its evidence or legal theory.") (internal

quotations omitted); *Torres*, 901 F.2d at 233-34 (agreeing with district court that demands for

"whens" and "wheres" and "by whoms" within charged conspiracy were "ill-disguised attempts

at general pre-trial discovery"); *United States* v. *Persico*, 621 F. Supp. 842, 868 (S.D.N.Y. 1985)

(rejecting request for specification of particular acts in which the defendants allegedly

participated); *United States* v. *Shoher*, 555 F. Supp. 346, 349-51 (S.D.N.Y. 1983); *Mitlof*, 165 F.

Supp. 2d at 569-70.

Finally, "[t]he decision whether to grant a bill of particulars rests within the sound

discretion of the district court."  *United States* v. *Morales*, 280 F. Supp. 2d 262, 274 (S.D.N.Y.

2003) (citing *United States* v. *Barnes*, 158 F.3d 662, 665-66 (2d Cir. 1998)).  A denial of a

request for a bill of particulars is reviewed for abuse of discretion.  *Barnes*, 158 F.3d at 665-66.

### B.     Defendants Are Not Entitled to a Bill of Particulars

The defendants are not entitled to a bill of particulars, as they have been amply apprised of the nature of the charges against them through the detailed charging instruments and extensive discovery in this case.  To begin, the Government filed an extraordinarily particularized, 73-page Complaint setting forth in detail the disability fraud scheme in which the defendants participated. The Complaint alleges that the charged former LIRR workers "who were ready to retire falsely claimed to be disabled, including occupationally disabled, so that they could receive extra benefits to which they were not entitled.  Specifically. . . [they] sought — through this widespread fraud — to supplement their LIRR pension with a separate RRB disability annuity . . . ." (Complaint ¶ 11).  The Complaint alleges that, in furtherance of the scheme, the charged doctors knowingly "prepared fabricated or grossly exaggerated medical assessments and/or illness narratives," among other things, and that the charged "facilitators" were paid by the LIRR workers "to assist with the disability process by, among other things, working with the doctors' offices, coordinating the disability benefit applications of LIRR employees, and either filling out their applications themselves or coaching the LIRR employees to fill out their disability applications in such a way as to maximize the likelihood that such employees would receive disability benefits." (Complaint ¶ 12).  *See Gottlieb*, 493 F.2d at 994 (finding no error where court refused to order compliance with demands for a bill of particulars and discovery, and stating: "[i]t was sufficient that [defendant] was apprised that the theory of the government's case would be that he fraudulently misrepresented himself as a member of the National Guard to avoid being drafted and that this was done in conspiracy with" another individual).

In addition to setting forth, in detail, the nature of the scheme and the role of the LIRR workers, facilitators, and doctors in carrying out the scheme, the Complaint describes, step-by-

78

step, how these co-conspirators are alleged to have committed the fraud.  (*See* Complaint ¶ 12(a)-(f) (listing the steps taken by the co-conspirators in furtherance of the fraud, from initial steps taken "in anticipation of filing an RRB disability application" to steps taken in the preparation and submission of the false application)).  On top of that, the Complaint contains separate, multi-page sections devoted to the respective roles and particular alleged fraudulent conduct of the defendants charged in the Complaint, including, among others, Ajemian, Rutigliano, Noone, and Walsh, who have filed bill of particulars motions.[27]

Separately, all of the defendants who have filed bill of particulars motions have been charged in the 33-page Indictment, which contains many of the same detailed allegations regarding the defendants' scheme as the Complaint.  For example, regarding the charged former LIRR workers, the Indictment alleges that the defendants submitted fraudulent disability pension applications to the RRB in which they "falsely claimed to be disabled, including occupationally disabled, in order to receive extra benefits to which they were not entitled."  (Indictment ¶ 11).  The Indictment also makes the same detailed allegations regarding the many coordinated steps

_____

[27]Indeed, in these detailed sections, the Complaint sets forth examples of the allegedly false statements in disability applications that Ajemian, Rutigliano, Noone and Walsh now seek to compel the Government to provide through a bill of particulars.  (*See, e.g.* Complaint ¶ 69 ("Contrary to the assertions made by [Noone] and [Ajemian] — such as that Noone could not reach overhead, bend or crouch — this investigations has shown that during his retirement, Noone has been and is in fact an avid athlete whose physical condition permits him to regularly engage in physical activity. . . "); *id.* ¶¶ 74-88 (alleging multiple false statements made by Walsh in her disability application and recertifications, and that contrary to those statements, Walsh admitted to a physical therapist in 2005 that she "has no pain" and "can do as much as [she] want[s] to" with respect to her job); *id.* ¶ 54(c) (alleging that Rutigliano falsely stated, in support of his disability application that "'I was no longer able to do this work because of the severe disabilities I suffer,'" and that contrary to his statement,  Rutigliano played golf regularly in 2008 and can be seen in a particular video image in which he "appears to swing a golf club and walk on a golf course with ease, notwithstanding his claims to the RRB about his shoulder, knee, wrist and back conditions")).

taken by the LIRR workers, facilitators, and doctors in furtherance of the scheme.  (Indictment ¶ 8(a)-(g)).  Furthermore, the Indictment alleges 46 separate overt acts committed by the defendants in furtherance of the conspiracy, including, with respect to the former LIRR workers, the specific dates on which each of them signed and mailed their respective, allegedly false disability applications.  In addition, the substantive counts contain "to wit" clauses that provide further particularization; Count Five, for example, identifies by name 12 separate LIRR workers whose disability applications are alleged by the Government to have been knowingly falsified in part by, or with the assistance of, Ajemian, and at least 2 LIRR workers for whom Rutigliano is alleged to have acted as a facilitator.[28]  Thus, in this case, the charging instruments alone provide more than sufficient detail to apprise the defendants of the nature of the conspiracy charge, to prevent any unfair surprise at trial, and to obviate any need for additional information.  *See Shoher*, 555 F. Supp. at 349-50 (no right to bill of particulars in light of detailed indictment).[29]

While the defendants' bill of particulars motions may easily be denied based on the

---

[28]In addition to identifying Brittell and Bianchini as two of the former LIRR workers for whom Rutigliano is alleged to have acted as a faciliator, and further contrary to Rutigliano's claim that the Government has provided no information concerning the identities of any such former LIRR workers, the Complaint sets forth certain distinctive language that Rutigliano is alleged to have used in fraudulent applications that he facilitated (all of which, as set forth below, have been made available to the defendants in discovery).  (*See* Complaint ¶ 55 (alleging that many disability applications facilitated by Rutigliano "repeatedly assert, in substance, that the applicant became "'no longer able to do this work because of the severe disabilities [he or she] suffer[s].'")).

[29]With respect to Walsh's request that the Government identify whether she is charged as an aider and abettor or a principal, such a request is irrelevant to the determination of her guilt at trial.  The Second Circuit has held that the concept of aiding and abetting is implicit in every substantive offense.  *See United States* v. *Mucciante*, 21 F.3d 1228, 1234 (2d Cir. 1994) (because aiding and abetting charge is implicit in all substantive charges, district court properly instructed jury on aiding and abetting even though indictment did not specifically charge such violation).

charging instruments alone, the Government has also made substantial discovery available to the defendants, as they concede.  This discovery, accompanied by indices and descriptions, provides further particularization of the Government's anticipated proof at trial, and an additional basis on which to deny their bill of particulars motions.  Among other things, the Government has provided the defendants with:

1.     disability applications submitted to the RRB during the time period of the conspiracy, including, but not limited to, the allegedly false applications submitted by the annuitant-defendants and the allegedly false narratives written by Ajemian (among others) in support of those false applications;

2.     records reflecting the billings to private health insurance for the medical visits and tests performed on the LIRR employees;

3.     medical files from Ajemian, Lesniewski, and other doctors related to the charged LIRR defendants and others;

4.     surveillance videos and/or photographs of defendants, including Noone, Walsh, Rutigliano, Nugent, and Delalla;

5.     consensual recordings of Ajemian and Rusin made in the course of the conspiracy;

6.     statements made by various defendants and others to law enforcement officials investigating the scheme;

7.     over 600 pages of grand jury testimony given in this case; and

8.     most recently, over 1800 pages of documents supporting the allegations in the Complaint, with references to the particular paragraphs in the Complaint to which

81

each document relates

As this list illustrates, the defendants have been provided a wealth of evidentiary detail in support of the Government's detailed allegations in the charging instruments.

