**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

Plaintiff,

- v. -

PETER J. AJEMIAN, et al.,

Defendants.

11-Cr.-1091-VM

**REPLY MEMORANDUM IN SUPPORT OF**
**DEFENDANT PETER J. AJEMIAN'S MOTIONS**

## <u>TABLE OF CONTENTS</u>

Introduction..........................................................................................................................1

Argument ............................................................................................................................2

      A.     The Statistical Allegations in the Indictment Are Improper
and Evidence Thereof Should Not Be Admitted. ....................................................2

      B.     The Government Should Be Directed to File a Bill of
Particulars. ...........................................................................................................7

      C.     The Government Should Be Directed to Search for and
Produce All Potentially Exculpatory Evidence From the
Files of the RRB and the EDNY USAO. ..................................................................8

      D.     The Court Should Sever the Trial of the Charges Against
Dr. Ajemian From the Trial(s) of the Charges Against the
Patient Defendants, the Facilitator Defendants, and Dr.
Peter Lesniewski. ..................................................................................................9

Conclusion .......................................................................................................................10

McKool 839565v1

Defendant Peter J. Ajemian, M.D. ("Dr. Ajemian"), respectfully files this Reply in support of his motion for (1) an order striking the allegations of statistics set forth at paragraphs 22-26 of the May 22, 2012 Superseding Indictment (the "Superseding Indictment") and precluding the Government from introducing, referring to, or relying upon such statistics; (2) an order directing the Government to file a bill of particulars; (3) an order directing the Government to search for and produce all potentially exculpatory evidence from the files of the Railroad Retirement Board ("RRB") and the United States Attorney's Office for the Eastern District of New York ("EDNY USAO"); and (4) an order severing the trial of the charges against Dr. Ajemian from the trial(s) of the charges against the remaining patient defendants (collectively, the "Patient Defendants"), the two alleged facilitators, and Dr. Peter J. Lesniewski.

## Introduction

In its Opposition ("Opp'n Mem."), the Government glibly asserts that this is a "straightforward" prosecution and invites the Court to reflexively deny Defendants' motions on the basis that they are allegedly "largely the same as those that are routinely made, and routinely denied, in fraud cases in this Court."  (Opp'n Mem. at 1-2.)  Like most glib pronouncements, these assertions are not true.  Were this a "routine[]" prosecution, the Government—after conducting four years of investigative work, collecting half a million pages of documents, interviewing hundreds of witness, and promulgating a coercive witness cooperation program devised to extract admissions of guilt and potential cooperation from hundreds of LIRR employees—should be able to prove it directly, with competent evidence from witnesses and documents, rather than from makeweight, misleading statistics that assume the truth of the Government's theory of the case.  If this case is indeed neither "extraordinary [nor] unprecedented," as the Government straightfacedly contends (*cf. id.* at 1), then the Government should be able to identify readily the specific charges against Dr. Ajemian, most notably the

purported "lies" he told to the RRB, the "disability applications" he purportedly falsely supported, the identities of the RRB agents he allegedly "duped," and precisely how he "duped" them (*id.*).  Finally, if the arguments Dr. Ajemian raised in support of its motions were truly "routinely made, and routinely denied" (*cf. id.*), then the Government should have had no trouble responding to these arguments head on, rather than mischaracterizing or ignoring them altogether, as it did in its Opposition.

Despite the Government's false modesty, this prosecution is, indeed, extraordinary—it charges a massive fraudulent scheme allegedly in effect for fourteen years and involving perhaps fifteen hundred (1,500) LIRR employees, among others.   (*See* Dr. Ajemian's Opening Memorandum ("Opening Mem.") at 2.)  And precisely because this is an extraordinary case, we respectfully submit that the Court must take extraordinary care to preserve Dr. Ajemian's constitutional right to a fair trial.   The stakes are far too high for the Court to allow the Government to shortcut a conviction (1) by relying on voodoo statistics; (2) without requiring the Government to articulate the specifics of the charges alleged against Dr. Ajemian; (3) without directing the Government to turn over all exculpatory evidence; and (4) by failing to sever the case and thus permit Dr. Ajemian to adequately defend himself.

<u>**Argument**</u>

### A. The Statistical Allegations in the Indictment Are Improper and Evidence Thereof Should Not Be Admitted.

In Dr. Ajemian's Opening Memorandum, we demonstrated that permitting the jury to rely on the type of statistical data outlined in the Superseding Indictment would be reversible error.  We explained that the Government intends to use these statistics to lead the jury astray by suggesting that the sheer number of LIRR patients Dr. Ajemian saw over the years establishes the existence of a scheme to defraud.  In other words, the Government clearly intends to tell the

McKool 839565v1

jury that it should infer Dr. Ajemian's criminal intent from "numbers" alone. We further explained that, unless a preclusion order is issued, the Government's mere mention of statistics will immediately shift the focus of the jurors away from direct evidence, if any, against Dr. Ajemian, and shift the burden to Dr. Ajemian both to *disprove* a case of fraud by statistics and to defend each and every one of the hundreds of medical diagnoses and recommendations he made for LIRR employees over the course of 14 years. That impossible task would take months to complete, all the while bewildering the jury and obscuring the focus of the Superseding Indictment, which concerns only a dozen or so patients.

