UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA,                S1 11 Cr. 1091 (VM)

                Plaintiff,

   -*against*-


PETER LESNIEWSKI,

                Defendant.
-------------------------------------------------------x


# REPLY MEMORANDUM IN SUPPORT OF
# DEFENDANT PETER J. LESNIEWSKI'S PRETRIAL MOTIONS


                                JOSHUA L. DRATEL
                                DRATEL & MYSLIWIEC
                                2 Wall Street
                                3rd Floor
                                New York, New York 10005
                                (212) 732-0707

                                THOMAS ANTHONY DURKIN
                                DURKIN & ROBERTS
                                2446 N. Clark Street
                                Chicago, Illinois 60615
                                (312) 981-0123


                              *Attorneys for Defendant Peter Lesniewski*


—Of Counsel—
Lindsay A. Lewis
Joshua G. Herman
Janis D. Roberts

TABLE OF CONTENTS

Table of Contents ................................................................................................... ii

Introduction ............................................................................................................1

POINT I

THE COURT SHOULD ORDER INSPECTION OR IN
CAMERA PRODUCTION OF THE GRAND JURY MINUTES .....................1

POINT II

THE COURT SHOULD ORDER THE IMMEDIATE DISCLOSURE
OF FAVORABLE EVIDENCE REGARDING THE DECISION OF THE
U.S. ATTORNEY FOR THE EASTERN DISTRICT OF NEW YORK
NOT TO INDICT BASED UPON ITS REVIEW OF THE SAME
ALLEGED CRIMINAL CONDUCT CHARGED IN THIS INDICTMENT .....3

POINT III

ANY AND ALL WITNESSES AND INFORMATION ACQUIRED
BY THE GOVERNMENT THROUGH ITS AMNESTY PROGRAM
SHOULD BE SUPPRESSED AND/OR PRECLUDED FROM TRIAL
BECAUSE THE GOVERNMENT'S INDUCEMENTS TO THOSE
PERSONS DENY THE DEFENDANTS DUE PROCESS; AND THE
COURT SHOULD ORDER THE GOVERNMENT TO DISCONTINUE
ITS USE OF THE GRAND JURY TO PREPARE ITS CASE FOR TRIAL
AND DENY THE DEFENDANTS ACCESS TO POTENTIAL WITNESSES ................4

POINT IV

THE COURT SHOULD ORDER THE IMMEDIATE PRODUCTION
OF THE ORIGINAL UNDERLYING MATERIALS PROVIDING
THE BASIS FOR THE GOVERNMENT'S STATISTICAL DATA
REFERRED TO IN THE INDICTMENT, ALONG WITH ANY
STATISTICAL SUMMARIES PRESENTED TO THE GRAND JURY ..........7

POINT V

THE COURT SHOULD CONDUCT A PRETRIAL HEARING
OR REQUIRE THE GOVERNMENT TO SUBMIT A FORMAL
WRITTEN PROFFER OF ITS EVIDENCE IT INTENDS TO
OFFER AT TRIAL AS CO-CONSPIRATOR STATEMENTS .........................9

POINT VI

THE GOVERNMENT'S CONSENT TO SEVER
THE CASE INTO TWO TRIAL GROUPS ....................................................................10

Defendant Peter J. Lesniewski, M.D. ("Dr. Lesniewski"), respectfully files this Reply in support of his pretrial motions. This Reply also addresses the government's consent to sever the case into two trial groups, as proposed in its Response.

## Introduction

Counsel for Dr. Lesniewski could not agree more with the introductory comments in Co-Defendant Dr. Ajemian's Reply: the government's glib assertion that this is a "straightforward" prosecution that invites the Court to reflexively deny Defendants' motions as if they are routine, and routinely denied, is simply not true. Likewise, Dr. Lesniewski joins Dr. Ajemian in urging that because this is an extraordinary, high stakes case this Court must take "extraordinary care to preserve [the defendants'] constitutional right to a fair trial." Ajemian Reply at 2.

