UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
UNITED STATES OF AMERICA
                                    :
        -v-                         :          INDICTMENT
                                    :          ~~ ~~ Cr. 1091 (VM)
PETER J. LESNIEWSKI,                :
JOSEPH RUTIGLIANO,                  :
STEVEN GAGLIANO, and
RICHARD EHRLINGER,                  :
                                    :
        Defendants.                 :

------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: JAN 0 9 2013

                        COUNT ONE

             (Conspiracy to Commit Mail Fraud, Wire Fraud
                      and Health Care Fraud)

        The Grand Jury charges:

                      The Defendants

        1.   PETER J. LESNIEWSKI, the defendant, is a

Board-certified orthopedist.  From at least in or about the 1990s

up to and including no earlier than in or about 2008, LESNIEWSKI

assisted retirees from the Long Island Rail Road Company ("LIRR")

in applying for occupational disability benefits from the United

States Railroad Retirement Board ("RRB").  LESNIEWSKI submitted

medical reports to the RRB, recommending hundreds of LIRR workers

for disability benefits.  At times relevant to this Indictment,

LESNIEWSKI worked with another orthopedist who is deceased

("Disability Doctor-2").

        2.   JOSEPH RUTIGLIANO, the defendant, was a former LIRR

conductor and union president who applied for and received RRB

occupational disability benefits after his retirement.  No later than upon his retirement, RUTIGLIANO also worked as a "facilitator" who purported to advise and assist LIRR workers in planning for post-retirement disability and in preparing disability applications for submission to the RRB.  In exchange for this service, RUTIGLIANO was paid a fee of approximately $1000 per client, typically in cash.

3.    STEVEN GAGLIANO and RICHARD EHRLINGER, the defendants, are former LIRR employees who have retired on LIRR pensions.  After their retirement, they each applied for and received RRB disability benefits.

### Overview Of The Premeditated Disability Fraud

4.    The defendants and their co-conspirators committed a fraud in which LIRR workers who were ready to retire falsely claimed to be disabled, including occupationally disabled, in order to receive extra benefits to which they were not entitled. Specifically, LIRR employees, who were eligible to retire as early as age 50 with an LIRR pension, sought to supplement their LIRR pension with a separate RRB disability annuity which, when combined with their LIRR pension, resulted in a total income level that often approximated their pre-retirement, working income. This fraud was perpetrated with the knowing and intentional involvement of PETER J. LESNIEWSKI, the defendant, and another doctor ("Disability Doctor-2") – who falsely declared retiring LIRR workers to be disabled when in truth and in fact the workers

were not disabled.  Typically, these disability doctors claimed
that their LIRR patients suffered from various musculoskeletal
impairments, which can involve claims of soft tissue injury that
are more difficult to confirm by objective criteria than are other
impairments, and are often diagnosed clinically, based upon pain
as subjectively reported by the patient.  This fraud was also
aided by "facilitators," such as JOSEPH RUTIGLIANO, the defendant,
who served as liaisons between the retiring workers and
participating doctors.  As a result, the doctors received at least
hundreds of thousands of dollars from patients and insurance
companies, and the foreseeable loss to the RRB disability funds,
if the fraudulent claims were paid out in full, would be at least
tens of millions of dollars.

     5.  Participants in the fraud typically took some or
all of the following steps, among others:

     a.  In anticipation of filing an RRB disability
application, LIRR employees saw PETER J. LESNIEWKSI, the
defendant, or Disability Doctor-2, who together accounted for
approximately 39% of LIRR disability applications filed during the
four-year period from in or about 2004 through in or about 2008.
Together with a third well-known "disability doctor," LESNIEWSKI
and Disability Doctor-2 accounted for approximately 86% of the
LIRR disability applications filed during this time period.
LESNIEWSKI personally accounted for approximately 13% of all LIRR
disability applications during this time period.

      b.    LESNIEWSKI and Disability Doctor-2 prescribed for the LIRR employees – and billed their insurers for – a series of unnecessary medical tests, including at times rounds of x-rays, scans and nerve conduction tests, as well as purported treatments, including physical therapy, in order to pad the patients' medical files.

      c.    The LIRR employees generally paid these doctors between approximately $800 and $1200, often in cash, to prepare a medical assessment and illness narrative, or both, for submission to the RRB.

