UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                        :

UNITED STATES OF AMERICA
                                        :

      -v-
                                        :

PETER J. LESNIEWSKI,
MARIE BARAN,                         :
JOSEPH RUTIGLIANO, and
STEVEN GAGLIANO,                :

               Defendants.     :

------------------------------------x

**ORIGINAL**

<u>INDICTMENT</u>
S13 11 Cr. 1091 (VM)

## <u>COUNT ONE</u>
(Conspiracy to Commit Mail Fraud, Wire Fraud
and Health Care Fraud)

     The Grand Jury charges:

<u>The Defendants</u>

     1.   PETER J. LESNIEWSKI, the defendant, at all times relevant to this Indictment, was a Board-certified orthopedist. From at least in or about the 1990s up to and including no earlier than in or about 2008, LESNIEWSKI assisted retirees from the Long Island Rail Road Company ("LIRR") in applying for occupational disability benefits from the United States Railroad Retirement Board ("RRB"). LESNIEWSKI submitted medical reports to the RRB, recommending hundreds of LIRR workers for disability benefits. At times relevant to this Indictment, LESNIEWSKI worked with another orthopedist who is deceased ("Disability Doctor-2").

     2.   MARIE BARAN, the defendant, worked as an RRB district office manager, based in Westbury, New York, until her retirement in or about December 2006. No later than upon her

retirement, BARAN began working as a "facilitator" who purported to advise and assist LIRR workers in planning for post-retirement disability and in preparing disability applications for submission to the RRB.  In exchange for this service, BARAN was paid a fee of approximately $1200 per client, often in cash.

3.    JOSEPH RUTIGLIANO, the defendant, was a former LIRR conductor and union president who applied for and received RRB occupational disability benefits after his retirement, supported by a recommendation from PETER J. LESNIEWSKI, the defendant.  No later than upon his retirement, RUTIGLIANO also worked as a "facilitator" who purported to advise and assist LIRR workers in planning for post-retirement disability and in preparing disability applications for submission to the RRB.  In exchange for this service, RUTIGLIANO was paid a fee of approximately $1000 per client, often in cash.

4.    STEVEN GAGLIANO, the defendant, is a former LIRR employee who retired on an LIRR pension in or about August 2006. After retirement, he applied for and received RRB disability benefits.  GAGLIANO's application was supported by a recommendation from PETER J. LESNIEWSKI, the defendant.  In his disability application, STEVEN GAGLIANO, the defendant, falsely claimed to be unable to "do any of the physical labor required in his job as a signalman," because of "severe and disabling pain in back, shoulder & legs."  Nevertheless, in 2009, GAGLIANO successfully completed a 400-mile bike tour in northern New York.

2

<u>The Premeditated Disability Fraud Scheme</u>

5.     Various individuals, including the defendants and their co-conspirators, committed a fraud in which LIRR workers who were ready to retire falsely claimed to be disabled, including occupationally disabled, in order to receive extra benefits to which they were not entitled.  Specifically, LIRR employees, who were eligible to retire as early as age 50 with an LIRR pension, sought to supplement their LIRR pension with a separate RRB disability annuity which, when combined with their LIRR pension, resulted in a total income level that often approximated their pre-retirement, working income.

6.     This fraud was aided by participating doctors and by "facilitators," such as MARIE BARAN and JOSEPH RUTIGLIANO, the defendants, who prepared various false and exaggerated portions of the disability applications and at times served as liaisons between the retiring workers and participating doctors.

7.     Participants in the fraud typically took some or all of the following steps, among others:

a.     In anticipation of filing an RRB disability application, LIRR employees saw a doctor, such as PETER J. LESNIEWKSI, the defendant.  LESNIEWSKI accounted for approximately 13% of LIRR disability applications filed during the four-year period from in or about 2004 through in or about 2008.  Disability Doctor-2 accounted for approximately 26% of LIRR disability applications filed during that same time period.  A third well-

3

known "disability doctor," Peter J. Ajemian, who is named but not charged as a co-conspirator in Count Two below, accounted for approximately 47% of the LIRR disability applications filed during that same time period.  Accordingly, LESNIEWSKI, Disability Doctor-2, and Ajemian together accounted for approximately 86% of the LIRR disability applications filed during this time period.

        b.    The doctor prescribed for the LIRR employees – and billed their insurers for – a series of unnecessary medical tests, including at times rounds of x-rays, scans and nerve conduction tests, as well as purported treatments, including physical therapy, in order to pad the patients' medical files.

        c.    The LIRR employees generally paid the doctor between approximately $800 and $1200, often in cash, to prepare a medical assessment and illness narrative, or both, for submission to the RRB.

        d.    The doctor then prepared fabricated or exaggerated medical assessments and illness narratives, or both, in which he recommended a set of restrictions that, if bona fide, would have prevented the LIRR employees from continuing in their occupations.

