D678LESC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                                    11 Cr. 1091 (VM)

PETER LESNIEWSKI,
MARIE BARAN,
JOSEPH RUTIGLIANO,
STEVEN GAGLIANO,

                Defendants.

------------------------------x

                            June 7, 2013
                            2:10 p.m.

Before:

                HON. VICTOR MARRERO

                            District Judge

                    APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
BY:  JUSTIN S. WEDDLE
     NICOLE W. FRIEDLANDER
     DANIEL B. TEHRANI
     Assistant United States Attorneys

DURKIN & ROBERTS
     Attorneys for Defendant Lesniewski
BY:  THOMAS A. DURKIN

KOEHLER & ISAACS, LLP
     Attorneys for Defendant Baran
BY:  JOEY JACKSON

JOSEPH W. RYAN, JR.
     Attorney for Defendant Rutigliano

STEPHEN P. SCARING
     Attorney for Defendant Gagliano

D678LESC

```
1              (In open court)
2              THE COURT:  Good afternoon.  This is a proceeding in
3    the matter of United States v. Lesniewski, docket number 11 Cr.
4    1091.
5              Counsel, please enter your appearances for the record.
6              MR. WEDDLE:  Justin Weddle for the government.  I am
7    here with Nicole Friedlander and Daniel Tehrani.
8              MR. DURKIN:  Tom Durkin on behalf of the defendant
9    Peter Lesniewski who is present.
10             MR. JACKSON:  Joey Jackson of Koehler & Isaacs for
11   Marie Baran, who is sitting to my left.
12             MR. RYAN:  Joe Ryan for Joey Rutigliano.
13             MR. SCARING:  Stephen Scaring for Mr. Gagliano.
14             THE COURT:  The Court has scheduled this conference of
15   some months ago as the final pretrial conference in this
16   matter, which is scheduled to proceed to trial in roughly one
17   month.
18             Mr. Weddle, would you bring the court up-to-date on
19   the status of the matter insofar as preparation for trial and
20   any possibility of any further dispositions short of trial?
21             MR. DURKIN:  If I could, I have a matter I would like
22   to raise before we begin.
23             THE COURT:  Is it a matter of such urgency that needs
24   to be raised at this time?
25             MR. DURKIN:  I think so.  I can wait for Mr. Weddle.
```

D678LESC

There is something of concern that we have that I would like to
raise as soon as possible.

THE COURT:  Is the government aware of whatever it is
that you have to raise?

MR. DURKIN:  No.

THE COURT:  Mr. Weddle.

MR. WEDDLE:  There is some suspense there, your Honor.

I think we are on track for our July 15 trial from the
government's point of view.  We obtained the superseding
indictment in the beginning of May, which is denoted S14.  So
that indictment does what we discussed after the February
trial, or at the time of the February trial was adjourned, that
is, it puts these four defendants together in a single trial.

We have been obviously making discovery from the
beginning, from the time that this case began.  We have made
extensive discovery.  And as we collect material and as we
prepare for trial and find things that may have slipped through
the cracks, we are continuing to produce those things as
promptly as we can.

Our prediction for the trial is still that it's about
a four-week trial, your Honor.  We currently count about 25
witnesses.  That's not counting custodial witnesses and
witnesses on relatively technical matters like venue.  We have
had some discussion with defense counsel about stipulations
that would cover those matters, and defense counsel have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D678LESC

1    been -- I don't want to overstate it, but they have not been

2    dismissive.  They have been somewhat receptive to the idea of a

3    stipulation, but they wanted to see the written stipulation.

4    So we are in the process of drafting those up and that should

5    help keep the trial to the length that I have described.

6            Among the witnesses, we have a number of cooperators,

7    as your Honor is aware.  So every cooperator tends to take a

8    significant amount of time at a trial.  I estimate eight or so

9    cooperator type witnesses, one expert witness, and then a

10   number of other witnesses, including summary witnesses who are

11   going to talk about pattern evidence that we have briefed

12   before and things that like.

13           So that's kind of the outline of the trial.  We are on

14   track for making disclosures on the timeline that was

15   previously ordered by the Court with respect to the February

16   trial.  That is, we have made expert disclosure.  We have

17   supplemented it I believe two times.  We are going to continue

18   to supplement it as necessary.  The expert disclosure relates

19   to this medical doctor, @Dr. Baron.

