D7fdles1
                              Trial

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,                New York, N.Y.

 4              v.                            S14 11 Cr. 1091 (VM)

 5   PETER LESNIEWSKI, MARIE BARAN
     and JOSEPH RUTIGLIANO,
 6
                    Defendants.
 7
     ------------------------------x
 8

 9                                           July 15, 2013
                                             9:30 a.m.
10

11   Before:

12                      HON. VICTOR MARRERO,

13                                           District Judge

14
                          APPEARANCES
15
     PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17   BY:  JUSTIN S. WEDDLE
          DANIEL BEN TEHRANI
18        NICOLE WARE FRIEDLANDER
          Assistant United States Attorneys
19
     LAW OFFICES OF JOSHUA L. DRATEL, P.C.
20        Attorneys for Defendant Peter Lesniewski
     BY:  JOSHUA LEWIS DRATEL
21        LINDSAY A. LEWIS

22   DURKIN & ROBERTS
          Attorneys for Defendant Peter Lesniewski
23   BY:  THOMAS ANTHONY DURKIN

24

25

D7fdles1
                          Trial

 1                  APPEARANCES CONTINUED

 2   KOEHLER & ISAACS, LLP
          Attorneys for Defendant Marie Baran
 3   BY:  JOEY JACKSON

 4   JOSEPH W. RYAN, JR.
     KEVIN MENEILLY
 5        Attorneys for Defendant Joseph Rutigliano

 6             - also present -

 7   Annie Chen
     Emma Larson, Government Paralegals
 8

 9   SA Frank LoMonaco, FBI

10   Yeni Yrizarry, Defendant Baran Paralegal

11                        oOo

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7fdles1
Trial

1        THE COURT:  Good morning.  You may be seated.

2        This is a proceeding in the matter the United States

3   v. Lesniewski and others, docket number 11 Cr. 1091, and it is

4   scheduled as the commencement of the trial of the defendants

5   remaining in this matter.

6        Counsel, please enter your appearances for the record.

7        MR. WEDDLE:  Good morning, your Honor.  Justin Weddle

8   for the United States.  I'm here with Daniel Tehrani and Nicole

9   Friedlander, Assistant U.S. Attorneys, and next to

10  Ms. Friedlander is Emma Larson and then Annie Chen, paralegals

11  in our office, and Special Agent Frank LoMonaco.

12       THE COURT:  Good morning.  Thank you.  Welcome.

13       MR. DURKIN:  Good morning, Judge.  Thomas Durkin on

14  behalf of Dr. Lesniewski.  Along with me is Joshua Dratel and

15  Lindsay Lewis from Mr. Dratel's office.

16       MR. DRATEL:  Good morning, your Honor.

17       THE COURT:  Thank you.

18       MS. LEWIS:  Good morning, your Honor.

19       MR. JACKSON:  Judge, it's pleasant.  Good morning to

20  you.  Joey Jackson representing Ms. Baran.  I also have

21  Ms. Yeni Yrizarry, our paralegal.

22       THE COURT:  Good afternoon.

23       MR. RYAN:  Good morning, your Honor.  Joe Ryan for Joe

24  Rutigliano and Kevin Meneilly.

25       MR. MENEILLY:  Good morning, your Honor.

D7fdles1
Trial

1          THE COURT:  Good morning.  Thank you.  Welcome.

2          All right.  The jury pool will probably not be here

3   for, I would say, at least an hour, so we have some time to go

4   over whatever major issues remain and additional housekeeping

5   matters.

6          The Court issued its rulings on the various motions in

7   limine on Friday.  Since then the Court has received an

8   additional motion from Mr. Rutigliano dealing with the golf

9   video issue.

10          The Court also has received from Mr. Lesniewski a

11   motion for reconsideration and/or reargument relating to the

12   Court's ruling on the government's motion to preclude certain

13   portions of the testimony of the expert proposed by

14   Dr. Lesniewski.

15          The Court has also received correspondence from the

16   government dated July 11th, which it is making available to the

17   Court and copies to the defendants certain material that it

18   classifies as 3500 or particular material pertaining to one of

19   the issues that the Court ruled upon in the motions in limine.

20          So we can address some of these matters at this point.

21   Some of them may or may not be immediate.  For example, the

22   matter of the testimony of the government's expert regarding --

23   or I should say Dr. Lesniewski's expert may not be something

24   immediate unless there is something about that issue that needs

25   to be addressed at this point.  We can take a greater amount of

D7fdles1
Trial

time for the parties to review the submission from

Dr. Lesniewski; otherwise, we can deal with it at a sooner

time, if it is necessary.

Let me first ask the government whether it received

the submission from Mr. Rutigliano and Dr. Lesniewski?

MR. WEDDLE:  Yes, your Honor.  We received the

submission --

MR. JACKSON:  Judge, I'm sorry.  I don't mean to

interrupt.

Excuse me, Mr.  Weddle.

Judge, my client does have a slight hearing problem,

and your microphone, Judge, is not up that loudly.  I was

wondering if there was any possibility --

THE COURT:  Let me see if I can turn on the

microphone.  It may be off.

MR. JACKSON:  Thank you, Judge.

THE COURT:  I will just speak a little louder.

Yes, Mr. Weddle.

MR. WEDDLE:  Sorry, your Honor.  We received the

filings that your Honor mentioned.

The motion by Mr. Rutigliano is to preclude evidence

relating to golf on the grounds that it is irrelevant.  I think

that it is completely obvious that the defendant's ability to

play golf is highly relevant when he claimed disability based

on things like his inability to grip tools and to walk on an

D7fdles1
                              Trial

1    uneven ground and other things.  I don't have his filing in

2    front of me, but I think that that motion is really something

3    that should be denied out of hand.  If your Honor would like a

4    written response, we are happy to do that.

5         THE COURT:  No.  We don't need any further

6    argumentation in writing on that matter.

7         MR. WEDDLE:  The motion to reconsider, you know, I

8    think that there is nothing new in it.  So I can go through --

9    I mean, as I was reading it, I noted some items that I think

10   are wrong and are quite easily explained.  We could do that now

11   or we could do that at a future time or we could do that in

12   writing; whatever your Honor's preference is we are happy to

13   do.

14        THE COURT:  If it is not urgent, if it is not

15   something that is going to come up today, for example, during

16   the opening statements, we could put it off, give you more time

17   to review the matter and respond in writing, if necessary.

18        One issue that I noted the motion stresses is the

19   argument that the government underestimated the qualifications

20   of Dr. Freeman insofar as his experience in reviewing

21   disability claims as a consultant to the SSI program and in the

22   Navy's.  That may be an issue that you may want to address in

23   further submissions.

