D7hnles1
                              Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                New York, N.Y.

4              v.                            S14 11 Cr. 1091 (VM)

5   PETER LESNIEWSKI, MARIE BARAN
    and JOSEPH RUTIGLIANO,
6
                   Defendants.
7
    ------------------------------x
8

9                                           July 17, 2013
                                            4:40 p.m.
10

11  Before:

12                      HON. VICTOR MARRERO,

13                                          District Judge

14
                            APPEARANCES
15
    PREET BHARARA
16       United States Attorney for the
         Southern District of New York
17  BY:  JUSTIN S. WEDDLE
         DANIEL BEN TEHRANI
18       NICOLE WARE FRIEDLANDER
         Assistant United States Attorneys
19
    LAW OFFICES OF JOSHUA L. DRATEL, P.C.
20       Attorneys for Defendant Peter Lesniewski
    BY:  JOSHUA LEWIS DRATEL
21       LINDSAY A. LEWIS

22  DURKIN & ROBERTS
         Attorneys for Defendant Peter Lesniewski
23  BY:  THOMAS ANTHONY DURKIN

24

25

D7hnles1
                              Trial
                       APPEARANCES CONTINUED

KOEHLER & ISAACS, LLP
        Attorneys for Defendant Marie Baran
BY:   JOEY JACKSON

JOSEPH W. RYAN, JR.
KEVIN MENEILLY
        Attorneys for Defendant Joseph Rutigliano

              - also present -

Annie Chen
Emma Larson, Government Paralegals


SA Frank LoMonaco, FBI

Yeni Yrizarry, Defendant Baran Paralegal

                              oOo

49

D7hnles1
                              Trial

1              (A jury of twelve and two alternate was duly impaneled

2       and sworn)

3              THE COURT:  I am going to give you some very

4       preliminary remarks that will serve as an introduction to the

5       trial.  This will take possibly around 20 minutes or so.

6              At that time it will be roughly 5 o'clock.  I will

7       then adjourn for the day and ask you to return tomorrow at 9.

8       Be prepared tomorrow to stay until about 6:00.  We are trying

9       to see if we can make up some of the time that we have lost by

10      virtue of the length of time that it took for the selection of

11      the jury.  Given the circumstances that you know and are aware

12      of, it took much longer than we anticipated.

13             We are also going to meet for a full day on Friday,

14      until 5.  I will let you know about the schedule for the

15      following week as it develops, but be prepared to meet the

16      entire week.

17             Now, these instructions are not a substitute for the

18      detailed instructions on the law and the evidence that I will

19      give you at the conclusion of the case before you retire for

20      your deliberations.  Rather, these remarks are a simple

21      explanation of your duties and responsibilities and the basic

22      principles of law which are likely to be involved in this case.

23             As a preliminary matter, we will review the schedule

24      with you again.  As I indicated, we expect the trial to last

25      approximately six to seven weeks.  We will make every effort

D7hnles1
Trial

1    possible to streamline and save time in order to maintain

2    within that time frame and if at all possible even to shorten

3    it in any way that we can.

4        We will begin each day at 9 a.m., unless I indicate

5    otherwise, and we will continue until 5 p.m. on most days,

6    again, unless I indicate otherwise.

7        It is extremely important that you allow sufficient

8    time in the morning to ensure that you arrive by 9 a.m.,

9    because the trial cannot start without all of you being present

10   in the jury room and here, and delays could result in our

11   having to stay later on any particular day or stay later beyond

12   the six or seven weeks we are talking about.  We would like to

13   avoid that if at all possible.

14       You can do your part by being here on time and not

15   letting your delays cause an extension.  To the extent that

16   there are delays caused by jury lateness, we may need to

17   respond to that by lengthening the days or shortening the

18   breaks and the lunch so that we maintain within the time frame

19   that we have allotted.

20       We will take a lunch break every day at around 1

21   o'clock for roughly an hour, and we will take ten-minute breaks

22   in the midmorning and midafternoon, roughly around 11, 11:30 or

23   around 3 o'clock for so.

24       If at any time any of you wants the Court to declare a

25   brief recess for any reason, just raise your hand and let me

D7hnles1
                              Trial

1   know and we will take a brief recess, no questions asked.  We

2   will be glad to accommodate such requests.

3          Your purpose as jurors is to find and determine the

4   facts that are at issue in this case.  The jury is the sole

5   judge of facts in the case.  Your task is to decide factual

6   issues based on the evidence presented and then to apply the

7   facts as you find them to the law as contained in my

8   instructions to you at the conclusion of the trial.

9          As I mentioned during the jury selection process, the

10  question of punishment is for the Court alone to determine, and

11  must not enter into your deliberations on the guilt or

12  innocence of any defendant.

13         You may not speculate as to the potential punishment

14  or sentence that any defendant you are considering may face in

15  connection with the charges against him or her brought by the

16  government, nor may you consider the question of punishment

17  when you apply the facts to the law during your deliberations.

18         While you are the judges of the facts, the Court is

19  the sole judge of the law.  In other words, it is my duty to

20  preside at the trial to rule on various legal issues that may

21  come out during the course of the trial and to instruct you on

22  the legal principles that you are to apply to the facts as you

23  find them.

24         The law as given by the Court constitutes the only law

25  for your guidance, and it is your duty to follow the law as I

D7hnles1
                              Trial

1    give it to you.  You are to determine the facts in the case

2    solely from the evidence, which consists of the sworn testimony

3    of witnesses regardless of which party may have called them,

4    any video recordings, audio recordings, documents and physical

5    things that have been received in evidence, regardless of who

6    may have produced them, all facts which may be judicially

7    noticed, and all facts which the parties have stipulated to and

8    which I instruct you to take as truthful for purposes of the

9    case.

10           Later on I will indicate the meaning of some of these

11   terms, such as stipulation and judicial notice.

12           Evidence is a very specific and limited concept.  Not

13   everything that you see or hear in a courtroom is evidence.

14   For instance, what I say now or later is not evidence.  Also,

15   what the lawyers say in their opening statements and closing

16   arguments is not evidence.  To put it affirmatively, evidence

17   consists of the answers given by the witnesses from the witness

18   stand under oath.

19           It is the answer that is the evidence, not the

20   question or how the question was asked.  Obviously, to evaluate

21   the answer, you have to consider the question to which it is a

22   response.

23           As I mentioned statements and arguments of counsel are

24   not evidence in the case unless made as an admission or

25   stipulation, which means that the attorneys agree to a certain

                                    Trial

fact.  When the attorneys on both sides stipulate, or agree, to

the existence of a fact, I will instruct you that you must

accept the stipulation as evidence and regard the fact as

proved.

            On occasion I may tell you that I am taking judicial

notice of certain facts or events.  You may, but are not

required to, accept as conclusive any fact that the Court may

judicially notice.

            You are to consider only the evidence in the case, but

in your consideration of the evidence you are not limited only

to statements of witnesses.  In other words, you are not

limited solely to what you see or hear as the witness

testifies.  You are permitted to draw from the facts which you

find to have been proved such reasonable inferences as you feel

are justified in light of your experiences.

            Your decision on the facts in the case should not be

determined by the number of witnesses testifying for or against

the party.  You should consider all of the facts and

circumstances in evidence to determine which of the witnesses

you choose to believe and not to believe.  You may find that

the testimony of a smaller number of witnesses on one side is

more credible than the testimony of a greater number of

witnesses on the other side.

            Finally, keep in mind that you are not to consider

anything that you may have read or heard about in the case

D7hnles1
                              Trial

1    outside of the courtroom as evidence before or during the

2    trial.

3              I would like to mention a few more principles about

4    evidence that I think will help you as we proceed.  Some

5    evidence is admitted for a limited purpose only.  If I instruct

6    you that an item of evidence has been admitted for a limited

7    purpose, you must consider it only for that limited purpose and

8    no other purpose.

9              Some of you may have heard the terms direct evidence

10   and circumstantial evidence.

11             Direct evidence is simply evidence, like the testimony

12   of an eyewitness, which is, if you believe it, directly proves

13   a fact.  If a witness testified that he or she saw it raining

14   outside and you believe that witness, that would constitute

15   direct evidence that it was raining.

16             Circumstantial evidence is simply a chain of

17   circumstances that indirectly proves a fact.  If someone walked

18   into a courtroom wearing a raincoat covered with drops of water

19   and carrying a wet umbrella, that would be circumstantial

20   evidence from which you could conclude that it was raining.

21             It is your job to decide how much weight to give the

22   direct and circumstantial evidence.  The law makes no

23   distinction between the weight that you should give to either

24   one and does not say that one is any better evidence than

25   another.

Trial

You should consider all of the evidence, both direct
and circumstantial, and give the evidence whatever weight you
believe it deserves.

