```
D7inles1
                              Trial
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4              v.                          S14 11 Cr. 1091 (VM)

 5   PETER LESNIEWSKI, MARIE BARAN
     and JOSEPH RUTIGLIANO,
 6
                   Defendants.
 7
     ------------------------------x
 8

 9                                         July 18, 2013
                                           9:00 a.m.
10

11   Before:

12                       HON. VICTOR MARRERO,

13                                         District Judge

14
                              APPEARANCES
15
     PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17   BY:  JUSTIN S. WEDDLE
          DANIEL BEN TEHRANI
18        NICOLE WARE FRIEDLANDER
          Assistant United States Attorneys
19
     LAW OFFICES OF JOSHUA L. DRATEL, P.C.
20        Attorneys for Defendant Peter Lesniewski
     BY:  JOSHUA LEWIS DRATEL
21        LINDSAY A. LEWIS

22   DURKIN & ROBERTS
          Attorneys for Defendant Peter Lesniewski
23   BY:  THOMAS ANTHONY DURKIN

24

25
```

D7inles1

Trial

APPEARANCES CONTINUED

KOEHLER & ISAACS, LLP
    Attorneys for Defendant Marie Baran
BY:  JOEY JACKSON

JOSEPH W. RYAN, JR.
KEVIN MENEILLY
    Attorneys for Defendant Joseph Rutigliano

       - also present -

Annie Chen
Emma Larson, Government Paralegals


SA Frank LoMonaco, FBI

Yeni Yrizarry, Defendant Baran Paralegal

oOo

D7inles1
Trial

1          (Trial resumed)

2          (In open court; jury not present)

3          THE COURT:  I understand the jury is here, so we

4    should be ready to begin momentarily.

5          Before we do, let me come back for just 30 seconds to

6    this question with regards to the continuing disability

7    reviews.  The Court has received a letter from the government

8    dated July 17 in which the government repeats the arguments

9    that we have heard repeatedly again concerning this matter.

10         Let me just be absolutely clear, if it has not been

11   clear to date, the Court has ruled that the continuing

12   disability reviews evidence is not admissible and will not be

13   permitted under any circumstances that I can now foresee.

14   Except, although we have closed the front door and we've closed

15   the back door, I hope, there's still a keyhole.  If the

16   government uses it to open the matter, of course, at that point

17   the defendants will be free to pursue it.  That's the only

18   circumstance in which I can see now there being any permissible

19   use of that evidence.

20         Bring in the jury.

21         MR. DURKIN:  Can I ask one question?

22         THE COURT:  Unless you have something else.

23         Yes.

24         MR. DURKIN:  Let's assume we have the RRB file,

25   Exhibit 101 for Mr. Gagliano, there are medical records

D7inles1
                              Trial

 1   contained in it.  I can use that to refresh his recollection if

 2   I ask him on such and such a date he went to the doctor, as

 3   long as I don't get into why he went to the doctor or why that

 4   is in there.

 5            THE COURT:  If he does not have a present recollection

 6   and you have a document that may refresh his recollection, you

 7   can show it to him without indicating what the document is.

 8            MR. DURKIN:  Thank you, your Honor.

 9            THE COURT:  Yes?

10            MR. WEDDLE:  Your Honor, the issue with what

11   Mr. Durkin just said is that there are medical records in the

12   file that postdate Mr. Gagliano's obtaining occupational

13   disability, and I would say that that is fair game.

14            There are also records in the file relating to a

15   continuing disability review of Mr. Gagliano, including a

16   document relating to him visiting a doctor for what they call

17   an independent medical exam.

18            As we said in our motion papers and have said

19   repeatedly, Mr. Gagliano lied in that context.  This is the

20   issue that we have raised in our motion.  They want to talk

21   about what he said in that independent medical exam, which was

22   part of the continuing disability review process.  Then they

23   are attempting to open the door themselves.

24            So I don't think that they should be asking

25   Mr. Gagliano about his visit to a doctor in the independent

D7inles1
                              Trial

1   medical exam context.  There are other visits to doctors, and I

2   don't have a problem with that.  But he has a single visit to a

3   doctor in the context of a continuing disability review, and I

4   don't think that they should be asking about that.  That is

5   exactly what we moved on, and whether he remembers it or

6   doesn't remember it, I don't think they should be asking him

7   about it.

8          THE COURT:  I think we are talking in the abstract.

9   We will deal with that if it comes up.  Mr. Gagliano may or may

10  not have a present recollection.  If he does not, and there is

11  something in the record that may refresh his recollection -- if

12  he's testifying about that matter, presumably it is because it

13  was part of your direct.  If it is not part of your direct,

14  then on cross-examination that evidence could be barred anyway.

15         MR. WEDDLE:  That's right.  It is not going to be part

16  of our direct.  But if they want to say what happened when

17  Mr. Gagliano went for the independent medical exam is he lied,

18  because he was worried about losing his disability.

19         If they are going to ask him on such and such a date

20  you went to this doctor -- I'm forgetting the doctor's name but

21  I can look it up readily -- you went to this doctor and you

22  lied to this doctor in the context of the independent medical

23  exam continuing disability review process, the government is

24  prejudiced.  This is what I talked about yesterday with respect

25  to --

D7inles1
                              Trial

1        THE COURT:  You are getting ahead of yourself,

2   Mr. Weddle, because that presumes that you will have opened the

3   door for him to testify about that matter.  If you have not

4   opened the door on direct, then how does the cross-examination

5   on that issue come up?

6        MR. WEDDLE:  I agree.

7        THE COURT:  If you agree, then let's put it to bed

8   right now.

9        (Jury present)

10        THE COURT:  Good morning.  Welcome.

11        We very much appreciate that all of the members of the

12   jury were here on time.  We had to take care of a few

13   housekeeping matters before, so we are reasonably on schedule.

14        As I indicated yesterday, I anticipate that we will go

15   today through 6 o'clock in order to make up some of the lost

16   time, and we will meet tomorrow morning and afternoon.  We will

17   endeavor to conclude tomorrow by 5.

18        At this point, we move into the next phase of the

19   proceeding, which is the opening statements from the parties.

20   The government goes first, and the defendants, if they choose,

21   could make an opening statement.

22        Just by way of reminder, as I indicated yesterday

23   several times, the opening statements are not evidence.  They

24   are intended to give you an advance roadmap of what the

25   government contends the evidence will show and the defendants,

D7inles1
                                Trial

 1   if they choose, what the evidence will not show.

 2          I indicated yesterday also that you can take notes if

 3   you choose.  For that purpose we will give you notepads,

 4   pencils, and pens if you need them.

 5          But bear in mind what I also said.  If you take notes,

 6   there are limitations on your use of them, so bear those in

 7   mind as well.

 8          Is the government ready to proceed?

 9          MR. TEHRANI:  Yes.  Thank you, your Honor.

10          The Long Island Rail Road is one of the busiest

11   commuter railroads in the nation.  Day after day thousands of

12   employees work to keep the railroad running.  But year after

13   year hundreds of Long Island Rail Road employees also committed

14   a massive and brazen fraud.

15          Year after year, in order to retire early and pad

16   their pensions, hundreds of Long Island Rail Road employees

17   filed bogus applications for disability benefits with the

18   federal government, disability benefits those employees did not

19   need and certainly did not deserve, disability benefits that

20   were intended to provide an important safety net to

21   legitimately disabled workers.

22          Over more than a decade, nearly 80 percent of all Long

23   Island Rail Road retirees obtained disability benefits.  That's

24   four out of five people, costing the federal government

25   hundreds of millions of dollars.

D7inles1                    Opening - Mr. Tehrani

1          How was that possible?  Because of people like these

2     three defendants.

3          This is Dr. Peter Lesniewski.  He was a corrupt doctor

4     who Long Island Rail Road employees paid, often in cash, to

5     falsely declare that they were disabled.  The employees counted

6     on him to cook up phony paper trails of made-up diagnoses of

7     medical problems that would make them seem disabled, and

8     Dr. Lesniewski delivered.  Of the hundreds of Long Island Rail

9     Road employees that he claimed to have treated, over 98 percent

10    of them obtained disability benefits, 98 percent of them.

11         Dr. Lesniewski declared his Long Island Rail Road

12    patients to be disabled on the date of their choosing, even

13    though he knew they were not disabled, even though he knew they

14    just wanted to retire and obtain disability benefits they were

15    not entitled to.

16         This is Marie Baran.

17         This is Joseph Rutigliano.

18         They were disability application consultants who

19    helped Long Island Rail Road employees commit this fraud.

20    Those defendants filled out simple, straightforward

21    applications for Long Island Rail Road employees for money,

22    usually about a thousand dollars, usually in cash.

23         And Baran and Rutigliano filled them with lies, lies

24    they knew would work, lies they knew would trick the federal

25    government into approving the bogus disability claims.

1          Now, all three of these defendants -- Peter

2     Lesniewski, Marie Baran, and Joseph Rutigliano -- made a

3     lucrative business out of this disability fraud.  They helped

4     Long Island Rail Road employees commit this fraud because they

5     themselves profited from it.

6          That, ladies and gentlemen, is why we are here today.

7          Now, in order to understand why so many Long Island

8     Rail Road employees decided to commit this fraud, let me talk

9     to you very briefly about how the pension system works at the

10    Long Island Rail Road.  Generally speaking, Long Island Rail

11    Road employees who worked for a certain number of years were

12    eligible to retire with a pension at age 50, but at age 50 that

13    pension was only about half their salary.

14         At age 65 for most employees that pension increased to

15    almost their full salary.  So at age 50 they got roughly half

16    their salary; at age 65 they got roughly their full salary.

17         But many Long Island Rail Road employees figured out a

18    way to retire before 65 and still get almost their entire

19    salary.  As you will learn, a federal agency called the

20    Railroad Retirement Board or RRB provides a disability benefit

21    for railroad employees who are too disabled to do their jobs.

22    It's called an occupational disability.

23         Long Island Rail Road employees realized that if they

24    were able to get that occupational disability money, they would

25    end up with almost their entire salary.  So many Long Island

D7inles1                          Opening – Mr. Tehrani

1    Rail Road employees, most of them in their early 50s, submitted

2    fraudulent disability applications to the RRB in droves,

3    applications filled with lies, applications that falsely

4    claimed that they were no longer able to work.

5           Why did they do that?  Because they wanted to retire

6    early, but they didn't want to make less money.

7           The RRB then reviewed those applications, applications

8    that on their face were required to be filled out truthfully

9    under penalty of criminal prosecution.  The RRB relied on the

10   applications to determine whether the applicant was eligible

11   for an occupational disability, to determine whether the

12   applicant was unable to do his or her job.

13          So what were in those application materials?

14          First, there was the application itself, simple forms

15   that ask questions about the applicant, questions like:  What

16   is your disability?  When were you unable to work because of

17   your disability?  Is it easy, hard, or impossible for you to do

18   simple basic activities?  Who is your doctor?  What is your

19   job?  What are your job responsibilities?  Could you please

20   describe your daily activities.  Straightforward questions

21   about the applicant's life, job, and physical condition.

22          Second, the application asked for medical information

23   from a doctor, medical information documenting the applicant's

24   disability.

25          As the evidence will show, Long Island Rail Road

D7inles1                        Opening - Mr. Tehrani

employees paid people to falsify both parts of their

applications.  They paid a corrupt doctor like Peter Lesniewski

to lie to the RRB and claim they were too disabled to do their

jobs, and they paid a corrupt application consultant, someone

like Marie Baran or Joseph Rutigliano, to fill out their

disability applications for them, to answer the questions about

the applicant's own physical conditions in jobs, to answer

questions about the applicant's own daily activities.  They

paid them a thousand dollars, usually in cash, to answer those

questions with lies, the kinds of lies needed to convince the

RRB that they were no longer able to work.

So, focusing first on Dr. Lesniewski, he was one of

three known disability doctors, along with Dr. Peter Ajemian

and Dr. Ralph Parisi, who saw the vast majority of Long Island

Rail Road employees seeking disability.

You will hear that over a four-year period those three

doctors saw over 80 percent of the Long Island Rail Road

employees who retired and said that they were disabled.

Together those three doctors ensured that the employees would

get the bogus medical records that they needed, and the

evidence will show that Dr. Lesniewski ran his practice like a

disability fraud mill.

A Long Island Rail Road employee would typically begin

seeing Dr. Lesniewski about a year before he wanted to retire.

Why then?  So Lesniewski had enough time to create a paper

D7inles1                    Opening - Mr. Tehrani

1    trail of fake diagnoses, tests, and visits that would make it

2    seem like the employee was really disabled.

3          Over the course of that year, Lesniewski would order a

4    host of unnecessary tests and space out a series of needless

5    visits.  He would direct each Long Island Rail Road employee to

6    visit him again and again for months on end, billing for each

7    visit to make it look on paper like he diagnosed these people

8    with serious conditions and was trying to heal them.

9          In truth, though, he hadn't found any serious

10   conditions, and he wasn't providing meaningful treatment at

11   all.  As you will hear, what Lesniewski was doing was padding a

12   file to trick the federal government into thinking that the

13   patients could not work.  Yet all the while, the employees

14   continued to work, usually taking no sick leave, and, in fact,

15   were usually working overtime, lots of overtime, extra hours to

16   pad their retirement pensions.

17         As the date the employee wanted to retire approached,

18   Lesniewski would write a summary or a narrative that the

19   employee could attach to his disability application.  The

20   employee typically paid Lesniewski about a thousand dollars for

21   the narrative, often in cash.

22         The narrative would invariably describe a gradually

23   worsening condition, each one inevitably resulting in a patient

24   being declared disabled exactly as planned and exactly on time.

25         In fact, as you will learn, some of Dr. Lesniewski's

1   patients were explicit about what they wanted him to do.  You

2   will see notes in Dr. Lesniewski's medical records, notes

3   indicating that a patient is coming for retirement disability

4   only to retire and file for disability almost a year later with

5   Dr. Lesniewski's recommendation.

6          You will see another chart note reading, and I quote,

7   "He works for Long Island Rail Road and needs disability and

8   retiring next year."  The patient retired as planned a year and

9   three months later and obtained a disability as planned with

10  the recommendation from Dr. Lesniewski.

11         You will learn about another Long Island Rail Road

12  employee who was concerned that his fake disability, his

13  shoulder injury, wasn't enough.  You will learn that he told

14  Dr. Lesniewski in writing to create more fake disabling

15  conditions and to do it fast.  He told him in writing that he

16  wanted to get a permanent disability after he stopped working.

17         He wrote, "Once I get shoulder fixed railroad

18  retirement may withdraw disability benefits."  So he told

19  Dr. Lesniewski to do tests on his back, knees, and ankle and

20  you will see how quickly Lesniewski obliged.

21         You will learn that within weeks Lesniewski had

22  created a paper trail of multiple other phoney disabilities,

23  inventing supposedly disabling conditions in the employee's

24  back, hands, and knee exactly as he was directed and paid to

25  do.  You will learn that, based on those lies, the employee was

D7inles1                    Opening - Mr. Tehrani

awarded a federal disability pension, and they retired too a

busy and physically active life playing, among other things,

ice hockey.

          Marie Baran and Joseph Rutigliano were the disability

application consultants.  They filled out forms for both

Dr. Lesniewski and Dr. Ajemian.  They were paid approximately a

thousand dollars in cash to fill out simple, straightforward

forms asking questions about the applicant's lives.

          They answered those questions with lies.  They said

the employees had terrible physical problems that prevented

them from doing their jobs.  Those were lies.

          They said they had difficulty performing the most

basic activities of everyday life, sitting, standing, walking,

feeding themselves, bathing themselves, dressing, driving, even

reading and writing.  All of it lies, and all lies created with

little, if any, input from the applicant.

          And why were they even paid to answer those kinds of

questions?  Because Baran and Rutigliano knew what the right

lies were to convince the RRB to award the disability.  As the

evidence will show, both Baran and Rutigliano were insiders,

people who knew exactly how the process worked and how best to

exploit it.

          Up until 2007, Baran worked for the RRB as a district

manager of the Westbury district office.  Rather than continue

to work for the RRB, she chose to retire and take advantage of

1    it.

2           In fact, as you will learn, Marie Baran benefited from

3    the scheme even from before then.  As you will learn her

4    husband, Gus, retired from the Long Island Rail Road and got a

5    fraudulent disability based on Dr. Lesniewski's recommendation,

6    and you will learn that he retired to a life of golf and

7    travel, world travel, with Marie, funded by his fraudulently

8    obtained disability benefits.

9           So Marie Baran went into the disability fraud business

10   herself.  How did that business work?  You will learn that she

11   met briefly with her Long Island Rail Road clients, asking few

12   if any questions, and spending almost no time asking about

13   their actual physical condition.  Yet she then filled out

14   fraudulent application after fraudulent application with the

15   same boilerplate lies about their physical conditions and their

16   abilities to work.

17          She often used virtually the same descriptions of

18   their daily activities, cookie cutter applications that had

19   almost nothing in common with her applicant's physical

20   conditions and instead described sad, almost homebound lives.

21          Rutigliano was also an insider, a former conductor at

22   Long Island Rail Road and president of the union local.  You

23   will learn that, like Baran, he retired and went into business

24   filling out bogus disability applications.  And he, like Baran,

25   for about a thousand dollars a person filled out application

D7inles1                    Opening - Mr. Tehrani

1    after application with lies.

2            How did he know what lies to tell?  Because, as you

3    will learn, he committed the same disability fraud himself.  He

4    was also receiving disability money from the RRB, money based

5    on an application filled with lies and a medical narrative from

6    Dr. Lesniewski.

7            While Rutigliano claimed that he was too disabled to

8    work, while he said in his application that it was hard for him

9    to sit, stand, or walk, hard for him to tie his shoes or put on

10   his pants, hard for him to write because of hand and wrist

11   cramping, he retired to a life of regular, year-round golf.

12           You will also learn that, although he said he was too

13   disabled to work, he in fact kept working, except now as a

14   corrupt disability application consultant.  He worked helping

15   others cheat the same way he had.

16           He, too, would meet briefly with his clients and ask

17   few if any questions.  He would fill out applications about the

18   employees' own lives with lies, often by copying and pasting

19   directly from his own fraudulent disability application.

20           You will also learn that, because Rutigliano was on

21   disability, he had to tell the RRB if he earned any income,

22   income that would have indicated, among other things, that he

23   was able to work.  So what did he do?  You will learn that he

24   lied again.  He told the RRB that he had not worked and he had

25   not made any money.  In truth, Rutigliano had worked for years

D7inles1                         Opening - Mr. Tehrani

1    charging each client a thousand dollars in cash to fill out

2    fraudulent disability applications.

3           For the defendants' conduct, they are charged with a

4    number of different crimes.  Judge Marrero will explain them to

5    you at the end of the trial, but basically they are charged

6    with conspiring or agreeing with others to commit fraud, and

7    they are also charged with committing fraud, all in connection

8    the fraudulent disability applications submitted to the RRB.

9           So that is a brief overview of the case.  Let me tell

10   you know how the government will prove it to you.

11          First, you are going to hear from a number of former

12   Long Island Rail Road employees who, like so many others,

13   participated in this disability fraud, conductors, engineers,

14   signalmen, office workers.

15          You will hear from Long Island Rail Road employees who

16   submitted fraudulent disability applications and received

17   disability benefits they weren't entitled to.

18          And you will hear from Long Island Rail Road employees

19   who were planning to submit fraudulent disability applications

20   but chose not to because they got cold feet.

21          These former Long Island Rail Road employees will tell

22   you all about the cultural fraud of the railroad.  They'll tell

23   you about how people talked openly about how the scheme worked,

24   and they'll tell you how they learned how they could cheat and

25   retire early.

D7inles1                    Opening - Mr. Tehrani

1              They will tell you about the well-established

2      blueprint for the fraud, the three disability doctors,

3      including Lesniewski and the application consultants, including

4      Baran and Rutigliano.

5              These witnesses were tell you about their interactions

6      with Lesniewski, that they knew he would document a disability

7      and that he didn't disappoint.  They'll tell you about their

8      short visits and their numerous tests.  They'll tell you that

9      he offered little, if any, meaningful treatment, and they

10     didn't ask for any.  They went to Lesniewski to document a fake

11     disability, and he did exactly what they paid him to do.

12             They will tell you that after they had purchased their

13     narratives from Dr. Lesniewski, they sometimes never saw him

14     again, unless, of course, they needed him to fill out

15     additional fraudulent disability forms.

16             They will also tell you about their face-to-face

17     meetings with Baran and Rutigliano, about how they discussed

18     very little about their physical conditions or their jobs.

19             They will tell you that most of them didn't look at

20     the applications that Baran and Rutigliano had filled out, but

21     they knew that Baran and Rutigliano would say what needed to be

22     said to make sure they got their disability benefits.  They'll

23     tell you that they knew they were committing a fraud, but that

24     even they were shocked and embarrassed to see the applications

25     that Baran and Rutigliano had filled out.  They will tell you

D7inles1                    Opening - Mr. Tehrani

1    the applications were filled with outrageous lies, lies that

2    Baran and Rutigliano had made up.

3              And what was the truth?

4              They will tell you that they were not disabled, that

5    they could have continued doing their jobs, but that they just

6    wanted to retire and keep getting their full salaries and that

7    they had been planning on retiring when they retired for years.

8              They will tell you that despite what was written in

9    their disability applications, the retirements funded by

10   federal disability benefits were quite active.

11             You will hear from one witness who biked 400 miles

12   across New York State, who hiked Mt. Kilimanjaro in Africa and

13   ran three-mile races.  You will see his disability application

14   that states it was hard for him to sit because of severe and

15   disabling pain in his back, shoulder, and legs; that it was

16   impossible for him to do chores of any kind.

17             You will hear from a witness who paid Marie Baran over

18   a thousand dollars to fill out his disability application and

19   then played golf three to four times a week, including on two

20   occasions with Baran's husband while they were both on

21   disability.  You will see that Marie Baran claimed that

22   stretching, reaching, bending, and crouching caused this avid

23   golfer pain and discomfort, that it was hard for him to sit,

24   stand, and walk.  He will tell you that none of that was true

25   and that he didn't tell Baran any of it.

D7inles1                    Opening - Mr. Tehrani

1          You will hear from a witness who drove from his

2    meeting with Joe Rutigliano in New York to his home in Florida,

3    and you will see that Rutigliano wrote in his application that

4    it was hard for him to drive.

5          You will hear from a fitness buff who exercises

6    multiple days per week weight training and cardio training.

7    You will see the application Rutigliano filled out for him,

8    claiming that he suffered unbearable knee and back pain simply

9    from walking.  You will have an opportunity to see these

10   witnesses, to observe them the same way Baran did and the same

11   way Rutigliano did.

12         Now many of these witnesses have pled guilty to

13   serious crimes because of their involvement in this scheme.

14   They are testifying because they hope that if they cooperate

15   they will get leniency at sentencing.  So listen to them all

16   and scrutinize their testimony.  Ask yourselves whether what

17   they tell you makes sense, and whether it supported by the

18   other evidence in this case.

19         And there will be plenty of other evidence.

20         You will see the cookie cutter disability applications

21   containing flagrant lies.  You will see applications that Baran

22   filled out, many of them virtually identical, applications in

23   which Baran stated that nearly every activity of daily life was

24   hard or impossible for the applicant.  You will see that the

25   application asked for a description of the applicant's typical

D7inles1                    Opening - Mr. Tehrani

1   day, and you will see that for many of Marie Baran's clients

2   their days were clearly identical and always described days and

3   nights filled with pain and little activity.

4          You will also see applications that law enforcement

5   found in Marie Baran's computer and in her e-mails.  You will

6   see that she started preparing disability applications for Long

7   Island Rail Road employees who had not yet retired and were

8   just planning to retire in the future on account of an

9   anticipated disability.

10          You will see the applications listing the dates in the

11   future when the applicants were planning on being disabled.  In

12   other words, you will see Marie Baran helping her clients

13   preplan a disability.

14          You will also see applications that Joe Rutigliano

15   filled out.  You will see that his applications, like Baran's,

16   were riddled with lies, listing a series of everyday activities

17   that supposedly were difficult or impossible for the applicant

18   to do.  You will see that the applications he filled out

19   contained variations of boilerplate job descriptions,

20   descriptions that in many cases had little, if anything, in

21   common with the applicant's own jobs, each one using telltale

22   phrases over and over and over again multiple times in the same

23   application that had been lifted directly from Rutigliano's own

24   fraudulent disability application.

25          You will also see that, like in his own disability

D7inles1                         Opening - Mr. Tehrani

1    application, Rutigliano usually listed sports that the

2    applicant was no longer physically able to do, sports you will

3    learn that the applicant usually had never played at all, let

4    alone stopped playing because of some disability.

5          You will also see Lesniewski's medical records,

6    records showing that patients told him that they were looking

7    to retire in the future with a disability.  You will see the

8    note from the Long Island Rail Road employee directing

9    Lesniewski to do more tests and find more disabilities, and you

10   will see Lesniewski' records quickly documenting those

11   requested disabilities.

12         You will hear from an expert, a widely renowned

13   orthopedic surgeon.  He will review some of the Lesniewski's

14   files and medical diagnoses related to a number of the Long

15   Island Rail Road employees that Lesniewski declared disabled.

16   He'll tell you that Lesniewski made many diagnoses that were

17   completely unsupported by the medical evidence.

18         He will tell you that, based on his review, Lesniewski

19   didn't take the most basic steps that doctors take in order to

20   diagnose a medical condition, and that sometimes he made

21   diagnoses that were contrary to the little medical evidence

22   that he had.

23         The expert will explain that Lesniewski took tiny

24   findings on MRI's and x-rays, things most people in their 50s

25   have and that cause no symptoms or problems, and made it sound

1    like those findings were evidence of serious and disabling

2    conditions.

3           It wasn't true.  On top of that, he'll tell you that

4    even if Lesniewski' patients actually had the conditions that

5    Lesniewski had diagnosed, those conditions are not serious and

6    disabling the way Lesniewski made them sound, but he said are

7    common, easily treatable conditions that orthopedists treat all

8    the time for patients who lead active, normal, healthy lives.

9           But, unlike what orthopedists typically do, the expert

10   will tell that you Lesniewski provided no meaningful treatment

11   for the conditions he was claiming his patients had.

12          You will hear from RRB witnesses as well.  They'll

13   tell you how the RRB reviews a claim for disability.  They'll

14   tell you that they are not fraud investigators and they are not

15   medical professionals.

16          Not surprisingly, they'll tell you that they relied an

17   the applications that the employees submitted.  They trusted

18   the employees when they said they were unable to do their jobs

19   and they trusted the doctors who claimed to have examined the

20   patients and concluded that they were no longer able to work.

21   They trusted that these people were telling them the truth.

22   They will tell you that they would never give disability

23   benefits to someone who was able to do their job.

24          Finally, you will hear from law enforcement witnesses

25   who were involved in the investigation.  They will tell you

D7inles1                    Opening - Mr. Tehrani

about an interview with Dr. Lesniewski.  They will tell you

that during that interview Lesniewski admitted that if he could

do it all over again he wouldn't have written what he did in

the disability forms.

He admitted that he knew that he was not being

accurate about his patients' medical conditions and that he

knew that those statements would help his patients get a

disability benefit.

Now, all of this evidence is going to come in in bits

and pieces through several witnesses over the course of this

trial.  No one witness is going to be able to tell you

everything.

But at the end of this trial we are going to have an

opportunity to talk to you again, to explain how all of the

evidence fits together and how it shows beyond a reasonable

doubt that the defendants are guilty as charged.

So between now and then I just want to ask you to do

three things:

First, please pay attention to the evidence, the

testimony, and the exhibits.

Second, please listen carefully to Judge Marrero's

instructions on the law throughout the trial and at the end

when he explains the charges and what they mean.  He will

explain to you how to apply the law to the facts of this case.

Third, and finally, use your common sense, the same

D7inles1                         Opening - Mr. Tehrani

1   common sense you use in your everyday lives will serve you well

2   here.  It would help you understand the evidence and how it all

3   fits together.

4           If you do those three things, we are confident that

5   the defendants will get a fair trial, the government will get a

6   fair trial, and you will reach a fair and just verdict, the

7   only verdict consistent with the evidence in this case, that

8   the defendants are guilty as charged.

9           THE COURT:  Thank you.

10          Defense.  Does any defendant choose to make a

11  statement?

12          MR. DRATEL:  Yes, your Honor.

13          THE COURT:  Mr. Dratel.

14          MR. DRATEL:  Good morning.

15          May it please the Court, my name is Joshua Dratel, and

16  along with Thomas Durkin, we have the privilege of representing

17  Dr. Peter Lesniewski.

18          You may have noticed that I called him Dr. Lesniewski.

19  That's the actual pronunciation.  I think we are too far down

20  the road to expect consistency on that.  Even Mr. Durkin will

21  call him Dr. Lesniewski.  Mr. Durkin is from Chicago, and just

22  to paraphrase George Bernard Shaw who was speaking about the

23  U.S. and England, New York and Chicago are two great cities

24  separated only a common language.  So, Mr. Durkin is involved

25  in this case as well.  Dr. Lesniewski was living in Illinois at

D7inles1                        Opening - Dratel

1    one point, and you will hear that from the evidence.

2              You have heard a lot of discussion from the government

3    thus far.  There is one important fact to keep in mind

4    throughout this case:  Dr. Lesniewski never intended to defraud

5    anyone, not the LIRR, not the Railroad Retirement Board, which

6    we will refer to as the RRB, not the U.S. government, not

7    anyone.

8              No one, not a single witness will come to you and

9    discuss a conversation that they had with Dr. Lesniewski in

10   which they said, Hey, I've got a fake disability.  You need to

11   lie for me.  I want you to make this up.  I want you to make

12   that up.

13             In fact, the opposite is true.  That's what the

14   evidence will show you, that Dr. Lesniewski did what doctors

15   do.  He did what an orthopedist does.  He examined the

16   patients, he diagnosed them, and he treated them.

17             And the RRB through the objective evidence, the

18   objective medical evidence confirmed.  They had the medical

19   file, the entire medical file that they use to determine

20   disability.  It is not just a narrative.  It's the entire

21   medical file.  That confirmed the disability or impairment that

22   entitled these employees to their disability pensions.

23             Those narratives that the government discussed, you

24   will hear what role the narrative played and what role the file

25   played with the objective medical evidence in it.  These were

1    patients for Dr. Lesniewski, some of whom saw him after their

2    disability pensions were granted.  He treated some of their

3    family members.  He treated them like his patients.  They were

4    his patients.

5           You won't hear any evidence, there is no evidence,

6    because he had never, he had no involvement, never saw, never

7    completed, never filled out any of these applications that the

8    government is talking about.

9           Hindsight is 20/20.  In hindsight things are obvious

10   when things are made obvious by the way that they are

11   interpreted later on, and an attempt is made to revise history

12   and rewrite it to fit that hindsight.

13          That's what this case is about.  There was a New York

14   Times article several years ago about the rate of disability

15   pensions for the Long Island Rail Road, and that proceeded to

16   begin the revision of history.

17          Politicians jumped on the bandwagon, the RRB was

18   forced and pressured to defend its system, Long Island Rail

19   Road employees were forced and pressured with respect to their

20   disabilities and impairments, and prosecutors were given an

21   opportunity to present this case.

22          They have charged a premeditated conspiracy,

23   premeditated conspiracy to defraud.  They have to prove to you

24   that Dr. Lesniewski intended to defraud, that he was part of

25   this large premeditated conspiracy.

1          I am talking here also in terms about occupational

2     disability.  We are not talking about complete disability,

3     incapacitation.  We are talking about physically demanding and

4     sometimes hazardous jobs that require a certain amount of

5     physical capability, occupational disability.

6          The government talked about the percentages in terms

7     of disability applicants who saw three doctors.  They said

8     nearly 80 percent.  It makes it sounds like a lot in the

9     abstract.  But what if two of the doctors, not Dr. Lesniewski,

10    were responsible for 73 percent.  It puts it in a different

11    context.  That's what the evidence will show.

12         The government talked about Dr. Lesniewski's

13    statement.  You will hear about that.  You will hear about the

14    context in which it occurred, again, as part of the revisionism

15    that was going on after that New York Times story that was

16    already at work.  You won't hear in that statement that he ever

17    intended, that he admitted intending to defraud anyone, that he

18    was never part of a premeditated conspiracy that's charged in

19    this indictment.

20         You will hear about the narratives and why the

21    narratives are filled out and why he filled them out the way he

22    did.

23         This is paperwork.  It is not part of what a doctor

24    does ordinarily in terms of treating, seeing, diagnosing

25    patients like Dr. Lesniewski did with all of these patients, a

D7inles1                          Opening - Dratel

1    very busy doctor.  You will hear about his schedule.  He had

2    surgical prep, surgery itself, recovery visits, office hours,

3    hospital rounds, orthopedic meetings with other doctors, staff

4    management, surgical meetings with hospitals and doctors,

5    dictating charts, all of that that goes into an extraordinarily

6    busy day.

7         You will hear evidence about these Long Island Rail

8    Road employees who have pleaded guilty.  You will hear from

9    them, and you will see what pressure was brought to bear.  You

10   will see the revisionism that goes on from their disability to

11   the point where they will take the stand and tell you that they

12   weren't disabled, that they didn't tell people that they were

13   disabled.

14        You will hear about other doctors who made the same

15   conclusions that Dr. Lesniewski did with respect to some of

16   these employees.

17        It a lot easier to try this case in the newspaper than

18   it is in the courtroom.  The evidence will show you that as

19   well.

20        You will hear from the experts.  I submit to you that

21   you will hear, at the end of the day the expert testimony will

22   establish that Dr. Lesniewski did his job in good faith and

23   without any intent to defraud anyone, not as part of any

24   conspiracy.

25        And you will hear that Dr. Lesniewski is a respected

surgeon, a busy surgeon, someone with a wide range of practices

throughout his career, including underserved communities, Bronx

Lebanon Hospital in a clinic, someone who's given his life to

service to his community and his profession, a pillar of his

community, a pillar of his church, a deacon in his church.

They talk about a mill.  The government says he ran a

disability mill.  Well, you will hear that 5 percent of his

patients were Long Island Rail Road employees seeking

disability.

You will hear that he got eight hundred to a thousand

dollars from these patients.  You will hear that he would not

throw away his life, his career, his profession for that.

They say "often in cash," as if it's something

nefarious.  You will hear no evidence -- in fact, you will hear

the opposite.  It was all reported with respect to

Dr. Lesniewski.  You won't hear any allegation that there's

anything that wasn't reported as part of his business income,

that money.  They paid often in cash, that gives you something

to chew on before you hear any evidence.  You won't hear any

evidence about that, completely the opposite.

There are legal principles as well that you will hear

about, judge Marrero will tell you about during the course of

the trial and at the conclusion of the trial.  Some he's

already explained to you already, reasonable doubt, the

government's burden to prove every element of each of the

D7inles1                        Opening - Dratel

1   charged offenses beyond a reasonable doubt unanimously to each

2   of you before you can possibly consider a verdict of guilty.

3           But I want to go back to the facts again.  When you

4   hear all the evidence and the lack of evidence, which is just

5   as important as the evidence in this case as in any other, the

6   government will not have proved beyond a reasonable doubt that

7   Dr. Lesniewski ever intended to defraud anyone, that he ever

8   joined a conspiracy to defraud anyone.

9           The evidence will show that he acted in good faith at

10  all times in his medical practice, as he has for his whole

11  career.

12          Again, we will have closing argument, a chance to wrap

13  up and summarize the facts for you, but I'm confident that you

14  will use your common sense and you will find Dr. Lesniewski not

15  guilty on each and every count of the indictment.

16          Thank you.

17          THE COURT:  Mr. Jackson?

18          MR. JACKSON:  Ladies and gentlemen, a pleasant good

19  morning to you.  Before I come and approach you, I just want to

20  stand here for one moment with my client.

21          I represent Ms. Marie Baran, and it's my privilege to

22  do so.  And make no mistake about it, by virtue of her sitting

23  here, that speaks loudly and clearly as to the feelings about

24  this case, and that is, is that Ms. Marie Baran acted honorably

25  under all circumstances and conditions; that in sitting here

D7inles1                    Opening – Mr. Jackson

1    she is putting her trust and faith in you and that trust and

2    faith that she's placing in you goes to what you will learn and

3    the evidence will show.  And that is at no time did Ms. Marie

4    Baran have any understanding, whether that is express or

5    implied, did she have any agreement, whether it was written or

6    otherwise, to commit any criminality whatsoever.  At all times

7    what Ms. Marie Baran did was her job.

8            You will hear, and the government has said so, from

9    cooperating witnesses with agreements with the government, and

10   you have already heard about revisionist history from my

11   cocounsel.  I am sure they will say things, and I am just going

12   to ask you to evaluate it in the context of people who now,

13   having been prosecuted, having the incentive to save

14   themselves, what that might add here as to assessing what

15   Ms. Marie Baran did and didn't do.

16           But by virtue of her sitting here and putting her

17   trust in you, we trust and fully expect that at the end of the

18   day you will see through the fog and the darkness and you will

19   see the light, and that light will speak loudly and clearly as

20   to the issue of her innocence and certainly no guilt.

21           Now, there's a few things that I want to address with

22   you this morning, if I might.  The three things that I want to

23   talk to you about, one relates to who Ms. Marie Baran is.  You

24   are going to learn a lot about her and I want to start off by

25   talk a bit about her if I can.

1           The second thing I want to talk to you about is how

2      she even got involved here, what her job was and her role is,

3      the lawful role that she played.

4           And then I want to go over some points about why you

5      will come to the conclusion, the just conclusion, the right

6      conclusion, the proper conclusion, that she committed no crime

7      and is innocent, not guilty.

8           Now, let's talk about the first prong first.

9           Ms. Baran has served the federal government for over

10     40 years, over 40 years.  How?  Well, at 19 -- she is a native

11     New Yorker growing up in Queens -- at 19 she worked for a year

12     and a half at the Air Force, a year and a half.  That's where

13     her federal government service started, working for them.

14          Following that she spent 20 years, 20 years working

15     for the Social Security administration.  Certainly in doing

16     that she gained some knowledge and understanding of disability

17     of disability laws and of what the Social Security

18     Administration did and what their role was.  It was at that

19     time and during the course of that time that she served people,

20     helped people, respected people and became knowledgeable as to

21     the process and served admirably.

22          Now, after she left the Social Security

23     Administration, when she was about 40 or so, you will learn

24     that she went to the Railroad Retirement Board -- and we will

25     speak in terms of LIRR and RRB and you will become very

D7inles1                          Opening – Mr. Jackson

1  familiar throughout the course of these six, seven weeks --

2  hopefully sooner -- as this case goes forward.  But just to be

3  clear, she worked for the RRB following her 20 years with the

4  Social Security Administration, where she served admirably.

5         She then went and worked for the Railroad Retirement

6  Board for another 20 years.  Throughout the course of that 20

7  years, she became the district manager of the Railroad Board.

8  As the district manager, she had many responsibilities.  Those

9  responsibilities included looking at applications, evaluating

10 applications and assisting potential annuitants who were

11 applying for disabilities.  So she learned the ropes of the job

12 there, again serving admirably.

13         With respect to the government's argument, they would

14 have you believe, what the evidence will not show, and that is

15 that Ms. Baran, after living a law-abiding life and working

16 with the government for over 40 years did not decide at the age

17 of 60 and 65 to become a criminal.

18         (Continued on next page)

19

20

21

22

23

24

25

1              MR. JACKSON:  That will be clear from what the

2     evidence shows.  She served admirably in those positions, and

3     she continued to serve thereafter.

4              Now, something that's telling here is that in working

5     as an RRB official, she again dealt with these very

6     applications that the government is speaking about.  And you'll

7     learn that once a consultant and she dealt with these

8     consultants, which she became after she retired -- I'll talk

9     about that momentarily -- and what happened is is that once a

10    consultant works with the applicant, you know, the people who

11    will be testifying, who have cooperation agreements, who have

12    agreements that say we'll shave off sentences, they're going to

13    say they worked with a consultant, in this instance, Ms. Marie

14    Baran, and we didn't know anything.  We had nothing in the

15    application.  We didn't see anything.  She filled it out for

16    us.  But in her job when she was at the RRB, her very job and

17    the job of those who worked for her were to go over those

18    applications that were filled out with consultants again.  And

19    so, therefore, there's two layers, two layers before that

20    application gets submitted to Chicago that are evaluated to

21    ensure the integrity and propriety of them.

22             One is the consultant -- and she worked with many and

23    that's how she learned that this was a job that she could

24    perhaps perform after she retired -- they would fill out the

25    application with the annuitant.  You'll learn about annuitants,

D7idles2                    Opening - Mr. Jackson

1   which are the applicants.  And they would then take those

2   applications to the Railroad Retirement Board, and they would

3   be gone over again with a specialist to ensure that all the

4   materials were there, all the medical was there, and that all

5   the answers to the questions were properly, appropriately and

6   completely filled out

7          And so in assessing the evidence when it comes

8   forward, you have to believe that, of course, Ms. Baran, who

9   lied on these applications for everyone, that not only they

10  didn't see anything, they'll tell you, she filled everything

11  for them, but then they would have to then, you would have to

12  believe as the evidence is presented, that they then went to

13  the Railroad Retirement Board and those officials didn't go

14  over the applications with them and they know nothing again.

15  Something that you'll come to learn makes no sense

16         Now, again, shifting now from who Ms. Marie Baran was,

17  and, yes, I talked about the 40 years and they talked about her

18  husband and the world traveling and he worked for the Railroad

19  and he got fraudulent disability from Lesniewski, you'll come

20  to learn that he got a disability because he was disabled.  And

21  that's how he got a disability.  And, yes, they traveled

22  because they weren't blessed with children and college expenses

23  and education that they have to provide for.  And you know

24  what, traveling with the person you love and that you've been

25  married to for 42 years is not a crime.  And that's money that

D7idles2                    Opening - Mr. Jackson

1   she earned, you'll learn, and that she earned from doing her

2   job, from working all her life.  And then after she retired --

3   and I'll switch into her consulting position that she became --

4   she didn't herself take an occupational disability.  She was

5   qualified and was able -- in the event that she's a fraud,

6   she's beating the system, she knows what lies to put -- the

7   most telling evidence is why then, as the evidence will

8   establish, did she not herself apply for an occupational

9   disability, having worked all this time, since she wanted to

10  beat the system?

11          Now, let's make a distinction here.  The distinction,

12  you're going to learn, there is a grave difference between an

13  occupational disability, on the one hand, and a permanent and

14  total disability, on the other.  And so a permanent and total

15  disability you might presume that people will be coming onto

16  the witness stand in wheelchairs and in crutches and that type

17  thing, that's permanent disability.  We are not speaking about

18  that here.  OK?  And counsel have mentioned this when he spoke

19  with you about this distinction that's very important.

20          There is an occupational disability here that the

21  Railroad provides, and that was what Ms. Marie Baran was a

22  consultant to many clients who saw her, who respected her, who

23  came to her for her talent, knowledge and affability.  And the

24  occupational disability spoke to the issue of not being able to

25  perform your particular job -- not being able to perform your

 1   particular job -- inhibiting you from performing a function

 2   associated with your job, not that you were so disabled that

 3   you couldn't walk, stand, kneel or do anything and therefore

 4   were completely disabled.  And it's a big distinction to make

 5   because you'll learn through the evidence about what you could

 6   observe.  There are disabilities that people have that are not

 7   observable, you'll learn.  And I'm sure everyone who has spoken

 8   to you so far has talked about common sense.  And as I sit

 9   here, you won't -- I couldn't tell you or you couldn't tell me

10   if my back hurts now, if you back hurt, if your shoulder hurt

11   or anything else hurt.  So this is something that I have to

12   rely upon you to tell me.  And let's speak to that issue.

13          Now, when people came to see Ms. Baran, she decided

14   again when she was retiring that she wanted to do something

15   meaningful, that she wanted to do something helpful, that she

16   wanted to use her knowledge and ability to assist other people,

17   and she did, by having a legitimate business wherein people

18   would come to her and give her information as to the nature of

19   their disabilities.  And in giving her information as to the

20   nature of their disabilities, she would incorporate that into

21   an application, make sure they had all the medical, all the

22   information filled out, and specifically go over that

23   application with the particular client.  The same people who

24   will tell you she spent no time with them, she kicked them out

25   of their office or, you know, she just told them sign here and

D7idles2                      Opening – Mr. Jackson

1   leave, you'll learn a different story.

2           Again, in evaluating any witness to say that, I want

3   you to evaluate it under the context of what those witnesses

4   have to gain or benefit by saying I didn't say that, I didn't

5   see that, I don't know anything about that.  Evaluate it under

6   that context.  She was paid a thousand dollars, or more, cash

7   or not, because she earned it, because she did her job, and

8   because that job entailed getting information from people to

9   place in the application

10          Now, understand that she had every reason to believe,

11  and not that it's her call and not that it is up to her, but

12  she had every reason to believe that those people coming to her

13  needed the assistance that they were suggesting that they

14  needed.  Every reason to believe that.  And just as

15  misrepresentations were made to the RRB, who they brought their

16  application to later, who went over that application with them

17  then, misrepresentations were made to Ms. Baran as well.

18          And the other basis for her having reason to

19  believe -- again, you can't see these disability in the

20  abstract, meaning you don't particularly know how much

21  somebody's back hurts, how much somebody's shoulder is hurting,

22  whether someone has a headache now, whether some of you have a

23  spinal issue or something else by just visualizing you, but the

24  other issue is there is medical evidence that would support

25  that.  And these people coming to Ms. Baran already having had

D7idles2                    Opening - Mr. Jackson

1   doctors and already having told her, listen, I need you to fill

2   out this application with me, and that's exactly what she did

3   in assisting them.  Comparable, you'll learn, to when you go to

4   an accountant with your tax information.  The accountant relies

5   upon the information that you provide, and you'll hear about

6   taxes in this case.  But you'll learn, over the course of the

7   testimony, you go to an accountant with tax information.  They

8   input and incorporate what you give them, and then they submit

9   it off attempting for you to get the most lawful deductions

10  that you possibly can

11         By analogy, that's what Ms. Murray Baran was doing.

12  The same concept.  And now she's being held accountable for

13  being a consultant, for assisting people in their time of need

14  by saying she lied for them.

15         Now, in evaluating whether she lied to them, I want

16  you to evaluate a number of things and I want to spell them out

17  to you.

18         Number one, she's assisting people navigating their

19  way through a difficult process.  Ms. Baran, having known about

20  the Long Island Rail Road -- you'll learn about these jobs and

21  you'll learn about the taxing nature of these jobs and you'll

22  learn about how you have to traverse roadways on the railroad,

23  on the track, railroad track.  You'll learn about uneven

24  surfaces.  You'll learn about dangerousness conditions.  You'll

25  learn about, you know, people are looking up onto the trains,

D7idles2                    Opening - Mr. Jackson

1    you'll learn about crouching.  You'll learn about standing on

2    to trains.  She knows, based upon her knowledge and experience

3    of that system, that there would be people who absolutely if

4    they worked there for 20/25 years would of course acquire

5    conditions along the way of that.  So she would have every

6    reason to believe that.

7              Now, these are blue-collar people who were working

8    hard every day of their lives, and in working hard every day of

9    their lives obviously, and being subjected to these hazardous

10   conditions, there certainly would be the need for them to have

11   this occupational disability benefit.

12             I want you to understand, as the evidence will show,

13   that one of the main reasons for an occupational disability

14   benefit is the fact that you are working on the Railroad.  You

15   are working in a system that affects the lives of millions of

16   people, and you don't want a person who is less than whole to

17   be doing that.  You don't want a person with a shoulder

18   problem, with a back problem, with a spinal problem, with a

19   foot problem, with any problem to be working on that Railroad

20   because lives depend upon it.  And so you'll learn about the

21   development of this occupational disability so as to assist

22   those people who can't perform those functions so that the

23   public health and the public safety could be OK.

24             Now, in assessing this also I want -- you'll learn

25   that she had no contact whatsoever as a consultant with

D7idles2                    Opening - Mr. Jackson

1    Dr. Lesniewski, with Dr. Ajemian, with anybody here.  Certainly

2    none of the defendants who are charged here did she have any

3    contact with -- Mr. Rutigliano -- as she was a consultant.

4    There was no agreements:  We are going to do these things.  We

5    are going to conspire.  We are going to cheat the government.

6    We are going to do that.

7           She didn't have any contact with them.  So what is the

8    basis for this conspiracy, as the government will charge you?

9    There's no conspiracy.

10          Now, the other issue is that she didn't use any of her

11   contacts or any of her influence with the Railroad Retirement

12   Board in any way to influence any application.  If she's this

13   person who is dishonest and cheating and lying and stealing,

14   why not use your influence with the Railroad Retirement Board

15   to do something to help someone?  She didn't.

16          You'll also learn she didn't guarantee anybody that

17   they would get a disability.  No one at all.  If they came to

18   her, they had a right, based upon working for the Railroad and

19   based upon, you'll learn, them paying a special assessment in

20   their taxes, they have a right to apply.  And she's not a judge

21   or jury or an executioner.  By virtue of that, she is going to

22   assist them but she's going to assist them in a lawful way.

23          Now, the government addresses these applications that

24   are just fraudulent, that they are just made up, or anything

25   else.  Ms. Baran, having done this over and over, over and

D7idles2                    Opening - Mr. Jackson

1    over, understands that there are symptoms and ailments that are

2    consistent, meaning that there are generally certain problems

3    associated with it.  If you have a bad back, you may have

4    trouble standing, walking, kneeling, sitting, crouching.  You

5    may have those problems.  And so what she would do is that in

6    an effort, based upon all the clients that she had, to save

7    time, she would pre fill out an application.  And when someone

8    sat with her, she would ask them those questions -- do you have

9    trouble sitting?  Is it easy, hard or impossible?  And when

10   they told her, she, for example, would have "hard" already

11   prefilled as a prompt on her application on her computer.  And

12   if they said, no, it is easy, she would switch it to the "easy"

13   box.  It is an application, meaning it is a computer

14   application.  If it was easy, she would switch it to the box.

15   Hard, she switches it again.

16        But she prefilled it out in a way if somebody's come

17   to you with a disability, you are not going to fill out

18   previously everything easy because it wouldn't be a disability.

19   That doesn't make sense.  So she used her computer program,

20   that the government went and they got from her, OK, in order to

21   assist people.  And what you'll learn based upon that is that,

22   yes, there are prefilled out applications on the computer, but

23   she would go over the specifics of what was on that computer

24   with each and every applicant.  And if there was something they

25   needed to be changed, then absolutely she would change it and

D7idles2                    Opening - Mr. Jackson

1    she did change it.

2             And with respect to the narrative that the government

3    says that was made up for everything, you'll learn about where

4    that information came from, too.  You'll learn about the nature

5    of the information they are speaking about, where she got that

6    information, and the fact that that information needed to be

7    changed as well, and when it was -- needed to be changed, she

8    did change it.

9             You'll learn about the vast majority of her patients

10   and the fact that they've already had doctors at the time that

11   they consulted with her.  And if they had doctors at the time

12   they consulted with her, what conspiracy is she engaging in?

13   They have a doctor.  They come to her.  They say they have a

14   disability.  And she is assisting them in that process.

15            You'll learn about none of them coming to her, these

16   clients saying, hey, I'm not disabled.  Can you assist me in

17   getting a disability?

18            You'll learn about the fact that none of the doctors

19   who are involved here, there is no special relationship there.

20   She didn't go out with these doctors, didn't fraternize with

21   them, didn't socialize with them, didn't engage in any other

22   activity with them.  Obviously, there were times when she might

23   have reached out to their offices for purposes of missing

24   documents or making sure applications were complete.  But other

25   than that, what she was doing, ladies and gentlemen, was a job.

D7idles2                    Opening - Mr. Jackson

1    And in doing that job, at all times she did it properly, she

2    did it lawfully, she did it respectfully, she did it decently.

3           You'll also learn she didn't have any practice to make

4    referrals to any of these doctors.  And the most important

5    thing you'll learn is that there was no special relationship

6    with the annuitants who were making these -- filling these

7    applications.  Why would you stick your neck out?  What would

8    be the basis of you sticking your neck out for someone else

9    that you don't even know in order to get them a disability when

10   you don't have a horse in the race?  And the evidence will show

11   she didn't have a horse in the race.  She was getting paid

12   whether she got them a disability or didn't get them a

13   disability.

14          So at the end of the day I'm going to ask you to

15   evaluate and assess all of that, and in evaluating and

16   assessing all of that, I'm confident that you'll come to the

17   conclusion -- and that conclusion is where we first started --

18   that Ms. Murray Baran acted honorably, with honorable

19   intentions.  She didn't defraud anyone.  There was no intent to

20   defraud anyone.  She didn't conspire with anyone.  All she did

21   was serve the people that she trusted, the people that she

22   relied upon, and the government that she loved.

23          And it's for that reason, ladies and gentlemen, that

24   I'm going to ask at the conclusion of this case for you to come

25   back with a verdict of not guilty.

1          Thank you.

2          THE COURT:  Mr. Ryan.

3          MR. RYAN:  May it please the Court?  May it please the

4  prosecution?  May it please my fellow defense counsel?

5          Stand up, Joe.

6          Ladies and gentlemen, my name is Joe Ryan.  It's my

7  privilege —— my privilege —— to represent Joe Rutigliano in

8  this case before you, judges of the facts.

9          We intend to prove to you that Mr. Rutigliano was a

10  man with a heart, was a union leader of 27 years on the Long

11  Island Rail Road.  They elected him to represent them for 19

12  years.  And if you had a worker problem, you went to Joe

13  Rutigliano.  If you have had a beef because the Railroad wasn't

14  going to pay you for ten days' sick leave and you thought you

15  were entitled to sick leave, you go to Joe Rutigliano and he'll

16  try to work it out.  If you got a grievance because you didn't

17  show up on a job on time and the Railroad wants to dock you the

18  pay, you go to Joe Rutigliano.  If you want to think about

19  retiring and you want some help with your occupational

20  disability application, you can go to Joe Rutigliano.

21          You can go to a lawyer, Mike Flynn.  You can go to

22  Eddie Yule, a former labor official.  They all knew about the

23  occupational disability program.  And why?  Because of people

24  like Marie Baran.  They had lectures, seminars promoting the

25  program if —— if —— you were occupationally disabled within the

D7idles2                         Opening - Mr. Ryan

1   meaning of the law.

2          Thank you, Joe.

3          We're going to spend all -- we are going to make it

4   four weeks.  OK?  I pledge to you that we're going to finish

5   this trial well before six weeks because this is not a

6   complicated case.

7          Before 1997, when Joe was with the Railroad and the

8   president of the union, all it took for a railroad worker, any

9   railroad worker in the nation, who wanted to get occupational

10  disability was to check off a box, I got this problem, and they

11  start giving him the checks.  Somebody said -- the Railroad, of

12  course -- that's too easy.  So in 1997, the management of the

13  national railroads and the management of all the railroad

14  unions said we need a system that's objective so that before we

15  start paying out these disability payments we know we're paying

16  it for a good, proveable reason.

17         And they hired two expert doctors, Dr. Laura Welch and

18  Dr. Richling, R-i-c-h-l-i-n-g.  And they came up with a system

19  that had a chart that said -- the chart was broken into body

20  parts like neck, mental, back, knee, foot -- a chart.  And this

21  chart said that if you're going to claim a problem with the

22  knee, meniscus, they had a chart that said they recommend that

23  you get a confirmatory test, like an x-ray, MRI, and if you had

24  that job and you had that diagnosis and it was recommended with

25  these independent diagnostic tests, your occupationally

D7idles2                          Opening - Mr. Ryan

1   disabled.  You had an impairment.  You couldn't perform your

2   job a hundred percent.  You had an impairment.

3          This plan, in 1997, when Joe was serving as the union

4   president, was announced, and it said, quote, if you can't

5   perform one or more tasks of your job, whether you are an

6   engineer, signalman, conductor, whatever, and you comply with

7   this chart and these demands that we require, you get

8   occupational disability.

9          And in this case you're going to see that every

10  application had a doctor's report -- Dr. Lesniewski -- x-rays,

11  MRIs, EMGs, physical examination.  And then when the RRB got

12  it, Ms. Baran's office screened it, and it went to Chicago.

13  And in Chicago they had well-trained examiners, conscientious

14  examiners, trained by the two doctors that set up this whole

15  plan, and they had every test to examine these applications.

16         If they had a question, they could go to another

17  doctor, their own doctor.  They actually had their own doctor

18  conduct an examination of the applicant.  Or they had doctors

19  review the medical matter that was submitted to help the

20  examiner make the right decision, because we're not paying out

21  a check for annuities if you don't have an impairment, as

22  required by law.

23         This was the system that Joe Rutigliano learned, as

24  the union president, when all of his workers came to him and

25  said, you know, I'm working with pain and I've got a problem,

D7idles2                    Opening - Mr. Ryan

what should I do?  And I'm thinking of retiring.  My gosh, if I
can retire at 50, I don't want to work with pain anymore.

        Joe Rutigliano had a problem with pain.  In 1988, he
fell off a ladder at home.  He had two compressed fractures in
his lower spine.  Stony Brook Hospital.  He worked with pain.
But as he was approaching 1997, April of 1997, he went to
Dr. Lesniewski about his pain.  Doctor, the shoulder is not a
hundred percent.  Doctor, my right hand is not a hundred
percent.  Doctor, my right knee is not a hundred percent.  And,
Doctor, my back is not a hundred percent.

        So what did Dr. Lesniewski do?  He did what the plan
required.  He had an x-ray done of Mr. Rutigliano's back to
confirm that he had a degenerative disease, disc disease.  OK?
He did a physical examination of his shoulder to confirm that
he had a rotator cuff disease.  He did a physical examination
of the wrist to see whether he had carpal tunnel syndrome.

        Yes, he was a conductor, and that's one of the things
they do, use the wrist.  OK?

        He had an MRI done of his right knee, which confirmed
he had a meniscal tear in his knee.

        This is what the 1997 plan was intended to address.

        And you know what, when his application was reviewed
by the RRB, they had their own doctor review that paperwork.
Dr. Paul Boettcher.  B-o-e-c-h-t-e-r, I hope.  And Dr. Paul
Boettcher says, yes, I confirm.  I affirm what Dr. Lesniewski

D7idles2                    Opening – Mr. Ryan

1      said.

2              And then there is a consequence to this process.  And

3      this case is not about the Social Security Administration, but

4      you're going to hear that a consequence of this process is they

5      also review to see whether or not a doctor of Mr. –– that

6      condition also qualifies under the law for Social Security

7      disability.  OK?

8              I don't want to get off track here.  I want to stay on

9      track.

10             The point is that the Social Security Administration

11     doctor, Bernard Stevens, he read the medical record submitted

12     by Dr. Lesniewski.  Yes, Mr. Joe Rutigliano qualifies under the

13     Social Security Administration for their definition of

14     disability.  Three doctors.

15             They are calling him a criminal.  They are calling him

16     filing a false, fraudulent application.

17             We intend to prove to you that there were meetings,

18     seminars given about the occupational disability program, and

19     Marie Baran, who was the most qualified person in the Westbury

20     office, explaining to the union members that if you have these

21     impairments on your job and you can't perform one or more

22     tasks, under the law, the Code of Federal Regulations, you're

23     entitled, if the RRB agrees, with their examining force, to

24     occupational disability.

25             Now, there really would be no argument about this but

D7idles2                    Opening - Mr. Ryan

1    for the fact that in September 2008, some enterprising

2    reporters from the New York Times got statistics, and their

3    statistics show that there was a high rate of occupational

4    disability granted to Long Island Rail Road retirees.  And

5    Metro-North, those guys, they weren't getting all these

6    applications; they weren't even filing.  And using that little

7    argument, everybody said, oh, my God, there's something rotten

8    in Denmark.  There's something rotten here.  There's got to be

9    some smoke.  Where there is smoke, there's got to be some fire.

10           Ladies and gentlemen, by four weeks -- and I promise

11   you, OK -- in four weeks you're going to know that this was an

12   honest, understandable process.  The union contract that the

13   Long Island Rail Road had with these worker was the most

14   favorable in the nation.  At 50 you could retire.  You won't

15   get a full pension but you are good, if you had 20 years.

16   Metro-North, no way.  No way.  No way.

17           So, ladies and gentlemen, sometimes I feel like the

18   caboose on this train, and it's a little shorter, so I am as

19   anxious as you to take the railroad trip back on a little

20   voyage for four weeks, and we are going to learn about what it

21   takes to work on a railroad, the impairments that a worker

22   gets.  And four weeks from now we're coming back to this

23   station.  You'll be more qualified than any Railroad boys have.

24   You'll be more knowledgeable about workers on the Railroad.

25           And we got the best stationmaster to make sure we're

D7idles2                         Opening - Mr. Ryan

1   on time.  We have Judge Victor Marrero.  He's going to be the

2   time clock.

3          Thank you very much.

4          THE COURT:  All right.  Thank you.

5          We will then be ready to continue with the

6   presentation of the evidence, but before we begin we are going

7   to take the morning break at this point.  It is 10:25.  We will

8   return in ten minutes.

9          MR. DRATEL:  It is 10:35.

10          (Recess)

11          (Time noted at 10:53 a.m.)

12          (Jury not present)

13          THE COURT:  Good morning.  Welcome back.

14          MR. WEDDLE:  Good morning, your Honor.

15          I have just one thing to address before the jury comes

16   in, which is that both Mr. Durkin and Mr. Jackson challenged

17   the credibility of cooperating witnesses, and under United

18   States v. Cosentino, a Second Circuit case, I believe that the

19   government is now permitted to offer the cooperation agreement

20   and elicit its truth-telling position on direct examination.

21          THE COURT:  Mr. Durkin, do you have any comment on

22   this point?

23          MR. WEDDLE:  I'm sorry.  Not Mr. Durkin.  Mr. Dratel.

24   I apologize.

25          THE COURT:  All right.

D7idles2

```
 1              MR. WEDDLE:  And, I'm sorry, your Honor.  I have a

 2     binder of exhibits for the witness.

 3              If I may have just leave them at the witness stand?

 4              THE COURT:  Yes.

 5              MR. WEDDLE:  Your Honor, is this podium in the right

 6     place?

 7              THE COURT:  Yes.  It is fine.  Thank you.

 8              MR. WEDDLE:  Would your Honor prefer a copy of the

 9     exhibits like this, or in a binder form?

10              THE COURT:  It is usually better in a binder, if you

11     have the binder.

12              (Pause)

13              MR. WEDDLE:  Your Honor, this binder has the exhibits

14     I plan to use, and the 3500 material is behind the exhibits.

15              THE COURT:  Thank you.

16              Are you ready?

17              MR. WEDDLE:  I'm ready.

18              Your Honor, I have conferred with all defense counsel,

19     and they have no objection to the admission of the exhibits

20     that I intend to offer during this witness.  So if your Honor

21     could --

22              THE COURT:  In that case, what I would ask is that

23     when we begin, you list each of the exhibits that have been

24     admitted without objection, and the court reporter will make a

25     record of them.
```

D7idles2

1          THE LAW CLERK:  All rise.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7idles2

1           (Jury present)

2           THE COURT:  Thank you.  Welcome back.

3           We could resume now.  Mr. Ryan made a promise, perhaps

4    a commitment, that he would make his utmost efforts to make

5    sure that we finish this trial on time, and this particular

6    railroad will continue to remain on time.

7           I am sure that his enthusiasm is shared not only by

8    himself but the Court and the other parties.  Unfortunately, it

9    is not by the Court's cafeteria.  We had ordered coffee for the

10   jurors to be delivered to the jury room by a particular time,

11   and you saw that it was not there.  Our apologies.  We will

12   make sure that they get on board for the afternoon.

13          Mr. Weddle, is the government ready to resume?

14          MR. WEDDLE:  We are, your Honor.

15          The government calls Steven Gagliano as its first

16   witness.

17          (Continued on next page)

18

19

20

21

22

23

24

25

D7inles3                    Gagliano - direct

1       STEVEN GAGLIANO,

2            called as a witness by the Government,

3            having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. WEDDLE:

6            MR. WEDDLE:  Your Honor, before I begin questioning

7    the witness, as the government would just like to offer the

8    following government exhibits:  3532-04, 606-A, 606-B, 600,

9    101-A, 101-C, 101-B, 101-D, 101-S, 610, 101-G, 609, 609-A,

10   101-L, 607, 1601, 1602.

11           THE COURT:  All right.  Those exhibits have been

12   admitted without objection.

13           (Government's Exhibits 3532-04, 606-A, 606-B, 600,

14   101-A, 101-C, 101-B, 101-D, 101-S, 610, 101-G, 609, 609-A,

15   101-L, 607, 1601, 1602 received in evidence)

16           MR. WEDDLE:  Thank you, your Honor.

17   BY MR. WEDDLE:

18   Q.  Mr. Gagliano, how old are you, sir?

19   A.  56.

20   Q.  Where do you live?

21   A.  North Babylon, New York.

22   Q.  Do you have a family?

23   A.  I do.  I have a wife and two children.

24   Q.  How far did you go in school, sir?

25   A.  High school, a little bit of college.

1   Q.  Where did you go to work after you finished school?

2   A.  I worked as an electrician's apprentice, a draftsman, and

3   then a signalman for the Long Island Rail Road Company.

4   Q.  What year did you start at the Long Island Rail Road

5   Company?

6   A.  1978.

7   Q.  During your time at the Long Island Rail Road Company, what

8   jobs did you do?

9   A.  I started out as a signal helper, then I became an

10  assistant signalman, and then I became a signalman.

11  Q.  When did you stop working at the Long Island Rail Road?

12  A.  2006.

13  Q.  Under what terms did you leave your work at the Long Island

14  Rail Road?

15  A.  I retired.

16  Q.  When you were working at the Long Island Rail Road, what

17  kind of pension program were you covered by?

18  A.  I was covered by an MTA pension.

19  Q.  And what were the terms of the MTA pension that applied to

20  you as a Long Island Rail Road employee in terms of when you

21  could get a pension and how much it would be?

22  A.  Well, it was based on several factors.  It was based on, in

23  my case, 50 years of age and at least 20 years of service.

24          The more service you had, the larger your pension

25  would be.  For instance, if you left with 20 years, your

D7inles3                         Gagliano - direct

```
1   pension would be 40 percent, and if you left with 25 it would

2   be 50, and it would also go up from there.

3   Q.  This pension that you are describing, this Long Island Rail

4   Road/MTA pension, did this have anything to do with health

5   conditions?

6   A.  Excuse me?

7   Q.  Did this pension that you have just described have anything

8   to do with health conditions --

9   A.  No.

10  Q.  -- or was it simply based on your age and years of service?

11  A.  That's correct.

12  Q.  Which one?

13  A.  It was based on age and years of service.

14  Q.  So it's --

15  A.  You had to be at least 50.

16  Q.  So it is a retirement pension?

17  A.  Yes, it is a retirement pension.

18  Q.  How old were you when you were retired?

19  A.  50.

20  Q.  How many years of service did you have at the Long Island

21  Rail Road?

22  A.  Just shy of 28.

23  Q.  So how long after you first became eligible to retire with

24  a retirement pension did you retire?

25  A.  That day.
```

D7inles3                          Gagliano - direct

1   Q.  Why did you retire when you retired?

2   A.  Is there were several factors.  I was able to obtain an

3   earlier thing called an occupational disability from the United

4   States Railroad Retirement Board, and coupled with my pension,

5   my pay was approximately the same as when I worked, so it

6   didn't make sense to me to continue working.

7   Q.  So financially it made sense if you retired and obtained

8   occupational disability?

9   A.  Absolutely.

10  Q.  What about if you had not gotten an occupational

11  disability?  Would it have made financial sense to you to

12  retire just on your Long Island Rail Road pension?

13          MR. DURKIN:  Objection.

14          THE COURT:  Sustained.

15  Q.  Just to be clear, the occupational disability, did that

16  come from a Long Island Rail Road/MTA or someplace else?

17  A.  That came from what's known as the United States Railroad

18  Retirement Board.

19  Q.  What is the United States Railroad Retirement Board?

20  A.  It is a benefit package for railroad workers that we get

21  instead of Social Security.  Railroad workers don't pay into

22  Social Security.  They pay into what's called Railroad

23  Retirement.  It has things like spousal survivor benefits and

24  the like.  And also, much like Social Security, you would

25  collect it at either age 60 or 62.

D7inles3                         Gagliano - direct

1   Q.  And you said that railroad workers pay into Railroad

2   Retirement.  How does that work?

3   A.  Well, I think that Social Security you pay 7 percent into

4   Social Security --

5            MR. DURKIN:  I am going to object.

6   A.  Railroad workers pay --

7            MR. DURKIN:  I am going to object.  Lack of

8   foundation.

9            THE COURT:  Sustained.

10  Q.  Sir, just talking solely about Railroad Retirement, how did

11  the contributions from railroad workers to Railroad Retirement

12  work?  You send them a check?  Is there some other way that

13  that money --

14  A.  It is taken out of your paycheck.

15  Q.  About how much money is taken out of your paycheck?

16  A.  12 percent.

17  Q.  If you make a certain amount of money in a year, what

18  happens?

19  A.  Well, there are different tiers in that 12 percent.

20  There's tier 1, a tier 2, and I believe a tier 1A.  You might

21  be able to max out, depending on your earnings, to pay off some

22  of those tiers, so that later in the year you would take home

23  more money.

24  Q.  Sir, do you have a general understanding of how Social

25  Security works in terms of working people paying in towards

D7inles3                          Gagliano - direct

1   Social Security taxes out of their paychecks?

2                MR. DURKIN:  Objection.  Relevance.

3                THE COURT:  Overruled.

4   A.  No, I don't.

5   Q.  Who is covered by the Railroad Retirement Board system?

6   A.  Railroad workers and their families.

7   Q.  Railroad workers where?

8   A.  In the United States.

9   Q.  You mentioned survivor benefits and retirement pensions

10  that are some of the benefits under Railroad Retirement Board.

11  Are there other benefits under Railroad Retirement Board?

12  A.  Could you repeat the question, please.

13  Q.  You mentioned retirement when you reached age 62 or 65 I

14  think you said, you might be able to get retirement benefits

15  from the Railroad Retirement Board, and you mentioned that they

16  had some survivor benefits.

17               Are there also other types of benefits that are

18  offered by Railroad Retirement Board?

19  A.  If you are able to obtain a disability, you can collect

20  sooner than age 60 or 62.

21  Q.  Prior to getting ready to retire, what was your

22  understanding based on conversations with your coworkers about

23  the finances of retiring and getting disability?

24               MR. DURKIN:  Objection.

25               THE COURT:  What is the objection?

D7inles3                          Gagliano - direct

1            MR. DURKIN:  Hearsay, lack of foundation.

2            THE COURT:  Overruled.  Speaking to his understanding.

3            MR. WEDDLE:  Yes.

4    A.  My understanding from speaking to coworkers as they were

5    retiring --

6            MR. DURKIN:  Judge, could we have some foundation for

7    the coworkers he's talking about.

8            THE COURT:  Sustained.

9    Q.  Sir, is it correct that you had conversations with

10   coworkers about the finances of retiring and getting

11   occupational disability?

12   A.  Yes, I did.

13   Q.  Can you name some of the coworkers that you had those

14   conversations with?

15   A.  Yes.  There were some that come to mind.

16   Q.  Can you give us some names here today?

17   A.  Someone by the name of Steve Borakowski might be a name,

18   Sam Racioppi, someone named Rich Luzinski, just to name a few.

19   Q.  And if you are talking about conversations about the

20   finances of retiring from the Long Island Rail Road and getting

21   occupational disability with your coworkers, did that happen a

22   small number of times or something else?

23   A.  It was quite often.

24   Q.  Can you describe to the jury what you mean when you say it

25   was quite often?

D7inles3                          Gagliano - direct

1    A.  Well, if you ever had a question about obtaining an

2    occupational disability, you would always find someone that

3    would have an answer to help you.

4    Q.  You mentioned that you planned to get an occupational

5    disability.

6    A.  Yes, I did.

7    Q.  I'm sorry.  If I may back up.  So what did you hear in

8    conversations with coworkers?  What was your understanding

9    about the finances of retiring and getting disability?

10             MR. DURKIN:  Objection, Judge.  It goes to the prior

11   motion, and it's not a declaration of a coconspirator.

12             THE COURT:  Overruled.  Speaking of his own personal

13   impressions.

14   A.  It seemed that if you were able to obtain an occupational

15   disability, you would earn just about what you did while you

16   were working.

17   Q.  So you have been talking about occupational disability.

18             What does occupational disability mean to you?

19   A.  Well, it was understood that --

20             MR. RYAN:  Objection.

21             THE COURT:  Sustained.  Speak about what you

22   understood or what your impressions were, not what others

23   believed or thought or had impressions or beliefs about.

24   Q.  Do you still have the question, sir?

25   A.  No, I don't.

D7inles3                         Gagliano - direct

1    Q.  OK.

2                THE COURT:  Could the reporter read back the question.

3                (Record read)

4    A.  It meant that I would be able to retire early.

5    Q.  What standard did you think applied to determine whether

6    you got occupational disability?

7    A.  It seemed it would be slightly lower than a total

8    disability would be.

9    Q.  I am not talking about comparing it to other things.  What

10   was your understanding about what it meant -- before you

11   retired, what was your understanding about what it meant to be

12   occupationally disabled?

13   A.  You just weren't able to do your occupation.

14   Q.  At the time that you retired, were you able to do your

15   occupation?

16   A.  Yes, I was.

17   Q.  What kinds of documents did you have to submit to get an

18   occupational disability?

19   A.  There were several documents.  You needed to start with

20   seeing a doctor and getting a narrative stating that you are

21   unable to do your job.  Then from there you went on to, you

22   have to go to the Railroad Retirement Board and apply for it.

23   In between there were other gentlemen that filled out your

24   paperwork for you for Railroad Retirement.  In between the two

25   of them you went there and applied for it and it was sent off.

D7inles3                          Gagliano - direct

1   Q.  The paperwork that you have described that went into

2   applying for an occupational disability, those documents, the

3   paperwork, that was designed to convince the United States

4   Railroad Retirement Board that you were what?

5               MR. RYAN:  Objection.

6               MR. DURKIN:  Objection.

7               THE COURT:  Sustained.

8   Q.  When you submitted the paperwork in order to obtain a

9   disability, what were you trying to tell the United States

10  Railroad Retirement Board?

11              MR. RYAN:  Same objection.

12              THE COURT:  Overruled.

13  A.  That I was unable to do my job.

14  Q.  Was that true at the time that you submitted the documents?

15  A.  No, it was not.

16  Q.  Were the documents that you submitted to the United States

17  Railroad Retirement Board truthful about your medical

18  conditions?

19  A.  No, they were not.

20  Q.  Were they truthful about your physical ability to do your

21  job at the railroad?

22  A.  No, they were not.

23  Q.  Who, if anyone, helped you to prepare these false documents

24  for submission to the United States Railroad --

25              MR. RYAN:  Objection to the form of the question.

D7inles3                          Gagliano - direct

1   Q.  -- Retirement Board?

2             THE COURT:  Overruled.

3   A.  Well, I needed to get a narrative, and I believe there was

4   a medical report also from a doctor.

5   Q.  Can you tell me the names of people who helped you prepare

6   the false documents for submission to the United States

7   Railroad Retirement Board?

8             MR. DURKIN:  Objection.  Leading and it calls for --

9             THE COURT:  Rephrase the question.  Leading.

10  Q.  Sir, what I'm asking for here is a name.

11            Who, if anyone, helped you prepare these false

12  documents for submission to the United States Railroad

13  Retirement Board?

14            MR. RYAN:  Objection to the form.  Question.

15            MR. DURKIN:  Objection.

16            THE COURT:  Overruled.

17  A.  There were two people.  Dr. Peter Lesniewski and someone

18  who helped fill out the actual application to the Railroad

19  Retirement Board, and his name was Ed Yule.

20  Q.  Do you see the Dr. Peter Lesniewski who helped you with

21  this false application in the courtroom today?

22            MR. DURKIN:  Objection to the form of the question,

23  and we'll stipulate that he can identify the doctor who treated

24  him.

25            THE COURT:  All right.

D7inles3                         Gagliano - direct

1           MR. WEDDLE:  Your Honor, can we get an answer to that

2    question, because it is a perfectly appropriate question.

3           MR. RYAN:  Objection.

4           THE COURT:  Overruled.

5    A.  He's in the courtroom.

6    Q.  Can you please point out and describe an article of

7    clothing that Dr. Lesniewski, who assisted you with your false

8    application, is wearing today?

9    A.  He's standing right now with a red tie.

10          MR. WEDDLE:  Your Honor, I would ask that the record

11   reflect that the witness has identified the defendant Peter

12   Lesniewski?

13          THE COURT:  Noted and stipulated.

14   Q.  With Dr. Lesniewski's help, did you in fact get disability

15   benefits from the Railroad Retirement Board?

16   A.  Yes, I did.

17          MR. DURKIN:  Objection.

18          THE COURT:  Overruled.

19   Q.  About how much money did you get a year from the United

20   States Railroad Retirement Board in disability benefits?

21   A.  It was approximately $35,000 to $40,000.

22   Q.  Did you get in any trouble for submitting these false

23   documents to the United States Railroad Retirement Board?

24   A.  I did.

25   Q.  What trouble did you get into, sir?

1    A.  I was arrested in October 27, 2011.

2    Q.  What crimes were you charged with?

3    A.  Fraud.  Mail fraud, wire fraud, health care fraud.

4    Q.  Were you charged with conspiracy?

5    A.  I believe I was, but I'm not positive.

6    Q.  How did you resolve the charges against you?

7    A.  I pled guilty to all charges.

8    Q.  Before you pled guilty, did you enter into a cooperation

9    agreement with the government?

10   A.  I did.

11   Q.  Was the agreement oral or written down?

12   A.  Written.

13           MR. WEDDLE:  Your Honor, at this point I would ask to

14   display Government Exhibit 3532-4 for the jury.

15   Q.  Sir, if you look in the binder in front of you, it should

16   be the first document in your binder.

17           Do you have 3532-4, sir?

18   A.  I do.

19   Q.  What is 3532-4?

20   A.  It is my agreement with the government.

21   Q.  Does this document contain all of the terms and conditions

22   of your agreement with the government?

23   A.  Yes, it does.

24   Q.  Is your signature on the last page of it?

25   A.  It is.

D7inles3                              Gagliano – direct

1   Q.  Under this agreement, what are you supposed to do?

2   A.  I'm supposed to testify for the government.

3   Q.  How are you supposed to testify?

4   A.  Truthfully.

5   Q.  Are you also required to meet with the government if

6   requested?

7   A.  If requested.

8   Q.  If you meet with the government and provide information,

9   what kind of information are you supposed to provide?

10  A.  Truthful information.

11  Q.  Before you signed the cooperation agreement which is on the

12  screen, did you meet with the government?

13  A.  Yes, I did.

14  Q.  What about after you pled guilty?  Did you also meet with

15  the government?

16  A.  Yes, I did.

17  Q.  About how many times in total have you met with the

18  government?

19  A.  Four or so.

20  Q.  What happened in those meetings that you had with the

21  government?

22  A.  We discussed my knowledge of the case.

23  Q.  Under your agreement, are you also required to commit no

24  further crimes?

25  A.  Yes.

D7inles3                        Gagliano - direct

1    Q.  If you do everything that you are supposed to do under the

2    agreement, what is your understanding of what the government

3    has to do for you?

4    A.  There is a possibility they could send a favorable letter

5    to the judge when my sentencing comes.

6    Q.  What is your understanding of what the government writes in

7    such a letter to the judge, if it writes one?

8    A.  It's up to the judge.

9    Q.  What is your understanding of what government writes in the

10   letter, if it writes one?

11   A.  Well, if it writes something favorable, I'll be lucky

12   enough to have a lesser sentence, if the judge looks upon it

13   that way.

14   Q.  Now, if the government writes a letter, what is your

15   understanding about how high your sentence can still be?

16   A.  55 years.

17   Q.  If the government writes the letter, what is your

18   understanding -- or actually, regardless of whether there is a

19   letter, what's your understanding of how low your sentence

20   could be?

21   A.  It could be probation.

22   Q.  What is your understanding as to who will decide what your

23   sentence will be?

24   A.  The judge will.

25   Q.  As you sit here today, has the government promised that it

1    will for sure send this letter to the judge?

2    A.  No, they have not.

3    Q.  Has anyone promised you that you will for sure get a

4    reduced sentence?

5    A.  No, they have not.

6    Q.  As far as you understand it, is the government in this

7    letter, if it sends one, going to recommend a specific sentence

8    to the judge?

9    A.  Not to my knowledge, no.

10   Q.  What is your understanding of whether your testimony has to

11   result in a conviction in order for you to get a letter from

12   the government?

13   A.  I don't believe it has any bearing.

14   Q.  Sir, regardless of what sentence you get in terms of

15   prison, what have you agreed in your agreement regarding the

16   money that you got for disability?

17   A.  I agreed to pay my money back that was paid to me by the

18   United States Railroad Retirement Board.

19   Q.  About how much have you agreed to repay?

20   A.  It's approximately $243,000.

21   Q.  Has the Long Island Rail Road also required you to give you

22   part of your Long Island Rail Road pension?

23   A.  Yes, they have.

24   Q.  How much of your pension are you going to agree to give up?

25   A.  I have agreed to forfeit 15 percent of it.

D7inles3                     Gagliano - direct

1    Q.  And do you see in your binder, do you have Government

2    Exhibit 3532-10 and 3532-11?

3    A.  I have them here.

4    Q.  Are these documents relating to your dealings with the Long

5    Island Rail Road relating to your Long Island Rail Road

6    pension?

7    A.  Yes, they are.

8           MR. WEDDLE:  Your Honor, I didn't plan to offer those.

9    That's why they weren't in the list that I read at the

10   beginning of the testimony.

11   Q.  Now, sir, let's go back and talk in some more detail about

12   how you retired and obtained occupational disability benefits.

13          About how long before you turned 50 did you start

14   planning for retiring at age 50?

15   A.  About two and a half years.

16   Q.  Take a look at Government Exhibit 606-A.

17          MR. WEDDLE:  Can we put that on the screen.

18          Ms. Larson, can you blow up the date and signature in

19   the lower third of the page.  Higher than that.  Thank you.

20   Q.  So, sir, you have the binder in front of you.  Government

21   Exhibit 606-A is a three-page document, right?

22   A.  Yes, it is.

23   Q.  Each of the three pages is what?

24   A.  There are applications for pension estimates.

25   Q.  Who filled them out?

1    A.  I did.

2    Q.  So the first one is also on the screen here.  Who signed

3    this first one?

4    A.  I did.

5    Q.  What's the date that you signed it?

6    A.  May 18, 2004.

7    Q.  On May 18, 2004, what were you asking for in filling out

8    this document?

9    A.  I was asking to get an idea of what I would take home per

10   year from the MTA pension.

11   Q.  So when you asked for this in May of 2004, what date were

12   you predicting you were going to retire?

13   A.  September 1, 2006.

14            MR. WEDDLE:  Ms. Larson, can you blow that date up

15   which is in the top third of the form.

16   Q.  Then the second page shows different retirement date, is

17   that right?

18   A.  Yes, it does.

19   Q.  And what does that date signify, the July 1, 2009 date?

20   A.  That would have given me a few more years, specifically 30.

21   Q.  So, in this second page of Government Exhibit 309, you were

22   asking for what?

23   A.  I was asking for an estimate if I was to retire on that

24   date.

25   Q.  Then the last page you filled out, can you read what year

D7inles3                      Gagliano - direct

1  you filled it out on your copy?

2  A.  The last page, I have applied January 17 of '06 also for a

3  pension estimate.

4  Q.  And the date that you wanted the estimate to assume your

5  retirement date as, what was that?

6  A.  September 1 of '06.

7  Q.  So how does that September 1, 2006 date that you requested

8  in 2004 and again in 2006 compare with the date that you

9  actually ended up retiring?

10 A.  That is the date.

11          MR. WEDDLE:  We're done with that exhibit.

12          Thank you, Ms. Larson.

13 Q.  Before you retired about how much were you making at the

14 railroad?

15 A.  My base salary was approximately $60,000 per year.

16 Q.  What about overtime?  Were you making overtime as well

17 generally?

18 A.  Yes, I did.

19 Q.  About how much money did you make in overtime in the last

20 few years before you retired?

21 A.  I averaged somewhere between 25,000 to 30,000 generally.

22 Q.  If you take a look at Government Exhibit 606-B --

23          MR. WEDDLE:  If we could display that for the jury,

24 please.  Can you blow up the top quarter of the screen.

25 Q.  What is this document?

D7inles3                         Gagliano - direct

1   A.  It's showing hours worked, straight time hours and also

2   overtime hours.

3   Q.  And it relates to whom?

4   A.  It relates to me.

5   Q.  And so what's the total amount of overtime -- sorry, what

6   year does this first page relate to?

7   A.  2006.

8           MR. WEDDLE:  Your Honor, may I just adjust this

9   projector because I'm missing part of the screen here.

10          Thank you.

11  Q.  How many overtime hours did you have in 2006?

12  A.  It shows 393.1.

13          MR. WEDDLE:  I'm sorry, your Honor, I just wanted to

14  check.

15  Q.  If you take a look at the second page of this document.

16          MR. WEDDLE:  Ms. Larson, can you blow up the center of

17  the page.

18  Q.  The second page shows the total for what year?

19  A.  2005.

20  Q.  And how many overtime hours did you work in 2005?

21  A.  675.5.

22  Q.  Now, the number that's been highlighted on the screen that

23  says overtime, double time hours, do you see that?

24  A.  Yes, I do.

25  Q.  What is the difference between overtime hours and double

 1   time hours?

 2   A.   Overtime hours would be paid at a rate of straight time

 3   plus half time.   Double time hours would be double straight

 4   time.

 5   Q.   When you worked overtime hours, were those hours that you

 6   were actually working?

 7   A.   Yes, they were.

 8   Q.   When you worked double time hours, were those hours that

 9   you were actually working?

10   A.   Yes, they were.

11   Q.   When you worked overtime or double time hours, how did your

12   work compare to the type of work you were doing in normal

13   hours?

14   A.   Usually it was the same work.

15   Q.   Was working overtime optional?

16   A.   Yes, it was.

17   Q.   Why did you work these overtime hours in the years before

18   you retired?

19   A.   A couple of reasons.   One of them is the cost of living in

20   New York.   The other one is that your pension is based on your

21   straight time and overtime together averaged, and the more you

22   would earn in your years prior to retirement, the higher your

23   pension would be when you did retire.

24           MR. WEDDLE:   Thank you, Ms. Larson.

25   Q.   Now, you mentioned that in conjunction with your retirement

1    you got occupational disability from the Railroad Retirement

2    Board.  How did you come to know about occupational disability?

3    A.  Speaking with coworkers.

4    Q.  Based on your discussions with coworkers, what did you

5    understand the process of getting occupational disability to be

6    in the years coming up to your retirement?

7    A.  Well, you had to go see one of a few doctors and prior

8    to -- a couple of years prior to start a paper trail and then

9    you would need to obtain --

10             MR. DURKIN:  Judge, can we have a better foundation

11   for these conversations.

12             THE COURT:  Sustained.

13   Q.  Sir, how widespread were discussions about the process for

14   obtaining occupational disability in your years working at the

15   Long Island Rail Road?

16             MR. DURKIN:  Objection.

17             THE COURT:  Overruled.

18   A.  It was discussed openly.

19   Q.  When you say that it was discussed openly, do you mean that

20   it was just discussed between you and let's say one or two

21   other people?

22   A.  It could have been more than that.  At that time it was

23   just an open discussion.  It could have been with anyone.

24   Q.  So in your years at the Long Island Rail Road, when you say

25   it was discussed openly, how many people at the Long Island

D7inles3                      Gagliano - direct

1    Rail Road were discussing it openly?

2    A.   That would be just a guess.  I just worked with a few

3    people in my own department for the most part.

4    Q.   Were there people who retired before you at the Long Island

5    Rail Road?

6    A.   There were many, yes.

7    Q.   When people were retiring before you, did they talk to you

8    and others about the process for retiring?

9    A.   Yes, they did.

10   Q.   For how many years before you retired do you think you

11   started hearing about the process for retiring and obtaining

12   occupational disability at the railroad?

13   A.   Probably three or four.

14   Q.   Were you aware of people who had retired before you who

15   told you that they planned to get occupational disability?

16           MR. DURKIN:  Judge, objection.

17           THE COURT:  Sustained.  Rephrase.

18   Q.   In terms of the people who retired before you, what had

19   they told you about whether they planned to get occupational

20   disability?

21           MR. DURKIN:  Objection.

22           THE COURT:  Sustained.

23   Q.   Can you name some people who retired before you, sir?

24   A.   Yes, I can.

25   Q.   Go ahead?

D7inles3                        Gagliano - direct

 1  A.  There was Rich Luzinski, Steve Borokowski, Sam Racioppi,

 2  Dan Callahan.  There were loads of people, hundreds.

 3  Q.  I'm sorry?

 4  A.  There were literally, you know, hundreds of people that I

 5  had known that did retire.

 6  Q.  In terms of the hundreds of people who retired that you

 7  knew, to what extent were those hundreds of people discussing

 8  retiring and getting occupational disability versus something

 9  else?

10          MR. DURKIN:  Objection.

11          THE COURT:  Sustained.

12  Q.  Sir, the hundreds of people who retired before you, to what

13  extent did you come into contact with them talking about

14  occupational disability?

15          MR. DURKIN:  Same objection.

16          THE COURT:  Overruled.

17  A.  Yes, I did.

18  Q.  To what extent, sir?  To what extent?

19  A.  It was quite a big extent.  It was something you asked

20  somebody at their retirement party.

21  Q.  You said it was something you asked somebody at their

22  retirement party.  What do you mean by that?

23  A.  Well, you would sort of ask them, did you put in for an

24  occupational disability or did you get one.

25  Q.  How often did the hundreds of people who retired before you

D7inles3                          Gagliano - direct

1    have retirement parties?

2    A.  Probably about 90 percent did.

3    Q.  And would you say that it was rare to talk about at these

4    retirement parties whether people were getting occupational

5    disability?

6    A.  No, it wasn't rare.

7    Q.  What was it instead?

8    A.  It was spoken about openly.

9           MR. DURKIN:  I'm sorry.  I didn't hear the answer.

10          THE COURT:  Would the reporter read back the answer.

11          (Record read)

12   Q.  In your discussions, in those open discussions that you

13   have described involving hundreds of people, had you also

14   heard --

15          MR. RYAN:  Objection to the form of the question.

16          THE COURT:  Sustained.

17   Q.  In these discussions that you described that were open at

18   the Long Island Rail Road, had you also heard that some people

19   applied for private disability insurance as part of the process

20   of retiring with disability?

21          MR. DURKIN:  Objection.

22          THE COURT:  Sustained.  Leading.

23   Q.  Sir, are you familiar with private disability insurance?

24   A.  I am.

25   Q.  What is it?

D7inles3                          Gagliano - direct

1   A.  From what I understand, if you do have private disability

2   insurance, that if you do get disabled, some of your loans for

3   big-ticket items will be taken care of or paid for by the

4   insurance.

5   Q.  This understanding that you have just described to us about

6   what private disability insurance does for you, from whom did

7   you learn this?

8   A.  In those same discussions.

9   Q.  When you say in those same discussions, sir, please explain

10  to the jury what you are talking about?

11  A.  Well, in some of the same discussions with coworkers, they

12  brought this up, that if you were able to obtain --

13          MR. DURKIN:  Judge, I am going to object unless they

14  are named in a bill of particulars.

15          THE COURT:  Overruled.

16  A.  It was my understanding that some people would apply for

17  this disability insurance full well knowing that they were

18  going to get a disability.

19  Q.  Can you name any of the companies that sold this private

20  disability insurance?

21  A.  The only one I ever heard of was Aflac.

22  Q.  Did you buy private disability insurance in preparation for

23  retirement?

24  A.  No, sir, I did not.

25  Q.  Why not?

D7inles3                          Gagliano - direct

1    A.  It seemed very wrong.

2    Q.  Why is that?

3    A.  You were just about guaranteed to get a disability as it

4    was.  It just seemed totally wrong.  I don't know how to

5    expound on it.

6    Q.  You mentioned before that in the years leading up to your

7    retirement you had heard from others that there were certain

8    doctors that people would go to for help in documenting a

9    disability claim.

10         Who are the doctors that you had heard of in the years

11   before you retired?

12         MR. DURKIN:  Foundation for the conversation, Judge.

13         THE COURT:  Overruled.

14   A.  There were three in particular that I can remember.  Their

15   name was Parisi, Ajemian and Lesniewsky.

16   Q.  So as were you considering retiring, what, if anything, did

17   you do to prepare for getting a disability benefit?

18   A.  I went to visit one of the doctors.

19   Q.  Which one did you go to?

20   A.  Dr. Lesniewski.

21   Q.  Of the three that you had heard of, why did you decide to

22   go to Dr. Lesniewski?

23   A.  He was recommended by and friend and also his name wasn't

24   heard of as often.

25   Q.  How did the fact that his name wasn't heard of as often

1   factor into your thinking, if at all, in deciding to got to

2   Dr. Lesniewski instead of one the other doctors?

3   A.   It seemed there might be less of a light shining on him if

4   I used him.

5   Q.   When you say there might be less of a light shining on him

6   if you used him, what do you mean?

7   A.   Well, it seemed like a lot of people were getting

8   occupational disability, and I just had a feeling that maybe

9   somebody was going to do something about it.

10  Q.   When did you first go to Dr. Lesniewski?

11  A.   I believe it was toward the end of 2003.

12  Q.   So, at the time you first went to Dr. Lesniewski in 2003,

13  what was your plan in terms of when you would retire with a

14  disability?

15  A.   I was looking towards 2006.

16  Q.   So that was about how long in the future when you first

17  went to him?

18  A.   A little more than two and a half years.

19  Q.   What did you recall about your first visit with

20  Dr. Lesniewski?

21  A.   Just a regular checkup.

22  Q.   About how many times did you see him in the two-plus years

23  between 2003 and when you retired?

24  A.   Just a guess, but I believe somewhere between 10 and 20.

25  Q.   During your visits to Dr. Lesniewski during that time

D7inles3                          Gagliano - direct

1   period, what did he do?

2   A.   Prescribed me anti-inflammatories, did a couple MRIs.

3   Q.   To what extent did Dr. Lesniewski treat you for any of your

4   complaints?

5   A.   That was it, just anti-inflammatories.  I never had any

6   surgeries.

7   Q.   Did you discuss having surgery with Dr. Lesniewski?

8   A.   No.

9   Q.   Did Dr. Lesniewski mention to you the possibility of having

10  surgery?

11  A.   He may have said you may require surgery in the future.

12  Q.   So although he talked to you about surgery, why didn't you

13  have it?

14  A.   I didn't have anything acutely wrong with me.

15          MR. DURKIN:  I'm sorry.  Can I have the last answer

16  read back.

17          THE COURT:  Would the record he had read back the

18  answer.

19          (The following was read back:

20          "Answer:  I didn't have anything really wrong with

21  me.")

22          MR. WEDDLE:  Your Honor, I heard the answer

23  differently.

24          THE WITNESS:  I said acutely.

25          MR. WEDDLE:  Can you just answer the question again if

D7inles3                        Gagliano - direct

1    you can.

2            THE COURT:  Answer the question again.

3    A.  I didn't have anything acutely wrong with me.

4    Q.  What is the purpose for which you were going to

5    Dr. Lesniewski?

6    A.  To create a paper trail towards the occupational

7    disability.

8    Q.  Did you tell your purpose to Dr. Lesniewski when you

9    visited before you retired?

10   A.  No, I did not.

11   Q.  In the visits that you mentioned that you went to

12   Dr. Lesniewski before your retirement, did Dr. Lesniewski say

13   anything to you during any of these visits that indicated he

14   understood why you were going to him?

15   A.  At one point he said --

16           MR. DURKIN:  Object.

17           THE COURT:  Overruled.

18           MR. DURKIN:  Can we ask for foundation and at least

19   when we are talking about, Judge.

20           THE COURT:  All right.

21   Q.  Well, OK.  When were you seeing Dr. Lesniewski before your

22   retirement?

23   A.  From the end of 2003 until 2006.

24   Q.  And you mentioned that there were a number of visits,

25   right?

D7inles3                          Gagliano - direct

1    A.  Yes, I did.

2    Q.  How far apart were these different visits that you went to?

3    A.  Usually a couple of months.

4    Q.  There were times where it might be longer?

5    A.  Yes, there was.

6    Q.  There were times when they were closer, right?

7    A.  Yes, there was.

8    Q.  How clear is your memory in terms of distinguishing between

9    one particular visit versus any of the other dozen or so visits

10   that you went to Dr. Lesniewski between 2003 and 2006?

11   A.  I remember something from one particular visit.

12   Q.  Do you remember the date that this occurred?

13   A.  I believe it was in early 2006, maybe January or February.

14   Q.  So, in early 2006, what was it that Dr. Lesniewski said to

15   you that indicated to you that he understood that you were

16   going to him to get an occupational disability?

17   A.  He said, You have enough.

18   Q.  When he said, You have enough, what did you understand that

19   to mean?

20   A.  I understood that to mean that I had enough things that he

21   would write me a narrative.

22   Q.  How did you feel when he told you that?

23   A.  I was glad he felt that way.

24   Q.  Why is that?

25   A.  It would help me to retire sooner.

D7inles3                          Gagliano - direct

1    Q.  At the time that Dr. Lesniewski said that you had enough,

2    were you still working?

3    A.  Yes, I was.

4    Q.  Were you also working overtime?

5    A.  Yes, I was.

6    Q.  At that time, when Dr. Lesniewski said you had enough, had

7    Dr. Lesniewski asked you whether you could do your job?

8    A.  No, he did not.

9    Q.  Had you told him that you were unable to do your job at

10   that time?

11   A.  No, I did not.

12   Q.  Sir, did there come a time that Dr. Lesniewski gave you a

13   narrative?

14   A.  Yes, there did.

15   Q.  What is a narrative?

16   A.  It is a written report based on your medical condition.

17   Q.  What prompted Dr. Lesniewski to give you a narrative?

18   A.  I asked him for one.

19   Q.  Did you have to pay anything for the narrative?

20   A.  Yes, I did.

21   Q.  How much did you have to pay?

22   A.  It was $850.

23   Q.  How did you pay the fee for the narrative?

24   A.  In cash.

25   Q.  Did you get a receipt?

D7inles3                      Gagliano - direct

```
1    A.  I did.
2    Q.  At this point, if you would take a look in your binder at
3    Government Exhibit 600 and if we could display that on the
4    screen.
5              MR. WEDDLE:  Could you blow it up.
6    Q.  Sir, what is Government Exhibit 600?
7    A.  It is a copy of the receipt that I got for paying for the
8    narrative.
9    Q.  What is the date on it?
10   A.  August 18, 2006.
11   Q.  How long is that before you retired?
12   A.  About two weeks.
13   Q.  What does it say about the form in which you paid it?
14   A.  There is a checkmark by cash.
15   Q.  Do you remember who you gave it to, who you gave the $850
16   to?
17   A.  I think it was the receptionist.
18             MR. WEDDLE:  We are done with that exhibit.  Thank
19   you, Ms. Larson.
20   Q.  Were there other materials that came -- I'm sorry.  How did
21   you get the narrative from Dr. Lesniewski?
22   A.  The receptionist gave it to me.
23   Q.  Were there other materials that came with the narrative?
24   A.  There was also a medical report.
25   Q.  After you got the narrative, what did you do to continue
```

1   the disability process?

2   A.  You took the narrative and you went to, there were other

3   people that filled out forms for you.  The form I'm talking

4   about is the application for the Railroad Retirement Board for

5   disability, so I had to take that to one of those people.

6   Q.  In the years prior to retiring, what was your understanding

7   about who were some of the people who would were perform this

8   task for a retirement?

9   A.  There were two names that I kept hearing.  One of the names

10  was -- one of the guys I used his name was Yule, and right now

11  the other name escapes me.  Actually the other name was

12  D'Avanzo.

13  Q.  And Yule is spelled Y-u-l-e?

14  A.  Correct.

15  Q.  So after you got the narrative and the accompanying

16  materials from Dr. Lesniewski's office, who did you go meet

17  with?

18  A.  I met with Ed Yule.

19  Q.  Who is Ed Yule?

20  A.  To my knowledge, he was a retired union either president or

21  general chairman.

22  Q.  Where did you meet with Mr. Yule?

23  A.  I met with him in his office up in Northport.

24  Q.  What did you give to him?

25  A.  The narrative and medical report from the doctor along with

D7inles3                          Gagliano - direct

1    an application.

2    Q.  And what did he do for you?

3    A.  He filled out the form.

4    Q.  How closely did you read the forms at the time?

5    A.  I didn't read them until much later.

6    Q.  When you say until much later, what are you talking about?

7    A.  I read them the day after I was arrested.

8    Q.  Although you hadn't read them closely before your arrest,

9    in general terms, what was your understanding of what the forms

10   and the rest of your application package would say in terms of

11   whether you could do your job?

12          MR. DURKIN:  Foundation as to how he got that

13   understanding, Judge.

14          THE COURT:  Sustained.

15   Q.  Sir, two and a half years before you retired, why did you

16   go see Dr. Lesniewski?

17   A.  To start a paper trail.

18   Q.  When you went to him the first time, was it for the same

19   reason?

20   A.  Yes, it was.

21   Q.  The second time you went to him, what was the reason for

22   the second time?

23   A.  The same thing.

24   Q.  A paper trail?

25   A.  Correct.

D7inles3                          Gagliano - direct

1    Q.  The third time you went to him, what was the reason for

2    that visit?

3    A.  The same reason.

4    Q.  Also creating a paper trail?

5    A.  Correct.

6    Q.  When you went to get the MRI test, what was the reason for

7    that, sir?

8    A.  Create a paper trail.

9    Q.  When you went to Dr. Lesniewski the fourth time, what was

10   the reason for that?

11   A.  Create a paper trail.

12   Q.  For the other times up until you your retirement, what was

13   the reason for all of those?

14   A.  To create a paper trail.

15   Q.  When you paid Dr. Lesniewski $850 in cash, what were you

16   paying him for?

17   A.  A narrative report.

18   Q.  And when Dr. Lesniewski said to you you had enough --

19             THE COURT:  Mr. Weddle.

20   Q.  -- what was your understanding about --

21             THE COURT:  We have had enough.

22             MR. WEDDLE:  Thank you, your Honor.

23   Q.  In general terms, sir, what was your understanding about

24   what the paperwork you were submitting to the United States

25   Railroad Retirement Board would say in terms of whether you

D7inles3                          Gagliano - direct

1   could do your job?

2   A.  It would say I couldn't.

3   Q.  Was that true at the time you submitted it?

4           MR. DURKIN:  Judge, excuse me.  The term paperwork is

5   very misleading, and I object.

6           The application is different than the narrative, and

7   the government in this line of questioning is commingling the

8   two and I think that's inappropriate.  I think he should

9   identify what paperwork he is talking about.

10          THE COURT:  Sustained.

11          MR. WEDDLE:  Your Honor, I am planning to get to the

12  materials in detail in about ten more questions.  I'm going to

13  go through them in detail and talk about what's said in each

14  one and whether those statements are true or false.

15          MR. RYAN:  I object, your Honor.  If he can do it in

16  five, I would appreciate it.

17          THE COURT:  He will make his best efforts.

18          Mr. Weddle.

19  Q.  In general terms, sir, what was your understanding about

20  what the paperwork you submitted to the United States Railroad

21  Retirement Board would say about whether you could do your job?

22  A.  It would say I couldn't.

23  Q.  And was that true at the time you submitted it?

24  A.  No, it was not.

25  Q.  About how long was your meeting with Ed Yule?

D7inles3                          Gagliano - direct

1   A.  Probably a half hour or less.

2   Q.  What do you recall saying to him and what do you recall him

3   saying to you?

4   A.  I can just recall having to give the paperwork to him, my

5   name, my Social Security number, and my occupation.

6   Q.  After you told him your occupation, do you recall what he

7   said to you?

8   A.  He said, you have something for that.

9   Q.  What did you understand that to mean?

10  A.  He had something to describe how a signalman couldn't do

11  his job.

12  Q.  Did Mr. Yule ask you about your activities of daily living?

13  A.  No, he did not.

14  Q.  How did you actually apply for the disability?

15  A.  I brought -- I met Mr. Yule and brought all the

16  aforementioned paperwork to the Railroad Retirement Board in

17  Westbury and dropped it off.

18  Q.  What had you heard from your coworkers about where you

19  should apply for disability?

20  A.  It was --

21          MR. DURKIN:  Objection.

22          THE COURT:  Overruled.

23  A.  They were known to have a lot of success in getting people

24  occupational disabilities from that office.

25  Q.  What happened when you went to the Westbury office to turn

D7inles3                          Gagliano - direct

1   in your forms?

2   A.  Mr. Yule and the person that worked at the Railroad

3   Retirement office went through the paperwork, finished filling

4   it out, had me sign it, and then submitted it.

5   Q.  When you say they went through the paperwork, what does

6   that mean?

7   A.  They were just reading through it to be sure that

8   everything was filled out.  That was about it.  The two of them

9   were doing it together.

10  Q.  I just would like to read for the record a stipulation

11  which is Government Exhibit 1601 in evidence, your Honor.

12         I am going to skip the preamble with your Honor's

13  permission.

14         THE COURT:  Yes.

15         MR. WEDDLE:  It is hereby stipulated and agreed by the

16  parties that, if called as a witness, a representative of the

17  Railroad Retirement Board also known as hereinafter the RRB

18  would testify as follows:

19         Government Exhibits 100 through 162 are true and

20  correct copies of claim filings maintained by the RRB in the

21  ordinary course of business.

22         I would also like to read, your Honor, Government

23  Exhibit 1601, another stipulation also stipulated between the

24  parties.

25         If called as a witness, a representative of the

1   Railroad Retirement Board, hereinafter the RRB, would testify

2   as follows:

3          Government exhibits marked with the prefix number 100

4   through 162 followed by an alphabetic suffix are excerpted from

5   the respective RRB claim file corresponding to the prefix.

6   Thus, for example, Government Exhibit 100-A is excerpted from

7   the RRB claim file that is Government Exhibit 100.

8          I didn't know that would be such a tongue twister.

9          THE COURT:  All right.  It is stipulated.

10  Q.  Let's take a look in your binder, Government Exhibit 101-A.

11  Let's display 101-A.

12         Sir, could you also look at 101-C, which is the next

13  item in your binder.

14         Sir, are 101-A and 101-C two of the forms that made up

15  your application package?

16  A.  They are.

17  Q.  The first one which is on the screen is called what?

18  A.  It is an application for determination of an employee's

19  disability.

20         MR. WEDDLE:  Ms. Larson, can you blow up just the top

21  left corner.

22  Q.  So you see in the top left, whose form is this?

23  A.  The United States Railroad Retirement Board.

24         MR. WEDDLE:  Thank you, Ms. Larson.

25  Q.  The bottom half of the first page has information about

D7inles3                          Gagliano - direct

1    you?

2    A.   Yes, it does.

3    Q.   Do you see the date stamped at the bottom?

4    A.   I do.

5    Q.   It says, "Received, Westbury, New York, D/O, October 31,

6    2006."

7              When did you go to the Westbury office?

8    A.   October 31, 2006.

9    Q.   Is this your writing where it says name, social security,

10   number, etc.?

11   A.   No, sir, it's not.

12   Q.   Whose is it?

13   A.   Mr. Yule's.

14             MR. WEDDLE:  If you could turn to page 10 of this

15   Exhibit, Ms. Larson, and Mr. Gagliano.  Now, could you blow up

16   the beginning with the No. 64, Ms. Larson, through the

17   signature.  Thank you.

18   Q.   Do you see there is a legend there next to No. 64 that

19   says, "I know that if I make a false or fraudulent statement in

20   order to receive benefits from the RRB or if I fail to disclose

21   earnings or report employment of any kind to the RRB, I'm

22   committing a crime which is punishable under federal law."

23             Do you see that?

24   A.   I do see that, yes.

25   Q.   And do you see that it also says, "I agree to immediately

D7inles3                    Gagliano - direct

 1   notify the RRB if I work for any employer, railroad or

 2   nonrailroad, or perform any self-employment work."

 3            And then the next bullet says "If my condition

 4   improves."

 5            Do you see that?

 6   A.  Yes, I do.

 7   Q.  Whose signature appears under those two legends?

 8   A.  Mine.

 9   Q.  When you signed it, do you see that you are also certifying

10   that "the information I give to the RRB on this application is

11   true to the best of my knowledge"?

12   A.  Yes, I see that.

13   Q.  Was the information you gave on this application true to

14   the best of your knowledge when you signed it on October 31,

15   2006?

16   A.  I hadn't read it at that point.

17   Q.  In terms of your general understanding about what it was

18   going to say?

19   A.  It should have been, yes.

20   Q.  And was it?

21   A.  No, it was not.

22            MR. WEDDLE:  Ms. Larson, could you turn back to page 2

23   of this exhibit.

24            If you could blow up questions 11 through 13.

25   Q.  Whose writing is this that we see on the screen here?

D7inles3                        Gagliano – direct

1   A.   Mr. Yule's writing.

2              (Continued on next page)

D7idles4                         Gagliano – direct

1   Q.  You see, question 11 says, "Enter the date you could no

2   longer work because of your condition."

3            And what is the date that your form says?

4   A.  July 26, 2006.

5   Q.  And is that answer true to that question?

6   A.  No.  It is not.

7   Q.  Why is it false?

8   A.  Because I was still able to work.

9   Q.  Do you see question 13 says, Does your condition prevent

10  you from working now?"

11  A.  Yes, I see it.

12  Q.  And it says "Yes," right?

13  A.  Yes, it does.

14  Q.  Is that also false?

15  A.  It's also false.

16  Q.  For the same reason?

17  A.  Yes.

18  Q.  And then in question 12, it says, in handwriting, "Account

19  of my disabilities," in Item 6.  "I no longer can lift and

20  carry up to 100 pounds, climb ladders, 90-foot poles,

21  embankments," etc., "or do any of the physical labor required

22  by my job as a signalman on the Railroad."

23            Was that true at the time?

24  A.  No, it was not.

25  Q.  To what extent did you have to lift and carry up to a

D7idles4                    Gagliano - direct

1    hundred pounds on your job as a signalman on the Railroad?

2    A.   Not very often.

3    Q.   When you had to do it, what did you do?

4    A.   Usually get help.

5    Q.   And you did it?

6    A.   Yes.

7    Q.   And how often did you have to climb ladders and 90-foot

8    poles?

9    A.   90-foot poles not too often, but the use of ladders was

10   quite often for signal --

11   Q.   Did you have a medical condition that made you unable to do

12   those things?

13   A.   No, I did not.

14   Q.   Did you tell Mr. Yule the information that is written here

15   and that you've said is false?

16   A.   No, I did not.

17   Q.   Did you tell Mr. Yule that you could no longer work as of

18   July 26, 2006 because of a condition?

19   A.   No, I did not.

20          MR. WEDDLE:  Now, if we could turn to page 4 of the

21   exhibit, Ms. Larson, and blow up the top half.  Zoom in on the

22   top half of the paper.

23   Q.   And on this page of the application it asks that you enter

24   information about doctors who have treated you, right?

25   A.   Correct.

D7idles4                          Gagliano - direct

1   Q.  And whose information is here?

2   A.  Dr. Lesniewski.

3   Q.  And you see that there are a number of dates of treatment;

4   do you see that?

5   A.  Yes.

6   Q.  How many are there?

7   A.  Approximately a dozen; maybe a little more, a little less.

8   Q.  And the first one chronologically is what?

9   A.  November 25th of '03.

10  Q.  And there is a visit on July 25th of '06.  Do you see that?

11  A.  Yes.

12  Q.  Were you working on that day?

13  A.  No, I was not.

14  Q.  And then there is a visit for September 26, '06.  Do you

15  see that?

16  A.  I do.

17  Q.  Then when did you retire?

18  A.  September 1st of '06.

19       MR. WEDDLE:  And then, Ms. Larson, if we could move to

20  page 6 of this exhibit.  And if we could zoom in on the lower

21  section, Section 6.

22  Q.  Do you see Section 6 is called "Information about your

23  daily activities?"

24  A.  Yes, I do.

25  Q.  It has questions about daily activities and whether they

D7idles4                        Gagliano - direct

1    are easy or hard or you can't do them at all, right?

2    A.  Yes, it does.

3    Q.  Do you see that "easy," "hard" or "not at all" are defined

4    in the printed part of the form in Section 6?

5    A.  I see that.

6    Q.  And what are most of these activities of daily living

7    filled out as being in your application form?

8    A.  Most of them are X'd off as being hard to do.

9    Q.  So it says, for example, sitting, standing, walking,

10   eating, bathing, dressing.  Those are what?

11   A.  Hard.

12   Q.  Was that true at the time?

13   A.  No, sir.

14   Q.  And it says there is an explanation for some of the hard

15   answers.  Do you see that?

16   A.  Yes, I do.

17   Q.  And the explanation for why it's hard for you to sit, it

18   says, "Severe and disabling pain in back, shoulder and legs."

19   Do you see that?

20   A.  Yes, I do.

21   Q.  Was that true at the time?

22   A.  No, it was not.

23   Q.  And it says -- down at the bottom, it says, "Driving a

24   motor vehicle is hard."  And then it says, "Hard, back,

25   shoulder, leg, and hand pain after 20 to 30 minutes."  Do you

1    see that?

2    A.  I see that.

3    Q.  Was that true?

4    A.  No, sir.

5    Q.  Around the time that you retired, did you take any long car

6    trips?

7    A.  Yes, I did.

8    Q.  What kinds of car trips did you take at that time?

9    A.  I have a little place up in Maine.

10   Q.  And how do you get between -- and where do you normally

11   live?

12   A.  In -- on Long Island, in North Babylon.

13   Q.  How do you get from North Babylon to your place in Maine?

14   A.  I drive.

15   Q.  How long a drive is it?

16   A.  If I'm lucky, eight hours.

17   Q.  And then do you see the bottom of this form says that

18   writing English is hard?  Do you see that?

19   A.  Yes, I see that.

20   Q.  And then the explanation is "Wrist and back pain, hard to

21   write."  Was that true?

22   A.  No.  It's not.

23   Q.  Who filled this portion of the form out?

24   A.  Mr. Yule.

25   Q.  Did Mr. Yule ask you how to fill these out?  Did he ask you

1    whether these things were easy, hard, or not, or you couldn't

2    do them at all?

3    A.  No, sir.

4    Q.  Did he ask you to explain why some of them might be hard?

5    A.  No, sir.

6             MR. WEDDLE:  And then if we could take a look at the

7    next page, Ms. Larson, and zoom in on question 40.

8    Q.  You see question 40 asks for additional information that

9    describes your daily activities during a normal day.  Do you

10   see that?

11   A.  Yes, I see that.

12   Q.  And on your form it says, "Wakes up at 6 a.m.  Shower.

13   Eat.  Watch TV.  Lunch at 12 noon.  Watch TV.  Nap.  Dinner at

14   6 p.m.  Watch TV.  Bed at 10 p.m.  Wake up four to five times a

15   night with back, shoulder, wrist, hand and leg pain."  Do you

16   see that?

17   A.  Yes, I do.

18   Q.  What kind of person is this describing?

19   A.  It sounds likes someone in a wheelchair.

20   Q.  Was that you?

21   A.  No, sir.

22   Q.  Now, let's take a look at Government Exhibit 101C.

23            101C is also a United States of America Railroad

24   Retirement Board form, right?

25   A.  Yes, it is.

D7idles4                          Gagliano - direct

1    Q.  And what is the title of the form at the top?

2    A.  "Vocational Report."

3    Q.  And it is about you, right?

4    A.  Yes, it is.

5    Q.  Whose handwriting is on this?

6    A.  That's Mr. Yule's handwriting.

7    Q.  And if we could take a look at page 5 of this exhibit,

8    question 22.

9            I'm sorry, I guess it is not page 5.  It is the last

10   page.  Page 5 is a form.

11           So there's a legend in question 22, and it says, "I

12   know that civil and criminal penalties may be imposed on me for

13   false or fraudulent statements, or for withholding information,

14   to misrepresent a fact material to determining a right to a

15   payment under the Railroad Retirement Act.  I affirm that to

16   the best of my knowledge, the information I have given

17   represents the complete truth."

18           Do you see that?

19   A.  I do see that.

20   Q.  You signed under that legend?

21   A.  I did.

22   Q.  What's the date?

23   A.  October 31, 2006.

24   Q.  And if you could take a look at page 2 of the exhibit.

25           MR. WEDDLE:  And you can blow up the first, the top

D7idles4                        Gagliano - direct

1    half.

2    Q.  And so what kinds of questions are on this form?

3    A.  It's questions about how I do my job, what it entails to do

4    the job.

5    Q.  And this also talks about lifting and carrying up to

6    100 pounds and climbing ladders and poles and that kind of

7    thing, right?

8    A.  Yes, it does.

9    Q.  Then it says, "See vocational report supplement job

10   description 12 attached."  Do you see that?

11   A.  Yes, I do.

12              MR. WEDDLE:  And then if we could turn, Ms. Larson, to

13   the next page of the exhibit.

14              And if you could blow up the top half of this piece of

15   paper.

16   Q.  Did you type up this part?

17   A.  No, I did not.

18   Q.  Did you provide the information that goes into this part?

19   A.  No, I did not, other than what was written on the

20   narrative.

21   Q.  Who prepared this word-processed job description?

22   A.  Mr. Yule did.

23   Q.  And do you see, it says kind of in the center of what's on

24   the screen, "I'm disabled from doing this work.  My

25   disabilities are caused by severe, back, shoulder, wrist, arms,

D7idles4                         Gagliano - direct

1    hand and leg problems that prevent me from bending, limiting,

2    twisting, carrying, crouching, kneeling, climbing and prolonged

3    standing."  Do you see that?

4    A.  I do see that.

5    Q.  Is any of that true?

6    A.  No, it is not.

7    Q.  Was it true at the time you submitted it?

8    A.  No, it was not.

9            MR. WEDDLE:  Ms. Larson, could you just display this

10   entire page again.

11   Q.  Do you see that this page also has the "received Westbury

12   PO" stamp of the same date?

13   A.  Yes, I do.

14           MR. WEDDLE:  Ms. Larson, will you turn to the next

15   page of this exhibit and just blow up the first paragraph next

16   to number 2.

17   Q.  It says, "I also worked around impedance reactors rated at

18   six million watts used for return electrical power of trains to

19   substations," and then it continues.  Do you see that?

20   A.  I do.

21   Q.  What is an impedance reactor?

22   A.  I don't know.

23   Q.  Do you know whether you worked with anything that is

24   related to six million watts?

25   A.  I'm unaware.

D7idles4                         Gagliano - direct

1    Q.  And did you pay -- did you have to pay Mr. Yule anything

2    for helping you with this process of obtaining a disability?

3    A.  I did.

4    Q.  How much did you pay Mr. Yule for helping you with this

5    process?

6    A.  $1,300.

7    Q.  What form did you give him the $1,300 in?

8    A.  Cash.

9    Q.  Why did you give him cash?

10   A.  That's what he asked for.

11   Q.  Let's now talk about the medical materials that you

12   mentioned that made up part of your application.

13          Where did the medical materials that made up part of

14   your application come from?

15   A.  Dr. Lesniewski.

16   Q.  And do you know if they included MRI reports or anything

17   like that?

18   A.  I don't believe they included the actual MRIs but --

19   Q.  What about reports about the MRIs?

20   A.  I believe they did.

21   Q.  And did you get those from Dr. Lesniewski's office or from

22   somewhere else?

23   A.  I believe they came right from the MRI's office, the place

24   where they were done.

25   Q.  How sure are you about that?

1    A.  Not very.

2    Q.  Did you go pick up anything from the MRI office?

3    A.  I wouldn't have to include it in this, no.

4    Q.  Where did you go to pick up medical materials to include in

5    your application?

6    A.  Just Dr. Lesniewski's office.

7    Q.  How did the medical materials get from Dr. Lesniewski's

8    office to the Railroad Retirement Board?

9    A.  I brought them with me to Mr. Yule's office in Northport,

10   and from there we met together at the Railroad Retirement

11   Office in Westbury and submitted them.

12   Q.  And let's see.  Sir, could you take a look at Government

13   Exhibit 101B, like boy; 101D, like David; and 101S, like Sam.

14          B like boy, D like David, S like Sam, all from the

15   government 101 series.

16          Do you see those documents, sir?

17   A.  I do.

18   Q.  And collectively, what are these three documents?

19   A.  They are medical reports.

20   Q.  From where?

21   A.  From Dr. Lesniewski's office.

22   Q.  And where did you submit them?

23   A.  At the United States Railroad Retirement Board.

24          MR. WEDDLE:  And, Ms. Larson, would you start with

25   Government Exhibit 101B, like boy, and could you blow up the

D7idles4                          Gagliano - direct

1   top half of the paper.

2   Q.   This is also a form of the United States of America

3   Railroad Retirement Board.   Do you see that on the top left?

4           (Pause)

5           Sir?

6   A.   I do see it.   Yes.

7   Q.   The title of it is what?

8   A.   "Medical Assessment."

9   Q.   And it is about you, right?

10  A.   Yes, it is.

11  Q.   Is some of the handwriting that is on the screen your

12  handwriting?

13  A.   It looks like I filled in the address and phone number.

14          MR. WEDDLE:   And if you could just show the full page,

15  Ms. Larson.

16  Q.   And then there is other handwriting below you, and your

17  name is in different handwriting, right?

18  A.   That's correct.

19  Q.   And if you take a look -- if we could display it for the

20  jury, the last page of this exhibit.

21          Excuse me, your Honor.

22          (Pause)

23          Who did you have sign this form?

24  A.   Dr. Lesniewski.

25  Q.   And what's the date on it?

D7idles4                         Gagliano - direct

1   A.  August 2nd of '06.

2           MR. WEDDLE:  Ms. Larson, would you turn to the second

3   page and blow up the top third or so of the paper.

4   Q.  Now, do you see on the second page of the exhibit, sir,

5   there is a number of -- there is like a chart that's filled out

6   with numbers?

7   A.  I see it.

8   Q.  What does this relate to?

9   A.  It looks like something -- one of them relates to shoulder

10  and cervical spine, elbow, dorsolumbar spine.

11  Q.  And do you see there is a column that's called "Normal

12  Degrees," do you see that?

13  A.  I do.

14  Q.  Then there are some handwritten figures for the left

15  shoulder and there are handwritten figures for the dorsolumbar

16  spine, right?

17  A.  Yes.

18  Q.  Sir, did you have limited range of motion in your spine at

19  the time that you retired?

20  A.  No, I did not.

21  Q.  What about in your left shoulder, do you have limited range

22  of motion?

23  A.  No, I did.

24  Q.  When you went to Dr. Lesniewski for that 10 to 20 visits

25  before your retirement, did you tell him that you had limited

D7idles4                    Gagliano - direct

1    range of motion in your spine?

2    A.  No, I did not.

3    Q.  What about your left shoulder?

4    A.  No, sir.

5    Q.  Who filled out this form?

6    A.  I believe the doctor did.

7    Q.  And when he was examining you, did he ask you to move your

8    body around at all in order to assess your range of motion?

9    A.  I don't recall that.  No.

10   Q.  Do you think he might have?

11   A.  It would just be speculation.

12   Q.  But you are not saying that because you don't recall it, it

13   certainly didn't happen?

14   A.  No, I'm not.

15   Q.  When Dr. Lesniewski was examining you, to what extent were

16   you -- or were you, if at all, playacting for him?

17   A.  No.  I was not.

18        MR. WEDDLE:  Ms. Larson, would you turn to page 6 of

19   this exhibit, and I'll talk first about the center third of the

20   page.

21   Q.  Sir, do you see on page 6 there is an entry relating to

22   exertional restrictions?

23   A.  I do.

24   Q.  And it says, "No lifting greater than 20 pounds, no

25   bending, no twisting, no prolonged sitting/standing, no

D7idles4                          Gagliano - direct

1    overheard work."  Do you see that?

2    A.  I do.

3    Q.  That is in handwriting, right?

4    A.  Correct.

5    Q.  Who filled this part out?

6    A.  Dr. Lesniewski.

7    Q.  And did you -- I'm sorry, withdrawn, your Honor.

8          Did Dr. Lesniewski tell you, in the many visits that

9    you had with him before your retirement, that you were

10   medically restricted from doing any activities?

11   A.  No, he did not.

12   Q.  Were you medically restricted from doing these activities

13   that are listed here?

14   A.  No, I was not.

15   Q.  Did you tell Dr. Lesniewski that you were medically

16   restricted from doing these activities?

17   A.  No, I did not.

18          MR. WEDDLE:  Ms. Larson, would you zoom in on the

19   lower third of the page.

20   Q.  Do you see in Section 12 it talks about environmental

21   restrictions, right?

22   A.  Yes, I do.

23   Q.  And it says, "No vibration exposure."  Do you see that?

24   A.  I do see that.

25   Q.  At any time did Dr. Lesniewski tell you that you needed to

D7idles4                         Gagliano - direct

1    avoid all vibrations?

2    A.  I don't ever recall.

3    Q.  Did you need to avoid all vibrations?

4    A.  No, I do not.

5    Q.  Did you tell Dr. Lesniewski that you needed to avoid all

6    vibrations?

7    A.  No, sir, I did not.

8    Q.  In the years both before and after your retirement, have

9    you been exposed to vibrations, sir?

10   A.  Yes, I have.

11   Q.  Have they caused any adverse effects on you?

12   A.  No, sir, they haven't.

13   Q.  Let's talk now about Government Exhibit 101D, like David.

14          Or actually, I'm sorry, can we switch the order and do

15   Government Exhibit 101S, as in Sam?  And can we start with page

16   6 of this exhibit?

17          Sir, 101S, what is 101S?

18   A.  It looks like another medical report.

19   Q.  Do you see, it has entries and each entry is dated; do you

20   see that?

21   A.  Yes, I do.

22   Q.  And there are a number of different dates, right?

23   A.  Yes, there are.

24   Q.  So the date -- the entries that are on the screen relate to

25   what date?

D7idles4                         Gagliano – direct

1    A.   It looks like November 25th of '03.

2    Q.   That's the case both in the handwritten part at the top,

3    and what about the part at the bottom?

4    A.   Yes, the typewritten part also.

5    Q.   And how did it work when you went to Dr. Lesniewski's

6    office?  Did you talk only with Dr. Lesniewski or with multiple

7    people, do you recall?

8    A.   Just mainly spoke with the doctor.  I don't recall if there

9    was a nurse or anything involved.

10   Q.   What was the first day that you went to see Dr. Lesniewski?

11   A.   11/25 of '03.

12   Q.   And you see that in these notes, let's see -- let's blow up

13   the typewritten part.

14          These notes say, "Initial consultation."  You see

15   that.  And it says, "Comes in with low back pain.  Had surgery

16   in 1986," etc.

17          Do you see that?

18   A.   I do see that.

19   Q.   In your first visit, what, if any, pains did you discuss

20   with Dr. Lesniewski?

21   A.   I don't believe I discussed any.

22   Q.   Was it true that you had surgery back in 1986?

23   A.   Yes, I did.

24   Q.   How long was that before you retired?

25   A.   20 years.

D7idles4                        Gagliano - direct

1   Q.  And during that 20-year period, what were you doing with

2   yourself?

3   A.  Working.

4   Q.  And you see at the bottom of this it says, "Needs to get an

5   MRI to see where he is going," and then there is a parentheses

6   and it says "PJL."  Do you see that?

7   A.  Yes.

8   Q.  And after -- in your first visit, did Dr. Lesniewski send

9   you for any tests?

10  A.  I think he may have did an x-ray, I believe.

11  Q.  Now, sir, these -- this document, 101S and -- or 101S, it

12  has a number of entries, right?

13  A.  Yes, it does.

14  Q.  For different visits?

15  A.  Yes, it does.

16  Q.  At the time you submitted this document to the Railroad

17  Retirement Board, how closely, if at all, did you review these

18  entries for the different visits?

19  A.  I didn't review them at all.

20  Q.  And in preparation for testifying here in this trial, did

21  you in fact have an opportunity to review them closely?

22  A.  I was able to look at them, yes.

23          MR. WEDDLE:  And let's look at the next page, Ms.

24  Larson.  And if we could just blow up the top half of the page.

25          Thank you.

D7idles4                          Gagliano - direct

1   Q.  Sir, do you see the top entry on this page is for

2   December 2003, right?

3   A.  Yes.

4   Q.  And it says, "Continues to have some back pain," etc.  "Had

5   an MRI which basically showed degenerative changes.  Discussed

6   various options with him.  I think eventually he will need

7   effusion.  He has to decide."

8          Do you recall what kind of options, if any,

9   Dr. Lesniewski discussed with you?

10  A.  The only thing that might have been said that I can recall

11  is he may need surgery at some time later on.

12  Q.  And then the next entry says -- the handwritten part says

13  "C/O" -- I'm sorry.  The handwritten part is from

14  November 2004, right?

15  A.  Right.

16  Q.  It says, C/O L hand - pain in hand and wrist for a few

17  weeks.  No known injury.  Pain level 10.  Weakness, numb,

18  tingling in the morning.  Range of motion down."  Etc.

19          Do you see that?

20  A.  Yes, I do.

21  Q.  What do you recall telling Dr. Lesniewski, if anything,

22  about any hand pain that you suffered from in 2004?

23  A.  I don't recall.

24  Q.  Do you recall whether you told him that you had a pain

25  level of 10?

1    A.  No, I don't.

2    Q.  Does that mean you might have or you are not sure one way

3    or the other, or do you think for sure no?

4    A.  I think I would remember if I had a pain level of 10.

5    Q.  My question was different.  My question was do you recall

6    whether you told Dr. Lesniewski that you had a pain level of

7    10?

8    A.  No.

9    Q.  You don't recall one way or the other?

10   A.  No, I don't.

11   Q.  And, in fact, did you have a pain level that was that

12   severe?

13   A.  No, I did not.

14   Q.  And do you see -- Ms. Larson, could we just pull up the

15   bottom of this page.

16           So we were just on November 23, 2004.  Then there is

17   December 14, 2004, right?  Do you see that?

18   A.  Yes.

19   Q.  And it talks about MRI's, and it says, "I would treat this

20   expectantly with anti-inflammatories.  Will not do surgery."

21           Do you see that?

22   A.  Yes, I see that.

23   Q.  What are the letters right after the word "surgery"?

24   A.  "PJL."

25   Q.  How, if at all, or what did Dr. Lesniewski tell you you

1   should do about any hand pain you had?

2   A.  Just take anti-inflammatories.

3   Q.  And then if we take a look at the last entry on this page.

4   Now we are in April 2005.  Do you see that?

5   A.  Yes.

6   Q.  It says, "Still has some wrist pain.  Tear of the triangle

7   fibrocartilage.  Otherwise stable.  Just continue present

8   care."

9           Do you see that?

10  A.  Yes, I do.

11          MR. WEDDLE:  And if we could turn now to, let's see,

12  the fifth page of this exhibit, and blow up the first

13  typewritten section.

14  Q.  So this now is October 2005, a few months later, right?

15  A.  Right.

16  Q.  And here it says you returned for a follow up, continues

17  with significant low back pain.

18          And in the bottom it says --

19          MR. DURKIN:  What page number is that?

20          (Mr. Weddle conferred with Mr. Durkin)

21          MR. WEDDLE:  I'm sorry about that, your Honor.

22  Q.  And then "Impression & Plan," it says, "This patient does

23  have significant osteoarthropathy.  He will continue treatment

24  with anti-inflammatories."

25          Do you see that?

D7idles4                         Gagliano - direct

1    A.  I do.

2    Q.  What are the two letters that come after that?

3    A.  "PL."

4           MR. WEDDLE:  Ms. Larson, will you blow up the bottom

5    entry on this page.

6    Q.  And there is a visit for January 17, 2006.  Do you see

7    that?

8    A.  I do.

9    Q.  So how long after the October 18, 2005 we just looked at?

10   A.  Right just a couple of months.

11   Q.  And it says, "He still has a significant amount of pain in

12   his wrist.  Range of motion is somewhat restricted."

13          Do you see that in the middle?

14   A.  I do.

15   Q.  Did you have significant pain in your wrist in

16   January 2006?

17   A.  No, I did not.

18   Q.  Did you tell Dr. Lesniewski that you did?

19   A.  No, I did not.

20   Q.  Did you ever have any pain in your wrist in 2006?

21   A.  If I did, it was minute.

22   Q.  And if you did have a small amount of pain in 2006, would

23   you have told Dr. Lesniewski about the pain that you did have?

24   A.  I may have.

25   Q.  Did you have limited range of motion in your wrist in

D7idles4                    Gagliano - direct

1    January 2006?

2    A.  No, sir.

3    Q.  And then "Impression & Plan," it says, "We know he has

4    significant carpometacarpal problems.  I don't believe there is

5    much else we can do at this time.  The patient will continue

6    his present care for now."

7          And now what are the letters right after that?

8    A.  "PL."

9          MR. WEDDLE:  Then it looks like -- let's see.  This is

10   page -- two pages previous to this, if you could blow up the

11   typewritten portion.

12   Q.  And this is February 28, 2006.  Do you see that?

13   A.  I do.

14   Q.  About how long after the last visit?

15   A.  Maybe a month or so.

16   Q.  And here it says you're developing pain in your left

17   shoulder.  Do you see that?

18   A.  Yes.

19   Q.  And what is the Impression & Plan?  What does it say the

20   Impression & Plan are?

21   A.  I'm sorry?

22   Q.  Do you see where it says "Impression & Plan?"  It is on the

23   screen at the bottom entry, "Impression & Plan."

24   A.  I'm sorry.  I just picked up on that.

25          It just says, "The patient will be treated with

1   anti-inflammatories."

2   Q.  Then what are the letters?

3   A.  "PL."

4   Q.  And then after PL, it says slash what?

5   A.  "lm."

6   Q.  Do you know who "lm" is?

7   A.  No, I do not.

8   Q.  Then if we could turn to the page previous to this.

9       And there is an entry for May 2, 2006.  Do you see

10  that?

11  A.  Yes.

12  Q.  A couple of months later?

13  A.  Yes, a couple of months later.

14  Q.  It says, "He has significant amount of pain in his left

15  shoulder," etc.  It says, the patient does not wish surgery.  I

16  discussed that with him.  He doesn't wish injections.

17  Therefore, we will just continue his present care with

18  anti-inflammatories."

19      Do you see that?

20  A.  Yes, I do.

21  Q.  Did you want surgery in May 2006 on your shoulder?

22  A.  No, sir.

23  Q.  Why not?

24  A.  There was nothing significantly wrong with it.

25  Q.  Was there anything about your shoulder that was interfering

D7idles4                         Gagliano - direct

1   in an important way with your life?

2   A.  No.

3   Q.  What about injections, do you remember whether you

4   discussed with Dr. Lesniewski getting injections?

5   A.  That may have been brought up at the time.

6   Q.  And did you want to get injections at the time?

7   A.  I didn't feel I had pain severe enough.  It was controlled

8   without any problem with anti-inflammatories.

9   Q.  Sir, I think we are done with this exhibit.

10          MR. WEDDLE:  Thank you, Ms. Larson.

11  Q.  Sir.

12  A.  Yes.

13  Q.  We are done with the exhibit for now.

14          So why were you going back to Dr. Lesniewski for visit

15  after visit when he was just continuing you on

16  anti-inflammatories?

17  A.  To continue a paper trail.

18  Q.  Who paid for your visits to Dr. Lesniewski and the tests

19  that he ordered for you?

20  A.  My medical insurance.

21  Q.  Who provided your medical insurance at the time?

22  A.  I believe -- it was my medical insurance at work.  I just

23  can't think of the name.  It is Empire, I believe.

24  Q.  Now, sir, let's take a look at Government Exhibit 101D,

25  like David.

 1              MR. WEDDLE:  And if we could display that on the

 2   screen?  Could you blow up just the top half of that page.

 3   Q.  Sir, what is Government Exhibit 101D?

 4   A.  It's a written narrative from a doctor.  It is a report

 5   that's written.

 6   Q.  Is this what you were calling before the narrative that you

 7   paid for?

 8   A.  Yes, it is.

 9              MR. WEDDLE:  Ms. Larson, will you just show us the

10   whole page again.  I am sorry.

11   Q.  And it has that same date stamp on the bottom, October 31,

12   2006, right?

13   A.  Yes.

14   Q.  That's the day you turned in these documents to the RRB?

15   A.  Correct.

16   Q.  Could you take a look at the second page at the bottom, or

17   if you could blow up, Ms. Larson, maybe the second half of the

18   page.

19              This talks about different dates, some of which you

20   saw Dr. Lesniewski, right?

21   A.  Yes, it does.

22   Q.  On the bottom it says, "The patient will require several

23   areas of surgical intervention, most acutely in his left

24   shoulder."  Do you see that?

25   A.  Yes, I do.

D7idles4                         Gagliano - direct

1  Q.  Have you had any surgery since you retired?

2  A.  No, sir, I have not.

3  Q.  And we talked about the fact that you didn't want to get

4  surgery in your left shoulder because it wasn't that bad.

5          What about any other part of your body in 2006, did

6  you want to have surgery on any other part of your body?

7  A.  There's nothing that's hurting that would need surgery, no,

8  sir.

9          MR. WEDDLE:  And let's take a look at the third page,

10 under the heading that says "Prognosis" through the signature,

11 please, Ms. Larson.

12 Q.  So it says, "Prognosis."  Actually, let me ask you this,

13 sir.

14         MR. WEDDLE:  Just leave that on the screen, if you

15 will, Ms. Larson.

16 Q.  What is the date of this narrative on the first page, sir?

17 If you could just read it out to the jury?

18 A.  July 31st of 2006.

19 Q.  And so on the "Prognosis" section, what did Dr. Lesniewski

20 write?

21 A.  It says, "I am aware of this patient's occupation on the

22 Long Island Rail Road, and given the above noted diagnoses, it

23 can be stated within a reasonable degree of medical certainty

24 that the patient is disabled for his occupation and this

25 disability is permanent."

D7idles4                          Gagliano - direct

1    Q.  Sir, did Dr. Lesniewski ask you about your job and what its

2    requirements were?

3    A.  No, he did not.

4    Q.  Do you recall whether you gave to Dr. Lesniewski the

5    vocational report that Mr. Yule filled out for you?

6    A.  I did not, no.

7    Q.  Did you tell Dr. Lesniewski about what the requirements

8    were of your job apartment the Long Island Rail Road?

9    A.  No, I did not.

10   Q.  Did Dr. Lesniewski ask you if you could do your job at the

11   Long Island Rail Road?

12   A.  No, he did not.

13   Q.  Did you tell him that you were unable to do your job at the

14   Long Island Rail Road?

15   A.  No, I did not.

16   Q.  At the time you got this narrative from Dr. Lesniewski,

17   were you able to do your job at the Long Island Rail Road?

18   A.  Yes, I was.

19          THE COURT:  Mr. Weddle, could we have an estimate of

20   how long you think you will need to complete Mr. Gagliano's

21   testimony?

22          MR. WEDDLE:  I think it may be 40 minutes, your Honor.

23          THE COURT:  All right.  We will go until 1 o'clock.

24          MR. WEDDLE:  We are done with that exhibit.  Thank

25   you, Ms. Larson.  Sorry.

1    Q.  Sir, when you retired, did you get payouts for vacation and

2    sick pay?

3    A.  Yes, I did.

4    Q.  How did the vacation and sick pay payouts work?

5    A.  Because I was retiring and hadn't taken any vacation, I'd

6    worked well enough into the year, more than 100 days, that I'd

7    be eligible to collect not only my five weeks vacation for the

8    year of 2006 but also the five weeks vacation for 2007, so I

9    was able to get ten weeks' pay, ten weeks' vacation pay for the

10   vacation part.

11          For the sick part, you are given 12 sick days a year.

12   And if you have more than half of the 12 from all the years

13   that you've worked, they will pay you half of what you have

14   left.  And I did get a buyout for that also.

15   Q.  When during the year did people at the Long Island Rail

16   Road typically retire, in your experience?

17   A.  There were two prominent dates.  It was either June 1st or

18   early November.

19   Q.  And the June 1st date relates to what?

20   A.  You need to work 100 days in order to be able to get your

21   vacation pay for the following year, and they usually would

22   have amassed 100 days by that point.

23   Q.  And the November date relates to what?

24   A.  Well, the November date a lot of people use because at that

25   point they will have paid off some -- or two of the tiers that

1    I mentioned earlier for Railroad Retirement and, thereby, that

2    will be higher.

3    Q.  When you say they paid off the tiers, what does that mean

4    in terms of their week -- whatever it is, monthly, weekly

5    paycheck?

6    A.  Well, they would -- with one of the tiers, they would take

7    home probably $50 a week more.  And if they met the other two,

8    they would probably take home maybe an additional 50 on top of

9    that.

10   Q.  What does it mean to say that they've paid off the tier for

11   that year, what does that mean?

12   A.  There is like a ceiling, I don't know what the numbers are,

13   where if you work a lot and get to that point, you don't have

14   to pay any more into Railroad Retirement.

15   Q.  And you are talking about the taxes part of paying --

16   A.  Correct, for the year, just for that particular year.

17   Q.  And then it would start again for the next year, is that

18   what is --

19   A.  Correct.

20   Q.  And, sir, let's take a look now at --

21           (Pause)

22           MR. WEDDLE:  Sorry, your Honor.  I have to get one of

23   my exhibits.

24           (Pause)

25   Q.  I'm handing you Government Exhibit 610.

D7idles4                              Gagliano - direct

1            What is 610, sir?

2    A.   It's a date book from 2006 -- my date book from 2006.

3    Q.   And that's the original one, right?

4    A.   Yes, it is.

5    Q.   I think you have a copy of it in your binder, sir.

6    A.   OK.

7            MR. WEDDLE:  I'm trying to switch technology here in

8    mid-stream, your Honor.  I hope it will work properly.

9            (Pause)

10           If it doesn't, we have a backup plan.

11           THE COURT:  All right.

12           MR. WEDDLE:  Let's go with the backup plan, Ms.

13   Larson.

14           (Pause)

15   Q.   So Government Exhibit 610, do you see what it says on the

16   front there?

17   A.   Yes, I do.

18   Q.   What does it say?

19   A.   It says, "Michael D. Flynn and Valerie J. Lauriello,

20   Attorneys at Law."

21   Q.   And who are these people?

22   A.   From what I'm reading, they're lawyers.

23   Q.   How did you get this calendar?

24   A.   They send them to all Railroad workers.

25   Q.   Year after year?

D7idles4                           Gagliano - direct

1    A.  Until you retire.

2    Q.  And did you ever talk to Mr. Flynn?

3    A.  No, I did not.

4    Q.  Or Ms. Lauriello?

5    A.  No, I did not.

6    Q.  Any dealings with them at all?

7    A.  None at all.

8    Q.  Would you take a look now at your January calendars, and I

9    guess we could just blow up the region around the 15th to the

10   25th, thereabouts.

11          So what kinds of things did you typically enter in

12   your calendar in 2006?

13   A.  Appointments and the hours I've worked during the days.

14   Q.  OK.  Do you see the entry for the 17th of January?

15   A.  Yes, I do.

16   Q.  What does that say about what you worked?

17   A.  It says I worked extra from 6 in the morning until 8 in the

18   morning.

19   Q.  And what does it say under that?

20   A.  That I had an appointment with Dr. Lesniewski at 4:30.

21   Q.  What about the part where it says "2 OT," do you see that?

22   A.  Yes.  That's two hours overtime from 6 a.m. in the morning

23   until 8 a.m. in the morning.  I typically worked 8 to 4.

24   Q.  OK.  And sometimes you wrote some personal stuff in your

25   calendar?

D7idles4                          Gagliano - direct

1   A.   Yes.  The 18th was "Be Nice to Your Wife Day.  She's your

2   best friend ever."

3   Q.   Take a look at the February calendar, the next page.

4        And do you see on the 28th you have another

5   appointment with Lesniewski?

6   A.   Yes.  It shows it at 4:45 p.m.

7   Q.   On the 25th, how many hours of overtime?

8   A.   Eight hours.

9   Q.   And let's take a look at March.

10       In the middle of March, did you go away?

11  A.   Yes, I did.

12  Q.   Where did you go?

13  A.   It looks like I went to Key West for a few days.

14  Q.   And let's take a look at April.

15       I'm sorry, not April.  Take a look at May.

16  A.   OK.  I have May.

17       MR. WEDDLE:  Could you blow up the top half of this,

18  just start with the top half.  Thank you.

19  Q.   So May 2nd, what does it say?

20  A.   It says I had an appointment with Dr. Lesniewski, and I

21  also wrote myself a little note to call Mr. Yule.

22  Q.   Do you see there is an entry on May 5th, and it says the

23  number "100" with a circle around it?

24  A.   Right.

25  Q.   What does that mean?

D7idles4                    Gagliano - direct

1   A.  At that point I reached 100 days.

2   Q.  And what did that mean in terms of money?

3   A.  Well, it meant in terms of I could retire -- I had my time

4   in for the year.

5   Q.  And you would get --

6   A.  And I would get my five weeks' vacation pay for the

7   following year also.

8   Q.  And then what does it say for the 7th?

9   A.  Five Borough Ride.

10  Q.  What's the Five Borough Ride?

11  A.  It's a bike ride through New York City.

12  Q.  Did you do that on May 7th?

13  A.  Yes, I did.

14  Q.  How far did you ride on that day?

15  A.  42 miles.

16  Q.  And then the next day, is there an entry relating to your

17  disability?

18  A.  There is a note.  It looks like that I had an appointment

19  to see Ed Yule at 4:30.

20  Q.  And then, let's see, let's take a look then at June.

21          Now, sir, on the June entry, do you see at the top

22  left it says "Call pensions, call," and then there is a space

23  and then it says Parasno appointment."  Do you see that?

24  A.  Yes.

25  Q.  On the original what is next to the word "call"?

1   A.  I had the name of my accountant there and I whited it out.

2   Q.  So on the original that I'm holding in my hand there is

3   Whiteout over the name of your accountant?

4   A.  Correct.

5   Q.  When did the government request from you your calendar,

6   sir?

7   A.  Earlier this week.

8   Q.  And when did you whiteout the name of your accountant in

9   the calendar?

10  A.  Earlier this week.

11  Q.  Before or after the government requested it from you?

12  A.  After.

13  Q.  Why did you whiteout the name of your accountant?

14  A.  It was late at night and I wasn't thinking clearly.  I was

15  thinking about taking out all the personal things, but I

16  thought better of it as soon as I put the Whiteout to the

17  paper.

18  Q.  Why did you stop whiting out entries from your calendar?

19  A.  Because I -- I didn't think it would look good so I stopped

20  right there.

21  Q.  Are there other entries in your calendar relating to your

22  accountant?

23  A.  There are.  I'm sure there is.

24  Q.  Is there anything else about your calendar besides this

25  whiting out of your accountant's name on the page relating to

D7idles4                         Gagliano - direct

1   June that is altered from the way the calendar was in or about

2   2006?

3   A.   There's been no pen put to this book since 2006.

4   Q.   Anything else altered?

5   A.   No, sir.

6   Q.   What is the name of your accountant?

7   A.   Scoma.

8   Q.   So on the June calendar, let's see, there is also an

9   appointment with Dr. Lesniewski, right, on the 20th?

10  A.   Yes, there is.

11  Q.   And then let's look at July.

12          And then the top corner of July, it's talking about

13  what?

14  A.   It looks like I wrote myself some notes about going to

15  visit pensions and what I need to bring with me.

16  Q.   And when you're going to visit pensions in July of 2006,

17  what was that for?

18  A.   Well, I'm looking forward to my retirement in September 1st

19  of 2006.

20  Q.   And then at the end of this month there is an entry for

21  Dr. Lesniewski on the 25th, right?

22  A.   Yes, there is.

23  Q.   And there is an "F" there with a circle around it.  What

24  does that mean?

25  A.   At that point I -- that was my last day at work.

1   Q.   And then it says "PD, PD, PD."   What is that?

2   A.   That means personal days.   They had to be used up.   They

3   didn't pay you for them.   So the 26th, 27th and 28th, it was

4   paid personal days.

5   Q.   OK.   And then it says "fine"?

6   A.   "Fine."

7   Q.   What is that?

8   A.   I'm done.

9   Q.   Let's take a look at August.

10          So right after you stopped working, where did you go?

11  A.   I went up to Maine for a week, it looks like.

12  Q.   How did you get there?

13  A.   I drove.

14  Q.   And then on the 15th it says what?

15  A.   It says "Lesniewski" and "saw lawyers."

16  Q.   What did the "Lesniewski" relate to?

17  A.   I believe I was picking up the narrative that day because

18  there's no time entered.

19  Q.   And what does the "saw lawyers" relate to, do you remember?

20  A.   I believe it might be something that I was looking into for

21  a will, because I was coming -- sorry, going to retire.

22  Q.   How sure are you of that?

23  A.   I'm not.

24  Q.   And then -- well, did you talk to or get the assistance of

25  any lawyers in applying for disability?

D7idles4                        Gagliano - direct

1    A.  No, I did not.

2    Q.  And then on the 18th it says "Call Dr. L."  What does that

3    mean?

4    A.  I may have had a question for him.

5    Q.  And then on the 23rd, what does that say?

6    A.  I had to drop the narrative off at Mr. Yule's office at

7    1 p.m.

8    Q.  And then on the 31st, what does that say?

9    A.  Call Ed Yule about a sick form.

10   Q.  Did you also apply for any kind of sickness benefits in

11   relation to your disability?

12   A.  Yes, I did.

13   Q.  Where did those benefits come from?

14   A.  It was sick time.  I believe that also comes from Railroad

15   Retirement, but I'm not really positive where that comes out

16   of.

17   Q.  And if you'll take a look at -- Ms. Larson, could we put up

18   Government Exhibit 609.  And if you could zoom in on the top

19   half of the page.

20        This is also a United States -- it is not zoomed in on

21   the screen, but on the copy that you see, sir, it is a United

22   States of America Railroad Retirement Board form?

23   A.  Yes, that's it.

24   Q.  "Application for Sickness Benefits," right?

25   A.  Right.

1    Q.  And is any of the writing that's on the screen your

2    writing?

3    A.  Yes.  Numbers 1 through 6 is my writing.

4    Q.  And who filled out 7 through 12, if you know?

5    A.  I don't know but I would think it would be the doctor or

6    Mr. Yule, but I'm not positive on that one.

7    Q.  Then on the second page, you signed it, right?

8    A.  Right.

9    Q.  And the date?

10   A.  9/1 of '06.

11   Q.  How does that date compare to the date that we just looked

12   at where your calendar says you should call Yule about sickness

13   form?

14   A.  It was, I believe, the same date, or just shortly

15   thereafter.

16   Q.  We were looking at August 31st, do you remember?

17   A.  OK.  So it is the next day.

18   Q.  And then if we will take a look at the next page, who

19   signed off on the "Statement of Sickness" for you?

20   A.  Dr. Lesniewski.

21   Q.  And the date that he signed it?

22   A.  July 31st of '06.

23        MR. WEDDLE:  And let's go back, Ms. Larson, to the

24   calendar, 610, if we can.  And let's take a look now at the

25   September entries.

1        And if you could just blow up the bottom three -- I

2   guess that's fine.

3   Q.   The 14th, what is that about?

4   A.   The 14th is just a note to myself to pick up my vacation

5   check because that wasn't direct deposited, and also to make an

6   appointment and get -- or, actually, just to go in and get a

7   picture with my retiree pass from the Railroad.

8   Q.   Then that following week was what?

9   A.   It looks like I took a vacation to Bermuda.

10  Q.   Right after you got back from Bermuda, you went to see

11  whom?

12  A.   Dr. Lesniewski.

13  Q.   That is on the 26th?

14  A.   The 26th, yeah.

15  Q.   And then if you take a look at the next month in your

16  calendar.

17       What are the entries on the 12th and the 13th -- the

18  12th?

19  A.   It looks like I had an appointment going over some

20  retirement stuff with some women that do it from John Hancock,

21  and also to call Yule at 1 p.m.  I must have had a question.

22  Q.   And then on the 15th, what does that mean, that entry?

23  A.   It says "MS Bike Tour."  That's also a bike ride through

24  Manhattan that has -- you could sign up and, you know, pick the

25  route that you want to go, and it raises money for multiple

D7idles4                        Gagliano - direct

1   sclerosis.

2   Q.  And did you participate in that ride on the 15th of October

3   in 2006?

4   A.  I did.

5   Q.  How far did you ride?

6   A.  30 miles.

7   Q.  How much money did you raise, do you remember?

8   A.  No, I don't.

9   Q.  And then starting on the 17th through I guess -- I don't

10  know if it is the 28th or the 29th, the 30th, what is that?

11  A.  It looks like the 30th I went to South America.

12  Q.  Sorry.  The 30th, you went to the South America?

13  A.  From the 17th to the 30th.

14  Q.  What did you do in South America?

15  A.  We went to the Galapagos Islands in Ecuador and Crisco in

16  Peru and Machu Picchu.

17  Q.  What's Machu Picchu?

18  A.  It is an ancient Mayan temple up in the Andes.

19  Q.  Did you take any kind of tour around Machu Picchu?

20  A.  We hiked around it, yes.

21  Q.  And for how many hours?

22  A.  Probably about four.

23  Q.  And then the day after you got back, what did you do?

24  A.  Went to the Railroad Retirement Board at 9:30 a.m.

25  Q.  And do you see there are some notes there to the right of

D7idles4                              Gagliano - direct

1    the 31st of October?

2    A.   Yes.

3    Q.   What do those say?

4    A.   Yes.  The notes are to meet at the Railroad Retirement

5    Board and what I needed to bring -- birth certificates for

6    myself and my wife.  And there is also a note to bring the

7    $1,300 to pay Ed Yule.

8    Q.   Then if you'll take a look at November 2006.  The next day,

9    where did you go?

10   A.   You mean November 1st?

11   Q.   Yeah.

12   A.   It looks like I went to visit my dentist and then

13   Dr. Lesniewski at 3:15 in the afternoon.

14   Q.   And could we show now Government Exhibit 609A?

15        What is Government Exhibit 609A?

16   A.   It is a supplemental doctor's statement.

17   Q.   And who signed this?

18   A.   Dr. Lesniewski.

19   Q.   When did he sign it?

20   A.   November 1st of '06.

21   Q.   And is that the same day we were just looking at in your

22   calendar.

23   A.   Yes, it is.

24   Q.   And based on these, or what are the sickness benefits that

25   you got from the Railroad Retirement Board?

1   A.  Well, that was to continue sickness benefits, I believe

2   that last one that we just looked at, 101L.  When you go out

3   sick, you get X amount per day from Railroad Retirement.  And I

4   believe that's what it was.  If memory serves me correct, it

5   was maybe 50 bucks a day or something.  So you get $250 a week.

6   Q.  And was that -- is that the same thing as what you were

7   talking about before when you were talking about six -- I mean

8   12 sick days a year and you get paid for half of them?

9   A.  No, that is separate.  That is different.

10  Q.  How is it different?

11  A.  It just comes from a different place.

12  Q.  Please explain.

13  A.  It comes from Railroad Retirement, as opposed to coming out

14  of your sick bank.

15  Q.  So your sick bank --

16  A.  I think.

17  Q.  Your sick bank comes from what organization?

18  A.  The MTA.

19  Q.  And the specific part of the MTA where you worked was what?

20  A.  The Long Island Rail Road Company.

21  Q.  These are sickness benefits that come from where?

22  A.  The Railroad Retirement Board.

23  Q.  And you got these before or after you retired?

24  A.  After.

25  Q.  And in order to get them --

D7idles4                          Gagliano - direct

1    A.   Could I correct that for a second?

2    Q.   Yes.

3    A.   When you said before or after, it is actually both because

4    I started collecting in August so it was before I retired and

5    after.

6    Q.   And in order to get the sickness benefits from the United

7    States Railroad Retirement Board, what did you need in terms of

8    signatures?

9    A.   You needed a doctor's signature.

10   Q.   And whose signature did you get in order to obtain those

11   benefits?

12   A.   Dr. Lesniewski.

13            THE COURT:  Mr. Weddle, I will give you two more

14   minutes to wrap up.

15            MR. WEDDLE:  Are you saying wrap up entirely, your

16   Honor?

17            THE COURT:  Wrap up for the lunch break.

18   BY MR. WEDDLE:

19   Q.   Let's take a look back at 610.

20            What did you do in November 2006, what did you do on

21   the 7th?

22   A.   I played golf.

23            MR. WEDDLE:  Your Honor, this would probably be a good

24   time to break.

25            THE COURT:  Thank you.  We will take an hour break for

D7idles4                     Gagliano – direct

1  lunch.  It is roughly 5 after 1.  We will return at 5 after 2.

2          As you go out, please do not discuss the case among

3  yourselves or with anyone on the outside or have any contact or

4  communication concerning the case.  If any of these things

5  occur you are directed to inform the Court immediately and not

6  discuss it with your fellow jurors.

7          Thank you.  Have a good lunch.

8          (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

250
D7inles5                    Gagliano - direct

1              A F T E R N O O N    S E S S I O N

2                        (2:05 p.m.)

3              THE COURT:  All right.  Bring in the jury.

4              Welcome back.  Thank you.

5              Mr. Weddle, you may resume.

6    BY MR. WEDDLE:

7    Q.  Mr. Gagliano.

8    A.  Yes.

9    Q.  Sometime after you submitted these application materials to

10   the RRB, did you in fact get awarded occupational disability?

11   A.  Yes, I did.

12   Q.  Take a look at Government Exhibit 101-G.  Do you have that

13   in your binder?

14             MR. WEDDLE:  Ms. Larson, would you just blow up the

15   top half.

16   Q.  What is this letter?

17   A.  It's stating that an application for benefits based on

18   disability is also an application for two different

19   disabilities.  They sort of go through and say if you qualify

20   for one or the other, if you qualify for either occupational

21   one or a total one.  And this is saying I didn't meet I didn't

22   meet the requirements for a total one.

23   Q.  Sir, do you see the sticker on the piece of paper you are

24   looking at?

25   A.  Yes.

1    Q.  It says Government Exhibit?

2    A.  101-L.

3    Q.  You are looking at L.

4    A.  Am I looking at the wrong sheet?

5    Q.  Take a look at 101-G.

6    A.  Sorry.

7    Q.  We'll get to L in a minute.

8    A.  OK.

9    Q.  Hopefully it's the one right before L.

10   A.  I stand corrected.  That's just a letter that is stating

11   that I met the requirements for a disability.

12   Q.  What's the date that you were notified that you met the

13   requirements for disability annuity?

14   A.  November 28, 2006.

15   Q.  About how much money did you end up getting for disability

16   benefits?

17   A.  It was somewhere in between $35,000 and $40,000 a year.

18   Q.  How did you receive that money?

19   A.  It was electronically deposited in my credit union account

20   in Hicksville, New York.

21   Q.  After you got your occupational disability, were you later

22   considered for other benefits?

23   A.  Yes, I was.

24   Q.  Now let's take a look at Government Exhibit 101-L.

25

1           MR. WEDDLE:  If you could blow up the top half

2    Ms. Larson.  Thank you.

3    Q.  So how many months later was this letter dated?

4    A.  It looks like four months later, five months later.

5    Q.  In this letter, in the first paragraph the RRB is telling

6    you that your application for benefits based on a disability is

7    also an application for a period of disability "disability

8    freeze" under the Social Security Act.

9           Do you see that?

10   A.  Yes, I do.

11   Q.  What kinds of benefits were you later considered for, sir?

12   A.  This would have been for a total disability, and I believe

13   you would get Medicare or Medicaid earlier.

14   Q.  Your consideration for this total disability that happened

15   later, did that have any effect on your occupational

16   disability?

17   A.  No, it did not.

18   Q.  Did you get the additional benefits, the early Medicare or

19   the total disability?

20   A.  No, I did not.

21   Q.  Is this letter telling you that?

22   A.  Yes, it is.

23          MR. WEDDLE:  Can we blow up the bottom half of this

24   page.

25   Q.  Do you see at the bottom it says, "The following medical

1   records were used:

2              "Peter Lesniewski" and "MRI of Deer Park."

3              And then it says, "You claim you became disabled in

4   July 2006 because of a left rotator cuff tear and degenerative

5   disk disease of the lumbar spine.  The medical evidence shows

6   that you have limited range of motion of the left shoulder with

7   some decreased motor strength but no signs of sensory or reflex

8   loss in the extremities" so on and so forth.

9   A.  Yes, I see that.

10  Q.  Where did that medical evidence come from that's described

11  here?

12  A.  It is showing from MRIs, from stand up MRI in Deer Park and

13  from Dr. Peter Lesniewski's findings.

14  Q.  Was it true in March 2007 that you were unable to perform

15  your job because of a rotator cuff injury and degenerative disk

16  disease?

17  A.  No, it was not true.

18  Q.  Now, sir, both before and after retirement --

19              MR. WEDDLE:  We're done with that exhibit, thank you,

20  Ms. Larson.

21  Q.  Both before and after retirement, did you sometimes have

22  physical pains?

23  A.  Yes, I did.  I worked a blue collar job.

24  Q.  What kinds of physical pains did you have?

25  A.  Occasionally I would have a backache, occasionally

D7inles5                         Gagliano - direct

1    different parts, knees would bother me, or shoulders or wrists.

2    It depends what work I was doing at the time at work.

3    Q.   Is that also true of the two and a half years before you

4    retired?

5    A.   Yes.

6    Q.   Is the same thing true after you retired?

7    A.   Yes.

8    Q.   In the two and a half years before you retired when you

9    were seeing Dr. Lesniewski and you went to visit him, to what

10   extent did he tell him about the different aches and pains that

11   you have just described?

12   A.   Well, I described having pains when I went in for my low

13   back, also for my left wrist, and also from my left shoulder.

14   They just happened to be fatigued from what I was doing the

15   particular days before I went to see the doctor.

16   Q.   To what extent did you emphasize how bad your pains were or

17   did you try to downplay how bad they were or something in

18   between?

19   A.   No, I didn't -- I didn't try to downplay them at all.

20   Q.   Did you try to do the opposite, play them up?

21   A.   Maybe a little, yeah.

22   Q.   Did you ever tell Dr. Lesniewski that any of these aches

23   and pains that you were describing prevented you from doing

24   something at your job?

25   A.   No.

D7inles5                          Gagliano - direct

1   Q.  Now, did you also talk to Dr. Lesniewski about shoulder

2   pain, do you think, from time to time?

3   A.  Yes, I did.  My left shoulder.  Both my shoulders

4   occasionally give me trouble.

5   Q.  Now, you mentioned that you went to Dr. Lesniewski to

6   create a paper trail for disability.  After you retired, who

7   did you go to for treatment of your shoulder?

8   A.  I went to a group of doctors in Rockville Centre.  I

9   believe they are, the group was Orlin & Cohen.

10  Q.  About how many doctors worked at Orlin & Cohen as far as

11  you know?

12  A.  There were many doctors.  There were all different types of

13  specialties that they took care of.  There were certain doctors

14  that took care of back problems, certain doctors that took

15  player of knee problems, certain ones that took care of

16  shoulder problems.

17  Q.  Which doctors did you see at Orlin & Cohen?

18  A.  I recall seeing a Dr. Keefer for my shoulder.

19  Q.  In what time frame did you see doctors at Orlin & Cohen

20  about your shoulder Dr. Keefer and whoever else?

21  A.  I believe it was in the middle of 2009.

22  Q.  So a few years after your retirement?

23  A.  Several years after my retirement.

24  Q.  And when you wint to see Dr. Keefer and the other doctors

25  at Orlin & Cohen, what did they do for you with respect to your

D7inles5                          Gagliano - direct

1   shoulders?

2   A.  Well, they did MRIs first, and they determined it was just

3   inflammation.  And they offered me a cortisone shot if I chose

4   to have one.

5   Q.  Do you remember whether they told you you should do any

6   physical therapy?

7   A.  At one point they did, yes.

8   Q.  Did you do physical therapy?

9   A.  Yes, I did.

10  Q.  Did that help at all?

11  A.  It made it worse.

12  Q.  And what about the cortisone injection?  Did that help at

13  all?

14  A.  It made my symptoms go away.

15  Q.  Did you have a cortisone injection in one shoulder or both

16  shoulders?  Do you recall?

17  A.  Just my left shoulder.

18  Q.  How sure are you about that?

19  A.  I'm positive.

20  Q.  How many cortisone shots did you have?

21  A.  Two.

22  Q.  When was the first one?

23  A.  I believe it was in '09.

24  Q.  And when was the second one?

25  A.  I believe the following year, a year or so later.

1    Q.  So in 2010?

2    A.  Correct.

3    Q.  You said that you sometimes have pain in both shoulders, is

4    that right?

5    A.  Correct.

6    Q.  So you had one shot in your shoulder in 2009, right?

7    A.  Yes.

8    Q.  That made the pain go away?

9    A.  Yes, it did, for about a little more than a year or so.

10   Q.  When you had the second shot in your shoulder, you think it

11   was the same shoulder or the other shoulder?

12   A.  It was the same one.

13   Q.  Why did you have the second shot?

14   A.  Because the physical therapy didn't work.  It made me

15   worse.

16   Q.  How did you feel after you got the second shot?

17   A.  I have been fine since.

18   Q.  When you went to see Dr. Keefer and other doctors at Orlin

19   & Cohen and they finished with their treatment of you, what did

20   they tell you about when you should come back?

21   A.  Only if I needed to.

22   Q.  After they gave you a shot, did they tell you come for any

23   follow-ups?  Do you recall?

24   A.  I don't recall.

25   Q.  But at some point they just said only come back if you need

D7inles5                          Gagliano - direct

1   to?

2   A.   Only if you need to, if this doesn't work.

3   Q.   Do you ever go to anyone for help with back pain?

4   A.   Yes, I do.

5   Q.   Who do you go to for help with back pain?

6   A.   A chiropractor.

7   Q.   How helpful is the chiropractor when you go to a

8   chiropractor?

9   A.   Very helpful.

10  Q.   How frequently did you go to the chiropractor in the years

11  since you retired?

12  A.   I only go when I need to.  It just depends.  It is not a

13  weekly thing or a biweekly thing.  It's just when I need to.  I

14  don't think I have been there in about two months at this

15  point.

16           MR. WEDDLE:  May I just have one moment, your Honor.

17  Q.   Sir, just to clarify, you said your bank was in Hicksville.

18  Is that in Long Island?

19  A.   Yes, it is.

20  Q.   Sir, in the years since you retired, what kinds of physical

21  exercise activities have you engaged in?

22  A.   I go to the gym a few times a week.  I ride my bike an

23  awful lot, occasionally jog.  Just about anything.

24  Q.   So during retirement what kinds of long bike rides have you

25  taken?

D7inles5                         Gagliano - direct

1   A.  I took a long run in upstate New York.  It was called the

2   Erie Canal Ride.

3   Q.  How long was that one?

4   A.  It was eight days and 400 miles.

5           MR. WEDDLE:  If we could display Government Exhibit

6   607.

7   Q.  What is Government Exhibit 607, sir?

8   A.  That is a picture of me at the end of the ride.

9   Q.  Can you read what the sign says that's to the right of you

10  in the picture?

11  A.  It says, "You made it, Buffalo to Albany, 400 miles."

12  Q.  What year did you do this 400-mile bike ride?

13  A.  2009.

14  Q.  At the time you did this 400-mile bike ride, were you on

15  disability, occupational disability from the Railroad

16  Retirement Board?

17  A.  Yes, I was.

18  Q.  And in terms of running, you said that you go running

19  sometimes.  How far do you typically run?

20  A.  Usually it is a time, about 30 to 40 minutes, 5K.

21  Q.  And in your retirement, would you say that you have any

22  hobbies?

23  A.  I enjoy traveling, yes.

24  Q.  Where have you traveled to since you retired?

25  A.  Central America, South America, Europe, Africa.

D7inles5                         Gagliano - direct

1    Q.  Have you climbed any mountains on your travels?

2    A.  Yes, I did.

3    Q.  What mountains have you climbed?

4    A.  I climbed Kilimanjaro.

5    Q.  Where is Mt. Kilimanjaro?

6    A.  Tanzania.

7    Q.  That's in Africa?

8    A.  Yes, it is.

9    Q.  How long did it take you to climb Mt. Kilimanjaro?

10   A.  Seven days.

11   Q.  Did you climb it on foot?

12   A.  Yes, I did.

13   Q.  Have you done any construction or renovation type work on

14   your travels?

15   A.  In Costa Rica.  I have been there several times with my

16   mission group from my church, and we work on schools either

17   adding rooms on them or renovating them in a little town called

18   Siquirres.

19   Q.  As part of this church mission group, how many times have

20   you gone to Costa Rica?

21   A.  Twice.

22   Q.  Each time how long were you there?

23   A.  A week.

24   Q.  What kinds of work did you specifically do on the school

25   that your mission was working on?

D7inles5                          Gagliano - direct

1    A.  Tiling, cement work, like corrugated tin roofing and

2    electrical work.

3    Q.  That was all while you were on disability?

4    A.  Yes, it was.

5    Q.  Sir, today are you capable of performing your railroad job?

6    A.  Yes, I am.

7            MR. WEDDLE:  No further questions, your Honor.

8            THE COURT:  Defense.  Mr. Durkin.

9            MR. DURKIN:  Thanks, Judge.

10   CROSS EXAMINATION

11   BY MR. DURKIN:

12   Q.  Mr. Gagliano, when you were climbing Mt. Kilimanjaro or

13   hiking in Machu Picchu, would I be correct in assuming that you

14   didn't expect you were someday going to get arrested by the

15   federal government?

16   A.  Yes, you would be correct in assuming that.

17   Q.  The fact of the matter is, is that this whole issue over

18   what occurred regarding your occupational disability never even

19   became an issue until the New York Times ran an exposé in late

20   2008, correct?

21   A.  I don't read the Times, but that's what I understand, yes.

22   Q.  Up until then, you never thought you had engaged in any

23   criminal activity concerning this, did you?

24   A.  I didn't think so, no.

25   Q.  You thought you were entitled to this pension because it

D7inles5                          Gagliano - cross

1    was something you had paid into, correct?

2    A.  You could say that, yeah.

3    Q.  And you did have some injuries, correct?

4    A.  I did.

5    Q.  But the whole world turned upside down once the New York

6    Times ran this story and subsequent stories, correct?

7    A.  What's what I understand, yes.

8    Q.  You and some what?  29 other people were arrested, right?

9    A.  Yes.

10   Q.  In fact, up until a month ago today, you had been sitting

11   at this table as a defendant with every intention to go to

12   trial, correct?

13   A.  That's correct.

14   Q.  Because you believed in your heart that you had not

15   committed a crime, correct?

16   A.  Not totally, no.

17   Q.  But you wanted to go to trial, didn't you?

18   A.  No, I did not.

19   Q.  You wanted to solve your problem, right?

20   A.  That's not true.

21   Q.  Well, when did you get arrested?

22   A.  October 27, 2011.

23   Q.  As I understand your testimony, that was the first time you

24   ever read your disability application, am I right?

25   A.  The next day was, yes.

D7inles5                        Gagliano - cross

1   Q.  Up until then you thought that this guy you hired,

2   Mr. Yule, was doing things appropriately and going to get you

3   this pension, the occupational disability, right?

4   A.  As far as I knew, yes.

5   Q.  You had no idea that Yule put all that stupid stuff in that

6   Section 6.  Do you remember that when Mr. Weddle showed you

7   that?

8   A.  Yes, I do.

9   Q.  I think there was a part of it where you said you would

10  have to be in a wheelchair or something if that was the way you

11  were described, correct?

12  A.  Yes.

13  Q.  That certainly didn't apply to you, did it?

14  A.  No, it did not.

15  Q.  OK.  Am I correct that you have been a decent athlete

16  throughout your life?

17  A.  I wouldn't say that, but I'm in pretty good shape.

18  Q.  You play sports?

19  A.  No, I don't.

20  Q.  You didn't play any sports in high school?

21  A.  No, I did not.

22  Q.  Where did you go to high school by the way?

23  A.  In Brooklyn.

24  Q.  What was the name of the school?

25  A.  Brooklyn Tech.

D7inles5                        Gagliano - cross

1   Q.  You grew up in Brooklyn?

2   A.  I did.  I completed high school in North Babylon.

3   Q.  You never had any trouble with the law before this, did

4   you?

5   A.  No, I did not.

6   Q.  Up until the day the FBI took you off the street and

7   arrested you, you had led what you thought was an exemplary

8   life, correct?

9   A.  Yes.

10  Q.  You are married, right?

11  A.  Yes, I am.

12  Q.  You got two kids?

13  A.  I do.

14  Q.  How old are your kids?

15  A.  28 and 30.

16  Q.  What do they do?

17  A.  One of them is a tugboat captain and one of them works in

18  the environmental field.

19  Q.  And you have grandchildren?

20  A.  Not yet.

21  Q.  Hoping to?

22  A.  If I live long enough, yeah.

23  Q.  And you're hoping not to be in prison so you can see your

24  grandchildren, correct?

25  A.  If they ever come along, yes.

D7inles5                          Gagliano - cross

1    Q.  You would also like to spend time with your wife, who is

2    your best friend, correct?

3    A.  Yes.

4    Q.  And your children?

5    A.  Absolutely.

6    Q.  Now, going back to before you pled guilty, you certainly

7    didn't think that what you did should cause you to end up in a

8    penitentiary, did you?

9    A.  Counsel, the hardest thing I have ever had to do in the

10   world is to admit I made a mistake, and I finally admitted that

11   I made a mistake, and it was a big one.

12   Q.  I understand that.  But I am talking about there's mistakes

13   and then there's criminal conduct.  There is a difference,

14   isn't there?

15   A.  Yes.

16   Q.  Prior to your arrest, you never thought you had committed a

17   crime, did you?

18   A.  No.

19   Q.  You thought Yule had prepared that application at least

20   correctly enough for you to get this pension or occupational

21   disability under the rules as you understood them to be,

22   correct?

23   A.  Correct.

24   Q.  You did not know that Yule made up that nonsense about you

25   sit and watch TV all day and do nothing, correct?

D7inles5                     Gagliano - cross

1    A.  I did not know at all, no.

2    Q.  You also didn't know, as you told us earlier, about all

3    these hard things --

4              MR. DURKIN:  Mr. Weddle, could I impose upon your

5    assistant to put that exhibit up.  I think it's --

6              MR. WEDDLE:  It's 101-A.

7              MR. DURKIN:  101-A.

8              Could we go do Section 6, please.  Not that one.

9    That's Section 3.

10             That's the part I am talking about.

11   Q.  Do you remember that?

12   A.  Yes, I do.

13   Q.  Now, for someone even with your injuries and your problems,

14   that is absurd, isn't it?

15   A.  Yes, it is.

16   Q.  Just like, for example, standing, the second one.

17             MR. DURKIN:  Could I impose upon you to blow that one

18   up.

19   Q.  Severe pain and weakness in legs, back, shoulder and wrist,

20   right?

21   A.  That's what it says.

22   Q.  When you are standing, correct?

23   A.  Correct.

24   Q.  So certainly somebody that can climb Machu Picchu and Mt.

25   Kilimanjaro, that would be incorrect, right?

D7inles5                          Gagliano - cross

1    A.   Correct.

2    Q.   That does not mean, however, that you don't have pain

3    sometimes when you stand, does it?

4    A.   It's possible, yes.

5    Q.   It's possible?

6    A.   Yes, if you're standing for -- sure.

7    Q.   I'm not trying to put words in your mouth.

8    A.   Sure.

9    Q.   I'm asking you a question.

10   A.   Yes.

11   Q.   Do you have trouble sometimes standing?  Do you have pain

12   when you stand?

13   A.   Not usually.

14   Q.   But sometimes you do, correct?

15   A.   Correct.

16   Q.   You do admit that you had back surgery in the '80s,

17   correct?

18   A.   Yes.

19   Q.   In fact, you even have a scar from it, correct?

20   A.   Yes.

21   Q.   You concede, as you've said at the end of your testimony

22   here a little while ago, that your shoulders bother you,

23   correct?

24   A.   Occasionally.

25   Q.   To this day, correct?

D7inles5                          Gagliano - cross

1   A.  Occasionally.

2   Q.  I think you said you just went to the chiropractor two

3   months ago, correct?

4   A.  Yes.

5   Q.  You also got cortisone shots, correct?

6   A.  Yes.

7   Q.  And the cortisone shots helped, right?

8   A.  Absolutely.

9   Q.  One of the things you told Dr. Lesniewski that you had was

10  shoulder pain, correct?

11  A.  Yes.

12  Q.  He attempted to treat your shoulder pain, didn't he?

13  A.  He prescribed anti-inflammatories for me, yes.

14  Q.  He also treated your back, did he not?

15  A.  He didn't really do anything for the back other than the

16  same thing, the anti-inflammatories.

17  Q.  But did he not give you Celebrex for your back?

18  A.  He did.

19  Q.  That helped, didn't it?

20  A.  It did.

21  Q.  So you didn't just go to Dr. Lesniewski as a scam, did you?

22  A.  It was part of the plan.

23  Q.  That was part of your plan, correct?

24  A.  I think we all know.

25  Q.  Who's we?

D7inles5                           Gagliano - cross

1    A.  Everybody involved.

2    Q.  Oh, really?

3    A.  Yeah.

4    Q.  Well, did Dr. Lesniewski tell you that he was going to

5    throw his license away for you?

6    A.  No, he did not.

7    Q.  When you went to see Dr. Lesniewski, he treated you like

8    every other doctor you had ever seen, correct?

9    A.  Yes.

10   Q.  You walked in and you filled out paperwork and you answered

11   the forms, correct?

12   A.  I did.

13   Q.  The forms all had a history of what kinds of things were

14   wrong with you, correct?

15   A.  Correct.

16   Q.  You did all that, right?

17   A.  I did.

18   Q.  In fact, when you first went to see him, you didn't even

19   know when it was you were going to retire, did you?

20   A.  I did.

21   Q.  You knew when you wanted to, right?

22   A.  Yes.

23   Q.  I would presume you are like most people, that you would be

24   happy to retire as soon as you could, assuming you could get

25   the right amount of money?

D7inles5                          Gagliano - cross

1    A.  Correct.

2    Q.  But when you were shown those documents earlier from

3    Mr. Weddle about your estimate -- do you remember those three

4    estimates?  I don't want to have to dig that out, but --

5    A.  Yes, the pension estimates.

6    Q.  The pension estimate?

7    A.  Yes.

8    Q.  One of them you even had a date of 2009, correct?

9    A.  Yes.

10   Q.  And I'm correct in assuming that that was one of your

11   thoughts, correct?

12   A.  It was.

13            MR. DURKIN:  I'm sorry.  I do need to just pull it up.

14   Could I just see the date of that, if you don't mind.

15            MR. WEDDLE:  Ms. Larson I think he wants the second

16   page of 606-A, not the first page.

17            Is that right, Mr. Durkin?

18            MR. DURKIN:  That's right.

19   Q.  You signed that with this date of 7/1/09 on June 26, 2004,

20   correct?

21   A.  Yes.

22   Q.  And at that point in time, you had already seen

23   Dr. Lesniewski several times, correct?

24   A.  Yes.

25   Q.  You first saw him in early 2003, correct?

D7inles5                          Gagliano - cross

1   A.  I believe it was November or later of 2003, yes.

2   Q.  And there was a question about whether you told

3   Dr. Lesniewski when you were going to retire, correct?

4   A.  Yes.

5   Q.  I believe you said you couldn't remember.

6   A.  Right.

7   Q.  Is it possible that you did or did not tell him that?

8   A.  I don't remember whether I did or I didn't, whether it was

9   even brought up.

10  Q.  But going back to when you first went to Dr. Lesniewski,

11  you filled out all the paperwork for the office?

12          MR. DURKIN:  You can take that down.  Thank you.

13  Q.  Correct?

14  A.  Yes.

15  Q.  Would I be correct that one of his assistants talked to

16  you?

17  A.  Possibly, but I really don't remember.

18  Q.  Do you remember those documents that you were looking at

19  earlier with respect to the patient notes, there was some

20  typing?

21  A.  Yes.

22          MR. DURKIN:  Could we have that exhibit?  I think it's

23  101-S.

24          I would like to go to Bates No. 002861.  It's the

25  sixth page.

D7inles5                        Gagliano - cross

1   Q.  Do you see that handwriting there?

2   A.  Yes, I do.

3   Q.  Up at the top?

4   A.  Yes.

5   Q.  Steven Gagliano, right?

6   A.  Yes.

7   Q.  That's not Dr. Lesniewski's handwriting, is it?

8   A.  I don't believe so.

9   Q.  That is the woman that interviewed you, correct?

10  A.  OK.

11  Q.  Am I right?

12  A.  It looks like it could be someone else's other than the

13  doctor's, yes.

14  Q.  Right.  You don't deny that you told that woman that you

15  have lower back pain, right?

16  A.  No, I don't deny it.

17  Q.  Or that you had surgery in '86, correct?

18  A.  Yes.

19  Q.  And you also said you had upper back pain, right?

20  A.  Yes.

21  Q.  And that your pain radiates down your left and right leg

22  occasionally?

23  A.  OK, yes.

24  Q.  But you don't have numbness or tingling in the legs,

25  correct?

D7inles5                          Gagliano - cross

1    A.  Correct.

2              MR. WEDDLE:  Is he asking if the witness remembers

3    saying this or if this is the recorded on the document.

4              MR. DURKIN:  I asked whether he denies saying it.

5    Q.  You don't deny that, right?

6    A.  No, I don't.

7    Q.  As you sit here right now I assume your recollection is

8    somewhat vague as to what you might have told some nurse or an

9    office assistant on November 25, 2003, correct?

10   A.  It was some years ago.  I think we can all understand that,

11   yes.

12   Q.  Right.  But you did have those symptoms at some times,

13   didn't you?

14   A.  I did.

15   Q.  The same is true with respect to the initial consultation

16   in the typed portion, correct?

17   A.  Yes.

18   Q.  You did have a laminectomy back in 1986, correct?

19   A.  I did.

20   Q.  You don't deny that you told Dr. Lesniewski himself that

21   you had pain again over the last few months, correct?

22   A.  No, I don't deny it.

23   Q.  You certainly don't deny that you told him that you were in

24   some distress, correct?

25             MR. WEDDLE:  Objection, your Honor.

1           THE COURT:  Sustained.

2           MR. DURKIN:  Take a look at -- I'm sorry, the next

3   page, if I could.  About the middle of the page, there is an

4   entry, it looks like there's some handwriting, 12/14/04.  Right

5   there.  Could you blow that section up, that and the typed

6   portion, the handwriting above it and the typed portion.

7   Q.  You were asked questions about that earlier.  Do you

8   remember?

9   A.  Yes.

10  Q.  I believe you said that you weren't sure whether

11  Dr. Lesniewski had ever recommended surgery for something,

12  correct?

13  A.  Correct.

14  Q.  But that record at least says, "Will not do surgery."  In

15  other words, you didn't want surgery, correct?

16          MR. WEDDLE:  Objection, your Honor.

17          THE COURT:  Sustained.

18  Q.  You don't deny that Dr. Lesniewski suggested to you in that

19  visit that surgery could be appropriate for your wrist,

20  correct?

21          MR. WEDDLE:  Objection, your Honor.

22          THE COURT:  Sustained.

23          MR. DURKIN:  Basis?

24          THE COURT:  You are interpreting the document.  Ask

25  the witness.

D7inles5                         Gagliano - cross

1    Q.  What do you think that means?

2              MR. WEDDLE:  Objection, your Honor.

3              THE COURT:  Overruled.

4    A.  The fact that it says will not do surgery would appear that

5    he maybe asked me if I would like to have surgery on it.  I

6    just didn't feel it was anywhere near -- an occasional problem

7    that I should have surgery on it and I still don't.

8    Q.  But the point is it was suggested as a possible solution by

9    Dr. Lesniewski, correct?

10             MR. WEDDLE:  Objection, your Honor.

11             THE COURT:  Overruled.

12   A.  Yes.

13   Q.  You do know that he is primarily a surgeon, don't you?

14   A.  I am aware.

15   Q.  In fact that's the largest part of his practice, isn't it,

16   if you know?

17   A.  I don't know.

18   Q.  The wrist was also something that he treated you for,

19   correct?

20   A.  Yes.

21   Q.  This wrist problem?

22   A.  Yes.

23   Q.  In fact, he prescribed a whole series of exercises for you,

24   did he not?

25   A.  He did.

D7inles5                     Gagliano - cross

1    Q.  And they, lo and behold, were effective, correct?

2    A.  They certainly were.

3    Q.  And they were kind of small, seemingly insignificant

4    things, like using a tomato paste can and small twisting and

5    things like that?

6    A.  It was with a, he suggested with a small weight.

7    Q.  Like --

8    A.  Like a one-pound weight or something, yes.

9    Q.  Something almost sounding too stupid to help, but it

10   actually helped, didn't it?

11   A.  It did.

12   Q.  Because that wrist was bothering you, wasn't it?

13   A.  It was.

14   Q.  He also at some point recommended that surgery was an

15   option for your shoulder, correct?

16   A.  Yes, he did.

17   Q.  Again, you decided that you did not want to elect to have

18   the surgery, correct?

19   A.  Yes.  That's correct.

20   Q.  That is because it was effectively an elective surgery,

21   correct?

22   A.  That is correct.  It's something that, like the other

23   things, is not permanent.  It's just an occasional bother if I

24   ride a bicycle for too many hours straight.

25   Q.  But whatever you told Dr. Lesniewski caused him to

D7inles5                          Gagliano - cross

1    recommend surgery -- or at least say that surgery was an

2    option, correct?

3              MR. WEDDLE:  Objection.

4              THE COURT:  Sustained.

5    Q.  Well, do you recall as you sit here today what types of

6    things you described about your shoulder to Dr. Lesniewski?

7    A.  Just that it was bothering me that particular day, whenever

8    that visit was.

9    Q.  Would I be correct if I said that Dr. Lesniewski is kind of

10   a hands-on type doctor, he does a lot of feeling of the

11   particular parts in question?

12   A.  Yes.

13   Q.  And he did that to you, correct?

14   A.  He did.

15   Q.  He would frequently feel all over your wrist, correct?

16   A.  Correct.

17   Q.  He would frequently when you came in -- let me ask you one

18   other thing.  It's true, is it not, that whenever you came in

19   he always asked you, the first thing he would ask is whether

20   the issues you had talked about the last time were either

21   better or worse, correct?

22   A.  I believe so.

23   Q.  Sometimes they were and sometimes they weren't, correct?

24   A.  Yes.

25   Q.  And you never stopped him at any time and said, Can we just

1  cut out this dance, Doc, can we stop the charade here, right?

2  A.  No, I did not.

3  Q.  And he never suggested to you that you should stop the

4  charade, correct?

5  A.  No.

6          MR. DURKIN:  If I could have the second page of that

7  Exhibit 101-S.  I think that covers the shoulder.

8  Q.  That record pretty much sums up what we just talked about

9  regarding the shoulder, correct?

10          MR. WEDDLE:  Objection, your Honor.

11          THE COURT:  Sustained.

12  Q.  Well, you can read that record, correct?

13  A.  Yes, I can.

14  Q.  And do you have a specific recollection as you sit here

15  today of what you might have said to Dr. Lesniewski on May 2,

16  2006?

17  A.  No, I don't.

18  Q.  But you don't deny that you told him that you had --

19          MR. WEDDLE:  Objection, your Honor.

20          THE COURT:  Overruled.

21  Q.  You don't deny that you told him that you have a

22  significant amount of pain in your left shoulder, correct?

23          MR. WEDDLE:  Objection, your Honor.

24          THE COURT:  Overruled.

25          MR. WEDDLE:  Assumes facts.

279

D7inles5                         Gagliano - cross

1   A.  I don't deny it, no.

2   Q.  Do you have any recollection whether or not you discussed

3   with him, as it mentions there about injections, do you have

4   any recollection of discussing injections with him?

5   A.  Yes, I do.

6   Q.  Do you recall around that time that he suggested injections

7   or at least said that was an option?

8   A.  I didn't think it required that, but he did say we could

9   someday do an injection.

10  Q.  That would be an injection of cortisone, wouldn't it?

11  A.  That's what I would believe it to be, yes.

12  Q.  As you just told us before, when you -- finally when you

13  went to doctors, was it Orlin and -- what was their name?

14          MR. WEDDLE:  Keefer.

15  Q.  You finally had the cortisone and it worked, correct?

16  A.  Yes.

17  Q.  Do you think if you had had those injections on May 2 that

18  maybe you could have kept working?

19  A.  I could have kept working all along.

20  Q.  I understand that.

21  A.  I'm not denying that.

22  Q.  That is what you say now, right?

23          MR. WEDDLE:  Objection, your Honor.

24          THE COURT:  Sustained.

25  Q.  That is your testimony?

1           MR. WEDDLE:  Objection, your Honor.

2           THE COURT:  Sustained.

3           Rephrase the question.

4  Q.  You said in the application that you couldn't do your job?

5  A.  I did.

6  Q.  But now you say that you could, right?

7  A.  Yes.

8  Q.  But you don't deny that around the time of the application,

9  in October of 2006, that you wanted to get the occupational

10 disability, correct?

11 A.  I don't deny it, no.

12 Q.  That was your goal, correct?

13 A.  It was my wish, yes.

14 Q.  And the reason you didn't take the injections in 2006 is

15 that you didn't want to improve your shoulder, correct?

16 A.  That's not true.

17 Q.  What is true?  You didn't want it for what reason?

18 A.  It was controlled with just anti-inflammatories.  There was

19 no need to get injections.  There was no need for it.

20 Q.  You continued to see Dr. Lesniewski, correct?

21 A.  Yes, I did.

22 Q.  As you say, you were hoping to build a paper trail,

23 correct?

24 A.  Yes.

25 Q.  And you did build a paper trail, didn't you?

D7inles5                          Gagliano - cross

1    A.  I did.

2    Q.  Because, lo and behold, there were x-rays taken, correct?

3    A.  Yes, there were.

4    Q.  The x-rays revealed certain problems, didn't they?

5    A.  I believe so.

6    Q.  Like degenerative problems with your back, right?

7    A.  Yes.

8    Q.  A potential triangular tear with your wrist?

9             MR. WEDDLE:  Objection, your Honor.

10            THE COURT:  Overruled.

11   Q.  Correct?

12            THE COURT:  If you know.

13   A.  I have had follow-ups with the wrist that show no tears in

14   it, so I don't really know what to buy on that one.

15   Q.  Well, you do know with the number of doctors you have seen

16   over the years for your either your wrist, your knee, your back

17   or your shoulder that some of these things are hard to detect,

18   correct?

19            MR. WEDDLE:  Objection, your Honor.

20            THE COURT:  Overruled.

21            MR. WEDDLE:  Foundation.

22            THE COURT:  Overruled.

23   A.  I'm not a doctor.

24   Q.  But you know enough about medicine apparently to make your

25   own decisions even when a doctor tells you that you could do

1    something different, right?

2              MR. WEDDLE:  Objection, your Honor.

3              THE COURT:  Sustained.

4    Q.  Well, first of all, you are aware that pain is a subjective

5    issue, correct?

6    A.  Yes.

7    Q.  So that your pain threshold may be very different than

8    mine, correct?

9    A.  It's possible.

10   Q.  You also know that some of this is trial and error, as

11   you've already told us, correct?

12   A.  OK.  Yeah.

13   Q.  Like sometimes the anti-inflammatories --

14   A.  Or the physical therapy doesn't work.

15   Q.  Right.  Like you said, the physical therapy didn't work,

16   but, lo and behold, the cortisone did, correct?

17   A.  Yes.

18   Q.  Just like sometimes the Celebrex worked and sometimes

19   another anti-inflammatory may not, right?

20   A.  That's been my findings, yes.

21   Q.  The application got filed.  If I'm reading this right, you

22   and Mr. Yule walked the application down to Westbury or you

23   drove there, whatever you did, on October 31, 2006, correct?

24   A.  Yes.

25   Q.  And that's 101-A.  That's the one we looked at that has the

D7inles5                          Gagliano - cross

1   Section 6 that's goofy, right?  Am I right?

2   A.  I'm sorry.  I didn't get that.

3   Q.  I'm sorry.  The application is Government Exhibit -- I

4   think you have your binder there, 101-A.

5   A.  Yes, it is.  I have it in front of me.

6   Q.  That was October 31, 2006, correct?

7   A.  Yes.

8   Q.  But the narrative and the medical assessment, Government

9   Exhibit 101-D, as in David, is the narrative and 101-B, as in

10  boy, is the medical assessment.

11          Would you just take a look at those two for a minute,

12  101-D like David and 101-B?

13  A.  Yes, I have them in front of me.

14  Q.  Those you got from Dr. Lesniewski, both of them, almost

15  three months before Yule filled out that application, correct?

16  A.  Approximately, yes.

17  Q.  Well, the narrative, Dr. Lesniewski's narrative is dated --

18          MR. DURKIN:  Could we have 101-D, please.

19          I don't think Mr. Weddle asked you this.  He asked you

20  about that date on the bottom with the stamp, but --

21          MR. WEDDLE:  I did.

22          MR. DURKIN:  You asked about the stamp?

23          MR. WEDDLE:  Are you going to ask whether I asked the

24  date on the top of the document?

25          MR. DURKIN:  Yes.  I said I didn't recall.

1          MR. WEDDLE:  Are you going to ask him.

2          MR. DURKIN:  That's fine.  If you did, I will withdraw

3   it.  I said I couldn't recall.

4   Q.  Do you see the date up there on that letter?

5   A.  I do.

6   Q.  That's the narrative that's dated October -- I'm sorry.

7   A.  July 31.

8   Q.  July 31, 2006.

9   A.  Correct.

10  Q.  And that has Dr. Lesniewski's impression, correct.

11         MR. DURKIN:  That's on the third page, if I could,

12  ma'am.

13  Q.  Do you see that where it says impression?

14  A.  I have that, yes.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

D7idles6                         Gagliano - cross

1    Q.  And it says, "acromioclavicular" -- I'm sure Dr. Lesniewski

2    will shoot me for not being able to pronounce it, but

3    "arthrosis, left shoulder with impingement."

4              You know what that means in layman's terms, don't you?

5              Doesn't that mean arthritis in layman's terms?

6    A.  I didn't know, but OK.

7              MR. WEDDLE:  Objection, your Honor.  I move to strike.

8              THE COURT:  Sustained.

9    Q.  Well, has anybody ever told you that you have arthritis in

10   that left shoulder?

11             MR. WEDDLE:  Objection, your Honor.

12             THE COURT:  Sustained.

13   Q.  Has a doctor ever told you that you have arthritis in the

14   left shoulder?

15             MR. WEDDLE:  The same objection.

16             THE COURT:  Overruled.

17   A.  No, sir.

18   Q.  When they -- I believe you said that it was your left

19   shoulder that you had those cortisone injections in?

20   A.  That's correct.

21   Q.  Did anybody tell you what was wrong with the shoulder that

22   would require the cortisone?

23   A.  They said I had inflammation and that this would take care

24   of it a lot quicker than just letting it rest and heal.

25   Q.  Now, the second thing is "degenerative disc disease of the

1    lumbar spine," correct?

2    A.  That's what it says, yes.

3    Q.  And "lumbar" means back, correct?

4    A.  Yes.

5    Q.  And you did have back surgery?

6    A.  I did.

7    Q.  And number three is "triangular fibrocartilage complex

8    tear, left wrist," correct?

9    A.  That's what it says, yes.

10   Q.  Now, that just says that's his impression, doesn't it?

11            MR. WEDDLE:  Objection, your Honor.

12            THE COURT:  Overruled.

13   Q.  Am I right?

14   A.  That's what it reads, yes.

15   Q.  And then --

16            MR. WEDDLE:  Objection, your Honor.  It doesn't say

17   just anything.  Everyone can read the word on the page.  That

18   is a characterization by counsel.

19            MR. DURKIN:  Well --

20            THE COURT:  Rephrase the question.

21   BY MR. DURKIN:

22   Q.  Those three things are under the section that's labeled

23   "Impression," correct?

24   A.  Yes.

25   Q.  Then underneath that there is a prognosis, correct?

D7idles6                          Gagliano - cross

1   A.  Yes, there is.

2   Q.  Now, I believe you said -- and Dr. Lesniewski says, or at

3   least the record says there, signed by him, that he was aware

4   of your occupation on the Long Island Rail Road, and given the

5   above noted diagnosis, it can be stated within a reasonable

6   degree of medical certainty that the patient is disabled for

7   his occupation and that this disability is permanent, correct?

8   A.  I see that, yes.

9   Q.  OK.  Now, I believe there were some questions earlier about

10  whether or not you ever told Dr. Lesniewski what you did,

11  correct?

12  A.  I believe there was.

13  Q.  OK.  Do I remember correctly that you couldn't remember

14  whether you told him that?

15  A.  That's correct.

16          MR. WEDDLE:  Objection, your Honor.  "Told him that"?

17  Q.  You told him that you couldn't -- when you testified

18  earlier and you were asked about that, is my memory of your

19  testimony --

20          THE COURT:  Could we have a foundation of what is

21  "that"?

22          MR. DURKIN:  That's what I am doing.  I will rephrase

23  it.  I'm sorry.

24  Q.  When you testified earlier about whether or not you could

25  recall telling Dr. Lesniewski what you did, am I correct in

 1    hearing that your answer was you couldn't remember?

 2               MR. WEDDLE:  Objection, your Honor.

 3               THE COURT:  Overruled.

 4               MR. WEDDLE:  Relevance of his memory of this morning's

 5    testimony?

 6               THE COURT:  All right.  Overruled.

 7    Q.  Now, do you remember the document that you looked at --

 8               MR. DURKIN:  Can I have a minute, Judge?

 9               (Pause)

10               I'm sorry, Judge.  I misplaced one document.

11               (Pause)

12               Here it is.  Could I have Exhibit 609?

13    BY MR. DURKIN:

14    Q.  Do you remember being shown that a little while ago?

15    That's the application for sickness benefits.

16    A.  Yes, I do.

17    Q.  And I believe you testified that the top portion of that

18    was your handwriting for numbers 1, 2, 3 and 4?

19    A.  All the way up, including 6.

20    Q.  I'm sorry?

21    A.  Numbers 1 through 6.

22    Q.  Right.  Then I believe your testimony was you thought the

23    Section B was handwritten by Dr. Lesniewski, correct?

24    A.  Yes.

25    Q.  And this is signed by Dr. Lesniewski on the same day of the

D7idles6                          Gagliano - cross

1    narrative, 7/31/06, correct?

2              Let's turn to the last, the third page.

3              Am I right?

4    A.  Yes.

5    Q.  So we do know that at least as of 7/31 of 2006, that

6    Dr. Lesniewski knew that you were a signalman for the Long

7    Island Rail Road, correct?

8              MR. WEDDLE:  Objection, your Honor.

9              THE COURT:  Overruled.

10   Q.  Am I right?

11   A.  It appears to be correct, yes.

12   Q.  And if we look at Exhibit 101C, if we could, this

13   vocational report, this is something that Mr. Yule filled out,

14   not Dr. Lesniewski, correct?

15   A.  I believe so, yes.

16   Q.  And this is something that's signed by you, not Mr. Yule or

17   Dr. Lesniewski, correct?

18   A.  Yes, it is.

19   Q.  And that's signed the same day as your disability

20   application, October 31, 2006, correct?

21   A.  Yes.

22   Q.  And take a look on page 2, where it says 12B.

23              I believe you were asked questions about that earlier;

24   am I right?

25   A.  I believe so, yes.

1    Q.  OK.  Now, you did install and repair signals, correct?

2    A.  Yes, I did.

3    Q.  And wire and cable communications along the right of way,

4    correct?

5    A.  Yes, sir.

6    Q.  Now, did I understand you to say while you had to climb

7    poles, they weren't necessarily 90-foot poles?

8    A.  That's correct, yes.

9    Q.  How big -- how high were the poles that you used to have to

10   climb?

11   A.  I would probably estimate them somewhere between maybe 30

12   and 40 feet -- 20 and 30 feet.

13   Q.  Do you have to swear special equipment when you do that?

14   A.  You have to wear what's called hooks.

15   Q.  So you don't fall off the pole, right?

16   A.  They jam into the pole, unless they have rungs on the

17   outside.

18   Q.  And that's somewhat dangerous, isn't it?

19   A.  It can be, yeah.

20   Q.  Now, it also says dig trenches, correct?

21   A.  Yes.

22   Q.  And that you did have to do, correct?

23   A.  I did.

24   Q.  And you had to shovel dirt, right?

25   A.  Yes.

1   Q.  And you had to shovel stone ballast?

2   A.  Yes.

3   Q.  And snow?

4   A.  Yes.

5   Q.  And it's true that you had to crouch, kneel, bend, stand,

6   crawl, twist and turn, correct?

7   A.  I had to do all them things.

8   Q.  As you said, you are a blue-collar guy.  You are proud of

9   being a blue-collar guy, aren't you?

10  A.  I am.

11  Q.  You worked hard all your life?

12  A.  I did.

13  Q.  It took a toll on your body, didn't it?

14  A.  It does.

15  Q.  But it was a good job, right?

16  A.  It was a great job.

17  Q.  And you had a great union?

18  A.  I'm not so sure about that now but OK.

19  Q.  Well, now; but at least at the time it sure seemed good,

20  didn't it?

21  A.  It seemed like it.

22  Q.  OK.  And you got to retire early, correct?

23  A.  Correct.

24  Q.  And you -- when you first decided to see whether or not you

25  could enter into this cooperation agreement with the

1    government, you first had to go in and give what's called a

2    proffer to the government, did you not?

3    A.  I did.

4    Q.  And a proffer is something that where the government says,

5    in effect, you can come in and they won't hold what you say

6    against you should you go to trial but they want to hear what

7    you have to say, correct?

8    A.  I believe so, yes.

9    Q.  And you did that a month ago today, am I right?

10   A.  I'm going to have to take your word on that one.

11   Q.  Well, I'll -- I could give you -- let me show you a

12   document.

13            (Pause)

14            Let me show you a document that we received, and just

15   take a look at page 1, towards the bottom, and see if that

16   refreshes your recollection as to when it was you met with the

17   government for a proffer.

18            (Pause)

19   A.  It shows 6/18 of 2013.  So it would be exactly a month,

20   yes.

21   Q.  OK.  And you went there with your lawyer, correct?

22   A.  I did.

23   Q.  And you told them what you might be able to say, correct?

24            (Pause)

25            Am I right?  They asked you questions and you gave

1    them answers, correct?

2    A.   That's correct.  Yes.

3    Q.   OK.  And you told them, at the very outset of the

4    interview, that your job could become physical, correct?

5    A.   Yes.

6    Q.   And on some days you may need to dig in signal equipment

7    such as cables, correct?

8              MR. WEDDLE:  Objection, your Honor.  I'm not sure why

9    we are rehashing an out-of-court statement.

10             THE COURT:  Sustained.

11             MR. DURKIN:  May I be heard?

12             THE COURT:  Yes.

13             Step up.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1            (At the sidebar)

2            THE COURT:  I don't know how you can use this document

3    to refresh his recollection.  Are you taking it a step further

4    than that?

5            MR. DURKIN:  Well, the reason I'm doing that is that I

6    believe -- and maybe I misunderstood so I will just be

7    corrected, but I thought the government elicited from him that

8    his job wasn't physical and that that stuff was false that he

9    just admitted to, and this is exactly what he says at the

10   outset of his proffer.  So for the government to have elicited

11   that is somehow, you know --

12           MR. WEDDLE:  We didn't elicit that.  We asked him

13   about that question and his location, and he reported to me, he

14   said he had to do some of those things.  We didn't elicit that

15   his job was not physical.

16           Unless Mr. Durkin has a citation, we didn't elicit

17   anything like that.  There is no inconsistent statement here.

18   He has testified consistently throughout.

19           THE COURT:  All right.  You can ask him about his

20   testimony about his job before or pose a question without

21   putting words in his mouth.

22           MR. WEDDLE:  Your Honor, he already has that on

23   cross-examination.  That is over.  There is no reason to

24   rehash --

25           MR. DURKIN:  I've got it.

D7idles6                          Gagliano - cross

1              THE COURT:  OK.

2              (In open court)

3    BY MR. DURKIN:

4    Q.  Now, how long was that proffer meeting?

5    A.  It seemed like forever, but probably a couple of hours, at

6    least.

7    Q.  It seemed like forever because at least from your

8    perspective your whole life was being put into the hands of the

9    government, correct?

10   A.  I wouldn't put it that way, but it was a rough thing to go

11   through.

12   Q.  How about your foreseeable future being put into the hands

13   of the government?

14   A.  You could look at it that way.

15   Q.  Well, you said earlier on your direct examination that you

16   were facing up to 55 years in prison, correct?

17   A.  That is correct.

18   Q.  And that you hope by testifying here that you will get a

19   lesser sentence, correct?

20   A.  That testifying truthfully could possibly lower my

21   sentence, yes.

22   Q.  You wouldn't think of testifying any way other than

23   truthfully, would you?

24   A.  I would not.

25   Q.  And you hope to get this letter that they will write the

D7idles6                          Gagliano - cross

1    Judge on your behalf, correct?

2    A.  I should just hope so, yes.

3    Q.  Because you don't want anything like 55 years in prison or

4    anything in prison at all, do you?

5    A.  I don't think anybody would.

6    Q.  And as a result of this meeting, the government agreed to

7    enter into this cooperation agreement that we've talked about

8    with you, correct?

9             MR. WEDDLE:  Objection, your Honor.

10            THE COURT:  Overruled.

11   Q.  Am I right, where they agreed with you and your lawyer?

12            You reached an agreement, right?

13   A.  Yes, we did.

14   Q.  That's the agreement that we saw earlier, correct?

15   A.  The written agreement, yes.

16   Q.  That's the letter that the government wrote?

17   A.  That's correct.

18   Q.  And discusses all the terms and conditions of this

19   agreement that you have, right?

20   A.  Yes.

21   Q.  And you ultimately entered a guilty plea in this court,

22   correct, a different courtroom of a magistrate judge but it was

23   under the auspices of this Court, correct?

24   A.  Yes, sir.

25   Q.  And you pled guilty to a conspiracy, correct?

D7idles6                         Gagliano - cross

1   A.  I did.

2   Q.  And you also pled guilty, if I remember correctly your

3   testimony, to some wire fraud, mail fraud and healthcare

4   counts, correct?

5   A.  That is correct.

6   Q.  You essentially pled guilty to what everybody here is on

7   trial with, correct?

8   A.  I'm not sure I pled guilty to all the counts that were

9   against me.  I'm not sure what they all were.

10  Q.  One of the charges, though, in the conspiracy that you pled

11  guilty to described what the government called in the

12  Indictment a premedicated disability fraud scheme; do you

13  remember that?

14  A.  Yes.

15  Q.  Am I correct in assuming that you certainly never believed

16  for one minute that you had participated in a premedicated

17  disability fraud scheme?

18  A.  Not initially, maybe.

19  Q.  In fact, you didn't even know anyone else that got arrested

20  when you got arrested, correct?

21  A.  I knew none of them, no.

22          Let me check that.  I was at a retirement seminar with

23  one of the people that is in the courtroom.

24  Q.  But when you talked to the government on June 18th, you

25  told them that you didn't know anyone else that was arrested,

D7idles6                          Gagliano - cross

1   correct?

2   A.   That's correct.

3   Q.   And then you remembered something different, right?

4              MR. WEDDLE:   Objection, your Honor.

5              MR. DURKIN:   I will withdraw it.   It is not important.

6              THE COURT:   Sustained.

7              MR. WEDDLE:   Objection to the commentary, your Honor.

8   Inappropriate.

9              THE COURT:   Sustained.

10             Next question.

11  BY MR. DURKIN:

12  Q.   By the way, you and I have never spoken to each other

13  before, have we?

14  A.   No, we have not.

15  Q.   Other than maybe if I saw you in the courtroom I might have

16  nodded, but you and I have never had any personal contact,

17  correct?

18  A.   No, we have not.

19  Q.   OK.   And I never asked you about what your testimony was

20  going to be or nobody on my staff or Mr. Dratel, nobody has

21  questioned you about what you are going to say here, correct?

22  A.   No, sir.

23  Q.   And would I be correct in assuming that over time over the

24  number of times you saw Dr. Lesniewski, I think those dozen or

25  so times that you saw him, that you came to like him, didn't

D7idles6                         Gagliano - cross

1   you?

2   A.  He was a likeable guy, yeah.

3   Q.  And he treated you well, didn't he?  And I don't mean like

4   medical treatment.  He treated you well, did he not?

5   A.  He did.

6   Q.  He was courteous?

7   A.  Yes, he was.

8   Q.  You said something about paying him cash.  You're not

9   suggesting in any way, shape or form that Lesniewski is the one

10  that wanted cash, are you?

11  A.  I believe it was requested that it would be cash.

12  Q.  Really?

13  A.  Otherwise I --

14          MR. WEDDLE:  Objection, your Honor.

15          THE COURT:  Sustained.

16  Q.  Do you put that in some type of nefarious context that

17  there would be cash?

18          MR. WEDDLE:  Objection, your Honor.

19          THE COURT:  Sustained.  Rephrase the question.

20  BY MR. DURKIN:

21  Q.  What's your best recollection of the topic of payment?  As

22  you sit here now, what is your best recollection of who

23  discussed the payment for the narrative?

24  A.  It may have harkened back to a bit before that.  I, I -- I

25  don't recall if the doctor or whether a receptionist or whoever

D7idles6                          Gagliano - cross

1  it was had requested the payment in cash, but it was always

2  done that way in speaking to the other people that had gone

3  before me.

4  Q.  OK.  But those conversations about the other people that

5  had gone before you, those weren't particular to Lesniewski,

6  those were just particular to any of the doctors that you heard

7  about, correct?

8  A.  I believe it was meant to be to all of them but --

9  Q.  And the fact of the matter is, however, if we could have

10 the receipt?

11         You got a receipt, correct?

12 A.  Yes, I did.

13 Q.  And there was no suggestion that somehow that was going to

14 end up in Dr. Lesniewski's pocket, was there?

15         MR. WEDDLE:  Objection, your Honor.

16         THE COURT:  Sustained.

17 Q.  Do you recall who you paid the money to?

18 A.  I believe it was a receptionist.

19         MR. DURKIN:  Can I have a minute, Judge?

20         (Pause)

21         Just one other thing.

22         Could I have Government Exhibit 607?

23         (Pause)

24 Q.  Do you recall exactly when this race was?

25 A.  It was a ride, it wasn't a race but --

1    Q.  I'm sorry.  I meant a ride.

2    A.  It was in July of 2009.

3    Q.  OK.  And this was after The New York Times' story broke,

4    wasn't it?

5    A.  I don't read The Times.  I don't know.

6    Q.  Are you aware that someone saw you on that bike and

7    reported you to the FBI?

8              MR. WEDDLE:  Objection, your Honor.

9              THE COURT:  Sustained.

10   Q.  Do you remember speaking to someone who identified themself

11   as working for the police around sometime between July 6th and

12   July 8th of 2009, where you informed this person, who said he

13   was a police officer, that --

14             MR. WEDDLE:  Objection, your Honor.

15             THE COURT:  Foundation?

16             MR. WEDDLE:  I'm not sure why we are talking about an

17   out-of-court statement.

18             THE COURT:  He was only asked so far whether he

19   recalls speaking to someone.

20             MR. WEDDLE:  What is the relevance of that?

21   BY MR. DURKIN:

22   Q.  Do you recall speaking to somebody who said that he was a

23   police officer and that you were training -- you told him that

24   you were retired, you had worked for the Long Island Rail Road

25   and that you were training for this upcoming bike ride?

D7idles6                           Gagliano - cross

1    A.   There is a particular individual that I do recall, yes.

2    Q.   Do you know that that person reported you to the FBI?

3               MR. WEDDLE:   Objection, your Honor.

4               THE COURT:   Sustained.

5    Q.   You do drive a red Jeep Cherokee, or at least you did --

6               MR. WEDDLE:   Objection, your Honor.

7               THE COURT:   Sustained.

8               MR. WEDDLE:   May I be heard at the sidebar?

9               THE COURT:   Sustained.   No.

10   BY MR. DURKIN:

11   Q.   Anyway, you don't have to raise your arms up when you ride

12   a bike, do you?

13   A.   No, you don't.

14   Q.   So other than the pressure going down, your shoulders don't

15   really affect the bike riding, do they?

16   A.   It actually gives me a lot of problems with my shoulders

17   because you are putting -- you know, the weight of your whole

18   body is basically being absorbed through your arms and handle

19   bars.

20   Q.   So you do have problems with your shoulders when you ride

21   the bike?

22   A.   When I ride for long periods, yes.

23   Q.   How about your back?

24   A.   None whatsoever.

25   Q.   Your back is fine?

D7idles6                    Gagliano - cross

1    A.  Yes.

2    Q.  How about the wrist?

3    A.  Fine.

4    Q.  Your shoulder still bother you, right?

5    A.  If I ride a bicycle for several hours straight it will act

6    up.

7    Q.  You don't get to rest during work, do you?

8    A.  Other than lunch, no.

9    Q.  You have to work straight through four hours or

10   three-and-a-half hours before lunch and three-and-a-half or

11   four hours after lunch, correct?

12   A.  Somewhere along those lines, yes.

13            (Pause)

14            MR. DURKIN:  That's all I have, Judge.

15            THE COURT:  All right.  Thank you.

16            We are going to take the afternoon break now for ten

17   minutes.

18            (Recess)

19            (Jury not present)

20            THE COURT:  You may be seated.

21            Mr. Weddle, how long a redirect do you anticipate?

22            MR. WEDDLE:  At this point, ten minutes or so, but I

23   don't know if there is any more cross-examination.

24            (Jury present)

25            THE COURT:  Good afternoon.  Thank you.  Welcome back.

D7idles6                    Gagliano - cross

1          Mr. Weddle, would you want to resume.

2          MR. WEDDLE:  Your Honor, I'm not sure if there is

3     cross-examination by other defendants.

4          MR. JACKSON:  Briefly, Judge.

5          THE COURT:  If there is, let's come forward.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Mr. Jackson, I want a proffer of any

3     cross-examination that is relevant to anything on direct that

4     bears on your client.

5          MR. JACKSON:  In fact, there are a couple of things

6     that are relevant.  One is that I want to do two things:

7     Clarify that there was no interaction between him and Baran at

8     all.  That is number one.

9          Number two.  He mentioned something about the RRB,

10    Railroad Retirement Board, with respect to having a meeting

11    with the consultant.  He then went to the RRB to confirm the

12    confirm the application process.  In other words, after he

13    finished with Yule, he went to the RRB, who confirmed whatever

14    the facts were.  He would have to sign the application and send

15    it in.  That is why I just have a five-minute cross-examination

16    to emphasize some issues that affect my client in this case.

17         MR. WEDDLE:  That wasn't his testimony, your Honor.

18    He didn't say that they confirmed it.  He said that they looked

19    at it to see if it was all filled out.

20         MR. JACKSON:  That's what I mean.  I am not

21    characterizing my cross.  I am just telling you what --

22         THE COURT:  Let me ask.

23         MR. JACKSON:  Sure.

24         THE COURT:  Is this the best opportunity that exists

25    from what you know about this case for the testimony that you

1    seek or not?

2           MR. JACKSON:  Judge, in fairness, there will be

3    probably 20 other options.

4           THE COURT:  All right.  There is going to be people

5    here from the RRB, right?

6           MR. JACKSON:  Yes.  But this witness goes to the issue

7    of knowledge of Yule, the consultant.

8           THE COURT:  That was about Yule, not Ms. Baran.

9           MR. JACKSON:  The only reason I think is it is on the

10   heels of the opening statements where I told the jury in the

11   opening that after someone filled out an application, they then

12   go to the RRB, who, sorry, doesn't confirm it but they review

13   it then.

14          MR. WEDDLE:  He said checked it to see if it was

15   complete.

16          I don't have a problem with him doing the

17   cross-examination.  I just don't want him to mischaracterize

18   the testimony.

19          THE COURT:  I don't know as to what extent we are

20   going to get after every witness the same question.  If there

21   will be another opportunity for which you can get it done

22   through the same question to a witness who has bearing on your

23   client, that's for them and it will save some time.

24          I assume Mr. Ryan is agreeing with that.

25          MR. RYAN:  Judge, I hope you agree with me that I want

D7idles6                         Gagliano - cross

to find out where the retirement seminar was that he went to

where he blurted that out.  I just remember he went to a

retirement seminar.  That's all I want to do.

          MR. JACKSON:  Is he asking about the retirement

seminar, or is he withdrawing?

          THE COURT:  He wants to ask about a retirement seminar

and argue.  He can ask whether he knows anything about Ms.

Baran, whether he had any contact or anything that he knows

pertaining to Ms. Baran and what she was doing.  I think that

that is fair.  But your other questioning is going to open up a

brand new area of what I think is going to be cumulative

testimony.

          MR. JACKSON:  It is not so brand new because --

          THE COURT:  It is not new but it is going to be

cumulative because other people are going to be testifying to

similar things.

          MR. JACKSON:  In fairness, Judge, it is not that

important to argue over.  I am sure that we will have other

potential differences that I would rather save my stock for

those issues than this.  So why don't we just move on.

          THE COURT:  OK.

          (Continued on next page)

D7idles6                          Gagliano - cross

1              (In open court)

2              THE COURT:  Mr. Jackson, do you have questions of this

3    witness?

4              MR. JACKSON:  You know, I don't, Judge.  No.

5              THE COURT:  Mr. Ryan.

6              MR. RYAN:  Just a couple.

7    CROSS-EXAMINATION

8    BY MR. RYAN:

9    Q.  Mr. Gagliano, where was that retirement seminar you just

10   told us about?

11   A.  I believe it was in the Hibernian hall in Babylon.

12   Q.  The Hibernian hall in Babylon.

13              And what was this retirement seminar about?

14   A.  There was a representative from the pension office and the

15   Long Island Rail Road Company and there was a representative

16   from the Railroad Retirement Board, and they basically told you

17   about your retirement, how to max out your earnings while you

18   were working, and things to plan ahead a little bit.  You went

19   to the that five years before you were eligible to retire.  So

20   it helped --

21   Q.  Did someone from the Railroad Retirement Board explain the

22   Occupational Disability Program?

23   A.  It was 12 years ago, I don't recall that.  But I do recall

24   from the woman from the Railroad Retirement Board that she said

25   stay for 30 years.  That's what I took out of it from her.

D7inles7                          Gagliano - cross

1   Q.  You rejected that advice?

2   A.  I did, yes.

3          MR. RYAN:  Thank you.  No further questions.

4          THE COURT:  Thank you.  Mr. Weddle.

5          MR. WEDDLE:  Thank you, your Honor.

6   REDIRECT EXAMINATION

7   BY MR. WEDDLE:

8   Q.  Sir, to be clear, you testified today that you committed

9   crimes, correct?

10  A.  I did.

11  Q.  You knew that you were lying by claiming that you couldn't

12  work anymore?

13  A.  I did.

14  Q.  You did that because you wanted money from the Railroad

15  Retirement Board, right?

16  A.  Yes, that is true.

17  Q.  Based on your understanding of what occupational disability

18  means and your understanding of your condition, you knew you

19  didn't deserve that money in 2006, right?

20         MR. DURKIN:  Objection.

21         THE COURT:  Sustained.

22         Rephrase the question.

23  Q.  When you applied for occupational disability, sir, what did

24  you understand occupational disability meant in terms of what

25  you could or couldn't be able to do?

1   A.  The occupational disability was, the way I understood it is

2   that if you weren't able to do your occupation.

3   Q.  When you applied, were you able to do your occupation?

4   A.  Yes, I was.

5   Q.  In 2006, did you think that it was OK to lie to the United

6   States Railroad Retirement Board in order to get money?

7            MR. DURKIN:  Objection.

8            THE COURT:  Overruled.

9   A.  At the time I thought so, yes.

10  Q.  You thought that it was OK to lie in these forms that we

11  are talking about?

12  A.  Yes.

13  Q.  The reason that you committed crimes -- I mean the reason

14  that you pled guilty to crimes was what?

15  A.  Because of the fraud I committed by doing that.

16  Q.  You said that you went to Dr. Lesniewski because there

17  would be less of a light on you by doing that.

18            Do you remember that?

19  A.  Yes, I do.

20  Q.  Was that because you thought that what you were doing was

21  entirely appropriate?

22            MR. DURKIN:  Objection to the leading.

23            THE COURT:  Sustained.

24  Q.  Why did you think it would be a good idea to have less of a

25  light on you as you prepared to apply for occupational

1    disability?

2    A.  Well, you are worried that someone might catch on to it.

3    Q.  And when you say catch on to it, you are talking about

4    what?

5    A.  Come to light, that somebody realizes that there are so

6    many people going to the same person or the same doctor, along

7    those lines.

8    Q.  When you say you were worried that someone might catch on

9    to it, does that mean that you were worried that you might get

10   caught and you might get prosecuted?

11           MR. DURKIN:  Objection.  Leading.

12           THE COURT:  Sustained.

13   Q.  When you were saying you were thinking that someone might

14   catch on to it, what do you mean?

15   A.  I was concerned that eventually the whole thing would come

16   to an end and people would get in trouble.

17   Q.  Did you get in trouble?

18   A.  Yes, I did.

19   Q.  Did you know that what you were doing was wrong?

20   A.  Yes, I did.

21   Q.  You said in your cross-examination that Dr. Lesniewski

22   treated you like every other doctor you have seen.  To be

23   clear, how many times did you see Dr. Lesniewski approximately?

24   A.  Somewhere, a dozen or more.

25   Q.  Other than giving you anti-inflammatories -- sorry.  You

1    talked about anti-inflammatories, and counsel asked you about

2    Celebrex.  Were those the same thing or different?

3    A.  I believe they are the same thing.

4    Q.  Other than giving you anti-inflammatories, was

5    Dr. Lesniewski doing anything for you at these visits?

6    A.  He showed me the exercises for my wrist.

7    Q.  Other than exercises for your wrist and

8    anti-inflammatories, was he doing anything to make your health

9    conditions better?

10   A.  That was it.

11   Q.  Have you been to other doctors in your life that acted in

12   that way, that simply were creating paper records and not

13   trying to make your health condition better?

14           MR. DURKIN:  Objection.

15           THE COURT:  Sustained.

16   Q.  Have you been to other doctors in your life who had you

17   just come back over and over again --

18           MR. DURKIN:  Objection.

19           THE COURT:  Sustained.

20   Q.  Have you been to other doctors who did what Dr. Lesniewski

21   did?

22   A.  I am not quite sure I understand that part.

23   Q.  Why did you go to him?

24   A.  I went mainly because he wrote narratives so that I would

25   be able to get an occupational disability.

D7inles7                              Gagliano - redirect

1    Q.  Have you been in any other doctors for the purpose of

2    getting a narrative for some benefit?

3            MR. DURKIN:  Objection.

4            THE COURT:  Overruled.

5    A.  No, sir, I have not.

6    Q.  When you went to Dr. Keefer for pain in your shoulder and

7    he gave you some injections, did he keep having you come back

8    every couple of months?

9    A.  No, he did not.

10   Q.  What did he say about when you should come back?

11   A.  He said if it acts up again we will take another look.

12   Otherwise, there was really no need to return.

13   Q.  Counsel asked you some questions about your vocational

14   report.  Do you remember that question that talked about

15   climbing poles --

16   A.  Yes.

17   Q.  -- and that type of thing.

18   A.  Yes.

19   Q.  As far as you know, did Dr. Lesniewski ever see your

20   vocational report?

21   A.  I don't really believe so.

22   Q.  When you went to Mr. Yule for assistance with disability,

23   what did you know about whether you could do your job?

24   A.  I could still do it.

25   Q.  What did you know you had to tell the RRB about whether you

D7inles7                         Gagliano - redirect

1    could do your job?

2              MR. DURKIN:  Objection.  Foundation.

3              THE COURT:  Rephrase the question.

4    Q.  What was your understanding about what you needed to tell

5    the RRB about whether you could do your job?

6    A.  I was to make it seem like I couldn't.

7    Q.  So when you went to Mr. Yule, did he think that you were

8    asking him to do everything appropriately and properly?

9    A.  I thought that's what he would be doing, yes.

10   Q.  When you say you thought that's what he would be doing, you

11   thought he would be putting what into your application

12   materials about whether you could do your job?

13   A.  Well, that I wouldn't be able to do it.

14   Q.  Was that true at the time?

15   A.  No, that was not.

16             MR. WEDDLE:  May I have a moment, your Honor?

17             THE COURT:  Yes.

18             (Pause)

19             MR. WEDDLE:  No further questions.

20             THE COURT:  Thank you.

21             Mr. Durkin?

22             MR. DURKIN:  May I be heard briefly, Judge.

23             THE COURT:  Yes.

24          (Continued on next page)

25

1              (At sidebar)

2              MR. DURKIN:  I think he just gave me the keyhole.

3    They asked him whether he ever went to any other doctors for

4    the same thing, to get other recommendations for these reviews.

5              MR. WEDDLE:  No, absolutely not.  I said did you go to

6    any other doctors to get a narrative.  That is certainly not

7    why he went to the independent medical exam at the RRB.

8              THE COURT:  I agree.

9              MR. DURKIN:  We will brief it later.  I disagree.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2     RECROSS EXAMINATION

3     BY MR. DURKIN:

4     Q.  Mr. Weddle asked you some questions about whether you knew

5     what you were doing was wrong at the time you were doing it or

6     words to that effect.

7          Do you remember that?

8     A.  Yes.

9     Q.  Do you remember telling us this morning that the one thing

10    you didn't do because you thought it was wrong was get the

11    private insurance?

12    A.  Yes, I recall that.

13    Q.  That was different, wasn't it?

14    A.  I saw it differently.  I don't know why.

15    Q.  You saw it differently because you know that getting an

16    occupational disability or an impairment is something that is

17    provided by law to railroad workers if they qualify, correct?

18    A.  Correct.

19    Q.  And you were willing to try to qualify, correct?

20    A.  Correct.

21    Q.  You had the sense that everybody was getting it, and that's

22    why you weren't too worried that it was going to happen.  You

23    were going to get it, correct?

24    A.  Correct.

25    Q.  But you've told us, and I don't want to go back into all of

1    it, that you had legitimate injuries or diagnoses, correct?

2    A.  Correct.

3    Q.  And whether or not you could do your job is what you are

4    saying now, correct?

5            MR. WEDDLE:  Objection, your Honor.

6            THE COURT:  Overruled.

7    Q.  You are saying now that you could do your job?

8    A.  Yes, I am.

9    Q.  But you never told Peter Lesniewski that you could do your

10   job, did you?

11   A.  I did not, no.

12   Q.  He did know that you were a signalman, correct?

13   A.  Yes, he did.

14   Q.  Mr. Weddle asked you about going to the doctor and getting

15   the injections and not ever going back to that doctor, right?

16   A.  Yes.

17           MR. WEDDLE:  Objection.  That's not what I asked him.

18           THE COURT:  Rephrase the question.

19   Q.  Mr. Weddle asked you about the doctor that you got the

20   injections from.

21           Do you remember that?

22   A.  Yes, I do.

23   Q.  He said that he didn't ask you to come back, correct?

24           MR. WEDDLE:  Objection.

25           THE COURT:  Sustained.

D7inles7                          Gagliano - recross

1   Q.  I'm sorry.

2           The reason that you didn't -- that doctor told you to

3   come back if you had a problem, correct?

4   A.  Yes, he did.

5   Q.  But in fact the cortisone worked, correct?

6   A.  It did.

7   Q.  But you turned down the cortisone from Dr. Lesniewski in

8   2006, didn't you?

9   A.  I did.

10  Q.  And you kept telling Dr. Lesniewski in 2006 that not only

11  did you have shoulder problems, but that you had back problems

12  and wrist problems, correct?

13  A.  On occasion, yes.

14           MR. DURKIN:  That is all I have.

15           THE COURT:  Thank you.  You are excused.  You may step

16  down.

17           (Witness excused)

18           THE COURT:  Mr. Weddle.

19           MR. WEDDLE:  Your Honor, I apologize for not doing

20  this when we were all up there.  There are a couple of things I

21  need to just mention to your Honor relating to the next

22  witness's testimony.  I am prepared to call our next witness.

23           THE COURT:  Call your next witness.

24           MR. WEDDLE:  The government calls Gary Supper.

25           THE COURT:  Counsel please approach.

D7inles7                          Gagliano - recross

1                (At sidebar)

2                MR. WEDDLE:  Your Honor, I just wanted to raise a few

3     things relating to this witness.  This witness tried drugs in

4     the '70s, marijuana and cocaine.  We moved to preclude

5     cross-examination on those issues, and we haven't gotten a

6     ruling from your Honor.  I am not sure if I should be eliciting

7     that on direct testimony or not.

8                If there is going to be cross-examination about that

9     kind of ancient drug use, then I would like to elicit it on

10    direct.

11               THE COURT:  Was it use or was it convictions.

12               MR. WEDDLE:  Use.

13               THE COURT:  All right.

14               MR. DURKIN:  I don't have any issue.

15               THE COURT:  If it is not convictions, it is not

16    pertinent especially if it's that old.

17               MR. WEDDLE:  I was going to elicit from this witness

18    the fact that in the midst of preparing to retire his wife

19    died.  I just wanted to mention that to your Honor.  It helps

20    him date certain events and documents in the case.  That's the

21    reason I'm eliciting it.

22               THE COURT:  Does he not remember whatever it is?

23               MR. WEDDLE:  There is an undated document and he knows

24    it happened, he wrote it shortly after list wife died.  He

25    knows for sure the date his wife died.

D7inles7                            Gagliano - recross

1              MR. RYAN:  He wants to use it as a frame of reference.

2              THE COURT:  The question is whether he could use some

3      other frame of reference.

4              MR. WEDDLE:  Your Honor, his credibility I take it is

5      going to be attacked by defense counsel.  I think it's highly

6      probative on this.

7              THE COURT:  Let him make an attempt to remember.  If

8      he doesn't remember, you can try to refresh his recollection by

9      whatever means.

10             MR. WEDDLE:  Your Honor, if he's just saying I know

11     that this document is created in I think it's November I can't

12     remember the year, and the jury is just being asked to just

13     rely on this recall of this one event, they are going to be

14     confused.

15             THE COURT:  I am saying you can ask him if something

16     might refresh his recollection and it can remind him.

17             MR. WEDDLE:  He does remember.  But the reason he

18     remembers is probative of why he remembers and that he's just

19     not making it up, your Honor.

20             THE COURT:  Understood.

21             Anything else?

22             MR. WEDDLE:  The third thing is, your Honor, he was

23     sent for two medical exams.  One was not related to the

24     continuing disability reviews that we have been talking about

25     at length.  The second one was.  So I plan to elicit testimony

D7inles7                        Gagliano - recross

1   relating to the first one, but not the second one.  I just

2   didn't want to spring that on your Honor without realizing that

3   I'm not opening the door on the second one.  I am just going to

4   talk about the first one.

5           THE COURT:  All right.

6           MR. DURKIN:  OK.

7           THE COURT:  OK.

8           MR. DURKIN:  I am not agreeing.

9           THE COURT:  Understood.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7inles7                          Gagliano - recross

1                  (In open court)

2                  THE COURT:  Swear in the witness.

3         GARY P. SUPPER,

4              called as a witness by the Government,

5              having been duly sworn, testified as follows:

6         DIRECT EXAMINATION

7         BY MR. WEDDLE:

8                  THE COURT:  Mr. Weddle, how long do you think you will

9         be?

10                 MR. WEDDLE:  Your Honor, I have a binder of exhibits

11        for the witness that we plan to talk about, and for your Honor.

12                 THE COURT:  What is your estimated direct, the time?

13                 MR. WEDDLE:  I think about two hours, your Honor.

14                 THE COURT:  Let's see if we can conclude it before 6,

15        if possible.

16                 MR. WEDDLE:  I will do my best, your Honor.

17                 I apologize, your Honor.  We are moving more quickly

18        than I had thought, so I didn't have a chance to create a list

19        of exhibits to offer at the start of this, but I think it

20        should go smoothly nevertheless.

21                 THE COURT:  All right.

22        BY MR. WEDDLE:

23        Q.  Mr. Supper, how old are you?

24        A.  I am 58 years old.

25        Q.  What town do you live in?

D7inles7                          Supper - direct

1   A.  I live in Glen Head New York.

2   Q.  How far did you go in school, sir?

3   A.  I went to high school and then I went to two years of

4   college.

5   Q.  Where did you go to work after school?

6   A.  I went to Morgan Guaranty Trust right down the street on

7   Wall Street, and then in 1974 I went to the railroad.

8   Q.  The Long Island Rail Road?

9   A.  The Long Island Rail Road, yes, sir.

10  Q.  Do you have any family members who are also railroaders?

11  A.  Yes, I do.

12  Q.  Who are they?

13  A.  I have a great uncle that was a locomotive engineer, Walter

14  Miller.  I have a grandfather that was a police officer, I have

15  a father that was a locomotive engineer, I have a brother that

16  was a locomotive engineer, and I have a son right now in the

17  M&E department.

18  Q.  How long did you work for the Long Island Rail Road?

19  A.  32 and a half years.

20  Q.  And after 32 and a half years, what did you do?

21  A.  I retired.

22  Q.  How old were you when you retired?

23  A.  52.

24  Q.  What was your job at the Long Island Rail Road?

25  A.  I was a locomotive engineer.

D7inles7                          Supper - direct

1    Q.  So at what age and number of years of service did you

2    become eligible to retire with a Long Island Rail Road pension?

3    A.  At the age of 50 years and 25 years' service, or 20 years'

4    service.

5    Q.  When you turned 50, you had more than 25 years of service,

6    right?

7    A.  That's correct.  I had 30 years.

8    Q.  So you retired about how long after you first became

9    eligible to retire?

10   A.  About two and a half years later.

11   Q.  Why did you retire when you retired?

12   A.  Why?  There was a point that -- there was a point I was --

13   we were working for hardly anything, meaning that if you stayed

14   home and you got your pension and you also got a disability

15   pension you would be making almost the same amount of money as

16   working.

17   Q.  So financially it made sense if you retired with a

18   disability?

19   A.  Yes, it did.

20   Q.  What if you had not been able to get a disability?

21         Would it have made financial sense for you to retire

22   with us just your Long Island Rail Road pension?

23   A.  No.

24   Q.  The pension came from what organization?

25   A.  Railroad Retirement Board.

D7inles7                          Supper - direct

1    Q.  I'm sorry.  The retirement pension that you were eligible

2    at age 50, that came from where?

3    A.  That came from the MTA.

4    Q.  And the disability that we are talking about, that came

5    from where?

6    A.  That came from Railroad Retirement.

7    Q.  How did you know about the finances of retiring and getting

8    disability?

9    A.  Just it was the culture of how everybody --

10             MR. RYAN:  Objection.

11             THE COURT:  Rephrase the question.

12   Q.  Sir, your understanding about the finances of retirement,

13   you mentioned that the finances were that you really made about

14   the same amount of money if you got occupational disability and

15   retired as you would if you were working.

16   A.  Not the same, but almost the same.

17   Q.  Almost.  Where did you get that understanding from?

18   A.  I got that understanding from other employees that I worked

19   with, other crew members.

20   Q.  What kind of disability did you plan to get?

21   A.  An occupational disability.

22   Q.  What does occupational disability mean to you?

23   A.  It means to me that you can no longer perform your duties

24   as an engineer, a locomotive engineer.

25   Q.  At the time that you retired, were you unable to perform

1   your job duties as a locomotive engineer?

2   A.  No, I was not.

3   Q.  What materials had to be submitted to the United States

4   Railroad Retirement Board in order to get occupational

5   disability benefits?

6   A.  A form had to be filled out and submitted to the Railroad

7   Retirement Board, and you needed a narrative from an orthopedic

8   surgeon or a doctor.

9   Q.  And those materials together were designed to convince the

10  Railroad Retirement Board that you were what?

11  A.  That I was unable to perform my duties.

12  Q.  Was that true at the time that you submitted the documents

13  to the Railroad Retirement Board?

14  A.  No, it was not.

15  Q.  Were the documents that you submitted to the Railroad

16  Retirement Board truthful about your medical conditions?

17  A.  No, they were not.

18  Q.  Were they truthful about your physical ability to do your

19  job at the railroad?

20  A.  No, they were not.

21  Q.  You knew that those materials were false at the time?

22  A.  Yes, I did.

23          MR. DURKIN:  Object to the leading, Judge.

24          THE COURT:  Sustained.

25  Q.  Who, if anyone, helped you to prepare these false documents

D7inles7                         Supper - direct

1   for submission to the Railroad Retirement Board?

2   A.  I had a gentleman named Fred Kreuder helped me with the

3   form to fill out to submit to the Railroad Retirement Board.

4   Q.  Did anyone else help you?

5   A.  No.

6   Q.  What about with respect to the medical information?

7   A.  Well, yeah, that was Dr. Lesniewski.

8   Q.  Do you see the Dr. Lesniewski who helped you with this

9   false application material in the courtroom today?

10         MR. DURKIN:  Again, we will stipulate that he can

11  identify Dr. Lesniewski.

12         THE COURT:  Answer the question.

13  A.  Yes, I do.

14         THE COURT:  It's been stipulated.  The Court notes

15  that the witness has identified Dr. Lesniewski.

16         MR. WEDDLE:  Thank you, your Honor.

17  Q.  With Dr. Lesniewski's help, did you in fact get

18  occupational disability benefits from the RRB?

19         MR. DURKIN:  Object to the form of the question.

20         THE COURT:  Rephrase the question.

21  Q.  Based on the medical materials and the other application

22  materials that you have just described as false, did you in

23  fact get disability benefits from the RRB?

24  A.  Yes, I did.

25  Q.  About how much money did you get a year from the RRB in

D7inles7                          Supper - direct

1   disability benefits?

2   A.  Approximately $43,000.

3   Q.  Did you get in any trouble for submitted these fraudulent

4   documents to the RRB?

5   A.  Did I get in any trouble?

6   Q.  Yes.  Did you get in any trouble for submitting these

7   fraudulent documents to the RRB?

8   A.  Well, last year I was notified to come down, and I was

9   subpoenaed to testify, that I was being indicted.

10  Q.  Were you, in fact, indicted?

11  A.  Yes, I was.

12  Q.  And what crimes were you charged with?  In general terms

13  what is your understanding what crimes you were charged with?

14  A.  Fraud, I guess.  A bunch of other things.  I can't remember

15  now.

16  Q.  Then how did you resolve the charges against you?

17  A.  I surrendered and I pleaded guilty.

18  Q.  Do you remember what you pled guilty to?

19  A.  The ones that were in the document.

20  Q.  Before you pled guilty, did you enter into a cooperation

21  agreement with the government?

22  A.  Yes, I did.

23  Q.  Was the agreement oral or written down?

24  A.  It was written.

25          MR. WEDDLE:  Your Honor, at this time we would offer

D7inles7                          Supper - direct

1    Government Exhibit 3507-05.

2              THE COURT:  Any objection?

3              MR. DURKIN:  No.

4              THE COURT:  None, it is received.

5              (Government's Exhibit 3507-05 received in evidence)

6    Q.  Sir, you have a binder in front of you.

7    A.  Yes, sir.

8    Q.  That should have copies of a number of exhibits we are

9    going to be talking about today.  There is an exhibit on the

10   screen, but it should be the first one in your binder as well.

11             3507-05, do you see it?

12   A.  Yes, I see it.

13   Q.  What is 3507-05?

14   A.  It looks like it is a letter from the department of justice

15   to Charles Kelton, my lawyer, in Kew Gardens.

16   Q.  Did you sign the last page of this?

17   A.  Yes, I did.

18   Q.  Is this your cooperation agreement with the government?

19   A.  That's correct.

20             MR. WEDDLE:  May I have a moment, your Honor.

21             THE COURT:  Yes.

22             MR. WEDDLE:  I apologize, as I said, since we are

23   moving a little more quickly.

24   Q.  Does this document contain all of the terms and conditions

25   of your agreement with the government?

D7inles7                          Supper - direct

1    A.  Yes, it does.

2    Q.  Sir, what are you supposed to do under your cooperation

3    agreement?

4    A.  I'm supposed to be honest and truthful in any questions

5    that were asked me today.

6    Q.  Before you signed the cooperation agreement, did you meet

7    with the government?

8    A.  Yes, I did.

9    Q.  About how many times?

10   A.  Three or four times.

11   Q.  What about after you pled guilty?  Did you also meet with

12   the government?

13   A.  A few times, yes, sir.

14   Q.  What happened during those meetings with the government?

15   A.  They were just asking me questions on how I went about

16   getting the disability.

17   Q.  And you answered them?

18   A.  I did.

19        MR. WEDDLE:  We are done with that exhibit,

20   Ms. Larson.

21   Q.  If you do everything that you are supposed to do under the

22   agreement, what is your understanding about what the government

23   is supposed to do for you?

24   A.  Well, there were no promises.  But, like I said before, if

25   I was truthful and honest in my testimony, that a 5K letter

D7inles7                           Supper - direct

1    would be submitted to the judge.

2    Q.  What is your understanding about what the government writes

3    in what you call a 5K letter, if it writes it?

4    A.  Excuse me.  Can you repeat the question, please.

5    Q.  What is your understanding about what the government would

6    write in such a letter, if it writes one?

7    A.  Just that I was honest and truthful in my testimony.

8    That's my understanding.

9    Q.  Would the letter also describe your criminal conduct?

10   A.  Beg your pardon?

11   Q.  Do you also expect that the letter is also going to

12   describe your criminal conduct as well?

13   A.  I would think so.

14   Q.  If the government writes that letter, what's your

15   understanding about how high your sentence could still be?

16   A.  I'm not sure about that.  That is up to the government.

17   That's up to --

18   Q.  Well, when you pled guilty to crimes, you understood that

19   they had a maximum punishment?

20   A.  Right, correct.

21   Q.  Do you have an estimate of how high the maximum punishment

22   is?

23   A.  I think it was 60 years, I think.

24   Q.  What is your understanding about how low your sentence

25   could be?

1    A.  I am not sure, that I wouldn't go to jail I hope.

2    Q.  There could be no time in prison?

3    A.  No time in prison, correct.

4    Q.  What's your understanding about who is going to decide your

5    sentence?

6    A.  I guess the judge.

7    Q.  As you sit here today, has the government promised you that

8    it is for sure going to send this letter that you described?

9    A.  They have not promised me anything, no.

10   Q.  Has anyone promised you that you will for sure get a

11   reduced sentence?

12   A.  No, they have not.

13   Q.  As far as you understand it, is the government going to

14   recommend a specific sentence to the judge?

15   A.  I am not sure of that, but I hope so.

16   Q.  What is your understanding about whether your testimony has

17   to result in a conviction in order for you to get a letter from

18   the government?

19   A.  I have no bearing on that.  I am just here to tell the

20   truth.  That is all.

21   Q.  Regardless of what sentence you get in terms of prison,

22   what have you agreed in your agreement regarding the money that

23   you got for disability?

24   A.  I was agreed to pay back the money that was given to me

25   over the past six years.

D7inles7                              Supper - direct

1    Q.  About how much money?

2    A.  About $230,000.

3    Q.  Let's go back and talk in some more detail about how you

4    retired and obtained disability benefits.  As you approached

5    age 50, did you start to consider retiring?

6    A.  Yes, I did.

7    Q.  Take a look in your binder at Government Exhibit 1152.

8    A.  Yes, sir.

9               MR. WEDDLE:  And, your Honor, I would offer 1152.  I

10   am just showing it to counsel.

11              MR. DURKIN:  That is fine, no objection.

12              MR. WEDDLE:  Judge, if we could take like 30 seconds

13   to get these in order, I think we can save about ten minutes.

14              THE COURT:  All right.  Mr. Weddle.

15              MR. WEDDLE:  I apologize.  We had them in number

16   order, not in the order they were going to come up.

17              THE COURT:  See if you can put them in order.

18              MR. DURKIN:  This isn't going to save us any more

19   time, so we will make due.

20              MR. WEDDLE:  Sorry, your Honor.

21              So 1152, has that been admitted, your Honor.

22              THE COURT:  Yes.

23              (Government's Exhibit 1152 received in evidence)

24              MR. WEDDLE:  Display that on the screen.

25   Q.  1152 consists of a number of documents.  Is that right,

D7inles7                        Supper - direct

1    sir?

2    A.  Yes, sir.

3    Q.  They are all what?

4    A.  It is an application for a pension estimate on how much I

5    would receive if I retired.

6    Q.  There were different pension estimates that were obtained

7    by you over time, right?

8    A.  That's correct.

9    Q.  The different pension estimates ask for different

10   retirement dates, right?

11   A.  That's correct.

12   Q.  So the first page asks for a pension estimate relating to a

13   retirement of November 1, 2004, right?

14   A.  Yes, sir.

15   Q.  That would have been after how many years of -- I mean how

16   old would you have been at that point?

17   A.  I would have been 50 years of age and four months.

18   Q.  And the next one asks for a pension estimate, which is the

19   next -- I guess two pages later.  That's for a pension estimate

20   with what retirement date?

21   A.  December 1, 2005.

22   Q.  So that would have been at 51 years old?

23   A.  Yes, sir.

24   Q.  When did you submit this application for a pension

25   estimate?

D7inles7                        Supper - direct

1   A.  Is there a date on here.  I am not sure.

2   Q.  I have it here on the screen, but it's probably --

3   two-thirds of the way down the page.  I'm sorry.  Are you

4   looking?

5   A.  12/24/04 it looks like.  12/22.  I got it.

6   Q.  That is your signature there?

7   A.  Yes, sir, it is.

8   Q.  Then the last one that you submitted relates to a

9   retirement date of what?

10  A.  November 1, 2006.

11  Q.  Do you see that there is a stamp on the top right of this

12  page?

13  A.  Yes, February 2, 2006.

14  Q.  So that's about when you asked for this estimate?

15  A.  Yes, sir.

16  Q.  When did you end up retiring?

17  A.  December 1, 2006.

18  Q.  Why were you thinking of retiring late in the year as

19  opposed to right at your birthday?

20  A.  I wanted to make sure my Railroad Retirement was all paid

21  up, meaning that you had to pay up so much for the year.

22  That's why I did that.

23  Q.  When you say your Railroad Retirement, you are talking

24  about taxes?

25  A.  Yeah.

D7inles7                              Supper - direct

1   Q.  And your birthday was in what month?

2   A.  It is August 1.

3   Q.  Before you retired, sir --

4           MR. WEDDLE:  We don't need that anymore.  Thank you.

5   Q.  -- about how much money were you making working at the

6   railroad?

7   A.  Approximately $160,000.

8   Q.  Was that overtime, salary, or a combination?

9   A.  It was overtime, salary, it was penalty claims that we had

10  received as a locomotive engineer.

11  Q.  Can you explain what penalty claims are to the jury.

12  A.  The locomotive engineers have an agreement with the

13  railroad itself about different penalties that you would be

14  paid if you operated different equipment, if you went outside

15  of your assignment, if you worked within 22 and a half hours of

16  a prior day, those things like that there.

17  Q.  So you would get extra money if those things occurred?

18  A.  Yes, sir.

19  Q.  About how much overtime did you work in the couple of years

20  before you retired?

21  A.  A lot.

22  Q.  Let's take a look at Government Exhibit 1153.

23  A.  All right.

24          MR. WEDDLE:  We offer 1153, your Honor.

25          THE COURT:  All right.

D7inles7                            Supper - direct

1                MR. WEDDLE:  Can we display that, Ms. Larson.

2                Thank you.

3                (Government's Exhibit 1153 received in evidence)

4     Q.  The first page shows -- it is kind of a little hard to

5     read, but it shows the yearly total for 2005, right?

6     A.  Yes, sir.

7     Q.  And do you see where it says overtime total on the bottom

8     right?

9     A.  Yes, I see it.

10    Q.  Do you see the number next to that is 94015?  Do you see

11    that?

12    A.  Right.

13    Q.  What does that mean in terms of how many hours you worked?

14    A.  I'm not sure at all.

15    Q.  I take it it doesn't mean you worked 94,000 hours?

16    A.  No.

17    Q.  You think it might be 940 hours of overtime?

18    A.  I'm not sure about this.

19    Q.  Then you see the amount of money that you received for

20    overtime for this year?

21    A.  That's correct.

22    Q.  And it's about $42,000?

23    A.  That's correct.

24    Q.  The next page shows at the bottom a yearly total for 2006,

25    right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  Yes, it does.

2   Q.  That again shows the overtime total, 66543?

3   A.  Yes.

4   Q.  And about 31,000, right?

5   A.  That's correct.

6   Q.  Why did you work all of these overtime hours?

7   A.  Why?  Because I wanted to build up my pension as best I

8   could.

9   Q.  Can you explain what you mean.

10  A.  Well, the pension is based on the prior five years of your

11  earnings, so the last 60 months.  So that's the last four or

12  five years.

13  Q.  When it's based on earnings, that would be salary and

14  overtime and the penalty pay that you are talking about?

15  A.  That's correct.

16  Q.  As you were approaching retirement what were you trying to

17  do in terms of overtime and penalty pay and everything else?

18  A.  I was trying to build it up.

19  Q.  How did the work that you did for overtime compare with the

20  work that you did for normal hours?

21  A.  I was a hard worker.  I used to go to work at midnight and

22  I used to get done at 11 o'clock in the morning a lot of times,

23  and then my days off I would maybe work my day off also.  It's

24  called a relief day, and I would work one of those.

25  Q.  Was overtime optional?

1   A.  Yes, it was.

2   Q.  How were your assignments as an engineer chosen or

3   assigned?

4   A.  Well, I was in the top ten on the roster, and the last

5   three years I was very high up, so I had a lot of seniority.

6   So I worked jobs that made the most overtime.

7   Q.  So let me break that down a little bit.  What does it mean

8   to be top ten on the roster?  What are you talking about?

9   A.  There's over 450 engineers.  When I retired I was number

10  ten as an engineer.

11  Q.  Based on that seniority, you were able to do what with

12  respect to your assignments?

13  A.  Work whatever job I wanted to.

14  Q.  What kinds of jobs did you pick?

15  A.  I picked the ones that made the most money and the ones

16  with the most penalty claims.

17  Q.  Were you trying to pick or avoid jobs that were physically

18  more demanding or less demanding or anything like that?

19  A.  No.  I was -- I worked.  It was physical, you know.  What I

20  did was very physical.

21  Q.  Some of the jobs that you decided to pick as opposed to

22  other jobs were the more physical ones?  Is that what you are

23  saying?

24  A.  Yes, they were.

25  Q.  And you picked those ones because of what?

D7inles7                                Supper - direct

1    A.  Because they had a chance of making overtime or a chance of

2    getting some penalties.

3    Q.  So which specific jobs did you tend to pick as you were

4    leading up toward retirement?

5    A.  The last few years was on the extra list.  I used to work

6    out roustabout out of Jamaica.  I used to work at 12:01 a.m.

7    and we would go all around the island to try to pick up

8    equipment that no longer could be used in service.

9            And we went to work at 12:01, and I went from

10   different -- from Jamaica to Far Rockaway, to Babylon, to

11   Speonk, to all different locations.  I also worked the change

12   of engines, where I had to pick up engines and trains that had

13   broken down, and that was, the hours, I would work midnights a

14   lot of times also.

15   Q.  With your seniority, you could have picked one of the

16   easiest engineer jobs, right?

17   A.  I could have, yes.

18   Q.  What would a job like that have been like?

19   A.  Well, I would have worked out of Port Washington or Oyster

20   Bay or protect crew.

21   Q.  And doing what?

22   A.  Just operating trains, you know, from point A to point B,

23   maybe three or four trains a day, or sometimes it's lot of

24   trains a day.

25   Q.  At this time period, let's say when you were right around

D7inles7                          Supper - direct

1   49, 50, 51, the process of retiring with a disability, what did

2   you understand that process to entail?

3   A.   I guess the process was just to go and get some paperwork

4   done and get some tests done on myself to see if I was disabled

5   to work or not.

6   Q.   When you say to see if you were disabled to work, were you

7   able to work?

8   A.   Yes, I was.

9   Q.   Did you need to go find out from someone else whether you

10  were able to work?

11              MR. DURKIN:   Object to the leading.

12              THE COURT:   Sustained.

13  Q.   In terms of the process of retiring with a disability --

14  let me ask the question.

15  A.   I got you.

16  Q.   In terms of the process of retiring with a disability, were

17  you going to see people in order to see if you were disabled?

18  A.   It would be easy to get the disability --

19              MR. DURKIN:   Same objection.

20              THE COURT:   Overruled.   You may answer.

21  A.   It would be easy to get the disability if you had a

22  doctor's narrative with the form that you had to fill out.

23  Q.   Did you also understand that it was part of the process to

24  get private disability insurance?

25  A.   Yes, I did.

1    Q.  What is private disability insurance?

2    A.  It's insurance that was being sold on the railroad by

3    Aflac.

4    Q.  What does this insurance do for you?

5    A.  It pays you an amount for a couple of years if you are

6    disabled.

7              MR. WEDDLE:  At this point, your Honor, we would offer

8    Government Exhibit 1150.

9              MR. DURKIN:  No objection.

10             THE COURT:  It is admitted without objection.

11             (Government's Exhibit 1150 received in evidence)

12             MR. WEDDLE:  Can we put that on the screen.

13   Q.  Actually, let's just take a look at page 4 of this

14   document.  You signed this, right, sir?

15   A.  Yes, sir.

16   Q.  This is an application for what?

17   A.  It is an application for Aflac short-term disability income

18   insurance.

19             MR. WEDDLE:  Can we go to the first page, Ms. Larson

20   and blow up the bottom half.

21   Q.  See you see here this is applying for disability benefits

22   for 24 months?  Do you see that?

23   A.  Yes, sir.

24   Q.  And then there is a premium that you have to pay to the

25   insurance company.  Do you see that?

D7inles7                          Supper - direct

1    A.  Yes.  Yes, sir.

2    Q.  At the time you applied for this disability insurance, what

3    was your plan in terms of when you would retire?

4    A.  I wasn't sure when I was going to retire at that point.

5    Q.  At the time you applied for this insurance, what was your

6    plan in terms of whether you would claim to be disabled when

7    you ultimately retired?

8    A.  Yes, I would be disabled when I retired.  That's correct.

9            MR. WEDDLE:  We are done with that.  Thank you,

10   Ms. Larson.

11   Q.  You said earlier that part of the process, as you

12   understood it, was to go get some tests or medical?

13   A.  Yes, correct.

14   Q.  Why did people start going to the doctor before retiring?

15   A.  I guess to --

16           MR. DURKIN:  Objection.

17           THE COURT:  Sustained.

18   Q.  Do you have an understanding of why people at the Long

19   Island Rail Road generally went to a doctor in preparation for

20   retiring?

21           MR. DURKIN:  The same objection.

22           THE COURT:  You may testify to your impression or

23   understanding, not to anything that you are hearing from other

24   people or statements attributable to other people, just your

25   understanding, your impressions.

344

1   A.  My impressions were if you went to a doctor for like a

2   paper trail it would help with the disability.

3   Q.  At the time, that is, in the lead-up to when you retired,

4   were there certain doctors that you had heard of as doctors to

5   go to for help with creating this paper trail?

6   A.  Yes, I did.

7            MR. DURKIN:  Objection.

8            THE COURT:  Overruled.

9   Q.  What were the names that you had heard of?

10  A.  Dr. Parisi, Dr. Ajemian, and Dr. Lesniewski.

11  Q.  So, as you were considering retiring, what, if anything,

12  did you do to prepare for getting disability benefits?

13  A.  I went to Dr. Lesniewski.

14  Q.  Of the three, why did you go to Dr. Lesniewski?

15  A.  Well, living on the North Shore in Glen Head, I heard that

16  Dr. Lesniewski was over in East Meadow.

17  Q.  So he was closest to where you lived?

18  A.  He was closest to where I lived, yes.

19  Q.  Did you know other Long Island Rail Road employees who had

20  gone to Dr. Lesniewski?

21  A.  Yes, I did.

22  Q.  Why did those people go to Dr. Lesniewski as you understand

23  it?

24            MR. DURKIN:  Objection.

25            THE COURT:  Sustained.

D7inles7                          Supper - direct

1   Q.  Those people you knew who had gone to Dr. Lesniewski before

2   you, did they end up getting disability.

3              MR. DURKIN:  Objection.

4              THE COURT:  Sustained.

5   Q.  Did you discuss with these other people who had gone to

6   Dr. Lesniewski --

7              MR. DURKIN:  Same objection.

8              THE COURT:  Sustained.

9              MR. WEDDLE:  Your Honor, I think I'm not offering this

10  for an 801 purpose.  This goes to this witness's understanding.

11             THE COURT:  Understanding of what?

12             MR. WEDDLE:  I don't want to say too much in front of

13  the jury, your Honor, but it relates to his understanding of

14  the situation and the reasons that he was doing it.

15             MR. DURKIN:  Objection based on --

16             THE COURT:  Sustained.  You can find some other way to

17  rephrase the question.

18  Q.  When did you first go to Dr. Lesniewski, sir?

19  A.  A year and a half maybe before I retired.

20  Q.  So on the first day you went to him, were you still working

21  on the railroad and working overtime?

22  A.  Yes, I was.

23  Q.  When did you plan to claim to be disabled and unable to do

24  your job when you first went to him?

25  A.  I wasn't quite sure at that point.

D7inles7                        Supper - direct

1   Q.  What were you thinking in terms of the likely --

2   A.  Maybe a year or two down the line.

3           MR. WEDDLE:  At this point I would like you to turn to

4   Government Exhibit 303-B like boy in your binder.

5           The government offers 303-B.

6           MR. DURKIN:  No objection.

7           THE COURT:  Admitted without objection.

8           (Government's Exhibit 303-B received in evidence)

9   Q.  Sir, the handwriting on this piece of paper, whose is it?

10  A.  It's my own.

11  Q.  You signed it?

12  A.  Yes, sir, that's correct.

13  Q.  What's the date?

14  A.  November 15, 2005.

15  Q.  What is this document?

16  A.  It looks like it's a questionnaire you get when you first

17  visit the doctor's office?

18  Q.  And I don't know if you can see, but --

19          MR. WEDDLE:  Actually, Ms. Larson, would you just blow

20  up the printed part above the signature.

21  Q.  This relates to, the thing that you are signing here

22  relates to Dr. Lesniewski, Dr. Meyer and Dr. Yerys, right?

23  A.  That's correct.

24          MR. WEDDLE:  Thank you, Ms. Larson.

25  Q.  On here you say what your occupation is?

D7inles7                        Supper – direct

1   A.  Locomotive engineer, correct.

2   Q.  Do you see in the top right it says "referred by"?

3           What did you write in there.

4   A.  I don't see.  Where is that?  Referred by Long Island Rail

5   Road, BLE, Brotherhood of Locomotive Engineers.

6   Q.  What is that?

7   A.  That is the union I was affiliated with.

8   Q.  Did anyone in particular refer you to Dr. Lesniewski?

9   A.  No.

10  Q.  It says locomotive engineer, but does it say anywhere in

11  here what that job entails?

12  A.  No, it does not.

13  Q.  Then if you turn to page 4 of this form, do you see there

14  is a section called "Orthopedic Problems."

15          MR. WEDDLE:  Can we pull that up, please, Ms. Larson.

16  Q.  It says, "Orthopedic problems.  Check all areas with which

17  you have had problems."

18          Do you see that?

19  A.  Page 4?  That's page 3 you mean?

20  Q.  I'm sorry.  It is printed at the bottom page 3.  It's the

21  fourth page of this exhibit.

22  A.  OK.

23  Q.  Sorry about that.

24  A.  I see it.

25  Q.  You made those checkmarks?

D7inles7                          Supper - direct

1   A.  I did.

2   Q.  Had you had any problems with your shoulder, arm, hand,

3   ankle or foot?

4   A.  I had problems with my shoulder, my ankle, and in the past

5   my foot.

6   Q.  Did any of those problems interfere with your work at that

7   time?

8   A.  No, it did not.

9   Q.  What do you recall about your first visit with

10  Dr. Lesniewski?

11  A.  Just meeting him and speaking with him, telling him that I

12  may be looking to take my pension in a few years.

13  Q.  How clearly do you remember what you said to him at your

14  first visit?

15  A.  I can't remember that much, my first meeting with him too

16  much.

17          MR. WEDDLE:  We're done with this exhibit.

18  Q.  And about how frequently did you see Dr. Lesniewski in the

19  year after you first went to see him?

20  A.  Every few months, maybe.

21  Q.  During your visits to Dr. Lesniewski during that period of

22  time, what did he do?

23  A.  He examined me and asked me how I was feeling.

24  Q.  Did he sometimes order tests?

25  A.  Yes, he did.

1    Q.  Why were you going to him for these repeated visits?

2    A.  I felt I needed, you know, to have a paper trail to make

3    sure that if I put in for disability I would receive it.

4    Q.  Who decided how frequently you should come see

5    Dr. Lesniewski?

6    A.  The office did.  He did I guess.

7    Q.  Explain what you mean.

8    A.  Can you repeat the question, please.

9    Q.  Please explain what you mean.  When you said, "The office

10   did, he did I guess," please explain?

11   A.  He would write down to me when he would want to see me

12   then, and I would give it to the front desk and they would set

13   up an appointment for me within a couple months.

14   Q.  Who paid for these visits to Dr. Lesniewski and the tests?

15   A.  I did.

16   Q.  Did you have any medical insurance at the time?

17   A.  Yes, I did.

18   Q.  Did medical insurance also pay for part of it?

19   A.  Yes, they did.

20   Q.  What was your health insurance plan or company at the time?

21   A.  It was Empire.

22   Q.  Did there come a time in your visits to Dr. Lesniewski when

23   you decided for sure when you were going to retire?

24   A.  Yes.  At --

25   Q.  Sorry.  About what part of the year did that happen?

D7inles7                          Supper - direct

1   A.  The end of 2006, September, October, somewhere around

2   there.

3   Q.  What was your planned retirement date?

4   A.  December 1.

5   Q.  What was your plan in terms of when you were going to stop

6   working for a December 1 retirement?

7   A.  November 21 or 22.  I worked up to the last day I could

8   possibly work.

9   Q.  As you neared November 21, what did you think in terms of

10  whether the paper trail that was being created was enough?

11  A.  I thought it was enough.

12  Q.  Do you recall -- actually, if you would just take a look at

13  Government Exhibit 303-A.  Do you see that?

14  A.  Yes, sir.

15  Q.  What is 303-A?

16  A.  It is a letter that I had written to Dr. Lesniewski.

17  Q.  Whose handwriting is it?

18  A.  It is my handwriting.

19          MR. WEDDLE:  The government offers Government Exhibit

20  303-A.

21          THE COURT:  Mr. Durkin?

22          Admitted without objection.

23          MR. DURKIN:  I'm sorry, no.

24          THE COURT:  Are you objecting?

25          MR. DURKIN:  No.

1          THE COURT:  All right.  So admitted without objection.

2          (Government's Exhibit 303-A received in evidence)

3          THE COURT:  You may publish it.

4          MR. WEDDLE:  Ms. Larson, put that up on the screen.

5   Q.  Sir, there is no date on this document, right?

6   A.  No, there is not.

7   Q.  Approximately when in terms of a date, sir, did you write

8   this document?

9   A.  November 20, somewhere around there maybe.

10  Q.  And could you read it to the jury?

11  A.  It says, "Dear Dr. Lew.

12          "Want permanent disability.  Please do tests for my

13  back, knees, ankle, MRI, EMG, NVC, NCS tests.

14          "After I stop working please document symptoms why I

15  cannot perform duties so I need something wrong besides

16  shoulder.  Once I get shoulder fixed, Railroad Retirement may

17  withdraw disability benefits.  I need tests, MRIs, by December

18  10 or ASAP if I cannot get it before December 1.

19          "It does not give time for a narrative.  I need full

20  synopsis of this treatment on me and tests through final

21  diagnosis of all my problems."

22  Q.  Why did you write this note?

23  A.  I wrote this note because I felt that my shoulder would not

24  be positive that I would get the disability.

25  Q.  And you wanted the disability?

1    A.  Yes, sir.

2    Q.  I'm sorry.  Let me just ask you another question.  Do you

3    see there's some writing in the top right-hand corner of this

4    document?

5    A.  Yes, sir.

6    Q.  Is that your writing?

7    A.  No, it's not.

8    Q.  Do you know who wrote that?

9    A.  No, I do not.

10   Q.  What did you say in the first line -- it says "Dr. Lew."Who

11   is that referring to?

12   A.  Dr. Lesniewski.

13   Q.  What does it mean when you say "Want perm." underlined

14   "disability"?

15   A.  I just want to make sure I get the permanent disability.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1   Q.  Do you see at the bottom it says, "I need test, MRIs by

2   December 10 or ASAP."

3           MR. WEDDLE:  Actually, can we blow the bottom third of

4   this up, Ms. Larson.

5   Q.  "If I can get this done before December 1st."

6           Is that what that says?

7   A.  If I can get this done before December 1st, right, it says

8   that.

9   Q.  What was important about December 10th and December 1st?

10  A.  Well, I wanted to bring the application to the Railroad

11  Retirement Board because there was a big backlog, and if you

12  waited past the beginning of the year you would have to wait

13  maybe four/five months sometimes to get an appointment with

14  them.

15  Q.  And what was your retirement date?

16  A.  December 1st.

17          MR. WEDDLE:  Can we look at the whole page again,

18  Ms. Larson.

19  Q.  And so up until this point what were you primarily saying

20  to Dr. Lesniewski in terms of where you might have some pain or

21  aches?

22          MR. DURKIN:  Objection.  It speaks for itself.

23          THE COURT:  Please rephrase the question.

24  Q.  Prior to sitting down and writing this letter, you had been

25  to Dr. Lesniewski a number of times?

1    A.  Yes, sir.

2    Q.  And when you went to him, what did you typically tell him

3    were parts of your, if anything --

4    A.  I had told him my shoulder was giving me problems when I

5    had to climb up and down on the equipment and go underneath in

6    between the trains and drop like hoses and the like.

7    Q.  When you say it was giving you problems, it hurt?

8    A.  It hurt.

9    Q.  And did it prevent you from doing your job?

10   A.  No, it did not.

11   Q.  Did you tell Dr. Lesniewski about your shoulder hurting

12   prevented you from doing your job?

13   A.  No, I didn't tell him that.

14   Q.  Here you're asking him to document what?

15   A.  I just wanted some tests done to make sure I got the

16   disability besides the shoulder.

17   Q.  So what were you asking him besides the shoulder to

18   document symptoms of?

19   A.  Of back, knees and ankle.

20   Q.  Why did you take the trouble of writing a note rather than

21   just telling him?

22   A.  I had lost my wife two weeks prior to that, and I just

23   wrote the note.  I don't know why I did it but I did.

24   Q.  What did you do with this note after you wrote it?

25   A.  I gave it in.

D7idles8                          Supper - direct

1   Q.  You say you gave it in.  You gave it in where?

2   A.  I think I either gave it into the office or I gave it into

3   Dr. Lesniewski.  I cannot -- one or the other.  I handed it to

4   somebody there.

5   Q.  And did you and Dr. Lesniewski discuss the substance of

6   this note, the ideas that are in it?

7   A.  Yes.

8   Q.  Did Dr. Lesniewski do or say anything to indicate that he

9   saw the note or understood these ideas?

10  A.  I think he understood the ideas because he sent me for a

11  couple of more tests.

12  Q.  What kinds of tests did he send you for?

13  A.  An MRI on my back, I think.

14  Q.  Any other MRIs?

15  A.  Maybe my ankle but I'm not sure about that.

16  Q.  Prior to -- sorry.  Withdrawn, your Honor.

17          What kinds of tests had you had performed on you prior

18  to giving this note in to Dr. Lesniewski's office?

19  A.  I had an MRI done prior to that on my shoulder.

20  Q.  OK.  I think we are done with this exhibit.

21          So you retired December 1st, 2006, right?

22  A.  That's correct.

23  Q.  When you retired, did you get payouts for vacation time or

24  sick time or any combination?

25  A.  Yeah.  I got payouts for both of those.

1  Q.  About how much money?

2  A.  I'm not sure what the total amount was, but I had some

3  vacation and I had some sick days that weren't used so maybe

4  30/40,000.  I'm not sure how much the amount was.

5  Q.  And when did you apply for the disability?

6  A.  I applied for the disability the end of December.

7  Q.  How did you apply for the disability?

8  A.  I had a form that I had to fill out and submit it to the

9  Railroad Retirement Board.

10  Q.  You mentioned earlier in your testimony that Fred Kreuder

11  helped you?

12  A.  That's correct.

13  Q.  Who was Fred Kreuder?

14  A.  He was an employee of the Railroad.  I think he worked in

15  the Benefits Department or Human Resources Department.

16  Q.  What was his involvement in your application?

17  A.  He helped me fill it out.

18  Q.  How many times did you meet or talk to him in connection

19  with your disability application?

20  A.  I met with him twice.

21  Q.  And what happened in your meetings with him?

22  A.  I just told him what was wrong and when I wanted to retire.

23  Q.  When you say you told him what was wrong, did you tell him

24  that you were unable to do your job?

25  A.  I told him I was unable to do my job, yes.

1   Q.   You said that to Mr. Kreuder, you think?

2   A.   Yes.

3   Q.   Was that true at the time?

4   A.   No, it was not.

5   Q.   To what extent did you give him the other information to

6   put into your forms?

7   A.   He made up a lot of the things in the form.

8   Q.   For example, did you tell him what your activities of daily

9   life were?

10  A.   Yes, I did.

11  Q.   Did you tell him how you spent a normal day?

12  A.   Yeah, I think so, but --

13  Q.   Do you recall one way or the other?

14  A.   Not really but -- no, I do not.

15  Q.   Where did you meet with Mr. Kreuder?

16  A.   I met him twice.  I met him at his house one time and then

17  I met him at a bowling alley.

18  Q.   How long were your meetings with him?

19  A.   The first one was about a half hour, maybe, and the second

20  one was the same amount.

21  Q.   And did you pay Mr. Kreuder for helping you fill out the

22  forms?

23  A.   Yes, I did.

24  Q.   How did you pay him?

25  A.   I think I wrote him a check.  I think I wrote the check to

1   the little league, not to him.

2   Q.  About how much money?

3   A.  I think it was $500.

4   Q.  Why did you write a check to the little league?

5   A.  Because that's what he told me to do.

6   Q.  So let's talk now about Government Exhibit 103A and 103C.

7           MR. DURKIN:  No objection.

8           THE COURT:  Received without objection.

9           (Government's Exhibits 103A and 103C received in

10  evidence)

11  BY MR. WEDDLE:

12  Q.  Let's first look at 103A.

13          What is 103A, sir?

14  A.  It's an application for determination of employee's

15  disability.

16  Q.  Whose application is it?

17  A.  It's mine.

18  Q.  Do you see that it is computer-generated or typed-in

19  basically, the information is filled in?

20  A.  Yes, sir.

21  Q.  Did you type up this form?

22  A.  No, I did not.

23  Q.  Who did?

24  A.  I guess it was Mr. Kreuder.

25  Q.  And then if you take a look at page 10 of this document,

D7idles8                          Supper - direct

1    and if you blow up question 64.

2              So you see there is this legend there that says I know

3    that if I make a false or fraudulent statement, it is a crime,

4    and then it also said I certify that the information that I

5    give to the RRB on this application is true to the best of my

6    knowledge; do you see that?

7    A.  I see it, yes, sir.

8    Q.  And it also says, "I agree to immediately notify the RRB if

9    I work for any employer, railroad or non-railroad, or perform

10   any self-employment work."

11   A.  Yes.

12   Q.  "Or if my condition improves."  Do you see that?

13   A.  That is correct, yes.

14   Q.  And then who signed this?

15   A.  I did.

16   Q.  What is the date you signed it?

17   A.  December 29, 2006.

18   Q.  And let's take a look at page 2 of the document, question

19   11, 12 and 13.

20   A.  Mm-hmm.

21   Q.  Question 11 says, "Enter the date you could no longer work

22   because of your condition," and it says "November 22, 2006."

23   A.  Correct.

24   Q.  Is that true?

25   A.  I could have worked after that.

1  Q.  And then it says, in 13, "Does your condition prevent you

2  from working now?"  It says, "Yes."  Is that true?

3  A.  No, it's not.

4  Q.  And then there is a description in question 12 that says

5  "Describe how your condition prevents you from working," and it

6  says, "I cannot properly grip or hold the engine throttle

7  without extreme pain in my hands."  Was that true?

8  A.  No.  It's not true.

9  Q.  "I cannot climb onto or down from train equipment without

10  experiencing shoulder, knee, hand or back pain."  How true was

11  that?

12  A.  Somewhat true.

13  Q.  What do you mean, "somewhat true?"

14  A.  Every time I got up and down on the equipment it did bother

15  my shoulder.

16  Q.  OK.  But you could do it?

17  A.  But I could do it, that's correct.

18  Q.  But it didn't hurt your back or knee or hand, right?

19  A.  No.

20  Q.  And then it says, "I cannot safely climb any vertical

21  ladder without extreme shoulder and knee pain."  You had some

22  pain in your shoulder --

23          MR. DURKIN:  Objection.

24          THE COURT:  Sustained.

25  Q.  Is that entirely accurate, where it says "I cannot safely

1    climb any vertical ladder without extreme shoulder and knee

2    pain?"

3             MR. DURKIN:  Objection to the entirety.

4             THE COURT:  Overruled.

5    Q.  You can answer.

6    A.  I could climb up and down on the equipment but I had some

7    pain.

8    Q.  So would you say it was what you called extreme?

9    A.  No, it wasn't extreme.

10   Q.  And what about knee pain?

11            MR. DURKIN:  I object to that last question and move

12   that it be stricken.

13            THE COURT:  All right.  Sustained.

14   Q.  Sir, the characterization that's in here about extreme

15   shoulder and knee pain, is the word "extreme" accurate or

16   inaccurate?

17   A.  Inaccurate.

18   Q.  And it goes on to talk about many things, right?  Opening

19   and closing doors, operating overhead controls, walking along

20   the tracks, and all of these things being -- having severe pain

21   and pain in multiple parts of your body, right?

22   A.  That's correct.

23   Q.  Was that true at the time?

24   A.  No, it's not.

25            MR. DURKIN:  Asked and answered.

D7idles8                        Supper - direct

1           THE COURT:  Overruled.

2    BY MR. WEDDLE:

3    Q.  And if you take a look at page -- it continues, you see, on

4    page 9.  If you could take a look at page 9?

5           If you could blow that up, Ms. Larson.

6           And it goes on to talk about many other things that

7    cause you hand, shoulder, knee and back pain, right?

8    A.  Mm-hmm.

9    Q.  And were these accurate at the time?

10           MR. DURKIN:  Objection.

11   A.  No.

12           THE COURT:  All right.  Asked and answered.  It is

13   cumulative now.

14           MR. WEDDLE:  May I ask one more, your Honor?

15   Q.  "I cannot hold a pen or pencil to complete reports without

16   pain in my hand," is that accurate?

17   A.  No, it's not.

18   Q.  And let's take a look now at page 3 of this document, and

19   if we could zoom in on the top half.

20           Do you see this is talking about two MRIs, one of the

21   left knee and one in the spine; do you see that?

22   A.  Yes, sir.

23   Q.  And do you see the dates, December 6, 2006 and December 4,

24   2006?

25   A.  That's correct.

D7idles8                         Supper - direct

1   Q.  Two days apart?

2   A.  Yep.  Yes, sir.

3   Q.  Do you recall having back-to-back MRIs?

4   A.  Yes, I did.

5   Q.  And how -- when did you have them in relation to the notes

6   that we were looking at where you asked Dr. Lesniewski to

7   document additional problems?

8   A.  Approximately two weeks later.

9   Q.  Let's take a look at the next page of this exhibit.

10              MR. DURKIN:  What page of the exhibit?

11              MR. WEDDLE:  Page 4 of the exhibit.

12              And if you could expand the top half.

13  Q.  And this talks about Dr. Lesniewski, right?

14  A.  Yes, sir.

15  Q.  And it shows nine visits in the space of about a year?

16  A.  Yes, sir.

17  Q.  And let's take a look at the next page of the document.  If

18  you could zoom in on questions 24 through 26.

19              And this is talking about restrictions; do you see

20  that?

21  A.  Yes, sir.

22  Q.  And it says Dr. Lesniewski imposed a restriction on you of

23  no heavy lifting, no use of arm above horizontal, no strong

24  gripping --

25              MR. DURKIN:  I'm having trouble with the page number.

1    What page are we at?

2              MR. WEDDLE:  (Indicating).

3              MR. DURKIN:  I object to the reference to

4    Dr. Lesniewski.

5    BY MR. WEDDLE:

6    Q.  OK.  Do you see in question 24, it says, "Enter the name of

7    the medical doctor who imposed the restriction."

8    A.  I see it.

9    Q.  And who is it?

10   A.  Dr. Peter Lesniewski.

11   Q.  And then the restriction, which is described in question

12   26, it says, "No heavy lifting, no use of arm above horizontal,

13   no strong gripping, no walking on uneven surfaces (ballast), no

14   vibrations."  Do you see that.

15   A.  I see it.

16   Q.  Had Dr. Lesniewski told you that you were medically

17   restricted from doing the things that are described here?

18   A.  He might have.  I can't remember that far back.

19   Q.  Were you able at the time in 2006 to walk on uneven

20   surfaces?

21   A.  Yes, I could.

22   Q.  How about vibrations, did you have to work with vibrations

23   at the time?

24   A.  No.

25   Q.  How about heavy lifting, using your arm above horizontal,

1    strong gripping, could you do those things in your daily life?

2    A.  Yeah.  Everything but the heavy lifting was to the

3    shoulder, but everything else was OK.

4    Q.  OK.  Were there times at your work when you were working or

5    working overtime where you had to lift heavy things?

6    A.  I did, yes.

7    Q.  When you needed to do that, what did you do?

8    A.  A lot of times I had to have help lifting it.

9    Q.  And you succeeded in doing your job on those occasions?

10              MR. DURKIN:  Objection.

11              THE COURT:  Sustained.

12   Q.  When people helped you lift those things, what happened?

13              MR. DURKIN:  Objection.

14              THE COURT:  Overruled.

15   A.  What happened?  I lifted them with the help of a conductor

16   or assistant conductor.

17   Q.  Was it part of those people's job to help lift heavy items?

18              MR. DURKIN:  Objection.

19              THE COURT:  Overruled.

20   A.  Yes, it was.

21   Q.  And so to what extent were you able to accomplish your job

22   in the year or so before your retirement?

23              MR. DURKIN:  Objection.

24              THE COURT:  Overruled.

25   A.  I could still do my job.

1    Q.  Let's take a look at page 6 of this exhibit, and if you

2    could zoom in on the Section 6 section.

3              OK.  Do you see this is a list of check boxes asking

4    whether you -- whether it is hard or easy for you to, or you

5    can't do it at all, sit, stand, walk, eat, bathe yourself,

6    dress yourself, take care of other bodily needs, do indoor

7    chores, do outdoor chores, drive a motor vehicle, use public

8    transportation, and all the way down to writing English; do you

9    see that?

10   A.  Mm-hmm.

11   Q.  And it says using public transportation you can't do at

12   all; do you see that?

13   A.  Mm-hmm.

14   Q.  Was that true at the time?

15   A.  No.

16             THE COURT:  Mr. Supper, answer the questions "yes" or

17   "no."  We have a reporter.  He does not know what you are

18   saying.

19             THE WITNESS:  I'm sorry.

20   BY MR. WEDDLE:

21   Q.  You have to use words when you answer other than saying

22   "mm-hmm" because the reporter --

23   A.  I apologize.

24             Can you repeat the question, please?

25   Q.  This document says you could not use public transportation

1   at all.  Was that true when you submitted it to the Railroad

2   Retirement Board?

3   A.  No, it was not true.

4   Q.  And it says -- in the "Explanation" section, it says, "Any

5   vibrating or rocking causes back, neck and knee pain."  Is that

6   true?

7   A.  No, it is not true.

8   Q.  And all of these things that it says are hard -- sitting,

9   standing, walking, eating, bathing, etc. -- were those hard for

10  you in the end of 2006?

11          THE COURT:  Asked and answered.

12  Q.  And were the explanations that are listed next to them, are

13  those true?

14  A.  No, they are not.

15  Q.  Do you see under "Other bodily needs," it says, "Pain in

16  shoulder and knee interrupts sleep?"

17          Did you have pain in your shoulder that interrupted

18  your sleep?

19  A.  Yes.  That is true.

20  Q.  Otherwise, the explanations and the check boxes are

21  basically not --

22          THE COURT:  Asked and answered.

23  Q.  Then if you take a look at question -- I'm sorry, the next

24  page, page 7 of the document, question 40.

25          It says, "I get up at around 7:30.  I let the dog out.

1    I wash and dress.  I feed the dog.  I have a light breakfast.

2    I go on the Internet for a few hours.  I read the newspaper.  I

3    do some stretching and therapeutic exercises.  I may go to an

4    appointment.  I eat lunch.  I watch TV.  I spend some time

5    outside in the backyard.  I play with the dog."  And then it

6    continues.

7            Do you see that?

8    A.  Yes, I do.

9    Q.  Does this describe a typical day for you in 2006?

10   A.  Before I retired or after I retired?

11   Q.  After you retired.

12   A.  Oh, after, yeah.

13   Q.  I mean, when you -- after you retired, what kinds of things

14   did you do with yourself?

15   A.  Well, I went to the gym --

16           MR. DURKIN:  I object to this.  I don't understand the

17   question.  This is after retirement.

18           THE COURT:  Mr. Weddle.

19           MR. WEDDLE:  Well, I can clarify.

20   Q.  Before retirement, what was your typical day like?

21   A.  A typical day was working for the railroad.

22   Q.  Starting at midnight, right?

23   A.  Starting at midnight.

24   Q.  Working hard?

25   A.  Working hard.

D7idles8                           Supper - direct

1    Q.  And accomplishing things, right?

2    A.  Yes, sir.

3    Q.  And after you retired, were you stuck at home watching TV

4    basically?

5    A.  No.

6    Q.  What did you do when you were retired?

7    A.  Well, I would go to the gym or visit friends, take trips,

8    take a vacation here and there.

9    Q.  Whatever you wanted, right?

10   A.  Right.

11          MR. DURKIN:  Objection to the leading.

12          THE COURT:  Sustained.

13   A.  Let's take a look now at Government Exhibit 103C, as in

14   Charlie.

15          MR. WEDDLE:  And we offer 103C.

16          MR. DURKIN:  No objection.

17          THE COURT:  Admitted without objection.

18          (Government's Exhibit 103C received in evidence)

19   BY MR. WEDDLE:

20   Q.  This is a vocational report, right?

21   A.  Yes, sir.

22   Q.  This is among the forms that made up your application for

23   disability, right?

24   A.  That's correct.

25   Q.  And who filled this out?

D7idles8                         Supper - direct

1   A.  Mr. Kreuder and myself.

2   Q.  OK.  And do you see on the third page there's -- if you

3   could display that, Ms. Larson -- there is like a word

4   processor, you know, typed up portion of it.  Do you see that?

5   A.  I see it.

6   Q.  Who wrote that?

7   A.  I did.

8   Q.  Did you have a model for how you would write that?

9   A.  No, there was no model.  This is what my job was.

10  Q.  OK.  And in here it talks about lots of things that you do.

11  But let's see.  In the fifth paragraph, it talks about using a

12  heavy compromise coupler.  Do you see that?

13  A.  Yes, sir.

14  Q.  What is a compromise coupler?

15  A.  A compromise coupler is used when a train breaks down, and

16  a lot of times it has to be coupled up from a locomotive to a

17  multiple -- to an electric train.

18  Q.  How heavy is a compromise coupler?

19  A.  About a hundred pounds.

20  Q.  In let's say the five years before you retired, how often

21  did you use a compromise coupler?

22  A.  Maybe once or twice.

23  Q.  And when you did that, did you do it alone or with other

24  people or --

25  A.  I couldn't do it by myself.

D7idles8                              Supper - direct

1    Q.  So it was not a one-person job?

2    A.  No.

3    Q.  And on the couple, one or two possible times that you did

4    it in the five years before you retired, you were able to do

5    it?

6              MR. DURKIN:  Judge, I am going to object to the

7    leading.

8              THE COURT:  Sustained.

9    Q.  What happened in the one or possibly two times in the five

10   years before you retired that you needed to use a compromise

11   coupler?

12   A.  Like I said, a train would be broken down and we couldn't

13   couple up to the electric train to pull it out.  So a lot of

14   times you had to use a compromise coupler to couple off from

15   the engine to the car, and you would have to have somebody help

16   you put it in.

17   Q.  And when that happened, let's say in the last five years,

18   did it work?

19   A.  Did the compromise coupler work?

20   Q.  Yeah.

21   A.  Yeah, it worked.

22   Q.  And if we could take look at page 5 -- or, well, let's see.

23   It is the seventh page of the exhibit.  It is numbered at the

24   bottom page 5.  It is the one with the signature on it.

25   A.  Yes, sir.

1   Q.  And do you see there is a legend on here talking about

2   civil and criminal penalties for making a false or fraudulent

3   statement in this document; do you see that?

4   A.  Yes, sir.

5   Q.  And who signed it?

6   A.  I did.

7   Q.  When did you sign it?

8   A.  On 12/29/2006.

9   Q.  OK.  So we are done with that.  Thank you.

10          Oh, wait.  Actually, let me just double-check one

11  thing.

12          (Pause)

13          Other than the part that you typed up in this form,

14  who filled out the rest of it?

15  A.  Mr. Kreuder.

16  Q.  OK.  Let's talk now about the medical material that

17  accompanied your application.

18  A.  Yes, sir.

19  Q.  Where did that medical material come from?

20  A.  Dr. Lesniewski.

21  Q.  And how did that material get from Dr. Lesniewski to the

22  RRB, if you remember?

23  A.  I can't remember how it got there.  Somehow.  Maybe it was

24  given to me but I wouldn't swear on it.  I don't know how it

25  got there.

D7idles8                              Supper - direct

1    Q.  OK.  Let's take a look now at Government Exhibit 103B, as

2    in boy.

3              MR. WEDDLE:  And I guess we offer -- actually, your

4    Honor, we would offer Government Exhibit 103B, 103G, like

5    George, and 103D.

6              MR. DURKIN:  No objection.

7              THE COURT:  Admitted without objection.

8              MR. DURKIN:  B and G?

9              MR. WEDDLE:  B like boy, D like David, and G.

10             MR. DURKIN:  No objection.

11             (Government's Exhibits 103B, 103G and 103D received in

12   evidence)

13   BY MR. WEDDLE:

14   Q.  So you see that 103 -- what is 103D?  Let's talk about that

15   first.

16   A.  103D?

17   Q.  Do you have 103D there?

18   A.  I've got 103B, D, E.  No D.

19   Q.  Perhaps before B in your binder?

20   A.  B as in boy?

21   Q.  Yes.  Just prior to B as in boy.

22   A.  Oh, OK.  OK, I got you.  103D.  OK.

23   Q.  They are kind of in the order that I am supposed to talk

24   about them rather than the number.

25             What is 103D, as in David?

D7idles8                         Supper - direct

1   A.  It's November 28, 2006.

2   Q.  What is it, though?

3   A.  It looks like a --

4            (Pause)

5   Q.  Do you want to take a look at the whole thing?  Maybe look

6   at the last page.

7   A.  Yes.

8            (Pause)

9            It looks like it is a narrative of Dr. Lesniewski.

10  Q.  Who does it relate to?

11  A.  Myself.

12  Q.  OK.  And this narrative on the first page is dated what?

13  A.  November 28, 2006.

14  Q.  OK.  And then it says right there on the first line, "The

15  above-named patient was first seen by me on November 15, 2005,"

16  right?

17  A.  Correct.

18  Q.  Complaining about pain in his left shoulder?

19  A.  Correct.

20  Q.  Is that true?

21  A.  That is true.

22  Q.  And then if you look down -- if we can blow up the bottom

23  half of the page.

24            It says -- or let me back up, actually.

25            This date, November 28, 2006, this is before or after

1   you gave that note to Dr. Lesniewski's office?

2   A.  That was after.

3   Q.  This is after?

4   A.  This was after the note, correct.

5   Q.  And it says, "When first seen, the patient was in mild

6   distress."

7           Were you in mild distress a year before you retired?

8   A.  That's correct.

9   Q.  You were in mild distress?

10  A.  On my shoulder?

11  Q.  Distress.  I'm asking about mild distress.

12          MR. DURKIN:  Objection.  Asked and answered.

13          THE COURT:  Overruled.

14  A.  I wasn't in that much pain.

15  Q.  When you went to see Dr. Lesniewski the first time --

16          MR. DURKIN:  Objection, your Honor.  Objection.  I

17  move that it be stricken.  There is no foundation for that last

18  question.

19          THE COURT:  All right.  Rephrase the question.  Lay a

20  foundation.

21  BY MR. WEDDLE:

22  Q.  When you went to see Dr. Lesniewski the first time, why did

23  you go to see him?

24  A.  I went to see him because I wanted to create a paper trail

25  to possibly get a disability later on down the line.

D7idles8                          Supper - direct

1   Q.   And when you went to him the second time, why did you see

2   him?

3   A.   The same reason, paper trail.

4   Q.   Third time?

5   A.   The same thing.

6   Q.   When you went to see Dr. Lesniewski for the, I guess,

7   whatever it was, ten or so times before you retired, were you

8   playacting when you went to him?  Were you trying to act --

9            MR. DURKIN:  Objection.

10           THE COURT:  Sustained.

11  Q.   -- put on an act about --

12           MR. DURKIN:  Objection.

13           THE COURT:  Sustained.

14  Q.   When you went to see Dr. Lesniewski before you retired, to

15  what extent were you trying to deceive him about how severe

16  your pain was?

17           MR. DURKIN:  Objection.

18           THE COURT:  Sustained.

19  Q.   Do you see that it says here -- can we blow up the bottom

20  half of this?

21           Do you see, sir, that it says here in the second

22  paragraph that is on the screen, "The patient has been

23  complaining of significant left knee pain with tenderness and

24  clicking sensation?"

25           Was that true?  Had you been complaining about

D7idles8                         Supper - direct

1    significant knee pain?

2    A.   No.

3    Q.   When did you -- what did you say in your note to

4    Dr. Lesniewski about knee pain?

5    A.   Have me checked out for knee pain.  I had hurt my knee

6    prior on the railroad.

7    Q.   When had you hurt your knee prior?

8    A.   Oh, maybe two/three years prior to that.

9    Q.   And notwithstanding that prior injury, what had you been

10   doing for two to three years?

11   A.   I was continuing working.

12   Q.   Why did you ask Dr. --

13            MR. DURKIN:  Judge, I object to the repeated reference

14   to -- just because someone could keep working doesn't --

15            MR. WEDDLE:  Objection, your Honor, to the speech.

16            THE COURT:  Sustained.

17   Q.   And then if we could take a look at the second page of

18   this, bottom half of the page.

19            And do you see, it says, "Patient was seen on

20   11/21/2006 with back pain," do you see that?

21   A.   Correct.

22   Q.   When did you give Dr. Lesniewski the note asking him to

23   document back symptoms?

24   A.   That day.

25   Q.   November 21, 2006?

D7idles8                           Supper - direct

1    A.  I think so.

2    Q.  And in your note to Dr. Lesniewski, what did you tell him

3    about why you wanted him to document back pain symptoms?

4    A.  Because I felt that my shoulder would not get me the

5    disability with the Railroad Retirement Board.

6    Q.  And what did you tell him about whether you wanted a

7    disability from the Railroad Retirement Board?

8    A.  I told him I wanted disability.

9    Q.  OK.  Then if we take a look at the third page of this

10   document.  It says, "The patient remains disabled due to his

11   multiple problems.  It would be almost impossible for him to

12   climb on trains or bend/lift any significant weighs.  Walking

13   across uneven surfaces would also be impossible."

14            Was any of that true of you, "almost impossible"?

15   A.  No, not "almost impossible."  That is not true.

16   Q.  Were you disabled, as you understand the word at the time?

17            MR. DURKIN:  Objection.

18            THE COURT:  Overruled.

19            You may answer.

20   A.  I was -- I was -- I wasn't disabled.

21   Q.  And then it says -- in the last paragraph, it says, "I am

22   aware of this patient's occupation with the Long Island Rail

23   Road," and so on and so forth.  "It will become progressively

24   more difficult/dangerous to get his left shoulder above the

25   horizontal, especially when trying to climb onto a train.

D7idles8                         Supper - direct

1    Secondarily, he will have difficulty with utilizing controls

2    due to his thumb problem.  These disabilities are permanent."

3            Do you see that?

4    A.  I see it.

5    Q.  Had you -- other than the intake form that we talked about

6    where you said you were a locomotive engineer, had you

7    described to Dr. Lesniewski what your job entailed, what it

8    required?

9    A.  I had mentioned to him that I was a locomotive engineer and

10   what my responsibilities were.

11   Q.  Did you tell him all of what goes into the different

12   assignment that you chose to do?

13           MR. DURKIN:  Objection.

14           THE COURT:  Overruled.

15   A.  I didn't detail every, what job I worked, but he was aware

16   from other engineers, I think, or other employees what our

17   responsibilities were.

18   Q.  Did he tell you -- did he explain to you his understanding

19   of what a locomotive engineer does?

20   A.  No, he did not.

21   Q.  Did Dr. Lesniewski at any time before you retired ask you

22   whether you were able to do your job?

23   A.  No, he did not.

24   Q.  Did you tell him before you retired that you were unable to

25   do your job?

1   A.  I had told him that I wanted to retire, but I still could

2   have -- I don't remember whether I told him or not whether I

3   could do my job or not.

4   Q.  And let's take a look now at -- oh, I'm sorry.

5           Did you have to pay for this narrative?

6   A.  Yes, I did.

7   Q.  About how much money, do you recall?

8   A.  Around 6/$700.  6/700, something like that.

9   Q.  How did you know what it would cost?

10  A.  Umm, I guess the office told me.  I'm not sure who it was.

11  Or maybe some other employees maybe --

12  Q.  Do you remember one way or the other?

13  A.  No, I do not.

14  Q.  Did you pay by cash or with a check; do you remember that?

15  A.  I think it was a check.

16  Q.  Who did you give the check to?

17  A.  That I can't remember.  Probably the front desk.

18  Q.  OK.  Now, let's take a look at Government Exhibit 103G.

19          And you see that 103G looks like patient records

20  relating to you from Dr. Lesniewski's office?

21  A.  Yes, sir.

22  Q.  And to what extent did you review these in any kind of --

23  to what extent did you review these before you submitted them

24  to the Railroad Retirement Board?

25  A.  I don't think I reviewed them at all.

D7idles8                         Supper - direct

1   Q.  And in connection with preparing to testify here in this

2   trial, did you take an opportunity to, at my request, look

3   through them in more detail?

4   A.  Yes, I did.

5   Q.  So if you take a look at the first page, it has an entry

6   for that first date that you visited.  It says, "Patient hurt

7   shoulder during hockey or climbing, is not sure how."  Do you

8   see that?

9   A.  That's correct.

10  Q.  And then the next visit is December 6, 2005.  Do you see

11  that?

12  A.  Yes, sir.

13  Q.  About how long later?

14  A.  Three weeks.

15  Q.  Then the next visit is about two weeks later?

16  A.  That's correct.

17  Q.  All of those relate to your shoulder?

18  A.  That's correct.

19  Q.  And if you take a look at the second -- the second page.

20  Let's look at the second page.

21          The second page is a typed up discussion of your first

22  visit, right?

23  A.  Yes, sir.

24  Q.  And let's take a look at the next page.

25          And the next page there is an entry for December 23,

D7idles8                          Supper - direct

1    2005.  Do you see that?

2    A.  Yes, sir.

3    Q.  And it says, "The patient will require surgical

4    intervention for rotator cuff reconstruction."  Do you see

5    that?

6    A.  That's correct.

7    Q.  What did Dr. Lesniewski say to you about surgery in your

8    visits to him?

9    A.  He asked me if I wanted to have surgery.

10   Q.  And did you want to have surgery?

11   A.  Not at that point, no.

12   Q.  Why not?

13   A.  Because I wanted to continue to work.

14   Q.  And then the next visit is February, about two months

15   later, right?

16   A.  February 17th, that's correct.

17   Q.  And it is also talking about your shoulder, right?

18   A.  That's correct.

19   Q.  And then the next visit is in July, correct?

20   A.  Yes, sir.

21   Q.  And this -- sorry.  This is on the next page.  So this

22   says, "Patient here for left shoulder.  Still has pain."

23        Do you see that?

24   A.  Mm-hmm.

25   Q.  And then there is a different writing, and it says,

D7idles8                              Supper - direct

1      "Patient has pain in left knee on outer side while during

2      almost all bending of the knee."

3              Do you see that?

4      A.   That's correct.

5      Q.   OK.  Is that the knee that you had hurt several years

6      earlier?

7      A.   That's correct.

8      Q.   Did it interfere with your ability to do your work at that

9      time?

10     A.   No, it did not.

11     Q.   And let's turn to the next page.

12             July 31st, it also talks about -- if we blow up the

13     top half, please.  I'm sorry.  Yes.

14             So this is the same visit, just a typewritten version,

15     right?

16     A.   Yes, sir.

17     Q.   How did it work when you went to Dr. Lesniewski's office?

18     Did you just talk to Dr. Lesniewski or other people first or in

19     conjunction or what?

20     A.   You waited in the waiting room, and then they brought you

21     in and then Dr. Lesniewski came in and examined me.

22     Q.   Did you describe to anyone other than Dr. Lesniewski any

23     pain you might be having or anything like that?

24     A.   I think maybe I -- the nurse or the lady that brought me in

25     would ask me how I was feeling, and I would tell her that my

D7idles8                         Supper - direct

1   shoulder was still bothering me.

2   Q.  Do you remember clearly any of those discussions --

3            MR. DURKIN:  Objection.

4   Q.  How clearly do you remember whether that's how it went?

5            MR. DURKIN:  Objection.

6            THE COURT:  Sustained.

7   Q.  OK.  So let's look now at the lower half, the bottom half

8   of this page.

9            So the next visit is September 12, 2006, right?

10  A.  That's correct.

11  Q.  Also talks about your shoulder.  It says it feels a little

12  better, right?

13  A.  Mm-hmm.  That's correct.

14  Q.  Then the next visit is October 31st, right?

15  A.  Mm-hmm.

16  Q.  About six weeks later?

17  A.  That's correct.

18  Q.  Also talking about shoulder, right?

19  A.  Yep.

20  Q.  And then the next visit is November 21, 2006, right?

21  A.  That's correct.

22  Q.  Could we look at the next page.  Can we blow that up.

23            And how does this date compare to the date that you

24  gave that letter asking for documenting more symptoms?

25  A.  It's the same -- the same date.

D7idles8                          Supper - direct

1    Q.  And here in these notes it talks about pain in your

2    shoulder in the first part, right under "Physical Examination."

3    And then the next paragraph talks about pain where?

4    A.  Pain -- "He also has back pain, with normal reflexes."

5    Q.  And then the next paragraph talks about pain where?

6    A.  "Tenderness on the left knee."

7    Q.  And then it says -- as the impression and the plan, what

8    does it say?

9         (Pause)

10        Could you please read that?

11   A.  "The patient does need shoulder surgery.  We will treat him

12   with anti-inflammatories at this time."  PL/im it looks like.

13   Q.  And then if you take a look at the next page.

14        The handwritten part says, "Patient here to review MRI

15   of" what parts of your body?

16   A.  His back and left knee.

17   Q.  And what parts of your body had you asked for MRIs and

18   other tests done?

19   A.  My back and my knee.

20   Q.  About how long before this visit?

21   A.  Two, three weeks before this.

22   Q.  Closer to a month, right?  You said November 21st and this

23   is December 19th?

24   A.  Oh, yes.  OK.

25   Q.  Did you ultimately get disability benefits from the

D7idles8                              Supper - direct

1   Railroad Retirement Board?

2   A.  Yes, I did.

3   Q.  When did you get them, or when did you hear that you got

4   them?  Do you recall?

5   A.  Sometime in 2007.

6   Q.  Let's take a look at Government Exhibit 103N, like Nancy.

7             MR. WEDDLE:  We offer Government Exhibit 103N.

8             MR. DURKIN:  No objection.

9             THE COURT:  Admitted without objection.

10            (Government's Exhibit 103N received in evidence)

11            MR. WEDDLE:  Ms. Larson, put it on the screen and blow

12  up the top half.

13  Q.  And what is the date of this letter?

14  A.  It's February 20, 2007.

15  Q.  And this is telling you that you what?

16  A.  "Have determined that you have met the requirements for a

17  disability annuity."

18  Q.  And about how much money did you get for disability

19  benefits after this?

20  A.  About $42,000, I think.

21  Q.  In what time period?  $42,000 --

22  A.  42,000 for one year.

23  Q.  How did you receive that money?

24  A.  It was deposited into my checking account.

25  Q.  And where do you bank?

1    A.  UBS, United Bank of Scotland.

2    Q.  And that bank is based where?

3    A.  In New York City.

4    Q.  In Manhattan?

5    A.  Yes, sir.

6    Q.  After you learned that you would receive occupational

7    disability payments, were you later considered for other

8    disability-related payments by the Railroad Retirement Board?

9    A.  Other?

10   Q.  Yeah.  After this, were you considered for other benefits?

11   A.  No.

12   Q.  Take a look at Government Exhibit 103M, like Michael.

13   A.  OK.

14   Q.  And do you see the second paragraph of this document?  Do

15   you see that?

16   A.  Yes, sir.

17   Q.  Do you remember whether you were considered for other

18   benefits after you received occupational disability?  Do you

19   remember that one way or the other?

20   A.  No, I do not.

21   Q.  Taking a look at this document, does this refresh your

22   recollection?  If you just take a minute and read the second

23   paragraph of it.

24   A.  "Besides making a disability decision under the Railroad

25   Retirement" --

D7idles8                          Supper - direct

1    Q.  Read it to yourself, sir.  Just read it to yourself.

2    A.  OK.  I'm sorry.

3    Q.  And see if that reminds you about any further benefits.

4    A.  I remember having to go for an examination, if that's what

5    you're asking me.

6    Q.  OK.  And the examination happened before or after you got

7    occupational disability?

8    A.  It happened after.

9    Q.  And what kinds of benefits did the examination relate to?

10   A.  It just related to a minimal amount of more money you would

11   receive if I was deemed full disability.

12   Q.  And so can you explain to the jury what do you mean when

13   you say "full disability?"

14   A.  I guess you could -- I'm not really sure what it meant,

15   full disability, but I know it just meant a few more dollars.

16   And I'm not really sure how to answer that.

17   Q.  Did you understand that full disability was different from

18   the standard for occupational disability?

19   A.  All I knew, it was more money.  It was a few more dollars a

20   month.  That was it.

21   Q.  And in connection with these additional benefits relating

22   to full disability, you had to go for an exam?

23   A.  That's correct.

24            MR. WEDDLE:  Your Honor, I offer Government Exhibit

25   103M.

1              MR. DURKIN:  No objection.

2              THE COURT:  Received without objection.

3              (Government's Exhibit 103M received in evidence)

4              MR. WEDDLE:  And if you could blow up the first three

5    paragraphs, basically.

6    Q.  So this is dated in January 2008, right?

7    A.  That's correct.

8    Q.  Is that about how long after you got occupational

9    disability, the occupational disability letter that we were

10   just looking at?

11   A.  About 10/11 months later.

12   Q.  And this says, in the second paragraph, "Besides making a

13   disability decision under the Railroad Retirement Act, we also

14   decide if you are disabled under the Social Security Act.

15   Under SSA's rules, we must find you disabled for all work."

16         Correct?

17   A.  That's correct.

18   Q.  And then in the next paragraph it says, "To make this

19   decision using SSA's rules, the RRB will schedule one or more

20   medical examinations for you soon."  Correct?

21   A.  That's correct.

22   Q.  And is this letter how you learned that you were going to

23   have an exam relating to these other benefits?

24   A.  Yes.

25   Q.  And how extensive was that examination when you went to it

D7idles8                         Supper - direct

1   relating to these benefits?

2   A.  I remember going twice to Hempstead, and it was like a

3   five- or ten-minute exam.

4   Q.  And what did you tell the doctor?  I'm just talking about

5   an exam in connection with these benefits.

6   A.  I had told the doctor --

7            MR. WEDDLE:  Actually, if I may, your Honor, I would

8   just like to just withdraw that question.

9            THE COURT:  Mr. Weddle, would you stop for a moment.

10           It is five minutes of 6.  What is your projection at

11  this moment?

12           MR. DURKIN:  Judge, I --

13           MR. WEDDLE:  I think about 15 minutes or so.

14           THE COURT:  OK.  Proceed.

15           Mr. Durkin.

16           MR. DURKIN:  I'm sorry, Judge.  I thought you were

17  talking to me.

18           THE COURT:  No.  Mr. Weddle.  I'm asking for an update

19  of time.

20           MR. WEDDLE:  15/20 minutes.  I think I have four more

21  documents and then some final questions after that.  15/20

22  minutes probably.

23           THE COURT:  Take five.

24           MR. WEDDLE:  Five?

25           THE COURT:  Yes.

D7idles8                         Supper - direct

1    BY MR. WEDDLE:

2    Q.  If you take a look at Government Exhibit 103L, do you see

3    that?

4    A.  Yes, sir.

5             MR. WEDDLE:  Your Honor, we offer Government Exhibit

6    103L.

7             MR. DURKIN:  No objection.

8             (Government's Exhibit 103L received in evidence)

9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  This letter, sir, tells you you didn't get the other

2    benefits, right?

3    A.  No, I was denied.

4    Q.  Did that affect your occupational disability benefits in

5    any way?

6    A.  No, it did not.

7    Q.  Let's talk about some other money that you received.

8           In addition to applying for disability benefits, did

9    you also get sickness benefits from the Railroad Retirement

10   Board?

11   A.  Sickness benefits?

12   Q.  Yes.

13   A.  I don't recall that.

14   Q.  Take a look at Government Exhibit 1155.

15   A.  Yes.

16   Q.  And 1156.

17   A.  Correct.

18           MR. WEDDLE:  I offer Government Exhibits 1155 and

19   1156.

20           MR. DURKIN:  No objection.

21           THE COURT:  Admitted without objection.

22           (Government's Exhibits 1155 and 1156 received in

23   evidence)

24   Q.  1155 is an application for sickness benefits, right?

25   A.  Yes.

D7inles9                         Supper - direct

1    Q.  For the United States Railroad Retirement Board?

2    A.  That is correct.

3    Q.  It relates to you, right?

4    A.  Yes, it does.

5    Q.  Take a look at the second page.  You signed it?

6    A.  Yes, sir.

7    Q.  And when did you sign it?

8    A.  On 11/28/2006.

9    Q.  In order to get the sickness benefits, did you have to get

10   a signature from anyone else?

11   A.  I guess Dr. Lesniewski.

12   Q.  And turn to the third page of the document.  Is this a

13   document Dr. Lesniewski signed for you to get sickness

14   benefits?

15   A.  Yes, it is.

16   Q.  And then did you have to from time to time get updated

17   doctor's signatures to keep getting the sickness benefits?

18   A.  Yes, I did.

19   Q.  Take a look at Government Exhibit 1156.

20           MR. WEDDLE:  Put that up.

21   Q.  Is this a form that you needed to get signed in order to

22   keep getting sickness benefits?

23   A.  That's correct.

24   Q.  Who signed it?

25   A.  Dr. Lesniewski.

D7inles9                         Supper - direct

1    Q.  When did he sign it?

2    A.  12/19/2006.

3    Q.  Then if you take a look at --

4            MR. WEDDLE:  At this point, your Honor, I would like

5    to offer Government Exhibit 1151.

6            MR. DURKIN:  No objection.

7            THE COURT:  Admitted without objection.

8            (Government's Exhibit 1151 received in evidence)

9    Q.  1151 has a bunch of pages.  Do you see that?

10   A.  Yes, sir.

11   Q.  They are from multiple different dates, right?

12   A.  That's correct.

13   Q.  And collectively, what are they all?

14   A.  Repeat the question, please.

15   Q.  Collectively, all these different dates and different forms

16   that all together make up Government Exhibit 1151, what are

17   they?

18   A.  It is a sickness claim form that I had to fill out.

19   Q.  In order to get sickness benefits from where?

20   A.  From the Railroad Retirement.

21   Q.  Could you take a look at the bottom of the first page.

22           MR. WEDDLE:  Can we blow that up, Ms. Larson.  That is

23   a bad copy on the screen.

24   Q.  Did you sign this document here?

25   A.  Yes, I did.

D7inles9                          Supper - direct

1   Q.  Could you read, when did you sign it?

2   A.  On the 29th of January, 2007.

3   Q.  All right.  Can you read the words that are below the

4   signature lines, the centered language?  It starts with

5   "American."

6   A.  American Family Life Assurance Company of New York, Aflac.

7   Q.  So all of these documents relate to benefits from what

8   company?

9   A.  From Aflac.

10  Q.  If you would look now at January 29, 2007, the next page.

11  So, if we look at the next page, in the center of the page it's

12  signed by a doctor?

13  A.  Yes, sir.

14  Q.  Who signed it?

15  A.  I think it's Dr. Lesniewski's signature.

16  Q.  The date?

17  A.  Is January 23rd or 20th, 2007.

18  Q.  You are reading that as 23?

19  A.  20 maybe.

20  Q.  Possibly 30?

21  A.  I'm not sure what that -- it's 1 something or other.

22  Q.  At any rate, it's January, right?

23  A.  It's January.

24  Q.  2007?

25  A.  Correct.

1   Q.   Then let's look at the next page?

2   A.   Yes.

3   Q.   The center of the page, this is another Aflac form, right?

4   A.   That's correct.

5   Q.   March 2007, right?

6   A.   That's correct.

7   Q.   Signed by Dr. Lesniewski?

8   A.   That's correct.

9   Q.   Then let's look at two pages later.

10  A.   Uh-huh.

11  Q.   Actually, let's go backwards one page.  At the bottom of

12  this page, you signed it on what date?

13  A.   March 25, 2007.

14  Q.   Then you see in the top left corner there's a date, April

15  24, 2007?

16  A.   That's correct.

17  Q.   Then the next page also has a date in the top left corner,

18  April 24, 2007?

19  A.   That's correct.

20  Q.   Then who signed this page in the middle of the page?

21  A.   Dr. Lesniewski.

22       MR. WEDDLE:   I don't know, Ms. Larson, if you can blow

23  up that date a little bigger.

24  Q.   Can you tell what that says?

25  A.   It looks like it's March 3 or March 4, 2007.

1    Q.  Do you think it could be 31?

2    A.  31?  Maybe.

3    Q.  Then the next page is signed, the next page is signed by

4    you?

5    A.  Yes.

6    Q.  April 23, 2007, right?

7    A.  That's correct.

8    Q.  Then the next page is signed by?

9    A.  Dr. Lesniewski.

10   Q.  It has, it looks like it could be a signature stamp, right?

11   A.  Possibly, yeah.

12          MR. DURKIN:  Objection.

13   Q.  April 27, 2007?

14   A.  Correct.

15   Q.  There are a number more that are like this, right?

16   A.  Yes, sir.

17   Q.  Multiple additional dates?

18   A.  Yes.

19          THE COURT:  All right.  Mr. Weddle, we are going to

20   call a halt.  Did you need the witness for any more questions

21   tomorrow.

22          MR. WEDDLE:  I do, your Honor.

23          THE COURT:  How much more?

24          MR. WEDDLE:  I think maybe ten minutes or so.

25          THE COURT:  All right.  We are going to adjourn at

D7inles9                         Supper - direct

1    this point until tomorrow at 9 o'clock.

2              I am going to give the jury the same caution and

3    warning that I will give you regularly every day.  Do not

4    discuss the case among yourselves or with anyone else from the

5    outside or have any contact of any kind or communication with

6    anyone concerning the case.

7              If any of these things occur, inform the Court

8    immediately, and don't discuss it with your fellow jurors.

9              Thank you.  We will see you tomorrow at 9.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

d7inles9

1            (Jury not present)

2            THE COURT:  Mr. Weddle.

3            MR. WEDDLE:  Yes, your Honor.

4            THE COURT:  Do we know the lineup for tomorrow?  You

5     had Mr. Parlante next on the list.

6            MR. WEDDLE:  That's right, your Honor.  After

7     Mr. Parlante is Special Agent Del Favero.  I am pleased to

8     report that we are flying through this.  We are going very

9     quickly, I think.

10           THE COURT:  All right.

11           MR. WEDDLE:  So I do have Mr. Parlante and then

12    Mr. Del Favero.

13           THE COURT:  You told us the other day that

14    Mr. Parlante was about two hours.

15           Is that still your estimate?

16           MS. FRIEDLANDER:  I think so, your Honor.

17           THE COURT:  All right.  Let me make a couple of

18    suggestions at this point, Mr. Weddle and Ms. Friedlander.

19           Having laid the groundwork for much of the testimony

20    of the witnesses who are like the first two, there may be ways

21    in which you might be able to streamline and move a little

22    faster by not delving or dwelling too much on matters that have

23    already been pretty much put on the record.  If there is

24    something unique about any of the others, you certainly should

25    pursue that, but to the extent that they are only repeating

d7inles9

1    things from those forms, for example, that prior witnesses have

2    already made clear, you may be able to save some time by

3    summarizing rather than raising the same questions over and

4    over.

5              MR. WEDDLE:  I definitely think we can do that, your

6    Honor.  I've tried to go a little more quickly with Mr. Supper.

7    I skipped a bunch of questions.

8              THE COURT:  You did.  And I think the next one, if

9    there is one like that, you can go a little faster.

10             MR. WEDDLE:  I do have one sort of caveat, your Honor.

11   We have to get on the record that a lot of the stuff that is in

12   these documents are false.  And also we would like to draw the

13   sting on things that are recorded in the chart notes for

14   Dr. Lesniewski that he may say, oh, look these people are

15   reporting this stuff.  We would like to clarify to what extent

16   they are reporting things and to what extent they are

17   exaggerated in the chart notes as being severe when they're not

18   really severe.

19             THE COURT:  Understood.  I will try from here on in to

20   give you some hint of where I think it's beginning to become

21   cumulative and repetitive.

22             Now, how long is Mr. Del Favero going to be on the

23   stand?

24             MR. WEDDLE:  He's pretty short, your Honor.  I would

25   say an hour.

d7inles9

THE COURT:  All right.  After Mr. Del Favero?

MR. WEDDLE:  After Mr. Del Favero is Mr. Ellensohn.

THE COURT:  Ellensohn, how long with him?

MR. WEDDLE:  I think he is a couple of hours.

Frankly, I think, your Honor, we had originally predicted jury selection to last much shorter than it did.

THE COURT:  That is why I am trying to see if we can make up.

MR. WEDDLE:  I was going to say, just to finish that thought, that we had predicted only getting to Del Favero this week, even with a short jury selection.  So really we've made up the time already I would say.

THE COURT:  We have not made up the additional two weeks that Mr. Ryan has given us.

MR. RYAN:  I like the way you think, Judge.

THE COURT:  All right.  We will see you --

MR. WEDDLE:  Your Honor, can I just say one thing.  I had instructed the witness about your Honor's ruling with respect to the continuing disability reviews.

As I previewed for your Honor, I was intending to elicit one meeting from the doctor, and I think that he in a nonresponsive way said he went to two medical exams.  The second one relates to the continuing disability review.  I don't think that that counts as the government opening the door to anything on the continuing disability review.  He added that

d7inles9

 1    to a question that was in a nonresponsive way and we just moved

 2    on from there.

 3             So I think that your Honor's ruling still stays the

 4    same.  I didn't think that there was anything in the

 5    cross-examination of Mr. Gagliano that got too close to your

 6    Honor's ruling, but I think that we should have a similar

 7    cross-examination of this witness as well, notwithstanding his

 8    blurting out that additional fact.

 9             THE COURT:  All right.

10             Anything else, Mr. Durkin?

11             MR. DURKIN:  I am not sure I agree.  I need to look at

12    my notes.  I think they're getting awfully close to the line,

13    but we don't need to discuss it at this hour.

14             THE COURT:  Mr. Supper made reference to two visits,

15    but it was not in response to a question that would have

16    elicited that is what Mr. Weddle is saying.

17             MR. DURKIN:  I understand that.

18             What I am saying, and I would need to look at my notes

19    and think about it, I need to look at the documents.  I am not

20    following why they introduced this second visit.  I don't

21    understand it.

22             MR. WEDDLE:  Your Honor, the only reason we introduced

23    it was to draw the sting, your Honor.  As I previewed for your

24    Honor, I assume that they may want to talk about the fact that

25    there was a medical exam relating to total disability.  I think

d7inles9

1    it is a red herring, but it is something we are prepared to

2    just argue about in front of the jury.

3           It is a red herring because it happened after

4    occupational disability and was related to this total and

5    permanent disability.  But that is different from the set of

6    continuing disability reviews that we've been arguing about

7    over and over again.  It is just different.

8           So we were just drawing the sting on it.  I mean, if

9    they had agreed that they weren't going to go into that also,

10   we can discuss it with them.  If someone had offered that up,

11   we probably wouldn't have gone into it at all.  It is not

12   helping our case to bring that out.

13          THE COURT:  It is not a question of not helping the

14   case.  I was having some doubts about the relevance of that

15   testimony entirely to what the charges in this case are.

16          MR. WEDDLE:  Well, perhaps that was my mistake, your

17   Honor, to elicit it at all.

18          MR. DURKIN:  I guess that's what is part of my

19   problem.  I don't understand why the government is so concerned

20   about trying to cut off areas of cross-examination.  It's like

21   the trial works a certain way.  They get to ask their questions

22   and we get -- I don't want to argue about it, now, Judge, but I

23   would rather not have to take a definitive position.  I think

24   Mr. Weddle and I get along, but I am concerned about -- that's

25   why at the sidebar I thought they opened the door last time.  I

404

d7inles9

1    think they're getting very close to it, but I don't think we

2    should have to coach them as to how not to open the door.

3               THE COURT:  Understood.

4               Mr. Weddle, you may just want to think about the

5    question I raised of relevance.

6               MR. WEDDLE:  We will do that, your Honor.

7               THE COURT:  If there are other witnesses that you have

8    planned this line of questioning about, it may not be necessary

9    because it has nothing to do with the charges against these

10   defendants.

11              MR. WEDDLE:  We will certainly do that, your Honor.

12              THE COURT:  All right.  Thank you.

13              (Adjourned to Friday, July 19, 2013, at 9:00 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     INDEX OF EXAMINATION
 2    Examination of:                         Page
 3     STEVEN GAGLIANO
 4    Direct By Mr. Weddle . . . . . . . . . . . . 162
 5    Cross By Mr. Durkin  . . . . . . . . . . . . 261
 6    Cross By Mr. Ryan  . . . . . . . . . . . . . 308
 7    Redirect By Mr. Weddle . . . . . . . . . . . 309
 8    Recross By Mr. Durkin  . . . . . . . . . . . 316
 9    GARY P. SUPPER
10    Direct By Mr. Weddle . . . . . . . . . . . . 322
11                     GOVERNMENT EXHIBITS
12    Exhibit No.                          Received
13     3532-04, 606-A, 606-B, 600, 101-A,  . . . . . 162
14            101-C, 101-B, 101-D, 101-S,
15            610, 101-G, 609, 609-A, 101-L,
16            607, 1601, 1602
17    3507-05  . . . . . . . . . . . . . . . . . . 329
18    1152  . . . . . . . . . . . . . . . . . . . 333
19    1153  . . . . . . . . . . . . . . . . . . . 337
20    1150  . . . . . . . . . . . . . . . . . . . 342
21    303-B  . . . . . . . . . . . . . . . . . . . 346
22    303-A  . . . . . . . . . . . . . . . . . . . 351
23    103A and 103C  . . . . . . . . . . . . . . . 358
24    103C  . . . . . . . . . . . . . . . . . . . 369
25    103B, 103G and 103D  . . . . . . . . . . . . 373
```

103N     . . . . . . . . . . . . . . . . . 386

103M     . . . . . . . . . . . . . . . . . 389

103L     . . . . . . . . . . . . . . . . . 391

1155 and 1156    . . . . . . . . . . . . . 392

1151     . . . . . . . . . . . . . . . . . 394