D7jdles1
                          Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4            v.                            S14 11 Cr. 1091 (VM)

5   PETER LESNIEWSKI, MARIE BARAN
    and JOSEPH RUTIGLIANO,
6
                  Defendants.
7
    ------------------------------x
8

9                                         July 19, 2013
                                          9:07 a.m.
10

11  Before:

12                      HON. VICTOR MARRERO,

13                                         District Judge

14
                           APPEARANCES
15
    PREET BHARARA
16       United States Attorney for the
         Southern District of New York
17  BY:  JUSTIN S. WEDDLE
         DANIEL BEN TEHRANI
18       NICOLE WARE FRIEDLANDER
         Assistant United States Attorneys
19
    LAW OFFICES OF JOSHUA L. DRATEL, P.C.
20       Attorneys for Defendant Peter Lesniewski
    BY:  JOSHUA LEWIS DRATEL
21       LINDSAY A. LEWIS

22  DURKIN & ROBERTS
         Attorneys for Defendant Peter Lesniewski
23  BY:  THOMAS ANTHONY DURKIN

24

25

D7jdles1
                          Trial

 1                  APPEARANCES CONTINUED

 2    KOEHLER & ISAACS, LLP
           Attorneys for Defendant Marie Baran
 3    BY:  JOEY JACKSON

 4    JOSEPH W. RYAN, JR.
      KEVIN MENEILLY
 5         Attorneys for Defendant Joseph Rutigliano

 6             - also present -

 7    Annie Chen
      Emma Larson, Government Paralegals
 8

 9    SA Frank LoMonaco, FBI

10    Yeni Yrizarry, Defendant Baran Paralegal

11                        oOo

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7jdles1
                                    Trial

1         (Trial resumed; jury not present)

2         THE COURT:  Good morning.  Welcome back.

3         ALL COUNSEL:  Good morning, your Honor.

4         THE COURT:  Is the witness here?

5         MR. WEDDLE:  He is, your Honor.  We just had a couple

6    of items that we hoped to raise with your Honor briefly before

7    we resume.

8         THE COURT:  Does they relate to this witness'

9    testimony?  If they do not, I would rather put it off, bring

10   the jury in.  If we have other matters, we can deal with them

11   after the witness' testimony.

12        MR. WEDDLE:  I think we are -- may I just have one

13   moment?

14        (Pause)

15        Your Honor, I think that in order to break up the

16   similarity of multiple witnesses in a row, we thought we might

17   switch the order today and call Special Agent Del Favero after

18   Mr. Supper and then Mr. Parlante rather than the other way

19   around.

20        THE COURT:  All right.

21        MR. DURKIN:  Judge, I may need an extra ten minutes,

22   then, if that is the case.  That should be fine.

23        THE COURT:  Is that all right?

24        MR. WEDDLE:  Mr. Durkin said he might need ten

25   minutes.  That is fine with me.

D7jdles1
                              Trial

1            THE COURT:  All right.  That is fine.

2            MR. DURKIN:  I don't need it right now.  But I am just

3    saying as long as I have maybe ten -- I had it organized the

4    other way, so if I could just have ten minutes or so to prepare

5    for the agent?

6            THE COURT:  That would be after Mr. Supper?

7            MR. WEDDLE:  Yes.

8            THE COURT:  All right.  We will have to take a break

9    at that point, then, though.

10           MR. WEDDLE:  OK.  And I don't know if there is any

11   prediction on the cross-examination for Mr. Supper at this

12   point.

13           THE COURT:  Any estimate, Mr. Durkin?

14           MR. DURKIN:  It shouldn't be any longer than the first

15   one.  I mean, probably shorter.

16           THE COURT:  All right.

17           MR. WEDDLE:  In that case, your Honor, we are moving

18   very quickly, and because my prediction for cross-examination

19   for Mr. Gagliano I think was a couple of hours and it ended up

20   being, I don't know, maybe a half hour.

21           THE COURT:  About an hour.

22           MR. DRATEL:  Closer to an hour.

23           MR. DURKIN:  Time flies when you are having fun.

24           MR. WEDDLE:  So we may have to -- you know, if we're

25   flying through this day, we have the witnesses that I talked

D7jdles1
                          Trial

1    about yesterday but we may have to scramble around a little

2    bit --

3              THE COURT:  That is fine.

4              MR. WEDDLE:  -- to fill in more hours at the end of

5    the day.

6              THE COURT:  If we end up early on a Friday, I'm sure

7    the jury will appreciate it all the more.

8              MR. WEDDLE:  We could do that.  That will be easier

9    than scrambling around to find witnesses to fill the day.

10             THE COURT:  A willing disclosure.  It seems to be that

11   this morning I ran into Mr. Durkin in the elevator.

12             MR. RYAN:  I object.

13             THE COURT:  You'll get equal time at some point.

14             But I will report that he was politely rude and

15   standoffish, which means that he was following the Court's

16   instructions.  He warmed up and said hello.

17             MR. WEDDLE:  Actually, there is one thing that I

18   wanted to mention that may relate to Mr. Supper's testimony.

19   And that is I just wanted to explain to your Honor there are

20   certain statements that we have been eliciting from these Long

21   Island Rail Road people that have to do with what they had

22   heard from other people at the Rail Road about who to go to and

23   other things that they had heard from other people at the Rail

24   Road.  I think that that's relevant as background and to

25   explain what these people did, what these witnesses did and why

D7jdles1
                                  Trial

1    they did it.  So it corroborates their testimony when they said

2    the reason that I went to this doctor was this reason if they

3    had heard beforehand that this doctor was one of the people to

4    go to for that reason.  So that is corroborative of the

5    testimony that they are giving, and it is background of the

6    conspiracy and background for the actions that they take.

7            And I think that there was an objection yesterday at

8    one point that sounded like the objection was a hearsay

9    objection and arguing that we have not shown that these were

10   co-conspirator statements.  And I just wanted to explain to

11   your Honor that we think that they are admissible regardless of

12   whether they are co-conspirator statements as background.

13           I was trying to explain that somewhat obliquely

14   yesterday in front of the jury.  I mentioned Rule 801 and some

15   other things.  But I don't think I made myself at all clear

16   yesterday, and I just wanted to explain to your Honor that is

17   the purpose for which we are admitting this, for the fact that

18   they were said and that they impact with these witnesses.

19           MR. DURKIN:  Judge, I understood that was what

20   Mr. Weddle was trying to signal.  I was likewise trying to

21   signal the same thing, though, that this goes back to the

22   motion we filed.  I know Second Circuit law is against me, but

23   it's very difficult without a proffer as to what co-conspirator

24   statements they are offering.  And that's just a good example

25   of the problem.  I can't tell whether they are including all

D7jdles1
                          Trial

1   those people as part of the conspiracy or not.  So, I mean, it

2   is just -- I think it is going to get more complicated this

3   way.

4              THE COURT:  All right.  I understand there is

5   substantial Second Circuit law on this issue of witnesses

6   acting in a particular way because of circumstances that they

7   are involved in and things that they hear from others, and the

8   testimony comes in to show that they acted consistently with

9   things that they heard and not necessarily from one particular

10  individual, and the statement is not being brought in, only the

11  consistency of the action based on things that the witness

12  heard.

13             All right.  Let's bring the jury in.

14             MR. DURKIN:  Judge, the other thing I might add -- and

15  we can talk about this later -- I think the same thing might

16  apply to the Mike Flynn statements that's coming up in Del

17  Favero's testimony, but we can talk about that later.

18             THE COURT:  All right.

19             MR. RYAN:  Your Honor, may I briefly state the basis

20  for my objection?

21             This generalized, imprecise testimony as to what the

22  witness was told by unidentified, unknown persons cannot be

23  cross-examined and developed, and the government is using it to

24  do what they claim is the truth, that you go to these doctors

25  to make a phony claim.  That's what they're trying to do here

D7jdles1
                            Trial

1    with this unidentified, generalized background testimony.  And

2    that's why I objected.

3              THE COURT:  All right.  Understood.

4              All right.  Bring them in.

5              MR. WEDDLE:  Your Honor, I think that any statements

6    relating to Mike Flynn that are contained in Dr. Lesniewski's

7    statements have been excluded.  So I don't think this issue is

8    going to come up.

9              THE COURT:  All right.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7jdles1
                              Trial

1              THE LAW CLERK:  All rise.

2              (Jury present)

3              THE COURT:  Good morning.  Welcome back.  Thank you.

4        Be seated.

5              Mr. Weddle.

6              MR. WEDDLE:  Thank you, your Honor.

7              THE COURT:  Let me remind the witness that he took an

8    oath to tell the truth yesterday.  He remains under oath.

9              THE WITNESS:  Yes, sir.

10    GARY P. SUPPER,

11        Resumed, and testified further as follows:

12   DIRECT EXAMINATION (Resumed)

13   BY MR. WEDDLE:

14   Q.  Good morning, Mr. Supper.

15   A.  Good morning.

16   Q.  Do you remember yesterday when we finished we were talking

17   about Government Exhibit 1151, and those were a series of Aflac

18   forms?

19   A.  Yes, sir.

20   Q.  And we went through a number of them, but there is form

21   after form, right?

22   A.  That's correct.

23   Q.  And the last one in this exhibit was signed by which

24   doctor -- a different doctor, right?  The last page of the

25   exhibit.

1   A.  The last page of the exhibit.

2   Q.  1151 -- I mean, sorry, 115 -- yeah, 1151.  Do you have

3   that?

4   A.  I'm looking right now.  The last page you are telling me?

5   Q.  Yep, the last page.

6   A.  Yes, I see it right now.

7   Q.  Who signed the last page?

8   A.  Dr. Yerys, it looks like, Paul Yerys.

9   Q.  And he dated it what date?

10  A.  September 29, 2008.

11  Q.  OK.  And who signed -- other than that one, who signed

12  as -- which doctor signed off on all the rest of them?

13  A.  It looks like it is Dr. Lesniewski.  I'm not sure about the

14  one on July 21st, though.  I don't know if that is his

15  signature or not.

16  Q.  Why did you go to Dr. Yerys to get the form signed in

17  September '08?

18  A.  Just to continue receiving my disability from Aflac.

19  Q.  Why did you decide to go to a different doctor to continue

20  doing that?

21  A.  Because he had all my records and I just felt to continue

22  to go back to him, the office I was going to.

23  Q.  OK.  Was Dr. Lesniewski available, as you understood it, at

24  that time, in September 2008?

25  A.  I don't think he was, no.  I don't know.

1    Q.   So without going through these page by page, about how

2    often did you have to continue to submit forms to Aflac in

3    order to keep getting those disability benefits?

4    A.   Approximately every six to eight weeks.

5    Q.   And those forms in general terms, they claimed what about

6    your health?

7    A.   That I was disabled.

8    Q.   And when you needed one of those forms signed, how did you

9    get it signed?

10   A.   I would bring it to the office and I would drop it off, and

11   they would either mail it back to me or give it back to me at a

12   later date.

13   Q.   Did you bring it -- when you brought it to the office, to

14   what extent was that in conjunction with a visit with or an

15   appointment with Dr. Lesniewski?

16   A.   It was in conjunction with a visit.

17   Q.   I'm sorry?

18   A.   It was in conjunction with an actual visit.

19   Q.   So after you retired, why did you continue to go back to

20   Dr. Lesniewski?

21   A.   To continue having the form filled out and having me

22   checked out.

23   Q.   Sir, did you ever end up having surgery on your shoulder?

24   A.   Yes, I did.

25   Q.   What prompted you to have surgery on your shoulder?

D7jdles1                              Supper - direct

1    A.  I was in a car accident approximately two years ago, and I

2    had the surgery done about, oh, four/five months later.

3    Q.  Sir, since your retirement what kind of physical activities

4    have you enjoyed?

5    A.  Bike riding, golf, ice hockey.

6    Q.  How often did you play golf in your retirement before your

7    car accident?

8            MR. DURKIN:  Objection.  No foundation.

9            THE COURT:  Sustained.

10   Q.  Sir, did you just say that in your retirement you enjoyed

11   playing golf?

12   A.  Yes, I did.

13   Q.  Did you play golf before your car accident?

14           MR. DURKIN:  The same objection.

15           THE COURT:  Sustained.  Lay a foundation for golf

16   before retirement.

17           MR. WEDDLE:  I'm sorry.  Maybe I misspoke.  I am a

18   little tired today, your Honor.  I thought I had asked if he

19   played golf in your retirement, after retiring, before your car

20   accident, did he play golf.

21           THE COURT:  You haven't laid a foundation for golf

22   playing before the retirement.

23           MR. WEDDLE:  Oh.

24   BY MR. WEDDLE:

25   Q.  Did you play golf before you retired?

D7jdles1                        Supper - direct

1   A.  Yes, I did.

2   Q.  OK.  Did you play golf after you retired?

3   A.  Yes, I did.

4   Q.  Between your retirement and when you got into a car

5   accident, about how frequently did you play golf?

6   A.  About once or twice a week for when it was warm out.

7   Q.  OK.  And you mentioned playing ice hockey.

8   A.  Mm-hmm.

9   Q.  Did you play ice hockey before you retired?

10  A.  Yes, I did.

11  Q.  Did you also play ice hockey after you retired?

12  A.  Yes, I did.

13  Q.  And between your retirement and your car accident, about

14  how often did you play ice hockey?

15  A.  Once a week for about three/four months.

16  Q.  In the winter months?

17  A.  That's correct.

18  Q.  And what about bicycle riding, have you done any long

19  bicycle rides in your retirement?

20  A.  I've done a few.

21  Q.  About how long?

22  A.  About 25 miles is maybe the furthest.

23  Q.  And in the time period after you retired up until your car

24  accident, did you have a medical condition that prevented you

25  from doing your Rail Road job?

1   A.   No, I did not.

2   Q.   Today would you be capable of doing your Rail Road job?

3   A.   Umm, yes.  I would be able to.

4            MR. WEDDLE:  May I have a moment, your Honor?

5            (Pause)

6            Nothing further, your Honor.

7            THE COURT:  Thank you.

8            Mr. Durkin.

9   CROSS-EXAMINATION

10  BY MR. DURKIN:

11  Q.   Mr. Supper, you and I have never met before, have we?

12  A.   No, we have not, sir.

13  Q.   We never talked to each other?

14  A.   Never.

15  Q.   And you have a lawyer, correct?

16  A.   Yes, I do.

17  Q.   And as far as you know, I've never talked to your lawyer

18  either, correct?

19  A.   I'm not aware of that, no.

20  Q.   Are you aware I'm from Chicago?

21  A.   No, I'm not.

22  Q.   You mentioned earlier that you went to this second doctor

23  to get these forms filled, and it was your understanding that

24  Dr. Lesniewski wasn't available, is that right?

25  A.   That's correct.

D7jdles1                        Supper - cross

1   Q.  Had you learned that he had moved to Chicago to be with his

2   family?

3           MR. WEDDLE:  Objection, your Honor.

4           THE COURT:  Sustained.

5   Q.  Do you know why he was unavailable?

6   A.  No, I do not.

7   Q.  You pled guilty about a year ago, am I right?

8   A.  That's correct.

9   Q.  I think it was September 19th of 2012?

10  A.  Yes, sir.

11  Q.  And you pled guilty after a whole series of negotiations

12  that your lawyer had with the government, correct?

13  A.  They had spoken, yes.

14  Q.  OK.  And before the government entered into any agreements

15  with you, you had to speak to the government on several

16  occasions, correct?

17  A.  Yes.  I spoke to them a few times, yes.

18  Q.  OK.  And when the government was talking to you, they

19  wanted to know what you knew, correct?

20  A.  Yes.

21  Q.  And you met with them twice in May of 2012, correct?

22  A.  Yeah, I think it was two times.

23  Q.  Right.  And even though you had met with them and had

24  offered to cooperate, you got arrested on May 12th, correct?

25  A.  I didn't get arrested, no.  I surrendered.

D7jdles1                          Supper - cross

1    Q.  They told you that you had to come in because you were

2    charged?

3    A.  Yes.  That's correct.

4    Q.  And if you didn't surrender, you were going to be arrested,

5    correct?

6    A.  Yes.

7    Q.  OK.  So there was no agreement by that point, right?

8    A.  No, not that I know of.

9    Q.  OK.  And I take it that that's not where you wanted to end

10   up in your retirement, was it?

11   A.  No.  Not at all.

12   Q.  You come from a whole long line of Rail Road engineers,

13   correct?

14   A.  That's correct.

15   Q.  Did you tell us yesterday your father was an engineer?

16   A.  Yes, he was.

17   Q.  Was your grandfather an engineer?

18   A.  My grandfather was a police officer.

19   Q.  OK.  But your father was an engineer, correct?

20   A.  Yes, sir.

21   Q.  And the engineer is, in reality, the most important job on

22   the whole Rail Road, isn't it?

23   A.  Well, the trainmen don't want to hear that but, umm --

24   Q.  You don't have to be shy.

25   A.  It is a very important job, yes, it is.  You have the

D7jdles1                          Supper - cross

1   responsibility of thousands of lives.

2   Q.  Right.  And you told us yesterday that you were one of the

3   highest paid people, correct?

4   A.  That's correct.

5   Q.  And the pay recognizes the importance of the job, correct?

6   A.  That's correct.

7   Q.  And this job meant a lot to you, didn't it?

8   A.  Yes, it did.

9   Q.  Because it's part of your family history, isn't it?

10  A.  Yes, it is, sir.

11  Q.  Did you tell us that your brother was an engineer?

12  A.  Yes, he is.  He was.

13  Q.  And your brother has obtained disability, has he not?

14  A.  Yes, he has.

15  Q.  OK.  And what was his problem?

16  A.  He had ear problems.  He had open heart surgery.  He had

17  cancer -- testicular cancer, lung cancer.

18  Q.  Had he been injured on the job, too?

19  A.  I am not aware of that.

20  Q.  OK.  But am I correct in coming to the conclusion that the

21  job of engineer takes a toll on your body?

22  A.  Yes, it does.

23  Q.  There is an awful lot of climbing up and down, as you

24  described, correct?

25  A.  That's correct.

D7jdles1                          Supper - cross

1   Q.  Now, in that climbing, there is a safety issue for you, is

2   there not?

3   A.  Sure there is, yes, sir.

4   Q.  Because these engines are pretty high, aren't they?

5   A.  Yes.  They are about 15/20 feet high.

6   Q.  Right.  And you've got to go up the side of the engine to

7   get into the engine, correct?

8   A.  That is correct.

9   Q.  Into the engine room, or what you do you call that?

10  A.  Engine room or engine cab.

11  Q.  Right.  And Dr. Lesniewski warned you a couple of times

12  about the safety issue of you trying to climb up those ladders

13  with your shoulder, correct?

14  A.  I don't know if he reminded me or he spoke many times about

15  it, but he maybe mentioned it maybe once or twice.

16  Q.  OK.  But the topic came up, right?

17  A.  I'm not -- I can't remember if it did or not.

18          (Pause)

19          MR. DURKIN:  Sorry.  I may have misplaced it.  Wasn't

20  there an exhibit yesterday, Mr. Weddle, with the notes?

21          MR. WEDDLE:  From the file you mean?

22          MR. DURKIN:  Yes.

23          MR. WEDDLE:  Yes.  Let me find it.

24          (Pause)

25          (Counsel conferred)

D7jdles1                          Supper - cross

1              MR. DURKIN:  I've got it, Mr. Weddle.  Thank you.  It

2      is 103G?

3              MR. WEDDLE:  (Indicating).

4              MR. DURKIN:  Yes.  I've got it.

5              Could we take a look at 103G, page 3.  And could you

6      enlarge the part that says "Impression & Plan?"

7              The middle one there that says -- right there.

8      BY MR. DURKIN:

9      Q.  Can you see this on your screen?

10     A.  Yes, I can, sir.

11     Q.  OK.  And this note from -- this is a note from December 23,

12     2005, correct?

13     A.  That's correct.

14     Q.  And when did you first start seeing Dr. Lesniewski?

15     A.  Oh, about maybe a month or two prior to that.

16     Q.  OK.  And this is -- so this is almost at the beginning of

17     your treatment, correct?

18     A.  That's correct.

19     Q.  And he raises it right away, doesn't he?  "Since he works

20     on a train and has to lift himself onto the engine, this may be

21     a problem as far as safety is concerned."  Correct?

22     A.  That's correct.

23     Q.  And it says, "I discussed this with him in detail."

24     Correct?

25     A.  That's correct.

D7jdles1                         Supper - cross

1    Q.  That's true, isn't it?

2    A.  He discussed it but I don't know if he discussed it in

3    detail.

4    Q.  Well, but it is not exactly a topic that requires, you

5    know, a Rhodes scholar to understand it, correct?

6              MR. WEDDLE:  Objection, your Honor.

7              THE COURT:  Sustained.

8    Q.  Forget the detail.  You certainly discussed it, right?

9    A.  Yeah, we discussed it.

10   Q.  And you yourself knew that that was a serious issue,

11   correct?

12   A.  Serious issue?

13   Q.  In terms of safety, your own safety.

14   A.  Yes.  It is a safety factor.

15   Q.  And it says you are aware of the problem and the

16   possibility of a complete rupture of the cuff, correct?

17   A.  Correct.

18   Q.  "And, therefore, inability to use his arm at all above the

19   horizontal," correct?

20   A.  Yes, sir.

21   Q.  And this says, "He wishes to continue working at this

22   time," correct?

23   A.  That is correct.

24   Q.  That's what you told him, didn't you?

25   A.  That's true.

D7jdles1                    Supper - cross

1   Q.  And the note says, "I don't know how long he is going to be

2   able to work but that is his wishes," correct?

3   A.  Yes, sir.

4   Q.  "Therefore, we will try to continue with conservative care

5   at this time," correct?

6   A.  Mm-hmm.

7   Q.  He did what you asked him to do, correct?

8          MR. WEDDLE:  Objection.

9          THE COURT:  Overruled.

10  A.  Can you explain a little more for me, please, counselor?

11  He did what you asked me to do?

12  Q.  Yesterday you told us, if my memory is correct, that when

13  you first went to the Dr. Lesniewski you weren't sure -- I

14  think your words were, or at least as I wrote them down, "I

15  wasn't quite sure what I was going to do when I first saw him."

16  Do you remember that?

17  A.  OK.  Yes.

18  Q.  That was true, correct?

19  A.  I was -- I was there to -- to possibly retire within a year

20  or two.  That's what I went to him for.

21  Q.  I understand that.  And you went to him to see what

22  physical issues you have, or might have had, that might qualify

23  you for a disability, correct?

24  A.  That's correct.

25  Q.  But insofar as you telling Dr. Lesniewski when you first

1    saw him, you still didn't know what you were going to do,

2    correct?

3    A.  I didn't know if I was going to retire right away, no.

4    Q.  Right.  And you told him that, correct?

5    A.  I told him I wasn't going to retire right away, that's

6    correct.

7    Q.  And then when he mentioned the safety in December of '05,

8    you said you understood but that you wanted to keep working,

9    correct.

10   A.  Correct.

11   Q.  Because you were going to try to keep working, correct?

12   A.  I was going to try to keep working, right.

13   Q.  OK.  And something changed your plans rather tragically,

14   correct?

15   A.  Well, I was going to retire anyway, I think, that year in

16   2006.

17   Q.  OK.  But then your wife died and that made -- and I

18   don't -- I don't want to go into it, but that was kind of a

19   watershed moment for you, wasn't it?

20   A.  Most definitely.

21   Q.  OK.  As it would be.

22           And by that point you knew you didn't want to be on

23   the Rail Road any longer, correct?

24   A.  That's true.

25   Q.  OK.  But at least before that you weren't sure, correct?

1          MR. WEDDLE:  Objection, your Honor.  Asked and

2     answered.

3          THE COURT:  Sustained.

4     Q.  Now, when you -- and just so it's clear, there's no

5     question that when you first came to see Dr. Lesniewski, you

6     had a shoulder problem, correct?

7     A.  I had a shoulder problem that was bothering me.

8     Q.  OK.  And, in fact, you have a torn rotator cuff, correct?

9     A.  Yes, sir.

10          MR. WEDDLE:  Objection, your Honor.  Timeframe.

11          THE COURT:  When he went to see Dr. Lesniewski the

12     first time.  That's correct?

13          MR. WEDDLE:  Objection, your Honor.  We talked about a

14     car accident, other things.  There are a lot of medical

15     records.

16     BY MR. DURKIN:

17     Q.  Even before your car accident while you were seeing

18     Dr. Lesniewski, you knew you had a torn rotator cuff, right?

19          MR. WEDDLE:  Objection, your Honor.  Hearsay.

20          THE COURT:  A more precise timeframe.

21          MR. WEDDLE:  And hearsay.

22     Q.  Well, let's just talk about this timeframe right here,

23     December 23rd, 2005, just before Christmas.

24     A.  Right.

25     Q.  He discussed with you the possibility that you could have a

D7jdles1                         Supper - cross

1   complete rupture of the cuff, correct?

2   A.  Yes, that's true.

3   Q.  And we are talking about there the rotator cuff, correct?

4   A.  Yes, sir.

5   Q.  That is the part of your shoulder that lets you move it up

6   and down and around, correct?

7   A.  That's correct, yes, sir.

8   Q.  Now, let me ask you this.  One of the reasons that you get

9   paid a lot of money for being an engineer is that there is

10  enormous responsibility on you driving that engine, isn't

11  there?

12  A.  Yes, sir.

13  Q.  Thousands of lives, as you said, are depended upon you,

14  correct?

15  A.  Yes, sir.

16  Q.  Now, I've never driven a train, but would I be correct in

17  understanding that in order to drive that train there is at

18  least three things you have to do at all times, or be ready to

19  be able to do, with your arms and shoulders.

20          One, you have to move the throttle, correct?

21  A.  Yes, sir.

22  Q.  And the throttle is heavy, isn't it, sometimes, on some

23  engines?

24  A.  No -- yeah, some engines, but I wouldn't call it heavy.

25  Q.  But you have to be able to push and pull on the throttle,

D7jdles1                    Supper - cross

1   correct?

2   A.  Yes, that's correct.

3   Q.  And that's done with your shoulder, correct, and your wrist

4   and your elbow and your whole arm, whatever skeletal issue

5   here, right?

6   A.  Yeah.  But I didn't do it with my left arm; I did it with

7   my right arm.

8   Q.  We'll get to that.

9   A.  Huh.

10          MR. WEDDLE:  Objection, your Honor.

11          THE COURT:  Overruled.

12  Q.  Regardless of which arm you used on the throttle, you also

13  have to be able to use the brake with your other arm and the

14  whistle, correct?

15  A.  The horn, yes.

16  Q.  And the horn, from a safety standpoint, is one of the most

17  important functions of all, correct?

18  A.  Correct.

19  Q.  Because as a matter of law and common sense, you have to

20  blow the whistle at every potential crossing, correct?

21  A.  That's correct.

22  Q.  So in order to drive that train, you've got to be able to

23  do three things at the same time sometimes, right?

24  A.  Sometimes.

25  Q.  And you sometimes drove some pretty big engines, correct?

1    A.  That's correct.

2    Q.  Would I be correct in saying that you drove sometimes a

3    GP38?

4    A.  Yes, back in the day.

5    Q.  That was an older engine, right?

6    A.  Yes, sir.

7    Q.  2,000 horsepower, right?

8    A.  That's correct.

9    Q.  Big engine, right?

10   A.  Big engine.

11   Q.  You also drove E10s and E15s, correct?

12   A.  That's correct.

13   Q.  Those are even bigger, right?

14   A.  They are smaller.

15   Q.  They are smaller than the GP38, but the 15 is bigger than

16   the 10, correct?

17   A.  That's correct.

18   Q.  You also drove what's known as the old power packs,

19   correct?

20   A.  Yes, sir.

21   Q.  Those are the old electric things that look like they're

22   connected together?

23   A.  Mm-hmm.  Without traction modes for power.

24   Q.  Right.  And those are -- and if you were driving some of

25   those engines on some runs, sometimes it's like three hours to

D7jdles1                       Supper - cross

1    Montauk, isn't it?

2    A.   That's correct.

3    Q.   So that's three hours where you've got to be at all times

4    able to work both arms, correct?

5    A.   Yes, sir.

6    Q.   And keep an eye on the road, correct?

7    A.   Of course.

8    Q.   And am I correct that you do this from a seated position

9    where you've got one knee out here and you're kind of going

10   like this (indicating)?

11   A.   Well, you are sitting down.  It is comfortable.

12   Q.   Right.  But you've got to keep your eye on the road, right?

13   A.   Yes.  You've got to keep focused.

14   Q.   OK.  And you've got to be able to move your arms and elbow

15   and shoulder, right?

16   A.   Yes, sir.

17   Q.   So let's go to that.  You say you could do that today?

18   A.   Yes, I could.

19   Q.   Would you ride on that train with yourself in the condition

20   you're in today?

21   A.   I don't think the condition I'm in wouldn't stop me from

22   running the train.

23   Q.   Really?

24   A.   Really.

25   Q.   Well, you've now had shoulder surgery.

D7jdles1                              Supper - cross

1    A.  Right.

2    Q.  So what was a bad shoulder got worse by this automobile

3    accident, right?

4    A.  Correct.

5    Q.  OK.  But that's your opinion alone?

6    A.  That's my opinion, right.

7    Q.  Now --

8              MR. WEDDLE:  Objection, your Honor.

9              THE COURT:  Overruled.

10   Q.  You haven't -- the government hasn't sent you to be

11   examined by anybody, have they?

12   A.  No, they have not.

13   Q.  You've been around for a year, however, right?

14   A.  Yes.

15   Q.  When is the first time the government asked you about

16   whether you could still drive a train today?

17   A.  I guess about back in May of last year.

18   Q.  They did?

19   A.  Yes.

20   Q.  OK.  And you were then talking to them about trying to get

21   a deal, correct?

22   A.  There was no deal.  No.  It was just they told me if I

23   spoke the truth and was honest, that they would present to the

24   Judge a 5K letter.

25   Q.  I understand that, but listen to my question.

D7jdles1                        Supper - cross

1    A.   OK.   Sorry.

2    Q.   When you first told them that, that you really weren't

3    disabled, you knew that if you told them that you had been, in

4    your opinion, you were disabled, your use to them would be

5    zero, correct?

6    A.   I'm not sure.  I know they wanted me to testify.

7    Q.   But you knew, when you were talking to them, that in order

8    to get favors from them you would have to tell them that you

9    believed that you weren't disabled, correct?

10   A.   I told them the truth and that's all I told them, and I

11   didn't expect any favors from them.

12   Q.   Are you telling us you don't expect any favors now?

13              MR. WEDDLE:  I object to the characterization, your

14   Honor.

15              THE COURT:  Sustained.

16   Q.   Didn't you say yesterday that you were expecting favors

17   from the government pursuant to that cooperation agreement?

18              MR. WEDDLE:  Objection, your Honor.

19              THE COURT:  Characterization.  Rephrase the question.

20   Q.   Your cooperation agreement calls for the government to

21   write a letter to Judge Marrero, if they deem it appropriate,

22   to give you a lower sentence, correct?

23   A.   I'm not sure how -- what they promised.  I know, like I

24   said, that they would write the 5K letter if I cooperated.

25   Q.   So I don't have to show -- I mean, I don't want to waste

D7jdles1                          Supper - cross

1    time showing you the letter.

2    A.  Right.

3    Q.  But we saw the letter yesterday, right?

4    A.  Right.

5    Q.  It is in evidence.

6            And so, therefore, you are hoping that your testimony

7    here will get you this 5K letter, right?

8    A.  I was -- I'm telling the truth and -- and I hope I get the

9    letter, of course, but there's no guarantee.  There was no

10   guarantee they were going to give me a letter.

11   Q.  I understand that.  But that's what you're hoping, correct?

12   A.  I guess so.

13   Q.  Well, you really don't want to go to prison, do you?

14   A.  No.  I don't want to go to prison.

15   Q.  You don't think you deserve to go to prison, do you?

16   A.  I did some things wrong; I know that.

17   Q.  Well, let's talk about that.

18           You've pled guilty a year ago to the crimes that are

19   charged here, correct?

20   A.  Correct.

21   Q.  And as part of the crime that you're charged with, one of

22   the charges is a conspiracy, correct?

23   A.  Yes.

24   Q.  And you've read the charges against you, correct?

25           (Pause)

1           And one of those charges was what the government

2     called in the indictment a premedicated fraud scheme; do you

3     remember that?

4     A.   Not really but --

5     Q.   Words close to that?

6     A.   Yeah, close to that.

7     Q.   But the truth of the matter is that you never once, before

8     you got arrested, thought that you participated in a

9     premeditated fraud scheme with anyone, did you?

10    A.   No, that's not true.  I knew that what I did was wrong.

11    Q.   I didn't ask you whether you knew what you did was wrong.

12           MR. WEDDLE:  Objection, your Honor.

13           THE COURT:  All right.  Sustained.

14    Q.   My question is did you, prior to your being arrested --

15           MR. WEDDLE:  Objection, your Honor.

16           THE COURT:  Ask the question.

17    Q.   -- think that you had engaged in criminal conduct?

18           THE COURT:  Overruled.

19           Overruled.

20    A.   I knew what I did was wrong, sir, prior to being arrested.

21    Q.   You didn't understand my question.

22    A.   You asked me whether I -- could you repeat the question,

23    please?

24           THE COURT:  The reporter will read back the question.

25           (Record read)

1              MR. WEDDLE:  Asked and answered twice, your Honor.

2              THE COURT:  All right.  Asked and answered.

3      BY MR. DURKIN:

4      Q.  How much time did you tell us yesterday that you were

5      looking at?  Was it 60 years?

6      A.  That's correct.

7      Q.  And you also know, as part of your negotiations, that there

8      are things called the federal sentencing guidelines, correct?

9      A.  No, I don't know about that.

10     Q.  You don't?

11             (Pause)

12             You pled guilty on September 19th of 2012 before a

13     Magistrate Judge named Gabriel Gorenstein, correct?

14     A.  Yes, sir.

15     Q.  And you remember the Judge saying to you, "Sir, do you

16     understand that in sentencing you, the sentencing judge will

17     consider as part of the sentence the prison range called for by

18     part of our law known as the Guidelines?"

19             And then he said, "Are you familiar with the

20     Sentencing Guidelines?"

21             Do you remember that question?

22     A.  Not really, no.

23     Q.  So you wouldn't remember what you answered?

24     A.  It's -- I was pretty nervous and I was just -- I

25     probably -- I'm not sure.

1   Q.  Do you think if I showed you a copy of the transcript of

2   that, it might refresh your recollection as to whether you were

3   asked that and what answer you gave?

4              MR. WEDDLE:  Do you have a page number for me?

5              MR. DURKIN:  11.

6   Q.  There is the question and there is the answer.

7              (Indicating to the witness)

8              (Pause)

9   A.  OK.

10  Q.  Does that refresh your recollection that the Judge asked

11  you that, asked you about whether you were familiar with the

12  guidelines, and that you said you were?

13  A.  Yep.  Yes, sir.

14  Q.  Let me go back to the driving the engine again.

15             You testified yesterday that even though your shoulder

16  was bad, there was these things, like you had to sometimes

17  perform uncoupling.  Can you explain what that is?

18  A.  A lot of times you have to uncouple from our engines or

19  from actual cars.  OK?  And that was done with a crew member

20  most of the time.

21  Q.  Most of the time, correct?

22  A.  Yeah.

23  Q.  But there were times when there wasn't a crew member,

24  correct?

25  A.  Right.

1   Q.  Particularly on those harder jobs that you would bid for

2   that paid more money, correct?

3   A.  Mm-hmm.

4   Q.  And you got those because you were senior, correct?

5   A.  That's correct.

6   Q.  So you're not saying you could do that job today, are you?

7   A.  I could do that job, sure.

8   Q.  I thought you said you couldn't do the uncoupling without

9   help from a conductor or someone else?

10          MR. WEDDLE:  Objection, your Honor.

11          THE COURT:  Overruled.

12  A.  If you had to couple up to equipment, you would need help

13  with a compromise coupler.  And that's what I said I couldn't

14  do.

15  Q.  OK.  So as far as you're concerned, then, you could even go

16  out there on these solo runs and do everything 100 percent?

17          MR. WEDDLE:  Objection, your Honor.

18          THE COURT:  Overruled.

19  A.  I could still work, sir.

20  Q.  That is not my question.

21          Can you do your job safely 100 percent of the time in

22  the physical condition you are in?

23  A.  I think so.

24  Q.  You do?

25          But no one has tested you to see that, correct?

1  A.  No, they have not.

2  Q.  The only tests we have are the tests that Dr. Lesniewski

3  ran, correct?

4  A.  That's correct.

5  Q.  And those are all reflected in those notes, correct?

6  A.  Yes, sir.

7  Q.  Now, the tests -- you even asked for more tests, correct?

8  A.  Yes, sir.

9  Q.  OK.  And that was with this note that you showed us

10  yesterday, correct?

11  A.  Yes, sir.

12  Q.  OK.  And you think that was around the time of your wife's

13  death, correct?

14  A.  It was approximately two weeks after that.

15  Q.  OK.  And you were, I presume, emotionally upset at that

16  time?

17  A.  Yes.  Very much so.

18  Q.  And you wanted to make sure that anything that could be

19  done to assist in getting a disability could be done, correct?

20  A.  That's correct, yes, sir.

21  Q.  Because by then you had changed your mind, or at least in

22  your own mind you knew you wanted out as soon as possible,

23  correct?

24        MR. WEDDLE:  Objection, your Honor.  This has been

25  asked and answered.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE COURT:  Asked and answered.

2     Q.  Dr. Lesniewski did not order every one of the tests that

3     you wanted, did he?

4     A.  I think I went for an MRI on my back and maybe my knee.

5     Q.  OK.  And how many tests did you want?

6     A.  Oh, maybe three or four.

7     Q.  And you got two, correct?

8     A.  That's correct.

9     Q.  Did you say to him, "What's the deal here?  Aren't we part

10    of a scam?  And why aren't you doing what I tell you to do?"

11    A.  I never said that to him.

12    Q.  That is because you weren't part of a scam with him, were

13    you?

14    A.  I think I was.

15    Q.  You do?

16          MR. WEDDLE:  Objection, your Honor.

17    Q.  What makes you think that you were part of a scam with

18    Dr. Lesniewski?

19    A.  Well, I went to Dr. Lesniewski because a lot of other Long

20    Island Rail Road employees went there and most of them got the

21    disability.

22    Q.  That's because you knew that you had to have medical

23    support to even get a disability, correct?

24    A.  That's correct.

25    Q.  So you had to go to some doctor, didn't you?

D7jdles1                         Supper - cross

1   A.  Yes.

2   Q.  And there aren't a lot of doctors that are familiar with

3   the RRB requirements, are there?

4            MR. WEDDLE:  Objection, your Honor.

5            THE COURT:  Sustained.

6   Q.  Well, did you hear all kinds of names when you went and

7   asked people who you might go to?

8   A.  Yes, I did.

9   Q.  How many names did you hear?

10  A.  Three.

11  Q.  That's my point.

12           MR. WEDDLE:  Objection, your Honor.

13           THE COURT:  Overruled.

14  Q.  You only heard three names, correct?

15  A.  That's correct.

16  Q.  OK.  And you didn't want to go to somebody in Manhattan,

17  correct?

18  A.  No.

19  Q.  Did you ever check to see whether there were other doctors?

20  A.  No, I did not.

21  Q.  OK.  But nobody said to you this is all a fix, did they?

22  A.  They never said it was a fix, no.

23  Q.  Because it's not a fix, is it?

24  A.  I think -- I think it is.

25  Q.  Oh, you do?

D7jdles1                          Supper - cross

1           MR. WEDDLE:  Objection, your Honor.

2           THE COURT:  Sustained.

3    Q.  Well, when you went to see Dr. Lesniewski, he didn't start

4    winking and nodding with you, did he?

5    A.  No.

6    Q.  He treated you like a physician, didn't he?

7    A.  He examined me, yes.

8    Q.  And he did an examination that was consistent with any

9    other medical examinations you've had, correct?

10   A.  That's correct.

11   Q.  And he an office that was a real doctor's office, correct?

12   A.  Yes, it was.

13   Q.  He was busy, wasn't he?

14   A.  Yes, he was.

15   Q.  You knew him to be primarily a surgeon, didn't you?

16   A.  I knew he was the doctor to go to.

17   Q.  All right.  I understand you -- well --

18   A.  I knew he was a doctor that you would go to -- that I was

19   told to go to by other employees.

20   Q.  Right.  But they didn't tell you go there because the fix

21   is in and don't worry about a thing, you won't have to say a

22   word and you'll just get it; right?  Nobody ever said anything

23   like that?

24   A.  No, nothing like that.

25   Q.  And nothing like that ever happened, did it?

D7jdles1                    Supper – cross

1          (Pause)

2  A.  I went there to retire, sir, and make sure that there was

3  something wrong with me.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7jnles2                          Supper - cross

1    Q.  You told him there was something wrong with you, didn't

2    you?

3    A.  Yes, I did.  I told him my shoulder was bothering me.

4    Q.  That's because you wanted to retire, correct?

5    A.  That is correct.

6    Q.  He told you you had a bad shoulder, correct?

7    A.  Yes, he did.

8    Q.  And he even recommended surgery, didn't he?

9    A.  Yes, he did.

10   Q.  But you were the one that rejected the surgery, correct?

11   A.  That is correct.

12   Q.  That is because if you had had the surgery that Peter

13   Lesniewski recommended, you knew in your own mind that you

14   couldn't get a disability, correct?

15   A.  I knew it would be harder, yes.

16   Q.  So you, Gary Supper, decided not to follow Peter

17   Lesniewski's advice, correct?

18   A.  Correct.

19   Q.  Even though he offered that to you?

20   A.  He wanted me some of surgery, correct.

21   Q.  Did you find that odd, that somebody that you thought or so

22   you claim today that the fix was in would recommend doing

23   something for you that would make it more difficult to get

24   disability?

25   A.  No.

D7jnles2                        Supper - cross

1   Q.  When you first talked to the government about this issue of

2   how long you could keep working, you told them on May 1 that

3   you could have continued --

4           MR. WEDDLE:  He is talking about an out-of-court

5   statement.  I'm not sure if there is any predicate for talking

6   about an out-of-court statement.

7           THE COURT:  He's referring to testimony yesterday.  Is

8   that correct, Mr. Durkin?

9   Q.  You've told us that at the time you didn't think you were

10  disabled, even though you said so.

11          MR. DURKIN:  I will rephrase the question.

12          THE COURT:  Rephrase the question.

13  Q.  Correct?

14          MR. WEDDLE:  I thought he was going to rephrase the

15  question, your Honor.

16          MR. DURKIN:  I thought I just did.

17          THE COURT:  He did.

18          Your answer?

19  Q.  Do you remember the question?

20  A.  No.

21          THE COURT:  Can the reporter read back the question.

22          (Record read)

23          THE COURT:  That's been asked and answered,

24  Mr. Durkin.

25  Q.  Did you ever tell the government that you thought you could

D7jnles2                         Supper - cross

1  continue working maybe two to four years?

2  A.  I don't know if it was two to four years, but I told them I

3  could work.

4  Q.  If I showed you a memorandum of an interview on May 1,

5  2012, do you think that might refresh your recollection?

6  A.  Sure.  OK.

7  Q.  Does that refresh your recollection that you did tell them

8  that?

9  A.  Yes.

10 Q.  Was there a reason why you picked two to four years?

11 A.  No.

12 Q.  Do you think you could keep working ten years from now?

13 A.  From now?

14 Q.  Well, that was in 2012.  That was in May of 2012.

15 A.  Well, I would probably want to work up to maybe 60 or so,

16 you know, I wouldn't want to work past that.  That would be 40

17 years at the railroad.

18 Q.  What you mean by that, when you say that you could have

19 kept working, is that you could have worked through the pain

20 that you had, correct?

21 A.  Yes, I could have worked through the pain.

22 Q.  You could have taken extra --

23 A.  Leave.

24 Q.  -- extra leave, correct?

25 A.  Yes.

D7jnles2                          Supper - cross

1    Q.  You could have taken more analgesics, correct?

2    A.  Yes.

3    Q.  In fact, there was a time when Dr. Lesniewski prescribed

     Vicodin for you, correct?

5    A.  That's correct.

6    Q.  And you took it, correct?

7    A.  No, I didn't take it.

8    Q.  Do you remember when it was that he prescribed the Vicodin?

9    A.  Oh, sometime at one of my visits maybe.

10   Q.  I'm sorry.

11   A.  I said sometime when I went for one of my visits.

12   Q.  Are you sure that you never took the Vicodin that

13   Dr. Lesniewski prescribed for you?

14   A.  I can't remember back that far.  I might have.  But I can't

15   remember if I took it once or twice maybe.

16   Q.  Do you remember telling -- you just told us a minute or two

17   ago --

18   A.  I understand that.

19   Q.  -- that you never took it, correct?

20   A.  Yeah, but it was so long ago, sir, that my memory's shot on

21   that.

22   Q.  Really?  But you told the government on May 1, 2012, that

23   you received prescriptions of Vicodin which you did take, but

24   not when you were at work driving trains, correct?

25   A.  I told -- I guess I told the government that, yes.

D7jnles2                          Supper - cross

1   Q.  Do you deny that you told the government that you took the

2   Vicodin?

3   A.  No, I do not.  But I didn't take it when I was operating

4   trains.

5   Q.  I didn't ask whether you took when you were operating the

6   train.  My question was, there was a time when you were seeing

7   Dr. Lesniewski that the pain was bad enough that he prescribed

8   Vicodin for you, correct?

9   A.  Correct.

10  Q.  And you know Vicodin to be a very powerful opiate-type pain

11  depressant, correct?

12  A.  Correct.

13          MR. WEDDLE:  Objection, your Honor.

14          THE COURT:  Sustained.

15  Q.  You know Vicodin is very strong.

16          MR. WEDDLE:  Your Honor, may I just have a moment with

17  counsel.

18          THE COURT:  Yes.

19  Q.  You know Vicodin to be a powerful drug, correct?

20  A.  Yes, sir.

21  Q.  That's why you didn't take it when were you driving the

22  train, correct?

23  A.  That is correct.

24  Q.  But you did take it, correct?

25  A.  Yes, sir.

D7jnles2                          Supper – cross

1    Q.  Dr. Lesniewski also gave you prescriptions for physical

2    therapy, didn't he?

3    A.  Yes, he did.

4    Q.  But you, Gary Supper, elected not to do the physical

5    therapy, correct?

6    A.  That's correct.

7    Q.  You did that for the same reason you elected not to have

8    the surgery, which is you didn't want to follow

9    Dr. Lesniewski's recommendation so that you could get the

10   disability, correct?

11   A.  That's correct.

12   Q.  But nevertheless this doctor who was involved in this scam,

13   as you claim you were involved with him, recommended things

14   that would have hurt your chances for getting the disability,

15   correct?

16           MR. WEDDLE:  Objection, your Honor.

17           THE COURT:  Overruled.

18   A.  That's correct.

19   Q.  Instead, you went to Mr. Krueder and you had Mr. Krueder

20   fill out your application, correct?

21   A.  Yes, he helped me out.

22   Q.  You and Mr. Krueder went over the application, correct?

23   A.  Yes.

24   Q.  Not you and Dr. Lesniewski and Mr. Krueder, correct?

25   A.  No, not Dr. Lesniewski, no.

1   Q.  Dr. Lesniewski simply gave the narrative that we have

2   already seen, correct?

3   A.  Yes, sir.

4           MR. WEDDLE:  Objection, your Honor.

5           THE COURT:  Overruled.

6   Q.  And you and Krueder got together and filled out those

7   forms, correct?

8   A.  Yes, sir.

9   Q.  And the forms you and Krueder filled out were false,

10  correct?

11  A.  Yes, they were.

12          MR. DURKIN:  That is all I have.

13          THE COURT:  Mr. Jackson?

14          MR. JACKSON:  Nothing at all, Judge.

15          Thank you very much.

16          THE COURT:  Mr. Ryan.

17          MR. RYAN:  No questions, your Honor.

18          THE COURT:  Yes.  Mr. Weddle.

19  REDIRECT EXAMINATION

20  BY MR. WEDDLE:

21  Q.  A second ago Mr. Durkin asked you if Dr. Lesniewski simply

22  gave you the narrative that we've already seen.  Do you

23  remember him asking you that?

24          Do you remember him asking you that?

25  A.  Mr. Durkin?

1   Q.  Yes.

2   A.  Yes.

3   Q.  When you went to Dr. Lesniewski the first time, why did you

4   go to him?

5   A.  I went to Dr. Lesniewski because I wanted to retire in a

6   few years, and I was looking to possibly receive an

7   occupational disability from the RRB.

8   Q.  When you went to him to the second time, did you go to him

9   for a different reason or the same reason?

10  A.  The same reason.

11  Q.  How about the third time?

12  A.  Yes, all the times.

13  Q.  All of them?

14  A.  Yes.

15  Q.  About how many times do you think in total you went to see

16  Dr. Lesniewski?

17  A.  Before I retired, about maybe eight to ten.

18  Q.  And after that for the Aflac forms?

19  A.  About another maybe dozen times, maybe.

20  Q.  The Aflac forms, who signed them?

21  A.  Dr. Lesniewski and myself.

22  Q.  And then there was that one that was Dr. Yerys, right?

23  A.  Yes.

24  Q.  In conjunction with helping you get a disability, did

25  Dr. Lesniewski also order any tests?

1   A.  Yes, he did.

2   Q.  What kinds of tests did he order?

3   A.  He ordered an MRI on my shoulder and then he ordered an MRI

4   on my knee and my back from what I recall.

5   Q.  Do you recall when we were looking at the files from your

6   application for disability, there were a number of documents

7   that came there Dr. Lesniewski's office, right?

8   A.  Yes, sir.

9   Q.  There was the narrative, right?

10  A.  That's correct.

11  Q.  Then there were other documents, too, right?

12  A.  Yes, sir.

13  Q.  Was it correct when you said to Mr. Durkin that

14  Dr. Lesniewski simply gave you a narrative?

15  A.  Well, he gave me a narrative, but he also gave me tests and

16  so on that I had performed.

17          MR. WEDDLE:  Can we put on the screen, I can't

18  remember now the exhibit number, but the note that Mr. Supper

19  wrote to Dr. Lesniewski.  Let's blow up the top half of that.

20  Q.  You said that this note you wrote in November, right?

21  A.  No -- yes, in November.

22  Q.  After you wrote this note, how many MRIs did Dr. Lesniewski

23  send you for?

24  A.  Two.

25  Q.  What did you tell Dr. Lesniewski about why you wanted him

1    to send you for those MRIs in this note?

2    A.   Because I felt that the shoulder would not totally get me

3    the disability.

4    Q.   Did you tell Dr. Lesniewski that you felt that the shoulder

5    might not totally get you the disability?

6    A.   I wrote it down.

7    Q.   Did you also tell him what kind of disability you wanted

8    there in the top line?

9    A.   Yes.  It says permanent disability, but I meant the

10   occupational disability.

11   Q.   What you told Dr. Lesniewski was that you wanted permanent

12   disability in this note, right?

13   A.   Yes.

14   Q.   You said he sent you for MRIs as a result of this note,

15   right?

16   A.   That's correct.

17   Q.   On what parts of your body?

18   A.   On my knee and my back I think.

19   Q.   What parts of your body did you ask him to perform MRIs on?

20   A.   Knee, back and ankle.

21        MR. DURKIN:   I think this is getting asked and

22   answered, Judge.

23        THE COURT:   Sustained.

24   Q.   What else did you ask -- do you see after the line where it

25   says, "I stopped working"?

1    A.  Yes.

2    Q.  What else did you ask Dr. Lesniewski to do in the next two

3    lines?

4    A.  It says, "Please document symptoms why I cannot perform

5    duties."

6    Q.  Did Dr. Lesniewski document symptoms about why you couldn't

7    perform your duties?

8    A.  In the narrative he did, I think.

9    Q.  What about in the other medical records that we have been

10   talking about?

11   A.  Yes, the Aflac.

12   Q.  In his chart notes that we were talking about, Government

13   Exhibit 103-G.

14   A.  Yes, sir.

15   Q.  Do you see to see it again?

16   A.  Sure.

17   Q.  If you would take a look at the third page of Government

18   Exhibit 103-G -- I'm sorry.  Not the third page.

19          The seventh page of this exhibit.

20          MR. WEDDLE:  If you could blow that up, please.

21   Q.  You recall that this is a document, this is

22   Dr. Lesniewski's chart notes, right?

23   A.  Yes, sir.

24   Q.  These are the chart notes for November 21, 2006, right?

25   A.  That's correct.

1    Q.  Is that the date that you gave Dr. Lesniewski the letter

2    asking him to perform MRIs for you so that you could get a

3    permanent disability?

4    A.  On or around that date, yes, sir.

5    Q.  In this chart note is Dr. Lesniewski documenting symptoms

6    for you that you had requested him to document?

7            MR. DURKIN:  Objection to the characterization.

8            THE COURT:  Rephrase the question.

9    Q.  In your letter, sir, we just read it.

10   A.  Right.

11   Q.  You said please document symptoms, right?

12   A.  Correct.

13   Q.  You specifically asked for symptoms relating to your back

14   and your neck and your ankle, right?

15   A.  Yes.

16   Q.  Do you see in this piece of paper it is documenting

17   symptoms with back pain?  Do you see that?

18           MR. DURKIN:  Object to the characterization.

19           THE COURT:  Sustained.

20   Q.  Sir, can you just read the second paragraph under the

21   heading that says, "Physical Examination."

22           Can you just read that.

23   A.  "He also has back pain with normal reflexes.  Pain on

24   extension, less on flexion.  Motor and sensory are full."

25   Q.  Can you read just the first sentence of the next paragraph?

1   A.  He also has tenderness of his left knee.

2   Q.  Do you remember Mr. Durkin asked you what makes you think

3   you were part of a scam with Dr. Lesniewski?  Do you remember

4   that question that he asked you?

5   A.  I think so, yes.

6   Q.  Is the letter that we have just been looking at among the

7   things, one of the things that makes you think you were part of

8   a scam with Dr. Lesniewski?

9           MR. DURKIN:  Object to the leading.

10          THE COURT:  Sustained.

11  Q.  Does the letter that we were just looking at where you

12  asked Dr. Lesniewski, you, the patient, asked Dr. Lesniewski to

13  document with MRIs and other tests more symptoms in your body

14  so you could get a permanent disability?

15          MR. DURKIN:  Objection.  Leading.

16          THE COURT:  Sustained.

17  Q.  To what extent did that play into --

18          MR. DURKIN:  Same objection.

19  Q.  -- your view about whether you and Dr. Lesniewski were part

20  of a scam together?

21          MR. DURKIN:  Same objection.

22          THE COURT:  Overruled.

23  A.  I felt that I needed more reasons for my disability to be

24  proved.

25  Q.  When you told Dr. Lesniewski that you wanted him to

D7jnles2                      Supper - redirect

1    document more reasons so that you could get a permanent

2    disability, did he say to you something to the effect of, Oh,

3    I'm just trying to treat your symptoms and make you better?

4              MR. DURKIN:  Objection.

5    Q.  Did he say anything like that?

6              THE COURT:  Sustained.

7              MR. DURKIN:  Objection.

8              THE COURT:  Sustained.

9    Q.  Sir, when you were driving trains at the railroad --

10   Mr. Durkin asked you about this -- did you ever put thousands

11   of people in danger?  Did you ever do that?

12   A.  Never.

13   Q.  Up until the last day you worked, did you ever do that?

14   A.  No, I was a good employee.

15   Q.  You had some pain in your shoulder, right?

16   A.  That's correct.

17   Q.  Did it make it dangerous for you to blow the whistle with

18   your left shoulder because of the pain that you had?

19   A.  No, it did not.

20   Q.  What's the only time that your shoulder caused you pain

21   when you were doing your job?

22   A.  Probably climbing up and down the equipment.

23   Q.  So when you were actually --

24   A.  Maybe going underneath to couple up the hoses and so on.

25   Q.  When you were in train driving one of these locomotives, we

1   heard all the different names of them, right?

2   A.  Right.

3   Q.  They are not small, right?

4   A.  No, they were big.

5   Q.  When you were sitting in the driver's seat of that driving

6   the train -- I am not going to pantomime it, but is that the

7   time when you had pain in your shoulder?

8   A.  No.

9   Q.  Did you ever endanger yourself at the railroad?

10  A.  I don't think so.

11  Q.  Mr. Durkin asked you about times when you had to couple up

12  trains, and said you did it with a crew member, and he said

13  there were times when you worked alone and theres were wasn't a

14  crew member there?

15  A.  Right.

16  Q.  How often did that happen that you needed to couple up

17  trains and you were alone in let's say the five years before

18  you retired?

19  A.  It all depends what job I was working.

20  Q.  Just an estimate.  Just ballpark.

21          Is this something that might have happened?  I mean,

22  we talked about compromised couplers in your direct testimony I

23  think you said maybe once or twice?

24  A.  In my whole career.

25  Q.  So this situation that Mr. Durkin was talking to you about,

1    is that similarly rare?

2    A.  No, I had to couple up a lot of times or uncouple.  It is

3    hard to uncouple by yourself.

4    Q.  When you had to do it by yourself, did you fail to do it?

5    A.  Did I fail to do it?

6    Q.  Yes.

7    A.  Well, no, I would get the job done usually.

8    Q.  You said usually, but did you ever fail to get the job

9    done?

10   A.  No, I got the job done.

11   Q.  Every time, right?

12   A.  Right.  A lot of times you couldn't couple up, because you

13   had to line them up.  The coupler had to be lined up correct,

14   and if you're doing it by yourself it's hard to do.

15   Q.  Sometimes you would try to couple it and it wouldn't be

16   lined up?

17   A.  Right.

18   Q.  And then you would adjust it and what would happen?

19   A.  Then it would couple up.

20   Q.  So every time it worked, right?

21   A.  Yes.

22              MR. DURKIN:  Objection.

23              MR. WEDDLE:  May I have a moment, your Honor.

24              Nothing further, your Honor.

25   RECROSS EXAMINATION

D7jnles2                          Supper - recross

1   BY MR. DURKIN:

2   Q.  Are you telling us that it wasn't until November 21 of 2006

3   that Dr. Lesniewski or any of his assistants ever came up with

4   something about your knee?  Is that what you are telling us?

5   A.  I'm telling you that I needed it more so than I guess my

6   shoulder.  But I also had told him that I have had injuries in

7   the past.

8   Q.  You just testified --

9   A.  Yes, sir.

10  Q.  -- did you not, just a few minutes ago and yesterday that

11  you believed that because you wrote that note in November 21,

12  2006, that all of a sudden Lesniewski made up the fact for you

13  that you had knee problems?  Isn't that the gist of your

14  testimony?

15           MR. WEDDLE:  Objection, your Honor.  Mischaracterizes.

16           THE COURT:  Overruled.

17  A.  When I wrote this note, I was very upset, and I knew I

18  needed something more than my shoulder, sir, and I was just

19  covering all the bases.

20  Q.  Right.  My question again --

21  A.  Yes, sir.

22  Q.  -- without wasting time to have it read back, is that isn't

23  the gist of that testimony that somehow based on that note

24  Dr. Lesniewski created a bogus or false issue regarding your

25  left knee?

1          MR. WEDDLE:  Objection, your Honor.

2          THE COURT:  Overruled.

3    A.  I had hurt my knee prior to this, but I wanted to make sure

4    that the knee was in the narrative.

5    Q.  What is the answer to my question?

6          MR. WEDDLE:  Objection, your Honor.

7          THE COURT:  Sustained.

8    Q.  Dr. Lesniewski didn't make up anything about tenderness in

9    your left knee on November 21, 2006, did he?

10   A.  It says here he did.

11   Q.  Really?

12         MR. WEDDLE:  Object to the commentary, your Honor.

13         THE COURT:  Sustained.

14   Q.  Let's take a look at, in the same document, the notes for

15   July 31 of 2006.  I believe it is on page RRB 025139.

16         MR. DURKIN:  Can we blow up that portion.

17   Q.  What does that say, Mr. Supper?

18   A.  It says, "Patient is in for left shoulder.  Still has pain,

19   fluid on rotator cuff.  PT has pain in knee, left knee, on

20   outer side while doing almost all bending of the knee."

21   Q.  So you told him that in July of 2006 some four months

22   before you gave him this smoking gun note, right?

23   A.  Right.

24         MR. WEDDLE:  Objection, your Honor.

25         THE COURT:  Sustained.

D7jnles2                      Supper - recross

1    Q.  Before you gave him this note --

2              MR. WEDDLE:  Objection, your Honor.

3              THE COURT:  Overruled.

4    Q.  -- you had already told him about the left knee in July,

5    correct?

6              MR. WEDDLE:  Objection, your Honor.

7              THE COURT:  Asked and answered.

8    Q.  Let's take a look at Government Exhibit 303-B, if we could.

9    Do you remember this document?

10   A.  Yes, sir.

11   Q.  This is a document you filled out before you even met

12   Dr. Lesniewski when you first arrived at his office, correct?

13   A.  That's correct.

14   Q.  This is the document that you told us yesterday you filled

15   out, that it has your health history and medical issues,

16   correct?

17   A.  Correct.

18   Q.  Now turn, if you would, to the fourth page of that

19   document.

20             MR. DURKIN:  I'm sorry.  Could you blow up the box

21   that says "Orthopedic Problems."

22   Q.  Before I ask this question, let's go back to the date that

23   this is signed on page 1.  This is November -- can we go to

24   page 1 down at the bottom.  What's the date you signed that,

25   Mr. Supper?

D7jnles2                    Supper - recross

1   A.  November 15, 2005.

2            MR. DURKIN:  Can we go back to that fourth page again.

3   Q.  What kind of orthopedic problems did you check to tell

4   Dr. Lesniewski you had as of November 15, 2005?

5            MR. WEDDLE:  Objection, your Honor.

6            THE COURT:  Overruled.

7            MR. WEDDLE:  The document says "have had," your Honor.

8   Q.  What boxes did you check, sir?

9   A.  Shoulder, arm, hand, ankle and foot.

10  Q.  You didn't check the knee there, did you?

11  A.  No, I did not.

12  Q.  But we know that as early as July you told him about the

13  knee, correct?

14  A.  That's correct.

15           MR. DURKIN:  Let's take a look at October 31 of 2006.

16  I think that's the -- I'm sorry.  Let's go back to 103-G.

17           That's it.  Would you go to the impression -- well,

18  just the typed box.  Yes.

19  Q.  This is before your wife passes away, correct?

20  A.  A week before.

21  Q.  And this is before you have given any notes, correct?

22  A.  Yes, sir.

23  Q.  This is Dr. Lesniewski saying that you probably should not

24  be an engineer on the Long Island Rail Road, and "I discussed

25  that plan with him," correct?

466

D7jnles2                          Supper – recross

1   A.  That's correct.

2   Q.  But still at that time you weren't sure whether you wanted

3   to even take the disability, correct?

4   A.  I knew that I wanted to retire.

5   Q.  At some point, correct?

6   A.  At some point.

7         MR. WEDDLE:  Objection, your Honor.  This was asked

8   and answered several times.

9         THE COURT:  Sustained.

10         MR. WEDDLE:  And that was not the answer.

11         THE COURT:  Sustained.

12         MR. DURKIN:  Can we go back to July 31, 2006, the

13   typewritten page.

14   Q.  This again is July, it is from several months before you

15   give that note, correct?

16   A.  Yes, sir.

17   Q.  And there it notes a secondary problem with your hands,

18   correct?

19   A.  Yes.

20   Q.  And you're quoted in that report as saying that you have

21   carpal tunnel, correct?

22   A.  Yes.

23   Q.  You have tenderness mostly over the basal joint, correct?

24   A.  Yes, sir.

25         MR. WEDDLE:  Your Honor, is he just reading from the

1  document?  That is fine.  Or is he asking if this is a

2  quotation.  It is not a quotation.

3          THE COURT:  Ask a question.

4  Q.  That's what you told Dr. Lesniewski, correct?

5  A.  Yes.

6  Q.  And, again, what he suggested there that time was that you

7  should have the surgery on your shoulder, correct?

8  A.  Yes, that's correct.

9  Q.  And his only comment is he, meaning you, Gary Supper, has

10 to decide when he wants to do that, correct?

11 A.  That is correct.

12         MR. DURKIN:  That is all I have.

13         I'm sorry, Judge, excuse me.  One second.

14         That's all I have, Judge.  Thank you.

15 REDIRECT EXAMINATION

16 BY MR. WEDDLE:

17         MR. WEDDLE:  Very briefly, your Honor.

18         Can we put up the handwritten note from July 31, 2006

19 that Mr. Durkin asked about.

20         Sorry.  This is from 103-G, page 4 of 103-G.

21         Is that it?  Yes.  That page.  Can you blow it up.

22 BY MR. WEDDLE:

23 Q.  Mr. Durkin asked you about this document, right?

24 A.  Yes, he did.

25 Q.  You also talked about this on your direct testimony,

D7jnles2                              Supper - redirect

1    correct?

2    A.  Yes, I did.

3    Q.  And the date on this handwritten note is July 31, 2006?

4    A.  Yes, sir.

5    Q.  Let's look at the doctor's note, the typewritten part for

6    the same date which is on the next page.

7              So the same date, right?

8    A.  Yes, sir.

9    Q.  Do you see at the bottom of this typewritten part there are

10   a couple of initials there?

11   A.  No, I do not see it.

12   Q.  After it says, "He will need bilateral fusions"?

13   A.  OK.  Got you.

14   Q.  OK.  And the initials say what?

15   A.  PLI IM I think it is.

16   Q.  Could it be slash LM?

17   A.  It could be.

18   Q.  But the PL part of these, PL, does that sound like Peter

19   Lesniewski's initials to you?

20   A.  Yes.

21             MR. DURKIN:  Objection.

22             THE COURT:  Overruled.

23   Q.  Sir, for this examination note, the typewritten one for

24   July 31, 2006, that corresponds to the handwritten thing that

25   we just looked at, is there any mention of your knee?

D7jnles2                           Supper - redirect

1   A.   Not that I see, no.

2   Q.   Is there any mention of any examination of your knee?

3   A.   No.

4   Q.   Is there any discussion of some method to treat some --

5           MR. DURKIN:   Objection.

6   Q.   -- problem in your knee?

7           MR. DURKIN:   Objection to foundation for this line of

8   questioning.

9           THE COURT:   Overruled.

10  Q.   Is there anything in this thing that is on the screen --

11          MR. DURKIN:   Objection.

12  Q.   -- about how to treat some kind of treatment that might be

13  offered for your knee?

14  A.   Nothing there.

15  Q.   Did Dr. Lesniewski ever treat your knee in any way?

16  A.   Not that I know of, no.

17          MR. WEDDLE:   Thank you.   Nothing further.

18          THE COURT:   All right.   Step down.   You are excused.

19          THE WITNESS:   Thank you.

20          (Witness excused)

21          THE COURT:   We are going to take the morning break at

22  this point.   It's 10:40.   Be back in 10 minutes, 10:50.

23          (Continued on next page)

24

25

1              (Jury not present)

2              (Recess)

3              THE COURT:  Mr. Weddle.

4              MR. WEDDLE:  I couple of issues, your Honor.

5         The next witness is Special Agent Del Favero, who

6    participated in an interview with Dr. Lesniewski.  Your Honor

7    has ruled on certain portions of the interview being admissible

8    as offered by the government, and other portions are excluded.

9         There are two phases to the interaction with

10   Dr. Lesniewski.  Your Honor may recall there was an interview

11   portion that Special Agent Del Favero is going to testify about

12   in the normal way.  I may have to do a little more leading to

13   target in on the particular statements that your Honor has

14   admitted, so hopefully I can get a little leeway with that.

15        Then there is a second portion, which is after they

16   interviewed Dr. Lesniewski he then agreed to write out or they

17   wrote out a statement that he made some changes to and agreed

18   on ultimately and signed.

19        The manner of presenting this written part of the

20   statement, I have talked to defense counsel about this, and we

21   propose to do it in the following way.  I have prepared, just

22   retyped the pieces that we would like to admit that are covered

23   by your Honor's ruling and we thought we would just read it

24   into the record rather than admitting a redacted copy, which

25   would have lots of redactions and which would invite

1    speculation, and doing it some other way.  I think we are in

2    agreement on that method of reading this into the record.

3            THE COURT:  Is there an agreement, Mr. Durkin?

4            MR. DURKIN:  Well, maybe I was asleep at the switch.

5    I thought they were just putting Mr. Del Favero on to put the

6    statement on.  I did not know that he was going to get into the

7    other interviews.

8            If he gets into the other interviews, then I think we

9    have to revisit the whole issue of the entire statement,

10   because then it is a completely different issue than what we

11   briefed on just whether it's completeness for that part of the

12   statement.  I thought they were just putting him up there to

13   read the statement.

14           MR. WEDDLE:  No, your Honor, that is exactly what we

15   briefed in our motion in limine.  We set out in great detail

16   the statements that we intended to admit that came from

17   defendant Lesniewski's oral statements, the statements that we

18   intended to admit that came from defendant Lesniewski's written

19   statement, and then the same thing, we summarized the portions

20   from both of those that we believed should be excluded and your

21   Honor granted that motion.

22           So this is exactly what we talked about in our motion

23   in limine.  It's simply a question for the written statement if

24   there were no portions of the written statement that were

25   excluded, you would simply offer the written statement signed

1    by the defendant, you would do that.  To do that here, since

2    large portions of it are excluded, would invite speculation and

3    cause prejudice.

4          So we are just going to read the parts that have been

5    admitted with respect to the written statement.  With respect

6    to Dr. Lesniewski's oral statements that were the subject of

7    the motion and have been ruled on, we are going to elicit them

8    in questions from Special Agent Del Favero.

9          MR. DURKIN:  Judge, respectfully I ask that he be put

10   over until after lunch and we keep the order that we had

11   yesterday.  Whether I was asleep at the switch or not, that's

12   not what I am prepared to do right now.  I'm not prepared to

13   cross him with respect to the other oral statements that we

14   have memoranda of.  I would respectfully ask that we keep the

15   same order then, because I am very uncomfortable.  I don't want

16   to violate your rule, and I would be very uncomfortable trying

17   to cross-examine on that right now.  I can do that after lunch.

18         THE COURT:  Mr. Weddle, is there any difficulty with

19   moving Special Agent Del Favero until after lunch --

20         MR. WEDDLE:  No, your Honor.

21         THE COURT:  -- and proceeding with Mr. Parlante.

22         MR. WEDDLE:  There is not as a logistical matter.  May

23   I have one minute to consult with my team here, your Honor?

24         THE COURT:  Yes.

25         (Pause)

1          MR. WEDDLE:  Logistically, your Honor, that's fine.

2          And perhaps I could just preview for your Honor a

3     couple of things that will come up when we get to Special Agent

4     Del Favero, or do you want to wait?

5          THE COURT:  Let's wait.  I don't want to keep the jury

6     wade waiting anymore.  Let's proceed then with the next

7     witness, and we may need to take a little extra time during the

8     lunch break to sort out any issues pertaining to Del Favero.

9          MR. DURKIN:  Thank you, Judge.

10          MR. WEDDLE:  Could we have one minute, your Honor,

11     since we are switching order?  I want to make sure that we've

12     got the witness in the right room.

13          THE COURT:  Sure.

14          (Pause)

15          THE COURT:  Are we ready?

16          (Pause)

17          MR. WEDDLE:  Your Honor, do you mind if I give you a

18     binder that is marked A.U.S.A. Friedlander?

19          (Handing to the Court)

20          MS. FRIEDLANDER:  Your Honor, just one thing.  There

21     may have been a miscommunication, but I only just received a

22     list of exhibits that Mr. Rutigliano's counsel intends to use

23     with Mr. Parlante.  You know, I think my direct will continue

24     through the lunch -- until the lunch break, so I expect I can

25     just review the exhibits then and hopefully we won't have an

D7jdles3

1    issue.

2              THE COURT:  All right.

3              MS. FRIEDLANDER:  I just wanted to raise it.

4              THE COURT:  All right.  Call in the witness, please,

5    and bring in the jury.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7jdles3

1           THE LAW CLERK:  All rise.

2           (Jury present)

3           THE COURT:  Welcome back.  Thank you.

4           Be seated.

5           MS. FRIEDLANDER:  The government calls Christopher

6    Parlante.

7     CHRISTOPHER PARLANTE,

8         called as a witness by the government,

9         having been duly sworn, testified as follows:

10          THE COURT:  You may sit down.

11          Speak into the microphone as closely as possible.

12          State your name and spell it for the record.

13          THE WITNESS:  My name is Christopher Parlante.

14   C-h-r-i-s-t-o-p-h-e-r; Parlante, P-a-r-l-a-n-t-e.

15          MS. FRIEDLANDER:  Your Honor, just before we get

16   started, by agreement of the parties the government offers the

17   following exhibits:

18          3506-5, 1109, 104A, B, C, D, E, G and J, 1107, 304A,

19   720, and I'm not sure if I said 1109.

20          THE COURT:  All right.  Those are admitted without

21   objection by agreement among the parties.

22          (Government's Exhibits 3506-5, 1109, 104A, B, C, D, E,

23   G and J, 1107, 304A, 720, received in evidence)

24   DIRECT EXAMINATION

25   BY MS. FRIEDLANDER:

D7jdles3                          Parlante - direct

1    Q.  Good morning, sir.

2    A.  Good morning.

3    Q.  Where do you live?

4    A.  I live in Oyster Bay on Long Island.

5    Q.  Are you married?

6    A.  I am married.

7    Q.  Do you have children?

8    A.  I have five children.

9    Q.  How old are you?

10   A.  I am 60 years old.

11   Q.  Are you currently employed?

12   A.  I am not.

13   Q.  Are you retired?

14   A.  I am retired, yes.

15   Q.  And before you retired, what did you do for a living?

16   A.  I worked on the Long Island Rail Road as a passenger

17   conductor and in the later part of my career a freight

18   conductor.

19   Q.  How many years did you work at the Long Island Rail Road?

20   A.  28 years.

21   Q.  When did you retire?

22   A.  I retired at the end of 2004.

23   Q.  How old were you at that time?

24   A.  53.

25   Q.  Sir, how were you able to retire at age 53 financially

D7jdles3                          Parlante - direct

1    speaking?

2    A.  Well, the Long Island Rail Road had a pension that you

3    could collect if you were 50 years old and had 20 years of

4    service and it increased.  So if you had 20 -- 50 and 25, you

5    got half of your Long Island Rail Road pension.  And then the

6    Railroad Retirement had a pension you could collect if you had

7    30 years of service and you were 60 years old where you could

8    get a disability pension from the Railroad Retirement.

9    Q.  And did you get a disability pension?

10   A.  I did.

11   Q.  Is that occupational disability?

12   A.  Yes, it was.

13   Q.  What is occupational disability?

14   A.  It's --

15   Q.  What is that money for, in your mind?

16   A.  That is money for people that can no longer work.

17   Q.  When you applied for occupational disability, were you

18   physically unable to do your job anymore?

19   A.  I was physically able to do my job.

20   Q.  How were you able to get disability benefits if you could

21   still do your job?

22   A.  By creating a -- the illusion that I had a problem.  In my

23   case it was a back problem.

24   Q.  Did you lie to get disability benefits?

25   A.  I did.

D7jdles3                          Parlante - direct

1   Q.  And when you lied, did you do that by yourself or with

2   other people?

3   A.  I lied with other people.

4            MR. DURKIN:  Objection.

5   Q.  Sir, who helped you lie to get disability benefits?

6            MR. DURKIN:  Judge, excuse me --

7            MR. RYAN:  The same objection.

8            THE COURT:  Sustained.

9            MR. DURKIN:  I move to strike.

10            THE COURT:  Sustained.

11   BY MS. FRIEDLANDER:

12   Q.  Sir, who helped you get disability benefits?

13   A.  I used a doctor, Dr. Lesniewski.  And I needed someone to

14   help me with my paperwork; that was Joe Rutigliano.

15   Q.  Do you see Dr. Lesniewski in the courtroom today?

16   A.  I did, yes.  I do.

17   Q.  Could you please point to him and --

18            MR. DURKIN:  Judge, again we will stipulate that he

19   can identify the patient.

20            THE COURT:  All right.  The Court notes that the

21   identification has been made.

22   BY MS. FRIEDLANDER:

23   Q.  Sir, do you see Mr. Rutigliano in the courtroom today?

24   A.  I do.

25            MR. RYAN:  So stipulated.

1           THE COURT:  All right.  By stipulation, the Court

2    notes that the witness has identified the defendant.

3    BY MS. FRIEDLANDER:

4    Q.  About how much money did you collect per year in disability

5    benefits that you were not entitled to?

6    A.  36,000.

7           MR. DURKIN:  Objection.

8    Q.  Are you still collecting disability?

9           MR. DURKIN:  Objection to the compound nature of that

10   question and it assumes facts --

11          THE COURT:  Sustained.

12   Q.  Are you still collecting disability?

13   A.  No, I'm not.

14   Q.  Did there come a time when you were arrested?

15   A.  Yes.

16   Q.  When was that, approximately?

17   A.  That was in 2012.

18   Q.  What were you charged with?

19   A.  I was charged with differ types of fraud and conspiracy to

20   commit fraud.

21   Q.  What did you ultimately decide to do with your case?

22   A.  I decided to enter into an agreement with the prosecution.

23   Q.  Did you plead guilty?

24   A.  I did.

25   Q.  What crimes did you plead guilty to?

D7jdles3                          Parlante - direct

1   A.  The fraud and the conspiracy.

2   Q.  Is that everything you were charged with?

3   A.  Yes.

4   Q.  Did you sign an agreement with the government at the time

5   you pled guilty?

6   A.  Yes, I did.

7   Q.  And before you signed it, did you meet with the government?

8   A.  Yes, I did.

9   Q.  I'm going to ask you to turn in your binder to I think it

10  is the last document in the binder in front of you; it is

11  marked 3506-05.  Take a look at that document and tell me

12  whether you recognize it.

13  A.  Yes, I do.

14  Q.  What is it?

15  A.  This is the agreement.

16  Q.  Is that the agreement you entered into with the government?

17  A.  Yes, that's right.

18  Q.  Do you see your signature on that agreement?

19  A.  Yes, I do.

20  Q.  And is your lawyer's signature on that agreement?

21  A.  Yes, it is.

22  Q.  Mr. Parlante, what's your understanding of your obligations

23  under this agreement?

24  A.  My obligations are to tell the truth, when asked to meet

25  with the prosecution, to do so, and to not commit another

1    crime.

2    Q.  If you live up to your obligations, what is your

3    understanding of what the government will do?

4    A.  The government will write a letter to the Judge about -- if

5    I cooperated and also about the seriousness of the crimes

6    committed.

7    Q.  What's your understanding as to whether the government will

8    recommend any particular sentence in your case?

9    A.  The government will not recommend any particular sentence.

10   Q.  What's your understanding as to who will decide your

11   sentence?

12   A.  My understanding is that the Judge will decide.

13   Q.  What is the most jail time that you could receive?

14   A.  50 years.

15   Q.  What sentence are you hoping to receive?

16   A.  I'm hoping to receive no jail time.

17   Q.  What is your understanding of whether any of the defendants

18   in this case have to be convicted in order for you to get a

19   letter from the government like you described?

20   A.  That I don't -- that is not my understanding that anybody

21   has to be convicted.

22   Q.  And what about the money that -- do you know how much you

23   received in disability benefits in total, approximately?

24   A.  Approximately 294,000.

25   Q.  And that money, does your agreement say about that?

1   A.  I have to make restitution.

2   Q.  Getting back to the Long Island Rail Road.

3           When did you -- you mentioned Long Island Rail Road

4   retirement pension.  When did you become eligible for that

5   pension?

6   A.  The Long Island Rail Road pension was at 50 years old.

7   Q.  And at what age did you retire?

8   A.  53.

9   Q.  Why did you wait until you were 53?

10  A.  By waiting and working, I could actually add to my yearly

11  income and increase my pension.

12  Q.  And in what way were you adding to your yearly income in

13  those years?

14  A.  By working overtime.

15  Q.  How does working overtime build up your pension?

16  A.  It's more than the base pay.  So it's based -- your pension

17  is based on a five-year average.

18  Q.  How much overtime did you work leading up to the time you

19  claimed to be disabled, approximately?

20  A.  I believe it was hundreds of hours each year in the last

21  three or four years.

22  Q.  Is that overtime required or optional?

23  A.  That's optional.

24  Q.  We are going to talk in a moment about the disability money

25  that you got from the government.

1          But first, what was your understanding at the time you

2     worked at the Rail Road about other ways you could make money

3     by claiming to be disabled?

4     A.  Well, there was some insurance policies that you could take

5     out; as an example, like an Aflac policy, a disability policy.

6     Then there was -- another one was, say, if you bought a car,

7     you could take an insurance policy, a disability policy out

8     against the loan.

9     Q.  And when you say there was an Aflac policy, what did you

10    understand that policy -- what is that?

11    A.  That's a disability policy, a private disability -- private

12    insurance disability policy.

13    Q.  Did you apply for any private disability insurance in

14    connection with your disability?

15    A.  I did not.

16    Q.  What time of year did you retire and claim to be disabled?

17    A.  I retired on November 1st.

18    Q.  And why November as opposed to some earlier time in the

19    year?

20    A.  You could actually, you know, increase your pension by

21    doing that by getting the vacation pay added on top of your

22    salary, your last year's salary.

23    Q.  Now, let's talk about occupational disability.

24          How did you learn about the possibility of getting

25    occupational disability?

1  A.  Well, when I went -- in my last couple of years I switched

2  into a department that had -- you had to have a lot of

3  seniority to get in, and there was a lot of people talking

4  about it.

5  Q.  What did you hear?

6  A.  I heard that you could go to one of three doctors and --

7         MR. DURKIN:  Judge, just for the record, the same

8  objection.

9         MR. RYAN:  The same objection.

10        THE COURT:  All right.  Noted.

11  Q.  You could continue.

12  A.  I went to one of three doctors that I knew as the

13  disability doctors.

14  Q.  And we're going to talk about them in a moment.  But as far

15  as you heard, what did you need to submit in order to get

16  disability, generally speaking?

17  A.  Submit a narrative.

18  Q.  OK.  What's a narrative?

19  A.  It's like you, you -- you go for a series of visits.  They

20  come up with a diagnosis.  And, you know, they tie that in to

21  how you can't work.

22  Q.  So as far as you understood, was a narrative something that

23  came from a doctor?

24  A.  Yes.

25  Q.  And in terms of anything else you needed to submit to get a

1   disability, what did you understand you might need to submit?

2   A.  Some paperwork.

3   Q.  Now, coming back to the doctors you heard about.

4         What steps did you hear you needed to take with

5   respect to those doctors?

6   A.  You had to start seeing the doctor at least a year before

7   you planned to retire.

8   Q.  Why?

9   A.  To -- so you could have it on paper that you went for like,

10  you know, five or six, whatever, number of visits before you

11  did retire so they could come up with a diagnosis.

12  Q.  And who were the doctors that you heard you should see?

13  A.  I heard of Dr. Ajemian and Dr. Lesniewski, and I don't

14  remember the other doctor's name.

15  Q.  What was the purpose of creating this series of visits on

16  paper?

17  A.  It was more or less a paper history, a trail.

18  Q.  Leaving aside the doctor portion of this, what did you hear

19  about I think you used the work paperwork, the disability

20  paperwork, what did you hear about that?

21  A.  Yeah.  I heard that Joe Rutigliano, you know, had to do the

22  paperwork.

23  Q.  Who is Joe Rutigliano?

24  A.  He was a Long Island Rail Road conductor and a union man.

25  Q.  And when you say you heard that he knew how to do the

D7jdles3                        Parlante - direct

1    paperwork, what was it that you heard he knew had to do?

2    A.  Basically --

3              MR. RYAN:  Objection.

4              THE COURT:  Overruled.

5    A.  Basically, there was a job description, and I heard that he

6    knew how to work that into the disability.

7    Q.  And as far as you heard, was this a free service that

8    Mr. Rutigliano offered?

9    A.  No.

10   Q.  What did you hear?

11   A.  I heard that --

12             MR. RYAN:  Objection.

13             THE COURT:  Overruled.

14   A.  I heard that it was right around a thousand dollars.

15   Q.  Do you know other people who paid Mr. Rutigliano to help

16   them apply for disability?

17             MR. RYAN:  The same objection.

18             THE COURT:  Sustained.

19   Q.  Did there come a time when you started taking steps to plan

20   a false disability claim?

21   A.  Yes.

22             MR. DURKIN:  Objection.

23             THE COURT:  Overruled.

24   Q.  What did you do?

25   A.  I started to see Dr. Lesniewski about a year and a half

D7jdles3                        Parlante - direct

1    before I refired.

2    Q.  Why did you pick Dr. Lesniewski of the three doctors you

3    heard about?

4    A.  He was actually closer to where I lived.  He was basically

5    in North Shore and the other guy was South Shore, Dr. Ajemian.

6    Q.  And when you saw Dr. Lesniewski -- did you see him once or

7    more than once in that year and a half?

8    A.  I saw him more than once, about every three months.

9    Q.  What kinds of complaints over time did you make to

10   Dr. Lesniewski?

11   A.  Over that whole period of time it was a bunch of stuff, but

12   it was my back and my neck primarily, and after a number of

13   visits it became my knee and my hand as well.

14   Q.  How did you describe the significance of those complaints

15   to Dr. Lesniewski when you spoke to him?

16          MR. DURKIN:  May we have a timeframe for this?

17   BY MS. FRIEDLANDER:

18   Q.  Generally speaking, sir, over the year and a half, how did

19   you did you describe the level of pain that you were

20   experiencing?

21   A.  Moderate dull pain.

22          MR. DURKIN:  Objection.

23          MR. RYAN:  Objection.

24          THE COURT:  Overruled.

25   Q.  You can answer.

D7jdles3                        Parlante - direct

1    A.  Moderate dull pain.

2    Q.  Have you ever -- did any of these complaints ever cause you

3    to miss work?

4    A.  No.

5    Q.  Was there any part of your job that you couldn't do because

6    of those complaints?

7    A.  No.

8    Q.  What made your back and neck feel better?

9    A.  Working out with weights.

10   Q.  What did you tell Dr. Lesniewski about what made your back

11   and neck feel better?

12   A.  I told him that I worked out with weights.

13   Q.  What did your workouts consist of at that time on, say, a

14   weekly basis?

15   A.  On a weekly basis, I worked body parts with free weights on

16   different days.  I'd work -- I have a leg day, a back day and a

17   chest day, and on the fourth day I would do aerobic, which was

18   stationary bike.

19   Q.  Approximately how long would you ride your bike for?

20   A.  Between 30 and 40 minutes.

21   Q.  How hard would you ride?

22   A.  Moderate until I went to high intensity at the end for a

23   minute or two or five.

24   Q.  And with respect to weight training, which areas of your

25   body were you doing weight training on?

1    A.  I was doing legs, chest and back.

2    Q.  How much weight were you lifting?

3    A.  Up to -- I got up to about 80 pounds.

4    Q.  During your visits to Dr. Lesniewski, what did he do, just

5    generally speaking?

6    A.  General tests.  Reflex tests.  Would test my strength.  You

7    know, poke me in certain areas to see if, you know, I had any

8    reaction to tenderness, I guess.

9    Q.  Did he ask you about pain?

10   A.  He asked me about pain, yes.

11   Q.  Did he sometimes send you for tests?

12   A.  He sent me -- he did an x-ray and sent me for an MRI.

13   Q.  What did he tell you about the result of your MRI?

14   A.  He told me that I had some herniated discs and some bulging

15   discs.

16   Q.  Did he tell you that you had degenerative disc disease?

17   A.  Yeah.

18   Q.  And how did you feel when you heard these things?

19   A.  Well, I felt that that was like a lock to get the

20   disability.

21   Q.  Were you happy?

22   A.  I was.

23            MR. DURKIN:  Judge, can we have a foundation for that

24   conversation?

25            THE COURT:  Sustained.

D7jdles3                          Parlante - direct

1   BY MS. FRIEDLANDER:

2   Q.  Do you recall the exact date on which you got the MRI?

3   A.  No.

4   Q.  Generally speaking, just as far as --

5              MR. DURKIN:  Objection.

6              THE COURT:  Overruled.

7   Q.  As far as you observed, was Dr. Lesniewski trying to make

8   you better?

9   A.  No.

10  Q.  Generally speaking, what treatment were you getting --

11             MR. DURKIN:  Judge, I object to the continued

12  "generally speaking."

13             MS. FRIEDLANDER:  Your Honor, I'm asking him about his

14  general impression based on 18 months of seeing this physician,

15  as a general matter, what his own observations were.

16             MR. DURKIN:  I object to that.

17             THE COURT:  All right.  Overruled.

18  BY MS. FRIEDLANDER:

19  Q.  Sir, based on your own personal observations, what

20  treatment were you getting from this doctor?

21  A.  Other than a prescription, no treatment.

22  Q.  Let's go condition-by-condition.

23             You mentioned your knees, a complaint about your

24  knees?

25  A.  Yes.

D7jdles3                         Parlante - direct

1   Q.  A complaint about your hand?

2   A.  Yes.

3   Q.  What treatment did you get at any time from Dr. Lesniewski

4   for either of those complaints?

5   A.  Nothing.

6   Q.  You mentioned a back problem.

7   A.  Yes.

8   Q.  What treatment can you recall getting from Dr. Lesniewski

9   for your back problem?

10  A.  I got no treatment.

11  Q.  OK.  Do you recall whether you got a prescription at some

12  point?

13  A.  I did get a prescription early on in one of my first two or

14  three visits.

15  Q.  Did you take the medicine?

16  A.  I did not.

17  Q.  Did Dr. Lesniewski ask you if you were taking the medicine?

18  A.  No.

19  Q.  Did you have a conversation with him about surgery at some

20  point on your back?

21  A.  Surgery came up, yes.

22  Q.  Tell us about that conversation.

23  A.  It was suggested that I --

24          MR. DURKIN:  Foundation for this conversation, please.

25  Q.  Sir, do you recall when you had that conversation with

1    Dr. Lesniewski?

2    A.  I don't recall exactly what visit it was, no.

3    Q.  Was it during the course of your 18 months of seeing him?

4    A.  Yes.

5          MR. DURKIN:  Judge, could we have a better time period

6    within that 18 months?

7          THE COURT:  See if you could get a --

8    A.  It was sometime after I had gotten the MRI.

9    Q.  Can you tell us about the conversation?

10   A.  He suggested that I could have surgery, and I said I wasn't

11   going to have surgery.

12   Q.  Why didn't you want surgery?

13   A.  I was keeping the pain at bay by doing the workouts.

14   Q.  And you mentioned the neck complaint.  What treatment did

15   you get over 18 months for your neck complaint?

16   A.  The only thing I could think of is a prescription.

17   Q.  Did you take that medicine?

18   A.  No.

19   Q.  Did Dr. Lesniewski ask you if you were taking that

20   medicine?

21   A.  No.

22   Q.  Did you ask Dr. Lesniewski for more treatment?

23   A.  No, I didn't.

24   Q.  Why not?

25   A.  I really didn't need it, so ...

D7jdles3                        Parlante - direct

1   Q.  How did each of your visits to Dr. Lesniewski end?

2   A.  I would set up an appointment for a follow-up visit.

3   Q.  Whose idea was the follow up visit, Dr. Lesniewski's or

4   yours?

5   A.  Dr. Lesniewski.

6   Q.  Did Dr. Lesniewski explain to you why he kept directing you

7   to come back?

8           MR. DURKIN:  Judge, could we have kind of some

9   foundation?  This is a conversation.

10  Q.  Sir, in any visit -- I believe you said that Dr. Lesniewski

11  directed you to come back at the end of each of these visits,

12  is that right?

13  A.  Yes.

14  Q.  At any one of these visits, did Dr. Lesniewski explain to

15  you why he was directing you to come back?

16  A.  No.

17  Q.  Did you have an understanding as to why he was directing

18  you to come back?

19          MR. DURKIN:  Objection.  I don't know how he could

20  have an understanding with --

21  Q.  What was your belief --

22          MR. DURKIN:  -- if there was nothing said.

23          THE COURT:  Overruled.

24  A.  I did.

25  Q.  What was that?

D7jdles3                          Parlante - direct

1   A.  That I was just there trying to get a disability.

2   Q.  These visits to Dr. Lesniewski, were they free?

3   A.  They were not.

4   Q.  How did you pay for them?

5   A.  Long Island Rail Road insurance, or insurance through the

6   Long Island Rail Road.

7   Q.  What insurance is that?

8   A.  That's Empire United Healthcare.

9   Q.  Did there come a time when you observed other people in the

10  waiting room at Dr. Lesniewski's office?

11  A.  There did, later on in my later visits.

12  Q.  Who did you observe there?

13  A.  I saw at one time a couple of fellow conductors.

14  Q.  What did you observe about their physical condition?

15          MR. DURKIN:  Objection.

16          THE COURT:  Sustained.

17  Q.  Sir, based on your own personal observations, what did you

18  observe?

19          MR. DURKIN:  Objection.

20          THE COURT:  Sustained.

21  Q.  Did you talk to any of your colleagues in Dr. Lesniewski's

22  waiting room?

23  A.  I did.

24          MR. DURKIN:  Objection.  I object to the conversation.

25          THE COURT:  The question was whether he talked to any.

1         MR. DURKIN:  I understand.  I withdraw that objection.

2         THE COURT:  Overruled.

3   Q.  What did you talk about?

4         MR. DURKIN:  Objection.

5         THE COURT:  What did he talk about, the witness?

6         MS. FRIEDLANDER:  Yeah.

7   Q.  What did you talk about?  What subject did you discuss with

8   each other?

9         MR. DURKIN:  Objection.

10         THE COURT:  Overruled.

11  A.  We talked about -- they asked me what my disability was,

12  and I asked them what their disability was.

13         MR. DURKIN:  The same objection, Judge, to what they

14  said.

15         THE COURT:  All right.  Sustained as to what others

16  said.

17  BY MS. FRIEDLANDER:

18  Q.  Mr. Parlante, did there come a time when you spoke with

19  Dr. Lesniewski about a narrative?

20  A.  Yes.

21  Q.  How long had you been seeing Dr. Lesniewski when that

22  subject came up, approximately?

23  A.  Approximately a year.

24  Q.  What did you say about a narrative?

25  A.  It was getting late in the year and I was getting, you

1   know, ready to retire and it hadn't really come up, so I had

2   mentioned it to him if I could get a narrative.

3   Q.  Did he agree to provide one?

4   A.  He did.

5   Q.  Did he ask you whether you could do your job?

6   A.  No.

7   Q.  Did you tell him you couldn't?

8   A.  No.

9   Q.  Could you do your job?

10  A.  Yes, I could have.

11  Q.  Was this narrative going to cost you money?

12  A.  Yes.

13  Q.  How much?

14  A.  $500.

15  Q.  Now, before we go on with the narrative, what happened to

16  you on your last day of work?

17  A.  On my last day of work I worked the midnight shift in the

18  freight department, and we were moving some trains around on

19  the siding.  And while I was watching one train pull out of the

20  siding, another train was rolling down the tracks at a slow

21  speed and I didn't hear it.  And the last minute -- the last

22  second, I tried to jump on it to avoid it and it knocked me to

23  the ground.

24  Q.  Did you go to the hospital?

25  A.  I did not.  I worked the rest of the night.

D7jdles3                          Parlante - direct

1   Q.  And what happened after that?

2   A.  I went to Dr. Lesniewski two days later.

3   Q.  Do you recall that visit well?

4   A.  I do not.

5   Q.  Why not?

6   A.  I had self-medicated.

7   Q.  And how did you have medication?

8   A.  My wife had some medication that I took.

9   Q.  Did you go back to Dr. Lesniewski again after that visit?

10  A.  I did.

11  Q.  Approximately how long later?

12  A.  Several weeks later.

13  Q.  What did you tell Dr. Lesniewski about your back?

14  A.  That it had gotten a lot better.

15  Q.  What did you get at or about that time?

16  A.  The narrative.

17  Q.  How did you pay for it?

18  A.  I believe I paid in cash.

19  Q.  Why did you pay in cash?

20  A.  Someone in the office said that you should pay in cash.

21  Q.  Had you ever been asked by a doctor's office --

22          MR. DURKIN:  Objection.

23          THE COURT:  Sustained.

24  Q.  Sir, have you seen doctors before in your life?

25  A.  I have.

1    Q.  Have you ever paid another doctor in cash for his services?

2    A.  No.  Just a copayment.

3    Q.  What did you get in return for your $500?

4    A.  I got a narrative.

5    Q.  How was it provided to you?

6    A.  In an envelope.

7    Q.  Did you read it at that time?

8    A.  I did not.

9    Q.  OK.  Leaving aside Dr. Lesniewski, earlier you said to

10   apply for disability you needed some paperwork besides medical

11   records?

12   A.  Yes.

13   Q.  Did there come a time when you contacted someone about the

14   paperwork?

15   A.  Yes, I did.

16   Q.  Who?

17   A.  I called Joe Rutigliano.

18   Q.  What did you discuss?

19   A.  We set up a meeting.  And I went and met him, and we

20   discussed just general things, as I recall.

21   Q.  How long was the meeting, approximately?

22   A.  15 minutes to a half an hour.

23   Q.  What did Mr. Rutigliano ask you, if anything?

24   A.  I only really remember him asking me, you know, general

25   questions about, you know, address, Social Security, phone, and

1    asking me about how -- if I had any hobbies.

2    Q.  What did you tell him when he asked you if you had any

3    hobbies?

4    A.  I believe I told him I worked out and I re-did furniture.

5    Q.  Do you have a dog?

6    A.  And I walk the dog.

7    Q.  You told Mr. Rutigliano?

8    A.  Yes.

9    Q.  Do you know why he was asking you those questions?

10   A.  I really didn't know why, no.

11   Q.  Did you pay Mr. Rutigliano?

12   A.  I did.

13   Q.  How much did you pay?

14   A.  A thousand dollars.

15   Q.  Do you remember how you paid?

16   A.  I don't really recall.  I think I paid in cash but I don't

17   really remember.

18   Q.  Did Joe Rutigliano ask if you could do your job anymore?

19   A.  No.

20   Q.  Did you tell him you couldn't do your job anymore?

21   A.  No.

22   Q.  Did you act -- were you in pain when you met with him?

23   A.  No.

24   Q.  Did you act like you were in pain when you met with him?

25   A.  No.

1    Q.  After your meetings with Joe Rutigliano, did there come a

2    tame where you visited the Railroad Retirement Board office?

3    A.  Yes.

4    Q.  What did you understand the purpose of that visit to be?

5    A.  It was to complete the paperwork for the disability.

6    Q.  Who did you meet with there?

7    A.  I met with Marie Baran.

8    Q.  And who is Marie Baran?

9    A.  She is the liaison between the Railroad Retirement Office

10   and Long Island Rail Road.

11   Q.  Where was she working at the time?

12   A.  At the Railroad Retirement Office.

13   Q.  Would you recognize Marie Baran if you saw her today?

14   A.  No.

15   Q.  What, if anything, did you bring with you to the meeting?

16   A.  I brought a canceled check so I would be able to set up a

17   direct deposit account and other things that I don't really --

18   I didn't really recall bringing but --

19   Q.  And how did you know what to bring with you?

20   A.  There was a list of things to bring.

21   Q.  If you could take a look in your binder at the document

22   marked Government Exhibit 1109.

23        Do you see that, sir?

24   A.  Yes, I do.

25   Q.  Do you recognize that document?

D7jdles3                         Parlante - direct

1    A.  Not really, no.

2    Q.  OK.  Is this a document you have seen before?

3    A.  I may have.

4          MS. FRIEDLANDER:  I'm sorry.  It is admitted.

5          Could we publish it.

6    Q.  Is this a document you gave to the government, sir?

7    A.  Yes, it is.

8    Q.  So at the bottom of this document -- at the top, it says

9    "United States of America Railroad Retirement Board."  It says,

10   "To file for a disability annuity, you will need to furnish the

11   following," and there is a list.  And then at the bottom it

12   says:  "Date and time of your appointment.  Thursday,

13   February 3, 2005."

14         Does that sound like the approximate time or date when

15   you went to the Railroad Retirement Board to apply for

16   disability?

17   A.  Yes, it does.

18   Q.  And it says -- in the second bullet point from the bottom,

19   it says, "You need a narrative medical report from your

20   treating physician in addition to having the enclosed form

21   G-250a completed."

22         Above that there is a bullet point that says, "You

23   need to bring your completed application for determination of

24   employee disability, AA-1d."

25         And right below that, it says, "You need to bring with

1   you your completed vocational report regarding all Rail Road

2   and non-Rail Road employment you have had in the last 15

3   years."

4           Now, I know you said you don't recall exactly what you

5   brought with you to the meeting, but when you met with Marie

6   Baran, were you told that you were missing any documents?

7   A.  No.

8           MS. FRIEDLANDER:  You can take that down.

9   Q.  So tell us what you and Ms. Baran said to each other when

10  you got to the meeting.

11  A.  Well, it was all very cordial.  I walked in and introduced

12  myself and a little smalltalk, and then we wound up she asked

13  me who I was using to do my paperwork.  And I told her Joe

14  Rutigliano, and she seemed surprised and said she had thought

15  that Joe was not doing it anymore.  And I said I must be one of

16  his last customers.

17  Q.  What else did she ask you about Mr. Rutigliano?

18  A.  About Mr. Rutigliano?  Oh, she asked me if he had charged

19  me.

20  Q.  Did she ask you if he had charged you?

21  A.  How much he had charged me.

22  Q.  What did you say?

23  A.  A thousand dollars.

24  Q.  Did Ms. Baran during your meeting ask you anything about

25  your physical condition?

D7jdles3                          Parlante - direct

1    A.   She might have been in the beginning of the meeting right

2    after the -- we said that have asked me what my disability was.

3    Q.   Did she ask you anything about your actual physical

4    condition?

5    A.   No.

6    Q.   Did Ms. Baran ask you anything about your daily activities?

7    A.   No.

8    Q.   Did she ask you how you live an average day?

9    A.   No.

10   Q.   Subsequently, did Ms. Baran ask you some questions?

11   A.   Yes, she did.

12   Q.   What types of questions did she ask you?

13   A.   It was name, marital status, you know, address, phone

14   number, that type of questions.

15   Q.   What was she doing as she asked you those questions?

16   A.   She was filling out a form.

17   Q.   Did you answer those questions as she asked them?

18   A.   I did.

19   Q.   Following the time of your meeting at the RRB office, were

20   you awarded occupational disability?

21   A.   I was.

22   Q.   What year was that?

23   A.   2005.

24   Q.   What, if any, short-term benefits did you -- money did you

25   receive before then?

1    A.  There was also a sick benefit.

2    Q.  What is that, a sick benefit?

3    A.  Yeah.  You got paid something for -- something to do with

4    the disability, I presume.

5    Q.  Who, if anyone, signed forms to allow you to get that

6    money?

7    A.  Dr. Lesniewski.

8    Q.  Let's take a look at some of the documents from your --

9    that you submitted to the RRB.

10           MS. FRIEDLANDER:  Can we see 104D?

11   Q.  I'm showing you what's in evidence -- if you could turn to

12   that in your binder.

13           Do you have that document in front of you?

14   A.  I do.

15   Q.  Now, I believe you said earlier that you did not read your

16   narrative when you received it from Dr. Lesniewski's office.

17   But did there come a time when you read part of it?

18   A.  Yes.

19   Q.  When did you first read any part of this?

20   A.  After I was arrested.

21   Q.  And why didn't you read the whole thing, or did you read

22   the whole thing at that time?

23   A.  I have since read the whole thing.  At that time I did not.

24   I just read what was listed as my disability, and when I saw

25   one of the things was carpel tunnel I was a little bit shocked.

D7jdles3                         Parlante - direct

1   Q.   Why?

2   A.   Because I didn't have carpal tunnel and we never really

3   discussed carpal tunnel.

4            MS. FRIEDLANDER:   Can we see page 2 of this narrative?

5            There is a -- thanks.

6   Q.   It says "Diagnosis."   And then there are three conditions

7   listed here, and then the fourth one says "carpel tunnel

8   syndrome."

9            Did Dr. Lesniewski ever tell you he thought you had

10   carpal tunnel syndrome?

11   A.   No.

12   Q.   Did Dr. Lesniewski treat you for carpal tunnel syndrome?

13   A.   No.

14   Q.   Sir, did you believe you had carpal tunnel syndrome?

15   A.   No, I did not.

16   Q.   How did you feel when you saw that this narrative --

17            MR. DURKIN:   Objection.

18            THE COURT:   Asked and answered.

19   Q.   Sir, here it says that "Based on these diagnoses,"

20   including carpal tunnel syndrome, it says:   "I am aware of job

21   occupation on the Long Island Rail Road.   Given the above-noted

22   diagnoses, it can be stated within a reasonable degree of

23   medical certainty that this patient is disabled for his job

24   occupation and that this disability is ongoing and permanent."

25            Did Dr. Lesniewski tell you he believed that you had

D7jdles3                        Parlante - direct

1    ongoing and permanent medical conditions?

2    A.  No.

3    Q.  Did you ever tell him you thought you couldn't do your job

4    because of any medical condition?

5    A.  No.

6    Q.  Could you have kept doing your job when you filed for

7    disability?

8    A.  Yes, I could have.

9    Q.  Could you do your job today?

10   A.  Yes, I could.

11           MS. FRIEDLANDER:  Could we see Government Exhibit

12   104G?

13           This document is on the -- it says "Railroad

14   Retirement Board" at the top, and "Medical Assessment of

15   Residual Functional Capacity."

16           Could we turn to the last page just to see the

17   signature.

18           I think the signature is not legible, but the stamp

19   below, it says Peter J. Lesniewski, December 2004.

20           Can we turn back to page 1.

21           Can we blow up Section A, "Exertional" -- well,

22   just -- can we see the instructions to the doctor?

23           OK.  It says, "Complete this form and submit to us

24   along with your narrative report and office records, as

25   requested on form G-250.  Describe below any restrictions in

1    the claimant's ability to perform basic work-related functions

2    within a regular work setting on a day-to-day basis."

3              So Section A says, "Exertional "Restrictions."  "For

4    all claimants with physical impairments."  And here it says,

5    "In an 8-hour workday, claimant can stand and/or walk with

6    normal breaks for," and here it says "less than two hours

7    total."

8    Q.  Did Dr. Lesniewski ever tell you he believed you could not

9    walk more than -- that you could not stand or walk with normal

10   breaks more than two hours in an eight-hour day?

11   A.  No.

12   Q.  Did you ever tell him you felt that way?

13   A.  No.

14   Q.  In fact, did you have any trouble standing or walking with

15   normal breaks in an eight-hour day for more than two hours?

16   A.  I had no problem.

17             MS. FRIEDLANDER:  Can you turn to page 2?  Can we look

18   at the top part of the form.

19   Q.  Here it says, "Claimant can lift," and then it says you are

20   restricted from ever lifting more than -- well, it says you are

21   restricted -- you can never lift more than 50 pounds.

22             Did you tell Dr. Lesniewski that you could never lift

23   more than 50-pound?

24   A.  No.

25   Q.  Did he tell you you could never lift more than 50 pounds?

1    A.  Not to my recollection.

2    Q.  Were you capable of doing that?

3    A.  Yes.

4    Q.  In fact, were you lifting more than that when you worked

5    out?

6    A.  I was.

7    Q.  Below that section it says, "Claimant is able to" and then

8    it says that you are never able to bend or stoop and that you

9    are never able to crouch or squat.

10        The same question.  Did Dr. Lesniewski ever tell you

11   he believed you could never bend, stoop, crouch or squat?

12   A.  No.

13   Q.  Did you ever tell him you could never do those things?

14   A.  No.

15   Q.  Did you have any problem doing any of those things?

16   A.  No.

17        MS. FRIEDLANDER:  Can we look at the bottom part of

18   the page, Section 5.

19   Q.  Section 5 says, "Claimant can use both hands for

20   repetitive," and then it lists some tasks.  And here it says

21   you cannot use your hands for repetitive fine manipulation.

22   And I think the handwriting here simply says carpal tunnel

23   syndrome.

24        Sir, did you have any problem manipulating things with

25   your hand?

D7jdles3                          Parlante - direct

1  A.  I did not.

2  Q.  Did Dr. Lesniewski ever tell you he believed you were

3  unable to perform fine manipulation?

4  A.  No.

5  Q.  And did you ever tell him you thought you had any issue

6  with that?

7  A.  No.

8          MS. FRIEDLANDER:  If we could just look at the next

9  section, Section 5.  It is the next page at the top.

10  Q.  I believe that says "Environmental Restrictions."

11          And here it says, "Totally restricted from any

12  exposure to vibration."

13          Did Dr. Lesniewski tell you you could never be exposed

14  to vibration?

15  A.  No.

16  Q.  Do you have any trouble being exposed to vibration?

17  A.  No, I don't.

18  Q.  How did you get here today?

19  A.  I took a train.

20          MS. FRIEDLANDER:  OK.  Can we see Government Exhibit

21  104E?

22  Q.  Do you have that in front of you, Mr. Parlante?

23  A.  Yes, I do.

24  Q.  OK.  This is on the letterhead of Dr. Lesniewski, and do

25  you see your name up here at the top?

D7jdles3                    Parlante - direct

1    A.  Yes, I do.

2    Q.  So this page says, "Initial consultation 6/24/03."

3         Does that sound like approximately when you started

4    seeing Dr. Lesniewski?

5    A.  Yes.

6    Q.  6/24/03.  Up at the top here it says he works for LIRR and

7    he's retiring.

8         Did you tell Dr. Lesniewski that you were retiring

9    from the LIRR?

10   A.  I did.

11   Q.  Why did you want him to know that?

12   A.  So he would know why I was there.

13   Q.  Why were you there?

14   A.  To get a disability.

15   Q.  Can we go back to that?  I just want to note it says, "He

16   has pain in his neck going to the back of his neck.  He works

17   out but he gets back problems."

18        I believe earlier you mentioned that you told

19   Dr. Lesniewski you worked out?

20   A.  Yes.

21   Q.  To alleviate your symptoms?

22   A.  Yes.

23        MS. FRIEDLANDER:  OK.  Can we go to the typewritten

24   part of this first segment?

25   Q.  Here it says, "First visit."  "Neck pain" and it looks like

1   some wrist injury.

2              And down at the bottom it says, "Put him on Flexeril,

3   see if that will help."

4              Is that one of the prescriptions that you mentioned

5   getting?

6   A.  Yes, it is.

7   Q.  Did you take that medicine?

8   A.  No.

9              MS. FRIEDLANDER:  Can we look at the next day, the

10  next visit?

11  Q.  Up at the top here, it says, it looks like about eight

12  weeks later, "complaints of neck and back.  He was re-doing

13  furniture and he felt something in his back."

14             Do you recall whether you told Dr. Lesniewski that you

15  were re-doing furniture?

16  A.  I don't recall.  I may have, yes.

17  Q.  The typewritten notes here say, "His neck still hurts.

18  Re-doing some furniture and he felt severe pain in his low

19  back."

20             Did you tell Dr. Lesniewski that you had severe pain?

21  A.  No, I didn't.

22  Q.  And the notes here at the end say, "Will treat him with

23  anti-inflammatories."

24             I believe you mentioned two prescriptions.  Do you

25  know whether that is the other prescription?

D7jdles3                         Parlante - direct

1    A.  Vioxx, yes.

2                MS. FRIEDLANDER:  Can we see the next visit, 3/29/04?

3    Q.  Here we've got a bunch of back, neck, shoulders, knees,

4    hand.

5                I don't think you mentioned shoulders earlier.  Do you

6    recall complaining about your shoulders?

7    A.  I don't, no.

8    Q.  So a list of complaints.

9                Do you see any treatment there at all, sir?  Just take

10   a moment and read the notes to yourself.

11   A.  No, I don't see any treatment.

12   Q.  For any of these complaints?

13   A.  Not for any of them.

14   Q.  Can we go to 5/17/04?  That is the next visit.

15               Here we have back, neck, shoulders, knees and hand

16   complaints.  There are some typewritten notes.

17               Do you see any treatment reflected there?

18   A.  I do not, no.  I don't see any.

19   Q.  Can we look at the notes from the next visit, 8/17/04?

20               Back, neck, shoulders, knees and hand complaints.

21               Do you see -- well, here there is a mention of

22   "Surgery is indicated.  Will eventually need surgical

23   intervention."

24               I believe you said earlier you recall Dr. Lesniewski

25   at one point mentioning surgery on your back?

D7jdles3                         Parlante - direct

1    A.  Yes, that's right.

2    Q.  Do you see any treatment reflected here?

3    A.  I do not.

4           MR. DURKIN:  Objection.

5           THE COURT:  Asked and answered.

6    Q.  OK.  Can we go to the next visit?

7           There is neck, knees, back.  And the typewritten part

8    says, "Neck is killing him."

9           Did you tell Dr. Lesniewski that your neck was killing

10   you?

11   A.  No.

12   Q.  Did you tell him you had some constant pain?

13   A.  I did.  And over the course of these visits, I may have

14   exaggerated it at a visit or two.

15   Q.  How much did you exaggerate?

16   A.  Not very much.  I would just up -- it was on a pain scale

17   of 1 to 10, and I would up it one number.

18   Q.  Generally on the 1 to 10 scale, where were your complaints?

19   A.  For the neck and back pain, I think right around 3 or 4.

20   Q.  Remind us what day you retired and had the injury where you

21   jumped -- you got hit, you know, you fell on your back when the

22   train was coming.  When was that?

23   A.  That was November 1st.

24   Q.  You saw Dr. Lesniewski right after that?

25   A.  On the 2nd.

D7jdles3                        Parlante - direct

1  Q.  OK.  Can we see the notes from that visit?

2         These notes say, "Fell down some stairs and got

3  sideswiped by a train.  Has severe back pain."

4         Was that true?

5  A.  That was true.

6  Q.  OK.  Now, can we see the bottom parts of this page?

7         Sir, I believe you said that you did see

8  Dr. Lesniewski again several weeks after the visit where you

9  had hurt yourself, is that right?

10 A.  That's right.

11 Q.  And what did you tell him at that time about your back?

12 A.  That it had gotten better.

13        MS. FRIEDLANDER:  Here, 11/23/04, it says, "Back

14 feeling better."

15        Can we go back to the narrative for a minute?  That is

16 104-D.

17        Can we show the jury the bottom part of this page?  We

18 are going to go into the top of the next page.

19        OK.

20        (Pause)

21        It says, "Apparently, on November 1st, 2004, he was

22 sideswiped by a train.  Severe back pain, stiffness, no

23 numbness or tingling."  A lot of stuff about the back here.

24 Essentially no range of motion.

25        Can we go on to the next page?

D7jdles3                          Parlante - direct

1              "Tenderness, reflexes, toes," a lot of things about

2     your back.

3     Q.   And you had real back pain from that injury, right?

4     A.   Yes, I did.

5     Q.   Here it says, "He was placed on steroids" -- did get some

6     medicine from Dr. Lesniewski for that injury?

7     A.   Yes, I did.

8     Q.   "He was placed on steroids and has not been seen since."

9              Was that true, that you were not seen after that visit

10    when you got steroids?

11    A.   I -- if that was the October -- the November 2nd, I went to

12    him after that.

13    Q.   Right.  OK.  So this says, "He was placed on steroids and

14    has not been seen since."

15             Let's go back to Dr. Lesniewski's record.  And then,

16    of course, his narrative goes on to say "Diagnosis" and to say

17    that you were disabled from your diagnoses.

18             MS. FRIEDLANDER:  Can we go back to 104D?

19             Can you blow up the bottom of the page?

20    Q.   Here is the visit on November 2, 2004, where you had your

21    injury and saw Dr. Lesniewski.  "Put him on Medrol Dose pack,

22    pain medication and Flexeril."

23             Are those the steroids that you were talking about?

24    A.   I don't really recall what they were.

25    Q.   And then here, sir, it says, "November 23, 2004, back

1    feeling better."

2            Do you see any reference to this in Dr. Lesniewski's

3    narrative, the fact that you came back and said your back was

4    feeling better?  Did you see that in the narrative I just

5    showed you?

6    A.  No.

7            MS. FRIEDLANDER:  Can we see the disability

8    application in evidence as 104A?

9            Could we go to the last page.

10   Q.  Is that your signature, Mr. Parlante?

11   A.  Yes, it is.

12   Q.  And did you complete this document?  Did you fill this all

13   out yourself, all of this typed stuff?

14   A.  No.

15   Q.  Did you read through it before you signed it?

16   A.  No.

17   Q.  Did there come a time when you did read this application?

18   A.  Yes.

19   Q.  When was that, approximately?

20   A.  That was after I was arrested.

21   Q.  What was your reaction to what you read about yourself in

22   this document?

23   A.  Not unlike the diagnosis, I was a little bit shocked.

24   Q.  Anything else?

25           (Pause)

D7jdles3                         Parlante - direct

1              MS. FRIEDLANDER:  You know, let's go through it.

2         Can we turn to -- let's turn to Section 12 -- it's

3    question 12.  I'm sorry, not Section 12.  It is on page 2.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7inles4a                    Parlante - direct

1    Q.   This says, "Describe how your condition prevents you from

2    working."

3             "My chronic neck, back and right hand pain along with

4    the right knee problems I suffer have made it impossible for me

5    to perform the duties of a railroad conductor."

6    Q.   Was that true or not true?

7    A.   That's not true.

8    Q.   Did you ever make any statements to Joe Rutigliano?

9    A.   No.

10   Q.   "I am unable to work on moving trains or locomotives, climb

11   aboard cars or engines, crouch and lift heavy air hoses, jumper

12   cable, couplers, etc."

13            Sir, is that true or not true?

14   A.   That is not true.

15   Q.   Did you ever tell Joe Rutigliano any of those things?

16   A.   No.

17   Q.   "Other duties, such as throwing and aligning hand thrown

18   track switches, cranking on-train handbrakes, coupling and

19   locomotives and cars, cutting out E.P. cocks, E.M.V. valves,

20   angle cocks, brake valves, etc., and walking on track beds are

21   impossible to accomplish."

22            Is that true or not true?

23   A.   That is not true.

24   Q.   Did you ever tell Joe Rutigliano any of those things?

25   A.   No.

D7inles4a                          Parlante - direct

1   Q.  My disabilities became so severe that I had to go sick on

2   October 31, 2004, was that true or not true?

3   A.  That was not true.

4   Q.  Did you ever tell Joe Rutigliano, that your disabilities

5   prevented you from working?

6   A.  No.

7   Q.  It says you finally left the railroad on November 26, 2004.

8   Actually, is that true?

9   A.  My last day of actual working was November 1.

10  Q.  OK.  Let's turn to Section 6, it's question 39.

11  A.  Question 39.

12  Q.  It is, did you have in front of you?

13  A.  I do.

14  Q.  OK.  The instructions at the top say, "Check the one box

15  after each activity listed below that best describes your

16  ability to do that activity."

17          "Easy.  That means I can easily do the activity.

18          "Hard.  I can do the activity with difficulty or with

19  help.

20          "Not at all.  I cannot do the activity even with

21  help."

22          Sir, here it says that sitting is hard for you to do,

23  meaning you can only do it with difficulty or with help because

24  it says neck and back pain when sitting for more than short

25  periods.

1          It says standing is hard for you to do, meaning you

2    can only do it with difficulty or with help, and the

3    explanation is that right knee, back, and neck pain -- your

4    right knee, back, and neck pain when standing is unbearable on

5    moving trains.

6          It says walking is hard for you because of unbearable

7    knee and back pain when walking, especially on moving trains.

8          Is any of that true?

9    A.  No.

10   Q.  Did you make any of those statements to Joe Rutigliano?

11   A.  No.

12   Q.  Did he ask you anything about your ability to sit, stand,

13   or walk?

14   A.  Not to my recollection.

15   Q.  Moving on, it says it is hard for you is to bathe yourself

16   because of sharp stabbing neck and back pain when making sudden

17   moves in the shower.

18         Was it hard for you to bathe yourself?

19   A.  No.

20   Q.  Did you ever suggest to Joe Rutigliano that it was?

21   A.  No.

22   Q.  Here it says it's hard for you to dress yourself because of

23   difficulty putting on shirts or sweaters, difficulty bending to

24   tie shoes.

25         Was it hard for you to dress yourself?

1    A.  No.

2    Q.  Did you ever tell Joe Rutigliano that it was?

3    A.  No.

4    Q.  Did he ask you about your ability to dress yourself?

5    A.  No.

6    Q.  Here it says -- I will just read a bunch of them at once.

7            It says it's hard to perform other bodily needs.

8            The explanation is it has become difficult sleeping

9    through the night due to the pain.

10           Next it says it's hard for you to indoor chores such

11   as meal preparation, laundry, or cooking.

12           It says you are unable to kneel to wash floors and you

13   have difficulty lifting laundry baskets.

14           Next it says, Outdoor chores are hard for you such as

15   shopping and yard work.

16           It says unable to climb ladders or clean gutters.

17   Cannot lift heavy trash cans.

18           Next it says driving a motor vehicle is hard for you.

19   You have difficulty turning your neck while driving, hand and

20   back cramping over long periods.

21           Next it says using public transportation is hard for

22   you because you are unable to stand for long periods and unable

23   to climb station stairs.

24           Then, finally, skipping to the bottom, it says,

25   Writing English, for example, notes and letters is hard for

D7inles4a                          Parlante - direct

1    you.  You have difficulty writing due to right hand/wrist

2    cramping for any length of time.

3          Were any of those things true about your physical

4    condition?

5    A.  No.

6    Q.  Did you say any of those things to Joe Rutigliano?

7    A.  No, I don't recall saying any of them.

8    Q.  Did Mr. Rutigliano ask you about your ability to perform

9    any of those tasks?

10   A.  No.

11   Q.  Question 40 says, enter any additional information that

12   describes your daily activities during a normal day.

13         "In the morning I carefully take a shower, read the

14   morning newspaper, have a cup of coffee, go over bills, etc.  I

15   then take a short walk with my dog to get some type of

16   exercise.  I was an avid softball and basketball player as well

17   as an avid jogger, but physically cannot do these activities

18   any longer.  Mechanical work was another activity I enjoyed,

19   but go to a local mechanic to have my auto work done.  I spend

20   most of my time reading novels, watching television or using my

21   computer.  Occasionally I attend  retiree club meetings or go

22   to a neighborhood movie theater with my wife."

23         I believe you said you did walk your dog, right?

24   A.  Yes.

25   Q.  Did you tell Joe Rutigliano you walked your dog?

1   A.  I may have.  I don't recall if I actually did.

2   Q.  OK.  Here it says you were an avid softball and basketball

3   player, is that true?

4   A.  No.

5   Q.  Did you ever tell Joe Rutigliano that you were a softball

6   and basketball player in the past?

7   A.  No.

8   Q.  It says mechanical work was another activity that you

9   enjoyed.  Is that true?

10  A.  No.

11  Q.  Have you ever done recreational mechanical work?

12  A.  No.

13  Q.  Here it says, occasionally -- did you ever tell Joe

14  Rutigliano that you did mechanical work?

15  A.  No.

16  Q.  Here it says, that you occasionally attend retiree club

17  meetings.  Was that true?

18  A.  No.

19  Q.  Did you ever tell Joe Rutigliano that you did?

20  A.  No.

21  Q.  Here it says that you, again, it says that you would

22  occasionally go to a neighborhood movie theater with your wife.

23  A.  No, I never said that.

24  Q.  Sir, do you have a movie theater in your town?

25  A.  No.

D7inles4a                    Parlante - direct

1   Q.  When Joe Rutigliano asked you about job duties, what did

2   you tell him?

3   A.  I told him walking the dog, working out, and redoing

4   furniture.

5   Q.  Do you see working out and redoing furniture referenced in

6   the paragraph I just read?

7   A.  I don't.

8   Q.  OK, we can put this exhibit away.  Can we look at

9   Government Exhibit 104-C.

10           104-C is a form called vocational report.  At the top

11   there it says United States of America, Railroad Retirement

12   Board.

13           If you could turn to page -- it's marked page 5.

14           MS. FRIEDLANDER:  You don't need to put it up on the

15   screen.

16   Q.  I just want you to tell me, sir, whether you see your

17   signature on that?

18   A.  Yes, I do.

19   Q.  Did you read any of this before you signed it?

20   A.  No.

21   Q.  Have you read it at any time?  Did there come a time when

22   you looked at this document?

23   A.  Yes.

24   Q.  When was that approximately?

25   A.  After I was arrested.

D7inles4a                          Parlante - direct

1    Q.  Who wrote this document?

2              MS. FRIEDLANDER:  You know what, we'll put up, it's

3    Bates 2401.

4              Page 9.  It called detailed job description.

5              Who wrote this document?  As far as you understand?

6    A.  Where is that?

7    Q.  It's called detailed job description.  It is about nine

8    pages in.

9    A.  As far as I understand, Joe wrote this, Joe Rutigliano.

10   Q.  What is your basis for saying that?

11   A.  It's job description.  That is what I understood that his

12   expertise was in.

13   Q.  This says, "Detailed job description."

14             Item No. 1.

15             "Exertion while doing repetitive and extensive

16   climbing."

17             "I did expensive climbing on and off railroad cars and

18   engines using vertical side ladders and grab irons.  Boarding a

19   unit required tremendous exertion using by back, neck, hands,

20   knees and body."

21             Is that accurate?

22   A.  I would say it's exaggerated.

23   Q.  I am not really going to read through all of this, but I

24   will just skip to the end.

25             It says, "Whenever I did this activity, my back, neck,

D7inles4a                    Parlante - direct

1    knees, ankles and right hand would experience pain, numbness

2    and tingling."

3              Is that true or not true?

4    A.  Not true.

5    Q.  Did you tell any of those things to Joe Rutigliano?

6    A.  No.

7    Q.  Did he ask you about your ability to do this activity?

8    A.  No.

9    Q.  Were you capable of doing this activity at the time you

10   applied for disability?

11   A.  Yes, I was.

12   Q.  Could you do it today?

13   A.  Yes.

14   Q.  Then it goes on to say, "As I attempted to do this work, my

15   back would give way underneath me and cause me to lose my

16   footing."

17             Is that true or not true?

18   A.  Not true.

19   Q.  Did you ever tell Joe Rutigliano that?

20   A.  No.

21   Q.  Did he ask you about that?

22   A.  No.

23   Q.  Then it goes on to say, "I was no longer able to do this

24   work because of the severe disabilities I suffer."

25             The same questions.  Is that true or not true?

D7inles4a                          Parlante - direct

1    A.   No.

2    Q.   Did you tell Joe Rutigliano that?

3    A.   Not to my recollection.

4    Q.   Did he ask you about any of that?

5    A.   No.

6    Q.   Can we look at the next paragraph.

7         It says, "I had to walk great distance through cars

8    and terminals," and it goes on.

9         Did you walk great distances in your job?

10   A.   That is exaggerated as well.

11   Q.   Again, I will try not to read the whole thing, but here it

12   says, "I weighed over 180 pounds and the excruciating pain in

13   my back shot down my body the more I walked."

14        Is that true?

15   A.   No.

16   Q.   Did you tell Joe Rutigliano that?

17   A.   No.

18   Q.   This line says, "I had to open and close approximately 100

19   heavy (over 100 pounds) railroad car doors."

20        Is that true or not true?

21   A.   That's not true in my case on the jobs that I worked.

22   Q.   This goes on to say, "This severely aggravated my back,

23   neck, and knees.  True or not true?

24   A.   Not true.

25   Q.   Did you tell Joe Rutigliano that?

D7inles4a                         Parlante - direct

1   A.  I didn't tell Joe that I severely hurt my back, neck, or

2   knees.

3   Q.  Here it says, Mr. Parlante, that you had to stop working

4   often because the back pain got so bad.  This work aggravated

5   your neck.  It says, "This work aggravated my neck in such a

6   way that excruciating pain developed in my back, causing

7   weakness, numbness and tingling."

8            True or not true, those sentences?

9   A.  Not true.

10  Q.  Did you tell Joe Rutigliano any of those things?

11  A.  No.

12  Q.  "I walked approximately 7 to 8 miles a shift I worked."

13           Is that true or is that exaggerated?

14  A.  I believe it's exaggerated, yes.

15  Q.  Then it says, "I was no longer able to do this work because

16  of the severe disabilities I suffer."

17           True or not true?  Is that correct?  True or not true?

18  A.  That is not true.

19  Q.  Did you tell Joe Rutigliano that you couldn't do walking --

20  you couldn't do the things in this paragraph because of the

21  severe disabilities you suffered?

22  A.  No.

23           MS. FRIEDLANDER:  Can we see the next paragraph.  OK.

24  Q.  I will just try to just pick out a couple of things from

25  these paragraphs.

D7inles4a                         Parlante - direct

1          Here it says, "Frequently I had to lift and carry

2    compromise couplers and metal devices weighing about 50 to 100

3    pounds great distances."

4          Was that true or not true?

5    A.  Not true.

6    Q.  Did you tell Joe Rutigliano that?

7    A.  No.

8    Q.  A couple other things.

9          "I had to lift, carry, push, pull, and adjust cables

10   weighing from 50 to 75 pounds.  I had to carry them great

11   distances to reach the work location."

12         Is that true or not true?

13   A.  Not true.

14   Q.  Did you tell Joe Rutigliano any of those things?

15   A.  No.

16   Q.  It goes on to say, "When I did this work I had to stop

17   working and rest because I experienced great pain in my back,

18   neck, right hand and knees.  I could not use my back for

19   leverage or exertion as I tried to do work.  My neck, back, and

20   right hand became painful as I tried my best to grip and

21   manipulate the objects.  I was no longer able to do this work

22   because of the severe disabilities I suffer."

23         Were those things true or not true?

24   A.  Not true.

25   Q.  Did you tell those things to Joe Rutigliano?

D7inles4a                      Parlante - direct

1   A.  No.

2   Q.  And let's look at the next paragraph.

3            This is called, "Exertion Involving Handbrakes."

4            Here it says --

5            THE COURT:  Ms. Friedlander, this is becoming

6   cumulative and repetitive.

7            MS. FRIEDLANDER:  OK.  That's fine, yes.

8            I think we get the idea.

9            THE COURT:  Can you summarize.

10  Q.  Are there other things in this job description that you

11  have read viewed prior to your testimony today that you think

12  are not true?

13  A.  Yes.

14           MS. FRIEDLANDER:  OK.  We can take that down.

15  Q.  I have a few more questions on Mr. Rutigliano.

16           How did you first, how did you know him -- pardon me.

17  How did you first know Joe Rutigliano?

18  A.  He was a fellow conductor, and he was a union official.

19  Q.  Did there come a time when you had an issue with the union?

20  A.  Yes.  There was an issue with the union.

21  Q.  Can you just tell us about it briefly?

22  A.  Yes, it was --

23           MR. RYAN:  May we have the time, Judge, please.

24           THE COURT:  Time frame.

25  Q.  When was that approximately?

1   A.  That was a while ago.  That was over ten years ago.

2            MR. RYAN:  Let me see.  That's 2003 approximately?

3   Q.  What is your recollection?

4   A.  It might have even been longer than that.

5   Q.  Can you just tell us briefly what the issue was.

6   A.  Yes.  I got a phone call one night from our crew

7   dispatchers, who tell us the jobs, saying that I was suspended

8   for the following day for a sick leave violation.  Actually,

9   they didn't say what it was for.  They just gave a code, and I

10  couldn't get anybody, you know, to tell me what the code meant.

11  Q.  Were you ultimately suspended for a day?  Or were you

12  ultimately suspended?

13  A.  No.

14  Q.  Did Mr. Rutigliano have any role in that dispute?

15  A.  No.

16  Q.  Now you said Mr. Rutigliano was a conductor at the Long

17  Island Rail Road?

18  A.  Yes.

19  Q.  You were a conductor, too?

20  A.  Yes, I was.

21  Q.  Were you a passenger train conductor at some point?

22  A.  I was for most of my career.

23  Q.  What kind of conductor was Mr. Rutigliano?

24  A.  I believe he was a passenger conductor.

25  Q.  What is the main job of a passenger train conductor?

1   A.  The main job is the safety, make sure everything is safe,

2   and collecting transportation.

3   Q.  Do you mean collecting tickets?

4   A.  Tickets.

5   Q.  Who retired first, you or Mr. Rutigliano?

6   A.  I believe Joe retired first.

7   Q.  Before he retired, did you see him around the railroad from

8   time to time?

9   A.  From time to time.  Not often.

10  Q.  What did you observe about his physical appearance?

11  A.  Nothing, you know, nothing out of the ordinary.

12  Q.  I want to talk about after you started receiving disability

13  benefits.

14          Did there come a time when you were contacted by a

15  federal agent about your disability benefits after you started

16  receiving them?

17  A.  Yes.

18  Q.  Directing your attention to 2008, did there come a time

19  when you were contacted by a federal agent?

20  A.  Yes.

21  Q.  How were you contacted?

22  A.  He actually left a card in my mailbox and I called him up

23  on the phone.

24  Q.  Did he ask you questions during the call?

25  A.  He did.

D7inles4a                    Parlante - direct

1   Q.  Can you remember all of them?

2   A.  I don't remember all of them.

3   Q.  Do you recall whether you answered all the questions

4   truthfully?

5   A.  I don't.

6   Q.  Is it possible in your mind that you are were not truthful

7   in all of your answers?

8   A.  Yes.

9   Q.  Following that call, did there come a time when you

10  testified in the grand jury in this case?

11  A.  Yes.

12  Q.  Were you truthful in all of your answers in the grand jury?

13  A.  No, I was not.

14  Q.  What are some of the things that you were not truthful

15  about?

16  A.  I wasn't truthful about why I went to Dr. Lesniewski.  I

17  wasn't truthful about the facilitators that I used, or the

18  people that helped me out with the thing and I wasn't truthful

19  about having the disability.

20  Q.  Were you asked why you retired?

21  A.  Yes.

22  Q.  Were you truthful about that?

23  A.  No.

24  Q.  In what way were you untruthful?

25  A.  I said I claimed to have a disability, I claimed to have

D7inles4a                    Parlante - direct

1     had back problems to get the disability.

2     Q.   Were you asked why you saw Dr. Lesniewski?

3     A.   I'm sorry.  Was I asked --

4     Q.   Were you asked in the grand jury about why you saw

5     Dr. Lesniewski?

6     A.   Yes.

7     Q.   Were you truthful about that?

8     A.   No, I wasn't.

9     Q.   Tell us what you said and in what way you were untruthful.

10              MR. DURKIN:  The page number, please.

11    Q.   You can answer.

12              MS. FRIEDLANDER:  I'll get that for you.

13    A.   I went to him to establish a diagnosis for a disability.

14    Q.   Do you recall what you said in the grand jury?

15    A.   Yes.  I said I went to him because I had physical issues,

16    back pain and neck pain.

17    Q.   Did you talk in the grand jury about whether you could

18    still work now?

19    A.   I did.

20    Q.   Were you truthful about that?

21    A.   I was.

22    Q.   Were you -- OK.  Was there a point in your testimony when

23    you said you could not still work?

24    A.   Oh, yes, there was.

25    Q.   OK.  Was that true or not true?

D7inles4a                          Parlante - direct

1   A.  That was not true.

2   Q.  Why weren't you honest about everything in the grand jury?

3   A.  When I initially went to the grand jury I thought I was

4   there as a witness.  And then it became apparent to me that it

5   was about me and I got really frightened, and, you know, I

6   thought by being vague with some of the questions that I could

7   skirt the issue.

8   Q.  Leaving aside questions that you believed you answered

9   untruthfully, were there any other questions that you believe

10  you misunderstood?

11  A.  Yes.

12  Q.  Have you reviewed you grand jury testimony prior to your

13  testimony today?

14  A.  Yes.

15  Q.  Based on that review, what question do you believe you

16  misunderstood when you were asked about it in the grand jury?

17  A.  I think it was a question about a facilitator.

18  Q.  What did you understand that question to be asking you?

19  A.  I thought it was asking about --

20          MR. DURKIN:  One second, Judge.

21          MS. FRIEDLANDER:  Sorry.  One second.

22  Q.  What did you think you were being asked about?

23  A.  I thought they were asking me if it was an agency other

24  than the Long Island Rail Road that helped me with the, fill

25  out the paperwork.

1  Q.  When you paid Mr. Rutigliano to help with your disability

2  paperwork, did you use the words consultant or facilitator to

3  describe him?

4  A.  No.

5  Q.  I mean back at the time that you were dealing with him.

6  A.  No.

7  Q.  How did you describe him?  Who was Joe Rutigliano?

8  A.  Just someone that knew how to fill out the paperwork.

9  Q.  Now, following the time you testified in the grand jury,

10  did there come a time when you were interviewed in person by an

11  agent?

12  A.  Yes.

13  Q.  What topic was he asking about generally?

14  A.  My dealings with Dr. Lesniewski, and I guess he was trying

15  to get information about who I used as a facilitator.

16  Q.  Was he asking about your disability?

17  A.  Yes.

18  Q.  Now, at the time that the agent interviewed you -- well,

19  how long after your grand -- was this in 2011?

20  A.  Yes.

21  Q.  At the time he interviewed you, had you ever read your

22  disability application?

23  A.  No.

24          MR. DURKIN:  Judge, can we get the foundation or the

25  time.

D7inles4a                       Parlante - direct

1   Q.  You said you testified in the grand jury in or about 2011,

2   right?

3   A.  Yes.

4   Q.  Approximately how long after that testimony did the agent

5   interview you?

6   A.  The next day.

7   Q.  I believe you said at the time the agent interviewed you,

8   you had not previously read your disability application?

9   A.  I had not.

10  Q.  At the time the agent interviewed you, was your disability

11  application a document that you independently recognized?

12  A.  I don't remember if I, if he had shown me that.

13  Q.  Now, since you have started meeting with the government,

14  have you reviewed that disability application and other

15  documents?

16  A.  Yes.

17         MS. FRIEDLANDER:  Can we see Government Exhibit 104-J.

18  Can we just see Mr. Parlante's name at the top.

19  Q.  Do you see your name at the top, sir?

20  A.  Yes.

21  Q.  C.P. Parlante?

22  A.  Yes.

23  Q.  Can we just look at the bottom of this page.  It says,

24  "BaranM Westbury office."

25         If you can turn to the next page.

D7inles4a                    Parlante - direct

 1              MS. FRIEDLANDER:  Can we see the top?

 2     Q.  This says, "Application Summary."

 3              Then it contains your name and it contains your Social

 4     Security number.

 5              MS. FRIEDLANDER:  Can we show the bottom piece of this

 6     page that says applicant information.

 7     Q.  Here it has your name and address.

 8              Is that your address?

 9     A.  Yes.

10     Q.  It has your date of birth, right?

11     A.  Yes.

12     Q.  Is that your telephone number?

13     A.  Yes.

14     Q.  Were these the types of questions Marie Baran was asking

15     you when you met with her in the Railroad Retirement Board

16     office to file your application?

17     A.  Yes.

18              MS. FRIEDLANDER:  Can we see the next page.

19     Q.  Up at the top it has some information about your bank and

20     your account number.

21              Did she ask you questions about your bank, your

22     banking information?

23     A.  Yes.

24     Q.  Is this a document that you first saw prior to your

25     testimony in this case when you were meeting with the

D7inles4a                    Parlante - direct

1    government?

2    A.   Yes.

3    Q.   Based on your review of this document, what form do you

4    believe that Ms. Baran was completing when she was asking you

5    questions at the Railroad Retirement Board office about your

6    name and your address and those types of things?

7    A.   This form here, I thought it was the application itself.

8           MS. FRIEDLANDER:  We can put that away.

9           I'm almost done, just maybe five minutes.

10   Q.   I am going to put a couple more documents in front of you,

11   sir.  They are just not in your binder.

12   A.   OK.

13   Q.   Can you look at Government Exhibit 720 in evidence.  Sir,

14   if you could look at 720.  That is part of the new documents

15   that I just put in front of you.

16           Do you see 720?

17   A.   Yes, I do.

18   Q.   Do you see your signature on page 2 of that form?

19           MS. FRIEDLANDER:  Can we have it up on the screen as

20   well if that's helpful.

21   A.   That's my signature.  I don't see it on this form.

22   Q.   I think what we gave you is double sided.  So you can look

23   and see if it's on the back of the first page.

24   A.   Yes.

25   Q.   Is this a document -- the date is March 2011.  And if we

D7inles4a                    Parlante - direct

1    could just see the questions above his signature on that page.

2    Q.  You know what.  I'm sorry.  We have to go to the first page

3    just see what period the document covers.  OK.

4              It says, "Report Period."

5              "Answer all questions for the following period.  From

6    April 1, 2005 to the present."

7              If we could go to the next page.  Question No. 4.

8              It says, "Which word best describes your health now as

9    compared to the beginning date of the report period."

10             And you checked "Worse."

11             Is that true or not true?

12   A.  That was not true.

13   Q.  Did you mail this document to the Railroad Retirement

14   Board?

15   A.  I did.

16   Q.  Where did you mail it from?

17   A.  From Oyster Bay.

18             MS. FRIEDLANDER:  Can we just is see the last page,

19   the envelope.

20   Q.  Where did you mail it to?  What is the address there?

21             MS. FRIEDLANDER:  I will just read it.  I can do it.

22   It says, Railroad Retirement Board, Federal Building, 26

23   Federal Plaza, New York, New York, 10278.

24   Q.  Do you believe you mailed this document to that address?

25   A.  Yes, I do.

D7inles4a                    Parlante - direct

1   Q.  Just a couple questions about your current physical

2   activities.

3          What kinds of things do you currently do?

4   A.  I continue to work out three times, three to four times a

5   week, basically the same routines.

6          MS. FRIEDLANDER:  OK.  Just one more minute.

7          Just small questions.

8   Q.  When you received your disability benefits, while you were

9   receiving them, how did you receive them?  Did you receive them

10  by into your bank account?

11  A.  Direct deposit, yes.

12  Q.  Where is your bank?

13  A.  It was in Oyster Bay.

14  Q.  Is that on Long Island?

15  A.  Yes.

16          MS. FRIEDLANDER:  Nothing further.  Thank you.

17          THE COURT:  Thank you.  It's 12:35.

18          Rather than starting cross-examination I am going to

19  break for the lunch hour and return in one hour at 1:35.

20  Again, do not discuss the case among yourselves or with anyone

21  outside or have any contact at any time with anyone involved in

22  the case.  If any of these things occur, you are directed to

23  inform the court immediately and not discuss the issue with

24  your fellow jurors.

25          Have a good lunch.

D7inles4a                    Parlante - direct

1              (Jury not present)

2              THE COURT:  You can step down.

3              Just briefly, let's get an update on what remains and

4    also whether the parties have been able to sort out the

5    question concerning Special Agent Del Favero.

6              MR. WEDDLE:  We haven't had any further chance to

7    discuss it, your Honor.

8              The issue that I was going to raise with respect to

9    Special Agent Del Favero was a couple of legal issues.

10             One is we mentioned that we would want to read from

11   this document, which is the admitted portions of the written

12   statement, just read it to them.

13             We thought it would be helpful to instruct the jury

14   that essentially that we're reading from a document and that is

15   a legal ruling that your Honor has made and they should accept

16   it and not concern themselves with why you made that ruling.  I

17   have some proposed language.

18             That's one issue.

19             The other issue is, and I haven't had a chance to

20   discuss it with defense counsel, this issue, but I think that,

21   based on your Honor's ruling, we should just elicit the

22   portions of the statement that are admissible.  I would think

23   that cross-examination about the fact that there are other

24   portions is not relevant.  The portions themselves have been

25   excluded, the substance of them have been excluded by your

1    Honor's ruling, but I also don't think that there's any

2    relevance to talking about the fact that parts have been

3    excluded.

4              THE COURT:  What else?

5              MR. WEDDLE:  That is all that I have.

6         Oh, There was one other question, your Honor, which is

7    that Lesniewski's statements to the special agents in 2008 is

8    something that would be subject to the confrontation clause

9    issue, and I don't know the defendants other than

10   Dr. Lesniewski would like to have a limiting instruction that

11   the jury should consider those statements only against

12   Dr. Lesniewski or if they prefer just to strategically not

13   highlight the issue.

14             THE COURT:  All right.

15        Mr. Durkin, if you wish to address any of these

16   matters at this point.

17             MR. DURKIN:  Judge, Mr. Dratel will.

18             THE COURT:  Mr. Dratel.

19             MR. DRATEL:  Your Honor, in terms of not so much the

20   question of what else was talked about, obviously, but the fact

21   sort of the process of the interview and the nature of the

22   interview is fair game.  I mean, not necessarily the substance

23   in terms of what the Court has excluded, but at least in terms

24   of the mechanics of the interview and the way it occurred and

25   all of that part, because there is a sequence there.  That's

D7inles4a                      Parlante - direct

1    still fair game for cross-examination.

2           The other part is that the Court did rule on certain

3    issues on completeness and hearsay, but did not rule on others.

4    But the Court has left open the notion that, if we came forward

5    with some others, the Court would decide these as necessary.

6    We weren't looking at the oral statements as much as the

7    written statements.  We will review those at lunch and come

8    back with the government and look at it if we have others.  I

9    don't know if we will, but if we do, we will obviously present

10   them before he starts.

11          THE COURT:  Why don't we in that case, in order to not

12   detain the jury unnecessarily, meet 15 minutes before the jury

13   comes back.  That will give us some time to review these issues

14   if there are issues.  If there are not issues, we will have

15   another 15-minute break.

16          Anything else?

17          Thank you.

18          MR. WEDDLE:  I would inquire, your Honor, or request

19   that your Honor inquire of the defense if they have a

20   prediction about the length of cross-examination.  We are

21   trying to think about other witnesses that are after Special

22   Agent Del Favero.  I should also revise my estimate for Special

23   Agent Del Favero's direct testimony.  I think it's shorter than

24   I said yesterday, probably less than half an hour.

25          THE COURT:  All right.

D7inles4a                    Parlante – direct

1         Any prediction as to how long the cross-examination of

2    Mr. Parlante is going to be?  Mr. Durkin?  Mr. Dratel?

3         MR. DURKIN:  I am not sure.  We may need to discuss

4    amongst ourselves.

5         THE COURT:  Why don't we get an estimate when you come

6    back.

7         MR. DURKIN:  Yes.  I think that would be better.

8         MR. JACKSON:  Judge, just so we are on time, what time

9    do you want us back here, a time as opposed to 15 minutes

10   before?

11        THE COURT:  We told the jury one hour.  That would

12   have been 1:35, so you should be here around 1:20.

13        MR. JACKSON:  Thank you, your Honor.

14        (Luncheon recess)

15

16

17

18

19

20

21

22

23

24

25

 1                  A F T E R N O O N   S E S S I O N

 2                          (1:30 p.m.)

 3          MS. LEWIS:  Your Honor, Mr. Dratel and Mr. Durkin were

 4  just here a moment ago.  I am not sure where they have gone to,

 5  but I would imagine they will just be back momentarily.

 6          THE COURT:  All right.  We are ready to resume.

 7          MR. DURKIN:  Judge, I don't think we are going to have

 8  any issue with the statement other than -- we have resolved

 9  whatever issues we had.

10          THE COURT:  That is very encouraging.  I am glad to

11  hear that.

12          MR. DURKIN:  Mr. Weddle has a statement that I am in

13  agreement with but for the part that I have put a red line

14  through.

15          THE COURT:  All right.  Hand it up.

16          MR. WEDDLE:  I hope my writing is legible, your Honor.

17          THE COURT:  I am not sure what the need for the

18  statement is at all.  Why highlight to the jury that we are

19  making a legal ruling as to this particular statement.

20          MR. WEDDLE:  Well, the testimony as I anticipate it,

21  your Honor, is that the agents interviewed Dr. Lesniewski in a

22  normal interview fashion and then at the end of the interview

23  they asked him if he would sign a written statement and then

24  they typed the statement on his computer and he signed it.

25          So there's going to be testimony that there was a

1   written statement, but the jury isn't going to be given the

2   written statement because of your Honor's ruling about

3   inadmissible evidence.

4           So they may wonder why don't we have the written

5   statement itself, and this just tells them you don't have the

6   written statement itself.  We are just reading into the record

7   the statements from it because of a legal ruling that they

8   don't have to concern themselves with.

9           THE COURT:  Mr. Durkin.

10          You crossed out four words.

11          MR. DURKIN:  I crossed out the reference to the

12  statement.  The problem I have with the whole thing is that I

13  have always conceptualized the value of a written statement to

14  be the actual signature and the fact that this is initialed and

15  all the usual kind of trappings that go on with a statement.

16  So that's why I have a lot of trouble with the whole idea of

17  putting in the redacted written version, if it is a statement,

18  because I would want the redactions in before I would want what

19  they originally proposed put in.

20          MR. WEDDLE:  We never told your Honor what we

21  originally proposed.  We worked out that issue among counsel.

22  So the proposal is to just read from these excerpts.  Actually,

23  I think your Honor makes a good point, and maybe it is just

24  unnecessary and we should just do it.

25          THE COURT:  We have another option, which is to admit

D7inles4a                          Parlante - direct

1    a redacted version.  What is the downside of that?

2              MR. WEDDLE:  The problem with admitting a redacted

3    version is that the portions that we are admitting are quite

4    targeted.  That just invites the jury to speculate about the

5    parts that are blocked out.  I think admitting a redacted

6    version just invites speculation.

7              THE COURT:  It amounts to the same thing if you tell

8    them we are going to read only a little portion, but this is

9    not the full statement.  They might say that you're reading

10   only a portion because of a legal ruling.  Isn't that the same

11   thing?

12             MR. DURKIN:  We would prefer the redacted version.

13             MR. WEDDLE:  OK, your Honor.  Let's not give the

14   instruction.  We withdraw the request, your Honor.

15             THE COURT:  Are you OK with that?

16             MR. DURKIN:  I would rather have the redacted version.

17   If they are going to talk about it as a statement --

18             THE COURT:  Let me cut it short.

19             Ms. Friedlander, you are rising?

20             MS. FRIEDLANDER:  No, your Honor.

21             THE COURT:  My preference would be to give a redacted

22   version.  It is not unusual for juries to be given documents

23   that have pieces redacted and the Court to explain that they

24   have been redacted because there are portions that are not

25   relevant and not part of the record and that they are not to

1    speculate about what may have been there.  It is a matter of a

2    legal determination by the Court.

3            MR. WEDDLE:  Your Honor, if I could show it to you.

4    The parts that we are admitting are quite narrow.  So I

5    think --

6            THE COURT:  It doesn't matter.

7            MR. WEDDLE:  The only reason to do this is to invite

8    speculation about what is redacted.

9            THE COURT:  We are talking about the ballgame.  That

10   is just as much speculation as he said something that may have

11   been prejudicial.

12           MR. WEDDLE:  I'm sorry, your Honor.  I didn't quite

13   understand that.

14           MR. DURKIN:  I understand completely.  Of course, they

15   could be thinking that maybe he talked about killing his

16   mother.  You know, it is not in there.

17           MR. WEDDLE:  Your Honor, I don't see the point of

18   giving them a document like this and then instructing them to

19   ignore these blacked out portions.  It doesn't seem like there

20   is any point to that, rather than just reading into the record

21   the portions that are going to be admitted.

22           THE COURT:  I will proceed with the redacted version.

23   I will instruct them that you have been given this redacted

24   version because there is material in there that is not

25   relevant, not pertinent.  They could have been talking about

D7inles4a                    Parlante - direct

1    the ballgame or about something else, and they are not to

2    speculate about why portions are redacted.  They are not

3    relevant.

4            MR. WEDDLE:  Your Honor, I'm sorry, we agreed with

5    defense counsel before the lunch break that we could just read

6    it into the record.  Now it seems like there is a shifting

7    ground here.  We had an agreement.

8            THE COURT:  You came in with --

9            MR. WEDDLE:  We had an agreement with respect to that,

10   your Honor.  Then your Honor asked questions about it, and we

11   asked to withdraw that.  I think what we should do is go back

12   to what was agreed between counsel, which is to just read it.

13           THE COURT:  Mr. Durkin had raised questions about

14   deleting four words in this statement.

15           MR. DURKIN:  Let me make clear what is happening here.

16   Last night they sent a written document that had just the words

17   in there.  I said I was unaccustomed to that, because in our

18   district -- I didn't say in our district, but I said in my

19   e-mail I am unaccustomed to this.  If there is a different

20   local practice, I will go along with it.  I said I would defer

21   to Mr. Dratel.

22           If what your Honor is saying now that it is your -- my

23   experience is our practice in Chicago, and elsewhere where I

24   have tried cases, is to put in a redacted version.  I thought

25   there was some type of special practice here, which is why I

1    was willing to say, OK, I defer.  And if it is going to come in

2    as a statement I think it should come in as a redacted

3    statement.  I said that.  I have said that all along.  So I

4    don't want to be --

5              MR. WEDDLE:  Your Honor, Mr. Durkin is only telling

6    half of the story.  We proposed something to the defense.  He

7    responded to my e-mail saying he didn't like it, but he

8    deferred to other people.

9              We had previously mentioned the issue to Mr. Dratel.

10   When we came in this morning we talked to Mr. Dratel and we

11   said why don't we do this instead.  Why don't we just read from

12   the excerpted parts.  He said that's fine.  That's why before

13   the lunch break we told your Honor that there was no issue

14   about this, the parties were in agreement about the method by

15   which we were going to introduce the written portions of the

16   statement.

17             So this is all news to me, what is happening here.

18   And so we would just ask that we just proceed in that fashion,

19   as we agreed with defense counsel earlier today, and simply

20   read the excerpts into the record.

21             MR. DURKIN:  Judge, can we do this.  I happen to have

22   on my laptop the three e-mails in question.  Can I just show it

23   to you?

24             THE COURT:  No.  Let's not prolong this.  We told the

25   jury 1:35.  It is now beyond 1:35.  I have made the ruling.  I

1    would prefer to have the redacted version.  I will instruct the

2    jury.  I will tell them that it is a redacted version because

3    there is material in that it has nothing to do with in case,

4    and they are not to speculate about why there may have been

5    redactions, only that they have nothing to do with the case and

6    are not relevant for their consideration.  The only thing that

7    is relevant is what is in the admitted portion.  Period.

8    That's it.  That is the rule with respect to any evidence, any

9    document, and some of these jurors may also have been in

10   previous cases where there are documents that were redacted,

11   this is no mystery.

12            Let's proceed.

13            MR. WEDDLE:  Your Honor, just in terms of scheduling.

14            THE COURT:  Yes.

15            MR. WEDDLE:  I told your Honor that after

16   Mr. Parlante, Special Agent Del Favero, and then we have

17   Mr. Ellensohn, who is also a retiree who obtained disability.

18            THE COURT:  Yes.

19            MR. WEDDLE:  I think he will be shorter than the other

20   ones that we have had.  Then, because our some of our witnesses

21   are out of town, I would propose to then call Robert Murray,

22   who is with the MTA office of inspector general.  He's the one

23   who prepared certain of the computations comparing disability

24   rates at Metro-North and Long Island Rail Road.

25            There is one evidentiary issue with respect to him, if

D7inles4a                    Parlante - direct

1    we get to him, which is that some of the documents that he

2    relied on, most of the documents that he relied on in

3    conducting his analysis are business records of Metro-North or

4    Long Island Rail Road or MTA.  As an MTA person he has access

5    to all of those and can authenticate them as business records

6    and admit them as business records.

7              Some of the data that he used came from the Railroad

8    Retirement Board.  Obviously, they are the ones who have the

9    data about who got disability and when that person got

10   disability.

11             We proposed a stipulation just on the business records

12   for that data.  I'm not blaming anyone, but we could just move

13   ahead with Bob Murray and take that evidence subject to

14   connection, or perhaps we can get the stipulation before he

15   starts, which would be sometime mid to late afternoon.  The

16   stipulation specifically relates to Government Exhibit 20,

17   which is a CD which contains the backup data that he used in

18   preparing his comparison.

19             THE COURT:  Is there any dispute about the

20   authenticity of the data?

21             MR. WEDDLE:  I don't believe so, but I don't know.

22             THE COURT:  So what is the issue that you are raising?

23             MR. WEDDLE:  I just don't have a signed stipulation

24   with respect to that.  I proposed one earlier this week.  I

25   haven't gotten it back with signatures.  But assuming that we

1    can either take the evidence subject to connection or get that

2    stipulation before he takes the stand, then he would be the

3    next person in order after Mr. Ellensohn.

4              THE COURT:  How long do you expect with Mr. Murray?

5              MR. WEDDLE:  An hour perhaps.

6              THE COURT:  All right.

7              From defense, what is the status of this proposed

8    stipulation?  Is there any serious, good-faith objection to

9    stipulating to the authenticity of the RRB figures that

10   Mr. Murray would be using?

11             MR. DURKIN:  Judge, I don't think so.  I simply don't

12   have a present recollection of it.  But I don't think that --

13   Mr. Weddle, was that one --

14             MR. WEDDLE:  That's the one that I brought in I think

15   on Monday morning and you deferred to Mr. Ryan.

16             MR. DURKIN:  I deferred on that one.

17             MR. RYAN:  I am going to have to take a look at it

18   during the break, if I may.

19             THE COURT:  Why don't you take a look at it before

20   Mr. Murray comes in.

21             MR. RYAN:  Thank you.

22             THE COURT:  All right.  Let's bring in the jury.

23             MR. RYAN:  Judge, we are reversing the order of cross.

24             THE COURT:  That's fine.

25             (Continued on next page)

1              (Jury present).

2              THE COURT:  All right.  Thank you.  Welcome back.  We

3    will proceed with the cross-examination by defense counsel of

4    Mr. Parlante.  Mr. Ryan.

5    CROSS EXAMINATION

6    BY MR. RYAN:

7    Q.  Mr. Parlante, do I understand you told the ladies and

8    gentlemen of the jury that it took you seven years to read the

9    application and you that you filed with the RRB?

10   A.  That's what I said, yes.

11   Q.  That is the application that Mr. Rutigliano prepared for

12   you?

13   A.  That's right.

14   Q.  And he relied on you?

15   A.  I don't know what he relied on.

16   Q.  He relied on the narrative of Dr. Lesniewski and all the

17   medical data that was given to you that you brought in the

18   package to Mr. Rutigliano to prepare the forms, isn't that

19   right?

20   A.  I suppose that's right.

21   Q.  Why do you suppose?  Can't you tell the jury whether you

22   did it or you didn't?

23              MS. FRIEDLANDER:  Objection.

24              THE COURT:  Sustained.

25   Q.  You went to Mr. Rutigliano because this form required some

D7inles4                          Parlante - cross

1    kind of help, didn't it?

2    A.  It did require help, yes.

3    Q.  As a matter of fact, you went to the pension office first

4    to try to get help and talk to people like Fred Kreuder and

5    Paula Winthrop?

6    A.  I went to the pension office.  I didn't try to get help

7    with this form from them, no.

8    Q.  You knew that there were other people available to try to

9    help you with the form, correct?

10   A.  I did not.

11   Q.  You didn't know that there was an attorney Mike Flynn?

12   A.  No.

13   Q.  And you didn't know that there was a former labor official

14   Ed Yule?

15   A.  No.

16   Q.  You didn't know that there was a former labor official Tony

17   D'Avanzo?

18   A.  No.

19   Q.  So you only knew that Joe Rutigliano was available, is that

20   it?

21   A.  That's right.

22   Q.  You knew Rutigliano not only as a fellow conductor but as a

23   union president, correct?

24   A.  As a union man, yes.

25   Q.  As a matter of fact, your relationship with Joe Rutigliano

1    goes back to the time when you were suspended by the railroad?

2              MS. FRIEDLANDER:  Objection.  Misstates the testimony.

3              THE COURT:  Sustained.

4    Q.  Didn't I understand you to say that you were subject to a

5    Long Island Rail Road suspension?

6    A.  The one we were talking about earlier?

7    Q.  Yes.  The one you mentioned in response to

8    Ms. Friedlander's question?

9    A.  I was subject to a suspension, yes.

10   Q.  Do you remember that there were some union officials that

11   were upset with your position with respect to the suspension?

12   A.  Yes.

13   Q.  And do you remember that they didn't want you to fight the

14   suspension?

15   A.  Yes.

16   Q.  Did you remember that they told you that you shouldn't

17   because you didn't deserve to fight the suspension?

18   A.  I don't remember that at all.

19   Q.  Do you remember that Joe Rutigliano didn't want you to

20   fight the suspension?

21   A.  No.

22   Q.  Why didn't they want you to fight the suspension?

23   A.  I have no idea.

24   Q.  So they were upset with you, these union officials,

25   correct?

D7inles4                        Parlante - cross

1    A.  One or two of them.

2    Q.  Including Joe Rutigliano.

3    A.  I don't know.  I never talked to Joe about this.

4    Q.  Do I understand you to say that you are telling the ladies

5    and gentlemen of the jury that you are now able to tell us that

6    you were not disabled when you went to Joe Rutigliano?

7    A.  Are you asking me if that is your understanding of --

8    Q.  I want your understanding.  Your understanding is you can

9    go work on the railroad today, correct?

10   A.  Yes.

11   Q.  You are telling the ladies and gentlemen of the jury that

12   when you went to Mr. Rutigliano you were able to work on the

13   railroad?

14   A.  Yes.

15   Q.  You could work without pain on the railroad?

16   A.  Yes.

17   Q.  Tell us about the time you fell off the train and got

18   sideswiped by another train coming by?

19   A.  OK.  I was on my last day of work.  I was working the

20   midnight shift.  I was conductor of a freight train.  And they

21   sent another crew out to make a move and switch some of the

22   cars out, switch some of the engines out.  I was watching a

23   train pull out of the siding, and, unbeknownst to me, there was

24   a train coming down the main, rolling down the main, and I

25   didn't hear it.

D7inles4                         Parlante - cross

1          The last second I did.  I tried to jump on it.  I got

2    knocked to the ground.  There was another train pulling out at

3    the same time.

4    Q.  All right.  Just bear with me.  I would like you to give us

5    a little more clearer picture of this episode, all right.  It

6    was on November of 2004?

7    A.  Halloween night.

8    Q.  It was on Halloween?

9    A.  Halloween night.

10   Q.  It was Halloween night?

11   A.  It was a midnight job.

12   Q.  Midnight job, so it's black out, correct?

13   A.  Yes.

14   Q.  And you are on a freight car?

15   A.  No, I was on the ground.

16   Q.  You are on the ballast on the bed of the tracks, correct?

17   A.  Yes.

18   Q.  Are you facing alongside the tracks, the direction of the

19   tracks when this happened?

20   A.  I had my back to the track that the engine came on.  I was

21   facing the train that was pulling out of the siding.

22   Q.  So you are on the track and you see a train pulling out in

23   front of you?

24   A.  Right.

25   Q.  And you are saying that there is another train coming from

D7inles4                          Parlante - cross

1   behind you?

2   A.   No.   He was coming from -- the train was pulling out in

3   front of me and the other guy was coming down the track behind

4   me.   So I was in between two tracks.

5   Q.   So you are standing in between two sets of tracks that are

6   parallel to each other, one set is in front of you going

7   across, and one set is behind you going across, correct?

8   A.   Yes.

9   Q.   And you are standing there?

10  A.   Yes.

11  Q.   The train behind you is the one that is going to sideswipe

12  you?

13  A.   Yes.

14  Q.   It was a dark Halloween night, correct?

15  A.   Yes.

16  Q.   And you couldn't hear the train coming behind you?

17  A.   No.   It wasn't a train.   It was an engine.

18  Q.   And what kind of engine was it?

19  A.   Diesel locomotive.

20  Q.   What kind of diesel locomotive?

21  A.   I don't know the brand name of it.

22  Q.   Was it one of those 2,000-horsepower engines?

23  A.   It could have been.

24  Q.   You couldn't hear a 2,000-horsepower engine coming behind

25  you?   Is that what you are telling us?

D7inles4                              Parlante - cross

1    A.   That's what I am telling you.

2    Q.   That train, that engine was hauling cars?

3    A.   No.   The other engine that was pulling out of the siding

4    was hauling cars.

5    Q.   So, as I understand it, to your back there is a

6    2,000-horsepower-type diesel engine coming from your right to

7    your left, correct?

8    A.   Left to the right.

9    Q.   Coming from your left to your right.   And in front of you,

10   you have a parallel track that goes across your vision,

11   correct?   Is that right?

12   A.   Yes.   I was standing in between the tracks.

13   Q.   Where is the train in relation to where you are standing

14   between the tracks when you are looking at it?

15   A.   The train that was pulling out?

16   Q.   Yes.

17   A.   I was approximately four feet away.

18   Q.   This train is going from your left to your right or from

19   your right to your left?

20   A.   The one pulling out was going from my right to my left.

21   Q.   So you have a train going from your right to your left in

22   front of you, and you have this engine going from your left to

23   your right behind you, correct?

24   A.   Right.

25   Q.   Two trains like passing in the night?   Is that the scene?

1    A.  Not exactly.

2    Q.  Well, correct me.

3    A.  There was no schedule of any kind of passing.  The other

4    train, the engine is coasting down the tracks.

5    Q.  You are in a freight yard, correct?

6    A.  No.  I was on the central branch on a freight track.

7    Q.  You tried to get on to which train?  The diesel that was

8    going behind you?

9    A.  The engine, the diesel engine going behind me.

10   Q.  Where was the diesel in relationship to the front of the

11   diesel and the rear of the diesel as it passed?

12              THE COURT:  Mr. Ryan, can we have a sidebar.

13              MR. RYAN:  Judge, I will move on.  I'm ready to move

14   on.  I will withdraw that last question.  OK.

15              THE COURT:  Thank you.

16              MR. RYAN:  I got the message.

17   Q.  When that episode happened, you fell down?

18   A.  Yes.

19   Q.  Were you in any way injured?  Any way?

20   A.  I got a big bruise on my back.

21   Q.  Did you go to work the following days or weeks?

22   A.  No, I retired the next day.

23   Q.  Did you put in for sick leave or anything like that?

24   A.  Yes, I did.

25   Q.  When you met with Joe Rutigliano, did you tell him about

D7inles4                        Parlante - cross

1   that episode?

2   A.  I did.

3   Q.  What did he tell you?

4   A.  I don't remember.

5   Q.  Well, did you tell him, You got to put that in the

6   application because that's going to help you with my disability

7   application?

8   A.  I don't remember him saying it.

9   Q.  Did you think it would help you that you were injured on a

10  job by a passing diesel?

11  A.  Quite frankly, I didn't want it mentioned.

12  Q.  You didn't want to tell the Railroad Retirement Board about

13  this episode?

14  A.  I didn't want to tell anybody.

15  Q.  Well, you told Joe Rutigliano.  Why did you tell Joe

16  Rutigliano and not tell anybody else?

17  A.  I don't know.

18  Q.  Why didn't you want to tell anybody about this episode?

19  A.  It is a little embarrassing.

20  Q.  Are you saying that it was embarrassing because you were

21  not really able to perform your job the way you should do it?

22  A.  No.

23  Q.  Tell the jury why it was embarrassing to you.

24  A.  To get hit by a train on your last day of work, that's kind

25  of embarrassing.

D7inles4                         Parlante - cross

1    Q.  You have a job description when you work on the railroad as

2    a conductor, correct?

3    A.  You have duties.  I never, I don't know of it as a job

4    description.  You have duties.

5    Q.  Well, when you first become a conductor, you have to go to

6    a training course, correct?

7    A.  That's correct.

8    Q.  You have to go through physicals, correct?

9    A.  Yes.

10   Q.  And they give you a list of what your duties are you can

11   expect to do?

12   A.  That was so long ago I don't really recall, but maybe they

13   do.

14          MR. RYAN:  Can I have R 5-B, please.  I offer it in

15   evidence.  See if this doesn't refresh your recollection.

16          MS. FRIEDLANDER:  Object to offering it in evidence.

17          THE COURT:  If it's for recollection, normally you

18   don't need to introduce it into evidence.

19   Q.  Let me show you R 5-B.  Do you recognize it?

20   A.  No.

21   Q.  Are you telling us that as a conductor you were not

22   required to open and close doors of the trains that may require

23   35 pounds of strength?

24   A.  That's not what I am telling you.  I'm telling you I don't

25   recognize this document.

1    Q.  Do you recognize the contents of the document as consistent

2    with your obligations as a conductor for 28 years?

3            MS. FRIEDLANDER:  Objection.  The document is not in

4    evidence.

5            THE COURT:  Sustained.

6    Q.  Does it refresh your recollection of the obligations,

7    physical demands --

8            MS. FRIEDLANDER:  Objection.

9    Q.  -- of a conductor when you worked for 28 years on the Long

10   Island Rail Road?

11           MS. FRIEDLANDER:  Objection.

12           THE COURT:  Sustained.

13   Q.  Well, did you ever testify that it required manual labor to

14   be a conductor?

15   A.  Did I ever testify that it required manual labor?

16   Q.  Yes.

17   A.  I may have.

18   Q.  Well, as a matter of fact, you did, didn't you, in April

19   2011 when you appeared before the grand jury in this district?

20           MS. FRIEDLANDER:  Objection, your Honor, there is no

21   inconsistent statement.  This is not proper cross.

22           THE COURT:  Sustained.

23   Q.  I am going to ask you some questions now, Mr. Parlante,

24   about your job as a conductor based upon photographs of working

25   conditions on the railroad.

1           MR. RYAN:  May I have R 5-B, please.

2    Q.  As a conductor does it require you to constantly walk on

3    moving trains and all surfaces and upon ballasted tracks?

4    A.  Yes.

5    Q.  Would you explain to the jury what you mean by ballasted

6    tracks?

7    A.  Those are the rocks on the tracks.

8    Q.  Does it require your constant balancing on moving trains

9    and climbing off and on trains to be a conductor?

10   A.  It requires you to walk on moving trains and get on and off

11   trains, yes.

12   Q.  Does it require you to frequently push and pull MU doors of

13   23 to 55 pounds with one arm?

14   A.  It requires you to open the doors.

15   Q.  Does it require you to open and push doors that get stuck

16   and require physical strength to open them?

17   A.  Yes, if you could.

18   Q.  When you say if you could, what do you mean by that?

19   A.  On some of the trains that I worked years ago, the diesel

20   trains, the doors would get stuck open and sometimes you

21   couldn't get them to move.

22   Q.  Despite all the physical strength that you could apply to

23   the door?  Is that what you are telling us?

24   A.  Well, if you're asking for my only personal experience with

25   it, I would not fuss with it all that much because I knew that

D7inles4                          Parlante - cross

1    there wasn't a lot you could do with it.

2    Q.  Do you recall that it required you as a conductor to

3    uncouple cars from the trackbed?

4    A.  As a conductor I was required to couple and uncouple

5    engines.

6    Q.  Did it require you to pull a pin out of what is known as

7    the knuckle?

8    A.  Yes, you pulled the pin out with a lever.

9    Q.  You have to pull or push that lever, correct?

10   A.  Right, yes.

11   Q.  Does it require you to use 100 pounds of pressure to push

12   or pull that lever?

13   A.  I couldn't say what the poundage is.  It wouldn't seem like

14   it took that much to me, but I wouldn't be able to tell you.

15   Q.  Isn't it a fact that one of the job descriptions requires

16   you to be able to push 95 pounds of pressure to uncouple the

17   knuckle.

18              MS. FRIEDLANDER:  Objection.

19              THE COURT:  Overruled, if he knows.

20   A.  I don't know.

21   Q.  Let me you show you some photographs if I may.

22              MR. RYAN:  I'm offering in evidence R 26, 27, 28, 30,

23   29, 34, 39, 40, 31, 33 and 35.

24              MS. FRIEDLANDER:  Your Honor, we are not willing to

25   just stipulate to the admissibility of all of these things.  I

1   don't know where these were taken, by whom, when.  We don't

2   know anything about these photos.  We were just given them.  If

3   he wants to go one by one, that's fine.  But I can't simply --

4            MR. RYAN:  I don't think it is a accurate to say they

5   were just given to the prosecution.  They had them prior to

6   this trial.

7            THE COURT:  Do you want to lay the foundation for each

8   of them.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7jdles5                           Parlante - cross

1              MS. FRIEDLANDER:  Your Honor, if I may just speak with

2    defense counsel for a minute?

3              THE COURT:  Yes.

4              MS. FRIEDLANDER:  I don't want to hold up the process.

5              (Counsel conferred)

6    BY MR. RYAN:

7    Q.  I show you R61, and tell me whether or not you recognize

8    the contents of that photo.

9    A.  That is Jamaica Station.

10   Q.  And it is looking eastbound, correct?

11   A.  Yes.

12   Q.  And it shows --

13   A.  It appears to be looking eastbound, yes.

14   Q.  Right.  And you recall reporting, as a regular course of

15   your duties, to the Jamaica Rail Road station to fill your

16   assignment to get on -- to fill your assignment as a conductor

17   during your 28 years?

18   A.  I have reported to Jamaica from time to time, yes.

19   Q.  Do you recall the process requiring you to get on to the

20   station and then to walk down through the tracks to find the

21   train in the yard that you were assign to?

22   A.  I've personally never really had to do that.

23   Q.  OK.  So you don't -- you had never walked on the east side

24   of the Jamaica Rail Road Station tracks of the yard, as shown

25   in that photograph; is that what your testimony is?

1  A.  I can't say that I never did in 28 years.  I don't recall

2  doing it.  I may have done it as part of a class or something.

3  Q.  Can I go back to the time you met with Mr. Rutigliano.

4       You seem to tell the jury that you remember telling

5  him about the dog, walking your dog; do you remember that?

6  A.  Yes.

7  Q.  But you don't remember telling him that you played

8  basketball?

9  A.  No.

10 Q.  Are you able to tell us anything else you told

11 Mr. Rutigliano to prepare your application?

12 A.  I just remember like him asking me what my hobbies were,

13 and as part of that answer I was walking the dog and working

14 out and redoing furniture.

15 Q.  You spent a lot of time on freight trains, correct?

16 A.  Fair amount of time.

17 Q.  OK.  And let's take the hopper car.

18      You know what a hopper car is, right?

19 A.  You would have to refresh my memory.

20 Q.  Let me show you R34.

21      MR. WEDDLE:  Your Honor, could we just have one second

22 to just locate it.

23      (Pause)

24 Q.  Do you recognize that as a hopper car?

25 A.  I can't really see the whole car but -- so I recognize it

571

D7jdles5                         Parlante - cross

1   as a freight car.

2   Q.  You never saw a car like that in your 20 years -- 28 years?

3   A.  I believe I have.

4   Q.  OK.  And on that car, for example, is it part of the

5   conductor's requirement to climb that car and close the brakes,

6   as shown in the photograph?

7   A.  You might have had to do that in a yard, to tie a break

8   onto the car so it wouldn't roll out.

9   Q.  In other words, you had to put the brakes on these cars so

10  they don't roll unassisted, correct?

11  A.  Yes.

12  Q.  All right.  Is that, in your opinion, a fair and accurate

13  representation of the typical hopper car with the brake on the

14  rear of the car as shown in the photograph?

15  A.  Yes.

16  Q.  OK.

17          MR. RYAN:  I offer it in evidence.

18          MS. FRIEDLANDER:  No objection.

19          THE COURT:  Admitted without objection.

20          (Defendant's Exhibit R34 received in evidence)

21          MS. FRIEDLANDER:  Your Honor, the issue with reading

22  the list of exhibits quickly was that we understood that there

23  were some exhibits in there that weren't photos.

24          Could I just have a moment to confer with defense

25  counsel?  If they are just photos and we can get some

1    understanding of that --

2              THE COURT:  Yes.

3              MR. RYAN:  I will just go one at a time to speed this

4    up, if we can.  Please bear with me.  OK?

5              And am I going to ask someone -- can this be put on

6    the screen, is that a possibility, with the disc that we gave

7    you?

8              MR. WEDDLE:  No.  We don't have --

9              MR. RYAN:  You don't have this one, OK.

10             MR. WEDDLE:  You can put it on the Elmo.

11             MR. RYAN:  That is quite all right.  Thank you very

12   much.

13   BY MR. RYAN:

14   Q.  As a conductor, as a conductor, freight conductor, you have

15   to climb up this ladder to handle the wheel at the top of the

16   ladder, correct?

17   A.  If you were going to apply the brake to it, yes.

18   Q.  That wheel you turn to lock the brake in the car so it

19   doesn't roll unassisted --

20   A.  That is right.

21   Q.  -- that is a job?  That is one of the typical jobs that is

22   required of a conductor, correct?

23   A.  A conductor might give that to the brakeman to do.

24   Q.  Well, he might do that but he is obligated to do it

25   himself, too, correct?

1    A.  I would agree with that.

2    Q.  Let's take the coupling process.  The coupling process

3    requires a conductor to be on the trackbed when an engine is

4    pushing a car to be coupled with an existing car; isn't that

5    correct?

6    A.  That's correct.

7    Q.  OK.  So the conductor is on the trackbed, and he has to do

8    something to assist in the coupling process?

9    A.  That's correct.

10   Q.  What does he do in that regard?

11   A.  Well, they couple up -- he signals them back.  They couple

12   up.  Both knuckles are open.  They couple up.  The pin drops.

13   And then there is hoses that have to be connected.  The train

14   is not moving.  You get under the knuckle and you connect the

15   hoses.

16   Q.  Those are the air hoses, correct?

17   A.  That's correct.

18   Q.  Now, there are occasions when the conductor has to be on

19   the trackbed for the uncoupling process, too?

20   A.  That's correct.

21   Q.  And he has to do something to extract the pin from one of

22   the knuckles to allow it to be released?

23   A.  Correct.

24   Q.  OK.  And I'll show you Exhibit R32, and see if that helps

25   you explain the uncoupling process.

D7jdles5                          Parlante - cross

1   A.   That is the uncoupling bar on the train side.

2   Q.   And the conductor has to grab that bar and pull it up to

3   assist in the uncoupling process, correct?

4   A.   Right.  It could be either that bar or the one on the

5   engine.

6   Q.   What pounds of pressure does it take to lift that bar to

7   uncouple that pin?

8   A.   I have no idea.

9   Q.   No idea at all?

10  A.   No.

11           MR. RYAN:  I offer the photograph in evidence.

12           MS. FRIEDLANDER:  No objection.

13           THE COURT:  Received without objection.

14           (Defendant's Exhibit R32 received in evidence)

15           THE COURT:  What is the number of this one, Mr. Ryan?

16           MR. JACKSON:  32.

17           MR. RYAN:  Judge, I'm almost finished.

18           (Pause)

19  Q.   One of the other functions of a conductor -- withdrawn.

20           You were a conductor on passenger trains for many

21  years, weren't you?

22  A.   Yes, I was.

23  Q.   And you would not think that -- withdrawn.

24           You would go to the yard to your assigned train; isn't

25  that the way the process started?

575

D7jdles5                              Parlante - cross

1    A.  Yes, for the most part.

2    Q.  So you would walk, for example, from the Jamaica Rail Road

3    platform down through the yard to wherever the train was

4    located?

5    A.  You could do that.

6    Q.  And it might be necessary to make up the train or to be

7    break up the train; that was another process, right?

8    A.  Well, not in the yard.

9    Q.  OK.  Where would that be done?

10   A.  If you had to -- you run the engine around or do any of

11   that at your destination, at the end of the run.  In the yard

12   they had a yard crew to do that.

13   Q.  So the train was made up for the beginning of the so-called

14   voyage, correct?

15   A.  Yes.

16   Q.  But at the end of the so-called voyage you might have to

17   break up the train, right?

18   A.  Right.

19   Q.  All right.  Now, as a conductor you also had to go down on

20   the trackbed and assist in that breaking up the train process,

21   correct?

22   A.  Well, you could delegate that or you could do it yourself.

23   Q.  And you'd have to do this whether it is January, February,

24   ice, snow, any conditions at all, right?

25   A.  That's right.

1    Q.   Correct?

2    A.   Yes.

3    Q.   OK.   And you also have another problem such that at the

4    east side of Jamaica Rail Road Station there is a worker on the

5    railroad dealing with the third rail?

6              MS. FRIEDLANDER:   Objection.

7              THE COURT:   Overruled.

8    Q.   Isn't that right?

9    A.   There is a third rail, yes.

10   Q.   And that could be fatal if you slipped and hit the third

11   rail?

12   A.   Could be.

13   Q.   Do you think if you were working today between those

14   tracks, you could hear the engine coming from behind you and

15   not get sideswiped?   Do you think you are able to do that

16   today?

17   A.   I think those are different circumstances.   I think it

18   would have been more diligent under those circumstances.

19   Q.   Do you think it was because it was the night of Halloween?

20   A.   I don't think it was because of any particular night.

21   Q.   I see.

22             MR. RYAN:   Thank you very much.

23             THE COURT:   All right.   Mr. Jackson.

24             MR. JACKSON:   Yes, Judge.

25   CROSS-EXAMINATION

D7jdles5                        Parlante - cross

1   BY MR. JACKSON:

2   Q.  Good afternoon.

3   A.  Good afternoon.

4   Q.  We've never met before, have we?

5   A.  No, we haven't.

6   Q.  OK.  Well, we'll meet now.

7          My name is Joey Jackson.  I represent Ms. Baran.  OK?

8   A.  OK.

9   Q.  So I just want to get a couple of things straight before

10  moving forward.

11         Ms. Friedlander asked you about a number of lies that

12  you told federal agents.  Do you remember that?

13  A.  I do.

14  Q.  OK.

15  A.  I remember her asking me that.

16  Q.  All right.  So it's fair to say, sir, that you agree that

17  you lied to multiple federal agents; is that fair to say?

18  A.  In the certain circumstances in the interviews being spoken

19  about, I don't really recall what was said.

20  Q.  Sir, did you lie to -- I didn't ask you about what was

21  said, did I?  I didn't ask you that, did I?

22         Do you understand my question?  And if not just tell

23  me and I will rephrase it.

24         I'm asking you whether or not Ms. Friedlander asked

25  you whether you lied to federal agents?  Do you recall her

1     asking you that question, sir?

2     A.  Not that particular way, no.

3     Q.  OK.  Do you recall you agreeing that you lied to federal

4     agents in your testimony earlier; yes or no, sir?

5           MS. FRIEDLANDER:  Objection.  Misstatements the

6     testimony.

7           THE COURT:  All right.  Sustained.

8     Q.  Sir, did you lie previously to federal agents of the United

9     States government, yes or no?

10    A.  I don't really recall those conversations, so I can't say

11    yes or no.

12    Q.  OK.  So you didn't tell Ms. Friedlander earlier it wasn't

13    your testimony that you did lie to federal agents, is that

14    correct?

15          MS. FRIEDLANDER:  Objection.

16          THE COURT:  Overruled.

17    A.  My -- I think what I was saying was that I lied in the

18    Grand Jury.

19    Q.  So you didn't lie to federal agents but you lied to the

20    Grand Jury; is that what you are saying, just to be clear?

21    A.  Yes.

22    Q.  OK.  So you lied to the Grand Jury previously; you agree to

23    that?

24    A.  May have I just add to that?  I'm not saying that I didn't

25    lie to the federal agents.  I'm saying I don't remember it.

1    Q.  OK.  I'll refresh your recollection momentarily, but let's

2    just speak about the Grand Jury.

3            You agree that you lied to the Grand Jury, is that

4    correct?

5    A.  That is correct.

6    Q.  But today you're telling the truth to this jury, right?

7    A.  Yes.

8    Q.  OK.  So let's discuss that truth.

9            So Ms. Friedlander asked you whether or not you

10   actually had a telephone conversation with federal agents

11   regarding yours experience with the RRB -- that's the Railroad

12   Retirement Board -- do you recollect that?

13   A.  I recollect that is the question that she asked me.

14   Q.  And do you recollect, sir, that you indeed did have a

15   conversation with a federal agent that you telephoned back; do

16   you remember that?

17   A.  Yes.

18   Q.  And in that conversation, sir, you were asked questions

19   concerning your experience with the Railroad Retirement Board;

20   you remember that?

21   A.  I don't.

22   Q.  You don't?

23   A.  No.

24   Q.  You do recall, however, having a conversation with that

25   agent, right?

1   A.  Yes.

2   Q.  And in that conversation, sir, you wouldn't want to lie to

3   a federal agent, would you?

4   A.  I don't remember lying to a federal agent.

5   Q.  That's not what I asked you, sir.

6          I asked you whether you would want to lie, that is,

7   misrepresent the truth to an agent of the United States

8   government.  Would you want to do that?

9   A.  No.

10  Q.  And, in fact, sir, since you didn't want to do that, when

11  you spoke to that agent over the telephone, you gave them

12  certain information in response to questions that they posed to

13  you, is that right?

14  A.  I may have.

15  Q.  And, in fact, they asked you questions concerning what it

16  was like when you went to the local Westbury office to file

17  your application; do you remember that?

18  A.  I don't.

19  Q.  OK.  Do you recall them asking you questions regarding the

20  whole Railroad Retirement Board process; do you recall that?

21  A.  No.

22  Q.  Do you recall saying that Ms. Baran was professional when

23  you went there?  Do you recall that?

24  A.  I do recall that.

25  Q.  Do you recall saying that Ms. Baran was helpful when you

D7jdles5                    Parlante - cross

1    went there?  Do you recall that?

2    A.  I recall that.

3    Q.  Do you recall --

4           MS. FRIEDLANDER:  Judge, objection.  There is no

5    inconsistent statement.  This is not proper cross.

6           THE COURT:  Sustained.

7           MR. JACKSON:  OK.

8    BY MR. JACKSON:

9    Q.  You said that in fact you don't remember what you told the

10   federal agents?

11   A.  I don't remember the whole conversation, no.

12   Q.  Is there something that could refresh your recollection as

13   to the conversation that you had with a federal agent over the

14   telephone on or about September 24, 2008?

15   A.  I don't know.

16   Q.  OK.  I'm showing you what is Bates stamped 3506-01, Office

17   of Investigation, United States of America, Railroad Retirement

18   Board.

19          Sir, I would ask you to look at that document, take

20   your time, and look up at me when you are done.

21          MS. FRIEDLANDER:  Objection, your Honor.  The document

22   is not in evidence.  It is not proper to read from it.

23          THE COURT:  He is showing it to him for refreshing his

24   recollection.  Whether it refreshes as to something that is

25   pertinent and within the proper scope of cross is something

1    else.

2              MS. FRIEDLANDER:  I'm sorry.  It is fine to ask if it

3    refreshes his recollection.  It is simply not proper to read

4    from it.

5              THE COURT:  All right.  Mr. Jackson, what is it in

6    this document that you are asking him to refresh his

7    recollection about?

8              MR. JACKSON:  Judge, there are a number of things.  I

9    think he recalls saying, number one, that he didn't lie to a

10   federal agent.  I believe that's the first thing.

11             MS. FRIEDLANDER:  Objection.  Misstates his testimony.

12             THE COURT:  Sustained.

13             MR. JACKSON:  Would you like me to go on, Judge?

14             THE COURT:  Yes.

15   BY MR. JACKSON:

16   Q.  With respect to the nature of the conversation, do you

17   recall giving information to the federal agent concerning what

18   happened at the Railroad Retirement Board?  Do you recall that?

19   A.  I recall saying these things about Marie Baran.

20   Q.  OK.  And what things are those that you said about Marie

21   Baran -- without reading them -- if you have a recollection as

22   to what you said about Ms. Marie Baran?

23             MS. FRIEDLANDER:  Objection.  Again, there is no

24   inconsistency.

25             MR. JACKSON:  Judge, I am not asking about

1    inconsistency.

2    Q.  At the time that you spoke to the federal agent, did you

3    say certain things about Marie Baran, yes or no?

4              MS. FRIEDLANDER:  Objection.  This is not proper

5    cross.

6              THE COURT:  Sustained.  Beyond the scope of direct.

7    Q.  Did there come a time, sir, that -- let me ask you this.

8              Throughout the course of that conversation, did you

9    say anything to the federal agent in that telephone call

10   regarding Ms. Baran making statements about Joe Rutigliano?

11   A.  I don't recall saying anything like that.

12   Q.  So you don't recall, or you didn't say anything to the

13   federal agent that you had a conversation in -- about on

14   September 24, 2008?

15             You had that conversation; you agree with that, right?

16   A.  I had a conversation.

17   Q.  And in that conversation, a conversation, did you say that

18   Ms. Baran said something about Joe Rutigliano?  Did you say

19   anything about that?

20   A.  Not to my recollection.

21   Q.  OK.  But today, sir, to your recollection -- and just to be

22   clear, that was in 2008, is that right?

23   A.  That's right.

24   Q.  That was prior to the cooperation agreement that you signed

25   with the government, is that correct?

D7jdles5                          Parlante - cross

1   A.  That's correct.

2   Q.  And that's prior to you entering a plea of guilty in this

3   case, is that right?

4   A.  That's correct.

5   Q.  And that's prior to you having been indicted in this case,

6   is that right?

7   A.  Yes.

8   Q.  And so, sir, you didn't at any point say on that

9   conversation that Marie Baran asked you about how much money he

10  had gotten for preparing an application from Joe Rutigliano,

11  did you?

12  A.  No, I have no recollection of that.

13  Q.  But today you have a recollection, five years after this

14  telephone conversation, right?

15  A.  Yes.

16  Q.  OK.  And in fact, with respect to anything concerning Joe

17  Rutigliano, did you mention anything about Joe Rutigliano when

18  you had that telephone conversation back with the federal agent

19  in September of '08.

20  A.  Not that I recall.

21  Q.  But today you do recall such a conversation, and, in fact,

22  you recall Marie Baran saying, well, I didn't know if Joe

23  Rutigliano was still doing this, right?

24  A.  Right.

25  Q.  That's what you remember now?

1    A.  That wasn't that conversation.  That wasn't the 2008

2    conversation.

3    Q.  And that's because, sir, there is nothing that reflects in

4    that discussion you saying anything about it, right?

5               MS. FRIEDLANDER:  Objection.

6               THE COURT:  Sustained.

7    Q.  Now, let's move on to a conversation you had with federal

8    agents on May 23rd of 2011.

9               Do you recall having another conversation with federal

10   agents at that time?

11   A.  I don't know the exact date.  If that's the day after the

12   Grand Jury?

13   Q.  OK.  And do you recall the day after the Grand Jury them

14   coming to your home to interview you?

15   A.  I do.

16   Q.  And do you recall them asking you numerous questions

17   concerning what, if any, role you played in any type of

18   disability program?

19   A.  I remember them asking me numerous questions.

20   Q.  And in asking those numerous questions -- how long were

21   they at your home, by the way?

22   A.  A little under an hour.

23   Q.  So they were at your home for --

24   A.  It was one agent.

25   Q.  One agent was at your home.  And that one agent was at your

D7jdles5                          Parlante - cross

1    home for approximately an hour, is that fair, or is it some

2    other time?

3    A.  Yeah, I'll agree to approximately an hour.

4    Q.  And that was out on Long Island, is that correct?

5    A.  That's correct.

6    Q.  And in your home they again asked you questions concerning

7    the disability program, right?

8            MS. FRIEDLANDER:  Objection.  The date.

9    BY MR. JACKSON:

10   Q.  You said it was one agent who was at your house.  Do you

11   recall who the agent was?

12   A.  Yes.

13   Q.  OK.  And that particular agent who was at your home asked

14   you questions about disability, is that right?

15   A.  I don't remember specific questions about, you know, yes,

16   but --

17   Q.  Is there something that could refresh your recollection

18   concerning the nature of the conversation that you had with an

19   agent at your home on Long Island on or about May 3rd, 2011?

20   A.  I don't know.

21   Q.  OK.  Showing you what has been Bates stamped as 3506-03, a

22   four-page document.  Sir, take a look at that.  Take your time.

23   Look up at me when you are done.

24           (Pause)

25           (Counsel conferred)

D7jdles5                          Parlante - cross

1   Q.  Sir, you have had an opportunity to read what I showed you,

2   which are four pages, correct?

3   A.  Correct.

4   Q.  And that reflected the interview that was conducted of you

5   at your home on Long Island, is that right?

6   A.  I don't remember most of that.

7   Q.  OK.  Sir, I just gave you something to refresh your

8   recollection, is that right?

9   A.  You did.

10  Q.  And what I gave you, sir, reflected an interview conducted

11  at your home on Long Island; is that fair to say?

12            MS. FRIEDLANDER:  Objection.

13            THE COURT:  Overruled.

14  A.  I don't really know if that is a fair assessment.

15  Q.  OK.  But it's an assessment that was made, you'd agree, by

16  the agent who interviewed you at your home, is that right?

17            MS. FRIEDLANDER:  Objection.

18            THE COURT:  Overruled.

19  A.  Yes.

20  Q.  You can answer the question.

21  A.  Yes.

22  Q.  OK.  And that was the document that I just showed you, is

23  that right?

24            MS. FRIEDLANDER:  Objection.

25            THE COURT:  Sustained.

D7jdles5                          Parlante - cross

1   Q.  Sir, based upon that interview, OK, based upon that

2   interview, at any point, sir, did you tell the agent who came

3   to your home on Long Island that Ms. Baran had had a discussion

4   with you about Joe Rutigliano and whether he charged money for

5   an application?

6   A.  I don't -- I never -- I never -- I don't remember that.

7   Q.  OK.  Sir, what I'm asking you, sir, you had an opportunity

8   to look at what I just showed you, is that right?

9   A.  Well, I read a document that you just showed me, yes.

10  Q.  Correct.  And what I'm asking you, sir, is at any point did

11  you tell the agent who came to your home that what I just

12  expressed to you; did you tell him that?

13          MS. FRIEDLANDER:  Asked and answered.

14          THE COURT:  Sustained.

15  Q.  Did you have a discussion with a federal agent who came to

16  your home about disability?

17          MS. FRIEDLANDER:  Asked and answered.

18          THE COURT:  Asked and answered, Mr. Jackson.

19  Q.  During the course of that conversation, at any point during

20  the conversation, did you mention anything about Marie Baran

21  knowing Joe Rutigliano?

22  A.  I don't recall.

23  Q.  Can I show you something that would refresh your

24  recollection?

25  A.  I don't know if it will refresh my recollection.  You can

D7jdles5                          Parlante - cross

1   show me something.

2   Q.  Again, 3506-03, four-page document, taken by the federal

3   agent.

4   A.  Is this the document I just read?

5   Q.  It certainly is, sir.

6   A.  Do you want me to read it again?

7   Q.  I don't want you to read it again.  I want you to answer

8   the question I just asked you.

9            Were you posed questions concerning what your

10  involvement was here?

11           MS. FRIEDLANDER:  Asked and answered several times.

12           THE COURT:  Asked and answered, Mr. Jackson.

13  Q.  Is it fair to say, sir, that at no time you told the

14  federal agent anything about a conversation between --

15           THE COURT:  Asked and answered.

16           Let's move on.  Next question.

17  Q.  With respect to Ms. Baran and her involvement in this case,

18  is it fair to say that at no time did she direct you to any

19  doctor?  Is that fair to say, sir?

20  A.  I don't recall.

21  Q.  You don't recall what?

22  A.  If she directed me to a doctor.  I don't know if she did or

23  if she didn't.  I don't remember her doing that.

24  Q.  You don't remember what?

25  A.  I don't remember her directing me to any doctor.

D7jdles5                        Parlante - cross

1   Q.  So when you went to see her -- just in context, when you

2   went to see Ms. Baran, this would have been about in 2005, is

3   that fair to say, or was it at some point after that?

4   A.  2005.

5   Q.  And this would have been in the Railroad Retirement Board

6   office, is that correct?

7   A.  Yes.

8   Q.  And, in fact, did you otherwise indicate that she filled

9   out the application for you?  Did you ever say that to anyone?

10  A.  I did.

11  Q.  OK.  And would it be fair to say that that was not true,

12  that Ms. Baran did not fill out the application for you, is

13  that right?

14  A.  She filled out what I thought was the application.

15  Q.  OK.  So when you came to Ms. Baran, you already had an

16  application with you, is that right?

17  A.  I don't know what paperwork I had with me.

18  Q.  So you went to Ms. Baran not knowing any paperwork that you

19  had; that's what you are saying?

20          MS. FRIEDLANDER:  Objection.

21  A.  I'm saying I don't recall exactly what paperwork I had.

22  Q.  And you came to Ms. Baran for the purpose of -- you made an

23  appointment, you would agree, at the Railroad Retirement Board

24  office, is that right?

25  A.  Yes.

D7jdles5                    Parlante - cross

1    Q.  When you went to that Railroad Retirement Board office, you

2    understood her to be an employee of that particular office, is

3    that right?

4    A.  That's right.

5    Q.  And you know when you went there that you showed her

6    certain paperwork, is that fair?

7    A.  That's fair.

8    Q.  And when you went and showed her that certain paperwork,

9    she reviewed that with you, did she not?

10   A.  I don't remember her reviewing that with me, no.

11   Q.  OK.  So what exactly do you recall her doing?

12   A.  Filling out -- asking me questions and filling out a form

13   at the same time.

14   Q.  So she was asking you questions and filling out a form.

15           Was she reviewing any documents with you, sir?

16   A.  I don't know if I could say that.  She was asking me

17   questions off of what looked like a document.

18   Q.  By the time that you went to her, sir -- by the way, did

19   she tell you what doctor to go to?

20   A.  Did she tell me what doctor to go to?

21   Q.  That's the question, sir.  Did she tell you what doctor to

22   go to?

23   A.  Which doctor to go to?

24   Q.  Yes.

25   A.  No.

D7jdles5                        Parlante - cross

1    Q.  Did she at any point recommend a doctor for you to go to?

2    A.  No.

3    Q.  Did she at any time tell you that your disability would be

4    guaranteed?

5    A.  No.

6    Q.  Did she at any time, sir, say that I know you're not

7    disabled but I'm going to put this form in anyway so that you

8    would get a disability?  Was that said to you?

9    A.  No.

10   Q.  OK.  And, in fact, sir, your paperwork -- if I could just

11   have the government put up Exhibit 104A.  If that could just be

12   made a little bit larger, the top portion of it, please.

13            Do you recognize that to be Marie Baran in the

14   right-hand corner, not her obviously, but whether that says M

15   Baran?

16   A.  Yes, it does.

17   Q.  And that would be the person who did the intake on your

18   application?

19   A.  I don't know if I could say that.  I don't know what that

20   means.

21            What's the intake on my application?

22   Q.  The intake, sir, is she was sitting there when you came in

23   and you gave her documents, is that right?

24   A.  Yes.

25   Q.  And she asked you certain questions concerning the

1    documents that you did give her, is that right?

2              MS. FRIEDLANDER:  Objection.  Asked and answered.

3              THE COURT:  Sustained.

4    Q.  You didn't know what "intake" means?

5    A.  In the context of your question, I don't.

6    Q.  The context is at the time that you went to the Railroad

7    Retirement Board it was Ms. Marie Baran who was dealing with

8    you; is that accurate?

9    A.  That's accurate.

10   Q.  And it would be accurate to say that you and her, with

11   regard to your understanding of intake, she was actually the

12   person you were having this conversation with?

13   A.  I was having a conversation with Marie Baran, yes.

14             MR. JACKSON:  OK.  Now, if I could just ask the

15   government to go from this page to page 4.  Actually,

16   question -- Section 5.  And if the bottom portion of that could

17   be blown up, please?

18   Q.  Do you see in Section 5, on the left-hand side here, do you

19   see whether or not -- it says "Section 5."  Do you see that?

20   A.  I see that, yes.

21   Q.  And do you see on the right portion that there is something

22   that's X'd out?

23   A.  Yeah.  I see two -- a bunched of X'd-out things.

24   Q.  When you say "a bunch of things," just to be clear, we're

25   looking at the document and we're looking at section 5 of the

594

D7jdles5                          Parlante - cross

1   document, that's right?

2   A.  That's correct.

3   Q.  And when you say "a bunch of things," the first thing I

4   want you to direct your attention to is question 31.

5          Can you look at that?

6   A.  Yes.

7   Q.  And in question 31, there is an X that says "yes," is that

8   right?

9   A.  Yes.

10  Q.  And then on the bottom it says "no," and that looks to be

11  scratched out, is that correct?

12  A.  That is correct.

13  Q.  Sir, did you do that?

14  A.  I did not.

15  Q.  OK.  But you know that this is something that you gave to

16  Ms. Baran, is that right?

17          MS. FRIEDLANDER:  Objection.  It misstates the

18  testimony.

19          THE COURT:  Sustained.

20  Q.  Do you know whether or not this is a document that you gave

21  to Ms. Baran?

22  A.  I don't.

23  Q.  OK.  34 of that document, do you see question 34?

24  A.  I do.

25  Q.  And you see where it says "No" there?

1   A.  Yes, I do.

2   Q.  And on that particular document, sir, you see that it's

3   scratched out also, is that correct?

4   A.  Yes.

5   Q.  Did you do that?

6   A.  I have no recollection of doing that.

7          MR. JACKSON:  If I could ask the government to go to

8   Section 7.  OK.  If you can blow that portion up, please, and I

9   thank you.

10         If you could just move it a little to the right.

11         Yes, the handwriting.

12         A little further, pretty please.

13         MR. WEDDLE:  You can put it on the Elmo, if you want

14  to.  We can't get it.  It is too close to the presentation --

15         MR. JACKSON:  I understand.

16  BY MR. JACKSON:

17  Q.  With regard to Section 7, sir, there is some writing on the

18  left-hand corner of this document; do you see that?

19  A.  I do see that, yes.

20  Q.  Did you put that writing there?

21  A.  I did not.

22  Q.  OK.  And I'm going to ask the government to go -- and, by

23  the way, there are zeros there.  Did you put those zeros there?

24  A.  What zeros?  The 2005?

25  Q.  Yes, sir.  Under Section 7, it says -- there are two zeros

1    and then they have a line through them.  Do you see that, sir?

2    One is in November.  The other one to the right of that is

3    December.

4    A.  I see that now, yes.

5    Q.  Did you do that, sir?

6    A.  No, not to my recollection.

7    Q.  OK.

8            MR. JACKSON:  I am going to ask the government then to

9    go to the final page -- excuse me, the next page.

10   Q.  And you see there is a line that goes through the document.

11   I believe it is Section 8.  Do you see that, sir?

12   A.  Yes.

13   Q.  OK.  Did you put that line there?

14   A.  No.

15   Q.  OK.  And then, finally, the last portion of the document,

16   just where your signature is, please.

17           And this is Section 11.  And that is your signature,

18   sir?

19   A.  That is my signature.

20   Q.  And the date is February 3rd of 2005, is that accurate?

21   A.  That's accurate.

22   Q.  And above that, sir, do you see where it says, "I know that

23   if I am receiving a disability annuity and fail to report work

24   and earnings properly, I am committing a crime punishable by

25   federal law and may result in criminal prosecution and/or

D7jdles5                    Parlante - cross

1    penalty deduction in my annuity payments."

2              Do you see that?

3    A.  I see that.

4    Q.  OK.  That's your signature thereafter, correct?

5    A.  That is my signature.

6    Q.  And it's fair to say, sir, that you can't even identify

7    Ms. Baran, is that right?

8    A.  That's correct.

9    Q.  She wasn't a friend of yours, is that right?

10   A.  That's correct.

11   Q.  Don't know who she was?

12             THE COURT:  Asked and answered.

13   Q.  So the fact is then, sir, that you don't know whether you

14   submitted, or do you know whether or not this document is

15   something that you went over with her, do you know?

16   A.  I don't know.

17             MR. JACKSON:  All right.  Now, if the government could

18   just put up Exhibit 104C.  And if we could just turn to page 5

19   of that document, which is Section 4.

20   Q.  And that's your signature, too, is that correct?

21   A.  That is my signature.

22   Q.  And it has under your signature a date that it seems to be

23   consistent with the last one, which is February 3rd of 2005?

24   A.  Yes, that's the date.

25   Q.  OK.  And when you say "that's the date," that was the date

D7jdles5                          Parlante - cross

1   that you signed this document?

2   A.  That's the date on this document.

3   Q.  OK.  Was that the date that you sat before Ms. Marie Baran,

4   if you know, at the time that you went to the Railroad

5   Retirement Board?

6   A.  I believe that that is the date.

7   Q.  All right.  And that's the same date, you'd agree, that

8   on the other document, which was the application for

9   disability, correct?

10  A.  Well, I don't know the difference between these documents.

11          MR. JACKSON:  OK.  If I could ask the government to go

12  to 104G, please, the last quarter of the page.

13  Q.  By the way, this is a medical assessment form, is that

14  right?

15  A.  I don't know.

16          MR. JACKSON:  Can you go back out.  Sorry.

17  Q.  Medical Assessment of --

18  A.  That's what it says on the form, yes.

19  Q.  Is that your name in the left-hand corner, sir?

20  A.  That is my name.

21  Q.  And that's -- at the bottom of it, do you see the bottom of

22  the document?

23  A.  Yes.

24          MR. JACKSON:  OK.  If that could just be blown up?

25  Q.  And it is Westbury District Office, February 3, 2005,

D7jdles5                          Parlante - cross

1    correct?  Do you see where it says that at the very bottom?

2    A.  Yes.

3    Q.  Next to "Exhibit"?

4    A.  Yes.

5    Q.  That was the date that you went to the office, is that

6    right?

7    A.  Yes.

8    Q.  OK.  Just to be clear, sir, when you went to Ms. Baran with

9    regard to the documents that you had, did you see her at any

10   point prior to going to the Railroad Retirement Board office?

11   Did you have any conversations with her prior to that?

12   A.  I may have had a phone conversation with her.

13   Q.  So a phone conversation you may have had prior, but beyond

14   that there was no other contact that you had with her?

15   A.  Not that I can remember, no.

16   Q.  You just remember the first time you had ever seen her was

17   when you went to that office, is that accurate?

18   A.  As far as I can remember, that's accurate.

19   Q.  And as far as you could remember, when you went to the

20   office, did you have your medical forms already with you at the

21   time that you went, if you can recall?

22   A.  I don't really recall what forms I had with me.

23   Q.  Did you have -- had you previously to going to Ms. Baran

24   already seen doctors?

25   A.  Before I went to the Railroad Retirement Board, yes.

600

1   Q.  And at no time when you were seeing those doctors, you

2   didn't even know who Ms. Baran was at the time you were seeing

3   those doctors; is that accurate?

4   A.  Well, I knew she worked for the Railroad Retirement Board.

5   Q.  But beyond that, sir, you had no other contact with her

6   while you were seeing those doctors, right?

7             MS. FRIEDLANDER:  Which the doctors?

8             MR. JACKSON:  I could clarify.

9             THE COURT:  Go ahead.

10  Q.  You saw a doctor here, correct?

11  A.  For this disability?

12  Q.  Right.

13  A.  Yes.

14  Q.  Did you see -- how many doctors did you see?

15  A.  One.

16  Q.  And the doctor that you saw, sir, just to be clear, when

17  you were going for the visits with the doctor, how many visits

18  did you have?

19  A.  I don't know the exact number.  It was about a

20  year-and-a-half worth of visits spaced approximately every

21  three months.

22  Q.  OK.  And in going to those -- while you were going through

23  those year-and-a-half visits to that doctor, there was no

24  discussion that you had with Ms. Baran, is that correct?

25  A.  None that I recall.

D7jdles5                      Parlante - cross

1   Q.  Did Ms. Baran ever call you to ask you during that time

2   about the doctor you were seeing?

3   A.  I don't remember any of that, no.

4   Q.  And when you went to see Ms. Baran, did she ever comment on

5   whatever doctor you were seeing?

6   A.  I don't -- I don't really recall if she ever commented on

7   what doctor I -- the one time I was in her office, I don't

8   really remember if she commented on that.

9   Q.  Would it be something -- in the event that Ms. Baran

10  commented on a doctor that you saw, would it be something you

11  would have shared with the federal agents when they spoke with

12  you over the telephone?  Would that have been something that

13  you might have mentioned?

14  A.  It would be something I might have mentioned.

15  Q.  And with regard to the actual conversation you had with the

16  agents at your home, would that have been something that you

17  mentioned to them regarding whether or not Ms. Baran had, for

18  example, said something about a doctor?

19  A.  I don't recall any of their questions, so I don't know how

20  to answer that.

21  Q.  You don't recall their questions?

22  A.  You are asking me if it may have been a type of a question.

23  I don't -- I don't know.

24  Q.  OK.  And I just want to clarify.  I've already, just to be

25  fair -- and, Judge, I'm wrapping up -- but just to be fair with

1    you, I've already shown you two documents to refresh your

2    recollection; is that fair to say?

3    A.   That is fair.

4    Q.   And one document I showed you was a telephone conversation

5    that you had with a federal agent, is that accurate?

6              MS. FRIEDLANDER:  Objection to summarizing,

7    characterizing, reading from this document.

8              THE COURT:  Sustained.

9    Q.   You would agree with me that there were two separate

10   conversations -- just for clarity, that you had two separate

11   conversations with federal agents in this case, is that right?

12   A.   There was a 2008 phone call and a meeting after the Grand

13   Jury.

14   Q.   OK.  And 2008 would have been after you went for your

15   appointment at the Westbury office, is that accurate?

16   A.   Yes.

17   Q.   OK.  And, again, the nature of that investigation, or the

18   nature of the discussion with you was regarding, amongst other

19   things, what, if any, role Ms. Baran may have had here, is that

20   right?

21             MS. FRIEDLANDER:  Asked and answered several times,

22   your Honor.

23             THE COURT:  Sustained.

24   Q.   With respect to the other conversation that you had, right,

25   with the other agent, you had a conversation at your home; we

D7jdles5                        Parlante - cross

1   agree with that, right?

2           MR. JACKSON:  Just for clarity, Judge.

3   Q.  We agree with that, correct?

4   A.  Yes.

5   Q.  And certainly in that conversation you would have wanted to

6   tell them everything that you knew concerning Ms. Baran's

7   involvement or participation here, is that correct?

8   A.  If they asked the question, I would have answered the

9   question about her.

10  Q.  And you were asked questions.  And, in fact, you mentioned

11  several -- you gave certain information regarding Ms. Baran,

12  did you not?

13  A.  I don't recall giving any information.  I recall saying

14  that she was professional and it was a pretty easy

15  conversation.

16  Q.  And at no time, just to be clear, did Ms. Baran ask you for

17  any money, is that right?

18  A.  Did she ask me for any money?

19  Q.  That's the question, sir.  You are testifying.  I'm asking

20  you.

21  A.  Well, she, to my recollection, did not ask me for money.

22  Q.  At no time did she ask you for any favors; is that

23  accurate?

24  A.  That's accurate.

25  Q.  At no time, sir, did she ever tell you that she would make

1    a phone call to any of your doctors concerning trying to get

2    this disability done for you, did she?

3    A.  No.

4    Q.  And at no time, sir, did she tell you she would use any

5    influence to help assist you in having your application

6    approved, is that right?

7            (Pause)

8    A.  You'll have to repeat that.

9    Q.  Absolutely.

10           At no time did Ms. Baran when you went to see her tell

11   you that she would use any of her influence to help get you a

12   disability?

13   A.  No.

14   Q.  No, she did not?

15   A.  She did not.

16           MR. JACKSON:  Thank you.

17           THE COURT:  Mr. Durkin.

18   CROSS-EXAMINATION

19   BY MR. DURKIN:

20   Q.  Mr. Parlante, my name is Tom Durkin.  I represent

21   Dr. Lesniewski.

22           You and I have never met, have we?

23   A.  No.

24   Q.  Would I be safe in assuming that this has become a

25   nightmare for you?

D7jdles5                          Parlante - cross

1   A.  On a certain level it has, and on another level it has

2   become a life saver for me.

3   Q.  How has it become a life saver?

4   A.  Well, this trial doesn't go into my personal life at all,

5   so I would rather keep that out of it.  But let's just say that

6   it changed my whole personal life.

7              MR. DURKIN:  Judge, could I just be heard for a

8   second?

9              THE COURT:  Do you want to approach?

10             MR. DURKIN:  Yes.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7jdles5                      Parlante - cross

1          (At the sidebar)

2          MR. DURKIN:  Does the government know what he is

3   talking about?  I am not trying to embarrass the guy, but I

4   haven't seen this in any of the 3500 material.

5          MS. FRIEDLANDER:  I do know that his wife suffered

6   from alcoholism from a very serious -- she had a very serious

7   problem, and I think that the trouble that he's faced has

8   helped their family become much stronger and helped their own

9   relationship.  I don't frankly know much more than that.  I

10  think that is what he means.

11         There are brief 3500 about alcoholism and things like

12  that.  I mean, I could take a look at it.

13         I think he would be willing to talk about it if your

14  Honor told him that, you know --

15         THE COURT:  If it does not have something to do with

16  this matter, his personal life is his personal life.

17         MR. DURKIN:  I understand.  Here's my concern and I

18  don't want to embarrass the guy.  I think he may be -- doesn't

19  he have a history of drugs or alcohol in his past?

20         MS. FRIEDLANDER:  Yeah.  20 years ago.

21         MR. DURKIN:  OK.  I guess what I want to know is did

22  he go back to drinking?  Was he drinking during this time

23  period, or anything like that?

24         MS. FRIEDLANDER:  No.  Absolutely not.  He has been

25  sober for I don't remember the number of years, decades, twenty

D7jdles5                    Parlante - cross

1    years.  He cleaned up I think at least ten years before he

2    retired.  He became clean and sober.  I don't think he has had

3    any alcohol since then.  That is the information that we have.

4              MR. DURKIN:  OK.  That's fine.

5              I mean, here's what I would ask.  Only that he be

6    subject to recall and that they attempt to verify that.  I want

7    to know whether -- I'm assuming that -- and I don't even want

8    to do a voir dire outside.  I don't want to embarrass him.  I

9    get it.  If it's because of his wife, then I don't want to go

10   into it because that's not -- I wouldn't do that to him.

11             What I want to know, I just want a representation from

12   the government that he has in fact been clean and sober,

13   because some of his behavior here is inimical of somebody who

14   is on drugs or alcohol.  I mean, he goes and testifies in the

15   Grand Jury without a lawyer.  He lies on a telephone interview.

16   He does things that are kind of inexplicable.  And if he was

17   clean and sober all that time, then I'll leave it at that.  I

18   just want them to represent that.

19             MS. FRIEDLANDER:  I can represent to you that this man

20   personally has represented to me that he's been clean and sober

21   for years and years, including for years prior to the time he

22   retired.  His counsel has separately told me the same thing.

23   I've reconfirmed it with him.  So I don't think there is any

24   need to recall him.  If you would like to voir dire him outside

25   the presence of the jury, we have no problem with that.

D7jdles5                              Parlante – cross

1          As to why a man in the Grand Jury who has committed

2      serious crimes might lie under oath, I don't think that is such

3      a surprise.

4                THE COURT:  OK.  Let's move on.

5                MR. DURKIN:  That's fine.

6                (Continued on next page)

1             (In open court)

2             THE COURT:  All right, Mr. Durkin.

3             MR. DURKIN:  Thank you, Judge.

4   BY MR. DURKIN:

5   Q.  I don't want to get into your personal life, so that's

6   fair.

7             But this is not how you planned your retirement,

8   correct?

9   A.  That's correct.

10  Q.  You told us you have five children, correct?

11  A.  I do.

12  Q.  What are their ages, from what to what?

13  A.  42 to 32.

14  Q.  And do I understand correctly you have six grandchildren?

15  A.  I have seven grandchildren now.

16  Q.  Seven.  And what did you tell us you were facing here for

17  the charges, what kind of sentence?

18  A.  50 years.

19  Q.  OK.  And you don't want to go to jail, correct?

20  A.  That's correct.

21  Q.  OK.  And like you told us, you hope you get -- that you are

22  not going to get a jail sentence, right?

23  A.  That is my ultimate hope.

24  Q.  That is your goal, right?

25  A.  That is my ultimate hope.

D7jdles5                          Parlante - cross

1    Q.   OK.  The fact of the matter is, though, is that you don't

2    really believe you should go to jail for this either, do you?

3    A.   That is not the fact of the matter.

4    Q.   Do you think you should go to jail for this?

5    A.   I don't know.  I don't know what to think about this.  As

6    far as legal terms, I don't know anything about that.

7    Q.   Well, at the time you were in the middle of this, you

8    didn't think you were committing a crime, did you?

9    A.   I knew that I was lying to get a disability.  I didn't know

10   the ramifications of the particular crime.

11   Q.   Do I take that to mean you could have also -- maybe it

12   could have been resolved civilly or something?

13   A.   I don't anything about the law so that didn't enter my

14   mind, no.

15   Q.   The fact of the matter is you really didn't give it much

16   thought while you were doing this, right?

17   A.   That's right.

18   Q.   OK.  And it was something that was going on on the Rail

19   Road, correct?

20   A.   It was talked about a lot.

21   Q.   OK.  And you knew a lot of people who were doing it?

22   A.   I wouldn't characterize it that way.  I knew people that

23   were talking about it.

24   Q.   OK.  You actually took your retirement before you applied

25   for the disability, didn't you?

D7jdles5                            Parlante - cross

1    A.  I'm not really sure of the time sequence there.

2    Q.  Well, you got hit by the train, as you told us, on your

3    last day of work, which was Halloween night, December 31st or

4    November 1st of 2004, correct?

5    A.  Right.  And I went off sick the next day.

6    Q.  OK.  How long were you off sick?

7    A.  I don't know.  It was like months.

8    Q.  But you had not -- at least when you got hit by the train

9    on November 1st or Halloween night, you hadn't applied for

10   disability yet, correct?

11   A.  Correct.

12   Q.  You didn't apply --

13   A.  As far as I know, that's correct.

14   Q.  Well, let's just look at your application, and if there is

15   any doubt.

16          MR. DURKIN:  104A, could we have that?

17          MR. WEDDLE:  I'm sorry, Mr. Durkin, I was doing

18   something else.

19          MR. DURKIN:  104A.

20          MR. WEDDLE:  Do you want that on the screen?

21          MR. DURKIN:  Yes.  Just the last page.  I mean, put

22   the first page on and then the last page.

23   BY MR. DURKIN:

24   Q.  This is your application for disability that is in

25   evidence, right?

D7jdles5                          Parlante - cross

1   A.  Yes.

2   Q.  This is the same one that you saw this morning; do you

3   remember that?

4   A.  I don't know if it is the same.  It may be the same cover

5   sheet, I don't know.

6   Q.  Do you have any problems with your memory?

7   A.  Not really, no.

8   Q.  Is there any doubt in your mind that this 104A is not the

9   104A you were looking at earlier?

10  A.  All I see is the cover sheet here.  I don't know.

11          Is this the cover sheet I saw earlier?  Yes.

12  Q.  Take a look in your binder, just so we're sure.

13  A.  Is this 104A?

14  Q.  Yes.

15  A.  What is the question?

16  Q.  Isn't this the document you looked at this morning?

17  A.  We did talk about this document this morning, yes.

18  Q.  How many times have you gone over your testimony here?

19  A.  Here --

20  Q.  With the government, how many times did you prepare your

21  testimony?

22  A.  Oh, I don't know.

23  Q.  More than two or three?

24  A.  Yeah.

25  Q.  Each time when they prepare you for your testimony, do they

1   go through the exhibits with you?

2   A.  They go through some of them, yeah.  They don't go through

3   all of them each time.

4   Q.  How many times do you think you've looked at 104A?

5   A.  I have no idea.

6   Q.  More than five?

7   A.  I wouldn't be able to speculate.  I don't know.  It could

8   have been less than five.  I have no idea.

9            THE COURT:  Mr. Durkin, let's get to the point.  The

10  point is whether that is the document.

11  Q.  I take it you don't remember then when you signed this,

12  correct?

13  A.  It says 2003 -- 2005 on February 3rd.

14  Q.  Let's take a look at the last page where you signed it.

15           The same date, right, February 3rd, 2005?

16  A.  Yes.

17  Q.  So that's after you got hit by the train, correct?

18  A.  It is.

19  Q.  And that's well after you began seeing Dr. Lesniewski,

20  correct?

21  A.  Yes.

22  Q.  You began seeing him on June 24, 2003, correct?

23  A.  That sounds right.

24           MR. DURKIN:  Could we see 104E, please?

25  Q.  Now, is it your testimony that you only went to see

1    Dr. Lesniewski so you could commit a crime?

2    A.   My testimony is I went to see Dr. Lesniewski to get a

3    disability pension.

4    Q.   OK.   That's because you wanted a disability pension,

5    correct?

6    A.   I did want a disability pension.

7    Q.   And you testified earlier -- take a look just in your

8    binder there -- I'm sorry.

9              MR. DURKIN:   Could you put up 1109 quickly?

10   Q.   Do you remember this document?   It is in your binder, too.

11   A.   Yes.

12   Q.   This is the document you got when you went to the RRB?

13   A.   That's right.

14   Q.   And this is a form document, isn't it?

15   A.   I don't know if I got that when I went to the RRB or if I

16   got that in a packet before I went to the RRB.

17   Q.   All right.   But this is a form, is it not?

18   A.   It is.

19   Q.   It lists things.   This isn't particular to you, is it?

20   A.   No.

21   Q.   OK.   And it says that you have to have certain things that

22   only a doctor could give you, correct?

23   A.   Yes.

24   Q.   You can't -- you have to have a treating physician in order

25   to get a narrative medical report, correct?

1          Look in the next-to-the-last bullet there.

2   A.  Yes.

3   Q.  So you went to Dr. Lesniewski because you knew that even if

4   you wanted to try to get one, you had to have a narrative,

5   right?

6   A.  You're asking me is that the reason I went to

7   Dr. Lesniewski?

8   Q.  You went to him to get a narrative, or at least find out

9   whether or not you could get a narrative, correct?

10  A.  I went to him to get a diagnosis established for a

11  disability claim.

12  Q.  And you were hoping that you could get a diagnosis that

13  would be sufficient, correct?

14  A.  Yes.

15  Q.  And over the course of time he treated you, correct?

16  A.  I don't know the word -- the meaning of your word "treated"

17  there.  I went to see him.  He prescribed some medicines once

18  or twice.  And as far as treatment, I don't recall any

19  treatment.

20  Q.  Well, you would consider a recommendation for surgery part

21  of treatment, wouldn't you?

22  A.  I don't know that I would consider that part of the

23  treatment, no.

24  Q.  Well, it is a solution to a medical problem, is it not?

25  A.  But it is not a natural operation.

D7jdles5                        Parlante - cross

1    Q.  Well, I understand that.

2             MR. DURKIN:  But could we have Exhibit -- I'm sorry.

3    I just had it in my hand.  I was distracted.

4             (Pause)

5    Q.  Take a look at 104E.  Now, this is the document you looked

6    at earlier today, correct?  Do you remember that?

7    A.  Yes.

8    Q.  And the very first day you went there is reflected in page

9    1, 6/24/03, correct?

10   A.  Yes.

11   Q.  And up in the handwritten portion, it says you worked for

12   the Long Island Rail Road and you're retiring, correct?

13   A.  Correct.

14   Q.  It doesn't say anything about a disability, does it?

15   A.  It doesn't say anything about a disability there.

16   Q.  It just says retiring, correct?

17   A.  Correct.

18   Q.  And you did retire before you got the disability, correct?

19   A.  I went off sick before I got the disability.

20   Q.  Well, you went off sick and you retired prior to filing

21   your application for disability, correct?

22   A.  I went off six and during that time I filed the application

23   for disability.

24   Q.  Right.

25   A.  During the time I was sick.

D7jdles5                        Parlante - cross

1    Q.  You call your last day of work the day you got hit by the

2    train, correct?

3    A.  Correct.

4    Q.  OK.  Now, you talk about back problems and working out,

5    correct?

6    A.  That's correct.

7    Q.  So you never hid the fact from Dr. Lesniewski that you

8    worked out quite a bit, did you?

9    A.  I don't believe I did.

10   Q.  OK.  And that's because your back was pretty bad, but you

11   found out that it responded to exercise, correct?

12   A.  I don't know if I can make the diagnosis that my back was

13   pretty bad.  I don't know what you mean by that.

14          Is there a range of pain that you are talking about?

15   I don't know what you mean by that.  I can't make that

16   diagnosis.

17   Q.  Well, let's put it in the perspective of your conversation,

18   first conversation with Dr. Lesniewski.

19          Dr. Lesniewski told you in his opinion your back was

20   bad enough that it will eventually require surgery, correct?

21   A.  I don't recollect that that was in my first meeting with

22   him.

23   Q.  Well, take a look at the bottom there.

24          MR. DURKIN:  Could we blow up the would the bottom

25   portion.

D7jdles5                        Parlante - cross

1              (Pause)

2      A.   It says that --

3      Q.   "Tenderness."  It says, the fourth line, "Tenderness and

4      spasm along the paravertebral musculature.  X-rays revealed

5      spondylopathy and a blocked vertebrae at 2, 3."  Correct?

6      A.   That's what it says, correct.

7      Q.   You don't deny that, that that's what he found, do you?

8      A.   I don't deny anything that he found except for the carpal

9      tunnel.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  He was wrong about that, but everything else you don't have

2   any problem with what he said, right?

3   A.  Well, I have nothing to base it on.  He is a doctor.  I am

4   not.

5   Q.  I agree.  You did have an x-ray that day when you were

6   there, correct?

7   A.  I did.

8   Q.  You don't dispute that that is what the x-ray revealed,

9   correct?

10            MS. FRIEDLANDER:  Objection.

11            THE COURT:  Overruled.

12  A.  I don't know what you mean if he by the x-ray saw that I

13  needed to have an operation.

14  Q.  Well, the rest of the note says, "Discussed that with him

15  and eventually he will require surgery."

16            Correct?  That's what the note says?

17  A.  That's what the note says.

18  Q.  Just before that, the "that" that we are talking about, we

19  are talking about what the x-ray revealed, correct?

20  A.  Yes.  As far as I can tell.

21  Q.  That's what he discussed with you the very first day you

22  saw him, that your back was going to require surgery, right?

23  A.  I don't really remember much of a discussion, and I

24  certainly wouldn't have remembered it from the first day.  I

25  remember him saying at some point that it would require

1   surgery.

2   Q.  Well, you don't remember much of anything, right?

3   A.  I don't know if I could agree with that.  But that's what

4   you are saying.  I don't know.

5   Q.  Let's talk about another time that surgery came up.  Let's

6   go to August 17, 2004.  This is 14 months after the first time

7   you were there.

8            Do you remember that?  Look at the bottom there.

9            MR. DURKIN:  Can we blow up that last part.

10           Do you remember that?

11  A.  I vaguely remember it, yes.

12  Q.  When you say vaguely, what do you mean?

13  A.  I remember a conversation about you need a surgical

14  procedure.

15  Q.  For your back, right?

16  A.  Yes, either the back or the neck, which I would consider

17  the same.

18  Q.  So you don't deny that you had around this time, August 17,

19  2004, that you had both back and neck problems that would

20  require surgery.

21           MS. FRIEDLANDER:  Objection.

22           THE COURT:  Sustained.

23  Q.  You don't deny that at least that it was Dr. Lesniewski's

24  opinion that your back and neck required surgery, correct?

25           MS. FRIEDLANDER:  Objection.

1              THE COURT:  Sustained.

2     Q.  What was the problem with your hand?

3     A.  I had a little arthritis in my hand.

4     Q.  So is that what the carpal tunnel was about?

5     A.  I don't know what the carpal tunnel was about.  I had a

6     pain, a shooting pain in my hand from time to time in one

7     finger in my hand.

8     Q.  Did you yourself diagnose that as arthritis?

9     A.  I don't know.  Did I diagnose it as arthritis?  I may have

10    suggested it was arthritis.  I don't remember.

11    Q.  You just said you thought it was arthritis.  I am trying to

12    figure out where you got the idea that you had arthritis in

13    your hand.

14    A.  Just because of what I knew of, you know, the shooting pain

15    that might be associated with arthritis.

16    Q.  Do you think it might have been associated with carpal

17    tunnel, too?

18    A.  I do not, no.

19    Q.  Do you know anything about carpal tunnel?

20    A.  I do.

21    Q.  You do?

22    A.  I do.

23    Q.  So you have ruled out carpal tunnel?

24    A.  Absolutely.

25    Q.  Tell us why?

D7inles6                          Parlante - cross

1    A.  My wife has carpal tunnel right now and has to have an

2    operation.

3    Q.  What's the difference?

4    A.  The symptoms.

5    Q.  What kind of symptoms does she have that you don't have?

6    A.  She has her arm going numb for hours at a time, tingling

7    and a dead arm like, basically I guess is the way you would

8    call it, for a good part of the day.

9    Q.  Do you know whether or not there's varying degrees of

10   carpal tunnel?

11   A.  I'm sure there are.

12   Q.  The one thing that we know for sure is that you were truly

13   injured and hurt the night you got hit by the train, correct?

14   A.  I was truly bruised by that train which cleared up within a

15   matter of less than a month.

16   Q.  Of all the people in the universe that you could have

17   picked to go get your treatment for that accident, who did you

18   pick?

19   A.  I picked Dr. Lesniewski.

20   Q.  And he treated you, didn't he?

21   A.  He prescribed some medicine.

22   Q.  And you got better, right?

23   A.  I did get better.

24   Q.  So his treatment worked, right?

25   A.  I am not qualified to say that.  It could have just been

1    the course of time would have done the same thing.  I have no

2    idea.

3    Q.  Of course, you could have not gone to the doctor, too,

4    right?

5    A.  Possibly.

6    Q.  But you chose --

7    A.  That is a possibility.

8    Q.  But you close to go to a doctor?

9    A.  Yes.

10   Q.  And you chose Peter Lesniewski?

11   A.  I did.

12   Q.  The fact of the matter is that you came to trust him over

13   time, didn't you?

14   A.  That is not really the fact of the matter at all.

15   Q.  Well --

16   A.  I had no opinion about what was going on.  It didn't matter

17   to me.

18   Q.  What didn't matter to you?

19   A.  Any of the diagnoses that he came up with, as long as I got

20   the disability.

21   Q.  Did you ever tell him that?

22   A.  No.

23   Q.  Why didn't you just tell him that?

24   A.  Why would I?

25   Q.  Well, if it didn't matter to you, why didn't you just tell

1    him?  Why didn't you just tell him?

2    A.   I didn't want to make it matter to me either.

3    Q.   Pardon?

4    A.   I didn't want to make it matter to me either, creating some

5    kind of backlash with it.

6    Q.   Just like you didn't want the surgery because you knew if

7    you got the surgery you might not get the disability, right?

8    A.   No, not at all.

9    Q.   No, not at all?

10   A.   No, I was already doing something that kept the pain at

11   bay.  I didn't want to get the surgery because the pain wasn't

12   enough to qualify in my mind for surgery if I could keep the

13   pain at bay by working out.

14   Q.   So that is --

15   A.   Which is what I call physical therapy.

16   Q.   That is your physical therapy?

17   A.   Yes.

18   Q.   So you went to my client, Dr. Lesniewski, to try to get

19   this paper back up or paper trail as you said, right?

20   A.   Yes.

21   Q.   But if you didn't care what the paper trail said, why did

22   you go through all the motions of having to be examined every

23   time you went there?

24             MS. FRIEDLANDER:  Objection.  Misstates his testimony.

25             THE COURT:  Sustained.

D7inles6                         Parlante - cross

1    Q.  Am I correct that it is your testimony that all you cared

2    about was a diagnosis that would get you a disability?

3    A.  That was my primary concern.

4    Q.  But you never told him that, did you?

5    A.  No.

6            THE COURT:  Asked and answered.

7    Q.  You simply went and got treated the way he recommended.

8    Sometimes you went along with his advice, other times you

9    didn't, correct?

10   A.  I don't see it as receiving any treatment.

11   Q.  Well, you did take medications he recommended, correct?

12   A.  When I got hit, hurt by the train, the one time I took that

13   medication.  The prior medications I didn't take.

14   Q.  That was the Flexeril, right?  The very first time he

15   recommended Flexeril?

16   A.  No, I didn't take that.

17   Q.  But he recommended it, right?

18   A.  Yes.

19   Q.  You chose not to take it, right?

20   A.  Yes.

21   Q.  Let's take a look at August 26, 2003 on 104-E.  Do you see

22   that at the very bottom, the very top on the typed part?

23           Your neck still hurts, right?

24           Am I right?

25   A.  Yes.

D7inles6                    Parlante - cross

1   Q.  And it says, redoing some furniture and you felt a severe

2   pain in your low back, mostly on the right side.

3            Am I right?

4   A.  Are you asking me if those are my words?

5   Q.  No.  I just asked you is that what that says.

6   A.  That's what that says.

7   Q.  And then towards the bottom it says, "X-rays show

8   significant spondylosis," right?

9   A.  That's what it says, yes.

10  Q.  That is the second time we have heard the term spondylosis

11  in these records, isn't it?

12  A.  Yes.

13  Q.  Then it says, "Loss of disk space and significant

14  osteoarthropathy, right?

15  A.  That's what it says.

16  Q.  It says, "Will treat him with anti-inflammatories,"

17  correct?

18  A.  That's what it says, yes.

19  Q.  Well, he recommended that treatment, didn't he?

20  A.  He did.

21  Q.  Did you just ignore it?

22  A.  I did not take the medicine.

23  Q.  But he at least recommended a course of treatment that you

24  decided not to take, correct?

25  A.  He prescribed that drug, yes.

D7inles6                        Parlante - cross

1    Q.  Do you think prescribing a drug is treatment?

2    A.  It is treatment if somebody takes the drug.

3    Q.  Oh, I see.  Are you telling us, then, that no matter what a

4    doctor said to you regarding what he recommends for treatment

5    that unless and until you do it, it is not treatment?

6    A.  I don't know that I just said that.

7    Q.  I don't know what you said either.  That's what I am trying

8    to figure out.  You said earlier when the government asked you

9    questions that you didn't get treatment from Dr. Lesniewski,

10   didn't you?

11   A.  I did say that I got prescription medicine.

12          MS. FRIEDLANDER:  Objection.

13   Q.  But you didn't get treatment, right?

14   A.  That's correct.

15   Q.  That's simply false, isn't it?

16   A.  I don't see it that way.

17   Q.  That is because for you treatment only means treatment you

18   follow, correct?

19   A.  No.

20   Q.  Let me ask you this.  Did you ever tell anybody that you

21   liked Dr. Lesniewski because other doctors wanted to operate

22   and he wanted to avoid surgery?

23   A.  I don't recall saying that.

24   Q.  Do you remember talking to Agent Fletcher by telephone on

25   October 7, 2008?

D7inles6                       Parlante - cross

1    A.  I don't remember saying that in 2008.

2    Q.  I didn't ask you whether you remembered saying that in

3    2008.  I just asked you whether --

4    A.  If I had a phone conversation.

5    Q.  What I asked you is do you remember having a telephone

6    conversation with Agent Fletcher on October 7, 2008?

7    A.  I don't remember having it with Agent Fletcher.  I remember

8    having a phone conversation in 2008.

9    Q.  Let me show you a document that I got in discovery and see

10   if this refreshes your recollection as to both who you spoke

11   with on the phone and the date.  Does that refresh your

12   recollection that you spoke with Agent Fletcher by phone on

13   October 7, 2008?

14   A.  I had a conversation in 2008.  I don't know who the agent

15   was, and it doesn't refresh my memory as to what took place

16   during that conversation.

17   Q.  So your memory is exhausted with respect to who you spoke

18   with and what you said?  Is that your testimony?

19   A.  That is not my testimony.

20   Q.  Well, do you remember who you spoke with or not?

21   A.  I didn't ever know it as inspector Fletcher.

22   Q.  How about Special Agent Patrick L. Fletcher?  Does that

23   refresh your recollection?

24   A.  No, it doesn't.

25            MS. FRIEDLANDER:  Your Honor, object to the reading

1    from the document.  Again, there isn't even an inconsistency

2    that makes this proper cross.

3               THE COURT:  Sustained.

4               MR. DURKIN:  Judge, can I have this stricken about

5    proper cross.

6               THE COURT:  Sustained.

7    Q.  Take a look at this paragraph and see if that refreshes

8    your recollection about the question I asked you earlier about

9    whether you ever told anybody that you liked Dr. Lesniewski

10   because other doctors wanted to operate?

11              MS. FRIEDLANDER:  Objection.

12              THE COURT:  Sustained.

13   Q.  Just read that.  Does that refresh your recollection?

14   A.  It does not.

15   Q.  So, as I understand your testimony, your recollection is

16   exhausted with respect to what you told a government agent in a

17   telephone call on September 24, 2008?

18   A.  No.

19              MS. FRIEDLANDER:  Asked and answered.

20              THE COURT:  Asked and answered.

21              MR. DURKIN:  Judge, I will offer this then.

22              MS. FRIEDLANDER:  Objection.

23              MR. DURKIN:  I offer it as past recollection recorded.

24              MS. FRIEDLANDER:  There is not even an inconsistent

25   statement.  Would you like --

1              THE COURT:  Sustained.

2    Q.  You have answered several other questions this afternoon

3    about this telephone conversation.  Do you remember that?

4    A.  I remember talking about this telephone conversation, yes.

5    Q.  Do you remember saying anything in that phone conversation

6    about Dr. Lesniewski?

7    A.  No, I don't.

8    Q.  Even reading this doesn't refresh your recollection --

9    A.  No --

10   Q.  -- as to what you may have said about Dr. Lesniewski?

11   A.  No, it doesn't.

12   Q.  After that phone call that you had in the fall of 2008, you

13   didn't hear from the government again until you ended up in the

14   grand jury on April 28, 2011, correct?

15   A.  I believe that's correct.

16   Q.  If I showed you the transcript, would that refresh your

17   recollection?

18              MS. FRIEDLANDER:  He just said he believes that is

19   correct.  Objection.

20              MR. DURKIN:  Is it or not?

21   A.  Repeat the question.

22              THE COURT:  Will the reporter read back the question.

23              (The following was read back:  "After that phone call

24   that you had in the fall of 2008, you didn't hear from the

25   government again until you ended up in the grand jury on April

D7inles6                         Parlante - cross

1   28, 2011, correct?")

2   A.  I don't believe I did, no.

3   Q.  They asked you questions about this disability application

4   in the grand jury, correct?

5   A.  Yes.

6   Q.  One of the things they asked you about was whether or not

7   your medical condition prevented you from working.

8          Do you remember that?

9   A.  I do.

10  Q.  Do you remember your answer?

11  A.  I said it did prevent me from working.

12  Q.  Your answer was "absolutely," correct?

13  A.  I believe that's correct.

14  Q.  Do you remember them asking you when did it occur that your

15  medical condition prevented you from working?

16  A.  Having seen these transcripts a lot of times, I didn't

17  remember at the time, but I know what it says.

18  Q.  You said that it was cumulative, that it started over 20

19  years ago and that you have degenerative disk disease, correct?

20          THE COURT:  Mr. Durkin, what is the purpose of the

21  testimony that you are reading?

22          MR. DURKIN:  Prior inconsistent --

23          THE COURT:  He's not disputing that he said those

24  things.  You are reading from a transcript for what purpose?

25          MR. DURKIN:  What I am asking -- I didn't ask the

D7inles6                      Parlante - cross

1    answer.  Let me ask it this way.

2    Q.  You told them that this disability that you absolutely had

3    was the cumulative result of having degenerative disk disease

4    over the course of 20 years, correct?

5    A.  I think you will have to read the question that I responded

6    to first.

7    Q.  How about this.  Do you recall being asked this question

8    and giving this answer:

9    "Q. When did it occur that your medical condition prevented you

10   from working?

11   "A. Like I said, it was cumulative.  It started over 20 years

12   ago.  I have degenerative disk disease.  It was cumulative.

13   Standing, walking, it has been 20 years."

14          Do you remember being asked that question and giving

15   that answer?

16   A.  I don't really remember being -- if you want me to go back

17   to that particular time, it's not a fully formed memory now.

18   Q.  How about if I showed you this transcript.  Do you think

19   that might refresh your recollection?

20   A.  It might.

21   Q.  Just read lines 3 through 9.

22          Does that refresh your recollection?

23   A.  I am not saying I didn't say that.  It doesn't -- you know.

24   Q.  Your recollection isn't refreshed, but you don't deny that

25   that's what you said?

633

D7inles6                          Parlante - cross

1    A.  I don't deny that that's what I said.

2              THE COURT:  Mr. Durkin, do you have an estimate of how

3    much longer you think you need so we can decide about the

4    afternoon break.

5              MR. DURKIN:  This might be a good time, Judge.  It

6    might be able to save a few minutes if we can get a break now.

7              MS. FRIEDLANDER:  Your Honor, can we just get an

8    estimate of the time.

9              THE COURT:  How much do you think?

10             MR. DURKIN:  Probably 15 minutes, maybe a little

11   longer.  Let's take a break now.  10 minutes.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Jury not present)

 2              (Recess).

 3              THE COURT:  Thank you.  Be seated.  Bring in the jury.

 4              MR. WEDDLE:  Your Honor?

 5              THE COURT:  Yes.

 6              MR. WEDDLE:  When we have a free two or three minutes,

 7    I would like to say a little bit, something about the courtroom

 8    mechanics, and in particular something that came up during the

 9    cross-examination by Mr. Ryan.  It doesn't have to be now, but

10    at some point.

11              THE COURT:  At some point we will get to it.

12              (Jury present)

13              MR. DURKIN:  Judge, can we just be heard very quickly.

14    Just for a second.

15              THE COURT:  OK.  Thank you be seated.

16              (At sidebar)

17              MR. DURKIN:  I apologize.  I should have seen this

18    before the jury came in.  His plea agreement does say that they

19    have agreed not to prosecute him for his personal use of

20    marijuana during the last five years.

21              Again, I don't want to belabor this, but I would like

22    a representation from the government as to his clean and sober

23    for the last 20 years.  I would not consider that being clean

24    and sober, at least not in the clean-and-sober places that I

25    hang out in.  That is just a non sequitur to being clean and
```

1  sober.

2          I would like to have him subject to recall so if we

3  just wouldn't excuse him.  I don't think I would need to call

4  him back.  I would like the government to inquire over the

5  weekend about any drug or alcohol use.

6          THE COURT:  All right.  Why don't you inquire, and we

7  will get back to that.

8          MS. FRIEDLANDER:  Just, if I can respond.  Obviously,

9  when we were speaking about before we were speaking about his

10  abuse of alcohol.  When I said he's been clean and sober, I was

11  referring to his use of alcohol.

12          I had forgotten, although we had disclosed it and in

13  fact moved in limine about his occasional use of marijuana

14  since he retired.

15          There is no secret about that.  They have known about

16  that.  We have moved on that very subject.

17          This witness has testified that he does not have any

18  trouble with his memory.  He believes he's fine.  I think his

19  testimony today has been totally credible.  I certainly don't

20  see any need to recall him.

21          If your Honor thinks it is appropriate, we can have

22  voir dire outside the presence of the jury.  There is no basis

23  to recall this witness for that.

24          MR. DURKIN:  I don't want to do that, because I don't

25  like doing this to somebody.

D7inles6                    Parlante – cross

1            THE COURT:  Let's return to the subject after we

2    discharge the jury.

3            MR. DURKIN:  Fine.

4         (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Mr. Durkin.

3          MR. DURKIN:  Thank you, Judge.

4   Q.  Mr. Parlante, when I left off, I was talking about your

5   grand jury testimony.  Do you remember that?

6   A.  Yes.

7   Q.  It was grand jury testimony February 28, 2011, correct?

8   A.  Yes.

9   Q.  You ultimately pled guilty on November 28, 2012, correct?

10  A.  Yes.

11  Q.  You said earlier in your direct examination that you had

12  lied in the grand jury, correct?

13  A.  That's correct.

14  Q.  Are you familiar with the term perjury?

15  A.  I am.

16  Q.  Do you have any agreements with the government concerning

17  whether or not you will be charged with perjury?

18  A.  I don't.

19  Q.  So is it your understanding that you still could be charged

20  with perjury?

21  A.  Yes.

22  Q.  When is that decision going to be made?

23  A.  I have no idea.

24  Q.  Do you know who makes that decision?

25  A.  I would guess the judge.

D7inles6                              Parlante - cross

1     Q.  Has the U.S. Attorney's Office, either any of the people

2     here or anyone else from the U.S. Attorney's Office that you

3     have spoken with, spoken to you or your lawyer about whether or

4     not you are going to be charged with perjury?

5     A.  No one has spoken to me about it, no.

6     Q.  So, as far as you are concerned, that is still something

7     that hangs over your head as you sit here today, correct?

8     A.  Yes.

9     Q.  But you did plead guilty to conspiracy, mail and wire

10    fraud, correct?

11    A.  Correct.

12    Q.  That carries the 60 years, correct?

13    A.  50 years to my understanding.

14    Q.  50.  You are also familiar with the federal sentencing

15    guidelines, correct?

16    A.  Yes.  I am not conversant on it, but --

17    Q.  But you know generally that there are sentencing guidelines

18    that adjust for certain offenses, correct?

19    A.  Yes.

20    Q.  Do you have any idea as you sit here today what you are

21    looking at under the guideline?

22    A.  I don't.

23    Q.  But is your understanding that the guidelines would call

24    for a penitentiary sentence?

25    A.  I didn't really process that.

D7inles6                          Parlante - cross

1   Q.  But you are aware that the government in your plea

2   agreement has agreed to move under Section 5K, has agreed to

3   consider moving under Section 5K1.1 for a downward departure

4   under the guidelines, correct?

5   A.  Yes.

6   Q.  So you know that much about the guidelines, that if they

7   write this letter and make a motion to the judge, the judge

8   could depart downward from the guidelines, correct?

9   A.  That's the way I understand it.

10  Q.  But that has nothing to do with the perjury that's still

11  hanging over your head, correct?

12  A.  I don't believe it does.  I don't know, though.

13  Q.  Did I hear you testify correctly on direct examination that

14  you got really frightened in the grand jury?

15  A.  Yes, you did.

16  Q.  That was because, not only did you lie, but you knew that

17  they knew you were lying, correct?

18          MS. FRIEDLANDER:  Objection.

19          THE COURT:  Sustained.

20  Q.  Why did you get frightened in the grand jury?

21  A.  Well, I don't know if I gave that in my answer, but I

22  didn't actually realize that it was going to be me that they

23  were investigating.  I thought I was being called as a witness.

24  So when the questions almost right from the beginning were

25  about me, I was looking for ways to dig out of a hole so to

1   speak.

2   Q.   That is because you really didn't think you had committed a

3   crime, correct?

4              MS. FRIEDLANDER:  Objection.  Asked and answered.

5              THE COURT:  Sustained.

6   Q.   Well, what caused you to think that they weren't interested

7   in you?

8   A.   It caused me to think that they were interested in me.

9   Q.   Before you went there, what caused you to think that the

10  government was not interested in you?

11  A.   I had had a phone conversation with an agent.

12  Q.   What did the agent tell you that caused you to believe that

13  they weren't interested in you?

14  A.   To my recollection he told me that I would be called as a

15  witness.

16  Q.   So did you think he was making you a promise?

17  A.   No, not at all.

18  Q.   So you thought you were going there just to talk about

19  other people, but the spotlight then began to shine on you in

20  other words, correct?

21  A.   I think that would sum it up, yes.

22  Q.   Shortly after that, you spoke with Agent Suites, correct?

23  A.   Suits.

24  Q.   Suits.  I'm sorry.  Correct?

25  A.   Correct.

1   Q.  You know him, right?

2   A.  Yes, I do.

3            MR. DURKIN:  I guess he's not here.  I'm sorry.

4   Q.  That is Agent Suites standing in the back, correct?

5            MR. RYAN:  I object.  It is Suits.

6            MR. DURKIN:  I apologize.  It's Friday afternoon.

7            THE COURT:  And you are from Chicago.

8            MR. DURKIN:  I am from Chicago on top of that.  Not

9   everybody can be from New York.

10  Q.  Agent Suites --

11           MR. RYAN:  I object.  It is Suits.

12           MR. DURKIN:  This is kind of like Lesniewski and

13  Linetsky.  I am not going to get it straight.

14  Q.  Adam, the guy in the back there, the good-looking guy in

15  the back, Adam, had a conversation with you on May 3, 2011,

16  correct?

17  A.  The day after the grand jury, yes.

18  Q.  Right.  And in that conversation you asked him whether or

19  not you needed a lawyer, correct?

20           MS. FRIEDLANDER:  Objection.

21           THE COURT:  Sustained.

22  Q.  After that conversation you decided to get a lawyer,

23  correct?

24  A.  No, not correct.

25  Q.  When did you get your lawyer?

642

1    A.   After I was arrested.

2    Q.   What day did you get arrested?  May 12?

3    A.   No.  It was in September or October.

4    Q.   OK.  Did anything happen regarding you and the government

5    between your conversation with Agent Suites and -- Suits I

6    mean -- on May 3 and the time you got arrested?

7    A.   I don't know what you are talking about.  I don't know what

8    you mean.

9    Q.   Did you have any other contact with government agents,

10   prosecutors, investigators?

11   A.   Not that I recall.

12   Q.   Did they come to your house and arrest you?

13   A.   They did.

14   Q.   What time of day or night?

15   A.   I think it was 5 in the morning.

16   Q.   Were your children home?

17   A.   No.  All my -- my children don't live with us.

18   Q.   Who was at home when you got arrested?  Your wife?

19   A.   My wife.

20   Q.   Did that frighten you?

21   A.   Absolutely.

22   Q.   Did it also make you angry?

23   A.   No, it did not make me angry.

24   Q.   How long were you in custody?

25   A.   A number of hours.  I don't know how many.  Say ten hours

1    approximately.

2    Q.  After that you hired a lawyer?

3    A.  I did hire a lawyer after that.

4    Q.  Just one last thing.

5          When you got hit by the train on Halloween, how long

6    did it take to recover from that?

7    A.  Two or three weeks.

8    Q.  So had you recovered from the train accident by the time

9    you filed the application?

10   A.  Yes.

11   Q.  What did that accident do to your back?

12   A.  Big bruise.

13   Q.  That is your back where you have been treated for 20 years

14   with various doctors in addition to Dr. Lesniewski, correct?

15   A.  It was actually a different part of the back, but if you

16   take the back as a total it was in the back.

17   Q.  Were you concerned when you got injured again that you were

18   going to have even worse and more permanent back problems?

19   A.  I wouldn't say I was concerned about that.

20   Q.  You weren't?

21   A.  I wouldn't say that, no.

22   Q.  As you sit here today, is your back OK?

23   A.  I still have the same nagging minor pain.

24   Q.  How many days a week do you have to work out in order to

25   keep your back in order?

D7inles6                        Parlante - cross

1    A.  I work out four days a week.

2    Q.  Religiously, correct?

3    A.  Pretty much.

4    Q.  You look like you are in good shape, right?

5    A.  Yes.

6    Q.  You work out outside?

7    A.  No, I don't.

8    Q.  Where did you get the tan?

9    A.  I sit outside.

10           MR. DURKIN:  That is all I have.

11           THE COURT:  Ms. Friedlander.

12           MS. FRIEDLANDER:  Very briefly, your Honor.

13           THE COURT:  Yes.

14   REDIRECT EXAMINATION

15   BY MS. FRIEDLANDER:

16   Q.  Mr. Parlante, defense counsel Mr. Durkin asked you some

17   questions about your grand jury testimony.  Do you recall that?

18           Do you recall that he asked you about that?

19   A.  I do.

20   Q.  He noted that you testified falsely in the grand jury that

21   you had a medical condition that prevented you from working.

22           Do you recall that?

23   A.  Yes.

24   Q.  I believe you said today that that testimony was false?

25   A.  That's right.

D7inles6                         Parlante - redirect

1   Q.  What we haven't asked you, sir, is did you, in fact,

2   correct that false statement later in your testimony?

3   A.  I did.

4   Q.  Sir, did you ultimately testify that there was no point

5   where you were actually unable to work?  Do you recall

6   testifying to that?

7   A.  Did I testify what?

8   Q.  Did you ultimately testify that there was no time where you

9   were actually unable to work?

10   A.  Yes.

11   Q.  Defense counsel Mr. Jackson, Ms. Baran's lawyer, asked you

12   some questions and he asked whether you reviewed your

13   disability application with Marie Baran.

14          Do you remember that?

15   A.  I remember him asking me that.

16          MS. FRIEDLANDER:  Can we just see his disability

17   application for one quick second.  It's 104-A, and I would like

18   to go to section 6.

19   Q.  You will recall he was asking you some questions about

20   whether there was handwriting on this document that wasn't

21   yours.  Do you remember those questions?

22   A.  Yes, I do.

23   Q.  Sir, to be clear, when you met with Marie Baran at the

24   Railroad Retirement Board, did she ask you whether it was hard

25   for you to sit, stand, walk, bathe yourself, dress yourself,

D7inles6                          Parlante - redirect

1   perform other bodily needs, perform indoor chores, outdoor

2   chores, drive a motor vehicle, use public transportation and

3   write English?

4   A.  No, she didn't.

5   Q.  Did she ask you -- I'm sorry?

6   A.  No, she didn't ask me that.

7   Q.  When you sat through your meeting with Ms. Baran, did you

8   act like you were in pain?

9   A.  No, I didn't.

10  Q.  I believe you described your conversation as breezy.

11  A.  Yes.

12  Q.  Did you act like it was hard for you to sit during your

13  meeting?

14  A.  No, I didn't.

15  Q.  Did you act like it was hard for you to write?

16  A.  No.

17  Q.  To be clear, why did you see Peter Lesniewski for a year

18  and a half of visits?

19  A.  I wanted to be diagnosed with something that would get me

20  the disability pension.

21  Q.  And did he do that for you?

22  A.  Yes.

23  Q.  To be clear, why did you pay Joe Rutigliano $1,000?

24  A.  I needed somebody that had more information about the

25  process than I had.

1   Q.  Did he provide that information to the Railroad Retirement

2   Board for you?

3   A.  He did.

4   Q.  When you say more information about the process, tell us

5   what you understood Mr. Rutigliano would be doing for you.

6   A.  The job description tied into the diagnosis.

7   Q.  Did you expect that Mr. Rutigliano would say whatever

8   needed to be said to get you a disability pension?

9   A.  I expected him to say what he needed to say to get the

10  disability pension, but I didn't expect it to be what he

11  actually said.

12          MS. FRIEDLANDER:  OK.  No further questions.

13          THE COURT:  Mr. Ryan.

14  RECROSS EXAMINATION

15  BY MR. RYAN:

16  Q.  Before you signed off on the form that Mr. Rutigliano

17  prepared for you, did you review it to see if there were any

18  corrections or exaggerations?

19  A.  I did not.

20  Q.  You didn't do that until seven years later, is that what

21  you are telling us?

22  A.  I didn't do that until after I got arrested.

23          MR. RYAN:  Thank you very much.

24  RECROSS EXAMINATION

25  BY MR. JACKSON:

D7inles6                              Parlante - recross

1   Q.  Sir, Ms. Friedlander just showed you on item on that

2   screen, right.  Could the government put that back up, please.

3           I think it was Section 6 to be clear, if that would be

4   blown up.

5           She specifically asked you whether or not Ms. Baran

6   asked you these questions.  Do you recall that just a minute

7   ago?

8   A.  Yes.

9   Q.  And that something that you remember with clarity whether

10  she asked you those questions, right?

11  A.  That's right.

12  Q.  But there's a number of other things that we asked you

13  today that you just don't happen to remember, is that correct,

14  sir?

15  A.  I wouldn't put it that way.

16  Q.  But you do remember this, right?

17  A.  I do remember this.

18  Q.  You remember that she didn't ask you anything there.

19  That's what your testimony is, right?

20  A.  That is correct.

21  Q.  You were also aware that when you took this plea, sir, that

22  there was a recommendation in that plea, you understand, that

23  for your substantial cooperation here you would be afforded the

24  benefit of a reduced sentence.  We agree with that, right?

25          MS. FRIEDLANDER:  Objection.  Misstates his testimony.

1           THE COURT:  Sustained.

2     Q.  Well, you remember appearing in front of the magistrate,

3     right?  Do you remember that?

4     A.  I don't know which person was the magistrate.

5     Q.  I didn't ask you about a person.  I asked you whether you

6     remembered appearing in front of a magistrate?

7     A.  You'll have to tell me what the magistrate is.

8     Q.  My pleasure.  Do you remember on November 28, 2012,

9     Honorable James L. Cott?  Do you remember appearing in front of

10    that magistrate?  Does that refresh your recollection?

11    A.  You'll still have to explain what a magistrate is.

12    Q.  Sure.

13          MS. FRIEDLANDER:  Judge, there is no inconsistency

14    here.  Objection.

15          THE COURT:  What point are you trying to get,

16    Mr. Jackson?

17          MR. JACKSON:  Judge, I am refreshing his recollection.

18    He doesn't recall, and I am refreshing his recollection.

19          THE COURT:  On what material point?

20    Q.  The material point regarding whether or not you appeared

21    before the magistrate on November 28, 2012, at 11:55 a.m.,

22    Honorable James L. Cott in this particular courthouse, it was

23    indicated to you that if you substantially cooperated with the

24    government you understand -- and this is the judge speaking to

25    you -- you understand that as a potential, as a result of that

D7inles6                         Parlante - recross

```
 1   there would be a potential reduction in your prison sentence.
 2               Do you recall that, sir?
 3   A.  Are you talking about the sentencing?
 4   Q.  You.  To my understanding --
 5   A.  Me pleading guilty?
 6   Q.  I am talking about the plea right.
 7   A.  Is that the magistrate?
 8   Q.  Correct, yes.
 9   A.  Now, what's the question?
10   Q.  The question, sir, is if you recall when you were standing
11   in front of that magistrate pleading guilty that that
12   magistrate asked you a question as to your cooperation?  Do you
13   recall that?
14   A.  He asked me if I had a cooperation agreement.
15               MS. FRIEDLANDER:  Objection, again.  There is just no
16   inconsistency here.
17               THE COURT:  What is the material point?
18   Q.  The material point is that today you have a memory as to
19   what you went over with Ms. Marie Baran in 2005, correct?
20   A.  I do.
21   Q.  And you said with clarity to Ms. Friedlander with clarity,
22   right now, today, in this courtroom, that this is something
23   that you reviewed with her, right?
24               MS. FRIEDLANDER:  Objection.  Misstates his testimony.
25               THE COURT:  Sustained.
```

1   Q.  You have a clear recollection as to that, is that accurate?

2           MS. FRIEDLANDER:  Objection.

3   Q.  I don't want to put words in your mouth.

4           THE COURT:  Sustained.

5   Q.  Do you recall as you sit here today whether or not that

6   occurred?

7           MS. FRIEDLANDER:  Objection as to that.

8   A.  What, that she read that?

9   Q.  Absolutely, yes.

10  A.  I recall that she didn't read it.

11  Q.  That she did not?

12  A.  Right.

13  Q.  That's something you remember very well, correct?

14          THE COURT:  Asked and answered.

15  Q.  Do you?

16          THE COURT:  Asked and answered.

17          MR. JACKSON:  All right.

18  Q.  Ms. Friedlander asked you a question about whether or not

19  she observed your physical condition when you went there, when

20  you went to see Ms. Baran, is that right?

21  A.  She asked me that question.

22  Q.  No, I don't want to --

23          MR. JACKSON:  Could you read back -- I don't want to

24  mischaracterize, Judge, at all.  But I believe the question

25  was, as to whether or not Ms. Baran had made observations as to

1    whether you were having pain sitting or doing whatever you were

2    doing?

3                MS. FRIEDLANDER:  Objection.

4                THE COURT:  Read back the question.

5                MR. JACKSON:  Ms. Friedlander's question on redirect,

6    please, as it relates to Ms. Baran.

7                THE COURT:  That is going to take too long.  Just ask

8    the question.

9    Q.  The point is, sir, when you went to Ms. Baran, it wasn't

10   your understanding that she was providing you with any medical

11   diagnosis or treatment, was it?

12   A.  That she was acting as a doctor?

13   Q.  Correct.

14   A.  No.

15   Q.  You didn't understand her to be evaluating you and making

16   judgments about whether or not you could do the things you

17   stated, is that correct?

18   A.  I don't understand the question.

19   Q.  Well, you went to doctors to assess your condition,

20   correct?  You did not understand Ms. Baran's role here, you did

21   not understand Ms. Baran's role here to be assessing your

22   medical condition when you met with her, is that accurate?

23   A.  I did not.

24   Q.  In fact, you knew that her role was a Railroad Retirement

25   Board official, correct?

D7inles6                    Parlante - recross

1   A.  Correct.

2          MR. RYAN:  Could the government put up 104-D, please,

3   just blowing up the bottom portion of that.  Before you blow

4   that up -- I'm sorry.

5   Q.  In looking at that, you agree that's dated November 24,

6   2004 correct?

7   A.  Correct.

8   Q.  And this is from your doctor?

9   A.  It is got the doctor's letterhead on it, yes.

10         MR. JACKSON:  Now can we go to the bottom, please.

11  Further down, pretty please.  Thank you.  Further.

12  Q.  You see that says February 3, 2005, is that right?

13  A.  That's right.

14  Q.  So that would correspond with the date that you went to see

15  Ms. Baran, is that right?

16  A.  Yes.

17  Q.  If the government could put up 104-E, please.  This is also

18  a document that is from your doctor, is that accurate?

19  A.  That's accurate.

20  Q.  At the bottom of that, sir --

21         MR. JACKSON:  Just if the bottom quarter, all the way

22  down could be blown up.

23  Q.  That says February 3, 2005, is that right?

24  A.  That's right.

25  Q.  That was the date that you saw Ms. Baran, is that right?

1    A.  That's right.

2    Q.  And you understood what her role was when you were meeting

3    with her, is that correct?

4    A.  I understood that she was filling out a form and asking me

5    questions when I met with her.

6    Q.  Did you understand her role to be assessing your medical --

7              THE COURT:  Asked and answered.

8    Q.  You knew that that was not her role, is that fair?

9              THE COURT:  Asked and answered.

10   Q.  What, if any, questions were asked of you by Ms. Baran at

11   the time that you went to do this application which points to

12   her personal observations as to your medical condition?

13             MS. FRIEDLANDER:  Objection.

14             THE COURT:  Asked and answered.

15             MR. JACKSON:  Can we put back up the exhibit dealing

16   with the disability, please.

17             MR. WEDDLE:  I am not sure what you're referring to.

18             MR. JACKSON:  The application, 104-A.

19             MR. WEDDLE:  Just the form, not the whole package?

20             MR. JACKSON:  We'll go through it.

21             MR. WEDDLE:  OK.

22   Q.  Looking at page 1, do you see page 1?

23   A.  I do.

24             MR. JACKSON:  Could you just blow up the bottom

25   section.  Section 1.

D7inles6                        Parlante - recross

1   Q.   Those are general instructions as to the form, is that

2   correct?

3   A.   Yes.

4           MR. JACKSON:   Can we go to Section 2.

5   Q.   Section 2 is identifying information, that's who you are,

6   is that right?

7   A.   That's correct.

8           MR. JACKSON:   Could you go to Section 3, please.

9           THE COURT:   Mr. Jackson, you are trying to make the

10  point that Ms. Baran was not acting as a medical evaluator?  Is

11  that the point.

12          MR. JACKSON:   If they would stipulate to that Judge, I

13  will sit down.

14          THE COURT:   Let's stipulate to that and move on.  Is

15  the government making an argument that Ms. Baran was making a

16  medical evaluation?

17          MS. FRIEDLANDER:   No, sir.

18          MR. JACKSON:   Thank you, Judge, very much.  I have

19  nothing further.

20          THE COURT:   Anyone else?

21          Thank you.  You may step down.

22          (Witness excused)

23          THE COURT:   Government?

24          MR. WEDDLE:   The government calls Special Agent Joseph

25  Del Favero.

1    JOSEPH DEL FAVERO,

2         called as a witness by the government,

3         having been duly sworn, testified as follows:

4              THE COURT:  Thank you.  You may be seated.

5              Speak into the microphone as closely as possible.

6    State your name and spell it for the record.

7              THE WITNESS:  Joseph Del Favero, D-e-l capital

8    F-a-v-e-r-o.

9    DIRECT EXAMINATION

10   BY MR. WEDDLE:

11   Q.  Where do you work, sir?

12   A.  I work for the United States Railroad Retirement Board

13   Office of Inspector General.

14   Q.  What is the Office of Inspector General?

15   A.  The Office of Inspector General is an independent agency

16   under the Executive Branch of the federal government.

17   Q.  And how long have you worked at the Office of the Inspector

18   General?

19   A.  26 years.

20   Q.  Are you a federal law enforcement officer?

21   A.  Yes, I am.

22   Q.  What is your current position?

23   A.  My current position is Deputy Assistant Inspector General

24   for Investigations.

25   Q.  What other positions have you held in your time at the

1   Office of Inspector General?

2   A.  Criminal Investigator, Senior Criminal Investigator,

3   Supervisory Special Agent, Special Agent in Charge, and a

4   Deputy Assistant Inspector General.

5   Q.  In October 2008, sir, what was your position?

6   A.  Special Agent in Charge for the Chicago Field Office.

7   Q.  And as Special Agent in Charge of the Chicago Field Office,

8   did you sometimes also do regular special agent work, like

9   going to interviews and things like that?

10  A.  Just when needed.

11  Q.  Did you participate in interviewing the defendant, Peter

12  Lesniewski?

13  A.  Yes, I did.

14  Q.  When did the interview take place?

15  A.  October 29, 2008.

16  Q.  Who conducted the interview?

17  A.  Special Agent Louis Rossignuolo and myself.

18  Q.  And how involved were you before the interview in the

19  investigation?

20  A.  Very minimal.

21  Q.  How about since this interview, what has your involvement

22  been like?

23  A.  Very minimal.

24  Q.  When you and Special Agent Rossignuolo went to interview

25  Dr. Lesniewski, where did you interview him?

1   A.  Genesis Orthopedics.  That was in St. Charles, Illinois.

2   Q.  Why did you go to Genesis Orthopedics to interview

3   Dr. Lesniewski?

4   A.  We went to interview regarding patients that worked for the

5   Long Island Rail Road that were applying for disability.

6           MR. DURKIN:  Judge, could we just have some foundation

7   for where St. Charles, Illinois is?

8           MR. WEDDLE:  That is foundational, your Honor.  I have

9   Q and A?

10          THE COURT:  Just ask what it is.

11  BY MR. WEDDLE:

12  Q.  OK.  What is St. Charles?

13  A.  St. Charles, Illinois is a suburb just west of Chicago.

14          MR. WEDDLE:  Do you have any other questions you want

15  me to ask?

16          MR. DURKIN:  Thank you.

17  Q.  Did you bring anything with you to the interview to ask

18  Mr. Lesniewski about?

19  A.  Yes, we did.

20  Q.  What did you bring with you?

21  A.  We brought some medical files, some claim files from the

22  U.S. Railroad Retirement Board, patients of his.

23  Q.  What time of day did the interview take place?

24  A.  Early afternoon.

25  Q.  What happened when you arrived at his office?

D7jdles7                              Del Favero - direct

1    A.  We went into his office and we identified ourselves to the

2    receptionist, who went and got Dr. Lesniewski.

3    Q.  And when Dr. Lesniewski was ready for you, where did you

4    talk with him?

5    A.  In his office.

6    Q.  Who was present when you spoke with him?

7    A.  Special Agent Louis Rossignuolo, myself and Dr. Lesniewski.

8    Q.  About how long were you in his office?

9    A.  Approximately an hour and a half.

10   Q.  Who did most of the talking?

11   A.  Louis Rossignuolo and Dr. Lesniewski.

12   Q.  What was your role in the interview?

13   A.  I was a secondary.

14   Q.  What does that mean?

15   A.  That means I was there just to take some notes and Louis

16   Rossignuolo was the primary.  He asked the questions, conducted

17   the interview.

18   Q.  And after the interview did you later use your notes to

19   write up a report or memorandum of what happened?

20   A.  Yes, I did.

21   Q.  Why did you write up a memorandum instead of just relying

22   on your notes?

23   A.  Well, because the notes were very minimal notes.  It didn't

24   have everything that was in the memorandum.  I wrote the

25   memorandum with memory the following day from the interview.

1   Q.  Prior to testifying here today, have you had an opportunity

2   to review your memorandum and your notes to refresh your

3   recollection?

4   A.  Yes, I have.

5   Q.  And today do you remember the interview and remember many

6   of the things that were said without having to read from your

7   memo or notes?

8   A.  Yes.

9   Q.  At the start of the interview, what did you tell

10  Dr. Lesniewski about what you wanted to speak with him about?

11  A.  We wanted to speak with him regarding patients of his that

12  worked for the Long Island Rail Road.

13  Q.  And in the course of the interview, did you ask

14  Dr. Lesniewski about narratives that he prepared for Long

15  Island Rail Road patients?

16  A.  Yes.  Yes, I did.

17  Q.  What did Dr. Lesniewski say about the amount of money he

18  charged to prepare these notes?

19          MR. DURKIN:  Could we have some foundation for the

20  patients?

21          THE COURT:  Mr. Weddle.

22          MR. WEDDLE:  I don't even understand what the request

23  is, but I think the foundation has been laid.  And, your Honor,

24  as I discussed when the jury wasn't present about the manner of

25  questioning on this topic, I think that we are well situated to

D7jdles7                              Del Favero - direct

 1   just go ahead with these questions.

 2              THE COURT:  All right.  Proceed.

 3   BY MR. WEDDLE:

 4   Q.  What did Dr. Lesniewski say about the amount of money he

 5   charged to prepare these narratives?

 6   A.  He stated he charged 850 to $1,000.

 7   Q.  During this interview, did Dr. Lesniewski also refer to

 8   these narratives by another term?

 9   A.  Yes, he did.

10   Q.  What was that?

11   A.  Summaries.

12   Q.  What did Dr. Lesniewski say was the purpose for doing these

13   narratives or summaries?

14   A.  He stated that the purpose was for disability benefits.

15   Q.  What did he say about how he prepared summaries for

16   disability benefits purposes?

17   A.  He stated that he highlighted the summaries to bring things

18   home.  He stated that he expounded on the complaints and

19   symptoms of the patients.

20   Q.  And when he was talking about the complaints and symptoms

21   of patients, did he refer to these things as positives or

22   negatives?

23   A.  Positives.

24   Q.  What did he say about his understanding of the incentives

25   of his Long Island Rail Road patients?

1    A.  Well, he stated that they had a secondary -- let me take a

2    second to think.  I want to get this right.

3         (Pause)

4         He said they had a secondary gain and that was to get

5    disability benefits.

6    Q.  What did Dr. Lesniewski say about what tests he would order

7    for patients who had minimal findings?

8    A.  He stated he would order an MRI.

9    Q.  What did he admit doing in his writeups for patients with

10   minimal findings?

11   A.  If they had minimal findings, then he would write the

12   narratives with subjective findings, and he would put in there

13   their complaints of pains for their back, their neck and so on,

14   etc.

15   Q.  Did Special Agent Rossignuolo ask Dr. Lesniewski to

16   estimate how many employees he prepared paperwork for

17   incorrectly?

18        MR. DURKIN:  Objection.

19        THE COURT:  Rephrase the question.

20   Q.  What kind of estimate of how many employees -- withdrawn,

21   your Honor.

22        Did Special Agent Rossignuolo ask Dr. Lesniewski to

23   what extent he prepared the paperwork in the manner that you've

24   just described?

25   A.  Yes, he did.

D7jdles7                              Del Favero - direct

1    Q.  And what was the estimate that Dr. Lesniewski gave during

2    the part of the interview where you were asking him -- where

3    Special Agent Rossignuolo was asking him questions and he was

4    answering them and you were taking notes?

5    A.  25 to 30 percent.

6    Q.  Did you also talk to Dr. Lesniewski about medical

7    assessment forms?

8    A.  Yes, we did.

9    Q.  And what's the name of a medical assessment form?

10   A.  It is a G-250.

11           MR. WEDDLE:  And if we could just put one on the

12   screen.  This is in evidence from Mr. Gagliano.  I think it is

13   101B, as in boy.

14   Q.  Is this a G-250 form, a medical assessment?

15   A.  Yes, it is.

16   Q.  Do you know if you had this particulars one with you?

17   A.  No, I don't recall which ones we had with us.  We just took

18   a random sample.

19           MR. DURKIN:  Judge, I object, then.

20           Could we be heard?

21           THE COURT:  Yes.

22           (Continued on next page)

23

24

25

D7jdles7                          Del Favero - direct

1            (At the sidebar)

2            THE COURT:  Yes.

3            MR. DURKIN:  The specific problem I had with the last

4     question is that if he doesn't have a recollection of which

5     files they had, I object to them using a file from this case.

6     They can use a blank form if they want to ask about the

7     question.  But I strongly object to the use of, for example,

8     Mr. Gagliano's as if that's one of the ones that he was

9     puffing, or whatever they are going to say he used.  That is

10    just not fair.

11           If he doesn't know what files they brought, that's

12    their problem, but they can't get to pick one and put it up

13    there.

14           MR. JACKSON:  Ms. Baran joins in that application.

15           MR. DURKIN:  The second problem I have is that they're

16    way beyond the issues that they represented --

17           MR. DRATEL:  It is on the page before.  It's

18    double-sided.

19           MR. DURKIN:  I'm not used to these documents.

20           But these are the three things that they said.  I'm

21    showing you their pleading now that they filed on June 14,

22    2013, and I'm referring to page 18 and 19.  At the bottom it

23    starts this is what they're going to elicit from the report.

24           (Pause)

25           And this was getting pretty far afield from that.

D7jdles7                           Del Favero - direct

1            THE COURT:  Mr. Weddle.

2            MR. WEDDLE:  Your Honor, I don't have the motion in

3    front of me.  When I prepared my Q and A for this witness, I

4    did have the motion in front of me and I made sure that

5    everything that I was asking him about was listed in the

6    motion.  Some of the things are repeated in the written

7    statement and, as he just said, it is the same statement, and

8    it is completely within the motion as we moved.

9            I mean, I think that they could have raised this at

10   some other point but, you know, this is all right within the

11   motion.  These are statements by Dr. Lesniewski, and we are

12   offering them as defendant's admissions, and it is exactly what

13   we moved on.

14           MR. DURKIN:  But the problem is, Judge, you made a

15   ruling based on certain representations that they said they

16   were going to follow with respect to the statement.  If they

17   start expanding the horizon of the statement, then we should be

18   permitted to put other portions of the written statement in to

19   show the difference between the oral statement and the written

20   statement.

21           THE COURT:  Let's not reopen that issue.

22           MR. DURKIN:  I don't want to, but that's why I don't

23   understand --

24           THE COURT:  Just remain within the questions that were

25   part of the motion, and that way we will avoid problems.

 1            MR. WEDDLE:  I am, your Honor.  There is a footnote in

 2     our motion that I think Mr. Durkin is ignoring.  It wasn't

 3     clear to me from what he said when he handed your Honor a

 4     brief, which I couldn't see and he was pointing at it, but I

 5     believe that the part that he failed to read in our motion is

 6     the footnote on page 18, which says that the same type of

 7     estimate visit is an estimate that's described in the text of

 8     the motion that's from the written statement about what

 9     proportion of applications Dr. Lesniewski lied on.  And the

10     footnote says he gave an even higher estimate in his oral part,

11     which the government also intends to elicit, and we're doing

12     exactly that, your Honor.

13            If I could add, your Honor --

14            MR. DURKIN:  They just said -- I think the statement

15     says 20 percent, and they have just elicited 25 to 35, right?

16     Isn't that what he just said?

17            THE COURT:  He said 20 to 25.

18            MR. DRATEL:  What they said they were just going to

19     report is very limited, and they want to do it from the report

20     and again from his written statement.  They've gone through

21     already what they said they would do for the statement.  What

22     they say in the report that they are going to elicit from the

23     report, there is nothing about G-250s, nothing.

24            MR. WEDDLE:  Your Honor, if the statement -- if he

25     says the same statement both in the written statement and

D7jdles7                          Del Favero - direct

 1   orally, then that's covered by the motion.  We said we intended

 2   to elicit the statements, and if it is the same statement, I

 3   think we should have raised this two weeks ago, your Honor,

 4   because we moved on this.

 5            THE COURT:  Let's move on.  If it is the same

 6   statement, I will allow it.

 7            MR. JACKSON:  Judge, I ask that the document that they

 8   are using --

 9            THE COURT:  The document is a sample rather than

10   Mr. Rossignuolo's particular one?

11            MR. WEDDLE:  I think he does know which ones he

12   brought.  I was just putting it up to show them what a G-250

13   was.  They have seen them before.

14            THE COURT:  He acknowledged that this is a G-250.  Do

15   you need anything more than that?

16            MR. WEDDLE:  No.  Is Mr. Durkin going to start pulling

17   pout G-250s on cross-examination?

18            MR. DURKIN:  No, I am not.

19            MR. WEDDLE:  Your Honor, I strongly object to defense

20   counsel sitting in their chair and requesting that the

21   government ask additional questions that are completely not

22   required by the Rules of Evidence.

23            THE COURT:  All right.

24            MR. WEDDLE:  A foundation is a foundation.  If the

25   witness is competent and knowledgeable to testify, he or she

D7jdles7                          Del Favero - direct

1    can testify.  He doesn't have to first give a date.  He doesn't

2    have to first give a location for where the interview took

3    place.

4              If Mr. Durkin thinks that that's relevant on

5    cross-examination and he wants to go into it and it is within

6    the scope and it is otherwise relevant to the testimony, he can

7    go into it.  He doesn't get to sit in his chair and call out

8    ways that he would like me to redo my questioning.

9              MR. RYAN:  Your Honor, I would like to just state, on

10   behalf of Mr. Rutigliano, I object to the use of this Gagliano

11   document being used by this witness.  I cannot cross-examine

12   Dr. Lesniewski as to what file he was shown and the

13   circumstances of it.  That is a fundamental problem for

14   Mr. Rutigliano.

15             THE COURT:  All right.  Let's just put on the record

16   that this form was there as a sample and we will take it down.

17   All right?

18             MR. WEDDLE:  Yes, your Honor.

19             (Continued on next page)

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Mr. Weddle.

3   BY MR. WEDDLE:

4   Q.  What did Dr. Lesniewski say about what kinds of

5   restrictions he would put on medical assessment forms for his

6   Long Island Rail Road patients?

7   A.  He stated that he put down that they could not bend, they

8   could not lift, they could not sit, they could not walk.

9           MR. WEDDLE:  May I have a moment, your Honor?

10          THE COURT:  Yes.

11          (Pause)

12  BY MR. WEDDLE:

13  Q.  And on what proportion of the medical assessment forms for

14  Long Island Rail Road patients did Dr. Lesniewski admit doing

15  that?

16  A.  He stated, all of them.

17  Q.  What did Dr. Lesniewski say about whether he regretted

18  putting those restrictions on the forms?

19  A.  He stated that if he was going to fill out those forms now,

20  he would not have said that.

21  Q.  Did Dr. Lesniewski say whether his understanding of the

22  reason Long Island Rail Road employees were coming to him

23  played into his putting those restrictions on the forms?

24  A.  Yes.

25  Q.  What did he say about that topic?

D7jdles7                         Del Favero - direct

1    A.  He stated that he knew that he was seeing all these

2    patients from Long Island Rail Road just to get a disability.

3    Q.  What did he say about whether his Long Island Rail Road

4    patients wanted to have their problems fixed?

5    A.  He stated that on some of his patients that he knew that

6    surgery would have corrected their problems, but they declined

7    to have the surgery because they were afraid that they would

8    lose their disability or not get their disability if they were

9    corrected.

10   Q.  After you had discussed these topics with Dr. Lesniewski,

11   did he agree to give a written statement?

12   A.  Yes, he did.

13   Q.  How did that statement get prepared?

14   A.  That statement was typed on his computer in his office by

15   Special Agent Rossignuolo.

16   Q.  And as Special Agent Rossignuolo was typing it, did he

17   describe what he was typing?

18   A.  Yes, he did.

19   Q.  And to what extent did Dr. Lesniewski have input on the

20   language while he was typing it?

21   A.  Well, he had input while it was being typed, and then after

22   it was typed he read sentence by sentence and made changes to

23   it.

24   Q.  And what did you or Special Agent Rossignuolo do when

25   Dr. Lesniewski requested changes in the wording or --

1    A.   Then Rossignuolo would make the changes right on the

2    computer.

3    Q.   What if the changes that he requested differed from what

4    Dr. Lesniewski had just said to you in the interview portion of

5    the --

6    A.   Then we would still make those changes because that was his

7    statement.

8    Q.   After Special Agent Rossignuolo typed up the statement,

9    what did he tell Dr. Lesniewski to do with it?

10   A.   He printed it out and then he had him sign it -- read it

11   again and then sign it.

12          MR. WEDDLE:   If I may approach and hand the witness

13   Government Exhibit 1, your Honor?

14          THE COURT:   Yes.

15   Q.   Sir, is this a redacted copy of the statement?

16   A.   Yes, it is.

17   Q.   And if you look at the end of it, is your signature there?

18   A.   Yes.

19          MR. WEDDLE:   The government offers Government Exhibit

20   1?

21          THE COURT:   Mr. Durkin?

22          MR. DURKIN:   No objections other than whatever, Judge.

23          THE COURT:   All right.   Thank you.   Admitted without

24   objection.

25          Mr. Jackson?

D7jdles7                          Del Favero - direct

1          MR. JACKSON:  Yes, Judge.

2          THE COURT:  Mr. Ryan?

3          MR. RYAN:  None other than previously stated.

4          THE COURT:  Admitted without objection.

5          (Government's Exhibit 1 received in evidence)

6          THE COURT:  Let me -- are you going to publish this?

7          MR. WEDDLE:  If I may, your Honor.

8          THE COURT:  All right.  Before it is published, let me

9     address the jury as to this document on a subject that I will

10    return to at greater length during my instructions.

11          You will note that the government is going to publish

12    a document that has been redacted.  That means that certain

13    portions of the document are crossed out, blacked out.  There

14    are many reasons why evidence introduced in a trial in

15    documents of this kind may be redacted.  There may be matters

16    in the redacted portions that are totally irrelevant to what's

17    at issue here.  If, for example, there was some discussion

18    about the weather or about who won the ballgame the day before

19    or some other such material, it is not relevant, it is not

20    necessary.  We limit the evidence that's introduced, especially

21    by documents, to whatever is necessary and relevant and

22    material to the case.

23          Sometimes statements are made during the course of

24    conversations that may contain double, triple or quadruple

25    hearsay.  That, too, is not material that would be admissible

1    if it would be testified to by a witness, and, therefore, we

2    would strike any such material from a document that you would

3    see, again, to make sure that what's permitted in the version

4    that you see is only that portion that's relevant and

5    admissible at trial under the Rules of Evidence.

6              So what you will see is what's been admissible, and

7    you are not to speculate or to conjecture in any way as to what

8    may have been in the balance of the document that's not there.

9              Mr. Weddle.

10             MR. WEDDLE:  Thank you, your Honor.

11             Ms. Chen, could you put that on the screen, please,

12   and let's blow up the -- great.

13             May I just read it for the record, your Honor?

14             THE COURT:  Yes.

15             MR. WEDDLE:  "The special agents showed me narratives

16   that I prepared for Long Island Rail Road employees.  The

17   narratives that I prepared generally concluded with a statement

18   stating that 'It can stated with a reasonable degree of medical

19   certainty that the patient is disabled for his occupation with

20   the Long Island Railroad.' I put this statement on the

21   narratives to ensure that the patient would receive his

22   occupational disability.

23             "I have advised the special agents that this

24   information was exaggerated on approximately 20 percent of the

25   narratives.  If I were to prepare the narrative now, I would

1    not have made this statement.

2              "The special agents also showed me the Form G-250,

3    medical assessments, that I have completed for some of my

4    patients.  I advised that there would be approximately

5    20 percent of the G-250s that I completed I exaggerated the

6    restriction on question number 21, 'Describe in detail any type

7    of exertional restriction (e.g. limitations on lifting,

8    standing, walking, sitting, stooping, crouching, climbing,

9    etc.)  For example, on approximately 20 percent (or 25 to 30

10   cases) of the G-250s, I would not have stated the absolute

11   statement, 'no heavy lifting, no bending, no lifting.' I knew

12   that by inserting this language would aid in their receiving an

13   occupational disability benefit from the U.S. RRB.

14             "The signatures on the G-250's are mine.  I was paid

15   approximately $850 to $1,000 for each narrative that I

16   prepared.  The narratives that I prepared highlighted the

17   patient's problems to aid them or to bring it home that they

18   would obtain their disability from the U.S. RRB.  Some of the

19   MRIs had minimal findings but I would insert subjective

20   complaints, not objective findings of pain.  The patient had

21   too much secondary gain not to exaggerate their symptoms and

22   problems."

23   BY MR. WEDDLE:

24   Q.  Sir, when you were there in the office with Dr. Lesniewski,

25   did you observe him signing this document?

1   A.  Yes, I did.

2   Q.  And where is his signature on the screen?

3   A.  It's the top one, the top right.

4   Q.  The uppermost one.  Is that it?  Whose signature is that?

5   A.  That's mine.

6   Q.  Above that?

7   A.  That's the Doctor's, Dr. Lesniewski.

8            MR. WEDDLE:  Nothing further, your Honor.

9            THE COURT:  Mr. Durkin?

10           MR. DURKIN:  Judge, we have no questions at this time.

11           THE COURT:  Mr. Jackson?

12           MR. JACKSON:  None whatsoever.  Thank you.

13           THE COURT:  Mr. Ryan?

14           MR. RYAN:  None.  Thank you.

15           THE COURT:  Thank you.  You may step down.  You are

16  excused.

17           (Witness excused)

18           MR. DURKIN:  Judge, we need to be heard very briefly.

19  I have a minor issue.

20           (Continued on next page)

21

22

23

24

25

1              (At the sidebar)

2              MR. DURKIN:  Could I just ask that he remain subject

3    recall in the event that we put a case on?  I know you just

4    excused him, but I would like to make sure that he is available

5    to us if we need to call him later.

6              MR. WEDDLE:  I'm sure he is available, but I have no

7    idea why they would be allowed to recall him.

8              THE COURT:  Do you want him to tell you his defense at

9    this point?  I don't think he would.

10             MR. WEDDLE:  If he has cross-examination, he can do it

11   on cross-examination, but he doesn't want to cross him and he

12   wants to call him as a witness to talk about other things.

13             THE COURT:  If he puts on a direct case, he is

14   entitled to call a witness.

15             MR. WEDDLE:  He will certainly be available, your

16   Honor.  We wouldn't object.

17             MR. DURKIN:  Thank you.

18             (Continued on next page)

19

20

21

22

23

24

25

D7jdles7

```
 1              (In open court)

 2              THE COURT:  Next witness.

 3    ROBERT ELLENSOHN,

 4         called as a witness by the government,

 5         having been duly sworn, testified as follows:

 6              THE COURT:  Please be seated.  Speak into the

 7    microphone as closely as possible.

 8              State your name and spell it for the record.

 9              THE WITNESS:  Robert Ellensohn, E-l-l-e-n-s-o-h-n.

10              THE COURT:  Mr. Weddle.

11              MR. WEDDLE:  Thank you, your Honor.

12    DIRECT EXAMINATION

13    BY MR. WEDDLE:

14    Q.  How old are you, sir?

15    A.  59.

16    Q.  Where do you live?

17    A.  Merrick, Long Island.

18    Q.  Do you have a family?

19    A.  Yes.

20    Q.  Who are the members of your family?

21    A.  My wife Gina, my son Brian, and my son Kevin.

22    Q.  How far did you go in school, sir?

23    A.  High school senior.

24    Q.  Where did you go to work after you finished school?

25    A.  I worked with my dad for a year or two and then started
```

1   with the Rail Road.

2   Q.  The Long Island Rail Road?

3   A.  The Long Island Railroad.

4   Q.  What year did you start at the Long Island Rail Road?

5   A.  '74.

6   Q.  What did you do at the Long Island Rail Road?

7   A.  I was a B and B mechanic.

8   Q.  What does that mean, "B and B mechanic?"

9   A.  Bridge and building mechanic.  It is like a carpenter.

10  Q.  And for how long were you a B and B mechanic?

11  A.  Ten years, approximately.

12  Q.  And then what did you do at the Long Island Rail Road after

13  that?

14  A.  I became a B and B inspector, Bridge and Building

15  Inspector.

16  Q.  When did you stop working at Long Island Rail Road?

17  A.  July 1st, 2004.

18  Q.  Did you retire?

19  A.  Yes.

20  Q.  How old were you when you retired?

21  A.  50.

22  Q.  And how many years of service did you have on the Long

23  Island Rail Road when you retired?

24  A.  30 years and a couple of days.

25  Q.  When was your 50th birthday?

1    A.  February 20th.

2    Q.  Of that year?

3    A.  Of that year, right.

4    Q.  Why did you retire later in the year rather than right at

5    your 50th birthday?

6    A.  To get the 30 years of service for Long Island Rail Road.

7    Q.  And so as soon as you got the 30 years of service, that's

8    when you retired?

9    A.  Yeah.  Shortly after that.

10   Q.  Why did you retire right after you got the 30 years of

11   service?

12        (Pause)

13        Why did you retire when you retired?

14   A.  Well, because I went for a disability.

15   Q.  You say you went for a disability.  How did that affect

16   your decision about whether you should retire or not?

17   A.  Well, I went to like some seminars and they discussed that,

18   different ways of retiring, and that was mentioned.

19   Q.  And how did it factor into your decision making in terms of

20   your finances in retirement, if at all?

21   A.  It would keep my finances the same, pretty much.

22   Q.  Please explain to the jury what you mean.

23   A.  Well, I would be -- I was making, say, $60,000.

24        THE COURT:  Mr. Weddle, could we deem this testimony

25   cumulative?  I think we heard it from others.  Assuming there

1   is nothing inconsistent or different than what this witness is

2   saying, let's just move to the next.

3          MR. WEDDLE:  That is fine, your Honor.

4   Q.  And you mentioned that you had learned about the finances

5   regarding retiring and getting occupational disability at

6   seminars.  Did you also hear that from other people who have

7   worked at the Rail Road?

8   A.  Yes.

9   Q.  And what kind disability did you plan to get?

10  A.  Occupational disability.

11  Q.  What does occupational disability mean to you?

12  A.  Can't perform my job.

13  Q.  At the time you retired, were you unable to perform your

14  job duties because of a medical condition?

15  A.  No.

16  Q.  What kinds of documents did you have to submit to get an

17  occupational disability benefit?

18  A.  An application for disability to the Railroad Retirement

19  Board and some other forms, a narrative from a doctor and other

20  forms.  There were other forms; I don't know exactly.

21  Q.  OK.  And collectively, that application set of materials

22  was designed to convince the United States Railroad Retirement

23  Board that you were what?

24          MR. DURKIN:  Leading and cumulative.

25          THE COURT:  Sustained.  Leading.

1   Q.  What were you trying to tell the Railroad Retirement Board,

2   if anything, when you submitted that package of documents?

3   A.  That I was disabled.

4   Q.  Was it true at the time you submitted those documents.

5   A.  No, it was not.

6   Q.  Were the documents that you submitted to the Railroad

7   Retirement Board true or false or something else?

8   A.  They were false.

9   Q.  Who, if anyone, helped you to prepare these false documents

10  for submission to the Railroad Retirement Board?

11  A.  I had a person that did the paperwork, Ed Yule, and I used

12  Dr. Lesniewski.

13  Q.  Do you see the Dr. Lesniewski who helped you with this

14  false application in the courtroom here today?

15          MR. DURKIN:  Objection.  That misstates the evidence.

16          THE COURT:  We don't need the characterization.  That

17  is cumulative.

18          The Court notes -- do you stipulate?

19          MR. DURKIN:  We will stipulate.

20          THE COURT:  We stipulate the presence of

21  Dr. Lesniewski and the identification of the witness.

22  BY MR. WEDDLE:

23  Q.  With Dr. Lesniewski's help, did you in fact get disability

24  benefits from the Railroad Retirement Board?

25  A.  Yes.

D7jdles7                           Ellensohn - direct

1   Q.  About how much money did you get a month from the Railroad

2   Retirement Board in disability benefits?

3   A.  Approximately $3,000 a month.

4   Q.  Did you get in any trouble for submitting these false

5   documents to the Railroad Retirement Board?

6   A.  Yes, I did.

7   Q.  What kind of trouble?

8   A.  A conspiracy to commit fraud against the Railroad

9   Retirement Board, mail fraud and wire fraud.

10  Q.  And how did you resolve the charges against you?

11  A.  I pleaded guilty.

12  Q.  Before you pled guilty, did you enter into a cooperation

13  agreement with the government?

14  A.  Yes, I did.

15  Q.  Was the agreement oral or written down?

16  A.  It was written down.

17  Q.  And would you take a look in your binder.  Do you see

18  3529-04?  Is that your cooperation agreement with the

19  government?

20  A.  Which?

21  Q.  It should be the first document in the binder.

22  A.  OK.

23  Q.  There is a number in the lower right-hand corner.

24  A.  Yes.

25  Q.  3529-04.

1    A.  Yes.

2    Q.  That is your cooperation agreement, right?

3    A.  Yes.

4           MR. WEDDLE:  The government offers it.

5           MR. DURKIN:  No objection.

6           (Government's Exhibit 3529-04 received in evidence)

7    BY MR. WEDDLE:

8    Q.  Does this document contain all the terms and conditions of

9    your agreement with the government?

10   A.  Yes.

11   Q.  Under this agreement, what is your understanding about what

12   you have to do?

13   A.  Be truthful and tell the truth.

14   Q.  Before you signed the cooperation agreement, did you meet

15   with the government?

16   A.  Yes.

17   Q.  And after you signed it, did you meet with the government?

18   A.  Yes.

19   Q.  What happened in those meetings you had with the

20   government?

21   A.  Well, the two meetings were pertaining to this, the first

22   two meetings, and the other two meetings were pertaining to the

23   trial, just general -- how this was probably going to take

24   place and some of the questions that might be asked.

25   Q.  And if you do everything that you are supposed to do under

D7jdles7                          Ellensohn – direct

1    the agreement, what is your understanding of what the

2    government has to do for you?

3    A.  That, hopefully, I won't do jail time.

4    Q.  And how is that going to happen if you live up to your part

5    of the agreement?  What is the government going to do if you

6    live up to your part of the agreement?

7    A.  Something about Section 5K1.

8               (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7JNLES8                          Ellensohn - direct

1    Q.  It is like a letter or something?

2    A.  Yes, a letter.

3    Q.  What is your understanding about what the government writes

4    in this letter, if it writes it?

5    A.  It is going to write that hopefully I don't get jail time.

6    Q.  Who does it send the letter to?

7    A.  To the judge.

8    Q.  What is your understanding about who will actually decide

9    what your sentence will be?

10   A.  The judge makes the ultimate decision on what is going to

11   happen.

12   Q.  As you sit here today, has the government promised that for

13   sure it is going to write this letter?

14   A.  No.

15   Q.  What is your understanding about whether your testimony has

16   to result in a conviction of any of these defendants in order

17   for you to get a letter from the government?

18   A.  There is no -- there is nothing about a conviction of

19   anybody.

20   Q.  Regardless of what sentence you get in terms of prison

21   term, what have you agreed to do with respect to the money that

22   you received as disability benefits?

23   A.  Pay it back.

24   Q.  About how much money?

25   A.  $303,000.

1    Q.  About how long before you retired did you decide you would

2    retire at 30 years of service?

3    A.  I would say about two years I was going to seminars about

4    the retirement, different ways of retiring and what have you.

5    Q.  So as you were considering retiring in the couple years

6    leading up to your 30th anniversary at the railroad what, if

7    anything, did you do to prepare to get disability benefits?

8    A.  I contacted a person that does all the paperwork, and he

9    then led me to Dr. Lesniewski and it all took place from there.

10   Q.  Let's start first with the person you contacted first.  Who

11   was that?

12   A.  Ed Yule.

13   Q.  Who is Ed Yule?

14   A.  He is a guy that was involved with the unions before and

15   just a name that I knew.

16   Q.  Where did you meet with Mr. Yule?

17   A.  I met at his office in Northport.

18   Q.  What did Mr. Yule tell you about the process of obtaining a

19   disability?

20   A.  Well, that I had to go to a doctor and make a paper trail

21   of medical records.

22   Q.  Which doctor, if any, did Dr. Yule tell you you should go

23   to?

24   A.  Dr. Lesniewski.

25   Q.  When did you first go to see Dr. Lesniewski?

1    A.  I believe it was April of 2003.

2    Q.  What do you recall about your first visit with

3    Dr. Lesniewski?

4    A.  Just telling him some of my ailments that I had, some

5    problems that I had.

6    Q.  About how many times did you see Dr. Lesniewski in the year

7    or so before you retired?

8    A.  I would say approximately a dozen, maybe a little more, a

9    little less.

10   Q.  During your visits to Dr. Lesniewski during that time

11   period, what did he do?

12   A.  Sent me for some MRIs, an EMG for the carpal tunnel, and I

13   guess an x-ray here and there.

14   Q.  To what extent did Dr. Lesniewski treat you for any of your

15   complaints?

16   A.  There was --

17            MR. DURKIN:  Judge, we object to the foundation.  This

18   man isn't qualified to answer that.

19            THE COURT:  All right.  You can develop the

20   foundation, Mr. Weddle.

21   Q.  Sir, who was it who was going to see Dr. Lesniewski?  You

22   or somebody else?

23   A.  Me.

24   Q.  Who was it who had conditions, if any, when you were going

25   to see Dr. Lesniewski?  You or somebody else?

1   A.   Me.

2   Q.   When you went to Dr. Lesniewski, you interacted with him,

3   right?

4   A.   Yes.

5   Q.   You said some things to him and he said some things to you,

6   right?

7   A.   Yes.

8           MR. DURKIN:   Object to the leading.

9   Q.   When you went to see Dr. Lesniewski, you told him about

10  some parts of your body that hurt you sometimes, right?

11  A.   Yes.

12  Q.   Did you have any parts of your body that actually did hurt

13  you in any way at that time period?

14  A.   Yes.

15  Q.   What were those?

16  A.   My hands would go numb, shoulder, my neck.  I guess that's

17  about it.

18  Q.   In your visits with Dr. Lesniewski before you retired you

19  told him about those things?

20  A.   Yes.

21  Q.   What, if anything, did Dr. Lesniewski do to treat you for

22  any of those complaints?

23          MR. DURKIN:   Objection.

24          THE COURT:   Overruled.

25  A.   Prescription for Celebrex.

1  Q.  Anything else?

2  A.  He recommended operations.

3  Q.  What operations did he recommend?

4  A.  For my hands for carpal tunnel and an impingement on my

5  shoulder.

6  Q.  Did you have those surgeries?

7  A.  No.

8  Q.  Why not?

9  A.  They didn't bother me enough to have the surgeries.

10  Q.  What was the purpose for which you were going to see

11  Dr. Lesniewski?

12  A.  To help get my disability from the railroad.

13         MR. WEDDLE:  Your Honor, I'm sorry, I forgot to talk

14  about the exhibits that I plan to use during this testimony.

15         Can I just consult with counsel first?

16         THE COURT:  Yes.

17         MR. WEDDLE:  Your Honor, I believe we have an

18  agreement of counsel that I can offer Government Exhibits

19  116-A, 116-B, 116-C, 116-D, 116-H, and 116-L.

20         THE COURT:  Admitted without objection.

21         (Government's Exhibits 116-A, 116-B, 116-C, 116-D,

22  116-H, and 116-L received in evidence)

23         MR. WEDDLE:  If we could just display Government

24  Exhibit 116-H and blow up the handwritten portion.

25  Q.  Sir, do you recall when you first went to Dr. Lesniewski

1   whether you told him that you were planning to retire from the

2   Long Island Rail Road?

3   A.  I am guessing it came up in the conversation.  That's why I

4   went to him.

5   Q.  Did there come time that Dr. Lesniewski gave you a

6   narrative?

7   A.  Yes.

8   Q.  How did you find out that you were definitely going to get

9   a narrative?

10  A.  Ed Yule told me I was having a narrative from the doctor

11  presented to the Railroad Retirement Board.

12  Q.  When did Mr. Yule tell you that?  Before or after you ever

13  went to see Dr. Lesniewski?

14  A.  I am unsure whether it was -- would say probably before.

15  Q.  Then you went to Dr. Lesniewski?

16  A.  Right.

17  Q.  And I think you testified --

18  A.  I had to go to Dr. Lesniewski and I would get a narrative

19  from Dr. Lesniewski.

20  Q.  After you had been going to Dr. Lesniewski a number of

21  times, did there come a time when you actually learned you were

22  getting the narrative?  That it was coming?  It was on its way?

23  A.  Yes.

24  Q.  How did you learn about that?

25  A.  From Ed Yule.

1    Q.  What did he say to you?

2    A.  That you are going to be getting a narrative from

3    Dr. Lesniewski and was there was a fee attached to it.

4    Q.  And what is a narrative?

5    A.  I think it is a summary of all the medical things that were

6    presented to the doctor.

7    Q.  Did you have to pay anything for the narrative?

8    A.  Yes.

9    Q.  What did Mr. Yule tell you you had to pay for the

10   narrative?

11   A.  I believe it was somewhere around $700.

12   Q.  How did you pay the money for the narrative?

13   A.  Cash.

14   Q.  To whom?

15   A.  To somebody in Dr. Lesniewski's office, the receptionist or

16   whatever.

17   Q.  After you got the narrative, what did you do --

18           MR. WEDDLE:  I'm sorry.  Ms. Chen, we're done with

19   that exhibit.  Thank you.

20   Q.  How did you get the narrative physically?

21   A.  I am unsure if I picked it up that day when I gave him the

22   money or if it was delivered to or picked up by Ed Yule.

23   Q.  How many times did you meet with Mr. Yule at his office?

24   A.  In the office twice.

25   Q.  About how long were your meetings with Mr. Yule?

1   A.  Half hour.

2   Q.  So the first time you met with him, was that before or

3   after you ever went to see Dr. Lesniewski?

4   A.  That was before.

5   Q.  The second time you met with him, was that before or after

6   you got a narrative?

7   A.  That was I think after.  I think it was after the

8   narrative.

9           THE COURT:  Mr. Weddle, can we get an estimate of how

10  much longer you will need.  We have about five minutes left

11  today.

12          MR. WEDDLE:  I think I have 30 minutes, your Honor,

13  hopefully less.

14          THE COURT:  Let's take five more then.

15  Q.  What did Mr. Yule do for you as part of this process of

16  getting a disability, besides telling you to go see

17  Dr. Lesniewski?

18  A.  He put all the paperwork together and presented it to the

19  Railroad Retirement Board.

20  Q.  Were there any forms that he filled out for you?

21  A.  I am sure there were, yeah.  There were forms.

22  Q.  How closely did you read the materials that were going to

23  the Railroad Retirement Board on your behalf at the time before

24  they were submitted to the Railroad Retirement Board?

25  A.  Not very closely.

1   Q.  But, in general terms, what was your understanding of what

2   the forms and the rest of the package would say in terms of

3   whether you could do your job?

4   A.  They said that I couldn't do my job.

5   Q.  Was it true at the time?

6   A.  Was it true at the time?  No.

7   Q.  When you met with Mr. Yule, what do you recall, aside from

8   telling you to go see Dr. Lesniewski, what do you recall him

9   saying to you and you saying to him about your occupation?

10  A.  I told him I was a B & B inspector, at one time was a

11  mechanic and I became an inspector, but I was retiring as an

12  inspector.

13  Q.  And do you recall what he said when you told him that you

14  were a B & B inspector?

15  A.  No.

16  Q.  Did Mr. Yule ask you about your activities of daily living?

17  A.  No.

18  Q.  How did you actually apply for the disability?  How did you

19  officially apply?  Where were you?

20  A.  I went to the Railroad Retirement Board with Ed Yule.

21  Q.  When you went to the Railroad Retirement Board -- sorry.

22  Which office of the Railroad Retirement Board did you go to?

23  A.  Westbury.

24  Q.  What happened when you went to the Westbury office with

25  Mr. Yule?

1    A.  We met and then we met another person in a small room, and

2    paperwork was all signed and finalized handed over and we

3    just -- I just waited.

4    Q.  You said you met I guess with Mr. Yule and yourself and

5    another person.  Who was the other person?

6    A.  I don't know who he was.  Somebody -- a representative of

7    the Railroad Retirement Board.

8    Q.  What happened or how long was that meeting in the small

9    room?

10   A.  No more than a half hour.

11   Q.  What happened during that meeting?

12   A.  It was paperwork signed and handed over and passed around

13   and --

14   Q.  Did anyone go through the paperwork with you in any detail

15   and ask you what your answers were to each of the questions?

16   A.  No.

17   Q.  Did you have to pay he had Yule for his assistance in

18   creating this false application?

19   A.  Yes.

20   Q.  How much did you pay Ed Yule?

21   A.  I believe it was a thousand dollars.

22   Q.  How did you pay him?

23   A.  Cash.

24   Q.  Why did you pay him cash?

25   A.  That's what he wanted.

1             MR. WEDDLE:  I was going to start looking at a couple

2     of these documents, your Honor.  Should we break now?

3             THE COURT:  If this is a logical place to stop.

4             MR. WEDDLE:  It is.

5             THE COURT:  We will stop and we will resume on Monday

6     at 9:00.

7             Let me remind the jury once again do not discuss the

8     case amongst yourself or anyone else on the outside or have any

9     contact of any kind with anyone related to the case or do any

10    research.  If any of these things occur, you are to inform me

11    immediately and not discuss it with your fellow jurors.

12            Thank you very much for your patience, forbearance for

13    being a model jury insofar as timeliness.  Let us maintain that

14    on Monday morning.  When you come in we'll give you some

15    estimate of where we are.  I think that we've made substantial

16    progress in the last couple days, but I can give you a better

17    estimate the early part of next week.

18            Thank you again.

19            (Continued on next page)

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  You may step down.  You are excused for

3     today.

4              THE WITNESS:  Thank you.

5              (Witness not present)

6              THE COURT:  All right.  Mr. Weddle, can we preview the

7     lineup for Monday after Mr. Ellensohn.

8              You still have Mr. Robert Murray.  You think you need

9     another half hour or so with Mr. Ellensohn.

10             MR. WEDDLE:  I think so, your Honor.

11             THE COURT:  What is the defense estimate of cross on

12    Mr. Ellensohn.

13             MR. DURKIN:  Certainly not any longer than the others,

14    Judge.  Maybe even shorter.

15             THE COURT:  Roughly a half hour?

16             MR. DURKIN:  45 at the most.

17             THE COURT:  Anyone else?

18             MR. JACKSON:  Minimal, Judge.

19             THE COURT:  Let's say that we will finish

20    Mr. Ellensohn around 10 on Monday and then we have Mr. Murray.

21             Mr. Weddle, you said Mr. Murray you had about an hour?

22             MR. WEDDLE:  That's right, your Honor.  I guess the

23    main reason, we were kind of taking Mr. Murray out of order

24    because other witnesses weren't here, but why don't we just for

25    now leave it with Murray.  We've talked about that.

1              Then after Mr. Murray would be Mr. Maher.

2              THE COURT:  How long?

3              MR. WEDDLE:  Oh, how long --

4              THE COURT:  Is he another retiree?

5              MR. TEHRANI:  Yes, your Honor, probably about the

6     same, although we will be able to streamline it given the

7     cumulative nature of some of the testimony.

8              THE COURT:  And after that?  That is an hour.  We are

9     now up to 11:30 or thereabouts.

10             MR. WEDDLE:  Your Honor, it is only taking me a minute

11    to answer because the speed that we are going at is probably

12    twice as fast as any of us predicted.

13             THE COURT:  That is very encouraging.

14             MR. WEDDLE:  It's very encouraging.  I haven't had a

15    minute to take a breath since we started with the testimony.

16             So we can reevaluate all of our time predictions.

17             MR. JACKSON:  Which goes to show how smart of a man

18    Joe Ryan is.

19             MR. RYAN:  I take no credit for that.  It's the judge.

20             MR. WEDDLE:  I think after Mr. Maher would be Regina

21    Walsh.  Your Honor will recall that there is an outstanding

22    issue with respect to Ms. Walsh with respect to the conflict of

23    interest involving Mr. Ryan.

24             He has not cross-examined certain of the witnesses, so

25    it may not be an issue to the extent Mr. Rutigliano does not

1     want to cross-examine Ms. Walsh, but that would be the next

2     witness.

3                THE COURT:  How long do you think you would need for

4     Ms. Walsh?

5                MS. FRIEDLANDER:  The same as the others, your Honor.

6     She is a retiree.

7                THE COURT:  All right.  So we are now in the morning

8     of Monday.  Let's go into the afternoon.

9                MS. FRIEDLANDER:  That was all just the morning

10    Monday?

11               THE COURT:  As you said, we are going twice as fast.

12               MR. WEDDLE:  If that's just the morning, that's like

13    four times as fast, your Honor.

14               Your Honor, we are now talking about witnesses that we

15    had on our calendar for late next week.

16               THE COURT:  They are only a phone call away.

17               MR. WEDDLE:  Well, some of them are out of town, so I

18    need to get some flights arranged and get them all in and

19    things like that.  But I think probably after Walsh would be

20    probably Special Agent Cuocci, your Honor.

21               THE COURT:  All right.

22               MR. WEDDLE:  I don't know what the

23    cross-examination -- we have seen some of the cross-examination

24    for the retirees.  I don't know what the cross-examination is

25    going to be for Robert Murray, who is presenting government

1    exhibits in the 21 range, a few summary charts.

2            Special Agent Cuocci is I think summarizing some

3    documents and presenting statements of Marie Baran made in an

4    interview.  It is hard for me to predict.  I don't think we

5    have a model from this trial on how long the cross-examination

6    is going to take on witnesses like that.

7            THE COURT:  Let's assume that it will be in the same

8    cooperative spirit that they have shown repeatedly up to this

9    point, so let's see if we can perhaps get in one more witness

10   on Monday after Mr. Cuocci.

11           MR. WEDDLE:  Another one after Special Agent Cuocci?

12   I don't think we are going to finish all of them.  I guess it

13   would be -- one witness I know that we would had otherwise

14   planned to call late next week I know is away at the beginning

15   of next week.  I am looking at my list.  We could call some

16   custodial witnesses.  We can call some custodial witnesses I

17   think.

18           THE COURT:  Why don't we assume that you'll get

19   through Agent Cuocci and then on Monday morning you let us know

20   whether you think you will need any more.

21           MR. WEDDLE:  Sure.  Your Honor, I have a couple of

22   things that I would like to raise.

23           THE COURT:  Yes.

24           MR. WEDDLE:  I mentioned to your Honor I wanted to

25   talk and explain a little bit about courtroom mechanics.  This

1    came up during the cross-examination by Mr. Ryan.  You guys can

2    all probably sit down.

3              I thought it was completely inappropriate the way that

4    Mr. Ryan acted in front of the jury when he was dealing with

5    his defense exhibits and started saying audibly to the jury and

6    to the rest of the room incredulously that the government had

7    these documents and suggested that we should be able to just

8    pop them up on the screen immediately.

9              We have two dedicated paralegals here, Ms. Annie Chen

10   and Ms. Emma Larson.  They are doing an extraordinary job under

11   difficult circumstances, and the presentation of government

12   exhibits has been entirely seamless.

13             I specifically talked to Mr. Ryan while we were here

14   for the Curcio hearing, your Honor, about this issue.  He asked

15   how are we going to display things.  I said the government is

16   going to display things using this software that we are

17   using -- and now I'm forgetting the name of it -- Sanction.  We

18   are going to display it on the screen.

19             He said, What am I supposed to do with my exhibits?

20             I said, You can just plug your computer in and display

21   them using any kind of software you would like.  You can put

22   them on the Elmo.  I suggested today that he put them on the

23   Elmo.  He, frankly, I think put on a big show in front of the

24   jury, totally inappropriately, as if it was the government's

25   fault for not displaying defense exhibits that he has produced

1    to us, as he's obligated to do in discovery.

2             He produced them to us recently, perhaps Monday

3    morning, but he can display his exhibits.  We're happy to be

4    helpful.  We've been helpful to every other counsel here.

5             But to stand up in front of the jury and somehow

6    suggest that our paralegals are at fault for not displaying his

7    material on the screen is offensive, your Honor.

8             If he would like to discuss it with us again, as I

9    already did at his Curcio hearing, which happened -- I can't

10   now remember -- probably two weeks ago, we can do that again.

11            He's fully capable, I assume, of using the Elmo.  He

12   was capable of doing the cross-examination that he did today.

13   But putting on an act like this in front of jury is akin to

14   what is expressly prohibited by your Honor's individual rules,

15   which is as if a lawyer is standing in front of jury calling

16   for a stipulation or something like that, reading out a list of

17   exhibits which he had handed to us on a Post-it.  Frankly, when

18   I read the Post-it, I thought there were a number of exhibits

19   there which I couldn't read.

20            I thought that he was planning to offer three or four

21   claim files.  Apparently, I was misreading the Post-it because

22   I was reading it as Defense Exhibit 41 and it was really 61 or

23   something like that.

24            But when we do these things, when we offer exhibits

25   without objection from the defense, we first consult with the

1    defense, and we do it quietly, not in the hearing of the jury

2    and not with a big show of body language, which is completely

3    offensive and inappropriate, your Honor.

4            THE COURT:  Thank you.

5            Mr. Ryan.

6            MR. RYAN:  Your Honor, I perhaps operated on a

7    misapprehension.  On Monday we gave the government a disk of

8    all the defense exhibits R 1 to R 66, consistent with the

9    understanding that we had a discussion with Mr. Weddle that

10   they would accommodate us and show the exhibits through their

11   own staff.

12           I was nice about it, and I had operated on that

13   assumption that they had our disk, they had all the

14   photographs, which they do have, and I thought that was the way

15   we were going to operate.  I was frustrated --

16           MR. WEDDLE:  He was certainly not nice about it.

17           MR. RYAN:  Because the photographs are in evidence, I

18   didn't want to delay anything by having to go through a process

19   that was really not necessary for the limited time.

20           I think it is a learning experience.  I'm sorry the

21   government was offended, but it was a frustrating thing for the

22   prosecutor to say that we don't have these exhibits when they

23   had them on Monday on a disk.

24           I did everything I could.  I gave them a list.  I gave

25   them all the pictures.  What I was using they had.  The

1   question is how to use it.  This morning I gave an e-mail to

2   Mr. Justin Weddle at 7 o'clock about a number of exhibits I

3   intended to use in the cross-examination of Parlante, and then

4   I supplemented it with a Post-it this morning.

5              So I am doing the best I can to give the government

6   the notice of the exhibits that I wanted to use, and I did want

7   to use them.

8              MR. WEDDLE:  Your Honor, we never had a discussion --

9              THE COURT:  Mr. Weddle, let's not prolong it.  Why

10  don't we just write it off to a misunderstanding.

11             MR. WEDDLE:  I suggest that Mr. Ryan displays --

12             THE COURT:  I am sure Mr. Ryan will do his best to

13  avoid any similar displays, and I am sure that you will do your

14  best to accommodate the defendants in this misunderstanding.  I

15  know that the government has, I believe, done a good job in

16  putting up the exhibits at the request of defendants, so this

17  is an exception.

18             All right.

19             MR. JACKSON:  Judge, if I might just say, we certainly

20  appreciate the hard work of the paralegals here, Ms. Chen as

21  well as Ms. Larson, in getting the exhibits up.  So that

22  cooperative effort, I hope that continues, and will maybe move

23  forward.

24             THE COURT:  Let's not hope.  We know that it will.

25             MR. DRATEL:  Your Honor, just one thing.  The Court

D7JNLES8                        Ellensohn - direct

1   said Monday morning if there is an additional witness they

2   could identify it.  I would just ask, because we come here with

3   a lot of materials, etc., we want to keep it moving, if we

4   could be informed Sunday night by e-mail, that would be great

5   so we could have materials ready for any other witness beyond

6   Agent Cuocci.

7            THE COURT:  All right.  That is fair enough.

8            MR. DRATEL:  Thank you.

9            MR. DURKIN:  There is only one other thing, and I have

10  discussed this with the government.  I think we have an

11  understanding.  Remember I mentioned to you I have to be in

12  Chicago on Tuesday.

13           THE COURT:  Yes, you did.

14           MR. DURKIN:  I am hoping to leave Monday night so I

15  can avoid the weather.  I have to be there for something in

16  southern suburbs at like 6 o'clock.

17           So I would prefer not to have to be here on Tuesday.

18  I think, if I heard correctly from Mr. Weddle, they will be

19  able to accommodate me.  I would like to be able to make my

20  reservation.

21           THE COURT:  What exactly --

22           MR. DURKIN:  The only witness I'm asking that they not

23  call that I am responsible for that I expect in the immediate

24  future is Mr. Fitzpatrick.

25           THE COURT:  On Tuesday you mean?

1           MR. DURKIN:  On Tuesday.

2           THE COURT:  Mr. Weddle, is there any reason why

3    Mr. Fitzpatrick could not be put off until Wednesday?

4           MR. WEDDLE:  No.  That is fine, your Honor.

5           THE COURT:  All right.

6           MR. DURKIN:  Thank you.

7           MR. WEDDLE:  Your Honor, just a couple of things.  We

8    just wanted to remind your Honor that, with respect to

9    Mr. Maher, the motion to preclude cross-examination about

10   certain materials that was filed with respect to all the

11   witnesses I think is of particular import at least with respect

12   to Mr. Maher, who is on -- we have him on not next, but right

13   after that.  So if we could get a ruling on that, that would be

14   helpful.  That motion is filed under seal, your Honor.

15          THE COURT:  All right.

16          The ruling on Mr. Maher is the same as that of any

17   other of the witnesses pursuant to which there have been

18   motions in limine.  To the extent that the matters that are of

19   concern are not convictions or material to the trial or in any

20   way deal with questions of credibility, cross-examination of

21   those matters or delving into them will not be permitted.

22          MR. JACKSON:  Thank you, Judge.

23          MR. WEDDLE:  Your Honor, if your Honor's articulation

24   is that our motion is granted, that is perfectly satisfactory.

25          THE COURT:  It amounts to that, yes.

D7JNLES8                          Ellensohn – direct

1           Now, have you disclosed to the defense the general

2      nature of your concerns?

3           MR. WEDDLE:  It is in the motion.  They've gotten the

4      motion, but the motion is filed under seal.

5           THE COURT:  Yes.

6           MR. TEHRANI:  It is also in the 3500 material.

7           THE COURT:  All right.

8           One thing, on Monday in the morning I may need to

9      adjourn for lunch early, probably around 11:30, because I have

10     a commitment, a conference call at 11:30 that will last about

11     an hour.  So expect that we will adjourn at around 11:30 for

12     lunch.

13          If we are doing well on time, we can take a slightly

14     longer lunch hour, but just adjust your calendars accordingly.

15          All right.  Thank you.

16          Have a good weekend.

17          (Adjourned to Monday, July 22, 2013 at 9 o'clock a.m.)

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   GARY P. SUPPER

 4   Direct By Mr. Weddle . . . . . . . . . . . 415

 5   Cross By Mr. Durkin  . . . . . . . . . . . 420

 6   Recross By Mr. Durkin  . . . . . . . . . . 462

 7   Redirect By Mr. Weddle . . . . . . . . . . 467

 8   CHRISTOPHER PARLANTE

 9   Direct By Ms. Friedlander  . . . . . . . . 475

10   Cross By Mr. Ryan  . . . . . . . . . . . . 555

11   Cross By Mr. Jackson . . . . . . . . . . . 577

12   Cross By Mr. Durkin  . . . . . . . . . . . 604

13   Redirect By Ms. Friedlander  . . . . . . . 644

14   Recross By Mr. Ryan  . . . . . . . . . . . 647

15    Recross By Mr. Jackson  . . . . . . . . . 647

16   JOSEPH DEL FAVERO

17   Direct By Mr. Weddle . . . . . . . . . . . 656

18   ROBERT ELLENSOHN

19   Direct By Mr. Weddle . . . . . . . . . . . 677

20                        GOVERNMENT EXHIBITS

21   Exhibit No.                          Received

22    3506-5, 1109, 104A, B, C, D, E, G and . . . . 475

23           J, 1107, 304A, 720,

24   1  . . . . . . . . . . . . . . . . . . . . 672

25   3529-04  . . . . . . . . . . . . . . . . . 683
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    116-A, 116-B, 116-C, 116-D, 116-H, and 116-L  689

2                       DEFENDANT EXHIBITS

3    Exhibit No.                              Received

4    R34  . . . . . . . . . . . . . . . . . 571

5    R32  . . . . . . . . . . . . . . . . . 574