D7mnles1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                    New York, N.Y.

4               v.                               S14 11 Cr. 1091 (VM)

5   PETER LESNIEWSKI, MARIE BARAN
    and JOSEPH RUTIGLIANO,
6
                Defendants.
7
    ------------------------------x
8

9                                                July 22, 2013
                                                 9:00 a.m.
10

11  Before:

12                      HON. VICTOR MARRERO,

13                                               District Judge

14
                            APPEARANCES
15
    PREET BHARARA
16       United States Attorney for the
         Southern District of New York
17  BY:  JUSTIN S. WEDDLE
         DANIEL BEN TEHRANI
18       NICOLE WARE FRIEDLANDER
         Assistant United States Attorneys
19
    LAW OFFICES OF JOSHUA L. DRATEL, P.C.
20       Attorneys for Defendant Peter Lesniewski
    BY:  JOSHUA LEWIS DRATEL
21       LINDSAY A. LEWIS

22  DURKIN & ROBERTS
         Attorneys for Defendant Peter Lesniewski
23  BY:  THOMAS ANTHONY DURKIN

24

25

D7mnles1

                        APPEARANCES CONTINUED

KOEHLER & ISAACS, LLP
        Attorneys for Defendant Marie Baran
BY:   JOEY JACKSON

JOSEPH W. RYAN, JR.
KEVIN MENEILLY
        Attorneys for Defendant Joseph Rutigliano

            – also present –

Annie Chen
Emma Larson, Government Paralegals


SA Frank LoMonaco, FBI

Yeni Yrizarry, Defendant Baran Paralegal

                            oOo

D7mnles1

1            (Trial resumed)

2            (In open court; jury not present)

3            THE COURT:  Do we have a witness?

4            MR. WEDDLE:  Yes, your Honor.

5            MR. DRATEL:  Your Honor, Ms. Lewis is not here today,

6    but another lawyer in my office Whitney Schlimbach.  She just

7    went to the ladies room, but she will be sitting behind us.

8            THE COURT:  OK.

9            MR. WEDDLE:  Your Honor, I think we need to raise one

10   thing with your Honor.

11           MS. FRIEDLANDER:  Your Honor, one small thing

12   regarding the next witness, Regina Walsh.  Her 3500 reflects a

13   hearsay statement by Ms. Baran to Ms. Walsh after they were

14   arrested while they were in a holding cell waiting to be

15   presented.  The statement is, the 3500 reflects, it says, When

16   woo were in jail, Marie Baran told me Ostap had been very sick.

17   Ostap is Marie Baran's husband.

18           So we asked, because it's hearsay, we asked counsel

19   whether he actually intended to try to cross-examine on that.

20   He indicated he would like to cross-examine on that.  We would

21   ask the Court to preclude questioning on that subject because

22   it's hearsay.  Ms. Walsh, I think we said on Friday she would

23   be the third witness.  She is going to be the next witness up.

24   We let defense counsel know that this weekend.

25           THE COURT:  All right.  Anything else?

D7mnles1

1          Thank you.

2      ROBERT ELLENSOHN, resumed.

3          THE COURT:  Let me remind the witness that he remains

4   under oath.

5          THE WITNESS:  Yes.

6        (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7mnles1

1           (Jury present)

2           THE COURT:  Good morning.  Welcome back, members of

3     the jury.  I hope you had a good weekend.

4           One slight difference in this schedule today.  We are

5     going to break for lunch early, as I have a commitment at

6     11:30.  So we will take the lunch break at 11:30.

7           Mr. Weddle.

8     DIRECT EXAMINATION (Continued)

9           MR. WEDDLE:  May I proceed, your Honor?

10           THE COURT:  Yes.

11           MR. WEDDLE:  Thank you, your Honor.

12     BY MR. WEDDLE:

13     Q.  Mr. Ellensohn, good morning.

14     A.  Good morning.

15     Q.  When we broke on Friday we were about to start talking

16     about some documents.  Could you just remind the jury whether

17     you reviewed the documents that went into your application

18     package in detail at the time they were submitted?

19     A.  No.

20     Q.  In connection with preparing to testify have you gone

21     through them in detail?

22     A.  Yes.

23           MR. WEDDLE:  If we could, your Honor, we'll start with

24     Government Exhibit 116-H, which is in evidence.

25     Q.  Sir, on Friday you talked about different things that you

D7mnles1                    Ellensohn - direct

1   had said had bothered you in the various times that you went to

2   visit Dr. Lesniewski.

3            I thought we would go through those one by one.

4            So let's start with your neck.  OK?  If you would take

5   a look at the handwriting part for your first visit.  Do you

6   see what it says you talked about there?  If you would prefer,

7   Mr. Ellensohn, there is a binder in front of you.  You can look

8   at the paper copy, if that's easier.

9            Do you see right next to the date?

10  A.  Yes.

11  Q.  In the first visit you were talking about your what?

12  A.  My neck.

13  Q.  At the end of the handwriting you also talked about

14  something else?

15  A.  Tingling in both hands.

16  Q.  Then what was the treatment, if you look at the typewritten

17  part?

18           MR. WEDDLE:  Can we look at that, Ms. Larson, the

19  second half of this page?

20  Q.  What was the treatment, if any, at the first visit relating

21  to your neck?  Do you see the bottom of the typewritten part?

22  A.  Yes, the treatment was Celebrex, a prescription for

23  Celebrex.

24  Q.  Then in the next visit, which talks about your neck, can we

25  go to May 6, 2003.

D7mnles1                    Ellensohn - direct

```
 1              Is there any treatment in the next visit from May 2003
 2     for your neck?
 3     A.  Yes.
 4     Q.  What do you see there?
 5     A.  The Celebrex really didn't help very much in the written
 6     part.
 7     Q.  Then is there anything further he sends you for?  A test?
 8     A.  An MRI.
 9     Q.  Any different treatment?
10     A.  No.
11              MR. DURKIN:  I am going to object unless we have a
12     better foundation for a definition of treatment.
13              THE COURT:  Sustained.
14     Q.  In the May 6 notes, the typewritten part, the doctor's
15     notes, is there any indication that he did anything relating to
16     your neck besides send you for an MRI?
17     A.  No.
18              MR. DURKIN:  Objection.  First of all, the document
19     speaks for itself.
20              THE COURT:  Overruled.
21     Q.  This second visit in May, it's about how long after your
22     first visit?
23     A.  About a month.
24     Q.  And then let's look at the next visit, which is June 17.
25     On June 17 it says you discussed MRI results, right?
```

D7mnles1                           Ellensohn - direct

1   A.   Yes.

2   Q.   Then do you see where it says "discussed treatment options

3   with him"?

4   A.   Yes.

5   Q.   And then it says "continue present care," right?

6   A.   Yes.

7   Q.   What was your present care for your neck at this time?

8   A.   The Celebrex.

9            MR. WEDDLE:   Let's blow up the August and September

10  visits together.

11  Q.   With respect to your neck in August, do you see it in the

12  handwritten part that your neck is mentioned?

13  A.   Yes.

14  Q.   For August 25, 2003 and also for September 24, 2003?

15  A.   Yes.

16  Q.   Do you see your neck is mentioned in the handwritten part?

17  A.   Yes.

18  Q.   Is your neck mentioned at all in the typewritten part for

19  August and September?

20  A.   In August, yes.  And in September, no.

21  Q.   In August it notes in the typewritten part, "Still has neck

22  pain with some numbness."

23           Is there anything reflected about what Dr. Lesniewski

24  did for your neck on that day?

25  A.   No.

D7mnles1                          Ellensohn - direct

1        MR. WEDDLE:  Let's look at, November 5 I think is the

2   next visit.  Blow that up.

3   Q.  So here you see neck is mentioned in the handwritten part?

4   A.  Yes.

5   Q.  Is there any mention of your neck at all in the typewritten

6   part?

7        MR. DURKIN:  Object to the relevance.

8        THE COURT:  Overruled.

9   A.  No.

10  Q.  Let's look at the next page of this document.

11       MR. WEDDLE:  If you could put up I guess the top half,

12  or the January section.

13  Q.  So this part relates to January -- do you see how the

14  handwritten part says 2003, but the typewritten part says the

15  same month and day, but 2004?  Do you see that?

16  A.  I see that, yes.

17  Q.  So for this January entry in the handwritten part you talk

18  about the neck, right?

19  A.  Yes.

20  Q.  Anything in the typewritten part about any exam of your

21  neck or anything that he suggested you to do for your neck?

22  A.  No.

23  Q.  Let's look at the March 15, 2004 entry.

24       Here again in the handwritten part, it mentions your

25  neck, right?

1   A.   Yes.

2   Q.   And anything in the typewritten part about an exam of your

3   neck or anything to do for your neck?

4   A.   No.

5   Q.   Let's look at June 2004.  I think it's the next page.  The

6   same questions.

7        Do you see neck in the handwritten part?

8   A.   Yes.

9   Q.   And in the typewritten part, any exam of your neck or

10  anything you should do for your neck?

11  A.   No.

12  Q.   Sir, for how long has your neck been the way that it is?

13  A.   My neck has bent bothering me since the early '90s.

14  Q.   Has it gotten worse over time, gotten better, stayed the

15  same?

16  A.   It's stayed the same, with flareups.

17  Q.   For part of the time where your neck has stayed the same

18  with flareups as you say, were you working?

19  A.   Yes.

20  Q.   For about how many years.

21  A.   From 12 years, 14 years.

22  Q.   Let's go back now and talk about numbness in your hands.

23       MR. WEDDLE:  We will go back to the first page of this

24  exhibit, if we may, Ms. Larson.  Could you blow up the

25  typewritten part.

D7mnles1                        Ellensohn - direct

```
 1    Q.  We already mentioned that in the handwritten part you
 2    talked about numbness and tingling in your hands, right?
 3    A.  Yes.
 4    Q.  Is there any mention in the typewritten part about your
 5    hands or anything you should do for your hands?
 6    A.  No.
 7    Q.  Just to save us some time, let's skip ahead to August 25,
 8    which is the next mention of a problem with your hands.
 9             MR. WEDDLE:  If we could blow that up, Ms. Larson.
10    Q.  In the handwritten part it says, "Hands are falling
11    asleep."  What does it indicate in the typewritten part that
12    relates to your hands?
13    A.  An EMG.
14    Q.  He also says something about hands on head and fencer sign.
15             You don't know what that means, right?
16    A.  No.
17    Q.  EMG is what, some kind of test?
18    A.  It is a test.  They stick like pins in you and they --
19    Q.  Did you end up having that test?
20    A.  Yes.
21    Q.  Let's look at September 24.
22             Here there is no mention of your hands in the
23    handwritten part, right?
24    A.  No.
25    Q.  But in the typewritten part it talks about problems with
```

D7mnles1                          Ellensohn – direct

1    your hands, right?

2    A.  Yes.

3    Q.  It says, "He does not want surgery at this point, but I

4    think that is inevitable.  He has to decide when and where he

5    wants to do it."

6         Did you discuss surgery relating to your hands with

7    Dr. Lesniewski in any of your visits?

8    A.  Yes, it was mentioned.

9    Q.  Did you have surgery for your hands?

10   A.  No.

11   Q.  Why not?

12   A.  It didn't bother me enough to do that.

13   Q.  Let's skip ahead to November 5, or I guess the next visit,

14   November 5.

15        MR. WEDDLE:  Can you blow that up.

16   Q.  Here again it says, I guess, "Left and right wrist

17   numbness, tingling when sleeping."  Do you see that in the

18   handwritten part?

19   A.  Yes.

20   Q.  Then in the typewritten part does it say that he did

21   anything or said that you should do anything with respect to

22   your hands?

23   A.  I guess it's discussing the operation, when to get it done.

24   Q.  So this is again a conversation about surgery that is

25   reflected in these documents?

D7mnles1                          Ellensohn - direct

1   A.  Yes.

2   Q.  And at this time you had the same reason -- did you have

3   the same reason or a different reason for getting or not

4   getting surgery?

5   A.  The same reason.

6   Q.  Let's take a look at January 2004.

7              In the handwritten part it talks about numbness and

8   tingling when sleeping.  Do you see that?

9   A.  Yes.

10  Q.  In the typewritten part it's basically the same

11  conversation again, right?

12  A.  Yes.

13  Q.  You had the same reasoning, right?

14  A.  Yes.

15  Q.  Let's take a look at March 15.

16             This is basically the same, right, the same

17  conversation again in March, is that right --

18  A.  Yes.

19  Q.  -- according to these notes?

20             And you had the same reasoning at that point --

21             MR. DURKIN:  Object to the leading.

22             THE COURT:  Sustained.

23  Q.  What was your reasoning at that point in terms of whether

24  you should or shouldn't have surgery?

25  A.  It still wasn't bothering me enough that I thought I needed

D7mnles1                          Ellensohn - direct

1    it.

2              MR. WEDDLE:  Let's take a look at May 18 and June 22.

3    Can we do both of them, or do we have to do them one at a time.

4    Next page.

5    Q.  May 18, is there any change with respect to this regular

6    routine on your hands?

7              MR. DURKIN:  Object to the characterization.

8              THE COURT:  Sustained.

9    Q.  How, if at all, has the routine with respect to your

10   hands --

11             MR. DURKIN:  Objection.

12             THE COURT:  Sustained.

13   Q.  Sir, do you see on May 18 it talks about carpal tunnel

14   release, right?

15   A.  Yes.

16   Q.  What do you understand that to be?

17   A.  Surgery.

18   Q.  What was your thinking at this time, in May 2004, about

19   whether you should have surgery?

20   A.  I still think I wanted to do it.  I didn't want to do it.

21   Q.  What about in June 2004?  Is that the same or different?

22   A.  The same thing.  I just --

23   Q.  I'm sorry?

24   A.  The same as the other one.  I just didn't want to have the

25   surgery done.

D7mnles1                         Ellensohn - direct

1   Q.  Other than talking about surgery, did Dr. Lesniewski give

2   you anything for your hands or suggest anything else that you

3   might do for your hands?

4            MR. DURKIN:  Objection.

5            THE COURT:  Overruled.

6            MR. DURKIN:  Suggesting, that is not in evidence.

7            THE COURT:  Overruled.

8   Q.  You can answer.

9   A.  He did not give me anything.

10  Q.  Let's talk about your shoulder.  The first notation in this

11  document relating to your shoulder is the previous page?

12           MR. WEDDLE:  Ms. Larson, the bottom, the handwritten

13  part for May 18, 2004.

14  Q.  So May 18, 2004, how long was that before you retired?

15  A.  Three months.

16  Q.  In the handwritten part relating to this date, it says

17  something about your shoulder.  Do you see that?

18  A.  Yes.

19  Q.  It says clicking?

20  A.  Clicking.

21  Q.  Range of motion limited, no known injury, pain for about a

22  month in level 2-6.  Did you have limited range of motion in

23  your shoulder at that time in May of 2004?

24  A.  No.

25  Q.  Did you tell Dr. Lesniewski that you did?

D7mnles1                          Ellensohn - direct

1        MR. DURKIN:  Objection.

2        THE COURT:  Overruled.

3   A.  I told him -- yes, I told him I had a shoulder problem.

4   Q.  Did you tell him that you had limited range of motion?

5   A.  Oh, limited range of motion, no, I don't believe so.

6        MR. WEDDLE:  Let's take a look at the next page and

7   blow up the entry -- actually, you can blow up the whole top

8   half of this page.

9   Q.  So in the typewritten part for May 18, 2004, according to

10  the note, what does he suggest doing for your shoulder?

11  A.  He just says the shoulder is clicking.  He doesn't give me

12  no -- nothing.

13  Q.  Do you see it says, "therapy, anti-inflammatories"?

14  A.  I'm sorry.  OK.

15  Q.  Were you looking at the right entry?

16  A.  I got it now.  Anti-inflammatories and possible MRI.

17  Q.  Did you go for therapy for your shoulder at this time, in

18  May of 2004?

19  A.  No.

20  Q.  Why not?

21  A.  It wasn't bothering me.

22  Q.  If you look down at the next entry for June 22, 2004, in

23  the handwriting, it refers to your shoulder, right?

24  A.  Yes.

25  Q.  So this is about a month after you first mentioned your

D7mnles1                          Ellensohn - direct

1    shoulder according to the notes, right?

2    A.   Yes.

3    Q.   And then in the typewritten part what does it say about

4    what needs to happen with your shoulder?

5    A.   Surgery.

6    Q.   Did you ever get surgery on your shoulder?

7    A.   No.

8    Q.   Why didn't you get surgery on your shoulder in 2004?

9    A.   It didn't bother me enough.

10            MR. DURKIN:  Objection.

11            THE COURT:  Overruled.

12   A.   It didn't bother me enough to get the surgery.

13   Q.   Let's talk about your knee.

14            MR. WEDDLE:  Can we go back to the March 15 entry,

15   Ms. Larson, which was on the third page of the exhibit in the

16   middle.

17   Q.   Now we're back in March 2004.  Do you see the handwritten

18   part talks about your knee?

19   A.   Yes.

20   Q.   It says, "Hurts and pressure when go up and down stairs"?

21   A.   Yes.

22   Q.   In the typewritten part do you see any exam or anything

23   suggested about what you should do for your knee?

24   A.   No.

25            THE COURT:  Mr. Weddle, at this point I think the

1   testimony is becoming repetitive and cumulative.  Is there a

2   way that you might be able to summarize it to make your point

3   without going through one by one, unless there is something

4   material than what you are doing now?

5            MR. WEDDLE:  If I can finish this up just by looking

6   at the May and June entries together.

7            THE COURT:  All right.

8            MR. WEDDLE:  I am trying not to draw leading

9   objections.

10           MR. DURKIN:  Sorry.  But I didn't make the rules,

11   Judge.

12           MR. WEDDLE:  I agree.

13   Q.  So in May there is a mention of your knee, right?  And also

14   in June.  Do you see that?

15   A.  Yes.

16   Q.  The same thing, right, any exam, treatment for May and June

17   for your knee?

18   A.  No.

19   Q.  Then there is also a mention of -- well, without putting it

20   on the screen, if you look at the handwritten part for May,

21   there is also a mention of your foot, right, if you look at the

22   previous page, sir.  Something with your foot.  Do you see that

23   mentioned in the handwritten part, May 18, 2004?  Let's just

24   skip ahead.  Do you see the June entry that is on the screen?

25   A.  I see in June, yes.

D7mnles1                        Ellensohn - direct

1   Q.  There is a mention of your foot, right?

2   A.  Yes.

3   Q.  Any exam of your foot or anything to do for your foot in

4   the typewritten part for June?

5   A.  No.

6   Q.  Do you later have an MRI that related to your numbness in

7   your foot in any way as you can recall it?

8   A.  I don't recall.

9   Q.  Now, after you retired from the Long Island Rail Road, did

10  you continue to see Dr. Lesniewski?

11  A.  Yes.

12  Q.  Why did you continue to see Dr. Lesniewski after you

13  retired?

14  A.  I thought it would help the disability as far as, you know,

15  continuing seeing him.

16  Q.  Had anyone given you any advice about that?

17  A.  Yes.

18  Q.  Who?

19  A.  Ed Yule.

20  Q.  What did he say?

21  A.  He said continue seeing the doctor.

22  Q.  So for about how long did you continue to see

23  Dr. Lesniewski for that purpose?

24  A.  I'm not sure.  Possibly about six months or whatever.

25  Maybe more.

1   Q.  Why did you go to Dr. Lesniewski on the schedule that we

2   have just been looking at, every month or thereabouts?

3   A.  Well, when I left the office he would reschedule an

4   appointment for whatever, you know, for the next month or

5   whatever it was, six weeks.

6   Q.  And then you would do it according to how he suggested?

7   A.  Yes.  After the visit he would bring my folder up to the

8   desk and --

9   Q.  After a period of time after you retired when you were

10  going to see him regularly for the purpose you just mentioned,

11  did there come a time when you stopped seeing him for that

12  purpose?

13  A.  Yes.

14  Q.  Did there later come a time when you went back to him?

15  A.  Yes.

16  Q.  When did you go back to him?

17  A.  I believe it was '08.

18  Q.  2008.  Why did you go to him between 2005 and 2008?

19  A.  Why did I --

20  Q.  Why did you got go to him between 2005 and 2008?

21  A.  Because I was already receiving -- I received disability.

22  I was getting the disability.

23  Q.  Why did you go back in 2008?

24  A.  Well, my shoulder, I did something to my shoulder and went

25  back to the doctor to see what was wrong with it.

D7mnles1                         Ellensohn - direct

1   Q.  Were you on disability at the time, in 2008?

2   A.  Yes.

3   Q.  When you went back in 2008, what kind of treatment did you

4   get for your shoulder?

5   A.  I believe I got a shot, a cortisone shot.

6   Q.  Did you also go for physical therapy at all in that time

7   frame?

8   A.  No.

9   Q.  And did the shot help?

10  A.  Yes.

11  Q.  When you went back to the doctor in 2008 because you had

12  hurt your shoulder and then got a shot, did you then continue

13  to go back to him over and over again?

14  A.  No.

15  Q.  Let's take a look now at Government Exhibit 116-D as in

16  David.

17          MR. WEDDLE:  Could you just blow up -- actually, you

18  can just leave it like this for a second.

19  Q.  What is 116-D?

20  A.  It is the narrative from Dr. Lesniewski.

21  Q.  What is the date on it?

22  A.  June 3, 2004.

23  Q.  At the bottom do you see there are three diagnoses there?

24  A.  Yes.

25  Q.  The first one relates to what part of your body?

D7mnles1                        Ellensohn – direct

1   A.  My hands.

2   Q.  The second one relates to what part of your body?

3   A.  I believe my neck.

4   Q.  The third one relates to what part of your body?

5   A.  My shoulder.

6   Q.  June 3, 2004 is about how long after you first mentioned

7   your shoulder to Dr. Lesniewski, according to his notes?

8           Do you need to see it again?

9   A.  Yes, I think I have to.

10          MR. WEDDLE:  Can you bring up maybe side by side

11  116-H, page 3.

12  Q.  Do you see at the bottom there what we were just looking at

13  where there is a handwritten part talking about your

14  shoulder --

15  A.  Yes.

16  Q.  -- on the left?  And the date on there is what?

17  A.  May 18.

18  Q.  So about how long between when you first mentioned your

19  shoulder and he gave you a diagnosis relating to your shoulder?

20  A.  One month, less than a month.

21          MR. WEDDLE:  Thank you, Ms. Larson.  We are done with

22  116-H.  Let's look at page 2 of 116-D and just blow up the text

23  there.

24  Q.  It says, "I'm aware of his job occupation on the Long

25  Island Rail Road.  Given the above noted diagnosis, it can be

1    stated within a reasonable degree of medical certainty that

2    this patient is disabled for his job occupation and that

3    disability is ongoing and permanent."

4            Do you see that?

5    A.  Yes.

6    Q.  Did you tell Dr. Lesniewski that you were unable to do your

7    job?

8    A.  No.

9    Q.  Did he ask you what your job entailed?

10   A.  I don't recall.

11   Q.  What do you recall talking to him about your job at all?

12   A.  That I worked for the railroad.

13   Q.  Let's take a look now at Government Exhibit 116-B as in

14   boy.  What is this document, sir?

15   A.  Medical assessment of residual functional capacity.

16   Q.  Does this relate to your application for disability?

17   A.  This, yes, it is.

18   Q.  Who signed this for you?

19   A.  Dr. Lesniewski.  I can't read the written part, but there

20   is a signature there.  His name is on the bottom.

21   Q.  If you could go back to page 1.  Do you see how it says --

22           MR. WEDDLE:  Please blow up the two boxes on the

23   bottom.

24   Q.  It says, for exertional restriction that in an eight-hour

25   workday you can stand and/or walk with normal breaks for only

D7mnles1                          Ellensohn - direct

1    less than two hours total.

2              Do you see that?

3    A.  Yes.

4    Q.  Was that true of you at the time?

5    A.  No.

6    Q.  Did you say to Dr. Lesniewski that it was true of you at

7    the time?

8    A.  I don't remember the form.

9    Q.  But did you say to him --

10   A.  No.

11   Q.  -- that you couldn't sit?

12   A.  No.

13   Q.  I'm sorry, that you couldn't stand or walk for any more

14   than two hours with normal breaks?

15   A.  No.

16   Q.  Then what about sitting?  It says you can only sit with

17   normal breaks for less than six hours.  Did you tell him you

18   had any limitation on whether you could sit?

19   A.  No.

20   Q.  Did you have a limitation like that?

21   A.  No.

22   Q.  Then take a look at the next page.

23             MR. WEDDLE:  Blow up the top half of the page.

24   Q.  It says you can never lift 20 pounds or more.  Do you see

25   that?

D7mnles1                          Ellensohn – direct

1    A.  Yes.

2    Q.  Was that true of you at the time?

3    A.  No.

4    Q.  Did you tell Dr. Lesniewski that it was?

5    A.  No.

6    Q.  Did he tell you that you were medically restricted from

7    lifting 20 pounds or more?

8    A.  No.

9    Q.  Do you see in the next section it says you can never bend

10   or stoop and never climb.  Do you see that?

11   A.  Yes.

12   Q.  Was that true of you at the time?

13   A.  No.

14   Q.  Had you told Dr. Lesniewski that it was?

15   A.  No.

16   Q.  Did he tell you you were medically restricted from doing

17   those things?

18   A.  No.

19   Q.  Then if you could look at the bottom of this page, it says

20   you are restricted from simple grasping, fine manipulation,

21   pushing, pulling.  Was that true of you at the time?

22   A.  No.

23   Q.  Did you tell Dr. Lesniewski that you could not do any of

24   those things?

25   A.  No.

D7mnles1                         Ellensohn - direct

1    Q.  Did he tell you you were medically restricted from doing

2    those things?

3    A.  No.

4    Q.  The same questions for foot controls.  It says you can't

5    use both feet for repetitive foot controls.  Do you see that?

6    A.  I see that.

7    Q.  True of you at the time?

8    A.  No.

9    Q.  Did you say to Dr. Lesniewski it was?

10   A.  No.

11   Q.  Did he tell you you were medically restricted from doing

12   it?

13   A.  No.

14           MR. WEDDLE:  And if we could take a look at the next

15   page.  Blow up the top half.

16   Q.  It says you need to totally avoid exposure to noise.

17           Do you see that?

18   A.  Yes.

19   Q.  Was that true of you at the time?

20   A.  No.

21   Q.  Had you told Dr. Lesniewski that it was?

22   A.  No.

23   Q.  Had he told you that you were medically restricted and

24   could not be exposed to noise?

25   A.  No.

1          MR. WEDDLE:  We are done with that exhibit.  Thank

2    you, Ms. Larson.

3    Q.  In connection with your disability application, did you

4    also have a narrative from someone other than Dr. Lesniewski?

5    A.  Yes.

6    Q.  Who was that?

7    A.  Steven Stumer, Stummer.

8    Q.  He was a foot doctor?

9    A.  Yes.

10   Q.  Like a podiatrist?

11   A.  A podiatrist.

12   Q.  Who sent you to see Dr. Stumer or Stummer?

13   A.  Ed Yule.

14   Q.  Did you have to pay Dr. Stumer, Stummer for his narrative?

15   A.  I don't remember if I did or I didn't.

16   Q.  Let's take a look now at Government Exhibit 116-A.

17          Is this part of your application materials for

18   disability?

19   A.  Yes.

20   Q.  Do you see the handwriting at the bottom of the first page?

21   A.  Yes.

22   Q.  Is that your handwriting?

23   A.  No.

24   Q.  Who did you pay to fill out this form?

25   A.  Ed Yule.

D7mnles1                              Ellensohn - direct

1    Q.  Who signed this form?

2    A.  I signed it.

3    Q.  Page 10 I guess.  Do you see on the fourth page of this --

4    actually, no, on the second page of this it says, "Enter the

5    date you could no longer work because of your condition," and

6    it says June 22, 2004.

7             Was that true at the time?

8    A.  No.

9    Q.  Let's take a look now at page 4.

10            MR. WEDDLE:  If we could blow up the top half.

11   Q.  It shows Dr. Lesniewski, right?

12   A.  Yes.

13   Q.  And there are a bunch of visits, right?

14   A.  Yes.

15   Q.  Let's take a look at page 6, the bottom half of the page.

16   It talks about information with your daily activities.  And it

17   says, sitting is hard for you because of severe neck, shoulder

18   and foot pain after 15 to 20 minutes.  Was that true of you at

19   the time?

20   A.  No.

21   Q.  Standing it says is hard for you and there is a explanation

22   about after 10 minutes.  Do you see that?

23   A.  Yes.

24   Q.  Was that true of you at the time?

25   A.  No.

D7mnles1                          Ellensohn - direct

1   Q.  What about the entry about walking?  Was that true of you

2   at the time?

3   A.  No.

4   Q.  How about eating?  Was that hard for you at the time?

5   A.  No.

6   Q.  How about bathing?

7   A.  No.

8   Q.  It says you can't tie your shoes because of hand pain at

9   all.  Do you see that?

10  A.  Yes.

11  Q.  Who tied your shoes in 2004?

12  A.  I did.

13  Q.  It says you can't do indoor chores at all.  Was that true

14  at the time?

15  A.  No.

16  Q.  Can't do outdoor chores at all.  Was that true at the time?

17  A.  No.

18  Q.  Driving a motor vehicle it says was hard for you?

19  A.  No.

20  Q.  It says, It is hard for you to control the car due to pain

21  in hands and foot and neck.  Do you see that?

22  A.  Yes.

23  Q.  Was it hard for you to control a car at the time?

24  A.  No.

25  Q.  Same things for public transportation.  Was that true?  It

1    says it's hard for you.

2    A.   No.

3    Q.   And what about writing, was that hard for you at the time?

4    A.   No.

5    Q.   Let's take a look -- I guess we're done with that one.

6    Let's take a look now at Government Exhibit 116-C as in

7    Charlie.  Is this another form related to your disability

8    application?

9    A.   Yes.

10   Q.   Who did you pay to fill this out?

11   A.   Ed Yule.

12   Q.   If you would take a look at -- is this your writing, sorry,

13   on the first page, your writing?

14   A.   No.

15   Q.   Take a look at the second page.

16        It says your job is bridge and building mechanic and

17   then there is an entry about carpentry, right?

18   A.   Right.

19   Q.   What was your job at the time you retired?

20   A.   Bridge and building inspector.

21   Q.   How long had it been since you had been a mechanic?

22   A.   20 years, approximately 20 years.

23   Q.   Then you see several pages into this after your signature

24   there is a word processed section of it.  Do you see that?

25        MR. WEDDLE:  I guess Ms. Larson that would be page 7

D7mnles1                         Ellensohn - direct

1   of the exhibit.  Thanks.

2   Q.  I'm sorry.  I forgot to ask you something.  Did you tell

3   Mr. Yule that all of those things that we were talking about

4   before were hard for you or you couldn't do them at all?

5   A.  No.

6   Q.  Did you discuss your daily activities with Mr. Yule at all?

7   A.  No.

8           MR. WEDDLE:  If we could blow up the top half of this,

9   Ms. Larson.

10  Q.  So the word processed thing, did you write this, this word

11  processed document?

12  A.  Did who?

13  Q.  Did you write it?

14  A.  No, I did not.

15  Q.  It says, "I'm disabled from doing this work as a mechanic

16  and it says my disabilities are caused by severe and disabling

17  neck, back, shoulder, hand, and foot pain caused by a number of

18  different diagnoses.

19          Do you see that?

20  A.  Yes.

21  Q.  Was it true of you in 2004 you that were disabled from

22  doing your own job?

23  A.  No.

24  Q.  In 2004, were you disabled from doing the job of a

25  mechanic?

D7mnles1                          Ellensohn - direct

1   A.   No.

2   Q.   Did you have severe and disabling pain in these different

3   parts of your body at that time?

4   A.   No.

5            MR. WEDDLE:   We are done with that exhibit.  Thank

6   you, Ms. Larson.

7   Q.   Who paid for your visits to Dr. Lesniewski and the tests

8   that he ordered for you?

9   A.   I paid a copay and my insurance company paid the rest.

10  Q.   What was your insurance company at the time?

11  A.   I believe it was United Healthcare.

12  Q.   If you could take a look at Government Exhibit 116-L as in

13  Larry.

14           MR. WEDDLE:   Which is in evidence, your Honor.  At any

15  rate, I don't think we need to look ate.  You can just describe

16  it.  116-L is what?  It is a letter?

17  A.   A letter.

18  Q.   To whom?

19  A.   To the Railroad Retirement Board -- I'm sorry to me.

20  Q.   To you?

21  A.   Yes.

22  Q.   From whom?

23  A.   From the Railroad Retirement.

24  Q.   This letter basically tells you you have obtained a

25  disability annuity, right?

1    A.   Correct.

2    Q.   What is the date on the letter?

3    A.   November 12.

4    Q.   What year?

5    A.   2004.

6    Q.   OK.  We're done with that.  In the years since you retired,

7    sir, how have you filled your time?

8    A.   I am a volunteer fireman.

9    Q.   How long have you been a volunteer fireman?

10   A.   I am in my 36th year.

11   Q.   Have you held any titles or positions in the volunteer fire

12   department?

13   A.   Yeah.  I was chief from '90 to '96 and a commissioner from

14   '11 until about a month ago.

15   Q.   What do you do as a volunteer fireman in your retirement?

16   A.   What I did?

17   Q.   Yes.

18   A.   I drove the ambulance.  I was qualified on a pumper also.

19             MR. DURKIN:  Can we have a time frame for when he's

20   doing these things.

21             THE COURT:  Time frame.

22             MR. WEDDLE:  I said in your retirement.

23   Q.   When did you retire, sir?

24   A.   2004.

25   Q.   So between 2004 and let's say 2012, when there were alarms

D7mnles1                        Ellensohn – direct

1    for your fire company, did you respond to them at all?

2    A.  Yes.

3    Q.  What did you do when you responded to alarms for your fire

4    company?

5    A.  I would drive.

6    Q.  Drive what?

7    A.  Either an ambulance or a pumper, depending on what the call

8    was.

9    Q.  Did your physical condition ever put your own or other

10   people's safety at risk as a firefighter since your retirement?

11   A.  No.

12            MR. DURKIN:  Objection.

13            THE COURT:  Sustained.

14   Q.  What about travel?  Have you done any travel in your

15   retirement?

16   A.  Yes.

17   Q.  What kind of traveling do you like to do?

18   A.  Camping.

19   Q.  What kind of camping?

20   A.  RV camping.

21   Q.  So that involves driving an RV?

22   A.  Yes.

23   Q.  What's the longest RV camping trip you have gone on in your

24   retirement?

25   A.  I went cross country.

D7mnles1                        Ellensohn – direct

1   Q.  And how long was that trip?

2   A.  Almost six weeks.

3   Q.  And what year was that?

4   A.  I believe it was '08, summer of '08.

5   Q.  Did you have trouble with driving because of your hands or

6   your shoulder or your neck?

7   A.  No.

8   Q.  Now, we looked at these notations about your hands

9   sometimes getting numb.  When does that typically happen, if it

10  happens?

11  A.  When I'm sleeping, most of the time.

12  Q.  Does it ever happen when you are driving at all?

13  A.  Once in a while.

14  Q.  What do you do when that happens?

15  A.  I just switch hands and drive with the other hand and flex

16  this one out.

17  Q.  Does the numbness go away?

18  A.  It goes away.

19  Q.  How fast?

20  A.  A minute or two.

21  Q.  At the time you retired, were you unable to perform your

22  railroad work?

23  A.  No.

24          THE COURT:  Asked and answered.

25  Q.  Did you understand that you were committing a crime by

D7mnles1                         Ellensohn – direct

1    getting disability anyway?

2    A.   Yes.

3    Q.   Today are you capable of performing your railroad work?

4    A.   Yes.

5           MR. WEDDLE:   Thank you, your Honor.

6           No further questions.

7           MR. DURKIN:   Can I have one second, Judge.

8           THE COURT:   Yes.

9    CROSS EXAMINATION

10   BY MR. DURKIN:

11   Q.   Mr. Ellensohn, you and I have never met before, have we?

12   A.   No.

13   Q.   Am I correct in listening to your testimony that there is

14   no question that you wanted this disability?

15   A.   Yes, I wanted the disability.

16   Q.   And you knew, did you not, that you had to have medical

17   support in order to get the disability, correct?

18   A.   Yes.

19   Q.   You have been to these seminars?

20   A.   Yes.

21   Q.   Did you ever get any handouts that told you you had to have

22   medical backup?

23   A.   I don't remember.

24   Q.   Is it possible?

25   A.   Possibly.

D7mnles1                         Ellensohn - cross

1   Q.  Can we have the page of the notes.  I think it's 116-H like

2   Henry.

3              Do you remember being questioned quite a bit by

4   Mr. Weddle about all these notes and everything?

5   A.  Yes.

6   Q.  There is no doubt in your mind, is there, that those notes

7   and entries are accurate, is there?

8              MR. WEDDLE:  Objection.

9              THE COURT:  Sustained.

10  Q.  Well, the dates are all consistent with what you recall

11  going there, right?

12  A.  Yes.

13  Q.  Let's just talk about the first entry just as an example.

14             Do you see that handwriting up there?

15  A.  Yes.

16  Q.  There's both handwriting and typewriting or printed

17  material for that date of April 15, 2003, correct?

18  A.  Correct.

19  Q.  Now, when you first went there, you had to fill out a form

20  like you do at any other doctor's office, correct?

21  A.  I don't recall filling out a form.

22  Q.  You don't recall filling out a several-page document where

23  you list all your past history and your personal information

24  and your insurance --

25  A.  I probably did.

1    Q.  The fact of the matter is when you went to Dr. Lesniewski

2    the first time, it was just like any other doctor you had ever

3    went to, right?

4    A.  No.

5    Q.  Pardon me?

6    A.  No.

7    Q.  It was different?

8    A.  Yes.

9    Q.  What was different about it?

10   A.  Because I knew he was part of this thing that Ed Yule, that

11   he sent me Dr. Dr. Lesniewski and it was part of -- it was all

12   wrong -- it was all false.

13   Q.  What was all false?

14   A.  All the documentation that we went through before that I

15   can't tie my shoes --

16   Q.  It is all false?

17   A.  Yes.

18   Q.  It is your testimony today that everything in those notes

19   and this exhibit is false?

20   A.  I pleaded guilty to that, yes, yes.

21   Q.  You pled guilty to submitting a false application, did you

22   not?

23   A.  I pleaded guilty --

24            MR. WEDDLE:  Objection, your Honor.

25            THE COURT:  Sustained.

D7mnles1                          Ellensohn - cross

1   Q.  You pled guilty to conspiracy?

2   A.  Correct.

3   Q.  You pled guilty to wire fraud correct?

4   A.  Correct.

5          THE COURT:  Sustained.  I'm sorry, overruled.

6   Mr. Weddle, overruled.

7   Q.  Correct?

8   A.  Correct.

9   Q.  And to mail fraud, correct?

10  A.  Correct.

11         MR. WEDDLE:  Objection, your Honor.

12         THE COURT:  Overruled.

13  Q.  Are you telling us that what you said there was false on

14  April 15, 2003?

15  A.  Yes.

16  Q.  It was false that you worked for the Long Island Rail Road?

17  A.  Well, that I worked for the Long Island Rail Road, but all

18  the medical information, I mean pertaining to my job.

19  Q.  Who supplied that medical information, Mr. Yule -- I mean,

20  Mr. Ellensohn?

21  A.  I guess I did.

22  Q.  You told whoever wrote this down that you had a bulging

23  disk from an MRI 10 years ago, didn't you?

24  A.  Yes.

25  Q.  You said you had constant pain in your neck, correct?

D7mnles1                          Ellensohn - cross

1    A.  Yes.

2    Q.  That was true, wasn't it?

3    A.  It didn't stop me from doing my job.

4    Q.  That's not the question.

5    A.  It was true, yes.

6    Q.  It was true that you had constant pain in your neck, wasn't

7    it?

8    A.  Yes.

9    Q.  It's true that that's what you told to the person who wrote

10   that down --

11   A.  Yes.

12   Q.  -- on April 15, 2003, correct?

13   A.  Yes.

14   Q.  It is also true that you told that same person that the

15   pain radiates in both shoulders, didn't you?

16   A.  Yes.  I don't remember the pain going through my two

17   shoulders.  It was the pain in my neck.

18   Q.  But you don't --

19   A.  The shoulder was another thing.

20   Q.  But you don't deny that you also had issues in your

21   shoulders connected to the neck issue, correct?

22   A.  My shoulder was another issue.  My shoulder was an

23   impingement.

24   Q.  So it's true you had a shoulder impingement, correct?

25   A.  Yes.

D7mnles1                        Ellensohn - cross

```
 1              MR. WEDDLE:  Objection, your Honor.

 2              THE COURT:  Overruled.

 3   Q.  It's true you told that to Dr. Lesniewski and his staff,

 4   correct?

 5   A.  No.

 6              MR. WEDDLE:  Objection, your Honor.  It misstates

 7   the --

 8              THE COURT:  Sustained.  Compound question.

 9   Q.  It is true that you told that about your shoulder to

10   Dr. Lesniewski, correct?

11              MR. WEDDLE:  Objection, your Honor.

12              THE COURT:  Overruled.

13              MR. WEDDLE:  Is he still talking about April 15?

14              THE COURT:  Overruled.

15   Q.  Correct?

16   A.  Can you repeat the question.

17   Q.  It's true that you told Dr. Lesniewski that you had a

18   shoulder issue?

19   A.  Yes, I had a shoulder issue.

20   Q.  I mean, the fact of the matter is you just got through

21   telling us that you went back too Dr. Lesniewski in what, was

22   it, 2000 --

23              MR. RYAN:  '8.

24   Q.  '8?

25   A.  Yes.
```

D7mnles1                          Ellensohn - cross

```
 1   Q.  For a shoulder problem, correct?

 2   A.  Yes.

 3   Q.  Was that part of a scam?

 4   A.  2008, no.

 5   Q.  So when you needed help with a shoulder injury in 2008, you

 6   went to Dr. Lesniewski, correct?

 7   A.  Correct.

 8   Q.  And you trusted his medical judgment, correct?

 9   A.  Yes.

10   Q.  You accepted the injection of cortisone that he gave you,

11   correct?

12   A.  Yes.

13   Q.  And it worked, didn't it?

14   A.  The shoulder got better.

15   Q.  That's why you didn't go back to him, correct?  After you

16   got the cortisone, Mr. Weddle asked you a question, did you go

17   back to him?

18   A.  No.

19   Q.  You said no, correct?

20   A.  Correct.

21   Q.  The reason you didn't go back to him after 2011 is that the

22   shoulder got fixed, correct?

23   A.  No.

24   Q.  I thought you just said it got better.

25   A.  It got better and it got worse again.  I went back again
```

D7mnles1                          Ellensohn – cross

1    after that.

2    Q.  To Dr. Lesniewski?

3    A.  No.  To Dr. Yerys or somebody else.

4    Q.  That is because Dr. Lesniewski was no longer at Island

5    Sports Medicine, correct?

6              MR. WEDDLE:  Objection.

7              THE COURT:  Overruled.

8    Q.  Am I right?

9    A.  Correct.

10   Q.  But you went back to the same office where he worked,

11   correct?

12   A.  Yes.

13   Q.  Let's just take a look at the bottom here where it says,

14   "Treat him with Celebrex," correct?

15             Do you see that at the very bottom?

16   A.  Yes.

17   Q.  You took that Celebrex, didn't you?

18   A.  Yes.

19   Q.  Did it help?

20   A.  No.

21   Q.  Right, because we know, if you turn to the next page you

22   came back roughly a month later and said that it didn't help,

23   right?

24   A.  Yes.

25   Q.  You told Dr. Lesniewski that day that you still had a

D7mnles1                          Ellensohn – cross

1    significant amount of pain, didn't you?

2    A.   Yes.

3              (Continued on next page)

D7mdles2                          Ellensohn – cross

1   Q.  Now, you didn't find it odd that when you went to a doctor

2   and said you had pain, that the doctor rescheduled the visits

3   in roughly another month, did you?

4   A.  I don't go to many doctors but I guess that's the way --

5   Q.  I'm sorry?

6   A.  I don't go to many doctors so I guess it's what happens.

7            MR. WEDDLE:  Objection, your Honor.  Foundation.

8            THE COURT:  Sustained.

9   BY MR. DURKIN:

10  Q.  You went there in April and you said you had pain and he

11  gave you medicine and told you to come back, right?

12  A.  Yes.

13  Q.  You didn't say what do I have to come back for, isn't this

14  a scam?  Can't you just take care of this?  Did you have any

15  conversation like that?

16  A.  I knew it was.

17  Q.  You knew it was a scam?

18  A.  I pleaded guilty to that.

19  Q.  Did you plead guilty to defrauding Dr. Lesniewski?

20  A.  No, but he was part of -- he was part of the whole -- the

21  whole system.

22  Q.  Really?  Who told you --

23            MR. WEDDLE:  Objection to the commentary, your Honor.

24            THE COURT:  Sustained.

25  Q.  Who told you he was part of the whole system?

D7mdles2                          Ellensohn - cross

1    A.  Ed Yule.

2    Q.  Really?

3            MR. WEDDLE:  Object to the commentary, your Honor.

4            THE COURT:  Sustained.  Sustained.

5    Q.  When did Ed Yule tell you that?

6    A.  He told me to go to Dr. Lesniewski for this disability to

7    do all the paperwork.

8    Q.  I understand.  But you're not telling this jury that Ed

9    Yule told you to go to Dr. Lesniewski because he's part of some

10   conspiracy, are you?

11   A.  Well, there was no other doctors.  He was the only doctor I

12   could go to was the one he recommended.  He was part of the --

13   Q.  That's not even true, is it?

14   A.  What's not true?

15   Q.  That Lesniewski was the only name you ever heard of.

16   A.  From Ed Yule it was.

17   Q.  But you knew from talking to other people on the Rail Road

18   that there were other doctors you could go to, correct?

19   A.  After I had already started going to Dr. Lesniewski.

20   Q.  You heard the name Dr. Ajemian, correct?

21   A.  In the paper.

22   Q.  Do you remember telling the government on May 30th, 2013,

23   that as far as which doctor to go to for an occupational

24   disability with the RRB, the names of the doctors were given

25   out?

D7mdles2                          Ellensohn - cross

```
 1   A.  The names -- I don't understand the question.

 2   Q.  Do you not remember saying something like that?

 3   A.  Saying what?

 4           MR. WEDDLE:  Objection, your Honor.

 5           THE COURT:  Will the reporter read the question.

 6           (Record read)

 7           MR. WEDDLE:  May I just have a moment with counsel,

 8   your Honor?

 9           THE COURT:  Yes.

10           (Pause)

11   Q.  Do you remember saying that, or words to that effect?

12   A.  No.

13   Q.  If I showed you a document that we obtained in discovery --

14           MR. WEDDLE:  Objection, your Honor.

15           THE COURT:  Overruled.

16           MR. WEDDLE:  We produced a great quantity of material

17   in discovery.

18           THE COURT:  All right.  Overruled.

19   Q.  (Handing to the witness).

20           (Pause)

21           MR. WEDDLE:  Your Honor, I object to this line of

22   questioning because there is no predicate for this out-of-court

23   statement at all.  There is no inconsistent statement.

24           MR. DURKIN:  Judge, I beg --

25           THE COURT:  This is for refreshing recollection.
```

D7mdles2                              Ellensohn - cross

 1           MR. WEDDLE:  I know.  But the only relevance of

 2   refreshing recollection is if there were a predicate to then

 3   talk about the out-of-court statement, which there isn't.

 4           THE COURT:  All right.  Overruled.

 5   BY MR. DURKIN:

 6   Q.  Does that refresh your recollection that that's what you

 7   told the government on May 30th of 2013?

 8   A.  I'm sure I said that but the name probably came from the

 9   newspaper before that because he was --

10           MR. WEDDLE:  That was my objection, your Honor.

11           THE COURT:  All right.  Sustained.

12   Q.  So you deny that you told the government that --

13           MR. WEDDLE:  Objection, your Honor.  Asked and

14   answered.

15           MR. DURKIN:  I haven't finished, yes.

16           THE COURT:  What was the question?

17   Q.  Do you deny that you told the government on May 30, 2013,

18   that as far as which doctor to go to for securing an

19   occupational disability with the RRB, the names of the doctors

20   were given out?  You do you deny that?

21           MR. WEDDLE:  Objection, your Honor.  Asked and

22   answered.

23           THE COURT:  Sustained.

24   Q.  Did you also tell them that you -- you, Ellensohn -- knew

25   people that used Dr. Lesniewski?  Did you tell them that on

1   May 30, 2013?

2   A.   I don't remember.

3   Q.   Do you remember also telling them that you had heard about

4   Dr. Ajemian?

5            MR. WEDDLE:   Asked and answered, Judge.

6            THE COURT:   Asked and answered.   Sustained.

7   Q.   If I showed you this document again, would that refresh

8   your recollection that I --

9            MR. WEDDLE:   Your Honor, there is no need to refresh

10  recollection if the question itself is improper.

11           THE COURT:   The previous question was not answered.

12           Go ahead.

13           MR. WEDDLE:   Your Honor --

14           THE COURT:   Sustained.   I'm sorry, Mr. Weddle.

15  Overruled.   Let him answer the question.

16           THE WITNESS:   Let me read it.

17           (Pause)

18           I just did that.

19  Q.   Did you read it to yourself?

20  A.   Yeah.

21           MR. WEDDLE:   Your Honor, as the witness is indicating,

22  he just did this.   We just did this question.   We finished

23  this.

24           THE COURT:   We did not do the question that's on the

25  table now, which is whether the witness told others that he had

D7mdles2                        Ellensohn – cross

1  heard from others who used Dr. Lesniewski.

2          Is that the question, Mr. Durkin?

3          MR. DURKIN:  Yes, Judge.

4          THE COURT:  All right.

5          MR. WEDDLE:  The question was about Dr. Ajemian.

6          THE WITNESS:  He just showed me Dr. Ajemian.

7          THE COURT:  All right.  Would the reporter read back

8  the question pertaining to what the witness heard from others

9  about whether he used other doctors.

10         (Record read)

11         THE COURT:  He didn't remember, so his recollection is

12 being refreshed.  Now, what is the problem, Mr. Weddle?

13         MR. WEDDLE:  I didn't object to that question.  He was

14 asked about the other doctor, your Honor.

15         THE COURT:  All right.  Let's move on.

16 Q.  Do you understand the question?

17 A.  I still don't understand the question.

18 Q.  Do you deny that you told the government on May 30, 2013,

19 that you knew people that used Dr. Lesniewski?

20         (Pause)

21 A.  I don't remember.

22 Q.  And if I showed you this document again, it wouldn't

23 refresh your recollection?

24 A.  No.

25 Q.  So is your recollection exhausted on that point?

1          MR. WEDDLE:  Objection, your Honor.

2          THE COURT:  Asked and answered.

3  Q.  Now, let's go back to what you told Dr. Lesniewski.

4          MR. DURKIN:  Can we bring up again Exhibit 116H?

5  Q.  I think I had left off at May 6, where the Celebrex didn't

6  help.  Do you remember that?

7  A.  Mm-hmm.  Yes.

8  Q.  And after that you came back on June 17th of 2003, correct?

9  A.  Yes.

10 Q.  About a month and ten days later, right?

11 A.  Yes.

12 Q.  And you didn't protest about coming back, did you?

13 A.  No.

14 Q.  You didn't say if this is a scam, why do I have to come

15 back?

16 A.  Well, I knew we needed a paper trail to do it.

17 Q.  You knew we needed the paper trail?  You and Ed Yule needed

18 a paper trail, correct?

19 A.  Yes.

20 Q.  And that's what Ed Yule told you, correct?

21 A.  Yes.

22 Q.  But when you went back, you kept telling Dr. Lesniewski,

23 like you did in August -- I'm sorry, that you were having on

24 and off -- on June 17th, you had off and on days in terms of

25 your neck, correct?

D7mdles2                         Ellensohn - cross

1    A.   Yeah.  That's what it says.

2    Q.   Well, you don't deny that, do you?

3    A.   No.

4    Q.   That's what happened, correct?  That's what you said?

5    A.   Yes.

6    Q.   OK.  And Dr. Lesniewski discussed an MRI with you that

7    showed that you had spondylosis at C-6 and 7, correct?

8                MR. WEDDLE:  Objection, your Honor.

9                THE COURT:  Overruled.

10   Q.   That's true, isn't it?

11   A.   I don't know what spondylosis is.

12   Q.   I understand maybe you don't know --

13               MR. WEDDLE:  Object to the commentary.

14               THE COURT:  Overruled.

15   Q.   The question is, that's what you -- that's what

16   Dr. Lesniewski discussed with you about the results of the MRI

17   you had taken, correct?

18   A.   Yes.

19   Q.   And he discussed, then, various treatment options, correct?

20   A.   Yes.

21   Q.   And you went back again on August 25th, am I right?

22   A.   Yes.

23   Q.   Now, when Mr. Weddle asked you some questions about

24   August 25th, he said there was nothing in there -- he asked you

25   the question about the fact that there was nothing in there

D7mdles2                          Ellensohn - cross

1    about your neck; do you remember that?

2              MR. WEDDLE:  Objection, your Honor.

3              THE COURT:  Overruled.

4              What is your question, Mr. Durkin?

5    Q.  Did you not get asked, just a little while ago by

6    Mr. Weddle, about this entry on August 25, 2003 and whether or

7    not there was anything in there concerning your neck?

8              MR. WEDDLE:  Objection, your Honor.

9              THE COURT:  Overruled.

10   A.  Yes.

11   Q.  And you said there was nothing in there regarding your

12   neck?

13             MR. WEDDLE:  Objection, your Honor.  That's not what

14   he said.

15             THE COURT:  Overruled.

16   Q.  Isn't that correct?

17             (Pause)

18   A.  Yes.

19             MR. WEDDLE:  Your Honor, objection.  That's not what

20   he said.  You can read back the transcript.

21             THE COURT:  You can correct it on redirect,

22   Mr. Weddle.

23             MR. WEDDLE:  It is in the transcript.

24             MR. DURKIN:  It is in the transcript.

25             THE COURT:  Let's not argue.  I don't want to waste

1   time.  You can correct it on redirect.

2   BY MR. DURKIN:

3   Q.  Isn't it a fact that on August 25, 2003, Dr. Lesniewski

4   made you put your hands on your head with respect to a test for

5   your neck?

6            MR. WEDDLE:  Objection, your Honor.

7            THE COURT:  Overruled.

8   A.  I don't remember.

9   Q.  You don't remember, do you?

10  A.  No.

11  Q.  But that happened at least some of the times you were

12  there, correct?

13           MR. WEDDLE:  Objection.

14  A.  I don't remember ever doing that.

15           THE COURT:  Overruled.

16  Q.  Do you deny that on August 25th of 2003, or at least some

17  other time as well, that there was a time when you were asked

18  to put your hands on your head?

19           MR. WEDDLE:  Asked and answered, your Honor.

20           THE COURT:  Overruled.

21  A.  No.

22  Q.  You don't deny that, right?

23  A.  No, I wasn't asked.

24           MR. WEDDLE:  Objection, your Honor.  Asked and

25  answered.

D7mdles2                    Ellensohn - cross

1          THE COURT:  All right.  Asked and answered.

2     A.  I never did that.

3     Q.  Do you ever recall being asked to make a movement with your

4     hand like a fencer?

5     A.  No.

6     Q.  Like I'm just describing, a thrust forward?

7     A.  Never.  No.

8     Q.  Never?

9     A.  Never.

10    Q.  But you don't deny, do you, that in August that you

11    discussed the EMG, which indicated carpal tunnel

12    symptomatology, or wrist radiculopathy, correct?  Did he

13    recommend that because you were having trouble with your hand?

14    A.  Yes.

15    Q.  And just like the next time you came back a month later, in

16    fact, Dr. Lesniewski told you, as it states there, that the EMG

17    revealed that you had carpal tunnel syndrome, correct?

18          MR. WEDDLE:  Objection, your Honor.

19          THE COURT:  Overruled.

20    A.  Yes.

21    Q.  And did that make you happy?

22    A.  Did that make me happy?

23    Q.  Yes.

24    A.  Why would it make me happy?

25    Q.  Well, you were hoping to create a paper trail, you tell us,

D7mdles2                        Ellensohn - cross

1    right?

2    A.  Well, for the disability, yes.  I was trying to get the

3    disability that I -- everybody knows that already.

4    Q.  That would have made you happy, then, right, because you

5    were looking for a paper trail and, lo and behold, the EMG came

6    up with a diagnosis that you had carpal tunnel syndrome,

7    correct?

8    A.  Yes, but it wasn't enough to stop me from doing my job.

9    Q.  I didn't ask you that.  I asked you were you happy when you

10   learned that an EMG confirmed that you had a medical issue with

11   carpal tunnel syndrome?

12   A.  At the time?

13   Q.  Yes.

14   A.  Yes.

15   Q.  Did it strike you odd, though, that this doctor that you

16   say you were in with the fix on recommended surgery for it?

17          (Pause)

18   A.  Yes.

19   Q.  Because if you had the surgery that he recommended, your

20   paper trail would have gone away, correct, at least about the

21   carpal tunnel syndrome?

22   A.  Yes.

23   Q.  And Dr. Lesniewski told you on September 24th of 2003,

24   after the EMG revealed carpal tunnel syndrome, that he thought

25   surgery was inevitable and that even though you didn't want to

```
 1   do it, then you had to decide when and where you would want to

 2   do it, correct?

 3   A.  Right, but I didn't have to do it because it didn't bother

 4   me.

 5   Q.  It also helped you with respect to your paper trail, didn't

 6   it?

 7            MR. WEDDLE:  I object to "it."

 8            THE COURT:  Clarify.

 9   Q.  The diagnosis helped you, correct?

10   A.  At the time, yes.

11   Q.  Now, you don't come back after September 24th until

12   November 5th, am I right?

13   A.  Yes.

14   Q.  And, once again, the topic of surgery comes up with respect

15   to the carpal tunnel syndrome, correct?

16   A.  Yes, but I didn't need the surgery.

17   Q.  That's what you tell us, correct?

18   A.  Yeah, it's my hand.

19   Q.  I understand.  But Dr. Lesniewski said that you should --

20   he suggested getting it done as soon as possible because of

21   possible permanent damage, correct?

22   A.  There is no permanent damage and I didn't have it done.

23   Q.  I understand that, but that's what he said on

24   November 5th of 2003, isn't it?

25   A.  Yeah.  But what he said is -- I don't know if it is right,
```

1   though, what he said.  That was part of helping me to get the

2   disability.

3   Q.  I didn't ask you whether it was --

4           MR. WEDDLE:  Objection, your Honor.  He is answering

5   the question.

6           THE COURT:  Sustained.

7   Q.  My question to you is --

8           MR. WEDDLE:  Can the witness answer the question?

9           THE COURT:  Yes.  What was the question, Mr. Durkin?

10  Q.  My question is on November 5th, 2003, he recommended the

11  surgery, correct?

12  A.  Yes.

13  Q.  Just like he did on March 15th of 2004, correct?  If you go

14  to the next page.  And on January 5th, 2004, correct?

15  A.  Yes.  As to this day I still didn't have the surgery and my

16  hands are working.

17  Q.  And the same thing, the next page, June 21st of 2004,

18  correct?

19  A.  I don't know if that's related to the carpal tunnel.

20  Q.  You don't know whether or not positive apley or positive --

21  A.  I don't know what that is.

22  Q.  Would it surprise you to know that that's something --

23  those are indications --

24          MR. WEDDLE:  Objection, your Honor.

25          THE COURT:  All right.  Sustained.

D7mdles2                       Ellensohn - cross

1    Q.  You don't know what it is, correct?

2          MR. WEDDLE:  Asked and answered.

3    A.  No.

4    Q.  Did you tell us, when you were answering Mr. Weddle's

5    question, that there was nothing in that note about carpal

6    tunnel syndrome?

7    A.  I don't remember.

8          MR. WEDDLE:  Do you want it on the screen, Mr. Durkin?

9          MR. DURKIN:  Pardon me?

10          MR. WEDDLE:  Do you want us to put that entry on the

11    screen?

12          MR. DURKIN:  It is already on the screen.

13          MR. WEDDLE:  I thought you were talking about

14    June 21st.

15          MR. DURKIN:  All right.  I thought it was.  Yes.

16          MR. WEDDLE:  Can you blow up June 21st?

17    BY MR. DURKIN:

18    Q.  Do you think there is anything in there relating to carpal

19    tunnel syndrome in that typewritten part on June 21st of 2004?

20    A.  I -- no.

21    Q.  You don't think there is?

22    A.  I don't know what those words are.

23    Q.  But since you don't know what those are, you're not sure

24    but nothing else indicates anything to do with carpal tunnel,

25    correct?

D7mdles2                          Ellensohn - cross

1    A.  No.

2    Q.  But if apley or tinel has something to do with carpal

3    tunnel syndrome, you wouldn't know that, correct?

4    A.  I don't know what that means.

5    Q.  Now, Mr. Weddle asked you some questions about the

6    volunteer fire department.  Do you remember that?

7    A.  Yes.

8    Q.  The fact of the matter is is that you never told

9    Dr. Lesniewski about the volunteer fire department, did you?

10   A.  I don't recall.

11   Q.  Do you remember discussing that topic again with the

12   government on May 30th of 2013?

13              MR. DURKIN:  Page 5.

14   A.  I don't remember it but --

15   Q.  If I showed you this document, might that refresh your

16   recollection?

17   A.  Maybe.

18              (Pause)

19              MR. WEDDLE:  Objection, your Honor.  There is no

20   predicate for discussing this --

21              MR. DURKIN:  Judge, I am going to object to his

22   repeated --

23              THE COURT:  All right.  Sustained.

24              (Pause)

25              MR. WEDDLE:  The objection was sustained, your Honor.

D7mdles2                              Ellensohn - cross

1            THE COURT:  No, Mr. Durkin's objection was sustained.

2    In other words, your first one was overruled.

3    A.  I don't remember that.

4    Q.  My question is, does this refresh your recollection --

5    A.  No.

6    Q.  I'm sorry?

7    A.  No.

8    Q.  Do you deny telling the government, on May 30th of 2013,

9    that you never told Dr. Lesniewski you drove a fire truck, that

10   you kept the two things separate?

11   A.  I don't remember that.

12   Q.  My question isn't whether you remember it.  We know that.

13           THE COURT:  Asked and answer.  Let's move on,

14   Mr. Durkin.

15   Q.  Do you deny it?

16           THE COURT:  Asked and answered.

17           MR. WEDDLE:  It is the same question, your Honor.

18   Q.  The fact of the matter is, as well, is that your health

19   problems or your injuries have limited your ability to even

20   work on the fire truck, hasn't it?

21   A.  No.

22   Q.  Well, you can't respond to fires anymore, correct, other

23   than drive the truck or the ambulance, correct?

24   A.  Drive the truck - I chose to do that.

25   Q.  I understand that.  But you can't wear that breathing pack

1   anymore --

2   A.  I chose not to do that.  That was my decision.  That was

3   not --

4   Q.  Isn't it a fact that you can no longer wear the breathing

5   pack to be able to go in the fires because of your neck and

6   shoulder problems?

7   A.  No.

8   Q.  Oh, that's something now, it's just what you chose to do?

9          MR. WEDDLE:  Objection, your Honor.

10  A.  I chose to --

11         THE COURT:  All right.  Asked and answered.

12         Next.  Next question.

13  Q.  Again, do you remember telling the government, on

14  May 30th of 2013 -- page 5, Mr. Weddle -- that a Scott Air Pack

15  would bother you if you wore it now?

16  A.  In reality, a Scott Air Pack would bother anybody if they

17  wore it.  It weighs 40-something pounds.  It is not a

18  comfortable thing for anybody.

19  Q.  My question, sir, was do you deny that that's what you told

20  the government on May --

21  A.  I don't recall.  I don't recall.

22  Q.  If I showed you this document, might it refresh your

23  recollection?

24         (Handing)

25         Does that refresh your recollection --

1    A.  No.

2    Q.  Do you have memory problems?

3    A.  Do I have memory problems?  Yeah, sometimes.

4    Q.  How is it that you can't remember what happened on

5    May 30th of 2013 but you can remember what happened in 2004 and

6    2005?

7    A.  I can't answer that.  I don't know.

8    Q.  Do you have one of those memories that you remember things

9    better in the past than in the current time?

10              MR. WEDDLE:  Objection, your Honor.

11              THE COURT:  Sustained.

12              MR. WEDDLE:  Everyone has --

13              THE COURT:  Sustained.

14   BY MR. DURKIN:

15   Q.  You mentioned that Mr. Yule recommended Dr. Lesniewski to

16   you, correct?

17   A.  Yes.

18   Q.  But the fact of the matter is is that Mr. Yule never told

19   you anything about Dr. Lesniewski, correct, other than you

20   should go see him?

21   A.  Other than, yeah, he would help with the disability.

22   Q.  But he never told you anything other than referring you to

23   him, correct?

24   A.  Yeah.

25   Q.  Or referring you to him?

D7mdles2                         Ellensohn - cross

1   A.   Yeah, he referred me to him.

2   Q.   And, likewise, Dr. Lesniewski never said anything to you

3   about Mr. Yule, did he?

4   A.   I don't recall.  I don't remember him saying anything

5   about --

6   Q.   Do you recall telling the government on May 30, 2013, that

7   Ellensohn never said anything regarding -- that you had never

8   said anything regarding -- strike that.

9           Do you remember telling the government that Lesniewski

10  never said anything to you about Yule, just like Yule never

11  said anything about Lesniewski to you; do you remember saying

12  that?

13  A.   No.

14  Q.   If I showed you this document, might it refresh your

15  recollection?

16          (Handing)

17          MR. WEDDLE:   What page are you referring to?

18          MR. DURKIN:   3.

19  Q.   Does that refresh your recollection of what you told the

20  government on May 30th, 2013?

21  A.   No.

22  Q.   When you talked to the government on May 30th, 2013, were

23  you on drugs?

24  A.   On drugs?  No.

25  Q.   Pain medication?

D7mdles2                    Ellensohn - cross

```
 1    A.  No.

 2    Q.  Anything that would affect your memory?

 3    A.  No.

 4    Q.  When you -- how many times did the government prepare your

 5    testimony, meet with you to prepare your testimony?

 6              MR. WEDDLE:  I object to the characterization, you

 7    your Honor.

 8              THE COURT:  Rephrase the question.

 9    Q.  How many times did you meet with the government to discuss

10    your testimony here today?

11    A.  Twice.

12    Q.  When?

13    A.  When?  I don't know the dates.  I don't remember the dates.

14    Q.  Two weeks ago?  Two months ago?  Two days ago?  Two hours

15    ago?

16    A.  Two weeks ago and then after that another time.

17    Q.  And when you were -- in those meetings, did they show you

18    this prior statement of yours that you gave an interview --

19              MR. WEDDLE:  I object to the characterization.

20              MR. DURKIN:  I'll strike "statement."

21    Q.  Did they show you a memorandum of your interview, of your

22    May 30th, 2013 interview, with Mr. Weddle, Ms.  Friedlander,

23    Mr. Tehrani, and Mr. Suits?

24    A.  No.

25    Q.  I'm sorry?
```

1    A.  No.

2    Q.  They never showed you a document?

3    A.  I've got to see the document.

4    Q.  The one I've been showing you.

5            (Handing)

6            Ignore the markings.

7    A.  No.  I didn't see this document.

8    Q.  You never saw that?

9    A.  No.

10   Q.  The fact of the matter is is that there are now several

11   things physically that you used to be able to do that you can

12   no longer do, isn't that true?

13   A.  That's with anything with getting older.

14   Q.  I get it.  I agree with that.

15           But you do have things you can no longer do because of

16   your injuries, correct?

17   A.  But it wasn't my job.  I don't play softball no more.

18   Q.  We'll get to your job in a minute.  But let's just talk

19   about the things you can no longer do because of your injuries.

20           You can't play softball any more, correct?

21   A.  I stopped playing softball before that, though.

22   Q.  Before what?

23   A.  In the early '90s.

24   Q.  OK.  You also used to ride a bicycle 20 miles, but you had

25   to stop doing that because you could feel it in your hands,

D7mdles2                        Ellensohn - cross

1   correct?

2   A.   Correct.

3   Q.   And that's because of the carpal tunnel syndrome, correct?

4   A.   I -- I guess that was why.  I don't know for sure.

5   Q.   You used to be able to run, as well, correct?

6   A.   Run?  I never ran.

7   Q.   OK.  Do you still go to the gym?

8   A.   Do I still -- no.

9   Q.   You used to be able to do that, didn't you?

10  A.   I did cardio at the gym.  I did stationary bikes and

11  elliptical.

12  Q.   That's because at least on the elliptical and the

13  stationary bike, that didn't bother your hands, correct?

14  A.   Well, it did.

15  Q.   Do you remember telling the government on May 30th, 2013,

16  that you were able to ride a bike in the gym, though, because

17  you would not feel it in your hands?  Did you tell them that?

18  A.   That was the stationary, sit-down bike, yes.

19  Q.   And did you also tell them that you could ride the

20  elliptical because you didn't need to hold on to it?

21  A.   The elliptical, you had to hold on to it otherwise you'd

22  fall off it.

23  Q.   So do you or do you not hold on to the elliptical with your

24  hand?

25  A.   I hold on to the sides of the elliptical when I was doing

D7mdles2                          Ellensohn - cross

1    it.

2    Q.   But now you don't do the elliptical any more?

3    A.   I don't do nothing any more.  I don't go to the gym.

4              MR. DURKIN:  May I have a minute, Judge?

5              (Pause)

6              MR. DURKIN:  Judge, could we have a minute at the

7    sidebar?

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7mdles2                    Ellensohn - cross

1              (It at the sidebar)

2              MR. DURKIN:  Judge.

3              THE COURT:  Yes.

4              MR. DURKIN:  Mr. Dratel reminded me that there was

5    another doctor that he was told to see through the RRB, and

6    Mr. Dratel did not think that was no a --

7              MR. DRATEL:  It is not a continuing disability review.

8              MR. DURKIN:  -- a continuing disability review.  I

9    didn't want to get into a problem if it was.  So I just wanted

10   to clear that.

11             THE COURT:  Who is the doctor?

12             MR. WEDDLE:  I frankly don't have the file in front of

13   me, and I have to look at it.  I thought that we went through

14   this, your Honor, and your Honor indicated when I was eliciting

15   this on direct it was irrelevant.  If I had known that they

16   intended to go into it on cross-examination, I would have

17   elicited it on direct to avoid being whipsawed, as they are

18   trying to do to me right now.

19             MR. DURKIN:  This is the only man in the universe who

20   feels he is getting whipsawed all the time by the rules.  I

21   don't know what he is talking about.

22             MR. DRATEL:  We didn't object.

23             MR. DURKIN:  I want to clarify this.  I don't want to

24   go into something I am not permitted to do.  But do you have

25   the report?

1          MR. DRATEL:  Yes.  Just let me describe what they are

2     as I get them out.  It is a little tight in here.  But one is a

3     letter that the RRB sent Mr. Ellensohn saying that you've been

4     denied disability based on Dr. Lesniewski and Dr. Stromer, but

5     they sent him to a separate contract physician, a Dr. Kaplan.

6     And this is Dr. Kaplan's report, and then his disability is

7     approved.

8          MR. WEDDLE:  Your Honor, this is --

9          THE COURT:  Short answer to all of this is none of

10    this came out on direct, right?  There was nothing on direct on

11    any of these things?

12         MR. WEDDLE:  That is correct, your Honor.

13         THE COURT:  If it is not on direct, then you cannot

14    cross-examine him then on that, period.

15         MR. WEDDLE:  Your Honor, the characterization of

16    Mr. Dratel is wrong.

17         THE COURT:  I don't care what it is.  If it didn't

18    come out on direct, you can't bring it out on cross.  All

19    right.

20         MR. DRATEL:  Let me show the Court --

21         MR. WEDDLE:  Your Honor, we had an explicit discussion

22    where we talked about a similar issue with respect to, I think,

23    Mr. Gagliano.

24         THE COURT:  I understand.  There is no more issue.  It

25    did not come out on direct.  No more cross-examination on this.

1              Thank you.

2              MR. DRATEL:  Your Honor --

3              THE COURT:  We can deal with this some other time.

4              (Continued on next page)

```
 1              (In open court)
 2    BY MR. DURKIN:
 3    Q.  Mr. Ellensohn, you were asked some questions on direct
 4    examination about what you hoped to get for your testimony here
 5    today.  Do you remember that?
 6    A.  Yes.
 7    Q.  And do I understand your testimony to be that hopefully you
 8    won't do jail time, correct?
 9    A.  Correct.
10    Q.  What kind of jail time are you looking at?
11    A.  45 years.
12    Q.  A long way from 45 years to zero, isn't it?
13    A.  Yeah.
14    Q.  And you pled guilty just recently, did you not?
15    A.  Yes.
16    Q.  July 3rd of 2013, correct?
17    A.  Yes.
18    Q.  You pled guilty in front of Judge Sidney Stein, correct?
19    A.  Yes.
20    Q.  He's the judge who has your case, correct?
21    A.  Yes.
22    Q.  And in order -- you are familiar with the -- not only are
23    you familiar with the maximum sentence of 45 years, you're also
24    familiar with what's called the U.S. Sentencing Guidelines,
25    correct?
```

1    A.  No.

2    Q.  Are you telling us that you don't know anything about the

3    sentencing guidelines?

4    A.  I don't recall.

5    Q.  Do you recall being asked, on July 3rd of 2013, some 19

6    days ago --

7    A.  Yes.

8    Q.  -- by Judge Stein, do you recall this question and giving

9    this answer?

10   "Q  Under current law, Mr. Ellensohn, judges such as myself

11   must utilize the Sentencing Guidelines in applying Section

12   3553(a), that's 18 United States Code, 3553(a), to determine

13   what an appropriate sentence is in your case.  Have you talked

14   to your attorney about the Sentencing Guidelines?"

15   A.  Yes.

16   Q.  Do you remember being asked that question?

17   A.  Yes.

18   Q.  And do you remember giving the answer "Yes?"

19   A.  Yes.

20   Q.  And you know that in order to get what's called a departure

21   under the Sentencing Guidelines, you have to get this letter

22   that was referred to in your direct examination from the

23   government, correct?

24   A.  Correct.

25   Q.  And that's a letter under what's known as Section 5K1.1 of

D7mdles2                          Ellensohn - cross

1    the guidelines, correct?

2    A.  Correct.

3    Q.  And the person who is going to send that letter for you,

4    you hope, is Mr. Weddle, correct?

5    A.  Correct.

6    Q.  And Mr. Weddle is the one that helped you prepare your

7    testimony here today, correct?

8    A.  Correct.

9             MR. WEDDLE:  I object to the characterization.

10            THE COURT:  Sustained.

11   Q.  Is he the one you met with when you reviewed what you might

12   say here?

13            MR. WEDDLE:  Objection, your Honor.

14            THE COURT:  Sustained.

15   Q.  When you met these two times that you said just a little

16   while ago, with whom did you meet when you talked about what

17   you would say here?

18   A.  Mr. Weddle and a bunch -- and other people, not just him.

19   Q.  And you hope that they will provide you with that letter,

20   correct?

21   A.  Yes.

22   Q.  That's important to you, isn't it?

23   A.  Yes.

24   Q.  Just like getting the disability was important to you,

25   correct?

1    A.  Yes.

2    Q.  This is even more important than the disability, though,

3    isn't it?

4    A.  Yes.

5    Q.  Because somewhere between zero and 45 years is riding on

6    what you are saying here, correct?

7    A.  Correct.

8    Q.  But even though you claim you lied for the disability, you

9    certainly wouldn't want to lie here, correct?

10   A.  Correct.

11   Q.  And --

12          MR. DURKIN:  That's all I have.

13          I'm sorry.  Hold on one second, Judge.  I apologize.

14          (Pause)

15          That's all I have, Judge.

16          THE COURT:  Thank you.

17          Mr. Weddle.

18          MR. WEDDLE:  Thank you, your Honor.

19   REDIRECT EXAMINATION

20   BY MR. WEDDLE:

21   Q.  Mr. Durkin was just asking you about your sentencing.  Do

22   you remember those questions?

23   A.  Yes.

24   Q.  What's the most important thing that you need to do in

25   order to get a letter from the government, the very most

D7mdles2                          Ellensohn - redirect

1    important thing?

2    A.   Be truthful.

3    Q.   Say it again.

4    A.   Be truthful.

5         MR. DURKIN:   Objection.

6         THE COURT:   Sustained.

7    Q.   And does anyone need to be convicted in this trial in order

8    for you to get a letter from the government?

9    A.   No.

10   Q.   Sir, before you pled guilty to crimes, had you ever been

11   arrested?

12   A.   No.

13   Q.   What happened?   When was the first time you had -- you met

14   face-to-face with the government?

15   A.   When the two agents came to my house and gave me a letter.

16   Q.   All right.   And then in response to that letter you went

17   somewhere?

18        MR. DURKIN:   Could we have a timeframe on this, Judge?

19        THE COURT:   OK.

20   Q.   In response to that letter you went somewhere?

21        THE COURT:   Could we have a timeframe of when this

22   occurred?

23   Q.   About when did this happen?

24   A.   May.

25   Q.   And where did you go?

D7mdles2                        Ellensohn - redirect

1   A.  I went to my attorney who went to -- that we both came to

2   see you.

3   Q.  OK.  And did you -- were you required to come and see us,

4   or did you come in voluntarily --

5   A.  I voluntarily came.

6   Q.  And so at the time you pled guilty, you had never been

7   charged with any crime, is that right?

8   A.  Correct.

9   Q.  And you voluntarily came in and admitted that you had

10  committed a crime, is that right?

11  A.  Yes.

12          MR. DURKIN:  Objection to the "voluntarily."

13          THE COURT:  Sustained.

14  Q.  Well, were you forced by anyone to come in and admit to

15  committing a crime?

16  A.  No.

17  Q.  What happened instead?

18  A.  I came in voluntarily to tell the attorney what went on.

19  Q.  And when you first came in to meet with the government, the

20  very first time, who did you tell the government helped you

21  together with you to commit this crime?

22          MR. DURKIN:  Objection.  Lack of foundation.

23          THE COURT:  Overruled.

24  A.  Ed Yule and Dr. Lesniewski.

25  Q.  Mr. Durkin asked you about going to the gym.  During what

D7mdles2                    Ellensohn - redirect

1    period of time did you go to the gym?

2    A.   Oh, 2004.

3    Q.   Before or after you retired?

4    A.   After.

5    Q.   And did you stop going to the gym because you were

6    prevented from doing so because of a medical condition?

7    A.   No.

8    Q.   Mr. Durkin asked you about playing softball, and you said

9    you stopped playing in the early '90s, right?

10   A.   Yeah, I was on the --

11   Q.   And he asked you about long bike rides you used to take,

12   right?

13   A.   I stopped, yeah.

14   Q.   And when did you stop taking long bike rides?

15   A.   Late '90s.

16   Q.   For how many years did you continue to work at the Long

17   Island Rail Road after you stopped playing softball?

18   A.   10/15 years.

19   Q.   For how many years did you continue to work at the Long

20   Island Railroad after you stopped taking long bike rides?

21   A.   Seven/eight years.

22   Q.   And when you took long bike rides, what was long for you?

23   A.   20 miles.

24   Q.   So are you saying that even though you felt like you

25   couldn't ride 20 miles, you could continue to work at the Long

D7mdles2                        Ellensohn - redirect

1   Island Rail Road, effectively?

2   A.  Yes.

3   Q.  And would it be fair to say that riding 400 miles would

4   have been even harder?

5           MR. DURKIN:  I object to the leading.

6           THE COURT:  Sustained.

7   Q.  Have you ever ridden 400 miles over the course of a week?

8   A.  No.

9   Q.  Now, Mr. Durkin asked you a number of questions about your

10  meeting with the government on May 30, 2013, right?

11  A.  Yes.

12  Q.  And what happened during that meeting?

13  A.  We discussed how I defrauded the RRB and the government.

14  Q.  OK.  And so were you asked any questions?

15  A.  Yes.

16  Q.  And did you give answers?

17  A.  Yes.

18  Q.  What kind of answers did you give?  Did you give true or

19  false answers?

20  A.  Truthful answers.

21  Q.  And when you were giving the truthful answers on May 30th,

22  2013 --

23          MR. DURKIN:  Objection.  Leading.

24          THE COURT:  All right.  Sustained.

25  Q.  When you were giving those answers that you just described

D7mdles2                        Ellensohn - redirect

1    as truthful, were you trying to memorize exactly the things

2    that you were saying at the same time you were trying to answer

3    the questions truthfully?

4              MR. DURKIN:  Objection.  Leading.

5              THE COURT:  Sustained.

6    Q.  How important was it for you to memorize --

7              MR. DURKIN:  Objection.  Leading.

8    Q.  -- what occurred in the meeting?

9              THE COURT:  Sustained.

10   Q.  How important was it for you to remember what happened in

11   the meeting on May 30, 2013?

12             MR. DURKIN:  Objection.

13             THE COURT:  Sustained.  Rephrase.

14   Q.  When you were there at the government's -- the meeting with

15   the government on May 30, 2013, what were you trying to do?

16   A.  Tell them what I did wrong with the -- the fraud with the

17   RRB and the wire fraud and all the other things.

18   Q.  At the time you had that meeting, to what extent did you

19   think you were going to be memory tested on what had occurred

20   at the meeting?

21             MR. DURKIN:  Objection.

22             THE COURT:  Sustained.

23   Q.  The document that Mr. Durkin kept showing you, do you

24   remember that document where he kept showing it to you and

25   asking you if it refreshed your recollection about what

1    happened on May 30th, do you remember that?

2    A.  Yes.

3    Q.  Before he showed it to you today, had you ever seen that

4    document before?

5    A.  No.

6    Q.  Did you write it?

7    A.  No.

8    Q.  I take it you never reviewed it, right?

9    A.  No.

10   Q.  Mr. Durkin asked you about whether you have a particular

11   kind of memory that allows you to remember certain things in

12   certificate timeframes; do you remember those questions?

13   A.  Yes.

14   Q.  Do you remember anything that happened to you in your

15   childhood, anything at all?

16   A.  I fell down the stairs.

17   Q.  That was a long time ago, right, that you fell down the

18   stairs, is that right?

19   A.  Yeah.

20   Q.  But you remember it, is that right?

21   A.  Yeah.

22          MR. DURKIN:  I object to the leading.

23   Q.  Is there anything that happened to you last week that you

24   don't remember, do you think?

25          MR. DURKIN:  I object to the leading.

D7mdles2                          Ellensohn - redirect

1         THE COURT:  Sustained.

2    Q.  Do you feel like your memory is different from a regular

3    human being's memory, or do you think it is about the same?

4         MR. DURKIN:  Objection.

5         THE COURT:  Sustained.

6    Q.  Mr. Durkin asked you if you have problems with your memory;

7    do you remember that question?

8    A.  Yes.

9         MR. DURKIN:  Asked and answered.

10        MR. WEDDLE:  This is redirect, your Honor.

11        THE COURT:  Go ahead.

12   Q.  And I think you said something like "sometimes"?  What did

13   you mean when you answered that question?

14   A.  Well, I don't know.  I guess sometimes I don't remember

15   things.  I guess it comes with age or whatever.  I --

16   Q.  Are there times when you do remember things?

17   A.  Yeah.

18   Q.  When you went -- Mr. Durkin asked you a bunch of questions

19   about carpal tunnel syndrome, and you talked about on

20   cross-examination different entries in chart notes relating to

21   carpal tunnel syndrome?  Did you see that?  Do you remember

22   that?

23   A.  Mm-hmm, yes.

24   Q.  And some of those entries referred to surgery, right?

25   A.  Yes.

D7mdles2                           Ellensohn - redirect

1    Q.  Did Dr. Lesniewski give you any medicine for carpal tunnel

2    syndrome or for any problems with your hands?

3    A.  No.

4    Q.  Did Dr. Lesniewski indicate to you that you should get

5    injections relating to any problems in your hands?

6    A.  No.

7    Q.  Did Dr. Lesniewski indicate to you that you should wear

8    braces in connection with any problems in your hands?

9    A.  No.

10            MR. DURKIN:  I object to the leading.

11   Q.  Did Dr. Lesniewski indicate to you that you should have --

12            THE COURT:  All right.  Sustained.

13   Q.  What about physical therapy, did Dr. Lesniewski discuss

14   physical therapy in connection with your hands at all?

15            MR. DURKIN:  The same objection.

16   A.  No.

17   Q.  And when you were seeing Dr. -- you talked about going to

18   see Dr. Lesniewski in 2008 and getting injections because you

19   actually had a shoulder injury at that time; do you remember

20   that?

21   A.  Yes.

22   Q.  When you mentioned to Dr. Lesniewski any problem with your

23   shoulder in connection with trying to get disability when you

24   were visiting him at that earlier time period, did he at any

25   time suggest to you that you should have an injection in your

D7mdles2                        Ellensohn - redirect

1   shoulder?

2   A.   No.

3   Q.   And Mr. Durkin asked you some questions about whether it

4   would hurt or help you if you had gotten carpal tunnel surgery

5   back in 2004; do you remember those questions?

6   A.   Yes.

7   Q.   And I believe you had testified that -- what was the reason

8   why you were going to Dr. Lesniewski in 2003, in 2004?

9   A.   To get the disability.

10  Q.   And what was he creating for you so that you could get a

11  disability?

12              MR. DURKIN:   Objection.

13              THE COURT:   Sustained.

14  Q.   How did the chart notes that you were talking about before,

15  how did those relate at all to whether you would get a

16  disability?

17              MR. DURKIN:   The same objection.

18              THE COURT:   Overruled.

19  A.   They were exaggerated.

20              (Continued on next page)

21

22

23

24

25

1    Q.  Did they end up getting submitting to the Railroad

2    Retirement Board?

3    A.  Yes, they did.

4    Q.  Was that part of the paper trail?

5               MR. DURKIN:  Objection.

6               THE COURT:  Sustained.

7    Q.  Did Dr. Lesniewski also prepare other documents that got

8    submitted to the Railroad Retirement Board?

9    A.  Yes.

10   Q.  We looked at those on direct, right?

11   A.  Yes.

12   Q.  That was the narrative and the medical assessment, right?

13   A.  Yes.

14   Q.  When you went to Dr. Lesniewski at that time frame, did it

15   hurt or help you in terms of getting disability to go back to

16   him time and time again?

17              MR. DURKIN:  Objection.

18              THE COURT:  Sustained.

19   Q.  When you went to Dr. Lesniewski in that time frame on the

20   schedule that he suggested for repeated visits, what did you

21   think about how that might affect your application for

22   disability?

23              MR. DURKIN:  Same objection.

24              THE COURT:  Sustained.

25   Q.  The chart notes that we saw, were those connected in any

1    way in your mind with what you were paying Dr. Lesniewski to

2    do?

3             MR. DURKIN:  Objection.

4             THE COURT:  Overruled.

5    A.  Yes.

6    Q.  How is that?

7    A.  It was adding to my medical problems for the disability.

8    Q.  So what about when he was writing those notes up and

9    mentioning surgery multiple times in the notes?  Did you think

10   that that was connected in any way with what you were paying

11   him to do?

12            MR. DURKIN:  Objection.  Lack of foundation.

13            THE COURT:  Sustained.

14   Q.  Well, you saw the surgery was mentioned a number of times

15   in those notes, right?

16   A.  Yes.

17   Q.  In your mind is that connected in any way with what you

18   were you paying Dr. Lesniewski to do for you?

19            MR. DURKIN:  Objection.

20            THE COURT:  Overruled.

21   A.  No.

22   Q.  When you went to him on multiple visits, did you expect

23   that there would be a written record of the fact that you were

24   going to visit him?

25            MR. DURKIN:  Objection.  Leading.

D7mnles3a                        Ellensohn - redirect

1          THE COURT:  Sustained.

2   Q.  What did you think would happen, if anything, to

3   memorialize your multiple visits to Dr. Lesniewski?

4   A.  It would help my disability.

5   Q.  Did you think it would help or hurt your disability if he

6   wrote in --

7          MR. DURKIN:  Objection.  Leading.

8   Q.  -- if it was written into documentation that --

9          MR. WEDDLE:  That.

10          THE COURT:  Sustained.

11   Q.  To what extent do you think it would have helped or hurt

12   your disability application if the documentation said --

13          MR. DURKIN:  Same objection.

14          THE COURT:  Sustained.

15   Q.  -- something like the following --

16          THE COURT:  Sustained.

17   Q.  You testified that the reason you didn't get surgery is

18   that the problem with your hands wasn't that bad, right?

19   A.  Correct.

20   Q.  When you went to Dr. Lesniewski and you paid him to help

21   you with creating this documentation, did you want him to write

22   that in the documentation?

23   A.  Did I -- no.

24   Q.  Did you want him to write that your problem wasn't that

25   bad?

1  A.  No.

2  Q.  What did you want him to do instead?

3  A.  I wanted him to write it to be as bad as it could be so I

4  could get disability.

5  Q.  Mr. Durkin asked you if it struck you as odd that the

6  doctor recommended surgery for carpal tunnel syndrome.

7          What were you there to do with Dr. Lesniewski at that

8  time period?

9          THE COURT:  Asked and answered.

10 Q.  I believe you testified that at that time period you were

11 there to help you get disability --

12         MR. DURKIN:  Objection.

13         THE COURT:  Asked and answered.

14 Q.  What did Dr. Lesniewski do for you at that time period?

15         MR. DURKIN:  Objection.

16         THE COURT:  Overruled.

17 A.  Nothing.

18 Q.  What did he create for you, if anything?

19         MR. DURKIN:  Objection.

20         THE COURT:  Sustained.

21 Q.  Did you receive anything from Dr. Lesniewski after you paid

22 him?

23 A.  A narrative.

24 Q.  Anything else?

25 A.  The paperwork that he had to fill out for the --

D7mnles3a                    Ellensohn – redirect

1    Q.  What were you paying him for?

2              MR. DURKIN:  Objection.  Asked and answered.

3              THE COURT:  Asked and answered.

4    Q.  When he gave you the narrative and other documents that you

5    paid him for, what did you use those documents to do?

6              MR. DURKIN:  Objection.

7              THE COURT:  Overruled.

8    A.  To get my disability.

9              MR. WEDDLE:  May I have a moment, your Honor.

10             THE COURT:  Yes.

11             MR. WEDDLE:  Nothing further, your Honor.

12             MR. DURKIN:  Judge, can I have a minute with

13   Mr. Weddle.

14             THE COURT:  Yes.

15             MR. DURKIN:  Judge, can we be heard?

16             THE COURT:  Yes.

17        (Continued on next page)

18

19

20

21

22

23

24

25

D7mnles3a                         Ellensohn - redirect

1            (At sidebar)

2            THE COURT:  Yes.

3            MR. DURKIN:  Judge, the reason I asked Mr. Weddle a

4    question was that I asked him what letter he was talking about

5    that caused him to come in.  I assumed they were taking about

6    the amnesty program letter.

7            I showed this to Mr. Weddle.  He said it was not this

8    letter; that instead he believes it was a subpoena.  I don't

9    have a copy of that subpoena.  This is the first I have heard

10   of it.  I have a lot of difficulty with the whole line of

11   questioning and the suggestion they made that in fact he was

12   responding to a subpoena as if he was doing it out of the

13   goodness of his heart.  I really question what the government

14   is doing here.

15           MR. WEDDLE:  Your Honor, I can clarify it with him.  I

16   think that he got a subpoena and then he got a lawyer and then

17   he talked to the lawyer and he came in voluntarily to speak

18   with us.  He didn't appear in response to the subpoena.  I can

19   clarify it.

20           MR. DURKIN:  I object to the whole thing about him

21   coming in voluntarily, thinking that he came in under the

22   auspices of the amnesty letter.  Had I known it was a subpoena,

23   I would have objected all along.  That is pretty absurd, that

24   they could suggest to a witness that he came in voluntarily

25   after they put a subpoena on him and then he comes in with a

D7mnles3a                    Ellensohn - redirect

 1    lawyer.  That is not voluntary by my way of thinking.

 2              THE COURT:  Do you wish to address this?

 3              MR. WEDDLE:  Why don't I just clarify it in a couple

 4    of questions and ask him if he got a subpoena and he understood

 5    he needed to respond to the subpoena, but instead of responding

 6    to the subpoena, what did he do instead.  And he got a lawyer

 7    and came and met with the government.

 8              MR. DURKIN:  Now that I know, I will just cross on it.

 9              THE COURT:  All right.

10              MR. DURKIN:  Are you telling me you don't have a copy

11    of the subpoena?

12              MR. WEDDLE:  I don't think I have it in the courtroom,

13    your Honor.

14              MR. DURKIN:  As long as they are not going to then

15    claim I can't ask the question without the document.  You will

16    represent that there was a subpoena?

17              MR. WEDDLE:  That's my best recollection.  I don't

18    know off the top of my head, your Honor.  We can go look at it

19    up.

20              MS. FRIEDLANDER:  I am not sure if there was.  I think

21    we need to check.

22              MR. WEDDLE:  We can take a break and find out.  I

23    think there probably was a subpoena.

24              THE COURT:  Maybe we can discuss this later on.

25              MR. WEDDLE:  He can be available when we need him.  I

D7mnles3a                  Ellensohn - redirect

 1  don't see exactly the relevance of this.  I think if you get a

 2  subpoena you still have a Fifth Amendment right.  He could have

 3  simply said I am not answering questions.  Instead he came in

 4  voluntarily.

 5          THE COURT:  You may not recall, but he may recall

 6  whether or not what he got from the government was or was not a

 7  subpoena.

 8          MR. DURKIN:  Let me try.

 9          THE COURT:  Ask him.  If he says I don't know --

10          MR. WEDDLE:  Can I ask it on redirect.  It seems like

11  they are going do make it look like the government is hiding

12  something.

13          MR. DURKIN:  That is exactly what they did.

14          MR. WEDDLE:  Absolutely not.

15          This then is a legal question that your Honor should

16  instruct them on because a witness is not required to testify

17  in substance in response to a subpoena.  If he has committed

18  crimes and has a Fifth Amendment right, he can assert a Fifth

19  Amendment right.  And what happened here is that he came in

20  voluntarily.  That is exactly what happened.

21          THE COURT:  Let us clarify.

22          MR. WEDDLE:  Any attempt to suggest otherwise in

23  cross-examination is misleading the jury and would require your

24  Honor to undo that.

25          MR. DURKIN:  Talk about misleading.

D7mnles3a                          Ellensohn – redirect

1              THE COURT:  Mr. Durkin, you can ask him what he

2      recalls about what he received directly or whatever to appear

3      to talk to the government.  Does he recall what it was.  If he

4      says it was a subpoena, then that answers it.  Let's not go any

5      deeper than that.  All right.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2     RECROSS EXAMINATION

3     BY MR. DURKIN:

4     Q.  You testified just a few minutes ago that you got some type

5     of letter.  I believe your testimony was you met with the

6     government when they brought you a letter.  Do you remember

7     that?

8     A.  Yes.

9     Q.  The fact of the matter is, when you say "they," it was

10    Agent Suits and someone else, correct?

11    A.  Yes.

12    Q.  They showed up at your house, correct?

13    A.  Yes.

14    Q.  They didn't bring you a letter, they brought you a

15    subpoena, didn't they?

16    A.  Correct.

17    Q.  That subpoena commanded your appearance to come down to

18    talk to them, correct --

19              MR. WEDDLE:  Objection.

20    Q.  -- and to talk to the grand jury?

21              MR. WEDDLE:  Objection.

22              THE COURT:  Sustained.

23    Q.  Do you recall what the subpoena required you to do?

24    A.  Come to, I believe Centre Street for grand jury or

25    something.

D7mnles3a                    Ellensohn - recross

1   Q.  It was to testify in a grand jury, correct?

2   A.  Right, yes.

3   Q.  When you got that, you then hired a lawyer, correct?

4   A.  I already had the lawyer, but, yes, I called my lawyer.

5   Q.  You already had a lawyer before then?

6   A.  Yes, I called my lawyer.

7   Q.  When did you get this subpoena?

8   A.  I don't remember the date, the exact date.

9   Q.  Roughly?

10  A.  It was --

11  Q.  In relation to May 30?

12  A.  Before May 30.

13  Q.  A week?  Two weeks?  Three weeks?

14  A.  Maybe two, three weeks.

15  Q.  It is your testimony that you had already hired a lawyer

16  when you got that subpoena?

17  A.  I called -- yes, I called the lawyer.  I called my lawyer.

18  Q.  My question is, the day you got the subpoena, had you

19  already hired a lawyer?

20  A.  Yes.

21  Q.  You hired that lawyer because you got another letter in the

22  mail regarding a government amnesty program, correct?

23  A.  Right.

24  Q.  Let me show you what I have marked as Defendant Exhibit

25  Lesniewski No. 1 with today's date and just ask you if you

804

D7mnles3a                     Ellensohn - recross

1    recognize that document.  Don't read from it or anything, but

2    do you recognize that?

3    A.  Yes.

4    Q.  And that was a letter that threatened to prosecute you and

5    take away your pension --

6              MR. WEDDLE:  Objection.

7              THE COURT:  Sustained.

8    Q.  Well, this letter scared you, did it not?

9    A.  It concerned me, yes.

10   Q.  It concerned you because it talked about potential criminal

11   prosecution, correct?

12   A.  Which happened, which ended up happening.

13   Q.  I'm sorry?

14   A.  Which ended up happening.

15   Q.  I understand that.

16             So when you went to see the government on May 30, you

17   went there with your lawyer, correct?

18   A.  Yes.

19   Q.  You didn't go just because you were a good citizen wanting

20   to help the government, correct?

21   A.  I knew I was wrong.  I knew it was wrong, what I did.

22   Q.  You went there because you were trying to cut a deal with

23   the government, correct?

24   A.  That came out of it during the meeting.

25   Q.  And that's why you went, correct?

D7mnles3a                    Ellensohn - recross

1   A.  Yes.

2   Q.  By then you read about this case in the paper, correct?

3   A.  I saw some articles about it in the paper, yes.

4   Q.  And you knew what the government was alleging, correct?

5   A.  I knew that, yes.

6   Q.  And you went there hoping that what you could tell them

7   would help them, correct?

8   A.  Correct.

9   Q.  Now, you said just a few minutes ago that when you came

10  there you told them that Dr. Lesniewski and Mr. Yule --

11           MR. DURKIN:  They tell me that is a bad sign in New

12  York.  I am a little nervous, being from the country, you know.

13           THE COURT:  That is a signal that we are almost out of

14  time.

15           MR. DURKIN:  I got it, Judge.  There we go.

16           THE COURT:  It is the five-minute warning.

17  Q.  Mr. Weddle asked you all kinds of questions at the end of

18  the redirect examination about what you had hoped to get from

19  Dr. Lesniewski, correct?

20  A.  Yes.

21  Q.  But you don't deny that you told him about all these

22  ailments you had, correct?

23  A.  No, I don't deny telling him.

24  Q.  Have you ever heard of the term medical malpractice?

25  A.  I have heard of it.

D7mnles3a                    Ellensohn - recross

1    Q.  You know that when you tell doctors that you have

2    complaints that they are obligated to pursue those complaints,

3    correct?

4    A.  Right.

5    Q.  Because if they didn't, you would turn around and sue them,

6    correct?

7            MR. WEDDLE:  Objection, your Honor.

8            THE COURT:  Sustained.

9    Q.  If the only time Dr. Lesniewski ever ordered a test for you

10   was in response to something you told him what was wrong with

11   you, isn't that true?

12           MR. WEDDLE:  Objection, your Honor.

13           THE COURT:  Overruled.

14   A.  Yes.

15   Q.  It certainly wasn't in your interest to tell Dr. Lesniewski

16   that you were really OK, was it?

17   A.  At the time, no.

18   Q.  You couldn't tell him that, could you?

19   A.  No.

20   Q.  Because you knew he was writing down what you told him,

21   correct?

22   A.  Correct.

23   Q.  You knew he was relying on what you said --

24           MR. WEDDLE:  Objection, your Honor.

25           THE COURT:  Overruled.

D7mnles3a                    Ellensohn - recross

1    Q.  Isn't that true?

2    A.  He was exaggerating all my --

3    Q.  How do you know he was exaggerating?

4    A.  Because the document --

5           MR. WEDDLE:  Objection, your Honor.

6           THE COURT:  Sustained.

7           MR. WEDDLE:  He can answer the question.

8           THE COURT:  Sustained.

9    Q.  What did he exaggerate for you in those notes that you

10   looked at?

11   A.  It was the whole package he exaggerated.

12   Q.  Oh, it was.

13          MR. WEDDLE:  Objection to the commentary, your Honor.

14          THE COURT:  Sustained.

15   Q.  By question is --

16          MR. DURKIN:  Let's put 116-H up there.

17   Q.  Show me one exaggeration in there.

18   A.  It wasn't in this form.  It was in the forms -- the other

19   forms.

20   Q.  Is there an exaggeration in that document?

21          MR. WEDDLE:  Your Honor, is he asking him to look

22   through the entire document?  It is not just this page.

23          THE COURT:  He is looking at one document.

24          MR. DURKIN:  It's right in front of you.  You can look

25   at the whole document.  It's right in front of you.

D7mnles3a                          Ellensohn - recross

1    A.  All of it.

2    Q.  Yes.  There's only, I think, five pages.

3    A.  Yes, but none of this stuff stopped me from doing my job.

4    I still continued to work --

5    Q.  But you --

6            Is your first name John?  What is your first name?

7    A.  Robert.

8    Q.  -- Robert Ellensohn never told Peter Lesniewski that you

9    could do your job, correct?

10   A.  I was still working.  He never told me not to work.

11   Q.  Who asked for the narrative?

12   A.  Who asked for the narrative?  Ed Yule needed the narrative,

13   but I also needed it to.

14   Q.  You told Dr. Lesniewski that is what you needed, correct?

15   A.  The narrative, right.

16           THE COURT:  Mr. Durkin, one more minute.

17           MR. DURKIN:  I am done.

18           THE COURT:  We have to adjourn.

19           MR. DURKIN:  I am finished.

20           THE COURT:  All right.  Thank you.  You have one

21   minute, Mr. Weddle.

22   REDIRECT EXAMINATION

23   BY MR. WEDDLE:

24   Q.  Sir, did you yourself ask Dr. Lesniewski to prepare a

25   narrative report for you, or did someone else do that on your

D7mnles3a                    Ellensohn - redirect

1    behalf?

2    A.  On my behalf Ed Yule did.

3    Q.  So Ed Yule was the guy who was doing what for you?

4    A.  He was getting all the paperworks together to present it to

5    the Railroad Retirement Board.

6    Q.  And your understanding is that he's the one who talked to

7    Dr. Lesniewski to get a narrative prepared on your behalf?  Is

8    that right?

9    A.  Yes.

10   Q.  Sir, Mr. Durkin asked you if you thought it -- I'm sorry,

11   your Honor.  Mr. Durkin said you had read the paper and you

12   knew about the case and so when you first came to meet with the

13   government you were trying to help yourself I take it, is that

14   right?

15   A.  Well, I knew it was already wrong, what I was doing, before

16   they had the article in the paper.

17   Q.  Did you do anything to help yourself by pretending you had

18   committed crimes, pleading guilty to them, and making up a

19   story to get a letter?

20   A.  No.

21   Q.  What did you think would help you?

22   A.  Doing whatever I had to do to be truthful.

23               MR. WEDDLE:  Thank you.  Nothing further.

24               THE COURT:  Mr. Jackson?

25               MR. JACKSON:  Nothing at all, Judge.  Thank you.

810

D7mnles3a                         Ellensohn – redirect

1               THE COURT:  Mr. Ryan?

2               MR. RYAN:  No questions, your Honor.

3               THE COURT:  Thank you.

4               It is 11:25.  We will adjourn, as I indicated earlier,

5       until 12:30.  Thank you.  Do not discuss the case among

6       yourselves or anyone outside or read any account.  If any of

7       these things occur you are to tell the Court without discussing

8       it with any of your fellow jurors.

9               (Luncheon recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7mnles3a                    Ellensohn - redirect

1          A F T E R N O O N   S E S S I O N

2                         (12:30 p.m.)

3          THE COURT:  Good afternoon.  Thank you.  Welcome back.

4     Counsel, approach for a moment.

5          (At sidebar)

6          THE COURT:  A few things.

7          We were informed that Ms. Rasbatt, one of the jurors

8     who you may recall during the selection that she indicated that

9     she had a medical condition for which she was receiving

10    treatment and from to time to time may have a doctor's

11    appointment.  She's informed the clerk that she has an

12    appointment for Thursday morning and just wants us to know how

13    we should handle that.

14         What I would like to do is bring her over and just

15    have a chat with her here to see how fixed that is, whether

16    there is any flexibility in the schedule, whether we may be

17    able to accommodate her in some other way, and, if not, we will

18    see where we are and possibly just not meet on Thursday.

19         MR. RYAN:  I don't think we have to be present.  You

20    can interview the juror as far as we are concerned one on one.

21         THE COURT:  If there is no objection.

22         MR. DURKIN:  That is fine.

23         THE COURT:  Second, Ms. Walsh and the issue of

24    cross-examination Mr. Ryan.

25         MR. RYAN:  I don't think there will be an issue

D7mnles3a                    Ellensohn - redirect

 1   because I am going to cross-examine her on a subject matter

 2   that doesn't involve my representing her.

 3            THE COURT:  Is the government satisfied with that?

 4            MS. FRIEDLANDER:  I think we have to raise it with

 5   Ms. Walsh's counsel and Ms. Walsh.  I don't think I can speak

 6   for her.

 7            MR. WEDDLE:  As we submitted in the letter relating to

 8   this issue --

 9            MR. DURKIN:  I can't hear you.

10            MR. WEDDLE:  As we submitted in the letter relating to

11   this issue, there is a duty of loyalty issue that is implicated

12   whenever a lawyer attempts to cross-examine his or her former

13   counsel.  I don't know what Mr. Ryan plans to do with her, but

14   based on --

15            THE COURT:  Mr. Ryan, why don't you give a proffer to

16   the government.

17            MR. RYAN:  I intent to elicit from Ms. Walsh she was a

18   representative of management during the years.  Her role was to

19   be a faculty member, to be sure that all employees were aware

20   of their rights and that she dealt with Joe Rutigliano as a

21   representative of the labor concerning grievances.  It has

22   nothing to do with my representing Regina Walsh.  All it is, is

23   in her personnel file and 3500 material.

24            MR. WEDDLE:  Your Honor, this could have been allayed

25   by having separate counsel conduct this.

1          THE COURT:  How long is Ms. Walsh's testimony going to

2     be on direct?

3          MS. FRIEDLANDER:  Probably an hour.

4          MR. RYAN:  And my cross will take about five minutes.

5          THE COURT:  Is there any way in which you could reach

6     out to Ms. Walsh's counsel and advise him or her?

7          MR. DURKIN:  He is in the witness room.

8          MS. FRIEDLANDER:  He might have run out but we can

9     certainly reach out to him.

10          THE COURT:  Give the proffer and have him consult with

11     Ms. Walsh and we will see if she can waive whatever conflict

12     there is on the basis of the proffer.

13          MR. WEDDLE:  Your Honor, just with respect to the

14     scheduling and Ms. Rabsatt --

15          MS. FRIEDLANDER:  We had spoken with Dr. Baran about

16     testifying on Thursday.  He's been like clearing his schedule.

17     He's been clearing his schedule and canceling surgery and stuff

18     so he can testify on Thursday.  He has Friday also, but just if

19     we miss Thursday morning I don't know how long these guys are

20     going to cross him for.

21          MR. WEDDLE:  Dr. Baran I think is unavailable early

22     the next week.  So we had kind of blocked Thursday and Friday.

23     If there is any chance she could do Wednesday, Wednesday is

24     much better.

25          THE COURT:  I will see what flexibility she has and

1    how urgent it may be.

2              MS. FRIEDLANDER:  One other small matter?

3              THE COURT:  Yes.

4              MS. FRIEDLANDER:  Just on the cross-examination that

5    Baran's counsel would like to do, there is a hearsay statement

6    of his client that her husband was sick.  It is total hearsay.

7    He shouldn't be allowed to cross-examine on that.

8              THE COURT:  Is that relevant in any way to anything?

9              MS. FRIEDLANDER:  The government has alleged that he

10   is an unindicted coconspirator we are proving up his fraught in

11   this trial.  So they would like to offer Ms. Baran's statement

12   that he's sick.  And we would just say that it is hearsay.  It

13   is total hearsay.

14             THE COURT:  All right.  Mr. Jackson.

15             MR. JACKSON:  Here I am, Judge.

16             THE COURT:  Yes.

17             MR. JACKSON:  How are you, your Honor?

18             THE COURT:  You are trying to hide.

19             MR. JACKSON:  I am trying to hide from you.

20             First of all, Judge, I don't want to presume what they

21   are going to do on direct.  I think we will see what they offer

22   on direct and we will see what avenues they explore.  If it is

23   somehow relevant or I think it should come in, I will attempt

24   to admit it and you will make a ruling at the appropriate time.

25             MS. FRIEDLANDER:  It is hearsay.  There is nothing I

1    can say on direct that changes it.

2              THE COURT:  Let's do the following.  This is an

3    opportunity for gold stars.

4              Mr. Durkin has been professionally and scrupulously

5    careful about not introducing stuff that the Court has ruled

6    inadmissible, and I appreciate that.

7              So, Mr. Jackson, if you want a gold star, proceed the

8    way that Mr. Durkin has.

9              MR. DURKIN:  Can I ask the reporter to type that up so

10   I can send it to about a dozen judges in Chicago.

11             THE COURT:  You can have it framed at your expense.

12             MR. WEDDLE:  Your Honor, just to follow up on the

13   issue that occurred before lunch, I did go back and find the

14   grand jury subpoena that we gave to Mr. Ellensohn, and I have

15   given a copy to Mr. Durkin.  I don't think it changes anything.

16             MR. DURKIN:  I have it.  I was going to mark it as

17   Defendant Liesnewski Exhibit No. 2.  I don't see that I will do

18   anything with it.  But this is the subpoena.  It was drafted by

19   hand by Mr. Weddle as I understand it.

20             THE COURT:  Is there any objection to its

21   introduction?

22             MR. WEDDLE:  Into evidence?  I don't think it is

23   relevant, your Honor.

24             MR. DURKIN:  I am going to offer it.  That is what I

25   would like to do.

D7mnles3a                    Ellensohn - redirect

1              MR. WEDDLE:  If it comes into evidence, your Honor

2     would simply have to explain away any significance of it

3     because there was no grand jury appearance by him.  What

4     happened is he called his lawyer, his lawyer called the

5     government, and then he voluntarily came in and met with the

6     government and ultimately pled guilty.

7              THE COURT:  I don't see that introducing it into

8     evidence, Mr. Durkin, adds anything.  There is testimony, not

9     contradicted --

10             MR. DURKIN:  If I could just state -- can I think

11     about it?

12             THE COURT:  Yes.

13             MR. DURKIN:  One of the issues that concerns me, so

14     you know, is that it was written by Mr. Weddle.  So I am

15     troubled by the fact that he let it stand that it was a letter

16     to begin with that he received.  But, more importantly, I have

17     some reservations about whether this was a true grand jury

18     subpoena.  This was issued on April 24, 2013.

19             THE COURT:  This is not the time or the place to

20     litigate that issue.

21             MR. DURKIN:  I understand.  I may not do anything

22     about it.  I just want some time to think about it.

23             THE COURT:  All right.

24             MR. DURKIN:  Thank you.

25             THE COURT:  Thank you, all.

1             (Counsel not present)

2             (Juror present)

3             JUROR:  Hi.

4             THE COURT:  Good afternoon.  The clerk has told me

5    that you informed him that you had told us last week about your

6    medical appointments.

7             JUROR:  Yes.

8             THE COURT:  And that you have an appointment scheduled

9    for this Thursday, some kind of prelab or something?

10            JUROR:  I did the lab on Saturday.

11            THE COURT:  That is good.  My question is, is there

12   any flexibility you have about the appointment.  How urgent is

13   it?  Is it anything that may be rescheduled, if necessary?

14            JUROR:  It is usually a follow-up to the labs.  So I

15   will call the doctor tomorrow when the labs are in and then

16   maybe we can talk over the phone.

17            THE COURT:  OK.

18            JUROR:  It is kind of a follow-up to go over the labs,

19   if there is any change or anything like that.

20            THE COURT:  Let us know tomorrow then.

21            JUROR:  OK.

22            THE COURT:  If it is urgent, if it is a matter of

23   something that may imperil your health, of course, we will make

24   adjustments and if necessary not meet on Thursday if you need

25   to go in.  If it is not that and there is some flexibility, let

1   us know and we will see how we can work around your needs and

2   ours.

3            JUROR:  All right.

4            THE COURT:  Thank you.

5         (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7mnles3a                    Ellensohn - redirect

1            (In open court)

2            THE COURT:  Welcome back.  Thank you.

3            THE COURT:  The government's next witness.

4            MS. FRIEDLANDER:  The government calls Regina Walsh.

5    REGINA WALSH,

6        called as a witness by the Government,

7        having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MS. FRIEDLANDER:

10   Q.  Good afternoon, Ms. Walsh.  Before I start asking you

11   questions I just need to read something into the record.

12            MS. FRIEDLANDER:   Without objection, the government

13   offers Exhibits 108-A, B, C, D, E and F, Government Exhibit

14   713, Government Exhibit 1400, and Government Exhibit 1402.

15            THE COURT:  Admitted without objection.

16            (Government's Exhibits 108-A, 108-B, 108-C, 108-D,

17   108-E, 108-F, 713, 1400, and 1402 received in evidence)

18   Q.  Good afternoon, Ms. Walsh.  Where do you live?

19   A.  In New Hyde Park on Long Island.

20   Q.  Are you married?

21   A.  Yes.

22   Q.  Do you have children?

23   A.  I have two grown children.

24   Q.  How old are you?

25   A.  My son is 39 and my daughter is 41.

D7mnles3                          Walsh - direct

1    Q.  And how old are you?

2    A.  65.

3    Q.  Are you currently employed?

4    A.  No, I am retired.

5    Q.  Before you retired, what did you do for a living?

6    A.  I was director of employee services at the Long Island Rail

7    Road.

8    Q.  Generally speaking, what were your duties and

9    responsibilities as director of employee services?

10   A.  I was responsible for the health and welfare for the

11   railroad, for the employees as well as the sick leave.

12   Q.  Did you work in an office?

13   A.  Yes.

14   Q.  How many years did you work in the Long Island Rail Road

15   approximately?

16   A.  30.

17   Q.  What year did you retire?

18   A.  2006.

19   Q.  When you retired, did you obtain any pensions?

20   A.  I received a pension from the Long Island Rail Road, and I

21   also received a disability from Railroad Retirement Board.

22   Q.  Your pension from the railroad, was that a retirement

23   pension?

24   A.  It was retirement pension, yes.

25   Q.  Did you receive an occupational disability pension --

D7mnles3                          Walsh - direct

1   A.   Yes.

2   Q.   -- from the Railroad Retirement Board?

3   A.   Yes.

4   Q.   What is occupational disability?

5   A.   It is stating that you can no longer do your job.

6   Q.   When you applied for occupational disability, were you

7   physically able to do your job?

8   A.   Yes.

9   Q.   How did you get disability benefits if you could still do

10  your job?

11  A.   I lied.

12  Q.   Who helped you get disability benefits that you were not

13  entitled to?

14  A.   Dr. Ajemian and Marie Baran.

15          MR. JACKSON:  Objection, Judge.

16          THE COURT:  Overruled.

17  Q.   Do you see Marie Baran in the courtroom today?

18  A.   Yes.

19  Q.   Could you please point to her and identify her by an

20  article of clothing that she's wearing.

21  A.   She has a dark shirt on, navy blue or black, I can't tell.

22          MS. FRIEDLANDER:  Your Honor, may the record reflect

23  that the witness has identified the defendant.

24          THE COURT:  So noted.

25  Q.   Ms. Walsh, for how long did you collect disability benefits

D7mnles3                    Walsh - direct

1    that you weren't entitled to?

2    A.  About 15 months.

3    Q.  How much did you collect in total?

4    A.  A little over $56,000.

5    Q.  Are you still collecting disability?

6    A.  No.

7    Q.  Did there come a time when you were arrested?

8    A.  Yes.

9    Q.  When was that?

10   A.  October 27 of two thousand --

11   Q.  Was it 2011?

12   A.  '11, 2011.

13   Q.  What were you charged with generally?

14   A.  With fraud, conspiracy.

15   Q.  What did you ultimately decide to do with your case?

16   A.  I took a plea agreement.

17   Q.  What crime did you plead guilty to?

18   A.  To lying on my application for disability.

19   Q.  Did you plead guilty to all the crimes you were charged

20   with or just one?

21   A.  There was a plea agreement that I had made with the

22   government, and it was for the one charge.

23   Q.  What does that agreement say about the sentence that you

24   may receive in this case?

25   A.  According to the federal guidelines, I think it's six to

twelve months' prison time.

Q.  That is in your plea agreement, a recitation of how the
sentencing guidelines may apply in your case?

A.  Yes.

Q.  What is your understanding of who will decide your actual
sentence?

A.  Judge Marrero.

Q.  What sentence are you hoping to get?

A.  Probation.

Q.  Does your plea agreement require you to cooperate with the
government?

A.  No.

Q.  Do you have any agreement with the government that requires
you to meet with the government or testify in this case?

A.  No.

Q.  Has the government agreed to do anything for you in
connection with your sentencing if you provide truthful
testimony.

A.  No.

Q.  Why are you testifying today?

A.  Because I lied and I know I lied, and I am trying to make a
right of something I did wrong.

Q.  What about the money that you received as disability
benefits?

         What does your plea agreement say about that?

1    A.  I have to repay it back.  I had to repay it back.

2    Q.  Have you paid back all of the money that you collected in

3    disability benefits?

4    A.  Yes.

5    Q.  How much did you repay the federal government?

6    A.  $56,234, something like that.

7    Q.  Getting back to the Long Island Rail Road, at what age were

8    you eligible for a Long Island Rail Road railroad pension?

9    A.  At age 50.

10   Q.  And at what age did you retire?

11   A.  At 58.

12   Q.  Why did you wait until you were 58 if you could have

13   retired earlier?

14   A.  I wanted to wait until I had 30 years of service.  If I had

15   30 years of service, if I didn't apply for a disability, at age

16   60 I would be eligible for full benefits under the Railroad

17   Retirement system.

18   Q.  Did you say you didn't know if you were going to apply for

19   disability?

20   A.  I wasn't sure if that was what I was going to do.  I wasn't

21   sure if I really had -- in my heart I knew I didn't have a

22   disability.

23   Q.  How did you learn about applying for disability at the Long

24   Island Rail Road?

25   A.  It was common knowledge there.

D7mnles3                    Walsh - direct

1   Q.  What did you need to submit to apply as far as you had

2   heard?

3   A.  I knew I had to have medical documentation and there was an

4   application that you had to fill out for the Railroad

5   Retirement Board.

6   Q.  As far as the medical records or the medical piece of that,

7   what did you hear you needed to do?

8   A.  That you had to build a case.

9            MR. JACKSON:  Objection to what she heard, Judge.

10           THE COURT:  Overruled.

11  Q.  You can answer.

12  A.  You had to build a case and prove that you had a condition

13  that was continuing, that wasn't getting any better, and so I

14  had gone to a doctor about a year and a half before I was ready

15  to retire.

16           MR. JACKSON:  Objection as to nonresponsive.

17           THE COURT:  Sustained.

18  Q.  Did you hear at the railroad about particular doctors to

19  see to get disability?

20  A.  I know there was various doctors out there, I didn't know

21  their names, but I did hear of Dr. Ajemian, and that's why I

22  went to him.

23  Q.  In terms of the application piece of applying for

24  disability, what did you hear you needed to do?

25  A.  That you needed someone to assist you in writing it out and

D7mnles3                        Walsh - direct

```
 1    filling it out.
 2    Q.  And did you hear --
 3          THE COURT:  Ms. Friedlander, frame the questions not
 4    as to what she heard, but her understanding and impression that
 5    she took from information that came to her attention.
 6    Q.  Certainly.  Did you have an understanding that there were
 7    people who would help you complete the paperwork?
 8    A.  Yes.
 9    Q.  What was your understanding as to whether this was a free
10    service that they offered?
11    A.  No, they had to pay for it.  I knew people out there, knew
12    there was lawyers and other people.  I didn't know names, but I
13    knew there were people out there.
14    Q.  What was your understand as to whether this was a free
15    service?
16    A.  No, it wasn't free.  You paid for it.
17    Q.  Did there come a time when you took steps toward
18    potentially applying for disability?
19    A.  Yes, like I had said, about a year and a half before I
20    retired, or maybe it was two years, I started, went to see
21    Dr. Ajemian so that if I decided to go for the disability at
22    least I would have the medical documentation that I needed.
23    Q.  How often did you see Dr. Ajemian leading up to your
24    retirement approximately?
25    A.  I think it was about every six weeks, two months.
```

1    Q.  Why did you see him with that frequency?

2    A.  Because when you went to him he told you to come back in a

3    couple weeks.

4             MR. JACKSON:  Objection as to what he said, Judge.

5             THE COURT:  Sustained.

6    Q.  What complaints did you make to Dr. Ajemian over time?

7    A.  I had told him that I had problems with my hand, that I had

8    the carpal tunnel, I had numbness in my legs and pain in my

9    shoulder.

10   Q.  Was it true that you had some pain?

11   A.  I had some, but it was minimal.

12   Q.  What made your legs and arms feel better?

13   A.  Actually by exercising or walking, going to the gym.

14   Q.  During your visits to Dr. Ajemian during that period, what

15   did he do generally during the visits?

16            MR. DURKIN:  Judge, I just want to raise an issue.

17            THE COURT:  Counsel, please approach.

18        (Continued on next page)

19

20

21

22

23

24

25

D7mnles3                          Walsh – direct

1           (At sidebar)

2           THE COURT:  All right.  Now I have allowed some of

3    this information to come in as general background about the

4    charged conspiracy that is part of the counts at trial.  You

5    are getting into deeper detail about her treatment with

6    Dr. Ajemian, and I think that at some point that it is going to

7    start becoming prejudicial to Dr. Lesniewski.

8           MS. FRIEDLANDER:  I am happy to skip over that stuff.

9           THE COURT:  I think you should.

10           MS. FRIEDLANDER:  As long as they don't start

11    cross-examining her on the treatment she got from him.

12           THE COURT:  All of it is going to be irrelevant

13    because there won't be direct on that.

14           MS. FRIEDLANDER:  I would like, if it is OK with the

15    Court, I will just jump to when she gets a narrative from him.

16    She hesitates about whether to get the narrative or not get the

17    narrative.  I will just jump to that.

18           THE COURT:  All right.  Anything else?

19           MR. DURKIN:  I don't think that they have proven up

20    the overall conspiracy yet to be interjecting statements of

21    Ajemian against Lesniewski.

22           THE COURT:  All right.  I am not going to allow the

23    any details about the narrative, just the fact that she

24    obtained a narrative.

25           MS. FRIEDLANDER:  Judge, the one thing I would like to

1    ask, I believe she would testify, if asked, that at the end of

2    her visits to Ajemian, right before she is going to retire, she

3    tells Dr. Ajemian, I'm planning to retire.

4            He said, OK, let me get you a disability narrative,

5    and she had never discussed disability with her before.

6            THE COURT:  This is Ajemian.  This is not Lesniewski.

7            MS. FRIEDLANDER:  But they are objecting that I am not

8    doing anything to prove up the conspiracy.

9            THE COURT:  That was a conspiracy between her and

10   Ajemian, not her and Lesniewski.

11           MS. FRIEDLANDER:  It is charged in Counts Two and

12   Four.

13           MR. WEDDLE:  Your Honor, may I have just one moment.

14           Your Honor, we have charged a conspiracy involving

15   Dr. Ajemian in Counts Two and Four of the indictment involving

16   Ajemian and Baran and Rutigliano and others that are not named.

17           We wouldn't have a problem with your Honor instructing

18   the jury that evidence about what Dr. Ajemian did or didn't do

19   should not be considered by them with respect to the conspiracy

20   charges against Dr. Lesniewski.  I don't say anything about

21   that.  But they are being admitted to prove the conspiracy

22   charges of Count Two and Count Four.

23           THE COURT:  All right.  Again, just limit or cabin the

24   testimony of this witness with regards to Ajemian to the

25   minimum possible --

D7mnles3                          Walsh - direct

1           MS. FRIEDLANDER:  OK.

2           THE COURT:  -- so it doesn't go into prejudicial

3     material of Dr. Lesniewski.

4           MR. DURKIN:  That's the problem we have been concerned

5     about all along.  A limiting instruction doesn't solve our

6     problem.  Counts Two and Four, we argued previously we

7     shouldn't have been joined with that for trial.  I just think

8     it's so prejudicial to Lesniewski that even if it is admissible

9     under 403 it shouldn't come in at all.

10          MR. WEDDLE:  Your Honor, they moved on this, and your

11    Honor denied their motion.

12          MR. RYAN:  That is correct.

13          MR. WEDDLE:  We are entitled to prove the charges in

14    the conspiracy.  I don't see how they can argue that that we

15    can't prove the charges in the conspiracy.  Ajemian is an

16    extremely important coconspirator in those charges.  We need to

17    prove that he committed a crime.

18          THE COURT:  I understand.  I am just trying to limit

19    any potential prejudice by not going into more details than

20    necessary.

21          MR. WEDDLE:  Your Honor, I think maybe the best way to

22    handle that is for your Honor to instruct the jury that

23    Dr. Lesniewski is not charged in any conspiracy with

24    Dr. Ajemian.  He simply is not charged that way.  And so

25    conduct by Dr. Ajemian that is admitted in the trial is not

 1   admitted for purposes of proving any case against

 2   Dr. Lesniewski.

 3           MR. RYAN:  On behalf of Mr. Rutigliano, there is an

 4   objection, because you are offering this Ajemian evidence

 5   against Mr. Rutigliano, and we made a pretrial motion --

 6           MR. WEDDLE:  Of course we are.

 7           MR. RYAN:  -- to preclude this because we are

 8   confronted with this hearsay evidence.  Dr. Ajemian is not

 9   here.  There is nobody available to challenge these findings,

10   and that's exactly the prejudice that Mr. Rutigliano is

11   concerned about.

12           MR. JACKSON:  Judge, one other issue.

13           I am looking for the gold star.  So just in

14   anticipation, this deals with the exhibits, I just need the

15   government's attention.

16           We are going to be looking at Exhibit 1400, 1401.  I

17   wanted to know what, if any, objection the government had as to

18   that.  Again, gold star, Judge.  This deals with

19   cross-examination.

20           MS. FRIEDLANDER:  What is that.

21           MR. JACKSON:  Exhibit 1400.

22           MS. FRIEDLANDER:  These are our exhibits?

23           MR. JACKSON:  Yes.

24           MS. FRIEDLANDER:  Your question is what?

25           MR. JACKSON:  You don't have any objection to our

1    using the exhibits, right?

2              MS. FRIEDLANDER:  They are exhibits that I am

3    introducing?

4              MR. JACKSON:  No, not that you are introducing.

5              MS. FRIEDLANDER:  I just need to see what they are.

6              MR. JACKSON:  Apparently you didn't give those to me,

7    nor do I believe it is your indication to use them.

8              MS. FRIEDLANDER:  Is this the whole claim file?

9              MR. JACKSON:  There are portions of the claim file

10   that I think --

11             MS. FRIEDLANDER:  We have been through this ten times

12   with the judge already.  There's tons of hearsay.  You have to

13   show us what it is.

14             MR. JACKSON:  Sure.

15             I'll show you exactly what I intend to use.

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

```
 1    D7mdles4                    Walsh - direct
 2             (In open court)
 3             MS. FRIEDLANDER:  May I proceed, your Honor?
 4             THE COURT:  Just one moment.
 5             MS. FRIEDLANDER:  Sure.
 6             (Pause)
 7             THE COURT:  OK.  Counsel please approach again.
 8             (At the sidebar)
 9             THE COURT:  All right.  Here's the preliminary
10    limiting instruction that I would like to give to the jury
11    about the issue we just talked about.
12             The jury will note that some testimony from this
13    witness was admitted relating to conversations the witness had
14    with Dr. Ajemian.  That testimony was admitted to permit the
15    government to provide background information as to the charges
16    that were brought against -- that pertain to Ms. Baran.  The
17    testimony of actions by Dr. Ajemian do not involve conduct by
18    Dr. Lesniewski and may not be used by you to form any
19    conclusion about the government's charges against
20    Dr. Lesniewski.
21             MR. WEDDLE:  It may be technical, but, your Honor,
22    technically Ajemian and Baran and Rutigliano are charged as
23    co-conspirators together.  So there is a fine distinction
24    before inform jury to make.
25             THE COURT:  The jury is not going to be confused.
```

1              MR. WEDDLE:  OK.

2              (In open court)

3              THE COURT:  All right.  During the instructions that I

4    will give you at the end of the trial, I will make reference to

5    evidence that is admitted for a limited purpose, or subject to

6    limiting instruction, and I want to give you one of those

7    instructions now.

8              You will note that some testimony from this witness

9    was admitted relating to conversations that the witness had

10   with Dr. Ajemian.  That testimony was admitted to permit the

11   government to provide background information as to the charges

12   that the government brought that pertain to Ms. Baran.  The

13   testimony of actions by Dr. Ajemian do not involve conduct by

14   Dr. Lesniewski and may not be used by you to form any

15   conclusion about the government's charges against

16   Dr. Lesniewski.

17             All right.

18             MS. FRIEDLANDER:  Thank you, your Honor.

19   BY MS. FRIEDLANDER:

20   Q.  OK.  Ms. Walsh, leaving Dr. Ajemian for a moment.

21             Did there come a time when you contacted Marie Baran

22   in connection with your retirement?

23   A.  Yes.  I'm not sure if it was, I'm not sure, April, or

24   around that time anyway, in 2006 when I was -- before I was

25   going to retire.  I had called her to confirm that I would have

1   360 months of service under the Board.

2   Q.  Where did Ms. Baran work at the time?

3   A.  She worked at the Railroad Retirement Board in Westbury.

4   Q.  What was her job there?

5   A.  Manager, I believe.

6   Q.  And how did you know her?

7   A.  If we had any questions about the Railroad Retirement --

8   for any employee regarding benefits under the Railroad

9   Retirement Board or anything, we always referred them to Marie,

10  or I would call Marie to ask her.

11  Q.  Just to be clear, you worked for the LIRR?

12  A.  Right.  I don't work for the Railroad Retirement Board.  I

13  worked for the Long Island Rail Road.

14  Q.  Now, can you explain -- you mentioned 360 months.  Can you

15  explain you called Marie Baran to talk about that subject?

16  A.  Because you only can qualify while you were still working,

17  under the Railroad Retirement Board, working for a Rail Road,

18  and I just wanted to make sure that I had my 360 months.  And

19  if I was short a month, I would stay a month longer or

20  whatever.  But I just needed to be sure for my own benefit that

21  I had the 360 months.

22  Q.  To be clear, is that because if you worked 360 months, you

23  are eligible for a federal retirement pension?

24  A.  Under the Railroad Retirement Board, I would be eligible at

25  age 60 for a full retirement benefit.

1    Q.   OK.   Now, can you tell us what you said to Marie Baran and

2    what she said to you during this conversation?

3    A.   Obviously, first I asked her about the months.   And she

4    said, you know, definitely I had the months.   And then she

5    asked me if I was going to apply for a disability.   And I told

6    her I really wasn't sure.   And she said, well, if you are, you

7    know, I will be able to help you, but I won't be able to help

8    you until after I retire in January.   And I said, OK.   You

9    know, that was fine.

10          Then she asked me if in the meantime I was going to

11   see Dr. Ajemian, and I said I was.

12   Q.   You said Marie Baran asked you if you were going to file

13   for disability.

14          What, if anything, in the course of the conversation

15   prompted that comment?

16          MR. JACKSON:   Objection.

17          THE COURT:   Rephrase the question.

18   Q.   What, if anything, had you said in the conversation that

19   prompted that comment by Marie Baran?

20   A.   Just that I was retiring.

21   Q.   Had you ever suggested to Marie Baran that you were unable

22   to do your job?

23   A.   No.

24   Q.   Had you ever suggested to Marie Baran that you were in any

25   pain or discomfort?

```
 1    A.  No.

 2    Q.  To what extent have you ever discussed your physical

 3    condition with Marie Baran?

 4    A.  Nothing.

 5    Q.  You mentioned that Marie Baran asked you if you were seeing

 6    Dr. Ajemian?

 7    A.  Yes.

 8    Q.  To what extent had you ever discussed with Marie Baran who

 9    your doctors were?

10    A.  None.  Nothing.

11    Q.  You said that Marie Baran could help you with disability or

12    with the paperer work.  What did you understand her to mean by

13    that?

14    A.  That she was --

15              MR. JACKSON:  Objection.

16              THE COURT:  Overruled.

17    A.  That she would help me fill out the application.

18    Q.  And how did you answer her?

19    A.  I said I would let her know.  I wasn't really sure what I

20    was going to do.

21    Q.  Now, did there come a time when you talked to Dr. Ajemian

22    about your retirement plans?

23    A.  I guess at the end of August, a couple of weeks before I

24    retired, I had gone to see him, and I told him that I was going

25    to retire as of September 1.
```

1   Q.  How did he respond?

2   A.  He just said --

3            MR. JACKSON:  Objection.

4            THE COURT:  Sustained.

5            Rephrase the question.

6   Q.  When you told Dr. Ajemian that you were going to retire,

7   what did he say?

8            MR. JACKSON:  Objection.

9            THE COURT:  No, not what he said.  What is her

10  impression and what action did she take pursuant to that

11  impression?

12  Q.  How did Dr. Ajemian react when you told him you were going

13  to retire?

14  A.  He said, OK, then you're going to just pack it all in and,

15  you know, you'll apply for -- you know, you can no longer work

16  anymore and not work safely and I'll get you a -- I'll get you

17  the narrative and get all your files together for you.

18  Q.  What was your understanding of what a narrative was?

19  A.  That it was medical documentation from the doctor as to why

20  you couldn't work anymore.

21  Q.  When you told Dr. Ajemian that you were retiring and he

22  said he would get you a narrative, had you ever talked to him

23  about disability before?

24  A.  No.

25  Q.  Had you ever suggested to Dr. Ajemian that you were unable

```
 1   to do your job?

 2   A.  No.

 3   Q.  Had you asked him for a narrative?

 4   A.  No.

 5   Q.  Did there come a time when you returned to Dr. Ajemian's

 6   office to get the narrative?

 7   A.  Yes.  I had a sick leave form that had to be filled out to

 8   be sent to early retirement.

 9           Before I left the office that day, I believe it was

10   the receptionist had told me that I would have to pay for the

11   narrative --

12           MR. JACKSON:  Objection.

13           THE COURT:  I'm sorry.

14           MR. JACKSON:  I'm sorry, Judge.  She is talking about

15   a receptionist telling her things.

16           THE COURT:  Ask the question again, Ms. Friedlander.

17           MS. FRIEDLANDER:  I'm sorry, my co-counsel has a

18   comment.

19           (Pause)

20   BY MS. FRIEDLANDER:

21   Q.  Ms. Walsh, were you told that the narrative would cost

22   money?

23   A.  I was.  But before I left, the -- I believe it was the

24   receptionist told me that --

25           MR. JACKSON:  Objection.
```

1          MS. FRIEDLANDER:  Judge, this is not an 801 issue; it

2     is for the fact that it was said, of course.

3          THE COURT:  All right.  Sustained.

4     Q.  Did you come to learn that the narrative cost money?

5     A.  Yes.  I was told that I had to pay --

6          MR. JACKSON:  Objection.

7          THE COURT:  Now, Ms. Walsh, don't testify as to what

8     you were told by different parties.  What actions did you take

9     pursuant to what you learned?  What impressions did you have of

10    what you had to do?

11    Q.  Did you pay for your narrative?

12    A.  I had to pay for the narrative.  What happened was I went

13    back -- after I had retired, I went back to Dr. Ajemian's

14    office to have the sick leave form filled out.  When I went to

15    have it filled out, I paid his -- Marie, and I'm not sure of

16    her last name.  I gave the sick leave form for her to fill out.

17    And she went to give me the narrative, and I said I really

18    didn't want it yet because I wasn't sure what I was going to

19    do.  And on the other -- and if I was going to file, I knew I

20    didn't want it until -- I wasn't going to meet with Marie until

21    January, so I didn't want it right away.

22         But I also knew that I had to pay $2,000.  So I did

23    bring the money with me in case they were going to give it to

24    me, which they did.

25         MR. JACKSON:  Objection as nonresponsive, Judge.

```
 1              MS. FRIEDLANDER:  Your Honor --

 2              THE COURT:  Overruled.

 3   A.  So she -- it was printed yet.  So she went to print it, and

 4   I told her I didn't want it.  And she said, oh, why don't you

 5   take it --

 6              MR. JACKSON:  Objection as to what she told her.

 7              MS. FRIEDLANDER:  Your Honor, could he let the witness

 8   answer the question, please?

 9              THE COURT:  Overruled.

10   A.  So she printed it out and said, here, just take it, which I

11   did.

12   Q.  How did you pay for the narrative, in what form?

13   A.  In cash.

14   Q.  Why?

15   A.  Because I was -- I knew you had to pay it in cash.

16   Q.  Dr. Ajemian's office tell you to pay in cash?

17   A.  Yes.

18   Q.  Have you seen other doctors in your life?

19   A.  Yes.

20   Q.  Any other doctor ever request that you pay for his or her

21   services in cash?

22   A.  No.

23              MR. JACKSON:  Objection.

24              THE COURT:  Sustained.

25              MR. JACKSON:  I move to strike.
```

1              THE COURT:  Sustained.

2    Q.  Did you take the narrative with you that day?

3    A.  Yes.

4    Q.  And after that did there come a time when you contacted

5    Marie Baran again?

6    A.  Yes.  I'm not sure exactly when it was, October or

7    November, I'm not sure when, and we made an appointment for

8    January.

9    Q.  What was -- what happened next?

10   A.  In January I went to meet with Marie and we started filling

11   out the application.

12   Q.  How long did you meet with her for?

13   A.  It wasn't long.  Maybe about a half hour or so.

14   Q.  What, if anything, did Marie Baran ask you to bring to the

15   meeting?

16   A.  She said to bring all the medical documentation that I had.

17   Q.  Did you do that?

18   A.  I did.

19   Q.  Was that Dr. Ajemian's records?

20   A.  Yes.

21   Q.  What did Ms. Baran do with Dr. Ajemian's records during the

22   meeting?

23   A.  She just skimmed through them, looked for certain items on

24   it, and that was it.

25   Q.  What else did she do during the meeting?

1    A.   Then she also asked me about my job description and what I

2    did, what duties I have.

3    Q.   Tell us what else happened.

4    A.   So then she had -- the application was on the computer and

5    she was writing in.  As I was telling her what I did, she would

6    take it and just exaggerate it --

7              MR. JACKSON:  Objection, Judge.

8              THE COURT:  Sustained.

9              MS. FRIEDLANDER:  Your Honor, may we be heard?

10             THE COURT:  No.  Let's move on.

11   BY MS. FRIEDLANDER:

12   Q.   OK.  Can you explain what happened during the meeting --

13   A.   Like I would say, I would go down to -- we would have a

14   facility.  I would go down the hillside and walk across the

15   facility, and she would say, well, she walked from one facility

16   to the other great distances, things like that.

17   Q.   And when you said Marie Baran exaggerated, did she --

18             MR. JACKSON:  Objection, Judge.

19             THE COURT:  No, sustained.

20   Q.   Ms. Walsh, did Marie Baran type things in your application

21   in front of your eyes that you had not told her?

22   A.   Yes.

23   Q.   Did Marie Baran type things in front of your eyes that were

24   not true?

25   A.   Yes.

1    Q.   Did Marie Baran ask you whether what she wrote was true?

2    A.   No.

3    Q.   Did you correct her?

4    A.   No.

5    Q.   At the end of your meeting, what did you ask Marie Baran?

6    A.   Oh, I had said to her, do I really need -- I knew it was

7    wrong, and I just said to her do I really need to submit the

8    application for disability?  Could I just stay on sick leave?

9    Q.   And how did Marie Baran respond?

10   A.   And she told me, no, they would be too suspicious.  You

11   couldn't stay out that long and not file for disability.

12   Q.   What did you decide to do?

13   A.   I filled out, I signed the application, and I submitted it

14   to the Railroad Retirement Board.

15   Q.   How did your meeting with Ms. Baran end?

16   A.   I went to pay her but I had a check with me and then she

17   said she preferred cash.  I went to the ATM machine and I got

18   some cash and I came back later.

19   Q.   How much cash did Marie Baran ask you for?

20   A.   I think it was a thousand dollars.

21   Q.   Why were you paying Marie Baran a thousand dollars in cash

22   to fill out your disability application?

23   A.   Because I think she knew the right words to use and to say

24   on the application so that I could get a disability.

25   Q.   When you say "the right words," what do you mean?

1   A.   The correct words, the words that was needed in order for

2   me to get a disability under the Railroad Retirement Act.

3   Q.   OK.  When you say "the correct words," do you mean that she

4   was putting into your application --

5          MR. JACKSON:  Objection.

6          MS. FRIEDLANDER:  Excuse me.

7   Q.   Do you mean that she was putting in your application things

8   weren't true?

9          MR. JACKSON:  Objection.

10         THE COURT:  Overruled.

11  A.   No, they were not true.  I knew they were not true and they

12  were not true.

13  Q.   What did Ms. Baran give you to take with you, if anything,

14  at the end of the meeting?

15  A.   She gave me the application back and the medical

16  documentation to bring to the board.

17  Q.   What did you do with those things?

18  A.   I brought them to the Railroad Retirement Board in

19  Westbury.

20  Q.   Could you tell us about your meeting at the Railroad

21  Retirement Board in Westbury?

22  A.   I just brought the -- I brought the application in and the

23  medical documentation and the -- I think it was an MRI, I can't

24  remember, but he just went through it and made sure everything

25  was filled in and that was about it.

```
1    Q.  When you say he went through it, did he ask you any
2    questions about your physical condition?
3    A.  No.
4    Q.  Did he ask you any questions about your ability to do your
5    job?
6    A.  No.
7    Q.  Did he ask you whether the answers you had given in the
8    application were -- the answers that had been typed there for
9    you, whether they were true?
10             MR. JACKSON:  Objection.
11   Q.  Did he ask you whether the answers in the application were
12   true?
13             MR. JACKSON:  Objection.
14             THE COURT:  Overruled.
15   Q.  You can answer.
16   A.  Yeah -- no.  No, he never asked me.
17   Q.  Ms. Walsh, did you continue visiting Dr. Ajemian after you
18   filed for disability?
19   A.  Yes.
20   Q.  Tell us why.
21   A.  Because Mary had told me you have to continue going in case
22   you were denied your disability so that you can later on --
23             MR. JACKSON:  Objection.
24             THE COURT:  Overruled.
25   A.  -- so that you can --
```

1   Q.  Please finish your answer.

2   A.  So that you can appeal your case, and you would still need

3   additional medical documentation.

4   Q.  OK.  Did you continue visiting Dr. Ajemian as Marie Baran

5   told you to?

6   A.  Yes.

7   Q.  Did you do that once or more than once?

8   A.  I don't remember.  I think it was a couple of times.  I

9   really can't tell you for sure.

10   Q.  Were those visits free?

11   A.  No.

12   Q.  How did you pay for them?

13   A.  Through my insurance, which was United Healthcare, and

14   copays.

15   Q.  After you filed for disability, were you awarded disability

16   right away?

17   A.  No.  I guess we -- I put it in in January, and it was

18   around I would say in the end of April, maybe the beginning of

19   May, I'm not sure, and I contacted Marie.  I don't know if I

20   did it by e-mail or if I called her.  And I asked her if she

21   had heard anything because it seemed a long time that I hadn't

22   heard.  And she said she would look into it.

23        And then she called me back, and she said that they

24   were -- it had gone out for review.  And then she called again

25   and she said that they were going to have a few questions to

1   ask me.  And she told me what they were and how to respond to

2   them.

3   Q.  Can I stop you there?

4        What was your understanding of how Marie Baran had

5   found out -- you said she called you and told you that they had

6   questions they were going to ask you.  What do you mean by who-

7   is "they"?

8   A.  From the Railroad Retirement Board.

9   Q.  What was your understanding of how Marie Baran found out

10  that the Railroad Retirement Board had questions for you?

11       MR. RYAN:  Objection.

12       THE COURT:  Overruled.

13  A.  That she had called them to ask.

14  Q.  And you said she had worked there for some time?

15  A.  Yes.

16  Q.  At this point she was retired from the Railroad Retirement

17  Board?

18  A.  Yes.

19  Q.  All right.  You said that Marie Baran told you that they

20  were going to have some questions for you?

21  A.  Yes.

22  Q.  What types of questions did Marie Baran tell you that the

23  Railroad Retirement Board wanted to ask you?

24  A.  It was with regard to pushing or pulling, lifting heavy

25  objects or boxes, things likes that.

849

1  Q.  Was it questions related to your job duties?

2  A.  Yes.

3  Q.  Pushing and pulling in the course of your job duties, for

4  example?

5  A.  Right.

6  Q.  What did Marie Baran say about the answers you should give?

7  A.  She told me exactly what to say.  She gave me the verbiage

8  that I should use, and I wrote it down so that I would remember

9  because it was -- it wasn't exact -- it was not what I normally

10 would do at work.

11 Q.  In what way was it not?

12 A.  It was exaggerated, you know.

13         MR. JACKSON:  Objection.

14         THE COURT:  Sustained.

15         MS. FRIEDLANDER:  Your Honor, this --

16 Q.  Were the answers that Marie Baran gave you to give the

17 Railroad Retirement Board true?

18 A.  No.

19 Q.  Had you told Marie Baran those things?

20 A.  No.

21 Q.  In fact, did she tell you what to say to the Railroad

22 Retirement Board about your own job?

23 A.  Yes.  Well, she knew that I did some lifting.

24 Q.  You said you wrote down what she told you to say?

25 A.  Right.

1    Q.  Why did you write it down?

2    A.  Because I would not be able to remember exactly what she

3    had said, and it wasn't what I normally did.

4    Q.  How did you feel after you wrote down the answers you

5    should give the Railroad Retirement Board?

6              MR. RYAN:  Objection.

7              THE COURT:  Overruled.

8    A.  I felt very guilty and I knew I was lying but I did it

9    anyway.

10   Q.  What happened after you called Marie Baran?

11   A.  About a week or two later, I don't know if it was Marie

12   that called me or I got a letter first, I don't know which it

13   was, but I had been granted my disability.

14   Q.  Prior to that time, were you contacted by the Rail Road

15   Retirement Board?  Did they call you?

16   A.  No -- oh, yes.  They called and I gave them -- I'm sorry.

17   They had called me on the phone, and when they called I

18   answered the questions as she had told me to do it.

19   Q.  When the Railroad Retirement Board called you, did they ask

20   you the very questions Ms. Baran told you they were going to

21   ask?

22   A.  Yes.

23   Q.  Did you give the answers that Marie Baran told you to give?

24   A.  Yes.

25   Q.  How did you feel after you did that?

1          MR. RYAN:  Objection.

2          THE COURT:  Asked and answered.

3          MS. FRIEDLANDER:  This is a different question, your

4   Honor.

5   Q.  This is the question as to when you were speaking with the

6   Rail Road retirement board on the phone --

7          THE COURT:  All right.

8   Q.  -- how did you feel after you gave the answers that Marie

9   Baran told you to give?

10  A.  I felt like I was lying and I was.

11  Q.  After you gave those false answers to the Railroad

12  Retirement Board, what did you get?

13  A.  I received a disability.

14  Q.  At the time you received the disability, could you still do

15  your job?

16  A.  Excuse me.

17  Q.  At the time you received disability, could you still do

18  your job?

19  A.  Yes.

20  Q.  OK.  We're going to -- if you could take a look at what's

21  in evidence as Government Exhibit 108A.

22         MS. FRIEDLANDER:  If we could show that to the jury.

23  Q.  You don't need to put it on the screen, but, Ms. Walsh, do

24  you see your signature at the end of that document?

25  A.  Yes.

1    Q.   And the date January 25, 2007?

2    A.   Yes.

3    Q.   Is that approximately when you submitted this?

4    A.   Yes.  That's when I brought it to the Board.

5    Q.   Who completed this document?

6    A.   Marie had typed it up on the computer.

7    Q.   Can you turn to Section 11, Section 12.

8         Section 11 say, "Enter the date you could no longer

9    work because of your condition."  It says, "August 31, 2006."

10        Who put that date there?

11   A.   I don't even see it.

12   Q.   It is actually Question 11 in Section 3.  It is on the

13   second page.

14        (Pause)

15   A.   Marie had typed that in.  That was the last day I worked.

16   Q.   And did you tell Marie Baran that you could no longer work

17   because of your condition on August 31, 2006?

18   A.   No.  I said it was the day I retired.

19   Q.   Section 12 says, "Sitting at desk and using a computer

20   caused consider pain in neck, shoulder and hands.  Sitting or

21   standing for any length of time caused considerable pain in

22   both legs."

23        Did you -- first of all, is it true that sitting or

24   standing for any length of time caused you considerable pain in

25   both legs?

1    A.  No.

2    Q.  Did you tell Marie Baran that?

3    A.  No.  I said I had a little bit of pain.

4    Q.  Did you say you had -- at what time did you tell her you

5    had a little bit of pain, meaning you told her you had a little

6    bit of pain when you did what?

7    A.  When I sat for a long period of time.

8    Q.  OK.  Did you tell her that you had considerable pain?

9    A.  No.

10   Q.  Did you tell her that standing for any length of time

11   caused you considerable pain?

12           MR. RYAN:  Objection.

13           THE COURT:  Overruled.

14   A.  No.

15   Q.  Who wrote that?

16   A.  Marie did.

17   Q.  Then it says, "It was necessary to walk long distances from

18   facility to facility for meetings."

19           Is that the example that you recalled here in your

20   testimony earlier?

21   A.  Yes.

22   Q.  "Long distances," is that not true?

23   A.  No.  I would go to a facility but it wasn't long distances.

24   Q.  Who wrote "long distances"?

25   A.  Marie did.

```
 1   Q.  The next sentence says, "I was frequently required to drive

 2   to employees homes to provide counseling.  Sitting in an

 3   automobile for any length of time caused me great discomfort

 4   both in my neck and legs."

 5            Did you tell Marie Baran that?

 6   A.  No.

 7   Q.  Who wrote that?

 8   A.  She did.

 9   Q.  Is it true?

10   A.  No.

11            MS. FRIEDLANDER:  Could we see Section 6, the daily

12   activities.

13   Q.  OK.  Ms. Walsh, Section 6 at the top, it defines "Easy,

14   "Hard" and "Not at all."

15            The instructions say, "Hard is an activity that is

16   hard for you if you can only do it with difficulty or with

17   help."

18            Here it says that sitting is hard for you; you have

19   leg pain when sitting for more than 15 minutes.  Standing is

20   hard for you; you have leg pain when standing for more than

21   five minutes.  Walking is hard for you; you can only walk short

22   distances.  It is hard for you to dress yourself because you

23   have pain in your neck and hands that makes dressing difficult.

24            It says it is hard for you to --

25            MR. JACKSON:  Judge, objection.  The document will
```

1    speak for itself.  Is there a question?

2              MS. FRIEDLANDER:  I would like to read this into the

3    record, Judge, we have a transcript and a record.

4              THE COURT:  Overruled.

5    Q.  Here it says, "Indoor chores are hard for you.  You can

6    only do lighthouse keeping without pain."

7              The next line says, "Outdoor chores are impossible.

8    You cannot do them at all."

9              After that it says, "Driving a motor vehicle is hard

10   for you.  Sitting causes pain, arms on steering.  Then it says,

11   "using public transportation is hard for you.  Stairs at the

12   Rail Road station are difficult, sitting, pain."

13             Did you tell Ms. Baran these things?

14   A.  No.

15   Q.  Who wrote these things?

16   A.  Marie did.

17   Q.  Are they true?

18   A.  No.

19   Q.  Can we see Section -- the next question, 40?

20             And this says, "Enter any additional information that

21   describes your daily activities during a normal day."  It says,

22   "Rise early, coffee, go to gym four or five times a week to do

23   stretching and exercise to maintain flexibility.  Go home,

24   shower and dress.  Light shopping and/or light housework.

25   Lunch at home.  Watch TV or read a book.  Dinner at home with

1   spouse.  Evenings at home with family."

2          Was that accurate or inaccurate as to your activities

3   in a normal day on January 25, 2007?

4   A.  Well, I think at the gym I did more than just exercise to

5   maintain flexibility but --

6   Q.  What were you doing at the gym at the time?

7   A.  I was doing cardio as well as lifting weights and free

8   weights on machines.  I did spin classes.

9   Q.  And what else were you doing in January 2007 besides what

10  is listed here?

11  A.  I was babysitting for -- I called her my niece but she was

12  a baby, my friend's grandchild.  I was watching her 10 or 11

13  hours a day three days a week.

14  Q.  How old was the baby?

15  A.  She was an infant.  She was born in October and this was in

16  January.

17  Q.  Did you also do yardwork?

18  A.  Yes.

19  Q.  What kinds of yardwork were you doing?

20  A.  Well, then I probably wasn't doing much.  But normally I

21  would probably do it outside, you know, just putting in

22  flowers, things like that.

23  Q.  Did Ms. Baran review with you this description of your

24  supposedly typical day?

25  A.  No.

```
1    Q.  Can we see 108C?  This is called "Vocational Report."

2             Ms. Walsh, do you have it -- you have it in your

3    binder.  You can just turn to the last page of it, and let me

4    know if you see your signature there.

5    A.  Yes.

6    Q.  OK.  Can we see page 2?

7             It says, in the second half of the page, Question 14,

8    "Circle how often a day you have to do certain tasks."  Here it

9    is circled that you had to in your job frequently reach above

10   shoulder level.  Frequently climb.  Frequently push and pull.

11            And then there is some handwriting below it.  It

12   says -- under "push/pull frequently," it says, "train doors,

13   pulled cart with boxes and materials for seminars, pamphlets,

14   boxes, projector, laptop."

15            Is this all true an accurate?

16   A.  I did move.  I did bring materials and stuff but it wasn't

17   frequently.  None of it was frequently.

18   Q.  Whose description is this?

19   A.  Marie's.

20   Q.  Whose handwriting is this?

21   A.  Marie's.

22   Q.  Did you tell Marie Baran these things?

23   A.  No.

24   Q.  Down below it says, "Circle how often a day you lift and

25   carry."  It says "frequently."  And then it asks you the weight
```

 1   of the objects that you lift and carry.  It says you frequently

 2   lift up to 25 pounds.  Is that truth?

 3   A.  No.

 4   Q.  It says the heaviest weight you are lifting is 50 pounds.

 5   Is that true?

 6   A.  I could have but I don't -- not frequently.

 7   Q.  OK.  Not frequently, fine.

 8        Who circled these things?

 9   A.  Marie did.

10   Q.  Did you tell her these things?

11   A.  No.

12   Q.  Earlier -- we can take that down.

13        Earlier you testified that Marie Baran told you, after

14   you filed for disability but had not yet received it, that the

15   RRB was going to call you with some questions.

16   A.  Yes.

17   Q.  And I believe you said she told you what to say, how to

18   respond to those?

19   A.  Yes.

20   Q.  OK.  Can we see 108E, in evidence -- I'm sorry.  I have my

21   numbers backward, I think.  Hold on.

22        108F.

23        MS. FRIEDLANDER:  Can you blow that up?

24   Q.  The date on this e-mail is May 10, 2007.

25        Can you remind us approximately when it is that

1   Ms. Baran contacted you and told you that the RRB was going to

2   be calling you with certain questions and how you should

3   respond?

4   A.  I don't know the exact date.

5   Q.  Remind us approximately when you thought it was.

6   A.  I thought it was around April/May.  The end of April or

7   May.

8   Q.  This is an e-mail May 10, 2007.  The subject is Regina

9   Walsh.  It says, "Importance:  High."

10          "Inquirer:  Cathy Quinn, DM."

11          Do you know who that person is?

12  A.  She worked at the Railroad Retirement Board in Westbury.  I

13  think Cathy did.

14  Q.  Here it says, "EE failed for DIB 1/25/07."

15          That is the date we saw when you submitted your

16  application?

17  A.  Yes.

18  Q.  It says, "Case pending review.  Please provide status on

19  this case.  Thanks, Cathy."

20          "Response:"  Down here.

21          "Case was forwarded to review.  However, authorizer

22  feels that additional information is needed about the EE's job

23  description.  The EE indicated that she frequently reaches

24  above shoulder level.  Doing what?  She indicated that she was

25  exposed to excessive vibrations.  How?  She frequently

1    pushed/pulled.  What?  Please consult with EE and advise.

2    Thanks."

3            OK.  Can we see now 108E?

4            Can we look -- let me see, just the top for a second.

5    The date on that is June 5, 2007.

6            It bears the subject, "Ms. Walsh."

7            Can we see the second half of the page?  A little

8    higher.  A little higher than that.  Thank you.

9            OK.  Here the date is June 4, 2007.  "Has this case

10   been rated?  Please let me know ASAP.  Thanks, Cathy."

11           Down here it has the same questions that I just read.

12   I will just read this into the record.

13           It says, "Per my telephone conversation May 14, 2007

14   with EE Regina Walsh.  As Director of Employee Services, EE

15   states that she frequently reached above shoulder.  EE took

16   trains to present seminars several times per week carrying

17   boxes of employee reference material.  Boxes of material had to

18   be stored on overhead racks on train.  While standing on the

19   trains EE had to hold on to overhead rails on moving trains

20   (seats were hardly ever available).  EE frequently reached

21   above head and shoulder for overhead files in the office.  Most

22   files, which were boxes of reference material, manuals, etc.,

23   were on overhead shelving.  She frequently needed to refer to

24   these files to perform her job.  Excessive vibrations were from

25   traveling to seminars on moving trains and presenting seminars

```
 1   in railroad yards, which always had high train movement.  EE
 2   frequently pushed and pulled train doors, boxes of files,
 3   reference material, pamphlets, office equipment, etc.
 4           "Nothing further to submit.  Cathy Quinn."
 5           Did you tell all of these things to the RRB when they
 6   called you?
 7   A.  Yes.
 8   Q.  Was that a true and accurate description of what your job
 9   entailed?
10   A.  No.
11   Q.  Who told you to say these things?
12   A.  Marie.
13   Q.  Did you describe your job to Marie Baran that way?
14   A.  No.
15           MS. FRIEDLANDER:  OK.  Can we see 108D, in evidence?
16           Judge, I will move through this quickly.
17   Q.  It says Dr. Ajemian's letterhead up top.
18           It says, "Chief Complaints.  Regina Walsh first
19   presented to my office on October 10, 2005."
20           And if I can just skip down to the sentence that
21   begins here.
22           It says, "She says she experiences tightness and pain,
23   numbness to both hands, particularly discomfort, soreness in
24   the back of both legs that persists all the time as well."
25           Did you tell Dr. Ajemian that you were having pain
```

1   that persisted all the time?

2   A.  No.

3   Q.  OK.  The next page.  The paragraph that ends here, it says.

4   "She presents for an evaluation" -- can we blow this up?

5            "She presents for an evaluation as the numbness in the

6   back of her neck and spasm there, and tightness in the arm

7   wakes her from her sleep constantly."

8            Did you tell Dr. Ajemian that you had tightness in

9   your arm that woke you from your sleep constantly?

10  A.  No.  I said I had occasional pain.

11           MS. FRIEDLANDER:  Can we see 10/18/05?

12  Q.  This says, Ms. Walsh, that you underwent an MRI that showed

13  that you had mild to moderate central spinal stenosis.

14           Are you having any significant pain in your back?

15  A.  Nothing significant, no.

16           MS. FRIEDLANDER:  Just two more things -- one more

17  thing.  Could we go to 8/15/06?

18           It says, "Interval History."

19           We don't need the physical examination.

20  Q.  It says, "The patient has failed to improve.  The above

21  discussed ongoing discomfort and pain is unremitting at this

22  time."

23           Did you tell Dr. Ajemian that you were having

24  unremitting pain?

25  A.  No.

```
 1  Q.  The next sentence says, "She feels she cannot continue
 2  working."
 3           Did you tell that to Dr. Ajemian?
 4  A.  No.  I told her I was retiring.
 5  Q.  It goes on to say, "She feels she cannot continue working
 6  safely for the Long Island Rail Road."  Did you tell him that?
 7  A.  No.
 8  Q.  And then it says you decided at this point in time to
 9  consider disability retirement and asked for Dr. Ajemian's
10  recommendations.  Is that true?
11  A.  No.
12  Q.  OK.  Can we see 108B, like boy.
13           It says, "Medical assessment."
14           Can we just see who signed it?  It is the last page.
15           (Indicating)
16           I think the signature is illegible but it says
17  Dr. Ajemian.
18           Can we see the page before, Sections 11 and 12?
19           This says, "Exertional Restrictions.  No pushing,
20  pulling, carrying, or lifting more than 10 pounds."
21           Did Dr. Ajemian tell you that you were medically
22  restricted from doing any of those things?
23  A.  No.
24  Q.  And were you in fact?
25  A.  No.
```

```
 1    Q.  The next line says, "No sitting or standing more than two
 2    hours a day."
 3              Did Dr. Ajemian tell you that you were medically
 4    restricted from doing those things?
 5    A.  No.
 6    Q.  And were you in fact restricted in any way from doing those
 7    things?
 8    A.  No.
 9    Q.  It goes on to say, "No kneeling, crouching, bending,
10    stooping, climbing, or reaching overhead."
11              And then down here it says, "Avoid vibration and
12    extensive -- extremes of heat and humidity."
13              Did Dr. Ajemian tell you that you were medically
14    restricted from doing any of those things?
15    A.  No.
16    Q.  And were you in fact?
17    A.  No, I wasn't.
18    Q.  A person who cannot sit or stand for more than two hours a
19    day or bend or be exposed to vibration, what does that person
20    sound like to you?
21    A.  Someone that was --
22              MR. JACKSON:  Objection.
23              THE COURT:  Sustained.
24    Q.  Ms. Walsh, can you just look in your binder at Government
25    Exhibit 713.
```

```
 1              Is that a document that you sent to the Railroad
 2    Retirement Board?
 3    A.  Yes.
 4    Q.  Did you do that in 2011?
 5    A.  Yes.
 6    Q.  Did you say in this document that your health was the same
 7    as compared to when you first filed for disability?
 8    A.  Yes.
 9    Q.  Was that true?
10    A.  Yes.
11    Q.  Well --
12    A.  Well, it wasn't -- was it true?  No.  I was fine.
13    Q.  OK.  And did you mail this document -- where did you mail
14    if from?
15    A.  I mailed it from New Hyde Park.
16    Q.  Is that Long Island?
17    A.  Yes.
18    Q.  You mailed it to Manhattan?
19    A.  I don't know where it went to.  There was probably an
20    address on it.
21    Q.  Yeah.  There is an address on the last page.
22              Do you see, it says 26 Federal Plaza, New York, New
23    York?
24    A.  Then that's where -- oh, right.
25    Q.  Do you believe that's where you sent it to?
```

```
 1   A.  Yes.

 2   Q.  Now, did there come a time in 2009 when you were

 3   interviewed by federal agents?

 4   A.  Yes.

 5   Q.  And what, generally speaking, what did they ask you about?

 6   A.  They asked me about my disability, who I had gone to see,

 7   who helped me fill out my paperwork, things of that nature.

 8   Q.  Do you remember all of the questions that they asked you?

 9   A.  No.

10   Q.  Do you remember all of the answers that you gave?

11   A.  Absolutely not.

12   Q.  In your own mind, is it possible that you were not truthful

13   in response to every question?

14   A.  I thought I was, but I was just very nervous and I was

15   scared so I don't know.

16   Q.  OK.  Is it possible as you sit here in your own mind that

17   you were not --

18   A.  I could have lied, I don't know.

19            MR. JACKSON:  Objection, your Honor.

20            THE COURT:  Sustained.

21   BY MS. FRIEDLANDER:

22   Q.  Just a couple of short subjects and I am done.

23            Do you know Joseph Rutigliano?

24   A.  Yes, I do.

25   Q.  How do you know him?
```

1   A.   Joe was on the -- he was the union representative when I

2   worked at the Rail Road, and I used to work at one time in

3   labor relations and then I worked in employee services.  So I

4   knew Joe.

5   Q.   Do you see him in the courtroom today?

6   A.   Yes.

7   Q.   Is he standing?

8   A.   Yes.

9           MS. FRIEDLANDER:  May the record reflect the witness

10  has identified the defendant?

11          THE COURT:  So noted.

12  Q.   Was he an employee of the Rail Road?

13  A.   Yes.

14  Q.   And how is it -- did you say you saw him?  I missed your

15  last answer.  Did you see him from time to time?

16  A.   Yeah.  He would come into my office.  If some of the

17  employees had problems, he would be there to help them and they

18  would come in and ask me to help them for -- on his behalf.

19  Q.   How often did you see him, approximately, leading up to the

20  time you retired?

21  A.   Maybe every three weeks, every month.  You know, whenever

22  someone had a problem.  Sometimes maybe it would be twice in a

23  week and then I wouldn't see him for a little bit.  Whenever

24  someone had problems.

25  Q.   And when did you stop seeing him with that frequency?

1    A.   When I retired.

2    Q.   Can you describe Mr. Rutigliano's physical appearance as

3    you observed it leading up to the time of his retirement?

4    A.   He seemed fine.

5            MS. FRIEDLANDER:  Excuse me.

6            (Pause)

7    Q.   Do you have Exhibit 1400 in front of you?  Do you have the

8    original?

9    A.   I think I do.

10   Q.   It is in evidence.  If we could just see --

11   A.   1402?

12   Q.   Yes.  1400.

13   A.   Oh, that's something different.

14   Q.   Ms. Walsh, do you recognize this?

15   A.   Yeah.  That is my calendar.

16   Q.   This is your calendar?

17   A.   Right.

18   Q.   Can we see January 2007?

19           Is this the month that you applied for disability?

20   A.   Yes.

21           No.  That is the wrong date.  It is in January.

22   Q.   January 2007.

23           Up here it says January 5, 2007, "Marie 10 a.m."  What

24   do you believe that is?

25   A.   That was when I met with Marie.

1    Q.   To complete your application?

2    A.   Yes.

3    Q.   Here it says, "January 11, Dr. Ajemian."

4    A.   I had a doctor's appointment.

5    Q.   Was that in connection with getting disability from him?

6    A.   Yes.

7    Q.   And down here, "January 25th, RRB 11 a.m.," what is that?

8    A.   That is when I went to submit my application to the board.

9    Q.   Can we see 1402?

10        Is that your signature, Ms. Walsh?

11   A.   Yes, it is.  The bottom one is mine.

12   Q.   January 5, 2007.  I believe that is the date that we just

13   saw on year calendar when you met with Marie Baran?

14   A.   Correct.

15        MS. FRIEDLANDER:  Here it says, "I hereby authorize

16   the Railroad Retirement Board to release any Railroad

17   Retirement records and information requested to Marie Baran."

18        OK.  You can put that away.

19   Q.   OK.  How were your disability benefits paid?

20   A.   Direct deposit into my banking account.

21   Q.   Where was your bank?

22   A.   BankAmerica in New Hyde Park.

23   Q.   Do you know anyone else whose disability application was

24   completed by Marie Baran?

25        MR. RYAN:  Objection.

1          THE COURT:  Sustained.

2   Q.  Have you seen any doctor for your legs, arms or hands since

3   you saw Dr. Ajemian?

4   A.  No.

5   Q.  Why not?

6   A.  I didn't have any need for it.

7   Q.  I believe you said earlier that you were physically able do

8   your job when you applied for and received disability benefits

9   from the federal government.

10          MR. JACKSON:  Asked and answered, Judge.  Go.

11          MS. FRIEDLANDER:  I didn't get to the question.

12          THE COURT:  What is your question?

13  BY MS. FRIEDLANDER:

14  Q.  Can you still do your job today?

15  A.  Yes.

16  Q.  Did you ever tell Dr. Ajemian or Marie Baran that you were

17  unable to do your job anymore?

18  A.  No.

19  Q.  Did either of them ever ask you that question?

20  A.  No.

21  Q.  When you met with Marie Baran, did you ever act like you

22  were in pain?

23  A.  No.

24          MS. FRIEDLANDER:  No further questions.

25          THE COURT:  Mr. Jackson, are you taking the lead?

1          MR. JACKSON:  I'm sorry, Judge?

2          THE COURT:  Are you taking the lead on cross?

3          MR. JACKSON:  I am.  Thank you, Judge.

4    CROSS-EXAMINATION

5    BY MR. JACKSON:

6    Q.  Good afternoon.

7    A.  Hi.

8    Q.  How are you, Ms. Walsh?

9    A.  I'm fine.

10   Q.  Good.  My name is Joey Jackson.  I represent Ms. Baran.

11   OK?

12   A.  OK.

13   Q.  I have some questions for you.  All right?

14   A.  Sure.

15   Q.  Now, I guess from your testimony, it appears that Marie

16   Baran, basically you're saying she lied on your behalf, is that

17   right?  Is that what you're saying?

18   A.  I don't know what Marie did.  I know I lied.

19   Q.  You recall Ms. Friedlander asking you a series of questions

20   about your application, you recall that, correct?

21   A.  Correct.

22   Q.  And you recall making a number of statements regarding what

23   Ms. Baran's role was in that regard, you recall that, is that

24   right?

25   A.  Right.

D7mdles4                    Walsh - cross

1           MR. JACKSON:  OK.  Now, if I could just have the

2    government put up the application itself.

3    Q.  All right.  Now, I want to look at the application itself

4    and I just want to be clear about a number of things.  All

5    right?

6

7           MR. JACKSON:  Can we go to Section 2 of the

8    application.  If we can just blow that up?

9    Q.  So this would be Section 2.  That is information that

10   identifies you, Regina Walsh, is that correct?

11   A.  Correct.

12   Q.  OK.  That information would be accurate as it appears on

13   that application, is that true?

14   A.  Yes.

15   Q.  OK.  Now, if we could just cut to the chase and if we could

16   just go to Section 6, please.

17          Now, there are a number of representations on there,

18   and I think it was your indication that Ms. Baran -- these are

19   her words, not yours, is that right?

20   A.  Yes.

21   Q.  And these are things that she conjured up on your behalf;

22   is that accurate?

23   A.  I guess so.

24   Q.  And that's something that you certainly didn't have

25   anything to do with, correct?

D7mdles4                         Walsh - cross

1   A.  No.

2   Q.  No, you did not have something to do with it, or no, you

3   did?

4   A.  I might have said I had leg pain and that was it.

5   Q.  OK.  And that was it, but she went ahead and you said she

6   put these items there, is that right?

7   A.  Correct.

8   Q.  OK.  And you reviewed this application with her, is that

9   not true?

10  A.  No.  She went -- she gave it to me when she was -- she read

11  certain items to me and that was it.

12  Q.  The question is, did you have an opportunity to review the

13  application, yes or no?

14  A.  Yes, I did.

15  Q.  And in having that opportunity to review the application,

16  certainly you would have occasion to change things that were

17  improper, is that right?

18  A.  Yes.

19  Q.  And at any time when she gave you the application to

20  review, did you tell Ms. Baran that these items were not true?

21  A.  No.  I admitted, I lied.

22  Q.  OK.

23  A.  I allowed it.

24  Q.  You lied to Ms. Baran, is that correct?

25  A.  No.  I lied by allowing that to be put on and submitting

D7mdles4                          Walsh - cross

1    it.

2    Q.  OK.  So what you're saying, just to be clear, and my

3    question is, when you reviewed this application, Ms. Walsh, did

4    you tell Ms. Baran at that time that you wanted something

5    changed?

6    A.  No, I didn't.

7    Q.  And you had an opportunity when you got the application to

8    do just that, is that correct?

9    A.  Yes.

10   Q.  And you didn't do that, right?

11   A.  No, I didn't.

12   Q.  OK.  You signed the application at the end of it attesting

13   to its truth, is that right?

14   A.  Yes.  That's right.

15   Q.  And today you make a representation that Ms. Baran told all

16   these lies on your behalf; that's what you're saying, is that

17   right?

18   A.  No, I didn't say she lied.  I said she made exaggerations

19   there.  I take credit for her having done it.  I submitted it.

20   Q.  OK.  And, in fact, it's your responsibility to submit that

21   application, correct?

22   A.  Correct.

23   Q.  And it was you that reviewed the application with

24   Ms. Baran, is that right?

25            THE COURT:  Asked and answered.

D7mdles4                          Walsh - cross

1   Q.  And when you ultimately -- when you gout the application to

2   do, you were sitting across from her; is that fair to say?

3   A.  When she was filling it out.

4   Q.  Yes.

5   A.  Yes.

6   Q.  You were sitting across from her at that particular time?

7   A.  Yes.

8   Q.  And at any time did she ask you questions concerning the

9   nature of your disability?

10  A.  A few, not many.

11  Q.  OK.  Now, if I can just ask you, regarding the nature of

12  your disability, if we could just go to Section 3, please.

13  Question 19, please.

14          MR. JACKSON:  OK.  If I could just have the dates

15  blown up, the treatment, please?  All right.

16  Q.  Now, these are the various dates upon which you were

17  treated, is that correct?

18  A.  Correct.

19  Q.  And you went to a doctor then on 10 -- if we look at that,

20  for the sake of brevity, on 10/10/05, that would indicate that

21  that was a date that you were treated, is that right?

22  A.  Correct.

23  Q.  On 10-18-05, that indicates another date that you were

24  treated, is that right?

25  A.  Correct.

D7mdles4                        Walsh - cross

1   Q.  And etc., etc., correct?

2   A.  Yes.

3   Q.  These are all your treatment dates, is that accurate?

4   A.  Yes.

5   Q.  Now, you went to the doctor and you went to doctors on

6   these specific dates to be treated for your ailments, is that

7   accurate?

8           MS. FRIEDLANDER:  Objection.  It misstates the

9   testimony.

10          THE COURT:  Sustained.

11  Q.  Did you go to the doctors on these various dates to get

12  treatment?

13          MS. FRIEDLANDER:  Objection to "doctors."

14          THE COURT:  Sustained.

15  Q.  We will take it one at a time.

16          Did you go to Dr. Ajemian on any of those dates?

17  A.  Yes.

18  Q.  Did you go to any other doctors on any of those dates?

19  A.  No.

20  Q.  OK.  Now, it's fair to say that today you mentioned that

21  Ms. Baran assisted you with these various -- with your filling

22  out of these applications, and were you -- you understand that

23  you were actually seen by federal agents to ask you questions

24  about this; do you remember that?

25  A.  Yes.

1   Q.  Do you remember you were asked questions about that back in

2   2009?

3           Do you remember that?

4   A.  Right.

5   Q.  In 2009 federal agents asked you about your role here,

6   correct?

7   A.  I don't understand what you mean.

8   Q.  Did you tell federal agents that you applied for a

9   disability because you felt entitled to a disability?

10           Did you tell them that?

11   A.  No, I don't know if I did or not.  I don't recall saying

12   that.

13   Q.  Do you recall saying to federal agents that the basis for

14   you applying for a disability is because you were having

15   trouble doing your job?

16           Do you remember that?

17           MS. FRIEDLANDER:  Objection.

18           THE COURT:  Overruled.

19   A.  I don't recall exactly what I told them.  I really can't

20   tell you.

21   Q.  Is there something I could show you to refresh your

22   recollection regarding what you told the federal agents?

23           MS. FRIEDLANDER:  Objection.  There is no

24   inconsistency.

25           MR. JACKSON:  We will clarify.

D7mnles5                          Walsh – cross

1          THE COURT:  Clarify.

2   Q.  You had an opportunity, did you not, in 2009 to speak with

3   the federal government, did you not?

4   A.  They came to my house, yes.

5   Q.  In fact, an agent came to your house by the name of Joseph

6   Del Favero and Special Agent Michael Angelico, is that right?

7   A.  I don't remember their names.

8   Q.  But you do remember that agents came to your home.

9          Is that accurate?

10  A.  Yes.

11  Q.  And in coming to your home they asked you whether or not

12  you applied for disability, is that fair?

13  A.  Yes.

14  Q.  You told them why you would have applied for disability.

15  Is that also fair?

16          MS. FRIEDLANDER:  Objection.  Your Honor, can we be

17  heard at sidebar.

18  A.  I don't think they asked why I applied.

19          THE COURT:  Step forward.

20          (Continued on next page)

21

22

23

24

25

1          MS. FRIEDLANDER:  Your Honor, in order for him to be

2     trying to impeach her with her statements to the agent he needs

3     to establish an inconsistency.  She hasn't testified to

4     anything --

5          THE COURT:  I am not sure whether he's trying to

6     impeach her or just trying to get her to testify about events

7     that happened.

8          MR. JACKSON:  That is what I am doing to lay the

9     foundation for impeachment, Judge.

10          MS. FRIEDLANDER:  He is asking her what she said to

11     federal agents.  He's not asking her what happened.

12          THE COURT:  Well, ask her what happened.  If she

13     doesn't have a recollection of what happened, you can refresh

14     her recollection.

15          MR. JACKSON:  Will do.

16          THE COURT:  All right.

17          MS. FRIEDLANDER:  Just to be clear, what happened does

18     not mean what she said to federal agents during the meeting.

19          MR. JACKSON:  Don't worry about that.  We'll get to

20     the impeachment.  Right now I am laying the foundation.

21          MR. WEDDLE:  What she said to federal agents is an

22     out-of-court statement, and it's offered for its truth.  It is

23     not admissible.

24          The only reason why it could be admissible is if it is

25     inconsistent.  We can't just rehearse what happened back then

D7mnles5                         Walsh - cross

1    and memory test her on what happened back then.  There is no

2    relevance to that and it is improper unless they first have a

3    predicate for doing that.

4           The only predicate would be if there is an

5    inconsistency that they have elicited here on the stand.  There

6    is no inconsistency, unless Mr. Jackson can show us something

7    in the 3500 that he thinks is inconsistent with the testimony

8    here on the stand.

9           Otherwise, it is simply attempting to memory test her

10   on the stand, which is unfair to the witness, violates the

11   rules of evidence, and is misleading to the jury.

12          MR. DRATEL:  Your Honor, it is not accurate that's the

13   only predicate.  If she fails to remember she can be refreshed

14   by reference to what is in the document.

15          MS. FRIEDLANDER:  About the events, Josh.  You

16   understand what I am saying.

17          MR. WEDDLE:  If it is something that is relevant, she

18   can be refreshed.  There is no relevance to these out-of-court

19   statements whether she remembers them or not unless there is a

20   predicate.

21          MR. JACKSON:  I will phrase it in a way to that gets

22   to the predicate.

23          THE COURT:  All right.  Let's go.

24          (Continued on next page)

25

D7mnles5                        Walsh - cross

1              (In open court)

2      Q.  Ms. Walsh, at the time that you retired, the reason that

3      you retired it would be fair to say is because you had

4      troubling doing your job, is that accurate?

5      A.  No.

6      Q.  It is not accurate for you to say -- you are saying it is

7      not accurate that the reason that you retired is because you

8      had a medical condition that prevented you from doing your job,

9      is that right?

10             Is that what you are saying?

11     A.  I said I don't have -- I didn't have a medical condition

12     that prevented me from doing my job.  That's why I am here.

13     Q.  Because you did not have a medical condition?  That wasn't

14     the reason you applied, because you felt that you had a medical

15     condition?  Is that what you are saying?

16     A.  No, I lied on the application.

17     Q.  OK.  I understand that.  I am just asking you a different

18     question.

19             just to be clear, at the time that you retired, did

20     you do so because you felt that you had a medical condition

21     that would prevent you from doing your job?

22     A.  No.

23             MS. FRIEDLANDER:  Asked and answered.

24             THE COURT:  Asked and answered.

25             MR. JACKSON:  Judge, I am getting clarification.

D7mnles5                          Walsh - cross

1    Q.  The answer is no, right?

2    A.  Yes.

3    Q.  That is not what you told federal agents when they came to

4    see you back in 2009, is that correct?

5    A.  I guess -- no, I guess not.  I am not sure.

6    Q.  You guess not what?

7    A.  I am not sure exactly what I told them.

8    Q.  Is there something I could show you to refresh your

9    recollection?

10           If I could just show you the document Bates stamped

11   3514-01.  I am going ask you to look at this document.  Could

12   you just look at that.  Read it to yourself.  Look up at me

13   when you're done.

14   A.  I don't remember saying it.  But that doesn't mean -- I

15   don't remember doing it when they came.

16           MS. FRIEDLANDER:  Objection.

17   Q.  There is not a question before you.  The fact is that, does

18   that refresh your recollection as to what you told federal

19   agents?

20   A.  No.

21   Q.  So you just read what I handed you, is that correct?

22   A.  Right.

23   Q.  It would be fair to say that you told the federal agents

24   that you have a medical condition that would prevent you from

25   doing your job?

D7mnles5                          Walsh - cross

1          MS. FRIEDLANDER:  Objection.

2          THE COURT:  Sustained.

3   Q.  With regard to Ms. Baran and her assistance in filling out

4   the application, are you saying today that Ms. Baran, it is her

5   who told you to write those things on the application?

6          MS. FRIEDLANDER:  Objection.  Misstates her testimony.

7          THE COURT:  Sustained.

8   Q.  Is it your testimony and are you saying that Ms. Baran was

9   exaggerating on your behalf on the application?

10  A.  Yes.

11  Q.  Did federal agents ask you questions in that regard when

12  they came to see you in January of 2009?

13  A.  No, I don't think so.

14  Q.  Did you give information to federal agents concerning

15  Ms. Baran's role in helping you with this application?

16  A.  I just told them she helped me write it out.  That was it.

17  Q.  At no point, it's fair to say, did you indicate to them at

18  that time that she was helping you exaggerate on an

19  application, is that right?

20  A.  No, I never told them, I don't think I did, that she was --

21  Q.  And they were in your home, is that correct?

22  A.  Yes.

23  Q.  This was back in 2009, is that right?

24  A.  Yes.

25  Q.  You had an opportunity to tell them what your role was with

D7mnles5                         Walsh - cross

1    regard to this case, is that accurate?

2    A.  I guess so.  I don't know what my role is.

3    Q.  Right.  Your role in terms of your filing of the

4    application, right?

5    A.  That I filed it?

6    Q.  Yes.

7    A.  That I did file it.

8    Q.  At no time it would be fair to say did you tell the federal

9    agents what you are saying here, which is that Ms. Baran

10   exaggerated on your behalf?

11   A.  No, I don't think I did.

12   Q.  You had an opportunity to do that because they were in your

13   living room, were they not?

14   A.  Well, it actually wasn't in my living room.  I was

15   babysitting at the time.  But I had the opportunity, yes.

16   Q.  You also would have had an opportunity to talk about how

17   Marie Baran might have influenced the Railroad Retirement

18   Board, is that right?

19   A.  I guess I could have.

20   Q.  And it is fair to say that you didn't take that opportunity

21   to tell the federal agents that when they came to your home, is

22   that right?

23   A.  No, I didn't.

24   Q.  And you's didn't take the opportunity to tell them that

25   Dr. Ajemian made things up on a file on your behalf, is that

D7mnles5                         Walsh - cross

1    right?

2    A.  No, I didn't tell them that.

3    Q.  You had an opportunity to do that as well, correct?

4    A.  Probably.

5    Q.  Just to be clear, this was prior to you entering into an

6    agreement with the government, is that accurate?

7    A.  The meeting with them, yes.

8    Q.  Yes.  In fact, you did indeed enter into an agreement with

9    the United States government, did you not?

10   A.  It was a plea agreement.  Yes.

11   Q.  Right.  The plea agreement provides for, right, a certain

12   sentence based upon the plea that you took, is that accurate?

13            MS. FRIEDLANDER:  Objection.  Misstates the document.

14            THE COURT:  Sustained.

15   Q.  Are you not testifying in order to get probation?  Is that

16   what you said to Ms. Friedlander?

17   A.  No, I'm testifying because I know what I did was wrong.

18   Q.  What you did was wrong, correct?

19   A.  Yes.  I'm hoping that the judge will grant me some leniency

20   for trying to be honest.

21   Q.  Right.  So you are honest now, correct?

22            That's what we're expected to believe, you are honest

23   to the jury right now, right, today?

24   A.  Yes, I'm under oath.

25   Q.  But you weren't honest in 2009, when you told the federal

1    agents you were not honest that you thought you could apply for

2    a medical disability because you qualified?  That wouldn't be

3    honest?

4    A.  I don't know if I said that to them.  I don't know if I

5    said that.  You said that.  I don't know what I said.

6    Q.  It is not what I said.  I just showed you a document.

7    Would that be fair to say?

8    A.  Yes.  I don't know exactly what I said.  Sometimes people

9    can interpret it differently from what you said.

10   Q.  OK.  My mistake.  Are saying the agent misinterpreted it?

11         MS. FRIEDLANDER:  Objection.

12   A.  I don't know.  I don't know what the agent did.

13         THE COURT:  Sustained.  Next question.

14   Q.  With respect to the interview that was conducted of you

15   back at that particular time, you answered all the questions as

16   truthfully as you could, is that correct?  That interview I'm

17   speaking about with the federal agents, is that right?

18   A.  Yes.

19   Q.  And you knew that --

20         MS. FRIEDLANDER:  Objection.  Misstates her testimony.

21         THE COURT:  Sustained.

22   Q.  Did you answer questions that were posed to you truthfully

23   back in May 2009?

24         MS. FRIEDLANDER:  Objection.  Asked and answered.

25         THE COURT:  It is too broad a question.

D7mnles5                          Walsh - cross

1   Q.  Back on May 20, 2009, it is fair to say that the federal

2   agents asked you specific questions concerning your disability

3   application, is that accurate?

4   A.  No, I don't know if they asked specific questions about the

5   application.

6   Q.  So they were just there to say hello to you?

7           Is that what you are saying?

8   A.  No, I don't --

9           MS. FRIEDLANDER:  Objection.

10          THE COURT:  Sustained.

11  A.  I just --

12          THE COURT:  Sustained.

13  Q.  Did they ask you a question concerning who helped you fill

14  out your application?  Let's start there.

15  A.  Yes, they did.

16  Q.  You responded to that question, is that correct?

17  A.  Correct.

18  Q.  You were truthful in giving an answer to that question, is

19  that also correct?

20  A.  Yes.

21  Q.  Indeed, they asked you what that person's role was who

22  helped you in the application, didn't they?

23  A.  I don't know.  I don't think so.  I don't know if they

24  asked that.

25  Q.  Did they ask you whether or not Marie Baran assisted you in

D7mnles5                          Walsh - cross

1    filing an application?

2               MS. FRIEDLANDER:  Objection.  Asked and answered

3    several times.

4               THE COURT:  Sustained.

5    Q.  With respect to the actual testimony that you gave, you

6    mentioned, did you not, that Ms. Baran put things down for you.

7               Did she take words out of your mouth or out of

8    context?

9    A.  Took it a little bit out of context, yes.

10              MR. JACKSON:  If I could have the government put back

11   on the screen the disability application.  That would be

12   Exhibit 108-A.  With regard to 108-A, if I could just have you

13   turn to page 4.  If you could just blow up that whole section

14   dealing with the dates, pretty please.  The whole section, I'm

15   sorry.  Not just the dates itself.

16   Q.  Now, those dates, as we discussed before, start with, I

17   guess it is 11 -- what is that?  9/05?  I don't want to put

18   words in your mouth.  Do you see that?

19   A.  It starts with 10/10/05.

20   Q.  There is something in writing there.  Do you see that?

21   A.  That was 11/9/05.

22   Q.  Who wrote that, by the way?

23   A.  I assume it was Marie or -- it could have been written by

24   someone -- it had to be --

25   Q.  Well, when you say Marie, you didn't go see Marie until

D7mnles5                         Walsh - cross

1    January of --

2    A.  I know.  I don't know who wrote that in.

3    Q.  So you don't know?

4    A.  No.

5    Q.  Would it be fair to say that 11/9/05 was prior to you going

6    and meeting with Marie Baran?  Would that be fair to say?

7    A.  Right.

8    Q.  Would it be fair to say that 10/05 was prior to you meeting

9    with Ms. Baran, is that right?

10   A.  Right.

11   Q.  You went to the doctor that day on your own, correct?

12   A.  Uh-huh.

13   Q.  Ms. Baran didn't tell you to go to the doctor, did she?

14   A.  No.

15   Q.  And on 11/19/05 you went on your own again?

16   A.  Yes.

17   Q.  That is prior to meeting with Ms. Baran?

18   A.  Yes.

19   Q.  Again, with respect to the dates that are listed here,

20   going to 9/5/2006 those are dates that you actually went to the

21   doctor on your own, correct?

22   A.  Correct.

23   Q.  Ms. Baran didn't tell you to go to the doctor, did she?

24   A.  No.

25   Q.  She didn't tell you she would call the doctor and see how

1    everything she went, did she?

2    A.  No.

3    Q.  Didn't tell you she had a special agreement with the doctor

4    to ensure that he said the right thing, did she?

5    A.  No.

6    Q.  These are dates that you just decided on your own to go to

7    the doctor, accurate?

8    A.  Yes.

9    Q.  To the right of the document it says describe the type of

10   treatment or examination.

11           Do you see that?

12   A.  Right.

13   Q.  You see it says EMG.  Do you see that in writing?

14   A.  Yes.

15   Q.  Then it says NCV.  Do you see that also?

16   A.  OK.

17   Q.  In looking at that, did Ms. Baran give you those

18   examinations?

19   A.  No.  They were done by outside.

20   Q.  What about the x-ray?  Did Ms. Baran give you an x-ray?

21   A.  No.

22   Q.  With respect to MRIs and cervical conditions, did she do

23   any of that?

24   A.  No.

25   Q.  These are things that you went to get done, correct?

D7mnles5                           Walsh - cross

1    A.  Correct.

2    Q.  You went to get done because you felt that you had a

3    medical condition that could justify the disability?  Would

4    that be accurate?

5              MS. FRIEDLANDER:  Objection.  Misstates the testimony.

6              THE COURT:  Sustained.

7    Q.  There is a reason that you had these tests done, is that

8    fair?

9    A.  They were done so that I could file for disability.

10   Q.  That was because you wanted to file for a disability,

11   correct?

12   A.  Correct.  I was considering it at the time, yes.

13   Q.  Just to be clear, you were assessed a certain fee by

14   Ms. Baran you stated, is that right?

15   A.  I'm sorry.  What did you say?

16   Q.  Ms. Baran charged you a certain amount of money to do the

17   application, is that accurate?

18   A.  Correct.

19   Q.  What she charged you was approximately a thousand dollars I

20   believe you said?

21   A.  I think so, uh-huh.

22   Q.  Did Ms. Baran predicate your getting a disability approval

23   on the amount of money that she charged you to do the

24   application?

25   A.  I don't understand what you mean.

D7mnles5                              Walsh - cross

1   Q.  Did she say to you, it is a thousand dollars but if it gets

2   approved it's $1500?  Did she say that?

3   A.  No.

4   Q.  Did she say, for example, it's two thousand instead of a

5   thousand if I'm able to get it done?  Did she say that to you?

6   A.  No.

7   Q.  It was your understanding that the thousand dollars was

8   paid to her no matter what, is that right?

9   A.  Correct.

10  Q.  And Ms. Baran didn't guarantee you any disability approval

11  either, did she?

12  A.  No.

13  Q.  She didn't say to you by coming to me I guarantee for sure

14  and certain that you are going to get this application passed?

15          THE COURT:  Asked and answered.

16  Q.  There came a time then when you ultimately went to the RRB,

17  the Railroad Retirement Board, and you filed that application,

18  did you not?

19  A.  Yes.

20  Q.  In looking at the application --

21          MR. JACKSON:  Could we go to the last section, please,

22  of this application.

23  Q.  That is your signature, is that correct?

24  A.  Correct.

25  Q.  And that date is January 25, 2007, is that right?

1    A.  Correct.

2    Q.  And this was the application that you brought to them that

3    you reviewed with Ms. Baran, is that accurate?

4    A.  Correct.

5    Q.  And at that particular time there was an official of the

6    Railroad Retirement Board that asked you certain questions, is

7    that true?

8    A.  He might have asked.  I don't remember the questions being

9    asked, but he might have, yes.

10   Q.  And at that time on that application --

11          MR. JACKSON:  If I could just blow up the portion just

12   above her name, please.  OK.

13   Q.  You see it says --

14          MR. JACKSON:  Just where it says, I know that if I'm

15   receiving disability annuity.

16          Starting from there, please, going to the signature.

17          Right there.  Thank you very much.

18          OK.

19   Q.  You see where it says, I know that if I'm receiving a

20   disability annuity and fail to report work earnings promptly,

21   I'm committing a crime, etc.?

22          Do you see that?

23   A.  Yes.

24   Q.  That uses your name, Regina Walsh?

25   A.  Correct.

D7mnles5                          Walsh - cross

1    Q.  Just under that --

2              MR. JACKSON:  If we could just display.

3    Q.  You already saw the date, is that accurate?

4    A.  Right.

5    Q.  At that particular time, when you went to the disability

6    people you could have told them at that point that none of this

7    is true?

8    A.  Correct.

9    Q.  You could have told them that really don't have conditions,

10   but I want to submit this application anyway, right?

11   A.  Right.

12   Q.  You knew Ms. Baran worked previously for the Railroad

13   Retirement Board herself, did you not?

14   A.  Yes.

15   Q.  And you knew at that point -- was it your understanding

16   that she knew people at the Railroad Retirement Board?

17   A.  Right.

18   Q.  Incidentally, despite her knowing people at the Railroad

19   Retirement Board, did she ever tell you that I am going use my

20   influence with these people to get you your application?

21   A.  No.

22   Q.  When you went there on that particular date, you certainly

23   could have could have at that point said to them that none of

24   this is true?

25   A.  I could have, but I lied.  I admit to that.

D7mnles5                    Walsh - cross

1   Q.  You lied, correct?

2   A.  Right.

3   Q.  In fact, you went and you lied, right, in submitting this

4   application?

5        You agree with that?

6   A.  Yes.

7   Q.  We established already that when the federal agents entered

8   your home you lied to them, too, right?

9        MS. FRIEDLANDER:  Objection.

10  A.  No, I didn't say that.

11  Q.  You were truthful?  Is that what you are saying?

12       MS. FRIEDLANDER:  Objection.  Misstates her testimony.

13       THE COURT:  Sustained.

14       MR. JACKSON:  OK.

15       THE COURT:  Asked and answered.

16  Q.  In addition to that, however, Ms. Walsh, you also went to

17  see Dr. Ajemian, is that right?

18  A.  Correct.

19       MR. JACKSON:  Now, if I could just have Dr. Ajemian's.

20  That would be Exhibit 108-D, please.

21       Chief complaints, if I could just have that blown up,

22  pretty please.  No, the whole -- thank you.

23  Q.  This says chief complaints.  Do you see that?

24  A.  Yes.

25  Q.  Is it your understanding by saying chief complaints that

D7mnles5                          Walsh - cross

1    that is what you are complaining to the doctor about?  Right?

2    A.  Correct.

3    Q.  When you are saying that do you see where it says, the

4    document in evidence, "Regina A. Walsh first presented to my

5    office on October 10, 2005."  We will start there.

6         Do you see that?

7    A.  Uh-huh.

8    Q.  That, of course, in you are being presented at that time

9    you went there voluntarily, correct?

10   A.  Yes.

11   Q.  Ms. Baran didn't tell you to go on that date, did she?

12   A.  No, I went on my own.

13   Q.  Then it says, "With complaints of pain involving her neck."

14        It says that, correct?

15   A.  Right.

16   Q.  Did Ms. Baran tell you to go complain about your neck to

17   Dr. Ajemian?

18   A.  No.

19   Q.  You did that, correct?

20   A.  Correct.

21   Q.  In addition to complaining about the neck, what you said

22   was a lie in 2005, you also said to him you were complaining

23   "about her right shoulder."

24        It says that, too.

25        MS. FRIEDLANDER:  Objection.  Object to the form.

D7mnles5                          Walsh – cross

1           THE COURT:  Sustained.

2           MR. JACKSON:  OK.

3   Q.  You gave an indication here, you would agree, that you were

4   complaining about your neck, your right shoulder, numbness to

5   the right hand, and occasional pain on both legs, muscles,

6   calves, and thighs.

7           MS. FRIEDLANDER:  Objection.

8           THE COURT:  The document speaks for itself.

9           Asked and answered.

10          MR. JACKSON:  OK.

11  Q.  So you don't dispute the document itself that speaks for

12  itself?

13          MS. FRIEDLANDER:  Objection.  Object to the form.

14          THE COURT:  As to form.

15  Q.  You don't dispute the contents or the substance of the

16  chief complaints, do you?

17  A.  No.

18  Q.  You don't dispute it because that's what you told

19  Dr. Ajemian, correct?

20          THE COURT:  Asked and answered.

21          MR. JACKSON:  OK.

22  Q.  There came a time that he was treating you for these

23  particular ailments that you told him about, right?

24          MS. FRIEDLANDER:  Objection.  Misstates her testimony.

25          THE COURT:  Sustained.

D7mnles5                          Walsh - cross

1   Q.   Did Dr. Ajemian treat you for the ailments that you

2   complained of?

3          MS. FRIEDLANDER:  Objection.  Can we be heard at

4   sidebar.

5          THE COURT:  No, let's move on.

6   Q.  Did he treat you?

7          MS. FRIEDLANDER:  Objection.

8          THE COURT:  Overruled.

9   A.  He gave me maybe braces for carpal tunnel, he gave me a

10  prescription, but that was about it.  That was the most he

11  treated me.

12  Q.  So he relied upon what you told him?  You said he gave you

13  braces.

14          MS. FRIEDLANDER:  Objection.

15          THE COURT:  Sustained.

16          MR. JACKSON:  If we could just go down to -- it says

17  history of present illness.  If we could go down to that.

18  Q.  Here again this states the history, would you agree, your

19  history?  Correct?

20          MS. FRIEDLANDER:  Objection.  The document speaks for

21  itself.

22  Q.  Do you have any reason to dispute that this history of

23  present illness is not the history that you presented to

24  Dr. Ajemian.

25          MS. FRIEDLANDER:  Objection.  She's already testified.

D7mnles5                          Walsh - cross

1              THE COURT:  Asked and answered.

2              MR. JACKSON:  OK.

3   Q.  So in the history we can see there, if you look at it, it

4   states your age, correct?

5   A.  Yes.

6   Q.  Do you see that?

7   A.  Yes.

8   Q.  Then it talks about that you are experiencing tightness and

9   pain, numbness to both hands, and particularly discomfort.

10             Do you see that?

11  A.  Right.

12  Q.  You do?

13  A.  Yes, I read it.

14  Q.  Soreness in the back of both legs that persists all the

15  time as well.

16             Do you see that?

17  A.  But I didn't say all the time.

18  Q.  OK.  Well, I am just asking you --

19  A.  It says it there, yes.

20  Q.  Marie Baran didn't tell you to say this to the doctor, did

21  she?

22             MS. FRIEDLANDER:  Objection.  This misstates her

23  testimony.

24             THE COURT:  Sustained.

25  Q.  At any point in having these items down here, it also says

D7mnles5                          Walsh - cross

1   doing her job requires keyboarding.

2           Does your job require keyboarding?

3   A.  Yes.

4   Q.  Does your job require lifting?

5   A.  Yes.

6   Q.  Does it require pushing?

7   A.  Yes.

8   Q.  Pulling?

9   A.  Uh-huh.

10  Q.  And other similar forms of transfer.

11          MR. JACKSON:  Can we get to the other page.

12  Q.  Of activity?  Do you see that?

13  A.  Right.

14  Q.  Do you see that?

15  A.  Uh-huh.

16  Q.  It also indicates that she presents for an evaluation as

17  the numbness in the back of her neck and spasms there and

18  tightness in the arms wake her from her sleep constantly.

19          Do you see where it says that?

20  A.  Yes.

21  Q.  Ms. Baran never told you, did she, that she had any

22  conversation with Dr. Ajemian, is that right?

23  A.  Correct.

24  Q.  In fact, with respect to Ms. Baran, you understood her role

25  here to be in assisting you in completing that application, is

D7mnles5                         Walsh - cross

1   that right?

2   A.  Correct.

3   Q.  And you didn't understand her role to be following up with

4   the doctor to see whether you went to visits, correct?

5   A.  Correct.

6   Q.  And you didn't understand her role to be following up with

7   the doctor to prepare documents that his office is responsible

8   for, is that right?

9   A.  Right.  That was my position -- my job to do.

10  Q.  At no time, we can agree, right, did you ever -- when you

11  were in Ms. Baran's office, right, did you hear -- did you see,

12  hear her or did she give any indication while you were there

13  that she called Dr. Ajemian?  I will withdraw that.

14          Did she call Dr. Ajemian at any time in front of you?

15  A.  No.

16  Q.  Did she at any point while you were in her office send an

17  e-mail to Dr. Ajemian telling him to make things up in an

18  application?

19  A.  No.

20  Q.  Did she at any point say anything while were you present to

21  Dr. Ajemian with regard to exaggerating your medical

22  conditions?

23  A.  No.

24  Q.  So as far as you knew, Dr. Ajemian provided you with

25  documentation, correct?

D7mnles5                        Walsh - cross

1   A.  Yes.

2   Q.  And you took that documentation and you brought it over to

3   Ms. Baran, is that accurate?

4   A.  Correct.

5   Q.  And in bringing it over to Ms. Baran, Ms. Baran assisted

6   you in the filling out of this particular application, is that

7   right.

8            THE COURT:  Asked and answered many times.

9            MR. JACKSON:  If I could just have the government go

10  to 108-B, please.  108-B Section 4 specifically.

11  Q.  In Section 4, you see where it says cervical stent spasms,

12  etc.  Do you see that?

13  A.  Yes.

14  Q.  Ms. Baran didn't fill that out, did she?

15  A.  No, it was filled out by the doctor.

16  Q.  Is he far as you know, she didn't call the doctor asking to

17  put certain things --

18            THE COURT:  Asked and answered, Mr. Jackson.

19            MR. JACKSON:  Yes, Judge.

20            THE COURT:  We are going over the same stuff again.

21  Q.  With respect to No. 2, which is the right shoulder, do you

22  see that?

23  A.  Yes.

24  Q.  Did Ms. Baran --

25            THE COURT:  Asked and answered.

D7mnles5                         Walsh - cross

1    Q.  With regard to 3 --

2              THE COURT:  Asked and answered.

3    Q.  Can we agree --

4              THE COURT:  Asked and answered.  Let's move on,

5    Mr. Jackson.

6              MR. JACKSON:  Yes, Judge.

7

8    Q.  With regard to the entire medical assessment form, which is

9    Exhibit 108-B, page 1, 2, 3, 5, etc., if I could just have the

10   government go to page 7, Section 13, please.

11             That says 9/15/06.  Do you see that?

12   A.  9/5/006.

13   Q.  Sorry.  It's 9/5?

14   A.  Yes.

15   Q.  9/5/06, it says that?

16   A.  Uh-huh.

17   Q.  That predates going to see Ms. Baran?

18             THE COURT:  Asked and answered.

19   Q.  With respect to any other doctors that you saw, did you see

20   any other doctors?

21   A.  No.

22   Q.  At no time?

23   A.  I went --

24             MS. FRIEDLANDER:  Objection.  Time frame.

25   Q.  Did you see any doctors between December 2005 to January of

D7mnles5                         Walsh - cross

1   2007?  Let's start there.

2   A.  No.  Unless I went to my own doctor for something, I don't

3   know of any doctors there would have been.

4   Q.  If I could have the government put up please, Exhibit 1400.

5   If I could direct your attention to January of 2006.

6           MS. FRIEDLANDER:  January 2006.

7           MR. JACKSON:  Yes.  January 2006.  Correct.

8   Q.  January 2006, if we could just direct your attention to the

9   20th of January 2006.  Do you see that?

10  A.  Right.

11  Q.  It says doctor appointment in your diary, is that right?

12  A.  Uh-huh.

13  Q.  At 3 p.m.

14          THE COURT:  Ms. Walsh, answer yes or no.

15  A.  Yes.

16          THE COURT:  The reporter is taking the answer.

17  A.  Yes.

18  Q.  What doctor did you see on that date?

19  A.  It could have been my internist.  I don't know who the

20  doctor is.  The only thing I can think of is the internist

21  or --

22  Q.  OK.  I ask you just moments ago --

23  A.  I said I could have gone to my own doctor.  I don't know

24  the exact dates I've gone to doctors.

25  Q.  My question -- I'm not asking you the dates yet.  I'll

1    direct your attention to that.

2              Just to be clear --

3    A.   Uh-huh.

4    Q.   -- did you see any other doctors between December 2005 and

5    January of 2007 besides Dr. Ajemian?

6    A.   I could have gone to my internist.

7    Q.   What's your internist's name?

8    A.   Craig Smolow.

9    Q.   Anyone else?

10   A.   I had -- at that point maybe I was still going to the

11   gynecologist.  I don't know.

12   Q.   OK.

13   A.   I go to -- that's it.  I think.

14   Q.   Now, on this particular day, it doesn't list the specific

15   doctor, is that right?

16   A.   Yes.

17   Q.   I want to direct your attention to February of 2006.

18             MR. JACKSON:  If you could just blow up that page.  A

19   little bit more.

20   A.   This is the 13th, Dr. Scheid.  He is an eye doctor.

21   Q.   What about, it says on February 3, do you see where it says

22   doctor, 2:45 p.m.?

23             MS. FRIEDLANDER:  Objection.  It's in the records.

24   A.   I don't know who it is.  I don't know whether it was

25   Dr. Ajemian or -- I don't know who it was.

D7mnles5                          Walsh - cross

1   Q.  You don't know if this was Dr. Ajemian?

2   A.  I don't know.  I don't know who the doctor was that I went

3   to.  I don't normally --

4   Q.  I'm sorry.  You don't normally?

5   A.  Go to him on a regular basis.  I don't know what it was.

6   Q.  In the event, though, that it was Dr. Ajemian, for example,

7   back on February 3, '06, you say that was Ajemian, is that

8   right?

9   A.  I don't know.  That's what I said.  I said I am not sure

10  who the doctor was.

11  Q.  OK?

12  A.  Obviously I put --

13  Q.  It is OK.

14  A.  I write the name, but this here, maybe I cancelled the

15  other one and went to Smolow then.  I don't know.

16  Q.  February 8.

17          MR. JACKSON:  If I could just have February 8 blown

18  up.

19  Q.  Who is that?

20  A.  Dr. Sherrer.

21  Q.  Who is that?

22  A.  I don't know.

23  Q.  It is in your diary, correct?

24  A.  I know it is.  I know it is.

25  Q.  You just don't know what doctor that is?

D7mnles5                      Walsh - cross

1   A.  It says 5:30 and 5:45.

2   Q.  I'm sorry.  I am not asking you --

3   A.  It has two times there.  I am thinking maybe it was

4   something that my husband and I went to together.  I don't

5   know --

6   Q.  I am not asking you to speculate.

7   A.  -- what it was.

8   Q.  You just don't know?

9   A.  I don't know who it is.

10  Q.  February 13.  Did you see a doctor then?

11  A.  Dr. Scheid is my eye doctor.

12  Q.  OK.  You said Smolow is?

13  A.  Smolow is my internist.

14  Q.  If we could look then at July 14, 2006, please.

15          Did you see a doctor that day?

16          MS. FRIEDLANDER:  Judge, objection.

17  A.  Dr. Metzger is the gynecologist.

18          MS. FRIEDLANDER:  Objection.  Relevance.

19          THE COURT:  Mr. Jackson, if you are going to continue

20  this line of questioning, you are going to have to tie it to

21  this action.

22          MR. JACKSON:  I will, Judge, momentarily if I can,

23  thank you, Judge.

24  Q.  With respect to your diary itself, in your diary, you did

25  indeed keep a list of doctors that you went to, correct?

D7mnles5                          Walsh – cross

1    A.  Yes.

2    Q.  That's the list that we just saw?

3    A.  Right.

4    Q.  Now, with regard to the list that we just saw, we saw that

5    you had an appointment with Dr. Ajemian and there were various

6    other indications of appointments with doctors.

7            Is that fair to say.

8            MS. FRIEDLANDER:  Objection.  Object to the form.

9            THE COURT:  Sustained.

10   Q.  You would agree with me this is something that you kept a

11   record for yourself, is that accurate?

12   A.  Right.

13   Q.  This is the diary that you kept for you?

14   A.  Right.

15   Q.  And on that particular diary, in showing you those dates,

16   you recollect that that would be something that you wrote, not

17   me, is that correct?

18   A.  Right.  That's what I remember.

19   Q.  And those are indications of dates that you had with

20   different doctors, right?

21   A.  Right.

22   Q.  Just going then to January 5 --

23           MR. JACKSON:  If we could just go to January 5.

24           MS. FRIEDLANDER:  2007.

25           MR. JACKSON:  2007.  I'm sorry.  We are on 2007.

D7mnles5                              Walsh - cross

1    Q.   January.  Here we go.  When you say Marie, you are talking

2    about the meeting you had with Ms. Baran, is that accurate?

3    A.   Correct.

4    Q.   It was on that date that you met with her, is that correct?

5    A.   Yes.

6    Q.   Following that date, we see January 25 is when you had the

7    date with the Railroad Retirement Board, correct?

8    A.   Correct.

9    Q.   That followed your meeting with Ms. Baran by a couple of

10   weeks or whatever that was, is that accurate?

11   A.   Right.

12   Q.   Now, just to be clear regarding your diary, did Ms. Baran

13   direct you to go to any other of those doctors?

14   A.   No.

15   Q.   Those were doctors that you went to for whatever reason on

16   your own.

17           THE COURT:  Asked and answered.

18   Q.   Now, with respect to the actual vocational report, if we

19   could just talk about that for a moment.

20           MR. JACKSON:  If the government could put up the

21   vocational report.

22   Q.   Now that is Exhibit 108-C.  Do you see that?  Do you see

23   that?

24   A.   Yes.

25   Q.   If I could just turn to, for example, page 2, which would

D7mnles5                         Walsh - cross

1   be question 12.

2             MR. JACKSON:  If that could just be blown up a little

3   bit.  Could I get more of the top in there, if we could.

4   Q.  Now, this is something that you would have went over with

5   Ms. Baran.  Is that accurate?

6   A.  She would have asked what my duties were and she wrote down

7   what I had said.

8   Q.  And the top right of that it says over six people.  Do you

9   see what that says, have supervisory responsibilities?

10  A.  I did.

11  Q.  Now, that would be accurate, correct?

12  A.  Yes.

13  Q.  That is information that you supplied, is that right?

14  A.  Correct.

15  Q.  With respect to, for example, another job, if we turn to

16  page 3 --

17            MR. JACKSON:  If we could just go to on page 3,

18  question 15B.

19  Q.  With respect to that job it is asking about, it indicates

20  that you supervise seven employees, is that accurate?

21  A.  Yes, I guess so.

22  Q.  That is not your writing, is it?

23  A.  No.

24  Q.  It's Ms. Baran's?

25  A.  Yes.

D7mnles5                          Walsh - cross

1   Q.  So far as you know, she was interviewing you regarding

2   certain things that you did, is that correct?

3   A.  Yes.

4   Q.  OK.  And she was putting answers based upon a discussion

5   she was having with you, would that be accurate?

6              MS. FRIEDLANDER:  Objection.

7              THE COURT:  Overruled.

8              MR. JACKSON:  I'm sorry?

9              THE COURT:  Overruled.  You may answer.

10  A.  Yes.  She asked me some questions and she wrote down some

11  of what I said.

12  Q.  Again.  Section 4?

13             MR. JACKSON:  Government, page 5.

14  Q.  Again, that is your signature?

15  A.  Yes.

16  Q.  That is the date you went to the Railroad Retirement Board?

17  A.  Yes.

18  Q.  Now, I want to ask you about a conversation you have said

19  you had with the Railroad Retirement Board.  You said that you

20  went -- the Railroad Retirement Board called you?

21  A.  Someone from the board did, yes.

22             MR. JACKSON:  And that would be 108-F, people.  I'm

23  sorry.  Government.

24  Q.  OK.  That is the first.  Do you see that?

25  A.  Yes.

D7mnles5                          Walsh - cross

1    Q.  You said you wrote down in response to that, you wrote down

2    something Ms. Baran gave you to say.  Did you say that?

3    A.  What happened was Marie had called me and told me they were

4    going to be calling me and asking certain questions.

5    Q.  I got that.  I'm not being rude.  I don't want to cut you

6    off, but just for the sake of brevity, I'm asking you --

7    A.  I wrote down the responses she told me to say.

8    Q.  Where is that?

9    A.  I don't have it.

10   Q.  So you wrote down something that Ms. Baran told you to say,

11   correct?

12   A.  Correct.

13   Q.  How did you take that down by the way?  Did you take it

14   with pencil, pen, e-mail?

15   A.  It was by pen.  It was on a scrap of paper.  It wasn't --

16   Q.  So you just happened to write on a scrap of paper

17   everything that Ms. Baran had you say, correct?

18   A.  Most of what she had said I wrote down, yes.

19   Q.  Most of it or all of it?

20   A.  As best I could.  When she was talking I wrote it down.

21   Q.  Could we go to the next exhibit regarding what you did say.

22            MR. JACKSON:  Just the bottom portion, the bottom

23   half, please.  If you can just blow that up a little bit more.

24   Response.  A little bit more, please.

25            MR. WEDDLE:  It is not clear to us what you mean by "a

1  little more."

2          MR. JACKSON:  "Per my telephone conversation 5/14/07

3  with Regina Walsh."

4  Q.  You see that, right?

5          MR. JACKSON:  If we could just fit it all on the page.

6  Q.  Just to be clear, this is the response you gave on May 14,

7  '07?

8  A.  Yes.

9  Q.  To the Railroad Retirement Board, is that right?

10  A.  Yes.

11  Q.  In the response you gave it says, Employee took trains to

12  present seminars several times per week.

13          Do you see where it says that?

14  A.  Yes.

15  Q.  Did you conduct seminars?

16  A.  Yes, I did.

17  Q.  Did you take trains to conduct seminars?

18  A.  Yes.

19  Q.  So Marie Baran wouldn't have had to tell you that.  That is

20  something you would already know?

21  A.  Yes, but I didn't do it several times per week.

22  Q.  When did you do it?

23  A.  On occasion.  It depended.

24  Q.  You didn't tell them on occasion, did you?

25  A.  No.

1    Q.  You told them several times a week?

2    A.  Right.

3    Q.  Then you indicated that you reached above your shoulder.

4            Do you see that, that you frequently reached above

5    your shoulder, is that correct?

6    A.  Correct.

7    Q.  Is that something you put on the scrap paper, too?

8    A.  The word "frequent" probably was, yes.

9    Q.  It probably was something that you turned over to the

10   government?

11   A.  I don't have that paper, no.

12   Q.  Is that something that you might have available at your

13   home?

14   A.  No. I was looking for it just the other day.  I went

15   through everything trying to find it.

16   Q.  By the way, when the agents came to your house in January,

17   is it something that you might have mentioned to them?

18   A.  No.

19   Q.  You didn't mention a piece of paper that Marie gave you to

20   tell, write down things and lie to agents?

21   A.  No.

22   Q.  You didn't tell them she gave you something to lie to the

23   Railroad Retirement Board either, right?

24   A.  I didn't mention anything about a conversation.

25   Q.  And then it says, Employee took trains.  It says, Boxes of

1    materials had to be stored on overhead racks on train.

2              Did you store boxes for your seminars?

3    A.  I could have put files up on the top, yes.

4    Q.  And Marie Baran told you to tell them where you put these

5    boxes?

6    A.  Yes.

7    Q.  That is something, again, that is on the scrap paper that

8    you don't have today?

9    A.  Correct.

10   Q.  And while standing on the trains, employee had to hold on

11   to overhead rails of the moving train.

12              Do you see that?

13   A.  Right.

14   Q.  And that the seats were hardly ever available.  You saw

15   that, too?

16   A.  Uh-huh.

17   Q.  Is it a yes or no.  Remember what the judge said.

18   A.  I'm sorry.  Yes.

19   Q.  It's OK.

20              Now, this is information that you gave to the Railroad

21   Retirement Board?

22   A.  Correct.

23              THE COURT:  Asked and answered.

24   Q.  Just with regard to everything --

25              MR. JACKSON:  This is just cutting to the chase,

1    Judge, almost done.

2              I'm sorry.  You can leave it.  You can leave that.

3    Q.  With regard to that entire statement, Most files, which

4    were boxes of reference materials manuals were overhead

5    shelfed.

6              Do you see that?

7    A.  Yes.

8    Q.  It says you frequently needed to refer to these files to

9    perform your job.

10             Do you see that?

11   A.  Yes.

12   Q.  Excess vibrations were from traveling to seminars to moving

13   trains --

14             THE COURT:  Mr. Jackson, ask the question.  They see

15   the whole statement.  You don't have to read every sentence.

16             MR. JACKSON:  Yes, your Honor.

17   Q.  So, ultimately this was the statement that you gave to

18   Cathy Quinn, right?

19             Is that a yes?

20   A.  Yes.

21   Q.  And was Marie Baran present at the time that you gave the

22   statement?

23   A.  No, she wasn't.

24   Q.  This is something that, with regard to you giving the

25   statement, it was something that they required of you to do?

1   A.  Yes.

2   Q.  With regard to your actual condition, did you experience

3   numbness in the legs?

4   A.  I had some.

5   Q.  You did have numbness in the legs.

6          With regard to your shoulder, did you experience pain

7   in the shoulder?

8   A.  A little, nothing excruciating.

9   Q.  With respect to the carpal tunnel that you had, did you

10  have a brace that was given to you about that?

11  A.  Yes.

12  Q.  These are treatments, so when you went to the doctor you

13  were being treated for these various ailments?

14          MS. FRIEDLANDER:  Objection.

15          THE COURT:  Sustained.

16  Q.  When you actually went and told Ajemian about these various

17  things that were wrong with you, was that the truth or was it a

18  lie?

19  A.  I told him that I had some.  I didn't say excessive.  I had

20  a little bit.  But when I went, maybe it was the first time,

21  but after that, you would go in and he would just ask you, How

22  are you feeling?  OK.  Fine.  That would be about it.  Nothing

23  excessive.

24  Q.  Did you meet with Ms. Friendlander about your testimony?

25          MS. FRIEDLANDER:  Yes, I did.

1   Q.  How many times?

2   A.  Once or twice.

3   Q.  When was the last time?

4   A.  A few hours ago.

5   Q.  A few hours ago, when you met with her, she went over

6   various exhibits with you, is that correct?

7   A.  Yes.

8   Q.  And she talked to you about the questions that she would

9   ask you about those exhibits?

10  A.  No.  Actually, I don't think I saw these exhibits.

11  Q.  She didn't show you any exhibits when you met with mer?

12  A.  Maybe I saw this before, maybe she did.

13  Q.  She did?

14  A.  Yes.

15  Q.  In a meeting with you to go over this you discussed your

16  testimony, would that be accurate?

17  A.  She was trying to make me more comfortable --

18  Q.  I am not asking you --

19  A.  -- and explain to me some of the questions that she would

20  ask.

21  Q.  And that happened, is that right?

22  A.  Yes.

23  Q.  Just to be clear, back in June of 2013 you actually met

24  with Ms. Friedlander then as well, is that right?

25  A.  Yes.  She actually came to the attorney's office.

D7mnles5                        Walsh - cross

1   Q.  And you had a conversation with her at that time?

2   A.  She was just asking me questions about what I knew about

3   the -- about all the information I had provided.

4   Q.  That was June of 2013, is that accurate?

5           MS. FRIEDLANDER:  Asked and answered, Judge.

6   A.  I can't tell you the exact date, but it was recently I

7   guess.

8   Q.  So about a month or so ago?

9   A.  I guess, yes.

10  Q.  When did you take a plea of guilty in this case?

11  A.  In January.

12  Q.  January of 2013?

13  A.  Yeah.

14  Q.  Subsequent to that, that's when you went and you spoke to

15  again to Ms. Friendlander about what you knew here, right?

16  A.  No.  Just in June was the first time I talked to her.

17  Q.  You know that in stating -- by the way, are you scared to

18  say something that would, for example, upset the government?

19  A.  No, I was only told to tell the truth.  I wasn't -- I don't

20  have -- I am just nervous.  That is all.  I am not afraid of

21  anyone.

22  Q.  In being nervous, could I just ask you, you understand that

23  you could potentially go to jail?  You understand that, right?

24  A.  I understand that.

25  Q.  You understand that what you say is conditioned upon

D7mnles5                          Walsh - cross

1   potentially going to jail.  Do you understand that?

2                   MS. FRIEDLANDER:  Objection.

3                   THE COURT:  Sustained.

4                   MR. JACKSON:  I will withdraw.

5   Q.  Do you understand that the government can make a

6   recommendation to the judge in this case regarding your

7   sentence?

8                   Do you understand that?

9   A.  Yeah.  Well, I have a plea.

10  Q.  You do?

11  A.  Yes.

12  Q.  As a result of that plea, you do understand the dynamic of

13  what can happen to you as a result of this case, is that

14  correct?

15                  MS. FRIEDLANDER:  Objection.

16                  THE COURT:  Asked and answered.

17                  MR. JACKSON:  OK.

18                  THE WITNESS:  I can answer?

19                  THE COURT:  Asked and answered already.

20  Q.  So the bottom line here, though, is that in giving your

21  testimony that you are giving today, right, you have not yet

22  been sentenced, is that accurate?

23  A.  Correct.

24  Q.  The sentence is pending, is that right?

25  A.  Yes, it is.

1          THE COURT:  Asked and answered.

2    Q.  By pending, do you have any idea of when the sentence is?

3          Has a specific date been given?

4    A.  Yes, September 5.

5    Q.  September 5 is the date that you are going to be sentenced?

6    A.  Correct.

7          THE COURT:  Asked and answered.

8    Q.  You understand September 5 to be six weeks or so away from

9    today?

10         THE COURT:  Asked and answered.

11         MR. JACKSON:  OK.

12   Q.  Ms. Walsh, regarding the testimony that you are giving

13   here, just to be clear, it is fair to say that you previously

14   lied, correct?

15   A.  Correct.

16   Q.  And it is also fair to say that you didn't only lie once

17   with regard to filling the application with Ms. Baran, right,

18   but you lied again when you signed in front of the Railroad

19   Retirement Board, is that right?

20   A.  I lied on the application.  It was the application that I

21   signed, and that's what I was convicted of.

22   Q.  That's something, just so that we know, when you say

23   convicted, it's something that you said that you were accepting

24   responsibility over?

25   A.  Correct.

D7mnles5                    Walsh - cross

1   Q.  In accepting responsibility over that, you have the

2   indication or you know again that on September 5, the

3   government -- and you are expecting a letter from them?

4   A.  No.

5   Q.  Do you have an understanding of how they would get you a

6   reduced sentence?

7          MS. FRIEDLANDER:  Objection.

8          THE COURT:  Sustained.

9   Q.  For example, was there a commitment by the government to

10  provide you with an argument to the judge to have that sentence

11  reduced?

12  A.  I don't know anything about that.

13  Q.  You just --

14  A.  I wasn't told that.  I wasn't.  What I am hoping is that by

15  being honest that maybe the judge would look at me and give

16  me -- you know, be kind to me.  That is all.  I don't have

17  any -- there was no guarantee.  There is nothing.

18  Q.  When you say being honest, you do understand that you have

19  an incentive to be honest, correct?

20          MS. FRIEDLANDER:  Objection, Judge.

21  A.  No, I am here to be honest.  I am here to make -- to

22  justify what I did and to change it in some way.

23  Q.  By changing it, you are providing the testimony that you

24  are providing today, right?

25  A.  I don't understand exactly what you mean.

1          MS. FRIEDLANDER:  Objection.

2          MR. JACKSON:  I will clarify.

3          THE COURT:  What's the point?

4          MR. JACKSON:  The point, Judge, is her incentive if

5    any --

6          MS. FRIEDLANDER:  Object to the commentary.

7          THE COURT:  Sustained.

8          MR. JACKSON:  OK.

9    Q.  Back in January of 2009, when the federal agents came to

10   your house, were you arrested at that time?

11   A.  Back in January -- when was January 2009?

12   Q.  I want to go back briefly to when the federal agents

13   actually came to your home, back in January of 2009.  Do you

14   remember that?

15   A.  No.  It wasn't in January.  What do you mean?  When they

16   came to my house?

17   Q.  I may have the date wrong.

18   A.  In May?

19   Q.  Right, May?

20   A.  May 2009.

21   Q.  May 2009.

22   A.  I am not sure of the dates.

23   Q.  You remember the federal agents came to your home at that

24   time?

25   A.  Correct.

1    Q.  At that time you had an opportunity to tell the truth,

2    correct?

3              THE COURT:  Asked and answered.

4              MR. JACKSON:  OK.

5    Q.  But at that time had you entered into an agreement with the

6    government?

7    A.  No.  Why would I have an agreement with the government?  I

8    wasn't charged with anything.

9    Q.  I'm asking you.

10   A.  I wasn't charged with anything.

11   Q.  At that point you weren't charged, correct?

12   A.  No.

13   Q.  Subsequent to that you were charged, is that accurate?

14   A.  Right.

15   Q.  You pled guilty, to be clear, to what?

16   A.  To submitting a false application.

17   Q.  So you pled guilty essentially to lying, is that accurate?

18   A.  Correct.

19   Q.  Was that all you pled guilty to?

20   A.  Yes.

21   Q.  So the agreement that you had with the government was to

22   plead guilty to that single count?

23             THE COURT:  Asked and answered.

24   Q.  That single count involved you giving testimony as it

25   related to Ms. Baran's role, is that right?

1    A.  No, it had nothing to do with that.

2              MS. FRIEDLANDER:  Objection.

3              THE COURT:  Sustained.

4              MR. JACKSON:  Just one moment, your Honor.

5    Q.  By the way, regarding the disability that you had, you went

6    to physical therapy for that, is that right?

7    A.  Correct.

8    Q.  The physical therapy you went to was when?

9    A.  I don't know the exact date.  I can't tell you when.  Maybe

10   it is in the record, but sometime in 2005 or '6, the beginning

11   of it probably.

12   Q.  You went to physical therapy in order to get better?  Was

13   that your purpose in going to physical therapy?

14   A.  I was sent by the doctor.

15   Q.  Which doctor?

16   A.  Ajemian.

17   Q.  You actually participated in that physical therapy, is that

18   right?

19   A.  Correct.

20   Q.  Participating in that physical therapy was -- would that

21   have been back in November of 2005?

22   A.  It could have been.  Like I said, I am not sure of the

23   date.

24             MR. JACKSON:  If I could just have the government go

25   to 108-A, page 5.  If we could just go to question 29.

D7mnles5                          Walsh - cross

1  Q.  Do you see where it says six weeks of physical therapy in

2  November 2005?

3  A.  Correct.

4  Q.  In fact, that November of 2005, did Marie Baran tell you to

5  go to physical therapy?

6  A.  No.

7  Q.  Did she in any way suggest that you go to physical therapy?

8  A.  No.

9  Q.  Just to be clear regarding Ms. Baran, was there any

10  indication that Ms. Baran gave you that she would get anything

11  as a result of you getting your disability other than the

12  thousand dollars you gave her?

13  A.  No.

14  Q.  Anything else?

15  A.  No.

16  Q.  That was it?

17  A.  Correct.

18  Q.  There was never any indication other than the thousand

19  dollars you gave her that she would otherwise use her influence

20  as a former Railroad Retirement Board employee to call the

21  medical doctors at the Railroad Retirement Board, correct?

22          MS. FRIEDLANDER:  Object to the form.

23          THE COURT:  Sustained.  Asked and answered.

24  Q.  Did Ms. Baran in any way tell you, and you are not saying

25  any way that when you went to Ms. Baran you went and told her

D7mnles5                         Walsh - cross

1   that you were really not disabled, but you wanted to get a

2   disability?

3            THE COURT:  Asked and answered.  She said that

4   repeatedly.  Now let's move on to the next -- if you're done

5   you're done.  You are just starting all over again with

6   questions that have been asked repeatedly.

7            MR. JACKSON:  Finally, Judge, if I could just go back

8   to the disability application and have the government show

9   that.  The first page, top of that page.

10  Q.  M. Henry, do you see that?

11  A.  Yes.

12  Q.  To you know who that is?

13  A.  It was someone from the Railroad Retirement Board in

14  Westbury.

15  Q.  Did you know that person previously?

16  A.  No.

17  Q.  Did you have any conversations with them prior to you

18  actually going?

19  A.  No.  Just to call to make the appointment.  That's it.

20  Q.  At any point in type did you tell Ms. Henry that Ms. Baran

21  was exaggerating on the application?

22  A.  No.

23  Q.  At any point in time did you tell Ms. Henry -- was it a

24  male?

25  A.  I am not sure.  I think it was.  I don't know.  I don't

D7mnles5                        Walsh - cross

1    remember exactly.

2    Q.  At any point in time did you tell Mr. Henry that Ms. Baran

3    in any way, shape, or form was influencing your questions on

4    the application?

5    A.  No.

6              THE COURT:  Asked and answered.

7              Mr. Jackson, we are starting a new cycle of questions

8    you have already asked repeatedly.

9              MR. JACKSON:  Judge, I'm almost done.

10             THE COURT:  You are done now.  All right.

11             Next?

12             Mr. Durkin, are you cross-examining this witness?

13             MR. DURKIN:  No, Judge.

14             Mr. Ryan?

15             MR. RYAN:  A very short cross.

16             MR. JACKSON:  Judge, can I ask one other thing that

17   was not asked previously.

18             THE COURT:  Ask the question, and I will determine

19   whether it was asked previously.

20   Q.  Did you go to see a Dr. Gomez at all regarding any

21   disability that you said that you had?

22   A.  Not -- was he one of the people that performed one of

23   the --

24             MS. FRIEDLANDER:  Objection.

25   A.  I don't --

1          THE COURT:  Sustained.

2          Mr. Ryan?

3    CROSS EXAMINATION

4    BY MR. RYAN:

5    Q.  Joe Rutigliano, can you give the jury a little idea of the

6    kind of dealings you had with him when you were working at the

7    railroad?

8    A.  Joe was a very good guy.  I used to work with him, I worked

9    with him in labor relations, and I worked with him -- when he

10   used to help his employees, he would come to me for some help.

11   But he was a very nice person, very helpful.

12   Q.  When he dealt with you, it was over issues involving

13   employee rights?

14   A.  Right.  It was about their benefits and whatever.

15   Q.  In your experience, was he a straightforward person with

16   you?

17   A.  Yes.

18   Q.  Straightforward and honest?

19   A.  Yes.

20          MR. RYAN:  Thank you.

21          No further questions.

22          THE COURT:  Ms. Friedlander.

23          MS. FRIEDLANDER:  May I just have one moment with

24   counsel.

25          THE COURT:  Yes.

D7mnles5                         Walsh - cross

1   REDIRECT EXAMINATION

2          MS. FRIEDLANDER:  Just a couple of questions.

3   BY MS. FRIEDLANDER:

4   Q.  Ms. Walsh, this is what's been marked for identification as

5   Government Exhibit 3514-10.  Take a look at that and tell me

6   whether you see your signature on the last page.

7   A.  Yes.

8   Q.  Is that the plea agreement you entered into with the

9   government?

10  A.  Yes.

11         MS. FRIEDLANDER:  The government offers -- you know

12  what I am not sure what number I just read, but we offer the

13  plea agreement.  We offer 3514-10.

14         THE COURT:  Mr. Jackson?

15         MR. JACKSON:  I don't object.

16         MR. RYAN:  No objection.

17         THE COURT:  Anyone else?

18         Admitted without objection.

19         (Government's Exhibit 3514-10 received in evidence

20  Q.  Ms. Walsh, at the time you entered into that plea agreement

21  with the government, had you ever spoken with the government

22  about your dealings with Ms. Baran whatsoever?

23  A.  No.

24  Q.  To be clear, did you first meet with the government about

25  this case, I mean, did you first meet with the government

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7mnles5                          Walsh - redirect

1   months after entering into this plea agreement?

2   A.   The first time was, I guess, in June when you -- when we

3   met in my attorney's office.

4   Q.   Leaving aside the interview counsel mentioned in 2009 by

5   some agents, the first time you met with the prosecution in

6   this case was months after you entered into that plea

7   agreement?

8   A.   Correct.

9            MS. FRIEDLANDER:  That is all I have.

10           THE COURT:  Anything else?

11           Thank you.  You may step down.  You are excused.

12           THE WITNESS:  Thank you.

13           (Witness excused)

14           MR. DURKIN:  Judge, could I just ask for the

15   instruction again that also applies to the cross-examination.

16           THE COURT:  Yes.

17           The instruction that I gave to the jury pertaining to

18   the government's direct examination of this witness applies

19   equally to the cross-examination.  Anything that may have been

20   said by the witness that pertains or pertained to Dr. Ajemian

21   related only to the charges by the government against

22   Ms. Baran, and any testimony that came out during the course of

23   cross-examination pertaining to actions taken by Dr. Ajemian do

24   not involve any conduct by Dr. Lesniewski and may not be used

25   by you in any form to draw conclusions pertaining to the

D7mnles5                        Walsh – redirect

1    government's charges against Dr. Lesniewski.

2              All right.

3              Government, next witness?

4              MR. WEDDLE:  Yes, your Honor, the next witness is

5    Robert Murray.

6              May I just have a moment with counsel, your Honor.

7              THE COURT:  Yes.

8              MR. WEDDLE:  Your Honor, there may be some

9    miscommunication among counsel.  Perhaps we could take a brief

10   break to work this out and talk about the witness order with

11   your Honor.

12             THE COURT:  How long do you think you would need to

13   sort out whatever it is?

14             MR. WEDDLE:  Five minutes, your Honor.

15             THE COURT:  We will take a five-minute recess.

16             (Jury not present)

17             (Recess)

18

19

20

21

22

23

24

25

D7mdles6

```
 1              (Jury not present)

 2              THE COURT:  Mr. Wedding, are you done?

 3              MR. WEDDLE:  Your Honor, we had a little

 4    miscommunication over the weekend.  We told your Honor on

 5    Friday that we would call Mr. Murray next.

 6              THE COURT:  Yes.

 7              MR. WEDDLE:  Over the weekend we changed our plan and

 8    said we would call Mr. Maher next to the defense, and I thought

 9    we had changed it back or we definitely internally had changed

10    it back.  I thought we communicated that to the defense.

11    Apparently, we did not.  So certain defense counsel said they

12    are not ready for Mr. Murray today, they want to do him

13    tomorrow, and we will just call Mr. Maher instead, who is here

14    and ready to go.

15              THE COURT:  All right.  So bring Mr. Maher in now.

16              MR. WEDDLE:  Your Honor, there is one issue that I

17    wanted to raise with your Honor, or that Ms. Friedlander wanted

18    to raise with your Honor regarding the last witness.  She is

19    still out of the room.  I can preview it for your Honor.

20              THE COURT:  Why don't you.

21              MR. WEDDLE:  I guess the issue that I saw from -- and

22    I hate to speak for her, but the issue that I saw was that at

23    the sidebar the defense essentially blocked us from going

24    through what Dr. Ajemian did or didn't do in any kind of detail

25    at all.  We elicited a couple of false statements from the
```

D7mdles6

1    narrative.  But, obviously, because he is a named

2    co-conspirator in counts charged against Ms. Baran and

3    Mr. Rutigliano, we had planned to do more.  We obviously don't

4    want to he belabor the issue, but we do need to prove our case

5    beyond a reasonable doubt.

6            But then what happened on cross-examination is

7    immediately the defense got up and started going right into

8    those areas that they had blocked us through their objections

9    from eliciting on direct that Mr. Jackson went through a number

10   of questions where he said, well, Dr. Ajemian was treating you

11   and he treated you on this day, he treated you on that day.

12   And that was testimony that we had planned to elicit on

13   direct -- Ms. Friedlander is back and I apologize for starting

14   without her.  But we had planned to talk about the fact that

15   Dr. Ajemian certainly did not treat Ms. Walsh.  And I can let

16   Ms. Friedlander take over at this point.

17           But to block us from going into the direct testimony

18   and then to go right into it on cross-examination and to

19   mischaracterize the facts is problematic.  And so we just

20   wanted to raise that with your Honor when the witness is

21   finished.  But there are other witnesses who are Dr. Ajemian

22   witnesses, including Mr. Maher, who is up next, and we need to

23   prove our case.  And in order to prove our case, we need to

24   show that Dr. Ajemian also was a co-conspirator.  And there

25   were certain objections during the testimony of Ms. Walsh,

D7mdles6

1    which were sustained by your Honor, that elicited things like,

2    you know, what Ms. Walsh was directed to do in terms of how to

3    pay or when to come back for visits.  Those statements -- first

4    of all, I would like to just revisit a couple of those rulings

5    with your Honor because similar issues may come up with

6    Mr. Maher.  Obviously, we've got through the testimony of

7    Ms. Walsh, I think, effectively.

8         But if Dr. Ajemian or someone from Dr. Ajemian's

9    office is directing somebody to do something, that's not

10   hearsay, it's offered for the fact that the direction was made.

11   It's not even a statement.  It's not an assertion of fact.  It

12   is simply a direction.  Or if somebody asks a question, that's

13   not hearsay either; that's simply a question.  Or fails to ask

14   a question, that's also not hearsay.  So those things that we

15   are eliciting from these witnesses about their interactions

16   with Dr. Ajemian or people in his office, those are not

17   hearsay.

18        In addition, to the extent there were statements of

19   fact that we were eliciting that came out of the mouth of

20   Dr. Ajemian and we wanted to offer for its truth, we would be

21   offering that as a co-conspirator statement.  But most of the

22   things that come out of Dr. Ajemian in the form of written

23   material is of course false, so we are not offering it for its

24   truth anyway in that context because many of those things are

25   false.

D7mdles6

1          But I just wanted to alert your Honor to the fact that

2     I think that these are fair questions.  They don't go into

3     hearsay.  They are not -- we are eliciting statements that are

4     relevant for the fact that they are said and they are often not

5     even assertions of fact.  If they are assertions of fact, often

6     we are eliciting them because they are false.  And if we are

7     eliciting them because they are true, they would typically be

8     statements in furtherance of the conspiracy, which is something

9     obviously that we have the burden of proving, foundationally,

10    that he is a conspirator, and so in order to do that we need to

11    elicit things that he did like the fact that he directed

12    Ms. Walsh to return repeatedly for visits and that he said to

13    Ms. Walsh, when she said she wants to retire, that she, you

14    know, there were safety issues and she couldn't work anymore.

15          In addition, your Honor, this wasn't really fair to

16    Ms. Walsh to make it seem -- to require her to testify about

17    her understanding about what came next.  It made her seem like

18    the mastermind when what she was doing was following

19    instructions.

20          So I just wanted to raise that with your Honor just in

21    terms of future witnesses, including Mr. Maher.

22          There was one other thing that I wanted to raise but

23    it has now just vanished from my brain.

24          MS. FRIEDLANDER:  Judge, can I just add one final

25    point in addition to what Mr. Weddle said?

D7mdles6

1            The challenge I had was that I was going to start

2    questioning her about what if any treatment did you get from

3    Dr. Ajemian and then defense counsel objected.  We had the

4    sidebar.  And I agreed with everyone at the sidebar I would

5    just skip to the end of her visit to Dr. Ajemian and go right

6    into the narrative.  I agreed to skip right over the treatment

7    questions, and defense counsel I think was happy with that.

8    But on cross-examination they went right into treatment.  So I

9    was blocked from asking about it, but they cross-examined her

10   on it; so, obviously, we felt that was unfair.

11            THE COURT:  Thank you.

12            MR. DURKIN:  Judge --

13            THE COURT:  Before I call you, Mr. Durkin, you recall

14   that it was the Court that raised the issue itself when

15   Ms. Walsh was testifying and going through details about the

16   visits to Dr. Ajemian, and I was trying to walk a very delicate

17   line between allowing the government to present this case as it

18   pertained to Ms. Baran without prejudicing Dr. Lesniewski

19   unduly.

20            And it was that concern that prompted my calling the

21   parties and trying to see if we could find a fair middle

22   ground.  It was not a question of hearsay.  It was a question

23   of undue prejudice to the extent that we could find some means

24   of getting the material in that is relevant but without undue

25   prejudice to Dr. Lesniewski.

D7mdles6

1          I agree with you that much of the material that was

2     excluded at the point that we had the sidebar in fact was

3     brought in during the cross-examination.  And to the extent

4     that it was brought in by Mr. Jackson during cross-examination,

5     to some extent it was opening the door, although it still

6     raised the question as to potential prejudice to

7     Dr. Lesniewski.  That is the reason I gave the limiting

8     instruction the second time.

9          Mr. Durkin.

10          MR. DURKIN:  Judge, I was only going to say, I would

11     object to it as much from going into cross-examination by a

12     defense lawyer as I would the government.  That is why I asked

13     for the instruction a second time.  I obviously didn't want to

14     stand up in while my colleague is in cross-examination and

15     object to it.  But it is the result of the joinder that we

16     complained about and I think it is problematic.  So I support

17     your ruling.

18          But I would like to be able to voice my objection

19     going forward, in the event it comes up during

20     cross-examination, I would rather not have to object.  I mean,

21     I will if I have to but I would rather not object.

22          THE COURT:  All right.

23          MR. WEDDLE:  Your Honor, there is nothing stopping

24     defense counsel from objecting to a cross-examination question

25     by another defense counsel.  If he feels that that's an

939

D7mdles6

1    appropriate objection to make, he should make it.  I don't

2    think he should have some kind of silent objection that no one

3    can know about or address at the time.  That is the whole

4    purpose of contemporaneous objections, if he wants to object to

5    it.

6              But the joinder issue and the prejudice issues have

7    been briefed, your Honor, and they have been ruled on by your

8    Honor.  And we're obviously sensitive to the fact of not

9    overdoing it, and we've done it in a very streamlined way.  But

10   we also don't want to present a distorted picture to the jury

11   and make it seem like Regina Walsh is doing a lot of things on

12   her own initiative when in fact what is happening is

13   Dr. Ajemian is telling her come back in six weeks and

14   Dr. Ajemian is saying things to her and Maria Rusin, or someone

15   in Dr. Ajemian's office, is saying pay the narrative fee.

16   Ms. Walsh is not making this stuff up.

17             Your Honor has instructed the jury that Dr. Ajemian's

18   conduct is simply not to be considered against Dr. Lesniewski,

19   and I think that's a simple and easy-to-follow instruction and

20   I'm confident that they are going to --

21             THE COURT:  All right.  I think we have struck what I

22   consider a sufficient and fair line.  So let's see to what

23   extent we are able to remain within those bounds in the

24   testimony to come.

25             MR. RYAN:  Let me state for the record, on behalf of

D7mdles6

1     Mr. Rutigliano, that we object to the whole Ajemian evidence,

2     as we did in our motion to preclude it prior to this trial.

3            What is happening here is that the government doesn't

4     have Dr. Ajemian testifying as a conspirator, doesn't have

5     anyone defending Dr. Ajemian's work, and we're trying to prove

6     Dr. Ajemian falsified and exaggerated medical conditions

7     without Dr. Ajemian being present to testify and be available

8     for cross-examination.  That is the fundamental difficulty that

9     the defense has had, and it has been created by the manner in

10    which the government has structured this Indictment.  They

11    could have tried the case, the Lesniewski matter and not had

12    these problems.

13           Mr. Rutigliano would like to make the record clear

14    that it renews the motion to preclude the Ajemian evidence.  It

15    is not reliable.  It is hearsay.

16           MS. FRIEDLANDER:  Your Honor, just one last word.

17           I don't need to tell the Court it is not uncommon for

18    the government to charge a case this way.  We have trials in

19    this case all the time that --

20           THE COURT:  I will take judicial notice of that.

21           MS. FRIEDLANDER:  Thank you, Judge.

22           THE COURT:  Can you bring in the jury.

23           (Continued on next page)

24

25

D7mdles6

1              (Jury present)

2              THE COURT:  Thank you.  Welcome back.

3              MR. TEHRANI:  As discussed, your Honor, the government

4     will now call James Maher.

5      JAMES MAHER,

6          called as a witness by the government,

7          having been duly sworn, testified as follows:

8              THE COURT:  Thank you.  Be seated.

9              Speak into the microphone as closely as possible.

10             State your name and spell it for the record.

11             THE WITNESS:  My name is James Maher.  It's spelled

12    J-a-m-e-s M-a-h-e-r.

13             THE COURT:  Mr. Tehrani.

14    DIRECT EXAMINATION

15    BY MR. TEHRANI:

16    Q.  Mr. Maher, how old are you?

17    A.  I am 60.

18    Q.  What city and state do you live in?

19    A.  I live in Eustis, Florida.

20    Q.  How far did you go in school?

21    A.  I had some college.

22    Q.  What did you do after that?

23    A.  I worked for the Long Island Rail Road.

24    Q.  Are you still employed there?

25    A.  No, I am not.

D7mdles6                         Maher - direct

1   Q.  How did that employment end?

2   A.  With retirement.

3   Q.  And when did you retire?

4   A.  In -- the last day of October of 2003.

5   Q.  How old are you?

6   A.  50.

7   Q.  When did you start working at the Long Island Rail Road?

8   A.  October 1973.

9   Q.  So when you retired in 2003, you were approximately 50

10  years old with 30 years of service?

11  A.  That's correct.

12  Q.  And when you retired from the Long Island Rail Road, were

13  you eligible for a pension from the Long Island Rail Road?

14  A.  Yes.

15  Q.  Do you know when you became eligible for that pension?

16  A.  At 50 years of service and 30 years -- and 50 years of age.

17  Q.  So you retired at the first year you were eligible for that

18  pension?

19  A.  That's correct.

20  Q.  When you retired, how would your Long Island Rail Road

21  pension have compared to your preretirement salary?

22  A.  Approximately half.

23  Q.  And what were you planning to do after retirement, if

24  anything, in order to supplement that income that you would get

25  from your pension?

D7mdles6                        Maher - direct

1    A.  I was going to apply for a disability pension from the RRB.

2    Q.  And at the time that you retired, what was your

3    understanding of what a disability pension was from the RRB?

4    A.  I understood it was a disability pension available to

5    employees who could no longer perform their duties.

6    Q.  Just to clarify.  We are talking about an occupational

7    disability?

8    A.  That is correct.

9    Q.  And you had to apply to the RRB in order to get an

10   occupational disability?

11   A.  Yes.

12   Q.  At the time that you retired, were you able to do your job

13   at the Long Island Rail Road?

14   A.  Yes.

15   Q.  So were the materials that you submitted to the RRB

16   truthful about your physical condition --

17   A.  No, they were not.

18   Q.  About your ability to do your job at the railroad?

19   A.  Correct.

20   Q.  Did anyone help you prepare your untruthful application?

21   A.  Yes.

22   Q.  Who was that?

23   A.  Dr. Peter Ajemian and Mr. Joe Rutigliano.

24   Q.  And do you see Joe Rutigliano, the person who helped you

25   make this disability claim, in the courtroom here today?

D7mdles6                          Maher - direct

1    A.  Yes, I do.

2    Q.  Could you please identify Mr. Rutigliano by an article of

3    clothing?

4    A.  The gentleman standing on the left side in a tan blazer.

5           MR. TEHRANI:  May the record reflect that the witness

6    has identified the defendant.

7           THE COURT:  So noted.

8    Q.  So with Ajemian's and Rutigliano's help, did you in fact

9    get a disability annuity?

10   A.  Yes, I did.

11   Q.  Mr. Maher, did you get into any trouble for making this

12   fraudulent disability claim?

13   A.  Yes, I did.

14   Q.  What happened?

15   A.  I was arrested.

16   Q.  When was that?

17   A.  I believe it was September of 2002 -- 2003 --

18   Q.  2012?

19   A.  What's that?  2012, I'm sorry.

20   Q.  And what were you initially charged with?

21   A.  I was charged with conspiracy to commit mail fraud,

22   conspiracy to commit healthcare fraud.

23   Q.  Did you plead guilty to those charges?

24   A.  Yes, I did.

25   Q.  And did you plead guilty to any crimes that you were not

1    initially charged with?

2    A.   Yes.

3    Q.   And what was that?

4    A.   And that was perjury to the Grand Jury.

5    Q.   Now, before your guilty plea, did you enter into a

6    cooperation agreement with the federal government?

7    A.   Would you repeat that, please?

8    Q.   Before your guilty plea, did you enter into a cooperation

9    agreement with the federal government?

10   A.   Yes, I did.

11   Q.   And was that agreement oral or written down?

12   A.   It was oral and then written.

13   Q.   And the written agreement, does that encompass all of the

14   conditions of your agreement with the government?

15   A.   Yes.

16   Q.   And before you signed the agreement, did you agree to meet

17   with the government?

18   A.   Yes.

19   Q.   And what about after you pled guilty?

20   A.   Yes.

21   Q.   You met with the government?

22   A.   Yes.

23            MR. TEHRANI:  Your Honor, I should have done this

24   before the witness started testifying.  There are a number of

25   exhibits that we are going to be offering, all of them, save

D7mdles6                      Maher - direct

1    for one which I will mention at the end, I believe are being

2    offered with no objection.

3              THE COURT:  All right.

4              MR. TEHRANI:  And be those are Government Exhibits

5    3504-05, 1000, 1001, 1002, 107A, 107B, as in boy, 107C, as in

6    Charlie, 107D, as in dog, 715, and there was another Government

7    Exhibit, 1004, which we did not notify defense counsel until

8    this morning so I'm not sure if they have any objection.

9              THE COURT:  1004?

10             (Pause)

11             MR. RYAN:  I am going to object to 1004.

12             THE COURT:  You are objecting now?

13             MR. RYAN:  That is the one I just got.  Unless I do a

14   voir dire.

15             MR. TEHRANI:  We can deal with it at the time.

16             THE COURT:  If it gets introduced, we will go over

17   that.

18             The others are admitted without objection.

19             (Government's Exhibits 3504-05, 1000, 1001, 1002,

20   107A, 107B, 107C, 107D, 715 received in evidence)

21   Q.  Mr. Maher, there is a binder of documents in front of you.

22   Could you please look at Government Exhibit 3504-05.

23             (Pause)

24   A.  All right.

25   Q.  Do you recognize that document?

1    A.  Yes, I do.

2    Q.  And what is it?

3    A.  This is my cooperation agreement with the government.

4    Q.  Turn in to page 6.  Is that your signature?

5    A.  Yes, it is.

6    Q.  Mr. Maher, under your agreement, what is your understanding

7    of what you have to do?

8    A.  My agreement with the government is that I commit no

9    further crimes, I will meet with the government if they need me

10   to meet with them, and that if brought to testify, that I

11   testify truthfully.

12   Q.  And if you do everything you are supposed to do under the

13   agreement, what is your understanding of what the government

14   has to do?

15   A.  My agreement is that the government will write a letter to

16   the judge who pronounces sentence.

17   Q.  And what is your understanding of what the government will

18   write in that letter?

19   A.  I don't have an understanding -- there is no understanding

20   that there will be a letter written.

21   Q.  Assuming a letter is written, do you have an understanding

22   of what the government will write in that letter?

23   A.  It will be written that, you know, they will just write

24   that I've been very cooperative with the government.

25   Q.  Now, if the government does write that letter, what is your

D7mdles6                     Maher - direct

1   understanding of how high your sentence could be?

2   A.  It could be as high as 55 years.

3   Q.  And what is your understanding of how low your sentence

4   could be?

5   A.  I could be sentenced to no jail times.

6   Q.  And what is your understanding as to who will decide your

7   sentence?

8   A.  The judge will decide the sentence.

9   Q.  And I believe you testified that, sitting here right now,

10  you don't know for sure whether the government will write that

11  letter?

12  A.  No.

13  Q.  Has anyone promised you that you will get a reduced

14  sentence?

15  A.  No.

16  Q.  As so far as understand it, is the government going to

17  recommend any specific sentence?

18  A.  No.

19  Q.  What is your understanding of whether your testimony has to

20  result in a conviction in order for you to get a letter?

21  A.  All I'm required to do is just testify truthfully.

22  Q.  Mr. Maher, approximately how much money did you receive in

23  disability payments?

24  A.  Over the period of time, approximately $320,000.

25  Q.  And as part of your agreement, what, if thing, did you

1    agree to do with that money?

2    A.  I agreed to -- to re-- to restitution of that money.

3    Q.  Getting back to your retirement from the Long Island Rail

4    Road, before you retired, what was your job?

5    A.  I was a conductor.

6    Q.  And what were the duties and responsibilities of a

7    conductor?

8    A.  Well, I was responsible for the movement of the trains,

9    supervise personnel assigned to the train, and just ensure the

10   safety of the passengers on that train.

11   Q.  And when you retired, approximately how much money were you

12   making?

13   A.  With my overtime, I was probably making around 80,000.

14   Q.  So you worked overtime in the years leading up to your

15   retirement?

16   A.  Yes, I did.

17   Q.  If we can look at Government Exhibit 1002.  Turn to the

18   second page.  I'm sorry.  Let's turn to the third page.

19        Is that your name on the top right corner?

20   A.  Yes.

21   Q.  And do you see the column for overtime hours?

22   A.  Yes.

23   Q.  And are those actual hours printed there or are those

24   multiples?

25   A.  They are in tenths.  So it's a decimal number.

1   Q.  I'm sorry.  Look at the column for overtime hours.

2   A.  Oh, the hours?

3           All right.  Yes, I see it.

4   Q.  And are those actual hours or are those multiples?

5   A.  They will be the total hours that I worked overtime.

6   Q.  So, for example, if you look at the first entry on page 3,

7   under "Overtime Hours," there is a 300 there.  Do you see that?

8   A.  Yes.

9   Q.  That is not 300 hours?

10  A.  No.  That would be three hours.

11  Q.  And if you look at the bottom, there is a yearly total.

12  A.  Yes.

13  Q.  Do you see that?

14  A.  That's correct.

15  Q.  What year is that for?

16  A.  That is for the end of 2002.

17  Q.  And if you divide the overtime total by a hundred, you get

18  approximately a thousand hours, is that right?

19  A.  Correct.

20  Q.  Do you recall working approximately a thousand hours of

21  overtime in the year before you retired?

22  A.  Yes.

23  Q.  Turning to the last page of the document.

24  A.  All right.

25  Q.  Do you see at the bottom where it says "yearly total"?

1    A.   Yes.

2    Q.   That's for 2003?

3    A.   This will be for 2003, correct.

4    Q.   And the total overtime is approximately 855 hours?

5    A.   That's correct.

6    Q.   Now, you testified that you retired at the end of October?

7    A.   Yes.

8    Q.   So that's not for a full year?

9    A.   No.

10   Q.   What type of work did you do when you were working

11   overtime?

12   A.   Basically the same type of work.  It would be different

13   runs.  My particular run that I had, I had three hours built

14   right into the job.  So every day I would work it would be

15   three hours every day, so it would be 15 hours a week.  And

16   then I would work some days that I had off, I would work an

17   extra day.

18   Q.   And why did you work so much overtime?

19   A.   I worked the overtime because my pension was based on the

20   best of my last five years.

21   Q.   So the overtime was in connection with your retirement

22   payment?

23   A.   That's correct.

24   Q.   You testified that when you retired, you were eligible for

25   a pension?

1    A.  That's correct.

2    Q.  And that pension was approximately half your salary?

3    A.  Yes.

4    Q.  Would you have retired when you did if you were only

5    eligible for a Long Island Rail Road pension?

6    A.  No.

7    Q.  Why not?

8    A.  There would be a shortfall in my salary.

9    Q.  Why did you retire when you did?

10   A.  Because I had the time, I had the age, and the availability

11   of a disability pension was quite real.

12   Q.  Now, did you ever visit the pension office in connection

13   with your retirement planning?

14   A.  Yes.

15   Q.  Could you take a look at Government Exhibit 1000.

16   A.  All right.

17           MR. TEHRANI:  Show it to the jury, please.

18   Q.  You see on the line about three-quarters of the way down

19   the page there is a signature and a date.

20   A.  Yes.

21   Q.  And that is your signature?

22   A.  Yes, it is.

23   Q.  And the date is September 15, 2002?

24   A.  Yes.

25   Q.  That is about a year before you retired?

D7mdles6                       Maher - direct

1   A.  Correct.

2   Q.  And then up at the top it lists your planned retirement

3   date in October 2003?

4   A.  Yes.

5   Q.  Which is in fact when you did retire?

6   A.  Yes.

7   Q.  What is the purpose of you filling out this form?

8   A.  It was to see what my pension would be if I retired at that

9   date.

10  Q.  Now, could you turn to Government Exhibit 1001.  This is

11  also a pension estimate application?

12  A.  Yes.

13  Q.  That is your signature?

14  A.  Yes.

15  Q.  And what is the date?

16  A.  July 15, 2003.

17  Q.  And the planned retirement date is what?

18  A.  November 1, 2003.

19  Q.  And, again, your last day of work was the end of October?

20  A.  Yes.

21  Q.  So other than working overtime, going to the pension

22  office, what other steps did you take as part of your

23  retirement planning?

24  A.  I started going to see Dr. Ajemian of Rockville Centre to

25  start a paper trail to try to get a narrative so that I could

1   apply for disability pension from the RRB.

2   Q.  Again, we are talking about an occupational disability?

3   A.  That is correct.

4   Q.  What did you hear about occupational disabilities?

5   A.  That they were pretty easy to get.

6   Q.  And who did you hear this from?

7   A.  Just word of mouth on the Rail Road.

8   Q.  Coworkers of yours?

9   A.  Yes.

10  Q.  Was it a common topic of conversation?

11  A.  Yes.

12  Q.  Approximately when did you first start hearing about

13  occupational disabilities?

14  A.  Maybe about four or five years before I retired.

15  Q.  And did people talk about a process for obtaining an

16  occupational disability?

17  A.  Yes.

18  Q.  And what was that process?

19  A.  And that would be to go to a doctor and have him certify

20  with a narrative that you were unable to do your job due to

21  medical issues, and then make an application to the RRB to

22  obtain a disability pension -- occupational disability.

23  Q.  Had you heard anything about private disability insurance?

24  A.  Yes.

25  Q.  And what did you hear?

D7mdles6                         Maher - direct

1   A.  I heard you could apply for it if you knew you were going

2   to be retiring and possibly getting a disability pension.

3   Q.  Did you apply for that private insurance?

4   A.  I did not.

5   Q.  Why not?

6   A.  I just didn't feel it was the right thing to do.

7   Q.  Did you ever attend any seminars or conferences where

8   occupational disability was discussed?

9   A.  Yes.

10  Q.  One conference?  More than one?

11  A.  One.  I went to one.

12  Q.  What was the purpose of that meeting?

13  A.  It was basically to give retirees a general idea of the

14  process of retiring and what you could possibly expect from --

15  in retiring and also what you could expect from the RRB and the

16  basic process of if you feel that you qualified for a

17  disability pension, the process of doing that.

18  Q.  And who discussed occupational disability?

19  A.  There was a member of the union and basically it was a

20  representative from the RRB.

21  Q.  Do you remember who that was?

22  A.  I believe her first name is Marie.  I don't remember her

23  last name.

24  Q.  So when did you begin taking active steps towards applying

25  for an occupational disability?

D7mdles6                        Maher - direct

1   A.  Active steps would have been around December of 2002.

2   Q.  And what steps did you take?

3   A.  I made an appointment with Dr. Peter Ajemian.

4   Q.  Had you heard about any other doctor names?

5   A.  Yes.

6   Q.  Which names?

7           MR. DURKIN:  Objection.

8           THE COURT:  Overruled.

9   Q.  What names had you heard?

10  A.  I heard about, I may mispronounce it, Dr. Lesniewski, and

11  there was another doctor but I don't recall his name.

12  Q.  Why did you choose Dr. Ajemian?

13  A.  His hours were very flexible.  He works on Saturdays and

14  some evenings and it worked for my schedule.

15  Q.  And you also testified that Joe Rutigliano helped you out

16  with your application?

17  A.  That's correct.

18  Q.  How did you hear about him?

19  A.  Word of mouth on the Rail Road.

20  Q.  And what did you hear about him?

21  A.  Just that he could help you with the process of getting the

22  application filled out.

23  Q.  Had you heard about any other people who could help you

24  with the application?

25  A.  Not at that time.

D7mdles6                          Maher - direct

1   Q.  When did you ultimately apply for an occupational

2   disability?

3   A.  December of 2003.

4   Q.  And did that application include a medical narrative from

5   Dr. Ajemian?

6   A.  Yes, it did.

7   Q.  And materials you got from Joe Rutigliano?

8   A.  That is correct.

9   Q.  You testified that you were awarded an occupational

10  disability?

11  A.  Yes.

12  Q.  How did you receive your disability benefit?

13  A.  Through direct deposit into my checking account.

14  Q.  Which account was that?

15  A.  At that time it was NetBank and then it was bought by ING,

16  and now it's been -- now it's owned by Capital One.

17  Q.  Can you look in your binder at Government Exhibit 1004.

18  A.  I'm sorry.  I'm not finding 1004 here.

19          MR. TEHRANI:  Your Honor, may I approach?

20          THE COURT:  Yes.

21  Q.  Do you recognize that document?

22  A.  It's a statement from ING Bank.

23  Q.  And how do you recognize it?

24  A.  The logo on the top.

25  Q.  And is that a document that you would receive on a periodic

1    basis?

2    A.  Yes.

3    Q.  Is that your name at the top?

4    A.  Yes.

5    Q.  It was sent to you at your address?

6    A.  That is correct.

7            MR. TEHRANI:  Your Honor, the government offers

8    Government Exhibit 1004.

9            MR. RYAN:  May I ask a few questions?

10           THE COURT:  Yes.

11   VOIR DIRE EXAMINATION

12   BY MR. RYAN:

13   Q.  Does this relate to the direct deposit that you get from

14   the Railroad Retirement Board relating to your occupational

15   disability?

16   A.  Yes.

17   Q.  Can you point out which entry it is?

18   A.  Where it says -- the second -- actually, third entry on the

19   sheet.  It says, "U.S. Treasury."

20           MR. RYAN:  Thank you.  No objection.

21           THE COURT:  Admitted without objection.

22           (Government's Exhibit 1004 received in evidence)

23   DIRECT EXAMINATION (Resumed)

24   BY MR. TEHRANI:

25   Q.  Mr. Maher, turning to the second page.  Do you see, the

D7mdles6                     Maher – direct

1    last entry on the second page, an ATM withdrawal?

2    A.  Yes.

3    Q.  Where was that?

4    A.  That was the Hyatt Regency in Hauppauge, New York.

5    Q.  Is that in Long Island?

6    A.  Yes.

7    Q.  Focusing now on Dr. Ajemian, and we will just go through

8    this briefly.

9         What kind of doctor is Dr. Ajemian?

10   A.  He is an orthopedic doctor.

11   Q.  And what was the purpose of your visits with him beginning

12   in 2002?

13   A.  To have a paper trail, have him examine me and qualify me

14   for a -- to give me a narrative stating my medical condition so

15   I could apply to the RRB for a disability pension.

16   Q.  What did you tell him about your physical condition?

17   A.  I told him I had pain in my upper back and my lower back.

18   Q.  Did you tell him the truth?

19   A.  I told him the truth but I did exaggerate.

20   Q.  Did you actually have pain at that time?

21   A.  Yes.

22   Q.  How would you describe that pain?

23   A.  Annoying, numbing.

24   Q.  And did that pain get worse or better or something else

25   during the time period that you were seeing Dr. Ajemian?

D7mdles6                          Maher - direct

1    A.  It stayed about the same.

2    Q.  And when you went to Dr. Ajemian and told him about your

3    physical condition, what did he say?

4              MR. DURKIN:  Objection.

5              THE COURT:  Overruled.

6    A.  He just -- he heard everything I said, and he did an

7    examination.  And after the examination he had a list of things

8    he thought, you know, what the problem was, and he went

9    about -- he at that point, he told me that he would go through

10   everything and prove what he thinks the problems are.

11   Q.  Mr. Maher, did you ever miss any work because of your back?

12   A.  No.

13   Q.  Your neck?

14   A.  No.

15             THE COURT:  Let me pause at this moment.  Since you

16   elicited testimony concerning statements made by Dr. Ajemian, I

17   am going to give the jury the same limiting instruction that I

18   gave in connection with Ms. Walsh's testimony.

19             To the extent there is evidence and testimony

20   pertaining to actions and statements made by Dr. Ajemian, they

21   are to be considered by you only with respect to the charges

22   brought in this instance against Mr. Rutigliano and not to be

23   considered by you in any way to draw any conclusions pertaining

24   to the charges against Dr. Lesniewski.

25   BY MR. TEHRANI:

1    Q.  Mr. Maher -- might I repeat the question, your Honor.  I am

2    not sure if I got an answer?

3            Did you miss any work because of your back?

4    A.  No.

5    Q.  Your neck?

6    A.  No.

7    Q.  Approximately how often did you see Dr. Ajemian?

8    A.  It was like once a month and then might have skipped a

9    month here and there.

10   Q.  And how long were your visits?

11   A.  20 minutes.  The first -- the first visit was very long, it

12   was about three hours, and after that it was like 20 minutes a

13   visit.

14   Q.  When you say it was a long visit, were there tests done

15   during that visit?

16   A.  He did a full set of x-rays and a lot of prodding and

17   poking.

18   Q.  Did he ever send you out for any other tests?

19   A.  Yes.

20   Q.  What kind of tests?

21   A.  EMGs and MRIs.

22   Q.  Do you know what an EMG is for?

23   A.  Yes.

24   Q.  What is that for?

25   A.  It is to actually ascertain whether you have any delay from

1    one point to another in your nerves in your extremities.

2    Q.  Do you know what kind of condition it is a test for?

3    A.  Yes.

4    Q.  And what is that?

5    A.  It was carpal tunnel.

6    Q.  Did you complain about carpal tunnel syndrome --

7    A.  No.

8    Q.  -- to Dr. Ajemian?

9    A.  No, I did not.

10   Q.  Did Dr. Ajemian offer you surgery?

11   A.  No.

12   Q.  Did he offer you physical therapy?

13   A.  Yes.

14   Q.  Did you go to physical therapy?

15   A.  Yes.

16   Q.  Did it help?

17   A.  No.

18   Q.  Did he offer you any injections?

19   A.  No.

20   Q.  Did you ever talk to anyone in Dr. Ajemian's office about a

21   narrative?

22   A.  Yes.

23   Q.  What happened during that conversation?

24   A.  I was told that a narrative would be at the end of his

25   examinations and a narrative would be written and of the cost

1   of the narrative.

2   Q.  And what was the cost?

3   A.  $750.

4   Q.  And did you ultimately get a narrative?

5   A.  Yes.

6   Q.  Did you pay for it?

7   A.  Yes.

8   Q.  In what form?

9   A.  Cash.

10  Q.  How did you pay for your visits with Dr. Ajemian?

11  A.  I think I paid in cash but it was for a copay.

12  Q.  And was the rest of it paid for by insurance?

13  A.  Yes.

14  Q.  Who was your insurance provider?

15  A.  United Healthcare.

16  Q.  In the last ten years since you retired, have you received

17  any treatment for your back and neck?

18  A.  Yes.

19  Q.  What kind of treatment?

20  A.  I've had physical therapy.  I am on Norflex, which is a

21  muscle relaxant, and I have had some epidural shots in my upper

22  back.

23  Q.  And why did you go for that treatment?

24  A.  Because I was having nagging pain and I wanted to see if I

25  could get rid of it.

D7mdles6                        Maher - direct

1   Q.  And was it helpful?

2   A.  Yes.  I'm on medication.  It is helpful.  The epidural

3   shots helped after the third shot.

4   Q.  And so you got a narrative from Dr. Ajemian?

5   A.  Yes.

6   Q.  What did you do with it?

7   A.  I brought it to Joe Rutigliano and so we could fill out an

8   application to the RRB.

9   Q.  Did you know Joe Rutigliano from the Rail Road?

10  A.  Yes.

11  Q.  Did you work with him?

12  A.  Yes.

13  Q.  What was his job?

14  A.  He was a conductor.

15  Q.  And approximately when was last time you worked with him?

16  A.  It's really hard to say.  I would say the early '90s.

17  Q.  And when you say you worked with him, you worked on the

18  same train as he did?

19  A.  Yes.

20  Q.  And when you were working on the same train with him, did

21  he appear to you to have any difficulty doing his job?

22  A.  No.

23  Q.  And when did you first speak to Joe Rutigliano about your

24  occupational disability application?

25  A.  Shortly after my first visit with Dr. Ajemian.

D7mdles6                          Maher - direct

1    Q.   And was that conversation in person?

2    A.   Yes.

3    Q.   Where was it?

4    A.   It was on the train.

5    Q.   What happened in that conversation?

6    A.   I just spoke to Joe --

7              MR. RYAN:  Judge, may we have a time, please?

8              THE COURT:  Timeframe.

9              MR. TEHRANI:  I believe the witness testified it was

10   shortly after his first visit with Dr. Ajemian.

11             MR. RYAN:  Month and year?

12             THE WITNESS:  December 2003.

13             MR. RYAN:  Thank you.

14             THE WITNESS:  Ah, 2002.

15   BY MR. TEHRANI:

16   Q.   And what happened in that conversation?

17   A.   Joe was a passenger on the train, and I just told him that

18   I was looking at retirement and that I may be looking for his

19   help.  And I told him that I was going to Dr. Ajemian.

20   Q.   What did he say?

21   A.   He said he was a good man and that say hello.  That's all

22   that was said about that.

23   Q.   Did you ever contact Joe Rutigliano about actually having

24   him fill out your application for you?

25   A.   Yes.

1   Q.  And was that in person or was that over the phone?

2   A.  No, that was over the phone.

3   Q.  What happened in that conversation?

4   A.  We made an appointment.

5   Q.  Did he tell you to bring anything?

6   A.  Yes.

7   Q.  What did he tell you to bring?

8   A.  The narrative and the payment that I was going to give him.

9   Q.  Did he tell you how much?

10  A.  Yes.

11  Q.  How much?

12  A.  $1,000.

13  Q.  Did he tell you in what form?

14  A.  Yes.

15  Q.  And in what form?

16  A.  Cash.

17  Q.  Approximately when did you first meet with him about your

18  disability application?

19  A.  It was the day after Thanksgiving of 2003.

20  Q.  And did you -- so that was your first meeting.  Did you

21  ever meet with him again?

22  A.  No.

23  Q.  Did you bring anything to that first meeting?

24  A.  I brought the narrative and I brought the payment that he

25  requested.

1   Q.  And during that meeting, what, if any, questions did he ask

2   you about your job?

3   A.  Nothing about my job.

4   Q.  What, if any, questions did he ask you about your job

5   responsibilities?

6   A.  No.

7   Q.  What, if any, questions did he ask you about your physical

8   condition?

9   A.  He only asked me about the type of pain I was having, and I

10  said I had pain in my upper back and in my lower back.

11  Q.  Did he look through the narrative that you had given him?

12  A.  Yes.

13  Q.  What, if anything, did he say?

14  A.  One thing that stands out is he looked through the

15  narrative and he told me that Dr. Ajemian said that I could not

16  drive a motor vehicle.  And I thought that was kind of strange

17  that Dr. Ajemian would have written that since I drove to

18  the -- I was never told that by him, not to drive, and I drove

19  to Joe's office -- the office to meet with Joe.  So I thought

20  that was odd.

21  Q.  Do you remember talking about any other physical activities

22  with Mr. Rutigliano?

23  A.  No, not really.  We talked about what my normal day would

24  be, because I was already retired at the time.  And what's your

25  normal day?  What do you do in your normal day?

1    Q.   What did you tell him?

2    A.   Oh, basically the best part was I got to sleep late because

3    I was always up early going to work, and I had time to just

4    relax and read the paper and things like that.  And he asked me

5    about hobbies, and I told him the hobbies I had and that was

6    about it.

7    Q.   Did you ever tell him that you were no longer physically

8    able to work?

9    A.   No.

10   Q.   Did he ever ask?

11   A.   No.

12   Q.   Did he say anything to you about whether you were

13   definitely going to get an occupational disability?

14   A.   Never -- he never said I would definitely get it.

15   Q.   What, if anything, did he say about that subject?

16   A.   The only thing he ever said to me was after we were

17   finished with the process, he told me he wanted me to

18   understand that it wasn't a "gimme," that it wasn't

19   something -- you know, that this is a big guarantee, that we

20   filled it out and we'll see where it goes.

21   Q.   How long did your meeting with Mr. Rutigliano last?

22   A.   It wasn't very long.  It was only about 20/25 minutes tops.

23   Q.   And what did you do after you left Rutigliano's office?

24   A.   I drove back home to Florida.

25   Q.   How long a drive is that?

1   A.  Approximately 19 hours.

2   Q.  Did you tell Rutigliano that you were about to drive 19

3   hours to Florida?

4   A.  Yes, because we talked about it and I was on my way right

5   from his office going to Florida.

6   Q.  Did you make any plans with Mr. Rutigliano for the next

7   steps?

8   A.  The only plans we made was he was -- he told me that the

9   forms would be -- he would take them home, they would be typed

10  out, and that he would return them to me by mail.

11  Q.  And where was he going to mail them to you?

12  A.  Florida.

13  Q.  How did you ultimately get the documents?

14  A.  I ended up flying up the day before my appointment with the

15  RRB.  And that morning that I was meeting with the RRB, I drove

16  to Babylon and I picked up the forms in the UTU office and then

17  drove right from there to the RRB, because I had an appointment

18  at 10 o'clock in the morning.

19  Q.  So he never sent you the documents?

20  A.  No, I had to pick them up.

21  Q.  After you picked oven the documents from the UTU office,

22  did you review them?

23  A.  Very quickly in the car when I got to the RRB office.

24  Q.  And did you make any observations about the truthfulness of

25  the application?

D7mdles6                         Maher - direct

1    A.  Well, I just thumbed through it.  I did see the issue about

2    the driving, and I did see that it wasn't checked not at all,

3    as Dr. Ajemian had said, and it was just checked I believe it

4    was difficult, or whatever he -- the thing was for that.

5    Q.  Did you observe anything else about the points in the

6    application?

7    A.  I saw a few things there that really had to do with my job

8    and things like that that I thought was a little, but didn't

9    question it because I just assumed that that's the way it is

10   supposed to be written out.

11   Q.  Did you file the application anyway?

12   A.  Yes, I did.

13   Q.  Why?

14   A.  Because I wanted to receive my dis-- my retirement annuity.

15   Q.  Where did you submit the document?

16   A.  The RRB office in Westbury, Long Island.

17   Q.  And when you went to the RRB office, did you meet with

18   anyone?

19   A.  Yes.

20   Q.  Male or female?

21   A.  Female.

22   Q.  How long was that meeting?

23   A.  Once again, another quick meeting, maybe 20 minutes.

24   Q.  What did you discuss there?

25   A.  Not much.  I mean, I gave her the forms that I got from Joe

D7mdles6                         Maher - direct

1   Rutigliano and she did some forms of her own in front of me,

2   and that was about it.

3   Q.  Did she go through all of the questions in the application

4   with you?

5   A.  No.

6   Q.  Did she ask you any questions about your physical

7   condition?

8   A.  No.

9   Q.  Mr. Maher, did there come a time when you testified before

10  the Grand Jury in connection with this investigation?

11  A.  Yes.

12          THE COURT:  I am going to take a ten-minute break at

13  this point.

14          MR. TEHRANI:  Thank you, your Honor.

15          (Recess)

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

D7mnles7                        Maher - direct

1

2              THE COURT:  All right bring in the jury.

3              MR. DURKIN:  Judge, can I ask how late we are going to

4    go tonight.

5              THE COURT:  5 o'clock.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Jury present)

2    THE COURT:  Thank you.  Be seated.

3    I understand the jury got its coffee and refreshments.

4    It reminds me of a story about a president of the United States

5    who was outgoing and the incoming president once asked him,

6    Mr. President, with all of your power and all of the prestige

7    and everything that you have, what did you find to be the most

8    frustrating and difficult time during your tenure?  He said,

9    When I have gave an order and nothing happened.  That's what it

10   feels like when you order the cafeteria coffee and nothing

11   happens.

12   MR. TEHRANI:  Thank you, your Honor.

13   Q.  Mr. Maher, I believe right before we broke you had

14   testified that you had previously testified before the grand

15   jury in connection with this investigation?

16   A.  That's correct.

17   Q.  When was that approximately?

18   A.  I believe that was April of 2002 -- 2003.

19   Q.  2011?

20   A.  I'm sorry.  2011.

21   Q.  Were you a hundred percent truthful in your grand jury

22   testimony?

23   A.  No, I was not.

24   Q.  In what way were you not truthful?

25   A.  Well, there was one point where I lied to the grand jury

1   when I was questioned about doing some home remodeling.  I

2   claimed that I had a handyman do the work when I actually did

3   the work.

4   Q.  Why did you say that?

5   A.  I think I just panicked.

6   Q.  Did you also testify about Joe Rutigliano in the grand

7   jury?

8   A.  Yes.

9   Q.  What did you say?

10          MR. RYAN:  Objection.

11          THE COURT:  Overruled.

12  A.  I told him that Joe helped me fill out the application in

13  his office.

14  Q.  Did you also testify that you helped fill out the

15  application?

16  A.  Yes.

17  Q.  Was that truthful?

18  A.  No.

19  Q.  Why did you say that?

20  A.  After taking some time, I have had time to review the

21  application and it kind of brought back some stuff in my mind

22  about that period, and it wasn't exactly accurate.

23  Q.  So at the time that was your best recollection?

24  A.  At this time it was my recollection, yes.

25  Q.  At the time you testified, was your application fresh in

1   your mind?

2   A.   Not really.

3   Q.   Prior to your grand jury testimony, had you reviewed your

4   application?

5   A.   No.

6   Q.   Since then, have you had an opportunity to review your

7   application?

8   A.   Yes.

9   Q.   Have you had an opportunity to think about the application

10   process?

11   A.   Yes.

12   Q.   How, if at all, has that affected your recollection?

13   A.   It just made me realize that it wasn't a form that we

14   actually filled out in the office.  It was more of a Q and A,

15   and I believe Mr. Rutigliano took notes.

16   Q.   In preparation for your testimony today have you also had

17   an opportunity to review the transcript from your grand jury

18   testimony?

19   A.   Yes.

20   Q.   Based on that review, were there other questions that you

21   did not answer truthfully.

22   A.   Yes.

23   Q.   Why did you answer those questions untruthfully?

24   A.   The same reason.  I think I panicked.

25   Q.   You testified previously that you pled guilty to perjury

D7mnles7                         Maher - direct

1    before the grand jury?

2    A.   Yes.

3    Q.   Is that based on testimony that we have just been talking

4    about?

5    A.   Yes.

6    Q.   Did you ever lie about your health in any other context?

7    A.   Yes.

8    Q.   Approximately when was that?

9    A.   Several years ago.

10   Q.   What happened?

11   A.   I claimed that I had a debilitating medical condition to a

12   credit agency.

13   Q.   Was that the truth?

14   A.   No.

15   Q.   Why did you say it?

16   A.   I was getting harassed by phone calls and I wanted them to

17   stop.  So I wrote them a letter and I asked them to give me an

18   accounting of the accounts and to put everything in writing and

19   send it to me through the mail.

20   Q.   What happened?

21   A.   Everything stopped.  They stopped everything they were

22   doing.

23   Q.   To the best of your understanding, did you repay your debt?

24   A.   Yes.

25   Q.   Could you now take a look at Government Exhibit 107-A.

D7mnles7                          Maher - direct

1                    MR. TEHRANI:  Ms. Chen, would you please publish it.

2     Q.  Do you have it in front of you?

3     A.  You said B?

4     Q.  107-A.

5     A.  A.

6     Q.  It says at the top "Application for Determination."

7     A.  Yes.

8     Q.  Is that your name on the front?

9     A.  Yes, it is.

10    Q.  Do you see the stamp on the front "RRB Westbury district

11    office, December 17, 2003"?

12    A.  Yes.

13    Q.  On the last page of the document -- or page 10 of the

14    document --

15    A.  Yes.

16    Q.  -- is that your signature?

17    A.  Yes, it is.

18    Q.  Is that your handwriting filling in the date there?

19    A.  No.  That's not my handwriting.

20    Q.  Other than the signature, is there any other handwriting on

21    this document that is yours?

22    A.  No.

23    Q.  Did you type in the information on this document?

24    A.  I did not.

25    Q.  Turning to page 2, question 11, it says, "Enter the date

1    you could no longer work because of your condition."

2                The answer there is October 23, 2003.

3                Do you see that?

4    A.   Yes.

5    Q.   What is the significance of that date?

6    A.   That was the actual last day I worked for the Long Island

7    Rail Road, physically worked.

8    Q.   Is the answer to that question accurate?

9    A.   No.

10   Q.   Why not?

11   A.   Because I could have continued to work.

12   Q.   Did you tell Joe Rutigliano that you couldn't work after

13   October 23, 2003?

14   A.   No.

15   Q.   Did he ever ask?

16   A.   No.

17   Q.   Looking at question 12, it asks you to describe how your

18   condition prevents you from working.  I am not going to read

19   the entire thing, but the answer says, "My disabling constant

20   back, neck, right knee pain, along with the hand numbness I

21   suffer has gotten to the point I can no longer perform my

22   duties as a railroad conductor.  I am unable to open and close

23   heavy interior and exterior train doors, left heavy couplers,"

24   etc. and then it concludes by listing a series of activities

25   that are each impossible.

1          Do you see that?

2     A.   Yes.

3     Q.   Is that true?

4     A.   No.

5     Q.   Turning to page 6 -- let me ask you, before we turn to

6     that, did you ever tell Joe Rutigliano any of the information

7     that was in the answer to question 12?

8     A.   No.

9     Q.   Turning to page 6, question 39, this is a series of daily

10    activities.

11         Do you see that?

12    A.   Yes.

13    Q.   For each activity, the answer is supposed to be easy, hard,

14    or not at all?

15    A.   Correct.

16    Q.   At the top it explains what those definitions mean.  For

17    hard, for example, it says, "I can do the activity with

18    difficulty or with help."

19         Do you see that?

20    A.   Yes.

21    Q.   The answers here are that sitting, standing, walking,

22    eating, bathing, dressing, performing other bodily needs,

23    indoor chores, outdoor chores, driving a motor vehicle, using

24    public transportation and writing are all hard.

25         Do you see that?

D7mnles7                        Maher - direct

1    A.  Yes.

2    Q.  Are those activities hard for you?

3    A.  No.

4    Q.  Were they hard for you at the time you filled out or you

5    submitted this application?

6    A.  No.

7    Q.  Did you tell Joe Rutigliano those activities were hard for

8    you?

9    A.  No.

10   Q.  Did he ask?

11   A.  No.

12   Q.  Focusing on the driving a motor vehicle, the explanation,

13   there's explanations for all of the activities that are listed

14   as hard.  Do you see that?

15   A.  Yes.

16   Q.  In particular, the activity or the explanation for driving

17   a motor vehicle says that, "Difficulty driving long distances

18   due to back and knee pain, difficulty turning neck."

19           Do you see that?

20   A.  Yes.

21   Q.  Where did you drive from Joe Rutigliano's office?

22   A.  To my home in Florida.

23   Q.  Looking at question 40, it asks you to enter additional

24   information that describes your daily actives during a normal

25   day.

D7mnles7                        Maher - direct

1              Do you see that?

2    A.  Yes.

3    Q.  Mr. Maher, do you see that?

4    A.  Yes, I see it.

5    Q.  Is some of the information in here accurate?

6    A.  Some of it is, yes.

7    Q.  For example, it says, "As a hobby I retain a coin

8    collection."

9              Do you see that?

10   A.  Yes.

11   Q.  Is that true?

12   A.  That's true.

13   Q.  You were testifying earlier about Joe Rutigliano asked you

14   what your hobbies were?

15   A.  Yes.

16   Q.  And was this one of the hobbies you told him?

17   A.  Yes.

18   Q.  What about the portion here where it says, "I am able to

19   watch television or use my computer, but must get up and

20   stretch every five minutes or so to alleviate my back and neck

21   pain."

22              Is that true?

23   A.  I am able to watch television and use my computer, but to

24   say that I have to get up frequently to stretch, no.

25   Q.  Did you ever tell Joe Rutigliano that?

1    A.  No.

2    Q.  Turning now to Government Exhibit 107-C --

3            MR. TEHRANI:  Put that on the screen.

4    Q.  Do you see at the top this is labeled a vocational report?

5    A.  Yes.

6    Q.  That is your name in the answer to question 1?

7    A.  Yes.

8    Q.  The stamp at the bottom says RRB Westbury district office,

9    December 17, 2003?

10   A.  Correct.

11   Q.  Turning to page 5, that is your signature, right?

12   A.  Yes.

13   Q.  Is any of the other handwriting on here yours?

14   A.  No, it is not.

15   Q.  In question 7, it asks you to list your job title there,

16   and written there is railroad conductor.

17           Do you see that?

18   A.  Yes.

19   Q.  That was your job?

20   A.  Yes.

21   Q.  Then in question 12 it asks you to, 12B, it asks to you

22   explain your basic duties of your job listed in 7A, which is

23   the railroad conductor?

24   A.  Yes.

25   Q.  The answer is, "Please see vocational report and job

1   description supplement"?

2   A.  Yes.

3   Q.  Do you see that?

4   A.  I see that.

5   Q.  And then for 13 it asks for environmental hazards.  The

6   answer there is also, "Please see vocational report and job

7   description supplement."

8           Do you see that?

9   A.  Yes.

10  Q.  Now, turning to page 8 of this document, that is your name

11  at the top?

12  A.  Yes.

13  Q.  Underneath your name it says, "Vocational Report

14  Supplement"?

15          Do you see that?

16  A.  I'm sorry.  I think I have the wrong page.  Yes, OK.  Yes,

17  I have it.

18  Q.  Then it says, "Job Description"?

19  A.  Yes.

20  Q.  Turning to the next page, it is a summary job description,

21  and it lists 12 activities?

22  A.  Yes.

23  Q.  Starting on the next page, it goes through each one of

24  those activities in some detail.

25          Do you see that?

1   A.  Yes.

2   Q.  I promise we won't go through every one, but No. 1 lists,

3   "Exertion while doing repetitive and extensive climbing," and

4   it starts by saying, "I did extensive climbing on and off

5   railroad cars and engines using vertical side ladders and grab

6   irons."

7            Do you see that?

8   A.  Yes.

9   Q.  Is it fair to say that this paragraphs describes you how

10  you climb a latter?

11  A.  Yes, it does explain how to climb a ladder to infinite

12  detail.

13  Q.  Then the paragraph concludes, after describing the pain, it

14  says, "Other employees covered for me when I could not do my

15  work.  I was no longer able to do this work because of the

16  severe disabilities I suffer."

17           Do you see that?

18  A.  Yes.

19  Q.  Is that true?

20  A.  No.

21  Q.  Did you ever tell Joe Rutigliano that?

22  A.  No.

23  Q.  And can you look at activities 2, 3, 4, 5, 6, 7, 8, 9, 10.

24           Do they all conclude with the two sentences: "Other

25  employees covered for me when I could not do my work.  I was no

1    longer able to do this work because of the severe disabilities

2    I suffer."

3    A.  All of them up to 11.  12 doesn't include that.

4    Q.  Were those true statements?

5    A.  No.

6    Q.  Focusing on activity 3, exertion involving heavy work with

7    coupling equipment.

8            Do you see that?

9    A.  Yes.

10   Q.  What is coupling equipment?

11   A.  It could be a number of things, but I think in this case

12   it's talking about train couplers, compromise couplers to

13   couple trains together.  They're big pieces of metal that you

14   are able to couple certain types of equipment together to move

15   the equipment around the railroad.

16   Q.  Did you ever do that kind of work in your job?

17   A.  Very early in my career.  Certainly not within the last 15,

18   20 years of my career did it come up.

19   Q.  Looking at activity 7, "Physical exertion while switching

20   out trains."

21           Do you see that?

22   A.  Yes.

23   Q.  Did you switch out trains in your job?

24   A.  Very early in my career, basically I worked regular

25   electric equipment, and to switch out trains, unless you worked

D7mnles7                          Maher - direct

1   a yard job where that was your job, switching out trains, it
2   wasn't an issue.  So it wouldn't be something I would do
3   normally.  Maybe in an emergency situation, but not in a
4   normal, it's not a normal thing I would do.
5   Q.  I know I'm jumping around, but I'm trying to do this
6   quickly.
7           Activity 2, "Extensive walking."
8           It says that you walked "approximately seven to eight
9   miles a shift when I worked."
10          Is that accurate?
11  A.  No, it is not.
12  Q.  Did you ever tell Joe Rutigliano that?
13  A.  No.
14  Q.  Activity 4, "Exertion involving handbrakes."
15          "I would say that I did this at least 10 times a
16  shift."
17          Do you see that?
18  A.  Yes.
19  Q.  Is that accurate?
20  A.  No.
21  Q.  How often do you think you would do it?
22  A.  Maybe once a shift, maybe.
23  Q.  Some shifts you didn't do it at all?
24  A.  Some shifts you wouldn't do it at all.
25  Q.  Now, activity 5, "Exertion while crouching, stooping,

D7mnles7                          Maher - direct

1    squatting and bending in cramped areas."

2    A.  Yes.

3    Q.  Do you see that?

4         There is a portion in the middle that says, "This was

5    a catch-22.  Since I could not depend on my back and neck for

6    support or leverage, I had to employ increased leverage and

7    exertion.  As I tried to use my arms and hands, my back and

8    knee pain uncontrollably flared up, such that I could not do my

9    work."  And this goes on to say, "That caused increased

10   numbness and tingling."

11        Is that true?

12   A.  No.

13   Q.  Did you ever tell Joe Rutigliano that these activities were

14   a catch-22 for you?

15   A.  No.

16        MR. RYAN:  Objection to catch-22.

17        THE COURT:  Overruled.

18   Q.  Mr. Maher, is it fair to say that this supplement is

19   neither accurate about your job responsibilities or your

20   abilities to do your job?

21   A.  I think some of the activities are correct, but not

22   relating to the inability to do them.

23   Q.  But, for example, No. 3, where it is talking about coupling

24   equipment, it is not something you did in the last 20 years?

25   A.  Right.

D7mnles7                              Maher - direct

1    Q.  Did you type this document?

2    A.  I did not.

3    Q.  Who did?

4    A.  I have no idea.

5    Q.  Did you pay for anyone to help you prepare your disability

6    application?

7    A.  Yes.

8    Q.  Who was that?

9    A.  Joe Rutigliano.

10   Q.  Looking now at Government Exhibits 107-B as in boy and

11   107-D as in dog.  We will start with 107-B.

12         This is a document entitled, "Medical Assessment of

13   Residual Functional Capacity"?

14   A.  Yes.

15   Q.  It has your name at the top?

16   A.  Yes.

17   Q.  The last page, who is it signed by?

18   A.  The last page would be Peter Ajemian.

19   Q.  If you turn to the third page, under "Environmental

20   Restrictions."

21         That's where it says you are totally unable to drive

22   or operate machinery.

23   A.  Yes.

24   Q.  Is that what you think Mr. Rutigliano was referring to when

25   he was going through the paperwork?

D7mnles7                          Maher - direct

1   A.  I assume so.

2   Q.  107-D, do you see that?

3   A.  Yes.

4   Q.  Is that your name at the top?

5   A.  Yes, it is.

6   Q.  And the last page signed by Dr. Ajemian?

7   A.  Yes, it is.

8   Q.  And on the first page it is addressed to the United States

9   of America Railroad Retirement Board?

10  A.  Yes.

11  Q.  What is this document?

12  A.  This is my medical narrative.

13  Q.  At my request, have you reviewed this document prior to

14  your testimony?

15  A.  Yes.

16  Q.  In general terms, is this document accurate?

17  A.  No.

18          MR. RYAN:  Objection.

19          THE COURT:  Overruled.

20  Q.  How is it not accurate?

21          MR. RYAN:  Same objection.

22          THE COURT:  Overruled.

23  A.  It is not accurate in the respect that there are

24  exaggerations and certain things in here that just are not

25  true.

D7mnles7                          Maher - direct

1    Q.  At some point after being awarded an occupational

2    disability --

3              MR. TEHRANI:  We are finished with this exhibit.

4    Q.  -- were you considered for other RRB disability benefits?

5    A.  Yes.

6    Q.  What were those?

7    A.  I believe it was for permanent disability.

8    Q.  In connection with that consideration, were you sent to see

9    a doctor other than Dr. Ajemian?

10   A.  Yes.

11   Q.  How many times did you see that doctor?

12   A.  Once.

13   Q.  What was that examination like?

14   A.  It was a quick 15-, 20-minute go-through.

15   Q.  Did you bring any medical records to that doctor?

16   A.  No.

17   Q.  Did the doctor provide any diagnoses?

18   A.  Yes.

19   Q.  To you?

20   A.  No, not to me.

21   Q.  Did the doctor offer any treatment?

22   A.  No.

23   Q.  Were you awarded a permanent disability?

24   A.  No.

25   Q.  Turning to Government Exhibit 715.

D7mnles7                          Maher - direct

1    A.  All right.

2    Q.  It has your name at the top?

3    A.  Correct.

4    Q.  Do you recognize this document?

5    A.  Yes, I do.

6    Q.  What is it?

7    A.  This is an update report to the RRB to continue to verify

8    my continuing disability.

9    Q.  On page 2, is that your signature?

10   A.  Yes.

11   Q.  When is it dated?

12   A.  March 7, 2011.

13   Q.  Why did you fill out this form?

14   A.  Because it's required to continue to get your railroad

15   disability.

16   Q.  If you look at the third page, there is a copy of an

17   envelope.

18           Do you see that?

19   A.  Yes.

20   Q.  The envelope is postmarked from Orlando?

21   A.  That's correct.

22   Q.  That's where you sent it from?

23   A.  Yes.

24   Q.  It is addressed to the Railroad Retirement Board, 26

25   Federal Plaza, New York, New York?

1  A.  Correct.

2          MR. TEHRANI:  Your Honor, may I have a minute?

3          THE COURT:  Yes.

4          MR. TEHRANI:  No further questions, your Honor.

5          THE COURT:  Thank you.  Mr. Ryan.

6          Mr. Jackson.

7          MR. JACKSON:  Briefly, Judge.

8  CROSS EXAMINATION

9  BY MR. JACKSON:

10  Q.  How are you, sir?

11  A.  All right.  Thank you.

12  Q.  Good.  You mentioned earlier something about seminars that

13  were conducted.

14          Do you recall that?

15  A.  Yes.

16  Q.  I believe you said they were retirement seminars of some

17  sort?

18  A.  Yes.

19  Q.  The retirement seminars that we are talking about, you

20  actually attended in what forum or setting?

21  A.  It was in a hall.  I don't really remember.  I think it was

22  in Babylon.

23  Q.  At that hall, do you recall who convened these seminars?

24  A.  I don't know who the actual convening person was, but there

25  were members of the union and a representative from the RRB.

1   Q.  You mentioned before that there was a representative from

2   the RRB, her name was Marie?

3   A.  Yes.

4   Q.  Do you recall that?

5   A.  Yes.

6   Q.  Do you recall what her last name was?

7   A.  No, I don't.

8   Q.  I'm going to ask you to look at the person who is standing

9   at the defense table.

10  A.  Yes.

11  Q.  Was that the individual who was at the seminar, or do you

12  not know?

13  A.  I do not recall.

14      MR. JACKSON:  OK.  You can sit down.

15  Q.  Just briefly, as it related to those seminars, do you

16  remember whether there was just a general discussion about

17  retirement?

18  A.  Yeah.  There was a general discussion about retirement both

19  from the railroad end of it and the RRB end of it, and each

20  took their time to explain what the procedure was.

21  Q.  For retirement?

22  A.  Correct.

23  Q.  Did the issue of occupational disability come up at that

24  time as well?

25  A.  Yes.

D7mnles7                                Maher - cross

1    Q.  In discussing the issue of disability, did that come from

2    both the railroad as well as the RRB?

3    A.  I don't remember the issue of RRB disability coming from

4    the Long Island Rail Road.  I think it just came from the RRB.

5    Q.  At that particular time, whoever that would have been, the

6    person by the name of Marie, did they just give a general

7    overview as it related to retirement?

8    A.  Yes.

9    Q.  And did they give a general overview as it related to the

10   occupational disability?

11   A.  Yes.

12   Q.  Was there any encouragement to having people apply for

13   that, or was it more informational?

14   A.  It was more informational.

15   Q.  Based upon that, it was just giving general information to

16   the parties that were present, is that correct?

17   A.  That's correct.

18           MR. JACKSON:  Thank you, Judge.

19   CROSS EXAMINATION

20   BY MR. RYAN:

21   Q.  Did I understand you to say that you were examined by a

22   doctor at the request of the Railroad Retirement Board.

23   A.  Yes.

24   Q.  Not Dr. Ajemian?

25   A.  No.

D7mnles7                         Maher - cross

1   Q.  A different doctor.  That was done while you were receiving

2   the checks in your bank account, correct?

3   A.  That's correct.

4   Q.  And they wanted to check you out?  That was the purpose of

5   the examination?

6   A.  Yes.

7   Q.  Didn't the doctor make findings that were consistent with

8   what Dr. Ajemian said?

9           MR. TEHRANI:  Objection, your Honor.

10          THE COURT:  Sustained.

11  Q.  Let's go through this examination.  Do you recall it was in

12  Orlando, Florida on January 9?

13  A.  It was actually in Kissimmee, Florida.

14  Q.  What was the date, the approximate date?

15  A.  I don't recall the date.  I would have to look at the form.

16  Q.  Well, I am going to mark this --

17  A.  It was about two years after I retired.

18  Q.  January 19 of '06 refresh your recollection?

19          Tell the ladies and gentlemen of the jury,

20  Mr. Maher -- is that now you pronounce your name?

21  A.  That's correct.

22  Q.  Tell the ladies and gentlemen of the jury what happened in

23  that examination?

24  A.  I received a letter that I was to report to a medical

25  facility for determination whether or not I qualified for a

D7mnles7                         Maher - cross

1    permanent disability.

2              They gave me a date and time, and I went to the

3    facility and it was almost like a clinic.  It looked like a

4    facility that it was for like new hires and they were just

5    rolling people through.

6              And the physician that examined me brought me into the

7    room and basically just had me move my arms, lift my legs, do

8    some crouches.  Didn't ask me a lot of questions, but just

9    basically looked at my overall movement.

10   Q.  Didn't they determine that you could lift up to 20 pounds

11   on an occasional basis?

12             MR. TEHRANI:  Objection.

13             THE COURT:  Sustained.

14   Q.  After this examination, you got another letter from the

15   RRB, correct?

16   A.  That's correct.

17   Q.  That letter said in effect you are not eligible for total

18   disability, correct?

19   A.  That's correct.

20   Q.  But after the examination you are still eligible for

21   occupational disability?

22   A.  That's correct.

23   Q.  That was based upon an examination by an RRB doctor?

24             MR. TEHRANI:  Objection.

25             THE COURT:  Sustained.

D7mnles7                          Maher - cross

Q.   Let me understand a few things.  Did you tell the ladies
and gentlemen of the jury that before you went through this
process it was your understanding that getting occupational
disability was easy to get?

         MR. TEHRANI:  Objection.

         THE COURT:  Overruled.

A.   I was told that it was relatively easy to get at the time.

Q.   You had at that time been serving as a conductor for almost
30 years?

A.   Yes.

Q.   Is that an easy job --

A.   You have good days and bad days.

Q.   -- as a conductor?

         When you went to Dr. Ajemian, did you explain to him
exactly what your situation was as a conductor and your health?

A.   I didn't need to.

         MR. RYAN:  Could you put 107 up, please.

         MS. FRIEDLANDER:  What is 107?

         MR. RYAN:  The Dr. Ajemian report.

         MR. DURKIN:  Just so the record is clear, the same
issue I raised earlier.

         THE COURT:  Yes.

         I will give the same limiting instruction to the jury
concerning the cross-examination of this witness.  Insofar as
any testimony comes in relating to conduct of Dr. Ajemian, it

D7mnles7                          Maher - cross

1   is not to be used in any way by the jury to draw any

2   conclusions with respect to the charges brought by the

3   government against Dr. Lesniewski.

4          MR. RYAN:  Could you please show 107-D, page 1.

5          Are we looking at the same page?

6          MR. WEDDLE:  For some reason the screens --

7   Q.  If I may, Mr. Maher, we are in a hurry, and I would like to

8   speed things up, OK?

9   A.  That's fine.

10  Q.  But the document, according to Dr. Ajemian, says the

11  following, and I would like you to listen carefully and see

12  whether Dr. Ajemian gave a fairly accurate account of what you

13  told him on the very first meeting.

14         You said it was three hours, right?

15  A.  Approximately.

16  Q.  "Mr. Maher, otherwise active, healthy and youthful

17  appearing 49-year-old Caucasian male."

18         You agree with that, right?

19  A.  Yes.

20  Q.  "Working as a conductor for the Long Island Rail Road for

21  nearly 30 years' time reports these pains:  Difficulties

22  climbing up and down from his train equipment, throwing

23  switches, connecting air hoses, collecting tickets, punching

24  ticket stubs and also walking in moving trains between moving

25  doors, and having to close windows.  Cumulatively he has

D7mnles7                         Maher - cross

1    problems and pain that accentuate his neck, his upper back and

2    bilateral shoulder pain.

3               "He says his lower back is irritated with prolonged

4    standing.  When the train slows down or goes around a curve, he

5    cannot balance himself comfortably because of discomfort in his

6    lower back.  The patient reports stiffness in his lower back,

7    worse on the left than on the right side, tightness and

8    occasional headaches from his neck and restricted motion as

9    well.  And he noticed recently, particularly with punching of

10   tickets, numbness and tingling involving both his hands that

11   presented worse on his right hand than on his left side in this

12   right-hand dominant individual.

13              "The patient has currently been able to do his job,

14   but notices increasing difficulty as noted above.  He is

15   anxious about any type of medication to be taken because of a

16   brand new spot testing."

17              Will you tell the ladies and gentlemen of the jury

18   whether Dr. Ajemian gave a fairly accurate assessment as I just

19   read to you?

20   A.  No.

21   Q.  Dr. Ajemian made this up?  Is that what you are saying?

22   A.  I'm saying that it was exaggerated.

23   Q.  Are you saying -- well, let's go through it.  You want to

24   go through each item?

25              How about throwing switches was that exaggerated?

D7mnles7                         Maher - cross

1    Difficulty throwing switches?

2               MR. TEHRANI:  Objection.

3               THE COURT:  Overruled.

4    A.  Do you want to go through each one?  We can do that.

5    Q.  Let's just take throwing switches.

6    A.  OK.  It could be, but I didn't report that to Dr. Ajemian.

7    Q.  Excuse me.  Did you have difficulty throwing switches at

8    your age after 30 years of service when you went to

9    Dr. Ajemian?

10   A.  No.

11   Q.  Did you ever testify anywhere that in your last six months

12   you would have somebody else to it than yourself?

13   A.  Yes.

14   Q.  Where?

15   A.  The grand jury testimony.

16   Q.  And that was under oath, correct?

17   A.  That's correct.

18   Q.  That was April of 2011?

19   A.  That's correct.

20   Q.  Throwing a switch requires you to disembark from the train

21   onto the trackbed, correct?

22   A.  That's correct.

23   Q.  You have to walk on the ballast to reach the switch?

24   A.  Yes.

25   Q.  Then you have to bend over and flip the switch in effect?

1   A.  That's correct.

2   Q.  You have to do that promptly, efficiently, and timely?

3   A.  Right.

4   Q.  You have to do it safely, correct?

5   A.  Yes.

6   Q.  Did you ever testify that you had difficulty because of

7   your physical condition doing what I just described to you?

8   A.  Yes.

9   Q.  When?

10  A.  During the grand jury testimony.

11  Q.  The grand jury that Mr. Tehrani was eliciting here?

12  A.  Yes.

13  Q.  So you told a group of grand jurors -- there's supposed to

14  be 26 -- that when you were at your stage of your career,

15  before you went to Dr. Ajemian, you were having difficulty

16  throwing switches and you had someone else do it for you,

17  correct?

18          THE COURT:  Asked and answered.

19  Q.  This Dr. Ajemian report was given to Joe Rutigliano, wasn't

20  it?

21  A.  Yes, it was.

22  Q.  That was part of the package you gave to Joe, right?

23  A.  That's correct.

24  Q.  How long have you known Joe prior to going to Dr. Ajemian?

25  How many years?

D7mnles7                        Maher - cross

1   A.   20 years.

2   Q.   In fact, you worked on some trains with him, correct?

3   A.   That's correct.

4   Q.   You had a discussion with other members about Joe as a

5   president of the union, correct?

6   A.   That's correct.

7   Q.   What was his reputation as president of the union?

8   A.   He had a great reputation.

9   Q.   Why?

10  A.   Because he was a good guy.

11  Q.   Did he help his fellow members?

12  A.   Yes.

13  Q.   Did that give you some level of comfort that when you went

14  to him he would help you?

15  A.   Yes.

16  Q.   Is it fair to say that you're critical now of looking at

17  your application for disability benefits?

18  A.   Would you explain -- say that again, please.

19  Q.   Well, you've testified before the ladies and gentlemen of

20  the jury that driving long distances was not a difficulty or

21  things of that nature.  They went through the various points,

22  and I'm trying to save time here.  You said that's not so; that

23  that wasn't so, correct?  You just testified to that?

24  A.   Yes.

25  Q.   That's part of an effort, as you understand it, for the

```
 1   government to point out false entries on the application?

 2                MR. TEHRANI:  Objection.

 3                THE COURT:  Overruled.

 4   Q.  Isn't that what this is all about?  You are going to point

 5   out incorrect or false answers and blame Joe for it?

 6   A.  No, it was a matter of telling the truth about exactly

 7   what --

 8   Q.  Telling the truth, OK.

 9                You understand that the government here wants to

10   convince this jury that these entries are false, don't you?

11                MR. TEHRANI:  Objection.

12   Q.  Isn't that your understanding?

13                THE COURT:  Sustained.

14   Q.  Did you ever review all the papers before you brought them

15   down to the RRB and signed off certifying that they were

16   truthful?

17   A.  I looked through them very quickly.

18   Q.  Well, this was not a routine matter for you, was it?

19   You're filing an application with a federal agency.

20   A.  Well, I had limited time.  I had to drive to Babylon and

21   pick up the papers because they weren't mailed to me as they

22   were promised.  I picked them up at 9:30 in the morning,

23   something like that, and then I had to drive to Westbury from

24   there because I had an appointment with the RRB to file for the

25   disability.
```

D7mnles7                         Maher - cross

```
 1  Q.  How long do you think it took for you to testify here in
 2  reviewing those papers before the jury?  How long did that
 3  take?
 4  A.  I'm sorry.  Say that again.
 5  Q.  In this courtroom how long did it take you to review your
 6  application?
 7  A.  In the courtroom?
 8  Q.  Yes.
 9  A.  I didn't really review it in the courtroom.
10  Q.  Weren't you asked questions about entires or most of the
11  entries on the application in an effort to prove that they are
12  false entries?
13  A.  Some of them, not all of them were asked of me.
14  Q.  Are you telling the ladies and gentlemen of the jury that
15  because you were in a hurry, you couldn't review them as you
16  have here in the courtroom?
17  A.  I would say I was rushed that day that I --
18  Q.  You were so rushed that you couldn't have time to study
19  each answer, is that it?
20  A.  Yes.
21  Q.  As a matter of fact, when you went down to the RRB, didn't
22  Lucy Lucas at the RRB review the application that you
23  submitted?
24  A.  I didn't know her name.
25  Q.  Well, describe her to us, please.
```

D7mnles7                          Maher - cross

1     A.  I don't remember even what she looked like.  It was nine

2     years ago.

3          MR. RYAN:  If the government could be good enough to

4     show 107-A, please.  Is that the best we can do at this time?

5          MR. WEDDLE:  I am not sure why the screens are showing

6     it differently than the paper.

7          MR. RYAN:  It is not a problem.  OK.

8     Q.  Let's deal with the hard copy, Mr. Maher.

9     A.  OK.

10    Q.  I am going to call your attention to No. 10.

11         No. 10, do you have it before you?

12    A.  Yes.

13    Q.  When you picked it up from Joe Rutigliano, there was an

14    entry there in the changes and typed in was, "It became

15    physically impossible for me to perform the duties of a

16    railroad conductor."

17         That was there when you were in a hurry and you got to

18    the RRB office, right?

19    A.  I don't know because I don't remember seeing it.

20    Q.  Well, somebody at the RRB saw it, correct?

21         MR. TEHRANI:  Objection.

22         THE COURT:  Overruled.

23    A.  I could only assume they did.

24    Q.  And they crossed that out?

25    A.  I don't know that.

D7mnles7                          Maher - cross

1    Q.  Well, did you cross it out?

2    A.  I did not.

3    Q.  If you look at the top page, it says, "Approved L. Lucas."

4            Do you see?

5    A.  Yes.

6    Q.  Does that indicate to you or in any way refresh your

7    recollection that the RRB employee crossed out that paragraph?

8    A.  No.

9    Q.  It doesn't?  You have no idea?

10   A.  No idea.

11   Q.  Did Joe cross it out?

12   A.  I don't know that either.

13   Q.  With respect to job description, you testified here that

14   you never gave Joe a job description?

15   A.  No.

16   Q.  There's one included in the paperwork that was submitted,

17   right?

18   A.  Yes.

19   Q.  But you and Joe know what the job is, correct?

20   A.  That's correct.

21   Q.  You have been spending 30 years as a conductor?

22   A.  Correct.

23   Q.  And Joe has got at least 20 years at that time?

24   A.  Right.

25   Q.  So you have 50 years between you as to what the job

1  entails, correct?

2  A.  Correct.

3  Q.  So you don't have to discuss it for that reason, correct?

4  A.  Correct.

5  Q.  In addition, there is a record on file in the Long Island

6  Rail Road of a specific job description for your occupation, is

7  that right?

8          MR. TEHRANI:  Objection, your Honor.

9          THE COURT:  Sustained.

10 Q.  Are you aware that there is an official description of your

11 job as a conductor on file at the Long Island Rail Road?

12 A.  Yes.

13 Q.  Have you seen it?

14 A.  No.

15         THE COURT:  Mr. Ryan, we are at about the five-minute

16 mark.

17         MR. RYAN:  Better than that, Judge.  I'm finished.

18         THE COURT:  All right.  We can always count on you.

19         MR. RYAN:  Thank you.  We are going to get there,

20 Judge.

21         THE COURT:  Mr. Tehrani, unless we have cross from

22 anyone else?

23         MR. DURKIN:  No, Judge.

24         THE COURT:  Mr. Tehrani?

25         MR. RYAN:  Thank you, Judge.

D7mnles7                         Maher - cross

1              MR. TEHRANI:  Nothing further, your Honor.

2              THE COURT:  Thank you, you are excused.  You may step

3    down.

4              THE WITNESS:  Thank you.

5              (Witness excused)

6              THE COURT:  We are going to adjourn for the day.  I

7    had indicated here on Friday when we met that I would let you

8    know where we are and give you an estimate.  I am going to wait

9    until tomorrow morning to do that because I want to discuss the

10   status with the parties and get a sense of the next witnesses,

11   how many more.  From that I will have a better assessment of

12   the timetable and we'll share that with you tomorrow morning.

13             As you go home today, do not discuss among yourselves

14   or with anyone on the outside or have any contact of any kind

15   with anyone involved in the case.  If any of these things

16   occur, you are directed to inform me immediately and not

17   discuss it with your fellow jurors.

18             Have a good evening.  See you tomorrow morning at 9

19   o'clock.

20             (Jury not present)

21

22

23

24

25

D7mdles8

```
 1              (Jury not present)
 2              THE COURT:  All right.  Thank you.
 3              Could we go over the schedule for the next couple of
 4    days?  On my list, I have Mr. Murray, Special Agent Cuocci and
 5    some custodian.  Is that still what you have next, government?
 6    And what more after that for the next couple of days?  Overall,
 7    where do you think you are in terms of how many more witnesses
 8    to the termination of your case?
 9              MR. WEDDLE:  Thank you, your Honor.
10              So the next witness is Robert Murray, then Special
11    Agent Cuocci, then Mr. Stavola, and --
12              THE COURT:  Mr. Stavola is who?
13              MR. WEDDLE:  He is a retiree.
14              THE COURT:  Oh, all right.
15              MR. WEDDLE:  We have been moving quickly today, as
16    well, your Honor.  I think I need to find the available
17    witnesses in case we get through Stavola.
18              May I just have one minute?
19              THE COURT:  Yes.
20              (Pause)
21              MR. WEDDLE:  I guess, probably the witness after
22    Stavola would be Camporese.
23              As an overall thing, your Honor, as I indicated on
24    Friday, we were moving at a pace much faster than I had
25    predicted, and we have continued to move at such a pace.  On
```

D7mdles8

1    Friday I said we were moving twice as fast.  I think we may in

2    fact be moving twice as fast.  Looking at my schedule, I think

3    there is some chance that we would get close to resting on

4    Monday.

5           And it's a little unpredictable.  It is hard for me to

6    guess how long Dr. Barron's testimony on cross-examination is

7    going to be.  We scheduled him for Thursday.  And so basically

8    as we are getting to the end of this thing, we have a few

9    shorter witnesses in the middle, some witnesses from the RRB --

10   a couple of witnesses from the RRB, then Dr. Barron --

11           THE COURT:  Dr. Barron you have for Thursday?

12           MR. WEDDLE:  Right.

13           THE COURT:  And let's go over Tuesday.  That's --

14           MR. WEDDLE:  I think --

15           THE COURT:  Murray, Camporese, Stavola.

16           MR. WEDDLE:  Stavola, Camporese, and then after that I

17   have a little bit of a question mark.  I need to get in contact

18   with some witness.  It could be Dunaj.  It could be

19   Chirichella.

20           THE COURT:  Now, Mr. Durkin, you indicated that you

21   are going to be out tomorrow?

22           MR. DURKIN:  Yes.  I should be back by -- I think my

23   flight gets in at 9:30 on Wednesday morning.  I should be here

24   by 10:30/11 o'clock.

25           THE COURT:  So none of these witnesses that the

D7mdles8

1    government has lined up for tomorrow present any --

2              MR. DURKIN:  No, Judge.  Mr. Dratel is prepared to

3    cross-examine Mr. Murray.

4              THE COURT:  OK.  And Wednesday you have assorted loose

5    ends?

6              MR. WEDDLE:  Yeah.  I think Wednesday would be

7    assorted loose ends and a couple RRB witnesses.  And then at

8    that point, your Honor --

9              THE COURT:  So Dr. Barron for Thursday?

10             MR. WEDDLE:  Yeah.  Then Dr. Barron would be next.

11   But I may need to reshuffle my order if Wednesday is going

12   quickly; I have to pull someone that I had scheduled for after

13   Dr. Barron in here.  I think it would be -- we have a witness

14   who has done a bunch of different computations and summary type

15   charts in the 10 to 19 series of government exhibits.  I was

16   going to do her after Dr. Barron, but I could do her before

17   Dr. Barron if we are running out.

18             THE COURT:  It looks to me that you are going to have

19   a big chunk of time on Wednesday.

20             MR. WEDDLE:  I think it will probably be that witness,

21   your Honor, Natasha Marx.

22             THE COURT:  What do you have after Dr. Barron, or do

23   you propose to rest after Dr. Barron?

24             MR. WEDDLE:  Then after Dr. Barron we have -- we have

25   one witness who -- and I should back up, your Honor, and say

D7mdles8

1     that is our thinking currently is that we are going to cut a

2     couple of witnesses who are on our original list.  And as I had

3     mentioned to your Honor early in the case, I think before we

4     started in connection with telling the jury how many counts or,

5     you know, we are going to pursue, I think we are going to cut

6     some witnesses, which is just going to result in us not

7     pursuing some of the substantive counts.

8            So after Dr. Barron, we really have the witness I just

9     mentioned, who is Natasha Marx.  Then we have Ms. Cameron, who

10    I believe is traveling this week, so that causes a little bit

11    of an issue for us.  We will have to work it out.  And then

12    there is a short witness named -- a brief witness named Jeffrey

13    van Etten.  And then we have a summary witness at the end,

14    Special Agent -- sorry, maybe I was wrong about the first name

15    of Mr. Van Etten.  Then we have a summary witness, Special

16    Agent Sean Tumulty of the FBI, and then we would rest.

17           So we are close to the end, I think, and I think we've

18    cut the original estimate that we gave your Honor in terms of

19    the length of the trial in half.  And we are now looking ahead

20    I think toward hopefully getting some estimates for what the

21    defense cases actually look like and the likelihood that the

22    defendants are going to be testifying.  Based on the opening

23    statements, it looks to me as if the defendants are testifying

24    because I can't imagine how some of the statements in opening

25    would otherwise be coming into evidence but we haven't heard

D7mdles8

1    yet.

2              THE COURT:  All right.  We will visit that later in

3    the week as the government comes closer to resting.

4              Anything else?  Mr. Ryan?

5              MR. RYAN:  I did file ECF over the weekend a request

6    for a Daubert motion with respect to Dr. Barron, and I have a

7    hard copy for the Court.

8              THE COURT:  Did you receive that?

9              MS. FRIEDLANDER:  Your Honor, we will be filing our

10   response to that this evening.

11             If I could just ask whether the defendants have an

12   estimate of how long Dr. Barron's cross will be, just a rough

13   idea so that we can coordinate our planning?  Some of our

14   witnesses are coming in from out of town, a number of our

15   witnesses are.

16             MR. DRATEL:  How long will the direct be?

17             MS. FRIEDLANDER:  I think it will be a few hours.

18             MR. DRATEL:  If the direct is a few hours, cross will

19   be less than that, but two hours --

20             THE COURT:  How long do you say the direct will be?

21             MS. FRIEDLANDER:  It is a little hard for me to say,

22   in fairness, Judge.  I think several hours, three hours.  It is

23   really sort of a guess.  I mean, we are going to use a number

24   of charts with him, which we provided to the defense, but I

25   don't have the best sense as to how long it will take for him

D7mdles8

 1   to explain all of those things.  I think it will be two hours.

 2              THE COURT:  All right.  If you follow what I gave you

 3   as a general guideline and cut his pedigree in half, you may

 4   save an hour.

 5              MS. FRIEDLANDER:  Yes, sir.

 6              THE COURT:  All right.

 7              MR. DURKIN:  Judge, I was just going to inquire as to

 8   whether the juror's issue was solved?

 9              THE COURT:  Whether?

10              MR. DURKIN:  You had the sidebar with the juror.

11              THE COURT:  I am sorry, yes.  I should have gotten

12   back to you on that.

13              Ms. Rabsatt indicated that there were two aspects of

14   her request.  She had to do some kind of culture test of some

15   sort for which she had to have an appointment, but she took

16   care of that over the weekend, and now she has to wait until

17   tomorrow for the results of that test, be available to the

18   doctor based on the results of that test.  The doctor will

19   determine whether or not he needs to see her on Thursday.  And

20   she said that it is possible that it may not be necessary, or

21   that it could be done on the phone.  She will let me know

22   tomorrow.

23              All right?  Thank you.  Have a good evening.

24              (Adjourned to 9 a.m., Tuesday, July 23, 2013)

25

1

INDEX OF EXAMINATION

2    Examination of:                                Page

3     ROBERT ELLENSOHN

4    Direct Mr. Weddle . . . . . . . . . . . . . 713

5    Cross By Mr. Durkin . . . . . . . . . . . . 744

6    Redirect By Mr. Weddle . . . . . . . . . . 783

7    Recross By Mr. Durkin . . . . . . . . . . . 802

8    Redirect By Mr. Weddle . . . . . . . . . . .808.

9    REGINA WALSH

10   Direct By Ms. Friedlander . . . . . . . . . 819

11   Cross By Mr. Jackson . . . . . . . . . . . . 871

12   Cross By Mr. Ryan . . . . . . . . . . . . . 929

13   Redirect Ms. Friedlander . . . . . . . . . . 930

14   JAMES MAHER

15   Direct By Mr. Tehrani . . . . . . . . . . . 941

16   Cross By Mr. Jackson . . . . . . . . . . . . 992

17   Cross By Mr. Ryan . . . . . . . . . . . . . 994

18                      GOVERNMENT EXHIBITS

19   Exhibit No.                                Received

20    108-A, 108-B, 108-C, 108-D, 108-E, 108-F, 713,8140, 1400, and 1402

21    3514-10  . . . . . . . . . . . . . . . . . 930

22    3504-05, 1000, 1001, 1002, 107A, 107B, . . . 946

23            107C, 107D, 715

24    1004  . . . . . . . . . . . . . . . . . . . 958

25