d7ndles1
                            Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

              v.                             S14 11 Cr. 1091 (VM)

PETER LESNIEWSKI, MARIE BARAN
and JOSEPH RUTIGLIANO,

                    Defendants.

------------------------------x

                                             July 23, 2013
                                             9:05 a.m.

Before:

                    HON. VICTOR MARRERO,

                                             District Judge

                            APPEARANCES

PREET BHARARA
        United States Attorney for the
        Southern District of New York
BY:   JUSTIN S. WEDDLE
        DANIEL BEN TEHRANI
        NICOLE WARE FRIEDLANDER
        Assistant United States Attorneys

LAW OFFICES OF JOSHUA L. DRATEL, P.C.
        Attorneys for Defendant Peter Lesniewski
BY:   JOSHUA LEWIS DRATEL
        LINDSAY A. LEWIS

                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

d7ndles1

Trial

APPEARANCES CONTINUED

KOEHLER & ISAACS, LLP
        Attorneys for Defendant Marie Baran
BY:   JOEY JACKSON

JOSEPH W. RYAN, JR.
KEVIN MENEILLY
        Attorneys for Defendant Joseph Rutigliano

            - also present -

Annie Chen
Emma Larson, Government Paralegals


SA Frank LoMonaco, FBI

Yeni Yrizarry, Defendant Baran Paralegal

                        oOo

d7ndles1
                              Trial

1        (Trial resumed; jury not present)

2        THE COURT:  Good morning.  I understand the jury is

3   here, so let's get started with the witness.

4        MS. FRIEDLANDER:  Your Honor, we have just one quick

5   issue.  I just wanted to advise the Court.  We are going to

6   file a motion later today seeking to admit malpractice records

7   of the defendant Peter Lesniewski to refute the assertion made

8   by the defense counsel in opening statements that Lesniewski is

9   a respected surgeon who would never willingly sacrifice his

10  reputation and his career for this fraud.  We will explain it

11  in the motion, but we intend to offer the evidence through ten

12  minutes of testimony and perhaps a couple of documents that I

13  think will tell a very different story.

14       THE COURT:  All right.

15       MR. DRATEL:  Have we been provided the documents?

16       MS. FRIEDLANDER:  No.

17       MR. DRATEL:  I haven't seen anything yet.

18       MS. FRIEDLANDER:  We had not initially intended to

19  introduce it.  Of course, we are only going to seek to do that

20  if defense counsel open the door to it.

21       MR. DRATEL:  That doesn't mean they don't produce it

22  before they --

23       THE COURT:  Let me just note also for the record that

24  the Court has received a letter from the government indicating

25  that the government will seek the Court to take judicial notice

d7ndles1
                              Trial

1    of The New York Times video and photo of Mr. Rutigliano.

2              MR. WEDDLE:  And Mr. Ryan replied to it, your Honor.  I

3    am not sure if your Honor has seen the reply.

4              THE COURT:  I have not seen the reply.

5              MR. RYAN:  You haven't, Judge.  I have it here in my

6    hand.

7              THE COURT:  Just hand it up to the clerk.

8              MR. RYAN:  Sure.

9              THE COURT:  Thank you.

10             MR. RYAN:  You are welcome.

11             MR. WEDDLE:  And, your Honor, I filed by ECF our

12   response to Mr. Ryan's Daubert motion, and I am I believe later

13   today going to be in a position to file the written response to

14   defendant Lesniewski's motion to reconsider your Honor's ruling

15   precluding certain parts of his proposed expert testimony.

16             I previewed that orally for the Court early in the

17   case, I believe it might have been the first day of trial, and

18   set out our position that nothing in that motion for

19   reconsideration changed the analysis at all.  I have now

20   written that up, and hopefully I will be filing that later

21   today.

22             THE COURT:  Thank you.  Bring in the jury.

23             MR. WEDDLE:  Your Honor, would you like me to get

24   Mr. Murray?

25             THE COURT:  Yes, please.

d7ndles1
                                    Trial

 1              THE LAW CLERK:  All rise.

 2              (Jury present)

 3              THE COURT:  Thank you.  Welcome back.

 4          Before we call a witness, let me come back to what I

 5      indicated to the jury yesterday evening, that I want to give

 6      you a sense of where we are and what remains.

 7          From discussions with the parties, it appears that we

 8      are making very good progress.  Indeed, with the exceptional

 9      cooperation of both sides, not only Mr. Ryan, we have made

10      enough progress that it is possible -- it is not a promise but

11      it is possible -- that the government might be able -- might be

12      ready to conclude its case the early part of next week.  That

13      might put us as much as two weeks ahead of our earlier

14      predictions.  But that is just an indication now of where we

15      are and where we might be.

16          What happens after that depends upon whether or not

17      the defense elect to put on any evidence.  As I indicated

18      during the preliminary instructions, they do not have to.  But

19      if they choose to, that would happen after the conclusion of

20      the government's case.  As to how long that might take, it is

21      not predictable at this point.  We will give you a better sense

22      of that as we approach the conclusion of the government's case.

23          All right.  Swear in the witness.

24          Please rise.

25      ROBERT MURRAY,

d7ndles1
                                   Trial

1            called as a witness by the government,

2            having been duly sworn, testified as follows:

3                  THE COURT:  Please speak into the microphone as

4     closely as possible.

5                  State your name and spell it for the record.

6                  THE WITNESS:  My name is Robert Murray.

7                  THE COURT:  Mr. Weddle.

8     DIRECT EXAMINATION

9     BY MR. WEDDLE:

10    Q.  Could you spell your name for the record?

11    A.  R-o-b-e-r-t M-u-r-r-a-y.

12    Q.  Good morning, Mr. Murray.

13                How are you employed, sir?

14    A.  I am a manager with the MTA Office of Inspector General.

15    Q.  What is the MTA Office of Inspector General?

16    A.  The Office of Inspector General is an oversight agency

17    created by New York State to identify fraud, waste and abuse

18    within the MTA and its subordinate agencies.

19    Q.  So what is the MTA and what are its subordinate agencies?

20    A.  The MTA is a parent agency that manages the major -- all of

21    the agencies of the MTA.  They include New York City Transit,

22    Long Island Rail Road, Metro-North Railroad, MTA Bridges and

23    Tunnels, the MTA Capital Construction Corporation, and MTA Bus.

24    Q.  How long have you worked at the Office of Inspector General

25    for the MTA, sir?

D7ndles1                          Murray - direct

```
1    A.  I have been there for over 15 years.

2    Q.  Are you a Certified Public Accountant?

3    A.  Yes, I am.

4    Q.  What does it mean to be a Certified Public Accountant?

5    A.  As a CPA I am familiar with accounting and auditing

6    standards, and I have passed the CPA examination.

7    Q.  Generally speaking, how is the Office of Inspector General

8    for the MTA organized?

9    A.  Our office has two major units, the investigative side and

10   the audit side.

11   Q.  And which side are you on, sir?

12   A.  I am on the audit side.

13   Q.  On the audit side of the Office of Inspector General, what

14   records do you have access to?

15   A.  We have access to all business records of the MTA and its

16   agencies.

17   Q.  Let's focus on two of the subordinate agencies that you

18   mentioned, the Long Island Rail Road and Metro-North.

19           What are the Long Island Rail Road and Metro-North?

20   A.  Long Island Rail Road and Metro-North are the two railroad

21   operations that service the counties above, to the north of New

22   York City and on Long Island.

23   Q.  And in your time at the Office of Inspector General, have

24   you become familiar with certain characteristics of the Long

25   Island Rail Road and Metro-North?
```

D7ndles1                        Murray - direct

1    A.  Yes, I have.

2    Q.  How have you become familiar with their characteristics?

3    A.  I've conducted several audits at both railroads during my

4    time there.

5    Q.  And to what extent have you seen their equipment or their

6    operations and facilities?

7    A.  I have had the opportunity to be not only at their

8    administrative offices but at various train yards and

9    maintenance facilities throughout both railroads.

10   Q.  Based on your experience, how do the functions of the Long

11   Island Rail Road compare with the functions of Metro-North

12   Railroad?

13   A.  The functions are essentially the same.  They both bring

14   commuters from outlaying counties to Manhattan and Brooklyn.

15   Q.  And how does the equipment used on the Long Island Rail

16   Road compare with the equipment used at Metro-North Railroad?

17   A.  The equipment is very similar.  They both have electric

18   train, diesel engines.  Many of the trains are made by the same

19   manufacturer.

20   Q.  What about in terms of the number of trains or train cars,

21   how does that compare?

22   A.  The numbers are basically similar.

23   Q.  What about the pension plans, how do the pension plans that

24   cover employees at Long Island Rail Road compare with pension

25   plans that cover employees at Metro-North Railroad?

1   A.  Pension plans are different, especially for those who had

2   started at the Rail Road prior to 1988.

3   Q.  So at Long Island Rail Road, if a person started prior to

4   1988, what kind of pension plan, or what kind of pension

5   benefits are they covered by?

6   A.  The basic pension plan for Long Island Rail Road employees

7   prior to 1998 gives them the opportunity to retire at age 50

8   with 20 years of service.

9   Q.  Now, sir, you just said that what you described applied to

10  employees hired before "1998."  Is that the right year?

11  A.  No.  1988.

12  Q.  '88.

13          And what kind of pension plan applies to employees of

14  Metro-North Railroad?

15  A.  For Metro-North Railroad, they basically require to be at

16  age 55 and have 30 years of service to get a full retirement.

17  Q.  And, so, if a person started working at the Long Island

18  Rail Road in 1987, and was therefore covered by this plan that

19  you just described, when would he or she be eligible for a

20  retirement pension?

21  A.  He or she would be eligible in 2007, if they were age 50.

22  Q.  Now, if a person started at Metro-North Railroad in 1987

23  and so was covered by that Metro-North plan that you just

24  described, when would he or she be eligible for a pension?

25  A.  They would be eligible in 2017 if they were age 55.

D7ndles1                          Murray - direct

1   Q.   That would be the 30 years of service?

2   A.   That would be 30 years of service, yes.

3   Q.   Now, what about for people who have started working at the

4   Long Island Rail Road after 1988, what kind of pension plan are

5   they covered by?

6   A.   They are now in the same plan as Metro-North employees.

7   Q.   And so if an employee started before 1988, do they stay in

8   the plan that was in effect at that time or do they switch

9   plans?

10  A.   If they were hired before 1988 they stayed in the Long

11  Island Rail Road pension plan.

12  Q.   Now, you mentioned that as an auditor with the Office of

13  Inspector General you have access to all the business records

14  of the constituent agencies; do you remember that?

15  A.   Yes.

16  Q.   And in the course of your work, have you become familiar

17  where databases that Long Island Rail Road keeps regarding

18  retirees and their benefits?

19  A.   Yes, I have become familiar with those.

20  Q.   And have you similarly become familiar with databases that

21  Metro-North keeps regarding its retirees and their benefits?

22  A.   Yes, I have.

23  Q.   And the same answer for MTA records?

24  A.   Yes.  MTA records also.

25  Q.   And are those databases made and kept in the ordinary

D7ndles1                              Murray - direct

1    course of business?

2    A.  Yes, they are.

3    Q.  And are the entries in those databases made at or near the

4    times of the matters recorded therein?

5    A.  Yes, they are.

6    Q.  And are the entries made by people with knowledge of the

7    information that they are entering?

8    A.  Yes, they are.

9    Q.  Now, in connection with this case, have you performed some

10   computations using these business records?

11   A.  Yes, I have.

12   Q.  What kind of computation did you do with respect to

13   disability rates at these two railroads?

14   A.  I obtained the numbers of retirees of each of the

15   railroads --

16          MR. DRATEL:  I object, your Honor, to the form of the

17   question.

18          THE COURT:  Rephrase the question.

19   Q.  Sir, did you perform any computation relating to the

20   disability rates at these two railroads?

21          MR. DRATEL:  I object as to the precision of the

22   question, your Honor.  That is really to form.

23          THE COURT:  Overruled.

24   A.  I'm sorry.  Repeat the question.

25          THE COURT:  Could the reporter read back the question.

1     (Question read)

2   A.   I obtained databases and determined how many of their

3   retirees obtained disability from the Railroad Retirement

4   Board.

5   Q.   Now, we're talking about -- we have just been talking about

6   disability from the Railroad Retirement Board.  What is the

7   Railroad Retirement Board?

8   A.   The Railroad Retirement Board is a federal agency that

9   provides retirement benefits to railroad employees throughout

10  the country.

11  Q.   So to what extent are Railroad Retirement Board benefits

12  the same or different as they apply to Long Island Rail Road

13  versus Metro-North?

14  A.   They are the same for both agencies.

15  Q.   Now, in order to do the analysis that you have described

16  relating to disability rates, what was the first thing that you

17  had to figure out?

18  A.   First I had to determine the number of retirees from the

19  Long Island Rail Road and from Metro-North.

20  Q.   And how did you go about figuring out the number of

21  retirees from Long Island Rail Road on the one hand and

22  Metro-North on the other?

23  A.   I obtained various databases from the Long Island Rail

24  Road, from the MTA and from Metro-North that would provide all

25  the retirees going back to 1995.

D7ndles1                          Murray - direct

1   Q.  And the databases that you obtained, were those among the

2   business records you've already described?

3   A.  Yes, they were.

4   Q.  And with these different databases, once you collected a

5   series of databases, what did you do with them?

6   A.  I had to review them, make sure there were no duplicate

7   entries, make sure the data in them was accurate, and then put

8   them together by year.

9   Q.  And when you say make sure the data was accurate, what kind

10  of tools did you have to make sure the data was accurate?

11  A.  I used an Excel software database to put all the data on

12  and then to match it and check it from one to the other.

13  Q.  So you were cross-checking the different data sets that you

14  have?

15  A.  That's correct.

16  Q.  And as part of your work, did you also take police officers

17  out of your list of retirees?

18  A.  Yes, I did.

19  Q.  And during what period of time were police officers listed

20  as employees of either Long Island Rail Road or Metro-North?

21  A.  Up until about 1998 Long Island Rail Road and Metro-North

22  police officers were in those agencies.

23  Q.  And what changed in 1988 -- I mean, '98?  I'm sorry.

24  A.  In 1998, the MTA consolidated all police operations under

25  the MTA Police, so all Metro-North and Long Island Rail Road

D7ndles1                          Murray - direct

1  police officers were transferred into the MTA Police

2  Department.

3  Q.  And so at the end of the work that you've just described of

4  collecting data sets, eliminating duplicates and cross-checking

5  across the data sets, what was the end result?  What did you

6  have at the end?

7  A.  The end result was I had a database of 7,290 retirees from

8  the Long Island Rail Road and Metro-North for the period 1995

9  to 2012.

10 Q.  And when you say you had a date base and you have an exact

11 number of people, did you know identifying information for

12 individual people?

13 A.  Yes.  I had their name and Social Security number for each

14 individual in the database.

15 Q.  So when you say it is a database, it's basically a list of

16 people and information about those people?

17 A.  Exactly.

18 Q.  And then once you had a list of people who had retired from

19 the two -- I'm sorry, I may have missed it.

20        What timeframes was covered by your list?

21 A.  It covered the period 1995 through 2012.

22 Q.  OK.  And then once you had that list of people who had

23 retired from the two railroads during that time period, what

24 did you do in terms of pursuing this computation of disability?

25 A.  I obtained databases from the Railroad Retirement Board of

D7ndles1                        Murray - direct

1    all retirees who had obtained a disability from the Railroad

2    Retirement Board.

3              MR. WEDDLE:  Your Honor, may I just have a moment?

4              THE COURT:  Yes.

5              (Pause)

6              MR. WEDDLE:  Your Honor, at this time I offer a

7    stipulation of the parties, which has been marked Government

8    Exhibit 1605, and I would like to read the pertinent part to

9    the jury.

10             THE COURT:  All right.

11             MR. WEDDLE:  It is hereby stipulated among the parties

12   that, if called as a witness, a representative of the Railroad

13   Retirement Board, hereinafter the RRB, would testify as

14   follows:

15             The data contained in the Excel spreadsheets contained

16   in the file folder called "RRB" on Government Exhibit 20 is

17   data pulled from RRB databases.  The RRB databases are records

18   of regularly conducted activity, and the data contained in

19   those databases is entered at or near the time of the events at

20   issue by or from information provided by a person with

21   knowledge of the matters reflected therein, and the data

22   entries are made by the regularly conducted activity of the RRB

23   as a regular practice.

24   BY MR. WEDDLE:

25   Q.  And, sir, once you obtained the RRB databases, what then

D7ndles1                          Murray - direct

1    were you able to identify with respect to the list of people

2    who had retired?

3    A.  I was able to identify those retirees who had obtained a

4    disability from the RRB.

5    Q.  How did your methods compare between the Long Island Rail

6    Road retirees and the Metro-North Railroad retirees?

7    A.  The method I used was the same for both.

8    Q.  And so at the end of this process, including the checking

9    against RRB databases, what did you then have?

10   A.  I then had a database of all retirees, and I was able to

11   identify those that had received a disability.

12           MR. WEDDLE:  And if I may approach, your Honor?

13           THE COURT:  Yes.

14           MR. WEDDLE:  I have Government Exhibit 20.

15   Q.  And, sir, the other exhibits which are on paper are here in

16   this folder in front of you.

17           Do you recognize Government Exhibit 20?

18   A.  Yes, I do.

19   Q.  What is it?

20   A.  It's a disc containing the databases that I had created and

21   provided to your office.

22   Q.  And how do you recognize it?

23   A.  I initialed off on this database when I reviewed it.

24   Q.  Then if you take a look in your folder, do you also see

25   Government Exhibit 20A?

D7ndles1                        Murray - direct

1   A.  Yes.

2   Q.  And did you also initial the pages of 20A when you reviewed

3   them?

4   A.  Yes, I did.

5   Q.  And 20A is essentially a series of screenshots from the

6   computer that shows the contents of the disc which is 20A,

7   right?

8   A.  That's correct.

9   Q.  And do you see the materials on the disc are organized into

10  folders; do you see that?

11  A.  Yes.

12  Q.  And so there is a folder for LIRR, a folder for RRB, a

13  folder for MTA, a folder for MNR.  What do those different

14  folders that I mentioned mean?

15  A.  Those are all the different agencies where I obtained the

16  data from.

17  Q.  And then there is a folder called "Chase."  What does the

18  "Chase" reference?

19  A.  That represents the Chase databases that it was their

20  data -- I obtained it from the MTA but it was their databases

21  that I obtained.

22  Q.  And what role does Chase play in the process that related

23  to your work identifying the retirees?

24  A.  Chase actually sends the checks to the retirees.  They

25  maintain a database and send it to them for the MTA.

1    Q.  And when you say checks that are sent for the MTA to

2    retirees, what kind of checks are these?

3    A.  They may be stock checks or they may be electronic EFT

4    transfers, electronic fund transfers.

5    Q.  But the payments relate to what kind of benefits?

6    A.  All pension benefits.

7    Q.  That is retirement benefits?

8    A.  All retirement benefits for those agencies.

9    Q.  And then there is a file on here which is called Bates --

10   listed on Government Exhibit 20A which is called Bates

11   142198database.SS -- sorry, XLSX.

12           What is that, sir?

13   A.  That is the database of the 7,290 retirees that I compiled

14   together.

15   Q.  And that is a spreadsheet?

16   A.  Yes, it is.

17   Q.  And what is the software that you used?

18   A.  It was an Excel software.

19           MR. WEDDLE:  Your Honor, I offer Government Exhibits

20   20 and 20A.

21           MR. DRATEL:  No objection, your Honor.

22           THE COURT:  Admitted without objection.

23           MR. RYAN:  No objection other than previously stated.

24           MR. JACKSON:  Not here, Judge.  Thank you very much.

25           THE COURT:  Admitted without objection except as

D7ndles1                              Murray - direct

1    previously stated.

2                (Government's Exhibits 20 and 20A received in

3    evidence)

4    BY MR. WEDDLE:

5    Q.  So, sir, using your consolidated database, what were you

6    able to do in terms -- what were you able to do?

7    A.  I was able to match up retirees for Long Island Rail Road

8    and Metro-North and determine whether they obtained a

9    disability benefit from the RRB.

10               MR. WEDDLE:  And, your Honor, at this point I would

11   like to --

12   Q.  Sir, if you could take a look in your folder and find

13   Government Exhibit 23B.

14   A.  20 what?

15   Q.  23 -- sorry, they are not order.  It is 23B, like boy.

16   A.  23B, yes.

17   Q.  And is this -- well, what is 23B?

18   A.  23B is a schedule of disabilities rates among retirees from

19   the Long Island Rail Road and Metro-North.

20   Q.  Is this basically a summary of the totals from your

21   database?

22   A.  It's a total for the years 1998 through 2011.

23   Q.  That is a shorter period of time than your entire database?

24   A.  Yes.

25               MR. WEDDLE:  Your Honor, the government offers

D7ndles1                          Murray - direct

 1   Government Exhibit 23B.

 2            MR. DRATEL:  No objection other than previously

 3   stated, your Honor.

 4            MR. RYAN:  The same objection.

 5            Withdrawn.  No objection other than previously stated.

 6            MR. JACKSON:  No objection.

 7            THE COURT:  All right.  Admitted without objection

 8   except as previously stated.

 9            (Government's Exhibit 23B received in evidence)

10            MR. WEDDLE:  May we display that for the jury?

11   BY MR. WEDDLE:

12   Q.  So, Mr. Murray, the title of this chart is what?

13   A.  "Disability Among Retirees From Long Island Rail Road and

14   Metro-North."

15   Q.  Do you see that in general terms the chart is split into

16   two sides; do you see that?

17   A.  Yes.

18   Q.  What is the left side about?

19   A.  The left side is the Long Island Rail Road.

20   Q.  And the right side is what?

21   A.  Metro-North.

22   Q.  And then the far left-hand column is what?

23   A.  It is the years 1998 through 2011.

24   Q.  And then if you could just explain the other columns under

25   "Long Island Rail Road"?

D7ndles1                          Murray - direct

1   A.   The second column are the number of retirees in each of

2   those years, 1998 through 2011.

3           The third column is the number of those retirees that

4   received disability from the RRB.

5           And the fourth column is the percent of those retirees

6   in that year that received RRB, or received disability

7   benefits.

8           MR. WEDDLE:   May I have a moment, your Honor?

9           THE COURT:   Yes.

10  Q.   Let's just take -- oh, I'm sorry.  And then, Ms. Chen, can

11  you just highlight the headings under "Metro-North," the column

12  headings.

13          And then can you explain the headings under

14  "Metro-North"?

15  A.   The retirees are the number of retirees in each of those

16  years, 1998 through 2011.  The number on disability is the

17  number that received RRB disability benefits of the 54.  And

18  the percent on disability is the percentage of retirees

19  receiving disability benefits.

20  Q.   For both the Long Island Rail Road side and the Metro-North

21  side, when you are talking about number of people who received

22  disability benefits from the RRB, are you talking about

23  occupational disability or total and permanent disability or

24  some combination?

25  A.   It includes both of them.

D7ndles1                            Murray - direct

1   Q.  And how can you tell from your database which one is which?

2   A.  In my database I have codes that indicate whether they are

3   on total and permanent or occupational disability.

4            MR. WEDDLE:  And if we could just take one year just

5   for illustration purposes, Ms. Chen, and let's try 2004.

6   Q.  So for 2004, how many individual people did you identify

7   who had retired in 2004 from the Long Island Rail Road?

8   A.  311 retirees retired from the Rail Road in 2004.

9   Q.  And how many people ended up going on disability?

10  A.  275 of those went on disability.

11  Q.  So is the 275, is that a different group from the 311?

12  A.  No, it is the same group.  They are in that group.

13  Q.  So it is a subset, is that right?

14  A.  Yes.

15  Q.  And then the third -- the next column says 88 percent.  Do

16  you see that?

17  A.  Yes.

18  Q.  So how do you get 88 percent from the two numbers that we

19  just talked about, 311 and 275?

20  A.  It is a simple division of 275 by 311.

21  Q.  And then so for the same year for Metro-North, how many

22  people retired in 2004?

23  A.  141 retired in 2004.

24  Q.  And of the 141 people who retired, how many ended up

25  getting disability benefits?

1   A.   24.

2   Q.   And that translates into a percentage of what?

3   A.   That was 17 percent.

4   Q.   Now, does this chart, is this a probabilistic analysis?

5   A.   No.

6           MR. RYAN:  Objection to "probabilistic."  I don't know

7   what that is.

8           THE COURT:  Sustained.  Define.  Rephrase.

9   Q.   How complex is the work that went into creating these

10  numbers on this chart?

11  A.   This is basically a simple accounting of the number of

12  retirees from the database.

13  Q.   And when you say -- when we are talking on your chart

14  about, let's say, 311 people who retired in 2004 from the Long

15  Island Rail Road, would you be able to look at your database

16  which is on Government Exhibit 20 and identify the names and

17  Social Security number of each of those 311 people?

18  A.   Yes, I would be able to do that.

19  Q.   And you would also be able to identify which of that list

20  of 311 by name and Social Security number ended up on

21  disability?

22  A.   Yes.

23  Q.   And would you also be able to tell which of them ended up

24  on total and permanent versus occupational disability?

25  A.   Yes, I would.

D7ndles1                    Murray - direct

1   Q.  Now, sir, you see there is a bottom line of this chart --

2   Ms. Chen, will you highlight the bottom line.

3         What is the bottom line?

4   A.  The bottom represents the total number of retirees in the

5   period 1998 through 2011.

6   Q.  And so the total number of retirees for Long Island Rail

7   Road for this period of time is what?

8   A.  3,888.

9   Q.  The total number who ended up getting disability?

10  A.  3,089.

11  Q.  And for the total period of time, what is the percentage

12  that ended up getting disability?

13  A.  79 percent.

14  Q.  For Metro-North Railroad, what is the total number of

15  retirees?

16  A.  2,093 retirees.

17  Q.  The number who got disability?

18  A.  432.

19  Q.  And that translates into a percentage of what?

20  A.  21 percent.

21  Q.  Now, do you see that the number of retirees for Metro-North

22  is lower than the number of retirees for Long Island Rail Road;

23  do you see that?

24  A.  Yes.

25  Q.  It is about 1800 people fewer?

D7ndles1                         Murray - direct

1   A.  Yes.

2   Q.  How does Metro-North Railroad compare with Long Island Rail

3   Road in terms of the number of employees at any given time?

4   A.  They are similar.  Long Island Rail Road may have a few

5   hundred more.

6   Q.  And at any given time they both have about how many

7   employees?

8   A.  About 6,000, a little over 6,000 employees.

9          MR. WEDDLE:  If we could now display, Ms. Chen,

10  Government Exhibit 21B, as in boy.  Oh, actually, I'm sorry,

11  can we first display government Exhibit 123A?

12          I'm sorry, your Honor.  It is early in the morning.

13          Before we display it, I should probably discuss 23A

14  with the witness.

15  Q.  What is Government Exhibit 23A, Mr. Murray?

16  A.  23A is a schedule of disability among retirees from Long

17  Island Rail Road.

18  Q.  Is this just a piece of the exhibit we were just looking

19  at?

20  A.  Yes.  It's the left-hand side of the piece.

21          MR. WEDDLE:  I offer Government Exhibit 23A, your

22  Honor.

23          MR. DRATEL:  No objection except as previously stated,

24  your Honor.

25          MR. RYAN:  No objection.

D7ndles1                          Murray - direct

1          MR. JACKSON:  The same here, Judge.  No objection.

2          THE COURT:  Then without objection, it is received.

3          (Government's Exhibit 23A received in evidence)

4    BY MR. WEDDLE:

5    Q.  So this is just the Long Island Rail Road?

6    A.  Yes.

7    Q.  The same numbers?

8    A.  The same numbers, just the Long Island Rail Road.

9    Q.  Now, can you take a look at 21B, as in boy.

10         What is 21B?

11   A.  21B is a graphic presentation of our chart showing the

12   percentage of retirees in each year comparing the Long Island

13   Rail Road and Metro-North on disability.

14         MR. WEDDLE:  The government offers 21B.

15         MR. DRATEL:  The same, your Honor.  No objection other

16   than as previously stated.

17         MR. RYAN:  No objection.

18         MR. JACKSON:  The same, Judge.  Thank you.  No

19   objection.

20         THE COURT:  Admitted without objection except as

21   previously stated.

22         (Government's Exhibit 21B received in evidence)

23         MR. WEDDLE:  Can you display that, Ms. Chen?  Can we

24   blow up the chart part?

25   Q.  So is this the same -- are these numbers in the bar chart,

D7ndles1                          Murray - direct

1   the graphic representation of how large the numbers are, is

2   this coming straight from that percentage column on the

3   previously exhibits?

4   A.  Yes, it is.

5   Q.  And it is for the same timeframe, 1998 to 2011?

6   A.  Yes, it is.

7   Q.  Sir, I think we are done with that exhibit.

8            Using your database, were you also able to analyze

9   when during the year Long Island Rail Road employees retired?

10  A.  Yes, I was.

11  Q.  And based on your experience at the Office of Inspector

12  General, how does the time of year that a person retires affect

13  him or her?

14  A.  Depending on when they retired it can affect how much

15  benefits they get in terms of their vacation and sick leave

16  buyouts.

17  Q.  How does it affect the benefits in terms of vacation and

18  sick leave buyouts, as you understand it?

19  A.  When retirees leave they are entitled to their vacation pay

20  for the year they retire, usually five weeks' pay, from both

21  railroads.  If they retire late, if they retire -- or, excuse

22  me, if they work about 100 days in, for example, in 2013, they

23  would be entitled to their vacation pay for the following year,

24  for 2014.  So most employees tend to retire after they've

25  worked 100 days, about four or five months, so they are then

D7ndles1                              Murray - direct

1     entitled to another five weeks of vacation pay.  So they tend

2     to retire after those first four or five months.

3     Q.  Now, what about the amount of taxes that are deducted from

4     payouts that people get upon their retirement, is that affected

5     by the time of year that they retire?

6     A.  Yes, it is.  Rail Road employees pay to the Railroad

7     Retirement Board taxes that are similar to Social Security

8     taxes.  They pay 6.2 percent of their first $110,000 about to

9     the Railroad Retirement Board.  And in addition, they also pay

10    another 4 percent to the RRB on income up to 84,000.  So they

11    pay about a total of 10 percent.  But once they reach the

12    maximum, the 110,000 for the first six percent and the 84,000

13    for the next four percent, they don't have to pay that.

14          So what a lot of them will try to do is retire later

15    in the year, when they have reached or have come close to those

16    maximums, so when they get their vacation and sick leave

17    buyouts, which can amount to 20/$40,000, they don't have to pay

18    that tax.

19    Q.  In the thresholds that you just mentioned, the maximum

20    taxable income for a particular year of 84,000 and 110,000,

21    have those maximums changed over time?

22    A.  Yes.  They change probably each year.

23    Q.  And so let's say in 1998, were they higher or lower?

24    A.  They were lower at that point.

25    Q.  And would you take a look now at Government Exhibit 22A?

D7ndles1                          Murray – direct

1    Do you see that?

2            Actually, why don't you take a look at 22A and 22C

3    together.  Do you see those?

4    A.  Yes.

5    Q.  And are these summaries of your work figuring out which

6    month retirees retired?

7    A.  Yes, it is.

8    Q.  And where does the information come from that results in

9    these total figures?

10   A.  This comes from the retired database of 7,290 retirees.

11           MR. WEDDLE:  I offer -- the government offers

12   Government Exhibit 22A and 22C?

13           MR. DRATEL:  No objection.

14           MR. RYAN:  No objection.

15           MR. JACKSON:  No objection.

16           THE COURT:  All right.  Before we do that...

17           (The Court conferred with the law clerk)

18           (Pause)

19           THE COURT:  Counsel, please approach.

20           (Continued on next page)

D7ndles1                         Murray - direct

1               (At the sidebar)

2               THE COURT:  Mr. Weddle, everything that you've wrote

3     up to this point has been the comparison of the two Railroads.

4               MR. WEDDLE:  That is right, your Honor.

5               THE COURT:  This is only referencing what happens in

6     the Long Island Rail Road.  So it shows a pattern of when

7     people retired.

8               MR. WEDDLE:  Right.

9               THE COURT:  The question is this is probative of what

10    if you don't have something to compare it to?

11              MR. WEDDLE:  Your Honor, I think it is probative --

12              THE COURT:  In other words -- let me summarize.

13              There is no indication that if you look at the same

14    figures for the Metro-North, you would not find a different

15    pattern or a different pattern of any other railroad or any

16    other workers retiring from any other business.

17              Do you understand the problem?

18              MR. WEDDLE:  Yes, your Honor.  We think that this is

19    independently relevant, because it shows that people are

20    retiring at a time of their choosing rather than a retirement

21    when they are unable to work.  So regardless of the

22    comparison --

23              THE COURT:  That could hold for A.U.S.A.s or it could

24    hold for any other workers.

25              MR. WEDDLE:  Your Honor, this is a subset of the

1    people that are on the other charts.  These are Long Island

2    Rail Road retirees who got disabilities.  It is only the people

3    who got disability.

4              THE COURT:  How do we know that if we look at the

5    pattern for Metro-North we won't find exactly the same thing?

6              MR. WEDDLE:  He has done the analysis, but it was a

7    little bit more complex when you looked at it in that way.  I

8    think this is a much simpler way to understand the point, and I

9    don't think it depends upon a comparison between railroads

10   because the comparison between railroads is designed to rebut

11   any kind of argument from the defense, which we've already

12   heard, which is there is something special about working on a

13   railroad and that basically everybody who works on a railroad

14   is disabled.  The comparison between Metro-North and Long

15   Island Rail Road rebuts that, and it shows that there is

16   nothing about working on a railroad that disables a person.

17   This is a different point --

18             THE COURT:  I understand that, but I'm not sure if I

19   am making my point.

20             MR. WEDDLE:  I understand your Honor's point.  I just

21   think that it's not required to do an interrailroad comparison

22   in order to make this pretty simple point, which is that people

23   are retiring at a time of their choosing based on the numbers

24   that Mr. Murray just described, and it also corroborates --

25             THE COURT:  You are not answering my question.  How do

D7ndles1                          Murray - direct

 1    you know, how do we know, that if you make a similar comparison

 2    about any industry, the same considerations might prompt people

 3    to retire towards the end of the year because of tax reasons or

 4    any other reasons?

 5             MS. FRIEDLANDER:  I think you might well see that

 6    pattern.  I don't think we are making any suggestion that you

 7    would see a different pattern at the Metro-North or at any

 8    other place of employment.  If you saw that same pattern at

 9    Metro-North with respect to the people on disability there, it

10    would just suggest that those people are also planning when to

11    retire on disability but it wouldn't suggest that there is a

12    problem with this data.

13             This just shows that, you know, contrary to the

14    suggestion by the defense that people are just becoming

15    disabled, just randomly becoming disabled in the course of any

16    year because of the tough work that they are doing, in fact

17    they are planning when they are going to go out on disability.

18    So you may well see the same thing at Metro-North.  It would

19    just suggest that perhaps there are issues there, too.

20             I think that what Justin means when he says this is

21    independently relevant, it just shows you that people are

22    planning when they are going to go out on disability.  All

23    right.

24             THE COURT:  I think that if you look at any industry,

25    people plan when they want to retire.

D7ndles1                         Murray - direct

1              MS. FRIEDLANDER:  Sure.

2              MR. WEDDLE:  But that is not what this is.  This is

3     when they get --

4              MS. FRIEDLANDER:  But this is people on disability; it

5     is not just when people retire.  It is not retirees; this is

6     people on disability.

7              THE COURT:  Yes.  Let's see if you could clarify that

8     point in case other jurors might have the same concern that I

9     have.

10             MR. WEDDLE:  OK.

11             THE COURT:  All right.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D7ndles1                          Murray - direct

1              (In open court).

2              THE COURT:  All right.  The exhibit is admitted

3    without objection except as previously noted.

4              (Government's Exhibits 22A and 22C received in

5    evidence)

6              THE COURT:  Mr. Weddle.

7              MR. WEDDLE:  Thank you, your Honor.

8              Let's just display 22C, Ms. Chen.

9    BY MR. WEDDLE:

10   Q.  Now, Mr. Murray, what is the title of this document?

11   A.  "Long Island Rail Road Disability Retirements 1998 to 2011

12   by Month of Retirement."

13   Q.  And do you see where it is -- I am pointing my laser at it.

14   Do you see where it says "disability retirements?"  What is the

15   significance of that part of the title?

16   A.  These are -- these retirees have received Railroad

17   Retirement Board disability retirement.

18   Q.  So if we were to refer back to the summaries we were

19   looking at earlier, which column do all of the people on this

20   chart come from on the other side?

21   A.  They come from the column with disability, the ones under

22   "disability" column, receiving disability benefits.

23   Q.  To what extent does this chart include anyone who just

24   retired and did got end up getting disability?

25   A.  No.  This chart just includes those getting disability

D7ndles1                        Murray – direct

1    retirements.

2    Q.  OK.  And it is the same time period we were talking about

3    earlier, right?

4    A.  1998 to 2011, yes.

5    Q.  And then there are these bars that are broken up by month,

6    is that right?

7    A.  Yes.

8    Q.  OK.  So can you explain, for example, what the significance

9    of the July bar is?

10   A.  For the years 1998 through 2011, those who retired during

11   the month of July in those years, it was 526 people retired in

12   the month of July.

13   Q.  So, for example, if somebody retired in July 2001, which

14   bar would that person be in?

15   A.  He would be in the July bar.

16   Q.  And if a person retired in July 2008, which bar would he or

17   she be in?

18   A.  He would be in the same July bar.

19   Q.  And so the total number of people that are covered by this

20   chart, that is the people who ended up getting disability who

21   retired during this timeframe from Long Island Rail Road, what

22   is the total number of people on this chart?

23   A.  3,089.

24   Q.  And that is the same total that we saw in your earlier

25   chart of Long Island Rail Road disability rates?

D7ndles1                        Murray – direct

1   A.   That is the total number on –– yes, total number on

2   disability.

3   Q.   And, sir, do you see these tall bars here from June through

4   December?

5   A.   Yes.

6   Q.   If you look at Government Exhibit 22A, just you, what

7   percentage of people who ended up going on disability does that

8   group of tall bars, June to December, represent out of all of

9   this 3,089?

10  A.   That represents 90.5 percent of all of those retirees.

11  Q.   And these bars here, from January through May, what

12  percentage of people who retired from Long Island Rail Road and

13  ended up getting disability, what percentage of them retired

14  during the first five months of the year?

15  A.   9.5 percent retired during the first five months of a year.

16          MR. WEDDLE:  May I have a moment, your Honor?

17          (Pause)

18          MR. WEDDLE:  I have nothing further.

19          THE COURT:  Thank you.  Mr. Dratel, is there anything

20  for the defense?

21          MR. DRATEL:  I do have something, your Honor.  Thank

22  you.

23  CROSS-EXAMINATION

24  BY MR. DRATEL:

25  Q.   Good morning, Mr. Murray.

D7ndles1                    Murray - cross

1   A.  Good morning.

2   Q.  We went through a number of charts, essentially two charts,

3   right, with different presentations?  In other words, there is

4   one chart that compares Metro-North and Long Island Rail Road

5   retirees and another that just looks at the timing of the Long

6   Island Rail Road retirees during the year, right?

7   A.  Yes, these several charts.

8   Q.  Despite that one is a bar graph, another is just numbers,

9   they are really in many respects just two different sets of

10  numbers, right?

11  A.  Yes.  There is a number -- yes.

12  Q.  Now, you collected these from a series of databases, right?

13  A.  Yes.

14  Q.  And 37 different databases?

15  A.  37 to begin with and then I think it was a total of 43,

16  actually 43 or 44.

17  Q.  And some were from your own office's audits going back to

18  2004, right?

19  A.  That's correct.

20  Q.  And those audits sometimes found many errors in the

21  databases for Long Island Rail Road pensions, right?

22  A.  The ones -- the earlier ones in 2004.

23  Q.  Right.  So there were a lot of errors that were in those

24  databases?

25          MR. WEDDLE:  Objection, your Honor.

1     THE COURT:  Sustained.

2  BY MR. DRATEL:

3  Q.  Now, let's talk about retirees.  Does that include all

4  people who retired from the Long Island Rail Road or

5  Metro-North that year?

6  A.  Yeah.  That includes all retirees from the railroads in

7  those years.

8  Q.  So people who took early retirement, people who took

9  retirement at one particular point or another point, right, the

10  total?

11  A.  That's the year of retirement, yes.

12  Q.  And also, when you say disabilities, it includes all types

13  of disability, right, not just occupational disability but

14  other types of disability?

15  A.  Total, permanent and occupational disability.

16  Q.  Did you prepare a chart breaking out that kind of

17  disability?

18  A.  I did not prepare a chart here breaking out across --

19  Q.  You weren't asked to do so by the government, right?

20  A.  Correct.

21  Q.  In fact, all the charts here you were asked to do

22  specifically by the government, right?

23  A.  Yes.

24  Q.  This wasn't something done as part of your function at MTA;

25  you did this with respect to this case at Mr. Weddle's request

D7ndles1                          Murray - cross

1    or the request of the prosecution team, right?

2              MR. WEDDLE:  Objection, your Honor.

3              THE COURT:  Overruled.

4              MR. WEDDLE:  Compound.

5              THE COURT:  Break the question down, Mr. Dratel.

6              MR. DRATEL:  Sure.

7    Q.  This analysis you did in 2012, correct?

8    A.  Yes.

9    Q.  And you did it at the request of the prosecution team here,

10   whether it was Mr. Weddle or someone else, correct?

11   A.  Yes.

12   Q.  So the charts you prepared were prepared at the request of

13   the government, the prosecution --

14             THE COURT:  Asked and answered.

15             MR. DRATEL:  Yes, your Honor.  Thank you.

16   Q.  So you didn't prepare -- asked and answered that one.  I

17   will try to get back to where I was, your Honor.  Thank you.

18             So you don't break it down by the types of retirement,

19   right?  There is no chart that you were able to --

20             THE COURT:  Asked and answered.

21   Q.  Now, with respect to Metro-North, you described the

22   differences in the plan between Metro-North and Long Island

23   Rail Road, the pension plan, right, on your direct?

24   A.  Yes.

25   Q.  Just to go over it again, Long Island Rail Road has -- used

D7ndles1                           Murray - cross

1   to have for the period of time that we are talking about, had a

2   what's called a 50/20 breakdown, right, 50 years of age, 20

3   years of service?

4   A.  Yes.

5   Q.  Right?  Metro-North never had that, correct?

6   A.  Correct.

7   Q.  Metro-North has always been a 55/30, right?  And now it is

8   ah 60/30, but for a period of time it was 55/30, right?

9   A.  It's 55 and 30 now.

10  Q.  And so in order to get to the point of full retirement, a

11  Metro-North worker would have to serve 30 years on the

12  railroad, right?

13  A.  Yes.  He would have had to serve 30 years.

14  Q.  Metro-North began in 1983, correct?

15  A.  Yes.

16  Q.  So in order to get to the 30 years, this is the first year,

17  2013, that a Metro-North worker who started the very day that

18  the Rail Road started would hit that 30 years, correct?

19  A.  Yes.

20  Q.  Now, Long Island Rail Road started what, 1884?

21  A.  They started earlier.

22  Q.  Earlier, OK.

23  A.  Excuse me.  What year did you say?

24  Q.  1884.

25  A.  1884?  I don't know what year they started.

D7ndles1                        Murray - cross

1   Q.  But certainly it's been around for significantly longer --

2   it's been around since -- what is your estimate of when it

3   started, if you know?

4   A.  It was a private railroad earlier in the 1900s.  It was

5   taken over by the MTA I think sometime in the '60s.

6   Q.  Right.  So someone who started and retired in 2004 could

7   have 30 years of service on the LIRR, right?

8   A.  If they started in 2000 --

9   Q.  No, if they retired in '74.

10          Withdrawn.

11          If they retired in 2004, right, they could have 30

12  years of service on the LIRR, right?

13  A.  Yes.

14  Q.  Because they could have started in '74, right?

15  A.  They could have, yes.

16  Q.  But someone who retired in 2004 from Metro-North would not

17  have 30 years, right?

18  A.  That is correct.

19  Q.  They couldn't until 2013?

20  A.  Correct.

21  Q.  By the way, does this include -- withdrawn.

22          So Metro-North employees are not covered by this

23  contract, correct?

24  A.  Which contract?

25  Q.  The pension plan, right?

D7ndles1                         Murray – cross

1    A.   They are covered by the MTA Defined Benefit Pension Plan.

2    Q.   But aren't there some employees who are not in the same

3    union?  Are there different unions that cover Metro-North?

4    A.   There are different unions, but most of them now are in the

5    MTA Defined Benefit Plan.

6    Q.   Most but not all, right?

7    A.   There are a few who opted out of it.

8    Q.   Are they covered by this chart?

9    A.   No, I don't believe they are.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7nnles2                        Murray - cross

1    Q.  Were you asked to include them by the government?

2    A.  I was asked to obtain all retirees from the MTA defined

3    benefit plan.

4    Q.  But that doesn't include all retirees necessarily from

5    Metro-North during that period, does it?

6    A.  There may have been a very small number of people who opted

7    out of the MTA defined benefit plan.

8    Q.  But that is not covered by your charts, right, or by you?

9    Withdrawn.  It is not covered by the chart.  I think you

10   answered that it's not.

11           If you could pull up --

12           MR. DRATEL:  If we could please have 23-B.

13   Q.  If we look at the years 2008 -- let's start with 2008,

14   2009, '10, '11, the numbers drop, correct, for Long Island Rail

15   Road?

16   A.  Right.

17   Q.  In 2008 there was a New York Times article, right?  You are

18   aware of that, correct, about the percentage of Long Island

19   Rail Road retirees out on disability?

20   A.  I know the New York Times had an article.  I am not sure

21   exactly when.

22   Q.  2008 was also a significant year economically for the

23   railroad, right, for MTA, correct?

24   A.  I am not sure why.

25   Q.  The market collapse caused a significant shortfall,

1    correct, in the finances of the MTA?

2    A.  I am not sure exactly how much of a shortfall it had.

3    Q.  The investment portfolio significantly underperformed,

4    correct?

5    A.  I am not sure how much it underperformed.

6    Q.  There was a projected shortfall of $534 million, right?

7                THE COURT:  Mr. Dratel, I think that this is way

8    beyond the scope of direct.  Is there any basis for this?

9                MR. DRATEL:  Yes, your Honor.  It is in his 3500

10   material.

11               THE COURT:  It may be there, but it was not part of

12   the direct.

13               MR. DRATEL:  I am trying to get the numbers on the

14   chart, your Honor, for the basis, and some of the differences

15   in the numbers.

16   Q.  Are you familiar with the MTA's defined pension plan

17   January 2009 actuarial valuation report?

18   A.  I have seen it.

19   Q.  I am going to ask you again whether you recall that the

20   2008 market conditions produced an underperformance by the

21   investments or by the portfolio of the pension plan by a

22   significant amount, $534 million shortfall?

23   A.  I don't know how much the shortfall was.  I know all

24   pension plans in general went down because of the economic

25   downturn at that time.

D7nnles2                              Murray - cross

1          MR. DRATEL:  May I approach, your Honor?

2          THE COURT:  Yes.

3     Q.  I just want you to look at this document and I will

4     highlight --

5          MR. DRATEL:  Let me just tell --

6          (Counsel conferred)

7     Q.  I will highlight for you what I would like you to look at.

8     You can look at the beginning of the document, if you like.

9     Let me know when you have had a chance to look at that to your

10    satisfaction.

11    A.  I see it.

12    Q.  Does that refresh your recollection that there was a 39

13    percent underperformance in the market and that there was a

14    $534 million shortfall that the MTA was looking at for the

15    pension plan?

16    A.  Just the wording here seems unusual.

17    Q.  But does it say -- withdrawn.

18    A.  The rate of return was --

19    Q.  But does it refresh your recollection that there was a $500

20    million shortfall essentially?

21         THE COURT:  Mr. Dratel, please approach.

22         (Continued on next page)

23

24

25

D7nnles2                         Murray - cross

1           (At sidebar)

2           THE COURT:  Mr. Dratel, my difficulty is that you

3    haven't laid a foundation for why you are asking this witness

4    questions about a document that you have not established he had

5    any familiarity with or prepared.

6           MR. DRATEL:  OK.

7           THE COURT:  It may be in the 3500 material, but so is

8    a whole bunch of other things.  You didn't ask whether he had

9    seen this in the course of his duties, he has reason to or

10   occasion to examine these documents.  If he has no familiarity

11   with this document, there is no reason why he would have

12   recollection of what you are asking him.

13          MR. DRATEL:  I agree, your Honor.  I am not trying to

14   introduce the document, but I understand the Court's point.  I

15   agree.

16          THE COURT:  All right.

17          MR. DRATEL:  Thank you.

18          (Continued on next page)

19

20

21

22

23

24

25

D7nnles2                         Murray - cross

1          (In open court)

2  Q.  Mr. Murry, as an auditor in MTA, you are familiar with the

3  defined benefit pension plan?

4  A.  Yes.

5  Q.  Are you familiar with the actuarial reports that are issued

6  on an annual basis?

7  A.  Yes.

8  Q.  You review them as part of your job?

9  A.  I have reviewed them in the past.  I don't review them

10  every year.

11  Q.  Looking at what I have put in front of you, does that

12  refresh your recollection that there was a $534 million

13  shortfall --

14  A.  Yes, there was.

15  Q.  -- going into 2009.

16          Also, a portion of that loss was attributable to

17  salary differences at Metro-North versus Long Island Rail Road,

18  correct?

19  A.  I don't know that.

20  Q.  If you would look at the bottom of that page, if that

21  refreshes your recollection, the bottom of page 3 and the top

22  of page 4.

23  A.  Yes.

24          MR. WEDDLE:  Your Honor, I don't think there was a

25  failure of recollection.  The question was does he know, and he

D7nnles2                          Murray - cross

1    said no.

2              THE COURT:  All right.  Sustained.

3    Q.  Have you reviewed this document before?

4    A.  I have seen it before, yes.

5    Q.  Do you recall that it says that part of that loss was

6    attributable to the difference in salaries for Long Island Rail

7    Road versus Metro-North?

8    A.  It wasn't a question of versus one or the other.  I think

9    it was a question of both of them together.

10   Q.  I am asking you for a comparison, that they have different

11   salary structures, correct?

12   A.  That is not how I read that.

13   Q.  I am asking you, do they have different salary structures?

14   A.  The salaries are comparable, I believe.

15   Q.  But the average salary increase for active members from

16   Long Island Rail Road in the pension plan during 2008 was 9.25

17   percent, while for Metro-North it was 17 percent, correct?

18             MR. WEDDLE:  Your Honor, the document is not evidence,

19   and the witness said he doesn't know these things.

20             THE COURT:  Sustained.

21   Q.  I am asking as a direct question.  Isn't it a fact for the

22   year 2008 the average salary increase for Long Island Rail Road

23   retirees in the plan -- sorry, for active members of the Long

24   Island Rail Road union in the pension plan during 2008 was 9.25

25   percent while the average salary increase for members of the

D7nnles2                         Murray - cross

1  Metro-North railroad who were in the pension plan during 2008

2  was 17 percent; is that correct?

3  A.   That's what the document says.

4  Q.   You talked also a little bit about the taxes which you

5  described as Social Security.  So that is essentially what

6  comes back to the employee, correct, in the context of

7  retirement pay, right?  What they pay into the RRB is

8  essentially what comes back to them in some form in their

9  disability or their retirement pay, correct?

10            MR. WEDDLE:  Object to the form, your Honor.

11            THE COURT:  Sustained as to form.  Rephrase.

12 Q.   A Long Island Rail Road employee or Metro-North employee

13 pays as part of their tax package money that goes to the RRB,

14 to fund similar to Social Security, correct?

15 A.   Yes.

16 Q.   When they retire, or take disability or however they are

17 paid by RRB, essentially a portion that is, that's part of the

18 money that is coming back to them is from that fund, correct?

19            MR. WEDDLE:  Same objection, your Honor.

20            THE COURT:  Sustained.

21 A.   Yes, they are paid from that fund.

22            MR. WEDDLE:  Your Honor, move to strike.

23            THE COURT:  Sustained.

24            You don't need to answer if I sustain an objection.

25            THE WITNESS:  I'm sorry.

D7nnles2                          Murray - cross

1    Q.  A retiree's benefits are paid from that fund in part,

2    correct?

3    A.  Yes.

4    Q.  And another part is from the MTA pension plan itself,

5    correct?

6    A.  It not from the pension plan.  The MTA pays directly into

7    the RRB.

8    Q.  So part of it is from the employee; part of it is from the

9    employer?

10   A.  Yes.

11   Q.  22-C, which was the timing of retirement during the year,

12   were you asked to do an analysis of Metro-North timing of

13   retirement?  Withdrawn.

14          Were you asked to do a chart for Metro-North

15   retirement, the timing during the year?

16   A.  No, I was not.

17   Q.  Were you asked to do an analysis of that?

18   A.  No, I was not.

19   Q.  So there is no comparison here, correct?

20   A.  There is none, no.

21   Q.  Everybody knows this going in, right?  When I say the

22   railroad knows it and the employee knows it, the benefits of

23   retiring later in the year, correct?  It is not a mystery?

24   A.  Yes, railroad employees understand that.

25   Q.  In fact, this chart would be what would be expected,

D7nnles2                    Murray - cross

1   correct?

2               MR. WEDDLE:  Objection, your Honor.

3               THE COURT:  Sustained.

4   Q.  As an auditor working for the MTA, did that surprise you

5   that chart?

6   A.  No, it does not surprise me.

7   Q.  That was according to the rules?

8   A.  Well, this is for disability retirees.  For service

9   retirees I would expect it.

10  Q.  So you haven't look at disability retirees, though, for

11  Metro-North in the same vein, right?

12  A.  I am not sure what it would be for disability retirees for

13  Metro-North.

14  Q.  Any other railroad in the country you wouldn't know, right?

15  A.  Yes, I don't know anything.

16  Q.  Now, you had other charts that you prepared, correct, that

17  are not in evidence, right?

18  A.  These are the charts I prepared.

19  Q.  But you did other analyses for the government that you did

20  not put into charts put into evidence, correct?

21  A.  Yes, I did other comparisons.

22  Q.  Right.  Do you have them with you, or would you need to see

23  them?

24  A.  No, I don't have anything with me.

25  Q.  OK.  That's fine.

D7nnles2                         Murray - cross

1           MR. DRATEL:  May I approach, your Honor?

2           THE COURT:  Yes.

3           MR. DRATEL:  Thank you.

4   Q.  I ask you to just look at that for the time being.  So you

5   prepared a chart with some additional columns, correct?  Not a

6   chart.  I'm sorry.  Withdrawn.  You did an analysis that

7   included a spreadsheet with additional columns, correct?

8   A.  Yes.

9   Q.  And one that you called LIRR and Metro-North Retirees

10  Receiving RRB Benefits, 1995 to 2011, right?

11  A.  Yes.

12  Q.  There is something called RRB service benefit, right?

13  A.  Yes.

14  Q.  In fact, the Metro-North numbers are significantly higher

15  than they are for Long Island Rail Road, right?

16  A.  Yes.  Let me just check that.  Yes, they are higher.

17  Q.  Did you do any investigation as to why that was?

18  A.  No.

19  Q.  Were you asked to?

20  A.  No.  Could I add that service benefit, it's all benefits

21  for the RRB, all the regular retirement benefits are included

22  in there.

23  Q.  But the numbers are still significantly higher for

24  Metro-North than for Long Island Rail Road, right, for those

25  years?

D7nnles2                          Murray - cross

1    A.  For those years, yes.

2    Q.  Those years are 2004 through 2011 basically, right?

3    A.  1995 -- well --

4    Q.  For all the years, but they begin to spread out quite a bit

5    in 2004, right?

6    A.  Yes.

7    Q.  106 Metro-North retirees that year versus 18 for Long

8    Island Rail Road, right?

9    A.  For service benefit, yes.

10   Q.  You weren't asked to do a chart based on ages, were you,

11   ages of retirement?

12   A.  I don't recall.

13   Q.  Were you asked to do any analysis of the average age of

14   Metro-North retirees?

15   A.  At times we did -- I did put in a column to determine the

16   age of retirees when they retired.

17   Q.  You weren't asked to put that in the chart that was put in

18   evidence?

19   A.  It is not in this chart, no.

20        MR. WEDDLE:  Objection, your Honor, to the

21   characterization.  The entire database is in evidence on

22   Government Exhibit 29.

23        THE COURT:  Sustained as to form.

24   Q.  You were not asked for purposes of these exhibits to put a

25   column in about age, right?

D7nnles2                           Murray - cross

1   A.  Yes.

2   Q.  Were you asked to do any analysis with respect to the rate

3   of injury Metro-North versus Long Island Rail Road?

4   A.  No.

5   Q.  Were you asked to do any analysis of the age of the

6   workforce in its entirety Long Island Rail Road versus

7   Metro-North?

8   A.  No.

9   Q.  Are you familiar with statistics as a subject matter?

10  A.  I know of it, yes.

11  Q.  Are you familiar with the principle that correlation does

12  not imply causation?

13  A.  No, I'm not familiar with that.

14  Q.  Did you do an analysis with respect to maintenance between

15  Long Island Rail Road and Metro-North?

16  A.  No.

17  Q.  So you essentially were asked to just compile these numbers

18  without seeking to eliminate or incorporate any other variable

19  than what we see here, right?

20          MR. WEDDLE:  Objection, your Honor.

21          THE COURT:  Sustained.

22  Q.  So those variables that I just --

23          MR. WEDDLE:  Objection, your Honor.

24          THE COURT:  Overruled.

25  Q.  Those variables that I just discussed, age of the

D7nnles2                         Murray - cross

1    workforce, maintenance issues, rate of injury, none of that was

2    incorporated into this analysis?

3              THE COURT:  Asked and answered.

4              MR. DRATEL:  OK.

5    Q.  Another variable that was not included was any salary

6    differences between the two, correct, between the two

7    railroads?

8    A.  I did not adjust for salaries.  It doesn't reflect

9    salaries.

10             MR. DRATEL:  Thank you very much, Mr. Murray.  Nothing

11   further, your Honor.

12             THE COURT:  Mr. Ryan.

13   CROSS EXAMINATION

14   BY MR. RYAN:

15   Q.  All of this data, Mr. Murray, was a matter of record at the

16   Metropolitan Transit Authority for all of the years you have

17   testified about, right, all of this data?

18   A.  Excuse me.

19   Q.  All of this data --

20             MR. WEDDLE:  Your Honor, objection.

21             May we be heard on this?

22             THE COURT:  What is the point.

23             MR. WEDDLE:  We moved in limine regarding this issue.

24   I can't remember what Mr. Ryan's --

25             THE COURT:  I haven't heard the question yet.  Let's

D7nnles2                          Murray - direct

1     see what the question is.

2              MR. WEDDLE:  He started out by asking what was

3     available.

4              THE COURT:  He asked whether this data was of record

5     at the MTA.

6              MR. WEDDLE:  I believe he's going to the direction --

7              THE COURT:  We don't know where he's going because I

8     haven't heard the question.

9     Q.  Let's take the database that you used for the Metro-North

10    retirees, the database.

11             It's designated MN retirees.  Do you see it up there

12    in your records?

13    A.  Yes.

14             MR. RYAN:  Could you put that up on the screen, the MN

15    retirees database for Metro-North.

16             MR. WEDDLE:  Your Honor, I don't --

17             THE COURT:  I still haven't heard.

18             MR. WEDDLE:  I don't know what he's referring to.

19    There is a folder --

20             MR. RYAN:  Let me withdraw the question and ask

21    another question.

22    Q.  Isn't it a fact, sir, that this jury could take your

23    database and calculate the average age of Metro-North employees

24    when they retire and the years of service when they retire?

25    A.  They could calculate the average age with the data in

D7nnles2                        Murray - direct

1   there.  The number of service for some they may.  I don't know

2   if I have the hire date for everybody in there.

3   Q.  Just in the interest of time I'm going to show you what's

4   deemed marked R-71 and see if you recognize it.

5              MR. WEDDLE:  May I see it?

6              MR. RYAN:  Sure.

7   Q.  I just show you this R-71 to see whether or not, just

8   looking at that document, this jury, with your database, could

9   determine --

10             MR. WEDDLE:  Objection, your Honor.  There is no

11  foundation for what this document is.

12             THE COURT:  We don't know what this document is yet,

13  Mr. Ryan.

14  Q.  Do you recognize that document as relating to the database

15  that you used for the charts that you used in this case?

16  A.  It looks like it could be part of it.

17  Q.  You have the database, and I ask Mr. Weddle if you would

18  put on the screen part of Exhibit 20, MN retirees database?

19             MR. WEDDLE:  Your Honor, I object to that

20  characterization.  There is no MN retirees database as far as I

21  know.

22             THE COURT:  Identify what Mr. Ryan is talking about.

23             MR. WEDDLE:  We can put Mr. Murray's database on the

24  screen.  It is on Government Exhibit 20.  Would you like to do

25  that?

D7nnles2                          Murray - direct

1             THE COURT:  If Mr. Ryan would.

2             MR. RYAN:  I'm sorry.  It's Metro-North Railroad.  I

3    should be using the term MNR.  I have been corrected.  If you

4    can put that up on the screen, please.

5             MR. WEDDLE:  Your Honor, since the witness can't see

6    which actual file we are opening on the screen, can I just say

7    for the record which file we are going to open?

8             THE COURT:  Yes.

9             MR. WEDDLE:  He may not be able to tell from looking

10   at it which one it is.

11            THE COURT:  All right.

12            MR. WEDDLE:  Do you want him to open his consolidated

13   database?

14            MR. RYAN:  I would like the jury to see the database

15   that was offered in evidence.

16            MNR database dealing with retirees.

17            MR. WEDDLE:  MNR is a folder.

18            MR. RYAN:  Yes.

19            MR. WEDDLE:  Can you display what is on your screen,

20   Ms. Chen.

21            MR. RYAN:  Just the second line.

22            MR. WEDDLE:  Just give us a second.

23            MR. RYAN:  Take your time.

24            MR. WEDDLE:  Can you move back.

25            Your Honor, this is the disk, or the contents of the

D7nnles2                          Murray - direct

1   disk are here, and I think Mr. Ryan wants to open the folder

2   called MNR.

3              MR. RYAN:  Precisely.

4              MR. WEDDLE:  In the folder are two spreadsheets, your

5   Honor.

6              MR. RYAN:  Yes.  The bottom one, please.

7   Q.  According to the database these are the retirees for

8   Metro-North, right?

9   A.  It is one of the databases I received with Metro-North

10  retirees.

11  Q.  You have the date of birth of each retiree?

12  A.  In this database, yes.

13  Q.  You have the date of retirement?

14  A.  I have this termination date, which could be different from

15  the retirement date.

16  Q.  What do you mean by that?  How different?

17  A.  Usually they are close, but sometimes a person can leave

18  and not retire because he doesn't have the age.  There can be

19  circumstances where they are not exactly the same.

20  Q.  But in this list you were dealing with people who did

21  retire, correct, Metro-North, and they got disability?

22  A.  Yes.

23              MR. WEDDLE:  Objection, your Honor.  I don't think

24  that is what this list is.

25              THE COURT:  Sustained.

D7nnles2                          Murray - direct

1    Q.  Mr. Murray, we can also determine from this database the

2    years of service that that retired employee had worked at the

3    Metro-North railroad, right?

4    A.  It has a hire date and the termination date.

5    Q.  All right.  So we have two elements on this database.  We

6    have age and years of service, correct?

7    A.  You have to calculate the years of service, yes.

8    Q.  That's easy for you, isn't it?

9    A.  Right, yes, you can do that.

10   Q.  Pick any name out that you want and just run it through and

11   tell us, give us an example where this jury can find out how

12   old the employee was when they retired and how many years of

13   service.  Just pick any name out.

14   A.  Well, I can pick out a name from here.  This database is

15   one of a few that I used to get the overall data on Metro-North

16   employees.

17   Q.  I understand.

18   A.  It is not the final one?

19   Q.  I understand that.  And you weren't asked to prepare a

20   chart dealing with the age of the Metro-North railroad

21   employees when they got the disability or the years of service,

22   were you?  You didn't prepare a chart like that?

23   A.  No, I did not.

24   Q.  You weren't asked to, isn't that correct?

25   A.  That's correct.

1    Q.   Do you want to just give us an example of how you compute

2    the age of the retiree and the years of service.

3          I'm returning R-71 unless you would like to have this

4    as an aid.

5    A.   No.  Thank you.  This doesn't have the retirement date.

6    That's what I would usually use to determine age at retirement.

7    I would take the retirement age, subtract the birth date from

8    that, and determine how many, what he was at retirement.  The

9    same thing for years of service.  I would take the retirement

10   date, deduct the hire date, and get an estimate of the years of

11   service.  There could be a difference if he had a break in

12   service, things like this.

13   Q.   In the interest of time, isn't it a fact that, using this

14   database, the average age of a Metro-North railway retiree

15   getting occupational disability was over 60 and had served 30

16   years?

17   A.   That's not true.  No.

18   Q.   You say it's not true.  Let's just pick one out.  Pick any

19   name out.

20   A.   Frank Cruz.

21   Q.   OK.  How many years of service?

22   A.   From this he would have about 32 years of service.

23   Q.   How old was he when he retired?

24   A.   He would be about -- retired in 2010, 56.

25   Q.   So that is an example of how you do the process to

D7nnles2                          Murray - direct

1    determine the age, correct, and the years of service?

2    A.  Yes.

3    Q.  Have you been asked to go down the list and determine all

4    of the ages and years of service on this database?

5          THE COURT:  Asked and answered.

6          MR. RYAN:  OK.

7    Q.  Now, all of this data was known to the MTA in 2004, wasn't

8    it?

9          MR. WEDDLE:  Objection, your Honor.

10         THE COURT:  Sustained.

11   Q.  Isn't it a fact that the high rate of disability and

12   retirements at the Long Island Rail Road was no secret to the

13   MTA?

14         MR. WEDDLE:  Objection, your Honor.  This is exactly

15   what I moved on.

16         THE COURT:  Sustained.

17   Q.  Isn't it a fact --

18         MR. WEDDLE:  I object to continued questioning on this

19   line.

20         THE COURT:  If it is the same question, Mr. Ryan, the

21   objection is sustained.

22   Q.  How long have you worked as an auditor for the MTA?

23   A.  15 years.

24   Q.  Did you work on an audit of Long Island Rail Road retirees

25   for the period 2002 to 2004?

D7nnles2                          Murray - direct

1    A.  I worked on an audit of the Long Island Rail Road pension

2    plan and why it was underfunded.

3    Q.  As a matter of fact, the reason for that audit was that

4    there was such a high rate of retirees that the Long Island

5    Rail Road had to ask that its budget for pensions had to be

6    increased from $67 million to $130 million.  Do you remember

7    that?

8    A.  No.  It is not totally correct.  The major reason for it

9    was to find out why the Long Island Rail Road pension fund was

10   underfunded.  There were many reasons why it was underfunded.

11   Q.  Wasn't there a determination of the audit made that there

12   was an unusually high rate of retirees during that period of

13   time?

14   A.  Yes.  There was a high rate of retirees, more than they

15   anticipated.

16   Q.  You worked on this audit in what year, sir?

17   A.  In 2004 or '5.

18   Q.  As a basis for that audit, wasn't there a request to double

19   the budget to fund the pensions of the Long Island Rail Road

20   retirees?

21   A.  It had to be increased.  I am not sure how much.

22   Q.  You don't remember whether it was double or half or

23   minimal?  No idea?

24   A.  You know, the funding went up from 30 million, 40 million

25   to close to 100 million a year.

D7nnles2                          Murray - direct

1    Q.  At that time it was no secret that these Long Island

2    retirees were taking advantage of the 50-year union contract

3    that made them eligible to apply for retirement, isn't that a

4    fact?

5              MR. WEDDLE:  Objection, your Honor.

6              THE COURT:  Sustained.

7    Q.  Wasn't it part of the audit's finding that the union

8    contract was one of the reasons why they had such a high rate

9    of retirees?

10             MR. WEDDLE:  Objection, your Honor, 401.

11             THE COURT:  Sustained.

12   Q.  Do you have the audit report resulting in that analysis

13   with you?

14   A.  I don't have it with me here.

15   Q.  It is a matter of public record?

16   A.  Yes, it is.

17   Q.  Did the New York Times article utilize that information, to

18   your knowledge, when it published this article in September of

19   '08?

20   A.  Yes, it did.

21   Q.  So the New York Times article published what was a matter

22   of record in the MTA?

23   A.  It used that report as one of its sources, yes.

24   Q.  Is it your understanding that it was fraud that created

25   that problem?

D7nnles2                          Murray - direct

1    A.  No, it was not.

2              MR. RYAN:  No further questions.

3              THE COURT:  Mr. Jackson.

4              MR. JACKSON:  Judge, just briefly.  Thank you.

5    CROSS EXAMINATION

6    BY MR. JACKSON:

7    Q.  Sir, good morning to you.

8              MR. JACKSON:  If the government could just put up

9    22-C, please.

10   Q.  Sir, as a point of clarification, if you look at 22-C --

11             MR. JACKSON:  If you could just enlarge that a little

12   bit, more focused on the months of January, February, March,

13   April and May.

14   Q.  Sir, as you look at that, you prepared this chart, is that

15   correct?

16   A.  Yes.

17   Q.  In preparing that chart, it is fair to say that there is a

18   significant difference with regard to the elevation in that

19   diagram for months January, February, March, April and May as

20   compared to the other months there, is that right?

21   A.  Yes.

22   Q.  You know what I am speaking about, right?

23             MR. JACKSON:  If you could just show the whole chart.

24   Thank you very much.

25   Q.  You see how they are minimal as it relates to the other

D7nnles2                          Murray - cross

1    months in question?  Do you see that?

2    A.  Yes.

3    Q.  It is fair to say, however, that you need to have at least

4    100 days before you retire, is that right, in the calendar

5    year?

6    A.  You don't have to have a hundred days.  You can retire at

7    any point.

8    Q.  With respect to the hundred days, however, don't generally

9    employees retire after getting that 100 days?  Is that

10   something you are aware of?

11   A.  When they retire on a service benefit they generally try to

12   have 100 days in.

13   Q.  Is that something that would affect the elevation in this

14   diagram as far as the -- you see how it goes January, February,

15   March, April, May and then it starts to escalate?  Do you see

16   that?

17   A.  It should do it for service retirees.  For disability

18   retirees, it really shouldn't have an effect.

19   Q.  Does it have an effect with regard to this chart here?

20   Does that explain the differential in the elevation of the

21   days, the hundred days that I am talking about?

22   A.  It appears that these retirees waited until they had four

23   or five months in for the year before they retired.

24   Q.  Is that something that is generally standard, as you just

25   explained?

D7nnles2                          Murray - cross

1    A.  It is standard for service retirees.

2    Q.  So you are aware of that, right, that standard?

3    A.  It occurs with service retirees.  These are disability

4    retirees.

5              MR. JACKSON:  Now if I could just have the government

6    show, if you will, 23-B.

7    Q.  In 23-B you see the differential here in this chart between

8    Long Island Rail Road employees and Metro-North employees.  Do

9    you see that?

10   A.  Yes.

11   Q.  Of course, as we have established here, and I won't

12   otherwise belabor the point, but there are a variety of

13   variables, would you agree, that would account for the

14   distinction or the difference in percentages?  Is that

15   accurate?

16   A.  I am not sure what variables would account for that.

17   Q.  Let's start with age, for example.  Mr. Ryan went into the

18   issue, as well as Mr. Dratel, of the issue of age, correct?  Is

19   that right?

20   A.  We discussed that, yes.

21   Q.  With regard to age, we can agree that the Long Island Rail

22   Road you have to be how old to retire?

23   A.  You have to be at least 50 in the Long Island Rail Road

24   retirement.

25   Q.  And in the Metro-North plan you have to be how old?

D7nnles2                          Murray - cross

1    A.  55.

2    Q.  So that is a five-year age differential, you would agree,

3    is that correct?

4    A.  That is for service retirees.

5    Q.  With respect to that service retirees, there is a

6    distinction, would you agree, between the ages where you become

7    eligible to retire, is that right?

8    A.  I'm sorry.  Repeat that question.

9    Q.  Sure.  You would agree with me that under one system, that

10   would be the Metro-North system, you need to be 55?  Is that

11   accurate?

12   A.  Yes, with 30 years of service.

13   Q.  Right.  That is the other part I was getting to.  In Long

14   Island Rail Road you just need to be 50, correct?

15   A.  With 20 years of service.

16   Q.  Right.  Just, again, not to belabor the point, but there is

17   also not only an age distinction, but there is a

18   years-of-service distinction between the two systems, is that

19   accurate?

20   A.  Yes.

21   Q.  Also, another thing with respect to this chart.  How about

22   awareness.  Did your analysis factor in the awareness amongst,

23   for example, the different employees with regard to what their

24   benefits were?  Did you factor that in to your analysis?

25   A.  I don't know what you mean by awareness, but I don't think

1   I factored anything like that into it.

2   Q.  Sure.  For example, Metro-North, you would agree, has a

3   union?  Are you aware of that?

4   A.  Yes.

5   Q.  Are you aware of how many times the union conducted

6   seminars that were informational to their members?

7   A.  I do not know that.

8   Q.  Therefore, you don't know, because you don't know if they

9   conducted these seminars, whether they conveyed the benefit to

10  the various employees, correct?

11  A.  I don't know what they did there.

12  Q.  This chart does not account for that, is that correct?

13  A.  That wasn't a factor in this chart.

14  Q.  With respect to the Long Island Rail Road, did you come to

15  understand that they conducted various seminars to make their

16  members aware of the benefits?  Did you learn that?

17  A.  I am not aware of that.

18  Q.  That is something, since you are not aware of, you don't

19  know whether it factored into the chart that you produced for

20  the government?

21  A.  Yes.  I am not aware of the seminars they maintain.

22  Q.  Now, as part of your investigation, did there come a time

23  that you actually met with Marie Baran to get information on,

24  for example, disability rates of retirement?

25          Do you remember that?

1   A.  I remember meeting with her nine years ago.

2   Q.  So you do remember meeting with her?

3   A.  Yes.

4   Q.  That would have been about 2004?

5   A.  Yes.

6   Q.  In 2004, Ms. Baran was an official at the Railroad

7   Retirement Board.  Would that be accurate?

8   A.  She worked at the Westbury office.

9   Q.  And you went to the Westbury office to meet with her?

10  A.  Yes.

11  Q.  In meeting with her in her capacity you discussed the

12  distinction in the disability rates between the systems, is

13  that accurate?

14  A.  We didn't discuss the rates so much.  We discussed what the

15  requirements were for an RRB disability.

16  Q.  Ms. Baran provided you with information regarding those

17  requirements, is that accurate, at that time?

18  A.  As I recall, yes.

19  Q.  Again, it was pointed out --

20          MR. JACKSON:  And I'm almost done, Judge.

21  Q.  It was pointed out by Mr. Ryan with regard to the age

22  distinctions when he talked to you, do you remember that?

23          MR. WEDDLE:  Objection, your Honor.

24          THE COURT:  Sustained.  Rephrase the question.

25          MR. JACKSON:  Yes, Judge.

D7nnles2                        Murray - cross

1   Q.  When you were speaking with Ms. Baran, were you made aware

2   or did you come to understand that the Long Island Rail Road

3   was different from Metro-North or other railroads because of

4   the age upon which someone could retire?

5   A.  At that point we were only interested in the Long Island

6   Rail Road.

7   Q.  I am not asking you what you were interested in.  I'm

8   asking you, as part of your analysis or investigation, did

9   Ms. Baran give you the indication?

10         MR. WEDDLE:  Objection, your Honor, to the relevance

11  of something that happened in 2004.

12         THE COURT:  Overruled.

13  A.  Repeat the question.

14  Q.  Sure.  You conducted an investigation into this matter, is

15  that right?

16         MR. WEDDLE:  Objection, your Honor.

17         THE COURT:  Sustained.  What matter?

18         MR. JACKSON:  Just laying a foundation.

19  Q.  Judge.  With regard to the chart that you are here to

20  testify today, you did significant research about this, is that

21  right?

22  A.  That was an audit of the Long Island Rail Road pension

23  fund.

24  Q.  And as a result of the audit of the pension fund, it became

25  necessary for you to get all the information that you could.

D7nnles2                        Murray - cross

1    Would that be accurate?

2    A.  To get all the information relevant to the questions we had

3    for her.

4    Q.  You wanted to get information that was relevant so that you

5    could produce accurate information, is that right?

6    A.  Yes.

7    Q.  And have accurate findings?

8    A.  Yes.

9    Q.  And give information that would otherwise --

10              MR. WEDDLE:  Objection, your Honor.

11              THE COURT:  Sustained.  Asked and answered.

12              MR. WEDDLE:  Objection to all of this.

13              Your Honor, objection to anything relating to a

14   separate audit of the pension plan in 2004.  It is irrelevant.

15              THE COURT:  We are trying to get the point.

16   Mr. Jackson, what is the connection?

17              MR. JACKSON:  Yes, Judge.

18   Q.  Were you made aware in your discussions or did it come to

19   your understanding --

20              MR. WEDDLE:  Objection to made aware, your Honor.

21              THE COURT:  Sustained.

22   Q.  Did you acquire an understanding --

23              MR. WEDDLE:  Objection, your Honor.

24              THE COURT:  Overruled.

25              MR. WEDDLE:  801, your Honor.

D7nnles2                           Murray - cross

1          THE COURT:  Overruled.

2   Q.  Did you come to an understanding following your meeting

3   with Ms. Baran as to the issue of age and how it would affect

4   the different railroads?

5          MR. WEDDLE:  Objection, your Honor.  801.

6          THE COURT:  Overruled.

7   A.  I don't recall any discussion on age.

8   Q.  Is there something that I could show you that would refresh

9   your recollection as to that matter?

10  A.  I am not aware of it.  Perhaps.  I don't know.

11  Q.  Before I approach with, of course, your Honor's permission,

12  did, of course, you come to an understanding at that same

13  meeting regarding the issues that were brought up here today

14  regarding service, for example, time?

15         MR. WEDDLE:  Objection, your Honor.  This is hearsay.

16         THE COURT:  Overruled.

17         MR. WEDDLE:  All hearsay.

18         THE COURT:  Overruled.

19  A.  I would have to look at the memo of the meeting.

20  Q.  3524-01, Bates stamped.

21         MR. WEDDLE:  Thank you.

22         MR. JACKSON:  You're welcome.

23  Q.  I would like to just have you look at this document, the

24  first page, History of Railroad Retirement Disability.

25  A.  Yes.

D7nnles2                          Murray - cross

1   Q.  Does that refresh your recollection?

2   A.  Yes, this is the meeting -- the minutes of the meeting or

3   the writeup of the meeting.

4   Q.  Please don't read from it.  It is not in evidence.

5   A.  OK.

6   Q.  But that does refresh your recollection --

7   A.  Yes.

8   Q.  -- as to the issues that I just addressed with you?

9           MR. WEDDLE:  Objection, your Honor, to the form.

10          THE COURT:  Sustained.

11  Q.  You said, yes, it does.

12          MR. WEDDLE:  The objection was sustained, your Honor.

13          THE COURT:  Sustained.

14  Q.  Just regarding this meeting --

15          MR. JACKSON:  Wrapping up, your Honor.

16  Q.  Regarding this meeting, who else was with you, if anyone?

17  A.  Henry Kagan from my office was with me.

18  Q.  And who is Henry Kagan?

19  A.  He was an assistant deputy inspector general at the time.

20  Q.  Could it be, Mr. Murray, that Metro-North disability rates

21  are lower because they retire at age 60 where they are eligible

22  for age and service retirement?

23  A.  If they retired with a service benefit under RRB, they were

24  not included in these disability columns here.

25  Q.  They were not?

D7nnles2                    Murray - cross

1  A.  They were not.  They received a service benefit just like

2  you would get Social Security.

3  Q.  So they are not included in the chart?

4  A.  They are not included in the numbers on disability.

5          MR. JACKSON:  Thank you.

6          THE COURT:  Mr. Weddle.

7  REDIRECT EXAMINATION

8  BY MR. WEDDLE:

9  Q.  Sir, just to finish the thought you were just articulating,

10  are retirees who just got a pension, who just got a retirement

11  pension that worked until age 60, are they included in the

12  column of retirees?

13  A.  They are included in the column of retirees.

14  Q.  Sir, did your interview in 2004 with Marie Baran have

15  anything to do with this case?

16  A.  No.  They are two different topics.

17  Q.  Did any audit of the Long Island Rail Road pension fund,

18  that is, retirement pension, in 2004 have anything to do with

19  this case?

20  A.  It had nothing to do with this investigation.

21  Q.  You have used the term in cross-examination a couple of

22  times, you talked about service retirees.  What does that mean?

23  A.  Under any retirement plan, when you retire at age 55 with

24  30, Metro-North, you get a service benefit.  The same thing

25  with the RRB.  You get a service benefit when you reach age 60

D7nnles2                          Murray - redirect

1    or 62, depending on your years of service and you get a benefit

2    from that.  It's based on -- similar to Social Security.

3              (Continued on next page)

1    Q.  That's just a retirement pension, right?

2    A.  Yes.

3    Q.  It is for people who are just retired?

4           MR. DRATEL:  Objection, your Honor.  Asked and

5    answered.

6           THE COURT:  Asked and answered.

7    BY MR. WEDDLE:

8    Q.  And is a service benefit pension, is that related in any

9    way to a person's health?

10   A.  No, it is not.

11   Q.  And so several of the charts that we were talking about

12   here also talked about people who got disability benefits,

13   right?

14   A.  Yes.

15   Q.  Are those related to a person's health?

16   A.  Yes.

17   Q.  How are those related to a person's health?

18          MR. DRATEL:  Objection, your Honor.  Foundation.

19          THE COURT:  Overruled.

20   A.  They must have a disability and obtain medical

21   certification, so to speak, of that.

22          MR. WEDDLE:  And if we can put on the screen the

23   month-by-month bar chart, Exhibits 23B?  I'm sorry.  23C.

24   Q.  Sir, Mr. Jackson asked you about this document.  And you,

25   in response, gave an answer which was that the financial

D7ndles3                        Murray - redirect

1    effects of retiring later in the year you would expect might

2    have an affect for regular retirements but should not, in your

3    view, have an effect for disability retirements.  Do you

4    remember that answer you gave?

5    A.  Yes.

6    Q.  Why is that?  Can you explain to the jury why in your view

7    there should be no effect based on the time of year if someone

8    is getting -- if someone is disabled?  Why is that?

9              MR. JACKSON:  Objection.

10             THE COURT:  Sustained.

11   Q.  Can you explain the answer that you gave to Mr. Jackson

12   when you said that you wouldn't have expected an effect like

13   this for disabled people?

14             MR. JACKSON:  The same objection.

15             THE COURT:  Overruled.

16   A.  Disability -- when you have a health issue that could occur

17   at any time during a year and if you find yourself no longer

18   able to perform your duties, you can apply for a disability

19   retirement.  So, theoretically, it should occur at any time

20   during the year, whereas with a service benefit you can plan

21   your retirement and retire later in the year.

22   Q.  Now, Mr. Jackson also asked you whether you were required

23   to work 100 days before retiring, and you said, no, you can

24   retire at any point during the year.  Do you remember that?

25   A.  Yes.

D7ndles3                           Murray - redirect

1    Q.  Is there any requirement about when during a year a person

2    can become disabled?

3    A.  No.

4    Q.  Is there any requirement about how old a person has to be

5    in order to become disabled, unable to do their work because of

6    a health condition?

7    A.  No.

8    Q.  Do you remember Mr. Ryan at the close of his questioning,

9    he asked you whether it was fraud that created that problem?

10   Do you remember that?

11   A.  Yes.

12   Q.  And the problem, as he was talking about, was what?

13            MR. DRATEL:  Objection.

14   BY MR. WEDDLE:

15   Q.  Well, sir, do you recall that when he asked you that

16   question about fraud causing a problem, it was after he had

17   asked you a whole series of questions about the funding levels

18   of Long Island Rail Road's pension fund; do you remember that?

19   A.  Yes.

20   Q.  And so does the funding levels of Long Island Rail Road's

21   pension fund, does that have anything to do with the analysis

22   that you did in this case?

23   A.  No.

24   Q.  Sir, is it correct that using your database -- well, can we

25   put on the screen, Ms. Chen, the -- actually, if I might just

D7ndles3                          Murray - redirect

1    have a moment, your Honor?

2                (Pause)

3                I am just taking a second to find the right file on

4    the disc.

5                (Pause)

6                Sir, you were talking about people who had opted out

7    of the MTA's Defined Benefit Plan that you came across?

8    A.   Yes.

9    Q.   Information about those people, it is all on your disc,

10   right?

11   A.   Yes.

12   Q.   All the data sets you used and everyone you came across in

13   conducting your analysis, it is on Government Exhibit 20?

14   A.   Yes.

15   Q.   So anyone who wanted to if they felt there was a

16   significance to those people, they could have pulled that

17   together and analyzed it, right?

18   A.   Yes.

19   Q.   Is it fair to say that your database is a big spreadsheet,

20   right?

21   A.   Yes.

22   Q.   Is it fair to say that you conducted a number of different

23   analyses?

24                MR. JACKSON:   Objection, Judge.

25                THE COURT:   Sustained.

1   Q.  In the course of working with your database, have you, in

2   addition to the charts that have been admitted in evidence,

3   have you also prepared other tables and charts and analyses?

4           MR. JACKSON:  Objection.

5           THE COURT:  Overruled.

6   A.  Yes, I have.

7   Q.  Is it your understanding that all of those draft charts

8   that you prepared were turned over to the defense in this case?

9           MR. DRATEL:  Objection.

10           THE COURT:  Sustained.

11           MR. WEDDLE:  And could we put up Government Exhibit

12   23B?

13   Q.  Now, sir, Mr. Dratel asked you some questions about the

14   retirement available to Metro-North employees; do you remember

15   that?

16   A.  Yes.

17   Q.  And he talked about the fact -- he said that in order to

18   have 30 years of service if you started at the first year at

19   Metro-North Railroad, you would now have your 30 years of

20   service in 2013.  Do you remember that?

21   A.  Yes.

22   Q.  OK.  Why are there any retirees in your Metro-North column

23   for the years 1998 through 2011?

24   A.  These are retirees who retired with less than 30 years and

25   may have taken an early retirement at age 60.  They may have

D7ndles3                              Murray - redirect

1  been age 60 or 65 and taken an early retirement.  At age 60,

2  with a certain number of years, less than 30 but I'm not sure

3  of the exact number, but you can retire at age 60 or 65 with a

4  certain number of years of service.  So there are employees in

5  here, retirees in here like that.

6  Q.  So on your direct testimony, when you say the earliest a

7  person could retire under the Metro-North plan was at age 55

8  and 30 years of service, there are other measurements that

9  would permit you to retire if you were older than 55, is that

10 right?

11 A.  Yes.

12 Q.  And if you take a look -- sorry, Mr. Dratel asked you about

13 somewhat decreasing numbers in 2009, 2010 and 2011, do you see

14 that, at Long Island Rail Road in terms of disability rates?

15 Do you see that?

16 A.  They did come down there.

17 Q.  OK.  What's the lowest rate of any year on this chart, 1998

18 through 2011, for Long Island Rail Road?

19            MR. JACKSON:  Objection, Judge.  The document speaks

20 for itself.

21            THE COURT:  Sustained.

22 Q.  Sir, do you see the number, the disability rate for 2010,

23 is 62 percent for Long Island Rail Road; do you see that

24 number?

25 A.  Yes.

D7ndles3                          Murray - redirect

1    Q.  How does that number compare to the very highest number on

2    the Metro-North disability rate?

3              MR. DRATEL:  The same objection, your Honor.

4              THE COURT:  Overruled.

5    A.  The highest number for Metro-North is 31 percent.

6    Q.  So how does the 31 percent disability rate at Metro-North

7    in 1998 compare with the 62 percent --

8              MR. DRATEL:  Objection, your Honor.

9    Q.  -- disability rate in the 2010?

10             THE COURT:  Sustained.

11             MR. WEDDLE:  I have nothing further, your Honor.

12             THE COURT:  Thank you.

13             Very briefly, Mr. Dratel, because we are going to

14   adjourn.

15             MR. DRATEL:  Thank you, your Honor.

16   RECROSS-EXAMINATION

17   BY MR. DRATEL:

18   Q.  Now, you were asked about the timing.  And theoretically --

19   you said theoretically you wouldn't necessarily expect

20   disability retirements to be later in the years, right, is that

21   correct?

22             MR. WEDDLE:  Objection, your Honor.  That is not what

23   he said.

24             THE COURT:  Sustained.

25   Q.  Well, the transcript will reflect what you said, but, in

D7ndles3                          Murray - cross

1   fact, you didn't do any analysis of that for Metro-North,

2   right, about timing?

3   A.  No, I did not.

4   Q.  Or any other railroad, right?

5   A.  No, no other railroads.

6   Q.  Nor at any other MTA subordinate agency, right?

7   A.  We did not look at any other agencies.

8   Q.  Right.  So there is nothing to compare it to, is there?

9           THE COURT:  Asked and answered.

10  Q.  Now, with respect to -- you talked about age.  You were

11  asked on redirect by Mr. Weddle about age and disability.  Do

12  you consider yourself an expert on disability?

13  A.  No.

14  Q.  Do you think age has anything to do with disability, sir?

15  In other words, as someone gets older, the likelihood of

16  disability might increase?

17  A.  I don't know.

18  Q.  Now, you also know that disability does not equal

19  incapacity, correct?  You know that, right?

20          In other words, an inability to work at all is not

21  necessarily disabled for purposes of pension plans, right?

22  A.  I'm not sure.  This --

23  Q.  So when you answered the question about disability, you

24  really know nothing about disability, correct?

25  A.  I don't know anything about -- yeah, I don't determine who

D7ndles3                          Murray - cross

1   gets disabled.

2   Q.  And you don't know the standard either?

3              MR. WEDDLE:  Objection, your Honor.  He testified

4   about that already.

5   A.  Basically --

6              THE COURT:  Answer the question.

7   A.  Basically, as I understand it, you have to be unable to

8   perform your work at the railroad to be disabled.

9   Q.  That's your understanding?

10  A.  That's my understanding, yes.

11  Q.  OK.  Do you ever get to determine impairment in that

12  regard?

13  A.  No.

14  Q.  So you don't know whether or not you have to be unable to

15  do your job or just impaired in doing your job, right?  You

16  don't know?

17  A.  My understanding, you have to be unable to do your job.

18  Q.  Do you know whether or not an impairment in doing your job

19  is the equivalent of being disabled for these purpose, do you

20  know?

21             MR. WEDDLE:  Objection, your Honor.

22             THE COURT:  Asked and answered.

23  Q.  You were asked by Mr. Weddle about early retirements.

24  Obviously, that factored into your chart; in other words, you

25  don't break them out at all, right?

D7ndles3                        Murray - cross

1   A.  Early retirees are in here --

2   Q.  No, but they are not broken out to separate from those

3   numbers and the charts that are in evidence, right?

4   A.  It's not broken out separately.

5   Q.  And you were asked about early retirements, why people were

6   retiring from Metro-North even though they don't have 30 years

7   of service, right?

8   A.  Yes.

9   Q.  You were asked about why there were any retirees at all.

10          In fact, though, to get a full pension you have to

11  do -- you have to do the 30/55, 30 years of service, 55 years

12  of age, right?

13  A.  That's what's considered a full pension, yes.

14  Q.  That's right.  That's where incentive to retire comes in,

15  when you reach that, correct, for most workers?

16  A.  Yes.  That gives them incentive to retire.

17          MR. DRATEL:  Nothing further, your Honor.

18  RECROSS-EXAMINATION

19  BY MR. RYAN:

20  Q.  Did the comptroller of the Long Island Rail Road, Ken

21  Porcelain, P-o-r-c-l-a-i-n --

22          MR. WEDDLE:  Objection, your Honor.  This is exactly

23  what with we moved on.

24  Q.  -- ever held --

25          THE COURT:  Sustained.  There was no --

1           MR. RYAN:  Can I ask this question, Judge?

2           MR. WEDDLE:  Can we have a sidebar?

3           THE COURT:  There is nothing on the direct related to

4   this individual.

5           MR. RYAN:  The problem questions that Mr. Weddle asked

6   on redirect.

7           THE COURT:  Sustained.

8           MR. RYAN:  That's what I would like to cover.

9           THE COURT:  Sustained.  If you have something that

10  came up in direct?

11          MR. RYAN:  No.  Redirect.

12          THE COURT:  Redirect.

13          MR. RYAN:  Mr. Weddle asked about the problem.

14          THE COURT:  What problem?

15          MR. RYAN:  That's what Mr. Weddle asked the witness,

16  about the problem.

17          MR. WEDDLE:  Your Honor, may we be heard at the

18  sidebar if he is going to ask questions that impact --

19          THE COURT:  Excuse me.  Ask the question, Mr. Ryan.

20  BY MR. RYAN:

21  Q.  Were you, or any member of your audit team, ever told by

22  the comptroller of the Long Island Rail Road that in her

23  opinion the problem was the union contract?

24          MR. WEDDLE:  Objection, your Honor.

25          THE COURT:  Sustained.

D7ndles3                              Murray - recross

1              MR. RYAN:  No further questions.

2     FURTHER REDIRECT EXAMINATION

3     BY MR. WEDDLE:

4     Q.  Sir, you said, on cross-examination by Mr. Dratel just now,

5     that you never calculated the timing of the year that

6     Metro-North people went out on disability, the timing that they

7     retired; do you remember saying that just now?

8              MR. RYAN:  Objection.  Not covered on redirect or

9     cross.

10             MR. WEDDLE:  It was just covered by Mr. Dratel.

11             THE COURT:  It was Mr. Dratel's.

12    BY MR. WEDDLE:

13    Q.  Do you remember that question and answer, sir?

14    A.  Yes.

15    Q.  Do you remember all of the analyses right here sitting at

16    the top of your head that you did with your database?

17    A.  I don't remember all of it, no.

18    Q.  If I show you this document, or may I show --

19             THE COURT:  Yes.

20             MR. WEDDLE:  -- the witness 3524-35?

21             I believe this is one of the ones that Mr. Dratel used

22    to refresh recollection.

23    Q.  Do you see that document, sir?

24    A.  Yes.

25    Q.  Does that refresh your recollection about whether you ever

D7ndles3                         Murray - redirect

1    computed the time of the year that people from Metro-North

2    retired who ended up getting disability?

3    A.  Yes, it does.  Now that I see it, yes.

4    Q.  And do you recall, do you remember, we were talking about

5    90 percent of the people at Long Island Rail Road who went on

6    disability left their employment in the last seven months of

7    the year?

8    A.  Yes.

9    Q.  And is the percentage -- the comparable percentage for

10   Metro-North lower or higher?

11   A.  The Metro-North percentage is lower in the last seven

12   months of the year.

13            MR. WEDDLE:  Thank you.

14            MR. DRATEL:  May I, your Honor?

15            THE COURT:  No.  I'm not going to.

16            Mr. Jackson, I'm sorry, I don't know if I called on

17   you to cross.

18            MR. JACKSON:  You didn't, but I don't feel that -- I

19   just have one question.  Is that OK?

20            THE COURT:  Yes.

21   RECROSS-EXAMINATION

22   BY MR. JACKSON:

23   Q.  Sir, just for clarification, in order to get an

24   occupational disability, can you be working?

25   A.  My understanding is you cannot.

1           MR. JACKSON:  That's it.  Thank you.

2           MR. DRATEL:  Your Honor, just --

3           THE COURT:  One question.

4           MR. DRATEL:  Yes.  Well, I have to approach with it.

5           Do you have the document?  Do you have 3524-35?

6           MR. WEDDLE:  Sorry.

7           MR. DRATEL:  Just the first page.

8           MR. WEDDLE:  That's not what I showed him.

9           MR. DRATEL:  Well, I want to show him the first page.

10    RECROSS-EXAMINATION

11    BY MR. DRATEL:

12    Q.  OK.  So isn't it a fact that Metro-North retirees going out

13    on disability by a factor of at least 25 percent, it looks

14    like, maybe not quite but the largest number -- I'm sorry, the

15    largest number of retirees go out in July, correct?

16    A.  For Metro-North, yes.

17    Q.  13.4 percent go out in July, right?

18    A.  Yes.

19    Q.  And 9.1 percent go out in November, right?

20    A.  Yes.

21    Q.  And 8.9 in August?

22    A.  Yes.

23    Q.  6.9 in September?

24           MR. WEDDLE:  Your Honor, we have no objection to

25    admitting the document if he simply wants to offer it.

D7ndles3                          Murray - recross

1           THE COURT:  Do you wish to offer this document?

2           MR. DRATEL:  Sure.

3   Q.  This is one of your analyses?

4   A.  Yes, it is.

5   Q.  OK.

6           MR. DRATEL:  So I move it, your Honor.

7           THE COURT:  All right.  Admitted without objection.

8           (Government's Exhibit 3524-35 received in evidence)

9           MR. DRATEL:  Thank you.

10          THE COURT:  All right.  You may step down.  You are

11   excused.

12          (Witness excused)

13          THE COURT:  We are going to take the morning break at

14   this point.  It is 11:10.  Return at 11:25.

15          (Recess)

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

D7ndles3                         Murray - recross

1              (Jury not present)

2              MR. WEDDLE:  Your Honor, as I told defense counsel, I

3    e-mailed, Special Agent Cuocci, who is walking to the witness

4    stand right now is our next witness.  Depending on how long she

5    goes, we may have a different witness after her.  We have a

6    witness who is coming into town and won't be here until after

7    the lunch break who it makes most sense to call after her.  But

8    if that witness -- that is Mr. Chirichella.  If he is not here,

9    then we will call -- unless your Honor just wants to break for

10   lunch when she is done.  If Mr. Chirichella is not here, then

11   we will call Mr. Stavola.

12             THE COURT:  All right.  Thank you.

13             When will the issue concerning The New York Times

14   photo and video come up, in connection with whose testimony?

15             MR. WEDDLE:  Let me check, your Honor.

16             (Pause)

17             I mean, I guess if your Honor grants our request and

18   takes judicial notice of the authenticity of the material, then

19   we would just play it at any time.  I think we night play it at

20   the end of our case with a summary witness.  Otherwise, we

21   would have to call a witness and it would depend on scheduling.

22             THE COURT:  I just want to make sure that it is not

23   going to be now so that we have an opportunity to discuss it.

24             MR. WEDDLE:  No.  It is not now.

25             THE COURT:  All right.

1           (Pause)

2           Mr. Weddle, what is your estimate of the testimony of

3    this witness?

4           MR. WEDDLE:  I think it is about 40 minutes, your

5    Honor.

6           THE COURT:  All right.

7           MR. JACKSON:  Judge, just regarding, I guess -- we

8    were just handed over the exhibits I guess that Mr. Weddle is

9    going to use with this witness.  The only objection we have is

10   to 529, which is a letter by me -- 529 and 530, actually.

11          MR. WEDDLE:  Your Honor, I'm sorry.  I may have given

12   an outdated set.  I don't intend to use 529 or 530.

13          THE COURT:  All right.

14          MR. WEDDLE:  Wait.  You know what, I may be wrong.

15   Let me look.

16          (Pause)

17          Your Honor, we do not intend to use 529.

18          (Pause)

19          We reached a stipulation that obviates 529.  We are

20   not going to use it.

21          THE COURT:  All right.

22          MR. JACKSON:  I will withdraw my objection to 530,

23   Judge.  Just 529.

24          THE COURT:  All right.

25          MR. JACKSON:  Thank you, your Honor.

D7ndles3                        Murray - recross

 1            THE COURT:  Any objections as to any of the others

 2   that you are going to introduce, Mr. Weddle?  Any objections as

 3   to any of the others?

 4            MR. WEDDLE:  I am not aware of any, your Honor.

 5            MR. DRATEL:  Your Honor, other than just a limiting

 6   instruction.

 7            THE COURT:  The same issue?

 8            MR. DRATEL:  Yes.

 9            THE COURT:  All right.  We'll make the limiting

10   instruction at the appropriate time.

11            MR. DRATEL:  Thank you, your Honor.

12            MR. JACKSON:  Judge, I believe a statement is being

13   elicited from this witness.  I would again believe that your

14   Honor is following the same protocol.

15            THE COURT:  Yes.  If it is the same issue?

16            MR. JACKSON:  Yes.

17            THE COURT:  The same protocol.

18            MR. JACKSON:  Yes.

19            (Continued on next page)

20

21

22

23

24

25

D7ndles3                          Murray - recross

 1             (Jury present)

 2             MR. WEDDLE:  Your Honor, perhaps we can approach on

 3    Mr. Jackson's last comment?

 4             THE COURT:  What is the issue?

 5             MR. WEDDLE:  Well, the other time there was a

 6    redaction, your Honor.

 7             THE COURT:  Yes.

 8             MR. WEDDLE:  That was because there was a written

 9    statement.  Here there isn't.  So it is handled differently.

10    It is handled in the same manner that the other one was handled

11    but through testimony rather than on a document.

12             THE COURT:  All right.  When we get to that, we will

13    address it.

14             MR. JACKSON:  Thank you, Judge.

15             THE COURT:  Thank you.  Welcome back.

16             All right.  Mr. Weddle.

17             MR. WEDDLE:  Thank you, your Honor.

18             Your Honor, the government calls Special Agent

19    AnnMarie Cuocci.

20             THE COURT:  Swear in the witness.

21     ANNMARIE CUOCCI,

22        called as a witness by the government,

23        having been duly sworn, testified as follows:

24             THE COURT:  Sit down.  Speak into the microphone as

25    closely as you can.

D7ndles3                         Murray - recross

1           State your name and spell it for the record.

2           THE WITNESS:  My name is AnnMarie Cuocci, A-n-n

3    capital M-a-r-i-e C-u-o-c-c-i.

4           THE COURT:  Mr. Weddle.

5           MR. WEDDLE:  Thank you, your Honor.

6    DIRECT EXAMINATION

7    BY MR. WEDDLE:

8    Q.  How are you employed?

9    A.  I am employed as a Special Agent with the Federal Bureau of

10   Investigation.

11   Q.  How long have you been a Special Agent with the FBI?

12   A.  Approximately 22 years.

13   Q.  Have you participated in an investigation of disability

14   fraud by Long Island Rail Road retirees?

15   A.  Yes.

16   Q.  What agency started the investigation?

17   A.  The Railroad Retirement Board Office of Investigations.

18   Q.  When did the FBI join the investigation?

19   A.  In May of 2008.

20   Q.  And what's your understanding of how long before the FBI

21   joined the investigation that the Office of -- that the RRB's

22   investigators were working on the case?

23          MR. DRATEL:  Objection, your Honor.  Foundation.

24          THE COURT:  Overruled.

25   A.  They had been working on it for at least several months

D7ndles3                         Cuocci - direct

1   before they came to us, the FBI.

2   Q.  So for how long had you been working on it before a New

3   York Times article came out about the issue?

4   A.  Well, we had started in May and so several months.

5   Q.  During what period of time were you assigned to the case,

6   from May 2008 until when?

7   A.  I was assigned from May 2008 'til approximately May or June

8   or so of 2010.

9   Q.  And in September 2008, did you participate in an interview

10  of Marie Baran, the defendant?

11  A.  Yes.

12  Q.  What was the date of the interview?

13  A.  September 24, 2008.

14  Q.  Why did the investigators decide to interview Marie Baran

15  on that day?

16  A.  An article had come out from the New York Times, and we had

17  decided to go out and interview several witnesses.

18  Q.  And who conducted the interview of Marie Baran?

19  A.  It was myself and Special Agent Louis Rossignuolo of the

20  Office of Inspector General with the RRB.

21  Q.  Where did you go to talk to Marie Baran?

22  A.  We went to her residence.

23  Q.  What time of day did you go to her house?

24  A.  It was late afternoon.

25  Q.  Was her husband home when you were there?

D7ndles3                          Cuocci - direct

1    A.  No.

2    Q.  What happened when you first arrived?

3    A.  We had identified ourselves as agents and asked if we could

4    talk to her.

5    Q.  What did you tell her about what you wanted to talk to her

6    about?

7    A.  We told her that we were looking into allegations of fraud

8    regarding occupational disability on the Long Island Rail Road.

9    Q.  And about how long were you there at her house?

10   A.  We were there about 45 minutes.

11   Q.  After you identified yourself and told her what you wanted

12   to talk to her about, what happened?

13   A.  She invited us in.

14   Q.  To where?

15   A.  Into her house, in her living room.

16   Q.  OK.  And in the course of the discussion with her, did she

17   tell you that she got paid by Long Island Rail Road employees

18   to do anything?

19   A.  Yes.  She did.

20   Q.  What did she say she got paid to do for Long Island Rail

21   Road employees?

22   A.  She said that she got paid to help them fill out Railroad

23   Retirement Board forms and that she was a consultant.

24   Q.  And what kind of forms did you understand her to be talking

25   about?

D7ndles3                          Cuocci - direct

1   A.  Forms for relating to occupational disability.

2   Q.  What did she say about any authorizations that her clients

3   gave her?

4   A.  She said that her clients would sign a release that allowed

5   her to act on their behalf with the Long Island Rail Road

6   benefits office and the Railroad Retirement Board offices as

7   well as doctors.

8   Q.  Did you or Special Agent Rossignuolo ask her about whether

9   she reports her income for this work to the IRS?

10  A.  Yes.

11  Q.  How did she respond when she was asked about her tax

12  reporting?

13  A.  She said that any money that she made as a consultant was

14  between her and the IRS.

15  Q.  What was her demeanor when she said that?

16  A.  She got agitated at that point.

17  Q.  What did Marie Baran say about her husband's status?

18  A.  That he was a former Long Island Rail Road worker and that

19  he was currently on --

20          MR. JACKSON:  Your Honor, objection, as to her

21  husband.

22          THE COURT:  Overruled.

23  Q.  You can continue, Special Agent Cuocci.

24  A.  That he was a former Long Island Rail Road worker and that

25  he was currently on occupational disability.

D7ndles3                           Cuocci - direct

1  Q.  Do you recall whether she specified occupational disability

2  or just said disability?

3  A.  I think it was -- I think it was occupational disability.

4         MR. WEDDLE:  May I have a moment, your Honor?

5         (Pause)

6  Q.  But you don't recall for sure, sitting here today?

7  A.  I don't.

8  Q.  I'm handing you Government Exhibit 3517-02.

9         If you could read the sentence that I've put an arrow

10 next to?

11 A.  "Baran" --

12 Q.  No.  Just read it to yourself, ma'am.

13 A.  OK.

14        (Pause)

15 Q.  May I look at the document?

16 A.  There is a page missing.

17 Q.  Oh.  I think it is double-sided.

18        (Pause)

19        This one is double-sided (handing).

20        (Pause)

21        MR. WEDDLE:  Actually, your Honor.  We are just going

22 to skip this part.

23 Q.  What did Marie Baran say was the cause of her husband's

24 disability?

25 A.  A bad back.

D7ndles3                          Cuocci - direct

1   Q.  What did Marie Baran say about how her husband spends his

2   time?

3   A.  She said that he played golf every week.

4   Q.  At the close of the interview, did you give anything to

5   Marie Baran?

6   A.  Yes.  We served her with a federal Grand Jury subpoena.

7   Q.  Calling for what, generally?

8   A.  For any and all documents that she would have had in her

9   possession regarding the RRB and the Long Island Rail Road and

10  her consulting business.

11  Q.  Did there come a time that you visited Marie Baran's office

12  space at a union office?

13  A.  Yes.

14  Q.  What union was it?

15  A.  It was the Transportation and Communications Union, TCU.

16  Q.  I'm sorry?

17  A.  It's known as TCU.

18  Q.  What did you ask for when you went to the TCU offices?

19  A.  We had asked for a computer.

20  Q.  And what kind of computer did you ask for?

21  A.  It was a computer that Marie Baran had used in their

22  offices.

23  Q.  And what did you get in response to that request?

24  A.  A computer tower, yes.

25  Q.  Who owned the computer, as you understood it?

D7ndles3                          Cuocci - direct

1    A.  The TCU.

2    Q.  And what did you do with the computer you got?

3    A.  I brought it back to our offices and provided it to agents

4    that are computer analysis experts.

5    Q.  And what did the computer analysis experts do with that

6    computer, generally speaking?

7    A.  They mirror-imaged the drive.

8    Q.  And did the computer analysis team give you access to the

9    contents of the drive?

10   A.  Yes.

11   Q.  And what did you and other investigators on the case then

12   do with respect to the contents of that computer?

13   A.  We reviewed the contents.

14   Q.  And did you identify certain files that you wanted

15   extracted?

16   A.  Yes.  We bookmarked certain files.

17   Q.  And after you bookmarked them, what did the computer

18   analysis team do with respect to the ones you had bookmarked?

19   A.  They loaded them onto a CD for us.

20   Q.  And did that process alter the metadata of the files, like

21   the names of the files or the dates modified?

22   A.  No.

23   Q.  If you could take a look in front of you, there should be a

24   disc there which is called Government Exhibit 502B, as in boy.

25   Do you have that one?

D7ndles3                         Cuocci - direct

1    A.  Yes.

2    Q.  Have you gone back and compared the contents of this disc

3    that you are holding in your hand with the original hard drive

4    that you received from the TCU offices?

5    A.  Yes.

6    Q.  And Special Agent Cuocci, how do you recognize that this is

7    the disc you did that with?

8    A.  My initials are on it and the date that I had reviewed it.

9    Q.  Are all the files on Government Exhibit 502B, are they all

10   from the TCU hard drive?

11   A.  Yes.

12   Q.  And is the metadata, the dates that we talked about a

13   minute ago, is that the same as what was on the original

14   mirror-image hard drive?

15   A.  Yes.

16           MR. WEDDLE:  The government offers 502B, your Honor.

17           MR. JACKSON:  Without objection.

18           THE COURT:  Admitted without objection.

19           MR. WEDDLE:  Thank you, your Honor.

20           (Government's Exhibit 502B received in evidence).

21   Q.  Did there come a time that you also received material from

22   a Marie Baran e-mail account?

23   A.  Yes.

24   Q.  Where did you receive that e-mail account material from?

25   A.  We had obtained the e-mail account from looking through

D7ndles3                          Cuocci - direct

1   certain documents from the TCU computer.

2   Q.  Where do you get actual e-mails from?

3   A.  At Excite.com.

4   Q.  And what is Excite.com?

5   A.  It's an Internet provider of e-mail.

6   Q.  And how did you get those materials from Excite.com?

7   A.  We had served them with a search warrant for e-mails.

8   Q.  And then did you conduct a search of their systems, or what

9   happened?

10  A.  No.  They did, and they provided to us the information on a

11  CD.

12          MR. WEDDLE:  Your Honor, at this point I would offer

13  and read, I guess, portions of a stipulation, Government

14  Exhibit 1606.

15          THE COURT:  All right.

16          MR. WEDDLE:  The stipulation says that it's stipulated

17  by the parties that:

18          "If called as a witness, a representative of

19  Excite.com would testify that Excite.com is a provider of

20  e-mail services.  That is, subscribers are provided e-mail

21  addresses with which they can send and receive e-mails over the

22  Internet.

23          "mbaran7@excite.com is an Excite.com e-mail address

24  subscribed to Marie Baran, the defendant.

25          "Government Exhibit 500 is a compact disc containing

D7ndles3                    Cuocci - direct

1    true and correct copies of electronic mail messages from Marie

2    Baran's e-mail account, mbaran7@excite.com.  The contents of

3    Government Exhibit 500 are maintained by Excite.com in the

4    ordinary course of business.  These e-mail messages contain

5    date sent information that is automatically created by Excite's

6    computer system.  It is a regular practice for Excite.com's

7    systems to make and keep 'metadata' such as the dates for

8    e-mails sent and received by Excite.com users, as well as the

9    metadata (such as date created or modified) for underlying

10   documents attached to e-mails."

11          And then, your Honor, the stipulation is in evidence.

12   I don't think we need to read paragraph 2 because it has

13   already been covered with respect to 502B.

14          And then paragraph 3 says:

15          "If called as a witness, a representative of the TCU

16   would testify that he voluntarily provided a TCU computer used

17   by Marie Baran to Special Agent AnnMarie Cuocci."

18          Your Honor, at this time I would offer --

19   Q.  Special Agent Cuocci, do you see in front of you a disc

20   called Government Exhibit 500?

21          MR. JACKSON:  Judge, I'm sorry.  I don't mean to

22   interrupt.  Before Mr. Weddle goes on, I confirm that that was

23   a stipulation that I signed and that was actually read into the

24   record.

25          MR. WEDDLE:  Thank you.

D7ndles3                          Cuocci - direct

1              THE COURT:  Admitted as stipulated.

2    BY MR. WEDDLE:

3    Q.  So Government Exhibit 500, do you see that in front of you,

4    Special Agent Cuocci?

5    A.  Yes.

6    Q.  That is the disc that we just talked about, or the

7    stipulation that we just talked about?

8    A.  Yes.

9              MR. WEDDLE:  We offer Government Exhibit 500.

10             THE COURT:  Admitted without objection.

11             (Government's Exhibit 500 received in evidence)

12             MR. WEDDLE:  And then if I could read some more

13   portions of the stipulation?

14             "Government Exhibit 504 is a true and correct copy of

15   a payment leger created and maintained by Marie Baran, the

16   defendant, listing names and payment amounts for individuals

17   who hired Baran in connection with their Railroad Retirement

18   Board disability annuity applications.  Government Exhibit 504

19   was produced to the government on or about October 31, 2008 in

20   response to a subpoena."

21             Finally, your Honor, "Government Exhibit 502A is a set

22   of RRB forms, AA1-D and G-250 completed by Marie Baran and

23   produced to the government in the original electronic format on

24   or about October 31, 2008 in response to a subpoena."

25             And based on the stipulation, your Honor, we would

D7ndles3                         Cuocci - direct

1    offer Government Exhibit 504 and the disc, which is 502A?

2              MR. JACKSON:  Again, Judge, accurately read.  No

3    objection.

4              THE COURT:  Admitted without objection.

5              (Government's Exhibits 504 and 502A received in

6    evidence)

7    BY MR. WEDDLE:

8    Q.  And Special Agent Cuocci, do you have in your binder a

9    chart which is Government Exhibit 527?

10   A.  Yes, I do.

11   Q.  What is Government Exhibit 527?

12   A.  It's a chart that contains records that are on the prior

13   three discs that we just spoke about.

14   Q.  And, actually, would you take a look at 528 also?  Do you

15   see that?

16   A.  Yes.

17   Q.  So 528 is an index of e-mails that are on the e-mail disc,

18   right?

19   A.  Yes, it is.

20   Q.  And 527 is an index of the files on the other two discs,

21   right?

22   A.  That is correct.

23   Q.  And did you go back and check the information in these two

24   indexes against the contents of the disc?

25   A.  Yes, I did.

1           MR. WEDDLE:  Your Honor, the government offers the two

2    indexes, 527 and 528.

3           MR. JACKSON:  Again, Judge, without objection.  Thank

4    you.

5           THE COURT:  Admitted without objection.

6           (Government's Exhibits 527 and 528 received in

7    evidence)

8           THE COURT:  Mr. Weddle, can we confirm whether there

9    are objections to any of the documents in the binder that you

10   distributed?

11          MR. WEDDLE:  I don't believe that there are any, your

12   Honor.

13          THE COURT:  All right.  Just read the numbers into the

14   record, and we need not go through them one by one.

15          MR. WEDDLE:  So we've already covered 504 and 528.

16          The other numbers are 500A, 500B, 500C, 500D, 502B1,

17   502B2, 502B3, 502B4.  We are skipping 529, we are not offering

18   that.

19          MR. JACKSON:  May I approach, Judge, and just check

20   the board?

21          THE COURT:  Yes.

22          (Pause)

23          MR. WEDDLE:  So there is no objection, I'm told, to

24   any of the ones that I just read, your Honor.

25          THE COURT:  All right.  All of those are admitted

D7ndles3                         Cuocci – direct

1    without objection.

2              THE WITNESS:  Excuse me.  The document for 528, it's

3    in the folder for 528.  It is just missing the sticker.

4              MR. WEDDLE:  OK.  We can correct that at the break,

5    your Honor.

6              THE COURT:  All right.  Proceed.

7              (Government's Exhibits 500A, 500B, 500C, 500D, 502B1,

8    502B2, 502B3, 502B4 received in evidence)

9              MR. WEDDLE:  So let's take a look at 502B1.  If you

10   could display that on the screen?

11   Q.  Special Agent Cuocci, 502B1 is a document from the TCU

12   computer, is that right?

13             (Pause)

14             It relates to Navin Patel?

15   A.  Yes.

16   Q.  The letter at the top says "Marie Baran Retirement

17   Consultant TCU Offices."  Do you see that?

18   A.  Yes.

19   Q.  Then it is giving information -- it looks like it is giving

20   information to someone named Navin Patel about an appointment,

21   right?

22   A.  Yes.

23   Q.  It talks at the bottom about cash payment for services,

24   right?

25   A.  Yes.

D7ndles3                         Cuocci - direct

1   Q.  Then let's look at the second page.

2           And if we could blow up the part that is already

3   highlighted.

4           And the second page of this document, it says, "Call

5   Dr. Peter Ajemian, at 516-536-6800, ask for Maria -- tell them

6   that you are retiring from LIRR and are working with Marie

7   Baran.  Get the earliest possible appointment."

8           Do you see that?

9   A.  Yes.

10  Q.  And the date of the appointment on page 1 is August 19,

11  2008, right?

12  A.  Yes.

13  Q.  From your index of the records, can you tell us what the

14  modified date is, that is, the last date that this computer

15  file was modified?

16  A.  July 29, 2008.

17  Q.  What is your understanding of date last modified on a

18  computer file in terms of metadata?  What does that mean, in

19  general terms?

20  A.  I believe it was the last time that that document was

21  changed or worked on.

22  Q.  And then let's take a look at Government Exhibit 500C, like

23  Charlie.

24          500C -- and if you could blow that up.  So the first

25  page of 500C is one of the e-mails that comes from the Excite

D7ndles3                        Cuocci - direct

1    e-mail account, right?

2    A.  Yes.

3    Q.  And what's the date -- I'm sorry, the e-mail is from

4    mbaran7@excite.com to where?

5    A.  To mbaran7.mbaran7@roc2@bluetie.com.

6    Q.  And the subject is?

7    A.  Patel, Navin, AA-1D and G-251.

8    Q.  And what is the date of the e-mail?

9    A.  The date of the e-mail is September 2, 2008.

10   Q.  And the e-mail has documents attached to it, right?

11   A.  Yes.

12   Q.  In the printout we have here, it is just one of the

13   documents, right, which is the second page?

14   A.  Yes.

15   Q.  All right.  The second and subsequent pages, right?

16   A.  Yes.

17   Q.  So this is -- what is this -- generally speaking, what is

18   this document?

19   A.  This is a Form AA1-D.

20   Q.  OK.  And if you take a look -- and it relates to Navin

21   Patel, right?

22        MR. WEDDLE:  Can we blow up, Ms. Larson, the bottom

23   half of the first page?

24   A.  Yes.

25   Q.  Then if you take a look at the next page, what does this

1   document say about the date that Navin Patel can no longer work

2   because of a medical condition?

3   A.  September 30, 2008.

4   Q.  So how long after this document was sent by e-mail between

5   Marie Baran's e-mail accounts is that predicted date of

6   disability?

7   A.  28 days.

8   Q.  If we could take a look at page 3 of this document?  I'm

9   sorry, I guess it is page 4 of the exhibit.

10          And do you see -- can you blow up the part -- can you

11  just blow up the top half of the page?

12          So in this section it asks for information about

13  medical institutions where you've received treatment.  Do you

14  see that?

15  A.  Yes.

16  Q.  And it's basically blank in terms of where any kind of

17  tests or visits took place, right?

18  A.  Yes.

19  Q.  What's filled in in terms of the type of testing on this

20  form?

21  A.  Certain medical tests are filled in here.  It says, "MRI

22  of, MRI of, EMG and NCV of both upper extremities.  EMG and NCV

23  of both lower extremities."

24  Q.  If you take a look -- I ask you to take a look at the next

25  page.  There is an entry relating to a doctor at the top.

D7ndles3                              Cuocci - direct

1    A.  Yes.

2    Q.  Who is the doctor?

3    A.  Dr. Peter Ajemian.

4           MR. WEDDLE:  Ms. Larson, can we just show a little bit

5    more of this page?  I.

6    Q.  Just want to point out, there are no dates of service,

7    right?

8    A.  No, there isn't.

9           MR. WEDDLE:  And then if we take a look at the next

10   page.  And could you blow up questions 24 through 26.

11   Q.  So 24 says, "Enter the name of the medical doctor who

12   imposed the restriction."  Do you see that?

13   A.  Yes, I do.

14   Q.  And it says who?

15   A.  Dr. Peter Ajemian.

16   Q.  And then the restriction is what, as reflected in this

17   document e-mailed about a month earlier, or, I mean, e-mailed

18   at the beginning of September?

19   A.  "No pushing, pulling, lifting, bending, climbing, or

20   stretching.  Sitting, walking, or standing for extended periods

21   should be avoided."

22          MR. WEDDLE:  Then if you take -- can we take a look at

23   the next page and blow up Section 6?

24   Q.  And Section 6 has a bunch of check boxes about activities

25   of daily living, right?

1129

D7ndles3                         Cuocci - direct

1    A.  Yes.

2    Q.  And in Section 6 there is explanations, right, and the

3    explanations talk about why things are hard, right?

4    A.  Yes.

5    Q.  And so just to save time, in summary form, the check boxes

6    here indicate that for Patel, according to this document from

7    Marie Baran's e-mail, sitting, standing, walking, bathing,

8    dressing, other bodily needs, indoor chores, outdoor chores,

9    driving motor vehicle, and using public transportation are

10   hard?

11   A.  Yes.

12   Q.  Now, if you could take a look at question 40.

13              MR. WEDDLE:  And if we could blow that up?

14   Q.  So for this document, the activities of a normal day are

15   filled out as, "I sleep very poorly because of neck pain and

16   lower back pain.  I get up about 7 a.m.  I have breakfast,

17   shower, and dress.  I do some light exercise to stretch as

18   prescribed by my doctor.  Sometimes I do laundry or light

19   housework that doesn't require any bending or reach or lift.  I

20   rest in the afternoon and take a short nap.  I have lunch at

21   home alone, and read books or magazines.  Evenings I have

22   dinner at home with my family and watch TV.  Occasionally I

23   visit with friends or family."

24              Do you see that?

25   A.  Yes.

D7ndles3                          Cuocci - direct

1   Q.  Now let's turn to Government Exhibit 500D.

2            THE COURT:  Before you go into this document, let me

3   come back to the limiting instruction that I gave to the jury

4   yesterday in connection with the testimony of at least two

5   witnesses who made references to statements and conduct of

6   Dr. Ajemian that was referred to in some similar documents.

7            Insofar as that evidence was permitted, it was

8   permitted with regards to the charges the government has

9   brought here today against Ms. Baran, and they are not to be

10  used in any way or to draw any inferences or conclusions about

11  the charges against Dr. Ajemian -- I'm sorry, as against

12  Dr. Lesniewski.

13           Mr. Weddle.

14           MR. WEDDLE:  Thank you, your Honor.

15  BY MR. WEDDLE:

16  Q.  So if you take a look at 500D, as in David.

17           So this is an e-mail sent from a Marie Baran Excite

18  address to another Marie Baran Excite address, right?

19  A.  Yes.

20  Q.  And it is September 4, 2008, right?

21  A.  Yes.

22  Q.  And it contains an attachment, right?

23  A.  Yes.

24  Q.  What is the attachment?

25  A.  "AAA-1D BLANK.pdf."

D7ndles3                        Cuocci - direct

1    Q.  If you turn to the next page of the paper copy you have

2    there, the attachment is there, right?

3    A.  Yes.

4                MR. WEDDLE:  Can we blow up the bottom of the first

5    page?

6    Q.  And it is blank in terms of who it relates to, right?

7    A.  Yes.

8    Q.  Let's take a look at page 2, question 12.

9                Although it is blank of who it relates to, it says,

10   "The physical requirements of my job are such that I can no

11   longer perform them without severe pain.  I have pain and

12   discomfort when I am pushing, pulling, lifting, carrying,

13   bending, climbing or stretching.  Any walking or sitting or

14   extended periods of time causes me pain and discomfort."

15               Do you see that?

16   A.  Yes.

17   Q.  And then can we skip ahead, I guess, three pages.  So this

18   would be page, I guess, 5.  It should be "Name of Physician,"

19   question 19 at the top, and "Dates of Service."

20               Blank, right?

21   A.  Yes.

22   Q.  Then if you take a look at the next page, question 26.

23               Although the physician is blank, it says there is a

24   medical restriction, right?

25   A.  Yes.

D7ndles3                              Cuocci - direct

1   Q.  And the restriction is no pushing, pulling, lifting,

2   bending, climbing or stretching.  Sitting, walking or standing

3   for extended periods should also be avoided."

4           Do you see that?

5   A.  Yes.

6   Q.  Now, if you please take a look at the next page, Section 6,

7   and blow that up.

8           Once again, there are a bunch of check boxes, right?

9   A.  Yes.

10  Q.  And explanations about different activities causing pain or

11  severe pain and discomfort; do you see that?

12  A.  Yes.

13  Q.  And in this blank form there is no person identified.  This

14  form says it is for this person, "Sitting, standing, walking,

15  bathing, dressing, other bodily needs, indoor chores, outdoor

16  chores, driving a motor vehicle" are all what?

17  A.  Hard.

18  Q.  Now, if we take a look at the next page, take a look at

19  question 40 of this blank form.

20          The activities of a normal day are described as "I

21  sleep very poorly because of neck pain and lower back pain.  I

22  get up about 7 a.m.  I have breakfast, shower, and dress.  I do

23  some light exercise to stretch as prescribed by my doctor.

24  Sometimes I do laundry or light housework that doesn't require

25  I bend or reach or lift.  I rest in the afternoon and take a

1    short nap.  I have lunch at home alone, and read books or

2    magazines.  Evenings I have dinner at home with my spouse and

3    watch TV.  Occasionally I visit with friends or family."

4              Do you see that?

5    A.  Yes.

6    Q.  Now, if we take a look at 502B2.  And, actually, my

7    mistake, 500B and 502B3.

8              Do you see the two of those go together, right?

9    A.  Yes.

10   Q.  And 500B is the e-mail, right, from Marie Baran to Marie

11   Baran?

12   A.  Yes.

13   Q.  And the date is what?

14   A.  Tuesday, June 17, 2008.

15   Q.  And it relates to Neville Simpson, right?

16   A.  Yes.

17   Q.  And then the other document is one of the attachments to

18   the application, right?

19   A.  Yes.

20   Q.  So as of June 17, 2008, the date that Marie Baran e-mailed

21   this attachment to herself, what was the date the attachment

22   says Neville Simpson could no longer work because of a medical

23   condition?  Do you see that on page 2?

24   A.  October 31, 2008.

25   Q.  So how far in advance -- or when she e-mailed this, the

D7ndles3                         Cuocci - direct

 1  October 31st date on which Neville Simpson could no longer work

 2  is how far in the future?

 3  A.  About four months.

 4  Q.  And let's now take a look at 502B2.

 5          MR. WEDDLE:  And I'm sorry, your Honor.  I have my

 6  exhibits a little out of order.

 7  Q.  And 500A.

 8          So the same kind of thing, right?

 9  A.  Yes.

10  Q.  We have an e-mail, which is 50DB2, from Marie Baran to

11  Marie Baran, dated March 5, 2008?

12  A.  Yes.

13  Q.  With attachments related to John Riddle, right?

14  A.  Yes.

15  Q.  Then 500A is one of the attachments in the application

16  relating to the one you read?

17  A.  Yes.

18  Q.  So when Marie Baran e-mailed this document to herself, what

19  was the date the attachment said Riddle could no longer work

20  because of a medical condition?

21  A.  October 31, 2008.

22  Q.  How far in advance -- or how far in the future was that at

23  the time that Marie Baran e-mailed this to herself?

24  A.  About seven months.

25  Q.  And then let's take a look at -- actually, your Honor, may

D7ndles3                          Cuocci - direct

1    I have a moment to consult with Mr. Jackson?

2                THE COURT:  Yes.

3                (Pause)

4    Q.  Special Agent Cuocci, you testified earlier about

5    documents -- about giving Marie Baran a subpoena.  Do you

6    recall that?

7    A.  Yes.

8    Q.  Can you take a look at these documents I have just handed

9    you that are marked B1 through B5.

10               (Pause)

11               As far as you can recall it, do those documents look

12   like things that were or were not produced in response to the

13   subpoena?

14   A.  Were not.

15   Q.  And let me hand you government -- I mean, I'm sorry, a

16   document that's been marked B4.

17               MR. WEDDLE:  I am not offering those documents, your

18   Honor.

19   Q.  B4, had you ever seen B4 before?

20   A.  No.

21               MR. WEDDLE:  And if we could just display Government

22   Exhibits 504, which is in evidence.

23               If we could blow up the top half of the page.

24               Your Honor, this was one of the documents referred to

25   in the stipulation as having been produced in response to the

1    subpoena.

2              THE COURT:  OK.

3              MR. WEDDLE:  And it is described in the stipulation as

4    a payment ledger.

5              THE COURT:  Yes.

6    BY MR. WEDDLE:

7    Q.  Can you just read the top entry on this document, Special

8    Agent Cuocci?

9    A.  "1/5/2007, Walsh 1200."

10   Q.  And now if we could take a look at Government Exhibit 530.

11             Is 530 a document that was produced in response to the

12   subpoenas?  Do you recall that?

13   A.  Yes.

14   Q.  And it is a blank form, and it just says, "I hereby

15   authorize the Railroad Retirement Board to release any

16   requested information about me to Marie Baran."

17             Do you see that?

18   A.  Yes.

19   Q.  And if we take a look, finally, at Government Exhibit

20   502B4.

21             502B4 comes from where, do you recall?

22   A.  Yes.  The TCU computer.

23   Q.  And can you just read it to the jury?

24   A.  Yes.

25             "Marie Baran, Railroad Retirement Disability

D7ndles3                          Cuocci - direct

1     Specialist & Retirement Consultant.

2                   "Congratulations and best wishes for a happy and

3     healthy retirement to the United Transportation Union 2007

4     retirees.

5                   "Tell No. - 516-536-8281.

6                   "Fax - 516-536-3860

7                   "Email: Mbaran7@excite.com."

8                   MR. WEDDLE:  Thank you.

9                   Nothing further, your Honor.

10                  THE COURT:  Mr. Jackson.

11                  MR. JACKSON:  Yes, your Honor.

12                  THE COURT:  How long do you think you would need?

13                  MR. JACKSON:  I'll be done before lunch, Judge, with

14    the witness.

15                  THE COURT:  How do you know when lunch is?

16                  MR. JACKSON:  Presuming it is 1 o'clock, but if it is

17    earlier, obviously I am guided by you, Judge, your Honor.

18                  THE COURT:  All right.  If it is 1 o'clock, then you

19    will be done by 1 o'clock.

20                  MR. JACKSON:  If not earlier.

21                  THE COURT:  If not earlier.

22                  MR. JACKSON:  Thank you, your Honor.

23    CROSS-EXAMINATION

24    BY MR. JACKSON:

25    Q.  Is it Ms. Cuocci?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7ndles3                      Cuocci - cross

1    A.  Yes.

2    Q.  How are you?  I'm Joey Jackson.

3         Now, I first want to visit the statement.  You

4    mentioned that you went and you visited Ms. Baran at her home;

5    is that accurate?

6    A.  Yes.

7    Q.  And at the time that you visited her at her home, you asked

8    her certain questions concerning this whole disability issue.

9    Would that be accurate, too?

10   A.  Yes.

11   Q.  And without telling us anything that was said, she was

12   responsive to your questions?

13   A.  Yes.

14   Q.  And, in fact, invited you in, and you had a discussion in

15   her living room, is that right?

16   A.  Yes.

17   Q.  And you met for I think you said about 45 minutes, is that

18   right?

19   A.  Yes.

20   Q.  And following that, you just got up and you left and that

21   was it, correct?

22   A.  We had served a subpoena and then we left.

23   Q.  OK.  And just with regard to the subpoena, was that served

24   that day, was it served the following day?  If you could

25   recall.

D7ndles3                              Cuocci - cross

1   A.  My recollection is that we served it before we, you know,

2   when we were leaving.

3   Q.  And, in fact, I think Mr. Weddle asked you about certain

4   portions of the conversation that you had, and you gave the

5   responses that Ms. Baran gave you, is that right?

6   A.  Yes.

7   Q.  OK.  And throughout the course of that conversation, it

8   would be fair to say that Ms. Baran was corporative, is that

9   accurate?

10  A.  Yes.

11  Q.  She was responsive to your concerns?

12  A.  Yes.

13  Q.  And it wasn't only you, I think you were with someone else,

14  is that right?

15  A.  Yes, Agent Rossignuolo.

16  Q.  So she was responsive not only to you but to him as well,

17  is that accurate?

18  A.  Yes.

19  Q.  OK.  Now, with regard to, with the government's help and

20  the Court's permission, of course, if I could just have you put

21  up 502B1?

22          Now, beyond the statement, there came a time that I

23  think you went and you said you got information from her

24  computer, is that true?

25  A.  Yes.

1    Q.  And in getting information from the computer, that was

2    without notice to Ms. Baran; would that be accurate?

3    A.  Yes.

4    Q.  And when I say "without notice," you didn't say, hey,

5    listen, I'm coming tomorrow to get your computer from you, did

6    you?

7    A.  We didn't approach her to get the computer.  We went to the

8    TCU.

9    Q.  So she had nothing to do with you going and getting the

10   computer or otherwise assisting you; that's something you did

11   on your own, is that right?

12   A.  Yes.

13   Q.  And she would have no knowledge that you were going to do

14   that, correct?

15   A.  I wouldn't know if she had knowledge if we were going to or

16   not, but we went independent of her.

17   Q.  OK.  You didn't inform her, for example, when she invited

18   you into her living room for a discussion, that tomorrow we're

19   going to the TCU offices, right?

20   A.  Yes.

21   Q.  OK.  No, you didn't inform her, or yes in response to my

22   question?

23            No, you didn't inform her of that, is that right?

24   A.  That's correct.

25   Q.  OK.  And you in fact went and you executed the subpoena,

D7ndles3                         Cuocci - cross

1  and you got documents from her computer, is that fair?

2  A.  It wasn't a subpoena.  It was --

3  Q.  A search warrant?

4  A.  I'm sorry.  No.  It was voluntarily given to us by the TCU.

5  Q.  So there was no issue there.  The TCU went and they just

6  handed over the computer that was in the office, is that right?

7  A.  The one that they identified Marie Baran as using.

8  Q.  And that's one that Ms. Baran was using, as far as you

9  know, at the TCU offices, is that right?

10  A.  Yes.

11  Q.  And Mr. Weddle asked you a number of questions concerning

12  what you extracted from that computer, correct?

13  A.  Yes.

14  Q.  And I want to have a discussion with you now about those

15  items.  OK?

16  A.  OK.

17          MR. JACKSON:  OK.  Now, regarding 502B1, If we could

18  just take a look at the -- if you could just blow it up a

19  little bit more.

20          Thanks you much.  A little bit more, please.

21          Maybe we could focus on the first half of it for the

22  time being.  OK.

23  Q.  Now, this is a document that related to Mr. Navin Patel

24  that you got from her computer, is that right?

25  A.  Yes.

D7ndles3                        Cuocci - cross

1    Q.  This was something that she apparently was informing him

2    that he had an appointment on this date, August 19th of 2008,

3    fair?

4    A.  Yes.

5    Q.  It gives the time of 1 o'clock, correct?

6    A.  1:30.

7    Q.  Sorry.  1:30.  And, in fact, it alerts him of what items

8    would be necessary for him to bring, is that right?

9    A.  Yes.

10          MR. JACKSON:  OK.  And if you could just show the full

11   page at this point and make it a little bit bigger.  Thank you.

12   A little bit more, pretty please.

13   Q.  All right.  So that lists the various items, as we've

14   discussed, that Mr. Patel was to bring to that meeting.

15          Now, in your evaluation of this document, it would be

16   fair to say, would it not, that Ms. Baran is not giving any

17   guarantees to Mr. Patel as to whether he would get the benefit,

18   is that right?

19   A.  This document just lists out what he needs to bring.

20   Q.  Right.  There is no indication on this document that if you

21   come to me, Ms. Marie Baran, I guarantee you I'd get you a

22   disability benefit, is that right?

23   A.  I don't think I can determine that from the document.  It

24   just lists --

25   Q.  Take a look and see.  Is there anything on there that says

D7ndles3                          Cuocci - cross

1    I guarantee you a disability benefit for coming to me?

2    A.  I think it lists when his appointment is and what he needs

3    to bring.

4    Q.  Correct.  It doesn't list anything about her --

5               THE COURT:  Asked and answered.

6               MR. JACKSON:  Yes.

7    Q.  With regard to payment, is there anything on this

8    particular document that conditions payment upon the actual

9    getting that disability benefit?

10   A.  The document just says that he needs to bring cash payment

11   for services, $200.

12   Q.  And do you know whether that $200 would refer to, for

13   example, a preliminary interview or the entirety of the

14   interview, or do you just not know?

15   A.  I don't know.

16   Q.  But certainly where it says $200, there is no indication

17   there, or anywhere else, that there would be some other amount

18   of money that would have to be brought by Mr. Patel if he were

19   to get an occupational disability; is that fair?

20   A.  I can only tell from this document that I'm looking at, it

21   just says to bring cash payment for services of $200.

22   Q.  And that's it, correct?

23              THE COURT:  Asked and answered.

24              MR. JACKSON:  All right.

25   Q.  Now, with respect to the -- if we could just get to the

D7ndles3                          Cuocci - cross

1   next page, please, and blow up the highlighted portion.

2            That highlighted portion says to call Dr. Ajemian.  Do

3   you see where it says that?  It is saying who they should ask

4   for, is that right?

5   A.  Yes.

6   Q.  Now, this is one document, we could agree, that you took

7   from Ms. Baran's computer, is that right?

8   A.  Yes.

9   Q.  Beyond this one document relating to Mr. Patel, can you

10  tell us whether you extracted other documents that have the

11  indication that people should call Peter Ajemian?

12  A.  I don't recall right now.

13  Q.  OK.  And with respect to this particular indication to call

14  Peter Ajemian, you have no personal knowledge as to whether or

15  not this particular person, Navin Patel, inquired as to

16  Peter -- Dr. Ajemian, is that right?

17  A.  Can you repeat the question?

18  Q.  Absolutely.

19            THE COURT:  Will the reporter read back the question.

20            (Question read)

21  A.  I'm not sure that's correct.  From this document it just

22  says for him to call, but I don't have other documents from the

23  RRB, or whatever, that may tell me that he ultimately did go to

24  Dr. Peter Ajemian.

25  Q.  I'm sorry.  I'm asking you a different question.

1              In other words, I'm just referencing this particular

2     document.  And you don't know what, if any, conversation that

3     Mr. Patel or Ms. Baran had that might have led that call to Ms.

4     Baran indicating that he should call Peter Ajemian, is that

5     right?

6     A.  I believe that this document indicates that he should call

7     him as soon as possible.

8     Q.  Correct.  Absolutely, it does.

9              But beyond that, you don't know what, if anything,

10    prompted her to place this on this document, is that fair?

11    A.  Yes.

12    Q.  OK.  Now, could you show us, since you extracted other

13    documents from her computer, if you can, could you show us, for

14    example, a blank document that you might have gotten from her

15    computer that's like this, 502B1 -- just leave it up

16    momentarily, we'll move on in one minute -- can you tell us

17    whether you took blank documents from her computer like this

18    that gave any indication at all of who people should call or

19    speak to by way of doctors when they were consulting with her?

20    A.  I don't recall.

21    Q.  So beyond this one document that we have that references

22    this, you don't have anything with you today that you extracted

23    from the computer which gives an indication of who people

24    should call by way of a doctor, is that right?

25    A.  I don't recall that.  I don't have anything here and I

D7ndles3                          Cuocci - cross

1    don't recall --

2    Q.  Having anything else, is that correct?

3    A.  I might have something else, but right now I don't recall

4    if I do without going back and looking at them again.

5    Q.  OK.  Where would you have to go to look to get that?

6    A.  Are you talking about just from the TCU computer?

7    Q.  Absolutely.  We'll start there.  Yeah, I just want to start

8    there.

9            And I guess the question is, if you had to look at --

10   you took everything off the computer -- it was your job to

11   extract everything from the computer; would that be accurate?

12   A.  Myself and other agents that were on the investigative team

13   did go through it and extract it.

14   Q.  In the event, for example, that you have a blank form, not

15   for Mr. Patel but just in general, a blank form that she had on

16   her computer -- and just by way of clarification, I'll get to

17   this, we've seen other blank forms which I'm going to go over

18   with you momentarily that you took from the computer, correct?

19   We saw that by way of the application that was done?

20   A.  Yes.

21   Q.  And that was blank, is that right?

22           MR. WEDDLE:  Objection, your Honor.  That was from the

23   e-mail.

24           THE COURT:  Sustained.

25   Q.  I'm just asking you -- just for clarity, your Honor -- I'm

D7ndles3                          Cuocci - cross

 1    just asking you for clarity, is there -- do you have with you

 2    now or could you obtain anywhere where there would be, for

 3    example, a blank form like this -- and when I say "blank" I'm

 4    just referencing no Mr. Patel and no particular date for

 5    someone to come in, where Marie Baran is asking someone to see

 6    Dr. Ajemian?

 7    A.  I don't have a recollection today.

 8    Q.  OK.  And if you have a recollection tomorrow, would you

 9    promise to let --

10              MR. WEDDLE:  Objection, your Honor.

11              THE COURT:  Sustained.

12              MR. WEDDLE:  Can we please have a sidebar on this?

13              THE COURT:  Sustained.

14    BY MR. JACKSON:

15    Q.  Now, if I could just ask you -- if we could just go to

16    500C, please?

17              And the government asked you a number of questions

18    about 500C.  OK.

19              Now, attached to this -- this, for example, is -- do

20    you see where it says from Marie, mbaran7@excite.com; do you

21    see that?

22    A.  Yes.

23    Q.  This looks to be -- and you can correct me if I am wrong, I

24    do not want to misrepresent -- that it is from Marie Baran to

25    Marie Baran, is that correct?

D7ndles3                         Cuocci - cross

1   A.  Yes.

2   Q.  Now, did you extract any items from a personal computer of

3   Ms. Baran?

4   A.  No.

5   Q.  Now, this would seem to indicate that she is sending a

6   document from the office to herself, her personal computer

7   e-mail; would that be accurate?

8   A.  The only e-mail that I can verify is the Excite.com one.  I

9   don't know for sure if this other e-mail is hers.

10  Q.  OK.  It just says to Marie Baran from Marie, right?  Do you

11  see that?

12  A.  Yes.

13  Q.  OK.  If we can just go to the actual --

14          MR. WEDDLE:  Your Honor, objection.  That is not what

15  it says.

16          MR. JACKSON:  Judge, for the sake of time.  I could

17  read everything into the record if your Honor would like me to.

18          MR. WEDDLE:  Your Honor, the document is right there.

19  We don't disagree that Marie Baran e-mailed it to herself but

20  the document is there --

21          MR. JACKSON:  Judge, as long as we have a stipulation

22  as to that, we are good and I could move on.  I am not going to

23  argue with Mr. Weddle.

24          THE COURT:  All right.  Let's move on.

25          MR. JACKSON:  Thank you.

D7ndles3                          Cuocci - cross

1              If we could just go now to the actual part of 500C, I

2      believe there is a document attached to that.  If we could just

3      blow up that name, please, under Section 2.

4      Q.  So this would have been Navin Patel, the document that the

5      government agrees that Ms. Baran was presenting to herself; do

6      you see that?

7      A.  Yes.

8      Q.  Now, let's go to -- let's go to Section 3 of the document

9      and I believe it's question 11.

10             There is a date here of September 30, 2008.  Do you

11     see that?

12     A.  Yes.

13     Q.  And are you familiar with whether in an occupational

14     disability you have to stop working prior to qualifying for an

15     occupational disability?  Are you familiar with that at all, or

16     do you just not know?

17             (Pause)

18     A.  I don't recall exactly.

19     Q.  All right.  Now, the date here of 9/30/2008, do you have

20     any personal knowledge as to whether or not Ms. Baran was given

21     this date by Mr. Patel as to when he would not be working any

22     longer?

23     A.  From the document, I don't know --

24     Q.  You just see a date there, correct?

25     A.  Yes.

1    Q.  And you don't know whether it was given to Ms. Baran or

2    not; you just can attest to a date being placed there, is that

3    accurate?

4              THE COURT:  Asked and answered.

5              MR. JACKSON:  Now, if we can go to question 17, which

6    I believe is in Section 4.  And under Section -- if you look at

7    Section 17 -- if we can just blow up that question?  17 all the

8    way down, maybe half the page.  Thank you much.  All right.

9    Q.  And you see to the right it says -- Mr. Weddle asked you,

10   it says "MRI, MRI of, EMG," etc.?

11   A.  Yes.

12   Q.  Do you see that?

13   A.  Yes.

14   Q.  You are not aware, are you, of whether or not those are,

15   for example, prompts that Ms. Baran placed in the computer to

16   remind herself to ask whether MRIs were conducted, are you?

17   A.  I wouldn't know.

18   Q.  You just know that, in response to Mr. Weddle's question,

19   that what appears there appears there, correct?

20   A.  Yes.  It was on the document.

21   Q.  You don't know what, if any, use Ms. Baran might place that

22   there for her own personal purposes, do you?

23   A.  I wouldn't know.

24             MR. JACKSON:  Now, if you could go now, people, to

25   page -- I'm sorry, Section -- question 19.

D7ndles3                    Cuocci - cross

1   Q.  And, again, under question 19, this does indeed list

2   Dr. Peter Ajemian; do you see that?

3   A.  Yes.

4   Q.  And if we cross-referenced it back to Exhibit -- and you

5   don't have to put this up, government.  But if we

6   cross-reference that back up to Exhibit 502B1, that is the list

7   that Ms. Baran says what to bring?

8   A.  Yes.

9   Q.  Do you see that?

10          It references that this person should call Peter

11  Ajemian, right?

12  A.  Yes.

13  Q.  So that section is indeed filled out, and it gives Peter

14  Ajemian -- Dr. Ajemian, excuse me, his address and his number,

15  right?

16  A.  Well, it is a little bit different.  I mean, the form says

17  to call him.  And question 19 actually says, "Enter information

18  about each personal physician or other doctor who has treated

19  you."

20  Q.  Right.  And you are not aware, for example, of whether or

21  not in this particular case Dr. Ajemian had treated him

22  previously or was, according to the annuitant, in the process

23  of treating him, correct?  You don't know that, right?

24  A.  Well, from the form, it just says for him to -- I'm sorry.

25  From the form it just says to call him, and then, according to

1    the AA1-D, it just says who was treating you.

2    Q.  And those people would be consistent; again, we could

3    agree, right?

4    A.  The name of the physician is the same.

5    Q.  OK.  On this particular document pertaining, of course, to

6    Navin Patel, right?

7    A.  Yes.

8    Q.  Now, Mr. Weddle also asked you about questions 24, I

9    believe, through 26.

10          MR. JACKSON:  And if we could just go to that.  OK.

11   Q.  And just focusing on for the moment, do you see 26 there,

12   right?

13          Now, with regard to these -- the "Describe the nature

14   of the restriction."  Would you understand it to be that a

15   person who might -- that Mr. Patel was going to speak to

16   Ms. Baran about an occupational disability; you understand

17   that, correct, or had spoken to her, rather, about this

18   disability?

19   A.  Yes.

20   Q.  And you don't know, nor can you say, whether or not this is

21   a prompt that Ms. Baran places there so that she can confront

22   the particular annuitant or applicant with whether or not they

23   have the ability to do these things, do you?

24          (Pause)

25          In other words, Agent, you just know it's there, you

1    don't know the basis for it being there; would that be fair to

2    say?

3    A.  According to the document, I think it's referring to the

4    restrictions that a medical doctor imposed because in question

5    24 it's referring to the restrictions.

6    Q.  Correct.  I'm asking you a different question.

7            In other words, these are restrictions that are placed

8    in this document, we could agree, is that right?

9    A.  Yes.

10   Q.  And you don't know whether or not Ms. Baran places

11   restrictions in a document for the purposes of ensuring that

12   she addresses this specific question, is that right?  You don't

13   know why?

14   A.  I wouldn't know that.

15   Q.  You just know that it's there?

16   A.  Yes.

17   Q.  OK.  Now, Mr. Weddle also asked you about Section 6.

18           MR. JACKSON:  If we can just go to Section 6, which

19   would be question 39.  If you can just blow that up a little

20   bit more.

21   Q.  Now, do you have any knowledge, again, as to whether or not

22   this is something that Ms. Baran places in the application

23   because of anticipating a person who has an occupational

24   disability and what their responses would be?  Do you know

25   that?

D7ndles3                          Cuocci - cross

1   A.  I would think that the responses are specific to each

2   person that comes to see her individual --

3   Q.  Exactly.  And, therefore --

4   A.  Specific to an individual.

5   Q.  I didn't mean to interrupt you.

6        And, therefore -- are you finished?

7   A.  Yes.

8   Q.  And, therefore, in the event that she asked somebody about

9   sitting, since it is individual, and they said not at all, you

10  don't know whether or not she would thereafter change that to

11  not at all, correct?

12  A.  If we're just talking about this document, I mean --

13  Q.  We are.

14  A.  OK.

15  Q.  Yes.

16  A.  This document at this point had these checkmarks in them --

17  Q.  I understand that.

18  A.  -- that pertain to Mr. Patel.

19  Q.  Right.  What I'm asking you is do you have any personal

20  knowledge as to how Ms. Baran uses this particular prompt

21  within the document?  Do you know that?

22  A.  I would say that these would be specific to the person that

23  came to see her.

24  Q.  Exactly.  And so, therefore, for example --

25        MR. WEDDLE:  Objection, your Honor.  There is no

D7ndles3                         Cuocci - cross

1    knowledge to any of this.

2              THE COURT:  Sustained.

3    Q.  I am asking you about your personal knowledge.

4              Would it be fair to say, just cutting to the chase

5    before moving to the next section, would it be fair to say that

6    you have no personal knowledge as to how Ms. Baran uses the

7    information that's within Section 6, is that right?

8    A.  No, I wouldn't know personally.

9    Q.  And you wouldn't know what she talks about with any

10   particular annuitant concerning these different items?  You

11   wouldn't know that personally?

12   A.  No, I wasn't there.

13   Q.  You wouldn't know whether or how often she changes it, is

14   that right?

15             THE COURT:  Asked and answered.

16   Q.  And just with regard to the Judge's question that you

17   answered, would the answer be no?

18   A.  I wasn't there so I wouldn't have the personal knowledge,

19   no.

20   Q.  OK.  If we can go to 40.  If we can go to question 40.

21             And again in question 40, there is an indication --

22   there is a narrative there in question 40, and Mr. Weddle read

23   you this narrative in its entirety.  I will not.  But do you

24   agree that there is a narrative there under question 40,

25   correct?

D7ndles3                          Cuocci - cross

1   A.  Yes.

2   Q.  And you don't know what, if anything, Ms. Baran does to

3   edit that narrative to, as you say, make it specific to the

4   individual that she is sitting down with, is that right?

5   A.  I don't.  I mean, I just have what it is on this form that

6   I'm looking at.

7   Q.  Sure.  And, therefore, you don't know whether, for example,

8   for purposes of saving time, she might place this in there and

9   then edit it based upon what someone tells her; you don't know

10  that?

11          MR. WEDDLE:  Your Honor, I object to this entire line

12  of questioning.

13          THE COURT:  Sustained.  Asked and answered.

14  Q.  Now, by the way, with regard to this particular question,

15  do you know whether or not Ms. Baran did an intake of Mr. Patel

16  to determine what his initial symptoms were?

17          MR. WEDDLE:  Objection, your Honor.  403 as well as

18  summation.  There is no point to this.

19          THE COURT:  Overruled.

20          MR. JACKSON:  Judge, may I object to the commentary by

21  the government?

22          THE COURT:  All right.  Sustained.

23          MR. JACKSON:  Thank you, your Honor.

24  BY MR. JACKSON:

25  Q.  Can you answer the question?

D7ndles3                        Cuocci - cross

1    A.   Can you repeat the question?

2    Q.   Absolutely.

3         You don't know, do you, whether Ms. Baran -- you have

4    no personal knowledge as to whether she did an intake of

5    Mr. Patel to determine at least initially what he was

6    symptomatic of, what his problems were?

7    A.   No.  I just have the knowledge that he, according to the

8    other document, that he had an appointment.

9    Q.   OK.  Now, with regard to -- if the people can pull up 500D,

10   please.

11        Now, 500D, this apparently is a blank form, correct?

12   A.   It's entitled "BLANK."

13   Q.   And just to confirm, if we could just go to the second

14   page, which would be the first page of the application, going

15   to Section 2, and just blow up Section 2.  Thank you very much.

16        And there is no one here?  There is no name here,

17   correct?

18   A.   No.

19   Q.   And with regard to this not having a name, was there a

20   document with this, for example, a blank document, which would

21   be 502B1 -- and, again, that was just to refresh your

22   recollection, if it needs to be -- of Ms. Baran asking

23   Mr. Patel to come to the appointment, when he would be there,

24   what he needs to bring?  I just want to cross reference.

25        MR. WEDDLE:  Objection to form, your Honor.  I have no

D7ndles3                          Cuocci - cross

```
 1    idea what he is asking.
 2                THE COURT:  All right.  Sustained.
 3    Q.  I just want to clarify.  Was there -- with this particular
 4    document, was there any form, blank form, that you found
 5    attached to this document where Ms. Baran was suggesting that
 6    Dr. -- that this blank person should go to Dr. Ajemian?
 7                MR. WEDDLE:  Objection, your Honor.  The document is
 8    in evidence.  The attachments are in evidence.
 9                THE COURT:  Sustained.
10    Q.  Was there any form at all attached to this document where
11    Ms. Baran was otherwise suggesting which doctor that anyone
12    should go to?
13                (Pause)
14    A.  On this specific document?
15    Q.  Yes.  This document.
16    A.  No.
17                MR. JACKSON:  Now, if I could just have the actual
18    people go to question 19, please.
19    Q.  OK.  Now, right here, where it says "Name of Physician" on
20    top, 19A, "Name of Physician," Dr. Ajemian's name doesn't
21    appear there, we could agree, correct?
22    A.  Yes.
23    Q.  There is no other doctor's name that appears there, is that
24    right?
25    A.  Yes.
```

D7ndles3                    Cuocci - cross

1          THE COURT:  Asked and answered.

2   Q.  And with regard to going down to question B, "Name of

3   Physician," Dr. Ajemian's name is not there, is that right?

4   A.  Yes.

5   Q.  Going down just a little bit more, "Dates treated or

6   examined," there is no indication of anybody who was treated or

7   examined there either, is that right?

8   A.  Yes.

9   Q.  OK.  And if we could just go back before we go forward to

10  question 17, which would have been on the prior page.

11          And on question 17, it says, "Enter information about

12  the hospital, institution," we could agree that that's blank,

13  too, is that right?

14  A.  Yes.

15  Q.  Now, in going to question 26 -- if we could go to question

16  26, which would be in Section 4, and, again -- and, Judge, I

17  don't mean to rehash this, but I'm just asking the question.

18          This indicates a description of the restriction, do

19  you see, as I asked you on the prior application?  Do you see

20  that?

21  A.  Yes.

22  Q.  And, again, Agent Cuocci, just for purposes of clarity, you

23  don't have any indication of whether Ms. Baran placed this

24  there?  You don't have any indication --

25          MR. WEDDLE:  Objection.

D7ndles3                          Cuocci - cross

1           THE COURT:  Asked and answered.

2           MR. JACKSON:  And Section 6, if we could go to that.

3    Q.  Section 6, you would agree, is pre-filled, is that right?

4    A.  It's filled in on this document.

5    Q.  Yes.  It's pre-filled in on the document, right?  It is

6    already there?

7           THE COURT:  Asked and answered.

8    Q.  And, again, with regard to this pre-filling the items that

9    are pre-filled, do you have any indication of how Ms. Baran

10   uses this information?

11          THE COURT:  Asked and answered.

12   Q.  On this application?

13          THE COURT:  Asked and answered.

14          Next.

15   Q.  Let's go to question 40, please.

16          And that, again, Mr. Weddle read you the entirety of

17   question 40.  I will not.

18          But, again, on this pre-filled application, you see

19   that this is already there, correct??

20          (Pause)

21          Do you see that?

22   A.  It's a blank application.  I wouldn't describe it as -- I

23   don't know -- it says that it is a blank -- it is blank.  The

24   title of it was "BLANK."

25   Q.  Absolutely.

D7ndles3                    Cuocci - cross

1    A.  And this was on it.

2    Q.  It was on it previously, is that right?

3    A.  What we extracted was on it.

4    Q.  Question 40 was already written is what I am trying to get

5    at.

6    A.  It was on the document that we extracted.

7    Q.  OK.  And, again, if I could -- Judge, and I'll do it

8    three-for-one, if it would please the Court.

9           With regard to question 40 here, and with regard to

10   question 40, or the prior question, 39, on any of the other

11   applications, you notice that it was already pre-filled,

12   correct?

13   A.  It's --

14   Q.  If I need go --

15          THE COURT:  Would the government stipulate they were

16   pre-filled?

17          MR. WEDDLE:  Your Honor, it doesn't make any sense.

18   We have extracted the documents --

19          THE COURT:  All right.  Did you obtain information at

20   the time they were extracted?

21          MR. WEDDLE:  They say exactly what they said.

22          THE COURT:  All right.  The documents contain what it

23   says they contain.  All right.

24          MR. WEDDLE:  Yes.

25          THE COURT:  Let's move on.

D7ndles3                          Cuocci - cross

BY MR. JACKSON:

Q.  Now, if I can go to 502B3.  And this is as to Neville

Simpson, correct?

A.  Yes.

Q.  OK.  Now, Neville Simpson -- and by the way, 502B is just

the e-mail referencing the intake from Ms. Baran to Ms. Baran.

         But just moving on, 502B3, if we could focus on that?

         MR. WEDDLE:  Your Honor, I object to the

characterization, "referencing the intake."

         MR. JACKSON:  Judge, I will do it individually if I

need to.  I am just trying to save file.

         MR. WEDDLE:  It mischaracterizes the document.

         THE COURT:  It is a technical term.  What you meant

was that there was an e-mail from one person to another.

         MR. JACKSON:  Correct, Judge.  If the government would

just stipulate that that e-mail appears to be from Marie Baran

to Marie Baran?

         THE COURT:  You don't need them to stipulate to it.

It just says what it says.

         MR. JACKSON:  Thank you, Judge.

Q.  So going to 502B3, do you see that?

A.  Yes.

Q.  Did you get anything from Ms. Baran's computer where she

was referring Neville Simpson to Dr. Ajemian?

A.  In the documents, I don't recall.

D7ndles3                              Cuocci - cross

1    Q.  OK.  Well, let's look at the document itself, 502B3.

2           And just with respect to you not recalling, are you

3    saying that there you have some other independent recollection

4    that she did refer Neville Simpson to Dr. Ajemian?

5    A.  I'm just saying looking at the document --

6    Q.  Mm-hmm.

7    A.  -- I don't have a recollection.

8    Q.  OK.  So there wouldn't be something, for example -- and,

9    again, Judge, just going back quickly to move forward -- 502B1.

10          Did you pull something like this, similar,

11   substantially similar to, related to, page 1 of this or page 2

12   of this?  Do you see the document in front of you?

13          If we could just go to page 2 of this?  "This" being

14   502B1.

15          Did you pull anything like that from her computer --

16   Ms. Baran's computer, that is -- where she was referring

17   Neville Simpson to Dr. Ajemian?

18   A.  I don't recall.

19   Q.  Do you have anything here where it's similar to this

20   particular document that you could show us or show the jury

21   where Ms. Baran was referring this Neville Simpson to

22   Dr. Ajemian?

23   A.  No.

24   Q.  And looking at this particular document, if I could just

25   refer you to government -- question 19 of this document.  I'm

D7ndles3                        Cuocci - cross

1    sorry, the "document" being 502B3, and it's Neville Simpson.

2              Question 19, page 4.

3              Do you see any physician filled out there?

4    A.  No.

5    Q.  Now, with regard to 502A, or, excuse me, 502B2, that would

6    be John Riddle.  Again, that's just -- would you agree that

7    that would be an e-mail -- and you can look on the screen if

8    you can't find it there, Agent.  Do you see that?

9              Feel free to do whatever you are comfortable with.  I

10   am just saying if you can't see it, it is right on the screen

11   as well.  OK?

12   A.  OK.

13   Q.  Now, 502B2 is from Marie to Marie; do you see that?

14   A.  To mbaran7@excite.com.

15   Q.  Absolutely.  I don't mean to misrepresent, but it says

16   "from Marie," do you see, up top?

17   A.  Yes.

18   Q.  And then it says to "mbaran7"?

19   A.  Yes.

20   Q.  On this particular form, is there anything -- and if we

21   could just go to 500A, which is the actual application for

22   determination of disability.

23             Is there anything relating to John Riddle where you

24   had a sheet from the Ms. Baran where she was referring him --

25             Just quickly just so that you know what I'm

1   referencing.  Government, if we could just go back to 502B1?

2               -- where she was -- and going to the second page --

3   this is the first page; it is what to bring.  The second page

4   says, "Call Dr. Ajemian.

5               Is there anything relating to John Riddle --

6               If you can go back to 500A?  Thank you very much.

7               Is there anything relating to John Riddle that you

8   found similar with regard to Ms. Baran directing him to see

9   Dr. Ajemian?

10  A.  I don't recall.

11  Q.  And do you have any document with you that you could show

12  us or show the jury where Ms. Baran is directing this

13  particular applicant to see Dr. Ajemian?

14  A.  No.

15  Q.  And if we could go to page 3, question 17.

16              OK.  And you see this is information about the

17  hospital?

18  A.  Yes.

19  Q.  OK.  And if we could go to C, question C?

20              And just with regard to -- do you see question C, it

21  says, "Electrodiagnostic Laboratory," right?

22  A.  Yes.

23  Q.  OK.  Now, if you do go to question 19, you'll see a name

24  there.  And whose name is that?

25  A.  Dr. Peter Ajemian.

D7ndles3                    Cuocci - cross

1   Q.  And, again, just with regard to this Dr. Peter Ajemian

2   here, was there any indication that you came across, either an

3   e-mail from Ms. Baran to this annuitant, or some other phone

4   log or any other information, that would suggest that Ms. Baran

5   referred this person to Dr. Ajemian?

6   A.  I don't recall.

7   Q.  OK.  And if we could go to 502B4, please.

8            And this is the advertisement that Mr. Weddle showed

9   you.  Do you see that?

10  A.  Yes.

11  Q.  And we'd agree that there is nothing on this advertisement

12  that says, you know, come to Ms. Baran and she guarantees a

13  disability; nothing about that, right?

14  A.  It just says that she's a disability specialist.

15  Q.  Right.  It doesn't say that her fees are conditioned upon

16  the success of any disabilities' application, does it?

17  A.  It only says what it says.

18  Q.  And just, again, with regard to the actual e-mails -- and,

19  Judge, I'm almost done, just so your Honor is aware.

20           With regard to the actual e-mails, you had access when

21  you did this whole computer extraction for all of the e-mails

22  that were there, correct?

23           MR. WEDDLE:  Objection, your Honor.

24           THE COURT:  Sustained.

25  Q.  In performing the extraction from her e-mails, did you see

D7ndles3                          Cuocci - cross

 1   any e-mail between Ms. Baran and John Riddle saying that she

 2   would use her influence to get him a disability application?

 3   A.  No.

 4   Q.  Did you see any e-mails between Ms. Baran and Navin Patel

 5   saying that she would use any influence she had to get a

 6   disability application granted?

 7   A.  It's just the documents that we produced is what I recall

 8   seeing.

 9   Q.  Which we're talking about today, is that fair?

10   A.  Yes.

11   Q.  OK.  And with regard to -- this is the last question about

12   the e-mails.

13           Was there any e-mail that you found from Ms. Baran to

14   Dr. Ajemian saying she would be referring people to him?

15   A.  To Dr. Ajemian?

16   Q.  That's the question, yes.

17   A.  No.

18   Q.  Was there any e-mails by Ms. Baran to another doctor saying

19   that she was referring annuitants to that doctor other than

20   Ajemian?

21   A.  In the e-mails?

22   Q.  Correct.

23   A.  No.

24   Q.  And if I could just show you 504.

25           And 504, if we could just blow that up a little bit.

D7ndles3                        Cuocci - cross

1           And do you understand this to be a ledger, if you do,

2      of the particular people that Ms. Baran might have consulted

3      with, the times that they came to consult with her, and the

4      dates?

5           MR. WEDDLE:  Your Honor, there is a stipulation about

6      what this document is.

7           MR. JACKSON:  Judge, I don't mean to misrepresent

8      anything.  I am just asking about the document.  That's all.

9           THE COURT:  All right.  Go ahead, ask her.

10     Q.  And you see the actual document, correct?

11     A.  Yes.

12     Q.  And you see there is fees or there appears to be numerical

13     amounts next to each document?

14     A.  Yes.

15     Q.  This is something that was produced to you as a part of the

16     subpoena, is that right?

17     A.  Yes.

18          MR. JACKSON:  And if we could just go through the

19     document.  OK.  And if we could just blow that up.  Just a

20     little slower.  I'm sorry.  If you could just go back.  All

21     right.

22     Q.  So this is a ledger.

23          And then we could go to the next page.

24          MR. JACKSON:  And, your Honor, I have three more

25     minutes left.

D7ndles3                              Cuocci - cross

1   Q.  And in this particular page here, you see it says "2008" at

2   the top, if you could see that?

3           MR. JACKSON:  If you could just blow it up just a

4   little bit so the jury can see it.

5   Q.  And you see the notation versus the client and the amounts

6   that were charged, is that right?  Do you see that?

7   A.  I see names and dollar amounts.

8   Q.  Fair enough.  OK.

9           This, again, was something -- the entirety of this

10  document was something that was produced pursuant to the

11  subpoena that you gave to Ms. Baran, is that right?

12  A.  Yes.

13  Q.  OK.  And if we could just go to 530, which is the last and

14  final thing that I would like to discuss with you.

15          MR. JACKSON:  If we could just blow up the top of

16  that?

17  Q.  And you see 530 gives the name and Social Security -- well,

18  it doesn't give the name, but it asks for the name and Social

19  Security number; do you see that?

20  A.  Yes.

21  Q.  "I hereby authorize the Railroad Retirement Board to

22  release any requested information about me to Marie Baran."  Do

23  you see that?

24  A.  Yes.

25  Q.  And signature and date, do you also see that?

1   A.  Yes.

2   Q.  OK.  And do you have any knowledge as to whether or not a

3   consultant, in the course of putting together an application,

4   may need information so that it could be a complete

5   application?  Do you have any information as to how that's

6   done?

7           MR. WEDDLE:  I object to "any information," your

8   Honor.

9           THE COURT:  Sustained.

10           MR. JACKSON:  I will narrow it down.

11   Q.  Do you know what the purpose of this form is for?

12   A.  I know that she said that she obtained a release for -- so

13   she could act on the -- on her clients' behalf with the Rail

14   Road, the RRB and the doctors.

15   Q.  And that's something that she told you, correct?

16   A.  Yes.

17   Q.  And this is something that confirmed what she voluntarily

18   told you at a meeting?

19           MR. WEDDLE:  Objection, your Honor.

20           THE COURT:  Sustained.

21   Q.  Would this document be consistent --

22           MR. WEDDLE:  Objection, your Honor.

23           THE COURT:  Overruled.

24   Q.  -- with what Ms. Baran told you during the conversation you

25   had with her?

1    A.  Yes.

2              MR. JACKSON:  Thank you, Judge.

3              THE COURT:  All right.  Thank you.

4              MR. WEDDLE:  Can we just keep that ledger up on the

5    screen?

6              THE COURT:  Before Mr. Weddle, let me remind the jury

7    of the limiting instruction as it pertains to the

8    cross-examination of this witness.

9              Any information that the witness has supplied or that

10   pertained to Dr. Ajemian is not to be used by you in any way to

11   draw any conclusions with regard to the government's charges

12   against Dr. Lesniewski.

13             MR. WEDDLE:  Thank you, your Honor.

14   REDIRECT EXAMINATION

15   BY MR. WEDDLE:

16   Q.  Special Agent Cuocci, do you know from your own personal

17   knowledge, and, if not, from what you may have been told by you

18   someone else or what you may have read in a document, whether

19   Marie Baran reported this tens of thousands of dollars of --

20             MR. JACKSON:  Objection.  Leading.

21   Q.  -- of fees to the IRS?

22             THE COURT:  Sustained.

23   Q.  Do you remember Mr. Jackson asked you whether there were

24   documents showing that Marie Baran referred Mr. Simpson or

25   Mr. Riddle to a doctor?  Do you remember those questions?

D7ndles3                              Cuocci - redirect

1    A.  Yes.

2    Q.  When you interviewed Marie Baran back in September 2008,

3    what did she say about whether she recommended people for her

4    clients to go to in connection with a disability?

5    A.  She said she sometimes recommended doctors for

6    appointments.

7               MR. WEDDLE:  Thank you.

8               Nothing further, your Honor.

9               THE COURT:  Any other defense?

10              MR. JACKSON:  Nothing from me, Judge.

11              MR. DRATEL:  No, nothing, your Honor.

12              MR. RYAN:  No, your Honor.

13              THE COURT:  Thank you.  You are excused.  You may step

14   down.

15              THE WITNESS:  Thank you.

16              (Witness excused)

17              THE COURT:  We will take the lunch hour at this point.

18   It is 1 o'clock.  Please return at 2.

19              (Continued on next page)

20

21

22

23

24

25

D7ndles3

```
 1              (Jury not present)
 2              THE COURT:  All right.  Just very briefly.  So,
 3    Mr. Jackson, you've earned your gold star.
 4              MR. JACKSON:  Thank you, Judge.  It took me 24 hours
 5    but finally I have it.
 6              THE COURT:  Mr. Weddle, would you clarify what your
 7    understanding now is of the lineup for the afternoon?
 8              MR. WEDDLE:  Yes, your Honor.
 9              Now the witness' name has escaped me because it is Ms.
10    Friedlander's witness.
11              MS. FRIEDLANDER:  John Chirichella.
12              MR. WEDDLE:  John Chirichella next and then
13    Mr. Stavola, and then I think Mr. Dunaj, who is coming in from
14    out of town.  I need to confirm that he is here.  And then I
15    think Ms. Marx.
16              Ms. Marks relies on business records obtained from
17    United Healthcare, so we need to hammer out a stipulation on
18    that, hopefully, before she takes the stand.  I don't
19    anticipate a problem with that, but I just need to get
20    everyone's signature on the stipulation.
21              That should finish the day.
22              THE COURT:  All right.  Thank you.
23              We should go until around 5.
24              (Luncheon recess)
25
```

D7ndles3b

**A F T E R N O O N   S E S S I O N**

2:04 p.m.

1
2
3          (Jury not present)

4          THE COURT:  All right.  Be seated.

5          Could you check to see whether the jurors are ready or

6     not?

7          THE LAW CLERK:  I will check.

8          (The Court conferred with the law clerk)

9          THE COURT:  Mr. Dratel.

10         MR. DRATEL:  Thank you, your Honor.

11         In addition to the instruction with respect to the

12    Dr. Ajemian evidence, we would also like the Court to instruct

13    on the limited admissibility of the statement by Ms. Baran with

14    respect to Ms. Baran alone and not to Dr. Lesniewski and I

15    guess Mr. Rutigliano, if he wants that as well.

16         MR. RYAN:  I would join in that request.

17         THE COURT:  All right.

18         MR. DRATEL:  Thank you, your Honor.

19         (Pause)

20         MR. WEDDLE:  Your Honor, one issue is, just in terms

21    of scheduling, Mr. Dunaj doesn't live very close to here.  So

22    he told me it took him about three-and-a-half hours to get

23    here.  So it may make sense, just so he doesn't have to do that

24    trip two days in a row, to do him before Stavola and then do

25    Stavola.  So it would be Chirichella, Dunaj, Stavola.

D7ndles3b

1        THE COURT:  All right.

2        THE LAW CLERK:  All rise.

3        (Jury present)

4        THE COURT:  Thank you.  Be seated.

5        Mr. Weddle.

6        MR. WEDDLE:  Your Honor, I apologize but we are

7   missing part of our team right now.  I told the agent to just

8   grab another witness out of order.  But it may be that

9   Ms. Friedlander and our next witness that we had predicted will

10  be here momentarily.

11        So I apologize to your Honor and to the jurors for the

12  delay that we are having.

13        THE COURT:  Do we have the exhibits for the next

14  witness, and are they agreed upon?

15        MR. WEDDLE:  So this is Mr. Chirichella.

16        Ms. Friedlander will be questioning Mr. Chirichella.

17   JOHN CHIRICHELLA,

18      called as a witness by the government,

19      having been duly sworn, testified as follows:

20        THE COURT:  You may be seated.  Speak into the

21  microphone as closely as possible.

22        State your name and spell it for the record.

23        THE WITNESS:  John Chirichella.  The last name is

24  C-h-i-r-i-c-h-e-l-l-a.

25        THE COURT:  Ms. Friedlander.

D7ndles3b

```
 1              MS. FRIEDLANDER:  Your Honor, we do have two exhibits

 2      that we plan to introduce through this witness.  It is

 3      Government Exhibits 503B and 522.

 4              MR. JACKSON:  Judge, there will be an objection on

 5      relevance grounds.

 6              THE COURT:  All right.  Thank you.

 7              MS. FRIEDLANDER:  OK.

 8      DIRECT EXAMINATION

 9      BY MS. FRIEDLANDER:

10      Q.  Good afternoon, sir.

11              Where do you live?

12      A.  281 Burr Road, East Northport, New York.

13      Q.  Are you currently employed?

14      A.  Yes.  Hassett Tax and Financial Services, H-a-s-s-e-t-t.

15      Q.  What do you do for a living?

16      A.  I prepare personal income tax returns and offer financing

17      planning services.

18      Q.  Are you a tax preparer?

19      A.  Yes.

20      Q.  Do you know Marie Baran?

21      A.  Yes.

22      Q.  How do you know her?

23      A.  She was a client from the late '90s until about 2010.

24      Q.  Do you see Marie Baran in the courtroom today?

25      A.  I do.
```

D7ndles3b                      Chirichella - direct

 1    Q.  Could you please describe where she is sitting and identify

 2    her by an article of clothing that she is wearing?

 3    A.  She is sitting the second set of benches, and she is

 4    wearing a white shirt with black on it.

 5          MS. FRIEDLANDER:  Your Honor, may the record reflect

 6    the witness has identified Ms. Baran, the defendant?

 7          THE COURT:  So noted.

 8    BY MS. FRIEDLANDER:

 9    Q.  Mr. Chirichella, you said you are a tax preparer?

10    A.  Yes.

11    Q.  What is a tax preparer?

12    A.  We prepare personal income tax returns based on the

13    information provided by our clients.

14    Q.  Is it the same thing as an accountant?

15    A.  CPAs are more of a professional designation.  They do

16    things a little differently where they might do auditing and

17    require additional documentation.

18    Q.  CPA, is that a Certified Public Accountant?

19    A.  Public Accountant, yes.

20    Q.  Directing your attention to 2007.

21    A.  Yes.

22    Q.  Where had Marie Baran been employed prior to that time?

23    A.  The Railroad Retirement Board.

24    Q.  And did there come a time that year when Ms. Baran told you

25    she had a new business?

1  A.  Yes.

2  Q.  And according to her, what was she doing?

3  A.  She was going to do retirement paperwork consulting.

4  Q.  Did there come a time when you met with Ms. Baran to

5  prepare her 2007 tax return?

6  A.  Yes.

7  Q.  When was that meeting, approximately?

8  A.  That was early 2008, sometime between either -- between

9  January and April 2008.

10  Q.  Did the subject of Ms. Baran's new consulting business come

11  up during that meeting?

12  A.  Yes.

13  Q.  Tell us about that.

14  A.  Marie provided me with the income she had made that year as

15  well as the expenses for the business.

16  Q.  And when you say she provided you with the income she had

17  made, how did she give you information about the income that

18  she earned from this business?

19  A.  Orally.  She told me.

20  Q.  Did Ms. Baran give you any documents showing what she

21  earned?

22  A.  No.

23  Q.  For example, bank records, receipts, invoices, anything

24  like that?

25  A.  No.

D7ndles3b                         Chirichella - direct

1   Q.  Did you prepare Ms. Baran's tax return based on what she

2   told you?

3   A.  Yes.

4   Q.  Did you review that return with Ms. Baran before you filed

5   it?

6   A.  Yes.  My practice.

7   Q.  OK.  Do you specifically recall if you reviewed it, or is

8   it your practice to review --

9   A.  It's my practice to review it.

10  Q.  And did you give Ms. Baran a copy of her 2007 tax return

11  when you filed it with the IRS?

12  A.  Yes.

13  Q.  Do you have in front of you Government Exhibit 522?

14  A.  Yes.

15  Q.  Do you recognize that document?

16  A.  I do.

17  Q.  What is it?

18  A.  It's the income tax return filed for Marie Baran from my

19  file.

20  Q.  And is that for the 2007 tax year?

21  A.  Correct.

22  Q.  OK.  And does it include an invoice from you at the top?

23  A.  Yes.

24  Q.  Is this the copy that you provided Ms. Baran for her

25  records?

D7ndles3b                    Chirichella - direct

1    A.  Yes.

2              MS. FRIEDLANDER:  The government offers 522.

3              MR. JACKSON:  Again, Judge, objection as to relevance

4    and prejudice.

5              THE COURT:  Overruled.

6              (Government's Exhibit 522 received in evidence)

7              MS. FRIEDLANDER:  OK.  Can we publish this document,

8    please?

9    Q.  Is this your invoice on the top?

10   A.  Yes.

11   Q.  On the bottom right it shows a fee.  Your fee is $250 to

12   prepare this tax return?

13             It shows a fee of, it says, 200, and then it says 50--

14   A.  $50.

15   Q.  Oh, it says $200.  I'm sorry.

16             What is your fee for preparing the tax return?

17   A.  It's by client depending on what I have to do.

18   Q.  Does this reflect a fee of $200?

19   A.  Minus a $50 discount.

20   Q.  OK.  So if we could turn to page 3, just to show whose tax

21   return this is.

22             Up at the top it says Ostap Baran and Marie Baran?

23   A.  Correct.

24   Q.  Who is Ostap Baran?

25   A.  Ostap is Mrs. Baran's husband.

D7ndles3b                           Chirichella - direct

1    Q.   What name does he go by?

2    A.   Gus.

3              MS. FRIEDLANDER:  OK.  You can zoom out.

4              So this tax return shows, I guess on line 28 -- well,

5    let's turn to page -- the document marked Schedule C.  I think

6    it is page 9 of the document.

7              That might be page 6.  Yes.

8              OK.  And at the top of this document -- let's see.

9    The top third -- it says at the top left, "Schedule C," and the

10   title is "Profit or loss from business (sole proprietorship)."

11   Q.   What is a Schedule C?

12   A.   A Schedule C reports the income and expenses and the net

13   income from a consultant or sole proprietor, self-employed

14   person.

15   Q.   So is this the document on which you would report the

16   income that Ms. Baran earned from her consulting work from

17   2007?

18   A.   Yes, correct.

19   Q.   And here it says, under Part 1, "Income."

20             MS. FRIEDLANDER:  Ms. Chen, if you wouldn't mind

21   highlighting that.

22   Q.   It says, "Gross receipts, $14,400."

23             What is that?

24   A.   That was the gross income Ms. Baran told me she had for

25   2007.

D7ndles3b                    Chirichella - direct

1   Q.  When you say "gross income," is that the amount of money --

2   A.  The amount of money she earned at the consulting business.

3   Q.  That's the amount that she told you she earned in 2007?

4   A.  Yes.

5   Q.  I should have asked before, do you talk to your clients

6   about whether they need to report all of their income to you?

7   A.  Yes.

8   Q.  And to the IRS?

9   A.  Yes.  They have to report all of their income.

10  Q.  And you tell them that?

11  A.  Yes.

12  Q.  OK.  And just to be clear, did Ms. Baran and her husband,

13  did they have other income that year besides just the money

14  that's listed here?

15  A.  Correct.

16  Q.  What types of income did they have, generally?

17  A.  Various pensions from the Long Island Rail Road.

18  Q.  OK.  Did you expect Marie Baran to be truthful when she

19  told you she earned $14,400 from her business that year?

20  A.  Yes.

21  Q.  Was that important to you?

22  A.  Yes.

23  Q.  As a tax preparer, do you rely on your clients to be

24  truthful with you?

25  A.  Yes.

D7ndles3b                    Chirichella - direct

1    Q.  Did there come a time when you learned that Marie Baran did

2    not give you accurate information for this return?

3    A.  Yes.

4    Q.  When was that, approximately?

5    A.  Late 2008.

6    Q.  How did you learn that she had not given you accurate

7    information?

8    A.  Marie had called me requesting an appointment.  It sounded

9    urgent.

10           At the appointment we went over that federal agents

11   had been to her house to talk to her about her consulting

12   business and that she had to restate her income on the return.

13   Q.  When you say she had to restate her income, what was the

14   problem with the tax return that you filed which we just saw?

15   A.  The income was underreported.

16   Q.  We saw in the original return that you filed that Ms. Baran

17   reported earning $14,400 from her consulting work in 2007.  How

18   much did Marie Baran tell you she had actually earned?

19   A.  It was actually over 67,000.

20   Q.  What was your reaction when she told you how much she had

21   actually earned?

22   A.  I was shocked.

23           MR. JACKSON:  Objection.

24           THE COURT:  Sustained.

25   Q.  In front of you you have Government Exhibit 503B.  Do you

1   recognize that document?

2   A.  I do.

3   Q.  Before we get there, after Ms. Baran told you how much she

4   actually earned, what did you do?

5   A.  We prepared an amended tax return reporting the income.

6   Q.  What is Government Exhibit 503B?

7   A.  That document.

8   Q.  That is the amended tax return?

9   A.  Correct.

10  Q.  How do you recognize it?

11  A.  My signature is on it.

12  Q.  Do you recall this document?

13  A.  I do.

14          MS. FRIEDLANDER:  The government offers 503B.

15          MR. JACKSON:  The same objection, Judge.

16          THE COURT:  Overruled.  It will be admitted over

17  objection.

18          (Government's Exhibit 503B received in evidence)

19          MS. FRIEDLANDER:  Can we publish this?

20  Q.  OK.  At the top it reflects the Barans' names and the year

21  2007.  It says -- this is titled "Amended U.S. Individual Tax

22  Return."

23          It shows in the lower right of this their actual

24  income that year was over $200,000 in total.

25          That is all the pensions and other income taken

D7ndles3b                    Chirichella – direct

1   together?

2   A.   Correct.

3           MS. FRIEDLANDER:   OK.   Can we turn to page 3?   It

4   says, "Schedule C."

5           Can we go to the first page of Schedule C?

6           Two more pages ahead.   Go forward.

7           You want to go forward like three pages.   The

8   document, the title of it is Schedule C.   I think it is one

9   more page.   That's it.

10  Q.   OK.   So is this the amended Schedule C that you filed?

11  A.   Yes.

12  Q.   And up at the top it says "Marie Baran, Retirement

13  Consultant?"

14  A.   Yes.

15          MS. FRIEDLANDER:   Can we show the actual gross

16  receipts reported?   It says 67,000.   If you could just

17  highlight that figure.   OK.

18  Q.   Is this the amount that Ms. Baran told you she had actually

19  earned in 2007?

20  A.   Yes.

21  Q.   Did Marie Baran have to -- did she owe taxes on the income

22  she had not reported?

23  A.   Yes.

24  Q.   And as a result of the amended tax return, approximately

25  how much did she have to pay in taxes?

D7ndles3b                    Chirichella – direct

1    A.  Over 21,000.

2    Q.  OK.  Can we turn to page 2 of this document.

3           And at the bottom of the page, it says:  "Explanation

4    of changes.  Upon review of business record, the taxpayer

5    discovered unreported business income."

6           Who told you that?

7    A.  Marie, Ms. Baran.

8           MS. FRIEDLANDER:  You can take that document down.

9    Q.  Do you know Gus Baran?

10   A.  Yes.

11   Q.  How often did you see him between 1998 and 2010,

12   approximately?

13          MR. JACKSON:  Objection, Judge.

14          THE COURT:  Sustained.

15   Q.  Did you see him from time to time during that period?

16          MR. JACKSON:  Objection.

17          THE COURT:  Please approach.

18          (Continued on next page)

19

20

21

22

23

24

25

D7ndles3b                         Chirichella – direct

1               (At the sidebar)

2               THE COURT:  What is the proffer of the relevance of

3    the testimony concerning Mr. Baran?

4               MS. FRIEDLANDER:  So he is an unindicted

5    co-conspirator, as your Honor is aware.  He is on total and

6    permanent disability, and we are proving up his fraud in this

7    case.  He is a patient of Dr. Lesniewski's, and this witness

8    will provide just one minute of testimony.  I think, in sum, he

9    is going to say that Mr. Baran appeared physically normal to

10   him.  They saw each other once or twice a year.

11              MR. JACKSON:  Judge, he is not in a possession to

12   assess whether or not --

13              THE COURT:  I agree with that.

14              MS. FRIEDLANDER:  He has no opinion on his medical

15   problems.  I am just going to ask about his appearance, whether

16   he appeared to be in any physical pain or distress.

17              THE COURT:  I will sustain the objection.

18              MS. FRIEDLANDER:  So he can't --

19              THE COURT:  No.

20              (Continued on next page)

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1                (In open court)

 2                MS. FRIEDLANDER:  Thank you, Mr. Chirichella.  No

 3     further questions.

 4                Actually, if I could just check my notes?

 5                (Pause)

 6                Yes.  No further questions.  Thank you.

 7                THE COURT:  Mr. Jackson.

 8                MR. JACKSON:  Yes.  Thank you.

 9     CROSS-EXAMINATION

10     BY MR. JACKSON:

11     Q.  Mr. Chirichella, is it?

12     A.  Yes.

13     Q.  How are you, sir?

14     A.  I'm well.  How are you?

15     Q.  I'm fine.  Thank you.  My name is Joey Jackson.

16                I just want to ask you, as a tax preparer, you rely on

17     the information that people present to you, is that correct?

18     A.  That is correct, sir.

19     Q.  In 2007, Ms. Baran presented you with certain information,

20     is that accurate?

21     A.  That is accurate.

22     Q.  And you charge a fee based upon a service that you provide,

23     is that right?

24     A.  That is correct, sir.

25     Q.  When people present you with information, do you do any

D7ndles3b                     Chirichella – cross

1    independent research or assessment to confirm it's true?

2    A.  No.

3    Q.  You basically rely upon what they tell you, is that

4    correct?

5    A.  That is correct.

6    Q.  And in this instance that's exactly what you did, is that

7    right?

8    A.  Yes.

9    Q.  And as a tax preparer, in relying upon that information, as

10   Ms. Friedlander said to you, you expect the people that come to

11   you to be truthful, correct?

12   A.  That is correct.

13   Q.  And in the truthful information that you believe they

14   provide you, you then prepare your documentation, is that

15   accurate?

16   A.  Yes.

17   Q.  And in preparing that documentation, you then give it to

18   the applicant and they sign the document, is that correct?

19   A.  Yes.

20   Q.  And in them signing the document, whatever applicant it is,

21   they are themselves attesting to the truth of that information,

22   is that right?

23   A.  Yes.

24   Q.  You're not yourself attesting to any truth, are you?

25   A.  I'm attesting to the truth of the documents, you know, the

D7ndles3b                          Chirichella - cross

1     information provided from the clients.

2     Q.  Right.  And that's all you are attesting to, information

3     that they give to you?

4     A.  Correct.

5           MR. JACKSON:  And if we could just put up on the

6     screen the first amended tax form -- excuse me, the original

7     tax form that Ms. Baran gave you.

8           If you can just go to the amount of income that was

9     reported for that particular year, pretty please.

10          Could you blow that up.

11    Q.  OK.  That is the amount of information that you believe in

12    good faith that Ms. Baran earned, is that right?

13    A.  Yes.

14    Q.  And in believing --

15          MS. FRIEDLANDER:  Objection.

16          THE COURT:  Rephrase the question.

17          MR. JACKSON:  Can we go to the amount of income that

18    Ms. Baran earned?  That is all I am looking at.

19          MS. FRIEDLANDER:  What do you mean by "amount of

20    income"?  Do you mean Schedule C?

21          MR. JACKSON:  Yes.  The first document that you have,

22    that you questioned the witness about, regarding what Ms. Baran

23    reported to you.  All right.

24    Q.  And is that the amount of income that was reported to you?

25    A.  Yes.

D7ndles3b                    Chirichella - cross

1    Q.  And that says $14,000, is that right?

2    A.  Yes.

3    Q.  And you took the income that she said she earned and you

4    put it in that document, is that right?

5    A.  Yes.

6    Q.  You didn't do anything with regard to this year in part 1,

7    you didn't do any other independent research, did you?

8         THE COURT:  Asked and answered.

9    Q.  Did you do any forensic -- did you -- Ms. Friedlander asked

10   you about requesting bank records.  Did you request any bank

11   records from Ms. Baran?

12   A.  No.

13   Q.  Did you request any other financial documents from

14   Ms. Baran?

15        THE COURT:  Asked and answered.

16   Q.  Now, going to the actual next document, which is the

17   amendment -- if I could, government -- Ms. Baran then came to

18   you and she corrected this, is that accurate?

19   A.  Yes.

20   Q.  And in correcting it, she gave you a different amount of

21   income, is that right?

22   A.  Yes.

23   Q.  And based upon the new information that you received, you

24   inputted it into this document, is that right?

25   A.  Yes.

D7ndles3b                    Chirichella - cross

1   Q.  And this is what you charge a fee to do, correct?

2   A.  Yes.

3   Q.  Because that's how you earn your living, is that right?

4   A.  Correct.

5           THE COURT:  Asked and answered.

6   Q.  As an accountant, what you do is you assist people, as you

7   mentioned, with their financial planning correct?

8   A.  Yes.

9   Q.  In assisting people with their financial planning, you rely

10  in good faith that whoever you assist -- last question,

11  Judge -- will give you the information that you ask for, is

12  that right?

13          THE COURT:  Asked and answered.

14  Q.  And in developing the actual application -- if I could

15  just -- you could just blow up what the actual income was.  OK.

16          And did that amendment, did you discover that or did

17  Ms. Baran discover that?

18  A.  Ms. Baran discovered that.

19  Q.  And after she discovered it, you said she gave you a phone

20  call, correct?

21  A.  Yes.

22  Q.  And you had every reason to believe when she called you

23  that second time that this was accurate, right?

24  A.  Yes.

25          MR. JACKSON:  Thank you.

D7ndles3b                        Chirichella - cross

1    Q.  And just by the way -- I'm sorry, Judge.

2            And just by the way, in the second document, she

3    signed for that herself, correct?

4    A.  Yes.

5    Q.  She is required to do that?

6    A.  Yes.

7    Q.  And she is required to go -- you are required to go over it

8    with her, right?

9    A.  Yes.

10   Q.  And after she goes over it with you, again you have her

11   sign attesting to its truth, right?

12   A.  Yes.

13   Q.  Because you don't independently on your own --

14           THE COURT:  All right.  Asked and answered.

15           MR. JACKSON:  Got it, Judge.  Thank you.

16           MS. FRIEDLANDER:  Your Honor, just one moment.

17           THE COURT:  Yes.

18           MS. FRIEDLANDER:  I apologize.

19           (Pause)

20           MS. FRIEDLANDER:  Really briefly.

21   REDIRECT EXAMINATION

22   BY MS. FRIEDLANDER:

23   Q.  Just to be clear, Mr. Chirichella, you learned that Marie

24   Baran had reported inaccurate information on her tax returns

25   after she called you, correct?

D7ndles3b                        Chirichella - redirect

1    A.  Correct.

2    Q.  To be clear, she expressed a sense of urgency --

3              MR. JACKSON:  Objection.

4    Q.  -- about the need to meet with you?

5              MR. JACKSON:  Objection.

6              THE COURT:  Sustained.

7    Q.  How would you describe the tone of her voice when she asked

8    to meet with you?

9              MR. JACKSON:  Objection.

10             THE COURT:  Overruled.

11   A.  There was an urgency to have the meeting.

12   Q.  And during that meeting, did she tell you federal agents

13   had been to her home?

14             MR. JACKSON:  Objection.

15             THE COURT:  Overruled.

16   A.  Yes.

17   Q.  And did she tell you she needed to restate her income?

18   A.  Yes.

19             MS. FRIEDLANDER:  No further questions.

20             THE COURT:  Thank you.  You may step down -- any other

21   defendants?  Defense?

22             You may step down.  You are excused.

23             THE WITNESS:  Thank you.

24             (witness excused)

25             MR. WEDDLE:  Your Honor, the government calls Robert

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1195

D7ndles3b

1    Dunaj.

2         THE COURT:  Before Mr. Dunaj takes the stand, I want

3    to go back for one moment to the testimony given by the

4    previous witness -- the witness previous to Mr. Chirichella,

5    and that was Ms. or Agent Cuocci.

6         You may recall during the testimony of Agent Cuocci,

7    she made references to statements made by Ms. Baran in the

8    documents that were described, or the exhibits, in which there

9    were references to Dr. Ajemian and indications that Ms. Baran

10   had recommended Dr. Ajemian.

11        Again, as a limiting instruction, I direct you not to

12   consider any of that testimony as it pertains to any actions

13   charged by the government in this matter against

14   Dr. Lesniewski.

15        MR. JACKSON:  Judge, could we approach on this?

16        THE COURT:  Yes.  On this matter?

17        MR. JACKSON:  Yes.  This.

18        (Continued on next page)

19

20

21

22

23

24

25

D7ndles3b

1           (At the sidebar)

2           THE COURT:  Yes.

3           MR. JACKSON:  Judge, is it your intention to give a

4   limiting instruction on the nature of the testimony that was

5   just heard?  And I just think that it could lead to some

6   confusion.

7           Ms. Baran is not on trial for any tax evasion or tax

8   fraud.  The charges against her are what they are.  I don't

9   want the jury misled or otherwise confused.  I think it might

10  be appropriate to instruct the jury that this particular issue

11  does not go to in any way, shape or form the underlying charges

12  in the Indictment nor should be considered as proof of the

13  underlying charges in the Indictment, and so I think that they

14  would need some limiting instruction to the jury so that they

15  don't believe that the fraud at issue here has anything to do

16  with any type of tax fraud.

17          THE COURT:  That is an overstatement.

18          MS. FRIEDLANDER:  Exactly.

19          THE COURT:  I understand that there is a concern.

20          I will instruct the jury that Ms. Baran is not here

21  charged with tax fraud, and they should not consider that in

22  any way as evidence of tax fraud.

23          MR. JACKSON:  That is all I am asking, Judge.  Thank

24  you.

25          MR. WEDDLE:  But, your Honor, I think it is helpful to

D7ndles3b

1     the jury to explain to them the purpose for which the evidence

2     was admitted.   It is properly admitted and it is properly

3     admitted so that they can evaluate whether Marie Baran acted

4     with intent and knowledge and without mistake.

5              MS. FRIEDLANDER:   Intentionally and knowingly.

6              THE COURT:  All right.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7ndles3b

1              (In open court)

2              THE COURT:  I am going to give the jury another

3      limiting instruction.

4              So with regards to the testimony by Mr. Chirichella

5      regarding the testimony pertaining to Ms. Baran's tax returns,

6      Ms. Baran is not here charged with tax fraud.  So bear that in

7      mind as you consider the weight of this testimony.

8              The testimony was admitted for the purpose the

9      government has introduced it, which is to establish an element

10     of the charges that the government must prove beyond a

11     reasonable doubt, which is that in committing the acts that the

12     government charges in its various charges against Ms. Baran,

13     that she acted with the necessary intent to commit those acts.

14             MR. WEDDLE:  Thank you, your Honor.

15             THE COURT:  Please rise.

16      ROBERT DUNAJ,

17         called as a witness by the government,

18         having been duly sworn, testified as follows:

19             THE COURT:  You may be seated.

20             Speak into the microphone as closely as possible.

21             State your name and spell it for the record.

22             THE WITNESS:  Robert Dunaj, D-u-n-a-j.

23     DIRECT EXAMINATION

24     BY MR. WEDDLE:

25     Q.  Sir, how old are you?

D7ndles3b                    Dunaj - direct

1    A.  61.

2    Q.  Where do you live most of the year?

3    A.  South Carolina.

4    Q.  Do you have a family?

5    A.  Yes.

6    Q.  Who are the members of your family?

7    A.  My wife.

8    Q.  How far did you go in school, sir?

9    A.  I graduated college with a BA.

10             MR. WEDDLE:  And I'm sorry, your Honor, before I go

11   further into the question and answer, I do have a list of

12   exhibits.  I meant to admit them.

13             THE COURT:  OK.  List them.

14             MR. WEDDLE:  The exhibits are 3519-06, 114-G, as in

15   George; 114-B, as in boy; 114-D, as in David; 1353; 114-A,

16   114-F, like Frank; 114-C, like Charlie.

17             THE COURT:  Are all of these agreed upon?

18             MR. DRATEL:  Other than previously stated, your Honor.

19             THE COURT:  All right.  Admitted without objection

20   except as previously stated.

21             (Government's Exhibits 3519-06, 114-G, 114-B, 114-D,

22   1353, 114-A, 114-F, 114-C received in evidence)

23   BY MR. WEDDLE:

24   Q.  Sorry, Mr. Dunaj.

25             Where did you go to work after you finished school?

D7ndles3b                    Dunaj - direct

1   A.  The Long Island Rail Road.

2   Q.  What year did you start at the Long Island Rail Road?

3   A.  1974.

4   Q.  Can you give an overview of the different jobs that you

5   held at the Long Island Rail Road?

6   A.  I was a ticket clerk, ticket agent, customer sales

7   representative, assistant manager, manager, and director.

8   Q.  When you ended up as director, what were you director of?

9   A.  I was director of reverse peak commute and travel

10  information center.

11  Q.  What does that mean?

12  A.  Call center, basically.

13  Q.  When did you stop working at the Long Island Rail Road?

14  A.  2008.

15  Q.  And under what terms did you leave your work at the Long

16  Island Rail Road?

17  A.  I retired.

18  Q.  When you retired how old were you?

19  A.  56.

20  Q.  And about how many years of service did you have on the

21  Rail Road?

22  A.  33.

23  Q.  Did you end up receiving occupational disability payments

24  after you retired?

25  A.  No, I didn't.

D7ndles3b                    Dunaj - direct

1  Q.  Did you submit an application for them?

2  A.  I submitted and withdrew it.

3  Q.  What does occupational disability mean to you?

4  A.  It means that you are not able to work your current job.

5  Q.  And did you have the same general understanding at the

6  time?

7  A.  Not prior to retiring and prior to submitting.

8  Q.  At the time you retired, could you do your Rail Road job?

9  A.  Yes.

10  Q.  And, generally speaking, when you submitted an application

11  for disability, was your application honest?

12  A.  No, it wasn't.  I --

13  Q.  Why was that?

14  A.  As I said, I figured I could work my job and it just didn't

15  sit right with me, the whole process of applying.  So I

16  withdrew it.

17  Q.  Now, who helped you prepare the application material that

18  you submitted and later withdrew?

19  A.  Dr. Ajemian and Marie Baran.

20  Q.  Do you see the Marie Baran who helped you prepare these

21  application materials here in the courtroom?

22  A.  Yes.

23  Q.  Can you point her out and please describe an article of

24  clothing that she is wearing?

25  A.  White blouse with black stripes or dots or pattern.

D7ndles3b                    Dunaj - direct

1              MR. WEDDLE:  Your Honor, may the record reflect that

2      the witness has identified the defendant, Marie Baran?

3              THE COURT:  So noted.

4      BY MR. WEDDLE:

5      Q.  Sir, are you testifying here pursuant to an agreement with

6      the government?

7      A.  Yes.

8      Q.  Have you ever been arrested?

9      A.  No, sir.

10     Q.  Have you ever been charged with a crime relating to this

11     case?

12     A.  No.

13     Q.  And if you take a look in your binder -- it may be the last

14     document in your binder -- there is a document called 3519-06,

15     in evidence -- I'm sorry.

16              There is a binder next to you there, Mr. Dunaj, that

17     may have some documents in it that relate to you, I hope.

18              Do you see the last one in the binder?  Is that your

19     agreement with the government?

20     A.  Yes.

21     Q.  And is your signature on the last page of it?

22     A.  No.  It is a copy.

23     Q.  This is a copy that is unsigned.  We may be able to correct

24     that.

25              But you did sign the document at some time?

D7ndles3b                          Dunaj – direct

1   A.  Yes.

2   Q.  Under this agreement what are you required to do?

3   A.  Give honest testimony.

4   Q.  And under this agreement what has the government agreed to

5   do or not do?

6   A.  Not prosecute me in any way.

7   Q.  Relating to what?

8   A.  Related to the occupational disability.

9   Q.  And what about sickness benefits?

10  A.  And sickness benefits also.

11  Q.  So talking about sickness benefits, about how much money

12  did you receive in sickness benefits?

13  A.  About $4,600.

14  Q.  And did you pay that money back?

15  A.  Yes, I did.

16  Q.  What agency did you pay the money back to?

17  A.  Railroad Retirement Agency.

18  Q.  Were you required to do that as part of your agreement?

19  A.  Yes, sir.

20  Q.  Before you signed the agreement, did you meet with the

21  government?

22  A.  Yes, I did.

23  Q.  About how many times?

24  A.  Twice.

25  Q.  What about after you entered into the agreement, did you

D7ndles3b                         Dunaj - direct

1    also meet with the government?

2    A.   Yes.

3    Q.   Generally speaking, what happened in those meetings?

4    A.   Just asked me about the whole process of I went through

5    applying for the occupational disability.

6    Q.   And for some of those meetings, did you have to travel from

7    South Carolina?

8    A.   Yes, I did.

9    Q.   How did you travel?

10   A.   I flew.

11   Q.   And who arranged for that travel?

12   A.   The government.

13   Q.   Let's go back and talk in some more detail about your

14   retirement and the events leading up to it.

15          As you approached the time that you were considering

16   retiring from the Long Island Rail Road, what had you heard

17   from other coworkers at the Rail Road about the finances of

18   retiring and getting occupational disability?

19          MR. JACKSON:  Objection.

20          THE COURT:  Mr. Weddle, a lot of testimony has been on

21   the record --

22          MR. WEDDLE:  I can move along, your Honor.

23          THE COURT:  Just see if you can move along, and I

24   would ask the defense to be equally indulgent and allow for

25   testimony that has been already admitted by other witnesses

D7ndles3b                      Dunaj - direct

1    just to flow along as smoothly as possible.

2              All right?

3    BY MR. WEDDLE:

4    Q.  Sir, leading up to your retirement, had you heard of any

5    doctors as "go to" doctors in connection with disability at the

6    Rail Road?

7              MR. DRATEL:  Objection to form.

8              THE COURT:  Sustained as to form.

9    Q.  What was your understanding in that time period that I just

10   discussed about who were some doctors or one or more doctors

11   that people typically went to in connection with disability?

12             MR. DRATEL:  Objection to foundation, your Honor.

13             THE COURT:  Overruled.

14   A.  Answer?

15   Q.  Yes, please.

16   A.  Dr. Ajemian.

17   Q.  Any others that you had heard about?

18   A.  No.

19   Q.  And did you have an understanding that people at the Rail

20   Road sometimes had had people help them with the paperwork for

21   occupational disability?

22   A.  Yes.

23   Q.  And for the people who helped fill out the paperwork for

24   occupational disability, did you understand that they did this

25   as a free service?

D7ndles3b                    Dunaj - direct

1   A.  No.

2   Q.  And who had you understood at that time leading up to your

3   retirement were some of the people who performed that service?

4            MR. JACKSON:  Objection.

5            THE COURT:  Overruled.

6   A.  Marie Baran by name, and I knew there was a trainman who

7   also did it.  I don't know his name.

8   Q.  When you say "trainman," what does that mean?

9   A.  Conductor.

10  Q.  And in addition to general talk around the Rail Road, did

11  you also attend a seminar that related to retirement in the

12  time period leading up to your retirement?

13  A.  Yes.

14  Q.  Who were the speakers at the seminar?

15  A.  Long Island Rail Road Pension Department representatives.

16  Q.  And about how many people were attending this seminar,

17  roughly speaking?

18  A.  30/40.

19  Q.  And what did the seminar presenter or presenters say, in

20  general terms, during the seminar?

21  A.  The process of how to retire and your benefits when you

22  retire.

23  Q.  Was there -- I'm sorry.  Just to clarify, do you recall

24  whether there was someone there as a presenter who was employed

25  by the Railroad Retirement Board one way or the other?

D7ndles3b                        Dunaj - direct

1    A.  I don't know.

2    Q.  And did the topic of occupational disability come up at the

3    seminar?

4    A.  Yes, it did.

5    Q.  How extensive was the discussion of that topic at the

6    seminar?

7    A.  Not very extensive but they mentioned it.

8    Q.  And what do you recall them saying about occupational

9    disability?

10   A.  That if you had an injury, that you should look into

11   possibly applying for occupational disability.

12   Q.  And did there come a time when you contacted Marie Baran?

13   A.  Yes.

14   Q.  Do you recall about how long that was or when that was in

15   relation to your retirement date?

16   A.  A couple of months before.

17   Q.  How did you first contact her?

18   A.  I called her.

19   Q.  In that first phone call, what do you recall saying to her

20   and what do you recall her saying to you?

21   A.  Well, I asked her for the process.  And, you know, she

22   basically said that I should go to a doctor and have him

23   certify that I would be qualified for it before seeing her.

24   Q.  At the time, did you have any pains anywhere in your body

25   from time to time?

D7ndles3b                           Dunaj - direct

1   A.  Yes.  Back pain.

2   Q.  And did your back pain at the time prevent you from doing

3   the demands of your job?

4   A.  No.

5   Q.  When you talked to Marie Baran and she said you should go

6   to a doctor, did she tell any particular doctor or suggest any

7   particular doctor or doctors' names to you?

8   A.  She mentioned a few.  The only one I remember is Ajemian.

9   Q.  And did you ultimately go to see Dr. Ajemian?

10  A.  Yes, I did.

11  Q.  Do you recall about how many times?

12  A.  Three or four times.

13  Q.  And do you recall when the first visit was?

14  A.  A month or two before I retired.

15  Q.  And why did you go to Dr. Ajemian at that time?

16  A.  I had lower back pain, and I knew he was one of the people

17  who would fill out the forms for disability.

18  Q.  And do you recall what happened on your first visit?

19  A.  He examined me, took x-rays.

20  Q.  Did he send you for any tests?

21  A.  Sent me for an MRI and some other tests with electric

22  shock.  I don't know the name of the test.

23  Q.  But the other tests involved some kind of an electrical

24  testing of you?

25  A.  Yes, sir.

D7ndles3b                         Dunaj - direct

1    Q.  And the second time you went to Dr. Ajemian, what do you

2    recall him saying to you or what happened on that day?

3    A.  He just examined me and asked me if I was getting any

4    better.  He sent me to physical therapy.

5    Q.  Did you go to a physical therapy?

6    A.  Yes, I did.

7    Q.  Did that help at all?

8    A.  A lot, yes.

9    Q.  Did there come a time when you got paperwork from

10   Dr. Ajemian in connection with applying for disability?

11   A.  Yes.

12          MR. WEDDLE:  And I am going a little bit out of order

13   here, your Honor.

14   Q.  If I could now talk about Government Exhibit 114G.  I

15   apologize, Mr. Dunaj.  It is probably the third-to-last

16   document in your binder.

17          MR. WEDDLE:  If we could also display it on the

18   screen.

19          (Pause)

20          I apologize, your Honor, to the Court and to the jury.

21   Sometimes we seem to have some glitches here, and we are back

22   to musical paper on the screen.  But can we blow up the top

23   half?

24   Q.  Sir, do you have the paper copy?  Did you find it in your

25   binder?

D7ndles3b                          Dunaj – direct

1   A.  I have it on the screen.

2   Q.  So do you recognize what this form is?

3   A.  It is just a registration form that I filled out when I

4   went to see the doctor.

5   Q.  And the doctor you are talking about is?

6   A.  Dr. Ajemian.

7   Q.  And do you see the date that you put on it?

8   A.  Yes.

9   Q.  Do you see the question at the bottom of the screen here?

10  It says, "Who may we thank for referring you us."

11  A.  Yes.

12  Q.  Who did you put in there?

13  A.  Marie Baran.

14          MR. WEDDLE:  Your Honor, if I may?  I offered the

15  wrong exhibit as the agreement.  I offered 3519-06, and as the

16  witness testified, that copy is not signed.

17          THE COURT:  All right.

18          MR. WEDDLE:  I would like to instead offer, or in

19  addition offer, however your Honor would like to do it,

20  3519-07, which is signed.

21          THE COURT:  All right.

22  Q.  So, Mr. Dunaj, do you see that that copy of your agreement

23  is signed by you?

24  A.  Yes.

25          (Government's Exhibit 3519-07 received in evidence)

D7ndles3b                    Dunaj - direct

1   Q.  Sir, did there come time when you got paperwork --

2           MR. WEDDLE:  I apologize, your Honor.  I think I may

3   have already asked this.

4   Q.  I think you testified that you got paperwork from

5   Dr. Ajemian, right?

6   A.  Yes.

7   Q.  Did you have to pay him for that?

8   A.  Yes.

9   Q.  How much did you have to pay him?

10  A.  I think it was $500.

11  Q.  And do you recall whether you paid him in cash or by check

12  or some other way?

13  A.  I think it was cash but -- I am pretty sure it was cash.

14  Q.  How sure are you about the $500 figure?

15  A.  Fairly sure.

16  Q.  OK.  And if we could take a look at some of that paperwork.

17          Let's start with Government Exhibit 114B, as in boy.

18  It should be the second document in your binder.

19          Sir, the paper copy doesn't have these lines across

20  it, right?

21  A.  Correct.

22  Q.  So feel free to use the paper copy if it is easier for you

23  to read.

24          Sir, when you submitted your documentation to the RRB

25  to obtain or to apply for occupational disability, how closely

D7ndles3b                    Dunaj - direct

1   did you read the documentation?

2   A.  I didn't read it.

3   Q.  OK.  And since then, or in preparation for testifying here,

4   have you had an opportunity to go through some of these

5   documents in detail?

6   A.  Yes.

7   Q.  And on page -- the fifth page of this document -- Ms. Chen,

8   if you can blow up the question 21 section -- do you see, it

9   says -- there is a medical restriction that's saying, "No

10  sitting, standing" -- I can't read it right now -- a certain

11  number of hours "total daily.  No pushing, pulling, lifting,

12  carrying greater than 25 pounds.  No bending, stooping,"

13  something, "squatting, kneeling, twisting, climbing or lifting

14  overhead."

15          Do you see that?

16  A.  Yes.

17  Q.  Did Dr. Ajemian tell you that you were medically restricted

18  from doing any of those things?

19  A.  No.

20  Q.  At the time could you sit, stand or walk for more than a

21  total of three hours a day?

22  A.  Yes.

23  Q.  Does that look like "Walking greater than three hours total

24  daily" there in the first line that is on the screen?

25          Can you highlight after the caret there?  It looks

1213

D7ndles3b                          Dunaj - direct

1   like "three hours total daily," right?

2   A.   OK.

3   Q.   You have to have answer verbally.

4   A.   Yes.

5   Q.   And then let's look at the next document, which is 114D, as

6   in David.

7          And do you have that in your binder?  It is a couple

8   of documents further into the binder.  Do you see that?

9   A.   Yes.

10  Q.   And what is this document?

11  A.   I think this is the report that the doctor prepared.

12  Q.   And it is about you, right?

13  A.   Yes.

14  Q.   And you submitted it to the RRB?

15  A.   Yes.

16  Q.   And it says on the first page, it says, "Robert Dunaj first

17  presented to my office on June 6, 2008 complaining of back pain

18  and pain to both legs."

19  A.   Yes.

20  Q.   Did you complain about pain to both legs?

21  A.   Yes.

22  Q.   And what kind of pain did you have in your legs?

23  A.   Pins and needles more than pain.

24  Q.   Did any of that pins and needles, how often did you have

25  pins and needles in your legs?

D7ndles3b                         Dunaj - direct

1   A.  Occasionally.

2   Q.  Did that interfere with your work in any way?

3   A.  No.

4   Q.  Now, do you see in the first page, it says -- I guess, the

5   third sentence, it says:  "Problems are associated with

6   sitting, standing and bending that interfere with his daily job

7   and home life as well."

8           Is that sentence true?

9   A.  No.

10   Q.  Then it says, a couple of sentences down, "The pain can be

11   dull or sharp and can be as high as 7 out of 10 in severity

12   that precludes comfortable activity, precludes sitting for long

13   periods of time."

14           Was that true at the time?

15   A.  No.

16   Q.  Did you tell Dr. Ajemian that it was true at the time?

17   A.  That I couldn't sit?  No.

18           (Pause)

19           MR. WEDDLE:  Sorry, your Honor.  I am just looking for

20   a page here.

21   Q.  Then if we can turn to the second-to-last page of this

22   document.

23           Do you see under July 27th, which that is the same day

24   as that intake sheet we just saw, right?

25   A.  June 27th.

D7ndles3b                         Dunaj - direct

1    Q.  I'm sorry, you are right.  June 27, 2008.

2                It says you had persistence complaints of lower back

3    pain, stating again that protracted walking of more than a half

4    an hour to 40 minutes, trying to go up and down stairs, sitting

5    in his work chair and getting to and from his job.  He has

6    persistent, dull, aching pain.

7                THE COURT:  Mr. Weddle, can we move this along?

8                MR. WEDDLE:  OK.

9    Q.  Fair to say that this is not totally accurate, right?

10   A.  Correct.

11   Q.  You had some back pain --

12   A.  Yes, sir.

13   Q.  -- from time to time?

14               And it was relatively minor?

15   A.  It was pain --

16               THE COURT:  Asked and answered.

17   Q.  And then on the last page, I guess the second-to-last

18   sentence, it says, "At this time the patient appears to be an

19   appropriate candidate for disability retirement as he has

20   problems that preclude his job at this time and forever."

21               Was that true?

22   A.  No.

23   Q.  Did you tell Dr. Ajemian that it was true?

24   A.  No.

25   Q.  Did he ask you about whether you could do your job?

D7ndles3b                    Dunaj - direct

1   A.  No.

2   Q.  Now, let's take a look at 1353.  And let's start by looking

3   actually at the second page of 1353.  And we could blow up the

4   top half.

5        Sir, what is this page?

6   A.  "Application for Sickness Benefits."

7   Q.  OK.  And who filled it out?

8   A.  I think Marie Baran filled this out.

9   Q.  OK.  Then let's take a look at the next page.

10       At the bottom, who signed it?

11  A.  I did.

12  Q.  And then let's take a look at the next page.

13       What doctor signed off on your claim for sickness

14  benefits?

15  A.  Ajemian.

16  Q.  If we can zoom out.

17       Do you see when he signed off on your sickness

18  benefits, he had seen you how many times, according to this

19  document?

20  A.  It says twice.

21  Q.  And, I guess, in the narrative, or the report that you just

22  mentioned, the report that we were just looking at -- let me

23  just ask it this way.

24       How many times do you think you went to Dr. Ajemian

25  before you retired?

D7ndles3b                    Dunaj - direct

1   A.  Two or three times, that's it.

2   Q.  And let's look at the first page of this exhibit.

3        And this is -- who wrote this letter?

4   A.  I did.

5   Q.  And in the first sentence of this letter, it says, "I am

6   applying for sickness benefits as of June 30, 2008.  The last

7   day I worked was June 27, 2008.  I was out sick on June 30, and

8   I am unable to work due to a disability."

9        Was that true?

10  A.  No.

11  Q.  OK.  Now, let's take a look at Government Exhibit 114 --

12  I'm sorry, let me back up.

13       After you got these documents from Dr. Ajemian, the

14  ones we were just talking about, what did you do next regarding

15  occupational disability?

16  A.  I made an appointment with Marie Baran.

17  Q.  And what, if anything, did she tell you to bring to the

18  meeting?

19  A.  Job description, doctors' information, I think

20  identification.  I don't remember what else.

21  Q.  And where did you meet with her?

22  A.  In Rockville Centre.

23  Q.  And what kind of office was it?

24  A.  In a union office.

25  Q.  Do you remember the union?

D7ndles3b                    Dunaj – direct

1    A.  TCU.

2    Q.  How long was your meeting with her, about?

3    A.  An hour, an hour and a half.

4    Q.  And what happened during that time?

5    A.  She took the doctors' information and inputted it into a

6    form on a computer.

7    Q.  To what extent was she asking you for information as she

8    was filling out the form?

9    A.  Every now and then she would ask me for information.

10   Q.  Did she ask you whether sitting or driving or bathing were

11   hard for you?

12   A.  No.

13   Q.  Did she ask you to describe your typical day?

14   A.  I think so.

15   Q.  And did she ask you if you were unable to do your job?

16   A.  No.

17   Q.  What did she ask you about your job, if anything?

18   A.  She asked me what physical demands I had on my job.

19   Q.  Like what?  Do you recall any of the physical demands?

20   A.  Just walking and climbing stairs and things like that.

21   Q.  And were you able to walk and climb stairs in your job?

22   A.  Yes.

23   Q.  Did you tell Marie Baran that you were unable to do those

24   things?

25   A.  No.

D7ndles3b                           Dunaj - direct

1    Q.  Did you pay Marie Baran for filling out the paperwork?

2    A.  Yes.

3    Q.  How much?

4    A.  $1,200.

5    Q.  When did you pay her?

6    A.  When I went to see her that one day in her office.

7    Q.  How did you pay her?

8    A.  Cash.

9    Q.  And how closely did you read the forms that she filled out?

10   A.  I didn't read them.

11   Q.  And what did you do with those forms and the medical forms?

12   A.  I made an appointment with Railroad Retirement and brought

13   them down and filed for an occupational disability.

14   Q.  And let's take a look at some of the forms.  Can we look at

15   114A?

16           So 114A is your application -- relates to your

17   application for occupational disability, right?

18   A.  Yes.

19   Q.  Who filled this form out in terms of the typewritten parts?

20   A.  Marie Baran.

21   Q.  And in question 11 it says, "Enter the date you could no

22   longer work because of your condition," and it says "June 28,

23   2008."

24           Is that true, that you could no longer work as of

25   June 28, 2008?

D7ndles3b                    Dunaj – direct

1   A.  That was my retirement date but I was physically able to

2   work.

3   Q.  And let's skip ahead to page 5 of this exhibit, questions

4   24 through 26.  Do you see that?

5   A.  Yes.

6   Q.  Here it says, "Enter the name of the medical doctor who

7   imposed the restriction on you."  And it says "Dr. Peter

8   Ajemian."

9          Then it says the restriction imposed on you is "No

10  standing, walking or sitting for extended periods of time.

11  Cannot bend, stretch or kneel or crouch.  No pushing, pulling

12  or lifting excessive weights."

13         Did Dr. Ajemian impose that restriction on you?

14  A.  No.

15  Q.  Did you tell Marie Baran that he had?

16  A.  No.

17  Q.  And in terms of the forms that we looked at, were there

18  indications in the forms that talked about the medical

19  assessment form where he had written restrictions in there that

20  he had never told to you, right?

21  A.  Correct.

22              (Continued on next page)

23

24

25

D7nnles4                          Dunaj - direct

1    Q.  Let's take a look at the next page.

2              MR. WEDDLE:  If you could blow up Section 6.

3    Q.  Section 6, you see it says -- let me just ask you, sir.

4              At the time, was it hard for you to sit because of

5    severe pain and discomfort if done for long periods?

6    A.  It hurt, but it wasn't hard.

7    Q.  Was it hard for you to stand for that same explanation?

8    A.  No.

9    Q.  Was it hard for you to walk?

10   A.  No.

11   Q.  Was it hard for you to bathe?

12   A.  No.

13   Q.  Let me just do a few more just in summary form.

14             Dressing, other bodily needs, driving a motor vehicle,

15   and using public transportation, were those things hard for

16   you?

17   A.  No.

18   Q.  Was it impossible for you to do indoor chores or outdoor

19   chores at the time?

20   A.  No.

21   Q.  Did you tell Marie Baran that it was?

22   A.  No.

23   Q.  Then let's look at question 40.

24             It says, "I sleep very poorly because of lower back

25   pain.  I get up around 7 a.m.  I have breakfast, shower, and

D7nnles4                          Dunaj - direct

1    dress, I go to physical therapy and do some light exercise to

2    stretch as prescribed by my doctor" -- sorry "I got to physical

3    therapy."

4              "Sometimes I cook or do light housework that doesn't

5    require I bend or reach or lift.  I rest in the afternoon and

6    take a short nap.  I have lunch at home and read books or

7    magazines.  Evenings I have dinner at home with my spouse and

8    watch TV.  Occasionally I visit with friends or family."

9    Q.  Do you think you drafted that language or somebody else?

10   A.  I'm sorry?

11   Q.  Did you draft that language?

12   A.  No.

13   Q.  Did you compose that text?

14   A.  No.

15   Q.  Who did?

16   A.  Marie Baran.

17   Q.  Then, on the last page, you signed the document, right?

18   A.  Yes, sir.

19   Q.  You realized that above your signature it says that you are

20   certifying that the information on this form is true to the

21   best of your knowledge, right?  You understand that?

22   A.  Yes.

23   Q.  And we have just been through it, but it wasn't?

24   A.  I didn't read the form before I signed it.

25   Q.  Today you know, right?

D7nnles4                          Dunaj - direct

1    A.  Yes.

2    Q.  If you take a look, sir, at 114-C, like Charlie.  This is a

3    vocational report.  Do you see that?

4    A.  Yes.

5    Q.  Who filled this out for you?

6    A.  Marie Baran.

7    Q.  Is any of the handwriting on this document yours?

8    A.  My signature.  That's it.

9    Q.  Do you know whose handwriting the rest of it is?

10   A.  Marie Baran.

11   Q.  Do you know that for sure or is that your belief?  That is,

12   did you see her write this or are you --

13   A.  I don't remember.

14   Q.  Do you have familiarity independently with her handwriting?

15   A.  No, I'm not.

16   Q.  Sir, as you were going through this process from your first

17   contact with Marie Baran to applying for occupational

18   disability, how did you feel about it?

19           MR. JACKSON:  Objection.

20           THE COURT:  Sustained.  Rephrase the question.

21   Q.  During this period of time that we have been talking about,

22   the first contact with Marie Baran to when you applied, what

23   was going through your mind in terms of this application?

24   A.  I didn't intend originally to apply for the occupational

25   disability, and I withdrew it, and I just didn't feel like the

D7nnles4                              Dunaj – direct

1   whole thing was right to do.  It just didn't feel like it was

2   the right thing to do, and that's why I withdrew it.

3   Q.  You said you didn't think it was the right thing to do.

4   How did you feel about it as you were going through the

5   process?

6           MR. JACKSON:  Objection.

7   Q.  How did you feel about it?

8           THE COURT:  Sustained.

9   Q.  And, sir, let's take a look now at Government Exhibit

10  114-E, like Edward.  On the screen this is a little bit hard to

11  read, but what is this?

12  A.  It is my letter to withdraw my application for disability.

13  Q.  What's the date of it?

14  A.  October 21.

15  Q.  2008?

16  A.  2008.

17  Q.  Who wrote this letter?

18  A.  I did.

19  Q.  Why did you write this letter?

20          THE COURT:  Asked and answered.

21  Q.  Sir, what have you done since retiring in terms of physical

22  activity and leisure activity?

23  A.  I don't have any restrictions.

24  Q.  Do you ever play golf?

25  A.  Yes.

D7nnles4                          Dunaj - direct

1    Q.  About how often have you played golf in your retirement?

2    A.  Twice a week.

3    Q.  And how about tennis?  Have you had a regular tennis game

4    at any point in your retirement?

5    A.  I did early in my retirement.

6    Q.  And when you did have a regular tennis game, about how

7    often?

8    A.  Once a week.

9    Q.  Did you stop your regular tennis because of any kind of

10   physical condition?

11   A.  No.

12   Q.  Why did you stop?

13   A.  We moved.  I couldn't find anybody to play down in South

14   Carolina.

15   Q.  Do you spend part of the year up here in the northeast?

16   A.  Yes, I do.

17   Q.  How do you get back and forth between your place in South

18   Carolina and the northeast?

19   A.  We drive.

20   Q.  How long a drive is that?

21   A.  12, 14 hours.

22   Q.  Today, sir, would you be capable of performing your

23   railroad job?

24   A.  I think so.

25            MR. WEDDLE:  Can I just have one moment, your Honor.

D7nnles4                          Dunaj - direct

1            Nothing further, your Honor.

2            THE COURT:  Mr. Jackson.

3            MR. JACKSON:  Thank you, Judge.

4            THE COURT:  Before Mr. Jackson begins, let me give the

5     same limiting instruction with regards to the testimony of this

6     witness during direct as well as during cross-examination.

7     Insofar as it pertains to any actions by Dr. Ajemian or any

8     statements attributable to him, they are not to be used by you

9     to draw any conclusions with respect to the charges brought

10    against Dr. Ajemian in this matter -- I'm sorry,

11    Dr. Lesniewski.

12           MR. JACKSON:  Your Honor?

13           THE COURT:  Yes.

14           MR. JACKSON:  Thank you, your Honor.

15    CROSS EXAMINATION

16    BY MR. JACKSON:

17    Q.  If I can ask you, during the hour and a half you spent in

18    Ms. Baran's office, did Ms. Baran give you any indication that

19    your occupational disability would be guaranteed?

20    A.  No.

21    Q.  Did she in any way say to you that the fee that she charged

22    you would be altered or otherwise increased based upon you

23    getting that occupational disability?

24    A.  No, I understood it as a one time fee for filling out the

25    application.

D7nnles4                          Dunaj - cross

1    Q.  At any time did she say that she would use any influence

2    that she had with the Railroad Retirement Board to get you any

3    type of disability?

4    A.  No.

5    Q.  Now, you mentioned that you submitted an application, and

6    that application you withdrew it because you felt bad about it.

7    Is that what you said?

8    A.  No, I didn't feel like it was the right thing to.

9    Q.  As a result of you not feeling it was the right thing to

10   do, you withdrew the application, is that correct?

11   A.  Correct.

12   Q.  Would it be fair to say, sir, that you withdrew the

13   application because right after you filed it you read a New

14   York Times article that discussed the issue here and the

15   problems with this occupational disability?  Would that be fair

16   to say?

17   A.  I did read an article, and it may have influenced me, but

18   it was a secondary thing.

19   Q.  But it was after you read that article, sir, about this

20   occupational disability that you then took steps to withdraw

21   your application.  Is that fair to say?

22   A.  Yes.

23   Q.  So it wasn't that you just went in because you had a change

24   of heart as to applying, there was a purpose and reason for

25   which you withdrew your application?

D7nnles4                         Dunaj - cross

1    A.  There was another reason, too.  I was starting to feel

2    better, so that was another, between that and feeling that it

3    was not the right thing to do.

4    Q.  So after you read the newspaper article, you started

5    feeling better?

6    A.  I started feeling better prior to that.

7    Q.  Before you read it, you felt better?

8    A.  Yes.

9    Q.  But you didn't actually take the affirmative steps to write

10   the letter that Mr. Weddle showed you, and that would be

11   People's 114-E?

12            MR. WEDDLE:  Your Honor, I apologize.  I think when I

13   read my list, I omitted 114-E.  We did talk about it and it was

14   on the screen.  With counsel's indulgence, can I just add it to

15   my list, 114-E?

16            MR. JACKSON:  I am indulgent, Judge, no problem.

17            THE COURT:  OK.

18            (Government's Exhibit 114-E received in evidence)

19            MR. JACKSON:  With the indulgence, my indulgence of

20   Mr. Weddle, if we can just see 114-E on the screen.  This is

21   the letter that we are talking about that you withdrew your

22   application, is that right?

23   A.  Correct.

24   Q.  The date on that letter is October 21, 2008?

25   A.  Correct.

D7nnles4                         Dunaj - cross

1   Q.  You did that because you tried to do it verbally but you

2   were told you needed to have something in writing, is that

3   accurate?

4   A.  That's accurate.

5   Q.  So, as a result of you then learning that you needed

6   something in writing, you prepared this and therefore submitted

7   it, correct?

8   A.  Correct.

9   Q.  Also, with regard to, prior to this I guess, you

10  actually --

11          MR. JACKSON:  If we can just see 1353, Government's

12  Exhibit 1353.  1353 if we could just have this blown up a bit.

13  Q.  1353, what is this?  Explain this in your own words.

14  A.  OK.  I was advised that I should apply for sickness

15  benefits since I was applying for the occupational disability

16  starting on the day I retired.

17  Q.  It's true that you created this letter, is that right?

18  A.  That's correct.

19  Q.  This came from you?

20  A.  Yes.

21  Q.  It is something that you drafted on your computer or

22  elsewhere, is that right?

23  A.  Yes.

24  Q.  That's your signature that appears there?

25  A.  Yes.

D7nnles4                          Dunaj - cross

1    Q.   That is not Ms. Baran who prepared the letter, is that

2    accurate?

3    A.   That's accurate.

4    Q.   And this letter didn't come from Ms. Baran's computer, is

5    that right?

6    A.   That's correct.

7    Q.   You took the affirmative steps and you actually mailed this

8    document as well, did you not?

9    A.   Yes.

10   Q.   You say that this wasn't true?  Am I accurate in saying

11   that the letter that you submitted concerning your sickness was

12   untrue?

13   A.   I don't understand the question.

14   Q.   Sure.  When you were applying for sickness benefits, were

15   you really sick?

16   A.   I had back pain, yes.

17   Q.   So you were sick?

18   A.   It wasn't enough to cause me not to be able to work my

19   current job.

20   Q.   But were you sick enough to write the letter, is that

21   right?

22   A.   I was advised that because I was applying for railroad

23   disability I should write -- this was the letter was written --

24   because there was a foul-up in the timing of putting in my

25   sickness benefit form.

D7nnles4                        Dunaj - cross

1   Q.  OK.  So --

2   A.  Because the forms crossed in the mail basically.

3   Q.  Just to be clear, though, you didn't write the letter

4   because you were -- I don't want to put words in your mouth.

5   So you were indeed sick when you submitted this letter?  Yes or

6   no?

7   A.  No, I wasn't sick.  My back hurt, but I wouldn't consider

8   myself unable to work.

9   Q.  But you submitted it anyway?

10  A.  Yes.

11  Q.  That would have been a lie, correct?

12  A.  What would have been a lie.

13  Q.  You submitting a letter indicating you're sick and you're

14  not?

15  A.  Yes.

16  Q.  In fact, you mentioned today that Marie Baran referred you

17  to Dr. Ajemian.  Did you not say that?

18  A.  She mentioned his name, yes.

19  Q.  That's different, but I'm asking you the question, did

20  Ms. Baran refer you to Dr. Ajemian?

21  A.  What do you consider a referral?

22  Q.  Telling you to go see Dr. Ajemian upon my recommendation.

23  That would be a referral.

24  A.  She recommended me to go to see a doctor, and she named

25  several names, including Dr. Ajemian.

D7nnles4                          Dunaj - cross

1   Q.  So she gave you several choices, then, to choose from, is

2   that correct?

3   A.  Yes.

4   Q.  She didn't specifically, because I believe Mr. Weddle asked

5   you about how you got to Dr. Ajemian, and you said that

6   Ms. Baran told you to go.  Did you say that?

7          MR. WEDDLE:  Objection.

8   A.  I don't remember exactly what I said.

9          THE COURT:  Sustained.

10  Q.  But it is clear now when you say she gave you several

11  names, could you name other names she gave you?

12  A.  I don't remember the other names.

13  Q.  You just know that there were a number of people other than

14  Dr. Ajemian to be clear that she said you should see, could

15  see?

16  A.  Could see, yes.

17  Q.  And she didn't give you a particular preference that she

18  had of one over the other, did she?

19  A.  No.

20  Q.  She didn't say, for example, someone other than Ajemian

21  that would be the better doctor to go to, right?

22  A.  No.

23  Q.  She just gave you a panoply of choices, leaving it up to

24  you?

25         THE COURT:  Asked and answered.

D7nnles4                          Dunaj - cross

1          MR. JACKSON:  OK.

2   Q.  Now, I want to go back to the hour and a half that you met

3   with Ms. Baran in her office.  OK.

4          The hour and a half that you met with her in her

5   office, you were having a conversation with her about certain

6   things, is that correct?

7   A.  She asked me questions.

8   Q.  She was asking you a number of questions?  That would be

9   true?

10  A.  Yes.

11  Q.  Those questions were regarding your disability, is that

12  right?

13  A.  Some of them.

14  Q.  In fact, Ms. Baran didn't, you called -- withdrawn.  You

15  called Ms. Baran to set up an appointment with her, is that

16  right?

17  A.  That's right.

18  Q.  She didn't otherwise find you and say, you know what, come

19  to me?

20  A.  No.

21  Q.  You actually went and you took --

22          THE COURT:  Asked and answered.

23          MR. JACKSON:  OK.

24  Q.  In going actually to Ms. Baran you said that she had

25  somewhat of a reputation, is that correct?

D7nnles4                          Dunaj - cross

1    A.  Correct.

2    Q.  In that reputation, just to be clear, people weren't

3    telling you that Ms. Baran is a fraud, you need to see her.

4    That never happened, right?

5    A.  Correct.

6    Q.  People weren't telling you that Ms. Baran would put

7    anything you want in a document and so therefore you should see

8    her.  That didn't happen, correct?

9    A.  Correct.

10   Q.  In fact, she just had a reputation in this particular

11   industry for being good at what she did.  Would that be right?

12   A.  Yes.

13   Q.  Based upon her reputation of being effective, what was an

14   impetus for you to go seek out her counseling, correct?

15   A.  Yes.

16   Q.  And associated with her counseling, of course, you didn't,

17   as Mr. Weddle talked to you, you didn't suppose that it would

18   be free, right?

19   A.  Correct.

20   Q.  Based upon that, you said that you spent a significant

21   amount of time in her office?

22   A.  An hour to an hour and a half.

23   Q.  In that hour and a half, do you recall her going over an

24   application with you, Government --

25              MR. JACKSON:  If I could just see 114-A, please.

D7nnles4                              Dunaj - cross

1   Q.  She went over an application with you, correct?

2   A.  Correct.

3   Q.  In going over an application with you it would be fair to

4   say that that was a series of time and you could just tell me,

5   I don't want to put words in your mouth, but this here --

6           MR. JACKSON:  If you could just blow it up a little

7   more, please, the first page, the first half of the page.

8   Q.  This is one of the documents that you reviewed with her, is

9   that right?

10  A.  Yes.

11  Q.  In reviewing one of the documents with her --

12          MR. JACKSON:  If we could just go on that document to

13  page 3, if we go to page 3, 17 from A to D, please.  Thank you.

14  Q.  There is information there that you see Dr. Sharon and

15  Dr. Effen.  Do you see that?

16  A.  Yes.

17  Q.  '04?  Do you see where it says that?

18  A.  Yes.

19  Q.  Do you see under that it says dates of treatment and you

20  list certain dates of treatment?

21  A.  Yes.

22  Q.  As a matter of fact, to the left of that it lists who the

23  doctor is.  Do you see that?

24  A.  Yes.

25  Q.  Under that it says Dr. Sharon, and then I can't quite make

D7nnles4                          Dunaj - cross

1   it out.  Under that it says Dr. Effenmon, I believe?

2   A.  Right.

3   Q.  Those are doctors that you went to see, is that right?

4   A.  Those are doctors that Dr. Ajemian sent me to to have a

5   test.

6   Q.  When Dr. Ajemian sent you there, you didn't say,

7   Dr. Ajemian, I'm not really disabled I am not going to go see

8   them.  You didn't say that to him, correct?

9   A.  I was interested in finding out what was wrong with my

10  back, so I went for the tests.

11  Q.  That is because you had a back problem, correct?

12  A.  I had back pain, yes.

13  Q.  Because of that back pain, you thought it was important to

14  go to the doctors who you were recommended to go to, right?

15  A.  Yes.

16  Q.  In fact, you did do that, right?

17  A.  Yes.

18  Q.  In addition to that, I see that there are some tests.  Do

19  you see where it says MRI lumbar spine?  Do you see that?

20  A.  Yes.

21  Q.  Under that, where it says nerve conductive study of lower

22  extremities, right?

23  A.  Yes.

24  Q.  Those are things that you actually participated in, is that

25  right?

1   A.  Yes, sir.

2   Q.  Therefore, you participated in them because you felt that

3   you were actually sick or disabled, right?

4   A.  My back hurt.  I didn't feel -- in my mind I wasn't

5   disabled.

6   Q.  Forgetting about the conclusion for a minute that you were

7   disabled, but you felt yourself that you were in enough pain to

8   seek out professional help, correct?

9   A.  Yes.

10  Q.  When you went to see Ms. Baran, in fact, you conveyed to

11  her that you believed you were an appropriate candidate for an

12  occupational disability, and you needed her assistance, is that

13  right?

14  A.  I came to her as an adviser to ask her if I was an

15  appropriate candidate for disability and get her assistance,

16  yes.

17  Q.  You understand that Ms. Baran wasn't a doctor.  You

18  understand that, correct?

19  A.  Yes, sir.

20  Q.  You understand that that's why, based on her not being a

21  doctor, that's why, for example, you were given a number of

22  options of other people to see, right?

23  A.  Yes.

24  Q.  Now, if we can go to Section 6, please where it's

25  information about your daily activities.  You are not

1   suggesting, are you, to this jury that in the hour and a half

2   that you were in Ms. Baran's office that she didn't ask you any

3   one of these questions?

4   A.  She didn't ask me a lot of those questions.

5   Q.  That is a recollection that you have today about her not

6   asking you that, correct?

7            MR. WEDDLE:  Objection, your Honor.

8            THE COURT:  Overruled.

9   A.  Repeat.

10  Q.  You have that recollection that in 2008 in an hour and a

11  half in her office that she didn't ask you any of this, right?

12  A.  She asked me some of it.

13  Q.  And what is some that she asked you, just if we can know?

14  A.  If I had problems sitting, walking that type of thing.  But

15  on the right hand side it says severe pain and discomfort if

16  done for long periods of time.  That is not true.

17  Q.  So it's not true that you don't have it for long periods of

18  time.  Is that what you are saying?

19  A.  Yes.

20  Q.  You just know that she asked you certain questions

21  associated with what is in Section 6.  You admit that, right?

22            MR. WEDDLE:  Objection, your Honor.  That's not what

23  he said.

24            THE COURT:  Overruled.

25  A.  Some of the questions, yes.

D7nnles4                         Dunaj - cross

1    Q.  What other questions, in addition to those that you just

2    conveyed to us, did she ask you while were you in her office?

3    A.  What I did for my job, physically what I did for my job.

4    Q.  We can also agree in response to Mr. Weddle's questions she

5    asked you about your daily activities as well, is that right?

6    A.  Yes.

7    Q.  You have her a response regarding your daily activities?

8    A.  Yes.

9            MR. JACKSON:  If we could go to the last page, please,

10   which is page 10.

11   Q.  On page 10, around where your signature is, it says

12   9/17/2008.

13           MR. JACKSON:  If we can just have that blown up a bit,

14   please.  Thank you.

15   Q.  That is your signature, correct?

16   A.  Correct.

17   Q.  You are attesting to the truth of what is in this

18   application?

19   A.  According to that, yes.

20   Q.  At any time, by the way, while you were with Ms. Baran, in

21   that conversation, did you say to her, You know what,

22   Ms. Baran, I'm really not disabled, but I really need you to

23   get me this disability?  Did you ever say that to her?

24   A.  I never said that to her.

25   Q.  At all, correct?

D7nnles4                          Dunaj - cross

1    A.   Correct.

2    Q.   You weren't in cahoots with Ms. Baran such that you said to

3    her, you know what, if I get this disability I'll give you a

4    percentage of it.   Did that ever come up?

5            MR. WEDDLE:   Object to the form.

6            THE COURT:   Sustained.

7    Q.   OK.   Now, in addition to that --

8            MR. JACKSON:   If I could just have the government put

9    up 114-B, please.

10   Q.   Before going to 114-B, sir, if I could just ask, when you

11   were having a conversation with Ms. Baran and she was asking

12   you questions, you do recall giving her information, correct?

13   A.   Yes.   Correct.

14   Q.   You do recall her asking you certain questions with regard

15   to what was in that application?

16   A.   Yes.

17           MR. JACKSON:   And if I could just, with the Court's

18   indulgence, and then we will move from 114-A, government, if

19   you could just put back up the first page of 114-A, the top

20   quarter of the page.

21   Q.   Now, after meeting with Ms. Baran, you went and you filed

22   this application again, correct?   I'm sorry.   Not again.   For

23   the first time.

24   A.   Yes, sir.

25   Q.   At the time that you filed that application you met with

D7nnles4                          Dunaj - cross

1    Railroad Retirement Board officials, did you not?

2    A.  Yes, sir.

3    Q.  At that time they reviewed the application with you, didn't

4    they?

5    A.  Yes.

6    Q.  In reviewing the application with them, at any time, sir,

7    did you say, You know what, it really isn't hard for me to sit?

8    A.  No.

9    Q.  Did you say to them, It says severe pain in the right-hand

10   side, but I'm really not severely painful, so could we take

11   that out?

12   A.  I really didn't look over the form.

13   Q.  But you had an opportunity to look at the form, correct?

14   A.  I did.

15   Q.  In fact, when you were in Ms. Baran's office that would

16   have been prior to 9/17/2008, right?

17   A.  Correct.

18   Q.  How much prior would it have been to that time?

19   A.  I would say during the month of August.

20   Q.  During the month of August when you saw her, you took the

21   application with you, didn't you?

22   A.  Yes.

23   Q.  She didn't take it and keep it in her office, did she?

24   A.  No.

25   Q.  She didn't say, It's between you and I, this application,

D7nnles4                      Dunaj - cross

 1   don't say nary a word.  She didn't say that?

 2   A.  No.

 3   Q.  You had this at all times in your possession?

 4        THE COURT:  Asked and answered.

 5   Q.  On the day that you went to give it to them, this

 6   particular person -- there is a signature there.  Do you see

 7   that, this particular signature?

 8   A.  Right.

 9        MR. JACKSON:  If you could just blow up that

10   signature.

11   Q.  That would have been a person at the RRB to reviewed the

12   application and, according to what it says there, approved it?

13        MR. WEDDLE:  Objection, your Honor, to the

14   characterization.

15        THE COURT:  Sustained.

16        MR. JACKSON:  OK.

17   Q.  Without telling us what they did, do you know that the

18   person whose signature appears there, do you know who it was

19   who actually interviewed you at the RRB?

20   A.  I don't know.

21   Q.  Do you know whether it was a male or female?

22   A.  I think it was a male.

23   Q.  That male, following the hour and a half that Ms. Baran

24   spent with you, how much time did this person at the RRB spend

25   with you?

D7nnles4                         Dunaj - cross

1    A.  Maybe an hour.

2    Q.  In that hour of time, you already had the documentation

3    completed, correct?

4    A.  Correct.

5    Q.  You were going over the completed documentation with

6    someone from the RRB, right?

7    A.  I handed it to him and he looked at it.

8    Q.  As he was looking at it for an hour, you were sitting

9    across from him, correct?

10   A.  Correct.

11   Q.  At any time during that hour and a half, did he ask you

12   questions concerning various entries in this application?

13   A.  I don't recall.

14   Q.  For an hour and a half, sir, did you have a conversation

15   with him?

16   A.  About an hour, sir.

17   Q.  I'm sorry.  It is Ms. Baran.  I apologize.  My correction.

18           For the hour that you sat across from him, can we

19   agree that he was asking you questions concerning the

20   application?

21   A.  He was reviewing it.  I don't recall exactly what went on.

22   Q.  Were you sitting across from him?

23   A.  Yes.

24   Q.  As he was reviewing it, was he saying things to you or was

25   it a silent one hour?

D7nnles4                    Dunaj - cross

1  A.  I am sure he said things to me, but I don't remember what.

2  Q.  Did you give any responses to him?

3  A.  I don't remember the questions or --

4  Q.  And that was because -- I'm sorry.

5  A.  Or the meeting.

6  Q.  That was because it was in 2008, right?

7  A.  It was five years ago, yes.

8  Q.  So five years ago, your memory wouldn't be as good as it is

9  now?

10 A.  My memory is fine.

11         MR. WEDDLE:  Objection, your Honor.

12         THE COURT:  Sustained.

13         Mr. Jackson, we need to take the afternoon break.  How

14 much longer do you need with the witness.

15         MR. JACKSON:  Judge, I have about 20 minutes or so.

16         THE COURT:  If it's that long, let's break at this

17 point.  10 minutes.

18         (Recess)

19       (Continued on next page)

20

21

22

23

24

25

D7nnles4                          Dunaj - cross

1          (Jury not present)

2               THE COURT:  All right.  Bring in the jury.

3               The latest that we have heard from Ms. Rasbatt, the

4     juror who had the appointment, is that she is still waiting to

5     hear from the doctor.  She may know by tomorrow, and she will

6     let us know.

7               (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7nnles4                          Dunaj - cross

 1             (Jury present)

 2             THE COURT:  Mr. Jackson.

 3             MR. JACKSON:  Judge, I have downwardly revised my time

 4   to five minutes.  If I could just have the government put up

 5   114-B, please.

 6   Q.  This, sir, you recognize to be a medical assessment, is

 7   that correct?

 8   A.  Correct.

 9   Q.  Is Ms. Baran responsible, was she responsible for giving

10   you this medical assessment, sir?

11   A.  No, sir.

12   Q.  That would have been Dr. Ajemian, is that right?

13   A.  Yes, sir.

14             MR. JACKSON:  If I could have the government go to

15   Section 11 of this report, which is on page 6.  If you could

16   just blow up section 11, please.

17   Q.  Do you see where it says, no sitting, standing, etc.?

18             You see that, correct?

19   A.  Yes.

20   Q.  You see the further restrictions, which would be under No.

21   2, no pushing, pulling, lifting?  Do you see that?

22   A.  Yes.

23   Q.  Then under 2 there are further restrictions as to no

24   bending or standing.  Do you see that also?

25   A.  Yes.

D7nnles4                          Dunaj - cross

1    Q.  That is not something that Marie Baran gave to you, is that

2    correct?

3    A.  Correct.

4              MR. JACKSON:  If I could have the government go to

5    Exhibit 114-C, please, the vocational report.

6    Q.  In the vocational report, under Section 3, it lists a

7    number of jobs that you would have held.  Do you see that, sir?

8    A.  Yes, sir.

9    Q.  I am going to direct your attention again to Section 3

10   under work history.

11             Do you see that?

12   A.  Yes, sir.

13   Q.  Were you indeed a marketing director?

14   A.  Yes, sir.

15   Q.  Were you a manager, customer service representative?

16   A.  Yes.

17   Q.  And were you a customer sales representative?

18   A.  Yes.

19   Q.  That is all accurate, is that right?

20   A.  Yes.

21   Q.  If I could just direct your attention to question 12A, the

22   next page, as well as the answer, please.

23             MR. JACKSON:  Just a little further down on the

24   answer, please.  Thank you very much.  Up to 13.  OK.

25   Q.  Here I gives the indication in response to the question

D7nnles4                          Dunaj - cross

1   about the different jobs, describe your basic duties.  Do you

2   see your duties as a marketing director?

3   A.  Yes.

4   Q.  And that would be accurate?

5   A.  Yes.

6   Q.  And what you were responsible for, going to paragraph 3 in

7   the interest of time, were you responsible for administration

8   of the department, including -- do you see that?

9   A.  Which paragraph.

10  Q.  Paragraph 3.  They are really short.  I think there's one

11  sentence.  Do you see that, Mr. Dunaj?

12  A.  Yes.

13  Q.  All the items there, that was given -- that was not

14  something that you typed, is that correct?

15  A.  That is correct.

16  Q.  That is something that Ms. Baran prepared on your behalf,

17  is that right?

18  A.  Yes.

19  Q.  Skipping to question 3 -- I'm sorry, to page 3.  There is

20  an indication in writing there about displaying brochure boxes

21  and displays, do you see that?

22  A.  Yes.

23  Q.  Is that part of your responsibilities?

24  A.  Yes.

25  Q.  Was it a part of your responsibilities displaying boxes of

D7nnles4                          Dunaj - cross

1   supplies?  Do you see that?

2   A.   Yes.

3   Q.   That's accurate, too, right?

4   A.   Yes.

5   Q.   Finally, with regard to this vocational report, if you go

6   to page 4, there is an indication on question 16 about you

7   taking groups of children to New York City.

8             Do you see that?

9   A.   Yes.

10  Q.   That would be information that you gave Ms. Baran to input

11  in here?

12  A.   Yes.

13  Q.   That is one of the things that she went over with you in

14  the hour and a half in her office, correct?

15  A.   Yes.

16  Q.   Now, sir, in conclusion, it is fair to say that you do have

17  an agreement with the government, is that right?

18  A.   Yes.

19  Q.   And that agreement provides for your testimony?

20  A.   Yes.

21  Q.   And that agreement provides for you not to be prosecuted,

22  does it not?

23  A.   Yes.

24            MR. JACKSON:  Thank you, Judge.

25            THE COURT:  Mr. Weddle.

D7nnles4                         Dunaj - cross

 1    REDIRECT EXAMINATION

 2    BY MR. WEDDLE:

 3    Q.  Sir, what does your agreement provide in terms of how you

 4    are supposed to testify here in court?

 5    A.  Honestly.

 6             MR. WEDDLE:  Ms. Chen, can you put in the top half of

 7    our display here the restrictions that Mr. Jackson was just

 8    asking about, 114-B like boy.  I think it was page, it's marked

 9    page 6, but it's actually the fourth page of the document.

10             Then in the bottom half of the screen can you put

11    let's say the first few questions from Section 6 of the

12    application, which is 114-A.

13    Q.  Sir, do you see what we have displayed here, the top half

14    is from in the medical assessment filled out by Dr. Ajemian?

15    A.  Yes.

16    Q.  The bottom half is from the application form filled out by

17    whom?

18    A.  Marie Baran.

19    Q.  In the top half, the Dr. Ajemian half, do you see the

20    words, "Severe pain and discomfort if done for long periods."

21    Do you see that?

22    A.  It is hard to read but -- no.

23    Q.  When you met with Marie Baran, did you tell Marie Baran

24    that sitting was hard for you because of severe pain and

25    discomfort if done for long periods?

D7nnles4                    Dunaj - redirect

1    A.  No.

2    Q.  Who crafted that language, severe pain and discomfort if

3    done for long periods?

4    A.  She did.

5    Q.  Let's talk about standing.  With respect to standing, in

6    Dr. Ajemian's medical assessment, do you see the words saying

7    that you have severe pain and discomfort if you stand for long

8    periods?

9    A.  No.

10   Q.  Did you tell Marie Baran that standing was hard for you

11   because of severe pain and discomfort if done for long periods?

12   A.  No.

13   Q.  Who crafted that language?

14   A.  Marie Baran.

15   Q.  Now let's talk about walking.  Do you see --

16          THE COURT:  Mr. Weddle, could we just ditto the

17   regulars.

18   Q.  Sir, did you tell Marie Baran that it was hard for you to

19   walk because of severe pain and discomfort if done for long

20   periods?

21   A.  No.

22   Q.  Who crafted that language?

23   A.  She did.

24   Q.  Is there going to be the same answer with respect to all of

25   these explanations in your AA1D?

D7nnles4                    Dunaj - redirect

1    A.  Yes.

2    Q.  So with respect to all of them, Marie Baran crafted them?

3    A.  Right.

4    Q.  I believe you have already testified that they were not

5    true, right?

6    A.  Yes.

7    Q.  With respect to all of them you did not tell that to Marie

8    Baran?

9    A.  No.

10   Q.  Is that right?

11          Sir, you were asked about --

12          MR. JACKSON:  Judge, I didn't hear an answer.  I

13   apologize.

14          THE COURT:  Could the reporter read the answer.

15          (Record read)

16          MR. WEDDLE:  Your Honor, I have nothing further.

17          THE COURT:  All right.  Mr. Jackson?

18   RECROSS EXAMINATION

19   BY MR. JACKSON:

20   Q.  Did Ms. Baran ever tell you that she would exaggerate on

21   your behalf to get your benefits?

22   A.  No.

23   Q.  Did she ever say to you, ever, that she intended to defraud

24   the government?

25   A.  No.

D7nnles4                          Dunaj - recross

1          THE COURT:  All right.  Any other?

2          MR. WEDDLE:  One more, your Honor?

3          THE COURT:  Sorry.

4          MR. WEDDLE:  One more?

5          THE COURT:  One question.

6    REDIRECT EXAMINATION

7    BY MR. WEDDLE:

8    Q.  Did Marie Baran in fact put false statements in your

9    application for railroad disability?

10         MR. JACKSON:  Objection.

11         THE COURT:  Sustained.

12         Any other defense counsel?

13         MR. DRATEL:  No, your Honor.  Thank you.

14         MR. RYAN:  No, thank you.

15         THE COURT:  You may step down, you're excused.

16         (Witness excused)

17         THE COURT:  Government?

18         MR. TEHRANI:  The government calls Michael Stavola.

19         THE COURT:  Mr. Tehrani, what is your estimate of the

20   time.

21         MR. TEHRANI:  We should be done by 5, your Honor.

22    MICHAEL STAVOLA,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25   DIRECT EXAMINATION

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7nnles4                         Stavola - direct

1   BY MR. TEHRANI:

2            MR. TEHRANI:  Your Honor, before I begin, I would like

3   to read into the record a number of exhibits that I believe are

4   admitted without objection.

5            THE COURT:  All right.

6            MR. TEHRANI:  Those are Government Exhibits 3513-08,

7   102-A, 102-B, 102-C, 102-D, 718, 1200, 1201, 1202, 1203, 1204

8   and 1205.

9            THE COURT:  Are these admitted without objection?

10           MR. DRATEL:  Other than the previously.

11           THE COURT:  Except as previously recorded.

12           (Government's Exhibits 3513-08, 102-A, 102-B, 102-C,

13   102-D, 718, 1200, 1201, 1202, 1203, 1204, and 1205 received in

14   evidence)

15  Q.  Mr. Stavola, how old are you?

16  A.  56.

17  Q.  What city and state do you live in?

18  A.  Farmingdale, New York.

19  Q.  Do you have a family?

20  A.  I have an ex-wife and a son.

21  Q.  Were you previously employed by the Long Island Rail Road?

22  A.  Yes.

23  Q.  How did that employment end?

24  A.  I retired in 2008.

25  Q.  What month?

D7nnles4                         Stavola - direct

1    A.   June.

2    Q.   How old were you at that time?

3    A.   51.

4    Q.   When did you start working at the Long Island Rail Road?

5    A.   1983.

6    Q.   So when you retired in 2008, you were 51 years old with

7    approximately 25 years of service?

8    A.   Yes, correct.

9    Q.   And when you retired from the Long Island Rail Road, were

10   you eligible for a Long Island Rail Road pension?

11   A.   Yes, I was.

12   Q.   Now, you testified that you retired in June?

13   A.   Yes.

14   Q.   Why did you retire then?

15   A.   I don't know.  I put a hundred days in to qualify for my

16   vacation for the next year and just picked that month.

17   Q.   When you retired from the Long Island Rail Road, how would

18   your pension have compared to your preretirement salary?

19   A.   Less.

20   Q.   What were you planning to do to supplement your pension?

21   A.   I was going to apply for, I applied for an occupational

22   disability.

23   Q.   At the time you were retiring, what was your understanding

24   of what an occupational disability was?

25   A.   It was if you had an injury that prevented you from doing

1    your job.

2    Q.   You had to apply for an occupation physical disability?

3    A.   Yes.

4    Q.   From whom?

5    A.   Excuse me.

6    Q.   From whom?

7    A.   The Railroad Retirement Board.

8    Q.   Mr. Stavola, at the time you retired, were you physically

9    able to do your job?

10   A.   Yes.

11   Q.   So were the materials you submitted to the RRB truthful

12   about your physical condition?

13   A.   No.

14   Q.   About your ability to do the job at the railroad?

15   A.   No.

16   Q.   Did you prepare those untruthful materials by yourself or

17   with others?

18   A.   With others.

19   Q.   Who else helped you prepare those materials?

20   A.   Dr. Parisi and Marie Baran.

21   Q.   Do you see Marie Baran, the person who helped you make that

22   false disability claim, in the courtroom today?

23   A.   Yes.

24   Q.   Could you please identify her by an article of clothing?

25   A.   In the white and black blouse.

1    MR. TEHRANI:  Your Honor, may the record reflect that

2    the witness has identified Marie Baran the defendant.

3    THE COURT:  Noted.

4    Q.  Now, with Dr. Parisi and Marie Baran's help, did you in

5    fact get a disability annuity?

6    A.  Yes, I did.

7    Q.  Mr. Stavola did you get in any trouble for making --

8    MR. JACKSON:  I am going to object to all

9    characterizations about help and false applications?

10   THE COURT:  Sustained.

11   MR. TEHRANI:  Would you like me to cover those

12   questions again or --

13   THE COURT:  No, just proceed.

14   Q.  Mr. Stavola, did you get in any trouble for making your

15   disability claim?

16   A.  Yes, I did.

17   Q.  What happened?

18   A.  I was arrested.

19   Q.  When was that?

20   A.  Last May.

21   Q.  What were you charged with?

22   A.  Seven counts of fraud.

23   Q.  How were those charges resolved?

24   A.  I pled guilty to them all.

25   Q.  And did you plead guilty to any crimes that you were not

D7nnles4                         Stavola - direct

1    initially charged with?

2    A.  Yes.

3    Q.  What charge or charges were those?

4    A.  Lying to the grand jury.

5    Q.  Before your guilty plea, did you enter into a cooperation

6    agreement with the government?

7    A.  Yes, I did.

8    Q.  Was that agreement oral or written down?

9    A.  It was written.

10   Q.  Before you signed the agreement, did you meet with the

11   government?

12   A.  Yes, I did.

13   Q.  What about after when you pled guilty?

14   A.  Yes, I have.

15   Q.  There is a binder of exhibits up in front of you.  Could

16   you please take a look at Government Exhibit 3513-08.

17          THE COURT:  Mr. Tehrani, again, with the cooperation

18   and indulgence of the defense counsel, would you summarize the

19   questions that are pertaining to the cooperation agreement

20   insofar as they are familiar from other witnesses?

21          MR. TEHRANI:  Absolutely, your Honor.

22   Q.  Is that your cooperation agreement?

23   A.  Yes.

24          (Continued on next page)

25

D7ndles5                        Stavola – direct

1    Q.   And under the agreement, are you required to meet with the

2    government?

3    A.   Yes.

4    Q.   Provide the government truthful information?

5    A.   Yes.

6    Q.   To commit no further crimes?

7    A.   Yes.

8    Q.   Testify truthfully?

9    A.   Yes.

10   Q.   If you do everything you are supposed to do under the

11   agreement, your understanding is the government will write a

12   letter?

13   A.   Yes, it is.

14   Q.   What is your understanding of what will be in that letter?

15   A.   It will be a letter to the judge saying that I -- I did

16   everything I was supposed to under the agreement.

17   Q.   And what is your understanding of the maximum sentence you

18   could receive?

19   A.   85 years.

20   Q.   And what is your understanding of how low your sentence

21   could be?

22   A.   Hopefully nothing.

23   Q.   And what is your understanding as to who will decide that

24   sentence?

25   A.   The Judge.

D7ndles5                           Stavola - direct

Q.  And the government hasn't, as you sit here today, promised you that it will write you that letter, has it?

A.  No.

Q.  Has anyone promised you that you will get a reduced sentence?

A.  No.

Q.  What is your understanding as to whether your testimony has to result in a conviction in order for the government to write you a letter?

A.  It doesn't.

Q.  Approximately how much money did you receive in disability benefits?

A.  About $160,000.

Q.  And as part of your agreement, are you required to pay that money back?

A.  Yes.

Q.  Getting back to your retirement from the Long Island Rail Road.

        Before you retired, what was your job?

A.  Road car electrician.

Q.  And what were your duties and responsibilities as a road car electrician?

A.  We repaired trains outside in the yards, you know, on the tracks if they broke down.

Q.  At the time you retired, how much money were you making,

D7ndles5                         Stavola – direct

1    approximately?

2    A.   170; 180,000.

3    Q.   And is that base salary or does it include any kind of

4    enhancements?

5    A.   Overtime.

6    Q.   So you worked overtime leading up to your retirement?

7    A.   Yes, I did.

8    Q.   Approximately how much overtime did you work?

9    A.   2,000 hours maybe.

10   Q.   And that's in the last year before you retired?

11   A.   Yes.

12   Q.   Just take a look at Government Exhibit 1204.  I am not

13   going to go through it in detail.

14   A.   1204.  OK.  Sorry.  Got it.

15   Q.   Those are your retirement records?

16   A.   Yes.

17   Q.   And do those records indicate that in 2008, when you

18   retired -- you retired in June -- that you had worked

19   approximately 800 hours of overtime?

20   A.   Yes, it does.

21   Q.   And turn to the last page.  Those are the hours for 2007,

22   which is the last full year you worked, and the overtime hours

23   are over 2100 hours of overtime?

24   A.   The last page?  Yes, it is.  Yes.

25   Q.   What type of work did you do for overtime?

D7ndles5                         Stavola – direct

1   A.  The same work I did on straight time.

2   Q.  So it is basically as demanding as your regular job?

3   A.  Yes.

4   Q.  And why did you work so much overtime?

5   A.  It gets calculated into your pension.

6   Q.  So working overtime was part of your retirement planning?

7   A.  Yes.

8   Q.  And you testified earlier that your retirement pension was

9   going to be less than your salary?

10  A.  Yes, it was.

11  Q.  Would you have been able to afford to retire at the time

12  you retired if you were only going to receive that salary --

13  that pension?

14  A.  Probably not.

15  Q.  When did you start planning on retiring?

16  A.  I don't know; five years, five or six years before I

17  actually retired.

18  Q.  And why then?

19  A.  Because the overtime calculation for your pension is your

20  last five years of -- last five years out of your -- best five

21  years out of your last ten.

22  Q.  Did you ever go to the pension office, Long Island Rail

23  Road pension office in connection with your retirement

24  planning?

25  A.  Yes.

1   Q.   And what was the purpose of that?

2   A.   I got a readout a couple of years, maybe a year or so, two

3   years before I retired to see what my pension was going to be.

4   Q.   Again, I am not going to go through these.  But if you look

5   at Government Exhibit 1205.  It should be the last one in your

6   binder.

7        Are those your applications for a pension estimate?

8   A.   Yes.  Two of them.

9   Q.   What other steps did you take as you planned your

10   retirement?

11   A.   I applied for Aflac insurance also.

12   Q.   What is Aflac insurance?

13   A.   Disability insurance.

14   Q.   And what does that mean?

15   A.   If you got hurt on the job, it paid you an income.  And if

16   you were disabled, it paid you an income.  It was disability

17   insurance.

18   Q.   And did you in fact collect on that policy?

19   A.   Yes, I did.

20   Q.   How much did you get?

21   A.   48,000.

22   Q.   And that was over the course of two years?

23   A.   Yes.

24   Q.   Did you have to get -- I'm sorry.

25   A.   I was just clearing my throat.

D7ndles5                          Stavola - direct

1    Q.   Did you have to get any forms signed by a doctor in

2    connection with that policy?

3    A.   Yes, I did.

4    Q.   Approximately how often?

5    A.   I believe, every three months.

6    Q.   And if you look at Government Exhibit 1201.

7          Is that your application for Aflac insurance?

8    A.   Yes.

9    Q.   And it's signed on the second-to-last page, it may be

10   third-to-last page, August 8, 2006?

11   A.   Yes.

12   Q.   Which is approximately a couple of years before you

13   retired?

14   A.   Yes.

15   Q.   And then if you look at 1202 and 1203, are those examples

16   of the forms that you needed your doctor to sign in order to

17   continue collecting under this policy?

18   A.   Yes, it is.

19   Q.   And who was the doctor who signed off on those forms?

20   A.   Dr. Parisi.

21   Q.   Did you take any other steps in connection with your

22   retirement planning?

23   A.   No.   The occupational disability and Aflac.

24   Q.   So let's talk about the occupational disability.

25          Did workers of yours at the Rail Road talk about

1    occupational disability?

2    A.  All the time.

3    Q.  What did they say?

4    A.  They, people that were retiring before me, you know, said

5    it was -- everybody was applying for it and getting it.

6    Q.  And did they talk about a process for --

7    A.  Yes.

8    Q.  -- how you get it?

9    A.  Absolutely.

10   Q.  And what was that process?

11   A.  Go to a doctor, have him justify some injuries, create a

12   paper trail so you had something to put into the application.

13   Q.  You used the word "paper trail."  Is that a word that

14   people used at the Rail Road?

15   A.  Yes.

16   Q.  And so what steps did you take in connection with applying

17   for an occupational disability?

18   A.  I started going to Dr. Parisi a few years before I was

19   going to retire, complained of bad back, bad neck, and having

20   him run some tests.

21   Q.  And had you seen Dr. Parisi before?

22   A.  Yes, I have.

23   Q.  For what?

24   A.  Back in '96 he scoped my knee.

25   Q.  And were you able to return to work after that?

D7ndles5                          Stavola – direct

1   A.  Yes, I was.

2   Q.  For how long?

3   A.  Until the end of my career.

4   Q.  And was your disability application based in any way on

5   your knee?

6   A.  No.

7   Q.  Why did you begin to see him again?

8   A.  To create a paper trail for my disability.

9   Q.  Did you see him also for any kind of back pain?

10  A.  Yes.

11  Q.  When was that?

12  A.  I don't know the exact dates.  A couple of years before I

13  retired.  Maybe I saw him once in between.  I think I pulled a

14  muscle once at work and went to his office.

15  Q.  Had you heard about Dr. Parisi at the Rail Road?

16  A.  Yes.

17  Q.  And what had you heard about him?

18  A.  Yes.  I had heard that he was one of the doctors that, you

19  know, would help you fill out the -- supply you with a

20  narrative.

21  Q.  What was your reaction when you heard that?

22  A.  Glad.  He was already my doctor.

23  Q.  Had you heard about any other doctor names?

24          MR. DRATEL:  Objection.

25          THE COURT:  Sustained.

D7ndles5                              Stavola - direct

1    Q.  As far as the disability application itself, did you pay

2    anyone to fill it out?

3    A.  Yes, I did.

4    Q.  And who was that?

5    A.  Marie Baran.

6    Q.  And you ultimately did apply for an occupational

7    disability?

8    A.  Yes.

9    Q.  And that application included medical documentation from

10   Dr. Parisi?

11   A.  Yes.

12   Q.  And the application you obtained from Marie Baran?

13   A.  Yes.

14   Q.  And how much money did you get in occupational disability

15   per year, approximately?

16   A.  36,000.

17   Q.  And how frequently do you get paid -- did you get paid?

18   A.  Once a month.

19   Q.  And how did you get paid?

20   A.  It was direct deposit into my checking account or savings

21   account.

22   Q.  And which bank?

23   A.  At the time Capital One.

24   Q.  And where did you access that bank?

25   A.  At Capital One bank in Farmingdale.

D7ndles5                              Stavola - direct

1    Q.  That's on Long Island?

2    A.  Yes.

3    Q.  So combined with your Long Island Rail Road pension, how

4    did the application for disability compare to your

5    preretirement salary?

6    A.  It was about the same.

7    Q.  So focusing now on Dr. Parisi.

8           When did you start seeing him in connection with your

9    disability application?

10   A.  A couple of years before I retired.

11   Q.  And what kind of doctor is he?

12   A.  An orthopedist.

13   Q.  And what did you tell Dr. Parisi when you began to see him

14   for purposes of your disability application?

15   A.  I just told him I was getting ready to retire and, you

16   know, I had some aches and pains in my back and neck and we ran

17   some tests.

18   Q.  And were you truthful about your physical condition with

19   him?

20   A.  I did have slight aches and pains but nothing -- nothing

21   earthshattering.

22   Q.  In the last five years that you worked, did you miss any

23   work because of aches and pains in your back or neck?

24   A.  No.

25   Q.  Approximately how often did you see Dr. Parisi?

D7ndles5                        Stavola - direct

1    A.  Every couple of months, every -- maybe every three months

2    or so, four months.

3    Q.  How long were your visits?

4    A.  20 minutes.

5    Q.  What kind of tests did he do?

6    A.  In the office or -- he sent me for MRIs.  He would take

7    some x-rays.  But that's about it.

8    Q.  And after he sent you for MRIs, did you discuss the results

9    of the MRIs with him?

10   A.  Yes.

11   Q.  What did he say?

12   A.  I had evidence of a herniated disc in my back and a bulging

13   disc in my neck.

14   Q.  And how did Dr. Parisi react when he told you that?

15   A.  He just said we have something to put on the narrative.

16   Q.  And did Dr. Parisi offer you any treatment options?

17   A.  Yeah.  We did a little physical therapy and some muscle

18   relaxers.

19   Q.  Did you have physical therapy?

20   A.  A couple of times.

21   Q.  And did it help?

22   A.  No.

23   Q.  Did Dr. Parisi ever recommend any kind of injection?

24   A.  Yes.

25   Q.  Did you get any?

1   A.   Yeah, I got one.

2   Q.   Why did you get it?

3   A.   Just to make it look good on the application.

4   Q.   Ultimately you told Dr. Parisi that you were planning on

5   retiring?

6   A.   Yes.

7   Q.   What did he say?

8   A.   I'm sorry.

9   Q.   What did he say?

10  A.   When I told him I was planning on retiring?

11  Q.   Yeah.

12  A.   He said that, you know, when you're ready, let me know when

13  you need the narrative and he'll write me a narrative.

14  Q.   What is your understanding of what a narrative is?

15  A.   I guess it was a folder of all my medical records, and I

16  didn't know at the time but he also wrote something in there.

17  That's my understanding of it.

18  Q.   And did you ultimately obtain a narrative from Dr. Parisi?

19  A.   Yes, I did.

20  Q.   Did you pay for it?

21  A.   Yes.  $800.

22  Q.   How did you pay for your visits with Dr. Parisi?

23  A.   I paid the co-pay.

24  Q.   And was the rest of it paid by insurance?

25  A.   Yes.

1   Q.   And what insurance provider?

2   A.   United Healthcare.

3   Q.   What did you do with the narrative that you got from

4   Dr. Parisi?

5   A.   I brought it to Marie Baran when I went to her.

6   Q.   And after you got your narrative, did you continue to see

7   him, Dr. Parisi?

8   A.   Yes.

9   Q.   Why?

10   A.   For the Aflac forms.

11   Q.   Turning now to Marie Baran.

12         How did you hear about her?

13   A.   I heard about her from the guys at work.

14   Q.   And what did they say?

15   A.   They said that she was helping the guys fill out their

16   applications.

17   Q.   Did you know about her any other way?

18   A.   I knew her husband.

19   Q.   What did you know about her husband?

20   A.   I worked with him.

21   Q.   On the Long Island Rail Road?

22   A.   Yes.

23   Q.   Had you heard about any other names other than Marie Baran

24   who could help you fill out an application?

25   A.   Yes.

D7ndles5                          Stavola - direct

1   Q.  And who was that?

2   A.  Tony D'Avanzo and Joe Rutigliano.

3   Q.  How did you set up your first meeting with Marie Baran?

4   A.  I called her office and made an appointment.

5   Q.  And what happened in that initial conversation?

6   A.  She asked me when I was thinking of retiring and how she

7   structured the payment.  You know, it was a $200 consultation

8   fee, I believe, the first visit, and if I hired her then

9   another thousand at -- after she did the form.

10  Q.  And approximately when did you first meet with Marie Baran?

11  A.  I think it was in April of 2008.  I am just guessing.

12  Q.  Were you still working at the time?

13  A.  Yes.

14  Q.  And where did you see her?

15  A.  At her office.

16  Q.  Where was her office?

17  A.  I think it's Rockville Centre.

18  Q.  How many times did you meet with her?

19  A.  Twice.

20  Q.  What happened in that first meeting with Marie Baran?

21  A.  In the first meeting she explained what -- you know, what

22  we had to do, what I needed to apply.  I needed the narrative

23  from Dr. Parisi.  And she was, you know, going to fill out the

24  form.  And I don't know, there might have been a birth

25  certificate or some other stuff I might have needed.  That was

D7ndles5                              Stavola - direct

1    it.

2    Q.  Did she perform any calculations for you?

3    A.  I'm not sure if that was the first meeting or the second,

4    but at one point she figured out approximately what I would be

5    getting from Railroad Retirement.

6    Q.  Approximately how long was that first meeting with Marie

7    Baran?

8    A.  20 minutes, half an hour tops.

9    Q.  Did she ask for the doctor you were seeing?

10   A.  Yes.

11   Q.  And did you tell her?

12          What did she say?

13   A.  She said she knew Dr. Parisi.

14   Q.  What, if any, documents did you give to her in that first

15   meeting?

16   A.  In the first meeting, nothing.

17   Q.  And did you meet with her again?

18   A.  Yes.

19   Q.  Approximately when?

20   A.  End of May.  Yeah, the end of May.  I think right after I

21   retired, or maybe right before I retired.  I don't remember

22   exactly.

23   Q.  And what happened in that meeting?

24   A.  In that meeting I brought the narrative that I picked up

25   from Dr. Parisi, and she put it in with the forms that she had

D7ndles5                         Stavola - direct

1  filled out and I signed and I went on my way.

2  Q.  So when you went to that meeting, that second meeting with

3  Marie Baran, was the form that she had filled out already

4  filled out?

5  A.  Yes.

6  Q.  And you signed it?

7  A.  Yes.

8  Q.  Did you pay her any money?

9  A.  I paid her another thousand dollars.

10 Q.  In what form?

11 A.  What's that?

12 Q.  In what form?

13 A.  Cash.

14 Q.  What did you do with the documents that you picked up from

15 Marie Baran?

16 A.  I put them in an envelope and brought them to Railroad

17 Retirement in Westbury.

18 Q.  Prior to submitting the application, did you review it?

19 A.  No.

20 Q.  Why not?

21 A.  I didn't want to know what was in there.  I just wanted my

22 disability.

23 Q.  What was your general understanding of what was going to be

24 in those documents?

25 A.  Whatever had to be in there to get the disability.

D7ndles5                          Stavola - direct

1  Q.  In your meeting with -- or meetings with Marie Baran, what,

2  if any, questions did she ask you about your job?

3  A.  None.

4  Q.  I'm sorry?

5  A.  None.

6  Q.  And what about your job responsibilities?

7  A.  She just might have asked me my job title but that's it.

8  Q.  And what, if any, questions did she ask you about your

9  physical condition?

10  A.  I don't recall any.

11  Q.  What did you tell her about your physical condition?

12  A.  I might have told her that Parisi found that I had a

13  herniated disc but I'm not a hundred percent sure if I did or

14  didn't.

15  Q.  Did you ever tell Marie Baran that you were no longer

16  physically able to work?

17  A.  No.

18  Q.  Did she ask?

19  A.  No.

20  Q.  Did she ask you what your typical day was like?

21  A.  No.

22  Q.  Could you describe what your typical day was like around

23  the time that you retired?

24  A.  After I retired?

25  Q.  After you retired.

D7ndles5                         Stavola - direct

1    A.  I would get up and play golf a couple of days a week to

2    maybe three days a week.  You know, go home, relax, have

3    dinner.

4    Q.  When you golf, do you use a golf course?

5            I'm sorry.  Did you use a golf cart?

6    A.  No, I don't.

7    Q.  And so you walked the entire length of the golf course?

8    A.  Yeah, I had a pushcart.

9    Q.  How long is the golf course?

10   A.  Four miles.

11   Q.  What do you if you were not golfing?

12   A.  I had a bike.  I would ride a bike once in a while.  Go to

13   the gym.

14   Q.  And what did you do at the gym?

15   A.  I usually rode the stationary bike at the gym.

16   Q.  How long did you go?

17   A.  A half an hour.

18   Q.  Now, you testified that you submitted your application at

19   the RRB?

20   A.  Yes.

21   Q.  Which office again?

22   A.  Westbury.

23   Q.  And did you meet with anyone there when you submitted your

24   application?

25   A.  Yes.

1    Q.  How long did that meeting last?

2    A.  I don't know.  Maybe a half an hour.  They typed what was

3    on the form into a computer.

4    Q.  And did you meet with -- was the person you met with a male

5    or female?

6    A.  It was a male.

7    Q.  Did he ask you any questions about your application?

8    A.  No.  Just maybe, you know, my name, address, stuff like

9    that, but whatever was on the forms he typed into -- he typed

10   into the computer.

11   Q.  Did he ask you to reconfirm any of your answers on the

12   application?

13   A.  Not that I remember.

14   Q.  Did he ask you any questions about your physical condition?

15   A.  No.

16   Q.  I am going to show you Government Exhibit 1200.

17        MR. TEHRANI:  Your Honor, may I approach?

18   Q.  Do you recognize that document?

19   A.  Yes.

20   Q.  What is it?

21   A.  It's my date book from 2008.

22   Q.  And turning to the week April 14th to April 20th.

23        MR. TEHRANI:  Could we put that on the screen?

24        THE COURT:  What is the exhibit number?

25        MR. TEHRANI:  Exhibit 1200.

1   Q.  Now, April 17th shows two appointments.  Do you see those?

2   A.  Yes.

3   Q.  What are they?

4   A.  I had a doctor's appointment with Parisi at 8:30, and I was

5   meeting Marie Baran at 1:30 in the afternoon.

6   Q.  That was your first meeting with Marie Baran?

7   A.  Yes.

8   Q.  Now, turning to the week of May 12th to the 18th.

9           Looking first at the 12th.  You had a golf outing that

10  day?

11  A.  Yes.

12  Q.  There are also notations throughout this logbook, for

13  example, on the 13th looks like 8 hours overtime, is that

14  right?

15  A.  Yes.

16  Q.  And the 14th also 8 hours overtime?

17  A.  Yes.

18  Q.  And there is a notation on the 16th.  One of them -- there

19  is a number of notations on the 16th.  One of them says,

20  "possible last day of work.  Last workday."  Do you see that?

21  A.  Yes.

22  Q.  Was that in fact the last day that you worked?

23  A.  Yes, it is.

24  Q.  Then it says underneath that, "Get note from Parisi."

25  A.  Yes.

D7ndles5                          Stavola – direct

1   Q.  And what does that mean?

2   A.  I needed to get a sick note filled out so that I would get

3   sick time until my Rail Road retirement kicked in.

4   Q.  Then if you look at the next week, May 19th to 25th, and

5   you look at Monday, the 19th, it says, "DS forever."  What does

6   that mean?

7   A.  That means I was retired sick.  I went sick and wasn't

8   going back.

9   Q.  Turning to the week of June 23rd to 29th, specifically

10  June 24th.

11  A.  Mm-hmm.

12  Q.  There are again two appointments there.

13  A.  Yes.

14  Q.  There is one at 9 a.m. with Parisi and then at 1:30 with

15  Marie Baran?

16  A.  That's correct.

17  Q.  Then there is a notation for "Narrative 1200."

18          Does that refresh your recollection as to whether the

19  narrative cost you a thousand dollars or $1,200?

20  A.  I thought the narrative was 800.  I thought -- 1200 is

21  Marie's charge, Marie's fee.

22  Q.  Got it.

23          Now, this was the meeting where you -- as I understand

24  your testimony, you picked up your narrative from Parisi and

25  then went and picked up your completed application from Marie

D7ndles5                          Stavola – direct

1    Baran and signed it?

2    A.  Yes.

3         MR. JACKSON:  Sorry, Judge.  What month are we in

4    again?

5         MR. TEHRANI:  We are in June.

6         MR. JACKSON:  Thanks.

7    Q.  Then on the 27th it says, "11 a.m. RRB."

8    A.  Yes.

9    Q.  What is that?

10   A.  That is the date I delivered the application to the

11   Westbury office.

12   Q.  And then if we can turn to July 21st through the 27th.

13   A.  July 21st.

14   Q.  There is a notation there that says, "Need appointment with

15   Parisi for Aflac form."  What's that?

16   A.  I had to go to Dr. Parisi every three months to fill out an

17   Aflac continuing disability form.

18   Q.  And so this was in connection with -- you made an

19   appointment in connection with that?

20   A.  Yes.

21   Q.  Again, if you look at the week of September 15th through

22   the 21st, on the 16th there is a notation "Parisi 8:30" it

23   looks like it says "Bring form."

24   A.  Yes.

25   Q.  Which, again, in connection with the Aflac form?

D7ndles5                         Stavola - direct

1    A.  Yes.

2    Q.  Mr. Stavola, did there come a time when you testified

3    before the Grand Jury in connection with this investigation?

4    A.  Yes, I did.

5    Q.  And when was that?

6    A.  April of 2011.

7    Q.  And were you a hundred percent truthful in your testimony

8    before the Grand Jury?

9    A.  No.

10   Q.  In what way were you not truthful?

11   A.  I lied about being disabled.

12   Q.  Did you talk about -- you testified about your interactions

13   with Marie Baran?

14   A.  Yes, I did.

15   Q.  And what did you say?

16   A.  I said that I thought at the time she had helped me fill

17   out the form by asking me the questions and me answering them,

18   but that wasn't true.

19   Q.  And so why did you say it?

20   A.  I didn't want me or anyone else to get in trouble at that

21   point.

22   Q.  Did you also believe it was benefiting you?

23   A.  Yes.

24   Q.  How so?

25   A.  Just felt it was.

D7ndles5                          Stavola - direct

1   Q.  And you also testified in the Grand Jury that -- I believe

2   you testified here that you testified in the Grand Jury that

3   you were unable to work?

4   A.  Yes.

5   Q.  And that wasn't true?

6   A.  No.

7   Q.  Have you pled guilty to your testimony before the Grand

8   Jury?

9   A.  Yes, I have.

10  Q.  And that is the testimony we were just talking about?

11  A.  Right.

12  Q.  Did you speak with law enforcement on the day of your Grand

13  Jury testimony?

14  A.  Yes.

15  Q.  But outside of the Grand Jury?

16  A.  Yes.

17  Q.  And were you entirely truthful in that conversation?

18  A.  No.

19  Q.  How so?

20  A.  I told them I couldn't work and I could have.

21  Q.  Can we look at Government Exhibit 102A?

22          This document has your name on it?

23  A.  Yes.

24  Q.  It is stamped at the bottom "RRB Westbury District Office,

25  June 27, 2008" at the bottom?

D7ndles5                          Stavola - direct

1    A.  Yes.

2    Q.  And on the last page, is that your signature?

3    A.  Yes, it is.

4    Q.  Other than your signature, is there any other writing on

5    this document that appears to be yours?

6    A.  No.

7    Q.  Did you type in any of the information on this document?

8    A.  No, I didn't.

9    Q.  Now, looking at page 2, question 11.  It says, "Enter the

10   date you could no longer work because of your condition."  And

11   the answer there is "May 17, 2008."  Do you see that?

12   A.  Yes.

13   Q.  What is the significance of that date?

14   A.  That's the day after I stopped working.

15   Q.  And was the answer to question 11 a truthful answer?

16   A.  No.

17   Q.  Why not?

18   A.  Because I could have kept working.

19   Q.  Did you tell Marie Baran that you were unable to work as of

20   May 17, 2008?

21   A.  No.  I just told her the day I was retiring.

22   Q.  Did she ask you whether you were unable to work?

23   A.  No.

24   Q.  Question 12 asks for a description of how your condition

25   prevents you from working.  Do you see that?

D7ndles5                          Stavola - direct

1   A.  Yes, I do.

2   Q.  And the answer is, "The physical requirements of my job as

3   a road car electrician are such that I can no longer perform

4   them without severe pain.  I have pain and discomfort when I am

5   pushing, pulling, lifting, carrying, bending, climbing or

6   stretching.  Any walking, standing or sitting for extended

7   periods of time causes me pain and discomfort."

8          Is that true?

9   A.  No.

10  Q.  Did you tell Marie Baran any of that?

11  A.  No.

12  Q.  Did she ask?

13  A.  No.

14  Q.  Turning to question 39, Section 6.

15         Do you see, there is a series of questions about

16  various daily activities?

17  A.  Yes.

18  Q.  You are supposed to answer "easy," "hard" or "not at all,"

19  and the legend at the top indicates that "Hard means you can do

20  the activity with difficulty or help."  Do you see that?

21  A.  Yes, I do.

22  Q.  The answers here are that it is hard for you to sit, stand,

23  walk, bathe, dress, perform other bodily needs, indoor chores,

24  driving motor vehicle, using public transportation.

25         Were any of those things hard for you?

D7ndles5                        Stavola - direct

1   A.  No.

2   Q.  Did you ever tell Marie Baran those things were hard for

3   you?

4   A.  No.

5   Q.  Did she ever ask?

6   A.  No.

7   Q.  And it indicates also that outdoor chores, you cannot -- it

8   indicates "not at all," which means I cannot do the activity

9   even with help.

10          Was it true that you cannot perform outdoor chores

11  even with help?

12  A.  No.

13  Q.  Did you ever tell Marie Baran that?

14  A.  No.

15  Q.  Did she ask?

16  A.  No.

17  Q.  Now, you'll see to the right there is a series of

18  explanations.  For example, "Sitting," it says "extended period

19  causes severe pain and discomfort."

20          Was that your language?

21  A.  No.

22  Q.  Did Marie Baran ever ask you that?

23  A.  No.

24  Q.  Did you ever tell Marie Baran that extended periods of

25  sifting causes severe pain and discomfort?

D7ndles5                           Stavola - direct

1  A.  No.

2  Q.  I am not going to go through them all, but is it fair to

3  say that your answer is the same for every single one of those

4  explanations?

5  A.  Yes, it is.

6  Q.  Now, looking at question 40.  It asks you to "provide any

7  additional information that describes your daily activities

8  during a normal day."

9        And the answer is, "I sleep very poorly because of

10  neck pain and lower back pain.  I get up about 7 a.m.  I have

11  breakfast, shower, and dress.  I do some light exercise to

12  stretch as prescribed by my doctor.  I do light housework that

13  doesn't require I bend or reach or lift.  I rest in the

14  afternoon and take a short nap.  I have lunch at home with

15  family and read books or magazines.  Evenings I have dinner at

16  home with my spouse and watch TV.  Occasionally I visit with

17  friends or family."

18        Is that true?

19  A.  Maybe the part about occasionally visiting some friends and

20  family but that's it.

21  Q.  Did you ever tell Marie Baran that's how you spent your

22  day?

23  A.  No.

24  Q.  Did she ever ask?

25  A.  No.

D7ndles5                            Stavola - direct

1    Q.  Now, you testified that you did not review your application

2    before you submitted it?

3    A.  That's true.

4    Q.  At any point before today did you review your application?

5    A.  I reviewed it after I was arrested.

6    Q.  What was your reaction?

7    A.  I -- shock, I guess.

8    Q.  Turning to Government Exhibit 102C.

9            The document is titled "Vocational Report."  It has

10   got your name on the front.  Do you see that?

11   A.  Yes.

12   Q.  And the job title is "Road Car Electrician."

13   A.  Yes.

14   Q.  That was your job?

15   A.  Yes.

16   Q.  And the last page it has your signature?

17   A.  Yes.

18   Q.  Have you reviewed at my direction the substance of this

19   document?

20   A.  Yes.

21   Q.  And is it largely accurate about the demands of your job?

22   A.  Yes.

23   Q.  Did you discuss any of it with Marie Baran?

24   A.  No.

25   Q.  At the time you retired, were you able to perform all of

D7ndles5                        Stavola - direct

1    the demands of your job?

2    A.   Yes.

3    Q.   I just want to look very briefly at -- first look at

4    Government Exhibit 102B, as in boy.

5    A.   102B.

6    Q.   This is a document titled "Medical Assessment."  It has

7    your name on the front.

8    A.   Mm-hmm.

9    Q.   And the last page, who is it signed by?

10   A.   Dr. Parisi.

11   Q.   And then 102D, as in dog.  Do you see that?

12   A.   Yes.

13   Q.   And what is that document?

14   A.   102D?

15   Q.   Yes.

16   A.   I think this is my narrative.  Yes.

17   Q.   And that's got your first name -- it has got your name on

18   the first page there?

19   A.   Yes.

20   Q.   And when is it dated?

21   A.   It is dated May 15, 2008.

22   Q.   And the last page, it is signed by Ralph Parisi?

23   A.   Yes.

24   Q.   If you can just turn to page -- what is labeled page 2.  It

25   might be the third page in the document.

D7ndles5                          Stavola - direct

1          Do you see under the heading "Treatment," the second

2     full paragraph, it says:  "The patient cannot get up from a

3     sitting position, cannot walk any distance.  He was having

4     difficulty getting out of bed in the morning.  He cannot walk

5     more than two blocks without having to rest.  He is now

6     experiencing difficulty in bending as well as getting up from a

7     sitting position."

8          Do you see that?

9     A.  I don't see it.  Where are you?

10    Q.  If you look at the screen, it is being highlighted.

11    A.  OK.

12    Q.  Do you see that?

13    A.  Yes.

14    Q.  Did you ever tell Dr. Parisi any of that?

15    A.  No.

16    Q.  Did you ever talk to Dr. Parisi about your golfing?

17    A.  Yes.

18    Q.  And if we turn to page 4, the last paragraph before the

19    signature, and the third-to-last sentence says:  "At this point

20    I suggested that he should start considering retirement as I

21    don't believe that he is going to get better to a point that he

22    can do his job on a sustained basis."

23          Did Dr. Parisi ever say that to you?

24    A.  No.

25    Q.  Did he ever recommend that you retire?

D7ndles5                          Stavola - direct

1   A.  No.  I told him when I was retiring.

2   Q.  Now, look at Government Exhibit 718, and this is a document

3   titled "Continuing Disability Update Report."

4           And that is your name at the top?

5   A.  Yes, it is.

6   Q.  And the second page, is that your signature?

7   A.  Yes.

8   Q.  And it is dated March 20, 2011?

9   A.  Yes.

10  Q.  Why did you fill this form out?

11  A.  To keep getting my disability.

12  Q.  And then there should be a copy of an envelope.  Do you see

13  that?

14  A.  Yes.

15  Q.  And it's postmarked from Long Island?

16  A.  Yes.

17  Q.  On March 21, 2011?

18  A.  Yes.

19  Q.  And it is addressed to the Railroad Retirement Board

20  Federal Building, 26 Federal Plaza, New York, New York?

21  A.  Yes.

22  Q.  Now, you had mentioned a couple of times that you play

23  golf?

24  A.  Yes.

25  Q.  Do you still play golf?

D7ndles5                          Stavola – direct

1    A.  Excuse me?

2    Q.  Do you still play golf?

3    A.  Yes, I do.

4    Q.  How often?

5    A.  Once a week.

6    Q.  And why less than before?

7    A.  I'm working now.

8    Q.  And where do you currently work?

9    A.  I work at Lombardi Design.

10   Q.  And what do you do there?

11   A.  I work in the maintenance department.

12   Q.  And what does that job entail?

13   A.  Building maintenance, lights, outlets, repairing the

14   equipment on the floor.  It is injection molding, so.

15   Q.  How much do you work?

16   A.  About maybe 40 to 50 hours a week.

17   Q.  And when did you start working there?

18   A.  In May.

19   Q.  And what did you do before that?

20   A.  I worked for a contractor in Hicksville as an electrician.

21   Q.  And what were you doing?

22   A.  A lot of post-Sandy work.

23   Q.  Was that a physically demanding job?

24   A.  Very physically demanding.

25   Q.  Was it more physically demanding than your job at the Long

D7ndles5                          Stavola – direct

1    Island Rail Road?

2    A.  Yes.

3    Q.  Did you ultimately stop doing that job, that work?

4    A.  Yes, I did.

5    Q.  And why was that?

6    A.  I couldn't do it anymore.

7    Q.  Was it because of your physical condition?

8    A.  Yeah.  It's because I'm old.

9    Q.  Now, you testified that you know Gus Baran, right?

10   A.  Yes.

11   Q.  Do you see Gus Baran in the courtroom today?

12   A.  Yeah.

13   Q.  Where is he?

14   A.  He's in the back back there.

15          MR. JACKSON:  Judge, objection.

16          THE COURT:  Overruled.

17   Q.  Now, could you identify him by something that he is

18   wearing?

19   A.  He's got from here it looks like a gray suit on.

20   Q.  What row?

21   A.  The second row.

22   Q.  Which side?

23   A.  The left side.

24   Q.  Your left side?

25   A.  My left side.

1   Q.  Is he wearing glasses?

2   A.  Yes.

3           MR. TEHRANI:  One second, your Honor.

4           (Pause)

5   Q.  Did you ever work with Gus Baran?

6   A.  Yes, I did.

7   Q.  What did he do?

8   A.  He was an electrician also.

9   Q.  And approximately when was the last time you worked with

10  him?

11  A.  Maybe 2004.

12  Q.  How frequently did you work with him?

13          MR. JACKSON:  Objection, Judge.

14          THE COURT:  Overruled.

15  A.  Not that frequently.  Every once in awhile I worked

16  overtime during the day I'd see Gus.

17  Q.  And when you worked with him, did he appear to you to be

18  unable to do his job?

19          MR. JACKSON:  Objection.

20          THE COURT:  Overruled.

21  A.  No.

22  Q.  Have you ever played golf with Gus Baran?

23  A.  Yes, I have.

24  Q.  How many times?

25  A.  Twice.

D7ndles5                          Stavola - direct

1   Q.   Approximately when?

2   A.   A couple of years ago.

3   Q.   And when you were golfing with Gus Baran, did he appear to

4   you to be in any pain?

5              MR. JACKSON:  Objection.

6              THE COURT:  Overruled.

7   A.   No.

8   Q.   Did you speak with Gus Baran as you were golfing?

9   A.   Yes.

10  Q.   Where?

11  A.   In the golf cart, at the bar afterwards.

12  Q.   And did Gus Baran have any difficulty understanding you?

13  A.   No.

14  Q.   Mr. Stavola, could you do your job at the Long Island Rail

15  Road today?

16  A.   Yes.

17             MR. TEHRANI:  No further questions, your Honor.

18             THE COURT:  Before we go to the cross-examination, let

19  me give the jury a limiting instruction with respect to this

20  witness' testimony on direct and also as it may come out in

21  cross-examination.

22             The witness made references to statements and conduct

23  by Dr. Parisi involving --

24             MR. WEDDLE:  Your Honor, I'm sorry to interrupt.

25             Can we just be heard briefly at the sidebar on this?

D7ndles5                          Stavola – direct

1          THE COURT:  On this issue?

2          MR. WEDDLE:  Yes, your Honor.

3          (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7ndles5                          Stavola - direct

1          (At the sidebar)

2          THE COURT:  Yes.

3          MR. WEDDLE:  Your Honor, Dr. Parisi is identified not

4     by name but as a co-conspirator of Dr. Lesniewski in the

5     Indictment.  So I'm not sure that it is correct to say that his

6     statements shouldn't be used in considering Dr. Lesniewski.

7          MR. DRATEL:  Your Honor, they haven't proved up any

8     conspiracy with Dr. Parisi.  So regardless of whether he is a

9     co-conspirator, he shouldn't come in as part of the conspiracy

10    since they haven't established any kind of contact that would

11    prove a conspiracy by any standard between the two doctors.

12    Also, it is not just statements, it is also the whole process

13    that is part of this as to why this is a separate issue.

14         MR. WEDDLE:  Your Honor, I think we've proven a

15    wide-ranging, extensive conspiracy.  It is the defendants'

16    objection that we split this conspiracy into pieces.  And as

17    we've explained throughout the case, that split is, you know, I

18    think it could easily have been charged a different way.  But

19    the way that it has been pled, this wide-ranging conspiracy

20    involving many people, it has Dr. Lesniewski and Dr. Parisi and

21    Joseph Rutigliano and Marie Baran in conspiracy charges

22    together, your Honor.

23         MR. RYAN:  On behalf of Mr. Rutigliano, let me state

24    that the government doesn't label everybody as a coconspirator;

25    it is the evidence.  And we object to this procedure, like we

D7ndles5                           Stavola – direct

1    did before trial.

2            MR. WEDDLE:  Your Honor, I think that maybe my

3    objection is too, you know, theoretical.  I think it is fine

4    for you to give the instruction.

5            THE COURT:  I agree with the defense.  Even if you've

6    charged, I have not seen any evidence of any connection between

7    the two doctors to establish that they were co-conspirators.

8    If you have something, you can put it in, but I have not seen

9    it.

10           MR. DRATEL:  Thank you, your Honor.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (In open court)

 2              THE COURT:  We are coming back to what I began to say

 3    in connection with the testimony of Mr. Stavola.  Insofar as

 4    the testimony made references to statements or actions

 5    attributable to Dr. Ralph Parisi, those statements or actions

 6    are not to be used by you in any way as established evidence of

 7    conduct by or concerning the charges brought by the government

 8    against Dr. Lesniewski.

 9              This applies to the direct testimony, and the same

10    instruction will pertain to any comparable testimony that may

11    come out in cross-examination.

12              Mr. Jackson.

13              MR. JACKSON:  Thank you, Judge.

14              THE COURT:  Mr. Jackson, it's about 10 minutes to 5.

15    You can earn another gold star.

16              MR. JACKSON:  I will do the best I can, your Honor.

17              Thank you, your Honor.

18    CROSS EXAMINATION

19    BY MR. JACKSON:

20    Q.  Sir, good afternoon.  Let me start off, you mentioned you

21    saw Gus Baran.

22              MR. JACKSON:  Stand up, sir.

23    Q.  That is Gus Baran you are speaking about?

24    A.  Yes.

25    Q.  You said you saw him because you were riding in a golf cart

D7nnles6                          Stavola – cross

1    with him, is that right?

2    A.   Right.

3    Q.   Is that to say that he was not walking on the golf course,

4    he was taking a golf cart to the various holes that you were

5    playing, is that accurate?

6    A.   Yes.

7    Q.   So you didn't see him walking from hole to hole, is that

8    right?

9    A.   No.

10   Q.   He was actually in the car, and that's how you got around

11   as you played, is that right?

12   A.   Yes.

13   Q.   Moving on, sir, I want to go over the various lies that you

14   have told previously that were brought out by the government

15   OK.  Could we start there.  You remember testifying in front of

16   the grand jury.  I just want to get the correct date.  That

17   would have been Thursday, April 28, 2011.  Do you remember

18   that?

19   A.   Yes.

20   Q.   Before you testified in front of that grand jury, you took

21   an oath like you did today, do you remember?

22   A.   Yes.

23   Q.   You put your hand up, correct?

24   A.   Yes.

25   Q.   I solemnly do swear to tell the truth, nothing but the

D7nnles6                         Stavola - cross

1  truth so help me God, correct?

2  A.  Correct.

3  Q.  Unlike today where there's 14 jurors -- 12, we have two

4  alternates -- the grand jury has 23 people or there about

5  there, correct?

6  A.  I wasn't counting.

7  Q.  OK.  But you know that there were a large group of people,

8  counting on you, sir, be to truthful, right?

9  A.  Yes.

10  Q.  In counting on to be truthful, a prosecutor asked you

11  questions, didn't they?

12  A.  Yes.

13  Q.  Let's start with those questions.

14        Mr. Tehrani has talked about your various lies in

15  front of the grand jury.  Let's start here.  You lied to the

16  grand jury about having a disability.

17        Is that fair to say?

18  A.  Yes.

19  Q.  Specifically, you told the grand jury on page 20 that -- we

20  can start on page 19, line 21 -- about how much pain you were

21  in.

22        Do you remember that?

23  A.  Yes.

24  Q.  Do you remember telling them that?

25  A.  Yes.

D7nnles6                          Stavola - cross

1    Q.  You have to answer verbally.

2            Do you remember on page 21 about how you wouldn't be

3    able to keep going, it hurt after a while with you standing and

4    walking it just kept hurting, correct?

5    A.  Correct.

6    Q.  And I won't belabor the point in the interest of time, but

7    as it relates to that disability issue, a prosecutor asked you

8    an abundance of questions in front of 23 or a large number of

9    people, and you lied, correct?

10   A.  Correct.

11   Q.  In addition to that lie, you were asked by the prosecutor

12   whether or not -- in the grand jury again, back in April of

13   '03, excuse me, April of 2011 -- you were asked about whether

14   or not you went through your application with Ms. Baran.

15           Do you remember being asked that question?

16   A.  Yes, I do.

17   Q.  In fact, you told the grand jury, page 19, lines 9 through

18   15, that you met with Ms. Baran three or four times and that

19   you and her went through the application together.

20           Do you remember that?

21   A.  Yes.

22   Q.  Today, however, you are saying that's not true, correct?

23   A.  That's right.

24   Q.  The prior thing you told about the disability, you are

25   saying today that's not true either, right?

D7nnles6                          Stavola - cross

1    A.  Correct.

2    Q.  Now, moving on, also to the grand jury you lied about not

3    being able to work.  You said you couldn't work when you

4    testified in front of them, is that right?

5    A.  That is right.

6    Q.  Today you are saying, after taking that oath, you know

7    what, that was a lie, too, correct?

8    A.  Correct.

9    Q.  In addition to that, Mr. Tehrani asked you about when you

10   stepped out of the grand jury, you had conversations with law

11   enforcement.

12         Do you remember that?

13   A.  Yes, I do.

14   Q.  In having those conversations with law enforcement, sir, I

15   think you mentioned to Mr. Tehrani -- we can go through the

16   details, if you like -- that you lied again, correct?

17   A.  Yes.

18   Q.  And those were agents of the federal government, is that

19   right?

20   A.  I didn't know who they were, but, yes.

21   Q.  But you do know you didn't tell the truth, right?

22   A.  Correct.

23   Q.  So we have established already that's four separate times

24   so far -- I have more -- that you told lies, right?

25   A.  Yes.

D7nnles6                    Stavola - cross

1  Q.  But today in front of this jury you are telling the truth.

2  We should believe you, right?

3  A.  Yes.

4  Q.  In fact, today I think you testified that you are facing 85

5  years in jail, aren't you?

6  A.  Yes.

7  Q.  And you weren't facing the 85 years and didn't have a

8  cooperation agreement with the government back then, right?

9  A.  No.

10  Q.  But today you do, don't you?

11  A.  Yes.

12  Q.  And today you are being truthful, right?

13  A.  Yes.

14  Q.  We should take you at your word today, right?

15  A.  Yes.

16  Q.  Let's talk about the actual -- there are these Aflac

17  agreements that you entered into.  Do you see these Aflac, the

18  insurance Aflac?

19  A.  Yes.

20  Q.  That is insurance that you get, and that's insurance that

21  you get for purposes of your disability, right?  You are

22  insuring a disability?

23  A.  Correct.

24  Q.  Of course, when you went to get those Aflacs -- we don't

25  have to put them up, but it's 1201, Government Exhibit; 1202,

D7nnles6                        Stavola - cross

1    Government Exhibit; 1203, Government Exhibit -- you were

2    purchasing disability insurance expecting to become disabled at

3    some later time, right?

4    A.  Correct.

5    Q.  In fact, you signed each one of these, right?  1201, if I

6    showed it to you, right -- again, we can put it up if you would

7    like --

8    A.  Yes.

9    Q.  -- but in the interest of time, you signed them, didn't

10   you?

11   A.  Yes, I did.

12   Q.  That was you trying to get this policy, right?

13   A.  Yes.

14   Q.  And you did get it?

15   A.  Yes, I did.

16   Q.  Marie Baran didn't sign this Aflac form, did she?

17   A.  No.

18   Q.  You didn't consult her about anticipating to become

19   disabled, did you?

20   A.  No.

21   Q.  That was your decision, sir, correct?

22   A.  Yes.

23   Q.  In fact, they're dated, right, these forms are dated, we

24   can agree with that?

25   A.  Yes.

D7nnles6                          Stavola – cross

1   Q.  For example, you said you met Ms. Baran, and we saw your

2   calendar, that was 2008, right?  I don't want to

3   mischaracterize.  You tell me.

4   A.  Yes, it was.

5   Q.  This would have been 2006, is that right?

6   A.  Yes.

7   Q.  You hadn't seen Ms. Baran in 2006, right?

8   A.  No.

9   Q.  You hadn't complained to her and told her you were disabled

10  in 2006, right?

11  A.  No.

12  Q.  But you were telling Aflac that, right?

13  A.  Yes.

14  Q.  In fact, you went back to them, July 22 of 2008, on another

15  form and you filled that form out with Aflac, too, right?

16  A.  What was that?

17  Q.  Sure.  July 22nd of 2008, your sickness claim form?

18  A.  Yes.

19  Q.  You remember that?

20  A.  Yes.

21  Q.  That wasn't true either?

22  A.  What wasn't true?  I'm losing you.

23  Q.  Were you sick?  Were you applying for insurance for

24  sickness with Aflac?

25  A.  I had to fill out a form every three months to get my

1   money.

2   Q.  When you were filling out this form, you were lying, were

3   you not?

4   A.  Yes.

5   Q.  So we don't have to count how many lies you told, but we

6   can agree that so far there's been plenty, correct?

7   A.  Correct.

8   Q.  But today in front of this jury, you are wholeheartedly

9   truthful, right?

10  A.  Yes.

11  Q.  Telling the whole truth, nothing but the truth, so help

12  you?

13  A.  Yes.

14  Q.  In fact, I want to talk about something else that's right.

15  You went to Ms. Baran because of her reputation in the industry

16  for helping people fill out complex forms, is that right?

17  A.  I went to Marie Baran because she was getting, everybody

18  that went to her got a disability.

19  Q.  Did you state at any time that Ms. Baran was aware that you

20  might have been intimidated by these forms, they were rather

21  complex, and that she would be good at filling out these forms,

22  that that was her reputation?  Did you say that?

23  A.  At the time, yes.

24  Q.  Was that true, and did you tell federal agents that, or was

25  that a lie?

1307

D7nnles6                         Stavola - cross

1    A.  At the time that's what I told them.

2    Q.  At the time when you told the agents that Ms. Baran was

3    very good at filling out complicated paperwork and that you

4    might have been intimidated, was that a lie or was that the

5    truth?

6    A.  That was the truth.

7    Q.  That was true.

8          So we can agree that Ms. Baran you went to not because

9    you were scheming with her to get a disability, right?

10   A.  Well, everybody that went to her got a disability, so I was

11   relying on her to write down on the form what needed to be

12   written down.

13   Q.  That is not what I am asking you, sir.  In fact, in writing

14   down what needed to be written down, you brought her paperwork

15   and documentation, correct?

16   A.  From Dr. Parisi, yes.

17   Q.  Regarding Dr. Parisi, let's just be accurate.  Ms. Baran

18   did not refer you to Parisi, did she?

19   A.  No.

20   Q.  In fact, your mom used Dr. Parisi, is that right?

21   A.  Correct.

22   Q.  So this was a long relationship you had with Dr. Parisi

23   wasn't it?

24   A.  Yes.

25   Q.  So Ms. Baran was in the picture long after you knew about

D7nnles6                           Stavola - cross

1    Dr. Parisi, right?

2    A.  Yes.

3    Q.  OK.  In fact, when you went --

4            MR. JACKSON:  If I could just have on --

5    Q.  Again, in the interest of time, 102-A, which is your

6    application form and you actually went to Ms. Baran and you

7    gave her certain information about doctors you went to,

8    correct?

9            Do you remember that?

10   A.  One doctor.

11   Q.  You went to one doctor.  OK.

12           Do you know something about a Dr. Finkelstein?

13   A.  Yes, I do.  Sorry.

14   Q.  Oh, you do.  Who's he?

15   A.  He gave me an injection in my back.

16   Q.  I see.  So that's not one doctor, that is another doctor?

17   A.  Excuse me.

18   Q.  You didn't mention him earlier, right?

19   A.  I mentioned it -- no, I didn't.  I guess I didn't.

20   Q.  You are mentioning it now because you want to be truthful,

21   right?

22   A.  Yes.

23   Q.  In fact, regarding Dr. Parisi, or Dr. Finkelstein, your

24   treatment started in '05, correct, concerning these ailments

25   that you had about your back, about your neck?  Did it start in

D7nnles6                         Stavola - cross

1   2005?

2   A.  If you say so.

3   Q.  I don't want to say anything.  I want -- and if you don't

4   know, I'll take the time to show you?

5   A.  OK.  I don't know.

6   Q.  OK.  So, with the Court's permission, just briefly, if you

7   could just look government --

8           MR. JACKSON:  I'm showing him Exhibit 102-A.

9   Q.  I want you to look at page 3.  I want you to look where it

10  says dates of treatment.

11          MR. WEDDLE:  We can just put it on the screen.  It is

12  in evidence.

13  A.  12/19/2005.

14          MR. JACKSON:  I am trying to move it through.

15  Q.  So you saw those dates there, correct?

16  A.  Yes.

17  Q.  Can we agree that all the dates upon which you were treated

18  were prior to you actually going to see Ms. Baran.  Can we

19  agree with that?

20  A.  Yes.

21  Q.  Ms. Baran didn't tell you what doctors to see when you were

22  getting treated, did she?

23  A.  No.

24  Q.  Just to be clear regarding Dr. Finkelstein, who you just

25  told the jury about, she didn't tell you to go to him either,

D7nnles6                      Stavola - cross

1   right?

2   A.  No.

3   Q.  That was a decision you made for you?

4   A.  Yes.

5   Q.  Now, regarding other interactions that you had with

6   Ms. Baran, she didn't tell you when you came to her that she

7   was going to exaggerate paperwork on your behalf.  Did she say

8   that, sir?

9   A.  Not in those words, no.

10  Q.  Not in any words to be clear, is that right?

11  A.  Yes.

12  Q.  Any words, right?

13  A.  Any words.

14  Q.  OK.  In fact, she didn't tell you that she was going to

15  call officials of the Long Island Rail Road so that you,

16  Mr. Stavola, can get your disability, right?

17          Didn't say that to you, did she?

18  A.  No.

19  Q.  At no time, sir, did she say, you know what, I am going to

20  charge you $1200, but if we get this disability, you know what,

21  I'm doubling it to $2400?

22          How about that?  Did she tell you that?

23  A.  No.

24  Q.  In fact, she assessed a fee based upon the work that she

25  performed on your behalf, is that accurate?

1    A.  Yes.

2    Q.  And when you went to her, she did indeed perform work for

3    you, correct?

4    A.  Yes.

5             MR. JACKSON:  Judge, I'm OK.  Thank you.

6             THE COURT:  Any other defense?

7             MR. RYAN:  Just a few questions.

8    CROSS EXAMINATION

9    BY MR. RYAN:

10   Q.  Mr. Stavola, you were an electrician working on a railroad

11   that depends upon electricity, right?

12   A.  Yes.

13   Q.  It was a key part of the operation to have people like

14   yourself available to correct whatever electrical problems were

15   confronting the railroad?

16   A.  Yes.

17   Q.  You did that on a regular basis?

18   A.  Yes, I did.

19   Q.  You coupled cars together, electrical cars, with your key

20   when it was necessary?

21   A.  Yes.

22   Q.  And you would carry, with another, couplers that weighed

23   about 150 to 130 pounds?

24   A.  Yes.

25   Q.  Tough work?

D7nnles6                          Stavola - cross

1   A.  Yes.

2   Q.  You would have to actually get under the self-propelled

3   carriage of the train car to do a repair work, whether it was

4   in the yard, or whether it was stuck on a track?

5   A.  Absolutely.

6   Q.  Was that easy work?

7   A.  No.

8   Q.  Let me show you a few pictures and see if you recognize the

9   contents.

10          MR. RYAN:  And I'm almost finished.  OK, Judge.

11  Q.  We also have another electrical concern working on the Long

12  Island Rail Road.  That's the third rail.

13  A.  Yes.

14  Q.  The third rail can be fatal?

15  A.  Yes, it can.

16  Q.  Everybody has to be aware, in good shape, not to slip and

17  fall and hit the third rail?

18  A.  That's correct.

19  Q.  Including yourself, right?

20  A.  Yes.

21          MR. RYAN:  Thank you.

22  Q.  Let me just show you R-11, R-38 and R-40, sir, and see if

23  you recognize the contents of these photographs based upon your

24  20 years' experience working on the railroad?

25  A.  OK.

D7nnles6                          Stavola - cross

1    Q.   Do you recognize the contents?

2    A.   Yes.

3    Q.   What is R-11?

4    A.   R-11, R-11 looks like a truck, a set of wheels and a truck.

5    I'm thinking an overhaul with the car above it.

6    Q.   The truck is the carriage underneath the electrical car?

7    A.   Yes.

8    Q.   Correct.  That's where you have to get under to work when a

9    train is broken down?

10   A.   Sometimes, yes.

11   Q.   What's the next photograph?  I think it's R-38?

12   A.   38, it looks like a diesel coupler.  A diesel locomotive

13   coupler, the front of a diesel train.

14   Q.   And do you work on those -- those diesels are also electric

15   and fueled by diesel fuel, correct?

16   A.   I didn't work diesel, in diesel territory.

17   Q.   Pardon me?

18   A.   I didn't work on diesel trains.  I only worked on electric

19   trains.

20   Q.   But you recognize it from your work?

21   A.   Yes, absolutely.

22   Q.   What is R-40?

23   A.   That is a fusebox.

24   Q.   That is a fusebox on the electrical car?

25   A.   Yes.

D7nnles6                          Stavola - cross

1    Q.  You will see your step.  Did you have that to get on the

2    train?

3    A.  Yes, two steps to get up into the --

4    Q.  And you have to put your foot on the step, and you have to

5    have a grab iron to get on?

6    A.  Yes.

7    Q.  And pull your whole body up with your hand --

8    A.  Yes.

9    Q.  -- and foot, right?

10   A.  Yes.

11           MR. RYAN:  I offer the photographs in evidence.

12           MR. TEHRANI:  No objection.

13           MR. RYAN:  No further questions.  Thank you, Judge.

14           THE COURT:  Admitted without objection.

15           (Defendant's Exhibits R-11, R-38 and R-40 received in

16   evidence)

17           THE COURT:  Mr. Dratel.

18           MR. DRATEL:  Nothing, your Honor.

19   REDIRECT EXAMINATION

20   BY MR. TEHRANI:

21   Q.  Mr. Stavola, you were asked questions on cross by

22   Mr. Jackson about whether you went to Marie Baran because these

23   forms were complex.

24           Do you remember those questions?

25   A.  Yes.

D7nnles6                    Stavola - redirect

1   Q.  Have you since seen the forms that Marie Baran filled out

2   for you?

3   A.  Yes, I did.

4   Q.  Do you think they are complex?

5   A.  Not at all.

6   Q.  Could you have filled them out on your own?

7   A.  Yes.

8           MR. TEHRANI:  No further questions, Judge.

9           THE COURT:  Thank you.  You are excused.  You can step

10  down.

11          (Within excused)

12          THE COURT:  We are going to adjourn for the day.

13  Return tomorrow at 9 o'clock.

14          As you go home today, let me give you the same warning

15  I have given you every day.  Do not discuss the case among

16  yourselves or with anyone on the outside or have any contact of

17  any kind with anyone involved in the case.  If any of these

18  things occur, you are directed to inform the court immediately

19  and not discuss it with the other jurors.

20          Have a good evening.

21          (Continued on next page)

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          (Jury not present)

2          THE COURT:  Thank you.  Let's, if we could --

3          MR. JACKSON:  Judge, did Mr. Ryan and I get our gold

4   star today.

5          THE COURT:  Absolutely.

6          MR. RYAN:  I didn't earn mine, your Honor.  You are

7   holding out.

8          THE COURT:  As has Mr. Dratel.

9          MR. DRATEL:  Thank you, your Honor.

10         THE COURT:  Now, let's go over tomorrow.

11         On my list the names previously indicated who did not

12  appear today, Mr. Camporese, Ms. Marx.

13         Are those still to come?

14         MR. WEDDLE:  Next, your Honor, we have Ms. Marx and

15  then we have two witnesses from the RRB in town, Mr. Coleman

16  and Ms. Graves.

17         Then I believe after that would be Mr. Daddino, who

18  relates to Mr. Rutigliano's tax returns.  And, your Honor, we

19  are continuing at a similar pace to what we have been doing,

20  which is I think is good.

21         it's possible that we would basically run out of

22  witnesses tomorrow, given that list.  I think Ms. Marx is

23  probably a couple hours on direct.  I don't know what the cross

24  is.  Coleman and Graves are each probably 40 minutes on direct.

25  I don't know what the cross is.  I think Mr. Daddino will be

1    brief, as Mr. Chirichella was.

2              Since we are so far ahead, your Honor, I hope that

3    your Honor may forgive us if we get into the afternoon and

4    don't have someone, because what we have, is we have Dr. Barron

5    next and then we have a summary witness, which Mr. van Etten is

6    in Florida.  I think it is going to be hard for him to get here

7    for tomorrow afternoon, but we can try.

8              The alternative may be if we just broke a little bit

9    early tomorrow and then we were to start first thing with

10   Dr. Barron.  I don't know how lengthy the cross is going to be

11   for Dr. Barron.  Then right after that we would basically just

12   have Dr. Barron and then van Etten and Special Agent Tumulty as

13   a summary witness.  And we have one other witness who I think

14   is out of town.  Ms. Cameron we are trying to get for Friday.

15             May I have one moment.

16             THE COURT:  Yes.

17             MR. WEDDLE:  I think we are just going to forgo

18   calling Mr. Camporese, your Honor.

19             THE COURT:  All right.  That sounds very encouraging

20   again.

21             MR. WEDDLE:  That's kind of the whole of the case.  I

22   need to go back and obviously check where we are in

23   stipulations and if there are any custodians that we need to

24   do, but we are sort of very close to the end.  Those are the

25   substantive witnesses that I see calling between now and when

1   the government rests.

2           We just need to make sure we haven't missed something,

3   as we always need to make sure when we come to the close of the

4   government's case.  But, given how fast we have been going, and

5   given the fact that some of these witnesses have these

6   scheduling issues, if we might be able to proceed that way, we

7   would greatly appreciate it.

8           THE COURT:  Based on this, there is some possibility

9   that you might be able to conclude Friday, depending upon the

10  cross-examination of Dr. Barron?

11          MR. WEDDLE:  Yes, your Honor.

12          THE COURT:  Is that a fair statement?

13          MR. WEDDLE:  Yes, your Honor.

14          THE COURT:  Friday we have cleared our calendar, so we

15  can have a full day.

16          Now let me come to a suggestion based on what

17  transpired this morning with the cross-examination of

18  Mr. Murray.

19          All three defense counsel took their whacks.  My

20  assessment is that a substantial amount of the

21  cross-examination by the defense counsel was somewhat

22  overlapping and repetitive.  It could have been streamlined.

23          I think that if defense counsel could get together

24  prior to the testimony of Dr. Barron and develop some method by

25  which your cross-examination could be shared to the extent you

D7nnles6                          Stavola – redirect

1   have common issues –– if you have individual issues that you

2   believe only one of you could handle, I could understand that,

3   but to the extent you have the same questions, the same

4   concerns, there is no reason why each of you needs to bring it

5   out serially.

6           Perhaps one way to do it is simply to take your common

7   questions and each of you could take a turn in presenting those

8   common questions, or you could delegate it to one person to

9   raise all the common issues.

10          I am not going to indicate how you should handle it.

11   I am making the observation that it could be handled more

12   efficiently if you cooperate and present one common

13   cross-examination, either by one or by all three.

14          Avoid the duplication and overlapping and save for

15   your individual clients any unique issues that pertain only to

16   your clients that need to be presented separately.

17          It is not uncommon for defense counsel in

18   multiple-defendant cases to cooperate in this way when there's

19   one witness that is presenting testimony that applies to all as

20   a way of avoiding the form of repetition and overlapping.

21          Is there anything else?

22          MR. WEDDLE:  Your Honor, since we are so close to the

23   end, I would inquire whether the defendants intend to testify.

24   That would be helpful for us to know in terms of our

25   preparation.

D7nnles6                              Stavola - redirect

1    THE COURT:  Is there any defendant who is in a

2    position at this point to answer the question?  If not, can you

3    indicate when is the soonest that you would be able to share

4    that information.

5         MR. DRATEL:  Your Honor, obviously we haven't made

6    that decision conclusively.  I think after Dr. Barron we would

7    be in a much better position to make a conclusive determination

8    in that regard.

9         Obviously, the fact that the government's case is

10   ending sooner has accelerated the need for the decision.

11   Obviously, it informs our decision as well perhaps somewhat

12   differently than it may have a week ago.

13        But at the same time, we understand.  Obviously

14   Mr. Durkin is not here, and I will be discussing it with him

15   this evening, the question that the Court posed.  I have had

16   the discussion with the government as well, so they are aware

17   of where we are on this issue.

18        THE COURT:  Mr. Jackson?

19        MR. JACKSON:  It is likely that Ms. Baran will

20   testify.

21        THE COURT:  Thank you.

22        Mr. Ryan.

23        MR. RYAN:  It is unlikely that Mr. Rutigliano will

24   need to testify.

25        THE COURT:  All right.  We will revisit the question

1    perhaps at the end of Thursday.

2            MR. WEDDLE:  Your Honor, we would also inquire whether

3    there are other witnesses that the defense intends to call.

4            They did provide a list of names in connection with

5    voir dire.  They have not provided, as your Honor's individual

6    rules require, an actual witness list with a summary of what

7    proposed testimony will be, so we don't know if the list of

8    names was just to keep their options open or if they actually

9    have an intention to call witnesses, but we would like to know

10   that as well, your Honor.

11           We would like to have any Rule 16 discovery, that is,

12   any documents that are currently in their possession that they

13   may intend to offer in evidence.  Then as soon as possible we

14   would also like to get their marked exhibits.

15           We have received some from Mr. Ryan and from

16   Mr. Jackson, but they have discovery obligations and they have

17   an obligation to turn over marked exhibits.

18           THE COURT:  Thank you.

19           Mr. Dratel.

20           MR. DRATEL:  I understand, your Honor.  Again, the

21   acceleration of the necessity for that has us working on that.

22   I will be speaking with Mr. Durkin about that as well, and

23   we'll get that formulated and begin production of what we know

24   we are going to do as soon as we know we are going to do it.

25           MR. WEDDLE:  Your Honor, could I just comment on that.

D7nnles6                       Stavola - redirect

1          THE COURT:  Yes.

2          MR. WEDDLE:  The government produced marked exhibits

3     and 3500 material two weeks in advance.  We've decided not to

4     call several of those witnesses.

5          If we had acted the way that Mr. Dratel was

6     suggesting, we might have produced -- basically would just be

7     producing the 3500 material after we for sure have called the

8     witness and then handed it over at the start of cross.

9          That is not how we have been conducting the trial, and

10    we suggest that if they have 3500 material, that is, any notes

11    of any meetings or conversations that they or their agents have

12    had with these people or any statements by these people, they

13    should be turning them over now as they are continuing to

14    consider it.  They should be turning over any documents that

15    they are considering admitting into evidence.

16         We have been producing discovery and we have not

17    admitted -- obviously we have just admitted the documents we

18    have admitted.

19         In addition, they have retained experts.  So I would

20    expect to see a great deal of 3500 material from their experts

21    and documentation relating to their experts.  I think that the

22    step of retaining an expert indicates at least provisionally an

23    intent to call that expert, and there would be no reason to

24    play hide the ball and to hold back that material that the

25    government produces routinely.

1          THE COURT:  All right.

2          Why don't we set close of business on Thursday for

3    defense counsel to produce whatever material they may have,

4    3500 or otherwise, even if it is as a placeholder.

5          In other words, you may decide not to call a witness,

6    but at least you will have had given the government some notice

7    of the possibility and have the government have enough time to

8    review it and determine what more may need to be done.

9          THE COURT:  Mr. Jackson, do you have any other

10   witnesses that may be contemplating?

11         MR. JACKSON:  I do, Judge.

12         Again, I will revisit it in short order based on the

13   new schedule that we have.  I think Mr. Weddle is right.  The

14   government has done a very good job I might say of giving

15   material that we need to move forward.

16         I don't want to hide the ball at all.  I will get that

17   together, Judge.  I will shoot for Thursday.

18         But the one proviso, your Honor.  If your Honor would

19   permit me to supplement, of course, in the event that that

20   becomes necessary.

21         THE COURT:  All right.  That goes without saying.

22         MR. JACKSON:  Thank you, Judge.

23         THE COURT:  Mr. Ryan.

24         MR. RYAN:  I don't have any witnesses at this time.  I

25   am going to revisit the issue, but I could assure you that the

D7nnles6                    Stavola - redirect

1    government will not be shortchanged on reciprocal discovery as

2    we move forward.

3              MR. WEDDLE:  Your Honor, can I just add one thing.

4              THE COURT:  Yes.

5              MR. WEDDLE:  Based on the list that we were given in

6    connection with voir dire, we did do some looking to try to

7    figure out who some of these people were.

8              It did look to us like some of the people that were on

9    Mr. Jackson's list are people who are on disability.  Just to

10   review for your Honor, we can submit a motion on this as soon

11   as we get some actual disclosure about who he may call and what

12   the intended subject matter of the testimony is along with 3500

13   material.  But to the extent he's trying to prove that there

14   are certain isolated clients of Ms. Baran who actually are

15   disabled and perhaps did not commit the crime substantively

16   themselves, that of course would be just a specific instance of

17   good conduct and would not be admissible under Rule 405.

18             THE COURT:  Didn't we address the issue in the motions

19   in limine as well, Mr. Jackson.

20             MR. JACKSON:  We did.  I know.  I am not trying to go

21   through any keyhole or behind the door to knock it down.

22             THE COURT:  Or helicopter.

23             MR. JACKSON:  No helicopters, Judge.  I have learned

24   from this Court not to.  I may be calling those people not to

25   confirm disabilities, but to confirm the manner in which they

D7nnles6                        Stavola – redirect

1   were treated, handled, reviewed, the application process and

2   not the disability itself.

3            THE COURT:  Is that a character witness?

4            MR. WEDDLE:  I think we will just take it as it comes,

5   your Honor, but if it is just nonfraudulent conduct in her

6   meetings with her clients, we would have the same objection.

7   But the sooner he can give us, as your Honor's rules require, a

8   summary of what their testimony is going to be and turn over

9   the 3500 that he has, the sooner we will know exactly what we

10  are talking about and we can submit a brief, your Honor.

11           THE COURT:  Let's aim for Thursday close of business.

12           Anything else?

13           Thank you.  Have a good evening.

14           MR. DRATEL:  Thank you, your Honor.

15           (Adjourned to Wednesday, July 24, 2013 at 9:00 a.m.)

16

17

18

19

20

21

22

23

24

25

1       INDEX OF EXAMINATION

2    Examination of:                         Page

3    ROBERT MURRAY

4    Direct By Mr. Weddle . . . . . . . . . . . .1021

5    Cross By Mr. Dratel  . . . . . . . . . . . .1051

6    Cross By Mr. Ryan  . . . . . . . . . . . . .1070

7    Cross By Mr. Jackson . . . . . . . . . . . .1080

8    Redirect By Mr. Weddle . . . . . . . . . . .1090

9    Recross By Mr. Dratel  . . . . . . . . . . .1098

10   Recross By Mr. Ryan  . . . . . . . . . . . .1101

11   Redirect By Mr. Weddle . . . . . . . . . . .1103

12   Recross By Mr. Jackson . . . . . . . . . . .1104

13   Recross By Mr. Dratel  . . . . . . . . . . .1105

14   ANNMARIE CUOCCI

15   Direct By Mr. Weddle . . . . . . . . . . . .1111

16   Cross By Mr. Jackson . . . . . . . . . . . .1137

17   Redirect By Mr. Weddle . . . . . . . . . . .1171

18   JOHN CHIRICHELLA

19   Direct By Ms. Friedlander  . . . . . . . . .1176

20   Cross By Mr. Jackson . . . . . . . . . . . .1188

21   Redirect By Ms. Friedlander  . . . . . . . .1193

22   ROBERT DUNAJ

23   Direct By Mr. Weddle . . . . . . . . . . . .1198

24   Cross By Mr. Jackson . . . . . . . . . . . .1226

25   Redirect By Mr. Weddle . . . . . . . . . . .1250

1   Recross By Mr. Jackson . . . . . . . . . . .1252

2   Redirect By Mr. Weddle . . . . . . . . . . .1253

3   MICHAEL STAVOLA

4   Direct By Mr. Tehrani  . . . . . . . . . . .1254

5   Cross By Mr. Jackson . . . . . . . . . . . .1298

6   Cross By Mr. Ryan  . . . . . . . . . . . . .1311

7   Redirect By Mr. Tehrani  . . . . . . . . . .1314

8                        GOVERNMENT EXHIBITS

9   Exhibit No.                              Received

10   20 and 20A  . . . . . . . . . . . . . . . .1034

11   23B   . . . . . . . . . . . . . . . . . . .1035

12   23A   . . . . . . . . . . . . . . . . . . .1041

13   21B   . . . . . . . . . . . . . . . . . . .1041

14   22A and 22C   . . . . . . . . . . . . . . .1049

15   3524-35  . . . . . . . . . . . . . . . . . .1106

16   502B   . . . . . . . . . . . . . . . . . . .1118

17   500   . . . . . . . . . . . . . . . . . . .1121

18   504 and 502A  . . . . . . . . . . . . . . .1122

19   527 and 528   . . . . . . . . . . . . . . .1123

20   500A, 500B, 500C, 500D, 502B1, 502B2, . . .1124

21            502B3, 502B4

22   522   . . . . . . . . . . . . . . . . . . .1180

23   503B   . . . . . . . . . . . . . . . . . . .1184

24   3519-06, 114-G, 114-B, 114-D, 1353, . . . .1199

25            114-A, 114-F, 114-C

1    3519-07   . . . . . . . . . . . . . . . .1210

2    114-E   . . . . . . . . . . . . . . . . .1228

3    3513-08, 102-A, 102-B, 102-C, 102-D,  . . . .1254

4              718, 1200, 1201, 1202, 1203,

5              1204, and 1205

6                        DEFENDANT EXHIBITS

7    Exhibit No.                          Received

8    s R-11, R-38 and R-40   . . . . . . . . . .1314

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25