D7onles1
                            Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                 New York, N.Y.

4              v.                             S14 11 Cr. 1091 (VM)

5   PETER LESNIEWSKI, MARIE BARAN
    and JOSEPH RUTIGLIANO,
6
                    Defendants.
7
    ------------------------------x
8

9                                            July 24, 2013
                                             9:00 a.m.
10

11  Before:

12                      HON. VICTOR MARRERO,

13                                           District Judge

14
                          APPEARANCES
15
    PREET BHARARA
16       United States Attorney for the
         Southern District of New York
17  BY:  JUSTIN S. WEDDLE
         DANIEL BEN TEHRANI
18       NICOLE WARE FRIEDLANDER
         Assistant United States Attorneys
19
    LAW OFFICES OF JOSHUA L. DRATEL, P.C.
20       Attorneys for Defendant Peter Lesniewski
    BY:  JOSHUA LEWIS DRATEL
21       LINDSAY A. LEWIS

22  DURKIN & ROBERTS
         Attorneys for Defendant Peter Lesniewski
23  BY:  THOMAS ANTHONY DURKIN

24

25

D7onles1
                            Trial

                      APPEARANCES CONTINUED

KOEHLER & ISAACS, LLP
        Attorneys for Defendant Marie Baran
BY:   JOEY JACKSON

JOSEPH W. RYAN, JR.
KEVIN MENEILLY
        Attorneys for Defendant Joseph Rutigliano

            - also present -

Annie Chen
Emma Larson, Government Paralegals


SA Frank LoMonaco, FBI

Yeni Yrizarry, Defendant Baran Paralegal

                            oOo

D7onles1
Trial

1          (In open court; jury not present)

2          MR. WEDDLE:  Your Honor, I have one issue to raise, if

3     your Honor has a moment.

4          THE COURT:  Yes.  I have also been informed that

5     Ms. Rasbatt, the juror who had the appointment for tomorrow,

6     has been able to juggle her schedule around so that she will be

7     available and we should be able to go a full day tomorrow and

8     Friday.

9          Mr. Weddle.

10          MR. WEDDLE:  Thank you, your Honor.

11          I wanted to raise one thing which came up during the

12     cross examination of Mr. Murray by Mr. Ryan yesterday.  There

13     were a number of questions by Mr. Ryan in which he asked

14     Mr. Murray -- who as your Honor will recall was from the MTA

15     office of inspector general and presented those charts -- he

16     asked Mr. Murray about whether the MTA was aware of the rates

17     of disability at different years in the past and questions to

18     that effect, your Honor.

19          THE COURT:  Yes.

20          MR. WEDDLE:  We objected.  I actually can't remember

21     to what extent your Honor sustained the objections.  I think

22     some were sustained and some were overruled.  But I just wanted

23     to say a little bit more about that.  We think that those kinds

24     of questions have been precluded by your Honor's ruling on our

25     motion in limine, which precluded evidence relating to

D7onles1
                              Trial

1   negligence of the victim.

2           The fact that the MTA was aware of any kind of rates

3   or the fact that the RRB conducts audits or does any kind of

4   analysis of its occupational disability system is irrelevant to

5   the issues here and should be precluded under Rule 4303,

6   because that kind of questioning can only invite the jury to

7   consider improperly any negligence of the victim, the RRB or

8   any negligence of the MTA in failing to stop these defendants'

9   fraud earlier than we have been able to bring them to justice

10  here, your Honor.

11          THE COURT:  All right.

12          Well, as you indicated, Mr. Weddle, I did allow some

13  questioning by Mr. Ryan on some of the material indicated.  I

14  did so because at some point I was persuaded that the

15  questioning related not so much to the issue of whether or not

16  the MTA was aware and should be responsible for what happened,

17  but more that the questions were providing background as to the

18  MTA's methods and some of the concepts, terms that have been

19  used in connection with the audits and Mr. Murray's preparation

20  of the charts.

21          So, to the extent that the questions dealt with

22  background that explained Mr. Murray's methodology and how he

23  came about his report, I allowed questioning.  At the point at

24  which I became persuaded that the questions went beyond that

25  and sought to suggest that the MTA knew and should have stopped

D7onles1
                                Trial
1    what was going on earlier, I precluded any further questioning

2    on that score.

3            MR. WEDDLE:  Along the same lines, your Honor, I

4    wanted to raise something that may come up during the testimony

5    of Mr. Coleman, an RRB witness, who Mr. Tehrani is going to

6    present.

7            In connection with the same board order that we have

8    submitted to your Honor in connection with our motion in limine

9    relating to continuing disability reviews, in that same board

10   order not only did the board order continuing disability

11   reviews of certain category of Long Island Rail Road people on

12   disability, but they also changed the procedures for reviewing

13   Long Island Rail Road claims and started ordering more

14   examinations of those files by consulting doctors.

15           We think that that change in procedure is irrelevant

16   to this case and shouldn't be brought out on cross-examination

17   in this case.  I think what we should be focusing on is the

18   normal procedures that claims examiners use before that board

19   order came out.

20           THE COURT:  All right.  Thank you.

21           We will see how the cross-examination goes.  If it

22   veers in the improper direction, we'll review it at that time.

23           Bring in the jury.

24           MR. TEHRANI:  Your Honor, if I may just briefly?

25           THE COURT:  Yes.

D7onles1

Trial

1      MR. TEHRANI:  If that is going to be brought out on

2 cross-examination, I think we are likely to want to bring it

3 out on direct.

4      THE COURT:  Let's go over exactly what changes are

5 made and why.

6      MR. TEHRANI:  So in connection with that 2009 board

7 order, as Mr. Weddle was saying, that in part ordered the

8 continuing disability reviews of a number of Long Island Rail

9 Road applications.

10      It also changed the procedure for reviewing

11 occupational disability applications for Long Island Rail Road

12 employees.  The order was that in every case of a Long Island

13 Rail Road application, the application is sent out for a

14 consultative exam, consultative opinion.  So there's two

15 different kinds of additional information that can be obtained.

16 There is a consultative exam and a consultative opinion.  The

17 consultative exam is where a doctor sees the applicant in

18 person.  The consultative opinion is where a doctor reviews the

19 file, but does not see the patient.

20      THE COURT:  Mr. Tehrani, excuse me for cutting it

21 short.

22      To what extent are you going to bring out evidence or

23 testimony concerning the procedure that existed rather than the

24 change?

25      MR. TEHRANI:  I'm sorry, your Honor.

D7onles1
                          Trial

 1            THE COURT:  To what extent are you bringing out direct

 2   testimony concerning the procedure that existed prior to the

 3   case here as opposed to the changed procedure?

 4            MR. TEHRANI:  I think we are going to go through that

 5   in some detail.  You know, we want to go through how a claims

 6   examiner reviews a file, the circumstances in which they

 7   typically would order a consultative opinion and the

 8   circumstances that they would typically order a consultative

 9   exam.

10            THE COURT:  Again, sorry to cut you short insofar as

11   the Railroad Retirement Board changed the procedures, I believe

12   those changes are not relevant, so testimony on that will not

13   be permitted.

14            So the cross-examination will be limited to questions

15   pertaining to the procedures that existed insofar as it comes

16   out in direct.

17            MR. TEHRANI:  Thank you, your Honor.

18            THE COURT:  All right.

19            MR. DRATEL:  Your Honor?

20            THE COURT:  Yes.

21            MR. DRATEL:  With respect to that, as long as it's

22   symmetrical.  In other words, the government can't put in

23   certain evidence about the nature of changes after 2008 and at

24   the same time sanitize the results of that.

25            So I just want to be clear in terms of the door

D7onles1
                              Trial

1    opening being very tight in this respect.

2              THE COURT:  Of course, yes.

3              MR. DRATEL:  Thank you.

4              THE COURT:  If you hear the squeaky hinges, just raise

5    your hand.

6              MR. DRATEL:  Thank you, your Honor.

7              I will do that.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7onles1
                              Trial

 1              (Jury present)

 2              THE COURT:  Thank you.  Welcome back.

 3              Mr. Tehrani.

 4              THE COURT:  The government calls John Coleman.

 5    JOHN COLEMAN,

 6         called as a witness by the Government,

 7         having been duly sworn, testified as follows:

 8    DIRECT EXAMINATION

 9    BY MR. TEHRANI:

10    Q.  Good morning, Mr. Coleman.

11              How far did you go in school?

12    A.  I have a college degree, a bachelor's degree.

13    Q.  Where do you work?

14    A.  I work at the Railroad Retirement Board.

15    Q.  Is that sometimes referred to as the RRB?

16    A.  Yes, it is.

17    Q.  What is the Railroad Retirement Board?

18    A.  The Railroad Retirement Board is a federal agency that pays

19    benefits to railroad workers.  They pay retirement, survivor,

20    disability unemployment, sickness benefits.

21    Q.  You mentioned that those benefits are available to railroad

22    employees?

23    A.  Yes, that's correct.

24    Q.  Nationwide?

25    A.  Yes.

D7onles1                         Coleman - direct

1    Q.  Mr. Coleman, do you know who Marie Baran is?

2    A.  Yes, I do.

3    Q.  Who is she?

4    A.  She used to work in one of the field offices for the

5    Railroad Retirement Board.

6    Q.  Do you know whether she's retired?

7    A.  I believe she is, yes.

8    Q.  As an employee of the RRB, was Marie Baran eligible to

9    apply for an RRB disability benefit?

10   A.  No, she would not, unless if she had railroad service, but

11   I don't know if she had railroad service.

12   Q.  So that would be both occupational disability or some other

13   disability benefit?

14   A.  Correct.

15   Q.  And why not?

16   A.  If she didn't work for the railroad, she wouldn't have paid

17   into the -- she wouldn't have paid taxes for that.  She

18   wouldn't have been eligible for those benefits.

19   Q.  Let's talk about that for a second.  How are RRB benefits

20   funded?

21   A.  Railroad employees pay a tax into the Railroad Retirement

22   fund similar to the way that most of us pay into Social

23   Security.  They don't pay into Social Security, they pay into

24   the Railroad Retirement fund, and also railroad companies pay,

25   also pay a tax to them.

D7onles1                          Coleman - direct

1   Q.  How long have you worked at the RRB?

2   A.  I have worked there for 25 years.

3   Q.  What division of the RRB do you currently work in?

4   A.  I work in the disability benefits division.

5   Q.  What are the sections within the disability benefits

6   division?

7   A.  There is a disability initial section and disability post

8   section.

9   Q.  We will talk about those in a minute.

10          But what is your current position?

11  A.  I am the supervisor of the disability post section.

12  Q.  What other jobs have you held in your time at the RRB?

13  A.  When I first started there I was a retirement claims

14  examiner.  Then I moved to the disability section and I paid

15  disability benefits.  After that I was an initial disability

16  claims examiner.  After that I worked in the policies and

17  procedures section of disability.  After that I was a quality

18  analyst for the disability section.  Then I was a lead examiner

19  in disability, which is basically an assistant supervisor

20  position.  After that I was the supervisor of the disability

21  initial section and currently the disability post supervisor.

22  Q.  How long have you been the disability post supervisor?

23  A.  About seven months now.

24  Q.  Before that, how long were you the supervisor in the

25  initial section?

D7onles1                        Coleman – direct

1   A.   About six months.

2   Q.   You mentioned that one of the benefit programs at the RRB

3   administers are disability benefits?

4   A.   Correct.

5   Q.   How many types of disability benefits are administered by

6   the RRB?

7   A.   We do occupational disabilities, total and permanent

8   disabilities, and then there's also survivor disabilities.

9   Q.   What is occupational disability?

10  A.   An occupational disability is something that is particular

11  to the railroad industry, where if certain eligibility

12  requirements are met and you were unable to do your railroad

13  job because of a medically determinable impairment, you could

14  be found occupationally disabled.

15  Q.   A total and permanent disability?

16  A.   A total and permanent disability is because of a medical

17  determinable impairment you would not be able to do any work in

18  the national economy.

19  Q.   How are those two standards the same?

20  A.   They are both disabilities.

21  Q.   How are the two standards different?

22  A.   The occupational is particular to the railroad industry.

23  We are just trying to find if a person would be able to do

24  their regular railroad job or not, whereas with the total and

25  permanent it's whether they could do any work in the national

D7onles1                          Coleman – direct

1    economy.

2    Q.  Now, you have mentioned a couple of times there is an

3    initial section in the disability division and there is also a

4    post section.  What does the initial section do?

5    A.  The initial section handles the initial determination,

6    whether somebody is occupationally disabled or totally

7    permanently disabled.

8    Q.  What does the post section do?

9    A.  The post section does reviews of the initial section's to

10   make sure that their proposed determinations are correct.  Then

11   they sign off on them.  They also do disability freeze, which

12   is every application for a disability under the Railroad

13   Retirement act is also an application under the Social Security

14   Act and I provide certain benefits such as early Medicare tax

15   benefits and survivor benefits.

16   Q.  You mentioned a disability freeze.

17   A.  Yes.

18   Q.  What is a disability freeze?

19   A.  A disability freeze is when we would evaluate to see if

20   somebody is totally and permanently disabled for all work using

21   Social Security guidelines, which are basically the same as a

22   total and permanent under the Railroad Retirement guidelines.

23   Q.  Just to clarify, a disability freeze determination is a

24   determination as to whether the person is totally and

25   permanently disabled?

D7onles1                    Coleman - direct

1   A.   Correct.

2   Q.   How many examiners are there in each section, the initial

3   section and the post section?

4   A.   The disability initial section has 16 examiners, and the

5   disability post section has 9 examiners.

6   Q.   Generally speaking, what is the educational level of claims

7   examiners at the RRB?

8   A.   Most of them have bachelor's degree.

9   Q.   Are any of them doctors?

10  A.   No, none of them are doctors.

11  Q.   Do any of them have any kind of formal medical training?

12  A.   No, not that I know of.

13  Q.   What type of training do claims examiners get from the RRB?

14  A.   When somebody becomes an examiner in the disability initial

15  section, there is a six-month training course.  The first three

16  months of that training is classroom training where they learn

17  how to evaluate the claim for eligibility requirements, work

18  duties, different technical issues.  They also receive some

19  medical training.

20          We have a contract with a medical provider that the

21  chief medical officer there provides medical training to the

22  examiners that lasts a couple of weeks.  It gives some basic

23  information about different body systems and how they work and

24  the impairments that we normally see for disabilities.

25  Q.   Is part of that six-month training also just the process

D7onles1                         Coleman - direct

1   that the claims examiners use to evaluate clams exams?

2   A.   Yes, that would be the other part of the three months, the

3   different classrooms about how to evaluate the medical

4   evidence.

5   Q.   How does an employee, a railroad employee apply for

6   disability benefits?

7   A.   They would contact a field office of the Railroad

8   Retirement Board and tell them that they want to file for

9   disability benefit.

10  Q.   What are the components of the application package that an

11  employee would file?

12  A.   They would file an application for benefits.  They would

13  also file a disability application.  There is also a job

14  information form that they have to complete, where they

15  describe what their job duties are and what their regular

16  railroad occupation is.  They also supply medical evidence from

17  the treating sources for us to evaluate.

18  Q.   What is a treating source?

19  A.   The treating source would be a doctor that the claimant has

20  seen over a period of time that would have different test

21  results and different reports.

22  Q.   Just getting briefly back to the components of the

23  application package, are you familiar with a form AA-1d?

24  A.   Yes.

25  Q.   What is that?

1   A.   That is the application for disability.

2   Q.   And a form G-251?

3   A.   The G-251 is the vocational report where the employee

4   describes what his jobs and his job duties are.

5   Q.   And a G-250?

6   A.   A G-250 is the medical assessment form that's completed by

7   the treating source doctor that says what they feel an employee

8   could or couldn't do.

9   Q.   In addition to the G-250, are additional medical records

10   provided?

11   A.   Yes, they are.

12   Q.   Mr. Coleman, does a person need to hire someone to fill out

13   the application form or the vocational report?

14   A.   No.   We have our field offices that are there to help them

15   to complete those forms.

16   Q.   And are the forms complex?

17            MR. DRATEL:   Objection.

18            THE COURT:   Rephrase the question.

19   Q.   Do the forms require any kind of expertise to fill out?

20   A.   No.   It's just general information about the person.

21   Q.   When an application comes into the disability division, how

22   is it assigned?

23   A.   By the Social Security number, the last two digits -- we

24   call it the terminal digits -- the last two digits of the

25   Social Security number, and they are assigned examiners.   The

D7onles1                       Coleman - direct

1  examiners have their own digits.  That is how the cases are

2  assigned.

3  Q.  What is the first thing a claims examiner does when he or

4  she gets a file?

5  A.  They would look at it and determine if the claimant is

6  eligible for an occupational disability or a total and

7  permanent disability.

8  Q.  When you say eligible for an occupational disability, what

9  do you mean by that as an initial matter?

10  A.  To be eligible for an occupational disability, someone

11  would have to have 20 years of railroad service and a current

12  connection with the railroad industry, which means that

13  basically that they have come right from railroad work to file

14  for disability.  There is no other work that would be in

15  between that.

16          Also, if an employee is 60 years old with ten years of

17  experience and the current connection they would be eligible

18  for an occupational disability.

19  Q.  Just to clarify, when you say eligible, you mean eligible

20  even to apply?

21  A.  Yes, to apply.

22  Q.  We are not talking yet about their medical condition?

23  A.  Right.

24  Q.  If a person is not eligible to apply for an occupational

25  disability, what happens to that application?

D7onles1                          Coleman - direct

A.  We would then look at it to see if they would be eligible

for a total and permanent disability and evaluated for a total

and permanent disability.

Q.  Is there a particular method that claims examiners use to

examine a claim?

A.  Yes.  In occupational cases they have a sequential

evaluation that they follow.

Q.  What is the beginning of that sequential evaluation?

A.  Of course, first they determine whether they are eligible

for occupational or total impairment.  After that they look to

see, is there a medically determinable impairment.  They look

to see, in the occupational standards, they have what they call

the tables, so they would look to see -- another step, they

would look to see if the person is actually working in the

railroad industry or in any other type of work.

        If they are working, it's felt they wouldn't be

disabled and they should be denied at that point.  Then they

would look at the tables to see if they could be found disabled

using those.

        If not, we would use an independent case evaluation

and writ the case, evaluate all the medical evidence and job

information and everything else in the file and determine if

they could do their regular railroad job.

Q.  We'll break that down and discuss them in a little more

detail.  Is there any part of the evaluation that looks at

D7onles1                          Coleman - direct

1    whether the railroad has disqualified the employee?

2    A.  Yes, there is one part, yes.

3    Q.  And how does that play into the evaluation?

4    A.  If the railroad indicates to the Railroad Retirement Board

5    that they are not allowing a person to work because of

6    medically determined impairment, then we would say that since

7    the railroad is not allowing him to work that he would be

8    occupationally disabled.

9    Q.  You mentioned some lists and I believe tables.  Can you

10   explain a little bit more about what that is?

11   A.  Do you want me to go through the listings and the tables?

12   Q.  Please?

13   A.  The listings of impairments, they have different body

14   systems in there and they have different criteria.  If you were

15   to meet those criteria, it would be felt that you would be so

16   disabled that you would be disabled for all the work.  You

17   could be reading the listings and you could be found disabled.

18        The tables are particular to the occupational

19   disability, and there are two sections to that.  There's one

20   where there would be a confirmatory test.  The tables are set

21   up just for certain occupations and certain impairments or body

22   systems.

23        The first thing you would look for is to confirm that

24   there is an impairment, so if you had a certain impairment, you

25   should have a certain test to show that you have that.  Once

D7onles1                         Coleman – direct

1    it's been confirmed that you have that impairment, then you

2    would go on to the tables, which would show different

3    impairments under those body systems and different tests that

4    would show that you are disabled.

5    Q.   This is all before you ever get to a, I believe you said

6    independent case evaluation?

7    A.   Independent case evaluation, yes.

8    Q.   Can you give an example of a listed condition.

9    A.   One example would be inoperable lung cancer.  That would be

10   in the table, and you could be found occupationally disabled.

11   Q.   Now, focusing on the independent case examination, is that

12   also sometimes referred to as ICE?

13   A.   Yes, it is.

14   Q.   What does "independent" mean?  What is it independent of?

15   A.   Well, it is independent of using the tables.  It is just

16   that we are basing our decision based on the information that's

17   in that file compared to anything else.  It is just the

18   individual file.

19   Q.   Overall, what materials are used in this individualized

20   evaluation?

21   A.   Well, we look at everything that is in the file, we look at

22   the applications, the job information, all the medical evidence

23   that is provided.

24   Q.   Does the RRB rely on all the forms submitted by the

25   applicant?

D7onles1                          Coleman - direct

1   A.   Yes, they do.

2   Q.   Including medical information?

3   A.   Yes.

4   Q.   Medical information provided by the treating source?

5   A.   Yes.

6   Q.   What do the application and vocational report forms say

7   about whether they are filled out truthfully?

8   A.   There is a section that the person signed the form

9   testifies that the information is true to the business of their

10   knowledge, that they understand that by signing it that they

11   realize that if they are providing false information they could

12   be held accountable for it, charges could be brought up against

13   them for fraud.

14   Q.   We've spoken a little bit about information provided by a

15   treating source.   How important is the treating source's

16   evaluation?

17   A.   That's very important information.   Treating sources are

18   usually doctors that have been seeing the claimant for a period

19   of time, and they are the ones that they actually see them and

20   they know the history, what's been going on over a period of

21   time, and they would have a lot of tests and actually interact

22   with the claimant.

23   Q.   As far as the weight that a claims examiner gives to the

24   treating source evaluation, what kind of weight is given?

25   A.   It's given great weight.   Because the treating source is

D7onles1                          Coleman - direct

1    the one that sees the claimant and knows their condition, they

2    are given the most weight.

3    Q.  Is that by regulation?

4    A.  Yes, that is in the federal regulations.

5    Q.  Are there circumstances where the treating source's

6    findings are conclusive?

7    A.  Yes.  If the objective medical evidence that supported,

8    that is sent in with the reports would back up that, it would

9    be conclusive.

10   Q.  Now, you have testified that occupational disability means

11   a person is unable to do his or her job, right?

12   A.  Correct, in the railroad industry, yes.

13   Q.  What materials do claims examiners use to determine what a

14   person's job entails?

15   A.  That would be primarily the G-251, the vocational report.

16   We look at that.  That gives the claimant an opportunity to

17   describe his job as he performs it, what his regular job is.

18   There is also a G-251A and B which are sent out to the

19   railroads, which give the railroad an opportunity to tell us

20   what the job duties are.

21   Q.  Do you always get a response from a railroad?

22   A.  No, we don't.

23   Q.  If you do not get a response from a railroad, what do you

24   do?

25   A.  Then we rely on the claimant's description.

D7onles1                    Coleman - direct

1   Q.  Even if you do get a response from a railroad, do you rely

2   on the response from the applicant?

3   A.  Yes, we do.

4   Q.  When you are looking at the person's job, are you trying to

5   determine whether the person can do his or her actual job or

6   are you trying to determine whether the person can do a generic

7   version of the job title?

8   A.  We're trying to determine if he can do the person's actual

9   job.

10  Q.  Why is that?

11  A.  Because if they can't do their job, then they would be

12  found occupationally disabled.

13  Q.  If an employee's real job was easier than what is described

14  in a generic job description, which description would you rely

15  on in making your determination?

16          MR. DRATEL:  Objection.

17          THE COURT:  Sustained.

18  Q.  In making your determination, do you rely on the

19  description of the actual job that the employee performs?

20          MR. DRATEL:  Objection as to form.

21          THE COURT:  Sustained.

22  Q.  Mr. Coleman, what do you rely on as far as a job

23  description goes to determine whether the employee is able to

24  do his or her job?

25  A.  We rely on their description of what they do.

D7onles1                        Coleman - direct

1    Q.  Of their actual job?

2    A.  Of their actual job, correct.

3    Q.  Now, in addition to getting information about what the job

4    entails, does the RRB ask the applicant whether he or she can

5    do his or her job?

6    A.  Yes.  There is an item on the AA-1d disability application

7    that asks if they can do their job.

8    Q.  I believe there should be an AA-1d in front of you?

9    A.  Yes, there is.

10   Q.  It's marked as Government Exhibit 101-A.

11   A.  Yes.

12          MR. TEHRANI:  Could we put that up on the screen.

13   Q.  So this is a completed and filed AA-1d?

14   A.  Yes.

15   Q.  If you can look at the last page.  Just above the

16   signature, is that the certification you were referring to?

17   A.  Yes, it is.

18   Q.  That is a certification that says that the information is

19   true to the best of my knowledge?

20   A.  Yes.

21   Q.  And indicates the consequences for providing false

22   information?

23   A.  Yes, it does.

24   Q.  Looking at question 11, page 2.

25   A.  Yes.

D7onles1                        Coleman - direct

1    Q.  Is that the question or the entry that you were referring

2    to about whether an applicant is able to do his or her job?

3    A.  It's asking what is the date that the person can no longer

4    work.

5    Q.  And if a person put on there there is no such date, I could

6    do my job, what would you do?

7    A.  Well, first of all, if we see that, we would probably go

8    out and verify that that information is correct.  And if they

9    came back and said yes, it is correct, well, we would deny the

10   claim, because they are telling us that they can actually do

11   their job, so they wouldn't be disabled.

12   Q.  Now, question 12 says, Describe how your condition prevents

13   you from working.  What if the answer was it doesn't?

14   A.  Just like the question before, we would go out to verify

15   that that's what they really meant to say.  And if they would

16   come back and they would say that, then we would deny the

17   claim, because they are telling us that they can do their job,

18   and if they can do their job, they are not occupationally

19   disabled.

20   Q.  Now, question 13 says, Does the condition prevent you from

21   working now.  How would you handle an application that answered

22   that no?

23   A.  The same as the last two questions.  We would go out and

24   verify it, because it's asking if their condition prevents them

25   from working.  If they are saying, no, it doesn't, basically

1  they are saying, well, I can work, we would verify that that's

2  how they wanted to answer that.  If they came back and said,

3  you know, they verified that, then we would deny the claim.

4  Q.  Turning to page 6, Section 6, question 39.

5        There is a series of daily activities and the

6  applicant is supposed to mark easy, hard, or not at all.  Do

7  you see those?

8  A.  Yes.

9  Q.  To what extent do claims examiners review the information

10 provided in this table?

11 A.  They would rely on it a lot.  Once they evaluate, once they

12 look at the medical evidence and try to see if it would, you

13 know, what that medical evidence shows, if they were to have --

14 if this is accurate or not, you know, should they be able to

15 perform these different activities easy or hard based on their

16 impairments.

17 Q.  So the answers to these questions play a role in the

18 evaluation of an occupational disability?

19 A.  Yes, they do.

20 Q.  And question 40, it says to enter any additional

21 information that describes your daily activities during a

22 normal day.  To what extent do claims examiners rely on the

23 answer to question 40?

24 A.  They would rely a lot on it, because it shows during the

25 regular day, you know, how they would be impacted by their

D7onles1                         Coleman - direct

1   impairments.  And, you know, if it's showing that they are,

2   there is no impact or a lot of impact, it would play into the

3   decision.

4   Q.  When a claims examiner is reviewing a claim for benefits,

5   what does a claims examiner assume about whether the

6   information is true or not?

7   A.  Because the person is signing, they are attesting to the

8   fact that's true to the best of their knowledge and they

9   acknowledge that there are penalties if it's not true, we

10  assume that everything is true that they put on the file.

11  Q.  What tools, if any, do claim examiners have to root out

12  fraud in the application materials?

13  A.  We're pretty reliant on whatever is in the file.

14  Q.  When claims examiners do their work, where do they do it?

15  A.  They do it at the Railroad Retirement Board in Chicago,

16  Illinois.  They have their own work station.

17  Q.  Do they go out to the field to investigate a particular

18  applicant?

19  A.  No, they don't.

20  Q.  What about statements made by a doctor?  To what extent do

21  claims examiners assume the doctor is making accurate reports?

22  A.  Well, we would assume that it's correct.  The doctor is the

23  one that is seeing him.  We rely on those reports, and we

24  assume that they are correct.

25  Q.  What about the medical assessment?

D7onles1                        Coleman - direct

1    A.  The same with the medical assessment.

2    Q.  You assume it's true?

3    A.  Yes, we do.  We assume it's true.

4    Q.  You rely on it?

5    A.  Yes, we do.

6    Q.  What about a narrative if the doctor submits one?

7    A.  We would rely on that.  The doctor is providing what his

8    findings and what he thinks the restrictions are, and we assume

9    that it is truthful.

10   Q.  I don't think we talked about a narrative.  Do you know

11   what a narrative is?

12   A.  The narrative report.  It's basically what -- instead of

13   having the form where the doctor, there are questions and the

14   doctors answer it, the narrative is just, it is kind of the

15   same information, but they provide different findings of what a

16   person's impairments are, you know, what tests are provided and

17   what the results of those tests would be.  And it could also

18   include any restrictions that the person might have.

19   Q.  And is a narrative required?

20   A.  It's not required.

21   Q.  But if a narrative is submitted, does the RRB rely on it?

22   A.  Yes, we do.

23   Q.  If the medical information in an application is complete,

24   what do claims examiners do?

25   A.  If the medical evidence submitted is sufficient for an

D7onles1                          Coleman - direct

1    examiner to determine what the restrictions would be, you know,

2    caused by the impairment and they can compare it to the job

3    duties, then they would make their determination.

4    Q.  And by make their determination, you mean determine whether

5    the applicant is occupationally disabled or not?

6    A.  Correct.

7    Q.  If the medical information is not complete, what can a

8    claims examiner do, if appropriate?

9    A.  When they review the file, if they don't feel there is

10   enough information, they are free to go out the treating doctor

11   and ask for additional information; or, if they need to, they

12   could order a consultative examination.  The board has a

13   contract with a provider that would schedule an examinations

14   nationwide.

15   Q.  Can you give an example of a circumstance where a claims

16   examiner might order a consultative exam?

17   A.  If the medical evidence came in and there were certain

18   information that wasn't in there that we would need for our

19   evaluation, we might go out and get a consultative examination

20   in those cases.

21   Q.  When the RRB orders a consultive exam, does the contractor

22   get the medical tests or results with other medical information

23   from the RRB file?

24   A.  The only time that we send out background medical evidence

25   is for psychiatric or neurologic cases.  In all other cases we

D7onles1                        Coleman – direct

1   don't send out any background medical.

2   Q.  So, for example, for an orthopedic exam, does the

3   contractor get the medical information in the claim file?

4   A.  No, we don't provide any information for that.

5   Q.  Is there also something called a consultative opinion?

6   A.  Yes, there is.

7   Q.  What is that?

8   A.  If the examiner's reviewing an evaluating a file that they

9   have some questions about, or there might be inconsistencies

10  there, he can go out to another contractor that we have where

11  doctors review the file and they can provide their expertise in

12  clearing up any discrepancies or providing restrictions.

13  Q.  I'm sorry.  You might have said it, but the consultative

14  opinion is performed by a doctor.

15  A.  Yes, it is.

16  Q.  What does that doctor have to look at?

17  A.  They have the same file that the examiners do.  The entire

18  file is shipped for these doctors to look at.

19  Q.  Does the doctor who is performing the consultative opinion

20  see the applicant?

21  A.  No, they do not.

22  Q.  So where does the material come from that the consultative

23  opinion doctor reviews?

24  A.  Well, they have the application package, the job

25  information and all the background medical evidence that we

1    have pulled.

2    Q.  So that is information from the applicant or the

3    applicant's doctors?

4    A.  Yes.

5    Q.  To what extent does a doctor who does a consultative

6    opinion rely on the treating source's information and the

7    applicant's information?

8    A.  It would be just as the examiners, do they rely on it

9    heavily because that is the person that sees the claimant the

10   most.

11   Q.  Does the doctor who is giving the consultative opinion also

12   rely on the applicant's self-reported pain in the file?

13   A.  Yes, they do.

14   Q.  Does the doctor who does the consultative opinion assume

15   the truth of the treating doctor's findings?

16   A.  Yes, they do.

17   Q.  Once a consultative opinion comes back to the claims

18   examiner, if one has been ordered, what happens with the file?

19   A.  The examiner will look at it and compare whatever

20   restrictions the consultative opinion doctor has given them,

21   and then they can make their final determination whether the

22   person is occupationally disabled or not.

23   Q.  Under normal procedures that the RRB follows, do claims

24   examiners order tests or consultative opinions to double check

25   whether the treating source is submitting accurate information?

1    A.  Not to see if it's accurate information.  It would just be

2    to provide information that is not in the file or clear up

3    discrepancies.

4    Q.  To the extent a claims examiner orders a consultative

5    opinion or a consultative exam, to what extent do those

6    materials replace the materials that are already in the file?

7    A.  They don't replace it.  They supplement the information,

8    but they don't replace it.  All the information stays in the

9    file.

10   Q.  Including the information provided by the applicant?

11   A.  From the applicant and from the treating sources.

12   Q.  Does a claims examiner still rely on that information?

13   A.  Yes, they do.

14   Q.  I want to show you portions of a claim file.

15            MR. TEHRANI:  Your Honor, may I have a moment.

16            Your Honor, I apologize, this will be a little bit out

17   of order to speed things along.

18   Q.  Mr. Coleman, if a person is rated as disabled, are there

19   any requirements that they report information to the RRB?

20   A.  Yes, there is.  When they fill out the application, the

21   AA-1d, on the last page there is certain information on there

22   that says that whether they returned to work, if their

23   condition improves, different things like that that they need

24   to report that to the RRB.

25            Also, every year we send out a reminder form with the

D7onles1                    Coleman - direct

1    same information telling them that, you know, telling the

2    disabled applicants that they need to report any improvement in

3    their condition or if they return to work.

4    Q.  What is that remainder form called?

5    A.  That is called an RL-4.

6    Q.  Can you look in the set of documents in front of you.

7    There should be four documents marked Government Exhibit 252,

8    251, 254, 255.

9    A.  Yes.

10   Q.  Do you see that?

11   A.  Yes.

12   Q.  Do you recognize those?

13   A.  Yes, these are copies of different versions of the RL-4.

14   Q.  Why are they different?

15   A.  Whenever there is any type of change to the form it has to

16   be approved, so there are different versions of it.

