```
D7pdles1
                              Trial
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,                    New York, N.Y.

4                   v.                            S14 11 Cr. 1091 (VM)

5    PETER LESNIEWSKI, MARIE BARAN
     and JOSEPH RUTIGLIANO,
6
                      Defendants.
7
     ------------------------------x
8

9                                                July 25, 2013
                                                 9:09 a.m.
10

11   Before:

12                      HON. VICTOR MARRERO,

13                                               District Judge

14
                            APPEARANCES
15
     PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17   BY:  JUSTIN S. WEDDLE
          DANIEL BEN TEHRANI
18        NICOLE WARE FRIEDLANDER
          Assistant United States Attorneys
19
     LAW OFFICES OF JOSHUA L. DRATEL, P.C.
20        Attorneys for Defendant Peter Lesniewski
     BY:  JOSHUA LEWIS DRATEL
21        LINDSAY A. LEWIS

22   DURKIN & ROBERTS
          Attorneys for Defendant Peter Lesniewski
23   BY:  THOMAS ANTHONY DURKIN

24

25
```

D7pdles1
                              Trial

1                          APPEARANCES CONTINUED

2    KOEHLER & ISAACS, LLP
          Attorneys for Defendant Marie Baran
3    BY:   JOEY JACKSON

4    JOSEPH W. RYAN, JR.
     KEVIN MENEILLY
5         Attorneys for Defendant Joseph Rutigliano

6              – also present –

7    Annie Chen
     Emma Larson, Government Paralegals
8

9    SA Frank LoMonaco, FBI

10   Yeni Yrizarry, Defendant Baran Paralegal

11                              oOo

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7pdles1
                              Trial

1              (Trial resumed; jury not present)

2              THE COURT:  Thank you.  Good morning.  Please be

3    seated.

4              MR. WEDDLE:  Good morning, your Honor.

5              THE COURT:  Bring in the jury.

6              MR. WEDDLE:  Your Honor, I just have one thing that I

7    needed to raise with your Honor.

8              THE COURT:  All right.  Is the witness available?

9              MR. WEDDLE:  He is here.

10             The issue is that the witness in her direct testimony

11   mentioned a software program into which we loaded the same

12   materials that we produced in discovery --

13             THE COURT:  Yes.

14             MR. WEDDLE:  -- called CACI.  She just didn't

15   understand that the defense were not part of that exact same

16   software program, although it is the same materials, it had

17   been produced to the defense, and they are free to load them

18   into whatever software program that they use.  I don't think

19   that discovery matters are a proper issue for

20   cross-examination.  And this actually came up earlier in the

21   trial when defense counsel -- one defense counsel said right in

22   front of the jury if I show you a document that's been produced

23   in discovery, of course, the jury tonight know anything about

24   discovery, and we have complied in good faith with our

25   discovery obligations.  We haven't had complaints from the

D7pdles1
                           Trial

 1   defense about our discovery.  And it is totally improper to

 2   raise that type of thing in front of the jury.

 3           So I inquired of defense counsel whether they intended

 4   to cross-examine Ms. Marx relating to the system that the

 5   government has used, that the government has loaded the

 6   discovery material into, and one defense counsel said that he

 7   did not intend to do that but two defense counsel indicated

 8   that they did.  And we would move to preclude any such

 9   cross-examination under Rule 403 and Rule 401 and because there

10   is absolutely no good faith basis for defense counsel to be

11   going into the matter in an attempt to indicate that the

12   government has something that they don't.

13           Because we produced -- we've gone above and beyond in

14   this case.  At the request of one defense counsel, we scanned

15   and produced in electronic format 1700, or thereabouts, claim

16   files at great expense to the government.  We produced

17   essentially all the material in electronic format.  And they

18   are free to use it and load it into any kind of search program

19   that they want to pay for and buy.  In fact, when defense

20   counsel has had trouble finding materials, they have not

21   hesitated to e-mail me and say we can't find a copy of this

22   claim file, and I often respond and I say here's the Bates

23   number for the first page of the claim file.  And I've gotten

24   responses for that kind of e-mail from defense counsel where

25   they say, well, just send us the pdf copy, you should be able

D7pdles1
                              Trial
1   to find it quickly.  And rather than me responding and saying

2   you should be able to find it quickly because it has been

3   produced in discovery and I just gave you the Bates number, I

4   just pull it for them and I send it to them.

5           So it is entirely without any good faith basis for

6   defense counsel to raise this matter at all with Ms. Marx, and

7   we would object to any further mention of discovery issues in

8   front of the jury.

9           THE COURT:  All right.

10          MR. RYAN:  I'm sorry your Honor had to go through this

11  monologue.  I am not going to complain about the government.

12          THE COURT:  Thank you.  So there were two?

13          MR. WEDDLE:  I could have avoided it, your Honor, if

14  counsel had told me that they didn't intend to cross-examine

15  before your Honor took the bench.

16          THE COURT:  Mr. Durkin.

17          MR. DURKIN:  I don't have any intention of going into

18  that.  The only comment I have is I think he is talking about

19  me when I mentioned a document in discovery.

20          MR. WEDDLE:  Go ahead.

21          MR. DURKIN:  But if I said it, I only said it as a

22  shorthand way --

23          THE COURT:  Let's just stick to this issue,

24  Mr. Durkin.

25          MR. DURKIN:  No.  We have no issue, your Honor.

D7pdles1
                                    Trial

1            THE COURT:  In that case, bring in the jury.  Thank

2   you very much.

3            MR. WEDDLE:  Your Honor, Ms. Friedlander is just

4   working on something with respect to our next witness.  She may

5   be a couple of minimum late.  I hope your Honor doesn't mind.

6            THE COURT:  All right.  Thank you.

7            MR. WEDDLE:  I'm sorry, your Honor.  Mr. Jackson was

8   one of the people who was intending to cross-examine on this.

9   I take it, it has been precluded?

10           THE COURT:  Mr. Jackson.

11           MR. JACKSON:  Judge, just quickly.  Are we saying that

12  I can't ask questions about the program the government used to

13  do statistics, is that it?  Or I thought his complaint was

14  about discovery or they unfairly had something.  I don't intend

15  to talk about any of that.

16           THE COURT:  What exactly then is the issue,

17  Mr. Weddle?

18           MR. WEDDLE:  I don't know what Mr. Jackson intends to

19  cross-examine on.  She was talking about a CACI -- a system

20  which is a software program into which we've loaded the

21  discovery which is searchable, just like it is searchable if

22  the defense loaded it into their software program, and she used

23  that in order to identify the signature language used by

24  Mr. Rutigliano in his vocational report supplement.  So this is

25  not a proper line of cross-examination because Mr. Jackson is

D7pdles1
                                    Trial

1    well aware of the rules regarding discovery.  He is well aware

2    of the fact that the government has complied.  He is well aware

3    of the fact that the government has gone above and beyond those

4    rules --

5              MR. JACKSON:  Your Honor --

6              THE COURT:  Mr. Jackson.

7              MR. JACKSON:  Thank you, your Honor.  I appreciate

8    that Mr. Weddle complained to you of what I am aware of and

9    what I am not.  I appreciate the assist on that.

10             But what I am looking to do, Judge, is I just need

11   some clarification.  I am not talking about the government

12   being unfair and not getting us discovery and how dare they and

13   they have the specialist --

14             THE COURT:  Don't tell us what you don't want, tell us

15   what you want.

16             MR. JACKSON:  Yes, Judge.  I am just asking whether it

17   is permissible to ask about the program that she used -- the

18   nature of the program, the type of program, the liability of

19   the program.  I don't think that has anything to do with

20   discovery.

21             THE COURT:  The short answer, Mr. Jackson, is of

22   course you are free to ask about the program --

23             MR. JACKSON:  Thank you, Judge.

24             THE COURT:  -- technology.  But bear in mind, does it

25   have any material impact on your defenses?  Does it matter

D7pdles1
                              Trial

1    to --

2               MR. JACKSON:  Judge, it probably doesn't but I just

3    need to know the ground rules.  In other words, there are a

4    number of things that I intend to cross on, but depending upon

5    what happens or my co-counsel do, I can limit my cross or I

6    will cut it down.  I just want to know the ground rules, Judge

7    and I am clear now.  Thank you so much.

8               THE COURT:  All right.  Thank you.

9               Bring in Ms. Marx, please.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7pdles1
                              Trial

1              THE LAW CLERK:  All rise.

2              (Jury present)

3              THE COURT:  Good morning.  Welcome back.

4              We will proceed.

5              Let me remind the witness that she is under oath from

6    yesterday's oath that she took and she remains under oath.

7              Mr. Weddle.

8              MR. WEDDLE:  Thank you, your Honor.

9     NATASHA MARX,

10        Resumed, and testified further as follows:

11   DIRECT EXAMINATION (Resumed)

12   BY MR. WEDDLE:

13   Q.  Good morning, Ms. Marx.

14   A.  Good morning.

15   Q.  Yesterday you testified about this Government Exhibit 19A1,

16   which was a compilation of vocational report supplements that

17   you had identified as having signature language.  Do you

18   remember that?

19   A.  Yes.

20   Q.  Now, beyond the 134 that are in Government Exhibit 19A1 and

21   the Vocational Report Supplement of Mr. Rutigliano himself, did

22   you see some of the signature language that we've talked about

23   in other vocational report supplements as well?

24   A.  Yes.

25   Q.  And is it fair to say that even though some of the

1   signature language you saw in other vocational report

2   supplements, is it fair to say that, nevertheless, you didn't

3   include those in Government Exhibit 19A1?  This is just the 134

4   that have extremely similar language, is that right?

5   A.  Correct.

6   Q.  If I could hand you two documents.  One has been marked

7   R51A and one has been marked R54A.

8          MR. WEDDLE:  Defense exhibits, your Honor.

9          (Pause)

10  Q.  Ma'am, looking at these two documents, do you see that

11  Catch-22 language?

12  A.  No.

13  Q.  OK.  So based on that, would you say that these documents

14  are not part of Government Exhibit 19A1?

15  A.  Yes.

16  Q.  And do they nevertheless have very similar language to what

17  we've been reading in paragraph 4 about applying handbrakes

18  with a strong two-hand grip, etc.?

19  A.  I'm looking.

20          (Pause)

21  Q.  In paragraph 4.

22  A.  Yes.  Mm-hmm.

23  Q.  Is that in both of them or just one of them?

24  A.  They both have it.  It's slightly different.  One has got

25  the dash; one doesn't.

D7pdles1                         Marx - direct

1          MR. WEDDLE:  OK.  And we are done with those.  Thank

2     you.

3          THE WITNESS:  OK.

4          MR. RYAN:  Sorry.  What exhibits were they?  I missed

5     that.

6          MR. WEDDLE:  Defense exhibits R54A and R51A.

7          MR. RYAN:  Are you offering them in evidence?

8          MR. WEDDLE:  No, I am not.

9     BY MR. WEDDLE:

10    Q.  Ma'am, you just talked about the fact that there are 134

11    vocational report supplements in Government Exhibit 19A1.

12    A.  Yes.

13    Q.  And yesterday we were talking about your summary chart that

14    related to this, which is Government Exhibit 19A.

15         MR. WEDDLE:  Can we put that on the screen?

16    Q.  And your chart talk about 135 people.  Can you explain

17    that?

18    A.  Yes.  These are the 135 people that I identified with the

19    same Vocational Report Supplement language.  So out of those

20    people, I reviewed within the RRB claim file their AA1-D forms,

21    and in the AA1-D form there is a section for daily activities.

22    So I was able to compile on a spreadsheet for each of those

23    individuals all 135 people.

24    Q.  My question is only if Government Exhibit 19A1 -- which is

25    this huge binder.

D7pdles1                         Marx - direct

1   A.   Yes.

2   Q.   -- if this contains 134 vocational report supplements, why

3   are you summarizing 135 people?  Who is the other person?

4   A.   Oh, Joseph Rutigliano.

5   Q.   The defendant?

6   A.   Yes.

7   Q.   If you could take a look, ma'am, at Government Exhibit 11.

8        Did you prepare an analysis comparing the extent to

9   which people who were on occupational disability from either

10  the Long Island Rail Road -- who had worked at either the Long

11  Island Rail Road or Metro-North, at what age or whether they

12  first obtained the occupational disability between the ages of

13  50 and 55?

14  A.   Yes.

15  Q.   What is Government Exhibit 11?

16  A.   It shows the individuals that are on occupational

17  disability that obtained occupational disability between

18  January 2004 and December 2008.  So the first column --

19  Q.   Well, before you discuss it.  Just generally speaking, this

20  is a summary of your analysis, is that right?

21  A.   Yes.

22       MR. WEDDLE:   The government offers Government Exhibit

23  11, your Honor.

24       MR. RYAN:   The same objection.

25       MR. DRATEL:   The same objection, your Honor.

 1             THE COURT:  Admitted subject to the objections.

 2             (Government's Exhibit 11 received in evidence)

 3             MR. WEDDLE:  Ms. Larson, put that on the screen.

 4   Q.  So the title of this is "Retirees on Occupational

 5   Disability," and there is a date limitation of 2004 to 2008?

 6   A.  Yes.

 7   Q.  Then it says "LIRR versus Metro-North," right?

 8   A.  Right.

 9   Q.  And so based on your analysis, you were trying to figure

10   out what age -- or you were trying to figure out whether people

11   retired and got disability when they were first within what age

12   range?

13   A.  50 and 55.

14   Q.  And that's limited to this date range that's on the chart?

15   A.  Correct.

16   Q.  And what did you use to determine this information?

17   A.  I took the Master Benefit File from the Railroad Retirement

18   Board, the database.

19   Q.  And how many people among retirees who were on occupational

20   disability who had worked at Long Island Rail Road, according

21   to the database, how many of them first got occupational

22   disability between the ages of 50 and 55?

23   A.  941.

24   Q.  And what is the comparable number for Metro-North?

25   A.  66.

D7pdles1                        Marx - direct

1    Q.  And then there are two footnotes here at the bottom.  Can

2    you explain the first footnote?

3    A.  Yes.  It says that of the 941 retirees, they represent

4    79.5 percent of all Long Island retirees on occupational

5    disability for that time period.

6    Q.  And the second footnote, can you explain that?

7    A.  The 66 retirees represent 40.5 percent of all Metro-North

8    retirees on occupational disability between 2004 and 2008.

9    Q.  So your chart doesn't start with all retirees in general,

10   is that right; it just starts with people who are on

11   occupational disability?

12   A.  Correct.

13   Q.  And then it figures out what age they were when they first

14   got occupational disability?

15   A.  Yes.

16   Q.  Thank you.  Let's move to the next topic.

17           As part of your work on this case did you also create

18   a list of Marie Baran clients?

19   A.  Yes.

20   Q.  Can we take a look at Government Exhibit -- sorry, your

21   Honor -- actually, let me just back up.

22           How did you compile the list of Marie Baran clients?

23   A.  There were four methods I used.  One was the authorizations

24   that we looked at yesterday that had a signature that said that

25   they authorize her to contact on their behalf the Railroad

D7pdles1                              Marx - direct

1    Retirement Board to ask any questions about their annuity or

2    benefits or application.  So that was one way.

3         Another way was using the RRB contact log, which is if

4    someone calls to the RRB to ask a question about their

5    benefits, it's logged in the system.  And if her name -- if she

6    called on their behalf or they mentioned her during their call,

7    that was the second method.

8         A third method was using payable records that she had

9    provided to us of people that paid her for her assistance.

10        And the fourth way was the computer records that we

11   received from her computer that showed AA1-D's that she

12   compiled and also vocational reports, the G-251.

13   Q.  And if you could take a look at Government Exhibit 507 and

14   507A, which should be in your binder.

15   A.  Yes.

16   Q.  What are 507 and 507A?

17   A.  These are the call logs, the RRB call logs that I used, the

18   second method that I mentioned.

19   Q.  These call logs are made and kept in the ordinary course of

20   business at the RRB?

21   A.  Yes.

22        MR. WEDDLE:  The government offers Government Exhibits

23   507 and 507A.

24        MR. RYAN:  The same objection.

25        THE COURT:  Mr. Dratel?  Mr. Durkin?  Mr. Jackson?

D7pdles1                          Marx - direct

1         MR. JACKSON:  If I can just have a minute?

2         (Pause)

3         MR. RYAN:  Your Honor, I withdraw my objection.

4         THE COURT:  All right.  Thank you.

5         MR. JACKSON:  Judge, just for also sake of time, I

6  know that Mr. Weddle is laying a foundation for the

7  admissibility of these documents, but to the extent that -- if

8  I can just confer with him because let me see if we are

9  withdrawing any objections to the documents he is seeking to

10  introduce.

11        (Pause)

12        MR. WEDDLE:  Sorry, your Honor.

13        MR. JACKSON:  Judge, believe it or not, we saved time.

14        I'm going to waive foundation as to these documents so

15  that he doesn't have to authenticate them through this witness

16  or otherwise lay any foundation for their admissibility,

17  withdraw any objection, and if he wants to offer them in

18  evidence at this time as they relate to Ms. Baran, he is

19  welcome to do that.

20        Thank you, Judge.

21        THE COURT:  Thank you.

22        Mr. Durkin?

23        MR. DURKIN:  No objection.

24        THE COURT:  All right.  Mr. Weddle, would you read the

25  numbers of the documents that you are admitting without

D7pdles1                      Marx - direct

1   objection at this time.

2           MR. WEDDLE:  Yes.  So we just talked about Government

3   Exhibit 507 and 507A.  And then the next one is 18B, as in boy.

4   The next one is 18A.  Then 18.  Then 17.

5           May I just have one moment?

6           (Pause)

7           And then there is one more that I will just get to at

8   the end of my questions and answers, but we don't have a

9   similar agreement on that so we will take that one up as we get

10  to it.

11          So I offer those exhibits:  507, 507A, 18B, 18A, 18

12  and 17.

13          THE COURT:  Admitted without objection.

14          (Government's Exhibits 507, 507A, 18B, 18A, 18, 17

15  received in evidence)

16          MR. WEDDLE:  Could we just display 507 briefly?

17  Q.  So this is the call log that we talked about?

18          MR. WEDDLE:  Can you blow up some portion of it?

19  Anything.

20  Q.  And do you see that like in the second entry, it says

21  "Contact Marie Baran," do you see that?

22  A.  Yes.

23  Q.  And then -- now, let's take a look at Government Exhibit

24  18B, and we could put that on the screen.

25          And what is on the screen is just the first page of

D7pdles1                          Marx - direct

1    18B, but is it correct that it is a multi-page document?

2    A.  Yes.

3    Q.  Do you have an estimate of about how many of these

4    authorization forms are compiled in 18B?

5    A.  86.

6    Q.  And the typewritten part is similar in all of them, is that

7    right?

8    A.  Yes.

9    Q.  And now let's take a look at your chart, which is

10   Government Exhibit 18A, which is in evidence.

11              MR. WEDDLE:  Can we blow up sort of the top left-hand

12   quarter of the page.  Maybe we should take a smaller portion.

13   Q.  So here you have multiple columns of a spreadsheet, right?

14   A.  Correct.

15   Q.  And the first column is what?

16   A.  It's the authorizations that you just showed on the screen.

17   Q.  In the very first column in the exhibit -- I mean, in the

18   chart itself.

19   A.  The count of the individuals that I identified.

20   Q.  So that's just how you can tally them up?

21   A.  Yes.

22   Q.  And then the next number is what?

23   A.  The claim number.

24   Q.  OK.  Then the next column is?

25   A.  The name of the annuitant.

D7pdles1                    Marx - direct

1    Q.  And then do you see on the screen at the very top of the

2    column that has some shading in it, it says "Source Number

3    One."  Do you see that?

4    A.  Yes.

5    Q.  Then listed under there it says what?

6    A.  "Marie Baran authorizations found."

7    Q.  And it's not very legible on the screen, but can you read

8    from the paper copy that is in front of you what is in the

9    parenthetical?

10   A.  "GX Exhibit 18-B."

11   Q.  That's what we just looked at, right, the compilation of

12   authorizations?

13   A.  Correct.

14   Q.  OK.  So if there is an authorization in that Government

15   Exhibit 18B, what did you do on your chart with respect to that

16   person?

17   A.  I put a "Y" for yes, meaning I found it, or located it.

18          MR. WEDDLE:  OK.  Then can we display, Ms. Larson, a

19   few more columns.

20   Q.  And then so the next item on the far top left of the

21   screen, it says "Source number two," right?

22   A.  Yes.

23   Q.  And then the text under there which is hard to read on the

24   screen says what?

25   A.  "Marie Baran mentioned in contact log" with a question.

D7pdles1                          Marx - direct

1   Q.  And if you saw -- and, sorry, what are the exhibits that

2   you used to answer this question?

3   A.  Exhibit 507 and 507-A.

4   Q.  OK.  And so if you found an entry relating to Marie Baran,

5   what did you do?

6   A.  The same thing.  I would put a "Y".

7   Q.  In that column?

8   A.  In that column.

9   Q.  OK.  Then the next source is what?

10  A.  "Listed in Marie Baran payables for 2007 to 2008."

11  Q.  OK.  And the payables is -- it says in parentheses, what

12  does it say under there?

13  A.  GX or Exhibit 504.

14          MR. WEDDLE:  Your Honor, that is a document in

15  evidence.  I can put it on the screen, but that is that ledger

16  that was discussed with Special Agent Cuocci.

17          THE COURT:  Thank you.

18  Q.  And then if you found a person's name on the payable

19  ledger, what did you do in your chart?

20  A.  I put a "Y" in that column.

21  Q.  OK.  Then in the next column, what is the title of the next

22  column?

23  A.  "Source and date in records."

24  Q.  And then there is these little numbers, like the first one

25  says zero-zero-zero-zero-six-eight, right?

D7pdles1                        Marx - direct

1   A.  Right.

2   Q.  What does that mean?

3   A.  That's the document, the Bates stamp at the bottom right.

4   Q.  So on the ledger itself there is a page number on every

5   page, is that right?

6   A.  Correct.

7   Q.  You are referring to that as what, a Bates?

8   A.  A Bates number.

9   Q.  So your chart tells exactly which page of the ledger you

10  were looking at?

11  A.  Yes.

12  Q.  And is it correct that in the ledger, oftentimes it is just

13  people's last names, is that right?

14  A.  Yes.

15  Q.  And then the next source that you used is what?

16  A.  It was a source for listed in Marie Baran's computer

17  records obtained in 2008.

18  Q.  Then if there was a file like a computer file in the

19  computer records relating to one of these people on your list,

20  what did you do in your chart?

21  A.  I put a "Y" in that column under "Source For."

22  Q.  What are the -- and then in the next column over, what is

23  that?

24  A.  The Marie Baran computer records reference.

25  Q.  OK.  So listed there is what?

D7pdles1                         Marx - direct

1    A.  The exhibit number, 502-A or 502-B.

2    Q.  OK.  502-A and 502-B are what?  Physically what are those

3    things?

4    A.  They are AA1-D forms or G-251.

5    Q.  The thing itself, 502A is a disc, right?

6    A.  Oh, it is a disc, correct.

7    Q.  And 502B is a disc, right?

8    A.  Yes.

9    Q.  It is your understanding that those are pieces of evidence

10   in this trial, right?

11   A.  Yes.

12   Q.  And there is also a reference -- we don't need to go to it,

13   but further down the list there is also a reference to

14   Government Exhibit 500.  Do you remember that?

15   A.  Yes.

16   Q.  And that's also a disc, right?

17   A.  Yes.

18   Q.  Admitted in evidence, right?

19   A.  Yes.

20           MR. WEDDLE:  Your Honor, those are the discs that were

21   discussed with Special Agent Cuocci that came from different

22   computer records relating to Marie Baran.

23   Q.  And then the next column in the chart says what?

24   A.  "AA1-D Signed Date."

25   Q.  And where did you get the information for that column?

D7pdles1                      Marx - direct

1   A.  These are the AA1-D's in the claim files, the RRB claim

2   files that I reviewed, the date that the annuitant signed that

3   form.  They are in chronological order.

4   Q.  And then the next column is titled what?

5   A.  "Total Sources Verified," and then in parentheses it says

6   "4 max."  There is a total of four sources that I used, so it

7   was up to four different sources per person.

8   Q.  And so to what extent did you find that people on your list

9   showed up in more than one of the sources?

10  A.  Out of the 180, there was like 115.  Let see if you do the

11  math.  About 115 had at least two.

12  Q.  When you say "do the math," are you talking about these

13  final two columns on the chart that show the tallies of how

14  many people had one source, how many people had two sources,

15  how many people had three sources and how many people had four

16  sources?

17  A.  Right.  And the total shows that, yes, 180.  I don't think

18  you guys can see that.

19      Right.  So out of all of them, 65 had one source of

20  the four.  There were 21 individuals that had two sources that

21  I identified Marie Baran listed in.  There were 28 individuals

22  that had three of the four sources that Marie Baran was

23  associated with.  And then 66 people that had all four sources

24  that Marie Baran was associated with.

25  Q.  And so for this group of 180 people, you just mentioned the

D7pdles1                        Marx - direct

1    number 180, did you compile the actual AA1-D's, the application

2    forms for those people?

3    A.  Yes.

4    Q.  And where did the AA1-D's that you compiled, where did

5    those come from?  Were those from Marie Baran's computer

6    records or from somewhere else?

7    A.  The RRB claim file.

8    Q.  And did you identify additional people as Marie Baran

9    clients after you had compiled this group of 180 application

10   forms?

11   A.  Yes.

12   Q.  And are those people also included on your chart?

13          MR. WEDDLE:  And, Ms. Larson, can we go to the last

14   page of this chart?

15          One page up, I guess.  Then if you could blow up that

16   lower left quadrant.  Yes.

17   Q.  So are these new people identified, are they also listed on

18   the chart?

19   A.  These are the -- yes, these are the people -- well, these

20   are above the 180.  So these are new individuals that I

21   identified after I compiled the 180.

22   Q.  OK.  So when you did analyses of the AA1-D's themselves,

23   that we're going to talk about in a minute, that was based on

24   how many AA1-D's?

25   A.  180.

D7pdles1                        Marx - direct

1   Q.   OK.   But there are some additional clients that you

2   identified after you had already put together the 180 and

3   started analyzing them, is that right?

4   A.   Yes.

5              MR. WEDDLE:   I think we're done with this chart.

6   Thank you.

7   Q.   So once you compiled 180 AA1-D's from the RRB claim files

8   corresponding to the people that you had identified -- the 180

9   of the people that you had identified as Marie Baran clients

10  using these sources, what did you do with respect to those

11  AA1-D's in terms of question 39, the one that talked about,

12  sitting is hard or easy or whatever?

13  A.   I did a similar review as I did for Joseph Rutigliano.   In

14  a spreadsheet I compiled -- I reviewed each of the questions --

15  the question 39 on their AA1-D's, and I listed if they put an

16  activity as hard or not being able to be done at all and so

17  forth.

18  Q.   And did you also summarize the result of that analysis in a

19  summary chart?

20  A.   Yes.

21  Q.   Is the underlying spreadsheet information, is that on the

22  disc that we have been talking about, Government Exhibit 10?

23  A.   Yes.

24  Q.   Is the compilation of AA1-D's themselves the 180, is that

25  on Government Exhibit 10?

D7pdles1                    Marx - direct

1   A.  Yes.

2          MR. WEDDLE:  And now if we could take a look at

3   Government Exhibit 18.

4   Q.  And so the title of this is "Daily Activities for Baran

5   Applications, 180 people," right?

6   A.  Right.

7   Q.  And so this is from which question of the AA1-D filed in

8   the RRB claim file?

9   A.  39.

10  Q.  And so when you tallied it up, what percentage of these 180

11  people who you identified as Marie Baran clients said that it

12  was hard for them to sit or they could not sit at all?

13  A.  91.7.

14  Q.  How about standing, how many -- what percentage of people

15  found it, according to their form, hard to stand or they

16  couldn't do it at all?

17  A.  96.7.

18  Q.  And how about walking, how many people said on their

19  application form, how many of Marie Baran's clients said that

20  walking is hard or they couldn't do it at all?

21  A.  96.7.

22          MR. WEDDLE:  And let's do one more, your Honor.

23  Q.  What percentage of people said dressing was hard for them

24  or they couldn't do it at all?

25  A.  91.1.

D7pdles1                          Marx - direct

1                 MR. WEDDLE:   OK.   Now, if you'll take a look at

2      Government Exhibit 17.

3                 If we could blow up just the top quarter of that.

4      Q.  So the title of this document is what?

5      A.  "A 'normal Day' from disability applications of Baran

6      clients."

7      Q.  And so this also is from the AA1-D forms?

8      A.  Yes.

9      Q.  And is this the version of the AA1-D that was on Marie

10     Baran's electronic records or the version that was actually in

11     the claim file?

12     A.  The version in the claim file.

13     Q.  Then on this exhibit, it has typed out the language of

14     question 40, right, from the application?

15     A.  Yes.

16     Q.  And the question is:  "Enter any additional information

17     that describes your daily activities during a normal day (i.e.,

18     a typical day from the time you get up until you go to bed)."

19                 Do you see that?

20     A.  Yes.

21     Q.  Underneath that there are a number of responses to this

22     same question, right?

23     A.  Correct.

24     Q.  And the responses relate to the same disability applicant

25     or a different disability applicant?

D7pdles1                         Marx - direct

1   A.  These are different disability applicants, all part of the

2   Marie Baran group that we were discussing.

3   Q.  And how can you tell which applicant the response relates

4   to?

5   A.  It says their name at the top, and then underneath would be

6   the screenshot or the picture from the question 40 of the

7   AA1-D.

8            MR. WEDDLE:  And, Ms. Larson, can you just blow up the

9   first three screenshots along with the names.  OK.  Can we move

10  it over a little.

11           So this is actually the second, third and fourth but

12  it doesn't too much matter.

13  Q.  So the first one is -- relates to whom?

14  A.  Michael Stavola.

15  Q.  And what is this date that is next to that?

16  A.  June 27, 2008, the date the AA1-D was signed.

17  Q.  OK.  And then the next person is who?

18  A.  David Foubert.

19  Q.  OK.  The next person is who?

20  A.  James Smith.

21           MR. WEDDLE:  I'll just read David Foubert.

22           "I sleep very poorly because of hip pain.  I get up at

23  about 7 a.m.  I have breakfast, shower and dress.  I do some

24  light exercise to stretch as prescribed by my doctor.

25  Sometimes" -- I'm sorry.  I'm reading the wrong one.

D7pdles1                          Marx - direct

1           "I do some light exercise to stretch as prescribed by

2   my doctor."

3           I was reading from Stavola for a second.  Now I am on

4   the right one, Foubert.

5           "Sometimes I do light housework that doesn't require I

6   bend or reach or lift.  I rest in the afternoon and take a

7   short nap.  I have lunch at home alone and read books or

8   magazines.  Evenings I have dinner at home with my spouse and

9   watch TV.  Occasionally I visit with friends or family."

10  Q.  Do you see that?

11  A.  Yes.

12  Q.  And the ones that are in this exhibit, how many are in this

13  exhibit, approximately?

14  A.  39.

15  Q.  When you say it is a screenshot, what does that mean that

16  it is a screenshot?

17  A.  It was taken verbatim.  They were not typed out.  They were

18  actually the pictures off of the AA1-D form for question 40 as

19  they were typed out, or as they were in the claim file.

20  Q.  So you had a scanned copy of the AA1-D, is that right?

21  A.  Correct.

22  Q.  On a computer screen, and you can actually just take a

23  picture --

24  A.  Crop it.

25  Q.  -- of the piece of it?

D7pdles1                         Marx - direct

1   A.  Yes.

2   Q.  And put it into another document?

3   A.  Correct.

4   Q.  And there are only 39 in this document although there are

5   180 clients in the compiled AA1-D's, is that right?

6   A.  Yes.

7   Q.  And this 39 are ones where these responses were highly

8   similar; is that fair to say?

9   A.  Yes.

10  Q.  Are there also similarities among the other ones, the ones

11  that are not in this compilation?

12  A.  Yes.

13  Q.  And how many pages is this compilation?

14  A.  Oh, gosh.  Seven or eight, maybe.

15  Q.  And it is just response after response, right?

16  A.  Correct, for that question 40.

17          MR. WEDDLE:  I'm not going to read them all, your

18  Honor.

19  Q.  OK.  And now let's take a look at Government Exhibit 24.

20          Do you have that in front of you?

21  A.  Yes.

22  Q.  And is this a summary of --

23          MR. DRATEL:  Your Honor, may we be heard on this?

24          THE COURT:  Do you have an issue with this one?

25          MR. DRATEL:  Yes.  This is the one that we have an

D7pdles1                          Marx – direct

1     issue with.

2              THE COURT:  OK.  Approach.

3              (Continued on next page)

D7pdles1                        Marx - direct

1          (At the sidebar)

2          THE COURT:  First, what is the document?

3          MR. WEDDLE:  It's just a summary of payments made by

4     United Healthcare to Dr. Lesniewski relating to Long Island

5     Rail Road employees.

6          MR. DRATEL:  The problem is it replicates yesterday's

7     problem with the chart, with the Government's 16, because it

8     appears to include the larger database of 427 because it starts

9     in 2003, and so we have the same objection.  It is not

10    relevant.  This could be payments for who knows what and having

11    nothing to do with disability.

12         MR. WEDDLE:  Your Honor, this directly rebuts

13    Mr. Dratel's claim in opening statements that Long Island Rail

14    Road patients accounted for only 5 percent of Dr. Lesniewski's

15    practice.  This amount of money $286,000, combined with

16    hundreds of thousands of dollars -- more than a hundred

17    thousand dollars in fees for narrative payments compared with

18    Dr. Lesniewski's reported income shows that the Long Island

19    Rail Road employees were an extremely important part of his

20    income and practice, especially in light of the malpractice and

21    other professional difficulties that he was facing in the heart

22    of the conspiracy.  So Mr. Dratel shouldn't have opened on that

23    if he didn't want us to rebut it and prove that it was not the

24    case.

25         THE COURT:  Mr. Dratel, is your concern the 2003

D7pdles1                        Marx - direct

1    number, is that something that you can bring out as well during

2    direct in the same way and clarify what that number represents?

3                MR. DRATEL:  Yes.

4                MR. WEDDLE:  It represents payments for visits for

5    that time period.

6                THE COURT:  They may be either duplicative, or what

7    does it entail?

8                MR. WEDDLE:  It is not duplicative.  All it means is

9    that in 2003 there are patients who were seeing Dr. Lesniewski

10   in 2003 and Dr. Lesniewski got that money from United

11   Healthcare for those patients.  There was some other chart,

12   there was some claim about when people -- there was the chart,

13   which is Government Exhibit 12A, which has to do with when

14   people first got disability.

15               This is a very straightforward chart.  These payments

16   were made to Dr. Lesniewski in that time period.  There is no

17   carry back or carry forward.  It doesn't say anything about

18   when people started seeing him

19               THE COURT:  Mr. Dratel.

20               MR. DRATEL:  It doesn't say that they are disability

21   patients.  They are Long Island Rail Road employees.

22               MR. WEDDLE:  Your Honor, this is one of the important

23   aspects of the chart.  Exhibit 16, is that the vast majority of

24   Long Island Rail Road employees that went to see Dr. Lesniewski

25   ended up getting disability.  But the point is not that he has

D7pdles1                          Marx - direct

1    to recommend them for disability.  Obviously, whenever he does

2    that, that's another step in furtherance of the fraud, and he

3    also got paid a thousand dollars to do it each time.

4            But this chart points out how important Long Island

5    Rail Road employees were to him in general, and that's all it

6    is.

7            Mr. Dratel opened on this, and he shouldn't have done

8    that if he didn't want us to rebut how important Long Island

9    Rail Road employees as a practice were to Dr. Lesniewski's

10   livelihood and they are extremely important.

11           THE COURT:  Mr. Dratel, you can bring out your concern

12   on cross-examination.

13           MR. DRATEL:  I just wanted two things.  One is I did

14   not open on employees.  I opened on the 134 that he signed the

15   G-250's for.

16           The second thing is what Mr. Weddle just articulated

17   is an amendment of the Indictment.  I will bring it out on

18   cross, your Honor.

19           MR. WEDDLE:  It is not an amendment of the Indictment.

20   It simply goes to note, your Honor, in the end Mr. Dratel made

21   some claims in opening, as he just said, relating to 134

22   people.  He did open on the percentages of people who saw

23   Dr. Lesniewski, although he got that number wrong as reflected

24   in Government Exhibit 12A.  He said that 73 percent went to

25   other doctors.  That is not the case.

D7pdles1                          Marx - direct

1          THE COURT:  Mr. Durkin.

2          MR. DURKIN:  If I can just add one thing?

3          THE COURT:  Yes.

4          MR. DURKIN:  If that's what the government claims that

5   was so important --

6          MR. DRATEL:  We'll just do it on cross.

7          And I would -- yes.  OK.  So the whole chart is coming

8   in, right?

9          THE COURT:  Right.  Yes.

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7pdles1                        Marx - direct

1              (In open court)

2      BY MR. WEDDLE:

3      Q.  Ms. Marx, do you have Government Exhibit 24 in front of

4      you?

5      A.  Yes.

6      Q.  Is this a summary of certain payments made to

7      Dr. Lesniewski?

8      A.  Yes.

9              MR. WEDDLE:  The government offers Government Exhibit

10     24.

11             MR. DRATEL:  Nothing other than the objection as

12     stated --

13             THE COURT:  Admitted over objection as noted.

14             (Government's Exhibit 24 received in evidence)

15     BY MR. WEDDLE:

16     Q.  And the left-hand column of this chart says what?

17     A.  It is the year.

18     Q.  And the right-hand column says what?

19     A.  The United Healthcare payments to Dr. Lesniewski for Long

20     Island employees.

21     Q.  OK.  And where did you get the information about how much

22     money was paid by United Healthcare to Lesniewski in each of

23     these years?

24     A.  From the United Healthcare records that we received.

25     Q.  And how did you limit the money to only payments that

D7pdles1                         Marx - direct

1    related to Long Island Rail Road employees?

2    A.   Once I identified just the Dr. Lesniewski patients based on

3    the provider's name, then I matched it up to the EDMA system,

4    the database from the Rail Road, to identify anyone who was,

5    one, a railroad employee and, two, worked for Long Island Rail

6    Road, with that code 1311 that we talked about yesterday.

7    Q.   And does this summary derive from the same spreadsheet and

8    analysis that you were discussing first in your testimony,

9    Government Exhibit 16 and --

10   A.   Yes.  Yes.

11   Q.   And so the time period that you used for your analysis was

12   what in terms of when people were actually -- or when United

13   Healthcare was -- withdrawn.

14        The time period that you used in this analysis was

15   what in terms of when people were visiting Dr. Lesniewski?

