D7qnles1

                           Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,               New York, N.Y.

4              v.                            S14 11 Cr. 1091 (VM)

5    PETER LESNIEWSKI, MARIE BARAN
     and JOSEPH RUTIGLIANO,
6
                    Defendants.
7
     ------------------------------x
8

9                                           July 26, 2013
                                            9:00 a.m.
10

11   Before:

12                    HON. VICTOR MARRERO,

13                                          District Judge

14
                         APPEARANCES
15

     PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17   BY:  JUSTIN S. WEDDLE
          DANIEL BEN TEHRANI
18        NICOLE WARE FRIEDLANDER
          Assistant United States Attorneys
19
     LAW OFFICES OF JOSHUA L. DRATEL, P.C.
20        Attorneys for Defendant Peter Lesniewski
     BY:  JOSHUA LEWIS DRATEL
21        LINDSAY A. LEWIS

22   DURKIN & ROBERTS
          Attorneys for Defendant Peter Lesniewski
23   BY:  THOMAS ANTHONY DURKIN

24

25

D7qnles1
                           Trial

                     APPEARANCES CONTINUED

KOEHLER & ISAACS, LLP
        Attorneys for Defendant Marie Baran
BY:   JOEY JACKSON

JOSEPH W. RYAN, JR.
KEVIN MENEILLY
        Attorneys for Defendant Joseph Rutigliano

              - also present -

Annie Chen
Emma Larson, Government Paralegals


SA Frank LoMonaco, FBI

Yeni Yrizarry, Defendant Baran Paralegal

                           oOo

D7qnles1
                          Trial

1              (Trial resumed)

2              (In open court; jury not present)

3              THE COURT:  Good morning.  Be seated.

4              Bring in the jury.

5              MR. WEDDLE:  Your Honor, a couple of scheduling

6      things.  We have an IRS witness who is here today.  It is, I

7      think, a very brief witness who is going to authenticate tax

8      returns that were filed.  It may be that we might be requesting

9      to just slide him in in the midst of testimony at some point.

10             THE COURT:  If it doesn't disrupt too much, that will

11     be fine.

12             MR. WEDDLE:  It will be a ten-minute witness.  That is

13     all I think we have.

14             THE COURT:  Call the witness to the stand.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

D7qnles1
                              Trial

 1              (Jury present)

 2              THE COURT:  Good morning.  Welcome back.

 3              Let me remind the witness that he took an oath

 4    yesterday to testify truthfully.  He remains under oath.

 5              THE WITNESS:  Yes, sir, your Honor.

 6              THE COURT:  Ms. Friedlander, you may resume.

 7    DIRECT EXAMINATION (Continued)

 8    BY MS. FRIEDLANDER:

 9    Q.  Good morning.  The paralegals are just on their way

10    upstairs so it will take a minute for us to put your next chart

11    on the screen, Doctor.

12              The next patient I wanted to talk about is Christopher

13    Parlante.

14              Your chart reflects that for Mr. Parlante,

15    Dr. Lesniewski rendered several diagnoses, including a couple

16    that you explained yesterday and a couple that you didn't.  If

17    you could just explain to us two of the diagnoses just briefly,

18    cervical spondylosis and lumbar spine spondylosis.

19    A.  Sure.  Yes, as we mentioned, spondylosis is just arthritis,

20    osteoarthritis, age-related gradual wear-and-tear types of

21    arthritis.  And cervical is the neck, and lumbar is the lower

22    back.

23              So the patient had some mild complaints of those two

24    in terms of subjective complaints for both of those, for neck

25    pain and for low back pain.  Then objective findings to support

1     that were very few.  They were what we call the soft findings

2     that are based on the patient's response to them and not

3     extensive.

4            At one point, Dr. Lesniewski mentioned that there was

5     an absent triceps.  The triceps is the muscle on the back of

6     the arm.  It is one of the reflexes we can test for neurologic

7     function.  Having an isolated absent triceps reflex when you

8     have normal strength, which was documented, when you have

9     normal strength means relatively nothing.

10           If I tested everybody in the room here for reflexes,

11    there would be absent reflexes in different tendons for no

12    apparent reason.  So we have to put that in the context of the

13    remainder of neurologic exam as to whether or not that is

14    meaningful.

15           In fact, Dr. Lesniewski said just below on that the

16    reflexes were intact.  Absent triceps reflex and reflexes being

17    intact are contradictory.

18           Then the objective physical findings for the MRIs were

19    the ones that we have been discussing.  They were very mild and

20    age-appropriate in terms of just the wear-and-tear changes that

21    occur over time.

22    Q.  I would like to look at some of the MRI findings.  Can we

23    look at 104-H, related to the cervical spondylosis diagnosis.

24           Doctor, we are going to put this up on the screen, but

25    you said the MRI showed what you called mild, age-appropriate

D7qnles1                         Barron - direct

1    findings.  I would like to look at the report.  If you could

2    explain to us why what is on the report shows just normal,

3    age-appropriate findings?

4    A.  I can read them, since you don't have them.

5            Generally, when a radiologist reads a cervical or a

6    lumbar spine MRI, they talk about the levels.  Remember we said

7    they are stacked one upon the another in the cervical spine

8    it's C1 down to C7, then it goes to thoracic which is from T1

9    down.  They say the alignment of the spine is normal.  There is

10   no fracture or dislocation.  Then they say that the C2-3, which

11   is high up at the base of the skull, is normal.

12           C3-4 -- there is fusion of the L3-L4 vertebral bodies.

13   That is developmental meaning some of us are just born without

14   a disc between certain levels and that is nothing.

15           Then 4-5 is normal.

16           5-6 says mild, diffuse disc bulging.  Remember we said

17   as they dry out they can compress down and they bulge out a

18   little bit.  That doesn't necessarily mean anything.  That is a

19   normal, age-appropriate finding.  That is in the vast majority

20   of us in our 50s and beyond.

21           C6-7, moderate diffuse disc bulging.

22           Lastly C7-T1, which is much lower, moderate sized

23   central and right paracentral disc herniation.  Remember I said

24   sometimes as it bulges out, it can actually herniate and push

25   through the soft tissue and push out into the canal.

D7qnles1                          Barron - direct

1        They say there is borderline spinal stenosis.

2        Stenosis is a term that is used for just narrowing.

3   You can have a stenotic coronary artery and that just means the

4   artery internally is narrowed, so the blood flow cannot get

5   through as quickly.

6        But in the spine it just means the circumference, the

7   diameter and the space there is decreased by those structures,

8   those degenerative structures pushing.  They can be bone spurs

9   they can be something called a ligamentum flavum, which is a

10  ligament.  It can be the discs themselves that are drying out

11  and then pushing out.

12       Then it says the cervical cord -- the cervical cord

13  meaning the spinal cord at that level -- is intrinsically

14  normal.  That means there is nothing pushing on it abnormally.

15  If any of those structures that we talked about actually push

16  on the spinal cord that is a problem, and it shows it.  It

17  shows up as, kind of lights up on the MRI and then we worry

18  because that's potentially creating neurologic deficits,

19  weakness, a host of problems.

20       The last thing they say is the neural foraminae --

21  remember the foraminae are the little tunnels that the nerve

22  roots follow to go out to arms and the legs.  They said those

23  are patent, meaning they are normal and open.

24       So that is basically -- these are, as I said, if we

25  took 100 people who are in this age group, we would find that

 1    60 to 70 percent of those people without any symptoms at all

 2    would have these types of findings.  They are just normal

 3    degenerative findings.  Most of us are walking around with some

 4    of these, and they don't mean anything clinically.

 5    Q.   Did you reach a similar conclusion about the MRI report

 6    with respect to the lumbar spine?

 7    A.   Yes.  I mean, using slightly different terms, it is almost

 8    identical in terms of very mild, age-appropriate findings.

 9    Q.   Overall what did you think of Dr. Lesniewski's method of

10    diagnosing both cervical spine spondylosis and lumbar spine

11    spondylosis in this patient?

12              MR. DRATEL:  Objection as to form.

13              THE COURT:  Sustained as to form.

14    Q.   Tell us what you thought of Dr. Lesniewski's method of

15    diagnosing cervical spondylosis in this patient?

16              MR. DRATEL:  Objection as to form.  It's the same

17    question.

18              THE COURT:  Overruled.

19              THE WITNESS:  Does that mean I answer it?

20              THE COURT:  Yes, you may.

21    A.   So basically I think it is more of the same.  It is very

22    soft findings and a lack of good supportive objective clinical

23    data to justify a disability diagnosis.

24    Q.   Here we have put up on the screen for the jurors GX-455.

25    Is this the summary of your opinions on Dr. Lesniewski's

D7qnles1                         Barron - direct

1    treatment of Dr. Parlante?

2             Do you see that?

3    A.   Yes.  Again, this was --

4    Q.   I'm sorry.

5    A.   Just the anti-inflammatory medications given and Flexeril,

6    which is a muscle relaxant.  Despite offering no additional

7    treatment, he made the statement that eventually he will

8    require surgery.  With such little treatment having been

9    rendered, it's pretty remarkable to say that, to predict

10   someone will need surgery based on normal, age-related findings

11   and very few objective findings.

12   Q.   I think on this chart we just talked about the first

13   diagnosis listed up at the top, cervical spondylosis.  You have

14   explained quite a bit about your view of the lumbar spine

15   spondylosis diagnosis, including what the MRI showed.

16            Overall, what was your view of Dr. Lesniewski's method

17   of diagnosing lumbar spine spondylosis in this patient?

18   A.   It was similar.  What was notable about that, in his note,

19   Dr. Lesniewski noted that the patient commented that he works

20   out or he gets back problems.

21            In other words, you can have some low back pain, as

22   many of us can have, and if you work out, you strengthen your

23   core, then you can eliminate that low back pain or effectively

24   modulate it and keep it at bay.

25            The idea that working out, staying active, and staying

D7qnles1                         Barron - direct

1   healthy is a way that he actually combats his back problem is

2   notable in that one way we stay active is by working.

3   Q.  The fact that the patient is able to keep his back problems

4   at bay by working out, what does that tell you as a physician

5   about the severity of any back problem that he has?

6   A.  That it's not very serious.

7   Q.  What is your opinion of Dr. Lesniewski's treatment for what

8   he called lumbar spine spondylosis in this patient?

9   A.  Once again it was anti-inflammatory medication.

10  Q.  What is your opinion of the meaningfulness of that as

11  treatment for this problem?

12  A.  Well, again, most of my patients have already tried that

13  when they come in to see me, so if that's what I offer them --

14          MR. DRATEL:  Objection.

15          THE COURT:  Sustained.

16  Q.  What is your opinion, Doctor, of the meaningfulness of

17  anti-inflammatories as all of the treatment provided for this

18  condition?

19  A.  Inadequate.

20  Q.  The next diagnosis is a herniated disc of the lumbar spine.

21          Can you explain your opinion of Dr. Lesniewski's

22  method of diagnosing this in his patient?

23  A.  Yes.  A herniated disc, as we mentioned, is when the disc

24  squirts out the back into the canal and presses on the nerves

25  or the spinal cord, depending on where it is.

D7qnles1                         Barron - direct

1           In the case of the lumbar spine, there is no spinal

2    cord there, so it's just the nerve roots, it is called the

3    cauda equina, which is horse's tail, which is just all the

4    nerve roots are coming down off the end of the spinal cord and

5    then they can be pressed on.

6           So if you have a clinically significant herniated disc

7    and that presses on nerve roots and then that creates pain

8    shooting down the legs, either one or both legs, usually the

9    back of the leg, and it always goes below the knee, because

10   there are a lot of diagnoses in the hip and the pelvic region

11   that can give pain down into the thighs, but it rarely goes

12   below the knees.

13          So one important way to diagnosis and differentiate

14   those two is with something called -- first of all, the

15   patient's complaints.  And so in this case, Mr. Parlante did

16   not complain of pain shooting down into his legs.  It was just

17   back pain.

18          So that could mean that he has a herniated disc, but

19   it doesn't mean that it is clinically significant because it

20   would not be pressing on nerves.

21          Then, when you are examining the patient, you want to

22   stretch those nerves, as we mentioned, the straight-leg raise,

23   where it pulls on those nerve roots moves them a little bit.

24   If they are actually contacting the herniated disc, then it

25   will actually cause, reproduce that type of pain that they are

1    feeling.

2            Then the MRI showed mild age-appropriate findings, but

3    nothing that's serious, as we have already discussed.  To get a

4    diagnosis of disabling herniated disc, you would need to see

5    some subjective complaints consistent with that and some

6    objective findings consistent with that.

7    Q.  To be clear, you did not see that in the records you

8    reviewed?

9    A.  I did not.

10   Q.  What did you think of Dr. Lesniewski's treatment for what

11   he called a disabling herniated disc of the lumbar spine?

12   A.  Anti-inflammatories.

13   Q.  What is your view of anti-inflammatories as the entire

14   amount of treatment offered by an orthopedic surgeon for what

15   he is calling disabling herniated disc of the lumbar spine?

16   A.  Well, it would be inadequate if it were legitimate.

17   Q.  When you say "if it were legitimate," you mean if the

18   patient actually had a significant herniated disc of the lumbar

19   spine?

20   A.  Yes.

21   Q.  If the patient just had a very mild back problem, could

22   anti-inflammatories be helpful?

23   A.  Sure.

24   Q.  Now, talk to us about the last diagnosis, carpal tunnel

25   syndrome.  You explained to us yesterday what that is.  Talk to

D7qnles1                    Barron - direct

1   us about your opinion of Dr. Lesniewski's diagnosis of this

2   problem.

3   A.  So for carpal tunnel syndrome, he said -- the heralding

4   primary complaint the patients have is numbness and tingling in

5   these three fingers and half of this finger.  The patient on

6   two different occasions said specifically he had no numbness or

7   tingling.  So that flies in the face of the baseline

8   information that we gather to make a diagnosis of carpal tunnel

9   syndrome.

10          Then there was not a single finding I could find in

11  the record that would support that diagnosis, as we talked

12  about, the Phelan's test, the Tinnel sign, the thenar atrophy

13  or weakness of those muscles, and the most sensitive one, which

14  is the carpal tunnel compression test where we squeeze on the

15  nerve and try to reproduce those symptoms.

16          There was not anything akin to that in the records.

17  Then, following that up, we looked for objective testing that,

18  if we think someone has significant carpal tunnel syndrome and

19  we think that it may require further treatment, then we may

20  order an EMG nerve conduction study, where they stick the

21  needles in and put the electrodes on, and that test was not

22  ordered or provided.

23  Q.  So to be clear, did you see any evidence that

24  Dr. Lesniewski ever actually diagnosed this problem in his

25  patient before writing in a narrative that the patient had

1    disabling carpal tunnel syndrome?

2    A.  I did not see any evidence of that.

3    Q.  Did you see any treatment whatsoever related to carpal

4    tunnel syndrome?

5    A.  No, I did not.

6    Q.  To be clear, the only comment by the patient that you saw

7    that would be relevant to carpal tunnel syndrome is

8    inconsistent with that diagnosis?

9    A.  The only comment that I saw that the patient made relative

10   to carpal tunnel syndrome was -- would actually refute that

11   diagnosis, meaning there was no numbness or tingling.

12   Q.  At the bottom of the chart you write that the patient's

13   secondary gain issue arises at the first visit and that there

14   is a note in the records he works for the LIRR and is retiring.

15   Why did that note strike you?

16   A.  Well, because if -- I have patients, many patients who are

17   retiring or about to retire, and they'll come to me, and if

18   they have -- and I have been treating them, perhaps maybe I've

19   operated on both of their rotator cuffs or something, or they

20   have some diagnosis that we have been treating for however

21   long, and if they come to me and say that they are retiring I

22   say, Great for you.  So we just need to do whatever we need to

23   do to get you through this and then you will be able to retire

24   and have fun.  So that would be the last circumstance I could

25   ever imagine, then saying, oh, we better take you out on

D7qnles1                          Barron - direct

1    disability.

2    Q.  If we could turn to the next patient.

3           THE COURT:  Ms. Friedlander, you have laid out a

4    template for all the other previous ones.  Let's see if we can

5    do the next in more summary form.

6           MS. FRIEDLANDER:  Sure.

7    Q.  Gary Supper, Government Exhibit 457.

8           Doctor can you tell us what you thought of

9    Dr. Lesniewski's diagnoses.  First, if you could just walk us

10   through the first couple diagnoses and what your opinion is of

11   the way he went about diagnosing disabling conditions in this

12   patient?

13   A.  Yes, I think I can be expeditious.

14          So the first one is bilateral basal or joint thumb

15   arthropathy.  That is arthritis at the base of the thumb here.

16   One out of three women and one out of five men will develop

17   this naturally.  Only a small subset will actually have

18   symptoms from that.  It is the workhorse of our hand, it is

19   what defines us as humans.

20          But the patient complained of just pain at only two

21   visits and then stopped complaining about it.  There was

22   virtually no examination on physical findings and an x-ray, it

23   was unclear to me that it was available.  I certainly didn't

24   see an x-ray.  But it is a very easy problem to treat.  I have

25   written a number of articles about this.

1          We treat them with just anti-inflammatories and then

2     injections.  If those don't work, cortisone injections and

3     splinting protocol, a hard, firm splint that is very effective.

4     More than 50 percent of people will become asymptomatic just

5     putting a well custom made splint on their thumb.

6          For meaningful treatment, Dr. Lesniewski commented

7     that I don't think there is anything we can do.  He will need

8     bilateral fusions, which means eliminating that joint and

9     fusing it together.  That is a treatment for very refractory,

10    very severe disabling basal thumb arthritis that in stage if

11    you will.

12         But that is not, that would never be indicated for

13    this type of picture, and there is a lot you can do that could

14    have been done but no treatment was actually provided.

15         For the lumbar spine, the osteoarthropathy, this is a

16    diagnosis, lumbar osteoarthropathy, that is one of the terms

17    for just the garden variety wear-and-tear arthritis.  The

18    patient only complained of pain once just weeks before it was

19    declared as disabling for him, just once, and there was

20    virtually no examination performed.  And the MRI was

21    consistent, the MRI actually showed almost nothing, even less

22    than average for age-appropriate changes.

23         Obviously, if it is legitimate, it's pretty easy to

24    treat, as we have discussed, and he was given

25    anti-inflammatories for one week before being declared that

D7qnles1                           Barron - direct

1    this was a disabling condition.

2              The left knee meniscal tear is the next diagnosis.

3              The patient only complained of pain twice and some

4    months apart.  And then he did have soft findings, such as the

5    medial joint line tenderness and so forth.  But again this was

6    just fairly cursory before declaring this was a disabling

7    condition, and it is a very treatable condition.

8              The MRI showed a small tear legitimately.  It is

9    unclear if that is significant because of the lack of patient

10   complaints ongoing and the lack of good physical examination.

11   Again, the treatment was anti-inflammatories for one week.  So

12   there's many more things we could do for that.  And if it were

13   disabling, of course, we could do a 30-minute outpatient

14   arthroscopic procedure.  Arthroscopic surgery is where we do it

15   just through little tiny holes with a camera and little narrow

16   device.

17             The last is the rotator cuff tear of the left

18   shoulder.  That's the last diagnosis.  That says that the

19   patient hurt his shoulder during hockey or climbing as a

20   complaint, and he did have complaints of shoulder pain.

21             There were hardly any findings on physical examination

22   supported in the notes by Dr. Lesniewski, and there was

23   specifically a negative drop arm.  Remember we said that the

24   rotator cuff gives us this elevation as we are coming down.  If

25   we have a significant rotator cuff pathology, at that point our

1    body will say no more and it will drop down.

2            So that is actually inconsistent with a clinically

3    significant tear, meaning the finding that was documented was

4    that he had a negative drop arm, meaning that did not happen,

5    so that would imply that he does not have a clinically

6    significant tear.

7            The MRI showed a small tear and what we called some

8    impingement syndrome.  Remember impingement is where it rubs on

9    that undersurface of the bone and can cause pain.

10           So that's one of the easiest things to treat.  I treat

11   them every week with just -- they have already taken the

12   anti-inflammatories, we give them physical therapy, and if that

13   doesn't work, I can give them cortisone shots.  It is usually

14   curative for extended times, sometimes years or forever.  For

15   something this small it is pretty rare to do surgery for it,

16   but if it is necessary and disabling a pretty quick simple

17   arthroscopic procedure can often do the trick.

18   Q.  Did you see any evidence that Dr. Lesniewski gave this

19   patient injections?

20   A.  No, I did not.

21   Q.  At the bottom of this chart you write that you saw

22   something showing that the patient directed Dr. Lesniewski to

23   diagnose additional conditions besides the shoulder and to find

24   them disabling.  Can we see Government Exhibit 303-A.  Is this

25   something you saw in the patient's file?

D7qnles1                         Barron - direct

1   A.  I sure did.

2   Q.  It says, "Dr. Lew, want to get permanent disability, back,

3   knees and ankle.  Please do tests for MRI and EMG, NVC and NCS

4   test.  After I stop working please document symptoms why I

5   cannot perform duties.  So I need something wrong besides

6   shoulder.  Once I get shoulder fixed, Railroad Retirement may

7   withdraw my disability benefits.  I need tests, MRIs EMGs by

8   December 10 or ASAP."

9            It goes on.  Why did this note strike you?

10  A.  It was the most upsetting thing I read in the whole review

11  of the notes.

12  Q.  Tell us why.

13           MR. DRATEL:  Objection, your Honor.

14           THE COURT:  Overruled.

15  Q.  What would you do if you received this note from a patient?

16           MR. DRATEL:  Objection, your Honor.

17           THE COURT:  Overruled.

18  A.  If a patient came to me -- a patient has never come to me

19  asking for anything like this.  But if they did, I would call

20  them in and close the door and say, What are you thinking?  Are

21  you kidding me?  Why would you ask me to do this?  I would say

22  this is totally inappropriate.

23  Q.  Just one moment before we go to the next patient.  If we

24  could just go back to Mr. Supper's chart, just a wrap-up

25  question on him before we leave Mr. Supper.  Just if we could

D7qnles1                          Barron - direct

1    get your overall impression of the quality of these diagnoses

2    and the meaningfulness of the treatment offered.

3              MR. DRATEL:  Objection, your Honor.

4              THE COURT:  Sustained.

5    Q.  Could we get your overall impression of the quality of

6    these diagnoses?

7              MR. DRATEL:  Objection, your Honor, to the form.

8              THE COURT:  Rephrase the question.

9    Q.  What is your opinion of the quality of Dr. Lesniewski's

10   diagnoses of this patient?

11   A.  There were very few complaints, subjective complaints.

12   They were generally unsupported by the objective physical

13   findings and there was essentially no treatment provided.

14   Q.  The next patient will be Robert Ellensohn.  That is

15   Government Exhibit 456.

16             Doctor, can you tell us what you thought of

17   Dr. Lesniewski's method of diagnosing conditions in this

18   patient?

19             MR. DRATEL:  Objection as to form, your Honor.

20   Q.  Can you tell us what you thought of Dr. Lesniewski's method

21   of diagnosing shoulder impingement syndrome in this patient?

22   A.  Yes.  So the first diagnosis is shoulder impingement

23   syndrome.  Again, the rubbing of the bursa developing bursitis

24   and rubbing on the upper part of the rotator cuff on the bony

25   roof underneath.

D7qnles1                          Barron - direct

1          It was unclear if the patient's complaints matched

2     that diagnosis, the subjective complaints, because his first

3     complaint was only two weeks before he was declared to have a

4     disabling condition.

5          The objective findings to support this was only on one

6     occasion, and they were very limited.  As I mentioned, there

7     are many tests we can do to ferret out what's going on with our

8     shoulder diagnosis, and most of those were not done.

9          there is no MRI or x-rays ordered to support this

10    diagnosis objectively.  It is an easy problem to treat, as I

11    discussed.  Again, he was given just anti-inflammatory

12    medications and then there was a statement in the notes that

13    said he needs surgery and that surgery is inevitable.  That

14    makes no sense to me whatsoever.

15    Q.  The next diagnosis is cervical spine spondylopathy?

16    A.  Cervical spondylopathy, again, just another term for the

17    osteoarthritis, the wear-and-tear arthritis.  There were

18    nonspecific complaints of neck pain.

19         Remember we said if there is significant spondylopathy

20    that's actually pressing on nerves there will be more than just

21    neck pain, they will actually have pain, maybe weakness, loss

22    of feeling in the upper limbs where those nerves are being

23    pinched, and they supply the different muscles and sensory

24    organs in our hands and arms and so forth.

25         In terms of objective physical findings to support

1     this diagnosis, before actually declaring this a disabling

2     condition, there were no findings over a one-year period

3     leading up to that.  One year is a long time in the life of a

4     patient.  So you would expect to follow that up with

5     reexamination to see what is actually going on.

6             The MRI showed very mild, age-appropriate findings as

7     we have discussed many times, and there was no x-ray available

8     for me to look at or a report.

9             Then, once again, anti-inflammatories were used as the

10    primary treatment or the only treatment.

11    Q.  The final diagnosis is carpal tunnel syndrome.  If you

12    could just talk to us about that.

13    A.  Yes, so the final diagnosis, carpal tunnel syndrome, the

14    patient did complain of numbness and tingling.  There was only

15    one test used, the Tinnel sign, which we said is the least

16    sensitive and specific.  In fact, many of us, if we tap on

17    different nerves, will get some tingling.  That's why it's the

18    least sensitive and specific test for carpal tunnel syndrome.

19    The most sensitive and specific tests were not done, the

20    Phelan's and the carpal tunnel compression test.

21            Additionally, there were what I have termed

22    nonsensical findings in that there was a hands on head, I don't

23    know what that means as far as diagnosing carpal tunnel

24    syndrome, and there was a fencer sign.  The only fencer sign I

25    know, which is actually for someone fencing, is it is a

1    primitive reflex that we are born with as babies and

2    disappears, as many of our primary reflexes do.

3              The only time we see it is when there's been traumatic

4    brain injury, catastrophic head injury.  It is one of the

5    things we look for on the football field if there is a head-on

6    collision, helmet on helmet.  Because if you see a patient

7    doing that -- well, they become a patient, a kid, a football

8    player doing that, it means they have had severe injury to

9    their brain stem, which is where our primitive reflexes come

10   from.  Obviously that wasn't applicable to this diagnosis of

11   carpal tunnel syndrome.

12             Then the Apley's sign.  I don't know what that is.  I

13   know what it is for the knee.  There is an Apley scratch test

14   for back.  I don't know what it is for the hands.

15             The EMG was performed in this case, as we talked

16   about, an EMG nerve conduction study.  It showed very mild

17   carpal tunnel syndrome.

18             We know it wasn't severe because the EMG specifically

19   shows -- remember I said that when you stick the needles in, if

20   there is significant loss of nerve function to those muscles,

21   then they will develop fibrillation potentials and positive

22   sharp waves.  It is highly excitable and erratic so that the

23   nerve, the wave signals that you get from that that you are

24   measuring on your monitor go crazy.  There were none of those

25   on there, so we know this was very mild.  There was no

D7qnles1                    Barron - direct

1    treatment rendered for this at all.

2              And there was a statement at one point in the notes

3    that said that mild atrophy had begun to develop.  As we

4    mentioned, as carpal tunnel syndrome gets further along, if

5    atrophy develops, that means it's becoming more severe.  There

6    was no indication on the nerve test that was the case, but if

7    that were the case, then you better not leave that alone.  You

8    better actually treat that.

9              If I actually witnessed atrophy developing in a

10   patient, that is one of the rare times that I say, Look, you

11   need surgery.  I don't care what you think about surgery, but

12   you need surgery, because it's the only way we are going to

13   preserve your hand.

14             There was a famous pianist who ignored that and he was

15   not able to play for a decade or more because he ignored it and

16   let the atrophy set in.

17   Q.  To be clear, you saw a note by Dr. Lesniewski that said

18   mild atrophy had begun to develop.  But did you see anything

19   independently corroborating that statement in the records?

20   A.  No, I did not.

21   Q.  So you have noted on your chart that the only treatment

22   this patient ever got for any of these conditions from

23   Dr. Lesniewski was anti-inflammatories.

24             Just to be clear the fact that only

25   anti-inflammatories were given for these conditions, what does

1   that tell you as a diagnosis about the significance of any

2   condition that this patient had?

3   A.  It would mean that they are minimal or nonexistent.

4   Q.  At the bottom of the chart again you've noted, "The

5   patient's secondary gain issue arises at the first visit.  He

6   works for LIRR and he wants to retire next August."

7           That is something you saw in the records?

8   A.  I did see that, yes.

9   Q.  So just again, before we leave Mr. Ellensohn, can you give

10  us your overall opinion of the quality of the diagnoses

11  rendered by Dr. Lesniewski for this patient?

12  A.  Well, they were just these three diagnoses, which are all

13  readily treatable.  They were very poorly supported by

14  objective physical findings and objective medical evidence and

15  essentially no treatment other than anti-inflammatories was

16  provided.

17  Q.  The last patient is Ostap Baran.  That is Government

18  Exhibit 452.  Here it says, "The claimed diagnosis is spinal

19  stenosis."

20          If you could talk to us about what you saw in the

21  records, the diagnosis of spinal stenosis.  I just want to note

22  for the jury, you have written here that there were limited

23  records, so if you could talk to us about those things.

24  A.  Yes, there were very limited records.

25          And spinal stenosis is, as I just mentioned, it is at

D7qnles1                        Barron - direct

1    different levels of the spine where it occurs.  It can be

2    narrowing of that tube through which either the spinal cord, up

3    higher, or the nerve roots, or cauda equina, pass down as a

4    protective tunnel, if you will, and column.

5          So as that narrows, that can narrow through the

6    development of bone spurs through the disc herniations that

7    occupy that space and other thickening of tissues, and even

8    shifting sometimes of the bones one on top of the other if the

9    disc really degenerates and loses its integrity.

10         So the patient did complain of low back pain, and they

11   were fairly nonspecific complaints.  The thing we look for in

12   spinal stenosis is, it is unique, because the two most common

13   things that patients actually present with in the low back are

14   spinal stenosis types of findings and a herniated disc.  They

15   are two biggies, the two most common ones.  When they become

16   symptomatic the stories are very different in that spinal

17   stenosis hurts more when you stand up, and it feels better when

18   you bend over.

19         It feels better -- people will find that they sleep in

20   the fetal position to kind of curve that back and take that

21   strain off their back for spinal stenosis.

22         If it's really severe, people will walk in with a cane

23   and they will be tilted very forward because that is the only

24   way they can get rid of that pain, or they will just try to sit

25   as much as possible.

D7qnles1                              Barron - direct

1             Then, in contrast, the herniated disc hurts more when

2    we straighten our knees out than when we bend over, so they are

3    kind of at odds with one another.  Those are the types of

4    historical things we ask the patient -- actually we don't even

5    have to ask them.  They can tell us, and certainly we can see

6    them when they are walking and they have significant spinal

7    stenosis, almost someone walking down the street you can almost

8    tell if they have spinal stenosis.

9             But this only says -- I mean, the complaints were

10   nonspecific for just low back pain, and the objective findings

11   just said restricted range of motion.  It didn't go into more

12   of the detailed examinations.

13            Furthermore, when there is low back pain, I don't

14   think I ever once saw in the entire medical records that -- you

15   want to differentiate that when there is pain in the legs and

16   the buttocks, you want to differentiate that with hip

17   pathology, because there are labral tears and hip arthritis,

18   which is very, very common, so you want do tests for that to

19   look at the rage of motion in the hips as well.

20   Q.  If I could just interrupt for one moment.  Just to be

21   clear, though, did you only have limited records available to

22   you for your review of this patient?

23   A.  That's correct.

24   Q.  In particular, you had the disability narrative provided by

25   Dr. Lesniewski to the Railroad Retirement Board?

D7qnles1                          Barron - direct

1    A.  Yes, I did.

2    Q.  Were the chart notes and treating notes of Dr. Lesniewski

3    just unavailable for you to review?

4    A.  I did not see them, yes.

5    Q.  Can you tell us what you thought of Dr. Lesniewski's

6    treatment of this problem as reflected in the narrative?

7    A.  Sure.  I would like to say first that the x-ray, the MRI

8    showed, the MRI was inconsistent with the disabling stenosis.

9    It showed kind of the garden-variety things that we have talked

10   about over and over again.

11          Certainly the treatment is straightforward, and there

12   was, again, just anti-inflammatories provided as treatment for

13   this problem.

14   Q.  Did you see evidence -- here you have written in the chart

15   that the patient got injections from another orthopedist right

16   after Dr. Lesniewski claimed that this problem was ongoing and

17   permanent.  Can you tell the jury what you saw.

18   A.  Yes.  I saw records that showed that -- they were from New

19   York, from here, that patient saw another orthopedic doctor who

20   actually performed a series of epidural steroid injections for

21   this problem, which is an appropriate treatment and a very,

22   very effective and useful treatment.

23   Q.  You mentioned severe spinal stenosis.  Could you just

24   explain to the jury, if an MRI says that spinal stenosis is

25   severe, what does that mean?  Does that have anything to do

D7qnles1                          Barron - direct

1    with whether the patient has symptoms of spinal stenosis?

2    A.  Right.  I mean, we do use -- we use it clinically and we

3    use it radiographically.  If we say a patient clinically has

4    severe stenosis, that means they are walking hunched over and

5    all of those things that I have just discussed clinically, that

6    the patients will complain about numbness and tingling.  Severe

7    clinical stenosis patients often have a shuffling walk.  They

8    will actually fall a lot because they don't have good nerve

9    function.  They have such stenosis that those nerves that

10   supply the muscles to the legs actually lose function.  They

11   will begin to atrophy and they will fall a lot and so forth.

12   So it is really disabling.  When we say severe clinical

13   stenosis, we mean the patient is having tremendous problems.

