D7snles1
                              Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                           S14 11 Cr. 1091 (VM)

5    PETER LESNIEWSKI, MARIE BARAN
     and JOSEPH RUTIGLIANO,
6
                   Defendants.
7
     ------------------------------x
8

9                                          July 29, 2013
                                           9:00 a.m.
10

11   Before:

12                      HON. VICTOR MARRERO,

13                                          District Judge

14
                           APPEARANCES
15
     PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17   BY:  JUSTIN S. WEDDLE
          DANIEL BEN TEHRANI
18        NICOLE WARE FRIEDLANDER
          Assistant United States Attorneys
19
     LAW OFFICES OF JOSHUA L. DRATEL, P.C.
20        Attorneys for Defendant Peter Lesniewski
     BY:  JOSHUA LEWIS DRATEL
21        LINDSAY A. LEWIS

22   DURKIN & ROBERTS
          Attorneys for Defendant Peter Lesniewski
23   BY:  THOMAS ANTHONY DURKIN

24

25

D7snles1

                              Trial

1                       APPEARANCES CONTINUED

2    KOEHLER & ISAACS, LLP
          Attorneys for Defendant Marie Baran
3    BY:  JOEY JACKSON

4    JOSEPH W. RYAN, JR.
     KEVIN MENEILLY
5         Attorneys for Defendant Joseph Rutigliano

6              – also present –

7    Annie Chen
     Emma Larson, Government Paralegals
8

9    SA Frank LoMonaco, FBI

10   Yeni Yrizarry, Defendant Baran Paralegal

11                          oOo

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7snles1
                                Trial

1                (In open court)

2                (Trial resumed)

3                THE COURT:  Just a few matters that --

4                MR. DURKIN:  Judge, I had one minor housekeeping

5      matter.

6                THE COURT:  Yes.

7                MR. DURKIN:  If you don't mind, can I introduce my

8      wife and law partner, Janice Roberts.

9                THE COURT:  Good morning.  Welcome.

10               MR. DURKIN:  Our partner, Joshua Herman.

11               THE COURT:  How do you do and welcome.

12               MR. DURKIN:  And your clerk has been kind enough to

13     tell me that he is going to prepare one of those cell phone

14     orders, if that's OK.

15               THE COURT:  That is fine.

16               I hope their presence doesn't crimp your style.

17               MR. DURKIN:  She's been known to do that.

18               THE COURT:  A couple of things.

19               One, the court received a letter from the government

20     dated July 28 in the form of a motion in limine to preclude

21     some testimony by Ms. Baran's, one of Ms. Baran's witnesses a

22     Ralph Domenici.  We will turn to that at the appropriate

23     moment.  I am just acknowledging its receipt.

24               Second, we left open on Friday the Court's ruling on

25     the government's offer to put on witnesses with regards to

D7snles1
                              Trial

 1   Dr. Lesniewski's malpractice insurance issues.  I indicated

 2   what my preliminary thoughts on that matter were, but leaving

 3   open the precise ruling.  In this connection I call to your

 4   attention three cases that I believe are on point and my basis

 5   for my ruling, United States v. Khadir, 718 F.3d 115, (2d Cir.

 6   2013).  In that case the government sought to introduce certain

 7   photos of the defendant in which the defendant is shown posing

 8   with some weapons.  That was introduced in response to

 9   statements made by defense counsel during opening statements in

10   which the defense sought to portray the defendant as a

11   peaceful, law-abiding person.  The Second Circuit essentially

12   indicated that it was permissible for the government to

13   introduce the photos as evidence of motive, opportunity, and

14   intent.  The Second Circuit laid out certain standards in that

15   case to guide district courts in considering this kind of

16   evidence under these circumstances.

17          Two district court cases on point.  United States v.

18   Vargas, in the district court.  It's reported at 06-2788 Cr. in

19   the Second Circuit 279 F.App'x 56 (2008) WL 40180176.  And

20   United States v. English, 293 F. App'x 39 (2008) WL 4280062.

21          In all of these cases the Second Circuit essentially

22   endorsed rulings by the district court allowing for the

23   government to introduce evidence to rebut statements made by

24   the defense in opening remarks.  In the Khadir case the Second

25   Circuit laid out standards for the Court to consider.  I will

D7snles1
                                Trial

 1    lay those out at the appropriate time.

 2                THE COURT:  Yes.  I'm sorry.  Both of you rose at the

 3    same time.

 4                MS. FRIEDLANDER:  Your Honor, I apologize for

 5    interrupting the Court.  We sent an e-mail to chambers

 6    yesterday.  I am not sure if the Court has had an opportunity

 7    to see it, but we spoke with defense counsel yesterday.  We

 8    understand that Dr. Lesniewski's current intention is not to

 9    present a case, and in light of that, we have agreed not to

10    offer the malpractice evidence in our case in chief.

11                MR. DURKIN:  That's correct, your Honor.

12                MS. FRIEDLANDER:  I apologize for any

13    miscommunication.  We did just speak yesterday.

14                THE COURT:  I spent the entire weekend checking my

15    e-mails, as you can imagine.  Yes.

16                MR. DURKIN:  That is correct.  We do intend to offer a

17    couple of stipulations, but we are not presenting a case.

18    Dr. Lesniewski is not testifying, nor is the expert.

19                THE COURT:  All right.  Thank you again.

20                If there is nothing else at the moment, bring in the

21    jury.  Yes, Mr. Jackson.

22                MR. JACKSON:  Judge, would you like me to address the

23    Ralph Domenici.

24                THE COURT:  Not at this point.

25                MR. JACKSON:  I will address it, of course, when your

D7snles1
Trial

1    Honor directs me or asks me or inquires of me.  I wanted to

2    address a subpoena that we received, that was e-mailed

3    apparently last night to Ms. Baran directing her to bring all

4    these items, but I will address that when it is appropriate.

5            THE COURT:  Thank you.

6            MR. JACKSON:  Thank you, Judge.

7            MS. FRIEDLANDER:  Your Honor, one brief matter.  We

8    would like to interrupt Agent Tumulty's testimony, which will

9    take some time, just to put on the New York Times witness, who

10   will only testify for a moment, and the Long Island Rail Road

11   witness.

12           Each of those witnesses will be just we think a few

13   minutes at most.  I think defense counsel has no problem with

14   it, if it is OK with the Court.

15           I have represented to the New York Times that as the

16   Court, I let them know what your Honor said from the bench,

17   which is that the Court will not allow questioning of the New

18   York Times witness beyond authenticity questions.

19           THE COURT:  Thank you.

20           Mr. Dratel.

21           MR. DRATEL:  No, your Honor.  I just want to speak to

22   the court reporter.

23           THE COURT:  All right.  Bring in the jury.

24           (Jury present)

25           MR. WEDDLE:  Your Honor, if you don't mind, just

D7snles1
                         Trial

1    before we call our first witness I thought I would read a few

2    stipulations.  And then we have a few items, five items in

3    particular that I think were offered and received, but when we

4    were checking the transcript just to double check everything,

5    in the transcript they didn't show up as received.  So I don't

6    know if your Honor would like me to reoffer them in front of

7    the jury just so we have that clarified for the transcript.

8               THE COURT:  That is fine.  Yes.

9               MR. WEDDLE:  Thank you.

10              Your Honor, one final thing is that a number of the

11   summaries that Dr. Barron presented were put on the screen and

12   discussed at length, but I am not sure that they were formally

13   received, so we would just offer those.  I am going to get a

14   list of the numbers.

15              THE COURT:  OK.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

D7snles1
                                    Trial

1           (Jury present)

2           THE COURT:  Good morning.  Welcome back.

3           The government will call its next witness.

4           MR. WEDDLE:  With the Court's permission, your Honor,

5   we would like to read some stipulations into the record just

6   prior to calling our next witness.

7           THE COURT:  All right.  Proceed.

8           MR. WEDDLE:  The first one I have, your Honor, is

9   Government Exhibit 1604.  It is a business records stipulation

10  relating to certain records of Aflac TransAmerica and CUNA.

11          It is background information so I don't think I even

12  need to read that one into the record, but I would just offer

13  1604 as a stipulation of the parties.

14          THE COURT:  Admitted as stipulated.

15          (Government's Exhibit 1604 received in evidence)

16          MR. WEDDLE:  The next one is Government Exhibit 1605,

17  which says it is stipulated by the parties that, if called as a

18  witness, a representative of Railroad Retirement Board would

19  testify as follows:

20          Actually, your Honor, I think that I have already read

21  this one, but this is one that I read and I offered and I think

22  we just wanted to clarify that that had been received, 1605,

23  relating to Railroad Retirement Board records used as

24  background by Mr. Murray.

25          The next stipulation I have is Government Exhibit 1608

D7snles1
                                    Trial

1    which says that the parties stipulate that, if called as a

2    witness, a representative of the New York State office of Parks

3    and Recreation would testify that Government Exhibits 554-A

4    through 554-E are sign-in sheets for the Alfred E. Smith Sunken

5    Meadows State Park Golf Course.  The sign-in sheets relate to

6    the years 2004 through 2008 respectively, and include the dates

7    on which Joseph Rutigliano, the defendant, signed in to play

8    golf.  Users of the golf course are asked to sign in before

9    playing golf.  These sign-in sheets made and kept in the

10   ordinary course of business.  That's Government Exhibit 1608.

11          And I have Government Exhibit 1609, which states that,

12   if called as a witness, a representative of United Healthcare

13   Corporation would testify that Government Exhibit 10-A includes

14   spreadsheets titled, and then it gives the title of the

15   spreadsheets listing all claims made by Peter Lesniewski, the

16   defendant, and Peter Ajemian for patients under the Empire Plan

17   of United Healthcare as of January 7, 2013.

18          Government Exhibit 650 contains a spreadsheet titled

19   Michael Stavola claim HX listing all claims made on behalf of

20   Michael Stavola by, among others Ralph Parisi under the Empire

21   Plan of United Healthcare as of June 29, 2010.  United

22   Healthcare retains records in the ordinary course of its

23   business activity for seven years.  Older records may be

24   retained if otherwise accessed by the claim department within

25   the seven-year retention period.

D7snles1
                              Trial

1            The spreadsheets contain the following data fields,

2   among others.  And then it list the field, the column heading

3   and describes what each of those column headings mean.  I am

4   going to skip all of that detail, but it's in the stipulation.

5            Then it says, Claims for reimbursement can be

6   submitted to UHC by a provider by mail, fax or electronic

7   communication.  Electronic transmission of claims does not

8   automatically result in a paper record.  Rather, the data

9   entered by the provider is electronically transmitted into

10  UHC's database.

11           Claim information contained in Government Exhibits

12  10-A and 650 and in particular the FLN office number field

13  indicate that Peter Lesniewski, Peter Ajemian, and Ralph Parisi

14  submitted claims to UHC electronically.  In particular,

15  electronic claims were submitted to UHC for Gary Supper, Regina

16  Walsh, and Michael Stavola.

17           Electronic claims are received by UHC computers in

18  Colorado Springs, Colorado; Chaska, Minnesota; or Elk River,

19  Minnesota.

20           The claim information contained in Government Exhibit

21  650 and in particular the series ID field indicates that UHC

22  reimbursed Peter Lesniewski, Peter Ajemian, and Ralph Parisi by

23  electronic payment.

24           In particular UHC made electronics payments as

25  reimbursements for services rendered to Gary Supper, Regina

D7snles1
                              Trial

1    Walsh, and Michael Stavola.

2            Electronic payments are issued by UHC's central

3    treasury in Minnetonka, Minnesota, and/or Hartford,

4    Connecticut, by automated clearing house, otherwise known as

5    ACH, to the provider's bank account.

6            If called as a witness, a representative of the Empire

7    Plan of UHC would testify that it would not reimburse providers

8    for office visits and medical tests performed to document

9    fraudulent disability claims.

10           And finally, your Honor, I have Government Exhibit

11   1610, which is another stipulation, which says, if called as a

12   witness, a representative of the Railroad Retirement Board

13   would testify as follows:

14           Government Exhibit 30 contains business records of the

15   RRB showing the amount of monthly disability benefits paid to

16   Ostap Baran for specific periods of time from July 1, 2004

17   through December 31, 2011.  These records were made and kept in

18   the ordinary course of business.

19           The payment beginning date entry shows the start of

20   the particular rate period in the format year month day.  The

21   payment end date shows the end of the particular rate period.

22   For each rate period the amount of benefits paid each month

23   during that rate period is listed in the entry Payment Recur.

24   Tot. Amount as a dollar figure.

25           So I offer each of those stipulations that I just

D7snles1
                              Trial

1    read.

2              THE COURT:  Admitted as stipulated.

3              (Government's Exhibits 1605, 1608, 1609, and 1610

4    received in evidence)

5              MR. WEDDLE:  Then there were some stipulations that I

6    previously read and I believe offered, but we just wanted to

7    make sure it was clear in the transcript that these

8    stipulations were received; and, in addition, that several

9    exhibits were received.  The stipulations are 1605, 1606, and

10   1607.  The exhibits are Government Exhibit 530, Government

11   Exhibit 10, and then several of the summary charts that Dr.

12   Barron testified about namely Government Exhibits 453, 454, 455

13   and 456, we offer those exhibits as well, your Honor.

14             MR. DRATEL:  Your Honor, we may be heard about the

15   charts.  We can do it later obviously.

16             THE COURT:  Let's do it later.

17             MR. DRATEL:  Thank you.

18             THE COURT:  All right.

19             MR. WEDDLE:  Thank you, your Honor.

20             THE COURT:  Call your witness.

21             MS. FRIEDLANDER:  The government calls Brent McDonald.

22    BRENT McDONALD,

23         called as a witness by the Government,

24         having been duly sworn, testified as follows:

25   DIRECT EXAMINATION

D72nles1                    McDonald – direct

1   BY MS. FRIEDLANDER:

2   Q.  Good morning, where do you work?

3   A.  I work at the New York Times.

4   Q.  What do you do there?

5   A.  I am a video journalist.

6   Q.  Have you reviewed a video marked Government Exhibit 550 and

7   a photograph marked Government Exhibit 551?

8   A.  I have.

9   Q.  Were those published on the New York Times website?

10  A.  They were.

11  Q.  When approximately?

12  A.  September 19th I believe?

13  Q.  Of what --

14  A.  2008.

15  Q.  When were the photo and videotape taken approximately?

16  A.  They were between mid-July on mid-August of 2008.

17  Q.  How do you know that?

18  A.  Because I was there.  I shot them.

19  Q.  Do Government Exhibits 550 and 551 truly and accurately

20  represent the activities depicted in them?

21  A.  They do.

22  Q.  Do you know who is shown in the photo and video marked 550

23  and 551?

24  A.  Joe Rutigliano.

25  Q.  How do you know that.

D72nles1                        McDonald - direct

1    A.  I addressed him as Mr. Rutigliano and he responded.

2              MS. FRIEDLANDER:  The government offers 550 and 551.

3              THE COURT:  Mr. Ryan.

4              MR. RYAN:  May I have a voir dire?

5              THE COURT:  Yes.

6    VOIR DIRE EXAMINATION

7    BY MR. RYAN:

8    Q.  Do you keep a record of the date that the video was taken?

9    A.  We don't.  I mean, I looked on our website and the date

10   published of September 19, 2008.

11   Q.  When the video was taken, it was logged or stored somewhere

12   in the storage facilities of the New York Times?

13   A.  It is.

14   Q.  The best you can give us for a date is July, August?

15   A.  Well, the original files don't have the original date

16   attached to them any longer.

17   Q.  At the time that the videotape was taken -- and I am going

18   to use the term logged in -- there was a record made as to when

19   it was taken?

20   A.  I don't believe so.

21             MR. RYAN:  Subject to those questions I have no

22   objection.

23             THE COURT:  All right.  Received subject to those

24   questions.

25             (Government's Exhibits 550 and 551 received in

1    evidence)

2              MS. FRIEDLANDER:  We will publish the photograph

3    first, that's 551.  Thank you, Ms. Larson.  If we could now

4    play the video, Government Exhibit 550.

5              (Video played)

6              MS. FRIEDLANDER:  Thank you.

7              No further questions.

8    CROSS EXAMINATION

9    BY MR. RYAN:

10   Q.  This video was logged in in the New York Times I am going

11   to say storage facility, correct?

12   A.  I logged it.

13   Q.  How did you know it was Mr. Rutigliano?

14             MS. FRIEDLANDER:  Objection.  Asked and answered.

15             THE COURT:  Overruled.

16   Q.  How do you know it was Mr. Rutigliano?

17   A.  I went up to him addressed him as Mr. Rutigliano and he

18   responded .

19   Q.  Did you check the log-in, the sign-in sheets to make sure

20   that that was him at the golf course?

21   A.  Yes.

22   Q.  Correct?

23   A.  Yes.

24   Q.  So he signed in his name?  You got confirmation, he

25   identified himself, correct?

D72nles1                          McDonald - cross

1    A.   Yes.

2    Q.   Would you explain to the jury how this videotape was put

3    into your storage facility and put on your website?  What's the

4    process?

5    A.   It wasn't a videotape.  It was recorded onto a Staple tape

6    drive so there's no tape.

7    Q.   So it's digital?

8    A.   It's digital.

9    Q.   Just explain to the jury.  That digital is then put on the

10   Times website, correct?

11   A.   Yes.

12   Q.   You said it was published on or about September 19, 2008?

13   A.   Yes.

14   Q.   Was it published in connection with an article about

15   Mr. Rutigliano?

16   A.   Yes.

17   Q.   Was the title of the article "Epidemic Among Railroad

18   Retirees" in words or substance?  That was the headline?

19   A.   I believe so.  I don't know exactly what it read.

20   Q.   It was an epidemic relating to the occupational

21   disability --

22            MS. FRIEDLANDER:  Objection.

23            THE COURT:  Sustained.

24            MR. RYAN:  OK.

25   Q.   This website was intended to allow this video that you took

D72nles1                        McDonald - cross

1   to be broadcast worldwide?

2              MS. FRIEDLANDER:  Objection.  Beyond the scope.

3              THE COURT:  Sustained.

4   Q.  When you say it was on the website, will you explain to the

5   jury what it means with respect to the public having access to

6   this video?

7              MS. FRIEDLANDER:  Objection, your Honor.  Beyond the

8   scope.

9              THE COURT:  Overruled.

10  A.  It appeared as videos did then; a video in the margins of

11  the article and also as a standalone video on our home page.

12  And then we have a library player where videos are archived and

13  stored as well.

14  Q.  So that anyone could log into the New York Times website

15  and see this video?

16             MS. FRIEDLANDER:  Objection.  Beyond the scope of

17  authenticity.

18             THE COURT:  Sustained.

19  Q.  Let's take the still photograph that was just showed up

20  there.  That still photograph, I am going to use the term was

21  logged in digitally in the New York Times storage facility,

22  correct?

23  A.  Yes.

24  Q.  Then it was used in a publication on the front page of the

25  New York Times on or about September 19, 2008, correct?

D72nles1                        McDonald - cross

1   A.  To be honest, I don't remember where it appeared, the

2   article that is, in the paper.

3   Q.  You never saw the article?

4          MS. FRIEDLANDER:  Objection, your Honor.

5          THE COURT:  Sustained.

6          MR. RYAN:  OK.

7   Q.  Well, the photograph of Mr. Rutigliano, if shown on the

8   front page of the New York Times, would be available to anybody

9   who wanted to read it whether by hand --

10          MS. FRIEDLANDER:  Objection.

11          THE COURT:  Sustained.

12  Q.  Was that article and that still photograph available to the

13  general public on your website?

14          MS. FRIEDLANDER:  Objection.

15          THE COURT:  Asked and answered.

16  Q.  The still photograph as opposed to video.

17          MS. FRIEDLANDER:  Objection.

18          THE COURT:  Asked and answered.

19          MR. RYAN:  OK.  Thank you very much.

20          THE COURT:  Thank you.  You're excused.  You may step

21  down.

22          (Witness excused)

23          THE COURT:  Mr. Tehrani.

24          MR. TEHRANI:  The government calls William Shaw.

25   WILLIAM SHAW,

D72nles1                        McDonald - cross

1              called as a witness by the Government,

2              having been duly sworn, testified as follows:

3     DIRECT EXAMINATION

4     BY MR. TEHRANI:

5              MR. TEHRANI:  Your Honor, just one second.  I need to

6     pass up the hard copies of the exhibits.

7              Your Honor, may I approach?

8              THE COURT:  Yes.

9     Q.  Mr. Shaw, where do you work?

10    A.  The Long Island Rail Road.

11    Q.  What is your position?

12    A.  I am deputy controller of disbursements and time and

13    attendance.

14    Q.  What are your duties and responsibilities in that position?

15    A.  I am in charge of all time and attendance and payroll for

16    the Long Island Rail Road.

17    Q.  I'm showing you what's been marked for identification as

18    Government Exhibits 553 and 813.  They are in front of you.

19    A.  That's correct.

20    Q.  Do you recognize those?

21    A.  Yes, I do.

22    Q.  What are they?

23    A.  We call them wage extractions.  They are time and

24    attendance records for these particular employees.

25    Q.  Are they kept and made in the ordinary course of business

D72nles1                          Shaw - direct

1    of the Long Island Rail Road?

2    A.   They are.

3    Q.   Where does the information reflected in the reports come

4    from?

5    A.   This information is a summary of all time and attendance

6    that is collected by the departments and sent to the corporate

7    payroll department for payment.

8    Q.   So the information there is also the same information that

9    is used to pay employees?

10   A.   That is correct.

11             MR. TEHRANI:  Your Honor, the government offers

12   Government Exhibits 553 and 813.

13             MR. RYAN:  Can I have a voir dire, Judge.

14             THE COURT:  Yes.

15   VOIR DIRE EXAMINATION

16   BY MR. RYAN:

17   Q.   You are aware that Mr. Rutigliano is a union official

18   during the period of time of 553?

19   A.   I don't know about the time.  I know he was an official.

20   Q.   And do these records reflect --

21             MR. TEHRANI:  Your Honor, I believe this is

22   cross-examination, not voir dire.

23             MR. RYAN:  I object.  I haven't finished the question.

24             THE COURT:  We will hear the questions.

25   Q.   Does this record that is being offered into evidence

D72nles1                         Shaw - direct

1    reflect time that Mr. Rutigliano was paid for as a union

2    official?

3    A.  These records will show all payments made to the employee

4    for that particular year.

5    Q.  That wasn't my question, sir.

6            My question was, does this time record, 553, cover

7    payments made to Mr. Rutigliano in his capacity as a union

8    official?

9    A.  Yes.

10           MR. RYAN:  No objection.

11           THE COURT:  All right.  Admitted without objection.

12           (Government's Exhibits 553 and 813 received in

13   evidence)

14           MR. RYAN:  I will develop the balance on cross.

15           THE COURT:  Anyone else?

16           All right.  Thank you.  Mr. Tehrani, continue.

17   BY MR. TEHRANI:

18   Q.  Mr. Shaw, looking first at Government Exhibit 553, who are

19   those records for?

20   A.  J. Rutigliano.

21   Q.  What years are they for?

22   A.  1998 and 1999.

23   Q.  Turning to page 2 -- Page 3.  What's the --

24   A.  I'm sorry, page 2 or 3.

25   Q.  Page 2 I believe in your copy.  It's page 3 on the screen.

D72nles1                          Shaw - direct

1           What is the yearly hourly overtime total for

2    Mr. Rutigliano in 1998?

3    A.   482 hours, point 17, which is hundredths.

4    Q.   Then turning to the last page of the exhibit, what's the

5    yearly hourly overtime total for Mr. Rutigliano in 1999?

6    A.   475.42.

7    Q.   I believe you mentioned when you were being questioned by

8    Mr. Ryan that these reports reflect overtime hours -- I'm

9    sorry.  Union hours --

10   A.   That's correct.

11   Q.   -- by Mr. Rutigliano.

12          Which hours are those?

13   A.   Under the column CON CDE, where you see a code 17, that

14   represents when an employee is out on a code 7, or union

15   business.

16   Q.   So only the hours where there's this code 17 in that column

17   are hours worked as a union official?

18   A.   When it's coded 17, that's when he gets paid for the union.

19   Q.   And did the individual, or Mr. Rutigliano in this case,

20   actually work hours where there is a code 17?

21   A.   Code 17 represents when an employee is out on union

22   business.  So he is not working at the actual railroad.  He's

23   working as a union rep or whatever the capacity of a union

24   person does.

25   Q.   Turning to Government Exhibit 813, that is also in front of

D72nles1                          Shaw – direct

1   you.

2   A.  OK.

3   Q.  Who are those records for?

4   A.  An O. Baran.

5   Q.  What years are those for?

6   A.  It starts in 1998 and ends in 2003.

7   Q.  Looking at page 43, there is a Bates number on your

8   document, 142087.

9   A.  OK.

10  Q.  What is the yearly hourly overtime total for Mr. Baran in

11  2002?

12  A.  811.7.

13  Q.  Turning to the last page of the document.  What is the

14  yearly hourly overtime total for Mr. Baran in 2003?

15  A.  1,376.2.

16          MR. TEHRANI:  No further questions.

17          THE COURT:  Mr. Ryan.

18  CROSS EXAMINATION

19  BY MR. RYAN:

20  Q.  Mr. Shaw, I am going to show you R-6.

21          Would you tell us whether or not you have ever seen

22  this document before in preparation for your testimony.

23  A.  I have seen this document in my normal course of business

24  at the railroad.  This is the first time I'm seeing it today.

25  Q.  All right.  But you keep records on a per-week basis, a

D72nles1                        Shaw - cross

1    cumulative total as to paid to date for each employee, correct?

2    A.  That's correct.

3    Q.  And R-6 reflects, as far as Mr. Rutigliano is concerned, a

4    date in September of I think it's '04 of his earnings as of

5    that date, correct?

6    A.  You said '04?

7    Q.  No, I could be wrong.  What date is it?

8    A.  I'm sorry.  The check date is 11/10/1999.

9    Q.  In the regular course of business, a statement is issued to

10   the employee like Mr. Rutigliano that summarizes the total

11   payments made for regular time, overtime, and union business,

12   correct?

13   A.  That's correct.

14   Q.  And does that record that you are looking at right now

15   appear to be kept in the regular course of business to record

16   those three elements for salary?

17   A.  Can you repeat that.  I'm sorry.

18   Q.  Does that record appear to be made in the regular course of

19   business by the Long Island Rail Road concerning

20   Mr. Rutigliano?

21   A.  Yes.

22              MR. RYAN:  I offer it in evidence.

23              MR. TEHRANI:  No objection.

24              THE COURT:  Admitted without objection.

25              (Defendant's Exhibit R-6 received in evidence)

D72nles1                          Shaw - cross

1   Q.  What was the effective date of the statement?

2   A.  November 10, '99.

3   Q.  As of November 10, what was the approximate amount of

4   moneys paid regular time?

5   A.  $15,128.

6   Q.  What was the amount of moneys paid for overtime?

7   A.  $17,802.

8   Q.  And what was the amount of time paid for union business?

9   A.  $25,484.

10  Q.  That works out to be about 43 percent of the total payments

11  for union business?  Would you take my word for it?

12  A.  Sure.

13          MR. RYAN:  Thank you.  No further questions.

14          THE COURT:  Anyone else?

15  CROSS EXAMINATION

16  BY MR. JACKSON:

17  Q.  Sir, good morning.

18          Now, you are here to testify about the amount of

19  overtime hours.  I think that's what Mr. Tehrani asked you

20  about, is that right?

21  A.  I am here to verify these reports.

22  Q.  Could you tell the jury whether or not Mr. Baran was

23  required to work overtime on the times noted on the report?

24  A.  I wouldn't have that information.

25  Q.  Could you tell the jury whether or not an electrician is

D72nles1                          Shaw - cross

1    mandated to be on duty at all times at the Long Island Rail

2    Road?

3    A.  I can't answer that question.

4    Q.  Could you tell the jury whether or not there are instances

5    where --

6            MR. JACKSON:  I will just withdraw that briefly,

7    Judge.

8    Q.  Could you tell the jury the amount of pain that Mr. Baran

9    might have been in as he worked that overtime?

10           MR. TEHRANI:  Objection, your Honor.

11           THE COURT:  Sustained.

12   Q.  So all you are here to do, just to be clear, is to

13   authenticate records, is that accurate?

14   A.  That's correct.

15   Q.  But the underlying purpose for which a party may, for

16   example, have engaged in overtime activity, you wouldn't have

17   any knowledge as to that, is that right?

18   A.  Correct.

19           MR. JACKSON:  Good to meet you.

20           THE COURT:  Mr. Tehrani, anything else?

21           MR. TEHRANI:  Nothing further, your Honor.

22           THE COURT:  Thank you.  You're excused.  You may step

23   down.

24           (Witness excused)

25           THE COURT:  Mr. Tehrani.

D72nles1                        Shaw - cross

1              MR. TEHRANI:  Your Honor, the government calls Special

2    Agent Sean Tumulty of the FBI.

3              THE COURT:  Mr. Tehrani, I see that there are a

4    considerable number of exhibits for this witness.  Are there

5    any that are not objected to?

6              MR. TEHRANI:  Your Honor, we are not going to be going

7    through all of those exhibits.  I can read the exhibits that we

8    will be going through.

9              THE COURT:  Would you do that.

10             MR. TEHRANI:  Sure.

11             THE COURT:  First let's swear in the witness.

12             MR. DURKIN:  Judge, we had raised a couple of

13   objections earlier.  We can raise them later.

