D7ULLES1                    Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               S14 11 Cr. 1091 (VM)

PETER LESNIEWSKI, MARIE BARAN
and JOSEPH RUTIGLIANO,

                  Defendants.

------------------------------x

                                             July 30, 2013
                                             9:16 a.m.

Before:

                    HON. VICTOR MARRERO,

                                             District Judge

                        APPEARANCES

PREET BHARARA
      United States Attorney for the
      Southern District of New York
BY:   JUSTIN S. WEDDLE
      DANIEL BEN TEHRANI
      NICOLE WARE FRIEDLANDER
      Assistant United States Attorneys

LAW OFFICES OF JOSHUA L. DRATEL, P.C.
      Attorneys for Defendant Peter Lesniewski
BY:   JOSHUA LEWIS DRATEL
      LINDSAY A. LEWIS

DURKIN & ROBERTS
      Attorneys for Defendant Peter Lesniewski
BY:   THOMAS ANTHONY DURKIN

D7ULLES1                     Trial

1                          APPEARANCES CONTINUED

2   KOEHLER & ISAACS, LLP
         Attorneys for Defendant Marie Baran
3   BY:  JOEY JACKSON

4   JOSEPH W. RYAN, JR.
    KEVIN MENEILLY
5        Attorneys for Defendant Joseph Rutigliano

6            – also present –

7   Annie Chen
    Emma Larson, Government Paralegals
8

9   SA Frank LoMonaco, FBI

10  Yeni Yrizarry, Defendant Baran Paralegal

11                           oOo

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7ULLES1                          Trial

1                    (Trial resumed)

2                    (Jury not present)

3                    THE COURT:  The witness take the stand.

4                    Bring the jury in, please.

5                    (Pause)

6                    THE COURT:  Mr. Jackson, did you provide that proffer

7        of that other witness we talked about yesterday?

8                    MR. JACKSON:  I did last night, Judge.  Thank you.

9                    THE COURT:  Thank you.

10                   (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Let me remind the witness that she took an

3      oath to tell the truth yesterday.  She remains under oath.

4              Mr. Jackson.

5              MR. JACKSON:  Thank you, Judge.

6       MARIE BARAN, resumed.

7          called as a witness by the Government,

8          having previously been duly sworn, testified as follows:

9      DIRECT EXAMINATION (cont'd)

10     BY MR. JACKSON:

11     Q.  Ms. Baran, a pleasant good morning to you.

12     A.  Good morning.

13     Q.  Where we left off yesterday we were transitioning from your

14     position with the RRB, Railroad Retirement Board, going into

15     your job as a consultant; do you remember that?

16     A.  I do.

17     Q.  I'd like to pick up on that today if I may.  May I?

18     A.  Yes.

19     Q.  Ms. Baran, did there come a time that you decided to become

20     a consultant?

21     A.  Yes.

22     Q.  Now, in telling us what I'd like it get into is your

23     consulting job, but just finally, when you were at the RRB, did

24     you deal with any other consultants?

25     A.  Oh, yeah, all of them.

2314

1   Q.  How many and what were their names, if you could recall?

2   A.  To the best of my recollection, Anthony Davanzo, Ed Yule,

3   Tony Orioles, Mike Flynn, Joe Rutigliano, another Mike Flynn.

4   Q.  Were they related at all?

5   A.  Not to my knowledge.  They were both attorneys.  That's all

6   I can remember at the moment.

7   Q.  Did you reach an understanding of what that position

8   entailed?

9   A.  The ones that were doing, were doing it to assist, they

10  were former labor union officials.  Most of them were general

11  chairmen or presidents of their respective union.  And upon

12  their retirement from the union, they would assist their

13  membership by helping them sift through the bureaucracy of

14  filing for retirement with the railroad and railroad

15  retirement.

16  Q.  And with respect to the applications that those consultants

17  prepared, were those then brought to your office when you were

18  still an RRB official?

19  A.  Yes.

20  Q.  What if anything did you do upon receiving those

21  applications?

22  A.  I reviewed them rather carefully because, as I said before

23  with no disrespect, their knowledge of railroad retirement

24  was -- how that application was supposed to be completed was

25  very limited.

D7ULLES1                        Baran - direct

1   Q.  I want to now transition to what I just mentioned and
2   that's your job as a consultant.
3           The first thing I'd like to ask you is what if any
4   reason did you opt to become one?
5   A.  Well, I have to say that, and I find this to be true of
6   almost everybody who's retiring, I was terrified of being
7   bored.  I had just spent 40 years being busy and working 50, 60
8   hour weeks sometimes, and I was afraid of being bored.  So I
9   thought if I could do this for two days a week, it would keep
10  my mind occupied and I'd be doing something useful.
11          The other reason was I thought that I could be better,
12  I could do it better because I had far more knowledge than the
13  others did.
14  Q.  What if any interaction did you have with the consultants
15  that you mentioned just a few moments ago?
16  A.  The interaction I had was probably more when they were
17  union officials and they came into my office for assistance
18  with something, or I was doing something for the union like
19  retirement seminar or something like that.
20  Q.  I want you now to describe your job as a consultant.
21          The first thing I'd like you to do, Ms. Baran, is give
22  us an approximate date upon which you began your business of
23  consulting.
24  A.  I'm guessing a little bit, but the retirement season
25  doesn't start until a hundred days into the year, I think.  We

D7ULLES1                        Baran - direct

1    saw that on one of the charts earlier that January, February,

2    March, April, and May really didn't have very high retirements

3    and that's because if they don't work a hundred working days in

4    the year, they don't get all of their benefits to which they're

5    entitled.  So most of the retirees don't start until June.

6              I think I probably started in April.  I'm not sure.  I

7    started in April of that month, that year, perhaps.  And it was

8    I was speaking to people who were going to be retiring in the

9    coming or the next year.  Sometimes people came a year in

10   advance.

11   Q.  And just to be clear, Ms. Baran, is that April of 2007 or

12   some other year?

13   A.  '07, yes.  I'm sorry.

14   Q.  Now, if you could just take us through the steps as a

15   consultant in structuring the business, take us through the

16   steps that you as a consultant followed when or if you were

17   assisting someone with an application.

18   A.  I don't proclaim to say this is what other consultants

19   did --

20   Q.  Just you.

21   A.  -- I have no idea what they did.

22             What I did was I would screen my clients on the first

23   telephone call by completing a form that I had actually created

24   as a manager in the railroad retirement office.  It was an

25   intake form getting their name, address, telephone number,

D7ULLES1                    Baran - direct

1    their job description, their age, their wife's age, so that I

2    could properly assess where their benefits would be and when.

3            And I would ask them, most of them would tell me that

4    they were going to be filing for an occupational disability.

5    So I would ask what conditions did they have that was causing

6    them to file and if they had been seeing a doctor because

7    that's one of the main requirements to an application is you

8    have to have medical documentation.

9            And most of them would tell me then that they were

10   seeing a doctor and this is their condition and so on and so

11   forth.  A lot of stuff on there, military service, which is

12   only important to us and stuff like that.

13   Q.  Now I'm going to show you a form that you may be

14   referencing and ask you to identify it.

15           But did you have all these forms when you initially

16   started your business or did you develop forms and information

17   as your business, as your business developed?

18   A.  I developed them as I went along.  Only form I had was the

19   intake form.

20   Q.  Now I'm going to show you what has been previously marked

21   as B1 and we'll make it B1, B1A.

22           MR. WEDDLE:  May I just have a moment, your Honor?

23           THE COURT:  Yes.

24           (Pause)

25           MR. JACKSON:  Judge, just so that you know Mr. Weddle

D7ULLES1                    Baran - direct

1    and I are discussing, these were handed to Special Agent Cuocci

2    previously and I believe at that time they were marked B1

3    through B5.

4           At this time I'm looking to formally introduce them

5    through this witness, Judge, and we're going to mark them B1,

6    B1A, B1B, B1C -- yes, one document.

7           And the final document I believe the prosecution

8    showed already, Judge, and that was Government Exhibit 530.

9           OK, your Honor?

10          THE COURT:  Yes.  Mr. Weddle.

11          MR. WEDDLE:  No objection, your Honor.  We're just

12   remarking them because there's some duplication of exhibit

13   numbers.  So just to keep the record clear, that's why they're

14   being renumbered.

15          THE COURT:  All right.  Admitted without objection.

16          (Defendant's Exhibits B1, B1A, B1B, B1C received in

17   evidence)

18          MR. JACKSON:  Thank you, Judge.

19   Q.  If I could just show Ms. Baran these documents.

20          Ms. Baran, take a look at those.  Take your time.

21   Look up at me when you're done.

22   A.  OK.

23   Q.  Do you recognize those?

24   A.  I sure do.

25   Q.  And what do you recognize those to be?

1    A.  They're forms that I created to work with.

2    Q.  And you just mentioned what was B1?

3    A.  B1 was the intake form.  This is -- I developed this at the

4    Railroad Retirement Board.  So I just adapted it to myself

5    because I thought it was good then; I thought it was good now.

6    It gets all the information we need to talk to a client.

7              MR. JACKSON:  Now, Mr. Weddle, these are in evidence;

8    is that correct?

9    Q.  If I could just show you this document that you just

10   referenced, which is B1, could you just briefly take us through

11   that, please?

12   A.  Again, this was created for my office as a manager.  So I

13   would instruct the contact to date, dated the day the call came

14   in, and then get the name, address, and phone number, social

15   security number, employee's date of birth, spouse's date of

16   birth -- you see all that -- the maiden name.

17   Q.  Yes.

18   A.  And then put the date they make an appointment for that

19   individual up at the top and the time of the appointment.

20   Q.  If you could just, and it appears as though most of this is

21   self-explanatory so we won't review it ad nauseam, but if I

22   could direct you to the final portion which is the nature of

23   the disability.  What is that?

24   A.  Well, that's exactly what I would ask them.  If you're

25   interested in filing a disability, tell me what the nature of

1    your disability is.  And they were usually orthopedic in

2    nature.

3    Q.  When you say orthopedic in nature, what do you mean,

4    please?

5    A.  Knees, backs, necks, all the -- from all the physical work

6    they did.

7    Q.  I'm sorry.  And at what point in the process did you review

8    this with them?

9    A.  This is the very first telephone call that we're having

10   together.

11   Q.  Was there a charge associated with this call?

12   A.  None at all, and sometimes it took an hour to get this out

13   of people.

14   Q.  And when you say an hour, just take us through --

15   A.  Well, you know, you see this part about previous spouse?

16   Q.  Yes.

17   A.  Railroads have a lot of those.  And they might have a

18   couple of them and they're all entitled to benefits under the

19   Railroad Retirement Act if you're married for ten years.  So if

20   you do one wife for ten and another wife for ten, they're all

21   entitled, just like social security, and all that has to be

22   included in an application process.

23   Q.  Now, if I may ask you, if we could move off of this exhibit

24   and if I could just look the government previously -- we're

25   going to see a little more of this a little later, Ms. Baran,

D7ULLES1                        Baran - direct

1    but for right now, this is Government Exhibit 530, that's

2    Government Exhibit 530.  And what is this?

3    A.  Well, when I was the manager of the railroad retirement

4    office, I entertained all these people coming in to the office

5    to assist others.  There's all these other consultants, and

6    they were all labor officials or they were lawyers.  They

7    automatically have the right to talk to us about their clients

8    because they were labor officials.  Remember, I said the

9    Railroad Retirement Board is all about labor.  So any time they

10   came into the office, even when they were retired they had the

11   right to speak about their membership.

12           I, on the other hand, as a retired former federal

13   employee had no right to speak to my office about my clients.

14   So I spoke to the new manager and I said how are we going to

15   handle this?  She said why don't you just get your clients to

16   sign something giving you authorization, fax it over to me and

17   it will be in the file.  She cleared that with headquarters.

18   Q.  Who is she?

19   A.  It wasn't done just between the two of us.

20           MR. WEDDLE:  Objection to the hearsay, your Honor.

21           THE COURT:  Sustained.

22   Q.  Without telling us what if anything was said, who are you

23   referring to?

24   A.  Kathy Quinn, who is the manager of the office.

25           MR. WEDDLE:  Objection.  There's no basis other than

D7ULLES1                    Baran - direct

1    hearsay for this testimony.

2              THE COURT:  Sustained.  Rephrase the question.

3    Q.  You're referencing the authorization; is that correct?

4    A.  I am, yes.

5    Q.  Were you permitted to speak to RRB officials once you left

6    regarding business for business purposes?

7    A.  No.

8    Q.  And with respect to any conversation that you had on behalf

9    of an annuitant, what if anything was required for them to

10   speak with you?

11   A.  Authorization.

12   Q.  Do you recollect who took your job after you left the RRB?

13   A.  Kathleen Quinn.

14   Q.  And with respect to having authorization to speak to Kathy

15   Quinn or any of her representatives concerning any of your

16   clients, what if anything did you need?

17   A.  I needed a signed authorization from my client.

18   Q.  And was that the purpose for which you got one?

19   A.  Yes.

20   Q.  Now, the government had previously, and we'll just do this

21   now since we're there.  If you and the Court would just bear

22   with me, I want to go through the process, your intake process,

23   but I want to take a slight diversion to talk about these

24   authorizations, OK.

25             OK.  Now, the government had previously introduced

D7ULLES1                        Baran - direct

1    Exhibit 1818; do you see that?

2    A.  I do.

3    Q.  And in 1818, it was a list of I believe 86 -- and I don't

4    want to misstate the record, I believe that was what was said

5    in the record, but the jury of course will be guided by what

6    the actual information is.  My understanding is there are 86

7    authorizations.

8              And I just want to, without thumbing through all 86 --

9              MR. WEDDLE:  Just for the record, it's not 1818.  It's

10   18-B.

11             MR. JACKSON:  18-B.

12             MR. WEDDLE:  18-B.

13             MR. JACKSON:  Yes.

14   Q.  And do you recognize these?

15   A.  I do.  That's all my handwriting.

16   Q.  And do you recognize these people, again, without going

17   through all 86, do you recognize these as your clients?

18   A.  I do.

19   Q.  And would it be fair to say for the sake of time that the

20   reasons that you got these authorizations were for the purposes

21   that we just discussed?

22   A.  Exactly.  I might address an issue that was brought up

23   earlier, that the date on my authorizations was months before

24   the application.

25   Q.  OK.  Now, I'm going to address that with you right now.

D7ULLES1                          Baran - direct

1   Hold that.  And I'm going to address that with regard to a

2   specific application, two specific applications in fact.

3           I want you to take a look at 14-A, which would be Anne

4   Puma.  Do you see Anne Puma?

5   A.  I do.

6   Q.  Was that a client of yours?

7   A.  She was.

8   Q.  And the date there is April 29 of '08; do you see that?

9   A.  Correct.

10  Q.  Now, in the application itself, it references the day you

11  can no longer work as July 29, 2008; do you see that?

12  A.  I do.

13  Q.  Can you address the purpose for acquiring an authorization

14  for an occupational disability in April, however, an

15  application reflecting a date into the future?

16  A.  The application is the final thing I do with my client.  I

17  do far more than that much earlier.  We start our conversation

18  in April and we work together for several months before the

19  application is the last thing we do after they're finally

20  retired and ready to go to railroad retirement.  So I need that

21  authorization to be able to contact railroad retirement,

22  perhaps for some numbers off the system to how much their

23  benefit is going to be.  I can usually get it from a few places

24  that they have it, but there's different sources and the best

25  source is always the Railroad Retirement Board.  So I'll

1   usually go to them for an estimate or perhaps something they've

2   done they might have a question as to how many months of

3   service they have.

4            Months of service, everything is done in months, not

5   years.  And months of service is a very big issue.  If they

6   don't have that 360 service months to make it 30 years, they

7   have 359, that's no good.  They have to get another one on to

8   make sure they have 30 years.  So I had lots of reasons to

9   contact the office prior to doing the application.

10  Q.  And I want to clarify that.  When people originally

11  contacted you -- and I'm sure everything is individual and you

12  can correct me, please -- are they initially inquiring as to an

13  occupational disability, are they asking for retirement advice,

14  what are the nature of the reasons as to why clients would

15  contact you?

16  A.  It was a 50/50.  Some would contact me originally just to

17  talk about retirement and benefits and to find out what they're

18  actually entitled to.  Others would call immediately and say I

19  want some guidance but I'm also filing for an occupational

20  disability.

21  Q.  And just along those lines, and, again, not at all to jump

22  back or be disjointed, but when you were in the RRB, your job

23  was not just for clarification occupational disability, was it?

24  A.  No.

25  Q.  There were a host of other responsibilities.  What if any

D7ULLES1                        Baran - direct

1   other things did you do at the RRB besides just occupational

2   disability?

3   A.   Retirement benefits, survivor benefits, surviving adult

4   disabled children -- there's a list as long as your arm --

5   unemployment, sickness.  It's quite comprehensive.

6   Q.   And with respect to the comprehensive nature of the

7   services that you provided for the government at the RRB, did

8   you provide those comprehensive services as a consultant as

9   well?

10  A.   I used the knowledge I had from there.  If someone came to

11  me to do an occupational disability and in the course of

12  conversation they told me they had an adult disabled child, I

13  could tell them that they had rights and benefits upon their

14  death for that child, things they didn't know.  Some people

15  were carrying huge life insurance policies to protect an adult

16  disabled child when not knowing that they would have income for

17  that child upon their death from the Railroad Retirement Board.

18  Just like social security.  That's the same as social security.

19  Q.   Ms. Baran, if you bear with me, just one other question

20  regarding your authorizations and this issue before getting

21  back to your intake process as a consultant.

22            If I could just show you 14-B, Government

23  Exhibit 14-B, what is that?

24  A.   It's an authorization form.

25  Q.   And that is from?

1   A.   Bruce Albano.

2   Q.   Now, the date there is June 12 of '08; is that correct?

3   A.   It is.

4   Q.   However, the application itself, it looks like the date

5   here is July 30 of 2008?

6   A.   Mm-hmm.

7   Q.   Can you address that, please?

8   A.   He came to me in June and we didn't do an application until

9   July.

10  Q.   Now, with regard to an occupational disability and when you

11  become eligible to apply for one, when is that?

12  A.   You cannot apply for a disability until you are no longer

13  working.  So it has to be the day after your retirement.

14  Q.   Ms. Baran, that concludes my questions regarding the

15  authorization forms.

16          I would now like to move back into as part of the

17  intake process, along with the authorization forms, were there

18  other items as well that you asked for or requested in doing an

19  intake?

20  A.   OK.

21  Q.   I would like to show you what I just showed you, but I'd

22  like to show it to you on the screen, OK.

23  A.   OK.

24  Q.   I'm going to show you B1A.  What is that?

25  A.   Immediately following that telephone conversation where I

D7ULLES1                    Baran - direct

1    did the intake of information, I would establish in that

2    conversation, I would have made an appointment with the

3    individual to come and see me, preferably with their spouse,

4    and I would send them this letter telling them when the

5    appointment was and all the things I'd like for them to bring

6    with them so that I could properly help them.

7    Q.  Ms. Baran, I know it's a compound question, but just for

8    the sake of time, this indicates July 29 of 2010; do you see

9    that?

10   A.  I do.

11   Q.  Is that demonstrative, in other words, did you put the

12   date, is that date the date that everyone came to see you?

13   A.  Of course not.

14   Q.  So this is just an example of what you would do?

15   A.  Exactly.

16   Q.  OK.  And you also, just to clarify, asked someone about,

17   you would ask them about their spouse.

18            What's the relevance of having information about who

19   their spouse is?

20   A.  Well, I wasn't just doing disabilities.  I was guiding them

21   through their entire retirement process and their wife is a big

22   part of that process.  She's eligible for benefits.  He or she

23   is eligible for benefits based on their work at the railroad as

24   well.  So they need to know about all of that if they're going

25   to make the proper decisions in when to retire, how much

1  insurance to have.  It's a very in-depth process.

2  Q.  And if I could just ask you, among the many things that it

3  lists there it says $200 cash or bank check.  It says bring

4  $200 cash or bank check.

5       What if any reason did you require people who

6  consulted with you to bring either cash or bank check?

7  A.  Well, I have two personal checks.  I still have them.  They

8  bounced.

9  Q.  OK.  Is that the reason that you require that?

10 A.  They could come spend two hours with me, pick my brain,

11 have all the information they need, give me a check, and if

12 it's no good I have no recourse.  I can't go after them.  I'm

13 not a corporation.

14 Q.  Now, this says $200.  But my understanding is that you were

15 charging more than this; is that right?

16 A.  $200 was just for retirement counseling.

17 Q.  Now, could you please explain to the jury the distinction

18 between $200 and any other money that you charged?

19 A.  This is what I really wanted to do.  I wanted to get people

20 through the retirement process successfully without making any

21 mistakes, without costing themselves a whole lot of money for

22 being ignorant.  This is what I wanted to do.  But in the

23 interim, they wanted me also to do the disabilities.  But this

24 is where -- this is the love of my life.  I enjoyed explaining

25 the retirement system to them.  So I did it for $200 and there

D7ULLES1                    Baran - direct

1   was probably -- I even did some over the phone and those checks

2   didn't bounce.

3   Q.  Did or did not?

4   A.  Did not.  They would send me a check and say, you know, I

5   said when it clears, we'll make an appointment to talk on the

6   phone.  But I did this for about an hour and a half to two

7   hours with them and their spouse.  And if they didn't want to

8   go any further, that's all I charged them.

9   Q.  Now, there was, in the event they did want to go further,

10  what did you charge them then?

11  A.  The same price everybody else was, which was $1,200 at the

12  time.

13  Q.  Was that in addition to the 200?

14  A.  Yes.

15  Q.  Or another --

16  A.  Because there was a lot of additional work.  It was a

17  separate thing.

18  Q.  Now, with regard to that money, was that the same protocol

19  as far as cash, bank check?  Explain how that would work.

20  A.  Yeah, I did not accept personal checks.

21  Q.  And again --

22  A.  Anymore.

23  Q.  I'm sorry?

24  A.  I did not anymore.

25  Q.  Now, with regard to, again, the basis in reason for you

D7ULLES1                        Baran - direct

1   asking for cash or a bank check as opposed to a personal check,

2   and we're referring to the $1,200 fee now, what was the reason

3   for that?

4   A.  I didn't have --

5          THE COURT:  Asked and answered.

6   Q.  Was that reason consistent with this?

7   A.  Yes.

8   Q.  Just to get to the point.

9   A.  Yes.

10  Q.  Moving off of this, if I could just show you, which I

11  already did show you, but I'd like to show you on the screen

12  here B1B.  What is this?

13  A.  This is the two-hour conversation.

14  Q.  Tell us about the two-hour conversation, but not in two

15  hours.

16  A.  I will not bore you to death, but I explained to them on

17  the right side under No. 1 that they had a Long Island Railroad

18  pension.  It was state funded, it was a private pension.  And

19  in big capital letters it had no cost of living adjustment.

20  Big issue.

21  Q.  Was that what the COLA stands for?

22  A.  Cost of living adjustments.  And because it has no cost of

23  living adjustments, you're losing approximately 2.5 percent

24  earn -- spending power on it every year.  People have to be

25  aware of that when they're retiring or they're going to make

D7ULLES1                       Baran - direct

1   financial mistakes.

2           You pay only federal tax on it because it's a state

3   pension.  You don't pay state tax.  People think that's a big

4   deal, but it isn't because one of the things you deduct on your

5   federal taxes is the state taxes you pay.  So it comes back to

6   you.  Again, I kept telling them that there was no state tax.

7   They paid only federal tax.

8           And then I would tell them when it was effective and

9   then when it would be paid to them.  It was retroactive, but it

10  took three months for the railroad to pay a first check.  And

11  their first question would always be oh, my God, how do I

12  survive for three months.  And I would explain that.  It's a

13  long explanation.  You don't need to have it, I'm sure.

14  Q.  And, Ms. Baran, just cutting to the chase regarding what we

15  see here in this exhibit, did you explain -- you explained what

16  you just stated as to the left side, the Long Island Railroad.

17  A.  And then I explained the right side.  That's railroad

18  retirement.

19  Q.  And you explained not only the railroad retirement and

20  everything listed, but I see it indicates monthly, it has tier

21  one, tier two?

22  A.  Railroad retirement has two different taxes.  Mostly you

23  worked under social security and you paid something called FICA

24  tax.  It was 7.65 percent of your salary every week.  Well,

25  railroaders pay that exact same tax but they call it tier one.

D7ULLES1                        Baran - direct

 1    They also pay an additional tax, a tier two tax, which was

 2    4.9 percent up until recently.  I believe it's gone down to

 3    three point something.  I'm out of the game so I don't know

 4    exactly anymore.

 5             But so the tier one gets a cost of living, just like

 6    social security does.  The tier two only gets one third of the

 7    cost of living, an average of about .9 percent a year.  Again,

 8    they have to know this.  Half of their income gets no cost of

 9    living; the other half has a portion of it that also doesn't

10    get a full cost of living.

11    Q.  And, again, just cutting to the chase, it indicates a total

12    there.  Would you total that for the employee?

13    A.  I would.

14    Q.  And in regard to the left side where it say says monthly

15    and it has a dollar sign there --

16    A.  Depending on what their estimate was, I would put that in

17    there and I would give them a picture of what their income was

18    going to be.

19    Q.  And just moving on, do you see where it says combined

20    income, without going exactly through what you did, would you

21    make those calculations?

22    A.  Exactly.  That's what I would do.

23             (Continued on next page)

24

25

D7unles2                          Baran - direct

1   Q.  There is a second page of this document, too.  Could you

2   just briefly explain, without going through the entirety of it,

3   the nature and purpose of page 2.

4   A.  OK.  This is really ugly.

5           Forgive me for boring you.

6           I would take that tier 1 and tier 2 and I would

7   calculate, no overtime.  It goes up annually with the cost of

8   living adjustment.  By the time they are age 65 I would give

9   them the amount -- let's say a $2500 Railroad Retirement

10  benefit to go up to as much as $3600 by the time they are 65,

11  maybe more.

12          Half of that at the age of 65.  Half of that, let's

13  say half of 36 is 1800, half of that comes off their private

14  pension when they are 65.  So that pension takes a crashing

15  dive at 65 years old.

16  Q.  Just moving on, as we see here, it says leaving you a Long

17  Island pension.  Would you calculate what the pension was?

18  A.  Yes.  That is if you don't take a survivor option.  If you

19  take a survivor option, forgive me again for boring you, there

20  is a 30 percent reduction in your pension at age 65, if you

21  take a survivor option.  This survivor option was written into

22  the pension by very well-meaning union officials.  They were

23  not actuarials.  They didn't know what they were doing when

24  they did this back in 1974 I think it was.  So it is not a very

25  good survivor option.

D7unles2                        Baran - direct

1           As a matter of fact, it is more like a stickup without

2      a gun.  So I try and guide my clients, if they are healthy

3      enough to take survivor -- forgive me -- term life insurance,

4      which is far less expensive, and not take the survivor option

5      because they are going to get beat up enough with just the

6      Railroad Retirement offset.  If they take this survivor offset

7      as well, they actually wind up not leaving their survivor very

8      much money.  It would be minimal.

9      Q.  As far as the recommendations there go, these are just

10     recommendations that you included?

11     A.  I got this from my own financial adviser, and I thought it

12     was such a good idea, I did it.  I thought I could pass it on

13     to my clients.

14          If you could work yourself, your system together that

15     you get your pension paid off by the time -- your mortgage paid

16     off by the time you are 65, then when that Long Island pension

17     comes crashing down, you won't feel it so much.

18          I actually made them go to their mortgage companies

19     and find out how much extra they could pay every month just to

20     make sure that mortgage was paid.  A lot of people have

21     remortgaged their homes.  And they still have mortgages by the

22     time they are 65.

23          So, saving to offset the cost of living, saving is

24     never a bad idea.  Insurance instead of survivor option has

25     always been my claim to fame.  Of course, they have a 401 or a

D7unles2                          Baran - direct

```
 1    457 at the railroad.  I told them, you know, that railroad 401
 2    is being taken care of by somebody who doesn't have your best
 3    interests at heart.  Understand you are eligible to roll it
 4    over when you retire.  You should do so and give it to a
 5    financial adviser or somebody who has your best interest at
 6    heart.
 7    Q.  Ms. Baran, before moving on or off of the intake process
 8    that you followed I just want to show you briefly two other
 9    forms.
10         That would be B1C.  What is this, please.
11    A.  After I have had their --
12    Q.  I'm sorry.  Excuse me.  I'm sorry.
13    A.  Sure.
14    Q.  My assistant points out that I missed a page.
15    A.  Oh, we missed a page.  OK.
16    Q.  Without going over anything, really anything related to
17    this page, you see where it says spousal and survivor benefits?
18    A.  Since I am telling them not to take a survivor option at
19    the Long Island Rail Road, I do give them the good news that
20    they do have a free -- they paid taxes for it all their life --
21    survivor benefits for their spouse and Railroad Retirement and
22    I tell them how much it is and I also give them an estimate of
23    what their spouse's will be at 60 or 62.
24    Q.  That is the purpose of this portion of the form?
25    A.  That's the purpose, yeah.
```

D7unles2                         Baran - direct

1    Q.   This is pretty much self-explanatory, the benefit that's

2    listed.

3    A.   Yes.  Everything I just said to them is in that.

4    Q.   OK.   Thank you.

5         Now, Ms. Baran, I would just like to show you briefly

6    B1C.  "For your disability appointment date please bring with

7    you" --

8    A.   After we spend two hours together and their heads are

9    spinning, they say to me I want to retire next year on a

10   disability.  I say, OK, then let's make an appointment to do

11   that.  And that's what I do.

12        Sometimes I make these appointments five, six months

13   in advance because they know when they want to retire and they

14   know when they are going to want to come and see me.  So they

15   have an opportunity to take this time now to gather together,

16   they might have to go looking for a marriage certificate or

17   birth certificates, and they need to have medical reports from

18   their doctors.  This will give them time to realize that they

19   have to go out and ask their doctors for them.

20   Q.   Again, I don't want to regurgitate, so I won't.  We are

21   leaving this form now.  At the end it says cash or bank check,

22   $1200.

23   A.   Right.

24   Q.   That is what you talked about, right?

25   A.   Yes.

D7unles2                        Baran - direct

Q.  I want to show you the final form, B1D.  What is this?

A.  Well, that's the statement that they should be getting at

the Railroad Retirement Board when they file this application.

But because I know this, I choose to tell them to them myself.

        The normal processing time for an application is three

to five months.  They will most likely be required to go to a

Railroad Retirement doctor.  Within six to eight weeks after

you see that doctor, you usually get a determination.  On a

disability you may do some work, but it must be of a

nonphysical nature and your earnings must be under $770 for the

month or you must return the disability payment for that month.

Q.  Again, without going through the entirety of the form, this

is information that you provided to clients to enhance their

awareness as to the process, is that correct?

A.  Yes.  I also tell them that they are going to be reviewed

for a disability freeze.  I remember Mr. Coleman mentioning

that the other day.

        He said within six to eighteen months, depending how

busy they are in Chicago, the file is going to go to the post

section, and they are going to make a determination as to

whether if you have been initially approved on the

occupational, whether or not you are eligible for the permanent

disability, which is called a disability freeze.

Q.  OK.  The occupational disability and the disability freeze

are different things?

D7unles2                        Baran - direct

1    A.  They are, absolutely.

2    Q.  Again, just for the sake of moving on, occupational

3    disability relates to not being able to do your job?

4    A.  Not being able to do a portion of your job.

5    Q.  Activities associated with your job?

6    A.  Yes.

7    Q.  And the permanent disability as we discussed a number of

8    times, the national economy, not being able to do jobs?

9    A.  Yes.

10   Q.  That is what you are referencing there?

11   A.  Exactly.

12   Q.  Moving off of that, I want to get down to the application

13   process itself, and I want to show you what you have seen

14   numerous times, question 39, question 40, Section 6.

15          Before I do, on any of your intake forms, did you

16   condition your payment upon approval of their disability?

17   A.  No.

18   Q.  With respect to conversations that you had with the

19   potential annuitants or applicants, at any time did you

20   represent that they would get money returned to them if they

21   didn't get their disability or --

22   A.  No.  I actually say the opposite.

23   Q.  -- you would go looking for more money from them?

24   A.  No.

25   Q.  What was the understanding concerning your job and the

D7unles2                        Baran - direct

1    extent to which you would be compensated for it?

2    A.  I tell them that I would follow them through the entire

3    process, that if any questions came up at all they were free to

4    call me.

5            And I have to say that most of my moony was earned on

6    the phone.  I got multiple, multiple, multiple calls from all

7    of my clients.  Even when I was down in Florida for the winter

8    they tortured me day and night, but that was my job and I was

9    happy to do it.

10           They needed clarification on every item because

11   Railroad Retirement is confusing.  There were sickness benefits

12   they were entitled to.  There was a five-month waiting period

13   before anyone gets paid a nickel for disability.

14           That's the same under Social Security.  Under Social

15   Security law, however, people pay into New York state

16   insurance, and they can get short-term New York State

17   disability while they are waiting in that five-month waiting

18   period.

19           Railroaders don't pay into New York State, so they can

20   get Railroad Retirement sickness benefits during that

21   five-month waiting period.

22           Getting the benefit application processed and all that

23   were multiple -- I told them I would take care of them through

24   the entire time that they were going through the process, they

25   could call me day and night, and that once their disability was

D7unles2                        Baran - direct

1    approved my job was done.

2    Q.  I want to talk a bit about, as far as -- I want to talk a

3    bit about the doctors momentarily, but with respect to any

4    relationship with any doctor -- again, I will cover this in a

5    minute -- but just in terms of your fee structures, did any

6    doctors give you additional money?  Did anybody from the RRB

7    give you any additional money?  Beyond the money you earned

8    that you just clarified that came with this process, did you

9    earn anything over and above this for writing an application?

10   A.  Absolutely not.

11   Q.  Now, if I could just ask you, I want to go into the process

12   of the application.  We've seen a lot of these applications on

13   the screen.

14          If I can just ask you, I want to start with question

15   40.  Just to be clear, you did the application why don't we

16   start with Mr. Dunaj.

17          MR. JACKSON:  The government, we are going to be

18   looking at Exhibit 114-A, B, C, D, F, G, or portions thereof,

19   Judge.  Just portions thereof.

20   Q.  This is Mr. Dunaj.  If I could just, as far as up top, if I

21   can -- this person up top, who is that?

22   A.  Roderick Summers.

23   Q.  Is that a person who worked for you?

24   A.  Yes, he is.

25   Q.  Without going over it, because I think we did this with

D7unles2                    Baran - direct

1    yours, the person on the right would be the one who goes over

2    that application?

3    A.  Yes.

4    Q.  Fast forward it.  I want to go to question 40.  We'll go

5    back to the other hard/easy thing that we've seen multiple

6    times, but I want to start with question 40.

7         Question 40, we talked a little bit about this

8    yesterday.  Do you remember that?

9    A.  We did.

10   Q.  I showed you what is in evidence as B-4.  Correct?

11   A.  Yes.

12   Q.  B4 -- I'm sorry to jump around, Ms. Baran.  I just want to

13   focus you on something, OK?

14   A.  Whatever makes you happy.

15   Q.  The B4 that we had into evidence, that is in evidence?

16   A.  Activities --

17   Q.  OK.  This document, again, to the left, just to summarize,

18   the top says identifying information.  Do you see that?

19   A.  Yes.

20   Q.  It goes down to daily routine.  Do you see that?

21   A.  Yes.  Look at the first sentence of that form.  "The

22   information contained in this worksheet is to be used when

23   developing activities of daily living."

24        That is what we did.  We summarized the information

25   from this form and used it in that block of activities of daily

D7unles2                    Baran - direct

1   living on the application.

2   Q.   This says sleeping.  Do you see "Sleeping and Rest"?

3   A.   Right.

4   Q.   "Personal Hygiene"?

5   A.   Right, that they shower regularly.

6   Q.   Yes.  The next page, "Eating and Meal Preparation"?

7   A.   Exactly.

8   Q.   Do you see that?  Housework and hobbies?

9   A.   Yes.

10  Q.   Without reading the stuff to the right --

11          MR. JACKSON:  Keep it going, please.

12  Q.   "Shopping."  "Transportation."

13  A.   Yes.

14  Q.   "Finance." "Socialization and Entertainment"?

15  A.   Yes.  If you were developing an application because you

16  felt it was a mental disorder, you would fill this out with

17  them in great detail.  This could take an hour or two to do it.

18  Q.   Employment and work routine.

19  A.   Right.

20  Q.   And then additional information?

21  A.   Yes.

22  Q.   Did there come a time, based on your training and

23  experience in that form, that you developed certain language in

24  your application?

25  A.   Exactly.  What I did, I put my key words in there and I

1    just spoke to my clients.  Like I said yesterday, nobody

2    sleeps.  I sleep very poorly because of lower back pain.  I

3    would have this prefilled on most of my applications just to

4    save time because that is who I am.

5            And I get up at 7 o'clock.  I change that if somebody

6    says, I don't get up -- I get up at 3 in the morning and I walk

7    around all night.  It is just the average person.

8            I did this with your -- with Yeni when we -- we were

9    joking one day and she said all the same exact answers.

10           And if I asked any one of you and you didn't know what

11   we were doing, you would give me all the same answer.  Just a

12   natural reaction.  I get up early, I take a shower, I get

13   dressed.  If you're normal, that's what you do.

14   Q.  Without getting into that, just the whole issue of the

15   prompts that you said you developed, and I don't at all want to

16   puts words in your mouth, but when you say you develop prompts,

17   if you could just explain.

18   A.  From that form, from the activities of daily living

19   questionnaire --

20   Q.  Yes.

21   A.  -- I put words in here to prompt me to make sure I ask

22   these things.  I have been doing this for 40 years.  After a

23   while you start to forget stuff or you think you did it for

24   this application because you did it for the last one.  But I

25   make sure I have the words in there about sleeping, showering,

1   physical activity, housework, visiting with friends.

2            And then as people talk to me, I will change it or not

3   change it, depending on how the conversation goes.  Again, once

4   I realize someone is capable, this isn't a big issue.  If

5   someone wasn't capable, then it would like a much larger

6   development.

