D7vles1

                              Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,                 New York, N.Y.

4              v.                              S14 11 Cr. 1091 (VM)

5    PETER LESNIEWSKI, MARIE BARAN
     and JOSEPH RUTIGLIANO,
6
                   Defendants.
7
     ------------------------------x
8

9                                             July 31, 2013
                                              9:15 a.m.
10

11   Before:

12                     HON. VICTOR MARRERO,

13                                            District Judge

14
                           APPEARANCES
15

     PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17   BY:  JUSTIN S. WEDDLE
          DANIEL BEN TEHRANI
18        NICOLE WARE FRIEDLANDER
          Assistant United States Attorneys
19

     LAW OFFICES OF JOSHUA L. DRATEL, P.C.
20        Attorneys for Defendant Peter Lesniewski
     BY:  JOSHUA LEWIS DRATEL
21        LINDSAY A. LEWIS

22   DURKIN & ROBERTS
          Attorneys for Defendant Peter Lesniewski
23   BY:  THOMAS ANTHONY DURKIN

24

25

D7vles1

Trial

APPEARANCES CONTINUED

KOEHLER & ISAACS, LLP
        Attorneys for Defendant Marie Baran
BY:   JOEY JACKSON

JOSEPH W. RYAN, JR.
KEVIN MENEILLY
        Attorneys for Defendant Joseph Rutigliano

              - also present -

Annie Chen
Emma Larson, Government Paralegals


SA Frank LoMonaco, FBI

Yeni Yrizarry, Defendant Baran Paralegal

                          oOo

D7vles1
                              Trial

1                (Trial resumed)

2                (In open court; jury not present)

3                THE COURT:  Good morning.  Welcome back.

4           The purpose of this conference is to review the draft

5    jury instructions that the Court circulated to the parties

6    yesterday.

7                Has the government received the draft?

8                MR. WEDDLE:  Yes, your Honor.  We have received it and

9    I have reviewed it.

10               THE COURT:  All right.  Mr. Durkin?

11               MR. DRATEL:  Yes, your Honor.

12               THE COURT:  Mr. Dratel?

13               MR. DRATEL:  We received it and reviewed it.

14               THE COURT:  Mr. Jackson?

15               MR. JACKSON:  Yes, Judge.  Thank you.

16               THE COURT:  Mr. Ryan.

17               MR. RYAN:  Yes, I have, Judge.

18               THE COURT:  Let me outline the way I ordinarily go

19    through these conferences.

20               This is a first draft.  What I usually do is invite

21    the parties to give what I refer to as global comments, by

22    "global" meaning large issues that pertain to instructions that

23    are either there and should not be or that are not there and

24    should be or that are there and in your view do not reflect the

25    proper statement of the applicable law.

D7vles1
                            Trial

1              After we go through those global comments, I will

2    consider the comments and endeavor to revise in the next draft

3    as appropriate.  I may make revisions if I agree that revisions

4    are appropriate.  If do not, of course, I will not.  The next

5    draft will reflect comments accepted and comments not accepted.

6              At that time I will also make whatever technical or

7    grammatical or editorial changes of a routine nature that you

8    spot, and those I invite you to call to the clerk's attention

9    and we will reflect them in the next draft.  By "those" I'm

10   referring to obvious things.  If, for example, there is a

11   reference to one gender and it should be another, we will

12   automatically make those changes as you point them out.

13             One other general concept in my approach.  This case

14   involves wire fraud and mail fraud and health care fraud.  This

15   is not the first case in the history of the Southern District

16   of New York where government has brought charges involving wire

17   fraud, mail fraud and health care fraud.

18             I mention that by way of saying that there is a vast

19   amount of law and litigation and disputes about jury

20   instructions going back many, many years that pertain to these

21   issues.  By this time the law should be fairly clear as to what

22   a proper instructions for these kinds of charges that are at

23   this point fairly standard.

24             There are cases every year in this district that are

25   resolved one way or another based on instructions that have

D7vles1
                              Trial

1    been accepted time and again and tried and tested and adopted

2    or affirmed on appeal by the Court of Appeals.  The point is

3    that there should be little reason for major conceptual,

4    philosophical differences about what a standard instruction

5    should be for a mail fraud, wire fraud, health care fraud type

6    charge.

7              I could see that there may be some questions that

8    might arise that relate to the peculiarities of a particular

9    case, but on a large-scale view I think the pattern

10   instructions are fairly standard and sufficient.

11             If there is a major dispute about what the instruction

12   should be on a particular issue, what I generally do is go to

13   the pattern jury instructions from the Sand treatise, which

14   reflect years and years and years of wisdom and experience on

15   these charges, and I generally adopt what it says there insofar

16   as they reflect instructions already used and accepted on

17   appeal by this circuit.

18             So with that I will then ask the parties respectively

19   to indicate what global comments you may have.

20             The government, if you have something just indicate

21   the first page at which any of your comments appears and then I

22   will ask the defendants to respond.

23             MR. WEDDLE:  Yes, your Honor.

24             I think the first real substantive comment that we

25   have is on page 38.  It is just that Section 1349, which is a

D7vles1
                              Trial

1    relatively new conspiracy statute, does not require an overt

2    act.  So there is no overt act requirement for Section 1349.

3    This is the case also in other newer conspiracy statutes.

4              It is well settled that there is no overt act

5    requirement in a narcotics conspiracy or money laundering

6    conspiracy.  Those cases rely on the plain language of the

7    statute, and say that if there is an overt act requirement in

8    the statute, there is one; and if there isn't, then there

9    isn't.  I apologize I don't have the case citation at my

10   fingertips.  I can look for one.  I think it would only take me

11   a few minutes to find a case that stands for the proposition

12   that Section 1349 does not have an overt act requirement.

13             Because that is the law, we didn't enumerate any overt

14   acts in the indictment for the Section 1349 conspiracy, but we

15   did with respect to the 371 conspiracy.  So there are overt

16   acts in the indictment and plenty have been proven, but we

17   think there should just be two elements of the Section 1349

18   conspiracy.

19             THE COURT:  All right.  I think that is fairly

20   straightforward.  Any response to that from any of the defense

21   counsel.

22             MR. DRATEL:  Your Honor, that does state the law with

23   respect to the statute that does not have an overt act

24   requirement.  So that is the general tendency more recently.

25             THE COURT:  All right.  Thank you.

D7vles1
                              Trial

1            Next, government?

2            MR. WEDDLE:  The next, which is actually a quite small

3   change, but on page 59, which relates to the health care fraud.

4   The instruction talks about depriving Medicare of money or

5   property.  The victim of health care fraud here is United

6   Healthcare.

7            THE COURT:  What paragraph are you referring to?

8            MR. WEDDLE:  I'm sorry.  It's in the second full

9   paragraph at the end of the paragraph on page 59.

10           THE COURT:  Yes.

11           MR. WEDDLE:  The next comment --

12           THE COURT:  United Healthcare instead of Medicare?

13           MR. WEDDLE:  That's right.

14           THE COURT:  Yes.

15           MR. WEDDLE:  The next comment we have is on page 71,

16  which relates to wire fraud.

17           THE COURT:  Yes.

18           MR. WEDDLE:  We think there are good arguments to be

19  made based on out of circuit case law that there is no

20  unanimity requirement for the wiring.  But just to avoid the

21  issue, we are happy to have this jury instructed that they

22  should be unanimous on at least wire transmission for each

23  count.

24           THE COURT:  Any comment on that issue from any defense

25  counsel?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

D7vles1
                              Trial

1              MR. DURKIN:  We are in agreement unanimity is required

2       on each, at least one transmission in each count, your Honor.

3              THE COURT:  All right.  Thank you.

4              Mr. Weddle, next?

5              MR. WEDDLE:  This is not very substantive, but I think

6       your Honor anticipated in your draft something that I have been

7       thinking in the back of my mind we should do.

8              There are two theories on Count 21, which is the false

9       statements count brought against Joseph Rutigliano alone.  And

10      I don't think there is a material difference between the two

11      theories, but they each come with a five-element set of

12      instructions in the Sand treatise, your Honor.

13             We think, just to simplify things, as your Honor has

14      done, we should just use one of those two theories.  Your Honor

15      has just instructed on one of the theories, but in order to

16      avoid confusion, we could redact the other theory from the

17      indictment entirely.  On page 73, for example, just a

18      conforming change, your Honor says in your draft in the

19      paragraph at the bottom, "We now turn to the second theory

20      alleged in the indictment."

21             We could just redact part of the indictment, focus

22      only on one of the theories, and then there would only be one

23      theory we would need to instruct the jury on and that would

24      simplify things.  The instructions that your Honor has given

25      are unobjectionable with respect to the one theory which I

D7vles1
                              Trial

1   think is the most straightforward one.

2        THE COURT:  All right.  So the government is

3   representing that it will modify the indictment to remove

4   references to the second theory?

5        MR. WEDDLE:  Yes, your Honor.

6        I haven't made that change to the indictment, but I

7   can do that very quickly.  Along the same lines, as predicted

8   at the beginning of this case, the government substantially

9   pared down its proof as the trial was going on based on how the

10  proof was coming in, and so we've ended up not calling certain

11  witnesses, which means we ended up not proving certain of the

12  substantive counts that were originally charged.

13       I e-mailed this to your clerk last night.  I should

14  have done it earlier and I apologize.  But over the -- I can't

15  remember when, the last few days, I went through the indictment

16  and redacted the counts that we have not proven and therefore

17  that should be dismissed.

18       So with the exception of this one change on the

19  Section 1001 count, I think that the indictment that I

20  circulated last night just after your Honor circulated your

21  Honor's draft I think reflects the counts that should go to the

22  jury.  I think to avoid confusion we should just give the jury

23  a redacted indictment.  It's much simpler and eliminates things

24  where we didn't call witnesses.

25       So, after redacting the indictment in that manner, we

D7vles1

Trial

1    end up with 21 counts.

2            So I have small conforming changes that I have

3    handwritten on the draft to reflect those redactions, but we

4    have many fewer counts of each substantive charge.  The

5    conspiracy counts stay the same, although we have fewer overt

6    acts in each one.  It's really a smaller list of overt acts at

7    this point, and I think that simplifies the indictment.

8            THE COURT:  All right.

9            At some point, Mr. Weddle, for the record the

10   government should itemize the counts that are dropped so that

11   we have a transcript of what those are.

12           MR. WEDDLE:  I will do that, your Honor.  I would like

13   to just have a minute to make sure I do that right.

14           THE COURT:  Of course.  All right.  If there is

15   nothing else from the government then --

16           MR. WEDDLE:  Oh.

17           THE COURT:  Yes.

18           MR. WEDDLE:  Then outside the draft we had two

19   substantive issues.  One was we had proposed a charge that

20   negligence of the victim is not a defense.  I think, although

21   it hasn't been argued strenuously so far by the defense, they

22   have elicited from a number of witnesses the fact that the RRB

23   has doctors and that the RRB makes a determination.  I think

24   that has the possibility of raising a logical question in the

25   jury's mind, which is to what extent should we be considering

D7vles1
Trial

1    whether the RRB should have stopped this.

2             So it was something that was not included in the

3    Court's draft.  We think it's still appropriate and it is a

4    relatively brief instruction that I don't think is

5    controversial.  But we've submitted it in our requests to

6    charge.  That was one issue.

7             THE COURT:  We left it out recognizing that that would

8    be an issue.  It was purposely left out because I wanted to

9    invite comment on it, not that we left it out for the purpose

10   of leaving it out entirely.

11            MR. WEDDLE:  I can say more about it, but I think I

12   have said what I need to say about it.  Then I had one

13   additional charge.

14            THE COURT:  What was the additional charge?

15            MR. WEDDLE:  The additional charge, your Honor, that

16   we submitted, and defendant Rutigliano submitted a competing

17   version, but in our requests to charge at the end we proposed a

18   charge on occupational disability.

19            The standard for occupational disability is not

20   particularly controversial.  Witness after witness have

21   basically articulated the same standard.  But it is a matter of

22   law, so to the extent there is any difference between what the

23   witnesses have said, what really should control is what the law

24   is.

25            So we propose just a brief instruction on the law, the

D7vles1
Trial

1   standard that is in the law, that's in the Code of Federal

2   Regulations regarding the standard for occupational disability.

3           This came up early in the case, and your Honor may not

4   remember it, but one thing that Mr. Ryan was cross-examining

5   witnesses about, it may have just been one witness, was a

6   process that took place in 1997 where basically negotiating

7   representatives, not members of the board of the RRB, but

8   negotiating representatives put together a set of principles by

9   which they would work together in order to come up with

10  revisions to the Code of Federal Regulations.

11          Some of that questioning may have suggested to the

12  jury that this 1997 process or these principles that were put

13  together by these negotiating representatives who were not

14  government officials was somehow a competing standard or

15  somehow was the standard.  That process led to the regulations

16  that have been in place throughout this conspiracy, so we

17  objected at the time.  We thought that going into history of

18  1997 and what led to the final regulations which are the law

19  was irrelevant, but I think that it's useful to dispel any

20  confusion on that by talking about what is the standard that is

21  in the law.

22          THE COURT:  All right.  Thank you.  Mr. Dratel?

23          MR. DRATEL:  Your Honor, just if we can first talk

24  about negligence of the victim.  I don't think that instruction

25  is necessary or appropriate here because we haven't argued it.

D7vles1
                              Trial

 1   No one has argued it.  No one is going to argue it.  I think we

 2   essentially presented a defense through cross-examination of

 3   witnesses.  The defense as a whole I'm speaking of -- although

 4   I am not speaking for Mr. Jackson or Mr. Ryan -- but I think in

 5   my own observation presented the opposite, which is that the

 6   RRB's process is a coherent, comprehensive process that makes

 7   decisions based on objective evidence.

 8           We don't take the position that they somehow didn't do

 9   their job.  It is that they did do that their job.

10           I don't think that instruction is appropriate.  I

11   think it's confusing and gets the jury off on a diversion that

12   has not occurred in this case and will not occur during closing

13   argument, certainly not from us and speaking to cocounsel I

14   don't believe that they are going to argue that either.  So I

15   agree with the Court in leaving it out.

16           Second is with respect to the CFR instruction.  If the

17   Court could ask the government, if we could just find out where

18   that is.  I haven't looked at it because it wasn't in the -- I

19   haven't looked at it since we did it a month ago.  Is it in

20   joint instructions or the ones that the government provided

21   separately?

22           MR. WEDDLE:  It was not in the joint instructions.  It

23   was the page 44 of 45, the last two pages of the government's

24   requests to charge that we submitted on July 8.

25           MR. DRATEL:  If we could have a few minutes to discuss

D7vles1
                              Trial

1    that among ourselves, not necessarily right now.

2              THE COURT:  That's fine.

3              MR. DRATEL:  I will be happy to make my presentation

4    on the Court's charge.  I don't have very many big-picture

5    issues, and some of them are really just about a word or two.

6    It's not really grammatical.  The ones I'll raise are what I

7    consider substantive in that regard, even if it is one word

8    here or there.

9              THE COURT:  All right.

10             MR. DRATEL:  The first is on page 10 with respect to

11   charts.  The only question I have on that is -- I realize

12   Ms. Friedlander is not here, so perhaps we should defer

13   argument -- it has to do with Dr. Barron's charts.

14             There was a question about whether we would -- we

15   think that they are not substantive evidence.  We think they

16   are demonstratives.  There are even a couple of instances where

17   he corrected his charts from the stand and acknowledged that

18   they were inaccurate.  We think they are demonstrative and not

19   substantive evidence, which means they would not go to the jury

20   for purposes of summation.  They were used for purposes of his

21   testimony, but they are not substantive evidence.

22             THE COURT:  What specific language are you referring

23   to on page 10?

24             MR. DRATEL:  It is not the language.  It doesn't

25   require changing the instructions.  It is just something that

D7vles1
                              Trial

1     we hadn't resolved.

2              THE COURT:  The issue is whether or not the

3     demonstratives go to the jury?

4              MR. DRATEL:  Correct.

5              It is not for the instructions.  It's really more

6     about an open issue that I didn't want to let travel any

7     further before I addressed it.

8              THE COURT:  All right.  Mr. Weddle, do you have

9     comment on this?

10             MR. WEDDLE:  On that issue the law is very clear that

11    summary charts admitted in evidence by a witness like Dr.

12    Barron are evidence.  They have been admitted and they can go

13    to the jury.  It would probably take me ten minutes to cut and

14    paste from briefs that I have written in other cases on this

15    very issue.

16             THE COURT:  We don't need that.  It has been the

17    accepted and affirmed practice in this circuit, and this Court

18    routinely gives the jury any demonstrative that has been part

19    of the case.  I don't see any dispute on that, Mr. Dratel.

20             MR. DRATEL:  OK, your Honor.

21             They hadn't actually been admitted.  I think

22    Ms. Friendlander was moving to admit them afterwards, and we

23    objected and we deferred.  But if that's the Court's ruling, I

24    will move on.

25             On page 14, with respect to the second full paragraph

D7vles1
                              Trial

about stipulations about facts, I would just ask that after

that the Court repeat the last sentence from the previous

paragraph, in other words, that weight is always a question for

the jury.

          In other words, you have a sentence after the

stipulation paragraph, that's the first full paragraph, and I

would just ask that that last sentence, "However, it is for you

to determine the weight to be given that testimony," the same

thing for the factual stipulations as well.

          MR. JACKSON:  What page?

          MR. DRATEL:  Page 14.

          MR. JACKSON:  Got it.

          THE COURT:  All right.

          MR. DRATEL:  On page 16, your Honor, the large

paragraph, the final sentence.

          It says, after examining all the evidence -- and I

know the Court has had this in a number of places -- I just

think that or lack of evidence belongs there too, especially

when you are talking about the numerical weighing of witnesses,

I think it is appropriate to also just say, after examining all

the evidence or lack of evidence you may decide that the party

calling the most witnesses --

          Let me move to page 21.  The subpoena instruction I

don't think is necessary.  I am not sure what the purpose is

here, given that we haven't had any issues with respect to that

D7vles1
                                  Trial

1    as far as I can tell.  So that paragraph starting, "You have

2    heard that various documents," I think that paragraph is not

3    necessary and should be deleted.

4           MR. WEDDLE:  Your Honor, I think it is an appropriate

5    instruction.  We have heard testimony about Marie Baran

6    producing documents in response to a subpoena.  We have heard

7    testimony about Dr. Lesniewski or Island Sports Medicine

8    producing documents in response to a subpoena.

9           I think that sometimes jurors can be confused and

10   think that because someone produces documents, that is

11   indicative of their guilt or innocence.  It's really not.  It

12   is something they are obligated to do.

13          This instruction is appropriate to avoid any confusion

14   in that respect.  It is fairly standard, your Honor.

15          MR. DRATEL:  Your Honor, it's not standard in cases

16   that I have done in cases involving scores of subpoenas.  The

17   other problem is I think because there has not been any

18   testimony or suggestion about -- well, I think it creates the

19   opposite inference.

20          There is no suggestion here, there hasn't been a

21   suggestion that somehow people are free to avoid subpoenas or

22   somehow that because you produce in response to a subpoena that

23   that somehow absolves of you of any responsibility for conduct.

24   It creates the opposite inference, which is somehow that

25   somebody hasn't complied.  I think that's the danger of this

D7vles1
                                   Trial

 1   instruction, is that in a vacuum of any evidence about

 2   compliance with subpoenas being an issue, it is not an issue,

 3   that it creates an issue that maybe there was some problem,

 4   that people have an obligation to produce them.  Maybe they

 5   didn't produce everything.  I am very concerned about the

 6   opposite inference being drawn because of the vacuum in terms

 7   of it doesn't have a particular relevance in this case.

 8              THE COURT:  Thank you.  We will consider that.

 9              MR. DRATEL:  OK.  Thank you.

10              Pages 22 and 23, your Honor, the accomplice

11   instruction.

12              A couple of things.  One, I think where it starts

13   "however" on the bottom of 22 the last paragraph, I don't think

14   it's a possible interest.  I think the accomplices do have an

15   interest in testifying as part of their cooperation agreement.

16   They are obliged to testify when asked by the government.  So I

17   think they had an interest.

18              Also, what I think is missing from the instruction and

19   is necessary is a question of benefits, not so much an interest

20   in the outcome of the case.  And I would actually remove that

21   language on page 23, because they don't have an interest in the

22   outcome of the case.  They have an interest in performing

23   pursuant to their agreement to get the benefit of a 5K letter.

24              I don't think it has to be that technical, but I think

25   there has to be some concept that they anticipate or expect a

                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

D7vles1
Trial

1    benefit for their testimony and that's something the jury has

2    to consider.  I think that's standard in accomplice

3    instructions.

4         But I don't think they have an interest in the outcome

5    of the case.  I think the opposite.  I think the government

6    made clear from the direct that there doesn't have to be a

7    particular result in this case for the witnesses to gain a

8    benefit.

9         That's the second full paragraph has the interest in

10   the outcome of case language on page 23.

11   MR. WEDDLE:  Your Honor, the first part of

12   Mr. Dratel's comments I disagree with.  For example, we heard

13   from Regina Walsh, who was an accomplice in the fraud, has pled

14   guilty, and doesn't have a cooperation agreement.  She was here

15   testifying voluntarily.  So the first part of this comment I

16   think is incorrect.

17   MR. JACKSON:  Judge, before we move to the second

18   part, I don't mean to interrupt Mr. Weddle, but before he

19   transitions, he did mention Regina Walsh.  That directly

20   impacts me.  I think to suggest that she didn't have a benefit,

21   I asked her, and she was faces a year in jail and was hoping to

22   get probation.

23        I think what Mr. Dratel had just mentioned resonates

24   crystal clearly with regard to her testimony, and I argue

25   that's why she's here.  She is not here based upon being a good

D7vles1
                              Trial

1    Samaritan.  She is here to get probation.

2              That pretty much clarifies and buttresses the point

3    that my colleague is making, in that it is not so much in

4    interest in the outcome of this case.  It is an interest in

5    securing a benefit that she hoped to secure by your Honor's

6    sentencing of her.  Therefore, I would echo the concerns raised

7    by Mr. Dratel and ask that you factor them into your

8    instructions.

9              MR. DRATEL:  That's why, your Honor, I don't want it

10   to be technical language about 5K letters and things like that.

11   It is a more general proposition.

12             THE COURT:  All right.

13             MR. WEDDLE:  Your Honor, where are we?

14             THE COURT:  Philosophically let me just indicate that

15   every citizen should have an interest in good government and

16   that justice be done regardless of how the case goes.  So I

17   don't disagree that deriving a benefit is important as a

18   reflection, but the fact that having an interest in the outcome

19   of the case is generic language, I think both pertain.  I will

20   find some way of reflecting both ideas.

21             MR. DRATEL:  Thank you, your Honor.

22             THE COURT:  All right.

23             Mr. Weddle?

24             MR. WEDDLE:  I think the argument is only about the

25   word "possible."  "Possible interest," I think that people are

D7vles1

Trial

1    making different arguments here, and the Court's instruction as

2    drafted is perfectly appropriate because the Court shouldn't be

3    taking a position one way the other about what someone's

4    interests are.

5              Regina Walsh testified that she was interested in

6    righting a wrong.  That's what her testimony was.  Your Honor

7    shouldn't be taking a position that is adopting Mr. Jackson's

8    argument about what she was doing.

9              MR. JACKSON:  I am not asking you to adopt any

10   argument.  I'm asking that you, what Mr. Dratel says reflects

11   adequately why the witness is here.  In a utopian society we

12   all have interests in everything and humanity would be

13   wonderful and let's love the whales and support the

14   environment.

15             THE COURT:  Are you against that?

16             MR. JACKSON:  Not at all, Judge.

17             But the fact is I'm not asking you to adopt and

18   instruct the jury that Ms. Walsh is here to save her own hide.

19   The fact is that, you know what, she may be interested in the

20   outcome.  I'm asking you to reflect what Mr. Dratel is saying.

21   She has an interest, and it's clear she is here not because she

22   wants to save the whales and snails and elephants.  She's here

23   because she wants you to give her probation.

24             I am going make that argument crystal clear.  They

25   have a different view based on whatever their view of the

D7vles1
Trial

1    evidence is.

2              MR. DRATEL:  Your Honor, with respect to "possible,"

3    the way it's phrase right now is doubly conditional.  I think a

4    single conditional is sufficient.  So if it just said because

5    of the interest an accomplice may have in testifying, that is

6    sufficient to be conditional.  I don't think the possible there

7    creates another condition is --

8              THE COURT:  You pointed out the issue.  Let me reflect

9    upon it and we'll respond in some appropriate way.

10             MR. DRATEL:  Thank you, your Honor.

11             THE COURT:  Next, Mr. Dratel.

12             MR. DRATEL:  Let's go to 39, your Honor.

13             MR. DRATEL:  The language at the end of the last full

14   paragraph, the last sentence, "It is rare that a conspiracy can

15   be proven by direct evidence of an explicit agreement."

16             We would object to that sentence.  I don't think it is

17   necessary.  It may be true, but it's almost like marshaling the

18   evidence in a certain way.

19             THE COURT:  This is one of those instances,

20   Mr. Dratel, where we can start gilding the lily.

21             MR. DRATEL:  I understand.  But there are few of

22   these.

23             THE COURT:  It is in every instruction that I have

24   ever given in conspiracy cases.

25             MR. DRATEL:  I know.  This is my first trial before

D7vles1
                         Trial

1   you, your Honor.

2           THE COURT:  Could I cite my cases?

3           MR. DRATEL:  Page 40.

4           THE COURT:  Yes.

5           MR. DRATEL:  I would just change in that first full

6   paragraph where it says, "Often the only evidence," I would

7   just say "sometimes."   Again, I think that triggers a certain

8   thing that the jury should be looking for.  I don't think it is

9   intentional.  I just think that it does do that.

10           THE COURT:  Where on page 40?

11           MR. DRATEL:  I'm sorry.  It's the first full

12   paragraph, "The old adage 'actions speak louder than words'

13   applies here."

14           Then it says, "Often the only evidence."

15           I would just say "sometimes," because I think "often"

16   just tends to trigger a concept that, OK, here there is

17   something different that we have to do differently.

18           THE COURT:  All right.  We'll think about that.

19           Next?

20           MR. DRATEL:  Page 47, your Honor.  That first full

21   paragraph.  The word "frequently" I don't think is necessary

22   either.  I think it is a statement of a law that, however, an

23   apparently innocent act does shed its harmless character.  So I

24   think it should be just declarative.

25           THE COURT:  All right.  Next.

D7vles1
                        Trial

 1          MR. WEDDLE:  Your Honor, this part comes in the

 2   section on the Section 1349 conspiracy, so I think that page 46

 3   and page 47 should all be deleted.  The same concepts should

 4   probably be included if they haven't already, I have to check,

 5   in the Section 371 conspiracy, but on this, just execute that

 6   one issue, this part I think would be deleted.

 7          MR. DRATEL:  I do think, your Honor, that while it's

 8   true about the 1349, I think that's the most comprehensive

 9   treatment of overt acts, and then you simply refer to it later.

10   It may not be the case, but that's my recollection.

11          THE COURT:  So we will reflect the overt act language

12   in the other instructions as it applies here and we'll look at

13   the frequently language that Mr. Dratel has pointed to.

14          Next?

15          MR. DRATEL:  Page 55.  I don't think withdrawal is an

16   issue here, so we would object to that instruction.  Again, it

17   is just injecting an element that is not applicable in this

18   case as far as we can tell.  I don't know that any counsel is

19   going to argue withdrawal.

20          MR. WEDDLE:  It is an issue in the case, your Honor,

21   because if you will recall the mail fraud counts are tied to

22   these continuing disability certifications that were sent to 26

23   Federal Plaza in 2011.

24          I think Mr. Rutigliano's counsel has made explicit

25   arguments, or maybe it is just previewing specific arguments

D7vles1
                                    Trial

1    with respect to some of his requested instructions that Joseph

2    Rutigliano, who advised people like Christopher Parlante and

3    James Maher years before that 2011 mailing, had nothing to do

4    with the mailing.

5            But, of course, the conspiracy continues unless Joseph

6    Rutigliano withdraws from it, which he certainly didn't do.  So

7    when those mailings are made in furtherance of that conspiracy,

8    Joseph Rutigliano has committed the substantive crime.

9            Withdrawal is very important in this case, because

10   there is a time line sometimes of years between when Joseph

11   Rutigliano wrote up somebody's fraudulent application and that

12   person later confirmed by filing or was required to and did

13   file a certification form with the RRB in furtherance of

14   keeping that fraudulently obtained disability.

15           THE COURT:  Thank you.

16           Mr. Dratel, next?

17           MR. DRATEL:  Your Honor, this is about something that

18   is not in there, and I just wanted to, if you want me to get

19   into that -- I only have two more on what's in there.

20           THE COURT:  Let's get those two, and then we will

21   address what is not.

22           MR. DRATEL:  We object to the Pinkerton instruction.

23   I don't think this is a classic or even nonclassic Pinkerton

24   type of case.

25           THE COURT:  What page?

D7vles1                            Trial

1           MR. DRATEL:  Page 77.

2           MR. DRATEL:  It does state the law accurately.  I just

3     think this is not the kind of case where there is -- there is

4     no connection among defendants and possible conspirators enough

5     to have a Pinkerton instruction here.  That is our position.

6           THE COURT:  Mr. Weddle?

7           MR. WEDDLE:  The Pinkerton instruction is directly

8     applicable to what I just discussed with respect to the mail

9     fraud.  The conspiracy was formed when people were planning to

10    retire.

11          For example, Joseph Rutigliano prepared these

12    fraudulent applications.  They were submitted.  Then years

13    later people filed these certification forms that they were

14    required to, that they needed to submit in order to continue

15    getting their disability benefits.

16          At the outset they may not have even thought about the

17    fact that there would be a certification form in 2011, but it

18    is a foreseeable part of the conspiracy that you would have to

19    update the RRB, it might be checked on, so those mailings in

20    2011 were in furtherance of the conspiracy.  Under the

21    Pinkerton theory, properly applied to this case, that makes

22    Joseph Rutigliano guilty of mailings sent by Christopher

23    Parlante and James Maher in addition to the other theories that

24    are in the instruction.

25          THE COURT:  Thank you.

D7vles1
                              Trial

1              Next, Mr. Dratel?

2              MR. DRATEL:  Your Honor, page 83 the venue

3      instruction.

4              The language about -- it is after the listing of the

5      counties that comprise the Southern District.  It then says,

6      "In addition the Southern District of New York includes the

7      water surrounding Long Island and Manhattan as well as the air

8      space and all of the waters in the district, the air space

9      above the district or the waters in the district."

10             We object to that part of the instruction.  This is

11     not an appropriate application of the statute that the

12     government seeks to apply here, which is 28 U.S.C. Section 112.

13             This is not a situation in which conduct occurred on

14     the waterways like someone driving over a bridge or being on

15     the East River or somewhere else.

16             This is purely a completely semantic and technical

17     application of that statute which we think is inappropriate.

18             If I could just, I will do the argument briefly.  I

19     will start with the underlying and won't go into it in great

20     detail, but the underlying, not in order of importance, but

21     sort of going from the broad into the specific.

22             One is the constitutional dimension of venue, which is

23     important in all the cases.  It's the only provision that is in

24     the Constitution twice.  It was in the Declaration of

25     Independence.  It is a critically important aspect of

D7vles1
                              Trial

 1    jurisdiction.

 2              The second is that there are cases, and I will give

 3    the Court the cases.  One is United States v. Bezmalinovic.

 4    That's 962 F.Supp. 435.  It is a 1997 opinion in this district,

 5    your Honor, in which ministerial acts with respect to bank

 6    processing were found insufficient to provide venue in the

 7    Southern District of New York.  I think that's very similar, if

 8    not completely analogous to here.

 9              Another case is United States v. Geibel, 369 F.3d 682

10    (2d Cir. 2004).  And in that case it was processing of

11    securities transactions.  The Court recognized and endorsed the

12    position of the appellant in that case that to permit venue to

13    be based on that alone would be to basically give the Southern

14    District carte blanche to prosecute any securities case in the

15    country.

16              So that is an important aspect of this as well,

17    because it really provides venue for any transmission, and many

18    international transmissions come through here as well.  So the

19    notion that that creates venue I think opens up floodgates that

20    are inappropriate.  It is no more concrete in this case than it

21    would be in any of those other cases.

22              The third case is United States v. Ramirez, 420 F.3d

23    134 (2d Cir. 2005).  In that case the Court noted in the

24    context of a scheme to defraud and said that if a defendant

25    driving across the country devised a scheme to defraud, there

D7vles1
Trial

1    would not be venue in each district in which he drove through.

2              So they recognized that.

3              The third thing is in the context of what the conduct

4    elements are, which is what venue is supposed to be, the

5    conduct elements that comprise the offense here by the

6    defendants all occurred in the Eastern District.  In fact, this

7    case was first in the Eastern District, which I think

8    reinforces the argument that that particular statute should not

9    be used to establish venue in this case.

10             THE COURT:  Mr. Dratel, a couple of observations on

11   what you just said.  One is that sounds like a pretrial motion

12   on venue grounds.  Alternatively, are you making a motion for

13   dismissal on venue grounds at this point?

14             MR. DRATEL:  Well, I guess so, your Honor.

15             THE COURT:  Or are you preparing to appeal?

16             MR. DRATEL:  Even though we have a stipulation to put

17   in, we were going renew our Rule 29.  I thought it was

18   appropriate to do it here in the context of the charge, yes.

19             As far as the pretrial motion, the government charges

20   in the indictment in the Southern District and elsewhere.  That

21   is sufficient for indictment purposes.  They just didn't prove

22   it.  So it's really a question of proof.  It's a sufficiency

23   issue.  So I don't think it would have been right pretrial.

24             THE COURT:  All right.

25             Then the third observation is that some of the

D7vles1                         Trial

1     arguments that you are making pertaining to activities and

2     where they occurred don't address the issue raised by the

3     government, which is whether or not the waters and air space

4     referred to here surrounding Long Island and Manhattan are part

5     of the Southern District.

6             If you are prepared to say that you are waiving any

7     arguments on those issues and you will not raise them on

8     appeal, then I would consider what you are saying.  In other

9     words, if I leave this language out --

10            MR. DRATEL:  Yes.

11            THE COURT:  -- and then you appeal the case and you

12    say, but the waters around Manhattan and the air space are not

13    part of the Southern District of New York, if that had been the

14    case, it should have been in the instruction.  That sounds like

15    the classic whipsaw.

16            MR. DRATEL:  Oh, no, your Honor.  Our position is

17    that, while the statute is plain on its face and includes

18    within the Southern District those waters, that that is not a

19    basis for venue in this case, that that type of venue is for

20    cases in which a conduct element, such as the one case that it

21    appears in that we could find was a case in which someone was

22    driving over the Verrazano Bridge, and that created venue.

23    That is a conduct element.  That's someone's actually --

24            THE COURT:  You are arguing a different point.  The

25    point here is whether or not statutorily what it says here is

Trial

1    correct, that the Southern District of New York includes the

2    water and air space surrounding Long Island and Manhattan.  If

3    that is a statutorily proper statement, then I don't see why we

4    are having argument.

5            MR. DRATEL:  Your Honor, I guess we are making a

6    sufficiency argument initially.

7            THE COURT:  On the statute?

8            MR. DRATEL:  Right.  The Court has correctly

9    identified that.  Also, I think just in terms of -- I guess we

10   don't think as a matter of law that that would be a proper

11   basis for venue here.

12           THE COURT:  Again, you are raising a different issue.

13           MR. DRATEL:  I understand, your Honor.  I am just

14   trying to state our position.

15           THE COURT:  The issue is whether or not the statement

16   belongs until the instructions, assuming we give an instruction

17   as to what is venue and what is the Southern District of New

18   York.

19           MR. DRATEL:  Your Honor, I guess I'm trying to

20   articulate it for the Court, which is that if there were two

21   theories of a particular type of liability in a statute, and

22   one was presented in the evidence and one wasn't, then I would

23   argue that the second theory that the government didn't put in

24   any evidence of that -- and I'm asking this as an evidentiary

25   question -- shouldn't be instructed to the jury as a basis for

                          Trial

1   conviction when there was no basis -- I understand there was an

2   evidentiary basis because we have a stipulation that says it.

3        I am saying as a legal basis we don't believe this

4   statute applies as a basis for venue.  That is why we don't

5   think it should be in the instruction.

6        I don't know if I have made it clear, your Honor.  If

7   I haven't, I will try again.

8        THE COURT:  Mr. Dratel, the consequence of not having

9   in it in the statute is basically you are either giving the

10  jury a reason to find that they cannot convict, or the Court

11  would be obliged because it finds that this provision is not

12  satisfied essentially to dismiss the case at this point.

13       MR. DRATEL:  Certainly the latter, your Honor, we

14  believe, but I was going to wait until we closed.

15       THE COURT:  That is another issue.

16       MR. DRATEL:  Yes.

17       THE COURT:  Now we are talking about whether

18  technically the Southern District of New York as defined in the

19  statute includes the language that is here.

