UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA
                                  :
          - v -                              11 Cr. 1091 (VM)
                                  :
JOSEPH RUTIGLIANO,
                                  :
          Defendant.
- - - - - - - - - - - - - - - - - x


**THE GOVERNMENT'S SENTENCING MEMORANDUM**


                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York
                              Attorney for the United States
                                   of America


JUSTIN S. WEDDLE
NICOLE FRIEDLANDER
DANIEL B. TEHRANI
Assistant United States Attorneys
          - Of Counsel -

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x
                                   :
UNITED STATES OF AMERICA
                                   :
        - v -                              11 Cr. 1091 (VM)
                                   :
JOSEPH RUTIGLIANO,
                                   :
            Defendant.
- - - - - - - - - - - - - - - - - x
```

## THE GOVERNMENT'S SENTENCING MEMORANDUM

The defendant is scheduled to be sentenced in this matter on December 20, 2013, at 2:00 p.m.  The Government respectfully submits this memorandum in advance of the sentencing.  Based on Rutigliano's 268 identified clients, as well as his own disability application, the intended loss amount attributable solely to Rutigliano and his clients is staggering — more than $102 million.  The actual losses are likewise dramatic — more than $82 million.  In other words, while Rutigliano was convicted of participating in two massive conspiracies much broader than Rutigliano's clients, even considering Rutigliano's clients alone, a substantial incarceratory sentence is warranted.  Thus, the Government submits that this Court should sentence Rutigliano within the advisory Guidelines range of 135 to 168 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

I.   **The Offense Conduct**

   A.   **The Government's Evidence at Trial**

   The evidence at trial overwhelmingly demonstrated that Joseph Rutigliano, a former Long Island Railroad ("LIRR") conductor and Union Local President, was a key participant and facilitator in a longstanding scheme at the LIRR in which employees conspired fraudulently to obtain federal disability benefits from the United States Railroad Retirement Board ("RRB") in order to supplement their LIRR retirement pensions and thereby obtain total retirement income that approximated their pre-retirement, working income.  The fraud, which arose due to a unique feature of the LIRR retirement pension plan, was widespread at the railroad, and converged around a handful of disability "consultants," including Marie Baran and Rutigliano, and three doctors — Peter Ajemian and Peter Lesniewski (defendants convicted by guilty plea and following trial), and Ralph Parisi, now deceased.

   The Government's evidence presented at trial included: (1) seven former LIRR employees who participated in the fraud (Steven Gagliano, Gary Supper, Christopher Parlante, James Maher, Robert Ellensohn, Michael Stavola, and Regina Walsh); (2) an auditor for the Metropolitan Transportation Authority, Robert Murray, who testified about comparative disability rates at the LIRR and Metro-North Railroads; (3) an RRB-OIG auditor, Natasha

2

Marx, who identified hundreds of cookie-cutter disability
applications prepared by Rutigliano and Baran, respectively,
including Rutigliano's own application; (4) an RRB claims
examiner, John Coleman, who explained the disability claims
review process and the RRB's reliance on the statements in the
disability applications and supporting medical records in
deciding whether to grant a disability application; (5) an
expert, Dr. Alton Barron, an orthopedic surgeon who reviewed,
among other things, the medical records the defendants submitted
in support of disability claims, and specifically opined that
Rutigliano's claimed ailments either did not exist, or if they
did, were only mild and would not support the impairments he
claimed; (6) special agents of the RRB-OIG and the FBI who
testified about statements made by defendants Lesniewski and
Baran; (7) computer records of defendant Baran showing the
cookie-cutter nature of her applications and her referral of at
least one LIRR employee to Dr. Ajemian; (8) a golf pro who
testified about his observations of Rutigliano's physical
condition; (9) a New York Times video of Rutigliano golfing; and
(10) surveillance video, overtime records, tax returns, and
other evidence establishing the fraud.

      This evidence demonstrated that Rutigliano was one of
the early participants in this fraud, helping to develop a

blueprint for committing disability fraud that was followed by hundreds of other LIRR employees.

