UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
                                                   :

UNITED STATES OF AMERICA           :

                                                   :

    v.                                        :         11-cr-1091 (VM)

PETER LESNIEWSKI                 :         **Electronically Filed**

                   **Defendant.**            :
----------------------------------------------------------x

## REPLY MEMORANDUM IN SUPPORT OF
## DEFENDANT PETER LESNIEWSKI'S MOTION FOR NEW TRIAL OR, IN THE ALTERNATIVE, FOR RESENTENCING

                                           THOMAS ANTHONY DURKIN
                                           DURKIN ROBERTS & GROHMAN
                                           2446 N. Clark Street
                                           Chicago, Illinois 60615
                                           (312) 981-0123

                                           JOSHUA L. DRATEL
                                           LAW OFFICES OF JOSHUA L.
                                           DRATEL, P.C.
                                           29 Broadway
                                           Suite 1412
                                           New York, New York 10006
                                           (212) 732-0707

                           *Attorneys for Defendant Peter Lesniewski*

-Of Counsel-
John D. Cline
Law Office of John D. Cline
235 Montgomery St., Suite 1070
San Francisco, CA  94104
(415) 662-2260
cline@johndclinelaw.com

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 1

      I.     RELEVANCE................................................................................................ 2

      II.    RULE 403 ..................................................................................................... 7

      III.   THE EVIDENCE WOULD LIKELY RESULT IN AN ACQUITTAL ............... 8

      IV.   SENTENCING ............................................................................................. 9

CONCLUSION.................................................................................................................. 10

i

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Carnesi v. United States*,
    933 F. Supp. 2d 388 (E.D.N.Y. 2013) ...................................................................................10

*Gonzalez v. United States*,
    792 F.3d 232 (2d Cir. 2015)...................................................................................................10

*Kaminski v. United States*,
    339 F.3d 85 (2d Cir. 2003).....................................................................................................10

*Mansour v. United States*,
    2015 U.S. Dist. LEXIS 46884 (S.D.N.Y. Apr. 9, 2015)........................................................10

*United States v. Ethridge*,
    948 F.2d 1215 (11th Cir. 1991) ...........................................................................................3, 6

*United States v. Foshee*,
    569 F.2d 401, *amended*, 578 F.2d 629 (5th Cir. 1978).........................................................3, 6

*United States v. Garvin*,
    565 F.2d 519 (8th Cir. 1977) ...............................................................................................3, 6

*United States v. Persico*,
    645 F.3d 85 (2d Cir. 2011).................................................................................................1, 8

*United States v. Thomas*,
    32 F.3d 418 (9th Cir. 1994) .................................................................................................3, 6

**CONSTITUTION, STATUTES, AND RULES**

28 U.S.C. § 2255....................................................................................................................10

Fed. R. Crim. P. 33 ..................................................................................................................1

Fed. R. Evid. 403 ............................................................................................................1, 7, 8

## INTRODUCTION

The government's opposition [1] ignores the extensive use the prosecution made of statistical evidence in the indictment, at trial, and at sentencing. It ignores the prosecution's efforts to persuade the jury at trial and the Court at sentencing that the disparity between the LIRR and Metro North disability rates and the high percentage of Dr. Lesniewski's LIRR patients who obtained disability proved a massive fraud. Having attempted to airbrush its own statistical evidence out of the case, the government argues that the newly discovered evidence that more than 96% of Dr. Lesniewski's LIRR patients in fact are disabled has no relevance and would merely confuse the jury.

The government is wrong. It does not contest the accuracy of the RRB's disability findings under BO 13-55. Nor could it; the RRB made those findings based on examinations by independent physicians applying a "substantially enhanced review." The undisputed BO 13-55 disability findings leave no doubt that the prosecution presented the jury and the Court with a false and misleading picture of Dr. Lesniewski's conduct and intent. In the interest of basic fairness, the Court should grant a new trial or, at a minimum, a new sentencing.

## ARGUMENT

The government argues that the RRB findings are irrelevant; that, at a new trial, they would be excluded under Rule 403; and that they would not likely lead to an acquittal.[2] The

---

[1] Government's Memorandum of Law in Opposition to Defendants' Motions for a New Trial or, in the Alternative, for Resentencing (Doc. 838) ["G. Opp."]. The memorandum in support of Dr. Lesniewski's motion (Doc. 819) will be cited as "L. Mem."

