```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                        11 CR. 1091 (VM)

 5   PETER LESNIEWSKI, et al.,

 6             Defendants.

 7   ------------------------------x

 8                                    New York, N.Y.
                                      May 13, 2016
 9                                    3:20 p.m.

10
     Before:
11
                       HON. VICTOR MARRERO,
12
                                         District Judge
13

14                     APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     NICOLE FRIEDLANDER
17   DANIEL TEHRANI
          Assistant United States Attorney
18
     DURKIN & ROBERTS
19        Attorneys for Defendant Peter Lesniewski
     BY:  THOMAS A. DURKIN
20        JOHN CLINE

21   SEAN M. MAHER
          Attorney for Defendant Peter Ajemian
22
     JOSEPH W. RYAN, JR.
23        Attorney for Defendant Joseph Rutigliano

24

25
```

2

```
 1            THE COURT:  Good afternoon.  This is a proceeding in

 2   the matter of the United States v. Lesniewski and others,

 3   docket number 11 CR 1091.

 4            Counsel, please enter your appearances for the record.

 5            MS. FRIEDLANDER:  Good afternoon, your Honor.  Nicole

 6   Friedlander and Daniel Tehrani on behalf of the government.

 7            MR. DURKIN:  Tom Durkin and John Cline on behalf of

 8   Dr. Lesniewski.  For the record, Judge, Mr. Cline filed

 9   pleadings in this court of counsel.  I don't believe he's been

10   admitted pro hac vice, but I would ask that he be permitted to

11   appear today if that's okay.

12            THE COURT:  Is he going to be involved in the matter

13   beyond today?

14            MR. DURKIN:  Yes.  If we go beyond today, he can file

15   an appearance.

16            THE COURT:  I will then direct that be filed, file an

17   appearance and file an application for pro hac vice.  I will

18   allow him to appear or to sit at the table today.

19            MR. DURKIN:  Thank you, your Honor.

20            MR. MAHER:  Sean Maher for Dr. Peter Ajemian.  Good

21   afternoon again.

22            THE COURT:  Good afternoon.

23            MR. RYAN:  Joe Ryan for Joseph Rutigliano.  Good

24   afternoon, your Honor.

25            THE COURT:  Good afternoon.  The Court notes that the
```

3

1    defendants are not present in the courtroom for this

2    proceeding, but I indicate that this proceeding is not the

3    sentencing that the Court scheduled in the matter.

4          It's a hearing on a motion by the defendants for a

5    determination as to whether the sentencing was appropriate in

6    light of what they allege is new information that might have a

7    bearing on the amount of the loss that is part of the

8    underlying proceedings of which they were convicted, and that

9    amount of the loss, therefore, to some extent, determined the

10   sentencing range.

11         The defendants claim that in light of certain actions

12   taken by the Railroad Retirement Board with respect to some of

13   the Long Island Railroad retirees who have filed applications

14   for disability and who were subsequently or in recent months

15   re-examined by the Railroad Retirement Board and their

16   disability was reconfirmed, that those circumstances might have

17   some bearing on the amount of the loss that is at issue here.

18         In order to examine whether in fact the actions that

19   were taken by the Railroad Retirement Board does in fact affect

20   the loss amounts and, therefore, the potential sentencing range

21   of the defendants, the Court invited the parties to submit

22   briefings on the issue and subsequently to appear at this

23   proceeding in order to further enlighten the Court as to their

24   respective views on this matter.

25         I have received the submissions that were made by the

4

1    three defendants, as well as by the government.

2         One additional matter, the defendant, Dr. Ajemian,

3    began his defense of this matter pro se.  And the Court, upon

4    request by Dr. Ajemian, granted an application for appointment

5    of counsel.  And, for that reason, Mr. Maher was appointed to

6    represent Dr. Ajemian in this matter.

7         Ms. Friedlander, does the government have anything by

8    way of further background that the Court should consider before

9    turning the matter to the defendants to set forth their case?

10        MS. FRIEDLANDER:  Yes, your Honor.  Thank you.

11        To begin with, this comes in the context of the

12   sentencing that we had where the Court made a reasonable

13   estimate of loss.  "Reasonable estimate of loss" is, of course,

14   the legal standard.  Baran and Rutigliano claimed at the time

15   of sentencing --

16        THE COURT:  Ms. Friedlander, let me stop you for a

17   moment because I made reference earlier to the fact that the

18   defendants are not present.  I explained the reason.  I want to

19   make sure that there is no disagreement that any of the

20   defendants are entitled to be here.