In *United States* v. *Ferguson*, 478 F. Supp. 2d 220 (D. Conn 2007), the court dealt with a request for a bill of particulars in a large accounting fraud case.  In *Ferguson*, the defendants claimed that they were entitled to a bill of particulars identifying specific alleged fraudulent statements because they "claim[ed] that they [were] faced with a lengthy indictment alleging false statements, false documents, and a fraudulent scheme, but they [were] left with insufficient guidance through the government's 3.5 million page document production to specifically identify those false statements, false documents, and the fraudulent scheme."  *Id*. at 226.  In denying the defendants' motion, the court agreed with the Government that, as here, "the indictment describes in detail the allegedly fraudulent transactions, including sections containing extensive general allegations, an explanation of the manner and means of the alleged fraud, and eighty-two overt acts allegedly committed in furtherance of the conspiracy."  *Id.*  The court noted that "the indictment further identifies the documents containing false statements," just as the Government alleges in this case that the co-conspirators' false statements are contained in the disability applications and supporting materials submitted to the RRB.  *Id*.  Notably, in denying the defendants' motion, the *Ferguson* court held, equally applicable here, that the defendants "cannot 'use the vastness or complexity of the alleged conspiracy and its attendant documentary evidence as a sword against the government when the indictment, discovery, and other information provided by the government adequately notify the Defendants of the charges against them.'" *Id*. (quoting *United States* v. *Rigas,* 258 F. Supp. 2d 299, 305 (S.D.N.Y. 2003)).

82

Accordingly, because the Government has described the key aspects of this scheme through a detailed Complaint and Indictment, and because it has provided additional evidentiary detail concerning the defendants' fraudulent scheme and false statements through extensive pretrial disclosures, the defendants' respective motions for bills of particulars should be denied.

## POINT VIII

### Defendants' Pretrial Disclosure Motions Should Be Denied

Richard Ehrlinger argues for early pretrial disclosure of several categories of material.  In particular, Ehrlinger argues for: (1) disclosure of Jencks Act /3500 material 60 days before trial; (2) identification of 404(b) evidence 60 days before trial[30]; (3) disclosure of trial exhibits, charts, summaries or calculations 45 days before trial; (4) production of a witness list 45 days before trial; and (5) expert notification 60 days before trial.[31]

The defendant's proposed 60- and 45-day disclosure dates are, for the most part, well in advance of what is appropriate.  Accordingly, consistent with the Court's individual practices, the Government proposes a reciprocal pretrial discovery requiring disclosure of 3500 material and exhibits 14 days before trial and a preliminary witness list 30 days prior to trial.  Disclosure of 404(b) evidence should, consistent with practice in this District, be tied to the *in limine* motion schedule set by the Court, which, per the Court's individual practices, is 30 days before trial. The Government agrees to provide expert notification 60 days prior to trial, with defense expert notification 30 days prior to trial.  The Government also requests that the Court set a schedule

---

[30]Defendant Bianchini argues for disclosure of Rule 404(b) evidence at the earliest possible time.

[31]Based on a February 11, 2013 trial date, 60 days before trial is December 13, 2012, and 45 days before trial is December 28, 2012.

pursuant to which defendants must produce reciprocal Rule 16 discovery, 3500, exhibits and

witness lists.  This proposed reciprocal schedule will provide the requested material to

defendants well in advance of when defendants normally receive such materials and with more

than sufficient time to prepare for trial.

> **A.      Applicable Law**
>
> **1.      Jencks Act/3500 Material**

The Jencks Act provides, in relevant part:

> (a) In any criminal prosecution brought by the United States, no
> statement or report in the possession of the United States which
> was made by a Government witness or prospective Government
> witness (other than the defendant) shall be the subject of subpena,
> discovery, or inspection until said witness has testified on direct
> examination in the trial of the case.
>
> (b) After a witness called by the United States has testified on
> direct examination, the court shall, on motion of the defendant,
> order the United States to produce any statement (as hereinafter
> defined) of the witness in the possession of the United States which
> relates to the subject matter as to which the witness has testified. If
> the entire contents of any such statement relate to the subject
> matter of the testimony of the witness, the court shall order it to be
> delivered directly to the defendant for his examination and use.

18 U.S.C. § 3500.  Accordingly, "the Government is under no obligation to produce Jencks Act

material until after a witness has testified on direct examination at trial.  District courts lack the

authority to compel early disclosure of Jencks Act material."  *United States* v. *Ordaz-Gallardo*,

520 F. Supp. 2d 516, 523 (S.D.N.Y. 2007); *United States* v. *Coppa*, 267 F.3d 132, 145 (2d Cir.

2001) ("We have previously held that Jencks Act prohibits a District Court from ordering the

pretrial disclosure of witness statements.").  Nevertheless, as noted above, the practice in this

District is for the Government to produce Jencks act material before a trial commences (or at a

minimum, before a witness testifies).

### 2.    Rule 404(b)

Federal Rule of Evidence 404(b) requires the Government to "reasonable notice in advance of trial" of its intent to offer evidence of crimes, wrongs or other acts.  *See United States* v. *Fennell*, 496 F. Supp. 2d 279, 284 (S.D.N.Y. 2007) ("The rule establishes no minimum time . . . because 'the evidence the government wishes to offer may well change as the proof and possible defenses crystallize.'" (quoting *United States* v. *Matos-Peralta*, 691 F. Supp. 780, 791 (S.D.N.Y 1988))).  Accordingly, courts have found 14 days in advance of trial to be sufficient notice under the Rule.  *See United States* v. *Russo*, 483 F. Supp. 2d 301, 309 (S.D.N.Y. 2007) ("The government has in good faith noted its obligations under Rule 404(b), and indicated that it intends to provide notice of the 404(b) evidence it intends to introduce fourteen days before the beginning of trial, and perhaps earlier if the evidence proves to be unusually voluminous or involves acts that may be previously unknown to defense counsel.  There is therefore no need to issue the order Defendants seek."); *United States* v. *Groezinger*, 625 F. Supp. 2d 145, 159 (S.D.N.Y. 2009) ("The Government has indicated that it will make the required disclosure two weeks prior to trial, a practice that typically comports with Rule 404(b)."); *see also United States* v. *Gonzalez*, No. 12 CR. 88S,  2012 WL 4204170, at *2 (W.D.N.Y. Sept. 18, 2012) ("The Government replies that it will advise defendants of its intent to use [Rule 404(b)] evidence at the time it produces Jencks Act materials, noting that [the defendant] has full knowledge of his criminal history and the Government intends to use whatever convictions this Court deems to be admissible to attack [the defendant's] credibility if he testifies. This notice and its timing are sufficient." (citations and emphasis omitted)).

85

### 3.    Exhibits, Charts, Summaries

Rule 16 does not require the Government to identify its trial exhibits within any particular time frame.  *See Russo*, 483 F. Supp. 2d at 309.  Accordingly, although certain courts do provide for pretrial disclosure of trial exhibits, *see, e.g., id.*,  other courts in this District have declined to require the Government identify its trial exhibits *at any time* prior to trial, *see United States* v. *Nachamie*, 91 F. Supp. 2d 565, 570 (S.D.N.Y. 2000) ("[A] court has no license to rewrite the Federal Rules of Criminal Procedure. . . . In the absence of any controlling authority interpreting the Rule as requiring this action, I cannot direct the Government, at this time, to identify the documents it intends to offer in its case-in-chief."); *United States* v. *Carrington*, No. 02 CR. 897 (LTS), 2002 WL 31496199, at *2 (S.D.N.Y. Nov. 7, 2002).