With respect to the allegations set forth in paragraphs 22, 23, and 24 of the Superseding Indictment (which purport to compare LIRR disability rates against disability rates prevailing among Metro North employees), we explained that myriad differences no doubt exist between LIRR and non-LIRR employees, their job descriptions, the hours worked, their union contracts, for example,[1] and that those differences could certainly and benignly account for the discrepancy in numbers touted by the Government as evidence of a fraud.

Finally, with respect to the allegations in paragraph 26 (which concern the rate at which Dr. Ajemian made occupational disability recommendations), we explained that their use would contravene *United States v. Jones*, 570 F.2d 765 (8th Cir. 1978), and that, in any event, the statistics are plainly irrelevant because the RRB—the purported victim of the alleged fraud—<u>re-</u>

---

[1] As we explained in the Opening Memorandum, it might well be that non-LIRR employees were eligible for full retirement benefits before turning 65, in which case they might have been willing to work through pain longer than LIRR employees. It might also well be that, by virtue of their union membership, non-LIRR employees enjoyed particular rights, *e.g.*, the right to be reassigned to a different job posing fewer physical challenges than a current job, thereby obviating the need for occupational disability. It might also well be that LIRR employees were better informed of their rights to pursue occupational disability awards. The defense has no practical way to test these hypotheses, but all of them would have to be eliminated before the relevance, if any, of the Government's purported statistics could be demonstrated. This trial, we respectfully submit, should not be a trial of hypotheses.

confirmed occupational disability awards to hundreds of the patients Dr. Ajemian had previously recommended to the RRB.[2]

Quite remarkably, in its Opposition, the Government fails to respond to any of Dr. Ajemian's arguments. It does not contest that the jury may well infer guilt from statistics alone; it does not contest that the use of statistics will require Dr. Ajemian to defend each and every one of his medical assessments and recommendations—a task that would require months to complete; it does not contest that the disability program offered by the Metro North may well be drastically dissimilar to that used by the LIRR; and it does not contest that the statistics are meaningless given that hundreds of Dr. Ajemian's recommendations—in fact 100% of the recommendations audited by the RRB—were re-validated through independent review one year after the investigation that led to the filing of the Superseding Indictment began. The Government's adamant refusal even to acknowledge these arguments establishes beyond dispute that the prosecution's statistics do nothing more than bootstrap a case-in-chief short on proof.

None of the Opposition's handful of arguments passes logical muster. The Government's first argument—that the comparisons of "rates of disability, types of disability, and age of disability between LIRR and Metro North ... are highly probative that there is a criminal conspiracy and scheme to defraud at work" (Opp'n Mem. at 11-12)—ignores that for such a comparison to have any relevance, the Government must first establish an identity between the

---

[2] As we explained in the Opening Memorandum, in 2009, the RRB undertook an audit of occupational disability awards it had approved for 258 LIRR employees. (See 2009 RRB OIG Annual Report at 117, an excerpt of which was attached as Exhibit B to the Opening Memorandum.) Those 258 patients were sent for 422 medical tests that were administered by third-party independent medical professionals. Next, 200 patients were selected for further review by the RRB's Office of the Inspector General, and based on the "medical evidence" prepared by those independent third-party medical professionals, "none of the annuitants were determined not to be disabled." (Id. (emphasis added).) In other words, after careful review, the RRB agreed with 100% of Dr. Ajemian's recommendations.

disability programs, the job descriptions, the hours worked, and other relevant data at LIRR and Metro North, respectively, and the absence of compensating explanations for the discrepancy. Absent such proof, the Metro North comparison has no evidentiary value.[3]

The Government's second and third arguments—that "these same numerical comparisons are highly probative of motive" and that the purportedly "unmistakable pattern of widespread disability claims is important evidence of the background of the scheme" (Opp'n Mem. at 12)— are utter makeweight.  Both these arguments tautologically assume their own conclusion, *i.e.*, that the "numerical comparisons" are in fact evidence of fraud.  As explained above, they are not.  If the Government wishes to argue motive by reason of the LIRR's early retirement inducement to those with a disability, it is free to do so.  Comparing this to Metro North and its apparently different regime, however, adds nothing to this argument and is both irrelevant and improper.  The Government's claim that it needs "evidence of the background of the scheme" to dispel purported jurors' "pre-conceived notions of how a criminal conspiracy operates" (*id.*) is pure surplusage.  The Government says it fears that jurors may assume "the conspirators [had to have] met together in a darkened room to plan the scheme" (*cf.  id.*), but as the Government knows well, an instruction to dispel such assumptions is routinely given by the Court in the jury charge.  *See* Criminal Resource Manual § 2167 (model jury instruction on conspiracy).