Thus, as it did with Dr. Ajemian, the government's Response either mischaracterizes Dr. Lesniewski's motions or ignores crucial aspects of them. Dr. Lesniewski agrees, however, that the government's severance proposal of two trial groups, with Dr. Lesniewski's trial group proceeding second, is an appropriate and positive first step in addressing this complex case.

## POINT I
## THE COURT SHOULD ORDER INSPECTION
## OR *IN CAMERA* PRODUCTION OF THE GRAND JURY MINUTES

In order that a determination can be made whether the decision to indict rested on improper constitutional grounds, Dr. Lesniewski moved for the inspection or *in camera* production of grand jury minutes. In response, the government primarily rests on the presumption of grand jury secrecy. Response at 93. In so doing, the government ignores the fact that concerns for grand jury secrecy do not unequivocally insulate grand jury proceedings from all review. *See*, *e.g.*, *Vasquez v. Hillary*, 474 U.S. 254, 263 (1986) ("[w]hen constitutional error calls into question the objectivity of those charged with bringing a defendant to judgment, a

reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm").

The government also asserts that grand jury minutes cannot be sought even if the grand jury was presented with improper evidence or instructions. Response at 93. However, a prosecutor's instructions to a jury may not be "so misleading due to mistakes or omissions, that the ensuing indictment will not be permitted to stand even though it is supported by legally sufficient evidence." *United States v. Twersky*, 1994 WL 319367, at *4 (S.D.N.Y. Jun. 29, 1994) (ordering *in camera* inspection of Grand Jury minutes).

Moreover, "there remain certain limitations on the presentation that a prosecutor may make to the grand jury." *United States v. Hogan*, 712 F.2d 757, 759 (2nd Cir. 1983). Indeed, as the Second Circuit specifically observed in *Hogan*, "in presenting hearsay evidence to the grand jury, [the government] must not deceive the jurors as to the quality of the testimony they hear[,]" and that "[h]eavy reliance on secondary evidence is disfavored precisely because it is not first-rate proof." *Id*. at 761.

As Dr. Lesniewski's motion and those of his co-defendants make clear,[1] there is serious dispute regarding the government's use of statistical data and its theory of conspiracy, which establishes a particularized need for inspection of the grand jury minutes. Similar to the

---

[1] *See*, *e.g.*, Ajemian Pre-trial Motion at 1-9; Ajemian Reply at 2-7. In his reply brief, Dr. Ajemian acutely observes that the government's "mere mention of statistics will immediately shift the focus of the jurors away from direct evidence, if any, against Dr. Ajemian, and shift the burden to Dr. Ajemian both to *disprove* a case of fraud by statistics and to defend each and every one of the hundreds of medical diagnoses and recommendations he made for LIRR employees over the course of 14 years." Ajemian Reply at 3. Dr. Ajemian also correctly notes that there are myriad differences between LIRR and non-LIRR employees, and that those differences "could certainly and benignly account for the discrepancy in numbers touted by the Government as evidence of a fraud," and that the statistics are "plainly irrelevant because he RRB—the purported victim of the alleged fraud—<u>re-confirmed occupational disability awards to hundreds of the patients Dr. Ajemian had previously recommended to the RRB.</u>" Ajemian Reply, pp. 3-4 (emphasis in original). These arguments apply with equal force to Dr. Lesniewski, and are adopted herein.

extensive hearsay and double hearsay speculation" in *Hogan*, this statistical data and infirm assumptions related to the government's conspiracy theory may very well have "added a false aura of factual support to the government's case and may well have deceived the grand jurors." *Id*.

The government also conveniently ignores the request for *in camera* inspection, a reasonable alternative that would address the government's concerns for grand jury secrecy but also ensure that the grand jury did not return an indictment based on improper grounds.  The Court should thus, at a minimum, inspect the grand jury minutes *in camera* to ensure that the statistical data on which the government relies was not improperly used to secure an indictment.