      d.    LESNIEWSKI and Disability Doctor-2 then prepared fabricated or exaggerated medical assessments and illness narratives, or both, in which they recommended a set of restrictions that, if bona fide, would have prevented the LIRR employees from continuing in their occupations.

      e.    Sometime after retiring in anticipation of receiving an LIRR pension, the LIRR employees, including STEVEN GAGLIANO and RICHARD EHRLINGER, the defendants, submitted to the RRB disability applications that falsely claimed an inability to work, even though the employees were performing their jobs up until the time they retired, and could have continued to perform them beyond retirement, if they had chosen to do so.  The LIRR retirees continued engaging in active physical activity after they retired.  For example, in his disability application, GAGLIANO falsely claimed to be unable to "do any of the physical labor

4

required in his job as a signalman," because of "severe and
disabling pain in back, shoulder & legs."  Nevertheless, in 2009,
GAGLIANO successfully completed a 400-mile bike tour in northern
New York.  Similarly, in his disability application, EHRLINGER
falsely claimed that knee pain made standing and walking "hard"
for him, and that he could not perform outdoor chores at all.
Nevertheless, following his retirement, EHRLINGER ran a party
rental business for which he personally loaded and unloaded stacks
of chairs and tables.

      f.    The LIRR employees paid one of a small group of
so-called "facilitators," including JOSEPH RUTIGLIANO, the
defendant, to assist with the disability process by, among other
things, working with the doctors' offices, coordinating the
disability benefit applications of LIRR employees, and either
filling out the applications or coaching the LIRR employees to
fill out their disability applications in such a way as to
maximize the likelihood that such employees would receive
disability benefits.

      g.    LESNIEWSKI, RUTIGLIANO and other participants did
all of this knowing that the LIRR employees were not, in fact,
disabled as claimed – that is, they were not, in fact, unable to
perform their jobs because of medical impairments; rather, the
employees were simply planning to retire and wished to supplement
their LIRR pension benefits with RRB occupational disability
payments.  In fact, LESNIEWSKI, RUTIGLIANO, and other participants

knew full well that the LIRR employees, who were generally working full-time (and, indeed, who were often working overtime), had pre-planned the date on which they would declare themselves disabled, and that this scheduled date was contemporaneous with their projected retirement date.  LESNIEWSKI ordered and billed for unnecessary medical tests and wrote exaggerated medical narratives to conceal the fact that the LIRR employees were paying them to prepare disability applications when the employees were not in fact disabled as claimed.

6.   Before applying for RRB occupational disability benefits, certain LIRR employees applied for various forms of private disability insurance.  Benefits under those private insurance policies were triggered if the employees were later determined to be disabled.  After obtaining RRB disability benefits, these individuals then made claims on these private insurance policies.

7.   The doctors participating in the fraud profited by charging fees for preparing disability narratives and medical assessment forms, by obtaining new patient referrals from other LIRR employees and facilitators, and by billing private health insurers for unnecessary tests and visits.  From in or about 2004 to in or about 2008, the total revenue from insurance billings and fees for PETER J. LESNIEWSKI, the defendant, was at least hundreds of thousands of dollars.  This revenue provided financial motivation for LESNIEWSKI to participate in the fraud.

The Defendants' Exploitation Of The Overlap Between The LIRR
Pension And The Railroad Retirement Board Disability Programs

8.    The RRB is an independent agency within the
executive branch of the Federal Government that was created in the
1930s.  The RRB administers comprehensive retirement, survivor,
and benefit programs, including disability benefits, for the
nation's railroad workers and their families, under the Railroad
Retirement and Railroad Unemployment Insurance Acts.  LIRR
employees participate in the RRB disability program and in the RRB
pension program.  The RRB disability and pension programs are
primarily funded by federal employment taxes paid by railroad
employers and railroad employees nationwide and by certain federal
income taxes paid by recipients of RRB pensions.

9.    Retired LIRR workers can receive two pensions, but
the minimum eligibility age is different for the two programs.
First, LIRR workers are eligible for a pension paid by the LIRR.
LIRR workers hired before 1988 may draw the LIRR pension at the
age of 50, provided they have been employed for at least 20 years.
Second, LIRR workers are eligible for a pension paid by the RRB,
but most workers only become eligible for that full pension at the
age of 65.  Thus, a 65-year old LIRR retiree receives two pension
payments – one from LIRR and one from RRB.  But qualifying 50-year
old retirees receive only an LIRR pension, and generally must wait
15 years before receiving their full second, RRB pension.