        e.    Sometime after retiring in anticipation of receiving an LIRR pension, the LIRR employees, including STEVEN GAGLIANO, the defendant, submitted to the RRB disability applications that falsely claimed an inability to work, even though the employees were performing their jobs up until the time they retired, and could have continued to perform them beyond

4

retirement, if they had chosen to do so.  The LIRR retirees typically continued engaging in active physical activity after they retired.

f.   The LIRR employees paid one of a small group of so-called "facilitators," including MARIE BARAN and JOSEPH RUTIGLIANO, the defendants, to assist with the disability process by, among other things, working with the doctors' offices, coordinating the disability benefit applications of LIRR employees, and either filling out the applications or coaching the LIRR employees to fill out their disability applications in such a way as to maximize the likelihood that such employees would receive disability benefits.

g.   The doctors, BARAN, RUTIGLIANO and other participants did all of this knowing that the LIRR employees were not, in fact, disabled as claimed – that is, they were not, in fact, unable to perform their jobs because of medical impairments; rather, the employees were simply planning to retire and wished to supplement their LIRR pension benefits with RRB occupational disability payments.  In fact, the doctors, BARAN, RUTIGLIANO, and other participants knew full well that the LIRR employees, who were generally working full-time (and, indeed, who were often working overtime), had pre-planned the date on which they would declare themselves disabled, and that this scheduled date was contemporaneous with their projected retirement date.  The relevant doctor ordered and billed for unnecessary medical tests

and wrote exaggerated medical narratives to conceal the fact that the LIRR employees were paying the doctor to prepare disability applications when the employees were not in fact disabled as claimed.

8.    Before applying for RRB occupational disability benefits, certain LIRR employees applied for various forms of private disability insurance.  Benefits under those private insurance policies were triggered if the employees were later determined to be disabled.  After obtaining RRB disability benefits, these individuals then made claims on these private insurance policies.

9.    The doctors participating in the fraud profited by charging fees for preparing disability narratives and medical assessment forms, by obtaining new patient referrals from other LIRR employees and facilitators, and by billing private health insurers for unnecessary tests and visits.  This revenue provided financial motivation for them to participate in the fraud.

10.    The foreseeable loss to the RRB disability funds, if the fraudulent claims were paid out in full would be at least hundreds of millions of dollars.

The Defendants' Exploitation Of The Overlap Between The LIRR
Pension And The Railroad Retirement Board Disability Programs

11.    The RRB is an independent agency within the executive branch of the Federal Government that was created in the 1930s.  The RRB administers comprehensive retirement, survivor,

6

and benefit programs, including disability benefits, for the nation's railroad workers and their families, under the Railroad Retirement and Railroad Unemployment Insurance Acts. LIRR employees participate in the RRB disability program and in the RRB pension program. The RRB disability and pension programs are primarily funded by federal employment taxes paid by railroad employers and railroad employees nationwide and by certain federal income taxes paid by recipients of RRB pensions.

12. Retired LIRR workers can receive two pensions, but the minimum eligibility age is different for the two programs. First, LIRR workers are eligible for a pension paid by the LIRR. LIRR workers hired before 1988 may draw the LIRR pension at the age of 50, provided they have been employed for at least 20 years. Second, LIRR workers are eligible for a pension paid by the RRB, but most workers only become eligible for the full RRB pension at the age of 65. Thus, a 65-year old LIRR retiree receives two pension payments - one from LIRR and one from RRB. But qualifying 50-year old retirees receive only an LIRR pension, and generally must wait 15 years before receiving their full second, RRB pension.

13. An LIRR employee may obtain an RRB disability award after he or she has retired and stopped working, notwithstanding the fact that the employee collects an LIRR pension, if the employee convinces the RRB that he or she is disabled. This enables an LIRR worker to receive both the LIRR pension as well as

7

RRB payments prior to the time he or she would be eligible to receive an RRB pension.  For example, an LIRR worker who retired at age 50 would be eligible only for an LIRR pension, and would have to wait 15 years until her 65th birthday to begin collecting a supplemental RRB pension, thereby drawing a substantially lower income upon retirement.  However, if that worker was deemed occupationally disabled after she retired at the age of 50, then she could immediately begin collecting both her LIRR pension and RRB disability payments.  That retiree could then receive a combined disability/pension income that approximated her pre-retirement, working income.

14.  The RRB provides two types of disability annuities. First, a total disability annuity is based upon guidelines similar to those for Social Security disability; in other words, it requires a showing of a permanent and total disability.  Second, the RRB provides for "occupational disability" annuities for railroad workers who have permanent physical or mental impairments that prevent them from performing their specific railroad jobs, regardless of whether they might be capable of performing other work.  See 20 C.F.R. § 220.10(a).  A railroad worker is eligible to apply for an occupational disability at age 60 if he or she has 10 years of employment, or at any age with at least 20 years of employment.