20           We are looking forward to a few deadlines coming up.

21   30 days prior to trial we plan to make in limine motions, which

22   would include our 404(b) type notice, and we have in mind a

23   number of other motions that would go into in limine motions,

24   which I can preview for your Honor.  We plan to produce a

25   witness list at that time.  I think our further deadlines are

D678LESC

1    two weeks before trial to produce an exhibit list, and I

2    anticipate we will be producing the exhibits themselves at the

3    same time.  And two weeks before trial producing 3500 material.

4         We have already produced a large number of interview

5    memos in the course of discovery.  So some of the 3500 material

6    may be duplicative, but we plan to put together the 3500

7    material and probably some other interview memos for

8    non-testifying people two weeks before trial.

9         We are also looking forward to reverse disclosure,

10   that is disclosure by the defense to the government.  We

11   received some documentary discovery from Steven Gagliano months

12   ago, but have received no Rule 16 discovery from any other

13   defendant.  I assume and I hope that as they now are getting

14   close to the trial date, they are forming intentions to

15   introduce their own documents and things at the trial, and to

16   the extent they are forming those intentions, Rule 16 requires

17   them to turn that material over.  So we hope that they will do

18   that and comply with the rule.

19        Their deadline for expert disclosure is 30 days before

20   trial.  As I have said, we have disclosed our expert notice on

21   time and then supplemented it.  We have also disclosed the

22   actual names of the particular files that our expert, our

23   medical doctor -- I'm sorry.  If I could withdraw that.  We had

24   an agreement with one defendant to make some additional

25   disclosure relating to the expert, and we have done that, but

D678LESC

```
1    it only applies to one defendant.  So let me just withdraw
2    that.
3              So the defense expert disclosure, to the extent they
4    intend to call any experts, is 30 days before trial.  So we are
5    looking forward to that as well.
6              I don't know what Mr. Durkin's issue is going to be
7    that he is going to raise.
8              I guess the final thing I would typically do at a
9    final pretrial conference is to discuss pleas, and your Honor
10   inquired about the possibility of resolution.  Our office's
11   policy, as we have notified the defendants, is we only make
12   plea offers in writing.  So typically at a final pretrial
13   conference we would set forth on the record the dates of
14   written plea offers that we have made so that the record is
15   clear, in light of the Lafler and Frye cases, what the plea
16   offers have been and that the defendants themselves know that
17   there have or have not been plea offers.
18             We have obviously discussed the possibility of
19   resolution with each defense counsel here and have been told
20   that no defendant has any real interest in a resolution short
21   of trial.  So unless there is some interest from a defendant,
22   we don't normally formulate a plea offer, and we have not made
23   any plea offers with respect to these defendants.
24             THE COURT:  Thank you.
25             Before turning the floor over to Mr. Durkin, let me
```

7

D678LESC

respond to a couple of points to what Mr. Weddle has indicated

concerning the schedule and the procedures.

Bear in mind that if we begin this trial in the middle

of July, July 15, and according to the government it may go at

least four weeks, I assume, Mr. Weddle, when you said four

weeks, is that for the government's case or does that

contemplate the defense as well?

MR. WEDDLE:  That's for the government's case.  We try

to make an estimate about cross-examination and things like

that, but that's really the government's case.  Obviously, your

Honor, as we get closer to trial, we hope very much to

streamline the case as much as possible.

THE COURT:  It is that streamline theme that I wanted

to emphasize at this point.

If the government's projection bears out and we are

four weeks into this case, it's going to be into the middle of

August, and I know that some of you may be at that point

getting somewhat antsy about vacation schedules and other

commitments.  So it would be very critical, or it is very

critical for us to do everything conceivable to make sure that

we remain within the time frame that will allow us to conclude

the trial by the scheduled time of the middle of August.