24        MR. WEDDLE:  I can address that in 30 seconds right

25   now, your Honor, and I can further address it in writing as

D7fdles1
Trial

1   well.  But the primary thing that they point to for the

2   relevance of Dr. Freeman's experience with Social Security

3   claims is that it has to do with Social Security listings, and

4   I know what those are.  But basically there are lists of

5   certain impairments that render somebody, by definition,

6   disabled under Social Security rules, and under certain

7   circumstances those same rules are applied by the Railroad

8   Retirement Board.

9          None of the cases that we're going to be talking about

10  are cases involving the lists.  And in fact, the example given

11  by defense counsel in their brief says that there are documents

12  that are produced in discovery, called disability briefing

13  documents, that talk about a sequential evaluation, and one of

14  the items on the list when a claims examiner is going through

15  the evaluation is they ask does the impairment meet or equal

16  the listing of impairments.  The answer to that is always no,

17  and then they go into a different analysis which is basically a

18  case by case analysis.  They call it independent case

19  evaluation, or ICE for short, but it basically involves looking

20  at the person's conditions and determining whether that person

21  is unable to do his or her railroad job.

22          The listings are things like if you have -- I'm just

23  making this up, but it is the type of thing where it would say

24  if you have stage-three lung cancer, you are disabled.  It has

25  nothing to do with your capabilities, it's just on a list.  I

D7fdles1
Trial

don't know if that is one of them, but I think that that's the
type of thing that is on the list.  Whereas the evaluation in
this case, and the only decisions that are at issue in this
case, are evaluations of whether the person's conditions impair
them such that they can't do their job.  So it is not just a
definitional you have this diagnosis at this level of severity,
therefore you are disabled, which is what the lists are about.
It's much more functional.

    So this example that they give doesn't change the
analysis at all because we're not going to be dealing with the
world of Social Security's listed impairments except to say
that they don't apply.

    THE COURT:  All right.  Mr. Weddle, why don't we put
this issue off for the moment.  It is likely to take up more
time than we have this morning to deal with other more
important -- more pressing matters.

    Anything else on your end?

    MR. WEDDLE:  I had a few housekeeping type items that
I thought I would raise, your Honor.

    THE COURT:  Yes.

    MR. WEDDLE:  The most basic one is just to inquire
what your Honor -- what the trial schedule would look like.  I
read your Honor's individual practices, which indicate a
five-day week from 9 to 5 with certain breaks, but I just
wondered if your Honor was planning to keep to that schedule or

D7fdles1
                              Trial

1     alter it in this case.

2          THE COURT:  We are going to more or less stick with

3     it.  As you are aware, we have a long trial and at a very

4     inconvenient time for a lot of people in the middle of the

5     summer.  So we need to do everything possible to make up as

6     much time as we can.

7          Consequently, we will try to go as much as possible 9

8     to 5 every day except on Fridays.  We may need to meet only in

9     the morning on Friday in order to allow the Court to handle

10    other important matters in the afternoon such as sentencings

11    and pleas and matters of that kind, and that may or may not

12    apply to all Fridays, but at least initially we will not meet

13    on August 9th.  I have another commitment on that day.  If

14    there are times in which matters are pressing and we need to

15    move more expeditiously and get more in, I will work out a

16    schedule under which instead of ending at 5 we can go until 6

17    depending on the availability of court reporters.  But we will

18    have to adjust the schedule as we go along and as we get a

19    better sense of whether or not we are going to be able to

20    conclude within the time allotted.

21         Now, there is another matter that may help in gaining

22    at least as much as a day or a half a day, which is the jury

23    selection process, and we will get to that in a moment.

24         OK.  Anything else?

25         MR. WEDDLE:  Maybe it would be helpful if I just read

D7fdles1
                                   Trial

1    out the items that are on my list and then we can take them up

2    if your Honor would like.

3              THE COURT:  Yes.

4              MR. WEDDLE:  I had a couple of things to say about

5    jury selection, a couple of additional questions that we

6    thought might be useful to add, although your Honor may well

7    have covered them in your Honor's list of questions.

8              We had a few names that we thought perhaps should be

9    added to the list of names.

10             I also wanted to talk about our witness list, which

11   relates to stipulations.

12             I wanted to say something about the Court's initial

13   instructions to the jury describing the case.  I think it is

14   very minor.

15             And if we have time this morning, it might be useful

16   to raise -- just to give your Honor some background about an

17   issue that may arise in the future in the trial relating to

18   certain exhibits that we've marked for identification but we

19   are not planning to offer the entirety of it, and I am just

20   going to explain how we have marked them to your Honor so that

21   if this issue comes up later in the trial, you will understand

22   the context in which it is coming up.  We are not asking for a

23   ruling now.

24             THE COURT:  All right.

25             MR. WEDDLE:  Those are the items and I can talk

D7fdles1
                              Trial

1    further about any one of them.

2              THE COURT:  The question of names, if you -- we have

3    not yet made the final list of names and witness lists of the

4    people whose identities should be disclosed to the jury.  So if

5    you have any such names or people to enter the witness list,

6    just give it to my law clerks and we will make a composite list

7    later on.  The same thing for the defendants.  If they have any

8    names who should be disclosed, please hand those up during the

9    break that we will be taking before the jury pool comes in.

10             With regards to stipulations --

11             MR. WEDDLE:  We are still working on them, your Honor.

12   We've now -- well, I am not sure but I think that we've reached

13   a few.  I think that there are several more that we're still

14   conferring about.  I'm optimistic that we are going to reach

15   stipulations on essentially all of those issues.  It does look

16   like there are a couple where defense counsel made clear they

17   don't want to stipulate on this issue, they want to have a

18   witness.  So we may have to add a couple of witnesses to our

19   list that we were hoping to do by stipulation.  And I can't

20   make a promise with respect to the other stipulations, but I

21   don't want to be overly pessimistic either and say that we need

22   to add ten witnesses to our list because I do think we are

23   going to reach stipulations on many of the outstanding ones.

24             So that's on stipulations.

25             THE COURT:  All right.  Now, with regards to

D7fdles1
                                   Trial

1    description of the case, you have something else that you wish

2    to add?

3              MR. WEDDLE:  The only thing that I was going to raise

4    on that issue, your Honor, is I'm not sure how your Honor was

5    going to do it, and, actually, standing here right now, I've

6    forgotten how we wrote it up.  But I was going to suggest that

7    rather than listing for the jury the number of counts involved

8    and, you know, Count Five through 12 are this, that we just

9    leave that a little bit less defined.  And the purpose for

10   that, your Honor, is that depending on how the evidence is

11   coming in, the government might decide to streamline the case

12   and just say, you know what, we're not going to call that

13   witness, which means we are going to drop this substantive

14   count.