Part of your job as jurors while determining the facts
is to decide how credible, or believable, each witness is.  It
is your job, not mine.  It is up to you to decide if a
witness's testimony is believable and how much weight you think
it deserves.  You are free to believe everything that a witness
says or only part of it or none of it at all.  But you should
act reasonably and carefully in weighing and making your
decisions.

Let me suggest some things for you to consider in
evaluating the testimony of each witness.

Ask yourself if the witness was able to see or hear
the events in a clear manner.  Sometimes even an honest witness
may not have been able to see or hear what was happening and
may make a mistake.  Ask yourselves how good the witness's
memory seems to be.  Does the witness seem able to remember
accurately what happened?

Ask yourselves if there is anything else that may have
interfered with the witness's ability to perceive or remember
events.  Ask yourselves about how the witness acts while
testifying.  Does the witness appear honest?  Does the witness
appear evasive?  Ask yourself if the witness has any
relationship to the government or to the defendants or any

D7hnles1
                              Trial

1   defendant or anything to gain or to lose from the case that

2   might influence the witness's testimony.  Ask yourself if the

3   witness has any bias or prejudice or reason for testifying that

4   might cause the witness to slant testimony in favor of one side

5   or the other.  Ask yourselves whether the witness testified

6   inconsistently while on the witness stand or if the witness

7   said or did something at any other time that is inconsistent

8   with what the witness said while testifying.

9           If you believe that the witness is inconsistent, ask

10  yourself if this makes the witness's testimony less believable.

11  Sometimes it may, sometimes it may not.  Consider whether the

12  inconsistency is about something important or some unimportant

13  detail.  Ask yourself if it seems like an innocent mistake or

14  if it seems deliberate, and ask yourself how believable the

15  witness's testimony is in light of the all of the evidence in

16  the case.

17          Is the testimony supported or contradicted by evidence

18  that you do find believable?  If you believe that a witness's

19  testimony is contradicted by other evidence, remember that

20  people sometimes forget things and that even two honest people

21  who witness the same event may not describe it exactly the same

22  way.

23          These are only some of the things that you may

24  consider in deciding how believable each witness is.  You may

25  also consider other things that you think shed some light on

D7hnles1
                              Trial

1    the witness's credibility.

2              Use your own common sense and your everyday experience

3    in dealing with other people, and then decide what testimony

4    you believe and how much weight you think it deserves.

5              Now, no statement or ruling or remark or comment that

6    I may make during the course of the trial is intended to

7    indicate my opinion as to how you should decide the case or to

8    influence you in any way in your determination of the facts.

9              At times, I may ask questions of a witness.  If I do,

10   it will be to clarify a matter and should not be viewed in any

11   way to indicate my opinion about the facts or to indicate the

12   weight I feel you should give to the testimony of the witness.

13             Remember that you as jurors are at liberty to

14   disregard all comments of the Court in connection with any

15   factual matter in your determinations of the facts.

16             Also, I may at times take notes.  Keep in mind that

17   whether or not I have taken notes at any particular time should

18   not affect you or lead you to think that one piece of

19   information is more noteworthy than any other.

20             During the trial it may be necessary for me to confer

21   with the parties from time to time outside of the hearing of

22   the jury on questions of law or procedure that require

23   consideration by the court alone.

24             On some occasions you may be excused from the

25   courtroom as a convenience to you while I discuss these matters

D7hnles1
                                    Trial

1    with the lawyers.  These occasions will be kept to a minimum.

2                I will meet with the lawyers in the mornings before we

3    get started and in the afternoon after you have been sent home

4    in order to avoid to the extent possible interruptions when you

5    are here, but you should remember at all times the importance

6    of the matter that you are here to consider, and please

7    remember to remain patient.

8                The parties may sometimes present objections to some

9    testimony or other evidence.  You should not be prejudiced in

10   any way against a lawyer or a party who makes objections.

11               At times I may sustain the objections and you may hear

12   no answer to a question; or, where an answer has been made, I

13   may instruct you that the answer is to be stricken or removed

14   from the record, and I may direct you to disregard certain

15   testimony or evidence.  You must not consider any evidence to

16   which an objection has been sustained or any evidence which I

17   have instructed you to disregard.

18               The law requires that your decision be made solely

19   upon the evidence before you.  The testimony or evidence that I

20   exclude from your consideration will be excluded because it is

21   not legally admissible.

22               In reaching your decision you must not draw any

23   inference or conclusion from any unanswered question, and you

24   must not consider any testimony which has been stricken from

25   the record.

D7hnles1
                              Trial

1          I remind you if I sustain an objection, it means that

2   I have found the objection to be legally correct and the

3   information to which it pertains should not be considered by

4   you.

5          If I overrule an objection, it means that I have found

6   the objection to be incorrect as a matter of law and so the

7   information to which the objection pertains may be considered

8   by you as you determine the facts.

9          As you know, this is a criminal case.  There are three

10  basic rules about a criminal case that you should keep in mind:

11         First, the defendant is presumed innocent until proven

12  guilty.  The indictment against the defendant or any defendant

13  here is brought by the government and it is only an accusation,

14  nothing more.  It is not proof of guilt or anything else.  The

15  defendants, therefore, start out with a clean slate.

16         Second, the burden of proof is on the government

17  throughout the case.  A defendant in a criminal case has no

18  burden to prove his or her innocence or to present any evidence

19  or to testify.  Since defendants have a right to remain silent,

20  the law prohibits you from arriving at your verdict by

21  considering that a defendant may not have testified.

22         Third, the government must prove the defendant's guilt

23  with respect to the charges in the indictment beyond a

24  reasonable doubt.

25         I will give you further instructions on this point

D7hnles1
                              Trial

1      later, but bear in mind that in this respect a criminal case is

2      different from a civil case.  As I mentioned, at the end of the

3      trial I will give you instructions on the law, and those

4      instructions will control your deliberations and decision.

5            But in order to help you follow the evidence, I will

6      now give you a brief summary of the offense or offenses that

7      the government must prove beyond a reasonable doubt to make its

8      case with respect to the charges.

9            After you have heard and seen all of the evidence in

10     this case, I will ask you to deliberate carefully according to

11     my instructions and ultimately render a decision regarding the

12     defendants' guilt or innocence.  Ultimately, your verdict of

13     guilty or not guilty for any defendant will have to be based

14     solely upon the evidence about the particular defendant.

15           Now, I will just summarize the charges as I basically

16     repeat the summary that I gave you earlier, but it is important

17     for you to have this brief version.  You will have a copy of

18     the full indictment to take into the jury room, so you need not

19     at this point be concerned about remembering all of these

20     particular details.

21           The indictment in this case contains 33 counts.  It

22     will take too long to go through each of them at this point.  I

23     will simply summarize for you the concise version that I gave

24     you at the beginning of the process.

25           There are six types of charges contained in these 33

D7hnles1
                              Trial

1   counts of the indictment.

2          First, that the defendants knowingly and willfully

3   engaged in a conspiracy or illegal agreement to commit three

4   types of fraud:  Mail fraud, wire fraud, and health care fraud;

5          Second, that the defendants knowingly and willfully

6   engaged in the conspiracy to defraud the United States, namely,

7   the United States Railroad Retirement Board, or RRB;

8          Third, that all of the defendants committed health

9   care fraud;

10          Fourth, that all of the defendants committed mail

11   fraud;

12          Fifth, that all of the defendants committed wire

13   fraud; and,

14          Sixth, that one of the defendants, Mr. Rutigliano,

15   made a false statement to an agency of the United States,

16   namely, the RRB.

17          Again, in sum, all of the charges relate to

18   allegations that the defendants fraudulently obtained or helped

19   others, specifically, the Long Island Rail Road employees, to

20   fraudulently obtain benefits from the federal government that

21   they were not entitled to receive.

22          Once again, it is the government's burden to prove

23   every element of each of the offenses that I have just

24   described beyond a reasonable doubt, and I will give you

25   specific instructions and descriptions about what those

D7hnles1
                              Trial

 1    elements of each of the crimes are during the full instructions

 2    on the law.

 3          Now, a few words about your conduct as jurors.  As I

 4    have explained, your role is to consider all of the evidence

 5    properly before you in order to decide the facts.  You must

 6    endeavor not to decide any issue or form any opinion in the

 7    case until you have heard all of the evidence and have been

 8    instructed in the law and then retire to the jury room to

 9    deliberate.

10          Until the case is submitted to you, which means at the

11    end of the trial, you are not to discuss the case with anyone,

12    not even your fellow jurors.  It would be improper for you to

13    allow anyone to discuss the case in your presence or influence

14    you in any manner.

15          In addition, you must not talk to the parties or

16    witnesses or anyone else related to the case under any

17    circumstances.  Sometimes jurors have difficulty understanding

18    why it is that they are not allowed to discuss the case with

19    each other.  We ask that you not discuss the case because we

20    want you to keep an open mind until you have heard all of the

21    evidence and my instructions regarding the law.  Therefore, we

22    ask that you avoid discussing the case until you are ready for

23    deliberations.  It is very important that you strictly observe

24    the rules that govern you during the recess, during the breaks

25    in the trial, during lunch, and at the end of the day after you

D7hnles1
                              Trial

1    are discharged for the day so as to assure the parties a fair

2    trial by not allowing any form of outside information or

3    incidents or influence to sway you in your consideration of the

4    case in any manner.