17   Q.  So the current version of the form is sent out every year?

18   A.  Yes, it is.

19   Q.  To every railroad employee receiving disability benefits?

20   A.  Yes.

21   Q.  Including occupational disability benefits?

22   A.  Yes, occupational and total and permanent.

23          MR. TEHRANI:  Your Honor, the government offers

24   Government Exhibits 251, 252, 254 and 255.

25          MR. RYAN:  No objection.

D7onles1                          Coleman - direct

 1              MR. JACKSON:  No objection.

 2              MR. DRATEL:  No objection.

 3              THE COURT:  Admitted without objection.

 4              (Government's Exhibits 251, 252, 254 and 255 received

 5    in evidence)

 6    Q.  Mr. Coleman, directing your attention to Government Exhibit

 7    254.

 8              MR. TEHRANI:  Put that up on the screen.

 9    Q.  The indication at the top is that this is form RL-4, 10-06.

10    Do you see that?

11    A.  Yes.

12    Q.  Does that mean that this form was sent out after October

13    2006?  This was the form that the applicant would receive?

14    A.  Yes, the 10-06 is the latest revision date for this form.

15    Q.  The form indicates in the first paragraph you must notify

16    the Railroad Retirement Board if you perform any work.

17              Do you see that?

18    A.  Yes.

19    Q.  And "any" is in all caps?

20    A.  Yes.

21    Q.  And then at the bottom of the form --

22    A.  OK.

23    Q.  -- it says, Failure to report any event that my affect your

24    entitlement to an annuity may constitute a criminal violation.

25              Do you see that?

D7onles1                        Coleman - direct

1  A.  Yes.

2  Q.  And in substance are reminders on all of the RL-4s?

3  A.  Yes, they are.

4  Q.  And they are sent out yearly?

5  A.  Yes, they are.

6  Q.  If a claims examiner in the initial section proposes a

7  disability rating, meaning proposes either approved or denied,

8  what happens next?

9  A.  Then the case goes for review by a disability post

10  examiner.  A disability post examiner reviews the file just as

11  the initial examiner would, looks at the applications, the job

12  information forms, all the medical information submitted and

13  sees if they agree with the initial examiner's decision.  If

14  they do, then they approve it.

15  Q.  So in the post section the claims examiners are still

16  relying on all the information provided by the applicant?

17  A.  Yes, they are.

18  Q.  And the treating source?

19  A.  Yes.

20  Q.  And if they approve it, what happens?

21  A.  If they approve it, if it is a disability, if they are

22  approving the disability and granting the application, then it

23  goes on to be paid.  If it's denied, it's denied.  That's the

24  end of it.  If they approve the disability, then it goes to the

25  post section for the disability freeze.

D7onles1                         Coleman - direct

1    Q.   If it is approved for an occupational disability, is that

2    the end of the occupational disability process?

3    A.   Yes.

4    Q.   Now, I think you've mentioned a couple of times, we talked

5    about a disability freeze.  There are additional benefits that

6    are associated with a disability freeze?

7    A.   Yes, there are.

8    Q.   And what are those?

9    A.   If somebody is approved for a disability freeze, then they

10   are entitled to early Medicare.  They get tax benefits, and it

11   also helps for any survivor benefits that may be payable in the

12   future.

13   Q.   Do you know whether those benefits are paid for at least in

14   part by Social Security?

15   A.   Yes.  There is a transfer of money from the Social Security

16   Trust Fund to the Railroad Retirement Trust Fund.

17              (Continued on next page)

18

19

20

21

22

23

24

25

D7odles2                          Coleman - direct

1   Q.  And I just wanted to clarify, I know you said this before

2   but I don't think it is really in form, when talking about

3   disability freeze, are you talking about total and permanent

4   disability?

5   A.  Yes, it is.  It is determined that you are totally and

6   permanently disabled for all work.

7   Q.  When is that disability freeze total and permanent

8   determination done in relation to the occupational disability

9   determination?

10  A.  It is done after the occupational is completed.

11  Q.  If in reviewing an application for a disability freeze and

12  the application is denied, is there any mechanism for that

13  denial to come back and affect the occupational disability

14  determination?

15  A.  No, not really, no.

16  Q.  Now, there should be two documents in front of you,

17  government Exhibits 100G and 113G.

18          You don't have those?

19  A.  No.

20          Oh, I'm sorry.  They were at the bottom.  I'm sorry.

21  Q.  So taking a look first at Government Exhibit 100G.

22  A.  Yes.

23  Q.  Is this a letter sent out by the Railroad Retirement Board?

24  A.  Yes, it is.

25  Q.  And is 113G also sent out by the Railroad Retirement Board?

D7odles2                    Coleman - direct

1    A.  Yes, it is.

2            MR. TEHRANI:  Your Honor, the government would offer

3    Government Exhibits 100G and 113G.

4            MR. RYAN:  No objection.

5            THE COURT:  Be admitted without objection.

6            Sorry.  Mr. Jackson.

7            MR. JACKSON:  No objection, Judge.  Thank you.

8            MR. DRATEL:  No objection.

9            THE COURT:  Admitted without objection.

10           (Government's Exhibits 100G and 113G received in

11   evidence)

12   BY MR. TEHRANI:

13   Q.  Focusing first on Government Exhibit 100G, who is that

14   addressed to?

15   A.  Joseph Rutigliano.

16   Q.  And could you read the first sentence of the second

17   paragraph?

18   A.  It says, "A disability freeze has been established for you

19   beginning October 31, 1999."

20   Q.  And what does that mean?

21   A.  If means that they have been approved for a disability

22   freeze.  They have been found totally and permanently disabled

23   for all work.

24   Q.  So this means that based on the information provided by Joe

25   Rutigliano, or the information in the claim file, he has been

D7odles2                          Coleman - direct

1    determined to be unable to do any job in the national economy?

2    A.   That is correct.

3    Q.   Now, looking at Government Exhibit 113G, do you see that?

4    A.   Yes.

5    Q.   Who is that addressed to?

6    A.   Oslap Baran.

7    Q.   Could you read the second paragraph?

8    A.   It says, "A disability freeze has been established for you

9    beginning November 21, 2003."

10   Q.   What does that mean?

11   A.   It means that he has been found totally and permanently

12   disabled for all work in the national economy.

13            MR. TEHRANI:   Your Honor, I apologize.  Let me just

14   check again and see if we are in a position to do what we

15   wanted to do.

16            MR. WEDDLE:   Your Honor, I apologize.  I think I am at

17   fault here.  I think I misplaced one of the exhibits that we

18   want to look at.  Ms. Larson is bringing up more copies right

19   now.

20            (Pause)

21            Your Honor, I think we can just start out until

22   Ms. Larson comes and just display something on the screen, but

23   if you could just bear with us for one minute to just make sure

24   we have the right thing on the screen.

25            (Pause)

D7odles2                    Coleman – direct

1          MR. TEHRANI:  Your Honor, may I approach?

2          THE COURT:  Yes.

3          (Pause)

4          MR. RYAN:  I have no objection to these portions of

5     the file coming in as long as the whole file goes in.

6          MR. TEHRANI:  Your Honor, we are not offering the

7     whole file.

8               THE COURT:  Mr. Jackson.

9          MR. JACKSON:  Judge, I join in that application with

10    respect to completeness.  I ever no issue with that document as

11    long as the totality of the document could be shown.

12         Thank you, Judge.

13         MR. DRATEL:  The same, your Honor.

14         MR. TEHRANI:  Your Honor, could we be heard on this

15    issue?

16         THE COURT:  Yes.

17         (Continued on next page)

18

19

20

21

22

23

24

25

D7odles2                        Coleman - direct

1              (At the sidebar)

2              MR. TEHRANI:  Your Honor, this is an issue that we had

3     been raising since the beginning of the trial.  We don't think

4     it is appropriate to offer into evidence the entire claim file.

5     As an initial matter, there is stuff in these claim files that

6     your Honor has precluded.  There is also any number of

7     materials that are hearsay or otherwise inadmissible; they

8     don't need to be reviewed.

9              The entire claim file does not need to be reviewed for

10    completeness.  There are individual portions that we would like

11    to go through with witnesses.  We will lay a foundation with

12    the witness as to the particular documents that we want to go

13    through.  If there are other documents in the claim file that

14    defense counsel can lay an appropriate foundation to admit into

15    evidence, they can do that, but the entire claim file does not

16    need to come in in order to understand the particular document.

17             THE COURT:  Which claim file are you talking about?

18             (Pause)

19             MR. TEHRANI:  We are talking about Joe Rutigliano's

20    claim file.  We want to talk about three particular documents

21    in the claim file for Mr. Rutigliano's claim file.

22    Specifically, it doesn't appear that there is any kind of

23    objectionable material, and if they want to offer that, I don't

24    think we will have an objection.

25             But as a general matter, I don't think the entire

D7odles2                          Coleman - direct

1   claim files need to come in in order to talk about particular

2   documents.  We have been doing that all through the trial about

3   particular documents.  For example, the AA1-D's, the

4   application for disability, the narratives, the medical

5   section, those are all portions of claim files that we have

6   been talking about in isolation without admitting the entire

7   claim file.

8          THE COURT:  All right.  What specific item are you

9   debating now do you want to bring in at this point?

10         MR. TEHRANI:  So we would like to have Mr. Coleman

11   talk about the process for evaluating someone for occupational

12   disability and then in Mr. Rutigliano's case total and

13   permanent disability.  So there are two documents that are the

14   disability rationale that the claims examiner wrote for the

15   determination of occupational disability.

16         There is then a disability rationale for a total and

17   permanent disability determination.  There is also a

18   consultative opinion that we had been talking through with

19   Mr. Coleman about.  There is a consultative opinion report that

20   was rendered that we would like to go through with Mr. Coleman,

21   and then there is also the initial medical assessment that was

22   provided by Dr. Lesniewski.  That's already in evidence.

23         THE COURT:  All right.

24         MS. FRIEDLANDER:  Let's be clear.  We are doing this

25   simply because counsel has indicated that they intend to

D7odles2                        Coleman - direct

1    cross-examine on it, so we want to elicit it on direct.

2    Mr. Ryan opened in fact on some of these documents.

3              THE COURT:  All right.  Defense.

4              MR. RYAN:  The whole picture is in the RRB claim file.

5              THE COURT:  The whole what?

6              MR. RYAN:  The whole process of how Mr. Rutigliano was

7    evaluated for occupational disability and total disability is

8    fully documented in the complete file, Judge.  I intend to go

9    through the whole process just so the jury knows how the RRB

10   processed his file and made the findings that they show up on

11   the screen, and it requires the whole file on it.

12             MR. DRATEL:  Your Honor, it sounded like the

13   government does not have a problem with Mr. Rutigliano's file

14   itself because it doesn't have a continuing disability review

15   or the other extraneous documents that the government has a

16   problem with.

17             MS. FRIEDLANDER:  Right.

18             MR. DRATEL:  On cross-examination, if I intend to put

19   it -- I am not going to try to put in the whole file.  If I try

20   to put in specific documents, they will be the type of

21   documents that Mr. Tehrani is putting in as well.  So I don't

22   have a problem going case-by-case, but in this instance it

23   sounds like the government couldn't have an objection to

24   putting in the whole file.

25             MS. FRIEDLANDER:  I think that is right.

D7odles2                          Coleman - direct

1          THE COURT:  Since there is no objection to putting the

2     whole file in, what is the controversy?

3          MR. TEHRANI:  For Mr. Rutigliano I don't think there

4     is a controversy.

5          THE COURT:  Is there for someone else?

6          MR. JACKSON:  That is not proper for Osman Baran,

7     Judge.

8          MR. TEHRANI:  I don't know what else they want to do.

9     I don't think for any and all claim files we need to say that

10    if a part of the claim file comes in, the entire claim file

11    comes in.

12         MS. FRIEDLANDER:  I think we have no issue with Mr.

13    Lesniewski and his counsel.  There is no issue with

14    Mr. Rutigliano and his counsel.  I think Mr. Jackson is

15    signaling that he may have an issue with the procedure that the

16    parties had proposed.

17         THE COURT:  Mr. Jackson.

18         MR. JACKSON:  I'm not signaling that.  I'm just saying

19    that I'm going to be looking at Osman Baran's file and instead

20    of wasting time again, we could resolve it now.

21         MR. WEDDLE:  We just have to look through -- your

22    Honor, I'm sorry.  Just so all members of the government team

23    get a chance at the sidebar, when Mr. Tehrani initially spoke

24    about being heard at the sidebar or whoever it was, I had not

25    had a chance to look through Mr. Rutigliano's file to see

D7odles2                          Coleman - direct

1    whether or not it had some of these extraneous objectionable

2    material in it.  By the time we got to the middle of the

3    sidebar, I had had an opportunity to do that.

4            I think the general principle is sound that the whole

5    file does not necessarily come in, and there may be very good

6    reasons to exclude important portions of it, but we just have

7    to look at Mr. Baran's file and just check it.  I just haven't

8    had a chance to look through it in that detail.

9            THE COURT:  All right.  So why don't we begin with

10   Mr. Rutigliano.  All right?

11           MR. TEHRANI:  OK.

12           MR. JACKSON:  Thank you, Judge.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

 1                (In open court)

 2                MR. RYAN:  Your Honor, may I ask that Government's

 3     Exhibit 100 be admitted on consent?

 4                MR. TEHRANI:  Your Honor, the government offers

 5     Government Exhibit 100.

 6                MR. RYAN:  Thank you.

 7                THE COURT:  All right.  Admitted without objection.

 8                (Government's Exhibit 100 received in evidence)

 9                MR. TEHRANI:  Your Honor, may I approach?

10     BY MR. TEHRANI:

11     Q.  Mr. Coleman, I am showing you what has been offered into

12     evidence as Government Exhibit 100.

13                It is an RRB claim file for Joe Rutigliano.

14     A.  OK.

15     Q.  Do you see that?

16     A.  Yes.

17     Q.  Prior to your testimony right now, have you had an

18     opportunity to review portions of the claim file?

19     A.  Yes, I have.

20     Q.  Now, I want to draw your attention to -- may I just have a

21     moment, your Honor?

22                (Mr. Tehrani conferred with Mr. Weddle)

23     Q.  And so I would like to draw to your -- you don't have it in

24     front of you.  I am going to be referring to right now the page

25     of the claim file -- do you see at the very bottom of the claim

D7odles2                          Coleman - direct

1   file there are numbers that begin the prefix E39?

2   A.  Yes.

3   Q.  I want to direct your attention to the document with page

4   number 1652.

5            MR. TEHRANI:  Your Honor, for ease of reference, we've

6   separately marked this as Government Exhibits 100J, but the

7   entire claim file is in evidence.

8   Q.  Do you have the document?

9   A.  Yes, I do.

10  Q.  What is this?

11  A.  This is a rationale for an occupational decision.

12  Q.  And what is the decision?

13  A.  It says it is a 52-year-old conductor who alleges

14  disability for cervical lumbar pain, shoulder pain and knee

15  pain and carpal tunnel syndrome.  It lists some of the findings

16  that were in the file, and it says that he is occupationally

17  disabled.

18  Q.  Does the rationale indicate what medical records were

19  relied on?

20  A.  It says, "Medical records from Dr. Lesniewski reveal

21  history of back and knee pain," and then there are some other

22  claims from his report also.

23  Q.  Does it indicate whether any kind of consultative exam or

24  consultative opinion was used?

25  A.  No, it doesn't indicate that.

D7odles2                        Coleman – direct

1   Q.  And typically would that be listed here if such an exam or

2   opinion had been ordered and used?

3   A.  Yes, it would be because they would be part of the file,

4   and they should have referenced that in their decision.

5   Q.  And the date of this document is March 14, 2000?

6   A.  That was the date that the reviewer signed off on it, yes.

7   Q.  Now, looking at what has been separately marked -- you

8   don't have it, but for ease of reference Government Exhibit

9   100K, the document is -- or the page number is 1690.

10          Do you see that?

11  A.  Yes, I do.

12  Q.  What is that?

13  A.  This medical consultant opinion is the form that we send

14  out.  Examiners request a medical opinion from our consulting

15  doctors.

16  Q.  When is this document dated?

17  A.  The date that the examiner requested it was March 10th of

18  2000.

19  Q.  And so that is -- when did they come back?

20  A.  It was received back on May 19th of 2000.

21  Q.  So after the occupational disability determination had been

22  made?

23  A.  Yes, it is.

24  Q.  Before we talk about that, I want to direct your attention

25  to the document with the page number 1715, and that's in

D7odles2                          Coleman – direct

1    evidence as Government Exhibit 100, I believe, C.

2              Sorry, 100B, as in boy.

3              What is this?

4    A.  This is a medical assessment form.

5    Q.  And who signed this?

6    A.  This was signed by Dr. Lesniewski.

7    Q.  And this was used in connection with the occupational

8    disability determination?

9    A.  Yes, it would have been, yes.

10   Q.  And the total and permanent disability determination?

11   A.  Yes, it would have been considered for that, too.

12   Q.  Now, referring back to the consultative opinion that we

13   just referenced, page 1690, what, if anything -- and this is

14   done by whom?

15   A.  This was done by Dr. Boetchner.

16   Q.  And what information did Dr. Boetchner have access to in

17   making this -- in rendering this opinion?

18   A.  He would have had the entire file.  He would have had the

19   application, the job information form, all the medical evidence

20   that was in the file.

21   Q.  That would have been medical evidence provided by

22   Dr. Lesniewski?

23   A.  Yes, it would be.

24   Q.  And comparing this document to the medical assessment,

25   100B, as in boy, for example, does Dr. Lesniewski impose or

D7odles2                              Coleman − direct

1   conclude with restrictions regarding the ability of

2   Mr. Rutigliano to stand and/or walk?

3   A.  Yes, he does.  He says, "Less than two hours in an

4   eight−hour day."

5   Q.  And then looking at Dr. Boetchner's opinion, does he agree

6   or disagree with that restriction?

7   A.  No.  In that opinion, Dr. Boetchner says that for standing

8   and walking, the claimant should be able to at least walk or

9   stand two hours in an eight−hour workday.

10  Q.  Are there other restrictions that Dr. Boetchner and

11  Dr. Lesniewski agree upon?

12  A.  That they agree upon?  It looks like the lifting

13  restrictions.  They both say he could lift 20 pounds

14  occasionally.

15  Q.  Now, I want to direct your attention to −− so you indicated

16  that Dr. Boetchner was making his determination based on the

17  information in the claim file?

18  A.  Yes.

19  Q.  Including the information that Dr. Lesniewski provided?

20  A.  Yes.

21  Q.  And what, if anything, did Dr. Boetchner assume about the

22  information that Dr. Lesniewski provided?

23          MR. DRATEL:  Objection.  Form.

24          THE COURT:  Sustained to form.

25  Q.  What, if anything, did Dr. Boetchner assume as to the

1   truthfulness of the information provided by Dr. Lesniewski?

2   A.  Dr. Boetchner would be relying on the information that it

3   was truthful, and he would have to accept it as such.  There is

4   nothing else in the file to indicate it wasn't.

5   Q.  Did Dr. Boetchner have an opportunity to review

6   Mr. Rutigliano?

7   A.  No, he did.

8   Q.  He didn't examine him in person?

9   A.  No.

10           (Mr. Durkin was present)

11  Q.  Now, looking at what's been marked for identification as

12  Government Exhibit 100I, and in the claim file it would be

13  document page number 1647.

14           And focusing in on the second paragraph there, do you

15  see that?

16  A.  Yes.

17  Q.  It says, "Per the G-137 signed by Dr. Boetchner on May 13,

18  2000," that is the document we have been talking about?

19  A.  Yes.

20  Q.  How does a claims examiner resolve, if at all, this

21  disagreement as to restrictions?

22           MR. RYAN:  Objection.  "Disagreement."

23           THE COURT:  Sustained.  Rephrase.

24  Q.  What, if anything, does the claims examiner do with these

25  two -- with the medical assessment provided by Dr. Lesniewski

D7odles2                          Coleman - direct

1    and the consultative opinion provided by Dr. Boetchner?

2    A.  The least restrictive one was by Dr. Boetchner, but it was

3    still finding that the person would have been totally and

4    permanently disabled for a disability freeze.  So it's not

5    material, the discrepancy; using either one they would have

6    been found disabled so the examiner took the lesser restrictive

7    one and used that.

8    Q.  And that was Dr. Boetchner's restriction?

9    A.  Yes, it was.

10   Q.  And that was based on information provided by

11   Mr. Rutigliano?

12   A.  Information by Mr. Rutigliano and everything else that was

13   in the file, all the medical evidence and the applications,

14   everything in the file.

15   Q.  Including medical information provided by Dr. Lesniewski?

16   A.  Yes.

17            MR. DRATEL:  Objection, leading.

18            THE COURT:  Sustained.  Asked and answered.

19   Q.  And what was the conclusion?

20   A.  That the person was totally and permanently disabled under

21   the Social Security Act for a disability freeze.

22   Q.  Now, I want to direct your attention to Government Exhibits

23   100H and 100L.  In your claim file they are pages numbers 1645

24   and 16...

25            What is the document with page number 1645?

D7odles2                    Coleman - direct

1   A.   This is a form that SS-831.   The Railroad Retirement

2   examiner completes this form.   This is a joint freeze with

3   Social Security, meaning that there is a possibility that there

4   may be Social Security benefits at some time payable to

5   Mr. Rutigliano.   So we have to coordinate our decision with

6   Social Security.   So we actually send the file over to the

7   Great Lakes Program Service Center in Chicago, where they

8   review it, and we try to get them to agree with our decision.

9   In this decision, it was seen by Dr. Stevens and also by the

10  Social Security examiner, that they both agree with this

11  decision.

12  Q.   And do you know whether Dr. Stevens had an opportunity to

13  examine Mr. Rutigliano?

14  A.   I don't know that he did or not.

15  Q.   Have you also had an opportunity to review other claim

16  files at my request?

17  A.   Yes, I have.

18  Q.   And do those claim files also include consultative

19  opinions?

20  A.   Yes, they do.

21  Q.   And they also include disability rationales filled out by

22  the claims examiner?

23  A.   Yes.

24          MR. JACKSON:   Judge, just objection to the generality.

25  Could we get the specific files at issue?

D7odles2                          Coleman - direct

1    BY MR. TEHRANI:

2    Q.  Did you review a claim file for Mr. Parlante?

3    A.  Yes, I did.

4    Q.  Did you look at a claim file for Mr. Siani?

5    A.  I don't -- I don't remember.  I don't think we looked at

6    that one.

7    Q.  Well, just focus on the Mr. Parlante, Christopher Parlante

8    file.

9            Was it -- and I am just trying to sum up here -- was

10   the process similar based on the documents that you reviewed as

11   to what we just went through with Mr. Rutigliano's file?

12   A.  Yes.  They were similar, yes.

13   Q.  Now, Mr. Coleman, if an applicant submits false statements

14   about his or her condition in their application, how, if at

15   all, would that affect a claims examiner's determination?

16   A.  The claims examiner wouldn't be able to tell if it was

17   fraudulent or not.  They accept the statements being truthful,

18   and they would use it in their decision.

19   Q.  Does that result in a wrong decision?

20           MR. DRATEL:  Objection, your Honor.

21           THE COURT:  Sustained.

22   Q.  Just briefly, your Honor, can we take a look at Government

23   Exhibit 100A on the screen.

24           Mr. Coleman, this is Joseph Rutigliano's AA1-D?

25   A.  Mm-hmm.  Yes.

D7odles2                          Coleman - direct

1   Q.  And, for example, if we look at Section 6, question 39, if

2   that information were not truthful, how, if at all, would that

3   affect the RRB's determination?

4            MR. RYAN:  Objection.  Hypothetical question.

5            THE COURT:  Sustained.

6   Q.  Mr. Coleman, does the claims examiner assume the

7   truthfulness of the answers here?

8            MR. JACKSON:  Objection.

9            THE COURT:  Asked and answered.

10  Q.  Does the RRB rely on this information?

11           MR. JACKSON:  Objection.

12           THE COURT:  It is asked and answered.

13  Q.  Mr. Coleman, if a doctor submitted inaccurate information

14  to the RRB, would that affect a claims examiner's

15  determination?

16           MR. DRATEL:  Objection.

17           THE COURT:  Sustained.

18  Q.  Mr. Coleman --

19           THE COURT:  I don't forget.

20  Q.  -- would the RRB give disability benefits to people who

21  could do their jobs?

22           MR. DRATEL:  Objection, your Honor.

23           THE COURT:  Overruled.

24  A.  We would review everything that's in the file, and if we

25  determined that they could do their job, we wouldn't pay out a

D7odles2                    Coleman – direct

1    benefit; we would deny them.

2              MR. TEHRANI:  No further questions, your Honor.

3              THE COURT:  Is there anything for the defense?

4              MR. DRATEL:  Yes, your Honor.

5              THE COURT:  Counsel, please approach a moment.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7odles2                          Coleman - direct

1          (At the sidebar)

2          THE COURT:  All right.  Similar to the discussion we

3     had yesterday about all three defense counsel approaching a

4     witness who is testifying generally, the witness testified to

5     some things that pertained to each of the three.  And to the

6     extent that the testimony pertained to one of your respective

7     clients, there is no reason why you should not pursue whatever

8     protects your client.  But to the extent the witness went into

9     extensive general detail about process, there is no reason for

10    each of you to review all of that all over again.

11         If there is no dispute about the facts that he

12    testified to on process or procedure or documents, don't repeat

13    what's already on record that's not controversial.  As an

14    example, he gave extensive testimony about his experience,

15    where he had been in the system and how many years.  If that's

16    not controversial, if you have no reason to impeach him on

17    those kinds of things, let it rest so that we could move the

18    matter along.  All right?

19         MR. RYAN:  I am going to be the caboose.

20         MR. DRATEL:  May I make a suggestion, your Honor.

21         THE COURT:  The engine?

22         MR. DRATEL:  Well, after my cross, perhaps we should

23    take the break, or if in the middle of the cross the Court

24    wants to, depending on how long it goes, but then we can all

25    speak together and see how much I have covered ground that

D7odles2                         Coleman – direct

1    other counsel doesn't have to cover.  It is hard for me to do

2    that because I am going first.

3                THE COURT:  All right.  Thank you.

4                MR. DRATEL:  All right.  Thank you.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7odles2                          Coleman - direct

 1          (In open court)

 2          THE COURT:  All right.  In order to facilitate the

 3   discussion we just had at the sidebar, I am going to take the

 4   morning break at this point.  15 minutes.

 5          (Recess)

 6          (Jury not present)

 7          THE COURT:  Thank you.

 8          MR. DURKIN:  Judge, Mr. Dratel is in the men's room.

 9   He will be right back.

10          THE COURT:  We are going to be adjourning for an

11   earlier lunch today.  I have another commitment.  So we will

12   probably conclude the morning's session for lunch around

13   12 o'clock.

14          MR. JACKSON:  Judge, we are breaking from 12 to 1; is

15   that what we are doing?

16          THE COURT:  Yes.

17          (Continued on next page)

18

19

20

21

22

23

24

25

D7odles2                         Coleman – direct

1              (Jury present)

2              THE COURT:  Welcome back.  Please be seated.

3              Mr. Dratel.

4              MR. DRATEL:  Thank you, your Honor.

5    CROSS-EXAMINATION

6    BY MR. DRATEL:

7    Q.  Good morning, Mr. Coleman.

8    A.  Good morning.

9    Q.  In order for a Rail Road employee to be approved for

10   occupational disability, he needs a paper trail, correct?

11   A.  You need to have all the documents in the file, yes.

12   Q.  If he doesn't have the submissions by a doctor, he is not

13   going to get disability, correct?

14   A.  If there isn't medical evidence in the file, then we can

15   get consultative examinations to get that information.

16   Q.  In other words, it won't be approved without some doctor

17   making some finding, correct?

18   A.  There are some situations where there may be a technical

19   denial.  If there are certain things lacking in the file, there

20   may be a technical denial.

21   Q.  I'm saying, if it is not a doctor, though, it is someone

22   without a medical degree that submits the G-250, is that going

23   to suffice?

24   A.  It would be a part of the file, but if it is not a doctor,

25   we wouldn't -- it would be considered in the evaluation.

D7odles2                         Coleman - cross

Q.  But it wouldn't be sufficient, would it?

A.  It wouldn't be sufficient for it.

Q.  And, in fact, the disability has to be for 12 months, right?

A.  Part of the definition of a disability is it has to be expected to result in death or last for 12 months.

Q.  That's a legitimate part of the process, creating a file, that an employee would create these medical records -- when I say create, by going to a doctor, getting an examination --

          MR. TEHRANI:  Objection, your Honor.

Q.  -- getting tests?

          THE COURT:  Overruled.

Q.  That is a legitimate part of the process of seeking occupational disability from the RRB?

          MR. TEHRANI:  Objection, your Honor.

          THE COURT:  Rephrase the question.

Q.  There is nothing wrong with creating a paper trail, as you and I have just discussed, correct, in terms of applying for occupational disability, correct?

A.  The railroad Retirement Board would request certain documentation, and we get that from evidence in the file.

          (Continued on next page)

D7onles3                    Coleman - cross

1   Q.   There is nothing wrong with an employee going to a doctor,

2   having a doctor provide records to the Railroad Retirement

3   Board for a determination of occupational disability?

4   A.   There would be nothing wrong with the person going to the

5   doctor and having those doctors submitting them to the Railroad

6   Retirement Board and the Railroad Retirement Board would make

7   it part of the file, and it would be part of the evaluation.

8   Q.   Without that, they are not going to get disability,

9   correct?  Without a doctor's findings, it would not result in a

10  disability approval, right?

11  A.   Yes.

12  Q.   You are able at RRB to determine the date that someone

13  retires, correct?

14  A.   Yes.  Well, not the date that they would retire, but the

15  date that they would be entitled to a benefit, we would

16  determine that.

17  Q.   In terms of disability, you talked a little about the

18  definition, right, and you used the word impairment, correct?

19  A.   Yes.

20  Q.   It doesn't mean that you can't do your job entirely,

21  correct?  It means you are impaired from doing your job?

22  A.   Yes.  You have an impairment and there are restrictions

23  that don't allow you to do your regular railroad job.

24  Q.   Right.  You talked about lung cancer as one, right?

25  A.   That was one example, yes.

D7onles3                          Coleman - cross

1   Q.  It could be a lot less serious than lung cancer, right?

2   A.  Yes, there are a number of different --

3   Q.  It could be carpal tunnel syndrome for someone who has to

4   use their hands on a regular basis, right?

5   A.  It could be, yes.

6   Q.  It doesn't mean that the person can't go to work, right?

7   In other words, what I mean by that is, you don't award

8   disability only for people who say I haven't been to work in

9   six months because I have been too disabled or I haven't been

10  to work in a week, right, that is not the test?

11  A.  No.  What we do is we collect all the information and

12  evaluate it and determine whether they can do their regular

13  railroad job or not.

14  Q.  In fact, on direct you were asked about the railroad

15  sometimes disqualifying employees from work because of a

16  disability, correct?

17  A.  Yes.  That's correct.

18  Q.  That is a distinct minority of the cases for disability,

19  right?

20  A.  I don't have any statistics on it, but, yes, it is less.

21  Q.  Less than a third even, right?

22  A.  I don't know.

23  Q.  You don't know.  You are the supervisor in that particular

24  unit, right?

25  A.  Yes, I am.

D7onles3                    Coleman - cross

1    Q.  Nothing requires an occupationally disabled worker to

2    voluntary take themselves off the job, right?

3    A.  I am not sure I understand your question.

4    Q.  Withdrawn.

5            Someone who has an ailment or some condition that

6    might affect their ability to do their job, there is no

7    requirement for the employee to voluntarily take themselves off

8    the job, right?

9            MR. TEHRANI:  Objection.

10            THE COURT:  Sustained.

11    Q.  The railroad has the right to say that someone is disabled,

12    correct, and deny them the ability to work?

13    A.  That would be the railroad's decision, not the Railroad

14    Retirement Board.

15    Q.  Right.  But it wouldn't be the employee's decision either,

16    correct?

17    A.  I don't know.  We are just looking at what the Railroad

18    Retirement Board would do.  They would have to make that

19    decision themselves.

20    Q.  The question of occupational disability is not just about

21    the employee, right?  It's really also about safety for others

22    as well?

23            MR. TEHRANI:  Objection.

24            THE COURT:  Rephrase the question.

25    Q.  The concept behind disability and the ability for a

D7onles3                          Coleman - cross

1    railroad employee to do their job at the proper level of

2    function, the full range of their job function is also about

3    safety, is it not?

4            MR. TEHRANI:  Objection.

5            THE COURT:  Overruled.

6    A.  Basically when we have --

7    Q.  Can you answer my question, please, not another question.

8    A.  OK.

9    Q.  Not another question.  Does it also involve safety

10   considerations?

11   A.  It is to determine whether someone can do their regular

12   railroad job.

13   Q.  I am asking a different question.  I am not asking you for

14   that answer.  I am asking you for a yes or no.  Doesn't it also

15   involve safety considerations?

16           MR. TEHRANI:  Object, your Honor.  He asked the

17   question.  That was answered.

18           THE COURT:  Sustained.

19           MR. DRATEL:  Your Honor --

20   Q.  What role does safety play in occupational disability as a

21   concept?

22           MR. TEHRANI:  Objection.

23           THE COURT:  Overruled.

24   A.  Looking at regulations I don't know where it says anything

25   about safety.

D7onles3                          Coleman - cross

1    Q.  I said as a concept.  I am not asking you about

2    regulations.  Isn't it a fact that part of occupational

3    disability and the reasons that railroads find people

4    occupationally disabled, as well, is that it's unsafe for not

5    only the employee but for passengers, for other employees, for

6    equipment, for people on the roads near railroads, for people

7    at stations?  Isn't that part of why you want occupationally

8    disabled employees not to be working?

9               MR. TEHRANI:  Objection, your Honor.  Is there a

10   question?

11              THE COURT:  Overruled.

12   A.  We would look at a case and we would determine whether he

13   couldn't do his job if --

14              MR. DRATEL:  Can I have the question read back,

15   please, your Honor.  He didn't answer it.