16   A.   Between January 2003, and it should be through September of

17   2008.

18   Q.   And so just to repeat, with respect to the people whose

19   visits are reflected here in terms of money, can you tell from

20   your analysis of the spreadsheet that you used to prepare this

21   exhibit, can you tell whether Dr. Lesniewski recommended those

22   people for disability or anything like that?

23   A.   No.

24   Q.   And does this include people who never got disability at

25   all?

D7pdles1                    Marx - direct

1   A.  Possibly.  I didn't look into that.

2   Q.  With respect to this chart, did you --

3   A.  To this chart, right.

4   Q.  But in Government Exhibit 16, which we talked about

5   yesterday, you did look into whether people who visited

6   Dr. Lesniewski --

7            MR. DRATEL:  Objection, your Honor.  Leading.

8            THE COURT:  Sustained.

9   Q.  Take a look at Government Exhibit 16, then.

10  A.  Yes.  Yes, I did.

11  Q.  Can you explain what you mean when you say, "Yes, I did?"

12  A.  So for Exhibit No. 16, we looked at the 427 individuals.

13           MR. WEDDLE:  Could you put Exhibit 16 up, Ms. Larson.

14  Can you blow up the middle table.

15  Q.  In Government Exhibit 16, you took 427 people seen by

16  Lesniewski, is that right?

17  A.  Right, and --

18  Q.  You eliminated what from it?

19  A.  I eliminated the 17 individuals that were not eligible for

20  the Long Island pension.  So I got to the 410 that were

21  eligible for the Long Island pension.  Of those 410, there were

22  403 that obtained an RRB disability.

23  Q.  OK.  But the -- let's go back to Government Exhibit 24.

24           Are the payments reflected in Government Exhibit 24,

25  are those limited only to people who, for example, the 17

D7pdles1                        Marx - direct

1   people who were ineligible to get a Long Island Rail Road

2   retirement pension, would their payments be included here or

3   not?

4   A.   They would be included here.

5   Q.   OK.  So it is just all payments by United Healthcare

6   relating to Long Island Rail Road employees to Lesniewski

7   during this time period, right?

8   A.   Correct.

9   Q.   Does this chart say anything about when those Long Island

10  Rail Road employees first started seeing Dr. Lesniewski?

11  A.   Not necessarily because I only had records starting in

12  2003.

13  Q.   So if some people, Long Island Rail Road employees, for

14  example, went to Dr. Lesniewski in 2002, whether it related to

15  disability or didn't relate to disability, would the money that

16  Dr. Lesniewski received relating to that Long Island Rail Road

17  employee, would that money be on your chart?

18  A.   No.

19  Q.   Why is that?

20  A.   Because the date of service started in January 2003.

21  That's what the United Healthcare records that I reviewed, that

22  was the first date.  So anything prior to that I wouldn't have

23  reviewed.

24  Q.   Does this chart that's on the screen, does this include any

25  copayment that the patients themselves, the Long Island Rail

D7pdles1                          Marx - direct

1   Road employees themselves, would have paid to Dr. Lesniewski?

2   A.  No.  It was the amount that was paid to him.  I'm not sure

3   that the co-pay was part of that.  It was the amount that was

4   paid to him.  Not the part that was billed because the billing

5   was typically higher; it was the amount that was paid.

6   Q.  And you, as a person, you're familiar with the fact that

7   sometimes insurance companies have negotiated rates with

8   doctors?

9               MR. DRATEL:  Objection.

10              THE COURT:  Sustained.

11  Q.  Did you attribute anything to the fact that the billed

12  amount might sometimes be higher --

13              MR. DRATEL:  Objection.

14              THE COURT:  Sustained.

15  Q.  What did you think when you saw that the billed amount was

16  higher sometimes than the paid amount?

17              MR. DRATEL:  Objection.

18              THE COURT:  Sustained.

19  Q.  Ma'am, dud you use the billed amount or the paid amount?

20  A.  I used the amount paid.

21  Q.  And that was in a data column provided by whom?

22  A.  United Healthcare.

23  Q.  And United Healthcare says that the money was what?

24              MR. DRATEL:  Objection.  Asked and answered.

25              THE COURT:  Asked and answered.

D7pdles1                          Marx - direct

1   Q.  The column said it was money paid?

2           THE COURT:  Asked and answered.

3   A.  Yes.

4   Q.  And the total amount of money paid by United Healthcare to

5   Lesniewski during this time period relating to Long Island Rail

6   Road employees was what?

7   A.  $286,014.59.

8           MR. WEDDLE:  If I can just have a moment, your Honor?

9           (Pause)

10          MR. WEDDLE:  Nothing further, your Honor.

11          THE COURT:  Mr. Dratel.

12          MR. DRATEL:  Thank you, your Honor.  It will take me a

13  second to get everything together.

14          (Pause)

15          MR. WEDDLE:  Oh, I'm sorry, your Honor.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

D7pnles2                          Marx - direct

1           MR. WEDDLE:  I'm sorry, your Honor, could I just add

2    one thing.  I couldn't remember if I offered Government Exhibit

3    10.  It's the disk that has Ms. Marx's backup.  If I forgot to

4    offer it, I offer that.

5           MR. RYAN:  Same objection.

6           THE COURT:  It is received.

7           It was offered and admitted over objection as noted.

8           MR. WEDDLE:  Thank you, your Honor.

9           MR. DRATEL:  May I proceed, your Honor?

10           THE COURT:  Yes, you may.

11           MR. DRATEL:  Thank you, your Honor.

12    DIRECT EXAMINATION

13    BY MR. DRATEL:

14    Q.  Good morning, Ms. Marx.

15    A.  Good morning.

16    Q.  I want to talk to you about Government Exhibits 16 and

17    12-A.  If we could have Government Exhibit 16 up.  If you could

18    blow up the top portion of it, please.

19           Those 427 Long Island Rail Road employees seen by

20    Dr. Lesniewski between January 2003 and September 2008 includes

21    any Long Island Rail Road employee, right?

22    A.  Yes.

23    Q.  Even going down to the 410 number of those eligible for the

24    pension, and even going down further -- but you don't have to

25    do it right now -- but down to the 411 who applied and the 404

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7pnles2                         Marx - cross

1   who received disability.

2              MR. WEDDLE:  Objection, your Honor, I don't know where

3   he's getting these numbers from.

4              THE COURT:  Those numbers don't appear on this.

5              MR. DRATEL:  They are on the chart.

6              MR. WEDDLE:  The numbers on the chart, your Honor, are

7   403 and 410.

8              MR. DRATEL:  Not the one I have as Government Exhibit

9   16.  I have 404 and 7.  In any event, your Honor.  OK.

10  Q.  Ms. Marx.

11  A.  Yes.

12  Q.  They could have seen Dr. Lesniewski for any reason, right?

13  A.  Yes.

14  Q.  It could have been one visit, right, and no more?

15  A.  Yes.

16  Q.  It could have been patients who had been seeing

17  Dr. Lesniewski for a decade, right?

18  A.  Yes.

19  Q.  Could have had nothing to do with the disability

20  application, right?

21  A.  Yes.

22  Q.  They could have had surgery?

23  A.  Yes.

24  Q.  They could have seen Dr. Lesniewski and he could have told

25  them there is nothing wrong with you, right?

D7pnles2                          Marx - cross

1    A.  Possibly.

2    Q.  Now, you cross-referenced with United Healthcare records,

3    right?

4    A.  Yes.

5    Q.  On direct you were asked and answered yes that you don't

6    typically handle United Healthcare records, right?

7    A.  Yes.

8    Q.  Is this the first time you have handled United Healthcare

9    records in this way?

10   A.  Yes.

11   Q.  You said you went by claims, right, United Healthcare

12   claims?

13   A.  Yes.

14   Q.  That had Dr. Lesniewski and Long Island Rail Road

15   employees?

16   A.  Yes.

17   Q.  Claims information.  And the claims information is done by

18   policyholder?

19   A.  I don't understand the question.

20   Q.  The claims organized for United Healthcare, the information

21   that you received, claims organized by policyholder?

22   A.  I don't understand.

23   Q.  How were the claims identified?

24   A.  They were by line, by patients, their name, Social Security

25   number, the doctor they saw.

D7pnles2                      Marx - cross

1    Q.  When you say patient, is that the policyholder?

2    A.  I don't know if it's a policyholder.  There is a patient

3    Social Security number --

4    Q.  Do you know whether dependents have their Social Security

5    numbers on claims information to United Healthcare?

6         Do you know?

7    A.  In some cases they did, some did not; some there was a

8    subscriber number.

9    Q.  Subscriber number?

10   A.  Yes.

11   Q.  And your EDMA code 1311 relates only to RRB files, right?

12   A.  Yes.

13   Q.  Not to United Healthcare files, you can't sort out United

14   Healthcare files with a 1311 code, right, within the United

15   Healthcare files themselves, leaving aside the RRB?

16            MR. WEDDLE:  Objection, your Honor, 403.

17            THE COURT:  Mr. Dratel, clarify the question.

18            MR. DRATEL:  Sure.

19   Q.  The 1311 code applies only to what is in the RRB files,

20   right?

21   A.  Yes.

22   Q.  It doesn't apply to what is in the United Healthcare files?

23   That is a separate database, right?

24   A.  Yes.  It is a separate spreadsheet.

25   Q.  Right.  Now, if we could look now at 12-A, government's

D7pnles2                          Marx - cross

1    12-A.  Those 134 between August 2004 and August 2008, those 123

2    patients of Dr. Lesniewski, those are the ones that you

3    identified him being involved in the AA-1d as a signator or in

4    some other capacity where he was making a recommendation or a

5    narrative or something like that, correct?

6    A.  Yes.

7    Q.  Now, that is over a 55-month period, right?

8    A.  About.

9    Q.  So that would average about two and a half almost, nearly

10   two and a half per month, right?

11   A.  I haven't done the math.

12   Q.  Do you want to do the math?

13   A.  No.

14   Q.  Does it sound --

15   A.  It sounds right.

16   Q.  Did you check that against Dr. Lesniewski's 100 to 120

17   visits per week in his practice?

18            MR. WEDDLE:  Objection, your Honor.

19            THE COURT:  Sustained.

20   Q.  Did you check that against the number of visits he had in

21   his practice on a weekly basis?

22   A.  No.

23   Q.  If we could go to government's -- I think it's 14-B and C.

24   14-B is Albano, is that right?

25   A.  Yes.

D7pnles2                          Marx - cross

1   Q.   And 14-C is LiPuma?

2   A.   14-C is Viola.

3   Q.   I'm sorry, 14-A then.   14-A is LiPuma?

4   A.   Correct.

5   Q.   Those are two patients who saw Dr. Lesniewski but then

6   obtained a narrative from Dr. Ajemian, correct?

7   A.   Yes.

8   Q.   Do you know if they changed to Dr. Ajemian because they

9   weren't satisfied with Dr. Lesniewski's diagnosis?

10   A.   I don't know.

11   Q.   They didn't even include Dr. Lesniewski's records in their

12   application, correct?

13   A.   Yes.

14   Q.   Do you know whether Dr. Lesniewski told him there was

15   nothing wrong with him and that's why they didn't include his

16   records in their application?

17   A.   I have know idea.

18   Q.   Did you do any analysis of the doctors who -- withdrawn.

19   With respect to C, Viola, that was another doctor who submitted

20   that form, right?

21   A.   When you say submitted that form --

22   Q.   I'm sorry.   Who gave the recommendation of disability, not

23   Dr. Lesniewski, right?

24   A.   Yes.

25   Q.   Did you do a comparison of Dr. Lesniewski's rates, whether

D7pnles2                         Marx - cross

1    it was 2005, whether it was approvals, with any other doctor

2    other than Dr. Ajemian or Dr. Parisi?

3    A.   I don't understand the question.

4    Q.   You have charts where you compared rates of, let's say for

5    2005 the time frame of disability recommendations, right?

6    A.   Right.

7    Q.   For 2005, you have two charts, right?

8    A.   Correct.

9    Q.   Other than for Dr. Ajemian, did you do any analysis of any

10   other doctor in comparison?

11   A.   For that year, no.  It was just the two doctors.

12   Q.   Did you do the other years as well for Dr. Lesniewski?

13   A.   I've done many summaries.

14   Q.   Did you do any other years for those two particular charts?

15   A.   Charts -- for Dr. Lesniewski I did other years.  I reviewed

16   other narratives for other years for him.

17   Q.   Not review the other narratives.  Did you compile the

18   information like you did for 2005?

19   A.   For Dr. Lesniewski, yes, for 2004 through 2007.

20   Q.   You were asked to do a chart for 2005, right?

21   A.   Correct.

22          MR. DRATEL:  If we could go back to 16, please.  If we

23   could go to the portion that is highlighted, that second table,

24   please.

25   Q.   So a total of 410 patients received disability who had seen

D7pnles2                          Marx - cross

1    Dr. Lesniewski, correct?

2    A.   Correct.

3    Q.   But again you don't know of those -- withdrawn.

4          MR. WEDDLE:   Your Honor, objection.   That is not what

5    it says.

6    Q.   Eligible LIRR employees seen by Dr. Lesniewski during that

7    period of time who at some point received disability, right?

8    A.   Yes.

9          MR. WEDDLE:   Objection, your Honor, it is not 410.   It

10   is on the screen.   It is 403.

11   Q.   403.   403 total, with the seven who were denied.   So it's

12   403, right?

13   A.   Yes.

14   Q.   In 12-A, without going back to 12-A, you identified 134 for

15   a slightly shorter time period in which he was connected to the

16   recommendation in some way, right, meaning that he either

17   signed the G-250 --

18         MR. WEDDLE:   Objection, your Honor.

19   Q.   Did the narrative --

20         MR. WEDDLE:   Objection.   It is not in some way.   There

21   is a specific way.

22         THE COURT:   Rephrase it Mr. Dratel.

23   Q.   That he either made a recommendation for disability, did a

24   narrative or signed a G-250, right?

25         MR. WEDDLE:   Objection.   Misstates.

D7pnles2                          Marx - cross

1              THE COURT:  Overruled.

2    Q.  Right?  The 134 that you identified that he was involved --

3    withdrawn.  The 134 that you identified in 12-A, Dr. Lesniewski

4    either made a recommendation for disability, signed the G-250,

5    submitted a narrative, right?

6              THE COURT:  All right.  Mr. Dratel --

7              MR. DRATEL:  I will ask it differently.

8              THE COURT:  Mr. Weddle, could you clarify what it is

9    that Mr. Dratel is saying that doesn't satisfy you.

10             MR. WEDDLE:  Yes, your Honor.

11             The witness testified to a very specific criteria used

12   to put people into this chart, I believe it was question 26 of

13   the AA-1d.  It was not a list of things, as Mr. Dratel was

14   saying.

15   Q.  You reviewed narratives as well, right?  You looked through

16   his narratives, too, right?

17             MR. WEDDLE:  If he wants to ask her about this chart,

18   let's put on it on the screen and talk about it.

19             THE COURT:  Let's put on the record what it is that

20   were the criteria for the 134.

21             MR. DRATEL:  All right.

22             THE COURT:  Whatever the criteria is, and move on.

23   A.  It was question 24 of the AA-1d.

24   Q.  24.  All right.

25   A.  For 12-A.

D7pnles2                          Marx - cross

1   Q.  Those are the 134 that you identified, correct?

2          So there are potentially, from these 403 who received

3   disability, 279 I guess who received disability who he wasn't

4   on question 24, right, potentially?

5   A.  I can't answer that.

6   Q.  You didn't look for those?

7   A.  For Exhibit 16?

8   Q.  Yes.  For Exhibit 16?

9   A.  No, I cannot answer that.

10  Q.  There are only 134 that could be -- I'm sorry, that you had

11  identified him as from question 24 on the AA-1d, right?

12  A.  Yes, for that time period.

13  Q.  So, if we do the math, it's 269, right?

14          MR. WEDDLE:  Objection, your Honor.

15  Q.  If you take away the 134 --

16          MR. WEDDLE:  That wasn't.

17  Q.  Were you speaking to someone else?

18  A.  I didn't say anything.

19  Q.  I don't know who you were motioning to.

20          THE COURT:  Mr. Dratel, we're getting far from very

21  confusing numbers because the data is based on different

22  assumptions.  You know that.  It is very confusing and those

23  numbers don't mean anything because they're based on different

24  assumptions.

25          MR. DRATEL:  That's the original problem, your Honor,

D7pnles2                          Marx - cross

1   that we are trying to address.  That's why this -- well, your

2   Honor, if you want me to be heard.

3              THE COURT:  Don't ask a question that has no answer.

4   Q.  If you subtract 134 from 403, you get 269, right?

5   A.  Yes.

6              MR. WEDDLE:  401 and 403 objection to the last

7   question.

8              THE COURT:  Sustained.

9              MR. DRATEL:  Your Honor, may I be heard?

10             THE COURT:  No.  Let's move on.

11  Q.  That 98.3 approval rate that you see there in 16, 98.3

12  approval rate, right?

13             MR. WEDDLE:  Objection, your Honor.

14             THE COURT:  Overruled.

15  Q.  Of the people who got approval --

16             MR. DRATEL:  It doesn't use the word approval.

17  Q.  These are people who were approved for disability, correct,

18  by RRB?

19  A.  Yes.

20  Q.  So it's a 98.3 approval rate?

21             THE COURT:  Asked and answered.

22  Q.  That includes AA-1ds that Dr. Lesniewski was not identified

23  in question 24, correct?

24  A.  I cannot answer that.

25  Q.  Well, you know that, right?

D7pnles2                          Marx - cross

1    A.  The charts, if I could just explain --

2    Q.  No.  I can't answer it that way.

3           MR. DRATEL:  Your Honor, I --

4           THE COURT:  Mr. Dratel, if you have a point, get to

5    the point.  If you don't have a point, let's move to the next

6    one.

7    Q.  You know that Dr. Lesniewski was not on question 24 for all

8    of those 403 patients, right?

9    A.  I didn't review all 403 claim files.

10   Q.  That is not what I asked.  What I asked was you know he's

11   not on question 24 for all 403, correct?

12   A.  I cannot answer that.

13   Q.  You didn't look at a single one beyond the 134 to determine

14   whether he was on the question 24 or not?

15   A.  This group of individuals are different potentially in many

16   instances than these because these people may have seen

17   Dr. Lesniewski back in 1990.

18           All I had was UHC claims starting in January 2003.

19   Some of these claim files I probably did not even touch.  A lot

20   of them I may not have even touched because this was the data

21   that we had, and they may have seen him in years, like you had

22   mentioned earlier, decades earlier.  So I don't know.

23   Q.  How long have you been working on this investigation?

24   A.  Nine months.

25   Q.  You have had time to do all these other charts, right?

D7pnles2                              Marx - cross

1    A.  Yes.

2    Q.  Did you put in a number for which you can't tell it has any

3    relation where Dr. Lesniewski recommended disability for a

4    patient?

5               MR. WEDDLE:  Objection, your Honor.  The government

6    offered the exhibit.

7               THE COURT:  All right.  Sustained.

8    Q.  You can't tell us how many of those 403 Dr. Lesniewski

9    signed a -- sorry, whether he was on question 24, right?

10   A.  I cannot answer.

11   Q.  You can't tell us whether even a single one beyond the 134

12   has him on question 24, right?

13   A.  Yes, you're right.

14   Q.  So there could be 269 out of these 403 that were other

15   doctors on the 24, right?

16   A.  I don't know.

17   Q.  You don't know, but it could be, right?

18   A.  I don't know.

19               THE COURT:  Asked and answered.

20   Q.  And those 269 doctors would also have a 98.3 approval rate,

21   right?

22               MR. WEDDLE:  Objection, your Honor.  Calls for

23   speculation.

24               THE COURT:  Sustained.

25   Q.  Let's do the math.  269 --

D7pnles2                         Marx - cross

1                MR. WEDDLE:  Objection to the math.

2                THE COURT:  Sustained.

3   Q.  Did you do any analysis of any other railroad with respect

4   to approval rates for disability?

5   A.  No.

6   Q.  So there is nothing to compare the Long Island Rail Road to

7   from your data, right?

8   A.  Other than the first chart with Metro-North, the

9   occupational disability for ages 50 to 55.

10  Q.  No.  I am talking about approval rates for applications.

11               MR. WEDDLE:  Objection, your Honor.  She was answering

12  the question.

13  Q.  Approval rates for applications, not the age of retirement.

14  We'll get to that.

15  A.  No.

16  Q.  Did you do the rate of approval for the other 126 doctors

17  in the chart --

18               MR. DRATEL:  Let's go to 12-A and B, please.

19  Q.  The 126 doctors other than the three that are set forth,

20  right?

21  A.  Yes.

22  Q.  Did you do their approval rates?

23  A.  No.

24  Q.  You have that data, right?

25               MR. WEDDLE:  Objection, your Honor.

D7pnles2                          Marx - cross

1    Q.  You have all the RRB data, right?

2           MR. WEDDLE:  It is not approval rates.  It is people

3    on disability.  This says something about people who were not

4    approved.

5           THE COURT:  Sustained.

6    Q.  I am not asking about the chart itself.  I'm saying, did

7    you do an approval rate for applications submitted by those

8    doctors?

9    A.  No.

10          MR. DRATEL:  If we could have government 24, please.

11   Q.  Now, this covers the same time frame as 16, right?

12   A.  Yes.

13   Q.  Which means January 2003 through August 2008?

14   A.  Through September 2008, yes.

15   Q.  It says January to August at the bottom there, but you are

16   saying September, right?

17   A.  Yes.

18   Q.  The chart is wrong?

19   A.  It's not wrong.  There's a $400 in September and it's

20   included in the number.  The numbers are accurate on the chart.

21   Q.  But the information is not accurate, right?

22          MR. WEDDLE:  Asked and answered.

23          THE COURT:  Asked and answered.

24   Q.  Now, with respect to those numbers, they include any

25   patient during that time period who United Healthcare paid

D7pnles2                          Marx - cross

1    through a Long Island Rail Road policy, right, paid on a claim

2    to Dr. Lesniewski, any patient he saw, right?

3    A.  But this chart is for Long Island employees.

4    Q.  It is for their claims, right?

5    A.  I don't understand what you mean by claims.

6    Q.  Claims, claims made under their policy?

7    A.  I know it's under their policy.  The chart that I used

8    showed that they saw Dr. Lesniewski, and this includes the

9    amount that was paid to him for seeing that particular Long

10   Island employee.

11   Q.  Under their policy you said, at one point you said

12   something that just had subscriber information and not --

13              MR. WEDDLE:  Objection, your Honor.  Totally misstates

14   the testimony.

15   Q.  But it includes patients who were patients of his for

16   decades, right?  Were they included?

17   A.  Possibly.

18   Q.  And people who saw him once and never again, right?

19   A.  Possibly.

20   Q.  It could include surgery, right, these payments, right?

21              MR. WEDDLE:  Asked and answered.

22   A.  Yes.

23   Q.  It includes any Long Island Rail Road employee --

24              THE COURT:  Asked and answered.

25   Q.  -- who saw him for any reason?

D7pnles2                          Marx - cross

1          THE COURT:  Asked and answered.

2    Q.  You didn't go into any analysis of any particulars for

3    these payments, right?  These were all just gross numbers?

4          MR. WEDDLE:  Objection, your Honor.

5          THE COURT:  Sustained.

6    Q.  What they were for?

7    A.  You mean the procedure code, what it meant?  No.

8    Q.  If we look at these numbers from 2004 through 2007 and then

9    2008, it declines every year, right?

10   A.  Yes.

11   Q.  By the end dramatically, right?

12   A.  Yes.

13   Q.  So, if Dr. Lesniewski was involved in a fraud, one should

14   expect those numbers to go up, wouldn't one?

15   A.  I would not know.  I used the information I was given from

16   the United Healthcare records, and this is the data, the output

17   of my analysis.

18   Q.  Did you compare what he received from United Healthcare to

19   any of the other doctors, any of the 126 doctors who treated

20   the other Long Island Rail Road patients and were on those

21   question 24s?

22   A.  No.

23   Q.  Any other doctors treat any Long Island Rail Road patients

24   generally?

25   A.  No.

D7pnles2                          Marx - cross

1    Q.  In the nine months you have been involved with this

2    investigation, you have worked closely with the prosecution

3    team, correct?

4    A.  Yes.

5    Q.  And with the entire prosecution team, including all the

6    people from RRB, and the other agencies involved, right?

7    A.  Yes.

8    Q.  Is it fair to say that, in addition to performing certain

9    analysis at their direction, you have also tried to come up

10   with your own ideas about how to analyze the data?

11   A.  Yes.

12   Q.  But no one ever thought to analyze any other doctors,

13   right?

14           MR. WEDDLE:  Objection, your Honor.

15   Q.  Other than the one --

16           THE COURT:  Sustained.

17   Q.  Let's go to Government's Exhibit 11.

18           You work at the RRB, right?

19   A.  I work for the --

20   Q.  The OIG?

21   A.  Yes.

22   Q.  But connected to the RRB, right, so you are familiar with

23   RRB?

24           MR. WEDDLE:  Objection, your Honor.

25           THE COURT:  Sustained.

D7pnles2                        Marx - cross

1    Q.  You are aware, aren't you, that Metro-North employees can't

2    retire until they are 55, can't get a full pension until they

3    are 55, and Long Island Rail Road employees can retire at 50.

4              You are aware of that, aren't you?

5    A.  I am not too familiar with Metro-North's retirement policy

6    or program.

7    Q.  So you just ran numbers?

8    A.  I did.  Essentially that is what I did.

9    Q.  But that would make that chart meaningless, wouldn't it?

10             MR. WEDDLE:  Objection, your Honor.

11             THE COURT:  Sustained.

12             MR. WEDDLE:  Is he actually asking a question.

13   Q.  Just for the record, are you aware that Metro-North

14   employees cannot retire with a full pension until the age of

15   55?

16   A.  I cannot say I am a hundred percent sure.  That wasn't my

17   job.  I am not an expert with the retirement programs for any

18   of the railroads.

19   Q.  You have dealt with Robert Murray also on this

20   investigation, right?

21   A.  A handful of times.

22   Q.  Did you share information with him?

23   A.  A few times, yes.

24   Q.  You know he's at MTA, right?

25   A.  Yes.

D7pnles2                          Marx - cross

1    Q.  Which runs both Long Island Rail Road and Metro-North,

2    right?

3    A.  I don't know too much about him.

4    Q.  Let's go to 14-C, please.  This is the application for

5    Frank Viola, correct?

6    A.  Right.

7    Q.  This is the one that Dr. Chernoff is identified in question

8    24, correct?

9    A.  Yes.

10   Q.  It also includes Dr. Lesniewski's records, right?

11   A.  Yes.

12   Q.  You were asked a question about a New York Times article on

13   direct, and timing, right?

14   A.  What was that?

15   Q.  You were asked a question by Mr. Weddle about the timing of

16   a New York Times article, correct?

17   A.  Yes.

18   Q.  And you know also that even before that New York Times

19   article Dr. Lesniewski had moved to Illinois, right?

20   A.  No.  I don't know when he moved or if he moved.

21   Q.  No one told you anything about that?

22   A.  No.

23             MR. WEDDLE:  Objection, your Honor.

24             THE COURT:  Sustained.

25             MR. DRATEL:  So can we look at the -- if we can go to

D7pnles2                          Marx - cross

1    page --

2    Q.  Do you have that front of you?  Actually, you don't need

3    to.  We can put it up there.

4            MR. DRATEL:  You need the page number of the exhibit

5    as opposed to the Bates, right?  I'll give you the page number

6    of the exhibit.  I think it's probably 35.

7            MR. WEDDLE:  May I just have a moment with counsel?

8            That is the start page.

9            MR. DRATEL:  The last page, OK.  So it's the last

10   page.  We'll start with that.

11           MR. WEDDLE:  Sorry, your Honor.  We are just having a

12   frozen computer issue.

13           MR. DRATEL:  If we could blow up the part right

14   underneath the name.

15   Q.  Do you see in the handwriting it says, above his name it

16   says "Conductor," do you see that?

17   A.  Yes.

18   Q.  Underlined?

19   A.  Yes.

20   Q.  And then underneath his name it says "C/O," and that means

21   complained of, right, complains of, if you know?

22   A.  I do not know that.

23   Q.  It says "feels broken," right?

24   A.  Yes.

25   Q.  Then it says "knee" after that, right?  If you can't read

D7pnles2                          Marx - cross

1    it, that's fine.  Then the next one, "Complains of lower back,"

2    right?

3    A.  Yes.

4    Q.  Next, "Neck"?

5    A.  Right.

6    Q.  And then it talks about medications.  It says, "Took

7    Daypro, took Naprosyn, now takes aspirin, two every a.m.  This

8    flareup took six a day."

9            Right?

10   A.  OK.

11   Q.  Do you see that?

12           You see typed up March 30, 2005, right?

13   A.  Yes.

14   Q.  It says "Conductor on the Long Island Rail Road"?

15   A.  Yes.

16   Q.  It says, "Has knee pain, especially on stairs, low back

17   pain, neck pain as well.  Been taking Daypro on and off, seems

18   to be somewhat helpful."  Right?

19   A.  Yes.

20           MR. DRATEL:  If we could go to the preceding page,

21   please.  If we could just put up the top part, please.

22   Q.  That is a report from a radiology lab, right?

23   A.  Yes.

24           MR. DRATEL:  If we can go to the preceding page.  If

25   we just look at the handwritten -- actually the one that has

D7pnles2                              Marx - cross

1    the handwriting.  If you would just blow up the top half of the

2    page.

3    Q.  You see where it says 4/26/05, right?

4    A.  Yes.

5    Q.  So, just for purposes of why we're going backward in terms

6    of preceding pages, it seems to go in the opposite order,

7    correct --

8    A.  Yes.

9    Q.  -- chronologically.

10   A.  Yes.

11   Q.  So let's look --

12            THE COURT:  Mr. Dratel, let me interrupt for a moment.

13   I've lost track of where does this connect to anything on

14   direct.  This witness has not testified to anything relating to

15   treatment of specific patients.  What is the connection?

16            MR. DRATEL:  If I could be heard your Honor, because I

17   don't want to do it in front of the jury.  I have a strong

18   basis to do this.  I would be happy to give it.

19            THE COURT:  I will allow you a couple of more

20   questions, but then you are going to have to make the

21   connection.

22   Q.  Well, it rebuts something in direct, your Honor.  I would

23   rather not repeat the government's insinuation.  I need to

24   rebut it.

25            THE COURT:  I don't know whether this witness is the

D7pnles2                          Marx - cross

1    proper witness to rebut.

2                MR. WEDDLE:  She was the proper witness for government

3    to do it on direct.

4                THE COURT:  Go ahead and I'll rule when you get to the

5    point.  Go ahead.

6    Q.  Do you see there it says, "Will put him on Daypro for a

7    time," the last two lines of the typewritten, right?

8    A.  Yes.

9    Q.  And then if you go to the bottom of that page where it

10   says, that paragraph says, "I discussed treatment options with

11   him"?

12   A.  Yes.

13   Q.  And the last sentence, "We can hold off, but he will

14   require surgery"?

15   A.  Yes.

16   Q.  If you look at the paragraph right above that, it says, if

17   you go to the typewritten paragraph above that, it says, "At

18   this time I think an MRI of his lumbar spine is indicated just

19   because that is the worst area."  Right?

20   A.  Yes.

21   Q.  Now let's go to the preceding page, please.  Do you see the

22   entry for August 19 where it says, "He's actually doing quite

23   well, considering that he does have a huge herniated disk,"

24   right?

25   A.  Yes.

D7pnles2                        Marx - cross

1   Q.  And it says "Plan" -- do you see at the bottom there.  It

2   is typewritten.  "Since he is minimally symptomatic, I would

3   just keep him as is.  I think he is at high risk to have

4   significant pain, but he is OK for now"?

5   A.  Yes.

6   Q.  Then if we go to the preceding page, the top of the page.

7           THE COURT:  Mr. Dratel, one more question and then get

8   to the point.

9           MR. DRATEL:  I just have a couple more.

10          THE COURT:  If you don't have a point, I am going to

11   put an end to it.

12          MR. DRATEL:  I just have a couple more, your Honor, if

13   I may.

14   Q.  Do you see the last sentence, "It is suggested that the

15   patient return when it is painful"?

16   A.  Yes.

17          MR. DRATEL:  Then if we could just go -- it's two

18   pages before.  Sorry.  It's probably about six pages before.

19          MS. LARSON:  What is the date?

20          MR. DRATEL:  The date is September 3, '08.  It's

21   probably the second or third page of the -- actually, it's

22   maybe -- I think it's the first page of that part of his chart.

23   I think you went by it.  That's it.  If you could blow up the

24   typewritten part, please.

25   Q.  That is September 3, 2008, right?

D7pnles2                          Marx - cross

1  A.  Yes.

2  Q.  It says, "Plan, at this juncture the patient will be

3  referred to Dr. Meyer for evaluation and treatment."  Right?

4  A.  Yes.

5  Q.  Do you see the initials after that, "PL" for Peter

6  Lesniewski?

7  A.  OK.  I don't know if those are --

8  Q.  You don't know if those are his initials?

9  A.  It is noting that that I focused on for my analysis.

10 Q.  So it had nothing to do with the New York Times article,

11 right before the New York Times article ever appeared he had

12 referred this patient to Dr. Meyer, right?

13             MR. WEDDLE:  Objection, your Honor.

14             THE COURT:  Sustained.

15 Q.  Now, if we look at Dr. Chernoff's report in the same --

16             THE COURT:  All right.  Mr. Dratel, please approach.

17        (Continued on next page)

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1648

D7pnles2                              Marx - cross

1            (At sidebar)

2            THE COURT:  Mr. Dratel, we just spent 20 minutes

3    meandering through Mr. Viola's records.  I still don't see the

4    point of what you are trying to get to, what bearing it has on

5    anything that she testified to on direct.

6            MR. DRATEL:  OK.

7            THE COURT:  Or whether she had any reason to be

8    testifying about the particular individual's report.  If you

9    are going to go into another one, and it is going to be the

10   same thing, I am going to end it right now.

11           MR. DRATEL:  Let me explain to the Court where I am

12   going and why I went there.

13           Where I am going.  One is that they created a totally

14   gratuitous insinuation through her, not a qualified witness for

15   it, on the issue of when he changed doctors and the New York

16   Times article, as if the person changed doctors because

17   Dr. Lesniewski had a problem.

18           Totally false.  They know it is false.  They know

19   Dr. Lesniewski moved, and they know this guy saw a doctor

20   referred by Dr. Lesniewski when he moved before the New York

21   Times.

22           I believe I have a right to completely obliterate that

23   insinuation by showing the nature of the chart and that it is a

24   totally ordinary, perfectly good chart.  There is nothing about

25   it that has any indicia of anything.  It has all the stuff in

D7pnles2                    Marx - cross

1   it that you would have in any chart, including the pact that he

2   is a conductor on the Long Island Rail Road, all the things

3   that they claim in the course of this case are suspicious

4   factors in a chart.

5        they opened the door by putting in that New York Times

6   reference through her for no reason whatsoever.

7        Second, Dr. Chernoff's chart has things in it that are

8   suspicious.  I want to ask her if she did an analysis of him

9   because he calls him a her.  He says the patient came to me to

10  retire.  That is what he says in his chart.  The patient is

11  retiring.

12       This is all the stuff that they have done, and they

13  created an insinuation with this file.

14       Your Honor, also, the second thing is, yesterday when

15  you admitted those documents, you said you would give us

16  leeway.  Respectfully, you cut me off at the knees on this.

17  There is no way to make hay with that without being able to get

18  underneath it.  It is confusing because it is incomprehensible

19  to the jury and it is meaningless, and I should have the right

20  to show that it is meaningless.

21       You are sustaining objections on 403 grounds, but this

22  is a 403 problem that they created, not me.  It is their

23  creation, not mine.  I think that is unfair to constrain me so

24  that I cannot cross-examine the witness to show either that she

25  doesn't know anything or what she does know proves that it is

D7pnles2                          Marx - cross

1   meaningless.

2              MR. WEDDLE:  Your Honor, if I just respond briefly to

3   the last point.

4              With respect to the charts, Government Exhibits 16 and

5   12-A, their objection on 403 grounds was that these charts were

6   talking about different numbers and someone might be confused.

7              The government at great length allayed that concern.

8   In the order that they requested we did it, and we separated

9   those numbers out and then they tried to just mix them back

10  together which was confusing.  I don't have a problem with this

11  cross-examination that he's doing.  If he wants to do it, it is

12  fine with me.  I find it boring, but I don't think that it

13  points to what he is saying.

14             THE COURT:  I have a problem because it is taking too

15  long.  This jury is getting bored by Mr. Mr. Dratel.

16             MR. DRATEL:  I'm sorry, your Honor.

17             THE COURT:  Take my experience about judging --

18             MR. DRATEL:  I know.

19             THE COURT:  -- jury boredom.  The level is going up.

20             If you have a point, as I said before, do it in two or

21  three questions, not 40.  If your point is that when

22  Dr. Lesniewski moved to Chicago, ask her point blank does she

23  know when he moved to Chicago.

24             MR. WEDDLE:  He asked that and she answered it.

25             MR. DRATEL:  He insulated her from that.

D7pnles2                        Marx - cross

1          MR. WEDDLE:  Your Honor, this is absurd.

2          MR. DRATEL:  They didn't insulate her from the New

3     York Times.

4          MR. WEDDLE:  Witness have to testify based on their

5     knowledge.  If I tell her that he moved, that is not

6     admissible, first of all.

7          Second of all, they are trying to talk about why he

8     moved and when he moved to Chicago.  They opened on an a

9     completely incorrect reason why -- I mean, I guess they can

10    have their reason, but he moved because they pulled his

11    insurance.

12         THE COURT:  Mr. Weddle, is there another witness who

13    is yet to come who is in a better position to testify about

14    those issues, about when he moved and under what circumstances,

15    than this witness?

16         MR. DRATEL:  I am not going to do the moving anymore.

17    That's done.  It is a totally improper question by Mr. Weddle

18    because he knows the answer.  He knows from this chart that

19    that is not why this guy changed.  It had nothing to do with

20    the New York Times article.  That insinuation is what I had to

21    address.  This is what I am going to do.  Just a couple more

22    questions with this.