14          When we say severe stenosis in the radiologic realm

15   when we -- when I see a severe -- if I see a severe cervical

16   stenosis, because I see more neck pain than I do low back, if I

17   see a severe stenosis in the cervical spine on x-ray, then I go

18   back and look at the patient and say, Is that giving you

19   problems?  Sometimes we see it, we find it as an incidental

20   finding.  You can have severe stenosis and have no symptoms,

21   but you are more likely to have symptoms down the road if you

22   do have severe stenosis.  So you have to put two and two

23   together.

24          You put the clinical realm, whether that is severe or

25   not, and you put the radiographic realm together, the findings

D7qnles1                        Barron - direct

1   Q.   When you see the word "severe" to describe spinal stenosis

2   on an MRI report, what does that refer to?  Does that refer to

3   symptoms or to something else?

4   A.   On a radiologic report it refers to only one of two things,

5   nothing to do with the patient's symptoms.  It only has to do

6   with either the central canal is narrowed down or you can have

7   the little foramina that are coming out, the little tunnels,

8   those can have severe stenosis.  That is foraminal stenosis.

9   That is another form of severe, so you can have one without the

10  other or both.

11  Q.   Here you have written that if the problem existed as

12  claimed could he play golf?  Can you explain to us how spinal

13  stenosis, if it's symptomatic, can affect your ability to play

14  golf?

15  A.   I think I have already said that.  Basically if it is

16  severe you are very disabled and you can barely walk.

17  Q.   The next diagnosis you have written, Hoaglund heel (sic),

18  with chronic Achilles tendonitis.  Can you explain what you saw

19  in the records?

20  A.   Yes.  It is a Haglund's heel.  The other term for it is

21  pump bump.  It's most common in women because they wear more

22  high heels than men.  It is a large bump that develops on the

23  back, posterior lateral aspect of the heel from the rubbing,

24  from the friction.

25           It can be painful.  Some people have an anatomic

D7qnles1                          Barron - direct

1    predisposition toward it, where the calcaneus, which is our

2    actual heel bone, that can develop a little upturn right up

3    under where the Achilles tendon attaches on the heel, and that

4    little extra bump, it helps to create that callous or that

5    extra soft tissue that we can see externally as part of that.

6            It can be associated with chronic Achilles tendonitis,

7    as this was indicated.  He said the diagnosis was a Haglund's

8    heel with chronic Achilles tendonitis.  Again, these were very

9    limited records, but in that report there was no complaint of

10   pain actually noted regarding this supposedly disabling

11   condition.

12           There were no findings either for the heel deformity

13   or for Achilles tendonitis that I could identify in the record.

14   An x-ray was unavailable.  There was at least no remark about

15   any treatment offered for this.

16   Q.  Here you have written, If the problem existed as claimed,

17   could he play golf?  No.  Can you explain why?

18   A.  It is just hard to walk.  I mean, when they're really

19   symptomatic, there have been people whose dancing careers and

20   so forth were eliminated by this problem.  I mean, golf is a

21   walking game.  It would be hard pressed, if it was symptomatic

22   enough to prevent you from walking at work, then it would

23   likely prevent you from playing golf.

24   Q.  You said the problem is easy to treat.  How do you treat

25   it?

D7qnles1                         Barron - direct

1   A.  Well, you can do cortisone shots, you can do prednisone

2   tapers, remember I said the steroids by mouth because we don't

3   like to inject right at tendons.  We can, but you just have to

4   be careful with it, and obviously modification of footwear.

5   You have to wear unfashionable shoes instead of fashionable

6   shoes.  That's about it.

7   Q.  Did you say any evidence of any treatment provided for this

8   condition?

9   A.  No, I did not.

10  Q.  Dr. Barron, if this patient was playing golf regularly,

11  what would that tell you about how symptomatic either of these

12  supposed conditions were?

13           MR. JACKSON:  Judge, I am just going to object.

14           Can we have a sense of what regularly means.

15           THE COURT:  Sustained.

16  Q.  If they were playing golf at all --

17           MS. FRIEDLANDER:  I am happy to rephrase, your Honor.

18           THE COURT:  Yes.

19  Q.  If a patient were playing golf at all, what would that tell

20  you about the severity of any spinal stenosis or Haglund heel

21  problem that he had?

22  A.  Just that it is not that severe.

23  Q.  At the bottom of the chart you have written that

24  Dr. Lesniewski's restrictions are inconsistent with stenosis

25  and that the patient's complaints are inconsistent with

1    stenosis, sitting, bending, and driving.

2              MS. FRIEDLANDER:  Can we just see the patient that the

3    doctor is referring to here, it's 113-B.

4    Q.  Tell us what you saw, Doctor?

5    A.  Well, just that on here -- let's see.  It says the patient

6    cannot stand or walk.

7    Q.  I think that sitting is below.

8    A.  I was just comparing the two because they both apply.

9    There's spinal stenosis -- and they are claimant can stand or

10   walk less than two hours total per day.  If you have severe

11   stenosis, you can't stand or walk well.  So that would fit.

12             But then if you are told that you can also not sit,

13   you can only sit for less than six hours total, well, that's

14   what makes it feel better, bending over makes it feel better.

15             So sitting in any position actually makes spinal

16   stenosis feel better.  It's the standing up and extending the

17   back that is what worsens spinal stenosis

18   Q.  If we could turn to the next page of Dr. Lesniewski's

19   restrictions.  In the middle it says, "Claimant is able to"

20   where it says "bend and stoop."

21             Here Dr. Lesniewski said he can never bend and stoop.

22             Can you explain why that is inconsistent with the

23   diagnosis Dr. Lesniewski gave him?

24   A.  That's what people do when they have severe spinal

25   stenosis.

D7qnles1                          Barron - direct

1    Q.  Meaning that's what makes them feel better?

2    A.  Feel better, yes.

3    Q.  On the next page, at the top it says, "The patient is

4    moderately restricted from driving."

5    A.  Right.

6    Q.  Why is that inconsistent?

7    A.  Again, it's a sitting activity, so there is nothing wrong

8    with the arms.  If you are sitting, your legs are going to feel

9    better and your back is going to feel better.

10   Q.  Can we turn to Mr. Baran's disability application.  It is

11   113-A.  You said that his complaints were inconsistent with

12   stenosis.  If we could just turn to page 95, Section 6.

13            MS. FRIEDLANDER:  If you could blow that up.

14   Q.  Dr. Barron, here it says that it is hard for the patient to

15   sit and that it's hard for the patient to drive.  Again, why is

16   that inconsistent?  It says, in fact, that it's difficult for

17   this patient because of his back pain his stenosis.  Why is

18   that inconsistent with stenosis?

19   A.  Just, as I have said already, that is inconsistent with

20   severe spinal stenosis.

21   Q.  That is what makes people with stenosis feel better?

22   A.  Right.  Maybe not driving specifically, but driving would

23   be, it is a sitting position.  It would relieve it.

24   Q.  OK.  Thanks.  We are done with that exhibit.

25            Dr. Barron, I would just like to ask you now whether

D7qnles1                          Barron - direct

```
 1    you have formed opinions, general opinions based on your

 2    training and your experience and your review of records in this

 3    case, have you formed a general opinion about Dr. Lesniewski's

 4    diagnoses?

 5    A.  Yes, I have.

 6    Q.  What is that opinion?

 7    A.  After review of the medical records and to the best of my

 8    ability I've looked these over extensively and concluded that

 9    there were a number, many, many diagnoses given to these

10    patients that I reviewed that were at best unsupported by

11    objective medical evidence at times, and at worst even

12    contradicted by the objective medical evidence.

13    Q.  To what extent did Dr. Lesniewski make the necessary

14    objective physical findings to support his diagnosis of

15    disabling conditions in his patients?

16    A.  I'm sorry.

17              MR. DRATEL:  Objection, your Honor.

18              THE COURT:  Overruled.

19              MR. DRATEL:  "Disabling."

20              THE COURT:  Overruled.

21    A.  What was the first part of the question, please?

22    Q.  To what extent in your opinion did Dr. Lesniewski make the

23    necessary objective physical findings to support his diagnosis

24    of disabling medical conditions in his patients?

25    A.  Well, very rarely were any significant objective findings
```

D7qnles1                        Barron - direct

1    documented, and I don't think I ever saw any that were

2    documented that would actually indicate objectively a disabling

3    medical condition.

4    Q.  What was your reaction to the lack of necessary physical

5    findings that you observed as an orthopedic surgeon?  What was

6    your reaction to these records.

7              MR. DRATEL:  Objection, your Honor.

8              THE COURT:  Sustained.

9    Q.  If Dr. Lesniewski didn't make these necessary physical

10   findings, how did he support his diagnoses based on your

11   review?

12   A.  I don't think he did.

13   Q.  Did he sometimes rely on MRIs or patient's complaints in

14   order to --

15             MR. DRATEL:  Objection.  I will withdraw it, your

16   Honor.

17             THE COURT:  Withdrawn.

18   Q.  What did you observe about what Dr. Lesniewski used to

19   support his diagnoses in the records?

20   A.  Well, after not supporting it with objective physical

21   findings, then there were x-ray reports and MRI reports that

22   seemed to be relied upon to make these diagnoses of supposedly

23   disabling conditions.  The vast majority of those findings

24   would contradict a disabling medical condition and were mostly

25   age-appropriate and occasionally contradicted the diagnosis.

D7qnles1                         Barron - direct

1   Q.   Did you sometimes see Dr. Lesniewski support his diagnoses

2   simply based on a patient claiming pain?

3   A.   Yes.

4   Q.   Is that how doctors diagnose medical conditions?

5   A.   That is how we start.   That is not how we complete the

6   diagnosis.

7   Q.   Can you give us an example where Dr. Lesniewski diagnosed a

8   supposedly disabling medical condition based purely on MRI

9   findings that in your opinion are meaningless?

10          MR. DRATEL:   Your Honor, may I have a continuing

11   objection to this.

12          THE COURT:   Sustained.

13   Q.   Can you give us an example where Dr. Lesniewski diagnosed a

14   medical condition based purely on MRI findings that you believe

15   are meaningless?

16   A.   Yes.   Mr. Gagliano had complained of degenerative -- well

17   the diagnosis was degenerative lumbar disc disease.

18          The patient's complaints did not support that and

19   there were no objective physical findings to support that.   The

20   MRI was basically minimal findings and actually better than

21   average that I would have predicted for an active person in

22   middle age.

23          So this was an example where the MRI was used to

24   justify this, but didn't.

25   Q.   Can you give us an example where Dr. Lesniewski diagnosed a

D7qnles1                      Barron - direct

1    medical condition based on your review purely on a patient

2    saying I have pain?

3    A.   Yes.  Mr. Rutigliano complained of neck pain, and probably

4    a number of these have all kind of flowed together, but on that

5    particular diagnosis of cervical osteoarthritis that he was

6    given complaining purely on pain, there was actually no

7    physical findings no x-rays or MRIs.  So it was completely

8    unsupported by anything other than the patient saying he had

9    neck pain.

10   Q.   Why did Mr. Rutigliano's complaint of neck pain stand out

11   in your mind in that case?

12   A.   That was the one we talked about that was anatomically

13   impossible because it was neck pain radiating to the low back.

14   As you remember we talked about the fact that neck pain does

15   not radiate to the low back.  It is a different anatomical area

16   entirely.  When you have neck pain that radiates, it always

17   radiates to the upper extremities, to the upper shoulders and

18   to the arms and hands.

19   Q.   You mentioned that Dr. Lesniewski sometimes made diagnoses

20   that were not just unsupported but actually contradicted by

21   medical evidence that he had.

22          Can you give us an example of Dr. Lesniewski

23   diagnosing a condition where he had an MRI showing that the

24   patient did not have that condition?

25   A.   Yes.  Mr. Rutigliano was also given a diagnosis of knee

D7qnles1                      Barron - direct

1    osteoarthritis, and the MRIs we discussed did not -- it

2    actually said very clearly that there were no osseous

3    abnormalities, that the joint did not -- it didn't say it, I am

4    paraphrasing -- the joint did not have any osteoarthritis that

5    was in the report.

6             (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7qdles2                        Barron - direct

 1   Q.  Can you give us an example of Dr. Lesniewski diagnosing a

 2   medical condition where the patient has not made any complaints

 3   consistent with that diagnosis?

 4   A.  Yes.  We just spoke about that.  It was Mr. Parlante who

 5   had -- was given a diagnosis of disabling carpal tunnel

 6   syndrome, and that was the one where the patient actually said

 7   on two occasions that I have no numbness and tingling but he

 8   was still -- there were no physical findings to support it, no

 9   tests ordered, and a disabling carpal tunnel syndrome diagnosis

10   was awarded, or given to the patient.

11   Q.  Leaving aside your opinion that Dr. Lesniewski's diagnoses

12   were unsupported or contradicted, even if all of these patients

13   had all of these conditions, how serious are these conditions

14   and how treatable are they?

15             MR. DRATEL:  Objection, your Honor.

16             THE COURT:  Sustained.  Rephrase.

17   Q.  Doctor, even if all of these patients had all of these

18   conditions, how serious are these conditions?

19             MR. DRATEL:  Objection.

20             THE COURT:  Overruled.

21   A.  Well, I think we've gone through them one by one pretty

22   much, but I don't think we've seen one diagnosis that even if

23   it were evident based on what evidence we have, even if it were

24   actually in existence for the individual patient, that there

25   was not one that was not readily treatable.

D7qdles2                         Barron - direct

1    Q.  Have you formed a general opinion about the treatment given

2    by Dr. Lesniewski to the patients whose files you reviewed?

3    A.  Yes, I have.

4    Q.  What is that opinion?

5    A.  My opinion is there was almost no treatment provided, and

6    there was only one instance of injections being given of all

7    these conditions.  There was numerous instances, and if any

8    treatment was rendered it was generally anti-inflammatories.

9    There were a few instances of physical therapy being provided

10   and recommended, and otherwise there was no other treatment

11   rendered at all.  And all of these supposedly disabling

12   conditions, I think, in my opinion could have readily been --

13   if they existed could have been readily cured or treated to

14   where the patient could continue to live an active work and

15   recreational life.

16   Q.  Dr. Barron, what did you observe about the pattern and the

17   frequency of patients' visits to Dr. Lesniewski?

18   A.  Well, there were many occasions where there was no physical

19   exam performed.  There were many, many visits for these

20   patients over relatively short periods of time.  And these

21   are -- typically if there is no physical exam provided, they

22   are not even billable but that is a separate issue, I think.

23          But basically they were seen very frequently.  And it

24   boggles my mind that patients would continue coming back so

25   frequently if they were not being provided actual treatment

1   that would make them better.  I know my patients wouldn't come.

2              MR. DRATEL:  Objection, your Honor.

3              THE COURT:  Sustained.

4   Q.  Doctor, is it common --

5              MR. DRATEL:  Move to strike.

6              THE COURT:  Sustained.

7   Q.  Dr. Barron, is it common or uncommon in your experience for

8   patients to see an orthopedist with the frequency that you

9   observed these patients coming to Dr. Lesniewski?

10  A.  I think, as I mentioned before at some point yesterday.

11             MR. DRATEL:  Your Honor, I object to "orthopedists" in

12  terms of --

13             THE COURT:  Sustained.

14  Q.  Is it common or uncommon for your patients to see you that

15  frequently?

16  A.  It is uncommon except in a rare circumstance where they

17  have something such as infection or something very serious that

18  I need to follow up closely postoperatively.  If they had a

19  fracture or something that I operated on that I am worried

20  about them, so I will see them very frequently but that is only

21  for a short time.

22  Q.  When your patients see you, what do they typically ask you

23  for?

24             MR. DRATEL:  Objection, your Honor.

25             THE COURT:  Sustained.

D7qdles2                        Barron - direct

1   Q.  Dr. Barron, what did you observe about Dr. Lesniewski's

2   patients?

3           MR. DRATEL:  Asked and answered, your Honor.

4           THE COURT:  Sustained.

5   Q.  What did you observe about what Dr. Lesniewski's patients

6   were asking for, or not asking for?

7           MR. DRATEL:  Asked and answered, your Honor.

8           MS. FRIEDLANDER:  It has not been asked and answered.

9           THE COURT:  Overruled.

10          MR. DRATEL:  Also, your Honor, I think it has to be

11  more precise.

12          THE COURT:  It is a compound question,

13  Ms. Friedlander.

14          MS. FRIEDLANDER:  I would be happy to rephrase.

15          THE COURT:  Rephrase.

16  BY MS. FRIEDLANDER:

17  Q.  What, if anything, did you observe about whether

18  Dr. Lesniewski's patients were asking him for treatment?

19  A.  I don't recall any circumstance where the patient was

20  actually requesting treatment or demanding treatment.

21  Q.  Why did that strike you?

22  A.  That's why patients typically go to doctors.

23          MR. DRATEL:  Objection, your Honor.

24          THE COURT:  Overruled.

25  Q.  If you had a patient, doctor, who came to you without

D7qdles2                      Barron - direct

1    asking for treatment, what would you ask?

2    A.  Why are you here?

3    Q.  I want to just conclude by asking you some questions about

4    Dr. Ajemian and his patients.  You indicated yesterday that you

5    have also reviewed records relating to Dr. Ajemian.

6          Which files have you been focused on over the past,

7    say, six months?

8    A.  Dr. Lesniewski's files.

9    Q.  And prior to that did you also focus on files related to

10   Dr. Ajemian?

11   A.  Yes, I did.

12         MR. DRATEL:  Objection, your Honor.

13         THE COURT:  All right.  I will allow limited testimony

14   on this issue and give the jury the same limiting instruction

15   pertaining to any acts or statements attributable to

16   Dr. Ajemian.  They may not be used in any way to form any

17   conclusions as to the charges against Dr. Lesniewski.

18         MS. FRIEDLANDER:  I have only a couple of questions on

19   this.

20         THE COURT:  All right.

21         MS. FRIEDLANDER:  I'm sorry, I lost it.  Was there a

22   question outstanding?  I lost it.

23         THE COURT:  Would the reporter read back the last

24   question.

25         MR. DRATEL:  Your Honor, before that, if I could have

D7qdles2                          Barron - direct

1   a continuing objection under 403?

2              THE COURT:  All right.

3              MS. FRIEDLANDER:  You know, it is OK.

4   Q.  Prior to the most recent, several months ago, did you also

5   focus on files related to Dr. Ajemian?

6   A.  Yes, I did.

7   Q.  And did you reach opinions related to -- with respect to

8   those files?

9   A.  Yes, I did.

10  Q.  Just in general terms, what opinions did you reach?

11  A.  That there were many diagnoses given to these patients that

12  were unsupported by objective medical evidence and very little

13  treatment rendered.

14  Q.  And did you form a view on the seriousness of any

15  conditions diagnosed by Dr. Ajemian with respect to those

16  patients?

17  A.  To the best of my recollection, I do not recall any serious

18  orthopedic conditions.

19             MS. FRIEDLANDER:  Just one moment.

20             (Pause)

21             No further questions.  Thank you, Doctor.

22  CROSS-EXAMINATION

23  BY MR. RYAN:

24  Q.  "Why are you here?"  That's a question you normally ask a

25  patient when they come to you for the first time, right,

D7qdles2                          Barron - cross

1    Doctor?

2    A.  No, only if they don't request treatment.

3    Q.  Well, what did Dr. Lesniewski ask Mr. Rutigliano on the

4    first visit and what was Rutigliano's answer, according to the

5    documents?

6    A.  Well, I wasn't there so I don't know exactly what

7    Dr. Lesniewski asked him.  But I would have to look back and

8    see what the patient answered.

9    Q.  Well, in the interest of time, can I read the entry?

10   A.  Sure.

11   Q.  It is an exhibit -- Government' Exhibit 100.  The whole

12   file is in evidence.

13          Didn't Mr. Rutigliano answer that question by telling

14   the doctor, "I fell from the second floor off a ladder and

15   landed on my shoulder"?

16          MS. FRIEDLANDER:  Objection.  Dr. Barron asked to see

17   the document.

18          THE COURT:  Yes.

19   BY MR. RYAN:

20   Q.  Very well, Doctor.  Do you have the file in front of you?

21   A.  Yes, I do.

22   Q.  Dr. Lesniewski, please look at the first entry, please,

23   April of 1997.

24   A.  For which patient?

25   Q.  I'm Joe Ryan and I represent Joe Rutigliano.  Excuse me,

D7qdles2                        Barron - cross

1    Doctor.

2    A.   Thank you.

3    Q.   Have you ever met Joe Rutigliano?

4    A.   No, sir.

5    Q.   Have you ever examined him?

6    A.   No, sir.

7    Q.   Has there been any discussion during your $7,000 of hours

8    of time about the possibility of examining Mr. Rutigliano in

9    preparation for this trial to help you with your opinion about

10   Dr. Lesniewski's findings?

11   A.   It didn't come up.

12   Q.   Nobody suggested that he be examined?

13   A.   No.

14   Q.   Is it common for you to give testimony without examining

15   the patient?

16   A.   I don't give much testimony, but certainly I render my

17   opinion frequently without examining patient.

18   Q.   And here you were called to testify and offer your opinion,

19   and then are you telling the ladies and gentlemen of this jury

20   that you were never asked to examine Mr. Rutigliano -- we agree

21   with that, right?

22   A.   Yes.

23   Q.   And did anyone from the prosecution team or the Railroad

24   Retirement Board suggest that he undergo an MRI in preparation

25   for this trial?

D7qdles2                          Barron - cross

1    A.  No.

2              MS. FRIEDLANDER:  Objection.  Foundation.

3    Q.  DID anyone suggest that he undergo an x-ray in preparation

4    for this trial?

5    A.  Not that I know of.

6    Q.  Did anyone suggest that he go for an EMG or any other kind

7    of diagnostic tests that are regularly requested by the RRB in

8    order to make an objective finding?

9              MS. FRIEDLANDER:  Objection.

10             THE COURT:  All right.  Sustained.

11   A.  I don't know what's requested by the RRB.

12             MS. FRIEDLANDER:  Objection.

13             THE COURT:  Sustained.

14   Q.  You don't know what's requested by the RRB, is that it?

15             MR. WEDDLE:  Objection, your Honor.

16             THE COURT:  Sustained.

17             MR. RYAN:  I will withdraw the question.

18   BY MR. RYAN:

19   Q.  In reviewing the file of Dr. Lesniewski's treatment -- and

20   there was a chiropractor, John Romero, too; do you remember

21   that was in the file, too?

22   A.  Yes.

23   Q.  And do you remember the entry that in 1988, Mr. Rutigliano

24   fell from the ceiling of a garage and immediately was admitted

25   to the Stony Brook Hospital and treated for compressive

D7qdles2                          Barron - cross

1    fractures of his spine?

2    A.  I would have to look back at the records.

3    Q.  I represent to you, sir, that that's in the record.

4             MS. FRIEDLANDER:  Objection, your Honor.

5             THE COURT:  Sustained.

6             MR. RYAN:  The jury has this document.  I want to move

7    on, Judge.  I just want to move on.

8             THE COURT:  Excuse me, Mr. Ryan.  Ms. Friedlander has

9    the lead on this.  They are her objections.

10            MR. RYAN:  I'm sorry.

11            THE COURT:  All right.  Mr. Ryan.

12   BY MR. RYAN:

13   Q.  Well, in Government's Exhibit 100, which is the whole

14   Rutigliano file with the RRB, there is an entry on page 1729 by

15   John Romero, Doctor of Chiropractic.

16            And in that entry it states that Mr. Rutigliano fell

17   from the height of the ceiling in the garage.  He sought

18   immediate medical attention, and admitted at Stony Brook

19   Hospital.

20            Do you recall that entry?

21   A.  I would have to see it again just to tell you if I recall

22   it.  It is vaguely familiar but I can't speak intelligently

23   without seeing it again.

24   Q.  Well, let me ask you about your life experience, Doctor.

25            Would you say that a worker like Mr. Rutigliano, who

D7qdles2                          Barron - cross

1   falls from the ceiling of a garage and has to be treated in a

2   hospital, who falls from the second floor off a ladder and goes

3   to Dr. Lesniewski, is trying to create a paper trail to get

4   occupational disability?

5                MS. FRIEDLANDER:  Objection.

6                THE COURT:  Sustained.

7   Q.  Are you suggesting to this jury that Mr. Rutigliano and

8   Dr. Lesniewski conspired to fabricate or exaggerate his medical

9   condition?

10  A.  I don't think I ever said that.

11  Q.  Are you aware that that's the allegation in this case and

12  that's the determination this jury has to make?

13  A.  I'm actually not aware of the exact allegations.

14  Q.  In your 70,000 hours of preparation --

15               MS. FRIEDLANDER:  Objection.

16               THE COURT:  Sustained.

17  Q.  In the $70,000 hours of preparation for this case, did

18  anyone show you the Indictment allegation?

19  A.  I don't think so.

20  Q.  Do you think it might have been relevant in your

21  preparation for your opinion to offer this jury to look at the

22  allegation?

23  A.  I think it actually might have skewed my objective

24  perspective on it, and I think it might have detracted from the

25  effective objective analysis of these records.

D7qdles2                          Barron - cross

1   Q.  Could you explain by "skewed," just explain that to us,

2   please.

3   A.  Well, I've read other allegations and they can be all over

4   the place, and so I don't -- they are not pleasant to read and

5   I think it would not have been pleasant to read them, and it

6   would have altered perhaps, depending on what they said, my

7   perceptions.

8   Q.  Well, Dr. Ferderigos examined Mr. Rutigliano in November of

9   2008, correct?

10  A.  That's correct.

11  Q.  And he issued a comprehensive report of what he found and

12  what he did; isn't that correct, Doctor?

13  A.  I read that report.

14  Q.  It is a very comprehensive report, isn't it?

15  A.  I described it as a very well performed examination, a

16  complete examination.

17  Q.  And would you agree that the reporting by Dr. Ferderigos in

18  2008 was more comprehensive than the notes that Dr. Lesniewski

19  made of his treatment of Mr. Rutigliano in '97, '98 and '99?

20  A.  Well, I think what I would say is that Dr. Lesniewski

21  obviously saw Mr. Rutigliano on multiple occasions, on many

22  occasions.  So if you take the comprehensive amount of that,

23  then there were in one report that was the most complete report

24  by Dr. Frederico, and cumulative I wouldn't -- I would say they

25  were equal.

D7qdles2                        Barron - cross

1   Q.  Dr. Ferderigos saw Mr. Rutigliano on three occasions,

2   right?

3   A.  I would have to look back.  I believe so.

4   Q.  I represent to you that that's what the evidence shows.

5           MS. FRIEDLANDER:  Objection.

6           THE COURT:  Sustained.

7   Q.  When he walked into Dr. Ferderigos's office in Florida, he

8   complained of low back pain; do you recall that?

9           MR. WEDDLE:  Objection.

10  A.  I do.

11  Q.  And he wore a knee brace; do you recall that?

12  A.  I don't recall that.

13  Q.  And Dr. Ferderigos took an x-rays, an MRI of his lower

14  back -- withdrawn.

15          He took an MRI of the lower back, correct?

16  A.  I'd have to look back at the records to --

17  Q.  All right.  And Dr. Ferderigos found that Mr. Rutigliano

18  had a medical problem.

19  A.  I would agree.

20  Q.  And as a matter of fact, on the third visit, Mr. Rutigliano

21  agreed to a procedure that Dr. Ferderigos suggested?

22  A.  That's correct.

23  Q.  And that was this epidermal procedure, correct.

24  A.  Epidural, yes.

25  Q.  Epidural, OK.

D7qdles2                           Barron - cross

1    And, in fact, Dr. Ferderigos lays out in his report

2   how that was conducted?

3   A.  Yes, he does.

4   Q.  Mr. Rutigliano was taken into a separate room, like an

5   operating or a semi-operating room?

6   A.  I'm not sure of the specifics but that's frequently the

7   case.

8   Q.  Look in the report.  Do you have the report in front of

9   you?  See if it refreshes your recollection that he was

10  required to lay prone on a table in what would be considered a

11  dressing or a surgical gown.

12          (Pause)

13          Well, in the interest of time, Doctor, let me try and

14  help you out here.  OK?

15  A.  I have the record in front of me.

16  Q.  All right.  Do you see the page at 111908, "Procedure?"

17  A.  Yes.  I don't see anything about a hospital gown, but.

18  Q.  Oh, I'm sorry.  "He was prepped and draped in the normal

19  customary sterile fashion."  What does that mean?

20  A.  That means that in order to perform this test, they wanted

21  to have the field where they were going to put the injections

22  through to be sterile so it wouldn't develop an infection.

23  Q.  Now, was this a one-person doctor procedure or was there an

24  assistant, can you tell?  Was there an aide, based upon your

25  experience?

D7qdles2                         Barron - cross

1    A.  Based upon my experience, there is usually someone else in

2    the room.

3    Q.  OK.  Now, what's the first step in this procedure with

4    respect to injecting whatever medication is required in the

5    epidural?

6    A.  In my experience or in the report?

7    Q.  No, in Dr. Ferderigos' report.

8    A.  The image intensifier -- after sterilizing and laying out

9    the field, then the image intensifier, which is a portable

10   fluoroscopic machine, is brought over the patient's lower back

11   in this case, and then it gives you an x-ray visualization of

12   the structure so you can know where you are putting the needle.

13   Q.  And where did the first needle go?

14   A.  Into the interlaminar area of L4-5.

15   Q.  OK.  Were there any further needles injected?

16   A.  Yes.  An additional two needles were placed in the facet

17   region of the nerve bloc at L3-4, L4-5 bilaterally.

18   Q.  Was any one of those needles a 22 gauge spinal needle?

19   A.  It looks like they were all small, 22 gauge needles.

20   Q.  OK.  Was there a fourth needle injected?

21   A.  I don't think so.

22   Q.  Was the patient injected with 80 milligrams of Depro-Medrol

23   at L4-5?

24   A.  No.  20 milligrams of Depro-Medrol --

25   Q.  I'm sorry.  20 milligrams, correct?

D7qdles2                           Barron - cross

1   A.  Right.  And that was through the needles already placed.

2   Q.  OK.  So he had three needles before injection?

3   A.  No.  I think they were put through the needle.  The needles

4   are just placed into position and then you inject medicine

5   through them.

6   Q.  Now, did Dr. Ferderigos indicate in his report whether

7   Mr. Rutigliano -- how -- withdrawn.

8           How did Mr. Rutigliano react to this procedure,

9   according to Dr. Ferderigos?

10  A.  He tolerated it well.

11  Q.  He walked out of the doctor's office, correct?

12  A.  As he had walked in, yes.

13  Q.  He walked into the doctor's office and he walked out,

14  correct?

15  A.  That's correct.

16  Q.  As a matter of fact, in all three visits Mr. Rutigliano

17  walked in and walked out of the office?

18  A.  That's correct by -- according to the records, yes.

19  Q.  Now, are you telling the ladies and gentlemen of this jury

20  that given Mr. Rutigliano's condition found by Dr. Ferderigos

21  in November 2008, that Dr. Lesniewski made up his findings

22  about degenerative disc disease?

23  A.  I never said anything was made up.

24  Q.  Well, when Dr. Ferderigos met with Mr. Rutigliano,

25  Mr. Rutigliano also indicated he had a problem with his knee,

D7qdles2                        Barron - cross

1    correct?

2    A.  I could look back but I think that's correct, yes.

3    Q.  And an MRI was also conducted and found that there was a

4    tear on the medial meniscus, correct?

5    A.  Yes.

6    Q.  Now, are you telling the ladies and gentlemen of the jury

7    that Dr. Lesniewski's entry about a tear in the meniscus was

8    fabricated or false?

9    A.  I never said that.

10   Q.  Was it exaggerated?

11   A.  I didn't say that either.

12   Q.  So we have Dr. Lesniewski making two findings dealing with

13   Mr. Rutigliano's knee and his back that were confirmed by

14   Dr. Ferderigos in 2008, is that right?

15   A.  Well, what I said was that in the case of Dr. Lesniewski's

16   files there was a very poor correlation between the patient's

17   symptomatology and the physical findings correlated with the

18   objective findings of the MRI.

19   Q.  Do you agree, sir, that Dr. Ferderigos's findings were

20   consistent with Dr. Lesniewski's findings regarding the knee

21   and the lower back?

22   A.  So the knee findings were consistent, although more

23   specifically enumerated by Dr. Ferderigos, and then he had the

24   questionable McMurray sign, which is the most sensitive and

25   specific test for a symptomatic medial meniscal tear.

D7qdles2                           Barron - cross

1    Q.  Now, the McMurray sign is a test.  You put the patient on a

2    table, correct?

3    A.  That is correct.

4    Q.  And you would have him pull his knee back.  In this case it

5    would be the right knee, correct?

6    A.  The right knee, yes.

7    Q.  The right knee.  And then if the patient reacts to the

8    pulling back, you can make as a physician a determination of

9    whether there is a problem within that knee?

10   A.  That's not how it's done but that's --

11   Q.  Tell me how you do it.

12   A.  Yes.  You lie them prone and then you bend the knee up and

13   then the patient is relaxed, and then you push down on the heel

14   to load the knee and twist it back and forth, like this, to try

15   to exaggerate what's going on with the meniscus, that

16   interposed tissue.

17   Q.  Didn't Dr. Ferderigos follow that procedure?

18   A.  Yes.  And he said it was questionable.

19   Q.  Did he find there was a tenderness in the knee?

20   A.  He found a tenderness in the knee, yes.

21   Q.  And did he not order an MRI which confirmed that there was

22   a meniscal tear?

23   A.  Yes.

24   Q.  Doctor, do you think it would in any way influence your

25   ability to give this jury an opinion if you examined

1   Mr. Rutigliano over this weekend?

2   A.  It would be a different kind of opinion.  My opinion was

3   based on my review of the records.

4   Q.  Well, a different kind of opinion in what sense, Doctor?

5   A.  Well, then he would become presumably my patient or at

6   least someone that I'm touching and feeling so I would have the

7   whole host of information that would be available to me.

8   Q.  And you would feel more comfortable about Mr. Rutigliano's

9   condition, would you not, sir, in your medical experience?