14             THE COURT:  All right.

15             MR. DURKIN:  They would be the same objections as

16   Friday.

17             THE COURT:  Swear in the witness.

18    SEAN TUMULTY,

19        called as a witness by the Government,

20        having been duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MR. TEHRANI:

23             MR. DURKIN:  Judge, I'm sorry.  Mr. Tehrani tells me

24   that what we discussed on Friday they are not offering.

25             THE COURT:  All right.

D72nles1                          Tumulty - direct

1              THE COURT:  So, Mr. Tehrani, would you then read into

2      the record the exhibits that are to be admitted without

3      objection.

4              MR. TEHRANI:  Absolutely, your Honor.  The first is

5      303-A0.

6              MR. JACKSON:  Judge, do you have an objection to me

7      standing NEXT to him as he does that.  There were some that I

8      had objections to.  I just want to make sure.  Your Honor said

9      without objection?

10             THE COURT:  Without objection.  Right.

11             MR. JACKSON:  I just want to make sure.

12             MR. TEHRANI:  303-A0, your Honor, 719, 100-A through

13     D, which I believe are all in evidence, 113-A through D which

14     are all in evidence, 803, 800, 800-A, 801, 801-A through E,

15     554-A through E, 820, and that's it.  820 there may or may not

16     be an objection.  We can get to that as we get to it.

17             MR. JACKSON:  Judge as we get to the 800 series, if I

18     might just reserve my right to object, at that point.

19             THE COURT:  All right.

20             MR. JACKSON:  Thank you, Judge.

21             MR. TEHRANI:  Your Honor, all the other exhibits are

22     entered into evidence.

23             THE COURT:  Yes.  They are admitted without objection.

24             (Government's Exhibits 303-A0, 719, 100-A through D,

25     113-A through D, and 554-A through E received in evidence)

1    BY MR. TEHRANI:

2    Q.   Special Agent Tumulty, who is your current employer?

3    A.   The Federal Bureau of Investigation.

4    Q.   What is your title?

5    A.   Special Agent.

6    Q.   How long have you worked at the FBI?

7    A.   Approximately two years.

8    Q.   Are you in a particular squad?

9    A.   Yes.  I'm in the white collar squad of the criminal

10   division.

11   Q.   Describe your duties and responsibilities as a Special

12   Agent.

13   A.   We conduct criminal investigations.  As part of the white

14   collar squad it includes securities, you know, health care,

15   mortgages and the like.  Our duties include surveillance,

16   interviews, writing reports, documentation.

17   Q.   Did there come a time when you became involved in an

18   investigation regarding allegations of disability fraud from

19   the Long Island Rail Road?

20   A.   Yes, in December 2012.

21   Q.   Showing you what's been marked and entered into evidence as

22   Government Exhibit 303-A0.

23        MR. TEHRANI:  Can we put Government Exhibit 303-A on

24   the screen.

25   Q.   Special Agent Tumulty, what is the document that you have

1    in front of you?

2    A.   This is a document written by Gary Supper to Dr. Lew.

3    Q.   Were you asked to locate that document --

4              MR. DURKIN:  Your Honor?

5              THE COURT:  Yes, Mr. Durkin.

6              MR. DURKIN:  Just so the record is clear, I think the

7    government will agree this was already shown, a copy of this

8    was shown as part of an earlier exhibit.

9              MR. TEHRANI:  That is correct, your Honor.

10             THE COURT:  Yes.

11             MR. RYAN:  I am going to object to relevance.

12             THE COURT:  Overruled.

13   Q.   Special Agent Tumulty, were you asked to locate that

14   document in Dr. Lesniewski's original file for Mr. Supper?

15   A.   Yes.

16   Q.   And was the document located in the original file?

17   A.   Yes, it was.

18   Q.   Does that appear to you to be the original version of that

19   document?

20   A.   Yes.

21   Q.   Were you asked to see if the note was located in the RRB

22   claim file for Mr. Supper?

23   A.   Yes.

24   Q.   And was it?

25   A.   No.

1          MR. DURKIN:  Object to the relevance and move to

2     strike.

3          THE COURT:  Mr. Tehrani.

4          MR. TEHRANI:  Your Honor, the relevance is that this

5     document was located in the original claim file for

6     Dr. Lesniewski and was not located in the claim file for

7     Mr. Supper.

8          MR. DURKIN:  Judge, that's misstating the claim file.

9     It is a patient file.

10         MR. TEHRANI:  If I misspoke, I apologize.  It's

11    located in Dr. Lesniewski's patient file for Mr. Supper.

12         MR. DURKIN:  That's all.

13         THE COURT:  Overruled.

14    Q.  Special Agent Tumulty, during the course of your

15    investigation did you review any documents relating to Joseph

16    Rutigliano?

17    A.  Yes.

18    Q.  Looking at Government Exhibit 100-A, which is in the binder

19    in front of you.

20         MR. TEHRANI:  Could we put that on the screen.

21    Q.  This document by stipulation comes from Mr. Rutigliano's

22    RRB claim file.  Do you recognize it?

23    A.  Yes.

24    Q.  What is it?

25    A.  This is the AA-1d form for Joseph Rutigliano.

D72nles1                          Tumulty - direct

1   Q.  Looking at question No. 1, that's his name there?

2   A.  Yes, it is.

3   Q.  If we look at the top right corner --

4            MR. TEHRANI:  Could we blow that up.

5   Q.  When was this document filed?

6   A.  December 21, 1999.

7   Q.  Turning to question 6.

8            MR. TEHRANI:  Question 6, page 2.

9   Q.  That lists the medical conditions causing Mr. Rutigliano to

10  file.  Do you see that?

11  A.  Yes.

12  Q.  And it lists five conditions:

13           Low back pain, osteoarthropathy secondary to fracture

14  and osteoarthritis;

15           Cervical pain, osteoarthritis;

16           Tear of the medial meniscus and osteoarthritic changes

17  in the right knee;

18           Carpal tunnel syndrome in the right wrist;

19           Right shoulder, rotator cuff disease.

20           Do you see that?

21  A.  Yes.

22  Q.  And then question 11 --

23           THE COURT:  Mr. Tehrani, please approach.

24           MR. RYAN:  I am going to object, your Honor.

25           THE COURT:  Approach.

1              (At sidebar)

2              THE COURT:  Mr. Tehrani, I don't see, one, the

3    relevance of this information coming out through this witness.

4    He is an investigator.  Why are you getting into the substance

5    of these claims.

6              Two, it is cumulative.  All of this information is

7    already in the record through witnesses who are in a better

8    position to examine the substance of these files.

9              MR. TEHRANI:  Your Honor, Special Agent Tumulty is

10   going to be testifying in part as a summary witness and in part

11   related to the investigation that he's done.

12             THE COURT:  So far I haven't seen any of the

13   investigation that he has done.  He has found documents in the

14   files.  He's testified to information that is already on the

15   record through other witnesses.  What is he adding?

16             MR. WEDDLE:  May I just have one moment.

17             (Government counsel conferred)

18             MR. TEHRANI:  Your Honor, certain portions of

19   Mr. Rutigliano's file have come in at various points, but no

20   witness has put together the entire application that

21   Mr. Rutigliano submitted in order to obtain what the government

22   alleges is a fraudulent disability.

23             So, while the exhibit is in evidence, Government

24   Exhibit 100, the claim file is in evidence in its entirety.

25   There has been no one who has presented to the jury the entire

D72nles1                          Tumulty - direct

1   application in its entirety.

2              THE COURT:  I am not persuaded that this is the

3   witness to do it.  All he could testify is that he found this

4   document in a file.  What it contains, what difference does it

5   make?

6              MR. TEHRANI:  Your Honor, it could be any summary

7   witness.  We are putting what is in evidence in front of the

8   jury so the jury can see what this application --

9              THE COURT:  If you want to do that, you don't need to

10  go over every single question on material that is already in

11  evidence.  Just summarize it.

12             MR. TEHRANI:  Sure.  Absolutely, your Honor.

13             THE COURT:  Anything else?

14             MR. RYAN:  I am going to object on the ground that

15  this is in the guise of a summation through an FBI agent.  I

16  think the law enforcement role is supposed to impress the jury.

17  As your Honor pointed out, all of this is in evidence, and the

18  prosecutor should sum up on it in his summation, not through an

19  FBI agent.

20             MR. DURKIN:  I was going to say the same thing, Judge.

21  I don't think this is the kind of evidence that is appropriate

22  for a summary witness.  There is nothing overly complicated,

23  and he should not be permitted to testify to an ultimate

24  conclusion of fact in the case.

25             THE COURT:  Again, what I will allow is you do

1    indicate this was the file he found without going into the

2    specific questions.

3              MR. TEHRANI:  So we can't show the questions at all,

4    your Honor?

5              MR. WEDDLE:  Your Honor, I mean the document is in

6    evidence.  We could like to just publish parts of it to the

7    jury.  It seems a lot more interesting to do it with a

8    give-and-take with a witness.  It is totally standard to do

9    this with a summary witness at the end of the case.

10   Alternatively, Mr. Tehrani would just stand and the podium and

11   publish the document to the jury, which I think is a little bit

12   more boring for everybody, but it is not argument.  It's simply

13   publishing documents that are in evidence.  We are going to do

14   it quickly.

15             THE COURT:  Publish the document in summary form.  If

16   you need anything from him, then you can ask him questions

17   about what he may know based on his investigation.

18             MR. TEHRANI:  OK.  Can I publish it and go through

19   certain portions of the document?

20             THE COURT:  Yes.

21             MR. TEHRANI:  I will do it quickly.

22             THE COURT:  Without going question by question and

23   asking him if that is what it says.  It says what it says, and

24   it's already in evidence.

25             MR. TEHRANI:  OK.

D72nles1                         Tumulty - direct

1             (In open court)

2             THE COURT:  Mr. Tehrani.

3             MR. TEHRANI:  Thank you, your Honor.

4             So we will just go through this document quickly in

5     very summary fashion.  We can just blow up question 11, which

6     indicates that Mr. Rutigliano could no longer work because of

7     his condition as of October 29, 1999.

8             Question 12, which I will not read, describes how

9     Mr. Rutigliano's condition prevents him from working.

10            Question 13 indicates that his condition prevents him

11    from working now.

12            Question 19.  Next page.

13            The physician listed is Peter J. Lesniewski.

14    Underneath lists the days of treatment beginning on April 15,

15    1997.

16            Question 14 on the next page.  Enter the name of the

17    medical doctor who imposed the restriction.  Dr. Peter J.

18    Lesniewski.

19            Next page, question 39.  The daily activity matrix,

20    indicating that sitting, standing, walking, bathing, dressing

21    indoor chores, outdoor chores, driving a motor vehicle, using

22    public transportation and writing English are all marked as

23    hard.

24            I will not read all of the explanations, but certain

25    of them.

1              For sitting, back and knee pain when sitting for more

2      than short periods;

3              Bathing, back and knee pain when entering, bending,

4      and exiting shower or bath;

5              Dressing, back, knee, and neck pain when bending to

6      tie shoes and put on trousers;

7              Writing, right hand wrist cramping when writing long

8      notes or letters.

9              Question 40, lists additional information that

10     describes your daily activities during a normal day.

11             I won't read it in its entirety, but note that

12     Mr. Rutigliano indicates that he was an avid racquetball and

13     tennis player, but could not play those sports any longer due

14     to his painful back, right knee, and right hand/wrist.

15             Page 10 of the document, signed under the

16     certification that reads in part:  I know that if I make false

17     or fraudulent statements in order to receive benefits from the

18     RRB, or if I fail to disclose earnings or report employment of

19     any kind to the RRB, I am committing a crime which is

20     punishable under federal law.

21             I certify that the information I gave to the RRB on

22     this application is true to the best of my knowledge.

23             I agree to immediately notify the RRB if I perform any

24     work including self-employment.

25             I know that if I am receiving a disability annuity and

D72nles1                        Tumulty - direct

1    fail to report work and earnings promptly, I am committing a

2    crime punishable by federal law and may result in criminal

3    prosecution and/or penalty deductions in my annuity payments.

4           You can put up Government Exhibit 100-C on the screen.

5    This is a vocational report for Mr. Rutigliano from his RRB

6    claim file.  It lists his jobs as railroad conductor, president

7    of the local chairman in question 6 at the bottom.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Continued)  Question 12 on the next page, "Please

2     describe your basic duties."  It refers to an attached

3     vocational report supplement, slash, job description No. 5

4     signed, dated December 21st, 1999.

5           And then two pages later there is the attached job

6     description, vocational report supplement.  And, again, I will

7     not read this in its entirety, but there are 12 activities or

8     job responsibilities that are listed in the job description

9     that's on the next page.  What follows then is a more fulsome

10    description of each of those activities, each one, other than

11    question 12, ending with "I was no longer able to do this work

12    because of the severe disabilities I suffered."

13          Turning to activity five in the middle refers to a

14    Catch 22.  "I have poor leverage caused by my painful back and

15    right knee requiring increased manual exertion to turn valves.

16    This was a Catch 22.  As I could not depend on my back and

17    right knee for support or leverage.  I had to employ increased

18    leverage and exertion.  As I tried to use my hands, my back,

19    knee and neck pain uncontrollably flared up such that I could

20    not do my work.  This caused increased numbness and tingling in

21    my right wrist and hand such that I could not use it to do my

22    work."

23          Turning now to Government Exhibit 100C, the vocational

24    report from Mr. -- I'm sorry, 100B.  The medical assessment

25    from Mr. Rutigliano's claim file.  Under A, exertional

D7TPLES2                        Tumulty - direct

1    descriptions, No. 1, in an eight hour workday, the claimant can

2    stand and/or walk with normal breaks for less than two hours

3    total.  Before we go through that in more detail --

4                MR. DIRKIN:  Objection.  This is cumulative, Judge.

5                THE COURT:  Sustained.

6                MR. TEHRANI:  The document's in evidence.  Can we just

7    note that the document is signed?

8                MR. DIRKIN:  Objection.

9                THE COURT:  Sustained.

10   Q.  Turning to Government Exhibit 100D.

11               MR. DIRKIN:  Same objection.

12               THE COURT:  What's the question?

13               MR. TEHRANI:  Your Honor, I'm just summarizing these

14   documents that are already in evidence.

15   Q.  The document on Peter Lesniewski's letterhead signed on the

16   second page by Peter Lesniewski, concluding with the paragraph

17   "I'm aware of Mr. Rutigliano's duties for Long Island Rail

18   Road."

19               MR. DIRKIN:  Objection.

20   Q.  "As a result of the above-noted injuries, which are

21   permanent in nature, he's disabled for work with his regular

22   occupation for Long Island Rail Road."

23               MR. DIRKIN:  Same objection.

24               THE COURT:  This is submitted for summary purposes.

25   Anything else?

1          MR. TEHRANI:  Not on these documents, your Honor.

2     Q.  Mr. Tumulty, after Mr. Rutigliano was awarded a disability,

3     are you aware of any activities that he engaged in?

4     A.  Yes.

5     Q.  And what were those?

6     A.  Golfing.

7          MR. TEHRANI:  And, your Honor, we read a stipulation

8     earlier regarding Government's Exhibits 554A through 554E.

9     Q.  Special Agent Tumulty, have you reviewed those documents?

10    A.  Yes.

11    Q.  And what are they?

12    A.  Golf sign-in sheets.

13    Q.  For what periods of time?

14    A.  The spring and the summer months, roughly May through

15    December, from 2004 through 2008.

16    Q.  And those were sign-in sheets for Mr. Rutigliano?

17    A.  Yes, for the Sunken Meadow Golf Course.

18    Q.  And approximately how many times in the period between 2004

19    and 2008 that you reviewed, did Mr. Rutigliano sign in to play

20    golf?

21    A.  Approximately 110.

22    Q.  Special Agent Tumulty, turning to Government Exhibit 719.

23         MR. TEHRANI:  Put that up on the screen.

24    Q.  What is this document?

25    A.  This is a continuing disability update report for Joseph

D7TPLES2                    Tumulty - direct

1   Rutigliano.

2   Q.   And the top left, it's a document of the United States of

3   America Railroad Retirement Board; do you see that?

4   A.   Yes.

5   Q.   And on the second page it appears to be signed?

6   A.   Yes.

7   Q.   And dated?

8   A.   Yes.

9   Q.   And when is it dated?

10   A.   March 11th, 2011.

11   Q.   And it's under a certification?

12   A.   Yes.

13   Q.   Or an understanding.  The document says, "I understand that

14   civil and criminal penalties may be imposed upon me for

15   providing false or fraudulent statements"?

16   A.   Correct.

17   Q.   And "No. 3, failing to promptly report work earnings to the

18   Railroad Retirement Board"?

19   A.   Yes.

20   Q.   "I affirm to the best of my knowledge that the information

21   I provide on this form is true, complete and correct"?

22   A.   Correct.

23   Q.   Now, turning back to the first page, there's a report

24   period listed.  Do you see that?

25   A.   Yes.

D7TPLES2                        Tumulty - direct

1    Q.  And the report period is from April 1st, 2000, to the

2    present?

3    A.  Correct.

4    Q.  And then turning to the second page, question 2, "During

5    the report period, did you work for someone other than the

6    railroad or were you self-employed?"  And what's the answer

7    there?

8    A.  It's -- there's an X across the box for no.

9    Q.  And then question 4, "which word best describes your health

10   now as compared to the beginning date of the report period?"

11   Do you see that?

12   A.  Yes.

13   Q.  And what's the answer?

14   A.  There is an X across the box for worse.

15   Q.  And turning to the next page there's an envelope, and it's

16   addressed to the Railroad Retirement Board, Federal Building,

17   26 Federal Plaza, New York, New York?

18   A.  Correct.

19   Q.  And looking at the postmark, postmarked from Tampa,

20   Florida?

21   A.  Yes.

22   Q.  In March 2011?

23   A.  Yes.

24   Q.  Now, Special Agent Tumulty, were you also involved in an

25   investigation of Ostap Baran?

1    A.  Yes.

2              MR. TEHRANI:  And before we get to that, if we can,

3    just in a summary fashion, go through Government's Exhibits

4    113A through D, your Honor.  Starting first with 113A, this was

5    a form A1E for Ostap Baran from Mr. Baran's RFQ claim file,

6    stamped on the bottom December 29th, 2003.

7              Question 6 on the next page describes the medical

8    conditions causing you to file, acid reflux, hypertension,

9    spinal stenosis, Hoaglund heel on right foot with chronic

10   Achilles tendonitis, and hearing loss.

11             Question 11, enter the date you could no longer work

12   because of your condition, and the date is November 21st, 2003.

13   Question 12 then asks how Mr. Baran's condition prevents him

14   from working.  Cannot bend, lift, climb, crouch, kneel or walk

15   on uneven ground, and then there's more, including, "I have

16   difficulty hearing what is said over intercom system and cannot

17   understand what people are saying when there is background

18   noise present."

19             Turning to question 19 on the next page.  The treating

20   physician is listed as Dr. Peter Lesniewski.  Dates treated,

21   December 11th, 2001, through the present.  Question 24 on the

22   next page, enter the name of the medical doctor who imposed the

23   restriction, Dr. Peter Lesniewski.

24             MR. DIRKIN:  Objection, cumulative.

25             THE COURT:  Sustained.  This is for summary purposes?

1              MR. TEHRANI:  Sure, your Honor.

2              THE COURT:  Summarize quicker.

3              MR. TEHRANI:  Sure, your Honor.  Question 39 on the

4      next page, again, this lists a series of activities, and just

5      to summarize, sitting, standing, walking, dressing, indoor

6      chores, driving motor vehicle, using public transportation,

7      conducting personal business, all marked as hard.  Outdoor

8      chores marked as impossible.

9              MR. JACKSON:  I'm sorry, Judge.  I thought it says he

10     does not do that at all.  I see it says "not at all" not

11     "impossible."

12             THE COURT:  Sustained.

13             MR. TEHRANI:  Your Honor, I apologize.  It is marked

14     as "not at all."  Definition of not at all is, "I cannot do the

15     activity even with help."

16             The explanation for sitting, difficult due to lower

17     back pain.  Driving a motor vehicle explanation, it's difficult

18     sitting due to lower back pain.  Question 40 then lists any

19     different information that describes your daily activities

20     during a normal day.  Turning to Page 10 it's signed, dated,

21     December 29th, 2003, under the name certification that we went

22     through for Mr. Rutigliano's application.

23             113C is a vocational report from Mr. Baran's claim

24     file.  Turning to the next-to-last page it's signed, dated

25     December 29th, 2003.

D7TPLES2                        Tumulty - direct

                  104B it's a medical assessment.  B as in boy -- 113B,

medical assessment for Mr. Baran from his RRB claim file.  The

last page appears to be signed and the name underneath is Peter

Lesniewski.

                  113D, also from Mr. Baran's RRB claim file.  113D, as

in dog.  A letter on Peter J. Lesniewski's letterhead relating

to Ostap Baran.  Second page appears to be signed and

concludes, "I'm aware of his job occupation on the Long Island

Rail Road as an electrician.  Given the above-noted diagnosis,

it can be stated within a reasonable degree of medical

certainty that this patient is disabled for his job occupation

and that this disability is ongoing and permanent."

Q.  Now, Special Agent Tumulty, after Mr. Baran retired, do you

know whether he and Marie Baran did any international

traveling?

A.  Yes, they were both booked for international travel.

                  MR. JACKSON:  Judge, I'm just going to object on

relevance grounds.

                  THE COURT:  Overruled.

Q.  The government -- have you reviewed Government Exhibit 803,

which is before you?

A.  Yes.

Q.  And what is Government Exhibit 803?

A.  A record of booked travel flights for Ostap Baran and Marie

Baran.

D7TPLES2                        Tumulty - direct

1   Q.  And are these records that the FBI has access to?

2   A.  Yes.  It's from a system called TECS, Treasury Enforcement

3   Communication System.  It's a communal database between law

4   enforcement agencies that can review travel records.

5            MR. TEHRANI:  Your Honor, the government offers

6   Government Exhibit 803.

7            MR. JACKSON:  Objection.

8            THE COURT:  Overruled.

9            (Government's Exhibit 803 received in evidence)

10  Q.  Based on your review of those records, what are some of the

11  places that Mr. Baran and Marie Baran have booked travel to?

12           MR. JACKSON:  Objection again, Judge.

13           THE COURT:  Summarize, Mr. Tehrani.  Just indicate the

14  points you're trying to make.

15  Q.  Special Agent Tumulty, do those records indicate that Marie

16  Baran and Ostap Baran have booked travel to Italy, Spain,

17  Aruba, Dominican Republic on several occasions, Germany,

18  Vancouver and Mexico?

19  A.  Yes.

20  Q.  And I'm showing you what's been marked as Government

21  Exhibit 820.  Do you recognize that?

22  A.  Yes.

23  Q.  And what is it?

24  A.  It's a passport for Marie Baran.

25  Q.  And when was it issued?

D7TPLES2                         Tumulty - direct

1    A.  It was issued October 19th, 2007.

2            MR. TEHRANI:  And the government offers Government

3    Exhibit 820.

4            MR. JACKSON:  Objection.

5            THE COURT:  Overruled.

6            (Government's Exhibit 820 received in evidence)

7    Q.  And were there stamps in the passport?

8    A.  Yes.

9    Q.  And could you just indicate some of the places that are

10   stamped in the passport?

11   A.  Egypt --

12           MR. JACKSON:  Your Honor, I object.

13           THE COURT:  Is that the same that you just testified

14   to?

15           MR. TEHRANI:  No, your Honor.  There are additional

16   locations.

17           THE COURT:  All right.  Would you then summarize and

18   point.

19   Q.  Is there a stamp in there for Egypt?

20   A.  Yes.

21   Q.  For Dominican Republic?

22   A.  Yes.

23   Q.  For Russia?

24   A.  Yes.

25   Q.  For Ireland?

D7TPLES2                          Tumulty - direct

1    A.  Yes.

2    Q.  Scotland?

3    A.  Yes.

4    Q.  That's all with that exhibit.  In addition to travel, are

5    you aware of any other post-retirement hobbies of Mr. Baran's?

6    A.  Yes.

7    Q.  And what's that?

8    A.  Golfing.

9    Q.  And during the course of your participation in the

10   investigation, did you conduct any surveillance of Mr. Baran?

11   A.  Yes.

12   Q.  When was that?

13   A.  On May 16th, May 30th and June 20th, I conducted

14   surveillance of him golfing.

15           MR. JACKSON:  All right.  Judge, I just didn't hear --

16           THE COURT:  What year?

17   A.  2013.

18   Q.  And how did Mr. Baran get around the golf course?

19   A.  He drove a motor vehicle to the golf course.  Then,

20   throughout play, he would drive a golf cart between holes.

21   During the holes of play, he would use the golf course as well

22   as walk.

23   Q.  By golf course, you mean a golf cart?

24   A.  Yes, golf cart.

25   Q.  And did you observe him getting in and out of the golf

1    cart?

2    A.  Yes.

3    Q.  And you observed him walking when he wasn't in the golf

4    cart?

5    A.  Yes.

6    Q.  Did you surveil him the entire time?

7    A.  No.  During the first time of play on May 16th, we stayed

8    there the entire time.  There were points where he would be out

9    of view.  There would be some golf holes that were out of view,

10   but he continued along what would have been the golf course.

11          The second point, we discontinued the surveillance for

12   approximately 45 minutes to an hour due to him being out of

13   view.  We left, we came back, and he followed and continued

14   along the golf course.

15          The third time we stayed for the first three holes,

16   and then he would have been out of view; so we discontinued the

17   surveillance at that point.

18   Q.  And on the first and second time, did you see him both tee

19   off on the first hole and complete the 18th hole?

20   A.  Yes.

21   Q.  And from the first hole to the 18th hole, how long was

22   that, approximately?

23   A.  Approximately five hours.

24   Q.  And what did he do before he started on the first hole?

25   A.  Before he started on the first visit, he went to the

2142

1   driving range and practiced driving with the golf club.  Then

2   he went to the putting area and practiced putting.

3        The second time he went to the -- just to the driving

4   range and practiced on driving golf balls with the golf club.

5   Q.  And so how long in total, if you include that pre-first

6   hole activity?

7   A.  It would be approximately a half hour prior to starting; so

8   about five-and-a-half hours in total.

9   Q.  Now, you testified that he drove to the golf course?

10  A.  Yes.

11  Q.  Where did he park?

12  A.  The first two times we saw him arrive in his vehicle, and

13  he parked in a handicapped parking spot.  The third time his

14  vehicle was already parked in the handicapped parking spot, and

15  he was in the vehicle.  We watched him exit the vehicle.

16  Q.  Did you observe whether or not he had a handicapped --

17        MR. DIRKIN:  Can we have some foundation for the "we"?

18  A.  Me and a fellow agent.

19  Q.  Did you observe whether Mr. Baran had a handicapped parking

20  sticker on his car?

21  A.  Yes.

22  Q.  And did he?

23  A.  Yes.  He had a handicapped parking sticker that was in the

24  rear-view mirror inside his vehicle.

25  Q.  And did you observe Mr. Baran carrying his golf clubs at

D7TPLES2                          Tumulty – direct

1   any point?

2   A.  Yes, I did.

3   Q.  And when was that?

4   A.  He took the golf clubs out of his vehicle, carried them on

5   his shoulder at the beginning, after he arrived.

6   Q.  And then at the end, did you observe him again?

7   A.  Yes.  The first two times we saw him complete play, and he

8   carried the bag over his shoulder and put it into his vehicle.

9   Q.  And did he have any help carrying his bag?

10  A.  No, he did not.

11  Q.  At any point during any of your observations of Mr. Baran,

12  did he appear to you to be in any pain?

13  A.  No.

14  Q.  Did you or other agents who were with you take any videos

15  during your surveillance?

16  A.  Yes.

17  Q.  On all three occasions?

18  A.  Yes.

19  Q.  And have you reviewed those videos?

20  A.  Yes.

21  Q.  And have you reviewed clips of portions of those videos?

22  A.  Yes.

23  Q.  And do those videos and clips fairly and accurately depict

24  what you observed?

25  A.  Yes.

D7TPLES2                              Tumulty - direct

1   Q.   I'm showing you four CDs, Government's Exhibits 800, 800A,

2   801 and 801A through E.   Do you recognize those?

3   A.   Yes.

4   Q.   And what are they?

5   A.   They are videos of Ostap Baran golfing.

6   Q.   And how do you recognize those disks that are in front of

7   you?

8   A.   I recognize them because I dated and initialed the videos,

9   the CDs of the videos.

10  Q.   After you viewed the videos?

11  A.   Correct.

12          MR. TEHRANI:   Your Honor, the government offers the

13  four CDs marked as Government Exhibit 800, 800A, 801 and 801A

14  through E.

15          MR. JACKSON:   No objection.

16          THE COURT:   Admitted without objection, but I'm not

17  going to allow the playing.   It's cumulative.   Move on.

18          MR. TEHRANI:   Can I have just one second.

19          (Government's Exhibits 800, 800A, 801 and 801A through

20  E received in evidence)

21          MR. TEHRANI:   Your Honor, may we approach on this

22  issue?

23          THE COURT:   Yes.

24          (Continued on next page)

25

D7TPLES2                    Tumulty - direct

1           (At the side bar)

2           MR. TEHRANI:  Your Honor, we've never showed any

3    videos or pictures of Mr. Baran golfing in any way.  Special

4    Agent Tumulty testified to what he saw.  The picture is worth a

5    thousand words.