7   Q.  As far as that is concerned, is this used for purposes of

8   approving the occupational disability or some other purpose?

9   A.  Only if it's a psychiatric disability.

10  Q.  So, question 40, to be clear, has what, if any, effect upon

11  the approval of an occupational disability?

12  A.  Very little relevance.

13  Q.  If I could just show you what you were just referring to,

14  the government has shown you -- we'll get back to Dunaj.  I

15  apologize.

16  A.  It's OK.

17  Q.  Government Exhibit 17.  Do you recall going through this

18  exhibit that's Government Exhibit 17, and there were at the top

19  a normal day for disability applications for Baran clients.  Do

20  you see that?

21  A.  Yes.

22  Q.  We see responses here, and I want to look at some of these

23  responses.

24            It says Pulsonetti, June 23, 2008.  They appear to be

25  virtually identical.

1            Could you explain that?

2   A.   They both had neck and back issues which kept them up.

3   They both got up at 7 o'clock and had breakfast showered and

4   got dressed.  That's the way people answer these questions.

5   Everybody gets with these kinds of injuries.  Everybody gets

6   told by their doctors to either go for physical therapy or to

7   stretch in the morning.

8   Q.   Again, I don't mean to suggest that they are identical.

9   A.   Mr. Pulsonetti didn't do any housework, but Mr. Stavola

10  did.  As they talked to me, I changed them as we go along.

11  Q.   I see one, for example, took a short nap, another might

12  have.  But just explain -- and again the government went

13  through this exhibit, and you can just pick at random any

14  particular two, because you have to read them in tandem to get

15  a sense of how they may be similar or the same?

16  A.   Well, Mr. Horbatuk has neck and lower back pain, but

17  Mr. Berry only has lower back pain.

18            One rests in the afternoon but the other one likes to

19  nap.  Some of them had lunch at home -- they both had lunch at

20  home.  Other people go out with friends for lunch.  It depends

21  on what they answer to me.

22  Q.   Is this stuff that you just decided to make up or

23  exaggerate to put in an application?

24  A.   It has very little relevance in most cases, and that's why

25  I kind of like put in just the keywords, so I would make sure I

D7unles2                         Baran - direct

1    get the information in there, because otherwise Chicago would

2    say, we argued this point every time.  When I say "we," forgive

3    me.  When I was the manager at Railroad Retirement, we argued

4    this point time and time again, that this was a waste of time

5    and energy, why wasn't it taken out of the application and so

6    on and so forth.  They felt that this was the only way we were

7    is going to ever pick up a psychiatric evaluation -- a

8    psychiatric issue in a client.  So they left it in there.

9    Q.  Now, the balance of Government Exhibit 17 the jury can read

10   at their leisure if they choose to.  I want to take you through

11   what we admitted as 17-D.

12           In showing you 17-D, these are, for example, responses

13   which seem to be --

14   A.  The other ones were --

15   Q.  -- somewhat different?

16   A.  The other ones before that were very similar.

17   Q.  Right.  These are --

18   A.  These are an example of how each of them had a little

19   change in them?

20   Q.  How did you note these changes.  For example, Kevin Platz,

21   Raymond Jehl, and I won't go through everything.  Again, it's

22   in evidence.  It can be seen whenever.  For example, one, neck

23   pain it talks about.  Do you see that?  Tingling arms.  That's

24   Platz.

25   A.  I do.

D7unles2                          Baran - direct

1   Q.  And the other one, jumping down to Jehl, it says lower

2   back, shoulder pain, right?

3   A.  Correct.

4   Q.  One gets up at 5 a.m. and one gets up at 7?

5   A.  One has his coffee first and then takes a shower.

6   Q.  OK.  So how is it that you know these distinctions as you

7   are going through the application with your clients?

8   A.  I ask them the keywords, and I take it from there.

9   Q.  Again, I don't want to belabor this point, Ms. Baran, but I

10  would like to make it, just looking an a couple of other

11  things.

12          THE COURT:  Mr. Jackson let's not belabor it.

13          MR. JACKSON:  I won't, Judge.

14          Just two other things.  Is that all right?

15          If not, I will stop.

16  Q.  67 and 68.

17  A.  Mr. Magerko had chest pains, stomach pains, and arm pains.

18  He wasn't doing well, the poor guy, and he didn't get up until

19  8.  If he felt strong enough, he got dressed, and I rest most

20  of the day, and in the afternoon I take a nap.  This is where I

21  might have picked up that there was depression involved.

22          I don't know whether I did or not, it might have a lot

23  to do with how the rest of the interview went.

24          When someone tells me -- I don't know what his

25  condition was, if he was a cancer patient, then I wouldn't have

2349

D7unles2                         Baran - direct

1   worried about it.  But if he wasn't a cancer patient, if he was

2   just telling me that he was staying in bed all day and resting,

3   I might have thought we might have had some depression here.

4            It looks like he might have had a cardiac issue.  I

5   don't know.  I don't remember the session.  But, depending on

6   the situation, if someone tells me they are not getting up and

7   they are laying around all day, I might say in my notes to

8   Railroad Retirement when I send it to them or I might even send

9   an e-mail and say you might want to develop ADL, which is what

10  we call the activities of daily living on Mr. Magerko.  He

11  might have some depression.

12  Q.  I am not showing you any more.

13  A.  OK.  I don't want to see any more.

14  Q.  But is this the process -- the final question as it relates

15  to 40 -- as you just explained to us and jury, is that the

16  process of how you used and developed the question 40

17  paperwork?

18  A.  Yes.

19  Q.  I want to now go back to Mr. Dunaj's application.  I want

20  to use question 39, if we could.  This we have spoken a lot

21  about already?

22  A.  We have ad nauseam.  Isn't that the expression?

23  Q.  OK.  As it relates to Mr. Dunaj's application, are these

24  items, was it your role or generally your practice to prefill

25  these also?

D7unles2                          Baran - direct

1   A.  Yes.

2   Q.  And when I say prefill, explain in your own words how you

3   handled --

4   A.  They are on my blank application.

5   Q.  What do you mean by that?

6   A.  I have a blank application in my computer that has the

7   prompts for No. 40.  And it has the Xs in No. 39 only because I

8   am working with a computer, where everything can be changed

9   that quickly.  OK.  You would never do this when we had to do

10  paper applications.

11          So I put that in there, and then as I -- you know, no

12  matter who came here and said what they wanted to say, after 40

13  years of doing this kind of stuff, I asked these questions to

14  every applicant, because you get so much information from an

15  applicant when you can get them to chat.

16          But most of them answer, again, as we said yesterday,

17  a very wide range between easy and I can't do it at all.  So

18  hard is really the only choice if someone has an orthopedic

19  issue.  He said -- I said, and he confirmed, that it is only

20  for long periods of time.  We are not trying to say here that

21  he couldn't sit.  We are saying he couldn't sit for long

22  periods of time.  Probably couldn't serve on a jury.

23          He can stand, but he can't stand in line for a long

24  period of time.  It hurts.  He gets pain.

25          And walking for extended periods, the same thing.  We

D7unles2                        Baran - direct

1   are not saying he -- they cannot do these things.  In Chicago

2   when they are making their decisions they know we are not

3   saying that they can't do them.  We are putting in an

4   explanation.  That's why they ask for it.

5   Q.  To what extent does this explanation come from you versus

6   the annuitant that you are seeing?

7   A.  I put in those words when I do prefills.  Sometimes I

8   change them around, you know, but the point is I discuss it

9   with them.  When I say is it hard for you to sit, he'll say to

10  me, if I sit for too long I get stiff, my leg hurts, my back

11  hurts.

12          So there's only so many ways you can say I can't do it

13  for long periods of time.  So I put it in and I confirm it.

14          Every contact rep in Railroad Retirement does similar

15  things like this.  There is only so many ways you can say

16  things.

17  Q.  I won't take you through all the applications, but I do

18  want to ask you about repetition.  And if there's one thing we

19  learned in this trial, it's about repetition.

20  A.  It's about repetition.

21  Q.  I'm more guilty than anyone.  As it relates to repetition

22  to what extent, if any, does repetition play a role in the

23  applications that you fill out?

24  A.  There is tremendous repetition.  I'm only working in one

25  industry.

D7unles2                          Baran - direct

1        Social Security was a whole different ballgame.  Your

2   first interview in the morning might be somebody retiring from

3   Wall Street, and your second interview might be somebody filing

4   for SSI.  There is no diversity here.  This is the Railroad

5   Retirement Board.  Everybody who I see is working on a

6   railroad, and 90 percent of them in very physical jobs.

7   Q.  Now, without going chapter and verse through Mr. Dunaj's

8   application or any of the other applications that I have, which

9   are in evidence for the jury to see at their convenience, to

10  what extent, if we matched what's listed in Section 6, would

11  this be consistent with the medical information that you were

12  provided?

13  A.  No.  That is exactly where we're coming from, if I've

14  already got the medical and I've already entered it on the

15  application.  So I've looked at it, I possibly read some of it.

16  If he starts telling me stuff that doesn't coincide with the

17  medical, I am going to question him a little bit.

18        As a representative of the Railroad Retirement Board,

19  I know they are going to look at this.  So if it is not in the

20  same game, then they are not going to -- they are not going

21  to -- they are going to question it again.  Once you get down

22  to Chicago, if it is not in the same place as the medical, they

23  are going to question it again.  So, of course, we are going do

24  make sure that the questions are in coordination with the

25  medical.

1    Q.  To what extent did you refer Mr. Dunaj or any of your

2    clients to any medical facility, any medical doctor, or any

3    medical treatment?

4    A.  The only thing I ever suggested to any of my clients was

5    that if they ever had treatment at the VA that they should go

6    and get it from the VA records.  Other than that, I never sent

7    them to a doctor.

8    Q.  Now, moving off of Mr. Dunaj --

9    A.  May I say, they usually all had their doctors before they

10   came to me.  They would tell me in my intake form who their

11   doctor was.

12   Q.  If I could just show you Government Exhibit 18, "Daily

13   Activities for Baran Applications."

14          Do you recognize this exhibit?

15   A.  Very well.

16   Q.  OK.  Again, without going ad nauseam through every one of

17   these, if I could just ask you, to what extent, in the event

18   that these 180 people that Ms. Marx went and looked in their

19   Railroad Retirement Board file and pulled this, culled this

20   diagram together, to what extent, if you looked at these 180

21   people, would the medical conditions, when you compared them

22   against the sitting, standing, walking, eating, bathing, would

23   they be consistent with what's here?

24   A.  A hundred percent.

25   Q.  Now, moving from that, I want to ask -- I am going to look

D7unles2                          Baran - direct

1  at just one of the other individuals that you completed the

2  application, and that was Ms. Regina Walsh.

3          Do you remember that?

4  A.  I do.

5          MR. JACKSON:  Government, we will be looking at

6  Government Exhibit 108, 108-A B, C, D, E, not all of them, just

7  limited portions and briefly of this application.

8  Q.  As it's being prepared, if I could just ask you, do you

9  remember Ms. Walsh?

10  A.  Very well.

11  Q.  And there was an indication that she came to you, and I

12  don't -- whatever her testimony was, it is in the record.  I

13  don't want to rephrase it.  Whatever it was, it was as it's

14  remembered by the jury.  I am sure they have the memory of what

15  it is.

16          But with respect to assisting her, coaching her,

17  telling her what to say, you know, conspiring with her to put

18  information in an application, could you address that, please.

19  A.  It just didn't happen that way.

20          Regina called me after her application had gone into

21  the Railroad Retirement Board and she said, They called me with

22  a question, but panicky.

23          I said, What are you panicking about?

24          They called me with a question.  I don't know what to

25  do.

D7unles2                        Baran - direct

1          Answer them.  I said, Answer them honestly.

2          She said, They want to know when I put my hands over

3    my head.

4          I said, So when did you put your hands over your head?

5          You know, since I had seen her, I saw 50 other people.

6          I said, So when did you have to put your hands over

7    your head?

8          She said, When I had to put my stuff on the train.

9          I said, So tell them that.

10         And she said, They are asking me when I was ever

11   affected by vibration.

12         OK.  When were you affected by vibration.

13         She said, On the train.

14         I said, So there is your answer.

15         She said she wrote them down.  She wrote them down

16   because she was the one who provided the answers.  I wouldn't

17   even be able to -- how would I know when she put her hands over

18   her head?

19         I knew how she was affected by vibration.  That was a

20   no-brainer.  We are all on trains.  I really wouldn't have

21   known whether she put her hands over her head.  It was her

22   answer, not mine.

23   Q.  That's the Railroad Retirement Board, which, since you

24   brought it up, why don't we get do that.  I'll go to that

25   exhibit now, which is 108-E.

D7unles2                        Baran - direct

1           Do you remember this?

2   A.  Yeah.

3   Q.  OK.

4   A.  That would actually be called, if I was working, that would

5   have been called a write-back.

6   Q.  What is a write-back?

7   A.  If those applications leave, if the applications leave the

8   office and they get to Chicago and the examiner in Chicago

9   finds we haven't given them all the information they need to

10  make a determination, they send us a write-back.  That actually

11  would affect the appraisal.  My reps would have gotten a mark

12  against them on their appraisal.

13          Actually, when I saw this I was actually indignant

14  that I had given them all that information and they just didn't

15  look for it, but perhaps I didn't.  And that would have been a

16  mistake on my part.

17          But that's just Chicago looking at those applications

18  with great detail and determining that the district office let

19  it go without getting all the information it needed

20  Q.  Did you send her any e-mails or write things on scrap

21  papers for her --

22  A.  No.

23  Q.  -- or tell her exactly how to answer questions --

24  A.  It was just a telephone --

25  Q.  -- how she should cheat the system.

D7unles2                          Baran - direct

1   A.   -- call from her to me and it went down just like I said.

2   I just told her, Tell her the truth.

3        I also got a phone call from Regina when I was in

4   Florida when she got her first letter saying they wanted to do

5   a continuing disability review.

6        I said, Well, I told you once you got a disability my

7   job was done.  I don't do anything with continuing disability

8   reviews, and my answer to you is answer it, answer it honestly,

9   and send it in.

10  Q.   With regard to this, that's listed here, and again we'll

11  move on from this momentarily, but whose words are all of these

12  about --

13  A.   It looks like it's Cathy Quinn.

14  Q.   OK.

15  A.   And it came from Levette Fargo in Chicago.

16  Q.   Is this an interview that's done with you or someone else?

17  A.   That was the conversation that Cathy had with Regina on the

18  phone.

19  Q.   Were you a party to the conversation on the phone?

20  A.   Not at all.

21  Q.   The last Section 6 that I will ask you about.

22  A.   Yeah, sure.

23  Q.   OK.  At least that's what I'll try to do.

24       Do you recall this Section 6 of Ms. Walsh's

25  application?

D7unles2                          Baran - direct

1    A.   This is Regina's Walsh's application.  I don't remember

2    the -- but you see I changed the explanations, because she gave

3    me her own words.  And I chose her words over mine.

4              Leg pains when sitting for more than 15 minutes --

5    which, you know, that out and out proves that I asked her these

6    questions, because I changed my words that I put in there and I

7    put her words in.

8              A lot of clients can't give me words.  You would be

9    amazed at how tongue tied you get when you get in an interview.

10   So what when she gave me the words I chose her words instead of

11   mine.

12   Q.   When you say words we are talking about --

13   A.   The explanation, the leg pains when standing more than five

14   minutes, can only walk short distances, those are her words,

15   because that is not what I put on my applications.

16   Q.   OK.  Thank you.  We will move on.

17             I want to address, if I can, there were e-mails that

18   the government pointed out.  And it looked to me -- and I don't

19   want to at all misrepresent -- at the top of that --

20   A.   Marie to Marie.

21   Q.   Yes.  Exactly.

22             This is a John Riddle.  I won't go through his entire

23   application with you.  But it looks like an e-mail from you to

24   you.  What is this?

25   A.   To be perfectly honest, I wasn't very good at having my own

D7unles2                        Baran - direct

 1    business.  I was just being a manager and having everybody do

 2    all the work the detail work for me.

 3              So when I first started working -- and this is the

 4    second year, the beginning of the second year I was working --

 5    I wasn't quite sure how to get to do work in the office where I

 6    was working in Rockville Centre and get it home on my computer.

 7              I should have thought of one of those little

 8    thumbnails they call them that you can -- but I didn't.  So

 9    what I was doing is I would sit in the office, and from an

10    intake form I might start doing an application.  It takes a lot

11    of time to do stuff.  You have to look stuff up.  So I was

12    doing some of the intake, putting some of the intake

13    information on the application, and then I would e-mail the

14    application to myself home.

15              When I got home, I could take it off of my e-mail and

16    then put it in my computer.  I finally figured out how to do it

17    with the thumbnails, and I didn't do that after a while.

18    Q.  You mean a USB?

19    A.  Yeah, whatever they call.

20    Q.  A USB that you put into the computer?

21    A.  A USB, right.

22    Q.  I believe the government -- and we don't have to show those

23    again with regard to Exhibit 500-C, which is a government

24    exhibit from Marie to Marie with an attachment in evidence --

25    Nevin Patel, with regard to that e-mail, would you just have

D7unles2                        Baran - direct

1   been sending something for you to work --

2   A.  Yes.  That's how I got it back to myself, so I could work

3   on it at home.

4   Q.  I believe there is an Exhibit 500-D.  Again, just for the

5   sake of time, that's to Marie from Marie.  It's a blank

6   disability form.  Would that be consistent with the reason --

7   A.  Yes, I was just sending it back to my computer.

8   Q.  OK.  Now, the government also showed an exhibit, and it

9   related to, you might recall -- I apologize, because there's

10  writing on mine.

11          MR. JACKSON:  I apologize to the Court.  It is an

12  exhibit.  In the exhibit is not the circle, that is my circle.

13  I'm sorry.

14  Q.  But it says, "Call Dr. Ajemian" and it gives a number, "Ask

15  for Marie, tell them you're retiring from the Long Island Rail

16  Road and working with Marie Baran.  Get the earliest possible

17  appointment."

18  A.  Am I correct this is Mr. Patel?

19  Q.  Yes, you are.

20  A.  OK.  The reason for the whole thing was Mr. Patel wanted to

21  retire yesterday.  He called me, he wanted to retire right

22  away.  I did the intake form and he said -- I says, Do you have

23  medical?

24          No.

25          What do you mean you don't have medical?  How are you

D7unles2                           Baran - direct

1   going -- how are you asking for disability if you don't have

2   medical?

3           I haven't gone to the doctor.  But I know I have lots

4   of problems.

5           So you got to see a doctor.

6           He said, Well, the guys at work tell me I should go

7   see Dr. Ajemian.

8           I said, So call him and tell him you are working with

9   me.

10          I knew his secretary from when I was a manager at

11  Railroad Retirement.  I had to call back and forth for things

12  at times.

13          I knew if you told him that you were working with me

14  they would give you the earliest possible appointment, because

15  I cannot do your application until after you have  been seen by

16  a doctor and had some relevant medical to support it.

17  Q.  Besides that single form that the government showed you,

18  besides Exhibit 502-B-1, where the government displayed to the

19  jury that you are saying, Call, ask for Marie, tell her about

20  me, was there anything else on your computer regarding you

21  referring to Dr. Ajemian, another doctor, another doctor's

22  doctor, besides that one exhibit we saw 86 authorization forms,

23  right, is there anything else that would reference on your

24  computer you making any referral to anyone?

25  A.  No, because I didn't.

D7unles2                         Baran - direct

1    Q.  Now, the government also showed you 507.  That was an

2    activity log.  They showed you an activity log 507.

3               MR. WEDDLE:  That's 507-A.

4    Q.  This is 507-A.  They also showed 507.

5               That is an activity log.  What is that?

6    A.  They just put this into effect before I retired.  Every

7    time you get a phone call at Railroad Retirement, you have to

8    go into this computer log and say what the call is, who it

9    referred to, who you spoke to, and it is a real pain in the

10   neck.

11              I was glad I was retiring.  This is like the biggest

12   burden that they have.  They have enough to do, and now they

13   have to keep this log as well.  All this says is that -- I

14   don't even see my name maim anywhere.  Oh, Ms. -- I don't -- I

15   still don't see my name.  Those people have to be my clients,

16   but my name wasn't even mentioned there.

17              But they were keeping track of every time that I

18   called the office.  They were required on do that.  That was

19   their job.  They were told that they had to keep track of this

20   kind of stuff.  Who was calling, if there was anybody calling

21   on their behalf.

22              Specifically, because unions, again, are such a big

23   part of the agency that they wanted to know what a union rep

24   was calling on behalf of somebody.  Here we go.  Telephone call

25   with consultant Marie.  And because they all me they didn't

D7unles2                          Baran - direct

1    bother with a last name.  Date of appointment was set.  I made

2    an appointment for my client and asked them how much the tier 1

3    and tier 2 was, a breakdown.  That is all.  I was probably

4    doing a first appointment and I needed to know that.

5    Q.  Again, the jury can look through this exhibit, which is in

6    evidence, at their leisure, but the purpose of this is just to

7    document the nature of or purpose of a person who's contacting

8    the RRB?

9    A.  Railroad Retirement requires their representatives to keep

10   a log of who calls and why they call.

11   Q.  And this would fairly and accurately depict the

12   conversation that you had with them?

13   A.  Yes.

14   Q.  And the reason that you were calling them?

15   A.  And they wouldn't have spoken to me if there wasn't a

16   signed authorization form on that.

17   Q.  On file?  OK.  We can move of off of this.  Regarding

18   Exhibit 507, which --

19   A.  That is just a printout of that whole log.

20   Q.  That talks about the nature of the calls and what you

21   called for.

22   A.  She put in the keyword Baran, that's why Rita Baran and

23   other Barans came up.  It is just a printout of that log

24   summarized.  I called there a lot.  It was my business.

25   Q.  Just in general, what was the reason for you contacting

D7unles2                          Baran - direct

1   them?

2   A.  Usually to make an appointment for their disability to be

3   reviewed and processed or to find out what the tier 1 and the

4   tier 2 was or to make sure they had the right number of service

5   months.  It could have been any number of reasons why I would

6   have called.

7   Q.  Eventually, I eliminated the authorization form because it

8   became a burden to me and it became a burden to them.  Every

9   time they got a call from me they had to look in the file.

10             So I did what Verizon does.  Tell them you give me,

11  give permission for them to talk to me.  I would give it to my

12  client.  I would say -- they would say, Tell Marie anything she

13  wants to know, and they would take the phone back and ask them

14  whatever it was.  Verizon does it to me.  Every time I call I

15  have to get my husband's permission to speak to them.

16  Q.  I'm sorry.  Just for clarity, you mean this is after you

17  stopped using the authorization?

18  A.  I stopped using the authorization form after about two

19  years because it was a burden to both of us.

20  Q.  What do you mean a burden?

21  A.  Well, they had to look in the file every time I called to

22  make sure there was one there.  It was a pain in the neck.  So,

23  instead, I just said, I'm here with Mr. Jones, hold on a

24  second, speak to Mr. Jones.  And Mr. Jones says, Please tell

25  Marie whatever she needs to know, just like Verizon does, and

D7unles2                          Baran - direct

1    they were fine with that and they would put it in the log --

2    Q.  OK.

3    A.  -- that the employee approved the conversation.

4    Q.  OK.  Now, Ms. Baran, I now want to move away from this and

5    I want to discuss another topic with you.

6            Did there come time when FBI agents came to your home?

7    A.  Yes, in 2008.

8    Q.  Without telling us what, if anything, was said by you, by

9    them, could you just tell us whether or not you invited them

10   into your home?

11   A.  I did.  I told them -- I knew I didn't have to, but I

12   invited them in.

13   Q.  And again --

14           MR. WEDDLE:  Objection, your Honor.  Counsel and I

15   have discussed this.  I think that he's not going to elicit

16   what Ms. Baran said.

17           MR. JACKSON:  Absolutely not.

18           Mr. Weddle is absolutely right.  We have discussed it.

19   Q.  Again, without having a discussion of that conversation,

20   what you said what they said, what anybody said, did you invite

21   them into your home?

22   A.  Yes.

23   Q.  Following that conversation with the members of the FBI,

24   did you contact your accountant?

25   A.  I did.

D7unles2                          Baran - direct

1    Q.  Tell us about that?

2    A.  Again, I wasn't very good at this business stuff, and I

3    didn't keep any records at all the first year.  I was very bad.

4    And so when I went to do my taxes, I just winged it.

5            Then all of a sudden the FBI was at my house.  I

6    called my accountant.  I said, you know what, we got to go

7    through my computer.  We got to go through whatever I can find,

8    and we got to make certain that everything is straight.  And I

9    refiled.  I amended my tax returns, paid all the taxes that

10   were due, and I am not being charged for tax evasion.

11   Q.  OK.  Now --

12           MR. WEDDLE:  Objection, your Honor.

13           THE COURT:  Sustained.

14   Q.  I want to take you through your taxes.  I want to start

15   with 2007, the amendment?

16   A.  OK.

17   Q.  After that we'll take you through your other taxes.  Right

18   now I want to start with this, may I?

19   A.  OK.

20   Q.  OK.  I'm going to show you what's in evidence as 503-A and

21   then I'm going to show you 503-B.

22           Let's take a look at 503-A.

23           Do you recognize this?

24   A.  It's my husband's and my tax return.

25   Q.  By husband you mean Ostap Baran, is that correct?

D7unles2                    Baran - direct

1    A.  Yes.

2    Q.  This is your 2007 tax return?

3    A.  It is.

4    Q.  This tax return did not have all the income derived from

5    your business, did it?

6    A.  Not the first one.

7    Q.  But it lists other income that you made, is that right?

8    A.  Yes.

9    Q.  If you can take a look at this.  That is a schedule C.  Do

10   you see that schedule C?

11   A.  Yes, I do.

12   Q.  Do you see the income derived, it said $14,000 and some

13   change, do you see that?

14   A.  Yes.

15   Q.  Now, following that conversation with your accountant which

16   followed the visit from the FBI, you then went and amended

17   that, correct?

18   A.  I did.

19   Q.  I want to show you the amended portion if I could.

20           Again, this is schedule 2007, 2007C.  It represents

21   income of 67,600.

22           Do you see that?

23   A.  Yes.

24   Q.  Could you explain to us how that happened and explain to us

25   what you did to resolve it?

D7unles2                     Baran - direct

A.   I really didn't keep any records.  I had to go looking for

them.  I had to go looking for the files.  I had to go into my

computer and look, and I also had a computer crash that year.

So some of my records are there, some of them weren't.

         But when I realized that I wasn't keeping records and

that I got a subpoena from the FBI and I had to come up with

everything, that's what made me sit down and come up with a

whole sheet of everything and write them all down and then I --

I have never expected the business to take off the way it did.

Nobody was more surprised than I was.  I wasn't really ready to

be that busy either, so I was surprised.  I didn't realize it

was happening, and I didn't do very much to keep track of it.

         But once I was approached by the FBI, I got really

nervous and said, Oh, my God.  I better take another look at

this, and found out I had all this income.

Q.   Before we go on to other income, before we go on to other

income as a byproduct of you underreporting your taxes, did you

receive any pension benefit as a result of that?

A.   I did.  There is a tiny little portion of my pension that

is called the FERS portion.  I think it's 279.

Q.   What does FERS stand for?

A.   I switched from the old pension system to the new pension

system.  That's a whole other story that you don't need to do.

When I did, I started earning FERS benefits, and FERS benefits

are the only part of my pension that is affected by income.

D7unles2                          Baran - direct

1            So when I reported $14,000, they started paying me a

2      portion of my FERS benefit that I shouldn't have gotten for six

3      months, so I immediately told them I had refiled my taxes.  I

4      changed my estimate and gave it back to them because I wasn't

5      entitled to it.

6      Q.  Gave them back what?

7      A.  $279 times six months.  I think it's about six -- I'm

8      terrible at math.

9      Q.  Did you communicate --

10     A.  About $1800.

11     Q.  Did you communicate with the people responsible for giving

12     you that benefit?

13     A.  Yes, absolutely.  It is called the Office of Personnel

14     Management.

15     Q.  How did you communicate with them?

16     A.  By e-mail, because you can't reach them by phone.

17     Q.  Did you communicate with them in 2008?

18     A.  Yes.

19            MR. JACKSON:  Judge, we are just corresponding exhibit

20     numbers just to make sure we are OK.

21     Q.  I'm going to show you what's --

22            MR. JACKSON:  I believe we are admitting this without

23     objection, Judge.

24            THE COURT:  Mr. Weddle.

25            What is the exhibit number?

D7unles2                          Baran - direct

1                   MR. JACKSON:  B2, Judge.

2                   THE COURT:  Mr. Weddle is B2 one of those?

3                   MR. WEDDLE:  I think that's not a repeated number.

4       Actually, you are right, your Honor, it was one -- B2 is a

5       number that was shown to Special Agent Cuocci.  The B2 that was

6       shown to Special Agent Cuocci has been remarked as B1A I

7       believe.

8                   MR. JACKSON:  Right.

9                   MR. WEDDLE:  So this is B2, which is a different

10      exhibit.

11                  THE COURT:  Admitted without objection.

12                  (Defendant's Exhibit B2 received in evidence)

13      Q.  Do you see this?

14      A.  Yes.

15      Q.  And what is that?

16      A.  It's communication between myself and somebody by the name

17      of Kimberly at the Office of Personnel Management, and I sent

18      her a note telling her to please note that my earnings for 2008

19      and I also stated 2009 would also be in excess, will be in

20      excess of $13,000, and will therefore require a refund of the

21      FERS portion of my annuity for 2008.  I would appreciate you

22      withholding the FERS portion of my 2009 payments effective

23      immediately to avoid additional overpayment.

24      Q.  With respect to any tax that is underreported, have those

25      been paid?

D7unles2                           Baran - direct

1   A.  Oh, absolutely immediately.

2   Q.  With regard to any benefit that you received from your

3   pension for underreporting, has that been paid back?

4   A.  Absolutely.

5   Q.  I want to go over your income of 2008.  Do you recognize

6   your 2008 tax return?

7   A.  I do.

8   Q.  OK.  And, again, we've spent a lot of time with your tax

9   returns.  The jury can see it at their leisure should they

10  choose to.  But did you get also business income on schedule C

11  from your retirement consulting business?

12  A.  I did.

13  Q.  Do you see that income?

14  A.  I do.

15  Q.  That would be consistent with the income that you earned?

16  A.  Yes.

17  Q.  OK.  Again, without going through all of this for every

18  year, because I have a question relative to all of these that I

19  could probably just summarize, but in 2009, do you see your

20  income for 2009?

21  A.  Yes.

22  Q.  It would be fair to say, if I turned to schedule C, this is

23  retirement income from your business there as well?

24  A.  Yes.

25  Q.  Do you see your retirement -- do you see your income there?

D7unles2                        Baran - direct

1   A.  Yes.

2   Q.  And the deductions, the expenses, etc.?

3   A.  Yes.

4   Q.  And there is also a 2010 tax return, a 2011 tax return.

5   All your tax returns, which again the jury could see at their

6   leisure, if you want to see them, I could show them to you

7   again?

8   A.  I know them well.

9   Q.  OK.  But the bottom line is, with regard to any income in

10  any of those years --

11  A.  Yes.

12  Q.  -- I know it is a cumulative question, but just for the

13  sake of moving on, is there any income on that tax return that

14  was not earned by you or your husband?

15  A.  It is earned just by me.

16  Q.  With regard to your husband's income, how was his income

17  derived?

18  A.  He has a pension from the Long Island Rail Road, and he has

19  Railroad Retirement benefits.  And he also, because he didn't

20  go to the railroad until he was 30 years, part of his benefit

21  is actually derived from Social Security.

22  Q.  So with regard to the income that your husband derives, you

23  said part of the income was from Social Security?

24  A.  Yes.

25  Q.  After working for how long in his life?

D7unles2                    Baran - direct

1   A.  He started working I believe at 16 and he retired at 58.

2   Q.  How long did he work for the railroad?

3   A.  25 years.

4   Q.  And are you entitled, if you know based upon your

5   experience not only as his spouse but your experience in

6   working for the Railroad Retirement Board, whether or not

7   someone would accumulate a pension in that amount of time?

8   A.  Absolutely.

9   Q.  Is there any tax as you sit there today, beyond the fact

10  that it's 2013 and we haven't gotten into next year's taxes

11  yet, are there any taxes that you owe that are outstanding to

12  the government at all?

13  A.  I make quarterly payments.  I still do that.  I started

14  doing it with the business and I still do it now.  And I'm

15  making some quarterly payments.  I do that now.

16  Q.  OK.  Now, we are almost done.  And in being almost done, if

17  I could just ask you a couple more questions.

18           I would like to ask you how it is that, you know, if

19  at all, Joseph Rutigliano?

20  A.  I know Joe from the start of my career at Railroad

21  Retirement.  He's always, to my knowledge, he's always been a

22  union official.  And we have had dealings over the years with,

23  he would come into the office to represent one of his members.

24  I've done retirement seminars to his union, and he would always

25  be there.  We would attend dinners, celebrations, retirement

D7unles2                          Baran - direct

1  parties, Christmas parties that were presented by different

2  unions, and we would all be invited, so we socialized to some

3  level.

4  Q.  When you say "we would attend," you are referring to you

5  and your husband where he would be present?

6  A.  My husband and I, Joseph and his wife, all the members of

7  the unions, all the different chairmans of the unions.  They

8  attended each other's retirement parties.  They attended each

9  other's Christmas parties.  It was very nice social events, and

10  I was frequently included in that.  More so because my husband

11  was a railroader and I just also happened to be in the industry

12  by way of being with Railroad Retirement.

13  Q.  Are you engaged in any clandestine, secretive -- or open

14  for that matter -- agreements with him that you and he would

15  defraud the system, beat the system, cheat the government,

16  anything of that sort?

17  A.  Absolutely not.  My intent as a consultant -- I'm sorry --

18  was to help people.  I had no relationship with anyone else.  I

19  did it honorably and independently of anybody else.  Sorry.

20  Excuse me.

21  Q.  With regard to Dr. Lesniewski, as he sits there, do you

22  have any relationship with Dr. Lesniewski?

23  A.  I only knew his name from my clients when they brought

24  medical in from his office.  Oddly enough, they spoke very

25  highly of him.  Other than that, I had no relationship with

D7unles2                          Baran - direct

1    him.  I have never seen, met the man.

2    Q.  Did there come a time where you undertook a review of the

3    information that the government presented of all your

4    applications in any particular year?

5    A.  I'm sorry.  I'm so focused on water I didn't hear your

6    question.

7    Q.  It's OK.

8    A.  Say that again, please.

9    Q.  Did there come a time that you undertook a review based on

10   information that you had and based on information that the

11   government provided in discovery of all the total clients you

12   had by year and what doctors these clients went to?

13   A.  I did.  I did that because they were saying that now, you

14   know, everybody was going to the same doctors and what have

15   you.  So I looked.  I really don't pay attention on a

16   case-by-case basis, so I made a whole list of them.

17   Q.  If I could just direct you, and correct me if I'm wrong or

18   if you need to see clarification or anything else, in 2007, did

19   you have 54 clients?

20   A.  Yes.

21   Q.  Did eight of those clients use Dr. Parisi?

22            MR. WEDDLE:  Your Honor, object to the leading.

23            THE COURT:  Sustained.

24            MR. JACKSON:  Again, it is just to speed things along.

25            MR. WEDDLE:  I have never seen this analysis.

D7unles2                    Baran - direct

1            THE COURT:  Sustained.

2    Q.  All right.  Did you conduct an analysis of the various

3    clients that were used by different doctors?

4    A.  I did.

5    Q.  Did you concern yourself with what, if any, clients went to

6    what, if any doctors?

7    A.  I concerned myself with what doctors, how many of my

8    clients went to Dr. Ajemian.  And I found that in the first two

9    years that about, I think, if my memory serves me --

10   Q.  If there's something that --

11   A.  That might help.  About 50 percent of them went to

12   Dr. Ajemian or something like that.  I can't remember exactly.

13   But from 2009 to 2011, if you looked at all of the years

14   inclusively, it was only about 30 percent of them went there.

15   Q.  That went to who?

16   A.  Dr. Ajemian.

17   Q.  And the remaining 70?

18   A.  Went to a lot of -- a lot of them -- others.  They were

19   just other people's doctors.  Some of them went to Dr. Parisi,

20   some of them went to Dr. Lesniewski.  Mostly they went to just

21   other doctors.

22   Q.  Let me ask you, I asked you about Mr. Rutigliano, I asked

23   you about Dr. Lesniewski, as it relates to Dr. Ajemian, tell

24   us, what, if any, relationship you had with him.

25   A.  The only relationship I had is that as a representative of

D7unles2                          Baran - direct

1    the Railroad Retirement Board during the course of the review

2    of the application, it would say on the application, it would

3    list MRIs that were done, MRI of the neck, MRI of the back or

4    the shoulder, and I had to make sure that they were in the

5    file.

6             And if I'd look and they weren't there, I would just

7    pick up the phone while my client was there, it would be the

8    annuitant in the Railroad Retirement office, and I would say,

9    you know, I'm calling on behalf your patient who is here with

10   me.  They will give you permission to please send, fax over the

11   MRI of the shoulder.  It is not in the medical report.  It

12   should have been in.  It's not there.

13            I spoke mostly to the doctor's secretary.  Her name

14   was Maria.  And she was a very busy lady and had a lot going on

15   in her office, so I would be very nice and chat with her and

16   talk to her to get her to do what I needed to get done.

17            She would always fax over the things that were left

18   out.  That's the only way I knew -- I had never met Dr. Ajemian

19   ever.  The first time I saw him was when we were all arrested.

20   Q.  The first time in your life that you ever saw him?

21   A.  That was the first time I had ever lied eyes on him was the

22   morning -- I only knew it was him by the process of

23   elimination.

24   Q.  With regard to any phone conversations or other contact

25   that you had with Ajemian, you said you never met him?

1    A.   I never spoke to him either.  I only spoke to his staff.

2    Dr. Parisi I knew.  May he rest in peace.  He died of a brain

3    tumor.  Dr. Parisi was my orthopedic surgeon.  One of the

4    reasons these doctors were being used is because there was,

5    everybody was coming by United Healthcare.