20       MR. DRATEL:  Right.

21       THE COURT:  Which is the water and air space around

22  and Manhattan.

23       MR. DRATEL:  That does state the statute, your Honor.

24       THE COURT:  Then let's put the other issue aside for

25  the moment.

D7vles1
                              Trial

1          You had one other issue?

2          MR. DRATEL:  Yes, also on venue, I just want to

3    preserve the issue particularly in the case where venue is a

4    close issue here, is that we think venue should be established

5    beyond a reasonable doubt.

6          There is a series of cases that have evolved since the

7    initial -- I don't want to get into the whole thing.  I have a

8    whole thing on it.  I know that you are bound by the circuit

9    and all that, but I think it is a reasonable doubt.

10         THE COURT:  I don't know what happens in other

11   circuits, but in this circuit it has been black letter law that

12   preponderance of the evidence is the standard.

13         MR. DRATEL:  I understand, your Honor.  I am just

14   preserving that issue.  Someday.

15         THE COURT:  You are preserving it to argue in the

16   Ninth Circuit?

17         MR. DRATEL:  I think the Third Circuit is the only one

18   where it is an open issue.

19         THE COURT:  If you can find a way of appealing this

20   case to the Third Circuit, be my guest.

21         MR. DRATEL:  The one other issue that is not in the

22   instructions --

23         MR. WEDDLE:  Can I just say a couple of things about

24   venue.

25         THE COURT:  Let Mr. Dratel finish his points if he has

D7vles1
                              Trial

1    any more on venue.

2                   MR. DRATEL:  Nothing on venue, your Honor.

3                   THE COURT:  All right.

4                   MR. WEDDLE:  Going to your Honor's first point, your

5    Honor, the indictment specifically says in paragraph 52 in the

6    to-wit clause that in the course of the executing the wire

7    fraud scheme the defendants caused RRB disability papers to be

8    transmitted by wire and radio through the Southern District of

9    New York.  That's exactly what we've proven, and that's exactly

10   the theory that Mr. Dratel is now saying is not a valid theory,

11   because it needs to be something having to do with conduct that

12   occurred in Long Island.

13                  It is not the law, it is not what the indictment said,

14   and it is not what the facts are.  So if he wanted to make this

15   motion, he should have made it before trial, and it's waived

16   under Rule 12.

17                  Just to cite a little bit of law, your Honor.  In a

18   wire fraud prosecution, the Second Circuit has said in United

19   States v. Kim, 1246 F.3d 186, that wire fraud is a continuing

20   offense under Section 3237 of the United States Code, Section

21   Title 18, and may be prosecuted in a district where wire

22   transmission began and continued.

23                  So it is a very straightforward application of wire

24   fraud venue.  It doesn't have anything to do with driving.  And

25   the instruction that we have a proposed is the law.  It's

D7vles1
                              Trial

1    correct.  What Mr. Dratel was arguing is incorrect both on the

2    law with respect to wire fraud and the same law would apply to

3    health care fraud, which talks about wire transmissions in

4    furtherance of the fraud.  It is exactly what was alleged, and

5    it's what we have proven.

6              THE COURT:  Thank you.

7              Mr. Dratel.

8              MR. DRATEL:  Just that the indictment does not say

9    that they are relying on 112.  The indictment is sufficient in

10   the context of it says through the Southern District of New

11   York.  It doesn't say that they are going to rely on 28 U.S.C.

12   112, which we would have objected to if that was notice of

13   where it was.

14             MR. WEDDLE:  Your Honor, we proposed this very

15   instruction to the defense and to the Court on July 8.  There

16   was no motion made before trial.  There is no secret about this

17   theory.  It's always been the theory.  It was alleged in the

18   indictment, and the argument has been waived.

19             MR. DRATEL:  Your Honor, it hasn't been waived, Novak

20   is the case.  It has not been waived.

21             THE COURT:  On this issue I will just indicate,

22   Mr. Dratel, tell it to the judges up above.

23             MR. DRATEL:  Yes, I understand, your Honor.

24             We will never get there.

25             THE COURT:  All right.

D7vles1
Trial

1          MR. DRATEL:  The one issue that is not in there, and I

2     have a couple of possible places where it could go, is a

3     repetition of the Court's instruction with respect to the

4     Dr. Ajemian evidence.  I think it needs to be repeated

5     particularly in the context of the Court instruction with

6     respect to coconspirators and acts and things like that.

7          So there's limitations on that evidence that I think

8     need to be repeated.  I was looking at, page 46 I think is a

9     possible spot for it.  If I can go back there.  Yes, page 46 or

10    47.  Another possible spot is page 61.

11         THE COURT:  All right.

12         MR. DRATEL:  Which is where you talk about drawing

13    inferences from evidence of what the defendants said and all

14    the evidence or lack of evidence in the case.

15         So either place would be acceptable to us, your Honor.

16         THE COURT:  All right.  I think that is appropriate.

17         MR. DRATEL:  Thank you, your Honor.  That is all I

18    have, your Honor.

19         THE COURT:  All right.

20         MR. DRATEL:  Thank you.

21         THE COURT:  Thank you.

22         Mr. Jackson.

23         MR. JACKSON:  Yes, Judge.  I endorse my colleagues'

24    presentation regarding the indictment.  I support them and I'm

25    about to support Mr. Ryan's.

D7vles1

Trial

1          I just have a couple for you, Judge.  I will be the

2     briefest of the three.

3          One is on page 6, just one technical point, two

4     technical points, and then one substantive point, Judge.

5          I just want to make sure we get Ms. Baran's gender

6     right.  The first thing is, if we turn to page 6 of the

7     indictment -- I'm sorry, Judge, the jury charges, and on page

8     6, and I will be guided by your judgment as to this, this is

9     not the gender issue.  This says on page 6, if you look at the

10    first, second -- third paragraph, "Although the defendant has

11    been indicted, you must remember that an indictment" --

12         I don't remember whether your Honor wants to relate

13    that to the defendants or keep it separate and independent.  It

14    is all good.

15         MR. DRATEL:  May I make a suggestion, your Honor.

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

D7VLLES2

```
 1              THE COURT:  These are conforming changes that we can
 2    make throughout.  Remember, this is a draft and sometimes we
 3    take drafts --
 4              MR. DRATEL:  Sure, Judge.
 5              THE COURT:  -- go over them until we have the first
 6    charge conference.  So these are changes that you'll properly
 7    point out and we'll conform.
 8              MR. DRATEL:  Your Honor, may I just make a suggestion,
 9    because I had noted this but I thought it was one that was not
10    substantive.  But I would just say instead of "the," because we
11    do want to keep the individualized aspect of it, I would put
12    "although each defendant has been indicted, you must remember,"
13    and then at the end, "each defendant has pleaded not guilty."
14    And then in the next paragraph, "as a result of each
15    defendant's plea."  And that's all, that's how I would resolve
16    that.
17              MR. JACKSON:  I support that, Judge.
18              THE COURT:  Instructive.
19              MR. WEDDLE:  Your Honor, I had marked a number of
20    these kind of conforming changes.
21              THE COURT:  Those are the kinds I'd like you to hand
22    up to the clerk.
23              MR. JACKSON:  And then finally on page 18, it
24    references how Ms. Baran testified.  It just is an indication
25    of how he testified and his testimony.  It should be she.
```

D7VLLES2

1    Those are conforming.

2              A substantive change, Judge, page 82.  Eighty-two

3    addresses the issue of conscious avoidance.  I don't see any

4    basis for a charge of conscious avoidance.  I don't know about

5    any testimony that relates to anybody consciously avoiding

6    anything.

7              As it relates to Ms. Baran, certainly there was

8    testimony that the job, both her job at the Railroad Retirement

9    Board as well as her job when she left as a consultant did not

10   involve her getting involved in whether or not the person was

11   disabled or could be disabled, but it's their right to apply.

12   And her job, I believe, as a consultant is to ensure that

13   everything is complete, that the information is there and not

14   to pass judgments on whether or not they hobbled into her

15   office, had a cane when they came into her office, were in a

16   wheelchair in the office or otherwise had three people assist

17   them to her office.

18             So her job is not to pass judgments as to their

19   disabilities.  It was not her job at the Railroad Retirement

20   Board and it was not her job as a consultant.  In fact,

21   witnesses have affirmatively indicated that there's no space

22   for that.  There's nothing in the application that speaks to

23   the RRB claims representative passing judgment on someone's

24   disability.  Their sole job is to ensure the completeness of

25   the application.  And her job, again, as a consultant, was to

D7VLLES2

1    ensure the completeness and thoroughness of the application

2    with no independent duty to verify any medical condition.

3         And based upon that, Judge, and based upon her not

4    having any duty, I think it would be misleading to the jury to

5    suggest that she might have known or should have known or could

6    have known.  She's relying in good faith on what's represented

7    to her.  And to the extent they had medical forms

8    substantiating their injuries and to the extent that they

9    answered her questions as she went over the application, she

10   did her job.  And so, therefore, your Honor, I don't think a

11   conscious avoidance charge would be applicable.

12        And with that stated, I have nothing further and I

13   will let my other colleague, Mr. Ryan, deal with some other

14   matters which I will endorse.

15        THE COURT:  Before we do that, Mr. Weddle, any

16   response to Mr. Jackson's concern?

17        MR. WEDDLE:  Well, the evidence, of course, has shown

18   exactly the opposite of what he said.  And I think that the

19   conscious avoidance charge is totally warranted here.  For

20   Marie Baran to say that dozens and dozens of people came to her

21   while they were working and working overtime, preplanning that

22   they were going to become disabled in the future, and that she

23   then supposedly relied on what they said to her and she's just

24   an innocent duped in this process when she fills out

25   application after application to come out with exactly the same

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7VLLES2

1     answers is her way of saying she didn't know that these

2     applications were false.

3             And I think she obviously did know because her

4     arguments and her testimony was absurd on these points, but

5     also it's a classic case of conscious avoidance if she's not

6     trying to know.  She's not asking people can you do your job.

7     She's asking people, oh, you say that it's easy for you to eat,

8     you know, what about when you eat spicy food.

9             I think it's well-warranted and totally appropriate

10    here.

11            MR. JACKSON:  Judge, I just want to respond to some

12    characterizations about absurdities and everything else.  I'm

13    not sure what trial Mr. Weddle sat through, but the one, Judge,

14    I sat through for the last few weeks indicated that there was

15    no burden whatsoever -- and this was confirmed by their

16    witnesses, our witnesses -- there's no burden at all on any

17    person who is intaking applications to make any medical

18    assessment.  Someone represents information to that person and

19    as a result of that, they place it on the application and it

20    matches all the medical evidence.

21            And with regard to the absurdity of her testimony,

22    certainly his cross-examination didn't seem to point to

23    anything absurd, but we're not talking about credibility

24    questions.  Those are for a jury to determine.  We're talking

25    about evidentiary questions, and there has been no evidence

D7VLLES2

1    whatsoever which would be suggestive of somebody turning the

2    other way.

3            Finally, as to the point about planning disabilities,

4    he can argue what he wants.  What I heard was people coming in

5    to see her regarding retirement issues, and as a result of

6    that, her doing an authorization form in contemplation of their

7    retirement and then them subsequently giving her medical

8    information dealing with disability.

9            So he'll spin or whoever does their closing will spin

10   the evidence in any hundreds of ways and point to passports and

11   travel -- we'll get to that later this afternoon -- that have

12   no bearing on the facts.  But, Judge, since we're speaking

13   about the facts here, I think there should have been some facts

14   elicited concerning somebody who looked the other way, who knew

15   something was going on and didn't do anything about it.

16           Her obligation, again, just for clarity purposes, both

17   when she was at the Railroad Retirement Board for 18 years,

18   what she trained and what she trained others on was to ensure

19   the completion of the application.  There are no doctors at the

20   RRB local office in Westbury that can tell whether somebody is

21   disabled, that can tell whether somebody had a back problem.

22   There's not their job, not their issue, not within her purview

23   or scope.  With respect to her consultant job, again, Judge,

24   not within her purview, scope, or anything else.

25           So to make the argument that she consciously avoided

D7VLLES2

1    something that was not her duty to detect or otherwise report I

2    think misleads this jury and leads to confusion and is not

3    appropriate or warrant that that charge being included.

4            THE COURT:  OK.  Thank you.

5            Mr. Ryan.

6            MR. RYAN:  Of course, Judge, every treatise on jury

7    instructions urges the Court to tailor the instructions to the

8    case for the jury.  So strictly boilerplate might have been

9    used in another case, might have been approved, just as a

10   general observation.  My submission is that these charges

11   should be submitted concerning this case for this jury.

12            The first observation I have is the accomplice charge

13   on 21 and 22, I know your Honor doesn't want to deal with other

14   submissions so I'll reserve it.  But in my opinion, I'm going

15   to respectfully suggest that your Honor consider the

16   instruction that a guilty plea of a witness is not evidence of

17   a defendant's guilt.  That was a submission we made prior to

18   trial.

19            I'm going to continue on, Judge.

20            THE COURT:  I'm sorry, Mr. Ryan, where on 21 are you

21   referring to?

22            MR. RYAN:  It's not in here.  It has to be careted in

23   wherever you think it's appropriate.  The charge that is Sand

24   7-10, *U.S. v. Prawl*, that in essence says that guilty pleas of

25   witnesses -- I think we had at least five in this case -- while

D7VLLES2

1   properly considered for impeachment, may not be considered as

2   evidence of the defendant's guilt.

3          So Maher, who consulted with Mr. Rutigliano, and

4   Mr. Parlante, who consulted with Mr. Rutigliano, who pled

5   guilty, their pleas are not evidence of Mr. Rutigliano's guilt,

6   anywhere with respect to the discussion of accomplice

7   testimony, Judge.

8          THE COURT:  All right.  Mr. Weddle, do you have any

9   comment on that?

10         MR. WEDDLE:  It doesn't sound wrong to me, your Honor.

11   I'd like to look at the standard charge.

12         THE COURT:  I think that is a fairly standard charge,

13   and I would be inclined to accept it, Mr. Ryan.

14         Next.

15         MR. DRATEL:  Your Honor, also if it applies across the

16   board.

17         THE COURT:  Yes, it applies across the board.  And, in

18   fact, one possibility might be to fold it into the limiting

19   instruction pertaining to Mr. Ajemian.  All right.

20         Mr. Ryan.

21         MR. RYAN:  On page 39, this is a general observation

22   discussing conspiracy.  The conspiracy in this charge as

23   drafted is the jurors have to find whether there was an

24   agreement to commit mail fraud, wire fraud, and healthcare

25   fraud, but what is the offense?  The most essential element of

D7VLLES2

1      those three offenses if you're going to agree to commit those

2      offenses is intent to defraud the RRB, intent to defraud the

3      United Healthcare agency.

4              So my suggestion is that with respect to the

5      references to mail, wire, and healthcare fraud, that a clause

6      be inserted "with intend to defraud the RRB and United

7      Healthcare."  You can't agree to commit a crime unless you know

8      the elements of the crime.  In this case it's whether you

9      ripped off the RRB and United Healthcare agency.  That's what

10     the case is all about.  So the general generic language here

11     doesn't convey that concept to the jurors, and I respectfully

12     submit that your Honor consider that as an insertion.

13             THE COURT:  Mr. Weddle.

14             MR. WEDDLE:  I just think it's well covered throughout

15     your Honor's charge.  I don't think it needs to be on every

16     page.

17             MR. RYAN:  If I can go back, Judge, to the reasonable

18     doubt charge on 27.

19             THE COURT:  Twenty-seven.

20             MR. RYAN:  Yes.  There's nothing in this charge that

21     says what a reasonable doubt is.  And every charge I'm familiar

22     with, including Sand, says it's a doubt based upon reason and

23     common sense and that's a phrase.  It's a doubt based upon

24     reason and common sense.  I urge your Honor to consider, it

25     says the government doesn't have to prove or does have a burden

D7VLLES2

1   of proving beyond a reasonable doubt, but the charge doesn't

2   tell this jury what a reasonable doubt is.

3           THE COURT:  That's a fairly standard instruction.

4   It's here.  If you want it on page 27, we'll put it on page 27.

5           MR. RYAN:  So I ask your Honor to consider Sand 4-2

6   and the phrase it's a doubt based upon reason and common sense.

7           MR. WEDDLE:  I thought your Honor covered it.

8           THE COURT:  It's covered.  Mr. Ryan asks that it be on

9   27, but it is covered.

10          MR. WEDDLE:  I think it was covered before that

11  charge.

12          THE COURT:  Page 8.

13          MR. RYAN:  I plead guilty to carelessness and

14  inattention.

15          MR. DRATEL:  It doesn't say common sense.  It does say

16  it.  It says it is a doubt based upon reason and common sense.

17          THE COURT:  Straight out of Sand.

18          MR. RYAN:  I'm sorry.

19          Seventy-two, which deals with Count 33 where the

20  prosecutor told you that we're only going to rely on one

21  theory, not two theories, magnanimous as that may seem, the

22  fact of the matter is that their suggestion is relieving them

23  of burdens of proof concerning this element.  Seventy-two,

24  Judge.

25          THE COURT:  What's your comment?

D7VLLES2

1         MR. RYAN:  My comment is with respect to this count,

2    your Honor should leave it as is because the government's

3    burden is to prove all of the elements listed on 73 and 74.

4         THE COURT:  The government's issue was that it was

5    charging, it made original reference to two theories, and now

6    it is saying that it wants to pursue only on one theory.  I'm

7    not sure how your comment cuts on that.  The government is

8    effectively dropping one theory.

9         MR. RYAN:  And it's dropping the second theory which

10   has the five elements.

11        MR. WEDDLE:  That's not correct, your Honor.

12        I think we were proposing, on page 72, your Honor

13   quotes the statute and it has two numbered subsections.  And I

14   think we were going to just forego instructing the jury on the

15   first numbered subsection, which is one of the two theories

16   charged in the indictment, and only instruct the jury on the

17   second subsection, which your Honor's draft does.  Your Honor

18   doesn't instruct according to the five elements in Sand on the

19   first subsection.

20        We've proven both.  If Mr. Ryan wants both of these

21   things to be instructed to the jury, that's fine.  We're just

22   going to be here for a little bit longer.

23        MR. RYAN:  I don't see in the first theory five

24   elements on 72 or 73.  I see them on 73 and 74.  Maybe I missed

25   something.

D7VLLES2

1          MR. WEDDLE:  Your Honor, that's the point.  With

2     respect to the language in the statute which talks about

3     falsifying, concealing or covering up by any trick, scheme, or

4     device a material fact, there is a set of five elements

5     describing that theory of Section 1001.  Your Honor's charge

6     doesn't include those elements.  We think that's a helpful and

7     efficient way to do this.  We'll just drop that theory.  It's

8     pretty duplicative of the other theory.  The facts are the

9     same.  We've proven them.  We don't think we need to go through

10    those elements.

11         If Mr. Ryan would like to go through those five

12    elements and then go through the five elements of the second

13    theory that are already in the Court's charge, we're going to

14    be here longer during the charge to the jury.  But I think it

15    doesn't change at the end of the day anything because we've

16    proven the exact same facts which satisfies either theory.

17         I think it's simpler to just eliminate the first

18    theory.  It means your Honor wouldn't have to read that part of

19    the statute.  We would eliminate it from the indictment, and

20    your Honor would only instruct on five elements rather than

21    five and then an alternate five elements for this count.

22         THE COURT:  All right.  Mr. Ryan, I think that that

23    makes eminent sense and simplifies and will save a lot of time.

24         MR. RYAN:  I'll confess I'm very confused on this

25    item.  We'll read your Honor's new draft and see.

D7VLLES2

1           THE COURT:  It may be because you didn't take into

2      account, as no one did until the government indicated that it

3      was dropping the first theory.

4           All right.  Anything else?

5           MR. RYAN:  On the issue of venue, I would move for a

6      judgment of acquittal on the failure of the government's proof

7      because even the stipulation talks in general abstract terms

8      about why in communications they normally pass through, but

9      there's no evidence here that the RRB disability checks that

10     were deposited into the Federal Reserve Bank of New Jersey --

11          THE COURT:  Mr. Ryan, let me cut to the chase.  Is

12     that a motion for reconsideration of the ruling that I made in

13     connection with Mr. Dratel's motion?

14          MR. RYAN:  It certainly is.

15          THE COURT:  Denied.

16          MR. RYAN:  Thank you.  I have submitted a venue

17     charge, request to charge, but I don't know if you want to

18     discuss it now or at another time.

19          MR. JACKSON:  Judge, can I give you a chance to deny

20     mine?

21          THE COURT:  Absolutely.

22          MR. JACKSON:  I join in their application for venue.

23          THE COURT:  OK.

24          MR. RYAN:  The substantial contacts discussion on

25     venue is very relevant to this particular case, tailored to

D7VLLES2

1      this case, which Judge Cedarbaum used in a case I can't

2      pronounce but cited to by Mr. Dratel, and our requested charge

3      has got it in there too.

4              So I'm going to ask your Honor to consider the request

5      to charges that we submitted yesterday, but I understand that

6      you want to have a redraft of this and perhaps upon reviewing

7      our request to charges on venue, you considered ours more

8      appropriate and tailored to this case.

9              THE COURT:  All right.  Thank you.  If there's nothing

10     else, then.

11             MR. RYAN:  Just one second, Judge.

12             THE COURT:  Go ahead.

13             MR. RYAN:  Of course, the conscious avoidance charge

14     is an invitation to convict Mr. Rutigliano on negligence.  Two

15     witnesses -- Maher and Parlante -- had conversations with him.

16     And the government is going to argue that these forms, these

17     applications they submitted had some bizarre statements in it.

18     And if Mr. Rutigliano was careless or inattentive, negligent in

19     not cleaning it up before they were submitted by the applicant

20     to the RRB, the government is going to argue because of his

21     negligence he consciously avoided knowing what was in that

22     form.  And that's a major argument I expect to hear from the

23     government in this case.

24             So the conscious avoidance charge should not be used

25     in a case, in my opinion, where negligent conduct can be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7VLLES2

1    converted into criminal conduct simply on that charge.  The

2    government charge here is that it was an intentional effort to

3    defraud the RRB and United Healthcare agency.

4         So I urge your Honor to consider the danger of giving

5    a conscious avoidance charge in a case like this, particularly

6    where the government has all of these charts which have a

7    compelling, according to the government, inference to draw that

8    all of this was intentional.  And giving a conscious avoidance

9    charge in this particular case tailored for this jury is an

10   invitation for the jury to convict a man based upon his

11   carelessness and negligence.

12        Mr. Rutigliano was a union official.  He wasn't a

13   lawyer.  He wasn't an astute educated person.  And giving a

14   conscious avoidance charge in his case is an invitation for the

15   jury to convict.

16        THE COURT:  All right.

17        MR. RYAN:  Judge, I think I'm there.  Thank you very

18   much for your patience.

19        THE COURT:  All right.  Thank you.

20        MR. DURKIN:  Judge, I would join in that with Mr. Ryan

21   on a similar basis with respect to Dr. Barron's testimony

22   regarding Dr. Lesniewski.  I think there is a risk of the poor

23   recordkeeping or negligent standard to get converted to a

24   criminal standard, and I just would endorse that.

25        THE COURT:  All right.  If there's nothing else, why

D7VLLES2

```
 1    don't we take a ten-minute break and then come back for the
 2    instructions -- I'm sorry -- for the closing arguments.
 3            MR. DURKIN:  Judge, we have, I think we've reached a
 4    stipulation.  I have -- Mr. Weddle sent me an email this
 5    morning.  I converted what he sent me.  I'm changing -- I'm
 6    told we now have about six different definitions of gross
 7    income to pick from, gross receipts, and I'm confident we'll
 8    arrive at one, but if we could have maybe -- someone is on his
 9    way with the copies now.
10            THE COURT:  All right.  Why don't we tell the jury
11    that we'll start at 11.
12            MR. DRATEL:  Your Honor.
13            THE COURT:  Let me come back to this issue and how we
14    introduce it, the issue of the stipulation and the Court's
15    understanding of the consequence.
16            Is it going to be introduced, Mr. Durkin, by you or by
17    the government and what?
18            MR. DURKIN:  I had intended to read it.  I can read
19    you what I've changed.  It reads now:
20            If called as a witness, Lenny Konsker would testify as
21    follows:
22            He is a certified public accountant with the office in
23    Hicksville, New Jersey.  I'm sorry, it says New York.  I read
24    New Jersey.  And the tax preparer for Peter J. Lesniewski, MD,
25    P.C., and Peter J. Lesniewski and Linn C. Lesniewski.
```

D7VLLES2

1    Defendant Exhibits L-24-A through L-24-F -- and those are the

2    form 11 or here's what it says -- are true and correct copies

3    of form 1120S, U.S. income tax return for an S corporation,

4    filed in the respective years for Peter J. Lesniewski MD, P.C.,

5    which is the corporate entity owned by Peter J. Lesniewski

6    through which he did business.

7         DX L-24 is a summary chart reflecting gross receipts

8    line (Line 1a) on the corporate tax returns (Form 1120S) of

9    Peter J. Lesniewski, MD, P.C., the total income line from the

10   personal tax returns of Peter J. Lesniewski and Linn C.

11   Lesniewski (Line 22) on Government Exhibit 1500-1504, as well

12   as the United Healthcare payments to Dr. Lesniewski for Long

13   Island Railroad employees (Government Exhibit 24) for the

14   respective years 2003 through 2008.

15        And here's -- this is the sentence that may change

16   because this may not be the correct CFR, but it is a gross

17   receipts definition of CFR.

18        THE COURT:  Whatever that is, is that --

19        MR. DURKIN:  I'm sorry?

20        THE COURT:  Whatever the definition is that you

21   ultimately adopt.

22        MR. DURKIN:  Yes, and that's just one sentence.  And

23   then this is -- I believe I modified what Mr. Weddle said, but

24   I think it's in substance what he intended.

25        Various expenses are then deducted from the gross

D7VLLES2

1    receipts, (Line 7 through 19) resulting in either ordinary

2    income or loss from trade or business activities (Line 21).

3    The profit or loss from the trade or business, as well as wages

4    or other income paid to Peter J. Lesniewski, is reflected on

5    the individual tax returns (Form 1040) for Peter Lesniewski and

6    Linn Lesniewski (GX 1500-1504, Lines 7, 21, and 22).

7              THE COURT:  All right.  Mr. Weddle.

8              MR. WEDDLE:  Your Honor, that sounds fine to me.

9    There may be an issue lurking in the definition of gross

10   receipts because as your Honor will recall, one of the issues

11   that we identified with respect to this is that the accountant

12   used the bank records for the S corporation in order to prepare

13   the tax returns.  We've looked at those bank records and we

14   don't see repeated or substantial cash deposits.

15             So we're not going to make an argument about it, but I

16   don't want defense counsel to make an argument which I think is

17   not supported by the evidence in the record, which is that all

18   of the narrative payments are included in the gross receipts

19   figures.  I don't think he can say that's true, and so I don't

20   think he should make an argument that it is, but that's the

21   issue that I see lurking.

22             The language that I proposed was that the gross

23   receipts figure on the tax returns was prepared from the bank

24   records of the P.C.  It doesn't have to be that language.  It

25   could just be a generalized description of gross receipts, but

D7VLLES2

```
1   the evidence that's in this trial does not confirm that the

2   narrative payments that were made in cash actually ended up on

3   the gross receipts line of the tax returns.

4           MR. DURKIN:  As long as the government is willing not

5   to argue that they did not, then I'm willing to say I'm not

6   going to argue that it was all there.

7           THE COURT:  All right.  Let's understand that.  Let's

8   also understand the consequences of the stipulation coming in

9   through Mr. Durkin on behalf of Dr. Lesniewski.  My

10  understanding is that this material is being introduced as a

11  form of completing the record.

12          MR. DURKIN:  Yes.

13          THE COURT:  And not of opening the door for the

14  government to bring in the malpractice and insurance, loss of

15  insurance issues.

16          MR. DURKIN:  That was my understanding.

17          THE COURT:  Mr. Weddle, is that your understanding?

18          MR. WEDDLE:  Based on this stipulation, we don't

19  intend to introduce that evidence.  But I wouldn't want to see

20  a repeat of some of the arguments that we saw in opening or for

21  someone to say that there's no motive here to commit the crime

22  in summation.  I think that the defense should choose their

23  words carefully and they should not open, you know, basically

24  try to open a door that has been closed by their decisions

25  about what to put on and not put on and our decisions based on
```

D7VLLES2

1        their representations.

2                MR. DURKIN:  As long as the gander and the goose get

3        the same treatment, it's fine with me.  If they go into that in

4        their opening before I argue that somehow United Healthcare

5        shows how dependent he was on this whole scheme, then I assume

6        they've opened the door for me on that.  I can't imagine that

7        they're going to do that in light of what we've talked about.

8                MR. WEDDLE:  Maybe I should be a little more precise,

9        your Honor.  I think we are going to argue that and I

10       understand Mr. Durkin is going to respond to that in the way

11       that we've discussed related to these tax returns and the gross

12       receipts figures.

13               THE COURT:  That was my understanding, Mr. Durkin.

14               MR. DURKIN:  That's fine.

15               MR. WEDDLE:  It's the specific language that we talked

16       about in opening about --

17               THE COURT:  There are factual differences about what

18       those numbers mean, and you can argue your factual -- the

19       factual inferences you think the jury can make from them.

20               MR. DURKIN:  That's fine.

21               THE COURT:  All right.

22               MR. DRATEL:  Your Honor, to save time, since we know

23       what the contours of the remainder of the evidence will be, so

24       we don't have to send the jury out or have a side bar, I'd like

25       to renew our Rule 29 incorporating the stipulation so we can

D7VLLES2

1    get that out of the way and not have to interrupt once the jury

2    comes back.

3           THE COURT:  All right.  If there are other Rule 29

4    motions at this point, just put them on the record.

5           MR. RYAN:  So move.

6           MR. JACKSON:  Ditto, Judge.

7           THE COURT:  All right.  I've considered the Rule 29

8    motions, as I considered them earlier, based on the standard

9    applicable to Rule 29 motions, which the evidence must be

10    viewed in the light most favorable to the government.  I

11    believe that there is sufficient evidence on this record to

12    allow the case to proceed to the jury and, therefore, I deny

13    the motions.

14           Let's tell the jury we'll call them in at 11.

15           Now, the government indicated that it would need

16    something over an hour for closing arguments.

17           MR. WEDDLE:  I apologize, your Honor.  Ms. Friedlander

18    is not here right now.  She's been polishing and working on her

19    summation.  So I'm not in a better position than she was to

20    give estimate.  I think that it's going to be the same,

21    somewhere below an hour and a half.  I think she's been trying

22    to shorten it.  But as soon as she arrives, which I think will

23    be momentarily, we can find out more specifically.

24           THE COURT:  All right.  The government will have

25    roughly an hour and a half.  I would suggest that the defense

D7VLLES2

1    get together and work out a schedule on which you will have

2    among the three of you two hours.  All right?

3              MR. JACKSON:  Thank you, Judge.

4              MR. RYAN:  All right.

5              (Recess)

6              THE COURT:  Is the government ready to proceed to

7    closing arguments?

8              MS. FRIEDLANDER:  Yes, your Honor.

9              THE COURT:  All right.  You may bring in the jury.

10             Before we do, let me come back to the question of the

11   instructions, the issue of the conscious avoidance.  I think

12   that it is a difficult and close issue.  I'm not ready to rule

13   on it at the moment, so I would ask the government not to make

14   reference to that until the issue is fully decided.

15             MS. FRIEDLANDER:  No problem, Judge.

16             THE COURT:  All right.

17             (Jury present)

18             THE COURT:  Welcome back.  Thank you.  Be seated.

19             Before we begin, counsel please approach for just one

20   moment.

21             (At the side bar)

22             THE COURT:  All right.  Now, because I'm aware of the

23   defendants' sensitivity about the issue of Mr. Marks, I've

24   asked my clerk to prepare what I call a sleep log in which he

25   will note times, which started yesterday and until I give

D7VLLES2

1    instructions, in which what I consider Mr. Marks' distracting

2    and inattentive conduct will be indicated.  This is all in

3    order to establish a record, but the Court's attention remains

4    on that issue.

5              MR. DURKIN:  Can we still object, but I get it.

6              THE COURT:  Of course.  Even if you see the evidence.

7    All right.

8              (In open court)

9              THE COURT:  Mr. Durkin.

10             MR. DURKIN:  Your Honor, we have one final

11   stipulation, as we said last night.

12             The parties have agreed that if called as a witness,

13   Lenny Konsker would testify as follows:

14             Mr. Konsker is a certified public accountant with

15   offices in Hicksville, New York, and the tax preparer for Peter

16   J. Lesniewski, MD, P.C., and Peter J. Lesniewski and Linn C.

17   Lesniewski.  Defendant's Exhibits L-24-A through L-24-F are

18   true and correct copies of Form 1120S, U.S. income tax return

19   for an S corporation, tax returns filed in respective years for

20   Peter J. Lesniewski MD, P.C., which is the corporate entity

21   owned by Peter J. Lesniewski through which he did business.

22             Defendant's Exhibit L-24 is a summary chart reflecting

23   the gross receipts line, (Line 1a) on the corporate tax returns

24   (Form 1120S) of Peter J. Lesniewski, MD, P.C., the total income

25   line from the personal tax returns of Peter J. Lesniewski and

D7VLLES2

1    Linn C. Lesniewski (Line 22) on Government Exhibit 1500-1504,

2    as well as the United Healthcare payments to Dr. Lesniewski for

3    Long Island Railroad employees (Government Exhibit 24) for the

4    respective years 2003 through 2008.

5          According to the IRS, gross receipts are the total

6    amounts the organization received from all sources during its

7    annual accounting period, without subtracting any cost or

8    expenses.  Various expenses are then deducted from the gross

9    receipts, (lines 7 through 19) resulting in either ordinary

10    income or loss from trade or business activities (Line 21).

11    The profit or loss from the trade or business, as well as wages

12    or other income paid to Peter J. Lesniewski, is reflected on

13    the individual tax returns (Form 1040) for Peter J. Lesniewski

14    and Linn C. Lesniewski (Government Exhibits 1500-1504, Lines 7,

15    21, and 22).

16          Judge, if I could just publish them quickly.

17          THE COURT:  You may.

18          MR. DURKIN:  This is 24-A.  And I'll just publish

19    24-F, which is 2008.  They're virtually, other than the

20    numbers, the forms are all the same.

21          And then the actual summary chart to which we

22    referred, L-24, I'll publish now, but I may need Mr. Jackson's

23    assistant to help me as I'm not very talented.  Better than I

24    thought.  How about that.

25          This is L-24, and it's self-explanatory, as the

D7VLLES2

1    stipulation says.

2              THE COURT:  All right.  Thank you.

3              MR. DURKIN:  Thank you, Judge.

4              THE COURT:  All right.  With that introduction which

5    was presented --

6              MR. DURKIN:  I'm sorry, Judge.  I would move to

7    introduce the exhibits.

8              THE COURT:  Government?

9              MS. FRIEDLANDER:  No objection.

10             THE COURT:  Admitted without objection.

11             (Defendant's Exhibits L-24, L-24-A through L-24-F

12    received in evidence)

13             THE COURT:  With that introduction of that evidence,

14    defendant Peter Lesniewski's case has rested.

15             And, consequently, we're ready to proceed to the next

16    phase of the trial which is the presentation of the parties'

17    closing arguments.

18             As I will instruct the jury during the full

19    instructions, as I have indicated in the preliminary

20    instructions, closing arguments are not evidence.  Closing

21    arguments are the parties' explanation of what they believe the

22    evidence has established and what inferences they believe you

23    can reasonably draw from the evidence as they believe it has

24    come in.

25             So, government.

1              MS. FRIEDLANDER:  Thank you, your Honor.

2         Good morning.

3         Peter Lesniewski, Marie Baran, and Joseph Rutigliano

4    helped hundreds of Long Island Railroad employees lie to get

5    disability benefits from the federal government, disability

6    benefits these employees didn't deserve, disability benefits

7    that were supposed to be a safety net for truly disabled

8    people.  They lied again and again, day after day, and they

9    helped countless Long Island Railroad employees scam the

10   federal government so they could make a quick buck.  These

11   defendants were at the center of the fraud, they were engines

12   of the fraud, and each of them profited from their fraud in

13   multiple ways for years.

14        Ladies and gentlemen, this is the government's

15   summation.  It's our chance to put all the evidence together to

16   show you how it proves that Baran, Lesniewski, and Rutigliano

17   are guilty beyond a reasonable doubt of committing fraud, a

18   simple, definitive fraud with employees of the Long Island

19   Railroad.

20        So let's talk about the fraud.  There was a massive

21   fraud at the Long Island Railroad.  Employees routinely claimed

22   they were disabled and couldn't work anymore and those were

23   lies.  And the reason they lied is no mystery.  They lied so

24   they could retire early and pad their pensions with disability

25   benefits, money they weren't entitled to, money that was meant

D7VLLES2                    Summation - Ms. Friedlander

1   to be a safety net for suffering people.