### 1.   Disability Fraud at the LIRR

As the evidence established, the LIRR pension plan was unique in that it permitted employees with 20 years or more of service to retire as early as age 50 with a retirement pension. (Tr. 163-64 (Gagliano); Tr. 324 (Supper); Tr. 477 (Parlante); Tr. 824 (Walsh); Tr. 942 (Maher); Tr. 1024-25 (Murray); Tr. 1255 (Stavola)).  However, this LIRR pension typically amounted to only about half of their pre-retirement, working income.  (Tr. 942, 952 (Maher); Tr. 1255 (Stavola)).  Thus, in order to retire at such a young age, LIRR workers would have to be willing to live on a dramatically reduced income until they were eligible for their federal retirement pension, generally at age 65 (a pension similar to Social Security, but paid by the RRB) — *unless*, of course, the workers were willing to lie to obtain federal disability benefits from the RRB at the time they retired from the LIRR.  (Tr. 165, 169-70 (Gagliano); Tr. 324-25 (Supper); Tr. 477 (Parlante); Tr. 679-81 (Ellensohn); Tr. 820-21 (Walsh); Tr. 942-43 (Maher); Tr. 1255-56 (Stavola)).  Because many LIRR employees wanted to retire at age 50 but generally did not want to live on just half their pre-retirement income, LIRR employees made bogus disability claims to the RRB at the time of

their planned retirement from the LIRR, and thereby obtained both an LIRR retirement pension and an RRB disability pension that together equaled approximately their pre-retirement income. (Tr. 165 (Gagliano); Tr. 324 (Supper); Tr. 477 (Parlante); Tr. 679 (Ellensohn); Tr. 942-43 (Maher); Tr. 1255-56 (Stavola)). The LIRR employees typically engaged in this fraud with the knowing assistance of doctors and "consultants" who completed the fraudulent disability paperwork for them, and who knowingly and willfully engaged in the fraud for money.  (Tr. 172 (Gagliano); Tr. 344 (Supper); Tr. 478 (Parlante); Tr. 681 (Ellensohn); Tr. 825-26 (Walsh); Tr. 943 (Maher); Tr. 1256 (Stavola)).

Former LIRR employees involved in the fraud, including Steven Gagliano, Gary Supper, Christopher Parlante, Robert Ellensohn, Regina Walsh, James Maher, and Michael Stavola, testified that railroad employees openly discussed how to falsely claim a disability so they could receive federal disability benefits to supplement their retirement pensions. (Tr. 168 (Gagliano); Tr. 325 (Supper); Tr. 483-84 (Parlante); Tr. 686 (Ellensohn); Tr. 824 (Walsh); Tr. 954-55 (Maher); Tr. 1265 (Stavola)).  The witnesses explained how LIRR employees taught each other how to pre-plan their disability, including by seeing a doctor to create a disability "paper trail" of needless visits and tests to create the false appearance that they were

suffering from serious conditions that could not effectively be treated. (Tr. 168-70 (Gagliano); Tr. 375-76 (Supper); Tr. 484-85 (Parlante); Tr. 686 (Ellensohn); Tr. 825-26 (Walsh); Tr. 953-54 (Maher); Tr. 1265-66 (Stavola)). Stavola, for example, testified that he sought and endured an injection in his back while creating a paper trail of medical records to support his disability application in order to make the application look better. (Tr. 1269-70). The witnesses further explained that LIRR employees taught each other to visit certain "go-to" doctors who were involved in the fraud until 2008, including Ajemian and Lesniewski. (Tr. 344 (Supper); Tr. 485 (Parlante); Tr. 825 (Walsh); Tr. 956 (Maher); Tr. 1265-66 (Stavola)).

    The LIRR employees' description of the fraud was corroborated in many ways, including through the testimony of RRB auditor Natasha Marx (discussed further below) and that of Robert Murray, the MTA auditor. As Murray testified, the Metro-North and LIRR are functionally identical commuter railroads, with the exception of their retirement plans; during the relevant period, LIRR provided a retirement pension to employees at the relatively young age of 50, while Metro-North did not. (Tr. 1023-25). Based on MTA records, Murray further testified that while 21 percent of employees of Metro-North retired on disability from 1998-2011 (when the Government first announced charges related to the fraud), 79 percent of LIRR

employees retired on disability during the same period.  (Tr.