[2] The government does not dispute that the BO 13-55 evidence is "newly discovered" or that Dr. Lesniewski acted diligently to obtain the evidence. Nor does the government contend that the evidence is "merely cumulative or impeaching." *United States v. Persico*, 645 F.3d 85, 109 (2d Cir. 2011) (quotation omitted). Those prongs of the standard for a motion for new trial under Fed. R. Crim. P. 33 are not at issue.

1

government also argues that the new disability findings have no bearing on Dr. Lesniewski's sentence. It is wrong on each point.

## I. **RELEVANCE.**

Before turning to the government's specific relevance arguments, some context is necessary. As detailed in Dr. Lesniewski's initial memorandum (L. Mem. 2-12), the government relied at every stage of the case on two principal statistics: the 79% to 21% LIRR-Metro North disability disparity and the 98% disability rate for Dr. Lesniewski's LIRR patients. When the defense objected to this evidence, the government argued that it was "highly probative of the existence of the conspiracy and scheme, and of the participation of the doctors . . . in the scheme." Doc. 274 at 11-13, 16. The Court agreed, finding the statistical evidence "plainly relevant." Doc. 317 at 10.

The government's successful argument for admission of its own statistics contradicts its claim here that evidence which rebuts those statistics is irrelevant. If the government's statistical evidence was "plainly relevant," as the Court found, the new BO 13-55 findings are at least equally probative. Put differently, if an unexplained disparity between LIRR and Metro North disability rates permits an inference of fraud, as the government argued at trial, the fact that the disparity existed for reasons other than fraud tends to negate that inference and thus is relevant. Similarly, if an unexplained 98% disability rate for Dr. Lesniewski's LIRR patients permits an inference of fraud, the fact that the patients were in fact disabled is relevant to negate that inference.

In addition to rebutting the inference the government asked the jury to draw from its statistics, the new RRB findings provide crucial support for Dr. Lesniewski's defense that he acted in good faith and never intended to defraud the RRB or anyone else. The fact that more

2

than 96% of Dr. Lesniewski's LIRR patients in fact were disabled shows that he did not intend any exaggeration he included in his narratives to deceive or defraud the RRB.  *See, e.g., United States v. Thomas*, 32 F.3d 418, 420-21 (9th Cir. 1994) (evidence of overpayments to growers relevant to show that charged underpayments were not made with fraudulent intent); *United States v. Ethridge*, 948 F.2d 1215, 1217-18 (11th Cir. 1991) ("If Hanover [an insurance company] had lost money, the government would likely have introduced that fact as evidence of intent to defraud.  In our opinion, the Ethridges are equally entitled to argue that the fact that Hanover did not suffer a loss related to their intent, and present evidence to support that argument."); *United States v. Foshee*, 569 F.2d 401, 403 ("In determining intent, it is clear that the jury may consider that the banks were not defrauded since they suffered no financial loss."), *amended and clarified*, 578 F.2d 629 (5th Cir. 1978); *United States v. Garvin*, 565 F.2d 519, 521-22 (8th Cir. 1977) (evidence that defendant answered question truthfully on some insurance applications relevant to intent in answering the question falsely on charged applications).

The government does not address these points.  Instead of confronting head-on the obvious relevance of the new RRB findings, the government offers several diversionary arguments.  None has merit.

*First*, the government maintains that the BO 13-55 disability findings are irrelevant because the RRB made those findings beginning in 2014, several years after Dr. Lesniewski stopped preparing narratives for LIRR patients. G. Opp. 5-6.  The government seems to argue, in other words, that Dr. Lesniewski's LIRR patients were feigning disability when he examined them but had become disabled by the time of the BO 13-55 reevaluations.

There is not a shred of evidence to support the government's speculation.  The government does not identify a single LIRR patient who pretended to be disabled when initially

applying for benefits but had become disabled by the time of the RRB's reevaluation. Nor does the government's speculative theory make sense. The LIRR workers for whom Dr. Lesniewski prepared narratives were on the verge of retirement from the railroad when he saw them. Their occupational disability almost certainly arose from the repetitive stressful actions that their LIRR jobs required. Those actions injured their musculoskeletal systems. Their occupational disability did not arise from their presumably less stressful actions in retirement. In any event, the government's timing argument, to the very limited extent it may have some basis, goes at most to the weight of the evidence and not to its relevance. At a new trial, the government will be free to try to show that some meaningful number of Dr. Lesniewski's LIRR patients became disabled after retirement.