21        MS. FRIEDLANDER:  Your Honor, correct.

22        THE COURT:  And that their appearance is thereby

23   waived.

24        Mr. Durkin.

25        MR. DURKIN:  Judge, we have no problem going forward.

5

1    I think under the habeas rules, it's permitted to begin with.

2    We would waive it for today's purposes.

3              THE COURT:  Mr. Maher?

4              MR. MAHER:  So waived.

5              THE COURT:  Mr. Ryan?

6              MR. RYAN:  So waived.

7              THE COURT:  You may proceed.

8              MS. FRIEDLANDER:  Your Honor, as you'll recall at the

9    time of sentencing, Baran and Rutigliano objected to including

10   all the workers who applied for disability through them in

11   their loss calculations because they said, look.  It's possible

12   that some of these people actually were disabled.

13             As a matter of happenstance, some of those people

14   could have been disabled.  Of course, the law just requires the

15   Court to make a reasonable estimate of loss.  The Court did

16   that, and the Court was upheld summarily by the Second Circuit.

17   So that's the background.

18             Now the defendants are making a collateral attack on

19   the judgment.  They are subject to an extremely high standard,

20   as the Court knows.  They can only attack the judgment if there

21   was a fundamental defect in the judgment that inherently

22   resulted in a complete miscarriage of justice.  They cannot

23   come close to meeting that high standard here.

24             The Court used the proper measure of loss at

25   sentencing, and that is the intended loss.  Nothing the RRB has

1    done affects what the defendants' intended loss amount was.

2           The Court found that the defendants' intended loss was

3    a loss of the size and scope of the loss included in their

4    guidelines.  Dr. Ajemian allocuted to it.

5           He said he committed fraud -- I don't remember the

6    exact word -- droves of Long Island Railroad employees.  He

7    allocuted to widespread fraud in this court.  Our witnesses

8    testified to it.

9           We showed the Court and the jury at trial 269

10   identical applications completed by Mr. Rutigliano, these

11   cookie-cutter applications, as your Honor will recall, filled

12   with these boilerplate descriptions of incredible pain and

13   suffering.

14          They were all totally identical.  One set he used for

15   engineers, another set he used for white-collar folks, another

16   set he used for another kind of worker, all boilerplate.

17          Dr. Lesniewski, as you'll recall, was interviewed

18   before charges were brought.  He admitted to lying to further

19   false disability applications.  At one point in the interview,

20   he admitted to lying in roughly 20, 25 percent of the cases.

21   At another point in the interview, it was 50 percent.  At

22   another point in the interview, it was 100 percent of the

23   vocational reports that he helped prepare included statements

24   that he said he would not now make.

25          So there was overwhelming evidence that the

7

defendants' intended loss of the size and scope.  The Court has previously found that nothing about what the RRB is doing now changes that analysis.  So the intended loss calculation is absolutely correct.

Further, now as to this RRB process -- so I said nothing that the RRB has done ought to affect the intended loss, the Court's intended loss calculation.  Let me just talk about what the RRB has done.

We can't take at face value the veracity of reapplications of a bunch of people who committed fraud ten years ago with our defendants.  Maybe some of them are telling the truth, but maybe they're not.  We just don't know.

There is no reason to just assume that all of them are valid on their face, particularly in light of what we know, which is that there was a whole lot of fraud going on in the past.  So that's on the applicant's side.

On the process side, as the Court is well aware, there have been problems, to say the least, with the RRB's disability approval process.

Others have questioned whether there is negligence there.  Also the Second Circuit raised the question of whether there's complicity there.  I'm not raising those questions, but others have done that, as the Court is aware.

The RRB, the disability review process, is currently the subject of a congressional investigation.  So congress is

8

investigating whether the RRB's disability process,

particularly in light of these pre-approvals, is fundamentally

flawed.

They are looking at whether fraud is completely

endemic in the system to this day, whether the RRB has the

ability and the interest in rooting it out.  So these are

additional reasons why we can't just assume that all of these

pre-approvals are evidence that people are disabled and not

committing fraud.

Further, Judge, even if they all are disabled today --

and I don't think that they are.  I'm not saying that they are.