### 4.    Witness List

Although there is similarly no statutory or rule-based requirement that the Government disclose a witness list, "'district courts have authority to compel pretrial disclosure of the identity of government witnesses.'"  *United States* v. *Cannone*, 528 F.2d 296, 300 (2d Cir. 1975) However, "in the absence of 'a specific showing that disclosure was both material to the preparation of [the] defense and reasonable in light of the circumstances surrounding [the] case,'" a district court does not abuse its discretion in not compelling disclosure of a witness list. *United States* v. *Bejasa*, 904 F.2d 137, 139-40 (2d Cir. 1990) (citations and emphasis omitted) (quoting *Cannone*, 528 F.2d at 300).  Bare assertions of need due to complexity do not satisfy the "specific showing" standard.  *See Russo*, 483 F. Supp. 2d at 309 ("Defendants here make no particularized showing that the requested witness list is material to the preparation of the defense. Rather, Defendants merely argue that given the complexity of the case, disclosure of the

government witness list will level the playing field.  It would be inappropriate for this Court to grant Defendants' motions when they are only supported by an abstract statement of need.").

Courts in the Second Circuit evaluate six factors set forth in *United States* v. *Turkish*, 458 F. Supp. 874, 881 (S.D.N.Y. 1978), in evaluating whether to require production of witness lists, namely whether: (1) the charged offense involves a crime of violence; (2) the defendants have been arrested or convicted for crimes involving violence; (3) the evidence in the case will largely consist of testimony relating to documents; (4) there is a realistic possibility that supplying the witnesses' names prior to trial will increase the likelihood that the witnesses will not appear at trial; (5) the charged offenses occurred over an extended period of time; and (6) the defendants have limited funds with which to investigate and prepare their defense.  *See, e.g.*, *Nachamie*, 91 F. Supp. 2d at 579.

### 5.      Expert Notification

"Rule 16(a)(1)(E) contains 'no specific timing requirements,' [for expert notification], but the parties are expected to comply 'in a timely fashion.'" *United States* v. *Pirro*, 76 F. Supp. 2d 478, 488 (S.D.N.Y. 1999) (quoting Advisory Committee Notes to 1993 Amendment to Fed. R. Crim. P. 16.) (requiring disclosure 15 days prior to trial); *see Russo*, 483 F. Supp. 2d at 310 (holding that Government representation that it will provide expert disclosure two weeks prior to trial was sufficient); *United States* v. *Perez*, No. 01 CR. 112 (AGS), 2001 WL 36082803, at *4 n.8 (S.D.N.Y. May 25, 2001) (requiring expert disclosure 15 days prior to trial).

### B.      Ehrlinger's Proposed Pretrial Disclosure Schedule Is Unwarranted

Ehrlinger has proposed a pretrial disclosure schedule that represents a significant departure from practice in this District, and, in many respects, is not authorized by statute or

Rule.  In proposing the 60/45 day schedule, Ehrlinger relies primarily on the purported

complexity of the case and the need to have the disclosures prior to this Court's 30-day *in limine*

motion schedule.  Neither of these arguments warrant the requested disclosure schedule.

First, regarding the complexity of the case, Ehrlinger argues that, given the volume of

discovery, an exhibit list and witness list are necessary 45 days prior to trial.  (Ehrlinger

Disclosure Mem. 7-8; 9-10).  However, while Ehrlinger is correct that a significant volume of

documents has been produced to defendants, that production — which began nearly nine months

ago — has not been made in isolation.  In addition to the discovery indices that have been

provided to defense counsel, there have also been a detailed Complaint and an Indictment, that,

among other things, highlight many of the key documents in this case.  Moreover, pursuant to

defense counsel requests, the Government has provided Bates number ranges for each of the

defendants' RRB claim files — files containing many of the key documents at issue in this case.

Accordingly, it is simply not accurate to claim that "[w]ithout early production of an exhibit list,

defense counsel have no way of anticipating which of the over 400,000 pages of documents they

will need to address at trial."  *Id.* at 7.[32]

Second, Ehrlinger argues that early disclosure is required in order to be prepared to

comply with the Court's 30-day *in limine* motion schedule.  Yet that schedule coexists with the

normal pretrial disclosure practice in this district.  *See, e.g.*, *United States* v. *Davis*, No. 05 CR.

---

[32]It should be noted that no defendant, with the exception of defendant Gagliano (who has
produced Gagliano-related medical records), has produced reciprocal discovery to the
Government despite the requirement to do so and despite the Government's disclosures well
beyond what the rules require.  *See* Fed. R. Crim. P. 16(b)(1)(A).  Indeed, Ehrlinger himself has
indicated that he has medical records that he intends to use at trial, but he has not produced them
to the Government.

0694 (VM), 2006 WL 20493, at *1 (S.D.N.Y. Jan. 3, 2006) ("The Government has asserted that it intends to make a motion *in limine* for the admission of Rule 404(b) evidence approximately two weeks before trial.  In the absence of any showing that the evidence is required earlier, the Court denies Davis' request for immediate disclosure."); *United States* v. *Canter*, 338 F. Supp. 2d 460, 461-62 (S.D.N.Y. 2004) (VM) (denying request for disclosure of *Brady*, *Giglio* and Jencks Act material 30 days prior to trial); *United States* v. *Al-Marri*, 230 F. Supp. 2d 535, 541-42 (S.D.N.Y. 2002) (VM) (noting that "[o]bviously, every criminal defendant would find early production of Rule 404(b) materials to be of great assistance in preparing for trial," and denying request for production of Rule 404(b) materials earlier than two weeks before trial).

Accordingly, Ehrlinger has provided no valid justification for his proposed pretrial disclosure schedule — or any schedule that departs from standard District practice and the Court's individual rules.  Nevertheless, the Government proposes the following schedule for pretrial disclosure, which is more than sufficient to address the defendants' concerns: (1) Jencks Act material provided 14 days prior to trial; (2) exhibit list provided 14 days prior to trial; (3) expert notification provided 60 days prior to trial with defense expert notification provided 30 days prior to trial; (4) witness list provided 30 days prior to trial in conformity with the Court's individual practices; and (5) notification of 404(b) evidence 30 days prior to trial in connection with *in limine* motion practice.  As noted, the Government also requests that the Court set a schedule for reciprocal disclosure from defendants, including Rule 16 and 3500 materials, witness lists and exhibits.

**POINT IX**

**Lesniewski's Request for a Pretrial Hearing on
Co-Conspirator Statements Should Be Denied**

Defendant Lesniewski moves for a pretrial hearing — or in the alternative, a Government proffer — to assess the admissibility of co-conspirator statements pursuant to Federal Rule of Evidence 801(d)(2)(E). Such a hearing is not called for under the settled law in this Circuit, and Lesniewski's motion should therefore be denied.

**A.      Applicable Law**

Pursuant to Fed. R. Evid. 801(d)(2)(E), a co-conspirator statement is not hearsay if it is offered against an opposing party and it "was made by the party's coconspirator during and in furtherance of the conspiracy." Thus, a statement is admissible under this rule if a court finds, by a preponderance of the evidence, that a conspiracy existed, that its members included the declarant and the party against whom the statement is offered, and that the statement was made during the course of and in furtherance of the conspiracy. *See Bourjaily* v. *United States*, 483 U.S. 171, 175-76 (1987); *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990). As the defendant acknowledges, in this Circuit — unlike, apparently, in the Seventh Circuit — the practice of conditionally admitting such statements at trial, subject to the later submission of evidence necessary to make the preliminary pre-requisite findings, is not only permitted, it is preferred. *See United States* v. *Cambindo Valencia*, 609 F.2d 603, 630 (2d Cir. 1979) ("The law is well settled in this circuit that declarations that are otherwise hearsay may nevertheless be provisionally admitted, subject to eventual connection of the defendant with the conspiracy alleged, as long as the trial court is ultimately satisfied that the participation of the defendant

90

against whom the declaration is offered has been established by a fair preponderance of the

evidence independent of the hearsay utterances."); *United States* v. *Davis*, No. 06 CR. 911

(LBS), 2009 WL 1098477, at *5 (S.D.N.Y. Apr. 21, 2009) ("As the Indictment charges Gunn's

participation in a conspiracy, an 'admissibility ruling during trial is preferable to staging a

mini-trial that would significantly prolong the proceedings and afford the defendants a complete

preview of the government's evidence.' Gunn has provided no reason why we should deviate

from this Circuit's customary practice of resolving the admissibility issue at trial." (citation

omitted) (quoting *United States* v. *Solomonyan*, 452 F. Supp. 2d 334, 356 (S.D.N.Y. 2006)));

*United States* v. *Giraldo*, No. 90 CR. 085 (KMW), 1990 WL 134883, at *1 (S.D.N.Y. Sept. 12,

1990) ("In this Circuit the rule is well settled that rather than prolong the proceedings and

provide defendant with a full preview of the Government's case through a pre-trial hearing, the

Court should provisionally admit alleged co-conspirators' statements, subject to its

determination, at the close of the Government's case, that there is sufficient evidence to make the

required findings pursuant to Rule 801(d)(2)(E).").