---

[3] An example may prove illuminating.  Assume that a particular state (State X) enacted legislation that made it difficult for married couples to obtain a divorce, while another neighboring state (State Y) enacted legislation that made it easier for married couples to obtain a divorce.  Over time, the differences between the legislative regimes prevailing in states X and Y, respectively, will undoubtedly result in discrepancies in the rates at which couples get married and apply for and obtain divorces.  Using the Government's logic, one could conclude from those statistical discrepancies that many of the marriages consummated in State Y are sham. Such a conclusion would be completely illogical, however, just like the Government's attempt to argue fraud based on apples-to-oranges statistics.

The Government's fourth argument—that "comparative disability rates ... are probative to dispel any argument or notion that railroad work by its nature results in a high, but legitimate, disability rate" (Opp'n Mem. at 13)—is a red herring.  First of all, even if the Government were correct that these statistics could be used to "dispel" arguments made by the defense, they are proper only as rebuttal evidence if and when such a defense is raised.  More importantly, the Government knows precisely what the jobs of the Patient Defendants entailed and also knows, or should know, whether they suffered from medical conditions entitling them to apply for occupational disability awards.[4]  It is this evidence that is relevant, not statistics pulled from a pie chart.

The Government's fifth argument—that "the high rates of purported disability among [Dr. Ajemian's] … patients demonstrates that [his role] … was not to provide medical care to these patients, but rather to pad a file in order to support a future disability application" (Opp'n Mem. at 13)—is equally erroneous and only highlights the inherent prejudice of the Government's statistical evidence.  The Government may not simply recite a percentage in order to prove that Dr. Ajemian's allegedly "high rates of purported disability" were part of a scheme to defraud or in furtherance of a conspiracy.  It is obliged to prove that Dr. Ajemian's unindicted LIRR patients were *not* in fact disabled when they were examined by Dr. Ajemian and that Dr. Ajemian knew or must have known that.  That Dr. Ajemian saw "X" number of patients and recommended "Y" percentage of them for occupational disability proves nothing.  Furthermore, the mere fact that some of the LIRR workers may have fraudulently pursued occupational benefits, and some did not, does not mean that Dr. Ajemian was "in" on the chicanery, if indeed

---

[4]  As the Government acknowledges (Opp'n Mem. at 4), for each of the patients whose occupational disability applications he supported, Dr. Ajemian commissioned X-rays, Magnetic Resonance Images ("MRIs"), and nerve conduction studies.

there was any.  Again, as in *Jones*, permitting the jury to infer that because Dr. Ajemian saw hundreds of patients, he must have known that at least some of them were not genuinely disabled impermissibly redraws the indictment by discarding the charges and substituting only probability theory via statistics.  Moreover, as explained above, because the RRB agreed <u>with 100%</u> of Dr. Ajemian's recommendations it reviewed in 2009 with the help of independent medical professionals, the fact that Dr. Ajemian may have recommended occupational disability for a large percentage of the LIRR patients he saw is neither relevant nor indicative of criminal intent.

### B.  The Government Should Be Directed to File a Bill of Particulars.

In Dr. Ajemian's Opening Memorandum, we demonstrated that the breadth of this unique case compels the issuance of an order directing the Government to provide a bill of particulars setting forth certain basic information.  The Government's misguided opposition to this request rests entirely upon the that argument the "charging instruments and extensive discovery" provided by the Government (Opp'n Mem. at 78) set forth the detail Dr. Ajemian is seeking. The Government is incorrect.

While the Government's pleadings provide some information concerning a dozen or so patients whom Dr. Ajemian recommended for occupational disability, they fail to identify, among other things, (i) the hundreds or thousands of unindicted individuals alleged to be Dr. Ajemian's co-conspirators; (ii) the hundreds or thousands of LIRR patients Dr. Ajemian allegedly "falsely declared disabled"; (iii) the tens of thousands of diagnoses and medical observations that the Government may claim to have been "fabricated"; and (iv) the RRB claim examiners who were allegedly deceived by Dr. Ajemian.

The Government is plainly hiding the ball and thus hamstringing Dr. Ajemian's defense. The defense cannot reasonably be expected to identify defense witnesses without the requested detail.  The defense also cannot produce rebuttal testimony on the fly and without significant

-7-

advance work.  To defend Dr. Ajemian's clinical diagnoses, courses of treatment, and medical recommendations, the defense team will have to delve into mountains of evidence, including X-rays, MRIs, and nerve conduction tests, among other things, and interview and/or subpoena third-party medical professionals who administered some of those tests.  The Government's argument that it has provided *some* detail is thus legally irrelevant and should be rejected.  *See Bortnovsky*, *United States v. Bortnovsky*, 820 F.2d 572, 574-75 (2d Cir. 1987).