### POINT II
### THE COURT SHOULD ORDER THE IMMEDIATE DISCLOSURE OF FAVORABLE EVIDENCE REGARDING THE DECISION OF THE U.S. ATTORNEY FOR THE EASTERN DISTRICT OF NEW YORK NOT TO INDICT BASED UPON ITS REVIEW OF THE SAME ALLEGED CRIMINAL CONDUCT CHARGED IN THIS INDICTMENT

The government correctly identifies *United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011)*,* as setting forth the proper *Brady* analysis; however, the government either misreads or misunderstands that case with regard to Dr. Lesniewski's request for evidence regarding the decision of the U.S. Attorney's Office for the Eastern District of New York not to indict based on its review of the same evidence that the Southern District now finds to establish a massive criminal conspiracy.

The mere fact that one Office reviewed the same facts and had the good sense to walk away, yet another decides to bring a case as massive as this, should sound an alarm to anyone concerned about the existence of favorable evidence.  Certainly some facts must have persuaded the E.D.N.Y. *not* to act, unless something other than facts caused the S.D.N.Y. *to* act.

As noted by the government, in *Kohring* the Ninth Circuit held that "a prosecutor's opinions and mental impressions of the case are not discoverable under *Brady/Giglio unless* they contain underlying exculpatory facts." 637 F.3d at 907 (9th Cir. 2011) (emphasis in original; brackets omitted) (quoting *Morrison v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006)). Applying that analysis, the Ninth Circuit found certain material, including attorneys' handwritten notes, contained underlying exculpatory facts and thus could not be withheld on work product grounds. *Id*. at 908. This is the same basis for Dr. Lesniewski's request for *Brady* material as to the E.D.N.Y's decision, upon pondering the same facts reviewed by the S.D.N.Y., *not* to prosecute.[2]

If the government insists on asserting its work product privilege, then it should be ordered to produce a privilege log, so that Dr. Lesniewski may intelligently challenge specific claims of privilege on a document-by-document basis. In order to address any valid work product privilege concerns, Dr. Lesniewski, as discussed in *Kohring*, does not object to redaction of any work product that need not be produced in conjunction with underlying exculpatory facts.

In addition, the government's efforts to balkanize the government entities that participated in the investigation does not artificially put certain documents beyond its reach, or excuse it from its duties to seek out *Brady* material. On this point, Dr. Lesniewsiki adopts the persuasive points offered in Dr. Ajemian's Reply.[3]

## POINT III

---

[2] The government's other cases also support Dr. Lesniewski's position. For example, in *Williamson v. Moore*, 221 F.3d 1177, 1183 (11th Cir. 2000), the Court did *not* decide whether *Brady* "never reaches attorney work product," but instead held only that the defendant could not obtain a prosecutor's own handwritten notes of witness statements when those notes would not have been admissible as impeachment evidence in the first instance. Also, in *United States v. NYNEX*, 781 F. Supp. 19 (D. D.C. 1991), the Court acknowledged that "internal materials need only be disclosed 'if material to guilt or punishment.'" *Id*. at 25 (quoting *Brady v. Maryland*, 373 U.S. at 87 (1972)). This is precisely the type of information that would be reflected in material relating to the EDNY's declination to prosecute.
[3] *See* Ajemian Reply at. 8-9 (refuting government argument that RRB-OIG is separate from RRB; observing that E.D.N.Y. and S.D.N.Y. are not separate, but are part of the Justice Department, and that the RRB-OIG was part of the prosecution teams of both districts).