10.   An LIRR employee may obtain an RRB disability award

7

after he or she has retired and stopped working, notwithstanding the fact that the employee collects a LIRR pension, if the employee convinces the RRB that he or she is disabled.  This enables an LIRR worker to receive both the LIRR pension as well as RRB payments prior to the time he or she would be eligible to receive an RRB pension.  For example, an LIRR worker who retired at age 50 would be eligible only for an LIRR pension, and would have to wait 15 years until her 65th birthday to begin collecting a supplemental RRB pension, thereby drawing a substantially lower income upon retirement.  However, if that worker was deemed occupationally disabled after she retired at the age of 50, then she could immediately begin collecting both her LIRR pension and RRB disability payments.  That retiree – who would receive both her LIRR pension, as well as RRB disability payments – could then receive a combined disability/pension income that approximated her pre-retirement, working income.

        11.  The RRB provides two types of disability annuities. First, a total disability annuity is based upon guidelines similar to those for Social Security disability; in other words, it requires a showing of a permanent and total disability.  Second, the RRB provides for "occupational disability" annuities for railroad workers who have permanent physical or mental impairments that prevent them from performing their specific railroad jobs, regardless of whether they might be capable of performing other work.  See 20 C.F.R. § 220.10(a).  A railroad worker is eligible

to apply for an occupational disability at age 60 if he or she has 10 years of employment, or at any age with at least 20 years of employment.

12. At all times relevant to this Indictment, the RRB has required medical findings to support a claim of occupational disability, including "objective" tests and reports. See 20 C.F.R. § 220.46. Among other things, these medical findings must be complete and detailed enough to allow the RRB to make a determination about whether a claimant's disability is a legitimate impairment, including "(1) [t]he nature and limiting effects of the claimant's impairment(s) for any period in question; (2) the probable duration of the claimant's impairment(s); and (3) the claimant's residual functional capacity to do work-related physical and mental activities." Id. A "functional capacity test" is defined as "one of a number of tests which provide objective measures of a claimant's maximal work ability and includes functional capacity evaluations which provide a systematic comprehensive assessment of a claimant's overall strength, mobility, endurance and capacity to perform physically demanding tasks, such as standing, walking, lifting, crouching, stooping or bending, climbing or kneeling." 20 C.F.R. § 220.11.

13. Pursuant to federal regulations, the RRB must take into account an applicant's statement concerning the intensity of pain that he or she is suffering, as well as the treating physician's descriptions of those symptoms. While applicable

9

regulations require that the RRB determine that subjective symptoms such as pain be consistent with objectively demonstrable medical evidence, the regulations provide:

> Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the Board will carefully consider any other information the claimant may submit about his or her symptoms.  The information that the claimant, the claimant's treating or examining physician or psychologist, or other persons provide about the claimant's pain or other symptoms (e.g., what may precipitate or aggravate the claimant's symptoms, what medications, treatments or other methods he or she uses to alleviate them, and how the symptoms may affect the claimant's pattern of daily living) is also an important indicator of the intensity and persistence of the claimant's symptoms.  Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which the claimant, his or her treating or examining physician or psychologist, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . .

See 20 C.F.R. § 220.114(c)(3).

14.   The regulations further provide that, if the treating physician gives an opinion that is inconsistent with other medical evidence, including opinions obtained by RRB medical consultants, the RRB must resolve those inconsistencies based on all the evidence in the case record.  In doing so, however, the RRB must "give some extra weight to the treating source's supported opinion(s) which interprets the medical findings about the nature and severity of the impairment(s)."  20 C.F.R.

10

§ 220.112(d).  Thus, the regulatory system is vulnerable to abuse by employees and treating physicians who falsify and exaggerate symptoms, as the RRB is required to give their statements extra weight.

15.  Typically, a treating physician completes and signs an RRB Medical Assessment filing, known as a G-250 form (hereinafter referred to as a "Medical Assessment").  The Medical Assessment sets forth the doctor's view of objective medical tests, medical findings, and required medical restrictions.