15.  At all times relevant to this Indictment, the RRB has required medical findings to support a claim of occupational

disability, including "objective" tests and reports.  See 20
C.F.R. § 220.46.  Among other things, these medical findings must
be complete and detailed enough to allow the RRB to make a
determination about whether a claimant's disability is a
legitimate impairment, including "(1) [t]he nature and limiting
effects of the claimant's impairment(s) for any period in
question; (2) the probable duration of the claimant's
impairment(s); and (3) the claimant's residual functional capacity
to do work-related physical and mental activities."  Id.  A
"functional capacity test" is defined as "one of a number of tests
which provide objective measures of a claimant's maximal work
ability and includes functional capacity evaluations which provide
a systematic comprehensive assessment of a claimant's overall
strength, mobility, endurance and capacity to perform physically
demanding tasks, such as standing, walking, lifting, crouching,
stooping or bending, climbing or kneeling."  20 C.F.R. § 220.11.

　　　16.  Pursuant to federal regulations, the RRB must take
into account an applicant's statement concerning the intensity of
pain that he or she is suffering, as well as the treating
physician's descriptions of those symptoms.  While applicable
regulations require that the RRB determine that subjective
symptoms such as pain be consistent with objectively demonstrable
medical evidence, the regulations provide:

> Since symptoms sometimes suggest a greater
> severity of impairment than can be shown by
> objective medical evidence alone, the Board

will carefully consider any other information
the claimant may submit about his or her
symptoms.  The information that the claimant,
the claimant's treating or examining physician
or psychologist, or other persons provide
about the claimant's pain or other symptoms
(e.g., what may precipitate or aggravate the
claimant's symptoms, what medications,
treatments or other methods he or she uses to
alleviate them, and how the symptoms may
affect the claimant's pattern of daily living)
is also an important indicator of the
intensity and persistence of the claimant's
symptoms.  Because symptoms, such as pain, are
subjective and difficult to quantify, any
symptom-related functional limitations and
restrictions which the claimant, his or her
treating or examining physician or
psychologist, or other persons report, which
can reasonably be accepted as consistent with
the objective medical evidence and other
evidence, will be taken into account . . . .

See 20 C.F.R. § 220.114(c)(3).

17.  The regulations further provide that, if the

treating physician gives an opinion that is inconsistent with

other medical evidence, including opinions obtained by RRB medical

consultants, the RRB must resolve those inconsistencies based on

all the evidence in the case record.  In doing so, however, the

RRB must "give some extra weight to the treating source's

supported opinion(s) which interprets the medical findings about

the nature and severity of the impairment(s)."  20 C.F.R.

§ 220.112(d).  Thus, the regulatory system is vulnerable to abuse

by employees and treating physicians who falsify and exaggerate

symptoms, as the RRB is required to give their statements extra

weight.

18.  Typically, a treating physician completes and signs
an RRB Medical Assessment filing, known as a G-250 form
(hereinafter referred to as a "Medical Assessment").  The Medical
Assessment sets forth the doctor's view of objective medical
tests, medical findings, and required medical restrictions.

19.  As a critical part of the RRB disability process,
every applicant also must file an Application for Determination of
Employee's Disability, known as a Form AA-1d (hereinafter referred
to as a "Disability Application.")  On the form, applicants must
describe in detail the limitations resulting from their impairment
and state when they could no longer work because of their
conditions.  The signature page of the Disability Application
reminds an applicant that he or she must answer these questions
truthfully, as follows:

> I know that if I make a false or fraudulent
> statement in order to receive benefits from
> the RRB or if I fail to disclose earnings or
> report employment of any kind to the RRB, I am
> committing a crime which is punishable under
> Federal law.

At times, annuitants receiving disability payments are directed to
file a Continuing Disability Update Report, known as a form G-254
or a form G-254A (collectively hereinafter referred to as a
"Disability Recertification"), in which they have to certify,
under penalty of prosecution, certain facts about their physical
condition and employment.

20.  At all times relevant to this Indictment, RRB

11

claims examiners reviewing applications for disability generally:

a.   assumed that the doctor who provided a Medical Assessment and the applicant who submitted a Disability Application were telling the truth about the applicant's medical condition;

b.   relied on the applicant when the applicant stated, in response to a required question on the RRB Disability Application, that he or she was unable to continue working because of his or her medical condition;

c.   relied on the treating physician's statements about the medical condition of the applicant, including the doctor's opinion of exertional and environmental restrictions necessitated by the patient's medical condition; and

d.   relied on applicants' descriptions of their job requirements, set out in a Form G-251, to determine whether the applicants' medical conditions made them unable to fulfill their occupational duties.

21.   Prior to September 2008, the RRB generally requested review by an outside medical consultant or medical examiner only when the patient's application was incomplete or unclear in some manner, not as a method for detecting fraud. Because the RRB examiners were not medical experts, they could request that a contracted consultant review medical records if the examiner believed that he or she could not interpret the disability medical evidence without expert advice.