To that end, there are some things I would urge and

almost insist that the parties do.  Mr. Weddle may do at least

one of them, which is endeavoring to limit the witnesses who

D678LESC

```
 1   are not necessary to testify to substantive matters.  If you
 2   have witnesses whose sole purpose is to authenticate documents
 3   or dates or matters that don't go to substance, I would ask the
 4   parties to stipulate to those facts and circumstances so that
 5   we don't need to have live witnesses brought for those
 6   purposes.  It takes much more time to do that than to read a
 7   simple stipulation into the record on such matters as document
 8   authentication, etc.
 9           Second, this is very crucial, as to exhibits, it is
10   the Court's practice at trial to ask the parties to review all
11   documents that are proposed to be introduced at the trial and
12   to identify in bulk those as to which there is no objection or
13   reason for objection, and those are then identified in the
14   record early on en masse.  In other words, the government will
15   read the list of those documents that it seeks to introduce as
16   to which there is no objection from any defendant.  During the
17   course of the trial, then we don't need to have specific
18   individual introduction of those documents.  The government
19   simply puts them in and there will have been a record that
20   those are accepted without objection.  If there are objections
21   as to other documents, we will deal with the objections
22   separately as those documents are introduced.  That procedure
23   is intended to and, in this Court's experience, saves an
24   enormous amount of time because it does not require an
25   individual introduction of documents and then an individual
```

D678LESC

1    determination or demonstration by each defendant as to whether

2    or not there are objections to the documents.

3           So pay careful attention to those two guidelines, and

4    we should be able to save tremendous amounts of time if they

5    are complied with.

6           All right.  If there is nothing else from the

7    government, Mr. Durkin, you asked for the floor.

8           MR. DURKIN:  Thank you, Judge.

9           Judge, the issue I want to raise, I just mentioned in

10   passing.  I did not raise it with the government because I did

11   not expect them to entertain any agreement.  The issue I want

12   to raise with you, and I raise this delicately and

13   respectfully, and I wanted to raise it orally first, because

14   you don't know me and I don't know you, but it's an issue

15   regarding disqualification that I don't normally make lightly,

16   I would never make lightly, and I am certainly not making it

17   lightly in this case, but I thought it best if I raised it

18   orally first.

19          My client is concerned, and I think with some

20   justification, that there is at least an appearance that the

21   Court cannot be impartial based on its statements that it made

22   in the public filing that it did, docket number 399, when it

23   filed a record after the Ajemian sentencing.

24          THE COURT:  Mr. Durkin, let me see if we can cut this

25   short.  Whatever the Court said pertained to Mr. Ajemian and

D678LESC

1    his circumstances, his record, his involvement in the

2    conspiracy, and nothing else and no one else.

3         MR. DURKIN:  That's the problem I have, if I could

4    just raise it.  I don't want to be combative or argumentative.

5    I have great respect for you, and I don't make this

6    presentation lightly.

7         THE COURT:  The other thing, Mr. Durkin, is you're

8    kind of prejudging your own client's circumstance.  How do you

9    know he is going to be found guilty?

10        MR. DURKIN:  If I could just explain to you what I am

11   concerned about.

12        I was concerned about the fact that this was filed of

13   record to begin with, which is not critically important.  There

14   are two portions of the statement that concern us greatly.  The

15   first is that in the very beginning of your statement you

16   suggest that:  "This proceeding presents an illustration of the

17   staggering harm the criminal mind can bring about by means of

18   another device not ordinarily perceived as meant for breaking

19   the law:  The stethoscope."

20        Then this is the sentence that is very troubling.

21   "The case demonstrates, at least symbolically, how professional

22   methods and instruments developed to advance medical treatment

23   were perversely misused by this defendant and others to further

24   criminal ends."

25        And the reason we are concerned is that there is only

D678LESC

1    one other person alive in this conspiracy, and only one other

2    person waiting for trial who is licensed to use a stethoscope

3    in this case, and that's my client.

4            THE COURT:  Mr. Durkin, that is misleading of the

5    Court's statement.  The methods are used by Dr. Ajemian and his

6    co-conspirators, meaning those who were convicted, who have

7    pled guilty to being part of that conspiracy, as involved in

8    Dr. Ajemian's actions and Dr. Ajemian himself.  That statement

9    is not intended to refer to anybody else but Dr. Ajemian and

10   the codefendants who have pled guilty of the acts of which he

11   was found guilty and sentenced.  If that is of any comfort to

12   your client, that is what the Court intended.  I did not intend

13   to make any reference to any other defendant not found guilty

14   at this point.

15           MR. DURKIN:  I understand that.  I am not suggesting

16   that you would have intentionally done that.  Your reputation

17   precedes you, and I know you wouldn't have intentionally done

18   that.  But under 28 U.S.C. 455(a), the issue is appearance of

19   impropriety.  I'm sorry.  Not impropriety.  The appearance of a

20   lack of impartiality.

21           If I could give you one other instance.  Again, I am

22   not saying that you would have done it intentionally.  I

23   wouldn't suggest for a minute that you would have intentionally

24   caused a problem.  I think the statement speaks for itself.