15             The problem is we would have a disincentive to do that

16   if the jury has been told there are 33 counts in the

17   indictment.  Then the jury might wonder what happened to some

18   of the counts.  I don't think they need to know at the

19   beginning of the case that there are 33 counts.  I think that

20   your Honor could just say those are conspiracy counts, there

21   are a number of substantive healthcare fraud counts, if your

22   Honor was planning to describe the indictment in that kind of

23   detail at all.  But if your Honor is, I would just suggest that

24   we not give them count numbers and then we retain some

25   flexibility without having that disincentive.

D7fdles1
                              Trial

1            THE COURT:  The easiest thing to do, Mr. Weddle, is to

2       have you prepare what you think would be an acceptable summary

3       that addresses your concern.  I also would not want to prolong

4       the amount of detail count by count of all of the charges.  It

5       is simpler to summarize.  So if you could come forward with a

6       summary, show it to defense counsel, and if you all agree then

7       we will go with that.

8            MR. WEDDLE:  I will, your Honor.

9            THE COURT:  Now, with regards to exhibits?

10           MR. WEDDLE:  So the context that I would like to

11      explain to your Honor is there are a number of exhibits that

12      are entire files that have been marked as government exhibits.

13      And I think it's Government Exhibit 100 to 162, or something in

14      that area, are claim files from the Railroad Retirement Board.

15      And then there is a similar context with respect to patient

16      files that come from doctors' offices.  Those are in the 300

17      series of exhibits.  We've marked them as exhibits but we don't

18      plan to offer the file as a whole, you know, for a number of

19      reasons.

20           But there are situations where the fact that a

21      document comes from an RRB claim file has evidentiary value,

22      and there are situations where the fact that the document comes

23      from the doctor's office file has evidentiary value.  So what

24      we plan to do is just have them marked for identification and

25      then not offer them, but then a person could testify, you know,

D7fdles1
                              Trial

1    I looked in Government Exhibit 101, which is the claim file,

2    and this document comes from the claim file.  In fact, that is

3    a bad example because with respect to the claim files I think

4    we are going to reach a stipulation that is going to cover all

5    excerpts from the claim file for that purpose, just for

6    authentication purposes, that anything numbered in a certain

7    way means that it is an excerpt from the claim file.

8              Now, in talking to some of the defense counsel, they

9    may take the position -- I don't want to speak for them, but

10   the indication I have gotten is that certain defense counsel

11   may take the position that the entire file should just be

12   admitted every time, and we disagree with that position.  But

13   we just didn't want there to be confusion in the way that we've

14   put government exhibit stickers on documents.  We just put it

15   there for identification and it doesn't mean that we plan to

16   offer it.

17             And within the file there are any number of different

18   documents, and they would have -- depending on for what purpose

19   they were being offered, there might be different questions

20   about their admissibility.

21             And just with respect to the claim files, there is an

22   additional issue which is those claims files include the

23   documents that relate to the continuing disability reviews,

24   which your Honor has already excluded.  So with respect to the

25   claim files, at least it's clear that they can't be admitted in

D7fdles1
                            Trial

 1    their entirety.  But we just wanted to give your Honor that

 2    context, and then so your Honor knows when we're offering

 3    documents that we are offering them as excerpts and that there

 4    may come a time when we would have a witness say this document,

 5    which has been offered in evidence, comes from, you know,

 6    Government Exhibit 303, which is the patient file from the

 7    medical office, which wouldn't require offering into evidence

 8    Government Exhibit 303.

 9            THE COURT:  All right.  Thanks you.

10            MR. DURKIN:  Judge, I think --

11            THE COURT:  Yes.

12            MR. DURKIN:  I think I could expedite that.

13            The only thing we're concerned about is that we would

14    simply like the right to take an excerpt ourselves from that

15    file, from the bigger file, and obviously if it is something

16    that is excluded, then we can argue about that.  But insofar

17    as -- as long as it is OK if the whole -- let's say the whole

18    claim file for the particular individual, if the government

19    wants to do excerpts, we may want the same privilege to be able

20    to take a different document and use it.  And I think we are in

21    agreement on that, if I am not mistaken.

22            THE COURT:  Mr. Weddle, is there any disagreement with

23    that, as long as there is a basis and a foundation for the

24    defendants' use of someone else?

25            MR. WEDDLE:  We are not going to quibble and say it is

D7fdles1
                                Trial

1    not from the claim file if it is from the file or from the

2    doctor file, but we may have an argument about the

3    admissibility depending on the purpose for which they are

4    offering it.  I think we are in total agreement on this.

5              THE COURT:  That is fine.

6              MR. RYAN:  Sorry to interrupt, your Honor.  I have a

7    different view.  I don't believe that cherrypicking from the

8    RRB claim should be allowed.  The whole claim file is the whole

9    picture of the process that these claims were submitted.  It

10   has in detail the disability decision, the examiner gives

11   specific reasons for granting the application, and that's going

12   to be the bedrock of our defense.  This was an honest, open,

13   well-known system, and the whole file reflects that.  And that

14   the idea that you could pick out one document and not let the

15   jury evaluate that document the way the RRB evaluated it is the

16   most critical part of this case.  So we object to that, Judge.

17             And I think your Honor would be in a better position

18   to rule on these things as the trial proceeds than doing it now

19   in advance.

20             MR. JACKSON:  Judge, just to be clear, I don't want to

21   fill up the courtroom with words but I absolutely echo

22   Mr. Ryan's sentiment in that regard.

23             THE COURT:  All right.  We'll hold determination on

24   that issue until a later point.

25             All right.  Anything else from the government?

D7fdles1
                         Trial

1           MR. WEDDLE:  No, your Honor.

2           THE COURT:  Thank you.  Anything else from defense

3    counsel?

4           MR. DRATEL:  Your Honor, just in terms of

5    housekeeping.

6           THE COURT:  Yes.

7           MR. DRATEL:  Is it OK with the Court if, let's say, on

8    a particular -- there may be a morning session or a day where

9    one of us, either Mr. Durkin or myself might not be here, we

10   might be out doing something else on the case or doing

11   something else, if we let the Court know in advance -- it would

12   not be obviously in a way that would delay the trial.  We would

13   be prepared to do it at a time that we knew that particular

14   person who might be absent that day was not needed for a

15   variety of reasons, but if that is OK with the Court?

16          THE COURT:  As long as you get a note from your

17   client.

18          MR. DRATEL:  Yes.  Thank you, your Honor.

19          MR. DURKIN:  Judge, in that regard, we may have

20   mentioned this before.  I have a matter in Chicago on the

21   23rd that Dr. Lesniewski has agreed to permit me to go back to

22   attend to.  So I will not be here on July 23rd.

23          THE COURT:  All right.

24          Mr. Ryan.

25          MR. RYAN:  Your Honor, we did submit a proposed voir

D7fdles1
                              Trial

 1    dire submission of July 9.  If it is not in the Court file, we

 2    will give you our copy of what we have.  It has all the names

 3    and suggested questions and suggested concern about addressing

 4    the jury's adversity to sitting during the summer and the

 5    length of this trial.  I just wanted to call it to your Honor's

 6    attention.