5            So, let me summarize again.  As I mentioned, do not

6    discuss the case either among yourselves or with anyone else

7    during the course of the trial.  Do not permit anyone to

8    discuss the case with you or in your presence.  I realize this

9    may be difficult because it includes family members, spouses,

10   close friends, and close associates, but it is the only way for

11   the parties to be assured of the absolute impartiality that

12   they are entitled to expect from you as jurors.  Until you

13   retire to deliberate in the jury room, you are simply not to

14   talk about the case with anyone.

15           Second, attorneys and parties in the case, as in any

16   case, are instructed by the Court not to have any contact or to

17   communicate with you in any way.  If you should happen to see

18   attorneys or assistants or others involved in the case in the

19   hall or anywhere during the trial and they do not greet you or

20   exchange pleasantries, please understand that they are not

21   being rude.  They are simply following the instructions of the

22   Court that we give in every case.

23           Thirdly, it is important that you not read any form of

24   newspaper articles, listen to radio or television broadcasts

25   about the case, if there are any.  Media accounts may be

D7hnles1
                              Trial

1    inaccurate and may contain information which is not proper

2    evidence for your consideration.  If there are any media

3    reports, simply avoid reading or watching them.

4              Fourth, do not do any form of research or make any

5    investigation about the case on your own.  This includes by any

6    form of technology means, Internet, websites, social media or

7    any such form of communication.

8              Fifth, if anyone should try to talk to you about the

9    case, you must bring that to my attention immediately.  Do not

10   discuss it with your fellow jurors.  Should you inadvertently

11   read or see or hear anything concerning the case, you should

12   immediately inform me.

13             Finally, do not attempt to form an opinion of any kind

14   until after all of the evidence has been presented.   In

15   fairness to the parties to the lawsuit, you should keep an open

16   mind throughout the trial and reach your conclusion only during

17   the deliberations after all of the evidence is in and you have

18   heard the attorneys' closing arguments and my instructions on

19   the law.  Then, after an interchange of views with the other

20   members of the jury, in that way each party's evidence will

21   receive equal consideration from you.

22             If you want to take notes during the course of the

23   trial, you may do so.  However, it is difficult to take

24   detailed notes and pay attention to what the witnesses are

25   saying at the same time.  If you do take notes, be sure that

D7hnles1
                              Trial

1     your note-taking does not interfere with your listening and

2     considering all of the evidence.

3             Also, if you take notes, do not discuss your notes

4     with anyone before you begin your deliberations.  Keep in mind

5     that you will not be allowed to take any of your notes with you

6     at the break or at the end of the day or at the end of the

7     trial.  We will give you notepads that you can use for taking

8     notes, and these should be left on your chairs in the courtroom

9     during breaks at the end of the day and at lunch.

10            Whether or not you choose to take notes, remember that

11    it is your own individual responsibility to listen carefully to

12    the evidence.  You cannot give this responsibility to someone

13    else who is taking notes.  Notes should be used only to refresh

14    the recollection of a juror who took the notes.

15            You should not use any notes in jury deliberations to

16    prove to other jurors that your notes are in fact what

17    witnesses said.  Your notes reflect only your impression of

18    what witnesses said, and we depend on the judgment of all

19    members of the jury, who are all responsible for remembering

20    the evidence in the case.

21            Remember that notes are only aids to memory and should

22    not be given precedence over your own independent recollection

23    of the facts.  You must not allow note-taking to distract your

24    attention from the proceedings.

25            You will notice that we have a court reporter making

D7hnles1
Trial

an official court transcript or a record of the trial.

Although you will not have a typewritten transcript of the

trial made available to you for use during your deliberations,

if you have questions about any portion or excerpt of the

testimony, it may be possible to have an excerpt read back to

you.  Again, I will give you more instructions on that in the

final instructions.

Now, let me go over the order of proceedings.

The trial will go as follows:

The government will first make an opening statement,

which is simply an outline to give you a frame of reference and

help you understand the evidence as the government presents it

and as it comes in.

Next, the defendants' attorneys may, but they do not

have to, make opening statements.  What is said in the opening

statements is not evidence.

The government will then present its witnesses and

counsel for the defendant or defendants may cross-examine them.

At the end of the government's case, the defendants

may, if they wish, present witnesses whom the government may

cross-examine.

After all the evidence is in, the attorneys may

present their closing arguments to summarize and interpret the

evidence that has been presented as they perceive it.  What is

said in the closing arguments is not evidence, just as what is

D7hnles1
Trial

1    said in the opening statements is not evidence.  The closing

2    arguments are designed to present to you what the parties

3    believe the evidence has shown and what reasonable inferences

4    they believe may be drawn from the evidence.

5              After you have heard the closing arguments, I will

6    instruct you on the applicable law, and you will then be asked

7    to retire to the jury room to begin your deliberations on a

8    verdict.

9              Keep in mind that during your deliberations you will

10   be permitted to see all of the exhibits that have been admitted

11   into evidence at the trial or to have witness testimony read

12   back to you if you so request.

13             So, with those instructions, I will then adjourn at

14   this point and ask that you return tomorrow at 9 o'clock

15   promptly.

16             Bear in mind all of the difficulties that you may

17   encounter in transportation, and even, as I indicated

18   yesterday, in getting into this building.  Sometimes lines form

19   downstairs, and it may take five, sometimes as much as ten

20   minutes to go through lines.  So you should make allowance for

21   all of those prospects in determining what time you should

22   leave home in order to be here promptly and ready to start by 9

23   o'clock a.m.

24             Thank you.  Have a good evening.  We will see you

25   tomorrow.  The clerk will escort you into the jury room and

D7hnles1
                              Trial

1    give you instructions about what you should do.

2               (Jury not present)

3               THE COURT:  All right.  Thank you.

4               It is my practice to go over the order of the day or

5    days, give the parties some indication of what to expect.  We

6    had talked about the opening statements.  We had indicated 25

7    minutes for the government, 25 for each of the defendants.

8               Now, let me pose a question to the defense team.  To

9    some extent there is likely to be some amount of overlapping or

10   duplication in your presentation.

11              I wonder whether each of you will actually need the

12   full 25 minutes to present your opening statement.  If you do

13   not, if you feel that there may be some level of overlapping in

14   what you are going to be saying, it would be helpful if you

15   could streamline it so that we can save some time that way.

16              That said, would the government indicate its order of

17   the witnesses, the batting order and who is on deck?

18              MR. WEDDLE:  Yes, your Honor.

19              Our first witness is Steven Gagliano.  He is a

20   cooperating witness.  I think his direct testimony will take at

21   least two hours.

22              Our second witness is Gary Supper, also a cooperating

23   witness.  His direct testimony may be slightly shorter than

24   Mr. Gagliano's.

25              THE COURT:  How much slightly?

D7hnles1
                              Trial

 1          MR. WEDDLE:  Probably right around two hours.  I think

 2   Gagliano is probably between two and three.

 3          THE COURT:  All right.  Is that it?

 4          MR. WEDDLE:  Those are our first two.  I think that

 5   will probably take us through tomorrow, because I'm

 6   anticipating cross-examination for cross-examination for each

 7   of them.  We have about more than an hour and a half I would

 8   say for openings, and then Mr. Gagliano will probably take us

 9   through lunch and then cross-examination, and then Mr. Supper I

10   would imagine that the cross of Supper would go into the next

11   day.

12          There are a couple of issues with respect to

13   Mr. Supper that I wanted to raise.

14          THE COURT:  Let me raise an issue.  It may not be

15   something that you need to address at this point, but at some

16   point during the course of the trial.  If it becomes necessary,

17   depending upon how the time goes, I may resort to taking an

18   estimate of the time that we have allotted and dividing

19   whatever remaining time there is at that point between the two

20   sides so that we can make sure that we stay within the bounds

21   of what we've told the jury.

22          Yes, Mr. Weddle?

23          MR. WEDDLE:  We still need to get stipulations on

24   certain matters, your Honor.  So, to the extent that your Honor

25   is going to divide the time allotted and limit the government

D7hnles1
Trial

1      to half of that time and the defense to half of that time,

2      there may be an unfairness there or some strategy that could be

3      played by the defense to refuse to stipulate and cause the

4      government to use up portions of its time with meaningless

5      uncontested testimony by custodial witnesses.

6              I don't anticipate that that is going to happen, but

7      we've gotten three stipulations out of probably 15 or so

8      that -- four stipulations out of a large number that we've

9      proposed.