16              THE COURT:  Could the reporter read back the question.

17              (Record read)

18              MR. TEHRANI:  Objection.

19              Asked and answered.

20              THE COURT:  Overruled.

21   A.  Well, you were asking about the railroads with

22   occupational.  What the railroads do we don't have any control

23   over.

24   Q.  I am asking about the concept.  Why is it so difficult for

25   you to answer this simple question.

D7onles3                        Coleman – cross

1           MR. TEHRANI:  Objection, your Honor.

2           THE COURT:  Sustained.

3   Q.  You weren't supposed to be a witness in this case, were

4   you, until very recently, right?

5   A.  Correct.

6   Q.  In fact, the first interview with the government was July

7   15, the day we started the trial, correct?

8   A.  Correct.

9   Q.  There was supposed to be a gentleman by the John Bognar

10  here, right?

11  A.  Yes.

12  Q.  John Bognar is the architect --

13          MR. TEHRANI:  Objection.

14          THE COURT:  Sustained.

15          MR. DRATEL:  Your Honor, may I be heard?

16          THE COURT:  No.

17  Q.  John Bognar is the architect --

18          MR. TEHRANI:  Objection.

19          MR. WEDDLE:  May we be heard?

20          THE COURT:  Government, one person.  We don't need

21  objections from two.

22          MR. TEHRANI:  Your Honor, may we be heard on this

23  issue?

24          THE COURT:  Mr. Tehrani will raise objections.

25          MR. WEDDLE:  I apologize, your Honor, when I hear

D7onles3                        Coleman - cross

1    something like that, I have trouble.

2              THE COURT:  I am sure Mr. Tehrani heard it as well.

3              MR. DURKIN:  Do I get to say something now, Judge?

4              MR. DRATEL:  I would like to be heard on this, your

5    Honor.

6              THE COURT:  Let's move on.

7    Q.  2008 what was your position at RRB?

8    A.  I was the senior lead examiner for the disability benefits

9    division.

10   Q.  And John Bognar was the head of that unit, correct?

11   A.  Yes.

12   Q.  Is he the head of the unit now?

13   A.  Yes, he is.

14   Q.  In 2008, there was an investigation, correct?

15   A.  Yes.

16   Q.  Mr. Bognar was interviewed, correct?

17             MR. TEHRANI:  Objection, your Honor.

18             MR. DRATEL:  If he knows, your Honor.

19             THE COURT:  Sustained.

20   Q.  You were not interviewed, were you?

21             THE COURT:  Sustained.

22   Q.  You were talking about total and permanent disability and

23   Social Security, right?

24   A.  Yes.

25   Q.  You talked about that a little bit.  In fact, it's

D7onles3                          Coleman - cross

1   automatic that the review for Social Security and total and

2   permanent disability occurs when an employee applies for

3   occupational disability, right?

4   A.   Yes.   An application under the Railroad Retirement Act is

5   also an application under the Social Security Act.

6   Q.   So they don't have to separately apply and say, hey, I went

7   total and permanent.   They say I want occupational, you put it

8   in for total and permanent as well, right?

9   A.   Once the occupational --

10              MR. DRATEL:   Can we get a yes or no, your Honor.

11              It is a simple question.

12              MR. TEHRANI:   He is answering the question.

13              THE COURT:   Let him answer the question.

14   A.   Once an occupational disability has been approved, then it

15   goes to the disability post section and they do the disability

16   freeze.

17   Q.   Let me ask you the question again.   It is the Railroad

18   Retirement Board that does that, not the employee, correct?

19   A.   The Railroad Retirement Board does make a disability freeze

20   determination.

21   Q.   Not a determination, they make it an SSI, a Social Security

22   determination as well.   The employee applies for occupational

23   disability and RRB --

24              MR. TEHRANI:   Objection, your Honor.

25   Q.   -- turns it into SSI as well, correct?

D7onles3                          Coleman – cross

1              THE COURT:  Overruled.

2     A.  It is considered under the Social Security regulations.

3     Q.  That is not my question.  Please, this is a yes or no

4     question.

5              MR. TEHRANI:  Objection, your Honor.

6              THE COURT:  All right.

7     Q.  When a railroad employee applies for occupational

8     disability -- they apply for occupational disability, right?

9     A.  Yes, they are applying for disability under the Railroad

10    Retirement.

11    Q.  RRB then also considers that an application for Social

12    Security, correct?

13    A.  Yes, that is considered for disability under Social

14    Security, yes.

15    Q.  Regardless of whether the employee asks for that or not,

16    right?

17    A.  By filing the application, then they have applied for it.

18    Q.  No.  Regardless of whether they asked for it or not.

19    Please, yes or no.  That was not an answer.  You said by

20    applying for one, they applied for both.  I'm asking if they

21    applied for occupational disability, regardless of whether they

22    asked for an SSI determination, RRB makes that determination as

23    well.

24             MR. TEHRANI:  Objection.  He's misstating the

25    testimony.

D7onles3                        Coleman - cross

```
 1          THE COURT:  Mr. Coleman, answer yes or no.  Don't
 2   qualify, don't editorialize.  Just answer yes or no, if you
 3   can.
 4   A.  Yes.
 5   Q.  In fact, if someone is approved for SSI, some of the money
 6   that's paid comes off RRB's books, right?
 7   A.  There is a transfer of funds from Social Security to the
 8   Railroad Trust Fund.
 9   Q.  That is a yes, right?
10   A.  Yes.
11   Q.  So it is to the advantage of the RRB economically to have
12   employees declared totally and permanently disabled rather than
13   just occupationally disabled, because then they share the cost
14   with Social Security, correct?
15   A.  The best that I understand the process, I'm not really
16   involved --
17   Q.  Is that a yes?
18   A.  I am not involved with the financial interchange.  I can't
19   really --
20   Q.  You said that they share the cost, right?  Some of it is
21   transferred, the cost is transferred, right?
22   A.  To the best of my knowledge.
23   Q.  Now, a determination of disability is based on the totality
24   of evidence in the file, right?
25   A.  Yes.
```

D7onles3                    Coleman - cross

1   Q.  You were asked about narratives, correct?

2   A.  Yes.

3   Q.  And a narrative is part of the RFC, right?

4   A.  Well, the narrative usually comes from the treating source.

5   Q.  Withdrawn.  The RFC is a separate document, right?  Can you

6   just tell us what that is.

7   A.  RFC is residual functional capacity.  It's the doctor's

8   opinion of any restrictions from an impairment that they

9   believe would be caused by that impairment.

10  Q.  The narrative is separate, right?

11  A.  Yes.

12  Q.  And the narrative is not required, correct?

13  A.  Correct.

14  Q.  And in fact, there are instances in which a narrative is

15  essentially not accepted as sufficient, yet disability is still

16  approved, right?

17  A.  Well, if we received a narrative, we would accept it as

18  part of the report.

19  Q.  Not my question.

20  A.  We would review it and evaluate it.

21          MR. TEHRANI:  Objection.

22          Can he answer the question?

23          MR. DRATEL:  Withdrawn.

24          We'll go straight to it.  It's Government's Exhibit

25  116.

D7onles3                          Coleman - cross

1              MR. WEDDLE:  Sorry, your Honor.  May I just get a copy

2        of it.

3              MR. DRATEL:  Your Honor, may I approach the deputy.

4              THE COURT:  Yes.

5        Q.  I am going to mark this for identification as Defendant's

6        L-2 and ask you to just look at this particular document.

7              MR. WEDDLE:  Does it have a Bates number or something,

8        Mr. Dratel?

9              (Counsel conferred)

10       Q.  That is a Railroad Retirement Board document, right?

11       A.  Yes, it is.

12       Q.  And it relates to an employee and a disability application,

13       right?

14       A.  Yes, it does.

15       Q.  To Robert Ellensohn, is that right?

16       A.  Correct.

17             MR. DRATEL:  I move it in, your Honor, as Defendant's

18       Exhibit L-2.  That's regularly kept in the course of business

19       and all that is already in by stipulation.

20             (Counsel conferred)

21             MR. DRATEL:  Just that document.

22             MR. WEDDLE:  The four pages?

23             MR. DRATEL:  Just the four-page document.

24             MR. WEDDLE:  No objection.

25             THE COURT:  Admitted without objection.

D7onles3                          Coleman - cross

1                (Defendant's Exhibit L-2 received in evidence)

2    Q.  If you could look at the bottom of page 1 of that document,

3    please.

4    A.  Yes.

5    Q.  Do you see the examiner is Roman S -- and I may

6    mispronounce it -- Rokiciak?

7    A.  Rokiciak, yes.

8    Q.  He is still there, right, at RRB?

9    A.  Yes.

10   Q.  He actually has an important position at the RRB right now,

11   doesn't he?

12   A.  Yes, he is a disability --

13   Q.  He is a disability examiner --

14   A.  Yes.

15   Q.  -- but he has an important position, doesn't he?

16   A.  Yes.

17   Q.  If you look at page 2, if you look at the third -- under

18   RFC information.  Do you see that?

19   A.  Yes.

20              MR. DRATEL:  Can we actually have that.  I can put it

21   on an Elmo if you like.

22              I can tell you the page number of the --

23              MR. WEDDLE:  Can you tell us how many pages in.

24              MR. DRATEL:  Yes.  I'll tell you.  Page 9 of

25   Government's Exhibit 116.  If you could blow up the bottom

1    half, please.

2              Thank you.

3    Q.  Do you see under "RFC Information" there is, the fourth

4    paragraph the one that starts, "The RFC provided by

5    Dr. Lesniewski."

6              Do you see that?

7    A.  Yes, I do.

8    Q.  It says, "Treating physician is not acceptable because the

9    physical findings do not support severity of restrictions,"

10   correct?

11   A.  Yes, it does say that.

12   Q.  And nevertheless, this application was approved, right?

13   A.  Yes.

14   Q.  In fact, the RRB did a consultative examination, right, by

15   Dr. Leon, if you look at paragraph 2 there?  It's one above

16   where we highlighted.

17             MR. DRATEL:  If you would go up one slightly.

18   Q.  Do you see the RFC provided by Dr. Leone, medical

19   consultant?

20   A.  Yes, I see that.

21   Q.  If you look at the next paragraph, there is an RFC provided

22   by Dr. Kaplan, who is a medical exam contractor, right?

23   A.  Yes.

24   Q.  That was not acceptable because the physical findings do

25   not support the severity of restrictions, right?

D7onles3                          Coleman - cross

1   A.  Yes, the RFC was not acceptable.

2   Q.  And the application was approved?

3   A.  Yes.

4   Q.  So it's really the objective medical evidence in the file,

5   right, that determines whether someone gets disability from the

6   RRB?

7   A.  We look at -- well, we look at the entire file, and we use

8   the objective medical evidence in making a determination, yes.

9   Q.  So that is a yes.  OK.  Thank you.

10          MR. TEHRANI:  Objection, your Honor.

11          MR. WEDDLE:  Mischaracterized the testimony.

12          MR. TEHRANI:  That was not what the witness testified.

13          MR. DRATEL:  At the end he said yes.

14          THE COURT:  Sustained.

15          MR. DRATEL:  If I may approach, your Honor.

16  Q.  I will mark as Defendant's L-3 -- if you could take a look

17  at that document, please.  Just review it.  I think it is

18  page -- I am going to say 36.  I hope I counted correctly.  If

19  we could -- well, first of all, do you recognize that document

20  as an RRB consultative exam?

21  A.  No, it's an RRB consultative opinion.

22  Q.  Opinion from Dr. Leone, right?

23  A.  Yes.

24  Q.  I'm sorry.  Consultative opinion, yes.

25          MR. DRATEL:  I move it in, your Honor, as Defendant's

D7onles3                         Coleman - cross

1      L-3.

2                  MR. TEHRANI:  No objection.

3                  THE COURT:  It is admitted without objection.

4                  (Defendant's Exhibit L-3 received in evidence)

5      Q.  Dr. Leone draws certain conclusions and imposes certain

6      restrictions, correct?

7      A.  Yes, he does.

8      Q.  And he makes notes, if you look at, I think it's page 6 of

9      his opinion, his comments in the part 2, medical consultant

10     comments?

11     A.  Yes.

12     Q.  And he doesn't just rely on the narrative, right?  He looks

13     at the objective medical evidence, just like RRB does, as a

14     whole, right?

15     A.  He looks at all of the medical evidence in the file.

16     Q.  By all the medical evidence we are talking about tests that

17     were performed, right?

18     A.  Yes.

19     Q.  We are talking about the chart of treatment, right?

20     A.  Yes.

21     Q.  If you could look to the next yellow tab rather than me

22     going up there.  Do you see that there is a yellow tab?

23     A.  Yes.

24     Q.  Page 55, do you recognize that document as a consultative

25     exam report?

D7onles3                    Coleman - cross

1   A.  Yes, this is consultative, yes.

2   Q.  From Dr. Kaplan?

3   A.  Yes, this is from Dr. Kaplan.

4   Q.  Again, this all relates to Robert Ellensohn, correct?

5   A.  Yes, it does.

6           MR. DRATEL:  I would move that in as Defendant's L-4.

7           MR. TEHRANI:  No objection.

8           THE COURT:  Admitted without objection.

9           (Defendant's Exhibit L-4 received in evidence)

10  Q.  So that's Dr. Kaplan's report.  That's referred to in the

11  disability briefing document, L-2 that we looked at before,

12  right?

13  A.  Yes.

14  Q.  That is also part of what RRB relies on, correct?

15  A.  Yes.  Part of the file, yes.

16  Q.  In fact, as you said before, Dr. Kaplan is not provided the

17  prior medical records; this is sort of sorting from scratch.

18  Right?

19  A.  This is just a onetime report --

20          MR. DRATEL:  Your Honor, I asked a question, did you

21  not -- withdrawn.

22          MR. TEHRANI:  He can't withdraw the question while he

23  is answering.

24          THE COURT:  The question was withdrawn.  Let's move to

25  the next question.

D7onles3                    Coleman - cross

1  Q.  You testified earlier that for a consultative exam the

2  doctor is not provided prior medical records, right?

3  A.  Correct.

4  Q.  So he's starting from scratch with his exam, correct?

5  A.  He's just getting a onetime --

6  Q.  I'm asking you a question.

7          MR. TEHRANI:  Objection.

8  Q.  He is starting from scratch with his exam, correct?

9          THE COURT:  Answer yes or no, if you can.

10 A.  It is not really something you can answer yes or no.

11         THE COURT:  All right.  Then elaborate.

12         MR. DRATEL:  Well, can I ask another question, your

13 Honor, if he can't answer yes or no?

14         THE COURT:  Yes.

15 Q.  Isn't part of the purpose of not providing the prior

16 medical records so that the consultative examination be fresh

17 and new?

18 A.  The consultative exam is to give like a snapshot of what

19 person's condition is right now.

20         MR. DRATEL:  Can I have the question read back, your

21 Honor, because I don't believe the answer was -- it is a

22 yes-or-no question.

23 Q.  Isn't part of the reason why you don't give medical records

24 to the consultative examiner because you want a fresh and

25 independent examination?

D7onles3                          Coleman - cross

1     A.  What you said, it is an independent examination.

2     Q.  Is that part of it, why don't you give them the prior

3     medical records?

4     A.  No.  The reason we don't give them the prior medical

5     records --

6                THE COURT:  The answer is no.  Now if he wants to know

7     why, he will ask why.

8     Q.  But you agree it is an independent medical exam?

9     A.  It is an independent medical exam.

10               THE COURT:  Mr. Coleman, the answer is yes or no Don't

11    repeat.  Just say yes or no.

12    A.  Yes.

13               THE COURT:  It will please him more if he hears yes or

14    no.

15    A.  Yes.

16               MR. DRATEL:  Thank you, your Honor.

17    Q.  The independent medical exam could also include tests,

18    correct?  The doctor, the consultative examiner, the

19    consultative examining doctor can order tests, correct?

20    A.  No.

21    Q.  No?  Well, would they look at the old tests?

22    A.  No.

23    Q.  Could you look at the end of that report.

24               MR. TEHRANI:  Which report are we talking about?

25               MR. DRATEL:  L-4, the report from Dr. Kaplan.

D7onles3                          Coleman - cross

1    Q.  Doesn't it say there is a radiological exam?

2    A.  Yes, there is.

3    Q.  So he must have done a radiological exam, correct?

4             MR. TEHRANI:  Objection.

5             THE COURT:  Overruled.

6    A.  Yes, he did.

7    Q.  So he can do tests?

8    A.  He didn't order the test.  We ordered the test.

9    Q.  You ordered the test, OK.

10   A.  The Railroad Retirement Board ordered the test.

11   Q.  So you can order tests, right?

12   A.  Yes.

13   Q.  As a result of all of those elements of objective medical

14   evidence from Dr. Lesniewski, from Dr. Kaplan, the opinion from

15   Dr. Leone, the result was that Mr. Ellensohn was approved for

16   occupational disability, correct?

17   A.  Yes.

18            MR. DRATEL:  If I may approach, your Honor, I think I

19   have one more exhibit from this.

20            I will move on and I will come back to this, your

21   Honor.

22   Q.  If a narrative is particularly strong in terms of what it

23   describes, that doesn't necessarily mean that the person is

24   going to get disability approved, right?

25   A.  That's correct.

D7onles3                          Coleman - cross

1   Q.  You are going to rely on the objective medical evidence.

2              THE COURT:  Asked and answered.

3   Q.  If a narrative is weak or it isn't even submitted, that

4   doesn't mean the person is not going to get approved, right?

5   A.  That's correct.

6              MR. DRATEL:  If I could have government's Exhibit 101.

7   Q.  Let me show you what's marked as Government Exhibit 101-L,

8   but I don't think it's in.

9              MR. WEDDLE:  It is in evidence.

10             MR. DRATEL:  101-L in evidence.

11             It is in evidence?

12             MR. WEDDLE:  By our records.

13             MR. DRATEL:  OK.

14  Q.  This is already in evidence.  That is a letter from the

15  Railroad Retirement Board.

16             MR. DRATEL:  If we could get that up on the screen,

17  please.  The top half, please.

18  Q.  This is a letter from the Railroad Retirement Board to

19  Steven Gagliano, right?

20  A.  Yes, it is.

21  Q.  It is informing him that, even though he's approved for

22  occupational disability for the Railroad Retirement Board, his

23  impairment is not severe enough to prevent him from performing

24  a job in the national economy, so he doesn't get the SSI,

25  correct?

1   A.  Correct.

2          MR. DRATEL:  I am going to show you what's marked as

3   Government's Exhibit 103-L.  This is also in evidence already,

4   your Honor.  If we could have 103-L, if we could blow up the

5   top half, please.  Thank you.

6   Q.  This is to Gary Supper, right?

7   A.  Correct.

8   Q.  From the Railroad Retirement Board?

9   A.  Yes.

10  Q.  It says in paragraph 3, "After careful review it has been

11  determined that, even though you are entitled to a Railroad

12  Retirement disability annuity because you are unable to work in

13  your regular occupation, your condition is not severe enough to

14  prevent you from performing any substantial gainful work."

15          So basically the same thing, right?

16  A.  Yes.

17  Q.  Disabled enough for an RRB disability, but not for SSI?

18  A.  He's not disabled for a disability freeze.  It is not

19  technically a benefit for SSI because we don't pay out Social

20  Security benefits.

21  Q.  But he's not entitled to a total and permanent disability

22  pursuant to Social Security regulations?

23  A.  Correct.

24  Q.  But he is entitled to Railroad Retirement disability?

25  A.  Yes.

D7onles3                         Coleman - cross

1   Q.   If we go to the bottom of that, please.

2            It says, The following medical records were used in

3   this decision.  Right?

4   A.   Yes.

5   Q.   You see the first is Linell Skeene, M.D.?

6   A.   Yes.

7   Q.   And then there is Peter Lesniewski, M.D.?

8   A.   Yes.

9   Q.   And then there's that says Inland Sports Medicine?

10  A.   Yes.

11  Q.   And then Metropolitan Diagnostic Imaging, right?

12  A.   Yes, I see that.

13           MR. DRATEL:  If I could have 103, please.

14           Defendant's L-5, please, for identification.

15  Q.   Could you just look at that document.  It's a couple of

16  pages.  That is a medical doctor's report, right, submitted to

17  RRB as part of the RRB file, right?

18  A.   Yes.

19  Q.   We saw something that said Inland Sports.  That's from

20  Island Sports, right?

21  A.   Yes.

22  Q.   You think it might be a typo on the letter?  Look at the

23  dates.

24  A.   The dates are different on this.

25  Q.   But they are both in '08?

D7onles3                    Coleman - cross

1  A.  No, on the letter it's 2006.

2  Q.  Oh, one is 2006.  OK.  But that is a report that the RRB

3  considered, right, as part of its --

4  A.  Yes.  It would be considered part of the file.

5  Q.  That's from Dr. Yerys, Y-e-r-y-s?

6  A.  Yes.

7  Q.  Right?

8  A.  Yes.

9          MR. DRATEL:  I would move that in as Defendant's L-5.

10          MR. WEDDLE:  How many pages are you offering?

11          MR. DRATEL:  Let me get the original.  It's six.  From

12  74 to 79.

13          (Counsel conferred)

14          MR. DRATEL:  Just 74.

15          MR. WEDDLE:  I'm sorry.

16          What is the Bates number on the letter you just

17  showed?

18          MR. DRATEL:  The letter is 25100.

19          MR. WEDDLE:  I apologize for this delay, your Honor.

20          Your Honor, we object.

21          THE COURT:  Can you explain what the problem is,

22  Mr. Dratel?

23          MR. DRATEL:  Your Honor, there are two different

24  dates.  There is a date different in the letter than this

25  report.

 1          MR. WEDDLE:  That's not correct, your Honor.

 2          THE COURT:  Why don't you consult back there and

 3   figure it out.  In the meantime, we will do something else.

 4          MR. WEDDLE:  Can we have a brief voir dire, your

 5   Honor.

 6          THE COURT:  No, let's not have a voir dire.

 7          Identify the problem and let's move on.

 8          MR. WEDDLE:  The problem relates to a question that

 9   has already been asked and answered in a manner that was not

10   correct based on a limited look at the file, your Honor.

11          THE COURT:  Why don't you consult and see if you can

12   straighten that out.

13          (Counsel conferred)

14   Q.  So the letter says the report from Inland is in 2006, the

15   report from Dr. Yerys is 2008, right?

16   A.  Yes.

17          MR. WEDDLE:  Your Honor, this is totally misleading.

18          Can we put the letter on the screen?

19          MR. DRATEL:  I am trying to correct the fact that

20   there is a distinction.  I still would like to move Dr.Yerys'

21   one page from 2008 in.  It is in the file.

22          I'm ready to ask a question.

23          THE COURT:  Let's put it aside for a moment and

24   straighten it out later.  Let's move on to the next question,

25   all right.

D7onles3                           Coleman - cross

1              MR. DRATEL:  Thank you, your Honor.

2              MR. TEHRANI:  Your Honor, can we be heard on this?

3              THE COURT:  No.  I am going to move on.  We are going

4      to straighten it out later.  Let's not delay any more.

5              MR. DRATEL:  We will mark this as L-7 for

6      identification.

7              THE COURT:  What is this?

8              MR. DRATEL:  I'm sorry?

9              THE COURT:  I am asking what this is.

10             MR. DRATEL:  Yes, I just want to return here, your

11     Honor.

12     Q.  Mr. Coleman, is that the report from Dr. Skeene that's

13     referred to in the letter, February 15, 2008?

14     A.  Yes, it is.

15             MR. DRATEL:  I move it as L-7, your Honor.

16             THE COURT:  Does the government have a copy?

17             MR. TEHRANI:  No objection, your Honor.

18             THE COURT:  It is admitted without objection.

19             (Defendant's Exhibit L-7 received in evidence)

20             MR. DRATEL:  That is at page 95 of government's 103.

21             MR. WEDDLE:  Do you want that?

22             MR. DRATEL:  Yes.

23             MR. WEDDLE:  I'm sorry.

24     Q.  Now, the first sentence, "Referred by QTC Medical Services

25     for an orthopedic examination."

D7onles3                         Coleman - cross

1        Can you explain what QTC Medical Services is?

2   A.  QTC Medical Services is the contractor that the Railroad

3   Retirement Board uses for getting consultative examinations.

4   Q.  So this was ordered by the RRB?

5   A.  Yes, it was.

6        MR. DRATEL:  And if we could just go up to that

7   paragraph.  If we could just have the chief complaint paragraph

8   in its entirety.

9   Q.  This is an examination of the patient, right?

10  A.  Yes.

11  Q.  So for "Chief Complaint," it says, "Left shoulder pain.

12  The claimant had onset of left shoulder pain in 2005.  He

13  denies any trauma.  In 2006 the claimant was diagnosed with a

14  rotator cuff tear.  The claimant had PT" --

15       Is that physical thermie?

16  A.  Yes.

17  Q.  -- "for three months, three times weekly, which was

18  helpful.  The claimant has received no injections into the left

19  shoulder.  He describes the shoulder pain as sharp, constant

20  with the intensity of 6 out of 10 and nonradiating.  There is

21  no associated numbness.  The left shoulder pain is aggravated

22  by reaching and lifting greater than seven pounds.  The

23  claimant gets some relief of pain from Vicodin and that is

24  5/500 milligrams q.d."

25       Do you understand what that is?

D7onles3                        Coleman - cross

1    A.  The q.d. part I don't know that that means.

2    Q.  But the 5/500?

3    A.  That would be the dosage.

4    Q.  What would that be?

5    A.  500 milligrams.

6    Q.  What is the 5?

7    A.  I am not sure what that means.

8           MR. DRATEL:  Can you move up a little bit.

9    Q.  It says "Past History."

10          "In 1997 the claimant was diagnosed with

11   chondromalacia, patella of the right knee.  In 1999 the

12   claimant was diagnosed with a fracture of the right ankle and

13   had ORIF discectomy, Whitestone Hospital.  In 2006 the claimant

14   was diagnoses with a bulging disk of the lumbar spine.

15   However, the level is unknown to the claimant."

16          Right?

17   A.  Yes.

18   Q.  "Current Medication" it says "Vicodin," right?

19   A.  Yes.

20   Q.  This is Gary Supper, correct?

21   A.  Yes.

22   Q.  Ultimately, based in part on Dr. Skeene's examination,

23   Mr. Supper was approved for an occupational disability?

24          MR. TEHRANI:  Objection.  Misstates his testimony and

25   the record, your Honor.

1          THE COURT:  Rephrase the question.

2   Q.  He was approved for occupational disability, correct?

3   A.  He was approved for disability, occupational disability.

4   Q.  In that letter he is denied for -- this disability question

5   is something that continues, correct?

6          MR. TEHRANI:  Objection, your Honor.

7          MR. DRATEL:  In other words, there are

8   recertifications?

9          MR. TEHRANI:  Objection.

10          THE COURT:  Overruled.

11          MR. TEHRANI:  Object, your Honor.  Can we be heard on

12   this issue?

13          THE COURT:  No.  Overruled.

14   A.  I'm sorry.  What was the question?

15   Q.  There are recertifications, correct?  You talked about them

16   as a continuing process?

17          MR. TEHRANI:  Objection.  There was a motion on this

18   issue, your Honor.

19          MR. DRATEL:  There is an initial and a post, right?

20   A.  There are initial and post sections, right.

21   Q.  The post section is about the person's continuing to be

22   disabled, right?

23          MR. TEHRANI:  Objection.

24   A.  No, that's for --

25          MR. TEHRANI:  Objection, your Honor.

D7onles3                        Coleman - cross

 1              THE COURT:  Sustained.

 2   Q.  If you could look at 104, government's 104.

 3              Page 11.

 4              (Counsel conferred)

 5              MR. WEDDLE:  Your Honor, we just want to get a copy

 6   for ourselves.

 7              THE COURT:  All right.

 8   Q.  I show you what's marked as government's 104 in its

 9   entirety and ask you about what we will mark for identification

10   as Defendant's L-8.

11              MR. WEDDLE:  Do you have a Bates number for that?

12              MR. DRATEL:  It is page 11 -- starting from page 10

13   actually.

14   Q.  That is another disability briefing document prepared by

15   the RRB, correct?

16   A.  Yes.

17   Q.  For an employee with a disability application, correct?

18   A.  Yes.

19   Q.  And it's Christopher Parlante, P-a-r-l-a-n-t-e?

20   A.  It is.

21   Q.  If you look at the second page, it talks about RFC, again

22   the RFC from Dr. Lesniewski is not acceptable, right?

23   A.  Yes, it does say that.

24   Q.  Nevertheless, Mr. Parlante is approved for disability,

25   correct?

D7onles3                        Coleman - cross

```
 1   A.  Yes, he was.
 2              MR. DRATEL:  Did I move it?  I move L-8.  I move L-8
 3   in.
 4              MR. TEHRANI:  No objection, your Honor.
 5              THE COURT:  Admitted without objection.
 6              (Defendant's Exhibit L-8 received in evidence)
 7   Q.  That's based on the totality of the evidence in the file,
 8   correct?  That's what it's supposed to be based on?
 9   A.  The occupational disability allowance, yes.
10   Q.  Even though the RFC from the doctor, Dr. Lesniewski, was
11   found to be not acceptable, correct?
12   A.  I'm sorry.   What was the question?
13   Q.  It was found --
14              THE COURT:  Can the reporter read back the question.
15              (Record read)
16   A.  Yes.
17   Q.  If I may just point out another page for you here.
18              MR. DRATEL:  I'll let the government know the page.
19   Q.  If you could look at that.  That is a letter from the
20   RRB -- I will mark that for identification as L-9.  It is a
21   letter from the RRB to Mr. Parlante, correct?
22   A.  Yes.
23              MR. DRATEL:  I move it in, your Honor, as L-9.
24              MR. TEHRANI:  No objection, your Honor.
25              THE COURT:  Admitted without objection.
```

D7onles3                         Coleman - cross

1       (Defendant's Exhibit L-9 received in evidence)

2   Q.  That is a letter from the RRB telling Mr. Parlante that,

3   although he is approved for RRB occupational disability he did

4   not have a total and permanent disability, correct?

5   A.  That's correct.

6   Q.  So that, even though he's not able to do his railroad job,

7   he's able to do some job in the national economy essentially?

8   A.  Yes.

9   Q.  Does the RRB publish anything for doctors describing the

10  process of filling out a G-250?

11  A.  There are instructions on the form for them to follow.

12  Q.  Is there anything else besides those instructions?

13  A.  I am not aware of anything else.

14  Q.  Do they have any educational seminars or other programs for

15  doctors to go beyond the instructions in terms of filling out

16  these forms and the process for occupational disability

17  applications?

18  A.  No, I don't think so.

19  Q.  But the RRB does have seminars for employees, right, to

20  describe the program or did at some point?

21  A.  We have continuing training, yes.

22  Q.  For employees?

23  A.  For employees, for the RRB employees.

24  Q.  But not for doctors, right?

25  A.  Yes.

1422

D7onles3                          Coleman – cross

1          MR. DRATEL:  Nothing further, your Honor.

2          Thank you.

3          THE COURT:  All right.  I indicated I was going to

4    break for lunch earlier today, so we will break at this point.

5    It is about 5 minutes to 12.  We will return at 1:15.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7onles3                        Coleman - cross

1          (Jury not present)

2          THE COURT:  You may step down.

3          Let me ask defense counsel whether you had or have the

4     exhibits that you plan to use with this witness to share with

5     the government in advance of the testimony?

6          MR. DRATEL:  No, your Honor, I will tell you what the

7     story is.  That's part of why I was asking about Mr. Bodnar.

8     This witness had two or three pieces of 3500 material, all

9     within the last week.  It was very difficult to determine what

10    he was going to testify about.

11         THE COURT:  You may step out.

12         MR. DRATEL:  I'm sorry.

13         (Witness not present)

14         MR. DRATEL:  We were e-mailed the exhibits at I think

15    12:45 a.m., so I did not see them until this morning.

16         The exhibits don't necessarily say what he's been

17    getting into.  It was only after he started testifying that I

18    realized what he was going to get into and what we could do on

19    cross-examination.  That's why I was using the government's

20    copies of some of these documents.

21         I don't have copies even, I am marking them as I go.

22    That is why -- your Honor, just so I make a record on it, with

23    respect to my questions about Mr. Bognar, he had a prior

24    statement from the OIG investigation in 2008, among which he

25    said it is not a very hard standard to meet to get disability.

D7onles3                        Coleman - cross

He repeated that more than once in his statement to OIG.  He

was designated as a witness.  We got his 3500 in addition on

his OIG statement, which came earlier.  We found out about this

witness the day trial started.

        So that's why I wanted to get into that.  I wasn't

going to talk about Mr. Bognar's, the substance of his

statement; that he had been to prepared to testify he was the

architect of this whole program, and he was would have been the

best person for this.

        MR. WEDDLE:  Your Honor, this is absurd.

        MR. DRATEL:  This is just my record.

        MR. WEDDLE:  This is absurd.

        THE COURT:  Let's stop there.  Let's not belabor this

point.  The point is we wasted an enormous amount of time.  I

understand from Mr. Dratel why.  Let's see if we could avoid

that in the remaining cross-examination.  To the extent that

the other defense counsel are going to cross examine

Mr. Coleman with documents, identify those documents in advance

and provide copies to the government so that we avoid what

happened here in the cross-examination by Mr. Dratel.

        MR. DRATEL:  I do apologize for that, your Honor.

        MR. WEDDLE:  Your Honor, what Mr. Dratel just said is

totally --

        THE COURT:  It doesn't matter.

        MR. WEDDLE:  It does matter, your Honor, because we

D7onles3                        Coleman - cross

1    provided a witness list.

2               THE COURT:  I don't want to hear it, Mr. Weddle.  It

3    is just not relevant.

4               MR. WEDDLE:  Your Honor, can I say a couple of other

5    things that are separate from this claim.

6               THE COURT:  Mr. Weddle, please sit down.

7               MR. RYAN:  Judge, I think you will be pleasantly

8    surprised after lunch.

9               THE COURT:  All right.  The reason I am cutting it

10   short is because I have a commitment that I need to run to.  If

11   there is anything else on this point we will listen to it after

12   lunch.

13              MR. DRATEL:  OK, your Honor.

14              (Luncheon recess)

15

16

17

18

19

20

21

22

23

24

25

D7odles4

**A F T E R N O O N   S E S S I O N**

1:23 p.m.