23         THE COURT:  Why would she know why?

24         MR. DRATEL:  That's the point.  They got a gratuitous

25    question and answer about the New York Times article that they

D7pnles2                      Marx - cross

1    know is a false insinuation.  They know it's completely wrong

2    and he did it anyway.

3                MR. WEDDLE:  Your Honor --

4                MR. DRATEL:  What is the purpose of that question if

5    not --

6                MR. WEDDLE:  The purpose of that question, your Honor,

7    was that this person was going through the process that

8    everyone has seen time and time again with Dr. Lesniewski and

9    preparing to go out on disability and then he delayed that.

10   That is the point of that.

11               It also explains the fact that he didn't get a letter

12   from Dr. Lesniewski.  I don't know what his communications are

13   with Dr. Lesniewski.  But I think it is a fair inference that

14   people stopped getting letters from certain doctors because the

15   New York Times article came out.  In addition, Dr. Lesniewski

16   was not around because his insurance had been cancelled in New

17   York.

18               MR. DRATEL:  Your Honor, you see he just admitted

19   that's why he put it in, to show a juxtaposition between when

20   this person changed doctors and the New York Times article.

21   That is improper because they know that he referred him to

22   another doctor even before the Times article came out and he

23   what gone from New York by then.  They know it's completely

24   improper.

25               MR. WEDDLE:  It is not completely improper.

D7pnles2                        Marx - cross

1            MR. DRATEL:  It is a violation of a prosecutor's duty,

2    absolutely.  There is no question about that.

3            THE COURT:  Let's not get into recriminations.  Again,

4    Mr. Dratel, the question is, is this witness the proper witness

5    to be answering the 40 questions that you have asked so far of

6    which she has absolutely no knowledge.

7            MR. DRATEL:  I am just going to ask her a couple of

8    guess about Dr. Chernoff.  That is all.  Probably two

9    questions.

10           THE COURT:  Two questions.

11           MR. DRATEL:  Yes.

12           THE COURT:  The questions have to have a bearing to

13   what the point is, which is does it connect to when

14   Dr. Lesniewski moved to Chicago.

15           MR. DRATEL:  I want to ask her whether they did any

16   analysis of Chernoff based on the information in those two

17   answers.

18           THE COURT:  Ask if they are doing an analysis of

19   any -- Chernoff is one of the other doctors?

20           MR. DRATEL:  He's one of the 26.

21           THE COURT:  If that is your question, ask did they do

22   any analysis of Dr. Chernoff as part of the 16.  Ask her

23   directly.

24           MR. DRATEL:  I just have a two-question predicate.

25           THE COURT:  Go ahead.

D7pnles2                         Marx - cross

1          MR. DURKIN:  Judge, can I just ask one question.  I

2     don't know the answer to this.  Have we gotten any 302s or

3     discovery on Mr. Viola.  Have you interviewed Mr. Viola?

4          MR. WEDDLE:  I don't know off the top of my head.  I

5     believe we have produced, there are 302s in the investigative

6     stage of this case.

7          MR. DURKIN:  I just make a request for that now if we

8     can get it.  I don't need at this moment.

9          MR. WEDDLE:  I am not sure what the basis would be for

10    turning that over.  If we had one, I think we have turned it

11    over.  But I am not sure what the basis would be for having to

12    turn it other in the middle of trial.

13         MR. DURKIN:  The basis simply would be whether or not

14    the government knew why this man changed doctors.  That is all.

15    I would like to know whether they have an interview of

16    Mr. Viola.

17         MR. WEDDLE:  Your Honor, we made a very simple point

18    with this witness based on analysis that she did based on claim

19    files.  It was a very simple point.  I find, obviously, as I

20    said to your Honor before, I understand that some defense

21    counsel think that it is part of their duty of zealous

22    representation to make personal attacks on the prosecutor.

23         THE COURT:  We don't need those editorials.

24         MR. WEDDLE:  I don't know if he's been interviewed.  I

25    don't know.  When I was doing my Q and A with this person, I

D7pnles2                    Marx - cross

1    don't have in mind, with the hundreds of interviews that have

2    been conducted in this the case.  There was fair question and

3    answer.  There was no improper insinuation.  There was nothing

4    like what Mr. Dratel is talking about.  I mean, if they want to

5    actually come up with some kind of good-faith basis for these

6    kinds of claims, they should feel free to do it, but it that

7    has nothing to do with the jury, and it has nothing to do with

8    this witness.

9              MR. DRATEL:  It is black and white in the file.  It is

10   black and white.  They know the dates that Dr. Lesniewski left.

11   It black and white.

12             MR. WEDDLE:  This witness is not aware of --

13             THE COURT:  If there are notes for Mr. Viola,

14   Mr. Durkin is asking for them.  Check your files to see if you

15   have any.  All right.

16             MR. DRATEL:  I don't think -- yes.

17             MR. WEDDLE:  Your Honor, can the defense first check

18   their files to see if the MOIs have been turned over.  If they

19   already have it, we don't have to waste time looking at our

20   files.

21             THE COURT:  Check your files.

22             MR. DRATEL:  We will check our file.

23             THE COURT:  All right.

24        (Continued on next page)

25

D7pnles2                         Marx – cross

1              (In open court)

2              THE COURT:  Mr. Dratel.

3              MR. DRATEL:  Yes, your Honor.

4    Q.  Ms. Marx, if you can go to that same exhibit, and if we

5    look at Dr. Chernoff's report, which is a couple of pages

6    earlier.  OK.

7              It is page 11 of the exhibit.

8              MR. DRATEL:  If you could blow it up.

9              August 10, 2009.  Blow up the bottom, please; the

10   bottom half, please.

11   Q.  Do you see where it says employment history, "Patient works

12   as a railroad conductor"?

13   A.  Yes.

14   Q.  "Patient had gone out sick July 28, 2009.  The patient

15   states she is going to retire."

16             Do you see that?

17             The fact that it states that the patient is going to

18   retire, did that cause you to or anyone to ask you to do any

19   analysis of Dr. Chernoff?

20   A.  No.

21   Q.  The fact that it is a he and not a she, the patient, right,

22   Frank Viola, did that cause anybody to ask you or you to do any

23   analysis of Dr. Chernoff and his rates of approval or how many

24   question 24s he was honoring?

25   A.  No.

D7pnles2                        Marx – cross

1   Q.  Do you know how many of the 126 were his?

2           MR. WEDDLE:  Objection, your Honor.  It is 126

3   doctors, 150 people.

4   Q.  150 people?

5   A.  Yes.  I don't know.

6           MR. DRATEL:  Nothing further, your Honor.

7           Thank you.

8           THE COURT:  Let me ask Mr. Jackson, how long do you

9   think you would need?

10          MR. JACKSON:  Judge, I am not sure.  45 minutes.

11          THE COURT:  Is it more than 10 minutes?

12          MR. JACKSON:  Significantly more than 10 minutes.

13          THE COURT:  We will take the morning break at this

14  point.  We will return at 11:15.

15          MS. FRIEDLANDER:  Judge, we have one quick thing.  I

16  apologize, your Honor.

17          (Continued on next page)

18

19

20

21

22

23

24

25

D7pnles2                          Marx – cross

 1          (Jury not present)

 2          THE COURT:  All right.  Ms. Friedlander.

 3          MS. FRIEDLANDER:  Judge, you will recall we had an

 4     issue yesterday regarding the fact that some records are

 5     missing and whether we were going to get a stipulation from the

 6     defense about that.  We proposed, and I think the defense is

 7     agreeable to this, to just, if the Court's agreeable to it, to

 8     just have the Court instruct the jury.

 9          MR. DURKIN:  Judge, I'm sorry.  I can't hear.

10          THE COURT:  We are having a conference up here.

11          MR. JACKSON:  Sorry.

12          MS. FRIEDLANDER:  We thought, rather than having the

13     parties enter into a stipulation the court could instruct the

14     jury that patient files, x-rays and -- I can send you the

15     language or write it for your Honor.

16          THE COURT:  Why don't you prepare agreed-upon language

17     which the parties stipulate the Court can read.

18          MS. FRIEDLANDER:  Yes.

19          Patient files, x-rays and certain MRIs performed on

20     certain patients seen by Dr. Lesniewski before he joined Island

21     Sports Medicine in or about 2005, including but not limited to

22     patients Joseph Rutigliano and Ostap Gus Baran were not

23     available to the government or any of the defendants in the

24     case.

25          That is all.

D7pnles2                    Marx - cross

1          MR. DURKIN:  I think Mr. Ryan has some language he

2     wants to add to that.

3          MS. FRIEDLANDER:  I sent this to Mr. Ryan last night.

4     I haven't received any objection to him.

5          THE COURT:  If you have any agreed-upon language,

6     submit it before we return.

7          MS. FRIEDLANDER:  OK.  Thank.

8          THE COURT:  Thank you.

9          (Recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7pdles3                           Marx - cross

1               (Jury not present)

2               THE COURT:  Thank you.  Be seated.

3               Mr. Jackson.

4               MR. JACKSON:  Yes, Judge.

5               THE COURT:  Do you now have a better estimate?

6               MR. JACKSON:  Yes.  You know what, Judge, I guess it

7     will probably be about 45 minutes, I'm thinking.

8               THE COURT:  All right.

9               MR. JACKSON:  I have a little bit of ground to cover.

10    I mean, I try not to be repetitive.  You won't let me be

11    repetitive.

12              THE COURT:  Absolutely.

13              MR. JACKSON:  But I'm thinking with the nonrepetition,

14    a half hour/45 minutes, depending upon, of course, the answers

15    and the elaboration of them.

16              THE COURT:  I'm sure the witness will be

17    correspondingly cooperative.

18              MR. WEDDLE:  Your Honor, I don't know if this is going

19    to come up with this witness, but there are a number of records

20    that Mr. Jackson said he intends to use on cross-examination

21    that he represented come from Long Island Rail Road.  I don't

22    think that this witness or any other witness today knows

23    whether they come from Long Island Rail Road or, if they do,

24    what time period they relate to, and so we are going to be

25    objecting to the extent he wants to ask these witnesses about

D7pdles3                         Marx - cross

1    those documents.

2                 THE COURT:  Are those documents -- first, Mr. Jackson,

3    are you proposing to have some of those documents admitted?

4                 MR. JACKSON:  I would, Judge, propose to admit them.

5    There is nothing in my view.  Maybe in the people's view --

6    excuse me, the government's view, maybe there is something

7    controversial about them.  But they are just job descriptions

8    with respect to various jobs at the Rail Road.  I think it is

9    relevant.  It will become relevant in my questioning and --

10                THE COURT:  Have you shared those exhibits or proposed

11   exhibits with the government?

12                MR. JACKSON:  I have, Judge.

13                MR. WEDDLE:  He gave me a list of them.  And we

14   produced certain iterations of job descriptions in our

15   discovery.  He has his own copies.  I don't know where they

16   came from.  Unless I see them and the Bates number, I can't

17   tell whether they came from us and I don't know what timeframe

18   they relate to.

19                THE COURT:  All right.  Those questions, if you can

20   spend two minutes talking about them now rather than later?

21                MR. JACKSON:  I would love to.  Again, I don't see

22   there is anything controversial.  The thing to fight about,

23   Judge -- what people's jobs were at the Rail Road I don't think

24   necessarily is, but if the government would like to, then here.

25                MR. DURKIN:  Judge, on the issue of Mr. Viola that we

D7pdles3                          Marx - cross

1    raised at the sidebar, I had someone in my office do a database

2    search of our discovery, and we do not have anything for

3    Mr. Viola.  So I would ask the government to produce whatever

4    they have.

5              THE COURT:  All right.

6              MR. WEDDLE:  Your Honor, I just wanted to add one

7    thing to what Mr. Dratel said before.

8              Mr. Durkin was the one who asked the witness about

9    whether the world turned upside because of a newspaper article.

10   I think we are entitled to point to that apparently watershed

11   event in Mr. Durkin view when we are talking to other

12   witnesses, to the extent they are aware of it.  If a witness

13   who is on the stand had been aware of other pertinent events,

14   he might have asked the witness about that.  My understanding

15   from talking to the witness is the witness was not aware of

16   other pertinent events, and that became clear in the

17   cross-examination when Mr. Dratel talked about other pertinent

18   events.

19             So there is nothing to this.  We are trying to put our

20   case on.

21             THE COURT:  Mr. Durkin, If there are any documents

22   that you may have pertaining to Mr. Viola, if you have some and

23   there is no reason to withhold them at this point, produce

24   them.  If they have any bearing at this point forward, we'll

25   discuss that at that point.

D7pdles3                           Marx - cross

1             MR. DURKIN:  Thank you, Judge.

2             MR. JACKSON:  Judge, just one moment.

3             THE COURT:  Yes.

4             MR. JACKSON:  While Mr. Weddle is still looking

5    through the documents.

6             THE COURT:  Yes.

7             (Pause)

8             MR. WEDDLE:  Your Honor, as to some of them, they look

9    authentic.  Many of them are dated from the 2000 time period.

10   I don't know, as I stand here today, whether they were

11   superseded by subsequent ones.  Some of them I don't see a

12   signature, and there is another fax line that says they relate

13   to a union.  I'm not sure if this was actually something that

14   was issued by the Long Island Rail Road.  And one of them has a

15   series of photographs attached to it.  I don't know if that is

16   something that was added by somebody or if that's part of the

17   original description.

18            But regardless of the authenticity of these documents,

19   your Honor, I don't think that there is any basis to think that

20   the witnesses who are going to be testifying today have any

21   reason to be able to talk about these.  If they want to talk to

22   a witness who is knowledgeable about job description at the

23   Long Island Rail Road about these issues, they can call a

24   witness like that on their direct case.  But I don't think that

25   this is appropriately used on cross-examination of witnesses

D7pdles3                          Marx - cross

1    who they have no reason to believe that those people are

2    familiar with these documents and --

3             THE COURT:  All right.  Let's then go to a couple of

4    questions, Mr. Jackson.

5             One is the bearing that these documents may have to

6    the witness' testimony on direct, I don't recall the witness

7    testifying about anything relating to job description or

8    specific ones at any particular time.  If these documents don't

9    have anything to do with the witness' either testimony or

10   specific area or expertise in these areas or these particular

11   documents, you are going to be wasting a lot of time.

12            MR. JACKSON:  Yes.  Judge, two quick things.

13            Number one is I have learned not to waste time, and it

14   wasn't my intent to waste time, and I think it is to make a

15   brief point that needs to be made.  The witness could do

16   whatever exhibits that she needed to do based upon the

17   direction of the government.  That is not to suggest or

18   otherwise say that other things did or did not go into the

19   exhibit which may be relevant for the jury's consideration.

20   That's number one.

21            Number two.  I'm not attempting to introduce exhibits

22   for any nefarious purpose and I think different witnesses --

23            THE COURT:  It is not a question of nefariousness, it

24   is a question of relevance and this witness' position to be the

25   witness to which these documents may have some relationship to

D7pdles3                         Marx - cross

1    this case.

2            MR. JACKSON:  I think I could tie in through what I

3    will elicit from the witness the relevance of that, again, if

4    your Honor would permit me two minutes of latitude with her in

5    that regard.

6            But, again, I think that we as the defense have

7    stipulated and acted in good faith in stipulating to a number

8    of exhibits to move matters forward.  There have been some, of

9    course, arguments over things that are more vital, but I just

10   don't see job descriptions as being that earthshattering nor

11   ones that I, you know, created last night in my sleep to

12   support my case.  These are exhibits that are out there.  But I

13   don't want to waste a lot of time on it, Judge.

14           THE COURT:  We are not getting to the point.  The

15   point is not whether or not they are controversial or easy or

16   hard.  The issue is whether this is the proper witness to

17   introduce this testimony.  If the witness has no familiarity

18   with these documents and they did not come up in any way during

19   her direct examination, are we going to spend a lot of time

20   unnecessarily trying to lay a foundation for which there isn't

21   a foundation?

22           MR. JACKSON:  Judge, I have very limited questions in

23   this regard that are directly relevant and probative to charts

24   that the government showed.  We are talking about Rail Road

25   employees, after all, and those Rail Road employees did

D7pdles3                          Marx - cross

1    something, and the something that they did with respect to --

2    or the injuries that they acquired occupationally were related

3    to what they did on their job.

4          So, again, Judge, all I ask for is brief latitude.  As

5    I have learned, in the event that it isn't relevant or

6    probative or it is repetitious, I will be blocked from moving

7    further.  But I am just saying, your Honor, that I think I do

8    have a good faith basis in asking just a couple of questions

9    about that, and I am just asking that the Court permit me.

10         THE COURT:  All right.  I will allow you a couple of

11   questions.  If the witness indicates any reason or

12   unfamiliarity with what you are asking, at that point we are

13   going to close it.  All right?

14         MR. DRATEL:  Your Honor, could I just have one minute

15   based on an e-mail that I received that is not related to this

16   witness?

17         THE COURT:  Yes.

18         (Pause)

19         THE COURT:  All right?

20         MR. DRATEL:  Thank you, your Honor.  Yes.

21         (Pause)

22         (Continued on next page)

23

24

25

1       (Jury present)

2               THE COURT:  Welcome back.  Thank you.  Be seated.

3               Mr. Jackson.

4    CROSS-EXAMINATION

5    BY MR. JACKSON:

6    Q.  Ms. Marx, good morning to you.

7    A.  Good morning.

8    Q.  We haven't had an opportunity to meet, is that right?

9    A.  Right.

10   Q.  Good to meet you.

11   A.  Nice to meet you.

12   Q.  Thank you.

13              All right.  I want to start off -- if we could just

14   put up 18B, Government 18B.  And if you could just go through

15   18B.

16              Are you familiar with this particular exhibit, 18B,

17   the authorization forms?

18   A.  Yes.

19   Q.  OK.  And how many pages is in this exhibit, 18B?

20   A.  Well, there is 86 of these, but I think they are

21   double-sided, so 43.

22   Q.  OK.  So we have about 86 authorization forms, is that

23   accurate?

24   A.  Yes.

25   Q.  And those authorization forms were forms that you extracted

D7pdles3                          Marx - cross

1    from Ms. Baran's computer; is that also accurate?

2    A.  No.

3    Q.  How did you get the authorization forms?

4    A.  The majority of them came from the RRB claim file.

5    Q.  So you had occasion to review the claim file and you took

6    these from that claim file; would that be fair?

7    A.  Yes.  The scanned version of it, I would take out the

8    sheet, yes.

9    Q.  And the authorization -- if we could just blow up the

10   language in the authorization, please.

11           OK.  "I hereby authorize the Railroad Retirement Board

12   to release any railroad retirement records and information

13   requested to Marie Baran."

14           You see that, correct?

15   A.  Yes.

16   Q.  And you understand that the particular individual, the

17   applicant signed this form, is that right?

18   A.  Yes.

19   Q.  And as a result of that, that would authorize the Rail Road

20   to release information that was requested, is that accurate?

21   A.  Yes.

22   Q.  Did you know whether or not Ms. Baran previously worked for

23   the Rail Road?

24           MR. JACKSON:  You can take that down.

25   Q.  Do you know whether she previously worked there?

D7pdles3                          Marx - cross

1    A.  Yes.

2    Q.  And you knew that she worked there for some considerable

3    period of time; would that be right?

4    A.  Yes.

5    Q.  But notwithstanding the fact that she might know people

6    there, nonetheless, you found authorization forms which allowed

7    her to do request information, right?

8    A.  Yes.

9    Q.  And in doing that, that would protect the Rail Road if they

10   gave her information relative to any requests she made, is that

11   right?

12   A.  I don't know about "protect," but if they are giving --

13   yes, so they're relying -- the Rail Road can give information

14   to Marie Baran.

15   Q.  So it appears as though she wasn't using any particular

16   influence in calling, she was actually having a document that

17   she presented to them which permitted them to speak with her,

18   right?

19   A.  Yes.

20   Q.  So, in other words, Ms. Baran was, in essence, in doing

21   that, would you agree that she was pretty much going by the

22   book?  Would that be accurate?

23            MR. WEDDLE:  Objection, your Honor.

24            THE COURT:  Sustained.

25   Q.  OK.  Now, with regard to these forms, the government had

D7pdles3                        Marx - cross

1  you pull authorization forms with regard to the Rail Road.  I

2  just want to ask you --

3          MR. WEDDLE:  Objection, your Honor.  This is Railroad

4  Retirement Board, not the Long Island Rail Road.

5          MR. JACKSON:  I'm sorry, I misspoke.

6  Q.  This is the Railroad Retirement Board.  We could all agree

7  on that, right?

8  A.  Yes.

9  Q.  OK.  Now, with regard to authorization forms, when you

10  looked at the claim files, was there any information in the

11  claim files which would suggest that Marie Baran was getting

12  authorization to speak to doctors?

13  A.  I can't answer that.  I didn't focus on that so.

14  Q.  OK.  So the answer is you just don't know, correct?

15  A.  I don't know.

16  Q.  Now, did you find anything, when you looked, about any

17  e-mails in the RRB files, or anywhere else, where Ms. Baran was

18  communicating with the applicants that she was serving?

19          MR. WEDDLE:  Objection, your Honor.

20          THE COURT:  Overruled.

21  A.  There were e-mails taken off her computer, but that was

22  just one of the sources that was used.  There were other

23  source.

24  Q.  We'll get to her computer momentarily.  But I guess what I

25  am asking you is beyond the authorization forms that the

D7pdles3                           Marx - cross

1   government had you go through which permitted Ms. Baran to do

2   her job, in fact, you understand her --

3            MR. WEDDLE:  I object to the characterization, your

4   Honor.

5            THE COURT:  Sustained.

6   Q.  You understood Ms. Baran to be a consultant, is that

7   accurate?

8   A.  Yes.

9   Q.  And as a consultant, you understand that she is a conduit

10  of information?

11           MR. WEDDLE:  Objection, your Honor.  There is no

12  foundation for this.

13           THE COURT:  Sustained.

14  Q.  Let me ask you.  You just said you are aware that Ms. Baran

15  is a consultant, is that right?

16           MR. WEDDLE:  Objection to that question and the

17  answer, and I move that it is stricken.  There is no personal

18  knowledge.

19           THE COURT:  Overruled.

20  Q.  You can answer.  The Judge is permitting you to answer the

21  question.

22  A.  OK.  Now, what is the question?

23           THE COURT:  Would the reporter read back the question.

24           (Question read)

25           THE COURT:  You may answer.

D7pdles3                          Marx - cross

```
 1   A.  I don't want to say -- I don't know as a consultant.  She
 2   worked with these annuitants.  I don't have a formal word for
 3   it.  She worked with them to help them with their application
 4   for disability.
 5   Q.  Fair enough.  So you knew that she did that, correct?
 6            MR. WEDDLE:  Objection, your Honor.
 7            THE COURT:  Sustained.
 8   Q.  In doing that, would you have information that -- do you
 9   have knowledge of the fact that in helping them, she would need
10   certain information in order to do so?
11            MR. WEDDLE:  Objection, your Honor.
12            THE COURT:  Overruled.
13   A.  I don't know what her relationship was with these
14   individuals.  I didn't talk with the annuitants or with her.
15   All I did was review the information in the RRB claim file.
16   Q.  OK.  And just on that particular issue, I just want to
17   focus for a moment -- if we could put up 502B1?  And if we
18   could look at the second page.  If we could just blow up the
19   highlighted portion of the page, right there.
20            OK.  And you see what this says?  Call Dr. Ajemian,
21   ask for Marie, tell them that you are retiring from the Long
22   Island Rail Road.  Do you see that?
23   A.  Yes.
24            MR. JACKSON:  If we could just go out to the full
25   document, please.  Page 1 as well.
```

D7pdles3                          Marx - cross

1   Q.  Did you extract from any of the RRB files anything else
2   with regard to Ms. Baran making referrals to Dr. Ajemian?
3              MR. WEDDLE:  Objection, your Honor.
4              THE COURT:  Sustained.
5              MR. WEDDLE:   It suggests that this was extracted from
6   an RRB claim file.
7              THE COURT:  Sustained.
8   BY MR. JACKSON:
9   Q.  You did a number of research.  Would it be fair to say that
10  you did a number of things to get the information that you got
11  today; is that right?
12  A.  From the RRB claim files.
13  Q.  So you pulled together information from the RRB claim
14  files, is that right?
15  A.  Right.
16  Q.  OK.  And was there any -- I'm just asking you -- was there
17  any information in the RRB claim files which would suggest, as
18  this did, that Ms. Baran was making referrals to doctors?
19             MR. WEDDLE:  Objection, your Honor.  There is no
20  testimony that she --
21             THE COURT:  Sustained.
22  Q.  You did review the files, though, correct?
23             MR. WEDDLE:  Objection, your Honor.  There are
24  thousands of files.
25             THE COURT:  Sustained.

D7pdles3                          Marx - cross

1    Q.  So let's go, then, to Exhibit 17.

2           All right.  Now, the government asked you about this

3    particular exhibit, and they went over it, I believe -- if we

4    could just blow up, let's look at the first two.  Let's look at

5    this, these two.

6           Now, this describes a normal day.  And this was from

7    the files that you reviewed, is that correct?

8    A.  Correct.

9    Q.  This is something that you did look at, is that right?

10   A.  Yes.

11   Q.  And in looking at, for example -- if we can just go out to

12   the beginning of the document, please.

13           MR. JACKSON:  Judge, I have a different Exhibit 17.

14           (Counsel conferred)

15           MR. WEDDLE:  Your Honor, I could explain this at the

16   sidebar, your Honor, but when we produced --

17           THE COURT:  Whatever it is.  17 is the one that is up

18   on the screen, right?

19           MR. WEDDLE:  That is correct, your Honor.

20           MR. JACKSON:  Yes.  I am going to need to be heard

21   regarding this.

22           THE COURT:  Do your questions relate to what is on the

23   screen?

24           MR. JACKSON:  It relates to the Exhibit 17 that I was

25   given, Judge.

D7pdles3                          Marx – cross

1           MR. WEDDLE:  I object to the commentary in front of

2      the jury, your Honor.

3           MR. JACKSON:  Which is why I am asking to be heard.

4           THE COURT:  All right.  Come on up.

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7pdles3                          Marx - cross

1              (At the sidebar)

2              MR. JACKSON:  Judge, the copy of Government Exhibit 17

3    that I have pretty much gives the representation of there is

4    172 from the files.

5              MR. WEDDLE:  That is not correct.

6              MR. JACKSON:  OK.  You could take it.

7              MR. WEDDLE:  I am familiar with the document.  You are

8    just misrepresenting what it says.

9              MR. JACKSON:  Judge, I'm not misrepresenting anything.

10             It says response.  It says 51, 55.  There are various

11   responses here.  And it goes all the way, as I mentioned, to

12   172.  And this is the Exhibit 17 that I had that I was working

13   off of.  And if it was -- if this is --

14             THE COURT:  Is the narrative different from the one

15   that is up on screen?

16             MR. JACKSON:  Significantly.

17             MR. WEDDLE:  Your Honor, could I explain?

18             When we produced the government exhibits, we said

19   expressly in the cover letter that many of them were summaries

20   and charts and demonstrative exhibits.  I'm not sure if we used

21   that phrase, but many of them were drafts.  Obviously, if we

22   needed to wait until they were 100 percent final before we

23   produced them, we would have been producing government exhibits

24   not two weeks before trial but closer to trial.  So we produced

25   it in draft form.  We said that in the cover letter.  This was

D7pdles3                          Marx - cross

1    a draft.  We later revised it and eliminated some of the people

2    and eliminated some of the text to make it more legible.

3            And the one that is on the screen is the one that we

4    admitted.  So this is just a draft.  We've given him the final

5    one.  I can't remember the date on which we gave him the final

6    one.  I believe that it was at least a week ago but I could

7    check with Ms. Larson.  And it's just a draft.

8            MR. JACKSON:  Judge --

9            MR. WEDDLE:  We've given them many drafts.

10           MR. JACKSON:  -- I guess the question I would have:

11   Is there anything on here in the draft that is inaccurate?

12           There is a way to do this, and I think it would save a

13   significant chunk of time.  If we had to pull every one of

14   their files to make the point that I am making, so if there is

15   a draft that is available to show on the screen that we could

16   admit before this jury -- there is nothing to laugh about.

17           MR. WEDDLE:  No, your Honor.  If he wants to put in

18   his summary, he can put in his summary during his case.

19           THE COURT:  17 on the screen has four individual names

20   and four individual answers to question 40, is that correct?

21           MR. WEDDLE:  No.  It is a multipage document, your

22   Honor, so there are 39 individuals and 39 answers.

23           THE COURT:  The one that is screen right now?

24           MR. WEDDLE:  The first page has four.

25           THE COURT:  The first page has four?

D7pdles3                          Marx - cross

1            MR. WEDDLE:  Right.

2            THE COURT:  Is there anything different in the text of

3       those four from the draft that you have?

4            MR. JACKSON:  Judge, there is not --

5            MR. WEDDLE:  I can answer that, your Honor.

6            THE COURT:  Let Mr. Jackson answer.

7            Is there anything different in the text?

8            MR. JACKSON:  The answer is no with an explanation.

9            What the government did was they took out everything

10      where it shows that Ms. Baran made significant changes to the

11      daily activities.  Those are changes, Judge, that I highlighted

12      that go to show that this was not some rote recreation.  This

13      witness was the one who reviewed and examined all of these

14      things.  And I would have a right to then ask this witness did

15      she look at these various files -- she pulled them -- and go

16      through them, just like the government did.  And there is no

17      reason why this should not be admitted.

18           They say it is a draft.  It is a draft to the extent

19      not that the information is inaccurate, but it is a draft to

20      the extent that it shows information that they want to exclude

21      from the jury's purview.  And I think that since this witness

22      was the one who went over this, I should be able to point our

23      the distinctions.

24           Now, there is a long way to do this, Judge, and there

25      is an easy way to do it.  And if the government would concede

D7pdles3                        Marx - cross

1   that all of this is accurate and it is just a draft inasmuch as

2   they extracted information because they didn't want the jury to

3   see it, but I do, then I think it makes the process go a lot

4   quicker than me asking do you remember this, do you remember

5   that, approaching, reapproaching.  Just put it on the Elmo, and

6   let me point out what the differences are to the jury.  That is

7   it.

8           This is what I have.  A couple of days later they gave

9   me apparently another 17 and --

10          THE COURT:  How many of these 39 were you proposing to

11  go over with her?

12          MR. JACKSON:  Judge, every two -- what you will see on

13  this -- this is directly relevant to my case -- you will see

14  changes, I highlighted them, all the changes that Ms. Baran

15  made when she worked off the template.

16          THE COURT:  How many of the 39 are you proposing to go

17  over with her before it becomes cumulative?  Your point is that

18  she made changes, right?

19          MR. JACKSON:  Correct.

20          THE COURT:  How many times do you have to go over it

21  to make the point that she made changes?

22          MR. JACKSON:  I want to make the point, if we do it in

23  duplicate, if I can do it six different times.  For example, I

24  want to show a grouping of one.  Compare one to two.  A

25  grouping of two.  Compare one to the other.

D7pdles3                        Marx - cross

1            MR. WEDDLE:  Your Honor, this suggestion that we are

2      trying to hide something from the jury is completely unfounded

3      and misleading.  If they want to do it in front of the jury, it

4      is completely unfounded and misleading and it should be

5      excluded under Rule 403.

6            THE COURT:  Excuse me, Mr. Weddle.  If he wants to

7      make a point that Ms. Baran made changes by looking at two or

8      three or four of these individuals, make the point.

9            MR. WEDDLE:  Your Honor, this witness doesn't know

10     whether Ms. Baran made changes or didn't make changes.

11           MR. JACKSON:  She extracted these from the computer.

12           MR. WEDDLE:  Your Honor -- can I finish?  You talked

13     for a long time.

14           MR. JACKSON:  So do you, by the way.

15           MR. WEDDLE:  I said you "talked" for a long time,

16     Mr. Jackson.

17           MR. JACKSON:  So did you.

18           MR. WEDDLE:  If you give me a minute?

19           Your Honor, this is a draft that we prepared.  We cut

20     the draft.  Frankly, the prosecutors cut the draft because we

21     didn't want to just open it up to claims by the defense that we

22     were saying the things were similar when there were slight

23     dissimilarities.  I think that they are all similar.  I think

24     there are 68 on this document, the draft that Mr. Jackson has,

25     we cut it down to 39.  That's what we presented.

D7pdles3                          Marx - cross

1            If he wants to present that there are other ones that

2    are dissimilar, he can do that.  But I don't think he should

3    use our draft, because the reason we give these drafts is to

4    help the defense prepare for trial.  He can create his own

5    exhibit, your Honor.  We don't have to create exhibits for him.

6            And it is completely misleading to suggest that the

7    government is trying to hide the ball from the jury because he

8    has all of these files.  In fact --

9            MR. JACKSON:  Judge --

10           MR. WEDDLE:  -- this entire document -- can you just

11   let me finish?  It not that much longer.

12           This entire document, the AA1-D's, have been compiled

13   and they are on a disc that was produced to the defense.  The

14   witness testified about it.  They can clip and cut any parts of

15   it that they want to.  If they want to present their summary,

16   they should do it in their defense case.

17           MR. JACKSON:  Judge, again, most respectfully,

18   Mr. Weddle went chapter and verse through and are these the

19   same, is the same, are the others the same --

20           MR. WEDDLE:  And the ones that I did it with were the

21   same.  The ones that he is trying to do it with are the defense

22   case.

23           THE COURT:  If there are differences in the ones that

24   were gone through on direct, then point out that there are

25   differences.

D7pdles3                        Marx - cross

 1              MR. JACKSON:  Judge --

 2              THE COURT:  If there are differences in others, then

 3     you can ask the witness whether she is aware of any

 4     differences.

 5              MR. JACKSON:  OK.  Now, that's a very long way to get

 6     there, and I'm going to have to refresh recollection, I'm going

 7     to have to do a number of things.

 8              MR. WEDDLE:  I doubt it, your Honor, because she has

 9     already testified that she has gone through 180 of these, and

10     there are only 35 on this compilation.  She knows that the

11     other ones are not as identical as these ones are.

12              THE COURT:  Mr. Jackson, you can ask her if she aware

13     of whether they are all identical or if there are difference.

14     If she says there are differences, then point out those

15     differences.

16              MR. JACKSON:  OK.  Sure.

17              THE COURT:  I am not going to have you do 39 of them.

18              MR. JACKSON:  Your Honor, I told you, I would do about

19     12, which is six.

20              THE COURT:  12.

21              MR. JACKSON:  Well, the six.

22              THE COURT:  You don't need 12 to make the point.  The

23     jury, at some point they get it.

24              MR. JACKSON:  We only have six, Judge.  I understand.

25     In other words, in order for me to point it out, I have to show

1683

D7pdles3                          Marx - cross

1    that one is different than the other.

2              THE COURT:  At some point, the jury says I got it.

3              MR. JACKSON:  I got you.  OK.

4              MR. WEDDLE:  Your Honor, I don't have the draft set of

5    this for presentation on the presentation screen.

6              MR. JACKSON:  Could we break to get it, Judge?

7              THE COURT:  No.

8              MR. JACKSON:  How about I use the Elmo?  OK.  So, all

9    right.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7pdles3                        Marx - cross

 1          (In open court)

 2          MR. JACKSON:  Judge, I think we are going to use this

 3   particular piece of equipment, which I'm not too familiar with.

 4   If someone from the government is familiar and could give me a

 5   hand, I would appreciate it.

 6          (Pause)

 7          MR. WEDDLE:  Your Honor, I didn't think we were just

 8   going to throw this on the screen without any kind of

 9   foundation for it.

10          THE COURT:  All right.  Lay the foundation,

11   Mr. Jackson.

12   BY MR. JACKSON:

13   Q.  OK.  Before we see this, if we could just go through --

14   Mr. Weddle asked you -- could we see Government's Exhibit 17,

15   please?

16          Do you remember Mr. Weddle asking you questions about

17   Government Exhibit 17?

18          MR. JACKSON:  And could we blow up the first two

19   responses?  Let's look at the top, please, first.  The top half

20   of the page.

21   Q.  This is Government Exhibit 17.  It says, a normal day from

22   disability applications for Baran's clients.  Do you see that?

23   A.  Yes.

24   Q.  And it says "Responses."  And then Mr. Weddle read you

25   Philip Pulsonetti and how that was distinguishable, if at all,

1685

1    from Michael Stavola.  Do you recall that?

2              MR. WEDDLE:  Objection, your Honor.  Actually, they

3    are all the same, so I read a different one.  I didn't read

4    Pulsonetti but it doesn't really matter.

5    Q.  Whoever he read, do you recall him directing your attention

6    to this exhibit?

7    A.  Yes.

8    Q.  And throughout this exhibit -- and we could continue to go

9    through it.  If we can just see the whole page now, the bottom

10   half of the page.

11             And he went through and talked about how another one,

12   David Foubert, or whoever he used --

13             MR. WEDDLE:  I think that is the one I used, your

14   Honor.

15   A.  Right.

16   Q.  And he talked to you about how the language was very

17   similar.  Do you remember that?

18   A.  Yes.

19   Q.  OK.  If we could go to the next page.

20             And you remember again at the top it says a normal day

21   from disability applicants from Baran's clients.  Do you see

22   that?  And he showed you where all of these basically were the

23   same thing for this question 4.

24             You remember him asking you those questions, right?

25   A.  Yes.

D7pdles3                          Marx - cross

```
 1              MR. JACKSON:  If we could just go through and make
 2     this a full screen.  Let's go to the next page just to show the
 3     page.  It's up.  OK.
 4              Is there another page?
 5              Another page.  OK.
 6     Q.  You recall him going through, in sum and substance, this
 7     document with you, is that right?
 8     A.  Yes.
 9     Q.  And he pointed out to you how the language was similar, did
10     he not?
11              THE COURT:  Asked and answered.
12     Q.  OK.  Now, if I could just show you -- if you could just
13     take that off the screen.
14              And where did that information come from, by the way,
15     if I may ask?
16     A.  The AA1-D forms that are in the RRB claim file.
17     Q.  That is the claim file you were looking at that we are
18     discussing here?
19     A.  Yes.
20     Q.  I want to show you what I have, if we could just -- OK.  I
21     want to show you the document that I have.  If I could, just
22     starting with 51 at the top.  Right there.  OK.  If we could
23     just blow up 51 and 55.  51 and 55, please.
24              MR. WEDDLE:  Your Honor, I think we should just
25     clarify, because of the colloquy that happened before at the
```

D7pdles3                          Marx – cross

1    sidebar, I think that the jury is entitled to know that this is

2    a draft.