10  A.  Not based on what I provided.  If I was asked to provide

11  information based on the records, then, yes.  If I was asked to

12  provide an opinion based on my examination of him, then

13  obviously it would be better to examine him.

14  Q.  You would feel more comfortable today, wouldn't you, if you

15  examined Mr. Rutigliano?

16  A.  I feel very comfortable today.

17          MS. FRIEDLANDER:  Objection.

18          MR. RYAN:  Thank you, Doctor.  No further questions.

19  CROSS-EXAMINATION

20  BY MR. JACKSON:

21  Q.  Sir, are you a spinal doctor?

22  A.  I've treated a lot of spine problems but I'm not a spine

23  surgeon.

24  Q.  Is the answer to my question no?

25          MS. FRIEDLANDER:  Objection.

D7qdles2                            Barron - cross

 1              THE COURT:  Sustained.

 2   Q.  So with respect to your specialty, Doctor, would it be fair

 3   to say that you don't specialize in spines?

 4   A.  That's not a specialty, that is a subspecialty.

 5   Q.  With regard to the subspecialty of spines, would it be fair

 6   to say that you do not specialize in that, sir?

 7   A.  I do not subspecialize in spines, no.

 8   Q.  With respect to books, how many books have you read that

 9   deal with spine -- excuse me.  How many books have you written

10   that deal with the issue of spinal stenosis, sir?

11   A.  None.

12   Q.  How many articles have you prepared that deal with the

13   issue of spinal stenosis?

14   A.  None.

15   Q.  But you have written several articles, correct?

16   A.  I've written some, yes.

17   Q.  And they deal with shoulder, right?  Some deal with the

18   shoulder?

19   A.  They do.

20   Q.  Some deal with the hand, is that right?

21   A.  That's correct.

22   Q.  But none deal, as we've established, with that issue, is

23   that right?

24   A.  As you stated, yes.

25   Q.  Now, with regard to Mr. Baran -- and I won't be repetitive,

D7qdles2                          Barron - cross

1    I believe that was covered -- did you examine him?

2    A.  No, I did not.

3    Q.  And at any time did anybody suggest that it might aid your

4    analysis with respect to his condition that you just perform an

5    examination?

6    A.  No.

7    Q.  And did you become aware, as you reviewed the file, that he

8    was under the treatment of several doctors?

9    A.  Several, I'm not sure.  I know that he was treated by two

10   that I can recall for sure.

11   Q.  Well, tell us the ones that you recall.  Tell us the

12   doctors' names that you recall that he was treated for that

13   condition?

14   A.  Dr. Geiger, I believe, and Dr. Lesniewski.

15   Q.  OK.  Now, with respect to Dr. Geiger, did you call

16   Dr. Geiger to confer with him at all?

17   A.  I was not asked to do so.

18   Q.  OK.  And did you independently, without being asked to do

19   so, call Dr. Geiger, who treated him for spinal diagnosis, and

20   determine what his findings were?

21   A.  No.  I had very complete notes for that.

22   Q.  You had complete notes based upon other people's records,

23   is that right?

24   A.  That's correct.

25   Q.  Not records based upon your own treatment?

1    A.  That's correct.

2    Q.  And that's what you were relying upon, is that right?

3    A.  That is correct.

4    Q.  Now, did I hear you say that a person with spinal stenosis

5    can't play golf; did you say that?

6    A.  No.

7    Q.  What did you say, just to be clear?  Because I would never

8    want to put words in your mouth.

9          MR. JACKSON:  Could we show that chart?

10   Q.  I think the government showed you something on the screen,

11   Exhibit 452.  Because I don't want to misrepresent anything.

12         And if we could just look at the last portion there,

13   and it says, "If problem existed as claimed, could he play

14   golf?"  The answer to that is "No" there, isn't it?

15   A.  If the problem existed --

16   Q.  I'm sorry.  My question is, is the answer to that there

17   "No"?

18   A.  It is not a yes/no answer because that is written, but it

19   is the context of the question being asked.

20   Q.  I see.  So it says "No" on the government's diagram but you

21   have an explanation, is that correct?

22   A.  As I stated, spinal stenosis that was disabling --

23         MR. JACKSON:  I'm sorry.  Doctor, I don't want to

24   interrupt you.

25   A.  -- you would not be allowed --

D7qdles2                          Barron - cross

1          MS. FRIEDLANDER:  The witness is trying to answer the

2     question.

3          THE COURT:  If you don't want to interrupt, then don't

4     interrupt.

5          MR. JACKSON:  Judge, but he is answering something

6     that I didn't ask him, most respectfully, your Honor.  I need

7     him to answer my question.  OK.

8          THE COURT:  Ask your question.

9          MR. JACKSON:  Thank you, Judge.

10    BY MR. JACKSON:

11    Q.  Now, are you saying, sir, that although the government's

12    diagram says "No," where it says "If problem existed as

13    claimed, could he play golf," that it can't be answered yes or

14    no; are you saying that?

15    A.  As claimed -- as claimed and disabling, yes, he would not

16    be able to play golf.

17    Q.  Now, when we say "as claimed" -- if you can show the whole

18    thing?  I want the jury to just see the whole thing.

19          When you say "as claimed," what are you talking about?

20    A.  I'm talking about the fact that this was designated on the

21    medical records as a disabling medical condition that prevented

22    the patient from working.

23    Q.  Now, "from working," is that right?  You just said

24    "working," didn't you, sir?

25    A.  Yes.

D7qdles2                          Barron - cross

1   Q.  Now, do you know work to be five days a week or some other

2   time?

3   A.  Do I know work to be -- it varies for everyone.

4   Q.  It does, correct?

5       With regard to it varying, did at any point the

6   government provide you with the job description of a person who

7   works for the Long Island Rail Road?

8   A.  I don't know if they provided specifically for Mr. Baran,

9   but I saw many different descriptions.

10  Q.  With regard to many, do you know what Mr. Baran's job was?

11  A.  I don't actually know specifically what his job was.

12  Q.  Would it aid in your understanding as to whether he could

13  work if you knew what position he performed?

14  A.  In my analysis of whether he could work if he could not

15  sit -- whether he had a desk job or whether he had a very heavy

16  manual labor job, if he was disabled from that I would still

17  maintain he would not be able to play golf.

18  Q.  OK.  And, sir, with regard to not being able to play golf

19  with spinal stenosis, did you ever hear of Lee Trevino; did you

20  ever hear of him?

21  A.  Of course.

22  Q.  Do you know that he won about six major championships, did

23  you know that?

24  A.  I don't know the exact number but I know he has won major

25  championships.

D7qdles2                          Barron - cross

1   Q.  Could you share with the ladies and gentlemen of the jury

2   whether in your doctoral overview, studies, or anything else,

3   did you know whether he had spinal stenosis, sir?

4   A.  I don't know.

5   Q.  And with respect to working -- I just want to get back to

6   that issue -- would you agree with me that in golf -- because I

7   think you said something about golf involves a lot of walking;

8   you said that, didn't you?

9   A.  It does, yes.

10  Q.  And there are golf carts to get you around the golf course;

11  is that accurate, sir?

12  A.  There is still a lot of walking involved even if you use a

13  golf cart.

14  Q.  Not my question.  Are there golf carts --

15          MS. FRIEDLANDER:  Objection.

16          THE COURT:  Rephrase the question.

17  Q.  Sir, when people play golf, you are aware that they can use

18  a golf cart, right?

19  A.  I am aware of that, yes.

20  Q.  Did you read Mr. Baran's job description, and in it did it

21  talk about him when he was doing his job being able to go

22  around with a golf cart?

23          MS. FRIEDLANDER:  Objection.

24          THE COURT:  Sustained.

25  Q.  In any way with regard to Mr. Baran's job description,

D7qdles2                    Barron - cross

1     could you tell us a little bit about what he did?

2              MS. FRIEDLANDER:  Objection.  The witness hasn't

3     stated anything about Mr. Baran.

4              THE COURT:  Sustained.

5     BY MR. JACKSON:

6     Q.  Could you tell us about the limitations that would be

7     imposed on his job with his condition of spinal stenosis?

8     A.  Well, as I mentioned previously, if a patient had -- any

9     patient had severe, disabling spinal stenosis, then they would

10    have -- generally feel better when they are bending forward or

11    sitting down and be worse when they are standing up and

12    extending their spine.  If they had severe, disabling spinal

13    stenosis, those are generally heralded by shuffling gait, loss

14    of sensation, weakness, etc., etc. in the lower extremities.

15    Q.  And, sir, you just mentioned severe spinal stenosis to this

16    jury; is that what you said?

17    A.  I said severe disabling.

18    Q.  Does an occupational disability require you to have severe

19    and disabling spinal stenosis?

20             MS. FRIEDLANDER:  Objection.  Foundation.

21             THE COURT:  Sustained.

22    Q.  Are you aware of what it would take in order to perform the

23    normal activities of Mr. Baran's job?

24    A.  No, I am not.

25    Q.  OK.  And would it have helped with respect to examining the

D7qdles2                          Barron - cross

1  records to have an understanding of that in formulating an

2  opinion as to whether he could do that job?

3  A.  That wasn't what I was asked to do.

4  Q.  I'm sorry.  I didn't ask you about what you were asked to

5  do.  I asked you to answer the question I posed.

6         MR. JACKSON:  With your Honor's permission, if it

7  could be read back?

8         THE COURT:  Read the question back, Mr. Reporter.

9         (Question read)

10  A.  I don't know.

11  Q.  And you don't know because you didn't have the records?

12  Why don't you know?

13  A.  I don't know because I don't know what I'm being asked.

14  Q.  Well, let me ask you this.

15         Golfing, for example, requires a certain type of

16  physical activity, does it not?

17  A.  Yes.

18  Q.  And presumably a job with the Long Island Rail Road would

19  require a certain activity, is that right?

20  A.  That's correct.

21  Q.  And would it be, for example, important for you to know the

22  distinctions between the two with regard to the nature of the

23  activities for you to formulate an opinion as to whether

24  someone could work?

25  A.  If I was asked to determine whether Mr. Baran could perform

D7qdles2                        Barron - cross

1    his -- a specific array of tasks that are part of his job --

2    Q.  Yes.

3    A.  -- then -- and if I were provided with that information,

4    then -- and were asked to provide that, then I could provide

5    that.

6    Q.  Did that ever happen here?

7    A.  It was not what I was asked to do.

8    Q.  And, therefore, you didn't do it, right?

9    A.  I didn't need to.

10   Q.  OK.  Now, with regard to you not needing to do it, did you

11   come to the understanding that people who work for the Long

12   Island Rail Road are prohibited from taking medication?

13            MS. FRIEDLANDER:  Objection.

14            THE COURT:  Sustained.

15   Q.  Did you ever learn in your course of evaluation of this

16   case, whether or not medication could be used by a person

17   working at the Long Island Rail Road?

18            MS. FRIEDLANDER:  The same objection.

19   A.  I'm sorry.  Could you ask it again?

20            THE COURT:  Ask the question again.

21            MR. JACKSON:  Judge, should we read it back or would

22   you like me to ask it?

23            THE COURT:  Read back the question.

24            (Question read)

25            THE COURT:  Sustained.  Foundation for that.

D7qdles2                           Barron - cross

1    BY MR. JACKSON:

2    Q.  Now, with regard to the actual findings that you rendered,

3    all of those findings, it would be fair to say, were rendered

4    as a result of you evaluating information before you, is that

5    correct?

6    A.  I reviewed the records available to me.

7    Q.  Now, you mentioned Dr. Geiger, is that right?

8    A.  That's correct.

9    Q.  And Dr. Geiger, who is he?

10   A.  He is a physician.  I believe he is at Hospital for Special

11   Surgery.

12   Q.  And Dr. Geiger, Dr. Geiger rendered findings regarding

13   spinal stenosis?

14   A.  Yes.

15   Q.  And with respect to the findings rendered by Dr. Geiger,

16   those findings confirmed that Mr. Baran had spinal stenosis;

17   would that be accurate, sir?

18   A.  Yes.

19   Q.  Was Dr. Geiger given $70,000 to testify for the government?

20           MS. FRIEDLANDER:  Objection.

21           THE COURT:  Sustained.

22   Q.  Do you know if Dr. Geiger ever, for example, worked with

23   the government?

24   A.  I have no idea.

25   Q.  And you mentioned another doctor, Dr. Lesniewski, is that

D7qdles2                          Barron - cross

1    correct?

2    A.  Yes.

3    Q.  Did you happen to, in his file, happen to notice whether

4    Mr. Baron saw any other doctors?

5    A.  I don't recall.

6    Q.  Sir, what about a Dr. Stein, does that refresh your

7    recollection as to anything?

8    A.  Vaguely.  I don't see it.

9    Q.  What about a Dr. Altebrando, a chiropractor doctor, does

10   that refresh your recollection as to anything, would that name

11   in and of itself?

12   A.  I will look and check and see.

13   Q.  As you are looking and checking and seeing, if you could

14   look for a Dr. Inclendon, as well as a Dr. Frank DiMeo.  And as

15   you are searching, if you could look for a Dr. Barton Cohen.

16   And as you are searching, if you could look for a Dr. Jason

17   Karp?

18   A.  Here we go.

19            (Pause)

20            So I only have the notes of Dr. Lesniewski and

21   Dr. Barron in this particular file.

22   Q.  So in the file that you have, that file doesn't contain,

23   just to be clear, the names of the people that I asked you

24   about, is that right?

25   A.  Unless you asked me about -- there is one other name in

1925

1   here.  Kaufman, did you mention?

2   Q.  Didn't even mention him.

3   A.  That was a radiologist.

4   Q.  OK.  Just with regard to all the doctors that I had just

5   mentioned to you -- if I could just ask you, with respect to

6   the file that you reviewed, did you have any understanding as

7   to whether that file was complete?

8   A.  I may --

9            MS. FRIEDLANDER:  Objection as to "complete."

10           THE COURT:  Sustained.

11  Q.  Did you have any information as to whether that file

12  contained the full panoply of all the medical evidence as it

13  related to Mr. Baran?

14           MS. FRIEDLANDER:  The same objection.

15           THE COURT:  The same.  Sustained.

16  Q.  When you reviewed the medical file, would it have been

17  important to you to review a medical file that was complete?

18  A.  I just reviewed and was asked to comment on what I

19  reviewed.

20  Q.  And what you reviewed, were you given that by someone?

21  A.  I don't recall.  I may have looked at it.

22  Q.  How did you get the file that you have right now?

23  A.  I was provided that over time by the government.

24  Q.  So the government gave you what they asked you to look at,

25  correct?

D7qdles2                        Barron - cross

1    A.  Correct.

2    Q.  At any point, did you ask the government for any other

3    information regarding what you were seeing?

4    A.  I only asked for copies of x-rays and MRIs, actually, to

5    view the films, and there were very few of those available.

6    Q.  And when you say "few of those available," few of what?

7    A.  Few actual MRIs and x-rays.  I relied on the reports.

8            MR. JACKSON:  Could I have the government place up

9    Mr. Baran's file, please?  I believe it may be Exhibit 108.

10           (Pause)

11           It is 113.  If we could go on 113, and it is three

12   pages in.

13           Could we blow up that narrative portion, please?

14   Q.  Sir, did you have occasion to review this?

15   A.  What is the actual number of this?

16   Q.  You have that on the computer screen, don't you?

17   A.  It's on the computer screen, yes.

18   Q.  OK.  So looking at the computer screen, just for the sake

19   of time, is this amongst the things that you reviewed?

20           MS. FRIEDLANDER:  Your Honor, can the witness have a

21   hard copy of the document?  Mr. Jackson has that.

22   Q.  Do you need one?  Do you need the hard copy?

23   A.  I prefer it.  I do better on paper.

24   Q.  Take a look.  If you could just take a look at what you are

25   looking at right now in hard copy.

1   A.   Yes.   I think I probably reviewed this.   It is not --

2   Q.   Probably or you did?

3   A.   This actual page I don't recall specifically, but it has

4   information in there that seems an accumulation of other

5   information so that's why it looks familiar.   I don't know if I

6   actually read this page.

7   Q.   OK.   Just for the sake of time, if you look at that

8   document where it talks about Dr. Geiger's exam, "Found" -- I'm

9   look thing at about line four, "Found low back motion with pain

10  and decreased sensation in the right heel."   Do you see that?

11  A.   Yes.

12  Q.   And you also see where it says, just going down about seven

13  lines down -- I'm approximating -- "MRI of lower back done on

14  12-2001, showed L4-5 mild disc bulge.   Facet" -- and you could

15  read those better than I could, or pronounce them, certainly.

16  But you see that, right?

17  A.   Yes.

18  Q.   And you see that they are objective findings associated

19  with an x-ray that was done, is that correct?

20  A.   Yes.

21  Q.   And you see -- did I hear you say before that there was no

22  indication when Dr. Lesniewski was treating him of any type of

23  Hoaglund heel?   How do you say that?

24  A.   Hoaglund heel.

25            MS. FRIEDLANDER:   Objection.   It misstates the

D7qdles2                         Barron - cross

1    testimony.

2                 THE COURT:  Sustained.

3    Q.  Doctor, I don't want to misstate.  What did you say

4    regarding the right heel findings of Ostap Baran?

5    A.  I don't know what I said exactly.

6    Q.  OK.  But you'd agree that this exactly says that:  An x-ray

7    of the right heel done on January --

8                 It doesn't say "January."  To be fair, it says

9    "1-2003."

10                -- showed Hoaglund type deformity.

11                You see that, right?

12   A.  Yes.

13   Q.  And that would be consistent with what Mr. Baran complained

14   about with respect to what he was feeling, is that correct?

15                MS. FRIEDLANDER:  Objection.

16                THE COURT:  Sustained.

17   Q.  Now, if we could go to page 31.  And, in fact, even before

18   going to 31, if we just, on your way down -- if you could just

19   scroll to the application itself, please.

20                Just as we are going in, did you also say that someone

21   who had a Hoaglund heel problem couldn't play golf either?

22   A.  No.

23   Q.  Could someone with a heel problem play golf?

24   A.  What I said was if it were serious and very symptomatic and

25   if they were walking for their job, then it would be -- and

D7qdles2                          Barron - cross

1   they couldn't do that, then the same walking applies to golf.

2   Q.  OK.  Now, what we talked about walking for golf, I don't

3   want to get much into golf carts again, but you do know, for

4   example, that on a golf course there is a golf cart, right?

5   A.  Not all of them.  Some.

6   Q.  You do know that a person has the prerogative, the choice,

7   of purchasing a government cart to play, right?

8   A.  Not always.

9   Q.  OK.  And in this particular case do you know whether

10  Mr. Ostap Baran used a golf cart or not?

11  A.  I have no idea.

12  Q.  OK.  And with regard to his job, if you know, do you know

13  whether he was able to use a golf cart at his job to get

14  around?

15  A.  I have no idea.

16          MR. JACKSON:  All right.  Now, if we can just go to

17  the application itself.  If we could go to the next page.  OK.

18  Let's look at the top, please, of that page.  If you could just

19  blow that up.

20  Q.  Now, these are describing the medical conditions of

21  Mr. Baran, is that right?

22  A.  It says, "Describe the medical conditions causing you to

23  file."

24  Q.  OK.  Right.  Do you see that he's filing, we'd agree, based

25  upon several medical conditions, is that accurate?

D7qdles2                        Barron - cross

1    A.  There are five, yes.

2    Q.  OK.  And with regard to five, one is acid reflux, correct?

3    A.  Correct.

4    Q.  One is hypertension, right?

5    A.  Correct.

6    Q.  The other one, spinal stenosis?

7    A.  Yes.

8    Q.  The Hoaglund heel, right?

9    A.  Yes.

10   Q.  And then there is a hearing loss.

11           Would that be accurate?

12   A.  That's what it says.

13   Q.  Now, with respect to these conditions, with regard to the

14   doctors that you reviewed in the file in addition to

15   Dr. Lesniewski, were these conditions supported or not?

16   A.  I don't know about acid reflux, hypertension or hearing

17   loss.  I only know about spinal stenosis and the Hoaglund heel.

18   Q.  And we just saw what it said about Hoaglund heel, correct?

19   A.  Correct.

20           MS. FRIEDLANDER:  Objection.

21           THE COURT:  Sustained.

22           MR. JACKSON:  I am just trying to save time.

23   Q.  With regard to the Hoaglund heel, then, you saw where it

24   noted the deformity.  We just went over that.  Right?

25           MS. FRIEDLANDER:  Objection.

 1            THE COURT:  Sustained.

 2            MR. JACKSON:  Could we go back to page 3, please?

 3            MS. FRIEDLANDER:  Your Honor, objection.  The witness

 4    already testified it looks to him that this is some summary of

 5    what someone else said.  So I don't know what the point of the

 6    question is.

 7    Q.  Is that what you said?  Is this a summary of what somebody

 8    else said?

 9    A.  It seems to be.

10    Q.  Who said that?

11    A.  I don't know.

12    Q.  But with regard to the summary, do we see an objective

13    finding?  Did someone say that there was an x-ray of a lower

14    back done, or in your view review of the file did you see that

15    there was an x-ray of the back done?

16    A.  Yes.

17    Q.  And you did see that there was an x-ray of the right heel

18    done?

19    A.  Yes.

20    Q.  So it's more than what someone said, it's what in fact

21    occurred, is that right?

22    A.  Well, if this is true and I assume it is.

23    Q.  I don't want you to assume.  Is there anything that would

24    contradict what that says regarding those tests having been

25    done?

D7qdles2                         Barron - cross

1    A.  No.

2    Q.  OK.  Now, if we could then skip to page 31.

3            And what is this document, sir?

4    A.  It says, "Request for Medical Advice."

5    Q.  From who?

6    A.  Referred by Thomas Thomas, III.

7    Q.  Who is Thomas Thomas, III?

8    A.  I have no idea.

9    Q.  Is he an MD, do you know?

10   A.  No.

11   Q.  No, you don't know?

12   A.  I do not know.

13   Q.  And if we could just look at the narrative portion in the

14   bottom.

15           And what is that, sir?

16   A.  It's a paragraph that states what the number holder is

17   alleging.

18   Q.  Mm-hmm.  And you see the diagnosis of the Hoaglund heel

19   deformity in the right foot; do you see that?

20   A.  Yes.

21   Q.  And when it talks about the moderate hearing loss that

22   would not meet the 2008 lifting requirements, what is that?

23   A.  It says 2.08 listing requirements.

24   Q.  I'm sorry.  What is that?

25   A.  I have no idea.

D7qdles2                          Barron - cross

1    Q.  Did you take the time to find out as you reviewed the file

2    information that you weren't aware of?

3              MS. FRIEDLANDER:  Objection.  The witness has stated

4    repeatedly what his job --

5              THE COURT:  All right.  Sustained.

6    Q.  I'm asking you, as you reviewed the file, if there were

7    items in the file that you were not familiar with, sir, did you

8    take the time to determine what those were?

9              MS. FRIEDLANDER:  Objection, your Honor.  You

10   sustained this already.

11             THE COURT:  Sustained.

12   Q.  Would it be helpful in your evaluation as you review a file

13   to be conversant and otherwise familiar with information

14   contained in the file?

15   A.  I was conversant and familiar with what I was given.

16   Q.  OK.  Were you conversant with that?

17   A.  Was I conversant with it?  No.

18   Q.  OK.  And with regard to the other things that are listed

19   here, please review the "Medical Evidence" and "Evaluate

20   Physical Impairment Severity."  Do you see all of that?

21   A.  Yes.

22   Q.  And were there -- just fast-forwarding, were there actually

23   specific objective tests that you reviewed in this file that

24   confirmed Mr. Baran's condition, yes or no?

25   A.  Well, as I stated, I reviewed a limited set of documents.

D7qdles2                              Barron - cross

1    I reviewed Dr. Geiger's -- whatever was provided for me from

2    Dr. Geiger and from Dr. Lesniewski.

3    Q.  And with regard to -- we'll limit it to those two doctors,

4    since that's what you reviewed, and I won't discuss the other

5    doctor.

6         With regard to those two doctors that you reviewed,

7    did Dr. Geiger contradict Dr. Lesniewski?

8    A.  He never stated in his notes that I contradict

9    Dr. Lesniewski.

10   Q.  Were there any findings, then, sir, that would be

11   contradictory irrespective of what he stated in his notes?

12   A.  I would have to look back and look at both sets.

13   Q.  Please do.

14   A.  Are they included in this packet?

15   Q.  You could tell me, sir.  Could you look for page --

16   A.  I am just trying to save time.

17        MR. JACKSON:  Could you look at page 49 of the

18   Doctor's answer --

19   A.  I'm not sure what the page 49 --

20        MR. JACKSON:  Not you.  I'm just speeding up.

21   Q.  Let's stick with this.  If you could look at Dr. Geiger's

22   information.

23        THE COURT:  It would speed matters up if you provide

24   the information either to the government or the defense.

25        MR. JACKSON:  OK.  So specifically we are going to be

D7qdles2                         Barron - cross

1    looking at pages 44, 49, 52, 53, 54, 57, 62, 72, 73 --

2              MS. FRIEDLANDER:  Excuse me --

3              THE COURT:  Of what?

4              MR. JACKSON:  Of the documents that he is looking at.

5              MS. FRIEDLANDER:  If he wants the witness to find a

6    page, could you direct the witness to a page?

7              MR. JACKSON:  We don't need a speech.  I would be glad

8    to, Judge.

9    BY MR. JACKSON:

10   Q.  Could you go to page 44, please?

11   A.  OK.

12   Q.  OK.  Let's look at that.

13             MR. JACKSON:  Could we just blow up this particular

14   document, starting with the name at the bottom?

15   A.  That's not -- I see page 44.  At the bottom of mine I don't

16   see 5144.  It is different.

17   Q.  I'm sorry, Doctor.  It is my fault.  The system here is a

18   little bit different than the pages there.  OK?

19   A.  OK.  That's what I was asking before.

20   Q.  I apologize, Doctor.

21             If we could just look at this document that's their

22   Bates stamp 125119, starting with the Doctor's signature and

23   going up.

24   A.  Yes.  Dr. Gary H. Kaplan.

25   Q.  Who is that?

D7qdles2                          Barron - cross

1    A.  I have no idea.

2    Q.  It says M.D. after their name, though, right?

3    A.  That's why I said "doctor," yes.

4    Q.  That wasn't one of the doctors that you mentioned when you

5    mentioned Geiger, correct?

6    A.  I didn't mention that.

7    Q.  OK.  Now, what does this say?

8    A.  In the paragraph that I can see?

9    Q.  Mm-hmm.

10   A.  The above captioned patient was examined in accordance with

11   the restrictive rules concerning an independent medical

12   evaluation.  It is therefore understood that no doctor/patient

13   relationship exists or is implied by this exam.  Disclosure of

14   testing results.  And then under it, portions of the exam will

15   be the responsibility of the -- any other conditions which were

16   not specified or related to the specified medical conditions

17   were beyond the scope of this exam.

18   Q.  So that is the general language that apparently this doctor

19   put in their report concerning what the scope of that was;

20   could we agree with that?

21   A.  I would agree.

22   Q.  Now, I want to go to the paragraph before that.  If you

23   could go to the next couple of paragraphs before that.

24          "Based on the current examination and available

25   diagnostics, this claimant has radicular symptoms which appear

D7qdles2                          Barron - cross

1    to originate in the L-S spine.  Hypertension appears well

2    controlled."

3               Do you see that?

4    A.  Yes.

5    Q.  Did you review that as part of your medical records?

6    A.  Yes, I did.

7    Q.  Is anything on this contradictory from what you learned

8    from Lesniewski and from what you learned from Dr. Geiger?

9    A.  Well, it supports what I stated, which in this seemingly

10   well-performed physical examination, there is no evidence of

11   any objective medical -- objective physical findings.  And, in

12   fact, that's why he says the patient has radicular symptoms,

13   which are not actually objective findings.  Symptoms are

14   actually pain, subjective reports by the patient.

15   Q.  So this doctor confirms the pain that was felt by the

16   patient, is that accurate?

17              MS. FRIEDLANDER:  Objection.

18              THE COURT:  Sustained.

19   Q.  Did you come to the conclusion whether this doctor

20   supported the pain by the claimant?

21              MS. FRIEDLANDER:  The same objection.

22              THE COURT:  Overruled.

23   A.  Basically if a patient tells you --

24   Q.  Yes or no sir?

25   A.  It is not a yes or no answer.  If a patient states that

D7qdles2                      Barron - cross

1    they have pain in their lower back, or wherever, then you put

2    that in.  You cannot confirm or disprove what a patient has

3    reported to you.

4    Q.  And this particular doctor was stating this, is that right?

5    A.  He stated that the patient has radicular symptoms, is

6    complaining of radicular symptoms.

7    Q.  And this was another one beyond Dr. Geiger, we could agree,

8    correct?

9    A.  Correct.

10   Q.  And beyond Dr. Lesniewski?

11   A.  Correct.

12   Q.  Now, if we could go now to page 54?

13          We could stop right there.

14          OK.  What is this, sir?

15   A.  This was a brief operative report by Dr. Steven Geiger of a

16   fluoroscopically guided epidural steroid injection.

17   Q.  So what was he given an epidural steroid injection for?

18   A.  For his low back pain.

19   Q.  And in order to get an injection, do you have to complain

20   of pain?

21   A.  I would hope so.

22   Q.  And what doctor was this?

23   A.  This was Dr. Geiger.

24   Q.  So Dr. Geiger, who actually gave him the injection?

25   A.  Who actually provided treatment for him?

D7qdles2                    Barron - cross

1   Q.  Yes.

2   A.  Yes.

3   Q.  Is that right?

4   A.  I can't say, I wasn't there, but I would assume so.

5           MR. JACKSON:  If we could just blow up, then, the

6   findings.

7   Q.  OK.  What does that mean?

8   A.  It's just describing that the patient received the

9   injection and that there were no complications related to this,

10  and the patient was discharged in a stable condition.

11  Q.  After having been rendered treatment, is that correct?

12  A.  Correct.

13  Q.  Just fast-forwarding.  If we can go to page 72.

14          OK.  What is this, Michael C. Barth, M.D.?  Did you

15  review this document as part of your evaluation of Mr. Baran?

16  A.  I can't remember that.  I can't remember -- I believe so

17  but I'm not a hundred percent sure.

18  Q.  In your belief, is it your belief that this is from

19  Dr. Barth.

20  A.  Well, it is signed by him and it has his letterhead so I

21  would assume so.

22  Q.  OK.  If we can just go to the first part, "Past Medical

23  History."

24          Do you see that, all of the past medical history

25  there?

D7qdles2                          Barron - cross

1    A.  Yes, I do.

2    Q.  That would have been something that you reviewed as well?

3    A.  If I did in fact review it, I did, yes.

4              MR. JACKSON:  If we can just go, for the sake of time,

5    to the findings, which would be the last part here.

6              MS. FRIEDLANDER:  The witness has already testified he

7    doesn't recall if he has reviewed this.  Can he have an

8    opportunity to take a look at what it is?

9              MR. JACKSON:  Absolutely.  Take your time, sir.

10             THE COURT:  Mr. Jackson, what is your estimate at this

11   point of how much time?

12             MR. JACKSON:  Five minutes, Judge.

13             THE COURT:  I will give you five minutes because we

14   need to break.

15   A.  I don't need to review it.  I can see it.

16   Q.  Absolutely.  Can we just look at -- by the way, the Bates

17   stamp, if you want to look at not the computer version but your

18   version, is 125147.

19   A.  Yes.

20   Q.  And if we could just look at the bottom portion just above

21   the signature, I think it lists about seven things there.

22   A.  Yes.

23   Q.  OK.  Do you see number 1?

24   A.  Yes.

25   Q.  OK.  And you see where it says "2, hypertension," correct?

D7qdles2                    Barron - cross

1   A.  Yes.

2   Q.  "3, spinal stenosis," is that right?

3   A.  Based on the patient's history, yes.

4   Q.  And there are a number of other findings there, just to be

5   clear, right?

6   A.  Yes.

7   Q.  And this is by the Doctor Michael Barth?

8   A.  Well, these are impressions and they are based on history.

9   As you can see the physical exam right above, there is only an

10  examination of blood pressure, lungs, heart and abdomen.  So

11  there is no orthopedic evaluation performed.

12  Q.  With regard to no orthopedic evaluation having been

13  performed, what you're saying, then, Doctor is that this doctor

14  formulated impressions without evaluating the patient himself?

15  A.  No.  I'm saying that he formulated an opinion based on -- I

16  don't know what he based it on, frankly.

17          (Continued on next page)

18

19

20

21

22

23

24

25

D7qnles3                          Barron - cross

1    Q.  Do you know whether or not Mr. Baran was in his office?

2    A.  Well, he had a physical examination, so I am sure he was.

3    Q.  So a physical examination means this doctor actually saw

4    him, correct?

5    A.  That is correct.

6    Q.  And then a physical examination, as part of an examination,

7    Doctor, you would agree with me that you would conduct a

8    battery of tests.  Would that be accurate?

9    A.  It depends on the individual goal of that particular

10   examination.

11   Q.  With regard to the goal of the examination, of course, one

12   of the goals was to give impressions.  Could we agree with

13   that?

14   A.  Yes.

15   Q.  And those impressions as we see, were given?

16   A.  Yes.

17   Q.  Do you know whether or not this particular doctor, sir, was

18   paid $70,000 by the government when he did that?

19   A.  He would be lucky if he was.

20   Q.  He certainly would be.

21        With regard to that luck, do you know whether or not,

22   in addition to the items that you just saw, whether or not

23   there were degenerative changes to Ostap Baran regarding C3-C4,

24   C4-C5, C5-C6, C6-C7 regarding disc degeneration?

25        Do you know that?

D7qnles3                          Barron - cross

1    A.  I can look back at the MRI report.

2    Q.  I could direct you.

3    A.  That would be good.

4    Q.  As you are looking at that, do you know whether or not

5    there was an additional impression regarding four levels of

6    deformity that abut the spinal cord and small disc bulges?