6           THE COURT:  The jury will have the pictures if they

7    want to see them.  That's another concern which I did not

8    articulate here.  You have gone through an inordinate amount of

9    testify concerning Mr. Baran.  Now, I recognize that he was one

10   of the listed co-conspirators, but he also happens to be

11   Miss Baran's husband.

12          You didn't go into this kind of detail about

13   Mr. Supper, Mr. Ellensohn, any of the other co-conspirators.

14   There is a point in which it appears that, by going into this

15   kind of detail about Mr. Baran, you're going to prejudice the

16   jurors' view about Miss Baran.  So I think, at some point, you

17   have to cut it off.  You don't need to show video of him

18   golfing, if you already have the video, you have the testimony

19   of the agent who saw him, and I think it's just going to be

20   prejudicial at this point unnecessarily so.

21          MR. DIRKIN:  Judge, we're talking about a couple

22   minutes of clips.

23          THE COURT:  It doesn't matter.  I've ruled.  If the

24   jury wants to see it, they have the access to it.  Okay?

25          MR. JACKSON:  Judge, would you consider a limiting

D7TPLES2                        Tumulty - direct

1    instruction in this regard?

2                    MS. FRIEDLANDER:  No, this is direct --

3                    MR. JACKSON:  Can I finish?

4                    MS. FRIEDLANDER:  Yes.

5                    MR. JACKSON:  Wow.  Judge, with respect to the

6    testimony that we talked about with Mr. Baran, I think that it

7    does have an overly prejudicial effect.  I think that a

8    limiting instruction would be appropriate in light of that, in

9    light of conclusions and inferences that the jury can draw

10   unfairly that this is conduct that is ascribed to Ostap Baran,

11   and it's obvious why the government is doing this.  And I think

12   that to the extent that it could confuse and mislead the jury,

13   it might be appropriate for your Honor to instruct the jury in

14   that regard.

15                   MR. DIRKIN:  The problem that we have, a related

16   problem, I think it's pretty prejudicial to us that they're

17   putting in evidence of Ostap Baran's playing golf in 2013 when

18   he got the disability way back when and, I mean, that's really

19   attenuated to us.

20                   THE COURT:  Okay.  Miss Friedlander, you had a point?

21                   MS. FRIEDLANDER:  Your Honor, the evidence of her

22   husband's fraud is directly relevant to Miss Baran's knowledge

23   that this is all a fraud and her knowledge.

24                   THE COURT:  I'm not disputing all that.  I'm just

25   saying, at some point, it is unduly prejudicial.

D7TPLES2                          Tumulty - direct

1           MS. FRIEDLANDER:  I understand that, but as to a

2     limiting instruction, it's completely inappropriate.  This is

3     direct evidence of her knowledge and intent.  I'm going to

4     argue that in closing that's part of the reason we're

5     presenting --

6           THE COURT:  We don't to have the jury seeing this for

7     that purpose.

8           MS. FRIEDLANDER:  I understand.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court)
 2              MR. TEHRANI:  Special Agent Tumulty --
 3              THE COURT:  Continue.
 4    BY MR. TEHRANI:
 5    Q.  We're not going to display the video at this time, but does
 6    the video depict some of the things you described?
 7    A.  Yes.
 8    Q.  Including Mr. Baran golfing?
 9    A.  Yes.
10    Q.  Swinging his club?
11    A.  Yes.
12              THE COURT:  Asked and answered.
13    Q.  Carrying his bags?
14    A.  Yes.
15              THE COURT:  Asked and answered.
16    Q.  Tieing his shoes?
17    A.  Yes.
18              MR. TEHRANI:  No further questions, your Honor.
19              THE COURT:  Mr. Ryan?
20    CROSS-EXAMINATION
21    BY MR. RYAN:
22    Q.  Special Agent, you joined this investigation team in
23    December of '12; did I understand you correctly?
24    A.  Correct.
25    Q.  And that would be including Agent Cuocci as part of the
```

D7TPLES2                      Tumulty - cross

1    team, correct?

2    A.   Correct.

3    Q.   And you've been sitting here during this entire trial?

4    A.   Correct.

5    Q.   You've been following all the evidence in this case that's

6    been presented before this jury?

7    A.   I have sat here for the majority of the trial.

8    Q.   And all of the Joseph Rutigliano application forms and

9    things that are in the file, the jury already heard that, you

10   were here to watch that, correct?

11   A.   I have watched the majority of the trial.

12   Q.   Can you tell us why -- Can you add anything to what the

13   jury already has in evidence?

14           MR. TEHRANI:  Objection, your Honor.

15           THE COURT:  Sustained.

16           MR. RYAN:  Could you put 719 up, please.

17   Q.   And there was a continuing disability report marked as 719;

18   do you recall that?

19   A.   Yes.

20   Q.   Okay.  Now this was a report that Mr. Rutigliano signed and

21   submitted to the RRB on or about March 11 of 2011, correct?

22   A.   Yes, it's signed March 11, 2011.

23   Q.   Okay.  And it was in response to a letter of March 2, 2011,

24   Dear Mr. Rutigliano, correct, by John East, the district

25   manager in New York City?

D7TPLES2                          Tumulty - cross

1    A.  I don't -- I don't see that letter.

2    Q.  Well, let me show you 719.  The papers are double-sided; so

3    maybe that's why you might have missed it.

4    A.  Okay.

5    Q.  Okay?  Now, this inquiry, to which Mr. Rutigliano

6    responded, was sent by the Railroad Retirement Board, correct?

7    A.  The letterhead says United States of America Railroad

8    Retirement Board.

9    Q.  By John East, the district manager of New York, correct?

10   A.  That's the name that's written below the letter.

11   Q.  And at that time, the investigation, the criminal

12   investigation was ongoing, but you were not part of it,

13   correct?

14   A.  I was not a part of the investigation at that time.

15   Q.  Okay.  And can you tell the ladies and gentlemen of the

16   jury whether this request for a continuing disability report

17   was issued by the Railroad Retirement Board in the ordinary

18   course of business?

19        MR. TEHRANI:  Objection, your Honor.  Relevance.  He's

20   also testified he was not part of the investigation at the

21   time.

22        THE COURT:  Sustained.

23   Q.  So there's someone at the Railroad Retirement Board who

24   could tell us the circumstances --

25        MR. TEHRANI:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7TPLES2                    Tumulty - cross

1   Q.  -- under which in form was sent?

2           THE COURT:  Sustained.

3   Q.  You're not able to offer this jury anything concerning

4   the --

5           MR. TEHRANI:  Objection.

6           THE COURT:  Sustained.  Sustained.  Asked and

7   answered.

8   Q.  Now, you didn't have to do a surveillance on a golf course,

9   as you did with Mr. Baran, concerning Mr. Rutigliano because

10  the New York Times had already taken the video, correct?

11          MR. TEHRANI:  Objection.

12          THE COURT:  Sustained.

13          MR. RYAN:  No further questions.  Thank you.

14  CROSS-EXAMINATION

15  BY MR. JACKSON:

16  Q.  Sir, I'd like to ask you -- I want to talk about the trips.

17  You said that you -- I guess, Mr. Baran and Miss Baran, they

18  went traveling to various places.  You testified to that,

19  right?

20  A.  They were registered as being booked for travel, according

21  to the records.

22  Q.  And you're not at all suggesting to this jury that it's a

23  crime to go to Egypt, are you?

24  A.  Not to my knowledge.

25  Q.  Is it a crime, to your knowledge, to go to Italy?

D7TPLES2                    Tumulty - cross

1  A.  If they're allowed to travel, to my knowledge, it's not a

2  crime.

3  Q.  Was there anything in your information that suggested that

4  they were not allowed to travel, sir?

5  A.  During those dates, no.

6  Q.  And with regard to Dominican Republic, for example, to your

7  knowledge, is it a crime to go there?

8  A.  Not to my knowledge.

9  Q.  And do you have any idea whether or not they have any

10 children, Mr. Baran and Miss Baran?  Any idea of that?

11 A.  I believe she stated at one point that she did not have

12 children.

13 Q.  And do you know how long it took them to save for the trips

14 during their retirement -- that they took during their

15 retirement, any idea?

16 A.  I don't know how long they saved.

17 Q.  Any idea whether they had any accounts relating to

18 traveling when they retired, any idea, sir?

19 A.  I know they had bank accounts.  I don't know if anything

20 was designated for travel.

21 Q.  And with regard to the bank accounts, did you find pockets

22 of stolen money in bank accounts?

23            MR. TEHRANI:  Objection.

24            THE COURT:  Sustained.

25 Q.  Now, with regard to the actual golfing, I think you spent a

D7TPLES2                           Tumulty - cross

1   little bit of time at the golf course, right?

2   A.  I conducted surveillance three times.

3   Q.  Now, the three times, could you give us the dates again

4   that you went to the golf course to conduct the surveillance,

5   please?

6   A.  May 16th, 2013; May 30th, 2013; June 20th, 2013.

7   Q.  Okay.  And just give us a sense of the dates apart that

8   those are, if you can.  How many dates apart were they?

9   A.  Between the first and second, two weeks; and then the

10  second and third, about four weeks.

11  Q.  Okay.  Now, sir, in between that time --

12  A.  Three weeks, sorry.

13  Q.  Three weeks.  In between that time, did you have any

14  surveillance of Mr. Baran playing golf between the dates of

15  May 13th and the two weeks to May 30th, any surveillance?

16  A.  I did not conduct surveillance during those dates.

17  Q.  And do you have any information as to whether he did play

18  golf during those times, sir?

19  A.  I believe he was registered online to have being played

20  golf on some dates in between.  I don't have the dates offhand.

21  Q.  Well, tell us the dates.

22  A.  I don't have the dates.

23  Q.  How often did Mr. Baran play golf?  How often?

24  A.  He registered frequently for Thursdays to play golf.

25  Q.  What is frequently Thursdays?  Is that every week?

D7TPLES2                      Tumulty - cross

1   A.  Not every week.  I'd say, on average, maybe two out of

2   three weeks.

3   Q.  So he played golf, what, a couple times a month?

4   A.  For those dates that I know of.

5   Q.  What about other dates?

6   A.  And probably it would be more than that.  I would say maybe

7   three times a month.

8   Q.  So three times a month.  So you'd agree with me there's 30

9   days, about, in a month, right?

10  A.  30 to 31 days in a month.

11  Q.  And of the 30 to 31 days in the month, you're telling the

12  jury Mr. Baran was playing golf, right?

13  A.  That I've seen him register for.

14  Q.  And, in fact, just with regard to him playing golf, sir, do

15  you have any indication whether or not a doctor suggested he

16  might play golf to feel better?

17  A.  I would not know.

18  Q.  And just on the -- along those lines, I know you went to

19  see him play golf, and I want to get more into that, could you

20  tell the jury the surveillance you conducted of Mr. Baran going

21  to the gym?

22  A.  I did not conduct surveillance of him going to a gym.

23  Q.  Did you ever sea him going to a gym?

24  A.  I never saw him at the gym.

25  Q.  What about him jogging outside?  How about running in the

1    outdoors, did you ever see him do that?

2    A.  I never saw him run outdoors.

3    Q.  What about lifting weights in his backyard, any

4    surveillance of that?

5    A.  I never conducted surveillance at his house.

6    Q.  So essentially, the only activity that you're suggesting to

7    the jury that you observed was this golf playing, right?

8    A.  The three times in question we went to the golf course, and

9    two times we saw him arrive and one time he was already

10   present.

11   Q.  And I think you told Mr. Tehrani, in fact, that he was in a

12   golf cart; did you not?

13   A.  For a portion of the time he was in a golf cart.

14   Q.  And with regard to him getting around from hole to hole, I

15   think you told Mr. Tehrani that he was in a golf cart; is that

16   accurate?

17   A.  Hole to hole, he took a golf cart.

18   Q.  Do you have any idea of the weight of a club?  Any idea,

19   sir?

20   A.  Well, we had testimony earlier on that it was about a pound

21   to two pounds, right?

22   Q.  And that's because you were sitting back there, as Mr. Ryan

23   asked you, observing the trial, right?

24   A.  Correct.

25   Q.  Now, if I could just ask.  At any point, did the government

1    ask you to find out what, if any, medication Mr. Baran takes to

2    play golf?  Did they ask you to inquire about that?

3    A.  No.

4    Q.  Did you independently think it might be significant, as

5    opposed to going through the charts, you know, where it says

6    pain sitting, standing -- You saw those charts a number of

7    times, right?

8    A.  Correct.

9    Q.  Did you independently think it might be important to

10   determine what, if any, medication Mr. Baran was on as he

11   played golf?

12   A.  I never inquired about it.

13   Q.  And with respect to his health conditions, did you ever

14   make inquiries of a Dr. Stephen Geiger?

15   A.  I've never spoken to a Stephen Geiger.

16   Q.  Did you speak to a Dr. Adam Stein?

17   A.  I never spoke to Dr. Adam Stein.

18   Q.  Did you ever speak to Dr. Frank Altebrando?

19   A.  I never spoke to that doctor.

20   Q.  Did you ever speak to Dr. James Inclendon?

21   A.  I never spoke to that doctor.

22   Q.  Did you speak to Dr. Frank DiMeo?

23   A.  I never spoke to that doctor.

24   Q.  Would it be fair to say, without going on to the various

25   doctors, additional doctors that Mr. Baran saw, did you request

D7TPLES2                          Tumulty - cross

1    any information from those doctors concerning his medical

2    condition?

3              THE COURT:  Asked and answered.

4              MR. JACKSON:  The additional doctors.

5              THE COURT:  Asked and answered.

6    Q.  Okay.  So essentially, sir, just to be clear, as part of

7    your investigation, did the government at any point ask you,

8    for example, to inquire as to his handicap sticker?  Did they

9    ask you to do that?

10   A.  I observed his handicapped sticker and at the golf course.

11   Q.  Did they ask you to pull the records regarding how it was

12   issued?

13   A.  They asked a fellow agent.  I did not go to request the

14   sticker.

15   Q.  I'm sorry, my question is directed to you.

16   A.  To me, I did not pull up any documentation regarding his

17   handicapped records.

18   Q.  And with respect to the documentation, I'm also referring

19   to the agency that may have issued it.  You understand that,

20   right?

21   A.  Correct.

22   Q.  And do you understand what supporting documentation, if

23   any, went into that application?

24   A.  No, I do not know.

25   Q.  And that's because you didn't check, right?

D7TPLES2                    Tumulty - cross

1   A.  It was not my requirement to check.

2   Q.  I'm sorry.  You were required to investigate this case;

3   were you not?

4             MR. TEHRANI:  Objection, your Honor.

5             THE COURT:  Sustained.

6   Q.  You were an investigator that was gathering information

7   relative to Mr. Baran's activities; is that not true?

8             MR. TEHRANI:  Objection, your Honor.

9             THE COURT:  Sustained.

10            MR. JACKSON:  All right.  Let's pull up 113.  Let's do

11  it that way.  Can we see Exhibit 113, please?  Okay.  And,

12  specifically, Mr. Baran's disability application, if we could

13  just go to that.  Can we go to the next page.  Okay.

14  Q.  Now, we see Mr. Tehrani asked you questions about -- Let's

15  blow up the top there, right?  You remember him asking you

16  questions about this, right?

17  A.  Yes.

18            MR. TEHRANI:  Your Honor, objection.  Your Honor,

19  based on the sidebar, I did not ask any questions about the

20  application.

21            THE COURT:  This information came in in summary form,

22  Mr. Jackson.

23            MR. JACKSON:  And I'll summarize it too.

24            THE COURT:  Summarize your question.

25  Q.  So in summary, you see the information about the medical

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   conditions.  You see all those, right?

2   A.  In question 6?

3   Q.  That's what I'm asking you about.

4   A.  Yes.

5   Q.  And because we're summarizing, can we go to the medication

6   section, please?  Just keep going, please.  And, in fact,

7   Mr. Tehrani asked you about the physicians.  He directed your

8   attention to Dr. Lesniewski.  You remember that, right?

9   A.  He stated it and summarized.

10  Q.  Did he direct your attention to the Dr. Barth that's also

11  there too?

12  A.  What section is that under?

13  Q.  Under attending physicians.  Okay.  Let's start here.

14  Jeffrey Kaufman in MRI.  He didn't direct your attention to

15  that, did he?

16          MR. TEHRANI:  Your Honor, this is misstating,

17  mischaracterizing the summary nature of it.

18          THE COURT:  Sustained.

19  Q.  Let's go to summary.  Let's go to the attending physician

20  list on the application.  Okay.  There we go.  All right.  See

21  Dr. Barth?

22  A.  In section B, Dr. Michael Barth, yes.

23  Q.  You do see that?

24  A.  Yes.

25  Q.  And do you see above that where it indicates spinal

D7TPLES2                         Tumulty – cross

1    stenosis; do you see that?

2    A.   Under the Dr. Lesniewski section, yes, spinal stenosis.

3    Q.   Exactly.  And I asked you about a series of doctors before;

4    you remember that?

5    A.   Correct.

6    Q.   And this is an additional doctor that I didn't ask you

7    about.  Did you get records from Dr. Barth, sir?

8    A.   I personally never obtained records from Dr. Barth.

9             MR. JACKSON:  Let's go to the medication section, if

10   we can, please.  Scroll down.  Keep going.  Right there.

11   Q.   Okay.  Just above that section there's a variety of

12   medication right there.  If we could just blow that up.  So

13   could you tell us what, if any one of those medications

14   Mr. Baran took on the three days in the two months that you

15   saw --

16            MR. TEHRANI:  Objection, your Honor.

17            THE COURT:  Sustained.

18   Q.   Do you know whether or not Mr. Baran took any medication?

19   A.   I did not see him take any medication.

20   Q.   Okay.  And you -- you didn't see him at the golf course

21   take it, correct?

22            MR. TEHRANI:  Objection, asked and answered.

23            THE COURT:  Sustained.

24            MR. JACKSON:  And just one moment, Judge.  I'm done.

25   Thank you, your Honor.

1                THE COURT:  All right.  Thank you.  Mr. Dirkin?

2    CROSS-EXAMINATION

3    BY MR. DIRKIN:

4    Q.  Special Agent Tumulty, this is a very big case for the FBI;

5    is it not?

6                MS. FRIEDLANDER:  Objection.

7                THE COURT:  Sustained.

8    Q.  Well, how long have you been an agent?

9    A.  I've been with the FBI approximately two years.

10   Q.  Have you been involved in any cases that made the front

11   page of the New York Times?

12               MR. TEHRANI:  Objection.

13               THE COURT:  Sustained.

14   Q.  Well, you testified that you and another agent, do I

15   understand correctly, spent three days surveilling Ostap Baran

16   on a golf course?

17   A.  A portion of those three days we conducted surveillance of

18   him.

19   Q.  How long did you spend surveilling him on that golf course

20   each time?

21   A.  He was playing golf between the first and 18 hole

22   approximately five hours, and he beforehand was, you know,

23   practicing about a half hour before he started.

24   Q.  You and another agent were assigned to do just that that

25   day, correct?

D7TPLES2                          Tumulty - cross

1   A.  We were going to surveil him that day.  We were assigned to

2   surveil him that day.

3   Q.  Three times?

4   A.  Correct.

5   Q.  And that was when?

6   A.  May 16th, 2013; May 30th, 2013; June 20th, 2013.

7   Q.  That was shortly before this trial began, correct?

8   A.  Correct.

9   Q.  But you said you began -- became involved in the

10  investigation in 2012; is that right?

11  A.  December 2012.

12  Q.  Okay.  The investigation itself, however, has been going on

13  since 2008, hasn't it?

14          MR. TEHRANI:  Objection.

15          THE COURT:  Overruled.

16  A.  To my knowledge, 2008.

17  Q.  It was first begun by the U.S. Attorney's Office in the

18  Eastern District --

19          MR. TEHRANI:  Objection.

20          THE COURT:  Sustained.

21  Q.  -- of New York, wasn't it?

22          THE COURT:  Sustained.

23  Q.  Well, let's talk about -- Strike that.

24          So it wasn't until almost four-and-a-half years or

25  five years later that somebody decided that you should --

1    instructed you --

2              MR. TEHRANI:  Objection.

3    Q.  -- should go out and surveil the golf course?

4              THE COURT:  Overruled.

5    Q.  Right am I right?

6    A.  They instructed me to surveil the golf course when I found

7    out that Ostap Baran was registered to play golf on that

8    particular day for the first time.

9    Q.  Five years into the investigation, correct?

10   A.  From '08 to 2013, it's approximately five years of the

11   investigation.

12   Q.  Now, you testified to this note.

13             MR. DIRKIN:  Could I have that note, please?

14   Q.  Do you have the original there?

15   A.  Yes.

16   Q.  And that's what's up on the screen, right?

17   A.  Correct.

18   Q.  Now, you've been here through most of the testimony, right?

19   A.  Correct.

20   Q.  And you know that we've seen this already as part of

21   other -- another exhibit, correct?

22   A.  Correct.

23   Q.  Okay.  And you're testifying today to highlight this to the

24   jury; are you not?

25             MR. TEHRANI:  Objection.

D7TPLES2                      Tumulty - cross

1              THE COURT:  Sustained.

2     Q.  Well, you're a summary witness, correct?

3              MR. TEHRANI:  Objection.

4              THE COURT:  Sustained.

5     Q.  This document was turned over to the FBI or the OIG in the

6     investigation by Island Sports Medicine in 2008; was it not?

7     A.  I don't know the date.

8     Q.  Roughly?

9     A.  I don't know the date.

10    Q.  Is there anything that would refresh your recollection?

11    You just don't know?

12    A.  I don't know the date it was turned over.

13    Q.  Okay.  But you know that Island Sports Medicine -- you know

14    that this is part of records that were obtained from Island

15    Sports Medicine, where Dr. Lesniewski worked, correct?

16    A.  It's part of the medical file for Dr. Lesniewski.

17    Q.  And you know that either your agency, the FBI, or the OIG

18    or the U.S. Attorney's Office has had those records since

19    roughly 2008 or 2009, correct?

20    A.  I don't know when those records were obtained.

21             MR. DIRKIN:  Can we get a stipulation, Judge, rather

22    than waste time?

23             MR. TEHRANI:  Your Honor, I'm not sure what the

24    relevance of this entire line of questioning is.

25             THE COURT:  What's the relevance?

D7TPLES2                        Tumulty - cross

1            MR. DIRKIN:  I'll follow up with it, Judge.  I'll show
2       it to you.
3            THE COURT:  Yes.
4       Q.  This document was in the file when it was delivered to --
5            MR. TEHRANI:  Objection.
6       Q.  -- the FBI, correct?
7            THE COURT:  Overruled.
8       A.  When I reviewed the file, it was in the medical records.
9       Q.  No one had removed it, had they?
10      A.  To my knowledge, it was not removed.  It was in the medical
11      file when I reviewed it.
12      Q.  If it had been removed, you wouldn't have found it,
13      correct?
14           THE COURT:  Asked and answered.
15      Q.  Now, were you here during the testimony earlier regarding
16      this note?
17      A.  I saw a portion of Mr. Supper's testimony.
18      Q.  And were you here when Mr. Supper admitted that not all the
19      tests he asked for were given by Dr. Lesniewski?
20           MR. TEHRANI:  Objection.
21           THE COURT:  Sustained.
22      Q.  Do you know, as you sit here, whether all those tests were
23      given?
24      A.  I have no knowledge of the tests, if they were given or
25      not.

D7TPLES2                          Tumulty - cross

1   Q.  Do you get training in evidence when you're a special

2   agent?

3   A.  Yes.

4   Q.  When they teach you about incriminating documents, do most

5   people leave incriminating documents when they turn documents

6   over to the FBI?

7             MR. TEHRANI:  Objection.

8             THE COURT:  Sustained.

9   Q.  Now, you were shown Government Exhibit 719 by Mr. Tehrani,

10  correct?

11  A.  Yes.

12  Q.  And he took you through several questions, correct?

13  A.  Yes.

14  Q.  He did not take you through question 3, did he?  Can we

15  have that, please?

16  A.  No, we did not discuss that earlier.

17  Q.  That's because that says, "I have not discussed whether I

18  can work with my doctor," correct?

19            MR. TEHRANI:  Objection.

20            THE COURT:  Sustained.

21  Q.  What does question No. 3 say?

22  A.  "During the report period the doctor ... check only one

23  answer."

24  Q.  And that answer is?

25  A.  There is an X across the box for "and I have not discussed

D7TPLES2                         Tumulty - cross

1   whether I can work."

2   Q.  How many agents have been assigned to this case --

3              MR. TEHRANI:  Objection.

4   Q.  -- to your knowledge?

5              THE COURT:  Overruled.

6   A.  Two from the FBI and four from the RRB.

7   Q.  Would I be correct in assuming that there weren't any

8   terrorists to watch the day you went --

9              MR. TEHRANI:  Objection.

10  Q.  -- to the golf course?

11             THE COURT:  Sustained.

12             MR. DIRKIN:  That's all I have.

13             THE COURT:  Mr. Tehrani.

14             MR. TEHRANI:  Your Honor may we be heard?

15             THE COURT:  About what?

16             MR. TEHRANI:  Proper scope of redirect, your Honor.

17             THE COURT:  All right.

18             (Continued on next page)

19

20

21

22

23

24

25

1              (At the side bar)

2              MR. WEDDLE:  Your Honor, two things.  One is, given

3    the cross-examination by Mr. Jackson, where he talked on and on

4    about the fact that Gus Baran was playing golf, and he may have

5    been taking medication, I believe that more than justifies our

6    showing the brief slips that we proposed to show in the direct

7    examination.  And the reason is, the evidence of the

8    surveillance of Gus Baran is not just that he's playing golf,

9    it's what the video shows, and that's what we said before, a

10   picture is worth a thousand words.

11             What this video shows is his physical activities and

12   abilities juxtaposed to what he claimed in his application.

13   Like the fact that he couldn't bend, or it was hard for him to

14   dress himself.  The video completely demonstrates that that is

15   false.  And given all of the cross-examination questions that

16   Mr. Jackson asked, which is suggesting that this is just a day

17   at the golf course, it misses the point.  And we should be

18   allowed to show those clips.  That's the first thing.

19             The second thing is, Mr. Dirkin's questioning about

20   the number of agents assigned to the case and the length of the

21   investigation, I think, opens the door to putting in context

22   for this jury the scope of this investigation.  Namely, the

23   fact that there are hundreds of people engaged in this fraud.

24   The FBI and the Office of Inspector General have conducted well

25   more than a hundred interviews in this case.  They've

D7TPLES2                    Tumulty - cross

1    prosecuted successfully a number of people.  20-something

2    people have pled guilty.  Dr. Ajemian has pled guilty.

3           So to suggest that there's some kind of government

4    overkill here, and it's only targeting Mr. Baran and these

5    three defendants on trial, is completely misleading.  And I

6    think we should be permitted to bring out the fact that we've

7    investigated many people, we've charged many people, many of

8    those people have pled guilty, and some of those people planned

9    to go to trial in February, which required a great deal of work

10   on behalf of the government team, and that's what people have

11   been doing.

12          THE COURT:  All right.  Mr. Jackson, now, let me say,

13   Mr. Jackson, I was surprised at the extent to which you -- I

14   tried to close the door on testimony concerning Mr. Baran.  You

15   basically reopened it.

16          MR. JACKSON:  Judge, that's fine.  As long as you give

17   me creative license on my cross when they show it.  I didn't

18   object when they were going to admit the exhibits.  Remember, I

19   stood up and said no objection.  I want them to see the video.

20   I'm just saying that --

21          THE COURT:  All right.  I'll let the government --

22          MR. JACKSON:  I'm just saying that as long as when I

23   am on cross-examination am not restricted or restrained or

24   you've tied my hands behind my back on my questions when I go

25   through chapter and verse, sort of like the Rodney King video,

1    you know.  When it shows when he was doing this, was it proper?

2    When he was doing that, was it proper?  So on cross, I just

3    don't want to be restrained.  If your Honor is letting them see

4    it now, to not asking my questions of this witness regarding

5    his knowledge of what he was doing, that's it.  I'm guided by

6    what you say.  If you want to watch it, watch it, but allow me

7    to do my job.

8           THE COURT:  I don't want to watch it.  I was trying to

9    close the door, Mr. Jackson.

10          MR. JACKSON:  Judge, you didn't close the door.  You

11   said the jury could watch it at their leisure.  The door was

12   never closed.

13          THE COURT:  I'm talking about watching it here.

14          MR. JACKSON:  It's up to you.  I just want to cross.

15          THE COURT:  Now, with regard to the questions

16   regarding the number of FBI agents, again, Mr. Dirkin raised

17   questions about the number of agents.  The government can come

18   back and indicate or try to elicit why there were that number

19   of agents, but I am not going to allow a whole lot of testimony

20   about all of the people who have pled guilty and about how many

21   were prosecuted.  Indicate why there were four agents as an

22   indication that this was a fairly sizable investigation.  In

23   fact, Mr. Dirkin himself opened by saying this is a big case

24   for the FBI.

25          MR. DIRKIN:  The only problem, Judge, is I think you

D7TPLES2                          Tumulty - cross

 1    sustained the objection to that; so, you know.

 2              THE COURT:  Yes, but then you asked him -- you

 3    reopened the door again by asking him how many agents.  I'm

 4    trying to limit it.

 5              MR. WEDDLE:  In fact, your Honor --

 6              THE COURT:  Excuse me.  Mr. Dirkin?

 7              MR. DIRKIN:  I think that I would have far less

 8    objection had I been able to develop my cross along the lines

 9    that I wanted to on that.  I think if the government -- I think

10    the government is going to play with fire if they go into this,

11    but it's okay with me.  I think it's going to open up doors

12    that they don't want, but that's fine.

13              THE COURT:  All right.  We'll try to limit it as much

14    as possible.  All right?  I'm going to call a break at this

15    point so we'll do this when we come back.

16              MR. JACKSON:  Judge, and again, just to be clear.

17    With them showing the videotape, you will allow me the latitude

18    in cross to go over the videotape with this agent; is that

19    right?

20              THE COURT:  Yes.

21              MR. JACKSON:  Thank you.

22              THE COURT:  But again --

23              MR. WEDDLE:  Your Honor, I think the rules are still

24    going to apply.  He's asking -- as long as he's acting on a

25    good-faith basis --

D7TPLES2                          Tumulty – cross

1               MR. JACKSON:  I've got plenty of good-faith basis.

2               THE COURT:  All right.  Thank you.

3               (Continued on next page)

D7TPLES2                          Tumulty – cross

1                    (In open court)

2                    THE COURT:  We're going to take the morning break at

3        this point.  It's 11:00.  We'll return at 11:15.

4                    (Recess)

5                    (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7tnles3

1                   THE COURT:  Bring in the jury, please.

2                   (Jury present)

3                   MR. WEDDLE:  Your Honor, just briefly, we are nearing

4        the end of our case.  After Special Agent Tumulty is done, I

5        think Mr. Tehrani has a couple exhibits to offer and then we

6        have a stipulation that we thought was agreed to and now there

7        seems to be a glitch in that.  Mr. Ryan has raised an issue.

8                   So we may need to at the very last minute figure out a

9        witness to come in and testify solely about the fact that in

10       order to obtain or work with any bank information

11       electronically in Long Island, the transmission has to go

12       through the waters that surround Long Island.  Very simple, but

13       we may not be in a position to rest.

14                  THE COURT:  All right.

15                  (Continued on next page)

16

17

18

19

20

21

22

23

24

25

D7tnles3

1          (Jury present)

2          THE COURT:  Thank you.  Welcome back.

3          Mr. Tehrani.

4          MR. TEHRANI:  Your Honor, if I may, just before I

5    begin redirect, I just wanted to formally offer two exhibits

6    that have been discussed, but I don't think were officially

7    offered and received.  The first is Government Exhibit 650,

8    which is a CD containing UHC records.

9          The second is Government Exhibit 30, that was just in

10   the stipulation we read this morning and includes the travel

11   records that Special Agent Tumulty testified to.

12         THE COURT:  All right.  Is there any objection to

13   these?

14         Hearing none, they are admitted without objection.

15         (Government's Exhibits received in evidence)

16         MR. DURKIN:  I think we might have raised an earlier

17   objection to one.

18         THE COURT:  All right with the earlier objections as

19   noted.

20         (Government's Exhibits 30 and 650 received in

21   evidence)

22   REDIRECT EXAMINATION

23   BY MR. TEHRANI:

24   Q.  Special Agent Tumulty, are you assigned to the terrorism

25   squad?

d7tnles3                              Tumulty - redirect

1   A.   No.

2   Q.   Are you assigned to a squad that investigates fraud?

3   A.   Yes.

4   Q.   And theft?

5   A.   Yes.

6   Q.   And stealing?

7   A.   Yes.

8   Q.   Including theft from the federal government?

9   A.   Yes.

10  Q.   Does the FBI take white collar fraud seriously?

11          MR. DURKIN:   Objection.   Leading.

12          THE COURT:   Sustained.

13  Q.   Special Agent Tumulty, remember when Mr. Durkin asked you

14  about terrorists and and it resulted in laughter from the

15  gallery?

16  A.   Correct.

17  Q.   Do you know whether any of the people sitting in the

18  gallery are retired Long Island Rail Road employees who

19  obtained disability benefits?

20          MR. RYAN:   Objection.

21          MR. DURKIN:   Objection.

22          THE COURT:   Sustained.

23          MR. DURKIN:   I have a motion.

24          THE COURT:   Sustained.

25  Q.   Special Agent Tumulty, do you know whether anyone sitting

d7tnles3                        Tumulty - redirect

1    in the gallery is under indictment?

2              MR. DURKIN:  Objection.

3              MR. RYAN:  Objection.

4              THE COURT:  Sustained.

5              MR. TEHRANI:  No further questions, your Honor.

6              THE COURT:  Mr. Ryan, did you rise?

7              MR. RYAN:  No questions, thank you.  It's tempting,

8    but I am not going to ask the question.

9              THE COURT:  Mr. Jackson.

10             MR. JACKSON:  No questions.

11             THE COURT:  Mr. Durkin.

12             MR. DURKIN:  If it was tempting for Mr. Ryan, it is

13   even more tempting for me, Judge, but I don't.

14             THE COURT:  All right.  Thank you.

15             MR. DURKIN:  But I do have a motion later.

16             THE COURT:  All right.  Mr. Tehrani, we had talked

17   about those videos.  Does the government have a view that?

18             MR. TEHRANI:  We are not going to play them at this

19   time.  We will show them in summation.

20             THE COURT:  Thank you.  You are excused.

21             You may step down.

22             (Witness excused)

23             THE COURT:  Government.

24             MR. WEDDLE:  Your Honor, right now we are at the point

25   that I mentioned to your Honor just before the jury came in.

d7tnles3                    Tumulty - redirect

 1    We could discuss it at sidebar or take a break at this point.

 2              THE COURT:  Let's discuss it at sidebar.

 3              (At sidebar)

 4              THE COURT:  Mr. Weddle, is this all that is left of

 5    the government's case?

 6              MR. WEDDLE:  Yes, your Honor.  Two pieces of evidence

 7    that we still would like to put in.  One is a stipulation that

 8    I mentioned briefly to your Honor.  It's basically a

 9    testimonial stipulation from I think three different sources

10    that traces the path that shows the interstate wire

11    transmissions that result from disability payments being

12    electronically deposited and processed through the Federal

13    Reserve Bank of New York, which processes them in New Jersey.

14              Then different banks connect into that information in

15    different ways, but we were going to prove this in one fell

16    swoop in a very straightforward way.  We gave notice to all

17    defendants months and months ago about this.

18              Basically I spoke to the chief technology officer at

19    the FCC who obviously is very knowledgeable about how banking

20    information is transmitted in the world, and he said that in

21    order to communicate electronically with the Federal Reserve's

22    servers in New Jersey, if you are a customer in Long Island or

23    if you're spending money in Long Island or withdrawing it from

24    the bank account or checking your banking information, all of

25    those things are going to result in electronic transmissions

d7tnles3                    Tumulty - redirect

1    accessing that information that started out on the server in

2    New Jersey.

3              He is going to say that, based on his knowledge, those

4    electronic transmissions almost invariably travel by wire

5    either under the waters surrounding  Long Island, because, of

6    course, Long Island is an island, or attached to the bridges

7    that span that water or go through the tunnels.  So it's

8    extremely straightforward.

9              The defense has known about this for months and

10   months.  This stipulation has been outstanding for quite some

11   time.  Just now Mr. Ryan has said he wants to speak to the

12   chief technology officer of the FCC, and he does not want to

13   stipulate to this information.  So we had been prepared to rest

14   basically at this point, but what we thought would be a

15   forthcoming stipulation appears to have become problematic,

16   even though it is such a straightforward point.

17             The second item that we would like to put in,

18   hopefully by stipulation, is a document showing the amount of

19   money that Mr. Rutigliano received over the years in disability

20   payments and then at that point we would be prepared to rest.

21             So we can proceed however your Honor would like.  I

22   would try to work out with Mr. Ryan whether we can solve this

23   problem that I didn't think was going to be an issue.  And we

24   can try to solve the other issues.  If we can solve them over

25   the lunch period, then we would be prepared to rest.  If we

1    can't solve them, we have to find a witness to testify to the

2    straightforward fact.

3           The person I spoke to personally is obviously highly

4    placed at the FCC, and when I spoke to him he was in

5    Washington, D.C.  I don't know where he is today or whether he

6    is on vacation.  It would take some looking to find who would

7    come into town to testify about this matter.  But it almost

8    seems self-evident to me that in order for banks in Long Island

9    to have electronic information about money in people's

10   accounts, that if that information originates outside Long

11   Island, there has to be a wire transmission through or under or

12   over the waters that surround Long Island.

13          As your Honor knows, by law that means that those

14   transmissions go through the Southern District of New York,

15   because the water surrounding Long Island, or rather the water

16   in the Eastern District of New York is by law in the Southern

17   District of New York.

18          THE COURT:  All right.  Put that aside for a moment.

19   You indicated the second item relates to the disability

20   payments of Mr. Rutigliano.

21          MR. WEDDLE:  Right.

22          THE COURT:  Is this also contested?

23          MR. WEDDLE:  I doubt it.

24          THE COURT:  Is there an exhibit?  Was that exhibit not

25   brought out before?

d7tnles3                          Tumulty - redirect

1              MR. WEDDLE:  This is the exhibit.  We put one in that

2     was very similar to this.  Actually I think it's multipiece

3     exhibit.  But we put one in very similar to this related to Mr.

4     Baran, and you would read this in exactly the same way as with

5     Mr. Baran's exhibit, Government Exhibit 30.  We had a

6     stipulation saying how to read this form.  So I think based on

7     that stipulation we would just offer these exhibits and

8     everyone would be able to read them based on the stipulation

9     with Mr. Baran.

10             THE COURT:  Mr. Ryan?

11             MR. RYAN:  We have no objection to these payment

12    records.  That is what they look like.

13             MR. WEDDLE:  Yes.  But the rate information.

14             MR. RYAN:  The other information deals with venue.  I

15    am going to make a suggestion for your Honor to consider.  They

16    can rest and be subject to us ironing out a venue question.  It

17    has nothing to do with the factual issues for the jury at this

18    point.

19             The proposition in this part of the stipulation I

20    question, and I asked if I could have a telephone conference

21    with someone from the office, it doesn't have to be the top

22    person, to explain to me why a credit in a New York bank, and a

23    New Jersey bank that is the Federal Reserve bank, that is where

24    the RRB checks go.  You have someone on Long Island, such as

25    Mr. Rutigliano, getting a credit in New Jersey for their

d7tnles3                          Tumulty - redirect

1    customer accounts, and then the bank within its system gives

2    credits to Mr. Rutigliano for the payments.  That doesn't go

3    through the Southern District of New York in my opinion.  I

4    signed a stipulation to that effect concerning the Federal

5    Reserve point.  This stipulation is different.  This adds that

6    somehow the process goes through the Southern District of New

7    York by reason of waters and wire communication.  I simply have

8    to verify that.  That is all I want to to do, is verify it.

9              MR. WEDDLE:  It is very straightforward.  It says from

10   a server in New Jersey there is no way to get electronically

11   from that to a person in Long Island except going through the

12   waters that are in the Southern District of New York.

13             MR. RYAN:  I appreciate what he is saying.  If I was

14   in a car, I could avoid the Southern District by going over the

15   Staten Island bridge.

16             MR. WEDDLE:  That also would be in the Southern

17   District of New York, your Honor.  The case law has said if you

18   drive over the bridges, over the Verrazano Narrows Bridge in

19   particular, that is a body of water that is in the Southern

20   District of New York by law.  There are Second Circuit cases

21   saying even a flight path over the Narrows is in the Southern

22   District of New York.  Mr. Ryan is simply wrong.

23             THE COURT:  See if you can work it out.  Get somebody

24   on the phone.

25             MR. RYAN:  Right.

d7tnles3                    Tumulty - redirect

1              THE COURT:  If the meantime, the government can rest,

2     and come back after lunch and see if you have worked it out.

3     If you haven't, you can then rest subject to working this thing

4     out sometime before the defendants' case is completed.  All

5     right.

6              MR. WEDDLE:  Your Honor, why don't we just break and

7     then we will rest when this issue is completed rather than

8     resting conditionally.

9              THE COURT:  If you wish to do so, that is fine.

10             Mr. Durkin, you had a motion.

11             MR. DURKIN:  Well, can I just address this venue

12    issue.

13             THE COURT:  Yes.

14             MR. DURKIN:  I just want to make sure our objection to

15    the venue is properly noted.  I am assuming that the person

16    will testify to he what he says.  I disagree with the

17    government that it is a straightforward piece of testimony.  If

18    you read this, it is one of the most convoluted things I have

19    ever seen.  But we don't believe as a matter of law that that

20    satisfies venue.  So I don't want there to be any inference by

21    agreeing to the stipulation that somehow we are agreeing to the

22    venue that they are talking about.

23             THE COURT:  Let me ask, is the venue issue only with

24    regards to the wire transfer or all of the accounts?

25             MR. WEDDLE:  It is only with regard -- I mean, I think

1    that this stipulation also satisfies venue with respect to the

2    health care fraud counts, although I think there was also

3    evidence in the record that some of that was mailed.

4              THE COURT:  It was mailed to 26 federal plaza, wasn't

5    it?

6              MR. WEDDLE:  Yes.  That is a different issue.  For the

7    mail fraud counts, this stipulation has nothing to do with the

8    mail fraud counts.  Those are based on the mailing to 26

9    Federal Plaza.

10             THE COURT:  Right.

11             MR. WEDDLE:  This stipulation covers both the wire

12   fraud counts.  And the same proposition, which was

13   straightforward, covers the health care fraud counts, because

14   in order for a claim to be transmitted electronically from Long

15   Island to somewhere that is not in Long Island it has to go

16   through the waters surrounding Long Island because Long Island

17   is an island.

18             THE COURT:  Right.  OK.

19             See if you can work that out either on the phone or

20   through negotiations.  If you don't want to rest, we will

21   adjourn for lunch and see if we can work it out before we come

22   back.  All right.

23             MR. DURKIN:  Judge.

24             THE COURT:  Yes.

25             MR. DURKIN:  The motion I want to make is for a

d7tnles3                    Tumulty - redirect

1   mistrial regarding the fact of the repeated questioning about

2   whether there were people in the audience of retired Long

3   Island Rail Road workers.  There was no basis for that, no

4   good-faith basis for that at all --

5               MR. JACKSON:  Absolutely not.

6               MR. DURKIN:  -- under any circumstances.  And it

7   presumes they were the only people laughing, which they

8   weren't.  That is my motion.

9               THE COURT:  Thank you.  I am not persuaded that is a

10  basis for a mistrial, so I am going to deny the motion.

11              MR. RYAN:  I will share with you, Judge, that I

12  resisted asking whether or not Mr. Weddle's father was in the

13  room when the jury passes.  I resisted that.

14              MR. WEDDLE:  I am confident that my father was not

15  laughing at the totally improper questioning by Mr. Durkin.

16  But your Honor we would request that your Honor instruct the

17  members of the audience not to have that kind of outburst

18  during the questioning.  They should sit here quietly or they

19  should leave.

20              THE COURT:  Thank you.

21              MR. JACKSON:  That can happen outside the presence of

22  the jury.

23              (In open court)

24              THE COURT:  We are going to take the lunch break at

25  this point in order to allow for a number of issues that need

d7tnles3                         Tumulty – redirect

1    to be straightened out before we resume.

2              So we will return at 2 o'clock.  Enjoy the lunch.  As

3    you go out, do not discuss the case among yourselves or with

4    anyone else on the outside or have any contact with anyone

5    involved in the case.  If any of these things occur, you are

6    directed to inform the Court immediately and not to discuss it

7    with the other jurors.

8              Have a good lunch.

9              (Luncheon recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7TMLES4

                              AFTERNOON SESSION

 1                              2:05 p.m.

 2            (Jury not present)

 3            THE COURT:  Mr. Weddle, any resolution of the venue

 4   issue?

 5            MR. WEDDLE:  Yes, your Honor.  We resolved the issue

 6   and all parties have entered into the stipulation that we have

 7   proposed.

 8            So at this point the government would just offer and

 9   read that stipulation which we have marked as Government

10   Exhibit 1611 and then offer two documents that come in pursuant

11   to the stipulation that we read this morning, Government

12   Exhibit 1610, the two exhibits are Government Exhibit 570 and

13   571.  And then at that point we intend to rest, your Honor.

14            THE COURT:  Mr. Ryan.

15            MR. RYAN:  Your Honor, I signed off on the

16   stipulation.  I apologize for the delay.  If there is anything

17   that has come up that's material and I change my mind, I will

18   ask the Court for permission.  It's a question of signing the

19   stipulation.  We don't concede venue.  I just want to make that

20   clear.

21            THE COURT:  The Court's permission to change your

22   mind, you said?

23            MR. RYAN:  Yes.  If I come up with something material

24   within the next day or so relating to that stipulation, I will

D7TMLES4