6              MR. WEDDLE:  Objection.

7              THE COURT:  Sustained.

8    Q.   Do you have information as to what was the purpose these

9    doctors were used?

10             MR. WEDDLE:  Objection.  Foundation.

11             THE COURT:  Sustained.

12             MR. JACKSON:  I will lay a foundation.

13   Q.   You works for how many years in the Railroad Retirement

14   Board?  18 you said?

15             THE COURT:  Mr. Jackson, this is asked and answered.

16             MR. JACKSON:  I am laying a foundation, Judge.

17             THE COURT:  For what?

18             MR. JACKSON:  For the question that was objected to

19   and sustained.

20             THE COURT:  The question of why people went to doctors

21   is asked and answered a million times here.

22   Q.   Was there a reason?  Was there medical coverages that

23   people had that made doctors in your personal knowledge or

24   understanding more readily available to some clients than

25   others?

D7unles2                        Baran - direct

```
1   A.  Yes.

2   Q.  What was --

3   A.  They were listed.

4   Q.  Let me lay a foundation.

5   A.  OK.

6   Q.  Is that a yes or a no?

7   A.  Yes.

8   Q.  With respect to these medical coverages, what were the

9   medical coverages that you observed yourself for processing

10  applications, reviewing applications, and dealing with an

11  applicant?

12  A.  We were all covered by United Healthcare, and their names

13  were in the book as participating providers.

14  Q.  Who is their names?

15  A.  Dr. Lesniewski, Dr. Ajemian, Dr. Parisi.  They were all

16  listed under orthopedic surgeons.

17  Q.  Is there anything that I have not discussed with you --

18  again, I'm far from perfect I may have left something out.  Is

19  there anything that I haven't discussed with you that you want

20  to say?

21  A.  Oh, God I don't think so.  We covered just about

22  everything.

23          MR. JACKSON:  Thank you.

24          THE WITNESS:  May I have a break, Judge?

25          THE COURT:  We are going to take the morning break at
```

D7unles2                          Baran - direct

1    this point.  It's 10 minutes to 11.  11:05 return.

2              (Recess)

3              MR. WEDDLE:  Your Honor, can we raise one thing after

4    the jury leaves the room.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7unles2                          Baran - direct

 1              (Jury not present)

 2              THE COURT:  Mr. Weddle, you wanted to raise something.

 3              MR. WEDDLE:  I think it would be appropriate for

 4     Ms. Baran to be here for this, your Honor.  I don't know where

 5     she went.

 6              THE COURT:  Why don't we just come back a few minutes

 7     early.

 8              MR. WEDDLE:  OK.

 9              MR. DURKIN:  Judge, there is a matter that we can take

10     up that doesn't involve Ms. Baran.  It's rather urgent.

11              THE COURT:  All right.

12              MR. DURKIN:  I want to make an oral motion to quash a

13     subpoena that I am told was put on Dr. Lesniewski's accountant

14     maybe a half hour ago or 45 minutes ago commanding his

15     appearance here in two hours.  I can't possibly understand

16     what's going on here.  I want to show you an e-mail that I sent

17     Mr. Weddle last night over this issue that we discussed.

18              MR. WEDDLE:  Your Honor, we have competing e-mails.

19     The problem is -- we talked about this yesterday -- Mr. Durkin

20     was proposing a stipulation relating to Dr. Lesniewski's

21     corporate tax returns.  He has an S corporation.  He's the sole

22     owner, which is, of course, a passthrough entity.

23              So we said that we would stipulate as long as the

24     stipulation included certain facts.  So I e-mailed those facts

25     to Mr. Durkin after he e-mailed me with his argument about why

D7unles2                        Baran - direct

1      the returns just speak for themselves.  I think that his

2      analysis is too simplistic, and I think if he called a witness

3      to put in the returns we would get the basic facts that I've

4      proposed to get and a stipulation from him on

5      cross-examination.

6            Basically it is a passthrough entity.  He's trying to

7      argue, I think -- I don't want to make his argument for him,

8      but I think he's trying to argue that the United Healthcare

9      payments to Lesniewski that relate to Long Island Rail Road

10     employees were a small portion of the gross receipts line on

11     the 1120 S, the corporate tax return.

12           But, of course, as we said yesterday, if the expenses

13     are not variable, that is, they don't fluctuate with those Long

14     Island Rail Road employees, then if you took let's say 50,000

15     out of that gross receipts line, if you eliminated the Long

16     Island Rail Road employees from that line, that would drop

17     essentially straight to the bottom line of the tax return and

18     would flow through to Dr. Lesniewski's return.

19           So he's he getting salary and other payments that he's

20     reporting on his personal return from this entity which are in

21     the range of $100,000, $130,000, and then he gets the profit

22     from this entity, which is in the range of $20,000 in some

23     years, and one year it's negative $74,000.  But those numbers

24     flow through to his return.  So if you took $50,000 off the top

25     line, that $50,000 would come off the bottom line as well.

D7unles2                          Baran - direct

1          So I think that these are facts that the accountant

2     would say if he were called as a witness.  I think that how

3     they stipulate to them, they're pretty straightforward facts

4     about the way S corporation tax returns work and the way

5     expenses and gross receipts work.

6          But if Mr. Durkin doesn't want to stipulate to them,

7     then he could call this witness and we could cross-examine him

8     and get those facts, or we could call this witness for a very

9     brief rebuttal to point this fact out so that the jury is

10    confused.  That's the stipulation issue.  The broader issues --

11         MR. DURKIN:  Judge, this is my motion.  Can I be heard

12    on my motion --

13         THE COURT:  All right.  Mr. Durkin.

14         MR. DURKIN:  -- to quash a subpoena?

15

16         THE COURT:  Yes.  Is there a relationship between the

17    subpoena and this other issue.

18         MR. DURKIN:  There most certainly is.  And the

19    relationship is, is that last night and this morning, I simply

20    asked the government to stipulate to the truth and accuracy of

21    the copies of the tax returns so that I could introduce them.

22         I sent them a chart that I wanted to put in.  I told

23    them the basis -- now, keep in mind, Judge, that they have put

24    in -- let me just switch exhibits again.  This is the document

25    that is in evidence.  Forgive my handwriting.  That's the only

D7unles2                        Baran - direct

1    copy I have.  That's Government Exhibit 24 that is in evidence.

2              The government says to me they want to argue, can

3    you --

4              THE COURT:  Yes, I can see it.

5              MR. DURKIN:  Can you see this one?  All right.

6              They want to be able to argue that the $62,000 should

7    be compared to the $188,000 on the personal tax return rather

8    than the $753,000.

9              That's just wrong.  It's completely wrong.  You can

10   see here that they are wrong about this drop-through, whatever

11   theory they are talking about.  You can tell from the years.

12   There's one year where there is a $200,000 difference.  Look at

13   the difference between 2007 and 2008, for example.  There is a

14   $200,000 difference, $230,000 difference in gross receipts, and

15   yet the total income only goes down $9,000.

16             The same thing is up there in the year 2005.  There's

17   $631,000 gross receipts and there's $866,000 the next year.

18   That's a $230,000 increase and yet the income only goes up

19   $30,000.

20             I don't know what he's even talking about.  But, more

21   importantly, what I'm outraged over is them putting a subpoena

22   on my accountant when they know, one, that there is a pending

23   IRS investigation that somehow somebody picked out of the

24   newspaper that we had to stop.  We didn't raise it with you.

25   We almost raised it with you because I found that to be

1    abusive.  But we never raised it.

2            But they know there is an Internal Revenue Service

3    investigation.  They also want to talk about whether or not the

4    accountant properly reported cash income because I told them

5    last night that the accountant used only the PC bank

6    statements.

7            One of the things they want to try to get out of the

8    accountant now is some inference about that the cash wasn't

9    reported because he used only the bank statements.  The

10   accountant can't say either way whether the cash was there

11   because the bank statements don't reflect the difference

12   between cash and regular deposits.

13           None of that is the matter.  With respect to my motion

14   to quash the subpoena, which they commanded this man to come

15   down in two hours and never even told me that they had issued

16   this subpoena, when all I asked them to do was stipulate to the

17   accuracy of the return.

18           I said to him I would propose we can then just argue.

19   I will show this to you and you see whether you agree with me.

20   But I think in fairness, if nothing else, under completeness,

21   this exhibit is simply misleading if they are going to then try

22   to argue that that should be compared to the net, to the

23   personal income.

24           In completeness I want to be able to put in these

25   figures.  That is all I want to do.  I have the tax returns

D7unles2                     Baran - direct

1    here.

2            If I have to, I could call the accountant and keep his

3    direct examination simply are these true and accurate copies,

4    or I would ask to re-call the IRS agent.  I could have done

5    this through my cross I think.  We can re-call the IRS agent.

6    He can bring the returns in.

7            First of all, it is just wrong, and it is an abuse of

8    process to have subpoenaed the accountant under these

9    circumstances.

10           Secondly, it's simply wrong from the standpoint of

11   what they are trying to argue.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D7ULLES3

1           MR. DURKIN:  My chart is a much more accurate

2      portrayal, and I propose that's the solution to the problem.

3      If they want to argue this convoluted tax theory that they

4      think applies to sub S corporations, they can argue that, and I

5      can simply argue take a look.  You got 62,000 one year.  In a

6      year he made 753,000.  That's all it is.

7           MR. WEDDLE:  Your Honor.

8           THE COURT:  Let me just see if we can, as Mr. Jackson

9      says, cut to the chase -- something he borrowed from me.

10          You have what is a classical dispute of fact --

11     different theories, different assumptions.  If this were a

12     motion for summary judgment, you know what the Court would have

13     to do.  There is a dispute of fact.  It has to go to a fact

14     finder.  And each of you would have to present facts based on

15     not on theory, not on counsel's arguments, but on facts.

16          The only way that you're going to resolve this matter

17     is to present facts from somebody who has the facts because

18     both of you have different theories.  So either you call the

19     IRS agent back or you call the accountant for the purposes of

20     verifying the authenticity and accuracy of the tax returns.

21     And at that point you can then present your arguments based on

22     the facts on record to the jury.

23          MR. WEDDLE:  Your Honor, there's one additional issue

24     which is problematic about this.  I already described some of

25     the basic facts that we would get on cross-examination from the

D7ULLES3

accountant.  But in addition, the comparison that Mr. Durkin

made on the screen just now where you say that the gross

receipts went down, he said almost $200,000 from 2007 to 2008,

but the total income only reduced by about $10,000.  One major

reason for that is that Dr. Lesniewski's insurance was

canceled.  And so in 2008 the insurance expense on his

corporate tax return is in the order of $30,000, whereas in

2007 it's $130,000.  I think -- I'm doing this from memory, but

I think there's a hundred thousand dollar swing here.

       So if Mr. Durkin wants to put this chart in or make

arguments about gross receipts, then, you know, we withdrew our

motion to admit the malpractice insurance cancellation and the

fact that that resulted from staggering malpractice payouts and

if Mr. -- that was based on Mr. Durkin's agreement that he was

not going to put on a case.  This chart counts as putting on a

case that would call for us to rebut that with the malpractice

insurance cancellation and the staggering malpractice payouts.

       I think that this argument, I agree with your Honor

that it is a fact issue, and if it were only this, I would call

the accountant, I would get my basic facts.  I think I'm right

on this.  Believe it or not, I did a four-month trial that

involved dozens of 1120S tax returns and K-1s and so I've

gotten pretty good at reading them.

       I think when I read these things it's pretty clear

that the right number to compare it to is Dr. Lesniewski's

D7ULLES3

1    income, not the gross receipts.  I think I'm going to get that

2    from the accountant.  But the problem is going to be that once

3    that evidence comes in, I think that the probative value of

4    this chart referring to gross receipts and any kind of

5    calculation of percentages for gross receipts drops to almost

6    zero and the likelihood of confusion of the jury and waste of

7    time in order to walk through these K-1 tax returns and to show

8    if he took $50,000 out of gross receipts, what would be the

9    bottom line, and what about the fact that the insurance dropped

10   by a hundred thousand dollars.  And then we're going to prove

11   up why that is, I think there's a 403 issue with an argument

12   that's attempting to cabin this to just a bare comparison to

13   gross receipts.

14          And in addition, your Honor, I think that it's correct

15   based on what Mr. Durkin told me that Mr. Durkin told me the

16   accountant used the bank records.  We've gone through the bank

17   records.  There are not substantial or repeated cash deposits

18   into those bank records.  And so it's likely that cash payments

19   to Dr. Lesniewski for narrative payments were not reported on

20   the tax returns.  And the reason we would need to bring that

21   out is yesterday Mr. Durkin said to me that the gross receipts

22   on the corporate tax return includes narrative payments and I

23   think that's simply not true.

24          And with respect to the subpoena itself, your Honor, I

25   think the subpoena was entirely proper.  I had discussions -- I

D7ULLES3

1    doesn't want to bring your Honor too much into my discussions

2    with Mr. Durkin because I think we've been working through this

3    issue and we have a dispute.  But I think that everyone should

4    understand that if he wants to try to put in this chart and

5    make this argument that that counts as requiring us to prove up

6    the cancellation of the insurance and the malpractice.

7            But also I've been unable to speak to this accountant.

8    We had our agents reach out to him.  He said he wouldn't talk

9    to us without Mr. Durkin's go-ahead.  And so in case we need

10   him as a rebuttal witness and based on yesterday's

11   discussion -- I'm sorry, your Honor, I guess I misspoke.  I

12   think he told the agent this morning that he was instructed not

13   to speak to the government by defense counsel.

14           And so in case we need him as a rebuttal witness for

15   these basic facts that I emailed to Mr. Durkin as a proposed

16   stipulation, we wanted to have him here and available.  There's

17   nothing improper with sending the subpoena.

18           THE COURT:  Mr. Durkin.

19           MR. DURKIN:  Judge, I told him that I was -- I told

20   him -- the government kept calling him last night.  He called

21   me and said what should I do.  I said I don't want you to talk

22   to the government.  I think we're going to work this out and,

23   if anything, I only want you to talk to the government if I'm

24   on the line with you, which is what his preference was.  That's

25   what he told me was his preference.

D7ULLES3

```
1            I told him in light of this IRS issue that came up
2    where they did a jeopardy assessment essentially on
3    Dr. Lesniewski based on the Ajemian sentencing, a special agent
4    sent a jeopardy assessment type document to Dr. Lesniewski
5    prior to trial, as if he had already been convicted like
6    Dr. Ajemian.  And oddly enough, the figure they applied the
7    jeopardy assessment to was the figure in Dr. Ajemian's
8    sentencing.  And suffice it to say, everybody went to battle
9    stations for a while.  And the agent said he had spoken to
10   Mr. Weddle, and he was not going to cease everything until the
11   trial was over.
12            So that's why we never raised it with you, although I
13   gave it some thought because it was very disconcerting to me to
14   have my client hit with a jeopardy assessment.  The only reason
15   I'm concerned about the accountant is this other investigation
16   that they're conducting and this suggestion that somehow the
17   cash isn't reported and that's a -- that has nothing to do with
18   this issue here.
19            All I'm trying to do is make a fair comparison on a
20   completeness basis as to what is an apple to an apple.  And I
21   am positive that I am correct that the $62,000 for the year
22   2003 cannot be or they should not be permitted to argue that
23   that's one-third of his whole income.  That's what they're
24   going to try to do.  So that's another solution.  If they're --
25   if you would preclude them from arguing that, I don't have to
```

D7ULLES3

1    do this other thing.

2           I just don't want the unfair inference, and they say

3    they're going to argue it, that somehow the 62,000, even in the

4    year where he made 753, was one-third of his income.  That's

5    just not true.  It isn't.  And you know that.  Anybody that has

6    a business knows that.

7           THE COURT:  Except, Mr. Durkin, that I don't know from

8    any facts on the record.

9           MR. WEDDLE:  Your Honor, I can put this tax return on

10   the Elmo right now.  You can look at the deductions that come

11   off of the gross receipts.  They basically don't vary very much

12   except for a couple of exceptions.  One is the insurance

13   varies, as we've discussed.  And at some point Dr. Lesniewski

14   apparently leaves a place he was renting and joins a practice,

15   and then at that point he has what he lists on his tax return

16   as common charges.

17          His expenses are fixed.  They don't vary whether he

18   sees 62,000, whether he gets $62,000 from United Healthcare for

19   Long Island Railroad employees or doesn't, his expenses are

20   essentially the same.  And so if you took the $62,000 out of

21   the gross receipts line for 2003, the result on the front page

22   of the 2003 return would be that the ordinary income would be

23   cut in half.  That flows directly through to his schedule E on

24   his personal tax return, and so it would be essentially a

25   dollar for dollar reduction.  And the gross receipts number,

D7ULLES3

the $753,000 number, is essentially just confusing and
misleading.  It's not a proper comparison.

          MR. DURKIN:  What's confusing and misleading, Judge,
and this is very serious, is the suggestion that 62,000 is
one-third of his whole income that year.  That's just wrong.
The only fact, Judge, could I just say one thing?

          THE COURT:  Go ahead.

          MR. DURKIN:  For the record, the only fact that's not
in evidence regarding my chart, which I marked 24L as a proffer
that's not in evidence, is the true and accurate income tax
return.  Those figures are exactly the figures on the gross
receipts line of the L20S return.  If they -- there's three
solutions, it seems to me.  Either they don't argue that the
62,000 is 188,000 because it's all then too confusing and too
distracting and it will get us off into tangents, or they --
you let me put my chart in.  They can argue what they want.  I
can argue what I want.  It seems to me one of those three
solutions has to happen because it's simply not fair and it's
not complete for --

          THE COURT:  How do we get your chart in, Mr. Durkin,
without a witness?

          MR. DURKIN:  Well, I don't see -- are they really
going to argue it's not a true and accurate copy of the return?
We're going to waste the jury's time for me to find a witness
just to put in a true and accurate copy of a return after

D7ULLES3

1    everything I've stipulated for them?

2              MR. WEDDLE:  Your Honor, we offered to stipulate as

3    long as the stipulation has the basic facts.  It's like three

4    paragraphs of an email that we would get out of any witness.

5              MR. DURKIN:  Show him the email.  Show him what you

6    want.

7              MR. WEDDLE:  Your Honor, we got these tax returns last

8    night.  They opened on 5 percent of his income.  They opened on

9    this.  I've been asking from first day of this trial and before

10   for reciprocal discovery from all defendants.  I got these tax

11   returns last night.  So they're trying to sneak something in at

12   the last minute.  They could have marked these things, they

13   could have produced them in reciprocal discovery at the

14   beginning of the trial.  We could have addressed this in a

15   reasonable way.  They're just trying to say we've got it do

16   this today because they've created the urgency for today.

17             MR. DURKIN:  It's not urgent for today.

18             THE COURT:  Look, we've already kept the jury waiting

19   15 minutes.  We have not -- all of you -- taken a break.  Make

20   the submissions, whatever you think is relevant.  Let's take a

21   look at it over lunch.

22             MR. DURKIN:  That's fine.

23             MR. WEDDLE:  Your Honor, can we raise this other

24   thing?

25             MR. DURKIN:  Can I tell the accountant he doesn't have

1      to come in two hours?

2                  THE COURT:  Yes.

3                  MR. DURKIN:  Thank you.

4                  THE COURT:  We're not going to ready for him in two

5      hours anyway.

6                  MR. DURKIN:  That's what I thought.

7                  MR. TEHRANI:  Your Honor, we wanted to bring to the

8      Court's attention something that in our view was very

9      disturbing that happened during Ms. Baran's testimony,

10     something that I observed and other members at counsel table

11     observed.

12                 There was a period when Ms. Baran was testifying about

13     her underreporting her income on her tax returns.  She then

14     testified that she's not being prosecuted for tax evasion.

15     Mr. Weddle objected.  That object was sustained.  Ms. Baran

16     then mouthed F you with but actually the word to Mr. Weddle.

17     It's something that's inappropriate.  It's disturbing.  It's

18     something that we saw.  It's something the jury saw.

19                 Frankly, we've been overhearing Ms. Baran say things

20     that are inappropriate during this entire trial.  We have not

21     said anything about it.  We raised it with defense counsel.

22     And she's made statements to agents outside of the courtroom.

23     We've brought these issues to defense counsel's attention.

24     We've told defense counsel that we don't want to raise this.

25     We don't want to have this be an issue, and she just continues

D7ULLES3

1    to do it.  And it's just not appropriate for this courtroom.

2              THE COURT:  Mr. Jackson.

3              MR. JACKSON:  Judge, I hate to characterize anything,

4    but I just think we're hearing wild exaggerations.  With regard

5    to any mouthing of anything, I guess all the prosecution saw

6    it.  I didn't happen to.  I mean I don't know what they saw.

7    My colleagues.

8              THE COURT:  If it was something that was said, it

9    would be in the record, would it not?

10             MR. TEHRANI:  She didn't say it.  She mouthed the

11   words.

12             MR. WEDDLE:  Also, your Honor, she's waived her Fifth

13   Amendment right.  We could just ask her if she mouthed it.

14             MR. JACKSON:  Thank you for him telling me what my

15   client should be asked, Judge.

16             But so I'm not conversant or aware of that.  I think

17   that the facts are what the facts are in the record.  I think

18   we should stick to the proper decorum in the courtroom.  I

19   think your Honor has run probably the best I've ever seen in my

20   practice in terms of how a courtroom could be run and how

21   professionals should conduct themselves and just with regard to

22   everything.  So I hate at the last minute for it to degenerate

23   into this.

24             In terms of her mouthing things throughout, I'm not

25   really sure what they're talking about.  I think initially when

D7ULLES3

we started, in fairness to the prosecution, they pretty much
told me, as my colleagues did, that my client speaks too
loudly.  And so as a result of that, we've stopped talking in
the courtroom.

They also indicated initially to me in fairness
because I never want to misrepresent anything that favors me or
opposes me that there may have been an exchange they recounted,
as I recall it, a single exchange between her and an agent.  I
asked her about it.  She said she doesn't know what I'm talking
about.  Who am I referring to and what do I mean?  And that was
about two weeks ago.  Since then I haven't heard anything.  I'm
sure they would have brought it to my attention.

But that's the extent of my knowledge about it and I'm
sorry that was the perception of what might have happened here.
But if we could, Judge, just stick with the facts of the trial.
It's a long trial.  We're all tired, frustrated.  People are at
the beach now at the Hamptons.  We're here with you and, you
know, the fact is hopefully we'll get a vacation.

THE COURT:  For better or for worse.

MR. JACKSON:  Hopefully, Judge, we'll all get to rest
at some time in our lives soon.  But right now I know we're in
the heat of battle.  The prosecution is doing a tremendous job
with what they have to do.  We're just trying to do the best
for our clients, Judge, and I want to keep it on the level of
professionalism.  That's about it.

D7ULLES3

1          THE COURT:  Well, I don't want to go over lectures on

2     professionalism and decorum.  You're all adults.  So let's not

3     repeat what is appropriate.

4          If any of these things have occurred and they've been

5     deliberate and they occur again, we'll revisit it.  I am not

6     aware of what Ms. Baran may or may not have mouthed.  It was

7     not apparent to me.  And if it's not in the record, it's not in

8     the record.  If the government says it happened and defense

9     table nodded their heads no as the government said yes, you

10    have a he said/she said.  There's no way we can resolve that.

11         Just bear in mind the importance of what's happening

12    here and to the extent that there's a temptation to do

13    something inappropriate, it can only hurt and backfire.

14         MR. DURKIN:  For the sake of time, can I just give you

15    what I put up on the board and the tax returns so you can look

16    at them?

17         THE COURT:  Yes.

18         MR. DURKIN:  The personal returns are already in

19    evidence.  If you want a copy, I can get those too.

20         THE COURT:  At this point we'll just have to take

21    another ten minutes, apologize to the jury.

22         (Recess)

23         (Continued on next page)

24

25

D7unles4                         Baran - cross

1              THE COURT:  Please bring the jury in.

2              (Jury present)

3              THE COURT:  Thank you.  Welcome back.

4              All right.  Mr. Weddle.

5              MR. WEDDLE:  Thank you, your Honor.  I stood up here.

6    I don't know if there is any other cross before I start.

7              MR. DRATEL:  No, your Honor.

8              MR. RYAN:  I have a few questions, but I defer to

9    Mr. Weddle.

10             THE COURT:  All right.  Mr. Weddle.

11             On second thought, Mr. Weddle, Mr. Ryan has said he

12   had a few questions.

13             MR. RYAN:  Yes, Judge.

14             THE COURT:  If it's only a few, why don't we take

15   those.

16             MR. RYAN:  Fine.  Thank you.

17   CROSS EXAMINATION

18   BY MR. RYAN:

19   Q.  Ms. Baran, you mentioned that there were seminars given by

20   yourself on behalf of the RRB?

21   A.  Yes, many times.

22   Q.  And was there a procedure where reports were prepared and

23   filed with the RRB confirming these seminars?

24   A.  Yes.  Anytime an employee of the Railroad Retirement Board

25   had contact with any union for any purpose, we had to send a

D7unles4                          Baran - cross

1   memo to the office of the labor member.

2   Q.  I show you R3, which consists of 25 memos.  Just leaf

3   through it.  See whether you recognize it.  I will ask you a

4   few questions about it.

5   A.  Yes, I do.

6   Q.  Do you recognize those reports as being made in the regular

7   course of business of the RRB concerning the seminars given by

8   yourself and others concerning the occupational disability

9   program?

10  A.  Concerning all of Railroad Retirement.

11          MR. RYAN:  I offer them in evidence.

12          THE COURT:  Mr. Weddle?

13          MR. WEDDLE:  No objection.

14          THE COURT:  Admitted without objection.

15          (Defendants' Exhibit R3 received in evidence)

16  Q.  You mentioned ballast?

17  A.  Yes.  The little rocks, yes.

18  Q.  OK.  Let me show you R26, R63 and R64 and see whether or

19  not that refreshes your recollection of what ballast is?

20          MR. WEDDLE:  No failure of recollection, your Honor.

21          THE COURT:  Sustained.

22          MR. RYAN:  I offer the photographs in evidence.

23          THE COURT:  Mr. Weddle?

24          MR. WEDDLE:  I thought they were already admitted, but

25  I don't have any objection.

D7unles4                          Baran - cross

1                THE COURT:  All right.

2                (Defendants' Exhibits R26, R63 and R64 received in

3      evidence)

4      Q.  You mentioned in your testimony with respect to

5      occupational disability, as I understood your testimony, it

6      related to the inability of a worker to perform a portion of

7      his job?

8      A.  That's correct.

9      Q.  Will you explain to the ladies and gentlemen of the jury

10     based upon your experience at the RRB what that phrase means?

11     A.  For instance, an electrician must do a lot of climbing on

12     ladders and reaching above their head to work.  If they

13     suddenly had a condition that disabled them from being able to

14     walk up ladders without pain, they would be occupationally

15     disabled from the job.

16     Q.  You heard Mr. Coleman testify here concerning the phrase

17     failure to perform the full range of duties?

18     A.  Correct.

19     Q.  Is that the same as you have just explained?

20     A.  It is.

21     Q.  You also heard Mr. Coleman testify that if a worker was

22     unable to perform one or more tasks on his job.  Would that

23     phrase also fall within your definition?

24     A.  That is exactly what it means.

25                MR. RYAN:  Thank you.  No further questions.

D7unles4                          Baran - cross

1           THE COURT:  Thank you.

2           Mr. Durkin.

3           MR. DURKIN:  Judge, we have no questions.

4           THE COURT:  Mr. Weddle.

5           MR. WEDDLE:  Thank you, your Honor.

6    CROSS EXAMINATION

7    BY MR. WEDDLE:

8    Q.  Mr. Ryan just asked you about ballast, right?

9    A.  Yes.

10   Q.  Do they have ballast at Metro-North Railroad?

11   A.  They have ballast at all, anywhere there is a railroad

12   track.

13   Q.  So that would include Amtrak, too?

14   A.  Yes.

15   Q.  Any railroad covered by the Railroad Retirement Act?

16   A.  Yes.

17   Q.  Electricians at Metro-North, do they have to climb ladders?

18   A.  I don't know.

19   Q.  Do electricians have to work underneath trains at

20   Metro-North in order to fix the electrical components?

21   A.  I honestly don't know.

22           MR. JACKSON:  Objection.

23   Q.  Do conductors at Metro-North need to walk through the

24   trains and collect tickets?

25   A.  I would assume so, but I have no background at Metro-North.

D7unles4                     Baran - cross

1    Q.  Do office workers at Metro-North need to work in an office

2    and perhaps use a computer?

3    A.  I would assume.  But I have -- I am not an expert on

4    Metro-North.

5    Q.  Well, when you worked at the RRB for 18 and a half years

6    did you take any disability applications from Metro-North

7    employees?

8    A.  I did.

9    Q.  When you did that, you reviewed the vocational reports

10   submitted, right?

11   A.  I did.

12   Q.  That is really how you found out what a person's job was,

13   isn't that right?

14   A.  I did.

15   Q.  And when you were working at the RRB, you checked over a

16   Metro-North person's application just as you would a Long

17   Island Rail Road person's application, right?

18   A.  With far, far less frequency.  I wouldn't remember as well

19   as I do Long Islanders.

20   Q.  But when it happened, you would do it the same way, right?

21   A.  Of course.

22   Q.  You are not saying you had special --

23   A.  Not at all.

24   Q.  -- treatment for people at Long Island Rail Road, are you?

25   A.  No.

D7unles4                    Baran - cross

```
 1   Q.  When you checked over a Metro-North application, you were
 2   basically checking it to see if it was complete, right?
 3   A.  Any application would be checked to see if it was complete.
 4   Q.  All right.  And then your role was to send the materials on
 5   to Chicago, right?
 6   A.  Correct.
 7   Q.  So you understood that Metro-North is essentially a similar
 8   railroad to Long Island Rail Road, right?
 9   A.  Similar, but they had -- not the same.
10   Q.  One of the major differences is that they have a different
11   pension, right?
12   A.  That's one of the major differences, but there are other
13   differences.
14   Q.  Well, their equipment is the same basically, right?
15   A.  I don't know.  I only know the trains on Long Island.
16   Q.  You do know the trains on Long Island, but you don't know
17   the trains on Metro-North?  Is that what your testimony is?
18   A.  My husband was an electrician, so I know what M3 and M7 is,
19   but I have no idea what they run on Metro-North.
20   Q.  If they had the same equipment, you would assume that the
21   tasks of the different jobs of people who worked at Metro-North
22   would be pretty similar to the tasks --
23   A.  I don't choose to assume anything.
24            MR. JACKSON:  Objection, Judge.
25            THE COURT:  Sustained.
```

D7unles4                          Baran - cross

1    Q.  You don't think that electricians at Metro-North do

2    something different than electricians at Long Island --

3    A.  They could.  I have no idea.

4             MR. JACKSON:  Objection.

5             THE COURT:  Sustained.  Asked and answered.

6    Q.  You know that Metro-North has a third rail, right, in

7    certain tracks?

8    A.  Yes.

9    Q.  You talked about the fact that -- I'm sorry.  So you were

10   talking about the fact that you retired in 2006, right?

11   A.  I did.

12   Q.  When you retired you got a pension, right?

13   A.  I did.

14   Q.  You did not apply for disability benefits, right?

15   A.  I did not.

16   Q.  You had no opportunity to apply for a Long Island Rail Road

17   pension at age 50, did you?

18   A.  No.

19   Q.  Did you ever have the opportunity to apply for a Long

20   Island Rail Road pension?

21   A.  No, I don't work for the Long Island Rail Road.

22   Q.  So, when you were retired you were facing basically one

23   pension, right, one stream of income, right?

24   A.  Yes.

25   Q.  And that was your federal pension, right?

D7unles4                          Baran - cross

1   A.  Yes.

2   Q.  If you had been disabled, I suppose you might have been

3   able to apply for a federal disability benefit.  Is that your

4   testimony?

5   A.  Yes.  If I chose to, but I didn't need to because I had 40

6   years.

7   Q.  But you understood that if you had applied for federal

8   disability benefits you would only get those, you wouldn't also

9   get a pension, right?  You understood that?

10  A.  Of course.

11  Q.  Because under your system you can't get both things, right?

12  A.  Correct.

13  Q.  You can only get one or the other, right?

14           THE COURT:  Asked and answered.

15  Q.  That is a major difference between you and people who work

16  at the Long Island Rail Road, right?

17  A.  Well I also have the right to Social Security and Railroad

18  Retirement.

19  Q.  But a major difference between you and people who work at

20  Long Island Rail Road is that your clients and people that you

21  saw at the RRB retired and got a Long Island Rail Road pension

22  and then they separately got disability benefits, right?

23  A.  If they were disabled.

24  Q.  Only if they were disabled, right?

25           And so they got two major streams of income, right?

D7unles4                         Baran - cross

1   A.  It was available to them, yes.

2   Q.  Well, when you were meeting with clients, you explained

3   both of the streams of income, right?

4   A.  I did.

5   Q.  In fact, we looked at one of the forms that you said you

6   used.  I think that this one ended up being marked B1B.

7            MR. WEDDLE:  Can I put this on the Elmo.

8   Q.  Do you see that on the screen, ma'am?

9   A.  I do.

10  Q.  I think you said that this was a form that you prepared for

11  use in meeting with your clients, right?

12  A.  Yes.

13  Q.  And the form that you used had a listing at the bottom of

14  saying, "Combined Income," right?

15  A.  Yes.

16  Q.  And you would write in there the Long Island Rail Road

17  pension as well as the benefits for RRB, right?

18  A.  Correct.

19  Q.  The RRB benefits would either be disability or retirement

20  benefits.  Is that what you are saying?

21  A.  Correct.

22  Q.  But the retirement benefits were subject to an offset.  Is

23  that what you are saying?

24  A.  No.  The retirement benefits would be reduced if you didn't

25  have 30 years at 62, but they have no offset.  The railroad

D7unles4                          Baran - cross

1     pension has the offset.

2     Q.  So if someone gets RRB retirement benefits and the Long

3     Island Rail Road pension they don't actually get the full

4     amount of both of those, one of those is reduced.  Is that

5     right?

6     A.  Eventually, yes.

7     Q.  But that is not the case for disability benefits, right?

8     A.  Oh, it is the same for disability benefits.

9     Q.  You are saying that the disability benefits reduce the

10    amount of the Long Island Rail Road pension?

11    A.  It does.

12    Q.  And when you met with people you said that they sometimes

13    came to you months in advance, right?

14    A.  Sometimes months, sometimes years.

15    Q.  Sometimes years in advance.

16            When you met with them you were a disability

17    specialist, right?

18    A.  I was a Railroad Retirement specialist.

19    Q.  But you won't disagree that we've seen documents that you

20    created where you billed yourself as a disability specialist?

21    A.  Yes.

22    Q.  Right.  And you advertised yourself as a disability

23    specialist, right?

24    A.  I advertised myself as a retirement consultant.

25    Q.  You never advertised yourself as a disability specialist?

D7unles4                        Baran - cross

1   Is that what you are saying?

2   A.  I said -- but I have advertised myself as a retirement

3   consultant.  Actually I didn't advertise myself.  My card said

4   I was a retirement consultant.  And sometimes I put in

5   congratulatory notes at retirement dinners, and it said I was a

6   disability specialist.

7   Q.  Yes.  When you put those congratulatory notes into

8   retirement dinners, that would be like in the program at the

9   retirement dinner, right?

10  A.  Yes, which nobody looks at.

11  Q.  You paid for that?

12  A.  No, you don't pay for it.  You make a contribution to them.

13  Q.  You made a contribution and in return they put your flyer

14  in their newsletter, right?

15  A.  Yes.

16  Q.  You thought of that as a form of advertising, right?

17  A.  I really didn't, because nobody looks at the books and

18  nobody takes them home.  It was just goodwill between me and

19  the unions.  That is all.

20  Q.  You didn't do any advertising?  That is your testimony?

21  A.  My business card.

22  Q.  Just your business card.

23        Now, you have been saying now that you are a

24  retirement Railroad Retirement specialist, right?  And you also

25  acknowledged that sometimes you called yourself a disability

D7unles4                          Baran - cross

1    specialist, right?

2    A.  Uh-huh.

3    Q.  Now, when Mr. Jackson was asking you questions, he asked

4    you about doing an analysis of your clients.  Do you remember

5    that?

6    A.  I do.

7    Q.  You testified that you had 54 clients in 2007.  Do you

8    remember that?

9    A.  Yes.

10   Q.  And, ma'am, you typically charged your clients $1200,

11   right?

12   A.  Yes.

13   Q.  And the 54 clients that you found for 2007, those are

14   essentially all disability clients, right?

15   A.  No, not all of them, no.  Some of them just came in for

16   retirement counseling.

17   Q.  OK.  How many?

18   A.  Oh, I don't know.

19   Q.  You don't know?

20   A.  I don't know.

21   Q.  So if we multiply 54 by 1200 --

22   A.  Not all of them paid.

23   Q.  So some of your clients were for free?

24   A.  Some of them were pro bono.

25   Q.  But the paying ones were basically all disability, right?

D7unles4                          Baran - cross

1    A.  I don't know.  I don't have it in front of me.

2    Q.  OK.  Well, if you multiply 1200 by 54, you get about

3    $64,800.  Do you agree with that?

4              MR. JACKSON:  Judge --

5    A.  If you are just asking about math --

6              THE COURT:  Is there an objection?

7              MR. JACKSON:  Judge, I am going to object for

8    foundational reasons.  I don't think she said that there were

9    54 that she charged $1200 to.  If a foundation could be laid, I

10   wouldn't have an objection.

11             THE COURT:  Sustained.

12   Q.  OK.  So you are saying a number of these 54 clients you did

13   not charge $1200 to, is that right?

14   A.  They could be, a few of them in there, yes.

15   Q.  So the maximum amount of income, according to your

16   testimony right now, for 2007 would be, if you charged everyone

17   $1200, it would be about $64,000, right?

18   A.  No.  I am not saying that.  Some clients I only charged

19   $200.  Some paid $1400.  Some paid nothing.  I don't know.  I

20   don't have that in front of me.

21   Q.  Well, let's say if you charged 54 people $1200 each that

22   would add up to $64,000, right?