2          You have heard from and seen many people who told

3   those lies -- normal, healthy, and often active middle-aged

4   people.  They told you that they lied about being unable to

5   work anymore, lied about being disabled just to pad their

6   wallets with the government's money, and then retire to lives

7   of golf, cycling, fitness, and travel.

8          Steven Gagliano told you he traveled the world on the

9   government's dime with disability benefits he never deserved.

10  Michael Stavola told you that he played golf practically every

11  other day while on disability.  You also heard from Robert

12  Dunaj, a witness who applied for disability and then got cold

13  feet, withdrawing his application after the New York Times

14  published an article about the fraud because Dunaj knew what he

15  was doing was wrong and he knew, he saw that the fraud was

16  coming to light.

17         You also heard from Regina Walsh, who told you that

18  she too lied about being disabled to get disability money she

19  knew she never deserved.  Ms. Walsh told you that she hesitated

20  to apply at every step of the process because she knew what she

21  was doing was wrong and that for her, testifying here before

22  you was a way to begin to make things right.

23         These witnesses told you not just about their own

24  fraud, but about a massive culture of fraud at the Long Island

25  Railroad.  Employees taught each other that at least a year

1    before they planned to retire, they should start seeing one of

2    three corrupt doctors:  Dr. Parisi, Dr. Ajemian, and the

3    defendant, Peter Lesniewski.  These doctors for money would

4    willingly create a paper trail, a paper trail, as Long Island

5    employees called it, a paper trail of needless visits and tests

6    to create the false appearance that the employees were

7    suffering from serious conditions that were getting worse and

8    worse and couldn't effectively be treated.

9              On top of that, the witnesses told you that it was

10   common knowledge and openly discussed that you could pay

11   particular people, including the defendants -- Marie Baran and

12   Joseph Rutigliano -- to complete their disability applications

13   filling them with lies.

14             Chris Parlante told you that he paid Rutigliano $1,000

15   to complete his application because he knew Rutigliano would

16   say whatever needed to be said to get Parlante the disability

17   money that he wanted.  Regina Walsh told you that she watched

18   with her own eyes as Marie Baran filled her application with

19   lies.

20             Witness after witness described the lies that

21   Rutigliano and Baran put in their applications.  And remember,

22   this disability application is not complicated.  Mr. Jackson

23   tried to compare Marie Baran to a tax preparer who completes

24   people's federal income tax returns.  Are you kidding me?  The

25   application asks the most basic questions:  What is your job?

1    What things could you do in a normal day?  Is it easy, hard, or

2    impossible for you to stand, sit, walk, dress yourself, bathe

3    yourself?  Any legitimately disabled person could answer those

4    questions easily without paying a stranger a thousand dollars

5    cash to answer for them.

6            And you have heard that the employees maximized the

7    proceeds of their fraud every which way.  On top of bilking the

8    government for bogus disability benefits, witnesses told you

9    that it became common knowledge that they could bilk insurance

10   companies by taking out disability insurance before they

11   retired.  That way, when they falsely claimed to be disabled

12   upon retirement, they could also cash in on the disability

13   insurance.  Witness after witness told you that this disability

14   insurance scheme was openly discussed by LIRR employees.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1        Gary Supper and Michael Stavola both told you that

2   they engaged in this scheme taking out disability insurance as

3   they planned their bogus disabilities and cashing in on that

4   insurance when they filed their phony disability claims with

5   the government.

6        Stavola told you that he pocketed almost $50,000 by

7   cashing in on disability insurance that he took out because he

8   knew he was planning a fake disability.

9        Gary Supper told you he cashed in to the tune of over

10   $40,000.

11        You also know what a scam this was because as you

12   heard Long Island Rail Road employees worked overtime, huge

13   amounts of overtime leading up to the day they claimed to be

14   disabled.

15        Witness after witness told you they did that because

16   their pensions were based on the amount they earned in the few

17   years before they retired, so they worked as much as possible

18   in those years.

19        Steven Gagliano, Gary Supper, Michael Stavola, Chris

20   Parlante and James Maher all told you that they worked

21   thousands of hours of overtime, and it was same kind of work

22   they did all week long.  They worked overtime right up until

23   they applied for disability because they were fully capable of

24   doing their jobs.

25        Of course you know that Joe Rutigliano and Marie

1    Baran's husband, Gus Baran, did the same thing, and their

2    overtime records are in evidence.

3         Disabled?

4         These people were not in declining physical condition.

5    They were not even pretending to be.  They were working more

6    than they ever did because they were fully capable of working.

7    Filing for federal disability benefits was just a part of their

8    retirement plan.

9         You learned from witnesses that not only did they plan

10   what year they were going to claim to become disabled, they

11   even planned the time of year in which they were going to claim

12   to be disabled.

13        The witnesses told you that employees made more money

14   if they retired in the second half of the year, because if they

15   waited until then they could cash in on their vacation time for

16   that year and the following year.

17        The witnesses told you they all claimed to be disabled

18   in the second half of the year for that reason.  You even saw

19   in Steven Gagliano's calendar how he marked off the day in his

20   retirement year when he had worked 100 days and could retire

21   making a false disability claim and collecting his vacation

22   payout for the following year.

23        Ladies and gentlemen, what all of these witnesses have

24   told you about their fraud and the culture of fraud at the Long

25   Island Rail Road is corroborated by the numbers.

D7vnles3                    Summation - Ms. Friedlander

1        Robert Murray, the MTA auditor who you heard from in

2   this trial, showed you the data on employees retiring on

3   disability at the Long Island Rail Road.

4        Let's look at that again.

5        From 1998 to 2011 over 3800 employees retired from the

6   Long Island Rail Road and over 3,000 of them obtained federal

7   disability benefits when they retired.

8        As you can see, that is 79 percent of all Long Island

9   Rail Road employees over time.  These are staggering numbers.

10  The defense lawyers have been saying, Well, railroad work is

11  difficult, railroad work is bruising.  These aren't just manual

12  laborers.

13        MR. DURKIN:  We object, Judge.  The defense lawyers

14  didn't say anything.

15        THE COURT:  Sustained.

16        MS. FRIEDLANDER:  This is almost all employees of the

17  entire Long Island Rail Road railroad system, including white

18  collar workers in offices.  People like Regina Walsh, who

19  worked in human resources.  People like Robert Dunaj who worked

20  in a call center.

21        You also know these huge numbers have nothing to do

22  with the nature of the work at the Long Island Rail Road

23  because you saw these numbers compared to disability rates at

24  the Metro-North Railroad.

25        Mr. Murray told you that the Long Island Rail Road and

D7vnles3                        Summation - Ms. Friedlander

1    the Metro-North Railroad are identical in every meaningful way

2    except one.

3              Let's take at look at their comparative disability

4    rates.  You can see here a year-by-year comparison of the

5    comparative disability rates.

6              On average, from 1998 to 2011, while 79 percent of all

7    Long Island Rail Road employees retired on disability, just 21

8    percent of Metro-North Railroad employees went out on

9    disability.

10             Can we see the bar comparison.

11             This is the same data, just presented year by year.

12   These are staggering differences.

13             Metro-North and the Long Island Rail Road are

14   essentially identical railroads, as Mr. Murray told you.  They

15   both take commuters back and forth between Manhattan and

16   outlying areas.  They have the same purpose.  They have

17   virtually the same number of employees.  They have the same

18   electric and diesel trains and equipment.

19             Why is there such a huge difference in the disability

20   rates among their employees?

21             The reason, as you now know, is that Long Island Rail

22   Road rules created a unique incentive for employees to commit

23   this fraud.

24             Unlike Metro-North employees, Long Island Rail Road

25   employees could retire with pensions at the relatively young

D7vnles3                    Summation - Ms. Friedlander

1    age of 50 if they had worked at the railroad for at least 20

2    years.  But at 50, their pension would only equal about half

3    their salary.  As the witnesses told you, the employees wanted

4    to retire at 50, but not on just half their salary.

5         What the Long Island Rail Road employees figured out

6    is a way to get more money when they retired at 50.  They

7    figured out that they could retire at the young age of 50 with

8    their Long Island Rail Road pension equaling about half their

9    salary and then they could fake a disability to get federal

10   disability benefits that equaled just about the other half of

11   their salary.

12        That is the fraud that witness after witness has

13   described, and it's the fraud that the numbers we just looked

14   at show.

15        It is a fraud that has nothing to do with railroad

16   work being difficult.  You know that because the Long Island

17   Rail Road disability rate is nearly four times higher than the

18   rate at Metro-North, an identical commuter railroad serving New

19   York City.

20        You can also see from the data that, just as the

21   witnesses told you, Long Island Rail Road employees were

22   planning not just the year but the time of year in which they

23   would falsely claim to be disabled.

24        Can we see 22-C.

25        This shows you the month of retirement of Long Island

D7vnles3                    Summation - Ms. Friedlander

1   Rail Road employees who went out on disability.  This is not

2   just regular retirements.  This is people going out on

3   disability from 1998 to 2011.

4           Why is this so powerful?

5           This shows you these people are not really becoming

6   disabled.  They are just planning these disabilities like they

7   do any other retirement planning.

8           As your common sense tells you and as Bob Murray told

9   you, if the people are really becoming disabled you would

10  expect them to leave at all times of the year.  There is no

11  rhyme or reason to the time of year when someone becomes

12  disabled.

13          But that's not what happened at the Long Island Rail

14  Road, as you can see from these numbers.  People claimed to be

15  disabled in the second half of the year because they made more

16  money that way.

17          How else do you know this was a huge fraud and that

18  people were lying when they said they couldn't do their jobs

19  anymore?

20          Look at what people did after they went out on

21  disability.

22          Michael Stavola played 18 holes of golf practically

23  every other day until he was arrested and lost his disability

24  benefits.  What did he do then?  He got a job.  He got a job as

25  an electrician.  It was the same job that he had at the

D7vnles3                    Summation - Ms. Friedlander

1   railroad, and he still is working today.  He wasn't disabled.

2              Steven Gagliano while collecting disability benefits

3   ran five-kilometer races, traveled all over the world, climbed

4   Mt. Kilimanjaro in Africa.  Not only are these people capable

5   of doing their jobs, as they told you, as your eyes and your

6   common sense told you, some of them are in great physical

7   condition.

8              Chris Parlante has spent five days a week at the gym

9   lifting weights and doing cardio since going out on disability.

10             Regina Walsh told you she spends hours at the gym and

11  in fitness classes.

12             Robert Ellensohn is built like an oak tree and is a

13  volunteer firefighter to this day.

14             Disabled?

15             Steven Gagliano biked 400 miles in eight days on a

16  bike tour while on disability.

17             Here he is.  That is Steven Gagliano finishing a

18  400-mile bike tour while he is on disability.

19             And, of course, Joe Rutigliano and Gus Baran, in a

20  league all by themselves because they are not just on

21  occupational disability, they are on total and permanent

22  disability.  That means they are supposedly so physically

23  disabled that they are unable to do any job in the country.

24             Not able to do any job?

25             After he went on disability Rutigliano had a whole

1    business that you have heard about in this trial completing

2    other people's disability applications for cash.

3            Leaving aside work, look what they did for fun.

4            Rutigliano and Gus Baran have been golfing year round

5    by traveling to their winter homes in Florida and playing in

6    New York all summer long, all funded by disability benefits

7    from the government that they never deserved.

8            In the face of all of this evidence, the defense keeps

9    suggesting there is no fraud at all.  No one thought they were

10   doing anything wrong.

11           What they are really saying boils down to an argument

12   that it wasn't a crime and no one thought they were doing

13   anything wrong because everyone was doing it.

14           It's like saying that --

15           MR. DURKIN:  I object to that, Judge.  That is not

16   what any -- at least I said.

17           THE COURT:  Overruled.

18           MS. FRIEDLANDER:  It is like saying that if employees

19   of a bank were stealing the bank's money, it would be OK as

20   long as all the employees were doing it.

21           It is a ludicrous argument, it defies common sense,

22   and it flies in the face of what witness after witness has told

23   you.

24           They told you they lied to get money and they told you

25   they knew what they were doing was wrong.  Of course, there was

D7vnles3                      Summation - Ms. Friedlander

1    a fraud and these three defendants were right in the middle of

2    it.  They made it possible.

3              Lesniewski, Baran, and Rutigliano together helped

4    hundreds of Long Island Rail Road employees get disability

5    benefits they didn't deserve, including many people who you

6    heard from in this trial.

7              They were at the center of the fraud and profited from

8    it for years.  They want you to believe they had no idea, no

9    idea there was a fraud going on.  That is ridiculous.  The

10   proof of their guilt is overwhelming.  Let's go one by one.

11             First, Peter Lesniewski.

12             Many witnesses told you that Lesniewski was one of the

13   three go-to doctors for disability, along with Ajemian and

14   Parisi.  What the witnesses told you is corroborated by the

15   data.

16             The data shows that from 2004 to 2008, over 83 percent

17   of all Long Island Rail Road employees who got disability saw

18   Ajemian, Parisi or Lesniewski.  In that same period, over 130

19   Long Island Rail Road employees got disability with

20   Lesniewski's help.  That is a smaller number than Ajemian and

21   Parisi had, but without question it is a massive number.

22             How do you know that?

23             Just look at the fact that the 150 people who got

24   disability through doctors besides these three were seen by 150

25   different physicians.  I'm sorry.  I misspoke.  Sorry.  The 150

1    people who got disability through doctors besides these three,

2    as you can see, were seen by 126 other doctors.

3         Lesniewski supported almost as many disability

4    applications as 126 other doctors combined.  That is just in

5    the years 2004 to 2008.

6         How do you know that Lesniewski understood that all of

7    these people were coming to him for disability and not

8    treatment?

9         First, look at what they said to him.  The LIRR

10   employees told him they wanted disability.  They told him from

11   the get-go that they were seeing him because they were getting

12   ready to retire.  One of them instructed Lesniewski in writing

13   to make up disabilities.

14        These LIRR workers didn't ask him for treatment.  They

15   didn't pretend to be in serious pain.  They told him they were

16   leading active lives.

17        They didn't hide anything from him.  In his words and

18   his actions Lesniewski showed again and again that he

19   understood this was a sham and they were paying him to create a

20   phony paper trail.

21        From his very first visit, Chris Parlante told

22   Lesniewski that he was there because he worked for the Long

23   Island Rail Road and was planning to retire.

24        Parlante told you he wanted Lesniewski to know that

25   right away so Lesniewski would understand what he needed to do,

D7vnles3                    Summation - Ms. Friedlander

1   and Lesniewski immediately complied.  Lesniewski had him come

2   back for a series of pointless visits, billing Parlante's

3   insurance every time.

4          Parlante wasn't acting like he was in pain.  He wasn't

5   asking for treatment.  But Lesniewski kept directing him to

6   come back until the day Parlante asked Can I have a narrative

7   now?

8          Parlante didn't even bother to pretend like he

9   couldn't do his job anymore, and Lesniewski didn't even bother

10  to ask.  Lesniewski just gave him a narrative for $500 cash.

11         On top of that, when Parlante actually injured himself

12  in a minor accident on his last day of work, October 31, and

13  saw Lesniewski and complained of actual back pain, Lesniewski

14  spun that visit into part of the fraud by lying about it in

15  Parlante's disability narrative.

16         Let's take a look at it and at Lesniewski's own notes

17  which show that he lied.

18         This is Christopher Parlante's narrative.  You can see

19  at the top it's dated November 24, 2004.  This is Lesniewski's

20  narrative.

21         Now, if we go down to the bottom, the sentence begins

22  "apparently."

23         It says, "Apparently on November 1 Parlante was

24  sideswiped by a train."  The narrative goes on to talk about

25  his back and how bad his back is.

D7vnles3                    Summation - Ms. Friedlander

1          Can we go on to the next page.  Just that top

2     paragraph.

3          He continues talking about his back and how bad his

4     back is and he ends by saying that Parlante was "placed on

5     steroids and has not been seen since," not been seen since he

6     had a bad accident and came in on November 1, 2004.

7          Can we see Lesniewski's records which show that this

8     is a lie.

9          Really?  He hasn't seen him since November 1?  You

10    know what Lesniewski neglected to mention?

11         Look at the handwritten notes, ladies and gentlemen.

12    The day before Lesniewski wrote his narrative, on November 23,

13    2004, Lesniewski saw Parlante again for another appointment.

14         And what did Parlante say?  Parlante said his back was

15    feeling better.

16         Can you highlight the date?

17         It is right there.  But Lesniewski pretended in the

18    narrative that that visit never happened.  Why did he lie?

19    Because he was getting paid to make people look disabled on

20    paper.  He was not getting paid to report the truth.

21         Of course, that brings us to Gary Supper, a stunning

22    example of a patient being open with Lesniewski about how they

23    were faking disabilities together.

24         Like all the other witnesses, Supper testified that he

25    saw Lesniewski for over a year to create a paper trail and that

D7vnles3                    Summation - Ms. Friedlander

1    he kept coming back at Lesniewski's direction, getting billed

2    by Lesniewski every time for pointless visits that he paid for

3    through his United Healthcare insurance.

4            Supper told you his paper trail related to a shoulder

5    complaint.  But around Thanksgiving of 2006, right before he

6    planned to apply for disability and just after his wife passed

7    away, Mr. Supper decided his paper trail might not look good

8    enough.

9            He instructed Lesniewski in writing to create more

10   fake disabling conditions and to do it fast, since Supper's

11   retirement date was right around the corner.

12           Let's look at Supper's instructions again.  Here

13   Supper tells Dr. Lesniewski he wants permanent disability.

14           He writes, "Please do test."

15           he wants to get permanent disability.

16           "Please do test for back, knees, ankle.  MRI, EMG, NVC

17   test."

18           He writes, "Please document symptoms why I cannot

19   perform my duties.  I need something wrong.  I need something

20   wrong besides shoulder.  Once I get shoulder fixed, Railroad

21   Retirement may withdraw disability benefits.

22           "I need tests, MRIs, EMGs by December 10 or ASAP."

23           This is Supper telling Lesniewski in writing that he

24   wants Lesniewski to concoct fake disabling conditions so Supper

25   can get disability.

D7vnles3                    Summation - Ms. Friedlander

1              You saw this note when Mr. Supper testified.  You saw

2     it during the testimony of the government's expert, Dr. Barron.

3              It is one of the most devastating pieces of evidence

4     in this case.  Let's talk about what it shows you.

5              First, it shows that Supper knew he was faking medical

6     conditions to get disability money.

7              Second, it shows you that Supper knew that Lesniewski

8     was helping him to fake medical conditions for disability; that

9     they were working together to commit this crime.

10             Think about it.  If they were not involved in fraud

11    together, if Lesniewski were a legitimate doctor, it would be

12    crazy to write this note.

13             Remember what Dr. Barron said about this note?  Dr.

14    Barron told you that as a physician this was the most upsetting

15    document that he saw during his entire review of Lesniewski's

16    records.

17             Dr. Baran told you if he got a note like this from a

18    patient he would call his patient into his office and close the

19    door.

20             MR. DURKIN:  Objection.  I think that was stricken.

21             THE COURT:  Overruled.

22             MS. FRIEDLANDER:  And he would say to his patient,

23    What are you thinking?  This is totally inappropriate.

24             Dr. Barron's response was the common sense response of

25    an honest physician to a patient's invitation to commit fraud.

1          But what was Dr. Lesniewski's response?

2          Dr. Lesniewski accepted the invitation to commit fraud

3     because he had been doing that for a long time.

4          How do you know that Lesniewski simply complied with

5     Supper's instructions?  Well, Dr. Barron told you how.  Dr.

6     Barron told you he saw in the records that suddenly, out of

7     nowhere, Lesniewski started documenting back and knee symptoms

8     around Thanksgiving.  You can see that in the chart that we

9     introduced of Dr. Barron's opinions related to Mr. Supper.

10         You know Thanksgiving is right after Dr. Lesniewski

11    got Supper's note.  You know that documenting symptoms like

12    that is just what Supper asked Lesniewski to do.

13         Suddenly Lesniewski wrote that Supper was suffering

14    from back pain and knee pain, and Supper had never complained

15    of back pain in over a year of visits, and he hadn't mentioned

16    any knee pain for months and months.

17         How else did Lesniewski follow Supper's instructions?

18         Well, just as Supper asked him to do, to make the

19    paper trail look even better, Lesniewski ordered back-to-back

20    MRIs that were completely unnecessary.  Let's see the dates

21    that the MRIs were done.

22         This is the MRI of the spine on the left, early

23    December 2006; the MRI of the knee on the right, it is hard for

24    me to see from here, but it's approximately the same date.

25         On top of that, just as Mr. Supper asked him to do,

D7vnles3                        Summation - Ms. Friedlander

1    Lesniewski invented these phony disabling conditions right on

2    time before December 10, just as Supper had asked.

3            Let's see his narrative.

4            This is Dr. Lesniewski's disability narrative for Gary

5    Supper, November 28, 2006, right on time, claiming that Supper

6    had disabling conditions in his back, in his knees, just as

7    Supper had asked him to do.

8            Can we show page 2 where the diagnoses are at the

9    bottom.

10           You can see diagnoses 3 and 4:

11           "Osteoarthropathy of the lumbar spine.

12           "Tear of the medial meniscus, left knee."

13           That is exactly what Supper told him to do.

14           For the sake of it, since Supper had asked him for a

15   third phony condition, if you remember the note, Lesniewski

16   threw in a fake diagnosis of bilateral basilar thumb joint

17   arthropathy.

18           He just threw that in.  You can see that from Dr.

19   Barron's chart which is in evidence.  No complaints for months

20   about any hand problem, any thumb problem.  It just appears out

21   of nowhere.

22           Supper's instructions are devastating proof of

23   Lesniewski's guilt.  It is not just what Lesniewski's patients

24   said to him.  Look what he said to them.

25           Remember Steven Gagliano, the guy on disability who

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7vnles3                     Summation - Ms. Friedlander

1    biked the 400-mile bike race.  Gagliano told you he started

2    seeing Lesniewski about a year before he retired.  He kept

3    coming back again and again, at Lesniewski's direction, in

4    order to create a paper trail.  But it was Lesniewski who

5    suddenly, out of the blue, offered up a disability narrative.

6          One day, after a year of pointless visits, Lesniewski

7    turned to Gagliano and said, You have enough.

8          Enough?  Enough for what?

9          What's he saying with those three words?

10         Lesniewski is saying, You have enough of a paper trail

11   to make it look like you're disabled.  That is the doctor

12   talking.  It is outrageous.

13         Lesniewski gave Gagliano the narrative and Gagliano

14   gave him $850 cash.  When Dr. Lesniewski said, You have enough,

15   Gagliano knew exactly what he was talking about, and you know

16   exactly what he was talking about.  Lesniewski was talking

17   about tricking the government into giving Gagliano disability

18   in exchange for cash.

19         How else do you know that Lesniewski knew exactly what

20   he was doing when he supported these bogus disability claims?

21   He made up diagnoses.  He made them up out of thin air.

22         Remember Dr. Baran told you how a legitimate physician

23   goes about diagnosing a patient.  He told you that:  First the

24   doctor listens to the patient's complaints; second, the doctor

25   does a physical exam of the body part that the patient is

D7vnles3                    Summation - Ms. Friedlander

1    complaining about; and, third, the doctor does any ancillary

2    tests, like MRIs or x-rays, that might be needed.

3          Dr. Barron told you that a legitimate physician

4    matches those three things, correlates them, patient's

5    complaints, the physical findings from the exam, and the tests.

6    That's how a doctor arrives at a diagnosis.

7          But Dr. Barron also told you based on his review

8    that's not at all what Dr. Lesniewski did.

9          Lesniewski corrupted every step of the process to

10   further his crime.  To begin with, you learned from Dr. Barron

11   that Lesniewski invented supposedly disabling conditions where

12   patients had never complained about any symptoms associated

13   with those conditions.

14         Remember how Lesniewski said that Chris Parlante had

15   carpal tunnel syndrome in his narrative, but had never said

16   that anywhere in his records or to Parlante?

17         Lesniewski wrote in his narrative that he had been

18   treating Parlante for over a year for carpal tunnel syndrome

19   that Lesniewski claimed was ongoing and permanent and disabled

20   Parlante from working at the Long Island Rail Road.

21         Can we just see the reference to carpal tunnel

22   syndrome in the narrative, because this is the only reference

23   to carpal tunnel syndrome that exists anywhere in Lesniewski's

24   records.

25         There it is, diagnosis 4.  Parlante told you that the

D7vnles3                      Summation - Ms. Friedlander

1    first time that he learned that Lesniewski had supposedly

2    diagnosed carpal tunnel syndrome was after his arrest in this

3    case.

4          He told you how shocked he was to see that Lesniewski

5    had written this.  Other than complaining of a little arthritis

6    in his hand, he had never complained about anything involving

7    his hands.  Parlante told you he knows what carpal tunnel

8    syndrome involves because his wife suffers from it and that

9    Lesniewski never said a word to him about carpal tunnel

10   syndrome or treatment for it.

11         What Mr. Parlante told you was corroborated by Dr.

12   Barron.  Dr. Barron told you that a main symptom of carpal

13   tunnel syndrome is numbness and tingling in the hands.  Dr.

14   Barron told you he didn't see a shred of evidence that Parlante

15   made any complaint consistent with carpal tunnel syndrome, that

16   Lesniewski never made a single finding or performed any

17   diagnostic test consistent with carpal tunnel syndrome, that

18   Lesniewski never treated any carpal tunnel syndrome.

19   Lesniewski just invented his carpal tunnel diagnosis on a

20   document submitted to the federal government because he thought

21   it would sound good.

22         And there's more.

23         As you know now from Dr. Barron, Lesniewski diagnosed

24   supposedly disabling cervical osteoarthritis in Joe Rutigliano

25   based on nothing but an obviously fake complaint of neck pain

D7vnles3                    Summation - Ms. Friedlander

1    made by Rutigliano.

2              Do you remember this one?

3              Rutigliano came in one day, made one complaint about

4    his neck hurting.  What did Dr. Lesniewski do?  That day he

5    made up a diagnosis, cervical osteoarthritis, and he gave him

6    the disability narrative.  He gave him the disability narrative

7    the very day that Rutigliano first complained of neck pain.

8              He gave him a disability narrative claiming that

9    Rutigliano's so-called cervical osteoarthritis was a permanent

10   basis for disability.  As you know from Dr. Barron, Lesniewski

11   didn't even examine him.  Lesniewski didn't order any tests.

12   He did nothing.

13             What makes this even more absurd, you heard from Dr.

14   Barron that Rutigliano's complaint was anatomically impossible.

15             Let's see this in Lesniewski's records.  This is

16   100-E.

17             You can just highlight -- that's great.

18             Do you see the date?  September 28, 1999.

19             Can we highlight the complaint about the cervical

20   spine.

21             "Patient woke up with pain in neck for about one week

22   now.  It radiates down to his lower back."

23             Dr. Barron told you that that is an anatomically

24   impossible complaint because the nerves in the neck are not

25   connected to the nerves in the lower back.  You cannot have

1   pain that radiates from your neck to your lower back.

2              What does that fake complaint tell you besides that

3   Lesniewski's diagnosis is totally bogus.  It tells you

4   Rutigliano was lying and that Dr. Lesniewski, an orthopedic

5   surgeon, knew that Rutigliano was lying.

6              But Lesniewski didn't care.  He cooked up a phony

7   disability based on the complaint because that's what he was

8   paid to do.

9              We have discussed how Lesniewski diagnosed conditions

10  where the patients' complaints didn't match them.  Now let's

11  talk about how he corrupted the process of making physical

12  findings in an exam in order to commit this crime.

13             Dr. Barron told you that making physical findings in

14  an exam is the most important step that a legitimate doctor

15  takes in diagnosing a patient.

16             But Lesniewski didn't do what legitimate doctors do.

17             As Dr. Barron told you, Lesniewski didn't examine his

18  patients to make the necessary findings, and sometimes the few

19  findings he bothered to make flew in the face of the diagnoses

20  he was making.

21             We have already talked about Rutigliano's bogus neck

22  condition.  Do you remember Lesniewski's finding that Gagliano

23  had full range of motion in his wrist?  Dr. Barron told you

24  that proves Gagliano had no meaningful tear in his wrist as

25  Lesniewski claimed.

 1          Dr. Barron also told you that Lesniewski's sole

 2     findings related to Christopher Parlante's hands, a finding

 3     that Parlante had no numbness or tingling, flies in the face of

 4     Lesniewski's claim that he believed Parlante had disabling

 5     carpal tunnel syndrome.

 6          On top of that, Dr. Barron also told you how

 7     Lesniewski corrupted the final step doctors take in the process

 8     of diagnosing patients, getting ancillary tests like MRIs and

 9     x-rays.

10          Dr. Barron told you how Lesniewski completely misused

11     the tools of the medical profession to support his phony

12     diagnoses.  He told you that Lesniewski' tests showed totally

13     normal age-related changes that most middle aged people have;

14     changes like disc bulges, disk herniations, small meniscal

15     tears and bone spurs.

16          Dr. Barron told you that these are typical changes

17     that occur in the body as we age and that for most people those

18     changes will never cause any pain or symptoms.

19          Dr. Barron explained those middle-aged people like all

20     of Lesniewski's Long Island Rail Road patients in this case

21     will have those findings, these age-related changes.  They will

22     have them show up in their MRIs, but those findings will be

23     meaningless.  But Lesniewski twisted that fact to his advantage

24     in this fraud.

25          Dr. Barron explained to you how Lesniewski misused the

D7vnles3                    Summation - Ms. Friedlander

 1  findings from his MRIs and x-rays, grossly overstating them to

 2  make it sound like they were the cause of permanent disabling

 3  conditions when that was completely false.

 4          Dr. Barron told you, as an orthopedic surgeon looking

 5  at Gagliano's MRI report, that not only did the findings fail

 6  to suggest a disabling back problem, as Lesniewski claimed.

 7  They were better than average findings.

 8          Of course, Lesniewski knew that.  He knew Gagliano's

 9  MRI report showed normal age-related changes that weren't

10  causing Gagliano any symptoms.

11          But instead he pretended that those findings were

12  evidence of a disabling back problem because he was getting

13  paid to lie.

14          How else did Lesniewski misuse the tools of the

15  medical profession for his fraud?

16          Well, as Dr. Barron told you, not only did Lesniewski

17  overstate the findings in MRIs and other tests, but he

18  sometimes claimed people had disabling conditions when the

19  tests showed they didn't have any problems at all.

20          Dr. Barron told you, for example, that the report of

21  Rutigliano's knee MRI shows plainly that Rutigliano had no

22  arthritis in his knee whatsoever.  But Lesniewski provided a

23  disability narrative claiming that Rutigliano suffered ongoing

24  and permanent knee arthritis.

25          What is yet another way that you can tell Lesniewski

D7vnles3                    Summation - Ms. Friedlander

1    knew exactly what he was doing when he supported these phony

2    disability claims?

3            He didn't provide any treatment to these people.

4    Dr. Barron told you that even if all these patients had all of

5    these conditions, which they didn't, they are common and easily

6    treatable conditions.  He told you they are treatable with

7    injections, for example, and that he gives dozens of those

8    every week to patients who feel better immediately.

9            Dr. Barron said if injections didn't work for some

10   reason, although they usually do, most of the conditions are

11   curable with a short outpatient procedure, not major surgeries,

12   but procedures under local anesthetic where the patients walks

13   in and out of the office.

14           Is that what Lesniewski did to treat the LIRR

15   patients?  Nope, because he wasn't getting paid to treat them.

16   He was getting paid to make them look disabled on paper.

17           You heard about Lesniewski's lack of treatment from

18   witness after witness, including Parlante, Ellensohn, Gagliano

19   and Supper.

20           Lesniewski directed these witnesses to keep coming

21   back for visits every couple months for over a year.  And what

22   was the entire extent of the treatment that this physician,

23   this orthopedic surgeon gave them?  For the most part nothing

24   but anti-inflammatories, medication like Advil, Vioxx,

25   Celebrex.  Gus Baran, Parlante, Gagliano and Ellensohn got

D7vnles3                    Summation - Ms. Friedlander

1   nothing but anti-inflammatories from Dr. Lesniewski for over a

2   year of visits for conditions that they and Lesniewski claimed

3   to paper were completely disabling to them.

4           Rutigliano and Supper got hardly more than that, and

5   Rutigliano didn't get any treatment at all for his supposedly

6   disabling neck condition.  That is ridiculous.  And it shows

7   you what a fraud Lesniewski and his patients were committing

8   together.

9           Why?

10          Well, it shows you first that any pain these people

11  actually had was minor.  They came back and forth to

12  Dr. Lesniewski for over a year with generally nothing but

13  anti-inflammatories, and they didn't ask for anything more,

14  because they didn't need anything more.

15          It also shows you that Lesniewski didn't think there

16  was anything seriously wrong with them, even though he wrote

17  that after seeing them for over a year he concluded that they

18  had disabling conditions.

19          Lesniewski's lack of treatment is another powerful

20  reason that you know Lesniewski knew his job wasn't to try to

21  make people feel better, but just to create the false

22  appearance that they were disabled.

23          The defense wants you to think that because Lesniewski

24  asked some Long Island Rail Road workers if they wanted surgery

25  for some condition or another that somehow that means

D7vnles3                    Summation - Ms. Friedlander

1    Lesniewski was really trying to treat them.  That is ludicrous,

2    as the LIRR witnesses explained, as Dr. Barron explained, and

3    as your common sense tells you.

4              Lesniewski knew and they knew these little mentions of

5    surgery were a joke for many reasons:

6              First, there was very little wrong with them.

7              Second, they wanted him to say they were disabled, not

8    cured.  They didn't want surgery.  He knew that.

9              And, third, they weren't asking him for any treatment

10   at all, much less surgery.

11             So, of course, they said no in these little

12   conversations for all those reasons, as he knew they would.

13             So why have the discussion?  Because Lesniewski's not

14   stupid.  He knows he's not providing them any treatment.  He

15   knows anti-inflammatories are a complete joke for a year's

16   worth of treatment by an orthopedic surgeon.  This is just part

17   of his charade to make it look like the conditions are serious

18   and require surgery and that there's nothing else he can do.

19             Dr. Barron as a legitimate orthopedic surgeon, told

20   you that these surgery notes, "make no sense to me whatsoever"

21   because there are many forms of easy treatment that fix these

22   problems completely when people really have these problems.

23             But Lesniewski didn't offer those kind of treatments.

24   Instead, Lesniewski simply made a quick comment about surgery

25   or wrote that surgery was inevitable.

D7vnles3                    Summation - Ms. Friedlander

1              Dr. Barron said those notes were remarkable to him.

2      He said they made no sense to him, because he is an honest

3      doctor.  The notes make perfect sense if you see that

4      Lesniewski wasn't trying to treat anyone and was only trying to

5      create a paper trail of lies for cash.

6              If you want a great example of how Lesniewski knew

7      fully well that he was giving no meaningful treatment to these

8      people and that his notes about surgery are a complete joke,

9      look no further than what Robert Ellensohn told you.

10             As you will recall, while Ellensohn was seeing

11     Lesniewski to create a paper trail for disability, Lesniewski

12     gave him no treatment other than anti-inflammatories for his

13     supposedly serious shoulder condition, nothing else at any time

14     in all the visits.

15             To make it look like the condition was as serious as

16     he claimed on paper, Lesniewski wrote that Ellensohn needed

17     surgery.  But after getting disability, years later Ellensohn

18     actually got real pain in his shoulder, and he went to

19     Lesniewski.

20             What did he tell you Lesniewski did then?

21             What did Lesniewski do when he knew that Ellensohn

22     wasn't coming to him just to create a paper trail for

23     disability?

24             Did Lesniewski give him anti-inflammatories and tell

25     him to keep coming back every two months for a year?  No.

D7vnles3                    Summation - Ms. Friedlander

1           Did he write in his notes, Oh, there's nothing we can

2      do, surgery is inevitable, just like he did when they were

3      doing this disability scam together?

4           Nope.

5           This time, after Ellensohn was on disability, when

6      Ellensohn complained about his shoulder, Lesniewski gave him an

7      injection.

8           Ellensohn was cured as he told you.  He was cured.  He

9      didn't go back and Lesniewski didn't ask him to.  That shows

10     you show clearly that Lesniewski knows what real treatment is.

11     He knows when it's necessary to give it, and he is perfectly

12     capable of treating these minor conditions when he's not

13     getting paid to lie.

14          We talked about the fact that Lesniewski and his LIRR

15     patients made clear that Lesniewski's job was just to get them

16     disability.

17          We have talked about the fact that Lesniewski made up

18     phony diagnoses again and again and how he misused the tools of

19     his profession to do that.

20          We've talked about the fact that Lesniewski provided

21     no meaningful treatment to these LIRR employees and that they

22     didn't ask for any.

23          How else do you know that Lesniewski knew exactly what

24     he was doing when he supported these bogus disability

25     applications?  He confessed.