1039; GX 23-B).

### 2.   Rutigliano's Personal Disability Fraud

Rutigliano himself fit this pattern of fraud.  Before
retiring, Rutigliano went to Dr. Lesniewski to develop a
fraudulent paper trail purporting to document an inexorable
physical decline into disability, all while Rutigliano was
continuing to work, taking no sick days, and working hundreds of
hours of overtime to juice his anticipated pension payments.
(GX 100-A, 100-B, 100-D; GX 553).  Then, just as planned,
Rutigliano retired at age 52, submitting an application form, a
vocational report form and a "vocational report supplement," and
medical records and a narrative prepared by Lesniewski, among
other things.  (GX 100).  These documents were filled with lies.
For example, Rutigliano's application form, which was signed
under penalty of prosecution, claimed "My severe back, right
knee, right shoulder, right wrist, and neck pain has made it
impossible for me to perform my duties as a Railroad Conductor,"
and stated that sitting, standing, walking, bathing, dressing,
indoor chores, outdoor chores, driving, using public
transportation, and writing English were all "hard."  (GX 100 at
23, 27).  When asked to describe his "normal activities during a

normal day" Rutigliano painted a picture of himself as nearly homebound because of physical problem.  (GX 100 at 28).

In a document entitled "vocational report supplement," which Rutigliano attached to the official RRB form entitled "Vocational Report," Rutigliano's lies continued.  For example, Rutigliano wrote:

> The work caused increased back pain that traveled into my right knee.  The poor leverage caused by my painful back and right knee required increased manual exertion to turn valves.  This was a catch-22.  Since I could not depend on my back and right knee for support or leverage, I had to employ increased leverage and exertion.  As I tried to use my hands, my back, neck and knee pain uncontrollably flared up, such that I could not do my work.

(GX 100-C at 10).  This document comprises seven single-spaced pages of other similarly false and exaggerated claims.  (GX 100-C at 7-13).

Lesniewski's narrative and other documentation in support of Rutigliano's disability application was likewise false.  For example, Lesniewski's "Medical Assessment" form claimed that Rutigliano could "never" bend/stoop, crouch/squat, climb, or reach above shoulder level; and that Rutigliano could not, because of carpal tunnel syndrome, use both hands for "simple grasping," "fine manipulation," or "pushing/pulling." (GX 100-B).  Lesniewski's narrative claimed:

> I am aware of Mr. Rutigliano's duties for the Long Island Railroad.  As a result of the above noted injuries [back pain, neck pain, right knee tear,

carpal tunnel syndrome, and rotator cuff disease of
the right shoulder], which are permanent in nature, he
is disabled for work for his regular occupation for
the Long Island Railroad.

(GX 100-D at 2).

The evidence at trial demonstrated that these
materials were false in a number of ways.  First, Dr. Barron
analyzed the Rutigliano file in detail, and testified that most
of the claimed injuries were mild, typical, easily treatable,
or, in one case, medically impossible.  Thus, Dr. Barron noted
that Rutigliano claimed that he had neck pain radiating to his
legs, which Lesniewski dutifully recorded and adopted in his
medical records and narrative.  However, because of the way that
nerves are arranged in the body, it is *medically impossible* for
pain to radiate from the neck to the legs.  (Tr. 1781; GX 453).
Thus, based on this evidence, it is clear that Rutigliano was
lying when he made this claim, Lesniewski, as an orthopedic
surgeon, knew it, and Lesniewski went along with the lie by
adopting it and claiming that Rutigliano was disabled.
Similarly, Dr. Barron testified that Rutigliano first made a
complaint about his shoulder *on the very day* that Lesniewski
issued his narrative — a narrative claiming that this new,
unconfirmed, mild, and treatable complaint was disabling.  (Tr.
1782; GX 453).