*Second*, the government notes that the physicians who reevaluated Dr. Lesniewski's LIRR patients did not rely on the initial disability finding. It argues from this that the RRB reevaluations "do not relate to the initial disability determinations that were at issue in defendants' case." G. Opp. 6. But the government has it exactly backward. It is the fact that the RRB reevaluations did *not* rely on Dr. Lesniewski's findings that makes them so powerfully probative. The reevaluations represent *independent* determinations, by physicians applying a heightened standard, that more than 96% of Dr. Lesniewski's LIRR patients in fact are disabled.

The government's position here contradicts the argument it made pretrial in convincing the Court to exclude evidence of the RRB's "Continuing Disability Reviews." The government argued then that the CDRs were irrelevant to Dr. Lesniewski's intent in part because the RRB "continued to rely on Dr. Lesniewski's underlying (false) statements and findings in connection with the RRB's initial decision to award occupational disability." Doc. 406 at 10; *see* Doc. 434 at 8-10 (government reply makes same argument). The Court agreed; it found the results of the

CDRs largely irrelevant to Dr. Lesniewski's intent "because it is clear that the reviews were based in part on the same initial false statements in question." Doc. 462 at 9-10.

Having argued that the CDRs were irrelevant because they considered Dr. Lesniewski's initial evaluation, the government now argues that the BO 13-55 reevaluations are irrelevant because they *do not* consider Dr. Lesniewski's evaluation. The government cannot have it both ways. The reevaluations conducted under BO 13-55 eliminate the key flaw the government and the Court found in the CDRs. Because those reevaluations are fully independent, they have great probative force.[3]

*Third*, the government insists that the BO 13-55 reevaluations are irrelevant because "the defendants would have been guilty of fraud even if the annuitants at issue were actually eligible for disability benefits during the relevant time period . . . because the defendants lied to induce the RRB to provide them with those benefits." G. Opp. 6. If the matter were that straightforward, the government would have made its case at trial through its four cooperators—Parlante, Gagliano, Supper, and Ellensohn—and Dr. Lesniewski's statement to the FBI. The government introduced and continually emphasized the statistical evidence because neither the cooperators (who admitted exaggerating their symptoms to Dr. Lesniewski and conceded they had never discussed fraud with him) nor the statement (in which Dr. Lesniewski said he had exaggerated his disability finding in 20 percent of his narratives but denied any intent to defraud

---

[3] The government and the Court also found the CDRs irrelevant because, instead of determining "whether the disability recipient was capable of performing his job," the CDRs asked "only whether there had been 'significant medical improvement' since the recipient was determined to be occupationally disabled." Doc. 406 at 10; *see* Doc. 434 at 5-6 (government reply makes same argument); Doc. 462 at 9 (Court notes that "the RRB employed a different standard in conducting the subsequent reviews than it did in making the initial disability determination"). By contrast, the Board Order 13-55 reevaluations addressed the same question as the initial disability determination—whether the applicant was capable of performing his job—and did so under a "substantially enhanced review."

5

the RRB) established that Dr. Lesniewski had the requisite mens rea. The government sought to fill that gap in its proof by asking the jury to infer intent to defraud from the LIRR-Metro North disability disparity and the high percentage of Dr. Lesniewski's LIRR patients who obtained disability. The BO 13-55 disability findings completely defeat the inference the government invited the jury to draw. In addition, as in *Thomas*, *Ethridge*, *Foshee*, and *Garvin*, the evidence that more than 96% of Dr. Lesniewski's LIRR patients were in fact occupationally disabled strongly supports his defense that he acted in good faith and lacked an intent to defraud the RRB.

*Fourth*, the government argues in a footnote that "irrespective of the RRB's rate of approval of disability applications, evidence of the wide disparity in the rate at which workers *applied* for disability at the railroads—railroads that were substantively identical except with respect to their retirement policies—remains relevant to show that the LIRR pension plan created an incentive for LIRR workers to commit disability fraud." G. Opp. 6 n.1 (emphasis in original). This argument ignores the emphasis the government placed at trial on the 79%-21% *approval* disparity between LIRR and Metro North and on the 98% disability rate for Dr. Lesniewski's LIRR patients. The government tacitly concedes that the BO 13-55 findings eliminate the inference of fraud that the government urged the jury to draw from those statistics.