But even if they were, that doesn't tell us if they were all

committing fraud ten years ago, which was roughly when most of

these people applied for disability, when they were working

with the defendants in this case.

You just can't infer from the fact that they have some

problem now that they had some problem ten years ago.  And I'll

add to that that many or most of these people that are applying

applied based on conditions that were not the same condition

that they applied ten years ago.  Sometimes there's overlap;

sometimes there's not overlap.

Lastly, your Honor, even if the Court wanted to say I

think that all of these people who reapplied, all of the losses

associated with those people ought to be taken out of the

defendants' loss calculation and we're only going to now hold

1   the defendants accountable for losses associated with people

2   who have not reapplied for disability -- and the Court ought

3   not to do that for the reasons I've said, but even if it did,

4   as we said in our papers, the defendants' guidelines hardly

5   move.

6            Lesniewski and Ajemian's guidelines would come down by

7   two levels.  Rutigliano's by four levels.  Those result in

8   guideline ranges as to Lesniewski and Ajemian but are still

9   higher than the sentence the Court gave.

10           So the Court imposed a 96-month sentence.  The

11  adjusted guidelines ranges for those defendants I think would

12  be 97 to 121 months.  As to Mr. Rutigliano, his adjusted range

13  would be 87 to 108 months.  He too got a 96-month sentence.  So

14  his sentence is squarely within what the adjusted guidelines

15  range should be.

16           What that tells us is that there is no way that we can

17  look at the sentences that the Court gave them initially and

18  say that those resulted in a complete miscarriage of justice.

19           THE COURT:  Thank you.

20           Mr. Durkin.

21           MR. DURKIN:  Judge, I'm not sure I profess to

22  understand what a "miscarriage of justice" is anymore, but if

23  this isn't one from a sentencing perspective, then I don't know

24  what I'm doing.

25           I don't think there's any question that at the

1    sentencing that we had that I have a transcript of on

2    February 21, 2014, we were talking about the total amount of

3    individuals who were just simply not entitled to disability.

4            We attempted to raise some of that at the trial, but

5    we didn't do that because we don't need to discuss the Rule 33

6    aspect of it.  But there's no question, in my mind -- and I

7    doubt in yours -- that what we were talking about was the

8    government's theory that they espoused throughout the whole

9    case which we attacked throughout the whole case which was all

10   these people simply were not work-relatedly disabled.

11           I think this new evidence overwhelmingly shows that

12   they were.  Then we get into an argument over actual loss

13   versus intended loss.  I just cannot help but imagine that if

14   we had this evidence before you then, that we wouldn't have had

15   a different result.  I defer to you on that.  I know how much I

16   like you, even if we disagree.

17           The fact of the matter is that this new evidence

18   contradicts the entire theory of the government's case, which

19   is something we complained about from day one.

20           These sentences were based on, I think, assumptions

21   that the government withheld that much money, actual money.

22   They were sentenced accordingly.

23           Now I understand you didn't go within the guidelines.

24   But eight years is a very, very difficult sentence.  And I

25   think -- I could be wrong -- that it had to reflect what you

1    would have thought was the actual loss at that time.

2            I think there are very good arguments that we could

3    put forward to you that at best, if you want to take -- if

4    we're talking actual loss, which is what I believe they should

5    be sentenced under, Dr. Lesniewski -- if you want to say the

6    government proved that the four witnesses on the witness stand

7    whose credibility is what it is, and the jury accepted it.  So

8    I accept it for our purposes.

9            But that only amounts to close to $1,000,000, if my

10   math is correct, which is a substantial deduction in the --

11   what's the right term under the guidelines?  The projected

12   guideline range or whatever you have to make the finding of

13   before we get into 3553(a).

14           But it seems to me that if we had that actual loss

15   amount, we would have started with a lower guideline.  I think

16   then you still would have gone down.

17           I looked back over our sentencing papers last night

18   and this morning with the amount of letters that

19   Dr. Lesniewski's family submitted, the incredibly compelling

20   3553(a) factors.  I cannot help but believe vis-à-vis what I

21   would consider a miscarriage of justice.

22           I would consider having to spend more time than you

23   deserve in prison under facts that later are proven to be true

24   is a miscarriage of justice.  Whether that fits the legal

25   standard or not, I have no idea.