### B.     Discussion

Lesniewski has provided no convincing reason to depart from the well-settled practice in

this Circuit of conditionally admitting co-conspirator statements at trial, subject to later

connection.  He argues primarily the substance of his challenge of admissibility, namely that he

does not believe that the statements qualify as admissible co-conspirator statements under the

Rules of Evidence.  This, of course, is necessarily the same argument every defendant makes in

challenging the admissibility of such statements (and with which the Government disagrees).  He

also argues that the cost of his attorney's representation in a potentially lengthy trial warrants a

departure from this Circuit's settled practice. But adding an extensive hearing that would necessarily duplicate much of the trial would increase, not decrease costs. In any event, the situation Lesniewski faces is similar to that faced by many defendants in this District and does not justify a wasteful departure from established practice. *See United States* v. *Labate*, No. S1 00 CR. 632 (WHP), 2001 WL 533714, at *1, *21 (S.D.N.Y. May 18, 2001) (rejecting motion for pretrial 801(d)(2)(E) admissibility hearing in case charging nineteen defendants with twenty-eight counts arising out of a five-year, securities fraud scheme, because the defendant "provided no convincing reason to depart from [the Circuit's] well-settled practice"). Accordingly, Lesniewski's request for a hearing — or in the alternative, a Government proffer — to determine the admissibility of any co-conspirators' statements should be denied.

## POINT X

### Lesniewski's Motion to Inspect Grand Jury Minutes Should Be Rejected

Lesniewski also moves for an order to inspect the grand jury minutes. He claims that because of the potential admission of statistical evidence and co-conspirator statements in the grand jury, there are "constitutional questions" and "serious irregularities" that warrant the extraordinary relief requested. (Lesniewski Mem. 4.) Lesniewski's motion is without merit.

The Second Circuit has observed that "[t]here is a tradition in the United States, a tradition that is 'older than our Nation itself,' that proceedings before a grand jury shall generally remain secret." *In re Petition of Craig*, 131 F.3d 99, 101 (2d Cir. 1997) (quoting *In re Biaggi*, 478 F.2d 489, 491 (2d Cir. 1997) (quoting *Pittsburgh Plate Glass Co.* v. *United States*, 360 U.S. 395, 399 (1959))). In seeking disclosure of grand jury materials, "the burden is on the [defendant] to show a 'particularized need' that outweighs the need for secrecy." *United States*

v. *Moten*, 582 F.2d 654, 662 (2d Cir. 1978) (quoting *Dennis* v. *United States*, 384 U.S. 855, 868, (1966)).  "Mere speculation that the grand jury may have heard insufficient evidence, or that the Government may have improperly instructed the grand jury . . . , falls far short of the showing to overcome the presumption of secrecy."  *United States* v. *Forde*, 740 F. Supp. 2d 406, 414 (S.D.N.Y. 2010) (Marrero, J.).  Moreover, because an indictment cannot be challenged based on the competency of evidence presented to the grand jury, *see Costello* v. *United States*, 350 U.S. 359, 363-64 (1959), arguments regarding the ultimate admissibility of evidence at trial are insufficient to warrant an inspection of grand jury minutes.

Lesniewski argues solely that inspection is warranted because of the type of evidence he believes was presented to the grand jury and the legal instructions the grand jury received.  With respect to the evidence, even assuming the numerical evidence were not admissible at trial — of course, as set forth at Point I above, the Government believes such evidence is clearly admissible — that does not warrant inspection of the grand jury minutes.  With respect to the legal arguments, Lesniewski solely speculates that the grand jury was improperly instructed. That too, is insufficient to overcome the presumption of grand jury secrecy.  Accordingly, the defendant's motion should be denied.

**POINT XI**

**Noone's Motions Should Be Denied**

**A.**      **Noone's Motion to Exclude Evidence About His Golf Pass Should Be Denied**

Defendant Noone argues that the Government should be precluded from offering evidence of the defendant's disability-based golf access pass.  (Noone Mem. 4, 17.)  According to Noone, the golf pass, which was based on a certification by Ajemian, and indicates that Noone

93

had a "permanent" disability that required him to wear a knee brace on the golf course, is completely distinct from the issue of whether Noone was occupationally disabled. Therefore, Noone argues that admission of the golf pass would be confusing, prejudicial and irrelevant to the issues in the case. Noone's motion, however, is really a motion *in limine* and is therefore prematurely raised. In any event, the motion is meritless.

The evidence is properly admissible as both direct evidence of the charged conspiracy and Rule 404(b) evidence of the defendant's intent, motive, and plan. The Indictment alleges that Noone and Ajemian participated in a conspiracy to, among other things, falsely claim that Noone qualified for occupational disability with the RRB. It is therefore very much relevant that, as part of the conspiracy, and as a benefit of being declared occupationally disabled, Noone obtained a disability-based golf pass based on Ajemian's certification. It is also evidence of Noone's intent, motive and plan for seeing Ajemian (as opposed to any other doctor) and applying for occupational disability. On the other hand, the evidence is neither confusing nor unfairly prejudicial. The benefit was part of the overall scheme of Noone's false disability claim, and Noone's golfing activities, aided by Ajemian's certification, are no more prejudicial than any other evidence of Noone's physical condition.[33] Nor would the jury be confused by the fact that different entities may use different terminology to refer to the their disability-based benefits. Such a distinction is easily explained and thus any risk of confusion hardly "substantially outweigh[s]," Fed. R. Evid. 403, the relevance of the evidence. Accordingly, although the Court need not resolve this issue at this time, evidence of Noone's golfing pass is properly admissible

---

[33]Noone evidently expects the evidence to show that the golf pass disability determination was entirely distinct from his occupational disability award. Far from prejudicial, such evidence would seem to support Noone's defense that he was, actually, disabled.

against the defendant.

**B.      Noone's *Kastigar* Motion Should Be Denied At This Time**

Defendant Noone states that he testified in a New York State Grand Jury pursuant to a grant of immunity, and argues that as a result the charges against him should be dismissed. Noone's motion should be denied because claims pursuant to *Kastigar* v. *United States*, 406 U.S. 441 (1972), are most appropriately resolved at a hearing after trial.

Although New York's immunity statute has been construed by New York courts as granting transactional immunity to individuals testifying before a New York Grand Jury, *see United States* v. *Nemes*, 555 F.2d 51, 53 (2d Cir. 1977), this grant does not extend to or bind the Federal Government.

> As against the authority of the United States . . . this grant of state immunity and the implications of the Fifth Amendment provide the witness only with use immunity. *Kastigar* v. *United States*, 406 U.S. 441 (1972); *Murphy* v. *Waterfront Commission*, 378 U.S. 52 (1964).

*Nemes*, 555 F.2d at 53; *United States* v. *Ostrer*, 506 F. Supp. 962, 966 (S.D.N.Y. 1980) (rejecting contention that federal prosecution was barred by transactional immunity given by N.Y. Crim. P. L. § 190.40).  Thus, "[b]oth the statute and the Fifth Amendment allow the government to prosecute using evidence from legitimate, independent sources."  *Id.*

The evidence at issue in such a situation is the evidence presented at trial.  As Judge Weinfeld explained:

> That [a defendant] testified under a grant of immunity before he was indicted does not automatically compel dismissal of the indictment.  The Government is free to prosecute him but it has the affirmative duty to prove that *the evidence it proposes to use against him upon the trial* is derived from a legitimate source

95

wholly independent of [the defendant's] compelled testimony.