Similarly, the Government's massive "document dump" in this case, which adds up to hundreds of thousands of pages, only highlights the untenable situation in which the prosecution has deliberately placed the defense.  Without the information sought herein, most of the documents the Government has provided are meaningless.  Indeed, this case perfectly illustrates, as this Court and the Second Circuit have recognized, that "sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars."  *United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000) (citations omitted).

**C.  The Government Should Be Directed to Search for and Produce All Potentially Exculpatory Evidence From the Files of the RRB and the EDNY USAO.**

In Dr. Ajemian's Opening Memorandum, we demonstrated that it appeared highly likely that the prosecution team had not searched for, let alone produced, all potentially exculpatory evidence from the files of the RRB and the EDNY USAO, which handled the investigation that led to the filing of the Superseding Indictment in the aftermath of the *Times* articles.  While the Government concedes that it has a constitutional obligation to search for and produce such evidence, it argues that it need not search all of the RRB's files or even inquire of the EDNY USAO about potentially exculpatory evidence.  The Government is again incorrect.

First, with respect to documents in the possession of the RRB, the Government casually points out in a footnote of its Opposition that it has only "partnered with criminal investigators

from the [RRB's Office of the Inspector General ("RRB-OIG"), rather than] … the civil agency of the RRB."  (Opp'n Mem. at 67 n.26.)  This almost Orwellian distinction is of no consequence. While it may be merely an office within the RRB, the RRB-OIG is part of the RRB.  The RRB-OIG has access to all of RRB's files, and thus the RRB's entire files are in the possession of the prosecution team and should be searched for exculpatory evidence.

Secondly, although the Government asserts that there was never any "collaborative or joint investigation," it remains that the charges brought by the SDNY USAO were the fruits of an investigation, "including grand jury documents and interview memoranda," commenced by the EDNY USAO.  (Id. at 73.)  Thus here, the SDNY USAO and the EDNY USAO are not separate—they are both the Justice Department.  The Government contents itself to invoke the inevitable Government nostrum that it "takes its Brady allegations seriously" to justify both its circumscription of the defense's search for, and its right to censor, the evidence uncovered by the EDNY USAO that persuaded it not to bring charges.  But the geographical divide of the East River may not be conjured up to divorce the Department of Justice from itself.  As the Government notes in its Opposition, moreover, the RRB-OIG, concededly part of the current prosecution team, was also part of the EDNY USAO prosecution team.  (Opp'n Mem. at 66 ("The EDNY was assisted by agents from the … RRB-OIG").)  The Government should thus be directed to search for and produce all potentially exculpatory evidence from the files of the RRB, including all impeachment evidence, and all potentially exculpatory evidence collected by the EDNY USAO.

### D.  The Court Should Sever the Trial of the Charges Against Dr. Ajemian From the Trial(s) of the Charges Against the Patient Defendants, the Facilitator Defendants, and Dr. Peter Lesniewski.

In Dr. Ajemian's Opening Memorandum, we demonstrated that trial of the charges against him should be severed from the trial(s) of the charges against other defendants (other

than Maria Rusin, Dr. Ajemian's office manager), and that the trial of the charges against Dr. Ajemian proceed after the trial against the Patient Defendants is concluded.  In its Opposition, the Government concedes that severance may be appropriate but proffers a different configuration for trial purposes.  The Government's proposal ignores, however, that the most economical way to streamline this otherwise elephantine prosecution is to conduct an initial trial that will adjudicate the culpability, if any, of the Patient Defendants and facilitators.  If these defendants are acquitted, it follows that the case against Dr. Ajemian should be dismissed. This approach is not only sensible and efficient, but it is also the only way to ensure that Dr. Ajemian receives a fair trial.

To the extent, however, that the Court countenances the Government's severance proposal, we respectfully submit that the trial against Dr. Lesniewski and his proposed co-defendants proceed first.  That trial is certain to be shorter than the trial against Dr. Ajemian, and the looming evidentiary issues will undoubtedly be decided in that trial and result in a streamlined presentation of evidence in any trial involving Dr. Ajemian and his proposed co-defendants.

## Conclusion

For the foregoing reasons and those set forth in the Opening Memorandum, Dr. Ajemian's motions should be granted in their entirety.

Dated:  November 9, 2012                                   Respectfully submitted,


                              _____/s/ Thomas E. Engel_____
                              Thomas E. Engel, Esq.
                              McKool Smith, P.C.
                              One Bryant Park, 47th Floor
                              New York, NY 10036

                              *Attorneys for Defendant Peter J. Ajemian, M.D.*

-10-

McKool 839565v1