4

**ANY AND ALL WITNESSES AND INFORMATION ACQUIRED BY THE
GOVERNMENT THROUGH ITS AMNESTY PROGRAM SHOULD BE SUPPRESSED
AND/OR PRECLUDED FROM TRIAL BECAUSE THE GOVERNMENT'S
INDUCEMENTS TO THOSE PERSONS DENY THE DEFENDANTS
DUE PROCESS; AND THE COURT SHOULD ORDER THE GOVERNMENT
TO DISCONTINUE ITS USE OF THE GRAND JURY TO PREPARE ITS CASE FOR
TRIAL AND DENY THE DEFENDANTS ACCESS TO POTENTIAL WITNESSES**

The government does not deny that its Amnesty Program, which the government offered to every LIRR personnel awarded disability benefits, is unprecedented in scope.[4] In order to obtain the Program's extraordinary benefits, the former employee was requested to provide information listing all "facilitators" or "consultants" consulted "in connection with retirement and/or disability"; listing all medical professionals who filed documentation with the RRB on your behalf in connection with "retirement and/or disability"; specifically asked if the former employee saw Drs. Ajemian, Lesniewski, or Parisi.[5]

After providing this information, the former employee must attest pursuant to 28 U.S.C. § 1746 that, in connection with their application for RRB disability benefits, information provided by the individual "or doctors or others on my behalf" was "false and/or misleading" with respect to their "health condition, ability to work, and/or [his/her] eligibility for RRB disability benefits."

In its Response, at 53, the government asserts the Amnesty Program letter is not inherently coercive, and that the government took "pains to avoid even the appearance of heavy-handedness." Yet, the government quotes only two lines conveying that message: "If your application and statements submitted to the RRB relating to disability were truthful, the Program

---

[4] Under the terms of the Amnesty Program a former LIRR employee could (1) avoid criminal prosecution for committing the very offenses charged in this case; (2) avoid civil and administrative proceedings for those same offenses; (3) retain thousands of dollars of benefits that the government deems to have been obtained by fraud; and (4) continue to receive LIRR pension benefits that were void *ab initio* if one presumes to the fraud alleged in the indictment.

[5] The Amnesty Letter is part of Exhibit P to the September 14, 2012, Declaration of Paul B. Bergman, Esq.

is not relevant to you." *Id.* (also citing "Frequently Asked Question" stating an LIRR retiree is "not eligible" and "program does not apply to you," if the retiree's application was truthful.)

Of course, the government does not and cannot reconcile the negligible (if any) impact of those lines with the overt threats that course through the otherwise lengthy and dense Amnesty Program letter, such as the language stating that: "[i]f you do not participate in the [Amnesty Program], however, and engaged in wrongdoing, you may face criminal, civil or other administrative action. You may be prosecuted for various criminal offenses, including offenses carrying maximum punishments of 20 years' imprisonment, and if convicted, face a prison term." *See* Motion at 13 (describing threats of civil and administrative action for failure to participate in the Amnesty Program). The government fails to address this overtly coercive language in its Response. Nor does it confront the coercive manner in which the Amnesty Program was publicized. *See* Motion at 16-19.

The case law relied upon by the government is also readily distinguishable. Dr. Lesniewski acknowledges that Courts have afforded the government "essentially unfettered discretion in providing emoluments to potential witnesses to secure their testimony on the government's behalf," Motion at 20, and that courts have upheld plea agreements in exchange for truthful testimony as not violative of 18 U.S.C. §201, and have further held that a witness's monetary gain is not a basis for preclusion of testimony. Motion at 21. However, the typical scenario involves benefits provided to an individual witness based on individual negotiation, and also for leniency at sentencing after the witness has pleaded guilty to a crime. Motion at 22.

The cases cited by the government in its Response fall squarely within this typical scenario, and therefore do nothing to bolster the legitimacy of the extraordinary Amnesty

Program.[6]  Given the stark differences between the Amnesty Program's scope and extent of benefits, and the incentives offered to individuals in cases cited by the government, the government's assertion that that there is "no basis in logic or fact for distinguishing the [Amnesty] Program from other incentives the Government offers for witnesses to come forward with information[,]" Response at 52, is entirely without foundation or merit.

The government also argues that the Amnesty Program's terms did not intimidate former employees because only 44 of the over 1,500 former LIRR employees had been accepted into the Program as of October 23, 2012, which was only three days before the closure of the Amnesty Program.  Response at 48, fn. 17;  53.