16.  As a critical part of the RRB disability process, every applicant also must file an Application for Determination of Employee's Disability, known as a Form AA-1d (hereinafter referred to as a "Disability Application.")  On the form, applicants must describe in detail the limitations resulting from their impairment and state when they could no longer work because of their conditions.  The signature page of the Disability Application reminds an applicant that he or she must answer these questions truthfully, as follows:

> I know that if I make a false or fraudulent statement in order to receive benefits from the RRB or if I fail to disclose earnings or report employment of any kind to the RRB, I am committing a crime which is punishable under Federal law.

At times, annuitants receiving disability payments are directed to file a Continuing Disability Update Report, known as a form G-254 or a form G-254A (collectively hereinafter referred to as a

11

"Disability Recertification"), in which they have to certify, under penalty of prosecution, certain facts about their physical condition and employment.

17.   At all times relevant to this Indictment, RRB claims examiners reviewing applications for disability generally:

a.   assumed that the doctor who provided a Medical Assessment and the applicant who submitted a Disability Application were telling the truth about the applicant's medical condition;

b.   relied on the applicant when the applicant stated, in response to a required question on the RRB Disability Application, that he or she was unable to continue working because of his or her medical condition;

c.   relied on the treating physician's statements about the medical condition of the applicant, including the doctor's opinion of exertional and environmental restrictions necessitated by the patient's medical condition; and

d.   relied on applicants' descriptions of their job requirements, set out in a Form G-251, to determine whether the applicants' medical conditions made them unable to fulfill their occupational duties.

18.   Prior to September 2008, the RRB generally requested review by an outside medical consultant or medical examiner only when the patient's application was incomplete or unclear in some manner, not as a method for detecting fraud.

12

Because the RRB examiners were not medical experts, they could request that a contracted consultant review medical records if the examiner believed that he or she could not interpret the disability medical evidence without expert advice.

### The Pattern Of Disability Claims
### At The Long Island Railroad

19.   Between 2004 and 2008, approximately 61% of LIRR employees who stopped working and began receiving some type of benefits from the RRB were between the ages of 50 and 55 years old.  By contrast, at Metro-North Railroad (a comparable commuter railroad which did not share LIRR's unique contract allowing for retirement as early as age 50), only approximately 7% of the employees who stopped working and started receiving RRB benefits were between the ages of 50 and 55.  Over 75% of LIRR workers receiving RRB occupational disability first retired while in their early fifties.  Given the way that the LIRR and RRB pensions work, as described above, absent a disability award, these retirees – who could retire as early as age 50 under a unique LIRR contract – would generally have had to rely only upon their LIRR pensions until the age of 65.

20.   During the period from 1995 through 2011, the percentage of former LIRR employees who obtained RRB disability benefits far exceeded the percentage of former Metro North Railroad employees who obtained RRB disabilities.  A year-by-year analysis of employees terminating their employment during this

period showed that overall, more than 75% of LIRR former employees obtained RRB disability benefits, while less than 25% of Metro North former employees obtained RRB disability benefits.  In addition, according to this analysis, in each year, at least 60% of LIRR employees who terminated their employment in that year obtained RRB disability benefits, while the number of Metro North employees never exceeded approximately 30% of the employees terminating employment in any particular year.  Indeed, in the peak year, 2004, approximately 88% of LIRR employees who terminated their employment in that year went on to obtain an RRB disability annuity.

21.   PETER J. LESNIEWSKI, the defendant, declared disabled the vast majority of the LIRR employees he saw as patients who were eligible to retire with an LIRR pension.

<u>Statutory Allegations</u>

22.   From at least in or about the 1990s, up to and including in or about 2011, in the Southern District of New York and elsewhere, PETER J. LESNIEWSKI, JOSEPH RUTIGLIANO, STEVEN GAGLIANO, and RICHARD EHRLINGER, the defendants, and others known and unknown, willfully and knowingly, combined, conspired, confederated and agreed together and with each other to violate Title 18, United States Code, Sections 1341, 1343 and 1347.