12

The Pattern Of Disability Claims
At The Long Island Railroad

22.   Between 2004 and 2008, approximately 61% of LIRR
employees who stopped working and began receiving some type of
benefits from the RRB were between the ages of 50 and 55 years
old.  By contrast, at Metro-North Railroad (a comparable commuter
railroad which did not share LIRR's unique contract allowing for
retirement as early as age 50), only approximately 7% of the
employees who stopped working and started receiving RRB benefits
were between the ages of 50 and 55.  Over 75% of LIRR workers
receiving RRB occupational disability first retired while in their
early fifties.  Given the way that the LIRR and RRB pensions work,
as described above, absent a disability award, these retirees
would generally have had to rely only upon their LIRR pensions
until the age of 65.

23.   During the period from 1995 through 2011, the
percentage of former LIRR employees who obtained RRB disability
benefits far exceeded the percentage of former Metro North
Railroad employees who obtained RRB disabilities.  A year-by-year
analysis of employees terminating their employment during this
period showed that overall, more than 75% of LIRR former employees
obtained RRB disability benefits, while less than 25% of Metro
North former employees obtained RRB disability benefits.  In
addition, according to this analysis, at least 60% of LIRR
employees who terminated their employment in that year obtained

13

RRB disability benefits, while the number of Metro North employees never exceeded approximately 30% of the employees terminating employment in any particular year.  Indeed, in the peak year, 2004, approximately 88% of LIRR employees who terminated their employment in that year went on to obtain an RRB disability annuity.

### The Participation Of Peter J. Lesniewski

24.   This fraud was perpetrated with the knowing and intentional involvement of PETER J. LESNIEWSKI, the defendant, who falsely declared retiring LIRR workers to be disabled when in truth and in fact the workers were not disabled.  Typically, LESNIEWSKI claimed that LIRR patients suffered from various musculoskeletal impairments, which can involve claims of soft tissue injury that are more difficult to confirm by objective criteria than are other impairments, and are often diagnosed clinically, based upon pain as subjectively reported by the patient.

25.   From in or about 2004 to in or about 2008, the total revenue from insurance billings and fees for PETER J. LESNIEWSKI, the defendant, was at least hundreds of thousands of dollars.

26.   PETER J. LESNIEWSKI, the defendant, declared disabled the vast majority of the LIRR employees he saw as patients who were eligible to retire with an LIRR pension.

14

## Statutory Allegations

27.  From at least in or about the 1990s, up to and including in or about 2011, in the Southern District of New York and elsewhere, PETER J. LESNIEWSKI, MARIE BARAN, JOSEPH RUTIGLIANO, and STEVEN GAGLIANO, the defendants, and others known and unknown, willfully and knowingly, combined, conspired, confederated and agreed together and with each other to violate Title 18, United States Code, Sections 1341, 1343 and 1347.

28.  It was a part and an object of the conspiracy that PETER J. LESNIEWSKI, MARIE BARAN, JCSEPH RUTIGLIANO, and STEVEN GAGLIANO, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting so to do, would and did place in a post office and authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal Service, and would and did deposit and cause to be deposited a matter and thing to be sent and delivered by a private and commercial interstate carrier, and would and did take and receive therefrom, a matter and thing, and would and did knowingly cause to be delivered by mail and such carrier according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was

addressed, a matter and thing, in violation of Title 18, United States Code, Section 1341.

29. It was a further part and object of the conspiracy that PETER J. LESNIEWSKI, MARIE BARAN, JOSEPH RUTIGLIANO, and STEVEN GAGLIANO, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and televison communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

30. It was a further part and object of the conspiracy that PETER J. LESNIEWSKI, MARIE BARAN, JOSEPH RUTIGLIANO, and STEVEN GAGLIANO, the defendants, and others known and unknown, knowingly and willfully, would and did execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, a health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United

States Code, Section 1347.

(Title 18, United States Code, Section 1349.)

**COUNT TWO**
(Conspiracy to Commit Mail Fraud, Wire Fraud
and Health Care Fraud)

The Grand Jury further charges:

31. The allegations contained in Paragraphs 2 through 3 and 5 through 23 are repeated and realleged as if fully stated herein.

32. Peter J. Ajemian, a co-conspirator not named as a defendant herein, at all times relevant to this Indictment, was a Board-certified orthopedist who, from at least in or about the 1990s up to and including in or about 2011, assisted retiring LIRR workers in applying for occupational disability benefits from the RRB. From in or about January 2008 until his termination on or about September 29, 2008, Ajemian was employed at a medical practice based in Rockville Centre, New York (the "Ajemian Practice"). Ajemian previously had worked at other Long Island-based practices.