25           THE COURT:  Apparently, the first statement didn't

D678LESC

1    speak for itself because you misunderstood it.

2                MR. DURKIN:  Perhaps I did.  That's the problem with

3    appearance of impropriety.  I am not the only person that I

4    have talked to about this who understood it that way.  And

5    that's one of the problems with the appearance of impropriety.

6                The second problem that has arisen is on page 5, you

7    talk about what you call the pathological transformation of

8    Ajemian, referring to the use of his medical skills primarily.

9    But you say, "Through his fraudulent procedures he facilitated

10   the conversion of many Long Island Railroad employees into

11   convicted felons."

12               Now, I know you're only talking about Ajemian there.

13               THE COURT:  Ajemian and those others who were part of

14   the conspiracy who were convicted.  Who else is there?

15               MR. DURKIN:  I understand.  The central problem that

16   we have, and this is what I would like you to at least

17   consider, the government posited a theory of its evidence that

18   the physicians were the gatekeepers or the persons responsible

19   for this entire conspiracy.  We believe, and I believe that's

20   what caused the friction at the sentencing, I believe that in

21   Dr. Ajemian's counsel's pleading, which challenged the version

22   of the offense that was incorporated into the presentence

23   report based on the government's presentation, he challenged

24   this issue of gatekeeping.  And I understand the dynamics of a

25   courtroom and the dynamics of pleadings, but the challenge he

D678LESC

1    made over this gatekeeper theory is essentially the legal and

2    factual challenge we are going to be making in this entire

3    case.  We are confident that when you hear all this evidence,

4    you will not be able to make the same findings.

5         THE COURT:  Mr. Durkin, it is not I who is going to

6    make the finding; it is the jury.

7         MR. DURKIN:  You also have to sentence.  There are two

8    prongs to my concern.  It's not just the trial.  You are the

9    sentencing judge.  And you have, to me, and I again say this

10   respectfully, taken a position that these doctors were

11   responsible --

12        THE COURT:  No, Mr. Durkin, one doctor, Dr. Ajemian.

13   He was the only one who pled guilty, and there is a public

14   record that he committed the acts charged by the government.

15   Based on that public record, public admission, public

16   conviction, the Court made findings about the extent of his

17   culpability for the purposes of sentencing.  It does not refer

18   to anybody else.

19        MR. DURKIN:  I understand what you're saying.  But I

20   believe if you read this entire statement in context, I believe

21   a reasonable person could come to the same interpretation we

22   come to, which therefore causes the appearance of impropriety.

23   I keep using impropriety.  I don't mean that.  I believe the

24   statute reads lack of impartiality.

25        I am happy to file the motion, but I didn't want to

D678LESC

1    file a motion like that without first addressing it with you

2    orally.  I would ask you to consider disqualifying yourself.

3              THE COURT:  Thank you.

4              Anything else?

5              MR. DURKIN:  No.

6              THE COURT:  Mr. Durkin, I think I understand what

7    you're saying, in the same way that I hope you understand what

8    I was saying.  I do not believe that you have given any

9    sufficient reasonable grounds for the concern that you and your

10   client have.  I will not consider any such motion.  If you make

11   such a motion, I will deny it.

12             MR. DURKIN:  Thank you.

13             THE COURT:  Anything else from any other defendant?

14             MR. SCARING:  I have something.  There has been an

15   enormous amount of publicity in this case, press conferences,

16   press releases.  Every time a defendant takes a plea, there is

17   so much out in the public today about the Long Island Railroad

18   employees and the alleged scheme that I am concerned that we

19   need to address that in some way different than we would

20   otherwise in the selection process.

21             I was wondering if your Honor would consider, on the

22   question of publicity, individually voir diring the jurors.

23   Again, enormous publicity in this case, including The New York

24   Times front page stories on this, repetitive press releases,

25   repetitive press conferences.  The public is easily swayed, but

D678LESC

1    it is not so easy to then dissuade them.  And as your Honor

2    knows, the normal voir dire process goes along rather quickly

3    and many jurors have things they want to say, but because they

4    are in a crowd or in a group, they simply don't say it.

5           So given the length of this trial, since it's going to

6    be a long trial, if we were to spend an extra day to make sure

7    that the publicity has not impacted these jurors, I think that

8    would be an extra day well spent, and I request that your Honor

9    consider that.  I would be happy to speak with the government

10   and try to come up with some process, and co-counsel, that

11   might effectuate that in a reasonable way.