 7             THE COURT:  I don't have -- why don't you hand it up.

 8             MR. RYAN:  Sure.

 9             (Handing)

10             MR. RYAN:  Thank you.

11             (Pause)

12             THE COURT:  Mr. Weddle, does the government have the

13    submission as to which Mr. Ryan relates?

14             MR. WEDDLE:  I confess, your Honor, I don't have it in

15    any of the many binders I brought with me today.  I think I

16    remember seeing it, but I am sorry that I don't have it with

17    me.  I may be able to run down -- can we pull it up on the

18    computer?

19             (Pause)

20             I can run down and get it.

21             THE COURT:  It is not critical at this moment.

22             (Pause)

23             THE COURT:  All right.  We have a list of names

24    submitted by Mr. Ryan.

25             Mr. Ryan, what is the nature of this list of names?

D7fdles1
                                Trial

 1    Are they individuals who are going to be referred to in some

 2    form during the course of the trial?

 3           MR. RYAN:  Yes.  They are either workers from the Long

 4    Island Railroad, consultants.  I've tried to include unions.

 5    They will be referred to during the course of the trial, Judge.

 6           THE COURT:  All right.

 7           Anything else from defense counsel?

 8           MR. RYAN:  Judge, we have three defendants here, and

 9    may I respectfully request that we be given an additional three

10    peremptory challenges?

11           THE COURT:  Mr. Weddle.

12           MR. WEDDLE:  Your Honor, I don't think it is

13    necessary.  I think the defense already has ten challenges

14    compared with the government's six.  So they already have four

15    additional challenges beyond what the government has.  Then

16    they appear to have similar issues and defenses in the case.

17    So I don't think it is necessary in this case to increase the

18    number of peremptory challenges.

19           MR. RYAN:  Your Honor, I think this exchange today

20    shows that we are not on line.  For example, this discussion

21    about consenting to just portions of the RRB file, as opposed

22    to our position that the whole file should be available to the

23    jury, is one example.  We have a doctor who the government is

24    going to claim is fabricating evidence of medical condition,

25    and we have his client, patient, Mr. Rutigliano.  So we have --

D7fdles1
                              Trial

1    then we have Marie Baran, who actually worked for the RRB, and

2    until she retired she was working on the government's side of

3    this issue.  So we have different statuses of different

4    defendants, and there is going to be a confluence of interests

5    that may conflict and add to our need to have additional rights

6    to exercise peremptory challenges.

7              THE COURT:  All right.  Mr. Ryan, one possible

8    implication of having extra peremptory challenges, on the other

9    side of the coin, is that we have a larger pool from which to

10   exercise challenges.  We already have a difficult time in

11   trying to put together a list of jurors at this time of year

12   for a complicated trial.  Instead of 32, if we had to have,

13   let's say, 35 in the initial pool, it would mean essentially

14   prolonging and making it more complex for us to reach 35 rather

15   than 32.

16             I think that with the ten and six breakdown that is

17   traditional in this courtroom even for multiple defendant

18   trials, the defense should have sufficient peremptories and you

19   simply have to work that out among yourselves.

20             MR. DRATEL:  Your Honor, if I may?

21             THE COURT:  Yes.

22             (Continued on next page)

23

24

25

D7fnles2

1          MR. DRATEL:  Your Honor, if I may.

2          THE COURT:  Yes.

3          MR. DRATEL:  We join obviously Mr. Ryan's request.  In

4    addition, one other reason I think is because of the persistent

5    publicity in this case, which has not been favorable to the

6    defense at all, it's really been one sided in that regard, so

7    those additional challenges will enable us I think to have a

8    fair jury.

9          Thank you.

10          THE COURT:  All right.

11          While we are on the question of selecting a jury, let

12    me raise a concern that I alluded to earlier, which is still a

13    considerable issue.  We requested an initial pool of 100, from

14    which we need to have a venire of at least 32 in order to

15    enable us to have a jury of 12 regular jurors and two

16    alternates.  It is a significant challenge at this time of year

17    to find that number of jurors available for a trial that is to

18    last through most likely through the balance of the summer.

19          We have seen it in other courtrooms already where

20    judges are having a difficult time finding a considerable

21    number of jurors at this time.

22          One possibility that I suggest for you to think about

23    as a way of expediting our ability to find a suitable jury as

24    expeditiously as possible is to try to see if we can identify

25    from the 100 or so initial pool in the venire those for whom

D7fnles2

1    service in the course of the estimated time would not be a

2    problem and see whether we might be able to begin the process

3    with those rather than trying to go through almost all 100 of

4    them one by one and having them make individual determinations

5    as to whether or not they have good reason for not being able

6    to serve for six or seven weeks.

7          So I offer that as a possibility for you to consider,

8    because if we start with those who do not have a problem

9    serving for the six or seven weeks for whatever reasons, we

10   might be able to much more expeditiously reach a number that we

11   can have as a basis for challenges.

12         Mr. Weddle, does the government have any views about

13   that possible approach?

14         MR. WEDDLE:  Your Honor, I think it makes sense to

15   address what I would call hardship challenges first, because I

16   think that that is going to be the main issue with respect to

17   getting a jury.

18         I am not sure if your Honor is thinking of addressing

19   that matter in some way other than having people here in the

20   courtroom, but in my experience there is a great benefit to

21   having prospective jurors in the courtroom to talk about

22   whether they can or can't serve, because there are many, many

23   jurors who would much rather not be on a jury.  If you simply

24   ask them basically is there going to be any problem for you

25   being on this jury, you get many people selecting themselves

D7fnles2

1    out without any kind of disincentive of having to articulate

2    what their problem is here in the courtroom.  And if they can

3    just sort of privately say yes it is going to be a problem for

4    me to sit on that jury, I think it skews the jury pool.

5           I recognize your Honor's concern with efficiency.  It

6    does take a little longer to address the issue here in court,

7    but in every trial I have been in I have had jurors say I

8    really can't do this because I have a doctor's appointment on

9    the afternoon of August 5, and the judge says, Well, OK, why

10   don't I call the doctor and see if you can do it after 5 p.m.

11   or on a different day when we are not sitting, would that

12   suffice?  Then the juror says, yes, that would be fine.

13          You would lose that juror if we didn't do it in Court

14   is the problem that I see.

15          MR. RYAN:  I happen to agree.

16          THE COURT:  I recognize that.

17          The concern, however, is out of the hundred how many

18   do we have to go through one by one in order to make those

19   determinations.  If let's say as an example we ask and let's

20   say 20 out of the hundred initially say no problem, in that

21   case we have 20 to start with and then we can then go through

22   the process to find 12 acceptable ones.