10             I'm still optimistic that we are going to get more

11     stipulations.  I don't think that the defense wants a forced

12     march through a series of custodial witnesses and certainly the

13     government doesn't want to have that type of thing happen.  But

14     until we have them, we don't have them.

15             We do have a couple of stipulations that I plan to use

16     during the testimony of Mr. Gagliano, so we've made progress at

17     least that far.  We have been told with respect to some of our

18     proposed stipulations that the defense is confident that they

19     don't want to stipulate.

20             I think that I mentioned this in the morning on the

21     first day of trial, but it was on my list, I may have forgotten

22     to mention it, but I have been told that we need to add a

23     witness to authenticate the video and the still photograph of

24     Mr. Rutigliano playing golf that was taken by the New York

25     Times.

D7hnles1
Trial

1        And I have been told that we need to add a witness to

2    authenticate filed tax returns that were filed by

3    Mr. Rutigliano and Ms. Baran.

4        Those aren't long witnesses, your Honor, but it's two

5    additional witnesses that we had hoped to have stipulations on,

6    because I think that the facts surrounding that authentication

7    are probably not going to be highly contested.

8        But be that as it may, the defense obviously has a

9    complete right to refuse to stipulate if they would like.  But

10   I don't want the government to be prejudiced in terms of simple

11   timing matters by creating any kind of opportunities for

12   strategic action by the defense.

13        THE COURT:  All right.

14        MR. DURKIN:  Judge, could I speak to that?

15        THE COURT:  On that point, let me just give you my

16   general approach and impressions of these.

17        This is not aimed at any particular defendant or this

18   particular case.  In general, I do not take kindly to

19   situations where parties engage in hypertechnicalities, the end

20   result of which is to inconvenience everybody.

21        To the extent that there are facts that are facts and

22   there is no good-faith basis for challenging the authenticity

23   of a document, of course, the parties have the right to insist

24   on compliance with the rules, and it is something that the

25   Court can do if you insist on complying with the rules, but

D7hnles1
                                   Trial

1    bear in mind that the net result of this kind of what I call

2    hypertechnicality is that we delay the trial, inconvenience the

3    jurors, inconvenience the other side, for no good purpose.

4           If there is a document that on its face there is no

5    good-faith basis for challenges, that that is a document and

6    that it says what it purports to say, it just doesn't make any

7    sense to insist that you bring a witness here, also

8    inconvenienced, in order to, say, yes this is a true copy of

9    the document.

10          That is the general approach to these things, and I

11   will also ask about whether the parties have agreed to the

12   documents that are going to be introduced as exhibits as to

13   which there is no disagreement so that we can introduce those

14   and accept them into evidence in bulk.  We can come to that

15   point in a moment.

16          Mr. Durkin?

17          MR. DURKIN:  Judge, I am a little concerned about

18   Mr. Weddle's statement.

19          The only thing that we have said that we would not

20   stipulate to is the New York Times issue, and we have a

21   good-faith basis for doing that.  It is not going to be very

22   time consuming.

23          We had told the government that we have absolutely no

24   desire to delay this trial.  We are not getting paid by the

25   hour.  We have no motive to be here.  I don't even live here.

D7hnles1
                          Trial

1           So there is no suggestion whatsoever that -- I have

2    thought so far we have been getting along pretty well on this,

3    and I expect we are going to be able to stipulate to all the

4    kinds of things you just talked about.

5           So I just want to make that clear.  We have no reason

6    whatsoever to delay this trial.  We don't want to delay the

7    trial.

8           But what I did want to speak to, and I will just say

9    this now, and my mentor Frank Oliver, who is long since dead,

10   will be happy that I said it, but he always used to remind me

11   to remind judges that the only people in the courtroom that

12   have rights are the defendants.

13          The government has powers and authorities which they

14   can exercise.  But for the government to claim that somehow

15   they are going to be prejudiced, I disagree with.  We are

16   working with them.  I don't see a problem with stipulations.

17   We've gotten along very well as far as I can tell, and I resent

18   even the suggestion that somehow we would want to play games

19   with timing for tactical reasons.

20          THE COURT:  Well, I take in this circumstance,

21   Mr. Durkin, the word prejudice in its widest possible

22   application.

23          MR. DURKIN:  I appreciate that.

24          THE COURT:  To the extent that the government and you

25   will have to be working over the Labor Day weekend instead of

D7hnles1
Trial

1   being at home in Chicago or wherever, that is a form of

2   prejudice in my mind.

3           So it's important that we find ways of avoiding those

4   means of prejudice in its largest sense, inconvenience and the

5   possible effects.

6           MR. DURKIN:  I will venture to say, Judge, there is no

7   one in this courtroom that wants this trial to end more than I

8   do.  Trust me, we will do everything possible to expedite the

9   trial.

10          One thing that would greatly expedite the trial,

11  however, is if we can at least have the witness order in a

12  given week.  Because after Supper we don't know who is coming.

13  That could cause some delay because Mr. Dratel and I, for

14  example, have to split up the cross-examinations.  We need to

15  speak to cocounsel.  To the extent we can -- at least in

16  Chicago it's fairly common that the government, particularly in

17  a lengthy trial that the government has to give notice of

18  upcoming week's witnesses.

19          THE COURT:  Mr. Durkin, you heard me say to the

20  government that I wanted to hear who is the starting team and

21  who is on deck.  I heard the starting team of Mr. Gagliano and

22  Mr. Supper.

23          So, Mr. Weddle, who is on deck?

24          MR. WEDDLE:  Your Honor, before I answer your Honor's

25  question, if I may, I wanted to make clear and I hope that I

D7hnles1
                            Trial

1    made clear that I think we are working well with defense

2    counsel, and I am optimistic that we are going to reach

3    stipulations that we have proposed.

4            We are working with them.  We haven't had a problem.

5    I was just saying that we haven't had complete success yet

6    either.  So if we are at this early stage of the game talking

7    about dividing up a six-week period and saying the government

8    you get this much, the defense you get that much, that works to

9    our detriment.

10           I am not saying that we are going to come to that.  I

11   just wanted to make that simple point, that that type of effort

12   in order to keep the trial within the time frame that we have

13   been talking about works to the detriment of the government.

14           I don't think it's going to come to that.  I think

15   that we are going to reach agreement on these things.  As I

16   have said, we have been working well, and I echo what

17   Mr. Durkin has said.

18           But as a prosecutor, I know that anything that can go

19   wrong can go wrong.  So until I have a signature on a

20   stipulation, I need to continue to think about how am I going

21   deal with it if at the end of the day they say, you know what,

22   we are not going to do it.

23           So I tend to be anxious about that kind of thing, your

24   Honor, until I have a fully signed stipulation.  I don't have

25   that except with respect to a couple of the very most basic

D7hnles1
                              Trial

1    authentication stipulations that we have proposed.  It is just

2    a little anxiety that I have, your Honor, that I just wanted to

3    share with the room, and it is not to say that I am not

4    optimistic.  I am optimistic.

5              THE COURT:  All right.  To remain with the baseball

6    metaphor, it ain't over till it's over.

7              MR. WEDDLE:  Exactly, your Honor.

8              THE COURT:  Mr. Ryan.

9              MR. DRATEL:  Your Honor, can we ask this question

10   about witnesses first?

11             THE COURT:  Yes.

12             MR. DRATEL:  Because that's the one question that is

13   on the table.

14             THE COURT:  Anything else?  Mr. Ryan has stood up.

15   Mr. Ryan, were you addressing this issue?

16             MR. DRATEL:  Your Honor, you asked about the witnesses

17   after Mr. Supper.  Let's get that out of the way first before

18   we get distracted.  I would like to hear that because we've

19   been trying to get this answer to get some kind of lead time.

20             MR. WEDDLE:  Your Honor, when the defense has asked me

21   for this answer I don't like the dynamic of always being in the

22   position of giving everything for the government and getting

23   nothing in return.  So when the defense asks me for what I need

24   more than just the first two witnesses so that I can prepare, I

25   say a number of things to the defense.

D7hnles1
                              Trial

1              I say, number one, you have had the 3500 material for

2     weeks.

3              Number two, you have had the marked exhibits for

4     weeks.

5              Number three, I have told you the first two witnesses.

6              Number four, I'm waiting for stipulations.

7              So why don't you start giving me a stipulation or a

8     couple stipulations every morning, and I will give you a name.

9     That is sort of the posture that we are in here.  Obviously, if

10    your Honor is ordering me to simply give up the list of names,

11    then they are in a position where they don't need anything from

12    me and all I need is stuff from them, which are stipulations.

13             This is the type of thing that I would rather not

14    involve your Honor in.  It's a small-scale, you know,

15    small-game jockeying among counsel at the beginning of a trial.

16    It's going to work itself out.  I'm confident.

17             I have been through this many times before.  This is

18    the kind of thing that happens at the start of the trial.  It

19    stops happening very quickly.  So I think that's where we are

20    going to be.  I don't think we have to burden your Honor with

21    this kind of thing.