(Jury not present)

THE COURT:  All right.  Thank you.  Be seated.

All right.  A couple of matters before we call the jury in.

There are two motions that are still outstanding that we haven't addressed -- actually, three.  The government moved to have the Court take judicial notice of that New York Times video and photo.  I am going to deny that without prejudice.  If the government makes a showing that there is no person available at the New York Times to authenticate the photo or the video, I'll consider it.  But if there is somebody who can come in from the Times and testify that the document is authentic and that it was taken by a New York Times' photographer, that should be sufficient.

There is a second motion made by Mr. Rutigliano asking for a Daubert hearing.  I am going to deny that motion.  I am not persuaded that a Daubert hearing is required here.  Under the circumstances, Dr. Barron, in my view, based on the submission of the government, is sufficiently qualified to testify as an expert on the matters that he is being called upon to testify.  The fact that he did not examine the precise or specific x-rays and other material that Mr. Rutigliano cites I believe is not material to his ability to testify.  The

D7odles4

objections that Mr. Rutigliano raises are more pertinent to the

weight of the expert's testimony rather than to the

admissibility or his qualifications to testify on the issues

for which he is being offered.

Now, Mr. Weddle, I cut you off before the lunch break

in the middle of a sentence, as I had to leave.  Is there a

particular matter of urgency that you wanted to bring to the

Court's attention?

MR. WEDDLE:  No, your Honor.  I did have some response

to Mr. Dratel's remarks regarding Mr. Bognar.  I don't think

that it is proper to talk about that in front of the jury.  I

can talk at more length in response to what he said.  Your

Honor may not think that it is pertinent at this time to

respond to everything that he said.  I think I responded in

summary form before the lunch break, and I stand by that

response.  I can explain it further if your Honor would like.

I also wanted to remark that there were certain times

during the cross-examination of Mr. Coleman where counsel asked

a question, Mr. Coleman was answering it, and then counsel

tried to withdraw the question in the middle of the answer.  I

don't think counsel gets to cut off the witness and withdraw a

question because he doesn't like the answer that is coming out.

I think that those were the two things.  I feel like

there was one other thing but it has now left my brain, your

Honor.  I'm sorry.

D7odles4

1          THE COURT:  All right.

2          MR. DRATEL:  Your Honor, could I quickly respond?

3          THE COURT:  Yes.

4          MR. DRATEL:  With respect to withdrawing questions, he

5     wasn't answering the questions and he was going on with a pat

6     answer that had nothing to do -- not "nothing to do with" but

7     really was evasion.  I decided to try to get the key answer --

8     with the nonresponsive answer, I was trying to get at it with a

9     different question.  I was trying to move the process along.

10          THE COURT:  I understood and I appreciated that.

11     There were times in which the witness was taking too long to

12     answer and not being sufficiently direct with yes/no answers.

13     I think it was appropriate under those circumstances to

14     withdraw a question and pose another one.

15          MR. DRATEL:  If I can just clarify one other thing,

16     your Honor?

17          THE COURT:  Yes.

18          MR. DRATEL:  When I was asking about continuing sort

19     of a post initial disability, I was talking about when they

20     remind the -- and they put that in direct, you know, when they

21     remind the applicant that he had to be totally disabled.  I did

22     not articulate it properly.  I wasn't trying to get into an

23     area that the Court has precluded.

24          THE COURT:  I understood that, and that was the reason

25     I allowed it.  There was testimony on direct about those

D7odles4

1    continuing reminders, and that's what I understood the

2    questions to have been addressing.

3           MR. DRATEL:  Thank you, your Honor.

4           MS. FRIEDLANDER:  Your Honor, just briefly.

5           THE COURT:  Ms. Friedlander, yes.

6           MS. FRIEDLANDER:  Thank you.  Your Honor, briefly on

7    judicial notice, I just wanted to make the Court aware of a

8    couple of issues.

9           First, I understand The Times could make a witness

10   available to authenticate the video, I don't think that is the

11   issue.  There are two things.  First, I don't think defense

12   counsel is willing simply to have this witness be an

13   authentication witness; I think they want to cross-examine

14   someone in a much more substantive way.

15          THE COURT:  I will not allow that.  If the witness is

16   here to authenticate a document, then the issue is whether or

17   not that document is authentic.  It doesn't go into the

18   substance of the document or what it says.

19          MS. FRIEDLANDER:  OK.  Given your Honor's ruling, we

20   will raise with the defense again whether they are willing to

21   stipulate to the video.

22          I just raise one other issue just so you know about

23   it.  In order for us to put even an authentication witness from

24   The Times on the stand, we have to get approval from the

25   Department of Justice in Washington.  So it takes -- you know,

D7odles4

1     there are some steps and some hurdles to go through.

2                 THE COURT:  All right.

3                 MS. FRIEDLANDER:  Just so you understand it takes some

4     work on our part.

5                 THE COURT:  OK.  Mr. Durkin, welcome back.

6                 MR. DURKIN:  We talked to Mr. Weddle over the noon

7     hour.  There is one exhibit that we have an issue with with

8     respect to the testimony of Natasha Marx that we may need a

9     minute or two outside the presence of the jury.

10                THE COURT:  All right.  We can do that during the next

11    break.  We still have, I imagine, substantial testimony from

12    Mr. Coleman.

13                Then who comes after Mr. Coleman?

14                MR. WEDDLE:  Natasha Marx is after Mr. Coleman.

15                THE COURT:  So after Mr. Coleman we will get Ms. Marx.

16                Anything else?

17                (Pause)

18                All right.  Can we bring in the jury?

19                MR. RYAN:  We need the witness, too, Judge.

20                THE COURT:  Yes, and need the witness.

21                (Pause)

22                Mr. Jackson or Mr. Ryan, who is up next?

23                MR. RYAN:  Mr. Ryan.

24                THE COURT:  Mr. Ryan.  All right.

25                (Continued on next page)

1431
D7odles4

 1              (Jury present)

 2              THE COURT:  Good afternoon.  Welcome back.

 3              Mr. Ryan.

 4    JOHN COLEMAN,

 5       Resumed, and testified further as follows:

 6    CROSS-EXAMINATION

 7    BY MR. RYAN:

 8    Q.  Mr. Coleman, my name is Joe Ryan and I represent Joe

 9    Rutigliano.

10              Did you ever meet Joe Rutigliano before today?

11    A.  No, sir.

12    Q.  Did you ever have a chance to review his file in

13    preparation for your testimony since you have been here since

14    July 15th?

15    A.  Yes, I have.

16    Q.  OK.  And the file is in evidence.  It is Government's

17    Exhibit 100.  It is in evidence.  The jury has it.  So I'm

18    going to ask you some questions about the file.  OK?

19    A.  OK.

20    Q.  And the process of how your office deals with the file,

21    correct?

22    A.  OK.

23    Q.  All right.  The first thing is there was an Examiner

24    Breisblatt, B-r-e-i-s-b-l-a-t-t, I believe it is.  Do you know

25    that examiner?

D7odles4                         Coleman – cross

1   A.  Breisblatt?  I'm sorry, that doesn't sound familiar.

2   Q.  Well, M.L. Breisblatt?

3   A.  A Railroad Retirement examiner?

4   Q.  Yes.

5   A.  No.  I'm sorry.  That doesn't sound familiar.

6   Q.  I'm sorry.

7         (Pause)

8         You don't know anybody by the name of Breisblatt?

9         THE COURT:  Asked and answered.

10        MR. RYAN:  OK.

11  Q.  Would you look at the documents before you and see whether

12  or not that identifies the examiner who made the initial

13  decision to grant Mr. Rutigliano occupational disability?

14  A.  OK.  The examiner that signed the award is Ann Marie Kelly.

15  Q.  OK.  Now, what was the date of the award?

16  A.  For the occupational disability, it was March –– the date

17  it was approved was March 14, 2000.

18  Q.  OK.  And the application was filed on or about December 19,

19  1999, right?

20  A.  Yes.

21  Q.  OK.  So Examiner Kelly reviews the application and all the

22  medical data attached to it, correct?

23  A.  Yes.

24  Q.  And in this case the medical data included Dr. Lesniewski's

25  reports of 18 months of treatment, correct?

D7odles4                         Coleman - cross

1    A.  I'd have to look at the file again to make sure that it was

2    that amount of time.

3    Q.  Well, just to -- there is no dispute that this file shows

4    that Dr. Lesniewski took some x-rays of Mr. Rutigliano's back

5    in March '98 and reported that there was a degenerative disc

6    disease; do you dispute that?

7            MR. TEHRANI:  Your Honor, the witness needs to review

8    the file.

9            THE COURT:  All right.

10   Q.  And, also, Dr. Lesniewski took -- had an MRI conducted for

11   Mr. Rutigliano's right knee concerning a meniscal tear.  Does

12   that refresh your recollection?

13           (Pause)

14           Dr. Lesniewski also did a physical exam of

15   Mr. Rutigliano' right shoulder, according to the documents

16   submitted to Examiner Kelly, and he did an examination of

17   Mr. Rutigliano's right wrist and made certain findings with

18   respect to these four areas.  Does that help you?

19           MR. TEHRANI:  Your Honor, objection.  I'm not sure if

20   defense counsel is asking questions or --

21           MR. RYAN:  I'm trying to --

22           THE COURT:  Mr. Ryan, perhaps you can expedite it by

23   bringing the document that you are looking at --

24           MR. RYAN:  All right.

25   Q.  Examiner Kelly took all of the medical examination as part

1   of her training and made an assessment of the file, correct?

2   A.  Yes.  The examiner evaluated that evidence in the file and

3   made a decision.

4   Q.  And there were various options that Examiner Kelly could

5   have done.  If Examiner Kelly had any questions about the

6   medical submissions, Examiner Kelly could have had a review by

7   a CE consultant, correct?

8   A.  Yes.  They could have gotten a --

9   Q.  Examiner Kelly could have ordered a medical examination of

10  Mr. Rutigliano if she had any question?

11  A.  Yes, she could have.

12  Q.  And Examiner Kelly, according to the file, decided that

13  that was not necessary based upon the medical submissions,

14  correct?

15  A.  Based on the medical findings, she felt she could make a

16  decision without --

17  Q.  And then the RRB sent Mr. Rutigliano a letter that we find

18  that you are eligible for occupational disability annuity,

19  right?

20  A.  Yes.

21  Q.  And that's the process?

22  A.  Yes.

23  Q.  OK.  Now, with respect to the job description, Examiner

24  Kelly had to look through the file to see what the job

25  description was because Mr. Rutigliano was a conductor on the

D7odles4                        Coleman – cross

1    Long Island Rail Road, correct?

2    A.  Yes.

3    Q.  And Examiner Kelly could have gotten a job description from

4    the employer, the Long Island Rail Road?

5    A.  The Rail Road had an opportunity to supply a job

6    description, but I don't see a copy of that in the file, sir.

7    Q.  It is not in the file.  But it was a routine procedure that

8    your office, including Examiner Kelly, would send a request to

9    the Long Island Rail Road to give us a job description, an

10   official one on file?

11   A.  Yes.  The job description was requested, yes.

12   Q.  And you've seen job descriptions from railroad employers,

13   haven't you, in your career of 25 years?

14   A.  Yes, I have.

15   Q.  Have you ever seen any from the Long Island Rail Road?

16   A.  I haven't adjudicated a claim in a while.  I can't recall

17   if I've seen any or not.

18   Q.  Well, let me show you R5B and see whether or not you

19   recognize this document.

20           Have you reviewed the document?

21   A.  I looked it over quickly, yes.

22   Q.  And does it, based upon your experience, appear to be the

23   employer's description of a conductor's job on the Long Island

24   Rail Road?

25   A.  Yes --

1          MR. TEHRANI:  Objection, your Honor.  This is from

2     the -- I believe the question is whether this is from the Long

3     Island Rail Road, not from the employee.

4          MR. RYAN:  That was not my question.

5          MR. TEHRANI:  Then it misstates what you showed him.

6          MR. RYAN:  No, it doesn't misstate what I showed him.

7          THE COURT:  Could the reporter read back the question?

8          MR. RYAN:  To save time, I will rephrase it, Judge.

9          THE COURT:  Rephrase the question, then.

10    BY MR. RYAN:

11    Q.  Looking at that R5B exhibit, does it refresh your

12    recollection that the Long Island Rail Road would submit job

13    descriptions of the applicant's job, such as Mr. Rutigliano?

14    A.  To me this doesn't refresh my memory.  I don't really

15    recognize it.

16    Q.  You have no idea, correct?

17    A.  I don't know.

18    Q.  OK.  Now, Examiner Kelly had another option to get the job

19    description, didn't she?

20    A.  Yes.

21    Q.  What was that?

22    A.  When an application is submitted, we get a form G-251 job

23    description from the claimant.

24    Q.  That would be Mr. Rutigliano in this case?

25    A.  Yeah, that would be his description of his job.

D7odles4                         Coleman - cross

1   Q.  OK.  And have you had an opportunity to review his

2   description of his job with the Long Island Rail Road

3   description of his job?

4   A.  I haven't seen this before so I haven't had a chance to

5   look at the two of them, no.

6   Q.  Were you asked to review it in contemplation of your

7   testimony here?

8   A.  I'm sorry.

9   Q.  Were you asked by anyone on the prosecution team to review

10  the Long Island job description for conductor with

11  Mr. Rutigliano's description of a conductor?

12  A.  No.

13  Q.  Examiner Kelly had another option, didn't she, concerning

14  job description?

15  A.  There are other documents out there.  The Dictionary of

16  Occupational Titles, that could be used.

17  Q.  I'm sorry?

18  A.  The Dictionary of Occupational Titles.

19  Q.  Is that also known as Generic Job Descriptions?

20  A.  Oh, the Generic Job Descriptions?  No, that is a copy of a

21  form that goes out to the railroad that they have an

22  opportunity to send back and let us know whether they agree

23  with the job description or not.

24  Q.  So you have another resource to determine what the job

25  obligations are of a conductor such as Mr. Rutigliano before

1  Examiner Kelly makes any decision, correct?

2  A.  Yeah.  There are other options, yeah.

3  Q.  What's the other option besides the Long Island Rail Road

4  option, Mr. Rutigliano's description of his job, what's the

5  third one?

6  A.  Oh, well, you were mentioning the G-251A and B that goes

7  out to the Rail Road, but we didn't get a copy of that back.

8  Q.  You and your fellow examiners are trained and utilize the

9  disability manual to perform your duties, correct?

10 A.  Yes.

11 Q.  And that manual was prepared by Dr. Welch, W-e-l-c-h, and

12 Dr. Richling, R-i-c-h-l-i-n-g, correct?

13 A.  Yes.

14 Q.  In fact, those two doctors were the ones who designed this

15 whole program?

16 A.  Yes.  They were representative of rail labor and rail

17 management.

18 Q.  There was a time in 1997 where labor representatives and

19 management representatives got together and worked out a

20 program in black and white as to steps to be taken before

21 occupational disability awards could be made, isn't that right?

22 A.  Yes.

23 Q.  And that became the cornerstone for your work since 1997?

24          MR. TEHRANI:  Objection, your Honor.

25          THE COURT:  Overruled.

D7odles4                          Coleman - cross

1   A.  Yes.

2   Q.  And one of the objects of this process was to determine

3   whether or not the applicant employee could perform or not

4   perform one or more tasks on that particular job that that

5   employee filled, correct?

6   A.  Well, it's if they were able to perform their job duties,

7   yes.

8   Q.  No.  If they were unable to perform one or more of their

9   tasks, then they would be impaired and entitled to occupational

10  disability?

11  A.  Well, we would look at the -- we would look at -- we would

12  evaluate the medical evidence in the file and determine what

13  restrictions there were and then compare it to their job duties

14  to see if they could do what their occupation was.

15  Q.  But one of the primary objectives of the Management Labor

16  Committee was to determine if an employee, a railroad employee,

17  was unable to perform one or more tasks of his job?

18  A.  It's like I stated, it is just that we try and determine

19  what the job duties are and determine if they can do those job

20  duties.

21  Q.  Isn't it a fact, sir, that the agreement that was reached

22  in 1997 was based upon that very principle, to determine

23  whether or not an employee is unable to perform one or more of

24  his tasks?

25  A.  I think it is to determine whether someone would be

D7odles4                          Coleman - cross

1  occupationally disabled from doing the full range of their job

2  duties.

3  Q.  And the definition of occupational disability was whether

4  or not the employee was unable to perform one or more of the

5  tasks of their regular occupation, isn't that right?

6           MR. TEHRANI:  Your Honor, objection.  Defense counsel

7  is asking about something that predates the applicable

8  regulation.

9           THE COURT:  All right.  Sustained.

10 BY MR. RYAN:

11 Q.  Well, I am going to show us R1.

12          I'll show you R1 and I'll ask you to look at the first

13 two pages and see if that refreshes your recollection that that

14 was an objective of the occupational disability program.

15          MR. TEHRANI:  Your Honor, the same objection.

16          THE COURT:  Will the government stipulate that this

17 was an objective of the program?  An objective?

18          MR. TEHRANI:  Your Honor, we are asking about a

19 committee that predates the applicable regulations that

20 actually govern a claims examination.

21          THE COURT:  You can't stipulate that even subsequently

22 that was not an objective of the program?

23          MR. TEHRANI:  Your Honor, could we be heard at the

24 sidebar?

25          THE COURT:  No.

1    Mr. Ryan, make your point and let's move on.

2    MR. RYAN:  OK.

3  Q.  Can you review the document, the first two pages, please.

4    (Pause)

5    I will direct your attention to the second page, in

6  the interest of time, "Governing Principles."  First paragraph.

7    (Pause)

8    Having reviewed -- are you finished reviewing it?

9  A.  Yes.

10  Q.  Having reviewed the document, does it refresh your

11  recollection that one of the objectives of the Occupational

12  Disability Program, designed by Dr. Welch, was to determine

13  whether or not an employee was unable to perform one or more

14  tasks on his regular job?

15    MR. TEHRANI:  Objection, your Honor.  There is no

16  failure of recollection and this is irrelevant.

17    THE COURT:  Overruled.

18  Q.  Can you tell the ladies and gentlemen of the jury whether

19  that helps you?

20  A.  It does state here, "Benefits must be awarded to qualified

21  individuals who have a permanent physical and/or mental

22  condition that renders him" --

23    MR. TEHRANI:  That is not in evidence.

24    THE COURT:  Don't read from the document if it is not

25  in evidence, Mr. Ryan.

D7odles4                        Coleman - cross

 1              MR. RYAN:  My question is simple.

 2              THE COURT:  The question is whether it refreshes your

 3     recollection of that material.  If it does not, just say no.

 4              THE WITNESS:  No.

 5              MR. RYAN:  It doesn't, OK.

 6     Q.  Well, in your 25 years in your role as an examiner, are you

 7     familiar with -- withdrawn.

 8              In your 25 years as an examiner, have occupational

 9     disability claims been denied on the ground that the employee

10     has been unable to show that he can perform full range of

11     duties?

12     A.  I am not sure.  I can't answer that question.

13     Q.  You never heard of the phrase "unable to perform full range

14     of duties?"

15     A.  Yes, I have.

16     Q.  Where did you hear that from?

17     A.  It's a term that we use -- that's used, that we use.

18     Q.  As part of the Disability Bureau that reviews these claims,

19     correct?

20     A.  Yes.

21     Q.  And what do you and your fellow examiners understand the

22     meaning of "unable to perform the full range of duties on the

23     job?"

24     A.  If there is an impairment that prevents somebody from doing

25     their job duties, that they be found disabled.

D7odles4                        Coleman – cross

1  Q.  When you say unable to perform the job, I'm asking you

2  whether or not he is unable to do the full range of the job.

3  A.  Yes.

4  Q.  What do you mean by "yes"?

5  A.  Yes, that he wouldn't be able to do the full range of the

6  job.

7  Q.  So when a conductor may be able to walk up and down the

8  aisles and take "tickets" but he may not be able to go down on

9  the trackbed and climb onto the train without difficulty, is

10  that the concept?

11  A.  If there is medical evidence to support that.

12  Q.  OK.  So Joe Rutigliano has a meniscus tear in his knee and

13  rotator cuff in his right shoulder and carpal tunnel on his

14  right wrist, based upon your experience, that might be an

15  impairment that might prevent him from doing a certain task on

16  his job?

17  A.  Yes, it would be.

18  Q.  And as a matter of fact, when this program went into

19  effect, didn't your office give seminars to union officials to

20  explain what this program was all about?

21  A.  I wasn't involved with that.  It may have.  I don't know.

22  Q.  Well, you weren't involved, but you understood that there

23  was a training program for union officials and management

24  officials to understand this program?

25  A.  Well, I wasn't involved in that.  I really can't.

1   Q.  When you say you weren't involved in it, are you telling

2   the ladies and gentlemen of the jury you are unaware of it?

3            MR. TEHRANI:  Your Honor, asked and answered.

4            THE COURT:  Asked and answered.

5   Q.  Let me show you R66, and I'm showing this to you to see

6   whether or not you can tell us that there was another option

7   for the Railroad Retirement Board to determine the job

8   description for someone like Joe Rutigliano as a conductor?

9            THE COURT:  Rather than showing a document, Mr. Ryan,

10  why don't you ask him whether there is whatever it is that you

11  are saying that you are --

12           MR. RYAN:  OK.

13  Q.  Didn't the RRB have available to it an index of all the job

14  descriptions in the railroad industry with specific functions

15  for each job?

16  A.  For every job in the railroad industry, I don't think -- I

17  don't believe so.

18  Q.  Well, if not for every job but for some jobs?

19  A.  For some jobs there was, yes.

20  Q.  For some jobs it would be the subject of claims under the

21  Occupational Disability Program, right?

22  A.  I'm sorry.  I don't understand what you are getting at.  I

23  didn't understand that question.

24  Q.  Do you want to know where I'm getting at?

25           Withdrawn.

1    Wasn't there an index of job descriptions, including

2    conductor, for someone like Joe Rutigliano, or if he worked for

3    the Pacific Railway, that you could go to as an examiner to

4    determine what kind of functions the conductor was obligated to

5    perform in the industry?

6    A.  Yes.

7    Q.  OK.  And would it refresh your recollection that there were

8    155 tasks listed for a trainman such as Joe Rutigliano?

9    A.  I haven't reviewed that document in a long time.

10   Q.  Well, in the interest of time -- Judge, I'm sorry -- just

11   take a look at R66, and I'll direct your attention to the

12   section dealing with train and employee work task requirements.

13   Just flip through it.  It either refreshes your recollection or

14   it doesn't.

15        (Pause)

16   A.  Yes.  I have seen it before.

17        MR. RYAN:  I offer R66 in evidence and I also offer

18   R5B, the Long Island Rail Road description, and then I'm

19   finished, Judge.

20        MR. TEHRANI:  Your Honor, we have no objection to R66.

21   I don't know that any foundation was laid for R5B.

22        MR. RYAN:  Very well.  We will get another witness,

23   Judge.  Thank you.

24        THE COURT:  Thank you.  One document admitted without

25   objection, R66, and the other document not admitted at this

D7odles4                        Coleman - cross

1    time.

2              (Defendant's Exhibit R66 received in evidence)

3              THE COURT:  Mr. Jackson.

4              MR. JACKSON:  Thank you, Judge.

5    CROSS-EXAMINATION

6    BY MR. JACKSON:

7    Q.  Sir, good afternoon to you.

8    A.  Good afternoon.

9    Q.  I haven't had the pleasure of meeting you, is that right?

10   A.  No.

11   Q.  My name is Joey Jackson.  OK?

12   A.  OK.

13   Q.  I represent Ms. Baran.

14             I guess I want to start where you mentioned that -- I

15   believe you say said -- this was this morning so I'll just

16   direct you back to it -- that Ms. Baran would not be entitled

17   to apply for an occupational disability?  And I never want to

18   put words in your mouth so if I say something that you didn't

19   say, just please correct me.  OK?

20   A.  Yes.  I don't believe that she would be -- as far as I

21   know, she doesn't have railroad service.

22   Q.  Now, with regard to an occupational disability itself, are

23   you aware of whether federal employees can apply for an

24   occupational disability?

25   A.  Not unless they meet the eligibility requirements for an

1    occupational.

2    Q.  So what you're saying is that if she could meet the

3    eligibility requirements, then she would be able to apply for

4    an occupational disability, is that right?

5    A.  Yes.

6    Q.  So I just wanted to clarify what Mr. Tehrani asked you

7    earlier.

8            Now, with respect to the complexity of the

9    application, Mr. Tehrani asked you questions regarding whether

10   or not someone has to, are they required to get assistance for

11   filling out an application for disability?  Do you recall that?

12   A.  Yes.

13   Q.  And you said they were not required, is that correct?

14   A.  That's correct.

15   Q.  However, you'd agree that it is somebody's legal right to

16   get assistance in filling out that application; is that right,

17   sir?

18   A.  If they wanted to, yes, they could.

19   Q.  In fact, you talked about the complexity of that

20   application and you said it wasn't so complex; do you remember

21   that?

22   A.  Yes.

23   Q.  Sir, how many years have you been doing this?

24   A.  I have been in the disability section for 23 years.

25   Q.  So it is fair to say that it is not complex to you based

D7odles4                        Coleman - cross

1    upon the breadth and nature of your experience, is that right?

2    A.  Yes.  When I look at it, it --

3    Q.  But your -- I'm sorry, I don't want to cut you off.

4    A.  Go ahead.

5    Q.  But you are not denying the fact that perhaps to others who

6    haven't worked in the field for 23 years that this application

7    might be somewhat daunting; would that be accurate?

8    A.  I mean, it has multiple pages.  The questions on it itself

9    I don't think are all that complex.

10   Q.  But you just reference the nature of the pages, for

11   example.  That might give someone pause, correct?

12   A.  It may.

13   Q.  OK.  So with respect to someone actually hiring someone to

14   do this particular task, people would apply for an occupational

15   disability in the event that they met these requirements, is

16   that accurate?

17   A.  Yes.

18   Q.  Now, to be clear, someone with an occupational disability,

19   sir, they don't have to be in a wheelchair, is that right?

20   A.  No.  No, they don't.

21   Q.  And, for example, they don't have to walk with a limp;

22   would that be accurate?

23   A.  Umm, I mean, they might, they might not.  It's hard to say.

24   You would have to evaluate the whole file.  I mean, they might

25   or they might not depending upon what their impairment might

1    be.

2    Q.  Fair enough, and we will get to files in a little bit.  But

3    right now you would agree with me that it is on an individual

4    basis as to how somebody might appear, correct?

5    A.  Yes.

6    Q.  There may in fact be someone who might be in a wheelchair,

7    correct?

8    A.  There could be, yes.

9    Q.  And there may be others who wouldn't be?

10   A.  Correct.

11   Q.  And there might be someone who uses a cane, correct?

12   A.  Yes.

13   Q.  And there might be someone who does not?

14   A.  Correct.

15   Q.  Finally, there might be someone who has a visual impairment

16   that could be observed and there might be an applicant who

17   doesn't have a visual impairment but who still may be fit for

18   applying for occupational disability, right?

19   A.  Yes.

20   Q.  Now, you mentioned -- Mr. Tehrani asked you a number of

21   questions based upon reliance of the RRB and how you assume the

22   truth of certain things.  Do you remember that?

23   A.  Yes.  When we get evidence in a file, we assume that what

24   we're getting has some truthful information.

25   Q.  Absolutely.  And so you're assuming that the applicant, him

D7odles4                    Coleman - cross

1    or herself, is giving the Railroad Retirement Board, and its

2    claims examiners, truthful information, correct?

3    A.  Correct.

4    Q.  And with respect to the information that they provide,

5    that's because they sign an application attesting to the truth

6    of everything that they give your office, is that accurate?

7    A.  Yes.

8          MR. JACKSON:  Now, if the government would indulge me

9    and put up 101A.

10         Now, if we could just go to the last part, the very

11   last page of this particular application, which would be page

12   10.  And if you could just blow up the last half of the page,

13   please?

14   Q.  Now, sir, do you see that?

15   A.  Yes.

16   Q.  By "that," I mean page 10 of this particular application.

17   A.  Yes.

18   Q.  And it is Exhibit 101A?

19   A.  Mm-hmm.

20   Q.  Now -- just so you don't upset the Judge or anyone else,

21   you have to answer "yes" or "no."

22   A.  Yes.

23   Q.  OK.  Now, with regard to this particular application, there

24   is a signature listed there, is that correct?

25   A.  Yes, that's correct.

D7odles4                          Coleman - cross

1   Q.   And above that signature it references that the applicant

2   has to give truthful information, is that right?

3   A.   That is right.

4   Q.   And with regard to the applicant himself providing truthful

5   information, this is information that they're attesting that's

6   contained throughout this entire application, right?

7   A.   Yes.

8   Q.   And that would go to the attachments as well?

9   A.   Well, I think it refers to this document, but then again

10  under the G-251 job information form it has a similar

11  statement, something to this.

12  Q.   And this particular application here, if we can just say,

13  is there any signature page, sir, that requires your claims

14  examiners to provide their signature attesting to the truth of

15  it?

16  A.   To the truth of what's on this form?

17  Q.   Absolutely.

18  A.   No.

19  Q.   Is that because your claims examiners are relying upon that

20  applicant to give them information?

21  A.   Yes.

22  Q.   And that claims examiner, whoever it may be -- if we could

23  go to page 1 to see who it was here.

24          And if we could just blow up the top?

25          MR. TEHRANI:  Objection, your Honor.  That is not the

D7odles4                          Coleman - cross

1    claims examiner.

2            MR. JACKSON:  I will rephrase it and I will get there,

3    Judge.  I'm sorry.

4    Q.  Again, Mr. Coleman, if ever I say something that misdirects

5    you, just correct me, OK?

6    A.  Yes.

7    Q.  Thank you.  Now, with regard to the top quarter of that

8    page, there is a name there, is that right?

9    A.  Yes, there is.

10   Q.  And as I was rightfully corrected, that is not a claims

11   examiner, is it?

12   A.  No, it is not.

13   Q.  Who is that person?

14   A.  That's the spot for the contact representative that is

15   taking the application package.

16   Q.  What's their job?

17   A.  Their job is to help the claimant file the necessary forms

18   and papers and get the information that we need to evaluate the

19   file.

20   Q.  And that particular person there would be relying also upon

21   the truth that was given to them by the applicant, is that

22   correct?

23   A.  Yes.

24   Q.  And, for example, if you could just tell us -- I'll

25   withdraw that.

D7odles4                    Coleman - cross

1              If you could just tell us the job that they do, as you

2      just told us about, would that require this person to ask them

3      a series of questions about the application?

4      A.  For the contact representative in the field office?

5      Q.  Yes.

6      A.  I've never worked in a field office.  I'm really not sure

7      exactly, you know, what they would ask or what they wouldn't

8      ask.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7onles5                          Coleman – cross

1   Q.  In your 23 years of experience, sir, have you ever had any

2   dealings with the field office?

3   A.  Yes.

4   Q.  Have you had dealings with people who take applications?

5   A.  Yes, with the various contact representatives, yes.

6   Q.  With regard to the various contact representatives, have

7   you reached an understanding, as you just described to me, of

8   the job that they have in that particular office?

9              MR. TEHRANI:  Asked and answered, your Honor.

10             THE COURT:  Sustained.

11  Q.  With respect to the job that they perform, you just gave me

12  an indication of what they do, correct?

13             MR. TEHRANI:  Objection.

14             That misstates his testimony.

15             THE COURT:  Overruled.

16  A.  I stated that this is the contact representative and they

17  are the ones that help a claimant file an application package,

18  gather the information.  Other than that, I'm really not, I

19  have never worked in the field office, and I am not really sure

20  what other --

21  Q.  Beyond what you just told us, you can't tell us precisely

22  other than that what they do?

23  A.  Correct.

24  Q.  After it goes to this person -- and if I just might ask,

25  with regard to the complexity of the application, are you aware

D7onles5                    Coleman - cross

 1   of, you talked about, Mr. Tehrani talked about a lot of people

 2   assuming truthful information given to them by the applicant.

 3   Are you aware of whether or not --

 4           MR. JACKSON:  And if we could just go to the last page

 5   there, if we could just blow up again that signature.

 6   Q.  Is there any location on this document that provides for a

 7   signature of the -- what's the correct term of the field

 8   representative who takes the application, sir?

 9   A.  The contact representative.

10   Q.  The contact representative.

11           Is there any indication on this form where the contact

12   representative would assess the medical condition of the person

13   providing the application?

14   A.  No.

15   Q.  Are you aware of whether or not it is their job to assess

16   the medical condition, if you know, of the applicant?

17           MR. TEHRANI:  Objection, your Honor.  He's already

18   stated that he doesn't know.

19           THE COURT:  Overruled.

20   A.  I'm sorry.  Could you state the question again, please.

21           THE COURT:  Would the reporter read back the question.

22           (Record read)

23   A.  No, the contact representative doesn't assess the medical

24   condition.

25   Q.  In addition to the contact representative not assessing the

D7onles5                    Coleman - cross

1   medical condition, the claims examiner him or herself does not

2   assess the medical condition, is that accurate?

3   A.  They evaluate all the information in the file, the medical

4   evidence, the nonmedical evidence, and they make a decision

5   whether the person would be occupationally disabled.

6   Q.  That is based upon the information that they are presented,

7   is that correct?

8               THE COURT:  Asked and answered.

9   Q.  It is not based upon, to be clear, their personal

10  observation, and I'm referring now to the claims examiners; is

11  that right?

12  A.  Yes, they do not have personal observations.

13  Q.  As far as the application itself --

14              MR. JACKSON:  We could just go to Section 4 at this

15  time.  In fact, in the interest of time we can just go to

16  Section 6 on page 6.

17  Q.  Now, this here in Section 6 would be subjective criteria

18  that the applicant provides, is that right?

19  A.  Yes.

20  Q.  Again, with regard to the assumption of its truth, this

21  would be information that a person who received this

22  application would assume to be true, right?

23  A.  Yes.

24  Q.  The subjective information when it is evaluated has to be

25  matched against objective information, is that accurate?

D7onles5                    Coleman - cross

1   A.  Yes, it would be the claims examiner that would be

2   evaluating the rest of the medical evidence and the job

3   information in the file.  And they would look, and if there is

4   any discrepancies in this part -- it is about the daily

5   activities that they have, and it indicates whether it would be

6   easy, hard, or difficult for them to do.  And if there is

7   medical evidence that would kind of contradict that, there

8   would be a question and that is something that they would send

9   out to the field office.