3               MR. JACKSON:  Judge ––

4    Q.  May I ask you, when we talk about a draft –– I just want to

5    be clear –– if this is a draft, do you have any personal

6    knowledge as to, in this draft, whether this information would

7    have been altered by you in any way when you took it out of the

8    claim file.

9    A.  I don't understand the question.

10   Q.  Sure.  In other words, the government showed you a document

11   that has, which we'll establish, a lot less people than the one

12   I'm about to show you.  Do you see that?

13              MR. WEDDLE:  Objection, your Honor.

14   A.  It is about 20 less.

15              THE COURT:  Mr. Jackson, let me see if I can clarify

16   the issue for the jury.

17              MR. JACKSON:  Thank you, Judge.

18              THE COURT:  When the government produced a version, or

19   the original version of Exhibit No. 17 to the defendant, it

20   contained 172 names.

21              MR. WEDDLE:  No, your Honor.  68, your Honor.

22              THE COURT:  I'm sorry.  68.

23              MR. WEDDLE:  Approximately.

24              THE COURT:  That was what Mr. Weddle referred to as a

25   draft.  When it produced the Exhibit 17 which the jury was

1    shown and admitted into evidence, it had fewer.

2              MR. JACKSON:  Thank you, Judge.

3              MR. WEDDLE:  And the final was also produced to the

4    defense, your Honor.

5              THE COURT:  Of course.

6              MR. JACKSON:  Now --

7              THE COURT:  So Mr. Jackson is now referring to the

8    draft, that is, the original one with the 69 names.

9              MR. JACKSON:  That was produced by the government to

10   us.

11             THE COURT:  Yes.

12             MR. JACKSON:  Thanks.

13   BY MR. JACKSON:

14   Q.  Now, with regard to this draft --

15             THE COURT:  It is also fair to say that in reducing

16   the number from 69 in the original to the final one, the text

17   was not altered.  All right?  The text of each of those

18   summaries was not altered.

19             MR. JACKSON:  Thank you, your Honor.  That clarifies a

20   number of questions.  I appreciate it, Judge.

21             THE COURT:  All right.

22   BY MR. JACKSON:

23   Q.  Now, I would just like you to look at this, Ms. Marx, if

24   you can, and this would have been an applicant, is that

25   correct?  51?

D7pdles3                          Marx - cross

1    A.  Yes.

2    Q.  And that's Kevin Platz.  And then there it says how he

3    sleeps poorly because of neck pain, tingling, on to lower back

4    pain.  Do you see that?

5    A.  Yes.

6    Q.  It also references the time he got up to be 7 a.m., is that

7    right?

8    A.  Yes.

9    Q.  OK.  That differs, does it not, from Raymond Jehl, J-e-l-h,

10   who would be 55.  Do you see that?

11   A.  I see it.

12   Q.  Do you see how this person sleeps poorly because of lower

13   back pain and shoulder pain?  Do you see that?

14   A.  Yes.

15   Q.  And do you know the distinction between, at least with

16   regard to what I pointed out so far, between Kevin Platz and

17   Raymond Jehl; do you see that?

18   A.  Yes.

19           MR. WEDDLE:  Objection.

20   Q.  With regard --

21           MR. WEDDLE:  Distinction?  I'm not sure what that is.

22   Q.  Do you know that the languages on the top, where it says

23   neck pain, tingling of arms and lower back pain, would you

24   agree that that differs from here where it says lower back and

25   shoulder pain?  Would you agree that that's different?

D7pdles3                          Marx – cross

1    A.  The shoulder pain is different than the neck pain and the

2    tingling in the arms, yes.

3    Q.  Do you agree that that is a distinction, just to clarify it

4    for Mr. Weddle?

5    A.  Between the two?

6    Q.  Yes.

7    A.  Yes.  They are differ ailments.

8    Q.  Do you see the difference between the time they get up to

9    be 7a.m. and 5 a.m., do you see that to be a difference?

10   A.  Yes.

11   Q.  And do you see the difference with respect to what they do,

12   one, which would be, we'll call it 55, they read magazines; do

13   you see that?

14   A.  Yes.

15   Q.  OK.  Now, whereas the person on top reads books or

16   magazines, right?

17   A.  OK.

18   Q.  Now, let's go to 57.  I want to show you 57 and 61.  OK?

19            And 57, you see that the person sleeps poorly because

20   of lower back pain; do you see that?

21   A.  Yes.

22   Q.  That would Thomas Grossmann, what would be 57.  Do you see

23   that?

24   A.  Yes.

25   Q.  And that they get up at 6 a.m.?

D7pdles3                         Marx - cross

1   A.  Yes.

2   Q.  Apparently they have man's best friend, because they walk

3   the dog.  Do you see that, too?

4   A.  I do.

5   Q.  And they watch television, right?

6   A.  Right.

7   Q.  And on 61, which is Daphne Charran, this person:  I wake up

8   nearly every two hours.  You see that, too, right?

9   A.  I do.

10  Q.  Sometimes they do laundry, right?  Do you see that?

11  A.  Yes.

12  Q.  And that this person finally gets up at 5:30, right?

13  A.  Yes.

14  Q.  OK.  And you would agree, again, with regard to what I

15  pointed out, 57, with respect to the items I directed your

16  attention to, would be different than 61, is that right?

17  A.  The highlighted portions.

18  Q.  Correct.  And with regard to those highlighted portions --

19  and these were things that Ms. Baran, for example, she

20  prepared, that's what we are looking at, right?

21          MR. WEDDLE:  Objection, your Honor.

22          THE COURT:  Asked and answered.

23          MR. JACKSON:  OK.  Now, Judge, I won't go through all

24  of the pages, just with the patience of the Court, if I could

25  just go through a few more, which I will do as twofold.

D7pdles3                          Marx - cross

1    Q.  Now, this person, 67, which would be David Foubert, they

2    sleep poorly because of hip pain.  Do you see that?

3    A.  Yes.

4    Q.  And this particular person, which would be 68, they sleep

5    poorly because of chest pain, stomach pain, arm pain, lower

6    back pain, right?

7    A.  Yes.

8    Q.  And I didn't highlight it, but one gets up, which would be

9    67, at 7 a.m., right?

10   A.  Right.

11   Q.  And the other one, 68, gets up at 8a.m.  Do you see that?

12   A.  Yes.

13   Q.  And 68 says if I feel strong enough and dress, I rest most

14   of the day and in the afternoon I take a nap; is that right?

15   A.  Right.

16   Q.  And with regard to what I pointed out to you today, that

17   would be different, just with respect to the items I mentioned,

18   67 would be different from 68, is that right?

19   A.  The highlighted portions.

20   Q.  Correct.  And that's what I'm asking you about.

21   A.  OK.

22   Q.  Right?

23   A.  Yes.

24   Q.  Now, if we could just, again with the indulgence of the

25   Court, I'm moving forward.

D7pdles3                          Marx – cross

1           THE COURT:  Are you doing any more of these,

2      Mr. Jackson?

3           MR. JACKSON:  Judge, just a couple.

4           THE COURT:  Mr. Jackson, remember what I had mentioned

5      at the sidebar.

6           MR. JACKSON:  One more.

7           THE COURT:  The Court has the able to read bubble

8      speak from the jury.

9           MR. JACKSON:  One more, Judge.

10          THE COURT:  One point I could see is they say I got

11     it.

12          MR. JACKSON:  Judge, just to confirm that, if I could

13     just do one more, with the Court's permission and the jury's

14     indulgence, please?

15          THE COURT:  One more.

16          MR. JACKSON:  Thank you, your Honor.

17          One more in duplicate, I meant.

18          (Continued on next page)

19

20

21

22

23

24

25

D7pnles4                        Marx - cross

1   Q.  If we could look at, for example, 134 and 137.  134 says
2   they sleep poorly because of pain and numbness in the hands.
3            Do you see that?
4   A.  Yes.
5   Q.  And they get up at 6 a.m. and they have coffee and watch TV
6   and relax.  You see that, correct?
7   A.  Yes.
8   Q.  That would differ from -- I will just use 137, this one,
9   137.  Jerome Nantz sleeps poorly due to pain and discomfort.
10           Do you see that?
11  A.  Yes.
12  Q.  He gets up apparently at 5 a.m.
13  A.  Yes.
14  Q.  This person apparently reads music books and history books
15  and --
16           MR. WEDDLE:  Objection, your Honor.  There is no
17  evidence about what these people really do.
18  Q.  We have agreed that the text here was not altered in any
19  way, right?
20  A.  Yes.
21  Q.  When you presented this to the government --
22           MR. JACKSON:  And, Judge, that is all I have with
23  regard to this document.  So we will move on from there.
24  Before I move on, I just want to clarify.
25  Q.  These are items that, when you extracted from that file and

D7pnles4                          Marx - cross

1    presented to the government, you didn't change yourself at all,

2    did you?

3    A.  No.

4    Q.  You didn't alter them in any way, is that right?

5              THE COURT:  Asked and answered.

6              MR. JACKSON:  OK.

7    Q.  Would you agree that that was, the narrative that we saw in

8    40 was a template that came -- well, let's ask that question

9    first.  For example, there was language that appeared to be

10   very similar with regard to what I showed you, and there was

11   language that was different.  Is that right?

12   A.  Are you asking about all the individuals?  I don't

13   understand.

14   Q.  Sure.  Because when I asked you if the language was

15   different, you clarified with regard, yes, to the items I

16   showed you, that was different right.

17             MR. WEDDLE:  Objection, your Honor.  That is not what

18   she said.

19   Q.  Again, I'm guided by what you say, and I would never want

20   to put words in your mouth, so if I say something that is wrong

21   correct me, please.

22   A.  OK.

23   Q.  I'm simply asking you whether you would agree that the

24   narrative that I showed you, right, it seemed to be that there

25   were certain items that were asked for repetitively.  I will

D7pnles4                         Marx - cross

1    ask you this:  They asked about the time you got up, is that

2    right?

3    A.  Yes.

4    Q.  The narrative addressed the daily routine, is that right?

5    A.  Yes.

6    Q.  It addressed personal hygiene, would that be fair?

7    A.  What do you mean by personal hygiene?

8    Q.  Whether you groom, whether you bathe, whether you shower?

9    A.  Yes, they said I have breakfast, shower, and dress.

10   Q.  OK.  It also talked about, with regard to that, when you

11   might eat and prepare your meals, correct?

12   A.  The question didn't ask that.  The statements that I

13   extracted had that information.

14   Q.  Fair enough.  So information in there was about all the

15   items I asked you, of course, right?

16   A.  The ones that we talked to so far, yes.

17   Q.  And they had information in there about shopping habits,

18   for example.

19           THE COURT:  Asked and answered.

20   Q.  Transportation?

21           THE COURT:  Asked and answered.

22   Q.  Do you know whether or not this template with regard to

23   what was asked by Ms. Baran came from somewhere in particular?

24   A.  I have no idea.

25   Q.  Do you know whether or not the RRB, for example, if you

D7pnles4                          Marx - cross

1    know, puts out any information regarding what should be

2    addressed in question 40?

3    A.  Other than what's listed in the question, no.

4    Q.  Do you know if perhaps there might be some other source

5    beyond the RRB that puts out a template of what information

6    should be gone over with the applicant so that there would be

7    consistency in the applications that the RRB gets, if you know?

8    A.  No.

9    Q.  You just know that there was -- go ahead.  You can answer.

10   A.  I don't have anything else.  No.

11   Q.  If I could just direct your attention now to Exhibit 18.

12   With regard to Exhibit 18, if I could just ask, at the bottom I

13   see that you have there where it says "hard" and then there is

14   a slash and it says "not at all."

15           Do you see that?

16   A.  Yes.

17   Q.  Just for clarity, there is also something else on the

18   application, and that says "easy."

19           Do you have any independent knowledge of that?

20   A.  What do you mean by "independent knowledge"?

21   Q.  Meaning do you know whether or not the application really

22   says "easy, hard, not at all," although your chart only says

23   "hard, not at all"?

24   A.  Yes, the application gives three options, "easy, hard, not

25   at all," and then you can put a description.

```
 1   Q.  But yours, in just saying "hard" and "not at all," I just
 2   would like to ask, is the reason that you didn't put "easy" in
 3   your chart, if it is, that if it was easy for an annuitant or
 4   potential applicant to do something, they may not be applying
 5   for disability in the first place?
 6   A.  I can't answer that.
 7   Q.  You just know that what you produced left "easy" off,
 8   correct?
 9   A.  It is not in this chart.
10   Q.  Which means it was left off, right?
11   A.  Yes.
12   Q.  Now, with regard to that, if I could just ask you before we
13   go on, do you know what the definition of hard is as it relates
14   to the chart you put together of the daily activities for Baran
15   applications?  Do you know what the definition is?
16   A.  No.
17   Q.  Now, just briefly, if we could clarify this, if we can go
18   to Exhibit 14-D, specifically Section 6.
19           MR. JACKSON:  If we could just blow up Section 6
20   itself, just the definitional portions, please.  Thank you.
21   Q.  From your review of the RRB claim files, do you see "easy"
22   to be I can easily do the activity?
23   A.  Yes.
24   Q.  That would be consistent to what is in the RRB file, right?
25   A.  What do you mean by "consistent"?
```

D7pnles4                              Marx - cross

1    Q.  Meaning these applications, in general, right, would have

2    the language that I am showing you here?

3    A.  The applications, yes.

4    Q.  So as not to go through every application with you and get

5    the Judge upset, just focusing you on this, you would agree

6    that that would be consistent on an AA-1, which is a disability

7    application where "easy" it says I can easily do the activity?

8              MR. WEDDLE:  Objection, your Honor.  AA-1 is a

9    different form.

10             MR. JACKSON:  Judge, I'm sorry.

11   Q.  The disability application.  You understand what I mean?

12   A.  AA-1d.

13   Q.  AA-1d.  And the AA-1d you understand to mean the disability

14   application, is that correct?

15   A.  Yes.

16   Q.  That is the application that would have been in the claim

17   file that you reviewed, also correct, right?

18   A.  Yes.

19   Q.  And for "hard," it says, "I can do the activity with

20   difficulty or with help," right?

21   A.  Yes.

22   Q.  And then, of course, for "not at all" it says, "I cannot do

23   the activity even with help," right?

24   A.  Yes.

25   Q.  Now, your analysis which I would like to get back to, if we

1700

D7pnles4                          Marx - cross

1    could get back to that, Exhibit 18, as we have already

2    established just focuses on the "hard" and "not at all," right?

3    A.  Yes.

4           THE COURT:  Asked and answered.

5    Q.  If I could just ask you, this is information that you

6    extracted, not dealing with what Ms. Marie Baran can do

7    herself, right, but what her clients represented that they

8    could do, right?

9           MR. WEDDLE:  Objection, your Honor.  No personal

10   knowledge.

11          THE COURT:  Overruled.

12   A.  I don't know.  I don't know what her clients can or cannot

13   do.  I have never met any of them.  I have actually never met

14   Ms. Baran myself.

15   Q.  OK.

16   A.  I can't answer.  All I did was reviewed the forms and

17   documented what I found in the application that was in the RRB

18   claim file.

19   Q.  Let's talk about that.  When you say, for example, and then

20   you have various percentages of the daily activities for

21   Ms. Baran's clients regarding what they could do and what they

22   can't, do you see those percentages?

23   A.  I do.

24   Q.  It says sitting and standing and walking, you see that?

25   A.  Yes.

D7pnles4                        Marx - cross

1  Q.  Let's talk about the sitting first.

2          MR. JACKSON:  If we can just isolate the first three

3  bars, please.

4  Q.  With regard to the sitting, where it says 91.7 percent,

5  what does that mean?

6  A.  That means that 91.7 percent of the 180 people's AA-1d

7  forms I reviewed said that sitting was hard or not doable.

8  Q.  Again, hard by the definition that I've already shared with

9  you?

10         THE COURT:  Asked and answered.

11  Q.  With regard to the sitting, if I could just ask you, while

12  you were in that RRB file looking at these 180 people, for each

13  applicant did you compare whether the objective information in

14  that file comported with the narrative subjective information

15  of the file?  Do you understand the question?

16  A.  No, I do not.

17  Q.  OK.  So there was a file that existed for each of these

18  people, and you noted in that file that there would have been,

19  for example, MRIs, is that correct?

20  A.  Some had them.

21  Q.  Some had x-rays, is that also correct?

22  A.  Yes.

23  Q.  You know what I mean then when I say objective information?

24         MR. WEDDLE:  Objection, your Honor, to the

25  characterization.

D7pnles4                          Marx - cross

1              THE COURT:  Sustained.

2    Q.  When I refer to the items that you just mentioned, you

3    understand the difference, do you not, between subjective and

4    objective?

5              MR. WEDDLE:  Objection, your Honor.

6              THE COURT:  Mr. Jackson, can we establish that the

7    witness made the document based only on the subjective.

8              MR. JACKSON:  Yes.

9    Q.  Can we establish that?  That is up to you.  I don't want to

10   put words in your mouth.  OK?

11   A.  OK.

12   Q.  So we can then agree that at no time --

13             MR. JACKSON:  This is just for clarity, Judge, and I

14   will move off of all the objective MRIs and x-rays.

15   Q.  But just for clarity can we agree that at no time did you

16   with regard to any of these sitting, standing, walking -- I

17   don't know --

18             THE COURT:  All them.

19   Q.  All of them.  We can agree that at no time did you compare

20   the medical information in the file, objective information to

21   see whether these things were confirmed?

22   A.  I am not a medical expert, no.

23   Q.  I am not asking you about whether you are a medical expert.

24   A.  I did not.

25             THE COURT:  Asked and answered.

D7pnles4                     Marx - cross

1   Q.  With regard to the 180 people that you interviewed, at any

2   time in going through their applications, did you call these

3   individuals to confirm with them that they could do --

4            THE COURT:  Asked and answered.  It was based on the

5   forms.

6   Q.  So it was not based on any personal conversations?

7            THE COURT:  Asked and answered.

8            MR. JACKSON:  All right.

9   Q.  With regard to the sitting, standing --

10           MR. JACKSON:  And you can just blow it out to all of

11  them, if you don't mind.

12  Q.  With regard to the sitting, standing, walking, or any of

13  this information here, did you in any way compare the job

14  descriptions of these individuals relative to what they were

15  required to do over a period of time to see whether there was a

16  correlation between any job description and whether they could

17  do any of these activities?

18  A.  No.

19  Q.  Did the government at any point ask you to make the

20  correlation between various jobs that people may have and what

21  impact, if any, that that correlation would have on your diary?

22           MR. WEDDLE:  Objection.  Relevance, your Honor.

23           THE COURT:  Sustained.

24           MR. JACKSON:  I would like now to turn to 507-A.

25  Q.  You recognize this, don't you?

D7pnles4                          Marx - cross

1    A.  Yes.

2    Q.  Did you prepare this?

3    A.  Yes.

4    Q.  What do you recognize this to be?

5    A.  This is the RRB contact log.

6    Q.  What is an RRB contact log?

7    A.  It's the log that keeps track of individuals who call the

8    RRB to ask about benefits or have questions.  They will

9    document the information as discussed in this type of database.

10   Q.  Would that indicate who contacted the RRB?

11   A.  I don't know the details of how -- it's whatever's here.

12   So I don't know if they'll always list the name.  Sometimes

13   they do.  Sometimes I've seen it as blank.

14   Q.  Just for my knowledge, and more importantly the jury's

15   knowledge, this would be information that the RRB keeps itself?

16   A.  Yes.

17   Q.  The purpose, if you know, would be so that they could have

18   a sense of or a history of who is reaching out to them?

19   A.  I don't know why it was created.  I don't want to speak to

20   that.

21   Q.  You just know and can speak to the fact that it's a log

22   containing information of their contacts, correct?

23   A.  Yes.

24   Q.  Now, in going through the pages of these contacts -- and of

25   course we won't go through every page, in fact we don't have to

D7pnles4                        Marx – cross

1   go through any of the pages.  I just want to ask you a general

2   question.  In looking at this contact log, Ms. Marx, was there

3   any indication that Ms. Baran was asking the RRB to do any

4   favors on behalf of her applicants?

5   A.  I can't say I know noted that.

6   Q.  If you could just note now -- for example, if I could just

7   direct you to certain contacts, because not all of these

8   contacts are Ms. Baran's, is that right?

9   A.  In this exhibit?

10  Q.  Yes.

11  A.  They should be.

12  Q.  Are they?  I am just asking you.  You said they should be,

13  and, again, I don't want to put words in your mouth?

14  A.  Yes, they are.

15  Q.  OK.

16  A.  They are.

17  Q.  I just want to go over this.  By the way, did you have

18  occasion to review this with the government before you came to

19  testify today?

20  A.  I did.

21  Q.  So you have seen this prior.  Of course, the first time you

22  saw it is when you put it together, is that right?

23  A.  Yes.

24  Q.  Then you would have seen it on a number of other occasions

25  in preparation for your testimony, would that be accurate?

D7pnles4                          Marx - cross

1    A.  I use the same document, so I don't know.

2    Q.  I just want you to go through it.

3    A.  OK.

4    Q.  Take your time, but not too much time, and if you could

5    just tell us in going through it, in any way, shape, form,

6    fashion, does it reflect, indicate, suggest in any of the

7    contacts that Ms. Baran had that she was asking the RRB to do

8    favors for any of her annuitants?

9    A.  No.

10   Q.  Does it in any way suggest that she was telling the RRB

11   what doctors her annuitants would be using?

12   A.  Not that I can recall.

13   Q.  Does it in any way suggest that Ms. Baran was suggesting

14   that the RRB with regard to the doctors should be reaching out

15   to those doctors on behalf of the client?

16   A.  No.

17   Q.  The contact that is in evidence for the jury to review when

18   it feels like it just has perhaps contacts that Ms. Baran had

19   with regard to reaching out to them on her client's behalf?

20   A.  Yes.

21   Q.  You understand that that would be part of her job?

22              MR. WEDDLE:  Objection, your Honor.

23              THE COURT:  Sustained.

24              MR. JACKSON:  I would like to see 507, please.

25   Government Exhibit 507.  In 507, if we could just blow up the

D7pnles4                          Marx - cross

1    middle portion starting with 7201.

2              OK.  Just going down to 7205.  If you could just blow

3    it up a little more.  I guess we could focus on the first four

4    columns.

5    Q.  Mr. Weddle was asking you questions about this phone log or

6    anything else.  First of all, tell us what this is, Exhibit

7    507?

8    A.  It is an extract on the RRB contact log database.

9    Q.  When you say "extract," just in English what does that

10   mean?

11   A.  It's the same information that is in the RRB database, but

12   it was pulled out into this spreadsheet form.

13   Q.  Did you have occasion or did the government ask you to do a

14   statistical analysis to the reason that Ms. Baran may have been

15   reaching out to the RRB?

16             MR. WEDDLE:  Objection, your Honor.

17             THE COURT:  Sustained.

18   Q.  Did you at any point compare the basis for Ms. Baran

19   reaching out to the RRB?

20   A.  No.

21   Q.  In looking at, for example -- and again we, of course,

22   won't go through them all, but we can start with 7205.  Do you

23   see where that says appointment made by -- "EE" by the way is

24   employee, is that right?

25   A.  Yes.

D7pnles4                        Marx - cross

1   Q.  Do you see the next one, where it says appointment made

2   with employee, right?  If you look up here I'm pointing to

3   it --

4   A.  Yes.

5   Q.  -- but whatever is easier for you.

6          Then there are a number of other of these which

7   reference that appointments are being made for the employee,

8   right?

9   A.  Yes.

10  Q.  Just for clarity purposes, did you say that this was a

11  compilation or similar to the document that I just questioned

12  you about, because I don't want to be repetitive?

13  A.  No.

14  Q.  This is different?

15  A.  This is different.

16  Q.  With regard to this different document, I'll ask you the

17  same questions.

18          With respect to Ms. Baran's telephone communications

19  with the RRB, is there any type in any of the forms -- and I

20  don't want to guide you to what I want to show you, I want you

21  to look at the document on your own, and after you do that, can

22  you tell us is there any point where Ms. Baran is asking the

23  RRB for any special favors relating to any applicant?

24  A.  No.

25  Q.  Is Ms. Baran asking or suggesting to the RRB that she said

D7pnIes4                              Marx - cross

1   which doctor they should use?

2   A.  No.

3   Q.  This is just a log suggesting that Ms. Baran was acting as

4   a consultant on their behalf, is that correct?

5   A.  Assisting them with -- yes.

6           MR. JACKSON:  Finally, your Honor will be glad to

7   hear, I would like you to look at Exhibit 18-A.

8   Q.  What is 18-A?  If you could just explain before I have

9   anything blown up what on earth this is.

10  A.  This is a spreadsheet that I put together with the

11  individuals I identified as working with Ms. Baran and the

12  different methods and sources I used to identify them in

13  connection with her.

14  Q.  Again, with regard to everything you just said, these

15  individuals would be annuitants, for example?

16  A.  Yes.

17  Q.  Were there any e-mails that you were able to find in the

18  RRB file -- or elsewhere, I don't want to limit you to that --

19  where Ms. Baran and her applicants were talking about her

20  getting them a disability they didn't deserve?

21          MR. WEDDLE:  Objection, your Honor.

22          THE COURT:  Sustained.

23          MR. WEDDLE:  She hasn't reviewed everything.

24          THE COURT:  Sustained.

25  Q.  With regard to what you reviewed --

D7pnles4                         Marx - cross

1              MR. WEDDLE:  Relevance, your Honor.

2              THE COURT:  Overruled.

3     Q.  With regard to what you reviewed.  Again, Ms. Marx I don't

4     mean to interrupt you, I don't mean to suggest things for you.

5     I just want you to speak to what you have knowledge of.  If I

6     misspeak, it is because I don't know what I am talking about.

7     OK.

8     A.  Yes.

9     Q.  So just with regard to what you reviewed, I just need you

10    to answer that question.

11             THE COURT:  Would the reporter read back the question.

12             THE WITNESS:  Can I answer?

13             MR. JACKSON:  If you know it, the judge will allow you

14    to answer it.

15             THE COURT:  The reporter can read back the question.

16             (Record read)

17             THE COURT:  In one sentence, just state the question

18    again.

19             MR. JACKSON:  Yes, Judge.

20             THE COURT:  One concise sentence.

21             MR. JACKSON:  Yes, your Honor.

22    Q.  Were there any e-mails between Ms. Baran and any of the

23    annuitants regarding what you had seen, read, heard, where

24    Ms. Baran was --

25             MR. JACKSON:  I am trying to be precise, Judge.

D7pnles4                         Marx - cross

1    Q.   -- where Ms. Baran and the annuitant were making plans to

2    get a disability that they didn't deserve?

3    A.   No.

4    Q.   With regard to this review, it also points out -- on the

5    "source for" on the right-hand portion of the page.  "Source

6    for," it says, "Listed in Marie Baran's computer records

7    obtained in 2008."

8             MR. JACKSON:  If we can just go to source 4 at the top

9    of the page.  The top right.  There we go, around there.

10   Q.   It says at the top, "Listed in Marie Baran's computer

11   records obtained in 2008."  Then, on the right of that, it says

12   "Marie Baran's computer records reference."

13            Do you see that?

14   A.   Yes.

15   Q.   At any point did the government ask you to compile a list

16   between any applications that you found on Ms. Baran's computer

17   and the ones that were actually filed with the RRB?

18   A.   I am trying to think of how to answer that.

19   Q.   The best you can?

20   A.   Because I compiled a list, so I reviewed all of the unique

21   Social Security numbers within the computer records to see

22   whether they were a railroad employee, whether they were an

23   annuitant and whether they received a benefit.  I did review to

24   see whether they -- yes.

25   Q.   Your purpose in reviewing it was to see whether they

D7pnles4                            Marx - cross

1    received a disability?

2    A.   That was essentially -- I just compiled the spreadsheet.

3    Q.   The task at hand?

4    A.   Yes, the task at hand was to identify individuals through

5    these four different sources, and one of sources I used was her

6    computer records.

7    Q.   In those computer records at any time did the government

8    ask you to look at, for example, what we have looked at many

9    times, and I won't revisit, but the Section 6 where it says,

10   "hard, easy, not at all"?  Did you at any point in your

11   analysis look at any records on a computer, Ms. Baran's

12   computer relative to an applicant and how if at all the record

13   on her computer differed with respect to the one that was

14   actually filed with the RRB?

15   A.   No.

16          MR. JACKSON:  I know I said finally, Judge, but this

17   is really finally.  If I could just have the government go to

18   14-B.

19   Q.   14-B they asked you about the date that this document was

20   signed, June 12 of 2008.  Do you remember that?

21   A.   Yes.

22   Q.   Then they referred you to Section 3.

23          MR. JACKSON:  If we can go to Section 3, and that

24   date, again, June 12, 2008, section 3, question 11.

25   Q.   They referred you to July 30 of 2008, do you see that?

D7pnles4                              Marx - cross

1    "Enter the date you can no longer work because of your

2    condition."  Do you see that?

3    A.  I do.

4    Q.  Are you aware of whether or not you can apply for, if you

5    know, occupational disability while you are still working?

6    A.  I am not sure.

7    Q.  If we could just go back to the first date.

8              So you just could point to the differences in these

9    dates, but you can't tell us why there would be differences in

10   those dates, is that right?

11   A.  Well, I have my opinion.  I don't -- you want --

12   Q.  I don't think the judge will permit you to give your

13   opinion.  Just if you know or you don't.

14   A.  I wasn't there when the form was signed, so all I did is I

15   reviewed -- I see when it was stamped and I see when the person

16   decided to sign with Ms. Baran on this authorization form.

17   Q.  OK.

18   A.  I see that there is a difference in date.

19   Q.  Thank you, Ms. Marx.  And on 14-A -- this is B.  14-A.  Do

20   you see that it says here April 29, 2008, when they signed the

21   authorization form, correct?

22   A.  Right.

23   Q.  Then, if we were going to Section 3 again on this document,

24   there is another date, and that date is July 29, 2008?

25   A.  Yes.

D7pnles4                          Marx - cross

1   Q.   Same question.  Would it be the same answer?

2   A.   Yes.

3   Q.   Regarding the differences in the dates and you not --

4   A.   Yes.

5              THE COURT:  Asked and answered.

6              MR. JACKSON:  Thank you, Ms. Marx, very much for your

7   time.

8              THE COURT:  Mr. Ryan, before you begin, give us an

9   estimate so we can decide whether or not to break at this

10  point.

11             MR. RYAN:  I am going to make it short so we can take

12  a break for lunch, if that's all right with your Honor.

13             THE COURT:  We are going to have a break for lunch

14  even if you make it long.

15             MR. RYAN:  Trust me, I will do the best I can.

16             THE COURT:  All right.  Go ahead.

17  CROSS EXAMINATION

18  BY MR. RYAN:

19  Q.   Ms. Marx, you were in your Chicago office with your

20  computer as part of this nine-month project, right?

21  A.   Yes.

22  Q.   OK.  And you were given suggestions as to what you should

23  do for this case with respect to your computer?

24  A.   What do you mean by suggestions?

25  Q.   Well, did anyone guide you or tell you what the objective

D7pnles4                           Marx −cross

1   was for your work?

2   A.  No, not necessarily.  It was, I had to review claim files

3   and enter information as I saw it in the files or with the

4   records.  So it was just doing analysis on the data that I was

5   given.

6   Q.  So the analysis that you are given here today and yesterday

7   is all a product of your own thinking, is that it?

8   A.  No, it was a collaborative effort.

9   Q.  And who was the leader of the collaborative effort?

10  A.  I don't know what you mean by "leader."

11  Q.  Well, who do you go to for guidance as to what you are

12  supposed to do and what the objectives?

13  A.  I worked closely with the prosecution team.

14  Q.  Would that be Mr. Weddle?

15  A.  One of the individuals.

16  Q.  I see.

17  A.  Yes.

18  Q.  Did he or anyone in the prosecution team suggest that you

19  put in certain words in your computer to try to find out what

20  forms in those files are similar?

21  A.  Actually, I did most of that.  I reviewed some of the forms

22  that looked similar and then I would identify additional ones

23  that were similar.

24  Q.  OK.  This computer you had has a word association function,

25  correct?

D7pnles4                           Marx -cross

1   A.   What does "word association function" mean?

2   Q.   If you punched in catch-22, this computer can identify all

3   of the forms filed in the separate claims that have that

4   phrase, catch-22?

5   A.   Yes, that are in the database.

6   Q.   Whose idea was it to put catch-22 in there?

7   A.   That specific phrase, I believe it was Mr. Weddle's, I

8   think.

9   Q.   That catch-22 is on the 134 forms that are assigned to

10  Mr. Rutigliano, isn't that right?

11  A.   Yes.

12  Q.   You don't know whether Mr. Rutigliano submitted all of

13  those forms or caused them to be submitted, do you?

14  A.   I don't know.  I just put together what I presented what

15  you guys --

16  Q.   What Mr. Weddle suggested was catch-22, correct?

17          MR. WEDDLE:   Objection, your Honor.  That is not the

18  testimony.

19          THE COURT:   Asked and answered.

20  Q.   Let's look at 19-A-1.  This is a compilation of your

21  extractions from the various claim files that have the phrase

22  "catch-22" in them, correct?

23  A.   Right.

24  Q.   This wasn't an effort to catch Joe Rutigliano.  This was

25  part of your exercise in this project, right?

D7pnles4                          Marx -cross

1    A.  Yes.

2    Q.  In the forms we have various workers, I think it's about

3    132 workers?

4    A.  134.

5    Q.  Two of them are Mr. Parlante, who testified here, correct?

6    I?

7    A.  I don't know who's testified and who hasn't.

8    Q.  Well, take my word for it, Mr. Parlante is in here, OK?

9    A.  OK.

10   Q.  Mr. Maher he's in here too, right?

11   A.  Yes.

12   Q.  The jury has heard from these two witnesses, correct?

13          MR. WEDDLE:  Objection, your Honor.

14          THE COURT:  Sustained.

15   A.  I don't know who they've heard.

16   Q.  So they haven't heard from the other 132 people in this

17   document marked 19-A-1, correct?

18   A.  I don't know who they've heard --

19          MR. WEDDLE:  Objection, your Honor.

20          THE COURT:  Asked and answered.

21          MR. WEDDLE:  This an improper way to do this.

22          THE COURT:  Asked and answered.

23   Q.  Are you saying or suggesting to this jury that these men

24   had no back and neck pain?

25          MR. WEDDLE:  Your Honor, is he actually asking for her

D7pnles4                          Marx -cross

1    opinion on this question?

2              MR. RYAN:  Yes.  Yes, I am.

3    A.  I cannot give an opinion because I have never met any of

4    them to my knowledge.

5    Q.  Isn't that the suggestion here, that all of these forms

6    with the catch-22 that Mr. Weddle suggested had no back pain?

7    A.  I cannot answer that.

8    Q.  Did Mr. Weddle suggest that you should go in your computer

9    and pull up all of the application forms that contain the title

10   "exertion while crouching, stooping, squatting and bending in

11   cramped work areas"?  Did he ask you to do that?

12   A.  In the screen shots?

13   Q.  Yes.  In your computer.

14   A.  No.

15   Q.  Just plug in those words and see how many applications come

16   up?

17   A.  No.  That wasn't a phrase I specifically searched on.

18   Q.  If you had put that phrase in, according to the capacity of

19   your computer --

20   A.  Yes.

21   Q.  You would have gotten all of the applications by any

22   applicant containing that phrase, correct?

23   A.  Yes.

24   Q.  You were just shown by Mr. Weddle this morning 15, R-51A

25   and R-54A, correct?  You were shown those two?

D7pnles4                          Marx -cross

1   A.  Yes.

2   Q.  And that has the title, 5, exertion as I've recited to you,

3   correct?

4   A.  Yes.

5   Q.  And are those forms ascribed to Mr. Rutigliano in your 135

6   listings?

7   A.  No.

8   Q.  Well, they're very similar, aren't they?  Would you agree

9   based upon your expertise in this case?

10  A.  They have similarities.

11  Q.  It doesn't have catch-22 in it, does it?

12  A.  No.

13  Q.  And I represent to you that one of those forms came from

14  the Richard Ahern file, R-54, and the other form marked R-51-A,

15  says on it, it came from Ronny Siani.

16          Now, did you review in your process the Siani file and

17  the Ahern file as part of your project?

18  A.  I believe I did.

19  Q.  You don't ascribe those two workers to Mr. Rutigliano as

20  you have done with the 134 others, correct?

21          MR. WEDDLE:  Objection.  That wasn't really what she

22  was doing.  We can make arguments later, your Honor.

23          THE COURT:  Sustained.  Rephrase the question,

24  Mr. Ryan.

25  Q.  Does this in any way indicate to you that there were forms

1720

D7pnles4                          Marx –cross

1   that the Long Island Rail Road workers had that they could use

2   that were circulated around and they could use as part of their

3   application?

4          MR. WEDDLE:  Is he again asking for her opinion on

5   this?

6          MR. RYAN:  Yes.

7   A.  I don't know who talked to who and what they did.  I don't

8   know how these were filled out.

9   Q.  Where would Ronnie Siani get that form if it wasn't from

10  Mr. Rutigliano?

11  A.  I don't have an answer.  They could have -- I don't know.

12  Q.  How about Richard Ahern?  Where would he get that form if

13  it wasn't from Mr. Rutigliano?

14         MR. WEDDLE:  Assumes facts not in evidence, your

15  Honor.

16         THE COURT:  Sustained.

17  Q.  In all of your experience -- and you have a master's degree

18  in business administration?

19  A.  Yes.

20  Q.  And you have taken accounting courses?

21  A.  Yes.

22  Q.  Advanced accounting courses?

23  A.  No.

24  Q.  In all of your experience as you sit here today, did you

25  ever hear the expression that figures don't lie but liars can

D7pnles4                        Marx –cross

1   figure?

2   A.  I don't believe I have.

3           MR. WEDDLE:  Objection, relevance, your Honor.

4   Q.  You have never heard that?

5   A.  No.

6           MR. RYAN:  No further questions.  Thank you.

7   REDIRECT EXAMINATION

8   BY MR. WEDDLE:

9   Q.  Mr. Ryan just asked you about whether I, Justin Weddle,

10  asked you to do a search for catch-2.  Do you remember that?

11  A.  Yes.

12  Q.  Is that the only way that you identified the 134

13  applications that are in Government Exhibit 19-A-1?

14  A.  No.

15  Q.  What other kinds of similarities did you use to identify

16  those?

17  A.  Can I just back up to how I started the process?

18  Q.  Well, let me ask you this first, and then we will get to

19  that.