7    Take a look at that.

8    A.  Thanks.

9               MS. FRIEDLANDER:  May I see that?

10              MR. JACKSON:  Oh, sorry.  Of course.

11              THE WITNES:  This was in my packet?

12              MS. FRIEDLANDER:  Your Honor, I think this is not.

13              What is the question?  What is your question?

14              MR. JACKSON:  I just asked him a series of questions.

15              MS. FRIEDLANDER:  Your Honor, I am sorry.  This is a

16   document not in evidence.  If I could just have the question

17   back.

18              THE COURT:  Yes.  Reporter read back the question.

19              First, let's get the foundation.  First find out

20   whether the witness has any familiarity with this document.

21              MR. JACKSON:  I was trying to do that.

22              THE COURT:  I don't know if you asked that question.

23              MR. JACKSON:  OK.

24   Q.  Did you review this document as part of your evaluation,

25   sir?

1944

1   A.  I believe this was in Dr. Geiger's records, but I am not

2   absolutely sure.  I believe it was.

3   Q.  That was from another doctor, is that correct?

4   A.  That was sent to Dr. Geiger.

5   Q.  OK.  From?

6   A.  From the radiology Standup MRI of Carle Place.

7   Q.  Just with regard to who sent that, could you tell us who it

8   was?

9   A.  Dr. Harold Tice.

10  Q.  So yet another doctor sent information to Dr. Geiger,

11  correct?

12  A.  A radiologist.

13  Q.  That radiologist, I asked you certain questions regarding

14  disc bulges, etc.  Do you see that?

15  A.  Yes.

16  Q.  In fact, those were the conclusions of that doctor,

17  correct?

18  A.  Yes.

19  Q.  That related, of course to Ostap Baran?

20  A.  That did.

21          MR. JACKSON:  Thank you, Judge.

22          THE COURT:  We are going to break at this point.  It

23  is 11:05.  We will return at 11:20.

24          (Jury not present)

25          (Recess)

D7qnles3                         Barron - cross

```
 1              THE COURT:  Mr. Dratel, are you up next?

 2              MR. DRATEL:  Yes, your Honor.

 3              THE COURT:  How long do you expect?

 4              MR. DRATEL:  I have been obviously adjusting it based

 5    on the prior cross-examinations.  Looking at it now, I see it

 6    is probably being a little less than an hour, my cross.

 7              One problem we are having -- we are going to replace

 8    the Elmo.  I didn't want a repeat from yesterday, so we are

 9    going to do it efficiently on the Elmo.

10              THE COURT:  Can we get they are going to get you Elmo

11    right away?

12              MR. DRATEL:  Yes, they are going to.  Probably within

13    15, 20 minutes.

14              THE COURT:  Why don't we at least get going so we

15    don't have to wait.

16              MR. DURKIN:  Judge, one housekeeping matter, we filed

17    a response to the government's motion in limine regarding the

18    malpractice issues this morning.

19              THE COURT:  Yes, I heard.  Yes.

20              MR. DURKIN:  I apologize.  I don't have the filing

21    number so we had to get someone else to do it.  The signature

22    page was supposed to be put on and they failed to put it on.

23    Over the lunch hour we will try to correct that.

24              THE COURT:  Yes.  I was made aware of that, that it

25    was filed.
```

D7qnles3                           Barron - cross

1           MR. WEDDLE:  Your Honor, I just have a ministerial

2     thing.  We are trying to get the original of Marie Baran's

3     passport from pretrial services apparently they require a court

4     order.  I sent a cover letter and a proposed order.  I have

5     shown it to Mr. Jackson.  I don't know if any other counsel

6     want to see it.

7           MR. JACKSON:  Judge the fact that he showed it to me

8     should not any way, shape, or form mean that I otherwise

9     consent, agree with, think it to be relevant, think it to be

10    probative.  He showed it to me.

11          THE COURT:  OK.  Was that your entire exception?  Did

12    you leave something out.

13          MR. WEDDLE:  We are not offering it right now.

14          THE COURT:  Bring in the jury, please.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

D7qnles3                          Barron - cross

1              (Jury present)

2              THE COURT:  Good morning, welcome back.  Mr. Dratel

3    you may resume.

4              MR. DRATEL:  Thank you, your Honor.

5    CROSS EXAMINATION

6    BY MR. DRATEL:

7    Q.  Good morning, Dr. Barron.

8    A.  Good morning.

9    Q.  My name is Joshua Dratel, and I represent Mr. Peter

10   Lesniewski.  I want to talk to you first about treatment.

11             Would you agree with the definition of treatment, that

12   is something that a medical professional does to ameliorate or

13   cure a perceived or identified problem with a patient?

14   A.  That sounds pretty good.

15   Q.  That would include surgery at some point, correct, in some

16   cases?

17   A.  Yes, it does, sometimes, yes.

18   Q.  You had said earlier, I think yesterday you said that for

19   an orthopedist anti-inflammatories and physical therapy are

20   mainstays of treatment, right?

21   A.  I may have not said that exactly.

22   Q.  But would you agree with that?

23   A.  Yes.

24   Q.  There are additional treatments as well, such as you talked

25   about injections, steroids by mouth, right?

d7qnles3                        Barron - cross

1    A.  Yes.

2    Q.  Did you say 80 percent of your patients the take steroids

3    by mouth?

4    A.  80 percent?

5    Q.  Yes.

6    A.  No.

7    Q.  I didn't hear you correctly?  OK.

8            Steroids, prednisone in particular, is what you

9    prescribed as a steroid by mouth?

10   A.  That's correct.

11   Q.  There are side effects to prednisone, correct?

12   A.  In the doses that I prescribe them, there are very few.

13   Q.  It is not a long-term solution, is it?

14   A.  It is very short term, but generally it is curative in many

15   cases.  That's why I give it.  I don't give it if it's not

16   intended to have a great mitigation or even cure.

17   Q.  But what I am saying is it can't be done over a long period

18   of time, prednisone?

19   A.  It can be.

20   Q.  But it has side effects?  The longer you take it the more

21   likely you are going to have some of the serious side effects,

22   right?

23   A.  That is correct.

24   Q.  Some of those are compromise of the immune system, correct?

25   A.  Correct.

d7qnles3                          Barron - cross

1   Q.  It could interfere with -- well, it could interfere with

2   preventing osteoporosis?

3   A.  Correct.

4   Q.  Mood swings?

5   A.  Yes.

6   Q.  Eye problems?

7   A.  Yes.

8   Q.  Raised blood sugar?

9   A.  Yes.

10  Q.  Now, there are instances where a patient does not follow a

11  treatment protocol, correct?

12  A.  There certainly are, yes.

13  Q.  They sometimes don't take medication as prescribed, right?

14  A.  That's correct.

15  Q.  Sometimes they refuse certain procedures?  They don't want

16  injections perhaps?

17  A.  That is true.

18  Q.  They don't want surgery?

19  A.  Nobody wants surgery.

20  Q.  As a doctor you can't force them to?

21  A.  I definitely cannot force them.

22  Q.  If a patient keeps coming back and complaining of the same

23  ailment or pain, a doctor can keep offering the same set of

24  treatments, correct, if the patient comes back with pain and

25  says, but I don't want to do this or I don't want to do that?

d7qnles3                        Barron - cross

1    A.   Theoretically they could, but certainly that would not be a

2    way I would manage a patient.  I would have to document that

3    they were refusing all the other potentially more helpful

4    treatment regimens.  And then, if they are really refusing, I

5    would say, well, look, there is nothing more I can do for you

6    so there is no reason to come back unless you want to entertain

7    those other treatment options.

8    Q.   By "document" you mean in the chart?

9    A.   Yes.

10   Q.   You talked yesterday and I think this morning a little bit,

11   and I am not going to repeat, about the importance of an

12   examination, right?

13   A.   Yes.

14   Q.   The importance of a physical examination from your

15   perspective as a doctor?

16   A.   Yes.

17   Q.   That gives you some basis for objective findings, right?

18   A.   Correct.

19   Q.   You said sometimes that is enough on its own?

20   A.   Sometimes that is enough for me to formulate a very

21   accurate diagnosis and formulate a treatment plan as well.

22   Q.   Would you say that if secondary gain is an issue, physical

23   examination becomes even more important with respect to

24   subjective complaints by the weighs?

25   A.   I would say everything becomes more important, the whole

d7qnles3                    Barron - cross

1    constellation of everything that, all information we can

2    gather.

3    Q.  I don't want to -- again, because it's been gone over

4    before -- but you haven't examined anyone in relation to this

5    case, is that right?

6    A.  That is correct.

7    Q.  So whether it's Gagliano, Supper --

8              THE COURT:  Asked and answered.

9    Q.  -- Parlante?

10             THE COURT:  Asked and answered.

11   Q.  You weren't asked to examine any of those people, right?

12   A.  Correct.

13   Q.  Now, is it fair to characterize your opinion and your

14   testimony that there is insufficient evidence in the charts and

15   the other records to draw some of the conclusions that

16   Dr. Lesniewski drew with respect to the particular files that

17   you examined?

18   A.  I think that's fair to say, yes.

19   Q.  Doesn't that make a physical examination more important

20   before drawing a conclusion about whether a patient suffers

21   from a particular problem?

22             MS. FRIEDLANDER:  Objection.  Misstates his opinion.

23             THE COURT:  Sustained.

24   Q.  Well, let me ask you in the abstract.  If there is an

25   absence of sufficient information to draw a conclusion based on

d7qnles3                    Barron - cross

1    an examination of the documents, doesn't that make a hands-on

2    physical examination more important in order to draw a

3    conclusion about whether a particular patient suffers from

4    something that appears in those records?

5            MS. FRIEDLANDER:  Objection.  Same objection.

6            THE COURT:  It's been restated.  Overruled.

7    A.  Theoretically, if I do not have enough information to draw

8    a conclusion, I wouldn't draw a conclusion.  If I had

9    sufficient information to draw a conclusion, then I do draw a

10   conclusion.

11           If I stated that I was not able to draw a conclusion,

12   and then I was asked, well, what else would you need? then I

13   would ask for additional information, including possibly an

14   opportunity to examine someone if theoretically I could not

15   draw a conclusion.  But I would not provide a conclusion if I

16   felt I had insufficient information.

17   Q.  To a certain extent you have to trust your patient,

18   correct?

19   A.  Yes.

20   Q.  You can't just ignore a complaint without first doing

21   something either to confirm it or rule it out?

22   A.  I don't ignore any complaints.  Then sometimes you have to

23   do additional things or just speak to them further about it.

24   Q.  Do you let a patient make their own diagnosis?

25   A.  In New York City, sometimes.  Patients do frequently come

1   in with their diagnoses already made.

2   Q.  No.

3   A.  I don't ultimately base my treatment decisions on what they

4   are telling me.

5   Q.  So if someone comes in and says, "Don't worry about my

6   hand, it's only arthritis, it's not carpal tunnel syndrome,"

7   would you just take them at their word?

8   A.  No, I would not.

9   Q.  You don't have any familiarity, do you, with the

10  regulations that govern how the RRB makes its decisions, right?

11  A.  I do not.

12  Q.  You were talking about Dr. Lesniewski.  Is it fair to say

13  that in many of the instances that you discussed he didn't

14  order enough tests?

15  A.  There were a wide variety of things that I said.  In

16  certain circumstances, with certain diagnoses and certain

17  patients, there were no tests ordered to confirm or disprove

18  the presence of a particular diagnosis.

19  Q.  You would have ordered those tests?

20  A.  I don't know what I would have done.  I wasn't evaluating

21  the patient.

22  Q.  Like you said, you weren't there?

23  A.  I was not.

24  Q.  It is fair to say, though, based on your testimony thus

25  far, that you feel that Dr. Lesniewski was a little too quick

d7qnles3                          Barron - cross

1   to recommend surgery?

2   A.   There were a couple of circumstances, yes, where it

3   certainly seemed out of the ordinary to recommend surgery when

4   other treatment modalities had not been tried or when there was

5   not much objective medical evidence to support the actual

6   diagnosis to begin with.

7   Q.   And sometimes you hear that complaint about surgeons

8   generally?

9   A.   I hear every complaint about surgeons.

10  Q.   Have you heard that one more than once?

11             MS. FRIEDLANDER:  Objection as to that one.

12             THE COURT:  Sustained.

13  Q.   You had said on direct that sometimes tests are needed

14  because the patient needs more information, right?

15  A.   That's correct.

16  Q.   Is that because sometimes you have to help the patient rule

17  out certain things or confirm certain things that they may

18  believe they have?

19  A.   Certainly if a patient has a -- if I have evaluated them

20  and they say, Look, I still feel like I have this, and I say,

21  Well, look, we aren't finding that, it is pretty rare, but on

22  those rare occasions I will maybe order a test.  Most of the

23  time the insurance doesn't like that, so we don't do that very

24  frequently, but on rare occasions you would do it to reassure a

25  patient that they don't have something.

1955
d7qnles3                    Barron - cross

1    Q.  You talked about age appropriate.  You used that term a

2    lot, right?  Age appropriate findings?

3    A.  Yes.

4    Q.  You said that many people are asymptomatic even with age

5    appropriate findings, right?

6    A.  Most people actually.

7    Q.  Most people, but some people don't, right?

8    A.  Correct.

9    Q.  You don't know who those people are unless you examine

10   them, right?

11   A.  Correct.

12   Q.  It might also be related to someone's job function,

13   correct, as to whether or not an age-appropriate finding has a

14   particular impact on them?

15   A.  Their activity level in general can impact that, yes.

16   Q.  But also how about the use of a particular body part in the

17   context of their employment?

18   A.  You know, I can't answer that because many of the studies

19   that looked at this age-appropriate gradual activities were

20   done in a group of just athletes, asymptomatic athletes or a

21   variety of people doing a variety of things, so it is kind of

22   hard to specifically answer that.

23   Q.  They didn't do those studies on people in their 50s?

24   A.  No, they did.

25   Q.  But athletes you are talking about?

d7qnles3                      Barron - cross

1    A.  Yes.

2    Q.  There is a difference between lifting weights in the

3    controlled setting of a gym with a machine that is calibrated

4    properly and something on the job in many instances, right?

5    A.  There certainly can be, yes.

6    Q.  Now, with respect to Dr. Lesniewski's charts, as you said,

7    you weren't there, right, so you don't know precisely what was

8    said or not said by the patient or Dr. Lesniewski in toto or

9    any of those particular visits, right?

10   A.  I can only go by what I saw in the records, yes.

11   Q.  In fact, there's no fixed standard for what must be in a

12   chart or a particular note for a particular visit, right?

13   A.  Well, unfortunately, we are coming -- and there are

14   standards, Medicare and the government have issued pretty clear

15   standards on what constitutes what type of exam.  Now with the

16   evolution of the EMR, electronic medical records, there are

17   standards; and if you don't adhere to those, then you are not

18   allowed to bill for those types of things.

19   Q.  How about 2004?

20   A.  I'm sorry?

21   Q.  How about 2004?

22   A.  Medicare did still have and we try to follow those for all

23   of our patients.  We were only were required to adhere to them

24   if they were Medicare patients.

25   Q.  If they're Medicare patients.  But there's wide latitude

d7qnles3                          Barron - cross

 1   for doctors and what they put in their charts even with those

 2   particular regulations which only apply to Medicare patients?

 3   A.  There is.

 4   Q.  And what is the age at which someone qualifies for

 5   Medicare?

 6   A.  I got a mailing just the other day.  I think it's 65, but I

 7   think they are also talking about pushing that forward a little

 8   bit, a year or two, so I am not sure exactly.

 9   Q.  And what goes in a chart also depends on the number of

10   patients the doctor sees in a day or a week, correct?

11   A.  It shouldn't, but it does.

12   Q.  Do you know how many patients Dr. Lesniewski saw per week?

13   A.  I have no idea.

14   Q.  So you wouldn't know whether it had any impact on his

15   ability to dictate a set of notes more or less detailed?

16   A.  I only know if I am in my practice, if I'm seeing too many

17   patients where I can't complete the notes in a satisfactory

18   manner, then I have to cut down on the number of patients that

19   I see.

20   Q.  Your practice is in New York City, right?

21   A.  Yes, it is.

22   Q.  It is a high-end practice, right?

23   A.  Can you define "high end"?

24   Q.  You see musicians, athletes, professionals?

25   A.  I see every single person imaginable.

1   Q.  There is a difference between your practice and a practice

2   on Long Island, do you think, in many respects?

3   A.  I have no idea.

4   Q.  How many patients do you see a week?

5   A.  About a hundred.

6   Q.  You talked a little bit about an Apley test, right?

7   A.  Yes.

8   Q.  Isn't that just a compression test generally?

9   A.  I really don't -- what I mentioned is I know the Apley

10  test, the compression test for the knee and I know the Apley

11  scratch test for the shoulder.  I have never heard of the Apley

12  compression test for the wrist used in carpal tunnel syndrome.

13  Q.  But as a compression test it could be used?

14          MS. FRIEDLANDER:  Objection.

15          THE COURT:  Sustained.

16  Q.  I would like to take you now to your charts and the

17  underlying records that you based them on.  We will start with

18  Government Exhibit 100.  That's Mr. Rutigliano.

19  A.  OK.

20  Q.  Do you have your chart in front of you?

21  A.  I do.

22  Q.  For the right knee meniscal tear, right?

23  A.  Yes.

24  Q.  If you go down to meaningful treatment provided, right?

25  A.  Yes.

d7qnles3                          Barron - cross

1   Q.  You weren't asked that on direct, but in fact

2   Dr. Lesniewski provided two injections to that knee correct?

3           MS. FRIEDLANDER:  Objection to what he was not asked

4   on direct.  He was asked on that on direct.

5           MR. RYAN:  Objection.  It was asked on

6   cross-examination.

7           THE COURT:  If it was not asked, then see if you can

8   ask it.

9   Q.  You said two injections but no effort to cure.  In fact,

10  that is an effort to cure, right?

11  A.  At one point in my answer this morning as a general summary

12  I mentioned the fact that on a couple of occasions, at least on

13  this occasion, injections were given and that would be an

14  attempt to cure.

15  Q.  Right.  So the chart is wrong, right?

16  A.  No.

17  Q.  It says, "but no effort to cure."  Aren't two injections an

18  effort to cure?

19  A.  Let me clarify that, yes.  No effort to cure in that an

20  injection is not going to cure a degenerative tear.  It might

21  eliminate symptoms, but it is not going to cure --

22  Q.  Prednisone is the same thing really in the sense of a

23  short-term attempt to do the same thing as cortisone, right, to

24  reduce swelling?

25  A.  Actually the way I use it, it typically is not for

d7qnles3                         Barron - cross

1   degenerative meniscal tears but for tendonitis.  Tendonitis is

2   completely curable with prednisone, because it is a temporary

3   inflammatory condition hopefully.

4   Q.  It could be chronic?

5   A.  It doesn't always cure.

6   Q.  It can be chronic as well, correct?

7   A.  That's correct.

8   Q.  But just to say no effort to cure is not accurate when

9   there are two injections there, that particular statement in

10  your chart, right?

11  A.  In the clarification that I made, it would not be an effort

12  to cure a degenerative meniscal tear, but it could be a very

13  effective treatment.

14  Q.  It is not in the chart, is it?

15  A.  It is --

16  Q.  Is it in the chart?

17  A.  It is stated there that two injections were performed.

18  Q.  But it says "but no effort to cure," right?

19  A.  Yes, it does say that.

20  Q.  You reviewed this chart how many times?

21  A.  Many times.

22  Q.  You never thought to put that clarification in there?

23  Withdrawn.

24          Now, do you have the Rutigliano file with you,

25  Government's Exhibit 100?

1   A.  I do.

2   Q.  If you could look at page 1719.  I am going to give you a

3   copy.  Apparently you may not have it.  You do?

4   A.  Is that it?  The 100-D?

5           MS. FRIEDLANDER:  Do you want him to look at 100-D,

6   the narrative?

7           MR. DRATEL:  I am looking to see.  Actually it is

8   100-D, yes.

9   Q.  Do you have that?

10  A.  Yes.

11          MR. DRATEL:  So if we could put 100-D up, please,

12  since it's already in.  The last paragraph.

13  Q.  Do you see the second-to-last sentence?

14  A.  Yes.

15  Q.  This is written by Dr. Lesniewski, right?

16  A.  Yes.

17  Q.  OK.  Injection therapy has been helpful, but not completely

18  curative, right?

19  A.  Yes, it says that.

20  Q.  Now, if you could go a few pages further, 1722, if you look

21  at the Bates stamps on the bottom.

22  A.  Yes.

23          MS. FRIEDLANDER:  This is a different exhibit.

24          MR. DRATEL:  Yes, it's a different exhibit.  It's in

25  100 generally.  We have it up on the screen.  It is part of 100

d7qnles3                          Barron - cross

1   and all of 100 is in.

2             MS. FRIEDLANDER:  I will tell you what it is.  It is

3   100-E.

4             MR. DRATEL:  OK.

5   Q.  Do you see the entry for September 28, 1999?

6   A.  Yes, I do.

7   Q.  It says, "The injection helped his right knee for a while,

8   but now has significant pain.  I injected it again."

9   A.  Yes, I see that.

10  Q.  If you go to the next page, 1723, if you look at the middle

11  paragraph for June 15, '99, discussion of the knee, right?

12  A.  Yes.

13  Q.  It says, "That will need to be fixed.  Suggest same.  He

14  will decide when."  That is for June 15, 1999.

15  A.  I was looking above where it said, "I think eventually he's

16  going to have sort of surgery in multiple areas."

17            I don't know what that means.  He has a tear on the

18  MRI.  "Discussed with him that will need fixed.  Suggest same.

19  He will decide when."

20  Q.  It is up to the patient to decide when, right?

21  A.  It is.

22  Q.  Go to the next page.  Look at the November 10, 1998.  This

23  is going backward because of the way the file is in there.  It

24  is reverse chronology.

25            Going back in time to November 10, 1998, it says, "He

d7qnles3                         Barron - cross

1    will need at least an injection and possibly a clean out."

2            Right?

3    A.  That's correct.

4    Q.  That's for the knee again?

5    A.  I assume it is, yes.

6    Q.  If you look at 1726, which is another two pages, April 29,

7    1997.  It says with respect to the shoulder, right?

8    A.  That's with respect to the shoulder, yes.

9    Q.  It says, "Mr. Rutigliano's shoulder is better, although he

10   has significant weakness.  At this point, he will continue

11   therapy for another month and then consideration will be given

12   to MRI and possible surgery."  Right?

13   A.  Yes.  That confounds me.  I don't know how you could

14   possibly make a statement like that without any examination.

15   Q.  It doesn't say he didn't have an examination, right?  It is

16   just not noted in the chart, right?

17   A.  True.

18   Q.  It does say that he's doing physical therapy, right?

19   A.  It does say that, yes.

20   Q.  He's also taking anti-inflammatories, right, if you look at

21   the chart?

22   A.  Yes.

23   Q.  The mainstays of treatment, right, anti-inflammatories and

24   physical therapy?

25   A.  The mainstays of treatment for minor knee problems, yes.

d7qnles3                          Barron – cross

1  Q.  Let's go to Mr. Gagliano.  That is Government's Exhibit

2  101.  Did you review a report by a Dr. Dutta?

3  A.  I would have to see it.

4  Q.  OK.  Do you have it there with you?

5          MS. FRIEDLANDER:  Objection, your Honor.  We need a

6  sidebar on this.  I apologize.  This is the subject of motions.

7          THE COURT:  Mr. Dratel?

8          MR. DRATEL:  Well, if we could be heard at sidebar,

9  your Honor.

10          THE COURT:  All right.  Can you see if you can resolve

11  whatever it is first.

12          (Counsel conferred)

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

d7qnles3                          Barron - cross

1

2              (At sidebar)

3              MR. DRATEL:  Two things why this is admissible.

4              THE COURT:  What is this?

5              MR. DRATEL:  This is a doctor's report that was

6    obtained.  I am not going to go into why it was obtained or as

7    part of a CDR.

8              MS. FRIEDLANDER:  This is the continuing disability

9    review.  This is the medical exam.

10             MR. DRATEL:  May I?

11             MS. FRIEDLANDER:  I'm sorry.  Sure.

12             MR. DRATEL:  Two things.  They put in something that

13   was part of that file from the continuing disability review

14   yesterday, that the 2009 radiology report was submitted as part

15   of the same package.  They opened the door.

16             Second is, even independently of that, I am not going

17   into the basis for it or as to why it was done or any relation.

18   This is a doctor, an expert, and he said that my client

19   misdiagnosed and all of that, and there are other doctors who

20   examined this and they don't give him the files and he doesn't

21   use those.

22             I think that's relevant separately to impeach him.  It

23   is the quality of his preparation.  It goes to his opinions.  I

24   am not going to get into anything about continuing disability

25   reviews, but this is a doctor who examined this guy, examined

d7qnles3                          Barron - cross

1    Gagliano physically.  There are a number of them during the

2    course of this, and they found the same complaints and the same

3    things that Dr. Lesniewski found.

4            Gagliano comes in and says, I want a shot in my

5    shoulder.  This is after Dr. Lesniewski had made

6    recommendations to him that he refused because he wanted the

7    disability but later he wants these because the pain is too

8    great.

9            They opened the door.  They put in a 2009 radiology

10   report that is part of that package.

11           MS. FRIEDLANDER:  May I respond.

12           THE COURT:  Yes.

13           MS. FRIEDLANDER:  We put in a 2009 MRI report of a

14   doctor that Mr. Gagliano saw totally independently for

15   treatment.  He saw the doctor in 2009.  We elicited in

16   Mr. Gagliano's testimony, and indeed could have shown him the

17   very MRI report that I discussed with the doctor yesterday.

18   He's claiming we opened the door because there is a copy of the

19   MRI report in Mr. Gagliano's file.  That MRI was not performed

20   in connection with the continuing disability review.  It was

21   performed when Mr. Gagliano independently went to seek

22   treatment for a shoulder problem.

23           They are welcome to cross-examine him about that

24   doctor's treatment.  They are welcome to cross-examine Dr.

25   Barron about that MRI.  This is not an MRI performed in

1    connection with the continuing disability review.  It has

2    nothing to do with the independent medical exam that Josh

3    Dratel is proposing to now cross-examine Dr. Barron on.

4              He wants to cross-examine Dr. Barron on the very

5    medical exam performed by the RRB for that continuing

6    disability review.  It is totally separate.  He is welcome to

7    cross-examine on anything about the MRI report and Gagliano's

8    treatment for that problem in 2009.  But the fact that a copy

9    of it is in the file has nothing to do with whether it was

10   performed as part of a continuing disability review.  It was

11   not, and they can't even claim otherwise.

12             THE COURT:  Let me ask you this and see if we can

13   shortcut this.

14             MS. FRIEDLANDER:  Yes.

15             THE COURT:  Is there any reason why Dr. Barron would

16   have seen that document.

17             MS. FRIEDLANDER:  He probably did, because I've given

18   him all the claim files to review, so he's probably seen that

19   stuff.  The exam that Josh is proposing to cross-examine on is

20   what we moved on in limine.  This is the heart of the

21   continuing disability review.

22             THE COURT:  If it is part of that motion, then it is

23   not part of cross-examination.

24             MS. FRIEDLANDER:  We have no objection to cross on the

25   2009 treatment or the MRI report that I used on direct.  That

d7qnles3                          Barron - cross

1    is totally fair game.

2              MR. DURKIN:  Judge could I speak on this?

3              THE COURT:  Yes.

4              MR. DURKIN:  I read your order to say that you were

5    precluding reference to the continuing disability.  But if this

6    is something he's reviewed, and we don't make reference to the

7    continuing -- if he's reviewed it, I don't see how the

8    government is hurt by us being able to ask him about that

9    doctor's opinion.

10             We don't have to get into why he did it or any other

11   reason.  But I thought that the 403 prejudice was somehow this

12   blaming the victim type thing.  We are not using it for that

13   purpose.

14             MS. FRIEDLANDER:  The motion very clearly moved to

15   preclude and was granted on continuing disability review and

16   any finding made.  You are proposing to cross-examine on the

17   findings.

18             MR. DURKIN:  That is how I read your order.

19             THE COURT:  Let me come back.  Mr. Durkin is right.

20   Essentially the ruling was not to use the documents in the

21   continuing review for the purpose of suggesting somehow that

22   extra step cured what happened before.  It was not intended to

23   preclude a witness who has seen a report in it from commenting

24   on what he saw in the report without indicating what the

25   purpose of that examination was for.

d7qnles3                          Barron - cross

1           MS. FRIEDLANDER:  Justin, did you want to be heard on

2     this.  I think what the judge is saying -- I'm sorry, your

3     Honor.

4           THE COURT:  If a doctor saw a report in the file

5     without indicating what the purpose of the exam was, if he has

6     familiarity with what the exam was and what it contained, what

7     the findings were, as long as he doesn't go into anything

8     describing what that exam was for, that is fair game.

9           MR. WEDDLE:  That's right.

10          MS. FRIEDLANDER:  You think that is OK?

11          MR. WEDDLE:  I agree with Ms. Friedlander's position

12    that is we moved this and it was precluded.

13          THE COURT:  It was precluded for a reason.

14          MR. WEDDLE:  I know.  What your Honor just said, I

15    think if that is truly the purpose for which they are going to

16    ask questions about this, the questioning should be very

17    limited.  We have some situations where they have read from

18    documents not in evidence.

19          THE COURT:  I will now allow them to ask whether

20    during the course of his examination of the records he came

21    across that document.  If the answer is yes, then he could ask

22    questions from the document about what he saw, without

23    indicating anything about the purpose of the exam.

24          MR. WEDDLE:  Your Honor, there is another problem with

25    this, because we moved to preclude this and it was granted we

d7qnles3                          Barron - cross

1    never elicited the surrounding facts to this, which is that

2    Mr. Gagliano lied blatantly to this doctor.  It is in his

3    intake sheet with Dr. Dutta.  Mr. Gagliano made a lot of false

4    claims that underlie this report that he's looking at.

5              MS. FRIEDLANDER:  Right.  This is the RRB doctor.

6              MR. WEDDLE:  It is confusing and misleading to just

7    talk about this report without having proven all of this

8    surrounding information, which is that Mr. Gagliano would have

9    testified, that he lied to this doctor.

10             MS. FRIEDLANDER:  I have one other issue, which is,

11   because I understood this to have been precluded, he has spent

12   no time reviewing recently any of the CDR stuff because we

13   understood it not to be anything he would be asked about.  I

14   sort of feel a little hamstrung.

15             THE COURT:  Is there any way in which you can come

16   back and establish or ask whether the his analysis would remain

17   if there were indications that the patient was not truthful in

18   the information that he provided?

19             MR. DRATEL:  That is fine.

20             MS. FRIEDLANDER:  Just let me know what you want to

21   ask him.

22             MR. DRATEL:  Yes.  I will preview it all.  On the

23   Dutta report, just the MRI of his knee showing a torn meniscus

24   and 2007 and 2008 MRIs on shoulder showing impingement in both.

25   Then I think the only other one that I will go into that is in

d7qnles3                        Barron - cross

1    that context I think is Keefer, where I just want to say that

2    that the complainant --

3              MS. FRIEDLANDER:  That is fine.

4              MR. DRATEL:  -- I mean the patient complained of

5    chronic bilateral shoulder pain, worse with overhead motion,

6    worse on the left, worse anteriorly, and then came back from

7    Costa Rica after vacation and now wishes for a shot in the left

8    shoulder.  Indeed he already received a shot in his left

9    shoulder a month prior.  That is all I want.

10             MS. FRIEDLANDER:  I have no problem with those things.

11   It's only Dutta.  Are you going to ask him anything about

12   Dutta?

13             MR. DRATEL:  Just what I said.  In his reports are the

14   MRI findings.  He referred to these MRI findings.  I just

15   want --

16             MS. FRIEDLANDER:  That is fine.

17             MR. DRATEL:  There is another doctor using MRI

18   findings.

19             THE COURT:  Ask him if he has familiarity with those

20   documents, with those findings.

21             MR. DRATEL:  That is all I wanted to do.

22             THE COURT:  Just limit it to that.

23             MR. DRATEL:  Yes.

24         (Continued on next page)

25

d7qnles3                    Barron - cross

1             (In open court)

2             THE COURT:  Mr. Dratel.

3             MR. DRATEL:  Thank you, your Honor.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7qdles4                          Barron - cross

1              (In open court)

2              THE COURT:  Mr. Dratel.

3              MR. DRATEL:  Thank you, your Honor.

4    Q.  So, Dr. Barron, we spoke about Dr. Dutta, who examined

5    Mr. Gagliano, right?  Have you had a chance to look at that?

6    A.  No.

7    Q.  Or you haven't?

8    A.  I have not.

9    Q.  OK.  I'll give him mine for the time being.  I have my

10   notes.  I can hand him the report.

11             Have you seen -- did you review that as part of your

12   preparation, as part of your analysis?

13   A.  I'm just not sure.  I don't know why his name is not

14   particularly familiar to me.  But I'm not absolutely sure.

15   They all look the same, so I am just not sure.  But I'm looking

16   at it now.

17   Q.  Review the highlighted portion.  It says that there was an

18   MRI of the right knee showing a torn meniscus, correct?

19   A.  Yes.  He seems to be reporting that, yes.

20   Q.  2007, 2008 there were MRIs on the shoulders showing

21   impingement in both, correct?

22   A.  That's what it says.

23   Q.  OK.

24             THE COURT:  Excuse me, Mr. Dratel.  Come back.

25             (Continued on next page)

D7qdles4                          Barron - cross

1     (At the sidebar)

2          THE COURT:  Now, we established the document is not in

3     evidence.

4          MR. DRATEL:  Correct.

5          THE COURT:  You asked him whether he has familiarity,

6     whether he reviewed it.  He is not sure.  He has not

7     established a base for any familiarity for the document.  So

8     you can't ask him about something that is not in evidence about

9     which he has not established a recollection.