```
 1    call it to the Court's attention and ask permission to

 2    reconsider the application.

 3              THE COURT:  Thank you.

 4              Now, Mr. Durkin had risen at one point to indicate

 5    that there was some concern about an exhibit.

 6              Mr. Durkin, do you recall this morning you left

 7    open --

 8              MR. DURKIN:  They didn't put it in, Judge.

 9              THE COURT:  This morning there was some stirring in

10    the galleries at a point at which some testimony occurred.  Let

11    me caution the members of the audience in the gallery and the

12    benches that it is very important to restrain any expression

13    from the galleries that might possibly bear upon the issues in

14    the case or somehow influence the jury improperly.  The

15    consequences of any such expressions or outbursts can be very,

16    very severe.

17              Mr. Jackson, the government is going to be resting

18    momentarily.  Is Ms. Baran prepared to proceed with testimony?

19              MR. JACKSON:  She sure is, Judge.  What I'm doing is,

20    I am going to immediately call her.

21              Now, there is a couple of issues to address.  One is

22    the government had filed a motion in limine regarding a Ralph

23    Domenici regarding what they believe that he will be testifying

24    about.  We can address that.

25              I noted that I received an e-mail.  When I checked,
```

D7TMLES4

 1    there was an e-mail from last night at some point, a subpoena

 2    requesting Ms. Baran to bring in all this information.  I'm

 3    certain the Court is not going to adjourn this trial to have me

 4    go through that with Ms. Baran.  I would argue that this is

 5    completely untimely, Judge.  The government had five years to

 6    investigate the case, then asking me for records of her and her

 7    husband, pictures that they took when they were in Egypt and

 8    Italy.  I don't know how material or relevant it is to the

 9    case.  In addition to that, they asked for a number of things,

10    pension files and other things that they have or had an

11    independent basis to get on their own.

12            And so I first am going to ask, Judge, that this Court

13    recognize that that certainly is untimely, it's unduly

14    burdensome.  She would be required, in essence, to be a witness

15    against her spouse.  I didn't even believe when I saw the

16    subpoena, Judge, from Sunday night.  I don't know why I would

17    be getting a subpoena Sunday night on the eve of her testimony

18    today, so we may need to address that.  But I'm completely,

19    when they rest, I'm prepared, my first witness will be

20    Ms. Baran and she fully intends to testify.

21            THE COURT:  Two things.

22            Mr. Jackson, when we discussed the issue of defense

23    testimony on Friday, there was some question as to how many

24    witnesses you had and the proffer.  Do you have others besides

25    Mr. Domenici?

D7TMLES4

```
 1              MR. JACKSON:  I do, your Honor.  I believe there will

 2    be a couple of others besides Mr. Domenici.  Does the Court

 3    want to hear an offer of proof regarding him, Judge?

 4              THE COURT:  Before we do that, how long do you think

 5    you are going to need for the direct of Ms. Baran?

 6              MR. JACKSON:  We will probably take the rest of the

 7    afternoon.  She has got a lot of explaining to do.  At least a

 8    couple of hours.  I don't know how it will come out or

 9    whatever, but I'm thinking there is a couple of hours of

10    testimony, at least.  We are going to be going through

11    government exhibits.  She is going to be explaining her role

12    here.  There are a number of things that I ask of her.  I ask

13    that I be given latitude to do that.

14              She is a defendant in the case.  She sat here

15    patiently and respectively and with the appropriate decorum and

16    demeanor for weeks listening to things that, in her view, are

17    entirely untrue and she has a lot to say about it.  She is

18    going to say a lot about it.  I just need some latitude.  But

19    it's going to take a while, Judge, and I don't want to rush

20    through her testimony.

21              THE COURT:  If that's going to be the case, there is

22    no need to get into the issues of the other witnesses.  To the

23    extent that there is any dispute concerning the scope of what

24    they would be testifying to, we can address those at a later

25    point.
```

D7TMLES4

1              But bear in mind as to Mr. Domenici, based on what the

2    government has said in its motion, if the scope of what he is

3    going to be testifying to is what the government indicates it

4    is, based on your proffer, it appears that much of it is not

5    going to be permissible, but we don't need to address it at the

6    moment.  I'll give you a proper opportunity to elaborate later

7    on.

8              MR. JACKSON:  Thank you, Judge, very much.

9              THE COURT:  Concerning Ms. Baran's testimony, again,

10   you are entitled to as much latitude as is appropriate.  But

11   keep in mind that there has been an enormous amount of

12   testimony from many, many witnesses.  To the extent that

13   Ms. Baran is going to be testifying to things that are already

14   on the record, undisputed, gone over ad nauseam, I would

15   suggest that you try to limit to matters that are new and that

16   gives things from her perspective and not going over factual

17   things like the date on a document that should not be disputed

18   or should not require any additional testimony.

19             MR. JACKSON:  I agree, Judge.  I just think, as you

20   rightfully mentioned, Judge, she gives a different perspective,

21   and I think the facts according to how they will be laid out

22   with Ms. Baran add a great deal of perspective than what the

23   government witnesses suggest the facts are.  And so I will not

24   regurgitate, rehash, but there will be a number of exhibits

25   which she will explain what they really mean and there will be

D7TMLES4

 1    facts as to how they really are and there will be things that

 2    took place and she will explain how they really happened.  To

 3    the extent that's relevant and probative, I'll be getting that

 4    out through her and we will do it in the most efficient way

 5    that we possibly could, Judge.

 6              THE COURT:  Thank you.

 7              Mr. Weddle.

 8              MR. WEDDLE:  Your Honor, a number of things.

 9              One is, it would be helpful, so we don't have to

10    rummage around in the carts in the midst of the testimony if we

11    knew what the exhibits are that Mr. Jackson intends to question

12    Ms. Baran about.  That's the first thing.

13              The second thing is, we made a motion with respect to

14    Mr. Domenici because we got a single piece of 3500 material

15    from Mr. Jackson and it related to Mr. Domenici.  We have had

16    no proffer of what the substance of the testimony would be from

17    any other witness and we have not gotten a single scrap of 3500

18    material for any other witness.  I find it hard to believe

19    there are no notes, e-mails, memos or any other kind of

20    memorialization of what the substance of these people's

21    statements are.  But we have nothing.  As soon as we get a

22    proffer, it may be warranted to make additional motion

23    practice.

24              So we would request, number one, compliance with the

25    disclosure obligations regarding 3500 material and, number two,

D7TMLES4

```
 1   a proffer of what the substance of these people's testimony

 2   will be.

 3            THE COURT:  That's what we asked for on Friday.

 4            MR. WEDDLE:  Yes, your Honor.  We asked for it on

 5   Friday.  We have not gotten it.  We still have not gotten it.

 6   And Mr. Jackson still hasn't given any kind of proffer.  He

 7   hasn't turned over any additional 3500 material except for one

 8   document from Mr. Domenici, which was filled with a number of

 9   things that are plainly not permissible for him to testify

10   about.  That's why we made the motion we made.  But it doesn't

11   make sense to take this acting from the hip on these issues.

12   If there is 3500 material, we are entitled to it.  We have not

13   gotten it.  And if we can get a proffer of what the testimony

14   is going to be, we can resolve the proper scope of it and any

15   evidentiary issues that are appropriate to resolve ahead of

16   time rather than having objectionable, irrelevant questions

17   just being posed in front of the jury when it's clear that the

18   answer could never be admitted.  That's prejudicial, your

19   Honor.

20            THE COURT:  Thank you.

21            Mr. Jackson.

22            MR. JACKSON:  Judge, a couple of things.

23            I understand that questions to the jury that hurt the

24   government's case are objectionable and irrelevant, according

25   to them.  I just want to be very clear about two things.  The
```

D7TMLES4

first thing is that the government asked me for 3500 material

on Friday.  I told them, and I think I represented to the

Court, that I received a fax from Mr. Domenici, which I

forwarded to them.  He sent me another fax which I have not

forwarded to the government.  That was done, I believe, this

weekend.

In terms of him sending me a fax to my office, I have

not been back to my office.  But he has sent me another fax

which the government will get.  Beyond that, there is no 3500

material, Judge.  There is nothing else.  I'm not hiding

anything from the government.  I have spoken to witnesses.  I

have not interviewed them.  I have not had investigators

interview them.  I'm not hiding the ball.  I understand what my

obligations are.

THE COURT:  Mr. Jackson, part of your obligation is to

come forward with a good-faith proffer.

MR. JACKSON:  Judge, I just asked a minute ago before

I sat down whether you would like me to proffer for Domenici.

We will do that later.

THE COURT:  We are not talking about Domenici.  You

say that there are other witnesses and the government has no

clue who they are and what their role is or what they are

expected to testify about.

MR. JACKSON:  I'm glad to tell you whenever you are

ready.  I'm glad to tell you.

D7TMLES4

1          THE COURT:  The point is that it was asked for on

2     Friday and it should have been the subject of a written

3     submission to the government indicating exactly who, how many.

4          MR. JACKSON:  I did that already, Judge.  I indicated

5     to the government who the witnesses are and that they expect to

6     testify regarding their dealings with Ms. Baran and their

7     knowledge of the Long Island Railroad and knowledge of the RRB.

8          MR. WEDDLE:  Your Honor, it's just not enough

9     information to permit an orderly presentation of what the

10    evidentiary issues may be.

11         THE COURT:  What you just said could cover half of the

12    universe.

13         MR. JACKSON:  You know what, Judge, for example, on

14    the issue of job descriptions, I thought that there would be no

15    objection to me admitting the job descriptions.  Apparently,

16    the government objected, for whatever reason, to the admission

17    of job descriptions.  I think it's important to explain to the

18    jury what the Long Island Railroad is, what it's about, types

19    of jobs people do, the types of functions they have, the type

20    of climbing and lifting and bending and twisting and turning

21    and pulling that they do.  And certainly if there were matters

22    even that we could have stipulated to before, I don't even know

23    how necessary witnesses would be.

24         To the extent that I can't even have a stipulation as

25    to a job description that's readily available on the Internet,

D7TMLES4

1     that certainly they have, the government has in their own

2     information, I don't know what else to do but call a witness

3     and have them tell us what they do.  I think there is a

4     good-faith basis to do it.

5          On Mr. Domenici's testimony, when, again, your Honor

6     is ready, I'll fully proffer exactly what he is going to say.

7     I think it's relevant, it's probative, it's not objectionable,

8     and there is no need for this long-winded 3500 material because

9     it's about matters, I think, that the government already has

10    some knowledge of.

11         THE COURT:  We need to make a reasonable estimate,

12    especially for the jury and for the Court, of how long or how

13    much longer this case is going to take.  At this point I don't

14    have an idea whether you are going to be bringing in one

15    witness, Mr. Domenici, or Friday you mentioned that maybe it's

16    eight of them.

17         MR. JACKSON:  Just to be clear, Judge, and again just

18    to give you the full picture, the government reached out to

19    me -- I initially reached out to them.  E-mails are all there.

20    I don't want to speak out of school.  If I do, they will

21    certainly correct me.  I forwarded the information about Mr.

22    Domenici and also I think I received an e-mail Saturday or

23    Sunday saying I was paring down the eight to five.  I was asked

24    a question.  And not only did I do that, Judge, they asked me,

25    in what order?  I said, well, it will probably be Ms. Baran,

D7TMLES4

Mr. Domenici, and another witness, Mr. Jansen.  I even told
them the order.  But today, according to them, you know, I
didn't do anything.  I didn't comply with anything.  That's
exactly what happened.

        And so, Judge, I'll tell you right now that there
probably will be from the eight witnesses, I told them five.
There may only be about three of those witnesses that I end up
calling, depending on what happens with Ms. Baran, Mr.
Domenici.

        And regarding what their assumptions were, that he
would testify about with the 3500 material, that's because he
had strong opinions in the material he sent to me.  He's not an
expert witness.  I don't care about his opinion.  I don't think
you do or the jury does or anyone else does either.  But
because in the 3500 material, Judge, he had some opinions to
me, which I fully shared with the government, that doesn't mean
that that's the proper subject of his testimony.  It means that
he feels strongly about certain things that are happening that
shouldn't be.  That's all.

        But with regard to your question, I think Ms. Baran
will be a couple of hours.  I think Mr. Domenici will be a
couple of hours.  I think Mr. Jansen will be 45 minutes.  And
that may be it.  I don't know what the crosses will be, either
Ms. Baran or of Mr. Domenici or Mr. Jansen, but I believe that
I should be done by tomorrow morning.

D7TMLES4

1          THE COURT:  One last observation.  Then we are going

2     to bring in the jury.  I don't know anything about Mr.

3     Domenici.  I have not seen the proffer.  But it strikes me that

4     a witness who is not an expert, he's not a party, he has no

5     role here of any material involvement, to say that that witness

6     is going to be testifying for two hours, Mr. Jackson --

7          MR. JACKSON:  It might be, absolutely.  He knows

8     Ms. Baran.  He could attest to the nature of his contacts with

9     her.  He could attest to her good standing, her reputation.  He

10    knows her husband, who has been branded a criminal, who is

11    ripping the system off of disability.  He could testify to the

12    interactions with her.  He has been the general chairman.  He

13    worked for Long Island Railroad for 30 years.  He has been a

14    gang foreman.  He knows the union issues.  He knows a number of

15    other things.  He can talk about job descriptions, the extent

16    to which those jobs require very physical intensive labor,

17    electricians, which Mr. Baran is, who the government has

18    branded a criminal, the extent to which that job requires

19    climbing and jumping and leaping and a lot more than golf,

20    Judge.  I could assure you that.  He is going to talk about

21    that.  I think that's going to take a significant amount of

22    time to develop.  I am going to have to lay an appropriate

23    foundation.

24          Of course, if I don't, with regard to his testimony on

25    job descriptions, the government will object and he doesn't

D7TMLES4

know what he's talking about.  He has no basis in knowledge.
He's not the proper party.  He is.  Because he knows the inside
and outs of the railroad.

He will also give testimony on the whole issue of
Metro North.  Metro North attempted to become a part of the
Long Island Railroad as it related to certain unions that
wanted to join because of the benefits that Long Island
Railroad has.  He was involved in those negotiations.  He was
there.  He sat at the table.  He was on the executive
committee.  And he will otherwise demonstrate that that whole
chart and statistical analysis comparing an apple to an orange
is a joke and he will tell why.  And I think he has a basis of
knowledge of doing that because he has been doing it a long
time.  He knows Metro North inside out, he knows Long Island
Railroad inside out.  He can give testimony as to any
distinctions between the two and why statistical analysis is
really misleading here.  It may take me a while to develop
because, again, if I don't, I don't want to be objected upon,
which I'm sure I will because it was an improper foundation and
this is not the guy.  That might take me a long time.

THE COURT:  Let's not delay the point.  Let's bring in
the jury.

MR. WEDDLE:  Your Honor, at some point before we break
for the day it would be nice to have a detailed proffer as to
all of the witnesses Mr. Jackson intends to call.

D7TMLES4

1          MR. JACKSON:  I can finish now, Judge.

2          THE COURT:  No.  We are not going to do it now.  I

3     don't want to keep the jury waiting any longer.  Send a memo or

4     an e-mail to the government laying out in writing what the

5     good-faith proffer is for all the witnesses other than

6     Ms. Baran.

7          Mr. Durkin.

8          MR. DURKIN:  Judge, just briefly, I only want the

9     record to reflect -- this may be more appropriate before the

10    government begins its cross-examination of Ms. Baran -- as you

11    know, we moved for a separate trial.  I would renew that.  At

12    this point I want the record to reflect that we will be resting

13    and not putting in any evidence whatsoever.

14         THE COURT:  Thank you.

15         MR. DURKIN:  Other than the stipulations.  The only

16    reason that we are waiting is we have two stipulations, maybe

17    three.  I'm talking about the government's use of

18    cross-examination of Ms. Baran against Dr. Lesniewski.  I want

19    to object to that in advance.

20         MR. JACKSON:  Judge, would you like me to give the

21    exhibit numbers?

22         THE COURT:  Yes.  If you have exhibit numbers of

23    documents that you are going to be introducing or referring to

24    through Ms. Baran, we should have those ahead of time.

25         MR. JACKSON:  Thank you, Judge.

D7TMLES4

```
1            At this point I will say what the exhibits will be.