23             MR. JACKSON:  Objection.

24             THE COURT:  Overruled.

25   Q.  Right?

D7unles4                    Baran - cross

1   A.  If you are doing math exclusively, yes --

2            MR. JACKSON:  Judge, a hypothetical --

3   A.  -- but that is not what happened.

4            MR. JACKSON:  Is this the witness being asked --

5            THE COURT:  Mr. Jackson.

6            MR. WEDDLE:  We can check the math if you want.  I

7   don't think it's controversial.  Do you want me to get a

8   calculator out?

9            MR. JACKSON:  Judge, he can let me borrow one.  But I

10  guess what I am looking to know, Judge, is his questions, is he

11  asking her to assume how many or would he like to show her

12  something.

13           THE COURT:  He's trying to get some parameters.  It's

14  somewhere between zero and $60,000.

15           MR. JACKSON:  OK.

16           MR. WEDDLE:  Her testimony was that she did an

17  analysis and she found 54 clients for 2007.

18  Q.  Is that right, ma'am?  Is that your testimony?

19  A.  I found 54 when I looked after the -- after I had filed my

20  tax returns and I went scurrying through everything I found 54.

21  Q.  So this is an analysis you did in late 2008?  Is that what

22  you are saying?

23  A.  Yes, I didn't have the records.

24  Q.  So this is not an analysis?  I thought on your direct

25  testimony you were talking about an analysis that you did for

D7unles4                         Baran - cross

1    purposes of this trial.

2    A.  Which was after the fact, yes.

3    Q.  OK.  Well, which analysis are you talking about?

4         When you say that you did an analysis and you found 54

5    people, are you talking about something you did in 2008, or are

6    you talking about something you did in preparation for this

7    trial, or maybe it is the same number?

8    A.  My preparation for the trial.  It was already late into

9    the -- last year is when I did it.

10   Q.  If you charged 54 people that amount of money, we've

11   already established, right, $64,000, right?

12        MR. JACKSON:  Judge, are we asking --

13        THE COURT:  Mr. Jackson.

14        MR. JACKSON:  Are we asking hypothetical questions of

15   her, or are we asking questions based on facts that deal with

16   this case and what she actually did.  I just want to know.

17   Q.  You are saying --

18        THE COURT:  He's still trying to get a parameter,

19   Mr. Jackson.

20        MR. JACKSON:  OK.

21   Q.  All I am trying to find out is essentially all of those 54

22   people that you identified in your analysis were disability

23   clients, right?

24   A.  They could have been just retirement consulting clients.

25   They were not all disabilities to my knowledge.

D7unles4                    Baran - cross

1   Q.  The document that we were just talking about that is on the

2   screen, that's B1B, right, you said that you created this

3   document as part of your business, right?

4   A.  I did.

5   Q.  You recall that when the agents came to speak to you in

6   September 2008 they gave you a grand jury subpoena, right?

7   A.  They didn't.  They came back the next day and gave it to

8   me.

9   Q.  So you are saying the next day they gave you a grand jury

10  subpoena?

11  A.  Yes.

12  Q.  OK.  In response to the grand jury subpoena you turned over

13  certain documents, right?

14  A.  They asked me for everything I had regarding my clients,

15  and I gave it to them.

16  Q.  You didn't give them this document, though, right?

17  A.  That had nothing to do with a particular client.  It's

18  blank.

19  Q.  Did you create this document before you got the grand jury

20  subpoena or after the grand jury subpoena?

21  A.  I don't know.  I don't remember.

22  Q.  This document that I think is B1C, did you create this

23  document before or after you got a grand jury subpoena?

24  A.  I don't know.  I honestly don't know.

25  Q.  But you didn't turn this over in response to the grand jury

D7unles4                        Baran - cross

1    subpoena, right?

2    A.  I turned over everything regarding my clients.  That's what

3    they asked me for and I gave it to them.  I gave them

4    everything that I had that I thought was what they were looking

5    for.  I didn't think they were looking for blank forms.

6    Perhaps I had them and I didn't even think about them.

7    Q.  OK.

8    A.  I gave them everything I thought they were looking for.  I

9    was not trying to hide anything.

10   Q.  So you didn't think they were asking for blank forms?

11   A.  Exactly.

12   Q.  But we don't know whether this is before or after the grand

13   jury subpoena, right?

14   A.  I really don't remember.

15   Q.  This document you said is something you typically used with

16   your clients, right?

17   A.  Yes.

18   Q.  You see that this document says your disability appointment

19   date is?  Do you see that?  So this is a document that you used

20   for disability clients, right?

21   A.  Yes.

22   Q.  Did you have some other form that you used for pure

23   retirement clients?

24   A.  Yes.  The one you saw.  It is also an admission.

25   Q.  The one another one that we just were looking at?

1   A.  Yes.  Your preretirement counseling appointment.

2   Q.  The preretirement counseling appointment.  So the

3   preretirement counseling form, that's this?  B1A, right?

4   A.  If you say so.

5   Q.  It is the one that says at the top, "Your preretirement

6   appointment is July 29, 2010," right?

7   A.  If you show it to me, I can verify it.  Yes.

8   Q.  So this form says at the bottom, do you see it says, "When

9   you file your disability papers you will need originals"?

10          Do you see that?

11  A.  Yes.

12  Q.  Now, in talking about this analysis that you did of your

13  clients, you said that for a certain period of time about half

14  of your clients were from Dr. Ajemian, right?

15  A.  Yes.

16  Q.  Then in a later period of time it was only about 30

17  percent, right?

18  A.  It might even be less.  I don't have the figures in front

19  of me.

20          MR. JACKSON:  Judge, I am just going to object to the

21  characterization of "from Dr. Ajemian."

22          THE COURT:  Sustained.

23          MR. JACKSON:  Thank you.

24  Q.  You said about 50 percent of your clients were also seeing

25  Dr. Ajemian in connection with their disability.  That is what

D7unles4                        Baran - cross

1    you are saying, right?

2    A.  Yes.

3    Q.  Then at a later period of time you estimated about 30

4    percent in your direct testimony.  Do you remember doing that?

5    A.  I do.

6    Q.  And the later period of time that you picked was 2009 to

7    2011.  Do you remember that?

8    A.  No, it wasn't actually.  It was from -- what I said was if

9    you just looked at '7 and '8 it was about 50 percent.  But if

10   you looked at all the years, it was only about 30 percent.

11   Q.  So when you get that lower number, you are including the

12   years after the New York Times published an article?

13   A.  Absolutely.

14   Q.  You recall that Dr. Ajemian was specifically named in that

15   article, right?

16   A.  So were other doctors.

17   Q.  Along with Dr. Ajemian, right?

18   A.  Yes.

19   Q.  Now, just going back to your pure retirement consulting, do

20   you remember when we presented that list of your clients?  Do

21   you remember that?  180 people.  And then there was a few more

22   added later.  Do you remember that exhibit?

23   A.  I don't.  I'm sorry.

24   Q.  OK.

25   A.  We've seen a lot of things.

D7unles4                           Baran - cross

1              MR. WEDDLE:  I don't remember the number.  I think

2    it's --

3              MR. JACKSON:  Exhibit 18.

4              MR. WEDDLE:  -- 18 something.

5    Q.  Do you recall that document?

6              It is just a list of people, and then it has the

7    different source for how they were identified.

8              Do you remember that?

9    A.  To be perfectly honest, I cannot read that document.  I

10   can't even read the original, so I don't know what it is.

11   Q.  Well, you don't disagree that the 180 people listed on the

12   list are disability clients, they are not retirement?

13   A.  I can't read that.  I don't know what those names say.  I

14   have no idea what that is.  How can I agree to them being my

15   clients if I can't read it?

16             MR. WEDDLE:  Your Honor, let me just grab a paper

17   copy.

18   Q.  I am handing you Government Exhibit 18-A in evidence.

19   A.  Mr. Weddle, this is worse than an eye chart.  I can barely

20   read it.  I do recognize some of the names that I can see.

21   Q.  OK.  Like, for example, Regina Walsh.  You remember her,

22   right?

23   A.  Oh, it's better over there.  Yes, I do.  I can see that.

24   Q.  All the names you see on the screen are disability clients

25   of yours, right?

D7unles4                          Baran - cross

1   A.  I cannot state that to exact because I don't remember

2   everyone's name.  I do remember Regina Walsh.  I do remember

3   Joseph Lally.  I don't remember everybody.

4   Q.  But you are not denying that anyone on this list, you are

5   not saying that anyone on this list is a pure retirement client

6   of yours, right?

7   A.  I don't know what those other people are at all.  The ones

8   I remember were clients of mine.  If you want me to go with my

9   records name for name, I could tell you who they are.  But

10  otherwise I don't know who they are.  I don't remember

11  everybody I deal with.

12  Q.  When you did your analysis, you came up with at least 180

13  disability clients, right?

14  A.  Yeah.

15  Q.  In fact, you came up with more than that, right?

16  A.  Yes.

17  Q.  We are just talking about disability clients, right?

18  A.  Clients, period.  I never broke them down between

19  disability and just retirement or -- I never broke them down.

20  Q.  Anyone you got $1200 from would be a disability client?

21  A.  Yes.

22  Q.  And anyone that you did one of those waiver forms with,

23  that would be a disability client?

24  A.  Certainly -- no, not necessarily.  Those waivers could be

25  for a retirement client, too.

D7unles4                          Baran - cross

1    Q.  Now, you talked about Government Exhibit 108-A, which is

2    Regina Walsh's application.  I will put that up so you can see

3    it on the screen.  I have a paper copy if you would prefer.

4              Can you see that?

5    A.  I can.

6    Q.  Mr. Jackson asked you about this question 39, right?

7    A.  Yes.

8    Q.  He said that this question 39, these answers to question 39

9    prove that you modified the form based on what people said to

10   you, right?

11   A.  Yes.

12   Q.  Well, Ms. Walsh was your first client, right?

13   A.  She was.

14   Q.  So the blank form that you were talking about, where you

15   had the check boxes and you said that that was a prompt for

16   you, that postdates is this, right?

17   A.  I didn't -- this is -- I never remember.  This is 39, and

18   the other one is 40.  I didn't prefill 40 when I first started.

19   But because I was leaving things out, that's why I prefilled it

20   and stuff.  But these are not my words.  When you are doing

21   disability applications for 20 years, you know your words, and

22   leg pains and sitting for more than 15 minutes would not be my

23   words.  That was Regina's quote.

24   Q.  But you didn't have a template before you started with

25   Regina Walsh, right?

D7unles4                          Baran - cross

1    A.  No.  But, again, I know my words.  I would have never said

2    neck and hand pain make dressing difficult.  It wasn't words I

3    chose.

4              MR. WEDDLE:  Excuse me one second.

5    Q.  Mr. Jackson asked you about this document.  Do you remember

6    Government Exhibit B2, which is an e-mail I guess from you to

7    office of personnel management?

8    A.  Yes.

9    Q.  The e-mail that you sent, you see it says you are following

10   up from a phone conversation from December 24, 2008, right?

11   You say I'm sending a duplicate of the e-mail I sent on

12   November 15, 2008.  Do you see that?

13   A.  Yes.

14   Q.  So that was a month and a half after the federal agents

15   came in and asked you whether you were reporting your income on

16   your tax returns, right?

17   A.  Yes.

18   Q.  We talked about this document, this questionnaire.  Let me

19   zoom it out so that you can see it.  I think this is in

20   evidence as B4.  Do you remember this?

21   A.  I do.

22   Q.  So there is a questionnaire that's used to develop

23   additional information if someone is claiming a psychiatric

24   disability, right?

25   A.  Even if they are not claiming it and we feel it is

D7unles4                    Baran - cross

1   necessary.  Yes.

2   Q.  It is not something that the person just fills out, right?

3   It's something that is an interview?

4   A.  No, it has to be done by a different person.

5   Q.  It is an in-person interview by someone at the RRB?

6   A.  Yes.  It actually can be done by a family member if they

7   don't come to the RRB.

8   Q.  None of your clients who applied for disability were

9   psychiatric disability cases, right?

10  A.  Oh, yeah, they were.  There were a few of them.

11  Q.  But the vast majority were orthopedic, right, backs, next,

12  hands --

13  A.  Yes.

14  Q.  -- things like that, right?

15  A.  Yes.

16  Q.  You said that question 40 on the application, which asks

17  about a normal --

18  A.  Capability.

19  Q.  -- day, you said it really --

20  A.  The person's capability.

21  Q.  You said it has very little relevance except in a

22  psychiatric case, right?

23  A.  True.

24  Q.  But you filled it out, right, every time?

25  A.  You have to.  It's required.

1    Q.  And you knew that it was, even though you are saying it had

2    very little relevance, it still had to be true, right?

3    A.  Of course.

4    Q.  On direct examination you talked about some information

5    that you would tell to your clients about, if they are on

6    occupational disability, they could work, but it would have to

7    be a nonphysical job, right?

8    A.  Yes.  That came directly from -- the words came from a

9    booklet that's handed out to when they file an application for

10   disability.  I was just driving home the point.

11   Q.  If someone has a job and they are on occupational

12   disability, or, rather, if they are making income and they are

13   on occupational disability and they make more than about $700

14   in a month, then they no longer get their disability benefit,

15   right?

16   A.  They only lose the month benefit for the month they make in

17   excess of $770.

18   Q.  So each month that they make more than 700, they don't also

19   get disability, right?

20   A.  That's correct.

21   Q.  That is because disability is like a safety net, right?

22   A.  No, actually it's not.  The income restrictions on

23   disability are strictly to say that if you have the ability to

24   have substantial gainful activity -- which is pretty pathetic

25   to consider $770 substantial gainful -- but in saying that you

D7unles4                          Baran - cross

1   can be disabled, and from my experience at Social Security,

2   there is an army of disabled adult children who are in work,

3   schools, and housing where they make money every day.  You can

4   be disabled and earn money.  You just can't earn a lot of

5   money.

6   Q.  Well, you are allowed to earn as much money as you want, it

7   is just that you can't keep getting the disability benefits?

8   A.  That is correct.  But it doesn't say that you are not

9   disabled.  It never turns off your disability.

10  Q.  It just turns off the money?

11  A.  Yes.

12  Q.  And that's for occupational disability, right?

13  A.  No.  That's for total and permanent as well.

14  Q.  Well, total and permanent means that you are disabled for

15  work in the national economy, right?

16  A.  But you are allowed to make -- you are allowed to work in

17  something that is not physical and doesn't make too much money.

18  That wording is for occupational and total and permanent.  That

19  is actually Social Security wording.

20  Q.  Ma'am, when you retired at the end of 2006, you then went

21  to work as a consultant, right?

22  A.  I did.

23  Q.  In your direct testimony you said you started doing that

24  April of 2007, right?

25  A.  I said I wasn't sure.  It might have been March, but I

D7unles4                        Baran - cross

1  think it was April.

2  Q.  OK.  But that wasn't true, right?

3  A.  Pardon me.

4  Q.  That was not true, correct?

5  A.  It was true to the best of my knowledge.

6  Q.  You started seeing Regina Walsh one week after your last

7  day of work, right?

8  A.  I don't recall that.

9  Q.  Well --

10  A.  If I did, I don't recall that.

11  Q.  You don't recall that?

12  A.  Not at all.

13  Q.  Well, rather than pull up the document, you will agree that

14  you created a ledger of payments that you got for consulting

15  work, right?

16  A.  Yes.

17  Q.  And that ledger covered 2007, right?

18  A.  Yes.

19  Q.  So if we looked that the ledger, that would show --

20  A.  That would tell me when I started working.  I do not

21  remember.  Wow, I was starting in January.  I did not remember

22  that.

23  Q.  So you don't remember any of those --

24  A.  I did not remember starting in January.  I really did not.

25  Q.  -- first clients?

D7unles4                    Baran - cross

1    A.  I'm really surprised.  But, you know, I am not surprised

2    because Regina was a friend, and we had a lot of dealings over

3    the years we worked together.  So I am not surprised that I

4    would have done that for.

5              Mr. Cassidy was a friend also, so I am not advised at

6    that.

7              So was Mr. Antonette a very good friend.  You will

8    notice I didn't charge him.

9    Q.  You testified about a number of people who were your

10   clients or who were applying for occupational disability doing

11   physical jobs, right?

12   A.  I'm sorry.  I didn't hear the question.

13   Q.  You testified about people who were wearing steel-tipped

14   shoes --

15   A.  I'm sorry.  I didn't hear the question?

16   Q.  You testified about people who were your clients as doing

17   physical jobs, wearing steel-tipped shoes, having trouble with

18   the application?

19   A.  The majority of my clients, right.

20   Q.  I think you said 90 percent?

21   A.  I'll bet it is that high.

22   Q.  But a number of your clients were office workers, right?

23   A.  Yes.

24   Q.  Like, for example, Frank Kronenberg.  He was deputy general

25   counsel at the Long Island Rail Road.  Right?

D7unles4                    Baran - cross

1   A.  He was.

2   Q.  And that means he is a lawyer for the Long Island Rail

3   Road, right?

4   A.  Yes.

5   Q.  And Regina Walsh, she was an office worker, right?

6   A.  Yes.  But she had a lot of physical aspects of her job.

7   Q.  She didn't --

8   A.  She had to carry stuff around.

9   Q.  -- wear steel-tipped shoes to work --

10  A.  Pardon me?

11          See didn't wear steel-tipped shoes to work?

12  A.  No.

13  Q.  Barbara Lorenzo was payroll person?

14  A.  I don't know who Barbara Lorenzo is.  I won't remember all

15  of my names.

16  Q.  Let's see Daphne Charon.  She was an assistant

17  stationmaster?

18  A.  That is not an office job.

19  Q.  Denise Mace.  We saw her name?

20  A.  What did she do?

21  Q.  Assistant manager.

22  A.  I don't remember her at all.

23  Q.  Wage examiner, payroll clerk.  You don't remember that?

24  A.  I mean, I had -- to be perfectly honest, the reason all the

25  women came to me is because the others would turn them away

D7unles4                        Baran - cross

1   because they didn't want any denials on their record.  Women

2   were the only ones that got denied.

3   Q.  Your clients didn't get denied.

4   A.  Yes, they did.  Several of my women clients were denied.

5   Q.  The ones that I am talking about, didn't, right?  Ellen

6   McQueen, a secretary?

7   A.  I don't remember.  I know I had a bunch of denials, and

8   they were all -- I had one man and a bunch of women.

9   Q.  James O'Malley, director of reengineering.

10  A.  I'm sorry, Mr. Weddle.  This is five years of clients, and

11  I don't remember them all.

12  Q.  Joanne Domino.  Do you remember her?  A clerk.

13  A.  I remember the name because of the oddity of it, but, no, I

14  don't remember her.

15  Q.  John Harvey, a senior accountant and supervisor of ticket

16  stock and data control?

17  A.  No recollection of him at all.

18  Q.  Ma'am, your clientele was virtually all Long Island Rail

19  Road people, right?

20  A.  Yeah.  I had about 1 percent Amtrak and Metro-North.

21  Q.  1 percent of what?

22  A.  1 percent of my clients were perhaps --

23  Q.  Of something more than 180, right?

24  A.  Yes.

25  Q.  So 1 percent of the 180 would be like 1.8?

D7unles4                         Baran - cross

1    A.  I can remember offhand immediately two or three from

2    Metro-North and one from Amtrak.  That is all I remember right

3    now.

4    Q.  Metro-North ones were not disability clients.  They were

5    retirement, right?

6    A.  No, they were disability clients.

7    Q.  When you started seeing the Long Island Rail Road

8    employees, by and large they were working, right?

9    A.  Yes.  Probably working, yes.

10   Q.  By and large they were working overtime, right?

11   A.  I don't know that to be true.  You might say so.

12   Q.  But they likely were working overtime, right?

13   A.  I don't know.

14   Q.  In fact, there were sometimes when you calculated for a

15   client what his or her last day worked should be, right?

16   A.  Only if it concerned the hundred days.

17   Q.  Well, you also did it when you tried to figure out when

18   their retirement date would be and then work back from there

19   how many personal days they needed to take and when they should

20   go out sick, right?

21   A.  Only if they asked me, Can I take off sick?  I didn't get

22   involved in when they retired unless they asked me to.

23   Q.  If they did ask, then you would calculate for them what

24   their last day of work should be, right?

25   A.  No, I would tell them, if you are going take two weeks off,

D7unles4                          Baran - cross

1   then you can retire after that.  It wasn't a big calculation.

2   It didn't take rocket science to do this.

3   Q.  Ma'am, you talked about Social Security records and having

4   access to Social Security records when you were at the RRB?

5   A.  Yeah.

6   Q.  You know that the RRB checks other agencies' records to see

7   if people have wages or self-employment income, right?

8   A.  Yes.

9   Q.  You know that that information comes from tax reporting,

10  right?

11  A.  It does.

12  Q.  When you were working with clients who were going to apply

13  for disability, you told them that they should specifically go

14  to Westbury, right?

15  A.  Well, that was their servicing office.  Westbury serviced

16  everybody from the lighthouse in Montauk to the Midtown Tunnel.

17  Q.  Well, do you remember a client named Wentz?  Mr. Wentz?

18  A.  No.

19  Q.  He lived in New Jersey, right?

20  A.  I don't know.  I don't remember.

21          MR. WEDDLE:  Can I have Government Exhibit 507.  Never

22  mind.  I have it.

23  Q.  Ma'am, I'm showing you page 7 of Government Exhibit 507.

24          Do you see this entry relating to Mr. Wentz?

25          If you can just read that entry and let me know when

D7unles4                    Baran - cross

1   you're done reading it to yourself.

2   A.  OK.

3   Q.  Does that refresh your recollection that you, in fact, told

4   Mr. Wentz --

5   A.  I'm not surprised I did.

6   Q.  -- that he should file in Westbury, even though he lived in

7   New Jersey?

8   A.  Well, I worked there for 18 years.  I knew the contact

9   reps.  I knew they were good.  I knew they could get it done,

10  and properly.

11          And I also knew the New Jersey office in Newark.  It

12  is in a horrendous neighborhood.  You take your life in your

13  hands just to walk there.  So he worked on Long Island and he

14  knew Long Island, so I said go to Westbury and file.  I don't

15  remember him, but I know I would say that to somebody who lived

16  in New Jersey.

17  Q.  Ma'am, let's talk about total and permanent disability.

18  A.  OK.

19  Q.  Total and permanent disability means that you are disabled

20  from working any job in the national economy, right?

21  A.  Unable to sustain any gainful employment.

22  Q.  Do you remember in opening statement your lawyer said that

23  total and permanent disability involves people with canes and

24  wheelchairs?  Do you remember that?

25          MR. JACKSON:  Objection.

D7unles4                          Baran - cross

```
1    A.  I don't --

2               THE COURT:  Sustained.

3               MR. JACKSON:  100 percent.

4    Q.  With respect to your husband, this case is about total and

5    permanent disability, right?

6               MR. JACKSON:  Objection.

7    A.  His case he was awarded total and permanent disability,

8    yes.

9    Q.  You told your lawyer on direct testimony or you told all of

10   us on direct testimony that he's not bedridden, right?

11   A.  Of course not.

12   Q.  He doesn't use a wheelchair, right?

13   A.  No.

14   Q.  Or a cane --

15   A.  Yet.

16   Q.  -- right?

17   A.  Yet.

18   Q.  Or a cane, right?

19   A.  Not yet.

20   Q.  And he's still collecting total and permanent disability

21   benefits to this day, right?

22   A.  Yes.

23   Q.  All together he's probably received more than $200,000 in

24   disability benefits since --

25   A.  I have no idea.
```

D7unles4                          Baran - cross

```
1    Q.  -- he retired?

2              Long before your husband retired, he was planning to

3    retire and apply for disability, right?

4    A.  When the pain became unbearable, he started to think about

5    retiring.

6    Q.  When he started thinking about retiring, that was sometime

7    before he retired, right?

8    A.  A few years before.

9    Q.  And so let's say in the year before he retired, he was

10   planning to retire when he retired, right?

11   A.  If what you just said made sense, I didn't get it.  What

12   did you say, sir?

13   Q.  What was your husband's retirement date?  It's December 29,

14   2003, right?

15   A.  I don't remember his retirement date.  I don't remember

16   mine.  He retired a couple of years before me.  It could have

17   been '03.

18   Q.  For months before that day he knew that that was going to

19   be his retirement date, right?

20   A.  Yes.

21   Q.  He knew that when he retired he was going to apply for

22   disability, right?

23   A.  Yes.

24   Q.  In fact, he knew that the whole year of his retirement

25   year, right?
```

D7unles4                    Baran - cross

1   A.  Yes.

2   Q.  And that whole year he was working overtime, right?

3   A.  Some of it was mandatory.

4   Q.  But the answer is yes, right?  Overtime?

5   A.  The answer is yes, some of it was mandatory.

6   Q.  We saw on the screen that it was something like 1300 hours

7   of overtime in the year he retired, right?

8   A.  Yes.  You can work overtime in pain just like you work

9   regular time in pain.  You just make more money that way.

10  Q.  So when his overtime was voluntary, that is, optional, he

11  did it to make more money, right?

12  A.  He did it.

13  Q.  So let's talk about your taxes.

14          MR. WEDDLE:  May I just have a moment, your Honor.

15  Q.  Just going back to the total and permanent disability of

16  your husband, while he's been on total and permanent

17  disability, you have traveled to Egypt, right?

18  A.  Yes.

19  Q.  And Spain, right?

20  A.  Having pain in your back doesn't preclude you from

21  traveling, Mr. Weddle.  It precludes you from doing it with a

22  great deal of joy sometimes, and you can't do it without taking

23  pain medication, but it doesn't preclude you from traveling.

24  Q.  This will go a little faster if you just answer the

25  questions.

D7unles4                          Baran - cross

1          MR. JACKSON:  It would also go faster if we just

2    relied on the passport and the travel records.

3          THE COURT:  Asked and answered.

4          MR. JACKSON:  Thank you, Judge.

5    Q.  All the golf that your husband has played in his retirement

6    that's been while he's on total and permanent disability,

7    right?

8    A.  And on medication.  They go together.

9    Q.  Let's talk about your taxes, ma'am.  You typically charge

10   more than a thousand dollars to fill out disability forms,

11   right?

12   A.  Yes.

13   Q.  You knew that when you were doing that you needed to pay

14   taxes on the money, right?

15   A.  I did pay my taxes.

16   Q.  When you got the thousand dollars or the $1200 from Regina

17   Walsh, you knew you had to pay taxes on that money, right?

18   A.  I did.

19   Q.  We could put the list up again, but each time you got $1200

20   from a client you knew you had to pay taxes on it, right?

21   A.  I did.

22   Q.  So when you filed your 2007 tax return, you knew you were

23   suppose to fill it out truthfully, right?

24   A.  I amended those tax returns and paid all the taxes.

25   Q.  When you filed your 2007 tax return, you knew that you were

D7unles4                          Baran - cross

1   supposed to do it truthfully, right?

2          MR. JACKSON:  Asked and answered, Judge.

3          THE COURT:  Sustained.

4   Q.  You filed a tax return for 2007, originally you filed a tax

5   return for 2007 that said that you had made about $14,000 from

6   consulting, right?

7          MR. JACKSON:  Objection.

8          THE COURT:  Overruled.

9   A.  I amended that tax return.

10  Q.  I understand that.  I know that you amended the tax return.

11  But when you filed it in early 2008, you claimed that you had

12  made about $14,000, right?

13  A.  I didn't keep records very well.

14  Q.  When you filed your tax return in early --

15  A.  I did.

16  Q.  -- 2008?

17  A.  I did.  Yes, I did.

18         MR. JACKSON:  Judge, I am just going to object.

19  Q.  You did what?

20         MR. JACKSON:  We have had the accountant here, Judge.

21  We have had the IRS official here, Judge.

22         MR. WEDDLE:  If I could get a straight answer Judge,

23  it would be a lot --

24  A.  I did.  I said yes, I did.

25  Q.  When you filed that, that was false, right?

1          MR. JACKSON:  Objection.

2          THE COURT:  Overruled.

3   A.  It was amended, corrected, and all the taxes were paid.

4   Q.  When you filed it in early 2007, it was false, right?

5          MR. JACKSON:  Objection to the characterization.

6          THE COURT:  Overruled.

7   A.  It wasn't false.  It was a mistake.

8          THE COURT:  Ms. Baran, it is a yes-or-no answer.

9          What was the question?

10  Q.  When you filed your 2007 tax return in early 2008, it was

11  false about how much income you made from consulting?

12         MR. JACKSON:  Objection to the characterization of

13  false, Judge.

14         THE COURT:  Rephrase the question.

15  Q.  When you filed your tax return in the beginning of 2008 for

16  2007, it did not accurately report your true income from

17  consulting, right?

18  A.  Yes.

19  Q.  And after that you were interviewed by special agents,

20  right?

21  A.  Yes.

22  Q.  And they asked you whether you reported the money you got

23  from Long Island Rail Road?

24         MR. JACKSON:  Objection, Judge.

25  Q.  From Long Island Rail Road to the IRS, right?

D7unles4                        Baran - cross

1           THE COURT:  Overruled.

2    A.  Yes.

3    Q.  You told them that that was between you and the IRS, right?

4    A.  It was.

5    Q.  Immediately after that, you told your tax preparer that you

6    made tens of thousands of more money, right?

7    A.  I corrected -- I amended my tax return.

8    Q.  Ultimately you amended it and you filed a tax return

9    showing that you made $67,000, right?

10   A.  I did.  And I paid all the taxes that were due.

11   Q.  Which was another $20,000, right?

12   A.  Correct.

13   Q.  In the years since 2007, you have reported over $370,000 in

14   income from consulting --

15   A.  I did.

16   Q.  -- right?

17           with maybe two to three exceptions, that is all money

18   from Long Island Rail Road employees, right?

19   A.  It's from my clients, whoever they may be.

20   Q.  Your clients, with a couple of exceptions I think you have

21   already testified, were Long Island Rail Road employees, right?

22   A.  Correct.

23   Q.  When you call yourself a disability specialist, that

24   doesn't mean that you have some kind of medical training,

25   right?

D7unles4                    Baran - cross

A.   No.

Q.   It means you specialize in getting disability money for

people, right?

A.   No, it means I specialize in completing the applications

and going through the process.

Q.   And the process is designed to get money, disability money

for your clients, right?

A.   The process --

MR. JACKSON:  Objection.

THE COURT:  Sustained.

Q.   Ma'am, you knew from your experience how to fill out the

form in order to successfully get disability benefits for your

clients, right?

A.   No.  Sir, you are insinuating that I did something illegal,

and that's not the case.  I knew because I was instructed by

members of the Railroad Retirement Board who taught us what was

necessary on those applications.  Necessary, sir.  Not in any

way trying to enhance it to help a client.  Necessary for the

completion so that Chicago could make a determination.

MR. WEDDLE:  Your Honor, move to strike.  This is not

an answer to any question.

THE COURT:  Sustained.

MR. JACKSON:  I'm sorry, Judge.  I thought it was

responsive to the question.

THE COURT:  Sustained.

D7unles4                           Baran - cross

1    Q.  For filling out the disability applications for your

2    clients, you charged more than a thousand dollars, right?

3    A.  I did.

4                MR. JACKSON:  Objection.

5                THE COURT:  Overruled.

6                MR. JACKSON:  Judge, this is --

7                THE COURT:  Overruled.

8    Q.  More than a thousand dollars, right?

9                THE COURT:  Asked and answered.

10               THE WITNESS:  I'll say.

11               THE COURT:  Asked and answered.

12   Q.  The amount that you charged to fill out these disability

13   applications was more than four times what your tax preparer

14   charged you to fill out your tax returns, right?

15               MR. JACKSON:  Objection.

16               THE COURT:  Sustained.

17   A.  I don't remember what I paid for taxes.

18               THE COURT:  Sustained.

19               THE WITNESS:  Thank you.

20               MR. WEDDLE:  Can we put up the 2007 tax return, which

21   I think is Government Exhibit 503-A.  Can we go to the next

22   page.  Blow up the signature area.

23   Q.  Ma'am, when you filed your 2007 tax return, you knew you

24   were doing it under penalty of perjury, right?

25   A.  Yes.

D7unles4                          Baran - cross

```
 1    Q.  That is the same penalty that applies to your testimony

 2    here in court, right?

 3    A.  I beg your pardon?

 4    Q.  That is the same penalty that applies to your testimony

 5    here in court, right?

 6    A.  Yes.

 7    Q.  Penalty of perjury?

 8    A.  Yes.

 9    Q.  And you knew that when you filled out applications for your

10    clients that they needed to be filled out truly and accurately,

11    right, under penalty of criminal prosecution?

12    A.  Yes.

13    Q.  That's why I think in your direct testimony you said you

14    never exaggerated, is that right?

15    A.  Correct.

16    Q.  Because you know that to fill out those forms with

17    exaggerations would be --

18            MR. DURKIN:  Objection.

19    Q.  -- wrong, correct?

20            THE COURT:  Overruled.

21    A.  Of course.

22    Q.  You, in fact, know that to submit documents to the RRB in

23    order to get benefits from the RRB that are exaggerated would

24    be wrong, right?

25            MR. DURKIN:  Objection.
```

D7unles4                          Baran - cross

1              And I have a motion.

2              THE COURT:  Overruled.

3    A.  Of course.

4    Q.  When the clients came to you, you made sure that the forms

5    were filled out in virtually the same way for all your clients,

6    right?

7    A.  That is not true.

8    Q.  And the way that you filled them out was false, correct?

9    A.  No, they were not.

10   Q.  And you did it because you profited from it, right?

11   A.  I did it because I wanted to do something useful in my

12   retirement and to make a little extra money.  I didn't think

13   that was illegal in this country.

14   Q.  Well, people came to you because you knew what needed to be

15   said to get them the disability, isn't that right?

16   A.  Not true.

17             MR. JACKSON:  Objection.

18             THE COURT:  Sustained.

19   A.  Not true.

20             MR. WEDDLE:  I have nothing further, your Honor.

21   REDIRECT EXAMINATION

22   BY MR. JACKSON:

23   Q.  Mr. Weddle showed you a tax return, right?  Not the first

24   time you saw it, is that right?

25   A.  Not the first time.

D7unles4                    Baran - redirect

1    Q.  Not the second time you saw it, is that right?

2    A.  Not the second time.

3    Q.  How about the third time you saw it?

4    A.  Must be more than that.

5              MR. WEDDLE:  Asked and answered.

6    Q.  Regarding the tax return that he did show you, right, it

7    was a signature line that he showed you?  We don't need to put

8    it back up on the screen, but you remember the signature line?

9    A.  I do.

10   Q.  With regard to the signature line on those tax returns, of

11   the tax return that he showed you, whose responsibility was it

12   to fill out the signature an the signature page?

13   A.  Mine and my husband's.

14   Q.  And on the applications for disability that you assisted

15   applicants with, whose responsibility was it to put something

16   on the signature page?

17   A.  The applicant's.

18   Q.  And where did they do that, if you know?

19   A.  At the Railroad Retirement Board.

20   Q.  Now, regarding the taxes that you have seen, as you sit

21   there today, Ms. Baran, do you owe any money for 2007?

22   A.  None at all.

23   Q.  2008?

24   A.  No.

25   Q.  2009?

1    A.  No.

2    Q.  2010?

3    A.  No.

4    Q.  2011?

5    A.  No.

6    Q.  2012?

7    A.  I haven't done my taxes yet.

8    Q.  All the taxes for which the government is required to get,

9    are they paid and up to date?

10   A.  Absolutely.

11           THE COURT:  Asked and answered.

12   Q.  With respect to Gus Baran, we have talked about him a lot

13   too, is that correct?

14   A.  We have.

15   Q.  Ma'am, is your husband, Mr. Baran, permanently and totally

16   disabled?

17   A.  Yes, sir.

18   Q.  And as a result of that, is there anything that you are

19   aware of in your 20 years at Social Security which preceded the

20   Railroad Retirement Board which prohibits you to travel when

21   you are disabled?

22   A.  Absolutely not.

23   Q.  With regard to what you have done in the last 20 years at

24   the Railroad Retirement Board, is there anything in those

25   rules, regulations, etc., that prohibits you from traveling

D7unles4                          Baran - redirect

1    then?

2    A.   No.

3    Q.   Mr. Weddle asked you about Egypt, too, right, yes?

4    A.   Yes.

5    Q.   And Italy and other things, right?

6              With regard to all the trips that you have taken, is

7    there any law that you know of by Social Security or the

8    Railroad Retirement Board that says you can't purchase a plane

9    ticket?

10   A.   No.

11   Q.   What about with regard to the activities that you engage in

12   when you are there?

13             What, if any, limits do you have based upon your

14   husband's disability when you do travel?

15   A.   Well, we can't do as much as we used to.  We can't do as

16   much walking.  We limit ourselves to what we can do.  Usually

17   we take cruises because they are not very physical.

18   Q.   With regard to the travel that you keep hearing about

19   repeatedly and repeatedly, is there anything where you ever

20   stopped when you were in Egypt by the custom agents to tell you

21   you were not welcome?

22   A.   No.  Only Russia.

23   Q.   What about in Italy when you were there?  Were you stopped

24   there?

25   A.   No.

D7unles4                        Baran - redirect

```
 1   Q.   The Dominican Republic at any point?

 2   A.   No.

 3            THE COURT:  Asked and answered.

 4   Q.   You were also were shown some isolated entries, which again

 5   I don't have to put up, I will just tell you about it -- if you

 6   don't remember it, tell me and I'll show you -- about some Mr.

 7   Wentz from New Jersey.

 8            Do you remember that?

 9   A.   Yes.

10   Q.   Do you know who Mr. Wentz is?

11   A.   I don't remember him.

12   Q.   Beyond the single, isolated, particular, unique example

13   that the government showed you of Mr. Wentz, that he should go

14   to Westbury, could you tell the jury how many other people you

15   directed to go to Westbury?

16   A.   Well, all the people who live in their service area and

17   probably anybody who lives in New Jersey, because New Jersey's

18   office really is in a very nasty neighborhood and I don't want

19   to sent my clients there.

20   Q.   Forgetting about the nasty neighborhood or whatever else,

21   regarding people who are in a service area, what is a service

22   area please?

23   A.   The Westbury district is from Montauk Lighthouse to the

24   Midtown Tunnel.  Manhattan office, the other side of the

25   Midtown Tunnel up to probably Rockland County.
```

D7unles4                    Baran - redirect

1    Q.  And when you are talking about Montauk, am I understanding

2    you for the sake of time to mean out on Long Island in Suffolk

3    County?

4    A.  Yes.  I'm sorry if you don't understand that.

5    Q.  With regard to Montauk and Suffolk County out on Long

6    Island to the Midtown Tunnel --

7    A.  Right.

8    Q.  -- is it all the geography in between that's covered for

9    the area?