D7vnles3                    Summation - Ms. Friedlander

1              Lesniewski admitted to agents that he exaggerated the

2      LIRR employees' medical conditions on disability forms

3      submitted to the federal government.

4              That is another way of saying that Lesniewski admitted

5      to lying to get these people disability benefits.

6              MR. DURKIN:  Objection.

7              THE COURT:  Overruled.

8              MS. FRIEDLANDER:  Lesniewski admitted that he was

9      exaggerating when he said these people could not do heavy

10     lifting, could not bend, could not kneel, could not stand,

11     could not walk, could not sit.  He admitted he did that on all

12     the forms.

13             On top of that, Lesniewski admitted that he knew the

14     LIRR patients were lying, too.

15             In his words, the LIRR employees had "too much

16     secondary gain not to exaggerate their symptoms."

17             Remember Dr. Barron talked to you about secondary

18     gain.  Secondary gain is when a patient stands to gain

19     something or profit in some way from a doctor's diagnosis, such

20     as by getting money like disability benefits.

21             Lesniewski admitted he knew that these LIRR patients

22     were exaggerating their symptoms because they wanted disability

23     benefits.  On top of that, he admitted that he further

24     exaggerated their symptoms in the documents he submitted to the

25     government.

1          Lesniewski also admitted that he bolstered these

2    applications with MRI reports where he had made minimal

3    findings that would suggest anything was wrong with these

4    people.

5          Again, that is exactly what Dr. Barron told you that

6    he observed in the records.  Dr. Barron said in his opinion,

7    Lesniewski frequently based his diagnoses on MRIs that he

8    claimed showed serious problems when in fact the findings were

9    completely normal.

10         Why did Lesniewski do it?  Why did he lie?

11         Lesniewski admitted that he lied because he knew the

12   LIRR employees were seeing him to get disability.  He admitted

13   he was getting paid $850 to $1,000 per disability narrative

14   that he provided.

15         We will talk more later about the specific crimes that

16   Dr. Lesniewski is charged with, basically fraud and conspiracy

17   to commit fraud, but Lesniewski's confession amounts to an

18   admission --

19         MR. DURKIN:  Objection.

20         MS. FRIEDLANDER:  -- an admission of guilt of the

21   crimes that he is charged with.

22         MR. DURKIN:  Objection.  It's not a confession.

23         THE COURT:  Sustained.

24         MS. FRIEDLANDER:  It comes on top of the mountain of

25   other evidence of his guilt that we have already talked about.

1          You heard a suggestion from Mr. Dratel in his opening

2     statement that Lesniewski didn't earn a lot of money from doing

3     this.  Ladies and gentlemen, that's why you rely on the

4     evidence and not the statements of lawyers.

5          Lesniewski admitted to making $850 to $1,000 for each

6     narrative he provided.  On top of that, you heard evidence that

7     Lesniewski made an additional $286,000 through insurance

8     payments for visits by LIRR employees from 2003 to 2008 alone.

9     That is just a piece of the time he was committing this fraud.

10    In what universe is that not a lot of money?

11         You know it was a lot of money to Dr. Lesniewski

12    because you have his tax returns which show his income every

13    year.

14         Let me use 2005 as an example.  I think it's 24.

15         This is a chart showing the insurance reimbursements

16    to Dr. Lesniewski for LIRR patients just for the years 2003 to

17    2008.

18         As you can see here, based on the United Healthcare

19    records, in 2005 Lesniewski made just over $50,000 by charging

20    United Healthcare for visits by Long Island Rail Road

21    employees.

22         That is just the insurance payments.  On top of the

23    $50,000, he was making thousands and thousands and thousands of

24    dollars in cash for disability narratives.

25         How much money is that to Lesniewski?  Well you saw

D7vnles3                    Summation - Ms. Friedlander

1    his 2005 personal income tax return.  It showed that his total

2    income that year was $166,000.  I won't put it up on the

3    screen, but it's Government Exhibit 1501.

4           Ladies and gentlemen, that means in 2005 alone a huge

5    amount of Lesniewski's income came from this fraud.  The

6    defense may try to make some ridiculous argument about the

7    volume of Lesniewski's business to try to distract you from the

8    point that Lesniewski made a lot of money from this fraud and

9    that he got a large amount of his income every year from this

10   fraud.

11          They showed you just before I began speaking a chart

12   of the gross receipts of Lesniewski's business so that you

13   couldn't focus on Lesniewski's actual income.

14          MR. DURKIN:  Objection.

15          THE COURT:  Sustained.

16          MS. FRIEDLANDER:  Please look at Lesniewski's business

17   tax returns as well, because what you will see is that

18   Lesniewski could barely turn a profit in any year.  In some

19   years his business was losing money.

20          It is yet another way of showing how important this

21   money was to Lesniewski and what a tremendous motive it gave

22   him to commit fraud.

23          Ladies and gentlemen, you have the testimony of four

24   separate Long Island Rail Road employees that Lesniewski was

25   paid to create a phony paper trail for disability and that his

D7vnles3                    Summation - Ms. Friedlander

1    documents are filled with lies.

2              You have Lesniewski's records corroborating what they

3    told you, records showing a bunch of pointless visits and no

4    meaningful treatment.  You have the testimony of an expert that

5    Lesniewski didn't diagnose these people the way honest doctors

6    do, that he made no real effort to treat these people.

7              You also have evidence of Lesniewski's powerful

8    motive, his huge profit, and you have all of the admissions

9    that he made.

10             The evidence is overwhelming that Lesniewski knew this

11   was a fraud, he helped people commit it because he was making

12   money a lot of money that way.

13             Now let's go to Marie Baran and Joseph Rutigliano, the

14   disability consultants, who according to counsel had been

15   running perfectly legitimate businesses.

16             First of all, before getting into all the evidence of

17   their fraud, the very idea that you need to hire someone to

18   fill out a form that asks basic questions about your own life

19   is absurd.  It should set off alarm bells in your head.

20             In what legitimate world would you pay a thousand

21   dollars cash to a stranger to fill out a form that asks basic

22   questions about your own life, questions like whether you can

23   sit, stand, dress yourself or bathe yourself?

24             Of course, you don't need to rely on guesswork in this

25   case because the proof is overwhelming that Baran and

D7vnles3                       Summation - Ms. Friedlander

1    Rutigliano knew exactly what they were getting paid for and

2    what they had to do to get so much money.

3           Baran and Rutigliano knew they had to fill the

4    employees' disability applications with lies, the sort of lies

5    that would trick the RRB into thinking that the employees were

6    disabled when they were not.

7           Let's look at Marie Baran first.

8           Marie Baran knew all about the RRB because she worked

9    there for many years.

10          She knew the disability process, and she knew what

11   lies worked to help get people disability benefits.

12          Besides the fact that she worked there for so long,

13   how else did she know what lies would work?

14          Because she looked at her husband.  She saw how he was

15   able to swindle the government by faking a disability.

16          As you know Gus Baran worked for the Long Island Rail

17   Road until 2003.  Like everyone else, Gus Baran started seeing

18   one of the three disability doctors over a year before he

19   wanted to retire.

20          As you know, Gus Baran saw Lesniewski for a series of

21   pointless visits in which Lesniewski gave him no treatment at

22   any time except anti-inflammatories and no treatment ever for

23   the foot problem that he claimed to have.

24          Of course, all the time Gus Baran was seeing

25   Lesniewski while getting no treatment, Gus Baran was working,

D7vnles3                     Summation - Ms. Friedlander

1     and not just working full-time, but working overtime like so

2     many people you heard from who participated in this fraud.  You

3     saw Gus Baran's overtime records in the case.  They are in

4     evidence.  He worked over 1300 hours of overtime in his last

5     year leading up to the time he suddenly claimed to be disabled.

6         Marie Baran on the stand tried to suggest Gus Baran is

7     really disabled because he didn't volunteer for all of the 1300

8     hours of overtime that he worked.  He only volunteered for part

9     of the 1300 extra hours.  It was ridiculous testimony.

10        Gus Baran was not struggling to do his job.  He was

11     doing his job and then some.

12        Gus Baran and Lesniewski filled Baran's disability

13     application materials with lies.  Lesniewski said Gus Baran was

14     medically restricted from sitting, bending, or driving because

15     of his supposedly disabling spinal stenosis.

16        Dr. Barron showed you that in the records that

17     Lesniewski completed for the RRB.  I won't put them up, but

18     it's Government Exhibit 113-B.  Gus Baran told the same lies in

19     his disability application claiming that his back problem, his

20     disabling spinal stenosis made it hard for him to sit or drive.

21        Can we see his application.

22        There is his name, Ostap Baran, he goes by Gus.  Can

23     we see section 6.

24        Mr. Baran says it's hard for him to sit, it's hard for

25     him to drive.  He says he's completely incapable of performing

D7vnles3                    Summation - Ms. Friedlander

1    any outdoor chores at all.

2            How do you know these are lies?  Well, Dr. Barron told

3    you that many people with spinal stenosis have no symptoms, but

4    when they do have symptoms the one thing that makes them feel

5    better is sitting down.  They feel better when they sit or

6    bend.

7            Gus Baran and Dr. Lesniewski lied when they said

8    Baran's spinal stenosis made it hard for him to sit or bend,

9    and Marie Baran repeated that same lie on the stand.

10           Of course, Gus Baran didn't get just occupational

11   disability with these lies.  He was declared totally and

12   permanently disabled.

13           As a result, he not only got a disability pension he

14   didn't deserve.  He got early Medicare, all of it paid for by

15   Social Security and the U.S. Railroad Retirement Board.

16           Remember how Mr. Jackson said to you in opening this

17   is a case about occupational disability.  This isn't a case

18   about total and permanent disability.  Remember how he said

19   total and permanent disability, that's for people who use canes

20   that's for people in wheelchairs.

21           MR. JACKSON:  Judge, I am going to object.  I think

22   she mischaracterized what I said.

23           THE COURT:  Sustained.

24           MR. JACKSON:  Thank you.

25           MS. FRIEDLANDER:  Ladies and gentlemen, as you now

1    know, this is case about permanent disability, because Gus

2    Baran and Joe Rutigliano are both on total and permanent

3    disability.

4             Are they in wheelchairs?  No.

5             So what does Gus Baran do?  How have the Barans been

6    spending the government's money that is meant to be a safety

7    net for seriously sick and injured people?

8             (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7VLLES4                    Summation - Ms. Friedlander

1            MS. FRIEDLANDER:  First, they have been using Gus

2      Baran's total and permanent disability benefits to fund

3      expensive vacations together all over the world, traveling

4      around Europe, the Middle East, and the Caribbean, all on

5      government's dime.

6            Gus Baran said it was hard for him to sit, stand, walk

7      or bend, but since getting total and permanent disability, the

8      Barans have traveled to Italy, Egypt, Spain, Germany, Western

9      Canada, Ireland, Scotland, Mexico, and the Dominican Republic,

10     again and again to the Dominican Republic, all funded by a fat

11     disability pension that the government was defrauded into

12     paying.  The Barans have been wintering in Florida and

13     summering in New York.

14            MR. DURKIN:  Your Honor, excuse me, but we'll have a

15     motion later on.

16            MS. FRIEDLANDER:  So Gus Baran can enjoy 18-hole golf

17     year-round, all while he claims to be totally and permanently

18     disabled.

19            Mr. Jackson suggested to the government's expert,

20     Dr. Barron, who you know is not related to Marie and Gus

21     Baran -- they spell their names differently -- Mr. Jackson

22     suggested, well, Gus Baran may be able to sit in a golf cart,

23     but he couldn't just sit in a golf cart while doing his job.

24     So what?

25            MR. JACKSON:  Judge, can we make about this about the

1    facts of the case as opposed to what defense lawyers suggest?

2              THE COURT:  Overruled.  Overruled.

3              MR. JACKSON:  OK.  I'll make some suggestions later.

4              THE COURT:  Proceed.

5              MS. FRIEDLANDER:  Gus Baran claimed in his disability

6    application that it was hard for him to sit, period.  So if

7    it's easy for him to sit in a golf cart, he lied on his

8    disability application.

9              Mr. Jackson also said to Dr. Barron, well, did you

10   ever consider that maybe people get better?  But that's equally

11   absurd because the Barans have never told the RRB that Gus

12   Baran got better.  You know that Gus Baran signed his

13   disability application which says you have to immediately

14   notify the government if your condition improves and, of

15   course, Marie Baran knows that because she's a disability

16   expert.  They've never said Gus Baran got better.

17             Marie Baran said on the stand yesterday that he's

18   totally and permanently disabled, and as you now know, Gus

19   Baran is collecting total and permanent disability benefits to

20   this day.

21             They say that a picture is worth a thousand words.  So

22   rather than me describing what Gus Baran has been up to since

23   he became supposedly totally and permanently disabled, let's

24   see it.  As you know, Gus Baran was caught on videotape

25   enjoying multiple days of 18-hole golf this spring, all while

1   collecting total and permanent disability benefits.

2            And before we play the video, just remember that to

3   get disability, Gus Baran claimed that it was impossible for

4   him to do any outdoor chores and hard for him to sit, stand,

5   walk, drive, and bend to tie his shoes because of his

6   supposedly disabling spinal stenosis.  Now let's watch the

7   video where you will see him easily do all those things.

8            (Video recording played)

9            MS. FRIEDLANDER:  Here he is beside his car because

10  despite claiming that it's hard for him to drive, Gus Baran

11  drove himself to the golf course.  There he is bending easy to

12  tie his shoes.

13           MR. JACKSON:  Judge, can we blow it up so it's full

14  screen?

15           MS. FRIEDLANDER:  Can most people bend this easily?

16           THE COURT:  Is it possible to blow up?

17           MS. FRIEDLANDER:  I think that's the best we can do,

18  Judge.

19           Can we see the next clip.  In the next clip you will

20  see him easily standing, twisting, stretching, taking practice

21  swings, just swinging his golf club pointlessly around.

22           (Video recording played)

23           MS. FRIEDLANDER:  That's not hard for him.  He's not

24  suffering through that as Ms. Baran claimed so ridiculously on

25  the stand.

1          Of course, the fact that Gus Baran's application is

2     filled with lies about his back condition is shown not just

3     through the video, but through the testimony of Dr. Barron, who

4     told you that if Gus Baran can play golf, he does not have

5     significant spinal stenosis.

6          Ladies and gentlemen, those videos of Gus Baran show

7     an average, middle-aged man with no serious physical problems

8     enjoying a sunny day on the golf course.  It would all look

9     completely normal if you didn't know that when he parked his

10    car, Gus Baran parked in a handicapped spot, as Special Agent

11    Tumulty told you, because Baran has a handicap parking permit.

12    It would all look normal if you didn't know that Gus Baran was

13    at the golf course in the middle of the week, as you heard,

14    because Gus Baran doesn't have to work for a living because his

15    life of leisure is funded by his scam on the government.

16          In sum, ladies and gentlemen, and as Marie Baran, his

17    wife, has obviously always known, Gus Baran is not totally and

18    permanently disabled.  He's just another Long Island Railroad

19    employee involved in this fraud.

20          What does Gus Baran's fraud mean as far as Marie Baran

21    is concerned?  It means that she knew before she ever started

22    this disability consulting business that this was all a fraud.

23    Her own husband had been on total and permanent disability

24    since years before she started her business.  She knows he's

25    not totally and permanently disabled.  She knows what a fraud

1    this is.  And after living off her husband's fraud for years,

2    Marie Baran decided to go into the fraud business full-time,

3    helping other Long Island Railroad employees commit the same

4    fraud her husband committed.

5         Marie Baran created disability applications filled

6    with lies in exchange for cash.  How do you know Marie Baran

7    was lying?  Well, to begin with, you've heard from multiple

8    witnesses, multiple people who told you they paid her cash to

9    complete their applications and who told you that she

10   completely lied.

11        Regina Walsh, Michael Stavola, and Robert Dunaj all

12   told you that they met with Baran, they told her when they

13   wanted to retire, they told her basically nothing about their

14   physical condition, and she never asked about it.  And then she

15   filled their applications with sad stories about how they were

16   too disabled to carry out most of the normal activities of

17   daily living:  sitting, standing, dressing themselves, bathing

18   themselves.  Marie Baran didn't get those lies from the

19   applicants.  She made them up herself.

20        Let's talk about what the witnesses told you.  First,

21   Michael Stavola, a patient of Dr. Parisi, one of the three

22   disability doctors involved in this scheme, who offered Stavola

23   a disability narrative as soon as Stavola said he was retiring.

24   What did Stavola tell you?  He told you he went to Marie Baran

25   so she could complete his disability application and she agreed

D7VLLES4                    Summation - Ms. Friedlander

1    to do that.  She said she knew Parisi.  Stavola didn't tell her

2    anything about his physical condition.  He said, at most, he

3    may have said the doctor found a herniated disk, but's not even

4    sure he said that.  And that's it.

5         Stavola got a bogus narrative for an $800 payment to

6    that corrupt Dr. Parisi, and that same day Stavola picked up

7    his completed disability application from Marie Baran in

8    exchange for $1,000 cash.  You can see in his calendar how he

9    got the whole fraud package just in one day.  There it is.  You

10   can see he scheduled visits to Parisi and Marie Baran

11   back-to-back to get his fraud materials.

12        Baran never asked Stavola anything about his physical

13   condition before completing that application.  She never asked

14   him anything about his typical day.  She never asked him

15   whether he could do his job.  Why?  Because Baran didn't care.

16   She wasn't trying to be truthful.  She knew what she was going

17   to put in his disability application before she even met him

18   because it's the same garbage that she put in all these

19   applications.

20        Let's take a look at his application.  Michael

21   Stavola -- can we go to Section 6.  Here you go -- nearly

22   identical to so many other Marie Baran applications that you

23   have seen in this trial.  Sitting, standing, walking, bathing,

24   dressing, performing other bodily needs, indoor chores,

25   driving, using public transaction -- all supposedly hard for

1    Michael Stavola.

2            Can we see question 40.  Again, you have seen this so

3    many times in so many applications, you probably know it by

4    heart.  I sleep very poorly because of neck pain and lower back

5    pain.  I get up about 7 a.m.  I have breakfast, shower, and

6    dress.  I do some light exercise to stretch as prescribed by my

7    doctor.  It goes on and on.  You've seen this before.

8    Mr. Stavola told you these were all lies.  He didn't say these

9    things to Ms. Baran.  Of course, he wanted her to lie.  He

10   wanted her to say whatever she needed to say to get him

11   disability.

12           He told you that he paid Baran $1,000 cash to complete

13   the application, and he wasn't paying her to tell the truth.

14   He could tell the truth himself.  You know how long it would

15   have taken Michael Stavola to complete that truthfully?  It

16   wouldn't take him a minute to check the boxes saying that

17   sitting and standing and bathing himself and doing all those

18   other things listed there were easy for him to do.

19           And it didn't take him a minute to describe to you on

20   the witness stand how he really spent an average day.  He told

21   you that while he was retired, before the government cut off

22   his disability benefits and he had to get a job, Stavola told

23   you he played golf several days a week, including with Baran's

24   husband while both of them were on disability.  He told you he

25   spent other days riding a bike outside or at the gym.  Telling

D7VLLES4                    Summation - Ms. Friedlander

1    the truth wouldn't get him disability, so he paid Marie Baran a

2    thousand dollars to say whatever needed to be said to get it

3    for him.  She got paid a huge amount of cash to fill the simple

4    application with lies.

5              How do you know that Michael Stavola is telling you

6    the truth when he says he never told Marie Baran any of the

7    nonsense in that application about his physical condition or

8    his average day and that Baran made it all up?  Because you've

9    seen in this trial that his application was essentially a

10   duplicate of so many others, that she created just cookie

11   cutter bogus descriptions of a sad, physically limited life.

12             Let's take a look at Government Exhibit 17, which was

13   introduced during the testimony of the auditor Natasha Marx.

14   This is a compilation of the answers to question 40 on the

15   disability application -- please describe your normal day.

16   It's a compilation of the responses to that question taken from

17   applications of some of Baran's clients.

18             Just take a moment and compare Phillip Pulsonetti's

19   description of an average day in an application submitted on

20   June 23, 2008, compare that to the description of Michael

21   Stavola's average day submitted four days later.  They are

22   identical.  This list, Government Exhibit 17, goes on and on

23   and on.  Every few days you will see Baran is submitting

24   identical descriptions for client after client after client.

25             She's doing this, of course, because these are the

D7VLLES4                    Summation - Ms. Friedlander

1    lies that work.  It's her tried and true method of fraud.  Do

2    you think for a second that all of these people walked into

3    Marie Baran's office over time and described their normal day

4    and they just coincidentally all happened to live identical

5    days?  Of course not.

6           Of course, it's not just Michael Stavola who you heard

7    from.  You also heard from Robert Dunaj who told you, just as

8    Stavola did, that Baran didn't ask him all these questions

9    about his physical condition, didn't ask him if he could do his

10   job, didn't ask him about his average day, and he never told

11   her any of the things in his application.

12          On top of that, you heard from Regina Walsh, who

13   provided perhaps the most devastating evidence of Baran's fraud

14   that was presented in this entire trial.  And before we discuss

15   her testimony, let me remind you of Regina Walsh's status in

16   this case.

17          As Walsh told you, she committed this fraud and she

18   has pleaded guilty and she has paid back to the government

19   every cent of the $56,000 that she got in fraudulent disability

20   benefits.  She is not a cooperating witness.  Regina Walsh had

21   no obligation to testify in this trial.  She has no agreement

22   with the government for the government to provide a letter to

23   the judge talking about her cooperation in this case.

24          You'll remember I asked her on the stand:  Why are you

25   testifying today?  And she said, quote, because I lied and I

1   know I lied and I'm trying make a right out of something I did

2   wrong.  That's page 823 of the transcript.  It is important to

3   remember that as we talk about Walsh's testimony.  Ms. Walsh

4   got up on the stand and subjected herself to cross-examination,

5   and she did it because she's trying to make a right out of a

6   wrong.

7         So let's talk about her testimony.  Ms. Walsh told you

8   that she was the director of employee services at the Long

9   Island Railroad.  She worked in an office.  She did not work on

10  train tracks.  When Walsh got ready to retire, she started

11  seeing Dr. Ajemian, one of the three corrupt doctors involved

12  in this scheme.  But she wasn't sure if she was really going to

13  go through with applying for disability because she knew it was

14  wrong.

15        One day, Walsh called Marie Baran, who was still

16  working at the RRB at the time, to ask her a question about her

17  federal retirement benefits.  And what did Baran say?  First

18  Baran answered her question and then, out of the blue,

19  unprompted, Baran said, oh, you going to file for disability?

20  Are you seeing Dr. Ajemian?

21        Baran's questions show you that she knew everyone at

22  the Long Island Railroad was applying for disability, that they

23  were planning their disabilities, and that they were seeing

24  corrupt doctors for a series of visits to paper a file.

25        There is no legitimate reason why Marie Baran on her

1    own would just assume that Walsh had become disabled and would

2    apply for disability.  Walsh wasn't doing manual labor.  She

3    wasn't wearing steel-tipped shoes, as Baran suggested that all

4    of these employees did.  She worked in an office.

5            Of course, Dr. Ajemian did just what Baran did because

6    they are both totally corrupt.  And when Walsh told him she was

7    retiring, he simply offered up a disability narrative out of

8    the blue, even though she never even discussed disability with

9    him before and never suggested she had any trouble doing her

10   job.  Like Baran, Ajemian knew that people were retiring from

11   the Long Island Railroad just wanted disability and he charged

12   them accordingly.

13           Walsh paid him nearly $2,000 cash for the narrative,

14   which she told you is filled with lies from Dr. Ajemian, and

15   then she went to Marie Baran's office for the application.  And

16   what happened during that meeting?  Walsh told you she

17   described her job to Marie Baran and then Baran, in front of

18   her eyes, typed an exaggerated description of that job into her

19   disability application.

20           Here it is, the disability application that Baran

21   created.  Can we turn to Section 3, question 12.  It says

22   sitting at a desk and using a computer caused consider -- I

23   think it needs to say considerable -- pain in neck, shoulder

24   and hands.  Sitting or standing for any length of time caused

25   considerable pain in both legs.

1          It goes on to talk about how Walsh supposedly had to

2     walk long distances from facility to facility and how sitting

3     in -- she frequently had to drive and sitting in an automobile

4     for any length of time caused her great discomfort.  Ms. Walsh

5     told you these are all lies, this is Marie Baran's language,

6     this is the exaggerated language that Regina Walsh watched

7     Marie Baran type into this application.

8          We can take a quick look at Section 6, please.  Of

9     course, Section 6, you know what this is going to say before I

10    even say it to you.  Everything is hard.  Everything causes

11    pain.  Walsh told you that Marie Baran filled this section with

12    lies.

13         Walsh told you that all she ever said to Marie Baran

14    about her physical condition was that she had a little bit of

15    pain when she sat for a long period of time.  That's page 853

16    of the transcript.  That is it.  Walsh told you all of these

17    answers are completely false and she never discussed any of

18    this with Marie Baran and that Marie Baran just made it up.

19         Baran didn't stop there.  From all her RRB experience,

20    Baran knew that Walsh would have trouble getting disability.

21    So what did she instruct Walsh to do?  Keep seeing Dr. Ajemian.

22    Marie Baran, essentially a stranger, instructed Walsh to keep

23    visiting a physician.  She told Walsh to continue seeing

24    Ajemian because if the RRB denied disability, Walsh could

25    appeal the decision and it would help her get disability on

1    appeal if she had a record of continuing visits to a physician.

2              Ladies and gentlemen, that is a stunning demonstration

3    of Baran's knowledge that she was involved in a huge fraud.

4    Baran instructed Walsh to keep up the paper trail to try to

5    trick the RRB. And Walsh told you she did exactly what Baran

6    told her to do and kept seeing Ajemian even after she submitted

7    the application.

8              Still, Baran's fraud with Regina Walsh didn't stop.

9    You heard that Walsh didn't get disability right away.  Baran

10   said she'd find out why and then see used her pull at the RRB

11   to find out behind the scenes that the RRB had questions about

12   what Walsh was doing in her day-to-day job and that the RRB was

13   planning to call Walsh to ask those questions.

14             Ms. Walsh told you Ms. Baran called her and said the

15   RRB is going to call you with questions and here are the exact

16   questions they are going to ask you and here are the exact

17   answers that you are going to give.

18             Walsh told you that she wrote down everything Baran

19   was saying as best she could.  Why?  Because what Baran was

20   saying about Regina Walsh's day-to-day job was a complete lie,

21   and because it was a lie, Walsh didn't think she'd remember it.

22   Not only did Baran lie for Walsh on the disability application,

23   she was instructing Walsh to lie personally on the phone with

24   the federal agency.

25             And Walsh told you, sure enough, the RRB called and

D7VLLES4                    Summation - Ms. Friedlander

1    asked the exact questions that Baran said they were going to

2    ask, and Walsh told the exact lies that Baran told her to tell

3    and then she got her disability benefits.

4           What Walsh told you is corroborated by the emails that

5    we've shown you from her RRB file, the documents which show

6    that out of the blue, Kathy Quinn, who used to work for Baran

7    at the Westbury office, started inquiring into the status of

8    Walsh's application.  The documents show you the RRB told her

9    they had questions for Walsh.  The documents show the RRB

10   subsequently called Walsh and got detailed answers to those

11   questions.  Those are Government Exhibits 108E and F.

12          The defense spent a lot of time at this trial trying

13   to argue that Marie Baran never used her influence at the RRB

14   to get people disability benefits that they weren't entitled

15   to.  First, that argument is totally besides the point since it

16   has nothing to do with whether Baran helped people lie on their

17   disability applications.  But leaving that aside, Baran clearly

18   did use her influence for exactly that purpose.  That's exactly

19   what she did with Regina Walsh.

20          Now, Marie Baran, of course, testified yesterday that

21   Regina Walsh didn't tell you the truth.  Marie Baran testified

22   that Regina Walsh didn't tell you the truth when she said that

23   the statements in the application were Baran's and not Walsh's

24   and when Walsh told you that it was Baran who told her how to

25   answer the RRB's questions.

1          Why was Marie Baran claiming to you that Regina Walsh

2     lied on the witness stand?  Marie Baran knows that if you

3     believe Regina Walsh's testimony, it is over for her.  Marie

4     Baran is guilty.  And let me say, Baran's story that she told

5     you on the stand about Regina Walsh, that the words in the

6     application are Walsh's, make absolutely no sense.  Her story

7     makes no sense.

8          She tried at first to say, well, the language in

9     Regina Walsh's application, that doesn't look like the stock

10    language that I used.  But as you now know, that application

11    was the first one that Baran filled out completely for a client

12    before she started pre-completing forms with the same stock

13    answers and that's why the language looks different.

14         But more importantly, Baran's story makes no sense

15    because Regina Walsh has no motive to lie to you.  She gets

16    nothing from testifying here, and she completely admitted her

17    guilt on the stand.  Regina Walsh testified that she knew from

18    the beginning that what she was doing was wrong.  She testified

19    that she committed a fraud.  It's not like she was trying to

20    push blame off on Marie Baran.  Walsh just told you what

21    happened.  Baran knows exactly how devastating Regina Walsh's

22    testimony was, exactly how powerfully it proves Baran's guilt.

23         We've talked about how Marie Baran lived off of her

24    husband's disability fraud.  We've talked about all the

25    different witnesses who told you that Marie Baran filled their

 1  disability applications with lies.  How else do you know that

 2  Marie Baran knowingly participated in this fraud?  Look at the

 3  evidence found on her computer.

 4          Special agent Ann Marie Cuocci of the FBI showed you

 5  that Baran emailed herself completed disability applications

 6  containing the dates on which people supposedly became

 7  disabled, but that she did that months before the dates on

 8  which she was claiming people became disabled.  In other words,

 9  Baran listed the dates in the future when the applicants were

10  planning to become disabled.

11          What does that tell you?  Of course Marie Baran knew

12  this was a fraud.  Of course she knew these people were not

13  really disabled.  What legitimately disabled person could pick

14  the date months in the future when they would suddenly become

15  too disabled to work another day?  But that is exactly what

16  Marie Baran was doing in these applications and it's

17  devastating evidence of her guilt.

18          We showed you several of these during the trial, and

19  I'll just show you a couple examples.  Can we put up Simpson.

20  The date on this is June 17, 2008, when Marie Baran emails this

21  to herself, and when does this application say that Simpson

22  became too disabled to work?  October 31, 2008, four months in

23  the future.

24          One more example.  Can we see John Riddle.  Ms. Baran

25  emailed this to herself March 5, 2008.  Can we see when

1    Mr. Riddle supposedly became too disabled to work anymore?

2    October 31, 2008, she completed this seven months in advance of

3    the day on which John Riddle supposedly became disabled.  This

4    is devastating evidence that Baran knew that she was lying for

5    people.

6              Of course, we can't leave the subject of the computer

7    evidence without reminding you of the blank application that

8    you saw during the trial, an application just like the other

9    two that we looked at but that had no name filled in.  She

10   called it blank.  Can we just take a quick look at that.

11             Here Marie Baran emails herself what she calls a blank

12   application dated September 4, 2008.  In what way is it blank?

13   Well, there's no person listed there, there's no name, there's

14   no address; but it is prefilled out with lies about this

15   person's physical condition.

16             Can we just see Section 6.  This is the blank

17   application.  Identical responses to all the responses you've

18   seen.  Caught red-handed with applications found on her

19   computer that she prefilled out in advance, Baran tried to

20   explain away this devastating evidence when she testified.  She

21   testified that she filled out these applications in advance

22   with the same stock answer to remind herself to go over the

23   questions with the clients.

24             What?  That makes no sense.  The questions are written

25   on the form.  That would be a much better reminder of the fact

D7VLLES4                    Summation - Ms. Friedlander

1    that you need to go over the questions.  She could just read

2    her clients the questions from the form.  That is exactly, of

3    course, what her own witness, Michael Jansen, the district --

4    the former district manager from the RRB Detroit office told

5    you he would do.  You just read the questions.  Baran's

6    explanation was preposterous.

7         You also know it's not true that Baran was trying to

8    accurately report information in people's disability

9    applications by looking at Government Exhibit 17.  That's the

10   compilation we looked at earlier that contains dozens of nearly

11   identical answers to question 40.

12        You also know it's simply not true that Baran changed

13   the answers to Section 6, asking about people's physical

14   condition, because after speaking with her clients, as she was

15   suggesting to you from the stand, because she almost never

16   changed these answers.

17        We showed you the analysis of the disability

18   applications of 180 of Baran's clients, and the answers were

19   virtually identical.  Let's just see the analysis.  Almost a

20   hundred, over 90 percent of people found it difficult to bathe

21   themselves.  Nearly a hundred percent find it hard to walk?

22   This is ridiculous.

23        It shows you, contrary to what the defense has argued,

24   that Baran used these cookie cutter, prefilled out applications

25   with a huge number of people again and again.  She did it

1    because these were the lies that worked.

2            How else do you know that Marie Baran knowingly

3    participated in this fraud?  This legitimate business, the

4    legitimate consulting business we keep hearing about was so

5    legitimate, that she lied through her teeth to the government

6    about it on her tax returns from the get-go.  She lied about

7    all the money she was making.  Why?  Two reasons, both

8    fraudulent.

9            First, as Baran herself explained on the stand, at the

10   time she was earning a small extra federal pension that was

11   subject to an earnings restriction.  If Baran reported more

12   than a small amount of income from this consulting income, that

13   extra pension would be reduced or eliminated.  So to keep

14   collecting that small extra pension, which she knew she wasn't

15   entitled to because she earned so much money from her business,

16   Baran lied and drastically underreported her income on her tax

17   returns.  She falsely claimed to have earned just $14,400 that

18   year from her consulting, when in truth as she fully knew she

19   earned over $67,000 that year, all of it in cash.

20           Baran made her clients pay cash.  Remember Regina

21   Walsh told you she tried to pay with a check and Baran made her

22   go out and get cash instead?  Baran testified in front of you

23   yesterday that she only made people pay cash because some of

24   her clients' checks had bounced.  That is such a bogus claim.

25   Regina Walsh was her first client.  No checks from other

1   clients have bounced.

2          And Baran herself described Walsh as a friend.  She

3   really wants you to think she was worried that Regina Walsh's

4   check was going to bounce?  That was a totally false

5   explanation.  Baran made them pay cash so she could hide her

6   income from the federal government because cash is not

7   traceable.

8          Baran tried to explain away her false tax return

9   yesterday by saying it was all a big misunderstanding.  She's

10  just not very good at that business stuff.  She just didn't do

11  much to keep track of it.  Are you kidding?  When the FBI

12  knocked on her door in 2008 to ask her about this consulting

13  business and whether she reported her income to the IRS, what

14  did she say?  Did she say of course I report my income?  Did

15  she say, well, I sure do my best?  No.  She told the agents her

16  income was between her and the IRS.

17         Baran said that because she knew she knew she hadn't

18  reported the vast majority of her income.  She knew it and you

19  know she knew it because the next thing she did was call her

20  tax preparer urgently to say she needed to meet with him.  John

21  Chirichella, her tax preparer, told you about that meeting.  He

22  described his shock when Baran came urgently to his office and

23  said the FBI had interviewed her about her consulting business

24  and she needed to restate her 2007 tax returns.

25         She wants you to think she hadn't done much to keep

1    track of her income.  She told Chirichella on the spot how much

2    she really made.  She told him right in that very meeting.

3    Baran knew exactly how much she really earned.  She knew

4    exactly what she was doing when she lied under oath in a huge

5    way on her tax return.

6            And, of course, since 2008, when the FBI came knocking

7    at her door, she's been reporting all of her income from this

8    business and planning for her defense in this case.  Why else

9    is her false tax return in 2007 such powerful evidence against

10   Baran?  It shows you this wasn't a legitimate business.  This

11   was a fraud from the get-go.

12           It also shows you that Baran had fraudulent intent.

13   She wants you to think she would never lie to help people get

14   benefits from the government that they don't deserve.  But this

15   shows you of course she would.  She was doing that for herself

16   on her own tax return.

17           Now, I want to take just one moment before I turn to

18   Joe Rutigliano to show you the huge profits that Marie and Gus

19   Baran have made from their fraud.  One quick chart.

20           Here we've broken out the income earned by Marie Baran

21   as reported in her tax returns, including the amended 2007

22   return.  This is her income on the left from her disability

23   consulting business.  It shows you she's earned over $370,000

24   from this business.  The middle column, that shows you Gus

25   Baran's disability income from this fraud.  He made over

1    $200,000, and those records are in evidence.  In total, the

2    Barans have made over half a million dollars in fraud.

3            Ladies and gentlemen, the evidence is overwhelming

4    that Marie Baran knew exactly what she doing when she helped so

5    many people commit fraud.  That chart is the obvious reason why

6    she did it.  She profited enormously from the fraud.

7            Before I leave the subject of Ms. Baran, let me say

8    one more word about her testimony.  Marie Baran got up in front

9    of you with crocodile tears and tried to explain this all away,

10   but what she said didn't make any sense and was contradicted by

11   all of the independent evidence that you've seen and heard.