9

Dr. Barron also testified that any knee problem that Rutigliano may actually have is mild and treatable, and as demonstrated by Rutigliano's golf playing, is not something that would interfere with his work. (Tr. 1802-06). Indeed, after news reports identified Rutigliano as a participant in this fraud, Rutigliano went to a doctor in Florida, Dr. Ferderigos, to attempt to prepare a defense. Dr. Barron analyzed Dr. Ferderigos's records, and that analysis also showed that the problems Rutigliano and Lesniewski claimed were either fabricated or mild. (Tr. 1820-26; GX 563). Thus, for example, Dr. Ferderigos's exam showed that Rutigliano had no neck problems, hand problems, shoulder problems, or arthritis in his knee. (Tr. 1819-24; GX 563). Rather, Dr. Ferderigos only identified an isolated, small, normal knee tear, and mild degenerative changes in his back. (Tr. 1821, 1825-26).

Based on these false documents, Rutigliano obtained benefits based on a total and permanent disability, indicating that he was physically unable to perform any job in the national economy. (Tr. 1366-67; GX 100-G). But, of course, Rutigliano was not occupationally disabled, let alone totally and permanently disabled. Not only were his physical claims false and inconsistent with his avid golfing, but Rutigliano in fact continued to work — charging $1000 to prepare fraudulent disability application materials for other LIRR retirees.

### 3.   Rutigliano's Work as a Disability "Consultant"

The evidence at trial showed that Rutigliano not only cheated to obtain $409,498.33 in fraudulent disability benefits for himself (GX 570, 571), but he also prepared equally fraudulent cookie-cutter application materials for other LIRR retirees.   Two of Rutigliano's clients testified at trial — Christopher Parlante and James Maher.   Parlante and Maher, both former conductors like Rutigliano, each admitted that they fraudulently obtained disability benefits as part of the charged scheme.   (Tr. 477 (Parlante); Tr. 943 (Maher)). They each testified that they went to Rutigliano to prepare the non-medical paperwork for their pre-planned disabilities, and that he charged them $1000 for this service.   (Tr. 478, 485-86, 499 (Parlante); Tr. 965-66 (Maher)).   They also testified that Rutigliano filled out this paperwork without input from them, and that he filled it with lies.   (Tr. 498-99, 518-30 (Parlante); Tr. 966-68 (Maher)).   For example, Maher testified that although Rutigliano wrote in Maher's application that it was hard for him to drive, that was not true and he never told Rutigliano that it was hard to drive.   In fact, Maher told Rutigliano that, after their meeting, Maher was planning to drive from Rutigliano's office in New York to Maher's home in Florida.   (Tr. 968-69).   Rutigliano prepared the application form, the vocational report form, and an attached document

11

created by Rutigliano that Rutigliano entitled "Vocational
Report Supplement."  These documents were virtually identical to
each other and to Rutigliano's own materials, and all of them
were equally fraudulent.  (GX 104-A, 104-C (Parlante); GX 107-A,
107-C (Maher)).  For example, Parlante and Maher explained that
in their respective vocational reports, Rutigliano exaggerated
the demands of their jobs and falsely claimed that they were in
too much pain to continue working.  (Tr. 518-30 (Parlante); Tr.
978-88 (Maher)).  They never told Rutigliano that they could not
perform their job activities, and Rutigliano never asked them
about this subject.  (Tr. 499 (Parlante); Tr. 978 (Maher)).

        In addition, Natasha Marx testified at trial and
presented 134 "vocational report supplements" that were
identical to each other and to Rutigliano's own document in
almost every respect.  In fact, all of these documents, which
were compiled and admitted as GX 19-A-1, described, using
exactly the same distinctive language, how the identified
ailments interfered with the work.  (Tr. 1557-66; GX 19-A-1).
As Ms. Marx put it, "There's some variation in terms of the type
of ailment, whether it would be neck or back pain, but in terms
of the effect . . . of what it causes on their job, it's very
similar for all of them."  (Tr. 1566; GX 19-A-1).  Ms. Marx also
summarized the disability applications that corresponded to
these nearly identical "vocational report supplements," and not

12

surprisingly, those too fell into a cookie-cutter pattern, where nearly all of those applications claimed that many activities of daily living were "hard" or they could do them "not at all." (Tr. 1566-69; GX 19-A, 10).