The LIRR-Metro North application rate disparity cuts against the government in any event. The fact that a higher percentage of LIRR retirees applied for disability than Metro North retirees does not establish "an incentive for LIRR workers to commit disability fraud" if—as the BO 13-55 reevaluation establishes—those retirees in fact qualified for disability. To the contrary, the ease with which LIRR retirees could obtain disability legitimately (even under the heightened standard applied under BO 13-55) shows the *lack* of an incentive to commit fraud. If a retiree knows he is entitled to disability through legitimate means, he has no reason to resort to

fraud; the risk of getting caught and punished for fraud far outweighs the "benefit" of obtaining a disability that would almost certainly be granted through known legitimate means.

*Fifth*, in the same footnote the government argues that its statistical evidence "remain[s] relevant to corroborate the testimony of numerous cooperating witnesses that there was a widespread scheme among LIRR workers to commit such disability fraud." G. Opp. 6 n.1. That is wrong. The government's statistical evidence does not "corroborate" the cooperators' testimony about a widespread fraud scheme if—as the newly discovered BO 13-55 evidence proves—the LIRR workers who sought disability in fact were disabled. To the contrary, the BO 13-55 findings show that there was no "widespread scheme" to commit disability fraud; the overwhelming majority of LIRR disability applicants in fact qualified for disability, even under a heightened standard.

For all of these reasons, the BO 13-55 findings are directly relevant to rebut the government's statistical evidence and to establish that Dr. Lesniewski acted in good faith and without any intent to defraud.

## II.     RULE 403.

The government offers a perfunctory Rule 403 argument against admissibility of the BO 13-55 findings. G. Opp. 7. Contrary to the government's argument, the Rule 403 balance tilts strongly in favor of admissibility. The findings have great probative value, both to rebut the government's statistical evidence and to show that Dr. Lesniewski acted in good faith and lacked any intent to defraud. And there is minimal risk of "unfair prejudice, confusion, undue delay [and] waste of time for the jury." G. Opp. 7. As noted above, to the extent (if any) Dr. Lesniewski's patients feigned disability to obtain an initial disability determination but became disabled before the independent BO 13-55 determination, the government is free to make that

7

showing at a new trial.  It is a safe bet that the government will not find a single such retiree—but if it does, it can present that testimony.

To understand the weakness of the government's Rule 403 argument, the Court need only compare it to the Rule 403 objection the government lodged pretrial against the CDRs.  The government argued that the CDRs had minimal probative value and a high risk of jury confusion in part because (1) the CDRs applied a different standard than the initial disability determination, *see supra* note 3, and (2) the CDRs relied in part on Dr. Lesniewski's narratives.  *See* Doc. 406 at 15; Doc. 434 at 7-8.  The BO 13-55 findings present neither of these problems; they assess occupational disability (rather than "significant medical improvement," the CDR standard) and they do not rely at all on Dr. Lesniewski's findings.  In other words, the BO 13-55 findings have far greater probative value than the CDRs and far less risk of confusion or unfair prejudice.

### III.    THE EVIDENCE WOULD LIKELY RESULT IN AN ACQUITTAL.

The government offers a one-paragraph argument (G. Opp. 7-8) that introduction of the BO 13-55 evidence at a new trial would not "likely result in an acquittal" of Dr. Lesniewski.  *United States v. Persico*, 645 F.3d 85, 109 (2d Cir. 2011) (quotation omitted).  It relies on the equivocal testimony of its four cooperators and Dr. Lesniewski's statement to the FBI (which the government persists in describing, incorrectly, as a "partial confession").  For the reasons outlined above and in the initial memorandum, that evidence would not convince the jury beyond a reasonable doubt that Dr. Lesniewski intended to defraud the RRB.  The government would not have the enormous benefit of the false and misleading inference it asked the jury to draw from the statistical evidence.  On the other hand, Dr. Lesniewski would present the BO 13-55 findings and urge the jury to infer from the fact that more than 96% of his LIRR patients in fact are

disabled under a heightened standard that he acted in good faith in finding them disabled and never intended to defraud the RRB or anyone else.

## IV.    SENTENCING.

The Court should grant Dr. Lesniewski a new trial, for the reasons outlined above and in his initial memorandum. If the Court declines to grant a new trial, however, it should at least resentence Dr. Lesniewski based on a correct loss calculation.