1            After 43 years of doing this, if that's not a

2    miscarriage, I don't know what is.  It's something that should

3    be fixed.  I think you were correct in deciding that you needed

4    to look into fixing it.  I think it should be fixed.

5            I assume we don't need to get into any other

6    recommendations as if we're having a sentencing.  That's really

7    all I have on the miscarriage issue.

8            Could I just speak to Mr. Cline for a second.

9            THE COURT:  Sure.

10           (Pause)

11           MR. DURKIN:  Just one other issue.  Mr. Cline reminds

12   me that you did make a finding of $70,000,000 in restitution,

13   which I believe would indicate you must have been calculating

14   actual loss.  I don't think that's either here nor there.

15           I think that this evidence overwhelmingly demonstrates

16   that we were operating under bad facts, wrong facts, whatever

17   you want to say.  That's not being critical of anyone other

18   than I will stand on the proposition that we were critical of

19   that theory throughout.

20           One other thing that Ms. Friedlander talked about, the

21   confession.  We argued over that.  My recollection is that

22   Dr. Lesniewski said he was exaggerating.

23           The fact that he said he would do it over again, there

24   are a lot of things that you would do over again.  The reality

25   is I think this evidence shows that he's doing more time than

1    he should be doing.  I'd ask you to re-sentence him.

2             THE COURT:  Thank you.

3             Mr. Maher.

4             MR. MAHER:  If I may defer to Mr. Ryan first,

5    your Honor.

6             THE COURT:  Sure.

7             MR. RYAN:  Judge, I was really taken back by the

8    prosecutor telling you that you should have some doubt about

9    the RRB's approval process because congress is conducting some

10   kind of inquiry.

11            I don't know where that came from.  It's just the

12   opposite.  The inspector general, Martin Dickman, went before

13   the joint congressional committee and asked them to change the

14   law because the RRB found that 98 percent, under a standard

15   that was very lean, were a problem.

16            If you have any complaint about the payments on these

17   disabilities, you have to change the standard.  There's no

18   suggestion whatever that the RRB approval process, which

19   your Honor brings us here today, is suspect, absolutely no

20   suggestion at all.

21            And then the other suggestion I heard was that you

22   can't tell whether the applicant that was reapproved committed

23   a fraud in the first instance.

24            I don't know where that comes from, because when you

25   see the re-approval documents, the doctors that the RRB used to

1   reapprove these claims considered all of the impairments that

2   the applicant had and noted that they were degenerative discs,

3   which is a common injury in these cases, that pre-existed

4   existed at the time of re-approval despite the passage of time.

5          If the RRB doctors' examination showed that there

6   really was no impairment when the approval was first given,

7   they wouldn't approve the second application.

8          It doesn't make sense that a retiree makes an

9   application under false pretenses and is approved and then

10  eight years later is reapproved should be paid for the entire

11  period of time.  It doesn't make sense.

12         So this re-approval process was enacted by the RRB to

13  determine by every medical process available that these retiree

14  applicants were granted the annuities or entitled to the

15  annuities then and now.

16         They hired these doctors, independent medical

17  examinations conducted of these re-approval applicants.  The

18  claims examiner -- and they are very conscious of this case,

19  the public's oversight on this case, and the doctors who did

20  the re-approval submitted their reports.

21         They physically examined, physically examined, had

22  them do the musculoskeletal test where you have to lift weights

23  and bend over and they make all these measurements and found

24  that the applicants had these restrictions and they couldn't

25  perform every task on their job.

1    So they were entitled to a continuation of their

2  annuity.  Even though they were approved back seven or eight

3  years before, they're entitled to all this money.

4    So now if the RRB is saying that 538, whatever the

5  number was, are entitled to these payments, your Honor is

6  absolutely correct that this has a major impact on whether the

7  RRB lost money.

8    The RRB is telling your Honor that we're paying the

9  money.  We're not losing the money.  We're paying the money,

10  and that's why we're here.  So the answer to the question,

11  your Honor, if a resentencing should take place, I resoundingly

12  say yes.

13    One suggestion I have, because the determination as to

14  what constitutes a loss has been an issue for a motion for a

15  new trial and will be an issue before the Second Circuit, in

16  Rutigliano's case, the calculations of $82,000,000 -- there's

17  no way you can change that.  $82,000,000 was the actual loss

18  submitted by the government through the PSR.