*United States* v. *Gregory*, 611 F. Supp. 1033, 1042 (S.D.N.Y. 1985) (Weinfeld, J.) (footnotes omitted) (emphasis added); *see also Kastigar* v. *United States*, 406 U.S. at 461 (1972) ("Both the [federal use immunity statute] and the Fifth Amendment allow the government to prosecute using evidence from legitimate independent sources.").  As explained by the Second Circuit, "a violation of . . .  the privilege against self-incrimination . . . requires only the suppression at trial of a defendant's compelled testimony."  *United States* v. *Rivieccio*, 919 F.2d 812, 814 (2d Cir. 1990) (affirming post-trial denial of *Kastigar* motion because "the Government had demonstrated an independent source for all the evidence *introduced at trial*." (emphasis added)).  Thus, in *Rivieccio*, the Second Circuit rejected the defendant's argument that, regardless of what evidence was presented at trial, a tainted indictment invalidates the prosecution because "facially valid indictments may not be challenged by allegations that the grand jury heard immunized testimony or otherwise tainted evidence."  *Id.* at 816 & n.4.[34]

_____

[34]There are two narrow exceptions to the general rule that the indictment cannot be challenged as being based in part on immunized testimony: (1) where a defendant testified under immunity before the grand jury that returned the indictment; and (2) where the prosecution concedes that the indictment rests almost exclusively on tainted evidence.  *Rivieccio*, 919 F.2d at 816 n.4.  Neither of these exceptions apply here, because the defendant did not testify before the federal grand jury, and because the Government certainly does not concede that the federal indictments are based on statements that the defendant provided in the New York Grand Jury.  On the contrary, the Government denies that proposition.

At first blush, *United States* v. *Pelletier*, 898 F.2d 297 (2d Cir. 1990), appears to be in some tension with the unequivocal rule of *Rivieccio*, because in *Pelletier*, the Court stated that on remand, the district court should dismiss the indictment if the Government used immunized testimony to obtain it, unless the presentation of immunized testimony "constitut[ed] harmless error."  In *Pelletier*, however, the defense contended that the defendant's own immunized testimony was presented verbatim to the grand jury that returned the indictment, *Pelletier*, 898 F.2d at 300 ("The Pelletiers contend . . . that the government presented . . . their entire immunized testimonies."), and therefore *Pelletier* falls within *Rivieccio*'s second exception to the

96

Because the important question concerns the independent sources of the evidence used at trial, any hearing on the independence of that evidence should be conducted after trial.  *See United States* v. *Fuller*, 149 F. Supp. 2d 17, 26 (S.D.N.Y. 2001) ("[A]ny hearing to determine whether the Government relied upon [immunized statements] should be deferred until after all the evidence has been presented and the trial concluded."), *conviction aff'd, remanded for resentencing*, 332 F.3d 60 (2d Cir. 2003); *United States* v. *Volpe*, 42 F. Supp. 2d 204, 219 (E.D.N.Y. 1999) ("[I]t is the general practice in this Circuit to defer [a *Kastigar* hearing] until after trial."), *aff'd*, 224 F.3d 72 (2d Cir. 2000); *see also United States* v. *Helmsley*, 941 F.2d 71, 80 (2d Cir. 1991) (recounting that Judge Walker denied defendant's pretrial motion for a *Kastigar* hearing and postponed the question until the completion of the trial, "at which time he could determine with the benefit of trial evidence whether there was a sufficient nexus between the immunized testimony and the federal prosecution to warrant a hearing"); *Rivieccio*, 919 F.2d at 814 (*Kastigar* hearing deferred until after trial); *United States* v. *Mariani*, 851 F.2d 595, 597 (2d Cir. 1988) (same); *United States* v. *Fernandez*, 2000 WL 1409738, at *3 (S.D.N.Y. Sept. 22, 2000) ("[I]t is the general practice in this Circuit to defer such a hearing until after trial.  After a trial a court can better evaluate the Government's evidence and avoid disclosure of the Government's proof before trial."); *Gregory*, 611 F. Supp. at 1042 (the trial itself may establish the independent source of the Government's trial evidence and obviate a hearing).

At a post-trial hearing, the Government will be prepared to prove that all of the evidence

general rule precluding challenge to the indictment.  In any event, *Pelletier* recognized that the indictment should be allowed to stand if any errors were harmless.  *Id.* at 303; *see Rivieccio*, 919 F.2d at 816-17 & n.5 (any erroneous presentation of immunized information to the grand jury is harmless beyond a reasonable doubt if no immunized information is used at trial (or such evidence is suppressed by the Court), and the petit jury convicts).

presented against defendant Noone at trial is independent of any testimony he gave in the New York Grand Jury.

## POINT XII

### Nugent's Motion to Exclude Direct Evidence of the Fraud Should Be Denied

Defendant Nugent, without citation to authority or even explanation, requests that the Court exclude from evidence at trial evidence of "uncharged third party applications" and "golfing activity by defendant Nugent" as well as joining in defendant Noone's and Gagliano's motions to exclude evidence (responded to elsewhere in this brief).  This request should be denied.  Nugent is charged in a facially valid indictment with conspiring with others, and thus the applications of individuals other than him are plainly relevant to demonstrate the scheme, the existence of the conspiracy, and the participation of various individuals in that scheme.  Nugent's golfing activity demonstrates his guilt of the charged crime, but there is no rule of law or evidence that would exclude inculpatory evidence at trial.  As the Second Circuit has explained:

> To be sure, all evidence incriminating a defendant is, in one sense of the term, "prejudicial" to him:  that is, it does harm to him.  In that sense, the more pertinent evidence is, the more prejudicial it is. What "prejudice" as used in Rule 403 means is that the admission is, as the rule itself literally requires, "unfair" rather than "harmful."

*United States* v. *Jimenez*, 789 F.2d 167, 171 (2d Cir. 1986); *see United States* v. *Diaz*, 878 F.2d 608, 615 (2d Cir. 1989); *see also Oregon* v. *Kennedy*, 456 U.S. 667, 674 (1982) ("Every act on the part of a rational prosecutor during a trial is designed to 'prejudice' the defendant by placing before the judge or jury evidence leading to a finding of his guilt.").  Thus, Nugent's exclusion motion should be denied.

98

## POINT XIII

### Walsh's Jury Pool Motion Has Properly Been Denied

Walsh has renewed her motion relating to the jury selection plan to preserve it for appeal. This motion was properly denied by the Court by written order dated August 6, 2012.  Walsh's renewed motion has no more merit than it had when originally denied, and it should be denied.

**CONCLUSION**

For the foregoing reasons, the defense motions should be denied.