However, that misses the point entirely.  Even if the Amnesty Program produced *a single* coerced witness, that would justify preclusion of that witness' testimony;  *44* coerced witnesses (or any subset) is unconscionable.  Thus, the gross number and not the proportion is what matters in this context.  Also, the relatively small number of Amnesty Program enrollees evidences the lack of merit in the government's convoluted and misguided theory of prosecution, rather than the lack of the Program's coercive nature.

## POINT IV
### THE COURT SHOULD ORDER THE IMMEDIATE PRODUCTION OF THE ORIGINAL UNDERLYING MATERIALS PROVIDING THE BASIS FOR THE GOVERNMENT'S STATISTICAL DATA REFERRED TO IN THE INDICTMENT, ALONG WITH ANY STATISTICAL SUMMARIES PRESENTED TO THE GRAND JURY

---

[6] *See Hoffa v. United States*, 385 U.S. 293, 311 (1966) (considering use of single paid informant); *Benson v. United States*, 146 U.S. 325, 334 (1892) (holding that a codefendant severed from the defendant could testify competently against the defendant); *United States v. Murphy*, 41 U.S. 203, 211 (1842) (finding that the owner of stolen goods could testify competently against the accused in a larceny prosecution even though the witness has an economic interest in a conviction); *Lisenba v. California*, 314 U.S. 219, 227 (1941) (reviewing case where codefendant who plead guilty and testified against defendant (who was sentenced to death) in exchange for a lenient recommendation of a life sentence and finding "no corrupt bargain" between the State and the codefendant for his testimony).

Dr. Lesniewski moved for the production of underlying materials providing the basis of the government's statistical data referred to in the indictment, and also any statistical summaries presented to the grand jury.[7]  In preparing its response to this request, the government states that it "realized that the underlying data runs that [it] used as the base of [its] analyses were mistakenly not included in the discovery."  Response at 8, fn. 2.

Dr. Lesniewski acknowledges, as the government notes in its Response, that certain data was produced by the government on October 19, 2012.  However, that production does not render the motion moot.  The government acknowledges that its production of this underlying data is incomplete when it states that it "will continue to produce the data underlying any analysis [it] intend[s] to offer at trial."[8]  Response at 11, fn. 5.  Also, the government's production does not appear to appear to address all of the factual allegations from the indictment.

For example, the Indictment, at ¶ 22, alleges that LIRR workers applied for occupational disability benefits at a rate 12 times higher than workers from "comparable commuter railroads." Yet the government has produced data related to only one other comparable commuter railroad, while it clearly possesses statistical data concerning other commuter railroads that should be produced.

Similarly, there are references to percentages of "all RRB annuitants" who met criteria for total and permanent disability."  Indictment, ¶ 24.  However, the government has not produced data related to "all RRB annuitants."  Likewise, the government has not produced data underlying its conclusion that from 1997 to 2008 Dr. Lesniewski declared disabled over 98% of

---

[7] Dr. Lesniewski adopts the arguments made by Dr. Ajemian regarding the improper statistical allegations in the indictment.  *See* Pretrial Motion for Dr. Ajemian,  pp. 1-9;   Ajemian Reply, pp. 2-7.

[8] This pledge by the government appears to be in response to the argument pursuant to Fed. R. Evid. 1006.  Motion, pp. 38-39.  The government does not cite Rule 1006 in its Response; however, by agreeing to produce the data underlying any analysis it intends to introduce at trial, the government concedes the relief requested, and Dr. Lesniewski's motion on this point should accordingly be granted.

the LIRR employees he saw as patients.  Indictment, ¶ 26.   In light of the government's agreement to and production of the underlying data, rather than deny the motion as moot, or hold judgment in abeyance as the government continues its discovery, the Court should grant the motion.  Moreover, the government should produce the statistical data provided to the grand jury for the reasons set forth in Dr. Lesniewski's motion.