23.   It was a part and an object of the conspiracy that PETER J. LESNIEWSKI, JOSEPH RUTIGLIANO, STEVEN GAGLIANO, and RICHARD EHRLINGER, the defendants, and others known and unknown,

14

willfully and knowingly, having devised and intending to devise a
scheme and artifice to defraud, and for obtaining money and
property by means of false and fraudulent pretenses,
representations and promises, for the purpose of executing such
scheme and artifice and attempting so to do, would and did place
in a post office and authorized depository for mail matter, a
matter and thing to be sent and delivered by the Postal Service,
and would and did deposit and cause to be deposited a matter and
thing to be sent and delivered by a private and commercial
interstate carrier, and would and did take and receive therefrom,
a matter and thing, and would and did knowingly cause to be
delivered by mail and such carrier according to the direction
thereon, and at the place at which it was directed to be delivered
by the person to whom it was addressed, a matter and thing, in
violation of Title 18, United States Code, Section 1341.

        24.   It was a further part and object of the conspiracy
that PETER J. LESNIEWSKI, JOSEPH RUTIGLIANO, STEVEN GAGLIANO, and
RICHARD EHRLINGER, the defendants, and others known and unknown,
willfully and knowingly, having devised and intending to devise a
scheme and artifice to defraud and for obtaining money and
property by means of false and fraudulent pretenses,
representations, and promises, would and did transmit and cause to
be transmitted by means of wire, radio, and televison
communication in interstate and foreign commerce, writings, signs,

signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

25.   It was a further part and object of the conspiracy that PETER J. LESNIEWSKI, JOSEPH RUTIGLIANO, STEVEN GAGLIANO, and RICHARD EHRLINGER, the defendants, and others known and unknown, knowingly and willfully, would and did execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, a health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

(Title 18, United States Code, Section 1349.)

<u>COUNT TWO</u>
(Conspiracy to Defraud the United States RRB)

The Grand Jury further charges:

26.   The allegations contained in Paragraphs 1 through 21 are repeated and realleged as if fully stated herein.

27.   From at least in or about 1998, up to and including in or about 2011, in the Southern District of New York and elsewhere, PETER J. LESNIEWSKI, JOSEPH RUTIGLIANO, STEVEN GAGLIANO, and RICHARD EHRLINGER, the defendants, and others known and unknown, willfully and knowingly, combined, conspired,

16

confederated and agreed together and with each other to defraud the United States and an agency thereof, to wit, the RRB.

<u>Overt Acts</u>

28.    In furtherance of the conspiracy and to effect the illegal object thereof, PETER J. LESNIEWSKI, JOSEPH RUTIGLIANO, STEVEN GAGLIANO, and RICHARD EHRLINGER, the defendants, and their co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.    On or about November 6, 1998, Disability Doctor-2 signed a medical assessment relating to RICHARD EHRLINGER.

b.    On or about November 9, 1998, RICHARD EHRLINGER signed an application for RRB disability benefits.

c.    On or about March 24, 2011, RICHARD EHRLINGER mailed and caused to be mailed to the RRB's office in Manhattan, New York, a Disability Recertification.

d.    On or about September 28, 1999, PETER J. LESNIEWSKI signed a narrative relating to JOSEPH RUTIGLIANO.

e.    On or about December 21, 1999, JOSEPH RUTIGLIANO signed an application for RRB disability benefits.

f.    On or about March 22, 2011, JOSEPH RUTIGLIANO, the defendant, mailed and caused to be mailed to the RRB's office in Manhattan, New York, a Disability Recertification.

g.    On or about July 31, 2006, LESNIEWSKI signed a narrative relating to STEVEN GAGLIANO.

h.    On or about October 31, 2006, STEVEN GAGLIANO

17

signed an application for RRB disability benefits.

        i.    On or about August 25, 2010, STEVEN GAGLIANO signed a Disability Recertification.

        j.    On or about May 15, 2008, Disability Doctor-2 signed a narrative regarding Michael Stavola, a co-conspirator not named as a defendant herein.

        k.    On or about June 27, 2008, Michael Stavola, a co-conspirator not named as a defendant herein, signed an application for RRB disability benefits.

        l.    On or about March 21, 2011, Michael Stavola, a co-conspirator not named as a defendant herein, mailed and caused to be mailed to the RRB's office in Manhattan, New York, a Disability Recertification.

        m.    On or about November 28, 2006, PETER J. LESNIEWSKI signed a narrative relating to Gary Supper, a co-conspirator not named as a defendant herein.

        n.    On or about December 29, 2006, Gary Supper, a co-conspirator not named as a defendant herein, signed an application for RRB disability benefits.