33. Ajemian, together with his co-conspirators, also knowingly and intentionally executed a disability fraud scheme against the RRB that used the same methods as those described above in Count One. From 1998 through 2008, Ajemian created false and misleading medical reports for submission to the RRB recommending hundreds of retiring LIRR workers for disability

17

benefits, when in truth and in fact, as Ajemian well knew, the workers were not disabled.  Typically, Ajemian claimed that LIRR patients suffered from various musculoskeletal impairments, which can involve claims of soft tissue injury that are more difficult to confirm by objective criteria than are other impairments, and are often diagnosed clinically, based upon pain as subjectively reported by the patient.

34.  Among the "facilitators" that Ajemian's patients used to assist them in preparing and submitting fraudulent disability applications, were MARIE BARAN and JOSEPH RUTIGLIANO, the defendants.  BARAN and RUTIGLIANO assisted Ajemian's patients in preparing and submitting fraudulent applications for disability.  BARAN, RUTIGLIANO and other participants did this knowing that the LIRR employees were not, in fact, disabled as claimed – that is, they were not, in fact, unable to perform their jobs because of medical impairments; rather, the employees were simply planning to retire and wished to supplement their LIRR pension benefits with RRB occupational disability payments. Ajemian, BARAN, RUTIGLIANO, and other participants knew full well that the LIRR employees, who were generally working full-time (and, indeed, who were often working overtime), had pre-planned the date on which they would declare themselves disabled, and that this scheduled date was contemporaneous with their projected retirement date.

35.  Ajemian profited by charging fees for preparing

disability narratives and medical assessment forms, by obtaining
new patient referrals from other LIRR employees and facilitators,
and by billing private health insurers for unnecessary tests and
visits.  From in or about September 2004 to in or about September
2008, the total such revenue for Ajemian was at least hundreds of
thousands of dollars.

36.  Ajemian declared disabled the vast majority of the
LIRR employees he saw as patients who were eligible to retire with
an LIRR pension.

### Statutory Allegations

37.  From at least in or about the 1990s, up to and
including in or about 2011, in the Southern District of New York
and elsewhere, MARIE BARAN and JOSEPH RUTIGLIANO, the defendants,
together with Peter J. Ajemian and others known and unknown,
willfully and knowingly, combined, conspired, confederated and
agreed together and with each other to violate Title 18, United
States Code, Sections 1341, 1343 and 1347.

38.  It was a part and an object of the conspiracy that
MARIE BARAN and JOSEPH RUTIGLIANO, the defendants, together with
Peter J. Ajemian and others known and unknown, willfully and
knowingly, having devised and intending to devise a scheme and
artifice to defraud, and for obtaining money and property by means
of false and fraudulent pretenses, representations and promises,
for the purpose of executing such scheme and artifice and
attempting so to do, would and did place in a post office and

19

authorized depository for mail matter, a matter and thing to be
sent and delivered by the Postal Service, and would and did
deposit and cause to be deposited a matter and thing to be sent
and delivered by a private and commercial interstate carrier, and
would and did take and receive therefrom, a matter and thing, and
would and did knowingly cause to be delivered by mail and such
carrier according to the direction thereon, and at the place at
which it was directed to be delivered by the person to whom it was
addressed, a matter and thing, in violation of Title 18, United
States Code, Section 1341.

39.   It was a further part and object of the conspiracy
that MARIE BARAN and JOSEPH RUTIGLIANO, the defendants, together
with Peter J. Ajemian and others known and unknown, willfully and
knowingly, having devised and intending to devise a scheme and
artifice to defraud and for obtaining money and property by means
of false and fraudulent pretenses, representations, and promises,
would and did transmit and cause to be transmitted by means of
wire, radio, and televison communication in interstate and foreign
commerce, writings, signs, signals, pictures, and sounds for the
purpose of executing such scheme and artifice, in violation of
Title 18, United States Code, Section 1343.

40.   It was a further part and object of the conspiracy
that MARIE BARAN and JOSEPH RUTIGLIANO, the defendants, together
with Peter J. Ajemian and others known and unknown, the
defendants, and others known and unknown, knowingly and willfully,

would and did execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, a health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

(Title 18, United States Code, Section 1349.)

### COUNT THREE
(Conspiracy to Defraud the United States RRB)

The Grand Jury further charges:

41.   The allegations contained in Paragraphs 1 through 26 are repeated and realleged as if fully stated herein.

42.   From at least in or about the 1990s, up to and including in or about 2011, in the Southern District of New York and elsewhere, PETER J. LESNIEWSKI, MARIE BARAN, JOSEPH RUTIGLIANO, and STEVEN GAGLIANO, the defendants, and others known and unknown, willfully and knowingly, combined, conspired, confederated and agreed together and with each other to defraud the United States and an agency thereof, to wit, the RRB.