12          THE COURT:  All right.  Thank you.

13          I think your concern is certainly not unreasonable and

14   you're free to discuss the matter with the government, and if

15   you can come up with any additional assurances that will give

16   you greater comfort about the issue of publicity there should

17   be no problem.  As you undoubtedly know, part of the standard

18   voir dire of the court is to ask parties whether they have had

19   any prior knowledge about any of the circumstances of the case,

20   whether they have read anything about it, and if so, the court

21   typically asks for more detail.  So that is already built into

22   our standard voir dire.  Look at those questions in our

23   standard voir dire and if there is some supplementary question

24   that you believe might give you greater comfort, by all means

25   the court will consider that.

D678LESC

1        That said, I also have faith that there are enough

2    people out there in a huge jury pool, as this one is likely to

3    generate, who either may have heard about the case and could

4    still satisfy the court and the parties that they can be

5    impartial, or, as high profile cases such as the OJ and the

6    World Trade Center bombers will attest, people could be found

7    to have never heard of the matter.

8        Mr. Durkin.

9        MR. DURKIN:  Along the lines of jury selection, we

10   have drafted a request for a jury questionnaire and a jury

11   questionnaire itself.  I am going to circulate that to our

12   co-counsel over the weekend, and I will get a draft to the

13   government so that they can look at it, but I think that would

14   be appropriate as well.

15       THE COURT:  Thank you.

16       Mr. Weddle.

17       MR. WEDDLE:  Thank you, your Honor.

18       I don't have as much experience as many of the lawyers

19   in the room, but I have done some very lengthy trials in this

20   courthouse and based on my experience, I find questionnaires to

21   be a waste of time.  My experience is that they are lengthy,

22   they are lengthy to prepare and to distribute, they take an

23   extraordinary amount of time to review, and most of the answers

24   are somewhat cursory or ambiguous, and therefore the court is

25   just left with following up on every question anyway.

D678LESC

```
 1              So I am obviously happy to look at whatever counsel
 2     submits, but I think that this is not the most well-known case
 3     in this courthouse.  This courthouse deals with cases that are
 4     in the news on a daily basis.  It's a big city.  Typically we
 5     don't have any trouble finding juries with a regular voir dire
 6     that can sit fairly and impartially even in cases that have
 7     been in the news.  I have total confidence that we will be able
 8     to do the same thing here with a standard voir dire.  I don't
 9     want to add days or more than a week to the trial time just to
10     copy and distribute and consider questionnaires that ultimately
11     are not particularly helpful.  I also don't want to add days
12     and days to the trial time in order to do a person-by-person
13     voir dire when we are talking about a -- I think the biggest
14     concern in this case is a four week trial in the middle of the
15     summer.  A lot of people are going to have conflicts in terms
16     of their availability and hardship.  That's going to be the
17     biggest concern.  So we are going to be dealing with a
18     relatively large venire, not because of some notoriety of the
19     case, but just because it's a lengthy case.  It's not the most
20     lengthy, but it's not a tiny trial and it's the middle of the
21     summer.  So I don't want to bog that process down with some
22     kind of specialized procedure because a typical voir dire
23     normally talks about whether people have read about the case in
24     the news and that kind of questioning can be done just as
25     easily in this case.
```

D678LESC

1          So that's my sort of generalized view on

2     questionnaires, and I think this case doesn't present any kind

3     of specialized issues with respect to finding a fair jury.

4     Obviously, we who are involved in the case have a bias in favor

5     of noticing and reading articles about the case, but I think

6     your average potential juror in New York City may have paid no

7     attention to this case at all.

8          I would also like to say a little bit about the

9     sentencing issue that Mr. Durkin raised.  Obviously, I

10    completely disagree with him.  Your Honor was conducting a

11    sentencing and your Honor was giving reasons for the sentence

12    that you imposed, and they were obviously thoughtfully

13    considered and it was a public proceeding.  The document that

14    your Honor filed are the same words that your Honor spoke

15    publicly in this courtroom for anyone to write down.  It's

16    obviously hard to write it down as quickly as our court

17    reporters are able to do so, and I imagine that the interest of

18    the public were served by your Honor filing that document.