23          Doing it the other way has the disadvantage of having

24   to go one by one, and we may need to go through 50 in order to

25   get two or three we won't have a problem with or about whom we

D7fnles2

1    would have to make an individual determination, although I do

2    recognize what you are saying.

3         Yes, Mr. Ryan?

4         MR. RYAN:  I think we are talking about technique.

5    Our concern and the government's concern rightly is the jurors

6    can opt out by saying they are not available.  There is no

7    challenge.  There is no burden on the juror to explain why they

8    can't be here.  It is the burden of the juror to explain.

9         My suggestion is, Judge, that you have to address the

10   entire pool, I would suggest, and make this case interesting.

11   This is a very interesting case.  It is a wonderful opportunity

12   for any citizen to learn about railroads, unions, health issues

13   and things of that nature, to evoke an interest in the case.

14        There are jurors who would, instead of abhorring the

15   opportunity to serve as a juror would find it an opportunity to

16   learn something.  I think that is a suggestion I made to the

17   Court in our written submission.

18        I think if your Honor starts out with the idea that 80

19   can be knocked out by sitting and not raising their hand 80 out

20   of 100, we have eliminated a lot of jurors that could rightly

21   serve.

22        THE COURT:  Mr. Ryan, I don't think the way you are

23   characterizing it is the way I would envision it.

24        Out of the hundred there are going to be a certain

25   number who are not going to have a problem serving six weeks or

D7fnles2

1    seven weeks, whatever the number is.

2           The others may, and the reasons why they may want to

3    try to opt out may or may not be sufficient.  But if we have

4    already identified a pool who don't have a problem, then we

5    could limit the process to those who claim to have a problem

6    and then we can go one by one and deal with what they think is

7    sufficient.  But the question is whether we can identify a core

8    who say from the start we don't have a problem serving six or

9    seven weeks.

10          MR. RYAN:  Your Honor, I would have no objection to

11   that if it is not a blanket invitation on an abstract premise

12   that 80 percent do not raise their hand and they are out of the

13   case.  It is just a question of how it's presented to the jury.

14   I understand your Honor's objective.  The question is how to

15   get there.

16          If we do it in the beginning with one general blanket

17   proposition we are going to lose 80 percent of the jurors who

18   otherwise would be qualified and who really do have no good

19   excuse to be excused from this courtroom.

20          THE COURT:  All right.

21          MR. RYAN:  I am expressing this, and just to take -- I

22   understand your objective, and I agree with the objective.

23   Question is how to get there.

24          THE COURT:  Thank you.  Yes?

25          MR. DRATEL:  Your Honor, we agree with Mr. Ryan on

D7fnles2

this.  It may take a little more time.  This is such a crucial

part of the case, I don't want to rush through it for a very

minimal time advantage at the very beginning when it is such an

important part of the case.

I agree with Mr. Ryan, that an opportunity that

presents itself to jurors to opt out, the jurors will take

advantage of it even if they don't have a valid hardship

excuse.  We should see those jurors and hear from them, because

that is why they are here.

THE COURT:  Mr. Weddle.

MR. WEDDLE:  Your Honor there may be a middle ground

here, which is if your Honor somehow instructs the jury what

you are talking about when you say "problem," so it's not just,

I don't feel like doing it.  Your Honor could, for example,

just tell the jury this is what the trial is going to be.  It

could last as long as six or seven weeks.  That may cause a

hardship that would preclude certain of you --

THE COURT:  Let me stop you there because I think I

know where you are going and this is consistent with where I

was going.  I do not believe that jurors should be just given a

free pass without at least some indication of what would be the

standard by which the Court would give a pass.

In other words, what is the hardship in the form of a

reason why people might be excused and give a general

definition so that people can apply that in determining whether

D7fnles2

1    or not they may have a problem.

2           If they, after being given that standard, say we don't

3    have a problem, then those who have heard the standard and say

4    that they have a problem could then be questioned as we need

5    one by one to determine whether in fact the problem that they

6    claim they have is sufficient.

7           MR. WEDDLE:  I think if your Honor is telling them

8    those things, I think that that would go a long way.  I take it

9    your Honor is not going to be releasing those people, so you

10   would just be starting with the people who don't have an

11   affirmative answer on that issue and then we would go back and

12   check people's problems if we get to that point.

13          THE COURT:  Precisely.

14          MR. WEDDLE:  That seems fine to the government, your

15   Honor.

16          THE COURT:  All right.

17          Any further views from the defense?

18          Any other issues that we need to deal with before we

19   proceed?

20          MR. JACKSON:  Judge, I know that there is a pending

21   motion to reargue before you, but I just want to be clear on

22   your Honor's decision as it was handed down so that I don't run

23   afoul of it, knowing the parameters of that decision.

24   Obviously I object.  It is implicit, of course, in the argument

25   that I made in my opposition to the government's motion in

D7fnles2

1    limine that I differ from your Honor's ruling, but I just want

2    to be clear on a couple of things if I might.

3          The second prong of the argument in the motion in

4    limine dealt with the continuing disability, the

5    recertification.  Apparently the issue was whether that issue

6    can come up that the -- it dealt with the negligence of RRB.  I

7    understand that the negligence of the RRB, Railroad Retirement

8    Board is not at issue here, and that is not something we will

9    be attacking.

10          However, when it came to the continuing disability

11    review, I think your Honor said that it was irrelevant and that

12    was also something that we would not at liberty to discuss.

13          I think that issue could be relevant here for another

14    reason.  Because there would be a annuitants here who would be

15    testifying, I don't know what they will say, we will have some

16    sense based on the materials presented, but I think that the

17    fact that they recertified themselves, certainly that goes to

18    their knowledge and it goes to them saying that they were

19    disabled and it goes to their belief I guess that they were

20    disabled.  And, just as my argument would be they lied to the

21    RRB, they misrepresented things to my client.

22          So I just want to be clear on whether or not it's

23    permissible for me to cross-examine those annuitants who

24    testify on the continuing disability issue.  I have other

25    issues I would like to raise, but that's the first thing I

D7fnles2

1   wanted to be clear about.

2            THE COURT:  Mr. Weddle.

3            MR. WEDDLE:  May I just have one moment, your Honor.

4            THE COURT:  Yes.

5            MR. WEDDLE:

6            MR. DURKIN:  Judge, before Mr. Weddle begins, we would

7   join in Mr. Jackson's request as well and simply point out one

8   other fact.  It may also come up for impeachment purposes.

9   Several of the annuitants that I believe are going to testify

10  have admitted in their plea allocutions that that was part of

11  their crime.  It is not just the original application but also

12  that they have falsified the recertification.  So I think it

13  becomes an issue in that regard as well.