22             They have had these two witnesses' names since Friday.

23    I am sure that they are fully prepared to cross-examine these

24    witnesses.  I think that these witnesses -- perhaps it would be

25    helpful if the defense told me how long their cross-examination

D7hnles1
Trial

1    of Mr. Gagliano and Mr. Supper was planned to be.  Each defense

2    counsel could tell me that, and then it would be easier for me

3    to make a prediction about whether Mr. Summer and Mr. Gagliano

4    take us through the end of the day on Friday.

5             THE COURT:  All right.  Let me make a couple of

6    observations.

7             MR. DRATEL:  Your Honor, may I speak to what he said,

8    because there's inaccuracies in what he said.  Number one, we

9    got 50 pieces of 3500 material Monday night, including new

10   witnesses.  So that is just not true.

11            The second thing is, the stipulation issue, it is not

12   a tradeoff that we only get the names of witnesses if we

13   stipulate.  That is coercion.  That is a totally independent

14   issue.

15            The question on stipulations is we can only stipulate

16   to things that we agree with, matters of fact.  This is not

17   questions of authenticity that we are talking about.

18            There are questions in some of these stipulations

19   about facts.  Some of the facts are in dispute.  We are trying

20   to work out language that accommodates both sides without the

21   need to call a witness.  We can't have a stipulation that cuts

22   off at one point and is not reciprocal in the sense that it

23   only has one side of the story in it.  That is one of our

24   issues with stipulations, and we are confident that we can work

25   that out.  But the notion that we only get witness names which

D7hnles1
Trial

1     we are entitled to to make this trial work only if we give

2     something up that we don't have to give up as a matter of our

3     obligation to our clients we cannot give up, that is improper

4     to make that exchange.  That's what's happening.

5              THE COURT:  All right.  Let me make a couple of

6     observations, again because the dynamic that Mr. Weddle

7     describes is one that the Court is also very familiar with at

8     the beginning of many of these trials.  There's always this

9     kind of initial tension among counsel.  Despite the good

10    working relationship, some residual tension always remains.  It

11    works itself out eventually, but it causes a certain amount of

12    unpleasantness, and most of the time it is not necessary.

13              I agree with the defense that the government should

14    not see some of these things as tit for tat.  On the other

15    hand, I have had many cases in which the parties have arguments

16    about stipulations, that the drugs that the defendant was

17    caught with was cocaine and not sugar, and they argue about

18    whether or not they should bring the expert from Washington in

19    order to tell us that the drugs in the envelope were cocaine.

20              Sometimes the defense puts the government through that

21    kind of runaround.  It's common.  In cases where this has

22    happened, the reason why the defense does that is because they

23    want something from the government.  This is all human nature.

24              The bottom line in most cases is that it causes

25    unnecessary friction, tension, and it works against the kind of

D7hnles1
                              Trial

1   good working relationships that speed up cases.  We do not have

2   the luxury of delays of any kind in this case for the reasons

3   that you all know about.

4            It is the practice of the Court also to ask the

5   government to give us the names of people a couple of days down

6   the road in the same way that it is the practice of the Court

7   to insist that defendants not exercise hypertechnicalities on

8   matters where there is no good-faith basis for withholding

9   consent.

10            Of course, you will say that there are issues of fact,

11  but I have given you examples in which there are no issues of

12  fact and it is all technical holding back because one party

13  wants something from the other.  I am not saying that that is

14  what is involved here, but I have seen it enough times to see

15  it and to recognize it where it is what it is.

16            So I will ask the government to give us some

17  indication of what witnesses it expects after Mr. Supper, and I

18  will also ask the defendants to go back and think hard about

19  getting those stipulations in so that it gives the Court and

20  the government comfort that we are not going to be bringing in

21  witnesses here for no good-faith reason.

22            (Continued on next page)

23

24

25

D7hdles2

1          MR. WEDDLE:  After Mr. Supper, your Honor, we plan to

2     call Mr. Parlante, also a cooperating witness.  So I'd say his

3     direct testimony is probably around the same as Mr. Supper's.

4          And it would be helpful, your Honor, to know for our

5     own scheduling purposes some kind of prediction on how long the

6     defense thinks they maybe cross-examining.

7          THE COURT:  That was going to be my next question

8     because that's important, and it is also important for another

9     reason.  We have three defendants and each of them has his or

10     her own lawyer.  In many cases where we have multiple

11     defendants and multiple attorneys, we lose time unnecessarily

12     because each counsel wants to have an opportunity to

13     cross-examine and we find -- again, this a matter of

14     experience -- that a lot of the cross-examination becomes

15     repetitive, duplicative, and unnecessary.

16          If you have a witness who is testifying only as to

17     matters pertaining to one defendant and not to another, there

18     is no reason why the other defense counsel, unless something

19     extraordinarily compelling, should feel that they have some

20     cause to want to cross-examine every single witness on every

21     single issue.  If during the course of the cross-examination by

22     one defense counsel, the key points that pertain to the case

23     have already been brought out, it makes no sense to have the

24     cumulative cross-examination by other defense counsel bringing

25     out the same points all over again.

D7hdles2

1              We have instances in which -- and you will see this

2     happening during the course of the day -- where witnesses come

3     forward and give their pedigree.  One witness will give the

4     pedigree.  For whatever reason, this happens usually with

5     expert witnesses under cross-examination by one defense

6     counsel.  The next defense counsel will come up and ask the

7     witness again some pedigree questions.  Totally unnecessary.

8              If the witness has already said that he or she

9     graduated from such and such university, here the jury doesn't

10    need to hear that three times, unless there is some question of

11    fact as to whether or not the witness graduated from wherever

12    it was.  Just an example.

13             So I would ask the defense to see to what extent you

14    can coordinate and streamline cross-examinations, assign

15    witnesses to one person so that you don't all three need to

16    cross-examine every single witness, and you can take the lead

17    on different witnesses, depending upon what that witness is

18    testifying to, and that way we can also make a lot of time.

19             Now, coming back to exhibits.

20             In the Court's individual practices, I ask the parties

21    to do everything possible to identify documents that are

22    intended to be introduced into evidence and admitted as to

23    which there is no objection.  And then I ask that that list of

24    those exhibits numbered be read into the record before the

25    witness testifies so that during the course of the direct or

D7hdles2

cross-examination the party who is doing the examination,

direct or cross, could simply bring in the document that has

already been preadmitted.  You don't have to stop with every

single witness to introduce a document.  We lose an enormous

amount of time trying do it that way.

So if you have exhibits as to which there is no good

faith objection, identify those in advance.  We will read those

into the record before the witness testifies, and then the

examination, direct and cross, could go much more smoothly.

If there is a good faith objection to a particular

document, put those aside or flag them.  And when those are

introduced in the order in which they come in, we can then have

whatever arguments there may be about whether or not they

should come in.

All right.  Now, Mr. Ryan, I know that you were --

MR. RYAN:  Your Honor just said what I was about to

say.

THE COURT:  Thank you for anticipating the Court.

MR. RYAN:  The idea of exhibits and marking them,

that's got to be resolved before the witness testifies.  For

example, we are going to have Mr. Gagliano tomorrow.  We should

agree what exhibits they are going to offer and what exhibits

we may have so that we can eliminate that.  That is the most

productive process.  So that we are not talking in the abstract

now.  We are talking about Mr. Gagliano.  We are talking about

D7hdles2

1   Mr. Supper.

2           The government tells us what exhibits they want to use

3   for that examination tonight, and we will point out what

4   exhibits we have.  And we have premarked -- I have given the

5   government our defense exhibits, and I've even given them

6   written objections.  And I think if we do this

7   witness-by-witness and day-by-day, we iron out what exhibits we

8   want we don't have to go through these abstract arguments.  I

9   think that is a great suggestion, Judge.  Thank you.

10          THE COURT:  Thank you.  So the parties should -- if

11  you have not done so already, and I would be disappointed if

12  you have not, go through this exercise of identifying the

13  documents that are going to be used for the witnesses who are

14  coming up and marking those as to which there are no objections

15  and then making a list of those so that we can preadmit them.

16          All right?

17          MR. RYAN:  Thank you.

18          THE COURT:  Anything else?

19          Mr. Weddle.

20          MR. WEDDLE:  Sorry, your Honor, to belabor this issue,

21  but it would be very helpful in terms of scheduling witnesses

22  if we had a prediction about how long the cross-examination

23  would be.

24          THE COURT:  I was going to come to that.  That is the

25  reason I made the statement that I did about cross-examination

D7hdles2

1      so that we don't duplicate unnecessarily a cross-examination of

2      witnesses and that counsel coordinate their presentation so

3      that if it is not necessary that each cross-examine, that you

4      designate whoever it is that is going to do it per witness and

5      you share the burden that way.