10  Q.  It would be the office that would look to see whether or

11  not this subjective data would be consistent, would that be

12  fair to say with the medical evidence provided?  Is that

13  accurate?

14  A.  Well, you mean the contact representative?

15  Q.  Sure.

16  A.  Well, I think -- they would look at it for completeness.  I

17  don't think that they would evaluate.  That would be up to the

18  disability examiner to do that.

19  Q.  Because that is not their job.

20  A.  Correct.

21  Q.  They just gather the information, as we discussed?

22          THE COURT:  Asked and answered.

23  Q.  When you go to the claims examiner, when the actual claims

24  examiner gets this, the claims examiner is looking --

25          MR. JACKSON:  If we could just go to the next section

D7onles5                         Coleman - cross

1   also.

2   Q.  They not only look that the subjective information --

3            MR. JACKSON:  I'm sorry.  I said next section.  I

4   meant the next page at the very top.  Question 40.  Thank you

5   so much.

6   Q.  The claims examiner now, they not only look at that

7   subjective information that we just discussed, they look at

8   what's in question 40, is that accurate?

9   A.  Yes, they do.

10  Q.  That would be something that they would also match against

11  the medical evidence to see whether there was a consistency,

12  correct?

13  A.  Yes.

14  Q.  If it was inconsistent they would do something about it, is

15  that right?

16  A.  Right.  They would try to resolve the inconsistency, yes.

17  Q.  When you say resolve the inconsistency, what do you mean?

18  A.  Well, this is asking for a narrative about what the

19  activities of daily living of a person are.

20           And if, for example -- I'm trying to think of a good

21  example.

22           If the claimant was to list something here, but the

23  medical evidence doesn't support that, they would ask, well,

24  why do you claim that if it isn't supported by the medical

25  evidence.

D7onles5                    Coleman - cross

1   Q.  What if, for example, the medical evidence was inconsistent

2   in that the medical evidence didn't support the subjective

3   evidence?  As far as the field office is concerned in

4   evaluating the subjective data about standing, sitting,

5   kneeling, that depending upon the truth of the applicant, if

6   that doesn't match the medical evidence, then what happens?

7   A.  That would be for the disability examiner to resolve.

8   Q.  With regard to the resolution of that issue by the

9   disability examiner, would they or would they not approve the

10  application -- I will phrase it this way.  With regard to a

11  balance between the subjective data provided and the medical

12  documentation given, which one is more important?

13  A.  Could you say that one more time, please.

14          THE COURT:  Will the reporter read back the question.

15          (Record read)

16  A.  The objective -- well, you have to take everything into

17  account, the objective and subjective medical evidence --

18  Q.  Sure.

19  A.  -- in the file.  We look for the objective medical evidence

20  because that is something that's documentable and we can

21  actually see that compared to something that is subjective.

22  Q.  So, regardless of what the subjective data says, ultimately

23  it comes down to what is medically provable, is that accurate?

24  A.  What's medical -- yes, what can be proven with objective

25  medical evidence.

D7onles5                        Coleman - cross

1   Q.  When we talk about objective medical evidence, just to be

2   clear, we are talking about things like MRIs, for example, is

3   that right?

4   A.  Yes.

5   Q.  And tell me, because you know more than I would, what

6   beyond MRIs would you be looking for objectively?

7   A.  Objectively, MRIs, x-rays, different types of blood tests.

8   If they had surgery, that would be an objective finding.

9   Q.  Because that would go to a establish the disability, is

10  that right?

11  A.  Yes.

12  Q.  Now, you here looked at a number of applications, correct?

13  A.  Yes.

14  Q.  And with regard to the process, I'm going to ask you about

15  a few applicants, OK?

16  A.  All right.

17  Q.  I want to ask you about Ostap Baran.  Do you know who he

18  is?

19  A.  I have never met him.

20  Q.  You are familiar with the process, though, that goes into

21  reviewing an application, of course, of a person applying?

22  A.  Yes.

23         MR. JACKSON:  With the government's indulgence, Judge,

24  I would be moving Ostap Baran's Railroad Retirement Board claim

25  file into evidence at this time.

 1              MR. TEHRANI:  No objection, your Honor.

 2              THE COURT:  Admitted without objection.

 3              (Government's Exhibit 113 received in evidence)

 4              MR. JACKSON:  With the indulgence of the government if

 5     we could just have it up on the screen, if we could start with

 6     page 125078.  This is Exhibit 113.  If I could just have the

 7     government please, if you could just blow up the narrative

 8     portion of that.

 9     Q.  Sir, what is this?

10     A.  This is the examiner's rationale for Mr. Baran and this is

11     for the disability freeze.

12     Q.  When you say disability freeze, just to be clear, what is

13     that?

14     A.  That is when we evaluate a claim under the Social Security

15     guidelines to determine if they would be disabled for all work

16     in the national economy.

17     Q.  I just want to clarify that so that we are all on the same

18     page.  There is an occupational disability that relates to not

19     being able to do functions associated with your job, right?

20     A.  Correct.

21     Q.  Then there is a total and permanent disability that relates

22     to not being able to do any job in the national economy?

23     A.  Yes.

24     Q.  Before we go on, to be clear, does that mean if you are

25     totally and permanently disabled that you can't do any activity

D7onles5                          Coleman - cross

1    or just not activities associated with work in the national

2    economy?

3    A.  Just --

4              THE COURT:  Asked and answered.

5              MR. JACKSON:  Judge, can I just get --

6              THE COURT:  Asked and answered.

7              MR. JACKSON:  OK.

8    Q.  Now, I didn't mean to interrupt you.  I just wanted to get

9    clarity.  Can you continue along the lines of what that is?

10   A.  Do you want me to read it?

11   Q.  No, you don't have to read it.  Please no.  If you could

12   just summarize how this is relied upon by the claims examiner.

13   A.  OK, well, I mean this is the claims examiner's reason for

14   making the decision.  I see the beginning part they list the

15   impairments.  The second paragraph they have the different

16   findings that they have.  It goes down and shows if there is a

17   consultative opinion in there.

18   Q.  Not by way of being rude, I never want to interrupt you,

19   but just for the sake of time and moving this along, would

20   there be objective data there regarding x-rays, do you see

21   that, of the lower back?  Do you see that?

22   A.  Yes.

23   Q.  You see x-rays of the right heel, etc.?  Do you also see

24   that?

25   A.  Yes.

D7onles5                    Coleman – cross

1    Q.  It says all RFCs.  Could you tell us what RFC stands for?

2    A.  RFC stands for residual functional capacity.

3    Q.  That is something that was reviewed here and went into the

4    decision?

5    A.  Yes.

6          MR. JACKSON:  And if we can go to at the bottom it

7    would be 82, which would be four pages forward.  If we could

8    just blow up the top of this.  The top of the page, please.

9    Thank you.

10   Q.  What is this?

11   A.  This is the examiner rationale for the occupational

12   disability for Mr. Baran.

13   Q.  And that rationale would be supported by what, subjective

14   or objective evidence?

15   A.  It would be based on all the evidence in the file,

16   objective and subjective.

17         MR. JACKSON:  OK.  If we can go to page 125124.

18         By the way, you can stop there if you don't mind.  I

19   was going to come back to that.  Can we go back up a page.

20         If we could go to Section 3 of that document.  Right.

21   You could look at the top portion of the document itself.  Can

22   we blow up the quarter top page of this.

23   Q.  Do you see it says information about your medical

24   condition?

25   A.  Yes.

D7onles5                        Coleman - cross

1   Q.  That would be information that the applicant lists

2   concerning the nature of their medical condition, is that

3   right?

4   A.  Yes.

5   Q.  And if we could go to Section 4, please, that would be

6   question 29.

7            Right there.

8            Now, what is that?

9   A.  Those are different medications that the applicant puts

10  down, lets us know what medications that they are currently

11  taking.

12  Q.  Next to the medications would be the milligrams and the --

13  I don't want to misstate this, but the dosages I gather?

14  A.  Yes.

15  Q.  Is that right?

16  A.  Yes.

17  Q.  It has Nexium, and there is one, two, three, four, five,

18  six -- it looks like seven and then it's cut off, of

19  medications that Mr. Baran was on, is that right?

20  A.  Yes.

21           MR. JACKSON:  Just moving this along, if we now can go

22  to page 125124.

23  Q.  Sir, what is this?

24           MR. JACKSON:  If you could just blow up the top half

25  of the page.  OK.

1  Q.  What is that?

2  A.  This is a doctor's narrative report.

3  Q.  This would be Dr. Stephen G. Geiger?

4  A.  Yes.

5  Q.  When you say narrative report you are referring to a

6  synopsis -- again, I never want to put words in your mouth, so

7  please correct me -- you are referring to a synopsis of what

8  this doctor believes to be the medical ailments of this

9  particular applicant?

10 A.  Well, in this one it's just, the chief complaint is the

11 pain in the lower back.

12 Q.  So this is referring -- but it also says something about

13 some pain, numbness, to his right heel.  In other words, there

14 is some other information there, is that right?

15 A.  Yes, there is.

16 Q.  It talks about also flaring up pain, it relates to certain

17 pain that he was experiencing, is that right?

18 A.  Yes.

19      MR. JACKSON:  Page 127, please.  If we can just blow

20 that up.

21 Q.  What is this?

22 A.  This looks like notes from an office visit.

23 Q.  You see where it says "Plan and Recommendation"?

24 A.  Yes.

25 Q.  It talks about the second injection to further alleviate

1 | pain, etc., etc.?

2 | A.  Yes.

3 |          MR. JACKSON:  Page 128.

4 | Q.  Sir, what is in page 128, the top half of the page?

5 | A.  This is the operative report from epidural injection.

6 | Q.  It indicates that there is a spinal stenosis with

7 | radiculopathy?

8 | A.  Yes, that's the diagnosis, yes.

9 | Q.  That would be something that would be contained in this

10 | medical file?

11 | A.  Yes.

12 |          MR. JACKSON:  Without going through the entirety -- I

13 | believe it's in evidence it can be perused at a later time at

14 | the jury's pleasure -- if we can just go to page 144.  If we

15 | could just I guess blow up the top three quarters of the page,

16 | please.

17 |          You know what, if you don't mind, just starting with

18 | the right there and going downward.  Going down, please.

19 | Q.  What is that, sir?

20 | A.  This is also a part of the medical report.

21 | Q.  Would this medical report be part of the objective

22 | information that you were referencing?

23 |          THE COURT:  Asked and answered.

24 |          MR. JACKSON:  OK.

25 | Q.  So all of the information here, again moving off this file,

D7onles5                        Coleman - cross

1    all of the information that I just showed you concerned the

2    objective data?

3                THE COURT:  Asked and answered.

4                MR. JACKSON:  OK.

5    Q.  Based upon the nature of what was in this medical file, was

6    this approved or disapproved?

7    A.  Well, I saw the decision that he was approved for an

8    occupational disability and also a disability freeze.

9    Q.  Sir, do you remember the name or did you review the filing

10   of a Regina Walsh?

11   A.  No.  That name doesn't sound familiar.

12               MR. JACKSON:  If we could just go to Exhibit 108.

13   Q.  I have questions for you regarding the process upon which

14   this application was approved, OK?

15   A.  OK.

16               MR. JACKSON:  Judge, I am moving to offer Exhibit 108

17   into evidence, which is the RRB claim file.

18               MR. TEHRANI:  No objection, your Honor.

19               THE COURT:  Admitted without objection.

20               (Government's Exhibit 108 received in evidence)

21               MR. JACKSON:  Judge, we will try to be quicker with

22   this than we were with the other.

23               THE COURT:  Please approach.

24               MR. JACKSON:  Sure.

25            (Continued on next page)

D7onles5                         Coleman – cross

1           (At sidebar)

2           THE COURT:  Mr. Jackson.

3           MR. JACKSON:  Yes, Judge.

4           THE COURT:  You have spent a lot of time on process.

5    And you are leading again with process.  Is there anything

6    different about the application you are about to go to from the

7    one you have just gone through?

8           MR. JACKSON:  The forms are pretty much similar.

9           THE COURT:  If they are similar, if you have a point

10   get right to the point.

11          MR. JACKSON:  Got it.

12          THE COURT:  Without going to 0 questions to lay the

13   foundation for one point.

14          MR. JACKSON:  Fair enough.

15          THE COURT:  To the extent the process is the same,

16   assume the process is the same and then ask the question.

17          MR. JACKSON:  Done, Judge.

18          THE COURT:  All right.

19          MR. JACKSON:  Done.

20          (Continued on next page)

21

22

23

24

25

D7onles5                         Coleman - cross

1          (In open court)

2          MR. JACKSON:  May I, your Honor?

3          THE COURT:  Yes.

4   Q.  Going back to Exhibit 108, which is in evidence, sir, I

5   would like to direct you to page 39 of this particular

6   document, it would be 39 pages in.  Just with regard to asking

7   you, was this application approved or disapproved?

8   A.  Just from looking at this, I couldn't tell.

9   Q.  Is there something or some portion of the document that you

10  could look to to tell us?

11  A.  Of this document that we are looking at right now?

12  Q.  Yes, sir.  It is in evidence?

13  A.  No.

14  Q.  I will just cut to the chase.  With regard to this

15  document, this application which was approved, would this

16  follow the same criteria and format?  Again, without me going

17  over all of the questions I did for the last application, is it

18  the same pretty much concept where you look at the objective

19  evidence and you balance that with the subjective evidence?

20  A.  I mean, as with all disability cases, we review all the

21  medical and nonmedical, we make a determination, we use the

22  objective medical evidence and we try to determine whether -- I

23  am assuming this is an occupational patient that we are

24  discussing -- they are disabled or not.

25  Q.  Provided that, of course, it meets the criteria of an

D7onles5                        Coleman – cross

1    occupational disability your office or a claims examiner would

2    render a determination, correct?

3    A.   Yes.

4    Q.   That would be following the review of the information

5    that's provided by the particular applicant?

6    A.   It would be the information from the applicant, it would be

7    the information that we got from the different medical sources,

8    everything that is in the file that would be used to make a

9    decision.

10   Q.   We are assuming of course, the truth of the applicant, is

11   that right?

12   A.   We are assuming that from the applicant and from the

13   medical sources also.

14   Q.   And the medical sources would be confirming the subjective

15   criteria, as we discussed, correct?

16   A.   We would hope so, yes.

17   Q.   And when you say you would hope so, you refer people to

18   doctors to get MRIs and to get various types of exams so that

19   they could actually see whether the person has the ailments

20   they're claiming, right?

21            MR. TEHRANI:  Objection, your Honor.

22            THE COURT:  Asked and answered.

23            MR. JACKSON:  OK.

24   Q.   With regard to Regina Walsh, did that occur?

25   A.   I don't know.  I only saw the one page.

D7onles5                          Coleman - cross

1    Q.  Now, looking at Dolores Cameron, did there come a time that

2    you looked at the actual Railroad Retirement Board application,

3    disability application in the claim file of Dolores Cameron?

4    A.  The name doesn't sound familiar.

5               MR. JACKSON:  If I could have the government put up I

6    guess Government Exhibit 111.  And I would move to offer it at

7    this time.

8               MR. TEHRANI:  Your Honor, we would object to this

9    entire claim file coming in.

10              MR. JACKSON:  Judge, I would subject my moving it into

11   evidence subject to any redactions or sensitive documents that

12   the government wants to take out of it.

13              MR. TEHRANI:  That's fine.  We will take it subject to

14   potential subsequent redaction.

15              THE COURT:  All right.

16   Q.  With regard to that document, again, without rehashing all

17   that we just discussed, the same process would follow, is that

18   correct?

19   A.  Yes, that we would evaluate all of the medical and

20   nonmedical -- the same process, yes.

21   Q.  In order to make an assessment that was based upon the

22   totality of medical evidence, is that fair?

23   A.  Yes.

24   Q.  OK.  Again, for the interest of time, looking at two other

25   files, Michael Stavola, Government Exhibit 102 --

D7onles5                              Coleman – cross

1                MR. TEHRANI:  Your Honor, I am not sure the witness

2       has these exhibits.

3                THE COURT:  Have you examined any of these files?

4                THE WITNESS:  No, I haven't seen them recently.  And

5       if I have ever seen them in the past, they don't sound

6       familiar.

7                THE COURT:  If he has not seen them or has no

8       recollection of them, Mr. Jackson, you show him something that

9       may refresh his recollection.  If he has not seen it, he cannot

10      testify.

11               MR. JACKSON:  It is all right, Judge.  I will do it

12      another way.

13      Q.  Any Railroad Retirement Board claim file, for example?

14               MR. JACKSON:  Judge, for the sake of time, is the

15      government objecting to the offer of the two exhibits that I

16      just had, which would be Stavola, which would be Government

17      Exhibit 102 subject to any redaction, and Robert Dunaj,

18      Government Exhibit 114, the RRB claim file?

19               MR. TEHRANI:  No objection, your Honor.

20               THE COURT:  They are admitted without objection.

21               (Government's Exhibits 102 and 114 received in

22      evidence)

23      Q.  With regard to any Railroad Retirement Board claim file, it

24      follows the same process that I have had occasion to speak to

25      you about just now?

D7onles5                              Coleman – cross

1    A.  Yes.

2              MR. JACKSON:  Just one moment, Judge.  I may be done.

3              Your Honor will be pleased to know that I am.

4              THE COURT:  Thank you.  Mr. Tehrani?

5    REDIRECT EXAMINATION

6    BY MR. TEHRANI:

7    Q.  Mr. Coleman, Mr. Jackson asked you about Marie Baran and

8    whether she could apply for occupational disability.  Do you

9    remember that?

10   A.  Yes, I do.

11   Q.  I think you said as a federal employee she could apply for

12   occupational disability?

13   A.  No, I believe I said that I didn't –– I didn't believe that

14   she had railroad service, but I don't know for sure.

15   Q.  Just to clarify, in order to be able to apply for an

16   occupational disability from the Railroad Retirement Board, you

17   have to have worked for a railroad?

18   A.  Correct.

19   Q.  Not a federal agency?

20   A.  That's correct.

21   Q.  I wanted to ask you some questions about some of

22   Mr. Dratel's examination earlier this morning.  You were asked

23   some questions about Gary Supper.  Do you remember those

24   questions?

25   A.  Yes, some of them, yes.

1  Q.  You were asked about an independent medical exam performed

2  by Dr. Skeene.

3  A.  Yes.

4  Q.  I believe it was marked as 103 L-7.

5  A.  I don't think I have that up here.

6  Q.  On the bottom --

7         MR. TEHRANI:  Could you zoom back out for a second.

8  Q.  On the bottom it is RRB 25114.  Do you see that?

9  A.  Yes.

10  Q.  If you look at the top --

11         MR. TEHRANI:  Can we zoom in on the top.

12  Q.  -- what is the date?

13  A.  The date is February 15, 2008.

14  Q.  Now I want to show you a letter that is also in evidence.

15  Let me get you the Bates number.  25122.

16         MR. TEHRANI:  Can we see them both up on the screen at

17  the same time.

18  Q.  What is the letter dated at the top?

19  A.  February 20, 2007.

20  Q.  Is it fair to say it's about a year before the Dr. Skeene

21  examination?

22  A.  Yes.

23  Q.  And what does that February 20, 2007 letter say?

24  A.  That we have determined that Mr. Supper meets the

25  requirements for a disability annuity.  It gives the disability

D7onles5                        Coleman - redirect

1   onset date of November 22, 2006.

2   Q.  So does that letter indicate that as of February 20, 2007,

3   Mr. Supper had been determined to be occupationally disabled?

4   A.  Yes, it does.

5   Q.  Again, the date of the Skeene examination?

6   A.  That is February 15, 2008.

7   Q.  You were also shown a letter dated March 14, 2008.  Do you

8   remember that?  It is 25100.  Do you remember when Mr. Dratel

9   asked you questions about this document.

10  A.  Yes.

11  Q.  That document was denying a disability freeze for

12  Mr. Supper?

13  A.  Correct.

14  Q.  Meaning determining that he was not totally and permanently

15  disabled?

16  A.  That's correct.

17  Q.  And at the bottom of this document, it lists a number of

18  things that were relied upon to make that determination,

19  correct?

20  A.  Yes.

21  Q.  There's that Skeene report dated February 15, 2008?

22  A.  Yes.

23  Q.  And then there is a report from Dr. Lesniewski dated

24  November 15, 2005 and December 20, 2006?

25  A.  Yes.

D7onles5                        Coleman - redirect

1   Q.  Then there's that -- it says Inland Sports Medicine, I

2   think we agree that it was supposed to say Island Sports

3   Medicine, dated November 28, 2006, right?

4   A.  Yes.

5   Q.  Mr. Dratel suggested that that was a typo, right?

6   A.  Yes, he did.

7   Q.  And he showed you a letter from Dr. Yerys.  Do you remember

8   that?

9   A.  Yes.

10  Q.  That was dated in 2008?

11  A.  I don't know the date of that letter.

12  Q.  Did Mr. Dratel show you a document dated November 28, 2006

13  when he was asking you about this?

14  A.  From the Inland Sports?

15  Q.  Yes.

16  A.  He was showing one from Island Sports, and I think there

17  was a discrepancy on date on that one.

18  Q.  Right.  That's exactly what we are talking about.

19          MR. TEHRANI:  Can we put up the document numbered RRB

20  25080.

21  Q.  That is a document from Island Sports Medicine, correct?

22  A.  Yes, it is.

23  Q.  That's dated November 28, 2006, correct?

24  A.  Yes.

25  Q.  Can we look at the third page of that.

D7onles5                        Coleman – redirect

1           Who does that appear to be signed by?

2    A.  Peter Lesniewski.

3           MR. TEHRANI:  And could we blow up the paragraph just

4    above that.

5    Q.  It says, "I am aware of the patient's occupation with the

6    Long Island Rail Road"?

7    A.  Yes.

8    Q.  It talks about how he's disabled from his occupation?

9    A.  Yes.

10   Q.  He concludes that, "These disabilities are permanent"?

11   A.  Yes.  And that they will get progressively more difficult

12   and dangerous.

13   Q.  Then it concludes by saying that, "These disabilities are

14   permanent," correct?

15   A.  Yes.

16   Q.  That's not the document that Mr. Dratel showed you,

17   correct?

18   A.  No, I don't think so, no.

19   Q.  In fact, that is the document that's referenced in the

20   March 14, 2008 letter, correct?

21   A.  Yes.  Because I think the other letter was 2008.

22   Q.  Now, you were also asked some questions about a Robert

23   Ellensohn.  Do you remember that?

24   A.  Yes.

25   Q.  And you were asked about pieces of the file?

1   A.   Yes.

2   Q.   Defense counsel showed you a document where the claims

3   examiner wrote that Dr. Lesniewski's RFC assessment was

4   unacceptable.  Do you remember those questions?

5   A.   Yes.

6           MR. TEHRANI:  Can we see that document from

7   Mr. Ellensohn's file.

8   Q.   Do you remember this document you were shown?

9   A.   Yes.

10   Q.   To be clear, did the RRB rely on the medical information

11   provided by Dr. Lesniewski?

12           MR. DRATEL:  Objection.

13           THE COURT:  Overruled.

14           MR. DRATEL:  Asked and answered.

15   A.   Dr. Lesniewski's medical evidence was part of the file, so

16   it would be considered, it would have been considered in the

17   decision, yes.

18   Q.   Did the RRB completely disregard Dr. Lesniewski's

19   evaluation?

20           MR. DRATEL:  Objection.

21           THE COURT:  Rephrase the question.

22   Q.   Did the RRB disregard Dr. Lesniewski's evaluation?

23   A.   No.  Not from the indication here, no, they did not.

24   Q.   Did the RRB assume that Dr. Lesniewski was lying?

25           MR. DRATEL:  Asked and answered.

1   THE COURT:  Overruled.

2   A.  The RRB wouldn't assume that he was lying.  They would have

3   accepted his report as being truthful.

4   Q.  When the consultative opinion doctor concluded that

5   Ellensohn was subject to physical restrictions, whose medical

6   conclusions was he relying on?

7   MR. DRATEL:  Objection.

8   THE COURT:  Overruled.

9   A.  The doctor would have used Dr. Lesniewski and any other

10  medical evidence in the file to come up with those

11  restrictions.

12  Q.  In fact, in every example that you were shown today with

13  claim files involving medical information from Dr. Lesniewski,

14  did the RRB assume that Dr. Lesniewski was telling the truth?

15  MR. DRATEL:  Asked and answered.

16  THE COURT:  Asked and answered.

17  Q.  Mr. Dratel, also asked you some questions about whether

18  people only applied for occupational disability, right?

19  Do you remember those questions?

20  A.  Yes.

21  MR. TEHRANI:  Could we put up 108.

22  Q.  Whose application is this?

23  A.  This is Mr. Rutigliano's.

24  MR. TEHRANI:  Can we blow up the top third.

25  Q.  What is the title of the document?

D7onles5                    Coleman - redirect

1   A.   The title of the document is Application for Determination

2   of Employee's Disability.

3   Q.   So, when Joe Rutigliano applied for benefits from the RRB,

4   was he applying on a form that was specific to occupational

5   disability?

6   A.   No.  I mean, this form is used for both occupational and

7   total and permanent disability.

8   Q.   Mr. Ryan asked you some questions about job descriptions,

9   do you remember?

10  A.   Yes.

11  Q.   And you were asked about the sources of information about

12  an applicant's job description?

13  A.   Yes.

14  Q.   And he asked you about an index.  Do you remember that?

15  A.   Yes.

16  Q.   And he asked you about the G-251-As that were sent to the

17  employers?

18  A.   Yes.

19  Q.   To the railroads?

20  A.   Yes, I remember that.

21  Q.   What other information does the RRB use to determine what

22  an applicant's job is?

23  A.   Well, they would also use, as we said before, the G-251,

24  the job description that the claimant fills out.  These forms

25  that we were just talking about, the G-251-A and G-251-B are

1    sent tout railroad employers and they have the opportunity to

2    send it back.  There are generic job descriptions that go with

3    the G-251 A or B.  I am not sure which one it goes with.

4    Q.  Just to clarify, is the RRB trying to assess the actual job

5    description of the applicant or some generic job description?

6    A.  They are trying to assess the claimant's actual job

7    description.

8           MR. TEHRANI:  Can we look at the job description in

9    Mr. Rutigliano's application.  That would be 100-C, I believe.

10          Can we look at the first page of the vocational

11   report.

12          The second page.

13          The second page if we can look at question 12.

14   Q.  It references an attached vocational report supplement.  Do

15   you see that?

16   A.  Yes, I do.

17   Q.  Can we look at the vocational report supplement for

18   Mr. Rutigliano.  It is under the title "Detailed Job

19   Description."

20   A.  Yes.

21   Q.  Is this information that the RRB would use to determine

22   what Mr. Rutigliano's job description was?

23   A.  Yes, we would.  Since on the form he referred to the

24   attached job description, I would use that.

25          MR. TEHRANI:  Can we look at -- I believe it is going

D7onles5                    Coleman - redirect

1    to be No. 5.  Can you blow that up.

2    Q.  Let's start in the middle of that paragraph.  "The poor

3    leverage caused by my painful back and right knee required

4    increased manual exertion to turn valves.  This was a catch-22.

5    Since I could not depend on my back and right knee for support

6    or leverage, I had to employ increased leverage and exertion.

7    As I tried to use my hands, my back, neck and knee pain

8    uncontrollably flared up so that I could not do my work.  This

9    caused increase numbness and tingling in my right wrist and

10   hand such that I could not use it to do my work."

11            Do you see that?

12   A.  Yes.

13   Q.  Is that information that the RRB would have relied upon?

14   A.  Yes, it is.

15   Q.  You were asked by Mr. Jackson some questions about reports

16   of MRIs and x-rays and a couple of different files.  Do you

17   remember that?

18   A.  Yes.

19   Q.  Do you know how to read MRIs or x-rays?

20   A.  No.  We don't get the actual MRI or x-ray films in our

21   files.  We get reports from doctors, and the doctor that

22   usually requests them is the one that interprets those in part

23   of his narrative report.

24   Q.  Do you rely on that treating physician's interpretation of

25   those results?

D7onles5                     Coleman - redirect

1   A.  Oh, yes.

2   Q.  In a lot of the cross-examination today, defense counsel

3   picked out various pieces of files and asked you about them.

4   Do you remember all of those questions?

5   A.  Not all of them.  Quite a few of them.

6   Q.  Not specifically all of them, but you remember those

7   questions?

8   A.  Yes.

9   Q.  Where you were asked about pieces of claim files?

10  A.  Yes.

11  Q.  Does the RRB rely on the entire claim file when making a

12  disability determination?

13  A.  Yes, we do.  We look at all the medical and nonmedical

14  evidence that is in the file.

15  Q.  Including medical information from a treating source?

16  A.  Yes, we do.

17  Q.  Such as Dr. Lesniewski, if he provides it?

18  A.  Yes.

19  Q.  Such as Dr. Ajemian, if he provides it?

20  A.  Yes.

21  Q.  At any point does the RRB disregard the treating source's

22  information?

23  A.  No, it would always be included in the evaluation.

24  Q.  As to other doctors who might be involved in the process,

25  such as doctors rendering consultative opinions, do those

D7onles5                         Coleman - redirect

1   doctors rely on the treating physician's conclusions.

2              MR. DRATEL:  Asked and answered.

3              THE COURT:  Asked and answered.

4   Q.  Does the opinion of a treating physician matter to the RRB?

5              MR. DRATEL:  Asked and answered.

6              THE COURT:  Asked and answered.

7   Q.  Did the RRB think that Dr. Lesniewski was lying?

8              MR. DRATEL:  Asked and answered.

9              THE COURT:  Asked and answered.

10             MR. TEHRANI:  No further questions, your Honor.

11             THE COURT:  Mr. Ryan.

12  RECROSS EXAMINATION

13  BY MR. RYAN:

14  Q.  I represent to you, sir, that our 5B was produced by the

15  Long Island Rail Road pursuant to law to our office.  Would you

16  take another look at that job description form.

17  A.  This one?

18  Q.  Yes.

19             MR. TEHRANI:  Objection, your Honor.  Was that a

20  question?

21             MR. RYAN:  Yes.

22             THE COURT:  That was not a question.

23             MR. RYAN:  That is a predicate to this question.

24  Q.  I ask you to look at that again and tell the ladies and

25  gentlemen of the jury whether or not that is a job description

D7onles5                          Coleman – recross

1    provided by the Long Island Rail Road concerning a conductor.

2              MR. TEHRANI:  Objection, your Honor.

3              THE COURT:  Sustained.

4              MR. RYAN:  All right.

5    Q.  In your disability manual, with respect to job

6    descriptions, does it not provide that generic job descriptions

7    are used for a select number of railroad occupations?

8    A.  Yes, it does.

9              MR. RYAN:  Thank you, no further questions.

10             THE COURT:  Mr. Dratel.

11   RECROSS EXAMINATION

12   BY MR. DRATEL:

13   Q.  Mr. Coleman, when a consulting examination is done, that is

14   done without reference -- withdrawn.

15             When a consulting examination is done, the doctor who

16   does that examination does not have the original treating

17   physician's records, correct?

18   A.  That's correct, except in the case of psychiatric or

19   neurologic exams.

20   Q.  But in an orthopedic exam it wouldn't be?

21   A.  No, they would not send that --

22   Q.  That is an independent exam, correct?

23   A.  Yes, it is an independent exam.

24   Q.  And we saw one with respect to Dr. Kaplan, right, with

25   respect to Mr. Ellensohn?

D7onles5                          Coleman - recross

1   A.  Yes.

2   Q.  Now, you said that the RRB relies on the doctor and relies

3   on the applicant, correct?

4   A.  Yes.

5   Q.  And the doctor relies on the patient?

6          MR. TEHRANI:  Objection, your Honor.

7          THE COURT:  Sustained.

8   Q.  The doctor relies on the tests, correct?

9          MR. TEHRANI:  Objection, your Honor.

10          THE COURT:  Sustained.

11  Q.  Now, you said that you don't get the MRIs, but sometimes

12  you do get the reports directly from the radiologist, sometimes

13  the doctors include them, correct?

14  A.  Yes.

15  Q.  In fact, I'll show you what is part of Government's Exhibit

16  116, which I will mark as L-10.  It is 02339.

17          I just ask you if that is a report from a radiologist

18  to Mr. Ellensohn's RRB file?

19  A.  Yes, this is a copy of the radiologist's report of the MRI.

20          MR. DRATEL:  I move it into evidence, your Honor.

21          MR. TEHRANI:  No objection, your Honor.

22          THE COURT:  Admitted without objection.

23          (Defendant's Exhibit L-10 received in evidence)

24  Q.  That was written to Dr. Lesniewski, right?

25  A.  Yes.

D7onles5                    Coleman - recross

1   Q.  That was written by Dr. Lesniewski and sent by

2   Dr. Lesniewski as part of the file, right, to RRB?

3   A.  Yes.

4            MR. DRATEL:  Nothing further, your Honor.

5            Thank you.

6            THE COURT:  Mr. Jackson?

7            MR. JACKSON:  Nothing further.

8            THE COURT:  All right.  Thank you.

9            You are excused.  You may step down.

10           (Witness excused)

11           THE COURT:  Government?

12           MR. TEHRANI:  Your Honor, I think as we discussed, it

13   may make sense to take a break now.

14           THE COURT:  All right.  We will take 15 minutes.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

D7onles5                         Coleman - recross

1              (Jury not present).

2              THE COURT:  What is the issue concerning Ms. Marx

3      testimony?

4              MR. DRATEL:  Your Honor, there are two charts that the

5      government has designated that it's going to admit.  One is

6      Government Exhibit 16 and one is Government Exhibit 12A.

7              We object to 16 on 403 grounds because we believe that

8      it presents a misleading and confusing picture to the jury with

9      respect to certain numbers.  If the government could put it up

10     when we go through these, it would be great so the Court can

11     see it.

12             MR. WEDDLE:  I would have to explain them also, your

13     Honor.

14             MR. DRATEL:  I will explain them as far as we know

15     from the government just to present our objection.