20  A.  OK.

21  Q.  Did you see other similarities besides catch-22?

22  A.  Yes.

23  Q.  Many?

24  A.  There were many.

25  Q.  Ma'am, when you were first undertaking this project, what

D7pnles4                         Marx - redirect

1    were your instructions generally?

2    A.   Generally to look for Long Island individuals, review their

3    claim files, and see if I see similarities between some of the

4    information between the claim files.

5    Q.   Did you use just one catch phrase, like catch 22, or did

6    you use multiple criteria?

7    A.   Multiple.  Many, many.

8    Q.   This compilation, 19-A-1, is this just one of the patterns

9    that the ones that you identified fell into?

10   A.   Yes, this is one.

11   Q.   How many major patterns did you find?

12   A.   Three.

13   Q.   I'm now handing you Government Exhibit 19-B-1 and 19-C-1.

14   19-B-1 is probably a couple of hundred pages long, right?

15   A.   Yes.

16   Q.   And what is 19-B-1?

17   A.   One second.  I'll tell you just one minute.  This is

18   pattern 2 and pattern 3.  So 19-B is pattern 2?

19   Q.   It's been a little while since you have been working on

20   pattern 2 and pattern 3, right?

21   A.   Yes.

22   Q.   Do you just remember off the top of your head about how

23   many vocational report supplements you found that fell into

24   pattern 2 and pattern 3?

25   A.   Let me think.

D7pnles4                        Marx - redirect

 1                One was 75.  So 75.  It was 266, so one can do the

 2     math, minus 135, minus 75.  That's the other number.

 3     Q.  Can we put on the screen government Exhibit 19-B-1.

 4                MR. WEDDLE:  I offer 19-B-1 and 19-C-1.  May I borrow

 5     those?  These are my only copies.

 6                MR. RYAN:  Same objection, Judge.

 7                THE COURT:  What is the objection?

 8                MR. JACKSON:  I object with Mr. Ryan.

 9                MR. RYAN:  Then I will withdraw my objection.

10                THE COURT:  Mr. Durkin, Mr. Dratel?

11                MR. DRATEL:  Your Honor, no objection.

12                THE COURT:  All right.  Admitted without objection.

13                (Government's Exhibits 19-B-1 and 19-C-1 received in

14     evidence)

15     Q.  So 19-B-1 is what you have called pattern 2?

16     A.  Yes.

17     Q.  It's dozens of vocational report supplements that look like

18     that on the first page, right, with the heading, with the

19     person's name and then the footer that says U.S. Railroad

20     Retirement Board Railroad Retirement Board, right?

21     A.  Yes.

22     Q.  Let's just take a look at paragraph 2 of this first one for

23     Mr. McCormick.  Do you see the paragraph 2.

24                MR. WEDDLE:  If we could blow that up.

25     Q.  It says, "Extensive walking and exertion while walking."

D7pnles4                      Marx - redirect

1    And this paragraph ends with, "I am no longer able to perform

2    this work because of the severe disabilities that I suffer."

3            Do you see that?

4    A.   I do.

5    Q.   Let's take a look at the next one, which is the vocational

6    report supplement for Jose -- yes.  Let's take a look at

7    question 2 for Mr. Quinones.  Do you see that question 2 for

8    Mr. Quinones has extensive walking and exertion while walking?

9    Do you see that?

10   A.   I do.

11   Q.   It ends with, "I am no longer able to perform this work

12   because of the severe disabilities that I suffer."  Right?

13   A.   Yes.

14   Q.   And is it fair to say that every single one of the ones in

15   pattern No. 2 do that?

16   A.   Yes.

17           MR. WEDDLE:  And now if you would take a look, if we

18   could put on the screen Government Exhibit 19-C-1.  Let's take

19   a look at the third page of 19-C-1.

20           If you could blow up under the heading work duties.

21   The paragraph under the heading work duties.  Do you see that

22   this paragraph starts out with the phrase, "By the time I

23   arrived at work I felt like I worked all day."  Do you see

24   that?

25   A.   I do.

D7pnles4                          Marx – redirect

1   Q.  To what extent did you see that phrase repeated over and

2   over again in pattern No. 3?

3   A.  In every single one.

4   Q.  Ma'am, whose decision was it to only present during this

5   trial one of the three patterns that you identified?

6   A.  Your decision.

7            MR. WEDDLE:  I'm sorry, your Honor.

8            THE COURT:  Mr. Weddle, how much longer do you expect

9   on your redirect?

10           MR. WEDDLE:  I'm trying to keep it as brief as

11  possible, your Honor, but if we took a break I'm sure I could

12  tighten it.  Right now I would guess probably 25 minutes, 20

13  minutes.

14           THE COURT:  We will have to take a break because I

15  have another commitment at 1 o'clock.  We will take a break.

16  It is quarter to 1.  We will return at 2.

17           (Jury not present)

18           (Luncheon recess)

19

20

21

22

23

24

25

D7pdles5                        Marx - redirect

1                    **A F T E R N O O N   S E S S I O N**

2                                  2:07 p.m.

3              (Jury not present)

4              THE COURT:  All right.  Bring in the jury.

5              MS. FRIEDLANDER:  Your Honor.

6              THE COURT:  Ms. Friedlander, I have the proposed

7     language for the Court's instruction.  Is this going to be

8     during this witness' testimony?

9              MS. FRIEDLANDER:  No.  It is for Dr. Barron's

10    testimony, and we actually have a really brief witness after

11    this one.

12             All the parties agreed on the language except, I

13    believe, Mr. Ryan wanted to --

14             THE COURT:  Yes.  I have that.  I can deal with that

15    later.

16             MS. FRIEDLANDER:  All right.

17             (Continued on next page)

18

19

20

21

22

23

24

25

D7pdles5                          Marx - redirect

```
 1               (Jury present)
 2               THE COURT:  Thank you.  Welcome back.
 3               Mr. Weddle.
 4               MR. WEDDLE:  Thank you, your Honor.
 5    NATASHA MARX,
 6          Resumed, and testified further as follows:
 7    REDIRECT EXAMINATION (Resumed)
 8    BY MR. WEDDLE:
 9    Q.  Ms. Marx, before lurch we were talking about three patterns
10    that you identified.  Is it correct that only -- or, I'm sorry.
11    Withdrawn.
12          The only one that was presented in your direct
13    testimony was the one consisting of supplements that were
14    almost identical to whose supplements?
15    A.  Joseph Rutigliano's.
16    Q.  Mr. Jackson asked you about the answers to question 40 on
17    certain of Marie Baran clients' AA1-D's, and pointed out that
18    many of them talked about when people wake up and what their
19    hygiene is like and another series of questions.
20          Do you remember those questions?
21    A.  Yes.
22    Q.  Let me ask you a question about what does not appear in
23    question 40 responses.
24               MR. WEDDLE:  Can we put up Government Exhibit 17?
25               And can we blow up the entry for Michael Stavola.
```

D7pdles5                        Marx - redirect

1    Q.  Do you see any mention in the normal day for Mr. Stavola, a

2    mention of playing golf more than once a week?

3    A.  No Jack.

4              MR. JACKSON:  Judge, I'm sorry.  I thought it said

5    normal day, not normal week.  I just would object as to the

6    characterization.

7              THE COURT:  Sustained.

8    BY MR. WEDDLE:

9    Q.  And let's talk about Government Exhibit 18 for a minute.

10             And Mr. Jackson asked you -- I'm sorry.

11             So referring again to the same series of questions

12   that Mr. Jackson asked about whether people's normal day talked

13   about their hygiene and things like that, what percentage of

14   Marie Baran's clients' AA1-D's that you looked at said that

15   bathing was hard or they couldn't do it at all?

16             MR. JACKSON:  Sorry, Judge.  This document speaks for

17   itself.  It has also been asked and answered.

18             MR. WEDDLE:  Your Honor, this is redirect.

19             THE COURT:  Overruled.

20   Q.  Can you read it, ma'am?

21   A.  91.1.

22   Q.  And Mr. Jackson also asked you about this chart, and he

23   said that you left off the easy answers.  Do you remember that?

24   A.  Yes.

25   Q.  If you show on your chart the percentage that said that

D7pdles5                         Marx - redirect

1   something like bathing is hard or someone can't do it at all,

2   can you tell just from looking at Government Exhibit 18 what

3   percentage of people who were Marie Baran clients said that

4   bathing was either easy or their answer to that question was

5   blank?  Can you tell that?

6   A.  Yes.  It's -- the total would be 100 percent.  So it is 100

7   minus the 91.1.  8.9 percent.

8   Q.  So is there anything left off of this chart?

9   A.  No.

10  Q.  Mr. Jackson asked you about the definitions that apply to

11  question 39 regarding whether someone -- something like sitting

12  is hard or a person can't do it at all.  Do you remember that?

13  A.  Yes.

14          MR. WEDDLE:  Can we put on the screen Government

15  Exhibit 113A?

16  Q.  And 113A, you see it on your screen, that is an AA1-D for

17  Ostap Baran.  Do you see that?

18  A.  Yes.

19          MR. WEDDLE:  Can we take a look at the question 39

20  entry relating to sitting, along with the definition?  The

21  previous page, just the sitting part.  And the definition.  The

22  definition and then through sitting.

23  Q.  OK.  So can you read, according to this definition, it

24  says, "I can do the activity with difficulty or with help,"

25  which is the definition for hard.  What does Ostap Baran say in

D7pdles5                       Marx - redirect

1    his application about sitting?

2    A.  It was hard.

3    Q.  And his explanation was?

4    A.  Difficult due to lower back pain.

5    Q.  Do you know what Ostap Baran looks like?

6    A.  No.

7    Q.  Let's take a look now at Government Exhibit 507.  And this

8    is one of the call log documents that you used as a resource in

9    preparing your list of Marie Baran clients, is that right?

10   A.  Yes.

11           MR. WEDDLE:  Now, can you blow up the -- let's see.

12   There is an entry on here -- I am going to try to find it.  Can

13   you blow up this entry here?

14           Maybe you can just blow up the series of entries.

15   Q.  So this is an entry that relates to Rita Baran; do you see

16   that?

17   A.  I do.

18   Q.  It involves a call to Boston, Massachusetts, right?

19   A.  Yes.

20   Q.  And you are not saying that every entry on this call log

21   meant that you put somebody on your chart as a Marie Baran

22   client, right?

23   A.  No.

24   Q.  What is your understanding about how this call log was

25   pulled together?

D7pdles5                    Marx - redirect

1    A.  It was -- if I used a person from here, they would have

2    Marie Baran specifically mentioned or, you know, "MB

3    consultant," some type of -- or just the word "Marie

4    consultant."  Those were the types of information I pulled from

5    here.  So this, I wouldn't use -- I am not saying that this

6    individual -- they could show up if they came up on one of the

7    other three sources as being a client, but using this I would

8    not select them.

9    Q.  They just came up because their name happens to be Baran

10   also?

11   A.  Right.  There are a lot of these types of examples.

12   Q.  Now, let's take a look at Government Exhibit 24.

13            Mr. Dratel -- sorry.  Can we blow that up.

14            Mr. Dratel asked you about Government Exhibit 24, and

15   he asked some questions about whether the people whose payments

16   are reflected here might just be covered under the plan of an

17   employee but might be family members or something else.  Do you

18   remember those questions?

19   A.  Yes.

20   Q.  Did the calculations that are in this exhibit, Government

21   Exhibit 24, did these include any payments that relate to

22   someone other than the Long Island Rail Road employee himself

23   or herself?

24   A.  No.

25   Q.  How do you know that?

D7pdles5                          Marx - redirect

A.   I took the patient's Social Security number that was in the

UHC record, and I took that unique Social Security number and

matched it to the Railroad Retirement Board's EDMA system to

identify the Long Island Rail Road employees.

Q.   And now let's talk about Government Exhibit 14C.

          Mr. Dratel asked you a series of questions about

Government Exhibit 14C.  Do you remember that?

A.   Yes.

Q.   And in order to save time, did you review this exhibit at

my request during the lunch break for a certain specific

purpose?

A.   Yes.

Q.   How many visits to Dr. Lesniewski are reflected in this

exhibit in the two-and-a-half years between March 2005 to

September 3, 2008?

A.   16.

Q.   And Mr. Dratel showed you a number of the visits, but let

me just show one.  This is page 28 of the exhibit, at the

bottom.

          No.  That is not the right page.  The next page, 29.

Just the typewritten part at the bottom.

          Do you see that under "Impression & Plan," it says,

"At this stage, there is really not much more we can do, other

than surgical intervention, which he doesn't want to do at this

time.  I think surgery is going to be an eventuality.  He is

D7pdles5                         Marx - redirect

1    also going to need to restrict activities to some extent.  The

2    patient has to determine the timing of all of these decisions

3    that he has to make."  And then it has "PL/lm."

4          Do you see that?

5    A.  Yes.

6    Q.  What's the date on which Dr. Lesniewski indicates in this

7    document that Mr. Viola has to restrict his activities?

8    A.  July 7, 2006.

9    Q.  Now, let's go to page 2 of this exhibit.  And if you could

10   blow up the top half of the screen.

11         And in Mr. Viola's AA1-D -- I'm sorry.  Could you

12   highlight this entry for number 7?

13         Ma'am, how many years is it from that date, July of

14   2006, until the date upon which Mr. Viola's application says

15   that his condition began to affect him?

16   A.  Approximately --

17         MR. DRATEL:  Objection.  That is not what it says.  It

18   doesn't say it began to affect him.

19         THE COURT:  Sustained.

20   Q.  I'm sorry.  Began to affect his ability to work?

21   A.  Yes.  About two years.

22   Q.  And, let's see, finally, let's take a look at page 11 of

23   this document.  This is the letter from Mr. Chernoff, or

24   Dr. Chernoff that Mr. Dratel showed you.  Do you remember that?

25   A.  Yes.

1734

D7pdles5                                Marx - redirect

1   Q.  Let's take a look at the next page, and if you could blow

2   up the part that says "Plan."

3            Do you see anything in this part where it says "Plan"

4   at the end of the letter where Dr. Chernoff states that

5   Mr. Viola is disabled or unable to do a job?

6   A.  No.

7            MR. WEDDLE:  Can you now put on the screen Government

8   Exhibit 100D, as in David.

9   Q.  And 100D, as in David, is a narrative by Dr. Lesniewski for

10  Joseph Rutigliano, right?

11  A.  Yes.

12           MR. WEDDLE:  And if you could go to the second page,

13  please, Ms. Larson.

14           MR. DRATEL:  Objection, your Honor.  Beyond the scope.

15           MR. WEDDLE:  Blow up the last paragraph.

16           THE COURT:  Sustained.

17           MR. DRATEL:  It was sustained, right?

18           THE COURT:  Let me see, what's the question?

19           MR. WEDDLE:  Please blow up the last paragraph.

20           I am just comparing the final paragraph of these

21  letters.  Mr. Dratel made explicit comparisons between

22  Dr. Lesniewski and Dr. Chernoff in his questioning of this

23  witness, and I am trying to clear that up a little bit, your

24  Honor.

25           MR. DRATEL:  Objection, your Honor.  I did not do that

D7pdles5                    Marx - redirect

1    with respect to the Impression & Plan.  I did not do that at

2    all.  I did not even go into Chernoff's plan or impression, and

3    I used one sentence from his that was just about the applicant

4    saying that he was going to retire.  That's all I did.  I did

5    not do this.

6            MR. WEDDLE:  It is fair redirect, your Honor.  I am

7    just reading another portion of the exhibit.

8            THE COURT:  All right.  Sustained.  Let's move on.

9            MR. WEDDLE:  I was just going to read this one

10   paragraph, your Honor.

11           THE COURT:  Sustained.

12           MR. WEDDLE:  That's all I have of that.

13           THE COURT:  All right.  Sustained.

14           MR. DRATEL:  Your Honor, I have no questions.

15           MR. JACKSON:  Judge, two issue.

16           Number one, your Honor, is that as it relates to

17   Government Exhibit 17 draft, I neglected to move it into

18   evidence.  I would like to do that at this time.  I guess we

19   could call it Government Exhibit 17 draft, and if your Honor

20   would give the instruction that you did before regarding this.

21           That's the one issue, and then just a couple of

22   questions.

23           MR. WEDDLE:  Your Honor, if he wants to offer

24   exhibits, he can do that in his direct case.

25           The draft, we discussed the purposes for which we give

D7pdles5                          Marx - redirect

1  drafts at the sidebar, your Honor, and the misuse of drafts we

2  discussed at the sidebar.

3           MR. JACKSON:  Judge, I don't want to have any major

4  speaking objections before you.  However, to the extent that

5  this witness was asked questions about it, I think it would be

6  appropriate to aid the jury in their understanding if it came

7  in through this witness, the questions I asked her about on the

8  normal daily activity logs regarding Ms. Baran, 17D.

9           THE COURT:  You only asked about particular employees

10  within that draft, not all of them.

11           MR. JACKSON:  Right.  But it comes from the government

12  with your instructions that you gave.  It is the same thing.

13           MR. WEDDLE:  This is exactly what we discussed.  It

14  came from the government with specific limitations.

15           THE COURT:  All right.  Objection sustained.  You

16  could introduce this in some other way.

17           MR. JACKSON:  All right.  I will.  I am not finished

18  yet.  Joe, please.

19           Could we put up 113, which is Mr. Baran, Ostap Baran?

20  Could we blow up the section that Mr. Weddle talked about?  I

21  think it was Section D, hard, easy etc.  Can we go to that?

22  Could we blow up the precise area that we did when Mr. Weddle

23  asked.

24  RECROSS-EXAMINATION

25  BY MR. JACKSON:

D7pdles5                         Marx - recross

1   Q.  OK.  Now, Mr. Weddle asked you about whether you knew Ostap

2   Baran, is that correct?

3   A.  Yes.

4   Q.  And then he asked you about whether, in reference to this,

5   it says "sitting, hard."  Do you see that?

6   A.  Yes.

7   Q.  And it references "hard" here; would you agree?

8   A.  Yes.

9   Q.  It also references hard with regard to standing, is that

10  right?

11  A.  Yes.

12  Q.  Walking?

13  A.  Yes.

14  Q.  OK.  Is there any indication on this particular form as to

15  whether that would be made easy through any type of medication?

16  A.  I don't know.

17  Q.  I just want to clarify.

18          If you look at Section 6, could you just tell us

19  Section 6, do you see what it says?

20  A.  Yes.  And the question asks --

21  Q.  You could read it.

22  A.  "Check the one box after each activity listed below that

23  best describes your ability to do that activity."

24  Q.  Correct.

25  A.  I don't know -- I don't see any specification towards

1  medicine.  I don't know how -- I don't know their thought
2  process when filling out this form, or whoever filled it.
3  Q.  It's OK, Ms. Marx.  I'm not asking about your thought
4  process.  I just want to be clear that there is no indication
5  under Section 6 about whether that would be altered due to any
6  medication; is that right?
7  A.  Correct.
8          MR. JACKSON:  Thank you.
9          Nothing further.
10          THE COURT:  Mr. Ryan.
11          MR. RYAN:  Judge, I would like to offer into evidence
12  R51A and R54A, which were the subject of the testimony.
13          THE COURT:  Mr. Weddle.
14          MR. WEDDLE:  Your Honor, the problem with those
15  exhibits is that it is just simply one page, and one of them
16  doesn't even have a name on it.  Maybe I could just talk to
17  Mr. Ryan and we could --
18          MR. RYAN:  Your Honor, I will offer the whole file in,
19  R51 --
20          THE COURT:  See if you can work a stipulation.
21          MR. WEDDLE:  Can we just put the person's name on the
22  page that he has --
23          MR. RYAN:  Sure.  Richard Ahearn.  I will offer the
24  whole file in, Judge, Richard Ahearn, which is R51 -- 54, and
25  Siani, which is R51.  I offer the whole RRB file, your Honor.

D7pdles5                          Marx - recross

1              MR. WEDDLE:  Your Honor, the exhibit number that

2       Mr. Ryan just used referred to one piece of paper.  We had

3       discussions about the whole file before.

4              THE COURT:  I admitted the one piece of paper that was

5       the subject of the testimony.

6              MR. WEDDLE:  If the piece of paper just says the

7       person's name on it, I don't have an objection.

8              THE COURT:  All right.

9              MR. RYAN:  I'm going to write the person's name on it.

10             Mr. Weddle can write this person's name on it so we

11      won't have any difficulty.  Richard Ahearn.

12             (Pause)

13             MR. RYAN:  Thank you very much, Judge.

14             (Defendant's Exhibits R51A and R54A received in

15      evidence)

16             THE COURT:  All right.  Next.  Anything else?

17             (Pause)

18             Thank you.  You are excused.  You may step down.

19             THE WITNESS:  Thank you.

20             (Witness excused)

21             MS. FRIEDLANDER:  The government calls Roger van

22      Etten.

23             MR. WEDDLE:  Your Honor, I am just going to retrieve

24      these exhibits from the witness stand.

25             THE COURT:  All right.

D7pdles5                              Marx - recross

1   ROGER VAN ETTEN,

2          called as a witness by the government,

3          having been duly sworn, testified as follows:

4               THE COURT:  You may be seated.

5               Speak into the microphone as closely as possible.

6               State your name and spell it for the record.

7               THE WITNESS:  My name is Roger Van Etten.  R-o-g-e-r,

8   capital V-a-n, capital E-t-t-e-n.

9               MS. FRIEDLANDER:  May I proceed?

10              THE COURT:  Ms. Friedlander, yes.

11  DIRECT EXAMINATION

12  BY MS. FRIEDLANDER:

13  Q.  Good afternoon, Mr. Van Etten.

14  A.  Good afternoon.

15  Q.  Where do you live?

16  A.  Trinity, Florida.

17  Q.  And where do you work?

18  A.  Heritage Springs Community Association, the -- at the golf

19  course.

20  Q.  What do you do there?

21  A.  I am the Director of Golf.

22  Q.  What are your duties and responsibilities, just generally?

23  A.  Supervise and direct the entire golf operation and

24  teaching.

25  Q.  Do you supervise other people?

D7pdles5                          Van Etten - direct

1    A.   Yes.

2    Q.   How many?

3    A.   Between 20 and 30.

4    Q.   Can you just describe for us what Heritage Springs is and

5    can you describe the golf course there?

6    A.   It's an adult community for residents or individuals that

7    are 55 and older, and it is an 18 hole championship golf course

8    with a driving range and practice putting green and chipping

9    green.

10   Q.   Do you know Joe Rutigliano?

11   A.   Yes, I do.

12   Q.   How do you know him?

13   A.   He's a resident and a member of the country club.

14   Q.   Would you recognize Mr. Rutigliano if you saw him.

15   A.   Yes.

16   Q.   Do you see him in the courtroom today?

17   A.   Yes, I do.

18   Q.   Could you identify him by an article of clothing that he is

19   wearing?

20   A.   A greenish colored blazer.

21          MS. FRIEDLANDER:  Your Honor, may the record reflect

22   that the witness has identified the defendant?

23          THE COURT:  So noted.

24   BY MS. FRIEDLANDER:

25   Q.   When did you meet Mr. Rutigliano, approximately?

D7pdles5                          Van Etten – direct

1   A.  Oh, I would say at least five or six years ago.

2   Q.  And in what context did you meet him?

3   A.  I would meet him in the pro shop, out on the golf course,

4   around the clubhouse area.

5   Q.  Does Mr. Rutigliano live in Florida?

6   A.  He does part-time.  He is what we call a snowbird from

7   usually sometime in mid-December through maybe March or April.

8   Q.  And how frequently have you seen Mr. Rutigliano on the golf

9   course, just approximately, during those seasons over the

10  years?

11  A.  Typically two to three times a week, at least.

12  Q.  And is Mr. Rutigliano playing golf typically when you see

13  him?

14  A.  Yes, or using some of the other amenities.

15  Q.  And what else have you seen him doing around the community?

16  A.  I've seen him at the swimming pool area.

17  Q.  Anything else?

18  A.  That's about it.

19  Q.  How about on a bike?

20  A.  Yeah, I've seen him on his bicycle.  Sometimes he will take

21  his bike up to the clubhouse –- not for golfing but for the,

22  you know, to use the swimming area.

23  Q.  And when you see Mr. Rutigliano, does he play golf by

24  himself or with other people?

25  A.  He plays with groups of people, and he's a member of the

D7pdles5                          Van Etten - direct

1   Men's Golf Association so he plays with the Men's Golf

2   Association.

3   Q.  How often do they play?

4   A.  Once a week.

5   Q.  And when Mr. Rutigliano plays golf, does he play 18 holes

6   of golf.

7   A.  Yes, as far as I know, most of the time.

8   Q.  Approximately how long does it take to play 18 holes of

9   golf just on average?

10  A.  About four hours.

11  Q.  And for those of us who don't play golf, can you just

12  describe generally what it requires physically?

13  A.  It basically requires the whole body.  When you make a golf

14  swing you're synchronizing your arms with a body pivot.  So

15  when you swing the club, if you can just -- if you can picture

16  a clock, and you basically swing your arms back as far as you

17  can.  While you're doing that, you would transfer your weight

18  to the right and pivot your body to the right.  Then you

19  transfer your weight to the left and uncoil your body and swing

20  your arms through to a full finish.

21  Q.  Does playing golf typically require you to use your back,

22  your shoulders, your knees?

23  A.  Yes.

24  Q.  In front of you you have two documents marked for

25  identification as Government Exhibits 560 and 569.  Can you

D7pdles5                         Van Etten – direct

1    take a look at those and let me know whether you recognize

2    them?

3    A.  Yes, I do.

4    Q.  What are they?

5    A.  It's player history report.  Basically has their name and

6    the dates that they played golf and how many holes of golf they

7    played.

8    Q.  And was this -- are these records of Heritage Springs Golf

9    Course?

10   A.  Yes, they are.

11   Q.  Did you provide these to the government?

12   A.  Yes, I did.

13   Q.  And do these relate to Mr. Rutigliano?

14   A.  Yes, they do.

15   Q.  Are these made and kept in the normal course of business?

16   A.  Yes.

17              MS. FRIEDLANDER:  The government offers 560 and 569.

18              MR. RYAN:  No objection.

19              THE COURT:  Admitted without objection.

20              (Government's Exhibits 560 and 569 received in

21   evidence)

22              MS. FRIEDLANDER:  Can you publish 560, please?

23   Q.  There is a name that is a highlighted there.  Is that

24   Mr. Rutigliano's name?

25   A.  Yes.

1  Q.  And in the left-hand column there are some dates, and on

2  the right it says "Greens fee member 18 holes."

3          Can you just explain to the jury what we're looking

4  at?

5  A.  Yeah.  That is a code for a member that came into the pro

6  shop and signed up to play a round of golf, 18-hole round of

7  golf.

8  Q.  OK.  And so does this suggest that Mr. Rutigliano played 18

9  holes of golf on the dates reflected in the left-hand column?

10 A.  Yes, that's correct.

11 Q.  Sometimes there are dates that appear twice.  They will

12 appear -- I'm pointing to February 3rd.  There seem to be two

13 listings for February 3rd.  What do you believe that means?

14 A.  That would probably be Mr. Rutigliano paying for a greens

15 fee of another member or guest that he was playing with that

16 day.

17         MS. FRIEDLANDER:  Can we scroll to the next page?  And

18 can we blow up maybe a little just the left-hand column.  I

19 just want to see all the dates.  The whole thing.  Yep.  Is

20 there a way to make it bigger?  Perhaps the jurors could see on

21 their screens better than I can see from here.

22 Q.  Does this show regular golf during the months of February,

23 March, April 2008; October, November 2008; January 2009;

24 February, March, April 2009; October 2009, November 2009 into

25 2010?

1    A.  Yes, it does.

2            MS. FRIEDLANDER:  OK.  Can we see the next page?  If

3    you could maybe just highlight the dates for the jury.

4    Q.  And, again, are these all additional dates on which

5    Mr. Rutigliano signed up for 18 holes of golf?

6    A.  Yes, they are.

7            MS. FRIEDLANDER:  Can we scroll to the next page?  If

8    you can highlight the dates again.

9    Q.  These are dates in 2011 and 2012, again, where

10   Mr. Rutigliano signed up to play 18 holes?

11   A.  That's correct.

12           MS. FRIEDLANDER:  OK.  If you can scroll over to the

13   next page.

14           Government Exhibit 560 is a thick packet, and rather

15   than -- well, I will show a couple of more pages.

16   Q.  Are these all records of Mr. Rutigliano playing in golf

17   tournaments, golf meets or other golf competitions over the

18   years at Heritage Springs?

19   A.  Yes, they are.

20           MS. FRIEDLANDER:  Can you just go to 125927 and just

21   show a couple of examples.

22   Q.  And what is this?

23   A.  This is a result sheet or they are all result sheets of

24   different men's league competitions that Mr. Rutigliano

25   participated in.

D7pdles5                           Van Etten - direct

1    Q.  This shows his results in January 2008?

2    A.  January 16th, yes.

3    Q.  Let's just show a couple of more examples.

4          Fair to say this document is the about 100 pages long?

5    There are actually numbers on it.

6    A.  Yes.

7    Q.  Again, here is just one other example of Mr. Rutigliano

8    playing in a league competition.

9    A.  Yes.

10   Q.  The rest of this packet contains dozens of other examples

11   of the same type of thing over the years?

12   A.  Correct.

13          MS. FRIEDLANDER:  If we can just briefly show 569?

14   Q.  560, which we just saw, started with the beginning of 2008.

15   This is a similar type of document to the one we just saw

16   reflecting dates on which Mr. Rutigliano signed up to play golf

17   and do other things at the golfing center?

18   A.  Yes, it is.

19   Q.  OK.  I just want to point out that this document appears to

20   start a year earlier.

21          So this reflects golf by Mr. Rutigliano dating back to

22   January 2007?

23   A.  Yes.

24          MS. FRIEDLANDER:  Thank you.  That's all I have.

25          (Pause)

D7pdles5                          Van Etten - direct

1    Q.  Do you have golfers at the course sometimes with carpal

2    tunnel syndrome?

3    A.  Yes, we do.

4    Q.  What happens, in your experience, when it gets severe?

5    A.  When it gets to the point where they can no longer either

6    open their fingers or squeeze them, then they can no longer

7    play and they end up getting surgery or having surgery done,

8    again, on their hand.

9    Q.  And have you known people who had meniscal tears in their

10   knees?

11   A.  I do know of people that have had them.

12   Q.  And the people that you know with serious meniscal tears,

13   have they been able to play golf?

14   A.  I know one person in particular that did but was not able

15   to play when he had a meniscus tear.

16        MS. FRIEDLANDER:  OK.  No further questions.  Thank

17   you.

18   CROSS-EXAMINATION

19   BY MR. RYAN:

20   Q.  You know others that could play with a meniscal tear,

21   correct.

22   A.  I don't know of any others, no.

23   Q.  Do you Tiger Woods, with the U.S. Open, or the Masters in

24   2008, with a meniscus tear?

25   A.  Right.  I think that's right.

D7pdles5                          Van Etten

1    Q.  Correct.  Wasn't he grimacing on the tee?

2    A.  Yes.

3    Q.  Do you remember that?

4    A.  Yes.

5    Q.  Do you have third rails on your golf course, electrical

6    with 750 volts?

7    A.  No.

8    Q.  Do you know anything about working on the railroad?

9    A.  No.

10   Q.  Do you know anything about climbing up ladders?

11   A.  I've climbed a few ladders.

12   Q.  OK.  And do you know anything about the ballast that they

13   have to walk on on the tracks, do you know anything about that?

14   A.  Not too much, no, sir.

15   Q.  Do you know that a conductor has to sometimes lift up

16   something up to a hundred pounds?

17   A.  No, sir.

18   Q.  Do you know how much a golf club weighs?

19   A.  A golf club?

20   Q.  Yes.

21   A.  Yeah.

22   Q.  How many grams?

23   A.  Well, there's different weights.

24   Q.  OK.  Let's take the shaft.

25   A.  OK.

D7pdles5                          Van Etten

1   Q.  And put the largest head on it so you have a driver.  What

2   does that club weigh?

3   A.  It probably weighs a little less than a hundred grams.

4   Q.  And that converts into -- do you have a conversion?

5   A.  No.

6   Q.  Let me see if I can help you.  Let me show you Exhibit 73

7   and see if that helps you, Mr. Pro, if I can call you that.

8   A.  OK.

9           (Pause)

10          OK.  Where are we looking at?

11  Q.  I would like to know when Mr. Rutigliano had a driver in

12  his hand on the first tee --

13  A.  Mm-hmm.

14  Q.  -- how much did it weigh?

15  A.  This doesn't tell me how much it weighs.

16  Q.  Well, if you keep flipping the pages, maybe there is a hint

17  in there.

18  A.  All right.  It tells how -- there is a bunch of shafts and

19  in here it tells how much the shaft weighs.

20  Q.  All right.  Keep turning the pages.

21          (Pause)

22          Let me make it short.

23  A.  Here we go.

24          THE COURT:  Mr. Ryan, this is cross-examination.  You

25  can lead the witness.

D7pdles5                              Van Etten

1    Q.  A club, a full club, the driver weighs about 1.7 pounds,

2    which is a conversion of 200 grams, is that right?

3    A.  It is on the last page, yeah.

4    Q.  Do you agree with that?

5    A.  It seems kind of heavy to me.

6    Q.  Oh, it is even less.  OK.

7             And what kind of a golfer is Joe,

8    A.  I would say an average golfer.

9    Q.  He is not the club champ?

10   A.  No.

11   Q.  He enjoys it when he gets out there?

12   A.  He seems to.

13   Q.  And you've seen him playing four hours on your course?

14   A.  Yep.

15   Q.  And he goes out with his buddies, correct?

16   A.  Yep.

17   Q.  And this is an adult community?

18   A.  Yes, sir.

19   Q.  And are there golfers wearing braces on their backs or

20   sometimes knee braces?

21   A.  Yes.

22   Q.  And they play golf?

23   A.  Yes.

24   Q.  You don't have to swing all the way around like you do, you

25   could take a three-quarter swing, correct?

D7pdles5                          Van Etten

1    A.  Absolutely.

2    Q.  You can adjust your swing to whatever your conditions are,

3    correct?

4    A.  That's correct, yep.

5    Q.  Thank very much, Mr. Van Etten.

6    A.  You got it.

7              THE COURT:  Anyone else?

8              Yes, Ms.  Friedlander.

9              MS. FRIEDLANDER:  One quick thing on redirect.

10   REDIRECT EXAMINATION

11   BY MS. FRIEDLANDER:

12   Q.  Tiger Woods is a good example.  Tiger Woods had to stop

13   playing golf for a time because he had a really bad meniscal

14   tear, is that right?

15   A.  That is correct.

16   Q.  Then he had to have surgery to repair it, right?

17   A.  He had to have his knee reconstructed.

18   Q.  Then he got fixed and then he went to back to golf, right?

19   A.  That is correct.

20   Q.  Full-time?

21   A.  Correct.

22             MS. FRIEDLANDER:  Thank you.

23             MR. JACKSON:  No.  Thank you.

24             THE COURT:  You may step down.  You are excused.

25             THE WITNESS:  OK.  Thank you.

1753
D7pdles5                         Van Etten - redirect

1       (Witness excused)

2           MS. FRIEDLANDER:  Your Honor, may we just approach on

3   the matter we discussed earlier?

4           THE COURT:  Yes.

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7pdles5

1          (At the sidebar)

2          MS. FRIEDLANDER:  Two quick things.

3          The first is the instruction that the parties had

4   proposed that Mr. Ryan had an objection to.

5          THE COURT:  Yes.

6          MS. FRIEDLANDER:  Because that is for this witness.

7   Then I have a little scheduling thing.

8          THE COURT:  My view is that we cannot add language

9   concerning that there was no fault of anybody.  It is because

10  we don't know that, and the Court is not in a position to make

11  such a finding.  And if the parties cannot agree upon that, it

12  is not something that we can have in a document that has not

13  been stipulated.

14         MS. FRIEDLANDER:  So --

15         MR. RYAN:  Then I object to the stipulation.

16         MS. FRIEDLANDER:  Do you object to the instruction?

17  All of your co-counsel are OK with it.

18         THE COURT:  All right.  What is the second item?

19         MR. RYAN:  Are you OK with the instruction?

20         THE COURT:  Yes.

21         MS. FRIEDLANDER:  So Dr. Barron has cleared his

22  calendar for today and tomorrow to testify, but he can't come

23  back after that.  He is going to be away.  He has surgeries and

24  all kinds of things.  So I wonder if it makes sense for us to

25  go -- if the Court would prefer to go a half an hour late just

D7pdles5

1    for today just to allow for the possibility if cross is really

2    long tomorrow.  It probably isn't necessary.  I just raise it

3    so that everyone knows.

4              THE COURT:  That will give you a reason for some

5    discipline, or incentive.

6              MR. DURKIN:  Can I just see the instruction?  Is it

7    the one that you had e-mailed me last night?

8              MS. FRIEDLANDER:  It is.

9              MR. DURKIN:  OK.  That is fine.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7pdles5

```
 1              (In open court)

 2              MS. FRIEDLANDER:  The government calls Dr. Alton

 3    Barron.

 4     ALTON BARRON,

 5          called as a witness by the government,

 6          having been duly sworn, testified as follows:

 7              THE COURT:  Thank you.  Be seated.  Speak into the

 8    microphone as closely as possible.

 9              State your name and spell it for the record.

10              THE WITNESS:  My name is Otis Alton Barron, Jr., M.D.

11    O-t-i-s A-l-t-o-n B-a-r-r-o-n.

12              THE COURT:  Before the witness testifies, there are

13    two brief matters.

14              One.  There is an instruction that I would like to

15    give the jury, part of an instruction that relates to matters

16    that will come up during the course of the witness' testimony.

17              There was patient files, x-rays and certain MRIs

18    performed on certain patients seen by Dr. Lesniewski before he

19    joined Island Sports Medicine in or about 2005, including but

20    not limited to patients Joseph Rutigliano and Ostap "Gus" Baran

21    that were not available to the government or any of the

22    defendants in this case.

23              Second.  Because of the limitations of time,

24    availability by this witness, we may need the flexibility of

25    remaining a little bit overtime today, perhaps up to around
```

D7pdles5

1  5:30.  We don't know whether that will be necessary, but I am

2  sure that all of the parties will make all efforts necessary to

3  avoid it, if necessary.