10          MR. DRATEL:  I think under 702 I can ask him -- it

11     doesn't have to be admissible if he is an expert -- if he can

12     form a basis or challenge a basis --

13          MS. FRIEDLANDER:  He is not saying this is a basis.

14          THE COURT:  You have not established that --

15          MR. DRATEL:  I am trying to look at the rule here.

16          The government said that he did see the document.  So

17     he said he didn't remember.  So I wasn't sure.

18          THE COURT:  The government said that.  But he has not

19     established that he has seen the document or has any

20     familiarity with it.  So you need to establish that as the

21     groundwork for any questioning about the document.

22          MR. DRATEL:  OK.

23          THE COURT:  Because you started to read from the

24     document without establishing that there is a basis for it.

25          MR. DRATEL:  OK.  The reason was --

1    MS. FRIEDLANDER:  This is why I didn't --

2    THE COURT:  Ms. Friedlander.

3    MS. FRIEDLANDER:  I'm sorry.

4    MR. DRATEL:  So evidence if of a type reasonably

5 relied upon -- this is Rule 703 of the Federal Rules of

6 Evidence.

7    If of a type reasonably relied upon by experts in the

8 particular field in forming opinions or inferences upon the

9 subject, the facts or data need not be admissible in evidence

10 in order for the opinion or inference to be admitted.

11    So that's -- need not disclose it to the jury by the

12 proponent -- or the inference by the proponent of the opinion

13 or inference unless the court determines that their probative

14 value in assisting the jury to evaluate the expert's opinion

15 substantially outweighs their prejudicial effect.

16    MS. FRIEDLANDER:  Right.

17    MR. DRATEL:  So that's what I am relying on.

18    MS. FRIEDLANDER:  This has nothing to do --

19    MR. WEDDLE:  There is an additional problem here which

20 is that the MRI reports are also in the file.  This is a

21 document that's just reporting what Mr. Gagliano is telling

22 this independent medical examiner doctor about MRI reports that

23 happened in the past.  So I doubt that if this doctor -- if

24 Dr. Barron were asked whether he would rely on Dr. Dutta's

25 report of what Mr. Gagliano told Dr. Dudda about MRIs that were

1   performed years earlier or whether he would rely on the MRI

2   reports themselves which are in the file.

3            MS. FRIEDLANDER:  As we briefed in our motion, this

4   doctor doesn't have the MRI reports.  He was not never given

5   them.  In fact, you can see that from his own report.  He just

6   says when the patient describes his complaints, the patient

7   says that MRI reports were done in the past that shows these

8   things.

9            MR. DRATEL:  It doesn't say the patient said that.

10           THE COURT:  Mr. Dratel, you can try to establish

11  whether he has any foundation for testifying about what you

12  want him to elicit from that document.  If you cannot establish

13  that, I will not allow any more questioning.  All right?

14           MR. DRATEL:  OK.

15           MR. DURKIN:  Judge, would it save time if he just took

16  a break and showed it to him?  He has seen this, right?

17           MS. FRIEDLANDER:  No.

18           MR. DRATEL:  Now you are saying he hasn't seen it?

19           MS. FRIEDLANDER:  I'm not saying he hasn't seen it.  I

20  am saying it would not save time.

21           THE COURT:  To save time, you can see if it would

22  refresh his recollection.

23           MR. DRATEL:  Let him testify.  Nobody else.

24           (Continued on next page)

25

D7qdles4                        Barron - cross

1               (In open court)

2               THE COURT:  Mr. Dratel.

3               MR. DRATEL:  Yes.

4    BY MR. DRATEL:

5    Q.  Dr. Barron.

6    A.  Yes.

7    Q.  That Government's 101 that you have there, right -- that I

8    gave you, right?

9    A.  Yes.

10   Q.  You reviewed the Gagliano RRB claim file?

11   A.  I did, yes.

12   Q.  And that document is in there, right?

13   A.  It may very well be.  I have just read it so it is familiar

14   to me now for sure.

15   Q.  It is familiar to you, OK.

16              And it talks about the MRIs, right, that we -- I don't

17   want to have to go through it.  Can I move on?

18              THE COURT:  Yes.

19              MR. DRATEL:  Thank you.

20   Q.  If you look at page 2714 there.

21   A.  In this collection?

22   Q.  Yes.  Do you see the bottom right?  There is a page --

23   A.  Yes.  Is has a Bates number 2714, yes.

24   Q.  There is another doctor, Dr. Frank Parasmo, right, who saw

25   Mr. Gagliano?

D7qdles4                          Barron - cross

1   A.  I don't know if he saw him.

2   Q.  There is a chart it, right?

3   A.  Oh, I'm only looking at -- I can't tell by that one page.

4   Q.  If you go further.

5         You didn't call any of these doctors, right, to

6   discuss with them Mr. Gagliano's condition?

7   A.  I did not.

8   Q.  Is it fair to say you didn't discuss with any doctors who

9   might have --

10  A.  I did not.

11  Q.  Now, if you go to 2722, there is a Dr. Himmelfarb, a

12  radiology report from June 10, 2008?

13  A.  Yes.

14  Q.  It says, lateral meniscus may be a tear?

15  A.  It says may or may not represent a tear.

16  Q.  May or may not be a tear.

17         That is in the knee, correct?

18  A.  That is in the knee.

19  Q.  And there is also -- if you go to 2793.

20  A.  OK.

21  Q.  That is a report from Dr. Eric Keefer, correct?

22  A.  I don't see a name.  Oh, yes.  Yes.  Yes.

23  Q.  OK.  And you reviewed that, as well?

24  A.  Yes, I believe so.

25  Q.  Would you go to 2797, the entry for March 27, 2009.

D7qdles4                          Barron - cross

1    A.  Yes.

2    Q.  And it says, "Chronic bilateral shoulder pain, worse due to

3    overhead motion, worse on the left, worse anteriorly."  Right?

4    A.  Yes.  That's from the patient's complaint, yes.

5    Q.  It says, "The patient returned from Costa Rica and wishes

6    now for a shot in the left shoulder."

7    A.  Yes.  And "has noticed some improvement with PT," yes.

8    Q.  Right.  If you go to 2780, three pages later.  If you go to

9    the February 27, 2009 entry.

10   A.  I'm sorry.  2800 for the number?

11   Q.  2780.

12   A.  That's going back.

13   Q.  Three pages later.

14   A.  Going back, 2780?

15   Q.  I'm sorry.  You are right 2800.  You are right.  Sorry.

16        2800, for February 27, 2009.

17   A.  Yes.

18   Q.  And that is a month before the one we just read, right?

19   The one we just read was March 27.

20   A.  Yes.

21   Q.  In fact, in February of 2009, Mr. Gagliano had received a

22   cortisone short in the left shoulder already, right?

23   A.  There is, yes, an injection was performed on 2/27/09.

24   Q.  And he is coming back a month later and he wants another

25   shot, right?

D7qdles4                        Barron - cross

1   A.   Yes.

2   Q.   OK.  And if you go to 2820, please.  That is also

3   Government's 101E, I think, part of it.  There is a radiology

4   report from December 1, 2004 from Dr. Hershowitz?

5   A.   Yes.

6   Q.   And the finding is a possible triangular fibrocartilage

7   tear in the wrist?

8   A.   Yes.  That's what I discussed earlier, yes.

9   Q.   Let's go to 2856, please.  That's also in evidence as

10  Government's 101S.

11  A.   OK.

12  Q.   I am just going to put it on the Elmo.

13          If you look at the June 20, 2006 entry, and it says,

14  under "Impression & Plan," right?

15  A.   Yes.

16  Q.   It says, "The patient will need surgical intervention.  I

17  discussed that with him in detail.  He does not wish surgical

18  intervention at this time.  I believe reduction of activities

19  will help.  He wants to try that.  I think this will help, but

20  I don't think it will take care of his problem, since I believe

21  he has a rotator cuff tear."

22          Right?  That's what it says, correct?

23  A.   Yes.  Probably he does not have a rotator cuff tear --

24  Q.   That would be correct, right?

25  A.   Yes.

D7qdles4                          Barron - cross

1    Q.  But this is in 2006, right?  Three years later he is

2    getting two shots --

3    A.  Yes.

4    Q.  -- within 30 days in the shoulder?

5    A.  Right.

6    Q.  Would that indicate to you there is something wrong with

7    the shoulder?

8    A.  Yes.  As I pointed out.

9    Q.  If we go to the next page, 2857, May 20, 2006.

10           You had said -- you note, I think in your direct, the

11   lack of a cross over test at some point, right?

12           So look at this one, May 20, 2006.  The second line is

13   "Physical Examination, positive cross over."  Right?

14   A.  I didn't refer to cross over test.  That is not a term I

15   used, but it is a horizontal adduction test.  I am not sure

16   what a cross over test is.  It may very well be that.

17   Q.  So see whether I am moving my an arm across from one

18   shoulder to the other side, that is what it is?

19   A.  If that's what it is, I don't know.

20           THE COURT:  Mr. Dratel, the reporter asked for

21   clarification on the date.  It says, "May 2nd."

22           MR. DRATEL:  Oh, May 2nd.  I'm sorry, your Honor.

23   Q.  All right.  Let's now move to -- if I could just take that

24   from you just to keep the paperwork under control.

25           Thank you, Doctor.

1           Go to Gary Supper.  That would be Government's 103,

2     the RRB file.

3           Now, do you have that?

4     A.  I have my chart.

5     Q.  OK.  But do you have the Government's 103 up there?

6           MS. FRIEDLANDER:  No.

7           MR. DRATEL:  No, OK.

8           (Handing to the witness)

9     Q.  But you reviewed Mr. Supper's RRB file, right?

10    A.  I believe I did, yes.

11    Q.  OK.  And if you can look at -- I'll just do the last three

12    names of the Bates, OK?

13    A.  Mm-hmm.

14    Q.  Take a look at 024.

15    A.  OK.

16    Q.  That's a 2009 report from a Dr. Linell Skeene, correct?

17    A.  That's correct.

18    Q.  Did you review that?

19    A.  I did.

20    Q.  We'll come back to that.

21          If you can go to 114, which is also in evidence as

22    Defendant's L7.  It is already in evidence.

23          Let me know when you get there.

24    A.  OK.

25    Q.  And that's 2/15/2008, right; February 15, 2008?

1   A.  No, it is a different -- same doctor, different date, yes.

2   Q.  Dr. Skeene.  And he -- if you go to 25116, it says

3   "Diagnoses."

4           We have it up there if you want to see it on the

5   screen.

6           "A rotator cuff tear of his left shoulder," right?

7   A.  It does say that.

8   Q.  "Right chondromalacia patella," right?

9   A.  Yes.

10  Q.  And that would be the knee, correct?

11  A.  Yes.

12  Q.  And 5 would be "Disc disease of the lumbar spine."

13  A.  Yes.

14  Q.  OK.  Now, and then if you go back to 024, where we were

15  initially.  That is the 2009 report from Dr. Skeene.

16  A.  Yes.

17          MS. FRIEDLANDER:  Your Honor, I'm sorry.

18          Objection.  The same issue we discussed at the

19  sidebar.

20          THE COURT:  On the same basis.  I will allow

21  questioning on the same basis.

22          MR. DRATEL:  I think I have two more questions.

23  Q.  It references the 2008 exam, and this is a year later,

24  right?

25  A.  Correct.

D7qdles4                    Barron - cross

1    Q.  And he diagnosis right knee chondromalacia, disc disease of

2    the lumbar spine, rotator cuff tear in the right shoulder.

3    Right?

4    A.  Well, it says "Diagnosis," but I'm not clear that he's

5    making a diagnosis, and the reason is because he also includes

6    in diagnosis status post pilonidal cystectomy and status post

7    open reduction internal fixation of the right ankle for

8    fracture.  Those are not diagnoses, those are just historical.

9    So I'm not sure that this is based on diagnosis rather than

10   just repeating historical information.

11   Q.  You can't say it is not?

12   A.  I cannot say it is not.

13   Q.  And he certainly diagnosed those in 2008, right?

14   A.  I think the same applies there.

15   Q.  Is there anything about his ankle fracture post status in

16   that other one?

17   A.  No.  That is my point.

18            MS. FRIEDLANDER:  Objection, your Honor.  This is the

19   2008 one on the screen.

20            MR. DRATEL:  I'm not talking about the 2008 one when I

21   was talking to him before.

22            THE COURT:  All right, proceed.

23   Q.  So let's go to 074.

24   A.  I'm there.

25   Q.  074.  There is a letter from a Dr. Yerys, correct, of

D7qdles4                          Barron - cross

1   Island Sports Medicine?

2   A.   Yes.

3   Q.   It is a 2008 letter?

4   A.   2008, yes.

5   Q.   And it says that the patient does not wish to have surgery

6   performed?

7            If you need to read the letter?

8   A.   Yes, I see that.

9   Q.   He is talking about the shoulder, right?

10  A.   Well, he's talking about his shoulder.  He has said --

11  Q.   Is he talking about the shoulder when he says the patient

12  does not want to have surgery?

13  A.   Well, I don't know because he then says "certainly not a

14  rotator cuff repair, debridement or decompression."  So I

15  assume those are linked but I am not positive.

16  Q.   You wouldn't know unless you talked to the patient,

17  perhaps, right?

18  A.   Perhaps.

19  Q.   Let's go to 075.  This is in evidence as 103G.

20           This is Dr. Lesniewski's chart, right?

21  A.   Yes.

22  Q.   OK.  Would you look at October 16, 2007.  That's 076.

23  A.   Yes.

24           MR. DRATEL:  Well, I move it in, your Honor.

25           (Counsel conferred)

D7qdles4                              Barron - cross

1                    MS. FRIEDLANDER:  May I have a moment with counsel?

2                    THE COURT:  Yes.

3                    MS. FRIEDLANDER:  I need to clarify.

4                    (Counsel conferred)

5                    MR. DRATEL:  I'll move in that page, your Honor.

6                    MS. FRIEDLANDER:  No objection.

7                    THE COURT:  Received without objection.

8                    (Defendant's Exhibit L11 received in evidence)

9      BY MR. DRATEL:

10     Q.  So 076 is the page actually.  If you look at the

11     October 16, 2007 entry.  It says, "The patient does not wish to

12     have surgical intervention," right?

13     A.  It does say that.

14     Q.  OK.  If you look at page 77 -- and I would move this page

15     in as well, your Honor.

16                    MS. FRIEDLANDER:  No objection.

17                    THE COURT:  Admitted without objection.

18     Q.  Look at August 8, 2007?

19                    THE COURT:  Exhibit number?

20                    MR. DRATEL:  L12.  Could it be part of the L11, your

21     Honor, because these are brief consecutive pages and we can

22     make them all a part of the L11.

23     Q.  August 8, 2007.  It says, "He" -- patient -- well, "He will

24     do just a light workout in a gym to see if this helps," right?

25     A.  That's right.

D7qdles4                        Barron - cross

1   Q.  And that's the equivalent of physical therapy essentially,

2   right?

3   A.  I think a physical therapist would disagree with that, but

4   it certainly is a component of physical therapy.

5   Q.  Fair enough.  And it says "PL" after that.  That is for

6   Dr. Lesniewski, right, Peter Lesniewski?

7   A.  I believe so, yes.

8   Q.  Now, if you look at 078, which is the next pages.

9           MR. DRATEL:  I would like to include this in L11, your

10  Honor.

11          THE COURT:  All right.

12          MR. DRATEL:  Thank you.

13  Q.  Would you look, March 9, 2007, do you see where it says

14  "Physical Examination?"

15  A.  Yes.

16  Q.  "The left shoulder is doing better since he has been

17  resting it and he has not played golf."  Right?

18  A.  Yes.

19          THE COURT:  Mr. Dratel, we have another proceeding

20  here in a few minutes.  What is your estimate?

21          MR. DRATEL:  Ten minutes at most.

22          THE COURT:  What?

23          MR. DRATEL:  Ten minutes, maybe.

24          THE COURT:  All right.

25  Q.  Now, with respect to Christopher Parlante, do you have that

D7qdles4                         Barron - cross

1    with you, 104?  Government's 104, do you have that file?

2    A.  Yes, I do.

3    Q.  Now, on your chart, which is Government's 455, you found

4    that three of the four conditions diagnosed by Dr. Lesniewski

5    were confirmed by MRI or other test results, but you said they

6    were all mild and age appropriate findings, right?

7    A.  What I implied by this and stated here is that based on a

8    claimed diagnosis of cervical spondylosis, lumbar spine

9    spondylosis, herniated disc lumbar spine and carpal tunnel

10   syndrome -- or, actually, just those first three, not the

11   carpal tunnel syndrome, that they were supported in the sense

12   that if you take it in a vacuum and say that just technically

13   are there changes on the MRIs consistent, as I mentioned those

14   were mild and age appropriate and certainly I could find no

15   evidence that they would be disabling.

16   Q.  Well, leave out the "disabling," because you don't even

17   know what the RRB standards are, right?

18   A.  They had nothing to do with the RRB standards.  I was just

19   going by what I was reading in the chart.

20   Q.  But you said before that age appropriate can be symptomatic

21   and it may not be symptomatic, right?

22   A.  That's correct.

23   Q.  And so if a patient complains of the pain, he's probably

24   one of those people who's symptomatic right?

25   A.  Well, if so, then there should be very clear documentation

D7qdles4                              Barron - cross

1   and physical evidence, good -- you know, as I had mentioned,

2   the constellation of everything put together should be

3   consistent and should be -- support that actual diagnosis.

4   Q.  When you say that, you are talking about charts; you are

5   not talking about the MRIs?  You are talking about the charts,

6   right?

7   A.  I am talking about putting the MRI findings together with

8   objective physical findings together with patient's subjective

9   complaints.

10  Q.  Right.  And the MRIs are a component of that and would

11  confirm if the patient -- if the patient is complaining of

12  pain, these MRIs would establish a basis for that pain, age

13  appropriate or not, right?

14  A.  If the symptoms were consistent and if the objective

15  physical findings were consistent with that.

16  Q.  And here we have three with the same person, right?

17  A.  Correct.

18  Q.  All in the back, in one place or another, right?

19  A.  Correct.

20  Q.  And do you know whether Mr. Parlante was given a

21  recommendation for any particular kind of treatment or refused

22  it, do you know?

23  A.  I only know what I read in the records.

24  Q.  Right.  You haven't seen his testimony, right?

25  A.  Correct.

D7qdles4                        Barron - cross

1    Q.  OK.  Robert Ellensohn.  That would be 116.  The chart is

2    456.

3    A.  I have it.

4    Q.  Now, if you look at 2312 there, which is already in as L3.

5           MS. FRIEDLANDER:  I am handing the witness 116.

6    A.  OK.

7    Q.  That's a consultative opinion from a Dr. Leone, right?

8    A.  Let me check and confirm that.

9           (Pause)

10          Yes.

11   Q.  Did you review that?

12   A.  I did.

13   Q.  And it says there is an abnormal x-ray, correct?  Do you

14   see that on the handwritten part on the page, I think, 2315,

15   four pages in, the last entry?

16   A.  It says there is a bone infarction in the partial humeral

17   shaft.  That is something we are born with, and if we x-ray our

18   body in the room we would all have those.  Those are clinically

19   and completely insignificant.

20   Q.  Right.  But it says abnormal x-ray, right?

21   A.  They describe it as that.

22   Q.  That is not something that Dr. Lesniewski diagnosed,

23   correct?

24   A.  It is irrelevant clinically.

25   Q.  OK.  Here's my question.  Did Dr. Lesniewski diagnose that

D7qdles4                    Barron - cross

1    in his chart, to your recollection?

2    A.  I don't know.

3    Q.  Do you want to go back and look?

4    A.  It would only be something you can report on the x-ray.

5    Q.  It is not on the chart?

6    A.  There would be no reason for it to be on the chart.

7    Q.  Is it on your chart?

8    A.  It is not in my chart, but there would be no reason for it

9    to be in my chart.

10   Q.  Now, if you could look at 2330.

11   A.  OK.

12   Q.  That's an exam, right, physical exam by Dr. Barry Kaplan,

13   correct?

14   A.  Let me read through it again.

15           Yes, he saw the patient.

16   Q.  Did you review this?

17   A.  I did.

18   Q.  And if you look at the second page, it says the Tinel's was

19   positive in the left hand, right?

20   A.  Let me finish it.

21   Q.  I'm sorry.  The second full paragraph.  Take your time.

22   A.  Yes.  As I pointed out, the Tinel sign is a minimal find.

23   Q.  Right.  And this doctor, based on that finding, says, in

24   the two paragraphs later, "based on the current" -- do you se

25   the second-to-last paragraph?  "Based on the current

D7qdles4                    Barron - cross

1    examination and available diagnostics, this claimant has

2    findings consistent with carpal tunnel syndrome of the left

3    land.  Sensory deficit is present in the left foot."

4          Right?

5    A.  He does say that, yes.

6    Q.  Now, could you go to 2352, which is Dr. Lesniewski's chart.

7    It is also 116H, in evidence.

8    A.  OK.

9    Q.  Again, this is with respect to Mr. Ellensohn.  If you look

10   at 2354.

11   A.  OK.

12   Q.  June 17, 2003, the typewritten part.  Discussed treatment

13   objections with him, right?

14   A.  Yes.  It says that, yes.

15   Q.  And then August 25, 2003, the same page.  It says, "EMG is

16   indicated to differentiate between carpal tunnel symptomatology

17   or wrist radiculopathy."  Right?

18   A.  Yes.  And I have no idea what "wrist radiculopathy" means.

19   Q.  9/24/2003, the same page.  "He does not want surgery at

20   this point but I think it is inevitable.  He has to decide when

21   and where he wants to do it."

22          Right?

23   A.  It does say that.

24   Q.  OK.  November 5, 2003.

25          Before looking at that, your chart says that if, in

D7qdles4                           Barron - cross

1    fact, the condition was as serious as Dr. Lesniewski diagnosed,

2    he should be getting surgery promptly, right?

3    A.  If he had the development of atrophy, ongoing development

4    of atrophy --

5    Q.  Right, which was reported --

6    A.  -- then he should have prompt surgery.

7    Q.  -- right?

8          So look at 11/5/2003.  "I suggest he get it done soon

9    because of the possibility of permanent damage."  Right?

10   A.  Yes.

11   Q.  Now, what if a patient suffered from carpal tunnel syndrome

12   had to stop cycling because there is too much pain in his hands

13   to absorb that pressure.  Do you agree?  That's -- do you

14   consider that permanent damage?

15   A.  No.

16   Q.  You consider that an impairment?

17   A.  It's an inability to ride his bicycle because his hands

18   can't handle it.

19   Q.  If he doesn't want treatment for it, if he doesn't accept

20   the doctor's recommended treatment for it, there is nothing the

21   doctor can do, right?

22   A.  Well, what the doctor can do is document that he's

23   recommended this and the patient has declined.

24   Q.  Just like we just saw, right?

25   A.  I didn't see any discussion about the patient declining

D7qdles4                         Barron - cross

1    that.

2    Q.  Oh, let's go back.

3          Let's go back to September 24, 2003.

4    A.  I meant on that note.

5    Q.  September 24.  Just September 24, 2003.

6    A.  Right.

7    Q.  "He does not want surgery at this point but I think it is

8    inevitable.  He has to decide when and where he wants to do

9    it."

10         Right there in black and white, correct?

11   A.  Right.  There is no documentation there that there is any,

12   you know, atrophy on that examination.

13   Q.  That's not what you said before.  You said that the

14   patient -- what can a doctor do?  You said document that the

15   patient had declined.

16         Isn't that what that is right there?

17   A.  In the context of what I said, if the patient has thenar

18   atrophy on that particular examination, then that should be

19   documented.  And you tell the patient that they should consider

20   very seriously and I would recommend surgery, and if they don't

21   want that surgery I would say the patient understands that he

22   may have permanent impairment from that.  But there is no

23   documentation on that note where he says he does not want

24   surgery that there is any thenar atrophy on that physical exam.

25   There is actually no physical examination on that.

D7qdles4                      Barron - cross

1    Q.  So you don't know that it didn't occur, correct?

2    A.  There is no documentation.

3    Q.  You don't know whether it occurred or not, correct?

4    A.  I guess not.

5            MR. DRATEL:  No further questions.  Thank you.

6            THE COURT:  We are going to have to break at this

7    point.

8            Ms. Friedlander, how long do you think you will be on

9    redirect?

10           MS. FRIEDLANDER:  10 or 15 minutes at the most.

11           THE COURT:  Unfortunately, I have a little proceeding

12   in the courtroom at this point.

13           So it is twenty to 1.  Return at 2.

14           (Luncheon recess)

15

16

17

18

19

20

21

22

23

24

25

D7qdles4

```
 1                    A F T E R N O O N   S E S S I O N

 2                         (2:05 p.m.)

 3              (Jury not present)

 4              THE COURT:  Counsel, please approach for a moment.

 5              (At sidebar)

 6              THE COURT:  All right.

 7              This is the case of the sleeping juror.  It has come

 8    up fairly regularly in a number of trials.  My clerk and I have

 9    both observed that Juror No. 11, Mr. Marx, has frequently been

10    either asleep or appears totally distracted.

11              My clerk was approached by one of the jurors to

12    indicate that others of the jurors are concerned about

13    Mr. Marx's behavior insofar as distractions and that kind of

14    thing.  I bring it to your attention because I will continue to

15    monitor that.  If I see it happening more or if there are other

16    concerns addressed by jurors about Mr. Marx, I would disqualify

17    him, not tell him, simply substitute one of the alternate

18    jurors.

19              So this is just by way of information at the moment.

20              MR. RYAN:  Thank you.

21              Can I ask one question, Judge.

22              THE COURT:  Yes.

23              MR. RYAN:  Was it during my cross-examination?

24              MR. DRATEL:  It was mine yesterday.

25              THE COURT:  I will tell you after the trial.
```

D7qdles4

1          MR. DRATEL:  If the cafeteria were not in contempt of

2     your Honor's coffee order, maybe this wouldn't have happened.

3

4          MR. WEDDLE:  Your Honor, I wanted to mention

5     something.

6          THE COURT:  Wait a moment.  Mr. Durkin.

7          MR. DURKIN:  My own concern would be, before you

8     disqualify him, we get a chance to talk to him because it may

9     not be the case that he is -- maybe there is some explanation

10    for it.

11         THE COURT:  There may be some explanation for some

12    things, but sleeping there's not too much explanation you can

13    give, essentially where it distracts other jurors.

14         I had that happen at the last trial here, where --

15    this guy is sitting in the back row, but in the front row the

16    juror was there plainly sleeping and I asked counsel to observe

17    the person.

18         That has several problems.  One is you should be

19    paying attention to the trial and not to sleeping jurors.  It

20    also places the burden on me and my clerk, because we have to

21    spend time observing whether or not a juror is paying

22    attention.

23         But to the extent it comes to our attention not only

24    from our own observation but from other jurors, it is a

25    problem.

D7qdles4

```
 1              MR. DURKIN:  I understand.  My only point is I haven't
 2    noticed him sleeping.  I think he is a little eccentric.
 3              THE COURT:  That is part of it.
 4              MR. DURKIN:  I noticed that he stands up and he
 5    stretches.  He might be into meditation.  Who knows.
 6              THE COURT:  Right.  But it's very distracting to the
 7    jurors.
 8              Mr. Weddle, do you have something.
 9              MR. WEDDLE:  I wanted to put something on the record
10    relating to a juror's comment to me.  I don't know if you want
11    me to do it in open court or here.
12              THE COURT:  You can do it here.
13              MR. WEDDLE:  During the lunch break I was talking to
14    some of the spectators at the far end of the hallway there, and
15    three jurors walked out toward the elevator and they were
16    talking amongst themselves, but one of them kind of called over
17    and said, "Mr. Weddle, is that your father?"
18              I didn't respond.  I just kind of turned away.  Then I
19    heard them say sorry and then get in the elevator.
20              MR. RYAN:  Did you deny it?
21              MR. WEDDLE:  I didn't respond.
22              MS. FRIEDLANDER:  It is his father.
23              MR. WEDDLE:  It is sort of the thing speaks for
24    itself.
25              MR. DURKIN:  I want the record to reflect that I
```

D7qdles4

         1    introduced myself to both Mr. Weddle's father and his wife,

         2    because I noted Mr. Dratel was smart enough to notice the

         3    similarity.  I noticed the man in the back, but Mr. Dratel

         4    noticed the similarity, so I introduced myself and frankly told

         5    them they should be very proud of their son.

         6              MR. WEDDLE:  Thank you for putting that on the record,

         7    Mr. Durkin.

         8              MS. FRIEDLANDER:  I am going to give you my parents'

         9    number.

        10              MR. DURKIN:  I also frequently lie to people's

        11    parents.

        12              THE COURT:  All right.

        13          (Continued on next page)

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

D7qdles4

```
 1              (In open court)

 2              (Jury present)

 3              THE COURT:  Thank you be seated.

 4              Ms. Friedlander, you may resume.

 5              MS. FRIEDLANDER:  Thank you.

 6   BY MS. FRIEDLANDER:

 7   Q.  Dr. Barron, you were asked whether you examined

 8   Mr. Rutigliano or the other patients who you testified about.

 9              Do you remember those questions?

10   A.  Yes.

11   Q.  Do you need to examine these people to reach the

12   conclusions that you reached about the quality of

13   Dr. Lesniewski's diagnoses and his treatments of these people?

14   A.  No, I do not.

15   Q.  You were shown some records relating to a complaint that

16   Mr. Gagliano made in 2009 about his knee and an MRI showing a

17   meniscal tear of his knee in 2009.  Do you remember that?

18   A.  Yes, I do.

19   Q.  Based on your review, did Mr. Gagliano first complain about

20   his knee before or after he was awarded disability?

21   A.  I believe it was after, two or three years after.

22   Q.  Did Dr. Lesniewski's disability recommendation have

23   anything to do with any supposed knee problem of Steven

24   Gagliano?

25   A.  I don't believe so.
```

D7qdles4

```
 1    Q.  You were asked some questions about injections that
 2    Mr. Rutigliano and Mr. Baran got in their backs and an
 3    injection that Mr. Gagliano got in his shoulders.
 4              Do you remember that?
 5    A.  Yes.
 6    Q.  Did those people get that treatment before or after
 7    Dr. Lesniewski claimed that they were disabled from those
 8    conditions?
 9    A.  After.
10    Q.  Did Dr. Lesniewski offer them injections for those
11    conditions?
12    A.  I was not apparent in the records.
13    Q.  What do you think of injections as a form of treatment for
14    those conditions?
15    A.  I use them routinely as very effective treatment.
16    Q.  Counsel talked about whether patients sometimes say they
17    don't want injections or surgery.
18              Do you recall that?
19    A.  Yes.
20    Q.  If patient tells you they don't want an injection, what
21    does that tell you about their condition?
22              MR. DRATEL:  Objection, your Honor.
23              THE COURT:  Rephrase the question.
24    Q.  Doctor, in your experience, if a patient tells you they
25    don't want an injection, what does that tell you about their
```

D7qdles4

1    condition?

2              MR. DRATEL:  Objection.

3              THE COURT:  Sustained.

4    Q.  Doctor, from time to time do patients tell you they don't

5    want injections?

6    A.  Yes.

7    Q.  Do they do that when they have conditions that in your view

8    are serious conditions?

9              MR. DRATEL:  Objection, your Honor.

10             THE COURT:  Overruled.

11   A.  If a patient has a serious enough condition that I offer

12   injections, or if they have a condition and I offer an

13   injection and they decline, it either tells me they have great

14   fear of an injections --

15             MR. DRATEL:  Objection, your Honor.

16             THE COURT:  Sustained.

17   Q.  Counsel asked about whether there is a fixed standard for

18   what has to be in a doctor's chart notes about his examination.

19             Do you remember that?

20   A.  Yes.

21   Q.  Regardless of whether there is a fixed standard, is it

22   important for a doctor to document his physical findings if

23   he's actually making them?

24   A.  Yes, it is.

25   Q.  Why?

D7qdles4

A.  Well, most importantly -- there are multiple reasons, but

the most important reason is that it's how you create an

effective record for the patient.

        No doctor I know, including me, have perfect memories,

so frequently we will see patients over extended periods of

time, and it helps to create and maintain that record of what

we have done, what their examinations were at different times,

and to look back at and refer back to inform us how to move

forward and effectively treat the patient in an ongoing way.

Q.  You were shown notes of a physical exam performed on

Mr. Supper by Dr. Skeene that listed some things under a

heading called "Diagnosis."

        Do you remember those questions?

A.  Yes.

        MS. FRIEDLANDER:  Can we see that exhibit.  I think

it's D L-7.

        Can we turn to where it says diagnosis.  You can just

turn on the next page.

Q.  Dr. Barron, based on your review of this record, what do

you think the doctor was saying when he wrote "diagnosis"?

        MR. DRATEL:  Objection.

        THE COURT:  Sustained.

        MS. FRIEDLANDER:  I don't think I understand the basis

for the objection.

        MR. DRATEL:  I don't have to.  It was sustained.

D7qdles4

1    Q.  Dr. Barron, based on year review of this record, where did

2    this doctor get the information that he listed here under the

3    heading diagnosis.

4            MR. DRATEL:  Objection.

5            THE COURT:  Overruled.

6    A.  Since there were two diagnoses there that, and I used the

7    term in quotations because that's what they were referred to,

8    there aren't actually diagnoses.  They are status post open

9    reduction internal fixation of right and status post pilonidal

10   cystectomy.  Those are not diagnoses.  Those are part of the

11   patient's if you read the previous history that the patient

12   provided it seems that these diagnoses came from the --

13           MR. DRATEL:  Objection.

14           THE COURT:  Overruled.

15           MS. FRIEDLANDER:  Excuse me.

16   Q.  You can finish your answer, but let's turn back to the page

17   that you're referring to so the jury can see what you're

18   referring to.

19           MS. FRIEDLANDER:  Can we see the first few paragraphs

20   blown up, where it says there's both chief complaint and past

21   history.