2   113A.  In addition to 113A, the golf video of Mr. Baran, I

3   guess, playing golf.  I will be alluding to that.  I am not

4   sure what the exhibit number is.  Exhibit 800, exhibit 803,

5   Exhibits B5A through B5Q, Exhibit 104A, Exhibit B1 through B4,

6   Exhibit 17, Exhibit 17D, which I guess I can offer.

7            MR. WEDDLE:  We don't object to it.  I think it's

8   called 17D for draft.  We are not going to object to it.

9            MR. JACKSON:  114A, 114B, 114C, 114D.  1353, 108A,

10  108B, 108C, 108F, 108E, 108D, Exhibit 530, Exhibit 18B, Exhibit

11  14A, Exhibit 14B, Exhibit 18B, Exhibit 504, Exhibit 503A,

12  Exhibit 523, Exhibit 524, Exhibit 522, Exhibit 502B2, Exhibit

13  500C, Exhibit 500D, Exhibit 502B3, Exhibit 507, Exhibit 18,

14  Exhibit 502B1, Exhibit 502B4, Exhibit 527, 18A, 507, Exhibit

15  D2.  Then there was a disability exhibit.  I think this last

16  witness went over the amount of hours that Ostap Baran worked

17  overtime.  If you can just refresh my recollection of what

18  exhibit number that is.

19            THE COURT:  It has not yet been introduced.

20            MR. WEDDLE:  Government Exhibit 30, I believe.  I'm

21  sorry.  I was wrong about that.  813.

22            THE COURT:  Is that it, Mr. Jackson?

23            MR. JACKSON:  That's it.

24            THE COURT:  Are any among the ones that you've read

25  that are in dispute or are they already admitted.
```

D7TMLES4

1           MR. JACKSON:  Judge, I don't believe that the job

2     descriptions, which would be B5A through Q, I don't think those

3     are in evidence.  B4 is not in evidence.  Again, unless the

4     government at this point wants to stipulate to that.

5           MR. WEDDLE:  Your Honor, I think Ms. Baran can

6     probably authenticate it and put it in evidence.  The problem

7     is that she was served with a subpoena in 2008 and this

8     document was not turned over in response to the subpoena.

9           THE COURT:  Which document?

10          MR. WEDDLE:  B4, I believe.  I don't know what the

11    date is on the document.  There were a number of defense

12    exhibits at some point that Mr. Jackson gave us that we asked

13    Special Agent Cuocci on the stand whether these documents have

14    been turned over in response to a subpoena in 2008 and she said

15    no.  So there may be a questionable provenance to some of these

16    documents to the extent they were created, supposedly created

17    before 2008 but were not produced in response to a grand jury

18    subpoena.

19          MR. JACKSON:  Judge, my understanding is, Ms. Baran

20    ran a legitimate business for which she filed taxes.  The

21    government showed the jury those taxes repeatedly.  And those

22    taxes, I think the government showed the jury what were 2012.

23    If they were not produced in 2008, perhaps they didn't exist

24    then.  They could cross-examine Ms. Baran on that.  But she had

25    her business up and operational in 2009, 2010, '11, '12, and

1    this is what she used with her clients.

2              MR. WEDDLE:  Your Honor, I don't have these other

3    defense exhibits in front of me, so I don't know exactly what

4    they are.

5              MR. JACKSON:  Judge, to be clear, these are exhibits

6    that we gave the government a while ago.

7              MR. WEDDLE:  I'm not denying that, your Honor.

8              Your Honor, when we bring exhibits to court, defense

9    counsel have actually asked us to hand over a packet of paper

10   copies even though we have already produced them

11   electronically.  I don't have the paper copies in front of me

12   because I didn't know this was the list of exhibits that he was

13   intending to offer.

14             THE COURT:  That's why I asked before how many of

15   these exhibits are documents that have already been admitted.

16   Some of them are.

17             MR. JACKSON:  Judge, the vast majority.  There are

18   maybe three that are not in evidence.

19             THE COURT:  I was trying to get to narrow that

20   precisely to that question, and so far you've only indicated B4

21   and B5A through Q.

22             Let's bring the jury in.

23             MR. WEDDLE:  I have two different B4s.

24             Your Honor, logistically, often time after the

25   government rests there are motions by the defense.  I don't

D7TMLES4

1    know what your Honor's preference is in terms of taking another

2    break or doing a brief set of motions in front of the jury.  We

3    could discuss it briefly now, just before we rest, and then

4    they could renew the motion as soon as we rest and it would not

5    take a lot of time in front of the jury.

6            THE COURT:  Are there going to be any defense motions

7    after the government rests?

8            MR. RYAN:  Yes, your Honor.

9            MR. DURKIN:  Yes, your Honor.  We move for a judgment

10   of acquittal under Rule 29.

11           THE COURT:  Anyone else?

12           MR. RYAN:  I just filed ECF a written motion and I

13   have a copy for the Court.

14           THE COURT:  On what?

15           MR. RYAN:  Rule 29.

16           MR. JACKSON:  It's no surprise, same thing as it

17   related to Ms. Baran.

18           THE COURT:  So far as the Court's understanding of the

19   evidence that has been presented so far and the standard that

20   applies on Rule 29 motions, I am persuaded that the motions

21   should be denied.  There is, in the Court's view, more than

22   sufficient evidence for this case to proceed to the jury.

23           MR. DURKIN:  Judge, just to be sure, is it all right?

24   I am never sure whether it has to be in writing or not.  It's

25   my understanding we don't have to make that motion in writing.

D7TMLES4

```
 1              THE COURT:  You do not.  You just made that motion.
 2              MR. DURKIN:  That's sufficient?
 3              THE COURT:  That's sufficient.
 4              Proceed.
 5              You made the motion, Mr. Durkin and there is a court
 6    reporter who memorialized the fact that you made such a motion.
 7    It gives you the basis for whatever you may want to do with
 8    this.
 9              MR. DURKIN:  Thank you.  Hopefully nothing.
10              (Jury present)
11              THE COURT:  Welcome back.  Thank you.  We apologize
12    for the late start.  I hope we didn't cause an inconvenience
13    and thank you for your patience.  You will find from this point
14    forward that as we get closer to the conclusion of the trial,
15    the latest stages, there is a lot more unpredictability.
16    Things occur that we cannot control as easily because they come
17    in unexpectedly and that causes some amount of unavoidable
18    delays.  So we thank you for your patience.
19              Mr. Weddle.
20              MR. WEDDLE:  Thank you, your Honor.
21              The government offers Government Exhibit 570 and 571
22    pursuant to the stipulation read this morning, which was marked
23    Government Exhibit 1610.
24              THE COURT:  No objection.  It will be admitted without
25    objection as stipulated.
```

D7TMLES4

1          (Government's Exhibits 570 and 571 received in

2     evidence)

3          MR. WEDDLE:  Your Honor, I would like to offer and

4     read a stipulation Government Exhibit 1611.

5          The stipulation says that it's stipulated between the

6     parties that if called as a witness, a representative of the

7     railroad retirement board would testify that railroad

8     retirement board disability annuities are paid electronically

9     by fed ACH, the Federal Reserve's centralized application

10    software used to process automated clearing house transactions

11    from the United States Treasury's account with the New York

12    Federal Reserve.

13         If called as a witness, a representative of the New

14    York Federal Reserve would testify that fed ACH transactions

15    are electronically executed on servers located in New Jersey;

16    that is, the transfer of electronic funds is made from the

17    payor's account at the New York Federal Reserve to the

18    recipient bank's account at the New York Federal Reserve.  From

19    there, the recipient banks use different methods and routes to

20    communicate with the New York Federal Reserve Bank's server in

21    order to move the money electronically to the bank accounts of

22    the account holders at the recipient bank.

23         If called as a witness, Henning Schulzrinne, the chief

24    technology officer of the Federal Communications Commission,

25    would testify that regardless of the route by which wire

D7TMLES4

1    communications travel from outside Long Island into Long

2    Island, because Long Island is an island, the wire

3    communications necessarily would have to travel through, under,

4    or over the water that surrounds Long Island.  In particular,

5    regardless of the route by which communications travel from the

6    New Jersey server of the New York Federal Reserve Bank, in

7    order for the money or information about the money to be

8    accessed by a customer or a teller in Long Island, a

9    transmission would be required that crosses the waters

10   surrounding Long Island and enters Long Island.  Transmissions

11   of banking information such as this in the New York City area

12   are almost invariably by cable.  These cables either are under

13   the water surrounding Long Island or are attached to bridges

14   that go over the water surrounding Long Island.

15           With that, your Honor, the government rests.

16           THE COURT:  The government has indicated that it

17   rests.  It means that the government has concluded the

18   presentation of all of the evidence that it has sought to

19   produce in its direct case in order to meet its burden of proof

20   of satisfying all of the elements of the charges that it has

21   brought against the three defendants.  I will go into questions

22   of burden of proof during my final instructions.

23           At this point, as I indicated in my preliminary

24   instructions, the defense may, but does not have to, present

25   any evidence.  If any defendant chooses not to present any

D7TMLES4

```
 1    evidence, again, as I indicated in my preliminary instructions,

 2    the fact that the defendant chooses not to present the case

 3    cannot be used by you in any way to draw any negative

 4    inferences against any such defendant.

 5             If you recall, the preliminary instructions that I

 6    gave you, which I will give again in greater detail, defendant

 7    does not have to testify or present any evidence.  The

 8    government has the burden of proof at all times to prove guilt

 9    beyond a reasonable doubt.  And the fact that a defendant

10    chooses not to present any evidence cannot be used by you

11    against that defendant.  Again, I will address these issues in

12    greater detail during my final instructions, but I will not

13    inquire whether any defendant either chooses to present

14    evidence or to exercise a constitutional right not to.

15             THE COURT:  Mr. Durkin.

16             MR. DURKIN:  Judge, there will only be a couple of

17    stipulations.  Tomorrow we will have stipulations.  Other than

18    that, we will rest.

19             THE COURT:  Thank you.

20             Mr. Jackson.

21             MR. JACKSON:  Judge, it is our intent to put on a

22    defense case, and we would like to begin that defense case,

23    with your permission, at this time.