10   A.  That's right.

11   Q.  With respect to your clients and where they lived, worked,

12   etc., were they in that geographical area or somewhere else?

13   A.  99 percent of them were in that geographical area.

14   Q.  Mr. Weddle asked but whether your clients get denied.  Do

15   you remember that?

16   A.  Yes.

17   Q.  Have your clients been denied?

18   A.  Yes.

19   Q.  What's the process in the event that a client is denied for

20   you to follow?

21   A.  The Railroad Retirement Board, you have the option to file

22   what's called a reconsideration.  In the denial letter, they

23   tell you why they are denying you.  They will say that you can

24   carry too much weight to be disabled or you can don't do enough

25   of this or that.

D7unles4                        Baran - redirect

1          And you can go back to a doctor and ask the doctor if

2     he can contest that.  And if you can get medical to give them

3     to reconsider, they will reconsider.  If it's denied at that

4     level, you have the right to appeal it to an appeal board.  So

5     it goes to somebody entirely different.  It is no longer in the

6     disability unit anymore.

7          That's what people get a lawyer to speak for them.  It

8     is done every day under the Social Security law because they do

9     a tremendous amount of denials there because they are always

10    working with total and permanent.

11    Q.  Ms. Baran, I have two other areas to cover with you, but

12    before I do, just one more question, or just one more issue

13    regarding Gus Baran, your husband.

14         In your 20 years at Social Security, when you worked

15    there before the Railroad Retirement Board, were you aware of

16    any rule, regulation, policy, procedures, protocol, manual,

17    anything that prohibits a person who's permanently and totally

18    disabled from playing golf?

19    A.  Absolutely not.  Golf is usually suggested by doctors.  It

20    is a light form of exercise, especially if you're using the

21    cart.

22    Q.  With regard to the trips that you took all over the world,

23    all over the country, wherever it is that you went that your

24    passport reflects, which is in evidence, and that the travel

25    documents reflect, and I will not put up on the screen, did he

D7unles4                          Baran - redirect

1    play golf when he was there?

2    A.  No.

3    Q.  OK.  But in Florida, though, he did?

4    A.  Florida he played golf, yes.

5    Q.  When he was playing golf in Florida, what, if anything, did

6    he do so as to ensure his health and his physical condition?

7    A.  He used a golf cart.

8    Q.  Beyond the golf cart, did he consult with anyone while he

9    was in Florida for his physical health?

10   A.  Yeah.  He has to use a chiropractor because stenosis

11   constricts the blood in your spinal column.  So a chiropractor

12   uses stimulation and heat and spinal manipulation to help the

13   blood flow.

14   Q.  Mr. Weddle asked you about Dr. Ajemian and whether or not

15   some New York Times article came out.  You recall that?

16   A.  I do.

17   Q.  I don't know the specific question, the reporter knows it,

18   we can review it later, but with regard to Dr. Ajemian and the

19   New York times and his mention in the paper, what impact, if

20   any, did that have on your consulting business?

21   A.  The following year I had half the income.

22   Q.  OK.  Why?

23   A.  Well, a lot of people cancelled their retirements because

24   of this hoopla, which we all thought was nonsense anyway, but

25   they cancelled their retirements because they were afraid it --

1    Q.  With regard --

2    A.  -- was intimidation really.

3    Q.  With regard to those intimidated or afraid of retiring, did

4    you shut down your business because Dr. Ajemian, some New York

5    Times article came out about him?

6    A.  I consulted an attorney and asked him to look at all my

7    paperwork and tell me if I was doing anything wrong.  I could

8    see nothing wrong, but I wanted to make sure that an attorney

9    would say that.  And he said it what fine.

10            MR. WEDDLE:  Your Honor, can we approach on this.

11            THE COURT:  Sustained.

12            MR. JACKSON:  I will withdraw it.

13            MR. WEDDLE:  Objection.  Move to strike.

14            THE COURT:  Sustained.  Strike.

15            MR. JACKSON:  They are moving to strike.  We're moving

16   on.

17            MR. WEDDLE:  Can we approach on this if there any more

18   on this?

19            THE COURT:  No.

20   Q.  Ms. Baran, regarding your business in its form after

21   Ajemian's New York Times article that the prosecution brought

22   up, did you still continue to have a business?

23   A.  I did.

24   Q.  OK.  And what year was that?

25   A.  2008.

D7unles4                           Baran - redirect

1    Q.  In 2009 did you have a business?

2    A.  Yes.

3    Q.  In 2010 did you have a business?

4    A.  Yes.

5    Q.  In 2011 did you have a business?

6    A.  Yes.  Until November.

7    Q.  Thank you.  That was after the New York Times article?

8    A.  Yes.

9    Q.  That was after Ajemian that the people talked to you about,

10   the doctor?

11          THE COURT:  Asked and answered.

12   Q.  Finally, Ms. Baran, you were asked questions about ballast

13   at Metro-North, is the ballast the same at Metro-North as it is

14   on the Long Island Rail Road.  Do you remember those questions?

15   A.  I would imagine so, but I don't know.

16   Q.  Electricians, do they do the same thing as they do in the

17   Long Island Rail Road at Metro-North?

18   A.  I don't know.

19   Q.  I have a different question for you.  The question is, with

20   respect to the pension systems, based on your knowledge,

21   training, wisdom, experience in 20 years at the Railroad

22   Retirement Board, do you know if there are distinctions between

23   Metro-North and Long Island Rail Road as it relates to

24   retirement?

25   A.  Enormous difference.

D7unles4                        Baran - redirect

1   Q.  Now, with regard to the enormous differences which might

2   otherwise impact someone applying for an occupational

3   disability, would you give us a sense, if you know, based on

4   your personal training, knowledge, and experience of what, if

5   any, differences there are?

6   A.  Well, over the years, until they got life insurance, health

7   insurance rather, they -- I don't remember the year they got

8   health insurance, but before they got health insurance, if they

9   chose to retire, they could do so and they could even go for a

10  disability.  They might get their pension, but they had no

11  health insurance.

12        So that was a minimum of $1200 a month that it was

13  going to cost them to buy health insurance, where Long Island

14  Rail Road employees get health insurance with their pension and

15  they keep it until they're age 65 when they get Medicare.

16  Q.  In addition to Metro-North employees not having health

17  insurance and therefore not being in a position to retire, are

18  there any other differences that might affect someone at

19  Metro-North applying for retirement?

20  A.  They didn't make as much money.  I don't mean with their

21  overtime.  Their base pay was much less, so their pensions were

22  less.  So they didn't have enough money after 20 years in their

23  pension to retire.  Most of them work for at least 30 years at

24  Metro-North just to build up their pension.

25        And if they have 30 years and they get to 60, well,

D7unles4                         Baran - redirect

1    then they don't need a disability because they are eligible for

2    full benefits at Railroad Retirement.

3    Q.  What, if any, impact might that have upon a statistical

4    chart demonstrating the distinctions, the differences, the

5    amount in number of people from Metro-North that go out on

6    occupational disability as opposed to the Long Island Rail

7    Road?

8           MR. WEDDLE:  Objection, your Honor.

9    A.  Huge.

10          THE COURT:  Sustained.

11   A.  The chart was shown here was really --

12          THE COURT:  Sustained.

13          MR. JACKSON:  Judge, may I not address --

14          THE COURT:  You may rephrase the question.

15          MR. JACKSON:  OK.

16   Q.  With regard to Metro-North and with regard to Long Island

17   Rail Road you just addressed I believe the distinctions, is

18   that correct?

19   A.  I did.

20   Q.  What, if any, difference would those distinctions have upon

21   a person in Metro-North applying for occupational disability?

22   A.  They wouldn't -- they work wounded literally because they

23   can't consider retirement financially.  I mean, it comes down

24   to everybody is dollars and cents.  If you can't afford to

25   retire, no matter how bad it hurts, you are going to keep

D7unles4                        Baran - redirect

1    working.  They couldn't afford to retire because their pension

2    wasn't as good and they weren't going to have health insurance,

3    so that would have cost them a lot of money, and so they

4    continued to work in pain and misery whatever it is.  But they

5    could not afford to retire.

6    Q.  Is this something that you know based upon your personal

7    experience, your knowledge, your training dealing with these

8    people?

9    A.  When I was still working at the Railroad Retirement Board,

10   I was asked by the office of the labor member actually, I

11   actually got a call from Mr. Speakman.

12   Q.  Who is Mr. Speakman?

13   A.  Mr. Speakman was the labor member of the Railroad

14   Retirement Board for many years.  He's retired now.  And he

15   requested me to go to Croton on the Hudson -- which is not my

16   service area, it's the service area of the New York office, and

17   I told him that.  He said, Do me a favor, Marie, and I'll owe

18   you one.

19          You don't say no to the labor member, and so I took a

20   train up to Croton on the Hudson, and I sat with a large group

21   of union representatives from Metro-North.

22          And they told me their troubles and they told me how

23   their pension wasn't enough and they told me they didn't have

24   health insurance and they were asking me to tell them how to

25   negotiate.  And I thought this was pretty funny.  Tell me how

D7unles4                          Baran - redirect

1    to negotiate a contract like the Long Island Rail Road.  I told

2    them, of course, that I couldn't do that.  But --

3              MR. WEDDLE:  Your Honor, objection.  This is all

4    hearsay.  Move to strike.

5              THE COURT:  Sustained.

6    Q.  Now, with regard to -- my final question as far as your

7    husband, since he's come up an awful lot.

8    A.  He sure has.

9    Q.  You were asked about overtime that he made, is that right?

10   A.  Yes.

11   Q.  Were there times in your home where Gus Baran -- Ostap

12   Baran.  You know him as Gus, correct?

13   A.  Yes.

14   Q.  Gus Baran didn't come home for dinner?

15   A.  Yes.

16   Q.  Did you learn the basis or reason why he may not have come

17   home for dinner?

18   A.  He was working overtime.

19   Q.  With regard to him working that overtime, could you tell

20   us, in working that overtime, what, if any, impact did that

21   have upon his health?

22   A.  Well, of course he was in pain.  His back was a problem.

23             But he also had sleep apnea.  So, not sleeping

24   properly, working 16-hour shifts, and then coming home and

25   sleeping five, six hours and getting up again to go back to

D7unles4                          Baran – redirect

1    work was devastating on his health.

2              MR. JACKSON:  Thank you, Judge.

3              THE COURT:  Anyone else.

4              Recross?

5              Mr. Ryan?

6    RECROSS EXAMINATION

7    BY MR. RYAN:

8    Q.  Did you go to Ireland in your travels.

9    A.  I did.

10             MR. RYAN:  Thank you.

11             THE COURT:  Mr. Weddle, anything else?

12             MR. WEDDLE:  Nothing, your Honor.

13             THE COURT:  Thank you.  You may step down.  You are

14   excused.

15             (Witness left the stand)

16             THE COURT:  We will break at this point for the lunch

17   break.  We will return at 2.

18             (Continued on next page)

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Thank you.  Let's go over for a few

3    minutes, Mr. Jackson, your next witnesses based on the proffer

4    that you have made to the government.

5           MR. JACKSON:  Yes, my next two witnesses, Judge, are,

6    based on the proffer that I have made to the government for the

7    People's preparation, my next witness will be Michael Jansen,

8    and that will be followed by Ralph Domenici.

9           With regard to time, Judge, I would say for Jansen

10   maybe 45 minutes I'm thinking.  For Mr. Domenici maybe an hour

11   and 10 minutes, an hour and 15 minutes.

12          Following that, Judge, it is our intention to rest.

13          THE COURT:  Thank you.

14          MR. JACKSON:  Thank you, Judge.

15          MR. TEHRANI:  Your Honor.

16          THE COURT:  Mr. Tehrani.

17          MR. TEHRANI:  Just on Mr. Domenici, we did get a

18   proffer from Mr. Jackson last night.  He continues to suggest

19   that Mr. Domenici is going to testify about differences between

20   Metro-North and perhaps why people at Metro-North are retiring

21   or not retiring as opposed to Long Island Rail Road.

22          That was part of our motion that we submitted on

23   Sunday.  We continue to think that that is not appropriate for

24   him on testify about.  The other things that he wants to

25   testify about are character, etc.  That seems to be fine.  But

D7unles4                     Baran - recross

1    on that issue, to the extent they are pertinent character

2    traits, that would be fine.

3            But testimony on Mr. Domenici's experience or views on

4    why people at Metro-North are retiring are not --

5            THE COURT:  If there is no foundation for any personal

6    knowledge of expertise that he may have concerning Metro-North,

7    Mr. Jackson, his testimony in that score would have to be

8    limited.

9            MR. JACKSON:  Absolutely, Judge.  But I intend to lay

10   quite an adequate foundation, which accounts for the hour and

11   15 minutes of his testimony.  I suspect if I didn't lay the

12   foundation the prosecution would be objecting that there was no

13   foundation.

14           But, to the extent that I anticipate they will object,

15   I will lay a foundation as to his training, as to his

16   background, as to his experience, as to his dealings with

17   Metro-North, their union, their representatives, their

18   management.  So, therefore, I think it would be fair game.

19           THE COURT:  All right.  We'll await.

20           Anything else?  I'll see you at 2 o'clock.

21           Thank you.

22           In order not to keep the jury waiting -- I changed my

23   mind.  Why don't we conclude with Mr. Jackson's witnesses.

24   That will probably take the balance of the day.  Then we could

25   take time after the end of the day to return to the issue

D7unles4                        Baran – recross

1    raised by Mr. Durkin.

2              All right.

3              MR. DURKIN:   Thank you, Judge.

4              (Luncheon recess)

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7ULLES5

AFTERNOON SESSION

2:08 p.m.

1

2

3          (Jury present)

4          THE COURT:  Welcome back.  Thank you.

5          Mr. Jackson, your next witness.

6     MICHAEL ANTHONY JANSEN,

7          called as a witness by the Defendant Baran,

8          having been duly sworn, testified as follows:

9     DIRECT EXAMINATION

10    BY MR. JACKSON:

11    Q.  Mr. Jansen, could you just tell us who you are?

12    A.  I am retired.  I was a district manager of the Railroad

13    Retirement Board in Detroit for 31 years.

14    Q.  Do you have a family?

15    A.  Yes.  I've been married for 41 years.  I have two grown

16    children and three grandchildren.

17    Q.  Where were you born and raised?

18    A.  I was born and raised in Wisconsin.  My hometown is Pelican

19    Lake, Wisconsin.  Sure you've all been there.

20    Q.  And presently are you still at Pelican Lake or somewhere

21    else?

22    A.  No.  I reside in Livonia, Michigan.  It's a suburb in

23    Detroit.

24    Q.  So you're not from New York?

25    A.  No, not from New York.

1    Q.  Or Chicago.

2            As it relates to your past work with the railroad, you

3    said it was 31 years?

4    A.  Thirty-one years as the manager of the Detroit office, yes.

5    Q.  Could you tell us as the manager of the Detroit office,

6    first of all, what specifically is the office's name that you

7    were the manager of?

8    A.  The Detroit, Michigan District Office.

9    Q.  Is it that the Railroad Retirement Board office?

10   A.  Of the Railroad Retirement Board, yes.

11   Q.  Could you give us a sense, Mr. Jansen, of what your

12   responsibilities were in that 31-year period where you were the

13   manager?

14   A.  Primarily supervising my staff.  And the staff varied

15   anywhere from I had as many as 16 employees back in the earlier

16   days, and when I left finally in 2011, I had four plus myself.

17   Downsized that much.

18   Q.  And with regard to what you did beyond managing people,

19   what about the nitty-gritty tasks that were associated with

20   your daily activities?

21   A.  Oh, I took applications along with everybody else.  I

22   attended and spoke at union meetings, union lodge meetings,

23   spoke at retirement meetings.  Just I was the face of the

24   Railroad Retirement Board in Detroit.

25   Q.  And when you say you took applications, what applications

D7ULLES5                         Jansen - direct

1   are you referring to?

2   A.  All of the variety of applications that we take from

3   retirement applications, survivor applications, disability

4   applications.

5   Q.  In the course of the 31 years, did you become familiar with

6   the protocols and policies of the railroad board?

7   A.  Absolutely.

8   Q.  And just along those lines, if you could just talk for a

9   moment, please, about any training that you have?

10  A.  Well, when I started in 1975 with the Railroad Retirement

11  Board, they didn't have a formal training program.  We had some

12  audio tapes to listen to and that was about it and the rest of

13  it was OJT.  I was in the Milwaukee district office.

14  Q.  If I could just stop through without going further.

15          What does OJT mean?

16  A.  On the job.

17  Q.  OK, so on-the-job training?

18  A.  In your face, right.

19  Q.  So regardless of the manuals, just getting it done?

20  A.  Yes.

21  Q.  I'm sorry, didn't mean to interrupt.

22  A.  No, it's OK.  Sorry to start using government lingo.  I

23  don't want to do that.

24          THE COURT:  Mr. Jackson.

25          MR. JACKSON:  Yes, Judge.

D7ULLES5                          Jansen - direct

1            THE COURT:  Counsel, please approach.

2            (At the side bar)

3            THE COURT:  Mr. Jackson.

4            MR. JACKSON:  Yes, Judge.

5            THE COURT:  You were drinking coffee.

6            MR. JACKSON:  Sorry, your Honor.

7            THE COURT:  I don't mind people drinking water and I

8    prefer when they do that to take it out of a cup rather than

9    the bottle.  Just slight protocol, may be quirky, but sometimes

10   it presents an impression.

11           MR. JACKSON:  Thank you, Judge.  No worries.  Thank

12   you.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

D7ULLES5                          Jansen - direct

1              (In open court)

2    Q.  You can continue, please.

3    A.  When I started in '75, there was not really a formal

4    training program.  But I was in the Milwaukee district office

5    for only about six months where I had the opportunity to get

6    promoted to a one-person office down in Evansville, Indiana.

7    And since there was only one person down there, I didn't have

8    anyone to train me down there either.

9              So I became quite familiar with the field operating

10   manual, which is our set of instructions.  It's multiple three

11   ring binders of all the instructions and information that

12   contact representatives in the Railroad Retirement Board had to

13   know about the variety of for the laws and the instructions and

14   how to proceed, how to follow the protocols.

15   Q.  And if I might just ask, what is a contact representative?

16   A.  It's the face of the board.  It's the people who are in

17   direct contact, whether by telephone or in person, with the

18   public.

19   Q.  Now, with respect to the training that the contact

20   representatives had that worked for you, what was that, the

21   training they received just like your training?

22   A.  Well, after I came to Detroit, I was asked to join a group

23   of individuals who were -- who were given some training on how

24   to train others.  And I began as an instructor of training for

25   the new contact representatives, to give them some classroom

D7ULLES5                          Jansen - direct

1    time before they were put out into the offices.  So a person

2    who's newly hired with the board as quickly as possible after

3    their hiring was brought in to a group setting and was given as

4    many as four to six weeks of training.  At time it is dropped

5    down to two, sometimes it was three or four, but several weeks

6    of in-classroom training.  And I was an instructor for that in

7    12 different cases, 12 different times over the years.

8    Q.  May I ask, Mr. Jansen, the training that the contact

9    representatives received, is that quarterly, yearly, biyearly,

10   biannually, how much training do they receive generally?

11   A.  It changed over the years.  Initially it was the

12   four-to-five-week class, and then any subsequent training was

13   the responsibility of the local manager on a regular day-to-day

14   basis or weekly basis.  But some kind of ongoing continuing, as

15   changes occurred, as things happened, just keep the person up

16   on.  And there have been times when periodic training, as the

17   person gets a little bit, a few years under them where they're

18   brought back in for some brief reminder, reminder training.

19   Q.  Now, with regard to the training that the contact

20   representatives received, you mentioned that you were a manager

21   in another state office; is that right?

22   A.  Yes.

23   Q.  Now, is the training that contact representatives received

24   for the Railroad Retirement Board, is that uniform throughout

25   the country or does it differ by region or state, could you

D7ULLES5                    Jansen - direct

1   just explain that, please?

2   A.  It is uniform by the United States.  It is a federal law

3   that we're administering, the Railroad Retirement Act.  And the

4   goal is that whichever office a person talks to, whichever

5   person in that office a railroad worker or family member talks

6   to is consistent and accurate and thorough.

7   Q.  With regard to the training that we're speaking about now,

8   could you tell us whether that training includes the

9   application process, reviewing application with an applicant,

10  going through questions, and just anything associated with

11  preparing and getting that application to Chicago?

12  A.  Absolutely.  The development of what we call the

13  development of the application, the taking of the paperwork for

14  a person to receive a pension is critical because if we don't

15  get it right, they're not going to get their benefits as

16  quickly as they should.

17  Q.  And I mentioned Chicago.  What's the significance of

18  Chicago?

19  A.  844 North Rush Street is the address of our headquarters.

20  We're one of the few government agencies not headquartered in

21  Washington, D.C.

22  Q.  And with regard to an application for any disability, would

23  that go to that Chicago office?

24  A.  Yes.  The people who make the decisions are all in that

25  building.

D7ULLES5                        Jansen - direct

1    Q.  And when you say decisions, being of the application

2    approval or rejection?

3    A.  Yes.

4    Q.  Sir, I would like to show you an application just to ensure

5    we're speaking about the same thing.  And I'd like to show you

6    Government Exhibit 1735-A.

7               Now, while the -- you can have some water.

8               THE COURT:  Mr. Jackson, what is this witness going to

9    testify to about this application that the jury and you and the

10   parties here don't already know?

11              MR. JACKSON:  I just want it go through the protocols

12   of the application.  It's brief, just to make sure we're on the

13   same page, Judge.

14              THE COURT:  What protocol are you talking about,

15   Mr. Jackson?

16              MR. JACKSON:  That's what I want to elicit through him

17   Judge, not me, Judge.

18              THE COURT:  Can we stipulate what the protocol is?

19   It's been talked about.

20              MR. JACKSON:  I don't have an objection to stipulating

21   to it.  But I just want someone from the Railroad Retirement

22   Board to take this.  It's only a few minutes' worth of

23   questions, Judge.

24              THE COURT:  If it gets to be repetitive, I'm going to

25   stop it.

D7ULLES5                    Jansen - direct

1              MR. JACKSON:  I know you will, Judge.

2              Judge we're going to stipulate to Government

3     Exhibit 1735 going into evidence.

4              (Government's Exhibit 1735 received in evidence)

5     Q.  Now, just so that we're on the same page, when you speak

6     about the issue of the application, is this the application

7     you're referring to?

8     A.  This is part of the application paperwork, yes.

9     Q.  Now, on the top right portion, there's a person's name, if

10    you can see that?

11    A.  Yes.

12    Q.  OK.  Is that a contact representative?

13    A.  Yes.

14    Q.  And my questions to you regarding contact representatives,

15    that person's particular role, could you just briefly tell us

16    what this person's particular role is when they receive an

17    application?

18    A.  It's to make sure it's complete.  The bottom line is make

19    sure all the boxes are checked and all the answers are

20    answered.

21    Q.  And with respect to the completion of that application,

22    what if any obligation does that contact representative have to

23    go over the application with the person who brings it to them?

24    A.  To make sure that the -- all the boxes are checked and all

25    the answers are answered.

D7ULLES5                    Jansen - direct

1  Q.  And without directing your specific attention yet, I just

2  want to show you, this was the first page of the application,

3  OK.  You recognize this as the second page of an application?

4  A.  Oh, yeah.

5  Q.  You've seen many of these?

6  A.  Yes.

7  Q.  Can we go to -- that's part of the application as well?

8          THE COURT:  Mr. Jackson, you're getting repetitive.

9  He says he knows the application.  I assume that it means from

10  one through 40, whatever it is.

11  Q.  Can we agree?

12  A.  Yes.

13  Q.  OK.  Now, going to this section which is Section 6 of the

14  application, do you see this section here?

15  A.  Mm-hmm.

16  Q.  What if any obligation does a contact representative have

17  based on your past training and experience of 31 years to go

18  over the information contained in Section 6 with an applicant?

19  A.  The whole form is designed to get the information from the

20  applicant on paper, because it's going to be passed on to an

21  examiner in headquarters, so that all the information about the

22  physical or mental conditions that are bothering that person

23  are captured and reported so that the proper medical evidence

24  can be developed, we can get all the doctor's records that we

25  need to cover all the things claimed by this applicant on the

1    paper.

2            All of these here, there are -- job of the contact

3    representative is to go through each one of these things again,

4    make sure the box is checked and if it asks for it or requires

5    it, as it does for the answer, any hard answer is to make sure

6    that an explanation is put in there.

7    Q.  Now, with regard to any medical evidence that's provided,

8    and first may I ask you, what if any medical evidence is

9    provided with this application when a person comes in to meet

10   with a contact representative?

11   A.  We gather it up, make sure that it covers the complaints,

12   the issues, and it's all put together in a package.  After

13   we've got all of it that we're going to get, package it up all,

14   bundle it all up, and send it on to 844 Rush Street.

15   Q.  And that's the Chicago address?

16   A.  Yep.

17   Q.  Now, and you just have to answer yes or no.

18   A.  Yes.

19   Q.  Now, with regard to the information contained in Section 6,

20   what if any consistency does this information have to have, if

21   any, with the medical information provided?

22   A.  It wouldn't be for us to decide as contact representatives

23   whether it was consistent.  And we in most cases wouldn't even

24   have the medical evidence yet.  It's very rare for the

25   applicant to come in first meeting and have everything ready

D7ULLES5                         Jansen - direct

1    for us.

2    Q.  OK.  Now, when they do get the medical evidence, I'm

3    referring to once the medical evidence is there and placed upon

4    your hands, what if any significance does this section have to

5    the medical evidence that you're provided, is this section

6    consistent with the medical evidence that you're given?

7    A.  I cannot say that I would review that and challenge or

8    question whether their answers are consistent with the medical

9    evidence.  It's not something I would have done.

10   Q.  Who does that?

11   A.  The examiners in headquarters.

12   Q.  And they're the ones who actually make a determination as

13   to its consistency?

14   A.  Yes.

15   Q.  Now, with regard to question 40, what is that?

16   A.  Our terminology is ADL or activities of daily living.  It's

17   again an area of the application that we ask the applicant to

18   describe their typical day to get an understanding or kind of a

19   feel for what their day is like now that these conditions are

20   affecting them.  And we also look to see whether or not there's

21   any psychiatric or mental issues, depression, that might be

22   affecting them that maybe they didn't want to talk about in all

23   the other areas.

24   Q.  And with regard to question 40, what if any significance

25   does this question have as it relates to the approval of

D7ULLES5                        Jansen - direct

1    disability, is this information for the physical disability or

2    is it for something else?

3    A.  It's for the mental mostly.  It's an area --

4             MR. TEHRANI:  Objection, your Honor, foundation.

5             THE COURT:  Overruled.

6    Q.  You can answer the question.

7    A.  OK.  It's where we look for mental conditions.  The other

8    areas are already talking on the physical.

9    Q.  So this particular area, is it modeled after any particular

10   form or information that you know?

11   A.  There's a more extensive form that we would use if in fact

12   there was indicated a mental difficulty or psychiatric issue.

13   There is a more extensive form that we would use then if it got

14   to that, yes.

15   Q.  And I'm going to show you B4.

16   A.  That's the activities of daily living, the completed form,

17   much more extensive, much more in-depth.  And it, again, this

18   is the claimant's statement, the applicant's statement

19   explaining to us all the things that they have difficulties,

20   how they do their day and nights, and it's submitted with the

21   rest of the package.

22   Q.  OK.  And without going through the entirety of the form,

23   you've seen this before a number of times, I would take it?

24   A.  Yes, I have.

25   Q.  OK.  Now, this particular document, which is in evidence,

D7ULLES5                         Jansen - direct

1   is entitled Daily Activities for Baran applications; do you see

2   that?

3   A.  Yes.

4   Q.  And it lists -- and I'll ask you about if you know

5   Ms. Baran in a moment and to what extent if you do -- do you

6   see where it says sitting, standing, walking; you can see that?

7   A.  Yes.

8   Q.  And it says, it gives percentiles for each of those

9   particular segments; do you see that?

10  A.  Yes.

11  Q.  Now, with regard to an evaluation of this section -- and

12  this, by the way, refers to the section we just looked at,

13  Section 6, question 39?

14  A.  Yes.

15  Q.  With regard to daily activities and whether it's 90 percent

16  or 91 percent or whatever the percentages are here, as it

17  relates to an assessment, if you know, between the daily

18  activities as written in Baran's application or anybody else's

19  application, what if any assessment is done by Chicago with

20  this and the medical form?

21          MR. TEHRANI:  Objection, your Honor, foundation.

22          THE COURT:  Sustained.

23  Q.  Do you have knowledge and information as to how these

24  applications are processed?

25  A.  No, I don't.

D7ULLES5                    Jansen - direct

1   Q.  And with regard to what happened in your particular office,

2   do you know what happens there?

3   A.  Yes.

4   Q.  And with respect to the handling of an application, the

5   processing of an application just related to your office

6   itself, if I can, as far as your office itself is concerned,

7   when you have medical evidence in hand, when you have medical

8   evidence in hand with your examiners, to what extent do the

9   examiners in your office -- not talking about Chicago -- look

10  to this and the medical evidence?

11          MR. TEHRANI:  Objection, your Honor.  First of all,

12  your Honor, I believe he testified about this already.  Second

13  of all, there are no examiners in the district offices.

14          THE COURT:  Rephrase the question, Mr. Jackson.

15  Q.  Sure.  What I'm just getting at is as it relates to -- do

16  you have any indication at all as to what if any significance

17  question 39 has versus the medical evidence that's provided, if

18  you know?

19          MR. TEHRANI:  Objection.

20          THE COURT:  Overruled.

21  A.  There's no comparison made.  Again, we are not medical

22  examiners.  We're not trained to assess the degree of

23  difficulty of doing things.  We ask the claimant what their

24  feeling is, what their opinion is.  And we don't -- I don't

25  have the skill to read a medical, a doctor's report and compare

D7ULLES5                          Jansen - direct

1    that with that.

2    Q.  And who is making that assessment, ultimately, as to

3    whether or not someone gets disability?

4             THE COURT:  Asked and answered.

5    Q.  Now, are you familiar Ms. Marie Baran?

6    A.  Yes, I am.

7    Q.  And how are you familiar with Ms. Baran?

8    A.  Marie was one of the trainees in the first class that I

9    taught in the early eighties.  And I quickly recognized her

10   energy and intelligence and attitude as somebody who's going to

11   do well and be a star for our agency, a highlight of our

12   agency.  So we kept in touch.

13            And when she became a manager, we got together at

14   different manager meetings each when we'd have them annually or

15   less.  And I've also come here to Detroit -- to New York

16   several times to speak at informational conferences that she

17   put on.

18   Q.  Over what period of time did you know her?

19   A.  I've known her since the early eighties when she was newly

20   hired by the board.

21   Q.  What if any training did you do with her?

22   A.  I was her instructor for that first class.  I believe it

23   was for four or five weeks.  And then from that point on we

24   were simply peers, managers of different offices.

25   Q.  And as you were managers of different offices, did you keep

D7ULLES5                          Jansen - direct

1    in touch at that point?

2    A.  Yes.  We did we correspond by telephone once in a while,

3    not a lot, by email every so often just to keep in touch with

4    how things were going as far as office complaints and problems

5    and issues and the way the board operated.

6    Q.  And again over what period of time did you keep in touch

7    with her?

8    A.  Regularly from that point on from when I knew her because I

9    kept in touch with her because I liked her.

10   Q.  Were you able to interact with her and, if so, how often in

11   any yearly period?

12   A.  Manager meetings, we tried to have them annually where all

13   the managers would get together in a conference and we'd have

14   about a week of education and just things of interest to keep

15   us informed on what was changing in the board, different

16   policies and procedures, and so we would see each other at

17   those.  They weren't every year, but a good many of the years

18   we'd have one.  And we probably telephone once or twice a year

19   and email.  It wasn't very frequent.  We were both way too

20   busy.

21   Q.  With regard to the actual interactions that you had with

22   Ms. Baran, did she have a reputation that you were aware of?

23   A.  She had a reputation that began, as I said, when I first

24   met her with energy and intelligence and just hard worker and

25   she continued that.  And other people that I've -- other

1  managers that know her also have those same opinions.

2  Q.  Did you have an occasion to formulate an opinion as to her

3  honesty and integrity?

4  A.  I always felt her to be very honest and have a great deal

5  of integrity, as a matter of fact.

6  Q.  And with regard to the experience you mentioned that other

7  people, other ways in which other people felt about her, how do

8  you know that?

9  A.  Well, when she wasn't there, we talked about her.

10  Q.  And without --

11  A.  And there were positive things.

12  Q.  Do you recognize Ms. Baran in the courtroom?

13  A.  Yes, I do.

14  Q.  Could you identify her and point out an article of clothing

15  she's wearing?

16  A.  I can't see -- I can see her earrings and blue jacket.

17          MR. JACKSON:  Judge, the record will reflect he

18  pointed out Ms. Baran?

19          THE COURT:  Noted.

20  Q.  Did it come to your knowledge and attention that Ms. Baran

21  was being accused of fraud?

22  A.  Yes.

23  Q.  What if any, what if any not opinion you formulated, but

24  what was your feeling at the time that you heard that?

25  A.  I was shocked and I could not believe it.

D7ULLES5                        Jansen - direct

1          MR. TEHRANI:  Objection.

2          THE COURT:  Sustained.

3   Q.  Did you formulate any opinions or conclusions when you

4   heard that she was embroiled in fraud?

5          MR. TEHRANI:  Objection.

6          THE COURT:  Sustained.

7   Q.  Now, with regard to other managers or other people who

8   shared your opinion, could you tell us how many there were?

9   A.  Well, there are I believe 53 district offices around the

10  country.  Every one of them has a manager.  And the group that

11  we would normally be together with met different regions and so

12  on, 12, 15, 20.

13  Q.  Now, if I could just ask you about the 53 offices, could

14  you just explain that, you said there were 53 offices?

15  A.  There are district offices around the country -- the

16  Westbury office, the Detroit office, New York City has another

17  office.  Wherever railroaders are found, you're going to find a

18  district office for the Railroad Retirement Board.

19  Q.  And just for clarity purposes, at the time that you

20  actually had these annual training sessions that you alluded to

21  before, were participants from all those offices there?

22  A.  Whoever had a new hire.

23  Q.  When you say new hire, what are you referring to?

24  A.  A brand-new employee, newly brought in, who needed

25  training.

D7ULLES5                      Jansen - direct

1   Q.  Is there any experience that you had with Ms. Baran upon

2   which you would question her integrity?

3   A.  None.

4   Q.  Any experience that you had with Ms. Baran upon which you

5   would question her honesty?

6   A.  None.

7   Q.  In the event that I showed you tax records, and I won't put

8   them up, but in the event that you learned that Ms. Baran

9   amended her taxes in 2007, does that in any way alter the view

10  or opinion you have regarding her honesty or integrity?

11  A.  No.

12          MR. JACKSON:  Nothing further.

13          THE COURT:  Mr. Tehrani.

14  CROSS-EXAMINATION

15  BY MR. TEHRANI:

16  Q.  Good afternoon, Mr. Jansen.

17  A.  Good afternoon.

18  Q.  So you worked for the RRB for 31 years you testified,

19  right?

20  A.  Thirty-one years as the manager.  I had four and a half

21  years before that.

22  Q.  So 31 years as a manager of the district office in Detroit?

23  A.  Yes.

24  Q.  And I believe you testified that you're friends with Marie

25  Baran?

D7ULLES5                              Jansen - cross

1   A.  Yes.

2   Q.  And her husband too, right?

3   A.  I met him just a couple times over the years as I came here

4   for informational conferences.  Those are training sessions

5   that the board puts on sponsored by the labor members office of

6   the board where we give a half-day or three-quarter day

7   instructional meeting to the local lodge union meeting, union

8   members.

9            And so I came to the city, to Westbury, and went out

10  to dinner.  Normally we go out to dinner the night before with

11  the host managers in whatever city we come in, and that's how I

12  met him.

13  Q.  Now, you never worked at the Westbury office, have you?

14  A.  No.

15  Q.  And so you don't know how applications are processed in the

16  Westbury office?

17  A.  Well, all of the offices around the country, they're

18  processed under the same set of instructions, as I said

19  earlier, the field operating manual.

20  Q.  And do you know one way or the other whether people from

21  all around the country traveled to the Westbury office to

22  submit their disability applications?

23  A.  Normally district offices, no matter where they are, are

24  open for everybody.  People in Detroit who may go down to

25  Florida can go into the Tampa office or the whatever.  So

D7ULLES5                         Jansen - cross

1    they're open to everybody.  But generally speaking, it's your

2    local area.

3    Q.  And so do you know one way or the other whether people

4    traveled to go to the Westbury office to file their disability

5    applications?

6    A.  I wouldn't know that, no.

7    Q.  And the Westbury is where Marie Baran worked?

8    A.  Yes.

9    Q.  And you've also never been a claims examiner, right?

10   A.  A claims examiner, no.  I never worked in Chicago in

11   headquarters.

12   Q.  And so prior to being a district manager, you were a

13   contact representative?

14   A.  Yes.

15   Q.  And in both roles you accepted, you took in disability

16   applications?

17   A.  Yes.

18   Q.  Among other obligations, correct?

19   A.  Yes.

20   Q.  And if an applicant came in to the Detroit district office

21   and they had trouble filling out their application, you would

22   help them, right?