12   Her testimony was the testimony of a woman who intends to lie,

13   just like she lied to the IRS, and just like she lied to help

14   countless Long Island Railroad employees commit fraud.

15           Finally, Joe Rutigliano.  Like Baran, Rutigliano was

16   an insider who knew exactly what it took to trick the

17   government into paying disability benefits.  He worked at the

18   LIRR as a conductor for 27 years and was the president of a

19   union local.  Rutigliano committed fraud in multiple different

20   ways in this case.

21           First, like all the other LIRR witnesses that you

22   heard from, Rutigliano committed disability fraud.

23           Second, after he learned how to commit his own fraud,

24   and while collecting disability benefits on the ground that he

25   was supposedly so disabled that he could not do any work at

D7VLLES4                    Summation - Ms. Friedlander

1    all, Rutigliano had a job completing other people's disability

2    applications for cash, filling them with the same lies he told

3    his own fraudulent application.

4           And, third, in order to continue his disability fraud,

5    Rutigliano lied to the RRB again in a document that he signed.

6    He lied and told the RRB that he hadn't made any money since

7    going out on disability.

8           So let's talk about each of the ways that Joseph

9    Rutigliano committed fraud in this case.  First, his own

10   disability fraud.  Like many other LIRR employees who you heard

11   from in this trial, Rutigliano decided he wanted to retire in

12   his early fifties.  He started seeing one of the three

13   disability doctors.  He started seeing Dr. Lesniewski.

14          Rutigliano and Lesniewski created a paper trail to

15   support a bogus disability application.  You heard about some

16   of their lies from Dr. Barron, the government's expert.  What

17   did he tell you?  Well, as we mentioned earlier, he told you

18   that Rutigliano claimed he had neck pain radiating to his lower

19   back, which is anatomically impossible.  Dr. Baran told you

20   that if a patient made that complaint to him, a red flag would

21   go up in his mind immediately and he'd ask himself what is

22   going on here.  That's page 1781 of the transcript.

23          Of course, Rutigliano's lie would have been equally

24   obvious to Dr. Lesniewski, but Dr. Lesniewski didn't need to

25   ask himself what's going on here.  Lesniewski knew what was

1    going on here.  He knew he was involved in a huge fraud, and he

2    did what he was paid to do.  Lesniewski gave Rutigliano

3    disability narrative that same day falsely claiming that

4    Rutigliano had a permanently disabling neck problem.  That is

5    devastating evidence of Lesniewski's guilt, as we talked about

6    earlier.  It's also devastating evidence of Rutigliano's guilt

7    because, of course, Joe Rutigliano knew that he was lying about

8    the kind of pain he had.

9              On top of that, Dr. Baran told you that Rutigliano had

10   not made a single complaint about his shoulder for two years

11   when he and Lesniewski claimed it as a basis for disability for

12   Rutigliano.  Rutigliano knew what a lie that diagnosis was.

13             On top of that, on his knee, Dr. Barron told you that

14   the record shows nothing but a mild knee problem at most,

15   typically common in middle-aged person and totally treatable

16   and curable.  The defense suggested that Rutigliano had some

17   kind of serious problem with his knee, but you know that is

18   ridiculous for several reasons.

19             First, there's not a shred of evidence that Rutigliano

20   sought any treatment for his knee for years and years after

21   getting a disability through Lesniewski.

22             What else?  Rutigliano was playing golf all year

23   round.  Then, in 2008, nine years after he applied for

24   disability, nine years of no treatment, and not coincidentally,

25   just weeks after the New York Times published a photo and a

1   video of Rutigliano playing golf while on disability,

2   Rutigliano ran over to a doctor in Florida and suddenly started

3   complaining all about his back and knee.

4           Rutigliano hadn't seen an orthopedist in nearly a

5   decade because he had no significant conditions.  But now that

6   he'd been outed as a fraud, he ran to a doctor to start

7   preparing for his defense in this case.

8           Even then, as you now know from Dr. Barron's

9   testimony, the doctor in 2008 found almost nothing wrong with

10  Rutigliano.  Dr. Barron reviewed those records with you, the

11  records from Dr. Ferderigos.  He walked you through how they

12  confirm that Rutigliano had nothing wrong with his neck, as

13  Rutigliano had claimed when applying for disability, nothing

14  wrong with his hands, as Rutigliano had claimed, no arthritis

15  in his knee, and nothing wrong with his shoulders, all as

16  Rutigliano and Lesniewski had falsely claimed.

17          On top of that, as Dr. Barron told you, the doctor in

18  2008 didn't find any significant meniscal tear in Rutigliano's

19  knee or any significant back problem.  Dr. Barron told you the

20  MRI report of the knee showed nothing but, quote, a pretty

21  typical wear-and-tear type of tear for active people that's

22  pretty isolated, pretty small, stable, and quite treatable.

23          What does that tell you?  It's just another way you

24  know that not only was Rutigliano not disabled, but most of his

25  supposedly disabling conditions were just fabricated.  And any

D7VLLES4                    Summation - Ms. Friedlander

1    pain he had didn't bother him enough to complain about it until

2    after the New York Times exposed his fraud.

3            Dr. Barron also told you that if Rutigliano was able

4    to play golf, he certainly didn't have the serious conditions

5    that he and Lesniewski pretended he did.  And as you now know,

6    Rutigliano is an avid golfer playing every week, sometimes

7    multiple days a week, all year long.

8            We introduced records showing that Rutigliano signed

9    in to play golf over 100 times in New York in the spring and

10   summer from 2004 to 2008.  And on top of that, you've seen

11   records of him playing hundreds of times at Heritage Springs in

12   Florida, Rutigliano's winter home.

13           You saw records of Rutigliano playing in golf league,

14   golf tournaments, playing 18 holes of golf every week,

15   sometimes multiple times a week.  You also heard from Roger van

16   Etten, the golf pro at Heritage Springs.  Just like Dr. Barron,

17   van Etten told you that golf is stressful on the back,

18   shoulders, and knees, all areas that Rutigliano claimed as

19   basis for disability.  And just like Dr. Barron, van Etten told

20   you that people who actually have serious carpal tunnel

21   syndrome, which Rutigliano claimed to have, can't even hold a

22   golf club.

23           What else did he tell you?  He told you he's seen

24   Rutigliano not only playing golf, but riding his bicycle and

25   enjoying time at the pool, all while Rutigliano is supposedly

D7VLLES4                    Summation – Ms. Friedlander

1    totally and permanently disabled.  And, of course, you've seen

2    Rutigliano playing golf, and of course I mean in the photograph

3    and the video that were taken by the New York Times and shown

4    in this trial.  Here they are.

5              (Video recording played)

6              MS. FRIEDLANDER:  Do we have the photograph?  We did

7    it.  OK.

8              What does this tell you?  Obviously this tells you

9    Rutigliano is not totally and permanently disabled.  He lied in

10   his disability application.  He lied to get disability money

11   that he wasn't entitled to.

12             Let's see just how much money Rutigliano got through

13   these lies.  Since he's been on total and permanent disability

14   beginning in 2000, Joe Rutigliano has collected over $400,000

15   in disability benefits.

16             Now let's look at the lies he told to get all that

17   money.  Can we see his disability applications, Section 6.

18   This application is just littered with lies.  Rutigliano

19   pretended it was hard for him to sit, to stand, to walk.  He

20   even said he has so much pain that it was hard for him to hold

21   a pen long enough to write a note.  That's at the bottom.  Too

22   painful to grip a pen, but not too painful to grip golf clubs

23   all year.

24             Can we see question 40.  Look at his description of a

25   normal day.  It says he can't take more than a short walk

1    because too long a distance is just too painful.  He used to

2    play racquetball and tennis, but he cannot play these sports

3    anymore due to his painful back, knee, and hands.  He likes

4    reading and movies but he has to get up and stretch every five

5    to ten minutes because he's in so much pain.

6              This is an utter lie.  It is a work of fiction that

7    Rutigliano then copied over and over and over again to help

8    others scam the government the same way he did.  And by that of

9    course I mean that like Marie Baran, Joseph Rutigliano didn't

10   just live off his fraudulent disability benefits.  He also

11   started his own disability fraud business.

12             You heard from two different Rutigliano clients, Chris

13   Parlante and James Maher.  They both told you they were

14   conductors with Rutigliano at the Long Island Railroad.  They

15   both told you that Rutigliano retired before them and that

16   after he retired, Rutigliano became well-known for completing

17   people's disability applications for cash.

18             As you heard, Rutigliano completed each of their

19   applications and he charged each of them a thousand dollars for

20   that service.  Each of them told you Rutigliano never asked

21   them anything and they never told him anything about their

22   physical condition.  They never acted like they were in pain or

23   suffering with Joe Rutigliano.

24             How do you know that they're telling you the truth?

25   Well, you've seen the applications and the vocational reports

D7VLLES4                    Summation - Ms. Friedlander

1    that Rutigliano completed for them, and they are virtually

2    identical to Rutigliano's own fraudulent application and

3    vocational report.  Just like Marie Baran, Rutigliano used

4    certain cookie cutter language again and again, language that

5    he took from his own bogus application.

6            Let's take a quick look at their application which

7    Rutigliano completed and just compare them with Rutigliano's

8    own.  Can we just maybe see a couple of the lines from

9    Section 6.  You can see that these descriptions of sitting,

10   standing, and walking are almost identical.  Rutigliano says

11   it's hard for him to sit because he has back and knee pain when

12   sitting for more than short periods.

13           Maher, no surprise, sitting is hard for him because he

14   has back, neck, and right knee pain when sitting for long

15   periods.  Parlante, sitting is hard for him because he has neck

16   and back pain when sitting for more than short periods, again

17   and again and again.

18           And let's just see one paragraph of their vocational

19   reports compared.  Parlante -- these are paragraphs from

20   Parlante, Maher, and Rutigliano, from the vocational reports

21   they submitted to get disability.  Both Parlante and Maher told

22   you that these reports are not true about what their jobs

23   required.  They're not true in stating that they were suffering

24   pain and couldn't do their jobs.

25           Of course they could do their jobs.  They were working

D7VLLES4                    Summation - Ms. Friedlander

1    overtime to increase their pensions.  They told you they never

2    told Rutigliano any of the things that Rutigliano wrote here

3    about them not being able to do their jobs and he never asked.

4    And you know that's true because all of Joe Rutigliano's

5    vocational reports are nearly identical.

6         It's not just Parlante and Maher.  You have in

7    evidence Government Exhibit 19A.  It is a large binder

8    containing 135 of Rutigliano's cookie cutter vocational

9    reports.  Look at them in the jury room.  Flip through the

10   binder.  This is it, identical vocational reports created by

11   Joe Rutigliano.  You'll see that the lies that worked for him

12   he spun out again and again and again because he knew they

13   would work for others too.

14        You also saw Government Exhibit 19, which shows you

15   that Rutigliano, it wasn't just his vocational reports that

16   were identical, it was the applications too claiming that

17   virtually all the same activities were difficult or impossible

18   for people to do.  You can see on the screen 100 percent of his

19   clients found hard or impossible to bathe themselves?  That is

20   simply preposterous.

21        How else do you know that Joe Rutigliano knowingly

22   participated in this fraud?  Well, just like Marie Baran,

23   Rutigliano lied to the government on his tax returns about the

24   money that he was making from this business.  You heard from

25   the IRS witness and you have in evidence Rutigliano's tax

1    return information for years after he retired, 2000 to 2007,

2    and it shows that Rutigliano never at any time reported that he

3    was earning income from his work in these years.

4              Rutigliano lied to the government under penalty of

5    perjury year after year, just like he lied to the government on

6    his disability application, just like he helped others to lie

7    on theirs.

8              So why did he hide this income besides to avoid paying

9    taxes?  Two reasons, both arising from the fraud.

10             First, as you know, Rutigliano was on total and

11   permanent disability.  He knew that if he told the government

12   he was earning money, he risked raising a red flag that he was

13   not in fact a completely physically disabled person who is

14   unable to perform any work.  He didn't want to tell the

15   government that he was not only capable of working, but

16   actually working and earning money from his work as a

17   consultant.  He didn't want to get caught.

18             On top of that, by hiding his income, Rutigliano

19   enabled himself to continue receiving disability benefits which

20   would otherwise have been cut off because, as you heard, the

21   RRB has earnings restrictions for people on disability.  You

22   heard from the RRB witness, John Coleman, that people on

23   disability can only earn a small amount of money from any work

24   or the government will start reducing or eliminating the

25   benefits.  And that makes sense because, as he told you, the

D7VLLES4                      Summation – Ms. Friedlander

1    government doesn't want to pay disability benefits to people

2    who are working.

3          Mr. Coleman told you that people on disability are

4    required to inform the government if they start working and if

5    they earn any money and Rutigliano knew that.  He knew it from

6    his disability application which says it right above where

7    Rutigliano signed.  And he knew it from the yearly notices he

8    got in the mail which you saw in the trial.  Can we just see

9    the signature block.

10         That's Joe Rutigliano's signature on his disability

11   application.  Are you able to blow up -- it says he will

12   promptly notify the government if he starts working.  Maybe if

13   you want to just do one at a time.

14         OK.  You see above his signature, I agree to

15   immediately notify the RRB if I perform any work including

16   self-employment.

17         And can we see the yearly notice that Mr. Rutigliano

18   received?  He gets this in the mail every year.  You must

19   notify the railroad retirement work if you perform any work,

20   including self-employment.

21         But Rutigliano knew that if he did that, he'd start

22   losing his disability benefits so he hid it.  And unlike Baran

23   who got caught and had to restate her tax return and start

24   reporting all her income, Rutigliano skated by without ever

25   reporting a penny.

D7VLLES4                    Summation – Ms. Friedlander

1              That leads me to the third way, the third and final

2       way that Rutigliano defrauded the government.  Let's take a

3       look at Government Exhibit 719.  This is a disability update

4       report.  You've seen a number of these in the trial.

5       Rutigliano signed this on March 11, 2011, and mailed it to the

6       RRB in Manhattan.  In it, the RRB specifically asked Rutigliano

7       whether he had worked at all since he went out on disability in

8       April 2000.

9              So there's the question up at the top.  During the

10      report period, did you work for someone other than a railroad

11      or were you self-employed?  Here Mr. Rutigliano writes no, no,

12      he wasn't.  There's a signature and the date.  The report

13      period you can see from the first page refers to the time since

14      he's been out on disability in April 2000.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

D7vnles5                    Summation - Ms. Friedlander

1              Of course you know this is a lie.  You know it from

2    all the evidence in the case.  Maher paid him in 2003, Parlante

3    paid him in 2005.  You have a binder of all the work that he

4    did for other people.  You heard that he was well known for

5    doing this work.  Rutigliano lied again and again so he could

6    keep getting his bogus disability benefits.

7              He lied because he didn't want the government to know

8    that he's physically able to work and he always has been.  He

9    never should have received a disability in the first place.

10             Before I sit down, I need to talk very briefly about

11   the charges in the case.  Each of the defendants is charged

12   with a number of counts.

13             For the most part there are two kinds of crimes

14   charged.  First, is the charge of conspiracy, in this case

15   conspiracy to commit mail, wire and health care fraud and fraud

16   on the Railroad Retirement Board.

17             Second, they are charged with committing actual fraud,

18   not just conspiracy.

19             Now, Judge Marrero will talk to you a lot more about

20   the law and you should follow his instructions on the law.  But

21   a conspiracy, as I think he will tell you, is just an agreement

22   by two or more people to try to violate the law.

23             He will tell you more about that, and follow his

24   instructions, but what I think you will hear is that the

25   agreement doesn't have to be written, it doesn't have to be

D7vnles5                    Summation - Ms. Friedlander

1    shown.  It is a meeting of the minds.

2              As for health care, wire, and mail fraud, health care

3    is simply a fraud on a health care insurance provider, in this

4    case United Healthcare, which had to pay Lesniewski for all

5    these pointless visits and bogus tests.

6              Wire fraud is simply a fraud that uses wire

7    communications, meaning the telephone calls and the e-mails and

8    the direct deposit money transfers that you have heard about in

9    this case.

10             Mail fraud is simply a fraud that uses the mail.  We

11   have shown you, we actually just saw the disability update

12   reports mailed by people to the RRB's office in Manhattan.  We

13   just saw one on the screen related to Mr. Rutigliano.

14             Mr. Rutigliano is charged with one additional count

15   based on that disability update report.  He's charged with

16   making a false statement to a government agency.

17             Finally, Judge Marrero will tell you about venue,

18   which just means something that happened in this district, the

19   Southern District of New York, which includes Manhattan and

20   some other places.

21             You heard about things mailed to Manhattan, we just

22   talked about that, and you have a stipulation that wires were

23   transmitted through waters surrounding Long Island.  Those

24   waters as you will hear are part of this district.

25             Ladies and gentlemen, let me conclude by asking you,

D7vnles5                    Summation - Ms. Friedlander

1    as you enter your deliberations, to please do the three things

2    that Mr. Tehrani asked you to do at the start of the trial:

3            Focus on the evidence about Lesniewski, Baran and

4    Rutigliano;

5            Listen to Judge Marrero when he gives you instructions

6    on the law; and,

7            Finally, use your common sense.

8            No matter how complicated the defense tries to make

9    it, these defendants committed a straightforward fraud.  Peter

10   Lesniewski, Marie Baran, and Joseph Rutigliano would and did

11   say anything they had to say to make a quick buck.  They

12   deliberately exploited a safety net meant to protect the

13   disabled, and they did it out of sheer greed.  That is what

14   happened in this case.

15           There is a mountain of evidence.  The evidence is

16   clear, it's corroborated, and it all points in one direction.

17   The defendants are guilty as charged.

18           Thank you.

19           THE COURT:  All right.  We are going to take the lunch

20   break at this point.  It is about 1:20.  We will return in one

21   hour.

22           Again, even though the parties have rested and you

23   have heard the closing arguments from the government, you are

24   not yet ready to begin any deliberations or discussions among

25   yourselves or with anyone else on the outside about the case or

D7vnles5                          Summation – Ms. Friedlander

1    have any contact of any kind.  If any of these things occur,

2    you are directed to inform me immediately and not discuss it

3    with your fellow jurors.  We will see you in one hour.

4            (Continued on next page)

D7vnles5                    Summation - Ms. Friedlander

1               (Jury not present)

2               THE COURT:  All right.  Thank you.

3               Mr. Durkin, did you have something?

4               MR. DURKIN:  I do, Judge, I have two issues I want to

5     raise in the form of a motion for a mistrial.

6               The first deals with the repeated efforts by the

7     government to appeal to the prejudice of the jury as taxpayers

8     that this was some type of horrible ripoff of a safety net so

9     to speak.  I think she used the term "safety net" a couple

10    different times.  This was federal money and the people were

11    going to Florida and living lives of leisure off of the federal

12    government.

13              First of all, I think that's over the top and

14    inappropriate.

15              Secondly, factually, it is not even correct because

16    this is a program that is not funded by tax dollars.  It is

17    funded by contributions by the employees.  I think there is, of

18    all the monies that are provided from the general fund, it is

19    minuscule compared to the payments of the workers.  And I think

20    it's simply inappropriate to have tried to appeal to the

21    pocketbooks and prejudice of the jury over that.

22              The second issue is an issue with respect to the

23    suggestion by the government that this was a very simple form

24    and it was inappropriate to be filled out, and this may well be

25    something that my colleagues would want to raise more than me.

D7vnles5                    Summation - Ms. Friedlander

1   But the problem I have, I want to show you, I am just going to

2   provide you with a document that we were provided on Sunday

3   night after the RRB person testified.  It was a week ago

4   Sunday.  I am just going to mark it Mistrial No. 1 of today's

5   date.

6          It was this Sunday that we received it.  That's what I

7   thought.  I'm the oldest of this team, and sometimes these

8   younger people make me confused, but for once my memory is

9   correct.

10         This is a document that we were provided by the

11  government.  It is supposedly from off of the Internet.  It's

12  from some type of Social Security application which is

13  identical or similar to the forms for the RRB.  I don't have an

14  extra copy of it.

15         I am assuming it was turned over because it is Brady

16  material.  It reads:  "Form AA-1d is very detailed.  When

17  possible, help the applicant complete it."

18         I just think, in light of that, it was inappropriate

19  to stand up and vouch, the prosecutor, it was inappropriate for

20  the government to use their office to vouch for the fact that

21  this was a simple proposition.

22         That is all I have, your Honor.

23         THE COURT:  All right.  Thank you.  Mr. Weddle.

24         MR. WEDDLE:  Your Honor, it was completely fair

25  argument, nothing improper was said at all.  It is all

D7vnles5                    Summation - Ms. Friedlander

1    supported by the evidence in this case.  The fraud is a fraud

2    on a federal program.  It is federal money that was defrauded.

3            There was no appeal to the taxpayers.  Ms. Friedlander

4    didn't say the words "taxpayers."

5            This is RRB disability money.  It's the same thing we

6    have been talking about the entire case.  It was a massive

7    fraud, and we argued that in opening and we are going to

8    continue to argue that.  That is exactly what the government

9    has proven.

10           She did mention Social Security at one point because

11   Social Security gets involved when there is a total and

12   permanent disability payment, as I believe she was referring

13   specifically only to Mr. Rutigliano at that part of the

14   argument.

15           With respect to the document that's just been handed

16   to your Honor, it changes nothing.  The form speaks for itself.

17   It is a basic simple form.  The fact that a document says that

18   the form is detailed and that I believe -- I don't have it in

19   front of me -- but I believe it's some kind of internal RRB

20   guidance to their contact representatives, their customer

21   service people, it proves our point.

22           If somebody has any problem filling out the form, it

23   says help them with it.  It is a simple form.  You can go to

24   the RRB, they will help you fill it out for free.

25           Ms. Baran's own witness testified to those same facts.

D7vnles5                          Summation - Ms. Friedlander

1    This was completely fair argument, and there is absolutely no

2    basis for an objection, let alone a mistrial.

3            THE COURT:  All right.

4            Anyone else?

5            MS. YRIZZARY:  Your Honor, Mr. Jackson wanted to say

6    something.  He just went to the restroom real quick.  I do

7    apologize.

8            THE COURT:  While we wait for Mr. Jackson, I have

9    heard the concerns of Mr. Durkin.  I am not persuaded that

10   there is a sufficient basis here for a mistrial, certainly not

11   on the basis of this form or the arguments made during the

12   government's closing arguments.  I believe that they are fair

13   comments and that they open issues for the defense to counter.

14   They certainly don't rise to the level of grounds for mistrial.

15   So, insofar as Mr. Durkin is making a motion for a mistrial,

16   the motion is denied.

17           Mr. Jackson, did you have some comment or concern?

18           MR. JACKSON:  I do.

19           Judge, I had specifically objected to an exhibit that

20   the government had intended to introduce that dealt with the

21   grouping of Mr. Baran's income that he derived by virtue of his

22   disability -- which is total and permanent, completely lawful

23   and legitimate, as I will certainly be explaining this

24   afternoon -- in with the income that Ms. Baran received from

25   her lawful, legitimate business that she ran as a consultant.

1   I objected to it.  The government did not introduce it, I

2   thought based upon my objection.  There is a record at the

3   sidebar I think we had where you said that we should work it

4   out.

5           There was an e-mail generated that evening after you

6   said we should work it out.  I guess it led into the weekend,

7   and in the e-mail I reiterated some of the concerns that your

8   Honor had expressed at the sidebar as to why I would be opposed

9   to it.

10          At that time not only was it cumulative, but I thought

11  it was overly prejudicial and the very document that I objected

12  to that wasn't introduced into evidence was referenced to close

13  out the prong of Ms. Friedlander's closing that dealt with

14  Ms. Baran.

15          As opposed to jumping up and objecting frantically,

16  which I thought would give even more undue attention to this

17  misleading chart and inappropriate chart, one that I thought

18  would never see the light of day of this jury, I reserved until

19  now a discussion with you as to how that might have happened or

20  could have happened in light of the objection, in light of the

21  fact that exhibit was never put before the jury and I thought

22  would never see the light of day but surfaces in front of the

23  jury during closings without any notice to me.  I didn't even

24  have the document.

25          I just think, Judge, that certainly there needs to be

D7vnles5                          Summation - Ms. Friedlander

1    some remedy that is tailored to address that issue.

2                THE COURT:  Thank you.

3                Mr. Weddle.

4                MR. WEDDLE:  Your Honor, it is a completely fair

5    demonstrative chart to use in summation.  It is based entirely

6    on documents that are in evidence.  It itself is not in

7    evidence, but that's standard practice in summation to use

8    PowerPoints or demonstratives that are not themselves in

9    evidence, and it's fair argument to take pieces of evidence and

10   put them on a single piece of paper and display it to the jury

11   in argument.

12               It's not going something that is going to back to the

13   jury at end of the case.  I was looking for a reference,

14   perhaps Mr. Jackson has a page reference to when he made this

15   argument.

16               My recollection of what happened is that he said that

17   it was cumulative and we have heard the evidence and that it

18   was argumentative.

19               So what we did is we decided to just use it in

20   argument, which is exactly what we did.  It's entirely proper.

21   There is nothing to complain about here.

22               MR. JACKSON:  Argumentative.  I thought that was an

23   objection you use when maybe in cross-examination you are

24   badgering a witness.  My concern was the cumulative nature of

25   it is what makes it prejudicial, to keep going over and over

D7vnles5                    Summation - Ms. Friedlander

1    and over it again.

2            Just as a general matter, it also would have been nice

3    to give me notice of that.  But to do that on an exhibit, I

4    mean I've pretty much stipulated to 85 percent of the exhibits

5    they used.  Maybe 90 percent.  And the one exhibit I am jumping

6    up and down to -- and there is a record of at sidebar and there

7    are e-mail exchanges between myself and the prosecution -- is

8    the exhibit that they go to and use for closing.

9            THE COURT:  All right.  I will give the jury a

10   limiting instruction with regards to the testimony and evidence

11   pertaining to Mr. Baran and Ms. Baran.  We will find a way of

12   indicating that they should not use evidence pertaining to

13   Mr. Baran in their findings concerning the charges against

14   Ms. Baran.

15           MR. WEDDLE:  Your Honor, that instruction would not be

16   proper.  He's charged as a coconspirator.  So, of course,

17   evidence relating to Mr. Baran is relevant and probative of the

18   charges against Ms. Baran.

19           THE COURT:  Well, this is a little different,

20   Mr. Weddle.

21           MR. WEDDLE:  The money issue is very straightforward.

22           THE COURT:  But on the chart side by side I think is

23   more suggestive than necessary.

24           MR. WEDDLE:  Your Honor, it was a very straightforward

25   chart.  All of those numbers were in evidence.  It is just

D7vnles5                       Summation - Ms. Friedlander

 1    helpful to the jury to put them in one place.

 2            Ms. Friedlander could have taken each of those

 3    exhibits and put them on the screen in argument and talked

 4    about them all in argument, which would have taken a great deal

 5    of time.  It was a very brief, very straightforward reference

 6    to just tallying up documents that are in evidence.

 7            It is a straightforward point.  Everybody knows it.

 8    Ms. Baran testified about it in when she testified.  She

 9    testified about the fact that Gus Baran received this money in

10    disability payments.  It is straightforward.  It demonstrates

11    his motive to commit the fraud.  His participation in the fraud

12    is probative of the existence of the conspiracy.

13            THE COURT:  All right.

14            I will find appropriate language to reflect the

15    concern, and I will share it with you when we come back.

16            MR. JACKSON:  Thank you, Judge.

17            THE COURT:  All right.

18            (Luncheon recess)

19

20

21

22

23

24

25

1

2                  A F T E R N O O N   S E S S I O N

3                        (2:40 p.m.)

4       (At sidebar)

5       THE COURT:  In connection with the issue that came up

6  pertaining to the chart that Ms. Friedlander raised and

7  Mr. Jackson objected to, three points:

8       One is that I think the government is right, and I was

9  not intending to suggest that because of the use of this

10 material that nothing in the trial that has come in pertaining

11 to Mr. Baran would not be relevant to Ms. Baran.  That was not

12 my concern.  I had two concerns.

13       One is Ms. Baran has a unique connection in this case

14 because she happens to be the spouse of someone who was

15 involved in some of the underlying events.  This chart showing

16 those two, the events pertaining to one insofar as one made

17 money and the other made money, linked together can create a

18 potentially improper view with the jurors that because they

19 happen to be married that somehow that association by itself

20 may spill over into Ms. Baran.

21       Secondly, the chart is only one piece of evidence with

22 a lot of evidence in the case, and I would not want the jury to

23 single out one item of information in the case and make its

24 decision simply on that one thing, especially when it contains

25 this potential prejudicial association by marriage of Ms. Baran

1    to Mr. Baran.

2         I am prepared to give an instruction which says the

3    following:

4         During its closing arguments, the government presented

5    a chart which showed the amounts of money that the government

6    argues the evidence on the record establishes Marie Baran and

7    her husband, Ostap Baran, each gained from conduct that the

8    government contends forms part of the frauds involved in this

9    case.

10        That chart was not admitted in evidence as an exhibit

11   and will not be part of the trial evidence given to you to take

12   into your deliberations.  It was shown to you as a

13   demonstrative because the government points out that the

14   financial information it contains is found in the record

15   separately as to each Ms. Baran and Mr. Baran.

16        I take this occasion to call your attention to a

17   subject I will stress in my complete instructions.  As you

18   review the evidence against each of the defendants, you should

19   examine and consider the totality of the evidence and not

20   single out any one piece in isolation.

21        Second, Ms. Baran and Mr. Baran, of course, have a

22   unique connection to this case because of their spousal

23   relationship.  In weighing the evidence relating to Ms. Baran

24   you should not consider a verdict for or against Ms. Baran

25   solely on the basis of her association with Mr. Baran by

D7vnles5                        Summation - Ms. Friedlander

1    marriage.

2            MR. JACKSON:  Judge, I don't want the instruction.  In

3    my view it highlights it too much.  It makes it too

4    significant.  I will have to deal with it in my closing

5    argument, but I don't want to highlight the issue.  I don't

6    like the instruction.  And it pretty much points out the

7    same -- I mean, if I would have gotten up and objected, I think

8    it steers their focus in an area where you just don't want them

9    to be steered.

10           So I will just address the issue in my closing

11   argument as opposed to giving any instruction from your Honor

12   that might be too weighty and may point unduly to that

13   relationship.

14           It is my contention, and it will be, that there is no

15   fraud as it relates to him, so I don't think the instruction

16   would be helpful in any event.  So I don't want the instruction

17   and I will deal with it, as I must or need to, in my closing

18   argument and would ask the Court for some latitude in that

19   regard.

20           THE COURT:  Mr. Weddle.

21           MR. WEDDLE:  Your Honor, I had the same reaction, and

22   I have an objection to what your Honor proposed to instruct the

23   jury.  But I thought that it is a demonstrative and maybe the

24   jury may not be interested in seeing it again and may never ask

25   for it.  If they ask for it, they would simply be told it is

1    not in evidence.  I think highlighting it in this way, I am not

2    surprised that Mr. Jackson has the reaction that he has.  I

3    don't think that there is any need for any kind of leeway.  As

4    I said before, I think it was a proper demonstrative exhibit

5    used in summation.  It is not in evidence, and it is what it

6    is.

7             MR. JACKSON:  I disagree.  I think it was specifically

8    an exhibit that I addressed, that I didn't want in evidence,

9    had no notice it would be used in closing argument or I would

10   have brought it up before.  I think the government knew I was

11   objecting to it and could have, in light of that, brought it to

12   my attention so I could have renewed it, and we didn't have to

13   waste time now discussing it, but that didn't happen and I will

14   deal with it as I may.

15            THE COURT:  Implicit in your having raised the issue,

16   Mr. Jackson, is that you feel that the jury having been shown

17   the document is prejudicial to your client.

18            MR. JACKSON:  Of course it is, and they know that,

19   which is why they showed it to them.

20            THE COURT:  I am proposing an instruction which I feel

21   might limit the prejudice and somehow remove the some of the

22   concerns that you may have.  To the extent you don't want me to

23   give this what I consider curative or limiting instruction,

24   essentially you are waiving your objection on this issue.

25            MR. JACKSON:  I am not prepared to waive my objection

1    on the issue.  I just don't like your instruction.  I think it

2    makes it more prejudicial, quite frankly, in highlighting to

3    them something that shouldn't have been highlighted, because it

4    shouldn't have been shown.

5           I feel very uncomfortable with waiving something that

6    shouldn't have been brought up by the government in the first

7    instance, and/or my right a curative instruction that I think

8    might -- I just think that's too prejudicial.  It focuses on

9    Mr. Baran too unduly, and I think it highlights that, it

10   highlights the chart, it does precisely the things that I

11   didn't object because of, that I feared, and so therefore I

12   don't like the curative instruction.  We can revisit it maybe

13   at the time of your charging the jury, but right now I am not

14   prepared to waive anything, Judge.

15          MR. WEDDLE:  Your Honor, I would add that in the lunch

16   break I looked at the transcript when Mr. Jackson raised the

17   objection to this summary chart, and he made two objections.

18   He said that it was cumulative to use the chart, and he said

19   that it was misleading because Ms. Baran, he said, worked for

20   the money that was on the chart.  He never raised an objection

21   that the mere association of Mr. and Ms. Baran as husband and

22   wife might be improperly used by the jury.

23          So your Honor's instruction I think is not incorrect

24   obviously.  We would not be arguing that the jury should infer

25   guilt because of their marital relationship.

D7vnles5                    Summation - Ms. Friedlander

1          But the objection to the chart when it was originally

2    presented was different, and your Honor basically -- I don't

3    think your Honor ruled finally on the issue, but I think your

4    Honor indicated that your view was that the chart was

5    cumulative, which creates no bar or prejudice to using it as a

6    demonstrative during summation, which is what we did.

7          MR. JACKSON:  Let me just say this.  I just want to

8    clarify the record.

9          Number one, as to cumulative and a ruling by your

10   Honor, your Honor made no ruling.  Your Honor indicated that

11   your concern might be that it is cumulative, and therefore

12   indicated that the parties might stipulate or work something

13   out, and, if not, to revisit it with your Honor.  There was no

14   formal ruling by you.

15         That is number one.

16         Number two, Judge --

17         THE COURT:  Let me put on the record one thing before

18   you get to number two.

19         MR. JACKSON:  OK.

20         THE COURT:  You may recall that there was another

21   instance about evidence concerning Mr. Baran and Ms. Baran, and

22   at that point I said let's see if we can limit the amount of

23   evidence relating to Mr. Baran that might be used against

24   Ms. Baran, you may recall that conversation, because of the

25   potential prejudice.  So it was a concern that I have had

D7vnles5                    Summation - Ms. Friedlander

1    throughout the trial.

2                MR. JACKSON:  OK.

3                THE COURT:  Second point.

4                MR. JACKSON:  The second point is, with respect to my

5    objecting on misleading grounds, it was misleading for multiple

6    reasons, not the least of which I thought I needed to explain

7    where misleading went.

8                Of course, it is misleading for the fact that they are

9    husband and wife, and you are accusing her by virtue of

10   associating with him.

11               Misleading, just like the connotations of her

12   ridiculousness and ludicrousness and all the things she

13   mentioned during closing argument, the fact is "misleading" has

14   a number of connotations, none of which I felt I needed to

15   explain, because I think your Honor cut it off, not cut it off

16   in a negative way.

17               You said, Look, work it out, I do have a concern that

18   it's cumulative.  We will revisit this issue at a later time.

19   So I just want to be clear to the government's characterization

20   of when I say misleading is that to waive any other objection I

21   might have incorporated in that.  That's not so.  Misleading

22   for multiple reasons, which I will expound upon at the

23   appropriate time.  Thank you, Judge.

24               THE COURT:  All right.  Thank you.

25               (Continued on next page)

D7vnles5                          Summation - Ms. Friedlander

1              (In open court)

2              THE COURT:  Bring in the jury.

3              Before the jury comes in, I had indicated to defense

4     counsel that they should allocate the amount of time that is

5     between them.  Has that been agreed to.

6              MR. RYAN:  Judge I am going to be 20 minutes.  No

7     more.

8              THE COURT:  All right.

9              Mr. Jackson, yesterday you said you would be 30 to 40.

10             MR. JACKSON:  Judge, there is a number of things I

11    need to say, there's a number things I will say, there's a

12    number of things that must be said --

13             THE COURT:  And things that should not be said.

14             MR. JACKSON:  I am going to leave those out, Judge,

15    because I know what would happen in the event that that did

16    occur.

17             Having said that, Judge, I will use the time frame

18    that I think is appropriate under these circumstances.  I will

19    try my level best to work within the confines of the time

20    provided.  If I go over a few minutes or go under a few

21    minutes, please don't hold it against me.

22             THE COURT:  I am trying to establish how much time is

23    provided.

24             MR. JACKSON:  I think with Mr. Ryan's 20 and we have

25    thereby an hour and 40 minutes, and my colleague Mr. Durkin's

1     time, I think we are going to get the train in on time.