Although the Government, conservatively, and as an initial matter, only presented to the jury the nearly identical documents compiled in GX 19-A-1, after cross-examination incorrectly suggested that documents compiled therein were only identified because they contained the phrase "catch-22," on redirect examination, Ms. Marx explained that through computer searches and manual reviews of hundreds of files, she identified three major patterns (including the pattern compiled as GX 19-A-1) that were highly similar to Rutigliano's own fraudulent application. (Tr. 1721-25). Compiled copies of the two additional patterns were also admitted at trial as GX 19-B-1 and 19-C-1. (Tr. 1723). Based on the nearly identical language used in the applications compiled as GX 19-A-1, and other evidence, it is clear that the 134 LIRR retirees represented in that exhibit (including Maher and Parlante) are all Rutigliano clients. In addition, based on the similarities among the other two patterns identified, it is clear that they too are Rutigliano clients. Thus, the total number of clients attributable to Rutigliano includes the individuals identified in GX 19-A-1, 19-B-1, and 19-C-1, namely, 268 clients.

13

B.    **The Defense Case**

Defendants Lesniewski and Rutigliano submitted certain stipulations as the entirety of their defense case.  Defendant Baran testified and called two witnesses, including a former LIRR employee who was receiving disability payments based on a claim in his disability application that his hearing was so impaired that he could not hear sirens.  (Tr. 2518-19). Notwithstanding his purportedly disabling hearing impairment, he had no trouble hearing questions in the courtroom.  (Tr. 2518-19).

C.    **The Verdict**

After deliberating for approximately three days, the jury returned a verdict of guilty on all defendants on all counts.  Thus, Rutigliano was convicted of:  (1) conspiring with Lesniewski, Baran, and others to commit mail fraud, wire fraud, and health care fraud; (2) conspiring with Ajemian, Baran, and others to commit mail fraud, wire fraud, and health care fraud; (3) conspiring with Lesniewski, Baran, and others to defraud the United States; (4) conspiring with Ajemian, Baran, and others to defraud the United States; (5) three counts of mail fraud (Counts Ten, Twelve, and Thirteen); (6) three counts of wire fraud (Counts Thirteen, Fourteen, and Fifteen); and (7) one false statements count (Count Twenty-One).  The false statement that was the basis for the Count Twenty-One conviction was

14

Rutigliano's false statement that he had not worked or been self-employed while on disability.

## II.  **The Sentencing Factors**

In imposing sentence, this Court must consider the factors set forth in Title 18, United States Code, Section 3553(a).  Section 3553(a) requires the sentencing Court to consider, *inter alia*, the Sentencing Guidelines and the sentencing range recommended by application of those Guidelines, 18 U.S.C. § 3553(a)(4-5); "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); "the need for the sentence imposed to reflect the seriousness of the offense," and provide just punishment, 18 U.S.C. § 3553(a)(2)(A), to provide general and specific deterrence, 18 U.S.C. § 3553(a)(2)(B-C), and to provide any treatment or training the defendant may need, 18 U.S.C. § 3553(a)(2)(D); and "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  The statute further requires that the sentence imposed be "sufficient, but not greater than necessary," to comply with the foregoing purposes of sentencing.  18 U.S.C. § 3553(a).

An analysis of these factors demonstrates that a Guidelines sentence is warranted.

### A.    The Sentencing Guidelines Range

Rutigliano's Sentencing Guidelines Range is largely driven by the loss amount.  The intended loss amount was computed by Ms. Marx as follows.  First, she compiled a list of Rutigliano clients.  The Rutigliano clients were identified based on witness testimony from Parlante and Maher, and by circumstantial evidence, namely the highly similar three patterns of application material identified and complied by Ms. Marx.[1]  As noted above, Ms. Marx compiled as GX 19-A-1 134 vocational report supplements that were nearly identical to Rutigliano's own vocational report supplement.  The other corresponding application materials, such as the disability application itself and the vocational report form for these individuals were also shared many tell-tale, signature characteristics.  Ms. Marx also identified other vocational report supplements and forms that shared these same tell-tale characteristics and that had the same, idiosyncratic turns of

---

[1] Rutigliano is simply wrong in claiming that the only method of identifying Rutigliano's clients was "based upon a text recognition computer program and not upon an actual examination of the RRB files" (Rutigliano's Br. at 7).  Rather, initial identification of possible clients was assisted by computer word searches, but as Ms. Marx's testimony indicated (and as she could confirm in the context of sentencing), she also reviewed the files themselves manually, identified a number of tell-tale, signature characteristics, and analyzed hundreds of files to identify those falling into the three patterns introduced at trial.