At sentencing, the government—relying on a chart prepared by Natasha Marx, Doc. 645-1—argued that the actual loss figure was $70,632,900, based on the total amount paid out to LIRR retirees who consulted Dr. Lesniewski. It argued that the intended loss figure was $93,443,657, with the only difference representing the total funds not yet paid out to the annuitants whom Ms. Marx identified. Doc. 645 at 10; Doc. 645-1.

Not surprisingly, the government has abandoned its actual loss calculation in light of the undisputed BO 13-55 findings. Those findings demonstrate that the RRB suffered little, if any, actual loss from Dr. Lesniewski's alleged fraud. The government argues instead that no resentencing is necessary because "the intended loss figure is unaffected by evidence of the Post-Board Order Approvals." G. Opp. 11.

The government is wrong. It presented no evidence, apart from the purported actual loss and projected future loss, that Dr. Lesniewski intended to cause a loss of more than $93 million.[4] The intended loss figure rested on nothing more than an extrapolation from the false actual loss figure. With the collapse of the actual loss figure, the derivative intended loss figure must fall as well. If the Court declines to grant Dr. Lesniewski a new trial, it should at a minimum conduct a

---

[4] In fact, when Dr. Lesniewski challenged the PSR's proposed intended loss figure (Doc. 642-1 at 2-3), the government urged the Court to rely on the now-discredited actual loss figure. Doc. 645 at 9-10.

9

resentencing at which the government will have the burden of proving the amount of any actual or intended loss.

The government argues that, regardless of whether the Court vacates Dr. Lesniewski's custodial sentence, it has no power to vacate the obviously incorrect restitution and forfeiture orders, each exceeding $70 million and each based on the now-discredited actual loss figure. G. Opp. 12-13 (citing *Kaminski v. United States*, 339 F.3d 85 (2d Cir. 2003)). Apart from the patent unfairness of asking the Court to sustain a crushing financial penalty that has no basis in fact, the government's argument misreads *Kaminski*. That case leaves open whether a sufficiently onerous restitution (or forfeiture) order could restrain a defendant's liberty enough to meet the "in custody" requirement of § 2255. *See Gonzalez v. United States*, 792 F.3d 232, 237 (2d Cir. 2015) (citing *Kaminski*, 339 F.3d at 87-89). This is the precise circumstance that *Gonzalez* and *Kaminski* envisioned. Dr. Lesniewski faces a financial obligation of more than $140 million. Especially given his age and his inability to practice medicine, the restitution and forfeiture obligations condemn him and his family to a lifetime of penury. That extraordinary burden suffices to trigger jurisdiction under § 2255 as construed in *Gonzalez* and *Kaminski*.[5]

## CONCLUSION

For the foregoing reasons, and for the reasons stated in the initial memorandum, the Court should enter an Order granting Dr. Lesniewski a new trial on all counts of conviction. In the alternative, the Court should resentence Dr. Lesniewski.

---

[5] If it is ultimately determined that Dr. Lesniewski cannot challenge his restitution and forfeiture under § 2255, he will seek to do so through the writ of coram nobis. *See, e.g., Mansour v. United States*, 2015 U.S. Dist. LEXIS 46884, at *13 (S.D.N.Y. April 9, 2015) (citing cases); *Carnesi v. United States*, 933 F. Supp. 2d 388 (E.D.N.Y. 2013) (granting coram nobis relief from restitution order).

                                              Respectfully submitted,

Dated February 8, 2016                    /s/ THOMAS ANTHONY DURKIN
                                              DURKIN ROBERTS & GROHMAN
                                              2446 N. Clark Street
                                              Chicago, Illinois 60614
                                              (312) 981-0123
                                              tdurkin@durkinroberts.com

                                              /s/ JOSHUA L. DRATEL
                                              JOSHUA L. DRATEL, P.C.
                                              29 Broadway, Suite 1412
                                              New York, New York 10006
                                              (212) 732-0707
                                              jdratel@joshuadratel.com

Of counsel:

John D. Cline
Law Office of John D. Cline
235 Montgomery St., Suite 1070
San Francisco, CA  94104
(415) 662-2260
cline@johndclinelaw.com

                                         *Attorneys for Defendant Peter Lesniewski*

## CERTIFICATE OF SERVICE

      This is to certify that on this the 8th day of February, 2016, I caused to be filed a true and correct copy of the instant Memorandum and annexed exhibits using the Southern District of New York's Electronic Case Filing system ("ECF") which will send a notice of filing to all counsel of record.

                                            <u>/s/ Thomas Anthony Durkin</u>
                                            THOMAS ANTHONY DURKIN