19    It was the amount of restitution judgment, and it was

20  the amount that your Honor considered in sentencing

21  Mr. Rutigliano, $82,000,000.  That was based upon a spreadsheet

22  that had no relationship whatever to whether or not the claims

23  were properly paid or not.

24    That spreadsheet was used by the prosecution through a

25  computer text recognition program only for the purposes of

1    trial to say that Mr. Rutigliano must have prepared the other

2    268 because the language is similar.

3           But the RRB evidence shows that on that Exhibit 19,

4    which was admitted into evidence, that those payments, those

5    claimants, are being paid today.  That was not a loss.  These

6    people are getting paid today.

7           In our submission, I gave you ten cases illustrating

8    that these re-approval applicants were also on this Exhibit 19

9    that led your Honor to accept their calculation of $82,000,000.

10          Exhibit 19, your Honor, I respectfully submit isn't

11   worth the paper it's written on.  It wasn't made for

12   sentencing.  It was a trial technique to support the

13   government's argument about how bad Mr. Rutigliano was

14   influencing all these other applicants.

15          So I have one suggestion.  One suggestion I would like

16   the Court to consider is that there were two witnesses.  There

17   are three applications at issue that don't depend on Exhibit

18   19.  There's James Marr, Christopher Pelant, and

19   Mr. Rutigliano's application.

20          Marr we had the opportunity to cross-examine.  Pelant

21   we had the opportunity to cross-examine.  As to

22   Mr. Rutigliano's application, they called Dr. Baran, the expert

23   who never examined Mr. Rutigliano offered his opinion that

24   there was something I'm going to say fishy about his

25   application.

1        If you take the losses on those three applications, it

2   adds up to just over a million dollars.  Exhibit 19 is out of

3   the picture.  The Court doesn't have to rely on 19.  You rely

4   on the jury's acceptance of the testimony of Marr, Pelant, and

5   Baran, Dr. Baran.

6        You add that up, and it's a little over $1,004,000.  I

7   have the actual figures.  The loss figures for those three

8   applications are $295,000 for Mr. Pelant, $347,000 for

9   Mr. Marr, and $402,000 for Mr. Rutigliano.

10        That's how much money they were paid by the RRB based

11   on what the government claims were false applications.  That

12   adds up to $1,044,000.  Under the guidelines, that would add to

13   the base level of 7 14 levels.  So now you're at level 21.

14        Now, your Honor considered the 3553 factors which

15   deals with the background of the defendants that the Court must

16   consider.  At the original sentence, you reduced by four levels

17   what the sentence would be on loss alone.

18        So the proposition I'm offering the Court to consider

19   is that if you take the level 21, which is based upon a

20   $1,000,000 loss, you subtract the four levels, you're going to

21   get to level 17.  Level 17 provides a sentence between 24 and

22   30 months.  As I stand here today, Mr. Rutigliano has served 23

23   months.

24        So that's one suggestion I have.  When I make the loss

25   proposition, I'm making it for the purposes of sentencing.  I

don't concede that the determination was proper under the

standard at trial, but that's another issue.

So I would like to suggest that your Honor consider a

resentencing based upon the loss applications generated by the

Rutigliano, Pelant, and Marr applications and then apply the

guidelines and the 3553 factors.  Then I think you would come

to level 17.  I think that might be one practical way to cut

through all of this.  Thank you very much.

THE COURT:  Thank you.

Mr. Maher.

MR. MAHER:  Thank you, your Honor.

As your Honor knows, I'm pretty late to the game here.

But I think, having just come on to this case, it actually, I

think, gives me a somewhat unique perspective because I've been

reading the pleadings and other documents in this case almost

as if it was a novel.

It's amazing and heartbreaking for me to think about

what Dr. Ajemian and his family have been going through and

where I think basically the government has led this Court at

this point.

There are just three things I want to touch on.  One

is the role of defense counsel.  Mr. Ajemian's pro se

submissions talk about the role of his defense counsel.

As I read the evidence in this case now, I cannot

think right now of any attorney who has practiced criminal

1    defense in this country who I would consider competent and

2    above -- and I would even dip below competent -- who at this

3    point if they get this file that I have sitting in front of me

4    and piling up in my office and have to sit right now and say,

5    Dr. Ajemian, here is the government's case, and the government

6    wants you to consent to a forfeiture of $116.5 million and

7    almost a decade in prison.  I think you should do it.  I cannot

8    think of one attorney who is scraping competent and above who

9    would make that suggestion.