Dated:          New York, New York
                October 23, 2012

                                    Respectfully submitted,

                                    PREET BHARARA
                                    United States Attorney


                           By:          /S/
                                    JUSTIN S. WEDDLE
                                    E. DANYA PERRY
                                    DANIEL TEHRANI
                                    NICOLE W. FRIEDLANDER
                                    Assistant United States Attorneys
                                    (212) 637-2312/2434/2455/2211

# TABLE OF CONTENTS

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

POINT I — The "Statistical" Allegations Are Proper and the Government's Numerical Analyses Are Admissible. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.  Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B.  Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

POINT II — While Severance Is Not Required, the Government Nevertheless Consents to Sever the Case into Two Trial Groups. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    A.  Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    B.  Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        1.  While Severance Is Not Required, The Government Nevertheless Proposes that the Defendants Be Separated Into Two Smaller Trial Groups. . . . . . . . . . . . . . . . . . . . . 23

        2.  The Defendants' Severance Arguments and Proposals Are Without Merit. . . . . . . . 26

            a.  The Government's Proposal Cures Any Spillover Problems Caused by a Single Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

            b.  The Defendants' Claim of "Antagonistic Defenses"Does Not Justify Severance. 31

            c.  The *Bruton* Motion Is Both Premature and Meritless. . . . . . . . . . . . . . . . . . . . . 33

POINT III — The Indictment Properly Alleges a Unified Conspiracy. . . . . . . . . . . . . . . . . . . 39

    A.  Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    B.  Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        1.  Counts One and Two Are Not Duplicitous. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        2.  The Government's Severance Proposal Moots Rusin's Motion. . . . . . . . . . . . . . . . 46

POINT IV — The Government's Voluntary Disclosure and Disposition Program Is Proper and Has No Adverse Effect on the Defendant's Due Process Rights. . . . . . . . . . . . . . . . . . . 47

    A.  The Voluntary Disclosure and Disposition Program. . . . . . . . . . . . . . . . . . . . . . . . . 47

    B.  The Program Does Not Violate the Defendants' Due Process Rights. . . . . . . . . . . . . . 49

POINT V — The Motions to Dismiss Under Rule 7(c)(1), or Alternately to Strike Alleged "Surplusage" from the Indictment, Should Be Denied. . . . . . . . . . . . . . . . . . . . . . . . . . 57

    A.  Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

    B.  Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

        1.  Baran's Motion to Dismiss Is Meritless . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

        2.  Walsh's Motion to Dismiss for Prolixity Is Meritless. . . . . . . . . . . . . . . . . . . 59

        3.  Walsh's and Rusin's Motions to Strike Alleged "Surplusage" Are Meritless.. . . . . 60

POINT VI — The Government Has Conscientiously Complied with Its *Brady* Disclosure
Obligations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

    A.  Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

    B.  Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

        1.  The Government Is Not Required to Obtain and Produce Materials Not in the
            Possession of the Prosecution Team. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

        2.  Patient Files. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

        3.  "Innocent" Selection of the Doctor-Defendants. . . . . . . . . . . . . . . . . . . . . . . . 69

        4.  "Failure to Charge Others with the Same or Similar Claimed Injuries". . . . . . . . . 70

        5.  Improper Methods to Secure Witness Testimony. . . . . . . . . . . . . . . . . . . . . . . 72

        6.  Opinion Work Product in the Possession of the EDNY. . . . . . . . . . . . . . . . . . . 73

POINT VII — The Defendants' Bill of Particulars Motions Improperly
Seek Evidentiary Detail. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

    A.  Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

    B.  Defendants Are Not Entitled to a Bill of Particulars. . . . . . . . . . . . . . . . . . . . . . . 77

POINT VIII — Defendants' Pretrial Disclosure Motions Should Be Denied. . . . . . . . . . . . . . . 83

    A.  Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

        1.  Jencks Act/3500 Material. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

        2.  Rule 404(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

        3.  Exhibits, Charts, Summaries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

        4.  Witness List. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

        5.  Expert Notification.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

    B.  Ehrlinger's Proposed Pretrial Disclosure Schedule Is Unwarranted. . . . . . . . . . . . . 87

POINT IX — Lesniewski's Request for a Pretrial Hearing on Co-Conspirator
Statements Should Be Denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

ii

    A.  Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

    B.  Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

POINT X — Lesniewski's Motion to Inspect Grand Jury Minutes Should Be Rejected. . . . . . . . 92

POINT XI — Noone's Motions Should Be Denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

    A.  Noone's Motion to Exclude Evidence About His Golf Pass Should Be Denied. . . . . . . . 93

    B.  Noone's *Kastigar* Motion Should Be Denied At This Time. . . . . . . . . . . . . . . . . . . . . . . 95

POINT XII — Nugent's Motion to Exclude Direct Evidence
of the Fraud Should Be Denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

POINT XIII — Walsh's Jury Pool Motion Has Properly Been Denied. . . . . . . . . . . . . . . . . . . . 99

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

# TABLE OF AUTHORITIES

## CASES

*Benson* v. *United States*, 146 U.S. 325 (1892)........................................ 50

*In re Biaggi*, 478 F.2d 489 (2d Cir. 1997)........................................... 92

*Bordenkircher* v. *Hayes*, 434 U.S. 357 (1978)...................................... 52

*Bourjaily* v. *United States*, 483 U.S. 171 (1987).................................... 90

*Brady* v. *Maryland*, 373 U.S. 83 (1963). ...................................... 50, 64

*Bruton* v. *United States*, 391 U.S. 123 (1968).................................... 19, 34

*Cobb* v. *Pozzi*, 363 F.3d 89 (2d Cir. 2004). ......................................... 71

*Costello* v. *United States*, 350 U.S. 359 (1959).................................... 93

*Dennis* v. *United States*, 384 U.S. 855 (1966)..................................... 93

*Dranow* v. *United States*, 307 F.2d 545 (8th Cir. 1962). ............................ 59

*Ferreira* v. *United States*, 350 F. Supp. 2d 550 (S.D.N.Y. 2004)....................... 65

*Giglio* v. *United States*, 405 U.S. 150 (1972). .................................. 50, 64

*Gray* v. *Maryland*, 523 U.S. 185 (1998). .......................................... 34

*Hamling* v. *United States*, 418 U.S. 87 (1974). .................................... 57

*Hazelwood  Sch. District* v. *United States*, 433 U.S. 299 (1977). ........................ 8

*Hoffa* v. *United States*, 385 U.S. 293 (1966)....................................... 50

*International Broth. of Teamsters* v. *United States*, 431 U.S. 324 (1977)................... 9

*Kastigar* v. *United States*, 406 U.S. 441 (1972). ................................. 95-96

*Kyles* v. *Whitley*, 514 U.S. 419 (1995)............................................ 64

*Lisenba* v. *California*, 314 U.S. 219 (1941). ....................................... 50

*Morgan* v. *Salamack*, 735 F.2d 354 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   64

*Murphy* v. *Waterfront Commission*, 378 U.S. 52 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . .   95

*Oregon* v. *Kennedy*, 456 U.S. 667 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   98

*Pacheco* v. *United States,* No. 02 CV. 4266 (SAS),  2006 WL 760287 (S.D.N.Y. March 23, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   57

*People* v. *Collins*, 68 Cal. 2d 319 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

*In re Petition of Craig*, 131 F.3d 99 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   92

*Pina* v. *Henderson*, 752 F.2d 47 (2d Cir. 1985).  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   68

*Pittsburgh Plate Glass Co.* v. *United States*, 360 U.S. 395 (1959). . . . . . . . . . . . . . . . . . . . . .   92

*Richardson* v. *Marsh*, 481 U.S. 200 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19, 21, 25

*SEC* v. *Stanard*, No. 06 CV. 7736 (GEL), 2007 WL 1834709 (S.D.N.Y. June 26, 2007). . . . .   65

*United States* v. *Avellino*, 136 F.3d 249 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   65

*United States* v. *Al-Marri*, 230 F. Supp. 2d 535 (S.D.N.Y. 2002). . . . . . . . . . . . . . . . . . . . . . .   89

*United States* v. *Alameh*, 341 F.3d 167 (2d Cir. 2003).  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   71

*United States* v. *Aloi*, 511 F.2d 585 (2d Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

*United States* v. *Alvarado*, 882 F.2d 645 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

*United States* v. *Aracri*, 968 F.2d 1512 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39-40

*United States* v. *Archer*, 671 F.3d 149 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14-16

*United States* v. *Armstrong*, 517 U.S. 456 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   71

*United States* v. *Attanasio*, 870 F.2d 809 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . .   20-21

*United States* v. *Bari*, 750 F.2d 1169 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

*United States* v. *Barnes*, 158 F.3d 662 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   77

*United States* v. *Barnes*, 604 F.2d 121 (2d Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 47-48

*United States* v. *Barton*, 647 F.2d 224 (2d Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States* v. *Bejasa*, 904 F.2d 137 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*United States* v. *Bin Laden*, 91 F. Supp. 2d 600 (S.D.N.Y. 2000).. . . . . . . . . . . . . . . . . . . . 60