## POINT V
## THE COURT SHOULD CONDUCT A PRETRIAL HEARING OR REQUIRE THE GOVERNMENT TO SUBMIT A FORMAL WRITTEN PROFFER OF ITS EVIDENCE IT INTENDS TO OFFER AT TRIAL AS CO-CONSPIRATOR STATEMENTS

As described in Dr. Lesniewski's motion, the government will seek to use numerous statements that it deems to be co-conspirator statements pursuant to Rule 801(d)(2)(E) made by declarants to whom Dr. Lesniewski has absolutely no connection.  Dr. Lesniewski submitted that a pretrial hearing or the more limited relief of a written proffer would be necessary to ensure that he receive a fair trial. As his motion discussed, these safeguards will help protect against a mistrial, which would prejudice Dr. Lesniewski economically and would further preclude him from retaining counsel of choice in the event of a second trial.

The government fails to respond to the request for a pretrial written proffer regarding co-conspirator statements.  Dr. Lesniewski respectfully submits that, in a case such as this in which he is bound to other defendants with whom he had no contact or relationship by a tenuous overarching conspiracy theory that the government claims is demonstrated by "numerical evidence," Response at 12, that is itself inherently infirm and unreliable, a pretrial written proffer is necessary to prevent irremediable prejudice to Dr. Lesniewski.[9]

---

[9] A pretrial proffer should be ordered regardless of whether the government's severance proposal is granted.  This is so because the government has grouped Dr. Lesniewski with patients seen by the now-deceased Dr. Parisi, based on the grounds that Dr. Lesniewski was a "co-worker" of Dr. Parisi.  Response at19.  The government does not explain

9

## POINT VI
## THE GOVERNMENT'S CONSENT TO SEVER
## THE CASE INTO TWO TRIAL GROUPS

Regarding severance, Dr. Lesniewski agrees with the government's conclusion that a trial of 18 defendants would be unwieldy," and agrees with its proposal to divide the defendants in two trial groups,[10] with Dr. Lesniewski's group tried second.  Response at 24.

The government accurately observes that proceeding with the larger Dr. Ajemian group first "would result in the greatest judicial efficiency[,]" and streamline any subsequent trial.  Response at 25-26.  Consequently, Dr. Lesniewski disagrees with Dr. Ajemian's proposal, which involves two trial groups but would have Dr. Lesniewski's trial group proceed first.

Dated:  November 16, 2012
       New York, New York

                                        Respectfully Submitted,

| /s/Joshua L. Dratel | /s/Thomas Anthony Durkin |
|---|---|
| Joshua L. Dratel, Esq. | Thomas Anthony Durkin, Esq. |
| DRATEL & MYSLIWIEC | DURKIN & ROBERTS |
| 2 Wall Street, 3rd Floor | 2446 N. Clark Street |
| New York, New York 10005 | Chicago, Illinois 60614 |
| (212)732-0707;  jdratel@dratelmys.com | (312)981-0123;  tdurkin@durkinroberts.com |

---

how this "co-worker" relationship gives rise to a conspiracy between the two, or more to the point, between Dr. Lesniewski and Dr. Paris's patients.  Nor does or can the government state that Dr. Lesniewski was a "co-worker" during any of the relevant time periods set forth in the indictment, or that Dr. Lesniewski and Dr. Parisi shared any patients, specifically former LIRR employees who subsequently applied for disability benefits.  Moreover, as noted in the Motion, the indictment only alleges that Dr. Lesniewski provided services to two co-defendants, Gary Supper and Richard Ehrlinger, whom, as his counsel correctly notes, "was not treated by … Dr. Lesniewski."  Ehrlinger Mem., p. 4.

[10] The two groups are composed as follows:  (1) defendants Ajemian, Rusin, Baran, Noone, Walsh, Falloon, Pulsonetti, Bianchini, Brittell, Delgiorno, Plaia, Nugent, and Dellala; and (2) defendants Lesniewski, Rutigliano, Gagliano, Ehrlinger, and Stavola. S*ee* Response at 24.

10