        o.    On or about November 24, 2004, PETER J. LESNIEWSKI signed a narrative relating to Christopher Parlante, a co-conspirator not named as a defendant herein.

        p.    In or about 2004 or January 2005, JOSEPH RUTIGLIANO prepared a vocational report supplement relating to Christopher Parlante, a co-conspirator not named as a defendant herein.

q.   On or about February 3, 2005, Christopher Parlante, a co-conspirator not named as a defendant herein, signed an application for RRB disability benefits.

r.   On or about March 28, 2011, Christopher Parlante, a co-conspirator not named as a defendant herein, mailed and caused to be mailed to the RRB's office in Manhattan, New York, a Disability Recertification.

(Title 18, United States Code, Section 371.)

### COUNTS THREE THROUGH SIX
(Health Care Fraud)

The Grand Jury further charges:

29.   The allegations contained in Paragraphs 1 through 21 and 28 are repeated and realleged as if fully stated herein.

30.   From on or about the approximate first visit date set forth below, through in or about the approximate last claim paid date set forth below, in the Southern District of New York and elsewhere, the defendants named below, knowingly and willfully executed and attempted to execute a scheme and artifice to defraud health care benefit programs and obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, health care benefit programs, in connection with the delivery of and payment for health care benefits, items and services, to wit, the defendants fraudulently billed, and caused to be billed, private insurance carriers for unnecessary medical treatments, services,

19

and tests relating to the LIRR retiree named below:

| COUNT | Charged Defendants | LIRR Retiree | Approx. Date of First Visit | Approx. Last Claim Paid Date |
|-------|--------------------|--------------|-----------------------------|------------------------------|
| THREE | PETER J. LESNIEWSKI STEVEN GAGLIANO | STEVEN GAGLIANO | 11/25/03 | 06/22/07 |
| FOUR | PETER J. LESNIEWSKI | Gary Supper | 11/15/05 | 06/16/08 |
| FIVE | JOSEPH RUTIGLIANO | Michael Dasaro | 09/23/03 | 12/05/08 |

(Title 18, United States Code, Sections 1347 and 2.)

## COUNTS SIX THROUGH SEVEN
### (Mail Fraud)

The Grand Jury further charges:

31.  The allegations contained in Paragraphs 1 through 21 and 28 are repeated and realleged as if fully stated herein.

32.  On or about the dates listed below, in the Southern District of New York and elsewhere, the defendants named below, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting so to do, placed in a post office and authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal Service, and deposited and caused to be deposited a matter and thing to be sent and delivered by a private and commercial interstate carrier, and

20

took and received therefrom, a matter and thing, and knowingly
caused to be delivered by mail and such carrier according to the
direction thereon, and at the place at which it was directed to be
delivered by the person to whom it was addressed, a matter and
thing, to wit, the conspirator listed below as "Mailing
Conspirator," on the approximate dates listed below, for the
purpose of executing the fraudulent scheme and in furtherance of a
conspiracy with the other defendants named below as "Charged
Defendants," mailed and caused to be mailed a Disability
Recertification, to the RRB's offices in Manhattan, New York:

| COUNT | Charged Defendants | Mailing Conspirator | Approx. Date of Mailing |
|---|---|---|---|
| SIX | RICHARD EHRLINGER | RICHARD EHRLINGER | March 24, 2011 |
| SEVEN | PETER J. LESNIEWSKI JOSEPH RUTIGLIANO | Christopher Parlante | March 28, 2011 |
| EIGHT | PETER J. LESNIEWSKI JOSEPH RUTIGLIANO | JOSEPH RUTIGLIANO | March 22, 2011 |

(Title 18, United States Code, Sections 1341 and 2.)