### Overt Acts

43.   In furtherance of the conspiracy and to effect the illegal object thereof, PETER J. LESNIEWSKI, MARIE BARAN, JOSEPH RUTIGLIANO, and STEVEN GAGLIANO, the defendants, and their co-

conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.    On or about September 28, 1999, PETER J. LESNIEWSKI signed a narrative relating to JOSEPH RUTIGLIANO.

b.    On or about December 21, 1999, JOSEPH RUTIGLIANO signed an application for RRB disability benefits.

c.    On or about March 22, 2011, JOSEPH RUTIGLIANO mailed and caused to be mailed to the RRB's office in Manhattan, New York, a Disability Recertification.

d.    On or about July 31, 2006, PETER J. LESNIEWSKI signed a narrative relating to STEVEN GAGLIANO.

e.    On or about October 31, 2006, STEVEN GAGLIANO signed an application for RRB disability benefits.

f.    On or about August 25, 2010, STEVEN GAGLIANO signed a Disability Recertification.

g.    In or about April 2008, MARIE BARAN, the defendant, prepared a "Vocational Report," RRB form G-251, in the name of Michael Stavola, a co-conspirator not named as a defendant herein.

h.    On or about May 15, 2008, Disability Doctor-2 signed a narrative regarding Michael Stavola, a co-conspirator not named as a defendant herein.

i.    In or about June 2008, MARIE BARAN, the defendant, prepared an application for RRB disability benefits in the name of Michael Stavola, a co-conspirator not named as a defendant herein.

j.    On or about June 27, 2008, Michael Stavola, a co-

conspirator not named as a defendant herein, signed an application for RRB disability benefits.

k.  On or about March 21, 2011, Michael Stavola, a co-conspirator not named as a defendant herein, mailed and caused to be mailed to the RRB's office in Manhattan, New York, a Disability Recertification.

l.  On or about November 28, 2006, PETER J. LESNIEWSKI signed a narrative relating to Gary Supper, a co-conspirator not named as a defendant herein.

m.  On or about December 29, 2006, Gary Supper, a co-conspirator not named as a defendant herein, signed an application for RRB disability benefits.

n.  On or about November 24, 2004, PETER J. LESNIEWSKI signed a narrative relating to Christopher Parlante, a co-conspirator not named as a defendant herein.

o.  In or about 2004 or January 2005, JOSEPH RUTIGLIANO prepared a vocational report supplement relating to Christopher Parlante, a co-conspirator not named as a defendant herein.

p.  On or about February 3, 2005, Christopher Parlante, a co-conspirator not named as a defendant herein, signed an application for RRB disability benefits.

q.  On or about March 28, 2011, Christopher Parlante, a

co-conspirator not named as a defendant herein, mailed and caused

to be mailed to the RRB's office in Manhattan, New York, a

Disability Recertification.

(Title 18, United States Code, Section 371.)

## COUNT FOUR
(Conspiracy to Defraud the United States RRB)

The Grand Jury further charges:

44.   The allegations contained in Paragraphs 2 through

3, 5 through 23, and 32 through 36 are repeated and realleged as

if fully stated herein.

45.   From at least in or about the 1990s, up to and

including in or about 2011, in the Southern District of New York

and elsewhere, MARIE BARAN and JOSEPH RUTIGLIANO, the defendants,

together with Peter J. Ajemian and others known and unknown,

willfully and knowingly, combined, conspired, confederated and

agreed together and with each other to defraud the United States

and an agency thereof, to wit, the RRB.

## Overt Acts

46.   In furtherance of the conspiracy and to effect the

illegal object thereof, MARIE BARAN and JOSEPH RUTIGLIANO, the

defendants, and their co-conspirators, committed the following

overt acts, among others, in the Southern District of New York and

elsewhere:

a.   On or about September 5, 2006, Peter J. Ajemian

signed a narrative regarding Regina Walsh, a co-conspirator not

named as a defendant herein.

     b.   On or about January 5, 2007, MARIE BARAN charged a $1200 fee to Regina Walsh.

     c.   On or about January 25, 2007, Regina Walsh signed an application for RRB disability benefits.

     d.   On or about July 29, 2008, MARIE BARAN instructed an LIRR employee to contact Maria Rusin, a co-conspirator not named as a defendant herein, and obtain an appointment with Peter J. Ajemian.

     e.   On or about March 3, 2011, Regina Walsh mailed and caused to be mailed to the RRB's office in Manhattan, New York, a Disability Recertification.

     f.   In or about 2008, MARIE BARAN spoke with Thomas DeLalla, a co-conspirator not named as a defendant herein.

     g.   In or about December 2008, Peter J. Ajemian provided to the RRB medical documentation relating to Thomas DeLalla.

     h.   On or about December 9, 2008, Thomas DeLalla signed an application for RRB disability benefits.

     i.   On or about March 15, 2011, Thomas DeLalla mailed and caused to be mailed to the RRB's office in Manhattan, New York, a Disability Recertification.