19    Nothing that your Honor said prejudges the case.

20         I do think that the defendants here, like Dr. Ajemian,

21    are planning to attempt to blame the victim.  I told your Honor

22    that we are working on in limine motions.  This is part of our

23    in limine motion.  The case law that we found is very clear

24    that negligence of a victim in a fraud case is not a defense.

25         So the arguments that Mr. Durkin claims your Honor has

D678LESC

1   prejudged I think, first of all, I am confident that your Honor

2   hasn't prejudged them.  If Mr. Durkin comes up with some case

3   law or some law or some arguments that are different from what

4   your Honor has heard before, and that your Honor finds to be

5   convincing, I am confident that your Honor is going to do what

6   your Honor thinks is right at the time.

7        Obviously, I think that the presentation that he made

8   today is woefully inadequate to justify any serious look at

9   disqualification, but who knows what he is going to put in his

10   papers.  He is a very able lawyer, and he may come up with

11   something if he decides to file such a motion and decides that

12   it is worth the time.  But I think there is nothing unusual

13   about a judge sentencing one defendant when other defendants,

14   who were previously charged together with that defendant, have

15   yet to go to trial.  It's standard.  Your Honor is obliged to

16   explain your sentence.  Your sentence is pronounced in the

17   context of a defendant having allocuted under oath, admitted

18   his guilt, admitted that his guilt swept across hundreds of

19   people, and that those people were able-bodied and capable of

20   working.

21        Dr. Lesniewski has not done that, and obviously he is

22   going to present his defense, and I have every confidence that

23   your Honor is going to preside over the case fairly, and I have

24   every confidence every reasonable observer would have no

25   question about that issue.  Which isn't to say that Dr.

D678LESC

1   Lesniewski is going to be able to present any supposed defense

2   that he wants.  The trial is going to be conducted according to

3   the rules of evidence, and if he wants to say that the victim

4   of this case, the victim of fraud, the charged fraud should

5   have done more to stop him from committing the fraud, it's

6   simply not a defense and it shouldn't be admitted under the

7   rules of evidence.

8          So this is an issue that we plan to brief for your

9   Honor, but I think that some of the issues that came up at the

10  sentencing, namely, Dr. Ajemian's proposition that other people

11  were to blame for his crime, and that your Honor should

12  therefore give him a reduced sentence, your Honor dealt with

13  that argument.  That's a different argument from arguments that

14  may be presented at trial.  And those arguments that someone

15  else should have prevented me from committing this crime or

16  seen through my lies, those arguments are simply not a defense

17  to fraud, and therefore those should be dealt with as well, but

18  in a different way.  Now we are talking about guilt or

19  innocence as opposed to culpability and sentencing factors.

20         So I think that we are obviously getting close to

21  trial, and when we do that all lawyers focus very hard on the

22  case and think of arguments that they perhaps hadn't thought

23  about before, and I imagine that there are going to be more

24  between now and July 15, but that's part of getting ready for a

25  trial, and we will be ready and we think that certain of these

D678LESC

1    issues, we are obviously going to brief the issue, and I am

2    sure the defense will oppose those motions, but I think that

3    some of these issues are really not part of the trial and that

4    it's entirely routine and any reasonable observer of the court

5    would understand that it's routine that one defendant has pled

6    guilty and has to be sentenced before another defendant, who

7    has pled not guilty and is presumed innocent, is exercising his

8    or her rights to a jury trial, and that that jury trial is

9    going to be conducted fairly.

10          THE COURT:  Thank you.  Let me come back to the points

11   concerning questionnaires.

12          Acknowledging that this is a relatively long trial, I

13   do not believe that questionnaires are necessary.  I agree with

14   the government that they tend to lengthen the selection process

15   and sometimes are not entirely helpful.  I also agree that this

16   in the scheme of things is not the enormously high profile case

17   that would require questionnaires in advance.

18          I also take into account that the venire for trials in

19   this district are not limited to Manhattan.  This district goes

20   into the Bronx, Westchester, and all of the lower counties in

21   Downstate New York, extending as far as Dutchess and Sullivan.

22   It's inconceivable that everybody in those counties will

23   necessarily have read about circumstances in Long Island

24   Railroad in New York, in Manhattan, that might sway them in

25   some way.  Perhaps some, but I think that with such a large

22

D678LESC

geographic scope to draw from, I am confident that we should be

able to find sufficient people who will not raise those kinds

of concerns.