14           THE COURT:  Mr. Weddle.

15           MR. WEDDLE:  Your Honor, this is exactly what we moved

16  on, and that is exactly what your Honor has excluded.  The

17  motion was primarily a Rule 403 motion.  The standard used in

18  this set of continuing disability reviews was a different

19  standard, and to bring it in would tend to confuse the issues

20  and mislead the jury.  So that is exactly why we moved to

21  preclude it.

22           The witnesses are going to be admitting that they lied

23  to the RRB in their original applications.  They are also going

24  to be admitting that they submitted forms by mail to the RRB in

25  furtherance of the scheme.  I think that's what Mr. Durkin is

D7fnles2

1     referring to.  There are forms, I think they are called G254A,

2     continuing disability update forms or something like that.

3     That's totally different from what we moved on.  Those

4     documents correspond to certain overt acts in the indictment

5     and to substantive counts.  Defendant Rutigliano is charged

6     with making a false statement on one of those forms, namely,

7     saying that he was not working when or had not worked when he

8     was.

9              So that is a totally different issue, and it has

10    nothing to do with the continuing disability reviews that we

11    moved on.  I think, because this was a Rule 403 exclusion based

12    on confusion of the issues and misleading the jury and wasting

13    time, obviously that analysis applies notwithstanding

14    Mr. Jackson's reargument today about other reasons that he

15    would like to bring up the issue.

16             The witnesses who are going to be testifying as

17    cooperating witnesses are going to admit that they submitted

18    false documents to the RRB, a number of false documents that

19    were false in many ways, and that the documents were prepared

20    by different people, including all three of the defendants

21    here, the medical records prepared by Dr. Lesniewski and other

22    forms prepared by Mr. Rutigliano and Ms. Baran.

23             So to cross-examine about another form years later in

24    a different context on which they may or may not have made

25    false statements is still going to confuse the issues and

D7fnles2

1  mislead the jury and waste time.

2          The probative value is minimal, if anything, because

3  they have already will have admitted the false statements that

4  they made, and this really adds nothing to the picture that is

5  of value.  It's entirely cumulative and confusing because it is

6  in a different issue.

7          May I have one more moment, your Honor?

8          THE COURT:  Yes.

9          Let me see if we can cut this short.  Mr. Jackson, to

10  the extent that your argument amounts to is a request for

11  reconsideration of the issue --

12          MR. JACKSON:  It does not.

13          THE COURT:  -- ruled on in the motion in limine, that

14  request is denied.  The motion was acted upon.  The ruling is

15  what it is.  I don't see any basis so far that has been offered

16  that was not already taken into account in the Court's ruling.

17          MR. JACKSON:  Judge, most respectfully, the Court's

18  ruling did not take that into account at all, which is the

19  basis for which I'm bringing it up now.  If it did, Judge, in

20  the plain language and text of your ruling, it would be clear,

21  and I wouldn't address it with you.

22          What I am saying is in the context of the RRB, the

23  Railroad Retirement Board, the government urged this Court not

24  to allow the continuing disability recertification review.

25  That is fine.  However, if an annuitant is testifying they are

D7fnles2

going to be saying that they apparently -- I don't know what
they will say.  But what I am cross-examining them on is the
issue upon them recertifying a lie.

         So if they misled the RRB and misled them again,
clearly that could give some indication that they misled Ms.
Baran in the first instance.  It goes to their credibility,
which your Honor didn't address this at all regarding
cross-examination of the annuitants in the motion.  It goes to
the under lying foundation of what I am saying and what I am
urging to this jury.

         Just as they misled the Railroad Retirement Board,
they misled Ms. Baran, who was merely a consultant.  The fact
that again years later they themselves indicated to Ms. Baran
that they were disabled and indicating again to the Railroad
Retirement Board goes to the core issue of them believing
themselves to be disabled, submitting an application for
disability, asking Ms. Baran to assist them with that
application, and then again recertifying that they were
disabled.

         So the fact that I cannot cross-examine them on that
core issue certainly hinders my client's rights and I think
confuses the jury even further.

         THE COURT:  Mr. Jackson, Mr. Weddle has just pointed
out that these witnesses will have already indicated presumably
in their direct that they falsified documents and made other

D7fnles2

misrepresentations to the RRB.  That will be part of the record

that you can cross-examine on.  I don't understand what it is

that you are going to get beyond what you have said.

MR. JACKSON:  It is a lot I'm trying to get, Judge.

The fact is these annuitants filled another form out

recertifying that they were disabled, just as initially they

lied to the RRB, they lied to Ms. Barren they then subsequently

lied then by saying they are disabled, but I can't point out to

the jury that they lied again.  If my indication to the jury is

that he initially lied to Ms. Baran and then they went again

and lied to the RRB, certainly I should be able to point out

that at some later point they again stated they were disabled.

The fact that I'm precluded from doing that I think

certainly hinders Ms. Baran's right to get a fair trial, and it

goes to the core of their credibility.  It has nothing to do

with what you ruled on in the motion in limine.  It wasn't

addressed at all.  And I think impedes her greatly.  It is

unfair, it's prejudicial that I can't point out that this

witness who is testifying and whose credibility the government

is relying upon has lied yet again and tried to mislead the RRB

yet again, just as they misled Ms. Baran in assisting them in

the application process.

This is not a reargument, Judge.  This is not

something that I am seeking to back door in.  It wasn't

addressed.  I believe that I have a legitimate right on

D7fnles2

1    Ms. Baran's behalf to cross-examine witnesses in that regard,

2    and I think your Honor should permit it and allow it, as it's

3    coming in for completely different issue than the government

4    urged that it be precluded in their motion.  It goes to the

5    heart of the matter.  It goes to the credibility of that

6    witness, your Honor.

7              THE COURT:  Mr. Weddle.

8              MR. WEDDLE:  First of all, your Honor, Mr. Jackson

9    didn't respond to our motion in limine.  So actually I think

10   probably to be more precise this isn't a motion for reargument

11   because we moved to preclude any reference to any part of the

12   reviews on Rule 401 and 403 grounds, and he didn't respond.

13             So these are new arguments that he is making.  For the

14   reasons that I said earlier, they are meritless.  This is a

15   Rule 403 exclusion, which means that the prejudice in the form

16   of confusing the issues, misleading the jury, wasting time

17   outweighs any probative value.

18             This particular form filled out let's say in 2010

19   really is, if it has any probative value about a person telling

20   a lie in 2010, it's so minimal as to be clearly precludable

21   under Rule 403.

22             The people will have submitted forms to the RRB.  They

23   will admit on the stand that those forms were false.  Those

24   forms have legends on them saying that they have to be filled

25   out truthfully, that failing to do so is punishable as a crime.

D7fnles2

1   So everything that he's trying to do is covered.  What he's

2   trying to do with this additional form is cumulative of the

3   cross-examination that he's already going to have and is going

4   to cross great prejudice for the reasons stated in our brief

5   that your Honor has ruled on that he didn't respond to.