6              Mr. Durkin.

7              MR. DURKIN:  Judge, while I think Mr. Gagliano may

8      affect both -- I will cross-examine Mr. Gagliano first

9      tomorrow.  I would like to think I could do it within two

10     hours.  I hope so.  I don't want it to be any longer than that,

11     although sometimes I am told by other judges that my estimates

12     are poor.

13             But there is an issue -- Mr. Weddle and I have

14     discussed this.  There is an issue that I think may help here.

15     We have done a stipulation with respect to I believe it's

16     Government Exhibit 101.

17             Am I correct, Mr. Weddle?

18             MR. WEDDLE:  Yes.

19             MR. DURKIN:  101 is the entire RRB file for

20     Mr. Gagliano.  As I understand it, the government is going

21     to -- the stipulation authenticates Exhibit 101, that this is a

22     true and accurate copy, so we don't have any problem with that.

23     However, I don't believe the government is going to admit 101,

24     which might get into some timing issues, because there are

25     documents within -- the government, in addition to Exhibit

D7hdles2

1   101 -- do you have a copy of their exhibit list, Judge?  There

2   are a number of -- I just sent mine back with the clerk because

3   he has to go to class tonight.  But there is a number of 101

4   subexhibits, 101-A through I want to say G, Mr. Weddle.

5          THE COURT:  I have through S, 101S.

6          MR. DURKIN:  101S.

7          MR. WEDDLE:  I think we can do this a little bit

8   abstractly.  I think in refining my Q and A for Mr. Gagliano, I

9   have cut some of the exhibits, but there are some, a few

10  documents that come from that file that are submarked as

11  exhibits that we are planning to offer.  I don't have a problem

12  with going through with defense counsel and saying these are

13  the exhibits that I am planning to offer through Mr. Gagliano

14  and doing as your Honor suggested and as Mr. Ryan suggested.

15  But there is probably a shorter list than what is on the

16  exhibit list right now.

17         MR. DURKIN:  That is fine.

18         MR. WEDDLE:  In general terms --

19         MR. DURKIN:  Here is my point.  There are other

20  documents in that file, and this kind of goes to the length of

21  the cross.  I expect that Mr. Gagliano will admit to those.  I

22  don't think I am going to have to offer them.  I may use them

23  to cross-examine.

24         There are quite a few medical records, for example,

25  contained in Mr. Gagliano's medical records contained in 101.

D7hdles2

1    I am assuming he will -- I may need to use some of them to

2    refresh his recollection, and I'm assuming he is going to admit

3    to the things that are in there.  So I don't know that it will

4    be necessary for us to admit it.

5            But that's -- it would be easier if 101 could just

6    come in, I think, from a timing standpoint.  But I think the

7    government has issues with some of what 101 is coming in.

8            THE COURT:  Mr. Weddle.

9            MR. WEDDLE:  Your Honor, the stipulation is a

10   stipulation.  So the file is authenticated.  The file as a

11   whole should not be admitted.  It has a number of different

12   kinds of documents in it.  If, in fact, if we are talking about

13   Mr. Gagliano's file, it includes documents relating to a

14   continuing disability review which we made a motion in limine

15   on which your Honor granted.  And I have a little bit more to

16   say about continuing disability reviews which I would like to

17   come back to later.  So that's just one example of why that

18   entire file should not be in evidence.  So we plan to offer

19   some pieces of it.

20           What Mr. Durkin describes as using documents to

21   refresh recollection or to cross-examine a witness, if the

22   witness makes an inconsistent statement and there is a prior

23   inconsistent statement reflected in a document that's in that

24   file, then that seems like fair cross-examination.  That

25   doesn't involving offering the document, because, after all,

D7hdles2

1   you can refresh recollection with anything, or attempt to

2   refresh recollection with anything.

3           So to the extent Mr. Durkin is pulling items from the

4   file and cross-examining in those fashions, your Honor, it

5   seems fine.  It also seems not to matter that they come from

6   the file.

7           But to the extent he wants to offer the document, then

8   we are going to have to have a discussion with him about what

9   would be the basis for offering the document, and I think what

10  he's described so far doesn't involve offering the document.

11          THE COURT:  All right.

12          MR. DURKIN:  What I'm getting at, Judge, to be clear

13  is that there are documents, for example, that may well be part

14  of this continuing review.  I understand your order to say that

15  we can't make reference to the continuing review, but I don't

16  see that as precluding me -- you know, for example, if there is

17  a medical record that he submitted as part of that, it seems to

18  me I should still be able to use that document to cross-examine

19  him as long as I don't say "and this is all part of a

20  continuing review."  Do you understand my point?

21          THE COURT:  If you are using the document for a

22  purpose that doesn't require the introduction of it, you are

23  using it for credibility or impeachment or for refreshing

24  recollection that does not require an identification of the

25  document, those are all, as I view it, legitimate purposes of

D7hdles2

1    cross-examination of these documents.

2            MR. WEDDLE:  Your Honor --

3            MR. DURKIN:  I just wanted to make sure, I just

4    thought, since it is going to come up tomorrow.

5            MR. WEDDLE:  Your Honor, I just think this is

6    incorrect, your Honor, and this is the thing I wanted to come

7    back to on continuing disability reviews.  In fact, we are in

8    the process today of preparing a letter to your Honor because

9    we received an e-mail last night from Mr. Jackson in which

10   Mr. Jackson said that he fully intended to offer evidence

11   relating to continuing disability reviews for an additional

12   purpose that he claimed was not covered by our motion.

13           So last night, late at night, I was spending time

14   pulling quotes from our motion that demonstrated that what he

15   was arguing was exactly covered by our motion.  Our motion

16   moved to preclude any reference to the continuing disability

17   reviews both on relevance grounds and on 403 grounds.  And the

18   problem is --

19           THE COURT:  We are not talking about something else,

20   Mr. Weddle; we are talking about impeachment or refreshing

21   recollection that does not implicate having to indicate what

22   the nature of this document is or getting into a contest over

23   the source or the meaning or the definition of the document.

24           MR. WEDDLE:  Well, your Honor, that's highly

25   problematic because -- and this is exactly what we argued in

D7hdles2

1  our motion -- which is if they're pulling out a statement

2  relating to a continuing disability review process and they're

3  saying isn't it the case that you told somebody in 2010 X and

4  the witness says whatever the witness says in response to that,

5  we are now left hanging with another interaction with this

6  witness.

7  If the witness says, yeah, I remember saying that, now

8  the jury is left wondering, well, what was that interaction in

9  2010?  Where did that come from?  And what's the explanation?

10  And the problem is the explanation is going to add a tremendous

11  amount of time, and it's going to cause confusion -- well,

12  leaving it hanging causes confusion and threatens to mislead

13  the jury.  And in order to undo that confusion the government

14  would then have to prove up the whole continuing disability

15  review process, disprove these incorrect characterizations that

16  the defense -- that Dr. Ajemian, Dr. Lesniewski in his

17  opposition to the motion that we made, and Mr. Jackson in his

18  attempt to reargue the motion on Monday morning, and

19  Mr. Jackson in his e-mail to the government last night have all

20  mischaracterized these reviews.

21  And so we move to preclude any reference to the

22  reviews.  And to cross-examine a witness based on interactions

23  relating to that review, documents relating to that review,

24  things that a doctor may have written as part of the review,

25  things that the RRB may have written in conjunction with those

D7hdles2

1    reviews, things that the witness may have said or written in

2    conjunction with those reviews causes all of the prejudice that

3    we moved in limine to preclude, and your Honor granted it.

4         And the reason that we made the motion in limine was

5    because we knew this would be an issue, and we thought that in

6    limine motions are designed to permit these issues to be

7    resolved in an orderly fashion.  We made the motion.  It was

8    opposed by Dr. Lesniewski.  I can't remember now if Marie Baran

9    joined in their opposition, but, in any event, she did not

10   submit her own arguments on this.  They tried to reargue it on

11   Monday morning at the start of the trial.  They were sending us

12   e-mails last night trying to reargue it.  The same argument was

13   made by Dr. Ajemian in conjunction with his sentencing.  The

14   government responded to it then.  We made similar responses in

15   our motion in limine and in our reply papers, and the Court

16   granted the motion.

17        THE COURT:  All right.  Mr. Weddle, I think, again, we

18   are belaboring the point.  We will examine exactly the scope of

19   what was ruled, and if the defense come forward with something

20   that is not within the scope of what was ruled, the most we

21   could do is listen to see what form of creative mind they have

22   to think of something that hasn't been already said and argued

23   many, many times, but let's not prejudge their creativity.

24        MR. WEDDLE:  Well, your Honor, it is highly

25   problematic for the government.  We made this motion on time.

D7hdles2

1     It was decided on time.  We are planning to call Steven

2     Gagliano tomorrow.  He was subjected to a continuing disability

3     review.

4              We are entitled to know -- we did know that any

5     reference to the documents relating to the continuing

6     disability review were precluded.  This is from our brief.  We

7     move to preclude any suggestion or argument about the reviews,

8     any finding made or exam performed in connection with the

9     reviews.  And so we prepared -- I've prepared the questioning

10    of Mr. Gagliano accordingly.