16             12-A is a breakdown of percentages of Long Island Rail

17     Road retirees on disability who saw particular doctors.  You

18     see in that it says between August 2004 and August 2008

19     Dr. Lesniewski saw, 134 patients are attributable to him.

20     That's 13.7 percent.  That is based on reviews, I understand,

21     of these AA-1d applications to the extent that Dr. Lesniewski's

22     name appears on them as a treating physician.

23             The other chart, if we could go to it now, 16, has a

24     very different number.  The time frame is increased only

25     slightly, not dramatically enough to account -- it's January

D7onles5                          Coleman - recross

2003 through September 2008.  So it adds another 20 months or
so.  But it adds 300 patients essentially.

        The reason is because these are United Healthcare
records of Long Island Rail Road employees who are on
disability at one point or another.  It doesn't necessarily
have anything to do with Dr. Lesniewski submitting anything to
RRB.  These are based on United Healthcare records.  These
could be dependents showing up on somebody's insurance for all
we know.

        We don't know what the provenance is, number one.
Number two, it is completely misleading because Dr. Lesniewski
did not have anything to do with these patients' disability
determinations.  He could have seen them before, after, in
between, but the government has only identified those 134 from
the AA-1ds, and we think that is the appropriate number, not
this number, which is a distortion.  Because also it says the
number who obtained disability payments, 404, but he had
nothing to do with the majority of them, more than half of
them.  He's not involved in getting them disability.  So we
this is entirely misleading.

        THE COURT:  Thank you.

        First, who is Ms. Marx?

        MR. WEDDLE:  Your Honor, she is an auditor at the
office of inspector general for the RRB.  She just performed
some summaries and analyses that are contained in these charts.

1    I can give your Honor kind of on overview.

2            Obviously, there are different analyses, and they take

3    varying amounts of time depending on what kind of data is

4    available and what format the data is available in.  The chart,

5    I think it's going to be very clear from her direct testimony

6    what each of the charts means and what kind of data the charts

7    rely on.

8            But Government Exhibit 16, if we could put that up, I

9    can hand a copy to your Honor if you would like.

10           This analysis Ms. Marx is going to testify was done

11   using basically two database sources, and they are United

12   Healthcare records and RRB databases.

13           So it basically takes United Healthcare records, and

14   they were only available to us going back to 2003, just because

15   of United Healthcare's retention policies.  So we used this

16   time frame, January 2003 to September 2008.  That is anyone who

17   saw Dr. Lesniewski at any point during that time period.

18           THE COURT:  All right.  Stop there.  When you say

19   anyone, anyone who was an employee of the Long Island Rail Road

20   who used United Healthcare?

21           MR. WEDDLE:  Yes, your Honor.

22           THE COURT:  For any form of ailment?

23           MR. WEDDLE:  That's right, your Honor.

24           THE COURT:  And may not necessarily have had to do

25   with disability?

D7onles5                    Coleman - recross

1              MR. WEDDLE:  Well, the point of this chart, your

2     Honor, is that there have been a number of witnesses who

3     testified that they had heard that Dr. Lesniewski was a person

4     to go to for disability.  This chart shows that, of the Long

5     Island Rail Road employees who saw Dr. Lesniewski at any point

6     during this time period according to the United Healthcare

7     records, almost all of them ended up getting disability at some

8     point.  So the disability, the day that disability is granted

9     is not keyed to the time frame.

10             What's keyed to the time frame is when they saw

11    Dr. Lesniewski.  So if someone started seeing Dr. Lesniewski in

12    2001 and was still seeing Dr. Lesniewski in 2003, then they

13    would be within the United Healthcare people who saw

14    Dr. Lesniewski.

15             Then Ms. Marx used RRB databases to narrow that group

16    of people down to Long Island Rail Road employees.  That is,

17    there is an RRB database where you put in a code that

18    corresponds to the Long Island Rail Road, it's 1311, and she

19    just cross-referenced those United Healthcare records against

20    that database to figure out, of the people seeing

21    Dr. Lesniewski, which ones were Long Island Rail Road people

22    according to the RRB database.

23             Then she took that list and just looked up to see

24    whether those people ended up getting disability at any point.

25    So this just shows, I think that the point of this chart -- I

1  think it's fair.  Once she explains it, I think it is going to

2  be very clear how it was done.  The point of this chart is that

3  for Long Island Rail Road people who were seeing

4  Dr. Lesniewski, the vast majority went on disability.

5          Now, there is a separate question of whether

6  Dr. Lesniewski recommended them for disability or whether they

7  referred to Dr. Lesniewski in their disability.  Ms. Marx is

8  going to make that clear also.

9          But obviously that analysis is much more labor

10  intensive, because it involves manual review of the files, and

11  Ms. Marx did that manual review with respect to certain

12  subgroups.

13          But this chart is based on taking these two databases

14  and basically bumping them up against each other and finding

15  this information.  Then we have other charts --

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1493

D7odles6

1        THE COURT:  Mr. Dratel made reference to whether some

2    of the information on Exhibit 16 pertain not necessarily to the

3    employee but Dr. Lesniewski treating a dependent who was part

4    of the United Healthcare policy.  Is that issue there?

5        MR. WEDDLE:  I don't believe it is, your Honor,

6    because I don't think a dependent would show up as in the RRB

7    database for 1311.  I actually off the top of my head don't

8    know the answer to that but I can check with Ms. Marx.  I think

9    that only Rail Road employees are listed in this database under

10   code 1311.

11       So the original raw material that she started with are

12   United Healthcare records for the Empire plan, all right, so

13   that is limited.  That's not every one in the world.  It's just

14   the Empire plan, which basically covers Long Island Rail Road

15   and some other group.  And then she took that and narrowed it

16   by this 1311 code in the RRB database.

17       Now, 12A, which Mr. Dratel talked about, is very

18   different, because 12A -- so 12A has a date range which is

19   August 2004 to August 2008, but that's not a date range for

20   when people see Dr. Lesniewski.  That is a date range for when

21   people obtain disability.  So there is a code in the RRB

22   database called "annuity beginning date," and she used that

23   date to identify a group of people.  OK?

24       And then taking that group of people, she essentially

25   manually reviewed the AA1-D applications for these people and

D7odles6

1     checked to see if these doctors were listed in the application

2     itself.  OK?  So we've looked at a number of these AA1-D's.

3     There is I think it is question 17 that asks the name of your

4     doctor.  And so if any of these -- if Lesniewski or Parisi or

5     Ajemian was listed in that part of the form based on her manual

6     review, then they ended up in this chart according to those

7     different rows.

8           But if we are starting with a different group of

9     people because we are starting not with everyone who saw

10    Dr. Lesniewski, as reflected in the healthcare records, we are

11    starting with people who obtained a disability annuity during

12    this time period, and so it is a smaller -- I mean, it is

13    obviously a different group of people and smaller group of

14    people for Dr. Lesniewski, and it frankly made it possible when

15    you are dealing with a smaller group of people to do the kind

16    of manual review that I'm talking about.

17          THE COURT:  Mr. Dratel made a point which perhaps you

18    might address or explain.  The difference between 12A and 16 is

19    only roughly one year, '03 to '08 for 16 and '04 to '08 on 12A.

20    The impression is that in 16, in only one additional year,

21    Dr. Lesniewski saw 300 patients more than shown in 12, which is

22    one year less but only 134 employees.  How do you explain that

23    apparent large discrepancy?

24          MR. WEDDLE:  Yeah.  Well, it is not a discrepancy

25    because --

D7odles6

1            THE COURT:  I called it an "apparent" discrepancy.

2            MR. WEDDLE:  I understand, your Honor, and I see what

3     you're saying.  But I think the testimony is going to make

4     clear that these are people -- this is a group of 978 people

5     who obtained disability benefits, that is, they have an annuity

6     beginning date, that falls within this date range.  The other

7     chart is -- covers people who saw Dr. Lesniewski, according to

8     United Healthcare records, at any point during that date range.

9     So it might be people who started seeing Dr. Lesniewski in 2001

10    or earlier and were continuing seeing him in 2003.

11           Actually, we were looking at that other chart, and,

12    you know, if you tried to do a more detailed analysis of the

13    400-something people that are in the other chart, we thought it

14    looked a little skewed because it looks like he's seeing --

15    Dr. Lesniewski is seeing I think 200-something Long Island Rail

16    Road people for the first time in 2003.  He's not seeing that

17    many for the first time in 2003.  It's just that because of the

18    United Healthcare records only going back to 2003, anyone he

19    sees in 2003 looks like their first visit is in 2003.

20           So it is just a function of the data that Ms. Marx is

21    working with, and I think when she explains it she is going to

22    say this is the people who obtained disability during this time

23    and then she -- she built on other analyses that she did.  So

24    she had to look at these AA1-D's for multiple purposes.  She

25    didn't just go back and review 978 at one time.  But she looked

D7odles6

 1   at the AA1-D's themselves individually and confirmed which

 2   doctors were listed there.

 3        Now, there are certain people -- and we're going to go

 4   into this with Ms. Marx.  There are certain people who, for

 5   example, show up as having seen Dr. Lesniewski in United

 6   Healthcare records and they did see Dr. Lesniewski but they

 7   didn't list him in their application materials.  And so, for

 8   example, there are two people that we're going to talk about

 9   who saw -- first saw Dr. Lesniewski in 2005, who ended up

10   getting narratives from Dr. Ajemian.

11        So, you know, the chart that is chart 16 doesn't and

12   it doesn't purport to talk about what Dr. Lesniewski said about

13   these people, it just talks about what's reflected in these two

14   data sources.  And it's really not directed at talking about

15   what Dr. Lesniewski is saying in his files, but it's directed

16   at, you know, corroborating this idea that people are going to

17   him who are ultimately getting disability benefits, almost all

18   of them.

19             THE COURT:  Mr. Jackson.  You rise?

20             MR. JACKSON:  No, Judge.  I'm sorry.  I am just

21   stretching out my back.  My back is hurting me.

22             THE COURT:  Mr. Dratel?

23             MR. DRATEL:  Do you want me to respond?

24             THE COURT:  Yes.

25             MR. DRATEL:  OK.  A couple of things.  One is

D7odles6

Mr. Weddle did not answer the Court's question about whether these people saw Dr. Lesniewski for any ailment, and that's part of the problem with 16.

The technical problem with 16 is it's not the RRB records that matter, it is the united Healthcare records that matter with respect to the dependent issue.  Mr. Weddle spoke about RRB records.  Those are about employees on disability. It is United Healthcare records that overinclude, because they include a dependent or a parent or a significant other or some other policy.  That's the problem there, and we don't have any kind of filter for that.

Third --

MR. WEDDLE:  I think that's -- sorry.

MR. DRATEL:  Third is that with respect to the Court's noting the 300 that I mentioned, I just want to point out that the total number of retirees from the Long Island Rail Road who sought -- who obtained disability in 2003 is only 291.  These are completely skewed numbers that are bound to confuse, mislead and obscure what the issues are in this case.  Because if someone saw Dr. Lesniewski for any reason, just any reason, and they happened to be a Long Island Rail Road employee who somewhere down the line went to another doctor to get disability, why is that relevant, Judge?  That is just confusion.  And it is just designed to create a larger number that has no meaning.

D7odles6

1           There is also no comparison here between

2      Dr. Lesniewski and the other doctors in that particular -- in

3      16.  Dr. Lesniewski could have seen those people and said there

4      is nothing wrong with you.  They went to another doctor.

5           Just one second.

6           And so this is really classic 403 material,

7      particularly in the context of we have a hard-core review by

8      Ms. Marx as to that 134 number.

9           MR. WEDDLE:  Well, your Honor --

10          THE COURT:  Mr. Weddle.

11          MR. WEDDLE:  I'm glad that Mr. Dratel embraces the

12     Exhibit 12A as a hard-core review by Ms. Marx.  We'll see how

13     his cross-examination goes.

14          There is nothing misleading about the chart; it is

15     very clear, and I think it's probative.  And there is no

16     prejudicial value that would outweigh the probative value.

17     Ms. Marx is going to make clear where she got this information,

18     and she is going to make clear that this is based just on

19     database records.

20          I think that -- I believe -- I have to check with her,

21     but I believe that a dependent of a Long Island Rail Road

22     person I don't think would show up under that 1311 code.  But

23     in any event, I mean, is Mr. Dratel saying that there are

24     droves of Long Island Rail Road dependents who are seeing

25     Dr. Lesniewski and they, too, are on disability?  I mean, I

1499

D7odles6

1    guess we have -- you know, there may be some examples of family

2    members of defendants who are on disability, but I don't think

3    that this is a major issue.  I mean, they had the raw material

4    for these charts, I believe, for weeks.  I mean, we have been

5    turning over the underlying data for a long time.  It is

6    spreadsheet work.

7         I am not that good at spreadsheets and Ms. Marx is,

8    but she is basically creating a list of people,

9    cross-referencing it against another list of people, and then

10   counting up how many people made that cross-reference.  So it

11   doesn't strike me as anything misleading.

12        THE COURT:  I don't need to hear any more.

13        Mr. Ryan, do you rise or are you stretching your back

14   as well?

15        MR. RYAN:  Judge, I don't want to interrupt this

16   process and I don't want to delay things.  I suggest that your

17   Honor look at Exhibit 19 and 19A during the break so that I can

18   address my concerns with the Marx testimony, the same chart,

19   the conviction theory that the government is going to use with

20   Dr. Lesniewski.

21        THE COURT:  Is this issue different than the one we

22   are talking about now?

23        MR. RYAN:  Yes.  Yes.  Highly different.

24        They are going to offer, for example, a chart that

25   says there is 135 false applications all engineered by

D7odles6

1      Mr. Rutigliano based upon a chart.

2                  MR. WEDDLE:  I think we're going to argue that in

3      summation, your Honor.

4                  What we're going to offer through this witness is that

5      she took Joseph Rutigliano's vocational report supplement.

6      Your Honor has seen it with a number of witnesses -- I'm sorry,

7      you've seen Joseph Rutigliano's document, and you've also seen

8      other witnesses testifying about their cookie-cutter vocational

9      report supplements.  Using the claim files that were scanned

10     and provided to the defense in discovery, Ms. Marx was able to

11     identify 135 cookie-cutter versions of that exact same thing.

12                 I actually have the exhibit that I plan to use with

13     Ms. Marx which is this exhibit here, Government Exhibit 19A1.

14     And, frankly, the most compelling thing about this exhibit,

15     your Honor, is that you can essentially flip to any page of it

16     and read the same language from Joseph Rutigliano about a

17     Catch-22 and how it required extra leverage regarding this and

18     that.  And every paragraph I think except the last one says I

19     could no longer do this work because of the severe disability

20     that I suffer and -- I mean, the testimony will show that

21     although the people's parts of their body that they claim were

22     ailing them differ, the effect that those ailments, regardless

23     of the part of the body, had on them is identical throughout

24     this entire binder.  And I think that we are going to argue in

25     summation that that similarity shows that Joseph Rutigliano is

D7odles6

1  responsible for all 135 of those and that he prepared those

2  knowing that they were false.  In fact, he prepared the exact

3  same document regardless of what someone's ailments were or

4  regardless of any particular facts regarding those people, and

5  he prepared it and he charged money for it.

6       Then we took that group of people identified in that

7  manner, and Ms. Marx went through and looked up the Section 6

8  check box answers that they gave -- I can give your Honor a

9  copy of this document, this exhibit, too.  Can we put on the

10 screen 19A1?  And just put them into a spreadsheet and tallied

11 them up.

12      So it is taking these 135 people that are identified

13 in the binder by the cookie-cutter language and then it is

14 figuring out how their AA1-D questions about whether it is hard

15 for them to sit, stand, walk, etc. were answered.  So it is

16 highly probative information and we are going to make this

17 argument in summation.

18      But the work that Ms. Marx did is much more

19 straightforward.  She identified the cookie-cutter language,

20 identified those things, and then she looked at their

21 corresponding AA1-D's.  All of those documents are going to be

22 on a disc that we intend to offer in evidence.  The defense has

23 had these compilations and various drafts of them for a long

24 time.  They can perform their own analysis on it.  But it's

25 straightforward and accurate and probative.

D7odles6

 1          THE COURT:  All right.  Thank you.

 2          I'm persuaded that these documents should be admitted.

 3     The defense, of course, are open to vigorous cross-examination

 4     to point out whatever concerns, deficiencies you may see in the

 5     documents.

 6          All right.

 7          MR. WEDDLE:  May I have one moment for a break at the

 8     appropriate time?

 9          THE COURT:  Yes.  Mr. Durkin.

10          MR. DURKIN:  I just want to ask one thing and I don't

11     want to belabor it.

12          How do we get around the factor that you mentioned,

13     that you dumped from that big number?  I don't know how you

14     cross-examine her on that.  It just seems to me the probative

15     value is so limited versus how we could get hurt on just that

16     issue, that all of a sudden in that little time period there is

17     250/300 people .  That's what I'm concerned with.  I just don't

18     know how we do it.

19          THE COURT:  Well, Mr. Durkin, I cannot advise you or

20     give you a theory, but it is an issue that you are perfectly

21     free to cross-examine on.

22          MR. DURKIN:  I just want to make sure the record is

23     clear.  I really think that the limited probative value that we

24     get from that exhibit compared to the potential harm if the

25     jury gets confused by that and concludes that somehow

D7odles6

1    Lesniewski did that many more disabilities, I think that's very

2    detrimental to us.

3              THE COURT:  All right.

4              MR. RYAN:  Your Honor.

5              THE COURT:  Yes.

6              MR. RYAN:  We were able to cross-examine Mr. Parlante

7    and Mr. Maher, and that brought out all of the factors that the

8    jury could consider.  I think one witness said I didn't review

9    it for seven years that Mr. Rutigliano prepared.  Another

10   witness said I was in a hurry, I didn't review it.  Now I'm

11   confronted with 135 applicants that I can't cross-examine and

12   bring out to the jury these fatalities and infirmities and

13   unreliability of the nature of their testimony.  This chart

14   denies us the right of confrontation, and the jury will

15   evaluate the credibility of what each witness has to say.

16             THE COURT:  I don't see it that way, Mr. Ryan.  This

17   is a compilation based on records that you have, and I see it

18   as a straightforward compilation, nothing more.

19             All right.  We already ate up into the 15 minutes, so

20   five more minutes.

21             (Recess)

22             THE COURT:  Before we bring in the jury, let's come

23   back for just one moment to that issue concerning what we call

24   the "apparent" discrepancy.

25             Mr. Weddle, are you going to be doing the direct?

1504

D7odles6

1        MR. WEDDLE:  I am, your Honor.

2        THE COURT:  All right.  In light of the discussion

3   earlier, I think there might be a way of addressing the issue

4   that may not satisfy fully, but I'm asking Mr. Weddle to bring

5   out the question, the issue, the concern in direct and try to

6   get an explanation for why there is that what we call the

7   apparent discrepancy, and then the defendants of course would

8   pursue it on cross.

9        MR. WEDDLE:  Very well, your Honor.

10       Could I just have one minute to explain that to

11  Ms. Marx?

12       THE COURT:  Yes.

13       MR. DURKIN:  Thank you, Judge.

14       MR. DRATEL:  Thank you, your Honor.

15       (Pause)

16       MR. WEDDLE:  Thank you, your Honor.

17       (Continued on next page)

18

19

20

21

22

23

24

25

D7odles6

1           (Jury present)

2           THE LAW CLERK:  All rise.

3           THE COURT:  Welcome back.  Thank you.

4           Swear in the witness.

5    NATASHA MARX,

6        called as a witness by the government,

7        having been duly sworn, testified as follows:

8           THE COURT:  You may be seated.  Speak into the

9    microphone as closely as possible.

10          State your name and spell it for the record.

11          THE WITNESS:  Natasha Marx.  N-a-t-a-s-h-a, last name

12   M-a-r-x.

13          MR. WEDDLE:  Your Honor, may I just have one moment

14   with Mr. Ryan?

15          THE COURT:  Yes.

16          (Pause)

17          MR. WEDDLE:  Thank you, your Honor.

18   DIRECT EXAMINATION

19   BY MR. WEDDLE:

20   Q.  Good afternoon, ma'am.

21   A.  Hello.

22   Q.  How far did you go in school?

23   A.  I got my Master's in Business Administration.

24   Q.  And while you were studying for your Master's in Business

25   Administration, were you also working?

1506

1   A.   Yes.

2   Q.   Where did you work at that time?

3   A.   Sears Holdings Corporation.

4   Q.   After you finished your Master's in Business

5   Administration, did you continue working at Sears?

6   A.   Yes.

7   Q.   What kind of work did you do at Sears?

8   A.   I started off being an auditor and then I became a project

9   manager.

10  Q.   And when you left working at Sears, where did you go to

11  work?

12  A.   To the Office of Inspector General for the Railroad

13  Retirement Board.

14  Q.   And what was your job at the Office of Inspector General

15  for the Railroad Retirement Board?

16  A.   I'm an auditor.

17  Q.   How long have you worked as an auditor for the Office of

18  the Inspector General?

19  A.   It will be five years in October.

20  Q.   And during your time have you become familiar with some of

21  the databases used by the RRB to keep track of people covered

22  by the RRB?

23  A.   Yes.

24  Q.   Actually, let me just back up.

25       Have you ever worked for the RRB itself?

d7odles6                        Marx - direct

1    A.  No.

2    Q.  Just for the Office of Inspector General?

3    A.  Yes.

4    Q.  And among the databases is there one that's called EDMA?

5    A.  Yes.

6    Q.  Can you explain to the jury what EDMA is?

7            THE COURT:  Mr. Weddle, would you explain the

8    difference between the Office of Inspector General and the RRB

9    itself?

10           MR. WEDDLE:  Certainly, your Honor.

11   Q.  Ma'am, could you explain the difference between the RRB

12   itself and the Office of Inspector General for the RRB?

13   A.  The Office of Inspector General oversees some of the

14   functions at the Railroad Retirement Board.  So as an auditor,

15   we look at controlling weaknesses on different processes within

16   the Railroad Retirement Board to help and improve and find

17   weaknesses, so forth.  So we're independent from the Railroad

18   Retirement Board.

19   Q.  So it is an independent agency, basically?

20   A.  I'm not sure if an agency -- it is independent, yes.  It is

21   an independent office.  We report to a different area.

22   Q.  So what is the EDMA, the database that you mentioned?

23   A.  It is the Employment Data Maintenance Account System, and

24   it includes information about all railroad workers that work

25   for any railroad in the country.

d7odles6                          Marx - direct

1   Q.  So if someone works for a railroad, then they would show up

2   in that database, basically?

3   A.  Yes.  And it would show where they worked last, which

4   railroad.

5   Q.  And is there also a database called the Master Benefit

6   File?

7   A.  It's called PREH, and the Master Benefit File is part of

8   that.

9   A.  Yes.

10  Q.  So could you explain what the PREH database is that the RRB

11  uses in the Master Benefit File?

12  A.  Mm-hmm.  It includes information about anyone who is

13  receiving an annuity, whether it be a retirement or a

14  disability annuity, from the Railroad Retirement Board.

15  Q.  So the PREH database for the Master Benefit File, that

16  shows people who are actually getting benefits, money, from the

17  RRB?

18  A.  Yes.

19  Q.  And as an auditor at the Office of Inspector General, do

20  you have the ability to obtain data from both of these

21  databases?

22  A.  Yes.

23  Q.  In connection with this case, have you performed -- I'm

24  sorry.  Let me back up.

25          Is the data that's in these two databases, EDMA and

d7odles6                         Marx – direct

1    PREH, is that made and kept in the ordinary course of business

2    by the RRB?

3    A.  Yes.

4    Q.  And in connection with this case, have you performed

5    certain analyses?

6    A.  Yes.

7    Q.  And what are the main categories of the sources of

8    information for the analyses that you have done?

9    A.  I used the United Healthcare record.  Then I used the EDMA

10   system to see if individuals worked for the Rail Road.  I also

11   used the PREH with the Master Benefit File that we talked

12   about, and then the RRB claim files for individuals.

13   Q.  The RRB claim files, with respect to them, what format have

14   you accessed the RRB claim files?

15   A.  Either the physical folder or in a system called CACI that

16   would hold  them.

17   Q.  And CACI is just like an electronic copy of them?

18   A.  Yes, if they were scanned in in the database.

19   Q.  These scanned documents, did that database also include

20   documents other than claim files?

21   A.  Yes.

22   Q.  But when you looked at a document, could you tell whether

23   or not it is a claim file?

24   A.  Yes.

25   Q.  Have you come to prepare a number of summaries and charts

d7odles6                         Marx - direct

 1    that show the results of some of your analyses?

 2    A.  Yes.

 3    Q.  And if you take a look in the narrow binder that's in front

 4    of you, there should be some discs in the pocket of it.  Do you

 5    see one that is called Government Exhibit 10?

 6    A.  Yes.

 7    Q.  OK.  Do you recognize Government Exhibit 10?

 8    A.  Yes.

 9    Q.  How do you recognize it it?

10    A.  I reviewed it and I've got my initials on it.

11    Q.  OK.  And do you also have the date that you reviewed it?

12    A.  Yes.

13    Q.  And what is on Government Exhibit 10, generally speaking?

14    A.  Generally, it's got all the spreadsheets of all the

15    analysis that I did, including any supporting documentation

16    that went along with my analysis.

17    Q.  So to give an example for supporting documentation, that

18    would be what?

19    A.  Extracts from the claim files.  It could be an AA1-D form,

20    vocational reports --

21    Q.  From claim files?

22    A.  Everything from claim files and other spreadsheets would be

23    in here as well.

24    Q.  Among the analyses that you -- is it fair to say that not

25    every bit of work that you've done related to this case is on

d7odles6                         Marx – direct

1   Government Exhibit 10?

2   A.   Yes.

3   Q.   That's the backup for the charts that we plan to produce

4   today -- I mean, display today, right?

5   A.   Correct.  This is the backup.

6   Q.   Among the analyses that you did, did you do an analysis of

7   the extent to which Long Island Rail Road patients of Peter

8   Lesniewski ended up receiving RRB disability benefits?

9   A.   Yes.

10  Q.   How did you identify the people who were Long Island Rail

11  Road patients of Dr. Lesniewski?

12  A.   I started off with the UHC documents, the spreadsheets that

13  were in the CACI system.  I consolidated them to identify

14  individuals.  Once I identified all the individuals, then I had

15  to compare them to the EDMA system to see if they actually

16  worked for a railroad.  That's how I would identify people.

17  And then there is a separate column that shows which doctor was

18  a provider that billed, so that's how I identified

19  Dr. Lesniewski's patients.

20  Q.   OK.  So let me take that a little bit slower.

21       The UHC records, that stands for what, "UHC"?

22  A.   United Healthcare.

23  Q.   And the United Healthcare records are not something that

24  you typically work with as an auditor at the Office of

25  Inspector General, right?  Those came from an outside source?

1    A.  Yes.

2    Q.  And do you see Government Exhibit 10 -- sorry, 10A in front

3    of you, which should be another disc?

4    A.  Yes.

5    Q.  How do you recognize it?  Do you recognize it and how do

6    you recognize it?

7    A.  Yes, I recognize it.  I have my initials on it.  I reviewed

8    it.

9             MR. WEDDLE:  OK.  And, your Honor, at this point I'd

10   like to offer and read a stipulation, Government Exhibit 1607.

11            THE COURT:  You may.

12            MR. WEDDLE:  So the stipulation says:

13            "It's stipulated and agreed among the parties that, if

14   called as a witness, a representative of United Healthcare

15   Corporation would testify that the Excel spreadsheets contained

16   on Government Exhibit 10A contain records maintained by United

17   Healthcare.  The spreadsheets contain records of regularly

18   conducted activity that were made at or near the time of the

19   occurrence of the matters set forth by or from information

20   transmitted by a person with knowledge of those matters.  They

21   were kept in the ordinary course of the regularly conducted

22   activity of United Healthcare and made by the regularly

23   conducted activity of United Healthcare as a regular practice."

24            And we would offer Government's Exhibit 10A.

25            THE COURT:  Admitted as stipulated.

d7odles6                          Marx - direct

1              (Government's Exhibit 10A received in evidence)

2    BY MR. WEDDLE:

3    Q.  So 10A contains a number of spreadsheets, right?

4    A.  Yes.

5    Q.  And that's United Healthcare stuff?

6    A.  Yes.

7    Q.  And so when you have multiple spreadsheets, what did you do

8    to eliminate duplicates?

9    A.  I took all of -- there were nine separate documents.  I

10   combined them all, and there were some duplicates between them,

11   as I would expect, because they came from various spreadsheets.

12   I went by if it was the same Social Security number, the same

13   name, the same beginning date of service, ending date of

14   service, same procedure codes, same diagnostic code -- there

15   are a bunch of different columns -- so if those were exactly

16   the same throughout the whole row, I considered that a

17   duplicate.

18   Q.  Did you use some kind of computer program to help you

19   analyze whether there were duplicates?

20   A.  Yes.  Microsoft Excel.

21   Q.  And what is Microsoft Excel?

22   A.  It's just a spreadsheet on a computer to be able to quickly

23   identify and do different types of analysis.

24   Q.  And when you identified the duplicate entries from the

25   different sets of United Healthcare claims, what did you do

d7odles6                        Marx - direct

 1    with respect to the duplicates?

 2    A.  I eliminated the duplicates and I worked with the unique

 3    rows.

 4    Q.  So at that point then you had a list of visits to different

 5    doctors, is that right?

 6    A.  Correct.

 7    Q.  And what did you do to figure out whether the visits were

 8    by people who were Long Island Rail Road employees?

 9    A.  I took -- there was a column for the patients' Social

10    Security number from the UHC claims, and if that Social

11    Security number matched to what's in the RRB EDMA database, I

12    would consider that an employee of the railroad.

13    Q.  OK.  How could you tell -- so correct me if I'm wrong.  It

14    sounds like you could tell the Social Security number for the

15    person referenced in United Healthcare's records, right?

16    A.  Yes.

17    Q.  And then you could look that up in the RRB EDMA database,

18    is that right?

19    A.  Correct.

20    Q.  And that told you whether they were what?

21    A.  If they were working for a railroad.

22    Q.  Then could you also tell which railroad they had worked

23    for.

24    A.  Yes.  Also in the EDMA system it will show the last

25    railroad -- well, it shows more than that, but I looked to see

1   the last railroad that they had worked for and I was able to

2   identify the people that worked for Long Island Rail Road,

3   which is a code in --

4   Q.  What is the code for Long Island Rail Road in the EDMA

5   database?

6   A.  1311.

7   Q.  And does the EDMA database also include people who don't

8   work for a railroad but are just dependents of somebody who

9   works for a railroad?

10  A.  No.

11  Q.  And so once you compared the list of people from United

12  Healthcare with people from the EDMA database, what did you

13  then have?

14  A.  So then I identified all people that saw a doctor that

15  worked for a railroad.  So I had that group in an Excel

16  spreadsheet.

17  Q.  And did the United Healthcare records identify which doctor

18  those people had seen?

19  A.  Yes.  So my next step was to separate out -- my analysis

20  focused on -- for Dr. Lesniewski, I pulled out all the specific

21  claims in one spreadsheet and then I took Dr. Ajemian's in a

22  separate spreadsheet.

23  Q.  OK.

24  A.  Based on who the provider was that did the billing.

25  Q.  And these steps that you described where you take a set of

d7odles6                          Marx - direct

 1    data and then you cross-reference it by Social Security number

 2    and then look it up by 1311 code and so on and so forth, did

 3    you save your work?  Did you save those different steps along

 4    the way?

 5    A.  Yes.

 6    Q.  And how did you do that?

 7    A.  In Excel each step that I did I did a separate tab within

 8    the actual worksheet for each of the different summaries that

 9    will be shown forward here.  So each step -- so the first step

10    would show, for example, for Dr. Lesniewski's all the claims

11    that I identified.  The next tab would show all the claims that

12    were identified that were for Rail Road workers.  And then I

13    did each step in a different tab.

14    Q.  OK.  And is your spreadsheet that has all the tabs, is that

15    on Government Exhibit 10, along with other things?

16    A.  Yes.

17    Q.  And it's a large spreadsheet?

18    A.  Yes.

19    Q.  Now, using this process, about how many Long Island Rail

20    Road employees did you identify who had also been to

21    Dr. Lesniewski at some point in the date range you were using,

22    according to the United Healthcare records?

23    A.  427.

24    Q.  Then were you able to identify for those 427 people whether

25    they ended up getting -- at any point, whether they ended up

d7odles6                          Marx - direct

1    getting disability benefits from the RRB?

2    A.  Yes.

3    Q.  I'd ask you now to look in your binder at Government

4    Exhibit 16.

5            Is Government Exhibit 16 a summary of the results of

6    this analysis you have just told us about?

7    A.  Yes.

8            MR. WEDDLE:  The government offers Government Exhibit

9    16.

10           MR. DRATEL:  The same objection as before, your Honor.

11           THE COURT:  Admitted over objection.

12           (Government's Exhibit 16 received in evidence)

13           MR. WEDDLE:  Can we display that, Ms. Larson?

14           Could you just blow up the top -- the title and the

15   table.  That is fine.  Great.

16   Q.  So what's the title of this chart?

17   A.  "Disability rate for Long Island Rail Road employees who

18   saw Lesniewski."

19   Q.  And then there is a parenthetical.  What does that say?

20   A.  Long Island Rail Road employees that were seen between

21   January 2003 and September 2008.

22   Q.  Can you explain that?

23   A.  These were from the UHC records.  The first date of service

24   that was in the UHC records that I reviewed had a date of

25   service between January 1st, 2003 and through September 30th,

d7odles6                           Marx - direct

1    2008.

2    Q.  Was it your understanding that we didn't have United

3    Healthcare records that went back older than 2003?

4              MR. DRATEL:  Objection, your Honor.

5              THE COURT:  Sustained.

6    Q.  What was your understanding -- well, did you have United

7    Healthcare records that went back before 2003?

8    A.  No.  It was my understanding that they actually only went

9    back seven years.  That's all we were able to get.

10   Q.  When you say seven years, 2003 is ten years ago now.  Is it

11   your understanding that the different sets of United Healthcare

12   records that you were working with --

13             MR. DRATEL:  Objection, your Honor.

14             THE COURT:  Sustained.

15   Q.  When is it your understanding that the different sets of

16   United Healthcare records that you were working with were

17   obtained?  In 2013 or earlier?