4           MS. FRIEDLANDER:  Thank you.

5  DIRECT EXAMINATION

6  BY MS. FRIEDLANDER:

7  Q.  Good afternoon.

8  A.  Good afternoon.

9  Q.  What do you do for a living?

10  A.  I am an orthopedic surgeon.

11  Q.  And is that a kind of physician?

12  A.  That is.

13  Q.  What is orthopedics?

14  A.  Orthopedics is the study of, diagnosis and treatment of

15  problems with the bones, the ligaments, the tendons, and the

16  nerves that support those structures.

17  Q.  Can you tell us about your educational background?

18  A.  Sure.  Where do you want me to start?

19  Q.  Maybe with college.

20  A.  OK.  I went to the University of Texas in Austin, where I

21  majored in engineering, and then painted houses for two years.

22  That was very educational.

23           And then I went to medical school at Tulane University

24  in New Orleans four years, from '85 to '89.  And then through

25  '89 to '94, I went and kind of completed an orthopedic surgery

D7pdles5                              Barron - direct

1   residency.  That is a five-year study of the bones and joints

2   and so forth, orthopedic surgery, from '89 to '94.

3              Then I came to New York and did my shoulder fellowship

4   at Columbia, and then followed that with my hand fellowship at

5   Roosevelt Hospital, and that's where I stayed.

6   Q.  Are you Board certified in orthopedic surgery?

7   A.  Yes, I am.

8   Q.  What does it mean to be Board certified?

9   A.  It means that when you finish orthopedic residency, you

10  have to take a big, 300-question test that tests all orthopedic

11  knowledge, and if you pass that you become Board eligible.  And

12  then you go into practice at least after you finish your

13  fellowships.  And then you -- after two years in practice, you

14  then have to collect cases that you've done and then go to

15  Chicago, actually, and sit and have oral boards where

16  physicians who are older and wiser and can tell if you are

17  doing the right thing then test you.  And if they believe you

18  are doing the right thing, then they pass you and then you

19  become Board certified.

20  Q.  Are you currently a practicing orthopedic surgeon?

21  A.  Yes, I am.

22  Q.  Approximately how many orthopedic patients do you see in a

23  year?

24  A.  In a year, that is tough.  I see about a hundred a week.

25  So 400 a month.  So maybe 4,000, 5,000 a year.

D7pdles5                          Barron - direct

1    Q.  For how many years have you been practicing?

2    A.  Since 1996, January.  So that would be 18 -- 17 years.

3    Q.  Are you affiliated with any hospitals?

4    A.  Yes.  I'm on the faculty at -- I'm clinical orthopedic

5    faculty at Columbia-Presbyterian Hospital, but my practice is

6    at St. Luke's-Roosevelt Hospital.

7    Q.  Those are here in Manhattan?

8    A.  Yes.

9    Q.  Within the field of orthopedic surgery, do you have a

10   subspecialty in any particular areas of the body?

11   A.  Yes.  I subspecialize in shoulder, elbow and hand surgery.

12   Q.  Do you see patients with other orthopedic conditions

13   besides conditions of the shoulder, elbow and hands?

14   A.  Yes, I do.

15   Q.  How often do you perform orthopedic surgery?

16   A.  I do about an average of 10 or 12 cases a week.

17   Q.  Are you the orthopedic surgeon for any New York

18   institutions?

19   A.  I'm the -- one of the team doctors for Fordham University.

20   I am one of the treating physicians for the last 13 or 14 years

21   for the New York Philharmonic Orchestra and for the Met Opera.

22   Q.  And when you say the team doctor for Fordham University,

23   which teams?

24   A.  Well, all the teams technically, but we are on the field

25   for every football game in case there are any catastrophic

D7pdles5                          Barron - direct

1   injuries, and then we cover all the home games for the

2   basketball team and then anything else that we can cover but

3   usually there is not much else besides that.

4   Q.  Do you also hold academic positions?

5   A.  Yes, I do.

6   Q.  Which ones?

7   A.  I am a Clinical Assistant Professor of Orthopedic Surgery

8   at Columbia.

9   Q.  Have you published any academic papers in the area of

10  orthopedics?

11  A.  Yes, I have.

12  Q.  What kinds of publications or journals have those papers

13  appeared in?

14  A.  The papers appear in peer-reviewed journals where you --

15  and those are various orthopedic journals.  There is one called

16  Journal of Bone and Joint Surgery, one is called Journal of

17  American Shoulder and Elbow surgery, one that's Journal of Hand

18  Surgery, etc., and then there are many others.

19         And then those are peer-reviewed where you submit a

20  study that you performed, and then they -- people review it and

21  determine whether it qualifies to be published and then they

22  publish it, and then also write chapters and review articles

23  and so forth.

24  Q.  Are you a member of any professional organizations?

25  A.  Yes, I am.

D7pdles5                        Barron - direct

1   Q.  Which ones?

2   A.  The American Association of Orthopedic Surgery.  That is

3   the big umbrella organization for all Board-certified

4   orthopedic surgeons.  Then I am in the American Shoulder and

5   Elbow Surgeons, which is a much smaller group of about 300

6   surgeons around the world.  Then the American Society for

7   Surgery of the Hand and then the New York Society for Surgery

8   of the Hand and then some others that are smaller, much

9   smaller.

10  Q.  Do you hold any leadership positions in the New York

11  Society for Surgery of the Hand?

12  A.  I was president a year ago.

13  Q.  Have you been qualified as an expert in state or federal

14  court before?

15  A.  I have.

16  Q.  More than once?

17  A.  I believe so.

18  Q.  And have you been qualified as an orthopedic surgeon each

19  time?

20  A.  Yes.

21          MS. FRIEDLANDER:  Your Honor, at this point we move to

22  qualify Dr. Barron as expert in the practice of orthopedic

23  medicine and surgery.

24          MR. DRATEL:  No objection, your Honor.

25          THE COURT:  Mr. Jackson?

D7pdles5                          Barron - direct

 1              MR. RYAN:  No objection.

 2              MR. JACKSON:  None, Judge.

 3              THE COURT:  All right.  Qualified as an expert without

 4     objection.

 5     BY MS. FRIEDLANDER:

 6     Q.  Doctor -- actually, I should clarify.

 7              Dr. Barron, how do you spell your last name?

 8     A.  B-a-r-r-o-n.

 9     Q.  Do you have any relation to Marie Baran or Ostap Baran?

10     A.  I don't believe so.

11     Q.  Now, did there come a time when the government contacted

12     you in connection with this case?

13     A.  Yes.

14     Q.  And what did they ask you to do?

15     A.  They asked me to review some files, of patient files.

16     Q.  Was that patient files related to two orthopedists?

17     A.  Yes.

18     Q.  And did you form any opinions based on the records that you

19     reviewed?

20     A.  Yes, I did.

21     Q.  Who were the doctors whose records you were asked to look

22     at?

23     A.  Dr. Peter Ajemian and Dr. Peter Lesniewski.

24     Q.  Had you ever heard of either of those doctors before?

25     A.  No, I had not.

D7pdles5                          Barron - direct

1   Q.   Where did you get the records that you reviewed?

2   A.   They were provided at one of the federal buildings around

3   here.  I went into that, into their stacks.  There were

4   millions of records there, and there were some that were pulled

5   out on the table.

6   Q.   Did the government give you the records that you reviewed?

7   A.   Yes.

8   Q.   In terms of who the patients were whose files you reviewed,

9   what did you see in the files about where these patients were

10  working at the time they started seeing either Dr. Lesniewski

11  or Dr. Ajemian?

12  A.   I believe the ones I reviewed were all employed by the Long

13  Island Rail Road.

14  Q.   And based on your review, what were the two doctors'

15  ultimate conclusions about these patients?

16  A.   That they were disabled from their ability to do their

17  jobs.

18  Q.   Are you being compensated for your work on this case?

19  A.   Yes.

20  Q.   And what is your hourly rate?

21  A.   $450 an hour.

22  Q.   When did you begin working on the case, what year?

23  A.   I think over two years ago.

24  Q.   And have you done work in connection with other proceedings

25  in this case?

D7pdles5                        Barron - direct

1   A.  I'm not sure what you mean by the question.

2   Q.  Have you done work in connection with the investigation

3   this case before it was charged?

4   A.  Yes.

5   Q.  And have you done work in connection with other court

6   matters or proceedings that have occurred over time?

7   A.  I believe so but I have not been in court.

8   Q.  And for the two years of work that you have done, what are

9   your total fees over time, do you know?

10  A.  I think over two years, I think it will total up to date, I

11  think, almost $70,000.

12  Q.  Now, have you also reviewed some MRIs and other types of

13  tests related to some of Dr. Lesniewski's patients and some of

14  Dr. Ajemian's patients?

15  A.  Yes.

16  Q.  We are going to focus most of our questions today on

17  Dr. Lesniewski.

18          But before we get into that, can you just explain to

19  the jury what x-rays and MRIs are?

20  A.  They are commonly used diagnostic tests to add to our

21  objective clinical impression.  After we interview a patient

22  and then listen to their -- to whatever their symptoms are,

23  then we perform a physical examination and we try to find more

24  objective findings regarding what is going on with their

25  problem and how to best come to an accurate diagnosis.  Once we

D7pdles5                         Barron - direct

1    have that and we already have a good idea of what they have, we

2    may need further information.  And you can get that through, as

3    I mentioned, I'm sure you know, x-rays, MRIs, CT scans and even

4    neuro tests and so forth.  But x-rays are the classic means of

5    looking at bones and bone structure and joints.

6              And then the MRIs are kind of the flip side, if you

7    will.  X-rays look through the skin, soft tissues, and you

8    don't see those; you just see shadows of them.  Whereas the

9    MRIs kind of minimize the bones and they show the tendons and

10   ligaments and nerves and muscles much better, softer tissues of

11   the body.

12   Q.  And you said you formed opinions based on the records you

13   reviewed?

14   A.  Yes, I did.

15   Q.  Did you form opinions about the diagnoses made by

16   Dr. Lesniewski?

17   A.  Yes, I did.

18   Q.  And did you form opinions about any treatment offered by

19   Dr. Lesniewski?

20   A.  Yes, I did.

21   Q.  OK.  Before we get into those, I would like to ask you to

22   help us understand a few more background things.

23   A.  OK.

24   Q.  First, can you explain to the jury how a physician goes

25   about making a diagnosis?

D7pdles5                          Barron - direct

A.   OK.   A patient will come -- I'll use me as an example.   A
patient will come to me and say they have shoulder pain.   They
cannot sleep on their shoulder.   It hurts them to reach up and
get their clothes off their -- out of the closet, maybe to walk
their dog, etc.   They may or may not have had an injury.   They
may have had a fall, or they may have had a chronic -- they may
have had an overuse where they decided to move from an
apartment or may have decided to chop wood all weekend, some
type of history that will relate to a bad -- and we'll use the
shoulder as an example.

So once completing that history and asking all the
questions that I need to ask to hone in on that diagnosis --
and that can take us a long way down making an accurate
diagnosis down the road, and then we examine the patient.   I
will examine the patient and focus generally -- as an
orthopedic surgeon, we don't examine the whole body.   We don't
examine the abdomen and the big toe if it is not injured and so
forth, just certainly their head and heart.   But we will
examine -- focus that as an orthopedically focused exam.   So
that would be the head and neck region and the shoulder region.

And so then we would check range of motion.   We would
check strength.   We would check for any nerve abnormalities.
We would look at it and press on it and find points of
tenderness, any abnormal bumps or any atrophy, where there is
shrinking of the muscles, any asymmetry.   We look at both sides

D7pdles5                         Barron - direct

1    to compare and make sure there is nothing out of the ordinary

2    that they look -- that it is a matching set, if you will.

3            And then we will arrive at a better, more accurate

4    diagnosis that is still not totally complete.  Sometimes it is

5    complete.  Sometimes that is all we need and we can base

6    treatment on that good history and physical examination if it

7    is unequivocal.  Then if it is not, if we need additional

8    information, or sometimes I may know what the patient already

9    has but they need more information.  They want more for me to

10   be able to teach them more about what their problem is and to

11   arrive at a better treatment plan.  So in that case we may get

12   x-rays.  If we think there is a bone spur or a fracture a break

13   or a crack in the bone or maybe arthritis that shows distortion

14   of the joint, then we order those x-rays and we look at those.

15           And most insurance companies will not authorize an

16   MRI, if we need that, before we have x-rays.  That is just an

17   aside in case you are in that situation.

18           But then we will order an MRI if we think maybe there

19   is a tendon or a cartilage problem or other issue, and then we

20   order the MRI and look at that and put all of that information

21   together.

22           We call the patient's complaints and symptoms

23   subjective findings.  And then we have our physical

24   examination.  And then we have the ancillary tests that we

25   perform, the studies, x-rays and MRIs, and those are called

D7pdles5                         Barron - direct

1    objective, objective findings and objective tests.  Then we

2    arrive at a diagnosis.

3              (Continued on next page)

D7pnles6                          Barron - direct

1   Q.  When you perform the physical exam of the patient, you

2   sometimes refer to that as making physical findings?

3   A.  That's correct.

4   Q.  Or objective physical findings I think was the term you

5   used?

6   A.  Yes.

7   Q.  You described listening to the patient and their

8   complaints, and you sometimes described that as listening to

9   the patient's objective complaints?

10  A.  Yes.

11  Q.  Then you said you sometimes order ancillary testing like

12  MRIs or x-rays?

13  A.  Yes.

14  Q.  Do you correlate those three things?

15  A.  Of course.

16  Q.  What does that mean exactly?

17  A.  It just means that they need to fit together.  Someone may

18  have a stiff neck and they -- I all notice that on the exam and

19  I will say, Does your neck hurt you?  They will say, no, it is

20  been stiff all my life.  In that sense we have to correlate

21  that with what they are complaining about.

22          On the other hand, if they say they have a dull

23  burning pain up into the shoulder and they have a stiff neck

24  and they say yeah every time I turn my neck it gives me that

25  burning pain in my shoulder, then I think they probably have

D7pnles6                          Barron - direct

1    neck arthritis that is pinching those nerves and giving them

2    that shoulder pain.

3            On the other hand, if they have a normal neck but they

4    have weakness in the shoulder and they have specific pain in

5    their shoulder when they sleep on it and so forth, that is

6    probably more of an intrinsic shoulder problem as opposed to

7    something being driven from their neck or elsewhere.

8    Q.  Of the steps that you have described that a doctor takes in

9    order to make a diagnosis, meaning listening to the patient's

10   complaints, making objective physical findings in an exam,

11   perhaps ordering ancillary tests, is one of those steps

12   typically more important than the others?

13   A.  I mean, they are all very important.  Obviously the

14   conversation we would have first to derive at the subjective

15   complaints is how we get to know the patient initially.  We can

16   tell when they are relating to us and answering questions if

17   they are in pain or if they are nervous and so forth.  That is

18   all part of getting to know the patient.

19           But then we do place a little greater emphasis, since

20   most patients are not educated medically, they may not really

21   know if some symptom is more important than another to relate.

22   They may forget to tell me that, and often they will come back

23   later and say I forget to tell you X, Y, or Z.

24           We generally put the most emphasis on our objective

25   physical findings in our examination, because that is really

1    what it is.  They are in front of us and we are examining them,

2    and there is this problem or that problem.  So we do place a

3    little more emphasis on that, although they are both important.

4    Q.  In terms of perhaps other reasons why a patient's

5    complaints may not always be reliable as your own physical

6    findings, are you familiar with the term secondary gain?

7    A.  I am.

8    Q.  What is a secondary gain issue for a physician?

9    A.  Well, secondary gain means that, in the case of being a

10   physician, patients may come to you with some ulterior motive

11   or other issue going on than just simply coming to you to be

12   treated for their medical problem.

13   Q.  What did you observe based on your review about secondary

14   gain issues in the records of Dr. Lesniewski that you reviewed?

15   A.  Well, I mean, it was clear after review of the records that

16   these were based on disability claims and the --

17            MR. DRATEL:  Objection, your Honor.

18            THE COURT:  Rephrase the question.

19   Q.  What, if anything, did you observe about secondary gain

20   issues in the records of Dr. Lesniewski that you reviewed?  You

21   can answer.

22   A.  OK.  That there did seem to be secondary gain issues.

23   Q.  Why is that?

24   A.  Because these seemed to be, at the end of these complete

25   letters that were dictated apparently by Dr. Lesniewski --

D7pnles6                         Barron - direct

1          MR. DRATEL:  Objection.  Because he's really talking

2     about a third person's secondary gain, not Dr. Lesniewski.

3          MS. FRIEDLANDER:  We are talking about the secondary

4     gain of the patients.

5          THE COURT:  The patients?

6          MS. FRIEDLANDER:  Yes.

7          I believe he testified to that.

8          THE COURT:  Yes.

9     Q.  Do you have the question in mind so that you can finish

10    your answer.

11    A.  It appeared at the end of these Dr. Lesniewski would say

12    that these patients were disabled from their work.

13    Q.  So the patients were getting some benefit through, some

14    financial benefit as a result of that diagnosis?

15    A.  I would presume so.

16    Q.  What does it mean for you as a physician when you observe

17    that a patient --

18         MR. JACKSON:  Objection as to presumptions.  If he

19    knows, fine.  If not --

20         THE COURT:  Sustained.

21    Q.  Dr. Barron, have you observed patients with secondary gain

22    issues from time to time?

23    A.  Yes, I have.

24    Q.  What does that mean for you as a physician?

25    A.  Well, it just means I have to be careful.  It means I have

1    to be very compulsive.  I have to go the extra distance in both

2    communicating with them, and I make it clear that I do

3    understand that and I ask them even questions about it.

4            I will ask them if they have a lawsuit, if they have

5    been working, how long they have been out of work, etc., etc.

6            If it is a case of a young child or maybe a teenager

7    who has a medical problem that's been chronic and they become

8    the source of -- it's been in the way of keeping the family

9    together and they get more attention from the family for having

10   that medical problem then, I will discuss that with them, and I

11   will discuss it with the parents separately if they are there.

12           So there are all different ways to address it, but it

13   has to be addressed.  It is kind of elephant in the room, and

14   you have to get it out in public so to speak.

15   Q.  In your mind, does it make your objective findings even

16   more important than usual?

17   A.  It definitely does, yes.

18   Q.  You said that making objective physical findings in an exam

19   can be the most important of the three steps that you described

20   that a doctor takes in making a diagnosis.  And I'm wondering

21   why they might be more important than MRIs and x-rays.  Aren't

22   those objective tests?

23   A.  MRIs and x-rays are very objective.  They show what they

24   show.  They are not anybody's -- there are some degree of

25   interpretation, but if you are a board certified radiologist or

D7pnles6                          Barron - direct

1    orthopedic surgeon who's used to looking at these, it's pretty

2    easy to identify the abnormalities that are there and to

3    correlate those with the patients.

4           Most importantly, it is not the be all that ends all

5    to diagnosis and treatment because anybody, as we age, we have

6    a natural aging process that causes alterations in our joint

7    cartilage, just like the wearing out the tread on your tires in

8    a car.

9           We have ligaments that become looser, we have

10   arthritis that can develop and bone spurs that can develop.  We

11   have degenerate tendon tears that can occur.

12          We have in our spine shock absorbers that are the

13   inner vertebral disks that are stacked up along our spine, and

14   those gradually lose their water content.  They will desiccate,

15   dry out, and then they will shrink down a little bit.  That's

16   why we generally shrink as we age, as my dad complains about.

17          So these various degenerative changes, the interesting

18   thing about that, and there have been innumerable studies on

19   this, is when you get into middle age, for instance, if you

20   take a look at MRIs of the spine, you will find abnormalities,

21   such as disc protrusion, disc herniations, disc bulges, what's

22   called facet arthritis, those little joints that one is stacked

23   upon the other.  You have narrowing of the spinal canal.

24          And all of these you will find normally in a large

25   group, large studies of asymptomatic people, people that have

D7pnles6                        Barron - direct

```
 1    no symptoms whatsoever in middle age.  Upwards of 60 to 90
 2    percent of people will have those changes, and they will have
 3    no symptoms whatsoever.  So we have to be very careful.  That's
 4    why occasionally the patient will ask me should they get a
 5    total body MRI.
 6              MR. JACKSON:  Objection as to nonresponsive.  Is there
 7    a question.
 8              MS. FRIEDLANDER:  Your Honor, he's perfectly
 9    responding to my question, and I would like for the witness to
10    be able to finish his answer.
11              THE COURT:  Overruled?
12    A.  That's why I tell my patients never get a total body MRI,
13    because it will inevitably, even if you are 20 or 50, show
14    innumerable problems or at least abnormalities.  You then are
15    going to worry maybe the rest of your days about whether those
16    are significant or not.  So it's always important just to focus
17    in and to get the studies that you need and then look and see
18    if that correlates with the patient's complaints and with their
19    physical findings.
20    Q.  What did you observe about the age of the patients of
21    Dr. Lesniewski whose files you reviewed?
22    A.  I think they were all, if I am not mistaken -- I may be --
23    I think they were all in their 50s.
24    Q.  What does that mean in terms of the MRI and x-ray findings
25    you would expect to see from them?
```

D7pnles6                         Barron - direct

1   A.  I would expect to see -- just like in myself, I'm 52 --

2   that there are abnormalities that you would expect to see, even

3   if you are without symptoms.  I would expect to see significant

4   MRI changes in shoulders, knees, next, lumbar spines, etc.

5   Q.  Do you have in front of you charts marked for

6   identification as Government Exhibits 452 to 457.  They are on

7   long sheets of paper?

8   A.  I do.

9   Q.  What are those charts?  What do they reflect?

10  A.  These were my observations and kind of an organization of

11  the data that I extracted from these charts.

12  Q.  Do they reflect your opinions related to Dr. Lesniewski's

13  diagnosis and treatment of the patients, some of the patients

14  whose files you reviewed?

15  A.  They do.

16  Q.  Does each chart note which government exhibits the chart is

17  based on?

18  A.  Yes, they do.

19  Q.  Have you reviewed and confirmed the content of each of the

20  charts?

21  A.  I have.

22  Q.  Do they fairly and accurately summarize your opinion about

23  Dr. Lesniewski's diagnosis and treatment of these patients

24  based on both your review of the records and your training and

25  experience?

D7pnles6                      Barron - direct

1  A.  Yes, they do.

2            MS. FRIEDLANDER:  The government offers 542 to 457.

3            MR. DRATEL:  No objection, your Honor.

4            THE COURT:  Admitted without objection.

5            (Government's Exhibits 452 and 457 received in

6  evidence)

7            MS. FRIEDLANDER:  Can we see 453.

8  Q.  This is called "Dr. Barron's Opinions on Lesniewski's

9  Treatment of Joseph Rutigliano."

10            Doctor, before we get into the substance of the chart,

11  if you could just help us explain how it's organized.

12            The left-hand column says "Claimed Diagnosis."

13            Where did you see those diagnoses?  What are those?

14  A.  Those are the diagnoses for each individual that

15  Dr. Lesniewski listed in his chart to apply to each patient.

16  Q.  Are these the diagnoses on which Dr. Lesniewski based his

17  disability recommendation?

18  A.  I believe so.

19  Q.  The next -- I will just read the next three columns.

20            It says, "Patients' Complaints Match."

21            Why don't we take it one at a time.

22            THE COURT:  I'm sorry.  Mr. Ryan, I didn't hear

23  whether you had any objection to this chart.

24            MR. RYAN:  Other than previously stated.

25            THE COURT:  All right.  Thank you.

D7pnles6                          Barron - direct

1           MR. RYAN:  Thank you.

2     Q.  Dr. Barron this says, "Patients' Complaints Match."

3           What were you asking them?

4     A.  That is what I was talking about earlier with regard to the

5     patients' having -- I already had the diagnoses in front of me,

6     and then I looked back to see if the patient's subjective

7     complaints were consistent with the diagnoses that they had

8     been given.

9     Q.  Can you explain the next two columns to us?

10    A.  And then, as is the sequence of orthopedic diagnosis, then

11    I looked and asked whether the objective physical findings also

12    supported the diagnosis.

13    Q.  And how about the following column, "X-ray, MRI or other

14    test results support"?

15    A.  The next was whether the x-ray MRI reports on -- the rare

16    occasion that I had one to look at -- but the actual MRI

17    reports or x-rays supported again that diagnosis, just as I

18    described previously.

19    Q.  The next column says "If patient actually had this problem,

20    would it be treatable?"

21          What question are you asking there?

22    A.  Well, because it became clear to me that I wasn't sure

23    whether these patients actually had some of these diagnoses as

24    legitimate clinical entities, I asked just the question if it

25    was treatable, if they were just routine orthopedic problems

D7pnles6                         Barron - direct

1    that are ready treatable.

2    Q.  Does that mean you asked yourself if the patient actually

3    had, for example, in the first row, if the patient actually had

4    cervical osteoarthritis, is that a condition that's treatable?

5            Is that what you are asking there?

6    A.  That's correct.

7    Q.  The next column says, "meaningful treatment provided."

8            Can you explain that column?

9    A.  Then I asked, if it is treatable, then was it treated

10   effectively or appropriately.

11   Q.  And you reviewed the records related to Dr. Lesniewski's

12   office visits and treatment to answer that question?

13   A.  That is all I had available to me to answer that, yes.

14   Q.  The next column says, "If problem existed as claimed, could

15   he play golf?"  Why did you ask that question?

16   A.  I asked that because I was asked that question.

17   Q.  Did the government ask you that question and ask you to

18   reflect your opinion in this chart?

19   A.  Yes.

20   Q.  If you could just explain now these diagnoses to us.  The

21   first two cervical osteoarthritis and osteoarthropathy.  If you

22   could gist explain to us what those are.

23           If it is helpful, we have paper you can draw on, we

24   have anatomical charts, or you can just testify.  Whatever you

25   prefer.

D7pnles6                         Barron - direct

1   A.  I'm happy to draw or provide whatever, but I can start by

2   just describing.

3   Q.  Sure?

4   A.  The first thing is -- you will hear many terms for

5   arthritis.  They are largely interchangeable.  Osteoarthritis

6   is the general term for degenerative, gradual wear and tear

7   arthritis that we will all experience at one point.  Some

8   people develop it earlier than others.  But osteoarthritis is

9   really the same as osteoarthropathy.

10          Arthritis technically just means inflammation of the

11  joint, but it's used, as we use it, most people use it as

12  actually degenerative changes in that joint, the cartilage or

13  bone surface.

14          Osteoarthropathy is actually just -- another exact

15  term for that arthropathy is the same it just means a

16  pathologic condition in a joint.  "Arthro" means joint.  So

17  it's just another example.

18          There's also spondolosis and spondylarthritis that are

19  also used.  And "spondylo" means spine.

20          So if it's spondyloarthropathy, it's the same as

21  spondylarthritis, it is the same as osteoarthropathy, the same

22  as osteoarthritis.  So they're pretty interchangeable.

23  Q.  The first diagnosis mentions cervical osteoarthritis.  That

24  kind of arthritis is that?

25  A.  Cervical means neck, and that is the arthritis in the neck.

D7pnles6                         Barron - direct

1  Q.  As to Dr. Lesniewski's diagnosis of cervical osteoarthritis

2  in Mr. Rutigliano, can you walk us through what you found in

3  the records in the first three columns.

4          Just explain your opinions.

5  A.  Yes.  So we start with patient's complaints.  The

6  patient -- it didn't really match, and the reason it didn't

7  match in this case is the patient did complain of neck pain,

8  but he complained of neck pain specifically radiating to his

9  low back.  That is anatomically impossible, because the neck

10 provides the, supplies the nerves that come out of the spine

11 and then go to the upper limbs.

12         So if you have pinched nerves in the neck or

13 irritation of the nerves in the neck, then you don't get pain

14 in your lower back, you get it in your upper shoulders and then

15 down your arms and into your hands.  That's called

16 radiculopathy if you have that.  But it just anatomically is

17 distinct.

18         If someone tells us they have -- if a patient comes to

19 me and says I have neck pain radiating to my lower back,

20 immediately a red flag goes up for me and I say, What's going

21 on?

22 Q.  You have also written here that Dr. Lesniewski declared

23 this disabling condition the first day the patient complained.

24 Did you have that in the records?

25 A.  Yes, I did.

D7pnles6                         Barron - direct

```
 1   Q.  Can you just show the jury the complaint you are referring
 2   to.  It's 100-E, at 17, page 1722.  The next page.  If you can
 3   highlight the "C spine" handwriting.  It's kind of in the
 4   middle of the handwritten portion.
 5          Doctor, it says here "C spine, patient woke up with
 6   pain in neck for about one week now.  It radiates down to the
 7   lower back."
 8          Is that the an anatomically impossible complaint that
 9   you were referring to?
10   A.  Yes, it is.
11   Q.  Can you see the date of this complaint?
12   A.  That's September 28, 1999.  Can you see the date --
13          MR. DURKIN:  Can we have the number again.
14          MS. FRIEDLANDER:  100-E.
15          MR. DURKIN:  Thank you.
16          MS. FRIEDLANDER:  The complaint is September 28, 1999.
17   Can we see the narrative that Dr. Lesniewski provided to
18   Mr. Rutigliano.  It's 100-D.  And the disability narrative has
19   the same date, September 28, 1999.
20   Q.  Is that what you were referring to when you said
21   Dr. Lesniewski declared this a disabling condition on the first
22   day the patient complained about it?
23   A.  Yes, that was pretty remarkable to me.
24   Q.  If we could go back to 453, the summary chart.  You have
25   written here that Dr. Lesniewski didn't make a single physical
```

D7pnles6                        Barron - direct

1   finding before diagnosing this.  Can you explain what you saw

2   or didn't see.

3   A.  I just could not find any evidence in the note that there

4   was actually an examination of the neck performed to provide

5   any objective physical findings for that.

6   Q.  The next column says, "Does not even order an x-ray."  I

7   take it you saw no indication that x-ray was ordered?

8   A.  Certainly if I am going to consider someone disabled from

9   their work, I am going to try to get further information to

10  document that.

11  Q.  Is an x-ray a typical ancillary test used to diagnose a

12  problem with the bones?

13  A.  Yes, it's the simplest and first step.

14  Q.  The next column says, "If Mr. Rutigliano actually had

15  cervical osteoarthritis, would it be treatable?"

16        And you have written, "Yes, easy to treat."  Can you

17  explain that?

18  A.  Yes, well most people who start out with neck pain from

19  osteoarthritis often treat themselves before they even come or

20  don't treat seek treatment because they will take an

21  anti-imflammatory, such as Aleve or Motrin, they will get

22  massages and sometimes acupuncture and so forth, they will see

23  the chiropractor, etc.  But it's quite treatable.

24        If it becomes more advanced, it's still quite

25  treatable.  I see patients, high-level musicians and so forth,

D7pnles6                         Barron - direct

1   who have severe osteoarthritis and they are performing or

2   engaged in whatever manner of work they might do.  They

3   ultimately sometimes do need surgery for that, but then they

4   get back to those activities.

5   Q.  Did you see any evidence of any treatment provided by

6   Dr. Lesniewski for this condition at all?

7   A.  I did not.

8   Q.  The next column says, "If Mr. Rutigliano had cervical

9   osteoarthritis as claimed, could he play golf?"

10          And you have written, "Yes."

11  A.  Yes.

12  Q.  The next row, low back osteoarthropathy.  Can you explain

13  what you found with respect to the first three columns, the

14  diagnosis?

15  A.  Yes.  Low back osteoarthropathy is also lumbar, the lumbar

16  spine, the lower spine.  I said that the patient's complaints

17  may be consistent with that, but not typical.

18  Q.  Why?

19  A.  May I look back at them?

20  Q.  Sure.  You have a binder in front of you?

21  A.  Yes.

22  Q.  Does that binder contain some of the exhibits that are

23  referenced in your summary charts?

24  A.  Yes, it does.  So on the 9/28 note it said low back pain,

25  this is patient's complaint, pain in low back difficult,

D7pnles6                          Barron - direct

 1    difficulty going upstairs.  Going upstairs, that's kind of

 2    nonspecific for low back.  It might be there, but it's just

 3    fairly nonspecific.

 4          Pain in low back is very general.  That can be

 5    muscular, that even can be coming from a kidney problem, or

 6    lower down, the SI joints, the sacroiliac joints.  So it was

 7    just fairly nonspecific.  So I said maybe.

 8    Q.  In the next column you have written that Dr. Lesniewski

 9    made hardly any physical findings.  You have, I think,

10    reference to particular visits there.  Can you just explain to

11    us what you mean when you said that Dr. Lesniewski made hardly

12    any physical findings to support this diagnosis?

13    A.  Right.  I mean, that was on 3/3 and 8/17 that I referenced.

14    So on 3/3 it said he had severe low back pain radiating into

15    the buttocks and in the legs.  Then on examination it said pain

16    on extension, less on flexion.

17          The reflexes were intact, the toes are down going.

18    That is he normal.  That is when you slide an instrument across

19    the bottom of the feet and the feet curl down.  That's normal.

20          Motor and sensory were normal, so there was no

21    weakness or loss of sensation and there was no myelopathy.

22    Myelopathy, "myelo" is the spinal cord, so myelopathy would

23    mean compression or bruising or injury to the spinal cord,

24    which actually doesn't apply to the low back because the spinal

25    cord is higher than that.

1              But then no radiculopathy as well, meaning no evidence

2      of significant nerve root compression, because that would give

3      different signs.  Those signs aren't provided.

4              There was considerable tenderness at the SI joint.

5      That actually steers away from the diagnosis of lumbar

6      osteoarthritis, because that's lower down.  That is on kind of

7      the back of our upper buttocks, and those then would be -- you

8      would evaluate that further, because if you have pain there you

9      want to look and see if they actually have their pain isolated

10     from there, because you can also have pinched nerves down low

11     in the sacral region that gives pelvic pain and can radiate

12     down to the legs.

13             You test that by putting the leg into figure four

14     position and pushing down and leveraging on those SI joints.

15             So it just seemed to me that to make the diagnosis

16     there, there was the various other physical exam findings that

17     you can do, such as doing a straight leg raise, for instance,

18     or, you know, having the patient squat and see what their

19     quadriceps tone is and so forth would be helpful.

20     Q.  So you saw hardly any physical findings here that would

21     support this diagnosis of low back osteoarthropathy?

22     A.  It just was a very, a paltry amount of findings.

23     Q.  The next column says the x-ray is unavailable.  And the

24     column after that says, "If the patient actually had this

25     problem, would it be treatable."

D7pnles6                          Barron - direct

1              Can you explain why you believe it's easy to treat?
2      A.  Well, because it is easy to treat.  I mean, low back pain
3      can be very disabling.  It can be, but it's generally very
4      treatable.  We have, you know, many of us have experienced low
5      back pain at different times and treat it and get on with your
6      life.
7      Q.  Here you've written, "Was meaningful treatment provided?
8      No.  Just anti-inflammatory and MPT."
9              Does that stand for physical therapy?
10     A.  It stands for physical therapy.  Certainly
11     anti-inflammatories and physical therapy could be completely
12     appropriate treatment, and it is the main stay of treatment.
13     But if it doesn't make you better and is disabling and keeping
14     you from work, then you need to add on additional treatment.
15             There are epidural steroid injections that can be
16     tremendously effective.  There can be steroids by mouth,
17     prednisone, which we also today for poison ivy and things like
18     that that are about a hundred times stronger than Aleve or
19     Motrin, and they can be dramatically effective.
20             then if it's really bad and really disabling, then you
21     can do actually now remarkably minor, even outpatient, lower
22     spine surgery through small incisions to alleviate the pain
23     that's due to that and, again, go on with your life.
24     Q.  The kinds of treatment that you just mentioned, oral and
25     epidural steroids, other injections, and other surgical

1788

1    procedures, did you see any evidence of any of those things in

2    Dr. Lesniewski's records?

3    A.  I did not.

4    Q.  You mentioned Aleve and Motrin.  Are those

5    anti-inflammatories?

6    A.  Yes.

7    Q.  Is Advil another anti-inflammatory?

8    A.  Yes.  It's the same as Motrin.

9    Q.  Here you've written that, "If the problem existed as

10   claimed by Dr. Lesniewski, could Mr. Rutigliano play golf?"

11            You've written no.  Can you explain why someone with

12   significant low back osteoarthropathy can't play golf in your

13   opinion.

14            MR. RYAN:  Objection to significant.

15            THE COURT:  Sustained.

16   Q.  Could you explain, Doctor, why someone with disabling low

17   back arthropathy could not play golf?

18            MR. RYAN:  Objection to "disabled."

19            THE COURT:  Is that in the record?

20            MS. FRIEDLANDER:  I believe the doctor testified that

21   he saw, based his review of the records, that these are the

22   diagnoses on which Dr. Lesniewski based his recommendation that

23   the person retire with disability from the railroad.

24            MR. RYAN:  I object.

25            MR. DRATEL:  I object as well, your Honor, because the

D7pnles6                          Barron - direct

1  term has a specific meaning here and we haven't established

2  that.

3          THE COURT:  All right.  Lay the foundation for the use

4  of the word.

5          MS. FRIEDLANDER:  Well, your Honor, I'm simply asking

6  whether someone in your view with any significant low back

7  osteoarthropathy can play golf.

8          MR. DRATEL:  Objection to significant.

9          MS. FRIEDLANDER:  We can take it up at the sidebar.  I

10 don't see what the issue is.

11          MR. RYAN:  I object to sidebars.

12          THE COURT:  In this case that's granted because we are

13 going to take the afternoon break.

14          Ten minutes.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

D7pnles6                         Barron - direct

1

2              (Jury not present)

3              (Recess)

4              THE COURT:  Before the jury comes in, let's come back

5    to the issue of which we broke earlier with regards to the use

6    of the word either "disabling" or "substantial."

7              Ms. Friedlander, has that matter been resolved.

8              MS. FRIEDLANDER:  Judge, we didn't discuss it, but I

9    will just ask the witness to what extent low back arthropathy

10   can affect someone's ability to play golf.

11             THE COURT:  All right.

12             Also, in terms of time, we have roughly an hour, hour

13   and a half Ms. Friedlander.  Where do you think you are now in

14   terms of how much you will need to conclude your direct.

15             MS. FRIEDLANDER:  I think we can probably end at 5.  I

16   will definitely -- it could be a couple of hours in the

17   morning, but I think that should be plenty of time for the

18   defense to finish cross-examining him.

19             THE COURT:  You will be finished with your direct?

20             MS. FRIEDLANDER:  I will not be finished today whether

21   we end at 5 or 5:30, but I think it will be OK if we end at 5.

22   I think I can pick up in the morning.  If we have a couple more

23   hours of direct, I think that will still leave plenty of time

24   for all of the defendants to cross-examine Dr. Baran and for

25   redirect, but they can let me know if they disagree.