22   Q.  You were explaining where it seems the doctor got the

23   information that he listed under --

24           MR. DRATEL:  Objection.

25           THE COURT:  Sustained.

D7qdles4

1    Q.  Please finish your answer, Doctor.

2    A.  As I was mentioning, that in these two paragraphs, this is

3    the patient's history, this is what the patient is reporting to

4    that doctor.

5              It says, "Diagnosed with a rotator cuff tear."

6              Then, "Chondromalacia patella of the right knee."

7              Then fracture of the right ankle, and had ORIF.  You

8    see it says diagnosed with a fracture.  That is an appropriate

9    diagnosis.  But the right ankle status post ORIF is not a

10   diagnosis, and then had a pilonidal cystectomy.

11             So status post means he had underwent this.

12             Then a bulging disk of the lumbar spine.  So all those

13   are exactly what were enumerated in that later under the

14   heading of diagnosis.  And for instance -- that's it.

15   Q.  Does it appear to you the doctor was simply listing the

16   diagnoses the patient told hem that he had.

17             MR. DRATEL:  Objection.

18             THE COURT:  Overruled.

19   A.  It does appear so.

20   Q.  Just a few more questions.

21             You were asked about an isolated exam performed on

22   Mr. Baran by a Dr. Caplan.  I believe you said I can't confirm

23   or disprove what a person is reporting to you about pain.

24             Could you explain what you meant by that?

25   A.  If someone comes to me and says to me that they are in

D7qdles4

excruciating pain, for instance, as an example, then in that
moment I can certainly tell whether they are in excruciating
pain or not, because they will have irregular voice pattern,
they will be moving and looking different.

    Anybody in excruciating pain cannot maintain a
completely normal look and a normal tone of voice.  If someone
is in mild or moderate pain then they may be able to.

    So in that instant when they say that, I can't prove
or disprove it, but immediately thereafter, as I begin to talk
to them further and ask them more questions about that, and
then to examine them, then it becomes easy to document to prove
or disprove what level of pain they're in based on putting that
information together over a brief time.

Q.  Dr. Barron, when a patient comes to you and complains of
pain, what do you do?

A.  Well, I ask them a series of questions to try to clarify
the pain, more pinpoint it.  As I mentioned, people don't know,
most patients unless they are educated in health care issues
and the human body, actually don't know how to describe that in
full.  So I have to ask more leading questions to pinpoint that
and to try to detect the origin of it.

    I get that full history, how long it's been, how short
it's been and so forth and so on.  Then I immediately go to a
physical examination and try to objectify that to try to
perform the appropriate physical examination that will

D7qdles4

1  corroborate or clarify those subjective complaints.  That's the

2  obtaining of objective medical evidence.

3            And then if -- at that point I have generally a

4  diagnosis, and then if I need it, I will order additional

5  testing the objective to further support and objectify those

6  subjective complaints.

7  Q.  That's how you arrive at a diagnosis?

8  A.  And then I arrive at a diagnosis which allows me to develop

9  an effective treatment plan.

10  Q.  Based on the files that you reviewed, is that how

11  Dr. Lesniewski arrived at a diagnosis?

12            MR. DRATEL:  Objection.

13            THE COURT:  Overruled.

14  A.  No.

15  Q.  Based on your review, did Dr. Lesniewski provide meaningful

16  treatment for the conditions he was even claiming people had?

17            MR. DRATEL:  Objection to the form.

18            THE COURT:  Sustained as to form.

19  Q.  Based on your review, did Dr. Lesniewski provide meaningful

20  treatment to these people for the conditions he claimed they

21  had?

22  A.  No.

23            MR. DRATEL:  Objection.

24            THE COURT:  Overruled.

25  Q.  You can answer.

D7qdles4

1    A.  No.

2           MS. FRIEDLANDER:  No further questions.

3    RECROSS EXAMINATION

4    BY MR. RYAN:

5    Q.  Doctor, with respect to the injection of Mr. Rutigliano,

6    there were two by Dr. Lesniewski and four by Dr. Ferderigos,

7    isn't that right?

8    A.  That's correct.

9    Q.  Are you telling the ladies and gentlemen of the jury that

10   that is an indication of only subjective pain and not objective

11   evidence of pain?

12   A.  No.

13   Q.  The injections of by Dr. Lesniewski and by Dr. Ferderigos

14   confirm objectively in medical science that there was some

15   degenerative disease in his lumbar spine, isn't that correct,

16   sir?

17   A.  Performing an injection doesn't confirm anything.  It

18   confirms that the patient was willing to undergo an injection

19   for presumably pain, hopefully.

20   Q.  Are you suggesting to the ladies and gentlemen of the jury

21   that Mr. Rutigliano took injections from Dr. Lesniewski and

22   injections from Dr. Ferderigos in 2008 for no reason?

23   A.  Absolutely not.

24   Q.  Are you suggesting that he consented to do this to create a

25   paper trail to qualify for occupational disability?

D7qnles5                         Barron - recross

1    A.  Absolutely not.

2               MR. RYAN:  Thank you, Doctor.

3               THE COURT:  Mr. Jackson any questions?

4               MR. JACKSON:  Nothing further, Judge.

5          Thank you.

6               THE COURT:  Mr. Dratel.

7    RECROSS EXAMINATION

8    BY MR. DRATEL:

9    Q.  Dr. Barron, have you ever spoken with Dr. Skeene?

10   A.  No, I have not.

11   Q.  He wrote the word "diagnosis" there, right?

12   A.  Yes, he did.

13   Q.  You never examined Gary Supper, the patient he examined --

14   withdrawn.

15             You never examined Mr. Supper, right?

16   A.  Correct.

17   Q.  He examined Mr. Supper and wrote that report, correct?

18   A.  He did.

19   Q.  You weren't there, right?

20   A.  I was not there.

21   Q.  But you can tell us what people meant by it, right?

22   A.  I can offer my opinion based on the record that I see.

23   Q.  He is just another doctor who doesn't know how to write a

24   note, right?

25             MS. FRIEDLANDER:  Objection.

1              THE COURT:  Sustained.

2              MR. DRATEL:  Nothing further, your Honor.

3              THE COURT:  Thank you.

4              You are excused.

5              You may step down.

6              (Witness excused).

7              THE COURT:  Government?

8              MR. WEDDLE:  Yes, your Honor, the government calls

9     Paul Crowley.

10     PAUL CROWLEY,

11         called as a witness by the Government,

12         having been duly sworn, testified as follows:

13     DIRECT EXAMINATION

14     BY MR. WEDDLE:

15     Q.  Good afternoon, sir.  Where do you work?

16     A.  I work for the Internal Revenue Service out of Andover,

17     Massachusetts.

18     Q.  What is your job at the Internal Revenue Service?

19     A.  I am a court witness coordinator.

20     Q.  What do you do as a court witness coordinator?

21     A.  I secure records and returns of the Internal Revenue

22     Service, make certified copies of those documents, and testify

23     in court representing the Commissioner of the Internal Revenue

24     Service as custodian of records.

25     Q.  Hopefully you have in front of you a number of copies of

1    exhibits.

2            Do you have Government Exhibit 503-A, 503-B, 523 --

3    and are they stapled there?

4    A.   They were just --

5    Q.   In a different order?

6    A.   In a different order.

7    Q.   Sorry.  Starting with 503-A.  Do you have that?

8    A.   Yes.

9    Q.   503-B?

10   A.   I have that.

11   Q.   523?

12   A.   I have that.

13   Q.   524?

14   A.   I have that.

15   Q.   525?

16   A.   Yes.

17   Q.   526?

18   A.   Yes.

19   Q.   565?

20   A.   Yes.

21   Q.   566?

22   A.   Yes.

23   Q.   567?

24   A.   Yes.

25   Q.   568?

D7qnles5                     Crowley - direct

1    A.  Yes.

2    Q.  1500?

3    A.  I have that.

4    Q.  1501?

5    A.  Yes.

6    Q.  1502?

7    A.  Yes.

8    Q.  1503?

9    A.  Yes.

10   Q.  And 1504?

11   A.  Correct.  I have all those.

12   Q.  And I guess with the exception of 565 and 500, which we

13   will get to in a second, what are all of those?

14   A.  These are income tax returns for various individuals and

15   tax periods.

16   Q.  The government offers all of those exhibits except for 565

17   and 1500?

18          MR. RYAN:  Other than previously stated we have no

19   objection.

20          THE COURT:  All right.

21          MR. JACKSON:  Objection.

22          THE COURT:  Mr. Durkin or Dratel?

23          MR. DURKIN:  Nothing that we haven't raised before,

24   Judge.

25          THE COURT:  All right.  Admitted.  Objections noted.

D7qnles5                          Crowley - direct

 1              (Government's Exhibits 503-A, 503-B, 523, 524, 525,

 2      526, 566, 567, 568, 1501, 1502, 1503, and 1504 received in

 3      evidence)

 4      BY MR. WEDDLE:

 5      Q.  Sir, could you just tell us, let's start with 503-A, 503-B,

 6      523, 524, 525 and 526.  Who do those relate to and what are the

 7      tax years that those relate to?

 8      A.  These relate to Ostap Baran and Marie Baran for 2007, 2008,

 9      2009, 2010 and 2011.

10      Q.  With respect to 2007, is there more than one return there?

11      A.  Yes, there is an originally filed return as well as an

12      amended return.

13      Q.  What is the date on the amended return?

14      A.  The date it was received at the Internal Revenue Service

15      was October 24, 2008.

16      Q.  That one is 503-B, is that right?

17      A.  That's correct.

18      Q.  Let's talk now about Government Exhibits 566, 567, and 568.

19              Who do those exhibits relate to?

20      A.  These are returns for Joseph Rutigliano and Joanne

21      Rutigliano.  566 is for tax year 2005, 567 is for 2006, and 568

22      is for 2007.

23      Q.  And then the other returns relate to whom?

24      A.  These relate to Peter Lesniewski and Lynn Lesniewski.

25      Q.  Now, let's take a look at a couple of these.

1              MR. WEDDLE:  Can we put on the screen Exhibit 523.

2    Q.  That is one of the Ostap Baran and Marie Baran tax returns.

3    It the one for 2008?

4    A.  That's correct.

5              MR. WEDDLE:  If you could turn to schedule C of this

6    document, which I guess should be page 8 of the exhibit.  If

7    you could just blow up the top half of this.  Can you blow up

8    the top half of that, Ms. Larson.  Thank you.

9    Q.  This says in the top left Schedule C.

10             Do you see that?

11   A.  Yes.

12   Q.  What is a Schedule C?

13   A.  A Schedule C, this is a profit or loss from a business

14   which is a sole proprietorship.

15   Q.  For what tax year?

16   A.  This is for tax year 2008.

17   Q.  What does it say the name of the proprietor is?

18   A.  Marie Baran.

19   Q.  What does it say the business is?

20   A.  That would be box A, Retirement Consult.

21   Q.  What's the gross receipts for this business for 2008?

22   A.  That would be line 7 in the lower right-hand column,

23   $88,800.

24             MR. WEDDLE:  Now let's take a look at 2009, which is

25   524.  We will once again look at Schedule C, which would be

D7qnles5                          Crowley - direct

1    about page 9.  You have that.  Thank you.  If we could blow up

2    the top half again.

3    Q.  So this is the same thing, right, another Schedule C?

4    A.  That's correct.

5    Q.  This one is for 2009?

6    A.  That's correct.

7    Q.  How much is the gross income from the Marie Baran

8    Retirement Consult business for 2009 according to this

9    document?

10   A.  That would be line 7, $46,950.

11        MR. WEDDLE:  Let's take a look at 2010.  Once again

12   Schedule C.  Sorry, Exhibit 525.  We will just blow up the same

13   thing.

14   Q.  The same proprietor, same business, right?

15   A.  That's correct.

16   Q.  For 2010, what's the gross income?

17   A.  Again, that's line 7, $95,000.

18        MR. WEDDLE:  2011, which is Government Exhibit 526.

19        Let's see page 8 or so.  There we go.

20   Q.  The same proprietor, basically the same business.  It says

21   Service Retirement Consultant?

22   A.  That's correct.

23   Q.  The gross income for 2011?

24   A.  Line 7, $74,450.

25        MR. WEDDLE:  Then let's take a look at 2007, so going

D7qnles5                      Crowley - direct

1    back in time which is Government Exhibit 503-A.  We will just

2    start with the top of the first page.

3    Q.  So you said that there were two versions of 2007, right?

4    A.  That's correct.

5    Q.  Which one is this?

6    A.  This is the originally filed return.

7    Q.  Can you tell from looking at this when approximately this

8    was filed?

9    A.  This was filed in 2008, and it was the 85th day of 2008.

10   Q.  So that is in the early third of the year, right?

11   A.  That's correct.

12   Q.  Then let's take a look at Schedule C of the originally

13   filed 2007 return.

14           MR. WEDDLE:  You have that.  Thank you.

15   Q.  The amount reported for gross income on the original return

16   for 2007 is what?

17   A.  Line 7, $14,400.

18           MR. WEDDLE:  And in Government Exhibit 503-B.  Could

19   you look at that.  Let's go up the bottom half of this.

20   Q.  Sir, you can see the heading on yours, but what is this

21   one?

22   A.  This is the form 1040-X, amended U.S. individual income tax

23   return.

24   Q.  The date signed, according to the handwriting there on the

25   bottom right?

D7qnles5                         Crowley - direct

1   A.  Is October 16, 2008.

2   Q.  As amended, what's the gross income from the Schedule C

3   business?  I guess we can take a look at page 4.

4   A.  Line 7 is $67,600.

5            MR. JACKSON:  Judge, I am going to object based on the

6   cumulative nature of the testimony.  We had an accountant here

7   yesterday.

8            MR. WEDDLE:  That is all I have on that, your Honor.

9            Now, let's take a look at -- actually let's start with

10  the two exhibits we haven't talked about yet.  It's Government

11  Exhibit 565 and 1500.

12           Let's put on the screen 1500.

13           I'm sorry.  It is not in evidence.  Let me just first

14  talk about them.

15  Q.  565 and 1500 are what, sir?

16  A.  These are screen prints of a command code called Info R.

17  Those are specific line items that are transcribed from the

18  return on to the IRS databases.

19  Q.  So this is something that is not the exact return itself,

20  but it is something that is coming from where?

21  A.  Straight from the return when the return is received at the

22  Internal Revenue Service.

23  Q.  It's maintained in what kind of system?

24  A.  Integrated data retrieval system with the Internal Revenue

25  Service.

D7qnles5                        Crowley - direct

1    Q.  Approximately how long does the IRS keep the actual copy of

2    the return for?

3    A.  The actual copy of the return is kept for the end of the

4    processing year and six more years.

5    Q.  But the information that gets input into the database at

6    the IRS, is that kept for longer or shorter or something else?

7    A.  A much longer time.  We can go back to approximately 1987

8    and '88 with the electronic records.

9    Q.  So is it fair to say that 565 and 1500 are the electronic

10   records that go back further than the original returns would be

11   available at this point?

12   A.  Yes, the returns would not be available for these years.

13              MR. WEDDLE:  I offer Government Exhibit 1500 and

14   Government Exhibit 565.

15              MR. RYAN:  No objection than previously stated.

16              THE COURT:  Anyone else?

17              Admitted with objections previously stated noted.

18              (Government's Exhibits 565 and 1500 received in

19   evidence)

20              MR. WEDDLE:  Actually let's put on the screen

21   Government Exhibit 1501.

22   Q.  Do you have that in front of you, sir?

23   A.  Yes, I do.

24   Q.  1501, we skipped the first page, this is a tax return for

25   what year and what person?

1    A.  For tax year 2005, and this is for Peter Lesniewski and

2    Lynn Lesniewski.

3    Q.  What's the total income amount or what line is the total

4    income amount shown on that.

5              MR. DURKIN:  I object to the relevance of the total

6    income.  I don't have any objections to --

7              THE COURT:  Sustained.

8              MR. WEDDLE:  May I just have a moment with counsel.

9              (Counsel conferred)

10             MR. DURKIN:  I will withdraw the objection, Judge.

11             THE COURT:  Objection withdrawn.

12             MR. WEDDLE:  Thank you, your Honor.

13   Q.  So total income is on what line?

14   A.  22.

15             MR. WEDDLE:  Can we blow up that, right there.

16             Thank you.

17   Q.  So the total income for Mr. and Mrs. Lesniewski for 2005 as

18   reported on this return is what?

19   A.  $166,775.

20             MR. WEDDLE:  Now let's look at Government Exhibit

21   1500.  If you could blow up the top half of this.

22   Q.  So this is the database printout that you were talking

23   about before?

24   A.  That's correct.

25   Q.  Can you tell who this relates to?

D7qnles5                          Crowley - direct

1   A.  Well, this relates to a taxpayer with a social ending in

2   4126, which is towards the top left-hand corner.  We go across.

3   That indicates taxpayer 2003.

4   Q.  Let me walk through this a little.

5   A.  Sure.

6   Q.  Am I pointing the laster at the 4126 you were just talking

7   about?

8   A.  Yes.

9   Q.  You said this relates to 2003.  Is that embedded in this

10  number here that I am pointing to with the laser?

11  A.  That's correct, the 200312.

12  Q.  What is significance of 12?

13  A.  That indicates the return is filed calendar year.

14  Q.  We don't have to put this on the screen, but if you look

15  back at Government Exhibit 1501, can you tell who this taxpayer

16  with this Social Security number that is on the screen is.

17          MR. DURKIN:  For the sake of time, Judge, I will

18  stipulate that that is Dr. Lesniewski.

19          MR. WEDDLE:  Thank you.

20          THE COURT:  All right.  Stipulated.

21  Q.  Based on the transcript, or the database printout, what is

22  the total income reported for 2003?

23  A.  It is at line T pos income.  It's $257,374.

24  Q.  Then if we could take a look at the bottom half of this

25  page.

D7qnles5                         Crowley - direct

1          The same taxpayer, right?

2     A.   That is correct.

3     Q.   This is for which year?

4     A.   2004.

5     Q.   The total income for this year?

6     A.   $262,732.

7          MR. WEDDLE:  Your Honor, I think just to save a little

8     time I will just ask the witness to just tell us rather than

9     putting it on the screen the total income for the Lesniewskis

10    for 2006, which is on Government Exhibit 1502.

11    Q.   Do you have that handy.

12    A.   I have that.  $197,917.

13    Q.   And then the total income for the Lesniewskis for 2007?

14    A.   $225,007.

15    Q.   And then the total income for 2008 for the Lesniewskis?

16    A.   $216,859.

17    Q.   Let's take a look at the Rutiglianos' returns.  Let's start

18    with Government Exhibit 568.  Do you see that one?

19    A.   Yes.

20    Q.   So this is the income tax return for whom?

21    A.   Joseph and Joanne Rutigliano.

22    Q.   So the year is what?

23    A.   2007.

24         MR. WEDDLE:  Ms. Larson, could you just blow up the

25    label portion of this and the heading, just the top third

D7qnles5                     Crowley - direct

1    basically.

2    Q.  Are you familiar with the term in the IRS databases of a

3    taxpayer being referred to as primary versus a spouse?

4    A.  Yes.

5    Q.  Can you explain how that works out in the IRS databases.

6    A.  The primary taxpayer is also the first taxpayer listed on

7    the return.  In this case Joseph Rutigliano is in the primary

8    location.  And the next individual listed is the spouse's

9    information Joanne Rutigliano.

10   Q.  Right on the -- I guess parallel to the primary person's

11   name is also their Social Security number, right?

12   A.  That's correct.

13   Q.  The last four digits for Mr. Rutigliano are what?

14   A.  6527.

15             MR. WEDDLE:  Then let's take a look at Schedule C for

16   the Rutiglianos if there is one.  Actually let's see.

17   Q.  Is there any kind of Schedule C income for this tax return,

18   2007?

19             MR. WEDDLE:  Actually, if Ms. Larson, let's go back to

20   the first page.

21   A.  On line 12 it indicates Schedule C income, and there is no

22   figure there.

23             MR. WEDDLE:  Can you blow up the income section.

24   Thank you.

25   Q.  If there was income from a business, it should be reported

1    where?

2    A.  On line 12.

3    Q.  There is nothing there?

4    A.  Correct.

5    Q.  If there was also income from self-employment, would you

6    also expect to see any other lines filled out?

7    A.  Yes.  It could also be listed on line 21, other income.

8    Q.  But in this case for 2007 for Mr. Rutigliano and

9    Mrs. Rutigliano there is nothing, right?

10   A.  Correct.

11   Q.  There is no actual Schedule C in the exhibit, right?

12   A.  That's correct.

13              MR. WEDDLE:  Now let's take a look at Government

14   Exhibit 567.  Let's go to the first page of the tax return,

15   which would be page 5 of the exhibit.  If we could just blow up

16   the income section of this.

17   Q.  This is the Rutiglianos' 2006 tax return, correct?

18   A.  Correct.

19   Q.  Who is the primary on this one?

20   A.  Joseph Rutigliano.

21   Q.  Any reported business income on line 12?

22   A.  There is nothing reported there.

23   Q.  And how about line 21?

24   A.  There is nothing reported there either.

25   Q.  These other income lines, like wages, interest, dividends,

1    would those come from other reporting documents with the IRS?

2    A.  Yes.

3    Q.  Can you explain how that would work?

4    A.  The wages would come actually with the return from the

5    taxpayer, but the Internal Revenue Service also receives a copy

6    of the information when the employer submits it with the

7    Internal Revenue Service.

8    Q.  It would be wages, and the banks would submit interest

9    income information, right?

10   A.  That's correct.

11   Q.  Then for pensions and annuities there is also a line for

12   that here, right?

13   A.  That's correct.

14   Q.  There is also a line for Social Security benefits.  Do you

15   see that?

16   A.  Yes.

17   Q.  But self-employment would have to be on which lines?

18   A.  Line 12 for business income or loss, or line 21 and other

19   income.

20           MR. WEDDLE:  Let's take a look now at 2005 for the

21   Rutiglianos.  Let's blow up the income section -- I'm sorry,

22   it's Government Exhibit 566.  We will be looking at page 5.

23   Can you blow up the income section, Ms. Larson.

24   Q.  Just to speed things along, once again there is no entry on

25   line 12 and no entry on line 21, right?

D7qnles5                         Crowley - direct

1   A.  That's correct.

2   Q.  And Mr. Rutigliano is the primary on this one?

3   A.  Yes.

4   Q.  Now let's take a look at Government Exhibit 565, which is

5   another transcript.  Let's start at the end of this, if we can,

6   which would be 2004, correct?

7   A.  That's correct.

8   Q.  That is because of this number here on the top left, right,

9   2004?

10  A.  That is correct.

11  Q.  Can you tell from looking at this who the primary is on

12  this one?

13  A.  The primary is the taxpayer ending in 6527.

14  Q.  Looking back at the other return that's Joseph Rutigliano,

15  right?

16  A.  That's correct.

17  Q.  On the transcript, this return -- so is it fair to say this

18  return is no longer available, the filed return from the IRS

19  copy?

20  A.  That's correct.

21  Q.  This indicates that there is a Schedule C, right?

22  A.  That's correct.

23  Q.  Down below does it indicate whose income is reported on the

24  Schedule C?  Whether it's the primary, that is, Joseph

25  Rutigliano; or the spouse, that is, Joanne Rutigliano?

D7qnles5                              Crowley - direct

1    A.  It does indicate about four lines up from the bottom, there

2    is an S space SE income.  That indicates the income is from the

3    spouse of $15,308.

4    Q.  How much income is reported by the primary, Joseph

5    Rutigliano?

6    A.  That would be just above there.  The P SE income, and

7    there's zero dollars.

8    Q.  I just said income reported by Joseph Rutigliano, but I'm,

9    of course, only talking about self-employment income.

10   A.  That's correct.

11            MR. WEDDLE:  Now let's go to the previous page of

12   this.  Let's start at the bottom half, Ms. Larson.

13            Thank you.

14   Q.  So this is the transcript for 2003, right?

15   A.  Yes.

16   Q.  And Joseph Rutigliano, once again, is the primary, right?

17   A.  That's correct.

18   Q.  This also has a Schedule C associated with it, right?

19   A.  Yes, it does.

20            MR. WEDDLE:  If we could highlight the primary

21   self-employment income line and the spouse self-employment

22   income line.  I'm sorry.  If we could just highlight that.

23   Great.

24   Q.  So Joseph Rutigliano, the primary, is reporting how much

25   self-employment income for 2003?

D7qnles5                              Crowley - direct

1   A.   Zero.

2   Q.   And reported for the spouse Joanne Rutigliano is how much?

3   A.   $7,106.

4   Q.   Let's look at 2002, which is the top half of this page.

5            For 2002, the same primary, right, Joseph Rutigliano?

6   A.   That's correct.

7   Q.   How much self-employment income reported by Joseph

8   Rutigliano?

9   A.   Zero.

10  Q.   And for his spouse?

11  A.   $6,136.

12  Q.   Then, rather than putting it on the screen, I think we can

13  just do in summary fashion the years 2000 and the years 2001

14  for the Rutiglianos.

15           Is there any self-employment income at all reported

16  for either of them for either of those years?

17  A.   No, there is not.

18           MR. WEDDLE:   Thank you.

19           That is all I have, your Honor.

20           MR. RYAN:   May I?

21  CROSS EXAMINATION

22  BY MR. RYAN:

23  Q.   Mr. Crowley, are you appearing here pursuant to court

24  order.

25  A.   Yes, I am.

D7qnles5                    Crowley - cross

1   Q.   Why is that?

2   A.   Why is it that I am appearing here or why is it --

3   Q.   Pursuant to a court order.  Why does it require a court

4   order for you to come in and testify before this jury?

5   A.   Because the documents are records maintained by the

6   Internal Revenue Service, and to have them brought in you need

7   a court order to have them come in for this trial.

8   Q.   Is that because there is a law, a statute passed by

9   Congress that requires that all tax return information remain

10  confidential within your agency?

11  A.   I can't speak to that and say with a certainty that that's

12  the case.  There are certain trials that I go to that I do not

13  need a court order to testify.  Those are typically when the

14  Internal Revenue Service is bringing the case to court.

15  Q.   Right.  If there is a pending case for criminal tax fraud,

16  you could testify without a court order because that is an

17  agency function?

18  A.   That's correct.

19  Q.   In this case there are no tax fraud charges, right?

20  A.   Not that I am aware of, correct.

21  Q.   So are you aware there is a section, 26 6103, that holds in

22  effect that all tax returns shall remain confidential except

23  for your agency's purposes?

24  A.   I know there's specific regulations under which we can

25  release the information, yes.

D7qnles5                              Crowley - cross

1  Q.  That is specific with your understanding of -- how many

2  years at the service have you worked.

3          MR. WEDDLE:  Objection, your Honor.  Asked and

4  answered.

5          THE COURT:  Sustained.

6  Q.  So when a person files a tax return it stays with the IRS

7  unless he's prosecuted for tax evasion or whether there is an

8  application to have a court direct you to appear in a nontax

9  proceeding, isn't that right?

10          MR. WEDDLE:  401, your Honor.

11          THE COURT:  Go ahead.  Proceed.

12          Ask the question.  Rephrase the question, Mr. Ryan.

13          MR. RYAN:  I am going to rephrase it, Judge.

14  Q.  You are appearing here in a nontax fraud proceeding,

15  correct?

16  A.  I'm appearing here to represent the commissioner as

17  custodian of records for these documents.

18  Q.  That was at the request of the United States Attorney for

19  the Southern District of New York in a nontax prosecution?

20  A.  That's correct.

21  Q.  Is it your understanding that tax returns after they are

22  filed remain within your agency, are not distributed to any

23  other federal agency except for a court order?

24  A.  That is my understanding, yes.

25  Q.  So these tax returns would not be distributed to agencies

D7qnles5                    Crowley - cross

1    such as the Department of Labor on request without a court

2    order, correct?

3    A.  I can't answer to that.

4    Q.  Well, these tax returns would remain confidential in the

5    agency and they wouldn't be sent to the Railroad Retirement

6    Board, would they?

7    A.  I could not answer that.

8    Q.  Why not?

9    A.  I don't have the knowledge to answer that.  The law is very

10   specific on what can and cannot be done.

11   Q.  Yes.

12   A.  I don't know what all the requirements are.  The disclosure

13   office would be the one that would be able to tell you that

14   more specifically.

15   Q.  So you can't tell the ladies and gentlemen of the jury

16   whether the tax returns that Mr. Rutigliano during the years in

17   question were available to the Railroad Retirement Board, can

18   you?

19   A.  I can't answer that, no.

20   Q.  As a matter of fact, you mentioned it was six years that

21   the actual copies of the returns are retained?

22   A.  The end of the processing year and six additional years.

23   Q.  That's because there is a statute of limitations dealing

24   with tax prosecutions?

25            MR. WEDDLE:  Object to the relevance, your Honor.

1            THE COURT:  Sustained.

2    Q.  You understand why the IRS destroys copies of tax returns

3    six years after the filing?

4    A.  To my knowledge, it has to do with the sheer volume of

5    documents.

6    Q.  But you understand there is a six-year statute of

7    limitations for criminal tax fraud cases, correct?

8            MR. WEDDLE:  Objection.

9            THE COURT:  Sustained.

10   Q.  Do you understand why you're offering these tax returns

11   here?

12   A.  I am here just to authenticate records of the Internal

13   Revenue Service.

14   Q.  You don't know a thing about occupational disability, do

15   you?

16   A.  No, I do not.

17           MR. RYAN:  No further questions.

18   CROSS EXAMINATION

19   BY MR. JACKSON:

20   Q.  Sir, if I may, it's not a crime to make money in America,

21   is it?

22   A.  Not to my knowledge.

23   Q.  To your knowledge, you are making money today, right?

24   A.  Every day.

25   Q.  Because you are doing your job, right?

D7qnles5                        Crowley - cross

1   A.  Correct.

2   Q.  If you do your job, you should be paid for it.  You don't

3   have a problem with that proposition, do you?

4   A.  I can't speak to hypotheticals.

5   Q.  In fact, so that we don't speak to hypotheticals, let's

6   look at facts.

7           MR. JACKSON:  If the government could put up Schedule

8   C, Ms. Baran's Schedule C in 2009.

9   Q.  You were asked several questions by Mr. Weddle concerning

10  Schedule Cs, is that right?

11  A.  Correct.

12  Q.  Regarding the Schedule C of 2009, how much money did

13  Ms. Baran make for working for a year in her business in 2009,

14  sir?

15  A.  The total profit on line 31 after all expenses is $10,135.

16  Q.  In fact, some people can, for example, come testify and get

17  $70,000, right, where other people have to work a year to get

18  their income, right?

19          THE COURT:  Overruled.  I am ruling that irrelevant.

20  Q.  Without going through all of the Schedule Cs, Mr. Weddle

21  spent significant time talking to you about the retirement

22  consulting business of Ms. Baran, is that right?

23  A.  Well, we spoke about the documents.

24  Q.  Yes.  As part of the documents I think he highlighted in

25  that nice yellow highlight where it said "Retirement

D7qnles5                          Crowley - cross

1    Consultant."

2              Do you remember that?

3    A.  I remember talking about that.

4    Q.  In fact, you are not suggesting for a moment, are you, sir,

5    that this is money that has not been earned, are you?

6    A.  I am not suggesting anything.  I am just bringing in

7    records of the Internal Revenue Service.

8    Q.  Correct.  You don't have any idea how many hours Ms. Baran

9    spent away from her husband of 42 years to make that money, do

10   you?

11             THE COURT:  All right.  Mr. Jackson, it's beyond the

12   scope.

13   Q.  OK.  So you can just attest as to documents?  You are just

14   here to authenticate documents, is that right?

15             THE COURT:  Asked and answered.

16   Q.  You are not here to pass judgment.

17             THE COURT:  Asked and answered.

18             MR. JACKSON:  Judge, can I.

19             THE COURT:  No.  Asked and answered.  He's here to

20   authenticate records.  If you have a question about the

21   authenticity of the records, you can ask it.

22   BY MR. JACKSON:

23   Q.  Let me ask you about the authenticity of the record then.

24             On Schedule C, on any of the Schedule Cs that you

25   looked at and you examined, sir, you are saying, right, you are

D7qnles5                    Crowley - cross

1    telling the jury that all of these documents are authentic,

2    right?

3    A.  I am saying that these are authentic records of the

4    Internal Revenue Service.

5    Q.  As authentic records of the Internal Revenue Service, these

6    are records which were filed by Ms. Baran with your agency, is

7    that right?

8    A.  They were filed by the taxpayers listed.

9    Q.  You are not at all, other than authenticating documents,

10   suggesting at all to this jury that Ms. Baran got any money

11   that she wasn't entitled to, right?

12            MR. WEDDLE:  Objection.  There is no foundation.

13            THE COURT:  Sustained.

14            MR. JACKSON:  That is all I have, Judge.

15            MR. WEDDLE:  Can we blow up --

16            THE COURT:  Mr. Durkin, did you have

17   cross-examination?

18            MR. WEDDLE:  Sorry.

19            MR. DURKIN:  I was going to do something, but I don't

20   know that it's worth it, Judge.  I think I will just sit here

21   and enjoy the afternoon.

22   REDIRECT EXAMINATION

23   BY MR. WEDDLE:

24   Q.  Let's talk for a minute about this Schedule C for Marie

25   Baran for 2009.

D7qnles5                        Crowley - redirect

1           I asked you about the gross income and Mr. Jackson

2     asked you about the net income.

3           MR. WEDDLE:  Can you blow up the -- let me see.  I

4     want to blow up the expenses basically from here down to here.

5     Line 7 through line 29.

6     Q.  So the line 7 at top says the gross income, right, $46,000?

7           MR. JACKSON:  Judge, objection.  He's just here to

8     authenticate records.

9           MR. WEDDLE:  Your Honor, this is very fair redirect.

10           THE COURT:  What is the point of the redirect?

11           MR. WEDDLE:  The suggestion on cross, your Honor, was

12     that, based on however many hours, she only made $10,000.