24             THE COURT:  Mr. Ryan.

25             MR. RYAN:  Your Honor, Mr. Rutigliano will rest on the
```

D7TMLES4

1    government's case, subject to one stipulation to be offered in

2    evidence.

3              THE COURT:  Thank you.

4              In that case, Mr. Jackson, the floor is yours.

5              MR. JACKSON:  Thank you, Judge.  At this time the

6    defense calls the accused, Ms. Marie Baran.

7     MARIE BARAN,

8         a defendant, called as a witness on her own behalf,

9         having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MR. JACKSON:

12   Q.  Ms. Baran, how old are you?

13   A.  Sixty-five.

14   Q.  Where were you born?

15   A.  Born and raised in Queens, Springfield Gardens.

16   Q.  How many years did you spend in Queens in Springfield

17   Gardens?

18   A.  Almost 15.

19   Q.  Are you married?

20   A.  I am.  To Ostap or, as we call him, Gus Baran.

21   Q.  How long have you been married to Gus Baran?

22   A.  October 10 will be 43 years.

23   Q.  Where did you meet Mr. Gus Baran?

24   A.  He is my high school sweetheart.

25   Q.  What high school is that?

D7TMLES4                        Baran - direct

1   A.  Well, in 1961, the great little neighborhood I grew up in

2   in Queens started to become industrialized.  All the companies

3   wanted to be around the airport.  We were right at the end of

4   the airport.  I watched every plane that ever left JFK go over

5   my house; knocked over a few bricks on the chimney, too.  But

6   now they had -- when they used to feed you on the airlines,

7   they had all the food companies wanted to be in that area and

8   all the freight companies, so it became industrialized.  So my

9   mom and dad sold their house and moved us out to East Meadow,

10  Long Island.

11  Q.  I want to talk about Gus Baran for a minute.  Okay?

12  A.  Um-hum.

13  Q.  Now, you said that you married him in what year?

14  A.  1970.

15  Q.  You've heard a lot of discussion about Mr. Baran and his

16  lack of a disability, can I put it?  You remember that, right?

17  A.  I have heard it.

18  Q.  You sat there?

19  A.  Yes.

20  Q.  Now, I want to start you off with that.

21          MR. JACKSON:  Would the government please play the

22  videotape of him playing golf, the one that you were going to

23  play before with your agent who was under surveillance,

24  watching and following.

25          MR. WEDDLE:  Your Honor, there are a number of clips.

D7TMLES4                        Baran - direct

1    There is probably an hour plus long videotape.  We can play any
2    of them.  But it would be helpful to know which one he would
3    like.
4            MR. JACKSON:  Any clip of him swinging a golf club on
5    the golf course.
6    Q.  Ms. Baran, if you permit me this diversion, I want to get
7    back into you and where, again, you grow up and your job and
8    everything else.
9            But before I do, I want to focus you on your husband.
10   Okay.  We are going to take a trip there.
11   A.  That's fine by me.
12           (Video recording played)
13   Q.  Do you recognize the person on the screen?
14   A.  I bought him that hat.
15   Q.  Who is that?
16   A.  It looks like my Chi-Chi Rodriguez.  It's not.  It's Gus
17   Baran.
18   Q.  Gus Baran, is he playing golf there or about to?
19   A.  Looks that way.
20   Q.  Could you tell the jury how often Mr. Baran plays golf?
21   A.  He can only handle it about once a week.  And not every
22   week.
23   Q.  On any given month how many times is he out there on the
24   golf course?
25   A.  Two or three times a month.

1   Q.  Is your husband disabled?

2   A.  He is.  Unfortunately, he has very severe stenosis.

3   Q.  Could you tell us what, if anything, he does with respect

4   to medication prior to him going to play golf?

5   A.  I'm not crazy about it, but he takes two Tramadol, which

6   are an opiate that kills pain.  He takes two Tramadol to go out

7   there.  He takes them in the morning with his breakfast and he

8   takes two more at the ninth hole.

9   Q.  How many holes is it to play golf?

10  A.  Eighteen holes.

11  Q.  When he is actually on the golf course, do you go with him,

12  or no?

13  A.  No.  I think it's a dumb game.

14  Q.  Now, with respect to how he feels the day after him playing

15  golf, would you tell the jury about that?

16  A.  He's in a lot of pain.  He gets up and he complains about

17  his back and I go, what a surprise.  But I encourage him to do

18  it because he has very little exercise.  And stenosis, you

19  don't damage it further by being in pain.  If you can go out

20  there and do it once a week, so you'll be uncomfortable the

21  next day.

22  Q.  With regard to this condition that he has of stenosis, if

23  you know, does it require him, when he's not playing golf, to

24  be bedridden?

25  A.  Oh, no, absolutely not.  Actually, a body in motion, that's

1   what the doctors tell him.

2   Q.  Give us a sense of his activities generally when he's not

3   playing golf, as the jury sees this.

4   A.  My husband is a shopaholic.  He's at BJ's or Home Depot.

5   He will do stuff like that where it requires him to just walk a

6   little bit.  He doesn't really have any other habits.  I

7   shouldn't say bad habits.  He doesn't really have any other

8   hobbies and that's why he takes on the pain to play golf.

9   That's all he does.

10  Q.  To your knowledge, when he goes and plays golf, does he

11  walk from hole to hole or does he get there --

12  A.  No, he can never do that.  He actually had to leave a golf

13  course once because it was one of those golf clubs, fancy ones

14  in Florida, where they didn't have golf carts.  He couldn't

15  play.

16  Q.  With regard to his other activities, when he's not golfing,

17  and we could continue to play this, is that him swinging there?

18  A.  Yes.  He's a bit of a hacker, isn't he.

19  Q.  With regard to activities, do you know if on a daily basis,

20  does he go to the gym?

21  A.  No.

22  Q.  Could you tell the jury whether or not he lifts weights?

23  A.  Absolutely not.  The only thing the doctors suggest to him

24  is, if he is up to it, he can use a bicycle, one of those ones

25  where you sit down, not a bicycle where you are leaning over.

D7TMLES4                         Baran - direct

1   But contrary to what the doctor said here, my husband's pain is

2   worse when he is bending over.  He sits in the bike that sits

3   down and your legs are outstretched.  That's it.

4   Q.  With regard to his other exercise, is he a runner of any

5   kind?

6   A.  Oh, my, no.

7   Q.  Have you seen him jogging around your neighborhood or doing

8   that?

9   A.  No.  As a matter of fact, he used to like to garden.  His

10   father was a landscaper, and so he got a pretty good green

11   thumb.  I can say that he used to make the backyard look

12   beautiful with flowers, but he can't do that anymore.  But last

13   October -- last September, at the end of the season, he decided

14   to do a little gardening and he blew his back out so badly, the

15   pain was so bad that the doctor told him to take a bunch of

16   pills, muscle relaxers and what have you, lay down in bed for a

17   couple of days and take it easy.  Those few days in bed

18   developed seven blood clots in his legs.

19           MR. JACKSON:  If we can just go back to that last clip

20   where he was holding his golf clubs.

21   Q.  Did you see him holding his golf clubs and the golf bag?

22   A.  Um-hum.

23   Q.  Have you seen him do that before?

24   A.  Yes.

25   Q.  And with regard to him holding the golf clubs, do you have

1  any idea or sense of how heavy that is?

2  A.  It's not very heavy.  I can move it.

3  Q.  As far as his chores around the house, what, if anything,

4  does he generally do?

5  A.  You're serious?

6  Q.  Yes.  What does he do around the house?

7  A.  He makes the bed in the morning because it's hard for me to

8  bend over.

9      I should preface that with, I just had major back

10  surgery six weeks ago.  And prior to that, I couldn't bend over

11  at all.

12      He always makes the bed every morning.  He is the last

13  one out, anyway.  He makes the bed.  That's about it.

14  Q.  Was there a time in your relationship where he did do other

15  things around the home?

16  A.  Oh, my God.  He did all the landscaping.  He did

17  everything.

18  Q.  You see him there by the car, is that correct?

19  A.  Yup.

20  Q.  And what is he doing?

21  A.  Tying his shoe.

22  Q.  Have you seen him tie his shoe before?

23  A.  He only wears high shoes on the golf course because he

24  can't really bend over comfortably to do that.  Besides the

25  stenosis, he has got -- his left hip is bone on bone.

D7TMLES4                        Baran - direct

1   Q.  As far as his golfing activities, besides golfing, you say,

2   what, once every however --

3   A.  Two, three times a month.

4   Q.  Beyond that, does he engage in any other physical

5   activities?

6   A.  He might spin me around the dance floor once or twice on a

7   Friday night because we always like to dance.  But his left

8   foot goes numb after one or two dances and then he has to sit

9   down.

10  Q.  As far as that issue is concerned, do you know whether or

11  not he is required otherwise to be bedridden?  Something --

12  A.  No.  The doctor wants him to move, even if it causes him

13  pain.

14  Q.  And when he's not playing golf, what are his other

15  activities around the home?

16  A.  Because I couldn't, he did the food shopping.

17  Q.  Now, I want --

18              THE COURT:  Mr. Jackson, are you done with this video?

19              MR. JACKSON:  Yes, I'm done with it, Judge.

20  Q.  I want to show you, did there come a time, to your

21  knowledge, where Mr. Baran filed for a disability?

22  A.  He did.

23  Q.  And before I show you the application, can you just tell

24  us, what job, to your knowledge, did your hushed hold with the

25  Long Island Railroad?

D7TMLES4                          Baran - direct

1    A.   He was an electrician.

2    Q.   What period of time was he an electrician with the

3    railroad?

4    A.   From 1978 until 2003, 25 years.

5    Q.   Did you become familiar with his job duties and

6    responsibilities?

7    A.   Not from him, but from my own job, I saw the job

8    descriptions of an electrician.  He would tell me some things

9    like, they had to walk down into a pit where there was a train

10   over them and they had to work with their hands in the air

11   fixing the train.  That's absolutely the worst position for

12   somebody with stenosis to be in.

13   Q.   What else beyond that?

14   A.   He had to climb ladders, which is very painful for him.  I

15   do all the bulb changing in the house now.  He can't.  He had

16   to crouch down under those trains and do repairs.  He had to

17   work in very cold conditions.  Even though he worked in the

18   shops, the shop doors were all opened because the constant

19   movement of trains in and out.  So cold is also difficult for

20   stenosis.

21   Q.   I am going to show you the disability application which is

22   in evidence, and I want to point out specifically, this is

23   Exhibit 113A and I'm looking at Bates stamp 125094.

24            There are a number of medications listed there.  Do

25   you see that?

D7TMLES4                          Baran - direct

1    A.  Yes.

2    Q.  Are you familiar with the fact that your husband takes

3    medications?

4    A.  He does.

5    Q.  Are the medications listed in Exhibit 113A consistent with

6    the ones that you've seen him take?

7    A.  Yes.

8    Q.  Have you become familiar with the purpose of these various

9    medications?

10   A.  Yes, I have.

11   Q.  The first one is Nexium.  Do you see that?

12   A.  Yes.  That's for acid reflux.

13   Q.  There is a dosage next to that.  Do you see that?

14   A.  Yes.

15   Q.  The one under that is Celebrex.  What is that for?

16   A.  Celebrex is an anti-inflammatant.

17   Q.  What does that do?

18   A.  Well, it used to help in bringing down the inflammation in

19   his spine.  But, remember, I said he got laid up and he had

20   blood clots.  Well, because of those blood clots in his lungs,

21   that went through his heart and the good lord spared him.  He

22   can't take any kind of an anti-inflammatant anymore because he

23   takes Coumadin to thin his blood so he won't get any more blood

24   clots.

25   Q.  Is Coumadin listed there?

D7TMLES4                        Baran - direct

1    A.  No.  Because this happened after this.

2    Q.  This application was filed, to your knowledge, in 2003?

3    A.  Three or the beginning of four.

4    Q.  Thereabouts, some nine, ten years ago?

5    A.  Right.

6    Q.  And there is also Ultracet?

7    A.  Ultracet is a painkiller that he used to take.  Now he

8    takes Tramadol instead.

9    Q.  Is Tramadol listed there?

10   A.  No.  When one stops working you try another one.

11   Q.  Lipitor, what is that?

12   A.  For his cholesterol levels.

13   Q.  Is he still taking that?

14   A.  That or a generic of it.

15   Q.  And the other one, if you could pronounce it.

16   A.  Lotrel?

17   Q.  Yes.

18   A.  I believe that's for his blood pressure and he probably is

19   taking a different one now because they change them every once

20   in a while.

21   Q.  And Hytrin?

22   A.  Hytrin is a water pill.

23   Q.  In addition to the other medications that you said he now

24   takes, are there other medications beyond the ones listed from

25   nine years ago that you have personal knowledge as to him

2220

1    taking?

2    A.   I don't think he takes -- after he retired he got diagnosed

3    with very bad sleep apnea.  The blood oxygen level is supposed

4    to be 98.  And when they tested him his oxygen -- blood oxygen

5    level was 88.  It takes 85 to sustain life, according to the

6    doctor.  He stopped breathing once every 27 minutes or 27 times

7    an hour he stopped breathing, something like that.  Once they

8    diagnosed it, thank God, he had to use a mask to sleep at night

9    to prevent the sleep apnea.  But I don't know if he takes any

10   medication for that as well.

11   Q.   Now, I want to direct your attention to section 6 and list

12   various things that are hard to do.  Do you see that?

13   A.   Yes.

14   Q.   Now, are you familiar with whether or not on a daily basis

15   prior to coming to court your husband takes any medication?

16   A.   Oh, yeah.

17   Q.   What does take?

18   A.   Tramadol.

19   Q.   What does that do?

20   A.   It kills the pain in his back.  It's an opiate.

21   Q.   And what, if anything, does that do with respect to, if you

22   know, his ability to sit or walk or do any of the things listed

23   here?

24   A.   It let's him do it without severe pain.

25              (Continued on next page)

D7tnles5                          Baran - direct

1    Q.  Ms. Baran, I want to ask you, regarding his doctors, are

2    you aware of whether or not he is under the care of several

3    doctors?

4    A.  Oh, yes.

5    Q.  Now, if I can, I want to go through -- do you know who

6    Dr. Geiger is?

7    A.  Yes.  Dr. Geiger, right after Gus retired, he had been

8    seeing Dr. Lesniewski, and I am not even sure if it was

9    Dr. Lesniewski who recommended it or not, but somebody

10   recommended the pain management specialist because, other than

11   surgery, there's really not a lot you can do for stenosis.  The

12   doctors tell him that you can't have surgery until the stenosis

13   is so bad that you are starting to lose control over your

14   bladder or other bodily functions.  Well, that is not a very

15   pleasant thought, but the surgery is so serious they don't want

16   to do it until that point.

17            MR. WEDDLE:  Your Honor, I object to hearsay.  I don't

18   know what her base of knowledge is for this.

19            THE WITNESS:  OK.

20            THE COURT:  Sustained.

21   A.  But the bottom line is the best choice for him was that he

22   should go to a pain management specialist.

23            MR. WEDDLE:  Same objection.

24            THE COURT:  Sustained.

25   Q.  Do you have personal knowledge as to whether or not your

2222

D7tnles5                          Baran - direct

1   husband goes to a variety of doctors?

2   A.  Yes, he does.

3   Q.  Have you been to doctors with your husband?

4   A.  Absolutely.

5   Q.  Have you seen the effects that any medications they would

6   prescribe have on him?

7   A.  I do.

8   Q.  Are you familiar with, when he goes to the doctors, the

9   nature of the treatment they do provide?

10  A.  Absolutely.

11  Q.  Moving on from Geiger, are you familiar with an Adam Stein?

12  A.  Yes, Adam Stein was a hand specialist who did his carpal

13  tunnel surgery.

14  Q.  How are you familiar with that?

15  A.  Well, he couldn't do anything anymore with his hand because

16  the carpal tunnel was so bad from all the years of repetitively

17  screwing in plyers and -- all the small tools that an

18  electrician uses is repetitive actions.  So he got carpal

19  tunnel and he went to Dr. Stein and they did surgery.

20  Q.  Are you familiar with a Dr. Frank Altebrando?

21  A.  Dr. Altebrando keeps my husband on his feet.

22  Q.  What do you mean by that?

23  A.  He is a chiropractor.  Who uses a lot of heat and electric

24  impulse therapy to keep the blood flowing in his back.  That's

25  what stenosis is all about.  The blood can't get through to the

1    nerves.

2    Q.  How often does he go see Dr. Altebrando?

3    A.  It depends on how his back is feeling.  Sometimes once a

4    week, sometimes once a month.

5    Q.  Are you familiar with a Dr. James Aclendin?

6    A.  Dr. Aclendin is also a chiropractor.  We have been

7    fortunate enough to spend our last few winters in Florida.  He

8    couldn't do without a chiropractor, so we found one down in

9    Florida.

10   Q.  How often, when you are in Florida with your husband, does

11   he see Dr. Aclendin?

12   A.  Well, in Florida he cheats a little bit and maybe plays an

13   extra day of golf once in a while, so his is back worse.  So he

14   goes there every week.

15   Q.  How often, when you are in Florida, just to be fair, does

16   your husband play golf there?

17   A.  Definitely once a week, maybe an extra one or two in the

18   month.  That's why his back hurts more, so he goes to the

19   chiropractor more.

20   Q.  How long has he been being treated by Dr. Aclendin?

21   A.  Two years I think it is.  Two years ago, we went down two

22   years ago.

23   Q.  How do you know Dr. Barton Cohen is?

24   A.  Oh, yeah, Dr. Barton Cohen happens to be a cardiologist,

25   but because one of my cousin's kids works for him I have him as

D7tnles5                              Baran - direct

1   my GP.  He's my general practitioner, and he's also my

2   husband's general practitioner.  He offered that, which was

3   very nice.

4           Now that my husband has this problem with the blood

5   clots, it has to be monitored by taking your blood test every

6   two weeks to see what your INR number is.  That means that your

7   blood is not too thick or too thin.  Dr. Cohen keeps track of

8   that.

9   Q.  I won't go through all of the doctors, but just a couple

10  more if you would bear with me?

11  A.  Yes.

12  Q.  Dr. Carp.  Who is Dr. Carp?

13  A.  Dr. Carp is a pulmonary specialist.  That's who discovered

14  that Gus has sleep apnea and who treats him for it.  And I have

15  chronic obstructive pulmonary disease, so he also treats me.

16  Q.  Are you familiar with Tom Priscio?

17  A.  I'm sorry.  I didn't hear your name.

18  Q.  Tom Priscio?

19  A.  Yes, the Italian kid.  OK.  He's a hearing aid specialist.

20  We both wear hearing aids.  We have severe hearing loss.

21  Q.  I am going to move off this momentarily, but before I do I

22  just want to show you Section 3 of this exhibit 113-A.

23          At the top of that exhibit it lists a number of

24  medical conditions.  Do you see that?

25  A.  I do.

D7tnles5                         Baran - direct

1    Q.  Does that fairly and accurately describe the medical

2    conditions that your husband has, or are there more or are

3    there less?

4    A.  There's more.

5    Q.  What more are there?

6    A.  Right after he retired we discovered the sleep apnea.  When

7    he hurt himself, when we got the blood clots, they discovered

8    the reason for the blood clots is he's missing a blood factor

9    in his blood, factor 5, that's why he's going to be on Coumadin

10   for the rest of his life.

11          His hip, just from wear and tear from having worked

12   and played all his life, his hip is wearing down on the left

13   side.  He's probably going to need a hip replacement sooner or

14   later, so that's a problem.  I think that's it.

15   Q.  Just a couple more questions before moving off of your

16   husband.

17   A.  OK.

18   Q.  You have heard testimony about how people go getting all

19   these papers and then stop seeing doctors once they get their

20   occupational disability.  We have already established that he

21   got this disability in 2003 or '4, is that right?

22   A.  Yes.

23   Q.  Between 2003 and the present day, ten years, has Mr. Baran

24   been under the persistent and regular care of any doctor?

25   A.  I'm afraid so, a whole bunch.

D7tnles5                         Baran - direct

1   Q.   When you say a whole bunch, I mentioned a whole bunch to

2   you before, correct?

3   A.   All the ones you mentioned, yeah.

4   Q.   The ones I mentioned to you, to be clear to this jury, the

5   ones that I mentioned to you, has he seen any of those doctors

6   within the last ten years?

7   A.   All the time, two or three, four times a year.

8   Q.   Over the course of time after he retired?

9   A.   Yes.

10  Q.   With regard to the video that I showed you of your husband

11  playing golf, does that change at all your perception or your

12  view regarding your husband's disability?

13  A.   That's ridiculous.  The man does it in pain, and he does it

14  because it's the only enjoyment he takes in life, other than a

15  little, you know, planting a flower in the backyard.  He can't

16  do anything anymore.

17  Q.   Ms. Baran, you have also heard testimony regarding

18  overtime.  Did you hear that?

19  A.   Yes.

20  Q.   And your husband working overtime?  Did it come to your

21  understanding ever, if at all, during your relationship whether

22  or not overtime was something that he volunteered to do or was

23  forced to do, required to do or some of both?

24  A.   I think you are hitting the nail on the head.  It's some of

25  both.

D7tnles5                          Baran - direct

1                MR. WEDDLE:  Your Honor, same hearsay objection.

2                MR. JACKSON:  I will lay a foundation.

3                THE COURT:  Lay a foundation.

4     Q.  I don't want to belabor the point.  You have been married

5     42 years, correct?

6     A.  Yes.

7     Q.  Your husband was for 25 of those years working on the

8     railroad, is that right?

9     A.  Yes.

10    Q.  You lived with him all throughout the course of that time?

11    A.  I have.

12    Q.  You have seen him when he came home?

13                Is that a yes?

14    A.  Yes.

15    Q.  You saw him when he left?

16    A.  I did.

17    Q.  You saw him when he returned?

18    A.  Yes.

19    Q.  Were there instances when he came home later than he would

20    otherwise be expected to come home?

21    A.  Yes.

22    Q.  Did you acquire a knowledge or an understanding as to what

23    the reason was that he was --

24                MR. WEDDLE:  Hearsay, your Honor.

25                THE COURT:  Overruled.

1              THE WITNESS:  I can answer that?

2              THE COURT:  Yes.

3              THE WITNESS:  Thank you?

4    A.  The reason he was coming home late was because he was

5    working overtime.

6    Q.  Did you acquire any knowledge, personal knowledge, as to

7    what the reason or basis was as to him working overtime?

8    A.  Sometimes he would tell me, I'd been asked to work

9    overtime, and I am going to do it.

10             And I would say, you know, Are you feeling OK?

11             And he would say, Yeah, I am going to do it.

12             And he would work to make the extra money.  There were

13   other times he would call me and say they need an electrician

14   on the property and I'm the only one available, I have to stay.

15   Q.  Just as far as we've seen this Exhibit 813, I believe the

16   government showed you 813.  They showed all of us 813.

17             I don't know how good your eyesight is, but do you see

18   where it says electrician there?

19   A.  I do.

20   Q.  These are some indications of overtime throughout some

21   period of time that your husband worked?

22   A.  Yes.

23   Q.  And you just gave testimony as to why?

24   A.  Yes.  Did you notice that they're all in eight-hour

25   increments?

1   Q.   Explain that.

2   A.   They don't have a choice.  I am not a union official.  I

3   don't understand this stuff.  But the union's negotiated this,

4   and the company agreed to it.  They don't work an hour overtime

5   or two hours overtime.  When they ask them to work overtime

6   it's got to be for an entire shift of eight hours.

7   Q.   All right.  Now, I want to move from your husband,

8   Ms. Baran, if I might, to the trips that you took to Egypt, to

9   the Dominican Republic, to Italy.  There were others, but I

10  just want to focus on that for now.  May I?

11  A.   You may.

12  Q.   With regard to these trips, the jury may see it again, I

13  direct you to Exhibit 803.  803 there's number of indications

14  of you and your husband traveling.

15          Tell us about those trips that you took.  You went to

16  Egypt, the government said, right?  You went to Egypt, right?

17  A.   Two weeks before the overthrow of the government.

18  Q.   That would have been in -- that would have been when?

19  A.   2010 or '11.  Maybe '11.  I am not sure.

20  Q.   Who paid for your trip to go to Egypt?

21  A.   We did.

22  Q.   Who paid for your trip to go to Italy?

23  A.   We did.

24  Q.   Who paid for your trip to go to the Dominican Republic?

25  A.   We did.

D7tnles5                         Baran – direct

1    Q.  You mentioned you didn't have any children, is that right?

2    A.  Yes.

3    Q.  Was there any college fund that you needed to establish

4    that you worked for 40 years?

5    A.  No.  Other than the little bit I give to my godchildren.

6    Because when you don't have kids everybody makes you godmother

7    and godfather, so we had a bunch of those.  We used to take

8    them skiing with us and do stuff like that, but we didn't have

9    the expenses of children that most people have, so we had a

10   little extra money that we could spend on travel.

11   Q.  Did it ever come to your understanding that it was a crime

12   in this country to have a vacation?

13   A.  I never assumed that.

14          THE COURT:  That is over the top.

15          MR. JACKSON:  Yes, Judge.

16   Q.  There were other trips that you took beyond that?

17   A.  We went to Alaska.

18   Q.  Where else did you go?

19   A.  Most of our trips were cruises.  So one trip would take you

20   to several different countries.  The trip to Egypt took us to

21   Italy, Greece, Turkey.  It was ten days and we were on a ship,

22   and you would stop in a city for a day and see the sights.

23          The trips to Italy, my maiden name was Fattizzi.  I am

24   an Italian.  My family comes from the Bari, the Adriatic side

25   of Italy.  I went there twice and never got to the Adriatic

D7tnles5                          Baran - direct

1    side, so we finally made it there.

2    Q.  Just with regard to those trips, at the time that you took

3    those trips with your husband, could you tell us whether or not

4    at the time that you were there he was climbing any ladders or

5    crawling underneath trains or doing anything of that nature?

6    A.  The reason we take cruises is because they are not

7    physically demanding.  You can do whatever you can do.  Like I

8    said, I just had back surgery so I didn't do -- especially in

9    Egypt and Greece and that, there's a lot of hills, and we

10   didn't do it.

11        We used to send our friends up and say, Go take

12   pictures.  We'll wait down here.  You do what you can.  We got

13   to see things, but we couldn't do, I didn't walk to the top of

14   the Parthenon in Greece.  I couldn't do it.  I sat down and had

15   a Slurpee and they did the walk up.  My husband couldn't do it

16   either.  But you do what you can do, and you still have a good

17   time.

18   Q.  I want to direct you back now, if I can, to you.  And I

19   want to talk about, before we diverted to Gus Baran and your

20   trips, if I can divert you back to the facts here.

21        With regard to you being born and raised in Queens,

22   you mentioned, I want you to tell us a little bit about your

23   employment background.

24   A.  OK.

25   Q.  What was your first job out of high school?

D7tnles5                          Baran - direct

1   A.  My first job out of high school, I took a temporary

2   position.  That was supposed to last three or four months with

3   the U.S. Air Force right here in downtown Manhattan.  That was

4   what encouraged me to take the civil service exam, because if

5   the job was going to become permanent I was going to need to

6   pass the civil service exam to keep it.  So they sent me over

7   here to Vesey Street and I took the civil service exam and then

8   the job ended anyway.

9           We were in the heat of the Vietnam war at the time,

10  and the people I was working for were all pilots.  They were

11  all called from the recruiting detachment I was working for,

12  they were all called to go to Vietnam.  So the office pretty

13  much was dissolved.

14  Q.  How long did you do that?  How long did you hold that job?

15  A.  My memory back that far, and that's a long time ago, maybe

16  it was three or four months, maybe five months.  I can't

17  remember exactly.  But it ended, and then I did a short period

18  of working for an oil company.  And then I got a letter from

19  the Social Security Administration in Mineola, and they had

20  taken my name off the civil service list and they offered me a

21  position, which I accepted.

22  Q.  I want to talk about that position with social services.

23  A.  Social Security.

24  Q.  Excuse me.  Social Security Administration.

25  A.  Yes.

D7tnles5                          Baran - direct

1   Q.  Could you give us the approximate year that you took that

2   job.

3   A.  I believe that was in December of '66.  That's what my date

4   was on my working papers anyway.

5   Q.  How long did you stay there?

6   A.  I stayed with the Social Security Administration 20 years,

7   a little over 20 years.

8   Q.  What were your general responsibilities there?

9   A.  I started out in Mineola as a receptionist, and very

10  quickly thereafter I became a clerk who worked in all the

11  different divisions in the office.  They have survivor benefit

12  division, they have retirement benefit division, and they have

13  disability benefit division.

14          Ironically enough, I ended up in disability division.

15  I worked there for a long time.  In about 1971, after we were

16  married, we were living out on the island in Farmingdale and --

17  Q.  Long Island that is?

18  A.  Pardon me?

19  Q.  Long Island?

20  A.  Yes.  I decided to ask for a transfer to the Melville

21  office, which would have been closer to my home at that time.

22  I understood it had more advantages there, more opportunities

23  there.  So I transferred there, and within a year or two, I

24  cannot remember exactly, I was promoted to the assistant to the

25  district manager.

D7tnles5                          Baran - direct

1   Q.  If I can ask you, were you a federal employee?

2   A.  Yes, I was.

3   Q.  As a federal employee, would you have been entitled to an

4   occupational disability?

5   A.  No, oddly enough, federal employees are one of the few that

6   have occupational disabilities besides Railroad Retirement,

7   firemen and cops.

8   Q.  Any time in your 20 years with the Social Security

9   Administration, did you apply for an occupational disability?

10  A.  No, I did not.

11  Q.  While you were working with the Social Security

12  Administration, did you learn about disabilities and other

13  types of retirement issues?

14  A.  I did.  I had to work in all the divisions so I learned

15  everything, a little bit -- a lot about every division before

16  you went on to another one.

17  Q.  Did there come a time that you left that job?

18  A.  Well, my last promotion was from the Melville office to the

19  assistant to the area director.  The area director was the man

20  who supervised all 14 offices in that area on Long Island and

21  Queens.  So he was the boss of all of the managers and he

22  supervised all those offices.

23  Q.  When you were at the Social Security Administration?

24  A.  Yes.  And I was made his personnel financial management

25  assistant.  He had four assistants in the office.  One was to

1   know everything about SSI, the other one had to know everything

2   about SSA, which is Social Security -- forgive me for the

3   jargon -- and me, I was his financial management person.  Then

4   there was another one who was just administrator.

5   Q.  Why was it that you left?

6   A.  Well, it was the best job in the world and he was the best

7   boss in the world.  It was a very good experience in my life,

8   and we had a great working relationship in that office.  He

9   used to call us the A team.  And then suddenly, out of nowhere,

10  he decided to retire.  His health was failing, and he decided

11  to retire in, I think it was December of '87.

12          He gave us about six months' notice and they told us

13  very quickly who was going to be his replacement.  I didn't

14  like who his replacement was.  I had worked not with him but

15  around him in my career, and I knew it wasn't going to be a

16  match made in heaven.  So I started to look for another job.

17  Q.  To that point in those 20 years, to that point, had you had

18  any issues with the job?  Any disciplinary issues, any

19  suspensions, any problems?

20  A.  Not at that point, no.

21  Q.  How old were you when you left that job approximately?

22  A.  40.

23  Q.  Had you had any arrests in your life to that point?

24  A.  No.

25  Q.  Any FBI agents come to your home to that point?

D7tnles5                         Baran - direct

1    A.  Never.

2    Q.  Now, there did come a time, however, that you did leave for

3    the reasons you described.  Where then did you go?

4    A.  Ironically, everything happens for a reason in life.  My

5    husband came home one night and said that one of the unions is

6    having a retirement seminar and he would like me to come with

7    him and listen to what his Railroad Retirement and Long Island

8    Rail Road pension benefits are.  So we made a deal that he took

9    me out to dinner and I would go.

10         So we did.  And we sat there for about an hour

11   listening to the pension manager from the Long Island Rail Road

12   tell us about the benefits that they had from the Long Island

13   Rail Road.

14   Q.  Where was this?

15   A.  Where was it?

16   Q.  Yes.

17   A.  It was in a little hall in Bellmore, I believe, close to

18   our house.  There were people there who were very close to

19   retirement.  We weren't.  But they were very close to

20   retirement, and people started asking questions about Railroad

21   Retirement.  And they wanted answers.  And he kept saying,

22   Well, I think this is the answer, but I can't be sure because I

23   don't work for them.

24         Being me, I said, why don't you have somebody here

25   from Railroad Retirement to answer their questions?  It seems

D7tnles5                          Baran - direct

1    like, you know, ridiculous to just keep saying tell them to

2    call Railroad Retirement.

3            He said, Well, they were supposed to send somebody,

4    but he got a promotion and was sent back to Chicago.  There is

5    no manager on Long Island.

6            A light went off in my head, and out of luck the next

7    day I picked up the phone and I called the Railroad Retirement

8    Board in Manhattan.

9            I spoke to the manager there, and I told her who I

10   was, what my credentials were.  She said she would love to

11   entertain an application from me, so I sent her my résumé.

12           The following week I went in for an interview and the

13   following week I was in Interlaken, Wisconsin.  It was a very

14   whirlwind thing.  I got hired and they sent me -- there was a

15   new employee training class that was starting on September 10,

16   and I remember it because that happens to be my birthday.

17   Q.  You are talking about the Railroad Retirement Board, is

18   that correct?

19   A.  I am.

20   Q.  This job was a federal job with the Railroad Retirement

21   Board?

22   A.  Yes.  So I kept all my pension rights, just went to a

23   different federal agency.

24   Q.  When you went to that federal agency, you mentioned this

25   session that you had in Wisconsin.  What was that all about?

1  A.  It was a training class for new hires and people that were

2  promoted into the position of contact representative.  That's

3  who you might see if you went to a Railroad Retirement office.

4  I, of course, had a tremendous advantage over these people

5  because I had all my background in Social Security.

6       And Railroad Retirement and Social Security are very

7  much alike.  Then again there's very much differences in their

8  benefits also.

9  Q.  Now, before we go on about the job and the years that you

10  spent there, the specific things that you did, you mentioned

11  something about the similarities and the differences between

12  Social Security Administration and Railroad Retirement Board.

13       Could you just give us a general sense of what those

14  differences are.

15  A.  Well, what I had to learn at Railroad Retirement is they

16  also pay out sickness benefits to people who work for

17  railroads.

18  Q.  Who does?

19  A.  For instance, Amtrak doesn't have any benefits at all,

20  unless it's -- if they go out sick, the only payment they get

21  is from Railroad Retirement.  If they get unemployed because of

22  a reduction in force, they get their unemployment from Railroad

23  Retirement.  So those were two things that I had never seen

24  anything about at Social Security.

25       Pretty much retirement benefits were the same, except

1    there is an exception in everything.  Railroad Retirement has a

2    special 30-year rule, that if you put in 30 years of service at

3    any railroad industry, even if you do it in different places,

4    different railroads, once you have 30 years you can retire with

5    full benefits at age 60, no age reduction.

6           Anybody here who happens to be Social Security age

7    knows that if you were 62 and you decided to retire at Social

8    Security, you take an age reduction.  They take off 20, 25, 30

9    percent based on how old you are.  If they do 30 years at the

10   railroad, there is no reduction and they get it at 60, a big

11   opportunity for them, and so does their wife.  So that's

12   something I had to learn.

13          Disability, I thought I knew it all, because I had so

14   much experience at Social Security.  But the Railroad

15   Retirement Board is unique in that it has an occupational

16   disability.  As I had said before, like firemen, policemen, if

17   you cannot do your job, you're occupationally disabled.

18          Well, that was totally different from anything I had

19   learned about the total and permanent rules that we had at

20   Social Security.  They were very stringent.

21   Q.  What's the distinction between the two?  If you could just

22   briefly clarify the distinction between an occupational

23   disability on the one hand and a total and permanent disability

24   on the other?

25   A.  They are night and day.  I beg your pardon.  I am Italian.

D7tnles5                          Baran - direct

1    They are night a day.  A total and permanent you really have to

2    be -- I mean, I have seen people with cancer denied on a total

3    and permanent because it wasn't stage 4.  You have to be unable

4    to do any -- well, let's see.  The actual definition, if my

5    memory will serve me, unable to do any kind of substantial

6    gainful activity at all.  Period.

7    Q.  Total?

8    A.  I've seen disabilities denied, and part of the denial

9    letter says, We think you can use a broom and sweep.  That's

10   how stringent Social Security is.

11   Q.  But total and permanent disability?

12   A.  Total and permanent.  We at Railroad Retirement also had a

13   total and permanent.  If you didn't qualify for occupational

14   disability, which required a minimum of 20 years of service at

15   any age, and ten years of service at age 60, if you didn't meet

16   that -- and you have to have a current connection, which is a

17   railroad word.  It just means the last place you worked was a

18   railroad.  You have to have a current connection, you have to

19   have a certain amount of years at certain ages.  Once you meet

20   that, you have the legal right to file that application for

21   occupational disability.

22          No matter what anybody outside the Railroad Retirement

23   Board thinks of your condition, you have the legal right to

24   file an application, just like you have the legal right to go

25   into Social Security and file an application once you have the

D7tnles5                         Baran - direct

1    age and you worked ten years.  Nobody can stop you.  It is your

2    right.  You are legally entitled to ask for a decision.

3    Q.  Is that something you learned as part of your training?

4    A.  Absolutely.

5    Q.  Now, as it relates to your job and what you did when you

6    were at Railroad Retirement Board -- first of all, you spent

7    how many years there?

8    A.  18 and a half.

9    Q.  And in that 18-and-a-half-year period of time could you

10   just briefly describe for the members of the jury the job that

11   you had, your specific job function.

12   A.  When I first came back from Wisconsin I was managing a

13   small office, they called it a base point, in Hicksville.  I

14   had one employee.

15          So I was supervising that employee, I was running the

16   office physically, keeping it operational, and I was training

17   that employee on any new information that came in, any changes

18   in policy, any changes in law.

19          I was given instructions to find a new space for the

20   office.  I hired another person.  While we were still in this

21   little cramped quarters, I had another person hired;

22   supervising two people now.

23   Q.  What year was this approximately?

24   A.  I started with them in '87.

25   Q.  OK.

D7tnles5                        Baran - direct

1   A.  So there was '88 and '89.  Part of my responsibility in

2   those years, we were not instructed to ask a disability

3   applicant to bring in medical records.  We were just told to

4   ask them what their condition was and did they have medical.

5           If they said no, we would just automatically send them

6   to a doctor who we had previously made a contract with to do

7   work for us.

8           Part of my job was to go out and sign those doctors

9   up.  I had to have a cardiologist available, an orthopedist

10  available, and an otolaryngologist -- that is the guy who tests

11  your ears -- all that kind of stuff, because those were the

12  basic things that we were seeing more frequently.

13  Q.  You had to sign them up.  What do you mean by that?

14  A.  I had to go out to their office, sit in their waiting room,

15  and ask them:  Would you work for us?  This is what we do.  We

16  would like you to do an exam, and this is how much the agency

17  would pay.

18          I did that.  I recruited some doctors, and we would

19  send them our clients out there to be treated, to be looked at.

20  Q.  When you say clients, you mean applicants for disability?

21  A.  Applicants, yeah.  Uh-huh.

22  Q.  You would send them to the doctors to be evaluated?

23  A.  Exactly.

24  Q.  That was part of your job role?

25  A.  It was.

D7tnles5                         Baran - direct

Q.  Now, throughout that 18 years that you spent there, could
you tell us, what are some of the other job responsibilities
that you had?
A.  Well, as they were able to assess my ability, they would
promote me to -- they would move the office to Westbury, gave
me two more employees, promoted me to district manager.  That
means I was controlling an entire district.  My district went
from the lighthouse on Montauk to the 59th Street -- not 59th,
what's the name?  The tunnel in Astoria.  I didn't have
Manhattan.  I just went from Astoria out to there.

          And the Railroad Retirement Board is really a board.
It's a three-member board.  They actually are appointed by the
President of the United States.

          Unlike most government agencies, they are under the
executive branch of government.  They are really answering to
the President of the United States.  Social Security has a
commissioner, Railroad Retirement doesn't.  They have the
President of the United States.

          Actually, if you'll forgive me for going on, we were
the blueprint for Social Security.  Railroad Retirement came
first.  Nobody knows that.  Nobody even knows who we are if we
don't have to sit here and listen to it for two weeks.  But we
were the blueprint for Social Security.

          So there is a three-member board.  One represents
management, the people who own the railroads; one represents

D7tnles5                        Baran - direct

1    labor, the people who run the railroads; and one is the

2    tiebreaker I would say, the administrator.  If there is a

3    question as to how things should be changed, it goes before

4    those board members.

5            The United States Congress passed the law to give

6    railroad employees an occupational disability in 1946.

7    Q.  Were you trained on this?

8    A.  Of course.

9    Q.  When you mention, just regarding the training, not to

10   interrupt you, you can continue in a minute, but you mentioned

11   initially you went to Wisconsin, is that right?  And you spent

12   how long there?

13   A.  Three and a half weeks.

14   Q.  Briefly, what was the function of that?

15   A.  To train me in Railroad Retirement that I didn't know.

16   Q.  Policies, regulations, procedures?

17   A.  Laws, regulations.

18   Q.  On a yearly basis thereafter did you receive any additional

19   training?

20   A.  Yes.  Annually they shipped all the managers out to Chicago

21   or St. Louis or Florida, wherever they could get cheap hotel

22   rooms, and they would train us in the new procedures coming up,

23   the regulations, anything that might have changed, anything

24   that might need to be changed.  They put all the best people in

25   one place and tried to get them to figure out what to do next

D7tnles5                        Baran - direct

1   when we were having problems.

2   Q.  With regard to the training that you had, were you then

3   expected or otherwise required to train anybody else?

4   A.  Oh, absolutely.  I had to train my staff, and I was also

5   called upon to train the staff in Manhattan.  I can only say

6   this is kind of like, some managers stay abreast of things,

7   some don't, so they asked me to train Manhattan.  Sometimes