23   A.  Of course.  That's our job.

24   Q.  You wouldn't turn them away?

25   A.  Absolutely not.

1    Q.  But if an applicant came in and the application was

2    completed, right --

3    A.  Mm-hmm.

4    Q.  -- you wouldn't -- your job was to make sure that it was

5    completed?

6    A.  Yes.

7    Q.  And to make sure there was no information missing?

8    A.  Yes.

9    Q.  But you didn't confirm the accuracy of the application with

10   the applicant, right?

11   A.  We couldn't.  We wouldn't be trained for that.

12   Q.  And you assumed that the application materials were

13   truthful, right?

14   A.  Yes.  The certification on the form says that.  It's where

15   the applicant signs that they certify it's true and correct.

16   Q.  Now, you were also shown an application on the screen and

17   we looked at question 39.

18   A.  Yep.

19   Q.  And you were asked about whether you checked that against

20   medical information, right, do you remember those questions?

21   A.  Yes.

22   Q.  And I believe your testimony -- if I get it incorrect, let

23   me know, but I believe your testimony was that most of the time

24   you didn't have medical information when it was submitted to

25   you?

1   A.  Right.

2   Q.  And so you didn't check question 39 against the medical

3   information?

4   A.  No.

5   Q.  Do you know one way or the other whether Marie Baran would

6   instruct applicants to change the answers on question 39?

7   A.  No.

8   Q.  And do you also know one way or the other whether Marie

9   Baran, after she retired from the RRB, started a consulting

10  business?

11  A.  I know that.

12  Q.  And you have no experience with Marie Baran in her role as

13  a disability consultant?

14  A.  Well, only my understanding that it was essentially the

15  same job as what she had done prior, previously, assisting

16  people taking disability applications.

17  Q.  And so you have no idea what happened in any of the

18  meetings between Marie Baran and any of her clients, do you?

19  A.  No, I don't.

20  Q.  And so you have no idea whether Marie Baran submitted

21  applications that had virtually identical descriptions of their

22  daily activities?

23          MR. JACKSON:  Objection, Judge.

24          THE COURT:  Overruled.

25  A.  I -- no.  I would have never seen any of the applications

D7ULLES5                           Jansen - cross

1    that she took.

2    Q.  And you don't know whether her clients individually came in

3    to see her and all individually told her that their daily

4    activities were nearly identical, do you?

5    A.  No.

6    Q.  You were also asked some questions about question 40, the

7    description of your normal day?

8    A.  Mm-hmm.

9    Q.  That's an answer that has to be filled out in every

10   application, correct?

11   A.  Yes.

12   Q.  And it has to be filled out truthfully?

13   A.  Yes.

14   Q.  Just like the entire application?

15   A.  Of course.

16          MR. TEHRANI:  One moment, your Honor.

17   Q.  Just one last question.  Getting back to her, Marie Baran's

18   role as a consultant, do you know whether her clients were able

19   to work?

20   A.  No.  I wouldn't have any idea of that.

21          MR. TEHRANI:  No further questions.

22          MR. RYAN:  No questions.

23          MR. DURKIN:  Nothing, Judge.

24          MR. JACKSON:  Judge, just briefly.

25   REDIRECT EXAMINATION

D7ULLES5                    Jansen - redirect

1   BY MR. JACKSON:

2   Q.  I just want to ask you regarding the Westbury office if you

3   could just tell us, if you know, how is that office in Westbury

4   regarding whether it was busy or not busy, how was it

5   comparatively to the offices throughout the country?

6   A.  That office took many more disability applications than any

7   other office in the country.

8   Q.  And as a result of that, do you know whether if at all they

9   would have received medical information at the time they were

10  accepting a disability where your office didn't, if you know?

11  A.  I wouldn't know that, no.

12  Q.  And do you know based upon the fact that it was a busy

13  office or busier office than the other offices whether or not

14  their protocols may have been the same, slightly different,

15  could you just --

16  A.  I do know from conversations with Marie that because --

17          MR. TEHRANI:  Objection.

18          THE COURT:  Sustained.

19  Q.  Without telling us what if any conversations you had, just

20  asking based on your knowledge.

21  A.  I knew they --

22          MR. TEHRANI:  Objection, your Honor.  No foundation.

23          THE COURT:  Overruled.

24  A.  I know they had a very efficient operation or they would

25  have never been able to do the amount of work they did there.

D7ULLES5                        Jansen - redirect

1    Q.  And when you say the amount of work they did there, just

2    give us a sense.  When you say busy, relate it to something.

3    What do you mean when you say busy?

4    A.  Again, they had, they took a lot of disabilities for the

5    size of the office, for the size of the area, but they also

6    took regular retirement applications.  They had all the other

7    work that every other office has and they handled it well.

8    From management reports that I saw from about all of our

9    offices, they maintained an excellent workload.

10   Q.  Is it a claims representative's job to pass judgment on

11   whether someone has a disability or doesn't?  Tell us about

12   that.

13   A.  No, absolutely not.  In fact, I disciplined an employee at

14   one point who told an applicant, a guy came in to talk to him

15   and my representative told the gentleman that he didn't think

16   he was disabled enough to get a benefit.  And I disciplined him

17   for that because it is not our duty, it is not our

18   responsibility to make judgments one way or the other.  If a

19   person walks into our office and says I'm disabled but I've

20   never seen a doctor in my life, our job is to take his

21   application and send him to doctors.

22   Q.  And with regard to the actual sending him to doctors, did

23   your office in -- where were you?

24   A.  Detroit.

25   Q.  Did your office in Detroit make recommendations to the

D7ULLES5                          Jansen - redirect

1   doctors that they should see?

2   A.   You lost me.  I was too busy laughing at myself.  Sorry.

3   Q.   You said that you would refer them to doctors; is that what

4   you said?

5   A.   Yes.  All of our offices for a time had a list of doctors

6   that we regularly used because they knew -- they were

7   comfortable with the forms that they had to complete for us.

8   Q.   Did your office in Detroit receive any extra benefits or

9   any less benefits by virtue of who was approved or disapproved?

10  A.   Absolutely not.

11  Q.   With regard to the actual country and the way these were

12  processed, did any local office receive anything extra from the

13  government or something taken away depending upon what Chicago

14  did with applications?

15  A.   No.

16  Q.   With regard to the particular claims representatives in the

17  offices, were they awarded any bonuses or --

18             THE COURT:  Asked and answered.  Asked and answered.

19  Q.   As far as you as a supervisor were concerned, did you have

20  any standards, any standards that you implemented, performance

21  standards that would measure in your office how many

22  applications were approved?

23  A.   Part of my responsibility as a manager was to review a

24  minimum of 10 percent of each contact representative's

25  applications.  So as they'd finish their applications, they

1   would come across my desk for review or passing along and I had

2   to look at and see that all the boxes were checked and all the

3   forms were there for at least a minimum of 10 percent.

4   Q.  And just as far as people who acted as consultants in

5   Detroit, do you know what a consultant is?

6   A.  Yes.

7   Q.  And in Detroit --

8             MR. TEHRANI:  Objection, your Honor, beyond the scope.

9             THE COURT:  Sustained.

10   Q.  Well, you talked about the issue of reviewing applications,

11   right?

12   A.  Yes.

13   Q.  And Mr. Tehrani asked you about applications that when

14   people came to you whether they were complete and what you did

15   with them; do you recall that?

16   A.  Yes.

17   Q.  Were there instances where people came with completed

18   applications?

19   A.  I can't remember a time that an applicant came in with a

20   perfectly completed application that we didn't have to do some

21   assistance with it.  We did them daily.  They did them once in

22   their life.  They just weren't good at it and it's a lot of

23   paperwork.

24   Q.  And just finally with regard to the how it was that you

25   worked with an applicant to do the completion of the paperwork,

D7ULLES5                     Jansen - redirect

1    ultimately, who accepts responsibility for the truthfulness in

2    the application?

3    A.  The applicant themselves.

4    Q.  And with regard to the items that they're telling your

5    claims representatives, anything that they say to your claim

6    representatives beyond confirming the boxes of hard, easy, not

7    at all, or the narratives --

8            MR. TEHRANI:  Objection, your Honor.  Misstates his

9    testimony.

10           THE COURT:  What's the question?

11           MR. JACKSON:  I haven't been able to ask one, Judge.

12           THE COURT:  Ask the question.  But it sounds like an

13   asked and answered question.

14   Q.  Well, as far as the boxes that are checked, you know in the

15   boxes, hard, easy, not at all, you remember that, right?

16   A.  Yep.

17   Q.  And then there's a narrative portion that's next to it?

18   You have to answer yes or no.

19   A.  Yes, I do.  I'm sorry.

20   Q.  Beyond, for example, you confirming the accuracy of what

21   they say, what these people say --

22           MR. TEHRANI:  Objection, your Honor.  Misstates the

23   testimony.

24           THE COURT:  Ask the question.  I'll decide whether

25   it's an asked and answered.

1             MR. DURKIN:  Thank you.

2    Q.  Beside you confirming the accuracy --

3             MR. TEHRANI:  Objection, your Honor.  He checks it for

4    completeness, not accuracy.

5             THE COURT:  Sustained.

6    Q.  When you say completeness, just tell us what you mean, tell

7    us what you mean.

8    A.  When a person says that a given activity is hard for them,

9    we ask them to explain what do you mean by hard, when is it

10   hard, is it all the time, mornings, tell us a little more about

11   what you mean by that, what makes it difficult.

12   Q.  And when they give you the information as to what makes it

13   difficult and they answer your question, what do you do with

14   that answer?

15   A.  Write it down and go on to the next question.

16            MR. JACKSON:  Thank you.

17            THE COURT:  Mr. Tehrani.

18            MR. TEHRANI:  Nothing further, your Honor.

19            THE COURT:  Thank you.  You may step down.  You're

20   excused.

21            THE WITNESS:  Thank you.

22            (Witness excused)

23            THE COURT:  Mr. Jackson.

24            MR. JACKSON:  Judge, at this time the defense calls

25   Mr. Ralph Domenici.

D7ULLES5                        Jansen – redirect

1    RALPH JOSEPH DOMENICI,

2         called as a witness by the Defendant Baran,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. JACKSON:

6    Q.  Mr. Domenici, how old are you?

7    A.  I'm 65.

8    Q.  And are you employed?

9    A.  I'm retired.

10   Q.  What are you retired from?

11   A.  The Long Island Railroad.

12   Q.  Before getting into any duties you might have had there, do

13   you have a family?

14   A.  Yes, I do.  I have a wife of 42 years and three grown

15   daughters.

16   Q.  Now, regarding the Long Island Railroad, where did you work

17   when you worked there?

18   A.  I worked in the maintenance of equipment department.  I was

19   originally hired in 1972 as an electrician.  And I started in

20   the Morris Park facility, which is in Queens, New York.

21   Q.  Now, tell us what an electrician does for the Long Island

22   Railroad.

23   A.  Well, in the maintenance of equipment department, it is we

24   maintain, repair, update, and fix all of the passenger cars and

25   locomotives in the Long Island Railroad's fleet.

D7ULLES5                          Domenici - direct

1   Q.  Can you give us a sense of the physical job, type of things

2   that you have to do as an electrician, the physical

3   requirements of your job as an electrician?

4   A.  When I was first hired on in 1972, I worked in the facility

5   called Morris Park.  Morris Park was built in the 1800s, about

6   the same time as the Eiffel Tower was built, I think it's 1887

7   or so.  During the time period, of course, there was just steam

8   locomotives.  And as the railroad evolved, the shops basically

9   stayed the same even through the 1900s.

10          When I was hired in 1972 to work in the shops, I was

11  in one shop location that was what we dealt with was modifying

12  and updating and doing four-year work on the electric M1 cars.

13  The facility itself was from the 1900s.  The only thing that

14  really was updated about it was heat.

15          When we would come to work in the morning, we would

16  come to work in a street clothes.  We would change into our

17  work clothes which would have, you know, you'd have

18  steel-tipped shoes.  You'd have work uniforms on or work shirts

19  and pants, and you would perform your eight hours of duty.

20          The environment that we worked in was designed not for

21  the electric cars in the era in which I was hired but rather

22  the era that preceded it.

23  Q.  Just cutting to the chase without the historical

24  perspective, if you could give us a sense of the physical

25  requirements in terms of bending, stooping, lifting, kneeling,

D7ULLES5                         Domenici - direct

1    give us an overview of that.

2    A.  I'm sorry, that's what I was trying to get to.

3              There are pits in the shop.  What a pit is is rails

4    that ride into a shop facility.  The pit is where somebody

5    would get into that underground under the cars.  Those pits

6    were approximately three and a half to 4 feet high.  They

7    weren't designed for the electric cars that we were working on.

8              Therefore, when an electrician like myself would have

9    to go underneath the pit, which was every day, you would have

10   to bend down, open up to make access into the electrical

11   components of the cars, what they call Bombay doors, bend --

12   I'm a pretty short guy; I'm only five-five, five-six -- bend

13   down, contort yourself, get into the inside of the Bombay doors

14   and start working on the equipment.

15   Q.  And beyond that, what type of other, beyond the bending and

16   underneath it because of how it was structured, what else did

17   you have to do as far as your arms, your legs?

18   A.  There was, of course, there was lifting involved.  The

19   replacing motors or components, not traction motors, which are

20   the big motors that drive the train, but smaller component

21   motors that weigh anywhere from 30 to 50 pounds.

22             You have to get up on the cars using the grab handles

23   that's on the side of the cars and a stepladder to get in.

24   You're working above your head replacing florescent lights and

25   all the motors inside the car.  So you're working all about and

D7ULLES5                      Domenici - direct

1   you're moving your body constantly.

2   Q.  What about as it relates to anything you do with your back

3   or your knees?

4   A.  Constantly bending.  A lot of times, especially in the pits

5   with bigger guys, I know for sure they would be on their knees

6   rather than sit like Indian style and try to work around the

7   various components.  As far as laying on your back, there are

8   times you laid on your back replacing stuff.

9   Q.  Now, you were an electrician; is that right?

10  A.  That's correct.

11  Q.  Did there come a time that you took upon a supervisory role

12  as a gang foreman?

13  A.  Yes, I did.

14  Q.  When was that?

15  A.  In 1977, I was promoted to an M of E gang foreman.  M of E

16  means maintenance of equipment.  And I was in charge of around

17  38 people in a shop called Dutton Electric Car Shop.

18  Q.  And as a gang foreman, the people that you supervised, what

19  were their job responsibilities, all electricians or something

20  else?

21  A.  No.  There were different members of different crafts.

22  Each individual craft was called a gang.  So in that facility,

23  which was Dutton Electric Car Shop, it was located right off

24  the Van Wyck Expressway in Queens.

25          There were carmen, which they were represented by the

UTU.  They did all of the car body work, all of the brake work

on the trains, all of the inspection of the wheels.  There were

pipe fitters, there were electricians, there were laborers.  It

was a multicraft shop.

Q.  And just briefly, just for completion of the record, what

is the UTU?

A.  United Transportation Union.

Q.  And just an overview regarding the various job descriptions

that you just supplied us with, you said something about carmen

and who else?

A.  Yeah.  I said carmen, laborers, pipe fitters.  The carmen

were represented by the UTU.  The United Transportation Union

represents trainmen, carmen.  They have -- I don't really

recall what other -- conductors.

Q.  And just regarding the people that you supervised that you

just mentioned, are there the same or different physical

characteristics associated with doing those jobs?

A.  Oh, no, there's totally different.  A carmen's job could be

replacing brake shoes, which an electrician would not do.  They

more or less work on the car body and the components thereof.

They also work on gear units, which the traction motors and

wheels ride on.  It's their job is different than an

electrician's.  They do -- carmens work inside.  They just work

on the components of the passenger cars.

Q.  And in working on those components in passenger cars, are

D7ULLES5                    Domenici - direct

1   there physical characteristics associated with their job?

2   A.  Oh, yes, yes.  Some of the same as I described as an

3   electrician.  Some of them are even more strenuous that involve

4   more lifting, more bending.  They take apart gear units.  They

5   replace motors.  This is done with, of course, lifts and stuff,

6   but it requires more body strength, more bending, more lifting.

7   They use big pneumatic and electric drills and sockets to

8   tighten up radius rods on cars, on car bodies to make sure

9   they're straight.  There's a lot of welding, a lot of burning,

10  a lot of underneath the cars.  There's springs.  It's an entire

11  science into itself.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D7unles6                          Domenici - direct

Q.   Without describing all of the various job descriptions that
exist in the Long Island Rail Road, to what extent did you
observe or supervise various people who worked for the Long
Island Rail Road in various jobs?
A.   In that shop its main requirement was to do inspections on
a daily basis as mandated by the FRA, Federal Railroad
Administration.

         As part of my daily work I would get a schedule of
what cars were coming into the house, being Dutton, assign the
work accordingly to inspect whatever trains were coming in and
have those inspections made, have any of the repairs done after
I received the report from the inspectors, and then ultimately
at the end of the day we reached those cars for service so they
could pick up our 335,000 that we carry a day.
Q.   When you say 335,000 people that we carry, you are
referring to the Long Island Rail Road?
A.   Yes, I still am attached to it, yes, the Long Island Rail
Road.
Q.   To what extent, if at all, does safety play a role with
regard to your supervising of personnel who work for you?
A.   Extremely, extremely important.  In the era in which I
worked, safety was not viewed as it's viewed today.  The people
that I supervised in the work that they performed were experts
and are experts in what they do.

         However, to accomplish that job, starting out from

D7unles6                          Domenici - direct

1   when I first started to work, we used cleaners that we would

2   never use today.  We used a product called carbon

3   tetrachloride, which is a wonderful electronics and electrical

4   cleaner.

5   Q.  What is the significance of that?

6   A.  Well, when you are working, as I explained originally, in a

7   pit where your face is six to eight inches away from an

8   electrical contactor that breaks under current -- and how I can

9   explain that to you is if you have an iron or a toaster and go

10  to unplug that iron or toaster when it's still on, you will get

11  like a blue little spark.

12        Well, magnify that ten hundred -- magnify that ten

13  times ten, and that is sort of what an arc is drawn when a

14  contactor opens up.

15        Well, in that process, there is an arc chute which was

16  made out of asbestos that disperses that spark or quelches it

17  so the whole group doesn't go on fire.  We used to get those

18  cars into the shop.  As an electrician I was responsible to

19  replace the contact tips, clean various groups that had carbon

20  on it using this carbon tetrachloride.  It is a wonderful

21  cleaner, it dries, but it's a known cancer carcinogen.

22  Q.  With regard to the other occupations, this one I understand

23  can cause cancer and that type thing.

24  A.  Right.

25  Q.  As far as the other people that you supervise --

D7unles6                        Domenici - direct

1    A.   Right.

2    Q.   -- just generally, before I move into the next area, as far

3    as what they wore to work and the jobs that they held, could

4    you give us a sense of that?

5    A.   Their work clothes?

6    Q.   Yes.

7    A.   Generally in shop conditions they weren't heated or there

8    was no air conditioning.  They were big huge barns, they are

9    big huge barns, and you would dress accordingly.  You know, you

10   would wear stuff that would keep you warm, but yet allow you to

11   be mobile enough to work around cars and work in those

12   conditions.

13        Most people, if they are married, don't bring their

14   clothes home.  There is a cleaning service that takes care of

15   all of the diesel fuel, all of the carbon dust, all of the

16   copper dust that people have as they are working on a daily

17   basis, the grease, the oil.  So all of that stuff, you know, we

18   give to cleaners and they bring it back to us.

19        But working around those elements, even in Dutton

20   electric car shop when I went down there, it was built on the

21   bottom of a hill.  Jamaica station is on the top of a hill.  So

22   anytime it rained, even minimal, but anytime it rained

23   significantly, there were three major pits that used to fill up

24   with water.

25   Q.   What were they?

D7unles6                      Domenici - direct

A.  It was 8 Track, 7 Track and 6 Track.

        They filled up with water, I would say up into an 18

to a 24-inch grate that you used to be able to walk on.  These

pits, unlike Morris Park pits, were deeper.  They were five to

six feet deep when Dutton was built.  However, the flooding

condition was very perilous, because the trains still had to be

inspected.

        So they would call, the shop managers would call the

plumbers to come down and pump out the water, but there's

always residual stuff left.  Water and oil doesn't work.

There's always safety, environmental issues that we have when

we are repairing stuff, the carbon on the outside, underneath

cars, greasing, traction motors, greasing gear units,

electricians trying to perform their job.

        Unfortunately, when I was a supervisor, when I was

gang foreman down there, I did have one fatality.  It was from

a carman who was electrocuted going into a pit that had an

open, nonprotected fluorescent light fixture.

Q.  Now, if I could just ask you, regarding away from your gang

foreman responsibilities, did there come a time that you

actually became a union official?

A.  Yes, I did.

Q.  When was that and what did you do?

A.  When I first became a gang foreman, it wasn't too long

thereafter where I was approached to come on the executive

D7unles6                          Domenici - direct

1    board of the American Railway Supervisors Association.

2              I did take on that job, and I was in it for quite a

3    while.  Then I left that position because I was promoted to

4    another position, a managerial position.  I stayed in that

5    position for a while, and then I went back as a gang foreman.

6              In 1995, I became general chairman for my labor

7    organization.

8    Q.  With regard to your position as a general chairman of your

9    labor organization, did it involve you interacting with any way

10   with Metro-North or other railroads?

11   A.  Yes.

12   Q.  As a result of that interaction, did you come to learn of

13   the similarities and/or differences between the railroads?

14   A.  Yes.

15   Q.  As it relates to the extent of your interaction for

16   Metro-North, for example, could you just let us know what that

17   interaction was and when it was?

18   A.  Well, that's why I brought up when I was first involved on

19   the executive board of the original association.  It was during

20   the late '70s when my then general chairman was approached by a

21   Metro-North gang foreman with the idea in mind of us, the

22   American Railway Supervisors Association taking over their

23   labor organization and helping them out to get better benefits,

24   better wage, better contracts.

25   Q.  Did you ultimately take them over?

1  A.  Unfortunately that never took place, and I do not know why

2  it didn't take place, because I subsequently took a different

3  position in the management for a couple of years before I went

4  back.

5  Q.  How long were those discussions with Metro-North about Long

6  Island Rail Road taking over or them being subsumed into your

7  union?

8  A.  I was privy to at least four meetings on Long Island with a

9  group that represented the maintenance of equipment, gang

10  foremen and Metro-North.

11  Q.  In that time frame of those four meetings, did you become

12  conversant with the type of benefits that Metro-North had?

13  A.  Yes, I did.

14  Q.  As it relates to their pension benefit, could you describe,

15  if you know, based on your training, background, personal

16  experience and involvement in negotiations, how, if at all, did

17  the age, for example, of someone in Metro-North differ from the

18  age in which someone in Long Island Rail Road could retire?

19  A.  During the '70s, the late '70s, as I said, they would not

20  be able to receive an annuity until they were at least 62 years

21  old, and full retirement was at 65.

22  Q.  Long Island Rail Road, at what age could they receive a

23  benefit?

24  A.  50.

25  Q.  As it relates to the amount of base pay that a Metro-North

D7unles6                          Domenici - direct

 1    representative received, could you describe, if you know, based

 2    upon what we discussed with your executive committee meetings

 3    and meetings to subsume their railroad, what is the

 4    distinction, if any, between Long Island Rail Road base pay and

 5    Metro-North base pay?

 6    A.  At the time period we are talking about, again, in the late

 7    '70s, we are talking about quite a substantial difference.  It

 8    could be up to thousands-a-year difference between what a gang

 9    foreman in the M of E department for the Long Island Rail Road

10    made compared to a gang foreman in Metro-North made.

11    Q.  Beyond the age and beyond the base pay, what, if any, other

12    differences were there that you were aware of personally as it

13    related to the pension?

14    A.  Between Metro-North and --

15    Q.  Yes, Long Island Rail Road.

16    A.  -- Long Island Rail Road.

17    Q.  If anything else.

18    A.  The biggest thing I guess was, jumping forward, was -- let

19    me back up totally for a second.

20            In 1965 the Long Island Rail Road was taken over by

21    the MTA, or the MTA was formed by Governor Rockefeller because

22    he wanted to provide better service for the people that lived

23    and will live on Long Island Rail Road coming to Manhattan.

24            It was at that time that contracts started to be

25    negotiated, unions started to become more a bigger voice.

D7unles6                    Domenici - direct

1          MR. TEHRANI:  Objection, your Honor.

2     Q.  Were you involved in that?

3     A.  No.

4          MR. TEHRANI:  I am not sure of the relevance of all

5     this 1960s, '70s.

6          THE COURT:  Sustained.

7     Q.  We are discussing, as you know, the distinction between

8     Metro-North and Long Island Rail Road.  You know that?

9     A.  Right.

10    Q.  The question was beyond the age issue.  62 I think you said

11    at Metro-North.

12    A.  Right.

13    Q.  50, Long Island Rail Road?

14    A.  Right.

15    Q.  Health care benefits, was there a distinction there?

16    A.  Yes, there was.

17    Q.  Could you discuss, if you know, based on your knowledge and

18    experience, again as you described it, was there a difference

19    in the health care benefits between the two?

20          MR. TEHRANI:  Your Honor, can we get a time frame on

21    this?

22    Q.  I want to direct your attention to people in that era who

23    might be retiring, for example, in 2002, 2003, 2004, anywhere

24    from where the pension benefit existed as it would be relevant

25    and related to those people who were retiring in 2002 and

D7unles6                        Domenici - direct

1    beyond?

2    A.  Yes.

3    Q.  Just laying a foundation.  Did these discussions concern

4    that time period of people who would thereby be eligible for

5    retirement at the year that I just directed you to?

6    A.  Yes.

7    Q.  Now, with regard to that, what, if any, distinction existed

8    in the health care benefits of Long Island Rail Road employees

9    who could retire and Metro-North employees who could retire?

10   A.  OK.  In 1983, Metro-North was taken over by the MTA in

11   conjunction with the Connecticut Department of Transportation.

12   When it became part of the MTA, the contract negotiations were

13   under way.

14        In 1995, both the Metro-North and Long Island Rail

15   Road became one system as far as Empire Blue Cross Blue Shield,

16   and they were eligible for medical benefits until when they

17   retired, until they became Medicare eligible.

18   Q.  That would have been in 1995?

19   A.  That was in 1995.

20   Q.  Does that affect people who have retired already or people

21   who are to retire into the future?

22   A.  No.  People who had retired prior to 1995 did not receive

23   that benefit.

24   Q.  People from Metro-North that retired after when would

25   receive that benefit, if you know?

1    A.  Well, any person who had the time and grade at that point,

2    after 1995, if they would take a reduction in their pension

3    would receive medical benefits until they became Medicare

4    eligible.

5    Q.  When you say "reduction in benefits," to what extent, if

6    any, would that affect retirement?

7    A.  Well, at the time, Metro-North, their earliest retirement

8    age was 62 with 30 years of service for a full annuity.

9    Q.  I want to now ask you, if you know, as it relates to

10   occupational disability, with regard to people who would be

11   making application for occupational disability, are you

12   yourself conversant with occupational disability?

13   A.  Yes, I am.

14   Q.  As a result of your work in the union and as general

15   chairman and gang foreman, did you, do you have knowledge as to

16   what an occupational disability is?

17   A.  Yes, I do.

18   Q.  What is an occupational disability?

19   A.  There are two types of disabilities.

20          The first one is a permanent disability, where the

21   individual employee cannot perform any work whatsoever.

22          The second one is an occupational disability, where

23   the employee can no longer perform his or her task as it

24   pertains to their occupation.

25   Q.  Without getting into any specific reasons as to why any

D7unles6                    Domenici - direct

1    individual might decide to retire, based on your background,

2    training and experience, might there be a distinction based on

3    everything you said between the amount of people who were

4    retiring from the Long Island Rail Road and those who were

5    retiring from Metro-North?

6             MR. TEHRANI:  Objection, your Honor.  Speculative.

7             THE COURT:  Sustained.

8    Q.  Did you formulate any particular conclusions yourself as to

9    anything that would --

10            MR. TEHRANI:  Objection, your Honor.

11            THE COURT:  Sustained.  We are going to take the

12   afternoon break at this point.  Be back at 3:30.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

D7unles6                        Domenici - direct

1                  (Jury not present)

2                  THE COURT:  All right.

3                  Mr. Jackson.

4                  MR. JACKSON:  Yes, Judge.

5                  THE COURT:  Do we have an estimate of the remaining

6       portion of your direct?

7                  MR. JACKSON:  A whole 15 minutes, Judge.

8                  THE COURT:  All right.  An estimate of cross on this

9       witness.

10                 MR. TEHRANI:  15 minutes, your Honor.  Not long.

11                 THE COURT:  All right.  So it's likely that we will be

12      able to conclude today, Mr. Jackson?

13                 MR. JACKSON:  I hope so, Judge.  I am resting right

14      after this witness.

15                 THE COURT:  All right.  Fine.

16                 So we will have some time to talk about housekeeping

17      and procedures for tomorrow.

18                 All right.  Bring in the jury.  The witness will take

19      the stand.

20                 (Continued on next page)

21

22

23

24

25

D7unles6                          Domenici - direct

1         (Jury present)

2              THE COURT:  Thank you.  Welcome back.  At some point I

3    will have to ask my clerk, Conner, to share some of the jokes

4    with us.

5              All right.  Mr. Jackson.

6              MR. JACKSON:  Thank you, Judge.

7    BY MR. JACKSON:

8    Q.  Mr. Domenici, I want to turn now to Marie Baran and ask you

9    whether you are familiar with Ms. Marie Baran.

10   A.  Yes, I am.

11   Q.  And how are you familiar with Ms. Baran?

12   A.  I have known Ms. Baran for about 50 years.

13   Q.  In what capacity have you known her for that 50 years?

14   A.  Well, we went to grammar school together, the same grammar

15   school, and then I lost touch with her for many years and then

16   reacquainted myself with her basically when I got on the

17   railroad and became a supervisor and attended one of the

18   informal conferences that the Railroad Retirement Board does

19   every year.

20   Q.  What is an informal conference?

21   A.  An informal conference is a meeting between the Railroad

22   Retirement Board and union leaders on various railroads that is

23   conducted.  This particular one that I am talking about is

24   conducted on a yearly basis to bring union leaders up to date

25   with the latest laws and revisions to the law as it pertains to

D7unles6                        Domenici - direct

1    the railway labor board.

2    Q.  She was a participant in those?

3    A.  Yes, she was.  She was one of the participants in these

4    seminars, and she was given various tasks to do at different

5    times.

6    Q.  What tasks were those, as best you could recall?

7    A.  Well, it was a four-hour conference.  Generally not only

8    the Long Island Rail Road was represented, with all of their

9    major unions being present, I am only one small -- well, I was

10   only one small labor organization in the whole scheme of the

11   Long Island Rail Road.  There still are a lot larger railroads.

12   However, it was not only the Long Island Rail Road that was

13   present.  It was Metro-North, it was Jersey Transit, it was

14   people from SEPTA, which is in Pennsylvania.

15   Q.  What is that?

16   A.  SEPTA.

17   Q.  What does that stand for?

18   A.  I was afraid you were going to ask me that.  I forget.  But

19   it is an acronym for the Pennsylvania transit system or their

20   railroad.

21   Q.  These informational conferences were inclusive of these

22   various railroads?

23   A.  Yes, they were, all under the same law.

24   Q.  How often would you attend?

25   A.  Once a year.  They were sponsored by the Railroad

D7unles6                    Domenici - direct

1  Retirement Board and the topics would vary.  It would touch on

2  anything to do with unemployment benefits, sickness benefits,

3  retirement benefits, spousal benefits, widow and widowers

4  benefits and beneficiaries and what the employees that you

5  represent are entitled to.

6  Q.  Do you recall what Ms. Baran's specific role was at those

7  informational conferences?

8  A.  She would talk about sickness and unemployment.  She would

9  also talk about, upon retirement, disability, how you apply for

10 disabilities, what qualifies you for a disability.  But that

11 was only part of what her whole spiel was.

12 Q.  With regard on her discussions about that, was it by way of

13 encouraging or by way of information to --

14 A.  No.  She just read the letter of the law.  She was reading

15 from a script that is in a booklet that's given every union

16 leader.  It is a workbook that we receive when we sign in.  It

17 is an informational conference book that we also get to keep

18 and refer to if our constituents call with certain questions.

19 Q.  You went way back to grammar school, and then you said that

20 you lost contact and you saw her again.  If you could, just for

21 clarity, fill in the gap.

22       First of all, how many years of grammar school did you

23 go to school with her?

24 A.  Actually we went to the school called P.S. 52.  It's in

25 Springfield Gardens, Queens.  It was only through the sixth and

D7unles6                          Domenici - direct

1   seventh grade.

2   Q.  You said you lost --

3   A.  I mean, excuse me, seventh and eighth grade.

4   Q.  OK.

5   A.  Then I went to Thomas Edison Vocational High School in

6   Jamaica on Grand Central Parkway, and unbeknownst to me,

7   Marie's family moved out to Long Island and I stayed in

8   Laurelton and Springfield Gardens.

9   Q.  How old were you when you reacquainted yourself with her?

10  A.  I was out of the service.  I was -- how old was I?

11  Q.  Yes.  I just want a sense of -- you lost track in grammar

12  school.  In eighth grade you're what?  12?  13?

13  A.  Yeah, around there.

14  Q.  You saw her again at some point in your life when you were

15  in your to 20s?

16  A.  Yes, I think in my early 20s, 25, mid 20s.

17  Q.  From that point to today just describe your interactions

18  with her from the informational conference standpoint, and then

19  I'll ask you if there is any other interactions you have had.

20          Just to move it on, you said that they were these

21  yearly conferences?

22  A.  Right.

23  Q.  So would I be -- I don't want to put words in your mouth,

24  please correct me -- are you saying every year since in your

25  20s until now that you were --

D7unles6                        Domenici - direct

1    A.  Every year that, when I became involved with my labor

2    organization I attended those conferences.  They would be held

3    in different locations, and that would be up to the board where

4    those locations were.  Sometimes they were in Manhattan.

5    Sometimes they were in Long Island.  They were even where

6    Jersey Transit is in Newark.

7    Q.  How many times a year?

8    A.  Once a year.

9    Q.  Once a year?

10   A.  Yes.

11   Q.  How many would you say in total that you would have

12   attended when Ms. Baran was presiding or at least giving

13   explanations?

14   A.  At least nine years.

15   Q.  Beyond the informational conferences, is there any other

16   interaction you had with her with regard to the railroad?

17   A.  With regard to the railroad, no.

18   Q.  OK.  As far as any, I don't know, union meetings she might

19   attend or not, any dinners, dinner dances?  I don't know.  I'm

20   just asking.

21   A.  When there came a point in time where the Long Island Rail

22   Road would encourage -- how could I say?  They would encourage

23   the pension department employees, which were management

24   employees, to come to our union meetings to explain the

25   retirement packages that were currently in effect and talk to

D7unles6                         Domenici - direct

1    our members about retirement and talk to our members about what

2    they are entitled to.

3    Q.  Now, Mr. Domenici not by way of interrupting, but just

4    clarity, is that different from the informational seminars?

5    A.  Yes, it is.

6    Q.  OK.

7    A.  This was sponsored -- it was a union meeting which is held

8    every month with your labor organization.  But the participant

9    was a representative from the Long Island Rail Road's pension

10   department.  They came to explain what their pension was, our

11   pension was.  Along with that sometimes Marie would be there to

12   talk about disabilities.

13   Q.  How many times over how many years did you see her there?

14   A.  I think we had her a couple of years; two, three that I can

15   recall.

16   Q.  With regard to her role there, was it similar or different

17   to her role at the informational conferences?

18   A.  It was the same.  She gave out the same information.  The

19   only thing that people, the rank-and-file members that were

20   there had an opportunity to ask her questions, you know, as it

21   pertains to Railroad Retirement.

22   Q.  How well did you get to know, or reacquaint yourself with

23   her I should say over the course of that period of time?

24   A.  We developed a close relationship.

25   Q.  What type of relationship?  Just describe it.

1    A.  We would occasionally go to dinner, myself, my wife, Marie

2    and her husband.  Then after we retired, after I retired, we

3    would go away with them.  We would go on trips.

4    Q.  Before getting to the trips that you went to, I am going to

5    get there momentarily, but were you able to at all get a sense

6    of what her reputation was like in the community in which she

7    worked?

8    A.  Yes, I did.

9    Q.  Was that based upon the informational seminars, your

10   interaction with her, or just what was that based upon?

11   A.  Well, Marie has a, clearly has a leadership quality even

12   when she is at the podium discussing her expertise, which is

13   Railroad Retirement.  Her peers obviously admire what she does.

14   Her bosses wouldn't put her in the position that she was placed

15   in if she didn't have something on the ball, not only on the

16   ball, but knew what she was doing.

17           She's was employed prior to the Railroad Retirement

18   Board with Social Security.  She's been in this line of

19   business all of her career, for 40 years.  She worked for

20   public service.  That is all she wanted to do.

21   Q.  With regard to that reputation, did you form an opinion or

22   form a conclusion as to her reputation for honesty and

23   integrity?

24   A.  Absolutely.

25   Q.  What was that?

D7unles6                          Domenici - direct

1    A.  She is as honest as I know.

2    Q.  What do you base that upon, sir?

3    A.  Not only her actions, not only what her core belief is, her

4    religious belief is, how she performed her job.  I've seen her

5    go out of her way, even when she was a manager, to make sure

6    that people that deserved unemployment benefits, sickness

7    benefits understood the law, understood what they were entitled

8    to.  She spent many hours in my opinion perfecting that skill.

9    Q.  With regard to the trips that you just alluded to that you

10   went on with Ms. Baran and her husband, I guess you and your

11   wife?

12   A.  Right.

13   Q.  Did there come a time that you took trips with her, and

14   when was that?

15   A.  I retired in 2005 after 33 years with the railroad.  The

16   first trip that we went on was, I think in 2007, and I think we

17   went to, I think it was the Dominican Republic.  And we found

18   that we traveled very well together and we enjoyed each other's

19   company.

20        Well, we took a big trip and we went to Europe.  In

21   Italy we went on -- before we began a cruise, a Mediterranean

22   cruise, we booked a tour that did Tuscany and the wine country.