2              MR. DURKIN:  How much did that leave me?  I am a

3     little slow on the draw.  I think I just got cheated.  I will

4     be as quick as I can.

5              THE COURT:  By that computation, Mr. Durkin, you would

6     have roughly an hour.

7              MR. DURKIN:  Oh, that's fine.  If I go more than an

8     hour --

9              THE COURT:  Mr. Jackson, would have roughly 40

10    minutes.  All right?

11             MR. DURKIN:  That is fine.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D7vnles5                       Summation - Ms. Friedlander

1            (Jury present)

2            THE COURT:  Welcome back.  Thank you.  Thank you for

3     your patience.  All right.  At this point the defense, as I

4     indicated, may but does not have to present any closing

5     arguments.

6            If they do, Mr. Ryan are you prepared to lead off.

7            MR. RYAN:  I am, Judge.

8            THE COURT:  You may.

9            MR. RYAN:  May it please the Court, the Honorable

10    Victor Marrero, may it please the prosecution team, and the RRB

11    team in the back of the courtroom, may it please my fellow

12    defense counsel, may it please you, the ladies and gentlemen of

13    the jury, the judges of the facts in this case.

14            Judge Marrero told you at the very outset of this case

15    that you are the cornerstone of the administration of justice.

16    There is nobody more qualified than each and every one of you

17    to be the cornerstone of the administration of justice in this

18    case.  You have more than 300 years of life experience, common

19    sense, to be the judges of the facts in this case.

20            You are an extraordinary jury because not one of you

21    were trying to get out of this case.  At the outset, when Judge

22    Marrero said, Is there anybody who wants to serve on this case

23    that is going to take four to six weeks?  We had people come up

24    and say yes.  And then when you were selected, you weren't

25    trying to get out of this.  That is a credit to each and every

1    one of you because you are the cornerstone of the

2    administration of justice.  You are citizens of our great

3    country.

4            And this railing right here stops the government

5    power.  You are going to decide this case, not the government,

6    not the charts, not the New York Times.  You are going to

7    decide this case.

8            Now, we said that we were going to take a train ride,

9    and it might take four weeks.  Well, we are pulling into the

10   station ahead of schedule.  We got the best stationmaster you

11   could find.  And I promised Judge Marrero that when that clock

12   says 3:10 I'm finished.

13           So I would appreciate it if you could give me, and I

14   know you will, your utmost attention.

15           We learned a lot.  I hope you found this to be an

16   enriching experience.  We learned what it's like to work on a

17   railroad with third rails all around you that can kill you if

18   you slip and fall the wrong way.  We learned what it takes to

19   climb up on to a train from the ballast trackbed.

20           We also learned what physical impact this job has.  We

21   learned what is lumbar spine, cervical spine, rotator cuff,

22   carpal tunnel syndrome.  We learned a lot about health issues.

23           We learned the impact of unions, and I am proud to

24   represent the president of the United Transportation Union for

25   19 years, Joe Rutigliano.

1          When we finish, regardless of what the verdict is,

2     this has been a wonderful experience.

3          Now, I am not going to tell you what your verdict

4     should be.  I am not even going to go close to that.  I am

5     going to try to reason with you.  I am going to try to make

6     suggestions that you might use to help evaluate the evidence in

7     this case.

8          You have never seen, I dare say, a more exhaustive

9     investigation than was conducted in this case, and you have a

10    right to expect that.  We have investigative agencies from the

11    Office of Inspector General for the Attorney General, for the

12    inspector for the Railroad Retirement Board, for the

13    Metropolitan Transit Authority, from the FBI.  We even had a

14    man from the IRS.  They brought him in under a court order.

15         We have a brilliant prosecutorial staff.  They are

16    great lawyers, and they did the best they could with what they

17    had.

18         So let's talk about Joe Rutigliano.  The government

19    wants you to convict Joe based upon a form that he signed and

20    filed with the Railroad Retirement Board in March of 2011

21    because he answered a question no.

22         Here it is.  Exhibit 719.

23         Exhibit 719 asks one of several questions.  One of the

24    questions was, "During the report period did you work for

25    someone other than the railroad or were you self-employed?

D7vnles5                         Summation - Mr. Ryan

1          "No."

2          So you take this in the jury room, and you say, Well,

3     Mr. Prosecutor, where's the proof of self-employment?  How much

4     money was earned?  How was it earned.  Who worked with him?

5     Where is it?

6          With Marie Baran they got her tax returns, $80,000 a

7     year.  She has deductions on the tax return for the cost of

8     running a business.  But when it comes to Joe Rutigliano

9     where's the beef?  Where is it?

10         Have you seen any chart that says he was self-employed

11    in 2003 and earned $20,000?

12         Another chart that said he earned $35,000 in the next

13    year?  Another chart that he earned $45,000?  Where is it?

14         As the judges of the facts in this case, you have a

15    right to ask that question.  And if the evidence isn't there,

16    it isn't there.

17         The judge is going to tell you that before you can

18    find anyone guilty you must be convinced beyond a reasonable

19    doubt.  What is a reasonable doubt?  It a doubt based upon and

20    common sense.

21         You are being asked to convict this man without any

22    evidence.  Oh, yeah.  Back in 2003 James Maher gave him a

23    thousand dollars.  Back in 2005 Chris Parlante gave him a

24    thousand dollars.  What else is there?

25         Now, here's where the charts come in.  The government

1   has a lady in Chicago, very nice lady, Natasha Marx.  And she

2   has a computer.  And she's getting calls from Mr. Weddle during

3   a nine-month period.  Let's go into the computer and let's put

4   in "catch-22" because that's what Joe had on one of his forms

5   in the submissions.

6           And her computer spits out 134 other names.

7           Then they take the 134 names based upon Natasha Marx's

8   computer, and they put it on a chart here and they say, Joe

9   Rutigliano, he's the one who did all of these forms.  He's the

10  one who serviced all of these people.

11          Well, you as judges of the facts have the right to say

12  with all of the investigators in this case, well, where are

13  they?  Where are they?

14          Charts are not evidence of the underlying

15  transactions, because otherwise we might as well shorten this

16  trial and bring in charts and we will have the chart of

17  Metro-North and the chart of Long Island Rail Road and we will

18  have charts all over the place and we will convict you on

19  charts.

20          You are the cornerstone of the administration of

21  justice.  Thank God for that.

22          There is one witness in this case that's not subject

23  to any influence, a witness that is not under a plea of guilty,

24  a witness that is not influenced by the September '08 New York

25  Times article which started the fire.

D7vnles5                     Summation - Mr. Ryan

 1          You have the RRB claim file, Government's Exhibit 100.

 2     This is Joe Rutigliano's claim file, and it is uninfluenced by

 3     anything.

 4          You will see in this claim file that the railroad

 5     retirement examiner in Chicago made a determination that he was

 6     entitled to get occupational disability benefits.  Someone told

 7     you that this was a total and permanent disability case.  Well,

 8     you can look at the application, and you won't find anything

 9     about total and permanent disability under the Social Security

10     law.  This is an occupational disability application, 100.  I

11     will give you the end of the file by an examiner, who said,

12     "This 52-year-old former railroad conductor claims disability

13     due to arthritis right knee, medial meniscal tear, and carpal

14     tunnel syndrome.  He fractured his lumbar spine in a fall in

15     1988."

16          You are going to see in this file there is a report by

17     the chiropractor who treated Joe, that in 1988 he fell from a

18     ceiling in his garage down to the garage floor.  And he went to

19     Stony Brook Hospital and he fractured, three compression

20     fractures of his vertebrae.

21          And then you will see Dr. Lesniewski in April of

22     1997 -- it is all in here, in April of 1997, Joe fell from the

23     second floor roof off a ladder.  He went to Dr. Lesniewski for

24     his shoulder.

25          You are being told here, ladies and gentlemen, the

D7vnles5                         Summation - Mr. Ryan

1    cornerstone of the administration of justice, that he was

2    creating a paper trail.  He was creating a phony application.

3    He's laying the groundwork.  In that room you will decide

4    whether or not you are getting a straight story.

5           If Joe Rutigliano is falling down like this, maybe

6    this question 40 about mental instability, that's why it's on

7    the form.  Maybe he's crazy and he should be disabled because

8    he's crazy, falling off a ladder.  He shouldn't be a conductor

9    in charge of your welfare.

10          Then the examiner goes on.

11          "Current exams reveal LOM" -- that is loss of

12   motion -- "in spine showing osteoarthritis and history of

13   compression fractures."

14          I am not going to go on because you have it.  I am

15   only suggesting that you should look at it.

16          He also says, per a signed form by Dr. Boetchner, he's

17   limited to less than light work.  This is an RRB doctor that

18   reviews the special file.  You will also see in this 100 that

19   another doctor, Bernard Stevens, he also reviewed the medical

20   file and the history and he found he was disabled under the

21   meaning of the Social Security law, whatever that means.  Joe

22   Rutigliano doesn't meet any one of these two doctors.

23          So I commend to your attention, the judges of the

24   facts, Government Exhibit 100.  You go through that and I

25   respectfully submit to you you will have the full story as to

D7vnles5                        Summation - Mr. Ryan

1    whether or not the government told you an accurate description

2    that he was fabricating his injuries.

3           Let's talk about Dr. Alton Baran, because golf is a

4    major issue in this case.  Did you ever think when you sat in

5    this jury that golf would be a major issue in this case?

6           Dr. Alton Baran has a chart, and he has a column on

7    the right side, "If problem existed as claimed could he play

8    golf?"

9           Dr. Barron is referring to 100 because

10   Dr. Lesniewski's findings are in this 100, and they have this

11   question, no, no, he can't play golf.

12          Well, ladies and gentlemen of the jury, would it

13   surprise you -- I am going to make a chart up right now, 2004.

14   This chart deals with when Joe was working on the railroad,

15   1999.  The government's so-called golf proof doesn't start

16   until 2004, and the video was in 2008.  So are you being told a

17   straight story by putting on this Government's Exhibit 453, "If

18   problem existed as claimed could he play golf"?

19          He wasn't playing golf in 1999.  He was on the

20   railroad.  Do you think after not working on the railroad some

21   of your conditions are going to subside?

22          By 2008 he's before a doctor, a respected doctor even

23   by Alton Barron's view, who says the shoulder is better.  The

24   hand is better.  The knee, you still got the tear.  And your

25   back, you need four needles, you need an epidural injection,

1    and he gets it.

2              Is someone trying to mislead you here?  That's not for

3    me to say.  That is for you to determine.

4              This whole idea of playing four hours a week during

5    the week on a manicured golf course means that you can spend 40

6    hours working on the railroad.  You may find to be absurd,

7    whatever it is, but that's the proposition that you are being

8    asked.  Because a man can go out with his buddies for four

9    hours in the fresh air and swing a golf club that Roger van

10   Etten says weighs less than two pounds, you are being asked to

11   find that Mr. Rutigliano should be working on the railroad.  He

12   shouldn't be on the golf course.

13             He should be working on the railroad when the job

14   specification requires that he lift up to 95 pounds.  And then

15   he has to, if he is going from the trackbed and he has to get

16   back on the train after throwing the switch or uncoupling a

17   car, he's got to get back to the car, he's got to put his foot

18   on a 32-inch step and he's got to grab the rail by the right

19   hand and then he's got to pull himself up, his whole weight,

20   and onto the train.  They say because he can swing a golf club,

21   he should be able to do that.

22             There were two witnesses who testified, Maher and

23   Parlante.  Both of them told Joe they were hurting, they had

24   pain.  James Maher, it was ten years ago that Maher met Joe.

25   Ten years ago.  I got pain in my neck, I got pain in my lower

D7vnles5                         Summation - Mr. Ryan

1   back.  OK.  And Maher was examined by a doctor after he got the

2   approval by the RRB.  And guess what.  The RRB doctor found

3   that he was occupationally disabled still.

4          Now, Christopher Parlante is a conductor who can't

5   avoid getting hit by a train.  He is embarrassed.  He's knocked

6   out for weeks.

7          He tells Joe when he goes for the form, Don't tell

8   anybody, but I got hit by a train.  And you are being asked to

9   find that, even though he was hit by a train, this is a man

10  capable of resuming his duties on the Long Island Rail Road as

11  a conductor for your safety and the safety of themselves.

12         Two witnesses, both admit they had injuries, both

13  admit they had pain, and one of them even says went to Joe

14  because he was great man.  He was a union leader.  I didn't go

15  to him to fabricate anything.

16         Both of them say you know when government confronts

17  them with some language, this so-called telltale language that

18  they talk about, Well, I didn't read it until after my arrest

19  seven years later.  And the other one says, Well, I was rushing

20  to get to the office, the Westbury office.  I didn't have time

21  to look at it.

22         So we are down to two witnesses out of what?  The

23  government says there was 134 available.  And you are asked to

24  convict Joe on this kind of evidence.

25         I am going to keep my promise.  It is tough for me to

D7vnles5                          Summation - Mr. Ryan

1     sit down, it is tough for me to get off this train, but I know

2     when I get off this train and I walk out of this courthouse and

3     I go home, I know I did the best I could.

4              And I have every reason to believe that Joe deep down

5     has every reason to believe that when you get off this train

6     and you finish your jury duty and you go home and you meet your

7     family members and friends that you will be able to explain

8     your verdict without any hesitation whatsoever.

9              I render my verdict based upon reason and common

10    sense, and I don't care what any newspaper says.  I'm the only

11    one who really saw the evidence in this case.

12             You are the only ones who saw the revelation and the

13    honesty and the openness of the Railroad Retirement

14    occupational disability.  You are the only ones who know what

15    occupational disability is.

16             You can't perform one or more tasks.  We don't want

17    you to on the train if you are not a hundred percent for your

18    own good and for the good of all the people who travel in your

19    custody.

20             You are the only ones who know.

21             This idea that because the Metro-North workers are not

22    filing occupational disability claims at the rate of the Long

23    Island Rail Road, which was the crux of the New York Times

24    article taken from an audit of the MTA, you know the reason.

25             God bless you, ladies and gentlemen.  Good luck.

1          THE COURT:  Thank you, Mr. Ryan.

2          MR. RYAN:  How am I doing?

3          THE COURT:  You did fine.

4          Mr. Jackson.

5          MR. JACKSON:  Yes, Judge.

6          THE COURT:  Let's see you do just as fine.

7          MR. JACKSON:  We are going to give it a shot, your

8     Honor.  A pleasant good afternoon, ladies and gentlemen.  I

9     hope all is well.  Thank you for sitting here, for listening,

10    for being attentive, responsible, wonderful individuals,

11    citizens, and jurors.

12         Yesterday we spent a lot of time speaking about

13    character.  You remember that, right?

14         We spent time speaking about character because we had

15    the pleasure of hearing from witnesses who were familiar with

16    Ms. Baran.

17         In fact, one such witness, a person that had 31 years

18    at the Railroad Retirement Board, came in here from Michigan.

19    And from his travails and travels in Michigan, he talked about

20    values, he talked about honesty, he talked about integrity, he

21    talked about decency.

22         He was Ms. Baran's contemporary in Detroit.  He did

23    exactly what she did only in another state.  He came here and

24    he talked to you about that character and about her character

25    and about her reputation for honesty, her reputation for

1    integrity and what that was all about.

2                He wasn't the only one to do that, because you also

3    heard from Ralph Domenici.  And ralph Domenici, who knew and is

4    aware and familiar with Ms. Baran for over 40 years,

5    additionally talked about character and talked about reputation

6    and integrity and how all those words apply to Ms. Baran as she

7    sits there and how meaningful it is to have someone who knows

8    you, who trusts, you who knows about you to speak to those

9    issues of character, decency and integrity.

10               But you see when you don't have character, when you

11   don't have honesty, when you don't have integrity, or if at

12   least you don't have witnesses who have those qualities, you

13   resort to attacks.

14               Therefore, and I will discuss the lack of character of

15   the witnesses that you had to hear from, but when you don't

16   have the integrity and the character and the honesty you assail

17   someone not by way of evidence, but by way of family.

18               Let's get to your family.  And what did you see here

19   perpetrated upon you.  You saw Mr. Baran repeatedly attacked

20   and you saw a golf video of him playing golf and that was to

21   suggest to you that somehow he's defrauding the system, a

22   person who spent 25 years making railroads safe, spending 25

23   years in ensuring, as Ralph Domenici told you, that the 350,000

24   passengers who ride that train every day are safe, secure, and

25   they get home to their families.  And there are not you can

D7vnles5                         Summation – Mr. Jackson

1    infer the derailments and there are not people who are

2    subjected to danger because of the hard work that people like

3    Gus Baran did and the people like Ralph Domenici did.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. JACKSON:  So instead you're shown a video where he

2      plays golf three times a week and you're asked to and the

3      suggestion to you is drawn that somehow he's not disabled,

4      right, that's not a fact that relates to Ms. Baran and

5      corruption and fraud.  It's a fact that diverts you to a side

6      show and a side issue to attack her husband and attack her

7      family.

8           So let's talk about that.  And what evidence did the

9      government suggest to you would make it clear that he's not

10     disabled, total and permanent?  Now, just to make myself clear,

11     this trial is about occupational disability, and I gather from

12     what the government turned it into about Mr. Baran being total

13     and permanent, the definition is not holding a job in the

14     national economy.

15          And Mr. Ryan addressed that issue when he talked about

16     four hours of golf a week and how you can possibly convert that

17     into 40 hours of railroad time, and that's beyond me.  I know

18     as jurors, government reminds you, using your common sense, I

19     know you have that, and therefore you won't be fooled that

20     playing golf four times a week would somehow suggest and

21     comport with the definition of being able to hold a job in the

22     national economy.  Are they kidding me?

23          But what do they do in order to demonstrate that Gus

24     Baran, he's a fraud?  All these numbers that he got for

25     disability that he earned as a result of the fine work that he

1    did for that railroad, they bring to you a doctor that they

2    hired, right.  And we've heard about his $70,000.  All the tax

3    returns we've seen, be nice to see his.

4            But in any event, the reality is is that you saw a

5    doctor that they called to testify and that doctor, what did

6    they do?  He relied on the records the government gave him and

7    relied on the records that the government gave him, which

8    apparently there was apparently one or another doctor in that

9    entire file, didn't look at Gus Baran, didn't examine Gus

10   Baran, didn't do anything himself in order to assess and

11   analyze Gus Baran's position.

12           We all know, because you heard it time and time again

13   from me about the approximately 12 doctors that Mr. Baran had.

14   Now, if I can just ask you, in appealing to common sense, in

15   the event that you wanted to establish to the jury that Gus

16   Baran is not totally and permanently disabled, do you think

17   maybe one of those 12 doctors could have been called before you

18   and said you know what, yes, I know Gus Baran.  I've examined

19   Gus Baran.  He's been in my office.  I've done an x-ray with

20   Gus Baran.  I did an MRI with Gus Baran.  I prescribed

21   medication to Gus Baran.  He's not disabled.

22           But, no, they don't want to show you that because that

23   would conceal something they know and something if you look at

24   his claim file, which is in evidence and you'll have an

25   opportunity to see.  If you look at Gus Baran's claim file,

D7VLLES6                        Summation - Mr. Jackson

 1     you'll determine and it will show you -- the claim file number,

 2     I believe it's 103 or 113 -- it will establish clearly what his

 3     ailments were and it will establish clearly and plainly for you

 4     that he's a disabled person.  He's a disabled man.

 5          And don't let the fact that you see a video that they

 6     show you on a screen of him swinging a golf club in any way

 7     take you away from that critical fact that that's a person who

 8     absolutely is disabled, who applied for disability, and as a

 9     result of those conditions, was awarded a disability.

10          And in the event that that was not the case, I think

11     that certainly in terms of evidence being brought to your

12     attention, evidence that might have been compelling and

13     persuasive, perhaps, perhaps, only perhaps, and not to be

14     repetitive, a person who actually treated him could have come

15     in that jury box and looked at you and said, you know what, I

16     treated him and it was all a scam.

17          What else do we know?  We know that of course didn't

18     happen because it couldn't have happened.  You could infer if a

19     doctor who did treat him did testify what they might say, and I

20     think it might have been contrary to the $70,000 doctor that

21     they paid for to come in here and tell you otherwise, looking

22     at limited forms that they decide to show you.

23          And so therefore when you look and examine Gus Baran,

24     look at his application and the multiple ailments he has and

25     the multiple injuries that are alluded to, the multiple

1    treatments he's got.  And not only that, but the various forms

2    of medication that he's taken and the various forms of

3    medication that he has to use every single day in order to be a

4    functioning member of society.

5         And what about with this whole golf claim, do you

6    think maybe they have could have in conducting this

7    investigation brought you in information about what if anything

8    he was taking when he was on the golf course?  What about

9    investigating that?  What about sending an investigator to

10   follow him as he did the various holes or into the men's room

11   or wherever he was to establish what he was taking to aid him

12   in doing that.

13        But this is a tactic because they don't have

14   information in evidence against Ms. Baran that they're going to

15   attack Mr. Baran.  And they're going to attack him in the way I

16   described which is inadequate, wholly insufficient.  And I

17   would ask when you evaluate his claim file and evaluate the

18   evidence and the testimony, you reject that as out of hand, and

19   you come to the conclusion that that RRB file, when you look

20   through, will direct you to, that you come to the conclusion

21   that is in the documents on his application, which I need not

22   show you because you've seen again and again on that screen

23   what we saw the various medication, we saw the conditions and

24   we saw the reason nature and purpose of his disability.

25        That's what you need to evaluate.  That's the Gus

1   Baran who worked on the railroad that you need to see and the

2   disability income that he received is disability income that he

3   was entitled to.  And don't ever let the government divert you

4   otherwise to suggest anything other than that.

5              And so, again, after you look at this, now you have to

6   look at the issue of again character.  And let's talk about

7   that issue of character.  180 applicants, remember you saw the

8   diagram with 180 people.  180 people.  180 people.  And it

9   showed applications of Ms. Baran as it related to 180 different

10  applicants.  180 people standing, walking, whatever it is, OK.

11  And of those 180 people, ladies and gentlemen, they brought

12  here three witnesses to testify.

13             You're in a draft, right, and you get three top picks

14  of people to come in and to tell a jury how much of a corrupt

15  fraud Ms. Baran is, how she didn't do her job.  And who do they

16  bring you?  They bring you Regina Walsh, they bring you Michael

17  Stavola, and they bring you Robert Dunaj, and let's talk about

18  them.

19             Now, when you look at Ms. Walsh, for example, the

20  government directs your attention and they say, well, you know

21  what, she had nothing to gain.  She had nothing to lose.  I'm

22  not entirely sure which trial they sat through because it was

23  introduced in my questioning of her and I think the government

24  introduced a document that she signed.

25             And I asked her a question about what it is based on

D7VLLES6                          Summation - Mr. Jackson

1   her testimony she's hoping to gain and she said probation.

2   Why?  Because she's not sentenced yet.  She's sentenced in

3   September.  And so therefore if she would come and testify

4   before you -- and just to be clear, this is a document that's

5   in evidence.  Bates stamp 351410.  That's Ms. Walsh's

6   agreement.  And that looks to be her signature.  Nothing to

7   gain.  Agreed and consented to.  Last page.  Signature.  Regina

8   Walsh, agreed and consented to.  This is a six-page agreement

9   with the government.  Again, it's in evidence for you to see.

10          And I won't read it all.  Based on calculations, she's

11  facing up to 12 months.  It is understood that the sentence to

12  be imposed is to be determined by the Court.  But, no, she

13  doesn't have anything to gain.  She's just testifying because

14  she wanted to right a wrong and correct a mistake.  But is that

15  why she's being sentenced and it's delayed until after her

16  testimony at trial because she has nothing to gain?  She has

17  everything, everything to gain in this case by giving the

18  testimony that she did.

19          And let's talk about that testimony because I just

20  don't want to allow you to believe that I'm just focusing on

21  this agreement and saying that would be the basis of why she's

22  misrepresenting things to you and lying about Ms. Baran.  I

23  think her own application demonstrates the lies she's told.

24          So let's look at that application.  Then we don't need

25  to go through all of it.  The government focused you on, you

1    know, Regina Walsh and, my goodness, Ms. Baran lied for her.

2    Ms. Baran called her.  She said I'm retiring and I want an

3    occupational disability and she's going to get it and they were

4    in cahoots doing it.

5           Could you blow that up, please.  Dates of treatment,

6    well, that looks like November 9, 2005.  October 10, 2005.  You

7    could read, ladies and gentlemen.  It will be with you back in

8    the exhibit room -- in the jury room, excuse me.

9           And when you look at that, does that or does not that

10   predate by a year or more, two years, when she went to

11   Ms. Baran for her occupational disability?  So did she speak

12   with Ms. Baran in 2005 and were they cavorting in 2005 for

13   something that they sat down in 2007?  You didn't hear that.

14          The fact is that it was her idea, Regina Walsh's, to

15   get an occupational disability.  It was her lies that were told

16   regarding an occupational disability, and it's she who's

17   accountable for an occupational disability.  This is not

18   something that Ms. Baran said, you know what, let's conjure up

19   together.  Let's do this.  It's written right in the

20   application.  So you match that against her incentive to lie to

21   you and you see it right there.  And that's not it, but you

22   look at the application itself.

23          All right.  And you see these various boxes that are

24   checked.  Now, let's look at that.  You'll hear a lot about

25   Section 6.  And I shouldn't say you'll hear a lot about it.

1    You've certainly heard a lot before this Section 6 already and

2    this is just something that Marie Baran dreamed up.  This is

3    something she did.

4         Meanwhile, it says specifically leg pains when sitting

5    for more than 15 minutes.  Leg pains when standing for more

6    than five minutes.  Did Ms. Baran just unilaterally decide to

7    throw these things in an application for Regina Walsh who was

8    looking to get an occupational disability in 2005 before they

9    even spoke?

10        And on that issue, who was her doctor?  Her doctor was

11   Ajemian, a doctor she had consulted and gone to before she even

12   spoke to Ms. Baran.  It makes absolutely no sense at all that

13   Ms. Baran should be held accountable for something that Regina

14   Walsh does.  But then again, if you're facing prison time and

15   you're 65 years old or thereabouts, as Regina Walsh is, she,

16   according to the government, doesn't have any incentive to lie.

17   She's just here to right a wrong.

18        And now you see this on the application itself and you

19   see there are various boxes to the left that are highlighted.

20   And that's highlighted for a reason because I'm going to make

21   another point now and that's this.  Just a couple things.

22        The first thing is in most of the boxes of the

23   application, of course, the hard is checked.  Well, ladies and

24   gentlemen, if it were easy, if it were easy, would they be

25   applying for an occupational disability in the first instance?

 1   So naturally a hard box of course is going to be something that

 2   might be highlighted with an explanation in it.

 3          But by the government's own evidence, own evidence,

 4   and I'll show you momentarily, Ms. Baran of course went over

 5   applications because on Mr. Stavola's application that I'm

 6   about to show you, the boxes are different.  Did she make that

 7   up too?  She said, Ms. Walsh, we have to check this box.  But

 8   with you, Stavola, we have to check the other box.  The reason

 9   the boxes are checked differently because as we explained to

10   you and she explained to you, in the event they were filled

11   out, when she spoke with the parties, she switched the boxes to

12   otherwise describe the conditions that they were describing to

13   her.

14          Now, as far as Regina Walsh goes, let's give you a

15   further instance of why she's fabricating and then I'll compare

16   those highlighted boxes.

17          Now we have this email.  We have this email,

18   Exhibit 108-E and 108-E is when the Railroad Retirement Board

19   called her.  And when the Railroad Retirement Board called

20   Regina Walsh, she's saying that Ms. Baran told me to say all

21   these things.  I wanted to get a disability.  She told me

22   everything.

23          Well, think about something.  This is an exhibit that

24   I have access to.  This is something that is in her claim file

25   and you'll have in the jury room too.  It's Exhibit 108.  And

D7VLLES6                        Summation - Mr. Jackson

1    you'll look at her claim file and when you look at Regina

2    Walsh's claim file, I'm going to ask you in evaluating that

3    claim file, tell me -- and claim file contains all of her

4    medical information -- if there's anything that that claim

5    file, the entirety of which Ms. Baran doesn't even have access

6    to, that differs from the claim that Regina Walsh is making.

7           But here's the kicker.  This document here, she knows

8    I have access to this document.  So she has to explain away to

9    you why a document like this says Regina Walsh had this

10   conversation.  And the easiest way for her to explain that is

11   to say let's say Ms. Baran told me to say that, but I put it on

12   scrap paper, but guess what, I can't find the scrap paper.  I

13   looked for it last night and the night before, but I didn't

14   come to find it.

15          Does that make any sense whatsoever?  And the reason

16   it doesn't make sense is because it didn't happen.  She's

17   fabricating and she's covering her own tracks to explaining why

18   there's a document that speaks to what she said when she can

19   only say I didn't say it, someone told me to say it, and it was

20   Ms. Baran.  Of course.  That's explains it.

21          Now, of course, again, as I mentioned, there's 180

22   people to choose from, but they bring in Regina Walsh, who has

23   every incentive to lie to you.  Of the 180 applications

24   Ms. Baran filled out, she's a witness.

25          Now, the second witness we have Michael Stavola.  Now,

1    Michael Stavola, I don't think we have to spend a lot of time

2    with him.  We've learned about all the lies he's told.  And I

3    believe that in his testimony he said he was facing up to 85

4    years.  And we'll be guided by your judgment in terms of what

5    you remember, but there's another witness whose facing 85 years

6    in jail and although he's facing 85 years in jail, he doesn't

7    have an incentive.  No, he's facing 85 years to no jail time

8    and, of course, another witness who's being sentenced after

9    this trial.  So, but I'm here to tell the truth.

10        And him being here to tell the truth is after he went

11   to the grand jury and need we go into it?  Now, I would suggest

12   to you that the one thing in the grand jury that he made

13   crystal clear before he was arrested thereafter and facing all

14   of this jail time is he said in the grand jury about how

15   Ms. Baran went through the application with him chapter and

16   verse.  She did everything she needed to, he gave her answers

17   to questions, he did a number of things.

18        Now, later he changes that and he tells all of you,

19   right, no, that didn't happen.  She wrote everything.  I don't

20   know anything about it.  I didn't see the application.  Didn't

21   look at it.  Didn't want to get anybody in trouble and that's

22   the point.

23        But, you know, it's telling because if you look at

24   these two applications, if you look at Section 6 of these two

25   applications, you can see where, for example, under the

D7VLLES6                        Summation - Mr. Jackson

1   application of Michael Stavola, Michael Stavola's application,

2   if I could direct you to where it says eating and bathing,

3   eating, bathing, see that?  Eating, easy, bathing, hard.  And

4   I'll show you a number of other but, well, you could look at it

5   at your leisure.

6           But look at over here.  Eating, bathing, Regina

7   Walsh's application, easy.  Did Ms. Baran when she was doing

8   these with applicants just say eeny, meeny, miny, moe, for you

9   I'll say easy, for you I'll say hard, or does it speak to the

10  issue of her conferring with the people she was taking the

11  application for and modifying what was in that application

12  based on what they told her?

13          And also with Regina Walsh, we've already established

14  where it says leg pain for more than 15 minutes.  Don't need to

15  review that again.  But then we look at Mr. Stavola's

16  application and it talks about extended periods causing severe

17  pain, etc., etc.  So it indicates that crouching causes pain,

18  reaching, bending.  So that's different from Regina Walsh's

19  application.  So did she just decide to invent that with

20  Michael Stavola too?  Or does it make more sense, as I have

21  suggested and will suggest repeatedly, that it was Mr. Stavola

22  who in describing those conditions to clarify for Ms. Baran who

23  went through the application who told her that?  What makes

24  more sense?

25          And I would suggest to you that in evaluating what

D7VLLES6                    Summation - Mr. Jackson

1    makes more sense, it's obvious who makes more sense.  And the

2    person who makes more sense testified yesterday and she

3    testified on her own behalf and she told you exactly what

4    occurred and that's what did occur, ladies and gentlemen, I

5    would suggest.

6          And then, of course, we have Robert Dunaj.  And again

7    for Mr. Stavola -- we have a proffer agreement for Mr. Dunaj.

8    We've got another agreement for Mr. Stavola.  I won't belabor

9    the point.  We know what he said about his 85 years.  But

10   Mr. Dunaj, of course, him too.  We have a proffer agreement and

11   then we have this agreement that he has with the government

12   about giving testimony.  But he doesn't have anything to lose.

13   He has nothing to gain.  But, of course, he's being sentenced,

14   as we know, again, after, after this trial.

15         So think about that.  Having a hammer put over your

16   head, a hammer is put over your head regarding what testimony

17   you give.  But you're going to be truthful.  Is there anything

18   in that plea agreement that talks about a conviction?  Is there

19   anything about that plea agreement that says someone has to be

20   convicted?  Does it say to be truthful?

21         Now, now all of a sudden after all these witnesses are

22   caught in various lies, now they're swearing in front the grand

23   juries and everything else, now they're telling you I'm

24   completely truthful today, ladies and gentlemen.  I've had a

25   change of heart.  I know I lied to the FBI when they came to my

1     house.  I know I lied to the grand jury.  I know when I got out

2     of the grand jury I lied again.  I lied to everybody.  But to

3     you and today, you can take my word on it.  I took that oath,

4     I'm being truthful.

5                 And Mr. Dunaj, of course -- before we go to Mr. Dunaj,

6     another thing with Michael Stavola, again, seeing Ajemian well

7     before his meeting with Ms. Baran.  So she's in this grand

8     conspiracy to get doctors to tell these exactly what they

9     should say in applications and to make up things to get him an

10    application, but they see the doctors before they see her.

11                So how does that fit into the government's theory of

12    her being a crook and a criminal and a fraud and at 65 years

13    old just decided, you know what, it's about time that I engage

14    in a life of crime?  Never did before but I just think that I'm

15    going to take this opportunity, or are these witnesses having

16    some other motivation?

17                And the final witness, again, the big three.  They had

18    180 people to choose from.  These are the three they present to

19    you.  Final witness, Mr. Dunaj.

20                Now, Mr. Dunaj testifies.  And you'll have his -- we

21    don't have to go through his application in chapter and verse,

22    but you'll notice how the explanations differ from the other

23    two.  And with regard to the explanations and them differing

24    from the other two, Mr. Dunaj, of course, he had a change of

25    heart.  He decided to withdraw his application, right.  He

1  decided to withdraw it after he saw the New York Times article,

2  after he know he went in and lied to Ms. Baran and after he

3  knew that the gig was up for his lie, now he pulls it back and

4  again entered into an agreement with the government which

5  requires that he come and he testify in front of you.

6          So this is the evidence that they're relying upon for

7  you to draw the quantum leap, the quantum leap that Ms. Baran

8  here is fabricating everything.  Ms. Baran here is in cahoots.

9  She's lying with doctors that they went to before they saw her

10  and she's lying in cahoots with them because she's a good

11  Samaritan?  Which brings me to the issue of motive.

12          What motivation does Ms. Baran have to fabricate?  She

13  gets paid on the application whether or not they get their

14  disability.  She gets paid on the application whether or not

15  the disability application is approved, disapproved, modified,

16  and the witnesses had to admit that because there would be

17  nothing that would substantiate that lie if they said they paid

18  them off.  The government would say give them your bank records

19  and they wouldn't show anything.

20          So instead what would Ms. Baran's motivation be to

21  help these people?  Did they show you -- they ripped apart,

22  they -- the government went.  They got computer records from

23  her and they showed you her tax returns, which we'll get into

24  momentarily, and they showed you all this information and

25  investigated her life for years and going and digging in every

1     hole in her life.

2              Is there an email from the computer that they ripped

3     out of the TCU office with her and any annuitant saying, hey,

4     I'll create that application for you, don't worry.  Give me

5     more money for the application.  Is there an email to any

6     doctor, Ajemian, Lesniewski, I don't know, a nondoctor, Joe

7     Rutigliano, is there anything that would be suggestive of

8     Ms. Baran in cahoots or engaging in any type of criminal

9     enterprise with anyone?

10             What motivation other than running a legitimate

11    business, which I will also get into, would Ms. Baran have to

12    fabricate?  Why?  She's getting paid.  She's doing her job.

13    She's a wealth of knowledge and information, as you've learned,

14    regarding retirement issues, regarding the distinction between

15    Long Island Railroad and the Railroad Retirement Board,

16    regarding the nature of the pensions.

17             So is she just a good Samaritan that just wants to

18    defraud the government and cheat them because she doesn't like

19    the government that she worked for for 40 years because they

20    mistreated her?  It doesn't make sense.  Should there not be

21    some other internal motivation for her to fabricate?  She's

22    just going to lie for people because she wants their

23    application approved, is that the theory the government is

24    saying that -- I don't know.  I'm just not clear on what her

25    motivation.

1          Now, the judge will instruct you regarding motivation

2     and how the government need not prove motive, but it certainly

3     goes to what they like to talk about which is her intent, her

4     intent, her intent.  What's the intent here?  I'm lost as to

5     why Ms. Baran would unilaterally take it upon herself in her

6     own hands and just decide that she just wants to lie for

7     people.  Shouldn't she get something in return if she's lying?