phrase as Rutigliano's own documents.  These files themselves fell into two additional identifiable patterns.  The claim documents were highly similar across all three patterns (including that identified in GX 19-A-1), but were nearly identical within each pattern.  .  Compilations of these highly similar patterns were admitted at trial as GX 19-B-1 and 19-C-1. A review of those documents reveals that Rutigliano used Pattern 1 (GX 19-A-1) for conductors and engineers, Pattern 2 (GX 19-B-1) for trackmen and others with physical jobs, and Pattern 3 (GX 19-C-1) for supervisors and others with less common job descriptions.[2]

_____

[2] As noted, this loss calculation is extremely conservative, and the Court would be within its discretion to use the loss amount attributable to all individuals that either Ajemian or Lesniewski recommended for disability (this loss amount would far exceed the $200 million threshold that would add an additional two offense levels to the calculation).  This is because Rutigliano was convicted of conspiring with both Ajemian and with Lesniewski, and based on the testimony at trial, the Court could conclude that all LIRR disability clients of Ajemian and Lesniewski were within the scope of Rutigliano's jointly undertaken activity, see United States v. Studley, 47 F.3d 569, 574-75 (2d Cir. 1995) (sentencing court must "make a particularized finding of the scope of the criminal activity agreed upon by the defendant"), because he clearly believed that all LIRR employees were entitled to disability payments regardless of whether they could continue working and regardless of whether their application's claims were true.  Obviously, because Ajemian and Lesniewski lent their personal and professional imprimatur to each of their clients' fraud, it is much more straightforward to identify each of their clients than it is to identify which clients Rutigliano served as the facilitator.  Thus, the conservative loss amount used by the Government is based on circumstantial evidence of Rutigliano's involvement, but this circumstantial evidence, in the context of

The similarities across all of these patterns of materials demonstrate that they had a common author — Rutigliano — and also that they are false.  It is simply unreasonable to believe that these cookie cutter applications could be unconnected with Rutigliano or that they could accurately describe any particular individual's limitations.  Thus, in preparation for sentencing, Ms. Marx (with the assistance of others) identified the individual Rutigliano clients reflected in these three patterns, and for each of them (including Rutigliano himself), computed the intended losses and actual losses.  The intended losses are the disability payments extrapolated out to full retirement age — that is, age 65, or if the individual had 30 years of service before retiring, age 60. The actual losses are the disability payments received by each individual to date.  In addition to computing the staggering Rutigliano-linked losses to the RRB from disability payments, Ms. Marx also added the amounts (for Rutigliano and the 268 Rutigliano clients) relating to RRB sickness benefits, student loan forgiveness, private disability losses, and money paid by United HealthCare for doctor visits and tests that were not for

_____

the proof presented at trial, demonstrates well beyond a
preponderance that these clients are Rutigliano's and that he is
therefore directly responsible for the losses attributable to
them.

18

legitimate medical treatment, but instead were in order to pad a fraudulent disability file.

As noted, these computations do not include any losses that are unrelated to Rutigliano's own clients.  Although the "scope of the criminal activity" Rutigliano "agreed to jointly undertake" arguably includes losses relating to non-Rutigliano clients, the Government submits that a conservative, but nevertheless staggering, Rutigliano and Rutigliano-client-only compilation of losses should be used.  U.S.S.G. § 1b1.3, comment. (n.2).  In addition, although the trial evidence did not demonstrate Rutigliano's personal involvement in defrauding private insurers or student loan providers, or that he was directly involved in billing United HealthCare for unnecessary doctor visits or tests, the evidence at trial clearly demonstrated that those parts of the fraud were common knowledge at the LIRR — and in fact were known to Rutigliano, as a fraudulent disability recipient himself, and thus were more than "reasonably foreseeable in connection with the criminal activity jointly undertaken" by Rutigliano.  U.S.S.G. § 1b1.3, comment. (n.2).