10          Of course, this evidence was not available to prior

11   counsel when that plea agreement was made and when that plea

12   was entered.

13          So I think under newly discovered evidence, it is

14   nothing less than a bombshell what it suggests, as far as loss

15   amounts.  Basically, they have completely dematerialized as far

16   as Dr. Ajemian.

17          The second thing that I want to touch upon is the

18   independent role of the Court at sentencing.  That is, I think,

19   a bedrock principle that every citizen and parties in our

20   country expects and cherishes, that the Court has an

21   independent role to base its sentencing on truthful, reliable

22   facts and representations.

23          When that does not happen, that is what we consider a

24   miscarriage of justice.  We're not talking here about arguments

25   over whether there's a retroactive application of an adjustment

1    and a guideline.

2           We are talking about whether the Court's independent

3    assessment of the facts and arguments that led the Court to

4    craft a uniquely individualized sentence that reached all the

5    way up to 96 months and $116.5 million was based on misleading

6    and false facts.

7           Because that's what's happened.  I'm not trying to say

8    that the government intentionally mislead the Court, but the

9    facts that the Court relied on to generate those numbers were

10   misleading, and they're false at this point.  They're

11   objectively false.

12          So there is no greater manifest injustice, Fifth

13   Amendment due process violation, other than perhaps the actual

14   sentence of death to someone on false evidence, than for

15   someone to be incarcerated with the terms that Dr. Ajemian, who

16   was 61 years old when he came before this Court and who now

17   still is potentially facing what could be a sentence where he

18   dies in prison infirm.

19          So I do not see how there is any other definition of

20   manifest injustice under the due process clause.  When you wrap

21   these all together, there is no other course but for the Court

22   to grant a resentencing for Dr. Ajemian.  Thank you.

23          THE COURT:  Ms. Friedlander.

24          MS. FRIEDLANDER:  Your Honor, just a couple of quick

25   points that I think the defense might have made that I think

 1   muddies the waters a little bit.

 2          To be clear, this re-approval that the RRB has done --

 3   it's granting disability payments or declaring people disabled

 4   only from the time of this reapplication.  So it's from a time

 5   postdating the sentences in this case.  So the RRB did not say,

 6   okay.  You've been disabled since, you know, day one.  It's

 7   only since the post-sentencing date on which they reapplied.

 8          The second point, there was some discussion of the

 9   fact that restitution was based on actual loss.  I thought

10   defense counsel might have been suggesting, therefore, that the

11   Court based its loss amount for guidelines purposes on actual

12   loss.

13          Absolutely restitution is based on actual loss.  It

14   has to be.  Restitution is the amount that the victim has

15   actually lost.  It's not an independent loss figure.

16          The Court properly based the loss calculation, for

17   guidelines purposes, on intended loss.  As the PSR suggested,

18   as we suggested, as the Court found, and as the Second Circuit

19   upheld, that was the right way to calculate the guidelines.

20          MR. RYAN:  May I be heard on that?

21          THE COURT:  Briefly, Mr. Ryan.

22          MR. RYAN:  That's not correct to say.  You accepted

23   the calculations in the PSR.  The PSR had an actual loss of 82

24   and an intended loss of 102 millions.  That's what it was.

25          When you look at the RRB documents that we submitted

1   in support of this proceeding today, they're going to show you,

2   your Honor, that the RRB was well aware of the impairments that

3   were originally recognized, and they were recognized on

4   re-approval.

5        They were continuing payments, continuing payments

6   from the first day.  They never stopped the payments.  They

7   never sought the claimant to bring back payments because they

8   originally got them improperly but now they have them properly.

9   None of that makes sense.  It's continuing payments throughout.

10  Thank you very much.

11       THE COURT:  Thank you.  I will examine the testimony

12  of the arguments that were made today in light of the balance

13  of the record, and I'll make a determination as to what the

14  next steps will be, if any.  Thank you.

15       MS. FRIEDLANDER:  Thank you.

16       MR. RYAN:  Thank you, Judge.

17       THE COURT:  Have a good day and a good weekend.

18       (Adjourned)

19

20

21

22

23

24

25