*United States* v. *Borelli*, 336 F.2d 376 (2d Cir. 1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States* v. *Butler*, 351 F. Supp. 2d 121 (S.D.N.Y. 2004). . . . . . . . . . . . . . . . . . . . . . . 60

*United States* v. *Cambindo Valencia*, 609 F.2d 603 (2d Cir. 1979). . . . . . . . . . . . . . . . . . . 90

*United States* v. *Cannone*, 528 F.2d 296 (2d Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*United States* v. *Canter*, 338 F. Supp. 2d 460 (S.D.N.Y. 2004). . . . . . . . . . . . . . . . . . . . . . 89

*United States* v. *Cardascia*, 951 F.2d 474 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States* v. *Carrington*, No. 02 CR. 897 (LTS),
  2002 WL 31496199 (S.D.N.Y. Nov. 7, 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*United States* v. *Carson*, 702 F.2d 351 (2d Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . 22, 28, 30

*United States* v. *Casamento*, 887 F.2d 1141 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . 25, 29, 33

*United States* v. *Castellano*, 610 F. Supp. 1359 (S.D.N.Y. 1985).. . . . . . . . . . . . . . . . . . . . 61

*United States* v. *Cephas*, 937 F.2d 816 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*United States* v. *Cervantes-Pacheco*, 826 F.2d 310 (5th Cir. 1987). . . . . . . . . . . . . . . . . . . 51

*United States* v. *Cervone*, 907 F.2d 332 (2d Cir. 1990).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States* v. *Chang An-Lo*, 851 F.2d 547 (2d Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Coppa*, 267 F.3d 132 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*United States* v. *Dailey*, 759 F.2d 192 (1st Cir. 1985).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States* v. *Daly*, 842 F.2d 1380 (2d Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States* v. *Davis*, No. 05 CR. 0694 (VM), 2006 WL 20493 (S.D.N.Y. Jan. 3, 2006). . . . 88

*United States* v. *Davis*, No. 06 CR. 911 (LBS), 2009 WL 1098477 (S.D.N.Y. Apr. 21, 2009) . 91

*United States* v. *De Larosa*, 450 F.2d 1057 (3d Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States* v. *DeLaurentis*, 230 F.3d 659 (3d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States* v. *Diaz*, 176 F.3d 52 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States* v. *Diaz*, 878 F.2d 608 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*United States* v. *Ebner*, 782 F.2d 1120 (2d Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Fares*, 978 F.2d 52 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*United States* v. *Fennell*, 496 F. Supp. 2d 279 (S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . 85

*United States* v. *Feola*, 651 F. Supp. 1068 (S.D.N.Y. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*United States* v. *Ferguson*, 653 F.3d 61 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

*United States* v. *Ferguson*, 478 F. Supp. 2d 220 (D. Conn 2007). . . . . . . . . . . . . . . . . . . . . . . 82

*United States* v. *Fernandez*, 2000 WL 1409738 (S.D.N.Y. Sept. 22, 2000). . . . . . . . . . . . . . . . 97

*United States* v. *Finkelstein*, 526 F.2d 517 (2d Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States* v. *Finnerty*, 411 F. Supp. 2d 428 (S.D.N.Y. 2006). . . . . . . . . . . . . . . . . . . . . . . . 65

*United States* v. *Forde*, 740 F. Supp. 2d 406 (S.D.N.Y. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 93

*United States* v. *Fuller*, 149 F. Supp. 2d 17 (S.D.N.Y. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*United States* v. *Geibel*, 369 F.3d 682 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States* v. *Giraldo*, No. 90 CR. 085 (KMW),
    1990 WL 134883 (S.D.N.Y. Sept. 12, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*United States* v. *Girard*, 601 F.2d 69 (2d Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States* v. *Glover*, 398 F. App'x 677 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

vii

*United States* v. *Gonzalez*, 2012 WL 4204170 (W.D.N.Y. Sept. 18, 2012) . . . . . . . . . . . . . . .   85

*United States* v. *Gotti*, 42 F. Supp. 2d 252 (S.D.N.Y. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . .   61

*United States* v. *Gottlieb*, 493 F.2d 987 (2d Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . .   76, 78-79

*United States* v. *Gray*, 648 F.3d 562 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   68

*United States* v. *Green*, No. 04 CR.424 (RWS), 2004 WL 2985361(S.D.N.Y. Dec. 23, 2004).   77

*United States* v. *Gregory*, 611 F. Supp. 1033 (S.D.N.Y. 1985). . . . . . . . . . . . . . . . . . . . . . 96-97

*United States* v. *Grimes*, 438 F.2d 391 (6th Cir. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   51

*United States* v. *Groezinger*, 625 F. Supp. 2d 145 (S.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . .   85

*United States* v. *Guerrerio*, 670 F. Supp. 1215 (S.D.N.Y. 1987). . . . . . . . . . . . . . . . . . . . . . 66-67

*United States* v. *Haynes*, 16 F.3d 29 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

*United States* v. *Helmsley*, 941 F.2d 71 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   97

*United States* v. *Hernandez*, 85 F.3d 1023 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

*United States* v. *Jass*, 569 F.3d 47 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-37, 39

*United States* v. *Jimenez*, 789 F.2d 167 (2d Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   98

*United States* v. *Jones*, 570 F.2d 765 (8th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

*United States* v. *Joyner*, 201 F.3d 61 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

*United States* v. *Kassir*, No. S2 04 CR. 356 (JFK),
   2009 WL 995139 (S.D.N.Y. April 9, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   60

*United States* v. *Kelley*, 459 F. App'x 527 (6th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   58

*United States* v. *Kohring*, 637 F.3d 895 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . .   72, 73

*United States* v. *Labate*, No. S1 00 CR. 632 (WHP),
   2001 WL 533714 (S.D.N.Y. May 18, 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   92

viii

*United States* v. *Locasio*, 6 F.3d 924 (2d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 64-65

*United States* v. *Logan*, 845 F. Supp. 2d 499 (E.D.N.Y. 2012). . . . . . . . . . . . . . . . . . . . . . . 57-58

*United States* v. *Love*, 859 F. Supp. 725 (S.D.N.Y. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . 76

*United States* v. *Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990). . . . . . . . . . . . . . . . . . 44, 90

*United States* v. *Margiotta*, 646 F.2d 729 (2d Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

*United States* v. *Mariani*, 851 F.2d 595 (2d Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*United States* v. *Matos-Peralta*, 691 F. Supp. 780 (S.D.N.Y 1988). . . . . . . . . . . . . . . . . . . . 85

*United States* v. *McDermot*, 58 F.3d 636, 1995 WL 371036 (5th Cir. June 5, 1995). . . . . . . . . 60

*United States* v. *Miller*, 116 F.3d 641 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States* v. *Ming He*, 94 F.3d 782 (2d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States* v. *Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001). . . . . . . . . . . . . . . . . . . . . . 76, 77

*United States* v. *Moon*, 718 F.2d 1210 (2d Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*United States* v. *Morales*, 280 F. Supp. 2d 262 (S.D.N.Y. 2003). . . . . . . . . . . . . . . . . . . . . . 77

*United States* v. *Morell*, 524 F.2d 550 (2d Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*United States* v. *Morgan*, 942 F.2d 243 (4th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States* v. *Morrison*, 535 F.2d 223 (3rd Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States*  v. *Moten*, 582 F.2d 654 (2d Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*United States* v. *Mucciante*, 21 F.3d 1228 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*United States* v. *Mulder*, 273 F.3d 91 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . 10, 19, 61

*United States* v. *Murphy*, 41 U.S. 203 (1842). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*United States* v. *Murray*, 618 F.2d 892 (2d Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States* v. *Muyet*, 945 F. Supp. 586 (S.D.N.Y. 1996). . . . . . . . . . . . . . . . . . . . . . . . . 77

*United States* v. *NYNEX Corp.*, 781 F. Supp. 19 (D.D.C. 1987). . . . . . . . . . . . . . . . . . . . . . . 72-73

*United States* v. *Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000). . . . . . . . . . . . . . . . . . . . . 86-87

*United States* v. *Nemes*, 555 F.2d 51 (2d Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  95