## COUNTS NINE THROUGH TWELVE
(Wire Fraud)

The Grand Jury further charges:

33. The allegations contained in Paragraphs 1 through
21 and 28 are repeated and realleged as if fully stated herein.

34. Beginning no later than the annuity beginning date
set forth below, through at least in or about 2012, in the
Southern District of New York and elsewhere, the defendants named

21

below as "Charged Defendants," willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendants participated in a scheme to defraud the RRB by making false and fraudulent statements in order to obtain disability benefits, and in the course of executing such scheme, caused RRB disability payments to be transmitted by wire and radio through the Southern District of New York:

| COUNT | Charged Defendants | Disability Annuitant | Annuity Beginning Date |
|---|---|---|---|
| NINE | RICHARD EHRLINGER | RICHARD EHRLINGER | 03/01/1999 |
| TEN | PETER J. LESNIEWSKI STEVEN GAGLIANO | STEVEN GAGLIANO | 01/01/2007 |
| ELEVEN | PETER J. LESNIEWSKI JOSEPH RUTIGLIANO | Christopher Parlante | 04/01/2005 |
| TWELVE | PETER J. LESNIEWKI JOSEPH RUTIGLIANO | JOSEPH RUTIGLIANO | 04/01/2000 |

(Title 18, United States Code, Sections 1343 and 2.)

## COUNTS THIRTEEN AND FOURTEEN
(False Statements)

The Grand Jury further charges:

35.  The allegations contained in Paragraphs 1 through

21 and 28 are repeated and realleged as if fully stated herein.

36.  On or about the dates listed below, in the Southern District of New York and elsewhere, the following defendants, willfully, and knowingly, in a matter within the jurisdiction of the executive branch of the Government of the United States, falsified, concealed, and covered up by trick, scheme, and device material facts, and made materially false, fictitious, and fraudulent statements and representations, to wit, in Disability Recertification forms, filed with the RRB in Manhattan, New York, in response to the following question: "During the report period did you work for someone other than a railroad or were you self-employed," the defendants falsely checked "No":

| COUNT | Charged Defendant | Approx. Date of false statement |
|---|---|---|
| THIRTEEN | JOSEPH RUTIGLIANO | March 22, 2011 |
| FOURTEEN | RICHARD EHRLINGER | March 24, 2011 |

(Title 18, United States Code, Section 1001.)

## FORFEITURE ALLEGATIONS WITH RESPECT TO COUNTS ONE AND SEVEN THROUGH TWELVE

37.  As the result of committing one or more of the mail or wire fraud offenses as alleged in the counts listed below, the defendants listed below shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C § 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of one and more of these

offenses.

| Defendant | Counts |
|---|---|
| PETER J. LESNIEWSKI | One, Seven, Eight, Ten, **Eleven**, and Twelve |
| JOSEPH RUTIGLIANO | One, Seven, Eight, Eleven, **and** Twelve |
| STEVEN GAGLIANO | One and Ten |
| RICHARD EHRLINGER | One, Six and Nine |

<u>Substitute Assets Provision</u>

38.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of **due** diligence;

(2) has been transferred or sold to, or **deposited** with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property **which** cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b) and 21 U.S.C. § 853(p), to seek forfeiture of **any** other property of said defendants up to the value of the **above** forfeitable property.

(Title 18, United States Code, Sections 981, 982, **and** 1347;
Title 21, United States Code, Section 853(p);
Title 28, United States Code, Section 2461)

## FORFEITURE ALLEGATIONS WITH RESPECT TO
## COUNTS ONE AND THREE THROUGH SIX

39.   As the result of committing one or more of the Federal health care offenses, in violation of 18 U.S.C. §§ 1347 and 24, alleged in the counts listed below, the defendants listed below shall forfeit to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(7), and 28 U.S.C § 2461, all property, real and personal, that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of one or more of these offenses.

| Defendant | Counts |
|---|---|
| PETER J. LESNIEWSKI | One, Three, and Four |
| JOSEPH RUTIGLIANO | One and Five |
| STEVEN GAGLIANO | One and Three |
| RICHARD EHRLINGER | One |

### Substitute Assets Provision

40.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

25

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b) and 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

> (Title 18, United States Code, Sections 982;
> Title 21, United States Code, Section 853)

FOREPERSON

PREET BHARARA
United States Attorney

26

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

### PETER J. LESNIEWSKI,
### JOSEPH RUTIGLIANO, STEVEN GAGLIANO,
### RICHARD EHRLINGER,

**Defendants.**

### INDICTMENT

S10 11 Cr. 1091  (VM)

(Title 18, United States Code, Section 2, 371,
1341, 1343, 1347, 1349 and 1001)

PREET BHARARA
United States Attorney.

**A TRUE BILL**

Foreperson.

1/9/13  Fld Superseding Indictment.

Pitman, USMJ