     j.   On or about May 1, 2008, Peter J. Ajemian signed a narrative relating to Philip Pulsonetti, a co-conspirator not named as a defendant herein.

k.    In or about June 2008, MARIE BARAN prepared a disability application in the name of Philip Pulsonetti.

l.    On or about June 19, 2008, MARIE BARAN charged a $1200 fee to Philip Pulsonetti.

m.    On or about June 23, 2008, Philip Pulsonetti signed an application for RRB disability payments.

n.    On or about March 12, 2011, Philip Pulsonetti mailed and caused to be mailed to the RRB's office in Manhattan, New York, a Disability Recertification.

o.    On or about August 11, 2006, Peter J. Ajemian signed a narrative regarding Michael Dasaro, a co-conspirator not named as a defendant herein.

p.    In or about 2006, JOSEPH RUTIGLIANO prepared a vocational report supplement relating to Michael Dasaro.

q.    On or about January 8, 2007, Michael Dasaro signed an application for RRB disability benefits.

r.    On or about March 7, 2011, Michael Dasaro mailed and caused to be mailed to the RRB's offices in Manhattan, New York a Disability Recertification.

(Title 18, United States Code, Section 371.)

## COUNTS FIVE THROUGH TEN
(Health Care Fraud)

The Grand Jury further charges:

47.    The allegations contained in Paragraphs 1 through 26, and 32-36 are repeated and realleged as if fully stated

herein.

48.    From on or about the approximate first visit date
set forth below, through at least on or about the approximate last
claim paid date set forth below, in the Southern District of New
York and elsewhere, the defendants named below, knowingly and
willfully executed and attempted to execute a scheme and artifice
to defraud health care benefit programs and to obtain, by means of
false and fraudulent pretenses, representations, and promises,
money and property owned by, and under the custody and control of,
health care benefit programs, in connection with the delivery of
and payment for health care benefits, items and services, to wit,
the defendants fraudulently billed, and caused to be billed,
private insurance carriers for unnecessary medical treatments,
services, and tests relating to the LIRR retiree named below.

| COUNT | Charged Defendants | LIRR Retiree | Approx. Date of First Visit | Approx. Last Claim Paid Date |
|-------|--------------------|--------------|------------------------------|-------------------------------|
| FIVE | PETER J. LESNIEWSKI STEVEN GAGLIANO | STEVEN GAGLIANO | 11/25/03 | 06/22/07 |
| SIX | PETER J. LESNIEWSKI | Gary Supper | 11/15/05 | 06/16/08 |
| SEVEN | JOSEPH RUTIGLIANO | Michael Dasaro | 09/23/03 | 03/27/10 |
| EIGHT | MARIE BARAN | Regina Walsh | 10/10/05 | 06/19/07 |
| NINE | MARIE BARAN | Michael Stavola | 05/06/04 | 10/02/09 |
| TEN | MARIE BARAN | Philip Pulsonetti | 09/13/07 | 02/05/11 |

(Title 18, United States Code, Sections 1347 and 2.)

**COUNTS ELEVEN THOUGH SIXTEEN**
(Mail Fraud)

The Grand Jury further charges:

49.   The allegations contained in Paragraphs 1 through 26, and 32-36 are repeated and realleged as if fully stated herein.

50.   On or about the dates listed below, in the Southern District of New York and elsewhere, the following defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting so to do, placed in a post office and authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal Service, and deposited and caused to be deposited a matter and thing to be sent and delivered by a private and commercial interstate carrier, and took and received therefrom, a matter and thing, and knowingly caused to be delivered by mail and such carrier according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, a matter and thing, to wit, for the purposes of executing the fraudulent scheme of the defendants listed below as "Charged Defendants," the person listed below as "Mailing Individual," on the approximate dates listed below, mailed and caused to be mailed a Disability

28

Recertification to the RRB's offices in Manhattan, New York:

| COUNT | Charged Defendants | Mailing Individual | Approx. Date of mailing |
|-------|-------------------|--------------------|------------------------|
| **ELEVEN** | MARIE BARAN | Regina Walsh | March 7, 2011 |
| **TWELVE** | JOSEPH RUTIGLIANO | Michael Dasaro | March 7, 2011 |
| **THIRTEEN** | MARIE BARAN | Philip Pulsonetti | March 12, 2011 |
| **FOURTEEN** | MARIE BARAN | Michael Stavola | March 21, 2011 |
| **FIFTEEN** | PETER J. LESNIEWSKI JOSEPH RUTIGLIANO | JOSEPH RUTIGLIANO | March 22, 2011 |
| **SIXTEEN** | PETER J. LESNIEWSKI JOSEPH RUTIGLIANO | Christopher Parlante | March 28, 2011 |

(Title 18, United States Code, Sections 1341 and 2.)