I am also concerned, again, that we have only four

weeks in the middle of the summer and that is going to make it

difficult to select a jury.  So we don't want to do anything

that might lengthen the process.  In fact, as I was thinking

about it just a minute ago, it occurred to me that one thing we

might want to consider is to begin the jury selection process

the week before July 15 so that July 15 is the day when we

actually begin the presentation of the trial rather than begin

on July 15 with selection of the jury.  We might want to look

at calendars to see whether everybody might be available for

jury selection the week before July 15.

Yes, Mr. Durkin.

MR. DURKIN:  Can I address that?

THE COURT:  Yes.

MR. DURKIN:  That would be very difficult for me since

I am from out of town and it would add considerable cost to my

client.  I also had planned on using that week to prepare for

trial.  But you have correctly raised the issue of the

summertime and four weeks.  If I hear the government correctly,

they are only talking about four weeks for their case.  I have

told the government that I am pretty sure that we are going to

use an expert.  They were referring to us as the one they

D678LESC

shared information with because I told them I needed that in

order to make a decision about using our own expert.  We have

consulted with an expert, but I have not given any notice yet

that we intend to use him.

          I am concerned that this could very easily be a six

week trial.  I would prefer to try the case this summer because

I have it scheduled for that, but I am equally concerned, I

don't want a four week limitation on this to cause problems for

everyone else, the Court, the jurors.  I am not as familiar

with New York.  I know it is problematic in Chicago to try

cases and get jurors that will sit that length of time.  So I

think that might be fair to discuss.  I frankly have been

telling everybody I thought the government's case was two to

three weeks.  I am not faulting them.  That may well be what it

is.  But if it is, I think we can easily have two weeks of a

defense case.  And if you're concerned about four weeks, I

guess what I am saying, as much as it would be my preference

for my own convenience to try it this summer, I would certainly

move the date rather than have to worry about having to get

locked in if that's going to be a problem.  I defer to you.  I

don't know enough about New York.

          THE COURT:  It's not terribly different from what you

indicate is your experience in Chicago, and I am sure that

that's the case throughout the country.  People make

commitments for summer vacations and the deeper it gets into

D678LESC

July and August, the more difficult it gets for people to be

available for four to six weeks.  So that to me compels trying

to do everything conceivable to limit the time rather than to

find ways or possibilities for expanding it.

So let me come back to the question of whether we can

do jury selection the week before even if we have to do it in

the matter of two days during that week.

Mr. Durkin, I recognize that you need defense counsel

time to prepare, but we are still several weeks away, and if we

were to allocate, let's say, two days during the course of that

prior week for jury selection, it might be well spent.

MR. JACKSON:  Good afternoon again.  I presently do

not have the ability to do that.  I certainly am on focus to

begin July 15.  It was always my anticipation that beginning on

that date, that was the day that jury selection would proceed.

Additionally, I don't know that I will call an expert.

I am certainly contemplating and speaking about that and

certainly during the course of trial it's entirely possible.  I

like everyone else have my own vacation plans.  That I will

forgo in light of this trial, but I am concerned that to try to

get everything done within that four week time frame it could

cause some difficulty.  Again, as to my own personal issues, I

can scrap my vacation, but I don't have the ability, based on

my scheduling, to begin jury selection a week prior to July 15,

and to the extent that it may expand into August it could

D678LESC

1    become problematic.

2              THE COURT:  Anyone else who may have difficulty with

3    jury selection the week before?

4              MR. SCARING:  I would propose, if no one has any

5    objection, that we try the case in the fall.  That makes it a

6    lot easier.

7              THE COURT:  The fall of what year?

8              MR. SCARING:  This year.

9              THE COURT:  Not possible.

10             MR. SCARING:  I think that it shrinks the jury pool

11   also when you start out saying to them you're going to give up

12   your whole summer.  A lot of people will pretty much bail out

13   right away.

14             THE COURT:  I recognize that as a major concern, but

15   we are going to have to deal with it somehow.