6           THE COURT:  Thank you.

7           MR. JACKSON:  Judge, I just want to correct something.

8           THE COURT:  Yes.

9           MR. JACKSON:  Regarding me not responding, number one,

10  I did respond to what I thought in the motion in limine in fact

11  affected Ms. Baran.  Number two, to be clear the continuing

12  disability review was not responded to because they were

13  arguing it should be precluded in light of this argument that

14  we were going to raise about the negligence of the RRB and the

15  RRB not detecting this fraud.

16          I am not arguing that the RRB was negligent.  So the

17  continuing disability review in terms of how the government

18  sought to preclude it didn't relate, and I didn't care because

19  I'm not arguing the point about the RRB being negligent.

20          But in the context of your order, Judge, where you

21  seem to exclude for all purposes the whole continuing

22  disability issue, I just think it becomes problematic and it is

23  something that this Court needs to reconsider.

24          THE COURT:  Thank you.

25          I have considered it and I have considered it again,

D7fnles2

1    Mr. Jackson.  I have ruled on it.  I don't see anything new in

2    what you are saying.  The government is right.  This is a 403

3    issue.  The question that you are raising is cumulative.  If

4    the witness says on the stand I lied five times, I don't think

5    that it's material that he lied six times.  You will have

6    plenty of opportunity to drag out as much as possible the fact

7    that the witness lied five times.

8         I don't see that there is any merit in bringing in

9    possibly confusing and cumulative issues with yet another

10   document to establish the same point.  The witness lied.  You

11   don't need to hammer the jury with the same issue over and over

12   and over.  If the witness' credibility has been challenged by

13   five different lies, then the sixth one is not going to make

14   that much difference.  But bringing it in a new document, new

15   context, for other reasons the Court views as unnecessary.

16        MR. JACKSON:  Judge, most respectfully isn't that a

17   jury question?  Shouldn't the jury be allowed to assess

18   credibility?

19        THE COURT:  This is a Court question the.  Question of

20   being able to assess credibility for different reasons, for

21   different purposes, the determination of whether something is

22   cumulative and relevant is not a jury issue.  I have ruled on

23   the matter.  Let's move on.

24        Yes?

25        MR. JACKSON:  I have more, Judge, unless this is about

D7fnles2

1    the same issue.

2            THE COURT:  If it's about the same issue I don't want

3    to hear it.  Mr. Durkin.

4            MR. DURKIN:  I was only going to be ask that we be

5    permitted to join in Mr. Jackson's comments.  I did want to

6    address just one issue which is more than just this issue.

7            The government has several times now mentioned time,

8    wasting time.  There is a real easy way to cut down the time of

9    this trial, and that is them limiting their evidence with

10   respect to Dr. Ajemian and everything else that they are trying

11   to do.

12           I just don't think that it's fair that we should bear

13   the brunt of the waste-of-time argument when it comes to

14   cross-examination.  We also asked earlier -- and I was going to

15   raise this and I don't want this to be argumentative -- but we

16   filed a motion that said if we can't be assured that we could

17   put our defense on in the time allotted, we wanted to seek a

18   continuance.

19           I don't want a continuance.  I have said that we are

20   prepared to go to trial.  But I am very concerned about the

21   amount of evidence the government is going to try to put in,

22   which I think if you want to talk about cumulative or

23   unnecessary, it is unnecessarily prejudicial to our client, all

24   this Ajemian evidence.  I just want the record to be clear that

25   we are concerned that we are not going to have time to put our

D7fnles2

1    case in, and I don't think that our cross-examination choices

2    should be precluded simply as a waste-of-time issue.  That is a

3    far cry from 4303 prejudice.

4            THE COURT:  Two answers to your concern, Mr. Durkin.

5    One is nobody is precluding anything.  That is an incorrect

6    characterization.  The issue is not preclusion.  The issue is

7    how much is enough and whether at some point it becomes

8    irrelevant, immaterial, and cumulative.  That's what the issue

9    is, not whether or not you can cross-examine a witness as to

10   how many lies a witness may have said.

11           I repeat if you can cross-examine the witness as to

12   five lies, cross-examining as to the sixth lie becomes

13   cumulative, unnecessary, and wasteful, especially if it

14   requires the introduction of another document that is not yet

15   in the case and which the Court has ruled not material for

16   other reasons.

17           Second, with respect to the government's case, the

18   Court is very aware of the questions of time limitations and

19   the issue of cumulativeness.  At any point at which it appears

20   to the Court that the government's presentation of its case is

21   cumulative, either by documentation or by number of witnesses,

22   we will deal with that issue at that time.  This Court has on

23   numerous prior occasions in other trials made the government

24   aware that its case was cumulative and so ruled.

25

D7fnles2

1             MR. DURKIN:  Thank you.

2             THE COURT:  Anything else?

3             Mr. Jackson, you said you have other issues.

4             MR. JACKSON:  I do.  Judge, regarding the statement

5       issue, I believe that your ruling pretty much allowed the

6       government to take six assertions that Ms. Baran made, and the

7       other 42 assertions, to preclude those saying that, I guess the

8       Court was reasoning that the government would be allowed to

9       cherry pick statements that Ms. Baran made and that wouldn't

10      offend the rule of completeness or fairness.  I just want to

11      address that so I am absolutely clear.

12            The fact is, is that there was an interview conducted

13      of Ms. Baran, and if you parse out the totality of what Ms.

14      Baran said, there could be about 50 separate assertions,

15      depending upon how you parse out what she said.

16            I listed in my memorandum about 46, but I believe the

17      government is saying that it's only the six statements that the

18      government unilaterally determined to be of interest and

19      relevant and necessary that this jury should hear.  I believe

20      that was your ruling.

21            The other ones, although taken out of context and

22      completely not in proportion to what she was saying, I can't

23      use.  In the event that the witness takes the stand, Judge, and

24      is testifying regarding certain comments that Ms. Baran made

25      and I am looking at her statement and they are lifting

D7fnles2

something from a statement, I just believe -- and I will renew

my objection, your Honor, when I do object, and I will review

my application at that time.  But your Honor is not saying that

when that witness testifies that if they lift something out of

a statement taken out of context that I can't cross-examine

them upon it.  Is that what your Honor is saying?

THE COURT:  I am not saying that you cannot

cross-examine if cross-examination is appropriate an whatever

the issue in the statement is.

MR. JACKSON:  OK.

THE COURT:  The question is whether you can come and

try to offer another statement from Ms. Baran that you think

completes the context which in the Court's view does not

complete the context and may be objectionable for other

reasons.

MR. JACKSON:  That's part of the cross-examination.