11             Now, if I need to go back and add into the questioning

12    his interactions with people relating to the continuing

13    disability reviews, that undoes the ruling.  So he --

14             THE COURT:  Mr. Weddle, let me interrupt for a moment.

15             Cross-examination has to be within the scope of the

16    direct.

17             MR. WEDDLE:  Your Honor, the problem is that one of

18    the many reasons that we moved to preclude this evidence is

19    because the continuing disability reviews relied, of course, on

20    the false statements made by these three defendants as well as

21    false statements by their co-conspirators, like Mr. Gagliano.

22    And so as the government we don't want to be in a position of

23    not eliciting a false statement made by Mr. Gagliano if it's

24    going to be the subject of cross-examination.  That's exactly

25    what why we made motions in limine, so we know that that

D7hdles2

1    evidence is precluded, it will not be part of cross-examination

2    so that we're not unfairly whipsawed in cross-examination by

3    not eliciting the fact that when he went for the continuing

4    disability review he was afraid, obviously, that he might lose

5    his benefits and so he lied about what his condition was like.

6    And that played an important part, obviously, in the result

7    that came out of that continuing disability review, which is

8    that he continued to have his benefits.

9          There is more to that story, but we shouldn't be

10   whipsawed by making a motion that precludes the evidence,

11   leaving it out of our direct examination, and then having the

12   defense, having lost the motion, having made all these

13   arguments, that were fully considered by the Court and denied,

14   then pulling out documents and saying that they are only using

15   them to refresh recollection or to, you know, whatever they are

16   using them on cross-examination for credibility purposes.

17         There is a credibility issue with respect to the

18   continuing disability review because Mr. Gagliano lied.  He did

19   not tell the truth when he went to that exam.  These defendants

20   lied, which played into the continuing disability review, and

21   that information was precluded by the Court as irrelevant and

22   prejudicial under Rule 403.

23         And if that ruling means anything, it means we can

24   safely leave it out of the direct without being whipsawed on

25   cross-examination.

D7hdles2

1           THE COURT:  All right.  Now, again, let me come back.

2           When Mr. Durkin was talking about -- or made reference

3   to documents that he may want to use either for refreshing

4   recollection or impeachment purposes, I understood what he was

5   saying in its generic term, in its generic use.

6           If the document has already been precluded by a prior

7   ruling of the Court, then it is precluded.  So we'll just have

8   to cross that bridge when we come to it, Mr. Weddle and

9   Mr. Durkin.

10          MR. DURKIN:  Judge, I've read your ruling quite

11  carefully, and I intend to stay within the limits of your

12  ruling.

13          THE COURT:  All right.

14          MR. WEDDLE:  Your Honor, I think that this -- I mean,

15  crossing that bridge when we come to it causes extreme

16  prejudice to the government for the reasons that I just

17  explained.  If this evidence is going to be use on

18  cross-examination, I need to elicit it from my cooperating

19  witness.

20          THE COURT:  Mr. Weddle, listen carefully to what I

21  said.  If the evidence has been precluded by the Court's

22  previous ruling, it is precluded.

23          MR. WEDDLE:  I agree, your Honor, and Mr. Durkin has

24  said he --

25          THE COURT:  Let me just give you an example about

D7hdles2

1  refreshing recollection.

2          If the witness testifies to something where we are

3  sort of -- this is all speculative because we don't know what

4  Mr. Gagliano is going to be testifying to about which he won't

5  have present recollection.  But if it comes to a point where he

6  doesn't remember something and there is a document that might

7  refresh his recollection, without identifying what that

8  document is, it may be possible that he could be shown the

9  document, that it could refresh his recollection, without

10  getting into the question of where the document comes from,

11  what it is, or the kinds of concerns that you have.

12          MR. WEDDLE:  That's true, your Honor, in the abstract.

13          I think that what would be useful --

14          THE COURT:  The whole conversation is in the abstract.

15          MR. WEDDLE:  Exactly, your Honor.  And what I was

16  going to suggest is that since everybody knows that Steven

17  Gagliano is the first witness, that Mr. Durkin simply tells me

18  which documents he is planning to use.  Then we can look at

19  them, and I can see whether I think that they are within your

20  Honor's ruling as being excluded.

21          He says he's read your Honor's ruling and he doesn't

22  intend to violate it.  Mr. Jackson has said that he understands

23  your Honor's ruling and he doesn't intend to violate it.  But

24  based on his arguments on Monday and his e-mail to the

25  government last night, he clearly doesn't understand your

D7hdles2

1    Honor's ruling in the way that we do.  So this apparently is an

2    issue that maybe has to be rehashed.  We thought that it was an

3    issue that we could just make an in limine motion and things

4    would be clear, but, unfortunately, we are in a position -- and

5    I don't think that this is a big deal, your Honor.  I think

6    that rather than speaking abstractly, defense counsel could

7    just say here's the document that I want to cross-examine him

8    about, here's what I want to get from him.  If he doesn't give

9    me this, then I'm going to use this document to refresh his

10   recollection.

11           The problem is going to be if what he's trying to get

12   from the witness has been excluded by the Court, then --

13           THE COURT:  If it has been excluded by the Court and

14   they make an attempt to get it through the back door, the Court

15   will close the back door.

16           MR. DURKIN:  Judge, if I could just say one thing?

17           I don't anticipate, if this witness tells the truth,

18   of having to use any documents, because I anticipate he will

19   answer my questions "yes" when I ask him about the things I'm

20   talking about, because I don't know how he can dispute it.

21   This is a man who is going to come on and say I really wasn't

22   disabled when I filed this disability.  There are a number of

23   things -- and I don't really like to have to pre-try it now --

24   that I intend to ask him about with respect to those injuries

25   that he testifies he's now saying they're false.  I believe, if

D7hdles2

1    he tells the truth, I won't need to use any documents because

2    he will have to say "yes" to the answer.  I only anticipate a

3    problem if he says I don't know what you're talking about, or,

4    no, I never said that; then it is a different issue.

5         But, I mean, you know, Mr. Weddle knows the document

6    and everything is right in the document, either -- you know,

7    and I don't see anything in your order that said we were

8    precluded from using exhibits.  Your order says "reference."

9         Now, I grant you that I can't stand there and say

10   didn't you say in the review on such and such a date.  I don't

11   intend to do that.  That would be violating your order.  I

12   think you understand where I'm coming from, and at least I

13   understood what you were saying.  That's all I am going to try

14   and do.

15        THE COURT:  All right.

16        MR. JACKSON:  Judge, can I say one word before Mr.

17   Weddle goes again?

18        MR. WEDDLE:  Your Honor --

19        THE COURT:  Mr. Jackson stood up and has the floor.

20        MR. JACKSON:  Thank you very much, Judge.  I greatly

21   appreciate that.

22        The first thing I want to address, I'll start here, is

23   that with respect to the whole timing issue and the opening

24   statement issue, let me go to that.

25        THE COURT:  Excuse me, Mr. Jackson, for a moment.

D7hdles2

1          MR. JACKSON:  Yes.

2          (Pause)

3          THE COURT:  Yes, Mr. Jackson.

4          MR. JACKSON:  Thank you, Judge.  I fully intend to use

5     the 25 minutes.  I suspect the Court will at some point stop me

6     and have me exit stage left.  I understand the need for

7     coordination, but I also understand the need for everyone to

8     understand that every defendant here retained their own lawyer,

9     and I don't think ceding representation would be appropriate

10    for any particular defendant.

11          On that line and in that vein, if a witness -- I don't

12    intend to be duplicative.  I don't intend, provided that

13    counsel is covering cross-examination -- we are past the

14    opening statement now -- in their cross, I'm not going to redo

15    what Mr. Ryan does or what Mr. Durkin does or what Mr. Dratel

16    does, but I can't give you an estimate on my cross-examination

17    because I don't know what other additional things may be

18    elicited from this witness which affect Ms. Baran.  And,

19    obviously, Ms. Baran has a right not to have her representation

20    ceded and for me to agree to another lawyer cross-examine upon

21    a point which may be insignificant as it relates to their

22    client but may be very significant as it relates to me.

23          Having said that, coming back to the continuing

24    disability review issue.

25          I just received an e-mail from the government -- OK,

D7hdles2

1    this was not two months ago, this was not last year, this is

2    not when the case started and they were initially indicted --

3    this is an e-mail that I received wherein Monday -- we received

4    the e-mail Monday.  So Monday of this week, Judge, I received

5    an e-mail, and the e-mail happens to reference independent

6    medical examinations, opinions and tests, and the results that

7    were obtained to virtually all Long Island Railroad

8    occupational disability applications since August of 2008.  The

9    results through September of 2011 have confirmed the impairment

10   claims -- this is the e-mail, which is dated, by the way,

11   October 28, 2011, at 1:59 p.m.  Why I'm receiving it Monday,

12   July 15th, of 2013, is beside the point.  But I received this

13   e-mail.  And then it says, the results through September 2011

14   have confirmed the impairment claims by the applicants and

15   their treating physicians, with benefits being awarded -- only

16   four more lines, Judge -- to 346 applicants, benefits being

17   denied to 13 applicants, two applicants withdrawing an

18   application.