18   A.  Earlier.  It was around 2010.  I can't tell you the exact

19   time of when.  I don't recall.

20   Q.  And then the date range that you used for your analysis is

21   September 2008, right, as the ending date?

22   A.  Yes.

23   Q.  So this date range talks about which part of the title,

24   when the people got disability or when people saw

25   Dr. Lesniewski, or something else?

d7odles6                           Marx - direct

1    A.  When they saw Dr. Lesniewski.

2    Q.  And is this necessarily when they started seeing

3    Dr. Lesniewski or something else?

4    A.  It depends.  No, it was -- we had only started in

5    January 2003 so I don't know if they had seen him prior to

6    January 2003.  So this includes information that I had from

7    January through September 2008.

8    Q.  OK.  There were also available United Healthcare records

9    that were more recent than September 2008, right?

10   A.  Yes.

11   Q.  But that was excluded from your analysis, is that right?

12   A.  Yes.

13   Q.  So this is -- and then when are we talking about these

14   people obtaining disability?  Is that part of the analysis or

15   is it just at any time?

16   A.  At any time.

17   Q.  OK.  So let's talk about the top table.  It says, "Total

18   LIRR employees seen by Lesniewski," and it says "427," right?

19   A.  Right.

20   Q.  That's what we just talked about, just based on the United

21   Healthcare records and then comparing it to this RRB database,

22   right?

23   A.  Correct.

24   Q.  And then the next line says, "Ineligible for an LIRR

25   pension as of December 31, 2012."  Do you see that?

d7odles6                         Marx – direct

1   A.   Yes.

2   Q.   What does it mean –– what does that mean for your analysis

3   where you say ineligible for a LIRR pension?

4   A.   That they either were not old enough or did not have enough

5   service months with the Rail Road to receive a pension from

6   Long Island.

7   Q.   So what criteria did you use to determine that?

8   A.   To be eligible, they had to be 50 years with 20 years of

9   service or be 60 years old with ten years of service.

10  Q.   OK.  And this is –– it says "LIRR pension."  Is that

11  related to disability at all?

12  A.   No.  This is for the Long Island pension.

13  Q.   OK.  And so the number of people who, according to the

14  criteria you just described, were ineligible as of the date

15  that is on the chart was what?

16  A.   December 31, 2012.

17  Q.   Right.  But how many people fell into that category?

18  A.   17.

19  Q.   And then what did you do with that 17?

20  A.   I took them out of the rest of the analysis that is below.

21  Q.   And so you had a set of how many?

22  A.   I had a total of 410 people that were eligible for the Long

23  Island pension at the end of December 2012.

24  Q.   And then taking that 410 people, what did you do with that?

25  A.   I reviewed them against the PREH database or the Master

1   Benefit File to see if they obtained a disability from the

2   Railroad Retirement Board.

3   Q.  OK.  And when you say you reviewed them against the

4   database, how did you do that?  Did you use the Social Security

5   number lookup?

6            MR. DRATEL:  Objection, your Honor.

7            THE COURT:  Sustained.

8   A.  Yes.  I used the Social Security number --

9   Q.  How did you do that?  How did you compare them to the

10  database?

11  A.  I took the Social Security number from the individuals, the

12  410 that I identified.  I compared it to the Master Benefit

13  File to see if they were listed as receiving an annuity.  Once

14  I identified that they were getting an annuity, I checked to

15  see if they were getting a disability annuity, and that's how I

16  identified the 403 people that's in that second table.

17  Q.  OK.  And when you say you reviewed that 410 people against

18  the database, does that mean that you actually typed in

19  individually each of their Social Security numbers?

20  A.  No.  There's functions in Excel, the software that I used.

21  It was faster and more accurate to do it that way.

22  Q.  So then once you compared them or looked up to see whether

23  those people got disability benefits from the RRB, is that

24  what's shown in the next table?

25  A.  You mean the seven?

1522

d7odles6                              Marx - direct

1   Q.  What's the next table here?  What is the title?

2   A.  Oh, breakdown of eligible Long Island employees.

3   Q.  Then it says dash?

4   A.  Dashes for Dr. Lesniewski.

5   Q.  OK.  And so --

6            THE COURT:  Sustained.

7   Q.  The first line says what, ma'am?

8   A.  "Obtained Railroad Retirement Board disability payments."

9   Q.  And how many of the 410 people who were eligible for a

10  retirement pension from LIRR ended up obtaining the RRB

11  disability payments?

12  A.  403 out of the 410.

13  Q.  And then do you see the next column has a percentage.  What

14  is that?

15  A.  98.3 percent.

16  Q.  How did you figure that?

17  A.  I took the 403 that obtained the RRB disability payments

18  and I divided by the total number that were eligible, the 410.

19  Q.  And then the next line says what?

20  A.  Individuals that did not obtain an RRB disability payment

21  that saw Dr. Lesniewski.

22  Q.  How many people fell into that category?

23  A.  Seven, or 1.7 percent.

24  Q.  And then if we could take a look at the bottom of this

25  exhibit.

1        What is this, Ms. Marx?

2   A.   It's a piechart to summarize the table that we just

3   discussed.  So it's showing that out of the group of the 410,

4   there were 403 Long Island employees that obtained an RRB

5   disability that saw Dr. Lesniewski.

6            MR. DRATEL:  Your Honor, may we be heard?

7            THE COURT:  On this point?

8            MR. DRATEL:  Yes.

9            THE COURT:  Is this something new?

10           MR. DRATEL:  What we discussed before about

11  clarification.

12           THE COURT:  Clarification is to come in the next

13  chart.

14           MR. WEDDLE:  I thought I would do the clarification

15  when I do the next chart, your Honor, which is actually I think

16  lastly on my list.

17           THE COURT:  Is there a way you can get the

18  clarification now, since this is fresh?

19           MR. WEDDLE:  I could.  I could do that, your Honor.

20  I'm worried that I'm not sure that would alleviate other than

21  enhance the comments by defense counsel.  I could take it out

22  of order.

23           THE COURT:  Why don't we take it out of order and see

24  if it addresses some of the concerns.

25           MR. WEDDLE:  OK.

1    MR. DRATEL:  Thank you, your Honor.

2    BY MR. WEDDLE:

3    Q.  Now, ma'am, this analysis that you've just described, this

4    is all just based on -- is this based on a manual review of any

5    file information?

6    A.  No.

7    Q.  What is it based on?

8    A.  This is based on United Healthcare records.  That's where I

9    started off.  And then I compared them to the RRB EDMA system

10   to see if they were Rail Road employees, and then I used the

11   RRB's Master Benefit File or the PREH system to determine if

12   they received a disability payment.

13   Q.  OK.  So this is just comparing basically three databases,

14   right?

15   A.  Yes.

16   Q.  And so this doesn't tell you -- does this tell you, for

17   example, what Dr. Lesniwqaki said or didn't say with respect to

18   any of these patients?

19   A.  No.

20   Q.  And --

21        MR. DRATEL:  I object to that, your Honor.  It is just

22   not sufficient.

23        THE COURT:  All right.  We are getting there.

24   Q.  And, ma'am, did you also do some analyses that involved

25   actually manually looking up material from claim files?

d7odles6                          Marx - direct

1   A.  Yes.

2   Q.  And if we could -- we are going to jump ahead to Government

3   Exhibit -- actually, I will just ask you a couple of questions

4   before we get there.

5           Among your other analyses, did you analyze to what

6   extent Long Island Rail Road people who were on disability for

7   a certain time period went to Doctors Ajemian, Lesniewski and

8   Parisi?

9   A.  Yes.

10  Q.  And if we could take a look at Government Exhibit 12A?

11          Do you have 12A in front of you?

12  A.  Yes.

13  Q.  What is 12A, in general terms?

14  A.  Yeah.  It's an analysis of the Long Island Rail Road

15  employees that are on disability that saw Dr. Lesniewski,

16  Dr. Parisi or Dr. Ajemian, essentially.

17          MR. WEDDLE:  The government offers Government Exhibit

18  12A.

19          MR. RYAN:  The same objection.

20          MR. DRATEL:  Only as previously stated, your Honor.

21          THE COURT:  Admitted over the objections previously

22  stated.

23          (Government's Exhibit  12A received in evidence)

24          MR. WEDDLE:  Could we display 12A?  And let's just

25  blow up the top table.  Yes.  Great.

1  Q.  So the title of this chart or this document is what?

2  A.  83 percent of Long Island employees on disability saw

3  Lesniewski, Parisi or Ajemian.

4  Q.  OK.  Now -- and then there is a date range underneath

5  there, right?

6  A.  Right.  August 2004 through August 2008.

7  Q.  OK.  And so what does that date range relate to?

8  A.  It relates to the date that they received their annuity.

9  Q.  OK.  And could you --

10  A.  Disability annuity.

11  Q.  Can you explain what you mean by the date that they

12  received their annuity?

13  A.  The date that the Railroad Retirement Board began paying

14  them a disability annuity was between August 2004 and

15  August 2008.

16  Q.  OK.  And so for that group of -- so this is a group of

17  people who started getting disability from August 2004 to 2008,

18  right?  Just started getting it then, right?

19  A.  Yes.

20  Q.  And is this group -- does the date range or the number of

21  people in this group, does it depend on when the people on this

22  chart saw one of these doctors?

23  A.  No.

24  Q.  And is this analysis, when it says saw Dr. Lesniewski or

25  Parisi or Ajemian or other people, is this based on -- are the

d7odles6                          Marx – direct

1   identifications there based on United Healthcare records or

2   something else?

3   A.   No.   The Railroad Retirement Board claim files.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D70nles7                          Marx - direct

1   Q.  So can you just explain how you went about conducting this

2   analysis?  Where did you start?

3   A.  I started with the master benefit file or the PREH database

4   that I mentioned that includes all individuals that are

5   receiving some type of annuity from the Railroad Retirement

6   Board, or whether it be a retirement board disability annuity.

7   From there I identified only the people that were receiving a

8   disability annuity with the beginning date August 2004 through

9   August 2008.  So I got my group that way.  Then that total

10  was --

11  Q.  That is a group of how many people?

12  A.  978.

13  Q.  That is all spreadsheet work, right?

14  A.  Yes.

15  Q.  You can tell from the RRB data which railroad the people

16  relate to, right?

17  A.  Correct.

18  Q.  That is how you could tell that these are Long Island Rail

19  Road people?

20  A.  Yes.  These 978 are all Long Island Rail Road, with the

21  1311 as the railroad code.

22  Q.  You are talking about annuities.

23         Can you explain in sort of more basic terms what you

24  are you talking about when you say retirement annuities and

25  disability annuities.

1        What does it mean annuity?

2   A.   Either they will be getting a retirement annuity, meaning

3   they retired maybe early retirement, age 62, or 65 for regular

4   retirement, or they can get a different type of annuity, a

5   disability annuity prior to 65 years of age if they are

6   disabled.

7   Q.   When you are talking about these benefits, you are only

8   talking about RRB benefits, or are you also talking about the

9   thing we mentioned before, which is a Long Island Rail Road

10  retirement pension?

11  A.   No.   Just railroad disability annuity through the Railroad

12  Retirement Board.

13  Q.   So once you had this group of 978, what did you look at in

14  order to identify which doctor they had seen?

15  A.   I used the RRB claim folders.   Either I opened up each one

16  manually to see which doctor was listed on their AA-1d form or

17  it was in the CACI system that had the claims files in there,

18  and I was able to identify which doctor was listed on their

19  AA-1d that would be used to assist with getting the disability.

20  Q.   OK.   You said the AA-1d.   Are you saying that you relied

21  solely on the AA-1d, or did you also look to see if there were

22  other medical records or a narrative or something like that for

23  this chart?

24  A.   Not specifically.   It was more using the AA-1d and which

25  doctor would be listed on the specific line as giving them

1   their restriction.

2   Q.  So the AA-1d is the application form for disability, right?

3   A.  Correct.

4   Q.  The RRB form?

5   A.  Yes.

6   Q.  There are entries there.  I don't know if you remember what

7   question number, but there are entries there where you are

8   supposed to fill in which doctors you have seen?

9   A.  Right.  There's line 17, 19, and then there's line 24.

10  That says the doctor that I think it says gave me the

11  restriction or something similar to that.  So that's the one I

12  used, line 24.

13  Q.  So in order to show up in one of these categories, it had

14  to be someone who is identified in that application -- I'm

15  sorry, the doctor had to be somebody identified in an actual

16  application form as doing what?

17  A.  As giving them some type of a restriction.

18  Q.  So, starting from this group of people who started getting

19  disability benefits in this four-year time period who were Long

20  Island Rail Road employees, if their AA-1d form showed, for

21  example, that Dr. Lesniewski had imposed some kind of

22  restriction on them, where would that person show up on this

23  chart?

24  A.  For that example it would be one of those 134 under

25  Dr. Lesniewski's name.

D70nles7                          Marx - direct

1   Q.  OK.  Out of the 978 people that fell into this category of

2   getting disability in this four-year period who were Long

3   Island Rail Road employees, how many of them were you able to

4   identify as having restrictions imposed by Dr. Lesniewski?

5   A.  13.7 percent, or 134 people.

6   Q.  How about Dr. Parisi?  Did you identify them by the same

7   method?

8   A.  Yes.

9   Q.  How many?

10  A.  239, or 24.4 percent.

11  Q.  Then Dr. Ajemian.  How many did you identify in the same

12  way?

13  A.  444, or 45.4 percent.

14  Q.  So let me just back up now and talk about Government

15  Exhibit 16 for a second.

16         You recall Government Exhibit 16 talked about 410

17  people who had seen Dr. Lesniewski in the time frame 2003 to

18  September 2008, right?  And this chart, 12-A, talks about 134

19  people that you have listed next to the name Lesniewski.

20         is there a discrepancy here, or can you explain what

21  is happening here with these two different charts?

22  A.  Yes.  It is going to be a little bit of a long explanation.

23  I will try to make it as brief as possible.

24         OK.  So for the 410 between January 2003 and September

25  2008, we only had United Healthcare records beginning January.

So there were a lot more people that would fall under seeing

him in 2003, but in reality they may have seen him in 1999,

1997, I don't know.

          But because we had these records, that's why the

number is so much higher, 427, because our starting point was

January 2003 versus going back further.

Q.  Could I just follow up on that.

          So, Government Exhibit 16.  Did you do any checking

when you were working on Government Exhibit 16 to figure out

whether Dr. Lesniewski actually supported the application or

was mentioned in the application or is it simply just matching

up these two databases to see whether they saw Dr. Lesniewski

according to insurance records and whether they ended up

getting disability?

A.  It was just a comparison.  I did not go any further.  I

looked at UHC records and I compared it to the RRB databases.

Q.  For Government Exhibit 12-A, did you go further?

A.  Yes.

Q.  So even if somebody, for example, saw Dr. Lesniewski and

showed up in the billing records for United Healthcare but was

not mentioned in that person's application, the application

didn't say that Lesniewski imposed a restriction, where would

such a person -- do you have in mind what I am talking about?

          Let me try it again.  It got confusing.

          let's say a person saw Dr. Lesniewski for a doctor

1   visit, who was a Long Island Rail Road employee and saw

2   Dr. Lesniewski at some point during the time frame that is

3   listed on the screen in the bottom chart, which is from

4   Government Exhibit 16.

5         Then that person on their application for disability

6   with the RRB, if their application for disability did not say

7   in the line for who is the doctor who imposed a restriction on

8   you, if it did not say Lesniewski, where would that person show

9   up on these two charts, if at all?

10  A.  For 16, they would show up as seeing Dr. Lesniewski if

11  there are UHC claims that he billed for.

12        But for this other one, for the 12-A exhibit, they

13  would not show up in his count of 134 if it fell between August

14  2004 rand August 2008.  It depends which doctor was listed.

15  Q.  So the 427 relates to the number of patients during this

16  time period.  Is that fair to say?

17  A.  Yes.

18  Q.  And the 134 relates to the number --

19        MR. DRATEL:  Objection, your Honor.

20        MR. WEDDLE:  Your Honor, I am trying to do what

21  defense counsel is asking for.

22        THE COURT:  All right.  Proceed.

23  Q.  The 134 relates to people who obtained the disability

24  during this time period where the restriction was listed as

25  being imposed by whom?

D70nles7                                   Marx – direct

1   A.  Dr. Lesniewski for the 134.

2   Q.  So now let's just go and continue talking about Government

3   Exhibit 12-A.

4                MR. WEDDLE:  Let me just blow up the table.

5                Can we just blow up the table.

6   Q.  Government Exhibit 12-A shows a column of percentages in

7   the far right.  You see it says 83.5 percent?

8   A.  Yes.

9   Q.  What does that mean?

10  A.  Out of the total Long Island individuals between that time

11  period, August 2004, August 2008, that began receiving a

12  disability annuity, 83.5 percent of them saw one of the three

13  doctors, either Dr. Lesniewski, Dr. Parisi, or Dr. Ajemian, to

14  assist with obtaining a disability.

15  Q.  So the 83.5 percent is a combination of which lines?

16  A.  The 134, plus the 239, plus the 444.

17  Q.  Then the next line says what?

18  A.  126 other doctors.  And there's 150 individuals that fell

19  under there.

20  Q.  So the 150 means what with respect to 126 other doctors?

21  A.  That there were 150 individuals who obtained their

22  disability, but on their AA-1d a different doctor was listed as

23  imposing their restriction.  There is 126 other doctors, so

24  some of them saw more than one person essentially.

25  Q.  Then there were some where you were unable to find the

D70nles7                          Marx - direct

1   claim folder?

2   A.  11.

3   Q.  And so for those ones you couldn't figure out the answer to

4   who had imposed the restriction, is that right?

5   A.  Correct.

6   Q.  Now let's take a look at the pie chart.

7           The pie chart shows what?

8   A.  It shows what we had just talk about, just laid out in --

9   so the three -- more of the pink shade, those are the three

10  doctors.  Dr. Lesniewski was 13.7 percent of the total group

11  that I reviewed.  Dr. Parisi was 24.4 percent.  Dr. Ajemian was

12  45.4 percent.

13          Then the other doctors that we just mentioned, all

14  other doctors I should say, they are 15.3 percent of the

15  individuals.

16          And then the other small 1.1 percent are the claim

17  files I could not locate, so I could not distinguish which

18  doctor it would be that gave them the restriction.

19  Q.  Then if you would take a look at Government Exhibit 12-B.

20  What is 12-B?

21  A.  It is a breakdown of what we just talked about on the prior

22  exhibit, those 150 individuals that saw the 126 different

23  doctors.  It is a breakdown of how many employees each one of

24  those doctors saw.

25          MR. WEDDLE:  We offer Government Exhibit 12-B.

D70nles7                          Marx - direct

1          MR. RYAN:  Same objection.

2          MR. DRATEL:  As previously stated, your Honor.

3          MR. JACKSON:  Join in that, Judge.

4          THE COURT:  Admitted over objections as so stated.

5          (Government's Exhibit 12-B received in evidence)

6          MR. WEDDLE:  If we can just blow up the whole thing

7    again.

8    Q.  So at the table at the top it shows a breakdown of -- what

9    is this number, 126?  What is that?

10   A.  That is the total of the other doctors other than

11   Dr. Ajemian, Dr. Lesniewski, and Dr. Parisi that were seen by

12   about 150 Long Island employees.

13   Q.  When you say "seen," we are still talking about who imposed

14   the restriction?

15   A.  Who imposed, yes.

16   Q.  This entire pie chart corresponds to that one purple slice

17   of the other pie chart, is that right?

18   A.  Yes.

19   Q.  There's this big part which says 90.5.  What's the 90.5

20   percent?

21   A.  It shows that out of those -- that the majority of the

22   individuals, only one doctor saw one Long Island employee.

23   Q.  And I guess there's this slice here, which is .8 percent,

24   what does that mean?

25   A.  That there was one doctor that saw 12 Long Island

D70nles7                              Marx - direct

1    employees.

2    Q.  That doctor, that is the most of this group of people in

3    terms of how many Long Island Rail Road employees they

4    restricted according to the forms, is that right?

5    A.  Correct.

6          MR. WEDDLE:  Thank you very much.

7    Q.  Now, let's take a look at --

8          MR. WEDDLE:  Actually, let me just orient myself for a

9    second, your Honor.

10   Q.  So we talked about the Government Exhibit 16, which was

11   that United Healthcare comparison, right?

12         Do you remember that?

13   A.  Did you say Exhibit 16?

14   Q.  The first one we talked about, do you remember that?

15         Did you perform a similar analysis with respect to

16   people who saw Dr. Ajemian according to United Healthcare

17   records?

18   A.  Yes.

19   Q.  How did your methods for that analysis relating to

20   Dr. Ajemian patients who ended up going on disability at some

21   point, how did your methods compare to what you described when

22   we were talking about what United Healthcare showed about

23   Dr. Lesniewski records?

24   A.  The method was the same.  It was just a different doctor

25   from United Healthcare records.

D70nles7                          Marx - direct

1    Q.  Is the spreadsheet backup for your work on Government

2    Exhibit 10, the Ajemian analysis too?

3    A.  Yes.

4    Q.  So take a look at Government Exhibit 15.  What is

5    Government Exhibit 15?

6    A.  The disability rate for Long Island Rail Road employees who

7    saw Ajemian.

8              MR. WEDDLE:  The government offers Government Exhibit

9    15.

10             MR. RYAN:  The same objection.

11             MR. DRATEL:  Objection, your Honor, Rule 403 and 401.

12             MR. JACKSON:  Join in that.

13             MR. DRATEL:  In relation to the prior --

14             THE COURT:  I will admit the exhibit over objection.

15             (Government's Exhibit 15 received in evidence)

16             THE COURT:  I will note the limiting instruction that

17   I gave to the jury yesterday with respect to any testimony

18   pertaining to actions or statements attributable to

19   Dr. Ajemian.  They are not to be used by you in any way in

20   relation to the charges brought by the government here against

21   Dr. Lesniewski.

22             MR. WEDDLE:  And just because we have seen the

23   analogous one for Dr. Lesniewski I'm going to skip over parts

24   of this.  Can we just look at the pie chart.

25   Q.  So this is still that date range that's based on the

1   earliest United Healthcare records through September 2008, is

2   that right?

3   A.  Yes.

4   Q.  So for the people who were identified from United

5   Healthcare records, how many of them ended up obtaining RRB

6   disability at some point who saw Dr. Ajemian?

7   A.  858.

8   Q.  How many did not?

9   A.  53.

10  Q.  What does that translate into in terms of percentage?

11  A.  94.2 percent obtained a disability that saw Dr. Ajemian

12  between that time period.

13          MR. WEDDLE:  We are done with that.  Thank you,

14  Ms. Larson.

15  Q.  Your analysis for Government Exhibit 16 of Lesniewski,

16  United Healthcare related stuff and the one that we just looked

17  at for Dr. Ajemian, that was just based on these databases,

18  right?

19  A.  Yes.

20  Q.  Did you also perform a more detailed analysis of a subset

21  of Lesniewski patients who first started seeing Dr. Lesniewski

22  in 2005?

23  A.  Yes.

24  Q.  For this subset of people, what extra materials did you

25  rely on to perform your analysis?

1   A.  The Railroad Retirement Board claim files.

2   Q.  What part of the claim file in particular?

3   A.  The narratives.

4   Q.  Did you also look to see for certain people whether there

5   were also medical records?

6   A.  Yes, I did.

7   Q.  Are any Lesniewski narratives that relate to this group of

8   people, the people who first started seeing Dr. Lesniewski in

9   2005, are those narratives compiled in an electronic file on

10  Government Exhibit 10?

11  A.  Yes.

12  Q.  Let's take a look at Government Exhibit 14.

13          Is this a summary of your work relating to the people

14  who first started seeing Dr. Lesniewski in 2005?

15  A.  Yes.

16          MR. WEDDLE:  The government offers Government Exhibit

17  14.

18          MR. RYAN:  Same objection.

19          MR. DRATEL:  Same, your Honor.

20          THE COURT:  Admitted over objection, same limiting

21  instruction as far as pertinent.

22          (Government's Exhibit 14 received in evidence)

23          MR. WEDDLE:  Let's blow up the top table and the

24  title, please, Ms. Larson.

25  Q.  So the title of this exhibit is "LIRR Employees First Seen

D70nles7                              Marx – direct

1   By Lesniewski in 2005."

2           Do you see that?

3   A.  Yes.

4   Q.  And how did you figure out who that group of people were,

5   the people who first saw Dr. Lesniewski in 2005 who were Long

6   Island Rail Road employees?

7   A.  I started off with the United Healthcare records.  There is

8   a column for the minimum service -- or the first -- their date

9   of service.  So I took each individual and I found their

10  minimum date of service, meaning the first time that they saw

11  Dr. Lesniewski.  And if they fell within the year 2005, that's

12  how I could select those individuals.

13          From there I used the EDMA system, the railroad's

14  database, the Railroad Retirement Board's database to identify

15  if they were a railroad worker.

16  Q.  How did you identify if they were a Long Island Rail Road?

17  A.  There was also -- there is a 1311 code in the EDMA system,

18  so I would take the Social Security number and match it up.

19  Q.  Using that process, how many people did you identify as

20  eligible for Long Island Rail Road retirement pension who first

21  went to Dr. Dr. Lesniewski in 2005?

22  A.  43.

23  Q.  That's listed right there on the table that is on the

24  screen, right?

25  A.  Yes.

D70nles7                              Marx - direct

1   Q.  There's a footnote, right?

2   A.  Yes.

3          MR. WEDDLE:  Can we just look at the footnote quickly,

4   Ms. Larson.

5   Q.  The footnote says what?

6   A.  A total of 45 Long Island Rail Road employees first saw

7   Lesniewski in 2005.  Two of these were not eligible for a Long

8   Island Rail Road retirement.

9   Q.  And so this eligibility, is that the same criteria you were

10  talking about earlier, 50 years old and 20 years of service?

11  A.  Yes.

12  Q.  Or what?

13  A.  Or 60 years old with ten years of service.

14  Q.  So leaving those two ineligible people aside, you had 43

15  people, right?

16  A.  Yes.

17  Q.  Then for those 43 people you looked at what?

18  A.  So then I looked at the PREH system to see if they were

19  receiving a disability.  I also took each individual's claim

20  file to see if there was a Dr. Lesniewski, a narrative in there

21  from him or other medical records from him.

22  Q.  So how many people of this 43 did not end up getting

23  disability benefits?

24  A.  One.

25  Q.  And that's listed right on the next line of your chart?

D70nles7                           Marx - direct

1    A.  Yes.

2    Q.  And then the next line says what?

3    A.  Obtained disability with Lesniewski records or Ajemian

4    narrative.

5    Q.  And what does that line mean?

6    A.  It means that there were three people that either got their

7    disability -- there were medical records from Dr. Lesniewski or

8    there was a Ajemian narrative recommending the individual for

9    disability.

10   Q.  Let me break that down into two pieces.  So if it is

11   somebody who has Dr. Lesniewski medical records in their RRB

12   claim file, they would end up in this line?

13   A.  Yes.

14   Q.  How many people fell into that category?

15   A.  One out of the three.

16   Q.  And then if they separately, if they had a narrative from

17   Dr. Ajemian, they would end up where?

18   A.  In the same group of three, two out of the three, the other

19   two.

20   Q.  Let's take a look at Government Exhibit 14-C.  Is 14-C a

21   set of selected documents from a claim file?

22   A.  Yes.

23   Q.  Relating to whom?

24   A.  The individual's name is Frank V. Viola.

25           MR. WEDDLE:  The government offers Government Exhibit

```
 1   14-C.
 2              MR. RYAN:  The same objection.
 3              MR. DRATEL:  Yes, your Honor.  Same objection.
 4              THE COURT:  All right.
 5              Admitted over objections as noted.
 6              (Government's Exhibit 14-C received in evidence)
 7   Q.  So the name frank Viola is on the first page, right?
 8   A.  Correct.
 9   Q.  Let's take a look at page 3.  Sorry, page 4.  I'm sorry.
10              MR. WEDDLE:  Can you blow up actually the top
11   two-thirds, if you can.
12   Q.  So here you have on question 19, do you see there is an
13   entry at the top with the name of a physician?  Do you see
14   that?
15   A.  Yes.
16   Q.  What does it say?
17   A.  Dr. Lesniewski.
18   Q.  Then what does it show in terms of the date range for
19   service for Dr. Lesniewski?
20   A.  March 30, 2005 through September 3, 2008.
21   Q.  Are you aware that there was some media reports relating to
22   fraud on the Long Island Rail Road in September 2008?
23   A.  Yes.
24   Q.  Then there is another doctor listed, right?
25   A.  Yes.
```

D70nles7                         Marx – direct

1    Q.  When did this person, according to this form, start seeing

2    the other doctor?

3    A.  December 29, 2008.

4    Q.  Then let's take a look at the last page of this exhibit.

5    Actually, can I just go back to page 5.

6            MR. WEDDLE:  Can we blow up this question here, which

7    is question 24.

8    Q.  This says, "Enter the name of the medical doctor who

9    imposed the restriction."

10           Do you see that?

11   A.  Yes.

12   Q.  It says who?

13   A.  Dr. Chernoff.

14   Q.  So would this person end up on your chart -- actually

15   withdrawn.  When would this person's beginning date for when

16   they got disability be?  Before or after August 2008?

17   A.  For this person, I don't know their exact beginning date

18   for this annuity.

19   Q.  OK.

20   A.  But they signed their form October --

21           MR. DRATEL:  Objection, your Honor.  Nonresponsive.

22   She answered the question.

23   Q.  When did this person sign this form?

24   A.  October 28, 2009.

25   Q.  So this person would not be included in that Government

D70nles7                              Marx - direct

1    Exhibit 12-A that we looked at before, is that right, where you

2    have the 134 people whose restrictions were imposed by

3    Dr. Lesniewski, right?

4    A.  Yes.

5    Q.  Not only is that because Dr. Lesniewski --

6              MR. DRATEL:  Objection, your Honor.

7    Q.  -- did not impose the restriction --

8              THE COURT:  Sustained.

9    Q.  Is that person within or outside the date range for that

10   other exhibit?

11   A.  Outside the range.

12   Q.  Let's take a look at the last page of this exhibit.

13             MR. WEDDLE:  Can you just blow up I guess the top

14   half.

15   Q.  Do you see that this is some records on the letterhead of

16   Peter Lesniewski.  Do you see that?

17   A.  Yes.

18   Q.  Is this what you are talking about when you say that there

19   are records in the file from Dr. Lesniewski?

20   A.  Yes.

21   Q.  Now, let's go back to your summary chart which is

22   Government Exhibit -- we are on 14?

23   A.  14.

24   Q.  14.  So Mr. Viola is part this group of three, is that

25   right?

D70nles7                          Marx - direct

1    A.   Yes.

2    Q.   The other two, you said that they had an Ajemian narrative?

3    A.   Correct.

4    Q.   Is that a typo, Ajemian?

5    A.   No.

6    Q.   What happened with those people?

7    A.   Those are people that, even though they had a first date of

8    service with Dr. Lesniewski in 2005, when I reviewed their

9    claim folders in detail, I saw that it was Dr. Ajemian that was

10   listed throughout their claim file as well as he recommended

11   them for disability with a narrative.

12   Q.   So let's take a look at Government Exhibits 14-A and 14-B.

13   Are those both excerpts from two different RRB claim files?

14   A.   Yes.

15            MR. WEDDLE:   The government offers Government Exhibits

16   14-A and 14-B.

17            MR. RYAN:   Same objection.

18            MR. JACKSON:   Yes, Judge.

19            MR. DRATEL:   Same objection.

20            THE COURT:   Admitted over objection.

21            (Government's Exhibit 14-A and 14-B received in

22   evidence)

23   Q.   Let a take a look at 14-A on the first page.

24            MR. WEDDLE:   Can you blow up the top half.

25   Q.   This first page of the exhibit says, "I hereby authorize

1    the Railroad Retirement Board to release any requested

2    information about me to Marie Baran.

3              Do you see that?

4    A.  Yes.

5    Q.  What is the date that this form is signed?

6    A.  April 29, 2008.

7    Q.  Can we just look at this whole piece of paper now.   You

8    may want to look at the form in front of you, Ms. Marx, but how

9    long elapsed between when this form was signed relating to

10   Marie Baran to when it was received by the RRB Westbury

11   district office?

12   A.  About three months.

13   Q.  If we could take a look at page 3 of this exhibit.  I'm

14   sorry.

15              MR. WEDDLE:  If you could blow up the question 11

16   answer.

17   Q.  So this is the claim file related to a person named what?

18   A.  Ann LiPuma.

19   Q.  I misspoke.  This is the application, not the claim file.

20   A.  OK.

21   Q.  So, according to the application, the day that this person

22   could last work is what?

23   A.  July 29, 2008.

24   Q.  If we could take a look at page 6 of this exhibit.

25              MR. WEDDLE:  I want to see Section 6.  The next page.

D70nles7                              Marx - direct

1   Q.  Do you see that this has a number of things where it says

2   that they're hard and then there's some similar explanations in

3   different lines?  Do you see that?

4   A.  Yes.

5   Q.  For example, that the first three say extended periods

6   cause severe pain?  Do you see that?

7   A.  Yes.

8   Q.  Then if we take a look at the next page of this exhibit,

9   the answer to question 40 says, "I sleep very poorly because of

10  neck pain and lower back pain.  I get up about 7 a.m., I have

11  breakfast, shower, and dress.  I do some light exercise to

12  stretch as prescribed by my doctor.  Sometimes I do laundry or

13  light housework that doesn't require I bend or reach or lift.

14  I rest in the afternoon and take a short nap.  I have lunch at

15  home alone and read books or magazines.  Evenings I have dinner

16  at home with my spouse and watch TV.  Occasionally I visit with

17  friends or family."

18          Do you see that?

19  A.  Yes.

20  Q.  And then if we could jump ahead to page 20 of this

21  document.

22          MR. WEDDLE:  Blow up the top half.

23  Q.  Is this the narrative of Dr. Ajemian relating to this

24  person?

25  A.  Yes.

D70nles7                          Marx - direct

 1              MR. WEDDLE:  Can we look at the last page of the

 2     document.  Blow up the part where it says recommendation and

 3     the signature.  Sorry, at the bottom.