D7pnles6                         Barron - direct

1             THE COURT:  You may be prejudging the defense.

2             MR. DRATEL:  I don't disagree, your Honor, from my

3    perspective obviously.

4             THE COURT:  If we conclude Dr. Barron early in the

5    morning or by midmorning, is it fair to say that we can be done

6    by the end of the day?

7             MR. DRATEL:  Yes.

8             THE COURT:  Is that your opinion, too, Mr. Jackson.

9             MR. JACKSON:  It is my opinion, too, Judge.

10            THE COURT:  Mr. Ryan?

11            MR. RYAN:  I endorse their opinion.

12            MR. JACKSON:  Are we having another witness then

13   tomorrow after the esteemed doctor?

14            THE COURT:  Yes.  If we finish with Dr. Barron any

15   time tomorrow, we still have on the list, Ms. Friedlander,

16   Ms. Cameron and Sean Tumulty.

17            MS. FRIEDLANDER:  We do have those witnesses.  We also

18   have some short, more ministerial witnesses who we will

19   probably offer tomorrow, a witness from the New York Times, a

20   witness from the IRS, and a witness from a tax preparer for

21   Mr. Rutigliano.  We had tried to get agreement to introduce all

22   of that evidence through stipulation, but were not able to get

23   agreement on that.

24            THE COURT:  Thank you.  Bring the jury in.

25            Ms. Friedlander, what I would suggest also, whether

D7pnles6                        Barron - direct

1  today or tomorrow, and again with the cooperation and

2  indulgence of the defense, once you have at least one of these

3  fully in the record and exhaustively entered, perhaps the

4  others you might be able to summarize as much as possible, if

5  necessary by leading insofar as it becomes a pattern.

6          MS. FRIEDLANDER:  Sure.

7          MR. DRATEL:  Judge, while we are waiting, on the issue

8  of Mr. Viola, Mr. Weddle told me that he had done a search and

9  they don't have anything.

10          Is that correct, Mr. Weddle?

11          MR. WEDDLE:  I believe he was not interviewed by the

12  government.

13          THE COURT:  All right.  Thank you.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

D7pnles6                         Barron - direct

1      (Jury present).

2                 THE COURT:  Thank you, welcome back.

3                 Ms. Friedlander.

4                 MS. FRIEDLANDER:  Thank you, your Honor.

5      Q.  Dr. Barron, we were talking about low back

6      osteoarthropathy.  To what extent can low back osteoarthropathy

7      affect someone's ability to play golf?

8      A.  Obviously, it is a matter of degree complexity and

9      severity.  If someone is having trouble, if you play golf or

10     don't -- you may be have seen on TV or whatever, but there is a

11     lot of walking involved, a lot of up and down hills -- in and

12     out of sand traps in the rare case that I play -- and in and

13     out of golf cart and so forth.

14                So if you have trouble doing those things, walking,

15     climbing, twisting, torquing due to your osteoarthritis in your

16     low back, then you are definitely going to have trouble playing

17     golf.

18     Q.  The next item that you have noted here is carpal tunnel

19     syndrome, moderate to severe.  Could you tell us what that is.

20     A.  Carpal tunnel syndrome, which seems to be everywhere, is

21     compression of the median nerve as it passes underneath the big

22     thick ligament in our palm.

23                There's three nerves that go to the hand.  The median

24     nerve is on the front of the arm, on the anterior part of the

25     arm, and goes and supplies the thumb, index, long finger and

1    half of the ring finger with sensibility, and it provides motor

2    supply to the muscles of what we call the thenar eminence, the

3    thumb eminence, the muscles here.

4          Then there are two other nerves.  The radial nerve is

5    purely sensory in the hand, and it provides sensation to the

6    back part of the hand here.  It is a mirror image of the median

7    nerve, but a little further over.

8          And then the ulnar nerve, which is the funny bone

9    nerve, the elbow, that comes there, provides feeling to the

10   little finger and half of the ring finger typically.  There are

11   variations, but that's the typical pattern.

12         So carpal tunnel syndrome is where people have

13   numbness and tingling in primarily these three fingers that we

14   call our three-jaw chuck, which does most of the work for us in

15   our hand, fine manipulation and so forth.

16         So if you have compression there, you can lose feeling

17   there and an inability to button, an inability to tie

18   shoelaces, to pinch forcefully.

19         Also, you can actually lose the muscle mass here in

20   severe cases where you actually lose the ability to oppose,

21   which we need to be human beings.  So then you have more of a

22   flat palm and an inability to come around and oppose.  So that

23   opposing thumb is very important, and the median nerve provides

24   that.

25         So that's basically carpal tunnel syndrome.

D7pnles6                          Barron - direct

1            The way to diagnose it is the symptoms first.  The

2       symptoms are that the patient does have the numbness and

3       tingling.  Often it's worse at night.  When we lay down at

4       night, the blood that's been pooling in our legs and fluids

5       that have been pooling in our legs from standing upright or

6       sitting all day then redistributes and it goes to our upper

7       limbs.  That is why we mostly, many of us at my age and beyond,

8       wake up with some stiffness in your hands.  Then that loosens

9       up pretty quickly.

10           Then that also you can wake up in the middle of the

11      night with numbness, and it's just like you wake up and you

12      have been sleeping on your arm and it is kind a strange feeling

13      and you wake up and you don't like it.  Then the blood rushes

14      back in and you feel those pins and needles come back, you

15      shake your hands out and so forth.

16           Then during the day it can be worsened by forceful

17      activities.  When you lift and curl your wrist it increases

18      pressure on that nerve through the tendons that are also nearby

19      and that also can make it worse.

20           So you get that type of history.

21           Then on examination we look for atrophy of these

22      muscles.  You test the sensibility and make sure that they can

23      feel, you test pin prick and light touch and two-point

24      discrimination, the ability to feel that there are two distinct

25      points very close together.

D7pnles6                         Barron - direct

1              Then we look at, of course, range of motion.  That's

2    usually not affected.  Then we perform different what we call

3    provocative maneuvers.

4              The most sensitive and specific test for carpal tunnel

5    syndrome is something called the carpal tunnel compression

6    test.

7              That is where you put pressure in that same area on

8    that ligament to actually worsen the problem and bring it on.

9    That pressure is applied directly over that same ligament

10   that's compressing the nerve.  So when you do that, it will

11   make it worse.  It will make it more numb, more tingly etc.

12             Then you can do what's called a Phelan's test, which

13   is where you flex the hand down like this, the wrist down like

14   this, and those tendons that are up above the nerve, they try

15   to both spring down and they press against the nerve.  Then

16   that also exacerbates it.  That is the next most sensitive and

17   specific.

18             The third one that we do use is called a Tinnel sign.

19   That's where you just tap on the nerve.  You tap on the nerve

20   at the ligament, just proximal and just to the side of it.

21   That's similar to when you hit your funny bone you can feel the

22   zing, electrical shocks that go down to your hand.

23             That's the least sensitive and specific test, but we

24   do use that for completeness

25   Q.  In terms of objective findings made by Dr. Lesniewski, what

D7pnles6                        Barron - direct

1    did you see in the records relating to Mr. Rutigliano in the

2    diagnosis of carpal tunnel syndrome?

3    A.   In the case of Mr. Rutigliano, I saw that there were --

4    those classic findings that I described were not present.  The

5    only one that was the Tinnel sign.  That was the sole test.  I

6    don't remember if it was that or another that was described as

7    the Apley test.  There is an Apley with regard to carpal

8    tunnel, I don't know if it was there patient or not, but the

9    Apley test does not apply to the wrist for carpal tunnel

10   syndrome.  That is a maneuver that is he used to look at

11   actually the knee meniscus, an Apley compression test, but I

12   don't know of any Apley test for the wrist.

13   Q.   So many of the types of findings that you just described

14   that physicians make to diagnose carpal tunnel syndrome you

15   didn't see in Mr. Lesniewski related to Mr. Rutigliano?

16   A.   Correct.

17   Q.   Here you write, "The patient's complaints don't really

18   match the diagnosis because the patient complains of numbness

19   and tingling, but pain is unusual for his age."

20           Can you explain what mean and what you saw.

21   A.   Yes.  For some reason as we get older we have less pain

22   associated with carpal tunnel syndrome and more just numbness

23   and tingling, and occasionally atrophy.  It is the young

24   people, usually women in their 20s, that I see the most pain

25   with.  So while it's not impossible, it's atypical.

D7pnles6                      Barron - direct

1    Q.  And here you have noted that Dr. Lesniewski, you didn't see

2    any tests ordered.  What kind of tests could you order to

3    actually make the diagnosis of carpal tunnel syndrome?

4    A.  If you have a clinical -- it's pretty easy to diagnose

5    clinically with the examination that I described.

6              If you need to order -- if it is a little bit

7    aberrant, it is a little bit atypical, or if you need to

8    justify it for worker's comp or certain insurance companies,

9    then we'll order an EMG nerve conduction study, which we try

10   not to order if we don't have to, because the patient's don't

11   like them.  It's sticking needles in your hand.  But we still

12   do.  It's called electric diagnostic studies.

13             Those will look for two things.  They look for

14   abnormalities in the muscles themselves.  They will stick

15   little needles in the muscles supplied by the median nerve, and

16   it can -- if the nerve has been compressed and not sending

17   enough electrical current to the muscle, then the muscle

18   becomes hyperactive and irritable.

19             So that when you stick a needle in it, it will send

20   off all these extra little, what we call fibrillation

21   potentials.  That's very readily picked up on these nerve

22   tests.

23             The other one is the nerve conduction test, which is

24   where you put superficial electrodes to the skin and run a mild

25   electrical current through that, and you see how well the nerve

D7pnles6                          Barron - direct

1   conducts the electrical current across that nerve segment where

2   you are testing, across the elbow, from the neck down.

3           It's exactly akin to putting your foot on a garden

4   hose.  The water, if there's pressure on it, then the water

5   doesn't flow as well.  If you relieve the pressure on it, which

6   you do when you perform the surgery, then the water begins

7   flowing freely.  It's exactly the same.

8           So you can see that readily on that, and that is

9   called latency, how slow it is across that.

10  Q.  Here you say that if Mr. Rutigliano actually had moderate

11  to severe carpal tunnel syndrome it would be easy to treat.

12  Can you explain that?

13  A.  It's very easy to treat.  We start out with just reassuring

14  the patient that they have -- if it is very mild that it is

15  probably going to go away.  Maybe something is irritated, some

16  extra workload or something, and it will probably go away.

17          If it's been there long enough, then we offer them

18  splint to sleep in at night, just at night, because that is

19  when it is usually worse.  And so if they wear the splints,

20  that keeps the wrist in a neutral position and generally

21  relieves that pressure on the nerves.

22          Then, if it's more severe, they have atrophy,

23  especially if they have atrophy, because then it's getting into

24  the more severe stage and it is potentially irreversible and

25  they also lose the feeling, then we can do a cortisone shot,

D7pnles6                          Barron - direct

1    which we do when women get it when they are pregnant in the

2    third trimester, because that's when fluid in their bodies is

3    going crazy and they get extra compression.  That is what we

4    do, because we are not going to perform surgery at that time.

5             So we give cortisone shots.  That is a temporizing

6    measure to decrease the fluid, decrease the pressure and the

7    inflammation on the nerve.  But in the more severe cases we can

8    just simply perform a carpal tunnel release, which is one of

9    the simplest things we do.

10            There are a lot of horror stories out there about

11   carpal tunnel release, but it is two-and-a-half centimeter

12   incision right here in the palm.  I do 90 percent of these

13   under local anesthesia with the patient wide awake.  And they

14   are immediately or very soon thereafter better, unless it's

15   more severe and you have to wait for the nerve to regenerate.

16            The nice thing about it is they will regenerate, and

17   they are perfectly curable because the nerve, the peripheral

18   nerves, unlike our spinal cord, are one of the last vestiges of

19   us being like salamanders, and they actually can regenerate the

20   nerve axons, and so then you can get a return of normal

21   sensation.

22   Q.  Here you've written Dr. Lesniewski did not in your opinion

23   provide meaningful treatment.  You saw just evidence of a

24   brace.  Can you explain what you meant?

25   A.  Well --

D7pnles6                        Barron - direct

1   Q.  What would you have expected to see?

2   A.  I would have expected to see any of the treatment

3   modalities that cure this.  It's a pretty simple thing to treat

4   and cure.  Certainly I have never had any patients who had

5   carpal tunnel syndrome for the rest of their days.

6          So I would have started with a brace.  That's

7   appropriate.

8          Then, if that didn't work, and the patient was still

9   disabled by this and not able to use their hand, then I would

10  go on to additional treatment, as I mentioned

11  Q.  Any of the number of treatments that you described, for

12  example?

13  A.  Correct.

14  Q.  Here you have written, "If problem existed as claimed,

15  could he play golf?  No."

16         Why can't someone with moderate to severe carpal

17  tunnel syndrome in your opinion play golf?

18         MR. RYAN:  Objection to moderate or severe.

19  Q.  The diagnosis is moderate to severe carpal tunnel syndrome.

20  You saw that in Dr. Lesniewski's records?

21  A.  Yes, I did.

22  Q.  To what extent --

23         THE COURT:  Overruled.

24  Q.  In your opinion, why can't someone with moderate to severe

25  carpal tunnel syndrome play golf?

1    A.   Because if it is moderate to severe, you can't feel, so you

2    are going to be potentially -- and you are weak in your hands,

3    so you can't feel and you are weak.  So you are not going to be

4    a very effective golfer.  As you swing you may lose your club

5    and it may go flying into your friend's head.  But basically

6    it's not going to be compatible if it is that that severe.

7    Q.   Next diagnosis relates to -- there are two related to the

8    right knee.  The first is a meniscal tear.  Could you just walk

9    us through Dr. Lesniewski's diagnosis of that?

10   A.   Yes.  It starts with patient's complaints of medial knee

11   pain, and that is an appropriate complaint for a medial

12   meniscal tear.  The medial is the inside of the knee, toward

13   the other knee, and the lateral is the outside of the knee.

14            There's two menisci that are like horseshoes, flat,

15   broad horseshoes that are the soft rubbery cartilage, like

16   calamari, in the knee.

17            Those form cushions and spacers in between the hard

18   cartilage, which is more like the paint job on a car.  And so

19   those were in between and they got subjected to compression and

20   torques and twisting and so forth.

21            So there is two of them.

22            The one on the medial is, if you have a medial

23   meniscal tear, then you might have medial knee pain.

24            If you have a lateral meniscal tear, you would have

25   lateral knee pain.  You typically do not have lateral knee pain

1    if you have a medial meniscal tear and so forth.

2         Then the objective physical findings to support that,

3    there were -- they were very mild.  If you have a severe

4    meniscal tear, which a number of my friends have had at my age,

5    you can get very large swelling in the knee, you can get

6    significant loss of motion, you can have locking of the knee.

7         It can actually lock up, because if you have a big

8    tear in the meniscus, it can swing out and get wedged in

9    between the hard cartilage of the knee, and then it will lock

10   it up and it will flip on itself.

11        So they will often say that maybe after 30 minutes of

12   shaking their knee or wiggling it or having something pull it

13   it will loosen up and unlock and that means that flap flipped

14   back into position.

15   Q.  Did you see indication that Dr. Lesniewski made those types

16   of findings that you just described that would be associated

17   with a serious meniscal tear with respect to Mr. Rutigliano?

18   A.  No, I did not.

19   Q.  Here you say the MRI is supportive of the diagnosis of a

20   meniscal tear, but only a small degenerative tear?

21   A.  Yes.

22   Q.  Can you explain what that means?

23   A.  Yes.  As I mentioned earlier, in middle age we have MRIs

24   that show a variety of degenerative findings unfortunately.

25   And so degenerative meniscal tears are one of those.  It is

D7pnles6                        Barron - direct

1    generally a wear-and-tear phenomenon, unless you have a big

2    flap, where it can often come from an injury falling down some

3    stairs, twisting, motor vehicle accident or something more

4    significant than just the average wear and tear that we all do.

5    And or many of us do.

6              But this was a small degenerative tear, meaning it was

7    intra-substance, and so it was not a big flap.  And there was

8    not a large effusion associated with that, meaning a lot of

9    fluid produced by the knee, which is what it does, when there

10   is bad arthritis or bone spurs or large tear, it will produce

11   this extra fluid, and that's what gives you that stiffness and

12   that swelling, that feeling that it wants to explode.

13             So the MRI was consistent with a small age-appropriate

14   degenerative meniscal tear.

15   Q.  Here you say a meniscal tear is easy to treat.  Can you

16   explain why?

17   A.  As I mentioned, these more routine ones that are small and

18   straightforward, you start out by treating, as we treat almost

19   everything orthopedically speaking with anti-inflammatories and

20   that can cool down whatever inflammation has been generated by

21   this small tear.

22             Then, if that doesn't work, you can use cortisone

23   injections into the knee that are extremely effective.  Even

24   though I treat upper extremity, I end up treating a lot of the

25   meniscal tears of my patients with injections as needed.

D7pnles6                        Barron - direct

1              Then, if they ultimately need surgery and that just

2     doesn't -- it will always make them temporarily better, but if

3     it keeps recurring and keeps either locking up or just

4     preventing them from doing what they want to do, their work or

5     their recreational activity, then a 30-minute arthroscopic

6     procedure can clean that up and get them back on their way to

7     running and jumping and doing whatever.

8     Q.  You mentioned that it looked from the MRI report like

9     Mr. Rutigliano had what I think you what you described as an

10    age-appropriate degenerative meniscal tear.

11             To what extent is a tear like that symptomatic, or is

12    it possible for it to -- it to be a term that has no symptoms

13    at all?

14    A.  As I mentioned earlier, you can have a large number of

15    healthy asymptomatic middled aged volunteers, numerous studies

16    have shown that those types of tears are present in more than

17    50 percent of knees.

18    Q.  Here you write, "If the problem existed as claimed could

19    Mr. Rutigliano play golf?  No."

20             Can you explain why?

21    A.  Well, golf, as we mentioned earlier, is getting in and out

22    of golf carts or walking extensively.  But also the act of

23    swinging the club, there is a lot of torque involved, and we

24    have seen certain professional golfers who had these meniscal

25    tears who have not been able to perform at that high level.

D7pnles6                           Barron – direct

1    They have had to stop and have surgery and then return back to

2    their golf, and they certainly can return at a high level, but

3    it also applies to anything we do.

4           But in the case of golf, it would be difficult, if you

5    had a clinically significant one that was keeping you from

6    being able to bend and to walk long distance or to climb up

7    hills or get in and out of sitting and standing positions, then

8    that would preclude being able to play golf, at least in a fun

9    way.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7pdles7                        Barron - direct

1  Q.  So of the diagnoses that we've looked at so far, is the

2  right meniscal tear the only one, in your view, that looks like

3  it has a -- could have been appropriately diagnosed by

4  Dr. Lesniewski?

5  A.  That appears to be the case, yes.

6  Q.  The next item, it says right knee osteoarthritis.  Can you

7  walk us through the first three columns with respect to that

8  diagnosis?

9  A.  Yes.  Well, as I mentioned, osteoarthritis is that wear and

10  tear of arthritis.  That is basically the hard surfaces,

11  meaning the bone and the hard cartilage of the knee.  And that

12  is a much different presentation and there is a lot more

13  swelling.  There is actually deformity that you can palpate and

14  you can see when you look at it.  It is called bone spurring

15  and a little distortion.  And often as that cartilage wears --

16  you may know people that have it -- you see the knee start to

17  change direction.  It will start to -- either start to bend

18  out, or become more knock-kneed, because that cartilage on the

19  outside is wearing down, or the other, become more bowlegged

20  because the cartilage on the inside is wearing down.  Those are

21  all different levels of osteoarthritis that is more

22  significant.

23  Q.  In terms of Dr. Lesniewski's findings and the pain

24  complaints you saw, can you just explain what you saw on the

25  record?

D7pdles7                      Barron - direct

1    A.  Well, so the complaints that he had were more consistent

2    with a meniscal tear as opposed to significant -- clinically

3    significant osteoarthritis.  But you can have some pain --

4    obviously you do have some pain with osteoarthritis.  That is

5    why I put on the form that it was partly, partly matched the

6    diagnosis.

7            But then on -- as far as looking as far as our next

8    step, objective physical findings, there were only findings --

9    and there were few in number to begin with, but there were only

10   findings to support the medial meniscal tear, not the diagnosis

11   of osteoarthritis.

12           And then an MRI was ordered, and that was notable

13   because, as we said before, it did show a small degenerative

14   meniscal tear, but it actually completely contradicted the

15   diagnosis of osteoarthritis.

16           MS. FRIEDLANDER:  Can we take a look at that MRI

17   report, 100F?

18   Q.  Dr. Barron, I am just going to ask if you can help us

19   understand in what way this completely contradicts the

20   diagnosis Dr. Lesniewski gave of osteoarthritis?

21   A.  Yes.  Because in the report, which has a lot of lines

22   through it but I have a clear copy here, it says that the

23   osseous structures -- that is the bone.  Osseous is the bone --

24   osteo/osseous.  The bone structures, or osseous structures,

25   display unremarkable signal characteristics.

D7pdles7                        Barron - direct

1              Now, what that means is that in an MRI, when you have

2       extra pressure from arthritis, you have a build up of extra

3       bone -- that's why we form bone spurs -- so you see signal

4       changes on the MRI.  It is like a -- it is the equivalent of a

5       bone bruise, if you will, or cartilage bruise.  Then you will

6       actually see chips in that hard cartilage of the joint, just

7       like the pain chips on your car.  So both of those were not

8       present.

9              And then it says, "Suspicion not raised for marrow

10      replacement."  That is those marrow changes that we talked

11      about, or osteonecrosis, which can be in association with more

12      significant osteoarthritis.  And I believe it said --

13      Q.  It might be on the next page.  It continues.

14      A.  Yes.  It said -- very clearly it said, "No bony

15      derangement."  And that would exactly be the opposite of the

16      diagnosis of osteoarthritis.

17             If there was bony derangement, there would be

18      osteoarthritis.  If there is no bony derangement, there is no

19      osteoarthritis.  So that diagnosis would seem inappropriate.

20      Q.  OK.  Here it says, "No meaningful treatment provided.  See

21      above."

22             Does that mean that the injections that you saw for

23      the meniscal tear are the only treatment that he sought for the

24      osteoarthritis?

25      A.  I'm sorry?

D7pdles7                          Barron - direct

1   Q.  Could you just explain what you mean when Dr. Lesniewski

2   did not provide meaningful treatment for what he claims was

3   osteoarthritis?

4   A.  Yes.  Well, it couldn't have provided meaningful treatment

5   because it wasn't actually there.  Were it there, the

6   injections would have killed two birds with one stone if it

7   were there, but it was not there so it is irrelevant.

8   Q.  You have already talked to us a little bit about why

9   someone with a right knee meniscal tear might have trouble

10  playing golf.  Does that same explanation apply to someone who

11  has right knee arthritis?

12  A.  Yes, but it is worse.  I mean, that's why people, you know,

13  come and beg for knee replacements and they're done all the

14  time, because people can't walk significant distances and

15  squat, get up and down out of chairs and so forth.  So it's

16  not -- a significant knee arthritis is not very compatible with

17  something as leg-based as golf.

18  Q.  I meant to ask you about the meniscal tear.  You said that

19  that is the only diagnosis of the ones we looked at today that

20  appears to have been properly diagnosed by Dr. Lesniewski.

21          If a patient with a meniscal tear is playing golf,

22  what does that tell you about the significance of any tear that

23  he has?

24  A.  It tells me it's likely not very clinically significant.

25  Q.  OK.  The next diagnosis, the last one on this chart, is

1  "Right shoulder, rotator cuff disease."  Can you tell us what

2  that is?

3  A.  Yes.  Well, rotator cuff -- the rotator cuff is the muscle

4  tendon structure that's comprised of four muscles that enshroud

5  the humeral head, the shoulder arm bone.  And it is -- the

6  muscles are affixed onto the shoulder blade, or the scapula,

7  and then they extend out and form tendons.  Remember, the

8  tendons connect muscle to bone.

9          So the rotator cuff muscles are four in number, four

10  different muscles -- two in the back, one on top and one in the

11  front.  And those come around and then they become tendons,

12  change to tendons, and then attach to the bone of the proximal

13  humerus, and that's rotator.  It means it rotates our arm.  It

14  provides the power for external rotation, for internal

15  rotation, for elevation and abduction and reaching behind our

16  back.  So that's what the rotator cuff does.

17          If you have rotator cuff disease -- I've actually

18  never used that term, but rotator cuff disease can mean almost

19  anything.  It can mean you have some tendonitis or chronic

20  tendinosis, which is just the chronic version of tendinitis.

21  You can have tears.  You can have partial tears, complete

22  tears, interstitial tears.  You can have impingement, which is

23  pressure on the nerve on the tendon from above and so forth.

24  So it's not really very specific but.

25  Q.  OK.  And here you say the patient complaints are not

D7pdles7                       Barron - direct

1   consistent with the diagnosis of rotator cuff disease, you

2   know, whatever particular kind of disease is meant by that

3   term, because the patient had not complained of shoulder pain

4   for over two years when Dr. Lesniewski declared that this was a

5   disabling condition.

6              Is that something that you saw in the records?

7   A.  I did see that, yes.

8   Q.  So you saw no complaints for approximately two years

9   relating to the shoulder --

10             THE COURT:  Asked and answered.

11             MS. FRIEDLANDER:  Thank you.

12  BY MS. FRIEDLANDER:

13  Q.  Can you explain what findings you saw by Dr. Lesniewski

14  related to the shoulder?

15  A.  Well, what I would say to that, the findings include those

16  complaints.  And the shoulder is -- shoulders are notoriously,

17  rotator cuffs, incredibly painful when they are present and

18  when they are injured or strained or torn.  And the thing --

19  the single thing that drives patients in for treatment in my

20  practice is a lack of sleep.  They just can't sleep on their

21  shoulder, and there is nothing more debilitating than not being

22  able to sleep and being prepared for the next day.  So that

23  didn't fit with those complaint at all, especially going two

24  years without any complaint.

25             And then the objective findings you would expect to

D7pdles7                          Barron - direct

1    see for rotator cuff were many.  And there were very limited

2    findings in general for the shoulder and none that were

3    specifically for rotator cuff disease.

4            We look for crepitus when we rotate in and out,

5    because that is a crunchy feeling that you get when you have a

6    chronic rotator cuff problem.  You get an extra formation of

7    bursa on top of that, and that's the bursitis.  And that is,

8    again, large and thickened.  And then it rubs underneath the

9    bony roof that you can tap on.  And that bony roof is called

10   the acromion.  And so when that cuff is rotating underneath

11   there, then it can crunch and get this feeling.

12           Secondly, if you have either a bad chronic tendinosis,

13   then you have a significant amount of weakness and pain when

14   you resist.  So I have people test, try to push against my

15   hand, and if it really hurts them and they are weak, then that

16   can be just from very bad inflammation in the shoulder, in the

17   rotator cuff.

18           If they actually have weakness without too much pain,

19   then that can be a sign of a chronic rotator cuff tear, a full

20   thickness tear, where it actually detaches from the bone, and

21   you lose that power in the one that is rotating and lifting the

22   arm.  So then if it detaches it is weak, and you can see that.

23           Then there are a host of signs that we use in an exam

24   to clarify that further, such as the belly press where we put

25   our hands on our abdomen and then push our elbows forward.  If

D7pdles7                              Barron - direct

1    we have a significant tear or significant inflammation of the
2    front part of the rotator cuff, we can't do that.  This one
3    will come forward and that one will hang back.  Or if they do
4    it, it will be exquisitely painful and weak when they try and
5    do that.
6             Another is called the lag sign, where you -- I have it
7    here.  You externally rotate as far as you can go, and then you
8    ask the patient to do that and say to go to here and then you
9    test them.  And then if I can pull it out further and I say,
10   OK, now hold it there, and it goes, whoop, it slips back, the
11   that is also a classic sign for a rotator cuff tear.  The same
12   thing in the back, where it is called a lift off sign.
13            Then almost every rotator cuff I've ever seen of the
14   upper part is very painful and weak when we come up into this
15   position and try to rotate up this way such as when people are
16   pulling their seat belts, that is a common complaint, or
17   putting on a jacket or a coat.
18            So all those things are the type of things we like to
19   see to make a diagnosis of rotator cuff disease or problems.
20   Q.  Did you see those kind of things or those kind of findings?
21   A.  I did not.
22   Q.  Here you say the problem is easy to treat, but the only
23   treatment you saw were anti-inflammatories and physical
24   therapy, which are not very meaningful.
25            Could you explain those things?

D7pdles7                        Barron - direct

1   A.  They are not meaningful if it is severe.  If it is severe

2   enough to not be able to work, then obviously that's probably

3   not going to do the trick.  And --

4           MR. DRATEL:  Objection as to "work."

5           THE COURT:  Sustained.

6   BY MS. FRIEDLANDER:

7   Q.  Dr. Barron, if you gave a patient anti-inflammatories and

8   physical therapy and they told you that their shoulder

9   continued to bother them and it was interfering with their

10  day-to-day life, what other things might you do to treat them?

11  A.  Well, many of our patients that I see for the first time

12  have already had months of shoulder pain and then they've

13  already been given therapy often by their internists, who can

14  identify basic pathology and then send them for physical

15  therapy.  Then they will come to me frustrated because they

16  still have pain, still can't sleep on their shoulder and can't

17  reach overhead without pain and so forth.

18          At that point, if I know they are good historians and

19  have already had the anti-inflammatories and the therapy, then

20  I go straight to an injection.  And a cortisone injection is

21  the mainstay.  I probably give 20/25 a week and they are often

22  miraculous.  I mean, at that moment the patient suddenly is

23  without pain and it's just a really good feeling.

24  Q.  Did Dr. Lesniewski give an injection to Mr. Rutigliano's

25  shoulder, based on the records?

D7pdles7                        Barron - direct

1   A.  I do not find any evidence of that.

2   Q.  And here you've written that the problem existed as

3   claimed.  Could he play golf?  Here you've written no.  Can you

4   explain why?

5   A.  Well, if you have significant rotator cuff disease, it's

6   very difficult and painful to play golf.  So if it were very

7   mild you could, but many reasons why people also seek treatment

8   is because they cannot engage in that which they enjoy doing in

9   their pastime.

10  Q.  Dr. Barron, at the bottom of the chart you've written that

11  you found some examples of no physical exam here in two

12  separate visits.  Why did you note that?  What struck you about

13  that?

14  A.  Let me look at those.

15          MS. FRIEDLANDER:  We can show them to the jury.  100E

16  and 1723, please.

17  Q.  8/03/99.

18  A.  All right.  So for 8/3/99, if you read that, there's

19  basically no examination actually even performed.  There is --

20  it says, "neurologic remains constant," but that could be just

21  the patient's complaints.  There is no other evidence of even a

22  physical examination performed, which I don't know that I can

23  even submit a bill to insurance if I don't provide a physical

24  examination.

25          But, most importantly, there is a general statement

1  that says basically this patient has multiple problems.  I

2  don't think there is anything we can do except for surgical

3  intervention.  And it just seems like an extraordinary

4  statement to me.  There is so much you can do before surgery

5  that was not done.  So I don't know where that comes from.

6  Q.  We can put away this exhibit and this chart.

7           Doctor, more recently, has the government given you

8  records of another doctor's treatment of Mr. Rutigliano?  And

9  if you want, you can look at Government Exhibit 563, marked for

10  identification.

11          I think it is at the very back of your binder.

12          MR. WEDDLE:  Your Honor, can I just have one moment?

13          (Pause)

14  A.  Oh, 563, OK.

15          Yes.  I have those.

16  Q.  OK.  Do you see, these records of a Dr. Fred Ferderigos?

17  A.  Yes.

18          MS. FRIEDLANDER:  The government offers 563.

19          MR. RYAN:  We join in the offer, Judge.

20          THE COURT:  All right.  Admitted without objection.

21          Anyone else?

22          (Government's Exhibit 563 received in evidence)

23  BY MS. FRIEDLANDER:

24  Q.  Before we put this on the screen, do these records relate

25  to a visit by Mr. Rutigliano to a doctor on or about

D7pdles7                          Barron - direct

1    October 27, 2008.

2    A.  Yes, they do.

3    Q.  And if you want to just tell us generally -- well, let's

4    put up the document starting with maybe page 4.

5           Dr. Barron, can you tell us what you thought of these

6    records, how they informed your view, if at all, of the

7    diagnoses that Dr. Lesniewski gave to this patient?

8    A.  Yes.  So these are by Dr. Ferderigos, who is a

9    Board-certified orthopedic surgeon in Palms Medical Center,

10   Palm Harbor, Florida.  And so it is an orthopedic consultation.

11   It says that -- it begins back -- I think one more page back.

12   One more page back.  Sorry.

13          And so it starts with a more typical examination, a

14   first-time examination where there is, you can see, a chief

15   complaint, a history of present illness that goes through what

16   the patient complains about, different aspects of their medical

17   history.  And then it answers all the questions, the typical

18   ones about medications and so forth, and any previous surgery

19   they have had before.  And then it goes into the physical exam

20   on the next page.

21          And that physical exam includes -- halfway down you

22   can see "Physical Examination" there, and it says "General" and

23   then head, ears, nose and throat, lungs, heart.  It goes

24   through the basics, all the different systems.

25          And then on the next page it goes to the

D7pdles7                          Barron - direct

1  musculoskeletal examination, which is where we come in.

2          And that shows that the cervical spine, that says

3  there is no tenderness to palpation, no muscle tension on both

4  sides of the cervical spine, no deep and superficial muscle

5  hypertonicity.  That means extra tension.  And there is no

6  swelling or edema.  No trigger points.  So basically a normal

7  examination of the neck.

8  Q.  Let me just stop you there.

9          Earlier we saw that Dr. Lesniewski had given

10 Mr. Rutigliano a diagnosis of cervical osteoarthritis.  What do

11 these findings tell you about whether Mr. Rutigliano had

12 cervical osteoarthritis?

13 A.  Right.  That certainly would fly in the face of that

14 diagnosis.

15 Q.  Meaning these findings are inconsistent with the diagnosis

16 of cervical osteoarthritis?

17 A.  Correct.  Especially the additional tests that are

18 performed right under that which say cervical compression test.

19 That is where you press down on the head and try to pinch the

20 nerves as they are coming out of the different levels.

21 Foraminal compression test, which is another way of tilting the

22 head to the side to try to pinch down those little outlets

23 through which the nerves pass, those little tunnels.  And then

24 distraction test and Wright's test and so forth.  The point is

25 it is all negative.

D7pdles7                          Barron - direct

1           Then the thoracic spine is examined.  That appears to

2     be completely normal.

3           The lumbar spine has the first positive finding, and

4     that says he has tenderness to palpation along the

5     paravertebral -- that means parallel to the central vertebral

6     axis.  So the muscles that we have that support our spine and

7     maintain our posture and being able to walk on two legs are the

8     paravertebral muscles.  And those -- there is some tenderness

9     along there, and also at the superior part of the SI joints.

10    That is the sacroiliac joints, which, again, is the upper part

11    of our buttocks.

12          And then there is some decrease in flexibility of the

13    lumbar spine in bending with flexion, some discomfort, and side

14    rotation and so forth.

15          Importantly, straight leg raising is negative.  A

16    straight leg raise is when you are sitting and extend the knee

17    up.  That stretches the nerves that come out of the lower back

18    and down into the legs.  And if those are irritated by such as

19    a big herniated disc or encroachment by bone spurs, then when

20    you stretch, the nerves will actually move a little bit, a tiny

21    amount.  And if they stretch like that, then it actually

22    irritates them further and you get significant pain that runs

23    down the back of your leg.

24          And then going on, the extremities are shown to be --

25    Q.  I'm sorry.  If I could just stop you there?  I have one

D7pdles7                          Barron - direct

1      more question.

2                  Earlier we saw that Dr. Lesniewski gave Mr. Rutigliano

3      a diagnosis of low back osteoarthropathy.  That was one of the

4      diagnoses in which he based his disability recommendation.

5      A.  Yes.

6      Q.  What does this examine tell you about any low back

7      osteoarthropathy that Mr. Rutigliano may have?

8      A.  It says that he actually -- those findings -- I haven't

9      seen any other studies yet, but just based on that alone, he is

10     complaining of low back pain.  He has some stiffness there.  He

11     could very well have some mild osteoarthropathy of the lower

12     back.

13     Q.  OK.  Sorry.  Do you want to go on?

14     A.  Sure.  And then it says that the extremities, meaning the

15     arms and legs, appear to be normal.  The upper extremities, the

16     shoulders, show a normal range of motion and in the different

17     planes -- flexion, extension, adduction, internal/external

18     rotation, so all those different positions where we said that

19     each type of movement is important to help come to different

20     diagnoses.

21                  The drop arm test is negative.  That's when you have a

22     significant -- you lift your arm and you may be able to get it

23     up, but as you come down this midrange, it just gives way.

24     That's because you have either a very high degree of

25     inflammation or you have a tear in it.  The critical junction

1822

1    it just can't maintain, it comes down your body, lets go.  But

2    that is negative anyway.  So that would indicate not

3    significant rotator cuff disease, even though he was given that

4    diagnosis before.

5              And the next page please.

6              And so the apprehension test is where you torque on

7    the shoulder and look for any instability, and that's negative.

8              The supraspinatus scratch test is negative on both

9    arms.

10             The impingement sign is negative.  That is where you

11   bring your arm up and rotate it down and try to rub that

12   rotator cuff up under that bony roof, and if there is any bone

13   spur there or any bad bursitis, it will irritate it more and

14   hurt significantly.  And that's negative.

15             So everything that would be significant for rotator

16   cuff disease was negative on this examination.

17             And then there are -- he mentioned here that it is

18   negative Tinel sign and negative Phalen's sign.  Remember,

19   those are what we talked about for carpal tunnel syndrome, and

20   those were all negative.  So there would not be any significant

21   presence of carpal tunnel syndrome in this examination.

22             Then he looks at the knee.  And the knee shows to have

23   tenderness again on the medial side.  That is the finding that

24   Dr. Lesniewski found before.  And we know that he has a small

25   degenerative tear on that medial side of his knee.  So that

1     fits.

2             There is mild discomfort and compression of the

3     kneecap.  That's the patella.  And mild crepitus.  Remember, I

4     mentioned that before.  So that shows there is a little what we

5     call chondromalacia.  And the patient has good stability, good

6     motion and the various other sights.