13           THE COURT:  I ruled that to have been beyond the

14     scope, so why are we --

15           MR. WEDDLE:  He elicited the $10,000, your Honor.  I'm

16     merely trying to point out how we got from 46,000 to 10,000,

17     and primarily trying to point out line 10, which is a pension

18     and profit sharing plan for $28,000.

19           MR. JACKSON:  Judge, I renew my objection.  He's here

20     to authenticate records, Judge.

21           THE COURT:  You have made your point.  The point is

22     noted.  Is there anything else?

23           MR. WEDDLE:  No, your Honor.

24           THE COURT:  Thank you.  You are excused.

25           (Witness excused)

D7QLLES6

```
 1            THE COURT:  Let me come back to a point that was made

 2    when the government put the witness who testified, the tax

 3    preparer, you may recall who testified concerning the

 4    preparation of Ms. Baran's tax returns.  I gave you a limiting

 5    instruction at that point that Ms. Baran was not here charged

 6    with tax fraud.  The same limiting instruction that I gave at

 7    that point pertains to this witness for the same reason and it

 8    pertains also to Mr. Rutigliano.

 9            The testimony has been admitted for the government's

10    purpose of seeking to prove the intent element of the crimes

11    charged and not to prove charges of tax fraud, and you may take

12    the testimony only for that limited purpose.

13            Mr. Weddle, next?

14            MR. TEHRANI:  Your Honor, the government calls Special

15    Agent Sean Tumulty.

16     SEAN TUMULTY,

17        called as a witness by the Government,

18        having been duly sworn, testified as follows:

19            MR. TEHRANI:  Your Honor, I'm looking at a potential

20    stipulation.

21            THE COURT:  Mr. Tehrani, would you gave us an estimate

22    of the direct for this witness?

23            MR. TEHRANI:  Your Honor, I would expect about an

24    hour.  I could try to do it faster.

25            MR. DURKIN:  I agree, Judge.
```

D7QLLES6

```
 1              THE COURT:  This is going to be an hour, I'd rather
 2      not disrupt it.  Why don't we take the afternoon break at this
 3      break.  Fifteen minutes.
 4              (Jury not present)
 5              THE COURT:  You may step down.
 6              Counsel, please approach.
 7              (At the side bar)
 8              THE COURT:  Coming back to Mr. Mark, were any of you
 9      observing Mr. Mark between 2:20 and 2:25?
10              MR. RYAN:  Yes, and he was wide awake.
11              THE COURT:  That's not what I saw.
12              Were any of you observing him between 2:45 and 2:55?
13              MS. FRIEDLANDER:  Your Honor, I saw him sleeping.
14              MR. DURKIN:  Judge, I tried.  I can't say I watched
15      him the whole time, but I tried to watch him as often as I
16      could and he appeared to be paying attention.
17              THE COURT:  Between 2:45 and 2:55, I and my clerk
18      observed him fairly much sleeping.  It's not coincidental that
19      at 2:55 Mr. Ryan arose.
20              MR. RYAN:  I don't consider that a compliment.
21              THE COURT:  But, again, it was an indication that he
22      was not awake.  He basically arose and woke up.  He got alert
23      at 2:55 as soon as Mr. Ryan stood to examine, and he was sort
24      of in and out during that remaining period.
25              Now, to the extent that all of us are paying attention
```

D7QLLES6

1   to Mr. Mark rather than to what's happening in the trial, it is

2   not worth keeping a juror under those circumstances if we have

3   two others who are alternates, about whom there is absolutely

4   no indication they haven't been totally alert and paying

5   attention and about whom we have not heard complaints from the

6   jury that this particular gentleman is also disrupting them

7   because he they have observed things that they find disruptive.

8           MR. RYAN:  That comes from other jurors, Judge?

9           THE COURT:  Yes.

10          MR. DURKIN:  Judge.

11          THE COURT:  Conner, come around.  Let's put this on

12  the record.  Would you indicate what you were told by a juror.

13          THE LAW CLERK:  She indicated to me that a number of

14  the jurors were in agreement that his faculties might not all

15  be there.  There was one juror, specifically she told me --

16  there was one juror who I think is of Cuban decent.  Mr. Mark

17  got in a conversation with her about how he had been to Cuba

18  and had met Fidel Castro and other similar stories along those

19  lines with other jurors too, having met people that the stories

20  might not square.  And so that's how she raised it to me.

21          MR. RYAN:  Judge, may I make a suggestion that we

22  don't be so precipitous here.  This is a juror was one of the

23  first volunteers.

24          THE COURT:  That might say something, Mr. Ryan.

25          MR. RYAN:  I know he's a senior citizen.

D7QLLES6

1          MR. DURKIN:  Judge, here's the issue I have, to be

2     very blunt.  We perceive that the government tried to strike

3     virtually every intelligent juror in this case, in terms of the

4     lawyers, in terms of the more educated people.  He is one of a

5     few -- this is our perception.  We could be wrong.  I'm not

6     making any accusations.  Nobody has to get up in arms.  But we

7     perceived him to be one of the few more educated, intelligent

8     jurors.

9          MR. WEDDLE:  Are we talking about the same guy?

10          THE COURT:  Finish your statement.

11          MR. DURKIN:  Which we believe to be important.  And if

12     he's incompetent, I would certainly agree to get rid of him.

13     But I would really like to ask him whether he's having any

14     trouble.  It could very well be this information about a Cuban

15     woman being upset about Fidel Castro, there could be all --

16     that's too many curve balls to try to follow.  I think before

17     you strike him, I'd like you to at least ask him if he's having

18     any difficulty.  That's what I'd like.

19          MR. JACKSON:  Judge, from my perspective, I think

20     certainly it would at least be worth it to admonish the juror

21     and speak to him prior to giving him no opportunity and just

22     dismissing him.  I think it may make sense to admonish, see if

23     there is an issue.  And if there's not and there's a commitment

24     that he could participate and carry on, he should be afforded

25     the opportunity to do that.

D7QLLES6

1              MR. DRATEL:  Your Honor, we're close enough to the end

2     probably that the jurors don't know who's an alternate and

3     who's not.  It won't change the dynamic of who's paying

4     attention and who's not.  So leaving him on doesn't change

5     anything right now.

6              THE COURT:  No, if I decide to strike him, I will not

7     do it until after the very end.  So we're not going to upset

8     anything.

9              MR. RYAN:  Okay.

10             MR. WEDDLE:  My view is, first of all, I completely

11    disagree with the characterization that we tried to strike

12    educated people.  You know, I could go back and look at my

13    notes, but the defense I know struck an accountant, a number of

14    other people.  Everyone exercised their strikes as they did.  I

15    think we could try to recreate it, but I think it's neither

16    here nor there because what I think your Honor is observing is

17    problematic behavior by a juror.

18             But the bottom line is, your Honor has such broad

19    discretion in this kind of area, it's very clear in all of the

20    Second Circuit law that your Honor has great discretion.

21    You're in the best position to observe the jury.  I frankly was

22    talking to the witness.  I didn't look over at the jury at all.

23    And I think that if it is bothering other jurors, that creates

24    a separate issue that is concerning aside from a juror falling

25    asleep.  A juror falling asleep could easily be struck.

D7QLLES6

 1    There's plenty of discretion for your Honor to do that or not

 2    to do that.  But to the extent it's bothering other jurors, his

 3    behavior is bothering other jurors or other jurors are

 4    concerned about him and the integrity of the jury process,

 5    that's an additional issue.

 6         My view is based on experience and based on what the

 7    cases say is that any kind of inquiry of a juror is fraught

 8    with peril.  I think that the record is more than clear at this

 9    point for your Honor to exercise whatever discretion your Honor

10    would like to exercise.  But I think that inquiring of a juror

11    has great potential to interfere with the entire dynamic of the

12    jury room, makes the juror feel like he or she is under

13    investigation in some way.  It just causes problems.

14         MS. FRIEDLANDER:  Can I add a couple other

15    observations.  I saw the juror sleeping as well.  I've observed

16    him sleeping at other points during the trial.  Mr. Tehrani

17    told us previously that he observed the juror sleeping during

18    Mr. Tehrani's opening, which was really surprising to us.

19         THE COURT:  I raised it today not because this is the

20    first time, but because what I observe has accumulated to a

21    point where I felt it important to raise it with you, to

22    indicate that I have created a record so that if I decide at

23    some point to excuse him, I will let you know that I've done

24    so.  But I will not inform any of the jurors until after the

25    trial.  All right.

D7QLLES6

          MR. JACKSON:  Judge, just very quickly, I'm sorry to

be prolonging this.  In responding to Mr. Weddle's point,

perhaps as opposed to making a specific inquiry of him, tell

them that, the jury as a whole could be reminded in some gentle

way of what their obligations are, primarily to be awake during

the trial without singling him out so it will be more of

concern than that's you I have a problem with.

          THE COURT:  Of course I will not do anything that will

put any individual juror in a difficult position or

embarrassing or humiliation of any kind.  There are times in

which when I observe a sleeping juror I call for the seventh

inning stretch, and what that does is give you an opportunity

to see what I see.

          MR. RYAN:  Thank you, Judge.

          MR. DURKIN:  Judge, could we just raise an issue.  The

next witness, Tumulty, we got some exhibits this morning that

appear to be three different patient files or patient notes,

the charts -- my client calls the notes -- like we've seen

pertaining to three patients.  I don't understand the relevance

of these exhibits with this witness.

          MR. TEHRANI:  Your Honor, we previously disclosed

those chart notes as exhibits.  Those were the versions of the

chart notes from Dr. Lesniewski's file.  We frankly thought

defense counsel would think it appropriate to show these chart

notes were actually in the RRB claim files.  We marked the

D7QLLES6

 1   Exhibit RRB claim files as well.  It's just the same chart

 2   notes, or not the entirety of the chart notes because the chart

 3   notes continue for a period of time after he submits them to

 4   the RRB, but it's just the relevant portions of

 5   Dr. Lesniewski's chart notes that were submitted to the RRB and

 6   are in the RRB files.

 7          The point is simply that they were submitted to the

 8   RRB, right.  So the substantive point from the chart notes is

 9   that the chart notes indicate at the first visit for the two,

10   three patients we're going to be talking about that the patient

11   was considering or told Dr. Lesniewski, told Dr. Lesniewski's

12   office that they were retiring in about a year with a

13   disability.

14          MR. DURKIN:  Judge, the problem with that is two-fold.

15   First of all, I think all three of them -- I could be wrong.  I

16   don't have copies of them but other than on the screen -- but I

17   believe they're all handwritten in in female handwriting.  So

18   they're obviously written by whoever is taking the information

19   down.

20          But this would have been a lot easier to handle while

21   the expert was on the stand.  What I'm concerned about now is

22   that the expert made some point on these charts.  Of the six

23   people that he pointed out the ones that had that indication on

24   it.  And it seems to me that -- it seems to me we should have

25   had that.  If that was going to come in, we should have known

D7QLLES6

1   about that while we had the expert on the stand and we could

2   have maybe done something with it.

3       But to put it in now, it's like trumpeting these three

4   exhibits.  See, here's three more, as if they're somehow more

5   fraudulent than the others.  I think this is a 403 problem.  I

6   just don't understand how they get this in through this

7   witness.

8       THE COURT:  Mr. Tehrani.

9       MR. TEHRANI:  First of all, we disclosed these

10  exhibits previously.  Second of all, these notations are

11  actually significantly more inculpatory than some of the other

12  ones in the past.  These are chart notes in Dr. Lesniewski's

13  records that show that the person is coming to the office and

14  telling someone at the office -- and Mr. Durkin is free to

15  cross-examine about whether the agent can tell whose

16  handwriting it is, but it's certainly in the doctor's records

17  that a person is coming to the office and says I'm planning on

18  retiring in a year with a disability.  That's something we

19  opened on.

20      THE COURT:  Mr. Durkin's point is not what the notes

21  say, but why this witness is being used for this purpose.

22      MS. FRIEDLANDER:  We could not have used those with

23  him because these are not patients whose files Dr. Barron has

24  ever seen or reviewed.  They're saying perhaps we could have

25  used those documents with Dr. Barron.  They had those same

D7QLLES6

1    notes with respect to Mr. Parlante.

2              THE COURT:  How does this agent, how is this agent the

3    proper person?

4              MR. TEHRANI:  He's a summary witness.  He's going to

5    say that he went through at the government's direction to see

6    if this document was in Dr. Lesniewski's patient file.  For

7    example, for Mr. Herman, it says coming for retirement

8    disability in the very first visit.  There's another patient on

9    the very first visit says he works for Long Island Railroad and

10   disability and retirement next year.  All the agent is going to

11   say is this was found in both Dr. Lesniewski's patient file and

12   the RDB claim file.

13             MR. DURKIN:  But that's hearsay in terms of -- are

14   these coconspirators?

15             MR. TEHRANI:  Yes.  They were identified in the bill

16   of particulars.

17             MR. DURKIN:  These patients?

18             MR. TEHRANI:  These individuals were.

19             THE COURT:  They're coconspirators and these are

20   Dr. Lesniewski's notes, it would be admissible.

21             MR. DURKIN:  But, Judge, is he going to testify that

22   these were the only three he found?

23             MR. TEHRANI:  No.

24             MR. WEDDLE:  He didn't go to find them.  He just

25   looked to see if they were in somebody's file.

D7QLLES6

         1              THE COURT:  Let's establish a foundation for what his

         2    role was, what he was asked to do, how many records he looked

         3    into, and whether these particular ones that you're seeking to

         4    introduce were part of the things that he came across.

         5              MR. TEHRANI:  Your Honor, all he is going to be able

         6    to testify to is at our direction he looked to see if this

         7    document was in Dr. Lesniewski's patient file and whether this

         8    document -- we don't even need him to testify that these

         9    documents were in the claim file because by stipulation any

        10    document submarked with a letter comes from the claim file.  So

        11    he's going to testify that he was asked to see if this document

        12    was in Dr. Lesniewski's.

        13              THE COURT:  This particular one or several like this?

        14              MR. TEHRANI:  There's going to be three of them, I

        15    think.

        16              MS. FRIEDLANDER:  He was just given these files and

        17    ask to locate in these particular three files these particular

        18    notes.  That's all he's going to say.

        19              MR. DURKIN:  Can I ask this question?  Are these the

        20    only other three that have that in all of Lesniewski's files in

        21    RRB?

        22              MS. FRIEDLANDER:  I don't think anyone knows that.  I

        23    don't think he's going to testify one way or the other on that

        24    subject.  You can cross him on this.

        25              MR. WEDDLE:  Judge, the defense is free to search

D7QLLES6

1   these files.

2          THE COURT:  One at a time.

3          MR. DURKIN:  We got this at 11 o'clock this morning,

4   okay.  This is -- we have, you know.

5          THE COURT:  Mr. Durkin.

6          MR. DURKIN:  We have had mountains of documents.  I'll

7   take their word for it that those three were contained in this

8   mountain.  But we got notice that they were going to use these

9   exhibits at 11 o'clock in an email, which means we didn't even

10   get to look at it until the lunch hour.  All I'm concerned

11   about is how we use them.  Maybe I don't care, but if these

12   were self-selected by the prosecutors, I'd like to know why if

13   there are others or some other reason.  Otherwise, I need time

14   to think about the cross of this guy because this is pretty

15   important and it seems --

16          THE COURT:  How important is it to have this witness

17   here today?

18          MS. FRIEDLANDER:  Your Honor, they had these documents

19   for Dr. Barron.  These notes are disclosed on Dr. Barron's

20   charts they have had four weeks.  They did not do one question.

21          MR. DRATEL:  There are no charts --

22          THE COURT:  How important is it to have this witness

23   today?

24          MR. TEHRANI:  Your Honor, I don't think we have

25   another witness for today.

D7QLLES6

 1          THE COURT:  Do you have the New York Times person

 2   still?

 3          MR. TEHRANI:  For Monday.  Two --

 4          THE COURT:  Who else do you have on Monday?

 5          MR. TEHRANI:  We have two Long Island Railroad

 6   custodians who are going to authenticate simple records.

 7          MS. FRIEDLANDER:  The New York Times witness.

 8          Your Honor, what I'm trying to say about Dr. Barron is

 9   for both Mr. Parlante and one other patient who Dr. Barron

10   spoke about today, the same type of notes were in their files.

11   Dr. Barron testified about how unusual he found those things.

12   And he wrote in his chart that he noted that in those patients,

13   in Parlante's file and the other guy's file, he works for LIRR

14   and is retiring and there's an example of secondary gain.

15          That note in Dr. Barron's chart was provided to them

16   weeks ago.  They have had so much time to think about what the

17   cross of Dr. Barron was going to be, they literally didn't have

18   one question for him about those notes.  So to say all of a

19   sudden when you have the very same note related to a different

20   patient he needs more time to think about the cross is just

21   disingenuous.

22          THE COURT:  Mr. Durkin.

23          MR. DURKIN:  Judge, you know, this guy goes off the

24   charts when somebody accuses him of something and now she can

25   just flip around the word disingenuous.  It was good for the

D7QLLES6

1   goose.  And should I get crazy and say how can they attack my

2   credibility?

3              THE COURT:  That would be out of character.

4              MR. DURKIN:  Look, here's what I propose.

5              THE COURT:  Let me tell what you I propose.  If this

6   witness can come back Monday, we have plenty of time.  Give the

7   jury a break.  It's Friday.  Give yourselves a break.  Let's

8   adjourn.  Bring him in first --

9              MR. DURKIN:  Best idea I heard all day.

10             MR. JACKSON:  That's the best idea I've heard all day.

11             MR. DURKIN:  Government agrees.

12             MR. JACKSON:  While we're complaining about things --

13             THE COURT:  Do we have consensus on that?

14             MR. JACKSON:  It's about this witness, Judge.  So

15  Mr. Durkin at least, before you go, Mr. Durkin at least got

16  notice at 11 o'clock last night.  At 1:46 p.m. --

17             MR. DURKIN:  This morning.

18             MR. JACKSON:  Sorry, this morning.  At 1:46 p.m., I

19  got notice about these exhibits that the government is putting

20  in under the title Disability Income for Marie and Gus Baran.

21  What they're doing, they're making -- I don't want to

22  characterize the exhibit itself.  I'll show you the exhibit.

23             THE COURT:  Does it have to do with this witness?

24             MR. JACKSON:  It does because they're attempting to

25  introduce it.  Just to be clear for the record, it's 831 and

D7QLLES6

1     it's 830.  And apparently they're making a relationship between

2     income that Ms. Baran earned working as a consultant lawfully

3     and income that Mr. Baran got because he had a disability.  I

4     think it's completely misleading to otherwise suggest that's

5     the case to the jury, No. 1.

6          No. 2, it's also cumulative.  We heard from the tax

7     guy, Chirichella.  We heard from the other person who testified

8     as the authenticator of records.  And now we're going to get

9     another witness who talks about the totality of the income

10    earned and the fact that it's disability income, quote/unquote.

11         MR. TEHRANI:  Your Honor, we wouldn't have needed so

12    many witnesses if they had stipulated to some of these

13    witnesses.

14         The point of Special Agent Tumulty, it's a summary

15    witness.  So he's going to put together some of the evidence

16    has been admitted through different witnesses and it is

17    entirely relevant.

18         MR. JACKSON:  We've done this three times.

19         MR. TEHRANI:  It is entirely relevant --

20         MS. FRIEDLANDER:  Because you wouldn't stipulate.

21         MR. TEHRANI:  -- that Marie Baran is generating income

22    from helping people apply for disability applications and apply

23    for disability benefits and Ms. Baran is receiving disability

24    benefits which the government has alleged is a fraudulent

25    disability application.  Their motive for committing this fraud

D7QLLES6

```
 1    is extremely relevant.

 2                MR. JACKSON:  At best it's cumulative.  We've heard

 3    from the tax accountant.  We heard from the authenticator of

 4    records from the IRS.

 5                Not only did we hear from those two and it's

 6    cumulative, it's also misleading.  You're putting disability

 7    income.  She earned her income with a business.  He got income

 8    based upon his disability.  So we confuse the jury to make it

 9    seem like disability income is this income that's earned in

10    addition to income that you get because you apply for a

11    disability?  He didn't apply for any disability.  This is the

12    third different time you'd be introducing this evidence.

13                THE COURT:  All right.  Let's see.  To some extent I

14    agree with Mr. Jackson.  We've heard a lot of testimony about

15    Ms. Baran's income and Mr. Baran's income.  At some point we're

16    going to cross the line into cumulative.  If there's something

17    different about this testimony, then I'd like to hear it.

18                MS. FRIEDLANDER:  Your Honor, there has been no

19    testimony about the amount of money that Mr. Baran earned from

20    this disability what we allege is a fraud.  Absolutely no

21    testimony.  This will be the first information the jury has

22    seen about that.

23                Secondly, to the extent other witnesses have talked

24    about the Barans' income from tax returns, it's because they

25    made us call witnesses to authenticate.  This is the only piece
```

D7QLLES6

1    of evidence we ever wanted to admit.  It's a summary chart that

2    provides information about --

3              THE COURT:  All right.  Come back to Mr. Jackson.

4              MR. JACKSON:  I beg their indulgence, Judge.  Didn't

5    we go through tax returns of both of them with her accountant

6    and this other guy?

7              THE COURT:  Excuse me.  The simplest way to do this is

8    take whatever evidence is already on the record and whatever

9    evidence is here that you think is cumulative, see if you can

10   stipulate to it.

11             MR. JACKSON:  This is all duplicative, Judge.

12             MR. WEDDLE:  This is a standard summary chart, Judge.

13   There's no question that we have alleged and the jury is under

14   no misconception we've alleged this is a fraud and the money

15   that Marie Baran got and the money Gus Baran got for disability

16   payments --

17             THE COURT:  That's already on the record.  You need to

18   put the amounts, stipulate to it.

19             MR. WEDDLE:  This is how you put -- this is how you

20   put the amounts in in the most efficient way.  You put it on a

21   piece of paper.

22             THE COURT:  The most efficient way is to stipulate.

23             MR. JACKSON:  This is different from the tax records.

24             THE COURT:  See if you can stipulate to it.  Work it

25   out.

D7QLLES6

```
 1                  (In open court; jury present)

 2                  THE COURT:  Thank you.  Be seated.

 3             I mentioned this morning or yesterday that I would

 4      give you an assessment of where we are and what remains.  The

 5      most likely schedule at this point is that the government will

 6      be ready to rest probably on Monday.  On that schedule the

 7      defense then will determine whether or not any of the

 8      defendants will present a direct case.  Based on some

 9      preliminary indications, some defendants may, some may not.

10      But, again, we don't know for sure because it is their

11      prerogative not to and they retain that right until they choose

12      to exercise it.

13             But assuming that there is some defense direct case,

14      my best estimate is that we will probably go until maybe

15      Wednesday or Thursday, and at that point we may be ready for

16      the Court's instructions following the closing arguments and

17      the Court's instructions.  So it is possible under the best

18      case scenario for you to receive the case sometime around

19      Wednesday or Thursday.

20             Now, given that and because we made such exceptional

21      progress and you have been an exemplary jury and I appreciate

22      very much your timeliness every morning that has enabled us to

23      get going on time every day, I'm going to give you and the

24      parties a bonus and adjourn now and ask you to return on Monday

25      at 9 o'clock again.  So thank you again for having been such a
```

1    model jury at this point.

2            Do not discuss the case among yourselves or with

3    anyone else on the outside or have any contact of any kind with

4    anyone involved in the case.  And if any of those things occur,

5    you're directed to inform the Court immediately and not discuss

6    it with your fellow jurors.  Thank you and have a good weekend.

7            (Jury not present)

8            MS. FRIEDLANDER:  Your Honor, we have a couple thing.

9            I think there's a juror still in the room.

10           THE COURT:  All right.  Thank you.  There are a couple

11   of other items that are still outstanding.  The government has

12   a motion, motion in limine with respect to some 404(b) material

13   related to Dr. Lesniewski's record of complaints of malpractice

14   and other 404 conduct.  Dr. Lesniewski has opposed the motion.

15           I'm reviewing those papers and we'll come back to that

16   on Monday at some point, if necessary have some discussion

17   about the motion.  Is there anything else?

18           MR. DURKIN:  I just wanted to address that with you.

19   Obviously, and I'm not trying to push you, but if there's any

20   way that could get resolved, that will have a big impact on

21   some decisions we have to make over the weekend.

22           THE COURT:  All right.  Understood.

23           MR. DURKIN:  If you have any -- I had proposed to you

24   a couple ways it could be resolved without getting into all the

25   meat of it, but it would be very --

D7QLLES6

1            THE COURT:  Let me, I will sort of flag for you what I

2       see as difficulties on both sides.  And I'm going to be doing

3       some further work and necessary research.

4            Conceptually, and I use the word conceptually, defense

5       counsel during opening statements in any case could come in

6       and -- and this happens very often -- indicate that the

7       defendant is a model citizen and goes to a church or temple

8       religiously every Sunday or Sabbath and that the defendant is a

9       scout master and was an eagle scout and donates enormous

10      amounts of times to charity, creating a record of a model

11      citizen inconsistent with the criminal conduct for which the

12      defendant is charged.

13           Assuming that a defense counsel puts into the record

14      that kind of opening statement, there are cases and

15      circumstances under which if there is, if the government has

16      evidence that some of that is not true, if in fact the

17      government knows that in the tax returns for the defendant

18      under charitable contributions is zero for the last ten years

19      and that not only was he not a boy scout, but he was kicked out

20      for misconduct, and he's never been to a religious service in

21      the last 15 years, if that is the truth, to what extent should

22      the government basically allow defense counsel to buttress and

23      build a false record of the goodness and charity of the

24      defendant and not be able somehow to respond to that kind of

25      statement.

D7QLLES6

```
 1            If there were no constraints on that, you could
 2    imagine what defense counsel could and would do during the
 3    course of opening statements and then shield by, as you have,
 4    saying, well, opening statement is not evidence.  So that poses
 5    a problem as I've outlined it.  I'm talking conceptually and
 6    generically, not pertaining to this case, but that is a
 7    concern.
 8            Now, I will ask you how, and I will ask the
 9    government, under those circumstances, what is a reasonable
10    response to that kind of circumstance?  Should the government
11    then perhaps on closing arguments also say, well, this is not
12    evidence, your Honor and members of the jury, but it turns out
13    that the defendant has never been to a religious service in his
14    life and was not in the boy scouts at all and in fact he has
15    never contributed to charity.
16            Now, the government could say that and also not
17    present evidence because it's not evidence and this is now at
18    closing statements, closing arguments.  Is that a fair way of
19    proceeding?  You make statements and the government comes back
20    later on to say, well, those statements are not true.
21            MR. DURKIN:  I was raised on the idea that if you made
22    statements in your opening statement that you didn't back up,
23    that was fair game for argument, that somebody could come back
24    and say, you know, defense isn't obligated to do anything.
25    However, did you hear anything about what a respected surgeon
```

D7QLLES6

1    he was?  It seems to me that's --

2              THE COURT:  Are you proposing to put in witnesses now

3    to support your opening statement assertions that your client

4    was a model citizen and never had any problem in this life or

5    profession?

6              MR. DURKIN:  We're not.

7              THE COURT:  But how then does the government come back

8    and try to balance the picture that counsel has presented to

9    the jury about the reputation of the defendant as a model

10   citizen if in fact that reputation is not a hundred percent

11   accurate?

12             MR. DURKIN:  Well, the problem with your analogy is

13   that the malpractice claims themselves, it's not quite as

14   simple as that he's never gone to church or he's never given a

15   donation.  There's a lot of dispute over the merits of these

16   malpractice claims, first of all.  That's if you look, as I

17   said, in response there's almost a half to two-thirds of a

18   banker's box of underlying documents supporting this.

19             THE COURT:  There may be dispute, Mr. Durkin, but when

20   you have -- if it were one claim, that's one thing.  But if you

21   have ten claims over a period of ten years and you have

22   professional organizations that have weighed in on some of

23   those disputes and have made determinations, that's something

24   entirely different.

25             MR. DURKIN:  But there's only two of those versus the

D7QLLES6

         nine or ten complaints that they make.  And if you look at even

         some of the underlying documents, you can see there's

         considerable dispute even in the proceeding.  It's my

         understanding as well, and I'm looking into this, but that

         orthopedic surgery is the most -- what's the right word --

         risky or litigious type of surgery.

                 So it may not be, and this is part of what I said in

         my last argument, how much longer are we going to delay the

         trial if this stuff comes in because I think there is evidence

         to support the concept that that number of claims over that

         long a practice with the number of surgeries that he performed

         is not necessarily unusual, and it would not be inconsistent

         with somebody being a respected surgeon.

                 If you look even, for example, at the government

         claims like this Bronx-Lebanon when he got hired there, he got

         hired only as a nonsurgical doctor.  There's considerable

         evidence in that file that he was well-respected.  There's some

         very glowing things in there.  There's also like an award he

         won in 2007, 2008.

                 So it would really get us into some confusing

         territory.  I don't think it's necessarily clear-cut just

         because, for example, one of the claims, I think there's

         $150,000 settlement.  That case, as I understand it, was

         strongly disputed and was resolved by the insurance carrier as

         almost nuisance to make it go away.

D7QLLES6

| | |
|---|---|
| 1 | THE COURT:  All right.  Let me make three more points, |
| 2 | Mr. Durkin.  You mentioned that claims are disputed.  But how |
| 3 | often when claims are made do the doctors basically fold and |
| 4 | say, yes, I do it.  They're going to dispute it, so there's |
| 5 | going to be dispute.  And whether the incidence of claims is |
| 6 | 90 percent or 10 percent, it's going to be disputed. |
| 7 | Second, in the course of the totality of the incidents |
| 8 | that the government has indicated, there may be some that are |
| 9 | nuisance, but when you get into a million, 200,000, that's |
| 10 | probably not nuisance. |
| 11 | Third, I agree with you in one respect.  To the extent |
| 12 | that this becomes contested and becomes a side show or becomes |
| 13 | or creates a potential for a trial within a trial as to whether |
| 14 | or not Dr. Lesniewski was subject of many malpractice lawsuits, |
| 15 | I am concerned and I would not want to open that door. |
| 16 | But you can understand that somewhere between having a |
| 17 | trial within a trial and creating the concern that you have, |
| 18 | which I also share, and simply allowing a defendant to make |
| 19 | statements about the good character of the defendant and not |
| 20 | have the government be able to somehow to raise questions about |
| 21 | whether or not that is an accurate portrayal, there has to be |
| 22 | some way in which -- |
| 23 | MR. DURKIN:  Judge, I understand. |
| 24 | THE COURT:  -- loop is closed. |
| 25 | MR. DURKIN:  I understand that.  What the other issue, |

D7QLLES6

1    and this is we didn't get any notice of any 404(b) evidence,

2    and I just don't -- I have a lot of trouble with the legal

3    proposition that somehow even though there was an order for

4    notice that somehow the opening statement can trigger that.

5    Now, I grant you that it's an unusual circumstance, but.

6         THE COURT:  That is the issue that I raised upon which

7    I opened my concerns, that if we have a deadline for submission

8    of 404 material and the deadline passes and then the defendant

9    comes in at the opening statement and introduces reasons why

10   some 404(b) material may be relevant, then you can't come back

11   and say, hey, the deadline passed, because it was you who may

12   have opened that door.

13        MR. DURKIN:  I'm not saying that's the only reason,

14   but I am saying I think it's a factor you can take into

15   account.  And it's also I find it odd in terms of a notice

16   issue in terms of just what is out there.

17        THE COURT:  Let me give you another concern on

18   precisely this question.  To the extent there is a deadline for

19   404 material that pertains to the elements of the charges that

20   the government has made and the government wishes to bring in

21   material to prove those elements, I agree with you that the

22   government should be held to the deadline.  In other words, one

23   of the government's arguments is that this material is relevant

24   to show the defendant's intent.  Well, if the government knew

25   and had evidence about these malpractice lawsuits and all those

D7QLLES6

1   other 404(b) conduct and thought it was relevant to the intent

2   issue, on that point the government should be held to the

3   deadline because it had notice about that material and could

4   have provided it to you much sooner, if it was going to be used

5   to prove the elements of the crimes.

6       We're not talking now on the elements of the crime.

7   We're talking about whether or not the defendant opened the

8   door for the government to be given a fair opportunity to

9   present a different picture of the defendant.

10      MR. DURKIN:  As I understand their argument, they're

11  proposing it for motive, and I believe that motive is not an

12  element of the offense.

13      So one possible solution might be some type of

14  instruction that simply says, you know, you heard evidence, a

15  suggestion in opening statement about motive.  Motive is not

16  required to be proven.  I believe that's the case, and that

17  might solve the problem.  Because if it is to intent, I think

18  they should have been held to the notice.

19      Perhaps we erred in interjecting intent, but I am

20  embarrassed to tell you we erred not knowing or otherwise we

21  would have kept our mouths shut.  And I don't know how else to

22  put it other than to say that I'm embarrassed, but we certainly

23  didn't intentionally attempt to infect the issue.  And I

24  suppose that gets us the stupid award, but it was not

25  intentional and we're in a very, very difficult position.

D7QLLES6

1              THE COURT:  All right.

2              MR. DURKIN:  I can represent to you as an officer of

3     the court I was aware of a pending malpractice case and that

4     was all I was aware of.  So that's whether a shame on us is a

5     different issue, but I was only aware of a currently pending

6     case that actually was supposed to have gone to trial last

7     month and didn't.

8              THE COURT:  Let me make one other point expressing my

9     reaction to the government's direction.  My view is that if the

10    government seeks to bring in this material for the purposes of

11    rebutting your opening statements, under the 404(b) standard, I

12    would consider it more prejudicial than probative or more

13    prejudicial than necessary.  And it may be that what the

14    government proposes to introduce could be somehow minimized to

15    make the point but without necessarily getting in all the

16    details and the more than necessary prejudicial aspects of the

17    government's proffer.  Those are my preliminary thoughts.