8   they would ask me to train Boston over the phone in conference

9   calls.

10  Q.  You did that based upon the knowledge you gained in your

11  trainings?

12  A.  Absolutely.

13  Q.  With respect to informational exercises or disseminating

14  information or distributing your knowledge of what you know?

15  A.  My point in telling you about the board members is there

16  was always one board member that was a little more powerful

17  than the others.  That was usually the labor member.  The labor

18  member gave all of us explicit instructions to keep labor

19  happy.

20          So we did.  I would always reach out to the labor

21  unions and ask them if they would like me to present an

22  informational retirement seminar to their members.

23          All the big unions did that.  Some of the smaller ones

24  got together and did it together.  But I would do four, five,

25  six, depending on the year, retirement seminars for the

1    employees of the railroad who were members of that union.

2    Q.  Now, is this the Long Island Rail Road or another railroad?

3    A.  I did it mostly for the Long Island Rail Road.

4    Q.  And when --

5    A.  I went out to Amtrak once a year.  They had something

6    called a health fair, and they used to invite me there.

7    Metro-North was not my area, but I was actually asked to go

8    there and do it anyway.

9    Q.  When you were doing these seminars, what was the purpose

10   and function and goal of you conducting these multiple seminars

11   on a yearly basis to the unions?

12   A.  It was to make sure that the people who were paying the

13   taxes into this system understood their rights and

14   responsibilities and the benefits they were entitled to.

15   Q.  Was it your job to encourage them to apply or just make

16   them aware of what the benefits were so that, if they would

17   like to, it was their option to?

18   A.  Well, to answer that question, I'll start by saying I was

19   invited by the member, the labor member of the Railroad

20   Retirement Board to join something called an informational

21   conference team.  This was completely directed by the labor

22   member's office, and it would be managers going out to

23   different cities and doing informational conferences for, not

24   the employees, but for the union reps, in hope -- it didn't

25   work out this way, but in hope that they would then disseminate

D7tnles5                         Baran - direct

1    that information to their membership so that they would train

2    their membership in this.

3         But they did a PowerPoint program -- you have all seen

4    a PowerPoint program, with the little slides coming up on each

5    thing -- they did a PowerPoint program, and they told me I

6    could modify it for my use on Long Island, and that's what I

7    did.

8         I modified it, cut it down, made it a little shorter,

9    but it was all just to tell people what their benefits were.

10   Encourage them?  No, there was no need to encourage them.  They

11   knew what their benefits were.  They knew when they would be

12   entitled to them because I pounded it into their heads every

13   year.

14   Q.  At these seminars?

15   A.  Yes.

16   Q.  Now, I want to take you through the application process

17   itself.  In the event that someone wanted to apply for an

18   occupational disability, what, if any, role did your district

19   office have when you were an RRB official, a Railroad

20   Retirement Board official, what, if any, role did your office

21   play in that regard?

22   A.  Well, they would usually contact us first.

23   Q.  Who is "they"?

24   A.  The applicant would usually contact us first and say, I

25   would like to file for retirement, survivor benefits, or

D7tnles5                              Baran - direct

1    disability, whatever it was.

2    Q.  Once they did so, what then would they do?

3    A.  Well, because my office was the busiest in the country, I

4    had Metro-North, Amtrak and the Long Island Rail Road right in

5    my backyard, so it was a very busy office.  So we would work by

6    appointment.  I would ask them to make an appointment to come

7    in.

8    Q.  And once --

9    A.  When they did that, we would usually tell them what it was

10   going to take.  Perhaps if they told us exactly what they

11   wanted, let's say they wanted to file for disability, I might

12   mail out a package of material to them containing the

13   application, the vocational report, a list of documents that

14   are required to do the application, you know, and when to come

15   back in for the appointment.

16         I would mail that out to them, and usually when they

17   got that application, the next telephone call I would get would

18   say, Cancel that appointment.  I'll get back to you when I know

19   I can finish this application.

20         I've heard the prosecution say here that this is a

21   simple, it was easy, they should have been able to do it

22   themselves.

23         Let's get a picture of who we're dealing with here.

24   These are guys who were working in steel tipped shoes and

25   hardhats.  They were out on the track, or they are on a train,

D7tnles5                          Baran - direct

or they are under a train, or they're climbing a pole.  They
never deal with paper.

          Most of them can't turn a computer on.  They never
deal with paper.  So when I sent them an application package
that contained a 13-page application, and a six-page vocational
report asking them to describe their job, their first reaction
was, I can't do this.  I need help.

Q.  With regard to your office's role or function, did your
office assist in them filling out the applications, or were the
applications filled out and then brought to your office?

A.  We were instructed that we were not to fill out an
application for an annuitant unless they were unable to read
and write English.

Q.  As a result of that, they were required, the annuitants --

A.  To do it themselves or get help.

Q.  To your knowledge, what percentage of the actual annuitants
who were applying retained the services of some type of
consultant to assist them with this application?

A.  I would be guessing, but it's a very high percentage.  It
has to be over 75 percent, probably closer to 85 percent.

Q.  I want to get to the application, a specific application.

          Now, if I could show you what is 104-A.

          If you look at the top right of that, there's a name
there.

A.  That is me.

D7tnles5                         Baran - direct

1              THE COURT:  Mr. Jackson, I don't mean to interrupt.

2    How much longer do you envision.

3              MR. JACKSON:  Judge, I have a whole lot.

4              THE COURT:  Why don't we take a ten-minute break at

5    this point.

6              (Recess)

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2251

D7TMLES6                         Baran – direct

1              THE COURT:  Counsel, please approach the bench before

2    we begin.

3              (Continued on next page)

D7TMLES6                           Baran - direct

1            (At the side bar)

2            THE COURT:  Mr. Jackson, again, can you give us an

3    estimate?  Because I need to know whether we should go overtime

4    today or whether you want to conclude with Ms. Baran before we

5    go into cross.

6            Just as an observation, I think that some of the

7    testimony might be somehow more condensed.  She is going into a

8    lot of things that may be interesting and all that.  I don't

9    know to what extent you need to go into a lot of that personal

10   stuff.

11           MR. JACKSON:  It is going to take me a while, Judge.

12   I probably have another hour and a half maybe to go through,

13   maybe a little bit longer.  I'll try to condense her and focus

14   her and make it more efficient.  I think we have a lot of

15   ground to cover still.

16           THE COURT:  Second point, returning to Mr. Mark,

17   during the last hour or so, hour and a half of the testimony, I

18   observed them essentially distracted by, he has like a little

19   knife or something and he plays with it.  He fidgets a lot, and

20   I find it distracting because I have to keep an eye on him.

21   The jurors next to him also apparently find him distracted

22   because they keep watching to see what he's doing.  The clerk

23   also reported that one of the jurors, again, approached him and

24   reported that Mr. Mark was engaged in I wouldn't say

25   disqualifying behavior but a little bizarre.  I wanted to put

1       that on the record.

2                   MR. DURKIN:  Judge, I noticed there was a time when

3       you were looking at him and I looked over and I had two

4       observations.  One, he has very thick eyeglasses, so it's kind

5       of hard to tell what his eyes are doing.  But I did notice that

6       he uses his hands, but it was really just clasping them back

7       and forth.

8                   THE COURT:  He has a little knife or something, a nail

9       something, and he fidgets with it.

10                  MR. DURKIN:  I don't want to quarrel with the Court,

11      but I didn't observe him doing anything that I thought was

12      distracting, at least when I was looking at him, and I can't

13      profess to watch the whole time.  But one time in particular I

14      did see you look, which had caught my attention, and I actually

15      came away comfortable from it.

16                  MR. JACKSON:  Your Honor, the good news is, I have

17      observed him and he's awake.  That's a good thing.

18                  THE COURT:  I'm not saying today he is not awake.  I'm

19      just saying that he's fidgeting and one juror reported

20      something, a little bit of an odd incident.

21                  MR. WEDDLE:  Your Honor, I think that if he's

22      bothering jurors to the extent that they are reporting things

23      to the Court, it's problematic.  I think that type of thing can

24      throw a wrench into the entire jury dynamic, which can be

25      problematic, and I think that if jurors are having that kind of

D7TMLES6                        Baran – direct

1    interpersonal problem, combined with the observations the Court

2    has already put on the record, I think that it should be

3    stopped before it turns into a real issue.

4              THE COURT:  I'm just creating a record.

5              (Continued on next page)

D7TMLES6                    Baran - direct

 1                (In open court; jury present)

 2                THE COURT:  Mr. Jackson, you may resume.

 3                MR. JACKSON:  Thank you, your Honor.

 4     BY MR. JACKSON:

 5     Q.  Ms. Baran, when we left off I was asking you about the name

 6     in the top half of the page.  You see that?

 7     A.  I do.

 8     Q.  And that would be you?

 9     A.  It is.

10     Q.  Now, what is that?

11     A.  That indicates that's the representative at the railroad

12     retirement board who took the application and approved it for

13     completion to be sent up to Chicago.

14     Q.  I want to focus on that for a minute.  Now, there is a date

15     there, February 13, 2005.  Do you see that?

16     A.  February 3.

17     Q.  I'm sorry.  February 3.  February 3 of 2005.  If I could

18     just ask you, what were the years that you were the director at

19     the railroad retirement board?

20     A.  September 1987 to December 31, 2006.

21     Q.  And at the time that you were there, at this time were you

22     the director when you --

23     A.  I was the district manager.

24     Q.  You were the district manager.

25                How many people were under you at this particular

D7TMLES6                        Baran - direct

1   time?

2   A.   Four.

3   Q.   What are the names of those people?

4   A.   Kathleen Quinn, who is the new manager now; Lucy Lucas, who

5   is retired now; Roderick Sommers; and at various times there

6   was Judy DeChallis; Margaret Henry; and there is someone there

7   now by the name of Anthony --

8            THE COURT:  Mr. Jackson.

9            MR. JACKSON:  It is, Judge, very important, very

10  important.

11  Q.   Who was the last person you mentioned?

12  A.   Anthony, and I am not sure how to pronounce his last name,

13  but he was hired after I left.

14  Q.   For the sake of time I am not going to go through all the

15  various applications.  You've seen a number of them on the

16  screen with those designated individuals, would that be fair?

17  A.   Yes, I have.

18  Q.   When I say that, they have their signatures there as you

19  have yours there?

20  A.   Um-hum.

21  Q.   And could you tell us, what is the specific role?  Let's

22  start with you.  You were the person who approved this

23  application?

24  A.   Um-hum.

25  Q.   Let's start with this.  When you say approved, what do you

1   mean?

2              THE COURT:  Ms. Baran, please answer yes, no.  The

3   reporter does not know what um-hum means.

4              THE WITNESS:  I beg your pardon.  I'm a little hoarse.

5   I have a candy in my mouth.  I'll take it out.  So sorry.

6   Q.  Now, I want to start with you.  When you get an

7   application, this is an application that you reviewed, tell us

8   specifically what your responsibility, what your role is, what

9   you do to approve an application when an applicant comes to

10  you.

11  A.  Okay.  Well, this applicant came in and because I ran the

12  busiest office in the country, I had to do the same job that my

13  contact reps did at various times, so I was interviewing this

14  individual.

15  Q.  Not to interrupt you, when you say your contact reps, the

16  people who worked for you?

17  A.  Exactly.

18  Q.  The individuals that you just mentioned just now?

19  A.  Yes.

20  Q.  Tell us what you did.

21  A.  Sometimes I did it out of respect for a union official.  I

22  don't know who this application is, but I'll bet that's what it

23  is.  And I took the application.  That means I sat down with

24  the individual, I reviewed all the answers on the application,

25  I might, if I saw something that I thought was questionable,

1    might ask them, are you sure about this?  Are you sure about

2    that?  I would make sure everything was there that needed to be

3    there.

4    Q.  I just want to be specific, and I will not go through this

5    with each of the names that we saw there.

6    A.  Okay.

7    Q.  I just want to be clear.  The names that you mentioned

8    before, did you train all those people that you just talked

9    about?

10   A.  I did.  They went to a training course in Chicago for three

11   weeks, like I went to Chicago -- Wisconsin, they all went to

12   Chicago.  And when they came back I had to supplement their

13   training.

14   Q.  When we say supplement their training, specifically what

15   did you do?

16   A.  Keep it current.  Of course, I had to review everything

17   they did for the first year that they worked to make sure that

18   they had learned everything they needed to in Chicago.  I had

19   to fine-tune their training.

20   Q.  Now, again, I'm not going to take you through every

21   application of all the people who worked for you and what they

22   did, but I want to focus on this application and you.

23   A.  Okay.

24   Q.  The first section of the application, this person comes in.

25   This person happens to be Christopher Parlante.  Just briefly,

D7TMLES6                          Baran – direct

1   if you can, take us through Section 2.  You're the

2   representative at the RRB, Christopher Parlante comes to you.

3   What do you do as it relates to Section 2?

4   A.  I always make sure the spelling of the name is correct

5   because once you put it into that computer it's hard to correct

6   it.  And the Social Security number is of supreme importance

7   because, unfortunately, we are all nothing but a number.  I'll

8   check the address, check the phone number, and confirm it with

9   them.

10  Q.  Where is the applicant when you are doing this?

11  A.  Right in front of me.

12  Q.  Are they required to be in front of you at all times when

13  you're reviewing the application?

14  A.  Most certainly.

15  Q.  Before taking you to the next section, about how long,

16  generally, does it take to review an application with an

17  applicant?

18  A.  Depending on the applicant's ability to cooperate and

19  answer questions, anywhere from 45 minutes to an hour and a

20  half.

21  Q.  I want to take you to the next section, Section 3.  What is

22  that?

23  A.  Section 3 is describing the conditions causing them to file

24  the application.

25  Q.  Where does that information come from?

D7TMLES6                    Baran - direct

1   A.  It is supposed to come from the medical that's with them

2   and that's what I would do.  I would always verify those things

3   are in the medical.  And very frequently I would find other

4   things in the medical that weren't listed there.

5   Q.  In the event that that happens, what would you then do?

6   A.  I would ask them if it was okay for me to amend their

7   application.

8   Q.  And with respect to the other representatives, we will do

9   six for one with one application, what did you train them to do

10  with regard to --

11  A.  Precisely the same thing.  Actually, they were better at it

12  at me because they did it more than I did.

13  Q.  Question 7, 8, 9, what are you doing and where is the

14  applicant as you're looking through that?

15  A.  The applicant is with me and the date, they enter the date

16  this condition began to affect your ability to work.  There has

17  been a lot of hoopla about that question all through the trial.

18  And basically railroad retirement is only really interested in

19  one thing in that area, the last day you were able to work.

20  Q.  What does that mean?

21  A.  The day before you retired, usually, or the day before you

22  took off sick.  So Christopher Parlante probably took off sick

23  on June 6 and retired at the end of the month, with a July 1

24  retirement date.

25  Q.  When you say June 6, it says June 4?

D7TMLES6                          Baran - direct

1    A.  5th I thought I said.

2    Q.  5th?

3    A.  Yes.  Sorry.

4    Q.  That date, when you hear about people planning that they

5    are going to be occupationally disabled --

6    A.  It's just the last day they plan to physically work.

7    Q.  What, if any, reason would that have to be the date to be

8    incorporated into that application either by you or the six

9    reps that you mentioned?

10   A.  Because you are not entitled to file an application for

11   disability until you are no longer working.

12   Q.  Now, with regard to the rest of this page, there is another

13   section -- what is question 11?

14   A.  Enter the date you could no longer work because of your

15   condition.

16   Q.  For example, a person puts a narrative here.  Do you check

17   that as a representative?

18   A.  Sure.

19   Q.  And what, if anything, do you do in checking that?  Do you

20   confirm that with them?

21   A.  Absolutely.  That's probably priority one.  We would

22   confirm that and sometimes we get a little different

23   interpretation, and we will make amendments and what have you,

24   but usually it's stays the same.

25   Q.  Section 4, what's that?

D7TMLES6                              Baran - direct

1   A.  Section 4.

2   Q.  Yes.

3   A.  Have you received medical care.  Yeah.  That's a question

4   asking back in the days when they didn't have to bring in

5   medical, that was really important.  So if they said they had

6   received care, we would ask them to bring that medical in.

7   Q.  Again, with regard to every item on this application, is

8   the applicant in front of you while you're checking this?

9   A.  Yeah.  Those questions, if he had handed me medical and I

10  saw they were answered yes, I wouldn't necessarily review them

11  with him.  That would be a no-brainer.  I had the medical in my

12  hand.  He has obviously been to a doctor.

13  Q.  Now, the next page, this says there is a Steven King, M.D.,

14  et cetera.

15  A.  It says inpatient or outpatient, they didn't go to a

16  hospital for this.  It was an outpatient MRI done in a facility

17  where they just do MRIs, and that would be listed there so that

18  we would know those MRIs should be in our file.

19  Q.  When you are saying we, again, and I won't --

20  A.  Railroad retirement board wants them to be there and I

21  would have to verify that.

22  Q.  Again, with regard to the we, are you referring to your

23  training and the members that you mentioned?

24  A.  Exactly.

25  Q.  And with respect to my questions as they relate to this

D7TMLES6                        Baran - direct

1   application, will you presume I'm talking about you and the

2   people that you trained?

3   A.  Yes.

4   Q.  Now, it says dates treated or tested.  Do you see that?

5   A.  I do.

6   Q.  What are those dates?

7   A.  April 22, '04, he had an MRI of the cervical spine; and

8   then September 16 of '04, he had one of his lumbar spine.

9   Q.  Are these things that are just made up or are they a way

10  for you to independently confirm whether those objective tests

11  were taken?

12  A.  They have to be in front of me or I won't take the

13  application as complete.

14  Q.  What has to be in front of you?

15  A.  Those MRI findings, the report.

16  Q.  And that would be as an attachment of some sort?

17  A.  Of course.

18  Q.  Let's skip to the next page.

19          What's this?

20  A.  It indicates the name of the patient, the patient's doctor,

21  who is treating him, and the dates he has gone to that doctor,

22  the dates treated or examined.  That's every date that he could

23  remember that he went to the doctor.  It's usually right in the

24  medical because we get the doctor's office notes.

25  Q.  And when we go to the dates treated or examined and it

D7TMLES6                          Baran - direct

1    indicates the type of treatment or examination, is that

2    something that a representative would confirm with the

3    information you have available to you?

4    A.   Basically.  This is an orthopedic, so, yes, we would look

5    at it.  We have it in front of us.  We may not confirm it with

6    the employee, but it's in front of us.  We have got the

7    exams -- his paperwork in front of us and we would say, this is

8    good, it's all here.

9    Q.   What, if anything, are you saying to the person, the

10   applicant who is sitting --

11   A.   Somebody like me who rattles on, I might say, it confirms

12   that this is your medical from Dr. Lesniewski.

13   Q.   Moving to the next page, what are these items, just

14   briefly, 22, 23, 24?

15   A.   They are asking if you're medically disqualified by the

16   employer.  In my 18 and a half years I've seen two people

17   medically disqualified.  The railroad never wants to say that

18   you can't work for some reason.  So you don't see that very

19   often.  That's always a no.  And medical restrictions are

20   usually a yes because if you are going to a doctor, he will

21   usually tell you that for this condition you shouldn't be

22   lifting or bending or whatever.

23   Q.   What is a medical disqualification?

24   A.   That would be that the railroad would sign a piece of paper

25   that says, this man is no longer qualified to serve as an

D7TMLES6                        Baran - direct

1   electrician or a conductor or what have you.  That's an

2   absolute automatic occupational disability.

3   Q.  I want to direct you now to Section 5.  Let's look at

4   Section 5 here.

5          Now, it looks like in Section 5, when you see on

6   question 31 and 34, it looks like the no is scratched out.  Do

7   you see that?

8   A.  I'm guessing here that the employee did this, only because

9   it says I attended technical school.  And the person who filled

10  this out said no.  You see, this is just called a skip pattern.

11  It says go to item 32.  If he changed it to yes, he should have

12  filled in where he went to technical school.  So it looks like

13  the employee might have said, oh, I did go, but he didn't

14  bother to put the name of the school in.  The certificate

15  license I received is currently valid and he scratched out no.

16  But he still didn't clarify this.  Now, I should have clarified

17  this when I was doing the application.  I didn't.

18  Q.  Meaning, you should have put the school in?

19  A.  Yeah.

20  Q.  And that would have been something that you missed?

21  A.  Yeah.

22  Q.  Now, moving to the next section, Section 6, there has been

23  a lot of discussion about this section 6.

24  A.  There certainly has.

25  Q.  Explain Section 6 to us, please.

1    A.   Okay.  They want you to check the box after each activity

2    listed below that best describes your ability to do that

3    activity.  Now, easy, I can easily do the activity.  Hard, I

4    can do the activity with difficulty or with help.  Not at all,

5    I cannot do the activity, even with help.

6    Q.   Now, explain this whole section.  Let's start with the

7    choices that you have.  And in doing this for 18 years as a

8    representative of the railroad, how often do you see easy

9    checked off?

10   A.   Hardly ever.

11   Q.   Why?

12   A.   Okay.  This is my pet peeve in the whole world.  There is

13   three answers there.  We have got to answer one.  We have no

14   choice.  We have got to answer one.  And the scope of it goes

15   from sublime to ridiculous.  It's easy or I can't do it at all

16   and then there is a tiny little middle that says it's hard for

17   me.  The whole point of this hard is that we are supposed to

18   explain it, how hard is it, why is it hard.  So we really have

19   no choice.  I don't know what Mr. Parlante's disability is

20   here.  I haven't had the opportunity at this point to see it.

21   But let's just say, to be able to explain in a way, it's either

22   a back problem or a neck problem.  Because we did see MRI of

23   the neck and MRI of the lumbar spine.

24          So if I was to say to him, sitting.  In your head

25   think about this.  Can you sit easy, hard, or not at all?  He

1    is probably going to say easy.  Then I am going to say, for

2    extended periods of time.  Because that's what they are really

3    looking for.  If it was my application, that's what it would

4    say.  It would say, for extended periods of time, it's hard for

5    me to do.  Most of us who have been sitting here for two weeks

6    know what it's like to sit in that chair for a couple of hours

7    at a time.  If you have got a bad knee, it's stiff.  If you've

8    got a bad back, it's starting to ache.  My neck is killing me.

9    So that's why hard is the answer.  We are talking about people

10   who are claiming to be disabled.  We are not talking about

11   somebody who is in great health.  We are talking about people

12   who worked on hard jobs, doing hard chores every day eight

13   hours a day.  So now that they are all beaten up, is it hard or

14   easy for you to stand for long periods of time.

15   Q.  Now, what, if any, comparison needs to be made by the

16   representative between the answers here and the actual medical

17   that accompanies the application?

18   A.  Exactly.  When we are doing this, and we are looking at it,

19   we have got MRIs in front of us who give us -- the reports give

20   us every aspect of what their result is.  Now, if we fill it

21   out incorrectly, if we don't make it -- when I say we make it,

22   let's say I'm interviewing the guy and I'm doing this

23   application for him in my office as a representative of

24   railroad retirement.  It's a rare occasion, but sometimes we

25   did it.  If I was filling it out and I put it was easy for him

D7TMLES6                        Baran - direct

1    to sit, an examiner in Chicago might say, not with these

2    conditions it isn't.  If I put not at all and an examiner in

3    Chicago looked at the MRIs, they would say, that's ridiculous.

4    What do you mean, you can't sit at all.  So the middle ground

5    here is hard.  And if it doesn't comply with what the examiner

6    sees on those MRIs and the doctor's medical reports, they are

7    going to disregard it.

8           You know, they are looking at this application down in

9    Chicago and they are going to disregard it because as

10   Mr. Coleman said when he was sitting here for a few hours, the

11   real weight is the medical.  The doctor's report is the real

12   weight.  Yes, they look at some of these findings and see what

13   the employee is saying, and usually they will find that it is

14   consistent with the medical.

15   Q.  Now, when you are looking at this, as compared to medical,

16   I just want to be clear, you keep mentioning Chicago.  What's

17   the relevance or significance of Chicago in this discussion?

18   A.  I'm sorry if I assume.  Forgive me.  Chicago headquarters

19   is where the decision for the disability determination is made.

20   Mr. Coleman was a supervisor from the post, which they don't do

21   initial determinations.  But if the young lady from the initial

22   disability had come here, we would have gotten all these

23   answers.

24   Q.  What do you mean, initial?  The people that you trained,

25   that you work with?

1   A.  The initial decision, when the application first gets

2   there, they make an initial decision.  Post determines the

3   total and permanent and the continuing disability reviews.

4   Q.  So in the event that Section 6, through your experience of

5   18 years, not only you, but the people you train, to the extent

6   that Section 6 would be inconsistent with objective medical

7   criteria, what, if anything, in your experience, would happen?

8   A.  I think the Chicago examiner would dismiss it.

9   Q.  And are there instances where it needs to be rewritten?

10  A.  Well, if somebody comes in with an application already

11  done, most of the people doing applications as consultants

12  prior to myself were union officials, and their knowledge of

13  railroad retirement was limited.  So sometimes they might

14  answer something that was off base, and we would just discuss

15  it with the annuitant.

16  Q.  When you say the annuitant, that's the individual --

17  A.  Who is filing the application.  I'm using railroad

18  retirement jargon and I apologize for that.  Too many years on

19  the job.  But I might say to them, for instance, let's say I

20  had a person here who had acid reflux, like my husband does.

21  And I would say, you say it's easy for you to eat.  But do you

22  have time for spicy foods and things like that that will bother

23  you because of your acid reflux, and they would say yeah.  We

24  will change that to hard and we will tell them acid reflux

25  causes difficulty with spicy foods and sometimes causes me

D7TMLES6                          Baran - direct

1    gastrointestinal problems.

2    Q.  You're referring to your work when you were at the railroad

3    retirement board?

4    A.  I am.

5    Q.  When you're doing that, is there any incentive or

6    disincentive or anything else to assist the applicant to win an

7    occupation disability award?

8    A.  It is our job to do our best to prepare an application to

9    completeness in an attempt to get the employee an occupational

10   disability.  That is our job.  We are their advocates.

11   Q.  With respect to being their advocates, does that require

12   you to exaggerate, lie, put things on the application that are

13   not true?

14   A.  Absolutely not.

15   Q.  In any of your training that you've referenced that you did

16   before, does that come up in any of your training, that you

17   should exaggerate on behalf of the applicant?

18   A.  No.  But we are told that we are their advocates and it is

19   our responsibility to help them.  Sometimes -- I mean, okay,

20   let's go back to the obvious again.  Sometimes we are talking

21   about people who barely speak English who work track at Amtrak.

22   They don't require them to speak English on the tracks.  So if

23   they came into my office and wanted to do a disability

24   application, it would really be up to me to do it to their

25   advantage, not lying, not exaggerating anything, but to do the

1   best I would as if it was my father doing the application, and

2   that's exactly what I told my reps.  Forgive me again.  I'm

3   using jargon, but the contact reps who work for me treat

4   everybody in this office like they are your mother or they are

5   your father, and we will get along fine.

6   Q.  Now, as far as the actual processing of the application and

7   your doing the job for them, if I can ask you, when you're

8   working with the applicant to do the job and you're matching,

9   for example, the medical or anything else, to what extent does

10  this information come from you versus the applicant?

11  A.  It comes from the applicant.

12  Q.  And when you are speaking with the applicants who have this

13  application prepared already, what is your intent in -- for

14  example, you mentioned for the acid reflux, right?  And you

15  said, you have it easy here but I see your condition is acid

16  reflux.  When you eat too quickly or you eat too much, is there

17  any issue?  As a matter of fact, there is.  What, if any,

18  reason is there for you asking that question?

19  A.  Because I am their advocate and I am making that

20  application be the best it can be for him to receive an

21  occupational.

22          THE COURT:  Mr. Jackson, just wait for one second.

23  Can we take the seventh inning stretch.  The jury can just

24  stand and stretch a little bit.

25  Q.  Ms. Baran, I want to direct your attention to question 40.

1    Same section.  Question 40.  What is that?

2    A.  It's activities of daily living.

3    Q.  What are the activities of daily living?  What does that

4    mean?

5    A.  This question, as we were trained in Chicago and everywhere

6    else we went, Wisconsin, basically relates to the capability of

7    the client who we are speaking to.  As a contact rep, our

8    manager of the offices, I use this question to make sure that I

9    had a capable, stable individual in front of me.

10   Q.  When you say capable and stable, are you referring to their

11   physical or mental condition, or both?

12   A.  Mental condition.  For instance, I had a Long Islander in

13   front of me one day who told me about his bad knees.  And then

14   I proceeded to ask him the questions.  Now, the questions,

15   which I frequently prefilled when I was a consultant, because I

16   used them as prompts, so I would remember to ask them, remember

17   that I had to go in that direction.  And then I would change

18   them as I spoke to the individual, regardless of what some

19   people told you here.  This is where I would ask questions

20   like, how do you sleep?  Most people will tell you after 50

21   they don't sleep great.  They have pains here or pains there.

22   What time do you get up in the morning?

23        But as a manager I always ask these questions slowly

24   and got into it a little bit with my clients, especially if I

25   had a suspicion.  After 40 years of doing disabilities, I did

D7TMLES6                          Baran - direct

1    get suspicious.  But I had a guy in front of me who could

2    barely sit in that seat.  He was twitching around.  It was the

3    end of June.  I don't remember exact date, but it was the end

4    of June and he said to me, he finally said to me in part of the

5    conversation, I hate the 4th of July.  I said, why is that?  He

6    said, you know, I served two tours over in Vietnam and when

7    those firecrackers go off, I'm back in Vietnam.  My kids can't

8    even see me on the 4th of July.  I spend the day in the closet

9    or the night in the closet with headphones on so I don't have

10   to hear the fireworks.

11          Now we got a whole different disability application.

12   This man has emotional issues.  He has got posttraumatic

13   stress.  And no matter how good his knees are or not, he does

14   not belong on the railroad, that's for damn sure.  I would

15   develop the application that way then.  99 percent of the

16   applications were all normal.  This is where we picked up the 1

17   percent that wasn't.  But the normal ones get up, have

18   breakfast, they shower, they walk the dog, they go see their

19   mother, whatever they do.  But we are not looking to prove a

20   disability in this box unless it's a psychiatric one.  We are

21   just looking to see that they are capable.

22   Q.  Now, with regard to the actual, what you are looking to see

23   and what you are looking to evaluate, did it come to your

24   attention, when you were a railroad retirement board

25   representative, that there was a specific form upon which

D7TMLES6                        Baran - direct

1   question 40 was formatted?

2   A.  Well, actually, it goes the other way.  Once I determine

3   that there might be a psychiatric problem, I would then have --

4   I would then go through a 13-question form called activities of

5   daily living which takes this to the extreme and asks all the

6   questions about why don't you sleep well, when did this start,

7   is this a change, when did this change occur.  We are looking

8   to pinpoint the condition.

9          MR. JACKSON:  With the Court's permission I'm about to

10  approach.

11  Q.  Before I deal with this, you mentioned activities of daily

12  living, correct?

13  A.  Yes.

14  Q.  Activities of daily living, where does that come from?

15  A.  It's a generic -- forgive me.  I have to think for a

16  second.  It's a generic term that psychologists and

17  psychiatrists use.  If I at railroad determine if we have an

18  occupational disability based on any type of mental disorder,

19  even if it's just a panic disorder -- I don't mean to minimize

20  that, but if it's a panic disorder rather than somebody who is

21  really off there, we have to send them to a psychiatrist.  And

22  the actual questionnaire that the psychiatrist fills out is

23  this extended activities of daily living, the same way we do.

24  We do it in the office.  Then the psychiatrists do it.  I guess

25  they compare them afterwards.

D7TMLES6                        Baran - direct

1   Q.  I am going to show you an activities of daily living

2   report.  And in showing it to you I'm going to ask you if it

3   addresses a daily routine, sleeping and rest, personal hygiene,

4   meal preparation, hobbies, shopping, transportation, finance,

5   socialization, and employment, which is B4.

6            Ms. Baran, can you look at that document.  Take your

7   time and look up at me when you are done.

8   A.  This is the form that I used at railroad retirement.  From

9   my past experience I know Social Security uses one of their

10  own, but, again, don't forgot, they are trying to prove a total

11  and permanent disability.  We are not.

12  Q.  You do recognize that?

13  A.  Yes.

14  Q.  What specifically do you recognize that to be?

15  A.  This is where I actually took my little prompts from.  This

16  is an activities of daily living questionnaire and it's the

17  questions we want to ask to pinpoint capability.

18  Q.  When you say we, you're speaking about you --

19  A.  Contact representatives, yes.

20  Q.  And that form is one that you've used throughout that 18

21  years that you were at railroad retirement board?

22  A.  Yes.

23  Q.  Did you also use that form when you were at social

24  services, or was it a different form?

25  A.  Social Security has their own form.  It even has the SSA

D7TMLES6                           Baran - direct

1    number.  It's on all the websites out there.  All the lawyers

2    who want to represent people who have been denied it at Social

3    Security have it on their websites.  It's out there.  This one

4    is not out there.

5    Q.  Does that form fairly and accurately represent and

6    otherwise depict the form that you use to establish the

7    questions to question 40?

8    A.  It does.

9            MR. JACKSON:  Judge, I would move B4 into evidence at

10   this time.

11           MR. WEDDLE:  No objection.

12           THE COURT:  Admitted without objection.

13           (Defendant's Exhibit B4 received in evidence)

14   Q.  Now, Ms. Baran, did there come a time that you decided to

15   leave the railroad retirement board?

16   A.  I didn't want to leave.  It was a great job.  It really

17   was.  I have a lousy back.  They did just did surgery on it.

18   Part of my job was running around the country on airplanes and

19   staying in hotels with lousy mattresses and that got a little

20   old and I couldn't do it anymore.  The other part of my job was

21   to manage my office.  And even though there were men in my

22   office, it wasn't their responsibility to keep the office in

23   condition.  It was mine.  So if a box of supplies came in, they

24   were busy doing things, so I had to move that box of supplies,

25   kick it around with my feet, because I couldn't pick it up.  So

D7TMLES6                          Baran - direct

1   it became a chore.

2              It was no longer that great job I had for 18 years.

3   And I had 40 years of federal service.  Once you have 40 years

4   of federal service, your pension is really not going to get any

5   higher.  You're working for milk money.  It didn't make any

6   sense anymore.  I was 60 years old.  I wasn't in great shape

7   and I said it's time.  So I did.  But I have to say, I was very

8   reluctant to retire because I lived a very active life in this

9   job, that I was terrified I was going to be bored, as are many

10  people who retire, and so I decided to do some consulting on

11  the side to fill up a day or two in the week.

12  Q.  Before we get to the consulting, which we are moving into

13  momentarily, when you were working for the railroad retirement

14  board, did you yourself as a federal employee qualify for

15  occupational disability?

16  A.  I could have if I wanted to.

17  Q.  Did you file any application as it related to occupational

18  disability?

19  A.  No, I didn't.  I loved my job, even though it hurt.

20  Q.  You mentioned you flew around the country.

21  A.  I did.

22  Q.  What were the reasons for that?

23  A.  The labor member sends people from their office to the

24  conferences I went and presented to the Long Island Railroad

25  and Metro North.  And when they came to my conference they

1    said, we would like you to become a member of our informational

2    conference team.  And that's where managers from different

3    areas would get together and go to St. Louis, Atlanta,

4    Pittsburgh, and we would give informational conferences to not

5    just the employees.  There were no employees there, usually.

6    It was all union officials, just union officials.  That's who

7    we were addressing; like I said before, in the hopes that they

8    would spread that information to their membership.  It was much

9    harder to do than a conference on Long Island.  There was a lot

10   more preparation involved.  It was a lot of standing involved.

11          I'm very short.  I don't like to be without high

12   heels.  So I stood for two and three hours in front of a group

13   of 2 or 300 people with a microphone in hand.  That's what I

14   said today.  If they would just let me stand up, I would feel a

15   lot more comfortable.  I had to do this for two or three hours

16   at a time.  As much as I enjoyed, I love people, I loved

17   working with them, I couldn't do it anymore.

18   Q.  If I could just ask you a couple more questions about this,

19   again, before we go to consulting.  About how many applications

20   did you yourself assist with during those 18 years, the

21   disability application?

22   A.  Hundreds.

23   Q.  And if we can just break it down for an accurate figure,

24   say, for example, in any given month, how many applications

25   would you be involved in assisting?

D7TMLES6                           Baran - direct

1    A.  I would do at least one a week, if not two.

2    Q.  So every particular month we are talking about?

3    A.  Yeah.  Some months more.

4    Q.  And you did that throughout the course of the 18 years

5    there?

6    A.  Yeah.  More so in the beginning than in the end.

7    Q.  Did you develop any familiarity as you did these

8    applications what the various positions of the people who were

9    applying for occupational disability?

10   A.  Of course.  We had to read all their job descriptions.

11   Q.  When you say the job descriptions, their job descriptions,

12   are you referring to people at the Long Island Railroad?

13   A.  Yes.

14   Q.  And did you do the application, for example, of signalmen?

15   A.  Oh, yeah.

16   Q.  And yard masters?

17   A.  Yes.  As few as there are.

18   Q.  Station masters?

19   A.  Yes.

20   Q.  Warehouse people?

21   A.  Oh, yes.

22   Q.  Block operators?

23   A.  Yes.

24   Q.  Without going through the whole list, of course, your

25   husband was an electrician, is that correct?

D7TMLES6                           Baran - direct

1   A.  Yes.

2   Q.  Did you become familiar in the review and work with these

3   people of the various occupational disabilities that they would

4   endure?

5   A.  Absolutely.

6   Q.  Did you come to an understanding as to what the specific

7   job would entail?

8   A.  I did.  They were very emphatic about telling me what they

9   did.  They enjoyed telling me.

10  Q.  I am going to show you what's been marked B5A through B5Q,

11  which are various job descriptions of people who work for the

12  railroad.

13          I am going to show you what has been marked, as I just

14  mentioned to you, B5A through B5Q.  I want you to take a look

15  at these items.  You don't have to read them all.  Just review

16  them.  Just take a look at me when you are done.

17  A.  I see them.

18  Q.  Did you complete applications for these job descriptions in

19  your capacity as a railroad retirement board manager?

20  A.  Yes, I did.

21  Q.  And what was the frequency with which you completed

22  applications for these various parties?

23  A.  Again, at least one or two a week.  In the months when

24  retirements were heavier, my office did 20 of them a week.

25              (Continued on next page)

D7tnles7                          Baran - direct

1   Q.  What I just gave you, do those descriptions fairly and

2   accurately represent the descriptions of how they appeared when

3   you were in that office dealing with these annuitants who were

4   applying for disability?

5   A.  Most people use this as a guide to help them complete their

6   vocational report.

7              MR. WEDDLE:  Objection, your Honor.  Speculation.

8              THE COURT:  Sustained.

9   Q.  Do you have any particular knowledge as to what those

10  people did?

11  A.  The wording on the applications almost came verbatim from

12  here.

13  Q.  That is because you assisted in the applications, correct?

14  A.  That is because they would bring me this as part of their

15  vocational report if I was completing the application, but more

16  likely than not it would already been completed when they came

17  into the office.

18             MR. JACKSON:  Judge, I move those into evidence at

19  this time.

20             THE COURT:  Mr. Weddle?

21             MR. WEDDLE:  Your Honor, I don't object to them coming

22  into evidence, but I don't think they have anything to do with

23  the application materials that she reviewed.

24             MR. JACKSON:  I could lay more of a foundation if you

25  like, but I think they do.

D7tnles7                          Baran - direct