23   Tuscany is a very hilly place and Marie and Gus were with us,

24   and we came to this one little town, beautiful, quaint town.

25   And when the bus stopped, there was this church called St.

D7unles6                          Domenici - direct

1    Francis that was on level ground, and then about a quarter of a

2    mile up there was this much larger church.  And myself and my

3    wife went up to see this bigger, beautiful church and Gus and

4    Marie could not go up.

5    Q.  By the way, when you say "Gus," you are referring to Ostap

6    Baran?

7    A.  Yes, I'm sorry.

8    Q.  You know him as Gus?

9    A.  Yes, I do.

10   Q.  With regard to you just saying that he could not go up,

11   he -- being Gus Baran -- could not go up where?

12   A.  He couldn't traverse the hill.  He couldn't climb up that

13   hill without being in -- he couldn't do it.  Just his legs, his

14   back, he just couldn't do it.

15   Q.  What, if any, other limitations did you observe Mr. Baran

16   having at any point when you were traveling?

17   A.  We traveled, thank God, a lot so far, and I plan to do a

18   lot more.  But anyway, we were in -- to give you an example, we

19   were in Denmark, Copenhagen, and we were walking on level

20   ground on water, you know, by the water, and Gus had to stop

21   every couple of hundred feet.  We were walking at a normal

22   gait, and myself and my wife would sit down and wait for them

23   to catch up to us.  He has a lot of problems doing that.

24   Q.  With regard to him having problems, you're referring to Gus

25   Baran.  If I showed you a tape of him golfing, would that

1    change your perspective as to what you observed him doing or

2    not being able to do when you had trips?

3    A.  No, absolutely not.

4    Q.  Sir, as you testify here today, are you being given any

5    money to testify?

6    A.  Absolutely not.

7    Q.  Are you under any agreements with the government to

8    testify?

9    A.  No.  I wish I was home right now.

10   Q.  You may not be the only one.

11              MR. JACKSON:  Thank you, Mr. Domenici.  Thank you.

12              THE COURT:  Any other cross?

13              Mr. Ryan?

14              MR. RYAN:  No, your Honor.

15              MR. DURKIN:  No, Judge.

16              THE COURT:  Mr. Tehrani.

17   CROSS EXAMINATION

18   BY MR. TEHRANI:

19   Q.  Mr. Domenici, you drive a car, right?

20   A.  Yes, I do.

21   Q.  You take trains from time to time?

22   A.  Yes, I do.

23   Q.  You are able to hear Mr. Jackson's questions?

24   A.  Yes, I do.

25   Q.  Can you hear me now?

D7unles6                         Domenici - cross

1    A.  Yes, I do.

2    Q.  You are on disability, right?

3    A.  Yes, I am.

4    Q.  IN your disability application you claimed that you can't

5    hear anyone?

6    A.  I did not.

7    Q.  You claimed that you can't hear sirens?

8    A.  Excuse me.

9    Q.  You claimed that you can't hear sirens?

10   A.  If I put that on my application, yes.

11   Q.  You claimed that you can't hear during conversations?

12   A.  Yes.

13   Q.  You claimed that you couldn't hear public announcements?

14   A.  Yes.

15   Q.  So you have received disability benefits for years, is that

16   right?

17   A.  I retired in 2005.  I started receiving my annuity in 2006,

18   yes.

19   Q.  You still are receiving it today?

20   A.  I'm 65 years old, yes, I still am.

21   Q.  So you have received hundreds of thousands of dollars in

22   disability benefits, right?

23   A.  I don't know the figure.

24   Q.  More than 10,000?

25   A.  Yes.

D7unles6                         Domenici – cross

1    Q.  Do you know how much you receive per month?

2    A.  Not offhand I do not know.

3    Q.  You have no idea how much you receive in disability

4    benefits per month?

5    A.  I can give you a figure, but I don't know if that's

6    accurate or not.  About $3,000 a month.

7    Q.  $3,000 a month, understanding it is an estimate, that, by

8    my calculation, is $36,000 a year?

9    A.  OK.

10   Q.  Is that right?

11   A.  That's correct.

12   Q.  Over the course of eight years?

13   A.  Yes.

14   Q.  Hundreds of thousands of dollars?

15   A.  OK.

16   Q.  Your disability application was based solely on your

17   hearing, right?

18   A.  That is correct.

19   Q.  Not any kind of back pain?

20   A.  No.

21   Q.  Not any kind of neck pain?

22   A.  No.  Thank God.

23   Q.  Not any kind of shoulder pain?

24   A.  No.

25              THE COURT:  Asked and answered.

D7unles6                         Domenici - cross

1   Q.  Not carpal tunnel syndrome?

2   A.  No.

3           THE COURT:  Asked and answered.

4   Q.  So you retired in 2005.  Is that what you said?

5   A.  Yes, I did.

6   Q.  After 32 years on the railroad?

7   A.  33 years.

8   Q.  33 years.

9   A.  And I was 57 years old.

10  Q.  And you were an electrician and a gang foreman, correct?

11  A.  I was an electrician from 1972 to 1977.  I have been a

12  supervisor since 1977.

13  Q.  And you were a chairman of the IRSA?

14  A.  Yes, I was.

15  Q.  For over 10 years?

16  A.  Nine years.

17  Q.  When you applied for disability, you didn't hire Marie

18  Baran to fill out your application for you, did you?

19  A.  No, I didn't hire her.

20  Q.  In fact, she was working at the RRB at the time --

21  A.  Yes, she was.

22  Q.  -- that you applied, correct?

23  A.  Correct.

24  Q.  And you filed your application with the Westbury district

25  office?

D7unles6                          Domenici - cross

1   A.  Yes, I did.

2   Q.  And Marie Baran personally took in your application at the

3   Westbury district office, correct?

4   A.  Yes.

5   Q.  And you know that Marie Baran personally took in union

6   leaders' applications to make sure they got disability,

7   correct?

8           MR. JACKSON:  Objection.

9   A.  That is --

10          THE COURT:  Sustained.

11  Q.  Well, you know that Marie Baran personally took in

12  disability applications for union leaders, correct?

13          MR. JACKSON:  Objection.

14          THE COURT:  Overruled.

15  A.  No, I don't know that.  I have no knowledge of that.

16  Q.  Did you know that Marie Baran was the author of over 180

17  disability applications?

18          MR. JACKSON:  Objection as to "author," Judge.

19          THE COURT:  Sustained.

20  Q.  Did you know that Marie Baran was a consultant for over 180

21  disability applications?

22  A.  I never knew the number, no.

23  Q.  Did you know that she told applicants to change their

24  answers?

25          MR. JACKSON:  Objection, Judge.

D7unles6                         Domenici - cross

1           THE COURT:  Sustained.

2      Q.  Do you know that she completed disability applications

3      months in advance for people who were still working?

4           MR. JACKSON:  Objection.

5           THE COURT:  Overruled.

6      A.  I have no such knowledge.

7      Q.  You have no experience at all, do you, about Marie Baran as

8      a disability consultant?

9      A.  That is correct.

10     Q.  So you weren't in any meetings between --

11     A.  The only thing, if I can interrupt, the only experience I

12     do have was the personal experience when I filed my

13     application.

14     Q.  Right.  And Marie Baran was not your disability consultant

15     for that?

16     A.  No.

17     Q.  So you were not in any meeting between Marie Baran and

18     Regina Walsh?

19     A.  No.

20     Q.  You were not in any meeting between Marie Baran and Michael

21     Stavola?

22     A.  No.

23     Q.  You were not in any meeting --

24           THE COURT:  Asked and answered.

25     Q.  Is it fair to say that you were not in any meeting between

2524

D7unles6                         Domenici - cross

1  Marie Baran and any of her clients, correct?

2  A.  Correct.

3  Q.  You have no idea what happened in those meetings?

4           THE COURT:  Sustained.  Asked and answered.

5  Q.  During your over 30 years of Long Island Rail Road, you

6  heard people talk about occupational disability, right?

7  A.  Oh, I was well versed in it once I became involved with my

8  labor organization, yes.

9  Q.  And it was discussed at union meetings?

10 A.  Yes, it was.

11 Q.  Meetings you organized?

12 A.  Yes.

13 Q.  And you know that the vast majority of Long Island Rail

14 Road retirees obtain disability benefits, right?

15 A.  I have no such knowledge.

16 Q.  Now, getting back for a second to Marie Baran's consulting

17 business, do you know that in the first year of her business

18 she made approximately $68,000 in income?

19 A.  No, I do not.

20           MR. JACKSON:  Objection.

21           THE COURT:  Sustained.

22 Q.  Do you know that as a consultant a person has an obligation

23 to report income to the IRS?

24           MR. JACKSON:  Objection.

25           THE COURT:  Sustained.

D7unles6                        Domenici - cross

1    Q.  Would it affect your opinion as to her reputation for

2    honesty to know that Marie Baran underreported her income by

3    more than a half?

4              MR. JACKSON:  Objection.

5              THE COURT:  Overruled.

6    A.  No, it would not.

7    Q.  By more than 75 percent?

8              MR. JACKSON:  Objection.

9              THE COURT:  Overruled.

10   A.  Why would that change my opinion of Marie?

11   Q.  Well, you are aware, correct --

12   A.  I am aware that --

13   Q.  Sir, can I ask the question.

14   A.  Yes, sir.

15   Q.  Are you aware that when you file income tax returns you are

16   required to provide accurate information under penalty of

17   perjury?

18             MR. JACKSON:  Objection.

19             THE COURT:  Overruled.

20   A.  Yes.  However, people have the right to file applications

21   after they already filed their taxes amending their taxes.  My

22   daughter just had to do that.  We make mistakes.

23             MR. TEHRANI:  Your Honor, move to strike as

24   nonresponsive.

25             THE COURT:  Sustained.

D7unles6                    Domenici - cross

1  Q.  You have testified a bit about some of the differences

2  between Metro-North and Long Island Rail Road?

3  A.  Yes, I did.

4  Q.  About some of the differences in pension systems?

5  A.  Yes, I did.

6  Q.  And about some of the differences in health care, health

7  insurance?

8  A.  Yes, I did.

9  Q.  About some of the differences in wages?

10  A.  Yes, I did.  My knowledge is only regarding the maintenance

11  of equipment department in reference to their wages.

12  Q.  Now, you understand that occupational disability means that

13  a person is disabled for work in his or her regular railroad

14  occupation because of a permanent physical or mental

15  impairment, is that right?

16  A.  That's correct.

17  Q.  Is it fair to say that there is nothing in that standard

18  about pension benefits?

19          MR. JACKSON:  If he knows, Judge.

20  A.  Pension benefits in regards to what?

21  Q.  Well, we just discussed the standard for occupational

22  disability, correct?

23  A.  Yes.

24  Q.  Do you need me to go through it again?

25  A.  I don't understand what you are asking me.

1   Q.  Is there anything in that standard as to whether an

2   individual is occupationally disabled, about whether that

3   person is eligible for a pension?

4   A.  No.

5   Q.  Is there anything in that standard about health care

6   benefits?

7   A.  No.

8   Q.  Is there anything in that standard about wages?

9   A.  No.

10          MR. TEHRANI:  One moment, your Honor.

11          No further questions.

12          MR. RYAN:  No questions.

13  REDIRECT EXAMINATION

14  BY MR. JACKSON:

15  Q.  Mr. Domenici, your problem as you sit there today, however,

16  is not limited to hearing?

17  A.  Excuse me.

18  Q.  Your problem as you sit there today, medical problem, is

19  not only limited to hearing, is it?

20  A.  Correct, it's not.

21  Q.  Do you suffer from something else?

22  A.  Yes, I do.

23  Q.  What do you suffer from, sir?

24  A.  Parkinson's.

25  Q.  How long have you suffered from that?

D7unles6                    Domenici - redirect

1    A.  Since 2009.

2    Q.  Are you on medications for that?

3    A.  Yes, two different medications.

4    Q.  How do you treat yourself, as it relates to Parkinson's?

5              THE COURT:  Mr. Jackson, I think this is beyond the

6    scope.

7              MR. JACKSON:  He asked him if it was just hearing,

8    Judge.

9              THE COURT:  It was hearing related to his disability.

10             MR. JACKSON:  OK.

11   Q.  Well, let me ask you, regarding your current condition, OK?

12   A.  Yes.

13   Q.  Are there things that you can do notwithstanding the fact

14   that you have Parkinson's disease, activities upon which you

15   can participate?

16   A.  Yes.

17             MR. TEHRANI:  Objection, your Honor.

18             THE COURT:  Sustained.

19             MR. JACKSON:  OK.

20   Q.  Now, Mr. Tehrani asked you about taxes and filing taxes and

21   everything else.  Would it change your opinion to know that

22   Ms. Baran has paid taxes for 42 years of her life?  Would that

23   change your opinion of her honesty or anything else?

24             MR. TEHRANI:  Objection, your Honor.

25             THE COURT:  Sustained.

D7unles6                    Domenici - redirect

1           MR. JACKSON:  OK.

2    Q.  Let's start with 2007.  If taxes were amended so that every

3    tax and penny and cent and dime and nickel were paid, would

4    that change your assessment as to her --

5           MR. TEHRANI:  Objection, your Honor.

6           THE COURT:  Sustained.

7    Q.  What, if anything, about the filing of taxes would change

8    your opinion as to Ms. Baran's reputation for integrity and

9    honesty and truthfulness?

10   A.  Nothing.  It has no bearing on me.

11   Q.  Do you, when you assess a person, evaluate them on amending

12   taxes for one year, or might you evaluate them over the course

13   of what you observed for them being a friend of yours and

14   associate and a person that you have observed for 42 years?

15   What do you match it upon?

16   A.  That is a simple answer.  The lifetime that I have known

17   her.

18   Q.  So, in the event, sir, that, for example, as is pointed

19   out, there was an amendment in taxes in 2007, if you match that

20   up against every single thing that you observed regarding

21   Ms. Baran --

22          THE COURT:  Asked and answered.

23   Q.  With regard to her interactions with union officials and

24   other people that you observed -- let me just ask you this.

25   How many people did you observe Ms. Baran interact with?

D7unles6                          Domenici - redirect

1    A.   As far as labor organizations?

2    Q.   Correct, sir.

3    A.   Every labor head of the 12 or 14 labor organizations on the

4    Long Island Rail Road.

5    Q.   All right.

6    A.   And she always act professionally, always above board, and

7    always knew what she was talking about.

8    Q.   You said 14 labor organizations.

9    A.   Yes, 12, 14, something like that.

10   Q.   In addition to those 12, 14 labor organizations, were there

11   people who were not labor leaders but people who were labor

12   representatives or just --

13   A.   Oh, most definitely.

14   Q.   Did you see her interact with them?

15   A.   Yes, most definitely.

16   Q.   What about just your union membership?

17   A.   Very congenial, very honest, very straightforward, nice

18   woman.

19              (Continued on next page)

20

21

22

23

24

25

1   Q.  Over the course of what period of time?

2   A.  Over the course of my entire career as a general chairman,

3   which was nine years, and prior to that just being on the board

4   and prior to that knowing her personally.

5   Q.  And, therefore, your opinions, conclusions, and your

6   testimony today is based upon what?

7          THE COURT:  Asked and answered.

8   Q.  Mr. Tehrani asked you about wages.  Well, he said something

9   about -- I don't want to put words in his mouth -- about the

10  Metro-North.  What if anything does wages have to do with

11  retirement; do you remember that question?

12  A.  Yeah.

13  Q.  What if anything does healthcare have to do with

14  retirement?

15         MR. TEHRANI:  Objection, your Honor.  That was not the

16  question.

17         MR. JACKSON:  What was the question?

18  Q.  Do you remember questions being asked about pension?  I

19  don't have a photographic memory.  I have that limitation.

20  A.  He was, but what he was referring to, I think, was he was

21  referring to the occupational disability.

22  Q.  I want you to clarify when we talked about pension, we

23  talked about wages and healthcare and benefits, what's the

24  relevance of those issues as it relates to an occupational

25  disability?

1   A.  Well, my opinion, if you cannot --

2              MR. TEHRANI:  Objection, your Honor.

3              THE COURT:  Sustained.

4   Q.  Just without regard to your opinion, with regard to your

5   personal knowledge or experience.  He asked you about these

6   issues as they relate to your personal experience.

7              Do you understand that?

8   A.  Yes.

9   Q.  And the answer I would like to get is based on your

10  personal experience, so answer it that way.

11  A.  Based on my personal experience, an employee is not going

12  to be able to retire, even if they are disabled, if they do not

13  have the funds to do that.

14  Q.  And so what would wages have to do with funds that you

15  might need to retire, sir?

16  A.  Well, that has everything to do with the amount of money

17  you make compared to your pension, when you are able to retire,

18  when you are eligible to retire with an annuity that will

19  support yourself and possibly your family for the rest of your

20  life.

21  Q.  And what about healthcare, how would -- at all -- would

22  that relate to a decision to retire?

23  A.  Well, the amount of money that healthcare costs these days,

24  and even way back when when I was working, was astronomical.  I

25  know what the railroad paid for medical coverage for each

1    employee.  And when we received that benefit in 1995 that when

2    we retire, we retire with the same benefits as if we worked

3    until we became Medicare eligible, that was a great, great

4    thing to get and to negotiate.

5    Q.  Now, Mr. Tehrani asked you about your occupational

6    disability, right?

7    A.  Correct.

8    Q.  With regard to your occupational disability --

9    A.  Correct.

10   Q.  -- was that occupational disability approved or rejected?

11   A.  Approved.

12   Q.  And were you qualified to apply?

13   A.  Yes.

14   Q.  Or eligible to apply for that disability?

15   A.  Yes.

16   Q.  And in being eligible to apply, you were getting benefits

17   as a result of the approval process?

18   A.  Correct.

19   Q.  And these hundreds of thousands or, I'm sorry, 36,000 a

20   year that he said you got?

21   A.  Yes.

22   Q.  Is that money, sir, that is being granted to you based upon

23   that disability or for some other reason?

24   A.  Well, it's an annuity that I received early.  And since I

25   had 30 years and I wasn't 60 years old, with railroad

1   retirement you are fully vested if you have 60 -- if you are 60

2   years of age and have 30 years of service with a carrier, that

3   entitles you to a full annuity.  When a person goes out on a

4   disability, that individual is receiving that annuity at an

5   earlier stage.

6   Q.  Are you being charged with fraud of some kind for getting

7   an occupational disability, sir?

8   A.  Absolutely not.

9   Q.  And the occupational disability that you receive, did

10  anybody call in a favor to make you not here so you can get it?

11  A.  Absolutely not.

12  Q.  With regard to the application you filled in, Mr. Tehrani

13  said you used Ms. Baran; is that right?

14  A.  Yes, I did.

15          MR. TEHRANI:  Objection.

16          THE COURT:  Sustained.

17  Q.  Well, you heard him ask you questions about your

18  interaction with Ms. Baran when she was at the Railroad

19  Retirement Board, didn't you?

20  A.  Correct, yes.

21  Q.  And I want to ask you about that too.  May I?

22  A.  Sure.

23  Q.  Now, with regard to your interacting with Ms. Baran at the

24  time, did she take your application, sir?

25  A.  Yes, she did.

1    Q.  Did she review each and every question with you when she

2    took that application?

3    A.  Initially what happened is I had a phone conversation with

4    her or with somebody at the board, I think it was with her,

5    that said I needed a certain amount of things that I should

6    appear with at the board when I was retiring and applying for

7    the disability:  marriage certificate, date of birth, all of

8    that other stuff.

9    Q.  Did you bring those things?

10   A.  Yes, I did.

11   Q.  And when you went there, was your application checked by

12   Ms. Baran?

13   A.  Yes.

14   Q.  And did she go over it with you thoroughly, sir?

15   A.  Yes.

16   Q.  And was she complete in her review of that application with

17   you?

18   A.  Yes.

19   Q.  And did she tell you what to make up to cheat and defraud

20   the railroad or anybody else?

21           MR. TEHRANI:  Objection.

22           THE COURT:  Sustained.

23   Q.  Did she suggest any answers to you, sir, for that

24   application?

25   A.  Absolutely not.

1          MR. JACKSON:  Thank you.

2          THE COURT:  You're excused.  You may step down.

3          THE WITNESS:  Thank you very much.

4          (Witness excused)

5          THE COURT:  Mr. Jackson.

6          MR. JACKSON:  Ms. Baran rests.

7          MR. RYAN:  On behalf of Mr. Rutigliano, we rest on the

8     government's case with the offer of, without objection, to R76.

9     It's job descriptions.

10         MR. TEHRANI:  No objection, your Honor.

11         THE COURT:  Received without objection.

12         (Defendant's Exhibit R76 received in evidence)

13         THE COURT:  Counsel, please approach.

14         (At the side bar)

15         THE COURT:  Let's get an estimate of how long for

16    closing arguments which will start tomorrow.

17         MS. FRIEDLANDER:  I'll be less than an hour and a

18    half.

19         MR. DURKIN:  Less than what?

20         MS. FRIEDLANDER:  I think between an hour and an hour

21    and a half.

22         THE COURT:  Mr. Durkin.

23         MR. DURKIN:  I'm coming last.

24         MR. RYAN:  I'm coming first and I'm going to be 20

25    minutes tops.

D7ULLES7

1           THE COURT:  Mr. Jackson.

2           MR. JACKSON:  I'll probably be about --

3           THE COURT:  Can you match him?  It's a challenge.

4           MR. JACKSON:  I'll probably be about a half an hour to

5    40 minutes.

6           MR. DURKIN:  I think they're going to box me in.  So I

7    think half-hour, 45 minutes at the moment.

8           THE COURT:  I'm not going to hold you to the absolute

9    minute.  We're going to distribute or allocate times more

10   precisely tomorrow.  I just wanted to get a sense so I can tell

11   the jury when to return tomorrow.

12           So based on these estimates, closing argument probably

13   take somewhere around three hours or maybe a little more, three

14   and a half hours.

15           We're going to need a little bit of time to return to

16   Mr. Durkin's issue, so we can do that tomorrow or we can start

17   it today, perhaps wrap it up tomorrow if necessary.

18           We'll need some time to review for the first time the

19   draft instructions, which I'm going to email tonight after

20   close of business.  So review those and we'll have one general

21   overview of the big issues and then we'll return to them a

22   second time at this schedule probably on Thursday morning.  And

23   if we adhere to the schedule, I think we will probably be in a

24   position to give the instructions around 10 o'clock on Thursday

25   morning.

D7ULLES7

1          MR. DURKIN:  Judge, I have one stipulation that I can

2     read now.  I think I already said that I had rested in front of

3     the jury subject to stipulation.  So I'd rather not have to

4     wait until tomorrow to rest as if somehow there was an issue.

5     If there's another, if there's something I can put on tomorrow,

6     I'll do it.  But I don't think I need to rest in front of the

7     jury, do I?

8          THE COURT:  You can put that off because we still have

9     that other issue that might possibly reopen.

10          MR. DURKIN:  Can I read the stipulation now.

11          THE COURT:  Sure.  What is the stipulation?

12          MR. DURKIN:  It's regarding the Kelly Michaels, the

13     office manager at Island Sports Medicine, regarding the number

14     of patients he saw in a given week.

15          THE COURT:  All right.  Is this agreed upon?

16          MS. FRIEDLANDER:  It's OK.

17          THE COURT:  So just.

18          MR. DURKIN:  Can I just read it now?

19          THE COURT:  Yeah, sure.  All right.  So after this,

20     I'll send the jury home and we'll return to the open issues.

21          Mr. Weddle.

22          MR. WEDDLE:  Part of the open issue, your Honor, is

23     that the government may put on a rebuttal case, which would be

24     this malpractice insurance representative.  I think it's a

25     ten-minute witness.  But just for scheduling purposes, we

D7ULLES7

1        haven't discussed the issue with Mr. Durkin yet.

2                THE COURT:  We'll discuss it after the jury goes home.

3                MR. DURKIN:  So I can read this?

4                THE COURT:  Yes.

5                MR. DURKIN:  Can I just ask, did you read the whole

6        stipulation?

7                MR. TEHRANI:  Skip the preamble.  The parties have

8        agreed.

9                MR. WEDDLE:  The parties have stipulated that if

10       called as a witness.

11               THE COURT:  All right.  Thank you.

12               (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D7ULLES7

1          (In open court)

2          THE COURT:  Mr. Durkin, you indicated yesterday that

3     you had a stipulation.

4          MR. DURKIN:  I do, Judge.  Can I read it now?

5          THE COURT:  Yes.

6          MR. DURKIN:  Judge, the parties have stipulated and

7     agreed that if called as a witness, Kelly Michaels would

8     testify as follows:

9          During the time period of September 2005 through

10    June 2008, Ms. Michaels was a receptionist at Islands Sports

11    Medicine and, in that capacity, answered phone calls to the

12    office.  As part of her duties, she was also primarily

13    responsible for scheduling appointments for the doctors.

14         Island Sports Medicine used a scheduling program

15    template that was set to schedule six to eight patients per

16    hour.

17         During this time period, Dr. Lesniewski normally saw

18    patients from either 9 a.m. to 5 p.m. or 9 a.m. to 6 p.m.,

19    three full days per week.  The other two days per week were

20    devoted to surgery.

21         Ms. Michaels would testify that in a normal three day

22    week in the office, Dr. Lesniewski most often saw approximately

23    40 to 45 patients per day on a regular basis.

24         THE COURT:  All right.  Thank you.

25         All right.  The parties have indicated that they have

D7ULLES7

```
 1   rested.  There is a possible open issue that might require some

 2   additional testimony on rebuttal.  We don't know for sure

 3   whether that will be necessary, but at this point the schedule

 4   will call for the parties to present their closing arguments.

 5   I'm going to schedule that to begin tomorrow late morning with

 6   the government and then after lunch the defense.  Government

 7   then, because it has the burden of proof, has the last

 8   presentation.

 9           So I'm going to ask that you return tomorrow at 10:30,

10   and bear with us if that slips a little bit, but 10:30 should

11   give us enough time to deal with all the open issues.  And as

12   you go home now, again, do not discuss the case among

13   yourselves.  You're not yet free to begin any deliberations or

14   discussion among yourselves or have any contact with anyone on

15   the outside or read any accounts.  If any of these things

16   occur, you're directed to inform the Court immediately and not

17   discuss it with your fellow jurors.

18           Thank you again.  We'll see you tomorrow at 10:30.

19           JUROR:  Good night.

20           (Jury not present)

21           THE COURT:  All right.  Thank you.

22           Mr. Weddle.

23           MR. WEDDLE:  Your Honor, we mentioned this briefly

24   before, but I think that just to reiterate, I guess it was

25   Monday morning when we came in, we thought that we had
```

1    essentially reached an agreement that Dr. Lesniewski was not

2    going to put on a case to put his motive at issue.  And based

3    on that, we essentially withdrew our motion and said we weren't

4    going to offer the malpractice evidence.

5           The chart that he proposes using is pure motive

6    evidence.  And so if he's going to offer these tax returns or

7    try to put in the chart that he's offering, then we're going to

8    put on the malpractice evidence.  And so that unmoots, if you

9    will, the motion that we made that I think your Honor was in

10   the process of ruling on when we said that we had reached this

11   agreement with the defense.

12          THE COURT:  All right.  Mr. Durkin.

13          MR. DURKIN:  Judge, I'm -- I don't agree with that

14   proposition, first of all.  There are several different ways we

15   can handle this as far as I'm concerned.

16          One option, I believe that they introduced

17   Dr. Lesniewski's tax returns only for the purpose of comparing

18   the United Healthcare percentages.  One option would then be I

19   would move to exclude Dr. Lesniewski's tax returns and we'd be

20   done with it because I don't think they should be -- the only

21   thing I am trying to accomplish here is to counter the unfair

22   argument based in the record that the 50,000, you know, the

23   United Healthcare money is a large percentage of his net income

24   and, therefore, that's his motive.

25          I just -- they can't have it both ways.  They can't

1    lure me in to trying to respond to motive but then say, oh, if

2    you respond to motive, we're going to whack you over the head

3    with the 404(b) that we didn't give you the notice of.  I don't

4    think that's fair.

5            THE COURT:  Let me see if we can somehow parse this

6    out or try to simplify it.  There are a couple of questions

7    that I had in reviewing the material that you handed you before

8    the lunch break.

9            Government Exhibit No. 24 is the document that breaks

10   out the payments that Dr. Lesniewski received from United

11   Healthcare from Long Island Railroad employees.  I'm not sure

12   to what extent it is clear in the record whether all of those

13   funds relate to employees for whom Dr. Lesniewski provided

14   disability services or all employees.

15           Mr. Durkin.

16           MR. DURKIN:  I believe that's to all employees, and I

17   believe the government could not determine whether it was

18   disability, all disability, I think.

19           MR. WEDDLE:  Your Honor, that's not correct.

20           THE COURT:  Let Mr. Durkin answer and then you can

21   respond.

22           MR. DURKIN:  At least my recollection, and maybe

23   Mr. Dratel can correct me if I'm wrong, I thought they said

24   these were people who obtained -- had a record of payments from

25   United Healthcare for 2003 on, but and also appeared to get

D7ULLES7

1    disability but they did not.

2          MR. DRATEL:  No, all Long Island Railroad employees.

3    They could have been going from the nineties.  The discussion

4    we had about Government Exhibit 24 when we tried to preclude it

5    and Mr. Weddle was trying to clarify with Ms. Marx that this

6    does not distinguish among any employee.  And I cross-examined

7    her as well and I said it could be someone who had surgery, it

8    could be someone who didn't have disability, it could be any

9    Long Island Railroad employee.

10         So there isn't any distinction.  This is just a gross

11   number with no precision whatsoever as to the purpose for the

12   payment or the visit or how long the visit or what the status

13   of the patient was with respect to Dr. Lesniewski.

14         THE COURT:  All right.  Let's then, Mr. Weddle, do you

15   want to respond?

16         MR. WEDDLE:  Your Honor, that's just not the point of

17   the chart.  The point of the chart is that Dr. Lesniewski was

18   one of three go-to doctors, notorious among Long Island

19   Railroad employees as a person to go to for disability.  It was

20   an important part of his practice, an important source of

21   income for him, particularly when his medical, part of his

22   practice that is the part that was based on surgery was

23   crumbling because of staggering malpractice payments and

24   cancellation of his insurance to conduct surgery.

25         So this was an important part of his income and that's

D7ULLES7

1  all the chart shows is that by reputation, he was well-known at

2  the Long Island Railroad.  People went to him.  It was a major

3  part of his income.

4       THE COURT:  Let's stop there for a moment because the

5  government is saying it was a major part of his income.  The

6  62,000 in 2003, 65 in 2004, and then sort of varies.

7  Government argues that it was an important part of the income.

8  There's testimony that raises questions to whether all of that

9  related to the disability applications.  We don't know exactly

10  based on what has been said, what Mr. Dratel has indicated what

11  portion, let's say, let's take 2003, what portion of the 62,629

12  pertained to disability payments, disability services, rather

13  than just other services.

14       Pause there for a moment.  Mr. Durkin submitted the

15  form 1120S which indicates gross receipts for the subchapter S

16  corporation of Dr. Lesniewski, and in 2003 it shows 753,571.

17  Is it fair to say that those 753,571 in 2003 includes the

18  62,629 payments from United Healthcare?

19       MR. DURKIN:  Absolutely.

20       THE COURT:  All right.  Now, that being the case, and

21  you go down to the next line and Mr. Durkin's chart, the 1040

22  for Dr. Lesniewski for 2003 shows a total income of 188,486.

23  And that presumably is what comes from the 1120S into the

24  personal income and then with whatever deductions.

25       MR. DURKIN:  Each of the -- in each return, Judge, the

D7ULLES7

1      1040 reflects a certain amount of W-2 income or wages.

2                THE COURT:  Yes, from the 1120S.

3                MR. DURKIN:  No.  Well, the wages are on the 1120S,

4      but it's W-2 income.  I believe it's on line -- each of the

5      personal returns that are in evidence, for example, Government

6      Exhibit 1501, which is the 2005 return, on line 7, it's wages,

7      salaries, tips, etc.  It's 95,000.

8                And then there's line 21 which is other income and it

9      says see statement 2.  That amount is 71,000.  And statement 2,

10     if you turn to statement 2 in that return, which is in

11     evidence, it says statement 2, form 1040, line 21, other

12     income, Peter J. Lesniewski, MD, PC, 60,000.  Then is says

13     Peter J. Lesniewski, MD, PC, 2 percent medical insurance,

14     11,000.  And that's what makes up the 71,000 of other income.

15               THE COURT:  One of my questions is to what extent are

16     the figures in the 1120S incorporated, whether directly or

17     indirectly by reference, in the 1040 personal income statement

18     that is in evidence.

19               MR. DURKIN:  The way I just said, Judge.  It would be

20     each -- let me just show you.  Each return is almost identical

21     in that sense.  It's simply there's line 7 and then there's

22     line 21.  And those if you look, then if you go to the 1120s,

23     you can see where he gets those figures from.

24               MR. WEDDLE:  There's one additional place.  If there's

25     any profit in the 1120S, your Honor, that would show up on

D7ULLES7

1    Schedule E.

2         Now, Dr. Lesniewski takes some deductions against that

3    on Schedule E in other years, but the result of the Schedule E,

4    the bottom line from Schedule E shows up on line 17.  This

5    particular tax return that's on the screen, line 17 is blank.

6    In this year the schedule S reported a $74,000 loss.  That did

7    not end up being a deduction or a deductible loss on the 1040.

8    What that ends up being is that ends up being treated as a

9    contribution to basis for the corporation.  So basically that's

10   negative retained earnings in the corporation going forward.

11        But bottom line is if that money from 2005, let's see.

12   There's 2005, there's $50,000 of United Healthcare money going

13   into the entity relating to Long Island Railroad employees, if

14   that money were removed, if he lost that business or he didn't

15   have that business, then the loss would have not been $74,000.

16   It would have been 124, roughly, thousand dollars.  It would go

17   straight to the bottom line because the expenses in the 1120

18   are not variable expenses relating to the Long Island people.

19        So there are three places that any income to

20   Dr. Lesniewski show up on his personal return that are flow

21   through from the S corporation.  It's line 7, line 21.  Those

22   translate into the line on the S corporation which is called

23   compensation of officers.  And then there is profit in the

24   corporation then that flows through to Schedule E directly.

25        It's actually mysterious what the Schedule E deduction

D7ULLES7

```
 1   is that Dr. Lesniewski takes.  It's says it's from a K-1 but

 2   it's not on the K-1, so that seems questionable too.

 3            But those are the three places that it flows through.

 4            MR. DURKIN:  Judge.

 5            THE COURT:  Mr. Durkin.

 6            MR. DURKIN:  Your expenses aren't fixed to particular

 7   clients, and your expenses in a given year can be variable, as

 8   they are here.  The obvious fallacy of what the government

 9   says, Judge, is right on the face of my chart which is if what

10   Mr. Weddle is saying is true, then it would be, it would

11   fluctuate every year by just the amount of the United

12   Healthcare and it clearly doesn't do that.

13            THE COURT:  Let me come down to what my concern is.

14            Mr. Weddle, at this point the jury has seen the column

15   on the left in this exhibit, this chart, which is L24, and they

16   have also seen the column to the right, which is the form 1040s

17   for Dr. Lesniewski showing the total income.  A fair reading of

18   those two pieces of evidence side by side with the government's

19   argument that the healthcare payments and the Long Island

20   Railroad employees services to Dr. Lesniewski was a significant

21   part of the income is somewhat misleading insofar as I think

22   Mr. Durkin is correct, the 62 cannot be compared to the 188.

23            The 62 is a portion of the 753.  And by virtue of

24   other tax maneuvers that the statute permits, ultimately, you

25   reach 188,000.  The 62, when it becomes, when it goes into the
```

D7ULLES7

mix of the 753 then becomes part of that which is subject to

whatever expenses and other adjustments, everything else in

that mix goes through, and out of that process comes the 188.

So I can't at this point, I believe the jury could

have a misimpression that somehow almost a third of

Dr. Lesniewski's income in 2003 derived, total income derived

from the United Healthcare payments.  I think that is not a

correct or accurate impression.

MR. WEDDLE:  Your Honor, it is an accurate impression.

And if I could just use the Elmo for a second, I think I can

explain this pretty quickly.

Let's take the 1120S for 2005.  This has gross

receipts of $631,000, and then what happens to that money is

some of it goes to compensation of officers.  That's what we

flowed through to line 7 and line 21 on Dr. Lesniewski's

personal income tax return.  There's some other salaries.

Those are fixed costs, your Honor.  I don't think he's hiring

people solely to work on Long Island Railroad patients.

Then there's some other fixed costs -- rents, taxes

and licenses, interest, employee benefit programs -- and then

it says other deduction and there's $340,000 in other

deduction.  If you look at the 1120 deductions and compare them

year by year, these also are largely fixed costs.  This is the

other deductions line section of the tax return, and I can't

really, I think -- I'm not sure I can fit it all in, but

D7ULLES7

basically there's a one-time cost of abandonment of lease hold improvements, that's $91,000.  That's unrelated to whether he's seeing or not seeing Long Island Railroad people.

The accounting is the same, $48,000.  Amortization is approximately the same year to year.  All these fees and expenses are the same.  They fluctuate a little bit, but they don't depend on United Healthcare united railroad billings.

So if that money went away, these expenses would not change.  What does fluctuate from year to year is insurance, on this tax return is $114,000.  It's a third of this other deductions line.  Then this shared common charges, $71,000. That's also not going to fluctuate, your Honor.

His insurance payments are not fluctuating based on whether he's seeing Long Island Railroad patients.  They are fluctuating, but they're fluctuating based on the fact that he has these massive malpractice judgments that are being entered. So these fixed these costs are not fluctuating.

So basically if you took the money out of the top line and then you have the same fixed costs, the money you take out of the top line drops right to the bottom line.

THE COURT:  But, Mr. Weddle, you could say that any portion of the money in the top line could be taken out as if it were a discrete element unto itself and you would have the same results.

MR. WEDDLE:  Well, your Honor, he just read a

D7ULLES7

1    stipulation about how many patients he has.  He has the office.