8     Shouldn't there be some end game?  Shouldn't there be some

9     justification as to why she would want to lie, why she would

10    want to fabricate?  There is none.

11         The motivation is by the three people that come in

12    here to tell you what, to tell you that, you know what, it was

13    all her fault.  It was all Ms. Baran's fault.  I can say that

14    if I'm getting sentenced and, you know what, it gets me out of

15    trouble.

16         So I'm just anxious to hear.  And then the government

17    will point to all the money she made, all the money she made,

18    all of this.  Look at the tax returns, 2008, 2009, 2010.

19    Ladies and gentlemen, in America we're allowed to make money.

20         We talk about consultant and we talk about this whole

21    issue and the government brought it up in their case.  I don't

22    know how many times I heard ridiculous, ludicrous, and this is

23    absurd and the various adjectives I heard.  The only absurdity

24    and ludicrousness and ridiculousness and preposterousness that

25    I heard from the government is their theory as it relates to

1   why Ms. Baran would ever want to engage in a life of fraud

2   after working honestly all her life.  She gets paid to do her

3   job and you saw and heard what that job was.

4           Because she makes money as a consultant and they say,

5   well, the forms are easy.  It's easy.  Well, their own

6   witnesses said there was some intimidation as to them, there's

7   some complexity.  We're talking about blue collar people.  I'm

8   not being at all insulting, but these are blue collar people

9   who work on railroad trains.  Ms. Baran has some special

10  information and knowledge as to this, as other consultants did,

11  so they relied upon her to get them through the system to learn

12  what this is all about.  There's nothing wrong with that.

13          And the notion and insinuation and the inference that

14  the fact she's just working and doing a business which she's

15  reporting is somehow illegal in and of itself?  You didn't hear

16  any testimony or evidence regarding that.  She's allowed to do

17  that.

18          And, by the way, in the event that Ms. Baran was

19  attempting to hide or conceal, would she have even put a

20  business, consulting business on her tax returns to begin with?

21  When is the last time you saw a drug dealer file taxes of any

22  sort?  I mean I just -- it's beyond me the notion that she

23  would create a business and now she's trying to hoodwink

24  everybody, but she's going to report income from the business

25  that's a fraud to begin with?  So you're going to alert the

1    government that you're a fraud?

2           Let's talk about the further diversion.  Now, since

3    the government, again, having no evidence, relying upon three

4    people who have no character, who have no credibility, who have

5    an interest of their own, of all the people they have to choose

6    from, after they finish attacking her husband, now they attack

7    her with her taxes.  And somehow because she amended her tax

8    return in 2007 -- and I don't have to show you.  You've seen

9    her taxes over and over again.  Somehow that she's amended the

10   tax return from 2007 that that makes her a criminal because

11   she's amended and paid her taxes?

12          And if you look at the 2008 tax return, and they show

13   you these charts -- look at all the money she made by doing her

14   consulting, ladies and gentlemen.  Shouldn't people be entitled

15   to do the jobs they want, whatever they are?  Isn't that our

16   democracy?  That's the way it works.  And she's reported her

17   income in 2008, 2009, 2010, 2011.

18          So what do they show that to you for?  They show that

19   to you so that it would prejudice you against her.  So that you

20   would somehow think this modified tax return, she modified her

21   tax return, she must be doing something.

22          Ms. Baran is 65 years old.  The two things you heard

23   about her is she had a modified tax return in 2007 and she had

24   a two-day suspension from work in whatever it was, 2005.  If

25   everybody could be so lucky and fortunate as to have those two

1   things happen to you in a life and that's all the government

2   could present to you after investigating the case tooth and

3   nail and pulling out records and pulling out computers and

4   pulling out everything else.

5           But you know what, ladies and gentlemen, the

6   government says that may not do it.  You may not be prejudiced

7   enough against her because of the fact that she's making money

8   with a legitimate business, and you may not be prejudiced

9   against her enough because we're attacking her husband,

10  bringing in no evidence to support our attacks other than the

11  doctor we paid to not evaluate him, so now they want to talk

12  you to about her trips.

13          And they want to talk to you about the trips as if

14  there's something wrong with going to Egypt, as if there's

15  something wrong with going to the Dominican Republic, as if

16  there's something wrong with going to, Mr. Ryan, Ireland.

17          MR. RYAN:  Thank you.

18          MR. JACKSON:  The fact is that she's taking trips.  Is

19  that a crime to take trips based upon money, moneys that she

20  earned?

21          You didn't hear any testimony about here -- now, of

22  course, the government witnesses want to say I met her briefly,

23  except for Dunaj.  I'll give him credit that he mentioned he

24  met with Ms. Baran for the hour and a half.  And you might kind

25  of think and wonder, what might he have been doing for the hour

1  and a half, playing footsie?  I mean what were they doing?  She

2  was going over the nature of the application.

3        So if she's working for her income, should you be

4  suaded by tax returns and should you be suaded by trips that

5  she took?  And you'll have the passport because, of course,

6  that had to be introduced into evidence.  And can I see the

7  travel records?  And travel records, which I won't get through.

8  You'll have these to thumb through.

9        But maybe, according to the government, we look at her

10  travel records.  I've never been to Ireland.  I've never been

11  to Egypt.  She was allowed to go Egypt so maybe that's

12  something else you can hold against her.  But we know that

13  you're smarter than that and that's not something you're going

14  to do.

15        But why is that diversion brought to you?  Why is that

16  smoke screen brought to you?  Why are we here talking about the

17  trips she took for money that she earned doing her consulting

18  business and for moneys regarding what her husband earned from

19  his years of service and his disability?  In order to divert

20  you from the fact that there's not a shred of evidence pointing

21  to any wrongdoing by her, and so they're asking you to base and

22  convict her based upon the words of people who we've already

23  established have no credibility?

24        Now, let me just shift, if I can, back to the

25  application.  I addressed question 39 of the application, won't

1    address it again.  I promise you.  Easy, hard, whatever.  OK.

2              But now let's look at question 40.  And looking at

3    question 40 of the application, question 40, a normal day.

4    Now, the prosecution when they got up showed you the other

5    Exhibit 17 and said to you something that was a

6    misrepresentation, which you'll see for yourself.

7              All of these are the same.  All of them are identical.

8    Look at their, look at the Government's Exhibit 17 versus the

9    exhibit that I showed you and I'm showing you now, which is

10   17D, and look at the distinctions between the responses in

11   Section 6, excuse me, question 40.  And what you'll do when

12   you're looking at those is it will become clear, plain to you

13   what she did is she used certain prompt.

14             Again, she created language beforehand because it's a

15   repetitious business.  It's a matter of efficiency, you could

16   infer, that, look, all these people have disabilities, this is

17   something that needs to be done, so let me create language and

18   then as they talk to me I'll modify the language.

19             So did she make this up too?  The general language is

20   the same, right?  But the distinctions regarding the times they

21   woke up, the nature of their activities, I mean we can go page,

22   page, page, I won't, but if you look at all the pages, you'll

23   see that the differences that are there with regard to all the

24   applications, right, a number of applications that she took.

25             So why are these changes there?  Because she just

D7VLLES6                    Summation - Mr. Jackson

1   decided to fabricate?  Because Ms. Baran was doing her job.

2   She had the prompt and based upon that prompt, she incorporated

3   language that was suggestive of what the people who were coming

4   to her to do had.

5            And we further also know that regardless this is

6   pretty much irrelevant and it's irrelevant because this goes to

7   show, what, it goes to show for mental condition, the whole

8   purpose of Section 6, question 40, is to address somebody's

9   mental or emotional state.  It doesn't have anything to do with

10  injury.

11           And so I would ask as you go back into that jury room

12  and you're looking and Ms. Baran is just developing these

13  applications, having no motive herself to do it other than

14  being a good Samaritan, because I just don't understand what

15  else the government is saying to you, the fact she made money

16  they're attacking on complex applications?  Again, it's not

17  complex to someone who might wear a suit and tie and go to work

18  every day.  But by virtue of, you know, what these own

19  witnesses said and I asked the questions to Stavola.  The

20  complexity, yeah, it was kind of complex.  And that's what he

21  told the grand jury also.  Of course, he says a different

22  story.  Dunaj, yeah, a little complex.

23           And, in fact, it was Mr. Dunaj who talked about the

24  distinction in the FBI investigation about like tax forms.  I'm

25  just sort of -- I just they're intimidating.  So people who may

1   not be accustomed to that would need somebody's assistance.

2   What's wrong with that?  What's wrong with having a business

3   where you're assisting people, developing an application in an

4   area that you're very comfortable with and they're not?

5          And then to misrepresent to you and to misguide you on

6   question 40 so as to otherwise suggest that question 40 was all

7   the same when we could go through this and you have it, it's

8   Exhibit 17D, and you'll see where there's changes.  It just, it

9   defies logic.  It defies common sense, some of the arguments

10  that the government is making and I would suggest perpetrating

11  before you.

12         THE COURT:  Mr. Jackson, this is time to begin

13  summarizing.

14         MR. JACKSON:  Yes.

15         And so if you look at this and then you look at the

16  entirety of her business, let's look at the authorization

17  forms.  Authorization forms for purposes of her business,

18  right.  There's 86 authorizations forms and you'll have that.

19  They parade authorization forms in front of you like she was

20  doing something wrong with having her clients give her the

21  authorization to do her job?

22         And we know she wasn't doing anything wrong because we

23  also have -- and that's Exhibit 18B -- what we also have, we

24  also have 18A.  We have Exhibit 507, which are the call logs we

25  have with the RRB.  We have Exhibit 507, which are the call

1    logs with the RRB.  It's obvious if you look and examine those

2    exhibits that everything she says to them is noted on record

3    and on file.

4            So why parade authorization forms in front of you so

5    as to mislead you?  We got those from her computers.  So what?

6    She's doing her job with having an authorization form in the

7    first instance.

8            Five minutes, Judge.

9            And so if you examine the totality of the evidence

10   that the government has, they're asking you to make a quantum

11   leap to convict someone who runs a legitimate business and who

12   gives up herself and who served the public for years in and

13   years out and who's done what she's trained to do and knows to

14   do and gets no benefit in return from doing?

15           And then they had the nerve, you remember the email

16   they got, go see Dr. Ajemian.  Ask for Marie.  Tell them to get

17   the earliest possible appointment.  They showed you one such

18   form and they want you to I guess make the inference there were

19   loads of them on her computer when they showed you one and they

20   attack all of her records and everything else.  They pulled all

21   her records and all her files and they want you to make the

22   leap she was in cahoots with someone.

23           Who have they established Ms. Baran is in cahoots with

24   in any way, shape or form?  The doctors, really?  The

25   annuitants that she served?  Where is this grand conspiracy

1   that we're referring to?

2          And if you look at the nature of her business, you've

3   already seen the forms, the intake forms.  She explained them

4   just yesterday.  She explained the differences with the Long

5   Island Railroad, the Railroad Retirement Board, the plans that

6   she had.  Ms. Baran was doing her job and now she's being

7   prosecuted and caught up in some dragnet to otherwise suggest

8   that, you know what, she's doing something wrong?

9          And then they make this inference, the government

10  wants to make this inference between Metro-North and the Long

11  Island Railroad and why do they do that?  And they show you

12  these gross disparities.  These gross disparities.  Look at how

13  many of these, right.  And the reason they show that to you is

14  obvious.  There must be fraud at the Long Island Railroad.

15         But you heard the witnesses testify that's comparing

16  apples and oranges.  You have a different retirement age at

17  Metro-North, 62 as opposed to 50 at the Long Island Railroad.

18  You have one that gets healthcare benefits when they retire;

19  the other one does not.  You have one that has a different base

20  pay, Long Island Railroad has more, so they could afford to do

21  it.  So by virtue of that you should make the inference that's

22  fraud?

23         Ms. Baran has lived her life as a law-abiding citizen.

24  She has lived her life serving humanity.  She has lived her

25  life honorably, as the character witnesses that I began having

D7VLLES6                      Summation - Mr. Jackson

1    this discussion with you this afternoon talking about and that

2    I will end talking about.  In the same way that they would

3    suggest to you and tell you who Ms. Baran was, that's the same

4    way that her life is exemplified before the government has

5    attempted to perpetrate what I would suggest is an injustice

6    upon her by having you, based upon the evidence that they put

7    before you, hold her accountable and find her to be a criminal.

8         Ladies and gentlemen, I'm confident that you get it.

9    I think that what now has to happen is you have to allow the

10   government to get it.  And in allowing them to get it, ladies

11   and gentlemen, I'm confident that you'll reach a conclusion

12   that comports with justice, humanity, decency, and common

13   sense, and that conclusion will bring you to the notion that

14   Marie Baran is not guilty of any charge here.

15        She did her job, she did it well, she served.  You

16   have done your job, you have done it well, you have served.

17   Send the only message that you possibly can send here with

18   regard to Ms. Baran and with regard to her being the type of

19   human being she is.  And in doing that, I'm confident that you

20   will conclude that she's not guilty of any crime.

21        Thank you.

22        THE COURT:  Thank you.

23        Mr. Durkin.

24        MR. DURKIN:  Are we going to break at some point,

25   Judge?

1            THE COURT:  No.  Unless --

2            MR. DURKIN:  OK with me.

3            THE COURT:  Let's go ahead.

4            MR. DURKIN:  Can I move the podium?

5            THE COURT:  Yes.

6            MR. DURKIN:  Not the easiest of tasks of following

7    Ms. Friedlander and my Irish colleague, Mr. Ryan, Mr. Jackson,

8    but I will say the same thing that they said which is thank you

9    to you and thank you for giving me the opportunity to work in

10   kind of the Yankee stadium of the federal court.  This has been

11   a thrill for me to be here and it's been an educational process

12   for me as well.

13            I want to start where Mr. Ryan mentioned, which I

14   thought was very appropriate.  He said the jury box is where

15   the power of the government and the New York Times stops.  And

16   I think that's very appropriate for a case like this, and I'm

17   going to tell you why.

18            You're going to be told that in some of the

19   instructions that the judge is going to give you, and you also

20   heard some of this when you were being asked to be qualified as

21   jurors -- and I know how embarrassing and awkward that is

22   sometimes to have to talk that way.  And the reason it is is

23   because we people who spend our lives doing this -- you may

24   wonder what kind of crazy people we are for making those

25   choices, but we have to rely on your answers to those questions

1    because that's how the system works.

2            And one of the instructions you're going to get is

3    that you have to, you're reminded that you took an oath to

4    render a judgment impartially and fairly and not to be swayed

5    by prejudice, sympathy or fear and to be guided solely by the

6    evidence in this case and the applicable law.

7            And the reason I start with that is it is if there was

8    ever a case where prejudice or fear could take hold of a jury,

9    this is the kind of case.  Twice in the opening statement, in

10   the closing argument Ms. Friedlander suggested to you that this

11   was an epic fraud, a definitive fraud of money that was

12   supposed to be a safety net for suffering people.  And shortly

13   after that, she said to you that there was evidence of people

14   traveling around the world on the government's dime.

15           And I bring that up to you because that's dangerous

16   stuff in this day and age.  There's an ill will blowing in our

17   country these days that could take hold of you if you didn't

18   follow your oath and say, ha, one more time people ripping off

19   entitlements, one more time people ripping off the government.

20           It would be no more appropriate for you to do that

21   than for me to say to you, you can't convict on this evidence

22   because he'll go to prison.  That's out of bounds too.

23           The only thing that you can do -- and we have to rely

24   on your oath and I do -- is render something fairly and

25   impartially because some of what you saw here based on the

 1    evidence I heard is part of that tension that's in the air in

 2    our country right now.  There's a debate here about whether

 3    these men and women were entitled to this occupational

 4    disability, and the evidence that I heard is that that was

 5    negotiated by a union contract.  And I heard evidence that

 6    there was considerable differences in the union contracts

 7    between Metro-North and the Long Island Railroad.

 8            Now, that's a tricky issue because we're talking only

 9    about occupational disability, and that's a totally different

10    issue that goes all the way back to the 1930s when railroads

11    were somewhat different than they are today, when we had a

12    Great Depression and when unions took hold and many people say

13    saved this country.

14            Now, once again, we can argue unions, that could send

15    you over the edge too because there's many -- unions aren't too

16    popular these days.  Some of it for probably good reason, some

17    of it not.

18            But that's important for you to view this evidence

19    because the question on the table, as I heard the witnesses, is

20    could these people perform every function of their job.  That's

21    different than permanent disability, which the government

22    frequently wants to lop in here.  But I will point out to you

23    and I will do the same thing Mr. Ryan asked you to do, take

24    these whole files back there.

25            Ms. Friedlander said witness after witness came in

1    here and testified against Dr. Lesniewski.  Well, I'm sorry, I

2    only heard four.  Four patients came in:  Gagliano, Supper,

3    Parlante, and Ellensohn.  Those four people took the witness

4    stand the first week.  And those four, by the way, if you look

5    at the file and if you recall their testimony, each and every

6    one of them was denied permanent disability.

7          You heard evidence that there was, that the Railroad

8    Retirement Board had to send these people on to get other

9    reviews for permanent disability.  Every one of the four people

10   who testified against Dr. Lesniewski -- and some of them I

11   don't even think they testified against him.  I couldn't quite

12   tell whose side they were on at some point -- every one of them

13   did not qualify for permanent disability.  So don't get misled

14   by that.

15         The question is look in those files and does it

16   provide a basis for them, a medical finding, an objective

17   medical finding for them not to be able to perform any function

18   of their job.

19         The most important one I suggest you should look at is

20   Mr. Supper, who surprisingly to me Ms. Friedlander chose to

21   make it her star witness.  Mr. Supper is the one, if you

22   recall, was the engineer and he's the one with the bad

23   shoulder.  A lot of debate about all the other issues that he

24   had, but there was no question based on my observations of the

25   testimony -- and you decide -- that he had a bad shoulder.

1          Now, Supper, just like every one of the parrots who

2     came in to parrot the government line here, I might add, which

3     was did you get any treatment?  Oh, no, I didn't get any

4     treatment.  Did you -- were you able to do your job?  Oh, sure,

5     I could still do my job.

6          But the question isn't whether they think they could

7     still do their job.  The question is did they qualify at the

8     time.  And Supper is Exhibit A because do you remember -- I was

9     kind of embarrassed doing it, but do you remember me saying to

10    Supper, excuse me, you're the driver of the train, right?  1500

11    people, big engines, we went through all those engines.  I said

12    excuse me, you have a bad shoulder, right?  Yeah, I got a bad

13    shoulder.

14         Don't you have to have one arm -- remember I kind of

15    sat here and said, don't you have to sit here and stare ahead

16    and don't you have to grab the throttle at one time and while

17    you're grabbing the throttle still be able to reach up and pull

18    the horn and pull the brake?  Yeah.  That's, that's what an

19    occupational disability is.  That's the question.

20         And the question is what kind of evidence did they

21    present?  The first witness they presented, Gagliano, I thought

22    it was ridiculous because the first -- and, by the way, maybe

23    I'm wrong, maybe I'm nuts, but did you notice a little bit of

24    difference between each and every one of these four patients

25    when they were on direct examination versus when they were on

D7VLLES6                    Summation - Mr. Durkin

1    cross-examination?

2           Do you remember Mr. Parlante, for example, the guy

3    that got hit by the train, nothing wrong with me, Parlante

4    says.  Oh, yeah, really, the last day you're on the job you get

5    hit by the train but you're OK.  You can still keep working.

6    Yeah, we can rely on that evidence to convict somebody, can't

7    we?

8           Do you remember I had to ask Parlante after about the

9    fifth time in a row, you don't remember talking to the

10   government?  You don't remember saying this?  I had to say to

11   him, is there something wrong with your memory?  That's

12   evidence that we're going to use to prove beyond a reasonable

13   doubt because now he's saying, oh, now I'm part of a

14   conspiracy.  Yeah, I was part of a conspiracy.  I was part of a

15   conspiracy with Dr. Lesniewski.

16          Oh, really?  Did you tell him you were?  Did he tell

17   you you were?  Why did you stop going through the charade?  Why

18   didn't you just stop the charade then?  Why didn't you just get

19   on with it if you're paying that kind of money?  Do you

20   remember those questions of those witnesses?

21          But the most ridiculous one was the very first

22   cross-examination I did with Mr. Gagliano.  Just so you don't

23   think I'm making this up.

24          Up until the New York Times, you never thought you

25   would engage in criminal activity concerning this, did you?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1           I didn't think so, no.

2           Of course he didn't and neither did any of these four

3    because this is a conspiracy created by the New York Times and

4    adopted by the government because it's easy, it's easier to

5    deal with the allegation of fraud than it is what do we do with

6    this union contract?  What do we do with this complex social

7    issue that we're dealing with left over from the thirties?

8    What do we do about the fact these people can easily qualify

9    and yet the Metro-North can't because they have to wait?

10          And this whole thing about the charts and the

11   Metro-North is beyond me.  You know, you can really get

12   snookered into that one pretty easily because the whole point

13   of it is if you can't retire until you're 60, you're not going

14   to try to get disability to only get 50 percent of your salary.

15   That's why all these charts with the Metro-North you can throw

16   right out the window.  They're smoke screens.  This is a chart

17   case.  This is a guess, a leap.  Make the leap with us and the

18   New York Times that this is some type of premeditated -- wait

19   until you see this indictment -- premeditated fraud scheme.

20          Did one witness say that they engaged in a

21   conspiratorial conversation with Peter Lesniewski?  No.  Did

22   one person say anything other of these four patients -- and I

23   don't fault them.  They're in an impossible situation.

24          You heard Parlante.  You heard him say he went to the

25   grand jury without a lawyer, ended up getting charged with

1  perjury or accused of committing perjury because he didn't

2  think they were looking at him.  That's what Parlante says.

3  Another one of their star witnesses.

4          I go to the grand jury and I think they're looking at

5  other people and all of a sudden, I asked him, he said I got

6  frightened in the grand jury.  That's why he lied.  He said he

7  got frightened.  I said what did you get frightened by?

8          When I went there, I didn't think they were looking at

9  me.

10         I said, but then all of a sudden spotlights turned on

11 you, you got scared?

12         Yeah.

13         So he says then he lied.  I'm not too sure about that.

14 He might well have been telling the truth, but it wasn't the

15 truth on the government's version.  But that's neither here nor

16 there.

17         The question is can you convict anybody on that

18 evidence?  Gagliano, they want to put the picture of the bike

19 ride up there?  He had shoulder problems.  So you can't ride a

20 bike?  It's the same kind of thing.  What does that prove?

21         Look at these files.  If you look at, if you just --

22 and I don't want to belabor it because it's late in the day,

23 but if you look at the patient notes that are in each and every

24 one of those files and I'll use -- forgive me.  My mouth works

25 faster than my head.

1          This is Gagliano, the guy who -- first witness --

2     didn't think he was committing a crime at the time he was doing

3     it.  Surgical intervention.  Take a look at the patient notes.

4     You're going to have these all back there.  Very first time

5     he's there, Dr. Lesniewski says the patient will need surgical

6     intervention.

7          Now, I think Ms. Friedlander said I'm going to try to

8     distract you or confuse you with this one because I'm going to

9     say the surgery disproves the conspiracy.  Well, I'll stand by

10    that argument.  Why, if Peter Lesniewski was in a conspiracy

11    with Gagliano, Supper, Parlante, or Ellensohn, would he

12    recommend surgery at all?  And how many of them said to you or

13    how many of them said in response to my question, no, I didn't

14    want the surgery.

15         Gagliano of all people didn't want the surgery.  One

16    of them, I think it was Parlante, wouldn't even take the

17    anti-inflammatories.  Remember the debate I had with Parlante

18    over treatment?  Check your notes on that one on my

19    cross-examination of Parlante on treatment.  It was absurd.  He

20    basically admitted that treatment only amounted to something he

21    decided to do.

22         And I had to beat it out of him essentially to say,

23    oh, so if you go to a doctor and he offers you an

24    anti-inflammatory and you decide against the doctor's advice

25    not to take the inflammatory, then you can say with a straight

D7VLLES6                        Summation – Mr. Durkin

1    face that you didn't get any treatment.  Just like with the

2    surgery.  That's what Parlante said.  Again, your memory is

3    more important than mine, but you can check.

4            Here's Gagliano again.  You've got to look at these

5    notes.  These notes I submit to you create a reasonable doubt

6    unto themselves on this evidence because you will see time and

7    again notes like this that will say, therefore, I would treat

8    this with anti-inflammatory, will not do surgery.  Every one of

9    these files had something like this in it and I submit to you

10   unto itself is enough to create a reasonable doubt that Peter

11   Lesniewski engaged in any conspiracy with any of these people.

12           And, by the way, the evidence, you know, is

13   unquestionable that he didn't engage in any conspiracy with

14   Mr. Rutigliano or Ms. Baran.  They don't even know him other

15   than they know of him.  So you're going to have to search far

16   and wide, I think, to find evidence in these files, the patient

17   files, based on these notes that this was a scam.

18           (Continued on next page)

19

20

21

22

23

24

25

1          Just like what I said to these people.  What do you

2     mean?  It was Ellensohn I think.  No, it was Supper.

3          I said at one point, why did you go through the

4     motions?  Why didn't you just wait?

5          I think it was Gagliano that said, Oh, I didn't want

6     to -- what did he say?  Parlante.  I was cross-examining

7     Parlante about this.  Wait until you hear this if you don't

8     remember it.  I remember it.  I just didn't remember which one

9     it was.

10         I said to Parlante, I asked him about whether he came

11    to trust Dr. Lesniewski.

12         He said, I have no opinion on that.

13         What?

14         It didn't matter to me.

15         I said, What didn't matter to you?

16         Any of the diagnoses he came up with, as long as I got

17    the disability.

18    "Q.  Did you ever tell him that?

19    "A.  No.

20    "Q.  Why didn't you just tell him that?"

21         A pretty logical question if this is really some type

22    of conspiratorial agreement that they say it is.

23         Why would I?

24         Well, if it didn't matter to you, why didn't you just

25    tell him?  Why didn't you just tell him?

D7vnles7                         Summation - Mr. Durkin

1              I didn't want to make it matter to me either.

2              I said, Pardon?  Like, what are you talking about?

3              He says, I didn't want to make it matter to me either,

4    creating some kind of backlash with it.

5              Then my next question is, Just like you didn't want

6    the surgery because you knew if you got the surgery you might

7    not get the disability, right?

8              Oh, no, not at all, he said.

9              I was already doing something that kept the pain at

10   bay.  I didn't want to get the surgery because the pain wasn't

11   enough to qualify in my mind for surgery if I could keep the

12   pain at bay by working out, which is what I call physical

13   therapy.

14             That's your physical therapy?

15             Yes.

16             You want something else that might create a reasonable

17   doubt just on a piece of paper.  The government made a big deal

18   this morning -- it seems like it was a week ago -- about

19   Parlante.

20             Do you remember they talked about Parlante coming in

21   in November of '06.  He get hit by the train.

22             This is a guy, mind you, you want to talk more

23   certainty.  This is Christopher Parlante they want you to rely

24   on to contradict Dr. Lesniewski.

25             And Parlante says, When I got hit by the train, he

D7vnles7                        Summation - Mr. Durkin

 1   said -- of all the people in the world, when you got hit by a

 2   train and you really needed treatment, this is the guy, of

 3   course, he didn't go to Lesniewski for treatment.  He just went

 4   for a paper trial, right?

 5          Of all the people in the universe when you were

 6   unequivocally, no question asked, really hurt, when you got hit

 7   by a train, of all the people in the world who did you go to?

 8          Peter Lesniewski.

 9          And you let him treat you?

10          Yes.

11          And the treatment worked, because that's when he

12   decided he would take the anti-inflammatory.

13          But the government said with a lot of fanfare this

14   morning, Here's the smoking gun, because Dr. Lesniewski, his

15   narrative was dated the 24th of November.  Let me see if I can

16   find it.  I had it here a minute ago, but I get carried away

17   with myself.

18          The government told you this morning that they thought

19   this was a smoking gun because on November 24 of 2004

20   Dr. Lesniewski wrote the narrative for Parlante.

21          You will remember that Parlante got hit by the train

22   celebrating Halloween on the last day of October, the first day

23   of November, the night shift, 2004.

24          Then she said, you know why this is false.

25   Apparently -- I'm sorry.  I have a different copy.  Do you mind

1    putting up the one that you had.  I think it's 104-D.

2              Go down to the bottom.

3              "Apparently he was sideswiped by a train."

4              I'm sorry.  Could you go to the second page.

5              They said here's the smoking gun.  "He was placed on

6    steroids and has not been seen since."

7              Then they showed you, I believe it's 104-D or E.  It's

8    the chart.  Do you have the chart?  Can you go to November

9    24 -- November 23.

10             If you go up, could we have the whole page just for a

11   second.

12             What's interesting about this smoking gun is that

13   that's clearly not Dr. Lesniewski's handwriting.  That's

14   clearly the nurse's handwriting, because we know from all the

15   other charts that whenever Dr. Lesniewski sees somebody he has

16   the typewritten notes.  There is no typewritten note.

17             So I submit to you based on that evidence that it is

18   every bit as likely that this was already dictated and Parlante

19   may have come on the 23rd to pick it up and he wasn't there or

20   there's a typo on the 24th, because there is no evidence

21   whatsoever that Dr. Lesniewski talked to that person, to

22   Parlante, on the 23rd.

23             So the smoking gun goes out the door.  Just because

24   the letter is dated the next day doesn't work.

25             That's the best they can come up with on that?

D7vnles7                    Summation - Mr. Durkin

 1          One final thing about these four patients.  Talk about
 2   another smoking gun.  Here's what the government says is
 3   another smoking gun.  Gary Supper's note.  I submit to you
 4   there is a different explanation as the smoking gun.
 5          If you were really a coconspirator, what would this be
 6   doing in a file that you were going to turn over to the
 7   government, if this were really something incriminating?
 8          I submit to you that you can draw the opposite
 9   inference, which is the fact that they have it proves it is not
10   a smoking gun because only an idiot would leave this in the
11   file.
12          But, more than that, what proves that it is not a
13   smoking gun is that Supper admits and contradicts the whole
14   point of the smoke, which is Supper says, I asked him for four
15   tests, MRI, EMG, NVC, NSC test.  Not only does he ask for four
16   tests, he asks for it on his back, knees, and ankle.
17          So that's 12 different tests that they would have you
18   believe my flunky client coconspirator took orders from this
19   coconspirator and just rushed right out and did it.
20          Check the file.  You will be happy to know, even as he
21   admitted, that Dr. Lesniewski only performed two of those
22   tests, two MRIs.  And talk about blowing the smoking gun right
23   out of the water, you will have the results of those two tests.
24   One actually found a meniscus tear on Mr. Supper's knee.  So,
25   lo and behold, ask the government where the other ten tests are

D7vnles7                    Summation - Mr. Durkin

1     if this evidence should be interpreted the way they are asking

2     you to interpret it, just like the statement that they say is a

3     confession.  It is not a confession any more than I am Derek

4     Jeter.

5            You will have this back there.  You conclude on your

6     own whether this is a confession.  I think you will agree with

7     me that it is nothing close to a confession.  In fact, it

8     supports innocence as much as it supports guilt or

9     consciousness of guilt.

10           Keep in mind the date of this, which is October 29,

11    2008.  When you look at this statement, keep in mind the date

12    of the great New York Times exposé, which is September 19,

13    September 20 of 2008.

14           People are running around, all these investigators are

15    running around like chickens with their heads cut off because

16    the one thing politicians know how to respond to is the New

17    York Times.  We're going to get to the bottom of this all

18    right.  They did.  This is the bottom they got to, this case,

19    this evidence.

20           Now, I'm going to do something different than my Irish

21    colleague asked you.  I am going to ask for a verdict, but it

22    is a different kind of verdict.  You are going to be instructed

23    by the judge about reasonable doubt.  The first thing he's

24    going to tell you is that the government always wins when

25    justice is done, regardless of whether the verdict is guilty or

D7vnles7                    Summation - Mr. Durkin

1    not guilty.

2            That's true.  Both Mr. Ryan and I used to be federal

3    prosecutors, and when we were prosecutors that's what we

4    expected.  That's still what I expect.

5            I have spent my career in these rooms.  I care about

6    what goes on here.  I submit to you the day that we have to

7    worry about the government winning at all costs is the day we

8    all ought to get out of Dodge.

9            Our whole system is built on this.  The judge will

10   tell you that reasonable doubt is the cardinal principle of our

11   system of justice; that every person accused of a crime is

12   presumed to be innocent unless and until his guilt is

13   established beyond a reasonable doubt.

14           He will tell you, and so will I, this presumption is

15   not a mere formality.  It is what people who give themselves in

16   these courtrooms day in day out expect, no matter what side you

17   are on, whether you are on their side of the aisle or whether

18   you are on our side of the aisle.

19           It doesn't matter whether it's a doctor from Long

20   Island who may not be the best doctor in the world.  Maybe he's

21   not the best recordkeeper according to their genius, who by the

22   way also said, I never said anything was made up.

23           Do you remember that testimony?

24           Dr. Barron admitted they didn't even tell him what the

25   charges were.  For all he knew I guess this could have been a

malpractice case.  But it's not a malpractice case.  It's a

criminal case in a federal courthouse in the best federal

courthouse in the whole country.  The most sophisticated, the

best prosecutors in the country work in the Southern District

of New York.  Everybody who was a federal prosecutor knows

that.  Everybody would kill to have a spot at that table.

        But they win when justice is done.

        The verdict I am going to ask you to give is not one

of innocence.  It is simply not guilty.  The British have a

better way of putting it:  Not proven.

        That's what I think happened in this courtroom.  It is

not proven that Peter Lesniewski engaged in a criminal

conspiracy with anyone.  It is not proven that Peter Lesniewski

intended to defraud the federal government, United Healthcare,

or anyone else.

        If you need any further push in that direction, don't

forget the two stipulations that we put in.  Relying on your

oath and relying on the presumption of innocence, we chose to

put on only two stipulations.

        One was from the office manager, Kelly Michaels, who

said to you in a given week, Peter Lesniewski saw 40 to 45

patients per week.  If you ever want to know why you are always

waiting in a doctor's office, take a look at that stipulation.

        It says they had a template.  I never knew this

before.  They have a template that they schedule six to eight

1    people every 15 minutes.  I mean they schedule two people every

2    15 minutes.

3         It's always been one of my great thrills whenever I've

4    represented a doctor, and he gets very upset with me when I do

5    it, you never let him come in on time.  I let him sit in my

6    waiting room all the time, just for payback.  And I tell him

7    that.  He takes it in good nature.

8         Now I know why -- I'm sorry.  Did I say week?  40 to

9    45 patients per day.  Per day, which might give you a bit of an

10   explanation as to why those notes aren't as good as the

11   highbrow professor from Columbia and Mount Sinai and wherever

12   he was from in Midtown Manhattan.

13        That is a little bit of a different practice then when

14   you are out on the Island working, treating backs of railroad

15   workers and anybody else who walks in.

16        But think about that.  They put up evidence in these

17   charts, 134 people.  You can do the math any way you want.  I

18   am not going to play games with you that way, but you could.

19   If I wanted to play a game, I would say divide that by, you

20   know, he gets two people a week from the Long Island Rail Road.

21        But more than that, the other big point of their

22   argument that their evidence they think shows is this United

23   Healthcare money, how critical that was.

24        Several different times Ms. Friedlander said something

25   to the effect, They did it for easy money, or I think she ended

D7vnles7                     Summation - Mr. Durkin

1    her argument, if I got it correctly, saying, Use your common

2    sense.  They did anything they had to do to make a quick buck.

3          I am going to ask you to use your common sense, too.

4    Take a look at this, you want to use common sense.

5          Bear with me.  I'll get it.  Just take a look at this.

6          $62,000 from United Healthcare in 2003 when he had

7    gross receipts of $753,000.

8          Is that evidence that would cause somebody to do

9    anything that it took to make a quick buck?  I don't think so.

10         Take a look at 2004.  Out of $781,000, $65,000.

11         In 2005, $50,000.

12         And I might add, you want to think about another

13   reasonable doubt, if this was such a great conspiracy and he

14   was such a big co-conspirator, how come it doesn't go up

15   instead of down.  How come he has fewer Long Island Rail Road

16   patients in 2005, 2006, 2007?

17         Is that evidence of a conspiracy, or is it evidence

18   that they, the workers, went somewhere else?  They put this

19   fancy chart up there that talks about all the doctors.  That

20   cuts both ways, too.

21         How does that work?  How does that make it more likely

22   that Lesniewski is a coconspirator?  Maybe it makes it less

23   likely.

24         He only saw 134 patients, Ajemian saw 444, and Parisi

25   saw 239.  As Mr. Dratel told you, that was something like 79

1  percent of the whole total.  Two of them did that.  So I can

2  argue, if I want to be cute, and say that is evidence of

3  innocence, not guilt.