The summary spreadsheet prepared by Ms. Marx and showing her computations is attached hereto as Exhibit A. Underlying spreadsheets that she used to perform her calculations are available for submission in electronic format.

Moreover, although Rutigliano has requested a *Fatico* hearing, it appears that this is largely an attempt to relitigate his guilt, an issue that has been conclusively determined by the jury verdict. To the extent the Court would benefit from brief testimony from Ms. Marx about the steps she undertook to calculate the figures based on the people identified in the three exhibits admitted at trial (GX 19-A-1, 19-B-1, 19-C-1), the Government stands ready to present that testimony.

Based on these loss calculations, the Sentencing Guidelines calculation is as follows:

A.  The applicable guidelines manual is the November 1, 2013 manual.

B.  Pursuant to Appendix A, and U.S.S.G. § 2X1.1, the offense level for all counts is calculated pursuant to U.S.S.G. § 2B1.1, because for the conspiracy counts, the defendant and his co-conspirators completed all acts necessary for completion of the substantive offense.

C.  Pursuant to U.S.S.G. §§ 3D1.1, 3D1.2(d), and 3D1.3(b), all counts are grouped together and the offense level is calculated based on the aggregate loss amounts attributable to all counts.

D.  Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7, because Counts One, Two, Ten, Twelve, Thirteen, Fourteen, Fifteen, and Sixteen all have a statutory maximum term of imprisonment of 20 years or more.

E.  Pursuant to U.S.S.G. § 2B1.1(b)(1)(N), 26 levels are added because the intended loss amount is greater than $100,000,000 ($100 million).

Based on the foregoing, the applicable offense level is 33. The Probation Office argues that an additional two

offense levels must be added pursuant to U.S.S.G. § 3C1.1 and comment. (n.8). (PSR at 74). The Government believes that Rutigliano's false statement conviction was part and parcel of the conspiracy, and indeed was an act in furtherance of it, rather than a separate, and later, obstruction offense. Thus, we disagree with Probation on this point, and believe that no two-level enhancement for obstruction of justice should be added. The defendant has no criminal history. Accordingly, the advisory Guidelines range is 135 to 168 months' imprisonment.

**B.   The Nature and Circumstances of the Offense**

The evidence at trial demonstrates that the defendant was a key participant in a breathtaking fraud, a fraud that involved generations of LIRR employees, trusted doctors, and insiders and union officials like Marie Baran and Joseph Rutigliano. The LIRR disability fraud corrupted the very culture at the LIRR, causing hundreds of otherwise hard-working and honest employees to think that they deserved to retire early and abuse a federal safety net to pad their retirement incomes.

Witness after witness testified that the means and methods of the fraud were openly discussed and common knowledge at the railroad, and this very pervasiveness contributed to the fraud's success. The generations of LIRR employees who retired early and enjoyed a comfortable and active retirement filled with golf, tennis, cycling, or world travel subsidized by

21

fraudulently obtained disability payments by their very example encouraged those that came after them to follow in their footsteps, confident that if they followed the blueprint of their predecessors, their fraud too would be a success.  The handful of facilitators (like Baran and Rutigliano) and doctors (like Ajemian, Lesniewski, and Parisi) provided the institutional know-how necessary to ensure that scores of otherwise honest LIRR employees could successfully pull off a massive and lucrative fraud.  For example, hundreds of LIRR employees paid Rutigliano to prepare application answers and "vocational report supplements" that mirrored Rutigliano's own successfully fraudulent application.  And, when those same employees went to one of the disability doctors, they could rest assured that the doctor would corrupt his license and training, and deliver a fraudulent narrative exactly as ordered, and exactly on time.

The sheer number of people involved and the staggering actual and intended losses demonstrate the severity of this crime, and counsel for a significant prison sentence, particularly for defendants like Rutigliano, who were directly involved not only in their own fraud, but in the fraud of their hundreds of clients.