*United States* v. *Nersesian*, 824 F.2d 1294 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*United States* v. *Ohle*, 678 F. Supp. 2d 215 (S.D.N.Y. 2010). . . . . . . . . . . . . . . . . . . . . . . . .  40

*United States* v. *Ordaz-Gallardo*, 520 F. Supp. 2d 516 (S.D.N.Y. 2007). . . . . . . . . . . . . . . .  84

*United States* v. *Ostrer*, 506 F. Supp. 962 (S.D.N.Y. 1980). . . . . . . . . . . . . . . . . . . . . . . . . .  95

*United States* v. *Panza*, 750 F.2d 1141 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . .  22, 76

*United States* v. *Payden*, 613 F. Supp. 800 (S.D.N.Y. 1985). . . . . . . . . . . . . . . . . . . . . . . . .  76

*United States* v. *Pelletier*, 898 F.2d 297 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . .  96, 97

*United States* v. *Pelullo*, 399 F.3d 197 (3rd Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  68

*United States* v. *Perez*, 940 F. Supp. 540 (S.D.N.Y. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . .  77

*United States* v. *Perez*, No. 01 CR. 112 (AGS),
    2001 WL 36082803 (S.D.N.Y. May 25, 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  87

*United States* v. *Persico*, 621 F. Supp. 842 (S.D.N.Y. 1985). . . . . . . . . . . . . . . . . . . . . . . . .  77

*United States* v. *Persico*, 832 F.2d 705 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51

*United States* v. *Pilnick*, 267 F. Supp. 791 (S.D.N.Y. 1967). . . . . . . . . . . . . . . . . . . . . . . . 57-58

*United States* v. *Pirro*, 76 F. Supp. 2d 478 (S.D.N.Y. 1999). . . . . . . . . . . . . . . . . . . . . . . . .  87

*United States* v. *Pitre*, 960 F.2d 1112 (2d Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  62

*United States* v. *Quinn*, 445 F.2d 940 (2d Cir. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  65

*United States* v. *Rahman*, 854 F. Supp. 254 (S.D.N.Y. 1994). . . . . . . . . . . . . . . . . . . . . . . . .  30

*United States* v. *Rajaratnam*, 736 F. Supp. 2d 683 (S.D.N.Y. 2010). . . . . . . . . . . . . . . . . . .  40

*United States* v. *Ramirez*, 602 F. Supp. 783 (S.D.N.Y. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*United States* v. *Reinhold*, 994 F. Supp. 194 (S.D.N.Y. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States* v. *Reynoso-Ulloa*, 548 F.2d 1329 (9th Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . 51

*United States* v. *Rigas*, 258 F. Supp. 2d 299 (S.D.N.Y. 2003). . . . . . . . . . . . . . . . . . . . . . . . 82

*United States* v. *Rigas*, 583 F.3d 108 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*United States* v. *Rivieccio*, 919 F.2d 812 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96-97

*United States* v. *Romero*, 54 F.3d 56 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States* v. *Rooney*, 866 F.2d 28 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States* v. *Rosa*, 11 F.3d 315 (2d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22, 30-31

*United States* v. *Rucker*, 586 F.2d 899 (2d Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States* v. *Russo*, 483 F. Supp. 2d 301 (S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . 85-87

*United States* v. *Salameh*, 152 F.3d 88 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . 9, 12-13, 29, 32

*United States* v. *Salazar*, 485 F.2d 1272 (2d Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . 75, 77

*United States* v. *Sanin*, 252 F.3d 79 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States* v. *Sattar*, 314 F. Supp. 2d 279 (S.D.N.Y. 2004). . . . . . . . . . . . . . . . . . . . . . . . . 60

*United States* v. *Scarpa*, 913 F.2d 993 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 61

*United States* v. *Shoher*, 555 F. Supp. 346 (S.D.N.Y. 1983). . . . . . . . . . . . . . . . . . . . . . . . . 77, 80

*United States* v. *Shonubi*, 103 F.3d 1085 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States* v. *Smith*, 478 F.2d 976 (D.C. Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States* v. *Solomonyan*, 452 F. Supp. 2d 334 (S.D.N.Y. 2006). . . . . . . . . . . . . . . . . . . . 91

*United States* v. *Spector*, 793 F.2d 932 (8th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States* v. *Spinelli*, 352 F.3d 48 (2d Cir 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22, 23

*United States* v. *Stein*, 424 F. Supp. 2d 720 (S.D.N.Y. 2006). . . . . . . . . . . . . . . . . . . . . . . .   68

*United States* v. *Stewart*, 433 F.3d 273 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . .   68-69

*United States* v. *Stirling*, 571 F.2d 708 (2d Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

*United States* v. *Sturdivant*, 244 F.3d 71 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . .   40-41

*United States* v. *Sureff*, 15 F.3d 225 (2d Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39, 43-44

*United States* v. *Szur*, No. 97-108, 1998 WL 132942 (S.D.N.Y. Mar. 20, 1998). . . . . . . . . . .   40

*United States* v. *Taggert*, No. 09 CR. 984 (BSJ), 2010 WL 532530
   (S.D.N.Y. Feb. 11, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44

*United States* v. *Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988).. . . . . . . . . . . . . . . . . . . . . . . .   51

*United States* v. *Tillem*, 906 F.2d 814 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . .   64

*United States* v. *Torres*, 901 F.2d 205 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22, 75-77

*United States* v. *Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001). . . . . . . . . . . . . . . . . . . . . .   76

*United States* v. *Turkish*, 458 F. Supp. 874 (S.D.N.Y. 1978). . . . . . . . . . . . . . . . . . . . . . . .   87

*United States* v. *Tussa*, 816 F.2d 58 (2d Cir. 1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

*United States* v. *Tutino*, 883 F.2d 1125 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . .   34-35

*United States* v. *Upton*, 856 F. Supp. 727 (E.D.N.Y. 1994). . . . . . . . . . . . . . . . . . . . . . . . .   65

*United States*  v. *Valdez*, 16 F.3d 1324 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

*United States* v. *Valle Ferrer*, 739 F.2d 545 (11th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . .   51

*United States* v. *Valona*, 834 F.2d 1334 (7th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . .   51

*United States* v. *Vanwort*, 887 F.2d 375 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . .   23, 39

*United States* v. *Villegas*, 899 F.2d 1324 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . .   23, 29

xii

*United States* v. *Volpe*, 42 F. Supp. 2d 204 (E.D.N.Y. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . .   97

*United States* v. *Walsh*, 194 F.3d 37 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   75

*United States* v. *Whittington*, 783 F.2d 1210 (5th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . 54-55

*United States* v. *Williams*, 205 F.3d 23 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 62

*United States* v. *Williams*, 936 F.2d 698 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

*United States* v. *Zackson*, 6 F.3d 911 (2d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

*United States* v. *Zafiro*, 945 F.2d 881 (7th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

*Wayte* v. *United States*, 470 U.S. 598 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71-72

*Williamson* v *Moore*, 221 F.3d 1177 (11th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72-73

*Wong Tai* v. *United States*, 273 U.S. 77 (1927). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   75

*Zafiro* v. *United States*, 506 U.S. 534 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22, 31-33

## STATUTES

18 U.S.C. 3500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   84

Fed. R. Civ. P. 7(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   60

Fed. R. Crim. P. 8(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

Fed. R. Crim. P. 14(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

Fed. R. Crim. P. 16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87-88

Fed. R. Evid. 402. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

" Fed. R. Evid. 403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 94

Fed. R. Evid. 801(d)(2)(E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   90

## MISCELLANEOUS

1 Wright, *Federal Practice and Procedure* § 127 (2d ed. 1982). . . . . . . . . . . . . . . . . . . . . . . .   60

Laurence H. Tribe, *Trial by Mathematics: Precision and Ritual in the Legal Process,* 84
     Harv. L. Rev. 1329, 1334-35 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

Lucian E. Dervan, *Bargained Justice: Plea-Bargaining's Innocence Problem and the
     Brady Safety-Valve,* 2012 Utah L. Rev. 51, 94 (2012). . . . . . . . . . . . . . . . . . . . . . . . . 51-52