## COUNTS SEVENTEEN THROUGH TWENTY-THREE
### (Wire Fraud)

The Grand Jury further charges:

51.  The allegations contained in Paragraphs 1 through 26, and 32-36, are repeated and realleged as if fully stated herein.

52.  Beginning no later than the annuity beginning date set forth below, through at least in or about 2012, in the Southern District of New York and elsewhere, the following defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication

29

in interstate and foreign commerce, writings, signs, signals,
pictures, and sounds for the purpose of executing such scheme and
artifice, to wit, the defendants listed below as "Charged
Defendants" participated in a scheme to defraud the RRB by making
false and fraudulent statements in order to obtain disability
benefits for the individual listed below as "Disability
Annuitant," and in the course of executing such scheme, caused RRB
disability payments to be transmitted by wire and radio through
the Southern District of New York:

| COUNT | Charged Defendants | Disability Annuitant | Annuity Beginning Date |
|-------|-------------------|---------------------|------------------------|
| **SEVENTEEN** | PETER J. LESNIEWSKI JOSEPH RUTIGLIANO | JOSEPH RUTIGLIANO | 04/01/00 |
| **EIGHTEEN** | PETER J. LESNIEWSKI JOSEPH RUTIGLIANO | Christopher Parlante | 04/01/05 |
| **NINETEEN** | PETER J. LESNIEWSKI STEVEN GAGLIANO | STEVEN GAGLIANO | 01/01/07 |
| **TWENTY** | MARIE BARAN | Regina Walsh | 02/01/07 |
| **TWENTY-ONE** | JOSEPH RUTIGLIANO | Michael Dasaro | 05/01/07 |
| **TWENTY-TWO** | MARIE BARAN | Philip Pulsonetti | 10/01/08 |
| **TWENTY-THREE** | MARIE BARAN | Michael Stavola | 11/01/08 |

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TWENTY-FOUR
(False Statements)

The Grand Jury further charges:

53.   The allegations contained in Paragraphs 1 through

26, and 32-36 are repeated and realleged as if fully stated herein.

54.   On or about March 22, 2011, in the Southern District of New York and elsewhere, JOSEPH RUTIGLIANO, the defendant, willfully, and knowingly, in a matter within the jurisdiction of the executive branch of the Government of the United States, falsified, concealed, and covered up by trick, scheme, and device material facts, and made materially false, fictitious, and fraudulent statements and representations, to wit, in Disability Recertification forms, filed with the RRB in Manhattan, New York, in response to the following question: "During the report period did you work for someone other than a railroad or were you self-employed," RUTIGLIANO falsely checked "No."

(Title 18, United States Code, Section 1001.)

### FORFEITURE ALLEGATIONS WITH RESPECT TO COUNTS ONE, TWO, AND ELEVEN THROUGH TWENTY-THREE

55.   As the result of committing one or more of the mail fraud offenses in violation of 18 U.S.C. § 1341 as alleged in Counts One, Two, and Eleven through Sixteen of this Indictment, and one or more of the wire fraud offenses in violation of 18 U.S.C. § 1343 as alleged in Counts One, Two, and Seventeen through Twenty-Three of this Indictment, PETER J. LESNIEWSKI, MARIE BARAN, JOSEPH RUTIGLIANO, and STEVEN GAGLIANO, the defendants, shall forfeit to the United States, pursuant to 18 U.S.C.

31

§ 981(a)(1)(C), and 28 U.S.C § 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of one and more of these offenses.

<u>Substitute Assets Provision</u>

56. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b) and 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981, 982;<br>Title 21, United States Code, Section 853;<br>Title 28, United States Code, Section 2461)

<b><u>FORFEITURE ALLEGATIONS WITH RESPECT TO COUNTS ONE, TWO,<br>AND FIVE THROUGH TEN</u></b>

57. As the result of committing one or more of the Federal health care offenses in violation of 18 U.S.C. § 24 and

32

§ 1347, alleged in Counts One, Two, and Five through Ten of this Indictment, PETER J. LESNIEWSKI, MARIE BARAN, JOSEPH RUTIGLIANO, and STEVEN GAGLIANO, the defendants, shall forfeit to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(7), and 28 U.S.C § 2461 all property, real and personal, that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of the offenses.

<u>Substitute Assets Provision</u>

58.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C.

§ 982(b) and 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981, 982;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461)


_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

### PETER J. LESNIEWSKI,
### MARIE BARAN, JOSEPH RUTIGLIANO, and
### STEVEN GAGLIANO,

**Defendants.**

### INDICTMENT

S13 11 Cr. 1091  (VM)

(Title 18, United States Code, Section 2, 371,
1341, 1343, 1347, 1349 and 1001)

PREET BHARARA
United States Attorney.

**A TRUE BILL**

_Kathleen Smith_
Foreperson.

4/17/13 - Filed Super sealing Indictment
dc                  Judge Francis
                    U.S.M.J.