16             Anyone else?

17             MR. RYAN:  Joseph Ryan for Joe Rutigliano.

18             The question of peremptory challenges, I am going to

19   ask that your Honor consider our application for additional

20   challenges.  Based on the colloquy I have heard here in this

21   courtroom, there are going to be conflicting views of the

22   evidence on the defense team.  We do not plan to claim that the

23   railroad retirement court was negligent.  To the contrary, they

24   were very diligent and honest and they did the best they could

25   applying the law as they understood it at the time.  So that

D678LESC

| | |
|---|---|
| 1 | gives you a little idea of the necessity for different |
| 2 | considerations of each individual defendant and the |
| 3 | desirability of giving each defendant an additional peremptory |
| 4 | challenge during the jury selection process. |
| 5 | MR. DURKIN:  I'm sorry.  I talked to Dr. Lesniewski |
| 6 | and I thought there was a conflict.  I can come if we did it |
| 7 | the 11th and the 12th.  Are we set for the 15th or the 16th?  I |
| 8 | have the 16th in my book. |
| 9 | THE COURT:  It's Monday. |
| 10 | MR. DURKIN:  Are we starting on the 15th? |
| 11 | THE COURT:  Yes.  Juries usually are fresh on Mondays. |
| 12 | By the middle of the week we are getting a lot of, I don't want |
| 13 | to call them rejects but -- |
| 14 | MR. DURKIN:  That's what they are, as we all know. |
| 15 | THE COURT:  People on the rebound. |
| 16 | It's possible also that one thing we can do, which I |
| 17 | have done in the past, is ask the jury room to request a venire |
| 18 | to begin on Wednesday, let's say, so that they will be fresh on |
| 19 | Wednesday rather than on Monday. |
| 20 | MR. DURKIN:  So you would contemplate then the 10th? |
| 21 | THE COURT:  Yes.  Wednesday or Thursday.  My |
| 22 | experience, even with this kind of difficult case, is that we |
| 23 | may be able to conclude jury selection in about two days.  If |
| 24 | we start on Wednesday or even Thursday, we may be able to do |
| 25 | it.  But at least one counsel indicated he is not available at |

D678LESC

1   all that week.

2           MR. JACKSON:  I don't even know that I will be in the

3   state of New York that week.  I have scheduled my summer based

4   upon the representation that we are moving forward on the 15th.

5   So today, to be talking about beginning the week before, it

6   just doesn't comport with -- again, to the extent that we go

7   after and anything happens in August and we are here till

8   September, those are the breaks.  But with regard to prior to

9   that, I am completely prepared to begin on July 15, but I can't

10  at this date make a commitment to start jury selection the week

11  prior to that.

12          THE COURT:  I recognize that this has been somewhat

13  sprung upon you, but I ask that you examine your schedule, your

14  options, and the feasibility and inform us as to whether there

15  is any prospect at all that you might be able to adjust your

16  schedule to make it possible.  If you cannot in good faith,

17  then we will have to begin on the 15th of July and do the best

18  we can.  How much time do you think you might need to review

19  your situation and get back to the Court and the government?

20          MR. JACKSON:  I can tell you today, I more than likely

21  will be in Atlanta, Georgia at that time, and if I am not, I

22  think the obligations I will have will be in New York.  So I

23  can't commit in good faith to beginning jury selection the week

24  before.

25          THE COURT:  You are referring to what you can't commit

D678LESC

 1  at this point, but you haven't said what you might be able to

 2  do if you think about it and consult and examine your options.

 3  Take a couple of days and let us know.

 4           Let's say by Tuesday of next week?

 5           MR. JACKSON:  Yes, Judge.

 6           THE COURT:  Get in touch with the Court and the

 7  government by letter indicating what your circumstances are,

 8  and if they haven't changed, then we will proceed on the 15th.

 9  If they have, then we will all appreciate it and ensure that

10  instead of being here the last week in August, we might be able

11  to finish within the four weeks that we are talking about.

12           Anything else from anyone else?

13           Thank you.  Have a good day and a good weekend.

14           MR. DURKIN:  If I could, I know you said you were

15  going to deny the motion.  I always have something to say.  Can

16  I have at least leave to file something further to simply make

17  sure that I have covered the record completely?

18           THE COURT:  If you want to file something for the

19  record, you certainly are free to do that.

20           MR. DURKIN:  Thank you.

21           I don't agree with what Mr. Weddle said, nor do I want

22  to leave you with the impression that our defense is going to

23  be that the railroad retirement court was negligent.  It was a

24  mess, but that's not the defense.

25           THE COURT:  The defense is whatever it turns out to

D678LESC

 1    be.  This is not the forum in which to talk about the defense.

 2             MR. DURKIN:  I am only doing it because Mr. Weddle was

 3    suggesting it.  Trust me, that's not the defense.

 4             THE COURT:  Thank you.

 5             (Adjourned)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25