In other words, Judge, in the event that the witness testifies

to a statement that was made by Ms. Baran, and that is

something lifted wholesale prior to what she said before or

immediately following something, I would like -- and I guess

the Court just said I could -- to question that witness about

whether or not she said what she said to put it in context for

the jury so as not to mislead the jury, so as not to confuse

the jury, so as not to deny Ms. Baran the right to a fair

trial.  I will reserve for when that happens, but I just want

D7fnles2

1    to be absolutely clear as to your ruling.  You are not saying

2    that I cannot cross-examine on those portions, is that right?

3              THE COURT:  You cannot cross-examine on portions that

4    do not satisfy the standards for completeness.  If a witness

5    testifies that Ms. Baran asked them to make statements in the

6    forms that were not truthful, and in the next statement Ms.

7    Baran said the sky is blue, the sky is blue has nothing to do

8    with the statement that the witness is testifying to.  That

9    would not meet the standard of completeness.

10             MR. JACKSON:  I completely agree, Judge.  But in the

11   event that they do say something and it is out of context,

12   certainly I'm allowed then, Judge, to cross-examine, and we can

13   deal with it at that time, is that correct?

14             MR. WEDDLE:  Your Honor -- I'm sorry.

15             THE COURT:  We will have to make a determination

16   whether or not it is out of context.

17             MR. JACKSON:  OK.

18             THE COURT:  Mr. Weddle.

19             MR. WEDDLE:  A couple of things, your Honor.  This is

20   the reason why we made this motion, and I think your Honor has

21   ruled on the motion.

22             I don't think that we should reargue every motion over

23   and over again.  Our view is that, given your Honor's ruling on

24   the motion, Mr. Jackson should not articulate the substance of

25   any other statement reflected in that memo in cross-examining

D7fnles2

1   the witness.

2          So in your Honor's example, it is not OK, given your

3   Honor's ruling, that the sky is blue, is not subject to the

4   rule of completeness, not admissible if offered by Mr. Jackson,

5   it is not OK for him to say to a witness, Isn't it true,

6   Special Agent, that my client said the sky is blue?  That is in

7   violation of your Honor's ruling, and we would strongly object

8   to that.  It is simply an effort to get material before the

9   jury that your Honor has ruled to be inadmissible.  That is our

10  view.

11         Obviously I have met with the witness.  I am going to

12  continue to work on my questions and answers.  But my questions

13  are going to be highly targeted, and they are going to elicit

14  as best I can simply the pieces that we have put out in our

15  motion.

16         It is not going to be a wide ranging discussion of all

17  the things that Marie Baran said, and it's not going to be

18  purport to be all the things that Marie Baran said, it is going

19  to be what did she say with respect to this narrow topic and

20  the witness is going to say, I believe, the things we set forth

21  in our motion.

22         I don't believe it's consistent with your Honor's

23  ruling on this matter for Mr. Jackson to then be asking

24  questions about other things that Marie Baran said.

25         MR. JACKSON:  I agree.  However, my cross-examination

D7fnles2

```
1    will be targeted also, and to the extent that the government's
2    question elicits something out of context in the statement that
3    was made, I certainly believe I would be permitted --
4             THE COURT:  Mr. Jackson, the government has already
5    flagged for you what those statements are.  Presumably they are
6    six statements?
7             MR. WEDDLE:  Yes, they are in the motion.
8             THE COURT:  They are in their motion.
9             So whether or not they are out of context, you know
10   what they are now.
11            MR. JACKSON:  I do.
12            THE COURT:  So if you feel that any of those are out
13   of context, you have the opportunity during the motion in
14   limine to point that out.
15            MR. JACKSON:  I did, Judge.
16            THE COURT:  I disagreed with you.
17            MR. JACKSON:  I didn't think the disagreement, most
18   respectfully, Judge, was not targeted.  I gave the Court 46
19   various statements that Ms. Baran made.  I just got pretty much
20   a blanket response that didn't address the various statements.
21   The reality, Judge, is that the government is taking it out of
22   context.  It offends the rule of completeness.  It's totally
23   misleading to the jury, it's completely prejudicial, and it's
24   unfair and the Court did not rule on the specific statements
25   that I made with regard to them being out of context at all.
```

D7fnles2

1              THE COURT:  Thank you, Mr. Jackson.

2              MR. WEDDLE:  Your Honor, may I suggest a method of

3     proceeding in this matter.  Obviously Mr. Jackson is an

4     excellent lawyer, and he briefed the matter the way that he did

5     for the reasons that he did.  That was a choice that he decided

6     to make strategically.  Your Honor has ruled on the motion.  To

7     the extent he thinks that something that happens on direct

8     examination opens the door to a particular question that

9     articulates the substance of something that Marie Baran said, I

10    suggest that he first preview that at sidebar and then your

11    Honor can rule on it rather than just throwing out material in

12    front of the jury in a manner that your Honor has already ruled

13    is not admissible.

14             THE COURT:  Thank you.

15             Mr. Jackson, that is the proper way to address the

16    issue, and that is the way that this Court typically handles

17    issues such as you've raised.

18             Anything else?

19             Mr. Ryan.

20             MR. RYAN:  Is your Honor going to rule on the golf

21    evidence issue?

22             THE COURT:  Yes.  Mr. Ryan, I have looked at your

23    motion.  We discussed this at the conference on the telephone

24    on Friday.  I believe the evidence is relevant and I will not

25    preclude it.

D7fnles2

1          To the extent you take issue with the whether or not

2     the government expert physician could opine as to your client's

3     ability to play golf as he did in light of the disabilities

4     that he claimed, the way that that might have been handled is

5     for you to come forward with an equally qualified expert who

6     would testify that indeed your client could play golf in light

7     of the claimed disability, but that is not at issue at this

8     point.

9          Anything else?

10          All right.  Let's check to see what the status of the

11     jury pool is at this point.

12          Mr. Weddle, the issue concerning the summary of the

13     charges, did you work that out?

14          MR. WEDDLE:  I'm sorry, your Honor.

15          THE COURT:  We are going to need that very early on in

16     the voir dire?

17          MR. WEDDLE:  I am not sure what your Honor is planning

18     to use, but the introduction that is in the government's

19     proposed voir dire about the nature of the charges doesn't list

20     any count numbers, so I think that's fine.

21          I was thinking if your Honor is planning to say there

22     is an indictment in the case, and the indictment charges

23     generally this, I would just propose that we omit count

24     numbers.  But in looking at what the government proposed as the

25     explanation of the charges, it's simply one paragraph, and it

D7fnles2

1    doesn't have count numbers.  So I don't think it raises the

2    issue at all.

3            But I can draft something different if your Honor

4    would like something else.

5            THE COURT:  If you have that summary and it is

6    acceptable to the defendants, we can use that.

7            The pool will be about ten minutes, perhaps we can

8    take a break for ten minutes.

9            (Recess)

10           (Continued with jury voir dire in next volume)

11

12                              -   -   -

13

14

15

16

17

18

19

20

21

22

23

24

25