19          Continuing disability reviews consisting of

20   independent medical examinations, opinions and tests were also

21   completed for 355 Long Island Railroad employees already

22   drawing occupational disability.  The reviews demonstrate that

23   354 individuals continue to be occupationally disabled, one

24   annuitant being deceased.

25          Now, clearly, Judge, that was something within the

D7hdles2

province of the government, this e-mail, that was something

that clearly could have been disclosed at an earlier time that

would have been brought to my knowledge, the knowledge of

co-counsel, the knowledge of our respective clients, and could

have been addressed by the government in a way that was open to

everyone, in a way that your Honor's order would have

contemplated the issue of this going to the heart of this

matter.

    The argument of the government, Judge, is that my

client lied.  She's a fraud.  And she's a fraud because

everyone came to her telling her they weren't disabled but you

help me in my disability and we'll get it.

    Well, this, Judge, establishes that after independent

medical evaluations and reviews, guess what?  There are no

liars because that was confirmed.

    To be clear, as I understand your Honor's order, it

contemplates continuing disability reviews in the context of --

in the context of -- suggesting that in a potential defense,

which the government thought we would have, that the Railroad

Retirement Board is negligent, they didn't undercover this.

And so in the context of that your Honor said we are going to

preclude the discussion about that because it goes to the issue

of negligence.

    Judge, this does not go to the issue of negligence.

This was recently disclosed.  And this particular matter, your

D7hdles2

1    Honor, completely goes to the good faith defense that we'll

2    have.  And that good faith is that, just as -- just as the

3    people came and said they were disabled to Ms. Baran -- and, in

4    fact, she relying upon those representations and discussions

5    with them completing the application, apparently these people

6    are disabled, and they are disabled because that fact was

7    confirmed by the Railroad Retirement Board themselves.

8              This is not something that your Honor's order

9    contemplated.  This is not something that your Honor had seen.

10   This is something that Mr. Weddle apparently e-mailed your

11   Honor, as he e-mailed to us, these very recent disclosures.

12   And so I don't think that your order at all addressed this

13   issue.  And I think not allowing me to bring out this very

14   point that these people are truly disabled completely impairs

15   not only her defense, not only does it allow for an unfair

16   trial but it completely misleads this jury as to what the

17   government is arguing concerning what Ms. Baran did.

18             So that is the e-mail that Mr. Weddle is referring to.

19   This is something that -- clearly was not something that you

20   were aware of -- we're aware of it now, and that's the e-mail

21   that is being referenced in his discussion regarding this

22   continuing disability review.  So just as the government

23   shouldn't be prejudiced, Judge, we shouldn't be prejudiced at

24   all.  This is about fairness for everyone.

25             And certainly in light of this recent disclosure and

D7hdles2

1    in light of independent medical examinations, I should, of

2    course, be entitled to make this jury aware of these very

3    facts.

4              THE COURT:  All right.  Thank you.

5              MR. WEDDLE:  All right.  Your Honor, this is exactly

6    what I was preparing a letter on, and I can send the letter to

7    your Honor --

8              THE COURT:  All right.  Send the letter because I see

9    this just going around and around and around, and I see that

10   Mr. Jackson basically is going through the back door.  That is

11   exactly what we are trying to prevent, Mr. Jackson.  You are

12   trying to get through the back door.

13             MR. JACKSON:  Judge --

14             THE COURT:  I will not listen to reargument, argument

15   about matters that have been decided.

16             MR. JACKSON:  Judge, I got this Monday.  How is this

17   going through the back door when I got this Monday?

18             MR. WEDDLE:  Your Honor, just to respond to this point

19   that Mr. Jackson is making right now.  Your Honor took the

20   bench on Monday morning for the start of our trial, and your

21   Honor said, at page 4 of the transcript, line 15, "The Court

22   has also received correspondence from the government dated

23   July 11th, which it is making available to Court and copies to

24   the defendants certain material that it classifies as 3500,"

25   and it continues.  So this e-mail that Mr. Jackson is talking

D7hdles2

about is the same document that your Honor was referencing on

Monday morning.

        We had this argument on Monday morning.  I am drafting

a letter explaining the -- I think off the top of my head maybe

five or six reasons why everything that Mr. Jackson said here

just now is wrong.  The continuing disability review documents

are contained in the claim files.  The claim files were

produced in discovery, I believe, in February 2012.

        Our fourth production in discovery -- and I apologize,

your Honor, I don't know the date of it off the top of my head,

but our fourth production of discovery, which is written in my

draft letter on my computer, produced separately a compilation

of many of the same documents relating to continuation

disability reviews.  So the defense would have them in one

place.

        Later, one of the defendants, Mr. Ehrlinger,

complained that many claim files were produced in paper format,

and he wanted hem to be scanned and produced in a searchable

format.  The government did that at great expense.  The

government scanned I believe 1600 claim files and produced them

to the defense in searchable format.  I believe that production

was made either in October 2012 or December 2012.

        Simple searches in that material would bring up any

information about continuing disability reviews.  The same

argument that Mr. Jackson is arguing is new and somehow newly

D7hdles2

1   disclosed in the letter that we sent to your Honor on Friday

2   that your Honor mentioned in court on Monday was disclosed in

3   discovery a year-and-a-half ago, was disclosed again in

4   discovery more than a year ago, was expressly argued by

5   Dr. Ajemian at his sentencing, was expressly argued by Dr.

6   Lesniewski in his opposition to our motion, was expressly

7   refuted both in our opposition to Dr. Ajemian's sentencing

8   memo, in our motion in limine, in our reply, and in my remarks

9   on Monday morning.  So we're just rehashing the same ground.

10          I am happy to send the letter, your Honor, but the

11   presentation that we've heard here is alleging some kind of

12   holding back of information by the government, which is

13   completely false, and so I felt like I needed to respond

14   briefly to that point here.

15          MR. JACKSON:  Just quickly.  Did we have the e-mails?

16          MS. FRIEDLANDER:  Yes, you had them Friday.

17          MR. JACKSON:  I'm sorry.  So we had them Friday after

18   the Judge wrote to me.

19          MR. DURKIN:  Yes.

20          MR. JACKSON:  Just for the record.

21          THE COURT:  For the record, Mr. Jackson, I received

22   the e-mails after the decision had been issued.  I reviewed the

23   e-mails over the weekend.  On Monday morning I basically

24   acknowledged having received them.  And if I had felt that that

25   material had made any difference to the Court's ruling, I would

D7hdles2

1      have at that point indicated so.

2             I considered the defense arguments on Monday morning

3      as forms of motions for reconsideration.  I denied them, having

4      been fully aware of those e-mails at that time.  So to that

5      extent those issues are part of the record, part of what I

6      considered, and part of what I denied in reconsideration.

7             MR. JACKSON:  Judge, just for the record.  You

8      considered e-mails in your motion -- excuse me, in motions and

9      in a decision that you rendered prior to having received the

10     e-mails.

11            THE COURT:  I didn't say that, Mr. Jackson.  Please

12     listen to me carefully.  I said that I decided the motion.  I

13     subsequently saw the material.  Upon considering that material,

14     it did not make a difference to me in my ruling, and therefore

15     considered the ruling as having been reaffirmed and reratified,

16     however you want to characterize it, in the light of that

17     so-called new material.

18            I said, if that material had made a difference to the

19     Court's ruling, I would have said so on Monday morning when you

20     all presented your requests for reconsideration, which I

21     denied.  I could not have denied reconsideration at that point

22     without having been aware that that material was already in the

23     record.  It didn't make a difference to my ruling.

24            MR. JACKSON:  Just to preserve the record, Judge, and

25     I will adhere, that you are characterizing what I said as a

D7hdles2

1      motion to reconsider.  It was not at all a motion to reconsider

2      or reargue.  In my view, it was new information that was

3      injected into this case that was not considered previously, and

4      it is on that basis that I made the arguments.

5              THE COURT:  By its own definition, new evidence

6      submitted after a decision has been rendered is a request for

7      reconsideration, and, in fact, one of the defendants -- it may

8      have been Mr. Lesniewski, Dr. Lesniewski, submitted a reply

9      which it was formally characterized as a request for

10     reconsideration.

11             All right.  If there is nothing else, I will,

12     unfortunately, have to leave for another matter.  So thank you.

13             We'll see you tomorrow at 9 o'clock.

14             (Adjourned to 9 a.m., Thursday, July 18, 2013)

15

16

17

18

19

20

21

22

23

24

25