 4     Q.  Here at the end it says, "I highly endorse this" -- I'm

 5     sorry.  It says, "Upon review of all laboratory data, I

 6     recommend that she consider disability retirement.  She said

 7     she would go forward with this.  I highly endorse this as well

 8     for the patient on this date of July 31, 2008 and to be

 9     effective on August 1, 2008."

10              Do you see that?

11     A.  Yes.

12     Q.  Let's take a look now at Government Exhibit 14-B as in boy.

13              MR. WEDDLE:  Can we display the first page,

14     Ms. Larson.

15     Q.  So this exhibit also starts with one of these authorization

16     forms, right?

17     A.  Yes.

18     Q.  And this one relates to someone named Bruce Albano, and

19     it's authorizing Marie Baran, is that right?

20     A.  Correct.

21     Q.  If you could just jump ahead to Section 6 of the AA-1d.  So

22     that's going to be page 7 I think of the exhibit.

23              MR. WEDDLE:  Can you blow that up.

24     Q.  How does this section 6 compare to the Section 6 we just

25     looked at for Ms. LiPuma?

1   A.  They have the same information, the same comments.

2   Q.  Are they identical?

3   A.  They are identical.  The only difference is the top three

4   at the end there's not a period on the first individual LiPuma.

5   But the second one has the periods at the end after extended

6   periods cause severe pain.  That's with the period.

7           MR. WEDDLE:  Let's take a look at the next page and

8   blow up question 40.

9   Q.  Can you read the answer to question 40, please.

10  A.  "I have difficulty sleeping.  I take medication to help me

11  sleep.  I sleep very poorly because of neck pain and lower back

12  pain.  I get up about 7 a.m.  I have breakfast, shower and

13  dress.  I do some light exercise to stretch as prescribed by my

14  doctor.  Sometimes I do laundry or light housework that doesn't

15  require I bend or reach or lift.  I rest in the afternoon and

16  take a short nap.  I have lunch at home alone and read books or

17  magazines.  Evenings I have dinner at home and watch TV.

18  Occasionally I visit with friends or family."

19  Q.  Then if we take a look at the last page of this exhibit.

20          MR. WEDDLE:  Just blow up the very last recommendation

21  and the signature.

22  Q.  Here it says, "I highly recommend Mr. Bruce C. Albano for

23  occupational disability retirement from the Long Island Rail

24  Road effective on this date of August 1, 2008."

25          Do you see it appears to be signed by Peter Ajemian?

D70nles7                              Marx - direct

1   A.  Yes.

2             MR. WEDDLE:  Thank you, Ms. Larson.

3             We are done with that.

4   Q.  Where did these two people, Mr. Albano and Mr.LiPuma, end

5   up on your chart which we have been talking about, Government

6   Exhibit 14?

7   A.  They were two of the three people under that section called

8   "Obtained Disability with Lesniewski Records or Ajemian

9   Narrative."  They were the two out of the three.

10  Q.  So it is this number three?  They are two of the three that

11  I am pointing out with the laser?

12  A.  Correct.

13  Q.  The last line of this table says what?

14  A.  "Obtained Disability with Lesniewski records and

15  Narrative."

16  Q.  How many people out of the people who first started seeing

17  Dr. Lesniewski -- in 2005 is it?

18  A.  Yes.  39.

19  Q.  And that translates into what percentage?

20  A.  90.7 percent.

21  Q.  Let's look at the pie chart on this exhibit.  This is the

22  same information expressed graphically, is that right?

23  A.  Correct.

24  Q.  Then let's take a look at the table at the bottom of this

25  exhibit.  So it says, "Days to Declaration of Disability."

1        What is this table showing?

2   A.   It shows the number of people, when Dr. Lesniewski declared

3   them disabled from their first visit to the date that he signed

4   the narrative saying that they are disabled.

5   Q.   How did you figure out the date of the first visit?

6   A.   From the UHC claim files was one way.  But then I also

7   matched it up in Dr. Lesniewski's narrative.  It would say --

8   the first or second line of it would say, "I saw this person

9   for the first time," and it would list the date.  So that would

10  be the date I used as the first visit.

11  Q.   So how many people were declared disabled by Dr. Lesniewski

12  in the narrative as of the first visit with him?

13  A.   One.

14  Q.   How many were declared disabled within 180 days of the

15  first visit?

16  A.   The total of 8.

17  Q.   So that includes the one as well?

18  A.   Yes.

19  Q.   And that's about half a year?

20  A.   Correct.

21  Q.   How many were declared disabled within 360 days?

22  A.   A total of 27.

23  Q.   That's about a year?

24  A.   Yes.

25  Q.   How many were declared disabled within 540 days, or about a

D70nles7                          Marx - direct

1    year and a half of first seeing Dr. Lesniewski?

2    A.  All 39.

3            MR. WEDDLE:  Thank you, Ms. Larson.  We are done with

4    that.

5    Q.  Did you perform a similar analysis of Long Island Rail Road

6    patients of Dr. Ajemian who first saw Dr. Ajemian in 2005?

7    A.  Yes.

8    Q.  Take a look at Government Exhibit 13.

9            Let me back up.  How did your methods compare when you

10   were working on this set of Dr. Ajemian people versus the set

11   of Dr. Lesniewski?

12   A.  The method was the same, the only difference was I used,

13   from the United Healthcare records it was the Dr. Ajemian's

14   name as the provider instead of Dr. Lesniewski.

15   Q.  For this subset of 2005 people who first saw these doctors

16   in 2005, for this subset you were also looking at the claim

17   files?

18   A.  Correct.

19           MR. WEDDLE:  The government offers Government Exhibit

20   13.

21           MR. RYAN:  Same objection.

22           MR. DRATEL:  Same objections, your Honor as priestly

23   stated.

24           THE COURT:  Admitted over objection as noted.  The

25   same limiting instruction is applicable.

1          MR. DRATEL:  Thank you, your Honor.

2          (Government's Exhibit 13 received in evidence)

3          MR. WEDDLE:  So let's just blow up the top table,

4    please, and the title.

5    Q.  So the top line says, "Total Eligible for Long Island Rail

6    Road Retirement," and it has 122, right?

7    A.  Yes.

8    Q.  Of the people who first saw Dr. Ajemian in 2005, how many

9    were not eligible for Long Island Rail Road retirement pension?

10   A.  Seven.

11   Q.  As of what date do you recall when they were still not

12   eligible?

13   A.  December 31, 2012.

14   Q.  So of the 122, what did you find when you looked them up?

15   A.  Shall I go down the list?

16   Q.  Go ahead.

17   A.  OK.  That there were five that were eligible for Long

18   Island retirement, but they were not on a disability.  So that

19   was 4.1 percent of the group.

20          There were an additional five that obtained a

21   disability with Ajemian records.

22          There were four that obtained disability without

23   Ajemian records.

24          There are 108 out of the 122 that obtained a

25   disability with Ajemian records and a narrative recommending

D70nles7                           Marx – direct

1   them for a disability.

2   Q.  Is there a compilation of the narratives themselves from

3   Dr. Ajemian that is on your disk, which is Government Exhibit

4   10?

5   A.  Yes.

6           MR. WEDDLE:  Ms. Larson, could we just look at the

7   table at the bottom of this.  I'm going to skip displaying the

8   pie chart.

9   Q.  What is this table here?

10  A.  This is showing the days to declaration of disability.  So

11  again it's starting from the first time that Dr. Ajemian saw

12  them based on what he said in his narrative to the date that he

13  said that they were disabled in the narrative with a date.

14  Q.  This is just relating to the 108 people who were on

15  disability based on Ajemian records and narrative, is that

16  right?

17  A.  Correct.

18  Q.  Let's move on to -- oh.  For the people who were listed on

19  Government Exhibit 13 and Government Exhibit 14, these two

20  subsets that relate to people who first saw one of these two

21  doctors in 2005, to what extent were they working when they

22  first went to see either Dr. Lesniewski or Dr. Ajemian?

23  A.  For Dr. Ajemian there were seven that were not working, and

24  there were two that were not working for Dr. Lesniewski.

25  Everybody else was working.

1    Q.  At the first visit?

2    A.  At the first visit.

3    Q.  Now let's take a look at Government Exhibit 100-C, which is

4    in evidence.  This is the vocational report related to Joseph

5    Rutigliano, right?

6    A.  Yes.

7            MR. WEDDLE:  Could we move to the vocational report

8    supplement part of this.

9            I believe it's the seventh page.  Back.

10   Q.  So this page shows, the heading says "Joseph Rutigliano

11   Vocational Report Supplement."  Do you see that?

12   A.  Yes.

13   Q.  Then there is a footer there at the bottom that says U.S.

14   Railroad Retirement Board.  Do you see that?

15   A.  Yes.

16   Q.  Then let's go to the next page of this.  Actually, the next

17   page I'm sorry.  It says detailed job description.

18           MR. WEDDLE:  Could you just blow up the first entry

19   there.

20   Q.  Do you see that this paragraph ends with a sentence that

21   says, "I was no longer able to do this work because of the

22   severe disabilities I suffer"?

23   A.  Yes.

24   Q.  Have you had an opportunity to review this particular

25   document before?

D70nles7                           Marx - direct

1    A.  Yes.

2    Q.  To what extent does this same exact sentence appear

3    elsewhere in the same exact vocational report supplement, the

4    one for Joseph Rutigliano?

5    A.  In all of the paragraphs except for the last one, so I

6    think it's 11 out of 12.

7    Q.  Were you able to find other examples of vocational report

8    supplements that used this same sentence repeatedly in the same

9    vocational report supplement?

10   A.  Yes.

11   Q.  How were you able to do that?

12   A.  Through the CACI system that I had mentioned before.  That

13   has all the RRB claim files that were scanned in relating to

14   Long Island Rail Road, and I was able to search by certain

15   phrases, such as this type of phrase, and claim files would pop

16   up.  I would open them up and review them to see if the

17   information matched.

18   Q.  You could also just look up claim files and see if a

19   particular claim file had the language, is that right?

20   A.  Right, yes, the physical files as well.

21   Q.  About how many files did you identify that seemed to follow

22   this same pattern as Rutigliano's own vocational report

23   supplement?

24   A.  An additional 134.

25   Q.  Did you put those people into a spreadsheet which is

D70nles7                           Marx - direct

1    contained on Government Exhibit 10?

2    A.  Yes.

3    Q.  Did you also compile copies of vocational report

4    supplements for those 134 people and put that compilation on

5    Government Exhibit 10?

6    A.  Yes.

7             MR. WEDDLE:  I think I misspoke.

8    Q.  Well, do you recall whether that compilation is on

9    Government Exhibit 10 or as a separate exhibit?

10   A.  It is in Government Exhibit 10.

11   Q.  The compilation of vocational report supplements?

12   A.  Oh, the supplements.  I thought you meant the A-1 -- it's

13   in a binder.  We didn't have it on a CD.  Sorry.

14   Q.  Do you see a binder in front of you called Government

15   Exhibit 19-A-1.  It is a thick binder.

16   A.  Yes.  Oh, yes.

17   Q.  What is Government Exhibit 19-A-1?

18   A.  These have the other 134 vocational report supplements that

19   seemed to match the vocational report supplement from Joseph

20   Rutigliano's claim file.

21   Q.  Is this entire claim files or something else?

22   A.  No, the vocational report supplements from the claim files.

23   Q.  Are the materials in this binder double sided or single

24   sided?

25   A.  Double sided.

1    MR. WEDDLE:  I offer Government Exhibit 19-A-1.

2    MR. RYAN:  Objection.

3    THE COURT:  Admitted over objection as noted.

4    (Government's Exhibit 19-A-1 received in evidence)

5   Q.  Can we take a look at page 446 of this exhibit.

6    MR. WEDDLE:  Could we just blow up the top half.

7   Q.  This is the vocational report supplement that relates to

8   whom?

9   A.  James Maher.

10  Q.  Can we jump ahead to page 449 of this exhibit.

11   MR. WEDDLE:  Is it possible to blow up in the top half

12  of the screen, the answer to item No. 4?  Can we find that same

13  answer in Joseph Rutigliano's own vocational report supplement,

14  which is Government Exhibit 100 -- it's within 100-C.  I

15  believe it is page 7.

16  Q.  So the Joseph Rutigliano one is on the bottom, is that

17  right?  The Joseph Rutigliano one is on the bottom.  The one

18  for James Maher says, "I had to stand in front of and in a

19  repetitious bending motion or turning motion manually turn

20  crank or pump levers or wheels to apply and release railroad

21  car handbrakes, which required great exertion" etc.

22   It says, "My back gave way underneath me as I tried to

23  do this work.  My neck became numb."

24   Do you see that, ma'am?

25  A.  Yes.

1    Q.   Then, if you look down at the one for Joseph Rutigliano, do

2    you see that there is a sentence, two sentences that I have

3    pointed out with my laser.  It says, "My right knee gave way

4    underneath me as I tried to do this.  My right hand became numb

5    and useless."

6             Do you see that?

7    A.   Yes.

8    Q.   The next sentence says, "The work itself" with a space

9    there "caused more significant and longer lasting flareups of

10   my disabilities."

11            Do you see that?

12   A.   Yes.

13   Q.   Do you see also in James Maher it says, "The work itself

14   caused more significant and longer lasting flareups of my

15   disabilities."

16            Do you see that?

17   A.   Yes.

18   Q.   Then the last sentence of each of these says, "I was no

19   longer able to do this work because of the severe disabilities

20   I suffer."

21   A.   Yes.

22   Q.   Let's take a look at another one.  Can you turn to page 780

23   of Government Exhibit 19-A-1.  You may just want to look at the

24   screen, ma'am?

25   A.   Yes.

1   Q.  This vocational report supplement relates to whom?

2   A.  Christopher Parlante.

3   Q.  If we could take a look at question 4, which is page 783.

4           Do you see that for Mr. Parlante it says, "My back

5   gave way underneath me as I tried to do this work.  My right

6   hand became numb.  The work itself caused more significant and

7   longer lasting flareups of my disabilities.  I would say that I

8   did this at least 10 times a shift.  I was no longer able to do

9   this work because of the severe disabilities I suffer."

10          Do you see that?

11  A.  Yes.

12  Q.  Let's pick another one.  Can you turn to page 211.  I don't

13  know if you have Post-its in yours, ma'am?

14  A.  I do.

15  Q.  Probably the first Post-it.

16  A.  OK.

17  Q.  So this one relates to someone named Thomas Cornilow,

18  right?

19  A.  Correct.

20  Q.  If we could take a look at question 4 for this one, which

21  is on page 214.

22          Do you see that for Mr. Cornilow it says, "My back

23  gave way underneath me as I tried to do this work.  My hands

24  became numb.  The work itself caused more significant and

25  longer lasting flareups of my disabilities.  The back pain and

 1   neck pain increased to the point where I could not do any more

 2   of this work and had to get somebody to do it for me.  I would

 3   say that I did this at least ten times a shift.  Other

 4   employees covered for me when I could not do my work.  I was no

 5   longer able to do this work because of the severe disabilities

 6   I suffer."

 7              Do you see that?

 8   A.  Yes.

 9   Q.  Let's try another one.

10              THE COURT:  Mr. Weddle.

11              MR. WEDDLE:  I am going skip the next one.

12              THE COURT:  We have about 15 minutes left, and it's

13   getting cumulative at this point.

14              MR. WEDDLE:  I'm done with that comparison.

15   Q.  Now, ma'am, have you also seen a compilation of just the

16   question 5 responses for Government Exhibit 19-A-1?  Have you

17   seen that?

18   A.  Yes.

19   Q.  I don't know if you have it in your binder a document

20   marked 19-A-1-A.  Do you see that?  I can hand it to you.

21              Is 19-A-1-A just the question 5 response for the

22   vocational report supplements that are contained in Government

23   Exhibit 19-A-1.

24   A.  Yes.

25              MR. WEDDLE:  The government offers 19-A-1-A.

```
 1                MR. RYAN:  Objection.

 2                THE COURT:  Admitted over objection as previously

 3     noted.

 4                (Government's Exhibit 19-A-1-A received in evidence)

 5                MR. WEDDLE:  Can we display that, please.  Maybe we

 6     can just blow up the top half or the top two.

 7     Q.  So is it fair to say that these are not retyped manually,

 8     ma'am?

 9     A.  Right.  They are screen shots, pictures.

10     Q.  Do you see how I guess at about halfway through each of

11     these two people's responses it says, "This was a catch-22"?

12     A.  Yes.

13     Q.  And then the next one says, "This was a catch-22"?

14     A.  Yes.

15     Q.  And the first one relates to someone names Chester Luhrs,

16     right?

17     A.  Right.

18     Q.  And the second one relates to someone named John Horvath,

19     right?

20     A.  Right.

21     Q.  Do you see the last sentence of this says, "I was no longer

22     able to do this work because of the severe disabilities I

23     suffer."

24                Do you see that?

25     A.  Yes.
```

D70nles7                         Marx - direct

1   Q.  To what extent did each of the question 5 responses end in

2   this way?

3   A.  All of them.

4   Q.  To what extent does each of them talk about something being

5   a catch-22?

6   A.  All of them.

7   Q.  And if we take a look at -- actually, about how many pages

8   is this document, just the question 5 responses?

9   A.  I don't know how many pages.  It's got the 134 individuals.

10  So it's 134, maybe 20 pages double sided.

11  Q.  Is it double sided, the one you have?

12  A.  Yes.

13  Q.  Thank you.  I think we are done with that.  What kind of

14  order are the people in in Government Exhibit 19-A-1?

15  A.  In chronological order from the date their AA-1d was

16  signed.

17  Q.  In addition to some of the signature language that we have

18  talked about, are there other similarities in formatting or

19  otherwise?

20  A.  Yes.

21  Q.  Are these documents formatted according to some kind of

22  required format that is required by the RRB?

23  A.  No.

24  Q.  There are some variations in some of these, is that right?

25          Are there some variations among the language in this

1    binder of 19-A-1?

2    A.  There's some variation in terms of the type of ailment,

3    whether it would be neck or back pain, but in terms of the

4    effect it of what it causes on their job, it's very similar for

5    all of them.

6    Q.  Did you analyze or look up what the occupations were of the

7    people in this binder these 134 people?

8    A.  Yes.

9    Q.  What were their occupations when they worked on the Long

10   Island Rail Road?

11   A.  They were all either a railroad conductor or a locomotive

12   engineer.

13   Q.  Now, using this set of people, these 134 people, did you

14   look up how their AA-1ds were filled out in terms of their

15   daily activities?

16   A.  Yes.

17   Q.  What did you do with the information once you looked it up?

18   A.  I compiled the information in a spreadsheet.

19   Q.  Is the underlying spreadsheet contained on Government

20   Exhibit 10?

21   A.  Yes.

22   Q.  Are the AA-1ds, the application forms themselves, contained

23   in Government Exhibit 10?

24   A.  Yes.

25   Q.  Where did the AA-1ds come from?

D70nles7                              Marx - direct

1    A.   The RRB claim files.

2    Q.   If we could take a look at Government Exhibit 19-A.  Sorry.

3    If Ms. Marx could take a look at Government Exhibit 19-A.

4              Is this a summary of how those questions were filled

5    out on the AA-1ds for this group of people?

6    A.   Yes.

7    Q.   Does this also include how Mr. Rutigliano's own AA-1d was

8    filled out?

9    A.   Yes, it includes his as well.

10             MR. WEDDLE:   The government offers Government Exhibit

11   19-A.

12             MR. RYAN:   Objection.

13             THE COURT:   Admitted over objection as noted.

14             (Government's Exhibit 19-A received in evidence)

15             MR. WEDDLE:   If you could put that on the screen.

16   Q.   The title of this chart is, "Daily Activities for

17   Rutigliano Applications."

18             Do you see that?

19   A.   Yes.

20   Q.   Then it says 135 people, right?

21   A.   Yes.

22   Q.   So who are these 135 people and how were they identified?

23   A.   These were the individuals that took Joseph Rutigliano's

24   vocational report supplement, and I looked up people that had

25   similar language in the CACI system for their RRB claim file.

D70nles7                         Marx - direct

1   Q.  So this is the same group of people that we have just been

2   talking about in Government Exhibit 19-A-1?

3   A.  Yes.

4   Q.  And the legend at the bottom says "Hard/Not At All."

5       What does that mean?

6   A.  The question on the AA-1d asks about daily activities, if

7   it's easy or hard or not at all in terms of what you are able

8   to do.  So this includes where people would put either hard or

9   not at all for their various actives at the bottom.

10  Q.  If they put either hard or not at all, then they would show

11  up in one of these bars?

12  A.  Yes.

13  Q.  And so what percentage of people of this group of people

14  said that sitting was either hard or they couldn't do it at

15  all?

16  A.  It's 99.3 percent.  So that's 134 out of the 135 people I

17  reviewed.

18  Q.  And the same thing for standing?

19  A.  Yes.

20  Q.  And walking?

21  A.  Yes.

22  Q.  And for eating, about how many said or what's the

23  percentage of people who said hard or not at all for eating?

24  A.  52.6.

25  Q.  How many people of this group said that bathing was hard or

1    they couldn't do it at all?

2    A.  All, 135.

3    Q.  How many people said that driving a motor vehicle was hard

4    or they couldn't do it at all?

5    A.  100 percent, all.

6    Q.  How many people said using public transportation was hard

7    or they couldn't do it at all?

8    A.  All.

9              THE COURT:  Mr. Weddle, would you summarize the

10   balance.

11             MR. WEDDLE:  I think I'm done reading them.  The

12   document is in evidence.  Everyone can look at it.

13             THE COURT:  All right.

14             MR. WEDDLE:  Thank you, your Honor.

15             I was about to move to my next topic, your Honor.  I

16   can start, or I wasn't sure.

17             THE COURT:  How much more do you have to complete this

18   witness?

19             MR. WEDDLE:  Complete this witness?

20             THE COURT:  Yes.

21             MR. WEDDLE:  Oh, how much?

22             THE COURT:  Let me cut to the chase.  Can you do it in

23   five minutes?

24             MR. WEDDLE:  Three more summaries.  I would say 15, 20

25   minutes.

1          THE COURT:  Let's adjourn at this point then.

2          All right.  We will adjourn until tomorrow at 9 a.m.

3     As you go home today, do not discuss the case among yourselves

4     or with anyone else on the outside or have any contact with

5     anyone involved in the case or receive any information of any

6     kind.  If these things occur, you are directed to inform the

7     Court immediately and not discuss it with your fellow members.

8     Thank you.  Have a good evening.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D70nles7                          Marx - direct

 1

 2                    (Jury not present)

 3                    THE COURT:  You are excused.

 4                    (Witness not present)

 5                    MS. FRIEDLANDER:  Your Honor, I have one brief thing

 6      to raise.

 7                    THE COURT:  Could we go over the schedule for

 8      tomorrow.

 9                    Ms. Friedlander, you have something else?

10                    MS. FRIEDLANDER:  Yes.  After Ms. Marx I believe we

11      are going to call a short witness, Roger van Etten, who is just

12      going to testify about his seeing Joseph Rutigliano play golf

13      essentially and seeing him doing some other things, bike riding

14      and other stuff, at his winter home in Florida.  That will be

15      very brief.

16                    Then we intend to call Dr. Barron, who I think will

17      take the balance of the day.

18                    THE COURT:  All right.  Now, let me ask about a

19      witness that Mr. Durkin had mentioned at one point for which he

20      wouldn't be here on Wednesday, Mr. Fitzgerald.  Did you mention

21      such a witness?  Wasn't there a witness that you said you

22      wanted to be here for on Wednesday?

23                    MR. DURKIN:  But I am here.  I think they are not

24      going to call him.

25                    THE COURT:  That is my question.

1572

1       MS. FRIEDLANDER:  I think we are not intending to call

2  him at this point.

3       THE COURT:  You came back for nothing.

4       MR. DURKIN:  I could have said in Chicago.

5       MR. DRATEL:  Your Honor, is the government planning on

6  calling Ms. Graves?

7       THE COURT:  That was my next question, because

8  yesterday they indicated there were two RRB witnesses, Graves

9  and Coleman.  Is Graves still coming?

10      MS. FRIEDLANDER:  I am not sure at this point.  But

11 Dr. Barron has cleared his schedule for tomorrow and Friday.

12 So we really need to call him now.  We will make a decision

13 about Ms. Graves and we can let you know in the morning, if

14 that's OK.

15      THE COURT:  All right.

16      MR. DRATEL:  Your Honor, just for purposes of

17 Ms. Graves.

18      THE COURT:  Yes.

19      MR. DRATEL:  If the government decides not to call

20 her, they shouldn't release her, because we may call her if the

21 government does not.

22      THE COURT:  All right.

23      Anything else?

24      MS. FRIEDLANDER:  Just a quick matter.  We have asked

25 the defense to stipulate to the fact that we asked

1   Dr. Lesniewski for his patient files and x-rays and that we

2   have been informed by counsel that, after a diligent search,

3   Dr. Lesniewski has determined that he no longer maintains the

4   files and x-rays that we've asked for.  I think counsel doesn't

5   have a problem with the stipulation itself but may want to

6   object to its relevance.

7           We would like that stipulation because Dr. Barron is

8   going to testify tomorrow and he will say that he reviewed some

9   files that indicated that x-rays had been taken, but the x-rays

10  were not available.

11          We expect some cross-examination on that point.  I

12  think Mr. Ryan has already sort of teed up the

13  cross-examination along the lines of, You didn't review x-rays,

14  the government didn't give you x-rays, that sort of thing.

15          So we think the stipulation is relevant to show the

16  jury that these are records the government tried to obtain.

17  The government is not hiding the ball from the jury not hiding

18  the ball from Dr. Barron.  It is just that the records no

19  longer exist.

20          (Continued on next page)

21

22

23

24

25

1

2          MR. RYAN:  It also prejudices Mr. Rutigliano.  He

3     can't get the x-rays so this expert -- to challenge his

4     testimony, and we are prejudiced by that, too, and it is

5     relevant to Mr. Rutigliano's defense.  The search was made and

6     they couldn't be located.

7          MR. DURKIN:  May I speak to this, Judge?

8          THE COURT:  Yes.

9          MR. DURKIN:  The problem I have is the insinuation

10    by -- and I'm not saying anything, I'm not casting aspersions.

11    The problem I have is the inference that somehow they were no

12    longer available for a reason.

13          What happened -- and the government and I, I think we

14    are in agreement with what happened.  Before Dr. Lesniewski

15    went to Island Sports Medicine he was at a place called

16    Plainfield, or whatever -- Plainview, and the government has

17    interviewed a secretary or a clerk, office manager type who

18    came with him who said that they -- when they went to Island

19    Medicine, they put all of the records in a storeroom.  They

20    were unsure as to whether or not that storeroom was owned by --

21    either Dr. Lesniewski was paying for it or it was owned by

22    Island Sports Medicine.  It turns out, I think from what we can

23    gather, that Dr. Lesniewski was paying for it.

24          At a given point in time, some records from the

25    storeroom were taken to Island Sports Medicine, as I understand

D7odles8

1    it.  Island Sports Medicine then purged all the files that they

2    had going back seven years.  That still doesn't account for the

3    Plainview records in the storeroom.  They're gone.  But there

4    was no obligation to maintain them.

5           The problem I have with the whole thing is that

6    Dr. Lesniewski was first asked to provide documents in 2008 to

7    the U.S. Attorney in the Eastern District.  That was from

8    Island Sports Medicine.  They then returned those documents.  I

9    think there is another subpoena in 2010 from the Eastern

10   District, and other records were brought.  I could have some of

11   this out of order, but what I'm suggesting is it was kind of

12   haphazard.  And then there was a subpoena that was issued I

13   believe by Mr. Weddle in 2011.  I just don't think there should

14   be any suggestion that somehow Dr. Lesniewski did something

15   with the records intentionally.  That's the problem I have.

16          I just don't understand where the issue is.  I don't

17   intend to raise any issue about missing records.

18          MS. FRIEDLANDER:  So a couple of things.

19          First as to the prejudice, I think it is a natural

20   question for the jurors to think where are these x-rays.  You

21   know, is the government hiding the x-rays from the doctor?  Is

22   the government hiding the x-rays from us?  I mean, Mr. Ryan

23   just said he intends to cross-examine on that.  So we need that

24   sort of stipulation for us.  I mean, it's just important that

25   the doctor is going to be cross-examined on this.

D7odles8

1          Secondly, I had drafted a stipulation in a very

2    neutral way that doesn't cast any aspersions on Dr. Lesniewski,

3    and, in fact, counsel has already told me they don't object to

4    the language, they're only objecting to relevance.

5          Thirdly, and I don't know if this really matters

6    because I just want the stipulation and this is not about

7    assigning blame, but that was not an accurate representation of

8    the government's efforts to locate the records where we

9    understand the records to have been.  We never got -- the

10   government never at any time received any response from

11   Dr. Lesniewski regarding where his patient files and x-rays

12   went.  I believe there was one interview of a former employee

13   of his in which that employee indicated that she believed that

14   prior to the time she and Dr. Lesniewski went over to Island

15   Sports all the files were put in some storehouse, but the

16   government was never able to identify where that storehouse is,

17   who took custody of the records and, as I said, Dr. Lesniewski

18   never told us.  So that was not a productive avenue for the

19   government.

20         Island Sports Medicine, where he practiced in the

21   latter years of the conspiracy, told us that they never had any

22   records of his, that, you know, for patients who predated his

23   time there.

24         So, you know, the facts as Mr. Durkin stated them are

25   just not accurate.  I'm sure he didn't mean to get them wrong.

D7odles8

1   The point that really matters here is that we need the

2   stipulation, and I think we drafted it in a very neutral way.

3          THE COURT:  Thank you.

4          Mr. Durkin.

5          MR. DURKIN:  Well, I guess the only reason I'm having

6   a problem with it is that I was his lawyer for most of this

7   time.  Shortly after the first subpoena is when I became his

8   lawyer, and nobody, as far as I can remember, made an issue out

9   of it.  We simply said we didn't have them.  Whatever records

10  we had were with Island Sports, which was true.

11         If we can simply -- I just don't understand how

12  anybody could -- I don't mean to cast aspersions.  I'm not

13  suggesting Mr. Ryan is doing anything improper.  But if they

14  don't exist, they don't exist.  They were not in

15  Dr. Lesniewski's possession or control once the subpoenas came

16  out, but nobody made an issue out of it.  That is the problem I

17  have.  Nobody said, listen, we need a definitive answer as to

18  where these things are.   I would have done the search then.

19         THE COURT:  It seems to me that this is an issue of

20  wordsmithing.  If they don't exist and nobody is responsible

21  for the fact that they don't exist, then why can't you get

22  together and say that?

23         MS. FRIEDLANDER:  Your Honor, I just want -- all that

24  the stipulation says is that the government tried to get the

25  documents, and we have been informed that, after a thorough and

D7odles8

1    diligent search, Dr. Lesniewski doesn't maintain these files

2    anymore.

3            Counsel has already told us it is not the language of

4    the stipulation that is the problem.  It's a totally neutral,

5    non-aspersion-casting stipulation.  They are suggesting that

6    the stipulation is not relevant.  Of course it is relevant.

7            MR. DURKIN:  I said I thought we could work the

8    language out.

9            The problem I have is the request of counsel, or

10   anything like that.  If we can work out --

11           THE COURT:  Why don't you work out language.  Show it

12   to me in the morning, and I will try to see if I could do

13   shuttle diplomacy.

14           MS. FRIEDLANDER:  Thank you.

15           MR. DURKIN:  Thank you.

16           THE COURT:  All right.  Anything else?

17           MR. RYAN:  Good night, Judge.

18           THE COURT:  Yes.  Good night.  Have a good evening.

19           MR. DRATEL:  Good night, sir.

20           (Adjourned to 9 a.m., Thursday, July 25, 2013)

21

22

23

24

25

                          INDEX OF EXAMINATION

Examination of:                                    Page

JOHN COLEMAN

Direct By Mr. Tehrani . . . . . . . . . . . .1337

Cross By Mr. Dratel . . . . . . . . . . . .1388

Cross By Mr. Ryan . . . . . . . . . . . . .1431

Cross By Mr. Jackson . . . . . . . . . . . .1446

Redirect By Mr. Tehrani . . . . . . . . . .1473

Recross By Mr. Ryan . . . . . . . . . . . .1484

Recross By Mr. Dratel . . . . . . . . . . .1485

NATASHA MARX

Direct By Mr. Weddle . . . . . . . . . . . .1505

                          GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 251, 252, 254 and 255  . . . . . . . . . .1362

 100G and 113G  . . . . . . . . . . . . . .1366

 100 . . . . . . . . . . . . . . . . . . . .1374

 113 . . . . . . . . . . . . . . . . . . . .1461

 108 . . . . . . . . . . . . . . . . . . . .1467

s 102 and 114  . . . . . . . . . . . . . . .1472

 10A . . . . . . . . . . . . . . . . . . . . .1513

 16 . . . . . . . . . . . . . . . . . . . . .1517

  12A  . . . . . . . . . . . . . . . . . . . .1525

 12-B  . . . . . . . . . . . . . . . . . . . .1536

 15 . . . . . . . . . . . . . . . . . . . . .1538

 1    14      . . . . . . . . . . . . . . . .1540

 2    14-C      . . . . . . . . . . . . . . .1544

 3    14-A and 14-B   . . . . . . . . . . . .1547

 4    13    . . . . . . . . . . . . . . . . .1555

 5    19-A-1     . . . . . . . . . . . . . . .1560

 6    19-A-1-A    . . . . . . . . . . . . . .1564

 7    19-A     . . . . . . . . . . . . . . .1567

 8                    DEFENDANT EXHIBITS

 9   Exhibit No.                        Received

10    L-2   . . . . . . . . . . . . . . . . .1402

11    L-3   . . . . . . . . . . . . . . . . .1405

12    L-4   . . . . . . . . . . . . . . . . .1406

13    L-7   . . . . . . . . . . . . . . . . .1415

14    L-8   . . . . . . . . . . . . . . . . .1420

15    L-9   . . . . . . . . . . . . . . . . .1421

16    R66   . . . . . . . . . . . . . . . . .1446

17    L-10    . . . . . . . . . . . . . . . .1486

18

19

20

21

22

23

24

25