7             The McMurray sign is the most sensitive and specific

8     test for a significant rotator cuff tear.  If you have a flat

9     tear that I mentioned, then this is the way you can try to

10    reenact that and reproduce it in a patient in an examination

11    setting where you load the knee and then twist it back and

12    forth.  And that was questionable.  That will -- if it is a big

13    tear, that will really be positive and very painful.  And if it

14    is small, it is often normal.  And his was equivocal, or

15    questionable.

16            Everything else seemed normal.

17            Then he goes on to look at motor strength, and he is

18    pretty compulsive about looking at -- if you go down in the

19    motor strength.  Basically it is completely normal.  So all of

20    his strength and all of the upper and lower extremities is

21    tested, and that appears to be normal.

22            Then they go into the next page.  You can see that it

23    continues here for the sensory examination and that's all

24    normal.  So there is no abnormal sense ability.  No abnormal

25    strength, meaning loss of strength.  And the deep tendon

1824

1   reflexes are also tested, and those appear to be normal

2   throughout.  So this is a pretty benign exam overall.

3          And then we go to the next page.  And that ends with,

4   as we said, imaging to try to see if -- to corroborate what the

5   physical findings are.  And so this says evaluation today with

6   x-rays of the right knee reveals the patient to have no osseous

7   abnormality.  That would support what we saw previously about

8   not having any osteoarthritis, which is another diagnosis he

9   was given.

10  Q.  Just to stop you there.  This finding is inconsistent with

11  Dr. Lesniewski's diagnosis of right knee arthritis?

12  A.  It is inconsistent with that.

13  Q.  OK.  Sorry to interrupt.

14  A.  Then the lumbosacral spine revealed no severe compression

15  fractures.  Compression fractures happen especially as we get

16  older and develop a little osteoporosis or have a bad injury

17  where you actually have that relatively square vertebral body

18  that gets compressed or loaded essentially and it can shrink

19  down or wedge down or flatten out, and there was no evidence of

20  that.

21          And then no evidence on the x-rays of spondylolysis or

22  spondylolisthesis.  Those are where you have bony components of

23  the spine that are there to protect the spinal cord.  And those

24  were -- spondylolisthesis is where one slips on the other.  One

25  of the bodies slips on the other.  And that was not there.  And

D7pdles7                           Barron - direct

1    that usually happens in the absence of major trauma if you have

2    severe osteoarthritis.  It starts to shift a little bit.  And

3    then the spondylolysis, that cage of bone that's on the back of

4    our spine that we can palpate and touch, and that is -- that

5    was normal, that was without abnormalities.

6              Then the pelvis looked fine.

7              And the knee showed no evidence of osseous

8    abnormality, but he actually said that up above.

9              So he gave him his diagnosis based on a very complete,

10   very thorough physical examination of lumbago, which is just

11   low back pain, with spondylosis -- that means arthritis -- and

12   internal derangement of the right knee with a possible meniscal

13   tear.  Possible meaning because he had some finding, the

14   finding of medial joint line pain and a complaint of knee pain,

15   but not much else for that.  So it is mild, and it is

16   appropriate.  So he says possible because he was not sure yet.

17   He has to get an MRI.

18   Q.  Are there MRI reports that follow these notes, Doctor?

19   A.  Let me see if there are.

20              Yes, there are.

21   Q.  I think the second one there is the right knee.  If you

22   could just let us know what you think of that, of the MRI

23   report of the right knee?

24   A.  Yes.  It says that the impression is a horizontal tear of

25   the posterior horn of the medial meniscus.  That is just what

D7pdles7                         Barron - direct

1   the other MRI showed.  All right?  A degenerative tear of the

2   back part of the medial meniscus on the inside of the knee.

3             A mild join effusion and a small popliteal cyst.

4   Those are very common.  It is just a little outpouching of

5   fluid that is associated with a meniscal tear.  It doesn't

6   really have much impact, clinical meaning unless it is very

7   big.

8             Then everything else is intact.  Again, there is no

9   osteoarthritis of the knee.  That's pretty clear from that.  I

10  knew that from x-rays and the other MRI.

11  Q.  Overall, how would you characterize the tear that you see

12  described in the right knee MRI report?

13  A.  It's a pretty typical wear-and-tear type of tear for active

14  people that is pretty isolated, pretty small and, you know,

15  stable, not flopping around in the joint and locking up in the

16  end, and quite treatable.

17  Q.  I believe you said earlier that an injection is a very

18  common way to treat that type of condition?

19  A.  That is, yes.

20  Q.  Did you see evidence that this doctor gave Mr. Rutigliano

21  an injection for his knee?

22            I'm sorry.  This is for his back.

23  A.  I'm not sure.

24  Q.  I'm sorry.  We should have looked at the back MRI report,

25  as well.  There is an MRI report of the back, as well.  Do you

D7pdles7                              Barron - direct

1    see that?

2    A.   Yes.

3    Q.   Can you just describe for us what that MRI report showed?

4    A.   Yes.   That showed that there was some straightening of the

5    lumbar lordosis, which is the natural curve this way in the

6    lower back.   And it suggests maybe muscle spasm or strain.

7    That is a soft finding.

8            And then left paracentral disc protrusion and annular

9    disc tear at L5-S1.   So that is the lower part of the spine.

10   That's what we talked about as being those age-related

11   degenerative changes.   We talked about disc protrusions,

12   herniations, bulges, facet arthropathy, etc.

13           And so it said broad disc bulges at L4-5 and L5-S1.

14   Again, age appropriate degenerative changes that most of us

15   over 50 have.

16           And then right foraminal narrowing.   Foraminae are

17   those little tunnels through which each of the nerve roots

18   leave the spinal column and go out to our legs.   And that's a

19   narrowing at L4-5 and both sides at L5-S1.   So that means those

20   little outlets that they leave from or were narrowed down by

21   the arthritic process.   So those can irritate the nerves, pinch

22   them, and give you pain that radiates down your leg.   And so

23   you look for those and test for those.

24           One of the best tests for that if you have foraminal

25   narrowing is that straight leg test that I mentioned, and that

D7pdles7                          Barron - direct

1    was negative.

2              So these are here on the MRI.  These are common

3    findings for the natural wear-and-tear aging process, and we

4    correlate those with the clinical examination.

5              And the patient had some pain, clearly, and some

6    stiffness in the lower back, but not any what we call radicular

7    sign, where that means that you are stretching those nerves and

8    pinching those nerves.  No weakness, no other findings relating

9    to that, and that is pretty treatable.

10   Q.  And I believe you said earlier with respect to this problem

11   injections are also a common follow of treatment?

12   A.  Very common, yes.

13   Q.  Did you see that this doctor gave an injection to

14   Mr. Rutigliano in fact for this problem?

15   A.  I did not see that.  He may have but I didn't see that.

16   Q.  OK.  I believe --

17   A.  I see.  There is a follow up note that describes those

18   findings.  And then --

19   Q.  Do you have 144330?

20   A.  Yes.  Here we go.  It is the preparation for an epidural

21   steroid injection, which is what we discussed as a nice

22   treatment modality for that, a very effective one.

23             So, yes, he -- it doesn't say he -- oh, maybe on the

24   back it does.

25   Q.  Yes.

D7pdles7                          Barron - direct

1   A.  Yes.  So he consented and underwent epidural spinal

2   injections for that.  So very good treatment for that.

3   Q.  Did you see any evidence that Dr. Lesniewski ever gave

4   Mr. Rutigliano an injection before declaring his back problem

5   permanent?

6   A.  I did not.

7   Q.  Overall, how would you characterize the seriousness of

8   Mr. Rutigliano's back problem based on these records from 2008?

9   A.  Well, it was symptomatic enough to undergo steroid

10  injection but quite treatable.

11  Q.  Let's move on to another patient, Steven Gagliano,

12  Government Exhibit 454.

13          Here it says Dr. Lesniewski gave him a diagnosis of

14  acromioclavicular arthrosis with impingement and a rotator cuff

15  tear.

16          You've already described for us what a rotator cuff

17  tear is.  Can you just explain briefly what this other

18  diagnosis is?

19  A.  Yes.  The acromioclavicular joint -- the clavicle is the

20  collar bone, the S-shaped collar bone that comes out and meets

21  the shoulder blade, which is called the scapula, and it meets

22  it at the acromion.  It is that prominence on the top of the

23  shoulder that you can tap on and feel the bony roof, if you

24  will, of this over the rotator cuff.  So the acromioclavicular

25  joint is just a little bitty what we call appositional joint.

D7pdles7                          Barron - direct

1    It is not a ball-and-socket joint.  It doesn't move very much.

2    It just rotates about 20 degrees this way and about 20 degrees

3    this way when we lift up and move in different places.  I liken

4    it to a McPherson strut stabilizer bar on a car where it

5    basically holds our shoulders out and keeps them spread out.

6    If you are born without them, and some kids are, then you can

7    bring the shoulders all the way together and touch them

8    together right here in the center.  So it just holds your

9    shoulders abroad and appropriate.

10            So that little joint is very, very commonly arthritic.

11   I see it in tons of college student even, especially ones who

12   lift a lot of weights and so forth.  And it is generally an

13   isolated problem.  It gets progressively more arthritic.  You

14   can get little bone spurs, you can get big bone spurs.  If they

15   are big, then they can press down on the rotator cuff muscle.

16   It doesn't tear the tendon but it rubs on the muscle and causes

17   a lot of pain if that's the case.  Or they can go up, and maybe

18   you have seen people that have prominent AC joint spurs on top.

19   They get a little bump on top.  So the diagnosis was that.

20            As I said, the patient's complaints didn't really

21   match those diagnoses because they were just very basic

22   complaints of shoulder pain, shoulder hurt.  And generally my

23   patients who have these problems, they are highly specific.

24   They'll say, you know, it really hurts when I wash under my

25   arm.  It really hurts when I reach up and I fasten my seat

D7pdles7                        Barron - direct

1   belt.  It really hurts when I put on a coat.  It hurts when I

2   do a pushup.  It hurts when I sleep only on that side.  I mean,

3   there are just a whole slew of these types, and it can almost

4   tell me very specifically whether it is a rotator cuff, whether

5   it is an AC joint impingement.

6        So that's why I said that these are not really

7   matching because patients are usually so very informative and

8   specific about those, they give us those clues

9   Q.  And here you said Dr. Lesniewski did not appear to make the

10  necessary physical findings to support these diagnoses.

11       In what way did he not, based on your review, make the

12  appropriate physical findings?

13  A.  I would like to look back at that note to make sure I

14  didn't say he did not make the necessary findings, but I would

15  like to know what those were not.

16  Q.  So that is 101S in your binder.

17  A.  So 101S, yes.  That says a physical examination -- it says

18  the patient returns for follow up.  There is no subjective

19  complaints there.

20       It says that the patient continues to have problems

21  associated with his left shoulder.  Positive impingement, which

22  was that sign there that I mentioned.  And a negative Jobe's

23  and a negative drop -- a negative dropped arm.  And pain on

24  abduction, with mild rotate cuff weakness.

25       So those are just nonspecific.  I mean, the most

D7pdles7                    Barron - direct

1   simplest way is just to press on the AC joint and say does that

2   hurt.  The second most specific for that is a horizontal

3   adduction, where you come across and do those movements.  I

4   said that will load that little joint and make it painful.

5   They are highly specific, and those are the primary ways you

6   can test that.

7           And so that's why I said, no, it does not make the

8   necessary findings.

9   Q.  Here you note that with respect to the rotate cuff tear, he

10  didn't order an MRI before diagnosing it and that you saw an

11  MRI performed years later or a report of an MRI performed years

12  later that proved that no tear existed in this patient.

13          Can you explain to us what you saw there?

14  A.  Well, certainly if I were basing it on what the patient

15  said and the examination that was performed, I would certainly

16  not have been able to make a diagnosis of rotator cuff tear

17  based on that.  And if there was any question that I needed a

18  more specific or more accurate diagnosis, I would have ordered

19  an MRI for sure before giving that diagnosis.  And that indeed

20  was performed on 101P.

21          MS. FRIEDLANDER:  Can we show the jury 101P?

22          Your Honor, I neglected to offer some documents into

23  evidence.  The government offers 101E, F, O, P, S like Sam,

24  104F and H, 116F and J, and 103E.

25          THE COURT:  Is there any objection to any of these?

D7pdles7                          Barron - direct

 1            MR. JACKSON:  Judge, I don't know.  I would have to

 2    match them up.

 3            MS. FRIEDLANDER:  They are all from the claim files.

 4            MR. RYAN:  The Gagliano claim files?

 5            MS. FRIEDLANDER:  Yes.

 6            MR. RYAN:  Can we offer the whole file in evidence?

 7            MS. FRIEDLANDER:  No.

 8            MR. RYAN:  I object.  The whole file should go in

 9    evidence, Judge.

10            THE COURT:  Mr. Jackson?

11            MR. JACKSON:  Judge, I just want to make sure that the

12    exhibits that were read are consistent with what I have and

13    that there is not an objection to them.

14            Sorry, your Honor.

15            (Defense counsel conferred)

16            THE COURT:  Mr. Jackson.

17            MR. JACKSON:  No objection, your Honor.

18            THE COURT:  Mr. Dratel?

19            (Pause)

20            Mr. Dratel?

21            MR. DRATEL:  Yes.

22            THE COURT:  Any objection?

23            MR. DRATEL:  Oh, no, your Honor.  I said no.  I'm

24    sorry you didn't hear me.

25            THE COURT:  All right.  These are admitted.

D7pdles7                          Barron - direct

1   Mr. Ryan's objection is noted.

2            (Government's Exhibits 101E, F, O, P, S; 104F and H;

3   116F and J; 103E received in evidence)

4            MS. FRIEDLANDER:  Can we show the jury 101P.

5   Q.  And the date on this MRI report is February 12, 2009.

6            Is that several years after the date on which

7   Mr. Gagliano was given disability, based on your review?

8   A.  Yes, it is.

9   Q.  And if we could zoom back out.

10           Can we see the notes that say "Impression" at the

11  bottom of the report?

12           What is it that the radiologist here found, Doctor?

13  A.  It says mild degenerative changes.  They are referring to

14  the degenerative changes at the acromioclavicular joint that we

15  were talking about, which are completely age appropriate.

16           And with minimal tendinosis -- that is minimal

17  inflammation of the rotator cuff tendon -- near the junction of

18  the distal supraspinatus and infraspinatus tendons.  That is

19  two of those four rotator cuff muscles that we were talking

20  about.  And no evidence of rotator cuff tear or labral tear in

21  the left shoulder, which is remarkable.  Those are typically --

22  in middle age we start to see more significant findings on

23  average than these.

24  Q.  Dr. Lesniewski had given him a diagnosis of a rotator cuff

25  tear several years earlier.  Is it possible that the tear just

D7pdles7                        Barron - direct

1    healed on its own?

2    A.  They never heal on their own.

3    Q.  So does the fact that this 2009 MRI report says no tear

4    existed make you believe that he had no tear at the time

5    Dr. Lesniewski diagnosed him with one?

6               MR. DRATEL:  Objection to form.

7               THE COURT:  Sustained as to form.

8    Q.  What does this finding tell you about whether Mr. Gagliano

9    had a rotator cuff tear in 2006?

10   A.  It seems essentially impossible.

11   Q.  If we can go back to your chart.  In the column that says

12   whether meaningful treatment was provided, and you write, "No,

13   just anti-inflammatories."

14        What kind of treatment would you have expected to see

15   beside anti-inflammatories?

16   A.  Well, as I mentioned earlier, if you have aches, shoulder

17   problems are very effectively treated in sequence with

18   anti-inflammatories, with physical therapy.  If there is some

19   stiffness or weakness, for strengthening and modalities, heat,

20   ultrasound so forth.  Then if that doesn't work, then we can do

21   cortisone shots into the different locations.  So we will

22   inject directly into the acromioclavicular joint.  It is a very

23   tiny joint, and just inject a small needle there and that can

24   dramatically eliminate those symptom.  If it is more of a

25   bursitis and a tendinosis, we can give a cortisone shot.

1836

1    Sometimes if it is interstitial, meaning within the

2    tendon, and you can't get to that with a cortisone shot, but if

3    the anti-inflammatories didn't work, then you can give steroids

4    by mouth and take prednisone and it's very effective.  I give

5    that many, many times a week, especially to younger throwing

6    athletes and so forth who have that type of inflammation.

7    Q.  What was your reaction to seeing in the records that

8    Dr. Lesniewski had only given this patient anti-inflammatories

9    before declaring these conditions permanent?

10   A.  Well, it is just remarkable in that it is such

11   insignificant treatment if someone is disabled, if they are

12   going to be unable to -- if they are disabled.

13   Q.  Here in the same column you write that the patient has a

14   mild problem in the opposite shoulder which another orthopedist

15   successfully treated with an injection.

16   Is that something you saw -- the treatment the patient

17   got several years later based on your review of the records?

18   A.  Yes.  And that's more typical for what we see in what I do.

19   Q.  Can you talk to us about the next diagnosis that

20   Dr. Lesniewski gave to Mr. Gagliano?

21   A.  Yes.  That was degenerative disc disease of the lumbar

22   spine.

23   Q.  What is that?

24   A.  As I mentioned, as part of those age-related changes, the

25   discs, the intervertebral discs are the very firm, hockey-puck

D7pdles7                         Barron - direct

shaped discs that are made of soft tissue that are the shock

absorbers in between the bony stacked structures of the

vertebral bodies.  And degenerative disc disease, in its

simplest form, begins in middle age where we start to desiccate

or dry out those discs.  We lose some of the fluid.  And then

they can shrink down a little bit, and they can start to bulge

out.  And if it is more significant or if you are, depending on

your activity level -- and in individuals some people get it

worse than others, you start getting even disc herniations,

bulges and all the other things that we talked about.  So the

degenerative disc disease is specifically just that disc where

it shrinks down and losses its strength and can herniate, so

forth.

        The interesting thing about this diagnosis for this

patient, Mr. Gagliano, is that there was -- for nine months

leading up to that there was no complaint of back pain, but

then he complained a week before being declared disabled about

that, and that just seemed a little odd.

Q.  What did you think of Dr. Lesniewski's physical findings

related to the diagnosis he claimed Mr. Gagliano had?

A.  They were very what we call soft findings, meaning he

described many of those types of physical examination findings

you can do to pinpoint diagnoses, and these were just very soft

findings.  We can review those, if you would like.  That was

where --

D7pdles7                          Barron - direct

1   Q.   Is that 101S at 2861?

2   A.   2861?

3          (Pause)

4          Oh, yes.  So on the examination that was geared toward

5   the low back pain, it stated that -- and I'll just read it.  It

6   is notable that reflexes are intact.  There was pain in your

7   back -- in his back with extension, less on flexion.  That is a

8   soft finding.  That is the patient reporting that it is

9   painful.

10          And the toes are downgoing, which is normal.  The

11   reflexes are intact, which is normal.

12          Motor and sensory are full, which means normal.

13   Normal, no atrophy or asymmetry there.

14          Some trigger points in the back means you press on the

15   different parts of the back and it causes pain.  That is

16   another soft finding.

17          Otherwise unremarkable.  So we just have a couple of

18   minimal findings and then otherwise it is unremarkable.

19   Q.   Why do you call them soft findings?

20   A.   Soft because they are not based on pure objective; they are

21   based on the patient's response to what we're doing and saying

22   that it hurts to push or whatever.

23   Q.   Are there other findings you would have expected

24   Dr. Lesniewski to make before diagnosing a permanent condition

25   of this kind?

D7pdles7                    Barron - direct

1    A.  Well, there are a host of them.  I mean, if it is that

2    severe, then you would maybe have atrophy.  You would maybe

3    have -- actually, atrophy, loss of sensation in the lower

4    limbs, and some pattern of distribution, maybe loss of

5    reflexes.  And long track times -- not long track times, but

6    where the nerves being irritated by a straight leg raise.  A

7    variety of other things that we talked about.

8    Q.  Dr. Barron, in the next column you write that the MRI's

9    support it but that the findings are minimal and almost better

10   than average.

11            MS. FRIEDLANDER:  If we could put up the MRI report at

12   101E?

13   Q.  Can you explain to us what you mean when you say these

14   findings are almost better than average?

15   A.  As I said, over the age of 50 to 60, 90 percent of people

16   are going to have the changes that I discussed already.  And

17   this says that the patient has an L5-S1 disc bulge, which is

18   not impressed upon the fecal sac.  That means it is a bulging,

19   a kind of a curved-out convexity, but then it's not actually

20   pressing on the critical structures of the spine -- I mean, the

21   nerves.

22            And then it says minimal degenerative disease.  And

23   again, minimal degenerative disease is actually almost atypical

24   in this -- in our age group.

25   Q.  Is there anything about this report that suggests that the

D7pdles7                    Barron - direct

1    patient would have any symptoms?

2    A.   There is nothing in the report.  Of course, you can't base

3    symptoms on a report, but there is certainly nothing to

4    indicate there is a significant amount of arthritis.

5    Q.   Going back to your chart.  You say that the condition is

6    easy to treat but that meaningful treatment was not provided

7    because you saw evidence of anti-inflammatories being given.

8         What would you expect to see as this treatment?

9    A.   Well, you know, you go back to this idea of just

10   anti-inflammatories, which most people treat themselves with

11   before they ever come to an orthopedic surgeon anyway if they

12   have pain.  It's just -- if that is the extent of treatment,

13   that's all there was.  There is so much more that we can do.

14        Physical therapy, cortisone shots, trigger point

15   injections, epidural steroid injections, and even surgery if it

16   is bad enough, pretty successful surgery.  So there is just not

17   any meaningful treatment, in my opinion.

18   Q.   Going on to the next diagnosis, a triangular fibrocartilage

19   complex tear of the left wrist.

20        Just briefly, what does that mean?

21   A.   That's, as the word indicates, it's complex.  It is a

22   little structure that's in the wrist over here.

23        I can draw it if you would like.

24   Q.   Sure.

25   A.   OK.  From here?

D7pdles7                        Barron - direct

1            MS. FRIEDLANDER:  Your Honor, if you don't mind if he

2       turns his back to you to show the jury?

3            (Pause)

4            (At the jury rail)

5       A.  So if you look at the wrist like this, those are the two

6       bones of the wrist.  That is the radius.  The radius.  And that

7       is the ulna.  And so there are ligaments that connect these two

8       bones so they can rotate and be stable around one another.

9            And then there is a layer of cartilage here, a hard

10      cartilage around each of these surfaces.  And then over the top

11      of this, just like there is in the knee, there is a rubbery,

12      calamari-like structure, and that is a soft rubber cartilage

13      disc, and that is another shock absorber cartilage for the

14      small bones of the wrist that are held tightly together by a

15      bunch of ligaments and those move like that.

16           So this is the triangular fibrocartilage.  If you look

17      down from this view, that's the way the bone looks.  And the

18      triangular fibrocartilage is actually shaped kind of like a

19      triangle, so that is why it is called that.

20           So that sits like that.  And that is very commonly

21      inflamed, injured.  I see them all the time in young college

22      tennis players because they are doing so much wrist work back

23      and forth, also in manual laborers.  And those are very

24      commonly torn and they are really irritating.  They are not

25      structurally that important.  I mean, if they completely rip

D7pdles7                          Barron - direct

1      off in a traumatic event and they can be and they can be

2      repaired back, but most of these are what we call degenerative

3      tears.  These develop little fissures and holes in them.

4      Sometimes they can tear from over here.  They become inflamed

5      in this area.  So if they do, then we try to immobilize them

6      with a splint and rest them, give them anti-inflammatories as

7      the prevailing thing.  Then, if not, we can inject right

8      through here with some cortisone and bathe this whole area and

9      cool them down significantly.

10             On Wednesday, I operated on a young woman, a tennis

11     player, who had a small tear but she had chronic inflammation

12     there and had overgrown the tissue in there, and I just had to

13     clean that out arthroscopically, about a 30-minute operation,

14     and she will play tennis in a couple of weeks.

15             It is a pretty minor problem but it is a unique

16     structure, and that is called the triangular fibrocartilage

17     complex.  And the complex just means there is also ligaments

18     associated with that in addition to the cartilage disc.

19             (The witness resumed the stand)

20             MS. FRIEDLANDER:  Thank you.

21             MR. RYAN:  Judge, I object to the fact that you

22     couldn't see the chart.

23             THE COURT:  I'll see it later.  All right?

24             MS. FRIEDLANDER:  After the jury leaves, your Honor,

25     if you would like, I'm sure Dr. Barron would be happy to

D7pdles7                          Barron - direct

1    recreate the chart for you.

2    BY MS. FRIEDLANDER:

3    Q.  Dr. Barron, you said that you note here that the patient

4    had not complained of wrist pain for five months when

5    Dr. Lesniewski declared this a disabling condition.

6         I take it that is something you saw in the records?

7    A.  Yes.  I did.

8    Q.  How does that strike you?

9    A.  Well, if it's chronically significant, it's clinically

10   significant, and as long as he is not complaining about it,

11   then it must not be significant.

12   Q.  You write that, as far as objective findings, the patient's

13   range of motion was inconsistent with any tear.

14        Can you explain what that means?

15   A.  Yes.  Because it's stretched when you go from one extreme

16   to the other.  So most of us in our lives spend our time

17   rotating back and forth between pronation, such as typing at a

18   keyboard, and supination, the holding of things, carrying

19   things and so on and so forth.

20        So the range of motion was normal.  So that would

21   imply that there was no real pain coming from that, because

22   that's the classic way we can generate -- in fact, on of my

23   exams is I simply twist -- bend their elbow like that, twist

24   it, and they go ah.  Then you go in the other direction, they

25   go ah.  In the middle, right in the middle they don't hurt

D7pdles7                            Barron - direct

1   typically.  It is only when you go to the extremes.

2   Q.  Did you see evidence that Dr. Lesniewski had made a finding

3   that the patient's range of motion was normal?

4   A.  I believe so, yes.

5            MS. FRIEDLANDER:  Can you just show the jury 101B at

6   page 2.  If you can blow up the bottom left of the table.  It

7   says "Wrist."

8   Q.  There it says "N."  Is that what you are referring to?

9   A.  Yes.

10  Q.  Going back to your chart, with respect to the MRI

11  conducted, it says here that the MRI report says the area was

12  not well visualized but that it was -- the findings there were

13  inconsistent with any clinically relevant tear.

14           Can you explain what you meant by that?

15  A.  Yes.  As you can imagine from the picture I drew, there is

16  a lot going on in a very small area.  So -- and that is a

17  pretty small structure, anyway.  And so the MRIs are

18  notoriously inaccurate for small tears, but they are very

19  accurate for larger tears; about 90/95 percent accurate for

20  larger tears.  So that's why I say it's inconsistent with a

21  clinically relevant tear.  Tiny tears are ubiquitous; we all

22  have them.  It is the larger tears that actually causes

23  symptoms, and if you have those you generally see them on the

24  MRI.  So that's why I said that.

25  Q.  Here you noted that you only saw evidence that

D7pdles7                          Barron - direct

1    Dr. Lesniewski gave this patient anti-inflammatories for this

2    condition.

3    A.  Yes.

4    Q.  And you described I think a moment ago a couple of other

5    treatments you might expect to see for a problem of this type?

6    A.  Right.

7    Q.  Could you just remind us what those are?

8    A.  Yes.  A splint to rest the area and let it cool down with

9    the anti-inflammatories.  If that doesn't do it, then we can

10   provide steroids by mouth, or injections are the most direct

11   and simple way to treat that.

12   Q.  At the bottom of this chart you've noted some dates on

13   which -- it says examples of no physical exam.  Is that the

14   same type of thing we saw earlier with Mr. Rutigliano where you

15   saw that the patient had made certain complaints but that there

16   was no evidence that Dr. Lesniewski examined -- performed a

17   physical exam of the patient at that visit?

18   A.  Yes.

19   Q.  OK.  And here you have noted, does not examine the body

20   part the patient complaints about.  And is that the same type

21   of issue?

22           Here it says on February 28, 2006, the patient made a

23   wrist complaint.  Did you note that it did not appear that

24   Dr. Lesniewski examined his wrist at that visit?

25   A.  Yes, I did.

D7pdles7                          Barron - direct

1  Q.  If we could just go back to the chart.

2              Before we leave Mr. Gagliano, could you just maybe

3  give us an overall impression of the quality of these diagnoses

4  and the treatment offered?

5  A.  Well, I think, as we've gone through, there was clearly no

6  rotator cuff tear and that was given as a disabling diagnosis.

7              There was no evidence of a triangular fibrocartilage

8  tear either on examination or the MRI.

9              And there was the mildest of AC joint arthritis, that

10  was known as age appropriate, there as a supposedly disabling

11  condition.

12             And then an actually better-than-average looking MRI

13  of the lumbar spine also given a disabling diagnosis of

14  degenerative disc disease.

15             So all in all, it was a pretty remarkably unimpressive

16  array of physical findings and objective medical evidence to

17  support these five disabling -- supposedly disabling

18  conditions.

19             MS. FRIEDLANDER:  Your Honor, this is a good time to

20  break.

21             THE COURT:  Yes.  Why don't we adjourn at this point

22  until tomorrow at 9 o'clock.

23             And tomorrow, before we begin, I will give you the

24  best estimate we have of where we are and how much more we have

25  to go.  But preliminarily, I can say that it is very

D7pdles7                          Barron – direct

1    encouraging, given the extraordinary cooperation and

2    exceptional support that we've gotten from all counsel.  So it

3    is possible that we will be able to conclude the trial possibly

4    as early as the latter part of next week, but I will give you a

5    better estimate tomorrow morning.

6            Thank you.  As you go home today, do not discuss the

7    case among yourselves or with anyone else on the outside or

8    have any contact of any kind with anyone involved in the case

9    or examine any material.  If any of these things occur, you are

10   directed to inform me immediately and do not tell any of the

11   other jurors.

12           Have a good evening.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

D7pnles8

```
 1              (Jury not present)

 2              THE COURT:  All right.  If we could just again review

 3    the schedule if there is any change from where we were earlier

 4    this afternoon.

 5              MS. FRIEDLANDER:  Your Honor, I think it's likely that

 6    we will rest on Monday.

 7              THE COURT:  All right.  And we were going to get an

 8    update from Dr. Lesniewski as to whether or not the defense

 9    intend to put on a case and whether the defendant will be

10    testifying.

11              Mr. Durkin?

12              MR. DURKIN:  We think we will call our expert at

13    least, but we still need to speak to him again tonight.  If I

14    had to decide today, right now, that is probably all we would

15    do.  There might be one other brief witness with respect to his

16    practice in terms of the number of patients and gross receipts.

17    We are working on that right now.  I think at the moment that

18    is about it.  I told the government I am not going to mislead

19    about the defendant because I still haven't decided.

20              THE COURT:  All right.

21              MR. DURKIN:  If you said to me it now or never, that

22    is it.  That is what we are doing.  I would still like to --

23              THE COURT:  Keep your options open?

24              MR. DURKIN:  Yes.  In that regard, could I beg your

25    indulgence for another day to give the government notice we are
```

D7pnles8

1   supposed to give.  That fell on to my shoulders, and I regret

2   to say that it took me 24 hours to get to Chicago.  Monday

3   night I left, got to LaGuardia, there was a crash at LaGuardia,

4   they closed the airport.  I went back the next morning, and it

5   took me literally -- I didn't get to Chicago until 5:30 on

6   Tuesday.  I caught a 6:40 plane back and I just didn't have the

7   energy to do it last night.  I apologize.  If I could have just

8   until tomorrow.

9           THE COURT:  All right.

10          MR. DURKIN:  I think the government is going to be

11  pleased because the more work we put into it, the less.  If I

12  had to give them something last night, we would have had a much

13  longer list.  I think it's getting shorter.

14          THE COURT:  Thank you.  I appreciate that.

15          Ms. Friedlander.

16          MS. FRIEDLANDER:  Your Honor, I understand they still

17  have things to consider and decisions to make with respect to

18  whether Dr. Lesniewski is testifying, but given that we may

19  rest as early as Monday, the defense cases could be on as early

20  as Monday.  We would ask for some more guidance as soon as

21  possible on whether he is going to testify.

22          THE COURT:  Tomorrow is as soon as possible.

23          MR. DURKIN:  Thank you, Judge.

24          THE COURT:  Mr. Jackson, do we have any further update

25  from your end?

D7pnles8

1          MR. JACKSON:  I don't remember what update I gave last

2     time, Judge.

3          THE COURT:  The last update that I had was that it

4     appeared that your client was inclined to testify.

5          MR. JACKSON:  That's still the appearance as of today,

6     Judge.  In addition to that, I will pare down the list of

7     witnesses and --

8          THE COURT:  Is it only an appearance.  Sometimes

9     appearances can confuse.

10          MR. JACKSON:  I believe Ms. Baran will testify.  I do

11     believe that that will be the case.  I also believe, in

12     addition to her I think, Judge -- initially we gave the Court a

13     list when you were reading it off during jury selection, I will

14     pare that down or have pared that down significantly and will

15     this evening send that list to the government, Judge.

16          THE COURT:  All right.  Let me ask preliminarily, if

17     Ms. Baran takes the stand, do you have an estimate of how long

18     her direct would be?

19          MR. JACKSON:  I think it may be about an hour and a

20     half or so, maybe two hours.  She is my expert witness, Judge,

21     so it is going to take some time.

22          THE COURT:  Anything else?

23          MR. DURKIN:  Just one other thing, and I don't mean to

24     belabor this thing about Mr. Viola, but can we get a definitive

25     representation from the government, Mr. Weddle said he believed

D7pnles8

1    there wasn't.  I am not trying -- I don't know whether he's had

2    enough time.  If we could get a definitive answer.

3              MR. JACKSON:  Judge, before he goes --

4              MR. WEDDLE:  There have been a number of accusations

5    leveled at me by Mr. Durkin and Mr. Dratel.

6              MR. JACKSON:  I don't mean to interrupt --

7              MR. WEDDLE:  Saying something like a "definitive

8    representation," I am not all-knowing.  What I did was I asked

9    the agents, did we interview this person, can I get an

10   interview memo or something?  And I was told we don't have one,

11   and nobody thinks we interviewed the person.  So I am not

12   all-knowing.  That is my best representation that I can give.

13             I would rather not give a definitive representation so

14   that Mr. Durkin or Mr. Dratel can start talking about me

15   violating my duties as a prosecutor again, which I find to

16   be -- I guess it sometimes happens to me in trials, but it does

17   get to me after a little while.  It gets to be a little tedious

18   to hear that, and I would prefer not to hear that anymore.

19             THE COURT:  Based on the representations to you from

20   the agents, there was no interview of Mr. Viola.

21             MR. DURKIN:  Could I just say something?

22             THE COURT:  Yes.

23             MR. DURKIN:  I was a federal prosecutor myself.  If I

24   wanted to make an accusation against Mr. Weddle, I know how to

25   make it and I would have made it.  I just don't understand

1852

D7pnles8

1    where he's coming from.

2              THE COURT:  Maybe you do it differently in Chicago,

3    Mr. Durkin.

4              MR. DURKIN:  Honestly, I am not questioning his

5    integrity.  He simply said he believed.  I just wanted to know.

6    Nobody is accusing him of anything.  I don't do business that

7    way.  I resent that.

8              MR. WEDDLE:  Judge, the reason I said that is because

9    today at the sidebar Mr. Dratel said exactly that.

10             THE COURT:  People need to just learn to quit while

11   they are ahead.

12             MS. FRIEDLANDER:  I have something unrelated to --

13             THE COURT:  Mr. Jackson had risen earlier.

14             MR. JACKSON:  Thank you, Judge.

15             In the spirit of paring things down, it does not

16   appear as though I will be calling an expert witness, the

17   statistician.  I had served the government with notice.  There

18   were motions to preclude and everything else.  I just want to

19   alert them to that.  I will give the government, this evening I

20   will present them with a list, but it will not include that

21   expert witness, so that's one less thing.  I am just giving you

22   notice of that.

23             THE COURT:  Thank you.  I appreciate that, too.

24             Yes, Ms. Friedlander.

25             MS. FRIEDLANDER:  One small thing, your Honor.

D7pnles8

1          At the lunch break we observed that Ms. Baran and her

2     friends and family got in the elevator with some jurors, and we

3     have noticed that before.  I not suggesting that there is

4     anything nefarious about it, but they were talking, Ms. Baran

5     and her friends were talking to each other, and we have a

6     little concern about jurors being present for those types of

7     conversations.  Something inadvertently could be said.

8          THE COURT:  I just caution counsel to alert their

9     clients that they should be absolutely careful when they are in

10    public settings where there might be some jurors and they may

11    not be aware of their presence.

12         MS. FRIEDLANDER:  One last thing.  If we could get an

13    update from Mr. Ryan as to whether Mr. Rutigliano intends to

14    testify.  He said yesterday he was not.

15         THE COURT:  Mr. Ryan, is that still the case?

16         MR. RYAN:  It sure is.

17         THE COURT:  Thank you.

18         Have a good evening.

19         (Adjourned to 9 a.m., Friday, July 26, 2013)

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                           Page

 3    NATASHA MARX

 4    Direct By Mr. Weddle . . . . . . . . . . . .1589

 5    Direct By Mr. Dratel . . . . . . . . . . . .1622

 6    Cross By Mr. Jackson . . . . . . . . . . . .1667

 7    Cross By Mr. Ryan . . . . . . . . . . . . .1714

 8    Redirect By Mr. Weddle . . . . . . . . . . .1721

 9    Recross By Mr. Jackson . . . . . . . . . . .1736

10    ROGER VAN ETTEN

11    Direct By Ms. Friedlander  . . . . . . . . .1740

12    Cross By Mr. Ryan . . . . . . . . . . . . .1748

13    Redirect By Ms. Friedlander  . . . . . . . .1752

14    ALTON BARRON

15    Direct By Ms. Friedlander  . . . . . . . . .1757

16                      GOVERNMENT EXHIBITS

17    Exhibit No.                           Received

18     11    . . . . . . . . . . . . . . . . . . .1593

19     507, 507A, 18B, 18A, 18, 17  . . . . . . .1597

20     24    . . . . . . . . . . . . . . . . . . .1616

21     19-B-1 and 19-C-1  . . . . . . . . . . . .1723

22     560 and 569  . . . . . . . . . . . . . . .1744

23     452 and 457  . . . . . . . . . . . . . . .1777

24     563  . . . . . . . . . . . . . . . . . . .1817

25
```

```
 1        101E, F, O, P, S; 104F and H; 116F and  . . .1834

 2                  J; 103E

 3                         DEFENDANT EXHIBITS

 4        Exhibit No.                              Received

 5         R51A and R54A  . . . . . . . . . . . . . .1739

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```