18             MR. DURKIN:  Thank you, Judge.

19             THE COURT:  Ms. Friedlander.

20             MS. FRIEDLANDER:  Your Honor, I wanted to respond to a

21    few of the points that Mr. Durkin made if that's okay.

22             THE COURT:  Okay.

23             MS. FRIEDLANDER:  They argued the motion was late.  We

24    had no intention of offering this in our main case.  True, as

25    your Honor noted, it's evidence of intent and could have sought

D7QLLES6

```
 1    to offer it, but we have lots of evidence of intent in any case
 2    that we don't necessarily offer.  We don't offer every piece of
 3    evidence we have.  Here at the time we filed our 404(b) motions
 4    we did not intend to offer this.
 5          We now intend to offer it simply because counsel has
 6    put it in issue.  Mr. Durkin said he didn't know about it until
 7    we filed our motion.  That's not our fault.  Certainly, his
 8    client knew about it.  So I don't know what else to say about
 9    that.
10          Your Honor gave an example of where counsel opens on
11    the defendant's goodness and charity and other kinds of good
12    works in the community.  Here they've not just talked about
13    that.  They have used this so-called reputation, good
14    reputation specifically to rebut motive and intent.  They said
15    that in their opening statements.  So these are important;
16    these are not collateral issues.  These are issues that go to
17    the heart of the case.  We feel it's important to rebut that.
18          Third, as Mr. Durkin said, some of these claims were
19    contested, some of them are just claims.  There's no question
20    that these are staggering payouts by an insurance company.  Any
21    one of them is an absolutely staggering payout for any
22    orthopedic surgeon and there are 17 of them.  And this is an
23    incredible malpractice record.  He lost his surgical insurance.
24          THE COURT:  Let me ask you on that point,
25    Ms. Friedlander, sorry to interrupt, but Mr. Durkin made a
```

D7QLLES6

1    suggestion that because orthopedists may be subject to

2    malpractice more at a greater incidence than others, does the

3    government have any records to either verify or rebut that?

4            MS. FRIEDLANDER:  A couple points.

5            THE COURT:  If it turns out that the typical

6    orthopedist also has 17 malpractice lawsuits in the same span

7    of years, then this is not novel.  If on the other hand the

8    typical orthopedist has one malpractice in 15 years, then I

9    think your point is well taken.

10           MS. FRIEDLANDER:  What I can say, Dr. Lesniewski lost

11   his insurance because of the scope and size of these claims.

12   If what he is saying is true, this is just typical, your Honor,

13   these are just typical claims, typical sizes, typical payouts,

14   then there would be no orthopedic surgeons because none of them

15   could have insurance.  This is a phenomenal, extremely unusual

16   step by an insurance company to revoke his malpractice coverage

17   for his work.  I think if you asked Dr. Barron how much he's

18   had to pay out in malpractice actions, the answer would be zero

19   dollars ever.

20           But, again, I don't know whether it's typical or not

21   typical.  The point really is you are talking about a defendant

22   here, a physician who lost his insurance.  That is a

23   career-ending event.

24           THE COURT:  Mr. Durkin, on this point.

25           MR. DURKIN:  One issue on that point.  My

D7QLLES6

1    understanding -- I can be corrected because I haven't had

2    enough time to research it, but my understanding of the

3    insurance is that that company canceled him.  That's not -- it

4    didn't mean he lost insurance everywhere in the world.  It was

5    just that company canceled him because he no longer -- and I

6    saw a document last night that confirms this, it just says you

7    no longer meet our underwriting standard.  Just kind of the

8    same thing that happened if you have four automobile accidents

9    with Allstate.  They say thank you very much.  That doesn't

10   mean he's precluded.

11           The reality was is that he could have gotten insurance

12   elsewhere, but the best place to get it was the place in

13   question, which is the New York state pool from the doctors.

14   It would have been considerably higher, but it was not the

15   death sentence on his medical practice.  That's not the case,

16   as I understand it.

17           THE COURT:  Ms. Friedlander.

18           MS. FRIEDLANDER:  The insurer that revoked his

19   coverage is the largest malpractice insurance provider in New

20   York.  It is physician-owned and run.  In terms of whether he

21   has a good reputation in the community, this is a huge

22   community of his peers revoking his insurance.  He appealed it

23   to the Medical Society of New York.  They agreed with the

24   insurance company and said this is not a doctor who should be

25   covered by MLMIC.

D7QLLES6

1              Doctor, as we understand it, Dr. Lesniewski was

2    briefly able to secure some type of temporary surgical coverage

3    in Chicago for a short period of time and then that was either

4    revoked or the premiums were so astronomical to cover this

5    doctor that he could not afford it.  He has never had surgical

6    coverage since that time.  As your Honor knowns, he came back

7    to Bronx-Lebanon Hospital, where he was never able to practice

8    as a surgeon again.  He has never had any surgical coverage

9    since then.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7qnles7

1          MS. FRIEDLANDER:  Just the last point.  If

2     Dr. Lesniewski is intending to put on any case, we have to be

3     able to have this evidence in our main case.  We can't just

4     leave it on the table.  We would be happy to consider anything

5     your Honor thinks is appropriate in terms of how to put it in.

6     I just wanted to make that point.

7          THE COURT:  Two points.

8          One is, if Dr. Lesniewski puts on a defense in which

9     witnesses come in and give testimony about his character and

10    reputation in the community as a surgeon, and other statements

11    of that kind consistent with what the opening statement said,

12    then it would be appropriate for government to rebut that by

13    direct evidence of the kind that you are talking about.

14         Short of that, I have concerns about the concept of a

15    defendant putting in character statements at the opening and

16    not giving the government an opportunity to present what might

17    be a more accurate picture of relevant statements.

18         So my inclination would be to allow the government to

19    present some of the material, but on a limited basis and

20    targeted so that we don't get into a sideshow.  We don't need

21    to have every one of those incidents.  We don't need to have

22    charts showing every single malpractice and the amounts.  I

23    think that some of that could be summarized.  The fact of his

24    having been denied insurance by this company could also be

25    summarized, but not going into all the goriness of what's

D7qnles7

1    behind the conduct.  I think that might be a fair middle

2    ground.

3              MS. FRIEDLANDER:  Your Honor, just a couple other

4    things.

5              To be clear, we think there is not simply evidence

6    that rebuts character, nor do we think counsel simply opened on

7    him having good character.

8              They used this to try to rebut intent, which is an

9    element of this crime and motive.

10             So what your Honor is proposing is fine.  But I just

11   want to be clear --

12             THE COURT:  I heard you.

13             But again, Ms. Friedlander, to the extent that you

14   wished this evidence to come in as intent evidence, you also

15   were subject to a deadline in which this material could have

16   been --

17             MS. FRIEDLANDER:  Yes, your Honor.

18             If I could just finish.  This is not a point about our

19   main case.  I want to make clear, if they put on an expert, if

20   they put on Dr. Lesniewski or other witnesses who may testify

21   to things that are not strictly character points, we fully

22   intend to use this evidence.

23             THE COURT:  I agree.

24             MS. FRIEDLANDER:  It's classic cross-examination.

25             THE COURT:  I would agree with that.

D7qnles7

1          Mr. Durkin, do you understand the direction?

2          MR. DURKIN:  I think so.

3          Are they going to be permitted to put something in in

4     their case in chief?

5          THE COURT:  Yes, but on a limited basis, not with the

6     whole record of what was in the motion.

7          MR. DURKIN:  I would simply respectfully disagree that

8     there is no middle ground.  If you do that, as I said in my

9     pleading, I would move for a mistrial.

10          I won't belabor it.  I understand your ruling.  But I

11     just don't think there is a way to cut the baby in half.  I

12     don't think the government's version of the insurance is

13     correct.  I think that the malpractice will open up doors that

14     will just be so prejudicial, no matter how it comes in.  They

15     put an expert on who essentially accused him of malpractice.

16     That is one of the problems I have with it.

17          To then say, because we were too stupid to, I guess,

18     investigate, I think it is overkill.  I think it is

19     unnecessary.  The government has always insisted that this case

20     was overwhelming, that they had a confession.  I think to put

21     that in simply because of an opening statement under those

22     circumstances is simply unfair.  I think it will severely

23     prejudice Dr. Lesniewski.  I just don't think you can cut this

24     baby in half, respectfully.

25          THE COURT:  Let me again give you what I thought was a

1    preliminary indication.  I will not make it until the ruling.

2    Let me mull it over the weekend.  I also indicated that another

3    possibility which I am still muling over is not to permit it

4    during the direct case but allowing the government in closing

5    arguments to offer its version of Dr. Lesniewski through

6    statements that go to the material we are talking about.

7            MR. DURKIN:  I understand.

8            MR. RYAN:  Your Honor, on behalf of Mr. Rutigliano, we

9    are going to object to this whole issue coming in.  Because

10   what we see is the government arguing to the jury

11   Mr. Rutigliano went to a doctor who he knew was a quack doctor,

12   who was not qualified in an effort to create a paper trail or

13   his occupational disability payments.  That is exactly where

14   government is going with the strategy.

15           THE COURT:  I don't see anything in the record, Mr.

16   Ryan, that would support a finding that Mr. Rutigliano knew

17   anything about Dr. Lesniewski's malpractice record.

18           MR. RYAN:  I agree with you.  But that's the argument

19   that's going to be made, and that's the predicate.

20           THE COURT:  If they make the argument, you will

21   probably hit the ceiling and I will --

22           MR. RYAN:  I will try to control myself.

23           MS. FRIEDLANDER:  Your Honor, we are arguing

24   Mr. Rutigliano went to Dr. Lesniewski not because he was a

25   negligent doctor but because they were involved in a fraud

2071

D7qnles7

together.

        MR. RYAN:  I rest my case.  Thank you.

        MR. DURKIN:  We will look for some law over the weekend, too.  I might be able to get some clarification for you.  If I do, can I just send it in a letter?

        THE COURT:  Yes.

        MR. DURKIN:  I might be able to get some clarification on some issues.  I just don't know.  I tried to reach out to a medical malpractice lawyer I know in Chicago yesterday.  I couldn't reach him.  There may be statistics on this insurance issue.

        THE COURT:  All right.  Yes, Ms. Friedlander.

        MS. FRIEDLANDER:  Your Honor, we would like to know -- I think we have an understanding from both of the other defendants as to whether they intend to put on a case and to what extent.

        THE COURT:  We asked Mr. Durkin to let us know today what his inclination is or Dr. Lesniewski's inclination is concerning testimony.

        MR. DURKIN:  I think Dr. Lesniewski can think and chew gum at the same time.  In light of what was just discussed, I think he is not going to testify.

        THE COURT:  All right.

        MS. FRIEDLANDER:  Your Honor, do they intend to call this expert who they have given us notice about?

D7qnles7

1          THE COURT:  Well, there is also an open question

2     concerning the expert.

3          MR. DURKIN:  The expert, Judge, we have given them a

4     summary of the expert.  I have the expert's 3500 material that

5     I can get to them this evening.  He's coming on Sunday.

6          In light of what we just discussed, I need to discuss

7     that with him.  I don't know.  The expert may be able to help

8     me with some of these questions as well.  I think there is

9     still a 50/50 chance he will testify.  We have a fair amount of

10     3500, what I consider a fair amount of 3500 material for them,

11     so they should be happy that.

12          They do have a summary of his testimony.  We have

13     discussed the testimony with them.  So I think they should be

14     fine.

15          THE COURT:  All right.

16          MR. DURKIN:  There is still only one other potential

17     witness, Kelly Michaels, who the government has interviewed

18     already at least one or two times.  She is with Island Sports

19     Medicine.  They know what she will testify to.

20          The only thing -- well, I will tell them.  They are

21     saying they don't know.  She is going to testify -- she may

22     testify to producing documents.  She may also testify -- if she

23     can, I don't know whether she can, which is why I'm hedging, I

24     don't know whether I have sufficient records available, but she

25     may be able to testify to the percentage of patients that

1    Dr. Lesniewski saw that were Long Island Rail Road employees

2    versus his regular practice.  That would be her testimony.

3             THE COURT:  All right.

4             MS. FRIEDLANDER:  Your Honor, I am not aware of any

5    relevant testimony that Kelly Michaels could offer about

6    producing documents.  I can represent that we have interviewed

7    her, and she has said that Dr. Lesniewski did not bring with

8    him to that practice any files relating to patients he had seen

9    previously and he wasn't continuing to see at the practice,

10   Mr. Rutigliano, Gus Baran.  So I am not sure what relevant

11   testimony he could offer through her.

12            MR. DURKIN:  The only relevance to that would be that

13   may be what she uses to give her percentage.  That is all.

14            THE COURT:  All right.  If she testifies, we will hear

15   what she is being offered for, and if it is not relevant the

16   government will object.

17            MR. DURKIN:  That is fine.

18            MS. FRIEDLANDER:  Clearly, if she is proposing to

19   testify about the percentage of his patients that were LIRR

20   patients, all of the evidence that we are proposing to admit

21   about his malpractice and his motive for committing this fraud

22   and how his motive grew over time, particularly during the

23   years when he was at this practice, is totally relevant and

24   appropriate for cross-examination.  So we intend to use that.

25            MR. DURKIN:  There is one other issue, Judge, that

1     could come up if we put a case on.  We may not put a case on.

2              But I have been asking the government for a long time

3     to produce to me the names of the patients or a way of

4     identifying the patients of Dr. Lesniewski that rejected the

5     amnesty program.

6              The government doesn't want to give us those names for

7     whatever reasons as a way of identifying it.  They don't

8     consider it relevant.  I consider it exculpatory.

9              I am going to discuss again with the government the

10    concept of stipulating to the number.  It is my understanding

11    that only out of like 1500 people who were sent this amnesty

12    notice, and there is evidence -- one of the witnesses, I forget

13    who it was, one of the patient witnesses that I cross-examined

14    said he got a letter, and then he also admitted that there was

15    a subpoena.

16             But he had gotten a letter before the subpoena which

17    was the amnesty letter.  That's what caused him to come in.  We

18    believe it is relevant, if we put a case on, to be able to show

19    that, even in light of getting what we consider to be a

20    threatening letter from the government that we're going to

21    indict you and we are going to take your pension away from you,

22    only 80, I believe it was 82 or 86 people did that.

23             We think that's relevant to rebut all these statistics

24    that the government has put on.  The government disagrees.

25             MR. WEDDLE:  Your Honor, a few brief responses to this

D7qnles7

1   argument.

2          First of all, nobody rejected the voluntary disclosure

3   program.  What we did is we mailed letters to people who were

4   receiving disability benefits and we said if you want to

5   participate in this, you can sign this agreement and then you

6   are a participant if you are accepted in the program.

7          So all we have are the acceptances.  There is no

8   rejection.  There is just no response.  So we don't have any

9   rejections.

10         The people who are on disability, I mean, we haven't

11  produced a list of who we sent these letters to, but we have

12  produced lots of spreadsheets that have lots of lists of names

13  and Social Security numbers of people who are on disability at

14  various different periods of time.

15         It is not hard to find these people.  They are in the

16  discovery.  They are in exhibits that are admitted in evidence.

17  Government Exhibit 10 has these giant spreadsheets with like

18  30,000 entries in them.

19         So you can hone in on these people just from the

20  backup of our summary charts and from materials that are

21  produced in discovery.  If the defense wanted to go and

22  interview people who received this letter, I mean, they were

23  free to do that, and they had the available information.  But

24  what they did instead in pretrial motions is they moved to

25  preclude any reference to the voluntary disclosure program and

 1    they took the position that the voluntary disclosure program

 2    itself was coercive.

 3             So I don't think there is any relevance to bringing in

 4    evidence about what people may or may not have thought when

 5    they got this letter from the government.  If you just imagine

 6    this hypothetical, that it's relevant to bring in what other

 7    people thought about the possibility, what their calculus was

 8    in terms of whether they committed a crime and whether they

 9    wanted to participate in this, then we would be talking about,

10    well, let's talk about Dr. Ajemian's calculus, who pled guilty

11    to this fraud and was sentenced already, and let's talk about

12    some other people's calculus.

13             So, other people's calculus who are not in this

14    courtroom I think is just irrelevant.  They have had the

15    information.  If there was anything exculpatory there that they

16    wanted to follow-up on, they have had the information for a

17    long time.  They were free to follow up on it.

18             We don't have rejections.  They moved to preclude any

19    reference to this and took the position that it was coercive to

20    the people who received it.

21             We received some acceptances, and we interviewed some

22    of the people who we did accept, and we turned over those

23    interview memos to the defense.

24             So I don't think that there is any basis to go into

25    this on anybody's case, and it should be precluded.

D7qnles7

| | |
|---|---|
| 1 | MR. DURKIN:  Here's my simple point, Judge.   The |
| 2 | government has introduced in its case in chief statistics |
| 3 | showing this 99 percent rate of people on disability, or 93 |
| 4 | percent, whatever it was.  They have also introduced those |
| 5 | graphs going up in the air comparing Metro-North with the Long |
| 6 | Island Rail Road. |
| 7 | The inference on all of those statistics as far as I |
| 8 | am concerned is that this was all a scam and that everybody or |
| 9 | virtually everybody from the Long Island Rail Road that got |
| 10 | disability, occupational disability, was done fraudulently. |
| 11 | That is an improper inference to leave with this jury. |
| 12 | I believe that it is relevant.  Maybe you can argue |
| 13 | what the weight of it might be worth, but I think it's |
| 14 | relevant. |
| 15 | If need be, I think we should be permitted to call the |
| 16 | case agent or a government agent who can simply answer a few |
| 17 | simple questions:  Isn't it a fact that you offered amnesty to |
| 18 | 1500, to every annuitant that got occupational disability?  I |
| 19 | believe that shows that the government believed that everybody |
| 20 | that got disability was fraudulent.  Isn't it a fact, sir, that |
| 21 | out of those 1500 people, you only got 86 acceptances? |
| 22 | They can argue that maybe that is not a rejection. |
| 23 | Maybe it didn't get to the right addressee or whatever.  But I |
| 24 | think it's pretty staggering that they can put in all this |
| 25 | innuendo, and they only call five or six witnesses, and yet |

D7qnles7

1    there is all this innuendo that all the rest of it is a fraud.

2            Yet when they send what we think is a coercive

3    letter -- and you've seen the letter.  If it's not coercive,

4    it's pretty blunt and it's pretty threatening.  And yet 1400

5    people said, Thank you very much.

6            I think that's relevant.  How relevant, I don't know.

7    They can be free to argue.  But I think we should be permitted

8    to put it in if we choose to put a case on.  I agree with you,

9    we may not put a case on.

10           THE COURT:  You agree with me on that you said?  I

11   made no suggestions.

12           MR. DURKIN:  I'm sorry.

13           I meant that I got the warning from Ms. Friedlander.

14   If we put a case on, we do it at our own risk.

15           THE COURT:  All right.

16           MR. DURKIN:  Even though it's late in the day, I get

17   it.  There is a very good chance we won't put a case on.  But

18   if we do, I think that's something we should be permitted to

19   do.

20           THE COURT:  All right.

21           Mr. Weddle, last word and then we are going to

22   adjourn.

23           MR. WEDDLE:  OK.  The voluntary disclosure program,

24   first of all, has nothing to do at all with Dr. Lesniewski's

25   intent or any of these defendants' intent.  It happened after

D7qnles7

1    they had been arrest and indicted.  It just has nothing to do

2    with it.

3         I appreciate that Mr. Durkin feels that the charts

4    that we put together have compelling inferences that flow from

5    them.

6         I think that the charts that we put together were

7    simple charts.  They are not -- you know, everyone kept

8    complaining about statistical analysis and probabilities and

9    stuff like that.  They were simple computations.  They are

10   circumstantial evidence.

11        I think they do justify inferences about the validity

12   of the occupational disability claims at Long Island Rail Road

13   versus Metro-North, and they rebut various claims that we have

14   heard throughout this case that working on the railroad is

15   incredibly dangerous and things like that.

16        And, in fact, the difference seems to be that people

17   can retire on half of their salary from the Long Island Rail

18   Road at age 50, and they can't get any of their salary if they

19   retire from the Metro-North railroad at age 50.  So they keep

20   working.  They are doing basically the same job and they work

21   until they can get a retirement pension at Long Island, they

22   can get the retirement pension.

23        There's still no relevance to this.  I don't know how

24   important this is.  I think that this is very far from being

25   relevant, and maybe I am just belaboring the point.  I don't

D7qnles7

```
 1    think that this is a difficult question at all.  I think this
 2    is not even close to being admissible.
 3              But Mr. Ellensohn is maybe a good example, and perhaps
 4    it was my mistake for not remembering that he had gotten a
 5    subpoena which caused him to come into the government.  But he
 6    referred to it as a letter.  I think that what happened is
 7    he -- I imagine that what happened is he probably got a
 8    voluntary disclosure letter, decided that he was among 1500
 9    people and that it was unlikely that the government was ever
10    going to actually focus on him.
11              Then when he got a subpoena he realized that the
12    situation was different, and he was now in a small select group
13    of people, and at that point he decided to come in voluntarily.
14    At that point he decided to plead guilty to a crime, and he
15    testified here pursuant to a cooperation agreement.
16              So the fact that he did not sign up for the voluntary
17    disclosure program, I think it was a bad decision by him as
18    things turned out, but I think that it probably was based on a
19    calculus of how likely it was that he was ever going to be in
20    the spotlight.
21              THE COURT:  We are going to have to call a close --
22              MR. DURKIN:  Just one thing, Judge.
23              THE COURT:  Yes.
24              MR. DURKIN:  My recollection of his testimony was I
25    thought he got a lawyer after he got the letter.
```

D7qnles7

| 1 | THE COURT:  This may be all academic.  But if it |
|---|---|

1          THE COURT:  This may be all academic.  But if it

2    becomes pertinent, we will revisit it.

3          MR. JACKSON:  Judge?

4          THE COURT:  Mr. Jackson.

5          MR. JACKSON:  Thank you, your Honor.  I'm glad the

6    jury got the benefit of an early afternoon.

7          THE COURT:  There is still time for you.

8          MR. JACKSON:  Just moving forward, your Honor, just so

9    that we can schedule next week and things can go as planned,

10   the government's finishing Monday.

11         Does that mean the defendant should have witnesses to

12   go Monday or Tuesday morning?

13         THE COURT:  If the government finishes in the morning,

14   you should be ready for the afternoon.

15         MR. JACKSON:  Could we just have a sense of what

16   witnesses from the government there are going to be on Monday.

17         THE COURT:  We were told they are going to have the

18   New York Times person, and, as I have it, there is this

19   question also pertaining to Dr. Lesniewski if that matter is

20   resolved in some way that makes it appropriate.

21         Is there anything else?  Some other IRS person?

22         MS. FRIEDLANDER:  No, your Honor.

23         THE COURT:  You had mentioned at some point somebody

24   from the IRS named Adino?

25         MS. FRIEDLANDER:  Yes.  She was from a tax preparer's

D7qnles7

```
 1   office.  I don't think we need to call her.

 2              THE COURT:  All right.

 3              MS. FRIEDLANDER:  We were planning to admit some Long

 4   Island Rail Road records relating to Mr. Baran.  The defense

 5   has refused to stipulate to their admissibility.  As a result,

 6   we have to call two different witnesses from Long Island Rail

 7   Road.

 8              MR. JACKSON:  What records?

 9              Maybe we can cut a deal.  What records do you want to

10   admit?

11              MS. FRIEDLANDER:  All right.

12              MR. JACKSON:  Let's cut a deal.  You allow me to

13   introduce 17 drafts, and I will stipulate to the records right

14   now.

15              THE COURT:  You can do that on your own time over the

16   weekend.

17              MR. JACKSON:  Over the weekend.

18              MS. FRIEDLANDER:  Assuming we can stipulate to these

19   records, it will just be the New York Times witness and Agent

20   Tumulty.

21              One issue from our end, Mr. Jackson is proposing to

22   call a number of witnesses.  Your Honor has standing rules that

23   require parties to inform each other of the nature of their

24   witnesses' proposed testimony.  We haven't gotten that from

25   Mr. Jackson, but we've done some of our own --
```

D7qnles7

1          MR. JACKSON:  Of course, they do, Judge.  I sent it

2     last night.

3          MS. FRIEDLANDER:  It is extremely vague.

4          If I could just finish, it appears that all of these

5     people are annuitants.  It is not clear for what purpose he's

6     proposing to offer them.

7          If they are simply pure character witnesses, I think

8     he can offer character witnesses.  But it seems to us -- we

9     don't know he can tell us -- but I think he's proposing to call

10    them to have them testify to things like:  I was a client of

11    Marie Baran's.  She asked me all about my physical condition.

12    She asked me all about my ability to do my job, things like

13    that.  Or, She helped me with the application and I was really

14    disabled, I have a devastating heart condition or some other

15    real ailment.

16         The law is very well settled that evidence of

17    nonfraudulent conduct cannot be used, cannot be introduced in a

18    case to rebut evidence --

19         THE COURT:  We don't know what Mr. Jackson's intent

20    is.

21         MR. JACKSON:  The government should be very well aware

22    of the intent, since I think basically half the FBI agents who

23    work for Justice Department were knocking on doors of these

24    people was my information.

25         I think the government has statements from pretty much

D7qnles7

```
 1   all my witnesses.  They probably have more material about all
 2   my witnesses than I do.  So I think the government knows what
 3   the intent is.
 4           But we will call the witnesses and we will be guided
 5   by the law and we will ask questions.  If there are objections
 6   they will be sustained, and if --
 7           THE COURT:  The thing is, Mr. Jackson, we could save a
 8   lot of time if we knew in advance that your line of questioning
 9   is not going to invite multiple objections and if we knew that
10   your line of questioning is within proper bounds.
11           MR. JACKSON:  I think it is within proper bound to go
12   over the process, to determine what process was followed with
13   certain witnesses.
14           MS. FRIEDLANDER:  Your Honor, this is exactly what we
15   suspected.
16           MR. JACKSON:  It seems to me to be in the bounds.
17           THE COURT:  All right.
18           Anything else, Ms. Friedlander?
19           MS. FRIEDLANDER:  Yes, your Honor.  We will move to
20   preclude these witnesses.  We will file something over the
21   weekend.
22           THE COURT:  Well, that is going to be somewhat
23   abstract, because I don't have a clear indication from
24   Mr. Jackson what his intent is with regard to the questioning
25   of the witnesses.
```

D7qnles7

1     Mr. Jackson, I think in order to preclude motion

2   practice, along with your list of who the witnesses, according

3   to the Court's rules, you should indicate what the nature of

4   the proffered testimony is.

5     MR. JACKSON:  Judge, I have.  I have given them an

6   indication.  It seems the government -- I know they like to

7   file motions and documents, so I assume that they will continue

8   to do that.  But I did give an indication, the same notice that

9   we had, the generalized notice regarding what the witnesses

10   would testify for the government, is the generalized notice

11   that I gave to them.

12     So I suspect that in the event that we do move forward

13   with these witnesses they will give testimony that is in the

14   bounds of the rules and --

15     THE COURT:  What is most likely to happen,

16   Mr. Jackson, is that if the first witness is not within the

17   bounds of the rules, all of the others are going to be

18   precluded.

19     MR. JACKSON:  Not so, Judge.  The government is

20   presuming what I'm doing with witnesses.  They can make all the

21   presumptions they want.

22     MR. WEDDLE:  Your Honor, we are just asking for some

23   kind of proffer.  It may be that these witnesses are proper,

24   and it may be that these are simply specific instances of good

25   conduct, which are plainly not admissible.

D7qnles7

1          The fact that Marie Baran one time did not commit this

2    crime with a Long Island Rail Road employee is not admissible

3    to rebut the charges.

4          MR. JACKSON:  Your Honor, our argument is at no time

5    did she do it, so I don't know what Mr. Weddle is talking about

6    at one time.   Our argument is that going to be at no time she

7    did do that.

8          THE COURT:  You can't prove that with having three and

9    four witnesses --

10          MR. JACKSON:  I am not suggesting I can, Judge.

11          THE COURT:  All right.

12          MR. WEDDLE:  What we got from Mr. Jackson is we got a

13    letter that said the list of names, and it said so and so will

14    testify about his dealings with Marie Baran.

15          We did not get any 3500 material.  We did not get any

16    defense exhibits relating to these witnesses.  These were due

17    on Thursday night.

18          So to say that Mr. Jackson's letter is similar to the

19    disclosure that the government made is just not correct,

20    because we did turn over a witness list, which was in a couple

21    lines the substance of people's testimony, but we also turned

22    over 3500 material and our exhibits.

23          THE COURT:  If there is 3500 material related to those

24    witnesses, Mr. Jackson, you must turn that over.

25          MR. JACKSON:  Judge, I understand that.

D7qnles7

```
1          MS. FRIEDLANDER:  Your Honor, the fact that even now
2     your Honor has just asked him twice what do these people
3     propose to testify about, give me a proffer, the fact that he
4     still won't answer that I think makes it extremely likely that
5     he is proposing to call them for this entirely improper
6     purpose.
7          MR. JACKSON:  In other words, I guess the government
8     is accusing me of being prepared to violate the judge's rule,
9     being prepared to violate the rules of evidence.
10          I have a right to present my case.  I don't have to
11     put the people on notice about my defenses or what witnesses
12     will say.
13          Again, I gave a generalized description within the
14     bounds of the rules as to what the information would be from
15     the witnesses.  I suspect that they will give testimony in
16     conformity with what those are.
17          I don't have any 3500 material.  They have had FBI
18     agents talk to these witnesses.  They know better than I what
19     the witnesses will say, Judge.
20          THE COURT:  If they have the 3500 material, then you
21     must have the 3500 material.
22          MR. JACKSON:  I don't have anything, Judge.  I just
23     understand the witnesses were calling me in panics that FBI
24     agents were pounding on their doors and following them in the
25     middle of the street.  I don't know, Judge.
```

D7qnles7

1          So I suspect that the FBI agents have information that

2     they have given to the government.

3          MR. WEDDLE:  Your Honor, when we make our disclosures,

4     we don't play hide the ball.

5          Our understanding is that Mr. Jackson's paralegal has

6     interviewed several of these people.  I would surprised if

7     there is no record of any statement that any of these people

8     have made to anyone on the defense team.  It seems remarkable

9     to me that he's saying he has no 3500 material.

10         MR. JACKSON:  Judge, I have remarkable things happen

11    to me every day.

12         I am just saying, your Honor, that I don't have any

13    material.  I don't know what he is talking about, my paralegal

14    interviewing anybody.  I spoke with witnesses.  We have had a

15    conversation.  That's it.

16         MR. WEDDLE:  Your Honor.

17         MR. JACKSON:  Judge, actually I am reminded during the

18    course of this conversation that I believe one witness in

19    particular has faxed something over to my office.  I will

20    forward that to the government.

21         Beyond that I have nothing to share.

22         THE COURT:  How many witnesses are you talking about,

23    Mr. Jackson?

24         MR. JACKSON:  I am not sure how many I will call.  I

25    gave them notice of eight.  I will see how many I will call,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7qnles7

```
 1    Judge.  I don't know if I will call them.  The government gave
 2    us notice of 20 some odd witnesses.  They called who they felt
 3    like calling.
 4              THE COURT:  Let me then put you on notice also.  I
 5    will give you notice.
 6              If you propose eight and the first one proposes
 7    testimony that I ruled to be improper or not relevant, and you
 8    propose the other seven to do likewise, I am not going to allow
 9    the other seven.
10              MR. JACKSON:  That is not a surprise to me, Judge.
11              Thank you.
12              THE COURT:  All right.
13              MS. FRIEDLANDER:  Your Honor, to be clear, if he puts
14    a witness on the stand who is an annuitant who paid Ms. Baran
15    for her services and starts saying what did she ask you during
16    the meeting, that question is not proper.  We don't think --
17              MR. JACKSON:  Judge, the government may not believe
18    this, but I went to law school, your Honor, and I am fully
19    aware of what my responsibilities are.  Believe it or not,
20    there may be annuitants who actually might know Ms. Baran.
21    They may know how she is, they may know about her reputation,
22    they may know about her life.
23              THE COURT:  Those are character witnesses and there
24    are rules pertaining to those.
25              MR. JACKSON:  Thank you, Judge.
```

D7qnles7

1          MS. FRIEDLANDER:  Your Honor, I want to be clear.  He

2     is proposing to call them purely as character witness?

3          THE COURT:  We don't know.

4          MR. RYAN:  I make a motion, if I may, Judge.

5          THE COURT:  Yes, a motion to adjourn?

6          MR. RYAN:  I move we adjourn.

7          MR. JACKSON:  Second, your Honor.

8          THE COURT:  We are adjourned.

9          (Adjourned to Monday, July 29, 2013, at 9:00 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                      INDEX OF EXAMINATION

 2    Examination of:                            Page

 3    OTIS ALTON BARRON

 4    Direct By Ms. Friedlander  . . . . . . . . .1859

 5    Cross By Mr. Ryan  . . . . . . . . . . .1900

 6    Cross By Mr. Jackson . . . . . . . . . . .1913

 7     Cross By Mr. Dratel . . . . . . . . . . .1947

 8    Recross By Mr. Ryan  . . . . . . . . . . .2008

 9    Recross By Mr. Dratel  . . . . . . . . . .2009

10    PAUL CROWLEY

11    Direct By Mr. Weddle . . . . . . . . . . . .2010

12    Cross By Mr. Ryan  . . . . . . . . . . . .2027

13    Cross By Mr. Jackson . . . . . . . . . . . .2031

14    Redirect By Mr. Weddle . . . . . . . . . .2034

15    SEAN TUMULTY . . . . . . . . . . . . . . . .2036

16                     GOVERNMENT EXHIBITS

17    Exhibit No.                           Received

18     503-A, 503-B, 523, 524, 525, 526, 566,  . . .2013

19            567, 568, 1501, 1502, 1503,

20            and 1504

21     565 and 1500  . . . . . . . . . . . . . . .2018

22                     DEFENDANT EXHIBITS

23    Exhibit No.                           Received

24     L11  . . . . . . . . . . . . . . . . 1986

25
</pre>