```
 1              THE COURT:  Admitted without objection.

 2              MR. WEDDLE:  Based on her testimony, your Honor.

 3              THE COURT:  Admitted without objection.

 4              (Defendant's Exhibits B5A through B5Q received in

 5    evidence)

 6              MR. JACKSON:  OK.

 7              THE COURT:  Again, Mr. Jackson, you don't need to go

 8    over every single one.

 9              MR. JACKSON:  Of course not, Judge.

10    Q.  Without going through all of these, OK, I just want to ask

11    you, for example, I am going to show you a signalman, which is

12    B5A.  There we go.  Essential functions of the job.  Do you see

13    that?

14    A.  I do.

15    Q.  Do you see where it says walking, balancing, climbing,

16    standing, turning, bending, scooping, crouching, stooping,

17    kneeling, sitting.

18              Do you see that?

19    A.  I would like to correct you if I May.

20    Q.  Absolutely.  You always do.

21    A.  It says walking on ballast, not walking and balancing.

22    Q.  OK.  I'm sorry.

23    A.  That is so critically important, because ballast, which

24    absolutely nobody in this room knows what it is but the guys

25    from the railroad, are little rocks, little stones that are
```

D7tnles7                          Baran - direct

1    thrown between the trackbed, and this is what they have to walk

2    on all day long.  It is like walking on a bed of nails.  Your

3    knees and your back are constantly being jostled around by this

4    uneven terrain.

5    Q.  Without going through all of them -- by the way, is there

6    anything else besides ballast that you want to speak about?

7    A.  No.

8    Q.  Are you sure?

9    A.  The rest of them are pretty self-explanatory.

10   Q.  This would indicate again the requirements.  And then,

11   without reading them all, specifically, what stooping means,

12   for example, if we go to stooping, bending at the waist, etc.,

13   etc.  OK.  You have to answer yes or no.

14   A.  Yes.

15   Q.  This is something that you would see repeatedly, is that

16   correct?

17   A.  Absolutely.

18   Q.  That's for signalmen.  Let's just say for example, for a

19   yardmaster.

20         For a yardmaster it indicates walking, balancing,

21   climbing, standing, turning, twisting, reaching, lifting.  In

22   other words, the various physical requirements associated with

23   each job, correct?

24   A.  Absolutely.

25   Q.  These are in evidence for the jury to see or not see at

D7tnles7                          Baran - direct

1   their convenience or perusal, but with regard to all of these

2   jobs, without taking you through them, are you aware of -- and

3   we'll do just a couple more.  Block master, for example.

4   A.  Who?  I'm sorry.  I didn't hear you.

5   Q.  I'm sorry.  Block operator.  I was thinking yardmaster.

6   Block operator.

7   A.  OK.  I thought they had a new one.

8   Q.  Do you see the various physical requirements associated

9   with this?

10  A.  Yes, I do.

11  Q.  The final thing that I will show you, and, again, I won't

12  go over -- there's many more.  The electrician, for example.

13  Do you see the electrician job?

14  A.  I do.

15  Q.  Do you see the various physical requirements associated

16  with this job?

17  A.  I do.

18  Q.  Would it be fair to say again walking, balancing, climbing,

19  kneeling?

20  A.  They are all there.

21  Q.  With that page it talks about the nature of the crouching

22  and stooping.  It even gives you to the right what you have to

23  lift, endplate 60 pounds.  This is for an electrician, correct?

24  A.  Yes, it is.

25  Q.  That is something that your husband did?

D7tnles7                          Baran - direct

1    A.  That's right.

2    Q.  You see where I just said lifting endplate 60 pounds, etc.

3         Would it be fair to say that with all the jobs that I

4    showed you, which would B5A through B5Q, that you came to learn

5    that there are various physical requirements associated with

6    the job?

7    A.  Yes, I did.

8    Q.  The people who came to see you were generally working for

9    how many years engaged in these activities for which the

10   physical requirements are associated?

11   A.  A minimum of 20, a maximum of 40.  38 I think was the most

12   I've ever seen.

13   Q.  38 years.

14   A.  That I've ever seen.  If you go to Metro-North they're 40,

15   42.

16   Q.  I want to direct your attention now from what we were about

17   to get into, which is after you left your job at the Railroad

18   Retirement Board.

19   A.  Yes.

20   Q.  Before I do, I want to be clear in that 18-year period of

21   time, again when you left about how old were you now?

22   A.  I was 60.

23   Q.  At that particular time when you left you were about 60

24   years old?

25   A.  I was 60 in September.  I left in December.

D7tnles7                              Baran - direct

1   Q.  In the 18 years that you were there, again, any arrests?

2   Anybody come to arrest you at that time?

3   A.  I had one issue in my 18 years there.  I made a mistake one

4   day.

5   Q.  I am asking you about arrests.  I will get to your issue.

6   A.  I was never arrested.

7   Q.  Any FBI agents came to your house?

8   A.  No, never.

9   Q.  Members of the NYPD come to your house?

10  A.  No, never.

11  Q.  Nassau County Police Department?

12  A.  No.

13  Q.  Suffolk Police Department?

14  A.  No.

15  Q.  With regard to any disciplinary issues and the like when

16  you were there, what, if anything, happened?

17  A.  I made a mistake one day.  I am very human.  And I signed

18  on to the Social Security database while I was on the phone

19  with a Social Security supervisor who was helping me clear up a

20  problem on one of our spouses.  A big issue is that the spouses

21  work for Social Security and the husband works for Railroad

22  Retirement.

23          But remember I said we were the blueprint for Social

24  Security?  Well, because of that, if you as a spouse get

25  Medicare, it is on your husband's number, but he is a

1   railroader.  Most people hate this.  I don't know why.  The

2   women hate this.  But even mine, my Medicare card has his

3   number on it because he is a railroader.

4        Social Security gives us the right of way in

5   everything, because we came first.  So I was on the phone with

6   a Social Security rep trying to clear up a problem for a lady,

7   and I was on the Social Security database, which we were

8   allowed to get into when we needed to.  But we are not allowed

9   to do it -- and I completely forgot about this -- for people we

10  knew.  OK.

11       So we had our conversation.  We straightened out

12  something for this lady, who had an issue.  Then I said to her,

13  by the way, while you are on the phone, I mean, I knew her.

14  She was a supervisor while I was working at Social Security.

15  We were old friends.

16       I said, by the way, while we're on the phone, take a

17  look and see why my sister's application for Social Security is

18  taking so long.

19       She says, Well, you got the database right there in

20  front of you.  Put her number on.  And the keys went and it was

21  done before I could think.  I couldn't do anything about it.

22       I went, Oh, God.

23       So she said -- I said, I don't even know what I am

24  looking at.  Tell me what's going on.

25       She said, It is not delayed anymore.  It is actually

1   being processed.  She should hear momentarily.

2              I kind of like held my breath and hoped nobody

3   noticed.  I clicked off.

4              And within a day or two I got a phone call from the

5   security department from the Railroad Retirement Board, and

6   they said, Do you know Theresa so and so?

7              I said, Yes, it's my sister.

8              I said it was a stupid mistake.  I did it while I was

9   talk to go a Social Security rep.  The requirements there, was

10  an absolute two-day suspension no matter who did it.  Even if

11  it was a member of the labor board, you were not allowed to

12  break these rules about security, and I had.

13  Q.  Did you receive a two-day suspension?

14  A.  I did.  I took three more and made it a week's vacation.

15  Q.  Beyond the two-day suspension that you got, was there any

16  other disciplinary action --

17  A.  No.

18  Q.  -- that you were ever subject to in that 18 and a half

19  years?

20  A.  No, not in the 40 years.

21  Q.  So you are saying that time and the Social Security

22  Administration?

23  A.  Yes.

24  Q.  With regard to you leaving, deciding to retire and taking

25  up the role of a disability consultant, what, if anything,

1    factored into your analysis to go and to not retire but to fill

2    up your time with another job?

3    A.  Well, to be perfectly honest, I had been looking at all

4    these applications for 20 years.  People had been doing

5    consultative work for railroad employees for 20 years.  I

6    looked at these applications and I said, I'm so more qualified

7    to do this than any of these people are.  I think I can do a

8    better job of it.  I had more to give and more knowledge to

9    offer them than just filling out a piece of paper.

10          I said, you know, maybe I will throw my hat in the

11   ring and do it a little bit so I won't be bored.

12          I happened to mention this once at a function, and I

13   immediately got an offer from one of the labor unions:  We got

14   extra, lots of empty space in our office.  You can have one of

15   our offices to work out of.

16   Q.  What labor union offered you to do that?

17   A.  That would be the TCU.  They called it the T -- the

18   Transportation Communication Union.

19          They graciously offered me the space at no fee, and I

20   said, well, that would be a way for me to figure out if this is

21   going to work or not, and I did it.

22          The rest, as they say, is history.  It worked out.

23   People started calling me and I started doing it.

24          THE COURT:  Mr. Jackson, before we get into any more

25   history.  Why don't we take a break at this point for the day.

D7tnles7                          Baran - direct

1            Let me caution the jury once again that because the

2       government has rested and some of the defendants are putting on

3       a case does not mean that you are free to begin any form of

4       deliberations.

5            Do not discuss the case among yourselves or with

6       anyone outside or have any contact of any kind with anyone

7       involved in the case or read any account.  If any of these

8       things occur, you are directed to inform the Court immediately

9       and not discuss it with your fellow jurors.  We will adjourn

10      until tomorrow at 9 a.m.

11           (Continued on next page)

```
 1                (Jury not present)

 2                THE COURT:  All right.  If we may quickly review the

 3      status for tomorrow.

 4                Mr. Jackson?

 5                MR. JACKSON:  Yes, Judge.

 6                THE COURT:  Do you have a reading?

 7                MR. JACKSON:  I think I can probably be done with my

 8      case tomorrow by -- I can't speak for how long the cross of

 9      Ms. Baran will be, but I could probably limit it tomorrow to

10      two, maximum three witnesses.

11                THE COURT:  How much longer with Ms. Baran?

12                MR. JACKSON:  I would think I need about another hour

13      fifteen minutes or so with her.

14                THE COURT:  So that's 10 o'clock.

15                MR. JACKSON:  Why don't we safely say 10:30.

16                THE COURT:  Mr. Weddle, any indication of the length

17      of any cross?

18                MR. WEDDLE:  We haven't gotten too far into the story

19      I think, your Honor.  Right now I would say about 30 minutes,

20      40 minutes maybe.

21                THE COURT:  All right.

22                You say you have another two or three, Mr. Jackson.

23                MR. JACKSON:  Yes, Judge.  Your Honor, yes, I do,

24      about two or three witnesses.

25                I will certainly be done tomorrow.  I would think
```

D7tnles7                         Baran - direct

1    early afternoon, Judge, that I would be done.

2              THE COURT:  All right.  On that assumption, we will

3    aim to have the draft set of instructions for you probably by

4    the close of business tomorrow, and we should aim to have a

5    first charging conference probably Wednesday morning.

6              And if that schedule works, we should be looking at

7    beginning of closing arguments sometime by the middle of

8    Wednesday morning and through the afternoon, which means that

9    we might be into jury instructions either late Wednesday or

10   more likely Thursday morning.

11             All right.  Mr. Durkin?

12             MR. DURKIN:  Judge, did you give any more thought, I

13   know I discussed with you earlier the issue of the amnesty

14   program and those results.  I think you said you were going to

15   consider that.  I said I would ask for the results from the

16   government.  I am assuming that is something we can do by

17   stipulation.

18             THE COURT:  Mr. Weddle, do you have any other response

19   to that.

20             MR. WEDDLE:  We still think it is totally irrelevant,

21   your Honor, and would require a lot of rebuttal evidence about

22   the fact that some people have participated, some people have

23   been arrested and pled guilty, and I don't think any of this is

24   something that the jury should be concerned about.  And it

25   postdates the relevant intent and conduct of all of these

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

D7tnles7                          Baran - direct

1    defendants, your Honor.

2              THE COURT:  All right.  Thank you.

3              Mr. Durkin, on that issue, I am going to agree with

4    the government.  I think it can turn out to be a great

5    distraction, and I believe that any probative value that it may

6    have for the defense is minimal.  I think on that basis it is

7    best not to.

8              MR. DURKIN:  Could I just state for the record, Judge,

9    at least my proffer, that at least as I understand it there

10   were roughly 1500 letters sent out to 1500 annuitants, which is

11   virtually the entire universe of annuitants, and out of that

12   universe of annuitants only 84 or 86, as I understand it,

13   accepted.  That would be my proffer.

14             THE COURT:  All right.  Understood.

15             The problem that I see, which I think essentially the

16   government's argument, or part of it, is that why people would

17   choose to accept or not accept amnesty is something that is

18   going to vary substantially among 1500 people, and I don't

19   believe that we have a basis here for making any generalization

20   or drawing any conclusions or even inferences as to what may

21   have caused only 80 out of 1500 to choose one course of action.

22             MR. DURKIN:  I am told I misspoke.  It's 44 to 46.

23             THE COURT:  All right.

24             MR. DURKIN:  Not 84 to 86, 44 to 46.

25             THE COURT:  I think even with the revised number, I am

D7tnles7                              Baran - direct

1    not persuaded.

2              MR. DURKIN:  I understand.

3              Could I ask one thing, Judge?

4              THE COURT:  Yes.

5              MR. DURKIN:  I think Ms. Friedlander and I have had

6    some discussions about a stipulation regarding Dr. Lesniewski's

7    tax returns from his PC.  You may recall the government offered

8    the exhibits, they introduced his tax returns, and then they

9    offered this exhibit from the United Healthcare.

10             THE COURT:  Yes.

11             MR. DURKIN:  I want to introduce his because the

12   individual returns don't have his corporate returns.  His

13   individual returns only have his W-2 income and then any profit

14   from the PC.

15             He had a PC, and the PC itself filed returns.  I want

16   to introduce those returns, the corporate returns, to show the

17   gross receipts because I think that is a more applicable

18   apple-to-apple comparison.  I want to make sure that we can

19   reach a stipulation on that, because otherwise I have to call

20   the accountant tomorrow.

21             THE COURT:  Ms. Friedlander?

22             MS. FRIEDLANDER:  Yes, your Honor.

23             The corporate returns are passthrough.  The income

24   that he takes from the corporation in the form of salary and

25   profits goes through to his personal income tax returns.  It is

1    the source of all of his income, in fact, under the returns

2    that we introduced.  This money that he's showing you here --

3    let me just withdraw that.

4            We told Mr. Durkin that there are a couple of things

5    that we would want to see in a stipulation and absent those

6    things we would like him to call this witness.

7            MR. DURKIN:  Judge, can I just show you.

8            THE COURT:  Yes.

9            MR. DURKIN:  This, for example, 2005 return, all the

10   United Healthcare money and all his income even from the

11   narratives is contained on this line, the line where my finger

12   is, line 1a.

13           That's the gross receipts.  There is nothing about

14   fall-through or anything else.  The only apple-to-apple

15   comparison to make regarding these United Healthcare payments

16   is how they reflect to the gross receipts.

17           I would like to introduce a chart that will be roughly

18   the number -- I will have the 2003 and 2004 by tonight.  But

19   you can see the difference.  I mean, if you compare 50,000 to

20   say 190,000, it is a horribly dramatic difference in terms of

21   the money, and it's totally misleading.  This is exactly the

22   apple to apple.

23           MS. FRIEDLANDER:  Your Honor, it is completely not the

24   apple to apple.  He has like fixed expenses.  He is a doctor.

25   He pays malpractice insurance, he pays rent, he pays employees,

 1   I would assume.  Every dollar that he earns in income from the

 2   insurance company is another dollar that comes into his pocket.

 3   This is all money -- sure it comes in as gross receipts to his

 4   business, and it all is money that comes into his pocket.

 5         Mr. Durkin's argument would make sense if there were

 6   some additional expenses that get deducted from this in some

 7   way.  There is nothing like that.  This money all comes right

 8   through to Dr. Lesniewski's pocket.

 9         I don't have a copy of his personal income tax returns

10   with me here, but you can see, your Honor -- actually, I do.

11   I'm happy to hand them up.

12         The income from this business from this PC, the salary

13   and the profits flow through to Dr. Lesniewski.  So if you took

14   this money out of his corporate returns, that is how much his

15   personal income would have been reduced, his personal gross

16   income would have been reduced by in these years.

17         MR. DURKIN:  Judge, I have the return.

18         MS. FRIEDLANDER:  I hope I'm being clear because

19   Mr. Durkin is completely misstating.

20         MR. DURKIN:  I am not misstating a thing.  It's

21   completely wrong.  That would be like saying if I get an extra

22   fee in a given year it all ends up if my pocket.  That is

23   absurd.

24         Here's the 2005 return.  You can see it has gross

25   $95,000 in W-2 income, and another $71,000 from statement 2.

D7tnles7                          Baran - direct

1            I will show you statement 2, which is $60,000 from the

2     PC and 2 percent of his medical insurance, another $11,000.

3     That is his total income.

4            They shouldn't be permitted to get an inference that

5     somehow because he got $50,000, that's $50,000 compared to

6     $199,000.  It's $50,000 compared to $631,000.

7            THE COURT:  Mr. Durkin, why don't you prepare the

8     chart that you are indicating you would like, and let's do this

9     tomorrow.

10           MR. DURKIN:  OK.

11           THE COURT:  We will have the full information before

12    us in a form that lays out the dispute.

13           MR. DURKIN:  Can I at least, though, can we at least

14    agree that if you agree with me that I don't have to call the

15    accountant?

16           MS. FRIEDLANDER:  Your Honor, we will not stipulate --

17    I am glad he put this up, your Honor, because you can see

18    clearly that he takes a salary both from his company and the

19    profits flow through to him on his income statement.

20    Mr. Durkin pointed out in statement 2 here that it says MD PC,

21    he gets $60,000.  If he earned $50,000 less in United

22    Healthcare payments that year, that number would be reduced by

23    $50,000.

24           MR. DURKIN:  That is not even --

25           MS. FRIEDLANDER:  Of course it is true.  If he's

1    suggesting that there are some independent expenses associated

2    with UHC figures, which of course there are not, then his

3    argument would make sense, your Honor.

4            We have not said we won't stipulate.  We just said

5    that are two facts we would insist on seeing in any

6    stipulation.

7            First, that the records he wants to introduce, the

8    line item he wants to point this jury to reflects gross

9    receipts of the practice, not income to Dr. Lesniewski

10   personally or profit to Dr. Lesniewski personally.

11           And, second, Mr. Durkin just said to the Court that

12   Dr. Lesniewski's income tax returns include all of the

13   thousands and thousands and thousands of dollars in cash that

14   people were paying him for narratives.  We don't have

15   information to that effect.  I would like to understand what

16   basis he has to say such a thing.  If he doesn't, we would like

17   to put that accountant on the stand and ask him that.

18           MR. DURKIN:  Judge, I am astounded by that.

19           They have interviewed everybody at Island Sports

20   Medicine.  They know full well that that money went into Island

21   Sports Medicine accounts that were calculated towards him.

22   They have not one iota of good faith in announcing that to you

23   here.

24           THE COURT:  Mr. Durkin, what about getting an

25   affidavit from this accountant indicating the facts that the

1    government has suggested be part of your presentation?  Would

2    that help?

3              MR. DURKIN:  I am not sure what fact they want.  I

4    don't understand it.

5              THE COURT:  The facts that Ms. Friedlander indicated

6    they would want to see in a stipulation, if they are facts that

7    are part of your presentation.

8              MR. DURKIN:  I'm happy to get him on the phone.  If

9    they want to interview the accountant, I'm happy to let them

10   talk to the accountant.  I'm happy to do that.  I will

11   stipulate to whatever he will say about that, if that's OK.

12             THE COURT:  Why don't you discuss this some more

13   overnight.  See if an affidavit from the accountant would

14   address the concerns that the government is asking be a part of

15   the stipulation.  Perhaps the accountant can give the

16   government assurance the assurance that they are seeking,

17   clarify the issues that they want clarified, and then we may be

18   able to resolve it that way.

19             MR. DURKIN:  Do you understand my point?

20             THE COURT:  I understand the point, yes.

21             MS. FRIEDLANDER:  Do you understand the government's

22   point?

23             THE COURT:  There are technical issues.  I hesitate at

24   the moment because when two professionals get involved in these

25   technical issues about accounting or facts, they are not the

D7tnles7                              Baran - direct

 1   kinds of things that we can take judicial notice of or accept

 2   and not have the jury be left with all kinds of questions.

 3            MR. DURKIN:  My only point, is, Judge -- I will just

 4   use my own practice, and I don't know what your experience

 5   was -- just because you get an extra $50,000 in fees in a given

 6   year doesn't mean you get 50,000 more dollars into your

 7   pocketbook.  It doesn't drop down automatically.

 8            THE COURT:  I understand that very well.

 9            MR. DURKIN:  I wish it did.  I only wish it did.

10            THE COURT:  All right.

11            Let's see if you can work it out by having further

12   discussions, if necessary contacting the accountant, if

13   necessary getting an affidavit attesting to the facts about

14   which there is dispute.

15            MR. DURKIN:  That's fine.

16            THE COURT:  Then present your chart in the form that

17   you seek, and we can revisit the issue tomorrow again.

18            MR. DURKIN:  That's fine.  Thank you.

19            THE COURT:  Let's aim to do it after -- when would be

20   the most appropriate time?  After Mr. Jackson concludes?

21            MR. DURKIN:  That's fine.

22            THE COURT:  All right.

23            Now, would counsel approach for another moment.

24            (Pages 2300 to 2306 sealed)

25

D7tnles7                          Baran – direct

1              (In open court)

2              THE COURT:  I will see you tomorrow at 9.

3              (Adjourned to Tuesday, July 30, 2013, at 9:00 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2    Examination of:                                  Page

 3    BRENT McDONALD

 4    Direct By Ms. Friedlander  . . . . . . . . . .2104

 5    Cross By Mr. Ryan  . . . . . . . . . . . . . .2106

 6    WILLIAM SHAW

 7    Direct By Mr. Tehrani  . . . . . . . . . . . .2110

 8    Cross By Mr. Ryan  . . . . . . . . . . . . . .2114

 9    Cross By Mr. Jackson . . . . . . . . . . . . .2116

10    SEAN TUMULTY

11    Direct By Mr. Tehrani  . . . . . . . . . . . .2118

12    Cross By Mr. Ryan  . . . . . . . . . . . . . .2148

13    Cross By Mr. Jackson . . . . . . . . . . . . .2151

14    Cross By Mr. Dirkin  . . . . . . . . . . . . .2161

15    Redirect By Mr. Tehrani  . . . . . . . . . . .2175

16    MARIE BARAN

17    Direct By Mr. Jackson  . . . . . . . . . . . .2209

18                          GOVERNMENT EXHIBITS

19    Exhibit No.                                  Received

20     1604    . . . . . . . . . . . . . . . . . . .2099

21     1605, 1608, 1609, and 1610  . . . . . . . . .2103

22     550 and 551  . . . . . . . . . . . . . . . .2105

23     553 and 813  . . . . . . . . . . . . . . . .2112

24     303-A0, 719, 100-A through D, 113-A . . . . .2119

25          through D, and 554-A through E
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

803   . . . . . . . . . . . . . . . . . . .2138

820   . . . . . . . . . . . . . . . . . . .2139

800, 800A, 801 and 801A through E   . . . . .2144

     . . . . . . . . . . . . . . . . . . .2175

30 and 650  . . . . . . . . . . . . . . . .2175

570 and 571   . . . . . . . . . . . . . . .2206

DEFENDANT EXHIBITS

Exhibit No.                                    Received

R-6   . . . . . . . . . . . . . . . . . . .2115

B4   . . . . . . . . . . . . . . . . . . .2276

B5A through B5Q   . . . . . . . . . . . . .2282