2    He has these patients coming through.  If he lost the Long

3    Island Railroad patients, there would be two problems.  One is

4    he's losing his insurance to do surgery, right.  The Long

5    Island Railroad patients are perfect in that situation because

6    they're not going to him for surgery.  They're going to him to

7    get this paperwork.

8         So he's losing his ability to actually practice

9    medicine at the same time that he's got this important piece of

10   his business.  And if this important piece of his business

11   didn't exist, it would drop right to the bottom line.  It

12   wouldn't be -- it wouldn't be reduced by some kind of expense

13   ratio that comes off between his top line and his bottom line.

14   There's more that's misleading about just comparing it to -- I

15   don't want to overstate misleading -- but I think the

16   comparison that we've made is valid and not confusing, not

17   misleading.

18        I think that it is invalid to compare the importance

19   of the United Healthcare money to his gross receipts for the

20   reasons that I just stated, but also for other reasons, your

21   Honor.  Because in this particular year, not only did the

22   business lose $74,000, right, so if he didn't have that United

23   Healthcare money, as I said already, that would have been a

24   much greater loss.  But right here, your Honor, it's not just

25   the bottom line loss, but his debt itself is increasing by

1    $40,000.  He has a new line of credit from Bank of America in

2    2005.  So that's another $40,000 that is essentially lost

3    money.

4            And so I think it's an entirely valid comparison to

5    say this is a pass through entity.  Income comes into it.  It

6    has essentially fixed costs with the exception of his insurance

7    troubles.  And because of that, the income that comes into the

8    top line flows right through to the bottom line.

9            And so if he lost this $50,000, that would be an

10   important hit on his personal tax return.  His personal tax

11   return for this year, 2005, shows total income of 166, sorry,

12   it's $166,000.  So that's the wage information, the top line,

13   $95,000, and the line 21, $71,000.  That's all his income.  The

14   $74,000 loss gets accounted for differently.

15           But basically if we took another $50,000 out of this,

16   there would be even more loss.  It would be a huge loss on that

17   tax return.  And if we go through for comparison sake, I think

18   it would be useful to go through 2006 where there's a roughly

19   $20,000 gain.  That $20,000 gain goes right to Dr. Lesniewski's

20   personal income tax return.  And if he lost the money from this

21   important piece of his business, namely, Long Island Railroad

22   patients, that would be something that would matter to him.

23           It obviously is something that he's well aware of and

24   the matters to him.  He confessed to exaggerating for these

25   Long Island Railroad patients.  He never said I don't know who

D7ULLES7

you're talking about because it's only 5 percent of the
patients I see or it's $50,000 out of my gross receipts of
hundreds of thousands of dollars.  He said, oh, yeah, I
exaggerate because I know they're trying to get disability.

So to compare this to the top line figure though is
not correct.  That creates an incorrect view of how important
this money is to him because this is a flow through entity.
And if we had an accountant on the stand, they would explain
that.  We could just say if you subtracted $50,000 in gross
receipts, how would that end up on the bottom line?  And they
would say it would drop essentially to the bottom line unless
there is a variable cost associated with it, and that's exactly
the language I proposed in the stipulation, your Honor.

THE COURT:  Mr. Weddle, the issue, as I see it, is not
whether or not the figure of 50,000 or whatever it is is
significant or would be a big hit for Dr. Lesniewski.  The
issue is what percentage of his total income in the 1040 is
accounted for by his practice that's relevant here, which is
the Long Island Railroad employees for whom he performed
disability service.

This chart as presented now comparing L24 with the
income, total income gives the jury perhaps an exaggerated view
of what percentage of the practice of his total income derived
from the Long Island Railroad employees for which he provided
disability services.  I'm not questioning whether or not it was

D7ULLES7

1   significant.  He may have suffered a big, big blow if you take

2   those $62,000 away from the 2003 figure.

3            But the issue is whether or not it is accurate to say

4   that one-third or roughly one-third of 2003 total income

5   derived from employees at the Long Island Railroad for whom

6   Dr. Lesniewski provided the disability services.  I think

7   that's not an apples to apples comparison.

8            MR. WEDDLE:  Your Honor, the chart that your Honor is

9   referring to is not our chart.  That's the defense chart.  We

10  simply just put in the amount of money, and I think it's going

11  to be the argument that we're going to make is this is an

12  important amount of money to him.  This is something that he

13  notices.

14           THE COURT:  Mr. Weddle, the government did not put in

15  the 1040 form for Dr. Lesniewski?

16           MR. WEDDLE:  We put in the tax returns, yes.

17           THE COURT:  That's what we're talking about.

18  Comparing 2003.

19           MR. WEDDLE:  I thought your Honor said L24.  That's

20  the defense chart that has not been admitted.

21           THE COURT:  Government Exhibit 24.  Government

22  Exhibit 24 is the healthcare payments to Dr. Lesniewski for

23  Long Island Railroad employees which is not all of whom are the

24  disability patients, not all of whom.  We don't know what the

25  breakdown is.

D7ULLES7

1          MR. WEDDLE:  But your Honor.

2          THE COURT:  It could be a substantial number, it could

3     be most of them.  But the testimony at this point is that it is

4     not entirely clear how many or how much of the 62,000 is only

5     the disability patients.

6          MR. WEDDLE:  Your Honor, I think that we're putting

7     that information in based on the evidence that's been presented

8     that Dr. Lesniewski was a well-known, go-to doctor.  And so if

9     that's why people are going to him, that's an important part of

10    his practice.  It doesn't matter if they go there and say I

11    have a broken toe.  I mean for all of these people we've seen

12    the chart notes.  He does basically every test for every

13    person.

14          So but I think getting back to the main point, your

15    Honor, the defense has not identified a single item of expense

16    that's deducted on these tax returns that would vary if the

17    Long Island Railroad employees disappeared from the picture.

18          MR. DURKIN:  That's because --

19          MR. WEDDLE:  They just keep saying your common sense

20    will tell you that it doesn't happen.  But I've looked at these

21    returns.  These are not variable costs; they're fixed costs.

22    They have to do with his insurance mainly, his rent or his

23    common charges mainly, his employees.  These are not things

24    that are going to fluctuate.

25          THE COURT:  Mr. Weddle, money is fungible and just as

D7ULLES7

you say he cannot identify one particular item that's

attributable to the Long Island Railroad employees, at the same

time it is very hard to take the total income figure for any

one year and say that $62,000 of that is only the Long Island

Railroad employees income or the payments.

          MR. DURKIN:  Could I just interject?

          THE COURT:  Let me give Mr. Durkin a chance and then

we'll come back to you, Mr. Weddle.

          MR. DURKIN:  I feel like I'm in a house of mirrors on

this argument about the fixed costs.  I must be nuts because I

look at statement 2 of every return that I have, if you go to

statement 2 on the 2005, the total deductions are 340,850.  In

2006, it's 537,755.  In 2007, it's 524,731.  And in 2008, it's

327,632.  So those aren't the same.  Sometimes they're similar

but there's a range of 200,000 in each year on the book end.

          MR. WEDDLE:  That range.

          MR. DURKIN:  Let me finish.

          THE COURT:  Let Mr. Durkin finish.

          MR. DURKIN:  He says there's no difference in the

other costs; that's not true.  Take a look at line 8 in each of

those returns.  These are the salaries.  These are the things

he's saying, all the secretaries are all the same.  That's not

true.  In 2005, line 8 is for salary is 74,576.  In 2006, it's

3,750.  It's nothing in 2007 and nothing in 2008.

          The taxes and licenses fluctuate every year.  If you

D7ULLES7

          look at line 12, for example, Judge, 2005.  Taxes and licenses,

          15940.  2006; 8,964.  2007; 8,862, and then 8,000.  So they

          fluctuate there.  There's -- I don't even understand.

                There's, for example, there's an employee benefit

          program in 2005, line 18.  There's no such thing the rest of

          the years.  Look at the bad debts, line No. 11.  That

          fluctuates, 86,000 in '05; 94,000 in '06.  Nothing in '07.

          Nothing '08.  I don't understand what the government is talking

          about that these are all fixed.

                MR. WEDDLE:  Your Honor, the fact --

                THE COURT:  Mr. Weddle, you can address this point and

          then I'm going to pause it for a moment.

                MR. WEDDLE:  The fact that the numbers change year to

          year does not mean that they vary with United Healthcare.  It

          just means that they change from year to year.

                For example, 2006, your Honor, I'm putting on the

          screen, OK.  So statement to other expenses is $537,000, but

          let's look at why that is.  It's because in 2005, he only paid

          $71,000 for common charges, and in 2006 he's now part of this

          practice, so he has $375,000 in common charges.  That's

          unrelated to whether he's seeing Long Island Railroad employees

          or not.  It's just the way that he's set up his business in

          that year.  That accounts for essentially the whole change.

          There's an increase in the insurance, as we've talked about.

          But most of the other costs are staying the same.

1            And so, your Honor, the point here is your Honor said

2      money is fungible and that of course is true.  The point here

3      is for any block of $50,000 in income, because this is a pass

4      through entity and because many of the costs are sunk costs,

5      they're fixed.  They have to do with the office space or they

6      have to do with medical insurance or they have to do with

7      salaries of employees, any chunk of $50,000 worth of patient

8      revenue in any year matters to Dr. Lesniewski's bottom line.

9            And it matters a great deal more than if you simply

10     take $50,000 and divide it by the gross receipts line because

11     in this year, 2006, what happens is see there's gross receipts

12     of $865,000.  Compensation of officers is $187,000.  That flows

13     directly to Dr. Lesniewski's tax return.  And then the bottom

14     line profit, which also flows to his tax return, is on this

15     1120S and it's $10,000.

16           Any chunk of $50,000 worth of business that you

17     hypothetically take out of this year and eliminate is going to

18     turn that profit of $15,000 into a loss.  And that profit of

19     $15,000 shows up directly on Dr. Lesniewski's 1040.

20           THE COURT:  All right.  Mr. Weddle, let me come back

21     to the point.  The issue is not whether this amount of money

22     was important to Dr. Lesniewski, whether if he didn't have the

23     United Healthcare he was going to go on food stamps.  The issue

24     is what portion of his total practice was represented by the

25     Long Island employees who, for whom he was providing the

1    disability services.  I thought that that was what this debate

2    is all about.

3              MR. DURKIN:  You're a hundred percent right, Judge.

4              THE COURT:  Mr. Durkin opened up by making reference

5    to the fact, he said that this portion of the practice was

6    small, that Dr. Lesniewski had a much more robust and diverse

7    practice.  And this was a -- I'm not going to characterize it,

8    but the impression was that it was not a significant part of

9    his overall practice.

10             And Mr. Durkin is not arguing that the $62,000 for

11   2003 as a proportion of all of the revenues that

12   Dr. Lesniewski's received for that year reflects his theory

13   that that practice from Long Island Railroad disability was not

14   significant.  Not to say if he lost it, he wouldn't have a

15   significant impact on his lifestyle, as you would argue.  The

16   issue is what proportion did it represent of his practice.

17             MR. WEDDLE:  It represents the difference between a

18   $15,000 gain and $35,000 loss.

19             THE COURT:  The question is not -- the question is the

20   proportion of the practice.  The question is what part of the

21   practice was the $62,000 in 2003.  Let's say in quantitative

22   terms.

23             Let's suppose, according to Mr. Durkin's theory, that

24   in 2003, Dr. Lesniewski received $753,000 from all of his

25   patients.  If you quantified the total number of patients that

D7ULLES7

1    paid him that amount, let's say again for the sake of argument

2    that it was 200 patients, 200 individual patients.  What

3    Mr. Durkin is arguing, as I understand it, is that of those 200

4    patients, let's say 50 of them were Long Island Railroad

5    employees for whom he was providing disability services.  So

6    that would be 50 out of 200.

7              But if you take it on the basis of gross revenues from

8    United Healthcare and you compare it to total income, which is

9    the comparison that you're making, you're going to get a

10   totally different number.  You're going to get a skewed number

11   because you're comparing dollars of income as opposed to

12   individual patients seen.

13             Now, I said before I'm going to pause this and ask to

14   see if we can take a different direction.  This may or may not

15   be helpful, but at least I'm trying to see if we can find a way

16   of reaching what the crux of the argument is.

17             During the course of the government's investigation,

18   you obtained Dr. Lesniewski's patient files, I assume?

19             MR. WEDDLE:  We obtained some of them, your Honor.

20             MS. FRIEDLANDER:  Very few, Judge.  That was part

21   of -- we were able to obtain some files that were at Island

22   Sports Medicine where he spent just a couple years during --

23             THE COURT:  What years are those?

24             MS. FRIEDLANDER:  Mid-2005 until -- end of 2005 until

25   2008.

D7ULLES7

1          THE COURT:  All right.  Are those files sufficient for

2     the government to be able to say that in that year or that year

3     and a half Dr. Lesniewski saw some X number of individual

4     patients?  Let's say a hundred, 200.

5          MR. WEDDLE:  Your Honor, all the files that we got are

6     Long Island Railroad employees.

7          MS. FRIEDLANDER:  It would only have a subset.  We

8     wouldn't be able to tell from the records we have.

9          THE COURT:  You don't have the universe of all the

10    people he saw during that year?

11         MS. FRIEDLANDER:  No, your Honor.

12         MR. WEDDLE:  No, your Honor.  We have United

13    Healthcare records that show, that show all the people I think

14    only on the Empire plan.  But that's essentially very close to

15    Long Island Railroad also.  But I mean --

16         THE COURT:  Let me come back to Mr. Durkin.

17         Mr. Durkin, let's come to 2005.  And on your chart,

18    you indicate that the 1120S produced gross receipts of

19    $631,751.

20         MR. DURKIN:  Yes, Judge.

21         THE COURT:  Now, the government is saying that all of

22    the records that they obtained, which they say is not complete,

23    but at least for 2005 they have some records.  All of those

24    records indicate that all of Dr. Lesniewski's patients were

25    Long Island Railroad employees.  Is that your understanding?

D7ULLES7

1          MR. WEDDLE:  No, your Honor.  We didn't say that all

2     of his patients were Long Island Railroad employees.  We just

3     said in our chart that these people, this number of people in

4     the chart are Long Island Railroad employees.

5          THE COURT:  Which number of people, which people?

6          MR. WEDDLE:  The charts had different criteria.  So

7     I'd have to look at them, but I just missed if your Honor was

8     referring to a specific number.

9          THE COURT:  I'm trying to see if we can sort out by

10     year the number of patients that Dr. Lesniewski's files for the

11     year that you may have it break down as between Long Island

12     Railroad employees and non-Long Island Railroad employees.

13          Is that figure available anywhere in the record?

14          MR. WEDDLE:  No, your Honor.  It was not produced to

15     us.  We don't have that.

16          THE COURT:  Mr. Durkin or Mr. Dratel?

17          MS. FRIEDLANDER:  Your Honor, may I have a moment with

18     Mr. Weddle.

19          THE COURT:  Yes.

20          MR. WEDDLE:  Your Honor, I don't think we have a

21     way -- first of all, these are repeat patients, so they come

22     over and over and over again.  So there's some definitional

23     issue with saying how many patients in this time period.

24          THE COURT:  I acknowledge -- that's why I specifically

25     said individual patients.  I'm not talking about one person who

D7ULLES7

1    went through five times.  I'm talking about one person

2    individually.  And whether or not they went one time or ten

3    times, that is one patient.  And then you know whether that

4    patient, you should know somehow whether that patient is an

5    employee or not an employee because that would be part of the

6    records, presumably.

7         MR. WEDDLE:  That's right, your Honor.  But we got

8    records from the insurance company that covers Long Island

9    Railroad.  So there are other insurance companies that cover

10   other employees.  We didn't get records from them because

11   they're not Long Island Railroad people.  So we don't have the

12   full set of his patient roster for any period of time.

13        I think that I mean one thing -- I think that as your

14   Honor said yesterday, you said this was a factual issue.  And I

15   think that if they, if the defense wants to say that the United

16   Healthcare receipts for Long Island Railroad employees is

17   10 percent of the gross receipts, that's true, but I think that

18   it's also true that it is 40 percent of the income that ends up

19   on his personal tax return and in some years it makes the

20   difference between a gain and a loss.

21        So then we're just in the area of both sides arguing

22   from the facts that they are.  The problem is that I think

23   where we started with this was that in order to make that

24   argument, the government is just going to need a couple basic

25   facts about pass through entities from the accountant and

1    that's why we subpoenaed him.  We can get those basic facts.

2           But in addition to that, to put the comparison with

3    gross receipts and United Healthcare receipts in perspective,

4    we are also going to prove that he was losing his insurance and

5    he had been subject of all this malpractice judgments and

6    that's because that's powerful evidence of motive.  We elected

7    not to offer it because the defense was not going to put on a

8    case.  But now they're putting on a case.  That's fine.  They

9    can put on the case and they can argue motive, but the jury

10   shouldn't have half the story on motive.  They should have the

11   full story.

12          THE COURT:  Yes, Mr. Durkin.

13          MR. DURKIN:  Maybe I have to say it again and maybe

14   this time it will be heard.

15          It's the government that's trying to argue motive.

16   They told me -- this came up because he told me, Mr. Weddle

17   told me that intended to argue to this jury exactly what you

18   say is not fair, which is the $60,000 was 33 percent of his

19   income.  That's how this started.  It wasn't until he told me

20   that's what he was going to do that I asked simply to put this

21   in for completeness purposes because at least if he wants to

22   argue that, I should be able to argue the other.

23          Now, let me respond to a question you raised.  You

24   asked whether or not there was a master list of patients.  I

25   believe there is.  We received something from the government in

D7ULLES7

 1    discovery.  It's starts as the Bates ISL000001.  I don't have a

 2    hard copy.  I only have it in on my screen here because

 3    Mr. Herman knows computers better than I do.

 4              But that document is some 59 pages long, and we at one

 5    point went through this and were able to identify the Long

 6    Island Railroad patients and that's where one of the places we

 7    came to the 5 percent from and that's what we came to.

 8              I decided not to do this because we weren't going to

 9    put a case on and I'm not going to offer that, but I think we

10    can do that.  But I'm representing to you and there's in that

11    59-page document, there are 3,000, there are names of 3,128

12    patients.

13              THE COURT:  Individual patients?

14              MR. DURKIN:  Yes.

15              THE COURT:  Or visits?

16              MR. DURKIN:  No, individual patients.  They're listed

17    alphabetically.  And that's where we had a good faith basis of

18    making the 5 percent claim.

19              THE COURT:  Out of those 3,000, you have them also

20    broken out by Long Island Railroad employees and nonemployees?

21              (Continued on next page)

22

23

24

25

D7unles8

1            MR. DURKIN:  I don't know how.  Just a minute.

2    Dr. Lesniewski went through this document and arrived at a

3    number for people that he provided narratives to.  So it may

4    not be just the only Long Island Rail Road people, but of the

5    narratives of the people, of these 3128 people that he provided

6    narratives for -- forget the number, but it turned out to be

7    5.24 percent.  So I guess we could do it backwards and come up

8    with a number.

9            THE COURT:  Mr. Weddle.

10           MR. WEDDLE:  Your Honor, he was at Island Sports

11   Medicine for two years out of a multiyear conspiracy.

12           MR. DRATEL:  Three years.

13           MR. WEDDLE:  I think this number that the defense is

14   relying on is a number that comes from the defendant, who is

15   not testifying.

16           If he wants to testify about that number, then we

17   would welcome the opportunity to cross-examine him, but I think

18   that this is a list that's a limited snapshot and it just

19   simply doesn't answer the question that either they opened on

20   or that your Honor posed.

21           We're getting far afield here.  What they want to say

22   is they want to say that the amount of money coming from United

23   Healthcare is a tiny amount of money to Dr. Lesniewski in terms

24   of his income.

25           That is not correct.  Anyone can do the math comparing

D7unles8

1    it to gross receipts.  But with five minutes with an accountant

2    on the stand or with the stipulation that I propose we would

3    also show and we would separately argue that that amount of

4    income, because this is a passthrough entity drops right to his

5    tax return.

6          So it's 40 percent, or depending on the year, whatever

7    it is, it's 40 percent of his total income on his tax return.

8    It is a fair comparison.  They can make their comparison.  We

9    can make our comparison.  It is fair.  But they shouldn't try

10   to block us from making our comparison.

11         MR. DURKIN:  It's simply not fair, Judge, in any way

12   you cut it.  The one thing they have been trying to avoid from

13   day one is this small number of patients at the Long Island

14   Rail Road, any way you cut it, if you do it by patient number

15   if you do it by -- that's part of the stipulation.  He saw 40

16   to 45 people a week.

17         MR. DRATEL:  A day.

18         MR. DURKIN:  I'm sorry, a day, which is 120 to almost

19   150 people a week.  You heard the testimony.  It is just not

20   fair for them to be able to draw the inference that they want

21   to make off of the tax return.

22         It is just not fair.  We should be permitted to let

23   this jury see in proper perspective.  If they want to argue,

24   let them have at it, and I will argue right with them.

25         But the truth of the matter is, is that the Long

D7unles8

1   Island Rail Road disability people were a small percentage

2   gross receipts wise and a small percentage of his patients.

3           THE COURT:  All right.  The problem that I have at

4   this point, Mr. Weddle and Mr. Durkin, is that you can see how

5   difficult the issue is to construct and reconstruct.  There are

6   a lot of complexities.

7           I have read the e-mail in which Mr. Weddle proposed

8   language for a possible stipulation.  I must say that I think

9   my tax professor in law school wouldn't be able to follow this,

10  let alone the jury.

11          MR. DURKIN:  Did you read my e-mail, Judge?

12          THE COURT:  I did.  The point is it's very

13  complicated.  We are on the eve of completing this trial.  The

14  last thing I would want to do now is to reopen this issue for

15  two days of testimony about this issue and the complexities

16  that it involves.  And I question to what extent the jury is

17  going to be able to absorb all of these technicalities and

18  complexities and come out with a rational understanding of what

19  these numbers mean and how these sections of the code relate.

20  I'm trying to see if we can find a simple way of addressing the

21  issue or the dispute in a way that is sustainable in the record

22  and not reopen the record all over again for new testimony if

23  we can avoid it.

24          Now, again, I understand the dispute to be not about

25  whether or not Dr. Lesniewski would go into poverty if he lost

D7unles8

the Long Island Rail Road employees as a percentage of all of

his income, but to what extent was the number of individuals he

saw among all of his patients represented by Long Island Rail

Road employees.

          There seems to be a factual dispute about that.

Dr. Lesniewski is saying, according to the numbers that were

just put into the record this afternoon in the stipulation,

that he saw roughly 150 patients per week.

          Let's say he worked 50 weeks a year.  That's about

7,500 people.  Assuming that a lot of those are multiple

visits, take those aside, even if you cut it in half you are

still talking about a huge number of people, 2500 plus.  Were

there 2500 Long Island Rail Road employees that he saw in any

one year?

          MR. WEDDLE:  Your Honor, you are talking about 7,000

office visits in a year.

          THE COURT:  7,000.

          MR. WEDDLE:  The evidence in this trial shows that for

Long Island Rail Road patients, they came ten times in a year,

six to ten times in a year.

          THE COURT:  But how many of them?  That's the

question.

          MR. WEDDLE:  I can't do that division, but I think if

each Long Island Rail Road person saw Dr. Lesniewski five times

in a year or ten times in a year, that cuts down the list of

D7unles8

1   patients that your Honor just mentioned a great deal.

2          THE COURT:  It cuts it down, but it depends whether

3   that number is ten or a hundred or a thousand.  If you are

4   saying that it is a thousand, I agree with you.  But we don't

5   know exactly how many it is.  If the number is ten or a

6   hundred, you don't reach 2500 in a year.

7          MR. DURKIN:  There were only 1500 annuitants total.

8   You know that from the amnesty.  You know that Dr. Ajemian saw

9   47 percent.  You know that Mr. Parisi saw 23 more percent.

10  Dr. Lesniewski only saw in the whole time period 13 percent of

11  the patients.  So 13 percent of 1500 is only about 160 or 170

12  patients.  That's the number that we have thrown around here

13  the whole time.

14          I think the exhibit earlier, the other exhibit, I

15  don't know the number I think was 140, 143 or 144 patients.

16  That is all there is.

17          Now, I don't care what they want to argue.  But they

18  shouldn't be permitted to argue something that is not correct.

19  It's simply not correct that United Healthcare is correlated to

20  his income and therefore represents the true percentage of his

21  practice.  It is just not true.

22          MR. WEDDLE:  It just is, your Honor.  We could agree

23  to something that just said that the tax returns show gross

24  receipts of X amount of money, but gross receipts are not

25  income to him.  What is income to him, which flows through, are

D7unles8

```
 1   these other amounts of money.  Then we could both make

 2   argument.

 3            THE COURT:  We are not going to close the circle today

 4   because I think you are still arguing past one another, and

 5   we're not really getting down to the bottom line.

 6            My bottom line is that I am not prepared to reopen

 7   this case in a way that is going to invite several more days of

 8   testimony by expert witnesses and getting into the weeds of

 9   this very complicated tax issue.

10            MR. DURKIN:  I couldn't agree with you more, Judge.

11            THE COURT:  I would suggest that you think about it

12   and see if we could put our heads together and come up with a

13   simple way of addressing the dispute on the terms that the

14   dispute arises.

15            I see now that the difference is that the government

16   is seeking to ask the jury to draw an inference from numbers

17   from income and then translate that into percentage of the

18   practice that it represents in terms of individuals.  That to

19   me creates some conceptual problems.

20            I don't think that it translates 100 percent,

21   Mr. Weddle.

22            MR. WEDDLE:  We are not talking about the number of

23   individuals.

24            THE COURT:  You are not, but he is.  Mr. Durkin is.

25   So how do we get to --
```

D7unles8

1          MR. WEDDLE:  Your Honor, I mean, maybe we should just

2     continue to talk.  I think that I was proposing a stipulation

3     based on what I was confident I would get on cross-examination

4     from this witness.

5          MR. DRATEL:  Who he's never spoken to.

6          MR. WEDDLE:  Who I have not spoken to because defense

7     counsel instructed that witness not to speak to me and then

8     moved to quash the subpoena when I subpoenaed him for a

9     rebuttal case.

10          I'm confident I can get that information, but I think

11     we can simplify it, your Honor, and we should be able to

12     simplify it and say the gross receipts on the corporate return

13     were this, but the income that flowed through to his tax return

14     was that, the gross income that flows through to the tax return

15     is this other number, and then everyone would know what the

16     arguments are.

17          MR. DURKIN:  Judge, for the life of me I don't

18     understand what is wrong with my proposal based on what he just

19     said.

20          If I put that chart in and we put in the tax returns,

21     he can take the tax returns and argue off of that.  I told him

22     last night I didn't have a problem if he wanted to argue all

23     that.  And if I want to argue it, fine.  I don't really want to

24     get down into those weeds either.

25          I don't care about the argument, but there is nothing

D7unles8

1   misleading about my chart.  There is plenty misleading with

2   Government Exhibit 24, because it is not complete.  And my

3   chart is accurate.  It permits everybody to argue, and it is

4   what it is.

5            MR. WEDDLE:  Your Honor, what is missing from his

6   chart is that it is oversimplified and it doesn't point out the

7   fact --

8            THE COURT:  Why can't you then argue that to the jury?

9            MR. WEDDLE:  Because, your Honor, I know that because

10  I've done tax cases in the past.  The jury doesn't know that.

11  So we need some witness to say that this is a flow-through

12  entity, a passthrough entity, so these numbers end up on the

13  personal tax returns.  It is very simple.  Mr. Durkin could

14  stipulate to it.  We could do it in the manner that I proposed,

15  which is what I would get from cross-examining a witness, or we

16  could just do it on the simple facts of what would happen.

17           MR. DURKIN:  He just did it here.

18           MR. WEDDLE:  I am just in the middle of talking.

19           But for them to just put in a gross receipts, anything

20  in the abstract is a gross oversimplification because it leaves

21  out the fact that Dr. Lesniewski's insurance payments are

22  skyrocketing and then collapse when his insurance is cancelled.

23  It leaves out the fact that his expenses are changing because

24  he joins a practice.  It leaves out all these facts.  The

25  bottom line is that this money that we are talking about has a

D7unles8

 1   material effect on his personal income tax return.  To just

 2   leave that out is an oversimplification and is not right.

 3          MS. FRIEDLANDER:  Judge, I think all a stipulation

 4   would need to say is something like, you know, as Mr. Durkin

 5   wants, these UHC payments constitute X percent of his gross

 6   receipts in whatever year.  Gross receipts are not income.  His

 7   income was Y.  Or it could just say gross receipts are not

 8   income.

 9          THE COURT:  Mr. Durkin, anything else?

10          MR. DURKIN:  Only that I think my chart is accurate,

11   and I think it would permit fair argument and fair

12   consideration.

13          MR. DRATEL:  Just one second, your Honor.

14          MS. FRIEDLANDER:  One other thing is, if your Honor is

15   inclined let this in, we would want the actual returns because

16   they show that his business is suffering, suffering hugely

17   every year.  It is a money loser.  He's struggling.  He's

18   taking out loans to pay himself a salary.  The business is a

19   gigantic problem even before he loses his malpractice insurance

20   and his whole career has essentially ended.

21          MR. DURKIN:  I am proposing we put the returns in.

22          MS. FRIEDLANDER:  That is only if your Honor is

23   inclined to.  You know what our argument is.

24          MR. DURKIN:  I said last night it's only fair.  I have

25   to put the returns in in order to put the chart in.  I have no

D7unles8

1      problem with the returns coming in.

2                THE COURT:  How do we get the returns in?  Through

3      what vehicle?

4                MR. DURKIN:  I don't think they are contesting that

5      that is a true and accurate copy of the return.  They are

6      contesting other accounting technique issues in it.  But there

7      is no contest over the true and accurate copy of the return.

8                THE COURT:  Mr. Weddle, what is your view of how this

9      might come in if the Court is inclined or the Court were

10     inclined to admit them?

11               MR. WEDDLE:  Any witness who would authenticate these

12     would say that this has an effect on Dr. Lesniewski's income --

13               THE COURT:  We are not talking about the witnesses

14     testifying beyond the fact that this was a true copy of what

15     was filed.  You remember we had that argument with another

16     witness.

17               MR. WEDDLE:  I know, your Honor.

18               THE COURT:  Limited to authenticity and not to the

19     substance.

20               MR. WEDDLE:  We are not contesting the authenticity,

21     but this other piece is something that we need.

22               THE COURT:  This other piece is something you could

23     argue to the jury.

24               MR. WEDDLE:  Based on what evidence, your Honor.

25     Based on our own personal knowledge?

D7unles8

1              THE COURT:  Based on the facts in the document.

2              MR. DURKIN:  On the return itself.

3              MR. WEDDLE:  I think that's going to waste more time

4       than simply getting it from a witness, because we would have to

5       walk through these numbers.  I think basically if the defense

6       would just stipulate the gross receipts are not income -- I

7       find it very distracting your Honor because people keep

8       grunting behind me, so I'm sorry if I'm losing my train of

9       thought.

10             MR. DURKIN:  I would be happy to entertain, if

11      Mr. Weddle wants to provide me with a definition of gross

12      receipts out of the Internal Revenue Code, I believe I would be

13      willing to stipulate to that, and I think that would then solve

14      his problem.

15             MR. WEDDLE:  I doubt that that would solve my problem.

16      I think that would be more complicated than what your Honor is

17      proposing, or that that would be more complicated than what I

18      have proposed in my e-mail that your Honor found to be too

19      complicated.

20             I think that it's a fairly simple issue.  Gross

21      receipts are not income.  The income ends up on his personal

22      tax return.

23             It is very straightforward.  It seems like Mr. Durkin

24      should have no problem stipulating to that fact, and then we

25      would be making an argument based on facts rather than just

D7unles8

1    simply being left to argue from our own knowledge.

2         THE COURT:  Is your expert from the IRS still

3    available?

4         MR. WEDDLE:  I doubt it, your Honor.  He's based in

5    Massachusetts.  And he is not an expert.  He just authenticates

6    the records.  I don't know if your Honor remembers, but we

7    needed to get a court order for him to come into town.

8         THE COURT:  Yes.

9         MR. WEDDLE:  So the accountant who we subpoenaed would

10   be able to tell us this.  I think it would be simpler.  I take

11   your Honor's point.  It would be simpler to just do it.

12        THE COURT:  I am not persuaded, Mr. Weddle.  I think

13   you are oversimplifying the complexity of bringing a new person

14   to testify, and I don't know that the government will be able

15   to limit itself to just what you are saying.

16        This is an issue which I think is fraught with

17   possibilities for extending into an enormous amount of

18   complicated questions on technical issues of the tax code.  I

19   just think that you are underestimating the complexity.

20        MR. WEDDLE:  Your Honor, what I was going to say --

21   I'm sorry.

22        THE COURT:  That's not to somehow minimize what

23   Mr. Durkin would do on direct.  I just think it's going to take

24   a lot more than you are representing it might.

25        MR. WEDDLE:  Your Honor, what I was going to say is I

D7unles8

```
 1    think we could have a simpler stipulation, which would say
 2    these are the tax returns.  The gross receipts are what they
 3    are, gross receipts are not income.  Income is what happens
 4    after the expenses are deducted or something like that.  That
 5    would be very simple.
 6              THE COURT:  If you could develop a simple stipulation
 7    to that effect and then put the returns in and each of you can
 8    then address whatever issues you think they raise, why would
 9    that not solve the problem?
10              MR. WEDDLE:  I think it would solve the problem, your
11    Honor.  The problem is that Mr. Durkin is saying he just wants
12    to put in the gross receipts figure and he doesn't want to
13    stipulate to anything else.
14              THE COURT:  I didn't hear him say that.
15              MR. DURKIN:  I had said I would put the returns in.
16              THE COURT:  He would put the returns in with a
17    stipulation that says that gross receipts are not income.  Is
18    that it?
19              MR. DURKIN:  Or something.
20              THE COURT:  Whatever the code permits as a definition
21    of gross receipts.
22              MR. WEDDLE:  Then we have solved it, your Honor.
23              Thank you.
24              THE COURT:  All right.  Let's see if you can then
25    put --
```

D7unles8

1            MR. DURKIN:  Then I could put the chart in?

2            THE COURT:  Yes.

3            MR. RYAN:  May I make my motion now.

4            THE COURT:  I hope the motion is not to have your tax

5    expert come in and clarify this.

6            MR. WEDDLE:  Your Honor, if we are moving on to the

7    next topic, I wanted to mention --

8            MR. DURKIN:  So we are clear, if we arrive at the

9    stipulation, can I put in L24 and the return?

10           THE COURT:  That's my understanding of what the

11   understanding is.

12           MR. DURKIN:  Thank you.

13           THE COURT:  Mr. Weddle.

14           MR. WEDDLE:  I wanted to mention a couple of things

15   about the requests to charge.

16           I think most of the issues are fully presented based

17   on the pretrial submissions.  There was one item, I only

18   mention it now -- I don't mean to spring this on you -- but I

19   know that your Honor is working hard on the draft.

20           Mr. Jackson had proposed a multiple conspiracies

21   charge.  I just drafted up what I believe is a more appropriate

22   or standard multiple conspiracies charge.  I think the one that

23   he proposed is wrong, but I could submit this one and I think

24   it covers the issue.  I am not saying that a multiple

25   conspiracies charge is inappropriate, but I just think we have

D7unles8

```
 1    a counterproposal which I haven't had an opportunity to submit
 2    through the regular channels.
 3            THE COURT:  Have you submitted it to Mr. Jackson?
 4            MR. JACKSON:  Judge, I withdraw my charge.  That will
 5    withdraw the whole discussion.
 6            MR. WEDDLE:  OK.
 7            THE COURT:  That simplifies that.
 8            MR. JACKSON:  Yes.
 9            MR. WEDDLE:  We haven't really had an opportunity to
10    respond to Mr. Ryan's proposal -- I read it very briefly --
11    that he filed today.  He has some defense contention charges in
12    there which I think veer into the realm of testimony rather
13    than simply a defense theory charge.  We can respond in more
14    detail if your Honor would like, but it may be that your Honor
15    is so close to finishing a draft that --
16            THE COURT:  We are as close as one click of the
17    computer to having the draft to you.
18            MR. WEDDLE:  We will just address it based on the
19    Court's charge.
20            THE COURT:  All right.
21            MR. RYAN:  Thank you.
22            MR. JACKSON:  Judge, what time are we back?
23            THE COURT:  I told the jury to come at 10:30.  We
24    should come at let's say 9:15.
25            MR. JACKSON:  Yes, your Honor.
```

2581

D7unles8

1            THE COURT:  We can take the time to review the draft.

2            (Adjourned to Wednesday, July 31, 2013, at 9:15 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2    Examination of:                              Page

3    MARIE BARAN

4    Direct By Mr. Jackson . . . . . . . . . . .2313

5    Cross By Mr. Ryan . . . . . . . . . . . . .2399

6    Cross By Mr. Weddle . . . . . . . . . . . .2402

7    Redirect By Mr. Jackson . . . . . . . . . .2442

8    Recross By Mr. Ryan . . . . . . . . . . . .2456

9    MICHAEL ANTHONY JANSEN

10   Direct By Mr. Jackson . . . . . . . . . . .2460

11   Cross By Mr. Tehrani . . . . . . . . . . . .2479

12   Redirect By Mr. Jackson . . . . . . . . . .2485

13   RALPH JOSEPH DOMENICI

14   Direct By Mr. Jackson . . . . . . . . . . .2491

15   Cross By Mr. Tehrani . . . . . . . . . . . .2518

16   Redirect By Mr. Jackson . . . . . . . . . .2527

17

18

19

20

21

22

23

24

25

2583

```
 1                      GOVERNMENT EXHIBITS
 2    Exhibit No.                              Received
 3     1735     . . . . . . . . . . . . . . 2468
 4                       DEFENDANT EXHIBITS
 5    Exhibit No.                              Received
 6     B1, B1A, B1B, B1C   . . . . . . . . . . . . .2318
 7     B2    . . . . . . . . . . . . . . 2370
 8     R3    . . . . . . . . . . . . . . 2400
 9     R26, R63 and R64    . . . . . . . . 2401
10     R76   . . . . . . . . . . . . . . 2536
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```