4         Why didn't it go up if he's the coconspirator?  It

5  doesn't fit.  13 percent.

6         You also heard testimony of why.  Somebody said about

7  United Healthcare, they had their name there.  One guy said, I

8  went to him because he was the closest.  That's evidence of a

9  conspiracy, because other people said they were the go-to guys?

10 Really?

11        I am not asking you to give him a medal, and I'm not

12 asking you to give him doctor of the year.  What I'm asking you

13 to do is what jurors have been doing in this country for over

14 200 years, and that's saying, I'm sorry, I have a doubt.  I

15 have a reasonable doubt.  You did not prove the case.

16        As Judge Marrero told us, It's OK, government.  You

17 win when justice is done.  I'm going to ask you for a verdict

18 of not proven because that is what I believe this evidence

19 shows, not proven.

20        Thank you.

21        THE COURT:  Why don't we take a five-minute break just

22 to stretch.

23        (Continued on next page)

24

25

1                    (Jury not present)

2                    THE COURT:  Mr. Weddle, how long will you be?

3                    MR. WEDDLE:  I could probably give a better sense if I

4          have a minute to try to organize my thoughts, your Honor.

5                    THE COURT:  All right.

6                    (Jury not present)

7                    (Recess)

8                    THE COURT:  All right.  Bring in the jury.

9                    Mr. Durkin, when you made reference to this Court as

10         the best in the country, does that include Chicago?

11                   MR. DURKIN:  I was talking about you, Judge.  This is

12         the reputation.

13                   MR. RYAN:  Needless, to say, Judge the rebuttal is not

14         the second crack at the apple; it is a rebuttal to the defense

15         summations?

16                   THE COURT:  Correct.

17                   (Continued on next page)

18

19

20

21

22

23

24

25

 1             (Jury present)

 2             THE COURT:  Thank you.  Welcome back.

 3             Mr. Weddle, I would say 15 to 20 minutes.

 4             MR. WEDDLE:  Thank you, your Honor.

 5             Good afternoon, ladies and gentlemen.

 6             JUROR:  Good afternoon.

 7             MR. WEDDLE:  We are coming to the end.  This is the

 8    government's rebuttal.  It is our final word.  I am going to

 9    try to respond briefly to the defense arguments that they have

10    made.  They were extensive, and I am going to try to group them

11    together as much as I can.

12             But over the past two weeks you have heard witness

13    after witness tell the story of a culture of corruption at the

14    Long Island Rail Road, a culture of corruption that involved

15    hundreds of people, millions of dollars of disability claims,

16    the same pattern, the same three doctors, the same

17    facilitators, year after year, generation of Long Island Rail

18    Road employee after generation of Long Island Rail Road

19    employee.

20             Witnesses came in here and testified consistently,

21    participants in the fraud, Long Island Rail Road retirees who

22    told you they could do their job.  They were not disabled.

23    What they wanted to do is they wanted to retire early without a

24    cut in their pay.

25             MR. RYAN:  I'm sorry, Judge.  Objection.

D7vnles7                         Rebuttal - Mr. Weddle

1            Not rebuttal.

2            THE COURT:  Overruled.

3            MR. WEDDLE:  In order to do it, they knew what the

4    pattern was.  They went to the same doctors.  They started

5    before their predicted retirement date so they could create a

6    paper trail.

7            What is the point of the paper trail?  To dupe the

8    RRB, to convince the RRB that they were suffering, that they

9    were disabled, that they were unable to do their job from a

10   slew of diagnoses, when the reality was they had planned this

11   months or years in advance.

12           They were looking for the day that they got their 30th

13   year or right after they turned 50 years old or they wanted to

14   wait until they had their hundred days and they got their

15   vacation pay for next year, or until November or December when

16   they finished paying their payroll taxes for the year for a

17   couple of percentage points in taxes.  They were planning a

18   disability to occur in November months or years in advance.

19           This was not what you have heard in some of the

20   testimony from Marie Baran about people working wounded, people

21   in misery and pain.  You saw that from the comparison between

22   Long Island Rail Road and Metro-North two commuter railroads.

23   Robert Murray from the MTA testified they are the same size

24   railroad.  They have the same equipment.  They are in the same

25   city.  They are doing the same function.

D7vnles7                    Rebuttal - Mr. Weddle

1           There is one major difference.  The defense agrees

2     with this difference.  Marie Baran testified about it.  Marie

3     Baran's other witnesses testified about it.  The difference is

4     retirement.  It has nothing to do with pain.  It has nothing to

5     do with disability.

6           At the Long Island Rail Road, people can retire early,

7     at the age of 50, and get half their pension.

8           You know what.  If you want to retire early and retire

9     at age 50, go ahead.  That's fine.  There is nothing wrong with

10    that.

11          If Joseph Rutigliano wants to retire early and retire

12    on that portion of his pension and live on that and play golf,

13    more power to him.  That's great.

14          He didn't do that.  Other people at the Long Island

15    Rail Road didn't do that.  What they did is they would have

16    kept working, they did keep working until they could cheat and

17    lie and convince the RRB that they were unable to work so that

18    they wouldn't have to take --

19          MR. RYAN:  I'm sorry, Judge.  I have to object.  This

20    is a repeat of the summation previously given.

21          THE COURT:  Sustained.

22          MR. WEDDLE:  So that they wouldn't have to take a cut

23    in pay and they could retire to the life they wanted to lead

24    with the same income.

25          Now, let me talk and go back through the arguments and

D7vnles7                          Rebuttal - Mr. Weddle

1    try to hit all of them that are worth talking about.

2              Let's talk first about Mr. Durkin's arguments.  He

3    told you a number of times, probably three or four times, Look

4    at the files, look at these chart notes from Dr. Lesniewski.

5    This chart right here is reasonable doubt he said.

6              Mr. Ryan said the same thing:  Look in the file.  Look

7    at all these doctor notes and what they say about all the

8    problems that these people had.

9              He's asking you to look at the tools of the fraud.

10   This is how they committed the fraud.

11             Long Island Rail Road people went to Dr. Lesniewski,

12   they went to Joseph Rutigliano, they went to Marie Baran, they

13   paid them roughly a thousand dollars each.

14             Why did they do that?  To create false paperwork.

15             What happened to that false paperwork?  It ended up in

16   the RRB claim file.

17             That is all they want you to look at.  They want you

18   to look at the product of the fraud, what they worked on, what

19   they paid a thousand dollars a pop to get.  Fraud.  They want

20   you to only look at that, and they want you to take it as true.

21             MR. DURKIN:  I am going to object to that as a

22   mischaracterization of my argument.

23             THE COURT:  Sustained.

24             MR. WEDDLE:  Those documents, the entire purpose of

25   them is to mislead.

D7vnles7                      Rebuttal - Mr. Weddle

1          Looking at the witnesses, looking at all of the
2     exhibits in evidence, that is clear.  Those documents are
3     false.  They are part of a fraud.  They are part of a
4     multi-year fraud.
5          And you know what?  It worked.  That fraud worked.
6     These defendants filled those claim files with lies and the
7     money started flowing.  Then the participants in the fraud
8     lived their life however they wanted to live it.
9          It had nothing to do with being unable to work.  Let's
10    talk about one part of the application form that the defendants
11    did not talk about.  Let's put up, let's try Joseph
12    Rutigliano's application form, questions 11, 12 and 13.
13         Right here.  "Enter the date you could no longer work
14    because of your condition."
15         There is nothing complex about that question.  It is
16    not hard to understand.  You don't have to do what Marie Baran
17    said and ask yourself, well, did you have spicy food sometime.
18    Maybe that makes eating hard for you.
19         You look at this and you are being asked can you no
20    longer work because of your condition.  And Joseph Rutigliano
21    said, yes, on October 29, 1999 I could no longer work.
22         He went on.  How does your condition prevent you from
23    working?
24         "Severe back, right knee, right shoulder, right wrist
25    and neck pain has made it impossible for me to perform my

D7vnles7                    Rebuttal - Mr. Weddle

1    duties as a railroad conductor.  I have suffered since 1988 and

2    worked with pain, but my disability" -- and it goes on and on.

3    It is a big sob story.  It is a lie.

4            Fine.  He was injured in 1988.  He worked for a decade

5    with that injury.  If he wanted to retire early, retire early.

6    Don't fill an application with lies, send it to the RRB, and

7    try to convince them that you are practically bedridden.

8            Then go out on the golf course and demonstrate for

9    you, ladies and gentlemen of the jury, on videotape that these

10   claims are false.

11           The point of playing golf is not that it is a crime to

12   play golf.  The point of playing golf is it shows that these

13   are lies told by Joseph Rutigliano and told on Joseph

14   Rutigliano's behalf by Dr. Lesniewski, because Dr. Lesniewski,

15   remember, gave a narrative in support of Joseph Rutigliano's

16   disability application.

17           These lies and the ones told by Dr. Lesniewski were so

18   extreme that the RRB, the fraud worked.  The RRB thought, He is

19   totally and permanently disabled.  This is someone who can't do

20   anything.

21           That was false.  He was working.  He was working.

22           Did he come back to the RRB and say, Wait a minute

23   wait, you got it wrong.  I only wanted occupational disability

24   not total and permanent disability.  Or, I'm better.  I'm

25   better in 2004 since I haven't worked.

1         Did he go back to the RRB and say any of those things?

2         Did he say, Wait a minute.  I'm actually working.  I

3    am making thousands of dollars.  I'm making a thousand dollars

4    a pop to fill applications with lies so that other people can

5    engage in the same fraud that I engaged in?

6         Mr. Durkin also argued that the conversations between

7    his client and the witnesses were not explicit enough.

8         He said, Well, gee, if there was really a conspiracy,

9    wouldn't everyone just say to Dr. Lesniewski, Gee, Doc, this is

10   a conspiracy.  Let's just cook up to false documents together.

11        First of all, that scenario doesn't make much sense.

12        But, second of all, the witnesses here, it is not

13   typical for conspirators to have that kind of --

14        MR. DURKIN:  Objection.

15        MR. WEDDLE:  -- explicit conversation.

16        THE COURT:  Sustained.

17        MR. WEDDLE:  But it in fact happened here.

18        So Mr. Durkin is trying to have it both ways.  He says

19   it's not explicit enough, and then we see Gary Supper's note

20   where Gary Supper says, Please document symptoms.  My shoulder

21   isn't enough.  I want a permanent disability.

22        They argue that that note is not enough.  They say

23   that that note is reasonable doubt, because Dr. Lesniewski only

24   managed to get two MRIs back to back -- December 4 and December

25   6, two days apart -- on the very places that Gary Supper asked

D7vnles7                         Rebuttal - Mr. Weddle

1    for it.

2              Then on the same day that Gary Supper asked for it,

3    Dr. Lesniewski -- remember, the file that Mr. Durkin wants you

4    to rely on -- Dr. Lesniewski's treatment notes all of a sudden

5    start documenting back pain just as Gary Supper asked for, and

6    knee pain just as Gary Supper asked for.

7              In fact, he was in such a rush to comply with this,

8    and it comes through in the Gary Supper note itself.  He starts

9    talking about do we have time to do this, to get the narrative,

10   at the end of the note.

11             Dr. Lesniewski's in such a rush to get this done he

12   does the two back to back MRIs.  He writes up a narrative right

13   away.  He talks about the MRIs, and what they supposedly show.

14   He couldn't even remember to change the date on the front of

15   the narrative.  The MRIs are after the date of narrative.  He

16   throws this thing together on request by Gary Supper, it gets

17   sent into the RRB, and it works.  The fraud worked again.

18             You don't just have Gary Supper.  There's Steven

19   Gagliano, who is going to see a doctor over and over and over

20   again.  He's going to see Dr. Lesniewski.

21             Dr. Lesniewski doesn't say:  Gee, this is so terrible.

22   It is so sad that you are disabled and you need to stop

23   working.  I feel terrible for you.

24             He says, You have enough.  Like good news.  You have

25   enough.  That is an explicit conversation between two

D7vnles7                     Rebuttal - Mr. Weddle

1    conspirators engaged in a massive fraud to say I know what we

2    are doing here.  We are not trying to make you better.  We are

3    trying to create a paper record.  And you know what, it is

4    enough.  The money is going to come through.  That is exactly

5    what he said.  That is an explicit, blatant, conspiratorial --

6              MR. DURKIN:  I am going to object.

7              MR. WEDDLE:  -- conversation that Dr. Lesniewski said.

8              THE COURT:  Overruled.

9              MR. WEDDLE:  Mr. Durkin, of course, I wish he wouldn't

10   objecting so much, but he is an excellent lawyer, and his

11   cross-examinations were extremely skilled, but they don't

12   change the fact that witness after witness participant in the

13   fraud came in here and told you essentially the same story.

14        Did they all just make that up?  They just made up a

15   culture of corruption at the Long Island Rail Road?  They made

16   up the fact that they all had heard from their coworkers about

17   how the fraud worked, when you started planning for it, which

18   doctors you should go see?

19        Even Marie Baran testified about who the doctors were.

20   She said her clients were Parisi, Ajemian and Lesniewski

21   people.  Everybody knew and you know what --

22              MR. JACKSON:  Judge, I am going to object to that.

23              THE COURT:  Overruled.

24              MR. WEDDLE:  The charts that certain defense counsel

25   don't want you to look at, they corroborate that.

D7vnles7                        Rebuttal - Mr. Weddle

1          What does that mean?  They confirm exactly what these

2     witnesses were telling you.  These witnesses were speaking from

3     their experience at the Long Island Rail Road, where everybody

4     was doing this.  But they knew, they knew in their heart.  They

5     could do their job.  And they were just trying to retire early.

6     That is exactly what they told you from the witness stand.

7          The numbers that you saw on those charts, the 85

8     percent of the people going to see Lesniewski, Parisi and

9     Ajemian, and 126 other doctors is the next category.  That

10    shows you that what these witnesses were describing is exactly

11    true.

12         Now, there's been a lot of talk about these witnesses

13    and the agreements that they have.

14         First of all, Mr. Jackson -- I'm sorry, this is going

15    to take a little while -- but he completely misrepresented the

16    three different agreements that he was talking about.

17         There are a number of different kinds of agreements in

18    this case, and you have heard testimony about them.  They are

19    all in evidence.  You are free to peruse them at your leisure.

20         There are cooperation agreements.  Cooperation

21    agreements talk about the fact that defendant will plead guilty

22    and agree to testify truthfully.  Look at those agreements.

23    That's what it says.  It says testify truthfully.

24         All of those witnesses who had a cooperation agreement

25    they said there's nothing in there about having to get anyone,

D7vnles7                         Rebuttal - Mr. Weddle

1    there's nothing in there about having to win some case for the

2    government.  They are here on the stand to testify truthfully,

3    and they hope that by testifying truthfully they are going to

4    get a benefit at sentencing.

5            You know what happens if they don't testify

6    truthfully?

7            It's right in the agreement.  They are subject to the

8    full penalties.  They've already pled guilty.  They are subject

9    to further prosecution for perjury.  They get no benefit from

10   their testimony.

11           So ask yourself when you are considering these

12   witnesses' testimony, what is more worth it to them?  To come

13   in here and, despite the fact that the agreement doesn't

14   require it, they are just going to make up a story to try to

15   get some people.

16           And, by the way, according to these defense lawyers

17   there are making up the fact that they're guilty to.  There was

18   no fraud according to the defendants' lawyers.  People came in

19   and they plead guilty multiple felonies because they are trying

20   to make up a story and because they think I can plead guilty to

21   a bunch of felonies and lie.  I didn't commit them.  And then I

22   can make up a story about other people to try to get out from

23   under the sentence that I just invited for myself.

24           MR. DURKIN:  Objection.  That was not my theory.

25           THE COURT:  Overruled.

1          MR. WEDDLE:  It is absurd.

2          MR. JACKSON:  Objection.

3          THE COURT:  Overruled.

4          MR. WEDDLE:  So take a look at those agreements.

5          There are other agreements in this case.

6          Regina Walsh.  Ms. Friedlander talked about this.

7   This is not a cooperation agreement.  It is a plea agreement.

8          It says that she is going to plead guilty.  It says

9   that if she pleads guilty to the crime that's listed here she

10  will not be further prosecuted.

11         It has a series of agreements about how the sentencing

12  guidelines apply.  Take a look at this agreement.  There is

13  nothing in this agreement about having to testify, about

14  getting a letter or a 5K motion from the government.  This

15  isn't about testifying.  Testimony is not mentioned in this

16  agreement.

17         I don't want to read the whole thing to you, but,

18  please, if there's any doubt in your mind about that, take a

19  look at it.  It is not a cooperation agreement.

20         Finally, Mr. Jackson was talking about Mr. Dunaj, and

21  he said you should just -- Mr. Dunaj is a big liar too because

22  he has an agreement with the government.

23         Mr. Dunaj's agreement is an agreement to testify, but

24  there is no sentencing.  Do you remember when Mr. Jackson said

25  that he hasn't been sentenced and he's going to be sentenced

D7vnles7                     Rebuttal - Mr. Weddle

1     after the trial?

2             This is a nonprosecution agreement.  It says he will

3     not be prosecuted at all.  He hasn't been charged with a crime.

4     He hasn't been arrested.

5             He started down this road, he started down this same

6     road that person after person after person started down.  He

7     went to see Dr. Ajemian.  He went to see Marie Baran.  They

8     cooked up a bunch of false documents.  He submitted them to the

9     RRB.  And then he had second thoughts, and he cancelled that

10    application.  He paid back the money that he got -- I think it

11    was $4,600 -- and he has not been prosecuted.

12            That's what that agreement says.  There is no

13    sentencing for him.  There is no sentencing for him.  He does

14    have to testify truthfully.

15            Now, you heard from Mr. Durkin that this practice,

16    this Long Island Rail Road fraud practice of Dr. Lesniewski's

17    was a small part of the practice.  He has lots of patients.

18    You have to wait in the waiting room and so on and so forth.

19    The dollar amount isn't that high.

20            Here's the problem with that.  When Dr. Lesniewski was

21    interviewed by federal agents in 2008, he didn't say anything

22    like that.

23            He didn't say, you guys are here to talk to me about

24    Long Island Rail Road people.  I can't pay attention to them.

25    It just a tiny part of my practice.

D7vnles7                        Rebuttal - Mr. Weddle

1          MR. DURKIN:  Objection.  He wasn't asked that and they

2    know that.

3          MR. WEDDLE:  He didn't say --

4          MR. DURKIN:  Objection.

5          THE COURT:  Sustained.

6          MR. WEDDLE:  He didn't say, I don't know who you are

7    talking about because it is such a small part of my practice.

8    How would I even know who these people are.

9          MR. DURKIN:  Objection.

10         THE COURT:  Sustained.

11         MR. WEDDLE:  What did he say?

12         MR. DURKIN:  Judge --

13         THE COURT:  If it is in the record.

14         MR. WEDDLE:  Let's take a look at the testimony of

15   Special Agent Del Favero.

16         This was early in the trial.

17         "What did Dr. Lesniewski say about the amount of money

18   he charged to prepare these narratives?

19         "He stated he charged 850 to $1,000."

20         Just like the witnesses testified.  Just like Maher,

21   Parlante -- I'm sorry, not Maher.  Just like his patients

22   testified.  They testified about paying him for narratives.

23         MR. DURKIN:  He said they gave him $500.

24         THE COURT:  Mr. Durkin, please don't interrupt.

25         MR. WEDDLE:  "During this interview did Mr. Lesniewski

D7vnles7                          Rebuttal - Mr. Weddle

1    also refer to these narratives by another term?

2              "Yes, he did.

3              "What was that?

4              "Summaries.

5              "What did Dr. Lesniewski say was the purpose for doing

6    these narratives or summaries?

7              "He stated that the purpose was for disability

8    benefits.

9              "What did he say about how he prepared summaries for

10   disability benefits purposes?

11             "He stated that he highlighted the summaries to bring

12   things home.  He stated that he expounded on the complaints and

13   symptoms of the patients.

14             "And when he was talking about the complaints and

15   symptoms of patients, did he refer to these as positives or

16   negatives?

17             "Positives."

18             Think about that, ladies and gentlemen.  That is

19   exactly like what Steven Gagliano told you.

20             People are going to the doctor.  If you believe a

21   phony paper trail, they are in crippling pain.  It simply can't

22   be cured.  They are inevitably going to need surgery after

23   surgery, and they can no longer work.

24             Think about it.  If you were a human being and someone

25   came up to you and said, Listen, I have got all these

1    diagnoses, I can no longer work, I am in crippling pain, I can

2    sometimes go for a short walk, but I barely leave the house --

3              MR. DURKIN:  Judge, I hate interrupt, but --

4              THE COURT:  Overruled.

5              MR. DURKIN:  -- that is a misstatement of the

6    evidence.

7              THE COURT:  Overruled.

8              MR. WEDDLE:  Your Honor, this will go a lot faster in

9    I am allowed to argue.

10             THE COURT:  You have a few more, Mr. Weddle.

11             MR. WEDDLE:  You will say, I'm sorry.  That is

12    terrible.  That is so sad.

13             Not Dr. Lesniewski.  He says to Gagliano, You have

14    enough.  When he's interviewed by agents, he is talking about

15    positives, so-called pain.  He's accentuating, he is

16    highlighting the positives.  That right there is a confession

17    to a conspiracy.

18             MR. DURKIN:  Objection.

19             MR. WEDDLE:  He knows why people are coming to him and

20    he jumps in and helps.

21             MR. DURKIN:  Objection.

22             THE COURT:  Sustained.

23             Summarize, Mr. Weddle.

24             MR. WEDDLE:  Your Honor, I have two other closing

25    statements that I need to address.

 1            Oh, Mr. Durkin also made an argument that who would

 2    keep this Gary Supper note unless he was innocent.

 3            First of all, he's again trying to have it both ways.

 4    Either we don't have enough evidence or we have the evidence

 5    written in black and white.

 6            And he says, Oh, that must mean I'm innocent.  There

 7    is so much evidence I must be innocent.

 8            That is not how the world works.  There's so much

 9    evidence he must be guilty.  That is how these trials go.

10            MR. DURKIN:  Objection.

11            THE COURT:  Overruled.

12            MR. WEDDLE:  That note was not in the RRB claim file.

13    Special Agent Tumulty told you that.  He pulled that note out

14    of Lesniewski's own file that was obtained from the practice,

15    not in the RRB claim file.

16            This is something that Lesniewski kept home for

17    himself.  He didn't send that in with the rest of the paper

18    trail.

19            Now, let's talk a little bit more about Mr. Jackson.

20    Mr. Jackson talked a lot about --

21            MR. JACKSON:  Judge, I am not to trial.

22            MR. WEDDLE:  He talked a lot about character.

23            THE COURT:  Sustained.

24            MR. WEDDLE:  He talked a lot about Ms. Baran's 180

25    clients.  And why don't we call more of Mr. Baran's doctors.

D7vnles7                          Rebuttal - Mr. Weddle

1    Of course, the defendant has no burden in this case.  They

2    don't have to call any witnesses.  They don't have to make any

3    arguments.

4         But when they do make an argument, it's fair and

5    proper for you to evaluate it, to ask, Does this hold any

6    water.  And if they do call witnesses, it is fair for you to

7    evaluate, What does this witness mean?  Should they have called

8    other witnesses?

9         It's totally proper for you to consider that.

10        (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. WEDDLE:  Mr. Jackson is talking about his --

2          MR. DURKIN:  Motion, Judge.

3          THE COURT:  Overruled.

4          MR. WEDDLE:  -- Marie Baran's, he's talking about

5     Marie Baran's own clients, people she testified alternately she

6     couldn't remember or they were close friends of hers.  She can

7     call them to the witness stand.  Feel free.  He's talking about

8     Gus Baran's doctors.  He can call them to the witness stand.

9          MR. JACKSON:  Judge, I don't represent Gus Baran.  The

10    government knows that.

11         THE COURT:  Sustained.

12         MR. WEDDLE:  I believe the judge will instruct you

13    that the defense has subpoena power.  They can subpoena

14    witnesses just like anyone can subpoena witnesses and they can

15    call them to the stand.  So.

16         MR. JACKSON:  Judge, objection.

17         THE COURT:  Sustained.

18         MR. WEDDLE:  And I should say a little bit about the

19    fact that Gus Baran, Mr. Jackson made a lot about the fact that

20    in his view we were attacking Marie Baran because she's married

21    to Gus Baran.  That's not the case.  He's coconspirator.  Him

22    playing golf demonstrates, just like it does for Joseph

23    Rutigliano, that his application materials are false.  He went

24    to Dr. Lesniewski, just like the same pattern you've seen.

25    They're all conspirators together.

D7VLLES8                          Rebuttal - Mr. Weddle

1        I'm not trying to tar her for the fact of who she's

2   married to or how much golf he plays, and we're not trying to

3   tar her for traveling.  She can travel all she wants.

4        When Gus Baran says it's hard for him to bend or tie

5   his shoes or sit and then you see the video of him bending over

6   fully to the ground with both hands tying, untying his shoes

7   after playing a full round of golf while parked in a

8   handicapped parking space, that shows that that application was

9   a lie and it shows that Dr. Lesniewski lied in support of that

10  application and that the fraud worked.  That's what that shows.

11  And that's why we're talking about it.

12       If Gus Baran can't sit, then Gus Baran shouldn't be

13  allowed to sit to fly all around the world.  If he wants to fly

14  all around the world, can tell the truth to the RRB and he

15  doesn't have to claim that it's hard for him to sit.

16       Now, he doesn't want to do that because he wants to

17  retire early and get the disability money to fund it, not just

18  live on his regular pension.

19       THE COURT:  Two more minutes, Mr. Weddle.

20       MR. WEDDLE:  Mr. Jackson also claimed that there's one

21  piece of evidence where Marie Baran was referring someone to a

22  doctor and we saw that on the screen, Navin Patel, where she

23  said call Dr. Ajemian's office, get the first available

24  appointment.  There's not just that.  There's Marie Baran's own

25  statement to Special Agent Cuocci where she admitted that she

1    sometimes referred her clients to doctor.

2            Why is she lying about that now?  Because she knows

3    how bad that looks.  She's knows that the fact that her clients

4    are going to the same doctors year after year after year and

5    putting in the same cookie cutter applications year after year

6    and paying her a thousand dollars, think about it.  She's

7    saying she's a dupe.  I'm not sure if you got that.  Her

8    argument in closing statement was that she's a victim of this

9    fraud.  These Long Island workers came to her and told her all

10   of this stuff is hard for me and they told her I live this sad

11   homebound life which, by the way, is almost identical to all

12   the other question 40 responses that you saw.

13           Take a look at either version.  Take a look at

14   Government Exhibit 17D.  It's a draft chart.  It's longer than

15   the one that we put in, Government Exhibit 17.  I think there's

16   68 clippings in that one.  They are practically identical.  Do

17   you think it makes a difference whether someone gets up at

18   8 a.m. or 6 a.m.?  They all are describing the same sad

19   homebound life and, most importantly, they all are saying right

20   up-front, question 11, 12, and 13, are you unable to work.

21           And Marie Baran is pre-filling that form out.  She's

22   pre-filling all the check boxes and person after person after

23   person, they go in practically the same.  They describe a

24   diminished life, a life of almost no activity.  They all claim

25   that people are unable to work when in fact when they're

D7VLLES8                    Rebuttal - Mr. Weddle

 1   meeting with her, she knows they're working.  Their daily

 2   activities at that time are get up and go to work.  Do some

 3   overtime to pad your pension.

 4              THE COURT:  All right, Mr. Weddle.  That's it.

 5              MR. WEDDLE:  Your Honor, could I just have one more

 6   minute?

 7              THE COURT:  Thirty seconds.

 8              MR. RYAN:  No objection.

 9              MR. WEDDLE:  Ladies and gentlemen, when you look at

10   all the evidence together, when you look at the Lesniewski

11   confession, combined with the witness --

12              MR. DURKIN:  Objection.

13              THE COURT:  Sustained.

14              MR. WEDDLE:  When you look at the note from Gary

15   Supper, when you look at Baran's cookie cutter applications,

16   when you look at the absurdity of her testimony where she

17   admitted that she saw people, she admitted that the answer is

18   always hard for every one.  Remember the acid reflux thing.

19              Where she admitted that the main difference between

20   Metro-North Railroad and Long Island Railroad is that at Long

21   Island Railroad you can retire with a pension, and at

22   Metro-North, if you wanted to stop working at the railroad, you

23   wouldn't have that pension to live on.  So when people leave

24   Metro-North, it's because they're really unable to work.

25   They're doing the same job.  When they leave Long Island

1    Railroad, it's because they're padding their pension.

2            And you've got Joseph Rutigliano's own fraud on his

3    own application, take a look at his claim file.  Mr. Ryan was

4    reading to you from a document that shows that the fraud works.

5            MR. JACKSON:  Judge, in light of Mr. Weddle's overflow

6    of time, may we have --

7            THE COURT:  We're going to put a stop to it.

8            Mr. Weddle, please sit.

9            MR. WEDDLE:  Thank you, your Honor.

10           THE COURT:  We're going to adjourn for the day.  And

11   tomorrow I will be prepared to give you instructions.  I will

12   ask that you come at 1 p.m. and the instructions will take

13   about two hours.  So by the middle of the afternoon we should

14   be concluding with the instructions and at that point you can

15   begin your deliberations.

16           Until then, you're still not free to discuss the case

17   among yourselves or with anyone on the outside or have any

18   deliberations or read any account.  If any of these things

19   occur, you're directed to inform the Court immediately and not

20   discuss it with your fellow jurors.

21           Thank you.  Good evening.  See you tomorrow at 1 p.m.

22           JUROR:  Thank you.

23           (Jury not present)

24           THE COURT:  All right.  Thank you.  Our schedule, we

25   need time in the morning to revisit the draft instructions with

D7VLLES8

1    the changes that the Court contemplates.  I would suggest that

2    we meet at ten and that will give us enough time to go over

3    changes, give you time if you don't have the opportunity this

4    evening to do so early in the morning.  And then we can review

5    any further comments you may have at ten, and thereafter we'll

6    have enough time to put the final draft into paper.

7              Mr. Dratel.

8              MR. DRATEL:  Your Honor, if it's possible, if maybe an

9    electronic copy of the draft that has the changes.

10             THE COURT:  We'll send you a black line copy.

11             MR. DRATEL:  Great.

12             On Mr. Weddle's rebuttal, your Honor, just two, three

13   things.  And I think one of them certainly could be addressed

14   in the Court's instruction and I'll just go through the three

15   very quickly.

16             One, he talked about guilty pleas of other persons as

17   establishing, he basically implied and came close to stating

18   outright that that established a fraud.  And the Court has

19   addressed that in the instruction.  I think it really needs to

20   be reinforced based on that argument.

21             Second thing is he, when he talked about when he said

22   did Dr. Lesniewski say this, did Dr. Lesniewski say that, even

23   though the objections were sustained, there's a lot more to

24   that statement than what was put in evidence.  There's a lot of

25   redactions.  And I don't know right now -- I'll try to think

D7VLLES8

1    about it overnight as to whether something can be done about

2    that, I don't know.  But obviously there was more to that

3    statement.  So the fact that he didn't say is really not true.

4    He did say more.

5              MR. WEDDLE:  He didn't say those things, your Honor.

6              MR. DRATEL:  He didn't say this, but he said things,

7    he said some things and I'm trying to go over the statement to

8    see whether -- I don't know if it makes sense to put other

9    parts of the statement in at this point without context.

10             THE COURT:  Mr. Weddle was reading from the transcript

11   and I specifically asked him whether he was reading from a

12   transcript, which he was.

13             MR. DRATEL:  No, your Honor, before that, he said did

14   Dr. Lesniewski say this, did he said that.  He said more than

15   what was introduced in evidence.  So that left something --

16   that statement is a redacted statement.  And I don't know what

17   the solution is.  I'm going to try to think whether there's a

18   solution, your Honor.

19             The third thing is with respect to defense calling

20   witnesses, and I know there's a certain level of fair comment

21   with respect to that, but at the same time these are witnesses

22   who subpoena makes no difference for these witnesses.  They're

23   all going to take the Fifth Amendment if we call them.  We

24   don't have access to these witnesses.  They have immunity

25   power.  They can put witnesses on the stand with immunity, with

D7VLLES8

1   agreements, with nol pros agreements.  We can't.  So that's not

2   fair comment, your Honor.

3   　　　　THE COURT:  All right.  The Court's instructions, as

4   you know, stresses and I'll state again that defendants are not

5   required to put on any witnesses.

6   　　　　MR. DRATEL:  I understand.  But the notion of equal

7   availability to everyone is really not the case when it goes

8   into that about Gus Baran, really, there's no possibly that we

9   could call Gus Baran as a witness.  It's zero.  He could take

10  the Fifth Amendment, as he absolutely would be crazy not to in

11  light of this trial.  We do not have access to that witness.

12  They could immunize him if they wanted and put him on.

13  　　　　MR. WEDDLE:  Your Honor, I was responding specifically

14  to Mr. Jackson's arguments where he said we only saw three of

15  Marie Baran's 180 clients.  These are her clients.  And he said

16  that we only called -- we didn't call the 12 doctors.  We

17  called Dr. Barron instead.  He could call those doctors.  These

18  people are equally available to both sides.  It was a

19  completely fair argument.

20  　　　　I wasn't saying that someone should call Gus Baran to

21  the stand.  I was responding to that argument.  And I think

22  that I said it properly and your Honor's instructions will

23  certainly make clear that witnesses who are equally available

24  to both sides can be called by either side.

25  　　　　MR. JACKSON:  I don't think he said it properly at

2829

D7VLLES8

1     all.  I think it was misleading.  It was confusing, and it was

2     over the top.

3            THE COURT:  To the extent that it was not appropriate

4     or it was not properly stated, the Court's instructions will

5     state it properly.

6            MR. WEDDLE:  Your Honor, can I just respond to what

7     Mr. Dratel said about my argument.  I think that it's a fair

8     rhetorical point when you're reading from the transcript of the

9     trial of what Dr. Lesniewski said in his admissions to say on

10    these topics he didn't say I don't know who Long Island

11    Railroad people are.  He said exactly that he knew who they

12    were, that he prepared summaries for them, that they were

13    coming in for disability and that he helped them get it.  So

14    that's fair comment and fair argument.  It has nothing to do

15    with the parts of the statement that were not admitted.

16            MR. DURKIN:  Judge, could I respond to that because --

17            THE COURT:  I'm sorry?

18            MR. DURKIN:  Could I respond to what Mr. Weddle just

19    said?

20            THE COURT:  Very briefly because we need to break in a

21    moment.

22            MR. DURKIN:  What I'd like you to do tonight, we can

23    take it up in the morning, I want you to look at the whole

24    statement.

25            What I'm offended by, what I think was totally wrong

D7VLLES8

1    about what he did is they moved in limine to exclude, for

2    example, this language:  I put this statement on the narratives

3    to assure that the patient would receive his occupational

4    disability.  I thought that an independent doctor would have

5    determined that my statement would fall short of that level for

6    disability.  If I -- this statement was inserted based on

7    guidance I received and lack of knowledge of the independent

8    oversight of the process.  I was advised that this is the

9    language that was needed for the patient to be considered for

10   disability.  If I would have known that there was no oversight,

11   I would not have used this precise language.

12           Now, they moved to exclude this.  They knew it was

13   there.  For him to get up and say to this jury, well, he didn't

14   say this and he didn't say that, as if he didn't try to

15   exculpate himself, is simply wrong.

16           MR. WEDDLE:  Your Honor, I was responding directly to

17   Mr. Durkin's argument which is this is such a small part of his

18   practice.  And I said he didn't say it was such a small part of

19   my practice, I don't know anything about it.  He knows exactly

20   what it is.

21           THE COURT:  I don't want to prolong this because I

22   need to leave in a couple minutes.  If there's nothing else,

23   we'll see you at ten in the morning.

24           Let me just give you my reading of two issues that we

25   talked about the instructions so that when you read them,

D7VLLES8

1    you'll see how I come out.

2            I am persuaded that we should include the language the

3    government suggests concerning the negligence is not a defense.

4    I recognize the arguments made by defendants on that issue.  I

5    think on this record it would not be unusual for people to look

6    at this record and say what were those people at the RRB doing

7    and why should we prosecute these folks here because they were

8    not doing their job.  I think it's a fair, it's fair to preempt

9    that kind of thinking by instruction to indicate what is the

10   law, which is in fraud conspiracy, negligence of the victim is

11   not a defense.

12           Second, I am not persuaded that this is an appropriate

13   case for an instruction on conscious avoidance.  In this case,

14   as I see the evidence, the defendants, rather than avoiding

15   consciousness of guilt, they were participating, according to

16   the government's evidence and their arguments, they were

17   participating affirmatively.  They were not trying to avoid

18   participation or trying to avoid knowledge.  So I think that

19   that theory would not work and that instruction will not be

20   given.

21           All right.  See you in the morning at 10 o'clock.

22           (Adjourned to August 1, 2013, at 10 o'clock a.m.)

23

24

25