### C.   The History and Characteristics of the Defendant

As for the defendant's history and characteristics, while he has no criminal history and appears to be a responsible family man who served in the Coast Guard and worked at the LIRR for 27 years, his history and characteristics nevertheless counsel for a substantial sentence.  Rutigliano was not only a long-time conductor at the LIRR, but he was also president of the union local, a person of authority and a leader in the community.  It is particularly troubling that a leader such as Rutigliano would play a key repeat role in this fraud, charging $1000 a person to fill application after application with lies. And, Rutigliano's crime is all the more brazen because at the same time he was collecting these unreported fees, he had successfully and fraudulently convinced the RRB that he was "totally and permanently disabled" from all work in the national economy, using lies such as his claim that it was hard for him to write.  Similarly troubling is the participation of people like Marie Baran, a leader at the RRB, who corrupted her inside knowledge in order to herself pad her retirement by filling out false applications for clients.

### D.   Just Punishment and Deterrence

As noted, the LIRR disability fraud scheme was massive, spanning a decade and involving hundreds, if not thousands of people.  If unchecked, the losses from it may have

exceeded $1 billion.  Even the parts of the fraud that directly involved Rutigliano — that is, the fraud relating to his own clients — are massive, also spanning years, involving hundreds of people, and intending losses exceeding $100 million.  A significant prison term would provide just punishment for this brazen fraud.

The need for deterrence likewise supports a significant prison sentence.  The defendant himself continues to deny his guilt and to rehash the arguments and rationalizations that buoyed the corrupt culture at the LIRR and that were presented to and rejected by the jury at trial.  Thus, he argues that the fact that the fraud worked — that is, that the RRB, relying on the lies told in application materials, "found" people to be disabled — demonstrates that there was no fraud. And, he continues to ignore the lies he told in his application, and to claim that something about the "occupational disability" standard somehow means he can be both able-bodied and active for all leisure purposes, but totally and permanently disabled for work.  In addition, the evidence at trial showed that not only is the fraud widespread, it continued almost unabated after it was exposed by the *New York Times* and investigated by law enforcement over the course of years.  As audaciously articulated by Marie Baran to a Special Agent of the FBI ("you are never going to figure it out honey" (GX 3517-02 (not

24

admitted at trial)), it seems that many participants in this fraud simply thought that the Government would never be able to make a case relating to physical disabilities supported by corrupt doctors.  Rutigliano's bravado was similar — he told a *New York Times* reporter, when interviewed on video after a round of golf, "the doctors don't lie."[3]  As he well knew, these corrupt doctors *did* lie, which is exactly why he and hundreds of other LIRR employees went to them.

To deter this kind of brazen, widespread, and long-term fraud, a substantial prison sentence is warranted.

**E.    Other Factors**

Neither health and rehabilitation factors nor "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," suggest any mitigation or a lower sentence. 18 U.S.C. § 3553(a)(6).  The repeat participants in the fraud, such as Rutigliano and the doctors, all deserve substantial punishment, and are more culpable than the retirees.  The Government agrees with Probation that the doctors are the most culpable participants because they used a special skill and

---

[3] This portion of the video was not presented to the jury at trial, but it remains available on the *New York Times* website at http://www.nytimes.com/video/nyregion/long-island/1194817477585/the-most-dangerous-job.html.  The quotation appears at approximately 5:30. The portions of Rutigliano's video interview appear between 4:25 and 5:40.

abused a position of trust by corrupting their licenses to participate in a fraud.  However, because there are enhancements reflecting that additional culpability, these factors do not counsel for a non-Guidelines sentence for Rutigliano.

## Conclusion

For the foregoing reasons, the Government respectfully requests that the Court impose a Guidelines sentence of imprisonment in this case.

Dated:     New York, New York
           December 16, 2013

                         Respectfully submitted,

                         PREET BHARARA
                         United States Attorney


By:     _____/s/ Justin S. Weddle_____
        Justin S. Weddle
        Nicole Friedlander
        Daniel B. Tehrani
        Assistant United States Attorneys
        Tel.: (212) 637-2312/-2211/-2455